UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL IACOVACCI,<br><br>　　　　　　　　　Plaintiff,<br><br>　-against-<br><br>BREVET HOLDINGS, LLC, *a Delaware Limited Liability Company*, BREVET CAPITAL MANAGE-MENT, LLC, *a Delaware Limited Liability Company*, BREVET SHORT DURATION PARTNERS, LLC, *a Delaware Limited Liability Company*, BREVET SHORT DURATION HOLDINGS, LLC, *a Delaware Limited Liability Company*, DOUGLAS MONTICCIOLO, *as a Member and the Majority Owner of Brevet Holdings, LLC, Chief Investment Officer of Brevet Capital Management, LLC, a Member of Brevet Short Duration Partners, LLC, a Member of Brevet Short Duration Holdings, LLC, and Individually*, MARK CALLAHAN, *as President of Brevet Capital Management, LLC, a Member of Brevet Short Duration Partners, LLC, a Member of Brevet Short Duration Holdings, LLC, and Individually*, JOHNNY LAN, *as Vice President and Head of Technology of Brevet Capital Management, LLC and Individually*, and JOHN AND JANE DOES 1 THROUGH 100,<br><br>　　　　　　　　　Defendants. | Civil Case No.:<br>1:18-cv-08048-WHP<br><br>**AMENDED ANSWER WITH AMENDED COUNTERCLAIMS ON BEHALF OF DEFENDANTS BREVET HOLDINGS, LLC, BREVET CAPITAL MANAGEMENT, LLC, BREVET SHORT DURATION PARTNERS, LLC, BREVET SHORT DURATION HOLDINGS, LLC, DOUGLAS MONTICCIOLO, and MARK CALLAHAN** |

## PRELIMINARY STATEMENT

1.　　　　In October 2016, Plaintiff's employment relationship with Brevet Holdings, LLC,

Brevet Capital Management, LLC, Brevet Short Duration Partners, LLC, and Brevet Short Duration

Holdings, LLC (collectively "Brevet") was terminated for cause after Brevet discovered that Plaintiff

stole hundreds and potentially thousands of confidential, proprietary, and trade secret documents and

information in a blatant attempt to misuse that information to enrich himself.

2.　　　　Plaintiff unlawfully obtained this information through unauthorized and illegal access

to certain Brevet databases and systems and inappropriate use of the Dell Computer referenced in

Plaintiff's Complaint, which was purchased and configured by Brevet in February 2015 for Plaintiff

to use for purposes of Brevet-related work while at home (the "Brevet Computer"). This theft was uncovered by Brevet through the monitoring of its employees' electronic communications on company-owned devices, a practice clearly stated in Brevet's policies and required by regulations that apply to Brevet as a regulated financial institution. Plaintiff knew about and acknowledged these policies, and, as a financial professional and CPA with decades of experience who held a senior management position at Brevet, Plaintiff was very familiar with these long-standing regulations. Accordingly he did not have any rational expectation of privacy in relation to any content or access on a company-owned computer.

3.      Plaintiff then used and disclosed the information that he stole from Brevet to improperly and illegally start a competing business.

4.      Plaintiff acknowledged that he owed a fiduciary duty, and a duty of loyalty, to Brevet. Nevertheless, he engaged in the aforesaid illicit conduct and then sought to cover up his theft by refusing to return the Brevet Computer upon his termination (or to provide the contents of three cell phones that he has since wrongfully disposed of after he initiated litigation in State Court and was instructed in writing to preserve). Brevet, in the interest of its employees and its clients, backed up certain contents of its computer that were related to Brevet's business in order to comply with regulatory requirements.

## AMENDED ANSWER

Defendants Brevet Holdings, LLC, Brevet Capital Management, LLC, Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, Douglas Monticciolo and Mark Callahan (hereinafter "Defendants") by and through their attorneys, Biedermann Hoenig Semprevivo, A Professional Corporation, as and for their Answer to Plaintiff's Complaint allege, upon information and belief, as follows:

1.      Defendants deny the allegations contained in Paragraph "1" of Plaintiff's Complaint.

2.      Defendants deny the allegations contained in Paragraph "2" of Plaintiff's Complaint.

3.      Defendants deny the allegations contained in Paragraph "3" of Plaintiff's Complaint.

4.      Defendants deny the allegations contained in Paragraph "4" of Plaintiff's Complaint.

5.      Defendants deny the allegations asserted in Paragraph "5" of Plaintiff's Complaint.

## JURISDICTION AND VENUE

6.      Defendants admit this Court has subject matter jurisdiction over Plaintiff's claims and further answering, deny the implication that Plaintiff has any legal grounds to proceed herein with any of the claims asserted in Plaintiff's Complaint.

7.      Defendants admit that venue is proper and further answering, deny the acts complained of.

## PARTIES

8.      Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph "8", admit that prior to being terminated for cause by Brevet, Plaintiff was a Managing Director of BCM and a Member of Short Duration Partners ("Partners") and Short Duration Holdings ("Holdings"), and further answering, deny the remaining allegations contained in Paragraph "8".

9.      Defendants admit the allegations contained in Paragraph "9" of Plaintiff's Complaint.

10.     Defendants admit the allegations contained in Paragraph "10" of Plaintiff's Complaint.

11.     Defendants admit the allegations contained in Paragraph "11" of Plaintiff's Complaint.

12.     Defendants admit the allegations contained in Paragraph "12" of Plaintiff's Complaint.

13.     Defendants admit the allegations contained in Paragraph "13" of Plaintiff's Complaint.

14.     Defendants admit the allegations contained in Paragraph "14" of Plaintiff's Complaint.

15.     Defendants deny as stated the allegations contained in Paragraph "15" of Plaintiff's Complaint and further answering, refer Plaintiff and the Court to BCM's public filing as referenced to in Paragraph "15" of Plaintiff's Complaint for the true and accurate content contained therein.

16.     Defendants deny the allegations in Paragraph "16" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

17.     Defendants deny as stated the allegations contained in Paragraph "17" of Plaintiff's Complaint and refer Plaintiff and the Court to the "No-Action Letter" referred to in Paragraph "17" of Plaintiff's Complaint for the true and accurate content contained therein. Further answering, Defendants respectfully refer all questions of law to the Court for determination.

18.     Defendants deny the allegations in Paragraph "18" and respectfully refer all questions of law to the Court for determination.

19.     Defendants deny the allegations contained in Paragraph "19" of Plaintiff's Complaint, except admit that Douglas Monticciolo is a resident of the State of New York, County of New York, is a member of BH, is the Chief Investment Officer of BCM, a Member of the Board of Directors and a Member of Partners and Holdings. Further answering, Defendants respectfully refer all questions of law to the Court for determination.

20.     Defendants deny the allegations contained in Paragraph "20" of Plaintiff's Complaint, except admit that Mark Callahan is resident of New Jersey and is the President of Brevet Capital Management, a Member of the Board of Directors and a Member of Partners and Holdings. Further answering, Defendants respectfully refer all questions of law to the Court for determination.

21.     Defendants admit the allegations contained in Paragraph "21" of Plaintiff's Complaint, except deny that Johnny Lan "oversaw" Brevet's information technology and computer usage in that such term is overly vague, and further state that he is no longer an employee of any Brevet entity.

22.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "22" of Plaintiff's Complaint.

## AS TO THE ALLEGED MATERIAL FACTS IN SUPPORT OF ALL CLAIMS

23.     Defendants deny the allegations contained in Paragraph "23" of Plaintiff's Complaint, and further answering, aver that in February of 2015, Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home. At all times, Brevet owned - and continues to own - the Brevet Computer.

24.     Defendants deny as stated the allegations contained Paragraph "24" of Plaintiff's Complaint, and further answering, aver that Brevet purchased and configured the Brevet Computer to allow Plaintiff to conduct his Brevet-related work from home.

25.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "25" of Plaintiff's Complaint. Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home. At all times, Brevet owned - and continues to own - the Brevet Computer.

26.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "26" of Plaintiff's Complaint. Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home. At all times, Brevet owned - and continues to own - the Brevet Computer.

27.     Defendants deny the allegations contained in Paragraph "27" of Plaintiff's Complaint and further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home.

28.     Defendants deny the allegations contained in Paragraph "28" of Plaintiff's Complaint and further answering, aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home.

29.     Defendants deny the allegations contained in Paragraph "29" of Plaintiff's Complaint and further answering, aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home.

30.     Defendants deny the allegations contained in Paragraph "30" of Plaintiff's Complaint.

31.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "31" of Plaintiff's Complaint. Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home and provided Plaintiff with technology support in relation to the Brevet Computer.

