# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PAUL IACOVACCI,

      Plaintiff,

   v.

BREVET HOLDINGS, LLC, *a Delaware Limited Liability Company*, BREVET CAPITAL MANAGEMENT, LLC, *a Delaware Limited Liability Company*, BREVET SHORT DURATION PARTNERS, LLC, *a Delaware Limited Liability Company*, BREVET SHORT DURATION HOLDINGS, LLC, *a Delaware Limited Liability Company*, DOUGLAS MONTICCIOLO, *as a Member and the Majority Owner of Brevet Holdings, LLC, Chief Investment Officer of Brevet Capital Management, LLC, a Member of Brevet Short Duration Partners, LLC, a Member of Brevet Short Duration Holdings, LLC, and Individually*, MARK CALLAHAN, *as President of Brevet Capital Management, LLC, a Member of Brevet Short Duration Partners, LLC, a Member of Brevet Short Duration Holdings, LLC, and Individually*, JOHNNY LAN, *as Vice President and Head of Technology of Brevet Capital Management, LLC and Individually*, and JOHN AND JANE DOES 1 THROUGH 100,

      Defendants.

No. _____

**JURY DEMAND**

**COMPLAINT**

---

   Plaintiff Paul Iacovacci, by and through his undersigned attorneys, brings this Complaint against Defendants Brevet Holdings, LLC ("BH"), Brevet Capital Management, LLC ("BCM"), Brevet Short Duration Partners, LLC ("Partners"), Brevet Short Duration

Holdings, LLC ("Holdings") (collectively, "Brevet" or the "Company"), Douglas Mon-ticciolo, Mark Callahan, Johnny Lan, and John and Jane Does 1 through 100, and in support thereof alleges the following:

## NATURE OF THE CASE

1.       In January 2016, Paul Iacovacci, a co-founder of Brevet and Managing Di-rector of BCM, announced that he intended to retire from the Company because he had been experiencing significant health issues.  But instead of permitting Iacovacci to with-draw voluntarily from Brevet with the tens of millions of dollars in compensation he was contractually owed, Iacovacci's co-founders and the other Defendants instigated a cam-paign to deprive Iacovacci of what Brevet was contractually obligated to pay him.  Begin-ning in early 2016, Defendants secretly and repeatedly broke into Iacovacci's personal home network and electronic devices, stole information to which they were not entitled, and unlawfully viewed Iacovacci's personal Yahoo! e-mail inbox and privileged commu-nications.

2.       More specifically, on approximately two dozen occasions in 2016 after Iacovacci announced his intention to retire from the Company, Defendants hacked into his personal online account for an encrypted remote access service called LogMeIn, without Iacovacci's permission or knowledge.  Once Defendants gained unauthorized access to Iacovacci's LogMeIn account, which Iacovacci had purchased and installed so that he could securely use his personal home computer remotely, Defendants were then able to – and did – view and access Iacovacci's personal home computer without being detected.

2

And after Defendants secretly and repeatedly logged into Iacovacci's personal home computer, they were able to – and did – (i) review Iacovacci's personal Yahoo! e-mail inbox when it was open and available on his computer; and (ii) view, copy, and steal private data – including attorney-client privileged data – that Iacovacci stored on personal, external hard drives, which were physically located at Iacovacci's residence and which Iacovacci occasionally attached to his home computer.

3.      During their intrusions into Iacovacci's personal external hard drives, Defendants, by their own admission, unlawfully accessed hundreds of Iacovacci's files.  And during their intrusions, Defendants also surreptitiously installed and used software on Iacovacci's home computer that enabled Defendants to transfer large amounts of data from Iacovacci's personal external hard drives.

4.      Defendants engaged in these offenses and took Iacovacci's personal, private, and privileged information, even after he was no longer employed at the Company, in order to use what they stole against Iacovacci in the negotiations over his retirement and subsequent, related litigation.

5.      In light of and as a result of Defendants' unlawful and unauthorized hacking campaign, and seeking compensation for the harm that Defendants inflicted on Iacovacci, Iacovacci now asserts claims pursuant to the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030 *et seq.*, the Federal Wiretap Act (the "FWA"), 18 U.S.C. § 2510 *et seq.*, the Stored Communications Act (the "SCA"), 18 U.S.C. § 2701 *et seq.*, and New York State common law claims of conversion and trespass to chattels.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 be-
cause this action arises under the CFAA, 18 U.S.C. § 1030 *et seq*., the FWA, 18 U.S.C.
§ 2510 *et seq.*, and the SCA, 18 U.S.C. § 2701 *et seq.*  The Court has supplemental juris-
diction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.
§ 1391(b) because the acts complained of occurred in this District.

