UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL IACOVACCI,

                    Plaintiff,

      -against-

BREVET HOLDINGS, LLC, *et al.*,

                 Defendants.

Case No. 1:18-cv-08048 (MKV)

**PLAINTIFF'S AND DEFENDANTS'
CONSOLIDATED RULE 56.1 STATEMENT**

**PLAINTIFF'S RULE 56.1 STATEMENT**

**I.   Background**

P-1.    Plaintiff, Paul Iacovacci, was a co-founder and Member of Brevet Short Duration Partners, LLC, and Brevet Short Duration Holdings, LLC, and employee of Brevet Holdings, LLC.[1]

P-2.    Defendants Brevet Holdings, LLC; Brevet Capital Management, LLC; Brevet Short Duration Partners, LLC; and Brevet Short Duration Holdings, LLC (collectively, "Brevet") are Delaware Limited Liability companies with their principal place of business in New York, New York.[2]

P-3.    Brevet is a financial management and advisory service firm that provides loans and other lending solutions and facilitates the raising of capital, generally to middle-market entities, both public and private.[3]

P-4.    Defendants Douglas Monticciolo and Mark Callahan are Managing Directors of Brevet Holdings, LLC, and Members of Brevet Short Duration Partners, LLC, and Brevet Short Duration Holdings, LLC.[4]

P-5.    Iacovacci joined Brevet as a co-founder in or around 2004.[5]

---

[1] Iacovacci Dep. 17:7-12, Oct. 6, 2021; Brevet Answer (Dkt. 79) ¶ 8; Iacovacci Aff. ¶ 2, *Iacovacci v. Brevet Holdings, LLC*, Index No. 158735/2016 (N.Y. Sup. Ct.) ("NYS") Dkt. 71 (Dec. 26, 2017).

[2] Brevet Answer (Dkt. 79) ¶¶ 9-12 (admitting Compl. ¶¶ 9-12).

[3] Defs.' NYS Supp. Resps. & Objs. to Pl.'s First Interrogatory No. 18 (Sept. 29, 2017).

[4] Callahan Aff. ¶ 1, NYS Dkt. 72 (Jan. 17, 2018). Brevet Answer (Dkt. 79) ¶ 19; Monticciolo Dep. 52:13-20, Oct. 7, 2021

[5] Callahan Aff. ¶ 5, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 17:7-18:2.

P-6.    Initially, Iacovacci worked on sourcing and locating potential investors and borrowers to obtain funds to originate loans, but around 2010 Iacovacci stopped working with investors or potential investors and focused only on sourcing borrowers.[6]

P-7.    Iacovacci's primary function for Brevet was to find borrowers for Brevet's Direct Lending Short Duration Fund, L.P.[7]

P-8.    Iacovacci's job duties included sourcing potential transactions; conducting high-level reviews to evaluate targeted organizations, industries, or markets; identification of strategies to engage targeted companies; the provision of information about targeted companies to the Brevet compliance group; the sending of Non-Disclosure Agreements prepared by Brevet's compliance group to the targeted organization; and the presentation of possible loan arrangements at Brevet's intake meetings.[8]

P-9.    Iacovacci was in charge of finding and vetting borrowers, and if such borrowers fit the fund's criteria, he would bring the deal to the other members for discussion and approval.[9]

P-10.    Iacovacci's involvement in a transaction would end once the letter of intent was executed, moving the potential deal on to structuring.[10]

P-11.    In or around February 2015, Brevet purchased a Dell computer for Iacovacci's home use ("Dell Home Computer").[11]

---

[6] Iacovacci Aff. ¶ 4, NYS Dkt. 71 (Dec. 26, 2017).

[7] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019); Iacovacci Aff. ¶ 2, NYS Dkt. 71 (Dec. 26, 2017); Callahan Aff. ¶ 4, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 24:11-16.

[8] Brevet NYS Supp. Responses & Objections to Plaintiff's First Interrogatories, Sept. 29, 2017, Interrogatory 14.

[9] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019).

[10] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019).

[11] Iacovacci Dep. 99:15-102:9.

P-12.    At that time, Iacovacci was still able to work in person at Brevet's office, but he often worked late at night and on weekends from home.[12]

P-13.    In 2015, because of a debilitating bone condition, Iacovacci began working from home more often.[13]

P-14.    In December 2015, Iacovacci had extensive surgery on his right leg due to his medical condition.[14]

P-15.    Iacovacci suffered complications after that initial surgery, requiring extensive additional surgeries; and due to concerns about his recovery, his ability to walk again, his pain management, and long physical therapy time, Iacovacci believed he should retire from Brevet.[15]

P-16.    On or around January 6, 2016, Iacovacci informed Callahan and Monticciolo that he was retiring from Brevet due to his significant health issues.[16]

P-17.    In an email to Callahan and Monticciolo on January 12, 2016, Iacovacci confirmed his retirement and asked about timing to discuss the transition of his responsibilities.[17]

P-18.    Around mid-February 2016, Iacovacci's retirement was announced to Brevet at an office staff meeting at Brevet's Park Avenue office in New York City, where Iacovacci was also present by video.[18]

P-19.    In February 2016, Iacovacci spoke with Callahan to discuss his departure, and Iacovacci indicated that we was willing to continue working at Brevet for a transition period—as

---

[12] Iacovacci Dep. 102:2-9; Iacovacci Aff. ¶ 22, NYS Dkt. 382 (Nov. 1, 2018).

[13] Iacovacci Aff. ¶ 22, NYS Dkt. 382 (Nov. 1, 2018).

[14] Iacovacci Aff. ¶ 3, NYS Dkt. 975 (Jan. 22, 2020).

[15] Iacovacci Aff. ¶ 3, NYS Dkt. 975 (Jan 22, 2020); Iacovacci Aff. ¶ 9, NYS Dkt. 71 (Dec. 26, 2017).

[16] BREVET 396723; Iacovacci Dep. 36:15-16; Iacovacci Aff. ¶ 4, NYS Dkt. 975 (Jan. 22, 2020).

[17] DEL00013795; DEL00022138; DEL00046055; NYS Dkt. 728.

[18] Iacovacci Aff. ¶ 11, NYS Dkt. 71 (Dec. 26, 2017); Harris Dep. 18:14-20:21, Sept. 30, 2021; Cibrian Dep. 36:15-39:11, Oct. 7, 2021.

Callahan reported back in an email to Monticciolo: Iacovacci was "thinking that he would be an employee to help out until the end of March," and "would like it if we paid for benefits beyond then and he would still help out but he is not expecting this (us to cover benefits)."[19]

P-20.   Callahan told Iacovacci that Brevet wanted to "have a separation agreement" and proposed to "work one up."[20]

P-21.   Brevet provided Iacovacci with a draft separation agreement in March 2016.[21]

P-22.   Negotiation of the terms of the separation agreement dragged on for months beyond Iacovacci's original plan to "help out until the end of March."[22]

P-23.   On October 14, 2016, Brevet delivered a termination letter to Iacovacci on Brevet Holdings letterhead, stating the "effective date" of his termination was October 14, 2016, and purporting to terminate his employment with Brevet Holdings, LLC, and his membership in Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, Brevet Capital Partners, LLC, and Brevet Capital Holdings, LLC.[23]

P-24.   On October 17, 2016, Iacovacci initiated an action in New York state court against certain Brevet entities.[24]

P-25.   On October 18, 2016, at or around 12:59 AM and 2:37 AM, Brevet's Head of Technology, Johnny Lan, remotely accessed Iacovacci's Dell Home Computer without

---

[19] BREVETNEW-034248.
[20] BREVETNEW-034248.
[21] DEL00022168.
[22] *See* DEL00292328.
[23] BREVET 000861 (termination letter).
[24] *Iacovacci v. Brevet Holdings, LLC*, Index No. 158735/2016 (N.Y. Sup. Ct.) ("NYS Action").

Iacovacci's knowledge or consent and downloaded documents from the machine and external hard drives that were attached to the machine.[25]

P-26.   Lan accessed the computer using Iacovacci's LogMeIn password that Iacovacci had provided Lan on specific instances when Iacovacci had requested technological assistance.[26]

## II.   Regulatory Obligations

P-27.   Brevet contends as an affirmative defense that the allegations contained in Plaintiff's Complaint "arise out of Brevet's regulatory obligation to monitor certain communications and correspondence."[27]

P-28.   Brevet similarly contends that its access at 12:59 AM and 2:37 AM on October 18, 2016, was "in accordance with Defendants' regulatory obligations, including its obligations as an SEC Registered Investment Adviser."[28]

### A.   Brevet's Compliance Personnel and Conduct

P-29.   Brevet's Chief Compliance Officer is principally charged with assessing Brevet's compliance with regulatory requirements.[29]

P-30.   Brevet's decision to terminate Iacovacci was made without involving anyone from Brevet's compliance department.[30]

---

[25] *See* Defs.' NYS Resps. & Objs. to Pl.'s Am. Fifth Interrogatory No. 1 (Oct. 15, 2019) ("Login to back up the Computer" at 12:59 AM and 2:37 AM); Lan Dep. 30:13-33:11, 201:2-16, Oct. 1, 2021; Iacovacci Dep. 178:3-179:2; NYS Lan Aff. ¶ 1 (Feb. 16, 2021) (Lan is Head of Technology at Brevet Capital Management, LLC).

