UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL IACOVACCI,

                              Plaintiff,

            -against-

BREVET HOLDINGS, LLC, *et al.*,

                              Defendants.

Case No. 1:18-cv-08048 (MKV)

**PLAINTIFF'S AND DEFENDANTS'
CONSOLIDATED RULE 56.1
COUNTERSTATEMENT**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT**

**I.   Background**

P-1.     Plaintiff, Paul Iacovacci, was a co-founder and Member of Brevet Short Duration Partners, LLC, and Brevet Short Duration Holdings, LLC, and employee of Brevet Holdings, LLC.[1]

> **Response to P-1:  Undisputed** that Plaintiff Paul Iacovacci was a Member and co-founder of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC, and an employee of Brevet Holdings, LLC.  **Disputed** that the citations referenced support the fact that Paul Iacovacci was a co-founder of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC.

P-2.     Defendants Brevet Holdings, LLC; Brevet Capital Management, LLC; Brevet Short Duration Partners, LLC; and Brevet Short Duration Holdings, LLC (collectively, "Brevet") are Delaware Limited Liability companies with their principal place of business in New York, New York.[2]

> **Response to P-2:  Undisputed**.

P-3.     Brevet is a financial management and advisory service firm that provides loans and other lending solutions and facilitates the raising of capital, generally to middle-market entities, both public and private.[3]

> **Response to P-3:  Undisputed** to the extent that the material cited includes this general description of the Defendants overall.  **Disputed** that Brevet Capital Management, LLC is a financial management and advisory firm.  Brevet Capital Management, LLC is

---

[1] Iacovacci Dep. 17:7-12, Oct. 6, 2021; Brevet Answer (Dkt. 79) ¶ 8; Iacovacci Aff. ¶ 2, *Iacovacci v. Brevet Holdings, LLC*, Index No. 158735/2016 (N.Y. Sup. Ct.) ("NYS") Dkt. 71 (Dec. 26, 2017).
[2] Brevet Answer (Dkt. 79) ¶¶ 9-12 (admitting Compl. ¶¶ 9-12).
[3] Defs.' NYS Supp. Resps. & Objs. to Pl.'s First Interrogatory No. 18 (Sept. 29, 2017).

registered investment advisor (Consolidated Rule 56.1 Statement ("56.1 Statement")
¶¶ D3, D4).  **Disputed** to the extent that Brevet Holdings, LLC, Brevet Short Duration
Partners, LLC, and Brevet Short Duration Holdings, LLC do not provide financial
management services for other entities beyond Brevet's funds (Brevet's Statement of
Additional Facts ("Additional Facts") ¶¶ P-124-P-126).

P-4.     Defendants Douglas Monticciolo and Mark Callahan are Managing Directors of
Brevet Holdings, LLC, and Members of Brevet Short Duration Partners, LLC, and Brevet Short
Duration Holdings, LLC.[4]

> **Response to P-4:  Undisputed** to the extent that Douglas Monticciolo and Mark
> Callahan are Members of Brevet Short Duration Partners, LLC, and Brevet Short
> Duration Holdings, LLC and that Mark Callahan is a Managing Director of Brevet
> Holdings, LLC.  **Disputed** that the citations referenced support the fact that Douglas
> Monticciolo is a Managing Director of Brevet Holdings, LLC.  Douglas Monticciolo is a
> Managing Member and Managing Director of Brevet Holdings, LLC, Managing Member
> of Brevet Short Duration Holdings, LLC, and Managing Director of Brevet Short
> Duration Partners, LLC (56.1 Statement ¶¶ D8, D9; Additional Facts ¶ P-127).

P-5.     Iacovacci joined Brevet as a co-founder in or around 2004.[5]

**Response to P-5:  Disputed**.  Brevet did not exist in 2004 (Additional Facts ¶ P-128).
Iacovacci joined FCS Advisors, Brevet's predecessor, in 2004 (Additional Facts ¶ P-
129).

---

[4] Callahan Aff. ¶ 1, NYS Dkt. 72 (Jan. 17, 2018). Brevet Answer (Dkt. 79) ¶ 19; Monticciolo Dep. 52:13-20, Oct. 7, 2021
[5] Callahan Aff. ¶ 5, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 17:7-18:2.

P-6.     Initially, Iacovacci worked on sourcing and locating potential investors and borrowers to obtain funds to originate loans, but around 2010 Iacovacci stopped working with investors or potential investors and focused only on sourcing borrowers.[6]

**Response to P-6:  Disputed** that Iacovacci focused "only" on sourcing borrowers around 2010.  Iacovacci remained as a member of the Investment Committee until his termination (56.1 Statement ¶ D15; Callahan 9/25/2018 Affidavit ¶ 5; Callahan 12/10/2021 Declaration ("Callahan Decl.") ¶ 4; BREVET-REPRO-0151644; Callahan 10/5/2021 Dep. Tr. ("Callahan Dep.") 289:6-14).

P-7.     Iacovacci's primary function for Brevet was to find borrowers for Brevet's Direct Lending Short Duration Fund, L.P.[7]

**Response to P-7:  Disputed**.  Iacovacci had various roles at Brevet Capital Management, LLC, Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, and Brevet Holdings, LLC at different times.  For instance, Iacovacci was on the Investment Committee at Brevet Capital Management, LLC until his termination (56.1 Statement ¶ D15).

P-8.     Iacovacci's job duties included sourcing potential transactions; conducting high-level reviews to evaluate targeted organizations, industries, or markets; identification of strategies to engage targeted companies; the provision of information about targeted companies to the Brevet compliance group; the sending of Non-Disclosure Agreements prepared by

---

[6] Iacovacci Aff. ¶ 4, NYS Dkt. 71 (Dec. 26, 2017).
[7] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019); Iacovacci Aff. ¶ 2, NYS Dkt. 71 (Dec. 26, 2017); Callahan Aff. ¶ 4, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 24:11-16.

Brevet's compliance group to the targeted organization; and the presentation of possible loan arrangements at Brevet's intake meetings.[8]

**Response to P-8:  Disputed** to the extent that, in addition to the descriptions outlined above, Iacovacci was on the Investment Committee until his termination and was actively engaged in the approval of potential investments (56.1 Statement ¶ D15; Additional Facts ¶ P-130).  Further, Iacovacci was a member of the senior management team (Additional Facts ¶ P-133).

P-9.    Iacovacci was in charge of finding and vetting borrowers, and if such borrowers fit the fund's criteria, he would bring the deal to the other members for discussion and approval.[9]

**Response to P-9:  Disputed**.  Iacovacci did not have other employees reporting to him in the process of finding and vetting borrowers (Additional Facts ¶ P-131).  When Iacovacci found deals, he brought them to Intake meetings, and if approved, then to the members of Deal Team, who would then vet the deals (Additional Facts ¶ P-132).

P-10.   Iacovacci's involvement in a transaction would end once the letter of intent was executed, moving the potential deal on to structuring.[10]

**Response to P-10:  Disputed**.  Iacovacci's involvement in a transaction continued because he was a member of the Investment Committee (56.1 Statement ¶ D15).

---

[8] Brevet NYS Supp. Responses & Objections to Plaintiff's First Interrogatories, Sept. 29, 2017, Interrogatory 14.
[9] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019).
[10] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019).

P-11.   In or around February 2015, Brevet purchased a Dell computer for Iacovacci's home use ("Dell Home Computer").[11]

**Response to P-11:  Disputed** on the grounds that Brevet purchased the Dell Optiplex (the "Computer") for Iacovacci to use for work purposes at his home (56.1 Statement ¶ D24; Lan 12/10/2021 Declaration ("Lan Decl.") ¶¶ 2-4, 6; BREVET-REPRO-0173512; BREVET-REPRO-0099339).

P-12.   At that time, Iacovacci was still able to work in person at Brevet's office, but he often worked late at night and on weekends from home.[12]

**Response to P-12:  Disputed** that citations referenced support the fact that Iacovacci was still able to work in person during 2015.  Iacovacci testified that he worked only at home from December 2015 to October 2016 (56.1 Statement ¶ D40; Additional Facts ¶ P-134).

P-13.   In 2015, because of a debilitating bone condition, Iacovacci began working from home more often.[13]

**Response to P-13:  Disputed** that the citation referenced supports the fact that Iacovacci began working from home more often due to his condition.  **Disputed** that Iacovacci's condition was "debilitating" as he continued to work for Brevet in 2015 and 2016 (56.1 Statement ¶¶ D40-D41).  Further, Iacovacci testified that he worked only at home from December 2015 to October 2016 (Additional Facts ¶ 134).

---

[11] Iacovacci Dep. 99:15-102:9.

[12] Iacovacci Dep. 102:2-9; Iacovacci Aff. ¶ 22, NYS Dkt. 382 (Nov. 1, 2018).

[13] Iacovacci Aff. ¶ 22, NYS Dkt. 382 (Nov. 1, 2018).

P-14.   In December 2015, Iacovacci had extensive surgery on his right leg due to his medical condition.[14]

**Response to P-14:  Undisputed** that Iacovacci had surgery in December of 2015.

P-15.   Iacovacci suffered complications after that initial surgery, requiring extensive additional surgeries; and due to concerns about his recovery, his ability to walk again, his pain management, and long physical therapy time, Iacovacci believed he should retire from Brevet.[15]

**Response to P-15:  Undisputed** that Iacovacci has asserted that he suffered complications after that initial surgery, requiring additional surgeries.  **Disputed** that the citations referenced support the fact that Iacovacci believed he should retire from Brevet. Iacovacci did not inform Brevet that he was retiring from Brevet (Additional Facts ¶ P- 135).  Iacovacci continued to be an employee of Brevet Holdings, LLC, receiving benefits and salary, until his termination on October 14, 2016 (Additional Facts ¶ P-136). Further, Iacovacci started to engage in other transactions counter to the interests of Brevet and Brevet's investors during this time (Additional Facts ¶ P-137).

P-16.   On or around January 6, 2016, Iacovacci informed Callahan and Monticciolo that he was retiring from Brevet due to his significant health issues.[16]

**Response to P-16:  Disputed** that Iacovacci informed Mark Callahan and Douglas Monticciolo that he was retiring from Brevet.  Iacovacci did not bring up the topic of withdrawal from Brevet Short Duration Partners, LLC or Brevet Short Duration Holdings, LLC or retirement from Brevet Holdings, LLC (Additional Facts ¶ P-138).

---

[14] Iacovacci Aff. ¶ 3, NYS Dkt. 975 (Jan. 22, 2020).

[15] Iacovacci Aff. ¶ 3, NYS Dkt. 975 (Jan 22, 2020); Iacovacci Aff. ¶ 9, NYS Dkt. 71 (Dec. 26, 2017).

[16] BREVET 396723; Iacovacci Dep. 36:15-16; Iacovacci Aff. ¶ 4, NYS Dkt. 975 (Jan. 22, 2020).

P-17.   In an email to Callahan and Monticciolo on January 12, 2016, Iacovacci confirmed his retirement and asked about timing to discuss the transition of his responsibilities.[17]

**Response to P-17:  Disputed** that Iacovacci confirmed his retirement to Mark Callahan and Douglas Monticciolo on January 12, 2016.  Iacovacci did not bring up the topic of withdrawal or retirement to Mark Callahan and Douglas Monticciolo, and thus Iacovacci could not have confirmed his retirement (Additional Facts ¶ P-138).

P-18.   Around mid-February 2016, Iacovacci's retirement was announced to Brevet at an office staff meeting at Brevet's Park Avenue office in New York City, where Iacovacci was also present by video.[18]

**Response to P-18:  Disputed**.  Iacovacci's retirement was never announced to Brevet (Additional Facts ¶ P-139).  Rather, Iacovacci had been telling employees that he was retiring at some future date (Additional Facts ¶ P-140).

P-19.   In February 2016, Iacovacci spoke with Callahan to discuss his departure, and Iacovacci indicated that we was willing to continue working at Brevet for a transition period—as Callahan reported back in an email to Monticciolo: Iacovacci was "thinking that he would be an employee to help out until the end of March," and "would like it if we paid for benefits beyond then and he would still help out but he is not expecting this (us to cover benefits)."[19]

**Response to P-19:  Disputed** that there is an inference that Iacovacci informed Mark Callahan that he was retiring or withdrawing from Brevet.  Iacovacci did not bring up the

---

[17] DEL00013795; DEL00022138; DEL00046055; NYS Dkt. 728.

[18] Iacovacci Aff. ¶ 11, NYS Dkt. 71 (Dec. 26, 2017); Harris Dep. 18:14-20:21, Sept. 30, 2021; Cibrian Dep. 36:15-39:11, Oct. 7, 2021.

[19] BREVETNEW-034248.

topic of withdrawal from Brevet Short Duration Partners, LLC or Brevet Short Duration

Holdings, LLC or retirement from Brevet Holdings, LLC (Additional Facts ¶ P-138).

P-20.   Callahan told Iacovacci that Brevet wanted to "have a separation agreement" and

proposed to "work one up."[20]

**Response to P-20:  Disputed** that the citation referenced supports the fact that "Brevet

wanted" a separation agreement.  **Disputed** that Brevet Capital Management, LLC was

involved in the separation agreement negotiations with Iacovacci.  Further, it is standard

practice at Brevet Holdings, LLC to have separation agreements for departing employees

(Additional Facts ¶ P-141).

P-21.   Brevet provided Iacovacci with a draft separation agreement in March 2016.[21]

**Response to P-21:  Undisputed**.

P-22.   Negotiation of the terms of the separation agreement dragged on for months

beyond Iacovacci's original plan to "help out until the end of March."[22]

**Response to P-22:  Dispute** the language that the negotiations of the terms of the

separation agreement "dragged on for months".  **Disputed** to the extent that there is an

inference that delays were caused by Brevet.  If anything, the negotiation "dragged on"

because Iacovacci constantly changed his demands throughout the negotiations

(Additional Facts ¶ P-143).  **Disputed** that Iacovacci's original plan was to "help out until

the end of March".  Iacovacci wanted to work as an employee at Brevet for as long as

possible and receive benefits and salary from Brevet (Additional Facts ¶ P-142).  Further,

Iacovacci never provided 180 days' notice in writing to withdraw from Brevet Short

---

[20] BREVETNEW-034248.
[21] DEL00022168.
[22] *See* DEL00292328.

Duration Partners, LLC and Brevet Short Duration Holdings, LLC even though the LLC Agreements require Iacovacci to do so (Additional Facts ¶¶ P-144-P-145).

P-23.   On October 14, 2016, Brevet delivered a termination letter to Iacovacci on Brevet Holdings letterhead, stating the "effective date" of his termination was October 14, 2016, and purporting to terminate his employment with Brevet Holdings, LLC, and his membership in Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, Brevet Capital Partners, LLC, and Brevet Capital Holdings, LLC.[23]

> **Response to P-23:  Disputed** that Brevet delivered the termination letter "purporting to terminate" Iacovacci's employment.  Iacovacci was terminated on October 14, 2016 (56.1 Statement ¶¶ D13, D60, D61; BREVET-REPRO-0067951).

P-24.   On October 17, 2016, Iacovacci initiated an action in New York state court against certain Brevet entities.[24]

> **Response to P-24:  Undisputed** that the court file indicates that Iacovacci filed his complaint in New York state court on October 17, 2016.  Brevet adds that it did not know about the state action until November 2016 when its registered agent was served with the complaint (Additional Facts ¶ P-146).

P-25.   On October 18, 2016, at or around 12:59 AM and 2:37 AM, Brevet's Head of Technology, Johnny Lan, remotely accessed Iacovacci's Dell Home Computer without

---

[23] BREVET 000861 (termination letter).
[24] *Iacovacci v. Brevet Holdings, LLC*, Index No. 158735/2016 (N.Y. Sup. Ct.) ("NYS Action").

Iacovacci's knowledge or consent and downloaded documents from the machine and external hard drives that were attached to the machine.[25]

       **Response to P-25:  Disputed** that the Computer was "Iacovacci's" Computer.  **Disputed** that Johnny Lan remotely accessed the Computer without Iacovacci's consent.  Brevet had Iacovacci's authorization to access the Computer pursuant to its policies, which Iacovacci acknowledged (56.1 Statement ¶¶ D106, D113).

       P-26.   Lan accessed the computer using Iacovacci's LogMeIn password that Iacovacci had provided Lan on specific instances when Iacovacci had requested technological assistance.[26]

       **Response to P-26: Undisputed** that Iacovacci provided his LogMeIn password to Johnny Lan.  **Disputed** that Iacovacci provided Johnny Lan Iacovacci's LogMeIn password on multiple instances (Lan 10/1/2021 Dep. Tr. ("Lan Dep.") 208:2-13).  Johnny Lan did not ask for Iacovacci's password when Iacovacci requested technological assistance (*see generally* Additional Facts ¶ P-147).  Brevet further adds that Johnny Lan had full administrator rights to the Computer the entire time Iacovacci was an employee of Brevet (56.1 Statement ¶ D55; Lan Decl. ¶ 5).

---

[25] *See* Defs.' NYS Resps. & Objs. to Pl.'s Am. Fifth Interrogatory No. 1 (Oct. 15, 2019) ("Login to back up the Computer" at 12:59 AM and 2:37 AM); Lan Dep. 30:13-33:11, 201:2-16, Oct. 1, 2021; Iacovacci Dep. 178:3-179:2; NYS Lan Aff. ¶ 1 (Feb. 16, 2021) (Lan is Head of Technology at Brevet Capital Management, LLC).
[26] Lan Dep. 208:2-209:18.

## II.   Regulatory Obligations

P-27.   Brevet contends as an affirmative defense that the allegations contained in Plaintiff's Complaint "arise out of Brevet's regulatory obligation to monitor certain communications and correspondence."[27]

**Response to P-27:  Disputed**.  Brevet alleges the affirmative defense arises out of "Brevet's regulatory *compliance* obligation to monitor certain communications and correspondence" (ECF No. 79 at 15 ("Brevet Amended Answer") (emphasis added)).

P-28.   Brevet similarly contends that its access at 12:59 AM and 2:37 AM on October 18, 2016, was "in accordance with Defendants' regulatory obligations, including its obligations as an SEC Registered Investment Adviser."[28]

**Response to P-28:  Disputed.**  The citation supports that Brevet explained its access on October 18, 2016 was because "the Computer and its contents, including the contents of peripheral drives used in connection with the Computer, belong to Defendants; Plaintiff never possessed any reasonable expectation of privacy on the Computer; Defendants possessed the right to access its Computer at any time and for any reason; and login to back up Brevet's Computer after Plaintiff failed to return it was required in accordance with Defendants' regulatory obligations, include its obligations as an SEC Registered Investment Advisor." (NYS Defs.' Resps. & Objs. to Pl.'s Am. Fifth Interrogatory No. 1(k) (Oct. 15, 2019)).

---

[27] Brevet Answer (Dkt. 79) at 15 (Twenty Third Affirmative Defense).
[28] Defs.' NYS Resps. & Objs. to Pl.'s Am. Fifth Interrogatory No. 1 (Oct. 15, 2019).

A. **Brevet's Compliance Personnel and Conduct**

P-29.   Brevet's Chief Compliance Officer is principally charged with assessing Brevet's compliance with regulatory requirements.[29]

**Response to P-29:  Disputed**.  The Chief Compliance Officer is principally charged with the administration of its policies and procedures, as well as assessing Brevet's compliance with regulatory requirements, with the assistance and input from outside counsel (Harris 9/30/2021 Dep. Tr. ("Harris Dep.") 41:9-17; 61:18-22; 41; da Silva Vint 10/7/2021 Dep. Tr. ("da Silva Vint Dep.") 158:21-159:11; 56.1 Statement ¶ D135).

P-30.   Brevet's decision to terminate Iacovacci was made without involving anyone from Brevet's compliance department.[30]

**Response to P-30:  Disputed**.  Brevet's decision to terminate Iacovacci did not require involvement of the compliance department, as he was not terminated for a compliance purpose. (Callahan Dep. 213:20-214:24; BREVET-REPRO-0067951).  **Disputed**. Brevet's decision to terminate Iacovacci was an HR decision (Additional Facts ¶ 151).

P-31.   Gareth Lea, Brevet's former Chief Compliance Officer, left Brevet around June of 2015 but remained a "consultant" Chief Compliance Officer for Brevet until "around the summer of 2016."[31]

**Response to P-31:  Disputed** that the citation supports that Gareth Lea recalled the exact timeframe during which he was a consultant.  **Disputed**.  Gareth Lea remained a consultant until Mei-Li da Silva Vint became the Chief Compliance Officer (Lea 9/27/2021 Dep. Tr. ("Lea Dep.") 43:15-23, 50:4-25).

---

[29] Defs.' NYS Supp. Resps. & Objs. to Sixth Interrogatory No. 1 (Feb. 18, 2021).
[30] Harris Dep. 23:20-26:25; Lea Dep. 82:19-85:3, 103:21-105:10, Sept. 27, 2021; BREVETNEW-037670.
[31] Lea Dep. 50:5-51:16.

P-32.   Lea believes he would have been informed if Brevet were terminating an employee for a policy or compliance reason.[32]

> **Response to P-32:  Disputed** that the citation supports that Gareth Lea stated that he imagined he would have been informed if anyone was terminated for a compliance reason (Lea Dep. 105:3-10).

P-33.   Lea was not aware of Iacovacci's purported termination on October 14, 2016.[33]

> **Response to P-33:  Disputed** that the language "purported termination" suggests that Iacovacci was not in fact terminated.  Iacovacci actually was terminated on October 14, 2016 (BREVET-REPRO-0067951; 56.1 Statement ¶ D61).

P-34.   Lea did not authorize, participate in, or have knowledge of Brevet monitoring Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[34]

> **Response to P-34:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer at issue.  **Disputed** that the citation supports that Gareth Lea testified to whether or not he was authorized, participated in or had knowledge of Brevet monitoring Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.  **Disputed** on the grounds that the statement includes the unsupported assumption that Brevet monitored the Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.
>
> **Disputed** on the grounds that there is no evidence that Brevet monitored the Computer,

---

[32] Lea Dep. 103:21-105:10.
[33] Lea Tr. at 84:25-85:3.
[34] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1, Oct. 17, 2019.

external hard drives, LogMeIn account, or Yahoo! Email account during the above stated time period (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1 (Oct. 17, 2019)).

P-35.   Lea did not access or authorize, assist in, or have knowledge of any access of Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017.[35]

> **Response to P-35:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed** that the citation supports that Gareth Lea testified to whether or not he had access or authorize, assist in, or have knowledge of any access of the Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017.  **Disputed** on the grounds that the statement includes the unsupported assumption that Brevet accessed the Yahoo! email account at any time from February 2015 through February 2017 (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2 (Oct. 17, 2019)).

P-36.   Lea did not view, authorize, have knowledge of, or participate in the imaging, copying, transfer, or deletion of any date or information contained on or in Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[36]

> **Response to P-36:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed** that the citation supports that Gareth Lea testified to whether or not he had access or authorize, assist in, or have knowledge of, or participate in the imaging, copying, transfer, or deletion of any data or information

---

[35] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2, Oct. 17, 2019.
[36] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3, Oct. 17, 2019.

contained in the Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017. **Disputed** on the grounds that there is no evidence that Brevet copied, transferred, or deleted any of the data or information contained in the Yahoo! Email account during the above stated time period (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3 (Oct. 17, 2019)).

