UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL IACOVACCI,<br><br>                    Plaintiff,<br><br>   -against-<br><br>BREVET HOLDINGS, LLC, *et al*.,<br><br>                   Defendants. | 1:18-cv-0848-MKV |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

Louis M. Solomon
Colin A. Underwood
Traci S. Rea
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel.: (212) 549-0400
Lsolomon@reedsmith.com
*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..........................................................................................................................3

I.   RASMUSSEN'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD............5

    A.   Rasmussen's Opinion is Not Relevant and Would Not Assist the Trier of Fact .................5

    B.   Rasmussen is Not Qualified to Opine on the Purported Personal Nature of the Computer.........................................................................................................................6

    C.   Rasmussen's Testimony is Not the Product of Reliable Methodology ...............................7

II.  LIBROCK'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD .................11

    A.   Librock is Not Qualified to Opine on the Confidentiality of Brevet's Information ..........11

    B.   Librock's Testimony is Not the Product of Reliable Methodology...................................15

III. JARCHO'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD ..................19

    A.   Jarcho's Testimony is Not the Product of Reliable Methodology.....................................19

    B.   Jarcho's Testimony Will Not Assist the Trier of Fact ......................................................21

IV.  DEMIRKAYA HAS NOT BEEN DESIGNATED AS AN EXPERT AND CAN OFFER NO TESTIMONY.................................................................................................................22

CONCLUSION.....................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. Amtrak*,
  303 F.3d 256 (2d Cir. 2002)...................................................................................4

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*,
  970 F. Supp. 2d 278 (S.D.N.Y. 2013)................................................................5, 11

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.*,
  334 F. Supp. 2d 197 (N.D.N.Y. 2004)..................................................................15

*Colon ex rel. Molina v. BIC USA, Inc.*,
  199 F. Supp. 2d 53 (S.D.N.Y. 2001)......................................................................1

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)..................................................................................1, 3, 4

*Dreyer v. Ryder Automotive Carrier Group, Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005).................................................................4, 7

*Economist's Advocate, L.L.C. v. Cognitive Arts Corp.*,
  No. 01 Civ. 9468 (RWS), 2004 U.S. Dist. LEXIS 21805 (S.D.N.Y. Oct. 29,
  2004) ...............................................................................................4, 7, 11, 16

*Fernandez v. Cent. Mine Equip. Co.*,
  670 F. Supp. 2d 178 (E.D.N.Y. 2009) ...................................................................13

*Krause v. CSX Transp.*,
  984 F. Supp. 2d 62 (N.D.N.Y. 2013).....................................................................3, 6

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).........................................................................................4

*Lightfoot v. Union Carbide Corp.*,
  No. 98-7166, 1999 U.S. App. LEXIS 3329 (2d Cir. Mar. 1, 1999) ......................................18

*Loyd v. United States*,
  No. 08 Civ. 9016 (KNF), 2011 U.S. Dist. LEXIS 36237 (S.D.N.Y. Mar. 31,
  2011) ......................................................................................................3

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020)............................3

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)................................................................................4

*Primavera Familienstiftung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001) ................................................................ 5, 6

*In re Rezulin Prod. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005) ...................................................................... 5

*Roman v. Sprint Nextel Corp.*,
No. 12-cv-276 (VEC), 2014 U.S. Dist. LEXIS 138951 (S.D.N.Y. Sep. 29,
2014) ................................................................................................................... 5, 22

*U.S. v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004) ....................................................................................... 3

*U.S. v. Ray*,
No. 20-cr-110 (LJL), 2022 U.S. Dist. LEXIS 18056 (S.D.N.Y. Feb. 1, 2022) ..... 5, 6

*Vale v. U.S.*,
673 F. App'x 114 (2d Cir. 2016) ..................................................................... 3, 4, 11

*Valente v. Textron, Inc.*,
931 F. Supp. 2d 409 (E.D.N.Y. 2013) ...................................................................... 7

*Water Pollution Control Auth. v. Flowserve US, Inc.*,
782 Fed. Appx. 9 (2d Cir. 2019) ..................................................................... 11, 19

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .................................................................................................. 4

*Wiener v. AXA Equitable Life Ins. Co.*,
No. 16 Civ. 04019 (ER), 2019 U.S. Dist. LEXIS 42783 (S.D.N.Y. Mar. 15,
2019) ....................................................................................................................... 13

**Statutes**

15 U.S.C. § 80b-6 ........................................................................................................... 17

**Regulations**

17 C.F.R 275.206(4)-1 .................................................................................................... 17

**Rules**

Fed. R. Civ. P. 26(b)(4)(D) ............................................................................................ 22

Fed. R. Evid. 702 ........................................................................................................ 1, 3

**Other Authorities**

Interagency Statement on Sound Practices Concerning Elevated Risk Complex
Structure Finance Activities, Release No. 34-55043, File No. S7-08-06 (Jan.
5, 2007) ....................................................................................................................................18

## PRELIMINARY STATEMENT

All Defendants (collectively "Brevet") respectfully move to exclude the opinions and testimony of Plaintiff Paul Iacovacci's proffered experts Erik Rasmussen, Neil Librock and Jane Jarcho under Federal Rule of Evidence 702 ("FRE"), *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny.  Brevet also seeks to preclude testimony of any kind from Plaintiff's consultant Yalkin Demirkaya, who has not been proffered as an expert and has submitted no expert report in this matter.  Brevet brings this motion in conjunction with its Motion for Summary Judgment and its anticipated opposition to Plaintiff's motion for summary judgment.  *See Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (where "a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence").  To the extent any of Iacovacci's experts is not wholly excluded, Brevet reserves the right to seek to limit the opinions that they may offer at trial.

