# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 3

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   CASE NO:  1:18-cv-08048

5    - - - - - - - - - - - - - - X

6   PAUL IACOVACCI,

7                       Plaintiff,

8           -against-

9   BREVET HOLDINGS, LLC, et al,

10                      Defendants.

11   - - - - - - - - - - - - - - X

12                      Virtual Deposition

                        New York, New York

13

                        October 1, 2021

14                      8:30 a.m.

15          REMOTE ZOOM DEPOSITION of JOHNNY

16   LAN, in the above-entitled action, held at

17   the above time and place, pursuant to

18   Federal Rules of Civil Procedures

19   30(b)(6), taken before Tracie Shand, a

20   shorthand reporter and Notary Public

21   within and for the State of New York.

22

23

24

25

Page 2

```
 1                Johnny Lan
 2   A P P E A R A N C E S:
 3

     CYRULIK FATTARUSO, LLP
 4        Attorneys for Plaintiff
          55 Broadway, 3rd Floor
 5        New York, New York 10006
     BY:   IAN DUMAIN, ESQ.
 6          VIA ZOOM
 7

     WEISS & WEISS, LLC
 8        Co-Counsel for Plaintiffs
          50 Main Street, 10th Floor
 9        White Plains, New York 10606
     BY:    SCOTT A. WEISS, ESQ.
10          VIA ZOOM
11
12   REED SMITH, LLP
           Attorneys for Defendants
13         225 Fifth Avenue
           Pittsburgh, PA 15222
14   BY:   COLIN UNDERWOOD, ESQ.
            VIA ZOOM
15
16
   ALSO PRESENT:
17   Paul Fattaruso, Esq.
     Traci Rea, Esq.
18   Evelyn Fruchter, Esq.
     Marcelo Rivera, Videographer
19   Jason Cyrulnik, Esq.
     Yalkin Demirkaya, Esq.
20
21
22
23
24
25
```

Page 3

1                    Johnny Lan
2                S T I P U L A T I O N S
3
4          IT IS HEREBY STIPULATED AND
5     AGREED by and between the attorneys for
6     the respective parties herein, that
7     filing, sealing and certification be and
8     the same are hereby waived.
9             IT IS FURTHER STIPULATED AND
10    AGREED that all objections, except as to
11    the form of the question shall be reserved
12    to the time of the trial.
13            IT IS FURTHER STIPULATED AND
14    AGREED that the within deposition may be
15    signed and sworn to before any officer
16    authorized to administer an oath, with the
17    same force and effect as if signed and
18    sworn to before The Court.
19
20
21
22
23
24
25

1              Johnny Lan

2         WHEREAS, due to the circumstances

3    created by the COVID-19 pandemic, the

4    parties desire to enter into a stipulation

5    that will allow certain depositions to

6    proceed remotely and minimize travel and

7    social contact;

8         IT IS HEREBY STIPULATED AND

9    AGREED, by the parties hereto, through

10   their undersigned counsel, subject to the

11   approval of the Court, as follows:

12         1.  The parties agree that

13   depositions of agreed-upon deponents may

14   be conducted remotely.  Pursuant Federal

15   Rue of Civil Procedure 30(b)(4) and

16   subject to the provisions of

17   Paragraph 5 of this Stipulation, each

18   such remote deposition is taken in the

19   jurisdiction and at the place where the

20   deponent is to answer questions.

21         2.  The party that noticed the

22   deposition will provide the deponent, the

23   deponent's counsel, and counsel to all

24   other parties with access credentials to

25   an electronic remote deposition platform

1                   Johnny Lan

2      that will allow all participants in the

3      deposition to hear and be heard, and to

4      See and be seen, by all other

5      participants.

6           3.   The parties agree that the

7      deponent in each remote deposition shall

8      be video recorded.  Each person attending

9      a remote deposition should strive to (i)

10     ensure their environment is free from

11     noise and distractions and (ii) connect to

12     the videoconferencing platform using a

13     Case 1:18-cv-08048-MKV-DCF Document 234

14     Filed 09/24/21 Page 1 of 72 stable and

15     reliable internet connection with

16     sufficient bandwidth to avoid any

17     disconnection or disruptions during the

18     depositions.

19           4.   The parties agree that (an)

20     employee(s) from the court reporting,

21     video conference, and remote deposition

22     service provider (the "Court Reporting

23     Service Provider") may attend each remote

24     deposition to video record the deposition

25     and troubleshoot any technological issues

Page 6

1                    Johnny Lan
2     that may arise.
3               5.   The parties agree that the
4     court reporter is an "officer" as defined
5     by Federal Rule of Civil Procedure
6     28(a)(2) and shall be permitted to
7     administer the oath to the deponent via
8     Video conference.  The parties agree not
9     to challenge the validity of any oath
10    administered by the court reporter, even
11    if the court reporter is not a notary
12    public in the state where the deponent
13    Resides.
14               6.   Remote depositions shall be
15    transcribed by stenographic means
16    consistent with the requirements of
17    Federal Rule of Civil Procedure 30(b)(3),
18    and the court reporter's transcript
19    Shall constitute the official record.
20    The videographer will simultaneously video
21    record the deposition and preserve the
22    video recording.  The court reporter may
23    be given a copy of the video recording and
24    may review the video recording to improve
25    the accuracy of any written transcript.

Page 7

1               Johnny Lan

2          7.   The parties agree that remote

3     depositions may be used at a hearing or

4     trial to the same extent that an in-person

5     deposition may be used at a hearing or

6     trial, and the parties agree not to object

7     to the use of the video recording and/or

8     transcript on the basis that the

9     deposition was taken remotely.  The

10    parties reserve all other objections to

11    the use of any deposition testimony at

12    trial.

13         8.   The deponent, court reporter,

14    and counsel for the parties will each

15    participate in the videoconference

16    deposition remotely, except that counsel

17    representing the deponent may

18    Case 1:18-cv-08048-MKV-DCF Document 234

19    Filed 09/24/21 Page 2 of 73 appear in

20    person with the deponent.  Should counsel

21    representing the deponent elect to appear

22    in person with the deponent, that counsel

23    shall appear on the videoconferencing

24    platform when the hear or understand the

25    deponent.

Page 8

1              Johnny Lan

2          13.   Counsel shall endeavor to

3    ensure that every deponent has technology

4    sufficient to appear for a remote

5    deposition (e.g., a webcam and computer or

6    telephone audio), and bandwidth

7    Sufficient to sustain the remote

8    deposition.  Counsel for each deponent

9    shall consult with the deponent at least

10   reasonably in advance of the deposition to

11   confirm the deponent has the

12   Required technology.  If the deponent

13   does not have the required technology,

14   counsel for the deponent shall endeavor to

15   supply the required technology to the

16   deponent prior to the deposition.

17          14.   To the extent that there are

18   problems or issues with the technology

19   that interfere with the completion of the

20   deposition, the deposition will be

21   completed the next day on which

22   The deponent and counsel for the parties

23   are reasonably available, and the parties

24   will jointly request that the Court extend

25   any deadlines, if necessary, to allow

1              Johnny Lan

2   completion of the depositions.

3           15.   The parties agree that this

4   Stipulation and [Proposed] Order applies

5   to remote depositions of parties and

6   non-parties under Federal Rule of Civil

7   Procedure 45 and shall work in

8   A collaborative manner in scheduling

9   remote depositions of non-parties.  The

10  party noticing any non-party deposition

11  shall provide this Stipulation and

12  [Proposed] Order to counsel for any

13  Non-party at a reasonable time before the

14  date of the deposition.

15          16.   The parties agree that any

16  of the following methods for administering

17  exhibits may be employed during a remote

18  deposition:

19          I. Counsel may choose to mail

20  physical copies of documents that may be

21  used during the deposition to the

22  deponent, the deponent's counsel, the

23  other parties' counsel, and the court

24  reporter.  In that event, noticing counsel

25  shall so inform the Case

Page 10

1           Johnny Lan

2    1:18-cv-08048-MKV-DCF Document 234 Filed

3    09/24/21 Page 4 of 75 deponent's counsel,

4    the other parties' counsel, and the court

5    reporter prior to mailing the documents

6    and shall provide tracking information for

7    the package.  Such documents shall be

8    delivered by 12:00 pm ET the business day

9    before the deposition.  The deponent,

10   deponent's counsel, the other parties'

11   counsel, and the court reporter shall

12   confirm receipt of the package by

13   electronic mail to counsel noticing the

14   deposition.  If physical copies are

15   mailed, every recipient of a mailed

16   package shall keep the package sealed

17   until the deposition begins and shall only

18   Unseal the package on the record, on

19   video, and during the deposition when

20   Directed to do so by the counsel taking

21   the deposition.

22           Ii.  Counsel may choose to send a

23   compressed.zip file of the documents that

24   may be used during the deposition via

25   electronic mail or secure FTP site to the

Page 11

1              Johnny Lan
2   deponent, the deponent's counsel, the
3   other parties' counsel, and the court
4   reporter.  The .zip file shall be
5   delivered by 12:00 pm ET the business day
6   before the deposition.  Deponent's
7   counsel, the other parties' counsel, and
8   the court reporter shall confirm receipt
9   of the .zip file by electronic mail to
10  counsel noticing the
11  Deposition. The .zip file shall be
12  password protected, and counsel taking the
13  Deposition shall supply the password via
14  electronic mail immediately prior to the
15  Commencement of the deposition.  Every
16  recipient of a .zip file shall not open
17  the .zip file or any document contained
18  therein until directed to do so by the
19  counsel taking the deposition after the
20  deposition begins.
21          Iii.  Counsel may choose to share
22  exhibits as they are introduced at the
23  deposition by using exhibit or screen
24  sharing technology or the deposition
25  videoconference platform's "chat" feature

Page 12

1                    Johnny Lan

2    provided that a complete electronic copy

3    of the exhibit Case 1:18-cv-08048-MKV-DCF

4    Document 234 Filed 09/24/21 Page 5 of 76

5    is made available at that time through the

6    deposition platform or through reasonably

7    accessible means (including by e-mail).

8              17.  All deponents receiving

9    documents before or during a deposition

10   pursuant to paragraph 16.i shall return

11   the documents to the counsel who sent them

12   originally, within 2 business days

13   following the completion of the deposition

14   and shall not retain them in any manner.

15   Counsel noticing the deposition shall

16   include a pre-paid return shipping label

17   in any package of documents mailed to a

18   deponent.  In the alternative, the

19   deponent may certify that any copies of

20   exhibits that were provided in advance of

21   the deposition have been destroyed.

22             18.  Counsel for the parties may

23   keep any document or exhibit used during

24   the deposition, in accordance with the

25   Stipulated Protective Order (Dkt. 101).

Page 13

```
 1                  Johnny Lan
 2   19.  Counsel noticing the deposition
 3   shall provide any counsel for third-party
 4   witnesses with a copy of the Parties'
 5   Stipulated Protective Order.  Counsel for
 6   third-party witnesses may keep any
 7   document used during the deposition in
 8   accordance with the Stipulated Protective
 9   Order.
10            20.  A remote deposition shall
11   satisfy the parties' obligations to make
12   the deponent available for deposition and
13   the deponent's obligations to appear for a
14   deposition to the same extent as if the
15   deposition had been conducted in person.
16            21.  The parties may modify these
17   procedures as appropriate by mutual
18   agreement and reserve their rights to seek
19   reasonable modifications of these
20   procedures as appropriate in individual
21   instances.
22            VIDEOGRAPHER:  Good morning,
23       we're going on the record at 8:42 a.m.
24       on October 1, 2021.  This deposition
25       is being taken remotely of Mr. Johnny
```

Page 14

```
 1              Johnny Lan
 2    Lan in the matter Iacovacci versus
 3    Brevet Holdings, LLC, et al.
 4         My name is Marcelo Rivera from
 5    Veritext Legal Solutions.  I'm the
 6    videographer.  The court reporter is
 7    Tracie Shand in association with
 8    Veritext Legal Solutions.
 9         I'm not related to any party in
10    the action, nor, am I financially
11    interested in the outcome.
12         Counsel and all present remotely
13    will now state their appearances and
14    affiliations for the record.  If there
15    are any objections to proceeding,
16    please, state them at the time of your
17    appearance, beginning with the
18    noticing attorney.
19         MR. DUMAIN:  My name is Ian
20    Dumain.  I'm with Cyrulnik Fattaruso.
21    I represent the plaintiff, Paul
22    Iacovacci.  With me is my colleague,
23    Evelyn Fruchter.
24         MR. WEISS:  My name is Scott
25    Weiss, Weiss & Weiss, LLC, co-counsel
```

```
                                         Page 15
 1              Johnny Lan
 2       to Cyrulnik Fattaruso.  And I also
 3       represent the plaintiff, Paul
 4       Iacovacci.
 5              MR. UNDERWOOD:  Colin Underwood
 6       from Reed Smith, representing the
 7       defendants in this action, the Brevet
 8       entities, and the witness, Johnny Lan.
 9       And with me in the room is my
10       colleague Ruhi, R-U-H-I, Behal,
11       B-E-H-A-L.  Also, on the line is Traci
12       Rea, R-E-A, of our Pittsburgh office.
13              VIDEOGRAPHER:  Will the court
14       reporter, please, swear in the
15       witness.
16    J O H N N Y  L A N, the witness herein,
17    having been first duly sworn by a Notary
18    Public of the State of New York, was
19    examined and testified as follows via Zoom:
20  EXAMINATION BY
21  MR. DUMAIN:
22              THE REPORTER:  State your name
23       for the record, please.
24              THE WITNESS:  Johnny Lan.
25              THE REPORTER:  State your
```

```
                                              Page 16
 1                    Johnny Lan
 2        address for the record, please.
 3             THE WITNESS:  ████  ██████
 4   ██████  ████████  ███  █████  ████████
 5     ██████  ███  █████  ██████
 6        Q.    Good morning, Mr. Lan.  How are
 7   you?
 8        A.    Good.  Yourself?
 9        Q.    Okay.  Thank you.
10             As you heard, my name is Ian
11   Dumain.  I represent Paul Iacovacci who is
12   the plaintiff in this matter.
13             If at any point you can't hear
14   me, or you would like me to speak up, or
15   repeat myself, or speak more quickly, or
16   more slowly, I'll try.
17             Before we get started this
18   morning, have you setup or your counsel
19   setup your Exhibit Share software that
20   will allow you to see the exhibits that
21   are put in front of you?
22        A.    Yes, we have.
23        Q.    Mr. Lan, have you ever given a
24   deposition before?
25        A.    Yes.
```

```
                                          Page 17
 1                  Johnny Lan
 2       Q.    How many times?
 3       A.    Once before this.
 4       Q.    When was that?
 5       A.    I'm sorry?
 6       Q.    When was that?
 7       A.    I can't recall the exact date.
 8   It was a few years ago.
 9       Q.    Was it in connection with work
10   or was it a personal matter?
11       A.    It was a personal matter.
12       Q.    Were you a party to a lawsuit or
13   were you a witness in a lawsuit?
14       A.    I was a witness.
15       Q.    You're probably familiar with
16   this process, but just as a reminder, the
17   way this works, of course, I'm going to
18   ask you some questions.  As I said, if you
19   can't hear me, you should just ask me to
20   repeat; okay?
21       A.    Okay.
22       Q.    After I ask your question,
23   another attorney, your attorney in this
24   case, may state an objection for the
25   record.  He may say something like
```

```
                                        Page 18
 1                  Johnny Lan
 2    objection to the form of the question.
 3    Unless, Mr. Underwood expressly directs
 4    you not to answer, you should go ahead and
 5    answer the question; do you understand?
 6         A.   Yes.
 7         Q.   As you know, the court reporter,
 8    Tracie, is typing everything that we're
 9    saying to make a record.  So, it's
10    important that you give verbal responses,
11    not head nods, and that we don't speak
12    over each other; understand?
13         A.   Yes.
14         Q.   Finally, if you would like a
15    break at any point, please, let me know.
16    We'll try to take regular breaks.  The
17    only thing I ask, if there's a question
18    pending, you answer the pending question
19    before you ask for a break; okay?
20         A.   Yes.
21         Q.   Is there any reason you're aware
22    of that you would not be able to provide
23    competent testimony today?
24         A.   No.
25              THE REPORTER:  I think, he
```

```
                                     Page 19
 1                 Johnny Lan
 2        froze.
 3                VIDEOGRAPHER:  Yes.
 4                MR. DUMAIN:  Could you repeat
 5        that answer, I apologize?
 6        A.    To which question?
 7        Q.    Whether there was anything that
 8   would prevent you from giving competent
 9   testimony today?
10        A.    No.
11        Q.    Great.
12              Because this is a remote
13   deposition, I just want to ask you a
14   couple of questions about your
15   surroundings.
16              Where are you located?
17        A.    In my attorney's office.
18        Q.    That's the New York office of
19   Reed Smith?
20        A.    Yes.
21        Q.    Can you just tell us who's in
22   the room with you?
23        A.    My attorney, Colin Underwood,
24   and Ruhi Behal.
25        Q.    Are there any documents related
```

```
                                        Page 20
 1                  Johnny Lan
 2   to the case in the room with you?
 3        A.    Not that I'm aware of.
 4        Q.    You didn't bring any documents
 5   related to the case with you today,
 6   correct?
 7        A.    No.
 8        Q.    Aside from the computer in front
 9   of you, are there any other electronic
10   devices in the room?
11        A.    Yes.
12        Q.    Okay.  There are phones, I
13   gather?
14        A.    Yes.
15        Q.    All right.
16              Can you agree that while we're
17   on the record you will not check your
18   phone or any other electronic device,
19   aside from the Exhibit Share program we're
20   focused on?
21        A.    Yes.
22        Q.    Terrific.  Thanks.
23              Mr. Lan, will you again state
24   your full name?
25        A.    Johnny Lan.
```

Page 21

```
 1              Johnny Lan
 2      Q.    Again, state your address for
 3  the record, please?
 4      A.    ████ ████ ████ ████
 5  ██ ██ ████ ███ ██ ███ ████
 6      Q.    You're represented by Mr.
 7  Underwood at Reed Smith, correct?
 8      A.    Yes.
 9      Q.    That's as a witness in this
10  case, correct?
11      A.    Yes.
12      Q.    Let me state it differently.
13            You understand, sir, that you're
14  a defendant in this case, correct?
15      A.    Yes.
16      Q.    Is Reed Smith the attorneys that
17  are defending you in this action?
18      A.    Yes.
19      Q.    Who is paying for Reed Smith's
20  time?
21      A.    I believe, my employer.
22      Q.    Are you paying for Reed Smith's
23  time?
24      A.    No.
25      Q.    Mr. Lan, have you spoken to
```

```
                                          Page 22
 1                Johnny Lan
 2   anyone about today's deposition, aside
 3   from your lawyers?
 4       A.    Can you repeat the question?
 5       Q.    Yes.
 6             Aside from your lawyers, have
 7   you spoken with anyone about today's
 8   deposition?
 9       A.    Can you define spoken about?
10       Q.    Sure.
11             Let's do it this way, who,
12   besides the people in the room, know that
13   you are giving a deposition in this case?
14       A.    I believe, the internal counsel
15   at Brevet.
16       Q.    Anyone else?
17       A.    Perhaps, the other members of
18   Brevet.
19       Q.    What's the name of the internal
20   counsel at Brevet?
21       A.    Mei Li Dasilvavint.
22             MR. UNDERWOOD:  I believe, she's
23       actually joined the proceeding here.
24       She's the party representative.  If
25       you look at the list of participants,
```

Page 23

                    Johnny Lan
1
2       she would be listed there.
3       Q.     Aside from Ms. Dasilvavint, have
4   you spoken with anyone about giving this
5   deposition today, anyone from Brevet?
6       A.     Not that I recall.
7       Q.     Mr. Lan, what did you do to
8   prepare for your deposition?
9       A.     I spoke with my attorneys.
10      Q.     Did you look at any documents?
11      A.     "At any documents," did you say?
12      Q.     Yes.
13             Did you look at any documents to
14   prepare for your deposition today?
15      A.     Yes.
16      Q.     Did any of those documents
17   refresh your recollection about any of the
18   matters at issue in this case?
19      A.     Generally, no.
20      Q.     Aside from the deposition that
21   we've spoken about a few moments ago have
22   you ever given sworn testimony in any
23   proceeding?
24      A.     Not that I can recall at this
25   time.

Page 24

1             Johnny Lan

2             MR. DUMAIN:  We're going to mark

3       as Lan Exhibit 1 the Rule 30(b)(6)

4       notice in this case, which should pop

5       up in Exhibit Share momentarily, as I

6       understand it.

7             (Whereupon, Plaintiff's Exhibit

8       1, Rule 30(b)(6) notice was marked,

9       for identification, as of this date.)

10      Q.    You should see it now.

11            Are you looking at the document,

12  Mr. Lan?

13      A.    Yes.  This is a notice of

14  deposition.

15      Q.    Have you ever seen this document

16  before?

17      A.    Sitting here today, I can't

18  recall if I've seen or read through the

19  documents.

20      Q.    If you could look, flip to page

21  11 of the PDF.  I'm going to have you

22  review briefly topics 19 through 25.  When

23  you've had a chance to look at them, let

24  me know.

25      A.    Okay.

Page 25

```
 1                  Johnny Lan
 2      Q.    Have you made it through 19
 3   through 25, Mr. Lan?
 4      A.    Just about.
 5      Q.    Okay.
 6      A.    Okay.
 7      Q.    Do you understand that you have
 8   been designated by at least one of the
 9   Brevet entities to give testimony related
10   to these topics, 19 through 25?
11      A.    Yes.
12            Which entities?
13      Q.    I think, Brevet Capital
14   Management, but your counsel will clarify
15   if I'm getting that wrong, I hope.
16            MR. UNDERWOOD:  That's correct.
17      Q.    Let me put it to you more
18   squarely.
19            You understand that you have
20   been designated to give testimony on
21   behalf of Brevet Capital Management
22   related to topics 19 through 25?
23      A.    Yes.
24      Q.    Are you prepared to give
25   testimony on those topics?
```

Page 26

```
 1              Johnny Lan
 2      A.    Yes.
 3      Q.    When we speak about them
 4  specifically I'll ask you this question
 5  again, but, generally, what did you do to
 6  prepare to give testimony on behalf of
 7  Brevet Capital Management on these topics?
 8      A.    Generally, I spoke with my
 9  attorneys.
10      Q.    Did you speak with anyone other
11  than your attorneys?
12      A.    No.
13      Q.    Did you review any documents
14  related to these topics?
15      A.    Give me one second, let me just
16  review.
17            Yes.
18      Q.    What documents did you review in
19  preparation to give testimony on these
20  topics?
21            MR. UNDERWOOD:  I'm going to
22      instruct the witness not to answer the
23      question.
24            MR. DUMAIN:  On what grounds?
25            MR. UNDERWOOD:  Attorney/client
```

Page 27

```
 1              Johnny Lan
 2       privilege in the work product
 3       protection.
 4            To the extent that the witness
 5       is testifying in his personal
 6       capacity, he's already testified that
 7       the documents he reviewed didn't
 8       refresh his recollection.
 9            To the extent that we showed him
10       anything to prepare him to make sure
11       he could address the 30(b)(6) topics,
12       it's not a refreshing recollection
13       context in which you're entitled to
14       talk to him about the documents he
15       reviewed.  I believe, it's covered by
16       the protection.
17            MR. DUMAIN:  I think, we can
18       solve it this way.
19       Q.    Mr. Lan, independent of any
20  documents your attorneys may have showed
21  you to prepare for your 30(b)(6)
22  testimony, did you review any other
23  documents in preparation to give testimony
24  on behalf of Brevet Capital Management?
25       A.    No.  Not that I can recall.
```

```
                                              Page 28
 1                     Johnny Lan
 2        Q.     Thank you.
 3               Mr. Lan, you understand that
 4    we're here today in connection with claims
 5    brought by Paul Iacovacci against various
 6    Brevet entities and several individuals,
 7    including, yourself, correct?
 8        A.     Yes.
 9        Q.     Do you know Paul Iacovacci?
10        A.     Yes.
11        Q.     Who is Paul Iacovacci?
12        A.     He was a former colleague at
13    Brevet.
14        Q.     Do you recall what position he
15    held at Brevet?
16        A.     No, I can't recall, you know,
17    his exact position or title.
18        Q.     What was your relationship with
19    him when he worked at Brevet?
20        A.     Could you elaborate on what you
21    mean?
22        Q.     Sure.
23               Was Mr. Iacovacci your superior?
24               MR. UNDERWOOD:   Object to the
25        form of the question.
```

Page 29

```
 1                Johnny Lan
 2           MR. DUMAIN:  Let me withdraw it.
 3      Q.    Did you report to Mr. Iacovacci?
 4      A.    Not directly.
 5      Q.    Did you report to Mr. Iacovacci
 6  indirectly?
 7      A.    In a sense that he was a senior
 8  member of the firm.
 9      Q.    As you understood it, in the
10  seniority hierarchy of the firm, where was
11  Mr. Iacovacci?
12      A.    Sitting here today, I don't know
13  if I can give you an exact layout or
14  hierarchy.
15      Q.    Do you have a general
16  recollection of where Mr. Iacovacci sat in
17  the hierarchy of Brevet?
18           MR. UNDERWOOD:  Object to the
19      form of the question.
20      A.    No.  Again, I'm -- I don't think
21  I can answer your question.
22      Q.    Mr. Lan, on or about October 18,
23  2016, did you access Mr. Iacovacci's home
24  computer without notice to Mr. Iacovacci
25  and download files?
```

Page 30

1               Johnny Lan

2          MR. UNDERWOOD:  Object to the

3      form of the question.

4      A.    I disagree with the premises of

5  that question.

6          I was concerned that it was

7  Brevet's computer.

8          MR. DUMAIN:  Tracie, could you,

9      please, read back the question?

10         Let me state it a different way

11     so we're not going to quibble about

12     who owned what.

13     Q.    On or around October 18, 2016,

14  did you access a computer that was in Mr.

15  Iacovacci's home and download files

16  without notice to Mr. Iacovacci?

17     A.    Yes.

18     Q.    Did anyone tell you to do it?

19     A.    Yes.

20     Q.    Who told you to do it?

21     A.    Mark Callahan.

22     Q.    Do you recall what Mr. Callahan

23  said?

24     A.    I generally recall Mark Callahan

25  instructing me to make a backup copy of

```
 1                   Johnny Lan
 2   the Brevet related information on the
 3   computer.
 4        Q.     Did Mr. Callahan instruct you to
 5   do that without informing Mr. Iacovacci
 6   that you would be doing it?
 7        A.     Not that I can recall.
 8        Q.     Do you recall asking
 9   Mr. Callahan whether he should inform Mr.
10   Iacovacci that you would be doing this?
11        A.     I do not recall him saying that
12   at this time.
13        Q.     At the time that Mr. Callahan
14   gave you this instruction, did you express
15   to him any concern about the legality of
16   what you were about to do?
17        A.     Again, not that I can recall at
18   this time.
19        Q.     Did you seek any legal advice
20   before you accessed the computer in Mr.
21   Iacovacci's home and downloaded the files
22   without notice to Mr. Iacovacci?
23        A.     No.
24        Q.     Do you recall thinking about the
25   legality of it one way or the other?
```

```
                                        Page 32
 1                  Johnny Lan
 2      A.    I do not recall at this time.
 3      Q.    Do you regret having accessed
 4  the computer at Mr. Iacovacci's home
 5  without notice to Mr. Iacovacci and
 6  downloading those files?
 7            MR. UNDERWOOD:  Object to the
 8       form of the question.
 9      A.    I do not recall thinking about
10  that -- you know, what you were just
11  talking about.
12      Q.    I'm asking you, as you sit here
13  today, do you regret having done it?
14      A.    No.
15      Q.    When he gave you this
16  instruction, were you face to face?
17      A.    I believe, we were.
18      Q.    Where did he give you this
19  instruction?
20      A.    The best as I can recall, it was
21  in the Brevet offices at the time.
22      Q.    What time of day were you given
23  this instruction?
24      A.    Sitting here today, I couldn't
25  remember the exact time.
```

Page 33

1              Johnny Lan

2      Q.     Did you frequently work late

3  into the evenings in 2016?

4      A.     Yes.

5      Q.     Were you frequently in the

6  office late into the evenings in 2016?

7      A.     Again, you know, given that it

8  was a long time ago, I couldn't tell you

9  for sure, but, yes, I generally -- I've

10  worked late throughout my tenure with the

11  company.

12      Q.     Mr. Lan, if you could take a

13  look, again, at the deposition notice.

14  Just scroll back up to the very top.

15              That's not going to do it,

16  unfortunately -- it will do, actually.

17              Yes, please, scroll to the top.

18  Let me know when you're there, please.

19      A.     Yes.

20      Q.     Do you see in the first

21  paragraph on the first page a list of

22  Brevet entities?

23      A.     Yes.

24      Q.     Are you an employee of any of

25  these entities?

```
                                           Page 34
 1                  Johnny Lan
 2        A.     Do you mean at the current time?
 3        Q.     Let's start with the current
 4   time.
 5               Are you now an employee of any
 6   of these entities?
 7        A.     No.
 8        Q.     Have you ever been an employee
 9   of any of these entities?
10        A.     Yes.
11        Q.     Which of these entities have you
12   been an employee of?
13        A.     I believe, Brevet Holdings.
14        Q.     What is the business of Brevet
15   Holdings?
16        A.     Can you elaborate on what you're
17   looking for, in terms of what is the
18   business?
19               It's a little vague.
20        Q.     What does Brevet Holdings do?
21        A.     I'm not an expert in, you know,
22   what all the different entities and what
23   their specific purpose or function is.
24        Q.     I should be clear.  I hope it's
25   clear, this isn't a trick.
```

```
 1              Johnny Lan
 2          I just wonder, if you know,
 3   generally, what Brevet Holdings does?
 4      A.    Yes.
 5      Q.    Generally, what does it do?
 6      A.    It is an investment management
 7   firm.
 8      Q.    What types of investments does
 9   it manage?
10      A.    I'm not sure I'm at liberty to
11   state.
12      Q.    Why don't you think you can say
13   what types of investments Brevet manages?
14      A.    You know, because my
15   understanding is, some of that is
16   proprietary, confidential information.
17      Q.    There's a protective order in
18   this case, and your counsel will have the
19   opportunity to designate portions of this
20   transcript confidential.
21          So, unless, Mr. Underwood is
22   directing you not to answer, I would ask
23   that you answer the question.
24          MR. UNDERWOOD:  Ian, was your
25      question -- sorry.
```

Page 36

```
 1                    Johnny Lan
 2             I thought the original question
 3        was about Brevet Holdings.  I think,
 4        maybe, when you restated it you asked
 5        about Brevet.
 6             Are you asking specifically
 7        about Brevet Holdings or are you
 8        asking about the Brevet organization?
 9             MR. DUMAIN:  My recollection is
10        that I asked about Brevet Holdings.
11        He said the business was that of an
12        investment manager.  And I said what
13        types of investments.
14             MR. UNDERWOOD:  I think, in your
15        most recent question you just said
16        Brevet.  I was just asking you to
17        clarify if you're still referring to
18        Brevet Holdings.
19             I believe, your most recent
20        question just used the term Brevet.
21             MR. DUMAIN:  We're only talking
22        about Brevet Holdings, but we'll do it
23        simply.
24        Q.   Mr. Lan, what kind of
25   investments does Brevet Holdings, LLC
```

Page 37

```
 1              Johnny Lan
 2  manage, if any?
 3      A.    Financial investments.
 4      Q.    Could you be more specific than
 5  financial investments?
 6      A.    Generally, it's -- I would say
 7  the investments are related to lending.
 8      Q.    Mr. Lan, are you familiar with
 9  the entity Brevet Capital Management, LLC?
10      A.    Define familiar.
11      Q.    You don't know what the word
12  familiar means?
13      A.    I know what familiar means in
14  general, but are you -- you know, yes,
15  I've heard the entity, right.  I know it's
16  one of the Brevet entities, but like I
17  said before, I just -- I'm not an expert
18  in what all the different entities
19  specifically do or what they were set up
20  to do.
21      Q.    You can't tell me more than that
22  about what Brevet Capital Management does?
23      A.    I believe, that is the entity
24  for the actual management of the
25  investments.
```

Page 38

1              Johnny Lan
2      Q.     Forgive me if I've asked you
3  this already, what Brevet entity are you
4  employed by today?
5      A.     Today, I am self-employed.
6      Q.     Do you no longer work for
7  Brevet?
8      A.     Not as an employee.
9      Q.     Do you do work for Brevet as a
10 consultant?
11     A.     Yes.
12     Q.     Is that a contractual
13 relationship?
14     A.     Yes.
15     Q.     With which Brevet entity do you
16 have a consulting contract?
17     A.     Actually, I can't recall
18 specifically right now.
19     Q.     When did you cease to be
20 employed by Brevet and become a consultant
21 to Brevet?
22     A.     If I recall correctly, it was
23 approximately, in 2018.
24     Q.     For purposes of simplicity, when
25 I refer to Brevet today, I'll be referring

```
 1                 Johnny Lan
 2   to the Brevet entities as a collective,
 3   unless, the context, or the specific
 4   question, relates to a particular Brevet
 5   entity.
 6              Will you understand that to be
 7   what I mean if I say Brevet?
 8      A.     I understand that's what you
 9   mean, but I just, again, I'm not an expert
10   in, you know, the differences between the
11   various entities, so, I would like you to
12   keep that in mind.
13      Q.     In your day-to-day work at
14   Brevet, both as an employee and as a
15   consultant, do people, Brevet employees,
16   were they typically delineated by which
17   Brevet entity they worked for or did
18   people work, generally, for the collective
19   group of entities?
20              MR. UNDERWOOD:  Object to the
21         form of the question.
22      A.     Again, I'm not privy to the
23   details of who's employed by which entity.
24      Q.     When you were working at Brevet,
25   in your capacity as a consultant to
```

```
                                       Page 40
 1                 Johnny Lan
 2    Brevet, do you distinguish between which
 3    particular entity any Brevet employee
 4    might work for?
 5        A.    Generally, no.
 6        Q.    Do you today hold yourself out
 7    as having a Brevet title?
 8        A.    What do you mean by "Brevet
 9    title?"
10        Q.    Let me ask it in a different
11    way.
12             At various points you've had the
13    title head of IT at Brevet; is that
14    correct?
15        A.    Do you mean when I was employed
16    at Brevet?
17        Q.    When you were employed at
18    Brevet, was your title head of IT?
19        A.    Yes.
20        Q.    Is your title head of IT today?
21        A.    I suppose you say, in substance.
22    It's not that we have official titles, so
23    to speak.
24        Q.    Do you have a Brevet e-mail
25    account today?
```

```
                                              Page 41
 1                    Johnny Lan
 2        A.     Yes.
 3        Q.     Is there a signature block in
 4   this e-mail?
 5        A.     Yes.
 6        Q.     What is the title under your
 7   name in the signature block today?
 8        A.     There's no title in my signature
 9   block.
10        Q.     Was there ever a title in your
11   signature block at Brevet?
12        A.     No.  I don't believe there was.
13        Q.     When did you join Brevet as an
14   employee?
15        A.     Is someone hearing banging in
16   the background?
17        Q.     Yes.  We're going to have to
18   resolve that at a break.  My apologizes.
19        A.     Could you repeat the last
20   question?
21        Q.     Yes.
22               When did you first join Brevet?
23        A.     I believe, it was around 2008.
24        Q.     What was your title then?
25        A.     Again, I don't believe I was
```

```
                                      Page 42
 1              Johnny Lan
 2   assigned an official corporate title.
 3        Q.    What were your responsibilities
 4   in your first job at Brevet?
 5        A.    My responsibilities, primarily
 6   consisted of, assisting with the
 7   investments that Brevet was looking at.
 8        Q.    What were your responsibilities
 9   in that role?
10              How did you assist?
11        A.    In multiple ways.  As an
12   example, I would, let's say, help perform
13   analysis.
14        Q.    How long did you hold that
15   position for?
16        A.    I couldn't tell you for sure.
17   Several years.
18        Q.    Who did you report to in that
19   position?
20        A.    I don't believe I had an
21   official -- one superior that I reported
22   to.
23        Q.    What do you mean by "superior?"
24        A.    A supervisor or somebody above
25   me.
```

```
                                              Page 43
 1                    Johnny Lan
 2        Q.     I think, we'll mark the next
 3   Exhibit, a LinkedIn profile that might
 4   help us with a timeline.  It should appear
 5   in that marked Exhibits folder.
 6              (Whereupon, Plaintiff's Exhibit
 7        2, LinkedIn profile was marked, for
 8        identification, as of this date.)
 9        Q.     It should be there right now.
10        A.     It just showed up.
11        Q.     Is this your LinkedIn profile?
12        A.     It looks like it, yes.
13        Q.     To start, does it indicate, at
14   least on this document, that you are still
15   the head of technology at Brevet Capital
16   Management?
17        A.     I see that's what it says on the
18   document.
19        Q.     Is that accurate?
20        A.     Yes.
21        Q.     Then, underneath it says
22   "investment professional, January 2008 to
23   December 2013."
24              Is that the time period during
25   which you were an investment professional
```

Page 44

1                    Johnny Lan

2    at Brevet?

3        A.    I would say that's approximately

4    accurate.

5        Q.    Why did you change positions in

6    January of 2014?

7        A.    I believe, at the time Brevet

8    was looking for someone to step into that

9    role, and I had the interest, so, I

10   stepped up.

11       Q.    Did you have any IT job

12   experience prior to January of 2014?

13       A.    Yes.

14       Q.    What was that?

15       A.    I worked in Lehman Brothers IT

16   group early in my career.

17       Q.    Looking back at the LinkedIn

18   profile, is that with TDP, analyst entry?

19       A.    Yes.

20       Q.    What is a TDP analyst?

21       A.    If I recall correctly TDP stood

22   for Technology Development Program.

23       Q.    What did you do as a TDP analyst

24   on a day-to-day basis?

25       A.    To the best of my recollection,

```
                                      Page 45

 1               Johnny Lan
 2    I worked on the various IT systems that
 3    Lehman Brothers used.
 4         Q.    With regard to this role at
 5    Lehman, did you have any other
 6    professional IT experience at the time you
 7    became Brevets' head of technology in
 8    January of 2014?
 9         A.    Yes.  There was some technology
10    related experience, as you can see from
11    the LinkedIn profile before that.
12         Q.    What are you directing me to on
13    the LinkedIn profile?
14         A.    Summer analyst, Kiodex, Inc.
15    Before that at Consolidated Apparel Group.
16         Q.    Those were technology positions?
17         A.    Yes.
18         Q.    Have you had any training in IT
19    before you took the head of IT position in
20    January of 2014?
21         A.    Could you tell me what you mean
22    by IT training?
23         Q.    Sure.
24               Did you take any IT courses in
25    college, for example?
```

```
                                    Page 46
 1                Johnny Lan
 2      A.     I took technology related
 3   courses in college, yes.
 4      Q.     Can you tell me what those were?
 5      A.     Sure.
 6             Computer science, as I recall.
 7      Q.     When you took the head of
 8   technology role in Brevet in January of
 9   2014, had you had any training or
10   experience in IT security?
11      A.     Not that I can remember.
12      Q.     Do you recall ever having
13   received any training or taking any
14   courses related to the Federal Computer
15   Fraud and Abuse Act?
16      A.     You mean, training or courses
17   related to the actual law?
18      Q.     Correct.
19      A.     No.
20      Q.     Have you ever heard of the term
21   brut force attack?
22      A.     Yes.
23      Q.     What is a brut force attack?
24      A.     My understanding of a brut force
25   attack is -- this was attempting different
```

```
                                          Page 47
 1                  Johnny Lan
 2   combinations, permutations until you get
 3   the correct password.
 4        Q.    Could you briefly describe your
 5   educational background post high school?
 6        A.    Sir, you were fading in again.
 7        Q.    I'm just asking for you to tell
 8   us about your educational credentials post
 9   high school?
10        A.    Okay.
11               I have a bachelors degree and a
12   Masters Degree.
13        Q.    And those degrees are reflected
14   here on your LinkedIn profile, correct?
15        A.    Yes.
16        Q.    I see you have a degree in
17   operations research or undergraduate
18   degree, correct?
19        A.    Yes.
20        Q.    What is operations research?
21        A.    It is -- are you familiar with
22   industrial engineering?
23        Q.    I think, you should just say
24   industrial engineering to keep the
25   questions going in the right direction.
```

```
                                        Page 48
 1                  Johnny Lan
 2       A.     Okay.  Yes.
 3       Q.     Is operations research an
 4  industrial engineering field?
 5       A.     Yes.
 6       Q.     Is it correct that you received
 7  an Executive Master of Science in
 8  Technology Management from Columbia in
 9  2019?
10       A.     Yes.
11       Q.     Can you, briefly, describe what
12  the curriculum for a Master of Science and
13  Technology Management?
14       A.     It generally entails -- off the
15  top of my head, it generally deals with
16  being a leader and manager, specifically,
17  in the field of technology or in the role
18  of technology.
19       Q.     Is there any particular
20  concentration for this degree?
21       A.     Are you asking if the degree
22  has -- offers concentrations?
23       Q.     Did you have an area of
24  specialization or a major for your
25  technology management degree?
```

```
                                          Page 49

 1                   Johnny Lan

 2      A.     No.   The program did not offer

 3   any official majors or concentrations in

 4   that sense.

 5      Q.     I see on your LinkedIn profile

 6   that you received three certifications in

 7   security since December of 2020; is that

 8   correct?

 9      A.     No.

10      Q.     Have you received any

11   certifications in information security?

12      A.     Yes.

13      Q.     When did you receive them?

14      A.     August of 2021.

15      Q.     What caused you to obtain that

16   certification?

17             MR. UNDERWOOD:   Object to the

18        form of the question.

19      A.     Just personal and professional

20   interest in development.

21      Q.     Why had you not obtained that

22   certification earlier in your professional

23   development?

24             MR. UNDERWOOD:   Object to the

25        form of the question.
```

```
                                    Page 50

 1                    Johnny Lan

 2       A.    I just -- that certification is

 3   actually quite involved, so, I suppose I

 4   never found the time until recently.

 5       Q.    Mr. Lan, what was the reason

 6   your employment by Brevet ended and you

 7   became a consultant to Brevet?

 8       A.    Professionally, I wanted the

 9   opportunity to explore other perspective

10   opportunities.

11       Q.    Are you performing the same job

12   functions today as a consultant to Brevet

13   as you were performing when you were

14   employed by Brevet?

15       A.    Generally, yes.

16       Q.    Do you have any other employment

17   outside of Brevet?

18       A.    I have a couple of other

19   clients.

20       Q.    Did you decide to end your

21   employment relationship with Brevet or did

22   Brevet decide to end it?

23       A.    I believe, I decided.

24       Q.    Did you offer to stay on as a

25   consultant or did Brevet ask you to stay
```

Page 51

1                   Johnny Lan

2   on as a consultant?

3       A.    Sitting here today, I don't

4   recall the exact circumstances.

5       Q.    While you were still an employee

6   of Brevet, who did you report to?

7       A.    Understanding that I held

8   numerous roles throughout my tenure at

9   Brevet, so, I couldn't give you an exact

10  answer on that.

11      Q.    As the head of technology at

12  Brevet, who did you report to?

13      A.    Again, the way it was

14  structured, I did not have an official

15  reporting relationship or status with any

16  one particular person.

17      Q.    Did anybody give you performance

18  reviews in your capacity as head of

19  technology at Brevet?

20      A.    Yes.  I recall having

21  performance reviews done, yes.

22      Q.    Who delivered those reviews?

23      A.    I believe, at the time, we were

24  doing 360 Reviews, so, it would be across

25  the firm.

Page 52

1              Johnny Lan

2      Q.     What do you mean by a 360

3   Review?

4      A.     Generally, those -- 360 Reviews

5   are such that people that work around you

6   can put in reviews.

7      Q.     On this topic, finally, in your

8   capacity as a consultant to Brevet, do you

9   have a point of contact to whom you're

10  answerable?

11     A.     Again, I wouldn't say it's a

12  single point of contact.

13             Generally, senior management.

14     Q.     Who is senior management of

15  Brevet today?

16     A.     Sorry.  I couldn't hear the very

17  beginning.

18     Q.     Who is senior management of

19  Brevet today?

20     A.     As I understand it, Douglas

21  Monticciolo and Mark Callahan.

22             MR. DUMAIN:  Colin, we're going

23      to turn to the 30(b)(6) topics next,

24      so, perhaps it's a good place for a 10

25      minute break.

```
 1                Johnny Lan
 2           MR. UNDERWOOD:  Before we go off
 3      the record, you can ask him about
 4      whatever topics in whatever order.  I
 5      thought the process that we discussed
 6      all last week was to take his
 7      testimony, and if his testimony as
 8      Johnny Lan is unable to respond to
 9      things that you think are covered by
10      the 30(b)(6) notice, then, we can
11      discuss that at some point.
12           I think, Johnny can cover all of
13      those topics and has been designated
14      to cover all those topics.  I thought
15      it was just going to be taken in his
16      personal capacity, so, he doesn't have
17      to try and think about, gee, you
18      know -- I don't know if there's
19      anything in that category, but I
20      thought that was the way we were going
21      to go.  It also keeps it a little bit
22      clearer in terms of the time limits on
23      the deposition because there's a time
24      limit on his personal deposition,
25      which I don't know whether you
```

Page 54

```
 1                    Johnny Lan
 2        anticipate filling, but there's also a
 3        time limit that also applies to the
 4        30(b)(6) deposition.
 5             But it's your deposition and
 6        we'll muddle through however we want.
 7             MR. DUMAIN:  Let me respond to
 8        that because, I think, you're not
 9        saying anything that is too much
10        different.
11             I'm going to ask him questions
12        about the 30(b)(6) topics, because of
13        his role, I think, he will be able to
14        answer in his personal capacity.  I
15        guess, we can sort out later whether,
16        for purposes of 30(b)(6) testimony and
17        what that means, whether it's
18        ultimately designated, but I don't
19        think, as I look at what the questions
20        are going to be, that there's a
21        distinction here, in terms of he won't
22        be able to answer.
23             Terrific.  So, why don't we take
24        10.
25             MR. UNDERWOOD:  Okay.
```

Page 55

1              Johnny Lan

2         VIDEOGRAPHER:  The time is 9:49

3     a.m. and we're going off the record.

4         (Discussion held off the

5     record.)

6         VIDEOGRAPHER:  The time is 10:03

7     a.m.  We're back on the record.

8     Q.    Mr. Lan, if you could, please,

9  take a look again at deposition Exhibit 1,

10  which is a notice of deposition?

11     A.    Okay.

12     Q.    I'm going to ask you a series of

13  questions about topic 22, which is on page

14  12.

15     A.    Okay.

16     Q.    Do you see that this topic

17  concerns computers for use at Brevets'

18  physical offices, correct?

19     A.    Yes.

20     Q.    Did Brevet have a written policy

21  concerning the purchase of computers for

22  use at its physical offices?

23     A.    At this time, I can't recall

24  whether there's a specific policy on that.

25     Q.    When you say at the time, what

```
                                            Page 56
 1                  Johnny Lan
 2   time are you referring to?
 3        A.     At this time.
 4        Q.     At this time.
 5               Do you recall whether there was
 6   ever a written policy concerning the
 7   purchase of computers for use at Brevet's
 8   office?
 9               MR. UNDERWOOD:  Tracie, can you
10        read back at prior answer?
11               I think, he was just saying
12        right now he can't testify whether
13        there was.
14               Could you just read his answer?
15               (Whereupon, the record was read
16        back by the reporter.)
17               MR. DUMAIN:  Thank you.
18               Thank you for the clarification,
19        Colin.  Let me do it this way.
20        Q.    Mr. Lan, as you sit here today,
21   you cannot recall whether there was ever a
22   written policy concerning the purchase of
23   computers for use at Brevets' physical
24   offices, correct?
25        A.     Correct.
```

Page 57

```
 1                  Johnny Lan
 2      Q.     Thank you.
 3             As you sit here today, can you
 4  recall whether there was ever a written
 5  policy concerning the configuration of
 6  computers for use at Brevets' physical
 7  offices?
 8      A.     No.  Not that I can recall.
 9      Q.     To be clear, you cannot recall
10  there being a written policy concerning
11  the configuration of computers for use at
12  Brevets' physical offices?
13      A.     Could you clarify on what --
14  what you mean, in terms if such a policy
15  existed would cover?
16             Do you mean like a detailed
17  policy on how the computers should be
18  configured?
19      Q.     Was there any written policy
20  about how computers at Brevets' physical
21  offices should be configured?
22      A.     Sitting here today I can't
23  remember a specific policy that addresses
24  that, no.
25      Q.     Was there ever a written policy
```

Page 58

```
 1              Johnny Lan
 2   concerning how the computers at Brevets'
 3   physical offices would be serviced?
 4       A.    Again, not that I can recall at
 5   this time.
 6       Q.    To speed this up, I'm going to
 7   ask this question as a series.  If the
 8   answer is yes for any of them, we'll break
 9   it apart; okay?
10              Was there a written policy
11   governing the repair, setup, maintenance,
12   or administration of computers at Brevets'
13   physical offices?
14       A.    Not that I can recall at the
15   present time.
16       Q.    Thank you.
17              Was there a practice or
18   procedure for the purchase of computers at
19   Brevets' physical offices?
20       A.    There was a general practice,
21   sure.
22       Q.    Please, describe the general
23   practice?
24       A.    The purchase would be approved
25   by management.  I would acquire the
```

Page 59

1              Johnny Lan

2    computers.   Then, I would set them up.

3    And then deploy them.

4         Q.    Focusing just on the purchase.

5              Would you purchase computers for

6    Brevets' physical offices on an ad hoc

7    basis, one at a time, or systematically?

8         A.    It would depend on the

9    situation.

10         Q.    In what situation would you

11    purchase the computers systematically in a

12    group?

13         A.    Do you mean like in bulk?

14         Q.    Yes.

15         A.    Generally, that would be when we

16    were moving offices, something like that.

17         Q.    When you moved offices and

18    purchased computers in bulk, would those

19    be to replace existing computers?

20         A.    Generally, yes.

21         Q.    What would Brevet do with the

22    computers it was replacing?

23         A.    We would generally make a backup

24    of any business data and, then, dispose of

25    the computers.

```
                                         Page 60
 1               Johnny Lan
 2       Q.     How would you dispose of the
 3   computers?
 4       A.     Again, in general, we would use
 5   an IT liquidation firm.
 6       Q.     What's an IT liquidation firm?
 7       A.     It's a vendor that would come in
 8   and take equipment you wish to dispose of.
 9       Q.     Why would you use an IT
10   liquidation vendor, instead of, for
11   example, putting the old computers out
12   with the trash?
13       A.     Because IT liquidation firms,
14   they are professionals in, you know,
15   taking out the equipment, and in certain
16   cases, they may give us some nominal
17   amount of money for the equipment.
18       Q.     Are you aware of restrictions
19   concerning the disposal in the trash of
20   technology like computers?
21       A.     Am I aware of the --
22       Q.     To your knowledge, can you just
23   put computers out with the trash?
24       A.     You mean, Brevet computers?
25       Q.     Any computers.
```

```
                                              Page 61
 1                    Johnny Lan
 2        A.     I can only speak to what Brevet
 3    does.
 4               No, we don't generally just put
 5    computers in the trash.
 6        Q.     Why don't you just put computers
 7    in the trash?
 8        A.     Because that opens up security
 9    concerns.
10        Q.     So, you testified about the
11    practice with respect to purchasing
12    computers in bulk, correct; for Brevets'
13    offices?
14        A.     I believe, that's what you were
15    just asking me about, yes.
16        Q.     Under what circumstances would
17    you purchase a computer for Brevets'
18    office on a one off basis?
19        A.     Generally, let's say that would
20    be in the due course of running the
21    business.
22        Q.     Could you expand?
23               In what circumstances would you
24    need to buy a computer in due course of
25    running a business?
```

```
                                        Page 62
 1                    Johnny Lan
 2      A.    If we were hiring additional
 3   staff, for example.
 4      Q.    Returning to the purchase of
 5   bulk computers.
 6            What was the practice for
 7   configuring a bulk purchase of computers?
 8      A.    Again, our procedures change
 9   over time.  So, I need you to specify
10   which period of time you're referring to.
11      Q.    In 2015, what was the practice
12   for configuring multiple computers at
13   once?
14      A.    To the best of my recollection,
15   at that point in time, we had a standard
16   image that we replicated to the newly
17   acquired computers.
18      Q.    Could you tell me what you mean
19   by "standard image?"
20      A.    So, we would set up one computer
21   to how we want it and then we would
22   restore -- we would -- I'm just trying to
23   figure out how to explain this in layman's
24   terms.
25            Once you have that set, you
```

Page 63

1                    Johnny Lan

2    freeze that image, then, you would

3    replicate it across the rest of the

4    computers so you wouldn't have to do the

5    individual configurations.

6         Q.    By "configuration," you mean,

7    the software on the particular computer?

8         A.    Right.   For example, operating

9    system settings, applications.

10        Q.    When you would purchase a single

11   computer for a new employee, for example,

12   would you use the same process of using

13   the standard image to configure that

14   single computer?

15        A.    I would, if there's a matching

16   image to the model that was just acquired.

17        Q.    The model computer, you mean?

18        A.    Yes.

19        Q.    What would you do if there was

20   not a matching image to the model that had

21   just been acquired?

22        A.    I would typically configure it

23   manually.

24        Q.    Was it Brevets' practice to

25   equip each computer at its physical

```
                                        Page 64
 1                  Johnny Lan
 2    offices with the same fleet of software?
 3        A.    Generally, yes.
 4              You're on mute, I think.
 5        Q.    Thank you.
 6              What was the practice for
 7    servicing, and repairing, and maintaining
 8    the computers that were in Brevets'
 9    physical offices?
10        A.    It's kind of a broad question.
11    There are many things we do to ensure the
12    upkeep, and running, and health of the
13    computers.
14        Q.    Did you service, and maintain,
15    and repair the computer in-house or did
16    you use an outside vendor; if it changed
17    over time, please, let me know?
18        A.    We have generally configured the
19    computers in-house.
20        Q.    What about repairing or
21    maintaining, have you done that in-house,
22    also, or have you used outside vendors?
23        A.    We generally did that in-house.
24    We have had providers that assist, but we
25    never fully offloaded the maintenance to
```

Page 65

```
 1                    Johnny Lan
 2   the vendor.
 3        Q.    In what circumstances have you
 4   used vendors to perform maintenance on
 5   Brevet computers?
 6        A.    Can you specify what you mean by
 7   "maintenance?"
 8              Is it hardware maintenance,
 9   software maintenance?
10        Q.    Let's break it apart.
11              Have you used outside vendors to
12   perform hardware maintenance for Brevet
13   computers and Brevets' physical offices?
14        A.    Generally, no.  There may have
15   been a couple of instances.
16        Q.    At any point, have you used
17   outside vendors to perform software
18   maintenance or updates on the computer in
19   Brevets' physical offices?
20        A.    Yes, but that changes.  That's
21   something that changed over time or
22   evolves over time.
23        Q.    Can you describe the evolution
24   over time?
25        A.    Just, generally, the vendors
```

Page 66

1                      Johnny Lan
2     that we've used have become more -- we've
3     put more of the operating system updates
4     responsibilities onto the vendor over
5     time.
6         Q.     Starting with today, what is a
7     vendors' responsibility for operating
8     system updates?
9         A.     Today?  You're asking about
10    today, right?
11        Q.     Correct.
12               Again, this is all about the
13    computers in Brevets' physical offices?
14        A.     Okay.
15               Today, the vendor is responsible
16    for ensuring that the technical controls
17    are in place, such that the computers
18    would run updates automatically, and they
19    would also -- the vendor, that is, would
20    also monitor whether the updates were
21    performed successfully.
22        Q.     When did Brevet begin using a
23    vendor to perform these functions for the
24    computers in its physical offices?
25        A.     At this time, I can't recall the

Page 67

1                    Johnny Lan

2    exact time that that began.

3        Q.    Before Brevet began using a

4    vendor to perform operating system updates

5    for the computers at its physical offices,

6    who at Brevet was responsible for

7    operating system updates to the computers

8    in its offices?

9        A.    Generally, it was me.

10       Q.    What would that entail, in

11   practice?

12       A.    It would generally entail making

13   sure that the operating system had the

14   automatic update setting enabled, but, you

15   know, at the time Microsoft's operating

16   system wasn't always super consistent in

17   making sure the updates were installed,

18   even if the setting was there, so, I

19   would -- whenever I work on a computer, a

20   Brevet computer, I saw that -- if I

21   happened to see that the update wasn't

22   fully up to date, I would generally try to

23   manually tell it to update at that time.

24       Q.    Was the user of any particular

25   work station responsible for operating

Page 68

```
 1                 Johnny Lan
 2   system updates for the computers at
 3   Brevets' physical offices at any time?
 4       A.    I don't recall it ever being --
 5   officially being the user responsibility,
 6   but we do tell people -- we do generally
 7   tell people, hey, if the computer says it
 8   needs to restart to do an update, please,
 9   let it do so at your earliest opportunity.
10       Q.    Can you tell me the name of the
11   vendor you're referring to in your earlier
12   testimony about operating system updates?
13       A.    We've gone through several
14   vendors over the years.
15             Are you asking about the current
16   one?
17       Q.    Why don't we start with the
18   current one and move backwards in time, if
19   you can?
20       A.    By the way, I want to confirm
21   that we are able to designate parts of
22   these -- parts of this deposition as
23   confidential or protected, right?
24             Because even -- in our business,
25   even the vendor that you use is private
```

Page 69

1              Johnny Lan

2    information.

3       Q.    As I said before, there's a

4    protective order in the case.  Your

5    attorneys will have the opportunity under

6    the protective order to designate

7    testimony confidential in consultation

8    with you, subject to the terms of the

9    protective order.  So, please, go ahead

10   and answer.

11      A.    Okay.

12   ████ ████████ ████ █ ████ ██████

13   █████  ██████  ████

14   ████ █ ████ █ ████ ██████

15   ████ ████ ████████ ████ █ ███

16   █ ████ ████ █ █████ ████ ████

17   ████ ████ ████ █ ████ ███

18   ████ ████ ████ ████ ██████ ██ █

19   ████ ██████ ██████

20      Q.    Thank you.

21            Does Brevet have a practice as

22   it relates to the administration of the

23   computers that are in its physical

24   offices?

25      A.    Sorry.  Could you repeat the

```
                                        Page 70
 1                   Johnny Lan
 2   question?
 3        Q.    Let me state it a different way.
 4              Who was responsible for
 5   administration over the computers that are
 6   used at Brevets' physical offices?
 7        A.    It was generally me, my
 8   colleague Igor, and our IT provider at the
 9   time.
10        Q.    What's Igor's last name?
11        A.    K-O-Y-F-M-A-N.
12        Q.    What was the name of the IT
13   provider?
14        A.    I just enumerated the various
15   providers we had.
16        Q.    Those are the same, got it.
17              What's the term administrator or
18   administration rights mean, as it relates
19   to the administration of computers?
20        A.    Are you asking in general?
21        Q.    I'm asking, first, in general.
22        A.    Could you be more specific?
23              I think you said the
24   administration or administration rights;
25   could you be specific about which one
```

```
                                              Page 71
 1                    Johnny Lan
 2    you're asking about?
 3        Q.    Sure.   Fair clarification.
 4              Who had administrator rights for
 5    the computers that were physically located
 6    in Brevets' offices; and if it's changed
 7    over time, then, let's do it over time?
 8        A.    Okay.
 9              Generally, it's the same three
10    parties that I had answered before.
11        Q.    What do administrator rights
12    permit the administrator to do at a work
13    station?
14        A.    Generally, my understanding is
15    that administrator rights allow the user
16    to perform system -- to perform operations
17    on the system that are typically limited
18    to things that only an administrator
19    should be able to do.
20        Q.    Can you give examples of what
21    you're referring to?
22        A.    Yes.
23        Q.    Please, do.
24        A.    Installation of applications.
25    Uninstallation of applications.   Actually,
```

Page 72

```
 1              Johnny Lan
 2   off the top of my head, that's all that
 3   comes to mind at the moment.
 4              There are more, but I just can't
 5   think of them off the top of my head right
 6   now.
 7      Q.    We're going to mark as Exhibit
 8   2, or whatever is next in order, a
 9   document that Brevet Holdings, LLC
10   personnel policies and employee handbook
11   as of March 2015.  It should show up.
12              (Whereupon, Plaintiff's Exhibit
13      3, employee handbook was marked, for
14      identification, as of this date.)
15      Q.    Is this a document that you
16   recognize, Mr. Lan?
17      A.    Hold on.
18              MR. UNDERWOOD:  Hang on.
19      A.    Yes.  I generally recognize this
20   document.
21      Q.    What do you understand it to be?
22      A.    I understand it to be policies
23   that employees are to follow while
24   employed by Brevet.
25      Q.    If could you turn to page 38 of
```

Page 73

                        Johnny Lan

1

2    the PDF, to the page with the heading

3    ████████████  ██████████  ████  ████████████  ██████

4        A.     Okay.

5        Q.     You see the subheading ██████  ██

6    ██████████  ██████████

7        A.     Yes.

8        Q.     There's a paragraph, ████████████

9    ██████  ████████  ██████  ████████  ████████████  ██████  ██

10   ██████  ████████  ████  ████████  ██████████████  ████  ████

11   ████  ██████  ████████████

12       A.     Yes.

13       Q.     Does that paragraph, in part,

14   state the policy with respect to software

15   Brevet computers that were used in the

16   office?

17       A.     Sorry.

18              Could you repeat your question?

19       Q.     Sure.

20              You see the paragraph that

21   begins ██████████████  ██████  ████████  ██████  ██████

22   ████████  ████████  ████  ██████  ██████████  then,

23   it goes on?

24       A.     Yes.

25       Q.     Then, it prohibits employees

1              Johnny Lan

2   using software not directly supplied by

3   the company, correct?

4              MR. UNDERWOOD:   Object to the

5         form of the question.

6         A.    Yes.

7              Are you talking about the second

8   sentence in that paragraph?

9         Q.    Say that again.

10        A.    Are you talking about the second

11   sentence in that paragraph?

12        Q.    The second sentence is a

13   prohibition on using software not directly

14   supplied by the company on company

15   computers, correct?

16             MR. UNDERWOOD:   Object to the

17        form of the question.

18        A.    My reading of this document

19   implies -- the second sentence actually

20   says the opposite of that; no?

21        Q.    Let's do it this way:

22             Does the group of three

23   paragraphs under the heading ███ ██

24   ██████████  █████████ state the policy of

25   Brevet, as you understand it, relating to

Page 75

1                   Johnny Lan
2    the use of third-party software on Brevet
3    office computers?
4         A.    Yes.  I believe, that's what it
5    generally suggests on that document.
6         Q.    Besides what this document says,
7    I'm asking you, does this document state
8    Brevets' policy, as you understand it,
9    with respect to the use of third-party
10   software on Brevets' office computers?
11        A.    Yes.
12        Q.    As a matter of practice, could
13   users of Brevet office computers freely
14   install third-party software on their work
15   stations?
16        A.    Generally, no.
17        Q.    What are you excluding from your
18   answer, if anything?
19             MR. UNDERWOOD:  Objection to the
20        form of the question.
21        A.    I just wanted to make sure that
22   I'm testifying truthfully and accurately.
23             So, I'm saying that that's
24   generally the case.
25        Q.    You can't think of any specific

Page 76

```
1                    Johnny Lan
2    exclusions, as you sit here, can you, sir?
3        A.    I cannot right now.
4        Q.    If you could scroll down the
5    page and read the first paragraph under
6    the heading "use of company computers?"
7        A.    Okay.
8        Q.    Do you understand that first
9    paragraph to state Brevets' policy,
10   insofar as it goes, with respect to the
11   use of company computers at Brevets'
12   offices?
13       A.    Yes.  I see that everything
14   we've discussed so far applies to all
15   Brevet computers.
16       Q.    Right now we're just talking
17   about the computers at Brevets' physical
18   offices.
19       A.    Okay.
20       Q.    Insofar as we're talking about
21   that, this policy describes the
22   limitations around the use of Brevet
23   computers at Brevets' offices, correct?
24       A.    Yes.  That appears to be what
25   the document states.
```

Page 77

                     Johnny Lan

1

2       Q.      And that was the policy, as you

3   understand it, right?

4       A.      Yes.  To the extent that the

5   policy has probably gone through several

6   provisions.

7       Q.      Do you understand this element

8   of the policy to have changed at any

9   point?

10      A.      I don't have that information.

11      Q.      As a matter of practice, are the

12  computers at Brevets' physical offices

13  used solely for purposes to benefit the

14  company, excluding, some incidental use

15  unrelated to the clients of the company?

16          MR. UNDERWOOD:  Object to the

17      form of the question.

18      A.      Yes.  I see that's what the

19  document states.

20      Q.      I'm asking a slightly different

21  question, which is, in practice, is it the

22  case that the work stations at Brevets'

23  offices are used for purposes to benefit

24  Brevet, except for some minor incidental

25  use by employees; minor incidental

1                Johnny Lan

2    personal use by employees?

3        A.    I believe, that is generally the

4    case, yes.

5        Q.    If you could look again at

6    Exhibit 1.

7                Topic 22B relates to the

8    monitoring of the computers at Brevets'

9    physical offices.  And monitoring is a

10   defined term.  So, if you want to scroll

11   back to make sure you have the definition

12   in mind.

13                MR. UNDERWOOD:  Sorry.

14                Wait a minute.  Sorry, I had the

15        wrong document open.

16                If you want to refer him back to

17        Exhibit 1, what did you want to ask

18        him about?

19                MR. DUMAIN:  Sure.  I'm just

20        going to ask him a couple of questions

21        about topic 22B.  22B contains the

22        defined term monitoring.  So, I was

23        suggesting that he might review the

24        definition of monitoring.

25        A.    Which page?

Page 79

```
 1              Johnny Lan
 2     Q.    I do.  Page five of the PDF.
 3     A.    Yes, but this definition seems
 4  to be referring to yet another --
 5  something else.
 6     Q.    You're one of the defendants in
 7  this case, right?
 8     A.    Yes.
 9     Q.    The question you're asking is,
10  how the term monitoring was used in the
11  pleadings?
12     A.    Right.
13     Q.    Okay.
14          For purposes of my question, we
15  can strike out that clause and you can
16  answer with the understanding that
17  monitoring means the monitoring of Brevet
18  employees communications or usage of
19  electronic devices; does that work?
20     A.    Okay.
21     Q.    As a matter of policy, was
22  Brevet permitted to monitor the
23  communications of its employees that took
24  place on the computers in Brevets'
25  physical offices?
```

```
                                            Page 80
 1                    Johnny Lan
 2        A.     Yes.
 3        Q.     Where is that policy found?
 4        A.     Back to what we were just
 5   looking at.  The policies in the employee
 6   handbook.
 7        Q.     As a matter of practice, did
 8   Brevet Management actually monitor the
 9   work stations within Brevets' physical
10   offices?
11        A.     Sitting here, I don't believe I
12   can testify as to what Brevet Management
13   did or didn't do.
14        Q.     As head of IT, were you aware of
15   Brevet management monitoring the
16   communications of Brevet employees on the
17   computers that were in Brevets' physical
18   offices?
19        A.     When you say "computers," are
20   you referring to anything that was done on
21   the computers?  Like activity on the
22   computers?
23        Q.     Monitoring for these purposes,
24   means, "communications or usage of
25   electronic devices."
```

Page 81

                    Johnny Lan

1                  So, let me state it again.

2                  As the head of IT for Brevet,

3    were you aware of management monitoring

4    employees' usage of Brevet computers at

5    Brevets' offices?

6        A.    Again, as -- I can't speak to

7    what other parties may have monitored or

8    not.

9        Q.    You're not aware of Brevet

10   Management doing any monitoring of Brevet

11   employees' usage of Brevets' office

12   computers?

13       A.    I am aware that our compliance

14   department monitors the communications.

15       Q.    Can you describe your

16   understanding of how the compliance

17   department monitors communications of

18   Brevet employees?

19       A.    Yes.

20       Q.    Please, provide your

21   understanding, and if the compliance

22   department practices have changed over

23   time, then, please, describe how they

24   changed over time?

Page 82

```
 1                  Johnny Lan
 2      A.     Again, I just want to make
 3  clear, I cannot speak to everything that
 4  the compliance department does in the
 5  course of their duties in monitoring.  But
 6  I can say that I am aware that compliance
 7  has access to all of the electronic
 8  communications on Brevets' system.  And
 9  that due to regulatory compliance
10  requirements, we monitor the electronic
11  e-mails and instant messages that go
12  through the Brevet system.
13      Q.     I would just like to make sure
14  we're using the terms in the same way.
15  You used the term access to.
16            What I'm trying to understand is
17  whether the compliance department
18  actually, at any point that you're aware
19  of, has monitored, meaning, reviewed the
20  communications or activity of Brevet
21  employees on Brevet computers in Brevets'
22  offices?
23      A.     Yes, am I generally aware that
24  compliance performs reviews of the Brevet
25  electronic communications that we just
```

1              Johnny Lan

2  talked about.

3      Q.    Have you ever participated in

4  such reviews?

5      A.    No.

6      Q.    Did you help facilitate such

7  reviews?

8      A.    Yes.  At times.

9      Q.    How have you helped facilitate

10  such reviews?

11      A.    I helped make sure that, for

12  example, the compliance folks are able to

13  log into the archive system.

14      Q.    Do you recall ever assisting the

15  compliance personnel in logging into the

16  archive system at any point before October

17  of 2016?

18      A.    I do not.  At this point in

19  time, I do not remember specific

20  instances.  Just that I generally have.

21      Q.    To be clear, those specific

22  instances might have been before October

23  of 2016, you just can't recall?

24      A.    Yes.

25      Q.    If we could now mark as Exhibit

```
                                           Page 84
 1                  Johnny Lan
 2    4, the November 17, 2017 affidavit of Mr.
 3    Lan.
 4              (Whereupon, Plaintiff's Exhibit
 5         4, November 17, 2017 affidavit was
 6         marked, for identification, as of this
 7         date.)
 8         Q.    Before I ask you to look at this
 9    document, I just want to understand one
10    thing.
11              Could senior management of
12    Brevet monitor Brevet employee e-mails
13    without your assistance as head of
14    technology?
15         A.    Yes.
16         Q.    How would they go about doing
17    that?
18         A.    They could -- they could log
19    into the archive system by themselves.
20         Q.    Insofar as you understand it,
21    does the senior management of Brevet have
22    credentials to get into those archive
23    systems?
24         A.    Yes.
25         Q.    Do you know whether, as a matter
```

```
                                      Page 85
 1              Johnny Lan
 2    of fact, Brevet senior management ever
 3    logs into the archive systems to review
 4    the communications or computer usage of
 5    Brevet personnel?
 6        A.    I'm generally aware that they
 7    have done so in the past, but I couldn't
 8    tell you, you know, specifically or
 9    definitively whether the frequency or when
10    was the last time they did that.
11        Q.    Was their ability to monitor
12    computer usage limited to e-mail or is it
13    inclusive of all activity on Brevets'
14    network computers?
15        A.    The archive captures e-mails and
16    instant messaging communications.
17        Q.    Are you aware of any specific
18    instances where Brevet senior management
19    has monitored employee communications?
20        A.    Yes, in general.
21              What are you asking about?
22        Q.    I'm asking about specific
23    instances.
24        A.    I can't speak to specific
25    instances.  I can't testify to specific
```

Page 86

1                    Johnny Lan
2    instances because I wasn't -- at this
3    juncture, I don't recall being physically
4    present while any members of senior
5    management did such reviews.
6         Q.    Can you take a look now at your
7    November 17, 2017 affidavit, please.  I'm
8    going to direct you to specific
9    paragraphs, but as an initial matter, do
10   you recognize this affidavit?
11        A.    Yes.
12        Q.    Did you prepare this affidavit
13   yourself?
14        A.    No.
15        Q.    Who prepared it?
16        A.    I believe, I worked with my
17   counsel in the preparation of this
18   affidavit.
19        Q.    Who prepared the first draft?
20        A.    I do not recall at this point.
21        Q.    Do you recall whether you made
22   any changes yourself to the draft?
23        A.    No, I do not recall at this
24   time.
25        Q.    When you say your counsel, are

Page 87

```
 1              Johnny Lan
 2   you thinking of a specific person?
 3       A.    No.  I mean, generally, the
 4   attorneys I was working with.
 5       Q.    If you could take a look at the
 6   first paragraph.
 7             In the sentence that carries
 8   over from page one of six to page two of
 9   six, you state, "as head of technology, I
10   oversee Brevets' information technology
11   and computer usage, and I render technical
12   support to Brevet employees using Brevet
13   owned equipment;" do you see that?
14       A.    Yes.
15       Q.    Is it also true that in your
16   role as head of technology at Brevet, you
17   have rendered technical support to Brevet
18   employees using equipment that was owned
19   by the employees themselves?
20       A.    Yes.
21       Q.    What types of technical support
22   have you rendered to Brevet employees
23   using the employees' owned computer
24   equipment?
25       A.    I'm sorry.  Could we go back and
```

```
                                         Page 88
 1                    Johnny Lan
 2   clarify?
 3              At first, did you say computer
 4   equipment or technology equipment?
 5              MR. DUMAIN:  Tracie, maybe, we
 6        can go back and read back the previous
 7        question?
 8              (Whereupon, the record was read
 9        back by the reporter.)
10        Q.    Are you able to answer that
11   question, sir?
12        A.    The original question said
13   equipment, then, it became computers.
14              So, I generally, you know, I
15   don't recall -- yes, I can help.  I have
16   helped employees with their own equipment
17   because we had a bring your own device
18   program.
19        Q.    Can you describe for me the
20   bring your own device program?
21        A.    Yes.  It's -- it allows for
22   employees to -- it allows for us to insert
23   Brevet accounts or access to Brevets'
24   e-mails, for example, onto an employees'
25   personal mobile device.
```

Page 89

```
 1                Johnny Lan
 2      Q.    When was this program initiated?
 3      A.    I said program before.  What I
 4  meant was we allowed it.  It was not like
 5  an official program per se.
 6      Q.    But Brevet permitted and
 7  facilitated it?
 8      A.    Yes.
 9      Q.    Can you describe how that would
10  work in practice, or did work, in
11  practice?
12      A.    Yes.
13      Q.    Please, do?
14      A.    In general, we would add the
15  Brevet accounts onto the employees'
16  device, and from there on, it allowed the
17  employee to send and receive Brevet
18  e-mails from that device.
19      Q.    Aside from e-mails, would Brevet
20  facilitate the installation of any other
21  Brevet business software on employees'
22  personal devices?
23      A.    Yes.
24      Q.    What other software?
25      A.    This is something that has also
```

Page 90

```
 1                  Johnny Lan
 2   changed over time.
 3       Q.    Please, prescribe the practice
 4   as it changed over time?
 5       A.    So, based on my recollection,
 6   you know, in the earlier years, let's just
 7   say, it was the primary -- Brevet -- the
 8   primary access to Brevets' systems
 9   comprised of e-mails, calendar, and
10   contacts.  More recently, the access --
11            I would like to go back.  I
12   misspoke.
13            What I was thinking of was the
14   more recent practice of, you know -- we're
15   able to offer more access to more data, if
16   the employee was given a company issued
17   device.  So, as far as personal devices
18   go, the bring your own device setup, it
19   was primarily just e-mails, contacts, and
20   calendars.
21       Q.    When did that practice begin in
22   reference to the earlier years, but if you
23   could be more specific?
24       A.    Do you mean the practice of
25   bring your own device?
```

```
                                     Page 91
 1                Johnny Lan
 2      Q.    When did the practice of bring
 3   your own device by which Brevet would
 4   facilitate the installation of Brevet
 5   e-mails software on personal devices
 6   begin?
 7      A.    Sitting here today, I couldn't
 8   give you the exact date or even year.  I
 9   could only say that it began pretty early
10   on.
11      Q.    Was it in effect between 2014
12   and 2017?
13      A.    To the best of my recollection,
14   yes.  I believe, it was.
15      Q.    If an employee had Brevet e-mail
16   installed on the employees' personal
17   device, could the employee save
18   attachments and files to its own personal
19   device?
20      A.    Which time period are you
21   referring to?
22      Q.    2014 through 2017.
23      A.    I believe, they could at that
24   time, yes.
25      Q.    As a matter of policy, were
```

Page 92

```
 1              Johnny Lan
 2  Brevet employees permitted to save, for
 3  example, e-mail attachments onto their
 4  personal devices?
 5       A.    No.
 6       Q.    Is that pursuant to a written
 7  policy?
 8       A.    I believe so.
 9       Q.    Can you identify the policy by
10  name, as you sit here today?
11       A.    I'm not sure I can identify the
12  exact policy at present.
13       Q.    If could you take a look at
14  paragraph two of Exhibit 4.  You state
15  that "Brevet has a longstanding practice
16  of purchasing desktop computers and
17  providing them to founding members and
18  other employees for home business use,"
19  correct?
20       A.    Yes.
21       Q.    How longstanding is that
22  practice?
23       A.    I don't know.
24       Q.    What was the basis for your
25  statement in this affidavit that there had
```

Page 93

1                    Johnny Lan
2   been a longstanding practice?
3       A.    My basis is that, you know, it's
4   at least during the time that I've been at
5   the firm, I have been aware that Brevet
6   does purchase computers, in general, to
7   deploy at employees' homes to effect our
8   activity.
9       Q.    During your tenure with Brevet,
10  how many times have you personally been
11  involved in the acquisition of a computer
12  for a Brevet employee's home?
13      A.    Are you referring to my tenure
14  at Brevet as the head of technology or the
15  entire tenure?
16      Q.    Why don't we start with the
17  entire tenure?
18      A.    Sitting here today, I couldn't
19  give you an exact number or even a close
20  range.  It's just numerous.
21      Q.    Is it something that happened
22  multiple times a year?
23      A.    It can.
24      Q.    Can you list for me the Brevet
25  employees that you have assisted in

Page 94

1                    Johnny Lan
2    obtaining computers for their home use?
3         A.    Yes.
4         Q.    Please, do?
5         A.    Before I do, I just want to, you
6    know, clarify that this is -- I'm just
7    going off of my recollection.  This is by
8    no means a definitive or exhaustive list.
9         Q.    Thank you, Mr. Lan.
10               Just so we can be on the same
11   page, I understand all the testimony
12   you're giving today to be based on your
13   best recollection as you sit here.  As we
14   go forward, we can just treat that as an
15   assumption.
16        A.    Okay.
17               So, Douglas Monticciolo.  Mark
18   Callahan.  John Tripp.  Holly Iacovacci.
19   Steven O'Keefe.  Sam Shuster.  Peter
20   Sherman.
21        Q.    Does Mr. O'Keefe still work at
22   Brevet?
23               MR. UNDERWOOD:  I'm sorry.  I'm
24        not sure the witness finished his
25        answer.

Page 95

```
 1                 Johnny Lan
 2            MR. DUMAIN:  My apologies.
 3       A.    John Hinkle (phonetic).  Mei Li
 4  Dasilvavint.  There are likely more, but
 5  that's what comes to mind off the top of
 6  my head.
 7       Q.    Does Mr. O'Keefe still work at
 8  Brevet?
 9       A.    Not that I'm aware of.
10       Q.    Does Mr. Sherman still work at
11  Brevet?
12       A.    Not that I'm aware of.
13       Q.    Does Mr. Schuster still work at
14  Brevet?
15       A.    No.  Not that I'm aware of.
16       Q.    Does Mr. Hinkle (phonetic) still
17  work at Brevet?
18       A.    Again, not that I'm aware of.
19       Q.    Do you recall what happened to
20  Mr. O'Keefe's home computer when he left
21  Brevet?
22       A.    I believe, he returned it to
23  Brevet.
24       Q.    Do you know that?
25       A.    It was a long time ago, so -- to
```

Page 96

                    Johnny Lan

1   the best of my recollection, he did.

2       Q.    And Mr. Sherman, do you know?

3       A.    Yes, I believe, he did.

4       Q.    Do you know he did?

5       A.    Again, this was quite a long

6   time ago.  So, you're asking if I

7   specifically remember receiving it, the

8   computer, in the mail or having it dropped

9   off, no, I don't remember.

10      Q.    Looking at the second sentence

11  of paragraph two of your affidavit,

12  Exhibit 4, it states, the affidavit does,

13  "the computers provided to these employees

14  belong to Brevet."

15      A.    Sorry.  Where are you

16  referencing?

17      Q.    The second sentence of paragraph

18  two.

19      A.    Okay.

20      Q.    See that; "the computers

21  provided to these employees belong to

22  Brevet?"

23      A.    Yes.

24      Q.    Did you draft that sentence?

```
 1                  Johnny Lan
 2       A.    I cannot recall at this time.
 3       Q.    What's the basis for the
 4   statement that "these computers belong to
 5   Brevet?"
 6       A.    It is based on the understanding
 7   of Brevets' policies.
 8       Q.    Is there a written policy that
 9   states that these computers belong to
10   Brevet?
11       A.    I believe there is.
12       Q.    What is that policy?
13       A.    Again, right now, I can't recall
14   the exact policy or part of the policy,
15   but that is my understanding.
16       Q.    Is there a policy that provides
17   that these computers must be returned to
18   the company upon the end of the employees'
19   employment with Brevet?
20       A.    Again, I cannot point you to the
21   exact policy or section, but that is
22   certainly my understanding of Brevets'
23   policies.
24       Q.    Just to be clear, when I say
25   policy, I mean written policy that one
```

Page 98

```
 1                   Johnny Lan
 2   might look at.
 3              With that understanding, again,
 4   you're not aware of any written policy or
 5   can't point me to one, correct?
 6              MR. UNDERWOOD:  Objection to the
 7       form of the question.
 8              MR. DUMAIN:  I can restate it.
 9       Q.    Mr. Lan, can you point me to a
10   written policy that provides that the
11   computers described in paragraph two must
12   be returned to Brevet upon the end of the
13   respective employees' employment with
14   Brevet?
15       A.    Again, I'm not saying that I'm
16   not aware of any policy that says that.
17   I'm just saying, I believe, there is a
18   policy that states that, I just cannot
19   recall off the top of my head exactly
20   which one it is.
21       Q.    What are the names of the
22   policies that you believe might include
23   this requirement?
24       A.    The employee handbook.  The
25   compliance policy.
```

```
                                      Page 99
 1              Johnny Lan
 2     Q.    Are you finished?
 3     A.    Yes.
 4     Q.    If you look at paragraph three,
 5  the second sentence of the affidavit
 6  states "when these founding members were
 7  provided with new or updated computer
 8  equipment, they were expected to and did
 9  return their old computer equipment to
10  Brevet;" do you see that?
11     A.    Yes.
12           Can I request that we take a
13  break?
14     Q.    Yes.  As soon as this question
15  is complete.
16           MR. UNDERWOOD:  Wait.  I think,
17     he answered your question.  Now,
18     you're asking a new question.
19           MR. DUMAIN:  Fair enough.  Sure.
20           10 minutes?
21           MR. UNDERWOOD:  Sounds fine to
22     me.  When will we plan to break for
23     lunch; around 12:30?
24           MR. DUMAIN:  Why don't we, if
25     we're going to be off the record for
```

Page 100

                          Johnny Lan

1
2      10 minutes, why don't we plan on
3      12:45.  We'll go for another hour.
4              MR. UNDERWOOD:  Thanks.
5              VIDEOGRAPHER:  The time is now
6      11:28 a.m. and we're going off the
7      record.
8              (Discussion held off the
9      record.)
10             VIDEOGRAPHER:  The time is 11:49
11     p.m. and we're back on the record.
12     Q.    Hello, Mr. Lan.
13     A.    Hi.
14     Q.    When we broke we were looking at
15   paragraph three of Exhibit 4.
16             Could you take a look at that
17   again?
18     A.    Yes.
19     Q.    The second paragraph, second
20   sentence of paragraph three states, "when
21   these founding members were provided with
22   new or updated computer equipment, they
23   were expected to and did return their old
24   equipment to Brevet;" you see that,
25   correct?

1                Johnny Lan

2       A.     Yes.

3       Q.     Did you draft that sentence?

4       A.     I cannot recall.

5       Q.     Who are you referring to when

6   you say they were expected to and did

7   return their old computer equipment to

8   Brevet?

9            To be clear, who was doing the

10  expecting here?

11           MR. UNDERWOOD:   Object to the

12      form of the question.

13      A.    I'm not sure what you mean when

14  you say "who is they" in the sentence?

15      Q.    In the sentence, you say, "the

16  founding members were expected to return

17  their old computer equipment to Brevet,"

18  correct?

19      A.     Yes.

20      Q.     Whose expectation was it that

21  the founding members would return their

22  old computer equipment to Brevet?

23      A.     The firm's expectation.

24      Q.     Was that expectation

25  memorialized somewhere in writing?

Page 102

1                      Johnny Lan

2      A.      I do not recall.

3      Q.      Do you know why each of the

4   founding members and others who were

5   provided computers for home use returned

6   those computers when they were provided

7   with new or updated equipment?

8      A.      Yes.

9      Q.      How do you know why they

10   returned them?

11     A.      I understood that to be the

12   policy.

13     Q.      I'm asking you something

14   slightly different.

15              I'm asking you, do you know what

16   was in the heads of the founding members

17   when they returned their old computer

18   equipment?

19     A.      No.  I cannot speak to what was

20   in any other human's heads.

21     Q.      Did they ever tell you why they

22   were returning the old computer equipment

23   when it was replaced?

24     A.      I don't recall being told why,

25   no.

1              Johnny Lan

2      Q.    What did you do with the old

3   computer equipment that was turned in when

4   it was replaced with new equipment?

5      A.    It depends.

6      Q.    Was the equipment ever disposed

7   of by the firm's IT liquidation vendor?

8      A.    Yes, possibly.

9      Q.    When the founding members

10  returned their computers that had been

11  provided to them for home use, did you

12  remove any sensitive or confidential data

13  from those computers before repurposing

14  it?

15     A.    Our general practice is to make

16  a backup of any business related documents

17  or data.  And if the computer was being

18  disposed, we would either insure that --

19  after the backup copy has been made, we

20  would either still retain the drive or

21  ensure that the disposal is done in a

22  secure manner.

23     Q.    Can you look again at Exhibit 1,

24  the 30(b)(6) notice, and turn now to topic

25  20?

```
 1                  Johnny Lan
 2      A.    Give us a second.  Okay.
 3      Q.    Was there a written policy
 4  concerning the purchase of computers for
 5  use at the residences of Brevet
 6  principals, officers, directors, managers,
 7  or employees?
 8      A.    Sitting here today, I do not
 9  recall if there is a specific policy.  A
10  specific written policy.
11      Q.    Was there a written policy
12  concerning the configuration of those
13  computers?
14      A.    Again, sitting here today, I do
15  not recall if there's a written policy.
16      Q.    Was there a written policy
17  concerning the service, repair, or
18  maintenance of those computers?
19      A.    Sitting here today, I do not
20  recall if there's a specific written
21  policy about that.
22      Q.    Is there a written policy
23  concerning the administration of those
24  computers?
25      A.    I'm not sure if there's a
```

Page 105

1                  Johnny Lan

2    written policy.

3        Q.    To your knowledge, during Mr.

4    Iacovacci's tenure with Brevet, was there

5    a written policy concerning the

6    administration of computers purchased for

7    use at the residences of Brevet principals

8    and other Brevet employees?

9              MR. UNDERWOOD:   Object to the

10        form of the question.

11       A.    Again, sitting here today, I

12   cannot recall if there's a specific

13   written policy about that.

14       Q.    As you sit here today, do you

15   know whether there's a specific written

16   policy concerning the ownership of

17   computers that Brevet provided for use at

18   the residences of Brevet principals?

19       A.    Sitting here today, I'm not able

20   to recall whether there is a specific

21   written policy.

22       Q.    As you sit here today, do you

23   know whether there was a written policy

24   that expressly governed the monitoring of

25   computers that were provided for use at

```
 1              Johnny Lan
 2  the residences of Brevet principals?
 3      A.    Sitting here today, I'm not
 4  aware or I cannot recall if there's a
 5  specific written policy about that.
 6      Q.    What was the practice for the
 7  purchase of computers for use at the
 8  residences of Brevet principals?
 9      A.    Can you elaborate on what you
10  mean by practice?
11      Q.    Sure.
12            After it was determined, or how
13  was it determined, if you know, that
14  Brevet would provide a computer for use
15  the residence of a principal or other
16  employee?
17      A.    I can't speak to management's
18  state of mind when they made such
19  determinations, but I can say that,
20  generally, if there was -- if a need or a
21  desire arises for somebody to be able to
22  work from home, then, deploying a computer
23  at home would be considered.
24      Q.    If approval was granted for the
25  purchase of a computer, what was the
```

```
 1              Johnny Lan
 2   practice with respect to the selection and
 3   purchase of that computer?
 4        A.    Are you referring to -- which
 5   timeframe are you referring to?
 6        Q.    If it changed over time, why
 7   don't you tell me how it changed over
 8   time?
 9        A.    So, in the earlier times, we
10   would consider whatever was the current
11   model of the computer, the form factor,
12   and had to make our determinations that
13   way.
14        Q.    Did you use the term "form
15   factor?"
16        A.    Yes.
17        Q.    Can you tell me what that means?
18        A.    The size of the -- the physical
19   size of the computer or whether it is a
20   desktop or laptop computer.
21        Q.    Who would determine whether the
22   Brevet employee would be provided with a
23   laptop or desktop computer as between
24   those types?
25        A.    I don't know that there was an
```

```
 1              Johnny Lan
 2   official process for determining the form
 3   factor.  We had to evaluate it by a case
 4   by case.
 5       Q.    What was the practice for
 6   configuring these computers once they were
 7   purchased; and if it changed over time,
 8   please, let me know?
 9       A.    The general practice is that the
10   computers would be setup with the core
11   software necessary to perform Brevet work.
12       Q.    Is your answer complete?
13       A.    Yes.
14       Q.    Would you use a standard image?
15       A.    Not necessarily.
16       Q.    Why not?
17       A.    Because if we're purchasing
18   these -- usually, these purchases are not
19   part of a bulk purchase, so, at that point
20   in time, the model or make could be
21   different, especially, if it's a laptop
22   versus a desktop.  The images can only be
23   used for that specific model that it was
24   built on, essentially.
25       Q.    Did Brevet ever provide
```

```
 1              Johnny Lan
 2  computers that it had in stock or in its
 3  own inventory to its principals or
 4  employees for use at home?
 5      A.    Yes, that might have occurred.
 6      Q.    Do you recall that it did occur?
 7      A.    Again, to which timeframe are
 8  you referring?
 9      Q.    Did it ever happen?
10      A.    Yes.
11      Q.    When did it happen?
12      A.    I cannot recall if, you know --
13  I cannot recall specific instances, if
14  we're talking about the earlier
15  timeframes, but certainly recently, in the
16  past year, I would say, it has happened.
17      Q.    You can't recall a specific
18  instance more further in the past than
19  within the last year?
20      A.    Correct.
21      Q.    What were the practices with
22  respect to providing administrator rights
23  on these home computers?
24      A.    Our standard practice is to not
25  give administrator access to the
```

```
 1                 Johnny Lan
 2   computers, to the users.
 3       Q.    That's the standard practice
 4   with respect to these home computers?
 5       A.    Yes, to all of our computers.
 6       Q.    Between 2014 and 2017, what was
 7   the practice as it related to the
 8   monitoring of these home computers?
 9       A.    Generally, as I recall, it would
10   be the same as the computers in the
11   office.
12       Q.    Were you ever personally
13   involved in monitoring communications on
14   the home computers of Brevet principals?
15       A.    Not that I can recall at the
16   present time.
17       Q.    Were you ever personally
18   involved in the monitoring of usage of the
19   home computers of Brevet principals or
20   employees?
21       A.    Sorry.
22             Could I have that question read
23   back to me?
24             (Whereupon, the record was read
25       back by the reporter.)
```

Page 111

1                    Johnny Lan
2       A.     Can you elaborate on what you
3    mean by the monitoring of the usage?
4       Q.     Sure.
5              I'm going to go back to the
6    definition of monitoring.  Monitoring
7    means, monitoring of Brevet's employees
8    communications or usage of electronic
9    devices.  So, usage would mean the
10   activity on those devices.
11      A.     No.  Not that I recall.
12      Q.     Mr. Lan, were Brevet employees
13   permitted to conduct Brevet business on
14   their personal computers?
15      A.     Which timeframe are you
16   referring?
17      Q.     2014 and 2017, were Brevet
18   employees permitted to conduct Brevet
19   business on their personal computers?
20      A.     Sitting here today, I cannot
21   recall if that was permitted during the
22   years that you're referring to.
23              MR. DUMAIN:  We're going to mark
24       as Lan Exhibit 5, a November 15, 2014
25       e-mail, Bates range, Brevet 150464.

```
 1               Johnny Lan
 2          (Whereupon, Plaintiff's Exhibit
 3      5, 150464 was marked, for
 4      identification, as of this date.)
 5      Q.    The Bates range is 150464.
 6          MR. UNDERWOOD:  That's Exhibit
 7      5, correct?
 8          MR. DUMAIN:  Correct.
 9          MR. UNDERWOOD:  It hadn't shown
10      up on my screen yet.
11      Q.    Mr. Lan, take a look at this
12  document and let me know when you've
13  completed your review?
14      A.    Okay.
15      Q.    Mr. Lan, do you recognize this
16  e-mail exchange?
17      A.    Recognize?  Yeah.
18      Q.    What is it?
19      A.    It appears to be an exchange
20  between Paul and myself, and, then,
21  leading to an announcement from me to the
22  rest of the firm.
23      Q.    What is a VPN?
24      A.    Did you say VPN?
25      Q.    Yes.  The e-mail exchange, it
```

```
                                          Page 113
 1                    Johnny Lan
 2    makes reference to VPN instructions; what
 3    is a VPN, to start?
 4        A.    Stands for virtual private
 5    network.
 6        Q.    What is the purpose of a virtual
 7    private network?
 8        A.    The VPN generally allows or
 9    facilitates a secure means of access from
10    a device outside of the company network
11    into the company network.
12        Q.    Is the function of the VPN to
13    permit, among other things, Brevet
14    employees to access the Brevet network
15    using their own personal computers?
16        A.    Yes.
17        Q.    In this e-mail exchange, you are
18    inviting Brevet employees to install the
19    VPN on their own personal computers,
20    correct?
21        A.    I just want to clarify, I
22    disagree with the characterization.  It
23    was not an invitation per se.  It was just
24    letting people know that this was an
25    option.
```

Page 114

                    Johnny Lan

1

2        Q.     As of November 15, 2014, Brevet

3    was providing its employees with the

4    option of accessing the Brevet network

5    using their own personal computers through

6    a VPN, correct?

7        A.     Yes.

8        Q.     So, as of this date, at least,

9    Brevet permitted its employees to conduct

10   Brevet business using their own personal

11   computers, correct?

12       A.     It would appear so from the

13   document.

14       Q.     You sent this e-mail.

15           Are you saying, as you sit here

16   today, you don't have any recollection of

17   Brevet permitting its employees to access

18   the Brevet network using a VPN?

19       A.     I'm not disputing what it says

20   in the e-mail or that I sent the e-mail.

21   It's just our, you know, IT infrastructure

22   has transformed over time.  This was from

23   quite a while ago.

24       Q.     Do you recall that there was a

25   period of time during which Brevet

1              Johnny Lan

2   permitted its employees to access its

3   network using their own personal computer

4   through a VPN?

5       A.    Yes, vaguely.

6       Q.    During the period that Brevet

7   permitted its employees to access the

8   Brevet network using their personal

9   computers through a VPN, would it have

10  been possible, from a technological

11  perspective, for those employees to

12  download and save files from the Brevet

13  network to their own personal computer?

14      A.    Sitting here today, I cannot

15  recall the exact precisely whether that

16  was possible.

17      Q.    Can you describe with any

18  greater specificity the way the VPN

19  technology works?

20      A.    No.

21      Q.    Was the VPN an application that

22  would be installed on the personal

23  computer of Brevet employees?

24      A.    Sorry.  Was that a question?

25      Q.    Yes.

Page 116

```
 1                    Johnny Lan
 2      A.     Can you repeat the question?
 3      Q.     Sure.
 4             Let me rephrase it.
 5             As a functional matter, how did
 6   the VPN work?
 7             MR. UNDERWOOD:   Object to the
 8        form of the question.
 9      A.     As I stated before, generally,
10   the VPN allows the user to connect from a
11   device that's outside of the company
12   network into the company network.
13      Q.     Once the user gains access to
14   the company network through the VPN, what
15   are they allowed to do from within the
16   network?
17      A.     They could -- primarily, they
18   could access certain areas of the company
19   network to which they were privy.
20      Q.     You don't know whether they
21   could access those areas of the network
22   and download and save files to their
23   personal computers?
24      A.     Sitting here today, I cannot
25   recall if they could or not.
```

1                    Johnny Lan

2        Q.     We're going to mark as Lan

3    Exhibit 6, a November 15, 2014 e-mail with

4    the production number Brevet 150452.

5              Actually, let's withdraw that.

6    We don't have to mark that.

7              MR. UNDERWOOD:  Too late.

8              MR. DUMAIN:  Well, we're not

9        going to look at it.

10             MR. UNDERWOOD:  The one time you

11        don't want it to be quick, it's quick.

12             MR. DUMAIN:  It's okay.  It's

13        another version of the same chain.

14             (Whereupon, Plaintiff's Exhibit

15        6, 150452 was marked, for

16        identification, as of this date.)

17        Q.     Mr. Lan, if you could look at

18    what's already been marked Exhibit 5, the

19    top e-mail in the chain, you state that

20    "if the computer is shared with other

21    members of the family, please, install it

22    under your own Windows account and have

23    others use a separate account;" do you see

24    that?

25        A.     Yes.

```
 1              Johnny Lan
 2      Q.    What was the purpose of that
 3  direction, if you recall?
 4      A.    I did not want people's personal
 5  use of the computer, either by them or
 6  their family members, or people that lived
 7  with them, to interfere with the Brevet
 8  use of the computer.
 9      Q.    What caused you to be concerned
10  that Brevet employees' personal computers
11  might be accessed by their family members?
12      A.    Just to be clear, you're asking
13  about what, that to my saying, "use a
14  separate account" or what led to my
15  saying, "please, only install this on
16  personal computer, not public computers"?
17      Q.    I'm asking what caused your
18  concern that people might -- that Brevet
19  employees' family members -- might gain
20  access to the network through these
21  personal computers?
22      A.    Just because of the way it
23  worked, if someone was logged on, let's
24  say through the VPN, with access to Brevet
25  files, then, as an example, if someone's
```

```
 1                    Johnny Lan
 2   kids -- let's say they stepped away and
 3   someone's kids came up to the computer,
 4   they could inadvertently delete files or
 5   make changes that were unintentional.
 6        Q.    I'm going to show you what's
 7   already been marked Lee deposition Exhibit
 8   5.
 9            MR. UNDERWOOD:  Got it up here.
10        Three cheers for efficiency.
11            MR. DUMAIN:  I still think this
12        is more efficient than handing out
13        paper exhibits to a conference room
14        full of people.
15            MR. UNDERWOOD:  Sure.
16        Q.    Mr. Lan, do you recognize this
17   document?
18        A.    Yes.
19        Q.    What is it?
20        A.    Is appears to be the general
21   e-mail retention and instruction policy.
22        Q.    As of January 2015?
23        A.    Yes.
24        Q.    Could you turn to page four of
25   the PDF.  I'm going to direct your
```

Page 120

1              Johnny Lan
2    attention to a paragraph under heading
3    e-mail.
4        A.    Okay.
5        Q.    You see the second sentence, it
6    says, "it is permissible for an employee
7    to communicate via a home computer for
8    investment advisory related business,
9    provided that the employee uses the
10   electronic mail system of the company,"
11   right?
12       A.    I see that sentence.
13       Q.    First, do you have an
14   understanding of what the term investment
15   advisory related business means?
16       A.    I believe, that's referring to
17   Brevets' general business.
18       Q.    What was Brevets' general
19   business?
20       A.    Investment advisory.
21       Q.    Who did Brevet give investment
22   advice to?
23            MR. UNDERWOOD:   Objection to the
24       form of the question.
25       A.    I can't really speak to, you

```
 1              Johnny Lan
 2   know, exactly all the various parties,
 3   just the details of Brevets' business as
 4   described like that.
 5      Q.    Does this policy provide that
 6   for at least some portion of Brevets'
 7   business, as of January 2015, it was
 8   indeed permissible for employees to use
 9   home computers for business purposes?
10      A.    It appears that way from this
11   document.
12      Q.    Do you have any contrary
13   recollection?
14      A.    I do not.
15      Q.    Mr. Lan, did you ever use a
16   personal e-mail account for Brevet
17   business?
18              MR. UNDERWOOD:  Object to the
19       form of the question.
20      A.    Not that can I recall.
21      Q.    Have you ever used your own
22   personal computer to conduct Brevet
23   business?
24              MR. UNDERWOOD:  Objection to the
25       form of the question.
```

Page 122

```
 1                Johnny Lan
 2      A.    Sitting here today, I cannot
 3  recall if I did.
 4      Q.    Do you have a Brevet provided
 5  computer in your home?
 6      A.    Yes, but it's a laptop, so, it's
 7  not -- so, I guess, yes.
 8      Q.    Do you take that laptop to and
 9  from work with you when you go into the
10  office?
11      A.    No.  Not usually.
12      Q.    Do you have another computer
13  that you use when you're in the office?
14      A.    Yes.
15      Q.    Do you use that Brevet laptop
16  that stays mostly in your home for
17  personal business?
18      A.    For personal business, you said?
19      Q.    Yes.
20      A.    Kind of sounds like an oxymoron,
21  but, yes, I occasionally use the laptop
22  for personal matters.
23      Q.    Does the laptop that you have at
24  home, the Brevet laptop that you have at
25  home, have a separate family account?
```

1                    Johnny Lan

2        A.     No.

3        Q.     Does anyone else live with you

4   in your home?

5        A.     Yes.

6        Q.     Does anyone who lives with you

7   in your home use the Brevet provided

8   computer for any purpose?

9        A.     No.

10        Q.     Do you have another computer in

11   your home that the people who live with

12   you use?

13        A.     Yes.

14        Q.     Do you use that computer, also?

15        A.     Yes.

16        Q.     Turning back to Lan Exhibit 5.

17   Could you just look down the page at that

18   prohibited communication?

19        A.     Okay.

20        Q.     Do you see, it provides, "as

21   further described in the company's

22   technology usage policy, the company

23   prohibits e-mail that" -- the final bullet

24   says -- "it's an unauthorized transmission

25   of confidential information and/or trade

Page 124

1                  Johnny Lan

2   secrets;" do you see that?

3        A.    Yes.

4        Q.    In your role as head of

5   technology, did you have any

6   responsibility for ensuring that no

7   unauthorized transmission of confidential

8   information or trade secrets was made

9   through e-mail?

10       A.    It's generally not my job to

11  ensure that.

12       Q.    Whose job is it, if anyone?

13       A.    I don't know.  I'm assuming the

14  compliance department.

15       Q.    You don't know if it's anyone's

16  job?

17       A.    My understanding is that it's

18  the compliance department's job.

19       Q.    Aside from understanding that

20  it's the compliance department's job to

21  protect against unauthorized transmission

22  of confidential information or trade

23  secrets, do you have any understanding as

24  to what steps Brevet takes to ensure

25  against such transmission?

```
 1              Johnny Lan
 2    A.    I can't speak to that.
 3          MR. DUMAIN:  Not withstanding
 4    that it's 12:38, I think we're about
 5    to turn to a different subject.
 6    Maybe, we'll break two minutes earlier
 7    than I had said for lunch, if that's
 8    agreeable to everyone?
 9          MR. UNDERWOOD:  We'll suffer.
10          MR. DUMAIN:  How long would you
11    like to take?
12          MR. UNDERWOOD:  Hang on a
13    second.
14          Let's take an hour.
15          MR. DUMAIN:  Can I get a time
16    stamp on the record?
17          VIDEOGRAPHER:  Once we go off
18    the record, I'll give you an accurate
19    time.
20          MR. DUMAIN:  Terrific.  Thank
21    you.
22          VIDEOGRAPHER:  The time is 12:39
23    p.m. and we're going off the record.
24          (Discussion held off the
25    record.)
```

Page 126

```
 1              Johnny Lan
 2          MR. UNDERWOOD:  Tracie, just to
 3      give you a head's up, I would like to
 4      get a rough transcript when you can
 5      provide one at the end of this
 6      proceeding.  As soon as you can get
 7      it, of course, understanding it's
 8      Friday.
 9          THE REPORTER:  Okay.
10          (Whereupon, a lunch recess was
11      taken at this time.)
12          VIDEOGRAPHER:  The time is 1:39
13      p.m.  We're back on the record.
14      Q.    Good afternoon, Mr. Lan; how are
15  you?
16      A.    I'm well.  And yourself?
17      Q.    Good.  Same to you.
18          I'm going to ask, and so now I
19  will, were you involved in obtaining a
20  Dell OptiPlex computer for Mr. Iacovacci's
21  home in 2015?
22      A.    Yes.
23      Q.    As you recall, was that a
24  replacement for a different Brevet
25  provided computer that had been in Mr.
```

Page 127

```
 1                Johnny Lan
 2   Iacovacci's home?
 3       A.    I believe, it was.
 4       Q.    But you don't recall expressly
 5   one way or the other?
 6       A.    No.
 7       Q.    Do you recall whether you
 8   personally took the OptiPlex to Mr.
 9   Iacovacci's house in 2015 and installed
10   it?
11       A.    I do not believe I did.
12             MR. UNDERWOOD:  Could we go off
13       the record for one minute?
14             MR. DUMAIN:  Sure.
15             VIDEOGRAPHER:  Sure.  The time
16       is now 1:40 p.m. and we're going off
17       the record.
18             (Discussion held off the
19       record.)
20             VIDEOGRAPHER:  The time is 1:41
21       p.m.  We're back on the record.
22       Q.    Mr. Lan, could you take a look
23   again at your November 17, 2017 affidavit,
24   which, I believe, has been marked Exhibit
25   4?
```

Page 128

1              Johnny Lan

2         Are you there?

3    A.    Yes.

4    Q.    Look at paragraph six, the first

5    sentence.

6         Do you see it says "after

7    discussing Iacovacci's computer needs with

8    him and receiving Douglas Monticciolo's

9    approval to acquire through the firm a new

10   desktop for Iacovacci's home use, I

11   ordered a Dell OptiPlex desktop computer

12   on February 2015;" do you see that?

13   A.    Yes.

14   Q.    Can you, please, tell me what

15   you mean by "discussing Iacovacci's

16   computer needs with him?"

17   A.    At this point, I cannot recall

18   any specific details of that discussion.

19   Q.    Do you recall whether Mr.

20   Iacovacci's computer needs were business

21   related, family related, or both?

22   A.    I do not recall, no.

23   Q.    Do you recall whether Mr.

24   Iacovacci required two DVD drives on his

25   computer?

```
 1                    Johnny Lan
 2      A.     Sitting here today, I do not
 3   recall that detail.
 4             MR. DUMAIN:  Let's mark Lan
 5      Exhibit 7 a document labeled Brevet
 6      150533.
 7             (Whereupon, Plaintiff's Exhibit
 8      7, 150533 was marked, for
 9      identification, as of this date.)
10      A.     By the way, after seeing the
11   excerpt I just looked at --
12      Q.     Let me ask you a question; okay?
13      A.     Okay.
14      Q.     Have you looked at this e-mail?
15      A.     I have looked at it, yeah.
16      Q.     Does this e-mail refresh your
17   recollection that Mr. Iacovacci had
18   requested two DVD drives for his computer?
19      A.     It does not refresh my
20   recollection, no.
21      Q.     Is there any business reason in
22   2015 that Mr. Iacovacci would have needed
23   two DVD drives in his home computer?
24      A.     Sitting here today, I do not
25   recall.
```

```
 1              Johnny Lan
 2      Q.    Is there anything that you can
 3  think of, as you sit here today, as you
 4  understand, what Mr. Iacovacci's job was,
 5  in 2015?
 6      A.    I could think of potential
 7  reasons, but I would rather not speculate.
 8      Q.    In 2015, were there any Brevet
 9  work stations that had two DVD drives?
10      A.    Sitting here today, I cannot
11  recall if there was.
12      Q.    Do you see the e-mail states at
13  the top of the Exhibit, among other
14  things, "if you get it shipped to the
15  office first though I can most likely add
16  a second DVD drive for you, otherwise,
17  we'll just ship it directly to your home;"
18  do you see that?
19      A.    Yes, I see it.
20      Q.    Was it typical to have computer
21  equipment shipped directly to employees'
22  homes during this time period?
23      A.    Sitting here today, I do not
24  recall if there was specific -- if that
25  was a normal or not.
```

```
                                        Page 131
 1                  Johnny Lan
 2      Q.      It was not so normal that you
 3   remember it being a common practice,
 4   correct?
 5              MR. UNDERWOOD:  Object to the
 6         form of the question.
 7      A.      Sorry.  Could you repeat that?
 8      Q.      Can I withdraw it.
 9              Let's take a look again at Lan
10   Exhibit 4, your affidavit.  If you could
11   turn to page eight of the PDF, which is
12   Exhibit A to the affidavit.
13              I'm going to focus your
14   attention on the e-mail you wrote at 5:43
15   on February 3, 2015.
16      A.      Okay.
17      Q.      Can you tell from the chain who
18   you were sending this e-mail to, this 5:43
19   e-mail?
20      A.      By looking at this document, no,
21   it doesn't appear to have the recipients
22   listed.
23      Q.      There's an e-mail further up in
24   the chain from Mr. Monticciolo and copy to
25   Mark Callahan suggest to you that you are
```

```
 1              Johnny Lan
 2  corresponding with those two individuals?
 3      A.    That's what it appears like.
 4  Like looking at the document.
 5      Q.    Do you see your e-mail says,
 6  among other things, "Paul said that you
 7  guys approved to acquire through the firm
 8  a new desktop for his home use;" do you
 9  see that?
10      A.    Yes.
11      Q.    Do you know what the words
12  "approved to acquire through the firm"
13  mean in the context of that e-mail?
14      A.    I believe, it means for the firm
15  to purchase the computer.
16      Q.    Were you, as you understand it,
17  quoting Mr. Iacovacci's words in this
18  e-mail?
19      A.    No, I don't believe I was
20  attempting to quote him verbatim.
21      Q.    Do you think you were intending
22  to convey the substance of what he said?
23      A.    Sitting here today, I'm not sure
24  or remember.
25      Q.    If you could turn back, I guess,
```

1                    Johnny Lan
2    we're still looking at your affidavit, but
3    scroll back up to paragraph seven, which
4    is on page three of the PDF?
5         A.    Okay.
6         Q.    In the first paragraph you state
7    "the computer was delivered to Brevets'
8    offices where I configured it to Brevets'
9    specifications;" do you see that?
10        A.    Yes.
11        Q.    What was the purpose of
12   configuring it to Brevets' specifications?
13        A.    I believe, that meant installing
14   the standard sort of set of Brevet
15   software to enable Brevet work.
16        Q.    Do you recall what version of
17   the Windows operating system was installed
18   on this computer?
19        A.    I believe, it was Windows 7.
20        Q.    Do you know if Mr. Iacovacci
21   upgraded the computer to Windows 10?
22        A.    What was the beginning part of
23   that question?
24        Q.    Do you know if Mr. Iacovacci
25   upgraded the operating system to Windows

Page 134

1                    Johnny Lan

2    10?

3        A.    I vaguely recall Mr. Iacovacci

4    reaching out to me at one point and

5    indicating that his computer may have

6    automatically upgraded itself to Windows

7    10.

8        Q.    Is your recollection that he

9    called you or sent you an e-mail to that

10   effect?

11       A.    I can't remember the form of

12   communication.

13       Q.    Is an automatic update

14   something, in your experience, that could

15   have happened on a Windows systems in

16   2015?

17       A.    Yes.

18       Q.    Further into paragraph seven you

19   state that your standard business practice

20   was to also "install two different remote

21   access programs, LogMeIn and GoToMyPC,"

22   correct?

23       A.    Yes.  I see that's what it says.

24       Q.    Do you know whether or not you,

25   in fact, installed LogMeIn on Mr.

Page 135

1              Johnny Lan

2    Iacovacci's computer?

3         A.    When you say "Mr. Iacovacci's

4    computer," are you referring to the Brevet

5    computer that was deployed to his home?

6         Q.    Let me ask the question again.

7              Do you know whether you, in

8    fact, installed the LogMeIn program on the

9    Dell OptiPlex that we've been discussing?

10        A.    Yes.

11        Q.    And did you?

12        A.    Yes.

13        Q.    And is it your testimony that

14   you installed that LogMeIn software at the

15   same time that you configured the computer

16   with Outlook, Word, Excel, Power Point,

17   Kaspersky?

18              THE REPORTER:  And what was the

19        last thing you said?

20              MR. DUMAIN:  K-A-S-P-E-R-S-K-Y.

21        A.    At this point, I couldn't tell

22   you for sure that all of this happened

23   within the same short span amount of time,

24   but, I believe, these software programs

25   were all installed, essentially, during

```
 1                 Johnny Lan
 2   the same attempt to configure the
 3   computer.
 4       Q.    That's what you believe?
 5       A.    Yes.
 6       Q.    Do you know whether Mr.
 7   Iacovacci, in fact, purchased LogMeIn for
 8   himself for installation on the Dell
 9   OptiPlex?
10             MR. UNDERWOOD:   Object to the
11        form of the question.
12       A.    I have no idea if Mr. Iacovacci
13   purchased LogMeIn on his own at that
14   point.  All I know is that I installed
15   LogMeIn onto the computer and registered
16   it under Brevets' LogMeIn account.
17       Q.    Paragraph seven does not state,
18   does it, sir, that you installed LogMeIn
19   on the Dell OptiPlex?
20       A.    No.  It doesn't appear to.
21       Q.    But you are nevertheless certain
22   that you did so?
23       A.    Yes.
24       Q.    You executed this affidavit in
25   2017, correct?
```

Page 137

                    Johnny Lan

1        A.      That's the date on the
2   affidavit.
3        Q.      Look at paragraph eight.  You
4   state that "in configuring Brevet
5   computers for home use by employees, I
6   would also typically install VPN
7   software;" it goes on, correct?
8        A.      Yes.
9        Q.      There you state that you're not
10  able to determine whether or not, in fact,
11  you had installed VPN software on the
12  OptiPlex, correct?
13       A.      Yes, that's what it says.
14       Q.      Did Brevet maintain records in
15  2015 of the software that it installed on
16  the computers that were purchased for
17  principals and other employees to use in
18  their home?
19       A.      I don't recall there being an
20  official record.
21       Q.      Did Brevet, in 2015, maintain
22  written records of the software that was
23  installed on the Brevet home computers
24  that were in Brevets' offices?

Page 138

1                    Johnny Lan

2        A.     Sitting here today, I don't

3    recall there being an official written

4    record of software installed.

5        Q.     If I could focus your attention

6    on paragraph nine.  The affidavit states

7    that you "setup two user accounts on the

8    computer, one called Paul, which was

9    intended for business use, and the second

10   called family;" do you see that?

11       A.     Yes.

12       Q.     Is that consistent with your

13   recollection?

14       A.     Yes.

15       Q.     You understood at the time that

16   this computer would be used for both

17   business and Mr. Iacovacci's family's

18   personal purposes?

19       A.     Yes.

20              As a general rule, I would set

21   up the computers that way if I thought

22   that there was even a chance of that

23   happening.

24       Q.     Why did you do that?

25       A.     I believe, I discussed this

```
 1                 Johnny Lan
 2   earlier, where I did not want any
 3   unauthorized people to have access to the
 4   Brevet information on those computers.
 5       Q.    You understood at the time
 6   pursuant to Brevets' written policy that
 7   Brevet computers were, Brevet owned
 8   computers, were to be used only for Brevet
 9   business purposes and only incidentally
10   personal purposes, correct?
11       A.    I understand that, in general,
12   there -- Brevet computers were to be
13   primarily used for Brevet business.
14       Q.    Did you say primarily?
15       A.    Yes.
16       Q.    Did Brevet travel laptops have
17   family accounts setup on them?
18            MR. UNDERWOOD:  Objection to the
19       form of the question.
20       A.    Can you identify what you mean
21   by Brevet travel laptops?
22       Q.    Yes, absolutely.  That was a
23   problematic question.  Thank you.
24            Did Brevet have laptops that it
25   would loan to employees who were traveling
```

Page 140

                        Johnny Lan

1    on business?

2        A.    At which period of time are you

3    referring to?

4        Q.    If it changed over time, then,

5    you can answer with respect to the

6    particular time period?

7        A.    Sorry.

8              With respect to which particular

9    time period?

10       Q.    Was there a period that Brevet

11   would loan laptops to its employees who

12   were traveling on business?

13       A.    Yes, I believe, there was.

14       Q.    Did those laptops have family

15   accounts setup on them?

16       A.    No.

17       Q.    Are you aware of any Brevet

18   owned laptop, excluding for these

19   purposes, the computers that may have been

20   provided to Brevet employees for use in

21   their home, that had family accounts on

22   them?

23       A.    At present, I do not recall any.

24       Q.    Moving on to paragraph 10, your

```
                                      Page 141
 1                  Johnny Lan
 2    affidavit states, when you setup the
 3    computer in February slash March 2015,
 4    "neither of the two user accounts had full
 5    administrative rights," correct?
 6        A.    That's what it says.
 7        Q.    Did that change at some point?
 8        A.    I believe, it did.
 9        Q.    What's your recollection?
10        A.    My recollection was that after
11    having had the computer for a while, Mr.
12    Iacovacci constantly and persistently
13    hounded me to upgrade the privileges on
14    the family account.
15        Q.    We're going to mark Lan
16    deposition Exhibits 8 and 9, I believe.
17              (Whereupon, Plaintiff's Exhibit
18        8, 150621 was marked, for
19        identification, as of this date.)
20        Q.    The next one will be July 7th
21    2015 e-mail with the production number
22    Brevet 150621.
23              And Exhibit 9, will be an e-mail
24    with the same date with the production
25    number Brevet 150622.
```

```
 1              Johnny Lan
 2              (Whereupon, Plaintiff's Exhibit
 3       9, 150622 was marked, for
 4       identification, as of this date.)
 5       Q.    Do you see Exhibit 8, Mr. Lan?
 6       A.    Sorry.  It's still loading up on
 7   the screen.
 8              Okay.
 9       Q.    Is this one of the e-mail
10   communications you're referring to?
11       A.    Sitting here today, I cannot
12   recall this exact e-mail, but this
13   certainly appears to be.
14       Q.    If you could take a look at
15   Exhibit 9, if it's loaded?
16       A.    Yes.
17       Q.    Do you recall this e-mail?
18       A.    I do not recall the e-mail, no.
19       Q.    Is it consistent with what you
20   were describing before?
21       A.    Yes.
22       Q.    Do you see that Mr. Iacovacci
23   seems to be saying that he would like to
24   have the work software removed if that was
25   an obstacle to his becoming administrator
```

1            Johnny Lan

2    of the computer; do you read the e-mail

3    that way?

4            MR. UNDERWOOD:   Object to the

5        form of the question.

6        A.    I cannot speak to exactly what

7    Mr. Iacovacci meant in the way that you're

8    asking.

9        Q.    I'm asking how you understand

10   it?

11       A.    Frankly, I don't understand it.

12       Q.    Did you ultimately grant Mr.

13   Iacovacci administrator access to the Dell

14   OptiPlex?

15       A.    I believe, I did.

16       Q.    If you did, was that a violation

17   of company policy?

18       A.    No, I do not view it that way.

19       Q.    Did you ever give employees

20   administrator access to their work

21   stations in the office?

22       A.    Sitting here today, I cannot

23   recall to be able to tell you for sure

24   that it never happened.

25       Q.    Was allowing an employee to

Page 144

```
1                    Johnny Lan
2    install third-party software on the
3    employees' work station consistent with
4    Brevets' policy at the time?
5              MR. UNDERWOOD:  Sorry.  I missed
6         the end of that question.  There was
7         some banging.
8              MR. DUMAIN:  My apologies for
9         that.
10        Q.    The question was, was allowing
11   employees to install software --
12             MR. DUMAIN:  Sorry.  If it
13        doesn't stop in a minute we'll take a
14        five minute break.
15        Q.    Was allowing employees to
16   install third-party software on Brevet
17   owned computers consistent with Brevets'
18   policies at the time?
19             MR. UNDERWOOD:  I'm sorry.  It's
20        a little distracting.
21             MR. DUMAIN:  Why don't we go off
22        the record for three minutes and see
23        if I can manage that problem.
24             VIDEOGRAPHER:  The time is 2:12
25        p.m. and we're going off the record.
```

Page 145

```
1              Johnny Lan
2           (Discussion held off the
3     record.)
4           VIDEOGRAPHER:  The time is 2:13
5     p.m.  We're back on the record.
6           MR. DUMAIN:  Thank you for the
7     indulgence.
8     Q.    Mr. Question, Mr. Lan, is
9  whether permitting an employee to install
10 third-party software on a Brevet owned
11 computer would have been consistent with
12 Brevets' policies at the time?
13    A.    At the time, if we thought that
14 doing so wouldn't interfere with the
15 security of the computer, we would allow
16 it from time to time.
17    Q.    Who would have to grant
18 permission for the installation of
19 third-party software?
20    A.    There was no formal, you know,
21 process or hierarchy.
22    Q.    We're going to mark now a
23 document as Lan deposition Exhibit 10.
24           (Whereupon, Plaintiff's Exhibit
25    10, software application list was
```

```
 1              Johnny Lan
 2       marked, for identification, as of this
 3       date.)
 4       Q.    Mr. Lan, you're looking at a
 5   list of software applications; do you see
 6   it?
 7       A.    Yes.
 8       Q.    My question for you is, which,
 9   if any, of these software applications
10   were third-party non Brevet owned software
11   applications?
12       A.    What is the origin of this list?
13       Q.    I'll represent to you that this
14   is a list of software applications from
15   the Dell OptiPlex.
16       A.    At what point in time?
17       Q.    With respect, Mr. Lan, it
18   doesn't really matter for purposes of my
19   question.
20            The question is whether you
21   recognize any of these applications as
22   being applications that would have been
23   installed by Brevet and were Brevet owned?
24       A.    Number three.  Perhaps, number
25   10, 16, 25.
```

```
 1              Johnny Lan
 2     Q.     What about 24?
 3     A.     You're asking about software
 4  that Brevet owned or just software that
 5  Brevet would have installed?
 6     Q.     Why don't we do it in two parts.
 7            First, software that Brevet
 8  owned, and second, any additional software
 9  that Brevet installed?
10     A.     This list is clearly from a long
11  time ago.  Sitting here today, I can only
12  tell you, off the top of my head, numbers
13  three, and 25, and perhaps, 16, would be
14  software that Brevet paid for.  Some of
15  the other software, you know, are free.
16     Q.     Is there any software on this
17  list that you know that Brevet would have
18  neither purchased nor installed?
19     A.     Perhaps, but I cannot -- being
20  that this was from a long time ago and,
21  also, I'm not exactly sure what I'm
22  looking at here, so, I don't want to
23  speculate.
24     Q.     You can't say for certain, for
25  example, that Brevet would have neither
```

Page 148

1             Johnny Lan
2    owned nor installed an application called
3    Bible Study Six?
4        A.    I'm fairly certain we didn't own
5    that software.  I don't have any
6    recollection of helping install that
7    software, either.  If you want to say for
8    absolute certainty, right, I had no part
9    in the assisting and installing any of
10   these, I can't say that for sure.
11       Q.    We're going to mark as Lan
12   deposition Exhibit 11, the July 23, 2019
13   answer that you filed in this case.
14            (Whereupon, Plaintiff's Exhibit
15       11, 7-23-19 Answer was marked, for
16       identification, as of this date.)
17       Q.    Is the document loaded?
18       A.    Yes.
19       Q.    If you could turn to paragraph
20   42, which is on page seven of the PDF.
21       A.    Okay.
22       Q.    What do you understand this
23   answer to be, to start?
24            This document?
25       A.    This was also referred to -- I

1          Johnny Lan
2   would have to see paragraph 42 of the
3   complaint.
4       Q.    Just focusing on the final
5   sentence, or final part of the long
6   sentence, that states "Iacovacci held a
7   superior position to defendant, Lan, at
8   Brevet and complained to defendant, Lan,
9   to grant Iacovacci administrative rights
10  to the computer, and as a subordinate
11  employee, defendant, Lan, acceded to
12  Iacovacci's demand to be granted
13  administrative rights to the computer;" do
14  you see that portion of paragraph 42?
15      A.    Yes.
16      Q.    Does that accurately describe
17  what happened as to the granting of
18  administrative rights to Mr. Iacovacci?
19      A.    As best I can recall, that seems
20  accurate.
21      Q.    Is it fair to say, in other
22  words, that you were acceding to the
23  wishes of your superior -- I know you
24  shied away from the word "superior" when
25  we talked earlier in the today, and I am

Page 150

```
 1                Johnny Lan
 2    trying not to use it, but it's in your
 3    pleadings -- let me withdraw all of that.
 4             Fair to say you acceded to the
 5    will of your superior in the hierarchy at
 6    Brevet?
 7       A.    Sitting here today, I cannot
 8    recall if that was the sole or primary
 9    reason for acceding.
10       Q.    Mr. Lan, if you wanted to log
11    into Mr. Iacovacci's home computer using
12    LogMeIn, would you need to know his
13    password?
14       A.    Again, by Mr. Iacovacci's
15    computer, are you referring to the Brevet
16    computer that was at his home?
17       Q.    With respect, Mr. Lan, we're not
18    going to solve the issue of who owns the
19    computer between you and me.  That's not
20    the purpose of this.
21             So, yes, the only computer I
22    have been referring to is Mr.
23    Iacovacci's -- the OptiPlex computer at
24    Mr. Iacovacci's home.  So, let me ask
25    again.
```

```
                                    Page 151
 1                Johnny Lan
 2           In order to log into the Dell
 3   OptiPlex, did you need Mr. Iacovacci's
 4   password?
 5       A.    When you say "Mr. Iacovacci's
 6   password," are you referring to which
 7   services password are you referring to?
 8       Q.    To log into the Dell OptiPlex
 9   through LogMeIn, did you need Mr.
10   Iacovacci's personal LogMeIn credentials?
11       A.    Yes.  I would have had to have
12   the credentials for the LogMeIn account
13   attached to that computer.
14       Q.    Could you have obtained those
15   credentials from anybody but Mr.
16   Iacovacci?
17       A.    No.  Not that I know of.
18       Q.    Could you look at paragraph 11
19   of Exhibit 4, please.
20       A.    Yes.
21       Q.    This paragraph states that Mr.
22   Iacovacci at times provided his LogMeIn
23   password to you and that you retained that
24   password?
25       A.    Could you repeat that?
```

1        Johnny Lan

2    Q.    Does this paragraph state that

3    "Mr. Iacovacci, from time to time, would

4    provide his LogMeIn password" to you and

5    that you retained his password?

6    A.    Yes.  I retained the password to

7    the LogMeIn account.

8    Q.    Where did you record Mr.

9    Iacovacci's passwords?

10   A.    To be fair, I don't recall if I

11   simply retained it in my head or if I had

12   written it down anywhere.

13   Q.    Do you retain the passwords of

14   LogMeIn passwords of other Brevet

15   employees?

16   A.    I cannot recall for certain, but

17   it's certainly possible.

18   Q.    I didn't mean to cut you off.

19         Did you disclose to Mr.

20   Iacovacci that you were retaining his

21   LogMeIn password?

22   A.    I don't recall explicitly

23   talking about that, no.

24   Q.    Do you think Brevet employees

25   understood that you might retain their

Page 153

1                    Johnny Lan

2   LogMeIn passwords?

3       A.    I think, Brevet employees,

4   through the process -- through the due

5   course of supporting the employees every

6   day, they certainly would have, I would

7   think -- I don't like to speculate on what

8   other people think, but in this case, I

9   would think it's reasonable that people

10  would expect that if the passwords that

11  they told me in my support of them is

12  retained sometimes.

13      Q.    Did you ever urge Brevet

14  employees to change their passwords that

15  they provided to you so their personal

16  information could be kept secured?

17      A.    No.

18      Q.    Let's mark the next Exhibit, Mr.

19  Lan's February 16, 2021 affidavit.

20            (Whereupon, Plaintiff's Exhibit

21      12, 2-16-21 Lan affidavit was marked,

22      for identification, as of this date.)

23      A.    Could I request that we take a

24  short break?

25      Q.    Sure.   10 minutes work?

Page 154

```
 1              Johnny Lan
 2         MR. UNDERWOOD:  We're willing to
 3    go five.
 4         MR. DUMAIN:  Five is even
 5    better.
 6         VIDEOGRAPHER:  The time is 2:34
 7    p.m. and we're going off the record.
 8         (Discussion held off the
 9    record.)
10         VIDEOGRAPHER:  The time is 2:40
11    p.m.  We're back on the record.
12    Q.    Mr. Lan, I think, when we marked
13  the document I may have said February 16,
14  2020.
15         But for the record, we're
16  looking now at an affidavit dated February
17  16, 2021; is that correct?
18    A.    Yes.
19    Q.    Did you draft this affidavit?
20    A.    Are you asking if I drafted it
21  on my own?
22    Q.    What was the process for
23  drafting this affidavit?
24    A.    I conferred with counsel.
25    Q.    Is that the end of the answer?
```

Page 155

```
 1                   Johnny Lan
 2      A.    Yes.
 3      Q.    After you conferred with
 4  counsel, counsel drafted the affidavit,
 5  correct?
 6            MR. UNDERWOOD:  Object to the
 7       form of the question.
 8      A.    Yes, I believe so.
 9      Q.    Could you look at paragraph two?
10      A.    Okay.
11      Q.    Paragraph two states, in part,
12  "Brevet tries to keep its computer" -- let
13  me start again.
14            Paragraph two states, in part,
15  "in general, Brevet tries to keep its
16  computers up to date and configured with
17  the latest software and system updates,"
18  correct?
19      A.    Yes.
20      Q.    What steps did Brevet take to
21  keep the Dell OptiPlex we've been
22  discussing configured with the latest
23  software and system updates?
24      A.    As I stated before, I generally
25  try to ensure that the automatic updates
```

```
 1                 Johnny Lan
 2   switches, so to speak, were turned on, and
 3   but if I, you know, happen to see a system
 4   or software that was out of date, I
 5   generally try to manually make it perform
 6   the update.
 7        Q.    Were you able to keep track of
 8   whether the system, or systems or
 9   software, were up to date for computers
10   that were not connected to the Brevet
11   network?
12        A.    Best I can recall, that was
13   difficult to accomplish during the period
14   of time that we're discussing.
15        Q.    To be clear, the period of time
16   we're discussing is between February,
17   March 2015, when Mr. Iacovacci was
18   provided with the Dell OptiPlex and
19   October of 2016, when he left Brevet?
20        A.    Yes.
21        Q.    If you could look now at
22   paragraph three.
23              You say "virtually, all of
24   Brevets' computers, including all of those
25   in the office and most of the Brevets'
```

Page 157

```
 1              Johnny Lan
 2   owned computers used by Brevet employees
 3   outside of the office, are configured
 4   consistently," correct?
 5        A.    Yes.
 6        Q.    What does configured
 7   consistently mean in the context of this
 8   sentence?
 9        A.    I believe, it means having the
10   same core suite of software installed, as
11   I stated earlier.
12        Q.    In your view, was the Dell
13   OptiPlex configured consistently with the
14   Brevet work stations that could be found
15   in Brevets' offices?
16        A.    In terms of the software that
17   was installed, yes.
18        Q.    In what way was it not
19   configured consistently?
20        A.    Sitting here today, it's tough
21   for me to think off the top of my head
22   what all the differences were.
23        Q.    Were most Brevet computers
24   configured with a family account?
25        A.    No.
```

```
 1                Johnny Lan
 2      Q.    Were you aware of any other
 3  Brevet computers at that time that had a
 4  family account, by "at that time," I mean,
 5  between February 2015 and October of 2016?
 6      A.    Yes.
 7      Q.    Which ones were those?
 8      A.    One particular one I'm aware of
 9  is a computer that was deployed to Mark's
10  home, Mark Callahan's home.
11      Q.    Who configured that computer?
12      A.    I did.
13      Q.    Did Mr. Callahan ask you to
14  create a family account or did you do it
15  on your own?
16      A.    I believe, I did it, consistent
17  with my methodology back then.
18      Q.    Did you have any understanding
19  at the time with respect to whether and
20  the extent to which Mr. Callahan's family
21  would be using the computer?
22      A.    No, I don't believe I had any
23  idea as to extent or frequency.
24      Q.    Did you have any understanding
25  at all with respect to whether
```

1                    Johnny Lan

2    Mr. Callahan's family would be using the

3    computer?

4         A.    I did not.

5         Q.    When you were in the process of

6    obtaining the Dell OptiPlex for Mr.

7    Iacovacci, you were aware that Mr.

8    Iacovacci's children would use the Dell

9    OptiPlex for the purposes of home

10   schooling, correct?

11        A.    No.  No.

12        Q.    You did not know that?

13        A.    Again, I wouldn't have known or

14   had any real expectations of the frequency

15   or degree of personal use.

16        Q.    In your November 2017 affidavit,

17   you provided sworn testimony, correct,

18   that you discussed Mr. Iacovacci's

19   computer needs with him in connection with

20   obtaining the Dell OptiPlex?

21        A.    I see that's what it says.

22        Q.    You executed this affidavit

23   under penalty of perjury, correct?

24        A.    Yes.

25        Q.    Do you have any reason to

Page 160

1                    Johnny Lan
2     believe your memory now of these events in
3     2015 is better than your memory in 2017 of
4     these events?
5          A.     No.
6          Q.     Returning again to your February
7     2021 affidavit.  If you could look at
8     paragraph four.  Let me know when you've
9     done so?
10          A.     Okay.
11          Q.     Does this statement in the
12     affidavit make reference to the laptop
13     that you were referring to in your
14     testimony a few moments ago that had been
15     issued to Mr. Callahan?
16          A.     Yes.
17          Q.     In your testimony -- in
18     paragraph four of your affidavit, you
19     state that you were able to identify a
20     laptop that had been previously used by
21     Mr. Callahan in the 2016 timeframe, and to
22     your knowledge, had not been updated since
23     around 2016; is that correct?
24          A.     Yes.
25          Q.     Did you do anything to determine

Page 161

```
 1                    Johnny Lan
 2   whether the laptop had been updated since
 3   2016?
 4       A.    I didn't do anything proactive
 5   to determine whether it's been updated,
 6   per se.  The basis of that statement was
 7   the fact that I had placed the laptop into
 8   my drawer.
 9       Q.    I didn't mean to cut you off.
10       A.    Sorry.
11             Yes, since Mr. Callahan returned
12   it, it's been kept in my drawer,
13   basically.
14       Q.    Is there a reason it was kept in
15   your drawer since Mr. Callahan had
16   returned it?
17       A.    It was a laptop that we were not
18   intending to redeploy.
19       Q.    Why?
20       A.    Well, it was quite old at that
21   point.
22       Q.    Why didn't you have it
23   liquidated?
24       A.    We don't have a practice of
25   liquidating our IT equipment on an ongoing
```

```
                                    Page 162
 1               Johnny Lan
 2   basis.  Typically, when we've moved
 3   offices or, you know, had a large change
 4   in the equipment.
 5       Q.    Why then was this Callahan
 6   laptop the only 2016 era laptop you were
 7   able to identify?
 8       A.    I don't know.
 9       Q.    Was it subject to a litigation
10   hold?
11       A.    Not that I recall.
12       Q.    Does Brevet have a procedure for
13   retaining computer equipment that's
14   subject to litigation hold?
15       A.    If you're referring to some kind
16   of formal procedure, I'm not sure that
17   I'm -- I'm not sure there is one, but we
18   certainly would preserve things that are
19   subject to, you know, a litigation hold.
20       Q.    What is the status of Mr.
21   Iacovacci's Brevet office work station
22   right now?
23       A.    I do not have that information.
24       Q.    Who would?
25       A.    I don't know.  I don't know if
```

Page 163

```
 1                Johnny Lan
 2   anybody would.
 3      Q.    Who in Brevet is responsible for
 4   maintaining hardware and hard drives that
 5   are subject to a litigation hold?
 6             MR. UNDERWOOD:  Object to the
 7        form of the question.
 8      A.    I'm not aware that any specific
 9   person is designated as responsible for
10   that.  I would think any employee that
11   comes into knowledge of a litigation would
12   have that responsibility.
13      Q.    Just to be absolutely clear, you
14   don't know what happened to Mr.
15   Iacovacci's work station that Mr.
16   Iacovacci was using at the time he left
17   Brevet in October of 2016?
18             MR. UNDERWOOD:  Object to the
19        form of the question.
20      A.    Correct.  I don't know where it
21   is.
22      Q.    And you don't know who would
23   know?
24      A.    I do not.
25      Q.    Have you had any contact with
```

Page 164

1                    Johnny Lan
2      that computer that you can recall since
3      Mr. Iacovacci left Brevet in October 2016?
4          A.    I cannot recall like a
5      specific -- I can't recall anything
6      specifically.  Generally, when an employee
7      leaves, we generally repurpose the
8      computer after making a backup of the data
9      on it.
10         Q.    Where is that the backup saved?
11         A.    It's typically saved into the
12     what we call -- it's essentially a sort of
13     space on the network reserved for that
14     employee.
15         Q.    Do you take an image of the
16     entire hard drive?
17         A.    I do not.
18         Q.    What do you do?
19         A.    I review -- I do a review of any
20     data that's -- that may be only on the
21     computer and not on the network, and I
22     copy anything that I find in that category
23     onto the network.
24         Q.    How do you determine what
25     information might not be on the network?

Page 165

1              Johnny Lan
2      A.     If the information is sitting in
3  certain directories that are local to the
4  computer.
5      Q.     So, you make a copy of all local
6  drives?
7      A.     Not the entire drives, no.  Only
8  business related data.
9      Q.     How do you determine what's
10  business related and what's personal?
11             MR. UNDERWOOD:  Object to the
12      form of the question.
13             MR. DUMAIN:  Let me withdraw it.
14      Q.     How do you determine what's
15  business related and what's not business
16  related?
17      A.     It's more that I attempt -- I do
18  my best efforts to identify what seems to
19  be business related.  If it's not, then, I
20  consider it not business related.
21             I just want to clarify here,
22  it's not like there's only two kinds of
23  files that can exist.  It's not there's
24  only business or personal files.  There's
25  also system files that would have no

```
 1                    Johnny Lan
 2   relevance and no need to be backed up.
 3        Q.    Just to be clear, you personally
 4   don't know what became of Mr. Iacovacci's
 5   work station, correct?
 6        A.    The physical work station, I'm
 7   not sure, no.
 8        Q.    Did you personally backup the
 9   business related information on Mr.
10   Iacovacci's work station before it was
11   either repurposed or disposed of?
12        A.    Sitting here today, I couldn't
13   tell you for certain if it was me
14   personally.
15        Q.    If it was not you, who would it
16   have been?
17        A.    Likely, my colleague, Igor
18   Koyfman.
19        Q.    Mr. Lan, did you come to learn
20   at some point that Mr. Iacovacci intended
21   to retire from Brevet?
22        A.    At any point?
23        Q.    Yes, at any point?
24        A.    I suppose, yes.
25        Q.    How did you learn that he had
```

1           Johnny Lan

2    decided to retire?

3       A.    To the best of my recollection,

4    it's the most recent way that I can

5    remember is through the course of this

6    litigation.

7       Q.    Are you stating that you did not

8    know before you came to learn in this

9    litigation that at some point in 2016 Mr.

10   Iacovacci had announced his intent to

11   retire from Brevet?

12      A.    No.  I'm saying that's the most

13   recent example that I can think of.

14      Q.    But you can't recall the first

15   time that you heard that Mr. Iacovacci

16   intended to retire?

17      A.    I cannot, no.

18      Q.    When an employee announces the

19   employee's departure from Brevet, does

20   Brevet take steps to restrict the

21   employee's access to company data in

22   advance of their departure?

23      A.    I don't know if I could speak to

24   that.  Usually, senior management or human

25   resources lets me know when somebody is

```
 1              Johnny Lan
 2   either leaving or being terminated and we
 3   generally shutdown the access at the time
 4   of termination?
 5       Q.    Is that a matter of practice or
 6   a matter of policy?
 7             MR. UNDERWOOD:  Object to the
 8       form of the question.
 9       A.    I don't know.
10       Q.    Are you aware of any written
11   policy that lays out how and when an
12   employees' access to Brevets' systems and
13   information should be restricted upon
14   their departure from the firm?
15       A.    I cannot recall a specific
16   written policy at this point in time.
17       Q.    The next Exhibit which, I
18   believe, will be Exhibit 13, is a document
19   labeled Brevet New, B-R-E-V-E-T-N-E-W,
20   026779.
21             (Whereupon, Plaintiff's Exhibit
22       13, 026779 was marked, for
23       identification, as of this date.)
24       Q.    Can you review it from the
25   bottom up and let me know when you've
```

Page 169

```
 1              Johnny Lan
 2   completed it?
 3       A.    Okay.
 4       Q.    Do you recall this e-mail
 5   exchange?
 6       A.    I do not.
 7       Q.    Do you have any recollection of
 8   what Mr. Monticciolo is asking you to
 9   learn on the PC front on or about January
10   25, 2016?
11       A.    Sitting here today, I cannot
12   recall.
13       Q.    Do you know why Mr. Monticciolo
14   asked you to bring the hard drive with the
15   original files from Mr. Iacovacci's
16   computer to Mr. Monticciolo's office?
17       A.    No, I do not recall that.
18       Q.    Do you recall any other instance
19   in which Mr. Monticciolo asked you to
20   provide to him the hard drive from the
21   computer of a former Brevet employee?
22       A.    No, I do not recall at this
23   time.
24       Q.    I should clarify, at the time of
25   this e-mail, Mr. Iacovacci was not a
```

```
 1                  Johnny Lan
 2   former Brevet employee, he was an active
 3   Brevet employee.  Let me ask a different
 4   question.
 5             Do you recall, as you sit here
 6   today, Mr. Monticciolo ever asking you to
 7   bring to him the hard drive from a
 8   computer of a Brevet employee?
 9       A.    No, at this point in time, I do
10   not recall.
11       Q.    Did Mr. Monticciolo have any
12   computer hardware related responsibilities
13   at Brevet in the January 2016 timeframe?
14       A.    I do not recall at this time.
15       Q.    But you might have?
16       A.    No.  I just don't know.
17       Q.    Does this strike you as an
18   unusual request?
19       A.    Again, I do not recall this
20   e-mail interaction.
21       Q.    As you sit here today, does it
22   seem unusual to you that the senior
23   principal of Brevet would ask you to drop
24   off a computer hard drive of a current
25   Brevet employee?
```

Page 171

1                    Johnny Lan

2       A.     It's not my job, or place, to,

3    you know, to think about that.

4       Q.     With respect, sir, it's your job

5    to answer the questions.  So, if you have

6    a view that is it unusual, you should

7    answer truthfully?

8       A.     Right.

9              Also, because I want to give

10   accurate and truthful testimony, I would

11   rather not speculate on how I would view

12   or feel on a hypothetical.

13      Q.     But you don't doubt this

14   happened, do you, sir?

15             MR. UNDERWOOD:  Object to the

16        form of the question.

17      A.     I mean, I see what it says in

18   the e-mail.

19      Q.     We're going to mark Lan

20   deposition Exhibit 14.  It's an e-mail

21   exchange with the Bates labeled Brevet New

22   029916.

23             (Whereupon, Plaintiff's Exhibit

24        14, 029916 was marked, for

25        identification, as of this date.)

Page 172

```
 1                    Johnny Lan
 2        Q.    Have you reviewed the document,
 3   sir?
 4        A.    It didn't come up yet.  Okay.
 5              What would you like me to do?
 6        Q.    Have you read the document?
 7        A.    Yes.
 8        Q.    Now, we're going to mark
 9   deposition Exhibit 15, an Excel file,
10   Bates Brevet New 029918, which is the
11   attachment to this e-mail.
12              (Whereupon, Plaintiff's Exhibit
13        15, Brevet New 029918 was marked, for
14        identification, as of this date.)
15        A.    Okay.
16        Q.    Do you recall this e-mail
17   exchange, sir?
18        A.    No, at this time I can't say
19   that I do.
20        Q.    Do you see that Mr. Callahan
21   wrote to you on February 26th of 2016
22   asking you to download Mr. Iacovacci's
23   contacts into Excel and then send them to
24   Mr. Callahan, Mr. Monticciolo,
25   Mr. Sherman, and Mr. O'Keefe, correct?
```

Page 173

```
 1                    Johnny Lan
 2        A.     Yes, I see that.
 3        Q.     And you did that, right?
 4        A.     I don't have a specific
 5   recollection of having done that.
 6        Q.     Do you doubt having done that
 7   looking at this e-mail exchange?
 8        A.     I don't have a reason to doubt.
 9        Q.     Do you recall informing Mr.
10   Iacovacci that you had been asked to
11   download his contacts and provide them to
12   Mr. Callahan and others?
13        A.     No.  I do not recall that.
14        Q.     Did Mr. Callahan regularly ask
15   you to download Brevet employees' contacts
16   without those employees' notice and
17   provide those contacts to Mr. Callahan and
18   others?
19             MR. UNDERWOOD:  Object to the
20        form of the question.
21        A.     I do not recall if that was ever
22   a regular occurrence or not.
23        Q.     Can you recall any other
24   instance in which Mr. Callahan wrote to
25   you and asked you to download contacts
```

Page 174

1                    Johnny Lan

2    from another current Brevet employee

3    without notice to that employee and to

4    provide them to Mr. Callahan?

5              MR. UNDERWOOD:  Object to the

6         form of the question.

7         A.    No, I do not recall that.

8         Q.    Can you think of any other

9    instance in which Mr. Callahan wrote to

10   you and asked you to download files of

11   other Brevet employees without notice to

12   those employees and to provide them to

13   Mr. Callahan?

14             MR. UNDERWOOD:  Object to the

15        form of the question.

16        A.    At this present moment, I cannot

17   recall.

18        Q.    Do you know what Mr. Callahan

19   did with those contact lists?

20        A.    I can't speak to what

21   Mr. Callahan did.

22        Q.    Mr. Lan, could you open up

23   deposition Exhibit 15, the Excel

24   spreadsheet.

25             Just tell me, for the record,

Page 175

1                    Johnny Lan
2    how many lines of data there are in the
3    file?
4        A.    This appears to be a large file
5    and the way we're looking at it on the
6    screen it's difficult for me to be able to
7    scroll to the bottom and tell you the
8    number.
9        Q.    I'll represent to you that it's
10   6765 lines of data.  If you accept that
11   representation, as you understand what
12   happened here, is it accurate to say that
13   you downloaded, without Mr. Iacovacci's
14   notice, over 6700 contacts that he had on
15   his computer and provided them to
16   Mr. Callahan?
17           MR. UNDERWOOD:  Object to the
18       form of the question.
19       A.    I'm not sure I understand the
20   relevance of the number of records, but as
21   I said before, I do not recall whether I
22   informed Mr. Iacovacci of this contacts
23   download.
24           MR. DUMAIN:  Move to strike as
25       nonresponsive.

Page 176

```
 1                   Johnny Lan
 2       Q.     Take a look at deposition
 3  Exhibit 4, specifically, paragraph five,
 4  again.
 5              Did you come to learn that one
 6  day Mr. Iacovacci had been terminated?
 7       A.     Could you repeat that?
 8              I missed the beginning of that
 9  question.
10       Q.     Did you come to learn that Mr.
11  Iacovacci had been terminated?
12       A.     What's the period of time that
13  you're referring to?
14       Q.     Why don't we start with ever?
15       A.     Yes, I believe, I understand
16  that he's terminated.
17       Q.     Do you recall when he was
18  terminated?
19       A.     According to this, October 14,
20  2016.
21       Q.     By "according to this," you
22  mean, your sworn affidavit, correct?
23       A.     Yes.
24       Q.     According to your own sworn
25  affidavit Mr. Iacovacci was terminated on
```

```
 1              Johnny Lan
 2   October 14, 2016, correct?
 3       A.    Yes.
 4       Q.    Is it also true that on that
 5   day, you were instructed to deliver a
 6   letter to Mr. Iacovacci's apartment and to
 7   retrieve what you've characterized as the
 8   Brevet owned Cisco desktop, phone, and
 9   computer from Mr. Iacovacci?
10       A.    Yes.
11       Q.    Had you ever before been
12   dispatched to retrieve hardware from a
13   Brevet employee who had been terminated?
14       A.    Sitting here today, I can't
15   recall if I have.
16       Q.    You can't recall any other
17   instance in which you had been dispatched
18   to retrieve hardware from a Brevet
19   employee who had been terminated, correct?
20       A.    Correct.
21       Q.    Do you recall what happened when
22   you got to Mr. Iacovacci's home?
23       A.    I recall asking for --
24   delivering the envelope, as instructed,
25   and asking for the company equipment to be
```

Page 178

```
 1              Johnny Lan
 2   returned, as instructed.
 3       Q.    Are you done?
 4       A.    Yes.
 5       Q.    Do you recall, as you sit here
 6   today, what Mr. Iacovacci said?
 7       A.    Yes.
 8       Q.    What did Mr. Iacovacci say?
 9       A.    Again, this is not verbatim, but
10   I recall Mr. Iacovacci saying that he
11   could give back the phone, but not the
12   computer, at least not that day.
13       Q.    What do you recall about Mr.
14   Iacovacci's demeanor at that time?
15       A.    I do not recall anything out of
16   the ordinary with his demeanor.
17       Q.    Did you say anything else to
18   him?
19       A.    Sitting here today, not that I
20   recall.
21       Q.    What happened next?
22       A.    We picked up the phone, or Mr.
23   Iacovacci turned over the phone, and we
24   left, returned to the office.
25       Q.    What happened when you got back
```

Page 179

```
 1                    Johnny Lan
 2   to the office?
 3        A.    I do not recall.
 4        Q.    Did you tell anyone that Mr.
 5   Iacovacci had not turned over the Dell
 6   OptiPlex?
 7        A.    Yes, I believe, I communicated
 8   that to Mark Callahan.
 9        Q.    Did you communicate that to him
10   in person, or by phone, or by e-mail?
11        A.    At this point, I cannot recall
12   exactly.
13        Q.    Can you recall Mr. Callahan's
14   reaction to that news?
15        A.    No, I cannot.
16        Q.    Did you make any further efforts
17   to retrieve Mr. Iacovacci's computer, by
18   which I mean, the Dell OptiPlex, from his
19   home?
20        A.    No.  I do not remember being
21   further instructed to attempt to collect
22   the computer.
23        Q.    In your capacity as head of
24   technology, did you take any steps,
25   following Mr. Iacovacci's termination, to
```

```
                                    Page 180
 1              Johnny Lan
 2   restrict his access rights to Brevets'
 3   systems?
 4       A.    Yes, I believe, I would have
 5   gone through the standard procedure of
 6   affording an employee from a technology
 7   standpoint.
 8       Q.    What were the standard
 9   procedures?
10       A.    Generally, it would be to remove
11   the employees' access to Brevets' systems.
12   To make a backup of any business related
13   data on to the network.  And to reset the
14   computer for repurpose, basically,
15   repurpose and reassign the computer.
16       Q.    Did there come a time that you
17   used Mr. Iacovacci's LogMeIn credentials
18   to access the Dell OptiPlex?
19       A.    Yes.
20       Q.    How did that come about?
21       A.    Could you clarify which period
22   of time are you talking about?
23       Q.    After you delivered the letter
24   to Mr. Iacovacci on October 14th, did
25   there come a time that you accessed Dell
```

```
                                    Page 181
 1                  Johnny Lan
 2    OptiPlex using Mr. Iacovacci's LogMeIn
 3    credentials?
 4        A.    Yes.
 5        Q.    When was the first time after
 6    Mr. Iacovacci's termination that you did
 7    so?
 8        A.    I believe, it was a couple of
 9    days after the termination.
10        Q.    Who instructed you to do so?
11        A.    Mark Callahan.
12        Q.    Did he tell you in person or by
13    telephone?
14        A.    Sitting here today, I cannot
15    recall the exact method of communication.
16        Q.    Do you recall your reaction to
17    that instruction?
18        A.    No, I do not.
19        Q.    Mark Mr. Lan's February 28, 2020
20    affidavit.
21              (Whereupon, Plaintiff's Exhibit
22        16, Lan affidavit 2-28-20 was marked,
23        for identification, as of this date.)
24        Q.    Do you see it in front of you
25    yet, Mr. Lan, or not?
```

```
                                    Page 182
 1              Johnny Lan
 2     A.    No.  It's still loading.
 3           What Exhibit number is it
 4   supposed to be?
 5     Q.    This will be 16.
 6     A.    It's still not showing up.
 7     Q.    Why don't we do that while it's
 8   loading.
 9           Would you, please, take a look
10   at Lan Exhibit 11.
11     A.    Okay.
12     Q.    If you now look at page 17 of
13   the PDF, looking at the paragraph under
14   the heading "as and for a second
15   affirmative defense?"
16     A.    Yes.
17     Q.    It says "any actions undertaken
18   by defendant, Lan, were taken upon
19   assurances that legal counsel for Brevet
20   had advised that such actions were lawful
21   and authorized.  At all times relevant
22   hereto, defendant, Lan, was acting at the
23   direction of his employer, Brevet, and
24   with the understanding that those
25   directions had been approved by legal
```

```
 1                Johnny Lan
 2   counsel for Brevet;" do you see that?
 3        A.    I see it.
 4        Q.    My question for you is, at the
 5   time you logged into the Dell OptiPlex and
 6   downloaded files using Mr. Iacovacci's
 7   LogMeIn credentials, were you acting with
 8   the understanding and direction that you
 9   had received to do so had been approved by
10   legal counsel for Brevet -- (broken
11   audio) --
12        A.    Your picture is frozen.
13             MR. UNDERWOOD:  You're muted now
14        and, I think, your question may have
15        been broke up a little bit.  You
16        froze.
17             MR. DUMAIN:  My apologies.
18        Q.    My question again was, whether
19   at the time you logged into Mr.
20   Iacovacci's, to the Dell OptiPlex, using
21   Mr. Iacovacci's LogMeIn credentials, you
22   understood that the directions you had
23   been given to do so by your employer,
24   Brevet, had been approved by legal counsel
25   for Brevet?
```

Page 184

1                    Johnny Lan

2       A.     Yes.

3       Q.     Where did the understanding come

4   from that your conduct had been approved

5   by Brevets' legal counsel?

6       A.     My recollection is, it came from

7   a conversation with Mr. Callahan.

8       Q.     Did you finish your answer?

9       A.     Yes.

10      Q.     Do you recall asking

11  Mr. Callahan whether Brevets' lawyers had

12  signed off on the plan to log into Mr.

13  Iacovacci's computer or whether

14  Mr. Callahan volunteered that information?

15      A.     Sitting here today, I cannot

16  recall the exact circumstances or

17  conversations that led to that.

18      Q.     If you had not been given

19  assurances that the course of conduct that

20  you were about to undertake had been

21  approved by legal counsel for Brevet,

22  would you have participated in it?

23           MR. UNDERWOOD:  Object to the

24      form of the question.

25      A.     Again, I generally don't like to

1              Johnny Lan

2  speculate what I would or would not have

3  done.  But in this case, yes, it was part

4  of my duties.

5      Q.    So, as you sit here today, you

6  don't recall that advice as being

7  essential to your decision to follow Mr.

8  Callahan's direction?

9           MR. UNDERWOOD:  Object to the

10      form of the question.

11      A.    No.  I do not recall that.

12      Q.    Aside from Mr. Callahan, was

13  anyone else involved in the conversations

14  about using Mr. Iacovacci's LogMeIn

15  account to gain access to the Dell

16  OptiPlex and download files?

17      A.    I don't know.  My primary point

18  of contact with regard to that procedure

19  was Mr. Callahan.

20           Can I ask for a break?

21      Q.    Sure.

22           Five minutes or 10 minutes?

23           THE REPORTER:  Can we take 10?

24           MR. DUMAIN:  Of course.

25           VIDEOGRAPHER:  The time is 3:43

Page 186

```
 1                    Johnny Lan
 2        p.m. and we're off the record.
 3               (Whereupon, a recess was taken
 4        at this time.)
 5               VIDEOGRAPHER:  The time is 3:54
 6        p.m.  We're back on the record.
 7        A.     Before we continue I would like
 8    to say something.  I was thinking about it
 9    during the break and earlier when I said
10    that I did not like to speculate, and I
11    don't want to speculate on what I would or
12    would not have done, knowing that legal
13    counsel had approved or not.  I just want
14    to reiterate I don't want to speculate.
15    So I would like to leave it at that.
16        Q.     We marked as Lan Exhibit 16, Mr.
17    Lan's February 28, 2020 affidavit.
18        A.     Okay.
19        Q.     Mr. Lan, do you recognize this
20    affidavit?
21        A.     Yes.
22        Q.     Do you recall when you prepared
23    it?
24        A.     Not exactly.
25        Q.     Do you recall what the process
```

1                    Johnny Lan
2    for preparing this affidavit was?
3         A.    As I said before, as is the case
4    with all of my affidavits in this case so
5    far, I conferred with counsel.
6         Q.    And then, what?
7         A.    Then, the affidavit was drafted
8    and finalized, then, executed.
9         Q.    Could you look at paragraph
10   three?
11              Do you recognize that paragraph?
12        A.    I see the paragraph.
13        Q.    Do you recall drafting this
14   paragraph?
15        A.    No.  Sitting here today, I
16   cannot recall drafting the paragraph.
17        Q.    You see again that it contains
18   language stating that you downloaded the
19   files from the Dell OptiPlex that's
20   referred to here with the understanding
21   that the directions you had been given to
22   do so by your supervisors at Brevet had
23   been approved by legal counsel for Brevet,
24   correct?
25        A.    Yes.

1                    Johnny Lan

2       Q.      You signed this affidavit in

3   February of 2020, correct?

4       A.      Yes.

5       Q.      As you sit here today, can you

6   recall whether it was important to you

7   that you had been told that the course of

8   conduct that you were about to undertake

9   had been approved by Brevets' legal

10  counsel?

11      A.      As I sit here today, no, I

12  cannot specifically recall whether that

13  was an important factor.

14      Q.      Do you recall you testified this

15  morning that you did not think about the

16  legality of the course of conduct that you

17  were about to undertake before you

18  followed the directions of your

19  supervisors and downloaded files from the

20  Dell OptiPlex?

21          MR. UNDERWOOD:   Object to the

22      form of the question.

23      A.      Sitting here today, I cannot

24  recall as to what I was thinking of five

25  years ago.

```
 1                  Johnny Lan
 2      Q.    When you signed this affidavit
 3  on February 28, 2020, was it the truth, as
 4  you understood it?
 5      A.    Yes.  It was my understanding.
 6      Q.    Mr. Lan, could you look at
 7  paragraph eight of the affidavit.
 8      A.    Okay.
 9      Q.    You see that paragraph eight
10  states "in late September 2019 counsel
11  informed Brevet" -- and you were surprised
12  to learn -- "that the material you had
13  provided to StoneTurn included material
14  that Iacovacci had claimed was
15  privileged."
16            Let me withdraw it.
17            You may need to look at
18  paragraph seven and eight for the full
19  context, if you haven't.
20      A.    Okay.
21      Q.    So, my question is, why in
22  September 2019 were you surprised to learn
23  that material that you had provided to
24  StoneTurn, which included the files you
25  downloaded in 2016, included material that
```

```
                                         Page 190
 1                Johnny Lan
 2   Iacovacci had claimed was privileged?
 3        A.    I thought through the process
 4   testifying in the case, legal counsel on
 5   both sides, would have taken whatever
 6   steps they needed to take to avoid such a
 7   situation.
 8        Q.    So, you were surprised to learn
 9   at that late point in the litigation there
10   might be privileged material that was
11   circulating among the parties; is that
12   your testimony?
13        A.    Yes.
14        Q.    Do you have access to the copies
15   of the files downloaded in 2016, as you
16   sit here today?
17        A.    As the primary IT administrator,
18   yes.
19        Q.    Does anyone else?
20        A.    Not that I know of.
21              Well, I should also clarify
22   though that at least various parts of the
23   downloaded files have been produced by
24   plaintiff, or, actually, by both sides.
25   So, I can't speak to which legal counsel
```

```
 1                  Johnny Lan
 2   have access to which copies.
 3        Q.    I'm asking a slightly different
 4   question, which is simply this, who has
 5   access to the copy of the files that has
 6   been saved on Brevets' system?
 7        A.    Oh, and just me.
 8        Q.    Are you certain about that?
 9        A.    As much as I can be.
10              I was instructed by our counsel
11   to limit the access.
12        Q.    Are you able to restrict access
13   rights of Mr. Callahan?
14        A.    Yes.
15        Q.    Are you able to limit the access
16   rights of Mr. Monticciolo?
17        A.    Yes.
18        Q.    Is there anyone who's able to
19   limit your access rights?
20        A.    Yes.
21        Q.    Who is that?
22        A.    Our IT provider.
23        Q.    Can we mark, please, as Lan
24   Exhibit 17, if that's available, the
25   November 17, 2017 affidavit of
```

Page 192

1                    Johnny Lan

2    Mr. Callahan?

3              (Whereupon, Plaintiff's Exhibit

4        17, 11-17-17 affidavit was marked, for

5        identification, as of this date.)

6        Q.    Mr. Lan, when you have the

7    Exhibit ready, first, let me know if you

8    recognize the document?

9        A.    I see that it is an affidavit

10   signed by Mark Callahan.

11       Q.    Could you, please, read

12   paragraph five, and let me know when

13   you've completed it?

14       A.    Okay.

15       Q.    Focusing on the second full

16   sentence of the paragraph, which begins

17   with the word "review," toward the bottom

18   of the page.

19              I believe that it says, "review

20   of our Brevets' e-mail server showed that

21   on hundreds of occasions plaintiff

22   forwarded to his personal e-mail accounts

23   confidential e-mails about various

24   clients, potential clients, and

25   transactions, as well as thousands of

1               Johnny Lan
2    client contacts;" do you see that?
3         A.    Yes.
4         Q.    Were you involved in the review
5    of Brevets' e-mail server that
6    Mr. Callahan is referring to in this
7    paragraph five?
8         A.    I do not believe so.
9         Q.    As you sit here, you don't have
10   any recollection of being involved in this
11   review?
12        A.    Correct.  I don't.
13        Q.    Based on your understanding of
14   Mr. Callahan's access rights to Brevets'
15   e-mail server, it would have been
16   possible, as you understand it, for
17   Mr. Callahan to have undertaken this
18   review himself?
19        A.    As I stated earlier, senior
20   management and our compliance department
21   have access to our complete e-mail
22   archives, which they can access directly
23   on their own without my involvement.
24        Q.    Do you have any understanding as
25   to whether or not Mr. Callahan makes a

Page 194

```
 1                    Johnny Lan
 2   practice of accessing that archive?
 3       A.    I'm afraid I can't speak to
 4   that, as he has direct access, so --
 5       Q.    Would there be any record in the
 6   system of Mr. Callahan's having accessed
 7   the e-mail server to undertake this type
 8   of review?
 9       A.    I am not certain if that
10   information is captured or to what degree
11   it is captured.
12       Q.    If we could mark next as Lan
13   Exhibit 18, the October 15, 2019 responses
14   to plaintiff's amended fifth
15   interrogatories.
16            (Whereupon, Plaintiff's Exhibit
17       18, amended interrogatories was
18       marked, for identification, as of this
19       date.)
20       A.    Okay.
21       Q.    Do you see this document?
22       A.    I see the document.
23       Q.    Could you take a moment just to
24   look at it and let me know if you recall
25   having had any role in preparing it?
```

Page 195

```
 1                Johnny Lan
 2      A.    Can I confer with my attorney on
 3  the question of privilege?
 4      Q.    You can.
 5            If you need to confer to answer
 6  my question, with respect to whether you
 7  had a role in preparing this document, you
 8  certainly can.
 9            MR. UNDERWOOD:  We'll be right
10      back.
11            VIDEOGRAPHER:  Should we stay on
12      the record or go off?
13            MR. DUMAIN:  I think, we can
14      stay on.
15            VIDEOGRAPHER:  Okay.
16            (Whereupon, the witness and his
17      attorney left the Zoom.)
18            MR. UNDERWOOD:  Could we have
19      the question back, please?
20            (Whereupon, the record was read
21      back by the reporter.)
22      A.    Yes, I can.
23      Q.    Did you have any role in
24  preparing this document?
25            MR. UNDERWOOD:  Counsel, I'm
```

```
 1              Johnny Lan
 2        concerned that your question starts to
 3        get into work product protection, to
 4        the extent of the witness' particular
 5        involvement with counsel in preparing
 6        discovery responses.  I think, you are
 7        entitled to ask the witness what he
 8        knows about the facts that may be set
 9        forth here, but in terms of how
10        information made its way into the
11        interrogatory response, I think, is
12        covered by work product protection.
13              MR. DUMAIN:  That's fine.
14              MR. UNDERWOOD:  So, I'll let him
15        answer the question you just asked,
16        but I'm not going to let him get into
17        any details about it.
18              MR. DUMAIN:  That's fine.
19              How about we do it this way:
20        Q.    Have you seen this document
21     before today?
22        A.    I might have.  Honestly, I've
23     seen a lot of documents.
24        Q.    Okay.  If I could focus your
25     attention on interrogatory one, which
```

Page 197

1                    Johnny Lan

2    states, "identify and describe each

3    instance, including, dates and times in

4    which you accessed or gained entry into

5    the computer and/or the hard drive of the

6    computer;" and it goes on, do you see

7    that?

8         A.    Yes.  I see it.

9         Q.    Are you aware of any instances

10   after October 18, 2016 where you gained

11   access to the Dell OptiPlex?

12        A.    No, I'm not aware of any

13   instance.

14        Q.    Are you aware of any instance

15   after October 18, 2016 when any Brevet

16   employee or agent gained access to the

17   Dell OptiPlex?

18        A.    Sitting here today, I do not

19   recall the instances.

20        Q.    If I could focus your attention

21   to the bottom of the chart on page five.

22   The entry 10-18-16, 12:59 a.m.?

23        A.    Okay.

24        Q.    Do you recall gaining access to

25   the OptiPlex at or about 1:00 a.m. on the

```
 1                Johnny Lan
 2   morning of October 18, 2016?
 3       A.    Sitting here today, I couldn't
 4   confirm the exact time, but, yes, I do
 5   recall that log in.
 6       Q.    Was it late in the evening?
 7             I'm not trying to pin you down
 8   to 12:59 a.m.
 9       A.    No.
10             I believe, it was toward the
11   evening.
12       Q.    Do you recall whether you were
13   in the office or whether you were working
14   from home?
15       A.    I believe, I was working from
16   home.
17       Q.    Was anybody with you?
18       A.    Not that I can recall.
19       Q.    Were you in telephone contact
20   with anyone while you were gaining access
21   to the OptiPlex?
22       A.    Not that I can recall.
23       Q.    You see the third column in the
24   chart for this entry states "log in to
25   backup the computer after plaintiff failed
```

Page 199

1              Johnny Lan
2   to return it in accordance with
3   defendant's regulatory obligations,
4   including, its obligations as an SEC
5   registered investment advisor;" do you see
6   that?
7        A.    I see it.
8        Q.    At or around the time that you
9   were gaining access to the OptiPlex and
10  downloading files from it, did
11  Mr. Callahan or anyone else say to you
12  that the reason you were doing it was to
13  comply with Brevets' regulatory
14  obligations as an SEC registered
15  investment advisor?
16       A.    I'm sorry.  I think, I missed
17  one or two of your words towards the end
18  of that question.
19       Q.    Sure.  I'll withdrew it and
20  state it again.
21            At or around the time that you
22  were obtaining access to the Dell
23  OptiPlex, on October 18, 2016, did anyone
24  say to you that the reason Brevet was
25  doing this, that is, obtaining access to

Page 200

```
 1              Johnny Lan
 2   the OptiPlex and downloading files from
 3   it, was to comply with Brevets' regulatory
 4   obligations, including, its obligations as
 5   an SEC registered investment advisor?
 6        A.    Sitting here today, not that I
 7   can recall.
 8        Q.    When was the first time you can
 9   recall hearing that the reason that Brevet
10   gained access to the OptiPlex and
11   downloaded files from it was to comply
12   with Brevets' regulatory obligations,
13   including, its obligations as an SEC
14   registered investment advisor?
15        A.    Sitting here today, I really
16   couldn't tell you.
17        Q.    What was your understanding of
18   the reason that you were being asked to
19   use Mr. Iacovacci's LogMeIn account to
20   gain access to the OptiPlex and download
21   files?
22        A.    My understanding is that we were
23   attempting to do our standard process of
24   backing up business data upon an
25   employees' termination.
```

1              Johnny Lan

2     Q.    How did you identify the files

3  to download when you gained access to the

4  OptiPlex at 12:59?

5     A.    I generally browsed through the

6  computer file structure and looked for

7  anything that seemed like it was related

8  to Brevet.

9     Q.    How did you determine whether

10  something seemed like it was related to

11  Brevet?

12     A.    Based on the labels or text of

13  the folders, if it -- like, for example,

14  if it actually said the word Brevet, or if

15  it had the name of a known Brevet counter

16  party.

17     Q.    Did you encounter any open

18  browsers when you logged in?

19     A.    Yes.

20     Q.    What did you do?

21     A.    I saw that -- do you need a

22  minute?

23           I saw that there were -- their

24  Yahoo mail was opened.  I recognized names

25  of counter parties related to Brevet, so,

Page 202

```
1              Johnny Lan
2   I thought to take a photo of that screen.
3      Q.    Is that the end of your answer?
4      A.    Yes.
5      Q.    Did you manipulate the browser
6   at all?
7      A.    No.  I don't remember
8   manipulating the browser.
9      Q.    No, you didn't, or, no, you
10  don't remember having done it?
11     A.    As we agreed earlier, everything
12  I'm testifying to today is to the best of
13  my ability to recall.
14     Q.    Understood.  I don't mean to be
15  argumentative.  But I don't recall having
16  been in Kansas yesterday, and I can tell
17  you to a very high degree of certainty
18  that I wasn't.  That's the kind of
19  analysis I'm asking for from you.
20     A.    I appreciate that, but that's
21  also different than asking if you were in
22  Kansas five years ago.
23     Q.    I know I wasn't.
24     A.    Well, I have family there.
25     Q.    Kansas aside, your testimony is,
```

1                    Johnny Lan

2    so I can understand it, you don't recall

3    manipulating the browser; that's your

4    testimony today?

5         A.     Right.

6         Q.     Did you install the files or

7    software the first time you first gained

8    access at around 12:59 a.m.?

9         A.     Again, I don't recall the exact

10   time, but, yes, if I saw that it would

11   have been part of what I needed to do what

12   I had to do.

13        Q.     Have you ever undertaken an

14   exercise like this before?

15        A.     No.

16        Q.     Was there a reason you began the

17   download at 1:00 in the morning?

18        A.     Yes.

19        Q.     What was that?

20        A.     It was that -- well, Mr.

21   Iacovacci refused to return the computer,

22   so, we had to download a copy of our data

23   remotely.

24        Q.     You were concerned that if you

25   gained access in the middle of the day

```
 1              Johnny Lan
 2   that Mr. Iacovacci would have become aware
 3   of it; is that fair?
 4           MR. UNDERWOOD:  Object to the
 5       form of the question.
 6           MR. DUMAIN:  Let he withdraw it.
 7       Q.    Did you log into the OptiPlex
 8   using Mr. Iacovacci's LogMeIn in the
 9   middle of the night in an effort to avoid
10   detection by Mr. Iacovacci?
11       A.    No.  It wasn't to afford
12   detection, per se.  It was just simply --
13   the way LogMeIn works, is it allows you to
14   operate the computer as if you were
15   sitting in front of it.  So, you cannot be
16   on the machine through LogMeIn while
17   somebody else is also on it at the same
18   time trying to do whatever they want to
19   do.
20       Q.    If you had tried to log in using
21   LogMeIn at the same time Mr. Iacovacci was
22   actively using the OptiPlex, what would
23   have happened?
24       A.    Then, I imagine, neither of us
25   would have been able to accomplish much
```

Page 205

```
 1              Johnny Lan
 2   what we wanted to accomplish on the
 3   computer.
 4       Q.    Would Mr. Iacovacci have been
 5   able to end the LogMeIn session?
 6       A.    I don't know if Mr. Iacovacci
 7   would have been able to.
 8       Q.    Could Mr. Iacovacci have
 9   disconnected the OptiPlex from the
10   internet?
11       A.    I don't like hypotheticals, but
12   I don't know if Mr. Iacovacci knows how to
13   disconnect the internet.
14       Q.    Could Mr. Iacovacci have ended
15   the session by turning the computer off?
16       A.    Again, I can't speak to what Mr.
17   Iacovacci is capable of.
18       Q.    You worked with Mr. Iacovacci
19   for many years, correct, sir?
20       A.    Yes.
21       Q.    In your estimation, was he able
22   of turning a computer off?
23       A.    You may find this hard to
24   believe, but I'm actually not sure.
25       Q.    At or around 2:37 a.m. that
```

1                Johnny Lan

2    evening, October 18, 2016, you again

3    logged into the OptiPlex, correct?

4        A.    I don't have a specific

5    recollection of it, but I see that it is

6    in the records here.

7        Q.    Why was it necessary to log in a

8    second time that evening?

9        A.    I couldn't say for sure, but I

10   was probably waiting for some operation to

11   complete, some coping operation.

12       Q.    Does that mean that the files

13   were running in the background between

14   12:59 a.m., or about, and 2:37 a.m.?

15       A.    Sitting here today, I don't

16   recall.

17       Q.    Did Mr.Koyfman assist you with

18   downloading these files?

19       A.    No.

20       Q.    Where did you transfer the files

21   to?

22       A.    I believe, I transferred them to

23   a USB drive.

24       Q.    Did you make any configuration

25   changes to Mr. Iacovacci's LogMeIn

                    Johnny Lan

1
2  account?
3       A.    No.
4       Q.    Are you certain?
5       A.    Yes.
6       Q.    Did you change the default
7  printer while you were operating on the
8  Dell OptiPlex using Mr. Iacovacci's
9  LogMeIn?
10      A.    No.  Not that I can recall.
11      Q.    Did you delete any files from
12 the desktop of the OptiPlex that evening?
13      A.    No, I don't believe I did.
14      Q.    Did you open any files while you
15 were logged in to the OptiPlex that
16 evening?
17      A.    No.  I don't believe I did.
18      Q.    Other than files, did you save
19 any files on the OptiPlex that evening?
20      A.    I didn't explicitly create any
21 new files on the computer, but through the
22 process of creating backup transfer, I
23 couldn't tell you for sure if certain
24 files were not created at least
25 temporarily.

1              Johnny Lan
2      Q.    Do you recall specifically what
3  password you used to obtain access using
4  Mr. Iacovacci's LogMeIn account?
5      A.    Yes.
6      Q.    What was it?
7      A.    It was the password that Mr.
8  Iacovacci had provided to me over the
9  course of my helping him --
10     Q.    Do you recall --
11     A.    Sorry.
12           Through the course of my helping
13  him remotely on that computer.
14     Q.    Do you recall where you had
15  recorded that password?
16     A.    No.  I do not recall.
17     Q.    When Mr. Callahan approached you
18  about downloading files from Mr.
19  Iacovacci's computer, did he express any
20  concern that you might not be able to gain
21  access?
22     A.    I don't recall that he did.
23     Q.    Do you remember having any
24  conversation with him about how it was
25  that you would be able to gain access

Page 209

```
 1              Johnny Lan
 2  through LogMeIn?
 3       A.    I don't recall any specific
 4  conversation, but we may have talked about
 5  it.
 6       Q.    If you hadn't been in possession
 7  of Mr. Iacovacci's password as a
 8  consequence of you're having worked with
 9  him, would you have been able to use
10  LogMeIn to gain access to the OptiPlex?
11            MR. UNDERWOOD:  Object to the
12       form of the question.
13       A.    No.
14       Q.    You didn't have any type of
15  administrator credentials that would have
16  been sufficient to gain access through
17  LogMeIn, correct?
18       A.    Correct.
19       Q.    As you were logging in, do you
20  remember having any concern that, perhaps,
21  Mr. Iacovacci might have changed the
22  password?
23       A.    I'm not sure I understand you
24  because if he had changed the password how
25  would I have been able to log in?
```

1              Johnny Lan

2        Q.     I'm asking you about that moment

3    between when you typed the password into

4    the field and when you pressed enter, did

5    you have any concern that, perhaps, it

6    wouldn't be the right password?

7        A.     No.  I don't recall having any

8    particular concerns about that.

9        Q.     Do you recall having any plan

10   for what you would try next if Mr.

11   Iacovacci had changed the password?

12       A.     I would have reported, you know,

13   I would have just reported the finding to

14   Mr. Callahan.

15       Q.     When Mr. Callahan directed you

16   to gain access to the OptiPlex, did you

17   tell him that there was a chance that you

18   might not be able to because Mr. Iacovacci

19   might have changed his personal password?

20       A.     No.  I do not recall saying that

21   or asking that.

22       Q.     In your role as head of

23   technology, did you have any compliance

24   obligations?

25       A.     My understanding is that, in my

1                 Johnny Lan

2    role, my job is to help compliance or

3    facilitate compliance being able to do

4    their job when it involves technology.

5         Q.    Did you have any responsibility

6    for helping to draft Brevets' information

7    security handbook?

8         A.    No.  I don't believe I have any

9    specific responsibilities to draft a

10   handbook.

11        Q.    Do you recall whether Brevet had

12   any information technology policies in

13   place before October 14, 2016?

14        A.    Do you mean, like a stand-alone

15   policy?

16        Q.    Stand-alone policy or

17   constituent policies?

18        A.    I understood that Brevet had

19   policies related to technology within a

20   few different policies.

21        Q.    Do you know when Brevet first

22   implemented a cyber security policy?

23        A.    Yes.

24        Q.    When was that?

25        A.    Sitting here today, I cannot

Page 212

1                    Johnny Lan

2     remember the exact year, actually, but I

3     know it was a few years ago.

4               We can't hear you.

5               MR. UNDERWOOD:  Why don't we

6          take five minutes.

7               MR. DUMAIN:  Sure.

8               VIDEOGRAPHER:  The time is now

9          4:49 p.m. and we're going off the

10         record.

11              (Whereupon, a recess was taken

12         at this time.)

13              VIDEOGRAPHER:  The time is 5:07

14         p.m.  We're back on the record.

15         Q.    Good afternoon, Mr. Lan.

16              If you could take a look again

17    at Lan Exhibit 1, which is the 30(b)(6)

18    deposition notice.  Specifically, if you

19    could focus on topic 21, which concerns

20    Brevets' practices, policies, and

21    procedures concerning laptops for use

22    outside of Brevets' physical offices.

23         A.    Okay.

24         Q.    To start, between 2014 and 2017,

25    under what circumstances did Brevet

Page 213

1                      Johnny Lan

2     provide or make available laptops to

3     employees outside of Brevets' physical

4     offices?

5          A.    I would say it was on an as

6     needed or where it makes sense.

7          Q.    Were laptops assigned to

8     specific individuals or were they loaners,

9     so to speak?

10         A.    I believe, at that point, they

11    were typically assigned.

12               Well, let me rephrase.  We did

13    start out originally having a pool of

14    loaner laptops, so to speak.  I believe,

15    throughout that time range that you just

16    referred to, there was like a mix, so,

17    certain laptops were assigned to certain

18    people and we also had a pool.

19         Q.    During that time period, between

20    2014 and 2017, were there any written

21    policies concerning the purchase, or

22    configuration, or service, or repair, or

23    setup, or maintenance, or administration

24    of these laptops?

25         A.    Just to refresh the categories

Page 214

1              Johnny Lan
2     that you spoke of, you said it was
3     purchase --
4          Q.    I can do it one by one.  I was
5     trying to save everyone's time in light of
6     the hour.
7              MR. UNDERWOOD:  I'm just
8          referring him to the 30(b)(6) notice.
9          Because, I think, you just went
10         through the topics that are listed
11         there.
12             MR. DUMAIN:  Yes.  It's written
13         policies about any of the items in
14         21A.
15         A.    Okay.
16             Sitting here today, I don't
17    recall any specific written policies
18    regarding that.
19         Q.    Just so the record is clean,
20    your testimony is that you do not recall
21    any written policies about the items
22    listed in 21A of the 30(b)(6) notice for
23    the period of 2014 to 2017, correct?
24         A.    Yes.
25         Q.    Earlier today you testified

Page 215

1                    Johnny Lan

2    about the practices, Brevets' practices,

3    as it related to computers that were

4    available for use in Brevets' physical

5    offices; do you remember giving that

6    testimony?

7         A.     Right.

8                Computers that were just located

9    in the offices?

10        Q.     Correct.

11        A.     Yes.

12        Q.     Were Brevets' practices for the

13   purchase, or configuration, or service, or

14   repair, setup, maintenance, or

15   administration of laptop computers for use

16   outside of the office any different

17   between 2014 and 2017 than Brevets'

18   policies for the purchase, configuration,

19   service, repair, setup, maintenance, or

20   administration of the work stations at

21   Brevets' physical offices during that time

22   period?

23        A.     Yes, there may have been some

24   difference.

25        Q.     How were Brevets' practices with

1            Johnny Lan

2  respect to the laptop computers different

3  than its practices with respect to the

4  work stations at Brevets' offices between

5  2014 and 2017?

6       A.    I'll try not to get too

7  technical, but as an example, one primary

8  difference is that the desktop computers

9  located in the office were generally

10  joined so to speak to a domain controller

11  server that was physically present in the

12  Brevet office.  Whereas, the computers

13  that were deployed outside of the office

14  were not.

15       Q.    For purposes of topic 21, is it

16  fair to say that the laptops and the work

17  stations were configured differently

18  because the laptops were not always

19  connected directly to Brevets' network?

20       A.    Yes.  The distinguishing factor

21  was more whether the computer was usually

22  located outside of the office or not, not

23  whether it was a laptop or desktop.

24       Q.    From a configuration

25  perspective, what was the difference

Page 217

```
 1              Johnny Lan
 2   between computers that were located
 3   primarily outside the office and those
 4   that were located primarily within the
 5   office?
 6       A.    As I just stated, the computers
 7   located on the premises in the office were
 8   joined to a corporate -- what's called a
 9   domain, whereas, the computers outside of
10   the offices were not.
11       Q.    If you could look at -- before
12   we get there.
13             Was that the only distinguishing
14   factor as it related to laptops or other
15   computers that were outside the office
16   compared to computers that could be found
17   within the office?
18             MR. UNDERWOOD:  Object to the
19        form of the question.
20       A.    Sitting here today, just off the
21   top of my head, that's the primary
22   difference that comes to mind.  I can't
23   tell you for sure if there are others.
24             I couldn't tell you for sure if
25   there were others.  I'm just not recalling
```

Page 218

```
 1                 Johnny Lan
 2   at the moment.
 3       Q.    Look at topic 25 which begins at
 4   the bottom of page 12.
 5             Did Brevet have any written
 6   policies governing remote access to its
 7   network?
 8       A.    Do you mean written policies
 9   that specifically relate to this remote
10   access to Brevets' network or just in
11   general to Brevets' network?
12       Q.    The former.
13             Did Brevet have any written
14   policies relating specifically to remote
15   access to its network?
16       A.    Towards remote -- to the remote
17   access -- (inaudible)
18             No.  I do not recall any
19   specific written policies that relate to
20   this particular item.
21       Q.    What was the functional
22   difference between GoToMyPC and LogMeIn?
23       A.    They function quite similarly.
24       Q.    Do they work in the same
25   direction?
```

Page 219

1                   Johnny Lan
2              MR. UNDERWOOD:   Object to the
3       form of the question.
4       Q.    Sure.
5              GoToMyPC permits a user to
6    access its network computer from outside
7    the network; is that correct?
8       A.    GoToMyPC allows -- the answer is
9    not exactly.
10              GoToMyPC like LogMeIn allows you
11    to access a remote computer from another
12    computer.  It doesn't really have anything
13    to do with whether you're outside or
14    inside the network.
15       Q.    Does LogMeIn operate the same
16    way?
17       A.    Yes.
18       Q.    Scroll up to topic 24, please.
19       A.    Okay.
20       Q.    As of today, does Brevet place
21    any insignia or markings on the outside of
22    computers that it owns?
23       A.    Yes.
24       Q.    When did it start doing that?
25       A.    Sitting here today, I could not

```
                                    Page 220
 1                Johnny Lan
 2   tell you the exact -- I don't recall the
 3   exact time we started doing that, but a
 4   few years ago.
 5        Q.    Why did Brevet start doing that?
 6        A.    Well, for multiple reasons.  As
 7   the firm grew, we had more devices to keep
 8   track of.  So, we placed these barcodes on
 9   the devices.  Frankly, so that there will
10   never be another instance of an employee
11   being confused as to who owns the
12   computer.
13        Q.    That began, as you said, after
14   Mr. Iacovacci left the firm?
15        A.    Yes.
16        Q.    You said Brevet now assigns user
17   barcodes to assign identifiers to
18   equipment it owns; is that correct?
19        A.    Could you repeat that last
20   sentence?
21        Q.    Sure.
22              What's the purpose of barcodes?
23        A.    They uniquely identify the
24   device.
25        Q.    Before Brevet started using
```

1                    Johnny Lan

2    barcodes to uniquely identify the device,

3    did it maintain any kind of log or

4    inventory of computers or other devices

5    that it owned?

6        A.    Yes.

7        Q.    Who maintained that list?

8        A.    The list was, essentially,

9    posted on the Dell website and it

10   contained a list of devices that Brevet

11   had purchased from Dell.

12       Q.    The list of items that Brevet

13   had purchased, when an employee of Brevet

14   turns on his or her work station today in

15   2021, do any disclaimers, or waivers, or

16   log-in matters appear?

17       A.    There are no waivers or

18   disclaimers.  There is a log-in prompt.

19   I'm not sure what you mean by log on

20   banner.

21       Q.    Is there any Brevet logo?

22       A.    No.

23            MR. DUMAIN:  We should probably

24       take 10 minutes to just clean up

25       whatever we have left, then, we can

Page 222

1          Johnny Lan
2      probably wrap up pretty quickly.
3          MR. UNDERWOOD:  Okay.
4          VIDEOGRAPHER:  The time is 5:26
5      p.m. and we're going off the record.
6          (Discussion held off the
7      record.)
8          VIDEOGRAPHER:  The time is 5:32
9      p.m.  We're back on the record.
10     Q.    Hi, Mr. Lan.
11          Earlier today you referenced an
12  e-mail archive that's used by Brevets'
13  compliance and senior management personnel
14  to monitor e-mails; do you recall,
15  generally, that testimony?
16     A.    Yes.
17     Q.    Were you referring to a Global
18  Relay archive?
19     A.    Yes.
20     Q.    What is a Global Relay archive?
21     A.    Global Relay is the name of the
22  vendor.  They run a compliance archives
23  solution that captures e-mails sent and
24  received through the Brevet e-mail system.
25     Q.    It captures all e-mails sent and

1               Johnny Lan

2    received, correct?

3        A.    Yes.

4        Q.    Is that, insofar as you know,

5    without regard to any particular

6    regulatory obligation?

7              MR. UNDERWOOD:   Object to the

8        form of the question.

9              MR. DUMAIN:   Let me state it in

10       a different way.

11       Q.    Do you know whether Brevet is

12   obligated by law to retain every incoming

13   and outgoing e-mail that passes through

14   its system?

15       A.    My understanding is that the

16   regulatory bodies to which Brevet is

17   subject, it requires Brevet to capture

18   certain e-mails.

19       Q.    Do you know with any greater

20   specificity the particular categories of

21   e-mails that Brevet is required to keep

22   pursuant to those regulations?

23       A.    No, I don't.

24       Q.    Do you recall testifying about

25   what you characterized as a bring your own

Page 224

1              Johnny Lan

2    device practice that existed for a time at

3    Brevet?

4         A.     Yes.

5         Q.     What types of devices did the

6    bring your own device practice apply to?

7         A.     Bring your own device,

8    generally, applies to mobile devices.

9         Q.     Did that include iPads?

10        A.     Yes.

11        Q.     And phones?

12        A.     Yes.

13        Q.     How about personal laptops?

14        A.     Yes.

15               While, I believe -- generally --

16   when people say bring your own device, it

17   usually refers to mobile devices, yes.   I

18   do believe personal laptops would

19   certainly fall under that category as

20   well.

21        Q.     Earlier today you testified

22   about configuring computers for use at

23   home by certain Brevet employees; do you

24   recall that, generally?

25        A.     Yes.

Page 225

```
 1              Johnny Lan
 2      Q.    Do you recall creating family
 3  accounts for any of those employees, other
 4  than Mr. Iacovacci and Mr. Callahan?
 5      A.    Sitting here today, I just
 6  recall that that was my practice.  I
 7  cannot recall any other specific instances
 8  at this moment.
 9      Q.    Is Mr. Iacovacci the only Brevet
10  employee for whom you had a record of
11  their LogMeIn password at any time?
12      A.    Sitting here today, I cannot
13  recall if he was the only one.
14      Q.    Was it your general practice to
15  seek permission from a Brevet employee
16  before gaining access to that employees'
17  PC through LogMeIn?
18      A.    I generally don't -- I disagree
19  with the characterization of that.  I
20  don't see it as seeking permission, more
21  as I would log in at the employees'
22  request for help.
23      Q.    Are you done with your answer?
24      A.    Yes.
25      Q.    Aside from the events of Mr.
```

```
1                  Johnny Lan
2    Iacovacci that we had discussed today, do
3    you have any memory of ever using LogMeIn
4    to log in into another Brevet employees'
5    PC without notice to them?
6         A.     While I cannot, sitting here
7    today, recall specific occurrences, I do
8    believe I have done that in the past.
9         Q.     When you logged into Mr.
10   Iacovacci's computer on October 18, 2016
11   using his password, you didn't understand
12   him to have consented to that access by
13   virtue of his having shared his password
14   with you in the past, did you?
15             MR. UNDERWOOD:  Object to the
16        form of the question.
17        A.     As I stated before, I do not
18   view these company issued computers as
19   requiring permission or consent from the
20   user for me to remote in and perform IT
21   duties.
22        Q.     Whether or not you thought you
23   needed consent, did you understand Mr.
24   Iacovacci to have given his consent?
25             MR. UNDERWOOD:  Object to the
```

Page 227

```
 1                   Johnny Lan
 2        form of the question.
 3        A.    I can't speak to Mr.
 4   Iacovacci's -- what he was thinking.
 5        Q.    If you look at Exhibit 14, which
 6   was the e-mail exchange concerning the
 7   download of Mr. Iacovacci's contacts for
 8   Mr. Callahan, you'll see that a person
 9   named Nicholas was included on that e-mail
10   chain.
11             Do you know who Nicholas was?
12        A.    Can you pinpoint the location?
13             I don't believe I see that on
14   the screen.
15        Q.    There's a reference in that
16   e-mail toward the bottom of the page
17   ending in Bates number 16.  "There's no
18   automated export when sub folders are
19   involved so Nicholas helped piece this
20   together manually."
21        A.    So, going back, can you repeat
22   the question?
23        Q.    Who is Nicholas?
24        A.    He was an employee at Brevet.
25        Q.    What was his job function?
```

```
 1                Johnny Lan
 2      A.    I believe, he was an analyst.
 3      Q.    Do you recall his last name?
 4      A.    Yes.
 5      Q.    What is it?
 6      A.    Flemming.
 7      Q.    Does Nicholas Flemming still
 8  work at Brevet?
 9      A.    Klemming, with a K.
10      Q.    Does Nicholas Klemming still
11  work at Brevet?
12      A.    No.
13      Q.    Do you know where he works
14  today?
15      A.    No.
16      Q.    Are you familiar with the term
17  persistent VPN?
18      A.    Not off the top of my head.
19      Q.    So, you don't know whether the
20  Callahan laptop from 2016 has a persistent
21  VPN?
22      A.    Yeah, I'm not sure what that
23  term means in this context.
24      Q.    Are you familiar with LogMeIn
25  logs?
```

Page 229

1                    Johnny Lan

2      A.     Yes.

3      Q.     What is a LogMeIn log?

4      A.     I believe, they are logs that

5   the LogMeIn program produces.

6      Q.     Does it capture the IP address

7   from the accessing computer?

8      A.     I just generally know what

9   LogMeIn logs are.  I'm not familiar with

10  the details of what they capture or not.

11     Q.     When you were downloading files

12  on October 18, 2016 from the OptiPlex, you

13  downloaded the files onto a USB drive,

14  correct?

15     A.     Yes.

16     Q.     What computer was that USB drive

17  plugged into at the time you were

18  downloading the files?

19     A.     I believe, it was a computer I

20  had at home.

21     Q.     Was it a Brevet owned computer?

22     A.     I don't believe so.

23     Q.     Were you connected to the Brevet

24  network through GoToMyPC?

25     A.     Sitting here today, I do not

```
1                Johnny Lan
2  recall the exact software I used to
3  connect to the Brevet network.
4      Q.    Were you connected to the Brevet
5  network at the time you accessed the
6  OptiPlex on October 18, 2016?
7      A.    I believe so.
8      Q.    Would you have needed to be
9  connected to the Brevet network to access
10 the OptiPlex through LogMeIn?
11     A.    I'm not sure.
12           MR. DUMAIN:  Those are all the
13      questions I have this afternoon,
14      subject to any redirect from Mr.
15      Underwood.
16           MR. UNDERWOOD:  I don't have any
17      questions at this time.
18           MR. DUMAIN:  Thank you for your
19      time today, Mr. Lan.
20           THE WITNESS:  Thank you.
21           MR. UNDERWOOD:  Thank you, Ian.
22           VIDEOGRAPHER:  The time is 5:51
23      p.m.  We're going off the record.
24           (TIME NOTED:  5:51 P.M.)
25
```

Page 231

1          Johnny Lan

2        A C K N O W L E D G E M E N T

3   STATE OF NEW YORK)

4                        :ss

5   COUNTY OF NEW YORK)

6

7      I, JOHNNY LAN, hereby certify that I

8   have read the transcript of my testimony

9   taken under oath on October 1, 2021, that

10   the transcript is a true, complete and

11   correct record of what was asked, answered

12   and said during my testimony under oath,

13   and that the answers on the record as

14   given by me are true and correct.

15

16        _____

17              JOHNNY LAN

18

19   Signed and subscribed to

20   before me, this _____ day

21   of _____, _____.

22

23   _____

24   Notary Public

25

Page 232

```
                              I N D E X


WITNESS                  EXAMINATION BY          PAGE
Johnny Lan            Mr. Dumain                 15


                         EXHIBIT
PLAINTIFF'S           DESCRIPTION                PAGE
Exhibit 1   Rule 30(b)(6) notice          24

Exhibit 2   LinkedIn profile              43

Exhibit 3   employee handbook             72

Exhibit 4   November 17, 2017             84
            affidavit
Exhibit 5   150464                        112

Exhibit 6   150452                        117

Exhibit 7   150533                        129

Exhibit 8   150621                        141

Exhibit 9   150622                        142
```

Page 233

1

2

3   Exhibit 10   software application list   145

4

5   Exhibit 11   7-23-19 Answer               148

6

7   Exhibit 12   2-16-21 Lan affidavit        153

8

9   Exhibit 13   026779                       168

10

11  Exhibit 14   029916                       171

12

13  Exhibit 15   Brevet New 029918            172

14

15  Exhibit 16   Lan affidavit 2-28-20        181

16

17  Exhibit 17   11-17-17 affidavit           192

18

19  Exhibit 18   amended interrogatories      194

20

21

22

23

24

25

Page 234

1

2                    C E R T I F I C A T E

3

4           I, TRACIE SHAND, a shorthand

5      reporter and Notary Public within and

6      for the State of New York, do hereby

7      certify:

8           That the witness(es) whose

9      testimony is hereinbefore set forth

10     was duly sworn by me, and the

11     foregoing transcript is a true record

12     of the testimony given by such

13     witness(es).

14           I further certify that I am not

15     related to any of the parties to this

16     action by blood or marriage, and that

17     I am in no way interested in the

18     outcome of this matter.

19

20

21

22              _Tracie Shand_

23         TRACIE SHAND

24

25

Page 235

1
2                                   **ERRATA SHEET**
   **CASE NAME:**_____
3
   **DATE OF DEPOSITION:**_____
4
   **NAME OF WITNESS:**_____
5
   **PAGE     LINE**
6  _____     _____        **CHANGE:**_____
                          **REASON:**_____
7

   _____     _____
8
   **CHANGE:**_____
9                          **REASON:**_____
10 _____     _____
11 **CHANGE:**_____
                          **REASON:**_____
12

   _____     _____
13 **CHANGE:**_____
                          **REASON:**_____
14

   _____     _____
15
   **CHANGE:**_____
16                         **REASON:**_____
                          _____
17                              **WITNESS SIGNATURE**
   **Signed and subscribed to**
18 **before me, this _____ day**
   **of _____, _____.**
19
   _____
20 **Notary Public**
21              **My Commission Expires _____**
22
23
24
25

| & | | |
|---|---|---|
| **&** 2:7 14:25 | | |

**0**

**026779** 168:20,22
  233:9
**029916** 171:22,24
  233:11
**029918** 172:10,13
  233:13
**08048** 1:4 5:13
  7:18 10:2 12:3
**09/24/21** 5:14 7:19
  10:3 12:4

**1**

**1** 1:13 4:12 5:14
  13:24 24:3,8 55:9
  78:6,17 103:23
  212:17 231:9
  232:9
**10** 52:24 54:24
  99:20 100:2
  133:21 134:2,7
  140:25 145:23,25
  146:25 153:25
  185:22,23 221:24
  233:3
**10-18-16** 197:22
**10006** 2:5
**101** 12:25
**1017** 16:3 21:4
**10606** 2:9
**10th** 2:8
**11** 24:21 148:12,15
  151:18 182:10
  233:5
**11-17-17** 192:4
  233:17
**11101** 16:5 21:5
**112** 232:17

**117** 232:19
**11:28** 100:6
**12** 55:14 153:21
  218:4 233:7
**129** 232:21
**12:00** 10:8 11:5
**12:30** 99:23
**12:38** 125:4
**12:45** 100:3
**12:59** 197:22
  198:8 201:4 203:8
  206:14
**13** 8:2 168:18,22
  233:9
**14** 8:17 171:20,24
  176:19 177:2
  211:13 227:5
  233:11
**141** 232:23
**142** 232:25
**145** 233:3
**148** 233:5
**14th** 180:24
**15** 9:3 111:24
  114:2 117:3 172:9
  172:13 174:23
  194:13 232:5
  233:13
**150452** 117:4,15
  232:19
**150464** 111:25
  112:3,5 232:17
**150533** 129:6,8
  232:21
**150621** 141:18,22
  232:23
**150622** 141:25
  142:3 232:25
**15222** 2:13
**153** 233:7

**16** 9:15 146:25
  147:13 153:19
  154:13,17 181:22
  182:5 186:16
  227:17 233:15
**16.i** 12:10
**168** 233:9
**17** 12:8 84:2,5
  86:7 127:23
  182:12 191:24,25
  192:4 232:15
  233:17
**17003** 234:22
**171** 233:11
**172** 233:13
**18** 12:22 29:22
  30:13 194:13,17
  197:10,15 198:2
  199:23 206:2
  226:10 229:12
  230:6 233:19
**181** 233:15
**19** 4:3 13:2 24:22
  25:2,10,22
**192** 233:17
**194** 233:19
**1:00** 197:25
  203:17
**1:18** 1:4 5:13 7:18
  10:2 12:3
**1:40** 127:16

**2**

**2** 4:21 6:6 7:19
  12:12 43:7 72:8
  232:11
**2-16-21** 153:21
  233:7
**2-28-20** 181:22
  233:15
**20** 13:10 103:25

**2008** 41:23 43:22
**2013** 43:23
**2014** 44:6,12 45:8
  45:20 46:9 91:11
  91:22 110:6
  111:17,24 114:2
  117:3 212:24
  213:20 214:23
  215:17 216:5
**2015** 62:11 72:11
  119:22 121:7
  126:21 127:9
  128:12 129:22
  130:5,8 131:15
  134:16 137:16,22
  141:3,21 156:17
  158:5 160:3
**2016** 29:23 30:13
  33:3,6 83:17,23
  156:19 158:5
  160:21,23 161:3
  162:6 163:17
  164:3 167:9
  169:10 170:13
  172:21 176:20
  177:2 189:25
  190:15 197:10,15
  198:2 199:23
  206:2 211:13
  226:10 228:20
  229:12 230:6
**2017** 84:2,5 86:7
  91:12,22 110:6
  111:17 127:23
  136:25 159:16
  160:3 191:25
  212:24 213:20
  214:23 215:17
  216:5 232:15
**2018** 38:23

**[2019 - account]**                                    Page 2

**2019** 48:9 148:12
189:10,22 194:13
**2020** 49:7 154:14
181:19 186:17
188:3 189:3
**2021** 1:13 13:24
49:14 153:19
154:17 160:7
221:15 231:9
**21** 13:16 212:19
216:15
**21a** 214:14,22
**22** 55:13
**225** 2:13
**22b** 78:7,21,21
**23** 148:12
**234** 5:13 7:18 10:2
12:4
**24** 147:2 219:18
232:9
**25** 24:22 25:3,10
25:22 146:25
147:13 169:10
218:3
**26th** 172:21
**28** 6:6 181:19
186:17 189:3
**2:37** 205:25
206:14

**3**

**3** 5:6 6:17 72:13
131:15 232:13
**30** 1:19 4:15 6:17
24:3,8 27:11,21
52:23 53:10 54:4
54:12,16 103:24
212:17 214:8,22
232:9
**360** 51:24 52:2,4
**38** 72:25

**3rd** 2:4

**4**

**4** 4:15 5:19 10:3
84:2,5 92:14
96:13 100:15
127:25 131:10
151:19 176:3
232:15
**42** 148:20 149:2,14
**43** 232:11
**45** 9:7
**4:49** 212:9

**5**

**5** 4:17 6:3 12:4
111:24 112:3,7
117:18 119:8
123:16 232:17
**50** 2:8
**55** 2:4
**5a** 16:4 21:5

**6**

**6** 1:19 6:14 24:3,8
27:11,21 52:23
53:10 54:4,12,16
103:24 117:3,15
212:17 214:8,22
232:9,19
**6700** 175:14
**6765** 175:10

**7**

**7** 7:2 129:5,8
133:19 232:21
**7-23-19** 148:15
233:5
**72** 5:14 232:13
**73** 7:19
**75** 10:3
**76** 12:4

**7th** 141:20

**8**

**8** 7:13 141:16,18
142:5 232:23
**84** 232:15
**8:30** 1:14
**8:42** 13:23

**9**

**9** 141:16,23 142:3
142:15 232:25

**a**

**a.m.** 1:14 13:23
55:3,7 100:6
197:22,25 198:8
203:8 205:25
206:14,14
**abacus** 69:14,15
**ability** 85:11
202:13
**able** 18:22 54:13
54:22 68:21 71:19
83:12 88:10 90:15
105:19 106:21
137:11 143:23
156:7 160:19
162:7 175:6
191:12,15,18
204:25 205:5,7,21
208:20,25 209:9
209:25 210:18
211:3
**absolute** 148:8
**absolutely** 139:22
163:13
**abuse** 46:15
**acceded** 149:11
150:4
**acceding** 149:22
150:9

**accept** 175:10
**access** 4:24 29:23
30:14 82:7,15
88:23 90:8,10,15
109:25 113:9,14
114:17 115:2,7
116:13,18,21
118:20,24 134:21
139:3 143:13,20
167:21 168:3,12
180:2,11,18
185:15 190:14
191:2,5,11,12,15
191:19 193:14,21
193:22 194:4
197:11,16,24
198:20 199:9,22
199:25 200:10,20
201:3 203:8,25
208:3,21,25
209:10,16 210:16
218:6,10,15,17
219:6,11 225:16
226:12 230:9
**accessed** 31:20
32:3 118:11
180:25 194:6
197:4 230:5
**accessible** 12:7
**accessing** 114:4
194:2 229:7
**accomplish** 156:13
204:25 205:2
**account** 40:25
117:22,23 118:14
121:16 122:25
136:16 141:14
151:12 152:7
157:24 158:4,14
185:15 200:19
207:2 208:4

accounts 88:23 89:15 138:7 139:17 140:16,22 141:4 192:22 225:3

accuracy 6:25

accurate 43:19 44:4 125:18 149:20 171:10 175:12

accurately 75:22 149:16

acquire 58:25 128:9 132:7,12

acquired 62:17 63:16,21 69:18

acquisition 93:11

act 46:15

acting 182:22 183:7

action 1:16 14:10 15:7 21:17 234:16

actions 182:17,20

active 170:2

actively 204:22

activity 80:21 82:20 85:13 93:8 111:10

actual 37:24 46:17

ad 59:6

add 89:14 130:15

additional 62:2 147:8

address 16:2 21:2 27:11 229:6

addresses 57:23

administer 3:16 6:7

administered 6:10

administering 9:16

administration 58:12 69:22 70:5 70:18,19,24,24 104:23 105:6 213:23 215:15,20

administrative 141:5 149:9,13,18

administrator 70:17 71:4,11,12 71:15,18 109:22 109:25 142:25 143:13,20 190:17 209:15

advance 8:10 12:20 167:22

advice 31:19 120:22 185:6

advised 182:20

advisor 199:5,15 200:5,14

advisory 120:8,15 120:20

affidavit 84:2,5 86:7,10,12,18 92:25 96:12,13 99:5 127:23 131:10,12 133:2 136:24 137:3 138:6 141:2 153:19,21 154:16 154:19,23 155:4 159:16,22 160:7 160:12,18 176:22 176:25 181:20,22 186:17,20 187:2,7 188:2 189:2,7 191:25 192:4,9 232:16 233:7,15 233:17

affidavits 187:4

affiliations 14:14

affirmative 182:15

afford 204:11

affording 180:6

afraid 194:3

afternoon 126:14 212:15 230:13

agent 197:16

agio 69:13,13,14

ago 17:8 23:21 33:8 95:25 96:7 114:23 147:11,20 160:14 188:25 202:22 212:3 220:4

agree 4:12 5:6,19 6:3,8 7:2,6 9:3,15 20:16

agreeable 125:8

agreed 3:5,10,14 4:9,13 202:11

agreement 13:18

ahead 18:4 69:9

al 1:9 14:3

allow 4:5 5:2 8:25 16:20 71:15 145:15

allowed 89:4,16 116:15

allowing 143:25 144:10,15

allows 88:21,22 113:8 116:10 204:13 219:8,10

alternative 12:18

amended 194:14 194:17 233:19

amount 60:17 135:23

analysis 42:13 202:19

analyst 44:18,20 44:23 45:14 228:2

announced 167:10

announcement 112:21

announces 167:18

answer 4:20 18:4 18:5,18 19:5 26:22 29:21 35:22 35:23 51:10 54:14 54:22 56:10,14 58:8 69:10 75:18 79:16 88:10 94:25 108:12 140:6 148:13,15,23 154:25 171:5,7 184:8 195:5 196:15 202:3 219:8 225:23 233:5

answerable 52:10

answered 71:10 99:17 231:11

answers 231:13

anticipate 54:2

anybody 51:17 151:15 163:2 198:17

anyone's 124:15

apart 58:9 65:10

apartment 16:4 21:4 177:6

apologies 95:2 144:8 183:17

apologize 19:5

apologizes 41:18

apparel 45:15

appear 7:19,21,23 8:4 13:13 43:4 114:12 131:21 136:20 221:16

**appearance** 14:17
**appearances** 14:13
**appears** 76:24 112:19 119:20 121:10 132:3 142:13 175:4
**application** 115:21 145:25 148:2 233:3
**applications** 63:9 71:24,25 146:5,9 146:11,14,21,22
**applies** 9:4 54:3 76:14 224:8
**apply** 224:6
**appreciate** 202:20
**approached** 208:17
**appropriate** 13:17 13:20
**approval** 4:11 106:24 128:9
**approved** 58:24 132:7,12 182:25 183:9,24 184:4,21 186:13 187:23 188:9
**approximately** 38:23 44:3
**archive** 83:13,16 84:19,22 85:3,15 194:2 222:12,18 222:20
**archives** 193:22 222:22
**area** 48:23
**areas** 116:18,21
**argumentative** 202:15

**arises** 106:21
**aside** 20:8,19 22:2 22:6 23:3,20 89:19 124:19 185:12 202:25 225:25
**asked** 36:4,10 38:2 169:14,19 173:10 173:25 174:10 196:15 200:18 231:11
**asking** 31:8 32:12 36:6,8,16 47:7 48:21 61:15 66:9 68:15 70:20,21 71:2 75:7 77:20 79:9 85:21,22 96:7 99:18 102:13 102:15 118:12,17 143:8,9 147:3 154:20 169:8 170:6 172:22 177:23,25 184:10 191:3 202:19,21 210:2,21
**assign** 220:17
**assigned** 42:2 213:7,11,17
**assigns** 220:16
**assist** 42:10 64:24 206:17
**assistance** 84:13
**assisted** 93:25
**assisting** 42:6 83:14 148:9
**association** 14:7
**assuming** 124:13
**assumption** 94:15
**assurances** 182:19 184:19

**attached** 151:13
**attachment** 172:11
**attachments** 91:18 92:3
**attack** 46:21,23,25
**attempt** 136:2 165:17 179:21
**attempting** 46:25 132:20 200:23
**attend** 5:23
**attending** 5:8
**attention** 120:2 131:14 138:5 196:25 197:20
**attorney** 14:18 17:23,23 19:23 26:25 195:2,17
**attorney's** 19:17
**attorneys** 2:4,12 3:5 21:16 23:9 26:9,11 27:20 69:5 87:4
**audio** 8:6 183:11
**august** 49:14
**authorized** 3:16 182:21
**automated** 227:18
**automatic** 67:14 134:13 155:25
**automatically** 66:18 134:6
**available** 8:23 12:5 13:12 191:24 213:2 215:4
**avenue** 2:13 16:4 21:4
**avoid** 5:16 190:6 204:9
**aware** 18:21 20:3 60:18,21 80:14

81:4,10,14 82:6,18 82:23 85:6,17 93:5 95:9,12,15,18 98:4,16 106:4 140:18 158:2,8 159:7 163:8 168:10 197:9,12 197:14 204:2

**b**

**b** 1:19 4:15 6:17 15:11 24:3,8 27:11,21 52:23 53:10 54:4,12,16 103:24 168:19 212:17 214:8,22 232:9
**bachelors** 47:11
**back** 30:9 33:14 44:17 55:7 56:10 56:16 78:11,16 80:4 87:25 88:6,6 88:9 90:11 100:11 110:23,25 111:5 123:16 126:13 127:21 132:25 133:3 145:5 154:11 158:17 178:11,25 186:6 195:10,19,21 212:14 222:9 227:21
**backed** 166:2
**background** 41:16 47:5 206:13
**backing** 200:24
**backup** 30:25 59:23 103:16,19 164:8,10 166:8 180:12 198:25 207:22

| | | | |
|---|---|---|---|
| **backwards** 68:18 | 98:17,22 120:16 | 186:9 | 98:14 99:10 |
| **bandwidth** 5:16 | 127:3,11,24 | **breaks** 18:16 | 100:24 101:8,17 |
| 8:6 | 132:14,19 133:13 | **brevet** 1:9 14:3 | 101:22 104:5 |
| **banging** 41:15 | 133:19 135:24 | 15:7 22:15,18,20 | 105:4,7,8,17,18 |
| 144:7 | 136:4 138:25 | 23:5 25:9,13,21 | 106:2,8,14 107:22 |
| **banner** 221:20 | 140:14 141:8,16 | 26:7 27:24 28:6 | 108:11,25 110:14 |
| **barcodes** 220:8,17 | 143:15 155:8 | 28:13,15,19 29:17 | 110:19 111:12,13 |
| 220:22 221:2 | 157:9 158:16,22 | 31:2 32:21 33:22 | 111:17,18,25 |
| **based** 90:5 94:12 | 160:2 168:18 | 34:13,14,20 35:3 | 113:13,14,18 |
| 97:6 193:13 | 176:15 179:7 | 35:13 36:3,5,7,8 | 114:2,4,9,10,17,18 |
| 201:12 | 180:4 181:8 | 36:10,16,18,20,22 | 114:25 115:6,8,12 |
| **basically** 161:13 | 192:19 193:8 | 36:25 37:9,16,22 | 115:23 117:4 |
| 180:14 | 198:10,15 205:24 | 38:3,7,9,15,20,21 | 118:7,10,18,24 |
| **basis** 7:8 44:24 | 206:22 207:13,17 | 38:25 39:2,4,7,14 | 120:21 121:16,22 |
| 59:7 61:18 92:24 | 211:8 213:10,14 | 39:15,17,24 40:2,3 | 122:4,15,24 123:7 |
| 93:3 97:3 161:6 | 224:15,18 226:8 | 40:7,8,13,16,18,24 | 124:24 126:24 |
| 162:2 | 227:13 228:2 | 41:11,13,22 42:4,7 | 129:5 130:8 |
| **bates** 111:25 112:5 | 229:4,19,22 230:7 | 43:15 44:2,7 46:8 | 133:14,15 135:4 |
| 171:21 172:10 | **belong** 96:15,22 | 50:6,7,12,14,17,21 | 137:5,15,22,24 |
| 227:17 | 97:4,9 | 50:22,25 51:6,9,12 | 139:4,7,7,8,12,13 |
| **becoming** 142:25 | **benefit** 77:13,23 | 51:19 52:8,15,19 | 139:16,21,24 |
| **began** 67:2,3 91:9 | **best** 32:20 44:25 | 55:20 59:21 60:24 | 140:11,18,21 |
| 203:16 220:13 | 62:14 91:13 94:13 | 61:2 65:5,12 | 141:22,25 144:16 |
| **beginning** 14:17 | 96:2 149:19 | 66:22 67:3,6,20 | 145:10 146:10,23 |
| 52:17 133:22 | 156:12 165:18 | 69:21 72:9,24 | 146:23 147:4,5,7,9 |
| 176:8 | 167:3 202:12 | 73:15 74:25 75:2 | 147:14,17,25 |
| **begins** 10:17 11:20 | **better** 154:5 160:3 | 75:13 76:15,22 | 149:8 150:6,15 |
| 73:21 192:16 | **bible** 148:3 | 77:24 79:17,22 | 152:14,24 153:3 |
| 218:3 | **bit** 53:21 183:15 | 80:8,12,15,16 81:3 | 153:13 155:12,15 |
| **behal** 15:10 19:24 | **block** 41:3,7,9,11 | 81:5,10,11,19 | 155:20 156:10,19 |
| **behalf** 25:21 26:6 | **blood** 234:16 | 82:12,20,21,24 | 157:2,14,23 158:3 |
| 27:24 | **bodies** 223:16 | 84:12,12,21 85:2,5 | 162:12,21 163:3 |
| **believe** 21:21 | **bottom** 168:25 | 85:18 87:12,12,16 | 163:17 164:3 |
| 22:14,22 27:15 | 175:7 192:17 | 87:17,22 88:23 | 166:21 167:11,19 |
| 32:17 34:13 36:19 | 197:21 218:4 | 89:6,15,17,19,21 | 167:20 168:19 |
| 37:23 41:12,23,25 | 227:16 | 90:7 91:3,4,15 | 169:21 170:2,3,8 |
| 42:20 44:7 50:23 | **break** 18:15,19 | 92:2,15 93:5,9,12 | 170:13,23,25 |
| 51:23 61:14 75:4 | 41:18 52:25 58:8 | 93:14,24 94:22 | 171:21 172:10,13 |
| 78:3 80:11 86:16 | 65:10 99:13,22 | 95:8,11,14,17,21 | 173:15 174:2,11 |
| 91:14,23 92:8 | 125:6 144:14 | 95:23 96:15,23 | 177:8,13,18 |
| 95:22 96:4 97:11 | 153:24 185:20 | 97:5,10,19 98:12 | 182:19,23 183:2 |

183:10,24,25
184:21 187:22,23
189:11 197:15
199:24 200:9
201:8,11,14,15,25
211:11,18,21
212:25 216:12
218:5,13 219:20
220:5,16,25
221:10,12,13,21
222:24 223:11,16
223:17,21 224:3
224:23 225:9,15
226:4 227:24
228:8,11 229:21
229:23 230:3,4,9
233:13
**brevet's** 30:7 56:7
111:7
**brevets** 45:7 55:17
56:23 57:6,12,20
58:2,12,19 59:6
61:12,17 63:24
64:8 65:13,19
66:13 68:3 70:6
71:6 75:8,10 76:9
76:11,17,23 77:12
77:22 78:8 79:24
80:9,17 81:6,12
82:8,21 85:13
87:10 88:23 90:8
97:7,22 120:17,18
121:3,6 133:7,8,12
136:16 137:25
139:6 144:4,17
145:12 156:24,25
157:15 168:12
180:2,11 184:5,11
188:9 191:6
192:20 193:5,14
199:13 200:3,12

211:6 212:20,22
213:3 215:2,4,12
215:17,21,25
216:4,19 218:10
218:11 222:12
**briefly** 24:22 47:4
48:11
**bring** 20:4 88:17
88:20 90:18,25
91:2 169:14 170:7
223:25 224:6,7,16
**broad** 64:10
**broadway** 2:4
**broke** 100:14
183:15
**broken** 183:10
**brothers** 44:15
45:3
**brought** 28:5
**browsed** 201:5
**browser** 202:5,8
203:3
**browsers** 201:18
**brut** 46:21,23,24
**built** 108:24
**bulk** 59:13,18
61:12 62:5,7
108:19
**bullet** 123:23
**business** 10:8 11:5
12:12 34:14,18
36:11 59:24 61:21
61:25 68:24 89:21
92:18 103:16
111:13,19 114:10
120:8,15,17,19
121:3,7,9,17,23
122:17,18 128:20
129:21 134:19
138:9,17 139:9,13
140:2,13 165:8,10

165:15,15,19,20
165:24 166:9
180:12 200:24
**buy** 61:24

**c**

**c** 2:2 231:2 234:2,2
**calendar** 90:9
**calendars** 90:20
**call** 164:12
**callahan** 30:21,22
30:24 31:4,9,13
52:21 94:18
131:25 158:13
160:15,21 161:11
161:15 162:5
172:20,24 173:12
173:14,17,24
174:4,9,13,18,21
175:16 179:8
181:11 184:7,11
184:14 185:12,19
191:13 192:2,10
193:6,17,25
199:11 208:17
210:14,15 225:4
227:8 228:20
**callahan's** 158:10
158:20 159:2
179:13 185:8
193:14 194:6
**called** 69:12,16,17
69:19 134:9 138:8
138:10 148:2
217:8
**capable** 205:17
**capacity** 27:6
39:25 51:18 52:8
53:16 54:14
179:23
**capital** 25:13,21
26:7 27:24 37:9

37:22 43:15
**capture** 223:17
229:6,10
**captured** 194:10
194:11
**captures** 85:15
222:23,25
**career** 44:16
**carries** 87:7
**case** 1:4 5:13 7:18
9:25 12:3 17:24
20:2,5 21:10,14
22:13 23:18 24:4
35:18 69:4 75:24
77:22 78:4 79:7
108:3,4 148:13
153:8 185:3 187:3
187:4 190:4 235:2
**cases** 60:16
**categories** 213:25
223:20
**category** 53:19
164:22 224:19
**caused** 49:15
118:9,17
**cease** 38:19
**certain** 4:5 60:15
116:18 136:21
147:24 148:4
152:16 165:3
166:13 191:8
194:9 207:4,23
213:17,17 223:18
224:23
**certainly** 97:22
109:15 142:13
152:17 153:6
162:18 195:8
224:19
**certainty** 148:8
202:17

**certification** 3:7
49:16,22 50:2
**certifications** 49:6
49:11
**certify** 12:19
231:7 234:7,14
**chain** 117:13,19
131:17,24 227:10
**challenge** 6:9
**chance** 24:23
138:22 210:17
**change** 44:5 62:8
141:7 153:14
162:3 207:6 235:6
235:8,11,13,15
**changed** 64:16
65:21 71:6 77:8
81:23,25 90:2,4
107:6,7 108:7
140:5 209:21,24
210:11,19
**changes** 65:20
86:22 119:5
206:25
**characterization**
113:22 225:19
**characterized**
177:7 223:25
**chart** 197:21
198:24
**chat** 11:25
**check** 20:17
**cheers** 119:10
**children** 159:8
**choose** 9:19 10:22
11:21
**circulating** 190:11
**circumstances** 4:2
51:4 61:16,23
65:3 184:16
212:25

**cisco** 177:8
**city** 16:5 21:5
**civil** 1:18 4:15 6:5
6:17 9:6
**claimed** 189:14
190:2
**claims** 28:4
**clarification** 56:18
71:3
**clarify** 25:14
36:17 57:13 88:2
94:6 113:21
165:21 169:24
180:21 190:21
**clause** 79:15
**clean** 214:19
221:24
**clear** 34:24,25
57:9 82:3 83:21
97:24 101:9
118:12 156:15
163:13 166:3
**clearer** 53:22
**clearly** 147:10
**client** 26:25 193:2
**clients** 50:19 77:15
192:24,24
**close** 93:19
**colin** 2:14 15:5
19:23 52:22 56:19
**collaborative** 9:8
**colleague** 14:22
15:10 28:12 70:8
166:17
**collect** 179:21
**collective** 39:2,18
**college** 45:25 46:3
**columbia** 48:8
**column** 198:23
**combinations** 47:2

**come** 60:7 166:19
172:4 176:5,10
180:16,20,25
184:3
**comes** 72:3 95:5
163:11 217:22
**commencement**
11:15
**commission**
235:21
**common** 131:3
**communicate**
120:7 179:9
**communicated**
179:7
**communication**
123:18 134:12
181:15
**communications**
79:18,23 80:16,24
81:15,18 82:8,20
82:25 85:4,16,19
110:13 111:8
142:10
**company** 33:11
73:10,10,22 74:3
74:14,14 76:6,11
77:14,15 90:16
97:18 113:10,11
116:11,12,14,18
120:10 123:22
143:17 167:21
177:25 226:18
**company's** 123:21
**compared** 217:16
**competent** 18:23
19:8
**complained** 149:8
**complaint** 149:3
**complete** 12:2
99:15 108:12

193:21 206:11
231:10
**completed** 8:21
112:13 169:2
192:13
**completion** 8:19
9:2 12:13
**compliance** 81:14
81:17,22 82:4,6,9
82:17,24 83:12,15
98:25 124:14,18
124:20 193:20
210:23 211:2,3
222:13,22
**comply** 199:13
200:3,11
**compressed.zip**
10:23
**comprised** 90:9
**computer** 8:5 20:8
29:24 30:7,14
31:3,20 32:4 46:6
46:14 61:17,24
62:20 63:7,11,14
63:17,25 64:15
65:18 67:19,20
68:7 85:4,12
87:11,23 88:3
93:11 95:20 96:9
99:7,9 100:22
101:7,17,22
102:17,22 103:3
103:17 106:14,22
106:25 107:3,11
107:19,20,23
115:3,13,23
117:20 118:5,8,16
119:3 120:7
121:22 122:5,12
123:8,10,14
126:20,25 128:7

128:11,16,20,25
129:18,23 130:20
132:15 133:7,18
133:21 134:5
135:2,4,5,15 136:3
136:15 138:8,16
141:3,11 143:2
145:11,15 149:10
149:13 150:11,15
150:16,19,21,23
151:13 155:12
158:9,11,21 159:3
159:19 162:13
164:2,8,21 165:4
169:16,21 170:8
170:12,24 175:15
177:9 178:12
179:17,22 180:14
180:15 184:13
197:5,6 198:25
201:6 203:21
204:14 205:3,15
205:22 207:21
208:13,19 216:21
219:6,11,12
220:12 226:10
229:7,16,19,21
**computers**  55:17
55:21 56:7,23
57:6,11,17,20 58:2
58:12,18 59:2,5,11
59:18,19,22,25
60:3,11,20,23,24
60:25 61:5,6,12
62:5,7,12,17 63:4
64:8,13,19 65:5,13
66:13,17,24 67:5,7
68:2 69:23 70:5
70:19 71:5 73:3
73:10,15 74:15
75:3,10,13 76:6,11

76:15,17,23 77:12
78:8 79:24 80:17
80:19,21,22 81:5
81:13 82:21 85:14
88:13 92:16 93:6
94:2 96:14,21
97:4,9,17 98:11
102:5,6 103:10,13
104:4,13,18,24
105:6,17,25 106:7
108:6,10 109:2,23
110:2,4,5,8,10,14
110:19 111:14,19
113:15,19 114:5
114:11 115:9
116:23 118:10,16
118:21 121:9
137:6,17,24
138:21 139:4,7,8
139:12 140:20
144:17 155:16
156:9,24 157:2,23
158:3 215:3,8,15
216:2,8,12 217:2,6
217:9,15,16
219:22 221:4
224:22 226:18
**concentration**
48:20
**concentrations**
48:22 49:3
**concern**  31:15
118:18 208:20
209:20 210:5
**concerned**  30:6
118:9 196:2
203:24
**concerning**  55:21
56:6,22 57:5,10
58:2 60:19 104:4
104:12,17,23

105:5,16 212:21
213:21 227:6
**concerns**  55:17
61:9 210:8 212:19
**conduct**  111:13,18
114:9 121:22
184:4,19 188:8,16
**conducted**  4:14
13:15
**confer**  195:2,5
**conference**  5:21
6:8 119:13
**conferred**  154:24
155:3 187:5
**confidential**  35:16
35:20 68:23 69:7
103:12 123:25
124:7,22 192:23
**configuration**  57:5
57:11 63:6 104:12
206:24 213:22
215:13,18 216:24
**configurations**
63:5
**configure**  63:13
63:22 136:2
**configured**  57:18
57:21 64:18 133:8
135:15 155:16,22
157:3,6,13,19,24
158:11 216:17
**configuring**  62:7
62:12 108:6
133:12 137:5
224:22
**confirm**  8:11
10:12 11:8 68:20
198:4
**confused**  220:11
**connect**  5:11
116:10 230:3

**connected**  156:10
216:19 229:23
230:4,9
**connection**  5:15
17:9 28:4 159:19
**consent**  226:19,23
226:24
**consented**  226:12
**consequence**
209:8
**consider**  107:10
165:20
**considered**  106:23
**consisted**  42:6
**consistent**  6:16
67:16 138:12
142:19 144:3,17
145:11 158:16
**consistently**  157:4
157:7,13,19
**consolidated**
45:15
**constantly**  141:12
**constituent**  211:17
**constitute**  6:19
**consult**  8:9
**consultant**  38:10
38:20 39:15,25
50:7,12,25 51:2
52:8
**consultation**  69:7
**consulting**  38:16
**contact**  4:7 52:9
52:12 163:25
174:19 185:18
198:19
**contacts**  90:10,19
172:23 173:11,15
173:17,25 175:14
175:22 193:2
227:7

contained  11:17
221:10
contains  78:21
187:17
context  27:13 39:3
132:13 157:7
189:19 228:23
continue  186:7
contract  38:16
contractual  38:12
contrary  121:12
controller  216:10
controls  66:16
conversation
184:7 208:24
209:4
conversations
184:17 185:13
convey  132:22
copies  9:20 10:14
12:19 190:14
191:2
coping  206:11
copy  6:23 12:2
13:4 30:25 103:19
131:24 164:22
165:5 191:5
203:22
core  108:10
157:10
corporate  42:2
217:8
correct  20:6 21:7
21:10,14 25:16
28:7 40:14 46:18
47:3,14,18 48:6
49:8 55:18 56:24
56:25 61:12 66:11
74:3,15 76:23
92:19 98:5 100:25
101:18 109:20

112:7,8 113:20
114:6,11 131:4
134:22 136:25
137:8,13 139:10
141:5 154:17
155:5,18 157:4
159:10,17,23
160:23 163:20
166:5 172:25
176:22 177:2,19
177:20 187:24
188:3 193:12
205:19 206:3
209:17,18 214:23
215:10 219:7
220:18 223:2
229:14 231:11,14
correctly  38:22
44:21
corresponding
132:2
counsel  2:8 4:10
4:23,23 7:14,16,20
7:22 8:2,8,14,22
9:12,19,22,23,24
10:3,4,10,11,13,20
10:22 11:2,3,7,7
11:10,12,19,21
12:11,15,22 13:2,3
13:5 14:12,25
16:18 22:14,20
25:14 35:18 86:17
86:25 154:24
155:4,4 182:19
183:2,10,24 184:5
184:21 186:13
187:5,23 188:10
189:10 190:4,25
191:10 195:25
196:5

counter  201:15,25
county  231:5
couple  19:14
50:18 65:15 78:20
181:8
course  17:17
61:20,24 82:5
126:7 153:5 167:5
184:19 185:24
188:7,16 208:9,12
courses  45:24 46:3
46:14,16
court  1:2 3:18
4:11 5:20,22 6:4
6:10,11,18,22 7:13
8:24 9:23 10:4,11
11:3,8 14:6 15:13
18:7
cover  53:12,14
57:15
covered  27:15
53:9 196:12
covid  4:3
create  158:14
207:20
created  4:3 207:24
creating  207:22
225:2
credentials  4:24
47:8 84:22 151:10
151:12,15 180:17
181:3 183:7,21
209:15
current  34:2,3
68:15,18 107:10
170:24 174:2
currently  69:12
curriculum  48:12
cut  152:18 161:9
cv  1:4 5:13 7:18
10:2 12:3

cyber  211:22
cyrulnik  2:3,19
14:20 15:2

**d**

d  231:2 232:2
dasilvavint  22:21
23:3 95:4
data  59:24 90:15
103:12,17 164:8
164:20 165:8
167:21 175:2,10
180:13 200:24
203:22
date  9:14 17:7
24:9 43:8 67:22
72:14 84:7 91:8
112:4 114:8
117:16 129:9
137:2 141:19,24
142:4 146:3
148:16 153:22
155:16 156:4,9
168:23 171:25
172:14 181:23
192:5 194:19
235:3
dated  154:16
dates  197:3
day  8:21 10:8 11:5
32:22 39:13,13
44:24,24 153:6
176:6 177:5
178:12 203:25
231:20 235:18
days  12:12 181:9
dcf  5:13 7:18 10:2
12:3
deadlines  8:25
deals  48:15
december  43:23
49:7

**decide** 50:20,22
**decided** 50:23
  167:2
**decision** 185:7
**default** 207:6
**defendant** 21:14
  149:7,8,11 182:18
  182:22
**defendant's** 199:3
**defendants** 1:10
  2:12 15:7 79:6
**defending** 21:17
**defense** 182:15
**define** 22:9 37:10
**defined** 6:4 78:10
  78:22
**definition** 78:11
  78:24 79:3 111:6
**definitive** 94:8
**definitively** 85:9
**degree** 47:11,12
  47:16,18 48:20,21
  48:25 159:15
  194:10 202:17
**degrees** 47:13
**delete** 119:4
  207:11
**delineated** 39:16
**deliver** 177:5
**delivered** 10:8
  11:5 51:22 133:7
  180:23
**delivering** 177:24
**dell** 126:20 128:11
  135:9 136:8,19
  143:13 146:15
  151:2,8 155:21
  156:18 157:12
  159:6,8,20 179:5
  179:18 180:18,25
  183:5,20 185:15

187:19 188:20
  197:11,17 199:22
  207:8 221:9,11
**demand** 149:12
**demeanor** 178:14
  178:16
**demirkaya** 2:19
**department** 81:15
  81:18,23 82:4,17
  124:14 193:20
**department's**
  124:18,20
**departure** 167:19
  167:22 168:14
**depend** 59:8
**depends** 103:5
**deploy** 59:3 93:7
**deployed** 135:5
  158:9 216:13
**deploying** 106:22
**deponent** 4:20,22
  5:7 6:7,12 7:13,17
  7:20,21,22,25 8:3
  8:8,9,11,12,14,16
  8:22 9:22 10:9
  11:2 12:18,19
  13:12
**deponents** 4:13
  12:8
**deponent's** 4:23
  9:22 10:3,10 11:2
  11:6 13:13
**deposition** 1:12,15
  3:14 4:18,22,25
  5:3,7,9,21,24,24
  6:21 7:5,9,11,16
  8:5,8,10,16,20,20
  9:10,14,18,21 10:9
  10:14,17,19,21,24
  11:6,11,13,15,19
  11:20,23,24 12:6,9

12:13,15,21,24
  13:2,7,10,12,14,15
  13:24 16:24 19:13
  22:2,8,13 23:5,8
  23:14,20 24:14
  33:13 53:23,24
  54:4,5 55:9,10
  68:22 119:7
  141:16 145:23
  148:12 171:20
  172:9 174:23
  176:2 212:18
  235:3
**depositions** 4:5,13
  5:18 6:14 7:3 9:2
  9:5,9
**describe** 47:4
  48:11 58:22 65:23
  81:16,24 88:19
  89:9 115:17
  149:16 197:2
**described** 98:11
  121:4 123:21
**describes** 76:21
**describing** 142:20
**description** 232:8
**designate** 35:19
  68:21 69:6
**designated** 25:8
  25:20 53:13 54:18
  163:9
**desire** 4:4 106:21
**desktop** 92:16
  107:20,23 108:22
  128:10,11 132:8
  177:8 207:12
  216:8,23
**destroyed** 12:21
**detail** 129:3
**detailed** 57:16

**details** 39:23
  121:3 128:18
  196:17 229:10
**detection** 204:10
  204:12
**determinations**
  106:19 107:12
**determine** 107:21
  137:11 160:25
  161:5 164:24
  165:9,14 201:9
**determined**
  106:12,13
**determining** 108:2
**development**
  44:22 49:20,23
**device** 20:18 88:17
  88:20,25 89:16,18
  90:17,18,25 91:3
  91:17,19 113:10
  116:11 220:24
  221:2 224:2,6,7,16
**devices** 20:10
  79:19 80:25 89:22
  90:17 91:5 92:4
  111:9,10 220:7,9
  221:4,10 224:5,8
  224:17
**difference** 215:24
  216:8,25 217:22
  218:22
**differences** 39:10
  157:22
**different** 30:10
  34:22 37:18 40:10
  46:25 54:10 70:3
  77:20 102:14
  108:21 125:5
  126:24 134:20
  170:3 191:3
  202:21 211:20

215:16 216:2 223:10

**differently** 21:12 216:17

**difficult** 156:13 175:6

**direct** 86:8 119:25 194:4

**directed** 10:20 11:18 210:15

**directing** 35:22 45:12

**direction** 47:25 118:3 182:23 183:8 185:8 218:25

**directions** 182:25 183:22 187:21 188:18

**directly** 29:4 74:2 74:13 130:17,21 193:22 216:19

**directories** 165:3

**directors** 104:6

**directs** 18:3

**disagree** 30:4 113:22 225:18

**disclaimers** 221:15,18

**disclose** 152:19

**disconnect** 205:13

**disconnected** 205:9

**disconnection** 5:17

**discovery** 196:6

**discuss** 53:11

**discussed** 53:5 76:14 138:25 159:18 226:2

**discussing** 128:7 128:15 135:9 155:22 156:14,16

**discussion** 55:4 100:8 125:24 127:18 128:18 145:2 154:8 222:6

**dispatched** 177:12 177:17

**disposal** 60:19 103:21

**dispose** 59:24 60:2 60:8

**disposed** 103:6,18 166:11

**disputing** 114:19

**disruptions** 5:17

**distinction** 54:21

**distinguish** 40:2

**distinguishing** 216:20 217:13

**distracting** 144:20

**distractions** 5:11

**district** 1:2,3

**dkt** 12:25

**document** 5:13 7:18 10:2 11:17 12:4,23 13:7 24:11,15 43:14,18 72:9,15,20 74:18 75:5,6,7 76:25 77:19 78:15 84:9 112:12 114:13 119:17 121:11 129:5 131:20 132:4 145:23 148:17,24 154:13 168:18 172:2,6 192:8 194:21,22 195:7,24 196:20

**documents** 9:20 10:5,7,23 12:9,11 12:17 19:25 20:4 23:10,11,13,16 24:19 26:13,18 27:7,14,20,23 103:16 196:23

**doing** 31:6,10 51:24 81:11 84:16 101:9 145:14 199:12,25 219:24 220:3,5

**domain** 216:10 217:9

**doubt** 171:13 173:6,8

**douglas** 52:20 94:17 128:8

**download** 29:25 30:15 115:12 116:22 172:22 173:11,15,25 174:10 175:23 185:16 200:20 201:3 203:17,22 227:7

**downloaded** 31:21 175:13 183:6 187:18 188:19 189:25 190:15,23 200:11 229:13

**downloading** 32:6 199:10 200:2 206:18 208:18 229:11,18

**draft** 86:19,22 96:25 101:3 154:19 211:6,9

**drafted** 154:20 155:4 187:7

**drafting** 154:23 187:13,16

**drawer** 161:8,12 161:15

**drive** 103:20 130:16 164:16 169:14,20 170:7 170:24 197:5 206:23 229:13,16

**drives** 128:24 129:18,23 130:9 163:4 165:6,7

**drop** 170:23

**dropped** 96:9

**due** 4:2 61:20,24 82:9 153:4

**duly** 15:17 234:10

**dumain** 2:5 14:19 14:20 15:21 16:11 19:4 24:2 26:24 27:17 29:2 30:8 36:9,21 52:22 54:7 56:17 78:19 88:5 95:2 98:8 99:19,24 111:23 112:8 117:8,12 119:11 125:3,10 125:15,20 127:14 129:4 135:20 144:8,12,21 145:6 154:4 165:13 175:24 183:17 185:24 195:13 196:13,18 204:6 212:7 214:12 221:23 223:9 230:12,18 232:5

**duties** 82:5 185:4 226:21

**dvd** 128:24 129:18 129:23 130:9,16

**e**

**e** 2:2,2 12:7 15:11
15:12 40:24 41:4
82:11 84:12 85:12
85:15 88:24 89:18
89:19 90:9,19
91:5,15 92:3
111:25 112:16,25
113:17 114:14,20
114:20 117:3,19
119:21 120:3
121:16 123:23
124:9 129:14,16
130:12 131:14,18
131:19,23 132:5
132:13,18 134:9
135:20 141:21,23
142:9,12,17,18
143:2 168:19,19
168:19 169:4,25
170:20 171:18,20
172:11,16 173:7
179:10 192:20,22
192:23 193:5,15
193:21 194:7
222:12,14,23,24
222:25 223:13,18
223:21 227:6,9,16
231:2,2,2 232:2
234:2,2
**e.g.** 8:5
**earlier** 49:22
68:11 90:6,22
107:9 109:14
125:6 139:2
149:25 157:11
186:9 193:19
202:11 214:25
222:11 224:21
**earliest** 68:9

**early** 44:16 91:9
**educational** 47:5,8
**effect** 3:17 91:11
93:7 134:10
**efficiency** 119:10
**efficient** 119:12
**effort** 204:9
**efforts** 165:18
179:16
**eight** 131:11 137:4
189:7,9,18
**either** 103:18,20
118:5 148:7
166:11 168:2
**elaborate** 28:20
34:16 106:9 111:2
**elect** 7:21
**electronic** 4:25
10:13,25 11:9,14
12:2 20:9,18 73:3
79:19 80:25 82:7
82:10,25 111:8
120:10
**element** 77:7
**employed** 9:17
38:4,5,20 39:23
40:15,17 50:14
72:24
**employee** 5:20
33:24 34:5,8,12
38:8 39:14 40:3
41:14 51:5 63:11
72:10,13 80:5
84:12 85:19 89:17
90:16 91:15,17
98:24 106:16
107:22 120:6,9
143:25 145:9
149:11 163:10
164:6,14 167:18
169:21 170:2,3,8

170:25 174:2,3
177:13,19 180:6
197:16 220:10
221:13 225:10,15
227:24 232:13
**employee's** 93:12
167:19,21
**employees** 39:15
72:23 73:8,21,25
77:25 78:2 79:18
79:23 80:16 81:5
81:12,19 82:21
87:12,18,19,22,23
88:16,22,24 89:15
89:21 91:16 92:2
92:18 93:7,25
96:14,22 97:18
98:13 104:7 105:8
109:4 110:20
111:7,12,18
113:14,18 114:3,9
114:17 115:2,7,11
115:23 118:10,19
121:8 130:21
137:6,18 139:25
140:12,21 143:19
144:3,11,15
152:15,24 153:3,5
153:14 157:2
168:12 173:15,16
174:11,12 180:11
200:25 213:3
224:23 225:3,16
225:21 226:4
**employer** 21:21
182:23 183:23
**employment** 50:6
50:16,21 97:19
98:13
**enable** 133:15

**enabled** 67:14
**encounter** 201:17
**endeavor** 8:2,14
**ended** 50:6 205:14
**engineering** 47:22
47:24 48:4
**ensure** 5:10 8:3
64:11 103:21
124:11,24 155:25
**ensuring** 66:16
124:6
**entail** 67:10,12
**entails** 48:14
**enter** 4:4 210:4
**entire** 93:15,17
164:16 165:7
**entities** 15:8 25:9
25:12 28:6 33:22
33:25 34:6,9,11,22
37:16,18 39:2,11
39:19
**entitled** 1:16 27:13
196:7
**entity** 37:9,15,23
38:3,15 39:5,17,23
40:3
**entry** 44:18 197:4
197:22 198:24
**enumerated** 70:14
**envelope** 177:24
**environment** 5:10
**equip** 63:25
**equipment** 60:8
60:15,17 87:13,18
87:24 88:4,4,13,16
99:8,9 100:22,24
101:7,17,22 102:7
102:18,22 103:3,4
103:6 130:21
161:25 162:4,13
177:25 220:18

**era** 162:6
**errata** 235:2
**es** 234:8,13
**especially** 108:21
**esq** 2:5,9,14,17,17
2:18,19,19
**essential** 185:7
**essentially** 108:24
135:25 164:12
221:8
**estimation** 205:21
**et** 1:9 10:8 11:5
14:3
**evaluate** 108:3
**evelyn** 2:18 14:23
**evening** 198:6,11
206:2,8 207:12,16
207:19
**evenings** 33:3,6
**event** 9:24
**events** 160:2,4
225:25
**everyone's** 214:5
**evolution** 65:23
**evolves** 65:22
**exact** 17:7 28:17
29:13 32:25 51:4
51:9 67:2 91:8
92:12 93:19 97:14
97:21 115:15
142:12 181:15
184:16 198:4
203:9 212:2 220:2
220:3 230:2
**exactly** 98:19
121:2 143:6
147:21 179:12
186:24 219:9
**examination** 15:20
232:4

**examined** 15:19
**example** 42:12
45:25 60:11 62:3
63:8,11 83:12
88:24 92:3 118:25
147:25 167:13
201:13 216:7
**examples** 71:20
**excel** 135:16 172:9
172:23 174:23
**excerpt** 129:11
**exchange** 112:16
112:19,25 113:17
169:5 171:21
172:17 173:7
227:6
**excluding** 75:17
77:14 140:19
**exclusions** 76:2
**executed** 136:24
159:22 187:8
**executive** 48:7
**exercise** 203:14
**exhaustive** 94:8
**exhibit** 11:23 12:3
12:23 16:19 20:19
24:3,5,7 43:3,6
55:9 72:7,12 78:6
78:17 83:25 84:4
92:14 96:13
100:15 103:23
111:24 112:2,6
117:3,14,18 119:7
123:16 127:24
129:5,7 130:13
131:10,12 141:17
141:23 142:2,5,15
145:23,24 148:12
148:14 151:19
153:18,20 168:17
168:18,21 171:20

171:23 172:9,12
174:23 176:3
181:21 182:3,10
186:16 191:24
192:3,7 194:13,16
212:17 227:5
232:7,9,11,13,15
232:17,19,21,23
232:25 233:3,5,7,9
233:11,13,15,17
233:19
**exhibits** 9:17
11:22 12:20 16:20
43:5 119:13
141:16
**exist** 165:23
**existed** 57:15
224:2
**existing** 59:19
**expand** 61:22
**expect** 153:10
**expectation**
101:20,23,24
**expectations**
159:14
**expected** 99:8
100:23 101:6,16
**expecting** 101:10
**experience** 44:12
45:6,10 46:10
134:14
**expert** 34:21 37:17
39:9
**expires** 235:21
**explain** 62:23
**explicitly** 152:22
207:20
**explore** 50:9
**export** 227:18
**express** 31:14
208:19

**expressly** 18:3
105:24 127:4
**extend** 8:24
**extent** 7:4 8:17
13:14 27:4,9 77:4
158:20,23 196:4

**f**

**f** 70:11 234:2
**face** 32:16,16
**facilitate** 83:6,9
89:20 91:4 211:3
**facilitated** 89:7
**facilitates** 113:9
**fact** 85:2 134:25
135:8 136:7
137:11 161:7
**factor** 107:11,15
108:3 188:13
216:20 217:14
**facts** 196:8
**fading** 47:6
**failed** 198:25
**fair** 71:3 99:19
149:21 150:4
152:10 204:3
216:16
**fairly** 148:4
**fall** 224:19
**familiar** 17:15
37:8,10,12,13
47:21 228:16,24
229:9
**family** 117:21
118:6,11,19
122:25 128:21
138:10 139:17
140:15,22 141:14
157:24 158:4,14
158:20 159:2
202:24 225:2

**family's** 138:17
**far** 76:14 90:17
    187:5
**fattaruso** 2:3,17
    14:20 15:2
**feature** 11:25
**february** 128:12
    131:15 141:3
    153:19 154:13,16
    156:16 158:5
    160:6 172:21
    181:19 186:17
    188:3 189:3
**federal** 1:18 4:14
    6:5,17 9:6 46:14
**feel** 171:12
**field** 48:4,17 210:4
**fifth** 2:13 194:14
**figure** 62:23
**file** 10:23 11:4,9
    11:11,16,17 172:9
    175:3,4 201:6
**filed** 5:14 7:19
    10:2 12:4 148:13
**files** 29:25 30:15
    31:21 32:6 91:18
    115:12 116:22
    118:25 119:4
    165:23,24,25
    169:15 174:10
    183:6 185:16
    187:19 188:19
    189:24 190:15,23
    191:5 199:10
    200:2,11,21 201:2
    203:6 206:12,18
    206:20 207:11,14
    207:18,19,21,24
    208:18 229:11,13
    229:18

**filing** 3:7
**filling** 54:2
**final** 123:23 149:4
    149:5
**finalized** 187:8
**finally** 18:14 52:7
**financial** 37:3,5
**financially** 14:10
**find** 164:22 205:23
**finding** 210:13
**fine** 99:21 196:13
    196:18
**finish** 184:8
**finished** 94:24
    99:2
**firm** 29:8,10 35:7
    51:25 60:5,6
    69:12,16,19 93:5
    112:22 128:9
    132:7,12,14
    168:14 220:7,14
**firm's** 101:23
    103:7
**firms** 60:13
**first** 15:17 33:20
    33:21 41:22 42:4
    70:21 76:5,8
    86:19 87:6 88:3
    120:13 128:4
    130:15 133:6
    147:7 167:14
    181:5 192:7 200:8
    203:7,7 211:21
**five** 79:2 144:14
    154:3,4 176:3
    185:22 188:24
    192:12 193:7
    197:21 202:22
    212:6
**fleet** 64:2

**flemming** 228:6,7
**flip** 24:20
**floor** 2:4,8
**focus** 131:13 138:5
    196:24 197:20
    212:19
**focused** 20:20
**focusing** 59:4
    149:4 192:15
**folder** 43:5
**folders** 201:13
    227:18
**folks** 83:12
**follow** 72:23 185:7
**followed** 188:18
**following** 9:16
    12:13 179:25
**follows** 4:11 15:19
**force** 3:17 46:21
    46:23,24
**foregoing** 234:11
**forgive** 38:2
**form** 3:11 18:2
    28:25 29:19 30:3
    32:8 39:21 49:18
    49:25 74:5,17
    75:20 77:17 98:7
    101:12 105:10
    107:11,14 108:2
    116:8 120:24
    121:19,25 131:6
    134:11 136:11
    139:19 143:5
    155:7 163:7,19
    165:12 168:8
    171:16 173:20
    174:6,15 175:18
    184:24 185:10
    188:22 204:5
    209:12 217:19
    219:3 223:8

226:16 227:2
**formal** 145:20
    162:16
**former** 28:12
    169:21 170:2
    218:12
**forth** 196:9 234:9
**forward** 94:14
**forwarded** 192:22
**found** 50:4 80:3
    157:14 217:16
**founding** 92:17
    99:6 100:21
    101:16,21 102:4
    102:16 103:9
**four** 119:24 160:8
    160:18
**frankly** 143:11
    220:9
**fraud** 46:15
**free** 5:10 147:15
**freely** 73:9,21
    75:13
**freeze** 63:2
**frequency** 85:9
    158:23 159:14
**frequently** 33:2,5
**friday** 126:8
**front** 16:21 20:8
    169:9 181:24
    204:15
**froze** 19:2 183:16
**frozen** 183:12
**fruchter** 2:18
    14:23
**ftp** 10:25
**full** 20:24 119:14
    141:4 189:18
    192:15
**fully** 64:25 67:22

**function** 34:23
113:12 218:23
227:25
**functional** 116:5
218:21
**functions** 50:12
66:23
**further** 3:9,13
109:18 123:21
131:23 134:18
179:16,21 234:14

**g**

**g** 69:13 231:2
**gain** 118:19
185:15 200:20
208:20,25 209:10
209:16 210:16
**gained** 197:4,10
197:16 200:10
201:3 203:7,25
**gaining** 197:24
198:20 199:9
225:16
**gains** 116:13
**gather** 20:13
**gee** 53:17
**general** 29:15
37:14 58:20,22
60:4 70:20,21
85:20 89:14 93:6
103:15 108:9
119:20 120:17,18
138:20 139:11
155:15 218:11
225:14
**generally** 23:19
26:5,8 30:24 33:9
35:3,5 37:6 39:18
40:5 48:14,15
50:15 52:4,13
59:15,20,23 61:4

61:19 64:3,18,23
65:14,25 67:9,12
67:22 68:6 70:7
71:9,14 72:19
75:5,16,24 78:3
82:23 83:20 85:6
87:3 88:14 106:20
110:9 113:8 116:9
124:10 155:24
156:5 164:6,7
168:3 180:10
184:25 201:5
216:9 222:15
224:8,15,24
225:18 229:8
**getting** 25:15
**give** 18:10 25:9,20
25:24 26:6,15,19
27:23 29:13 32:18
51:9,17 60:16
71:20 91:8 93:19
104:2 109:25
120:21 125:18
126:3 143:19
171:9 178:11
**given** 6:23 16:23
23:22 32:22 33:7
90:16 183:23
184:18 187:21
226:24 231:14
234:12
**giving** 19:8 22:13
23:4 94:12 215:5
**global** 222:17,20
222:21
**go** 18:4 53:2,21
69:9 82:11 84:16
87:25 88:6 90:11
90:18 94:14 100:3
111:5 122:9
125:17 127:12

144:21 154:3
195:12
**goes** 73:23 76:10
137:8 197:6
**going** 13:23 17:17
24:2,21 26:21
30:11 33:15 41:17
47:25 52:22 53:15
53:20 54:11,20
55:3,12 58:6 72:7
78:20 86:8 94:7
99:25 100:6 111:5
111:23 117:2,9
119:6,25 125:23
126:18 127:16
131:13 141:15
144:25 145:22
148:11 150:18
154:7 171:19
172:8 196:16
212:9 222:5
227:21 230:23
**good** 13:22 16:6,8
52:24 126:14,17
212:15
**gotomypc** 134:21
218:22 219:5,8,10
229:24
**governed** 105:24
**governing** 58:11
218:6
**grant** 143:12
145:17 149:9
**granted** 106:24
149:12
**granting** 149:17
**gravitas** 69:16,17
**great** 19:11
**greater** 115:18
223:19

**grew** 220:7
**grounds** 26:24
**group** 39:19 44:16
45:15 59:12 69:15
69:15 74:22
**guess** 54:15 122:7
132:25
**guys** 132:7

**h**

**h** 15:10,11,16
**handbook** 72:10
72:13 80:6 98:24
211:7,10 232:13
**handing** 119:12
**hang** 72:18 125:12
**happen** 109:9,11
156:3
**happened** 67:21
93:21 95:19
109:16 134:15
135:22 143:24
149:17 163:14
171:14 175:12
177:21 178:21,25
204:23
**happening** 138:23
**hard** 163:4 164:16
169:14,20 170:7
170:24 197:5
205:23
**hardware** 65:8,12
163:4 170:12
177:12,18
**head** 18:11 40:13
40:18,20 43:15
45:7,19 46:7
48:15 51:11,18
72:2,5 80:14 81:3
84:13 87:9,16
93:14 95:6 98:19
124:4 147:12

152:11 157:21 179:23 210:22 217:21 228:18
**head's** 126:3
**heading** 73:2 74:23 76:6 120:2 182:14
**heads** 102:16,20
**health** 64:12
**hear** 5:3 7:24 16:13 17:19 52:16 212:4
**heard** 5:3 16:10 37:15 46:20 167:15
**hearing** 7:3,5 41:15 200:9
**held** 1:16 28:15 51:7 55:4 100:8 125:24 127:18 145:2 149:6 154:8 222:6
**hello** 100:12
**help** 42:12 43:4 83:6 88:15 211:2 225:22
**helped** 83:9,11 88:16 227:19
**helping** 148:6 208:9,12 211:6
**hereinbefore** 234:9
**hereto** 4:9 182:22
**hey** 68:7
**hi** 100:13 222:10
**hierarchy** 29:10 29:14,17 145:21 150:5
**high** 47:5,9 202:17
**hinkle** 95:3,16

**hiring** 62:2
**hoc** 59:6
**hold** 40:6 42:14 72:17 162:10,14 162:19 163:5
**holdings** 1:9 14:3 34:13,15,20 35:3 36:3,7,10,18,22,25 72:9
**holly** 94:18
**home** 29:23 30:15 31:21 32:4 92:18 93:12 94:2 95:20 102:5 103:11 106:22,23 109:4 109:23 110:4,8,14 110:19 120:7 121:9 122:5,16,24 122:25 123:4,7,11 126:21 127:2 128:10 129:23 130:17 132:8 135:5 137:6,19,24 140:22 150:11,16 150:24 158:10,10 159:9 177:22 179:19 198:14,16 224:23 229:20
**homes** 93:7 130:22
**honestly** 196:22
**hope** 25:15 34:24
**hounded** 141:13
**hour** 100:3 125:14 214:6
**house** 64:15,19,21 64:23 127:9
**human** 167:24
**human's** 102:20
**hundreds** 192:21
**hypothetical** 171:12

**hypotheticals** 205:11

**i**

**iacovacci** 1:6 14:2 14:22 15:4 16:11 28:5,9,11,23 29:3 29:5,11,16,24 30:16 31:5,10,22 32:5 94:18 128:24 129:17,22 133:20 133:24 134:3 136:7,12 141:12 142:22 143:7,13 149:6,9,18 151:16 151:22 152:3,20 156:17 159:7 163:16 164:3 166:20 167:10,15 169:25 173:10 175:22 176:6,11 176:25 177:9 178:6,8,10,23 179:5 180:24 189:14 190:2 203:21 204:2,10 204:21 205:4,6,8 205:12,14,17,18 208:8 209:21 210:11,18 220:14 225:4,9 226:2,24
**iacovacci's** 29:23 30:15 31:21 32:4 105:4 126:20 127:2,9 128:7,10 128:15,20 130:4 132:17 135:2,3 138:17 149:12 150:11,14,23,24 151:3,5,10 152:9 159:8,18 162:21 163:15 166:4,10

169:15 172:22 175:13 177:6,22 178:14 179:17,25 180:17 181:2,6 183:6,20,21 184:13 185:14 200:19 204:8 206:25 207:8 208:4,19 209:7 226:10 227:4,7
**ian** 2:5 14:19 16:10 35:24 230:21
**idea** 136:12 158:23
**identification** 24:9 43:8 72:14 84:6 112:4 117:16 129:9 141:19 142:4 146:2 148:16 153:22 168:23 171:25 172:14 181:23 192:5 194:18
**identifiers** 220:17
**identify** 92:9,11 139:20 160:19 162:7 165:18 197:2 201:2 220:23 221:2
**igor** 70:8 166:17
**igor's** 70:10
**ii** 5:11 10:22
**iii** 11:21
**image** 62:16,19 63:2,13,16,20 108:14 164:15
**images** 108:22
**imagine** 204:24
**immediately** 11:14

**implemented** 211:22

**implies** 74:19

**important** 18:10 188:6,13

**improve** 6:24

**inadvertently** 119:4

**inaudible** 218:17

**incidental** 77:14 77:24,25

**incidentally** 139:9

**include** 12:16 98:22 224:9

**included** 189:13 189:24,25 227:9

**including** 12:7 28:7 156:24 197:3 199:4 200:4,13

**inclusive** 85:13

**incoming** 223:12

**independent** 27:19

**indicate** 43:13

**indicating** 134:5

**indirectly** 29:6

**individual** 13:20 63:5

**individuals** 28:6 132:2 213:8

**indulgence** 145:7

**industrial** 47:22 47:24 48:4

**inform** 9:25 31:9

**information** 10:6 31:2 35:16 49:11 69:2 77:10 87:10 123:25 124:8,22 139:4 153:16 162:23 164:25 165:2 166:9 168:13 184:14

**informed** 175:22 189:11

**informing** 31:5 173:9

**infrastructure** 114:21

**initial** 86:9

**initiated** 89:2

**insert** 88:22

**inside** 219:14

**insignia** 219:21

**insofar** 76:10,20 84:20 223:4

**install** 75:14 113:18 117:21 118:15 134:20 137:7 144:2,11,16 145:9 148:6 203:6

**installation** 71:24 89:20 91:4 136:8 145:18

**installed** 67:17 91:16 115:22 127:9 133:17 134:25 135:8,14 135:25 136:14,18 137:12,16,24 138:4 146:23 147:5,9,18 148:2 157:10,17

**installing** 133:13 148:9

**instance** 109:18 169:18 173:24 174:9 177:17 197:3,13,14 220:10

**instances** 13:21 65:15 83:20,22

194:10 196:10 211:6,12

**instant** 82:11 85:16

**instruct** 26:22 31:4

**instructed** 177:5 177:24 178:2 179:21 181:10 191:10

**instructing** 30:25

**instruction** 31:14 32:16,19,23 119:21 181:17

**instructions** 113:2

**insure** 103:18

**intended** 138:9 166:20 167:16

**intending** 132:21 161:18

**intent** 167:10

**interaction** 170:20

**interest** 44:9 49:20

**interested** 14:11 234:17

**interfere** 8:19 118:7 145:14

**internal** 22:14,19

**internet** 5:15 205:10,13

**interrogatories** 194:15,17 233:19

**interrogatory** 196:11,25

**introduced** 11:22

**inventory** 109:3 221:4

**investment** 35:6 36:12 43:22,25 120:8,14,20,21

85:18,23,25 86:2 109:13 197:9,19 225:7

**instant** 82:11 85:16

199:5,15 200:5,14

**investments** 35:8 35:13 36:13,25 37:3,5,7,25 42:7

**invitation** 113:23

**inviting** 113:18

**involved** 50:3 93:11 110:13,18 126:19 185:13 193:4,10 227:19

**involvement** 193:23 196:5

**involves** 211:4

**ip** 229:6

**ipads** 224:9

**island** 16:4 21:5

**issue** 23:18 150:18

**issued** 90:16 160:15 226:18

**issues** 5:25 8:18

**item** 218:20

**items** 214:13,21 221:12

---

**j**

**j** 15:16

**jackson** 16:3 21:4

**january** 43:22 44:6,12 45:8,20 46:8 119:22 121:7 169:9 170:13

**jason** 2:19

**job** 42:4 44:11 50:11 124:10,12 124:16,18,20 130:4 171:2,4 211:2,4 227:25

**john** 94:18 95:3

**johnny** 1:15 2:1 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1,25 14:1

15:1,8,24 16:1
17:1 18:1 19:1
20:1,25 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1,8,12 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
231:7,17 232:5
**join** 41:13,22
**joined** 22:23
216:10 217:8
**jointly** 8:24
**july** 141:20 148:12
**juncture** 86:3
**jurisdiction** 4:19

**k**

**k** 70:11 135:20,20
228:9 231:2
**kansas** 202:16,22
202:25
**kaspersky** 135:17
**keep** 10:16 12:23
13:6 39:12 47:24
155:12,15,21
156:7 220:7
223:21
**keeps** 53:21
**kept** 153:16
161:12,14
**kids** 119:2,3
**kind** 36:24 64:10
122:20 162:15
202:18 221:3
**kinds** 165:22
**kiodex** 45:14
**klemming** 228:9
228:10
**know** 18:7,15
22:12 24:24 28:9
28:16 29:12 32:10
33:7,18 34:21
35:2,14 37:11,13
37:14,15 39:10
53:18,18,25 60:14
64:17 67:15 84:25
85:8 88:14 90:6
90:14 92:23 93:3
94:6 95:24 96:3,5
102:3,9,15 105:15
105:23 106:13
107:25 108:8
109:12 112:12
113:24 114:21
116:20 121:2
124:13,15 132:11
133:20,24 134:24

135:7 136:6,14
145:20 147:15,17
149:23 150:12
151:17 156:3
159:12 160:8
162:3,8,19,25,25
163:14,20,22,23
166:4 167:8,23,25
168:9,25 169:13
170:16 171:3
174:18 185:17
190:20 192:7,12
194:24 202:23
205:6,12 210:12
211:21 212:3
223:4,11,19
227:11 228:13,19
229:8
**knowing** 186:12
**knowledge** 60:22
105:3 160:22
163:11
**known** 159:13
201:15
**knows** 196:8
205:12
**koyfman** 166:18

**l**

**l** 3:2 15:11,16
231:2
**label** 12:16
**labeled** 129:5
168:19 171:21
**labels** 201:12
**lan** 1:16 2:1 3:1
4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1,2 15:1,8
15:24 16:1,6,23
17:1 18:1 19:1
20:1,23,25 21:1,25

22:1 23:1,7 24:1,3
24:12 25:1,3 26:1
27:1,19 28:1,3
29:1,22 30:1 31:1
32:1 33:1,12 34:1
35:1 36:1,24 37:1
37:8 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1,5 51:1
52:1 53:1,8 54:1
55:1,8 56:1,20
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1,16 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1,3 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1,9 95:1
96:1 97:1 98:1,9
99:1 100:1,12
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1,12,24
112:1,11,15 113:1
114:1 115:1 116:1
117:1,2,17 118:1
119:1,16 120:1
121:1,15 122:1
123:1,16 124:1
125:1 126:1,14
127:1,22 128:1
129:1,4 130:1

131:1,9 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
141:15 142:1,5
143:1 144:1 145:1
145:8,23 146:1,4
146:17 147:1
148:1,11 149:1,7,8
149:11 150:1,10
150:17 151:1
152:1 153:1,21
154:1,12 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1,19
167:1 168:1 169:1
170:1 171:1,19
172:1 173:1 174:1
174:22 175:1
176:1 177:1 178:1
179:1 180:1 181:1
181:22,25 182:1
182:10,18,22
183:1 184:1 185:1
186:1,16,19 187:1
188:1 189:1,6
190:1 191:1,23
192:1,6 193:1
194:1,12 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1,15,17
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1,10 223:1

224:1 225:1 226:1
227:1 228:1 229:1
230:1,19 231:1,7
231:17 232:5
233:7,15
**lan's** 153:19
181:19 186:17
**language** 187:18
**laptop** 107:20,23
108:21 122:6,8,15
122:21,23,24
140:19 160:12,20
161:2,7,17 162:6,6
215:15 216:2,23
228:20
**laptops** 139:16,21
139:24 140:12,15
212:21 213:2,7,14
213:17,24 216:16
216:18 217:14
224:13,18
**large** 162:3 175:4
**late** 33:2,6,10
117:7 189:10
190:9 198:6
**latest** 155:17,22
**law** 46:17 223:12
**lawful** 182:20
**lawsuit** 17:12,13
**lawyers** 22:3,6
184:11
**layman's** 62:23
**layout** 29:13
**lays** 168:11
**leader** 48:16
**leading** 112:21
**learn** 166:19,25
167:8 169:9 176:5
176:10 189:12,22
190:8

**leave** 186:15
**leaves** 164:7
**leaving** 168:2
**led** 118:14 184:17
**lee** 119:7
**left** 95:20 156:19
163:16 164:3
178:24 195:17
220:14 221:25
**legal** 14:5,8 31:19
182:19,25 183:10
183:24 184:5,21
186:12 187:23
188:9 190:4,25
**legality** 31:15,25
188:16
**lehman** 44:15 45:3
45:5
**lending** 37:7
**letter** 177:6
180:23
**letting** 113:24
**li** 22:21 95:3
**liberty** 35:10
**light** 214:5
**limit** 53:24 54:3
191:11,15,19
**limitations** 76:22
**limited** 71:17
85:12
**limits** 53:22
**line** 15:11 235:5
**linedata** 69:16,19
**lines** 175:2,10
**linkedin** 43:3,7,11
44:17 45:11,13
47:14 49:5 232:11
**liquidated** 161:23
**liquidating** 161:25
**liquidation** 60:5,6
60:10,13 103:7

**list**  22:25 33:21
  93:24 94:8 145:25
  146:5,12,14
  147:10,17 221:7,8
  221:10,12 233:3
**listed**  23:2 131:22
  214:10,22
**lists**  174:19
**litigation**  162:9,14
  162:19 163:5,11
  167:6,9 190:9
**little**  34:19 53:21
  144:20 183:15
**live**  123:3,11
**lived**  118:6
**lives**  123:6
**llc**  1:9 2:7 14:3,25
  36:25 37:9 72:9
**llp**  2:3,12
**loaded**  142:15
  148:17
**loading**  142:6
  182:2,8
**loan**  139:25
  140:12
**loaner**  213:14
**loaners**  213:8
**local**  165:3,5
**located**  19:16 71:5
  215:8 216:9,22
  217:2,4,7
**location**  227:12
**log**  83:13 84:18
  150:10 151:2,8
  184:12 198:5,24
  204:7,20 206:7
  209:25 221:3,16
  221:18,19 225:21
  226:4 229:3
**logged**  118:23
  183:5,19 201:18

206:3 207:15
  226:9
**logging**  83:15
  209:19
**logmein**  134:21,25
  135:8,14 136:7,13
  136:15,16,18
  150:12 151:9,10
  151:12,22 152:4,7
  152:14,21 153:2
  180:17 181:2
  183:7,21 185:14
  200:19 204:8,13
  204:16,21 205:5
  206:25 207:9
  208:4 209:2,10,17
  218:22 219:10,15
  225:11,17 226:3
  228:24 229:3,5,9
  230:10
**logo**  221:21
**logs**  85:3 228:25
  229:4,9
**long**  16:4 21:5
  33:8 42:14 95:25
  96:6 125:10
  147:10,20 149:5
**longer**  38:6
**longstanding**
  92:15,21 93:2
**look**  22:25 23:10
  23:13 24:20,23
  33:13 54:19 55:9
  78:5 84:8 86:6
  87:5 92:13 98:2
  99:4 100:16
  103:23 112:11
  117:9,17 123:17
  127:22 128:4
  131:9 137:4
  142:14 151:18

155:9 156:21
  160:7 176:2 182:9
  182:12 187:9
  189:6,17 194:24
  212:16 217:11
  218:3 227:5
**looked**  129:11,14
  129:15 201:6
**looking**  24:11
  34:17 42:7 44:8
  44:17 80:5 96:11
  100:14 131:20
  132:4 133:2 146:4
  147:22 154:16
  173:7 175:5
  182:13
**looks**  43:12
**lot**  196:23
**lunch**  99:23 125:7
  126:10

| m |
| --- |

**m**  70:11 231:2
**machine**  204:16
**mail**  9:19 10:13,25
  11:9,14 12:7
  40:24 41:4 73:3
  85:12 91:15 92:3
  96:9 111:25
  112:16,25 113:17
  114:14,20,20
  117:3,19 119:21
  120:3,10 121:16
  123:23 124:9
  129:14,16 130:12
  131:14,18,19,23
  132:5,13,18 134:9
  141:21,23 142:9
  142:12,17,18
  143:2 169:4,25
  170:20 171:18,20
  172:11,16 173:7

179:10 192:20,22
  193:5,15,21 194:7
  201:24 222:12,24
  223:13 227:6,9,16
**mailed**  10:15,15
  12:17
**mailing**  10:5
**mails**  82:11 84:12
  85:15 88:24 89:18
  89:19 90:9,19
  91:5 192:23
  222:14,23,25
  223:18,21
**main**  2:8
**maintain**  64:14
  137:15,22 221:3
**maintained**  221:7
**maintaining**  64:7
  64:21 163:4
**maintenance**
  58:11 64:25 65:4
  65:7,8,9,12,18
  104:18 213:23
  215:14,19
**major**  48:24
**majors**  49:3
**making**  67:12,17
  164:8
**manage**  35:9 37:2
  144:23
**management**
  25:14,21 26:7
  27:24 35:6 37:9
  37:22,24 43:16
  48:8,13,25 52:13
  52:14,18 58:25
  80:8,12,15 81:4,11
  84:11,21 85:2,18
  86:5 167:24
  193:20 222:13

**management's**
106:17
**manager** 36:12
48:16
**managers** 104:6
**manages** 35:13
**manipulate** 202:5
**manipulating**
202:8 203:3
**manner** 9:8 12:14
103:22
**manually** 63:23
67:23 156:5
227:20
**marcelo** 2:18 14:4
**march** 72:11
141:3 156:17
**mark** 24:2 30:21
30:24 43:2 52:21
72:7 83:25 94:17
111:23 117:2,6
129:4 131:25
141:15 145:22
148:11 153:18
158:10 171:19
172:8 179:8
181:11,19 191:23
192:10 194:12
**mark's** 158:9
**marked** 24:8 43:5
43:7 72:13 84:6
112:3 117:15,18
119:7 127:24
129:8 141:18
142:3 146:2
148:15 153:21
154:12 168:22
171:24 172:13
181:22 186:16
192:4 194:18

**markings** 219:21
**marriage** 234:16
**master** 48:7,12
**masters** 47:12
**matching** 63:15,20
**material** 189:12
189:13,23,25
190:10
**matter** 14:2 16:12
17:10,11 75:12
77:11 79:21 80:7
84:25 86:9 91:25
116:5 146:18
168:5,6 234:18
**matters** 23:18
122:22 221:16
**mean** 28:21 34:2
39:7,9 40:8,15
42:23 45:21 46:16
52:2 57:14,16
59:13 60:24 62:18
63:6,17 65:6
70:18 87:3 90:24
97:25 101:13
106:10 111:3,9
128:15 132:13
139:20 152:18
157:7 158:4 161:9
171:17 176:22
179:18 202:14
206:12 211:14
218:8 221:19
**meaning** 82:19
**means** 6:15 12:7
37:12,13 54:17
79:17 80:24 94:8
107:17 111:7
113:9 120:15
132:14 157:9
228:23

**meant** 89:4 133:13
143:7
**mei** 22:21 95:3
**member** 29:8
**members** 22:17
86:4 92:17 99:6
100:21 101:16,21
102:4,16 103:9
117:21 118:6,11
118:19
**memorialized**
101:25
**memory** 160:2,3
226:3
**messages** 82:11
**messaging** 85:16
**method** 181:15
**methodology**
158:17
**methods** 9:16
**microsoft's** 67:15
**middle** 203:25
204:9
**mind** 39:12 72:3
78:12 95:5 106:18
217:22
**minimize** 4:6
**minor** 77:24,25
**minute** 52:25
78:14 127:13
144:13,14 201:22
**minutes** 99:20
100:2 125:6
144:22 153:25
185:22,22 212:6
221:24
**missed** 144:5
176:8 199:16
**misspoke** 90:12
**mix** 213:16

**mkv** 5:13 7:18
10:2 12:3
**mobile** 88:25
224:8,17
**model** 63:16,17,20
107:11 108:20,23
**modifications**
13:19
**modify** 13:16
**moment** 72:3
174:16 194:23
210:2 218:2 225:8
**momentarily** 24:5
**moments** 23:21
160:14
**money** 60:17
**monitor** 66:20
79:22 80:8 82:10
84:12 85:11
222:14
**monitored** 81:8
82:19 85:19
**monitoring** 78:8,9
78:22,24 79:10,17
79:17 80:15,23
81:4,11 82:5
105:24 110:8,13
110:18 111:3,6,6,7
**monitors** 81:15,18
**monticciolo** 52:21
94:17 131:24
169:8,13,19 170:6
170:11 172:24
191:16
**monticciolo's**
128:8 169:16
**morning** 13:22
16:6,18 188:15
198:2 203:17
**move** 68:18
175:24

**moved** 59:17
162:2
**moving** 59:16
140:25
**mr.koyfman**
206:17
**muddle** 54:6
**multiple** 42:11
62:12 93:22 220:6
**mute** 64:4
**muted** 183:13
**mutual** 13:17

**n**

**n** 2:2 3:2 15:16,16
15:16 70:11
168:19 231:2,2
232:2
**name** 14:4,19,24
15:22 16:10 20:24
22:19 41:7 68:10
70:10,12 92:10
201:15 222:21
228:3 235:2,4
**named** 227:9
**names** 98:21
201:24
**necessarily** 108:15
**necessary** 8:25
108:11 206:7
**need** 61:24 62:9
106:20 150:12
151:3,9 166:2
189:17 195:5
201:21
**needed** 129:22
190:6 203:11
213:6 226:23
230:8
**needs** 68:8 128:7
128:16,20 159:19

**neither** 141:4
147:18,25 204:24
**network** 85:14
113:5,7,10,11,14
114:4,18 115:3,8
115:13 116:12,12
116:14,16,19,21
118:20 156:11
164:13,21,23,25
180:13 216:19
218:7,10,11,15
219:6,7,14 229:24
230:3,5,9
**never** 50:4 64:25
143:24 220:10
**nevertheless**
136:21
**new** 1:3,12,12,21
2:5,5,9 15:18 16:5
19:18 21:5 63:11
99:7,18 100:22
102:7 103:4 128:9
132:8 168:19
171:21 172:10,13
207:21 231:3,5
233:13 234:6
**newly** 62:16
**news** 179:14
**nicholas** 227:9,11
227:19,23 228:7
228:10
**night** 204:9
**nine** 138:6
**nods** 18:11
**noise** 5:11
**nominal** 60:16
**non** 9:6,9,10,13
146:10
**nonresponsive**
175:25

**normal** 130:25
131:2
**notary** 1:20 6:11
15:17 231:24
234:5 235:20
**noted** 230:24
**notice** 24:4,8,13
29:24 30:16 31:22
32:5 33:13 53:10
55:10 103:24
173:16 174:3,11
175:14 212:18
214:8,22 226:5
232:9
**noticed** 4:21
**noticing** 9:10,24
10:13 11:10 12:15
13:2 14:18
**november** 84:2,5
86:7 111:24 114:2
117:3 127:23
159:16 191:25
232:15
**number** 93:19
117:4 141:21,25
146:24,24 175:8
175:20 182:3
227:17
**numbers** 147:12
**numerous** 51:8
93:20

**o**

**o** 3:2 15:16 69:13
70:11 231:2
**o'keefe** 94:19,21
95:7 172:25
**o'keefe's** 95:20
**oath** 3:16 6:7,9
231:9,12
**object** 7:6 28:24
29:18 30:2 32:7

39:20 49:17,24
74:4,16 77:16
101:11 105:9
116:7 121:18
131:5 136:10
143:4 155:6 163:6
163:18 165:11
168:7 171:15
173:19 174:5,14
175:17 184:23
185:9 188:21
204:4 209:11
217:18 219:2
223:7 226:15,25
**objection** 17:24
18:2 75:19 98:6
120:23 121:24
139:18
**objections** 3:10
7:10 14:15
**obligated** 223:12
**obligation** 223:6
**obligations** 13:11
13:13 199:3,4,14
200:4,4,12,13
210:24
**obstacle** 142:25
**obtain** 49:15 208:3
**obtained** 49:21
151:14
**obtaining** 94:2
126:19 159:6,20
199:22,25
**occasionally**
122:21
**occasions** 192:21
**occur** 109:6
**occurred** 109:5
**occurrence** 173:22
**occurrences** 226:7

**october**  1:13 13:24
   29:22 30:13 83:16
   83:22 156:19
   158:5 163:17
   164:3 176:19
   177:2 180:24
   194:13 197:10,15
   198:2 199:23
   206:2 211:13
   226:10 229:12
   230:6 231:9
**offer**  49:2 50:24
   90:15
**offers**  48:22
**office**  15:12 19:17
   19:18 33:6 56:8
   61:18 73:16 75:3
   75:10,13 81:12
   110:11 122:10,13
   130:15 143:21
   156:25 157:3
   162:21 169:16
   178:24 179:2
   198:13 215:16
   216:9,12,13,22
   217:3,5,7,15,17
**officer**  3:15 6:4
**officers**  104:6
**offices**  32:21 55:18
   55:22 56:24 57:7
   57:12,21 58:3,13
   58:19 59:6,16,17
   61:13 64:2,9
   65:13,19 66:13,24
   67:5,8 68:3 69:24
   70:6 71:6 76:12
   76:18,23 77:12,23
   78:9 79:25 80:10
   80:18 81:6 82:22
   133:8 137:25
   157:15 162:3

212:22 213:4
   215:5,9,21 216:4
   217:10
**official**  6:19 40:22
   42:2,21 49:3
   51:14 89:5 108:2
   137:21 138:3
**officially**  68:5
**offloaded**  64:25
**oh**  191:7
**okay**  16:9 17:20
   17:21 18:19 20:12
   24:25 25:5,6
   47:10 48:2 54:25
   55:11,15 58:9
   66:14 69:11 71:8
   73:4 76:7,19
   79:13,20 94:16
   96:20 104:2
   112:14 117:12
   120:4 123:19
   126:9 129:12,13
   131:16 133:5
   142:8 148:21
   155:10 160:10
   169:3 172:4,15
   182:11 186:18
   189:8,20 192:14
   194:20 195:15
   196:24 197:23
   212:23 214:15
   219:19 222:3
**old**  60:11 99:9
   100:23 101:7,17
   101:22 102:17,22
   103:2 161:20
**once**  17:3 62:13,25
   108:6 116:13
   125:17
**ones**  158:7

**ongoing**  161:25
**open**  11:16 78:15
   174:22 201:17
   207:14
**opened**  201:24
**opens**  61:8
**operate**  204:14
   219:15
**operating**  63:8
   66:3,7 67:4,7,13
   67:15,25 68:12
   133:17,25 207:7
**operation**  206:10
   206:11
**operations**  47:17
   47:20 48:3 71:16
**opportunities**
   50:10
**opportunity**  35:19
   50:9 68:9 69:5
**opposite**  74:20
**option**  113:25
   114:4
**optiplex**  126:20
   127:8 128:11
   135:9 136:9,19
   137:13 143:14
   146:15 150:23
   151:3,8 155:21
   156:18 157:13
   159:6,9,20 179:6
   179:18 180:18
   181:2 183:5,20
   185:16 187:19
   188:20 197:11,17
   197:25 198:21
   199:9,23 200:2,10
   200:20 201:4
   204:7,22 205:9
   206:3 207:8,12,15
   207:19 209:10

210:16 229:12
   230:6,10
**order**  9:4,12 12:25
   13:5,9 35:17 53:4
   69:4,6,9 72:8
   151:2
**ordered**  128:11
**ordinary**  178:16
**organization**  36:8
**origin**  146:12
**original**  36:2
   88:12 169:15
**originally**  12:12
   213:13
**outcome**  14:11
   234:18
**outgoing**  223:13
**outlook**  135:16
**outside**  50:17
   64:16,22 65:11,17
   113:10 116:11
   157:3 212:22
   213:3 215:16
   216:13,22 217:3,9
   217:15 219:6,13
   219:21
**oversee**  87:10
**owned**  30:12
   87:13,18,23 139:7
   140:19 144:17
   145:10 146:10,23
   147:4,8 148:2
   157:2 177:8 221:5
   229:21
**ownership**  105:16
**owns**  150:18
   219:22 220:11,18
**oxymoron**  122:20

**p**

**p** 2:2,2 3:2 135:20
**p.m.** 100:11
  125:23 126:13
  127:16,21 144:25
  145:5 154:7,11
  186:2,6 212:9,14
  222:5,9 230:23,24
**pa** 2:13
**package** 10:7,12
  10:16,16,18 12:17
**page** 5:14 7:19
  10:3 12:4 24:20
  33:21 55:13 72:25
  73:2 76:5 78:25
  79:2 87:8,8 94:11
  119:24 123:17
  131:11 133:4
  148:20 182:12
  192:18 197:21
  218:4 227:16
  232:4,8 235:5
**paid** 12:16 147:14
**pandemic** 4:3
**paper** 119:13
**paragraph** 4:17
  12:10 33:21 73:8
  73:11,13,20 74:8
  74:11 76:5,9 87:6
  92:14 96:12,18
  98:11 99:4 100:15
  100:19,20 120:2
  128:4 133:3,6
  134:18 136:17
  137:4 138:6
  140:25 148:19
  149:2,14 151:18
  151:21 152:2
  155:9,11,14
  156:22 160:8,18
  176:3 182:13

187:9,11,12,14,16
189:7,9,18 192:12
192:16 193:7
**paragraphs** 74:23
86:9
**part** 73:13 97:14
108:19 133:22
148:8 149:5
155:11,14 185:3
203:11
**participants** 5:2,5
22:25
**participate** 7:15
**participated** 83:3
184:22
**particular** 39:4
40:3 48:19 51:16
63:7 67:24 140:7
140:9 158:8 196:4
210:8 218:20
223:5,20
**parties** 3:6 4:4,9
4:12,24 5:6,19 6:3
6:8 7:2,6,10,14
8:22,23 9:3,5,6,9
9:15 12:22 13:16
71:10 81:8 121:2
190:11 201:25
234:15
**parties'** 9:23 10:4
10:10 11:3,7 13:4
13:11
**parts** 68:21,22
147:6 190:22
**party** 4:21 9:10,10
9:13 13:3,6 14:9
17:12 22:24 73:6
74:24 75:2,9,14
144:2,16 145:10
145:19 146:10
201:16

**passes** 223:13
**password** 11:12
11:13 47:3 150:13
151:4,6,7,23,24
152:4,5,6,21 208:3
208:7,15 209:7,22
209:24 210:3,6,11
210:19 225:11
226:11,13
**passwords** 152:9
152:13,14 153:2
153:10,14
**paul** 1:6 2:17
14:21 15:3 16:11
28:5,9,11 112:20
132:6 138:8
**paying** 21:19,22
**pc** 169:9 225:17
226:5
**pdf** 24:21 73:2
79:2 119:25
131:11 133:4
148:20 182:13
**penalty** 159:23
**pending** 18:18,18
**people** 22:12
39:15,18 52:5
68:6,7 113:24
118:6,18 119:14
123:11 139:3
153:8,9 213:18
224:16
**people's** 118:4
**perform** 42:12
65:4,12,17 66:23
67:4 71:16,16
108:11 156:5
226:20
**performance**
51:17,21

**performed** 66:21
**performing** 50:11
50:13
**performs** 82:24
**period** 43:24
62:10 91:20
114:25 115:6
130:22 140:3,7,10
140:11 156:13,15
176:12 180:21
213:19 214:23
215:22
**perjury** 159:23
**permissible** 120:6
121:8
**permission** 145:18
225:15,20 226:19
**permit** 71:12
113:13
**permits** 219:5
**permitted** 6:6
79:22 89:6 92:2
111:13,18,21
114:9 115:2,7
**permitting** 114:17
145:9
**permutations** 47:2
**persistent** 228:17
228:20
**persistently**
141:12
**person** 5:8 7:4,20
7:22 13:15 51:16
87:2 163:9 179:10
181:12 227:8
**personal** 17:10,11
27:5 49:19 53:16
53:24 54:14 78:2
88:25 89:22 90:17
91:5,16,18 92:4
111:14,19 113:15

113:19 114:5,10
115:3,8,13,22
116:23 118:4,10
118:16,21 121:16
121:22 122:17,18
122:22 138:18
139:10 151:10
153:15 159:15
165:10,24 192:22
210:19 224:13,18
**personally** 93:10
110:12,17 127:8
166:3,8,14
**personnel** 72:10
83:15 85:5 222:13
**perspective** 50:9
115:11 216:25
**peter** 94:19
**phone** 20:18 177:8
178:11,22,23
179:10
**phones** 20:12
224:11
**phonetic** 95:3,16
**photo** 202:2
**physical** 9:20
10:14 55:18,22
56:23 57:6,12,20
58:3,13,19 59:6
63:25 64:9 65:13
65:19 66:13,24
67:5 68:3 69:23
70:6 76:17 77:12
78:9 79:25 80:9
80:17 107:18
166:6 212:22
213:3 215:4,21
**physically** 71:5
86:3 216:11
**picked** 178:22

**picture** 183:12
**piece** 227:19
**pin** 198:7
**pinpoint** 227:12
**pittsburgh** 2:13
15:12
**place** 1:17 4:19
52:24 66:17 79:24
171:2 211:13
219:20
**placed** 161:7
220:8
**plains** 2:9
**plaintiff** 1:7 2:4
14:21 15:3 16:12
190:24 192:21
198:25
**plaintiff's** 24:7
43:6 72:12 84:4
112:2 117:14
129:7 141:17
142:2 145:24
148:14 153:20
168:21 171:23
172:12 181:21
192:3 194:14,16
232:8
**plaintiffs** 2:8
**plan** 99:22 100:2
184:12 210:9
**platform** 4:25
5:12 7:24 12:6
**platform's** 11:25
**pleadings** 79:11
150:3
**please** 14:16 15:14
15:23 16:2 18:15
21:3 30:9 33:17
33:18 55:8 58:22
64:17 68:8 69:9
71:23 81:21,24

86:7 89:13 90:3
94:4 108:8 117:21
118:15 128:14
151:19 182:9
191:23 192:11
195:19 219:18
**plugged** 229:17
**pm** 10:8 11:5
**point** 16:13 18:15
52:9,12 53:11
62:15 65:16 77:9
82:18 83:16,18
86:20 97:20 98:5
98:9 108:19
128:17 134:4
135:16,21 136:14
141:7 146:16
161:21 166:20,22
166:23 167:9
168:16 170:9
179:11 185:17
190:9 213:10
**points** 40:12
**policies** 72:10,22
80:5 97:7,23
98:22 144:18
145:12 211:12,17
211:19,20 212:20
213:21 214:13,17
214:21 215:18
218:6,8,14,19
**policy** 55:20,24
56:6,22 57:5,10,14
57:17,19,23,25
58:10 73:14 74:24
75:8 76:9,21 77:2
77:5,8 79:21 80:3
91:25 92:7,9,12
97:8,12,14,14,16
97:21,25,25 98:4
98:10,16,18,25

102:12 104:3,9,10
104:11,15,16,21
104:22 105:2,5,13
105:16,21,23
106:5 119:21
121:5 123:22
139:6 143:17
144:4 168:6,11,16
211:15,16,22
**pool** 213:13,18
**pop** 24:4
**portion** 121:6
149:14
**portions** 35:19
**position** 28:14,17
42:15,19 45:19
149:7
**positions** 44:5
45:16
**possession** 209:6
**possible** 115:10,16
152:17 193:16
**possibly** 103:8
**post** 47:5,8
**posted** 221:9
**potential** 130:6
192:24
**power** 135:16
**practice** 58:17,20
58:23 61:11 62:6
62:11 63:24 64:6
67:11 69:21 75:12
77:11,21 80:7
89:10,11 90:3,14
90:21,24 91:2
92:15,22 93:2
103:15 106:6,10
107:2 108:5,9
109:24 110:3,7
131:3 134:19
161:24 168:5

194:2 224:2,6
225:6,14
**practices** 81:23
109:21 212:20
215:2,2,12,25
216:3
**pre** 12:16
**precisely** 115:15
**premises** 30:4
217:7
**preparation** 26:19
27:23 86:17
**prepare** 23:8,14
26:6 27:10,21
86:12
**prepared** 25:24
86:15,19 186:22
**preparing** 187:2
194:25 195:7,24
196:5
**prescribe** 90:3
**present** 2:16 14:12
58:15 86:4 92:12
110:16 140:24
174:16 216:11
**preserve** 6:21
162:18
**pressed** 210:4
**pretty** 91:9 222:2
**prevent** 19:8
**previous** 88:6
**previously** 160:20
**primarily** 42:5
90:19 116:17
139:13,14 217:3,4
**primary** 90:7,8
150:8 185:17
190:17 216:7
217:21
**principal** 106:15
170:23

**principals** 104:6
105:7,18 106:2,8
109:3 110:14,19
137:18
**printer** 207:7
**prior** 8:16 10:5
11:14 44:12 56:10
69:14,15
**private** 68:25
113:4,7
**privilege** 27:2
195:3
**privileged** 189:15
190:2,10
**privileges** 141:13
**privy** 39:22
116:19
**proactive** 161:4
**probably** 17:15
77:5 206:10
221:23 222:2
**problem** 144:23
**problematic**
139:23
**problems** 8:18
**procedure** 4:15
6:5,17 9:7 58:18
162:12,16 180:5
185:18
**procedures** 1:18
13:17,20 62:8
180:9 212:21
**proceed** 4:6
**proceeding** 14:15
22:23 23:23 126:6
**process** 17:16 53:5
63:12 108:2
145:21 153:4
154:22 159:5
186:25 190:3
200:23 207:22

**produced** 190:23
**produces** 229:5
**product** 27:2
196:3,12
**production** 117:4
141:21,24
**professional** 43:22
43:25 45:6 49:19
49:22
**professionally**
50:8
**professionals**
60:14
**profile** 43:3,7,11
44:18 45:11,13
47:14 49:5 232:11
**program** 20:19
44:22 49:2 88:18
88:20 89:2,3,5
135:8 229:5
**programs** 134:21
135:24
**prohibited** 123:18
**prohibition** 74:13
**prohibits** 73:25
123:23
**prompt** 221:10
**proposed** 9:4,12
**proprietary** 35:16
**protect** 124:21
**protected** 11:12
68:23
**protection** 27:3,16
196:3,12
**protective** 12:25
13:5,8 35:17 69:4
69:6,9
**provide** 4:22 9:11
10:6 13:3 18:22
81:21 106:14
108:25 121:5

126:5 152:4
169:20 173:11,17
174:4,12 213:2
**provided** 12:2,20
96:14,22 99:7
100:21 102:5,6
103:11 105:17,25
107:22 120:9
122:4 123:7
126:25 140:21
151:22 153:15
156:18 159:17
175:15 189:13,23
208:8
**provider** 5:22,23
70:8,13 191:22
**providers** 64:24
70:15
**provides** 97:16
98:10 123:20
**providing** 92:17
109:22 114:3
**provisions** 4:16
77:6
**public** 1:20 6:12
15:18 118:16
231:24 234:5
235:20
**purchase** 55:21
56:7,22 58:18,24
59:4,5,11 61:17
62:4,7 63:10 93:6
104:4 106:7,25
107:3 108:19
132:15 213:21
214:3 215:13,18
**purchased** 59:18
105:6 108:7 136:7
136:13 137:17
147:18 221:11,13

purchases  108:18
purchasing  61:11
  92:16 108:17
purpose  34:23
  113:6 118:2 123:8
  133:11 150:20
  220:22
purposes  38:24
  54:16 77:13,23
  79:14 80:23 121:9
  138:18 139:9,10
  140:20 146:18
  159:9 216:15
pursuant  1:17
  4:14 12:10 92:6
  139:6 223:22
put  16:21 25:17
  52:6 60:23 61:4,6
  66:3
putting  60:11

**q**

question  3:11
  17:22 18:2,5,17,18
  19:6 22:4 26:4,23
  28:25 29:19,21
  30:3,5,9 32:8
  35:23,25 36:2,15
  36:20 39:4,21
  41:20 49:18,25
  58:7 64:10 70:2
  73:18 74:5,17
  75:20 77:17,21
  79:9,14 88:7,11,12
  98:7 99:14,17,18
  101:12 105:10
  110:22 115:24
  116:2,8 120:24
  121:19,25 129:12
  131:6 133:23
  135:6 136:11
  139:19,23 143:5

144:6,10 145:8
146:8,19,20 155:7
163:7,19 165:12
168:8 170:4
171:16 173:20
174:6,15 175:18
176:9 183:4,14,18
184:24 185:10
188:22 189:21
191:4 195:3,6,19
196:2,15 199:18
204:5 209:12
217:19 219:3
223:8 226:16
227:2,22
questions  4:20
  17:18 19:14 47:25
  54:11,19 55:13
  78:20 171:5
  230:13,17
quibble  30:11
quick  117:11,11
quickly  16:15
  222:2
quite  50:3 96:6
  114:23 161:20
  218:23
quote  132:20
quoting  132:17

**r**

r  2:2 15:10,12
  135:20 168:19
  234:2
range  93:20
  111:25 112:5
  213:15
rea  2:17 15:12
reaching  134:4
reaction  179:14
  181:16

read  24:18 30:9
  56:10,14,15 76:5
  88:6,8 110:22,24
  143:2 172:6
  192:11 195:20
  231:8
reading  74:18
ready  192:7
real  159:14
really  120:25
  146:18 200:15
  219:12
reason  18:21 50:5
  129:21 150:9
  159:25 161:14
  173:8 199:12,24
  200:9,18 203:16
  235:6,9,11,13,16
reasonable  9:13
  13:19 153:9
reasonably  8:10
  8:23 12:6
reasons  130:7
  220:6
reassign  180:15
recall  17:7 23:6,24
  24:18 27:25 28:14
  28:16 30:22,24
  31:7,8,11,17,24
  32:2,9,20 38:17,22
  44:21 46:6,12
  51:4,20 55:23
  56:5,21 57:4,8,9
  58:4,14 66:25
  68:4 83:14,23
  86:3,20,21,23
  88:15 95:19 97:2
  97:13 98:19 101:4
  102:2,24 104:9,15
  104:20 105:12,20
  106:4 109:6,12,13

109:17 110:9,15
111:11,21 114:24
115:15 116:25
118:3 121:20
122:3 126:23
127:4,7 128:17,19
128:22,23 129:3
129:25 130:11,24
133:16 134:3
137:20 138:3
140:24 142:12,17
142:18 143:23
149:19 150:8
152:10,16,22
156:12 162:11
164:2,4,5 167:14
168:15 169:4,12
169:17,18,22
170:5,10,14,19
172:16 173:9,13
173:21,23 174:7
174:17 175:21
176:17 177:15,16
177:21,23 178:5
178:10,13,15,20
179:3,11,13
181:15,16 184:10
184:16 185:6,11
186:22,25 187:13
187:16 188:6,12
188:14,24 194:24
197:19,24 198:5
198:12,18,22
200:7,9 202:13,15
203:2,9 206:16
207:10 208:2,10
208:14,16,22
209:3 210:7,9,20
211:11 214:17,20
218:18 220:2
222:14 223:24

224:24 225:2,6,7
225:13 226:7
228:3 230:2
**recalling** 217:25
**receipt** 10:12 11:8
**receive** 49:13
88:17
**received** 46:13
48:6 49:6,10
183:9 222:24
223:2
**receiving** 12:8
96:8 128:8
**recess** 126:10
186:3 212:11
**recipient** 10:15
11:16
**recipients** 131:21
**recognize** 72:16
72:19 86:10
112:15,17 119:16
146:21 186:19
187:11 192:8
**recognized** 201:24
**recollection** 23:17
27:8,12 29:16
36:9 44:25 62:14
90:5 91:13 94:7
94:13 96:2 114:16
121:13 129:17,20
134:8 138:13
141:9,10 148:6
167:3 169:7 173:5
184:6 193:10
206:5
**record** 5:24 6:19
6:21 10:18 13:23
14:14 15:23 16:2
17:25 18:9 20:17
21:3 53:3 55:3,5,7
56:15 88:8 99:25

100:7,9,11 110:24
125:16,18,23,25
126:13 127:13,17
127:19,21 137:21
138:4 144:22,25
145:3,5 152:8
154:7,9,11,15
174:25 186:2,6
194:5 195:12,20
212:10,14 214:19
222:5,7,9 225:10
230:23 231:11,13
234:11
**recorded** 5:8
208:15
**recording** 6:22,23
6:24 7:7
**records** 137:15,23
175:20 206:6
**redeploy** 161:18
**redirect** 230:14
**reed** 2:12 15:6
19:19 21:7,16,19
21:22
**refer** 38:25 78:16
**reference** 90:22
113:2 160:12
227:15
**referenced** 222:11
**referencing** 96:17
**referred** 148:25
187:20 213:16
**referring** 36:17
38:25 56:2 62:10
68:11 71:21 79:4
80:20 91:21 93:13
101:5 107:4,5
109:8 111:16,22
120:16 135:4
140:4 142:10
150:15,22 151:6,7

160:13 162:15
176:13 193:6
214:8 222:17
**refers** 224:17
**reflected** 47:13
**refresh** 23:17 27:8
129:16,19 213:25
**refreshing** 27:12
**refused** 203:21
**regard** 45:4
185:18 223:5
**regarding** 214:18
**registered** 136:15
199:5,14 200:5,14
**regret** 32:3,13
**regular** 18:16
173:22
**regularly** 173:14
**regulations** 223:22
**regulatory** 82:9
199:3,13 200:3,12
223:6,16
**reiterate** 186:14
**relate** 218:9,19
**related** 14:9 19:25
20:5 25:9,22
26:14 31:2 37:7
45:10 46:2,14,17
103:16 110:7
120:8,15 128:21
128:21 165:8,10
165:15,16,19,20
166:9 170:12
180:12 201:7,10
201:25 211:19
215:3 217:14
234:15
**relates** 39:4 69:22
70:18 78:7
**relating** 74:25
218:14

**relationship** 28:18
38:13 50:21 51:15
**relay** 222:18,20,21
**relevance** 166:2
175:20
**relevant** 182:21
**reliable** 5:15
**remember** 32:25
46:11 57:23 83:19
96:8,10 131:3
132:24 134:11
167:5 179:20
202:7,10 208:23
209:20 212:2
215:5
**reminder** 17:16
**remote** 1:15 4:18
4:25 5:7,9,21,23
6:14 7:2 8:4,7 9:5
9:9,17 13:10
19:12 134:20
218:6,9,14,16,16
219:11 226:20
**remotely** 4:6,14
7:9,16 13:25
14:12 203:23
208:13
**remove** 103:12
180:10
**removed** 142:24
**render** 87:11
**rendered** 87:17,22
**repair** 58:11 64:15
104:17 213:22
215:14,19
**repairing** 64:7,20
**repeat** 16:15 17:20
19:4 22:4 41:19
69:25 73:18 116:2
131:7 151:25
176:7 220:19

227:21
**rephrase** 116:4
213:12
**replace** 59:19
**replaced** 102:23
103:4
**replacement**
126:24
**replacing** 59:22
**replicate** 63:3
**replicated** 62:16
**report** 29:3,5
42:18 51:6,12
**reported** 42:21
210:12,13
**reporter** 1:20 6:4
6:10,11,22 7:13
9:24 10:5,11 11:4
11:8 14:6 15:14
15:22,25 18:7,25
56:16 88:9 110:25
126:9 135:18
185:23 195:21
234:5
**reporter's** 6:18
**reporting** 5:20,22
51:15
**represent** 14:21
15:3 16:11 146:13
175:9
**representation**
175:11
**representative**
22:24
**represented** 21:6
**representing** 7:17
7:21 15:6
**repurpose** 164:7
180:14,15
**repurposed**
166:11

**repurposing**
103:13
**request** 8:24 99:12
153:23 170:18
225:22
**requested** 129:18
**required** 8:12,13
8:15 128:24
223:21
**requirement**
98:23
**requirements** 6:16
82:10
**requires** 223:17
**requiring** 226:19
**research** 47:17,20
48:3
**reserve** 7:10 13:18
**reserved** 3:11
164:13
**reset** 180:13
**residence** 106:15
**residences** 104:5
105:7,18 106:2,8
**resides** 6:13
**resolve** 41:18
**resources** 167:25
**respect** 61:11
73:14 75:9 76:10
107:2 109:22
110:4 140:6,9
146:17 150:17
158:19,25 171:4
195:6 216:2,3
**respective** 3:6
98:13
**respond** 53:8 54:7
**response** 196:11
**responses** 18:10
194:13 196:6

**responsibilities**
42:3,5,8 66:4
170:12 211:9
**responsibility**
66:7 68:5 124:6
163:12 211:5
**responsible** 66:15
67:6,25 70:4
163:3,9
**rest** 63:3 112:22
**restart** 68:8
**restate** 98:8
**restated** 36:4
**restore** 62:22
**restrict** 167:20
180:2 191:12
**restricted** 168:13
**restrictions** 60:18
**retain** 12:14
103:20 152:13,25
223:12
**retained** 151:23
152:5,6,11 153:12
**retaining** 152:20
162:13
**retention** 119:21
**retire** 166:21
167:2,11,16
**retrieve** 177:7,12
177:18 179:17
**return** 12:10,16
99:9 100:23 101:7
101:16,21 199:2
203:21
**returned** 95:22
97:17 98:12 102:5
102:10,17 103:10
161:11,16 178:2
178:24
**returning** 62:4
102:22 160:6

**review** 6:24 24:22
26:13,16,18 27:22
52:3 78:23 85:3
112:13 164:19,19
168:24 192:17,19
193:4,11,18 194:8
**reviewed** 27:7,15
82:19 172:2
**reviews** 51:18,21
51:22,24 52:4,6
82:24 83:4,7,10
86:5
**right** 20:15 37:15
38:18 43:9 47:25
56:12 63:8 66:10
68:23 72:5 76:3
76:16 77:3 79:7
79:12 97:13
120:11 148:8
162:22 171:8
173:3 195:9 203:5
210:6 215:7
**rights** 13:18 70:18
70:24 71:4,11,15
109:22 141:5
149:9,13,18 180:2
191:13,16,19
193:14
**rivera** 2:18 14:4
**role** 42:9 44:9 45:4
46:8 48:17 54:13
87:16 124:4
194:25 195:7,23
210:22 211:2
**roles** 51:8
**room** 15:9 19:22
20:2,10 22:12
119:13
**rough** 126:4
**rue** 4:15

**ruhi** 15:10 19:24
**rule** 6:5,17 9:6
  24:3,8 138:20
  232:9
**rules** 1:18
**run** 66:18 222:22
**running** 61:20,25
  64:12 206:13

**s**

**s** 2:2 3:2,2 5:20
  135:20,20
**sam** 94:19
**sat** 29:16
**satisfy** 13:11
**save** 91:17 92:2
  115:12 116:22
  207:18 214:5
**saved** 164:10,11
  191:6
**saw** 67:20 201:21
  201:23 203:10
**saying** 18:9 31:11
  54:9 56:11 75:23
  98:15,17 114:15
  118:13,15 142:23
  167:12 178:10
  210:20
**says** 43:17,21 68:7
  74:20 75:6 98:16
  114:19 120:6
  123:24 128:6
  132:5 134:23
  137:14 141:6
  159:21 171:17
  182:17 192:19
**scheduling** 9:8
**school** 47:5,9
**schooling** 159:10
**schuster** 95:13
**science** 46:6 48:7
  48:12

**scott** 2:9 14:24
**screen** 11:23
  112:10 142:7
  175:6 202:2
  227:14
**scroll** 33:14,17
  76:4 78:10 133:3
  175:7 219:18
**se** 89:5 113:23
  161:6 204:12
**sealed** 10:16
**sealing** 3:7
**sec** 199:4,14 200:5
  200:13
**second** 26:15 74:7
  74:10,12,19 96:11
  96:18 99:5 100:19
  100:19 104:2
  120:5 125:13
  130:16 138:9
  147:8 182:14
  192:15 206:8
**secrets** 124:2,8,23
**section** 97:21
**secure** 10:25
  103:22 113:9
**secured** 153:16
**security** 46:10
  49:7,11 61:8
  145:15 211:7,22
**see** 5:4 16:20
  24:10 33:20 43:17
  45:10 47:16 49:5
  55:16 67:21 73:5
  73:11,20 76:13
  77:18 87:13 96:21
  99:10 100:24
  117:23 120:5,12
  123:20 124:2
  128:6,12 130:12
  130:18,19 132:5,9

133:9 134:23
138:10 142:5,22
144:22 146:5
149:2,14 156:3
159:21 171:17
172:20 173:2
181:24 183:2,3
187:12,17 189:9
192:9 193:2
194:21,22 197:6,8
198:23 199:5,7
206:5 225:20
227:8,13
**seeing** 129:10
**seek** 13:18 31:19
  225:15
**seeking** 225:20
**seen** 5:4 24:15,18
  196:20,23
**selection** 107:2
**self** 38:5
**send** 10:22 89:17
  172:23
**sending** 131:18
**senior** 29:7 52:13
  52:14,18 84:11,21
  85:2,18 86:4
  167:24 170:22
  193:19 222:13
**seniority** 29:10
**sense** 29:7 49:4
  213:6
**sensitive** 103:12
**sent** 12:11 114:14
  114:20 134:9
  222:23,25
**sentence** 74:8,11
  74:12,19 87:7
  96:11,18,25 99:5
  100:20 101:3,14
  101:15 120:5,12

128:5 149:5,6
157:8 192:16
220:20
**separate** 117:23
  118:14 122:25
**september** 189:10
  189:22
**series** 55:12 58:7
**server** 192:20
  193:5,15 194:7
  216:11
**service** 5:22,23
  64:14 104:17
  213:22 215:13,19
**serviced** 58:3
**services** 151:7
**servicing** 64:7
**session** 205:5,15
**set** 37:19 59:2
  62:20,25 133:14
  138:20 196:8
  234:9
**setting** 67:14,18
**settings** 63:9
**setup** 16:18,19
  58:11 90:18
  108:10 138:7
  139:17 140:16
  141:2 213:23
  215:14,19
**seven** 133:3
  134:18 136:17
  148:20 189:18
**shand** 1:19 14:7
  234:4,23
**share** 11:21 16:19
  20:19 24:5
**shared** 117:20
  226:13
**sharing** 11:24

**sheet** 235:2
**sherman** 94:20
  95:10 96:3 172:25
**shied** 149:24
**ship** 130:17
**shipped** 130:14,21
**shipping** 12:16
**short** 135:23
  153:24
**shorthand** 1:20
  234:4
**show** 72:11 119:6
**showed** 27:9,20
  43:10 192:20
**showing** 182:6
**shown** 112:9
**shuster** 94:19
**shutdown** 168:3
**sides** 190:5,24
**signature** 41:3,7,8
  41:11 234:22
  235:17
**signed** 3:15,17
  69:17 184:12
  188:2 189:2
  192:10 231:19
  235:17
**similarly** 218:23
**simplicity** 38:24
**simply** 36:23
  152:11 191:4
  204:12
**simultaneously**
  6:20
**single** 52:12 63:10
  63:14
**sir** 21:13 47:6 76:2
  88:11 136:18
  171:4,14 172:3,17
  205:19

**sit** 32:12 56:20
  57:3 76:2 92:10
  94:13 105:14,22
  114:15 130:3
  170:5,21 178:5
  185:5 188:5,11
  190:16 193:9
**site** 10:25
**sitting** 24:17 29:12
  32:24 51:3 57:22
  80:11 91:7 93:18
  104:8,14,19
  105:11,19 106:3
  111:20 115:14
  116:24 122:2
  129:2,24 130:10
  130:23 132:23
  138:2 142:11
  143:22 147:11
  150:7 157:20
  165:2 166:12
  169:11 177:14
  178:19 181:14
  184:15 187:15
  188:23 197:18
  198:3 200:6,15
  204:15 206:15
  211:25 214:16
  217:20 219:25
  225:5,12 226:6
  229:25
**situation** 59:9,10
  190:7
**six** 87:8,9 128:4
  148:3
**size** 107:18,19
**slash** 141:3
**slightly** 77:20
  102:14 191:3
**slowly** 16:16

**smith** 2:12 15:6
  19:19 21:7,16
**smith's** 21:19,22
**social** 4:7
**software** 16:19
  63:7 64:2 65:9,17
  73:3,6,9,14,22
  74:2,13,24 75:2,10
  75:14 89:21,24
  91:5 108:11
  133:15 135:14,24
  137:8,12,16,23
  138:4 142:24
  144:2,11,16
  145:10,19,25
  146:5,9,10,14
  147:3,4,7,8,14,15
  147:16 148:5,7
  155:17,23 156:4,9
  157:10,16 203:7
  230:2 233:3
**sole** 150:8
**solely** 77:13
**solution** 222:23
**solutions** 14:5,8
**solve** 27:18 150:18
**somebody** 42:24
  106:21 167:25
  204:17
**someone's** 118:25
  119:3
**soon** 99:14 126:6
**sorry** 17:5 35:25
  52:16 69:25 73:17
  78:13,14 87:25
  94:23 96:16
  110:21 115:24
  131:7 140:8 142:6
  144:5,12,19
  161:10 199:16
  208:11

**sort** 54:15 133:14
  164:12
**sounds** 99:21
  122:20
**southern** 1:3
**space** 164:13
**span** 135:23
**speak** 16:14,15
  18:11 26:3,10
  40:23 61:2 81:7
  82:3 85:24 102:19
  106:17 120:25
  125:2 143:6 156:2
  167:23 174:20
  190:25 194:3
  205:16 213:9,14
  216:10 227:3
**specialization**
  48:24
**specific** 34:23 37:4
  39:3 55:24 57:23
  70:22,25 75:25
  83:19,21 85:17,22
  85:24,25 86:8
  87:2 90:23 104:9
  104:10,20 105:12
  105:15,20 106:5
  108:23 109:13,17
  128:18 130:24
  163:8 164:5
  168:15 173:4
  206:4 209:3 211:9
  213:8 214:17
  218:19 225:7
  226:7
**specifically** 26:4
  36:6 37:19 38:18
  48:16 85:8 96:8
  164:6 176:3
  188:12 208:2
  212:18 218:9,14

**specifications**
133:9,12
**specificity** 115:18
223:20
**specify** 62:9 65:6
**speculate** 130:7
147:23 153:7
171:11 185:2
186:10,11,14
**speed** 58:6
**spoke** 23:9 26:8
214:2
**spoken** 21:25 22:7
22:9 23:4,21
**spreadsheet**
174:24
**squarely** 25:18
**ss** 231:4
**stable** 5:14
**staff** 62:3
**stamp** 125:16
**stand** 211:14,16
**standard** 62:15,19
63:13 108:14
109:24 110:3
133:14 134:19
180:5,8 200:23
**standpoint** 180:7
**stands** 113:4
**start** 34:3 43:13
68:17 93:16 113:3
148:23 155:13
176:14 212:24
213:13 219:24
220:5
**started** 16:17
220:3,25
**starting** 66:6
**starts** 196:2
**state** 1:21 6:12
14:13,16 15:18,22

15:25 17:24 20:23
21:2,12 30:10
35:11 70:3 73:14
74:24 75:7 76:9
81:2 87:9 92:14
106:18 117:19
133:6 134:19
136:17 137:5,10
152:2 160:19
199:20 223:9
231:3 234:6
**stated** 116:9
155:24 157:11
193:19 217:6
226:17
**statement** 92:25
97:4 160:11 161:6
**states** 1:2 76:25
77:19 96:13 97:9
98:18 99:6 100:20
130:12 138:6
141:2 149:6
151:21 155:11,14
189:10 197:2
198:24
**stating** 167:7
187:18
**station** 67:25
71:13 144:3
162:21 163:15
166:5,6,10 221:14
**stations** 75:15
77:22 80:9 130:9
143:21 157:14
215:20 216:4,17
**status** 51:15
162:20
**stay** 50:24,25
195:11,14
**stays** 122:16

**stenographic** 6:15
**step** 44:8
**stepped** 44:10
119:2
**steps** 124:24
155:20 167:20
179:24 190:6
**steven** 94:19
**stipulated** 3:4,9,13
4:8 12:25 13:5,8
**stipulation** 4:4,17
9:4,11
**stock** 109:2
**stoneturn** 189:13
189:24
**stood** 44:21
**stop** 144:13
**street** 2:8
**strike** 79:15
170:17 175:24
**strive** 5:9
**structure** 201:6
**structured** 51:14
**study** 148:3
**sub** 227:18
**subheading** 73:5
**subject** 4:10,16
69:8 125:5 162:9
162:14,19 163:5
223:17 230:14
**subordinate**
149:10
**subscribed** 231:19
235:17
**substance** 40:21
132:22
**successfully** 66:21
**suffer** 125:9
**sufficient** 5:16 8:4
8:7 209:16

**suggest** 131:25
**suggesting** 78:23
**suggests** 75:5
**suite** 157:10
**summer** 45:14
**super** 67:16
**superior** 28:23
42:21,23 149:7,23
149:24 150:5
**supervisor** 42:24
**supervisors**
187:22 188:19
**supplied** 73:9,22
74:2,14
**supply** 8:15 11:13
**support** 87:12,17
87:21 153:11
**supporting** 153:5
**suppose** 40:21
50:3 166:24
**supposed** 182:4
**sure** 22:10 27:10
28:22 33:9 35:10
42:16 45:23 46:5
58:21 67:13,17
71:3 73:19 75:21
78:11,19 82:13
83:11 92:11 94:24
99:19 101:13
104:25 106:11
111:4 116:3
119:15 127:14,15
132:23 135:22
143:23 147:21
148:10 153:25
162:16,17 166:7
175:19 185:21
199:19 205:24
206:9 207:23
209:23 212:7
217:23,24 219:4

220:21 221:19
228:22 230:11
**surprised** 189:11
189:22 190:8
**surroundings**
19:15
**sustain** 8:7
**swear** 15:14
**switches** 156:2
**sworn** 3:15,18
15:17 23:22
159:17 176:22,24
234:10
**system** 63:9 66:3,8
67:4,7,13,16 68:2
68:12 71:16,17
82:8,12 83:13,16
84:19 120:10
133:17,25 155:17
155:23 156:3,8
165:25 191:6
194:6 222:24
223:14
**systematically**
59:7,11
**systems** 45:2
84:23 85:3 90:8
134:15 156:8
168:12 180:3,11

**t**

**t** 3:2,2 168:19
231:2 234:2,2
**take** 18:16 33:12
45:24 53:6 54:23
55:9 60:8 86:6
87:5 92:13 99:12
100:16 112:11
122:8 125:11,14
127:22 131:9
142:14 144:13
153:23 155:20

164:15 167:20
176:2 179:24
182:9 185:23
190:6 194:23
202:2 212:6,16
221:24
**taken** 1:19 4:18
7:9 13:25 53:15
126:11 182:18
186:3 190:5
212:11 231:9
**takes** 124:24
**talk** 27:14
**talked** 83:2 149:25
209:4
**talking** 32:11
36:21 74:7,10
76:16,20 109:14
152:23 180:22
**tdp** 44:18,20,21,23
**technical** 66:16
87:11,17,21 216:7
**technological** 5:25
115:10
**technology** 8:3,12
8:13,15,18 11:24
43:15 44:22 45:7
45:9,16 46:2,8
48:8,13,17,18,25
51:11,19 60:20
84:14 87:9,10,16
88:4 93:14 115:19
123:22 124:5
179:24 180:6
210:23 211:4,12
211:19
**telephone** 8:6
181:13 198:19
**tell** 19:21 30:18
33:8 37:21 42:16
45:21 46:4 47:7

62:18 67:23 68:6
68:7,10 85:8
102:21 107:7,17
128:14 131:17
135:21 143:23
147:12 166:13
174:25 175:7
179:4 181:12
200:16 202:16
207:23 210:17
217:23,24 220:2
**temporarily**
207:25
**tenure** 33:10 51:8
93:9,13,15,17
105:4
**term** 36:20 46:20
70:17 78:10,22
79:10 82:15
107:14 120:14
228:16,23
**terminated** 168:2
176:6,11,16,18,25
177:13,19
**termination** 168:4
179:25 181:6,9
200:25
**terms** 34:17 53:22
54:21 57:14 62:24
69:8 82:14 157:16
196:9
**terrific** 20:22
54:23 125:20
**testified** 15:19
27:6 61:10 188:14
214:25 224:21
**testify** 56:12 80:12
85:25
**testifying** 27:5
75:22 190:4
202:12 223:24

**testimony** 7:11
18:23 19:9 23:22
25:9,20,25 26:6,19
27:22,23 53:7,7
54:16 68:12 69:7
94:11 135:13
159:17 160:14,17
171:10 190:12
202:25 203:4
214:20 215:6
222:15 231:8,12
234:9,12
**text** 201:12
**thank** 16:9 28:2
56:17,18 57:2
58:16 64:5 69:20
94:9 125:20
139:23 145:6
230:18,20,21
**thanks** 20:22
100:4
**thing** 18:17 84:10
135:19
**things** 53:9 64:11
71:18 113:13
130:14 132:6
162:18
**think** 18:25 25:13
27:17 29:20 35:12
36:3,14 43:2
47:23 53:9,12,17
54:8,13,19 56:11
64:4 70:23 72:5
75:25 99:16
119:11 125:4
130:3,6 132:21
152:24 153:3,7,8,9
154:12 157:21
163:10 167:13
171:3 174:8
183:14 188:15

**[think - transmission]**

195:13 196:6,11
199:16 214:9
**thinking** 31:24
32:9 87:2 90:13
186:8 188:24
227:4
**third** 13:3,6 73:6
74:24 75:2,9,14
144:2,16 145:10
145:19 146:10
198:23
**thought** 36:2 53:5
53:14,20 138:21
145:13 190:3
202:2 226:22
**thousands** 192:25
**three** 49:6 71:9
74:22 99:4 100:15
100:20 119:10
133:4 144:22
146:24 147:13
156:22 187:10
**time** 1:17 3:12
9:13 12:5 14:16
21:20,23 23:25
31:12,13,18 32:2
32:21,22,25 33:8
34:2,4 43:24 44:7
45:6 50:4 51:23
53:22,23 54:3
55:2,6,23,25 56:2
56:3,4 58:5,15
59:7 62:9,10,15
64:17 65:21,22,24
66:5,25 67:2,15,23
68:3,18 70:9 71:7
71:7 81:24,25
83:19 85:10 86:24
90:2,4 91:20,24
93:4 95:25 96:7
97:2 100:5,10

107:6,8 108:7,20
110:16 114:22,25
117:10 125:15,19
125:22 126:11,12
127:15,20 130:22
135:15,23 138:15
139:5 140:3,5,7,10
144:4,18,24 145:4
145:12,13,16,16
146:16 147:11,20
152:3,3 154:6,10
156:14,15 158:3,4
158:19 163:16
167:15 168:3,16
169:23,24 170:9
170:14 172:18
176:12 178:14
180:16,22,25
181:5 183:5,19
185:25 186:4,5
198:4 199:8,21
200:8 203:7,10
204:18,21 206:8
212:8,12,13
213:15,19 214:5
215:21 220:3
222:4,8 224:2
225:11 229:17
230:5,17,19,22,24
**timeframe** 107:5
109:7 111:15
160:21 170:13
**timeframes**
109:15
**timeline** 43:4
**times** 17:2 83:8
93:10,22 107:9
151:22 182:21
197:3
**title** 28:17 40:7,9
40:13,18,20 41:6,8

41:10,24 42:2
**titles** 40:22
**today** 18:23 19:9
20:5 23:5,14
24:17 28:4 29:12
32:13,24 38:4,5,25
40:6,20,25 41:7
50:12 51:3 52:15
52:19 56:20 57:3
57:22 66:6,9,10,15
91:7 92:10 93:18
94:12 104:8,14,19
105:11,14,19,22
106:3 111:20
114:16 115:14
116:24 122:2
129:2,24 130:3,10
130:23 132:23
138:2 142:11
143:22 147:11
149:25 150:7
157:20 166:12
169:11 170:6,21
177:14 178:6,19
181:14 184:15
185:5 187:15
188:5,11,23
190:16 196:21
197:18 198:3
200:6,15 202:12
203:4 206:15
211:25 214:16,25
217:20 219:20,25
221:14 222:11
224:21 225:5,12
226:2,7 228:14
229:25 230:19
**today's** 22:2,7
**told** 30:20 102:24
153:11 188:7

**top** 33:14,17 48:15
72:2,5 95:5 98:19
117:19 130:13
147:12 157:21
217:21 228:18
**topic** 52:7 55:13
55:16 78:7,21
103:24 212:19
216:15 218:3
219:18
**topics** 24:22 25:10
25:22,25 26:7,14
26:20 27:11 52:23
53:4,13,14 54:12
214:10
**tough** 157:20
**traci** 2:17 15:11
**tracie** 1:19 14:7
18:8 30:8 56:9
88:5 126:2 234:4
234:23
**track** 156:7 220:8
**tracking** 10:6
**trade** 123:25
124:8,22
**training** 45:18,22
46:9,13,16
**transactions**
192:25
**transcribed** 6:15
**transcript** 6:18,25
7:8 35:20 126:4
231:8,10 234:11
**transfer** 206:20
207:22
**transferred**
206:22
**transformed**
114:22
**transmission**
123:24 124:7,21

124:25
**trash**  60:12,19,23
  61:5,7
**travel**  4:6 139:16
  139:21
**traveling**  139:25
  140:13
**treat**  94:14
**trial**  3:12 7:4,6,12
**trick**  34:25
**tried**  204:20
**tries**  155:12,15
**tripp**  94:18
**troubleshoot**  5:25
**true**  87:15 177:4
  231:10,14 234:11
**truth**  189:3
**truthful**  171:10
**truthfully**  75:22
  171:7
**try**  16:16 18:16
  53:17 67:22
  155:25 156:5
  210:10 216:6
**trying**  62:22 82:16
  150:2 198:7
  204:18 214:5
**turn**  52:23 72:25
  103:24 119:24
  125:5 131:11
  132:25 148:19
**turned**  103:3
  156:2 178:23
  179:5
**turning**  123:16
  205:15,22
**turns**  221:14
**two**  87:8 92:14
  96:12,19 98:11
  125:6 128:24
  129:18,23 130:9

132:2 134:20
138:7 141:4 147:6
155:9,11,14
165:22 199:17
**type**  194:7 209:14
**typed**  210:3
**types**  35:8,13
  36:13 87:21
  107:24 224:5
**typical**  130:20
**typically**  39:16
  63:22 71:17 137:7
  162:2 164:11
  213:11
**typing**  18:8

**u**

**u**  3:2 15:10
**ultimately**  54:18
  143:12
**unable**  53:8
**unauthorized**
  123:24 124:7,21
  139:3
**undergraduate**
  47:17
**underneath**  43:21
**undersigned**  4:10
**understand**  7:24
  18:5,12 21:13
  24:6 25:7,19 28:3
  39:6,8 52:20
  72:21,22 74:25
  75:8 76:8 77:3,7
  82:16 84:9,20
  94:11 130:4
  132:16 139:11
  143:9,11 148:22
  175:11,19 176:15
  193:16 203:2
  209:23 226:11,23

**understanding**
  35:15 46:24 51:7
  71:14 79:16 81:17
  81:22 97:6,15,22
  98:3 120:14
  124:17,19,23
  126:7 158:18,24
  182:24 183:8
  184:3 187:20
  189:5 193:13,24
  200:17,22 210:25
  223:15
**understood**  29:9
  102:11 138:15
  139:5 152:25
  183:22 189:4
  202:14 211:18
**undertake**  184:20
  188:8,17 194:7
**undertaken**
  182:17 193:17
  203:13
**underwood**  2:14
  15:5,5 18:3 19:23
  21:7 22:22 25:16
  26:21,25 28:24
  29:18 30:2 32:7
  35:21,24 36:14
  39:20 49:17,24
  53:2 54:25 56:9
  72:18 74:4,16
  75:19 77:16 78:13
  94:23 98:6 99:16
  99:21 100:4
  101:11 105:9
  112:6,9 116:7
  117:7,10 119:9,15
  120:23 121:18,24
  125:9,12 126:2
  127:12 131:5
  136:10 139:18

143:4 144:5,19
154:2 155:6 163:6
163:18 165:11
168:7 171:15
173:19 174:5,14
175:17 183:13
184:23 185:9
188:21 195:9,18
195:25 196:14
204:4 209:11
212:5 214:7
217:18 219:2
222:3 223:7
226:15,25 230:15
230:16,21
**unfortunately**
  33:16
**uninstallation**
  71:25
**unintentional**
  119:5
**uniquely**  220:23
  221:2
**united**  1:2
**unrelated**  77:15
**unseal**  10:18
**unusual**  170:18,22
  171:6
**update**  67:14,21
  67:23 68:8 134:13
  156:6
**updated**  99:7
  100:22 102:7
  160:22 161:2,5
**updates**  65:18
  66:3,8,18,20 67:4
  67:7,17 68:2,12
  155:17,23,25
**upgrade**  141:13
**upgraded**  133:21
  133:25 134:6

**upkeep**  64:12
**urge**  153:13
**usage**  79:18 80:24
  81:5,12 85:4,12
  87:11 110:18
  111:3,8,9 123:22
**usb**  206:23 229:13
  229:16
**use**  7:7,11 55:17
  55:22 56:7,23
  57:6,11 60:4,9
  63:12 64:16 68:25
  69:12 73:5,9,21
  74:23 75:2,9 76:6
  76:11,22 77:14,25
  78:2 92:18 94:2
  102:5 103:11
  104:5 105:7,17,25
  106:7,14 107:14
  108:14 109:4
  117:23 118:5,8,13
  121:8,15 122:13
  122:15,21 123:7
  123:12,14 128:10
  132:8 137:6,18
  138:9 140:21
  150:2 159:8,15
  200:19 209:9
  212:21 215:4,15
  224:22
**user**  67:24 68:5
  71:15 116:10,13
  138:7 141:4 219:5
  220:16 226:20
**users**  75:13 110:2
**uses**  120:9
**usually**  108:18
  122:11 167:24
  216:21 224:17

**v**

**v**  168:19
**vague**  34:19
**vaguely**  115:5
  134:3
**validity**  6:9
**various**  28:5 39:11
  40:12 45:2 70:14
  121:2 190:22
  192:23
**vendor**  60:7,10
  64:16 65:2 66:4
  66:15,19,23 67:4
  68:11,25 103:7
  222:22
**vendors**  64:22
  65:4,11,17,25 66:7
  68:14
**verbal**  18:10
**verbatim**  132:20
  178:9
**veritext**  14:5,8
**version**  117:13
  133:16
**versus**  14:2 108:22
**video**  5:8,21,24
  6:8,20,22,23,24
  7:7 10:19
**videoconference**
  7:15 11:25
**videoconferenci...**
  5:12 7:23
**videographer**  2:18
  6:20 13:22 14:6
  15:13 19:3 55:2,6
  100:5,10 125:17
  125:22 126:12
  127:15,20 144:24
  145:4 154:6,10
  185:25 186:5
  195:11,15 212:8

  212:13 222:4,8
  230:22
**view**  143:18
  157:12 171:6,11
  226:18
**violation**  143:16
**virtual**  1:12 113:4
  113:6
**virtually**  156:23
**virtue**  226:13
**volunteered**
  184:14
**vpn**  112:23,24
  113:2,3,8,12,19
  114:6,18 115:4,9
  115:18,21 116:6
  116:10,14 118:24
  137:7,12 228:17
  228:21

**w**

**w**  168:19 231:2
**wait**  78:14 99:16
**waiting**  206:10
**waived**  3:8
**waivers**  221:15,17
**want**  19:13 54:6
  62:21 68:20 78:10
  78:16,17 82:2
  84:9 94:5 113:21
  117:11 118:4
  139:2 147:22
  148:7 165:21
  171:9 186:11,13
  186:14 204:18
**wanted**  50:8 75:21
  150:10 205:2
**way**  17:17 22:11
  27:18 30:10 31:25
  40:11 51:13 53:20
  56:19 68:20 70:3
  74:21 82:14

  107:13 115:18
  118:22 121:10
  127:5 129:10
  138:21 143:3,7,18
  157:18 167:4
  175:5 196:10,19
  204:13 219:16
  223:10 234:17
**ways**  42:11
**we've**  23:21 66:2,2
  68:13 76:14 135:9
  155:21 162:2
**webcam**  8:5
**website**  221:9
**week**  53:6
**weiss**  2:7,7,9 14:24
  14:25,25,25
**went**  214:9
**white**  2:9
**willing**  154:2
**windows**  117:22
  133:17,19,21,25
  134:6,15
**wish**  60:8
**wishes**  149:23
**withdraw**  29:2
  117:5 131:8 150:3
  165:13 189:16
  204:6
**withdrew**  199:19
**withstanding**
  125:3
**witness**  15:8,15,16
  15:24 16:3 17:13
  17:14 21:9 26:22
  27:4 94:24 195:16
  196:4,7 230:20
  232:4 234:8,13
  235:4,17
**witnesses**  13:4,6

**wonder**  35:2

**word**  37:11 135:16
149:24 192:17
201:14

**words**  132:11,17
149:22 199:17

**work**  9:7 17:9
27:2 33:2 38:6,9
39:13,18 40:4
52:5 67:19,25
71:12 75:14 77:22
79:19 80:9 89:10
89:10 94:21 95:7
95:10,13,17
106:22 108:11
116:6 122:9 130:9
133:15 142:24
143:20 144:3
153:25 157:14
162:21 163:15
166:5,6,10 196:3
196:12 215:20
216:4,16 218:24
221:14 228:8,11

**worked**  28:19
33:10 39:17 44:15
45:2 86:16 118:23
205:18 209:8

**working**  39:24
87:4 198:13,15

**works**  17:17
115:19 204:13
228:13

**wrap**  222:2

**writing**  101:25

**written**  6:25 55:20
56:6,22 57:4,10,19
57:25 58:10 92:6
97:8,25 98:4,10
104:3,10,11,15,16
104:20,22 105:2,5

105:13,15,21,23
106:5 137:23
138:3 139:6
152:12 168:10,16
213:20 214:12,17
214:21 218:5,8,13
218:19

**wrong**  25:15 78:15

**wrote**  131:14
172:21 173:24
174:9

---

**x**

**x**  1:5,11 232:2

---

**y**

**y**  15:16 70:11
135:20

**yahoo**  201:24

**yalkin**  2:19

**yeah**  112:17
129:15 228:22

**year**  91:8 93:22
109:16,19 212:2

**years**  17:8 42:17
68:14 90:6,22
111:22 188:25
202:22 205:19
212:3 220:4

**yesterday**  202:16

**york**  1:3,12,12,21
2:5,5,9 15:18 16:5
19:18 21:5 231:3
231:5 234:6

---

**z**

**zip**  11:4,9,11,16,17

**zoom**  1:15 2:6,10
2:14 15:19 195:17