32.     Defendants deny the allegations contained in Paragraph "32" of Plaintiff's Complaint.

33.     Defendants deny the allegations contained in Paragraph "33" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

34.     Defendants deny the allegations contained in Paragraph "34" of Plaintiff's Complaint. Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home and provided Plaintiff with technology support in relation to the Brevet Computer.

35.     Defendants deny the allegations contained in Paragraph "35" of Plaintiff's Complaint. Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home and provided Plaintiff with technology support in relation to the Brevet Computer.

36.     Defendants deny the collective allegations contained in Paragraph "36" of Plaintiff's Complaint.  Further answering, Defendants aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home and provided Plaintiff with technology support in relation to the Brevet Computer.

37.     Defendants deny the allegations contained in Paragraph "37" of Plaintiff's Complaint.

38.     Defendants deny the allegations contained in Paragraph "38" of Plaintiff's Complaint.

39.     Defendants deny the allegations contained in Paragraph "39" of Plaintiff's Complaint.

40.     Defendants deny the allegations contained in Paragraph "40" of Plaintiff's Complaint.

41.     Defendants deny the allegations in Paragraph "41" of Plaintiff's Complaint, except admit that Brevet's computer policy, signed and acknowledged by Plaintiff, prohibits the use of Brevet devices for purposes that do not benefit the Company.

42.     Defendants deny the allegations in Paragraph "42" of Plaintiff's Complaint, except Defendants admit that Brevet's computer policy, signed and acknowledged by Plaintiff, prohibits the installation of non-Brevet software on Brevet devices without the express prior written approval of Brevet's information technology department.

43.     Defendants deny the allegations in Paragraph "43" of Plaintiff's Complaint, except admit that Brevet has not only a right, but an obligation, to monitor the usage of Brevet devices.

44.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "44" of Plaintiff's Complaint.

45.     Defendants deny the allegations contained in Paragraph "45" of Plaintiff's Complaint, except admit that a meeting took place between Plaintiff and Defendants' representatives on or about January 6, 2016.

46.     Defendants deny the allegations contained in Paragraph "46" of Plaintiff's Complaint.

47.     Defendants deny the allegations contained in Paragraph "47" of Plaintiff's Complaint.

48.     Defendants deny the allegations contained in Paragraph "48" of Plaintiff's Complaint.

49.     Defendants deny the allegations contained in Paragraph "49" of Plaintiff's Complaint.

50.     Defendants deny the allegations contained in Paragraph "50" of Plaintiff's Complaint and further answering, aver that on October 14, 2016, Brevet terminated Iacovacci for cause.

51.     Defendants admit the allegations contained in Paragraph "51" of Plaintiff's Complaint.

52.     Defendants deny as stated the allegations contained in Paragraph "52" of Plaintiff's Complaint and further answering, aver that Brevet's representatives took part in negotiations concerning Iacovacci's separation agreement and did so in good faith.

53.     Defendants deny the allegations contained in Paragraph "53" of Plaintiff's Complaint and further answering, aver that Brevet purchased and configured the Brevet Computer for the purpose of allowing Plaintiff to conduct his Brevet-related work from home and provided Plaintiff with technology support in relation to the Brevet Computer. At all times, Brevet owned – and continues to own – the Brevet Computer.

54.     Defendants admit the allegations contained in Paragraph "54" of Plaintiff's Complaint.

55.     Defendants deny the allegations contained in Paragraph "55" of Plaintiff's Complaint.

56.     Defendants deny the allegations contained in Paragraph "56" of Plaintiff's Complaint.

57.     Defendants deny the allegations contained in Paragraph "57" of Plaintiff's Complaint.

58.     Defendants deny the allegations contained in Paragraph "58" of Plaintiff's Complaint, except admit that proper counterclaims were asserted in the State Court Action.

59.     Defendants deny the allegations contained in Paragraph "59" of Plaintiff's Complaint.

60.     Defendants deny as stated the allegations contained in Paragraph "60" of Plaintiff's Complaint and further answering, Defendants admit that Mr. Callahan submitted an Affidavit in the State Court Action and direct Plaintiff and the Court to that document for its true and complete contents.

61.     Defendants deny the allegations contained in Paragraph "61" of Plaintiff's Complaint.

62.     Defendants deny the allegations contained in Paragraph "62" of Plaintiff's Complaint.

63.     Defendants deny the allegations contained in Paragraph "63" of Plaintiff's Complaint.

64.     Defendants deny the allegations contained in Paragraph "64" of Plaintiff's Complaint.

65.     Defendants deny the allegations contained in Paragraph "65" of Plaintiff's Complaint.

66.     Defendants deny the allegations contained in Paragraph "66" of Plaintiff's Complaint.

67.     Defendants deny the allegations contained in Paragraph "67" of Plaintiff's Complaint.

68.     Defendants deny the allegations contained in Paragraph "68" of Plaintiff's Complaint.

69.     Defendants deny the allegations contained in Paragraph "69" of Plaintiff's Complaint.

## CAUSES OF ACTION
### COUNT I

*Violation of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(2)(C), with regard to Iacovacci's Personal Computer.*

70.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "69" as if fully set forth herein.

71.     Defendants deny the allegations contained in Paragraph "71" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

72.     Defendants deny the allegations contained in Paragraph "72" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

73.     Defendants deny the allegations contained in Paragraph "73" of Plaintiff's Complaint.

74.     Defendants deny the allegations contained in Paragraph "74" of Plaintiff's Complaint.

75.     Defendants deny the allegations contained in Paragraph "75" of Plaintiff's Complaint.

### COUNT II

*Violation of the Computer Fraud and Abuse Act, 18. U.S.C 1030(a)(2)(C), with regard to Iacovacci's External Hard Drives.*

76.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "75" as if fully set forth herein.

77.     Defendants deny the allegations contained in Paragraph "77" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

78.     Defendants deny the allegations contained in Paragraph "78" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

79.     Defendants deny the allegations contained in Paragraph "79" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

80.     Defendants deny the allegations contained in Paragraph "80" of Plaintiff's Complaint.

81.     Defendants deny the allegations contained in Paragraph "81" of Plaintiff's Complaint.

82.     Defendants deny the allegations contained in Paragraph "82" of Plaintiff's Complaint.

## COUNT III

*Violation of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(2)(c), with regard to Iacovacci's Personal Yahoo! E-Mail Account*

83.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "82" as if fully set forth herein.

84.     Defendants deny the allegations contained in Paragraph "84" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

85.     Defendants deny the allegations contained in Paragraph "85" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

86.     Defendants deny the allegations contained in Paragraph "86" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

87.     Defendants deny the allegations contained in Paragraph "87" of Plaintiff's Complaint.

88.     Defendants deny the allegations contained in Paragraph "88" of Plaintiff's Complaint.

89.     Defendants deny the allegations contained in Paragraph "89" of Plaintiff's Complaint.

## COUNT IV

*Violation of the Federal Wiretap Act, 18 U.S.C. 2511(1)(a)*

90.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "89" as if fully set forth herein.

91.     Defendants deny the allegations contained in Paragraph "91" of Plaintiff's Complaint and respectfully refer all questions of law to the Court for determination.

92.     Defendants deny the allegations contained in Paragraph "92" of Plaintiff's Complaint.

93.     Defendants deny the allegations contained in Paragraph "93" of Plaintiff's Complaint.

## COUNT V

*Violation of the Stored Communications Act, 18 U.S.C. 2701*

94.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "93" as if fully set forth herein.

95.     Defendants deny the allegations contained in Paragraph "95" of Plaintiff's Complaint.

96.     Defendants deny the allegations contained in Paragraph "96" of Plaintiff's Complaint.

## COUNT VI

*New York State Common Law Claim of Conversion*

97.     Defendants repeat and reallege the answers set forth in Paragraphs "1" through "96" as if fully set forth herein.

98.     Defendants deny the allegations contained in Paragraph "98" of Plaintiff's Complaint.

99.     Defendants deny the allegations contained in Paragraph "99" of Plaintiff's Complaint.

100.    Defendants deny the allegations contained in Paragraph "100" of Plaintiff's Complaint.

101.    Defendants deny the allegations contained in Paragraph "101" of Plaintiff's Complaint.

102.    Defendants deny the allegations contained in Paragraph "102" of Plaintiff's Complaint.

103.    Defendants deny the allegations contained in Paragraph "103" of Plaintiff's Complaint.

104.    Defendants deny the allegations contained in Paragraph "104" of Plaintiff's Complaint.

## COUNT VII

*New York State Common Law Claim of Trespass to Chattels*

105.    Defendants repeat and reallege the answers set forth in Paragraphs "1" through "104" as if fully set forth herein.