## PARTIES

8.      Plaintiff Paul Iacovacci is a resident of the State of Connecticut and the
County of Fairfield.  Iacovacci is a former Managing Director of BCM, a Member of Part-
ners and Holdings, and a Member of the Board of Directors of Holdings.

9.      Defendant Brevet Holdings, LLC is a Delaware Limited Liability Company
with its principal place of business in New York, New York.

10.      Defendant Brevet Capital Management, LLC is a Delaware Limited Liabil-
ity Company with its principal place of business in New York, New York.

11.      Defendant Brevet Short Duration Partners, LLC is a Delaware Limited Li-
ability Company with its principal place of business in New York, New York.

12.      Defendant Brevet Short Duration Holdings, LLC is a Delaware Limited Li-
ability Company with its principal place of business in New York, New York.

13.      Brevet is engaged in the business of providing investment management and
advisory services.  At all times relevant and material hereto, BCM was registered with the
United States Securities and Exchange Commission ("SEC") as an investment adviser.

14.     BH is the sole member and 100% owner of BCM.

15.     According to BCM's public filings, BCM is the investment manager for non-party private fund Brevet Direct Lending – Short Duration Fund, L.P. ("Short Duration"), which was formerly known as Brevet Capital Special Opportunities Fund III, L.P. Partners is the General Partner of Short Duration, and Holdings is the Managing Member of Partners.

16.     Despite being comprised of multiple entities, Brevet functions and holds itself out as a single enterprise under common control.  All Brevet entities share the same office, and all individuals associated with Brevet use "brevetcapital.com" e-mail addresses. Brevet operates a single website, which refers to Brevet interchangeably as "Brevet," "Brevet Capital," "Brevet Capital Management," and "Brevet Capital Management, LLC." Brevet's employees and leadership team generally refer to all Brevet entities collectively as "Brevet."  Furthermore, all Brevet employees are subject to the same policies and procedures.  At all times relevant and material hereto, Brevet maintained a Personnel Policies & Employee Handbook that defined Brevet as "BREVET HOLDINGS, LLC OR ITS AFFILIATES, SUBSIDIARIES OR RELATED PARTIES."

17.     At all times relevant and material hereto, BCM represented in its public filings that BCM and Partners were under common control and part of a single advisory business.  In general, an investment adviser is required to file a Form ADV and update it each year. Each adviser must file its own Form ADV.  However, pursuant to a January 18, 2012 SEC no-action letter (the "No-Action Letter"), a filing adviser and its "relying advisers" are permitted to file or amend a single Form ADV so long as the "relying advisers" are

"controlled by or under common control with the filing adviser" and "the filing adviser and each relying adviser collectively conduct a single advisory business." Furthermore, "[e]ach relying adviser, its employees and the persons acting on its behalf [must be] subject to the filing adviser's supervision and control," which qualifies "each relying adviser, its employees and the persons acting on its behalf [as] 'persons associated with' the filing adviser (as defined in section 202(a)(17) of the [Investment Advisers Act of 1940 (the 'Advisers Act')])." Under the No-Action Letter, "[t]he filing adviser and each relying adviser [must also] operate under a single code of ethics adopted in accordance with Advisers Act rule 204A-1 and a single set of written policies and procedures adopted and implemented in accordance with Advisers Act rule 206(4)-(7) and administered by a single chief compliance officer in accordance with that rule."

18.     At all times relevant and material hereto, BCM was Brevet's sole filing adviser, and Partners was treated as a relying adviser. By taking the position that Partners qualified as a relying adviser, Brevet represented that BCM, Partners, and Holdings – Partners' Managing Member – were under common control. It also represented that Partners, Holdings, and BCM operated under a single code of ethics and a single set of written policies and procedures implemented and administered by a single chief compliance officer.

19.     Defendant Douglas Monticciolo is a resident of the State of New York and the County of New York. At all times relevant and material hereto, Monticciolo was a Member of BH, the Chief Investment Officer of BCM, a Member of Partners and Holdings, and a Member of the Board of Directors of Holdings. Monticciolo cannot be removed for cause from the Board of Directors of Holdings, and he holds a veto power over all actions

and decisions of the Board of Directors of Holdings.  According to BCM's public filings, Monticciolo owns more than 75% of BH.  Upon information and belief, his interest is approximately 99%, with his spouse owning the remaining 1%.  At all times relevant and material hereto, Monticciolo had control over and responsibility for Brevet's daily operations.  Monticciolo instituted a complex and frequently changing corporate structure at Brevet for the purpose of thwarting recovery by civil plaintiffs.