[26] Lan Dep. 208:2-209:18.

[27] Brevet Answer (Dkt. 79) at 15 (Twenty Third Affirmative Defense).

[28] Defs.' NYS Resps. & Objs. to Pl.'s Am. Fifth Interrogatory No. 1 (Oct. 15, 2019).

[29] Defs.' NYS Supp. Resps. & Objs. to Sixth Interrogatory No. 1 (Feb. 18, 2021).

[30] Harris Dep. 23:20-26:25; Lea Dep. 82:19-85:3, 103:21-105:10, Sept. 27, 2021; BREVETNEW-037670.

P-31.    Gareth Lea, Brevet's former Chief Compliance Officer, left Brevet around June of 2015 but remained a "consultant" Chief Compliance Officer for Brevet until "around the summer of 2016."[31]

P-32.    Lea believes he would have been informed if Brevet were terminating an employee for a policy or compliance reason.[32]

P-33.    Lea was not aware of Iacovacci's purported termination on October 14, 2016.[33]

P-34.    Lea did not authorize, participate in, or have knowledge of Brevet monitoring Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[34]

P-35.    Lea did not access or authorize, assist in, or have knowledge of any access of Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017.[35]

P-36.    Lea did not view, authorize, have knowledge of, or participate in the imaging, copying, transfer, or deletion of any date or information contained on or in Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[36]

P-37.    Brevet's subsequent Chief Compliance Officer, Mei-Li da Silva Vint, did not begin at Brevet until October █ 2016.[37]

---

[31] Lea Dep. 50:5-51:16.

[32] Lea Dep. 103:21-105:10.

[33] Lea Tr. at 84:25-85:3.

[34] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1, Oct. 17, 2019.

[35] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2, Oct. 17, 2019.

[36] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3, Oct. 17, 2019.

[37] da Silva Vint Dep. 36:2-4, Oct. 7, 2021.

P-38.   Brevet's only other compliance personnel at the time of Brevet's purported termination of Iacovacci was Cherie Harris, who was not involved in the decision to terminate Iacovacci.[38]

P-39.   Harris did not authorize, participate in, or have knowledge of Brevet monitoring Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[39]

P-40.   Harris did not access or authorize, assist in, or have knowledge of any access of Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017.[40]

P-41.   Harris did not view, authorize, have knowledge of, or participate in the imaging, copying, transfer, or deletion of any date or information contained on or in Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[41]

P-42.   Brevet's compliance personnel did not monitor email at the time of Iacovacci's purported termination.[42]

P-43.   Brevet's compliance department was not involved in the decision to access Iacovacci's Dell Home Computer on October 18, 2016.[43]

P-44.   Instead, Lan was acting on directions from Callahan.[44]

---

[38] Harris Dep. 23:20-26:25.
[39] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1, Oct. 17, 2019.
[40] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2, Oct. 17, 2019.
[41] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3, Oct. 17, 2019.
[42] Lea Dep. 62:11-65:11, 77:24-78:4; Harris Dep. 40:3-49:10; BREVET 109943.
[43] Lan Dep. 30:13-33:11; Lea Dep. 82:4-15; BREVETNEW-037670; Defs.' Resps. & Objs. to Pl.'s First Interrogatory Nos. 1-3 (Oct. 17, 2019).
[44] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020); Lan Dep. 30:13-33:11; Callahan Dep. 379:18-385:25, Oct. 5, 2021.

P-45.   Callahan directed Lan to download files from the Dell Home Computer because he "believed that the downloaded files might contain evidence of" Iacovacci's alleged "misconduct."[45]

P-46.   Callahan instructed Lan to copy the files to Brevet's computer system so Callahan could review them, which Callahan did.[46]

P-47.   Callahan stated the purpose of his review "was to see what, if any, proprietary Brevet documents and information Plaintiff [Iacovacci] had taken from the Brevet computer system and what, if any, communications he had had with our business partners or potential partners that might represent efforts to divert business opportunities away from Brevet for his own personal benefit."[47]

P-48.   Between February 2016 and February 2017, no Chief Compliance Officer or other compliance employee of Brevet viewed the data or information contained on or in Iacovacci's Dell Home Computer or external hard drives.[48]

**B. Policies and Required Records**

P-49.   Brevet Capital Management LLC's Compliance Policy and Procedure Manual as of June 2015 contains a Books and Records provision stating: "It is the policy of Brevet as a registered investment adviser to maintain books and records of business activities in accordance with Rule 204-2 under the Act. This rule specifies the types of books and records to be held and the duration of time they are to be readily available."[49]

---

[45] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020).
[46] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020).
[47] Callahan Aff. ¶ 19, NYS Dkt. 1005 (Feb. 28, 2020).
[48] Defs.' Resps. & Obs. to Pl.'s First Interrogatory No. 4 (Oct. 17, 2019).
[49] BREVET 001816 at p. 9.

P-50.   Rule 204-2 (the "Books and Records Rule") requires certain books and records of an advisor "relating to its investment advisory business," not all documents an investment adviser has ever sent, received, created, or otherwise used.[50]

P-51.   Iacovacci was not involved in the investment side of Brevet's business.[51]

P-52.   Brevet has not identified any documents downloaded from Iacovacci's Dell Home Computer or external drives that were books and records for purposes of Books and Records Rule.[52]

P-53.   The Books and Records Rule does not provide an affirmative defense to any claim in this case.[53]

P-54.   Brevet does not consider its borrowers to be Brevet's "clients."[54]

P-55.   At the time of Iacovacci's purported termination, Brevet used an email archive system, Global Relay, that captured all email traffic, for all employees, including attachments.[55]

P-56.   Brevet's 2016 General E-Mail Retention and Destruction Policy states that Brevet Capital Management, LLC "retains e-mail in accordance with the recordkeeping rules under Rule 204-2 of the Investment Advisers Act of 1940, as amended (the 'Advisers Act') and with the SEC interpretations on e-mail retention. In addition to creating and maintaining records of e-mail, it is important for the Company to destroy records of e-mail periodically when they are no longer necessary."[56]

---

[50] 17 CFR § 275.204-2; Expert Report of Jane Jarcho, Nov. 22, 2021 ("Jarcho Report") at 3; Joseph Dep. 112:17-113:5, Dec. 1, 2021.

[51] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019); Iacovacci Aff. ¶ 4, NYS Dkt. 71 (Dec. 26, 2017); Callahan Aff. ¶ 5, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 24:11-16.

[52] *See generally* Expert Report of Ken Joseph, Nov. 4, 2021 ("Joseph Report").

[53] *See* Joseph Dep. 105:21-112:9.

[54] Lea Dep. 71:6-9, 108:10-15, 114:8-11, 60:9-19 (discussing BREVET 109943).

[55] Harris Dep. 48:10-49:3, 51:19-51:24, 53:22-54:4, 55:21-56:21; BREVET 003045 at p. 3.

[56] BREVET 003045 at p. 3; *see also* BREVET 109943 (2015 manual).

## III.  Contract Claims

### A.  LLC Agreements

P-57.   On or around January 21, 2009, Mark Callahan, Paul Iacovacci, Douglas Monticciolo, and John Tripp executed a Limited Liability Company Agreement of Brevet Capital Holdings III, LLC, which later became Brevet Short Duration Holdings, LLC.[57]

P-58.   Iacovacci was a member of Brevet Capital Holdings III, LLC, which became Brevet Short Duration Holdings, LLC.[58]

P-59.   On or around January 21, 2009, Mark Callahan, Paul Iacovacci, Douglas Monticciolo, and John Tripp executed a Limited Liability Company Agreement of Brevet Capital Partners III, LLC, which later became Brevet Short Duration Partners, LLC.[59]

P-60.   Iacovacci was a member of Brevet Capital Partners III, LLC, which became Brevet Short Duration Partners, LLC.[60]

P-61.   The LLC Agreements list no third-party beneficiaries and provide that the members of the LLC should have no liability to third parties under the LLC Agreements except as expressly provided in the LLC Act.[61]

P-62.   The LLC Agreements contain provisions addressing Confidential Information (§ 7.2), Nonsolicitation (§ 7.4), and Noncompetition (§ 7.5).[62]

P-63.   The LLC Agreements state: "This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and thereof,

---

[57] "Holdings LLC Agreement" (NYS Dkt. 818).

[58] Holdings LLC Agreement Exhibit A.

[59] "Partners LLC Agreement" (NYS Dkt. 817) (together with Holdings LLC Agreement, "LLC Agreements").

[60] Partners LLC Agreement Exhibit A.

[61] LLC Agreements § 1.7.