P-37.     Brevet's subsequent Chief Compliance Officer, Mei-Li da Silva Vint, did not begin at Brevet until October ▮ 2016.[37]

**Response to P-37:   Undisputed**.

P-38.   Brevet's only other compliance personnel at the time of Brevet's purported termination of Iacovacci was Cherie Harris, who was not involved in the decision to terminate Iacovacci.[38]

**Response to P-38:  Disputed**.  Doug Monticciolo and Mark Callahan, as senior management, also conducted compliance at the time of Brevet's termination of Iacovacci. Further, Iacovacci was not terminated for a compliance reason, which is why Cherie Harris was not involved in the decision to terminate Iacovacci (Monticciolo 10/7/2021 Dep. Tr. ("Monticciolo Dep.") 363:19-24; Callahan Dep. 365:4-370:8).  **Disputed** to the extent that the language "purported termination" suggests that Iacovacci was not in fact terminated.  Iacovacci was terminated on October 14, 2016 (BREVET-REPRO-0067951; 56.1 Statement ¶ D61).

---

[37] da Silva Vint Dep. 36:2-4, Oct. 7, 2021.
[38] Harris Dep. 23:20-26:25.

P-39.   Harris did not authorize, participate in, or have knowledge of Brevet monitoring Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[39]

> **Response to P-39:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed** that the citation supports that Cherie Harris testified to whether or not she was authorized, participated in or had knowledge of Brevet monitoring the Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.  **Disputed** on the grounds that the statement includes the unsupported assumption that Brevet monitored the Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.  **Disputed** on the grounds that there is no evidence that Brevet monitored the Computer, external hard drives, LogMeIn account, or Yahoo! Email account during the above stated time period (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1 (Oct. 17, 2019)).

P-40.   Harris did not access or authorize, assist in, or have knowledge of any access of Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017.[40]

> **Response to P-40:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed** that the citation supports that Cherie Harris testified to whether or not she had access or authorize, assist in, or have knowledge of any access of the Computer, external hard drives, LogMeIn account, or the

---

[39] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 1, Oct. 17, 2019.
[40] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2, Oct. 17, 2019.

Yahoo! email account at any time from February 2015 through February 2017. **Disputed** on the grounds that the statement includes the unsupported assumption that Brevet accessed the Yahoo! email account at any time from February 2015 through February 2017 (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 2 (Oct. 17, 2019)).

P-41.   Harris did not view, authorize, have knowledge of, or participate in the imaging, copying, transfer, or deletion of any date or information contained on or in Iacovacci's Dell Home Computer, external hard drives, LogMeIn account, or Yahoo! email account at any time from February 2015 through February 2017.[41]

> **Response to P-41: Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer. **Disputed** that the citation supports that Cherie Harris testified to whether or not she had access or authorize, assist in, or have knowledge of, or participated in the imaging, copying, transfer, or deletion of any data or information contained in the Computer, external hard drives, LogMeIn account, or the Yahoo! email account at any time from February 2015 through February 2017. **Disputed** on the grounds that the statement includes the unsupported assumption that Brevet copied, transferred, or deleted the data or information in the Yahoo! email account at any time from February 2015 through February 2017 (Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3 (Oct. 17, 2019)).

---

[41] Defs.' Resps. & Objs. to Pl.'s First Interrogatory No. 3, Oct. 17, 2019.

P-42.   Brevet's compliance personnel did not monitor email at the time of Iacovacci's purported termination.[42]

**Response to P-42:  Disputed**.  Brevet utilized an e-mail archiving system, which monitored all incoming and outgoing emails from the Brevet e-mail system and was monitored by compliance personnel and senior management (Lea 10/1/2021 Dep. 62:11-65:11, 77:24-78:4; Harris Dep. 40:3-49:10; Lan Dep 82:2-86:5).  **Disputed** to the extent that the language "purported termination" suggests that Iacovacci was not in fact terminated.  Iacovacci was terminated on October 14, 2016 (56.1 Statement ¶ D60; BREVET-REPRO-0067951).

P-43.   Brevet's compliance department was not involved in the decision to access Iacovacci's Dell Home Computer on October 18, 2016.[43]

**Response to P-43:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.

P-44.   Instead, Lan was acting on directions from Callahan.[44]

**Response to P-44:  Disputed**.  The citation referenced does not support this fact, as the cited testimony refers to a time subsequent to Johnny Lan's October 18, 2016 access of the Computer at issue (Callahan 2/28/2020 Affidavit ("Callahan 2/28/2020 Aff.") ¶ 18 (Mark Callahan "instructed Brevet's Head of Technology Johnny Lan to copy the files from the USB Drive onto the Brevet Computer System so that [he] could review them")).

**Disputed**.  The decision to back up the computer was based on the Brevet policy to make

---

[42] Lea Dep. 62:11-65:11, 77:24-78:4; Harris Dep. 40:3-49:10; BREVET 109943.

[43] Lan Dep. 30:13-33:11; Lea Dep. 82:4-15; BREVETNEW-037670; Defs.' Resps. & Objs. to Pl.'s First Interrogatory Nos. 1-3 (Oct. 17, 2019).

[44] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020); Lan Dep. 30:13-33:11; Callahan Dep. 379:18-385:25, Oct. 5, 2021.

a backup of the computer after an employee leaves Brevet (Lan Dep. 164:4-9, 179:23-180:15).

P-45.   Callahan directed Lan to download files from the Dell Home Computer because he "believed that the downloaded files might contain evidence of" Iacovacci's alleged "misconduct."[45]

**Response to P-45:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer at issue.  **Disputed**.  The language quoted relates not to Jonny Lan's access of the Computer, but to Mark Callahan's request that Johnny Lan download the files which had already been backed up from the Computer on a later date from the initial back up on October 18, 2016 (Callahan 2/28/2020 Aff. ¶ 18).

P-46.   Callahan instructed Lan to copy the files to Brevet's computer system so Callahan could review them, which Callahan did.[46]

**Response to P-46:  Disputed**.  Mark Callahan instructed Johnny Lan to back up the files, which had already been downloaded previously, from the USB drive to the Brevet Computer system.  **Disputed**.  Mark Callahan reviewed these files in late 2016, after the backup had already occurred (Callahan 2/28/2020 Aff. ¶ 18).

P-47.   Callahan stated the purpose of his review "was to see what, if any, proprietary Brevet documents and information Plaintiff [Iacovacci] had taken from the Brevet computer system and what, if any, communications he had had with our business partners or potential

---

[45] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020).
[46] Callahan Aff. ¶ 18, NYS Dkt. 1005 (Feb. 28, 2020).

partners that might represent efforts to divert business opportunities away from Brevet for his own personal benefit."[47]

> **Response to P-47:  Disputed**.  Mark Callahan's review of the documents occurred well after the files had been backed up from the Computer (Callahan 2/28/2020 Aff. ¶¶ 18, 19).

P-48.   Between February 2016 and February 2017, no Chief Compliance Officer or other compliance employee of Brevet viewed the data or information contained on or in Iacovacci's Dell Home Computer or external hard drives.[48]

> **Response to P-48:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed.**  In late 2016, Mark Callahan reviewed some of the data or information backed up from the Computer.  During this review, Mark Callahan was looking to see what proprietary Brevet documents and information Iacovacci had taken from the Brevet computer system and what communications he had with Brevet's business partners or potential partners who might represent efforts to divert business opportunities away from Brevet.  This was the only time he reviewed the data backed up from the Computer (Callahan 2/28/2020 Aff. ¶¶ 18-20).

## B. Policies and Required Records

P-49.   Brevet Capital Management LLC's Compliance Policy and Procedure Manual as of June 2015 contains a Books and Records provision stating: "It is the policy of Brevet as a registered investment adviser to maintain books and records of business activities in accordance

---

[47] Callahan Aff. ¶ 19, NYS Dkt. 1005 (Feb. 28, 2020).
[48] Defs.' Resps. & Obs. to Pl.'s First Interrogatory No. 4 (Oct. 17, 2019).

with Rule 204-2 under the Act. This rule specifies the types of books and records to be held and the duration of time they are to be readily available."[49]

**Response to P-49:  Undisputed**.

P-50.   Rule 204-2 (the "Books and Records Rule") requires certain books and records of an advisor "relating to its investment advisory business," not all documents an investment adviser has ever sent, received, created, or otherwise used.[50]

**Response to P-50:  Disputed**.  This fact is purporting to state a legal conclusion and the citations referenced do not support the fact.

P-51.   Iacovacci was not involved in the investment side of Brevet's business.[51]

**Response to P-51:  Disputed**.  Iacovacci was on in the investment committee and therefore, was involved in the investment side of Brevet's business (56.1 Statement ¶ D15; Callahan Dep. 289:6-14).

P-52.   Brevet has not identified any documents downloaded from Iacovacci's Dell Home Computer or external drives that were books and records for purposes of Books and Records Rule.[52]

**Response to P-52:  Disputed** as to the use of the language "Iacovacci's Dell Home Computer" to describe the Computer.  **Disputed**.  Brevet has identified the documents Brevet recovered from the backup of the Computer were "Brevet's own confidential and proprietary documents, as well as Plaintiff's work-product created on behalf of Brevet"

---

[49] BREVET 001816 at p. 9.

[50] 17 CFR § 275.204-2; Expert Report of Jane Jarcho, Nov. 22, 2021 ("Jarcho Report") at 3; Joseph Dep. 112:17-113:5, Dec. 1, 2021.

[51] Iacovacci Aff. ¶ 2, NYS Dkt. 667 (July 16, 2019); Iacovacci Aff. ¶ 4, NYS Dkt. 71 (Dec. 26, 2017); Callahan Aff. ¶ 5, NYS Dkt. 319 (Sept. 25, 2018); Iacovacci Dep. 24:11-16.

[52] *See generally* Expert Report of Ken Joseph, Nov. 4, 2021 ("Joseph Report").

(Callahan 2/28/2020 Aff. ¶ 16).  **Disputed**.  Brevet has produced documents which

Brevet recovered from the backup of the Computer, including, but not limited to, the

following documents: BREVET-REPRO-0087532; BREVET-REPRO-0087300;

BREVET-REPRO-0098344; BREVET-REPRO-0098347; BREVET-REPRO-0115973;

BREVET-REPRO-0098519; BREVET-REPRO-0098522; BREVET-REPRO-0041187;

BREVET-REPRO-0087662; DEL00013959; DEL00013929.

P-53.   The Books and Records Rule does not provide an affirmative defense to any

claim in this case.[53]

**Response to P-53:  Disputed**.  This fact is purporting to state a legal conclusion and the

cited testimony does not support this fact.

P-54.   Brevet does not consider its borrowers to be Brevet's "clients."[54]

**Response to P-54:  Disputed**.  Brevet considers all of the investors and borrowers with

which it has relationships to be Brevet's clients (Additional Facts ¶ P-153).

P-55.   At the time of Iacovacci's purported termination, Brevet used an email archive

system, Global Relay, that captured all email traffic, for all employees, including attachments.[55]

**Response to P-55:  Disputed**.  Brevet used an email archive system, Global Relay,

which captured all email traffic from the Brevet email system for all employees (56.1

Statement ¶ D131; Additional Facts ¶ P-154).  **Disputed** to the extent that the language

"purported termination" suggests that Iacovacci was not in fact terminated.  Iacovacci

actually was terminated on October 14, 2016. (56.1 Statement ¶ D60; BREVET-REPRO-

0067951).

---

[53] *See* Joseph Dep. 105:21-112:9.
[54] Lea Dep. 71:6-9, 108:10-15, 114:8-11, 60:9-19 (discussing BREVET 109943).
[55] Harris Dep. 48:10-49:3, 51:19-51:24, 53:22-54:4, 55:21-56:21; BREVET 003045 at p. 3.

P-56.   Brevet's 2016 General E-Mail Retention and Destruction Policy states that Brevet Capital Management, LLC "retains e-mail in accordance with the recordkeeping rules under Rule 204-2 of the Investment Advisers Act of 1940, as amended (the 'Advisers Act') and with the SEC interpretations on e-mail retention. In addition to creating and maintaining records of e-mail, it is important for the Company to destroy records of e-mail periodically when they are no longer necessary."[56]

**Response to P-56:  Undisputed**.

## III.  Contract Claims

### A.  LLC Agreements

P-57.   On or around January 21, 2009, Mark Callahan, Paul Iacovacci, Douglas Monticciolo, and John Tripp executed a Limited Liability Company Agreement of Brevet Capital Holdings III, LLC, which later became Brevet Short Duration Holdings, LLC.[57]

**Response to P-57:  Undisputed**.

P-58.   Iacovacci was a member of Brevet Capital Holdings III, LLC, which became Brevet Short Duration Holdings, LLC.[58]

**Response to P-58:  Undisputed**.

P-59.   On or around January 21, 2009, Mark Callahan, Paul Iacovacci, Douglas Monticciolo, and John Tripp executed a Limited Liability Company Agreement of Brevet Capital Partners III, LLC, which later became Brevet Short Duration Partners, LLC.[59]

**Response to P-59:  Undisputed**.

---

[56] BREVET 003045 at p. 3; *see also* BREVET 109943 (2015 manual).

[57] "Holdings LLC Agreement" (NYS Dkt. 818).

[58] Holdings LLC Agreement Exhibit A.

[59] "Partners LLC Agreement" (NYS Dkt. 817) (together with Holdings LLC Agreement, "LLC Agreements").

P-60.   Iacovacci was a member of Brevet Capital Partners III, LLC, which became Brevet Short Duration Partners, LLC.[60]

**Response to P-60:  Undisputed**.

P-61.   The LLC Agreements list no third-party beneficiaries and provide that the members of the LLC should have no liability to third parties under the LLC Agreements except as expressly provided in the LLC Act.[61]

**Response to P-61:  Undisputed** to the extent that the LLC Agreements list no third party beneficiaries.  **Undisputed** to the extent that members of the LLC have no liability to third parties under the LLC Agreements for obligations of Brevet.  The LLC Agreements state in full, "Except as expressly provided in the Act, the Members shall not personally be liable for any liabilities, or for the payment of any debts and obligations, of the Company" (BREVET-REPRO-0152288 ("BSDH LLC Agreement") at § 1.7; BREVET-REPRO-0152243 ("BSDP LLC Agreement") at § 1.7 (collectively the "LLC Agreements")).  **Disputed** that the LLC Agreements address any other potential liability of members of the LLC (LLC Agreements).

P-62.   The LLC Agreements contain provisions addressing Confidential Information (§ 7.2), Nonsolicitation (§ 7.4), and Noncompetition (§ 7.5).[62]

**Response to P-62:  Undisputed**.

P-63.   The LLC Agreements state: "This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and thereof,

---

[60] Partners LLC Agreement Exhibit A.

[61] LLC Agreements § 1.7.

[62] LLC Agreements.

and supersedes all prior agreements and understandings, written or oral, between the parties

hereto relating to the subject matter hereof and thereof."[63]

**Response to P-63:  Undisputed**.

**B.  Employee Handbook**

P-64.   Brevet issued a Personnel Policies & Employee Handbook, dated March 2015.[64]

**Response to P-64:  Undisputed**.

P-65.   That Employee Handbook contains a provision entitled "Non-Competition/

No-Raiding/ Non-Solicitation."[65]

**Response to P-65:  Undisputed**.

P-66.   The Employee Handbook contains a provision entitled "Confidentiality of

Information."[66]

**Response to P-66:  Undisputed**.

P-67.   The Employee Handbook states, "The term 'Proprietary Information' shall not

include any information which is now generally known or which hereafter through no act or

failure on the part of you becomes generally known or available."[67]

**Response to P-67:  Undisputed** to the extent that this language is present in the

Employee Handbook.  The Employee Handbook states in full, "'Proprietary Information'

shall mean all unpublished materials and all information and data created, discovered,

owned or otherwise controlled by Company or its affiliates relating to the operations,

financial conditions, products, customers or business of Company of its affiliates,

---

[63] LLC Agreements § 9.7.
[64] "Employee Handbook" (BREVET-REPRO-0067776).
[65] Countercls. ¶ 9 (Dkt. 79); BREVET-REPRO-0067776 at p. 28.
[66] BREVET-REPRO-0067776 at p. 28.
[67] BREVET-REPRO-0067776 at p. 28.

including, but not limited to financial information, data, or statements, product research

and development, existing and future product plans, designs and schematics, patents,

trademark information, client lists, computer data, documentation, algorithms, processes

and know-how (whether or not reduced to writing and whether or not patentable or

copyrightable), and business and marketing plans and strategies, pricing policies, product

packaging, cost and profit information and supplier identities, whether discussed orally,

in writing, or by inspection.  'Proprietary Information' shall also include all other

materials and information which have clearly been identified by the Company and

'Proprietary Information,' 'Trade Secrets,' or confidential information.  The term

'Proprietary Information' shall not include any information which is now generally

known or which hereafter through no act or failure on the part of you becomes generally

known or available."  (56.1 Statement ¶¶ D115-116; BREVET-REPRO-0067776

("Employee Handbook") at 28.)

P-68.   The Employee Handbook states, "NOTHING IN THIS HANDBOOK

CONSTITUTES A CONTRACT OR PROMISE BY BREVET HOLDINGS, LLC OR ITS

AFFILIATES, SUBSIDIARIES OR RELATED PARTIES (COLLECTIVELY, 'BREVET' OR

THE 'COMPANY') TO GIVE OR MAINTAIN ANY BENEFIT OR TO CONTINUE THE

EMPLOYMENT OR ENGAGEMENT OF ANY PERSON."[68]

**Response to P-68:  Undisputed** that this language is present in the Employee Handbook

(Employee Handbook at 3).

---

[68] BREVET-REPRO-0067776 at p. 3.

P-69.   The acknowledgement form in the Employee Handbook provides that the signing employee "understands and agrees" that "The Handbook is not an employment agreement or guarantee of employment."[69]

**Response to P-69:  Undisputed**.

## IV.  Damages

P-70.   Brevet has not identified a quantum of profits or revenue that it lost due to any of Iacovacci's alleged conduct.[70]

**Response to P-70:  Disputed**.  Brevet has identified a quantum of profits or revenue that it lost due to Iacovacci's conduct through:  (i) the Rule 30(b)(6) testimony of Douglas Monticciolo (Monticciolo 11/17/2021 Dep. Tr. ("Monticciolo 30(b)(6) Dep.") 721:21-722:7); (ii) the testimony of Mei-Li da Silva Vint (da Silva Vint Dep. 108:9-109:7, 110:3-111:13); (iii) the Rule 30(b)(6) testimony of Mei-Li da Silva Vint (da Silva Vint 11/18/2021 Dep. Tr. ("da Silva Vint 30(b)(6) Dep.") 30:9-13, 40:13-15, 42:20-44:24); (iv) the damages summary (BREVETNEW-044631 ("Damages Summary") at 1-2); (v) the Callahan 9/25/2018 Affidavit ¶¶ 4, 13-15; and (vi) the Callahan 3/24/2021 Affidavit ¶¶ 10-12.

P-71.   Brevet did not proffer any expert on damages.[71]

**Response to P-71:  Disputed**.  Brevet does not dispute that it did not proffer any independent expert on damages.  However, damages evidence was offered through Rule 30(b)(6) witnesses, Douglas Monticciolo and Mei-Li da Silva Vint, and the Damages

---

[69] BREVET-REPRO-0067776 at p. 49; BREVET-REPRO-0068156 at -68191.

[70] *See* Defs.' Resps. & Objs. to Pl.'s Fifth Interrogatory No. 15 (July 27, 2020); *see also* Callahan Aff. ¶¶ 4, 12-17, NYS Dkt. 319 (Sept. 25, 2018); Callahan Aff. ¶¶ 10-12, NYS Dkt. 1357 (Mar. 24, 2021). Defs.' NYS Resps. & Objs. to Pl.'s Third Interrogatory No. 15 (Sept. 25, 2018).

[71] *Cf.* Defs.' Resps. & Objs. to Pl.'s Fifth Interrogatory No. 15 (July 27, 2020) (deferring production of damages information to expert discovery which Brevet ultimately did not proffer).

Summary (Monticciolo 30(b)(6) Dep. 717:7-722:7, 723:2-11; da Silva Vint 30(b)(6) Dep. 30:9-13, 40:13-15, 42:20-44:24; Damages Summary at 1-2).

P-72.   Brevet has not identified any harm to Monticciolo or Callahan personally.[72]

**Response to P-72:  Disputed**.  Douglas Monticciolo and Mark Callahan have been named as individual defendants in this action by Iacovacci (ECF No. 1 ("Complaint') ¶¶ 19-20).  Douglas Monticciolo and Mark Callahan have also been named as individual defendants in the state action (NYSCEF Nos. 820, 930, 999).  Further, both Douglas Monticciolo and Mark Callahan have been harmed personally by the harm to Brevet (Monticciolo 30(b)(6) Dep. 717:7-722:7, 723:2-11; da Silva Vint Dep. 108:9-109:7, 110:3-111:13; da Silva Vint 30(b)(6) Dep. 30:9-13, 40:13-15, 42:20-44:24; Damages Summary at 1-2; Callahan 9/25/2018 Affidavit ¶¶ 4, 13-15; Callahan 3/24/2021 Affidavit ¶¶ 10-12)).

P-73.   Brevet has not identified existing investors of Brevet whose business relationships would have gone forward but for Iacovacci's actions.[73]

**Response to P-73:  Undisputed** to the extent that Brevet has not been able to identify "actual investors who [Plaintiff] diverted away from Brevet" based on what has been produced by Iacovacci (da Silva Vint 30(b)(6) Dep. 15:8-18).  **Disputed** to the extent that the cited request for production does not support this fact.  In the cited request for production, Plaintiff did not ask Defendants for information related to existing investors, but instead asked for information regarding "potential investors" (Defs.' Resps. & Objs. to Pl.'s Second Requests for Production No. 48 (Jan. 8, 2020) ("All Documents, Things,

---

[72] Countercls. ¶ 84 (Dkt. 79).
[73] da Silva Vint Dep. 14:4-15:18, Nov. 18, 2021; Defs.' Resps. & Objs. to Pl.'s Second Requests for Production No. 48 (Jan. 8, 2020).

and Communications Relating to Defendants' allegation that Plaintiff 'diverted
prospective clients away from Brevet,' [Am. Countercls, ¶ 41] including Documents
sufficient to Identify each allegedly diverted transaction and the 'prospective clients'
involved therewith").

P-74.   Brevet has not identified any contract that a third party breached because of
Iacovacci's actions.[74]

> **Response to P-74:  Disputed**.  Iacovacci interfered with the employment contracts of
> Brevet personnel, including Samuel Schuster while he was a consultant working with
> Negotium Advisors (Additional Facts ¶ P-158).  **Disputed**.  The cited portions of the
> deposition transcript do not support this fact.  In the cited portion of testimony, Plaintiff
> did not ask Mei-Li da Silva Vint about contracts that a third party breached because of
> Iacovacci's actions, but instead asked about "potential investors" of Brevet (da Silva Vint
> 30(b)(6) Dep. 14:4-15:18).