In this action, Iacovacci seeks to hold Brevet liable under, *inter alia*, the Computer Fraud and Abuse Act ("CFAA"), the Federal Wiretap Act ("FWA"), and the Stored Communications Act ("SCA"), because Brevet remotely accessed a computer that it issued to Iacovacci for him to use for Brevet work at his home (the "Computer").  Brevet accessed the Computer to back-up its files after Iacovacci refused to return it upon his termination.  Brevet has asserted counterclaims against Iacovacci in this action, including but not limited to claims relating to Iacovacci's theft of Brevet's confidential and proprietary documents and trade secrets.  The experts proffered by Iacovacci in this action are unqualified to offer the opinions the purport to render, have not used any proper methodology to reach their conclusions, improperly offer legal opinions and/or offer opinions that are irrelevant to the claims in this action and therefore would only serve to confuse rather than assist the jury.

Rasmussen's opinion that the Computer was "personal" in nature should be excluded because it is entirely irrelevant to any of the legal issues in this case. Moreover, there is nothing about Rasmussen's experience in the cybersecurity industry that qualifies him to opine on the appropriate characterization of a computer provided by a company for an employee's at-home use. Rasmussen's testimony must also be excluded as unreliable because the methodology he employed to reach his opinions is not rooted in any testable, workable or recognized methodology, fails to take relevant evidence into account, and fails to explain how his experience informs or supports his conclusions.

Librock's testimony concerning the confidential nature of the Brevet information misappropriated by Iacovacci should be excluded because he has no experience in Brevet's industry, let alone any expertise or specialized knowledge concerning whether information or material relating to the business of a direct lending hedge fund is or is not confidential. Further, Librock's testimony is unreliable because it is not based on any testable or recognized methodology; fails to take relevant evidence into account; is contradicted by his own deposition testimony; relies on authority that does not apply to Brevet; and fails to explain how his experience relates to or supports his conclusions.

Jarcho's opinion that Brevet had no obligation to preserve any of the files or information from Iacovacci's computer must be rejected as unreliable because it consists of unsupported and untestable statements proffered without even reviewing the relevant evidence. Jarcho's opinions on Plaintiff's CFAA claim also should be rejected because she has no expertise with the CFAA and should in any event be precluded from offering a legal opinion in this action.

Demirkaya has acted on occasion as a consultant to Iacovacci, primarily in connection with the concurrent litigation in New York state court. He has not been identified as an expert in

the case and has offered no expert report, but Brevet has reason to believe that Iacovacci may nevertheless seek to offer testimony from Demirkaya concerning his consulting work.

Numbered exhibits cited herein refer to the exhibits annexed to the parties Joint Exhibit List.  Lettered exhibits cited herein refer to the exhibits annexed to the Declaration of Colin A. Underwood, dated May 3, 2022.

## ARGUMENT

FRE 702 "governs the admissibility of expert testimony and requires trial courts to determine whether the proffered testimony is relevant and reliable."  *Vale v. U.S.*, 673 F. App'x 114, 116 (2d Cir. 2016) (citing *Daubert*, 509 U.S. at 588).  The party seeking to admit the expert testimony must demonstrate by a preponderance of the evidence that: "(i) the expert is qualified, (ii) the testimony is based on sufficient data, (iii) the testimony is the product of reliable methods reliably applied, and (iv) the testimony is relevant and will assist the jury."  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 239-40 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

Whether a proffered expert witness is qualified by knowledge, skill, experience, training, or education to render his or her opinions is a "threshold matter" to be determined before reaching the testimony itself.  *Vale*, 673 F. App'x at 116.  To make this baseline determination, a court must compare the "area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citations omitted)).  While the Second Circuit adheres to a liberal qualification standard, a trial court may properly conclude that witnesses are insufficiently qualified where their expertise is too general or too deficient.  *Loyd v. United States,* No. 08 Civ. 9016 (KNF), 2011 U.S. Dist. LEXIS 36237, *12 (S.D.N.Y. Mar. 31, 2011); *see also Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 79 (N.D.N.Y. 2013).  Experience alone may serve to qualify a

witness as an expert, but only where that experience has "direct relevance to the issues in the case." *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413, 430 (W.D.N.Y. 2005) (citations omitted).

Additionally, the Court must serve as the "gatekeeper" to ensure that expert testimony is reliable and "fits" the facts and issues in the case. *Daubert*, 509 U.S. at 597.  This gatekeeping role applies to all forms of technical knowledge, and the Court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  The reliability standard is "exacting", *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), and applies to all aspects of an expert's testimony, including "the methodology, the facts underlying the opinion, the link between the facts and the conclusion, *et alia*." *Economist's Advocate, L.L.C. v. Cognitive Arts Corp.*, No. 01 Civ. 9468 (RWS), 2004 U.S. Dist. LEXIS 21805, *5 (S.D.N.Y. Oct. 29, 2004) (citations and quotations omitted).  The *Daubert* court identified a non-exhaustive list of factors that courts must consider in determining the admissibility of expert testimony:  (1) whether the theory at issue can and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory has been generally accepted within the scientific community.  *Daubert*, 509 U.S. at 593-94; *Nimely*, 414 F.3d at 396 (same).  An expert's entire analysis must pass the reliability standard; if it is unreliable at "any step" under the *Daubert* factors, the expert's testimony is inadmissible. *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).