106.    Defendants deny the allegations contained in Paragraph "106" of Plaintiff's Complaint.

107.    Defendants deny the allegations contained in Paragraph "107" of Plaintiff's Complaint.

108.    Defendants deny the allegations contained in Paragraph "108" of Plaintiff's Complaint.

109.    Defendants deny the allegations contained in Paragraph "109" of Plaintiff's Complaint.

110.    Defendants deny the allegations contained in Paragraph "110" of Plaintiff's Complaint.

111.    Defendants deny the allegations contained in Paragraph "111" of Plaintiff's Complaint.

112.    Defendants deny the allegations contained in Paragraph "112" of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and/or filing periods and/or by the doctrines of laches, waiver, and estoppel.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the statute of frauds.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by prior compromise and settlement or accord and satisfaction.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

Plaintiff failed to take reasonable steps to mitigate damages and may not recover damages that could have been avoided.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, are barred in whole or in part.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, either in whole or in part, by the doctrine of *Res Judicata*.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff suffered damages as alleged, such damages were caused or contributed to by the actions of others over whom Defendants exercised no control.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

Any damages allegedly suffered by Plaintiff were the result of superseding and intervening causes.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

Defendants hereby reserve the right to add additional affirmative defenses should any such defenses arise during the course of discovery.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred on the grounds that he breached his contractual and fiduciary obligations to Brevet.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages were caused in whole or in part by the culpable conduct of the Plaintiff, which either bars the claims completely or else diminishes the damages by the proportion that such culpable conduct of the Plaintiff bears to the total culpable conduct causing the damages.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's failure to act in good faith in commencing and prosecuting this action bars him from enforcing any rights he may otherwise have.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by Plaintiff's breach of his duty of good faith and fair dealing.

## AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages or legally cognizable injury.

## AS AND FOR A SEVENTEENTH AFFIRMATIVE DEFENSE

The damages allegedly suffered by Plaintiff were not the proximate or foreseeable result of acts or omissions of Defendants.

## AS AND FOR AN EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint and each cause of action alleged therein is barred in whole or in part to the extent that Plaintiff lacks standing to assert some or all of the purported causes of action.

## AS AND FOR A NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Brevet has complied with all applicable regulations of the federal and state governments.

## AS AND FOR A TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's Complaint and the purported causes of action alleged therein suggest that Plaintiff consented to the alleged injuries.

## AS AND FOR A TWENTY FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint and the purported causes of action alleged therein suggest an assumption of the risk as to Plaintiff's alleged injuries through his own negligence.

## AS AND FOR A TWENTY SECOND AFFIRMATIVE DEFESE

Plaintiff is not entitled to any recovery because he has breached his fiduciary duties to Brevet.

## AS AND FOR A TWENTY THIRD AFFIRMATIVE DEFENSE

The allegations contained in Plaintiff's Complaint arise out of Brevet's regulatory compliance obligation to monitor certain communications and correspondence.

## ADDITIONAL DEFENSES

Brevet has not knowingly or intentionally waived any applicable affirmative defenses and reserves the right to assert and reply on such other applicable affirmative defenses as may become available by law, or pursuant to statute, or appear during the proceedings in this action.  Brevet reserves the right to amend its answer and/or affirmative defenses accordingly and assert any such defense.

## AMENDED COUNTERCLAIMS

Counterclaim Plaintiffs BREVET HOLDINGS, LLC, BREVET CAPITAL MANAGEMENT, LLC ("BCM"), BREVET SHORT DURATION PARTNERS, LLC, BREVET SHORT DURATION HOLDINGS, LLC, DOUGLAS MONTICCIOLO ("Monticciolo") and MARK CALLAHAN, ("Callahan"), (collectively "Counterclaim Plaintiffs") for their Counterclaim Complaint against Counterclaim Defendant Paul Iacovacci ("Iacovacci"), allege, upon information and belief, as follows:

## NATURE OF COUNTERCLAIMS

1.      As a former employee and Managing Director, and/or member of one or more of the various affiliated Brevet entities named as Defendants in this action, Iacovacci agreed that he would not usurp corporate opportunities, compete with Brevet, or otherwise interfere with Brevet's business.

2.      Iacovacci however not only blatantly violated the terms of the agreed upon non-compete provisions, but he acted directly contrary to such terms by designing and furthering a scheme to compete directly with Brevet by inappropriately accessing, downloading, sending and using Brevet's confidential, proprietary, and trade secret information including emails, policy documents, and financial forms and usurping corporate opportunities from Brevet, all while purportedly acting in good faith and with loyalty toward Brevet and in compliance with all agreements and other provisions he entered into.

3.      Contrary to his fiduciary duty and duty of loyalty to Brevet, and in breach of his obligations to Brevet, Iacovacci dedicated his efforts not to Brevet, but rather to enriching himself to the detriment of the Brevet entities, including BCM, as well as Monticciolo and Callahan.

## IACOVACCI AGREEMENTS

4.      As a Managing Director and Member of certain Brevet entities, Iacovacci executed agreements and acknowledged policies which prohibited or restricted certain conduct while at Brevet as well as following his departure.  Each of the Brevet entities, as well as Iacovacci's co-Members of the LLCs, were and are intended beneficiaries of these agreements and policies.

5.      For instance, Iacovacci executed agreements and signed off on policies which prohibited Iacovacci from disclosing any confidential information of any of the Brevet entities and required that all confidential business information was to remain the property of the Brevet entities and be returned upon departure from Brevet.  Specifically, in the LLC Agreements Iacovacci agreed to the following:

> <u>Confidential Information</u>.  During the time that a Member owns his Interest in the Company and at all times thereafter, a Member shall (i) not use for his personal benefit and shall keep secret and non-public any and all proprietary information and knowledge concerning the Company and any of its affiliates, including, without limitation, the know-how, trade secrets and any information relating to the trading systems, processes, services and clients and other business and financial affairs of the Company and any of

its affiliates (collectively, the "Confidential Information") to which he has had or may have access, and (ii) shall not disclose such Confidential Information to any person other than (x) the Company and such other persons to whom the Member has been instructed to make disclosure by the Company in each case only to the extent required in the course of the Member's service to the Company or as otherwise expressly required in connection with court process, (y) as may be required by law, or (z) to the Member's personal advisers for purposes of enforcing or interpreting this Agreement, or to a court for the purpose of enforcing or interpreting this Agreement, and who in each case have been informed as to the confidential nature of such Confidential Information and, as to advisers, their obligation to keep such information confidential.

6.      Furthermore, all BCM employees have a duty to protect the Brevet entities' confidential, proprietary, and trade secret information, and sign an acknowledgement of receipt of Brevet's Personnel Policies & Employee Handbook ("Handbook"), which contains a strong confidentiality provision.  The Brevet entities have developed a competitive advantage based on their experience in providing capital and lending solutions to middle market companies.  Maintaining confidentiality about Brevet's business and operations was critical to their success.  The Handbook states that:

> You will not, at any time, whether during your employment at Company or following the end of it, for any reason whatsoever, directly or indirectly disclose or furnish any firm, corporation or person, except as otherwise required by law, any Proprietary Information or Trade Secrets of Company with respect to any aspect of its operations or affairs.…

7.      The Handbook further provides that employees are prohibited from making copies of confidential, proprietary, or trade secret information and documents for themselves:

> Employees are prohibited from making copies or duplicates of any Proprietary Information or Trade Secrets, except as essential for the fulfillment of the employee's duties to the Company. Employees are prohibited from removing any Proprietary Information or Trade Secrets, related documents or proprietary property or information without the prior written authorization of the Company. If requested by the Company, employees will immediately return all Proprietary Information and Trade Secrets, related documents and property or information.

8.    Additionally, pursuant to the LLC Agreements provision entitled "Non-Competition," Iacovacci was forbidden, while a Member of the Brevet Short Duration LLCs and for twenty-four (24) months thereafter, from participating in any way in a business that directly or indirectly competes with the Brevet entities.  Specifically, this provision provides:

> Noncompetition.  The Members hereby acknowledge and agree that each Member owes the Company and each other Member the highest fiduciary loyalty and duty.   In furtherance, and not in limitation, of such fiduciary obligation, each Member hereby agrees that, at all times that a Member owns an Interest in the Company, and for the twenty-four (24) month period after such Member ceases to be a Member for any reason other than his death, Permanent Disability, retirement or involuntary termination without Cause, the Member shall not, in any capacity, whether for his own account or for any other person or organization, directly or indirectly, with or without compensation, engage, directly or indirectly (as an owner, employee, consultant or in any other capacity), in any enterprise or activity involving investment management or advisory services that directly competes with the Company.