20.     Defendant Mark Callahan is a resident of the State of New Jersey and the County of Union.  At all times relevant and material hereto, Callahan was the President of BCM, a Member of Partners and Holdings, and a Member of the Board of Directors of Holdings.  Callahan, in conjunction with Monticciolo, oversaw all aspects of Brevet's daily operations.

21.     Defendant Johnny Lan is a resident of the State of New York and the County of Queens.  At all times relevant and material hereto, Lan was Vice President and Head of Technology of BCM.  In his role at Brevet, Lan oversaw Brevet's information technology and computer usage.

22.     Defendants John and Jane Does 1 through 100 are presently unidentified individuals or entities who participated in the actions described in this Complaint and whose identities will become known as facts are discovered during the pendency of this Action.  Iacovacci will seek leave to amend this Complaint to include the name or names of such additional individuals or entities if and when they are identified.

## MATERIAL FACTS IN SUPPORT OF ALL CLAIMS

**A.     Iacovacci's LogMeIn Account, External Hard Drives, and Computer Were Purchased for His Personal Use**

23.     In or around February 2015, Brevet purchased a Dell desktop computer (the "Computer") for Iacovacci's personal use.  Iacovacci owned, controlled, and operated the Computer.

24.     In or around February 2015, Lan configured and tested the Computer for Iacovacci.  Lan named the Computer's primary account "Family" because Iacovacci's wife and children would be using the Computer in addition to Iacovacci.  Upon information and belief, Brevet does not use this naming convention for Company computers.

25.     In or around February 2015, Iacovacci set up the Computer in his home office/children's playroom at his then residence in New York, New York.  At his home, Iacovacci occasionally attached to the Computer, among other things, two external hard drives that Iacovacci purchased for his personal use with his own funds and for which he never sought or received reimbursement from Defendants (the "External Hard Drives").  At all times relevant and material hereto, Iacovacci would disconnect and re-connect the External Hard Drives to the Computer as needed.

26.     Iacovacci stored all or nearly all of his files on the External Hard Drives, rather than on the internal hard drive of the Computer.

27.     At all times relevant and material hereto, the Computer was generally used as a family computer.  For example, Iacovacci's children used the Computer for school

activities or homework, and Iacovacci's wife used the Computer to prepare lessons in connection with the home-schooling of Iacovacci's children.  Iacovacci himself spent significant time using the Computer for personal purposes.  Iacovacci regularly used an internet browser on the Computer to access his personal Yahoo! e-mail account. When Iacovacci used the Computer for Brevet-related work that required access to the Brevet network, he would log into Brevet's network from the Computer using GoToMyPC, remote access software that was provided by Brevet.

28.     The External Hard Drives primarily stored materials of a personal nature, including family photographs, computer games, music, movies, personal correspondence, bible verses, and sensitive medical, financial, and tax-related documents.

29.     When physically present at the Computer, Iacovacci (or any other user) would have to enter a password to log onto the Computer and gain access to the Computer and the External Hard Drives.  The Computer's password was created by Iacovacci and Defendants never had use of the password unless authorized by Iacovacci.

30.     In order to remotely access the Computer and the External Hard Drives while away from home, Iacovacci used LogMeIn, a commercially available encrypted remote access service.  Iacovacci personally purchased and installed LogMeIn.  Iacovacci neither sought nor received reimbursement from Brevet for LogMeIn.  Iacovacci also did not seek Brevet's approval to install or use LogMeIn.

31.     LogMeIn works by connecting one computer (called the "host" computer) to a "LogMeIn Gateway" server at a secure datacenter maintained by LogMeIn.  An authorized user who wishes to remotely and securely access the host computer can then

simply sign onto their personal LogMeIn account. Once login occurs, the user is granted access to the remote host computer as if the user was physically present at that computer's keyboard. LogMeIn uses industry-standard algorithms and protocols for encryption and authentication to make sure that the data that is transmitted by the computers accessing or using LogMeIn software are not visible or accessible to third parties or even LogMeIn. At all times relevant and material hereto, the Computer was the sole host computer to which access was available through Iacovacci's LogMeIn account. In order to log onto the Log-MeIn account and gain access to the Computer and thereafter the External Hard Drives, Iacovacci (or any other user) would have to enter a username and password. Iacovacci's LogMeIn username and password were created by Iacovacci and Defendants never had use of the username and password unless authorized by Iacovacci.