[62] LLC Agreements.

and supersedes all prior agreements and understandings, written or oral, between the parties hereto relating to the subject matter hereof and thereof."[63]

### B. Employee Handbook

P-64.   Brevet issued a Personnel Policies & Employee Handbook, dated March 2015.[64]

P-65.   That Employee Handbook contains a provision entitled "Non-Competition/ No-Raiding/ Non-Solicitation."[65]

P-66.   The Employee Handbook contains a provision entitled "Confidentiality of Information."[66]

P-67.   The Employee Handbook states, "The term 'Proprietary Information' shall not include any information which is now generally known or which hereafter through no act or failure on the part of you becomes generally known or available."[67]

P-68.   The Employee Handbook states, "NOTHING IN THIS HANDBOOK CONSTITUTES A CONTRACT OR PROMISE BY BREVET HOLDINGS, LLC OR ITS AFFILIATES, SUBSIDIARIES OR RELATED PARTIES (COLLECTIVELY, 'BREVET' OR THE 'COMPANY') TO GIVE OR MAINTAIN ANY BENEFIT OR TO CONTINUE THE EMPLOYMENT OR ENGAGEMENT OF ANY PERSON."[68]

P-69.   The acknowledgement form in the Employee Handbook provides that the signing employee "understands and agrees" that "The Handbook is not an employment agreement or guarantee of employment."[69]

---

[63] LLC Agreements § 9.7.
[64] "Employee Handbook" (BREVET-REPRO-0067776).
[65] Countercls. ¶ 9 (Dkt. 79); BREVET-REPRO-0067776 at p. 28.
[66] BREVET-REPRO-0067776 at p. 28.
[67] BREVET-REPRO-0067776 at p. 28.
[68] BREVET-REPRO-0067776 at p. 3.
[69] BREVET-REPRO-0067776 at p. 49; BREVET-REPRO-0068156 at -68191.

## IV.  Damages

P-70.   Brevet has not identified a quantum of profits or revenue that it lost due to any of Iacovacci's alleged conduct.[70]

P-71.   Brevet did not proffer any expert on damages.[71]

P-72.   Brevet has not identified any harm to Monticciolo or Callahan personally.[72]

P-73.   Brevet has not identified existing investors of Brevet whose business relationships would have gone forward but for Iacovacci's actions.[73]

P-74.   Brevet has not identified any contract that a third party breached because of Iacovacci's actions.[74]

P-75.   Brevet has identified six potential transactions or third parties that it contends Iacovacci diverted from Brevet: ████████████████████████████████████

████████████████████████████████████████████████████████[75]

P-76.   Brevet has provided only speculative testimony and no documents showing that any of those transactions would have been executed but for Iacovacci's actions.[76]

---

[70] *See* Defs.' Resps. & Objs. to Pl.'s Fifth Interrogatory No. 15 (July 27, 2020); *see also* Callahan Aff. ¶¶ 4, 12-17, NYS Dkt. 319 (Sept. 25, 2018); Callahan Aff. ¶¶ 10-12, NYS Dkt. 1357 (Mar. 24, 2021). Defs.' NYS Resps. & Objs. to Pl.'s Third Interrogatory No. 15 (Sept. 25, 2018).

[71] *Cf.* Defs.' Resps. & Objs. to Pl.'s Fifth Interrogatory No. 15 (July 27, 2020) (deferring production of damages information to expert discovery which Brevet ultimately did not proffer).

[72] Countercls. ¶ 84 (Dkt. 79).

[73] da Silva Vint Dep. 14:4-15:18, Nov. 18, 2021; Defs.' Resps. & Objs. to Pl.'s Second Requests for Production No. 48 (Jan. 8, 2020).

[74] da Silva Vint Dep. 14:4-15:18, Nov. 18, 2021.

[75] da Silva Vint Dep. 6:16-18:17, Nov. 18, 2021.

[76] *See* da Silva Vint Dep. 6:16-18:17, 28:9-47:24, Nov. 18, 2021; da Silva Vint Dep. 106:11-111:13, Oct. 7, 2021; Iacovacci Aff. ¶¶ 3-12, NYS Dkt. 667 (July 16, 2019); Monticciolo Dep. 718:11-724:4, Nov. 17, 2021.

P-77.   Brevet provided no testimony about how much Brevet would have earned on any transactions with those third parties.[77]

P-78.   Brevet had never engaged in transactions with any of those third parties.[78]

P-79.   In 2015, Callahan and Monticciolo rejected a potential investment by Vik Kapoor's firm, Sprott, that Iacovacci brought to them.[79]

P-80.   In 2016, Kapoor had another proposal, and Iacovacci told him to discuss it directly with Monticciolo, since Iacovacci was leaving Brevet.[80]

P-81.   Kapoor and Monticciolo met several times following that suggestion, but no deal was executed.[81]

P-82.   Brevet has never executed a deal with Nokley and has rejected him as a borrower at least three times.[82]

P-83.   The funding criteria of Brevet Short Duration Holdings, LLC, and Brevet Short Duration Partners, LLC, was initially to originate individual loans of at least $5 million with a maturity of less than two years.[83]

P-84.   The funds' individual loan minimum was later increased to at least $10 million.[84]

---

[77] *See* da Silva Vint Dep. 28:9-47:24, Nov. 18, 2021.

[78] *See* da Silva Vint Dep. 6:16-18:17, Nov. 18, 2021.

[79] Iacovacci Aff. ¶¶ 5-8, NYS Dkt. 667 (July 16, 2019).

[80] Iacovacci Aff. ¶¶ 9-12, NYS Dkt. 667 (July 16, 2019).

[81] Iacovacci Aff. ¶¶ 9-12, NYS Dkt. 667 (July 16, 2019); da Silva Vint Dep. 28:9-37:8, Nov. 18, 2021.

[82] Iacovacci Aff. ¶ 14, NYS Dkt. 71 (Dec. 26, 2017).

[83] Iacovacci Aff. ¶ 3, NYS Dkt. 71 (Dec. 26, 2017).

[84] Iacovacci Aff. ¶ 3, NYS Dkt. 71 (Dec. 26, 2017); Cibrian Dep. Ex. 2 at 11 (Brevet 2016 website: "We seek transactions of $10 million to $75 million, with the capacity to participate in larger transactions up to $150 million.").

P-85.   The only "deal" Iacovacci engaged in with Nokley was a $150,000 equity investment that had nothing to do with lending, and the amount was far below the amount needed for Brevet to be involved.[85]

P-86.   A transaction amount of $150,000 was well below Brevet's minimum amount at the time Iacovacci made his investment with Nokley.[86]

## V.   Trade Secrets

P-87.   In January 2020, Defendants objected to producing any documents showing the value of their alleged trade secrets, claiming the request "purports to require disclosure of expert testimony, including without limitation concerning the value of Brevet Trade Secrets, in advance of the date ordered by the Court."[87]

P-88.   Defendants ultimately did not, however, proffer any expert to provide opinions as to the nature and value of Brevet's trade secrets.[88]

P-89.   Brevet's corporate representative testified that "Anything developed at Brevet is a trade secret that is confidential, proprietary and meets what we view to be a trade secret."[89]

P-90.   Brevet's corporate representative identified approximately forty-one purported categories of Brevet trade secrets (including approximately six categories as to which Brevet concedes it has not identified any damages from misappropriation).[90]

---

[85] Iacovacci Aff. ¶ 9, NYS Dkt. 975 (Jan. 22, 2020); Iacovacci Aff. ¶¶ 31-34, NYS Dkt. 382 (Nov. 1, 2018); Cibrian Dep. 22:15-23:7 (former Brevet managing director "would not have pursued" $150,000 equity investment as a potential Brevet transaction, "both because of the size and the investment type being equity").

[86] Iacovacci Aff. ¶ 14, NYS Dkt. 71 (Dec. 26, 2017); Cibrian Dep. Ex. 2 at 11.

[87] Defs.' Resps. & Objs. to Pl.'s Second Request for Production No. 39 (Jan. 8, 2020).

[88] *See* Defs.' Rule 26 Expert Disclosures (Mar. 9, 2020) (disclosing anticipated expert to "provide opinions as to the nature and value of Brevet's trade secrets"—ultimately not proffered).

[89] Monticciolo Dep. 815:13-15; *see also id.* at 794:18-23, 794:24-795:7.

[90] Monticciolo Dep. 420-46, 602-75.

P-91.   For example, Brevet identified "Vacation policies" and "Vacation days, what the holidays are" as a purported trade secret.[91]

P-92.   For each of Brevet's purported categories, however, the record is devoid of specific evidence concerning (i) the extent to which the information is known outside of Brevet; (ii) the extent to which the information is known by employees and others involved in the business; (iii) the extent of measures taken by Brevet to guard the secrecy of the information; (iv) the value of the information to Brevet and its competitors; (v) the amount of effort or money expended by Brevet in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others.[92]

P-93.   Brevet cannot identify any specific investor list that Iacovacci misappropriated.[93]

P-94.   Brevet cannot identify any specific sourcing client list that Iacovacci misappropriated.[94]

P-95.   Brevet cannot identify a specific date when Iacovacci misappropriated a sourcing list.[95]

P-96.   Prospective investors are not required to execute non-disclosure agreements to receive investor presentations from Brevet.[96]

---

[91] Monticciolo Dep. 432:17-433:3.