P-75.   Brevet has identified six potential transactions or third parties that it contends
Iacovacci diverted from Brevet: ████████████████████████
████████████████████████████████████[75]

> **Response to P-75:  Undisputed**.

---

[74] da Silva Vint Dep. 14:4-15:18, Nov. 18, 2021.
[75] da Silva Vint Dep. 6:16-18:17, Nov. 18, 2021.

P-76.   Brevet has provided only speculative testimony and no documents showing that any of those transactions would have been executed but for Iacovacci's actions.[76]

**Response to P-76:  Disputed**.  Mei-Li da Silva Vint, in her personal capacity and as a 30(b)(6) witness, provided testimony that transactions would have been executed but for Iacovacci's actions (da Silva Vint Dep. 108:9-109:7; 110:3-111:13; da Silva Vint 30(b)(6) Dep. 35:13-36:14, 37:9-38:13).

P-77.   Brevet provided no testimony about how much Brevet would have earned on any transactions with those third parties.[77]

**Response to P-77:  Disputed**.  The citations referenced do not support this fact.  In the cited portion of testimony, Plaintiff did not ask Mei-Li da Silva Vint about how much Brevet would have earned on such transactions.  Plaintiff did ask, and Ms. da Silva Vint answered, how much Brevet was planning to deploy for a transaction (da Silva Vint Dep. 30:9-16).  Brevet has also produced the Damages Summary which sets forth how much Brevet would have earned on transactions (Damages Summary at 1-2).

P-78.   Brevet had never engaged in transactions with any of those third parties.[78]

**Response to P-78:  Disputed**.  Brevet has engaged in a transaction brought to Brevet by Robert Nokley (Additional Facts ¶ P-152).  That transaction went to intake, but was not closed (Additional Facts ¶ P-152).  **Disputed**.  The cited portions of the deposition transcript do not support this fact.  In the cited portion of testimony, Plaintiff did not ask Mei-Li da Silva Vint about ever engaging in transactions with the third parties, but

---

[76] *See* da Silva Vint Dep. 6:16-18:17, 28:9-47:24, Nov. 18, 2021; da Silva Vint Dep. 106:11-111:13, Oct. 7, 2021; Iacovacci Aff. ¶¶ 3-12, NYS Dkt. 667 (July 16, 2019); Monticciolo Dep. 718:11-724:4, Nov. 17, 2021.

[77] *See* da Silva Vint Dep. 28:9-47:24, Nov. 18, 2021.

[78] *See* da Silva Vint Dep. 6:16-18:17, Nov. 18, 2021.

instead asked about "transactions or prospective clients Mr. Iacovacci diverted away from

Brevet" (da Silva Vint 30(b)(6) Dep. 6:16-18:17).

P-79.   In 2015, Callahan and Monticciolo rejected a potential investment by Vik

Kapoor's firm, Sprott, that Iacovacci brought to them.[79]

**Response to P-79:  Undisputed**.

P-80.   In 2016, Kapoor had another proposal, and Iacovacci told him to discuss it

directly with Monticciolo, since Iacovacci was leaving Brevet.[80]

**Response to P-80:  Undisputed** to the extent that Iacovacci told Vik Kapoor that he was

leaving Brevet (SPROTTBREV0113).  **Disputed** to the extent that Iacovacci gave Vik

Kapoor his personal email and phone number at this time and in September 2016 was

creating a financial model for Sprott himself (SPROTTBREV0113; BREVET 139461).

P-81.   Kapoor and Monticciolo met several times following that suggestion, but no deal

was executed.[81]

**Response to P-81:  Disputed**.  No deal was executed because Iacovacci was having

parallel discussions with Vik Kapoor (da Silva Vint Dep. 35:13-36:14).

P-82.   Brevet has never executed a deal with Nokley and has rejected him as a borrower

at least three times.[82]

**Response to P-82:  Disputed**.  Brevet has engaged in a transaction brought to Brevet by

Robert Nokley (Additional Facts ¶ P-152).  That transaction went to intake, but was not

---

[79] Iacovacci Aff. ¶¶ 5-8, NYS Dkt. 667 (July 16, 2019).

[80] Iacovacci Aff. ¶¶ 9-12, NYS Dkt. 667 (July 16, 2019).

[81] Iacovacci Aff. ¶¶ 9-12, NYS Dkt. 667 (July 16, 2019); da Silva Vint Dep. 28:9-37:8, Nov. 18, 2021.

[82] Iacovacci Aff. ¶ 14, NYS Dkt. 71 (Dec. 26, 2017).

closed (Additional Facts ¶ P-152).  **Disputed** that Brevet has rejected Nokley at least

three times (Iacovacci 12/26/2019 Affidavit ¶ 14).

P-83.   The funding criteria of Brevet Short Duration Holdings, LLC, and Brevet Short

Duration Partners, LLC, was initially to originate individual loans of at least $5 million with a

maturity of less than two years.[83]

> **Response to P-83:  Disputed**.  Brevet Short Duration Holdings, LLC, and Brevet Short
>
> Duration Partners, LLC do not have a minimum loan amount (Additional Facts ¶ P-155).
>
> Brevet has engaged in transactions under $500,000 (Additional Facts ¶ P-156).

P-84.   The funds' individual loan minimum was later increased to at least $10 million.[84]

> **Response to P-84:  Disputed**.  The funds do not have a minimum loan amount
>
> (Additional Facts ¶ P-155).  Brevet has engaged in transactions under $500,000
>
> (Additional Facts ¶ P-156).

P-85.   The only "deal" Iacovacci engaged in with Nokley was a $150,000 equity

investment that had nothing to do with lending, and the amount was far below the amount

needed for Brevet to be involved.[85]

> **Response to P-85:  Undisputed** to the extent that Iacovacci engaged in a deal with
>
> Robert Nokley.  **Disputed** to the extent that Iacovacci was also pursuing other
>
> opportunities with Robert Nokley, including one where final numbers were exchanged

---

[83] Iacovacci Aff. ¶ 3, NYS Dkt. 71 (Dec. 26, 2017).

[84] Iacovacci Aff. ¶ 3, NYS Dkt. 71 (Dec. 26, 2017); Cibrian Dep. Ex. 2 at 11 (Brevet 2016 website: "We seek transactions of $10 million to $75 million, with the capacity to participate in larger transactions up to $150 million.").

[85] Iacovacci Aff. ¶ 9, NYS Dkt. 975 (Jan. 22, 2020); Iacovacci Aff. ¶¶ 31-34, NYS Dkt. 382 (Nov. 1, 2018); Cibrian Dep. 22:15-23:7 (former Brevet managing director "would not have pursued" $150,000 equity investment as a potential Brevet transaction, "both because of the size and the investment type being equity").

with a purchase of $4.4 million (Additional Facts ¶ P-150).  **Disputed** to the extent that

Brevet has engaged in investments under $150,000 (Additional Facts ¶ P-157).

P-86.   A transaction amount of $150,000 was well below Brevet's minimum amount at

the time Iacovacci made his investment with Nokley.[86]

> **Response to P-86:  Disputed**.  Brevet has engaged in investments under $150,000
>
> (Additional Facts ¶ P-158).

## V.   Trade Secrets

P-87.   In January 2020, Defendants objected to producing any documents showing the

value of their alleged trade secrets, claiming the request "purports to require disclosure of expert

testimony, including without limitation concerning the value of Brevet Trade Secrets, in advance

of the date ordered by the Court."[87]

> **Response to P-87:  Disputed** to the extent that Iacovacci's Paragraph 87 presents
>
> Request No. 39 of Iacovacci's Second Request for Production (Jan. 8, 2020) as only
>
> requesting "any documents showing the value of [Brevet's] trade secrets."  In truth, that
>
> request calls for six broad subcategories of materials to be produced (*see* Defs.' Resps. &
>
> Objs. to Pl.'s Second Request for Production No. 39 (Jan. 8, 2020)).  Brevet further
>
> disputes Paragraph 87 because it fails to list each and every ground upon which Brevet
>
> objected to Iacovacci's Second Request for Production No. 39, and fails to mention that
>
> Brevet agreed to produce, and did produce, non-privileged documents responsive to this
>
> request (Defs.' Resps. & Objs. to Pl.'s Second Request for Production No. 39 (Jan. 8,
>
> 2020)).  Furthermore, Iacovacci's Paragraph 87 is immaterial because Brevet provided

---

[86] Iacovacci Aff. ¶ 14, NYS Dkt. 71 (Dec. 26, 2017); Cibrian Dep. Ex. 2 at 11.
[87] Defs.' Resps. & Objs. to Pl.'s Second Request for Production No. 39 (Jan. 8, 2020).

Iacovacci with information responsive to Iacovacci's Second Request for Production No. 39 through deposition testimony, sworn affidavits, discovery responses, and documents produced in this action and the related state action (*see* Callahan 1/17/2018 Affidavit ¶¶ 6-10, 14-15; Callahan 9/25/2018 Affidavit ¶¶ 4, 6-8, 10-19; Callahan 3/24/2021 Affidavit ¶¶ 5-14, 17; NYS Defs.' Resps. & Objs. to Pl.'s Third Interrogatories No. 6 (Sept. 25, 2018); Damages Summary; Brevet Witness Douglas Monticciolo for 30(b)(6) Topics).

P-88.   Defendants ultimately did not, however, proffer any expert to provide opinions as to the nature and value of Brevet's trade secrets.[88]

**Response to P-88:  Undisputed** to the extent that Brevet admits it did not proffer an independent expert to draft a report or give testimony regarding its trade secrets.  Douglas Monticciolo provided extensive testimony relating to the nature and value of Brevet's trade secrets in his capacity as Brevet's Rule 30(b)(6) witness (*see, e.g.*, Monticciolo Dep. 420-440, 488-489, 552:21-553:5, 602:8-603:5, 605:7-19, 619:18-620:2, 628-629:24, 646:8-647:4, 653:21-654:17, 674:4-675:6).

P-89.   Brevet's corporate representative testified that "Anything developed at Brevet is a trade secret that is confidential, proprietary and meets what we view to be a trade secret."[89]

**Response to P-89:  Undisputed** to the extent that Brevet confirms that Iacovacci accurately quoted a select portion of the deposition transcript of its 30(b)(6) witness Douglas Monticciolo.  **Disputed** in that Douglas Monticciolo identified specific trade secrets (Monticciolo 30(b)(6) Dep. 795 15-19; 793:17-794:6); how certain of Brevet's

---

[88] *See* Defs.' Rule 26 Expert Disclosures (Mar. 9, 2020) (disclosing anticipated expert to "provide opinions as to the nature and value of Brevet's trade secrets"—ultimately not proffered).

[89] Monticciolo Dep. 815:13-15; *see also id.* at 794:18-23, 794:24-795:7.

trade secrets were crafted (Monticciolo 30(b)(6) Dep. 796:9-21); how Brevet restricts

access to certain trade secrets to designated employees (Monticciolo 30(b)(6) Dep.

766:22-767:10, 769:11-23, 773:12-15); and the measures that Brevet takes to protect

certain trade secrets (Monticciolo Dep. 440:7-10; Monticciolo 30(b)(6) Dep. 798:22-25).

Furthermore, the Personnel Policies & Employee Handbook for Brevet Holdings, LLC

(2015) states that "'Trade Secrets' shall mean and include information, without regard to

form, including, but not limited to, technical or non-technical data, a formula, a pattern, a

compilation, a program, a device, a method, a technique, a drawing, a process, financial

data, product plans, or a list of actual or potential customers or suppliers which is not

commonly known by or available to the public and which information derives economic

value, actual or potential, from not being know to and being (i) readily ascertainable by

proper means by, other persons who can obtain economic value from its disclosure or

use; and (ii) is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy." (Employee Handbook at 28-29).

P-90.   Brevet's corporate representative identified approximately forty-one purported

categories of Brevet trade secrets (including approximately six categories as to which Brevet

concedes it has not identified any damages from misappropriation).[90]

> **Response to P-90:  Disputed** to the extent that the cited portions of the deposition
>
> transcript, including the speeches made by Iacovacci's counsel, do not support this fact
>
> (*see* Monticciolo Dep. 420-446, 602-675.  **Disputed**.  Douglas Monticciolo identified
>
> exactly forty-one categories of Brevet trade secrets (*see* Monticciolo Dep. 420-428, 431-
>
> 434, 646-648).

---

[90] Monticciolo Dep. 420-46, 602-75.

P-91.   For example, Brevet identified "Vacation policies" and "Vacation days, what the holidays are" as a purported trade secret.[91]

> **Response to P-91:  Undisputed** to the extent that Brevet confirms that Iacovacci
>
> accurately quoted a select portion of the deposition transcript of its 30(b)(6) witness
>
> Douglas Monticciolo.  **Disputed** to the extent that Iacovacci misconstrued Douglas
>
> Monticciolo's testimony regarding Brevet's trade secret relating to the holidays relevant
>
> to its business, its investors and its borrowers.  Douglas Monticciolo clarified that he
>
> "didn't say that the holiday is proprietary, I said the holidays and how we manage
>
> them . . . Make them available," (Monticciolo Dep. 433:16-20) "Again, I said our holiday
>
> policy approach or policy, not the specific holidays (Monticciolo Dep. 436:12-14).
>
> Additionally, Douglas Monticciolo explained precisely how Brevet's holiday policy is a
>
> trade secret given Brevet's status as an open-ended fund: "we get a big advantage and
>
> have historically for the fact that we count holidays differently" (Monticciolo Dep.
>
> 674:18-20, 674:4-675:6).

P-92.   For each of Brevet's purported categories, however, the record is devoid of specific evidence concerning (i) the extent to which the information is known outside of Brevet; (ii) the extent to which the information is known by employees and others involved in the business; (iii) the extent of measures taken by Brevet to guard the secrecy of the information; (iv) the value of the information to Brevet and its competitors; (v) the amount of effort or money

---

[91] Monticciolo Dep. 432:17-433:3.

expended by Brevet in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others.[92]

> **Response to P-92:  Disputed** to the extent that the discovery responses cited by Iacovacci do not support this fact (*see* Defs.' Resps. & Objs. to Pl.'s Second Requests for Production Nos. 44, 46 (Jan. 8, 2020)).  Furthermore, the record is replete with specific evidence responsive to the six categories listed in Iacovacci's Paragraph 92 (*see* Callahan 1/17/2018 Affidavit ¶¶ 6-10, 14-15; Callahan 9/25/2018 Affidavit ¶¶ 4, 6-8, 10-19; Callahan 3/24/2021 Affidavit ¶¶ 5-14, 17; NYS Defs.' Resps. & Objs. to Pl.'s Third Interrogatories No. 6 (Sept. 25, 2018); Damages Summary; Brevet Witness Douglas Monticciolo for 30(b)(6) Topics).

P-93.   Brevet cannot identify any specific investor list that Iacovacci misappropriated.[93]

**Response to P-93:  Disputed** to the extent that the cited testimony does not support this fact.  Douglas Monticciolo testified that, during his deposition, he could not identify specific emails by which Iacovacci misappropriated Brevet's investor lists, or "name" specific investor lists that Iacovacci misappropriated (Monticciolo Dep. 655:13-656:7; Monticciolo 30(b)(6) Dep. 760:6-11).  Additionally, on October 10, 2016 Iacovacci forwarded to his personal email iacovacccifamily1@verizon.net an email titled "Private Equity Capital Sources & Contacts – Fundraising, Deal Sourcing, Investors Contact Databases: 27,850 contacts" attaching a swath of excel sheets listing thousands of potential investors (*see* BREVET-REPRO-078596-078613).

---

[92] *See* Defs.' Resps. & Objs. to Pl.'s Second Requests for Production Nos. 44, 46 (Jan. 8, 2020) (refusing to produce documents relating to Brevet's "putative harm or damages resulting from Plaintiff's alleged misappropriation of Brevet's confidential information or trade secrets" or relating to efforts by Brevet "to protect the Brevet Trade Secrets from misappropriation").

[93] Monticciolo Dep. 655:7-17, 760:5-10.

P-94.    Brevet cannot identify any specific sourcing client list that Iacovacci

misappropriated.[94]

**Response to P-94:  Disputed** to the extent that the cited testimony does not support this

fact.  Douglas Monticciolo testified that he could not recall the exact date on which

Iacovacci misappropriated Brevet's sourcing list, but that the information responsive to

Iacovacci's counsel's line of questioning regarding the date that Iacovacci

misappropriated Brevet's sourcing list is shown in various affidavits and the documents

cited therein (Monticciolo 30(b)(6) Dep. 779:19-780:12).  Furthermore, with its response

to Interrogatory 6 of Iacovacci's Third Set of Interrogatories dated September 24, 2018

(State Action) Brevet identified an email dated October 29, 2015 by which Iacovacci sent

to his personal email iacovaccifamily@nycrr.com a document titled "Sourcing.CSV"

(BREVET-REPRO-0031398; BREVET-REPRO-0040650) a "sourcing list" containing

the contact information for 2,244 of Brevet's sourcing contacts.  Brevet likewise

identified a slew of other sourcing-related documents that Iacovacci also sent to that same

email account on October 29, 2015, among many other proprietary documents belonging

to Brevet (*see* BREVET-REPRO-0031486).  These include two Brevet PowerPoints

titled "Sourcing and Sectors" (BREVET-REPRO-0040873; BREVET-REPRO-0040875);

documents titled "Sourcing Network" (BREVET-REPRO-0040874); "Brevet Sourcing

Channels" (BREVET-REPRO-0040877); "Targeting and Sourcing Checklist"

(BREVET-REPRO-0040612); "sourcing.xlsx" (DEL00067470-67471); and "Fund III

Fund X Deal Sourcing December 2014v2.xlsx" (DEL00066893-66894).  Mark Callahan

confirmed that Iacovacci misappropriated Brevet's client, customer, and investor lists

---

[94] Monticciolo Dep. 762:11-764:25.

(Callahan 1/17/2018 Affidavit ¶ 14; Callahan 9/28/2018 Affidavit ¶¶ 10, 16).  During his deposition Iacovacci confirmed that he has likely marketed his new firm, Enascor Capital, to at least some of the same business contacts Brevet maintained from 2013-2016 (Iacovacci 10/6/2021 Dep. Tr. ("Iacovacci Dep.") 54:3-9, 55:10-15).

P-95.   Brevet cannot identify a specific date when Iacovacci misappropriated a sourcing list.[95]

**Response to P-95:  Disputed** to the extent that the cited testimony does not support this fact.  Douglas Monticciolo testified that at his deposition he could not recall the exact date on which Iacovacci misappropriated Brevet's sourcing list, but that the information responsive to Iacovacci's counsel's line of questioning regarding the date that Iacovacci misappropriated Brevet's sourcing list is shown in various affidavits and the documents cited therein (Monticciolo 30(b)(6) Dep. 779:19-780).  Furthermore, with its response to Interrogatory 6 of Iacovacci's Third Set of Interrogatories dated September 24, 2018 (State Action) Brevet identified an email dated October 29, 2015 by which Iacovacci sent to his personal email iaccovaccifamily@nycrr.com a document titled "Sourcing.CSV" (BREVET-REPRO-0031398, 0040650) a "sourcing list" containing the contact information for 2,244 of Brevet's sourcing contacts.  Brevet likewise identified a slew of other sourcing-related documents that Iacovacci also sent to that same email account, among many other proprietary documents belonging to Brevet (*see* BREVET-REPRO 0031486).  These include two Brevet PowerPoints titled "Sourcing and Sectors" (BREVET-REPRO 0040873, 0040875); documents titled "Sourcing Network" (BREVET-REPRO-0040874); "Brevet Sourcing Channels" (BREVET-REPRO-

---

[95] Monticciolo Dep. 779:9-780:12.

0040877); "Targeting and Sourcing Checklist" (BREVET-REPRO-0040612);

"sourcing.xlsx" (DEL00067470-67471); and "Fund III Fund X Deal Sourcing December

2014v2.xlsx" (DEL00066893-66894).  Mark Callahan confirmed that Iacovacci

misappropriated Brevet's client, customer, and investor lists (Callahan 1/17/2018

Affidavit ¶ 14; Callahan 9/28/2018 Affidavit ¶¶ 10, 16).  During his deposition Iacovacci

confirmed that he has likely marketed his new firm, Enascor Capital, to at least some of

the same business contacts Brevet maintained from 2013-2016 (Iacovacci Dep. 54:3-9,

55:10-15).

P-96.   Prospective investors are not required to execute non-disclosure agreements to

receive investor presentations from Brevet.[96]

**Response to P-96:  Disputed** to the extent that the cited testimony does not support this

fact.  Douglas Monticciolo never made a blanket statement that Brevet does not require

execution of non-disclosure agreements for any and all "investor presentations."

(Monticciolo 30(b)(6) Dep. 800:18-801:2).  Douglas Monticciolo testified that those

presentations that Brevet distributes absent the execution of non-disclosure agreements

are sent only to "qualified investors." (Monticciolo 30(b)(6) Dep. 800:22-801:2).

P-97.   Prospective investors are not required to return to Brevet any materials they

receive prior to executing a non-disclosure agreement.[97]

**Response to P-97:  Disputed** to the extent that the cited testimony does not support this

fact. "Qualified investors" who receive the PowerPoint presentation discussed during

---

[96] Monticciolo Dep. 800:18-801:2.
[97] Monticciolo Dep. 801:18-802:7.

Douglas Monticciolo's deposition are not required to return that PowerPoint presentation. (Monticciolo Dep. 801:18-802:7).

P-98.   Prospective investors sign a non-disclosure agreement only when they want to learn more than what is contained in the investor presentation.[98]

**Response to P-98:  Disputed** to the extent that the cited testimony does not support this fact in that Douglas Monticciolo did not testify that prospective investors "only" sign a non-disclosure agreement "when they want to learn more than that is contained in the investor presentation" (Monticciolo 30(b)(6) Dep. 801:8-10).

P-99.   Information provided to potential investors prior to execution of non-disclosure agreements is not "critical to Brevet."[99]

**Response to P-99:  Disputed** to the extent that this fact misrepresents Douglas Monticciolo's testimony.  Mr. Monticciolo testified that Brevet requires qualified investors to sign non-disclosure agreements "[w]hen they want to learn more than" what is in the PowerPoint presentation "[b]ecause the information beyond that point is critical to Brevet" (Monticciolo 30(b)(6) Dep. 801:9-14).

P-100.  At least some of Brevet's investor presentations are publicly available—for example, Brevet shared a presentation for the Brevet Direct Lending Intermediate Duration Fund at the Ulrich 2020 Economic Summit in 2020.[100]

**Response to P-100:  Disputed** to the extent that the cited evidence does not support that "[a]t least some" of Brevet's investor presentations are publicly available.  Brevet admits

---

[98] Monticciolo Dep. 801:8-10.
[99] Monticciolo Dep. 801:8-15.
[100] *See* https://ulrichcg.com/wp-content/uploads/2020/02/Ulrich-2020-Economic-Summit-Presentation-for-Upload.pdf, pages 143-65 (available as of Dec. 10, 2021).

that the "Brevet Direct Lending Intermediate Duration Fund" presentation, dated 2018,

may be accessed through the following url: https://ulrichcg.com/wp-

content/uploads/2020/02/Ulrich-2020-Economic-Summit-Presentation-for-Upload.pdf.