As a rule, testimony is inadmissible as unreliable where it consists of conclusory, conjectural, or speculative opinions, or lacks foundation.  *Vale*, 673 F. App'x at 116; *Atl.*

*Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 289 (S.D.N.Y. 2013) ("Expert testimony that is 'speculative or conjectural,' . . . is inadmissible") (citations omitted). Furthermore, "'[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *U.S. v. Ray*, No. 20-cr-110 (LJL), 2022 U.S. Dist. LEXIS 18056, *29 (S.D.N.Y. Feb. 1, 2022) (citations omitted); *see also Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (experts are not permitted to "'offer credentials rather than analysis'") (citation omitted).  Courts must also consider whether an expert has accounted for obvious alternative explanations "because any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect." *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005).

Finally, in evaluating expert testimony, the Court must also decide whether the testimony is relevant to the issues involved in the litigation and if it will "assist the trier of fact." *Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 U.S. Dist. LEXIS 138951, *7-8 (S.D.N.Y. Sep. 29, 2014).  Pursuant to this doctrine, testimony is inadmissible if it "'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it.'" *Id.* at *10.  As set forth below, Iacovacci's experts cannot meet these standards.

## I.    RASMUSSEN'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD

### A.    Rasmussen's Opinion Is Not Relevant and Would Not Assist the Trier of Fact

While Rasmussen opined that the Computer "was a personal computer, and not a Brevet company computer" (Ex. 33 at ¶ 8), he clarified in his deposition that he was ***not*** offering any opinion as to whether Brevet or Iacovacci ***owned*** the Computer (Ex. 15 at Tr. 13:9-11, 16:3), but only offering a view of how he believes the computer was ***used*** by Iacovacci.  Even if that

opinion were the product of a reliable methodology applied by someone with the necessary

experience and expertise (which it was not), it should be excluded because Rasmussen did not

even purport to explain the relevance of his conclusion or to draw any connection between that

conclusion and any issues in the case.  For example, he did not (and could not) assert that his

characterization of Iacovacci's use of the Computer would in any way affect whether the

Computer fell within the scope of Brevet's computer policies or procedures.  (In fact, as

discussed below, he conceded that Iacovacci's use was fully consistent with those policies.)

Under the CFAA, the relevant issue is not how Iacovacci chose to use the Computer, but whether

Brevet had the authority to access it, and the admission of any purported expert opinion on the

nature of Iacovacci's use would only serve to confuse the trier of fact into believing that

Rasmussen was, in fact, opining on ownership.

**B.      Rasmussen Is Not Qualified to Opine on the Purported Personal Nature of the
           Computer**

Rasmussen asserted that his conclusions are based on his "professional knowledge and

experience" in the cybersecurity industry (Ex. 33 at ¶ 36).  While his work in that field

undoubtedly involved computer devices, Rasmussen has offered no explanation as to how "that

experience leads to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts."  *Ray*, 2022 U.S. Dist. LEXIS

18056 at *29; *Primavera Familienstiftung*, 130 F. Supp. 2d at 529 (expert cannot "offer

credentials rather than analysis"); *Krause*, 984 F. Supp. 2d at 79 (notwithstanding plaintiff's

expert's "49 years of experience in the railroad industry", expert was not qualified to opine on

railroad worker's stress level, fatigue, and requirement for nourishment).

Indeed, Rasmussen's deposition testimony made clear that he has no knowledge, skill, experience, training, or education sufficient to qualify him as an expert in determining the personal nature of a computer:

- He has never been called or qualified as an expert to offer an opinion as to the personal nature of computers.  Ex. 15 at Tr. 38:12-56:16, 48:23-49:6.

- He has never taken any classes on computer science.  *Id.* at Tr. 30:2-20.

- He has no experience in dealing with the personal nature of computers.  *Id.* at Tr. 23:4-26:22, 30:21-31:1, 33:7-34:9, 35:6-11, 36:1-37:16.

- It would be "uncommon" in his current job to determine whether a computer is a personal computer or business computer.  *Id.* at Tr. 17:15-18.

Accordingly, the Court should reject Rasmussen's opinion testimony.  *Dreyer,* 367 F. Supp. 2d at 430 (opinion excluded where expert's experience had no direct relevance to the opinions being offered); *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 431 (E.D.N.Y. 2013) (finding expert unqualified who, despite having a degree in mechanical engineering, was not "'educated and experienced enough to make himself an expert regarding the [product] in question'") (citations omitted).

## C.    Rasmussen's Testimony Is Not the Product of Reliable Methodology

Rasmussen's opinion should also be excluded because his analysis is not reliable at "every step."  *Economist's Advocate, L.L.C.*, 2004 U.S. Dist. LEXIS 21805 at *5.  His opinions consist of conclusory statements instead of any testable, workable or recognized methodology for determining whether a device is "personal" and fail to take relevant evidence into account.

Rasmussen asserted that his opinion is supported by four related conclusions:

- The acquisition and use of the Computer indicate that it was a personal computer, not a Brevet computer.

- Brevet had limited security controls over the Computer.

- Digital artifacts "overwhelmingly" indicate personal use of the Computer not only by Iacovacci, but also by members of his family, with Brevet's knowledge.

- Brevet's access of the Computer was inconsistent with industry standards for company computers and Brevet's own policies for company computers.