9.    As an employee and Managing Director of BCM, Iacovacci agreed to a similar non-competition provision in Brevet's Handbook. That non-competition provision provides:

> **Non - Competition/ No-Raiding/ Non-Solicitation**
> (a) While you are employed by Company, and for a period of three (3) months following your voluntary termination of your employment, you will not act as follows: directly or indirectly, engage in, own, or control any interest in, or act as an officer, employee, or consultant to any company or entity engaged in a business which materially competes with the business of Company….

10.    Furthermore, Iacovacci was forbidden, while a Member of the Brevet Short Duration LLCs, and for twenty-four months thereafter, from soliciting any employee or agent of the Brevet entities, including BCM, to leave the company.  Specifically, his agreements provided:

> Nonsolicitation.  During the time that a Member owns his Interest in the Company and for a period of twenty-four (24) months following a Member's withdrawal from the Company for any reason other than his death, Permanent Disability or retirement, the Member shall not, in any capacity, whether for his own account or for any other person or organization, directly or indirectly, with or without compensation, solicit, retain, hire, offer to hire, entice away or in any manner persuade or attempt to persuade any Member, officer, employer or agent of the Company (including any affiliate of the Company) to discontinue his or her relationship with the Company or its affiliates.

11.     As an employee and Managing Director of Brevet Holdings, Iacovacci further agreed to a similar non-solicitation provision in the Handbook. The Non-Solicitation provision provides:

> **Non-Competition / No-Raiding / Non-Solicitation**
> (b)(i) For a period of twenty-four (24) months following the termination of your employment, you will not recruit or hire or induce any employee of Company to leave Company and joint an entity with which you are associated; and
> (ii) For a period of twenty-four (24) months following the termination of your employment, you will not solicit the trade or patronage of any clients with which you had direct contact or acquired knowledge about while employed at Company.

12.     Moreover, the Handbook applicable to BCM employees, including Iacovacci, contains a Conflict of Interest Policy, which was agreed to by Iacovacci annually, and which required employees to avoid any conflicts of interest between their personal interest and the interest of the Brevet companies.  The Conflict of Interest Policy further provided the following:

> As a condition of employment, all employees are obligated to not compete with the Company in any of its business activities.

13.     These covenants, agreements and policies were crucial to BCM.  BCM's action in offering Iacovacci to serve as Managing Director was contingent upon the commitment that Iacovacci would be loyal to the Brevet entities and would work to achieve its business goals and contribute to the success of the Brevet entities.

14.     As an employee and a Managing Director of BCM, Iacovacci agreed to maintain loyalty to BCM, not take personal advantage of BCM's corporate opportunities and preserve the confidentiality of its confidential information and trade secrets.

## THE BREVET CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

15.     As a provider of capital and lending services to middle market companies, the Brevet entities have developed a wealth of capital and lending information as well as specialized knowledge

of the middle market.  All of this information is critical to Brevet's success and to maintaining its position as an industry leader.

16.     Notably, Brevet has developed its own sourcing network including over 2,000 sourcing clients. Brevet has expended considerable resources, both financial and in personnel time, developing this non-public information.

17.     Similarly, Brevet has developed and documented methodologies, processes, and strategies pertaining to sourcing, underwriting, structuring, documenting, closing, monitoring, risk managing and valuing opportunities, as well as capital raising and lending.  Brevet has expended vast resources in developing these confidential, proprietary, and trade secret information and materials and constitute extremely valuable assets of the company.

18.     Brevet has also expended vast resources to develop its business-specific non-disclosure agreements. The form and content of the non-disclosure agreements themselves constitute confidential, proprietary, and trade secret information and materials, and constitute extremely valuable assets of the company.

19.     Access to Brevet's confidential, proprietary, and trade secret information and materials is restricted.  Brevet's computer systems are firewall protected and only certain Brevet employees have access to certain documents and files within Brevet's systems. Moreover, Brevet's documents maintained on its computer systems are log-in and password protected.  And, in relation to physical security, Brevet utilizes door-locks, swipe cards, cameras, and building security desks to protect its confidential, proprietary, and trade secret information.

20.     But Iacovacci, as a Managing Director of BCM and Member of the LLCs, was entrusted with access to some, but not all, of this information. Moreover, Brevet provided Iacovacci with a Brevet computer, phone and webcam for use when conducting Brevet business at home.  The

purpose of providing this equipment was so that Brevet confidential information did not leave Brevet's network or equipment.

21.     All Brevet employees are instructed that they have a duty to protect Brevet's information, and have signed the Handbook, which contains a confidentiality agreement.

22.     Iacovacci was a trusted member of senior management and privy to some of Brevet's most sensitive and confidential information, including a wealth of lending information and specialized knowledge of the middle market.  All of this confidential information is critical to Brevet's success and to maintaining its position in the industry.  Iacovacci was among only a handful of individuals with access to some of this non-public information.

## THE SUBJECT BREVET COMPUTER

23.     Brevet has a longstanding practice of purchasing desktop computers and providing them to some Brevet employees for home business use.  The computers provided to these employees belong to Brevet and were required to be returned to Brevet at the end of each employees' employment with Brevet.

24.     Iacovacci received at least two computers from Brevet for home business use. Each time, through various Brevet policies, including the Handbook, Iacovacci acknowledged that these computers were the property of Brevet.  The computer Iacovacci failed to return to Brevet ("the Brevet computer") was the second computer Brevet had provided to Iacovacci. Brevet had installed Brevet software, security software and software to access Brevet systems on the Brevet Computer. When Iacovacci received the Brevet computer, he returned to Brevet the first computer that had been provided to him by Brevet, confirming his understanding that he did not have ownership of the computers provided to him by Brevet for home business use.

25.     As a financial firm professional with decades of experience who held a senior management position at Brevet, Iacovacci was very familiar with these long-standing regulations. In

fact, he was reminded of them by way of company policies that he signed off on, including those contained in the Handbook.  Iacovacci did not have any rational expectation of privacy in relation to any content on or accessed through a company-owned computer.

26.     On October 14, 2016, the day Iacovacci's employment was terminated, Johnny Lan, Vice President and Head of Technology at Brevet, and fellow employee Igor Koyfman, went to Iacovacci's apartment to retrieve the Brevet computer.  Iacovacci refused to return the Brevet computer to Mr. Lan, claiming he could not return it at that time.

27.     On December 2, 2016, counsel for the Brevet entities requested return of the Brevet computer by means of a document request in the related pending action, venued in New York State Supreme Court ("the State Court Action").

28.     As of May 16, 2017, Iacovacci had still not returned the Brevet computer.  Therefore, counsel for the Brevet entities wrote to Iacovacci's counsel again requesting return of the Brevet computer.

29.     On November 17, 2017, more than a year after Iacovacci's employment was terminated, the Brevet entities were forced to file a motion in the State Court Action, seeking to compel return of the Brevet computer.

30.     Finally, on November 29, 2017, the State Court ordered that within twenty days, the Brevet computer and external hard drives were to be delivered by Iacovacci to a mutually agreed upon neutral expert.

31.     On December 20, 2017, Iacovacci's counsel provided the Brevet computer and external hard drives to the neutral expert agreed upon by the parties.  Notably, Iacovacci retained a copy of the Brevet computer and external hard drives after handing them over to the neutral expert.

32.     Because Iacovacci refused to agree to a protocol for forensic scanning of the Brevet Computer, the Brevet entities were compelled to file another motion in the State Court Action. And,

on November 5, 2018, the Court in the State Action entered an Order on the record setting forth the structure for a protocol concerning discovery of the contents contained on the computer hard drives. A formal protocol was agreed to thereafter in February 2019, and the neutral expert began its work in creating forensic scans of three separate drives. The production of the evidence is ongoing. As of the date of this Pleading, the Brevet entities have only just received a redacted version of a forensic scan of one of the three hard drives, as well as redacted versions of file level reports listing contents on the drives. Iacovacci's ability to maintain the redaction is subject to future in camera inspections before the State Court Judge.

33.     Notwithstanding the limited amount of computer hard drive evidence revealed in the State Action to date, it is nevertheless already apparent that the Plaintiff's unlawful activities were more extensive than previously thought.