32.    Defendants had no administrative rights or control over Iacovacci's Log-MeIn program and did not require Iacovacci to supply Brevet with his LogMeIn credentials.

33.    Iacovacci was never asked to, and never provided Defendants with his personal Yahoo! e-mail login credentials. Iacovacci also never authorized Defendants to view or access his Yahoo! account.

34.    On certain occasions during the time period that Iacovacci and his family owned and used the Computer and External Hard Drives, at Iacovacci's request, Lan logged into the Computer through Iacovacci's LogMeIn account to assist Iacovacci with technical issues. On each of those occasions, Lan sought and received Iacovacci's express permission to access Iacovacci's LogMeIn account before proceeding. On the occasions

10

that Lan accessed Iacovacci's LogMeIn account at Iacovacci's request, Iacovacci shared his LogMeIn credentials with Lan – and only Lan – but never authorized Lan to: (i) access, among other things, files and data saved on the External Hard Drives or Iacovacci's personal Yahoo! e-mail account; or (ii) access Iacovacci's LogMeIn account, External Hard Drives, or Computer on other occasions without Iacovacci's knowledge and permission.

35.     Lan neither asked nor required Iacovacci to provide Lan or the Company with Iacovacci's LogMeIn credentials on a regular or permanent basis, and Iacovacci never did so.  Lan never advised Iacovacci that Lan or the Company could or would access or was accessing Iacovacci's LogMeIn account, External Hard Drives, or Computer without Iacovacci's knowledge and permission.  In fact, Lan told Iacovacci to be proactive in changing his LogMeIn password so that the account would be safe from unauthorized access.  Iacovacci heeded those instructions and, except for the aforementioned occasions, did not provide Lan or anyone at the Company with his LogMeIn credentials.

36.     In creating his LogMeIn and other passwords, however, Iacovacci used variations of his children's names and birthdays and other personal information that, upon information and belief, Defendants were able to, and in fact did, deduce.  Iacovacci often used the same password across multiple electronic devices, accounts, and applications, some of which Defendants had access to, and Iacovacci changed these passwords in a pattern that may have been predictable to Defendants.

37.     Unlike the Brevet computers that Iacovacci and others used at Brevet's offices, Defendants did not register the Computer for warranty purposes.

11

38.     Unlike the Brevet computer Iacovacci used at Brevet's offices, Iacovacci had administrative rights to the Computer, and was responsible for installing certain software, as well as operating system updates.

39.     Unlike the Brevet computer Iacovacci used at Brevet's offices, the Computer and the External Hard Drives bear no markings or insignia indicating that these devices are Brevet property.  The Computer and the External Hard Drives were also not connected to Brevet's office servers, nor did they appear on Brevet's network.  In addition, unlike other computers that Brevet purchased for the use of the Brevet founders outside the office, a virtual private network connection between the Computer and Brevet's server was not installed on the Computer.

40.     Unlike the Brevet computer Iacovacci used at Brevet's offices, no Brevet disclaimer or login banner was displayed upon logging into the Computer.

41.     Brevet's computer policy prohibits the use of Brevet devices for purposes that do not benefit the company.  Brevet was aware that the Computer was used primarily for personal purposes and did not object to such usage.

42.     Brevet's computer policy prohibits the installation of non-Brevet software on Brevet devices without the express prior written approval of Brevet's information technology ("IT") department.  Because Iacovacci permitted Lan to access his Computer on occasion, as described above, Defendants knew that Iacovacci and his family had installed non-Brevet software on the Computer, including LogMeIn, without approval from the IT department and did not object to the installation or use of such software.

12

43.     Although Brevet claims a purported right to monitor the usage of Brevet devices, until the unauthorized intrusions that gave rise to this Action, Brevet made no effort or request to monitor the usage or contents of the External Hard Drives, the Computer, or, upon information and belief, the computers of other founders.

**B.     After Suffering Serious Medical Issues, Iacovacci Sought to Retire from Brevet, but Was Instead Terminated Without Cause**

44.     On December 18, 2015, Iacovacci underwent a substantial reconstructive surgery known as an osteotomy on his right leg.  During and after the procedure, Iacovacci developed complications requiring further extensive treatment and hospitalization.  Until recently, he continued to receive intensive physical therapy.

45.     Given these health issues and the anticipated lengthy and difficult recuperation period, on or about January 6, 2016, Iacovacci had an in-person meeting with Monticciolo and Callahan and informed them that he intended to retire from Brevet.