[92] *See* Defs.' Resps. & Objs. to Pl.'s Second Requests for Production Nos. 44, 46 (Jan. 8, 2020) (refusing to produce documents relating to Brevet's "putative harm or damages resulting from Plaintiff's alleged misappropriation of Brevet's confidential information or trade secrets" or relating to efforts by Brevet "to protect the Brevet Trade Secrets from misappropriation").

[93] Monticciolo Dep. 655:7-17, 760:5-10.

[94] Monticciolo Dep. 762:11-764:25.

[95] Monticciolo Dep. 779:9-780:12.

[96] Monticciolo Dep. 800:18-801:2.

P-97.   Prospective investors are not required to return to Brevet any materials they receive prior to executing a non-disclosure agreement.[97]

P-98.   Prospective investors sign a non-disclosure agreement only when they want to learn more than what is contained in the investor presentation.[98]

P-99.   Information provided to potential investors prior to execution of non-disclosure agreements is not "critical to Brevet."[99]

P-100.  At least some of Brevet's investor presentations are publicly available—for example, Brevet shared a presentation for the Brevet Direct Lending Intermediate Duration Fund at the Ulrich 2020 Economic Summit in 2020.[100]

P-101.  Brevet publicly filed an October 2015 "Brevet Direct Lending – Short Duration Fund, L.P." presentation on the New York state court docket in June 2019.[101]

P-102.  Free NDA templates can readily be found through a simple web search.[102]

P-103.  Brevet's "Targeting and Sourcing Checklist" is a list of seven industry standard activities that are generally known in the industry.[103]

P-104.  Brevet's "Case Studies v36" which contains descriptive summaries of certain loans with no details on the transaction sourcing, loan approval, or administration.[104]

---

[97] Monticciolo Dep. 801:18-802:7.

[98] Monticciolo Dep. 801:8-10.

[99] Monticciolo Dep. 801:8-15.

[100] *See* https://ulrichcg.com/wp-content/uploads/2020/02/Ulrich-2020-Economic-Summit-Presentation-for-Upload.pdf, pages 143-65 (available as of Dec. 10, 2021).

[101] NYS Dkt. 604 at SPROTT/BREV 0165-91.

[102] Librock Report n.21; Small Business Administration NDA template, available at https://www.sba.com/legal/tools-and-templates/non-disclosure-agreement/ (accessed Dec. 10, 2021).

[103] BREVET 035261; Librock Report ¶ 20; Defs.' NYS Supp. Resp. to First Interrogatory No. 23 (Sept. 29, 2017).

[104] BREVET 034805 (NYS Dkt. 1293); Librock Report ¶ 20(c); Defs.' NYS Supp. Resps. & Objs. to Pl.'s First Interrogatory No. 23 (Sept. 29, 2017).

P-105.  Brevet's "Transaction Summaries" and "Example Transactions" documents identify scenarios that are well known in the commercial lending industry.[105]

P-106.  Brevet's introductory email that it sent to potential customers describes Brevet's experience in an area of financing with well-defined and publicly known guidelines and procedures.[106]

P-107.  The Brevet Capital "one pager" flyer is a high-level promotional document that contains generic market statements that apply to a multitude of national and regional lenders.[107]

P-108.  Brevet's "Case Studies" document from September 2012 contains basic summaries of account receivables financing transactions (a widely practiced form of lending) dating from 2011.[108]

P-109.  In publicly available video of Monticciolo's "SALT Talk," Monticciolo openly discusses Brevet's business strategy and cumulative financial performance.[109]

P-110.  Brevet is unable to identify any instance in which Iacovacci misappropriated "offering materials."[110]

P-111.  Brevet's Valuation Principles and Procedures state that all assets will be valued in accordance with U.S. generally accepted accounting principles ("GAAP").[111]

---

[105] Librock Report ¶ 20(d); Librock Aff. ¶¶ 7-8 NYS Dkt. 1336 (Mar. 12, 2021); BREVET-REPRO 0111663-69; BREVET034789; *see also* Defs.' NYS Supp. Resps. & Objs. to Pl.'s First Interrogatory No. 31 (Sept. 29, 2017).

[106] Librock Aff. ¶ 5, NYS Dkt. 1236 (Feb. 8, 2021); Librock Aff. ¶ 7, NYS Dkt. 1352 (Mar. 19, 2021); NYS Dkts. 1204, 1291.

[107] Librock Aff. ¶ 6, NYS Dkt. 1236 (Feb. 8, 2021); NYS Dkt. 1203.

[108] Librock Aff. ¶ 9, NYS Dkt. 1352 (Mar. 19, 2021); NYS Dkt. 1293.

[109] *See* "Douglas Monticciolo: Financing a Post-Coronavirus 'Reboot' of the Economy," *available at* https://www.youtube.com/watch?v=Qo6acA1p9PI&ab_channel=SALT (discussing Brevet's financial performance at approximately 19:30 and its business model at approximately 25:10).

[110] Monticciolo Dep. 893:9-14.

[111] BREVET 146790-146904 at -890.

P-112.  The Valuation Principles and Procedures cite various valuation levels for different assets classes. These valuation levels are all defined by GAAP.[112]

P-113.  The policies set out in Brevet's "Transaction Process and Procedures" manual dated October 2015 are not unique to Brevet and are consistent with similar documents at other financial institutions.[113]

P-114.  Brevet's sourcing strategy contained in Brevet's "Transaction Process and Procedures" manual dated October 2015 is a high-level overview without any quantitative information that would give a third party insight into any process unique to Brevet.[114]

P-115.  Brevet's underwriting information contained in Brevet's "Transaction Process and Procedures" manual dated October 2015 does not contain any formulas or models to guide a credit analyst and instead contains underwriting information that is referenced in academic texts such as Richard Brealey, Stewart Myers, & Alan Marcus, *Fundamentals of Corporate Finance* (10th ed.) at 283-93 and federal financial guidance such as "Interagency Statement on Sound Practices Concerning Elevated Risk Complex Structured Finance Activities," *Approval Process*. Federal Register Vol. 72 No. 7, p. 1379.[115]

P-116.  Brevet's funding and closing and post-closing policies set out in Brevet's "Transaction Process and Procedures" manual dated October 2015 do not contain detailed instruction and instead contains clerical and document checking functions that are typical in commercial loan transactions.[116]

---

[112] BREVET 146790-146904 at -892; Librock Report ¶ 29.
[113] Librock Report ¶ 27; DEL00013447-13583 at -484.
[114] Librock Report ¶ 27(a); DEL000013451, DEL000013453.
[115] Librock Report ¶ 27(d).
[116] DEL000013492; Librock Report ¶ 27(f).

P-117.  In Brevet's risk management policies, the Brevet risk rating definitions are virtually a direct copy of published financial regulations.[117]

P-118.  Brevet's credit memoranda follow a typical form and format and contain industry standard terminology and analysis.[118]

P-119.  Brevet advertises its track record on its website, and Monticciolo has made public statements about Brevet's track record.[119]

P-120.  There is no evidence that Iacovacci accessed or misappropriated Brevet's purported "track record" Excel spreadsheet document.[120]

P-121.  Information about Brevet's assets and investments are stale and out of date after approximately twelve months.[121]

P-122.  Brevet is "a financial management and advisory services firm" that "serves the financing needs of companies seeking to raise capital, and does so primarily through the provision of senior-secured loans funded by funds managed by Brevet."[122]

P-123.  Brevet is not aware of any other entities using Brevet's fund structure or purported trade secrets related to Brevet's loan documents.[123]

---

[117] DEL000013492; Librock Report ¶ 27(i).

[118] Librock Report ¶ 35; BREVET020789-839.

[119] *See, e.g.*, https://brevetcapital.com/ ("The firm's experienced management team has a successful track record of creating exclusive and often proprietary financing solutions for our partners that are sustainable through multiple economic cycles."); https://www.businesswire.com/news/home/20190211005472/en/Brevet-Capital-Purchases-PanOptis ("Brevet has a 20-year track record of partnering with U.S. state, federal, and international government agencies to provide unique financing solutions."); http://www.wealthandfinancenews.com/issues/alternative-investment-awards-2016/44/ (Mr. Monticciolo discusses Brevet's "strong six-year track record of providing senior secured loans to private companies").

[120] Monticciolo Dep. 781:6-784:20, 789:4-791:21.

[121] Librock Report ¶ 38; Short Duration Fund Fact Sheet, BREVET034614.

[122] Callahan Aff. ¶ 2, NYS Dkt. 72 (Jan. 17, 2018).

[123] *See* Monticciolo Dep. 805:15-806:5, 807:21-808:2, 829:7-10, 834:21-835:5, 837:17-838:7, 840:2-9, 848:7-19, 858:17-25; Librock Report ¶¶ 40, 45, 46.