The foregoing presentation is not among the documents that Iacovacci misappropriated

from Brevet (*see, e.g.*, NYS Defs.' Resps. & Objs. to Pl.'s Third Interrogatories No. 6

(Sept. 25, 2018)).

P-101.  Brevet publicly filed an October 2015 "Brevet Direct Lending – Short Duration

Fund, L.P." presentation on the New York state court docket in June 2019.[101]

> **Response to P-101:  Undisputed.** The October 2015 "Brevet Direct Lending – Short
>
> Duration Fund, L.P." presentation is one of several Brevet presentations that Iacovacci
>
> misappropriated (*see* BREVET-REPRO-31601; BREVET-REPRO-0041255).  For
>
> instance, Iacovacci also misappropriated the October 2015 "Brevet Direct Lending –
>
> Intermediate Duration Fund, L.P." presentation ("Intermediate Duration Fund
>
> Presentation") (BREVET-REPRO-31601; BREVET-REPRO-0041255).  The
>
> Intermediate Fund Duration Presentation differs from the Short Duration Fund
>
> Presentation because it details an entirely different fund that Brevet manages, and
>
> includes descriptions of structuring and underwriting, risk management, and the
>
> Intermediate Duration Fund's bespoke strategy (BREVET-REPRO-0041267-41268,
>
> 41264).

---

[101] NYS Dkt. 604 at SPROTT/BREV 0165-91.

P-102.  Free NDA templates can readily be found through a simple web search.[102]

**Response to P-102:  Undisputed** to the extent that Brevet admits that a Small Business

Administration NDA Template may be accessed through the following url:

https://www.sba.com/legal/tools-and-templates/non-disclosure-agreement/.  **Disputed** to

the extent that this factual assertion bears any relevance to the negotiated terms found in

Brevet's NDAs.

P-103.  Brevet's "Targeting and Sourcing Checklist" is a list of seven industry standard

activities that are generally known in the industry.[103]

**Response to P-103:  Disputed** to the extent that the cited evidence does not support that

Brevet's "Targeting and Sourcing Checklist" itself is "generally known."  Mr. Librock

admitted that he has never worked at or on behalf of a hedge fund, or for any entity that

he would consider a "private fund" (Librock 12/3/2021 Dep. Tr. ("Librock Dep.") 64:24-

65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business

(Librock Dep. 98:9-18).

P-104.  Brevet's "Case Studies v36" which contains descriptive summaries of certain

loans with no details on the transaction sourcing, loan approval, or administration.[104]

**Response to P-104:  Disputed** to the extent that the cited evidence does not support that

Brevet's "Case Studies v36" contains "descriptive summaries" alone.  The "Case Studies

v36" document contains detailed information regarding seventeen loan granted by Brevet

---

[102] Librock Report n.21; Small Business Administration NDA template, available at
https://www.sba.com/legal/tools-and-templates/non-disclosure-agreement/ (accessed Dec. 10, 2021).
[103] BREVET 035261; Librock Report ¶ 20; Defs.' NYS Supp. Resp. to First Interrogatory No. 23 (Sept.
29, 2017).
[104] BREVET 034805 (NYS Dkt. 1293); Librock Report ¶ 20(c); Defs.' NYS Supp. Resps. & Objs. to Pl.'s
First Interrogatory No. 23 (Sept. 29, 2017).

to seventeen different borrowers including (i) the sectors in which the borrowers operate, (ii) the date the loans were extended to the borrowers, (iii) the size of the individual loan facilities; (iv) interest rates; (v) terms; (vi) fees; (vii) IRRs; (viii) overviews of the specific borrowers; (ix) the investment rationale supporting the loans; and (x) the impact that each transaction had on Brevet's fund structure (BREVET 034806-34830).  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep. 98:9-18).

P-105.  Brevet's "Transaction Summaries" and "Example Transactions" documents identify scenarios that are well known in the commercial lending industry.[105]

**Response to P-105:  Disputed** to the extent that the cited evidence does not support this fact.  Brevet's "Transaction Summaries" and "Examples Transactions" documents describe different investment opportunities, the sorts of transactions Brevet's structures to capitalize on those opportunities, the motivation for the transaction, the investment rationale for placing those transactions, and the historical or target return on such transactions (BREVET 034790-34796; BREVET-REPRO-011163-69).  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep. 98:9-18).

---

[105] Librock Report ¶ 20(d); Librock Aff. ¶¶ 7-8 NYS Dkt. 1336 (Mar. 12, 2021); BREVET-REPRO 0111663-69; BREVET034789; *see also* Defs.' NYS Supp. Resps. & Objs. to Pl.'s First Interrogatory No. 31 (Sept. 29, 2017).

P-106.  Brevet's introductory email that it sent to potential customers describes Brevet's experience in an area of financing with well-defined and publicly known guidelines and procedures.[106]

**Response to P-106:  Disputed.** The email that Brevet sends its potential customers describes Brevet's business in carefully vetted, proprietary terms; sets forth examples of actual Brevet borrowers, using Brevet's unique or differentiated method for doing so; and sets forth Brevet's actual experience in various types of financing (Callahan 2/23/2021 Affidavit ¶ 10).  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep. 98:9-18).

P-107.  The Brevet Capital "one pager" flyer is a high-level promotional document that contains generic market statements that apply to a multitude of national and regional lenders.[107]

**Response to P-107:  Disputed** as to "high level" and "generic statements."  The Brevet Capital "one-pager" describes Brevet's business in carefully vetted, proprietary terms; sets forth examples of actual Brevet borrowers, using Brevet's unique or differentiated method for doing so; and sets forth Brevet's actual experience in various types of financing (Callahan 2/23/2021 Affidavit ¶ 10).  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep. 98:9-18).

---

[106] Librock Aff. ¶ 5, NYS Dkt. 1236 (Feb. 8, 2021); Librock Aff. ¶ 7, NYS Dkt. 1352 (Mar. 19, 2021); NYS Dkts. 1204, 1291.
[107] Librock Aff. ¶ 6, NYS Dkt. 1236 (Feb. 8, 2021); NYS Dkt. 1203.

P-108.  Brevet's "Case Studies" document from September 2012 contains basic summaries of account receivables financing transactions (a widely practiced form of lending) dating from 2011.[108]

> **Response to P-108:  Disputed.**  The document cited in the Affidavit of Neil Librock dated March 19, 2021 bears excerpts of Brevet's "Case Studies v36" document, compared against excerpts of materials Iacovacci uses to promote Enascor Capital (NYS Dkt. 1293, 1352).  The full "Case Studies v36" document contains detailed information regarding seventeen loans granted by Brevet to seventeen different borrowers including (i) the sectors in which the borrowers operate, (ii) the date the loans were extended to the borrowers, (iii) the size of the individual loan facilities; (iv) interest rates; (v) terms; (vi) fees; (vii) IRRs; (viii) overviews of the specific borrowers; (ix) the investment rationale supporting the loans; and (x) the impact that each transaction had on Brevet's fund structure (BREVET 034806-34830).  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep. 98:9-18).

---

[108] Librock Aff. ¶ 9, NYS Dkt. 1352 (Mar. 19, 2021); NYS Dkt. 1293.

P-109.  In publicly available video of Monticciolo's "SALT Talk," Monticciolo openly discusses Brevet's business strategy and cumulative financial performance.[109]

**Response to P-109:  Disputed** as to "openly."  Douglas Monticciolo did not disclose any of Brevet's confidential or proprietary information relating to "business strategy and cumulative financial performance" during his "SALT Talk."

P-110.  Brevet is unable to identify any instance in which Iacovacci misappropriated "offering materials."[110]

**Response to P-110:  Disputed.**  With respect to Brevet's "offering materials," Douglas Monticciolo testified that he is "certain that those materials were taken" by Iacovacci "but I cannot put a date on specifically when they were taken" (Librock Dep. 888:12-20).

P-111.  Brevet's Valuation Principles and Procedures state that all assets will be valued in accordance with U.S. generally accepted accounting principles ("GAAP").[111]

**Response to P-111:  Undisputed** that Brevet's Valuation Principles and Procedures conform with GAAP.  **Disputed** to the extent that Brevet's Valuation Principles and Procedures are not themselves specified by GAAP.

---

[109] *See* "Douglas Monticciolo: Financing a Post-Coronavirus 'Reboot' of the Economy," *available at* https://www.youtube.com/watch?v=Qo6acA1p9PI&ab_channel=SALT (discussing Brevet's financial performance at approximately 19:30 and its business model at approximately 25:10).

[110] Monticciolo Dep. 893:9-14.

[111] BREVET 146790-146904 at -890.

P-112. The Valuation Principles and Procedures cite various valuation levels for different assets classes. These valuation levels are all defined by GAAP.[112]

**Response to P-112:  Undisputed** that the valuation levels are defined by GAAP.

**Disputed** to the extent that Brevet's Valuation Principles and Procedures are not themselves defined by GAAP.

P-113.  The policies set out in Brevet's "Transaction Process and Procedures" manual dated October 2015 are not unique to Brevet and are consistent with similar documents at other financial institutions.[113]

**Response to P-113:  Disputed** as to "not unique to Brevet."  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep.  98:9-18).  Douglas Monticciolo testified that Brevet uses its process and procedures to create competitive barriers in its investment strategy, and that what Brevet does is "unique" (Monticciolo 30(b)(6) Dep. 860-861).  Moreover, the Transaction Process and Procedures manual cited by Iacovacci is dated July 2015, not October 2015 (DEL00013447).

P-114.  Brevet's sourcing strategy contained in Brevet's "Transaction Process and Procedures" manual dated October 2015 is a high-level overview without any quantitative information that would give a third party insight into any process unique to Brevet.[114]

**Response to P-114:  Disputed.**  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock

---

[112] BREVET 146790-146904 at -892; Librock Report ¶ 29.
[113] Librock Report ¶ 27; DEL00013447-13583 at -484.
[114] Librock Report ¶ 27(a); DEL000013451, DEL000013453.

Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge

fund business (Librock Dep. 98:9-18).  Douglas Monticciolo testified that Brevet uses its

process and procedures to create competitive barriers in its investment strategy, and that

what Brevet does is "unique" (Monticciolo 30(b)(6) Dep. 860-861).  The Transaction

Process and Procedures manual cited by Iacovacci is dated July 2015, not October 2015

(DEL00013447).  Moreover, Brevet's "Transaction Process and Procedures" manual

refers the reader to Brevet's "Credit Policy" for more specific information

(DEL00013455, 13484, 13488, 13490).  Brevet's Credit Policy dated July 2015 includes

Brevet's credit principles (P-01-0010211), credit underwriting guidelines (P-01-0010212-

10217), models for specific transactions (P-01-0010223), and formulas (P-01-0010227,

10240, 10253, 10267) for various of Brevet's bespoke lending strategies.  Mr. Librock

did not consider, much less cite to, Brevet's Credit Policy in issuing his report (Librock

Report at Ex. B).

P-115.  Brevet's underwriting information contained in Brevet's "Transaction Process and

Procedures" manual dated October 2015 does not contain any formulas or models to guide a

credit analyst and instead contains underwriting information that is referenced in academic texts

such as Richard Brealey, Stewart Myers, & Alan Marcus, *Fundamentals of Corporate Finance*

(10th ed.) at 283-93 and federal financial guidance such as "Interagency Statement on Sound

Practices Concerning Elevated Risk Complex Structured Finance Activities," *Approval Process*.

Federal Register Vol. 72 No. 7, p. 1379.[115]

**Response to P-115:  Disputed.**  Mr. Librock admitted that he has never worked at or on

behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock

---

[115] Librock Report ¶ 27(d).

Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge

fund business (Librock Dep. 98:9-18).  Douglas Monticciolo testified that Brevet uses its

process and procedures to create competitive barriers in its investment strategy, and that

what Brevet does is "unique" (Monticciolo 30(b)(6) Dep. 860-861).  The Transaction

Process and Procedures manual cited by Iacovacci is dated July 2015, not October 2015

(DEL00013447).  Moreover, Brevet's "Transaction Process and Procedures" manual

refers the reader to Brevet's "Credit Policy" for more specific information

(DEL00013455, 13484, 13488, 13490).  Brevet's Credit Policy, dated July 2015, includes

Brevet's credit principles (P-01-0010211), credit underwriting guidelines (P-01-0010212-

10217), models for certain transactions (P-01-0010223), and formulas (P-01-0010227,

10240, 10253, 10267) for various of Brevet's bespoke lending strategies.  Mr. Librock

did not consider, much less cite to, Brevet's Credit Policy in issuing his report (Librock

Report at Ex. B).

P-116.  "Transaction Process and Procedures" manual dated October 2015 do not contain

detailed instruction and instead contains clerical and document checking functions that are

typical in commercial loan transactions.[116]

**Response to P-116:  Disputed.**  Mr. Librock admitted that he has never worked at or on

behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock

Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge

fund business (Librock Dep. 98:9-18).  Douglas Monticciolo testified that Brevet uses its

process and procedures to create competitive barriers in its investment strategy, and that

what Brevet does is "unique." (Monticciolo 30(b)(6) Dep. 860-861).  The Transaction

---

[116] DEL000013492; Librock Report ¶ 27(f).

Process and Procedures manual cited by Iacovacci is dated July 2015, not October 2015 (DEL00013447).  Moreover, Brevet's "Transaction Process and Procedures" manual refers the reader to Brevet's "Credit Policy" for more specific information (DEL00013455, 13484, 13488, 13490).  Brevet's Credit Policy dated July 2015 includes Brevet's credit principles (P-01-0010211), credit underwriting guidelines (P-01-0010212-10217), models for certain transactions (P-01-0010223), and formulas (P-01-0010227, 10240, 10253, 10267) for various of Brevet's bespoke lending strategies.  Mr. Librock did not consider, much less cite to, Brevet's Credit Policy in issuing his report (Librock Report at Ex. B).

P-117.  In Brevet's risk management policies, the Brevet risk rating definitions are virtually a direct copy of published financial regulations.[117]

**Response to P-117:  Disputed** to the extent that the cited evidence does not support this fact.  Mr. Librock posits that "[t]he Brevet risk rating definitions are virtually a direct copy of published financial regulations.  There is no commercially sensitive information here" without any documentary support (Librock Report ¶ 27(i)).

P-118.  Brevet's credit memoranda follow a typical form and format and contain industry standard terminology and analysis.[118]

**Response to P-118:  Disputed** to the extent that the cited evidence does not support this fact.  Mr. Librock admitted that he has never worked at or on behalf of a hedge fund, or for any entity that he would consider a "private fund" (Librock Dep. 64:24-65:7, 66:2-4).  Mr. Librock admitted that he has no experience in the hedge fund business (Librock Dep.

---

[117] DEL000013492; Librock Report ¶ 27(i).
[118] Librock Report ¶ 35; BREVET020789-839.

98:9-18).  Additionally, Douglas Monticciolo testified that Brevet's credit memoranda detail why Brevet "should make or invest in a certain transaction," and are "typically put together by [Brevet's] deal team," and contain "a recommendation to the investment committee" as to whether Brevet should pursue a transaction (Monticciolo 30(b)(6) Dep. 894:7-13).

P-119.  Brevet advertises its track record on its website, and Monticciolo has made public statements about Brevet's track record.[119]

**Response to P-119:  Disputed** to the extent that the cited evidence does not support this fact.  Brevet's track record is housed within Brevet's finance department (Monticciolo 30(b)(6) Dep. 781:781:6-23), and "contains the performance of every asset that we've originated, how it's performed, how it's produced, its performance, [and] the measures of that performance" (Monticciolo 30(b)(6) Dep. 782:19-25).  Brevet guards its track record very carefully (Monticciolo 30(b)(6) Dep. 784:25-785:2).  Further, the SEC has interpreted "track record" to mean "the prior performance results of accounts managed" by an entity (*see* Additional Facts ¶ P-159).  Additionally, Mr. Librock testified that he was unaware of how the term "track record" is used by registered investment advisers (Librock Dep. 137:22-138:2), and confirmed that he used the phrase "track record" in his report to "broadly' refer to "how [] something has performed over time" (Librock Dep. 138:3-5).  Mr. Librock also testified that he is not an expert in "the disclosure

---

[119] *See, e.g.*, https://brevetcapital.com/ ("The firm's experienced management team has a successful track record of creating exclusive and often proprietary financing solutions for our partners that are sustainable through multiple economic cycles."); https://www.businesswire.com/news/home/20190211005472/en/Brevet-Capital-Purchases-PanOptis ("Brevet has a 20-year track record of partnering with U.S. state, federal, and international government agencies to provide unique financing solutions."); http://www.wealthandfinancenews.com/issues/alternative-investment-awards-2016/44/ (Mr. Monticciolo discusses Brevet's "strong six-year track record of providing senior secured loans to private companies").

requirements that are unique to the hedge fund industry," and did not know the difference

between "describing" a track record and "disclosing' a track record (Librock Dep.

138:21-139:2).  However, Mr. Librock admitted that there may be details about Brevet's

track record that "go beyond the statements on Brevet's website" or "statements made by

Mr. Monticciolo about Brevet's track record" (Librock Dep. 139:3-10).

P-120.  There is no evidence that Iacovacci accessed or misappropriated Brevet's

purported "track record" Excel spreadsheet document.[120]

**Response to P-120:  Disputed** to the extent that the cited evidence does not support this

fact.  Mr. Monticciolo testified that he could not point to the specific email by which

Iacovacci misappropriated Brevet's track record, not that there was no evidence that

Iacovacci accessed or misappropriated it (Monticciolo 30(b)(6) Dep. 791:15-21).

P-121.  Information about Brevet's assets and investments are stale and out of date after

approximately twelve months.[121]

**Response to P-121:  Disputed** to the extent that the cited evidence does not support this

fact.  Brevet's Direct Lending – Short Duration Fund, L.P. fact sheet, dated September

30, 2015, states that Brevet's Short Duration Fund "targets high current yield, short

duration assets (generally less than 12 months)" (BREVET 034614).  Moreover, Mr.

Librock could not state whether "information about Brevet's assets and investments from

2015 to 2016" would carry any economic value in October 2016 (Librock Dep. 150:11-

151:1).

---

[120] Monticciolo Dep. 781:6-784:20, 789:4-791:21.

[121] Librock Report ¶ 38; Short Duration Fund Fact Sheet, BREVET034614.

P-122.  Brevet is "a financial management and advisory services firm" that "serves the financing needs of companies seeking to raise capital, and does so primarily through the provision of senior-secured loans funded by funds managed by Brevet."[122]

**Response to P-122:  Disputed** that Brevet Capital Management, LLC is a financial management and advisory firm.  Brevet Capital Management, LLC is registered investment advisor (Consolidated Rule 56.1 Statement ("56.1 Statement") ¶¶ D3, D4).

P-123.  Brevet is not aware of any other entities using Brevet's fund structure or purported trade secrets related to Brevet's loan documents.[123]

**Response to P-123**: **Undisputed.**

BREVET'S STATEMENT OF ADDITIONAL MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1

P-124.  Brevet Holdings, LLC does not provide financial management services to entities beyond Brevet's funds (Callahan 12/23/2021 Supp. Decl. ("Callahan Supp. Decl.") ¶ 3).

P-125.  Brevet Short Duration Partners, LLC does not provide financial management services to entities beyond Brevet's funds (Callahan Supp. Decl. ¶ 3).

P-126.  Brevet Short Duration Holdings, LLC does not provide financial management services to entities beyond Brevet's funds (Callahan Supp. Decl. ¶ 3).

P-127.  Douglas Monticciolo is a Managing Director of Brevet Holdings, LLC, Managing Member of Brevet Short Duration Holdings, LLC, and Managing Director of Brevet Short Duration Partners, LLC (Monticciolo Dep. 52:13-20; BREVET-REPRO-0152243).

---

[122] Callahan Aff. ¶ 2, NYS Dkt. 72 (Jan. 17, 2018).

[123] *See* Monticciolo Dep. 805:15-806:5, 807:21-808:2, 829:7-10, 834:21-835:5, 837:17-838:7, 840:2-9, 848:7-19, 858:17-25; Librock Report ¶¶ 40, 45, 46.

P-128.  The Brevet-named entities did not exist in 2004 (Callahan Supp. Decl. ¶ 2).

P-129.  Iacovacci joined FCS Advisors, Brevet's predecessor, in 2004 (Callahan Supp. Decl. ¶ 2).

P-130.  The Investment Committee reviews investments that are recommended by other Brevet professionals after a comprehensive evaluation process, and makes the ultimate decision to approve the investment opportunity (Callahan Decl. ¶ 4).

P-131.  Iacovacci did not have other employees reporting to him in the process of finding and vetting borrowers (Callahan Supp. Decl. ¶ 6).

P-132.  When Iacovacci found deals, he brought them to intake meetings, and if approved, then to the members of Deal Team, who would then vet the deal (Callahan Supp. Decl. ¶ 6).

P-133.  Iacovacci was on the senior management team at Brevet (Callahan Supp. Decl. ¶ 5).

P-134.  Iacovacci worked only at home from December 2015 to October 2016 (Iacovacci Dep. 104:24-106:11).

P-135.  Iacovacci did not inform Brevet that he was retiring from Brevet (Callahan Dep. 165:3-22, 192:11-23).

P-136.  Iacovacci continued to be an employee of Brevet Holdings, LLC until his termination on October 14, 2016, and continued to receive benefits and salary (Callahan Dep. 156:23-157:4, 158:16-159:18).

P-137.  In 2016, Iacovacci started to engage in other transactions counter to Brevet and Brevet's investors (Callahan Dep. 157:5-23).

P-138.  In January 2016, Iacovacci did not bring up the topic of withdrawal from Brevet Short Duration Partners, LLC or Brevet Short Duration Holdings, LLC or retirement from Brevet Holdings, LLC (Callahan Dep. 165:6-22, 169:6-18).

P-139.  Iacovacci's retirement was never announced to Brevet (Callahan Dep. 263:19-264:7; Cibrian 10/7/2021 Dep. Tr. ("Cibrian Dep.") 38:24-39:3; Monticciolo Dep. 317:8-21).

P-140.  Iacovacci was the one telling other Brevet employees that he was retiring (Callahan Dep. 266:5-20).

P-141.  It is standard practice at Brevet to have a separation agreement for departing employees (Callahan Dep. 227:9-15).

P-142.  Iacovacci wanted to work as an employee at Brevet for as long as possible and to receive benefits and salary from Brevet (Callahan Dep. 239:18-240:13).

P-143.  Iacovacci constantly changed his demands throughout the separation agreement negotiations (Callahan Dep. 423:20-25).

P-144.  Iacovacci never provided 180 days' notice in writing to withdraw from Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC (Callahan Dep. 192:11-23).

P-145.  The LLC Agreements of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC require "one hundred and eighty (180) days prior written notice to the Company of such Member's intention to withdraw" for a Member to voluntarily withdraw (LLC Agreements at 9).

P-146.  Brevet did not know about Plaintiff's complaint in state court (*Iacovacci v. Brevet Holdings, LLC*, Index No. 158735/2016 (N.Y. Sup. Ct.) until November 2016 when it received a copy of the complaint from its registered agent (Callahan Supp. Decl. ¶ 9).