Ex. 33 at ¶ 8(a)-(d).  In reaching these conclusions, Rasmussen purportedly considered dozens of "documents and forensic images," including forensic reports issued by Deloitte, documents produced by the parties to this action, documents filed in this action, and documents filed in *Iacovacci v. Brevet Holdings LLC et al.*, Index No. 158735/2016 (Sup. Ct. N.Y. Cnty.) (the "State Action"); Ex. 33 at 19-21.

Rasmussen's theory that the acquisition, configuration, markings, usage, and monitoring of the Computer support the conclusion that it is a "personal" device is based on nothing more than his own impression, rather than any sort of quantitative analysis or the application of an objective, recognized standard.  It is based first and foremost on the entirely unsupported assumption that a computer can meaningfully be characterized as either "personal" or "business", and never both.  Proceeding from that baseless assumption, Rasmussen's "analysis" can be summarized as follows: the way one uses a device, including the files saved on that device, can conclusively establish whether that device is "personal" or "business".  Rasmussen identified no authority that supported or endorsed this methodology, or explained how it can be applied to reach a reliable conclusion.

Moreover, Rasmussen contradicted many of his own suppositions.  Most significantly, as noted above, although his report stated that "Iacovacci's usage of the [Computer] for years — which was known by Brevet — was not consistent with [Brevet's] policies" (Ex. 33 at ¶ 12), at his deposition, Rasmussen testified unequivocally that Iacovacci in fact did ***not*** breach any of Brevet's policies in his use of the Computer and the way Iacovacci used the Computer was fully ***consistent*** with Brevet's policies:

Q:  The policies and procedures that you're citing are the ones set forth in the employee handbook and the electronic device usage policy or whatever those documents are; is that correct?

A:  Yes, and, you know, what I saw in e-mail correspondence which you can construe sometimes as policy or procedure.

Q:  Okay. And those were documents that were distributed to employees on an annual basis, correct?

A:  That's my understanding, yes.

Q:  And Mr. Iacovacci received those documents and policies on an annual basis and acknowledged having received and reviewed them, correct?

A:  Yes.

Q:  Okay. So *is it your testimony that Mr. Iacovacci breached those policies in his use of the [Computer]?*

***A:  No.***

* * * *

Q:  The company issued policies to Mr. Iacovacci that Mr. Iacovacci reviewed and acknowledged on an annual basis, correct?

A:  Correct.

***Q:  Was Mr. Iacovacci's use of the [Computer] consistent with those policies?***

***A:  Yes.***

Ex. 15 at Tr. 139:14-141:1 (emphasis added).

Rasmussen's report also stated (without support) that "[t]he fact that [Brevet's IT director Johnny] Lan did not have [administrative] access to (or an administrator account login on) the [Computer] indicates that the [Computer] was not a company computer" and that Brevet's inability to "even access the" Computer supports his conclusion that it was not a company computer.  Ex. 33 at ¶¶ 19-20.  Yet, even in the report Rasmussen contradicted this assertion, acknowledging that Lan in fact ***had*** administrative access to the Computer, and that Iacovacci was aware of it (*id.* at ¶ 20 n.20).  In his deposition, Rasmussen further clarified this admission,

acknowledging that, contrary to the assertion in his report, Lan had administrative access to the Computer at all times.  Ex. 15 at Tr. 71:2-72:14, 73:1-74:6.

Rasmussen also sought to support his opinion with a series of unsupported, untestable assertions:

- "Iacovacci and his family's ***extensive personal use*** of the [C]omputer, which was known by Brevet, indicates that the [Computer] was a personal computer and not a Brevet company computer" (Ex. 33 at ¶ 22)

- "the ***vast majority*** of email activity was ***tied to***" personal email accounts, "indicating that the [Computer] was a personal computer" (*id.* at ¶ 23)

- the Computer "did contain an OST file (offline storage table) for paul@brevetcapital.com, but the nature of that file ***was consistent with*** an archive rather than an active Outlook email account" (*id.*)

- the Computer was personal because Lan (purportedly) could not remember (i) whether there was a warning banner or log-in screen notifying a user that he/she was using a company computer, and (ii) how or where he stored Iacovacci's LogMeIn password (*id.* at ¶ 35(i)-(ii)).

Rasmussen offered absolutely no way of evaluating the accuracy of these assertions or how much weight he ascribed to them in reaching his conclusion.  There is, accordingly, no way to confirm or refute that conclusion.

Furthermore, critical and relevant facts were simply ignored in Rasmussen's "analysis", rendering it unreliable.  For instance, Rasmussen failed to acknowledge or take any account of the facts that:

- Brevet purchased the Computer and it was shipped directly to Brevet's offices. Ex. 15 at Tr. 60:22-61:14, 62:13-63:7.

- When Brevet delivered the Computer to Iacovacci's home, Iacovacci gave back the previous computer that Brevet had provided for him to use at home.  *Id.* at Tr. 68:15-69:6.

- Many of the artifacts that Rasmussen had identified in his report as "overwhelmingly personal" in his report could also, Rasmussen conceded, have a business purpose.  *Id.* at Tr. 88:12-94:15.

- o Indeed, as Brevet's own rebuttal expert Sankara Shanmugam explained, nearly all of the programs cited by Rasmussen as evidence of the "personal" nature of the Computer are in fact business programs, or consistent with business activity. Ex. 172 at ¶ 32(a)-(f).

- Iacovacci in fact used the Family Account on the Computer for work purposes. Ex. 15 at Tr. 121:9-12.