## IACOVACCI'S UNLAWFUL SCHEME

34.      While he served as a Managing Director of Brevet Holdings and BCM, and was a Member of the LLCs, Iacovacci devised an unlawful scheme to usurp corporate opportunities away from Brevet for himself.

35.     Iacovacci's primary role at Brevet was to source transactions and bring them to Brevet, which would fund the transactions.

36.     Brevet has an established process for sourcing.  After identifying and speaking with an organization interested in Brevet's services, an employee in Iacovacci's role should conduct a high-level review to evaluate the targeted organization, the industry, and the market generally.  Following this high-level review, the employee should identify a strategy about how to engage the targeted company.

37.     After a sourcing strategy is devised, the employee should be in contact with the Brevet compliance group to provide information about the targeted organization and to assess whether there

are any conflicts of interest.  If there are no conflicts of interest, the employee should send out nondisclosure agreements prepared by Brevet's compliance group to the targeted organization.

38.     At this stage in the sourcing process, the employee should then present the possible loan arrangement to Brevet at an "intake meeting," where additional information is generally requested and a more in-depth review is conducted.

39.     In 2014, the transactions Iacovacci brought to Brevet had significantly decreased. And, by late October and early November 2015, Iacovacci was essentially no longer bringing in any transactions to Brevet.  However, during this time, Iacovacci increased the number of Brevet confidential, proprietary, and trade secret documents he was forwarding to his personal email address.

40.     At the same time that Iacovacci was no longer bringing in deals to Brevet, he was no longer conducting any high-level reviews or sourcing strategy on behalf of Brevet. Iacovacci was not performing any of these activities, but instead was sending out and executing Brevet nondisclosure agreements on his own without informing Brevet, and further, failing to contact Brevet if the counter party had revisions to the nondisclosure agreements.  Most importantly, Brevet was not even provided with the executed nondisclosure agreements to which Iacovacci had bound Brevet, nor with any of the confidential information that was provided pursuant to those nondisclosure agreements.

41.     Iacovacci diverted prospective clients away from Brevet, and in violation of policy, he personally invested $150,000 in a transaction, contemplated as part of a series of transactions or deals with a prospective Brevet client which were projected by his secret partner, Robert Nokley, to be worth potentially $100 million.

42.     Throughout this sourcing process, Iacovacci was supposed to catalog all transactions, but Iacovacci stopped providing any catalog information to Brevet, despite his continued solicitation of transactions.  He would instead source a transaction utilizing his position at Brevet, and then work to obtain alternative funding arrangements so as to take the transaction elsewhere.

43.     Iacovacci used his position as an insider to convert and misappropriate Brevet's business and solicit Brevet's customers and, divert to himself transactions and corporate opportunities that should have been presented to Brevet.  One of the ways that he would do this was to take Brevet proprietary documents, remove the Brevet letterhead and customize the document for his own benefit.

44.     Iacovacci also solicited current and former employees of Brevet to leave Brevet and work for him in a separate venture, in violation of the non-solicitation provisions in the Brevet Short Duration LLC Agreements and the Brevet Personnel Policies and Employee Handbook.

45.     Iacovacci's unlawful activity continued from at least October-November 2015 up until his termination on October 14, 2016, throughout which time he continued to serve as a Managing Director of Brevet Holdings and a Member of the LLCs.

46.     One method used by Iacovacci to divert business was to inform a potential source of business through the Brevet email system that in the future the source should use his personal email or cell phone.  Upon information and belief, Iacovacci would then continue discussions with the sourcing opportunity.  Rather than bring this opportunity to Brevet for funding, which was his primary role, Iacovacci would attempt to consummate the transaction for himself, thereby usurping the corporate opportunity away from Brevet.

47.     Although Iacovacci was engaged in this spurious conduct, Iacovacci deliberately remained a Brevet Managing Director and Member of the LLCs for several reasons:

      a.     He knew that the longer he remained as a Managing Director and LLC Member, and pretended to be loyal, the more confidential, proprietary, and trade secret information he could acquire and convert for his own purposes;

      b.     He knew that he could use his position as a Managing Director and LLC Member to obtain access to Brevet clients and to exploit opportunities to poison Brevet's relationship with those clients or usurp corporate opportunities from

those clients as well as divert for himself corporate opportunities that should have been brought to Brevet for review; and

c.   He was able to use Brevet computers to communicate, by e-mail, with others outside of Brevet and continue to use Brevet's confidential, proprietary, and trade secret information to further this scheme;

d.   By remaining a Managing Director and LLC Member, Iacovacci continued to receive salary and benefits, as well as reimbursement for travel and entertainment expenses.

48.   While he should have been directing his efforts to the growth and business of Brevet, Iacovacci instead was engaged in activities designed to benefit himself at the expense of Brevet. Moreover, even though he had used Brevet resources to further his scheme, all while working for Brevet, Iacovacci concealed all of these facts from Brevet and continued to represent to Brevet that he was functioning as a loyal officer and director of Brevet.

### IACOVACCI'S MISAPPROPRIATION OF CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION

49.   Upon information and belief, prior to his termination from Brevet, Iacovacci stole Brevet's Sourcing Information, including sourcing statistics and Brevet's sourcing network and contact information, for over 2,200 Brevet sourcing clients.

50.   Iacovacci obtained and stole this confidential, proprietary, and trade secret information through his unauthorized and illegal access to Brevet's computer systems and servers, exceeding authorized access to such systems and servers, and use of the Brevet computer.

51.   Iacovacci continued with his improper conduct and misappropriated significant transaction information regarding various Brevet clients such as:

- Copies of or information regarding Brevet's existing arrangements with its clients;

- Brevet's Non-disclosure Agreement;
- Sourcing opportunities and communications; and
- Information regarding Brevet's plans and strategies to compete with its competitors.

52.     Iacovacci also copied hundreds of emails or pieces of information to his personal email without authorization and disseminated this information in further breach of his confidentiality obligations.  Among other things, Iacovacci took without authorization:

- Brevet's Investor presentations;
- Brevet's Transaction summaries;
- Brevet's Transaction Studies and Example Transactions;
- Brevet's Valuation Methodology, Principles and Procedures;
- Brevet's Background Check Reports;
- Brevet's Operating Agreements;
- Brevet's Sourcing and Finance Presentation;
- Brevet's Deal Scoring Template;
- Brevet's Targeting and Sourcing Checklist;
- Brevet's Risk Management Reports;
- Brevet's Transaction Process and Procedures Manual;
- Brevet private and confidential employee emails to which he was not a recipient;
- Brevet's Credit Policy; and
- Brevet pipeline reports regarding upcoming activity.

53.     Iacovacci also created folders on the Brevet computer that make plain Iacovacci's intent to start a competing business, including a business model for a direct lending portfolio called "Sprout Financial."   Iacovacci's Brevet computer folders include numerous other confidential, proprietary, and trade secret Brevet documents, most or all of which Iacovacci altered by removing Brevet's name and logo, with the apparent intent to use and disseminate to other parties for his Sprout Financial or other venture.  These confidential, proprietary, and trade secret documents altered by Iacovacci include:

- Brevet's Letter of Intent Master Template;
- Brevet's Letter of Intent Policy and Procedures;
- Brevet's Direct Lending Presentation;
- Brevet's Underwriting and Closing Guidelines;
- Brevet's Film Lending Economic and Underwriting Guidelines;

- Brevet's Fine Art Lending Economic and Underwriting Guidelines;
- Brevet's Intake Policies and Procedures;
- Brevet's Outline and Initial Business Plan for Selling Preferred Equity in Private Equity Firms;
- Brevet's Sourcing Process and Procedures;
- Brevet's Targeting and Sourcing Checklist;
- Brevet's Targeting Sectors and Sourcing Guidelines; and
- Brevet's Transaction Process and Procedures Manual.

54.     Iacovacci had no right to use, or keep stock of, Brevet's or its employees' confidential, proprietary, and trade secret information for his own purpose.  These confidential, proprietary, and trade secret materials were paid for, created by, owned by, and were for the exclusive use of, Brevet.

55.     Moreover, the aforesaid list of documents consists of the complete set of building blocks to start a competing business.

56.     In short, while Iacovacci was still working as a Managing Director of Brevet Holdings and a Member of the LLCs, he stole these confidential, proprietary, and trade secret materials from Brevet, in order to appropriate them to his own uses and generate business opportunities for himself which properly should have gone to Brevet.