46.     Iacovacci confirmed his intentions in an e-mail dated on or about January 12, 2016.

47.     Monticciolo and Callahan subsequently agreed to draft a retirement agreement.

48.     On or about February 15, 2016, Monticciolo announced Iacovacci's retirement at an internal Brevet staff meeting.  Shortly after this meeting, Brevet personnel shared with third parties that Iacovacci was no longer working at Brevet.

49.     Brevet provided Iacovacci with a draft retirement agreement in March 2016, shortly before Iacovacci was to undergo a second osteotomy.  That surgery occurred on or

about March 28, 2016.  After March 2016, Brevet and Iacovacci continued to negotiate the terms of the retirement agreement.

50.     On October 14, 2016, Brevet officially terminated Iacovacci's employment and wrongfully and unlawfully forfeited all interests he held in Brevet funds.

51.     On October 17, 2016, Iacovacci filed suit against BH, Partners, and Holdings in state court in an action captioned *Paul Iacovacci v. Brevet Holdings, LLC, et al*., Index No. 158735/2016 (N.Y. Sup. Ct. Oct. 17, 2016) (the "State Court Action").

52.     From in or around January 2016 through in or around October 2016, Monticciolo was actively involved with, and had final authority on Brevet's behalf, over the negotiations concerning the compensation due and owing to Iacovacci in light of Iacovacci's retirement.  During this time period, Iacovacci and Monticciolo had numerous communications through their respective counsel about Iacovacci's retirement and the terms of his separation.  Iacovacci also frequently communicated directly with Callahan about these matters, and Callahan reported to Monticciolo.

**C.     Defendants Hacked into Iacovacci's LogMeIn Account, External Hard Drives, and Computer in Order to Unlawfully Obtain and Access Data and Information**

53.     Less than a minute before midnight on October 17, 2016 – the very same day that Iacovacci filed the State Court Action, months after Brevet had announced his retirement internally, and three days after Brevet officially terminated Iacovacci's employment – a LogMeIn session was initiated by the 38.121.144.202 internet protocol ("IP") address (the "Brevet IP Address") using Iacovacci's personal credentials.  Iacovacci did not know about, or authorize, this LogMeIn session.

14

54.    Publicly available records indicate that the Brevet IP Address is assigned to Brevet Capital Management, 230 Park Avenue, Suite 1525, New York, New York 10169. Until at least 2017, those records listed Lan as the contact person for the IP address.

55.    At approximately 12:12 a.m. EST on October 18, 2016, without Iacovacci's knowledge or authorization, Defendants accessed or caused to be accessed the "Family" account on the Computer and installed software called FileZilla.  FileZilla is a program that, once installed, allows large quantities of files to be quickly and secretly transferred from one computer to another.  After the FileZilla program was installed on the Computer, the program was configured and subsequently closed at around 1:00 a.m.

56.    At approximately 1:37 a.m. EST on October 18, 2016, without Iacovacci's knowledge or authorization, Defendants again accessed or caused to be accessed the "Family" account on the Computer.  Upon information and belief, an unknown number of Iacovacci's files were accessed or taken during these early morning hours of October 18, 2016.

57.    Upon information and belief, Defendants installed, or caused to be installed, FileZilla on the Computer in order to unlawfully obtain information from the External Hard Drives and the Computer that Defendants believed could be useful in negotiating the retirement agreement with Iacovacci and defending against the lawsuit brought by Iacovacci. Iacovacci never downloaded, installed, or used FileZilla himself.

**D.    Defendants Accessed "Hundreds" of Iacovacci's Personal Files, Including Personal E-Mail Communications, and Improperly Used the Materials as the Basis for Counterclaims and Discovery Requests in the State Court Action**

58.    On November 30, 2016, BH, Partners, Holdings and two other Brevet affiliates (the "State Court Brevet Parties") asserted counterclaims against Iacovacci in the

State Court Action.  These counterclaims were based in significant part on information that Defendants obtained by hacking Iacovacci's LogMeIn account, External Hard Drives, and Computer and viewing Iacovacci's personal Yahoo! e-mails.  In support of their counter-claims, the State Court Brevet Parties alleged that "Brevet . . . was able to discover some of [Iacovacci's] e-mails and review files Iacovacci saved on [the] [C]omputer, which . . . allowed Brevet to develop the facts alleged herein."  They also alleged that "Brevet ha[d] . . . discovered folders created by Iacovacci on [the] [C]omputer that make plain Iacovacci's intent to start a competing business."  As set forth in this Complaint, the materials "discov-ered" by Brevet were the fruits of their unlawful accessing of Iacovacci's LogMeIn ac-count, External Hard Drives, and Computer, as well as his personal Yahoo! e-mail inbox.