Dated: December 10, 2021

/s/ Jason Cyrulnik
Jason Cyrulnik
Paul Fattaruso
Ian M. Dumain
Adina Levine
Evelyn N. Fruchter
Mary Kate George
CYRULNIK FATTARUSO LLP
55 Broadway, Third Floor
New York, New York 10006
646.844.2466

*Counsel for Plaintiff*

**Defendants' FRCP Rule 56.1 Statement:**

**Parties and Background**

D1.     Defendant Brevet Holdings, LLC is a parent company to various Brevet entities including Brevet Capital Management, LLC (Callahan 10/5/2021 Dep. Tr. ("Callahan Dep.") 55:19-25, 111:7-13).

D2.     Brevet Holdings, LLC is the entity under which many of the employees for the various Brevet entities are employed (Callahan Dep. 55:19-25).

D3.     Defendant Brevet Capital Management, LLC is a registered investment advisor with the Securities and Exchange Commission under the Investment Advisers Act of 1940 (Mei-Li da Silva Vint 10/7/2021 Dep. Tr. ("da Silva Vint Dep.") 13:9-13; BREVET-REPRO-0000670 at 0000673).

D4.     Brevet Capital Management, LLC is an investment manager for various funds in the Brevet family of companies (Monticciolo 10/7/2021 Dep. Tr. ("Monticciolo Dep.") 52:8-12).

D5.     Brevet Capital Management, LLC is the investment manager for non-party Brevet Direct Lending – Short Duration Fund, L.P. (Callahan Dep. 78:11-13, 111:7-13).

D6.     Defendant Brevet Short Duration Partners, LLC, formerly known as Brevet Capital Partners III, LLC, is the general partner to non-party Brevet Direct Lending – Short Duration Fund, L.P. (Callahan Dep. 116:20-117:3, 111:7-13; Callahan 12/10/2021 Declaration in Support of Summary Judgment ("Callahan Decl.") ¶ 2).

D7.     Defendant Brevet Short Duration Holdings, LLC, formerly known as Brevet Capital Holdings III, LLC, is the managing member of Brevet Short Duration Partners, LLC (Callahan Dep. 117:9-13; Callahan Decl. ¶ 3).

D8.     Defendant Douglas Monticciolo ("Monticciolo") is a managing director of Brevet Holdings, LLC (Callahan Dep. 76:18-23).

21

D9.     Monticciolo is a member of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC (Monticciolo Dep. 63:6-19; BREVET-REPRO-0152288 ("BSDH LLC Agreement") at 20; BREVET-REPRO-0152243 ("BSDP LLC Agreement") at 21).

D10.    Defendant Mark Callahan ("Callahan")is a managing director of Brevet Holdings, LLC and an employee of Brevet Holdings, LLC (Callahan Dep. 76:3-8, 80:15-18).

D11.    Callahan is a member of Brevet Short Duration Holdings, LLC and Brevet Short Duration Partners, LLC (Callahan Dep. 117:14-20; BSDH LLC Agreement at 20; BSDP LLC Agreement at 21).

D12.    Defendant Johnny Lan ("Lan") is the head of technology at Brevet Capital Management, LLC and was an employee of Brevet Holdings, LLC (Lan 11/17/2017 Affidavit ("Lan Aff.") ¶ 1; Lan 10/1/2021 Dep. Tr. ("Lan Dep.") 34:5-13, 43:13-20).

D13.    Plaintiff Paul Iacovacci ("Iacovacci" or "Plaintiff") was an employee of Brevet Holdings, LLC until October 14, 2016 (BREVET-REPRO-0067951).

D14.    Iacovacci was a member of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC until October 14, 2016 (BREVET-REPRO-0067951).

D15.    Iacovacci was a member of Brevet's Investment Committee during his employment with Brevet (BREVET-REPRO-0151644; Callahan Decl. ¶ 4; BREVET-REPRO-0022117; Callahan Dep. 289:6-14).

**Brevet Provided Computers For Home Business Use**

D16.    Brevet has a longstanding practice of purchasing desktop computers and providing them to Brevet's members – including Monticciolo, Callahan, and Iacovacci – and other employees for home business use (Lan Aff. ¶¶ 2-4).

D17.    The computers provided to these employees must be returned to Brevet upon the end of their employment with Brevet or when Brevet provides them with a new computer (Lan Aff. ¶ 2; Lan 12/10/2021 Declaration in Support of Summary Judgment ("Lan Decl.") ¶ 9 ).

D18.    Brevet provided the computers for work-related tasks (Lan Aff. ¶ 3).

D19.    Brevet did not prohibit use of the computers for personal matters (Lan Aff. ¶ 3).

D20.    Over the years, Brevet provided Iacovacci with at least two Brevet computers to use at his home (Lan Aff. ¶ 4).

D21.    When Iacovacci received a new Brevet-provided computer in 2015, he returned to Brevet the older model Brevet had provided (Lan Aff. ¶ 4; BREVETNEW-026779).

**The Computer at Issue**

D22.    In February 2015, Brevet purchased a Dell Optiplex Desktop computer for Iacovacci to use for work at his home (the "Computer") (Lan Aff. ¶¶ 2-4, 6; BREVET-REPRO-0173512; BREVET-REPRO-0099339).

D23.    Brevet paid for the Computer (Iacovacci 10/6/2021 Dep. Tr. ("Iacovacci Dep.") 100:19-22).

D24.    Brevet issued the Computer to Iacovacci for Brevet work at his home (Lan Aff. ¶¶ 2-4; Callahan 9/25/2018 Affidavit ¶ 21).

D25.    Brevet listed the Computer as a business expense on its 2015 tax returns (Callahan Decl. ¶ 5; Exhibit E to October 11, 2019 Letter to Judge Pauley, available on docket at ECF 108-5, also produced at BREVET-REPRO-0173477).

D26.    Plaintiff's 2015 tax returns do not show Plaintiff claiming the Computer as a gift or claiming depreciation (DEL00293390).

D27.    Brevet registered the warranty for the Computer (BREVET-REPRO-0173448 at 6; *see also* Iacovacci Dep. 125:6-8).

D28.    Dell's records reflect Brevet's ownership of the Computer (DELL0001-0006).

D29.    Dell delivered the Computer to Brevet's offices (Lan Aff. ¶ 7).

D30.    Lan configured the Computer in Brevet's offices to Brevet's specifications (Lan Aff. ¶ 7).

D31.    Lan installed Brevet-purchased software, including Microsoft Outlook, Word, Excel, PowerPoint, and Kaspersky Antivirus, on the Computer (Lan Aff. ¶ 7; *see also* BREVET-REPRO-0099320; BREVET-REPRO-0099021; BREVET-REPRO-0048954).

D32.    At the time Lan initially configured the Computer, Microsoft Outlook was set up to include the account paul@brevetcapital.com, which was Iacovacci's work email account. (11/22/2021 Rebuttal Expert Report of Sankara Shanmugam ("Shanmugam Report") ¶ 46).

D33.    Lan also installed LogMeIn software on the Computer (Lan Dep. 135:7-136:16; BREVET-REPRO-0173480).

D34.    Lan registered under Brevet's LogMeIn account the LogMeIn software installed on the Computer (Lan Dep. 135:7-136:16; BREVET-REPRO-0173480).

D35.    LogMeIn was used to access the Computer from Brevet's office or other remote locations (Lan Aff. ¶¶ 7, 11-12).

D36.    The Computer was delivered to Iacovacci's home in February/March 2015 after Lan configured the Computer (Lan Aff. ¶ 4).

D37.    After receiving the Computer, Iacovacci returned to Brevet the older Brevet computer he had been using (Lan Aff. ¶ 4; BREVETNEW-026779).

24

D38.    Brevet paid for Iacovacci's home internet access (Iacovacci Dep. 125:9-13; Mark Callahan 2/28/2020 Affidavit ("Callahan 2/28/2020 Aff.") ¶ 13).

D39.    Iacovacci rarely came into Brevet's offices in 2016 (Iacovacci 11/1/2018 Affidavit ("Iacovacci 11/1/2018 Aff.") ¶ 22).

D40.    To the extent Iacovacci worked for Brevet in 2016, he did so from home (Iacovacci Dep. 105:23-106:8).

D41.    When Iacovacci worked from home for Brevet in 2015-2016, he used the Computer (Iacovacci Dep. 107:9-108:3).

D42.    Iacovacci used the Computer for Brevet business when working from home (Iacovacci Dep. 107:9-108:3; Iacovacci 11/1/2018 Aff. ¶ 22; Lan Aff. ¶ 9; Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

D43.    The Computer contained Brevet files (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

D44.    Brevet documents were stored on the Computer (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

D45.    Brevet documents were processed on the Computer (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

D46.    Iacovacci had a Seagate external drive that he used with the Computer, which contained over 1,500 Brevet files (Shanmugam Report ¶¶ 41-42, 59).

D47.    The Computer contained information that had been used by a Brevet employee (Iacovacci) in connection with work at or for Brevet (Callahan Decl. ¶ 7).