P-147.  Johnny Lan did not ask for Iacovacci's password when Iacovacci requested technological assistance (*see generally* Lan 11/17/2017 Affidavit ¶ 11)

P-148.  At his deposition, Iacovacci testified that he was aware of a three month non-compete provision, which is found in the Employee Handbook (Iacovacci Dep. 215:16-216:5; Employee Handbook at 28).

P-149.  Brevet maintains its own unique Non-Disclosure Agreement ("NDA") (da Silva Vint Dep. 80:10-21.

P-150.  While Iacovacci was employed by Brevet, Iacovacci was pursuing other opportunities with Robert Nokley, including one where final numbers were exchanged with a purchase of $4.4 million (P-02-0003864).

P-151.  Brevet's decision to terminate Iacovacci was an HR decision.

P-152.  Brevet had previously engaged in a transaction that Robert Nokley had brought to Brevet and went to intake, but was not closed (Nokley Dep. 12:16-24; BREVET-REPRO-0073043 at 15-18; BREVET-REPRO-0104405).

P-153.  Brevet considers all of the borrowers and investors with which it has relationships to be its clients (Callahan Supp. Decl. ¶ 4).

P-154.  Brevet used an email archive system, Global Relay, which captured all email traffic from the Brevet email system for all employees (Callahan Dep. 372:14-22).

P-155.  Brevet does not have a minimum loan amount (da Silva Vint 30(b)(6) Dep. 40:19-24; Monticciolo Dep. 412:18-24; John Tripp 10/6/2021 Dep. Tr. ("Tripp Dep.") 47:11-19; Samuel Schuster 4/26/2018 Dep. Tr. ("Schuster Dep.") 30:2-25, 81:15-20).

P-156.  Brevet has engaged in transactions under $500,000 (BHS Ltr. to Ehrlich, dated 9/18/2019, Appendix A).

P-157.  Brevet has engaged in transactions under $150,000 (BHS Ltr. to Ehrlich, dated 9/18/2019, Appendix A).

P-158.  Iacovacci interfered with the employment contract of Samuel Schuster while he was a consultant working with Negotium Advisors (Callahan Supp. Decl. ¶ 7; P-02-0002184-85).

P-159.  The SEC has interpreted "track record" to mean "the prior performance results of accounts managed" by an entity (*see* Proposed Rule, Investment Adviser Advertisements; Compensation for Solicitations, File No. S7-21-19, Securities and Exchange Commission, 2019 SEC LEXIS 4371, *533 (Nov. 4, 2019)).

P-160.  The Employee Handbook provides that "Nothing in this section constitutes a contract or promise by Brevet to maintain medical insurance on behalf of employees" (Employee Handbook at 25).

Dated: New York, New York
          December 23, 2021

REED SMITH LLP

By: */s/ Louis M. Solomon*
Louis M. Solomon
599 Lexington Avenue
New York, New York 10022
(212) 549-0400
*Attorneys for Defendants*

**PLAINTIFF'S RULE 56.1 COUNTER-STATEMENT**

Pursuant to the Court's Post-Conference Scheduling Order dated August 17, 2021

(Dkt. 233), as modified on December 1, 2021 (Dkt. 239), Plaintiff respectfully submits this

Rule 56.1 Counter-Statement to Defendants' Rule 56.1 Statement dated December 10, 2021

(Dkt. 245 at 21-43). Plaintiff reserves the right to contest the facts set forth herein at trial. *See,*

*e.g.*, *Saks v. Franklin Covey Co.*, 117 F. Supp. 2d 318, 321 & n.2 (S.D.N.Y. 2000) (facts on

summary judgment were undisputed solely "for purposes of this motion" and party "reserved the

right to contest certain facts at trial"), *aff'd in part, remanded in part*, 316 F.3d 337 (2d Cir.

2003). While the headings in Defendants' Rule 56.1 Statement do not require a response,

Plaintiff disputes and does not concede any factual assertions or arguments embedded in

Defendants' headings. Plaintiff reserves the right to object to the admissibility of any testimony

or documents cited in Defendants' Statement. With respect to Defendants' selective quotation of

portions of documents and Defendants' characterization of its written policies, Plaintiff refers to

the documents themselves for a true and complete statement of their content. *See* Fed. R. Evid.

106, 1002.

Defendants' statements do not set forth any material fact entitling them to summary

judgment.

**<u>Parties and Background</u>**

D1.    **Defendants' Statement:** Defendant Brevet Holdings, LLC is a parent company
to various Brevet entities including Brevet Capital Management, LLC (Callahan 10/5/2021 Dep.
Tr. ("Callahan Dep.") 55:19-25, 111:7-13).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D2.    **Defendants' Statement:** Brevet Holdings, LLC is the entity under which many of
the employees for the various Brevet entities are employed (Callahan Dep. 55:19-25).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D3.     **Defendants' Statement:** Defendant Brevet Capital Management, LLC is a registered investment advisor with the Securities and Exchange Commission under the Investment Advisers Act of 1940 (Mei-Li da Silva Vint 10/7/2021 Dep. Tr. ("da Silva Vint Dep.") 13:9-13; BREVET-REPRO-0000670 at 0000673).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D4.     **Defendants' Statement:** Brevet Capital Management, LLC is an investment manager for various funds in the Brevet family of companies (Monticciolo 10/7/2021 Dep. Tr. ("Monticciolo Dep.") 52:8-12).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D5.     **Defendants' Statement:** Brevet Capital Management, LLC is the investment manager for non-party Brevet Direct Lending – Short Duration Fund, L.P. (Callahan Dep. 78:11-13, 111:7-13).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D6.     **Defendants' Statement:** Defendant Brevet Short Duration Partners, LLC, formerly known as Brevet Capital Partners III, LLC, is the general partner to non-party Brevet Direct Lending – Short Duration Fund, L.P. (Callahan Dep. 116:20-117:3, 111:7-13; Callahan 12/10/2021 Declaration in Support of Summary Judgment ("Callahan Decl.") ¶ 2).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D7.     **Defendants' Statement:** Defendant Brevet Short Duration Holdings, LLC, formerly known as Brevet Capital Holdings III, LLC, is the managing member of Brevet Short Duration Partners, LLC (Callahan Dep. 117:9-13; Callahan Decl. ¶ 3).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D8.     **Defendants' Statement:** Defendant Douglas Monticciolo ("Monticciolo") is a managing director of Brevet Holdings, LLC (Callahan Dep. 76:18-23).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D9.     **Defendants' Statement:** Monticciolo is a member of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC (Monticciolo Dep. 63:6-19; BREVET-REPRO-0152288 ("BSDH LLC Agreement") at 20; BREVET-REPRO-0152243 ("BSDP LLC Agreement") at 21).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D10.     **Defendants' Statement:** Defendant Mark Callahan ("Callahan") is a managing director of Brevet Holdings, LLC and an employee of Brevet Holdings, LLC (Callahan Dep. 76:3-8, 80:15-18).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D11. **Defendants' Statement:** Callahan is a member of Brevet Short Duration Holdings, LLC and Brevet Short Duration Partners, LLC (Callahan Dep. 117:14-20; BSDH LLC Agreement at 20; BSDP LLC Agreement at 21).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D12. **Defendants' Statement:** Defendant Johnny Lan ("Lan") is the head of technology at Brevet Capital Management, LLC and was an employee of Brevet Holdings, LLC (Lan 11/17/2017 Affidavit ("Lan Aff.") ¶ 1; Lan 10/1/2021 Dep. Tr. ("Lan Dep.") 34:5-13, 43:13-20).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D13. **Defendants' Statement:** Plaintiff Paul Iacovacci ("Iacovacci" or "Plaintiff") was an employee of Brevet Holdings, LLC until October 14, 2016 (BREVET-REPRO-0067951).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that Brevet purported to terminate Iacovacci's employment with Brevet Holdings, LLC as of October 14, 2016, and that Iacovacci was not an employee of Brevet Holdings, LLC after that date.

D14. **Defendants' Statement:** Iacovacci was a member of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC until October 14, 2016 (BREVET-REPRO-0067951).

**Plaintiff's Response:** Disputed. Iacovacci gave notice of his intent to withdraw as a member of the LLCs on January 6, 2016, which he confirmed in an email on January 12, 2016. DEL00013795; DEL00022138; DEL00046055; *see also* LLC Agreements § 7.1(a) (members may voluntarily withdraw on 180 days prior written notice); DEL00292247 (letter dated July 12, 2016, marking expiration of 180-day notice period).

D15. **Defendants' Statement:** Iacovacci was a member of Brevet's Investment Committee during his employment with Brevet (BREVET-REPRO-0151644; Callahan Decl. ¶ 4; BREVET-REPRO-0022117; Callahan Dep. 289:6-14).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

## Brevet Provided Computers For Home Business Use

D16. **Defendants' Statement:** Brevet has a longstanding practice of purchasing desktop computers and providing them to Brevet's members – including Monticciolo, Callahan, and Iacovacci – and other employees for home business use (Lan Aff. ¶¶ 2-4).

**Plaintiff's Response:** Disputed to the extent Defendants contend Brevet provided the

Dell Home Computer to Iacovacci solely for "business use" or on the same basis as computers

provided to "other employees." Brevet gave the Dell Home Computer to Iacovacci as a

customary perk extended to founding members. Iacovacci Dep. 126:17-22. The Dell Home

Computer was "primarily used for personal purposes." Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017).

Unlike laptops provided to other Brevet employees, the Dell Home Computer had no markings

or labels indicating that it belonged to Brevet. *See, e.g.*, *Id.*; Cibrian Dep. 42:15-19; Lan Aff. Ex.

V (Feb. 19, 2021), BREVETNEW-044451 (Brevet laptop with sticker "Property of BCM").

Brevet gave another founding member, John Tripp, a new computer and did not ask him to return

that computer or the iPhone that Brevet had paid for and that had been configured to send and

receive Brevet email. *See* BREVETNEW-044570 (separation agreement referencing Brevet

██████████████████████████████████; Tripp Dep. 78:6-19, 81:18-82:5, 163:20-

164:17.

D17.   **Defendants' Statement:** The computers provided to these employees must be
returned to Brevet upon the end of their employment with Brevet or when Brevet provides them
with a new computer (Lan Aff. ¶ 2; Lan 12/10/2021 Declaration in Support of Summary
Judgment ("Lan Decl.") ¶ 9).

**Plaintiff's Response:** Disputed to the extent Defendants contend that Iacovacci was

required to return the Dell Home Computer. The Dell Home Computer, a home desktop, was

given as a perk to Iacovacci as a founding member, as distinct from computers provided to other

Brevet employees for business use. *See* Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017). Brevet's policies

distinguished between personal devices and Brevet-owned devices, and Iacovacci's and others'

usage of the Dell Home Computer reflected usage of a personal device. *See* BREVET 0003766,

at -3785; Rasmussen Report ¶ 13; *see also* Pl.'s Resp. to ¶ D16 (distinguishing the Dell Home

Computer and other devices given to founding members as perks from computers provided to

other Brevet employees for work use). At his deposition, Brevet's head of IT and corporate

representative witness could not identify any written policy requiring the return of the Dell Home

Computer, nor could he testify as to the intention of Brevet founders in returning any given

computer. Lan Dep. 96:11-106:5.

D18.   **Defendants' Statement:** Brevet provided the computers for work-related tasks
(Lan Aff. ¶ 3).

**Plaintiff's Response:** Disputed to the extent Defendants contend the Dell Home

Computer was provided for the sole or primary purpose of "work-related tasks." The Dell Home

Computer was given to Iacovacci as perk and was set up for personal use, including by

Iacovacci's family. Iacovacci Dep. 126:17-22; Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017). It had

numerous external devices attached to it, which is not consistent with use as a company

computer. Rasmussen Report ¶ 17. Iacovacci had the Dell Home Computer equipped with a

second DVD drive for personal use and with two accounts, a "Paul" account and a "Family"

account that could be used by him and his family members, including for his children's

homeschooling. BREVET 150533; Lan Aff. ¶ 9 (Nov 20, 2017), NYS Dkt. 36; Iacovacci Aff.

¶ 5 (Sept. 21, 2017); Lan Dep. 138:5-140:24; Rasmussen Dep. 85:12-88:1.

Brevet IT did not configure the Dell Home Computer with a Brevet-domain user account

for use with the Brevet network. Shanmugam Dep. 110:21-24, 112:6-23; 114:2-9. Nor was it

configured with a VPN (virtual private network) to connect securely to the Brevet network.

Rasmussen Report ¶¶ 17, 21; Lan Dep. 137:10-14; Lan Aff. ¶ 8 (Nov. 17, 2017), NYS Dkt. 36.

The Dell Home Computer was never configured with an administrator account for the sole use of

Brevet IT (as then-current SEC recommendations for Registered Investment Advisors and

general IT standards of practice would dictate). Rasmussen Report ¶¶ 19-20. Without such an

account, Brevet could not access the Dell Home Computer without Iacovacci's credentials,

which Iacovacci could have changed at any time. Rasmussen Report ¶¶ 20, 35 n.37; Lan Dep.
152:2-7, 209:6-18. The Dell Home Computer was not configured with security controls
consistent with a company computer. Rasmussen Report ¶ 18, 35.

The Dell Home Computer was shipped to Brevet's offices so that Brevet IT could install
a second DVD drive that Iacovacci wanted for personal use. BREVET 150533; Rasmussen
Report ¶ 16 n.11 (identifying DVD duplicating software installed on the Dell); Lan Dep.
129:21-130:11 (no business reason for having two DVD drives); 145:22-146:25 (DVD
duplicating software is not Brevet software). The installation of a second DVD drive is
inconsistent with the Dell Home Computer being a company computer and consistent with the
admission from Brevet's head of IT that one of his duties was to render technical support for
employee-owned computer equipment. Lan Dep. 87:15-20; Rasmussen Report ¶ 16. Iacovacci's
use of the Dell Home Computer was not consistent with use of a company computer. *See id.*
¶¶ 15-27, 35. It was configured with a "Family" account, which is not standard practice for a
company computer. *Id.* ¶ 20; Iacovacci Aff. ¶ 6 (Sept. 21, 2017); Lan Dep. 138:5-11. It contained
extensive personal files, applications, and programs, which is inconsistent with the "limited" and
"incidental" personal use of company computers that is permitted by Brevet policy. *Id.* ¶ 24; da
Silva Vint Dep. 345:5-16, Oct. 7, 2021.

D19.   **Defendants' Statement:** Brevet did not prohibit use of the computers for
personal matters (Lan Aff. ¶ 3).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that Brevet did
not absolutely prohibit use of computers for personal matters, but required that personal use of
Brevet-owned devices be "limited" and "incidental." da Silva Vint Dep. 345:5-16, Oct. 7, 2021.
Brevet's current Chief Compliance Officer and corporate representative witness acknowledged

that Iacovacci's use of the Dell Home Computer for his children's homeschooling "doesn't sound incidental, to be honest." *Id.* at 347:4-15.

D20. **Defendants' Statement:** Over the years, Brevet provided Iacovacci with at least two Brevet computers to use at his home (Lan Aff. ¶ 4).

**Plaintiff's Response:** Disputed to the extent Defendants contend that the computers Brevet gave Iacovacci as perks were "Brevet computers." Iacovacci owned and controlled the computers. Iacovacci Dep. 125:14-126:4; Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017); *see also* Pl.'s Resp. to ¶¶ D106-07, below.

D21. **Defendants' Statement:** When Iacovacci received a new Brevet-provided computer in 2015, he returned to Brevet the older model Brevet had provided (Lan Aff. ¶ 4; BREVETNEW-026779).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement except to state that Iacovacci owned that prior computer and "returned the last computer for convenience since there is an expense to dispose electronic device in New York City and because the last computer contained sensitive data." Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017), NYS Dkt. 13; Iacovacci Dep. 126:2-4; Iacovacci Aff. ¶ 12 (Jan. 30, 2018), NYS Dkt. 93.

**<u>The Computer at Issue</u>**

D22. **Defendants' Statement:** In February 2015, Brevet purchased a Dell Optiplex Desktop computer for Iacovacci to use for work at his home (the "Computer") (Lan Aff. ¶¶ 2-4, 6; BREVET-REPRO-0173512; BREVET-REPRO-0099339).

**Plaintiff's Response:** Disputed to the extent Defendants contend that the Dell Home Computer was given for Iacovacci solely "to use for work at his home." The Dell Home Computer was not provided for the sole purpose of work-related tasks. Lan Aff. ¶ 5 (Feb. 16, 2021); Lan Aff Ex. G (BREVETNEW-043149); Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017) (Computer was "primarily used for personal purposes"); Lan Dep. 138:5–140:24. The vast majority of email activity on the computer was tied to Iacovacci's personal and family email accounts. *See* Rasmussen Report ¶ 23 (conclusion drawn from review of forensic image of the

Computer). Minimal digital artifacts found on the Dell Home Computer were associated with the paul@brevetcapital.com email address. *Id.* The Dell Home Computer did not have VPN (virtual private network) to enable access to the Brevet network, and this lack of VPN is inconsistent with Brevet IT's practice for Brevet company computers. *Id.* ¶¶ 17, 21; Lan Dep. 113:6-16, 137:10-14; Lan Aff. ¶ 8 (Nov. 17, 2017), NYS Dkt. 36.

D23.   **Defendants' Statement:** Brevet paid for the Computer (Iacovacci 10/6/2021 Dep. Tr. ("Iacovacci Dep.") 100:19-22).

**Plaintiff's Response:** Undisputed purposes of this Counter-Statement that Brevet paid for the Dell Home Computer hardware as a perk for Iacovacci as a founding member. Iacovacci purchased software for the computer, including the LogMeIn account Brevet IT used to remote-access the Dell Home Computer and the external hard drives from which Brevet extracted data without Iacovacci's knowledge or consent. Lan Dep. 150:10-153:12; Kiernan Report ¶ 40; Iacovacci Aff. ¶¶ 9-13 (Sept. 21, 2017), NYS Dkt. 13; NYS Dkt. 14.

D24.   **Defendants' Statement:** Brevet issued the Computer to Iacovacci for Brevet work at his home (Lan Aff. ¶¶ 2-4; Callahan 9/25/2018 Affidavit ¶ 21).

**Plaintiff's Response:** Disputed to the extent Brevet contends it "issued" the Dell Home Computer to Iacovacci solely "for Brevet work at his home." The Dell Home Computer was given to Iacovacci as a perk, and was not given for the sole purpose of conducting Brevet work. Lan Aff. ¶ 5 (Feb. 16, 2021); Lan Aff Ex. G (BREVETNEW-043149); Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017) (computer was "primarily used for personal purposes"); *see also* Pl.'s Resp. to ¶ D22, above.

D25.   **Defendants' Statement:** Brevet listed the Computer as a business expense on its 2015 tax returns (Callahan Decl. ¶ 5; Exhibit E to October 11, 2019 Letter to Judge Pauley, available on docket at ECF 108-5, also produced at BREVET-REPRO-0173477).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D26.   **Defendants' Statement:** Plaintiff's 2015 tax returns do not show Plaintiff claiming the Computer as a gift or claiming depreciation (DEL00293390).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D27.   **Defendants' Statement:** Brevet registered the warranty for the Computer (BREVET-REPRO-0173448 at 6; *see also* Iacovacci Dep. 125:6-8).

**Plaintiff's Response:** Disputed. Defendants' statement is unsupported by the cited evidence, which reflects only that the Dell Home Computer was under warranty starting February 27, 2015, and that Iacovacci did not register the Dell Home Computer for warranty purposes. Neither citation indicates that Brevet took any action to register the warranty. *Cf.* BREVET-REPRO-0173448.

D28.   **Defendants' Statement:** Dell's records reflect Brevet's ownership of the Computer (DELL0001-0006).

**Plaintiff's Response:** Disputed. Brevet's cited documents do not demonstrate ownership—for example, they do not address whether Brevet purchased the Dell Home Computer for Iacovacci or gave the Dell Home Computer to Iacovacci upon delivery. *See* DELL 0001-0003. The Dell Home Computer was given to Iacovacci as a perk for founding members and was his property rather than a business asset. *See* Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017).

D29.   **Defendants' Statement:** Dell delivered the Computer to Brevet's offices (Lan Aff. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D30.   **Defendants' Statement:** Lan configured the Computer in Brevet's offices to Brevet's specifications (Lan Aff. ¶ 7).

**Plaintiff's Response:** Disputed. While the Dell Home Computer was originally configured with some software that is consistent with that used by Brevet's employees, the Dell Home Computer was set up for use by Iacovacci and his family. *See* Pl.'s Resp. to ¶ D18. The Dell Home Computer was never configured with an administrator account for the sole use of Brevet IT. Rasmussen Report ¶¶ 19-20. After configuring the Computer in Brevet's offices,

Brevet IT did not assist Iacovacci in setting up the Dell Home Computer. *Id.* ¶ 15; Lan Dep. 127:7-11.

D31.   **Defendants' Statement:** Lan installed Brevet-purchased software, including Microsoft Outlook, Word, Excel, PowerPoint, and Kaspersky Antivirus, on the Computer (Lan Aff. ¶ 7; *see also* BREVET-REPRO-0099320; BREVET-REPRO-0099021; BREVET-REPRO-0048954).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D32.   **Defendants' Statement:** At the time Lan initially configured the Computer, Microsoft Outlook was set up to include the account paul@brevetcapital.com, which was Iacovacci's work email account.  (11/22/2021 Rebuttal Expert Report of Sankara Shanmugam ("Shanmugam Report") ¶ 46).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state that the version of Microsoft Outlook set up by Lan to include the account paul@brevetcapital.com was part of the "Paul" user account that was later deleted from the Dell Home Computer. Shanmugam Report ¶ 56. Artifacts observed by Brevet's experts indicated that this file was inactive after October 28, 2015. Shanmugam Dep. 117:6-15; Shanmugam Report ¶ 46. The vast majority of email activity on the Dell Home Computer was tied to Iacovacci's personal and family email accounts with minimal digital artifacts tied to his Brevet account. Rasmussen Report ¶ 23.

D33.   **Defendants' Statement:** Lan also installed LogMeIn software on the Computer (Lan Dep. 135:7-136:16; BREVET-REPRO-0173480).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement except to state that although Lan installed LogMeIn software at the time of the Dell Home Computer's initial set-up, Lan used a different LogMeIn to remote-access the Dell Home Computer in October 2016. Kiernan Report ¶¶ 40-44; LOGMEIN-BREVET-0012; NYS Dkts. 13-28. For the unauthorized access in October 2016, Lan used Iacovacci's personal LogMeIn account, associated with one of his personal email addresses. *Id.* Brevet had to use Iacovacci's personal

LogMeIn account to log onto the Dell Home Computer, inconsistent with Brevet's own policies for company computers. Lan Dep. 209:6-18; Rasmussen Report ¶¶ 19-21, 23; 35 n.37; BREVET 003766, at -3772.

D34.   **Defendants' Statement:** Lan registered under Brevet's LogMeIn account the LogMeIn software installed on the Computer (Lan Dep. 135:7-136:16; BREVET-REPRO-0173480).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state that although Lan installed LogMeIn software at the time of the Dell Home Computer's initial set-up, Lan used a different LogMeIn to remote-access the Dell Home Computer in October 2016. Kiernan Report ¶¶ 40-44; LOGMEIN-BREVET-0012; NYS Dkts. 13-28. For the unauthorized access in October 2016, Lan used Iacovacci's personal LogMeIn account, associated with one of his personal email addresses. *Id.* Lan's activity on the Dell Home Computer on October 18, 2016, was conducted using solely the Iacovacci Family account, which had been set up specifically for Iacovacci and his family's personal use. Kiernan Report ¶¶ 11, 41, 44.