Rasmussen further admitted that he had no knowledge of whether Brevet treated any other computers — at Brevet's offices or at other employee's residences — differently than the Computer, and did not bother to research that issue (Ex. 15 at Tr. 126:10-14, 139:8-13), nor did he ever even speak to Iacovacci or his family members about their use of the Computer (*id.* at Tr. 69:10-13, 86:7-88:11). Finally, he admitted that he did not consider who set up and configured the Computer for Iacovacci's use. *Id.* at Tr. 64:23-65:7. The lack of investigation into or consideration of these relevant factors renders his opinions unreliable. *See Water Pollution Control Auth. v. Flowserve US, Inc.*, 782 Fed. Appx. 9, 13 (2d Cir. 2019) (affirming district court's exclusion of expert testimony where expert reached her conclusions "without considering evidence relevant to the [issue]").

In sum, Rasmussen's opinions are not reliable at "every step" because the facts (or lack thereof) "underlying [his] opinion[s]," as well as "the link between [those] facts and his conclusions," are untenable. *Economist's Advocate, L.L.C.*, 2004 U.S. Dist. LEXIS 21805 at *5. His analysis is therefore conclusory, conjectural, and speculative and should be excluded. *See Vale*, 673 F. App'x at 116; *Atl. Specialty Ins.*, 970 F. Supp. 2d at 289.

## II.   LIBROCK'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD

## A.   Librock Is Not Qualified to Opine on the Confidentiality of Brevet's Information

As noted above, Librock's opinion is that the documents Iacovacci misappropriated from Brevet "do not contain information that a reasonable practitioner in the commercial lending

industry would regard as commercially sensitive information."  Ex. 25 at ¶ 1.  Librock bases this

conclusion on six opinions:

- Brevet's purported trade secrets do not contain material that a reasonable practitioner in the commercial lending industry would regard as commercially sensitive information.  *Id.*  at ¶ 8(a).

- Brevet's purported trade secrets are not secret or sensitive and do not carry economic value as secrets.  Rather, they reflect information that are matters of general knowledge in the industry or are readily ascertainable from other sources.  *Id.* at ¶ 8(b).

- Brevet's purported trade secrets consist of generic documents, materials that reflect industry-standard practices and federal financial services guidance that other companies could readily develop or apply.  *Id.* at ¶ 8(c).

- Brevet's purported trade secrets are dated and reflect stale information that is not commercially sensitive.  *Id.* at ¶ 8(d).

- Brevet's purported trade secrets are not materials that would provide Iacovacci or others with a competitive advantage against Brevet.  *Id.* at ¶ 8(e).

- Brevet is a hedge fund business that engages in well-known and common lending activities.  Those activities include government-sponsored lending programs that involve well-defined products and procedures that require conformity with established rules.  *Id.* at ¶ 8(f).

These opinions are (purportedly) informed and supported by Librock's "professional experience

and training" in the "commercial lending industry" (*Id.* at ¶ 8), a sector Librock defined "broadly

as providing loans and related services to a wide range of customers, individual consumers[,]

small-to-medium sized companies, large-sized companies, and both borrowers and investors of

various financial sophistication or financial resources" (Ex. 18 at Tr. 13:9-15).

Librock asserted that his experience and training in this industry support his opinions

relating to the confidentiality of Brevet's claimed trade secrets (Ex. 25 at ¶ 8; Ex. 18 at Tr. 13:9-

15).  In fact, he has ***no*** experience in Brevet's field.  The bulk of his professional experience has

been working for "large and complex" corporations (Ex. 18 at Tr. 32:4-10), such as Wells Fargo,

a public company regulated by (among others) the Federal Reserve, Federal Deposit Insurance

Corporation, Consumer Financial Protection Bureau and Financial Stability Oversight Council.

His experience at those corporations has focused on retail lending — such as credit cards, home

loans and auto loans — directly to individual consumers, a far different business from that

engaged in by Brevet.  He has never worked at, or on behalf of, a hedge fund or a "private fund"

(*id.* at Tr. 65:9-66:4); or at, or on behalf of, a registered investment adviser (*id.* at Tr. 95:25-

100:4).  His knowledge of the particular challenges and obstacles faced by those types of entities,

and how they deal with those challenges and overcome those obstacles, is not simply weak, but

non-existent.  He has offered no explanation why his experience in consumer lending should

have any application to Brevet's business.

      In short, while Librock might be qualified to opine on certain issues faced by "large and

complex" financial institutions in connection with their consumer lending business, that

experience does not qualify him as an expert on all things finance-related.  For example, in

*Wiener v. AXA Equitable Life Ins. Co.*, the court excluded testimony of an expert who, though an

expert on insurance, was not an expert on underwriting:

> As Defendants point out, [the expert]: has never served as an underwriter; has never
> supervised underwriters; has never evaluated underwriters; has never received the
> designations for Certified Financial Planner, Chartered Life Underwriter, or Chartered
> Financial Consultant; has never belonged to an underwriting association; he has never
> written an article on underwriting; has never served as an insurance agent; [and] has
> never held a license to sell insurance.

No. 16 Civ. 04019 (ER), 2019 U.S. Dist. LEXIS 42783, *21-22 (S.D.N.Y. Mar. 15, 2019); *see*

*also Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178, 184 (E.D.N.Y. 2009) (expert

unqualified because, although a licensed mechanical engineer, he had little to no involvement in

issues relating to the drilling industry: "[n]othing in his resume or his deposition testimony

permits this Court to conclude that [the expert] has any relevant experience").  Just as the

"insurance expert" in *Wiener* was excluded based on his abject inexperience in underwriting,

Librock professes no knowledge of, or experience with, the issues Brevet deals with in its particularized form of hedge fund direct lending.