57.     On multiple occasions, Iacovacci did in fact not only appropriate the confidential, proprietary and trade secret information but also used them to generate business opportunities for himself, when they should have been brought to Brevet.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(On Behalf of BCM)**

58.     BCM repeats and realleges the allegations set forth in paragraphs "1" through "57".

59.     Iacovacci entered into the Brevet Short Duration LLC Agreements with the Brevet Short Duration LLCs, pursuant to which he agreed, among other covenants, to be bound by the Non-Competition, Non-Solicitation, and Confidentiality provisions intended for the protection and benefit

of all of the Brevet entities, including BCM, during his time as a Member of the Brevet Short Duration LLCs, and for a time following his separation from the Brevet entities.

60. Iacovacci breached the Brevet Short Duration LLC Agreements by, *inter alia*: (a) diverting and usurping corporate opportunities away from the Brevet entities, including BCM; (b) directly competing with Brevet entities, including BCM; (c) attempting to recruit current and former employees away from Brevet entities; (d) using the resources of Brevet entities, including BCM, to facilitate this competition; (e) improperly accessing, using, and removing Brevet entities, including BCM's confidential, proprietary, and trade secret information and using them to compete directly with Brevet; and (f) soliciting Brevet entities, including BCM's clients to do business with Iacovacci.

61. The breaches alleged above are material to BCM and are continuing.

62. The Brevet Short Duration LLCs and its other Members fully performed their obligations under the Brevet Short Duration LLC Agreements.

63. As a direct result of Iacovacci's breach of contract BCM has suffered damages in an amount to be determined at trial, including, but not limited to those resulting from lost revenues and profits as a result of Iacovacci's actions.

64. Because Iacovacci has been in a continuous breach of the aforesaid Provisions, the term of the restrictions has not run.

65. In addition to damages, which cannot be adequately redressed at law, BCM is entitled to injunctive relief against Iacovacci to (a) enjoin Iacovacci from further and continuing breaches of the provisions of the Brevet Short Duration LLC Agreements, and (b) enforce specifically the provisions of the Brevet Short Duration LLC Agreements against Iacovacci.

## SECOND CAUSE OF ACTION
## BREACH OF COVENANT NOT TO COMPETE
### (On Behalf of BCM)

66.     BCM repeats and realleges the allegations set forth in paragraphs "1" through "65".

67.     The Personnel Policies and Employee Handbook contain provisions entitled "Non-Competition / No-Raiding / Non-Solicitation" ("Noncompetition and Nonsolicitation Provisions") which required Iacovacci during the period that he served as an employee, including his time as Managing Director, and for three months thereafter, not to directly or indirectly, either on his own behalf or on the behalf of any other firm or corporation compete against Brevet.  The Noncompetition and Nonsolicitation Provisions further required Iacovacci to refrain from soliciting Brevet employees away from Brevet.

68.     Iacovacci agreed to the terms of Personnel Policies and Employee Handbook and was bound by the Noncompetition and Nonsolicitation Provisions in the Handbook.

69.     The Brevet entities, including BCM, performed all of their obligations to Iacovacci.

70.     Iacovacci unjustifiably and inexcusably breached, and continues to breach, his obligations under the Noncompetition and Nonsolicitation Provisions by competing against Brevet during the time that he continued to work for Brevet and thereafter, as well as by, upon information and belief, attempting to recruit current and former employees of Brevet.

71.     Because Iacovacci has been in a continuous breach of the aforesaid Provisions, the term of the restrictions has not run.

72.     As a direct result of Iacovacci's breaches, BCM suffered damages in an amount to be determined at trial, including, but not limited to those resulting from lost revenues and profits as a result of Iacovacci's actions.

73.     As a result of the breach of the Noncompetition and Nonsolicitation Provisions, BCM has suffered irreparable harm, and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless Iacovacci is enjoined from engaging in further breaches of contract.

## THIRD CAUSE OF ACTION
### BREACH OF COVENANT OF CONFIDENTIALITY
#### (On Behalf of BCM)

74.     BCM repeats and realleges the allegations set forth in paragraphs "1" through "73".

75.     Iacovacci agreed to the terms of the Personnel Policies and Employee Handbook which contained a provision entitled "Employee Covenant as to Confidentiality" ("Confidentiality Provision") requiring Iacovacci not to divulge or use Brevet's confidential, proprietary and trade secret information -- whether or not that information would be deemed a trade secret –except on behalf of Brevet and with Brevet's authorization.

76.     Iacovacci was bound by the Confidentiality Provision.

77.     BCM, and the other Brevet entities performed all of their obligations to Iacovacci.

78.     As a direct result of Iacovacci's breaches, BCM suffered damages in an amount to be determined at trial, including, but not limited to those resulting from lost revenues and profits as a result of Iacovacci's actions.

79.     Iacovacci has unjustifiably and inexcusably breached, and continues to breach, his obligations under the Confidentiality Provision by misappropriating and disclosing Brevet's confidential, proprietary, and trade secret information without Brevet's consent, by using such information to benefit his competitive business activities, and by usurping corporate opportunities from Brevet.

80.     As a result of Iacovacci's actions, BCM has suffered irreparable harm, and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless Iacovacci is enjoined from engaging in any further breaches of contract.

### FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (On Behalf of BCM and Monticciolo and Callahan)

81.     BCM and Monticciolo and Callahan repeat and reallege the allegations set forth in Paragraphs "1" through "80".

82.     As a Managing Director of BCM and Member of the LLCs, Iacovacci occupied a position of trust and confidence with BCM, as well as with Monticciolo and Callahan.

83.     By virtue of these roles, he owed a fiduciary duty of loyalty to BCM, Monticciolo and Callahan.

84.     Iacovacci breached his fiduciary duties owed to BCM, Monticciolo and Callahan by, *inter alia*: (a) usurping the corporate opportunities of Brevet entities, including BCM; (b) directly competing with the Brevet entities, including BCM while still a Member of and still employed by Brevet; (c) using the resources of Brevet entities, including BCM to facilitate this improper competition; (d) improperly accessing, using, and removing confidential, proprietary, and trade secret information belonging to Brevet entities, including BCM and using them to compete directly with Brevet; (e) soliciting customers and vendors of Brevet entities, including BCM to do business with entities either controlled by or affiliated with Iacovacci; and (f) misappropriating, improperly using and failing to protect the confidential information of Brevet entities, including BCM.

85.     Iacovacci carried out all of these breaches of fiduciary duty listed above in secrecy and without the knowledge or consent of BCM, Monticciolo and Callahan.

86.     As a fiduciary, Iacovacci should have disclosed and obtained consent for each of these acts (to which BCM, Monticciolo and Callahan would never have agreed).

87.     By engaging in the acts described above, Iacovacci misused his position of trust and confidence and furthered his own interests at the expense of BCM, Monticciolo and Callahan, and therefore breached his fiduciary duties to BCM, Monticciolo and Callahan.

88.     As a direct result of Iacovacci's breach of his fiduciary duties, BCM, Monticciolo and Callahan have suffered damages in an amount to be determined at trial.

89.     Iacovacci acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above.  As a result, BCM, Monticciolo and Callahan are entitled to punitive damages.

### FIFTH CAUSE OF ACTION
### BREACH OF DUTY OF LOYALTY
### (On Behalf of BCM, Monticciolo and Callahan)

90.     BCM, Monticciolo and Callahan repeat and reallege the allegations set forth in Paragraphs "1" through "89".

91.     As a Brevet Managing Director and Member of the LLCs, Iacovacci had an undivided duty of loyalty to BCM and Monticciolo and Callahan.

92.     Iacovacci breached his duty of loyalty to BCM, Monticciolo and Callahan by, among other things, (a) usurping the corporate opportunities of Brevet entities; (b) directly competing with Brevet while still a Member of and still employed by Brevet entities; (c) using the resources of Brevet entities; to facilitate this improper competition; (d) improperly accessing, using, and removing Brevet entities' confidential, proprietary, and trade secret information and using it to compete directly with Brevet entities; (e) soliciting customers of Brevet entities; to do business with Iacovacci; and (f) misappropriating, improperly using and failing to protect the confidential information of Brevet entities, all while he was still a Managing Director and Member of the LLCs.

93.     Iacovacci further breached his duty of loyalty by deliberately taking actions to damage the reputation of BCM, Monticciolo and Callahan, thereby damaging their relationships with clients and prospective clients.

94.     As the duty of loyalty includes a duty to guard and not misuse an employer's confidential and trade secret information, BCM and Monticciolo and Callahan have been and continue to be materially, immediately and irreparably injured by Iacovacci's wrongful conduct.

95.     As a direct result of Iacovacci's conduct, BCM and Monticciolo and Callahan have suffered damages in an amount to be determined at trial, including but not limited to compensation that was paid to him by Brevet.