59.  In their combined discovery demands, the State Court Brevet Parties re-quested information that was unique to the files stored on the External Hard Drives and deep in the sub-levels of the file trees resident on the External Hard Drives.  For instance, the State Court Brevet Parties requested production of, among other things:

    a.  "[A]ll documents reflecting Iacovacci starting a business of any kind including but not limited to, Sprout Financial;"

    b.  "[A]ll powerpoint presentations made by Iacovacci relating to business not involving Brevet;" and

    c.  "[A]ll documents that have in the title the term 'New Opportunity.'"

60.  In connection with the State Court Action, Callahan submitted an affidavit that admitted that Brevet had reviewed "hundreds" of files on the Computer.

16

61.     Upon information and belief, the e-mails that Brevet was able to "discover" on the Computer came from Iacovacci's personal Yahoo! e-mail account.  If they had been e-mails sent through Company servers, Brevet would have had access to them without breaking into Iacovacci's LogMeIn account, Computer, and External Hard Drives.  In other words, the Company would not have "discovered" the e-mails on the Computer, if the e-mails were to/from a Brevet e-mail account.

62.     Furthermore, in the State Court Action, the State Court Brevet Parties produced to Iacovacci an image of the desktop of the Computer that displays Iacovacci's personal Yahoo! e-mail inbox.  This screenshot of Iacovacci's personal Yahoo! e-mail inbox could only have been obtained by Defendants during a time when they were unlawfully accessing the Computer.

63.     The State Court Brevet Parties also produced privileged communications between Iacovacci's personal attorney and Iacovacci (the "Privileged Documents"), which could only have been obtained from the External Hard Drives or Iacovacci's personal Yahoo! e-mail account.  When Iacovacci and his attorney communicated via e-mail, including about the employment dispute with the Company and the State Court Action, Iacovacci used his personal Yahoo! e-mail account.  In addition, Iacovacci only kept copies of the Privileged Documents on the server of his personal e-mail provider, Yahoo!, or on the External Hard Drives.

64.     At all times relevant and material hereto, Monticciolo and Callahan were knowledgeable about, and involved in, all significant decisions made at or by Brevet, or by

17

Brevet employees or agents.  Upon information and belief, Monticciolo and Callahan au-

thorized and directed the hacking into and pilfering of Iacovacci's private files and com-

munications.  Upon information and belief, Lan participated in this activity and was acting

within the scope of his employment at Brevet when he did so.  Upon information and belief

– and based on the aforementioned affidavit filed by Callahan in the State Court Action –

Monticciolo and Callahan also knew about and authorized the State Court Brevet Parties'

use of the illegal fruits of the hacking campaign in the State Court Action.

**E.      After Learning of Defendants' Unlawful Hacking, Iacovacci Retained Foren-
sic Investigators Who Uncovered a Series of Intrusions, Thefts of Data, and
the Potential Destruction of Files on the External Hard Drives**

65.      Once on notice of Defendants' unlawful conduct in or about December

2016, Iacovacci retained forensic computer experts to investigate Defendants' unauthor-

ized intrusions and assess the damage caused thereby.  The forensic investigation revealed

that between January 2016 and the end of October 2016, IP addresses associated with BCM

accessed the Computer via LogMeIn on about thirty separate occasions.  Iacovacci author-

ized – via Lan – no more than a handful of these logins.  Accordingly, Defendants' unlaw-

ful hacking campaign against Iacovacci began long before the theft of Iacovacci's personal

data from the External Hard Drives in October 2016.

66.      Upon information and belief, one of the reasons Defendants hacked into

Iacovacci's personal electronic devices on numerous occasions was that in order to review

and copy data stored on the External Hard Drives undetected, two conditions needed to be

present: (i) the External Hard Drives had to be connected to the Computer; and (ii) Iaco-

vacci or a member of his family could not be using the Computer at the time.

18

67.    The forensic investigation also revealed that on April 19, 2016, during one of the approximately thirty BCM logins, file deletion software was installed on the Computer and executed.  The investigation has not revealed what files were deleted during that session.  The investigation also revealed that numerous files, including files containing Iacovacci's personal financial information and tax-related documents, were deleted from an External Hard Drive on or about April 23, 2016.