D48.    The Computer contained information that was or had been stored on a Brevet computer or other equipment (Callahan Decl. ¶ 7).

D49.    The Computer contained information that was or had been processed on a Brevet computer or other equipment (Callahan Decl. ¶ 7).

D50.    The Computer contained information that was or had been used along with a shared filing system used with Brevet (Callahan Decl. ¶ 7).

D51.    The Computer contained information that was or had been created using Brevet computers, related equipment, or software (Callahan Decl. ¶ 7).

D52.    The Computer contained information that was or had been composed, sent, or received on Brevet's e-mail systems (Callahan Decl. ¶ 7).

D53.    The Computer contained information that was or had been created through the use of Brevet's communication equipment (Callahan Decl. ¶ 7).

D54.    The Computer contained documents, messages, or conversations of a Brevet employee (Callahan Decl. ¶ 7).

D55.    At all pertinent times, Lan had full administrator rights to the Computer (Lan Decl. ¶¶ 3-5; Erik Rasmussen (Plaintiff's Expert) 12/2/2021 Dep. Tr. 127:3-8).

D56.    At all pertinent times, Lan had the ability to access the Computer (Lan Decl. ¶¶ 6-8; *see also* Callahan 2/28/2020 Aff. ¶ 15).

D57.    At all pertinent times, Lan had the password(s) to access the Computer (Lan Decl. ¶¶ 7-8; *see also* Callahan 2/28/2020 Aff. ¶ 15).

D58.    On several occasions, Iacovacci requested, and Lan provided, the passwords necessary for Iacovacci to use the computer (Lan Aff. ¶ 11; BREVET-REPRO-0099335; BREVET-REPRO-0099306; BREVET-REPRO-0099300; BREVET-REPRO-0068788).

D59.    During the final two years of Iacovacci's employment, he requested remote technical assistance via LogMeIn numerous times (Lan Aff. ¶ 11; *see e.g.*, BREVETNEW-

020285; BREVET-REPRO-0099014; BREVET-REPRO-0099071; BREVET-REPRO-0099064; BREVET-REPRO-0099055).

**October 14, 2016 Termination**

D60.    On October 14, 2016, Iacovacci received a termination letter signed by Callahan, Managing Director ("Termination Letter", BREVET-REPRO-0067951).

D61.    The Termination Letter stated in part, "On behalf of Brevet Short Duration Partners, LLC (f/k/a Brevet Capital Partners III, LLC), Brevet Short Duration Holdings, LLC ( f/k/a/ Brevet Capital Holdings III, LLC), [and two other Brevet entities not at issue here] (each, an 'LLC' and, collectively, the 'LLCs') we write to advise you that your membership in each LLC is terminated for cause effective today, October 14, 2016 (the 'Termination Date'). Similarly, your employment with Brevet Holdings, LLC ('BH') (collectively, with the LLCs, 'Brevet') is terminated for cause effective as of the Termination Date."  (Termination Letter at 1).

D62.    The Termination Letter further stated:

> Furthermore, pursuant to Section 7.3 (Company Property) of the LLC Agreements, you must preserve and return to Brevet all Brevet records and property that you may have in your possession, including but not limited to, computer and/or computer materials including all electronic data files and emails, laptops, identification cards, cell phones, and company credit cards.  Additionally, any Brevet or other company materials, files, papers, memoranda, letters, electronic data files and emails, facsimiles, and/or other communications that you have in your possession that were written, authorized, signed, received, or transmitted during your membership in the LLCs or employment with BH are and remain the property of Brevet, must be preserved as such, and are to be immediately returned to Brevet, or if located at a future date, preserved.  (Termination Letter at 2.)

D63.    Lan hand delivered the Termination Letter to Iacovacci at Iacovacci's apartment (Lan Aff. ¶ 5).

D64.    After handed the Termination Letter to Iacovacci, Lan asked Iacovacci for both his company-issued desktop phone and Computer (Lan Aff. ¶ 5).

D65.    Iacovacci returned the phone to Lan (Lan Aff. ¶ 5).

D66.    Iacovacci did not return the Computer to Lan (Lan Aff. ¶ 5).

**Brevet's Off-Boarding and Computer Replacement Process**

D67.    Whenever Brevet replaced a computer that has been provided for Brevet

personnel to use outside of the office, Brevet took back the computer that was being replaced

(Lan Decl. ¶ 9).

D68.    This process was followed for at least one computer previously provided to

Iacovacci before Brevet provided the Computer to Iacovacci in 2015 (Lan Decl. ¶ 9; Lan Aff.

¶ 4; BREVETNEW-026779).

D69.    When an employee left Brevet, as part of the off-boarding process, Brevet took

back any computer that had been provided for that employee to use outside of the office (Lan

Decl. ¶ 9).

D70.    Iacovacci's refusal to return the Computer in October 2016 is the only time that

any Brevet employee has refused to return a computer provided by Brevet for use outside the

office (Lan Decl. ¶ 9).

D71.    When Brevet received a computer back that was used at a Brevet employee's

home, Brevet's procedure was to preserve all business-related information and files from the

computer (Lan Decl. ¶ 10).

D72.    The information Brevet preserved included .PST files, which contain emails

stored locally on the computer (Lan Decl. ¶ 10).

D73.    Lan followed this procedure with respect to all computers received back from

employees, including the computer Iacovacci returned in 2015 (Lan Decl. ¶ 10).

D74.   This procedure was part of Brevet's process to ensure compliance with Brevet's policies and procedures and applicable regulations (Lan Decl. ¶ 10).

**Brevet Accessed the Computer on October 18, 2016**

D75.   On October 18, 2016, Brevet remotely logged into the Computer and copied information from the Computer (Callahan 2/28/2020 Aff. ¶ 6).

D76.   This access was in compliance with Brevet's regulatory record-keeping requirements (Callahan 2/28/2020 Aff. ¶ 6; Callahan Decl. ¶ 6).

D77.   As a registered investment advisor, Brevet Capital Management, LLC is required to maintain and preserve records relating to its business for a period of at least five (5) years (Callahan 2/28/2020 Aff. ¶ 7; Callahan Dep. 360:4-361:3).

D78.   Further, under its regulatory framework, Brevet is responsible for ensuring that the transmission of its documents is done in a way to preserve their confidentiality (Callahan 3/24/2021 Affidavit ¶ 5).

D79.   Prior to Iacovacci's termination, Brevet learned that Iacovacci had on multiple occasions sent business information related to Brevet from his Brevet e-mail address to his personal e-mail (BREVET-REPRO-0068218).

D80.   Prior to Iacovacci's termination, Brevet knew that Iacovacci had asked Lan how Iacovacci could wipe an external hard drive (BREVET-REPRO-0067962).

D81.   On October 18, 2016, at the direction of Brevet, Lan backed-up certain files from the Computer directly onto a USB thumb drive (Lan Decl. ¶ 11).

D82.   Lan intended to copy and preserve all material on the Computer that appeared to be business related (Lan Decl. ¶ 12).

D83.    Such material included material on the Computer relating to Iacovacci's use of his non-Brevet email account(s) to the extent that Iacovacci had used those accounts to transmit any Brevet information or to conduct business related to Brevet (Lan Decl. ¶ 12).

D84.    The volume of information and the way it was stored on the Computer made it impossible under the circumstances for Lan to have excluded that material that was unrelated to Brevet information or to business Iacovacci conducted while he was employed at Brevet at the time that Lan copied it (Lan Decl. ¶ 13).

D85.    Lan's actions in backing up the Computer were consistent with what he would have done if Iacovacci had returned the Computer to Brevet (Lan Decl. ¶ 12).

D86.    Plaintiff has no evidence that Brevet deleted information from the Computer.

D87.    Lan did not download any material or information from the Yahoo! email website (Lan Decl. ¶ 14; *see also* Thomas Kiernan (Plaintiff's Expert) 11/30/2021 Dep. Tr. 23:17-24; 21:24-23:240).

D88.    Lan did not obtain information from the Yahoo! server (*see* Lan Dep. 201:17-202:8, 202:25-203:5; Lan Aff. ¶ 13).

D89.    Plaintiff has no evidence that Brevet intercepted any Yahoo! communication contemporaneously with the transmission of that communication.

D90.    Plaintiff has no evidence that Brevet obtained information from the Yahoo! server.

D91.    Plaintiff has no evidence that the condition, quality or value of the Computer, or any of the information on the Computer, was diminished as a result of Brevet's access to the Computer.

D92.    Plaintiff has no evidence that Plaintiff was excluded from use of the Computer or related information as a result of Brevet's access to the Computer (*see* Iacovacci 9/20/17 Affidavit ¶ 11).

D93.    Plaintiff has no evidence the Computer or any of the information on the Computer was damaged as a result of Brevet's access to the Computer.

D94.    Iacovacci alleges that his loss consists of being "forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign. The time and expense associated with these activities have caused a loss to Iacovacci during a one-year period in excess of $5,000." (Complaint ¶¶ 75, 82, 89.)