D35.   **Defendants' Statement:** LogMeIn was used to access the Computer from Brevet's office or other remote locations (Lan Aff. ¶¶ 7, 11-12).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, subject to Iacovacci's response to paragraph D34, above.

D36.   **Defendants' Statement:** The Computer was delivered to Iacovacci's home in February/March 2015 after Lan configured the Computer (Lan Aff. ¶ 4).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D37.   **Defendants' Statement:** After receiving the Computer, Iacovacci returned to Brevet the older Brevet computer he had been using (Lan Aff. ¶ 4; BREVETNEW-026779).

**Plaintiff's Response:** Disputed to the extent Defendants contend that the computers Brevet gave Iacovacci as perks were "Brevet computers." Iacovacci owned and controlled the computers. Iacovacci Dep. 125:14-126:4; Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017); *see also* Pl.'s

Resp. to ¶¶ D106-07, below. Iacovacci "returned the last computer for convenience since there is

an expense to dispose electronic device in New York City and because the last computer

contained sensitive data." Iacovacci Aff. ¶ 12 (Jan. 30, 2018), NYS Dkt. 93; Iacovacci Dep.

126:2-4.

D38.   **Defendants' Statement:** Brevet paid for Iacovacci's home internet access
(Iacovacci Dep. 125:9-13; Mark Callahan 2/28/2020 Affidavit ("Callahan 2/28/2020 Aff.") ¶ 13).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that home internet was one of several perks Brevet gave to founding members. Iacovacci Dep.

127:19-129:6.

D39.   **Defendants' Statement:** Iacovacci rarely came into Brevet's offices in 2016
(Iacovacci 11/1/2018 Affidavit ("Iacovacci 11/1/2018 Aff.") ¶ 22).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D40.   **Defendants' Statement:** To the extent Iacovacci worked for Brevet in 2016, he
did so from home (Iacovacci Dep. 105:23-106:8).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D41.   **Defendants' Statement:** When Iacovacci worked from home for Brevet in 2015-
2016, he used the Computer (Iacovacci Dep. 107:9-108:3).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that when working from home in 2015-2016, Iacovacci used the Dell Home Computer to

conduct work either locally on the computer or by accessing his office computer via

GoToMyPC. Iacovacci Dep. 108:12-21; 135:24-135:12.

D42.   **Defendants' Statement:** Iacovacci used the Computer for Brevet business when
working from home (Iacovacci Dep. 107:9-108:3; Iacovacci 11/1/2018 Aff. ¶ 22; Lan Aff. ¶ 9;
Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that Iacovacci and his family members also used the Dell Home Computer for personal purposes.

Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017); Lan Dep. 146:20-148:10 (computer's Bible Study

software was not installed for Brevet business purposes); Rasmussen Report ¶¶ 8, 22–24. Indeed,

the Dell Home Computer was set up for use by Iacovacci and his family. See Pl.'s Resp. to

¶ D18. The Dell Home Computer was never configured with an administrator account for the

sole use of Brevet IT. Rasmussen Report ¶¶ 19-20. The vast majority of email activity on the

Dell Home Computer was tied to Iacovacci's personal and family email accounts with minimal

digital artifacts tied to his Brevet account. Rasmussen Report ¶ 23.

D43.   **Defendants' Statement:** The Computer contained Brevet files (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that the Dell Home Computer also contained many personal files. *See* Rasmussen Report

¶¶ 22-24.

D44.   **Defendants' Statement:** Brevet documents were stored on the Computer (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that many personal documents were also stored on the Computer. *See* Rasmussen Report

¶¶ 22-24.

D45.   **Defendants' Statement:** Brevet documents were processed on the Computer (Shanmugam Report ¶¶ 36, 38-43 and Exhibits 3-6 thereto).

**Plaintiff's Response:** Disputed based on Defendants' use of the vague and ambiguous

term "processed," which is not defined or explained in Defendants' cited evidence. In whatever

sense Defendants contend the Dell Home Computer somehow "processed" what Defendants

characterize as "Brevet documents," it would also have "processed" many of Iacovacci's and his

family's personal documents. *See* Rasmussen Report ¶¶ 22-24.

D46.   **Defendants' Statement:** Iacovacci had a Seagate external drive that he used with the Computer, which contained over 1,500 Brevet files (Shanmugam Report ¶¶ 41-42, 59).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state that Iacovacci backed up both personal and Brevet-related files to the Seagate external drive, which he indisputably owned. Iacovacci Aff. ¶ 9 (Sept. 21, 2017), NYS Dkt. 13.

D47.   **Defendants' Statement:** The Computer contained information that had been used by a Brevet employee (Iacovacci) in connection with work at or for Brevet (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D48.   **Defendants' Statement:** The Computer contained information that was or had been stored on a Brevet computer or other equipment (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D49.   **Defendants' Statement:** The Computer contained information that was or had been processed on a Brevet computer or other equipment (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Disputed based on Defendants' use of the vague and ambiguous term "processed," which is not defined or explained in Defendants' cited evidence.

D50.   **Defendants' Statement:** The Computer contained information that was or had been used along with a shared filing system used with Brevet (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Disputed based on Defendants' use of the vague and ambiguous phrase "information that was or had been used along with a shared filing system used with Brevet," which is not defined or explained in Defendants' cited evidence.

D51.   **Defendants' Statement:** The Computer contained information that was or had been created using Brevet computers, related equipment, or software (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D52.   **Defendants' Statement:** The Computer contained information that was or had been composed, sent, or received on Brevet's e-mail systems (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D53.   **Defendants' Statement:** The Computer contained information that was or had been created through the use of Brevet's communication equipment (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D54.    **Defendants' Statement:** The Computer contained documents, messages, or conversations of a Brevet employee (Callahan Decl. ¶ 7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D55.    **Defendants' Statement:** At all pertinent times, Lan had full administrator rights to the Computer (Lan Decl. ¶¶ 3-5; Erik Rasmussen (Plaintiff's Expert) 12/2/2021 Dep. Tr. 127:3-8).

**Plaintiff's Response:** Disputed. At the time of the intrusion, Iacovacci was the administrator on the Dell Home Computer. Lan. Dep. 143:12-15, 149:4-20. At Iacovacci's request, Lan configured the account to grant administrator permissions to the Iacovacci Family account so Iacovacci could install software on the computer. BREVET 150621. In fact, Iacovacci emailed Lan: "I need to be the administrator for my home computer or please remove the work stuff because this is a pain." BREVET 150622. Additionally, Lan never configured the computer with an administrator account solely for the use of Brevet IT to remotely access the Dell Home Computer. Lan Dep. 209:14-18. Lan could not access the Dell Home Computer without Iacovacci providing his personal password. Lan Dep. 151:2-17, 208:17-209:18; *see also* Lan Dep. 134:18-25, 135:1-12. Lan did not have standing permission to use those credentials. Iacovacci Dep. 172:22-175:3.

D56.    **Defendants' Statement:** At all pertinent times, Lan had the ability to access the Computer (Lan Decl. ¶¶ 6-8; *see also* Callahan 2/28/2020 Aff. ¶ 15).

**Plaintiff's Response:** Disputed. *See* Pl.'s Resp. to ¶ D56, above.

D57.    **Defendants' Statement:** At all pertinent times, Lan had the password(s) to access the Computer (Lan Decl. ¶¶ 7-8; *see also* Callahan 2/28/2020 Aff. ¶ 15).

**Plaintiff's Response:** Disputed to the extent Brevet contends that Iacovacci provided his personal password to Lan because he was required to do so, or that Iacovacci consented to Lan's use of Iacovacci's personal LogMeIn credentials without Iacovacci's knowledge and express, case-by-case permission for any remote access. Iacovacci does not dispute that, at the time of the intrusion, Lan evidently had Iacovacci's personal passwords to remotely access the Dell Home

Computer; however, Iacovacci had not granted Lan blanket permission to access the Dell Home

Computer. Lan Dep. 151:7-152:7; Lan Answer ¶ 11 (July 23, 2019). Lan appears to have

obtained Iacovacci's personal passwords either in connection with obtaining Iacovacci's

permission on a prior occasion or by guessing the password using prior password information

and trial and error. *See* NYS Dkt. 14 at 10 (rows 339-343 showing four failed login attempts to

Iacovacci's LogMeIn account from Brevet's IP address on October 3, 2016).

D58.   **Defendants' Statement:** On several occasions, Iacovacci requested, and Lan provided, the passwords necessary for Iacovacci to use the computer (Lan Aff. ¶ 11; BREVET-REPRO-0099335; BREVET-REPRO-0099306; BREVET-REPRO-0099300; BREVET-REPRO-0068788).

**Plaintiff's Response:** Disputed. Brevet's cited evidence does not support its contention.

*See* BREVET-REPRO-0068788 (Lan providing Iacovacci with password for his Brevet Outlook

account, not the Dell Home Computer); BREVET-REPRO-0099335, BREVET-REPRO-

0099306 (March 2015 communications, shortly after Iacovacci received the Dell Home

Computer, in which Iacovacci requests Brevet Outlook password and LogMeIn account needed

to access his work computer, not the Dell Home Computer); BREVET-REPRO-0099300 (similar

request from May 2015). None of the cited evidence reflects Iacovacci requesting passwords that

were necessary for Iacovacci him to use the Dell Home Computer. Iacovacci simply requested

passwords to conduct certain Brevet business. *See* Iacovacci Dep. 168:16-169:16.

D59.   **Defendants' Statement:** During the final two years of Iacovacci's employment, he requested remote technical assistance via LogMeIn numerous times (Lan Aff. ¶ 11; *see e.g.*, BREVETNEW-020285; BREVET-REPRO-0099014; BREVET-REPRO-0099071; BREVET-REPRO-0099064; BREVET-REPRO-0099055).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

## October 14, 2016 Termination

D60.   **Defendants' Statement:** On October 14, 2016, Iacovacci received a termination letter signed by Callahan, Managing Director ("Termination Letter", BREVET-REPRO-0067951).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that Iacovacci received a putative termination letter on October 14, 2016, signed by Mark Callahan.

D61.   **Defendants' Statement:** The Termination Letter stated in part, "On behalf of Brevet Short Duration Partners, LLC (f/k/a Brevet Capital Partners III, LLC), Brevet Short Duration Holdings, LLC ( f/k/a/ Brevet Capital Holdings III, LLC), [and two other Brevet entities not at issue here] (each, an 'LLC' and, collectively, the 'LLCs') we write to advise you that your membership in each LLC is terminated for cause effective today, October 14, 2016 (the 'Termination Date'). Similarly, your employment with Brevet Holdings, LLC ('BH') (collectively, with the LLCs, 'Brevet') is terminated for cause effective as of the Termination Date."  (Termination Letter at 1).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D62.   **Defendants' Statement:** The Termination Letter further stated:

Furthermore, pursuant to Section 7.3 (Company Property) of the LLC Agreements, you must preserve and return to Brevet all Brevet records and property that you may have in your possession, including but not limited to, computer and/or computer materials including all electronic data files and emails, laptops, identification cards, cell phones, and company credit cards.  Additionally, any Brevet or other company materials, files, papers, memoranda, letters, electronic data files and emails, facsimiles, and/or other communications that you have in your possession that were written, authorized, signed, received, or transmitted during your membership in the LLCs or employment with BH are and remain the property of Brevet, must be preserved as such, and are to be immediately returned to Brevet, or if located at a future date, preserved.  (Termination Letter at 2.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D63.   **Defendants' Statement:** Lan hand delivered the Termination Letter to Iacovacci at Iacovacci's apartment (Lan Aff. ¶ 5).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D64.   **Defendants' Statement:** After [he] handed the Termination Letter to Iacovacci, Lan asked Iacovacci for both his company-issued desktop phone and Computer (Lan Aff. ¶ 5).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D65.   **Defendants' Statement:** Iacovacci returned the phone to Lan (Lan Aff. ¶ 5).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D66.   **Defendants' Statement:** Iacovacci did not return the Computer to Lan (Lan Aff. ¶ 5).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

**Brevet's Off-Boarding and Computer Replacement Process**

D67.   **Defendants' Statement:** Whenever Brevet replaced a computer that has been provided for Brevet personnel to use outside of the office, Brevet took back the computer that was being replaced (Lan Decl. ¶ 9).

**Plaintiff's Response:** Disputed. The Dell Home Computer, a home desktop, was given

as a perk to Iacovacci as a founding member, as distinct from computers provided to other

Brevet employees for business use. *See* Pl.'s Resp. to ¶¶ D16-18. Iacovacci's proffered expert in

business information technology as concluded that the acquisition, configuration, markings,

usage, and monitoring of the computer indicate that it was a personal computer, not a Brevet

company computer. *See* Rasmussen Report.

Further, Brevet's head of IT and corporate representative witness could not specifically

recall whether all departing employees returned computers that had been provided by Brevet and

could not point to any written policy requiring the return of the Dell Home Computer, nor could

he testify as to the intention of Brevet founders in returning any given computer. *See* Lan Dep.

95:19-106:5.

D68.   **Defendants' Statement:** This process was followed for at least one computer previously provided to Iacovacci before Brevet provided the Computer to Iacovacci in 2015 (Lan Decl. ¶ 9; Lan Aff. ¶ 4; BREVETNEW-026779).

**Plaintiff's Response:** Disputed. Iacovacci's return of his prior home computer was not

part of any "process" that applied to home desktop computers provided to founding members.

*See* Pl.'s Resp. to ¶ D67. Rather, there "was no policy regarding disposal of computers."

Iacovacci Aff. ¶ 12 (Jan. 30, 2018), NYS Dkt. 93. Iacovacci "returned the last computer for

convenience since there is an expense to dispose electronic device in New York City and

because the last computer contained sensitive data." *Id.*

D69.   **Defendants' Statement:** When an employee left Brevet, as part of the off-boarding process, Brevet took back any computer that had been provided for that employee to use outside of the office (Lan Decl. ¶ 9).

**Plaintiff's Response:** Disputed. *See* Pl.'s Resp. to ¶¶ D67-68.

D70.   **Defendants' Statement:** Iacovacci's refusal to return the Computer in October 2016 is the only time that any Brevet employee has refused to return a computer provided by Brevet for use outside the office (Lan Decl. ¶ 9).

**Plaintiff's Response:** Disputed. *See* Pl.'s Resp. to ¶¶ D67-68.

D71.   **Defendants' Statement:** When Brevet received a computer back that was used at a Brevet employee's home, Brevet's procedure was to preserve all business-related information and files from the computer (Lan Decl. ¶ 10).

**Plaintiff's Response:** Disputed. Brevet's Head of IT and corporate representative witness testified that he could not specifically recall whether all departing employees returned computers that had been provided by Brevet. *See* Lan Dep. 95:19-96:10. Brevet's written policies do not set forth such a procedure to preserve all business-related information and files. *See, e.g.*, BREVET-REPRO-0067776 (Employee Handbook) at 37-40 ("Computer, Software, and Electronic Mail" and "Technology Usage Agreement"); BREVET-REPRO-0000670 (Compliance Policy & Procedure Manual) at 9 (Books and Records provision discussing preservation of financial records and client files in accordance with Rule 204-2 under the Advisers Act). Brevet data was saved on a "sort of space on the network reserved for that employee" and Brevet's Head of IT only used his "best efforts" to identify and preserve business-related information, not any formal data classification process. Lan Dep. 162:12-166:2. In the case of Iacovacci's Dell Home Computer, Lan did not even adhere to this ad hoc process, but instead saved data to a USB drive connected to a personal computer at his home. Lan. Dep. 229:11-22.

D72.   **Defendants' Statement:** The information Brevet preserved included .PST files, which contain emails stored locally on the computer (Lan Decl. ¶ 10).

**Plaintiff's Response:** Disputed to the extent it is premised on the disputed facts in paragraph D72. *See* Pl.'s Resp. to ¶ D72. Undisputed for purposes of this Counter-Statement that .PST files generally contain emails and may be stored locally on computers.

D73.   **Defendants' Statement:** Lan followed this procedure with respect to all computers received back from employees, including the computer Iacovacci returned in 2015 (Lan Decl. ¶ 10).

**Plaintiff's Response:** Disputed. *See* Pl.'s Resp. to ¶ D71.

D74.   **Defendants' Statement:** This procedure was part of Brevet's process to ensure compliance with Brevet's policies and procedures and applicable regulations (Lan Decl. ¶ 10).

**Plaintiff's Response:** Disputed. *See* Pl.'s Resp. to ¶ D71. Plaintiff further disputes that Brevet had a regulatory obligation to back up all computer files from departing employees, as Brevet's record-keeping requirements pursuant to Rule 204-2 of the Advisers Act apply only to records related to Brevet's "investment advisory business." 17 CFR § 275.204-2.

**Brevet Accessed the Computer on October 18, 2016**

D75.   **Defendants' Statement:** On October 18, 2016, Brevet remotely logged into the Computer and copied information from the Computer (Callahan 2/28/2020 Aff. ¶ 6).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state that Brevet's Head of IT, Johnny Lan, logged in from his home to the Dell Home Computer using Paul Iacovacci's personal LogMeIn credentials at midnight Eastern Time on October 18, 2016. Kiernan Report ¶¶ 11, 18-54; LOGMEIN-BREVET-0012; NYS Dkts. 13-28.

D76.   **Defendants' Statement:** This access was in compliance with Brevet's regulatory record-keeping requirements (Callahan 2/28/2020 Aff. ¶ 6; Callahan Decl. ¶ 6).

**Plaintiff's Response:** Disputed. Iacovacci objects that this statement is a legal conclusion not an undisputed fact, and that Defendants' citation does not establish the proposition in that paragraph and is not admissible. Callahan is not a lawyer, regulatory expert, or member of Brevet's compliance department. Callahan Dep. 28:20-22, 43:20-45:21; BREVET-REPRO-0067720 at -721.

Brevet's unauthorized intrusion into the Dell Home Computer in October 2016 was not to comply with Brevet's regulatory requirements, including because the Advisers Act applies only to certain categories of investment-advisory related documents, and Brevet did not have reason to believe that such documents were uniquely stored on the Dell Home Computer. *See* Jarcho Report at 5-11. Brevet had access through its own archive system to any emails sent to or from Iacovacci's Brevet email address, and nothing in the Advisers Act requires an Adviser to maintain duplicates of records or documents. *See* Jarcho Report at 5. The recordkeeping rule of the Advisers Act applies only to investment-advisory related records (*see* 17 CFR § 275.204-2), and Iacovacci was involved in the borrowing side of Brevet's business, not investment-advisory work. Iacovacci Aff. ¶ 2 (July 16, 2019), NYS Dkt. 667; Iacovacci Aff. ¶ 2 (Dec. 26, 2017), NYS Dkt. 71; Callahan Aff. ¶ 4 (Sept. 25, 2018), NYS Dkt. 319; Iacovacci Dep. 24:11-16. Brevet's books and records policy acknowledges that the recordkeeping rule is directed at client communications, not communications with potential borrowers. BREVET-REPRO-0000670 (Compliance Policy & Procedure Manual) at 9 (Books and Records policy addressing records that "relate to client files"); Lea Dep. 71:6-9 (noting borrowers are not considered Brevet's clients). Further, the record-keeping rule of the Advisers Act only applies to records of the Investment Adviser (Brevet Capital Management, LLC), and to the extent Brevet alleges Iacovacci maintained documents on the Dell Home Computer related to non-Brevet business (e.g., Countercls. ¶¶ 2, 8, 9, 12, 53, 55, 79, 101 [Dkt. 79]), Brevet was not required to access or preserve those records. Jarcho Report at 9. Moreover, to the extent Brevet's access was illegal or impermissible, or access to certain files was illegal or impermissible, Brevet cannot claim that the federal securities laws, or any rule thereunder, permitted Brevet to undertake such an illegal or impermissible act. *See* Jarcho Report at 9. Brevet's expert did not dispute this. *See* Joseph

Dep. 105:21-112:9 (Books and Records Rule does not provide affirmative defense to any claim in this case).

Further, Brevet has admitted that it entered Iacovacci's computer not to comply with regulatory requirements but because it suspected Iacovacci of misappropriation or attempting to compete with Brevet. Callahan Aff. ¶¶ 18-19 (Feb. 28, 2020), NYS Dkt. 1005 (at the time of the intrusion, "Brevet was concerned that Plaintiff had misused his access to Brevet's computer system, and I believed that the downloaded files might contain evidence of any such misconduct. . . . The purpose of my review was to see what, if any, proprietary Brevet documents and information Plaintiff had taken from the Brevet computer system and what, if any, communications he had had with our business partners or potential partners . . . ."); NYS Dkt. 1034 (Callahan "focused on business, not legal, issues, and so looked for documents that related to Plaintiff's theft and misuse of Brevet's proprietary information"); Countercl. ¶ 55 (Dkt. 79) (expressing concern that Iacovacci would use documents to compete with Brevet). Indeed, Brevet's compliance personnel were not involved in Brevet's intrusion into the Dell Home Computer. *See* Pl.'s Rule 56.1 Statement ¶¶ P-29-48.

In addition, Brevet did not simply "access" the Dell Home Computer on October 18, 2016. Lan installed FileZilla, an application for transferring files from the Dell Home Computer. Kiernan Report ¶¶ 11, 55-75. Lan utilized a web browser on the Dell Home Computer to identify Iacovacci's IP address, which would be necessary to utilize the software program FileZilla. *Id.* ¶ 11, 77-85 (analyzing forensic artifact). Approximately 14 GB of data was transferred using FileZilla on October 18, 2016 between 2:00 AM and 2:32 AM Eastern Time. *Id.* ¶ 75.

D77.   **Defendants' Statement:** As a registered investment advisor, Brevet Capital Management, LLC is required to maintain and preserve records relating to its business for a period of at least five (5) years (Callahan 2/28/2020 Aff. ¶ 7; Callahan Dep. 360:4-361:3).

**Plaintiff's Response:** Disputed. The Advisers Act requires investment advisers to keep only certain categories of documents "relating to its investment advisory business," not all documents related to its business generally. 17 CFR § 275.204-2; *see also* Jarcho Report at 3, 5-6; Pl.'s Rule 56.1 Statement ¶¶ P-49-56. Plaintiff further objects that this statement is a legal conclusion not an undisputed fact, and the citation provided by Defendants does not establish the proposition in that paragraph and is inadmissible. Callahan is not a lawyer, regulatory expert, or member of Brevet's compliance department. Callahan Dep. 28:20-22, 43:20-45:21; BREVET-REPRO-0067720 at -721.

D78.   **Defendants' Statement:** Further, under its regulatory framework, Brevet is responsible for ensuring that the transmission of its documents is done in a way to preserve their confidentiality (Callahan 3/24/2021 Affidavit ¶ 5).