Librock also admitted that he has no experience dealing with the question of what does or does not qualify as a trade secret (Ex. 18 at Tr. 61:5-18) and has never been engaged as an expert on issues of confidentiality (*id.* at Tr. 61:20-62:10). Indeed, Librock conceded that he has no expertise concerning the types of work product created by an entity such as Brevet or the types of disclosures hedge funds must make. *Id.* at Tr. 138:18-20. He has no knowledge of, or experience with, the identification and solicitation of qualified investors to invest in limited offerings (*id.* at Tr. 70:13-19, 100:23-101:4) or investment management in the context of limited offerings (*id.* at Tr. 70:21-72:2). He also has no experience with EB-5 loans — one of Brevet's primary lines of business — and made no attempt to research what other EB-5 lenders do in the marketplace (*id.* at Tr. 81:2-17, 82:20-24, 97:5-12). Directly contradicting the opinion articulated in his report, he admitted that he had no idea whether Brevet's transaction documents for EB-5 loans are or are not unique (*Compare* Ex. 18 at Tr. 83:18-23 *with* Ex. 25 at ¶¶ 35, 43, 51).

Although Librock opined in his report that information regarding Brevet's customers and the structure of their loans is not commercially sensitive (Ex. 25 at ¶¶ 28(a)-(b), 30, 35(a)-(h), 20-21), in his deposition he conceded that he was unaware whether Brevet did repeat business with its clients (Ex. 18 at Tr. 121:18-122:5, 123:2-8) — in which case information about past transactions engaged in by those clients could be valuable in soliciting further investments from them. Yet Librock testified that he did not believe that factor would in any way affect his conclusions (*id.* at Tr. 123:10-20).

Moreover, even if Librock's experience in the consumer lending space were otherwise relevant to Brevet's hedge fund lending, he has not even worked in the consumer lending field since 2012, so whatever practical experience he had there is at least a decade old and of questionable validity even in that space.  In sum, while Librock's definition of "commercial lending industry" may be broad enough to include Brevet, he is, as his deposition testimony confirms, wholly unfamiliar with the details and the realities of Brevet's business, including the value of its work product and the confidential nature of its information.

Thus, Librock's testimony regarding the secrecy of Brevet's materials carries "no evidentiary value" and should be excluded because Librock is not "qualified to testify on those areas."  *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 251, 250 n.42 (N.D.N.Y. 2004) (excluding expert testimony on trade secrets consisting of "legal argument and conclusions" because "those claims are not properly the subject of expert testimony").

**B.      Librock's Testimony Is Not the Product of Reliable Methodology**

Librock's opinions should also be excluded because

- they are nothing more than conclusory statements based on made-up, undefined criteria masquerading as a legal standard instead of testable, reliable or recognized methodology;

- they fail to take relevant evidence into account and are contradicted by Librock's deposition testimony;

- they are based on at least one regulation that does not apply to Brevet; and

- they fail to identify regulations to which Librock compares Brevet's materials.

Librock's entire analysis is tethered to the information that (in his view) either a "reasonable practitioner" or "knowledgeable professional" in the overbroad "commercial lending industry" would consider commercially sensitive or secret — "standards" that appear to be nothing more than words offered to mask the absence of any true analysis.  Ex. 25 at ¶¶ 1, 8,

8(a), 15.  Librock did not explain the origin or definition of these standards, whether they are testable or recognized, how they can be reliably applied, how they connect to his analysis, or how they apply to Brevet's business.  Librock's testimony, vis-à-vis these invented standards, is altogether unreliable because the facts, or lack thereof, "underlying [his] opinion[s]," as well as "the link between [those] facts and his conclusions," are vague at best, and cannot be tested. *Economist's Advocate,* 2004 U.S. Dist. LEXIS 21805 at *5.

Nonetheless, in applying these standards Librock concluded that Brevet's "confidential, proprietary, and trade secret information" does "not represent commercially sensitive information," and that Brevet's "trade secrets reflect standard, unremarkable, and non-sensitive information" (Ex. 25 at ¶ 15).  This sweeping assertion cannot account for all of Brevet's trade secrets, for the simple reason that Librock ***never even reviewed*** the full universe of Brevet's confidential documents misappropriated by Iacovacci.  More specifically, Librock opined that Brevet's valuation methodology and loan documents are not secret or commercially sensitive (Ex. 25 ¶ 35), but admitted in his deposition that he had not actually reviewed or analyzed those documents in forming his opinion on that topic (Ex. 18 at Tr. 128:5-12, 130:16-131:1).  In fact, he did not do any independent research concerning the value of the materials and information that Brevet claims are trade secrets (Ex. 18 at Tr. 78:11-18) and made no effort to compare any of Brevet's policies and procedures to those of other hedge funds (*id.* at Tr. 118:9-22).

Likewise, Librock contended that Brevet's EB-5 loan documents are neither unique nor commercially sensitive (Ex. 25 at ¶ 51).  Yet, when pressed on this issue he could not state whether Brevet's EB-5 loan documents are, or are not, unique (Ex. 18 at Tr. 83:18-23), and admitted that he made no effort to investigate whether other EB-5 lenders in the marketplace use documents that are in any way similar to Brevet's (Ex. 18 at Tr. 97:5-12).