96.     Iacovacci acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above.  As a result, BCM and Monticciolo and Callahan are entitled to punitive damages.

97.     By reason of the foregoing, Iacovacci has caused BCM and Monticciolo and Callahan great damage. They have suffered irreparable harm as a result of Iacovacci's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless he is enjoined from engaging in any such further conduct.

<u>**SIXTH CAUSE OF ACTION**</u>
**UNFAIR COMPETITION**
**(On Behalf of BCM)**

98.     BCM repeats and realleges the allegations set forth in Paragraphs "1" through "97".

99.     The acts described above constitute unfair competition in violation of the law of the State of New York. The acts include but are not limited to: (a) breach of contract, (b) breach of non-competition and confidentiality provisions, (c) breach of fiduciary duty, (d) breach of the duty of loyalty, (e) tortious interference (f) conversion and (g) misappropriation of trade secrets.

100.     BCM invested substantial time, skill, and money in developing its trade secrets and confidential business materials and its customer contacts and goodwill.

101.     Iacovacci misappropriated and unlawfully used BCM's property by: (a) diverting and usurping BCM's corporate opportunities; (b) relying on BCM's confidential business documents and

information about BCM's business and products to compete with BCM's while a Managing Director of BCM and Member of the LLCs; and (c) soliciting BCM's existing customers and business partners.

102. Such actions were without the authorization or consent of BCM.

103. Iacovacci's actions were taken with bad faith or intent to injure BCM's business, including its right to enforcement of its contracts and preservation of its legitimate business interests, and to seek an unfair advantage in competing with BCM.

104. Iacovacci's conduct constitutes unfair competition.

105. As a direct result of Iacovacci's unfair competition, BCM has suffered damages in an amount to be determined at trial, including, but not limited to those resulting from lost revenues and profits, and damage to BCM's reputation in the industry, all as a result of the usurpation of corporate opportunities against BCM.

106. Iacovacci acted in an egregious, malicious, willful and wanton manner, and in bad faith. As a result, BCM is entitled to punitive damages.

107. As a direct result of Iacovacci's unfair competition, unless such conduct ceases, BCM will continue to be threatened with and suffer irreparable harm for which BCM possesses no adequate remedy at law.

## SEVENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (On behalf of BCM)

108. BCM repeats and realleges the allegations set forth in Paragraphs "1" through "107".

109. Iacovacci had full knowledge of the existence of a business relationship between BCM and each of its clients or investors.

110. Despite knowledge of the aforementioned, Iacovacci has interfered and continues to interfere with BCM's business relationships with its clients.

111.   Iacovacci's acts were and are intentional and carried out for the purpose of disrupting BCM relationships with its clients.

112.   As a direct result of Iacovacci's conduct, BCM has suffered damages in an amount to be determined at trial.

113.   Iacovacci has acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above.  As a result, BCM is entitled to punitive damages.

114.   By reason of the foregoing, Iacovacci has caused BCM great damage, including damage to BCM's reputation in the industry, and BCM has suffered irreparable harm as a result of Iacovacci's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless Iacovacci is enjoined from engaging in any such further conduct.

**EIGHTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**
**(On Behalf of BCM)**

115.   BCM repeats and realleges the allegations set forth in Paragraphs "1" through "114".

116.   Upon information and belief, Brevet has prospective business relationships with companies that, absent Iacovacci's interference, would have resulted in contractual and actual business relationships between them.

117.   Upon information and belief, Iacovacci used unfair, illegal, and improper means to interfere with BCM's potential and actual contractual and business relationships and continues to do so.

118.   As a direct result of Iacovacci's conduct, BCM has suffered damages, including damages to BCM's reputation in the industry, all in an amount to be determined at trial.

119.    Iacovacci acted in an egregious, malicious, willful and wanton manner, and in bad faith when committing the acts and omissions alleged above.  As a result, BCM is entitled to punitive damages.

120.    By reason of the foregoing, Iacovacci has caused BCM great damage. BCM has suffered irreparable harm as a result of Iacovacci's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless he is enjoined from engaging in any such further conduct.

**NINTH CAUSE OF ACTION**
**MISAPPROPRIATION OF TRADE SECRETS**
**(On behalf of BCM)**

121.    BCM repeats and realleges the allegations set forth in Paragraphs "1" through "120".

122.    BCM possesses trade secrets including, but not limited to, BCM's sourcing network, including its sourcing clients, and proprietary nondisclosure agreements.  This and other information is confidential and proprietary, and constitutes trade secrets.

123.    The trade secrets give BCM a significant advantage over its existing and would-be competitors, an advantage that would be lost if the trade secrets became known to the public or to BCM's competitors.

124.    The trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

125.    BCM has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, including designating certain information as confidential, requiring Members and employees to sign confidentiality agreements, and restricting access to such information and providing BCM issued computers and cellphones to employees including Iacovacci so that BCM confidential information remains on BCM devices and network.  BCM's trade secrets derive

independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure.

126. Iacovacci had knowledge of, and access to, BCM trade secrets.

127. Iacovacci was and is under a duty both to keep BCM's trade secrets confidential, and not to use, exploit or divulge such information other than for the benefit of BCM and with its authorization.

128. Iacovacci misappropriated BCM's trade secrets for his own gain, without regard to BCM's rights, and without compensation, permission, or license, including the disclosure and/or use of the trade secrets to directly compete with BCM.

129. Iacovacci's conduct was, is, and remains willful and wanton, in bad faith, and taken with blatant disregard for BCM's valid and enforceable rights.

130. Iacovacci has refused to return BCM's confidential and proprietary information and trade secrets.

131. As a result of Iacovacci's wrongful misappropriation of BCM's trade secrets, BCM has been and continues to be materially, immediately, and irreparably injured by BCM's continued wrongful conduct.

132. As a direct result of Iacovacci's conduct, BCM has suffered damages in an amount to be determined at trial.

133. By reason of the foregoing, Iacovacci has caused BCM great damage. BCM has suffered irreparable harm as a result of Iacovacci's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless he is enjoined from engaging in any such further conduct.

**TENTH CAUSE OF ACTION**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT,**
**18 U.S.C. § 1030(a)(2)(A); 18 U.S.C. § 1030(a)(2)(C); and, 18 U.S.C. § 1030(a)(4)**

**(On Behalf of BCM, Monticciolo and Callahan)**

134.    BCM, Monticciolo and Callahan repeat and reallege the allegations set forth in Paragraphs "1" through "133".

135.    At all times relevant and material hereto, the Brevet computer was a highspeed data processing device connected to the internet and performing logical, arithmetic and other storage functions including data storage facility and communications facility directly related to its operation and, as such, is a "computer" as defined under 18 U.S.C. § 1030(e)(1). Similarly, each of the other Brevet owned company computers and corporate data and email servers utilized by the various Brevet entities and their employees are also high-speed data processing devices connected to the internet performing logical, arithmetic and other storage functions including data storage facility and communications facility directly related to their operation and, as such, are "computers" as defined under 18 U.S.C. § 1030(e)(1).

136.    At all times relevant and material hereto, the subject Brevet computer, as well as each of the other Brevet owned company computers and corporate data and email servers utilized by the various Brevet entities and their employees were "protected computers" used in commerce as defined under 18 U.S.C. § 1030(e)(2).

137.    Iacovacci intentionally accessed, with an intent to defraud, the aforesaid "protected computers" without authorization or otherwise exceeded his authorized access in order to obtain information belonging to BCM, Monticciolo and Callahan, which he was not entitled to.

138.    Iacovacci used his unauthorized illegal access to obtain and misuse information and records that were personal and confidential and of a financial nature to BCM, Monticciolo and Callahan which he was not entitled to.

139.    At all times relevant and material hereto, BCM was and is an investment advisor registered with the Securities and Exchange Commission.

140.    Iacovacci was able to secure unauthorized access when he misused his positions as a Managing Director and Member, and by false pretenses gained the access to BCM confidential information, which he then altered and transmitted to third parties, including, but not limited to his non-Brevet business partner, Robert Nokley, all to further his illicit plans to compete with the Brevet entities.

141.    Iacovacci used his unauthorized access to obtain and misuse BCM's confidential, proprietary, and trade secret information to which Iacovacci was not entitled, including but not limited to: Trade Secrets, sourcing information, transaction information regarding clients, investor presentations, transaction summaries, valuation methodologies, principles and procedures, background check reports, operating agreements, sourcing and finance presentations, deal scoring templates, targeting and sourcing checklists, risk management reports, transaction process and procedures manuals, credit policies, and pipeline reports regarding upcoming activity.