68.    The forensic computer experts' fees have exceeded $5,000 during a one-year period.

69.    Iacovacci has also invested a significant amount of his own time and resources: (i) investigating and remediating Defendants' unlawful hacking campaign; and (ii) defending against meritless claims in the State Court Action that are based on information Defendants obtained only through their unlawful hacking campaign.

### CAUSES OF ACTION

### COUNT I

*Violation of the Computer Fraud and Abuse Act*, 18 U.S.C. § 1030(a)(2)(C), *with regard to Iacovacci's Personal Computer*

70.    Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as if fully set forth herein.

71.    At all times relevant and material hereto, Iacovacci's LogMeIn account was hosted on a server.  This server is a "computer" under 18 U.S.C. § 1030(e)(1).

72.    At all times relevant and material hereto, the Computer was connected to the Internet and was used in or affecting interstate or foreign commerce or communication.

Accordingly, it is both a "computer" and a "protected computer" under 18 U.S.C. § 1030(e)(1) and (2).

73.     Defendants intentionally accessed Iacovacci's LogMeIn account and the Computer without authorization or exceeded authorized access.

74.     Defendants used their unauthorized access to Iacovacci's LogMeIn account and the Computer to obtain information from the Computer.

75.     As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign. The time and expense associated with these activities have caused a loss to Iacovacci during a one-year period in excess of $5,000. Accordingly, Iacovacci seeks compensatory damages, reasonable attorneys' fees and costs, and equitable relief.

## <u>COUNT II</u>
*Violation of the Computer Fraud and Abuse Act*, 18 U.S.C. § 1030(a)(2)(C), *with regard to Iacovacci's External Hard Drives*

76.     Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as if fully set forth herein.

77.     At all times relevant and material hereto, Iacovacci's LogMeIn account was hosted on a server. This server is a "computer" under 18 U.S.C. § 1030(e)(1).

78.     At all times relevant and material hereto, the Computer was connected to the Internet and was used in or affecting interstate or foreign commerce or communication.

Accordingly, it is both a "computer" and a "protected computer" under 18 U.S.C. § 1030(e)(1) and (2).

79.     At all times relevant and material hereto, the External Hard Drives were connected to and operated in conjunction with the Computer and were used in or affecting interstate or foreign commerce or communication.  Accordingly, the External Hard Drives are both "computers" and "protected computers" under 18 U.S.C. § 1030(e)(1) and (2).

80.     Defendants intentionally accessed Iacovacci's LogMeIn account, the Computer, and the External Hard Drives without authorization or exceeded authorized access.

81.     Defendants used their unauthorized access to Iacovacci's LogMeIn account, the Computer, and the External Hard Drives to obtain information from the External Hard Drives.

82.     As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  The time and expense associated with these activities have caused a loss to Iacovacci during a one-year period in excess of $5,000.  Accordingly, Iacovacci seeks compensatory damages, reasonable attorneys' fees and costs, and equitable relief.

## COUNT III

*Violation of the Computer Fraud and Abuse Act*, 18 U.S.C. § 1030(a)(2)(C), *with regard to Iacovacci's Personal Yahoo! E-Mail Account*

83.     Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as if fully set forth herein.

84.     At all times relevant and material hereto, Iacovacci's LogMeIn account was hosted on a server.  This server is a "computer" under 18 U.S.C. § 1030(e)(1).

85.     At all times relevant and material hereto, the Computer was connected to the Internet and was used in or affecting interstate or foreign commerce or communication. Accordingly, it is both a "computer" and a "protected computer" under 18 U.S.C. § 1030(e)(1) and (2).

86.     At all times relevant and material hereto, Iacovacci's personal Yahoo! e-mail account was hosted on a server.  This server was connected to the Internet and was used in or affecting interstate or foreign commerce or communication.  Accordingly, it is both a "computer" and a "protected computer" under 18 U.S.C. § 1030(e)(1) and (2).

87.     Defendants intentionally accessed Iacovacci's LogMeIn account, the Computer, and Iacovacci's personal Yahoo! e-mail account without authorization or exceeded authorized access.

88.     Defendants used their unauthorized access to Iacovacci's LogMeIn account, the Computer, and Iacovacci's personal Yahoo! e-mail account to obtain information from Iacovacci's personal Yahoo! e-mail account.

89.     As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced

to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  The time and expense associated with these activities have caused a loss to Iacovacci during a one-year period in excess of $5,000.  Accordingly, Iacovacci seeks compensatory damages, reasonable attorneys' fees and costs, and equitable relief.