D95.    Iacovacci produced no invoices regarding his claimed damages.

D96.    Iacovacci produced no evidence concerning what amounts of money he spent on "defending against meritless claims in the State Court Action" as opposed to investigating alleged intrusions (*see* Complaint ¶¶ 75, 82, 89).

D97.    Iacovacci produced no evidence breaking out his claimed damages in relation to recoverable "losses" under and as defined in the Computer Fraud and Abuse Act.

D98.    Iacovacci claimed privilege concerning the nature and amount of work performed by his forensic experts (Iacovacci Dep. 187:3-192:19).

D99.    Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into the Computer, as alleged in Complaint Count I.

D100.  Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into the Computer.

D101.  Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into his external hard drives, as alleged in Complaint Count II.

D102.  Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into his external hard drives.

D103.  Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into his personal Yahoo! email account, as alleged in the Complaint in Count III.

D104.  Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into his personal Yahoo! email account.

D105.  Iacovacci produced no evidence of any other access by Brevet that was allegedly unauthorized.

**<u>Brevet Was Authorized to Access the Computer Pursuant to Its Policies and SEC Obligations</u>**

D106.  Brevet's policies authorized Brevet to access the Computer (*see* ¶¶ D112-D146, *infra*).

D107.  Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, information stored on Brevet's equipment (*see* ¶¶ D112-D146, *infra*).

D108.  Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, Brevet information stored on the Computer (*see* ¶¶ D112-D146, *infra*).

D109.  Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, all information emanating from Iacovacci's permitted use of Brevet's technology systems (*see* ¶¶ D112-D146, *infra*).

D110.  Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, all information stored or processed on Brevet's computers or other equipment (*see* ¶¶ D112-D146, *infra*).

D111.  Brevet's policies apply irrespective of Brevet's ownership of the Computer (*see* ¶¶ D112-D146, *infra*.

D112.  Sources of Brevet's policies include (1) Brevet Holdings, LLC Personnel Policies & Employee Handbook, dated as of March 2015 ("Employee Handbook", BREVET-REPRO-006776); (2) Brevet Capital Management LLC General E-Mail Retention and Destruction Policy, dated as of January 2015 ("E-Mail Policy", BREVET-REPRO-0000392); (3) Brevet Capital Management, LLC Compliance Policy and Procedure Manual, dated as of January 2015 ("Compliance Policy", BREVET-REPRO-0000670); and (4) Brevet Capital Management, LLC Code of Business Conduct, Ethics and Insider Trading Policy, dated as of January 2015 ("Code of Conduct", BREVET-REPRO-0073519).

D113.  Iacovacci acknowledged his receipt of these policies (*see* BREVET-REPRO-0068156 at 2).

D114.  The Employee Handbook defines "Brevet" or the "Company" as "collectively" "Brevet Holdings, LLC or its affiliates, subsidiaries or related parties" (Employee Handbook at 3 (all caps deleted)).

D115.  The Employee Handbook provides in part as follows:  "Confidentiality of Information: . . . You will not, at any time, whether during your employment at Company or

following the end of it, for any reason whatsoever, directly or indirectly disclose or furnish any firm, corporation or person, except as otherwise required by law, any Proprietary Information or Trade Secrets of Company with respect to any aspect of its operations or affairs" (Employee Handbook at 28).

D116.  The Employee Handbook provides in part as follows:  "Employees are prohibited from making copies or duplicates of any Proprietary Information or Trade Secrets, except as essential for the fulfillment of the employee's duties to the Company. Employees are prohibited from removing any Proprietary Information or Trade Secrets, related documents or proprietary property or information without the prior written authorization of the Company. If requested by the Company, employees will immediately return all Proprietary Information and Trade Secrets, related documents and property or information."  (Employee Handbook at 29.)

D117.  The Employee Handbook provides in part as follows (all emphases added unless otherwise noted):  "Use of Company Computers, Related Equipment and Software:  Company computers and related equipment and software are provided for use in connection with work performed for the Company. Employees should not use any Company computers, related equipment or software for purposes that do not benefit the Company. Notwithstanding the foregoing, some incidental use unrelated to the Company or its clients is permissible. Nonetheless **all documents and files created using the Company's computers, related equipment and software are the exclusive property of the Company**."  (Employee Handbook at 37.)

D118.  The Employee Handbook provides in part as follows:  "Electronic Mail, Messaging and Personal Phone Calls:  Brevet employees and others using Company owned e-mail systems should not have any expectation of privacy. Brevet reserves the right to read and

retrieve any message composed, sent or received on the Company's e-mail systems. All such e-mail messages and content are the property of Brevet. E-mail messages should be limited to the business of Brevet. As stated above, the content of the messages should not contain subject matter that may be considered offensive or disruptive to another individual. Any other use of Brevet's e-mail systems may result in disciplinary action, up to and including termination. Brevet also reserves the right to disclose e-mail messages to law enforcement officials or other third parties without notice to the parties involved in the messages."  (Employee Handbook at 38; da Silva Vint Dep. 231:4-232:23.)

D119.  The Employee Handbook provides in part as follows:  "Passwords:  The Company or its clients may provide you with boot-up or E-mail passwords for use in connection with software or systems belonging to the Company, its clients or third party vendors. Such **passwords are the property of the Company**, its clients or the third party, as applicable. . . . The Company is entitled to disable or change at any time any employee passwords related to their accounts." (Employee Handbook at 38.)

D120.  The Employee Handbook contains a Technology Usage Agreement (Employee Handbook 39-41), which provides in part as follows:  "Permitted Use:  **Brevet's technology systems are the property of Brevet and are to be used for legitimate business purposes**. Employees are provided with access to these systems to assist them in the performance of their jobs. All employees have a responsibility to use Brevet's technology resources in a professional, lawful and ethical manner. Abuse of the company systems may result in disciplinary action, including possible termination and civil and/or criminal liability.  Occasional limited appropriate personal use of the Brevet's technology systems is permitted if such use does not:  a. Interfere with the users or any other employee's job performance or; b. Violate any other policies,

provisions, guidelines or standards of Brevet.  Personal use of the systems is a privilege that may be revoked at any time."  (Employee Handbook at 39.)

D121.  The Technology Usage Agreement in the Employee Handbook further provides in part as follows:  "System Monitoring and Privacy:  **Brevet does not guarantee the privacy of electronic documents, messages and telephone conversations of its employees**.  In order to promote and improve quality control, customer relations, prevention of system misuse, investigation of misconduct, compliance with legal requirements applicable to Brevet as well as compliance with legal and regulatory requirements, Brevet reserves the right to monitor and/or record telephone communications of its employees that occur on Brevet's premises without further notification to be provided to its' employees. **Use of Brevet's communication equipment constitutes consent to Brevet's use of or engagement in such monitoring and recording activities.  Electronic documents and messages should be treated the same as any other shared filing system used with Brevet; that is, with the exception that such documents and messages be available for review by authorized representatives of Brevet for any purpose related to company business**.  These purposes may include retrieving business information, trouble-shooting hardware and software problems, preventing system misuse, investigating misconduct, assuring compliance with software distribution policies and assuring compliance with legal requirements applicable to Brevet and complying with legal and regulatory requests for information. **Brevet reserves the right to review, read, access or otherwise monitor all electronic documents (i.e., word processing documents, spreadsheets, databases and computer files of all other kinds) and messages (including, but not limited to, e-mail, voice mail, instant messages and any other means of electronic communications) that are stored or processed on Brevet's computers or other equipment, including but not**

36

**limited to, such documents and messages which do not directly relate to Brevet's business**. . . . Although some of Brevet's electronic communications tools contain **passwords or other security features**, it is possible for others to access electronic documents and messages. Brevet's use of such security features is designed to lessen the possibility of inadvertent or unauthorized access to such documents and messages both internally and externally. These security features **are not in place to create or protect employee privacy**. It is possible to retrieve electronic documents or messages even after such documents or messages have been 'deleted' by individual system users."  (Employee Handbook at 39-40; da Silva Vint Dep. 231:4-17, 233:3-236:8.)

D122.  The Email Policy provides in part as follows:  "The company retains e-mail in accordance with the recordkeeping rules under Rule 204-2 of the Investment Advisers Act of 1940, as amended (the 'Advisers Act') and with the SEC interpretations on e-mail retention" (Email Policy at 3; da Silva Vint Dep. 241:17-242:7).

D123.  The Email Policy further provides in part as follows: "[T]he purpose of this Policy is to collect, and inform all necessary personnel of the Company's document management policies and procedures.  No policy can, however, adequately cover every document management issue or situation. It is possible that documents may be encountered which appear not to be covered by any stated policy. Any questions concerning document creation, retention or destruction that are not answered in this Policy should be referred to the Company's Chief Compliance Officer."  (Email Policy at 3; da Silva Vint Dep. 242:8-24.)

D124.  The Email Policy further provides in part as follows:  "**All employees of the Company are required to read and understand this Policy**" (Email Policy at 3).