**Plaintiff's Response:** Disputed. This statement is a legal conclusion not an undisputed fact, and the citation provided by Defendants does not establish the proposition in that paragraph. Callahan is not a lawyer, regulatory expert, or member of Brevet's compliance department. Callahan Dep. 28:20-22, 43:20-45:21; BREVET-REPRO-0067720 at -721. Callahan's affidavit does not cite any rule or regulation as the basis for this purported obligation. Callahan Aff. ¶ 5 (Mar. 24, 2021). Brevet's proffered regulatory expert, Ken Joseph, did not opine that Brevet had an obligation to ensure confidential transmission of documents. *See* Joseph Report. To the extent Brevet is contending that there is an obligation arising from the Advisers Act to preserve confidentiality of documents, any such obligation would apply only to documents relating to investors and investments. *See generally* Investment Advisers Act. To the extent there were other regulations related to investment advisers' confidential transmissions, there is no evidence they applied wholesale to Brevet's transmission of documents or Iacovacci's emails. *Cf.* https://www.sec.gov/files/OCIE%20Risk%20Alert%20-%20Regulation%20S-P.pdf (discussing Regulation S-P regarding policies of investment advisers and broker-dealers' for protection of

customer records); https://www.thsh.com/uploads/Overview-Data-Privacy-Cybersecurity-Regulatory.pdf (discussing Regulation S-ID regarding identity theft protection programs).

D79.   **Defendants' Statement:** Prior to Iacovacci's termination, Brevet learned that Iacovacci had on multiple occasions sent business information related to Brevet from his Brevet e-mail address to his personal e-mail (BREVET-REPRO-0068218).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D80.   **Defendants' Statement:** Prior to Iacovacci's termination, Brevet knew that Iacovacci had asked Lan how Iacovacci could wipe an external hard drive (BREVET-REPRO-0067962).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that Iacovacci asked Lan how he could wipe his children's laptops used for homeschooling.

D81.   **Defendants' Statement:** On October 18, 2016, at the direction of Brevet, Lan backed-up certain files from the Computer directly onto a USB thumb drive (Lan Decl. ¶ 11).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement. Lan also used an external device to take a screenshot of at least one open browser window during his remote login on October 18, 2016. Kiernan Report ¶¶ 11, 90-92.

D82.   **Defendants' Statement:** Lan intended to copy and preserve all material on the Computer that appeared to be business related (Lan Decl. ¶ 12).

**Plaintiff's Response:** Disputed. Lan downloaded information from the Dell Home Computer and attached external hard drives that included substantial non-Brevet privileged and personal information. *See* NYS Dkt. 1400 (Contempt Order noting that Brevet "kept an entire copy of what was extracted from the computer and two external hard drives, which included the Privileged Transmission file"). Brevet's then-counsel, Greenberg Traurig, turned over the privileged material to Plaintiff in 2017 and certified that "all other copies have been deleted and are no longer in [Brevet's] possession." NYS Dkt. 1400 at 4-5 (Contempt order). But two years later, Brevet admitted for the first time that it had kept on Brevet's servers an entire copy of what it had downloaded, including the privileged material. *Id.* at 7; *see also* Lan Aff. ¶¶ 5-8 (Feb. 28,

2020), NYS Dkt. 1013. Lan testified he still has access to the materials. Lan Dep. 189:21-191:22.

This failure led to a finding of civil contempt against Greenberg Traurig, and a pending civil and

criminal contempt hearing against Brevet. NYS Dkt. 1400 at 28-29.

D83.    **Defendants' Statement:** Such material included material on the Computer
relating to Iacovacci's use of his non-Brevet email account(s) to the extent that Iacovacci had
used those accounts to transmit any Brevet information or to conduct business related to Brevet
(Lan Decl. ¶ 12).

**Plaintiff's Response:** Disputed to the extent it is intended to convey that Brevet had an

obligation to copy and preserve information from the non-Brevet email accounts. Iacovacci

incorporates his response to paragraph D82, above.

D84.    **Defendants' Statement:** The volume of information and the way it was stored on
the Computer made it impossible under the circumstances for Lan to have excluded that material
that was unrelated to Brevet information or to business Iacovacci conducted while he was
employed at Brevet at the time that Lan copied it (Lan Decl. ¶ 13).

**Plaintiff's Response:** Disputed, including to the extent Defendants suggest that they

were unable to exclude personal and privileged information from their unauthorized download of

information from the Dell Home Computer due to "circumstances" beyond their control. The

"circumstances" of Brevet's clandestine invasion of the computer were of Brevet's own

choosing: Lan testified that he accessed the Dell Home Computer in the middle of the night

because he wanted to make sure that Iacovacci was not on the computer at the same time. Lan

Dep. 203:24-205:3. Further, Brevet has admitted that it was looking for information Iacovacci

had with Brevet's business partners or potential partners, not just Brevet information. Callahan

Aff. ¶¶ 18-19 (Feb. 28, 2020) NYS Dkt. 1005.

D85.    **Defendants' Statement:** Lan's actions in backing up the Computer were
consistent with what he would have done if Iacovacci had returned the Computer to Brevet (Lan
Decl. ¶ 12).

**Plaintiff's Response:** Disputed. Iacovacci disputes that accessing a computer without

permission in the middle of the night and downloading privileged and personal materials without

notice is consistent with what Lan would have done if Iacovacci had returned the Dell Home

Computer to Brevet. Iacovacci incorporates his responses to paragraphs D82 and D84.

D86.   **Defendants' Statement:** Plaintiff has no evidence that Brevet deleted
information from the Computer.

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that Iacovacci

does not contend that Brevet deleted information from the Dell Home Computer and does not

base his claims on alleged deletion of such information.

D87.   **Defendants' Statement:** Lan did not download any material or information from
the Yahoo! email website (Lan Decl. ¶ 14; *see also* Thomas Kiernan (Plaintiff's Expert)
11/30/2021 Dep. Tr. 23:17-24; 21:24-23:240).

**Plaintiff's Response:** Disputed. The Chrome browser was live and the record confirms

that it was actively using system resources, including CPU usage, during the course of Lan's

intrusion into the Dell Home Computer 12:59:00 and 2:32:00 AM on October 18, 2018. Kiernan

Report ¶ 89 (citing C:\Windows\System32\SRU\SRUDB.dat). This is consistent with Lan

reviewing or otherwise obtaining or downloading information from the Yahoo! account. Other

than Lan's self-serving denial, the evidence cited by Brevet does not support their contention that

Lan did not download any material or information from the Yahoo! email website. Instead,

Brevet cites Kiernan's testimony that he would have included evidence that a website, such as

Yahoo!, had been visited while Lan was on the Computer, Kiernan Dep. 23:17-24, but the record

evidence shows that the Yahoo! account was *already opened* in the Chrome when Lan logged in,

such that Lan did not need to initiate a "visit" to the site himself. Lan Dep. 201:17 – 202:2. The

record evidence further shows that the portion of Mr. Iacovacci's personal email on the Yahoo!

email website that Lan viewed was opened to emails with the names of Brevet counterparties on

the screen, which further confirms that Lan navigated through Mr. Iacovacci's email on the web

page.

D88.   **Defendants' Statement:** Lan did not obtain information from the Yahoo! server (*see* Lan Dep. 201:17-202:8, 202:25-203:5; Lan Aff. ¶ 13).

**Plaintiff's Response:** Disputed. Lan obtained information from the Yahoo! Server by taking a digital photograph, or screenshot, of the open browser. BREVET-REPRO-0080436; Kiernan Report ¶¶ 90-92; Lan Dep. 201:17-202:2. That screenshot shows email subject lines, dates and times of emails, as well as the name of the email account being viewed, all details residing on a Yahoo! server.  BREVET-REPRO-0080436. The Chrome browser, which Lan concedes was open to Iacovacci's Yahoo! account, was active and using system resources during the course of Lan's intrusion. Kiernan Report ¶ 89 (citing C:\Windows\System32\SRU\SRUDB.dat); Lan Dep. 201:17-202:2. This is consistent with Lan using the browser to interact with the Yahoo! account. Iacovacci incorporates his response to paragraph D87.

D89.   **Defendants' Statement:** Plaintiff has no evidence that Brevet intercepted any Yahoo! communication contemporaneously with the transmission of that communication.

**Plaintiff's Response:** Disputed. Lan obtained information from the Yahoo! Server by taking a digital photograph, or screenshot, of the open browser. BREVET-REPRO-0080436; Kiernan ¶¶ 90-92; Lan Dep. 201:17-202:2. That screenshot shows email subject lines, email folders, dates of emails, as well as the name of the email account being viewed, all details residing on a Yahoo! server. BREVET-REPRO-0080436. The Chrome browser, which Lan concedes was open to Iacovacci's Yahoo! account, was active and using system resources during the course of Lan's intrusion. Kiernan ¶ 89 (citing C:\Windows\System32\SRU\SRUDB.dat); Lan Dep. 201:17 – 202:2. This is consistent with Lan using the browser to interact with the Yahoo! account. Plaintiff further objects that the statement embeds a legal conclusion to the extent that the word "interception" is a legal term as defined in the Federal Wiretap Act, 18 U.S.C. § 2510 et seq.

85

D90.   **Defendants' Statement:** Plaintiff has no evidence that Brevet obtained information from the Yahoo! server.

**Plaintiff's Response:** Disputed. *See* Response to ¶ D87, *supra*.

D91.   **Defendants' Statement:** Plaintiff has no evidence that the condition, quality or value of the Computer, or any of the information on the Computer, was diminished as a result of Brevet's access to the Computer.

**Plaintiff's Response:** Disputed. Lan installed on the computer FileZilla, an application

that exposed the Dell Home Computer to large file transfer activity. Kiernan Report ¶¶ 11, 55-

75. Brevet then utilized the compromised Computer and FileZilla to extract approximately 14

GB of data on October 18, 2016 between 2:00 and 2:32 A EDT. Kiernan ¶ 75. Lan utilized a web

browser on the Dell OptiPlex to identify Iacovacci's IP address, which would be necessary to

utilize the software program FileZilla. Kiernan ¶ 11, 77-85 (analyzing forensic artifact). Brevet

conceded that it accessed the Dell Home Computer in the middle of the night because it wanted

to ensure that Iacovacci would not be on the computer at the time it was infiltrating the

computer, installing FileZilla, and transferring files. Lan Dep. 203:24-205:3. The files that Lan

downloaded included attorney-client communications and privileged documents concerning the

dispute between Iacovacci and Brevet. *See* Pl.'s Resp. to ¶ D82; NYS Dkt. 1400.

D92.   **Defendants' Statement:** Plaintiff has no evidence that Plaintiff was excluded from use of the Computer or related information as a result of Brevet's access to the Computer (*see* Iacovacci 9/20/17 Affidavit ¶ 11).

**Plaintiff's Response:** Disputed. The reason Brevet accessed the Dell Home Computer in

the middle of the night was because Iacovacci could not have been on the computer at the same

time. Lan Dep. 203:24-205:3. Once Lan was logged on, Iacovacci would not be able to use the

Dell Home Computer at the same time. *Id.* The files that Lan downloaded included attorney-

client communications and privileged documents concerning the dispute between Iacovacci and

Brevet. *See* Plaintiff Response to ¶ D 82; NYS Dkt. 1400.

D93.   **Defendants' Statement:** Plaintiff has no evidence the Computer or any of the information on the Computer was damaged as a result of Brevet's access to the Computer.

**Plaintiff's Response:** Disputed. Plaintiff incorporates his response to paragraphs D91

and D92.

D94.   **Defendants' Statement:** Iacovacci alleges that his loss consists of being "forced to retain forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby, and defend against meritless claims in the State Court Action that are based on information Defendants obtained through their unlawful hacking campaign. The time and expense associated with these activities have caused a loss to Iacovacci during a one-year period in excess of $5,000." (Complaint ¶¶ 75, 82, 89.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement that those

paragraphs describe losses caused by Brevet's misconduct, but disputed to the extent that this

paragraph implies that those losses are the only losses alleged or suffered. Complaint ¶¶ 62, 68,

69, 93, 96, 104, 112.

D95.   **Defendants' Statement:** Iacovacci produced no invoices regarding his claimed damages.

**Plaintiff's Response:** Disputed. *See* Demirkaya Decl. & Exhibit A. Mr. Iacovacci

testified that an expert was hired before the commencement of this litigation "to investigate the

cyber attacks and the stealing of data" from his personal computer and that those damages alone

exceeded $5,000.  Iacovacci Dep. 187:12 - 192:10. Plaintiff's Rule 26(a) disclosures identified

Yalkin Demirkaya and David Ehrlich (and not Iacovacci) as people with knowledge of Plaintiff's

damages. Brevet chose not to depose either of the damages witnesses Iacovacci identified in his

Rule 26(a) disclosures. Iacovacci has expended more than $5,000 investigating the intrusions.

*See* Demirkaya Decl. & Exhibit A.

D96.   **Defendants' Statement:** Iacovacci produced no evidence concerning what amounts of money he spent on "defending against meritless claims in the State Court Action" as opposed to investigating alleged intrusions (*see* Complaint ¶¶ 75, 82, 89).

**Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

D97.   **Defendants' Statement:** Iacovacci produced no evidence breaking out his claimed damages in relation to recoverable "losses" under and as defined in the Computer Fraud and Abuse Act.

   **Plaintiff's Response:** Disputed.  Plaintiff incorporates his Responses to D95.

   D98.   **Defendants' Statement:** Iacovacci claimed privilege concerning the nature and amount of work performed by his forensic experts (Iacovacci Dep. 187:3-192:19).

   **Plaintiff's Response:** Disputed. Plaintiff disputes Brevet's characterization of the

testimony cited. Iacovacci testified that his understanding of the specific work his forensic

investigator performed was covered by attorney-client privilege. Iacovacci Dep. 187:25-189:14.

   D99.   **Defendants' Statement:** Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into the Computer, as alleged in Complaint Count I.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

   D100.  **Defendants' Statement:** Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into the Computer.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

   D101.  **Defendants' Statement:** Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into his external hard drives, as alleged in Complaint Count II.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

   D102.  **Defendants' Statement:** Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into his external hard drives.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

   D103.  **Defendants' Statement:** Iacovacci produced no evidence demonstrating how much money he spent investigating alleged unauthorized access into his personal Yahoo! email account, as alleged in the Complaint in Count III.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

   D104.  **Defendants' Statement:** Iacovacci produced no evidence showing that in one year, he spent $5,000 investigating alleged unauthorized access into his personal Yahoo! email account.

   **Plaintiff's Response:** Disputed. Plaintiff incorporates his Responses to D95.

D105.  **Defendants' Statement:** Iacovacci produced no evidence of any other access by Brevet that was allegedly unauthorized.

**Plaintiff's Response:** Disputed. Plaintiff produced a LogMeIn log showing numerous Brevet's LogMeIn attempts that were without Plaintiff's knowledge or consent. *See* Iacovacci Aff. ¶ 13 (Sept. 21, 2017) NYS Dkt. 13; Iacovacci Aff. Ex. 1 (Sept. 21, 2017) NYS Dkt. 14.

### Brevet Was Authorized to Access the Computer Pursuant to Its Policies and SEC Obligations

D106.  **Defendants' Statement:** Brevet's policies authorized Brevet to access the Computer (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed. The Dell Home Computer was not a "Company computer" to which certain Brevet policies purport to apply. *See, e.g.*, BREVET-REPRO-0067776 (employee handbook) at p. 37. Iacovacci was the administrator on the Dell Home Computer. Lan. Dep. 143:12-15. Brevet's Head of Technology could not access the Dell Home Computer without Iacovacci providing his personal credentials. Lan Dep. 208:17-209:18. The Dell Home Computer had hardware attached and software installed that Iacovacci purchased himself. Iacovacci Aff. (Sept. 9, 2017) ¶¶ 9-10. The Dell Home Computer contained no labels or markings indicating that it was a business asset or belonged to Brevet. Iacovacci Aff. ¶ 4 (Sept. 21, 2017). When the Dell Home Computer was turned on, there were no warnings or notices showing that the computer was a business asset or belonged to Brevet. Iacovacci Aff. ¶ 4 (Sept. 21, 2017). Iacovacci Aff. ¶ 4 (Sept. 21, 2017). The Dell Home Computer was not connected to the office server in any way. Iacovacci Aff. ¶ 4 (Sept. 21, 2017).

Iacovacci's Dell Home Computer was used as a family computer. *See, e.g.*, Lan Aff. (Feb. 16, 2021) Ex. G, BREVETNEW-043149 (showing user account "Callahan Family"); Iacovacci Aff. ¶¶ 3-5 (Sept. 21, 2017). The Dell Home Computer was purchased by Brevet as "a well-established perk for founding members" and it was Brevet's practice "to purchase

electronics like this computer on a pre-tax basis and to provide technical support services for

founding members." Iacovacci Aff. ¶ 3 (Sept. 21, 2017). Iacovacci has explained, "No one

advised me or suggested to me that this computer was a business asset rather than my private

property. . . . The computer was in my home office/children's playroom and was primarily used

for personal purposes. I was not the only person that used the computer. Both my children and

wife used the computer. My wife used the computer for various tasks including preparing lessons

for homeschooling my children. My children used the computer for school activities and

homework. I was never told that this computer was only to be used for business purposes."

Iacovacci Aff. ¶¶ 4-5 (Sept. 21, 2017).

Moreover, the policies Brevet cites purport to apply to employees, but Iacovacci was not

a Brevet employee at the time of the referenced unauthorized access, on October 18, 2016. *See*

BREVET-REPRO-0000392 (E-mail Retention Policy) at p. 3 ("All employees of the Company

are required to read and understand this Policy."); BREVET-REPRO-0000670 (Compliance

Manual) at p. 4 ("The Compliance Program (the 'Program') requires that any subsidiaries of and

agents acting for, or on behalf of Brevet comply with Brevet's compliance policies."); BREVET-

REPRO-0067776 (Employee Handbook) at 3 (addressing employees, consultants, and temporary

employees); BREVET-REPRO-0073519 (Code of Business Conduct) at p. 3 (addressing "All

employees and members"). Further, to the extent Brevet's policies purport to be based on legal

and regulatory requirements including the Advisers Act, those requirements did not require or

permit access to or preservation of the computer. *See generally* Jarcho Report at pp. 3, 5-11;

Plaintiff Responses to ¶¶ D76-78.

Nothing in the cited policies purport to permit unfettered access to the Dell Home

Computer, and none of the cited policies purport to authorize (let alone actually authorize)

Brevet to access any computer through an employee's home internet network. *Cf.* BREVET-REPRO-0067776 (Employee Handbook) at p. 38 ("Brevet reserves the right to read and retrieve any message composed, sent or received ***on the Company's e-mail systems***" (emphasis added)); *id.* at p. 39 (reserving right to monitor telephone conversations "that occur on Brevet's premises").

Plaintiff further objects to this paragraph to the extent Brevet contends that a policy purporting to authorize a particular practice conveys actual or legal authorization.

D107.  **Defendants' Statement:** Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, information stored on Brevet's equipment (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed to the extent Brevet contends that "Brevet's equipment" includes the Dell Home Computer, any of Iacovacci's hard drives that Brevet improperly accessed, or his personal email accounts and files. Plaintiff incorporates his response to ¶ D106, and further disputes that he had no "expectation of privacy" in information stored on the Dell Home Computer, Iacovacci's hard drives that Brevet improperly accessed, and his personal email accounts and files. Brevet's Information Security Handbook expressly provides: "Expectation of Privacy: The Firm will respect the privacy of your personal device and will only request access to the device to respond to legitimate discovery requests arising out of administrative, civil, or criminal proceedings." BREVET 003766 at § 7.2. Brevet's 30(b)(6) witness could not identify a Brevet policy that expressly disclosed that Brevet had authority to surreptitiously download information from a personal device. *Cf.* da Silva Vint Vol. I Dep. at 231:4-252:21. Brevet's employees did not believe Brevet was authorized to access personal devices, even if used for work purposes. *See, e.g.*, Cibrian Dep. 43:13-44:9 (former employee did not believe Brevet would have access to anything outside Brevet email on personal desktop).

Brevet's other policies contemplated some degree of personal use even for purported Brevet computers. For example, the employee handbook states that "some incidental use unrelated to the Company or its clients is permissible." BREVET-REPRO-0067776 at p. 37. Brevet's email retention and destruction policy states, "E-mail that is personal in nature to or from a member of an employee's immediate family may be deleted on an intra-day basis." BREVET-REPRO-0000392 at p. 5.

Plaintiff further objects that the citation provided by Defendants does not establish the proposition in that paragraph concerning Mr. Iacovacci's purported mental state. Plaintiff objects to this paragraph to the extent it contends that a policy purporting to authorize a particular practice conveys actual or legal authorization. Plaintiff objects to this paragraph to the extent it imports the legal conclusion that the Dell Home Computer was "Brevet's equipment." *See* Plaintiff Responses to ¶¶ D16-18.

D108.  **Defendants' Statement:** Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, Brevet information stored on the Computer (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed to the extent that Defendants contend that the presence of "Brevet information" on the Dell Home Computer somehow compromised Iacovacci's legitimate expectation of privacy with respect to the computer or in any permitted Brevet to access the Dell Home Computer without Iacovacci's specific consent.

D109.  **Defendants' Statement:** Pursuant to Brevet's policies, Iacovacci had no expectation of privacy in, and Brevet had the right to preserve, all information emanating from Iacovacci's permitted use of Brevet's technology systems (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed to the extent Brevet contends that "Brevet's technology systems" includes the Dell Home Computer, any of Iacovacci's hard drives that Brevet improperly accessed, or his personal email accounts and files. *See* Plaintiff Responses to ¶¶ D106-107. Plaintiff objects to this paragraph to the extent it embeds the legal conclusion that the

Computer was "Brevet's technology system." *See* Plaintiff Responses to ¶¶ D16-18. Plaintiff

also objects to this paragraph to the extent it contends that a policy purporting to authorize a

particular practice conveys actual or legal authorization. Plaintiff further objects on the grounds

that its reference to "all information emanating from" is unclear.

D110.  **Defendants' Statement:** Pursuant to Brevet's policies, Iacovacci had no
expectation of privacy in, and Brevet had the right to preserve, all information stored or
processed on Brevet's computers or other equipment (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed to the extent Brevet contends that "Brevet's computers or

other equipment" includes the Dell Home Computer, any of Iacovacci's hard drives that Brevet

improperly accessed, or his personal email accounts and files. *See* Plaintiff Responses to ¶¶

D106-107. Plaintiff further objects to this paragraph to the extent it embeds the legal conclusion

that the Dell Home Computer was "Brevet's computer[] or other equipment." *See* Plaintiff

Responses to ¶¶ D16-18. Plaintiff also objects to this paragraph to the extent it contends that a

policy purporting to authorize a particular practice conveys actual or legal authorization.

D111.  **Defendants' Statement:** Brevet's policies apply irrespective of Brevet's
ownership of the Computer (*see* ¶¶ D112-D146, *infra*).

**Plaintiff's Response:** Disputed. Brevet's Information Security Handbook provides,

"Expectation of Privacy: The Firm will respect the privacy of your personal device and will only

request access to the device to respond to legitimate discovery requests arising out of

administrative, civil, or criminal proceedings. This differs from the policy for Firm-provided

equipment and/or services . . ." BREVET 003766 at § 7.2. Brevet's policies and procedures in

the employee handbook related to "computers, software, and electronic mail" apply specifically

to "Company computers." *See, e.g.*, BREVET-REPRO-0067776 (employee handbook) at p. 37.