Additionally, Librock posited that Brevet's claimed trade secrets consist of publicly available information (Ex. 25 at ¶¶ 1, 20(c), 31, 35(c)), but made no effort to confirm that supposition, and could not identify any publicly available information (or material developed by other companies) that included the information in Brevet's documents (Ex. 18 at Tr. 86:19-87:10, 89:13-21, 90:11-18).  Furthermore, Librock insists that Brevet's "track record" is not confidential because "Brevet advertises its track record on its website, and Mr. Monticciolo has made many public statements about Brevet's track record (Ex. 25 at ¶ 33).  This suggestion simply ignores the fact that the term "track record" has a specific meaning in the financial industry.  As a registered investment adviser, Brevet is subject to (among other things) Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6, and its implementing Rule 206(4)-1, 17 C.F.R. 275.206(4)-1, which prohibit the use of past performance in advertisements.  The SEC has articulated very specific criteria governing an entity's disclosure of past performance (*see*, *e.g.*, Advisers Act Release No. IA-5653 at 264-65).  In light of these provisions, Brevet does not disclose its track record publicly, either on its website or anywhere else, and Librock does not identify any place that Brevet has ever done so, pointing only to places where Brevet has stated that it "has a 20-year track record" (https://www.businesswire.com/news/home/20190211005472/en/Brevet-Capital-Purchases-PanOptis), "has a successful track record" (https://brevetcapital.com), and has a "strong six-year track record" (http://www.wealthandfinancenews.com/issues/alternative-investment-awards-2016/44/) (*see* Ex. 25 at ¶ 33 n.55).  Librock is not even aware that the details of Brevet's track record of necessity go substantially beyond these simple references to the fact that Brevet has a track record, and readily admitted that he does not distinguish between "describing" Brevet's track record and "disclosing" the specific performance results underlying such track record (Ex. 18 at

Tr. 138-39).  Librock's utter lack of knowledge in this area compels the conclusion that his

opinion that Brevet's track record is publicly known must be excluded.

Worse yet, in a further effort to demonstrate that Brevet's Transaction Process and

Procedures Manual is not secret, Librock relied on a document that ***does not even apply to***

***Brevet***.  In his report, Librock cites "Department of the Treasury, Financial Crimes Enforcement

Network (2016), "Customer Due Diligence Requirements for Financial Institutions," final rules

(RIN 1506-AB25).  Federal Register Vol. 81, p. 29403" (Ex. 25 at ¶ 27(e)).  This regulation is

part of the Bank Secrecy Act, and because Brevet is not a bank, the regulation has no application

to Brevet's business.  Similarly, Librock cites to the "Interagency Statement on Sound Practices

Concerning Elevated Risk Complex Structured Finance Activities" ("Interagency Statement") to

conclude that "much of what Brevet claims as confidential information is not confidential but

instead industry regulatory guidance" (*id.* at ¶ 53).  Again, this document does not apply to

Brevet:  by its terms, it "pertains to national banks, state banks, bank holding companies (other

foreign banks), federal and state savings associations," and a slew of other financial entities that

do not include Brevet.  *See* Interagency Statement on Sound Practices Concerning Elevated Risk

Complex Structure Finance Activities, Release No. 34-55043, File No. S7-08-06 (Jan. 5, 2007).

Consequently, it has nothing to do with any information created and used by Brevet in its

business.  Finally, Librock suggest that Brevet's "risk rating definitions" do not deserve

protection because they "are virtually a copy of published financial regulations" (Ex. 25 ¶ 27(i)),

but fails to identify any of the regulations he is referring to, let alone demonstrate that they apply

to hedge funds, or that they actually contain any of the confidential Brevet information at issue.

Accordingly, "the record indicates that the expert failed to consider necessary factors"

and "his analysis rests on faulty assumptions."  *Lightfoot v. Union Carbide Corp.*, No. 98-7166,

1999 U.S. App. LEXIS 3329, *7 (2d Cir. Mar. 1, 1999).  By acknowledging that he failed to consider relevant evidence and by admitting that various aspects of his own analysis are not accurate, Librock has conceded that his analysis and conclusions are unsound, rendering his testimony unreliable.  *Water Pollution Control Auth.*, 782 Fed. Appx. at 13 (affirming district court's exclusion of expert testimony where expert reached her conclusions "without considering relevant evidence").  For all these reasons, Librock's opinions should be excluded as unreliable.

## III.   JARCHO'S TESTIMONY DOES NOT MEET THE *DAUBERT* STANDARD

### A.   Jarcho's Testimony Is Not the Product of Reliable Methodology

As with Rasmussen and Librock, Jarcho's opinions are little more than conclusory assertions proffered without any actual analysis or consideration of the relevant evidence. Jarcho's primary opinion is that Brevet had no obligation under the Advisers Act to retain any records on the Computer (Ex. 139 at 3).  In reaching this conclusion, however, Jarcho admitted that she only considered the Books and Records provision of the Act, and was not offering an opinion about any other record-keeping provisions (*see* Ex. A at Tr. 69:7-12).

With respect to her opinion that no documents on the Computer fell with the Books and Records requirements, ***Jarcho incredibly admitted that she did not review even one document that was contained on the Computer to reach this conclusion*** (Ex. A at Tr. 74:21-75:1). Instead, Jarcho repeatedly testified that her opinion is best understood as a "three-legged stool" that "you can't sort of pull . . . apart" which consists of  the following three faulty and unsubstantiated assumptions (Ex. A at Tr. 75:22-76:24).