142.    Iacovacci used his unauthorized access to obtain and misuse confidential, proprietary, and trade secret documents to which he was not entitled, including but not limited to: letter of intent master templates, letter of intent policy and procedures, direct lending presentations, underwriting and closing guidelines, film lending economic and underwriting guidelines, fine art lending economic and underwriting guidelines, intake policies and procedures, outlines and initial business plans for selling preferred equity in private equity firms, sourcing process and procedures, targeting and sourcing checklists, targeting and sourcing guidelines, and transaction process and procedures manuals.

143.    Discovery in the State Action specific to the contents of the subject Brevet Computer hard drives began in April 2019 and is continuing.  To date, it has revealed that Iacovacci also intentionally and unlawfully accessed without authorization, viewed, and downloaded documents and content from various restricted email accounts. These email accounts were assigned to and associated with BCM, Monticciolo, and Callahan, as well as several other Brevet entity employees.

144.    As a direct and proximate cause of Iacovacci's wrongful actions, BCM, Monticciolo, and Callahan have been and will continue to be severely and irreparably injured, including through the misappropriation of confidential, proprietary, and trade secret information, which could have been commercialized, and lost revenues and profits as a result of Iacovacci's unauthorized competition, and diversion of corporate opportunities. Moreover, they have been caused to retain forensic experts to investigate Iacovacci's unauthorized intrusions. The aggregate damage caused to BCM, Monticciolo, and Callahan during a one-year period as a result of these injuries is in excess of $5,000. Accordingly, BCM, Monticciolo, and Callahan are entitled to compensatory damages, reasonable attorneys' fees and costs, as well as equitable relief.

**ELEVENTH CAUSE OF ACTION**
**VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701**
(**On Behalf of all Named Brevet Entities, Monticciolo and Callahan**)

145.    Brevet, Monticciolo and Callahan repeat and reallege the allegations set forth in Paragraphs "1" through "144".

146.    At all times relevant and material hereto, Brevet maintained a facility via a third-party service provider through which electronic communication service was provided.

147.    At all times relevant and material hereto, Brevet stores in electronic format on said facility various electronic communications incidental to the transmission thereof.  Brevet also maintained a facility via a third-party for purposes of backup protection of such communications.

148.    Iacovacci intentionally accessed, without authorization, and thereby obtained numerous of the aforesaid electronic communications while they were in electronic storage.

149.    Iacovacci used his unauthorized illegal access to obtain and misuse information and records that were personal and confidential and of a financial nature to Brevet, Monticciolo and Callahan which he was not entitled to.

150.    At all times relevant and material hereto, Brevet was and is an investment adviser registered with the Securities and Exchange Commission.

151.    Discovery in the State Action specific to the contents of the subject Brevet Computer hard drives began in April 2019 and is continuing.  To date, it has revealed that Iacovacci also intentionally and unlawfully accessed without authorization, viewed, and downloaded documents and content from various restricted email accounts. These email accounts were assigned to and associated with Brevet, Monticciolo, and Callahan, as well as several other Brevet entity employees.

152.    As a direct and proximate cause of Iacovacci's wrongful actions, Brevet, Monticciolo, and Callahan have been and will continue to be severely and irreparably injured, including through the misappropriation of confidential, proprietary, and trade secret information, which could have been commercialized, and lost revenues and profits as a result of Iacovacci's unauthorized competition, and diversion of corporate opportunities. Moreover, they have been caused to retain forensic experts to investigate Iacovacci's unauthorized intrusions. The aggregate damage caused to Brevet, Monticciolo, and Callahan during a one-year period as a result of these injuries is in excess of $5,000. Accordingly, Brevet, Monticciolo, and Callahan are entitled to compensatory damages, reasonable attorneys' fees and costs, as well as equitable relief.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
### (On Behalf of all Named Brevet Entities)

153.    Brevet repeats and realleges the allegations set forth in Paragraphs "1" through "152".

154.    Brevet possesses trade secrets including, but not limited to, Brevet's sourcing network, including its sourcing clients, and proprietary transaction documents.  This and other information are confidential and proprietary, and constitutes trade secrets.

155.    The trade secrets give Brevet a significant advantage over its existing and would-be competitors, an advantage that would be lost if the trade secrets became known to the public or to Brevet's competitors.

156.    The trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

157.    Brevet has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, including designating certain information as confidential, requiring Members and employees to sign confidentiality agreements, and restricting access to such information and providing Brevet issued computers and cellphones to employees including Iacovacci so that Brevet's confidential information remains on Brevet devices and network.  Brevet's trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure.

158.    Iacovacci had knowledge of, and access to, Brevet trade secrets.

159.    Iacovacci was and is under a duty both to keep Brevet's trade secrets confidential, and not to use, exploit or divulge such information other than for the benefit of Brevet and with its authorization.

160.    Iacovacci misappropriated Brevet's trade secrets for his own gain, without regard to Brevet's rights, and without compensation, permission, or license, including the disclosure and/or use of the trade secrets to directly compete with Brevet.

161.    Iacovacci's conduct was, is, and remains willful and wanton, in bad faith, and taken with blatant disregard for Brevet's valid and enforceable rights.

162.    Iacovacci has refused to return Brevet's confidential and proprietary information and trade secrets.

163.    As a result of Iacovacci's misappropriation of Brevet's trade secrets, Brevet has been and continues to be materially, immediately, and irreparably injured by Brevet's continued wrongful conduct.

164.    As a direct result of Iacovacci's conduct, Brevet has suffered damages in an amount to be determined at trial.

165.    By reason of the foregoing, Iacovacci has caused Brevet great damage. Brevet has suffered irreparable harm as a result of Iacovacci's conduct and will continue to suffer irreparable harm, which cannot be adequately redressed at law, unless he is enjoined from engaging in any such further conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, BREVET HOLDINGS, LLC, BREVET CAPITAL MANAGEMENT, LLC, BREVET SHORT DURATION PARTNERS, LLC, BREVET SHORT DURATION HOLDINGS, LLC, DOUGLAS MONTICCIOLO and MARK CALLAHAN pray for relief against Iacovacci, jointly and severally, as follows:

- For compensatory damages in an amount to be determined at trial;

- For punitive damages in an amount to be determined at trial;

- For a preliminary and permanent injunction:  (a) enjoining Iacovacci from ever using Brevet's Trade Secrets and confidential, proprietary, or trade secret information or business materials including, but not limited to, Brevet's documents, policies, business plans, client lists, contacts and information, customer relationships, and any other non-public information about Brevet; (b) enjoining Iacovacci from selling or attempting to sell any Brevet business products or services or products or services created from Brevet Trade Secrets or Brevet's confidential and proprietary information; (c) enjoining Iacovacci from interfering with Brevet's contractual

relationships with any current or former customers or other third-party with whom Brevet has a business relationship; (d) enjoining Iacovacci from defaming Brevet's good business reputation or any of Brevet's clients, services, or products in any manner; and (e) enjoining Iacovacci from misappropriating, using, disclosing, distributing, or copying any and all Trade Secrets or confidential information of Brevet obtained by Iacovacci during or after his employment with Brevet Holdings or as a Member of the LLCs;

- For attorneys' fees and costs;

- Pre and post judgment interest; and

- For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Defendants demand a trial by jury on all issues triable in accordance with Federal Rule of Civil Procedure 38(b).

**WHEREFORE,** Defendants/Counterclaim Plaintiffs Brevet Holdings, LLC, Brevet Capital Management, LLC, Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, Douglas Monticciolo and Mark Callahan respectfully request that Plaintiff's Complaint be dismissed with prejudice, that judgment be entered in Brevet's favor and that Brevet be awarded its attorneys' fees, costs, expenses and disbursements incurred in this Action, together with such other and further relief that the Court deems equitable and just.

Dated: New York, New York
August 9, 2019

        BIEDERMANN HOENIG SEMPREVIVO,
        A Professional Corporation


        By:   /s/  Philip C. Semprevivo
            Philip C. Semprevivo

One Grand Central Plaza
60 East 42nd Street, Suite 660
New York, New York 10165
Tel: (646) 218-7560
Fax: (646) 218-7510
*Attorneys for Defendants/Counterclaim-Plaintiffs*
*Brevet Holdings, LLC,*
*Brevet Capital Management, LLC*
*Brevet Short Duration Partners, LLC,*
*Brevet Short Duration Holdings, LLC,*
*Douglas Monticciolo and Mark Callahan*