### COUNT IV
*Violation of the Federal Wiretap Act*, 18 U.S.C. § 2511(1)(a)

90.     Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as if fully set forth herein.

91.     Iacovacci and Defendants are "persons" under 18 U.S.C. § 2510(6).

92.     Defendants intentionally intercepted or endeavored to intercept Iacovacci's wire, oral, or electronic communications by hacking into and extracting communications from Iacovacci's personal Yahoo! e-mail account.

93.     As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  Accordingly, Iacovacci seeks compensatory and/or statutory damages, punitive damages, reasonable attorneys' fees and costs, and equitable relief.

## COUNT V
### *Violation of the Stored Communications Act*, 18 U.S.C. § 2701

94.    Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as if fully set forth herein.

95.    Defendants intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, Iacovacci's personal Yahoo! e-mail account, thereby obtaining access to wire or electronic communications while they were in electronic storage in that system.

96.    As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  Accordingly, Iacovacci seeks compensatory and/or statutory damages, punitive damages, reasonable attorneys' fees and costs, and equitable relief.

## COUNT VI
### *New York State Common Law Claim of Conversion*

97.    Iacovacci incorporates by reference all prior paragraphs of this Complaint and paragraphs in the count below as if fully set forth herein.

98.    At all times relevant and material hereto, Iacovacci maintained a possessory interest in the Computer, the External Hard Drives, his LogMeIn account, his personal Yahoo! e-mail account, and the data stored on these devices and accounts.

99.    Defendants intentionally accessed Iacovacci's LogMeIn account, the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

100.    Defendants intentionally viewed data stored on the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

101.    Upon information and belief, Defendants intentionally copied and transferred data stored on the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

102.    Defendants intentionally used data from the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account as the basis for meritless claims in the State Court Action.

103.    Through these acts, which Defendants performed without authorization, justification, or consent, Defendants denied or substantially interfered with Iacovacci's possession of the Computer, the External Hard Drives, his LogMeIn account, his personal Yahoo! e-mail account, and the data stored on these devices and accounts.

104.    As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  Accordingly, Iacovacci seeks compensatory damages, punitive damages, reasonable attorneys' fees and costs, and equitable relief.

**COUNT VII**
*New York State Common Law Claim of Trespass to Chattels*

105.    Iacovacci incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

106.    At all times relevant and material hereto, Iacovacci maintained a possessory interest in the Computer, the External Hard Drives, his LogMeIn account, his personal Yahoo! e-mail account, and the data stored on these devices and accounts.

107.    Defendants intentionally accessed Iacovacci's LogMeIn account, the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

108.    Defendants intentionally viewed data stored on the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

109.    Upon information and belief, Defendants intentionally copied and transferred data stored on the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account.

110.    Defendants intentionally used data from the Computer, the External Hard Drives, and Iacovacci's personal Yahoo! e-mail account as the basis for meritless claims in the State Court Action.

111.    Through these acts, which Defendants performed without authorization, justification, or consent, Defendants interfered with Iacovacci's possession of the Computer, the External Hard Drives, his LogMeIn account, his personal Yahoo! e-mail account, and the data stored on these devices and accounts.

112.    As a direct and proximate cause of Defendants' wrongful actions, Iacovacci has been and will continue to be severely and irreparably injured, including by being forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign.  Accordingly, Iacovacci seeks compensatory damages, punitive damages, reasonable attorneys' fees and costs, and equitable relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Paul Iacovacci prays for the following relief:

A.      An injunction restraining Defendants from using or disclosing any materials obtained from the Computer, the External Hard Drives, or Iacovacci's personal Yahoo! e-mail account and requiring the return of such materials to Iacovacci;

B.      An award of compensatory and/or statutory damages in an amount to be determined at trial;

C.      An award of punitive damages in an amount to be determined at trial;

D.      An award of reasonable attorneys' fees and costs;

E.      An award of pre- and post-judgment interest; and

F.      Such other and further relief as the Court deems just and proper.


Dated: September 4, 2018                          Respectfully submitted,
New York, New York

                                                 /s/ Paul M. Krieger
                                                 Paul M. Krieger
                                                 Jonathan F. Bolz
                                                 KRIEGER KIM & LEWIN LLP
                                                 500 Fifth Avenue, 34th Floor
                                                 New York, New York 10110
                                                 (212) 390-9550
                                                 Paul.Krieger@KKLllp.com
                                                 Jonathan.Bolz@KKLllp.com