D125.  The Email Policy further provides in part as follows:  "E-Mail:  A. Permitted Communications:  When using electronic mail, employees must use the Company's electronic mail system network to conduct investment advisory-related business. It is permissible for an employee to communicate via a home computer for investment advisory-related business *provided* that the employee uses the electronic mail system of the Company."  (Email Policy at 4 (italics in original); da Silva Vint Dep. 242:8-243:8, 246:19-247:20.)

D126.  The Email Policy further provides in part as follows:  "Prohibited Communications:  The Company prohibits employees to (i) use personal or other web-based e-mail accounts to conduct investment advisory-related business through such accounts or (ii) to use an electronic mail system other than the Company's electronic mail system to conduct investment advisory-related business" (Email Policy at 4; da Silva Vint Dep. 242:8-243:8, 246:19-247:20).

D127.  The Email Policy further provides in part as follows:  "In addition, as further described in the Company's Technology Usage Policy, the Company prohibits e-mail that: . . . Is an unauthorized transmission of Confidential Information and/or Trade Secrets" (Email Policy at 4).

D128.  The Email Policy further provides in part as follows:  "E-mail that is to be Retained:  **The Company is to retain e-mail that is related to its investment advisory business** including:  Communications relating to recommendations and advice to clients (including information in which such recommendations or advice are based); . . . Written agreements between a client and the firm" (Email Policy at 4; da Silva Vint Dep. 242:8-243:8).

D129.  The Email Policy further provides in part as follows:  "General Obligations of Authorized Personnel:  The Company's Information Technology personnel ('IT') and the

Company's Chief Compliance Office are the Authorized Personnel who will be solely responsible for maintaining long-term storage and back-up of electronic records.  Only Authorized Personnel are permitted to move or destroy archived email."  (Email Policy at 5.)

D130.  The Email Policy further provides in part as follows:  "Format of Archived E-mail; Electronic Format:  Statutory Requirements:  Email may be retained in electronic format. Electronic format includes . . . electronic storage media, including any digital storage medium or system.  **If e-mail is retained in electronic format, the Chief Compliance Officer is responsible to ensure that the Company undertakes the following: . . . Safeguard the records from loss, alteration or destruction.**"  (Email Policy at 5-6.)

D131.  The Email Policy further provides in part as follows:  "Format of Archived E-mail; Electronic Format:  SEC Inspections:  If e-mail is retained in electronic format, the following shall also apply:  The Chief Compliance Officer is responsible for providing to the SEC a legible, true and complete copy of the record in the medium and format in which the e-mail is stored. For the purposes of this Policy, the Company retains e-mail with, Global Relay, a secure third party e-mail retention and archive management system. Accordingly, if requested by the SEC, the Company shall provide the SEC a copy of retained e-mail in CD-R format.  The Company shall provide a legitimate, true and complete printout of retained e-mail if requested by the SEC. The Company shall provide the SEC with the means to access, view, and print retained e-mail."  (Email Policy at 6; da Silva Vint Dep. 242:8-244:9.)

D132.  The Email Policy further provides in part as follows:  "It is the Company's policy to maintain and preserve all archived e-mail, whether in paper format or in electronic format, for a period of five (5) years" (Email Policy at 6).

D133.  The Code of Conduct provides in part as follows:  "Statement of Company Policy:  As part of our Program, it is also our firm policy to record all transactions accurately in our books and records, and to be honest and forthcoming with bookkeepers, accountants, regulators and auditors.  No statement of policy or official Program can cover all circumstances or anticipate every situation." (Code of Conduct at 7; da Silva Vint Dep. 250:18-251:25.)

D134.  The Compliance Policy provides in part as follows:  "The success of Brevet Capital Management, LLC ('Brevet') depends on how effectively it pursues and strengthens its reputation for integrity. Brevet's commitment to high standards of conduct helps to build a relationship of trust with its clients and fosters a culture in which compliance with applicable laws, rules and regulations are an integral component of its business."  (Compliance Policy at 4.)

D135.  The Compliance Policy further provides in part:  "Brevet is a registered investment adviser with the Securities and Exchange Commission ('SEC') under the Investment Advisers Act of 1940 (the 'Act'). Pursuant to Rule 206(4)-7 (the 'Rule') of the Act, effective as of February 5, 2004, as an investment adviser registered under Section 203 of the Act it shall be unlawful to provide investment advice to clients unless the adviser has adopted and implemented written policies and procedures to prevent violation by Brevet or their supervised persons of the Act as well as rules the SEC have adopted under the Act. Brevet must have in place an annual review of the adequacy of the policies and procedures initiated as per this section ensuring the effectiveness of their implementation. The rule also requires that Brevet designate an individual as Chief Compliance Officer who is responsible for the administration of its policies and procedures."  (Compliance Policy at 4.)

D136.  The Compliance Policy further provides in part:  "As an employee of Brevet you must adhere to these standards and should consult the compliance principles outlined herein for

guidance when acting on behalf of Brevet or undertaking personal transactions. These principles contain individual duties and restrictions designed to satisfy the requirements of the Rule and assisting Brevet as well as supervised persons in the prevention, detection and correction of violations of the law, rules and our policies. Employees are required to carefully read and understand this Compliance Manual (the 'Manual')."  (Compliance Policy at 4.)

D137.  The Compliance Policy further provides in part:  "The Compliance Program (the 'Program') requires that any subsidiaries of and agents acting for, or on behalf of Brevet comply with Brevet's compliance policies" (Compliance Policy at 4).

D138.  The Compliance Policy further provides in part:  "The CCO [Chief Compliance Officer] has the responsibility for monitoring Brevet's advisory agreement policies, practices, disclosures and recordkeeping" (Compliance Policy at 6; da Silva Vint Dep. 237:1-238:7).

D139.  The Compliance Policy further provides in part:  "Books and Records:  Policy:  It is the policy of Brevet as a registered adviser to maintain books and records of business activities in accordance with Rule 204-2 under the Act. This rule specifies the types of books and records to be held and the duration of time they are to be readily available."  (Compliance Policy at 9.)

D140.  The Compliance Policy further provides in part:  "Books and Records: Background:  The Rule states that there are two types of books and records that must be maintained by a registered adviser. First are financial records of Brevet as a business and these include such items as general ledgers, bank statements and cash reconciliations. **The second type of records to be retained are those that relate to client files and include advertising, trade records, statements, agreements between Brevet and clients, etc. These books and records are required under the Rule to be held in a suitable office location of Brevet** for a

period of two years and accessible at another secure facility, such as an offsite warehouse, for an additional three years."  (Compliance Policy at 9.)

D141.  The Compliance Policy further provides in part:  "Books and Records: Responsibility:  The responsibility for the development and enforcement measures regarding the maintenance of books and records rests with the CCO. The CCO at his/her discretion may delegate the financial, accounting as well as other records to a qualified person(s) within Brevet" (Compliance Policy at 9).

D142.  The Compliance Policy further provides in part:  "Books and Records: Procedure: Brevet has implemented measures to establish a policy regarding the books and records and **to provide on-going monitoring to ensure the policy is followed**. . . . The policy ensures that: 1. Files are centrally located and easily located within the firm; 2. **Legible and accurate copies of all documentation are obtained**" (Compliance Policy at 9).

D143.  The Compliance Policy further provides in part:  "Supervision and Internal Controls:  Responsibility:  The CCO is responsible for the on-going monitoring of the policies put into place to ensure that Brevet is in compliance with applicable regulatory rules, regulations and laws. The CCO or designee will periodically test each policy and procedure relevant to such objective to make sure that it is current, accurate and in accordance with all disclosures.  Any violations of the policies of Brevet will be addressed by the CCO and any repeat violations will be escalated by the CCO to senior management for resolution. Each employee of Brevet has a duty to be aware of and follow all of the policies and procedures put into place by Brevet." (Compliance Policy at 26; da Silva Vint Dep. 237:15-239:2.)

D144.  Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC are governed by LLC Agreements (collectively the "LLC Agreements") (*see generally* BSDP LLC Agreement; BSDH LLC Agreement).

D145.  Iacovacci signed the LLC Agreements (BSDP LLC Agreement at 20; BSDH LLC Agreement at 19).

D146.  The LLC Agreements § 7.3 respectively provide in part:  "Any and all writings, inventions, improvements, processes, techniques, copyrights, trademarks, tradenames, service marks, and other intangible or intellectual property rights relating to the Company or any of its affiliates that may be invented, conceived, developed or enhanced by the Company or by the Members prior to, or during, their membership in the Company (collectively, the 'Company Property'), shall be the sole property of the Company and the Member hereby waives any right or interest that he may otherwise have in respect thereof"  (BSDP LLC Agreement at 14; BSDH LLC Agreement at 13).

Dated: New York, New York
          December 10, 2021

                                        REED SMITH LLP

                                        By: /s/ *Louis M. Solomon*
                                        Louis M. Solomon
                                        599 Lexington Avenue
                                        New York, New York 10022
                                        (212) 549-0400
                                        *Attorneys for Defendants*