Plaintiff further objects that it is unclear which "Brevet policies" are being referenced in this

paragraph.

D112.  **Defendants' Statement:** Sources of Brevet's policies include (1) Brevet Holdings, LLC Personnel Policies & Employee Handbook, dated as of March 2015 ("Employee Handbook", BREVET-REPRO-006776); (2) Brevet Capital Management LLC General E-Mail Retention and Destruction Policy, dated as of January 2015 ("E-Mail Policy", BREVET-REPRO-0000392); (3) Brevet Capital Management, LLC Compliance Policy and Procedure Manual, dated as of January 2015 ("Compliance Policy", BREVET-REPRO-0000670); and (4) Brevet Capital Management, LLC Code of Business Conduct, Ethics and Insider Trading Policy, dated as of January 2015 ("Code of Conduct", BREVET-REPRO-0073519).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D113.  **Defendants' Statement:** Iacovacci acknowledged his receipt of these policies (*see* BREVET-REPRO-0068156 at 2).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D114.  **Defendants' Statement:** The Employee Handbook defines "Brevet" or the "Company" as "collectively" "Brevet Holdings, LLC or its affiliates, subsidiaries or related parties" (Employee Handbook at 3 (all caps deleted)).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D115.  **Defendants' Statement:** The Employee Handbook provides in part as follows: "Confidentiality of Information: . . . You will not, at any time, whether during your employment at Company or following the end of it, for any reason whatsoever, directly or indirectly disclose or furnish any firm, corporation or person, except as otherwise required by law, any Proprietary Information or Trade Secrets of Company with respect to any aspect of its operations or affairs" (Employee Handbook at 28).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D116.  **Defendants' Statement:** The Employee Handbook provides in part as follows: "Employees are prohibited from making copies or duplicates of any Proprietary Information or Trade Secrets, except as essential for the fulfillment of the employee's duties to the Company. Employees are prohibited from removing any Proprietary Information or Trade Secrets, related documents or proprietary property or information without the prior written authorization of the Company. If requested by the Company, employees will immediately return all Proprietary Information and Trade Secrets, related documents and property or information."  (Employee Handbook at 29.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D117.  **Defendants' Statement:** The Employee Handbook provides in part as follows (all emphases added unless otherwise noted):  "Use of Company Computers, Related Equipment and Software:  Company computers and related equipment and software are provided for use in connection with work performed for the Company. Employees should not use any Company computers, related equipment or software for purposes that do not benefit the Company. Notwithstanding the foregoing, some incidental use unrelated to the Company or its clients is

permissible. Nonetheless **all documents and files created using the Company's computers, related equipment and software are the exclusive property of the Company**."  (Employee Handbook at 37.)

> **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants.

> D118.   **Defendants' Statement:** The Employee Handbook provides in part as follows: "Electronic Mail, Messaging and Personal Phone Calls:  Brevet employees and others using Company owned e-mail systems should not have any expectation of privacy. Brevet reserves the right to read and retrieve any message composed, sent or received on the Company's e-mail systems. All such e-mail messages and content are the property of Brevet. E-mail messages should be limited to the business of Brevet. As stated above, the content of the messages should not contain subject matter that may be considered offensive or disruptive to another individual. Any other use of Brevet's e-mail systems may result in disciplinary action, up to and including termination. Brevet also reserves the right to disclose e-mail messages to law enforcement officials or other third parties without notice to the parties involved in the messages."  (Employee Handbook at 38; da Silva Vint Dep. 231:4-232:23.)

> **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

> D119.   **Defendants' Statement:** The Employee Handbook provides in part as follows: "Passwords:  The Company or its clients may provide you with boot-up or E-mail passwords for use in connection with software or systems belonging to the Company, its clients or third party vendors. Such **passwords are the property of the Company**, its clients or the third party, as applicable. . . . The Company is entitled to disable or change at any time any employee passwords related to their accounts." (Employee Handbook at 38.)

> **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants.

> D120.   **Defendants' Statement:** The Employee Handbook contains a Technology Usage Agreement (Employee Handbook at 39-41), which provides in part as follows:  "Permitted Use: **Brevet's technology systems are the property of Brevet and are to be used for legitimate business purposes**. Employees are provided with access to these systems to assist them in the performance of their jobs. All employees have a responsibility to use Brevet's technology resources in a professional, lawful and ethical manner. Abuse of the company systems may result in disciplinary action, including possible termination and civil and/or criminal liability. Occasional limited appropriate personal use of the Brevet's technology systems is permitted if such use does not:  a. Interfere with the users or any other employee's job performance or; b. Violate any other policies, provisions, guidelines or standards of Brevet.  Personal use of the systems is a privilege that may be revoked at any time."  (Employee Handbook at 39.)

> **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants.

D121.  **Defendants' Statement:** The Technology Usage Agreement in the Employee Handbook further provides in part as follows:  "System Monitoring and Privacy:  **Brevet does not guarantee the privacy of electronic documents, messages and telephone conversations of its employees**.  In order to promote and improve quality control, customer relations, prevention of system misuse, investigation of misconduct, compliance with legal requirements applicable to Brevet as well as compliance with legal and regulatory requirements, Brevet reserves the right to monitor and/or record telephone communications of its employees that occur on Brevet's premises without further notification to be provided to its' employees. **Use of Brevet's communication equipment constitutes consent to Brevet's use of or engagement in such monitoring and recording activities.  Electronic documents and messages should be treated the same as any other shared filing system used with Brevet; that is, with the exception that such documents and messages be available for review by authorized representatives of Brevet for any purpose related to company business**.  These purposes may include retrieving business information, trouble-shooting hardware and software problems, preventing system misuse, investigating misconduct, assuring compliance with software distribution policies and assuring compliance with legal requirements applicable to Brevet and complying with legal and regulatory requests for information. **Brevet reserves the right to review, read, access or otherwise monitor all electronic documents (i.e., word processing documents, spreadsheets, databases and computer files of all other kinds) and messages (including, but not limited to, e-mail, voice mail, instant messages and any other means of electronic communications) that are stored or processed on Brevet's computers or other equipment, including but not limited to, such documents and messages which do not directly relate to Brevet's business**. . . . Although some of Brevet's electronic communications tools contain **passwords or other security features**, it is possible for others to access electronic documents and messages. Brevet's use of such security features is designed to lessen the possibility of inadvertent or unauthorized access to such documents and messages both internally and externally. These security features **are not in place to create or protect employee privacy**. It is possible to retrieve electronic documents or messages even after such documents or messages have been 'deleted' by individual system users."  (Employee Handbook at 39-40; da Silva Vint Dep. 231:4-17, 233:3-236:8.)

   **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants.

   D122.  **Defendants' Statement:** The Email Policy provides in part as follows:  "The company retains e-mail in accordance with the recordkeeping rules under Rule 204-2 of the Investment Advisers Act of 1940, as amended (the 'Advisers Act') and with the SEC interpretations on e-mail retention" (Email Policy at 3; da Silva Vint Dep. 241:17-242:7).

   **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

   D123.  **Defendants' Statement:** The Email Policy further provides in part as follows: "[T]he purpose of this Policy is to collect, and inform all necessary personnel of the Company's document management policies and procedures.  No policy can, however, adequately cover every document management issue or situation. It is possible that documents may be encountered which appear not to be covered by any stated policy. Any questions concerning document

creation, retention or destruction that are not answered in this Policy should be referred to the Company's Chief Compliance Officer."  (Email Policy at 3; da Silva Vint Dep. 242:8-24.)

**Plaintiff's Response:** Undisputed, except to state that the full paragraph states: "The Company promulgates this Policy because the Company is committed to the effective management of its records in accordance with legal and contractual requirements, the optimal use of space and resources, the control of e-mail retention costs, and the elimination and destruction of outdated, unnecessary records of e-mails. Consistent with those commitments, the purpose of this Policy is to collect, and inform all necessary personnel of the Company's document management policies and procedures.  No policy can, however, adequately cover every document management issue or situation. It is possible that documents may be encountered which appear not to be covered by any stated policy. Any questions concerning document creation, retention or destruction that are not answered in this Policy should be referred to the Company's Chief Compliance Officer." BREVET-REPRO-0000392 at p. 3.

The email policy further provides: "Scope of this Policy's Application: Unless the context suggests otherwise, this Policy reflects the Company's obligations and compliance methods under U.S. legal and regulatory requirements that apply to Brevet, its U.S.-based funds and its non-U.S. based funds (the 'Investment Funds') to the extent U.S. law and regulations do not conflict with the non-U.S. based funds' jurisdictions." BREVET-REPRO-0000392 at p. 3.

D124.  **Defendants' Statement:** The Email Policy further provides in part as follows: "**All employees of the Company are required to read and understand this Policy**" (Email Policy at 3).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to the emphasis added by Defendants.

D125.  **Defendants' Statement:** The Email Policy further provides in part as follows: "E-Mail:  A. Permitted Communications:  When using electronic mail, employees must use the Company's electronic mail system network to conduct investment advisory-related business. It is permissible for an employee to communicate via a home computer for investment advisory-

related business *provided* that the employee uses the electronic mail system of the Company." (Email Policy at 4 (italics in original); da Silva Vint Dep. 242:8-243:8, 246:19-247:20.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D126.  **Defendants' Statement:** The Email Policy further provides in part as follows: "Prohibited Communications:  The Company prohibits employees to (i) use personal or other web-based e-mail accounts to conduct investment advisory-related business through such accounts or (ii) to use an electronic mail system other than the Company's electronic mail system to conduct investment advisory-related business" (Email Policy at 4; da Silva Vint Dep. 242:8-243:8, 246:19-247:20).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D127.  **Defendants' Statement:** The Email Policy further provides in part as follows: "In addition, as further described in the Company's Technology Usage Policy, the Company prohibits e-mail that: . . . Is an unauthorized transmission of Confidential Information and/or Trade Secrets" (Email Policy at 4).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state

that the full paragraph states: "In addition, as further described in the Company's Technology

Usage Policy, the Company prohibits email that:

- Is obscene, defamatory, racially, sexually or religiously discriminatory, threatening, harassing, abusive, sexually explicit, hateful or intended to annoy, harass or intimidate any person of the Company;

- Infringes on the intellectual property, privacy or publicity rights of others;

- Constitutes a chain letter or pyramid scheme; or

- Is an unauthorized transmission of Confidential Information and/or Trade Secrets?" BREVET-REPRO-0000392 at p. 4.

D128.  **Defendants' Statement:** The Email Policy further provides in part as follows: "E-mail that is to be Retained:  **The Company is to retain e-mail that is related to its investment advisory business** including:  Communications relating to recommendations and advice to clients (including information in which such recommendations or advice are based); . . . Written agreements between a client and the firm" (Email Policy at 4; da Silva Vint Dep. 242:8-243:8).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants, and except to state that the full paragraph states: "The

Company is to retain e-mail that is related to its investment advisory business including:

- Communications relating to recommendations and advice to clients (including information in which such recommendations or advice are based)

- Documentation regarding the receipt, disbursement, or delivery of funds or securities, or placing or executing an order to purchase or sell a security;

- Written agreements between a client and the firm." BREVET-REPRO-0000392 at p. 4.

D129.   **Defendants' Statement:** The Email Policy further provides in part as follows: "General Obligations of Authorized Personnel:  The Company's Information Technology personnel ('IT') and the Company's Chief Compliance Office are the Authorized Personnel who will be solely responsible for maintaining long-term storage and back-up of electronic records. Only Authorized Personnel are permitted to move or destroy archived email."  (Email Policy at 5.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D130.   **Defendants' Statement:** The Email Policy further provides in part as follows: "Format of Archived E-mail; Electronic Format:  Statutory Requirements:  Email may be retained in electronic format.  Electronic format includes . . . electronic storage media, including any digital storage medium or system.  **If e-mail is retained in electronic format, the Chief Compliance Officer is responsible to ensure that the Company undertakes the following: . . . Safeguard the records from loss, alteration or destruction.**"  (Email Policy at 5-6.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants, and except to state that the full paragraph states: "Format of

Archived E-mail; Electronic Format:  Statutory Requirements:  Email may be retained in

electronic format.  Electronic format includes (i) micrographic media, including microfilm,

microfiche or any similar medium; or (ii) electronic storage media, including any digital storage

medium or system. If e-mail is retained in electronic format, the Chief Compliance Officer is

responsible to ensure that the Company undertakes the following:

- Arrange and index records of e-mail in a way that permits easy location, access, and retrieval of any particular record.

- Separately store a duplicate copy of the record in electronic format as well. Moreover, the electronic duplicate must be stored for the same duration as the original electronic record.

- Safeguard the records from loss, alteration or destruction; and

- Limit access to the records to Authorized Personnel (and the SEC)." BREVET-REPRO-0000392 at pp. 5-6.

D131. **Defendants' Statement:** The Email Policy further provides in part as follows: "Format of Archived E-mail; Electronic Format:  SEC Inspections:  If e-mail is retained in electronic format, the following shall also apply:  The Chief Compliance Officer is responsible for providing to the SEC a legible, true and complete copy of the record in the medium and format in which the e-mail is stored. For the purposes of this Policy, the Company retains e-mail with, Global Relay, a secure third party e-mail retention and archive management system. Accordingly, if requested by the SEC, the Company shall provide the SEC a copy of retained e-mail in CD-R format.  The Company shall provide a legitimate, true and complete printout of retained e-mail if requested by the SEC. The Company shall provide the SEC with the means to access, view, and print retained e-mail."  (Email Policy at 6; da Silva Vint Dep. 242:8-244:9.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D132. **Defendants' Statement:** The Email Policy further provides in part as follows:  "It is the Company's policy to maintain and preserve all archived e-mail, whether in paper format or in electronic format, for a period of five (5) years" (Email Policy at 6).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state for context that the preceding paragraph in that provision states, "Duration: Rule 204-2(a) of the Advisers Act mandates that all required records, whether in paper format or in electronic format, must be maintained and preserved for a period of not less than five (5) years from the end of the fiscal year during which the last entry was made on such record. The Company must retain records at its office for the first two (2) years after the last entry date and then retain such records for an additional three (3) years in an easily accessible place." BREVET-REPRO-0000392 at p. 6.

D133. **Defendants' Statement:** The Code of Conduct provides in part as follows: "Statement of Company Policy:  As part of our Program, it is also our firm policy to record all transactions accurately in our books and records, and to be honest and forthcoming with bookkeepers, accountants, regulators and auditors.  No statement of policy or official Program can cover all circumstances or anticipate every situation." (Code of Conduct at 7; da Silva Vint Dep. 250:18-251:25.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state that Defendants' excerpt omits several relevant portions. The provision states: "Statement of

Company Policy: . . . It is the policy of Brevet that every effort is taken by all of our officers, employees, and representatives to detect and deter any involvement of the Company or its personnel in insider trading. In order to implement and enforce this policy, a formal, written Insider Trading Program (the 'program') has been prepared. In addition, all officers and employees of the Company have received a copy of the Program. It is imperative that every person employed by Brevet: (a) comply with the procedures contained in this Program; (b) immediately report any actual or suspected violations of the Program or incidents of insider trading to the Chief Compliance Officer; and (c) assist in investigating any allegations of insider trading. It is our strict policy, and our specific goal, to prevent our Company from becoming involved in any aspect of insider trading, to halt any use of material non-public information as soon as possible after its discovery, and to discipline personnel who violate the standards contained in this Program. As part of our Program, it is also our firm policy to record all transactions accurately in our books and records, and to be honest and forthcoming with bookkeepers, accountants, regulators, and auditors. No statement of policy or official Program can cover all circumstances or anticipate every situation. Therefore, if any person employed by or affiliated with the Company encounters a situation that is not addressed specifically by the Program, but which the person believes or suspects could involve insider trading, he or she iss expected to either contact the Chief Compliance Officer directly or, if that Officer is not available, contact any other officer of the Company. In all cases, each person should follow the highest ethical standards to determine how to act. . . ." BREVET-REPRO-0073519 at p. 7.

D134. **Defendants' Statement:** The Compliance Policy provides in part as follows: "The success of Brevet Capital Management, LLC ('Brevet') depends on how effectively it pursues and strengthens its reputation for integrity. Brevet's commitment to high standards of conduct helps to build a relationship of trust with its clients and fosters a culture in which compliance with applicable laws, rules and regulations are an integral component of its business." (Compliance Policy at 4.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D135.  **Defendants' Statement:** The Compliance Policy further provides in part: "Brevet is a registered investment adviser with the Securities and Exchange Commission ('SEC') under the Investment Advisers Act of 1940 (the 'Act'). Pursuant to Rule 206(4)-7 (the 'Rule') of the Act, effective as of February 5, 2004, as an investment adviser registered under Section 203 of the Act it shall be unlawful to provide investment advice to clients unless the adviser has adopted and implemented written policies and procedures to prevent violation by Brevet or their supervised persons of the Act as well as rules the SEC have adopted under the Act. Brevet must have in place an annual review of the adequacy of the policies and procedures initiated as per this section ensuring the effectiveness of their implementation. The rule also requires that Brevet designate an individual as Chief Compliance Officer who is responsible for the administration of its policies and procedures."  (Compliance Policy at 4.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D136.  **Defendants' Statement:** The Compliance Policy further provides in part:  "As an employee of Brevet you must adhere to these standards and should consult the compliance principles outlined herein for guidance when acting on behalf of Brevet or undertaking personal transactions. These principles contain individual duties and restrictions designed to satisfy the requirements of the Rule and assisting Brevet as well as supervised persons in the prevention, detection and correction of violations of the law, rules and our policies. Employees are required to carefully read and understand this Compliance Manual (the 'Manual')."  (Compliance Policy at 4.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D137.  **Defendants' Statement:** The Compliance Policy further provides in part:  "The Compliance Program (the 'Program') requires that any subsidiaries of and agents acting for, or on behalf of Brevet comply with Brevet's compliance policies" (Compliance Policy at 4).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except to state the full paragraph provides, "The Compliance Program (the 'Program') requires that any subsidiaries of and agents acting for, or on behalf of Brevet comply with Brevet's compliance policies. Brevet intends to utilize a variety of tools to implement the Program such as annual education and employee training, monitoring of employee personal training in addition to, investigation, detection, reporting, associate performance evaluations, and a reporting system. It is Brevet's intention to monitor this program to verify compliance with our published standards." BREVET-REPRO-0000670 at p. 4.

D138.  **Defendants' Statement:** The Compliance Policy further provides in part:  "The CCO [Chief Compliance Officer] has the responsibility for monitoring Brevet's advisory agreement policies, practices, disclosures and recordkeeping" (Compliance Policy at 6; da Silva Vint Dep. 237:1-238:7).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D139.  **Defendants' Statement:** The Compliance Policy further provides in part: "Books and Records:  Policy:  It is the policy of Brevet as a registered adviser to maintain books and records of business activities in accordance with Rule 204-2 under the Act. This rule specifies the types of books and records to be held and the duration of time they are to be readily available."  (Compliance Policy at 9.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D140.  **Defendants' Statement:** The Compliance Policy further provides in part: "Books and Records: Background:  The Rule states that there are two types of books and records that must be maintained by a registered adviser. First are financial records of Brevet as a business and these include such items as general ledgers, bank statements and cash reconciliations. **The second type of records to be retained are those that relate to client files and include advertising, trade records, statements, agreements between Brevet and clients, etc. These books and records are required under the Rule to be held in a suitable office location of Brevet** for a period of two years and accessible at another secure facility, such as an offsite warehouse, for an additional three years."  (Compliance Policy at 9.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants.

D141.  **Defendants' Statement:** The Compliance Policy further provides in part: "Books and Records: Responsibility:  The responsibility for the development and enforcement measures regarding the maintenance of books and records rests with the CCO. The CCO at his/her discretion may delegate the financial, accounting as well as other records to a qualified person(s) within Brevet" (Compliance Policy at 9).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D142.  **Defendants' Statement:** The Compliance Policy further provides in part: "Books and Records: Procedure:  Brevet has implemented measures to establish a policy regarding the books and records and **to provide on-going monitoring to ensure the policy is followed**. . . . The policy ensures that:  1. Files are centrally located and easily located within the firm; 2. **Legible and accurate copies of all documentation are obtained**" (Compliance Policy at 9).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement, except as to

the emphasis added by Defendants and to state the paragraph in full provides: "Books and

Records: Procedure: Brevet has implemented measures to establish a policy regarding the books and records and to provide on-going monitoring to ensure the policy is followed. The policy is reviewed as business needs warrant and amended or updated as necessary. The policy ensures that: 1. Files are centrally and easily located within the firm; 2. Legible and accurate copies of all documentation are obtained; 3. Document integrity is maintained by placing restricted access on files; 4. Access to files is limited to authorized persons." BREVET-REPRO-0000670 at p. 9.

D143.  **Defendants' Statement:** The Compliance Policy further provides in part: "Supervision and Internal Controls:  Responsibility:  The CCO is responsible for the on-going monitoring of the policies put into place to ensure that Brevet is in compliance with applicable regulatory rules, regulations and laws. The CCO or designee will periodically test each policy and procedure relevant to such objective to make sure that it is current, accurate and in accordance with all disclosures.  Any violations of the policies of Brevet will be addressed by the CCO and any repeat violations will be escalated by the CCO to senior management for resolution. Each employee of Brevet has a duty to be aware of and follow all of the policies and procedures put into place by Brevet."  (Compliance Policy at 26; da Silva Vint Dep. 237:15-239:2.)

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D144.  **Defendants' Statement:** Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC are governed by LLC Agreements (collectively the "LLC Agreements") (*see generally* BSDP LLC Agreement; BSDH LLC Agreement).

**Plaintiff's Response:** Undisputed that the LLCs are governed in part by LLC Agreements which are governed by Delaware law. LLC Agreements § 9.6. To the extent this statement is undisputed, it is undisputed for purposes of this Counter-Statement.

D145.  **Defendants' Statement:** Iacovacci signed the LLC Agreements (BSDP LLC Agreement at 20; BSDH LLC Agreement at 19).

**Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.

D146.  **Defendants' Statement:** The LLC Agreements § 7.3 respectively provide in part: "Any and all writings, inventions, improvements, processes, techniques, copyrights, trademarks, tradenames, service marks, and other intangible or intellectual property rights relating to the Company or any of its affiliates that may be invented, conceived, developed or enhanced by the Company or by the Members prior to, or during, their membership in the Company (collectively, the 'Company Property'), shall be the sole property of the Company and the Member hereby

waives any right or interest that he may otherwise have in respect thereof" (BSDP LLC Agreement at 14; BSDH LLC Agreement at 13).

      **Plaintiff's Response:** Undisputed for purposes of this Counter-Statement.


Dated: December 23, 2021

                               /s/ Jason Cyrulnik

                           Jason Cyrulnik
                           Paul Fattaruso
                           Ian M. Dumain
                           Adina Levine
                           Evelyn N. Fruchter
                           Mary Kate George
                           CYRULNIK FATTARUSO LLP
                           55 Broadway, Third Floor
                           New York, New York 10006
                           646 844 2466

                           *Counsel for Plaintiff*