First, Jarcho suggested that Brevet would have had copies of all documents located on the Computer.  She based this conclusion on the false assumption that the only material on the Computer consisted of Brevet documents that Iacovacci emailed to himself from his Brevet email.  While it appears that the material on the Computer certainly *included* Brevet documents

that Iacovacci had emailed to himself, there is no evidence in the record, and no basis to suppose, that *all* of the files on the Computer fall into that category.  Having failed to review any of the documents on the Computer and compare them to any documents maintained by Brevet, Jarcho's opinion on this leg is wholly unsubstantiated speculation.

Second, Jarcho contended that, due to the nature of the Iacovacci's work, he would not have had documents that fell under the Books and Records requirements.  Incredibly, in reaching this conclusion Jarcho did not even speak to Iacovacci about his actual work for Brevet, relying instead exclusively on information provided by his counsel (Ex. A at Tr. 60:13-15; 61:7-17).  According to Jarcho, the Books and Records requirements do not apply until a recommendation is made to the Investment Committee and (as Jarcho understood it) Iacovacci's work predominately took place before a recommendation was made (*id.* at Tr. 87:14-88:4).  Jarcho acknowledged in her deposition, however, that Iacovacci was in fact a member of the Investment Committee and had also made recommendations to the Investment Committee during the time period in question (*id.* at Tr. 88:6-11).  She further admitted that she undertook no effort to determine if Iacovacci was a "supervised person" under the Act, which would carry with it additional retention requirements beyond those she had considered (*id.* at Tr. 110:4-6).  Having failed to determine the appropriate standard to apply to Iacovacci's conduct or to review even one document on the Computer, Jarcho's opinion that Iacovacci did not have documents subject to retention due to his job duties is wholly unsubstantiated speculation.

Third, Jarcho posited that if Iacovacci had modified any Brevet documents and used them for a competing business, Brevet would not be required to retain them.  For this leg, Jarcho appears to rely on Brevet's allegations in its Amended Answer and Counterclaim that Iacovacci stole documents that reflect "the "building blocks to start a competing business."  According to

Jarcho, these documents "do not constitute the types of documents required to be maintained" (Ex. 139 at 5) under the Books and Records rule.  She made this assumption without making any effort to ascertain what those documents actually were and (again) without examining even one document on the Computer (*see* Ex. A at Tr. 74:21-75:1).  Jarcho's conclusion that ***none*** of the documents on the Computer fell under the Books and Records rule based on assumptions about ***some*** of the documents as described by Brevet in its pleadings is fatally flawed.

Jarcho's flawed three-legged stool framework and her unreliable opinion that there were no documents on the Computer that Brevet was required to retain were ultimately laid bare in her admission that she did not know if all of the documents in question were covered by her three-part analysis:

> Q:  And do you know if there were any documents on the Computer that did not fall within one of those three legs?
>
> A:  I do not.

(Ex. A at Tr. 97:3-6).  In short, having not reviewed a single document on the Computer, Jarcho was in no position to conclude that the Books and Records requirements did not apply to any of those documents.  Her opinion on this issue is simply not the product of the reliable and testable application of a reliable methodology as required by *Daubert*, and should be excluded.

### B.  Jarcho's Testimony Is Not Relevant and Would Not Assist the Trier of Fact

Jarcho also purported to opine on what she believed to be Brevet's affirmative defense relating to the interrelationship between the Advisers Act and Iacovacci's claims under the CFAA (Ex. 139 at 1 n.1 & 3).  She offered that opinion despite admitting that she has no experience with or expertise in the CFAA, and is not offering a legal opinion on the interaction between the federal securities laws and the CFAA (Ex. A at Tr. 103:2-7).  Her testimony on this issue is thus unfounded and irrelevant, and will not "assist the trier of fact" because it "usurps"

the role of the jury "in applying the law to the facts before it." *Roman*, 2014 U.S. Dist. LEXIS 138951 at *8.

## IV.    DEMIRKAYA HAS NOT BEEN DESIGNATED AS AN EXPERT AND CAN OFFER NO TESTIMONY

Finally, Demirkaya has no role in this case and should not be permitted to offer testimony about any of his consulting work for Iacovacci.  Demirkaya has been involved in supporting Iacovacci's litigation efforts, and was designated as an "expert" in his complaint (ECF No. 1 ¶¶ 65, 68), his deposition (*e.g.*, Ex. 1 at Tr. 188-89), and as recently as his Rule 56.1 Response (ECF 270, Resp. to D95).  In the State Action, Plaintiff's counsel designated Demirkaya as "Iacovacci's digital forensics and electronic discovery consulting expert" (Ex. B at ¶ 8).  On January 17, 2020, Plaintiff withdrew his designation of Demirkaya as a testifying expert in this case (Ex. C).  As a non-testifying, consulting expert, Demirkaya was not subject to deposition in this action.  Fed. R. Civ. P. 26(b)(4)(D).  The Court should clarify that Demirkaya will not be permitted to offer any testimony in this action.

## CONCLUSION

For the foregoing reasons, Brevet respectfully requests that the Court grant its motion to exclude Iacovacci's experts' testimony in its entirety.

Dated: New York, New York
May 3, 2022

Respectfully submitted,

REED SMITH LLP

By: */s/ Louis M. Solomon*
Louis M. Solomon
Colin A. Underwood
Traci S. Rea
599 Lexington Avenue
New York, New York 10022
(212) 549-0400

*Attorneys for Defendants*