# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 5

Page 1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------X

   PAUL IACOVACCI,

4

                              PLAINTIFF,

5

6        -against-          Case No.:

                            1:18-cv-08048

7

8  BREVET HOLDINGS, LLC, et al.,

9                            DEFENDANTS.

   -------------------------------------------X

10

11                DATE: October 7, 2021

12                TIME: 9:00 A.M.

13

14

15        VIDEOTAPED VIRTUAL DEPOSITION of

16  the Defendant, BREVET HOLDINGS, LLC, et

17  al., by a 30(b)(6) Witness, MEI-LI da SILVA

18  VINT, taken by the Plaintiff, pursuant to a

19  Court Order and to the Federal Rules of

20  Civil Procedure, held remotely, at all

21  parties' locations, before KARYN CHIUSANO,

22  a Notary Public of the State of New York.

23

24

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   CYRULNIK FATTARUSO, LLP
        Attorneys for the Plaintiff
 5      PAUL IACOVACCI
        55 Broadway ~ 3rd Floor
 6      New York, New York 10006
        BY: IAN DUMAIN, ESQ.
 7          MARY KATE GEORGE, ESQ.
            EVELYN FRUCHTER, ESQ.
 8      Idumain@cf-llp.com
 9
     REED SMITH, LLP
10      Attorneys for the Defendants
        BREVET HOLDINGS, LLC, et al.
11      225 Fifth Avenue
        Pittsburgh, Pennsylvania 15222
12      BY: COLIN UNDERWOOD, ESQ.
            JILLIAN FITZPATRICK, ESQ.
13
14
15
     ALSO PRESENT:
16      MARCELO RIVERA, Videographer
        DAVID SPINLEY, Brevet
17      PAUL FATTARUSO, ESQ.
18
                *         *         *
19
20
21
22
23
24
25
```

Page 3

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5     IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20    IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24              *     *     *     *

25

1          OPENING STATEMENTS

2          THE VIDEOGRAPHER:  Good

3    morning.

4          We are going on the record at

5    9:00 A.M., on October 7, 2021.

6          This deposition is being taken

7    remotely, of Mei-Li da Silva Vint, in

8    the matter of Paul Iacovacci versus

9    Brevet Holdings, LLC, et al.

10         My name is Marcelo Rivera, from

11   Veritext Legal Solutions and I am the

12   Videographer. The Court Reporter is

13   Karyn Chiusano, in association with

14   Veritext Legal Solutions.

15         I am not related to any party

16   in this action nor am I financially

17   interested in the outcome.

18         Counsel and all present

19   remotely will now state their

20   appearance and affiliations for the

21   the record.

22         If there are any objections to

23   proceeding, please state them at the

24   time of your appearance, beginning

25   with the Noticing attorney.

```
 1            OPENING STATEMENTS
 2          MR. DUMAIN:  Hi.  My name is
 3     Ian Dumain.  I am with Cyruliak
 4     Futtaruso, LLP.  I represent Paul
 5     Iacovacci, the Plaintiff.
 6          And with me are my colleagues
 7     Evelyn Fruchter and Mary Kate George.
 8          MR. UNDERWOOD:  Colin Underwood
 9     from Reed Smith.
10          I am here with my colleague,
11     Jillian Fitzpatrick.  We represent
12     the Defendants in this action and the
13     witness, Mei-Li da Silva Vent.
14          THE VIDEOGRAPHER:  Will the
15     Court Reporter please swear in the
16     witness?
17          THE COURT REPORTER:  Can you
18     raise your right hand, please?
19          (Witness complies.)
20          THE COURT REPORTER:  Do you
21     swear that the testimony you are
22     about to give will be the truth, the
23     whole truth and nothing but the
24     truth, so help you, God?
25          THE WITNESS:  I do.
```

Page 6

1                   MEI-LI da SILVA VINT

2      M E I - L I   d a   S I L V A   V I N T,

3      called as a witness, having been first duly

4      sworn by a Notary Public of the State of

5      New York, was examined and testified as

6      follows:

7      EXAMINATION BY

8      MR. DUMAIN:

9           Q.    Please state your name for the

10     record.

11          A.    Mei-Li da Silva Vint.

12          Q.    What is your address?

13          A.    441 9th Avenue, 20th Floor, New

14     York, New York 10001.

15                THE COURT REPORTER:  Mr.

16          Dumain, any time you're ready, sir.

17                I am ready for you.

18                MR. DUMAIN:  Thank you.

19          Q.    Good morning, Ms. Da Silva

20     Vint.  My name is Ian Dumain, and I

21     represent Paul Iacovacci, the Plaintiff, in

22     this litigation.

23                Before we get started, in

24     earnest, can you confirm that you, or your

25     counsel, have set up the Veritext Exhibit

```
 1              MEI-LI da SILVA VINT
 2   Share app, so you can view documents?
 3        A.    Yes.
 4        Q.    Great. Thank you.
 5              Can you state your full name,
 6   again, for the record, please?
 7        A.    Mei-Li da Silva Vint.
 8        Q.    Can you, please, provide your
 9   home address for the record?
10        A.    It's New York, New York.
11        Q.    Can you give a more specific
12   answer, please?
13        A.    Why is it needed?
14        Q.    I am not sure I need to tell
15   you why but if you were to leave Brevet and
16   you were need -- you need -- need to serve
17   a trial subpoena and are no longer
18   represented by counsel, for example, we
19   would want to know where you live.
20        A.    Can we confirm this will not be
21   in the public record?
22              I'm a woman, providing my
23   personal address, for the record.
24        Q.    I can not -- well, let me put
25   it this way, we can designate it
```

1              MEI-LI da SILVA VINT

2    "confidential."  Your -- your counsel can

3    -- we don't have any -- as I sit here, any

4    reason to think of a reason why this would

5    be put in the public record.

6         A.    ███████ ██████ █████ ████████ ████████

7    ████████ █████ █████ █████ █████ █████ ██████

8         Q.    Thank you.

9              You're represented by Mr.

10   Underwood today?

11        A.    Yes.

12        Q.    Brevet is paying for your

13   representation, I assume; is that correct?

14        A.    Reed Smith -- Reed Smith is

15   yes, representing Brevet.

16        Q.    And you -- you, personally, as

17   a witness in the case?

18        A.    Yes.

19        Q.    Are you aware of any reason you

20   wouldn't be able to provide competent

21   testimony here today?

22        A.    No.

23        Q.    Have you ever given a

24   deposition before?

25        A.    No.

Page 9

                    MEI-LI da SILVA VINT
1
2       Q.    You have observed a lot of
3   depositions; is that correct?
4              MR. UNDERWOOD:   Object to the
5         form of the question.
6       A.    I don't know what "a lot"
7   means.  I have observed depositions in the
8   past.
9       Q.    You have observed -- how many
10  depositions, in this case, have you
11  observed?
12      A.    In this case?
13      Q.    Yeah.
14      A.    I -- I don't know the exact
15  number.
16      Q.    Okay.
17             Were you present, remotely, for
18  all, or a part, of Garreth Lee's
19  deposition?
20      A.    I was present for, um, part of
21  Garreth Lee's deposition.
22      Q.    Were you present for all, or
23  part, of Sherri Harrison's deposition?
24      A.    I was present for a part of
25  Sherri Harrison's deposition.

```
 1              MEI-LI da SILVA VINT
 2        Q.    Were you present for all, or
 3   part, of Johnny Lan's deposition?
 4        A.    I was meant for a part of
 5   Johnny Lan's deposition.
 6        Q.    Were you present for all, or
 7   part, of Paul Iacovacci's deposition?
 8        A.    I was present for a part of
 9   Paul Iacovacci's deposition.
10        Q.    Were you present for all, or
11   part, of Mr. Callahan's deposition?
12        A.    I was present for a part of
13   Mark Callahan's deposition.
14        Q.    Okay. Thank you.
15              Do you think you need me to
16   explain the rules of how a deposition
17   works?
18        A.    No.
19        Q.    Terrific.
20              Are you located in Reed Smith's
21   New York office now?
22        A.    Yes, I am.
23        Q.    And Mr. Underwood and Ms.
24   Fitzpatrick are with you; is that correct?
25        A.    Yes.
```

```
                                        Page 11
 1              MEI-LI da SILVA VINT
 2       Q.    Is there anyone else in the
 3   room?
 4       A.    No.
 5       Q.    Could you let me know if anyone
 6   else enters the room, please?
 7       A.    Yes.
 8       Q.    Okay.  Did you bring any
 9   documents related to this case with you to
10   Reed Smith this morning?
11       A.    All documents that I brought
12   are in possession of my attorney.
13       Q.    Did you bring documents with
14   you this morning?
15            MR. UNDERWOOD:  Ms. da Silva
16         Vint's has -- has in-house Counsel
17         brought some documents that relate to
18         the litigation, not -- not,
19         specifically, related to her
20         testimony here today.
21            THE WITNESS:  Correct.
22            MR. UNDERWOOD:  To deliver to
23         us but they -- they are not part of
24         the preparation for the deposition or
25         anything relevant to the deposition
```

```
                                        Page 12

 1              MEI-LI da SILVA VINT

 2         oday.

 3              MR. DUMAIN:  And they are work

 4         product?

 5              MR. UNDERWOOD:  Es.

 6         Q.    And Ms. da Silva Vint, are you

 7    -- you are a lawyer, I gather?

 8         A.    Yes.

 9         Q.    And as your registration

10    current?

11         A.    It is.

12         Q.    What is your title at Brevet?

13         A.    Um, officially, at BREVET

14    CAPITAL MANAGEMENT LLC, I am the Chief

15    Compliance Officer.

16         Q.    Do you have any other titles

17    with Brevet Capital Management, LLC?

18         A.    I do not have any other titles.

19         Q.    Do you have any employment

20    relationship with any Brevet entity, aside

21    from Brevet Capital Management?

22         A.    I actually do not have an

23    employment relationship with Brevet Capital

24    Management, LLC.

25              I have an employee relationship
```

```
 1              MEI-LI da SILVA VINT
 2    with Brevet Holdings.
 3         Q.    And who do you provide -- what
 4    -- what Brevet entity do you provide
 5    services to?
 6         A.    Um, it depends.
 7               There is not a specific Brevet
 8    entity I provide services to.
 9         Q.    So, is your title:  Chief
10    Compliance Officer of Brevet Holdings or
11    Brevet Capital Management?
12         A.    Brevet Capital Management is
13    the Registered Investment Advisor and I am
14    the Chief Compliance Officer of Brevet
15    Capital Management, LLC.
16         Q.    Okay. Do you provide legal
17    advice to any Brevet entity?
18         A.    I provide legal advice to many
19    Brevet entities.
20         Q.    Okay.  Is that part of your job
21    description?
22         A.    I don't know what you mean by
23    "job description."
24         Q.    Well, when you were hired, were
25    you hired to provide legal advice to one or
```

Page 14

```
 1              MEI-LI da SILVA VINT
 2   more Brevet entities?
 3        A.    There wasn't a specific job
 4   description in my -- in my Employee
 5   Agreement.
 6        Q.    I did you come to work at
 7   Brevet?
 8        A.    Through a Senior Advisor that I
 9   know.
10        Q.    This Senior Advisor is a
11   person?
12        A.    It's a person, yes.
13        Q.    Can you explain what you mean
14   by "Senior Advisor" in this context?
15        A.    Sure.
16              A person who has experience in
17   the Investment Advisor and I would say
18   "lending world," who has a relationship
19   with Brevet and many other of our peers,
20   who I know, who also knew Brevet.
21        Q.    Okay.  And this person referred
22   you to Brevet.
23        A.    Yes; introduced me to Brevet.
24        Q.    Okay. And was Brevet looking
25   for a Chief Compliance Officer at that
```

```
                                          Page 15
 1            MEI-LI da SILVA VINT
 2   time, to your knowledge?
 3        A.    To the best of my knowledge,
 4   yes, they were.
 5        Q.    Was Brevet looking for an
 6   in-house lawyer at that time, to the best
 7   of your knowledge?
 8        A.    To the best of my knowledge,
 9   no, I do not know.
10        Q.    During the interview process
11   with Brevet, did anyone from Brevet
12   communicate to you that you were being
13   hired in part to provide legal advice to
14   Brevet entities?
15        A.    At this time, I can't recall.
16   It was over five years ago or almost five
17   years ago.
18        Q.    Do you stay current with your
19   continuing legal education requirements?
20        A.    I do.
21              I just completed my
22   registration.
23        Q.    That must be a relief.
24              Who pays for your CLE courses?
25        A.    The firm has a PLI Membership,
```

```
                                              Page 16
 1              MEI-LI da SILVA VINT
 2   so, the firm pays for PLI Memberships for
 3   everybody at the firm.
 4        Q.     Are there any other lawyers who
 5   work at Brevet?
 6        A.     Yes.
 7               There are people who have their
 8   are -- there are lawyers.
 9        Q.     And is there anyone who works
10   at Brevet, whose job title is in-house
11   counsel?
12        A.     No.
13        Q.     Is there anyone who works at
14   Brevet whose principal job function is to
15   provide legal services to one or more
16   Brevet entities?
17        A.     When you say "principal job
18   functions," meaning that -- meaning what?
19        Q.     Do you know what "principal"
20   means?
21               MR. UNDERWOOD:  Object to the
22          form of the question.
23        A.     It can mean many things.
24               So, what do you mean in your
25   question?
```

Page 17

```
 1              MEI-LI da SILVA VINT
 2              MR. DUMAIN:  I meant it with an
 3         "A."
 4         Q.    So, is there --
 5              MR. DUMAIN:  "Principal," with
 6         an "A."
 7         Q.    Is -- is -- is -- does that
 8    help?
 9         A.    I know how to spell principal.
10    I know there are two forms.
11              But so, when you mean
12    "principle job functions," what do you
13    mean, specifically.
14         Q.    Is there someone whose main job
15    it is, at Brevet, to act as an in-house
16    lawyer?
17         A.    No.
18         Q.    Are lawyers that you described
19    people who have other job functions within
20    Brevet but are also lawyers?
21         A.    Yes.
22         Q.    And do those people provide
23    legal services to Brevet?
24         A.    Um, there is somebody on my
25    team that also provides legal services to
```

```
                                          Page 18
 1              MEI-LI da SILVA VINT
 2    Brevet.
 3         Q.    What is that person's name?
 4         A.    Daniel Bungee.
 5         Q.    Does Mr. Bungee provide any
 6    legal services to Brevet with -- in
 7    connection with the ongoing litigation with
 8    Mr. Iacovacci?
 9         A.    Um, no.
10         Q.    I should have asked you this
11    before:  Can you just agree that you won't
12    check your phone while we are on the
13    record?
14         A.    Yes.
15         Q.    Thank you.
16              MR. UNDERWOOD:  Let -- let --
17          let me just say, Ian, I think Ms. da
18          Silva Vint may have, um, um, a child
19          care issue that if she gets a certain
20          type of notice, she may need to check
21          her phone.
22              But we will let you know, if
23          something like that.
24              MR. DUMAIN:  Yeah.  I -- I
25          understand that.
```

Page 19

```
 1            MEI-LI da SILVA VINT
 2            MR. UNDERWOOD:  I just want to
 3       give you advance notice.
 4            Hopefully, she doesn't have to.
 5            MR. DUMAIN:  I appreciate the
 6       spirit of the question and I,
 7       certainly, appreciate the spirit of
 8       your answer.
 9       Q.    Have you been --
10            MR. DUMAIN:  Well, let me --
11       let me withdraw that and say it a
12       different way:
13       Q.    Have you participated in any
14  preparation sessions for your deposition?
15       A.    In my personal capacity?
16       Q.    Well, you were a witness today;
17  right?
18       A.    I am -- I'm a 30(b)(6) witness
19  and, also, testifying on my own behalf.
20       Q.    Okay.  I -- I -- I -- I -- I --
21  see the question you're asking. Okay. Yeah.
22            So, let's -- let's separate
23  that. Thanks for -- thanks for the
24  clarification.
25            So, yeah, in your -- in your
```

```
                                    Page 20
 1              MEI-LI da SILVA VINT
 2   capacity, as a fact witness, in this case,
 3   just think from a 30(b)(6) witness, have
 4   you participated in many deposition
 5   preparation sessions?
 6        A.    Yes, I have.
 7        Q.    How many?
 8        A.    Um, I think maybe one and a
 9   half.
10              Meaning that there was one
11   session and then, kind of like a knot -- it
12   was just speaking strategically.
13        Q.    Got it.
14              How many -- how many hours, in
15   total, preparing for this deposition?
16        A.    To the best of my knowledge,
17   maybe three.
18        Q.    Okay.  And you're also -- you,
19   also, understand that you have been
20   designated to provide testimony on behalf
21   of certain previous Brevet entities, on
22   30(b)(6) topics; correct?
23        A.    Correct.
24        Q.    Okay.  How long did you prepare
25   -- spend preparing for that testimony?
```

```
1                MEI-LI da SILVA VINT
2       A.     Probably, to the best of my
3   knowledge, an hour or less.
4       Q.     Okay. And as we covered before,
5   you are aware there have been other
6   depositions of Brevet employees in this
7   case; right?
8       A.     Yes.
9       Q.     Did you participate in any
10  deposition preparation sessions with any of
11  those witnesses?
12      A.     Yes.
13             Acting as counsel for them.
14      Q.     And which witnesses were those?
15      A.     I participated in Johnny Lan's,
16  um, and not in every session, of any of
17  these I'm saying.
18             Mark Callahan's, Douglas
19  Monticciolo.
20      Q.     Okay.
21             You've appeared at a number of
22  these depositions as a Corporate
23  Representative; is that correct?
24      A.     Correct.
25      Q.     What does that mean, if you
```

```
                                    Page 22
 1              MEI-LI da SILVA VINT
 2   understand it?
 3              MR. UNDERWOOD:  Object to the
 4         form of the question.
 5       A.     I was appearing as counsel to
 6   the -- the client. If that means something
 7   different than from "Corporate
 8   Representative" than I was not appearing as
 9   a Corporate Representative.
10       Q.     Okay. In your --
11              MR. UNDERWOOD:  Just -- just,
12         Ian just to clarify for the record.
13              MR. DUMAIN:  Sure.
14              MR. UNDERWOOD:  Brevet, the
15         client, did designate Ms. da Silva
16         Vint to appear as its Corporate
17         Representative in the deposition that
18         she appears in.
19              MR. DUMAIN:  Okay.
20              MR. UNDERWOOD: I don't -- I
21         don't want the record to be unclear.
22              The witness may not -- may not
23         know the ins and outs of the details
24         of exactly what it means but -- but
25         she was designated by the client, as
```

Page 23

1              MEI-LI da SILVA VINT
2          the Corporate Representative, to be
3          the person who attended deposition.
4              MR. DUMAIN:   Thank you for the
5          clarification.
6      Q.    Have you been acting as counsel
7   to Brevet, in connection with this
8   litigation, with Mr. Iacovacci since you
9   joined Brevet?
10     A.    Um, sorry.
11             What do you mean by "as
12  counsel"?
13     Q.    Well, as I understood it
14  before, your testimony is that you have
15  been providing legal advice to Brevet, in
16  connection with its ongoing litigation with
17  Mr. Iacovacci; is that correct?
18     A.    Yes, internally, along with
19  others.
20     Q.    And my question is:   For how
21  long have you been providing legal advice
22  to Brevet, in connection with its ongoing
23  litigation with Mr. Iacovacci?
24     A.    So, off and on, between -- from
25  October 20th -- November, 2016, to the best

```
 1              MEI-LI da SILVA VINT
 2   of my knowledge. Yes.
 3        Q.    Do you recall --
 4              MR. DUMAIN:  No.
 5              Withdraw that. We will get to
 6         that.
 7        Q.    Have you had any responsibility
 8   for collecting documents in response to
 9   document requests in litigation with
10   Mr. Iacovacci?
11        A.    I have been involved in some of
12   the document collection with respect to
13   Mr. Iacovacci.
14        Q.    And without meaning to intrude
15   on attorney work product or attorney/client
16   privilege, can you tell me what you mean by
17   "involved"?
18        A.    Um, I -- I don't understand
19   necessarily what you mean by "responsible."
20              Any technical collection, any
21   kind of working with, um, outside vendors,
22   um, I have been, I think, involved in
23   potentially pointing to where things might
24   be.
25              But anything, kind of, stored
```

Page 25

```
 1              MEI-LI da SILVA VINT
 2   on our systems, I wouldn't be tasked with
 3   the technical pulling of any production.
 4        Q.    Have you had any responsibility
 5   for ensuring that Brevet has complied with
 6   court orders issued in its litigation with
 7   Mr. Iacovacci?
 8        A.    Um, if we are aware of a court
 9   order? And if someone has spoken to me
10   about it? Yes.
11              But I think there have been a
12   number of court orders in this litigation
13   that I don't -- I don't know if I was told
14   about or know about.
15        Q.    Is your expectation that your
16   -- Brevet's counsel would inform Brevet of
17   any court orders issued in the case?
18              MR. UNDERWOOD:  I object to the
19         form of the question.
20        A.    I think if there is a court
21   order, to the extent our counsel thinks
22   it's appropriate or that we need to know
23   about it, they would speak to us about it
24   it.
25        Q.    Do you, personally, monitor the
```

Page 26

```
 1              MEI-LI da SILVA VINT
 2   dockets in any of the cases between Brevet
 3   and Mr. Iacovacci?
 4       A.    No.
 5       Q.    Do you know if anyone within
 6   Brevet is responsible for monitoring the
 7   dockets in the litigations -- Brevet's
 8   litigations, with Mr. Iacovacci?
 9       A.    I do not know, sitting here, if
10   anyone is tasked with monitoring them.
11       Q.    Are you the point of contact
12   between Brevet's counsel and its
13   litigations with Mr. Iacovacci and --
14              THE COURT REPORTER:  You broke
15         up.
16              MR. UNDERWOOD:  You're frozen,
17         Ian.
18              Come back, Ian.
19              Yeah.  I think he's frozen
20         there.
21              THE COURT REPORTER:  Off the
22         record, Marcelo, please.
23              THE VIDEOGRAPHER:  Yep.
24              MR. UNDERWOOD:  Yeah, sorry.
25         You're back.
```

Page 27

1              MEI-LI da SILVA VINT

2              MR. DUMAIN:  Yeah.  I -- I

3          thought that was -- seems like a

4          pretty long pause for that.

5         Q.    I gather I should ask that

6     again?

7         A.    Yes, please.

8         Q.    Okay.  Are you the principal

9     Brevet point of contact between Brevet and

10    its counsel in the litigations with

11    Mr. Iacovacci?

12             MR. UNDERWOOD:  I will object

13         to the form of the question.

14        A.    At this point in time? Yes, I

15    am.

16        Q.    When did you become the

17    principal point of contact?

18        A.    It's changed throughout the

19    litigation.

20        Q.    And can you describe for me how

21    it has changed?

22        A.    So, we have had other lawyers

23    internally, who are either consultants or

24    full-time, who were the principal point of

25    contact in the litigation over the years.

```
                                        Page 28
 1              MEI-LI da SILVA VINT
 2       Q.    What were their names?
 3       A.    David Prosean and Anthony Moro.
 4       Q.    When was David the principal
 5  point of contact?
 6       A.    At this point in time? I can't
 7  recall the exact dates.
 8       Q.    Who came first in time; David
 9  or Anthony?
10       A.    David came first in time.
11       Q.    Okay.  When did you become the
12  principal point of contact?
13       A.    I was initially the principal
14  point of contact and, then, it was David
15  Prosean.
16              And then, at some point, it was
17  Anthony Moro, and, then, me, again.
18       Q.    Do you know if, either, Mr.
19  Prosean or Mr. Moro had any personal
20  involvement with any of the events
21  underlying these disputes?
22       A.    I don't, personally, know.
23              But they were not at Brevet at
24  the time.
25       Q.    Do you recall whether anyone
```

Page 29

```
 1              MEI-LI da SILVA VINT
 2   mentioned the dispute with Mr. Iacovacci to
 3   you at the time you were interviewing for
 4   your job at Brevet?
 5        A.    I do not recall it ever being
 6   mentioned -- mentioned to me, when I was
 7   interviewing.
 8        Q.    Do you recall when you first
 9   became aware of Brevet's dispute with
10   Mr. Iacovacci?
11        A.    Um, to the best of my
12   knowledge, it was sometime in late 2016.
13   Maybe, even early 2017.
14        Q.    Have you ever been a party to a
15   lawsuit before?
16        A.    Um --
17              THE WITNESS:  So, you're frozen
18         again, but, I can hear you.
19        A.    I have been a party to a
20   lawsuit in the past.
21        Q.    Sorry.
22              Can you just repeat that?
23        A.    Yes.
24              "I have been a party to a
25   lawsuit in the past."
```

```
                                          Page 30
 1                  MEI-LI da SILVA VINT
 2       Q.     Were you the Plaintiff or the
 3   Defendant?
 4       A.     The Plaintiff.
 5       Q.     What type of a lawsuit was
 6   that?
 7       A.     It was against a landlord that
 8   refused to return a security deposit.
 9       Q.     You were not deposed in that
10   case?
11       A.     No.
12       Q.     Did it go to trial?
13       A.     No.
14       Q.     Did you get your deposit back?
15       A.     Most of it, yes.
16       Q.     Okay.
17              We are going to take a look at
18   what has already been marked "Lan
19   Deposition Exhibit 1."
20              It's our 30(b)(6) Notice.
21              (Whereupon, a short recess was
22       taken.)
23       Q.     Do you see that in front of
24   you?
25              (Witness reviews document.)
```

```
 1              MEI-LI da SILVA VINT
 2      A.      Yes.
 3      Q.      You understand you have been
 4  designated to provide testimony about some
 5  of these topics?
 6              (Witness reviews document.)
 7      A.      Yes.
 8      Q.      Do you know which ones?
 9              (Witness reviews document.)
10      A.      To be honest, I think it has
11  moved around a bit, so, I can't tell you
12  exactly. I haven't memorized which ones
13  have been designated.
14      Q.      Okay.  Why don't you -- why
15  don't you look at Page 9 of the pdf?
16              (Witness complies.)
17              (Witness reviews document.)
18      A.      Okay.
19      Q.      And if you first look at 16
20  through 18.
21              Let me know when you have
22  looked at it.
23              (Witness complies.)
24              (Witness reviews document.)
25      A.      Okay.
```

```
                                          Page 32
 1              MEI-LI da SILVA VINT
 2      Q.    Are you prepared to give
 3   30(b)(6) testimony on these topics?
 4              (Witness reviews document.)
 5      A.    Yes, I am.
 6      Q.    Okay. And we have a look at 20
 7   to 25?
 8              (Witness complies.)
 9              (Witness reviews document.)
10              THE WITNESS:   (Indicating.)
11      A.    Yes.
12      Q.    Are you prepared to give
13   30(b)(6) testimony on these topics?
14              (Witness reviews document.)
15      A.    I think with respect to
16   portions of 20 to 25.
17              I think Johnny was designated
18   as parts of it -- some of the technical
19   aspects of these.
20              But to the extent that I -- I
21   can, I will.
22      Q.    Okay.  And finally, will you
23   look at 32 to 33, please?
24              (Witness complies.)
25              (Witness reviews document.)
```

Page 33

```
 1                MEI-LI da SILVA VINT
 2                THE WITNESS:  That would be --
 3                MR. UNDERWOOD:  32 to 33.
 4                32 to 33; right?
 5                MR. DUMAIN: Correct.
 6                (Witness reviews document.)
 7          A.    Okay.
 8          Q.    And are you prepared to give
 9     30(b)(6) deposition testimony on these
10     topics?
11                (Witness reviews document.)
12          A.    Yes.
13          Q.    Okay. Sure thing.
14                MR. DUMAIN:  We are going to
15           mark our Internal Tab 2 as "da Silva
16           Vint Deposition Exhibit 1."
17                (Whereupon, Internal Tab 2 was
18           marked as da Silva Vint Exhibit 1 for
19           identification as of this date by the
20           Reporter.)
21                (Whereupon, a short recess was
22           taken.)
23                MR. DUMAIN:  As this is
24           loading, I will say I will try to do
25           a better job of looking down the road
```

```
1              MEI-LI da SILVA VINT
2         90 seconds so we are not waiting for
3          exhibits.
4              MR. UNDERWOOD:  Appreciate it.
5              MR. DUMAIN:  There we go.
6              MR. UNDERWOOD:  Okay.
7       Q.    Do you see Exhibit 1?
8              (Witness reviews document.)
9       A.    Yes.
10      Q.    Is this a document that is
11   familiar to you?
12             (Witness reviews document.)
13      A.    Yes.
14      Q.    What is it?
15             (Witness reviews document.)
16      A.    It's a, um, a profile related
17   to the conference.
18      Q.    Did you prepare this document?
19             (Witness reviews document.)
20      A.    I did not, personally, prepare
21   this document.
22      Q.    Do you know who did prepare it?
23             (Witness reviews document.)
24      A.    To the best of my knowledge, I
25   think multiple people have modified this.
```

```
                                              Page 35
 1              MEI-LI da SILVA VINT
 2              And it was officially prepared
 3    by someone who is not me.
 4         Q.    What is the "Salt Conference"?
 5              (Witness reviews document.)
 6         A.    It is a Think Tank Conference,
 7    um, and it's, typically, held in Vegas, and
 8    Abu-Dhabi, and recently, it was in New
 9    York.
10         Q.    Was that a relief or a
11    disappointment?
12         A.    Um, I, actually, have not
13    attended in the past.
14         Q.    Okay.
15              Did you approve this profile
16    before it was posted on the Salt website?
17              (Witness reviews document.)
18         A.    Did -- I -- I saw it posted on
19    the Salt website.
20         Q.    Did you have an opportunity to
21    make changes, if you wanted to?
22              (Witness reviews document.)
23         A.    To the best of my knowledge?
24    Yes.
25         Q.    Okay.
```

Page 36

```
 1              MEI-LI da SILVA VINT
 2              When did you become the Chief
 3     Compliance Officer at Brevet?
 4         A.    October ███ 2016.
 5              MR. UNDERWOOD:  Ian, can I just
 6         clarify for the record?
 7              There is some -- there is some
 8         highlighting on the document that you
 9         marked as an exhibit.
10              Was that on document originally
11         or is that highlighting --
12              MR. DUMAIN:  No.
13              That's -- that's the wrong
14         version.
15              I mean, there's no -- we can
16         keep that as the exhibit, there's
17         nothing especially -- it may,
18         actually, be helpful.
19              But, that's -- it shouldn't be
20         a highlighted version.
21              MR. UNDERWOOD:  Okay.
22              I just want to place on the
23         record clear on that.
24              Thanks.
25              MR. DUMAIN:  Yeah, thanks.
```

Page 37

```
 1              MEI-LI da SILVA VINT
 2              I will make sure that I am
 3         looking at that version.
 4              (Whereupon, a short recess was
 5         taken.)
 6              MR. DUMAIN:  Okay.  So, I will
 7         just do it in order of the
 8         highlights, as long as we have the
 9         highlights here.
10    Q.    Are you a legal expert?
11              (Witness reviews document.)
12    A.    Um, I don't know that means.
13    Q.    So, you don't know what that
14    means, in the context of this profile of
15    you?
16              (Witness reviews document.)
17    A.    I think this is a profile, to
18    the best of my knowledge, that it's not
19    defined.
20              And it's a laymen's, um, like
21    biography or profile.
22    Q.    Do you consider yourself a
23    legal expert?
24    A.    I don't consider myself to be,
25    um, an expert in anything.
```

```
 1              MEI-LI da SILVA VINT
 2        Q.    So, I gather you're not a
 3    compliance expert, either?
 4        A.    Like I said:  "I don't consider
 5    myself to be an expert in anything."
 6        Q.    Okay.
 7              Do you see here, it says:  "You
 8    have significant experience supporting M&A
 9    transactions and structuring complex
10    private credit loans"?
11              (Witness reviews document.)
12        A.    Correct.
13        Q.    Can you first tell me what it
14    means to "structure a complex credit loan"?
15        A.    Sure.
16              It -- it -- in my opinion or,
17    to the best of my knowledge, um, it's not a
18    typical, kind of, off-the-shelf, um, loan
19    that you don't negotiate.
20              For me, it involves on and --
21    typically, it could involve on an off-shore
22    elements. Um, different elements of a
23    credit stack, various types of collateral,
24    various types of tax implications and,
25    potentially, other counter-parties.
```

```
                                          Page 39
 1              MEI-LI da SILVA VINT
 2   Multiple counter-parties.
 3        Q.    Where did you gain experience
 4   structuring complex private credit loans?
 5        A.    Initially?
 6              At my lawfirm and then, at
 7   Morgan Stanley.
 8        Q.    Were you working as a lawyer at
 9   Morgan Stanley?
10        A.    I was not.
11        Q.    You were structuring -- you
12   were doing the structuring there, though?
13        A.    Yes.
14              I -- I, did, um, yes, a couple
15   of things at Morgan Stanley.  And one of
16   them was structuring.
17        Q.    Have you done any structuring
18   at Brevet?
19        A.    I -- it depends what you mean
20   by "structuring."
21        Q.    Well, in what sense have you
22   done any structuring work at Brevet?
23        A.    Um, I have worked on
24   structuring transactions on our corporate
25   side, as well as with respect to our fund
```

```
                                    Page 40
 1              MEI-LI da SILVA VINT
 2    vehicle.
 3         Q.    Have you provided legal advice
 4    in connection with that -- that work?
 5         A.    Yes.
 6         Q.    Has your structuring work, um,
 7    also been non-legal, at Brevet?
 8         A.    Um, like standard corporate
 9    filings?
10              I don't know what you mean by,
11    "non-legal work."
12         Q.    So, you -- you said that you
13    had done structuring both as a lawyer and
14    in the capacity of Morgan Stanley, where
15    you were not practicing as a lawyer; right?
16         A.    Correct.
17         Q.    Was the substance of the work
18    that you were doing any different, when you
19    were at Morgan Stanley, versus when you
20    were practicing as a lawyer?
21         A.    There's different elements that
22    went into structuring at Morgan Stanley.
23    We were structuring for the balance sheet
24    of the bank itself.  It involved different
25    counter-parties and different constituents.
```

Page 41

```
 1                MEI-LI da SILVA VINT
 2                I can't describe it as -- I
 3   mean there were some legal elements in
 4   both.  I was not providing legal advice at
 5   Morgan Stanley.
 6         Q.    Okay.  And do you provide legal
 7   advice, in connection with structuring at
 8   Brevet?
 9         A.    Yes.
10                I have provided legal advice,
11   in connection with the structuring at
12   Brevet.
13         Q.    To the extent that you can
14   recall, um, was providing structuring
15   advice something that you were hired to do,
16   in 2016, or something that you -- your job
17   came to include?
18         A.    So, that's my knowledge.  It is
19   something that my job came to include.
20         Q.    Okay.
21                (Whereupon, a short recess was
22          taken.)
23         Q.    The final piece of highlighting
24   on this document discusses your sourcing of
25   secured funding to manage Morgan Stanley's
```

Page 42

1                    MEI-LI da SILVA VINT

2    liquidity.

3                    Do you see that?

4                    (Witness reviews document.)

5         A.    Yes. Yep.

6         Q.    What does it mean to source

7    secured funding?

8         A.    So, at the end of the time that

9    I was at Morgan Stanley, I worked for a

10   bank resource management, which, like I

11   said before, managed the balance sheet of

12   the bank, itself.

13                    There were particular funding

14   needs of the balance sheet of the bank

15   itself, in terms of secured funding in

16   different tenures after the crisis that we

17   were required from our regulators.

18                    And so, we sourced secured

19   funding, meaning that you locked --

20   typically locked up secured loans or

21   repurchased facilities or

22   securities-lending portfolios, to manage

23   liquidity of the bank.

24        Q.    And how did you source that

25   funding?

```
                                          Page 43
 1            MEI-LI da SILVA VINT
 2       A.    Um, so, I was in a sales role
 3   at the end of -- sales and marketing role
 4   at the end.  And it was working with
 5   different counter-parties, to enter into
 6   transactions with us.
 7       Q.    Without disclosing any
 8   confidential information at Morgan Stanley,
 9   of course, can you tell me what types of
10   counter-parties you --
11       A.    Institutional.
12       Q.    -- Morgan Stanley would call
13   on?
14       A.    Institutional.
15            MR. UNDERWOOD:  I know -- I
16        know you may understand where he's
17        going --
18            THE WITNESS:  Yes.
19            MR. UNDERWOOD:  -- with the
20        question but please, just wait until
21        he finishes the question, just to
22        make a clean record here.
23            MR. DUMAIN:  Thanks, Colin.
24       Q.    And can you just tell me what
25   you mean by "institutional"?
```

Page 44

```
 1              MEI-LI da SILVA VINT
 2      A.      Non-retail.
 3      Q.      How long did you do that for?
 4      A.      Um, to the best of my
 5  knowledge, it was a little over two years.
 6      Q.      And mechanically, how did you
 7  source the funds?
 8              If you understand what I am
 9  asking you.
10      A.      Yes.
11              Sorry.  I think that is
12  confidential to Morgan Stanley.
13      Q.      Okay. Did -- did Morgan Stanley
14  have a collection of sources that you would
15  speak with, episodically, to determine
16  whether or not there was a transaction to
17  be done?
18      A.      Again, I think that is
19  confidential to Morgan Stanley.
20      Q.      Okay.  You were a lawyer at
21  McDermott Will & Emery.
22      A.      Yes, I was.
23      Q.      Did you do any loan structuring
24  while you were at McDermott?
25      A.      I did a little bit of loan
```

Page 45

```
 1              MEI-LI da SILVA VINT
 2   structuring at McDermott.
 3        Q.    What types of loans?
 4        A.    Private.
 5        Q.    So, what -- what do you mean by
 6   "private"?
 7        A.    Private companies.
 8        Q.    Did Brevet make private company
 9   loans?
10        A.    Yes. It does.
11              But to be clear:  You need to
12   be specific as to which Brevet entity
13   you're describing.
14        Q.    Sure.
15              Do any Brevet entities make
16   private company loans?
17        A.    Yes.
18        Q.    Which ones?
19        A.    Um, there are a number.
20              So, there are a number of, um,
21   companies, under Brevet Holdings, that
22   originate and structure loans and make
23   loans to private companies.
24        Q.    Would --
25              MR. DUMAIN:  Why don't we mark
```

Page 46

1              MEI-LI da SILVA VINT
2         Tab 12.
3              (Whereupon, a short recess was
4         taken.)
5              MR. DUMAIN:  This is da Silva
6         Vint Deposition Exhibit 2.
7              Should be loading.
8              And it's, um, an organization
9         chart from March 29, 2017.
10             (Whereupon, an organization
11        chart from March 29, 2017 was marked
12        as da Silva Vint Exhibit 2 for
13        identification as of this date by the
14        Reporter.)
15             MR. DUMAIN:  Oop.
16             No, it's not.
17             Um, okay. Let's not worry about
18         this right now.
19     Q.    Before you came to McDermott
20   Will & Emery, were you at a firm, called
21   Shutts and Bowen?
22     A.    That was after my time at
23   McDermott Will & Emery.
24     Q.    What did you do -- all right.
25   So, what time period did you work at that

```
                                        Page 47
 1            MEI-LI da SILVA VINT
 2   firm?
 3        A.    To the best of my recollection,
 4   it was during 2010.
 5        Q.    And what did you do there?
 6        A.    Um, corporate work.
 7        Q.    Any loan structuring?
 8        A.    To the the best of my
 9   recollection, there was some loan work
10   involved.
11            But it was a variety of
12   different corporate transactions.
13        Q.    Why did you leave?
14        A.    I decided to move back to New
15   York.
16        Q.    Got it. Okay.
17            Before you came to Brevet, had
18   you done any compliance work in any job you
19   had previously held?
20        A.    I had not done specific
21   compliance work.
22        Q.    The job that you were
23   interviewing for at Brevet was for Chief
24   Compliance Officer?
25        A.    Correct.
```

Page 48

```
 1                MEI-LI da SILVA VINT
 2        Q.     Do you recall what you told
 3   Brevet your qualifications were to be a
 4   Chief Compliance Officer, having not done
 5   Compliance Officer -- compliance work
 6   professionally in the past?
 7        A.     Sure.
 8               My --
 9               MR. UNDERWOOD:  Object to the
10        form of the question.
11        A.     I don't recall exactly what I
12   told Brevet.
13               But it's what's listed on my
14   resume.  I have a background as a lawyer
15   and I worked at Morgan Stanley, both, a
16   product-specific area that liaised with
17   different areas of the bank, including
18   compliance, as well as a sales side, but a
19   legal and commercial background.
20        Q.     But you never had -- but you
21   never -- you never have had a specific
22   compliance role?
23        A.     No.
24               I have never had a specific
25   compliance role.
```

```
                                            Page 49
 1              MEI-LI da SILVA VINT
 2      Q.    Who did you interview with when
 3  you were seeking the job at Brevet?
 4      A.    Um, I don't recall everyone I
 5  interviewed with at Brevet but it was a lot
 6  of people.
 7      Q.     How long was the interview
 8  process, if you recall?
 9      A.    It was over a span of I -- to
10  the best of my knowledge, or recollection,
11  it was over the span of a couple of months.
12      Q.    And so, did you speak with Mr.
13  Monticciolo?
14      A.    Yes, I did.
15      Q.    And did you speak with Mr.
16  Callahan?
17      A.    Yes, I did.
18      Q.    Did you speak with Garreth Lee?
19      A.    To the best of my recollection?
20  I don't remember if I spoke with Garreth
21  during the interview process.
22      Q.    Was Garreth the incumbent Chief
23  Compliance Officer at the time you were
24  interviewing?
25      A.    To the best of my recollection,
```

```
                                      Page 50
 1            MEI-LI da SILVA VINT
 2   I don't remember. I do not know.
 3        Q.    Was he the Chief Compliance
 4   Officer who directly proceeded you in the
 5   job?
 6        A.    To the best of my knowledge,
 7   yes.
 8        Q.    And do you recall what, if
 9   anything --
10            MR. DUMAIN:  Well, strike that.
11        Q.    Was there any transition period
12   between Mr. Lee and yourself in the job?
13        A.    What do you mean by "transition
14   period"?
15        Q.    Meaning was there any period of
16   time or well --
17            MR. DUMAIN:  Let me withdraw
18         that.
19        Q.    Was there any period of time
20   during which you and Mr. Lee overlapped at
21   Brevet?
22        A.    In the compliance function,
23   specifically?
24        Q.    Yes.
25        A.    To the best of my knowledge,
```

Page 51

```
 1              MEI-LI da SILVA VINT
 2   no.
 3        Q.    Do you recall -- did Mr. Lee
 4   tell you, um, anything about what he viewed
 5   as a -- areas for growth in compliance at
 6   Brevet?
 7        A.    Not to my recollection.
 8        Q.    This may have been assumed in
 9   some of my other questions, so, I'll beg
10   your indulgence if it was.
11              But, can you confirm:  Did you
12   ever provide legal advice regarding
13   compliance issues in any of your jobs
14   before coming to Brevet?
15              MR. UNDERWOOD:  I object to the
16        question.
17              MR. DUMAIN:  Sorry.
18              Can you speak up, Colin?
19              MR. UNDERWOOD:  I object to the
20        form of the question.
21              MR. DUMAIN:  Okay.
22        A.    Specifically, I don't recall.
23   It was over a long period of time a long
24   time ago.
25        Q.    Nothing sticks out, however?
```

Page 52

1                MEI-LI da SILVA VINT
2        A.    It's just -- so, to be clear,
3    like, even when I was at my lawfirm, I
4    covered a wide range of topics, specific
5    with the clients I was working.
6              So, it could have definitely
7    involved legal advice, with respect to
8    compliance.
9        Q.    Okay.
10       A.    Compliance is a very vague
11   word, by the way.
12       Q.    Neither of us are experts, so
13   --
14             Before you became the Chief
15   Compliance Officer at Brevet, did you have
16   any experience with the Investment Advisors
17   Act?
18       A.    Specifically with the
19   Investment Advisors Act of 1940, I did not
20   have experience with respect to having a
21   job function related to it.
22       Q.    Did you have any experience
23   with that?
24       A.    Outside of Force Brook?  No.
25       Q.    Could you describe -- can you

Page 53

```
 1            MEI-LI da SILVA VINT
 2   expand on your answer --
 3            MR. DUMAIN:  Well, let me
 4        withdraw.
 5        Q.    What course work had you taken
 6   about the Investment Advisors Act of 1940
 7   before you became the Chief Compliance
 8   Officer at Brevet?
 9        A.    I took general securities and
10   corporate course work in law school.
11        Q.    Had you completed any
12   continuing legal education on the
13   Investment Advisors Act before beginning
14   your job at Brevet?
15        A.    To the best of my recollection,
16   I -- I think I did take CLE's that had
17   covered the topic.
18        Q.    Did you maintain your CLE
19   certificates of completion?
20        A.    For whatever the statute -- for
21   whatever the requirement is.  I don't think
22   it goes as far back as to when I admitted
23   to the bar.
24        Q.    And if you took this
25   coursework, do you think it is beyond the
```

Page 54

1                MEI-LI da SILVA VINT

2   time period for which you would have

3   retained certificates of compliance?

4        A.    Sitting here today, I have no

5   idea.

6        Q.    Where do you keep the

7   certification of compliance that you

8   passed?

9        A.    Um, for the most recent years?

10  They are kept within PLI's system.

11              But sitting here today, I don't

12  know how far back that goes and if they are

13  beyond that limit, I would have pdf's of

14  them somewhere.

15       Q.    Are you able to check at the

16  lunch break to see if, in the PLI system if

17  there are any certificates of compliance

18  for the Investment Advisors Act?

19       A.    I did not bring my computer

20  with me.

21              (Whereupon, a short recess was

22        taken.)

23       Q.    Okay. Before the --

24       A.    Just to clarify:  Are you

25  asking me is this during my time at Brevet

Page 55

```
 1              MEI-LI da SILVA VINT
 2   have I taken CLE's, with respect to that?
 3       Q.    So, that is a fair
 4   clarification.
 5              So, these PLI, um, certificates
 6   would go back only for as long as you have
 7   been at Brevet?
 8       A.    Um, they I -- I don't -- I
 9   don't know.
10              I -- I -- sitting here today, I
11   don't know.
12       Q.    Since you have become the --
13   the Chief Compliance Officer of Brevet,
14   have you taken continuing legal education
15   courses on the Investment Advisors Act of
16   1940?
17       A.    I've taken PLI's related to SEC
18   enforcement, with respect to hedge funds
19   and private equity and try to stay within
20   those spaces, which, likely, covers the
21   exhibit, the Investment Advisors Act, as it
22   applies to our business.
23       Q.    Have you taken CLE courses on
24   the subject of, or that include, record
25   retention, obligations under the Investment
```

```
                                         Page 56
 1              MEI-LI da SILVA VINT
 2   Advisors Act of 1940 and related
 3   regulations?
 4        A.    Um, to the best of my
 5   knowledge, I don't think I have taken a
 6   course specifically covering that topic. It
 7   may have been covered.
 8        Q.    In your capacity as Brevet's
 9   Chief Compliance Officer, do you have full
10   responsibility for and authority to
11   implement and enforce the company's
12   policies and procedures?
13              MR. UNDERWOOD:  Object to the
14          form of the question.
15        A.    Um, which companies policies
16   and procedures?
17        Q.    Um --
18              MR. DUMAIN:  Let -- let -- let
19          me withdraw and I will take it piece
20          by piece a little bit later.
21              (Whereupon, a short recess was
22          taken.)
23        Q.    When you joined Brevet, was
24   there a woman named Sherree Harris working
25   in a compliance role?
```

Page 57

```
 1            MEI-LI da SILVA VINT
 2     A.     Yes.  There was.
 3     Q.     Do you remember her title?
 4     A.     Sitting here today, I do not.
 5     Q.     Do you remember what her job
 6  function was?
 7     A.     Um, to the best of my
 8  knowledge, she was in the Compliance
 9  Department but also did some stuff related
10  to HR.
11     Q.     Do you have any
12  responsibilities, aside from compliance and
13  providing legal advice at Brevet?
14     A.     Um, I have overseen HR, um, we
15  do have someone overseeing HR officially
16  now.
17     Q.     Over what time period did you
18  oversee HR?
19     A.     I can't recollect exactly when
20  it began, um, but sitting here today, I
21  think we hired the head of HR at the
22  beginning of 2021 and she started at the
23  beginning of 2021.
24     Q.     Up until the time the person
25  you're referring to began, were you
```

Page 58

```
 1              MEI-LI da SILVA VINT
 2   responsible for HR?
 3        A.    Yes.
 4              I oversaw HR.
 5        Q.    During your tenure overseeing
 6   HR, did Brevet, by this I mean any Brevet
 7   entity, terminate any employee for cause?
 8        A.    Um, sitting here today, I don't
 9   recall, um, an employee being terminated
10   for cause.
11        Q.    During your tenure overseeing
12   HR, did Brevet -- by which I mean any
13   Brevet entity, discipline any employees in
14   any way for violation of any Brevet
15   policies?
16        A.    What do you mean by
17   "discipline"?
18        Q.    Um, so, we'll provide (sic)
19   "discipline" as, you know, a -- a written
20   reprimand, a verbal reprimand, any kind of
21   punishment, an admonition, a warning.
22        A.    Yes.
23              We've had conversations with
24   people about violations of company policy
25   and there have been other things that have
```

```
                                      Page 59
 1            MEI-LI da SILVA VINT
 2   happened.
 3       Q.    What types of violations of
 4   compass -- company policy have given rise
 5   to discipline?
 6            MR. UNDERWOOD:  Objection to
 7        the form of the question.
 8       A.    Um, generally speaking?
 9            Failure to get pre-clearance on
10   a trade, um, you know, failing to unwind an
11   archived business activity that we
12   considered to be a conflict of interest.
13            There have been various other
14   ones.
15       Q.    What type of disciplinary
16   measure, um, did Brevet take during your
17   tenure overseeing HR in the one or more
18   instances where someone -- a Brevet
19   employee -- failed to get pre-clearance for
20   a personal transaction?
21       A.    They usually get, um, a verbal
22   reprimand, to begin with, and it can
23   escalate to a written, um, document that
24   goes into a file, um, and then, to the
25   extent we haven't had someone who is a
```

```
                                        Page 60
 1              MEI-LI da SILVA VINT
 2   repeat offender so, to the extent where we
 3   need to do anything beyond that.
 4       Q.    Does Brevet have a written
 5   discipline policy that outlines different
 6   stages of discipline before termination or
 7   --
 8       A.    No.
 9             No.  It wouldn't.
10             THE WITNESS:  Sorry.
11       A.    No.
12             Go ahead.
13       Q.    Go ahead.
14       A.    No.
15             He don't --
16             MR. UNDERWOOD:  I'm sorry.
17             Can you just read the question
18        then --
19             THE WITNESS:  Yeah.
20             MR. UNDERWOOD:  -- that you
21        want her to answer.
22             Just ask the Court Reporter to
23        read it.
24             THE COURT REPORTER:  Hold on,
25        please.
```

Page 61

1          MEI-LI da SILVA VINT

2          It was interrupted but I will

3      read you what I have.

4          MR. DUMAIN:  Let me just make

5      it easier. I will ask it again.

6          THE COURT REPORTER:  Sure.

7          MR. DUMAIN:  And I will

8      abridge.

9      Q.    Is Brevet's discipline policy

10  if it is reduced writing?

11          MR. UNDERWOOD:  Object to the

12      form of the question.

13      A.    So, there is various policies

14  and procedures, as you are aware, and it's

15  as disciplinary action for various things

16  that, I think, is up to, and including,

17  termination.

18          So, I think that's as far as it

19  gets.

20      Q.    Does -- who has the authority

21  to determine what discipline is imposed for

22  a particular policy violations?

23      A.    No single person has the

24  authority to determine.  It's not one

25  person saying "this happens."

```
 1              MEI-LI da SILVA VINT
 2      Q.     When you were describing this
 3  failure to get pre-clearance, is that
 4  something that has happened once or
 5  multiple times, in your tenure overseeing
 6  HR?
 7      A.     You have to pre-clear all
 8  trades and just provide -- get
 9  pre-clearance for private investments.
10              We are not, typically, in the
11  business of public security.  So, it has
12  happened not just once.
13      Q.     Is pre-clearance a compliance
14  issue, also?
15      A.     Pre-clearance is a compliance
16  issue.
17      Q.     Okay.  So, it's not -- it's not
18  an HR issue, per se?
19      A.     It can become an HR issue.
20      Q.     All right.  Can you describe
21  for me the circumstance you have alluded to
22  about a Brevet employee's failure to unwind
23  a personal investment?
24      A.     Um, we require all employees
25  to, um, disclose outside business
```

Page 63

```
 1              MEI-LI da SILVA VINT
 2   activities and account to certain things.
 3              Um, if the outside business
 4   activity comes to interfere with someone's
 5   job functions or become a conflict of
 6   interest, we would ask that person to step
 7   away from that outside business activity.
 8   Um --
 9      Q.    Where is that policy reduced to
10   writing, if it is?
11      A.    We -- outside business
12   activities?  I -- I am not sure -- in
13   sitting here today, I can't recall exactly
14   where it is, in terms of if it's in the
15   compliance policy, or not, or if it's under
16   "conflict of interest."
17              But, it is an affirmation made
18   on our compliance system.
19      Q.    What is it that Brevet
20   employees are required to affirm, as it
21   relates to outside business interest?
22      A.    So, sitting here today, I can't
23   describe to you the exact attestation
24   language. It's done on our compliance
25   system and usually you're required to
```

```
                                      Page 64
 1              MEI-LI da SILVA VINT
 2   disclose it.
 3              And in summary, I -- I can't
 4   describe the exact language.  But, it is
 5   what I just described to you. It -- it
 6   doesn't interfere with your job and it's
 7   not a conflict of interest.
 8       Q.    So, to start, Brevet employees
 9   are permitted to have outside business
10   interests; is that correct?
11       A.    That is not what I said.
12              I said "you have to disclose it
13   and it has to be approved."
14       Q.    There's no per-se rule against
15   Brevet employees having outside business
16   interests; is that correct?
17       A.    No.
18       Q.    Who determines whether a
19   conflict of interest is present?
20       A.    It's not one person
21   determining, it's an analysis.
22              (Whereupon, a short recess was
23        taken.)
24       Q.    Is it the policy that Brevet
25   employees are required to disclose all
```

1              MEI-LI da SILVA VINT
2    outside business interests or only those
3    that they perceive may be a conflict of
4    interest?
5         A.    I don't know what all "outside
6    business interests" means exactly.  But, it
7    would include even if you sit on the Board
8    of non-profit, started a company, or if
9    you're invested in a company. Those are
10   just some examples.
11             But I don't think I can give
12   you an all-encompassing answer to your
13   question.
14        Q.    Okay. And we will look at them
15   policies later.
16             But which policy, do you think,
17   we'd find this in, this requirement?
18        A.    Sitting here right now, I -- I
19   -- I can't exactly say. It may be in the
20   Code of Ethics, it may be in the compliance
21   manual, or it might be in the employee
22   manual.
23             But, sitting here, right now, I
24   can't tell you exactly where -- where it
25   might be described.

Page 66

1          MEI-LI da SILVA VINT

2              (Whereupon, a short recess was

3      taken.)

4      A.    Or even if it's specifically

5  described in a manual.

6      Q.    When did Sherree Harris leave

7  Brevet?

8      A.    Sitting here today, I do not

9  know exactly when she left Brevet.

10      Q.    Do you think it was before or

11  after December 31, 2017?

12      A.    Sitting here today, I do not

13  know.

14      Q.    Do you think it was before or

15  after December 31, 2018?

16      A.    Sitting here today, I don't

17  know.

18              The most-definitive thing I can

19  tell you is that it was not before December

20  31, 2016.

21      Q.    During the time period that you

22  were at Brevet with Ms. Harris, what was

23  her role in compliance?

24      A.    Um, she helped with the

25  liaising with our outside compliance

Page 67

1              MEI-LI da SILVA VINT

2    consultants, she helped with drafting the

3    Form ADV, she helped with our compliance

4    program and the attestations, putting

5    together the training.

6         Q.    Do you know why Ms. Harris left

7    the employ of Brevet?

8         A.    I don't know the exact reasons.

9         Q.    Was she terminated or did she

10   resign?

11        A.    To the best of my knowledge,

12   she was terminated.

13        Q.    Do you know generally why she

14   was terminated?

15        A.    Sitting here today, I can't

16   tell you exactly why.

17        Q.    Do you know generally why?

18        A.    I know that she was not

19   terminated for cause.

20              Beyond that, I can't say why

21   she was terminated.

22        Q.    Did -- was Brevet in the

23   practice of giving performance reviews

24   periodically, as you understand it, at the

25   time that you were hired?

```
                                        Page 68
1                  MEI-LI da SILVA VINT
2         A.    This is in my personal
3    capacity, you're asking me?
4         Q.    Yes.
5         A.    Yes.
6                To the best of my knowledge,
7    the -- I don't know how formalized it was.
8         Q.    Do you know whether Ms. Harris
9    received positive performance reviews in
10   her compliance role?
11        A.    I don't -- I -- I -- sitting
12   here today, I can't tell you if she did.
13        Q.    Did you have --
14        A.    Just --
15        Q.    Sorry, I didn't mean to cut you
16   off.
17               Did you have a positive
18   impression of Ms. Harris' performance in
19   her compliance role?
20        A.    Um, sitting here today, I can't
21   recall exactly what my perception was. It
22   wasn't overly negative.
23        Q.    Was it somewhat negative?
24        A.    I can't recall. That is the
25   best I can do.
```

Page 69

```
 1              MEI-LI da SILVA VINT
 2      Q.     Were you Ms. Harris' manager
 3   during the time period that she and you
 4   overlapped at Brevet?
 5      A.     Yes.
 6      Q.     And you don't -- do you have an
 7   impression of --
 8              MR. DUMAIN:  Well -- well,
 9        strike that.
10      Q.     When you began working at
11   Brevet, did you have -- formulate an
12   impression about how well the compliance
13   function was operating?
14      A.     Um, when I joined I felt that
15   they had a -- what I would describe as a
16   well-developed compliance program in place.
17      Q.     Did you take steps to develop
18   it further after you arrived?
19      A.     I wouldn't be doing my job if I
20   didn't take steps to further develop it.
21      Q.     Do you remember what your
22   priorities were in your first year at
23   Brevet, in terms of developing the
24   compliance function?
25      A.     It was onboarding our
```

Page 70

```
 1              MEI-LI da SILVA VINT
 2    third-party consultants, um, the -- like I
 3    said, it was a well-developed compliance
 4    program.
 5              But every year, the regulatory
 6    landscape changes and you need to keep up
 7    with it.
 8         Q.   Do you remember, in particular,
 9    what you were focussed on between October
10    ██, 2016 and 12/31/2017?
11         A.   No.
12              I can't recall, sitting here,
13    five years ago.
14         Q.   When you joined Brevet, in
15    October of 2016, did you form an impression
16    about the performance of your predecessor,
17    Garreth Lee?
18         A.   Sitting here today, I can't
19    recall forming an impression about Garreth.
20         Q.   When you were hired, in October
21    of 2016, who did you understand you would
22    be reporting to?
23         A.   Um, so, to be clear:  I can't
24    remember when I was hired, sitting here
25    today.  But I know my start date was
```

Page 71

1           MEI-LI da SILVA VINT
2    October ▆▆▆ and I would be reporting into
3    Doug, Mr. Monticciolo.
4        Q.    Did you have a reporting
5    relationship with Mr. Callahan?
6        A.    Um, no.
7              I did not report to Mark ever.
8        Q.    Have your reporting -- has your
9    reporting relationship changed, at all,
10   during your tenure at Brevet?
11       A.    No.
12       Q.    So, you still report to Doug
13   and only to Doug?
14       A.    Yes.
15             And, obviously, I have
16   fiduciary duty to our investors.
17       Q.    Does anyone report to you?
18       A.    Yes.
19       Q.    Who reports to you?
20       A.    Directly? Daniel Fungi and --
21       Q.    Do you --
22       A.    -- David Spinley.
23             And David Spinley.
24       Q.    And what is Mr. Spinley's
25   title?

```
                                        Page 72
1               MEI-LI da SILVA VINT
2        A.     He is a paralegal.
3        Q.     Does Mr. Spinley have any
4   responsibility for collecting documents in
5   response to document requests in the
6   litigation with Mr. Iacovacci?
7        A.     Yes, he assists.
8        Q.     How long has Mr. Spinley been
9   with the firm?
10       A.     I can't recall exactly, sitting
11  here right now.
12       Q.     More than a year?
13       A.     Yes.
14       Q.     More than two years?
15       A.     Beyond that, I don't know.
16              I know that he was here a year
17  ago.
18       Q.     I'm sorry? Say that again.
19       A.     I said "beyond that, I don't
20  know."
21              I know that he has been here at
22  least a year.
23       Q.     Okay.  Do you supervise anybody
24  else?
25       A.     I don't have any other
```

Page 73

```
 1              MEI-LI da SILVA VINT
 2    direct-reporting lines.
 3         Q.    Okay.
 4              As Chief Compliance Officer,
 5    are you ultimately responsible for Brev --
 6    Brevet's compliance with Federal
 7    regulations?
 8         A.    Um, I think it depends on what
 9    you mean by "Federal regulations."
10              As Chief Compliance Officer, I
11    am tasked with overseeing our compliance
12    program with respect to the Investment
13    Advisors Act, for Brevet Capital
14    Management.
15         Q.    Do you have responsibilities --
16    compliance --
17              MR. DUMAIN:  Let me withdraw
18          that and say it again:
19         Q.    Do you have compliance-related
20    responsibilities with respect to any other
21    Brevet entity, aside from Brevet Capital
22    Management?
23         A.    I oversee compliance, legal and
24    compliance, to a certain extent, with other
25    entities and our compliance with laws and
```

Page 74

```
 1              MEI-LI da SILVA VINT
 2   regulations.
 3        Q.    Do any -- does any other Brevet
 4   entity have compliance obligations under
 5   the Investment Advisors Act?
 6        A.    No.
 7              Only Brevet Capital Management.
 8        Q.    As you understand it, why is
 9   that?
10        A.    It is the Registered Investment
11   Advisor and to my understanding, it is the
12   only one required to, um, be in adherence
13   with that act.
14        Q.    Does Brevet Capital Management,
15   itself, have any employees?
16        A.    To my knowledge?  No.
17        Q.    Of the Brevet entities, is
18   Brevet Holdings the only entity that is an
19   employer?
20        A.    No.
21              To the best of my knowledge,
22   no.
23        Q.    So, which Brevet entities are
24   employers of Brevet employees?
25        A.    Um, Brevet Holdings has, um,
```

Page 75

```
 1              MEI-LI da SILVA VINT
 2   some subsidiaries underneath it that have
 3   employees that are outside of the
 4   investment manager.
 5        Q.    Can you identify the
 6   subsidiaries that you are referring to?
 7        A.    Sitting here right now, the one
 8   that I can remember and I don't know the --
 9   exactly the name is -- is an entity called
10   GLS.
11        Q.    Okay. Are you aware of any
12   others that have employees?
13        A.    Um, sitting here today, there
14   is, potentially, I think in an SPV
15   underneath the SPF onshore that also has
16   employees underneath it.
17        Q.    Are you responsible for
18   ensuring compliance with Brevet's internal
19   policies?
20        A.    You need to be more specific,
21   please.
22        Q.    Brevet Holdings has a number of
23   policies that govern the employees of
24   Brevet and its -- the Brevet entities; is
25   that correct?
```

Page 76

1                MEI-LI da SILVA VINT

2        A.    Sitting here today, I can't

3   tell you exactly.  I know the employee

4   handbook is under "Brevet Holdings."

5              Specifically, other handbooks

6   or policies and procedures, under Brevet

7   Holdings, I -- I can't recall every single

8   one.

9        Q.    Are you responsible for

10  ensuring compliance with the Brevet

11  employee handbook?

12       A.    As I said, there's -- there is

13  a Head of HR and depending what the matter

14  is, I may work with her on -- aspect of

15  that policy.

16       Q.    Okay. So, not every policy, in

17  the employee handbook, is necessarily

18  within the purview of compliance; is that

19  correct?

20       A.    Correct.

21              I think you have, like,

22  vacation policy in there, like, that is one

23  example that I can think of right there,

24  right now.

25       Q.    And do you --

Page 77

```
 1              MEI-LI da SILVA VINT
 2              MR. DUMAIN:  Not "you."
 3              Let me withdraw that.
 4      Q.     Does the compliance function,
 5  at Brevet Capital Management, have its own
 6  budget line?
 7      A.     I don't know what that means.
 8      Q.     Um, so, do you ever retain
 9  third-party vendors to provide compliance
10  programs to Brevet employees?
11      A.     Yes.
12      Q.     And if those -- such a program
13  costs money, who approves the expenditure
14  of those funds?
15      A.     Um, I think first-level
16  approval would be myself and then,
17  ultimately, the Exec Team.
18      Q.     And who is on the "Exec Team"?
19      A.     Mark Callahan, Douglas
20  Monticciolo, and myself.
21      Q.     Is there any threshold below
22  which you can authorize any expenditure for
23  such a program?
24      A.     Sitting here right now, I think
25  so.  But I don't -- I can't give you an
```

Page 78

```
 1              MEI-LI da SILVA VINT
 2   exact number.
 3        Q.    Have you ever authorized the
 4   expenditure of funds for compliance
 5   training without also obtaining approval
 6   from Mr. Monticciolo or Mr. Callahan or
 7   both?
 8        A.    Yes.
 9        Q.    When was that?
10        A.    I can't recall exactly.
11        Q.    Do you have --
12              MR. DUMAIN:  Well, let me ask a
13        foundation question:
14        Q.    Does Brevet have trade secrets?
15        A.    Please define what you mean by
16   "trade secrets."
17        Q.    Well, you're aware that Brevet
18   has filed counterclaims in this action
19   alleging misapproprian -- misappropriation
20   of trade secrets; right?
21        A.    Yes.
22              I don't know the exact details
23   sitting here what the exact counterclaims
24   are.
25        Q.    Okay.
```

1              MEI-LI da SILVA VINT

2              So, you don't know whether

3    Brevet has trade secrets as that term is

4    used in the claims --

5         A.    Well, I think --

6         Q.    -- that are being asserted

7    here?

8         A.    Well, I think that depends

9    entirely -- there are trade secrets defined

10   specifically in different areas, in Brevet,

11   and I would say that they are definitively

12   trade secrets within Brevet.

13        Q.    Do you have any responsibility

14   in your role, as Chief Compliance Officer,

15   for protecting those trade secrets?

16        A.    Yes.

17              Um, there is, I think, a little

18   bit of a cross of the reach in legal and

19   compliance and there are times when it

20   comes to trade secrets.

21        Q.    What is your responsibility as

22   it relates to protecting Brevet's trade

23   secrets?

24        A.    So, it varies.

25              But our group oversees the NDA

Page 80

```
 1              MEI-LI da SILVA VINT
 2   process. We work with IT, in terms of
 3   segregating access to certain drives and
 4   certain information and we work with the
 5   Marketing Team, when they are disseminating
 6   information to investors and potential
 7   investors.
 8        Q.    What is the NDA process you
 9   just mentioned?
10        A.    So, if you are going to
11   potentially discuss or provide information
12   that is confidential and proprietary, you
13   have to have an NDA in place before you do
14   those things.
15              And we have an NDA that has to
16   be signed.
17        Q.    Is it a -- is it a form NDA?
18        A.    We have our own NDA.
19              Um, from the top of my head
20   it's usually not negotiated.
21              So, yes, we have a form NDA.
22        Q.    Okay.
23              MR. DUMAIN:  We are going to
24        mark, um, I don't know what the next
25        exhibit is, Brevet's -- a document
```

Page 81

1        MEI-LI da SILVA VINT

2    with the Bates range Brevet New

3    015121.

4        (Whereupon, Brevet New 015121

5    was marked as da Silva Vint Exhibit 3

6    for identification as of this date by

7    the Reporter.)

8        MR. UNDERWOOD:  Ian, would it

9    be mean if we take a break?  We have

10   been going for over an hour at this

11   point.

12       MR. DUMAIN:  Yeah.

13       Why -- why don't we take it

14   now. We can come back to this after

15   the break.

16       What do you think is a good

17   amount of time for your guys?

18       MR. UNDERWOOD:  We just need --

19   I mean we can be back in five

20   minutes.

21       I don't know about the Court

22   Reporter or others.

23       MR. DUMAIN:  Sure.

24       So, we'll -- we'll, more or

25   less, five to seven minutes, we will

```
                                             Page 82
 1              MEI-LI da SILVA VINT
 2        call it.
 3              MR. UNDERWOOD:  Okay.
 4              Thanks.
 5              THE VIDEOGRAPHER:  The time is
 6        10:15 A.M.
 7              We are going off the record.
 8              (Whereupon, an off-the-record
 9        discussion was held.)
10              THE VIDEOGRAPHER:  The time is
11        10:23 A.M.
12              And we are back on the record.
13        Q.   Ms. da Silva Vint, can you take
14   a look at what has been marked "da Silva
15   Vint Exhibit 3"?
16              (Witness complies.)
17              (Witness reviews document.)
18        A.   Yes.
19        Q.   And --
20        A.   Do you want me to look at the
21   whole thing?
22        Q.   Look at it, to get comfortable
23   that you know what it is, when you look at
24   it.
25        A.   Okay. Sorry.
```

```
 1              MEI-LI da SILVA VINT
 2              (Witness complies.)
 3              (Witness reviews document.)
 4     A.    Okay.
 5     Q.    What is this document?
 6              (Witness reviews document.)
 7     A.    It appears to be a
 8  confidentially -- a confidentiality and
 9  Non-Disclosure Agreement.
10     Q.    Is this the form Non-Disclosure
11  Agreement that you were referring to before
12  the break?
13              (Witness reviews document.)
14     A.    This is from 2015.
15              So, it looks like it has a date
16  of "2015" on it, as an effective date.
17              So, yeah.
18     Q.    Can you --
19              MR. DUMAIN:  Withdrawn.
20     Q.    Has the form confidentiality
21  and Non-Disclosure Agreement changed since
22  2015?
23     A.    Um, I can't speak to, sitting
24  here right now, whether it's changed
25  materially.
```

Page 84

```
 1              MEI-LI da SILVA VINT
 2              It's -- obviously, it has
 3    changed.  Things have changed. It's a
 4    different year. Um, there are a number of
 5    things that have changed around
 6    confidentiality, right, over the years.
 7         Q.    What has changed about
 8    confidentiality over the years?
 9         A.    For example, um, I don't think
10    you can require people to remain -- prevent
11    people from going to regulators about
12    what's employed, so, that is one thing.
13              That is just one example.
14         Q.    So, you see that this
15    confidentiality and Non-Disclosure
16    Agreement concerns the disclosure of a
17    counterparty's confidential information to
18    Brevet; is that correct?
19              (Witness reviews document.)
20         A.    Um -- yes.  That is what it
21    appears to be.
22         Q.    And is that the type of
23    Non-Disclosure Agreement that the
24    Compliance Department, at Brevet, has
25    responsibility for this?
```

Page 85

```
 1              MEI-LI da SILVA VINT
 2              (Witness reviews document.)
 3       A.    Um, so, we have a form
 4   confidentiality agreements that -- actually
 5   today, this -- this one, I don't think we
 6   use.
 7              We use a Mutual B one way in
 8   our favor.
 9       Q.    So --
10       A.    And counterparty might give us
11   this one, but this is not what our form
12   would look like, in terms of what we put
13   out today.
14       Q.    Do you know whether if, in
15   2015, Brevet used a form like this?
16              (Witness reviews document.)
17       A.    Siting here today, I can't tell
18   if they used a form like this.
19       Q.    Since you joined Brevet, in
20   2015 -- '17, have you been personally
21   involved in the revision of Brevet's form
22   NDA's?
23       A.    I've been involved, yes, in
24   updating the NDA's.
25       Q.    Has anyone, other than you,
```

1           MEI-LI da SILVA VINT
2    been involved in updating Brevet's form
3    NDA's since you joined the firm?
4         A.    Um, yes.
5               I think, actually, I was not
6    overseeing NDA's, when I first joined.
7    Since I have been involved in NDA's, Daniel
8    Vonveiglight, as I mentioned before, as
9    well as outside counsel.
10        Q.    Who is the outside counsel that
11   Brevet uses on matters relating to NDA's?
12        A.    I can't recall at this moment.
13   I don't think it's one firm that we have
14   used but it might be.
15        Q.    Can you -- what -- what are --
16   which firms has Brevet worked with on form
17   transaction documents?
18              (Witness reviews document.)
19        A.    Um, what do you mean
20   "transaction documents"?
21        Q.    Documents memorializing an
22   agreement between Brevet and a
23   counterparty?
24        A.    There are a number of law firms
25   that have been used.  You know, in

```
1              MEI-LI da SILVA VINT
2    particular transactions, you might need a
3    law firm with a particular expertise and
4    some firms there are restrictions.
5              So, there have been a number of
6    firms used in different transactions.
7         Q.    Were you responsible for hiring
8    Brevet's outside counsel?
9         A.    I am involved in hiring, um,
10   Brevet's outside Counsel.
11             It depends on what the matter
12   is, if I am primarily responsible for just
13   overseeing, kind of, the approval of the
14   outside counsel.
15        Q.    During your tenure at Brevet,
16   can you name the top five law firms, in
17   terms of billables that Brevet has paid for
18   transactional work?
19        A.    Sitting here --
20             MR. UNDERWOOD:  Objection to
21         the form of the question.
22        A.    Sitting here today, I can't
23   tell you, specifically, the top five.
24        Q.    Who are some law firms that
25   Brevet uses for transactional work?
```

Page 88

1              MEI-LI da SILVA VINT
2        A.    You just want some of the
3    examples of law firms that have been used
4    on transactional work?
5        Q.    Yeah.
6        A.    Mayer Brown, Chapman Cutler,
7    Baker McKenzie, those are just three that
8    we have used for transactional work.
9        Q.    When Brevet --
10             MR. DUMAIN:  Withdrawn.
11       Q.    When a Brevet entity makes a
12   loan to a counterparty, does Brevet always
13   retain outside counsel to work on the
14   transaction?
15       A.    To my knowledge, outside
16   counsel would most likely have been
17   involved at some point.
18       Q.    What types of responsibilities
19   does outside counsel have in connection
20   with a loan that Brevet would make to a
21   counterparty?
22       A.    They might help in drafting
23   documentation and checking regulatory and
24   legal requirements.
25       Q.    Aside from you, who would be

```
                                      Page 89
 1             MEI-LI da SILVA VINT
 2   involved in choosing which outside counsel
 3   to retain for a particular loan
 4   transaction?
 5             MR. UNDERWOOD:  I object to the
 6        form of the question.
 7        A.    The team working on the
 8   transaction.
 9             (Whereupon, a short recess was
10        taken.)
11        Q.    Do you think that Exhibit 3 is
12   a trade secret of Brevet?
13             MR. UNDERWOOD:  (Indicating.)
14             This document here
15        (indicating.)
16             MR. DUMAIN:  I'm sorry, Colin,
17        I can't hear you.
18             THE WITNESS:  I was asking if
19        that is the exhibit we were looking
20        at.
21             MR. UNDERWOOD:  I just -- she
22        just asked if what was up on the
23        screen, I was just confirming for
24        her.
25             Sorry.
```

Page 90

```
 1              MEI-LI da SILVA VINT
 2              I'll try not -- again,
 3         whispering to the witness.
 4              THE WITNESS:  I can't --
 5              MR. DUMAIN:  And also, don't
 6          whisper.
 7       A.    I can't speak to this specific
 8   document.
 9       Q.    Does Brevet take measures to
10   keep its confidentiality and Non-Disclosure
11   Agreements secret?
12       A.    Yes.
13              Um, they are only changeable
14   and accessible by certain people within the
15   firm and they only go to certain parties.
16              The -- these are not blasted
17   around.
18       Q.    Since you joined Brevet, how
19   many NDA's has Brevet entered into with
20   counterparties?
21       A.    Sitting here today, I can't
22   tell you.
23       Q.    More than a hundred?
24       A.    Again, sitting here, I can't
25   tell you.  We sign NDA's with people on a
```

Page 91

```
 1            MEI-LI da SILVA VINT
 2  -- a loan side and we sign NDA's with
 3  personal investors and potential investors.
 4            So, I, sitting here today, I
 5  can't tell you.
 6       Q.    How many years have you been at
 7  Brevet?
 8       A.    As of October ████ of 2021, I
 9  will at -- I have been with Brevet for five
10  years.
11       Q.    So, you don't know whether
12  Brevet enters into more or less than twenty
13  NDA's a year?
14       A.    Like I said before, I can't
15  tell you how many NDA's have been entered
16  into over the past five years or if we
17  enter into twenty or more or less every
18  year.
19       Q.    Is there a policy that Brevet
20  employees are supposed to follow before
21  entering into an NDA?
22       A.    So, employees don't do their
23  own NDA's.
24            The NDA's only go through
25  compliance and then, can -- they can only
```

```
                                          Page 92
```

1              MEI-LI da SILVA VINT
2    be executed by certain people within the
3    firm.
4         Q.    So, if a sourcing professional
5    is in conversations with a potential source
6    and it has reached a point where the
7    potential counterparty wants to provide
8    confidential information, pursuant to an
9    NDA, what happens next?
10        A.    It would request an NDA from
11   testifying the counterparty and the reason
12   for the NDA.
13             Once it arrived at the
14   counterparty, Brevet would, um -- the
15   counterparty would execute it and Brevet
16   would, then, execute it.  And only specific
17   people, again, in Brevet can execute that
18   NDA.
19        Q.    Is there a written policy
20   setting out what you just described?
21        A.    The NDA process?
22        Q.    Yeah.
23        A.    There is not a policy around
24   how you get on NDA done. There are policies
25   and procedures around -- around how you can

Page 93

1              MEI-LI da SILVA VINT

2    disseminate confidential information and --

3    and the authority to do so.

4         Q.    Are there policies and

5    procedures written --

6              MR. DUMAIN:  Well, withdrawn.

7              Let me state it differently:

8         Q.    Is there a written policy

9    governing the receipt of potential

10   counterparty confidential information?

11        A.    If there is -- there are

12   written policies and sitting here right

13   now, I can't point you to the exact policy

14   but there are policies around

15   confidentiality, including the receipt of

16   confidentiality, in Code of Ethics,

17   potentially, the compliance, maybe the HR

18   policy and then, in made of people's

19   Employment Agreements, even.

20              There are in various policies

21   and procedures.  I just can't, sitting here

22   right now, tell you how -- which one,

23   exactly, it is.

24        Q.    So, I just want to make sure I

25   am clear:  Is it your testimony that there

Page 94

```
 1              MEI-LI da SILVA VINT
 2    is a written procedure describing the
 3    process by which a Brevet employee should
 4    obtain an NDA before receiving confidential
 5    information from a counterparty?
 6              MR. UNDERWOOD:  Objection to
 7         the form of the question.
 8         A.    Yeah, sitting here today, I --
 9    I can't point you to an exact policy around
10    obtaining an NDA, relating to a
11    counterparty.
12              MR. UNDERWOOD:  Ian, can I just
13         ask:  Did you -- did you, like, maybe
14         change your headphones or something,
15         because your voice, since the break,
16         is very muddy, at least on our end.
17              I don't know if the Court
18         Reporter is noticing it, as well. But
19         it's -- it's -- it's muddled.
20              Yeah, it's like you're talking
21         under water or something.
22              (Whereupon, a short recess was
23         taken.)
24              MR. UNDERWOOD:  Sorry.
25              I mean we can go ahead. It's
```

Page 95

```
1              MEI-LI da SILVA VINT
2         just if you had changed something, I
3         was hoping you would change it back.
4         But if you don't know what it is,
5         then -- then, we will go ahead.  And
6         if you can't understand what you're
7         saying someone will clear it up.
8              I can't hear anything that you
9         are saying now.
10             (Whereupon, a short recess was
11        taken.)
12             MR. DUMAIN:  Can you hear me
13        now?
14             MR. UNDERWOOD:  Yeah.
15             That -- that sounds more like
16        it was before.
17             MR. DUMAIN:  Great.
18             We will try it this way and,
19        um, if there is ambient noise, that's
20        causing a problem, we will see what
21        we can do resolve all issues.
22             Thanks for pointing it out.
23     Q.    Okay.  If, today, a new
24  sourcing employee came to you and asked
25  where he or she should look to learn what
```

Page 96

1                    MEI-LI da SILVA VINT
2     the process is for obtaining an NDA before
3     receiving confidential information from a
4     counterparty, what would you say?
5           A.    So, I would say:  As they have
6     read and attested to our policies and
7     procedures, and been given the opportunity
8     to ask any questions, including around
9     confidentiality, they would ask for
10    information on what they are supposed to
11    do, when they receive confidential
12    information.
13                  And if there is an NDA
14    required, what the process is, to have that
15    NDA approved and executed.
16                  And to be clear:  On the
17    sourcing side and the structuring side, in
18    the transaction's policies and procedures,
19    there is some language that I can't be
20    exact about right now, because I don't have
21    it in front of me, around NDA's in the
22    invest -- the invest -- on the loan side.
23          Q.    Is the loan side subject to
24    regulation under the Investment Advisors
25    Act?

```
                                           Page 97
 1              MEI-LI da SILVA VINT
 2       A.    Sir --
 3              MR. UNDERWOOD:  Object to the
 4        form of the question.
 5       A.    Certain aspects of it would be,
 6   depending on if it relates to transactions,
 7   with respect to the Investment Advisors
 8   Act.
 9       Q.    Can you clarify that answer?
10       A.    Yeah.
11              Meaning that if one of those
12   loans ends up going to some -- one of the
13   entities that are un -- has a relationship
14   with an Investment Advisor, you have clear
15   requirements, with respect to those loans.
16       Q.    You know, if Brevet -- if a --
17   if a Brevet entity makes a loan to a
18   counterparty that has no relationship with
19   Brevet Capital Management, does that loan
20   implicate the Investment Advisors Act?
21       A.    That is a very broad question.
22              It could.
23              You have fiduciary duty because
24   Brevet Capital Management is, you know, has
25   -- is affiliated or --
```

Page 98

```
 1            MEI-LI da SILVA VINT
 2            THE WITNESS:  That is not the
 3      word right.
 4      A.    But is owned by the Brevet --
 5   Brevet Holdings; right?
 6            You would have a duty to offer
 7   that to your fund vehicles, before you do
 8   anything with it, separate.
 9            So, yes, you have fiduciary
10   duties if one of those Brevet Holdings
11   origination vehicles makes a loan to
12   someone who is not affiliated with Brevet.
13            You have books and records
14   requirements, as well, if it goes into or
15   is offered to one.
16      Q.    What are the books and records
17   requirements that are implicated if a loan
18   that's originated by a Brevet entity is not
19   Brevet Capital Management goes into a
20   Brevet fund?
21      A.    So, sitting here today, I can't
22   tell you exactly.  The books and records
23   requirements are extensive.
24            But transactions that are
25   offered are given to a fund.  There are
```

Page 99

1            MEI-LI da SILVA VINT
2    retention requirements related to that.
3        Q.    Are the Brevet funds themselves
4    Investment Advisors that are regulated by
5    the Investment Advisors Act?
6        A.    No.
7        Q.    Who are the clients of Brevet
8    Capital Management?
9        A.    Um, it would be any fund that
10   is require -- they are stated in our N --
11   ADV but there are certain fund vehicles,
12   private funds, as well as certain co-exact
13   or SMA vehicles.
14       Q.    Does Brevet Capital Management
15   provide investment advice?
16       A.    Yes.
17             That is why it's a Registered
18   Investment Advisor.
19       Q.    And to whom does it provide
20   investment advice?
21       A.    To its clients.
22       Q.    The clients that you just
23   identified?
24       A.    Yes.
25       Q.    Any other clients?

Page 100

1                    MEI-LI da SILVA VINT
2        A.      No.
3        Q.      Ms. da Silva Vint, you
4    understand, of course, that we are here
5    today in connection with claims brought by
6    my client, Paul Iacovacci, against various
7    Brevet-related entities and several
8    individuals; correct?
9        A.      Yes.
10       Q.      Do you know Paul Iacovacci?
11       A.      I do not, personally, know Paul
12   Iacovacci.
13       Q.      Have you ever met him
14   personally?
15       A.      I never met Paul Iacovacci.
16       Q.      Are you familiar with the
17   claims at issue in this litigation?
18       A.      Specifically the -- is it
19   Federal or State?  It's a Federal case;
20   right?
21               Please be specific.
22       Q.      I will represent that we are
23   here in connection with the Federal -- the
24   Federal case in which Mr. Iacovacci is a
25   Plaintiff and Brevet entities --

Page 101

```
 1              MEI-LI da SILVA VINT
 2      A.      Yes.
 3      Q.      -- are the Defendants.
 4      A.      Yes.
 5      Q.      And you're familiar that
 6  Mr. Iacovacci has asserted a claim for
 7  violation of the Federal Computer Fraud and
 8  Abuse Act?
 9      A.      Yes, I am.
10      Q.      Do you know that Johnny Lan
11  logged into Paul Iacovacci's home computer?
12              Putting aside the dispute about
13  who owns that computer on, or around
14  October 18, 2016, and downloaded files,
15  without notice, to Mr. Iacovacci; correct?
16              MR. UNDERWOOD:  Counsel, you're
17          -- you're talking about events that
18          -- that predated Ms. da Silva Vint's
19          tenure at the company.
20              And to the extent that you're
21          asking about her personal knowledge,
22          I am going to instruct her to exclude
23          from testifying to her personal
24          knowledge about facts that she knows
25          because of her work, as an attorney,
```

Page 102

1          MEI-LI da SILVA VINT

2     for this company, in connection with

3     this litigation.

4          She is familiar with the

5     allegations and -- and, um, I am

6     going to instruct you not to disclose

7     information that you've learned from

8     attorneys or in -- in the context of

9     being counselled by the company in

10    this litigation.

11         MR. DUMAIN:  Yeah.

12         So, what I am trying to get at,

13    Colin, I understand the objection or

14    the statement that -- and I can

15    indulge it, whether or not it's

16    appropriate.

17         But what you just identified

18    is, precisely, what I am trying to

19    get at here, which is to, you know,

20    put -- understand the limits of Ms.

21    da Silva Vint's personal knowledge

22    such that -- so we can understand

23    what she might and might not testif

24    -- testify to at trial.

25         So, we are on the same page;

1              MEI-LI da SILVA VINT

2       okay?

3              MR. UNDERWOOD:  Sure.

4              THE WITNESS:  Sorry.

5              You're going to have to repeat

6       the question.

7              MR. DUMAIN:  Sure.

8       Q.    In your capacity, as Chief

9  Compliance Officer, did you come to learn

10 at some point that Johnny Lan had logged

11 into the Dell OptiPlex, at Paul Iacovacci's

12 home, on, or around, October 18, 2016, and

13 downloaded files, without notice to him?

14             MR. UNDERWOOD:  So -- so, I --

15       I appreciate Counsel's framing of the

16       question.

17             I -- I want to make sure that

18       you are clear:  To the extent that

19       you learned things, in your capacity

20       as legal counsel to the company --

21             THE WITNESS:  Yes.

22             MR. UNDERWOOD:  -- you should

23       exclude those from your answer.

24       A.    Yes.

25             I did come to learn that as

Page 104

```
 1              MEI-LI da SILVA VINT
 2    counsel and Chief Compliance Officer at
 3    this time.
 4              MR. UNDERWOOD: Okay. Any if you
 5         came to learn something, as counsel,
 6         you should not disclose it; okay?
 7              THE WITNESS:  Yeah.
 8              MR. DUMAIN:  I mean I am having
 9         a little trouble with the idea that
10         this is not something she would have
11         learned as Chief -- that she did
12         learn, as Chief Compliance Officer.
13              She was hired as Chief
14         Compliance Officer.
15              MR. UNDERWOOD:  And she was
16         hired after the date in question and,
17         so, in terms of understanding what
18         happened before she was hired --
19         okay.
20              If -- if -- if what you want to
21         ask here is in -- in -- outside of
22         the context of the litigation, did
23         she do an investigation into that,
24         something like that, I am fine -- I
25         am perfectly happy to allow her to
```

Page 105

```
 1            MEI-LI da SILVA VINT
 2        answer that.
 3            So -- so -- it -- it -- I'm not
 4        -- I'm not telling you how to do your
 5        job and I am not trying to interfere
 6        but if the question is:  Outside of
 7        any -- any legal analysis or -- or
 8        work that you did, as counsel to the
 9        company, did you investigate the
10        events that occurred before you were
11        employed, including, specifically, in
12        this case, the incident in -- in --
13        that counsel has identified?
14            MR. DUMAIN:  Put it this way:
15     Q.    Aside -- aside from knowledge
16  you gained in your role, as counsel, do you
17  have any knowledge of the events concerning
18  Mr. Lan's October 18, 2016 login to the
19  Dell OptiPlex computer at Mr. Iacovacci's
20  home?
21     A.    We keep a log of pending
22  litigations with the Brevet entities.
23     Q.    Do you have any personal
24  knowledge, outside of what you may have
25  learned as counsel, about Mr. Lan's
```

1              MEI-LI da SILVA VINT

2    accessing of Mr. Iacovacci's computer?

3         A.    I don't have personal

4    knowledge.

5         Q.    Did you have any personal

6    knowledge, outside of your role as counsel

7    to Brevet, of the events leading to

8    Mr. Iacovacci's departure from Brevet?

9         A.    I do not have personal

10   knowledge.

11        Q.    Do you understand that Brevet

12   has asserted counterclaims against

13   Mr. Iacovacci in this case?

14        A.    I do understand that.

15        Q.    Do you have any personal

16   knowledge of any damages Brevet has

17   suffered in connection with the

18   counterclaims it has alleged against Mr.

19   Iacovacci?

20        A.    I do not have personal

21   knowledge.

22        Q.    Do you understand, outside of

23   your role of -- as counsel, have you heard

24   --

25        A.    I'm sorry.

1          MEI-LI da SILVA VINT

2          THE WITNESS:  Can I ask -- can

3     I just can my attorney something

4     related to role of counsel?

5          MR. DUMAIN:  If it's about a

6     question of privilege, yes.

7          THE WITNESS:  Yes.

8          MR. UNDERWOOD:  So, can we --

9     can we just go off the record a

10    second before you ask your next

11    question?  So, I know there is a

12    question pending --

13         MR. DUMAIN:  Yes.

14         MR. UNDERWOOD:  Can see what

15    she wants?

16         We can all stay on the record,

17    Ian.

18         MR. DUMAIN:  Yep.

19         (Whereupon, a short recess was

20    taken.)

21         MR. UNDERWOOD:  I think -- I

22    think we have resolved the question.

23         Can you read the previous

24    question back?

25              (Whereupon, the referred to

1          MEI-LI da SILVA VINT
2       question was read back by the
3       Reporter.)
4          MR. DUMAIN:  Let me rephrase
5       because somehow, at least, on the
6       record, the word, "damages" slipped
7       out.
8          MR. UNDERWOOD:  Yeah.
9    Q.    Ms. da Silva Vint, outside of
10   your role as counsel to Brevet, do you have
11   any personal knowledge of any damages
12   Brevet has suffered as a result of the
13   conduct giving rise to its counterclaims in
14   this case?
15   A.    Yes.
16   Q.    What are the damages you're
17   referring to?
18   A.    With respect to investors that
19   did not come in because of these -- this
20   frivolous lawsuit.
21   Q.    What are the investors that did
22   not come in --
23          MR. DUMAIN:  Let -- let -- let
24       me state it differently:
25   Q.    Can you identify the investors

Page 109

```
 1              MEI-LI da SILVA VINT
 2   that did not come in because of
 3   Mr. Iacovacci's lawsuit?
 4        A.    Um, I can't recall the exact
 5   name at this moment but I was in a
 6   conversation where they specifically stated
 7   that.
 8        Q.    Aside from those damages, can
 9   you identify any other damages, outside of
10   of your role as counsel, that Brevet has
11   suffered as a consequence of the facts
12   underlying the counterclaims in this
13   lawsuit?
14        A.    So, I was -- I was only
15   speaking with my personal capacity in that
16   specific incident.
17              There is no other -- nothing
18   else that I can speak to, specifically, in
19   my personal capacity.
20        Q.    Okay. And you can't identify an
21   investor with any greater specificity?
22        A.    Sitting here right now,
23   honestly, I can't remember the exact name.
24              Talked to dozens of investors
25   and as of right now, I can't recall the
```

```
 1              MEI-LI da SILVA VINT
 2   exact name of the investor or investors.
 3        Q.    So, was it one investors or
 4   multiple investors?
 5        A.    The incident that I am
 6   specifically recalling at this moment was
 7   an investor.
 8        Q.    And what did that investor say?
 9        A.    I can't specifically recall at
10   this time.
11              Do you want me to summarize
12   what I remember?  I can do that.
13              But, I don't specifically
14   recall exactly what they said.
15        Q.    Yeah.
16              Please tell me everything that
17   you recall about that conversation.
18        A.    They said they were not moving
19   forward with the investment at the time,
20   specifically because of -- they didn't
21   agree with the, um, allegations that
22   Mr. Iacovacci had brought, but, because of
23   the fact there was a lawsuit pending, they
24   were not going to move forward on the
25   investment.
```

Page 111

```
 1              MEI-LI da SILVA VINT

 2              And that was specifically the

 3    reason why they were not moving forward

 4    with the investment.

 5         Q.    Do you recall how large the

 6    investment was?

 7         A.    It was hundreds of millions of

 8    dollars.

 9         Q.    And as you understand it, that

10    damage that arises from the conduct

11    underlying Brevet's counterclaims in this

12    case?

13         A.    Yes. As I understand it.

14         Q.    All right.

15         A.    In my personal capacity.

16         Q.    Let's take a look at the next

17    exhibit.

18              I think it will be Exhibit 4?

19              (Witness complies.)

20              (Whereupon, corporate

21         organizational chart was marked as da

22         Silva Vint Exhibit 4 for

23         identification as of this date by the

24         Reporter.)

25         Q.    Before we look at it, I think I
```

Page 112

```
 1              MEI-LI da SILVA VINT
 2   already covered this but:  When was this
 3   conversation?
 4        A.    I can't remember exactly,
 5   sitting here right now.
 6        Q.    Was it -- was it during the
 7   pandemic or before the pandemic?
 8        A.    Sitting here now, I remember it
 9   was before the pandemic.
10        Q.    Can you describe, generally,
11   what type of entity you're referring to?
12        A.    Um, it was an institutional
13   investor.
14              It was not an individual
15   investor, if that is what you're looking
16   for, in terms of distinction.
17        Q.    Well, I am looking for -- well,
18   give me -- give me as much detail, please,
19   as you would, as you can, without betraying
20   any legal obligations to third parties.
21        A.    But I don't -- I -- to be
22   honest, I don't recall the exact name and
23   it would have been -- it would be
24   confidential.
25              But it was an institutional
```

Page 113

```
 1              MEI-LI da SILVA VINT
 2   investor and it was hundreds of millions of
 3   dollars that they were going to allocate to
 4   us.
 5        Q.    Would anybody else know who
 6   that investor was?
 7        A.    I can't recall, right now, who
 8   was a part of that conversation.
 9              MR. DUMAIN:  Let's take a look
10       at Exhibit 4, please.
11              (Witness complies.)
12        A.    Do you want me to scroll
13   through the entire exhibit?
14        Q.    Well, why don't you take a look
15   at it and tell me just, in the first
16   instance, if you can tell me what it is?
17              (Witness complies.)
18              (Witness reviews document.)
19        A.    It looks like a PowerPoint.
20        Q.    What does it represent?
21              (Witness reviews document.)
22        A.    What does it represent?
23              (Witness reviews document.)
24        A.    It looks like some work charts.
25        Q.    Did you have any role in
```

1              MEI-LI da SILVA VINT

2    creating this work chart, to the best of

3    your knowledge?

4              (Witness reviews document.)

5        A.    Sitting here today, I can't

6    tell you if I had a role in creating this

7    work chart.

8        Q.    In your -- any of your

9    capacities at Brevet, do you ever create

10   work charts?

11       A.    Um, I have had input into work

12   charts.

13       Q.    Who is responsible for creating

14   work charts?

15       A.    Um, it depends.

16       Q.    What does it depend on?

17       A.    So, corporate org charts are

18   generally kept by the Legal and Compliance

19   Department.  And the employee org work

20   chart would be updated by Human Resources

21   and, then, it would have to be approved.

22       Q.    Okay.

23              Can you turn to the fourth page

24   of the pdf?

25              (Witness complies.)

```
                                        Page 115
 1              MEI-LI da SILVA VINT
 2      A.    I see "immigration fund."
 3      Q.    Sorry.
 4              I am looking at "Brevet Funds
 5   Organizational Chart."
 6      A.    Okay.
 7      Q.    As you understand it, is this
 8   chart an accurate representation of the
 9   relationships between the entities it
10   portrays?
11              (Witness reviews document.)
12      A.    Um, sitting here today, this
13   looks like a -- I don't know, like, a
14   theoretical like -- there is some
15   separate-managed accounts and Brevet direct
16   confirming short-duration fund LP's.
17      Q.    So --
18      A.    I don't know what the chart --
19   I don't know what it's trying to portray,
20   as I am sitting here.
21      Q.    Will you scroll down to the
22   next slide?  It's a page ending in 115?
23              (Witness complies.)
24              (Witness reviews document.)
25      A.    Yes.
```

1              MEI-LI da SILVA VINT

2      Q.    Do you know what this chart is

3  attempting to portray?

4              (Witness reviews document.)

5      A.    No. I do not, sitting here

6  today.

7              (Witness reviews document.)

8      A.    It looks wrong. I don't know

9  what it's trying to portray. But, I don't

10  know why Brevet and SPF Partners would be

11  next to Brevet Capital Management.

12              So, I can't tell you what what

13  -- what somebody would be trying to portray

14  here.

15      Q.    And you don't know why this

16  document was created?

17              (Witness reviews document.)

18      A.    I -- I wouldn't know.

19              I mean people create documents

20  that I never see sometimes.  If they are

21  working on documents internally, they might

22  be in progress and I would never see them.

23      Q.    Do you see every document that

24  leaves Brevet?

25      A.    I don't see every document that

Page 117

```
 1              MEI-LI da SILVA VINT
 2   leaves Brevet but an organizational chart
 3   that would go to an investor.  This -- this
 4   would only go to an investor or potential
 5   investor or someone working with an
 6   investor.
 7              I would see those documents, I
 8   -- I -- I do approve, from a compliance
 9   perspective, the documents that go to
10   investors and prospective investors.
11      Q.   So, any org chart that would go
12   to an investor, or prospective investor,
13   you would be presented with and would be
14   required to approve before it was
15   distributed?
16      A.   Yeah.
17              The org charts, specifically,
18   go through the compliance process, where
19   they are locked down and the Marketing Team
20   is -- which is who would be using the
21   Investor Relations Team only have access to
22   that locked-down version.
23      Q.   And so, as you look at this,
24   you don't recall having approved this org
25   chart for any external purpose?
```

```
                                              Page 118
 1              MEI-LI da SILVA VINT
 2              (Witness reviews document.)
 3        A.    Sitting here today, I don't
 4   recall this org chart.
 5        Q.    And it looks wrong to you?
 6        A.    I -- I -- what I am saying is I
 7   don't know why SPF Partners would be
 8   sitting next to Brevet Capital Management.
 9              So, I -- I can't speak to what
10   someone was doing, when they were creating
11   this org chart.
12        Q.    Got it.
13              Does SPF --
14              MR. DUMAIN:  Sorry.  Withdrawn.
15        Q.    ███████ ████ ███████████ ████  have
16   employees?
17        A.    ██████ ██████████████ █████, itself, does
18   not have employees.
19        Q.    ███████ █████████ ███████ █████████████
██  ████  have employees?
21        A.    █████████ ████████ ██████████████ ███████
22   does not have employees.
23        Q.    What does B████████ ███████████
██  █████████████████ █████  do?
25        A.    ████████ █ ████████████ █████████████
```

Page 119

1           **MEI-LI da SILVA VINT**

2 ███████ █ ██ ████ ██ █

███ ████████ █ █████ ██ ████████ ████

███ ███████ ██████ ██████ ████████

███ ████ ███ ███████ ██████

6           (Whereupon, a short recess was

7       taken.)

8       Q.    What is the ██████ ██████

██ ██████ ████, if you know?

10      A.    Are we on a different org chart

11 at this point or -- what are you looking

12 at?

13      Q.    You don't -- you don't need to

14 be looking at it but you can.

15            So, if you look at Page 113,

16 you will see a reference to █████ ██████

██ █████ █████

18            (Witness complies.)

19      A.    Oh.

20 ██ █ █ ██ ████ ██ █ █

███ ████████ ███ ████ ██████ ████ █ █

███ ███████ █ █ ██████ ██████ ███████

23      Q.    What does ███ ████████ ██████

24 do?

25      A.    ██████ █ ████ █████ █████ ██

```
                                        Page 120
 1              MEI-LI da SILVA VINT
 2    ███████████████████
 3        Q.    When was that fund formed, if
 4    you know?
 5        A.    To the best of my knowledge, it
 6    was a non-Brevet-related entity and Brevet
 7    Capital Management became Investment
 8    Manager, to the best of my knowledge, at
 9    the end of 2016.
10        Q.    Are you familiar with a Brevet
11    fund that is referred to informally as the
12    Offshore Fund?
13        A.    Um, there is not one fund that
14    is formally referred to as the "Offshore
15    Fund."
16        Q.    Are there multiple -- multiple
17    funds that are referred to collectively, as
18    the "Offshore Fund"?
19        A.    No, not "collectively."
20        Q.    So, is the term, "Offshore
21    Fund" a term that is used within Brevet?
22        A.    Um, no.
23              Because you wouldn't know what
24    someone was talking about if they just said
       the "Offshore Fund."
                    DIAMOND REPORTING  (877) 624-3287
         info@diamondreporting.com
                        120
25
```

Page 121

1                    MEI-LI da SILVA VINT
2          Q.      What about the Onshore Fund?
3      Is that a term that is used within Brevet?
4          A.      You would have to say which
5      fund you were speaking about, if you were
6      to say "Onshore Fund" or "Offshore Fund,"
7      because there are multiple vehicles.
8          Q.      You said Short-Duration
9      Offshore Fund, is that -- would that be
10     specific enough for you to know what
11     someone was talking about?
12         A.      Yes.
13         Q.      Does the Short-Duration
14     Offshore Fund have a Board of Directors?
15         A.      Yes, it does.
16         Q.      Who is on it?
17         A.      Um, Thomas Dean, um, Jeffrey
18     Gillespie and um, I can't recall the third
19     person right now.
20         Q.      Those -- those three people?
21         A.      Yes.
22         Q.      And --
23         A.      Amber Rambue.
24                 THE WITNESS:   Sorry.
25         A.      Amber Rambue is the third

Page 122

```
 1              MEI-LI da SILVA VINT
 2    person.
 3         Q.    Aside from being Directors of
 4    the Offshore Fund, did these individuals
 5    have any other business or legal
 6    relationships with any Brevet entities?
 7         A.    Thomas Dean is on the Offshore
 8    Board of another fund, as well as -- was on
 9    the Board of a Legacy Fund and sits at as a
10    Non-Voting Member of our Conflicts Advisory
11    Board.
12         Q.    And you said "Mr. Gillespi"?
13         A.    Thomas Dean.
14         Q.    No.
15               What I am -- I am asking -- so,
16    I am now asking about Mr. Gillespi.
17               MR. DUMAIN:  Sorry.
18         A.    Oh.
19         Q.    Sorry about that.
20         A.    So, nobody else has any other
21    type of relationship with Brevet.
22         Q.    Do you know how these three
23    individuals came to be Directors of the
24    Short-Duration Offshore Fund?
25         A.    Through -- to the best of my
```

Page 123

1           MEI-LI da SILVA VINT

2    knowledge, because I was involved in some

3    of it, was through an interview process and

4    a vetting process.

5           Q.    What were the qualifications to

6    become a Director of the Short-Duration

7    Offshore Fund?

8           A.    We look for independence, we

9    look for experience, both in the Events and

10   Asset Management space, experience directly

11   with payment funds because these are

12   payment funds, amongst other things, as

13   well as whatever type of other

14   qualifications they have with government

15   and accounting, et cetera.

16              (Whereupon, a short recess was

17       taken.)

18           Q.    Do -- is -- is -- does Brevet

19   Capital Management have a website?

20           A.    Brevet Capital Management,

21   itself, doesn't have a website.

22           Q.    Does any Brevet entity have a

23   website?

24           A.    There's no specific entity,

25   Brevet entity, that has a website.

Page 124

```
 1              MEI-LI da SILVA VINT
 2              Brevet Capital, I think it is
 3    BrevetCapital.com has a website.
 4         Q.    That is the website for what
 5    entity or entities?
 6         A.    It's just Brevet.  It's not for
 7    a specific entity.
 8         Q.    It's not associated with any
 9    particular entity?
10         A.    No.
11              And it's, specifically, not
12    related to any type of fund that Brevet
13    Capital Management manages.
14         Q.    What is it related to?
15         A.    Just if Brevet has business
16    outside of specific funds that are open
17    net.
18         Q.    Do any Brevet entities have
19    dedicated office space?
20         A.    Specific Brevet entities?
21         Q.    Correct.
22         A.    There's an -- a sourcing and
23    origination arm, out of -- out of San
24    Diego, that has a dedicated office space.
25    One of our sourcing and origination arms,
```

Page 125

MEI-LI da SILVA VINT

1          MEI-LI da SILVA VINT
2    offshore, also has dedicated office space
3    in that county.
4          But, if you're speaking about
5    the New York office space, it is not
6    dedicated to a specific Brevet entity.
7        Q.    Well, the office space that you
8    just described dedicated to specific Brevet
9    entities or specific functions within the
10   Brevet business?
11       A.    Um, entities.
12       Q.    So, which entities are the
13   non-New York offices --
14       A.    There is an entity called ██████
15   and there is an entity that is --
16   ████████████████  ████ ██ ███  ██████  ████████████
17       Q.    What does ████████ do?
18       A.    ████ ████████ ████ ████████████
     ██████.
20       Q.        ██████ ████████████ ██ ████████████████
21       A.        ██████
22            ██ ██████ ████████ ████ ██ ████ ████
██  ████████████████ ████████ ████ ██████ ████ ██
██  ████████ ████ ██ ████████████████ ████ ██ ████ ████████
██  ██████ ████████

```
1              MEI-LI da SILVA VINT
2    ███ ███ █ ████ ███ █
  █ ████ ███ ███ ██ ██ █ █
  █ ███ █ █ ███ ███ ██ ███ ██ █
  █ █ ████ ███ █ ███ █
  █ ███ ██ ███ █ ████ ██ ███
7        Q.    Okay. Do you know what it means
8    to be under common control -- for -- for
9    entities to be under common control, for
10   purposes of the Federal Securities Laws?
11       A.    Um, I think you would have to
12   be specific -- specifically definite it for
13   me.
14             (Whereupon, a short recess was
15        taken.)
16       A.    As well as any exceptions to
17   that.
18       Q.    Is Brevet Short-Duration
19   Holdings, LLC under common control with
20   Brevet Capital Management, as you
21   understand it?
22       A.    So, I don't know what
23   definition you're referring to, in terms of
24   "common control."
25             Brevet Short-Duration Holdings,
```

1                MEI-LI da SILVA VINT

2     though, does have different ownership than

3     Brevet Capital Management.

4                So -- I -- sit -- sitting here

5     today, I can't tell you what the specific

6     definition of "common control" and what any

7     exception to that is.

8                So, I can't answer that, other

9     than what I just said.

10         Q.    Do you know what a Form ADV is?

11         A.    Yes.

12         Q.    What is a Form ADV?

13         A.    It's the annual registration

14     that investment -- Registered Investment

15     Advisors have to fill out -- file.

16         Q.    Do you know:  Does this Form

17     ADV require the Registered Investment

18     Advisor to again, provide, um, affiliated

19     entities that are related persons?

20         A.    Sitting here today, I can't

21     tell you exactly if that is a requirement.

22         Q.    All right.

23                Have you ever filed the Form

24     ADV for Brevet?

25         A.    I sign off on the filing of

1           MEI-LI da SILVA VINT

2    Form ADV and I have input as to what goes

3    into the Form ADV.

4        Q.    Who else has input?

5        A.    We work with outside counsel,

6    as well as Daniel Fungi, currently, works

7    on it, as well.

8        Q.    Who is the outside counsel that

9    Brevet relies on for its SEC filings?

10       A.    For this specific filing?

11   Curtis, Mallet.

12       Q.    Okay.

13             Does it -- does Brevet rely on

14   other outside counsel -- outside counsel

15   for its SEC filing?

16             MR. UNDERWOOD:  Objection to

17        the form of the question.

18       A.    Yeah, I just can't -- I don't

19   know what SEC filings you're referring to.

20             Sitting here today,

21   specifically talking about the Form ADV, we

22   work with Curtis, Mallet.

23       Q.    Okay.  Well, does Brevet make

24   SEC filings?

25       A.    I don't -- again, I don't know

```
                                      Page 129
 1              MEI-LI da SILVA VINT
 2   what other SEC filings. None are coming to
 3   mind, right now.
 4              Outside of the Form PF, and
 5   with those specific ones, to the best of my
 6   knowledge, we work with Curtis, Mallet.
 7        Q.    Okay.  Do you spend any
 8   material amount of time, as a Chief
 9   Compliance Officer, dealing with Brevet's
10   SEC filings?
11        A.    What does:  "Material amount of
12   time" mean?
13        Q.    In a given week, how much time
14   do you spend focussed on SEC filings, at
15   Brevet?
16              MR. UNDERWOOD:  Objection to
17         the form of the question.
18        A.    I can't speak to how much time
19   I spend on SEC-related matters or filings
20   on any given week.
21        Q.    Over the course of a typical
22   year, how much time do you spend on SEC
23   filings?
24        A.    Again, it depends on the year.
25        Q.    In 2020?
```

Page 130

```
 1              MEI-LI da SILVA VINT
 2      A.    I -- I can't speak -- I don't
 3  know you're trying to get at here.  I don't
 4  know what "material" is and --
 5              MR. DUMAIN:  Sorry.
 6      A.    -- sitting here, I can't tell
 7  -- I can't tell --
 8              THE COURT REPORTER:  One at a
 9       time.
10              MR. DUMAIN:  Yes.
11      A.    Sorry.
12              I can't tell -- I can't tell
13  what you're trying to get at.
14              "Material amount of time," I
15  don't know what that means. I can't tell
16  you specifically, sitting here, how much
17  time I spent on the SEC filings.
18              Um, this year, or 2020, for
19  example, which is partially done in 2020
20  and 2021, we've had a couple of amendments.
21              So, I -- I can't tell you,
22  specifically, how much time was spent on
23  SEC filings.
24      Q.    Okay.  You can't say, for
25  example, whether, on a typical week, you
```

Page 131

```
 1              MEI-LI da SILVA VINT
 2   spend any time dealing with SEC filings?
 3              MR. UNDERWOOD:  Object to the
 4         form of the question.
 5      A.     Sitting here today, I can not
 6   tell you how much time, during the week, I
 7   spend on anything related to an SEC filing.
 8      Q.     Okay.
 9              MR. DUMAIN:  I think we are now
10         going to mark an exhibit.
11              We will go on exhibit --
12      A.     Sorry.
13              I was going to ask -- ask to
14   take a break.
15      Q.     Okay.
16      A.     I need -- I need about fifteen
17   minutes.
18      Q.     Okay.
19              THE VIDEOGRAPHER:  The time is
20         11:14 A.M.
21              And we are going off the
22         record.
23              (Whereupon, an off-the-record
24         discussion was held.)
25              THE VIDEOGRAPHER:  The time is
```

Page 132

```
 1            MEI-LI da SILVA VINT
 2        11:31 A.M.
 3             And we are back on the record.
 4             (Whereupon, an e-mail dated
 5        October 25, 2016 was marked as da
 6        Silva Vint Exhibit 5 for
 7        identification as of this date by the
 8        Reporter.)
 9        Q.    Hi, Ms. da Silva Vint.
10             We went off the record, we were
11   about to look at an e-mail, dated October
12   25, 2016, with our Tab 3.
13             MR. DUMAIN:  If it was not
14        loaded.
15        A.    I don't have it yet.
16             MR. DUMAIN:  It will be
17        imminently.
18             (Whereupon, a short recess was
19        taken.)
20        Q.    While it's being loaded, did
21   you --
22             MR. UNDERWOOD:  Got it.
23             Sorry.
24             MR. DUMAIN:  Sure.
25        Q.    -- have employment between your
```

Page 133

```
 1              MEI-LI da SILVA VINT
 2   starting at Brevet and finishing up with
 3   Morgan Stanley?
 4        A.    Did I have any break?
 5        Q.    Yes.
 6        A.    Is that what you asked?
 7        Q.    Yes.
 8        A.    No.
 9        Q.    Did you take any vacation of
10   any kind or ended up --
11        A.    No, my last --
12              THE COURT REPORTER:  Let him
13         finish, please.
14              MR. DUMAIN:  I will restate it:
15        Q.    Did you take any vacation
16   between your two jobs?
17        A.    I started on -- I did my last
18   job on a Friday and I started on a Monday
19   after that weekend. I did not take any
20   vacation.
21        Q.    If you can take a look now at
22   what has been marked as "da Silva Vint 4,"
23   I believe?
24        A.    Yes.
25        Q.    Oh, I'm sorry:  "da Silva Vint
```

Page 134

```
 1              MEI-LI da SILVA VINT
 2   5."
 3              (Witness reviews document.)
 4       A.    Yes.
 5       Q.    Do you recognize this e-mail?
 6              (Witness reviews document.)
 7       A.    I can read what is in front of
 8   me right now.
 9       Q.    Does it seem familiar to you?
10              (Witness reviews document.)
11       A.    At this point in time?  No.
12              I can't recall, specifically,
13   being familiar with this e-mail.
14       Q.    Okay.  Do you have any reason
15   to doubt that you sent this e-mail to Mr.
16   Monti -- Monticciolo and Callahan?
17              (Witness reviews document.)
18       A.    I have no reason to doubt that.
19       Q.    Okay.  It's dated "10/█/2016"
20   and you say:  "I look forward to hitting
21   the ground, full speed, on Monday."
22              Do you see that?
23              (Witness reviews document.)
24       A.    Yes.
25       Q.    Do you understand that that is
```

Page 135

```
 1              MEI-LI da SILVA VINT
 2    a reference to your start date, at Brevet?
 3              (Witness reviews document.)
 4         A.    I -- yeah.  Based on the dates,
 5    yes.
 6         Q.    Okay.  And you asked for
 7    materials that was discussed on the call;
 8    correct?
 9              (Witness reviews document.)
10         A.    That's what that e-mail looks
11    like it is saying.
12         Q.    Do you have any recollection of
13    the phone call with Mr. Callahan and Mr.
14    Monticciolo in the week before you began,
15    at Brevet?
16              (Witness reviews document.)
17         A.    I have no specific
18    recollection, sitting here today.
19         Q.    The e-mail makes reference to a
20    trip out of the country between November
21    5th and November 14th.
22              Do you recall that?
23              (Witness reviews document.)
24         A.    Yes.  I do see that.
25         Q.    Do you recall that trip?
```

Page 136

```
 1            MEI-LI da SILVA VINT
 2      A.    I do recall that trip.
 3      Q.    Where did you go?
 4      A.    I went to Isreal and Egypt.
 5      Q.    And the final sentence, of the
 6  second paragraph states:  "I will do
 7  everything to make sure that we abide by
 8  the tight timeline you laid out."
 9            Do you see that?
10            (Witness reviews document.)
11      A.    Yes, I do see that.
12      Q.    Do you recall what that was in
13  reference to?
14      A.    Sitting here today, no idea
15  what that is in reference to.
16      Q.    When you began work at Brevet,
17  on October ██, 2016, did you have a set of
18  priorities that you --
19            THE COURT REPORTER:  I didn't
20       hear you, sir.
21            MR. DUMAIN:  Sorry.
22      Q.    Did you have a set of
23  priorities that you hoped to tackle first?
24      A.    Sitting here today, I can't
25  recall, five years ago, what the priorities
```

Page 137

1              MEI-LI da SILVA VINT

2      were, when I first started.

3          Q.    Do you think you would have

4      memorialized, in a task list or some other

5      kind of document, the priorities that you

6      set out to tackle, when you started out at

7      Brevet?

8          A.    Um, I create to-do lists,

9      handwritten, all the time, various things.

10     So, I may have.

11               Sitting here today, I can't

12     recall specifically if I did.  And I do not

13     have that in my possession any longer, to

14     my recollection.  If I did.

15         Q.    What do you do with your to-do

16     lists?

17         A.    I usually though them away,

18     when they are stale or I completed things.

19         Q.    Okay. Do you recall Brevet

20     Senior Management providing you with a set

21     of objectives when you began in the role of

22     Chief Compliance Officer, on October 31,

23     2016?

24         A.    I do not recall that.

25         Q.    Do you recall reviewing the

Page 138

1                  MEI-LI da SILVA VINT

2   policy and procedures of Brevet before you

3   began working at Brevet?

4                  (Witness reviews document.)

5        A.     Sitting here today, I can't

6   recall if I reviewed the policies and

7   procedures before I began.

8        Q.     Aside from what's in this

9   e-mail, do you have any recollection of why

10  you wanted to review the policies and

11  procedures?

12       A.     Yeah.

13                  To the best of my knowledge,

14  sitting here today, I imagine, like when I

15  -- when you starting a new job, getting

16  onboarded with the firm's policies and

17  procedures, in advance, is helpful to your

18  first day.

19       Q.     Okay.

20                  MR. DUMAIN:  We are going to

21           take a look at a document that's

22           already been marked:  "Lee Deposition

23           Exhibit 7."

24                  (Witness complies.)

25                  THE WITNESS:  Okay.

Page 139

1              MEI-LI da SILVA VINT
2        A.    I have it up.
3        Q.    Okay. If you want to take a
4    quick look at it, just to see if you
5    recognize it. I'll, eventually, direct you
6    to specific provisions.
7               (Witness complies.)
8               (Witness reviews document.)
9        A.    It looks like the compliance
10   policies and procedures that were dated as
11   of January, 2015.
12       Q.    Do you know if there were any
13   revisions to the compliance policy and
14   procedure manual between January, 2015 and
15   when you started, on October 31st of 2016?
16              (Witness reviews document.)
17       A.    Sitting here today, I don't --
18   do not know that.
19       Q.    Okay. If -- if, indeed, you --
20   these were the policies that were in effect
21   at the time that you began, is it your
22   recollection that you would have reviewed
23   these policies, in preparation to be -- for
24   beginning work, as Chief Compliance
25   Officer?

```
                                            Page 140
 1              MEI-LI da SILVA VINT
 2              (Witness reviews document.)
 3       A.    If they were part of -- if they
 4  were part of what I was sent before
 5  starting and if this was in place, if this
 6  was part of the package that they sent me,
 7  then yes.
 8       Q.    Okay.
 9              If you can turn now to Page 5
10  of the pdf.
11              (Witness complies.)
12       A.    "████████████
13       Q.    Correct.
14       A.    Okay.
15       Q.    And if you look at the first
16  sub-heading, it states:  "██████████
17              You can review the whole thing,
18  of course, or as much as you need.  I am
19  going to focus on the sentence that begins
20  with word, "████  █████████."
21              (Witness reviews document.)
22       A.    Okay.
23       Q.    So, you see the sentence, it
24  says:  "████  ████████  ████████  ████
    ████  ████████  ██  ████████  ████████  ████
```

Page 141

1          M E I - L I  da  S I L V A  V I N T

2    ███████████  ████  ████████  ███  ███  █████████

     █  ██████████  ███  ████████

4          Correct?

5          (Witness reviews document.)

6     A.    Yes.

7     Q.    When you began working as the

8    Chief Compliance Officer, at Brevet, on

9    October 31st of 2016, was it, in fact, the

10   practice at Brevet that ████   ████████

     █  ████████████  ███  ████████  ███  ████████

     █  ████████  █████  ████  ██████████  ███  ██  ███

     █  ████████  ███████  ███  ██████? 

14    A.    Sitting here today, I can't

15   recall exactly if that was the practice.

16         I think it was the practice but

17   I can't tell you the exactness.

18    Q.    Do you have an understanding of

19   what the term: ██████████  █████████  ███

     █  ████████" means, in the context of this

21   paragraph?

22         (Witness reviews document.)

23    A.    Um, I think it's -- this is the

24   marketing section.  So, I think it's

25   materials distributed to -- in relation to

```
 1              MEI-LI da SILVA VINT
 2   investor's materials.
 3        Q.    Right.  But --
 4        A.    So, it depends on what the
 5   "████████  is.
 6        Q.    So, you don't know who an
 7   ████████████ ████████ █ ████████ would be, in
 8   connection with the requirement that
 9   ████████████ ████████████ █ ████████████ ███████ ██
10   █ ████████████
11              (Witness reviews document.)
12        A.    I can speak to what we do
13   today.
14              If you're asking me what was
15   done in 2015?  I can't tell you.
16        Q.    Well, I am asking you what the
17   practice was when you arrived.
18        A.    So, yeah.
19              When I arrived, to the best of
20   my recollection, marketing materials had to
21   go through the compliance process.
22        Q.    So, that -- and I appreciate
23   that answer.
24              But what I am trying to
25   understand is:  It sounds, to me, like you
```

Page 143

1                 **MEI-LI da SILVA VINT**

2    just stated a policy.  I am asking you if

3    you know, as a matter of practice, what, in

4    fact, happened ████ ███ ██████████

5    ██████████████ ██ █████████ ██ ██████████████

6    ████████ ████ █████████ ██ ████████ ██ ██

7    ████████████ ██ ███████ ███████ ███████ █████

8    ███████ ████████████████

9         A.    Sitting here, as an individual,

10   I can't tell you that as a practice -- as a

11   practice that every single material was

12   distributed to clients, or prospective

13   clients.

14              I can tell you that was the

15   policy that was supposed to be adhered to.

16        Q.    Okay. If you look deeper into

17   the page, under the word "███████████

18        (Witness complies.)

19        Q.    You will see that it says:

20   "██████ ██ ███████████ ██████ ██ █████████

21   █ ████████ █████████ █████████ ███ ██ ████████

22   ████████████ █████████ ██ ██████████ ███ █████

23   ██ ██████ ██ ██████████████

24              Do you see that?

25              (Witness reviews document.)

1          MEI-LI da SILVA VINT
2     A.    Yes.
3     Q.    Do you know what the words:
4     "███████ ████ ████████ ████████ ████ ████████
  █ ██████  mean?
6            (Witness reviews document.)
7     A.    Do you mean from the
8  perspective of who wrote this or how I
9  understand it?
10    Q.    I am asking you how you
11 understand it.
12    A.    I think that it is -- it has
13 created a policy, um, which you see written
14 here, it would be the initiation of such
15 policy, that you see anything after that
16 around marketing and ongoing monitoring of
17 that policy (indicating.)
18    Q.    So, is it your understanding
19 that as of January, 2015, at least, and for
20 the time period that this policy was in
21 place, that Brevet had not yet completed
22 establishment of its policy, regarding
23 marketing?
24            (Witness reviews document.)
25    A.    So --

Page 145

```
 1              MEI-LI da SILVA VINT
 2              MR. UNDERWOOD:  Object --
 3          object to the form of the question.
 4              THE WITNESS:  Yeah.
 5         A.    It's an ongoing process; right?
 6    I think you could be -- the policy could
 7    have been initiated before this January
 8    15th thing.
 9              It's always being reviewed and
10    -- and up -- enhanced, as needed.
11         Q.    Okay.  So, you don't understand
12    the words "███████   ██████████" to mean that
13    Brevet had begun establishing a policy?
14              MR. UNDERWOOD:  Object to the
15          form of the question.
16         A.    There is vagueness in what you
17    said.
18              It could have been any time. I
19    mean, like, it could have been before this
20    policy, it could have been right when this
21    policy was written.
22         Q.    Do you know when Brevet, in
23    fact, established a policy regarding
24    marketing?
25         A.    Sitting here today, I can't --
```

```
                                            Page 146
 1              MEI-LI da SILVA VINT
 2    I can't speak to when it began.
 3         Q.    When you first came to Brevet,
 4    as Chief Compliance Officer, and at all
 5    times thereafter, was part of your job
 6    function reviewing marketing materials to
 7    be distributed to clients, or perspective
 8    clients?
 9         A.    Yes.
10         Q.    Do you spend any time, last
11    week, doing that?
12         A.    Yes.
13         Q.    About how much time?
14         A.    Sitting here today, I can't
15    tell you exactly how much time.
16              I don't keep billable hours.  I
17    don't know how much time I spent reviewing
18    materials that are going to investors, or
19    prospective investors.
20         Q.    So, I didn't ask you exactly
21    how much time, I asked you about how much
22    time?
23         A.    Sitting here today I can't tell
24    you.
25         Q.    Is this -- the -- the review of
```

Page 147

```
1              MEI-LI da SILVA VINT
2  materials distributed to clients, or
3  prospective clients, something that you do
4  on an ongoing basis, as part of your job?
5       A.    Yes.
6       Q.    Is it something, barring
7  extraordinary circumstances, you do every
8  week?
9       A.    It's probably, typically,
10 something that, in some form, that I do
11 everyday.
12      Q.    What is the process for -- for
13 obtaining your approval of marketing
14 materials?
15            (Witness reviews document.)
16      A.    So, we don't -- we don't do,
17 like, big changes to, kind of, standard
18 marketing materials.
19            Someone might ask me a
20 question, or something, that they are
21 speaking to, or providing to, a potential
22 investor, or investors, the stress of, you
23 know, quarterly letters or scripts that are
24 going out and that is what talking about,
25 in the day to day.
```

1              MEI-LI da SILVA VINT

2              If we are talking about, kind

3    of, a pitch books, a fact sheet, et cetera,

4    there's a -- there's a process about when

5    it comes to finance and the forms that's

6    used, in terms of disclaimers and stuff,

7    but that always goes through compliance, as

8    the last signoff, unless you're changing --

9    if you're only changing the numbers, month

10   to month, that's a finance function.  But,

11   if you're changing anything else, that is

12   related to the material, it is us.

13             The pitch books have final,

14   kind of, signoff by compliance and those

15   don't change regularly enough.  They change

16   every month but only with respect to

17   numbers and performance. If anything else

18   changes, they would have an entire

19   compliance review.

20             Those are -- those are some

21   examples.

22        Q.    So --

23             MR. DUMAIN:   Thank you.

24        Q.    Once a pitch book has been

25   approved, does a Brevet employee need to

Page 149

MEI-LI da SILVA VINT

1      MEI-LI da SILVA VINT
2  seek approval before sending that document
3  out to a prospective client or a client?
4      A.    So, it's not Brevet's -- not
5  all Brevet employees have access to the
6  pitch book, it is the Marketing Team.
7            They don't need to seek
8  specific approval to send it to investors,
9  or poten -- potential investors.  It's
10  typically done through a system we use
11  called ██████████, that tracks who it is
12  going to.
13      Q.    And can you provide more detail
14  on how ██████████ tracks who this marketing
15  material is going to?
16      A.    I can't provide specifics
17  because I -- I can, kind of, provide a
18  summary:  A prospective investor, an
19  investor, is provided with access, given an
20  e-mail address, and there is an audit
21  trail, in terms of who accesses that
22  material.  We can provide things that allow
23  people to download, or not download, or
24  print.
25            But when they print stuff, it

```
 1            MEI-LI da SILVA VINT
 2   would, typically, have the name of whoever
 3   it was printed by on the printout.
 4        Q.    Is ███████████ the only method
 5   through which Brevet marketers are
 6   permitted to distribute Brevet marketing
 7   materials?
 8        A.    Um, I don't -- it depends on
 9   what you mean by "marketing materials."
10            So, I don't know what you mean
11   by "marketing materials."
12        Q.    Well, why don't we use the term
13   "████████ as it's defined here, in the
14   "████████  ████████" of the document.
15            (Witness reviews document.)
16        Q.    ████████ ████████ ██████ ██
     ████████
18            (Witness reviews document.)
19        A.    So, I think this -- this can
20   cut both ways when you are talking about an
21   Open-End Fund because after an investor
22   comes in, they can use information to sell
23   -- to redeem and essentially, get out of
24   their secure -- their interest.
25            And certain things like
```

```
 1              MEI-LI da SILVA VINT
 2   investor statements, for example, that show
 3   performance, blah, blah, blah, those are
 4   kept on, um, the Fund Administrator's site,
 5   which is where investors access information
 6   related to their investment after they come
 7   in.
 8        Q.    And what is the relationship
 9   between the Fund Administrator and Brevet?
10        A.    Brevet Capital Management has
11   an agreement with FS&C, the Fund
12   Administrator, to act as the Fund
13   Administrator.
14        Q.    What -- what are Brevet's
15   rights, under that agreement, to obtain
16   documents and information concerning the
17   administration of its fund?
18        A.    I don't know what
19   "administration of the funds" means.
20        Q.    Sure.
21              So, what does a Fund
22   Administrator do?
23        A.    Um, I can't speak to exactly,
24   sitting here right now, what is in the
25   agreement with the Fund Administrator.
```

Page 152

```
 1              MEI-LI da SILVA VINT
 2       Q.     Do you know what types of tasks
 3   the Fund Administrator performs?
 4       A.     They provide investors --
 5              THE WITNESS:  I don't know the
 6        exact word.
 7       A.     They can provide investors with
 8   access to their tax statements, um, or
 9   fund's performance.
10       Q.     The "fund performance"
11   documents are generated by the Fund
12   Administrator or are they generated by
13   Brevet?
14       A.     Um, with respect to a specific
15   investor?  I think they are generated by
16   the Fund Administrator.
17              Sitting here today, that is my
18   understanding.  But I can't give you more
19   details than that.
20       Q.     So, it's your understanding
21   that the Fund Administrator is an agent of
22   Brevet or not?
23       A.     No.
24              I don't -- if you're talking
25   about "agent," in the capacity that they
```

```
                                                    Page 153
 1                 MEI-LI da SILVA VINT
 2      act on -- they are a third-party. They are
 3      independent.  And they are hired as a
 4      service provider for the funds.
 5           Q.     Okay.
 6                  When -- when was the ████████
 7      system put in place?
 8           A.     Sitting here today, I can't
 9      tell you the exact date.
10           Q.     Was it before or after you
11      joined Brevet?
12           A.     Sitting here today, I think it
13      was before I joined Brevet but I can't tell
14      you the exact date that it was implemented.
15           Q.     Okay. And of these various
16      types of materials, set out here in the
17      "████████  section; ████████  █████████
        ██  █████████  █████████   ████████████████  which of
19      these types of these materials would be
20      distributed through  ████████████?
21                  (Witness reviews document.)
22           A.     If you are a prospective
23      investor, your information comes via
24      ████████████. If you are an existing
25      investor, your standard investor
```

```
 1              MEI-LI da SILVA VINT
 2   documentation would come through the Fund
 3   Administrator.
 4        Q.    Do -- do the sourcing
 5   personnel, at Brevet, use ███████  to
 6   provide materials to potential borrowers?
 7        A.    To my understanding, they
 8   typically use a system called "███."
 9        Q.    Can you spell that?
10        A.    ██████.
11        Q.    Okay. How does ████ work?
12        A.    Similarly, it's an invite only.
13   You walk down the e-mail addresses that
14   have access to that information and there
15   is an audit trail created.
16        Q.    When was the ████ system
17   implemented, if you know?
18        A.    Sitting here today, I can't
19   recall when it was implemented.
20        Q.    Do you know if it was
21   implemented before or after you began
22   working at Brevet?
23        A.    Um, sitting here today, I do
24   not know.
25        Q.    Okay.
```

Page 155

```
 1            MEI-LI da SILVA VINT
 2            MR. DUMAIN:  Can you turn to
 3       Page 7, of Exhibit 5?
 4            Sorry.  Not Exhibit 5.
 5            Lee Exhibit 7.
 6            It's the page we were looking
 7        at.
 8            My apologies.
 9            (Witness complies.)
10     A.    We have it up.
11     Q.    So, are you looking at the page
12   that has the header:  "Annual Compliance
13   Review" at the top?
14            (Witness reviews document.)
15     A.    Yes.
16     Q.    Okay.  And do you see, at the
17   very top, it says -- where it says:
18   "███████    It says:   ███████ █ █
   █ █████████████ ███████ ███████ ████████ █
   █ █████ ██████ ██ ████ █ █ ████████ ███████
   █ █████ █ █████████ ███ █ █████ ████████
   █ ███████ ██ █████████
23            (Witness reviews document.)
24     A.    Yes, I do see that.
25     Q.    Is that, as you understand it,
```

Page 156

```
 1              MEI-LI da SILVA VINT
 2   a reference to Brevet Capital Management?
 3              (Witness reviews document.)
 4        A.    Correct.
 5        Q.    Is it a reference to any
 6   entity, other than Brevet Capital
 7   Management?
 8              (Witness reviews document.)
 9        A.    No.
10              This specific document, that
11   you are looking at, is with respect to
12   Brevet Capital Management, LLC, which is a
13   Registered Investment Advisor that's
14   required to have a compliance program in
15   place.
16        Q.    Did any of the other Brevet
17   entities have a compliance program in
18   place?
19              MR. UNDERWOOD:  I object to the
20         form of the question.
21        A.    I think there is generally a
22   compliance program in place in that there
23   are policies and procedures that people are
24   required to abide by and follow.
25        Q.    Did Brevet undertake annual
```

Page 157

1           MEI-LI da SILVA VINT

2    compliance reviews, with respect to any

3    entity, other than Brevet Capital

4    Management?

5        A.    So, annual compliance reviews

6    is a very-specifically-defined part of the

7    Investment Advisors Act.

8              The other aspects of Brevet's

9    polices and procedures are reviewed and

10   updated, as needed.

11       Q.    So, no?

12       A.    Um, I -- I don't know exactly

13   what you're saying.

14             I am saying that this is

15   specifically governed by the reg -- the reg

16   -- the Investment Advisors Act.

17             And so, if you're trying to say

18   that this is the same type of testing and

19   annual review that is applied to other

20   programs, I can't speak to that right now.

21             In terms of if that happens, if

22   every single policy and procedure and

23   compliance there are seen within the firm

24   in the same way that this happened.

25       Q.    If you look at the words, under

Page 158

1           MEI-LI da SILVA VINT

2    that sub-heading:  "████████  on this

3    page.

4              (Witness complies.)

5        A.    Yes.

6        Q.    And do you see it says:

7    "███████ ████ ████████ ████████ ██ ███████

    █ █ ██████ ████████ █████████ █ ███████ ████████

    █ ████████

10             (Witness reviews document.)

11       A.    Yes.

12       Q.    What do you understand those

13   words to mean, in the context of this

14   document?

15             (Witness reviews document.)

16       A.    I understand it to mean, in the

17   same context as we discussed previously,

18   that at some point in time, it starts to

19   measure to establish a policy, regarding an

20   annual compliance review.

21       Q.    At the time that you arrived at

22   Brevet and began work, on October ██, 2016,

23   did Brevet, in fact, have a fully-formed

24   policy regarding the annual compliance

25   review of Brevet Capital Management?

Page 159

```
 1              MEI-LI da SILVA VINT
 2       A.     To the best of my knowledge,
 3   they did.
 4              They reviewed this -- this
 5   manual.  Um, updated it, as needed.  They
 6   did quality control reviews of business
 7   activities, you know, spoke with outside
 8   counsel -- counsel about any legal or
 9   regulatory changes and did monitoring and
10   testing, as well as updated, again, the
11   manual and provided training to employees.
12       Q.     So, in substance, the way you
13   read this procedure is, essentially, Brevet
14   has a policy regarding the annual
15   compliance review?
16              (Witness reviews document.)
17       A.     Um, at what point in time?  I
18   think yes?  Are you speaking -- when are
19   you speaking about?
20       Q.     At the time that you arrived.
21       A.     Yes.
22              At the time I arrived, there
23   was a policy -- this policy existed, when I
24   arrived.
25       Q.     So, we are looking at the
```

Page 160

1              MEI-LI da SILVA VINT
2    policy; is that correct?
3              Is that your understanding of
4    this?
5              (Witness reviews document.)
6         A.   My understanding, what you
7    provided, is the compliance policies and
8    procedures, as of January, 2015.
9              Unless, you tell me otherwise,
10   there is no reason -- I can only sneak to
11   what I am looking at.
12        Q.   Okay.
13             So, as you understand it, this
14   document is not making reference to some
15   other policy, external to what is on this
16   page?
17             (Witness reviews document.)
18        A.   At this point in time, I can't
19   speak to that.
20        Q.   And as best -- as best you can
21   recall, what we are looking at right now,
22   as of the time that you arrived at Brevet,
23   was the policy for annual compliance
24   reviews?
25        A.   Correct.

Page 161

1          MEI-LI da SILVA VINT

2          Q.     And as far as you can recall,

3    at the time that you arrived Brevet, in

4    October of 2016, on October ███ of 2016

5    more specifically, was Brevet in practice

6    and, specifically, the Chief Compliance

7    Officer, or his or her designee,

8    undertaking the eight enumerated tasks set

9    out here?

10              (Witness reviews document.)

11         A.     Sitting here today, and to the

12   best of my knowledge, I would understand

13   that they are reviewing these, as part of

14   their -- the compliance policy.

15         Q.     Do you see, um, Number 3?

16              (Witness reviews document.)

17         Q.     States, "███ ████ ██████████

18   ███ ████████ ██ ███ ██ ██ █████████ ███"

19              MR. DUMAIN:  Oh.

20              Sorry.

21              Let me restate it.

22              My eyes slipped down.

23         Q.     Do you see that Number 3

24   states, "███ ████ ██ ██ ██ ██ ████

25   ██ ██ ████████ ███ ████████ ███ ██████████

Page 162

1              MEI-LI da SILVA VINT

2  ███████ █████████ █ █ ████████ ██████ ██ ███

█ █████ ███ █ ████████ █████ ████████ ██ ████

█ █████ ██ █ ████ █ ████ █ █████ ██████ █████

█ ██████ ███████████

6              Do you see that?

7       A.    Yes, I see that.

8       Q.    Do you know who the legal

9  counsel was that Brevet retained to, um,

10 undertake the comprehensive review

11 contemplated by this paragraph?

12      A.    Um, with respect to this --

13 like, which year are we talking about?

14             Are you talking about when this

15 policy was put in place?

16      Q.    Any year.

17             (Witness reviews document.)

18      A.    I mean, I can speak to my

19 practice.

20             And to the best of my

21 knowledge, they consulted with legal

22 counsel to review legal and regulatory

23 requirements that applied to Brevet Capital

24 Management.

25      Q.    Have you ever seen any, um,

Page 163

```
 1              MEI-LI da SILVA VINT
 2    document, um, evidencing the comprehensive
 3    legal review, contemplated by Paragraph 3,
 4    for any time period before you joined
 5    Brevet?
 6         A.   Um, may I consult with Counsel
 7    for a moment, related to privilege and
 8    confidentiality?
 9              MR. DUMAIN: Um-hum.
10              MR. UNDERWOOD:  Let's go off
11         for that.
12              (Whereupon, an off-the-record
13         discussion was held.)
14              Can we have the question red
15         back?
16              (Whereupon, the referred to
17         question was read back by the
18         Reporter.)
19         A.   Yes, I have seen documentation.
20         Q.   For what years?
21         A.   Um, he saw documentation in
22    2015, but, related -- it could have related
23    to prior years.
24         Q.   And who was the legal counsel
25    that performed the comprehensive analysis?
```

1              MEI-LI da SILVA VINT

2      A.     From what I reviewed, um, Mayor

3   Brown and Curtis, Mallet.

4      Q.     To the best of your

5   recollection, was the date of this

6   comprehensive review?

7      A.     My apologies.

8             Sitting here today.  I couldn't

9   tell you what that is.

10      Q.     And do you believe it existed

11   at the time you joined Brevet or was it

12   performed after?

13      A.     Sitting here today, what I

14   recollect, was before I joined Brevet.

15      Q.     Are you aware of any SEC

16   enforcement action against any Brevet

17   entity?

18      A.     I am not aware of any, sitting

19   here today.

20      Q.     Are you aware of any other

21   regulatory enforcement or disciplinary

22   action against any Brevet entity or

23   employee?

24      A.     Sitting here today, I am not

25   aware of any regulatory or disciplinary

Page 165

```
 1              MEI-LI da SILVA VINT
 2   action against any Brevet entity or
 3   employee.
 4        Q.     Okay.
 5               Can you scroll down now to Page
 6   9 of the same exhibit?
 7               (Witness complies.)
 8        A.     (Indicating.)
 9        A.     Yes.
10        Q.     Okay. And it says, "████  ████
    ██   ██████████  are we looking at the same thing?
12               (Witness reviews document.)
13        A.     Yes.
14        Q.     Okay.
15               And the document makes
16   reference to Rule 2402, um, under the act.
17               Do you understand what that
18   reference is to?
19               (Witness reviews document.)
20        A.     Yes.
21               MR. UNDERWOOD:  Sorry, Ian, I
22          think you misstated.
23               2042.
24               MR. DUMAIN: Oh.
25               Sorry.
```

Page 166

1            **MEI-LI da SILVA VINT**
2       A.      Yeah.
3       Q.      If I said something other than
4    that, I did misstate it.
5            So, let me just state it again.
6            You see the policy paragraph
7    makes reference to Rule 204-2, under the
8    act?
9            (Witness reviews document.)
10      A.      Yes, I do see that.
11      Q.      Do you understand what that is
12   a reference to?
13      A.      Yes, I do.
14      Q.      And what is the reference to?
15      A.      It's the books and records
16   requirements under the Registered
17   Investment Advisors Act.
18      Q.      Okay.
19            Now, if you look at the next
20   paragraph?
21            (Witness complies.)
22            (Witness reviews document.)
23      Q.      Of the policy, states: "

Page 167

1              **M E I - L I   da   S I L V A   V I N T**

12              Do you see that?

13              (Witness reviews document).

14      A.      Yes, I do see that.

15      Q.      Is that an accurate statement

16  of Rule 204-2, as you understand it?

17      A.      I think it is a summarized

18  statement of the rule.

19              Um, as you can see it says,

    in the second type.

21              Um, in updated compliance

22  policies and procedures, we actually, um,

23  would type the documents and the

24  requirements related there to.

25      Q.      Meaning that the compliance

Page 168

```
 1              MEI-LI da SILVA VINT
 2   policy and procedure manual that existed,
 3   as of today, contains a more granular
 4   breakdown of the types of documents that
 5   must be retained?
 6        A.    Types of documents and time
 7   periods.
 8        Q.    Okay.
 9              Um, as you --
10              MR. DUMAIN:  Well, let me
11        withdraw that.
12        Q.    Um, first, what do you
13   understand the reference to ▓▓▓▓▓ ▓▓▓▓▓,
14   um, in that third paragraph -- third
15   sentence to be?
16              (Witness reviews document.)
17        A.    Um, it's -- I think it's
18   anything related to the fund.
19              So, it could be loan documents,
20   it can include any marketing materials that
21   went to them, um, offering documents, um,
22   their statements, um, any Side Letters,
23   actually, subscription documents, um.
24              It's a whole host of things
25   that relate to the funds and anything
```

Page 169

```
 1              MEI-LI da SILVA VINT
 2   related to the funds.
 3        Q.    Why would Brevet Capital
 4   Management have loan documents?
 5        A.    Um, because their clients,
 6   those would be investments of our clients.
 7              So, we need to keep records of
 8   the investments your clients, the funds,
 9   make.
10        Q.    So, records of the investments,
11   the clients, the funds make include loan
12   documents?
13        A.    Yes.
14              And if it's a defined security,
15   by the SEC, it actually needs to be held by
16   a qualified custodian.
17        Q.    What is a defined security?
18        A.    Sitting here today, I can't
19   tell you the exact definition.
20              But, an example is a warrant.
21              If you've got a warrant within
22   a loan, that needs to be custodied with a
23   qualified custodian.
24        Q.    Because of a warrant in
25   securities?
```

Page 170

```
 1              MEI-LI da SILVA VINT
 2      A.      Specifically defined, by the
 3   SEC, as a security.
 4      Q.      Is a loan a security?
 5      A.      Um, it could be private loans.
 6              Um, we take the stance they are
 7   not.
 8      Q.      Is a loan participation a
 9   security?
10              MR. UNDERWOOD:  Object to the
11          form of the question.
12      A.      Um, yeah, sitting here today,
13   we don't take the stance that a loan
14   participation is a security.
15      Q.      When you say:  "You don't take
16   the stance," what do you mean?
17      A.      It's not clearly defined.
18              If the principal transaction
19   was the private loan, it's not considered a
20   security. We would not take the position
21   that it's a participation, considered a
22   security.
23              It's not clearly defined, by
24   the SEC, as a security
25      Q.      And what I'm trying to
```

MEI-LI da SILVA VINT

```
 1                MEI-LI da SILVA VINT
 2   understand is:  Take the position in what
 3   context?
 4        A.     In whether you custody the
 5   instrument
 6        Q.     So, for your recordkeeping
 7   purposes, you consider what you understand
 8   to be the requirements of the Act, and
 9   then, make a judgment about, whether or
10   not, particular documents fit within the
11   categories set out by the Act; is that
12   correct?
13                MR. UNDERWOOD:  Object to the
14          form of the question.
15        A.     Yeah, I don't understand what
16   you mean.
17        Q.     Sure.
18                Well, I am just trying to
19   understand, you said, a couple of times,
20   "we don't take the position."
21        A.     Yes.
22        Q.     And I am trying to understand
23   in what context you're taking the position
24   on whether or not, for example, a loan
25   participation is a security.
```

Page 172

1                    MEI-LI da SILVA VINT

2        A.      Um, like I said before, we

3   don't consider a private loan to be

4   security.

5                It's not clearly defined as a

6   security, by the Act, and, so, we don't

7   consider participation of that loan to be a

8   security either.

9        Q.    And what would the

10  implications, under the Act, be in it was

11  deemed a security?

12       A.    It would go to a qualified

13  custodian to be held.

14       Q.    How did Brevet settle, um, on

15  its position that loan participations are

16  not securities?

17       A.    Can I consult with Counsel,

18  please?

19       Q.    Yes.

20                (Whereupon, an off-the-record

21          discussion was held.)

22       A.    Can you repeat the question,

23  please?

24                (Whereupon, the referred to

25          question was read back by the

Page 173

1              MEI-LI da SILVA VINT

2          Reporter.)

3          A.     In consultation with outside

4     counsel, but, it actually doesn't have

5     anything to do with recordkeeping

6     requirements.

7                 It's a separate -- it's a

8     separate requirement if something is deemed

9     to be a security.

10         Q.     During your tenure at Brevet,

11    has Brevet ever consulted with outside

12    counsel about what records it is required

13    to retain under the Act?

14         A.     Um, to my knowledge, no.

15                We keep -- I mean, we -- no,

16    not to my knowledge, sitting here today.

17                We've asked questions about

18    records, but, I can't think of a specific

19    instance of going to them about a question

20    around this aspect of the Investment

21    Advisors Act.

22         Q.     How does Brevet determine what

23    records it is required to retain, under the

24    Act?

25         A.     Based on the definition of the

Page 174

1              **MEI-LI da SILVA VINT**
2    Act, um, we retain all e-mails, for
3    example.
4              Um, on a loan documentation, we
5    track, um, offering materials that go to
6    investors, um, █████████ helped track that
7    with respect to any investors with
8    materials that they receive.
9         Q.    You said you keep all e-mails.
10             Um, you mean all e-mails that
11   come in to or leave, um, brevetcapital.com
12   e-mail domain?
13        A.    Um, we archive e-mails that go
14   in and out of the Brevet Capital, um,
15   domain, as well as certain subsidiaries,
16   like I mentioned ████.
17             We keep an archive of those, as
18   well.
19        Q.    Is it your understanding that
20   Brevet is required, under the Act, to
21   archive every e-mail that leaves or comes
22   into the brevetcapital.com e-mail domain?
23        A.    The Act requires us to retain,
24   um, records in accordance with certain time
25   requirements.

```
 1            MEI-LI da SILVA VINT
 2            Some of them are indefinite.
 3            We choose to archive all
 4   e-mails.
 5       Q.    So, there are some e-mails, at
 6   least, that Brevet retains, um, as a matter
 7   of its own policy, not as a matter of
 8   regulatory obligations under the Act;
 9   correct?
10       A.    Theoretically, yes.
11            MR. UNDERWOOD:  Object to the
12       form of the question.
13       A.    Theoretically yes.
14             You would have to review every
15   single e-mail to determine if it didn't --
16   you were outside of the bound of what was
17   required to be retained (indicating.)
18       Q.    Are Brevet employees permitted
19   to delete e-mails?
20       A.    It -- it doesn't matter if they
21   do.
22            We have an archive, so, it's
23   not a back up, it's an archive.
24       Q.    So, once an e-mail comes in,
25   it's in?
```

Page 176

```
 1                MEI-LI da SILVA VINT
 2        A.     Yep.
 3        Q.     And once an e-mail is sent out,
 4   it's sent out forever more?
 5        A.     Correct.
 6        Q.     If you look down on the same
 7   page, at, "███████████  you will see the
 8   first sentence states, "██████ █
 █   ██████████ ██████████ ██████████ █ ███████
 █   ██████ ████ ████ ████ ██████████ ██████ ██
 █   ██████ ██████ ██████████ █ ██████ █████
 █   ██ ████ ████ █ ████████
13               Do you see that?
14               (Witness reviews document.)
15        A.     Yes, I do see that.
16        Q.     And one more time, what do you
17   understand, "███ ██████████ ██████████ ███
 █   ██████████ █ ██████████  mean, in the context
19   of this sentence?
20        A.     At some point in time, Brevet
21   put into practice a policy around the books
22   and records requirement under the
23   Registered Investment Advisors Act.
24        Q.     Okay.
25               And do you think that the four
```

Page 177

1            MEI-LI da SILVA VINT

2   enumerated points, here below, are the

3   policy or is there an independent policy?

4            (Witness reviews document.)

5       A.    Around the books and records,

6   this is the general policy.

7       Q.    Okay.

8            At the time that you joined

9   Brevet, what were the measures Brevet had

10  implemented to provide ongoing monitoring,

11  to ensure that the books and records policy

12  was followed?

13      A.    Um, there were segregated

14  drives.

15           So, only specific people had

16  access to materials and even within that

17  there was read write access, so, materials

18  couldn't be altered. Um, people, with

19  respect to who were authorized, knew where

20  find those files and if there was a

21  physical file, for example, it was kept in

22  a locked file cabinet drawer, and that is

23  what I would say with those four points.

24      Q.    Um, but, were any of those

25  items, that you just mentioned, part of a

```
                                        Page 178
 1                MEI-LI da SILVA VINT
 2    monitoring process?
 3                (Witness reviews document.)
 4        A.    Um, I would say an example of a
 5    monitoring process, when I started, um, the
 6    annual audit would be a monitoring process.
 7    Um, the firm had done TC drives where they
 8    would check the integrity of loan files,
 9    um, to make sure everything that was
10    required for a completed loan was in place.
11                Um, I know that they reviewed
12    marketing materials for the accuracy.
13                So, those are examples of
14    monitoring that took place.
15        Q.    Just backing up for a moment.
16                Um, I just want to make sure
17    that I understand correctly.
18                If someone were to forward it
19    -- it --
20                MR. DUMAIN:  Withdraw that.
21        Q.    If a Brevet employee, or
22    someone with a Brevet Capital e-mail
23    account, were to forward an e-mail from
24    that employee's Brevet Capital e-mail
25    account to their own personal e-mail, would
```

1              MEI-LI da SILVA VINT
2    that, without exception, be captured by the
3    e-mail archive?
4         A.    Once the e-mail archive was put
5    into place, if something left or came in to
6    the Brevet system, it would be captured by
7    the Brevet system. Meaning, if something
8    came from a Brevet e-mail address, yes, it
9    would be captured by that.
10        Q.    If Brevet wanted to determine
11   whether an employee had been forwarding his
12   or her Brevet Capital e-mail to a personal
13   e-mail address, would it be as simple as
14   searching that employee's e-mails on the
15   archive?
16             MR. UNDERWOOD:  Object to the
17        form of the question.
18        A.    If you knew who you were
19   looking specifically, yeah.
20             You could search that person's
21   specific -- any e-mail that came in and out
22   of their e-mail account.
23        Q.    You would have to do that
24   without gaining access to that employee's
25   computer?

```
 1              MEI-LI da SILVA VINT
 2        A.    If you are speaking,
 3   specifically, about e-mails, yes.
 4        Q.    Are you drawing a distinction
 5   between e-mail and something else?
 6        A.    I am answering you a specific
 7   question.
 8              If we could access people's
 9   e-mails, coming in and out of the Brevet
10   e-mail system, without accessing that
11   person's computer, yes, because that is a
12   separate program.
13        Q.    Okay.
14              At the time that you began at
15   Brevet, on October ████, 2016, did Brevet
16   have a document called Information Security
17   Handbook?
18        A.    Um, I do not think that there
19   was an Information Security -- sitting here
20   today, I don't think there was an
21   Information Security Handbook when I
22   started.
23        Q.    Is information security, um,
24   within the -- or under the umbrella of
25   compliance?
```

Page 181

```
1              MEI-LI da SILVA VINT
2      A.    It's related to compliance.
3      Q.    How is that related to
4  compliance?
5      A.    Um, the SEC has put out
6  specific guidance around cyber.
7            So, there has to be certain
8  controls in place and review of what
9  control we have in place, with respect to
10  cyber.
11            But, obviously, information
12  security spans wider than what the
13  Investment Advisors Act would require
14  operating as a funnel.
15      Q.    Do you know when the guidance,
16  you were referring to, was issued?
17      A.    It's continuous and I can't
18  speak specifically, sitting here today,
19  when the SEC started issuing guidance on
20  cyber.
21      Q.    When you arrived at Brevet, um,
22  you seemed to understand there was not an
23  Information Security Handbook at that
24  point.
25            Were you surprised?
```

Page 182

1              MEI-LI da SILVA VINT
2              MR. UNDERWOOD:   Can you read
3         the question again?
4              (Whereupon, the referred to
5         question was read back by the
6         Reporter.)
7              MR. DUMAIN:   Let me restate the
8         question because it was not captured
9         on the transcript.
10        Q.     When you arrived at Brevet, on
11   October ██, 2016, and there after learned
12   that there was not an Information Security
13   Handbook, were you surprised by that fact?
14        A.     I can't speak to how I felt at
15   that time without anything, right now.
16        Q.     As you understood the
17   compliance landscape, in 2016, as a matter
18   of best practice, should a firm, like
19   Brevet, have had an Information Security
20   Handbook at the time?
21        A.     Sitting here today, and looking
22   back at, kind of, how the landscape has
23   changed, it's not surprising.
24              That from that size -- or even
25   this landscape of cyber, at that point, is

Page 183

```
 1              MEI-LI da SILVA VINT
 2   very different from what we are looking at
 3   today versus back then, um, so, no.
 4              I think it was an ever changing
 5   landscape and I think people were coming up
 6   to speed in what was appropriate for their
 7   business.
 8       Q.    So, at that time, you think it
 9   would not necessarily have been clear to
10   Brevet that it needed an Information
11   Security Handbook?
12       A.    I think you're really focussing
13   on the word, "Information Security
14   Handbook."
15              I think there were mechanisms
16   in place, in terms of security and
17   compliance, and other parts of the Brevet
18   policies and procedures.
19              Um, just certain parts of
20   information security were formalized in
21   this policy.
22       Q.    Okay.
23              MR. DUMAIN:  Um, I think, um,
24        Karyn, at least, could use a break.
25              I think we all could, I am
```

```
 1          MEI-LI da SILVA VINT
 2      indifferent as to whether we break
 3      for lunch now or some other -- you
 4      know -- after the next break.
 5          So, I would put it to the
 6      witness and Colin.
 7          THE WITNESS: I need a break
 8      around 1:00, 1:15. It's up to
 9      everybody else to probably work
10      around that.
11          MR. UNDERWOOD:  She'll need
12      another 15 minute break around that
13      time.
14          So, why don't we take a short
15      break now and then go until some time
16      in the 1:00, 1:15 range and then we
17      can take whatever lunch break we are
18      going to take.
19          MR. DUMAIN:  Certainly.
20          MR. UNDERWOOD:  Okay.
21          So, five minutes now?
22          MR. DUMAIN:  Yep.
23          THE VIDEOGRAPHER:  The time is
24      12:13 P.M.
25          We are going off the record.
```

```
                                        Page 185
 1              MEI-LI da SILVA VINT
 2              (Whereupon, a short recess was
 3         taken.)
 4              THE VIDEOGRAPHER: The time is
 5         12:31 P.M.
 6              We are back on the record.
 7      Q.   All right, Ms. da Silva Vint,
 8   can you take a look again at Lan Deposition
 9   Exhibit 1?
10              It's the 30(b)(6) notice.
11              (Witness complies.)
12      Q.   And, specifically, Page 14.
13              (Witness complies.)
14              MR. UNDERWOOD:  Wait.
15              Sorry.
16              I have the wrong document here.
17              MR. DUMAIN:  No problem.
18              MR. UNDERWOOD:  Lan Exhibit 1.
19              I'm sorry, I was -- I was in
20         Garreth Lee.
21              MR. DURMAIN: Get out of Garreth
22         Lee.
23              MR. UNDERWOOD:  Okay.
24              We are on Page 14, starts with,
25         "Topic 30?"
```

```
 1              MEI-LI da SILVA VINT
 2              MR. DUMAIN: Correct.
 3              MR. UNDERWOOD:  Okay.
 4              (Witness reviews document.)
 5       Q.    So, Ms. da Silva Vint, you
 6   testified earlier that you were prepared to
 7   testify in a 30(b)(6) capacity concerning
 8   Defendant's, that is Brevet, reasons and
 9   bases for the announcement to Brevet staff
10   on, or about, February 15th, 2016, that
11   Plaintiff Mr. Iacovacci.  Was retiring; is
12   that correct?
13       A.    Yes.
14       Q.    And what did you do to prepare
15   to give testimony on this topic, on behalf
16   of Brevet?
17       A.    Um, I went back and looked at
18   e-mail -- our e-mail system. Um --
19       Q.    I'm sorry.
20              I didn't mean to cut you off.
21       A.    I looked at our e-mail system,
22   um, and I spoke to a couple of people who
23   were here, internally, at that time.
24       Q.    Who did you speak with?
25       A.    Um, I think I spoke with Mark
```

Page 187

1              MEI-LI da SILVA VINT
2   Callahan.
3        Q.    Anyone else?
4        A.    Not to my knowledge, no.
5        Q.    So, first, do you agree that
6   Brevet did, in fact, announce to its staff,
7   on or about, February 15th, 2016 that
8   Mr. Iacovacci was retiring; correct?
9        A.    Unfortunately, I was not able
10  to confirm that happened.
11       Q.    So, you contest, in your
12  30(b)(6) capacity, that Brevet announced to
13  its staff, on or about, February 15th, 2016
14  that Mr. Iacovacci was retiring?
15       A.    Again, I have no basis to
16  support that happened.
17             I was unable to confirm that
18  that occurred.
19       Q.    What did you learn, um, in your
20  investigation about when, if at all, Brevet
21  announced to its staff that Mr. Iacovacci
22  was retiring?
23       A.    Um, I did not learn anything,
24  in terms of any confirmation, or
25  information, that it was ever announced, by

Page 188

```
 1            MEI-LI da SILVA VINT
 2   Brevet, that Paul -- the Plaintiff was
 3   retiring.
 4        Q.    So, I want to make sure we are
 5   not getting hung up on particular words
 6   like retiring.
 7        A.    Sure.
 8              Okay.
 9        Q.    Did you learn anything about
10   whether Brevet announced to its staff, at
11   any point, that Mr. Iacovacci would be
12   leaving the firm?
13              MR. UNDERWOOD:  I object to the
14          form of the question.
15        A.    Um, I personally had sent an
16   e-mail, later in the year after Paul was no
17   longer with the firm, that Paul was no
18   longer with the firm, and if anyone had
19   questions to come to me.
20        Q.    Did you learn about anything
21   about any announcement Brevet made, to its
22   staff, between January of 2016 and October
23   14th, 2016 about Mr. Iacovacci's departure
24   from the firm?
25        A.    Again, I was not able to
```

Page 189

```
 1              MEI-LI da SILVA VINT
 2   confirm anything, um, that that
 3   announcement was made.
 4        Q.    Whose e-mail did you look at,
 5   um, as you tried to answer this question?
 6        A.    I can't recall looking at a
 7   specific person's e-mail.
 8              Um, I think we looked at a
 9   general search of the relevant time period,
10   um, but, I can't -- right now, I can't
11   recall exactly what the search terms were
12   used for this, to confirm this
13   (indicating.)
14        Q.    Can you confirm that you did
15   use e-mail search terms?
16        A.    Yes.
17              I can confirm -- I can't recall
18   exactly what search terms were used and I
19   worked with David Spinley to do this, um,
20   but, yes, we did look at the e-mail system.
21        Q.    Okay.
22              Moving on to Topic 33, were you
23   able-
24              MR. DUMAIN:  I'll withdraw it.
25        Q.    As an initial matter, um, is it
```

Page 190

```
 1              MEI-LI da SILVA VINT
 2   Brevet's testimony that it, indeed,
 3   informed investors and others who contacted
 4   the Brevet offices, after April 1st, 2016,
 5   that Mr. Iacovacci had retired, as of that
 6   date?
 7        A.    I can't confirm -- I was not
 8   able to confirm that Brevet directed anyone
 9   to tell investors, prospective investors,
10   that, after this date the Plaintiff had
11   retired.
12        Q.    Were you able to determine
13   whether Brevet, or any of its employees, or
14   agents, in fact, informed investors, or
15   others who contacted the Brevet offices
16   after April 1, 2016, that Mr. Iacovacci had
17   retired?
18        A.    Well, I need to confer with
19   Counsel for a moment, please?
20             MR. UNDERWOOD:  Hold on.
21             We will be right back.
22             (Whereupon, an off-the-record
23         discussion was held.)
24             THE WITNESS: Can you repeat the
25         question.
```

Page 191

```
 1              MEI-LI da SILVA VINT
 2              (Whereupon, the referred to
 3          question was read back by the
 4          Reporter.)
 5      A.      Um, yes.
 6              So, in doing this review, we
 7    did see an e-mail from Michael Mahir, I
 8    think, around this date, April 1st.
 9              Um, but, we found no basis to
10    believe that this directive had come from
11    Brevet, and we believe it actually came
12    from Paul, directing that he was retiring
13    as of this date.
14              In addition, again, I will
15    point my e-mail, I think, later in 2016
16    where I, myself, said that Paul had left
17    the firm, was no longer with the firm, not
18    -- I did not use the word, "retired," and
19    if anyone had any questions they should
20    come to me.
21      Q.      Who was Mr. Mahir?
22      A.      Mr. Mahir was on the Investor
23    Relations and Marketing Team.
24      Q.      And what is the responsibility
25    of the Investor Relations Team?
```

Page 192

```
 1              MEI-LI da SILVA VINT
 2       A.    Um, they have a responsibility
 3  of communicating, um, with investors,
 4  bringing back any investor feedback and
 5  questions, um, if they don't know the
 6  answers to them.
 7             Basically they serve as the
 8  liaison between, um, investors and the rest
 9  of the firm, um, for certain matters.
10       Q.    Does Mr. Mahir still work at
11  Brevet?
12       A.    He doesn't work at Brevet.
13       Q.    When did he leave Brevet?
14       A.    Um, sitting here today, I can't
15  recollect when he left Brevet.
16       Q.    If Mr. Mahir had made these
17  statements, based on what Mr. Iacovacci had
18  said, as opposed to what he was directed to
19  communicate by Brevet, um, would that have
20  been a breach of Brevet policy?
21       A.    Sitting here today, I -- I
22  can't -- tell you whether if it would have
23  been a breach of policy, per se.
24       Q.    What is the scope of authority
25  that Investor Relations employees at Brevet
```

```
                                            Page 193
 1                 MEI-LI da SILVA VINT
 2    have, in terms of the substance of what
 3    they can communicate to outside investors
 4    about, um, internal employment matters?
 5                 MR. UNDERWOOD:  I object to the
 6          form of the question.
 7          A.     I think they are required to
 8    abide by the policies and procedures.
 9                 Um, I don't think there is
10    anything, specifically, saying not
11    communicating about employment matters.  I
12    think there are policies and procedures
13    around confidentiality. Um, I think that --
14    that -- yeah.
15                 There is nothing specifically
16    saying don't communicate about employment
17    matters.
18          Q.     As of May of 2016, what was
19    Brevet's understanding, with respect to the
20    employment status of Mr. Iacovacci?
21                 MR. UNDERWOOD:  I object to the
22          form of the question.
23                 Are you asking for her personal
24          testimony now or are you suggesting
25          --
```

Page 194

```
 1              MEI-LI da SILVA VINT
 2              MR. DUMAIN:  No.
 3              No.
 4              MR. UNDERWOOD:  Or about the
 5          30(b)(6) notice?
 6              MR. DUMAIN:  No. The 30(b)(6).
 7              I think it relates to the
 8          topic. I mean, if there -- well, I
 9          will stop there.
10      A.    Um, I have no reason to believe
11  -- I think there was a separation
12  discussion going on.
13              I don't -- there was a
14  separation discussion going on, with
15  respect to Paul's status.
16      Q.    Who was Araj Asadi at Brevet?
17      A.    Araj Asadi worked in the
18  sourcing and origination side, of Brevet.
19              To the best of my knowledge, he
20  started as a consultant before becoming a
21  full-time employee.
22      Q.    And he became a full-time
23  employee on that sourcing side of the
24  business?
25      A.    To the best of my knowledge,
```

Page 195

                        MEI-LI da SILVA VINT

1

2   yes.

3       Q.    Did you review e-mail of, um,

4   Jennifer Fleishner, in connection with your

5   investigation, with respect to Topics 32

6   and 33?

7             (Witness reviews document.)

8       A.    To the best of my recollection,

9   there were e-mails from -- to and from Jen

10  Fleishner in our review.

11      Q.    Who was Ms. Fleishner at

12  Brevet?

13      A.    Um, I believe she was the COO,

14  for a period of time.

15      Q.    Does Brevet have a COO today?

16      A.    Today, Brevet doesn't have a

17  formally appointed COO.

18      Q.    Does anyone operate as the COO,

19  notwithstanding -- not having a title?

20      A.    I think that is a very broad

21  question, as there are different meanings

22  of what a COO does in different places.

23      Q.    Well, is there anyone who

24  performs the job functions that Ms.

25  Fleishner performed when she had that title

```
                                          Page 196
 1               MEI-LI da SILVA VINT
 2   or were they diffused among many different
 3   people?
 4        A.    To the best of my knowledge,
 5   it's diffused amongst to many different
 6   people.
 7        Q.    What were the circumstances of
 8   Ms. Fleishner's departure from Brevet?
 9        A.    Um.
10               MR. UNDERWOOD:  I am not sure
11          what -- is this -- are you still
12          trying to shoehorn this into the
13          (30)(b)(6) notice or --
14               MR. DUMAIN: It's -- It's --
15        A.    Personally -- I do not know.
16        Q.    Did you overlap with her at
17   Brevet?
18        A.    To the best of my knowledge, I
19   did not.
20        Q.    Let's take a look at Lee
21   Deposition Exhibit 8 and we are done with
22   those topics.
23               (Witness reviews document.)
24        A.    Do you want me to read the
25   entire thing or --
```

Page 197

```
 1              MEI-LI da SILVA VINT
 2      Q.    No, thanks.
 3              Have you looked at the
 4   document?
 5              (Witness reviews document.)
 6      A.    Um,.
 7              Sitting here today, yes. At
 8   some point, I think I have seen this
 9   document.
10      Q.    Oh.
11              I mean, have you actually
12   looked at the document, as you sit here
13   today?
14      A.    Oh.
15              Yes.
16              Sorry.
17              I can see this document, right
18   now, yes.
19      Q.    Okay.
20              What do you -- what is it?
21      A.    The Brevet Capital Information
22   Security Handbook.
23      Q.    As of what date?
24              (Witness reviews document.)
25      A.    It looks like there's a
```

Page 198

1              MEI-LI da SILVA VINT
2     September, 2016 in brackets.
3          Q.     Could you please scroll --
4     well, backing up, you weren't, yet, at
5     Brevet as of September 16th, 2020; are you?
6               MR. UNDERWOOD:   Sorry?
7               MR. DUMAIN:   Let me restate
8          that.
9          Q.     You were not at Brevet as of
10    September of 2016; correct?
11         A.     Correct.
12              I didn't start until October
13    ▮▮▮▮▮, 2016.
14         Q.     Okay.
15              Were you aware of any policy
16    that would have been --
17              MR. DUMAIN:   Sorry.
18              Let me restate.
19         Q.     Are you aware of any
20    Information Security Handbook dated after
21    September, 2016, but, before you began in
22    October of 2016?
23         A.     To the best of my knowledge,
24    no.
25              Sitting here today, I don't.

Page 199

```
 1              MEI-LI da SILVA VINT
 2      Q.      Okay.
 3              So, do you have any reason to
 4   believe that this was not the operative
 5   policy at the time you started, um, in
 6   October of 2016?
 7              (Witness reviews document.)
 8      A.      Um, sitting here today, no.
 9      Q.      Okay.
10              Can you please turn to Page 20?
11              Or scroll to Page 20?
12              (Witness complies.)
13              (Witness reviews document.)
14      A.      Um, yes.
15      Q.      Do you see a reference to a
16   ███████████████████████  ████████?
17      A.      Yes.
18      Q.      Did you have an understanding
19   of what the ███████████████████████  ██████
20   was?
21      A.      Um, yes.
22              I did and do.
23      Q.      And can you tell me?
24      A.      Um, you have the -- my
25   understanding, you had the -- you had
```

Page 200

1              MEI-LI da SILVA VINT

2    ability to bring your own device, such as

3    your iPhone, for a specific Brevet

4    application to access your e-mail from that

5    device, which is a firm issued device.

6         Q.    Did you ever bring your own

7    device, for purposes of this policy?

8         A.    Um, I never had a firm --

9    sorry.

10             I've always had a firm issued

11   phone, um, an iPad, um, when I started at

12   Brevet to log into this system at home, I

13   would use my own personal computer.

14        Q.    Okay.

15        A.    I have firm issued laptops now.

16        Q.    For what period of time were

17   you logging into the Brevet system from

18   home on your own personal computer?

19        A.    I can't recall the exact, um,

20   period of time.

21        Q.    Did it end before pandemic

22   began?

23        A.    Yes, way before.

24        Q.    Can you scroll down the page to

25   Paragraph 7.2, "████████  █  ███████?"

```
                                                Page 201
 1              MEI-LI da SILVA VINT
 2              (Witness complies.)
 3              (Witness reviews document.)
 4      A.      Yes.
 5      Q.      Um, if you will read that?
 6              (Witness complies.)
 7              (Witness reviews document.)
 8      A.      Yes.
 9      Q.      And, um, just for the record,
10  the first sentence states, ████  ██  ████
██  ██████  ███  █████  █  ███  ██████    █████
██  ██████  ███  ████  █████  █  ███  ██████
██  ██  ██████  █  ███████  █████  ████  █████
██  ██████  █  █  ████████  ███  █████
██  ██  ████  ████████
16              Do you see that?
17              (Witness reviews document.)
18      A.      Yes.
19      Q.      Did you understand that that
20  was the policy, with respect to personal
21  devices, at the time that you began working
22  at Brevet, on October ████, 2016?
23              (Witness reviews document.)
24      A.      Um, so, I understood this to be
25  the policy, in conjunction, you have to
```

Page 202

```
 1              MEI-LI da SILVA VINT
 2   read it with all other policies, um, with
 3   respect to Brevet, as well.
 4        Q.    Okay.
 5              And as far as it goes, this was
 6   an accurate statement of the policy?
 7        A.    Um, if you're just reading
 8   what's written here, I don't think you can
 9   understand how it works without
10   understanding the other policies and
11   procedures that also apply, to you as
12   working at Brevet, or using Brevet systems,
13   and/or interact to information.
14        Q.    Okay.
15              But, in so far as it goes, this
16   sentence is consistent with your
17   understanding of Brevet's policy as it
18   related to personal devices, at that time?
19              (Witness reviews document.)
20              MR. UNDERWOOD:  Object to the
21         form of the question.
22        A.    Um, with the caveat that you
23   are abiding by all the other policies and
24   procedures in place.
25        Q.    Do you see the next sentence,
```

Page 203

1              MEI-LI da SILVA VINT

2    it says, ████████ ████████ ████████ ██ ██████ ██████

██ ████ ████ ████ ████████ ████████ ████████

██ ████ ████ ████ ██ ██ ████ ████ ████ ████

██ ████ ████ ██ ██ ████████ ██

██ ████ ████ ████ ████████ ██████

██ ████ ████ ██ ██ ████

8              Do you see that?

9              (Witness reviews document.)

10    A.    I do see that, yes.

11    Q.    Okay.

12              And as you understand it, at

13    least, at the time that Brevet's policy is

14    drawing a distinction between personal

15    devices that were used for business

16    purposes and devices that were owned by

17    Brevet; correct?

18              (Witness reviews document.)

19    A.    Um, I think the -- there's a

20    nuance there.

21              If you're using a personal

22    device, with respect to Brevet's business,

23    I don't think there is an expectation of

24    privacy, at all.

25              If you were using the firm's

MEI-LI da SILVA VINT

1    systems, or, um, using Brevet materials, I
2    don't think there is an expectation of
3    privacy.
4
5             So, yeah, I think
6    bring-your-own-device, with the expectation
7    of privacy is very limited.
8        Q.    Where do you understand the
9    words, " ████  ████  ████  ████  ██  ████
██  ████  ███████  ███████  in the context of
11   this sentence to mean?
12            (Witness reviews document.)
13       A.    Will respect the privacy of
14   your personal device so long as it's in
15   accordance with the firm's policies and
16   procedures.
17       Q.    So, you think by implication,
18   um, what this says is that Brevet will not
19   respect the privacy of your personal device
20   if you're using your personal device in a
21   way that Brevet perceives to have violated
22   Brevet's policies and procedures?
23       A.    I think, likely, you have
24   attested, and affirmed, and said that you
25   have read and will abide by other policies

Page 205

```
 1              MEI-LI da SILVA VINT
 2   and procedures in place.
 3              So, while, if you're reading
 4   this policy in collation, which doesn't
 5   make any sense, if you're only reading this
 6   and not looking at anything else.
 7              I think, with respect to this
 8   policy, specifically about
 9   ███████████████  ██████████  ████████,
10   they will respect the privacy of your
11   personal device.
12              But, then you're subject to
13   other things as you just affirmed and
14   attested you will be, in terms of the
15   firm's policies and procedures.
16              So, I think you're taking it
17   out of context, you're leading it as
18   something else.
19        Q.    I think, I read the whole
20   paragraph.
21        A.    No, but, um, yeah.
22              To finish, I think that you can
23   read this entire paragraph, but, the people
24   are subject to other policies and
25   procedures.
```

Page 206

```
 1              MEI-LI da SILVA VINT
 2       Q.     Why don't we take a look at Tab
 3   12?
 4              (Witness complies.)
 5              MR. DUMAIN:  That is Bates
 6         Number ending 772.
 7              MR. UNDERWOOD:  Is that -- is
 8         that an exhibit here?
 9              MR. DUMAIN:  It's going to
10         become an exhibit momentarily.
11              MR. UNDERWOOD:  Okay.
12              (Witness reviews document.)
13              MR. UNDERWOOD:  That is your
14         secret code. Steve, Evelyn.
15              MR. DUMAIN:  Yeah. That's, um,
16         we want to make it as confusing as
17         possible, so, we have tab numbers,
18         Lee exhibits, Lan exhibits, you know.
19              MS. GEORGE: Ian, that is
20         already marked as Exhibit 2.
21              MR. DUMAIN:  Oh.
22              That is the one we screwed up
23         before or I screwed up before, I
24         should make clear. Okay.
25       Q.     So, Ms. da Silva Vint, if you
```

```
 1              MEI-LI da SILVA VINT
 2   can look at what has already been marked at
 3   da Silva Vint Deposition Exhibit Number 2,
 4   please?
 5              (Witness complies.)
 6              (Witness reviews document.)
 7      A.     Yes.
 8      Q.     Okay.
 9      A.     Sorry.
10              There are 23 pages.
11              Do you want me to read every
12   page?
13      Q.     Why don't you take a quick look
14   at the cover e-mail, um, and look at as
15   much as you need to to get a sense what
16   this document is and I will direct you to
17   the appropriate places?
18      A.     Okay.
19              It looks like it's attached.
20      Q.     Okay.
21              So, focusing first, on the
22   first page of the pdf, the bottom e-mail,
23   that's an e-mail from you to Mr. Lam;
24   correct?
25              (Witness reviews document.)
```

Page 208

1              MEI-LI da SILVA VINT
2      A.      That is what it appears to be.
3      Q.    Okay.
4              And the subject line is:  "Here
5  is my signed document, Information Security
6  Handbook, February 2017, final?"
7      A.    Yes, that is the subject.
8      Q.    And just so we can get a sense
9  of what the document is, do you see the
10 attachments, the attachments as,
11 "Information Security Handbook, February,
12 2017 Final PDF," right?
13             (Witness reviews document.)
14     A.    Yes.
15     Q.    Okay.
16             And now, actually scroll down
17 to Page 2 of the PDF, is that your
18 signature on the front of the document?
19     A.    Yes.
20             Yes, it appears to be.
21     Q.    Um, so, in February 27th 2017,
22 did Brevet enact a updated Information
23 Security Handbook?
24             (Witness reviews document.)
25     A.    Um, it appears that we reviewed

1              MEI-LI da SILVA VINT

2    it and, um, I can't tell if you it looks --

3    I mean I can tell you that key contacts

4    were updated, um, but I was looking at this

5    previous to -- I can't tell you what else

6    was changed in this handbook.

7         Q.    Sorry about that.

8              What is the significance of

9    your signature on the front of the

10   document?

11             (Witness reviews document.)

12        A.    It means that I repeat --

13   reviewed and approved the -- this, um, the

14   effectiveness of this policy.

15        Q.    Okay.

16             Now, this policy, I guess we'll

17   start -- we should look at -- that the

18   cover page just says Brevet Capital;

19   correct?

20        A.    Correct.

21        Q.    So -- what -- is Brevet Capital

22   a legal entity?

23        A.    Um, Brevet Capital is not a

24   legal entity.

25             Um, it's a commonly used name

Page 210

1           MEI-LI da SILVA VINT

2    for a couple of different entities.

3           Q.    So, what does that mean for

4    purposes of applications of this policy?

5           A.    Um, it can -- it can apply to,

6    both, the sourcing and underwriting side,

7    as well as, the investment advisory side.

8           Q.    Okay.

9                 Can you scroll down, now, to

10   Page 20, I believe it is?

11                (Witness complies.)

12                (Witness reviews document.)

13                MR. UNDERWOOD:  Page 20 of the

14        pdf?

15                MR. DUMAIN:  Yeah, it's Page 20

16        of the document.

17                Page 20 or 22 of the document.

18                MR. UNDERWOOD: Page 21 of the

19        pdf, then.

20                MR. DUMAIN: Yeah, thank you.

21          Q.    Do you have an understanding

22   why, um, there is a header in the upper

23   left hand corner that says, "██████████

██    ████████████████ "

25          A.    That appears to be a mistake in

Page 211

```
 1            MEI-LI da SILVA VINT
 2   terms of, um, to the best of my knowledge,
 3   um, someone used a template, like, our
 4   firm's policy and procedures template and
 5   didn't delete the header.
 6            So, a different policies and
 7   procedures, or guidelines.
 8        Q.    Got it.
 9            So, at least in this document,
10   there was a header in there that's just
11   there by mistake?
12        A.    Yes.
13            That is what it appears to be.
14        Q.    Okay.
15            Could you have a look at
16   Section 7.2?
17            (Witness complies.)
18            (Witness reviews document.)
19            MR. DUMAIN:  Well, first --
20        sorry.
21        Q.    Just to orient ourselves, in
22   Section 7, this is the section governing
23   ███ ████████████████████ ██████; correct?
24        A.    Yes.
25            That is what it appears to be.
```

1               MEI-LI da SILVA VINT

2      Q.    So, this is the analogous

3   section, um, to the one we were looking at

4   a moment ago, in the September 16th version

5   of this handbook?

6      A.    Correct.

7      Q.    Okay.

8               And will you have a look at

9   Section 7.2?

10              (Witness complies.)

11     Q.    "███████████ ██  ███████."

12              (Witness complies.)

13              (Witness reviews document.)

14     A.    Yes.

15     Q.    Okay.

16              I don't know how easier it is

17   or difficult on the computer you're looking

18   at to compare this document with Lee 08.

19              Um, but, take your time and

20   compare them.

21              My question is going to be

22   about the sentence beginning with the word,

23   "██  ██████████  in da Silva Vint Exhibit 2.

24              (Witness reviews document.)

25     A.    Okay.

1          MEI-LI da SILVA VINT

2          MR. UNDERWOOD:  Alright.

3          You want to us go back to the

4     other exhibit?

5          MR. DUMAIN: Yeah.

6          And -- I am going to ask you to

7     confirm that the "██ ██████████"

8     sentence is new or kept the same.

9          (Witness reviews document.)

10         MR. UNDERWOOD:  Okay.

11   A.    7.2?

12         MR. UNDERWOOD:  Hum.

13         (Whereupon, a short recess was

14    taken.)

15         MR. UNDERWOOD:  So -- so, Ian,

16    when -- when I -- previously, we were

17    looking at Lee Exhibit 8, under the

18    "Lee" marked exhibits directory in

19    the Ignite access.

20         MR. DUMAIN:  Yes.

21         MR. UNDERWOOD:  I just opened

22    Lee Exhibit 8, as it exists in the --

23    in the da Silva Vint marked exhibits,

24    and I am just noticing when I open it

25    there -- um, it's okay.

Page 214

```
 1            MEI-LI da SILVA VINT
 2            It's just a difference between
 3       the two.
 4            MR. DUMAIN:  We should just --
 5       if it is okay with you, we should
 6       just swap in a clean version.
 7            It is not intended to have
 8       highlighting on it.
 9            THE COURT REPORTER:  You broke
10       up after "highlighting."
11            MR. UNDERWOOD:  We -- we are
12       going to go to the clean version and
13       leave the Lee Exhibit in the
14       directory.
15            MR. DUMAIN: Thank you for
16       pointing that out, Colin.
17            (Witness reviews document.)
18            MR. UNDERWOOD:  Do you see that
19       (indicating.)
20            THE WITNESS:  Yes.
21            MR. UNDERWOOD: Okay.
22            Now, we will go back to --
23            THE WITNESS:  Two.
24            MR. UNDERWOOD:  Exhibit 2.
25            THE WITNESS:  Oh, we have to go
```

```
                                        Page 215
 1              MEI-LI da SILVA VINT
 2       back to that.
 3              MR. UNDERWOOD:  Right.
 4              (Witness reviews document.)
 5       A.     Okay.
 6       Q.     Okay.
 7              So, the February 17th policy
 8    includes the language --
 9              THE COURT REPORTER:  You broke
10        up. I'm sorry. Includes the language
11        what?
12       Q.     -- includes the language ██
   ██ ████████ ████ ████ ████ ██████ ███████ ██████
   ██ ██ ████ ███████ ██ ██████████ "
15              And, then, it goes on; is that
16    correct?
17              (Witness reviews document.)
18       A.     Correct.
19              That is what I see.
20       Q.     And now, that language is new
21    in the February 17th -- February, 2017
22    policy; correct?
23       A.     It appears to be new.
24       Q.     First, do you have any
25    recollection, as to the circumstances
```

Page 216

```
 1              MEI-LI da SILVA VINT
 2   giving rise to the addition of that
 3   language?
 4       A.    I cannot sit here today and
 5   tell you I have specific recollection, as
 6   to what gave rise to that language.
 7       Q.    Do you have any general
 8   recollection, at all, about how that
 9   language was added to this policy?
10       A.    I'm sorry.
11             Can you repeat the question?
12       Q.    Sure.
13             Do you have any recollection,
14   at all, about that language being added to
15   the policy?
16       A.    I have no recollection, um, of
17   that specific language being added to the
18   policy.
19       Q.    Do you agree that that language
20   effects a change from the language in the
21   September of 2016 version of the policy?
22             MR. UNDERWOOD:  I object.
23             I object to the form of the
24        question.
25       A.    Yes.
```

Page 217

1           MEI-LI da SILVA VINT
2               It appears to be a change from
3     the version that we just looked at.
4        Q.     And in the February of 2017
5     version of the policy, Brevet is disclosing
6     to its employees that Brevet may access
7     company data on the employees personal
8     devices as necessary?
9        A.     It's added into -- you're
10    correct that it is an update to this
11    policy, but, it is disclosed elsewhere in
12    other policies and procedures.
13       Q.     Where do you think Brevet
14    disclosed, to its employees, that Brevet
15    might access company data on personal
16    devices, as necessary?
17       A.     I think that it is in the Code
18    of Ethics, the employee handbook, and,
19    perhaps, elsewhere, but, there's no
20    expectation of privacy, under certain
21    circumstances, if you are dealing with
22    Brevet materials, um, using any type of
23    system related to Brevet, um, Brevet
24    devices, or e-mails.
25       Q.     So, just to make sure that we

1            MEI-LI da SILVA VINT

2   have a complete understanding, I want to

3   draw a distinction between Brevet e-mail

4   and the -- and personal devices.

5            So, your testimony is that

6   Brevet has disclosed that Brevet might gain

7   access to an employee's personal device and

8   so, for example, a hard drive by an

9   employee's personal device, if that

10   employee was using the device for business

11   purposes?

12       A.   Um, so, I can't speak to the

13   technicalities, et cetera.

14            And are you asking me, again,

15   like, prior to this version?

16            Um, obviously, it's very clear

17   here and you're asking me if it's

18   elsewhere?

19            I am not clear on your

20   question.

21       Q.   I am asking you as of September

22   of 2016, as you understand it, Brevet had

23   disclosed to employees that it, Brevet,

24   might gain access to their personal

25   devices, as distinguished from their Brevet

Page 219

1                  MEI-LI da SILVA VINT
2    e-mail accounts, if the employees were
3    using those devices for business purposes?
4         A.    Yes.
5               I think it's clearly disclosed
6    that there's no expectation of privacy that
7    is occurring.
8         Q.    No expectation of privacy in
9    the Brevet e-mail or no expectation of
10   privacy in one's own personal device?
11        A.    I don't think it's -- it's not
12   specified in the e-mail.
13              I think it's -- you have no
14   expectation of privacy if you're crossing
15   that line where you are doing business
16   related to Brevet, um, with that device or
17   on Brevet's systems, et cetera.
18        Q.    So, for example, you think a
19   Brevet employee in September of 2016 was on
20   notice, that if the employee was doing
21   Brevet business on their personal computer,
22   using the VPN for example, that Brevet
23   could access their computer and download
24   files from a hard drive?
25        A.    I can't speak to what a Brevet

Page 220

```
 1                MEI-LI da SILVA VINT
 2    employee was thinking in 2016.
 3                Do you want me to speak as a
 4    person or --
 5         Q.    Um, um, I think neither.
 6                Let me try rephrase it.
 7                Because I am not asking you
 8    what any particular person was thinking.
 9                I am asking you what Brevet
10    disclosed.
11                So, let me ask the question
12    again.
13         A.    Sure.
14         Q.    Is it your understanding that,
15    as of September 1st, 2016, Brevet disclosed
16    in its written policies to its employees
17    that if an employee was using a personal
18    device, to conduct Brevet business, that
19    Brevet could gain access to the personal
20    device and download files from a hard
21    drive?
22         A.    There's no expectation of
23    privacy and that was clearly agreed to.
24         Q.    I am asking you a more specific
25    question which, maybe, is -- maybe -- maybe
```

Page 221

1              MEI-LI da SILVA VINT
2    you can answer that way, but, I don't think
3    you have yet: Whether Brevet had disclosed,
4    as of September 16th, that, in disclosed
5    expressly, that if a Brevet employee was
6    using his or her own personal device to
7    conduct Brevet business, that Brevet could
8    gain access to the personal device, and
9    download files from the hard drive?
10        A.    So, sorry if I am not making
11   myself clear.
12            No expectation of privacy is
13   broader than what you just said, so, yes,
14   it was very clear.
15        Q.    You think that was very clear
16   notwithstanding that the Section 7.2 of the
17   September 16th version of this document, in
18   the subsection of Expectation of Privacy
19   states, ██████  ███  ███  ██████  ███  ██████
██  ███  ███  ████████  █████████
21        A.    I think it's very clear and if
22   you had a question, in various policies and
23   procedures, to relate those questions.
24            So, if you had a question about
25   doing Brevet business on your own personal

Page 222

```
 1              MEI-LI da SILVA VINT
 2   device, it was clear that there was no
 3   expectation of privacy, and if you had a
 4   question about that, you had to -- you had
 5   to take the initiative to ask that
 6   question.
 7        Q.    So, as you understood the
 8   policy, as of the time that you started, if
 9   a Brevet employee was conducting Brevet
10   business through a personal iPhone, that
11   employee would have had no expectation of
12   privacy, such that if Johnny Lan, for
13   example, decided to log into the phone, and
14   look through personal photos, the employee
15   would have had no basis to complain?
16              MR. UNDERWOOD:  Object to the
17         form of the question.
18        A.    So, can you repeat the start of
19   that question? It's a very long question.
20        Q.    Yeah?
21        A.    When I started, you said, I
22   think?
23              MR. DUMAIN:  Let me withdraw it
24         and state it again.
25        Q.    So, first, I will put it in a
```

Page 223

```
 1              MEI-LI da SILVA VINT
 2    time.
 3         A.    Yes.
 4         Q.    At the time that you started,
 5    in October ████, 2016, under Brevet's
 6    policies as they existed at the time, as
 7    you understand it, a Brevet employee who is
 8    using their personal iPhone to conduct
 9    Brevet business wouldn't have been able to
10    reasonably expect that Brevet would not,
11    and could not, for example, log into that
12    phone and look at personal photographs?
13              MR. UNDERWOOD:  Can you read
14         the question back?
15              There were -- there were
16         someone wouldn't have expected -- I
17         just want to make sure I got the
18         knots here.
19              MR. DUMAIN:  I will just do it
20         again without as many knots, or at
21         least, I'll try to.
22              This is not a question that I
23         have written down, obviously.
24         Q.    As of October ████, 2016, did
25    Brevet disclose to its employees that if
```

Page 224

1          MEI-LI da SILVA VINT
2    its employees were using, for example,
3    their personal iPhones to conduct Brevet
4    business, they should have no expectation
5    that Brevet could not log onto their phone
6    and look at their personal photos?
7         A.    Again, you're giving a very
8    specific example and my answer remains the
9    same.
10              Yes, when I started, in the
11   handbook there's -- that -- there's no
12   expectation of privacy when you do that.
13   So, the specific example that you gave is
14   covered by that no expectation of privacy,
15   when you're doing Brevet business, on that
16   device.
17        Q.    Okay, so, um, just to --
18        A.    I'm sorry.
19              After this question, I need to
20   take a break.
21        Q.    Perfect.
22              Let me just ask one more
23   question just to follow up on this topic.
24              So, your understanding of the
25   Brevet -- Brevet's disclosed policies, as

Page 225

```
 1                MEI-LI da SILVA VINT
 2   of October ████, 2016, when you started,
 3   was that if a Brevet employee was
 4   conducting Brevet business on their
 5   personal phone, for example, Brevet had the
 6   right to log into their phone and look at
 7   their personal e-mails?
 8        A.    Okay.
 9              So, I, actually, am going to be
10   very specific.
11              There's no expectation of
12   privacy, um, if Brevet had to log in, if
13   someone is conducting Brevet business on
14   their own person device, it may have
15   involved looking at personal e-mails or
16   photos because you don't know exactly what
17   is related to Brevet's business. If some is
18   mixed in using Brevet's systems and
19   material, or business, and that is why
20   there is no expectation of privacy when you
21   use a personal device.
22              MR. DUMAIN:  Why don't we go to
23         lunch?
24              MR. UNDERWOOD:  Thanks.
25              How long do you want to make
```

```
 1              MEI-LI da SILVA VINT
 2         it?
 3              THE VIDEOGRAPHER:  The time is
 4         1:14 and we are going off the record.
 5              (Whereupon, a short recess was
 6         taken.)
 7               THE VIDEOGRAPHER:  The time is
 8         2:01 P.M. and we are back -- we are
 9         back on the record.
10    Q.    Hi, Ms. da Silva Vint, welcome
11  back.
12              When we broke, we were talking
13  about your understanding of, um, the
14  expectation of privacy Brevet employees
15  were informed that they should have in
16  their personal devices, that they used for
17  business purposes, as of the time you were
18  hired in October of 2016; correct?
19    A.    Correct.
20    Q.    Okay.
21    A.    And just so you know, I
22  actually printed both versions that we were
23  looking to make it easier, so we're not
24  going to have the split screen. And I
25  noticed some differences I just want make
```

Page 227

```
1              MEI-LI da SILVA VINT
2    note of.
3              Um, as I said, it looks like
4    the -- the date was bracketed on the
5    September 2016, and, I think, in the
6    beginning of my testimony, I don't recall
7    the handbook having been in place at the
8    time.
9              Um, I'm not -- sitting here
10   today, it does not look like it was
11   finalized, in terms, um, the differences in
12   terms of, like, the signature, um, kind of
13   the standard language about the proprietary
14   nature of it.
15             Um, it just doesn't like a
16   final. It looks like it was a draft in
17   process. And I can't say that this was a
18   final version, or not, when I started at
19   Brevet.
20        Q.    Okay.
21             Um, so, with that
22   clarification, is it still your testimony
23   that, as you understood it at the time that
24   you started at Brevet, that an employee who
25   was conducting Brevet business on their own
```

Page 228

```
 1              MEI-LI da SILVA VINT
 2   personal device was on notice that they had
 3   no expectation of privacy in their personal
 4   device, including in the hard drives of
 5   that device?
 6        A.    Yes, my testimony remains
 7   consistent. I think if you look at the
 8   employee handbook, there is specific
 9   language around that.
10        Q.    Okay.
11              MR. DUMAIN:  So, why don't we
12         take -- um, we're going to mark now,
13         a 2016, October ████  e-mail that ends,
14         um, with the Production Number 13319.
15              Once it's loaded up, you can
16         take a look at it, but, what you will
17         see is it's an e-mail that was sent
18         to you, um, just a short while before
19         you began working at Brevet,
20         attaching the employee handbook.
21              So, you can take a look at
22         that, once it's posted.
23              (Whereupon, a 2016, October ████
24         e-mail was marked as da Silva Vint
25         Exhibit 6 for identification as of
```

Page 229

1          MEI-LI da SILVA VINT

2      this date by the Reporter.)

3          (Witness complies.)

4      A.    Okay.

5          MR. UNDERWOOD:  This is going

6      to be Exhibit 6?

7          MR. DUMAIN: That sounds

8      correct.

9          MR. UNDERWOOD:  Hasn't come up

10     yet.

11         THE WITNESS:  Yeah.

12         MR. DUMAIN:  I understand it's

13     a large file.

14     Q.    It's up.

15     A.    Just loaded.

16         We are going to take a look.

17     Q.    Yep.

18         (Witness reviews document.)

19     A.    Okay.

20         Do you want me to read

21  something in particular?

22     Q.    Well, in the first instance,

23  can you just identify the document?

24         (Witness reviews document.)

25     A.    There is an e-mail, um, at the

Page 230

1              MEI-LI da SILVA VINT
2   top, there is an e-mail from Sherree Harris
3   dated 10/█/2016 at 9:20 -- 12 A.M. to Mark
4   Callahan.   Subject is:   "For Brevet
5   Capital, new hire information," and there
6   is an attachment.
7        Q.    If you look at the e-mail
8   underneath it, you're saying -- do you see
9   that that is the e-mail that you received
10   with the number of attachments?
11             (Witness reviews document.)
12        A.    Um, I see that there is an
13   e-mail sent to me, um, with a number of
14   attachments.
15             Um, I can't speak to whether it
16   was received, as you did say it was a large
17   file.
18        Q.    Okay.
19             Well, if you can turn to Page
20   91 of the pdf?
21             (Witness complies.)
22             (Witness reviews document?)
23        Q.    And can you identify what the
24   first page of what you're looking at is?
25        A.    Brevet Holdings, LLC, Personnel

Page 231

```
1              MEI-LI da SILVA VINT
2    Polices, and Employee Handbook, as of March
3    of 2015.
4         Q.    So, if you would, Ms. da Silva
5    Vint, please take as long as you need to,
6    um, review this handbook and point me to
7    the provision that discloses to Brevet
8    employees that if they conduct business on
9    their personal devices, that they had no
10   expectation of privacy in the device,
11   itself, including the hard drive?
12              (Witness complies.)
13              (Witness reviews document.)
14        A.    Um, I think there's a couple of
15   various, um, one being under, um,
16   "███████  ████  ████████  ██  ██████
     ███  ███  █  ████████  █  ███████  ███
18        Q.    Can you just point me to the
19   page that you are looking at?
20        A.    Sure.
21              (Witness complies.)
22        A.    Um, we are speaking,
23   specifically, about the expectation of
24   privacy; correct?
25        Q.    We are speaking specifically of
```

1          MEI-LI da SILVA VINT

2     the disclosure of -- Karyn, maybe, you

3     just want to read my question back?

4               (Whereupon, the referred to

5          question was read back by the

6          Reporter.)

7          A.    So, under, ███████████ ██████

██  ██████████████ ███ ██████ ██████████ ██████

██  ███████████ ██ █

███      █████ ██████ ██████ █████

███           █ ████ █████ ██████

███      █████ ██████ ████ ███████

███  █████ ██████ █████ █████

14               Brevet employees and other

15    using a company owned e-mail system should

16    have not have any expectation of privacy --

17    "

18         Q.    Can you tell me the page,

19    please?

20         A.    Um --

21               MR. UNDERWOOD:  It's Page 128

22        of 150 in the pdf.

23               It's Page 39 of the handbook --

24               MR. DUMAIN:  128 is great.

25               Thank you.

Page 233

1              MEI-LI da SILVA VINT
2              MR. UNDERWOOD:  Okay.
3         A.    And then, "system monitoring
4    and privacy, Brevet does not guarantee the
5    privacy of electronic documents, messages,
6    and telephone conversations of its
7    employees."
8              MR. UNDERWOOD:  This is on Page
9         130 of 150 in the pdf.
10        Q.    Are those the places that you
11   believe the disclousure, asked about in my
12   question,is made?
13             (Witness reviews document.)
14        A.    I am reading this document
15   quickly.
16             Um, if I can print this out and
17   spend time reading it thoroughly I can
18   probably find more places, but, in this
19   time, reading it on the computer, that is
20   quickly where I see it.
21             Brevet reserves the right to
22   read, review, and redact or, otherwise,
23   monitor --
24             MR. UNDERWOOD:  Slow down.
25        A.    -- all electronic documents and

1              MEI-LI da SILVA VINT

2    messages that are stored, or processed, on

3    Brevet's comps, computers, or other

4    equipment including, but not limited to,

5    such documents and messages which do not

6    directly relate to Brevet's business.

7         Q.    And --

8         A.    Sorry.

9         Q.    What page is that on?

10        A.    It's on Page 40.

11             MR. UNDERWOOD:  Page 40 of the

12         handbook which is -- which looks to

13         be Page 130 of the pdf.

14             Ends in 3448, the Bates Number.

15             (Witness reviews document.)

16        Q.    It's your understanding --

17        A.    Sorry, one more place.

18             One more place.

19             "Use of Brevet's communication

20    equipment constitutes consent for Brevet's

21    use, or engagement, in such monitoring and

22    recording activities."

23        Q.    Thank you.

24             So, to start with the last

25    line, um, is it your understanding that a

1             MEI-LI da SILVA VINT

2   Brevet employee's personal device, meaning

3   a device that that person bought with his

4   or her own funds, is within the ambit of

5   this sentence that begins, "use of Brevet's

6   communication equipment? "

7        A.    So, in order for someone to use

8   their own device, if they paid for it

9   themselves, to be able to access Brevet's

10  -- Brevet's e-mail, for example, um, some

11  type of Brevet communication equipment

12  would have needed to have been installed,

13  or used, to be able to access Brevet, so,

14  yes.

15       Q.    Your understanding of the word,

16  "equipment," is that it captures software?

17       A.    Communication equipment, yes.

18       Q.    That means software installed

19  on someone's phone?

20            MR. UNDERWOOD:  I object to the

21       form of the question.

22       A.    Yeah.

23            I said, "it includes."

24       Q.    Right.

25            Okay.

Page 236

1              MEI-LI da SILVA VINT

2              So, your understanding of the

3    word, "equipment," in this sentence,

4    includes software installed on an

5    employee's personal phone?

6         A.    Again, communication equipment

7    includes software that is used to

8    communicate with Brevet.

9         Q.    Okay.

10             Can you please, now, take a

11   look at Harris --

12             MR. DUMAIN:  Oh, no.

13             Excuse me.

14             Lee Exhibit 7.

15             It should be in the marked

16     folder.

17             (Witness complies.)

18             (Witness reviews document.)

19        A.    Yes.

20        Q.    And this is the document that

21   you read before?

22        A.    Yes.

23             (Witness reviews document.)

24        Q.    Can you tell me, and point me

25   to, where in this compliance policy and

```
 1            MEI-LI da SILVA VINT
 2   procedure manual Brevet disclosed to its
 3   employees that by virtue of conducting
 4   Brevet business, on their personal device,
 5   they would, um, not have any expectation of
 6   privacy in their personal device, including
 7   in that device's hard drive?
 8        A.    I'm sorry.
 9              But, can you remind me?
10              Did I say that it was included
11   in this policy before?
12        Q.    You listed a number of policies
13   where you thought it might be included?
14        A.    Maybe.
15        Q.    So, we are going to go through
16   them.
17        A.    All right.
18              (Witness reviews document.)
19        A.    I am just going to point you,
20   um, to some responsibilities throughout to
21   start, um, ███ ████████   █████████
   █  ███████████ ███   ████████████  █  ████████
   █  █████  ███████  ██████  █  ███████████  ████
   █  ████████████   █████████  so, that is Page 5 of
25   this manual, under, ████████   ███████
```

```
                                        Page 238
 1              MEI-LI da SILVA VINT
 2    ████████████████   um, "the CCO has the
 3    responsibility for monitoring Brevet's
 4    Advisory Agreement policies."
 5              MR. UNDERWOOD:  Slow down.
 6         A.    "████████  ███  ██████████  ██
 █    ████████████  that is Page 6.
 8              (Witness reviews document.)
 9         A.    I am under -- on Page 26,
10    "Supervision and Internal Controls."
11              "The CCO is responsible for
12    ongoing monitoring of the policies put into
13    place, to ensure that Brevet is compliant
14    with applicable, regulatory rules,
15    regulations, and laws." Um, "this CCO is at
16    an equal, periodically, tempering policies
17    and procedures --"
18              MR. UNDERWOOD:  Slow.
19         A.    "Relevant to such objectives to
20    make sure that all are current and
21    accurate, and in accordance with all
22    disclosures," and then, each -- there's
23    some other language, "and then, each
24    employee, at Brevet, has a duty to be aware
25    of, and follow all of the policies and
```

Page 239

```
 1            MEI-LI da SILVA VINT
 2   procedures put into place for Brevet."
 3        Q.    Thank you.
 4              And if you can --
 5        A.    I'm sorry, I am still going.
 6              I am still reading this
 7   document.
 8        Q.    Okay.
 9              THE COURT REPORTER:  Mr.
10          Dumain, I just wanted to let you
11          know, I am having a difficult time
12          hearing you since I got back from
13          lunch.
14              MR. DUMAIN: Let me move closer
15          to the microphone and try to keep my
16          voice up. Is that better?
17              THE COURT REPORTER: No.
18              I don't know.
19              It's just very low.
20              (Witness reviews document.)
21        A.    Um, and then there is reference
22   to the Code of Ethics e-mail which we would
23   have to look at separately.
24        Q.    Okay, but, you're through this
25   document, though?
```

Page 240

```
 1              MEI-LI da SILVA VINT
 2      A.     Yes, I am.
 3      Q.     Okay.
 4             And you have identified the
 5  language that you think notified Brevet
 6  employees, as of this time, that by using
 7  their personal devices to conduct Brevet
 8  business, they had no expectation of
 9  privacy in the devices themselves,
10  including any hard drives?
11      A.     Um, so, sitting here at this
12  moment, given the short amount of time that
13  I had to review this document, I think it
14  is clear in the one section where it
15  describes that you have to abide by all
16  Brevet policies and procedures, and I think
17  I clearly pointed to something, in the
18  employee handbook, that -- that you are
19  noticed to that effect.
20      Q.     Let's take a look at Lee
21  Deposition Exhibit 4?
22             (Witness complies.)
23             (Witness reviews document.)
24      A.     Okay.
25      Q.     Is this the document you
```

Page 241

                    MEI-LI da SILVA VINT

1                  MEI-LI da SILVA VINT

2    recognize?

3               (Witness reviews document.)

4         A.    Um, the general e-mail

5    retention and destruction policy, as of

6    June of 2016?

7         Q.    Yes.

8         A.    Um, I can't say, sitting here

9    today, that I have seen this exact copy of

10   this document.

11        Q.    Okay.

12              Have you seen general e-mail

13   retention and destruction policies of

14   Brevet Capital Management, LLC?

15        A.    Yes, I have.

16        Q.    Okay.

17              Could you take a look through

18   this document and identify, for me, the

19   places where you believe the disclousure,

20   we have been discussing, was made?

21              (Witness complies.)

22              (Witness reviews document.)

23        A.    So, this clearly states out the

24   requirements of Brevet Capital to retain

25   certain records under the Investment

Page 242

1              MEI-LI da SILVA VINT

2    Advisors Act of 204-2-A.

3              So, if they are not conducted

4    on firm e-mail, which this policy also

5    requires, an employee should be on notice

6    that we are required to retain copies of

7    those e-mails.

8         Q.   Can you point me to the page,

9    please?

10             (Witness complies.)

11        A.   Um, sure.

12             So, at the top, um --

13             MR. UNDERWOOD:  Here.

14             THE WITNESS:  I am going to go

15        to the top.

16             MR. UNDERWOOD:  Okay.

17        A.   It talks about -- so, I would

18    go first for the reason for the policy,

19    which is on Page 3 of this document, then I

20    would go to e-mail, which is Page 3, where

21    it says, "permitted communications," where

22    it tells you where you, "have to conduct

23    investment advisory related business," and,

24    then, on page -- same page --

25             MR. UNDERWOOD:  No.

Page 243

```
 1              MEI-LI da SILVA VINT
 2              No, this is --
 3        A.    Page 4.
 4              Where it says, "e-mail that is
 5    to be retained," um, and, then, um, the
 6    statutory requirements which are on Page 5
 7    of this document, and, then, "the SEC
 8    inspection," which is --
 9              THE WITNESS:  Sorry.
10              I don't know what page this is.
11              MR. UNDERWOOD:  This is Page 5.
12              THE WITNESS:  That is it,
13         right.
14              MR. UNDERWOOD:  Apologies.
15              At least, the browser we're
16         using, it doesn't always take over to
17         the next page, right.
18              When you get to Page 5, all the
19         way off the page, then it says this
20         is Page 6.
21              THE WITNESS:  Um, so, yeah.
22        A.    Um, so, "SEC inspection," which
23    comes after, "statutory requirements."
24        Q.    It may be helpful to use the
25    Bates Number for that reason.
```

Page 244

```
 1              MEI-LI da SILVA VINT
 2      A.    It's kind of blocked -- blurry
 3   from what I am reading. 300 --
 4              MR. UNDERWOOD:  That's 3049.
 5      A.    Okay.
 6              So, that is on, "statutory
 7   requirements," starts on 003049, continues
 8   on to Page 003050 where you also have, "SEC
 9   inspections."
10      Q.    Thank you.
11              So, focussing, for a moment, on
12   the page ending in 48?
13              (Witness complies.)
14              THE WITNESS:  What is it?
15              MR. UNDERWOOD:  48, this one.
16      A.    Okay.
17      Q.    It's Bates numbered.
18              You see, it states, "permitted
19   communications, when using electronic mail,
20   employees must use the company's electronic
21   mail system network to conduct investment
22   advisory reporting business;" do you see
23   that?
24              (Witness reviews document.)
25      A.    Correct.
```

Page 245

```
 1              MEI-LI da SILVA VINT
 2       Q.    Was that the policy, at Brevet,
 3  at the time that you joined?
 4       A.    Yes.
 5       Q.    And in the next sentence, it
 6  says, "it is permissible for an employee to
 7  communicate via a home computer for
 8  investment advisory related business,
 9  provided that the employee uses the
10  electronic mail system of the company."
11              Do you see that?
12              (Witness reviews document.)
13       A.    Yes, I see that.
14       Q.    And that was the policy at the
15  time you joined Brevet, as you understood
16  it?
17       A.    Um, yes.
18              If you had access to the Brevet
19  electronic e-mail system, you could use
20  your Brevet e-mail to conduct investment
21  advisory related business.
22       Q.    So, as you understood the
23  Brevet policy, and you understand the
24  disclosures, Brevet employees were on
25  notice that if they were using their
```

Page 246

```
 1              MEI-LI da SILVA VINT
 2   personal device to conduct Brevet business
 3   through the Brevet electronic mail system,
 4   they were, nevertheless, ceding their
 5   expectation of privacy over the rest of the
 6   personal device, including its hard drives
 7   and personal e-mail accounts?
 8        A.    So, I said that was -- that was
 9   conducted -- um, sorry -- that was covered
10   more broadly, um -- it was specifically in
11   the employee manual.
12              This, specifically, talks about
13   e-mail, and, so, I am not going to go as
14   broad to say that they were on notice for
15   all those things under the specific policy.
16              But, as you saw under the
17   compliance manual, they were expected to
18   abide by all policies in place.
19        Q.    This particular policy is
20   limited to Brevet's own electronic mail
21   system; is that correct?
22        A.    No.
23              It relates to e-mails,
24   generally.
25              Again, like, you're supposed to
```

Page 247

```
 1              MEI-LI da SILVA VINT
 2    be  using -- you're required to use
 3    Brevet's e-mail system to do investment
 4    advisory business.
 5              But, then it goes on to tell
 6    you what we're required to retain, right.
 7              So, if you choose not to abide
 8    by the policy, we'll still have statutory
 9    requirements.
10        Q.    Where does it say that?
11              (Witness reviews document.)
12        A.    It talks about, like, for
13    example, the SEC inspections on 00304 --
14    003050, um, and also the --
15              (Witness reviews document.)
16        A.    Just in the introduction, "█
```

█ ███████ ██████ █ █████████ ████
█ ████ ████ █ █████ ██████ ███████ █
█ ███████ ██████ █████ ██████ █ ███ ███
█ ██████ ████████ █ █████ █████ "

```
21        Q.    Okay.
22              You see there's a header at the
23    upper right-hand corner of this page which
24    says, ██████████ █████████ ██████
```

█ ████████████ ?"

Page 248

```
 1              MEI-LI da SILVA VINT
 2       A.    Yes.
 3       Q.    What do you understand the
 4  word, "strictly," to mean in the context of
 5  that heading?
 6       A.    Um, I don't understand it to --
 7  I don't understand the question.
 8       Q.    Well --
 9       A.    As opposed to what?
10       Q.    As opposed to merely a
11  proprietary and confidential?
12             THE COURT REPORTER:  I'm sorry.
13        I can't hear you.
14       Q.    As opposed to merely
15  proprietary and confidential?
16       A.    Um, I think they are the same.
17       Q.    So, in other words, "strictly,"
18  has no incremental meaning here?
19       A.    I don't think so.
20       Q.    Okay.
21             We are going to take a look,
22  next, at the January, 2015 Code of Business
23  Conduct.
24             That will be da Silva Vint
25  Deposition Exhibit Number 7.
```

Page 249

```
 1              MEI-LI da SILVA VINT
 2              (Whereupon, January, 2015 Code
 3         of Business Conduct was marked as da
 4         Silva Vint Exhibit 7 for
 5         identification as of this date by the
 6         Reporter.)
 7              (Witness complies.)
 8      A.    I see it.
 9      Q.    Okay.
10              Can you please -- um, first, do
11  you recognize this document?
12              (Witness reviews document).
13      A.    Um, I see it as the Brevet
14  Capital Management, LLC Code of Business
15  Conduct, Ethics and Insider Trading Policy
16  as of January 2015.
17              I cannot say that I,
18  specifically, recognize this document.
19      Q.    Do you not recognize,
20  specifically, this version of this document
21  or any -- any document Brevet Capital
22  Management Code of Business Conduct,
23  Ethics, and Insider Trading Policy?
24      A.    Um, this specific version.
25      Q.    Okay.
```

Page 250

1          MEI-LI da SILVA VINT
2               That, notwithstanding, um,
3    you're familiar, generally, that Brevet has
4    over time had various iterations of the
5    Code of Business Conduct, Ethics, and
6    Insider Trading?
7          A.    Yes.
8          Q.    And this is one of the
9    documents, not necessarily this version,
10   but this policy, that you suggested
11   earlier, might contain the disclosure about
12   what an employee who uses his or her
13   personal device to conduct Brevet business
14   might expect with respect to privacy;
15   correct?
16         A.    Yes.
17         Q.    Okay.
18              Ms. da Silva Vint, can you
19   please review this document, for as long as
20   you need, and point me to any places that
21   you believe disclose -- well, make the
22   disclosure that we have been discussing
23   with respect to an employee's expectation
24   of privacy on his or her personal device,
25   on which they conduct Brevet business?

Page 251

```
 1            MEI-LI da SILVA VINT
 2            (Witness complies.)
 3            (Witness reviews document.)
 4            MR. UNDERWOOD:  Marcello, do
 5       you think you can turn your camera
 6       off?
 7            THE VIDEOGRAPHER: Sorry about
 8       that.
 9            MR. UNDERWOOD:  Thank you.
10       A.    Well, to start with, I think,
11  on the page, on Bates Number 255212, um,
12  second paragraph, last sentence, "As part
13  of our program, it is our firm's policy to
14  record all transactions accurately in our
15  books and records, and to be honest and
16  forthcoming with bookkeepers, accountants,
17  regulators, and auditors.
18            No statement, or policy, or
19  official program can cover all
20  circumstances or anticipate every
21  situation."
22            So, I think there, um, "it is
23  our firm's policy to record all
24  transactions, accurately in our books and
25  records."
```

Page 252

```
 1              MEI-LI da SILVA VINT
 2              THE COURT REPORTER:  You're on
 3         mute, sir.
 4              You're on mute, sir.
 5    Q.    Anything else on this document?
 6    A.    Not specifically, um, given the
 7  time that I have been allotted to review
 8  it.
 9    Q.    Okay.
10              Having reviewed these four
11  documents, can you confirm that your
12  understanding is still that, as of October
13  ████, 2016, a Brevet employee who used his
14  or her personal device to conduct Brevet
15  business was on notice that they had no
16  expectation of privacy, in their personal
17  device, including in the hard drives?
18    A.    I think I didn't need to
19  actually look at those other manuals.
20              I think the employee handbook
21  is very clear.
22    Q.    Terrific.
23              Ms. da Silva Vint, in your role
24  as Chief Compliance Officer, do you
25  participate in any monitoring of Brevet
```

Page 253

1              MEI-LI da SILVA VINT

2    employee e-mails?

3         A.    Yes, I do.

4         Q.    Are those -- is that monitoring

5    limited to brevetcapital.com e-mail or are

6    there other e-mail domains included in that

7    monitoring?

8         A.    Um, we archive other domains,

9    but, I specifically monitor

10   brevetcapital.com.

11        Q.    Since you joined Brevet Capital

12   -- well, since you joined the Brevet group

13   of entities on October ███, 2016, have you

14   ever been involved in monitoring an

15   employee's personal e-mail?

16        A.    Monitoring a personal e-mail?

17        Q.    And by personal e-mail, let me

18   be clear, I don't mean a personal e-mail

19   sent on the brevetcapital.com domain, I

20   mean, monitoring a Brevet employee's

21   personal e-mail account like, for example,

22   G-Mail or Yahoo?

23        A.    Um, sitting here today, I don't

24   recall a situation where I monitored

25   someone's G-Mail or Yahoo account.

Page 254

1          MEI-LI da SILVA VINT

2      Q.    But, you believe you're

3  entitled to do so, to the extent that that

4  employee has used a personal device to

5  conduct Brevet business?

6          MR. UNDERWOOD:  I object to the

7      form of the question.

8      A.    If someone uses, again, Brevet

9  equipment, Brevet systems, um, I can't

10  remember, communication, um -- I can't

11  remember the exact phrase, um, is using

12  Brevet materials, um, yes, I do believe we

13  have the right to monitor those, or have

14  access to that personal e-mail, or whatever

15  is being used.

16      Q.    Since you joined Brevet in

17  October of 2016, have you ever participated

18  in accessing a Brevet employee's personal

19  device without notice to that employee to

20  read, or review, or download files from the

21  hard drive of that device?

22      A.    Sitting here today, to my

23  recollection, there has not been a need to

24  do that.

25      Q.    Is it your understanding that

1              MEI-LI da SILVA VINT

2   if a Brevet employee conducts Brevet

3   business on their own personal device, that

4   you -- by you, I mean you, in your

5   corporate capacity, as the Chief Compliance

6   Officer of Brevet, are entitled to access

7   that device without notice to the employee,

8   to review and download materials from their

9   hard drive?

10        A.    Yes.

11        Q.    Can you take a look, again, at

12  Lan Deposition Exhibit 1, please?

13              That is the 30(b)(6) Notice?

14              (Witness complies.)

15              (Witness reviews document.)

16        A.    It's up.

17        Q.    Okay.

18              Can you take a look at Topic

19  Number 18, please?

20              (Witness complies.)

21              (Witness reviews document.)

22              (Whereupon, an off-the-record

23         discussion was held.)

24              THE VIDEOGRAPHER:  The time is

25         2:49 P.M.

Page 256

```
 1              MEI-LI da SILVA VINT
 2              We are back on the record.
 3       Q.    You're prepared to testify
 4  about Topic 18?
 5       A.    Yes.
 6       Q.    And looking, specifically, at
 7  Topic 18-A, you're prepared to testify
 8  about that?
 9       A.    Yes.
10       Q.    And did you do anything to
11  prepare about Topic 18-A, either, for the
12  period before you joined Brevet or since?
13       A.    Yes.
14       Q.    And for the period before you
15  joined Brevet, what did you do to prepare
16  to testify?
17       A.    Um, I looked at, um, our
18  records, um, that we typically store, um,
19  and I -- that is about the extent to what I
20  did.
21       Q.    And for the time since you
22  joined Brevet, did you do anything to
23  prepare yourself to testify?
24       A.    No.
25       Q.    What types of records does
```

Page 257

                    MEI-LI da SILVA VINT

1  Brevet maintain about its monitoring of its

2

3  employees?

4                (Witness reviews document.)

5      A.    Um, "monitoring," is a broad

6  word.

7                Are you talking about

8  communication and correspondence?

9  Typically, again, um, Brevet business is

10  supposed to be conducted on Brevet systems,

11  um, so, we archive all e-mails, um, and

12  instant messages, as well, internally.

13      Q.    Is that the Global Relay

14  archive?

15      A.    Yes.

16      Q.    Who has access to the Global

17  Relay archive?

18      A.    Sitting here today, I can only

19  speak to who I understand has access to it,

20  um, and I don't understand people who have

21  access beyond the group I'm aware of.

22      A.    So, who is in that group of

23  people that do have access?

24      A.    So -- sure.

25                It's myself, Doug Monticciolo,

Page 258

1          MEI-LI da SILVA VINT
2    Mr. Callahan, Danielle Bungi, David
3    Spinley, and Johnny Lan.
4         Q.    Is a record made of, um, each
5    time someone accesses the Global Relay
6    system to review e-mail?
7         A.    Sitting here today, I can't
8    speak to that technicality of the system.
9         Q.    So, you don't know whether a
10   record is created when, for example, Mr.
11   Callahan accesses the Global Relay system
12   to review e-mails?
13        A.    No.
14        Q.    Okay.
15             And are you aware of any
16   internal policy that governs when any of
17   the people you just named gain access to
18   the Global Relay system to review employee
19   e-mails?
20        A.    No.
21             I think, to my knowledge, David
22   Spinley's access is limited, currently, it
23   may be expanding, but, we don't have a
24   policy, in terms of when anybody else can
25   go in to find these names to look at

Page 259

1              MEI-LI da SILVA VINT

2    people's e-mails.

3         Q.    Does Brevet have a, um,

4    procedure in place to systematically

5    monitor employee e-mails on an ongoing

6    basis?

7         A.    Um, we monitor employee e-mails

8    formally, periodically, that we document

9    and then we just monitor at other times,

10   for other reasons, go into employee

11   e-mails.

12        Q.    So, let's start, if we could,

13   with the systematic process that you just

14   described?

15        A.    Sure.

16        Q.    Could you tell me, in as much

17   detail as you can, how that process works?

18        A.    So, a certain percentage of

19   total e-mails over a certain period of

20   time, um, monthly or quarterly, um, subject

21   to certain terms, are searched across the

22   database, and documented that that was

23   reviewed.

24              Um, but, during that time, you

25   may also have -- that is systematic, done

Page 260

```
 1              MEI-LI da SILVA VINT
 2   periodically, no matter what.
 3        Q.    And is there a document that
 4   sets out the quantity of e-mails and the
 5   search terms used over a particular period
 6   of time?
 7        A.    That is not a policy that sets
 8   that forth.
 9              It may be documented, what we
10   use, but there's not a policy,
11   specifically, saying we have to use that.
12        Q.    So, how frequently does this
13   systematic monitoring happen?
14        A.    At least, quarterly.
15        Q.    When did this process of
16   systematic monitoring begin, to your
17   knowledge?
18        A.    Sitting here today, I can't --
19   I can't recall when it began.
20        Q.    Has it been in place for your
21   entire tenure at Brevet?
22        A.    To the best of my knowledge,
23   sitting here, yes.
24        Q.    You also described a more ad
25   hoc process, whereby, one or more people
```

Page 261

```
 1              MEI-LI da SILVA VINT
 2    might gain access for one reason or
 3    another; correct?
 4         A.    Um, no.
 5              I don't mean people --
 6    additional people that I named, that I know
 7    who would gain access, we might be using
 8    the system for -- to look at, you know,
 9    certain employees' e-mails, or someone that
10    left, or something specific.
11              But, there's not like --
12    additional people don't gain access to the
13    system.
14         Q.    Sorry.
15              I misspoke.
16              What I was trying to understand
17    was: Of the group of people that you
18    identified who have access to the system,
19    under what circumstances do they gain
20    access to the system, or enter the system,
21    to obtain -- to review employee e-mails?
22         A.    So, they can go on whenever
23    they want and I would expect them to.
24              Um, you know, part of our job
25    is to monitor employee e-mails. Um, they
```

Page 262

```
 1            MEI-LI da SILVA VINT
 2    can be going on to look at their own
 3    e-mails. I can't speak to why people would
 4    be doing it, but, they should be monitoring
 5    people's e-mails.
 6        Q.    So, you think it's part of Doug
 7    Monticciolo's job to monitor Brevet
 8    employee e-mails?
 9        A.    It is not part of his job, per
10    se, he does have a fiduciary duty which he
11    has delegated to the Chief Compliance
12    Officer, so, it is part of my job, or my
13    delegate to monitor e-mails.
14              But, as the, um, Chief
15    Investment Officer and, um, you know, the
16    owner of the Registered Investment Advisor,
17    if he wants to go monitor e-mails, to make
18    sure things are going smoothly or for
19    whatever reason, he should be monitoring
20    the e-mails.
21              THE WITNESS:  You're frozen.
22              I think.
23        Q.    As the Chief Investment Officer
24    and, then, you -- you completed your
25    answer.
```

Page 263

                    MEI-LI da SILVA VINT
1
2       A.    You didn't hear anything after
3    that?
4              MR. UNDERWOOD: Can the Court
5         Reporter read the rest of the answer?
6              MR. DUMAIN: Good idea. Thank
7         you.
8              (Whereupon, the referred to
9         answer was read back by the
10        Reporter.)
11      Q.    Is there more to your answer
12   that you'd like to complete?
13      A.    No.
14             I mean, it is not his specific
15   job duty.
16             Um, but, I think as, um, you
17   know, as an executive -- a senior member of
18   the firm, it's normal.
19      Q.    So, is it your understanding
20   that Mr. Callahan, for example, is free to
21   go into the Global Relay System and look at
22   any employee's e-mails for any reason or no
23   reason?
24      A.    Yes.
25      Q.    And same with Mr. Monticciolo?

```
 1              MEI-LI da SILVA VINT
 2      A.      Yes.
 3      Q.      Same with yourself?
 4      A.      Yes.
 5      Q.      As a matter of practice, when
 6  do you -- when have you gone on to the
 7  Global Relay System to review current
 8  employee e-mails?
 9      A.      Um, sitting here today -- I
10  mean I do it all the time.
11      Q.      As you sit here today, you do
12  it all the time?
13      A.      As I sit here today, I -- yes.
14  It can be past tense, it can be future,
15  but, not, specifically sitting right here,
16  right now, I do it all the time.
17              MR. UNDERWOOD:  She's not doing
18        it right now.
19              MR. DUMAIN:  I saw you looking
20        at your phone before.
21      Q.      And for what reasons do you do
22  it?
23      A.      Um, I am supposed to, you know,
24  make sure that people are following what we
25  are required to do, um, from a regulatory
```

```
                                            Page 265
 1              MEI-LI da SILVA VINT
 2   and legal perspective, um, and one of the
 3   tools that you use is e-mail communication,
 4   um, to make sure that the compliance
 5   policies, and other policies and
 6   procedures, are being followed, and that
 7   people are doing what they are supposed to
 8   be doing.
 9              I mean, we have policies and
10   procedures in place, but, we can't capture
11   everything, so, periodic review of employee
12   e-mail is a tool that we can use.
13       Q.    What might trigger your review
14   of an employee's e-mail?
15       A.    Um, it could be something I see
16   through the systematic review, it can
17   something that I hear, it can be just a
18   feeling.
19              Um, it can be literally
20   anything.
21       Q.    Do you typically disclose to an
22   employee that you have reviewed his or her
23   e-mails?
24       A.    I think employees expect that I
25   am reviewing their e-mails.
```

Page 266

```
 1              MEI-LI da SILVA VINT
 2              Um, I wouldn't say that I --
 3    every time that I review someone's e-mail
 4    or any time I review someone's e-mail, I
 5    tell them.
 6         Q.    Do you sometimes tell them:  "I
 7    was looking at your e-mail last week and I
 8    saw something."
 9         A.    Um, no.
10              If we find something that we
11    need to speak somebody about specifically,
12    that conversation may occur, but, no,
13    typically, I wouldn't tell somebody I
14    looked at their e-mail.
15         Q.    Well, if you don't identify any
16    any disciplinary issue, or if there is a
17    problem, you don't disclose that you have
18    been monitoring an employee's account?
19         A.    Correct.
20              MR. DUMAIN:  Okay. Let's go off
21         the record.
22              I just need ten minutes, now,
23         I'm sorry.
24              I will not ask for any
25         additional break until the Witness
```

Page 267

```
 1            MEI-LI da SILVA VINT
 2        asks.
 3            THE VIDEOGRAPHER:  The time is
 4        3:00 P.M.
 5            We are going off the record.
 6            (Whereupon, an off-the-record
 7        discussion was held.)
 8            THE VIDEOGRAPHER:  The time is
 9        3:09 P.M.
10            And we are back on the record.
11     Q.    Hi, Ms. da Silva Vint.
12     A.    Hi.
13            MR. UNDERWOOD:  This is that
14        screen over there, so, they can see
15        that I am not whispering in your ear.
16            THE WITNESS:  Got it.
17            Okay.
18            Sorry.
19     Q.    I think you testified that you
20  understand that Mr. Callahan, um, does
21  monitor Brevet employee e-mails on the
22  Global Relay System; is that correct?
23     A.    Um, to the best of my
24  knowledge, I know that he looks at or has
25  looked at employee communication on Global
```

Page 268

```
 1              MEI-LI da SILVA VINT
 2    Relay.
 3         Q.    Aside from generally being
 4    aware that he does that, um, have you ever
 5    had any specific conversations with him
 6    about particular instances of when he has
 7    monitored employee e-mails?
 8         A.    Um, so,, sitting here today and
 9    what I speak to is we have looked at stuff
10    together, or looked at people together. Um,
11    I -- I can't -- speak to, specifically, how
12    and when Doug and Mark use the system.
13              I do know that they look at
14    employee communications on that system.
15         Q.    And what circumstances have you
16    looked at e-mails on Global Access --
17    Global Relay with Mr. Callahan?
18         A.    Um, so, I can't speak to
19    specific instances, sitting here today, but
20    we might be looking for, um, something,
21    even our own e-mails that we sent in the
22    past, or something related to a
23    transaction, or it can be an employee.
24              I can't recall specific
25    instances, sitting here today.
```

Page 269

```
 1              MEI-LI da SILVA VINT
 2       Q.    Does anyone monitor Mr.
 3  Callahan e-mails?
 4       A.    Um, yes.
 5             Um, it's part of -- part of our
 6  systematic review, we look at everybody --
 7  all e-mails through the system.
 8       Q.    So, the same is true of Mr.
 9  Monticciolo?
10       A.    Yes.
11       Q.    When you say, "you look at all
12  e-mails that are going through the system,"
13  can you be more specific?
14       A.    A certain percentage of all
15  e-mails that go through the system are
16  subject to certain key terms.
17             But, it includes everybody --
18  anything that goes through the Brevet
19  e-mail system.
20       Q.    Could you define, "key terms?"
21       A.    Terms we use to break down a
22  certain percentage of e-mails that we're
23  going to review at that time.
24       Q.    So, like search terms?
25       A.    Yes.
```

Page 270

```
 1              MEI-LI da SILVA VINT
 2       Q.     So, can you give an example of
 3  what some terms you might use would be?
 4       A.     I can't speak to any,
 5  specifically, sitting here today.
 6       Q.     Who formulates the terms?
 7       A.     Um, we do, in the Compliance
 8  Department.  Um, sometimes we consult with
 9  outside counsel or advisors.
10       Q.     What, um, are the inputs that
11  go into formulating the terms?
12       A.     What do you mean by, "inputs?"
13       Q.     Well, do you take out a
14  dictionary and flip from page to page?
15       A.     We have not done that.
16       Q.     So, how is it that you settle
17  on the terms that you are going to use for
18  any particular search?
19       A.     Um, I think there is some
20  guidance, um, from our outside consultants,
21  um, client consultants, advisors, um, there
22  is some, you know, guidance put out by the
23  SEC, in terms of reviewing e-mails.
24              So, it's a number of things
25  that go into the search terms.
```

Page 271

1          MEI-LI da SILVA VINT
2      Q.    So, the terms might be key to
3  particular substantive areas of interest,
4  like IBOR, for example?
5      A.    That is an example probably
6  that wouldn't apply to us, but, perhaps.
7      Q.    But it might, at another time
8  period, applied to a different entity?
9      A.    Yes.
10      Q.    Got it.
11          This is a quarterly process,
12  did you say?
13      A.    Yes.
14          Currently, it's done quarterly.
15      Q.    Once, the search terms are run
16  and the universe of e-mails is identified,
17  how are they reviewed?
18      A.    Um, they are placed in a -- a
19  file with, like, the time period so Q1
20  2020, for example, um, and you open each
21  e-mail, and check that it has been reviewed
22  until you completed all e-mails that relate
23  to that search term in that percentage.
24      Q.    So, a -- a person in the
25  Compliance Department puts eyes on each of

1              MEI-LI da SILVA VINT

2    these e-mails?

3         A.    Correct.

4         Q.    And there's no machine aided

5    review?

6         A.    Unfortunately, no.

7         Q.    During your tenure, as Chief

8    Compliance Officer, um, has Brevet ever

9    used LogMeIn, or other software, to

10   remotely access an employee's home

11   computer, without the employee's knowledge?

12        A.    Um, I can't sit here today and

13   speak to that.

14              Um, to my knowledge, I can't

15   speak to a specific incident.

16              I might not know.

17        Q.    You think that could have

18   happened and you, as the Chief Compliance

19   Officer, would not be aware of it?

20        A.    Um, I think, again, the

21   policies and procedures permit that.

22              Um, I -- you know, there might

23   be an instance I am not aware of it or told

24   about it.

25        Q.    During your tenure as Chief

Page 273

1              MEI-LI da SILVA VINT
2    Compliance Officer, has Brevet ever
3    downloaded e-mails from an employee's
4    personal e-mail account, by which -- I
5    mean, like, a G-mail account?
6              THE WITNESS:  Can I consult
7         with counsel for a moment, please?
8              MR. UNDERWOOD:  Hang on just a
9         second, let me see.
10             THE WITNESS: Can you read that
11        question back to me?
12             (Whereupon, the referred to
13        question was read back by the
14        Reporter.)
15        A.    So, I know that they had
16   specifically, in relation to this case.
17        Q.    Excluding this case?
18        A.    Not to my knowledge, sitting
19   here.
20        Q.    And to be clear: The incident
21   that you are referring to was during your
22   tenure as Chief Compliance Officer, in
23   connection with this case?
24        A.    Yes, I think that there were
25   several of us where personal e-mails had to

Page 274

```
 1              MEI-LI da SILVA VINT
 2   be downloaded.
 3        Q.    So, just to be clear: While you
 4   were Chief Compliance Officer, in
 5   connection with this case, Brevet has
 6   without notice or permission --
 7        A.    You changed the question.
 8        Q.    Went into e-mails from an
 9   employee's personal e-mail account?
10        A.    You just changed question.
11              MR. DUMAIN:  Maybe we should
12         have the question back.
13              I didn't intend to.
14              That's what I thought I had.
15              (Whereupon, the referred to
16         question was read back by the
17         Reporter.)
18        A.    And I said yes. Um,
19   specifically, in connection with this case
20   is one example.
21        Q.    Can you please give me the
22   details of the incident that you are
23   referring to?
24              MR. UNDERWOOD:  Ian, let me
25         explain as -- as part of the
```

Page 275

```
 1              MEI-LI da SILVA VINT
 2        Discovery in this case, and as part
 3        of the -- the -- the process in this
 4        case, in the Federal action, um, I am
 5        going to say it was the summer of
 6        2020, we agreed to, um, um, review
 7        e-mails from the personal e-mail of
 8        certain select employees of the
 9        company.
10              I believe that's what Ms. da
11        Silva Vint is referring to. I think
12        she was one of the people who had to
13        give us access to her personal e-mail
14        account and we went through a process
15        of collecting e-mails from various
16        people as part of the search
17        protocol, or Discovery protocol that
18        we negotiated, and fought over, and,
19        ultimately, agreed to.
20              MR. DUMAIN:  Okay.
21              Thank you for that
22        clarification because that was not --
23        I do not dispute that it would have
24        been captured by my question.
25              But, that is certainly not what
```

Page 276

1          MEI-LI da SILVA VINT
2       I had in mind, so, I thank you.
3       Q.   Outside of the context of
4   litigation, um, during your tenure as Chief
5   Compliance Officer, has Brevet ever
6   downloaded e-mails from an employee's
7   personal e-mail account?
8       A.   Um -- e-mails, specifically,
9   not to my knowledge.
10      Q.   During your tenure as Chief
11  Compliance Officer, has Brevet, without
12  notice, um, downloaded files from an
13  external hard drive attached to an
14  employee's home computer?
15      A.   Um, so, during my tenure at
16  Brevet, you can't attach external hard
17  drives to your computer.
18      Q.   During your tenure as Chief
19  Compliance Officer, did Brevet ever without
20  notice, or permission, download files from
21  an internal hard drive of an employee's
22  home computer?
23      Q.   Sitting here today, not to my
24  knowledge.
25           I'm sorry, to be clear, you

Page 277

1           MEI-LI da SILVA VINT
2    said home computer or --
3        Q.    I said home computer and I can
4    clarify.
5        A.    Please do.
6        Q.    By which I mean: Personal home
7    computer.
8        A.    Not such as by Brevet.
9              Um, not to my knowledge.
10       Q.    While you were Chief Compliance
11   Officer, did Brevet ever, without notice,
12   or permission, download files from an
13   internal hard drive from a home computer
14   that was purchased by Brevet?
15       A.    They could have, as part of
16   just regular, I think, backups, um, happen
17   as well.
18             I can't, specifically, speak to
19   the technical nature of that, um, in our
20   systems, but, I would imagine so.
21             I can't speak, as a fact
22   witness, that I know that happened
23   specifically.
24       Q.    You know that backups happen?
25       A.    Yes.

1                    MEI-LI da SILVA VINT
2        Q.     And it's your testimony that
3    backing up of the system might reach the
4    hard drives of a computer at an employee's
5    home?
6        A.     Um, so sitting here today, I
7    know that I have a Brevet computer at home
8    and what is on that -- I think everything
9    is in the cloud, um, so, I don't know -- I
10   can't speak specifically to hard drive
11   versus not hard drive, but, the computer is
12   backed up.
13       Q.     The computer is backed up.
14              What data are you referring to,
15   specifically?
16       A.     Honestly, I -- I am not an IT
17   person, so --
18       Q.     Do you know if, um, Brevet has
19   ever remotely accessed the home computer of
20   Mr. Callahan, um, and downloaded files
21   without notifying Mr. Callahan?
22       A.     I can't speak specifically to
23   that.
24       Q.     Same question for Mr.
25   Monticciolo.

Page 279

1          MEI-LI da SILVA VINT
2      A.    Again, I can't speak
3  specifically to whether it has been done or
4  not.
5          Um, and I think there's a lot
6  of nuances and variables, in terms of
7  system backups, I think the Brevet network,
8  or communication equipment, so, I -- I
9  don't know.
10          MR. DUMAIN:  Evelyn, we are
11      going to, um, mark our Tab 15.
12          And while we do that, I gather
13      the last questions I just asked were
14      not questions you investigated in
15      preparing to testify as a 30 (b)(6)
16      witness.
17      A.    Whether we accessed and
18  downloaded materials specifically from Mark
19  Callahan and Douglas Monticciolo's
20  computers without notifying them?
21      Q.    Yes.
22      A.    No, I don't think those were
23  specified, um, under the 30(b)(6) Notice.
24      Q.    Okay.
25          I don't mean to quibble, I

Page 280

```
 1            MEI-LI da SILVA VINT
 2   think, within Defendant's monitoring --
 3   well, let me ask you a question.
 4            Who are Brevet's principals?
 5        A.    Brevet Capital Management?
 6        Q.    Brevet Holdings.
 7        A.    Brevet Holdings' principals?
 8            Doug.
 9        Q.    Without disclosing the content
10   of any legal advice, of course, um, during
11   your tenure at Brevet, and excluding legal
12   advice related to this litigation, after
13   October 14th, 2016, are you aware of Brevet
14   ever seeking legal advice concerning its,
15   um, e-mail monitoring practices?
16        A.    Um, so, October ████, 2016?
17            Um, I mean, we speak generally
18   to Counsel and experts about, um, an
19   external compliance consultants who are
20   considered to have expertise in this space
21   about monitoring e-mails and, so, generally
22   speaking, yes.
23        Q.    Who are the external compliance
24   consultants you are referring to?
25        A.    Um, so, we work with Sipperman
```

Page 281

1              MEI-LI da SILVA VINT

2    and ACA.

3        Q.    And when did you begin working

4    with Sipperman and ACA?

5        A.    So, Sipperman, I am speaking to

6    just -- started before I started.

7              Um, ACA, we worked with from a

8    cyber perspective.

9              I can't tell you the exact

10   date, um, but, shortly after I started and,

11   um, general compliance, external consulting

12   with ACA, um, I think started, um, the

13   process started at the end of 2020, but, I

14   can't recall recall exactly.

15       Q.    Are you aware of having ever

16   received advice from any of the consultants

17   about the accessing of employees' personal

18   computer hardware?

19       A.    I don't think we would -- that

20   is not who we would have spoken to,

21   specifically, about that topic, if we spoke

22   about that topic.

23       Q.    If you spoke about that topic,

24   who would you have spoken about it with?

25       A.    If we spoke about that topic,

Page 282

1              MEI-LI da SILVA VINT
2    it likely would have been more outside
3    counsel.
4         Q.    But, you don't know, as a
5    matter of fact, whether Brevet has ever
6    sought legal advise about whether and under
7    what circumstances it could access an
8    employee's personal device?
9         A.    I --
10             MR. UNDERWOOD:  Do you know the
11        answer to that question?
12             THE WITNESS:  No.
13             Sorry, can I confer with
14        outside counsel for a second?
15             MR. DUMAIN: Sure, if it's about
16        a question of privilege.
17             (Whereupon, an off-the-record
18        discussion was held.)
19         A.    Okay.
20         Q.    Anything else to add or no?
21         A.    No.
22         Q.    I think what should be marked
23    as da Silva Vint Deposition Exhibit 8
24    should now be loaded.
25             (Witness reviews document.)

Page 283

1              MEI-LI da SILVA VINT
2              (Whereupon, Defendant's
3         supplemental responses was marked as
4         da Silva Vint Exhibit 8 for
5         identification as of this date by the
6         Reporter.)
7         A.    Okay.
8         Q.    Is this a document you have
9    seen before?
10             (Witness reviews document.)
11        A.    I can't say that I have
12   specifically reviewed this document,
13   sitting here today.
14        Q.    Okay.
15             Well, if you would turn to Page
16   -- um, 4 of the pdf, and I am going to ask
17   you about a paragraph labeled,
18   "Interrogatory Number 6," and, then, a
19   couple of things in the response,
20   principally, the second full paragraph?
21        A.    All right.
22             Sorry.
23             Page 8, you said?
24             Okay.
25             (Witness reviews document.)

Page 284

```
 1              MEI-LI da SILVA VINT
 2      A.    Okay.
 3      Q.    Does this refresh your
 4  recollection, at all, of ever having seen
 5  this document or no?
 6              (Witness reviews document.)
 7      A.    Um, no.
 8      Q.    Focussing on the second
 9  sentence, of that second paragraph, of the
10  response, sentence begins with, "as a
11  Registered Investment Advisor?"
12      A.    Yes.
13      Q.    It then states, "as a
14  Registered Investment Advisor, regulated by
15  the United States Security and Exchange
16  Commission, Brevet is required to maintain
17  and preserve records relating to its
18  business for a period of at least five
19  years."
20              That is what it says; right?
21      A.    Yes, that is what it says.
22      Q.    Um, is it your understanding
23  that Brevet is required to maintain and
24  preserve all records relating to its
25  business for a period of at least five
```

Page 285

```
 1              MEI-LI da SILVA VINT
 2   years?
 3        A.    So, um, it depends.
 4              You really have to speak -- you
 5   have to look at, specifically, what
 6   documents you're speaking about because
 7   some documents have to be retained
 8   indefinitely.
 9              Um, so there's a time range,
10   depending on the document, that you have to
11   retain documents to, and like I said, if
12   it's related, at all, to anything in the
13   Registered Investment Advisor's business,
14   even if it's like on the loan servicing
15   side, then yes, it falls under the books
16   and records requirements, and it would be
17   subject to those time requirements.
18        Q.    Would this -- for the reasons
19   that you just gave, would this sentence be
20   more accurate if it said:  Brevet is
21   required to maintain and preserve some
22   records relating to its business for a
23   period of at least five years?
24        Q.    No, because I think that you,
25   kind of, cut out -- that looks like it
```

1              MEI-LI da SILVA VINT
2      seems like the maximum that would be
3      required versus the minimum.
4          Q.    There are some records relating
5      to Brevet's business that Brevet is not
6      required to preserve for even five years;
7      is that correct?
8          A.    Um, sitting here today, I would
9      have to look at the specific books and
10     records requirements to answer that
11     question, accurately.
12              MR. DUMAIN:  Evelyn, why don't
13          we mark Tab 24?
14              (Whereupon, 17 CFR Section
15          275.204-2 was marked as da Silva Vint
16          Exhibit 9 for identification as of
17          this date by the Reporter.)
18              MR. UNDERWOOD:  Should we get
19          out of this exhibit?
20              MR. DUMAIN: Um, sure.
21              We will come back to it in a
22          second but --
23          Q.    Okay.
24              So, Deposition Exhibit Number 9
25     should be up.

Page 287

1               MEI-LI da SILVA VINT
2        A.    Okay.
3        Q.    Okay.
4              So, Deposition Exhibit Number 9
5    is 17 CFR Section 275.204-2.
6              (Witness reviews document.)
7        Q.    Titled, this section is, "Books
8    and Records to be maintained by Investment
9    Advisors."
10             Is it your understanding that
11   this is the section of the Code of the
12   Federal Regulations that sets out which
13   categories of documents a Registered
14   Investment Advisor must maintain?
15       A.    That is what it appears to be.
16       Q.    So, um, do you want to take a
17   look and tell me if this refreshes your
18   recollection, as to whether your Registered
19   Investment Advisor is required to retain
20   all records related to its business?
21       A.    Um, so, I am happy to take a
22   look at this.
23             Um, I think that -- what the
24   Registered Investment Advisors Act into the
25   books and records requires you to adhere is

Page 288

```
 1              MEI-LI da SILVA VINT
 2   to keep those for a minimum of that amount
 3   of time.
 4              Like I said before, I think, in
 5   answering a different question, we keep
 6   records potentially for longer periods of
 7   time, or indefinitely, because you don't
 8   necessarily know if it relates to one of
 9   these requirements, um, where you would
10   have to keep them for that minimum amount
11   of time.
12        Q.    I am just trying to understand,
13   and I will rephrase it, the question.
14        A.    Yeah.
15        Q.    Whether this statement, "Brevet
16   is required to maintain and preserve
17   records relating to its business for a
18   period of, at least, five years", means
19   that Brevet is required to maintain and
20   preserve all records relating to its
21   business for a period of at least five
22   years?
23        A.    As it relates to -- it's
24   Registered Investment Advisory business and
25   there's other applicable walls and
```

Page 289

```
 1              MEI-LI da SILVA VINT
 2   regulations that the business might be
 3   involved in that are subject to other
 4   things.
 5        Q.    Where, in this paragraph, does
 6   it say Brevet Registered Investment
 7   Advisory Business?
 8        A.    Every investment, advisory
 9   registered, is required to be registered,
10   so, they can keep true and accurate,
11   currently -- I don't understand your
12   question.
13        Q.    I think you just put a
14   qualifier in front of business.
15              You said, "to its Registered
16   Investment Advisory Business?"
17        A.    You're talking about my
18   response to your previous question?
19        Q.    Yes.
20        A.    So, if one of these things that
21   they -- the Registered Investment Advisor
22   does with another outside business, it
23   relates to the books and records that they
24   had to keep, in order to comply with the
25   regulation.  So, they take a loan and it's
```

Page 290

```
 1              MEI-LI da SILVA VINT
 2   put into one of their funds where they
 3   review it.
 4              They are going to need the
 5   documentation to support that loan.
 6        Q.    Okay.
 7              So, um, your view is that this
 8   is a correct statement of Brevet's
 9   obligations under the registered investment
10   -- under the Investment Advisors Act?
11        A.    This is the regulations that
12   governs the Registered Investment Advisor.
13   I'm not sure what you're trying to say in
14   terms of, is this a correct and accurate
15   statement, with respect to what?
16        Q.    So, I am asking you whether
17   your understanding of the Investment
18   Advisors Act that Brevet is required to
19   maintain and preserve records relating to
20   its business for a period of at least five
21   years?
22        A.    Right, for a minimum period.
23        Q.    That is what, at least, means;
24   right?
25        A.    I don't know.
```

Page 291

1              MEI-LI da SILVA VINT

2              We had a little bit of a

3    discrepancy in terms of interpreting that

4    sentence, so.

5         Q.    I will just try it one more

6    time.

7              I know what, "at least," means

8    and I think you do.

9              The disconnect here and what

10   I'm trying to understand is whether this

11   sentence, your understanding, is that:

12   Brevet is required to maintain and preserve

13   one, some records relating to its business

14   for a period of at least five years or two,

15   all records relating to its business for a

16   period of at least five years?

17        A.    I would say that there's a

18   specific subset that the SEC requires you

19   to preserve for a specific amount of time.

20              And to comply with that

21   regulation, you need to preserve it for, at

22   least, that amount of time.

23        Q.    Okay.

24              So, a more accurate way of

25   stating this would be: Brevet is required

Page 292

1              MEI-LI da SILVA VINT

2    to maintain and preserve a specific subset

3    of records relating to its business for a

4    period of at least five years?

5              MR. UNDERWOOD:  Do you want to

6        go back?

7        A.     Please repeat that.

8        Q.     A more accurate way of stating

9    this would be -- by accurate, I mean,

10   consistent with the Investment Advisors Act

11   -- is Brevet is required to maintain and

12   preserve some records, relating to its

13   business, for a period of at least five

14   years?

15             MR. UNDERWOOD: I am going to

16        object to the form of the question.

17       A.     Yes, but, I don't think this

18   sentence is inaccurate.

19       Q.     The next sentence states,

20   ███████ ████████ ████████ ████

█  ███████ ██ ████████ ██ █████ ██

█  ██████ ██ ████ ██ ███████

█  █████████ █ ██████ ████ ███████ █

█  ████████ ."

25             Do you see that right?

Page 293

1                MEI-LI da SILVA VINT

2                (Witness reviews document.)

3        A.     Yes.

4        Q.     Which of Brevet's compliance

5    policies and procedures are designed to

6    detect breaches of regulatory requirements

7    or Brevet guidelines?

8                MR. UNDERWOOD:   I object to the

9          form of the question.

10       A.     Which policies and procedures?

11              Um, I would say the compliance

12   policies and procedures which requires

13   annual testing of your compliance program.

14   Um, the annual review of that program, um,

15   the -- I would have to look at it, but, the

16   -- the AML policy, um, and then we have a

17   -- currently, have a -- we do a cyber

18   annual review, as well.

19       Q.     Okay.

20       A.     But, again, I think all of our

21   policies and procedures specifically say

22   that the policies and procedures aren't

23   going to capture every instance and there

24   might be things not specifically spelled

25   out in the policies and procedures that we

Page 294

```
 1              MEI-LI da SILVA VINT
 2    do to try and prevent any breach of
 3    regulatory requirements.
 4        Q.    If it's useful, you may want to
 5    consult Exhibit 9, as you think about the
 6    answer to this question.
 7              Um, which of the categories of
 8    documents that are required to be retained
 9    under the registered investment -- the
10    Investment Advisors Act, do you believe
11    could have existed on Mr. Iacovacci's hard
12    drive, without also being resident in a
13    Brevet e-mail?
14              MR. UNDERWOOD:  I object to the
15        form of the question.
16              THE WITNESS:  This is Exhibit
17        9?
18              MR. UNDERWOOD:  It's the --
19        it's the right.
20              THE WITNESS:  So --
21              (Witness reviews document.)
22        A.    There could have been originals
23    over in communication, received, and copies
24    of all written communications sent by Paul,
25    relating to any recommendation made, or
```

Page 295

```
 1              MEI-LI da SILVA VINT
 2   supposed to be made, any advice given with
 3   respect to any receipt, disbursement, or
 4   delivery, or response, or security.
 5              Um, the placing or execution of
 6   any order to purchase, to sell any
 7   security, um, the performance, or rate of
 8   returns of any and all managed accounts, or
 9   securities recommendations, um, anything
10   that he would have been doing that was
11   outside of the e-mail -- the Brevet e-mail
12   server to be quite frank.
13        Q.    Can any of the -- sorry.
14        A.    Go ahead.
15        Q.    Can any of the activities, that
16   you just described, fall remotely within
17   Mr. Iacovacci's responsibility as a sourcer
18   of loans?
19              (Witness reviews document.)
20              MR. UNDERWOOD: I object to the
21        form of the question.
22        A.    Um, I think that he was tasked
23   with sourcing loans that potentially fit
24   the criteria of the funds that were our
25   clients.
```

Page 296

```
 1              MEI-LI da SILVA VINT

 2              I think that was his job.

 3      Q.     Okay.

 4              When did you last speak with

 5   John Tripp?

 6      A.     I can't recall.

 7      Q.     Um, what is Mr. Tripp's

 8   current, um, legal relationship with the

 9   Brevet entities, if you know?

10      A.     Um, sitting here today, I can't

11   tell you what his exact, if any, legal

12   relationship with Brevet is.

13      Q.     Does Mr. Tripp still have a

14   Brevet e-mail account?

15      A.     Sitting here today, I can't

16   tell you if he does or does not. I -- I --

17      Q.     Do you know --

18      A.     Sorry.

19      Q.     I didn't mean to cut you off.

20      A.     I know that he was part of the

21   GP, um, and there was another entity where

22   there was an online period.

23              I am not -- I do not know if he

24   has a Brevet e-mail account, still.

25      Q.     So, you haven't come across Mr.
```

Page 297

```
 1              MEI-LI da SILVA VINT
 2   Tripp's e-mails in your compliance
 3   monitoring program, legally?
 4        A.    Um, sitting here today?
 5              Um, possibly.
 6              Um, he wasn't -- I mean, like,
 7   since I -- since he wasn't separated from
 8   the firm when I started, right, so, um,
 9   there could have been e-mails that I came
10   across.
11        Q.    Okay.
12              We are going to look at Tripp
13   Exhibit 5 and 6, of that.
14              (Witness reviews document.)
15              MR. UNDERWOOD:  We have got 5
16      up now.
17              MR. DUMAIN:  Okay.
18              Let's start with 5.
19        A.    Okay.
20        Q.    Is this an e-mail exchange that
21   you recognize?
22              (Witness reviews document.)
23        A.    Sitting here today, no.
24              But, it looks like it's an
25   e-mail between myself and John Tripp.
```

```
 1              MEI-LI da SILVA VINT
 2       Q.     So, if you scroll to the very
 3  bottom.
 4              (Witness complies.)
 5       Q.     Of the pdf, there is an e-mail
 6  dated April 18th, 2017?
 7       A.     Okay.
 8       Q.     "Per our conversations, is the
 9  attached, is the Separation Agreement."
10              Do you see that?
11              (Witness reviews document.)
12       A.     Yes.
13       Q.     Do you remember any
14  conversations, with Mr. Tripp, about a
15  Separation Agreement?
16       A.     Um, yes, I remember
17  conversations about a Separation Agreement.
18       Q.     Do you remember anything more
19  than that?
20       A.     What are you asking?
21       Q.     Um, do you remember the
22  substance of the conversations with Mr.
23  Tripp around the Separation Agreement?
24       A.     You have to be more specific.
25       Q.     Do you remember anything Mr.
```

Page 299

1        MEI-LI da SILVA VINT

2   Tripp said to you in connection with the

3   separation from Brevet?

4        A.    Do I remember anything John

5   said specifically?

6        Q.    Yes.

7        A.    No.

8        Q.    Do you remember, generally, the

9   substance of your conversations around the

10  Separation Agreement?

11       A.    ███ ████ ████ ████ █ ██████

█████ █████ ████ ████ ███ ████ ███ ██ █████

███ ████ ████ ████ ██ ████ ███████ █████

███ █████ █ ████████ ████ ████ ████ █

███ █████ █████ ████ █████ ████ ████ █████

███ ███ ███ █████ ████

17       Q.    ███ ████ █ ████ ████ █████

███ █████ █ █████ █████ ████ ████ █████

███ ███ ███ █ █████ ████ ████ █████

20            MR. UNDERWOOD:   Object to the

21       form of the question.

22       Q.    If he told you.

23       A.    Um, I can't describe or speak

24  to what he thought.

25            █ ████ ████ █████ █████

1          MEI-LI da SILVA VINT

2

6      Q.

10              MR. UNDERWOOD:  I will object

11       to the form of the question.

12      A.    There was negotiation with

13   someone who was at the firm.

14              I mean, some of these

15   deliberations are negotiations.

16      Q.    What were the other issues in

17   the negotiation with Mr. Tripp, if you

18   recall?

19      A.    I don't recall there being

20   issues, sitting here today.

21      Q.    Okay.

22              So, if you scroll up in the

23   chain, you will see later on April of 2017,

24   Mr. Tripp says, "we can discuss Monday,"

25   right?

1              MEI-LI da SILVA VINT

2              (Witness reviews document.)

3      A.    Um, yes.

4      Q.    Okay. If you continue to -- to

5   scroll up there is some back and forth,

6   and, ultimately, on May 23rd, 2017, you

7   send an e-mail saying, "updated separation

8   letter attached here to."

9              Do you see that?

10             (Witness reviews document.)

11     A.    Yes.

12     Q.    Do you have any recollection of

13  what happened in the more than one month

14  between April 18th and May 23rd, 2017, in

15  connection with this negotiation?

16     A.    I do not remember anything

17  specifically with respect to this

18  negotiation.

19             I do remember there -- that

20  being audit season, but, can't recall

21  anything specific to this negotiation.

22     Q.    Do you recall what Mr. Tripp's

23  status, at Brevet, was between April 18th

24  and May 23rd, 2017?

25             (Witness reviews document.)

Page 302

```
 1            MEI-LI da SILVA VINT
 2      A.    Um, sorry.
 3            What do you mean by "status, at
 4   Brevet, was between"?
 5      Q.    Sure.
 6            His employment status with the
 7   -- whatever Brevet entity he was employed
 8   by at the time?
 9      A.    Um, I can't speak to,
10   specifically, what his status was, without
11   seeing his records.
12      Q.    Okay. If you scroll up to the
13   very top, you see an e-mail from you to
14   John saying:  "Attached, for your
15   reference, is the fully-executed separation
16   letter;" right?
17            (Witness reviews document.)
18      A.    Yes.
19      Q.    Take a look at Tripp 2006 --
20   Tripp 06 please. Tripp Exhibit 6.
21            (Witness complies.)
22      A.    Yes.
23      Q.    Do you recognize this document?
24            (Witness reviews document.)
25      A.    I can tell you that it looks
```

```
                                              Page 303
 1                MEI-LI da SILVA VINT
 2   like an agreement or something addressed to
 3   Mr. Tripp.
 4        Q.    And so, you see it's dated "May
 5   25, 2017;" correct?
 6              (Witness reviews document.)
 7        A.    That is what it looks like it's
 8   dated, yes.
 9        Q.    Just before -- before we move
10   on:  If you can just scroll to the very
11   bottom.
12              (Witness complies.)
13        Q.    Who signed this document, on
14   Brevet's behalf?
15              (Witness reviews document.)
16        A.    It looks like this -- this
17   looks like this was signed by Doug.  But I
18   actually can't tell.
19        Q.    That was not your signature?
20        A.    No.  It's definitely not my
21   signature.
22        Q.    Were you involved in the
23   negotiations with the agreement?
24        A.    To the best of my recollection,
25   I was involved in, um, updating and
```

1              MEI-LI da SILVA VINT

2    drafting this agreement.

3         Q.    So, we are looking at the date,

4    it says "May 25th, 2017."

5              The first sentence says:   "████

██ ████████ ████ ████ ████████ ████ ███

██ █████ ██████ █ ███ ████████████ ████ █

██ ██ ████ █████ ████

9              Do you see that?

10             (Witness reviews document.)

11        A.    Yes.  I do see that.

12        Q.    Can you explain why the

13   effective date of termination was backdated

14   to ████████ ███?

15        A.    Sitting here today, I can't

16   explain to you why.

17        Q.    Have you been -- worked on

18   other Separation Agreements in the past?

19        A.    Yes, I have.

20        Q.    Is it -- have -- have you ever

21   had any other experience where there will

22   be effective date of a termination that is

23   earlier in time than the actual execution

24   of a Separation Agreement?

25        A.    Um, I can't say that I

1              MEI-LI da SILVA VINT

2    specifically recall any but I wouldn't be

3    surprised if there were.

4         Q.    Why?

5         A.    Because legal documents have

6    effective dates all the time that predate

7    when they were actually executed.

8         Q.    Do you know when Mr. Tripp and

9    Brevet or its principals, senior

10   executives, started discussing Mr. Tripp's

11   departure from the firm?

12        A.    I can't say that I personally

13   know when that discussion began.

14        Q.    Do you recall if it was before

15   or after you joined Brevet?

16        A.    I can't say that I know.

17        Q.    Do you know if Mr. Tripp gave

18   notice of his intent to leave Brevet and

19   then, in the intervening time period, the

20   terms of his separation were negotiated?

21        A.    I don't have personal knowledge

22   of that.

23        Q.    Would that be consistent with

24   the dates in this document?

25              MR. UNDERWOOD:  Objection to

Page 306

```
 1              MEI-LI da SILVA VINT
 2         the form of the question.
 3        A.    I don't have personal knowledge
 4   of when he gave notice or intent or had
 5   conversations.
 6        Q.    Do you see the third sentence
 7   of the first paragraph?
 8              (Witness reviews document.)
 9        A.    Yes.
10        Q.    States that:   Nothing
11   withstanding --
12              MR. DUMAIN:   Sorry.
13              Strike that.
14        Q.    A sentence states:
15   ████████████████ ████████ ███ ████████
    ████████████ ████ █████ ██ ██ █████
    ████████ █████████ ██████ ████████ ██████
    ████████████ █ ███████ ████████ ██ ██
    ██████ ██████ ██████ █████████ █████
    ███ ███████ ████████ ██ ██████ █████
    ████████ ████████ ████████ ██ ████ ██████
    ████████ █████████ ██████ ██████ █████████
    ████ ██████ ████████ ████████ ███████
24              Do you see that?
25              (Witness reviews document.)
```

Page 307

```
1              MEI-LI da SILVA VINT
2         A.    Yes. Yes, I see that.
3         Q.    Do you recall how this language
4    wound up in this agreement?
5              (Witness reviews document.)
6         A.    I do not specifically recall
7    how this language ended up in this
8    agreement.
9         Q.    Do you recall any discussion
10   whatsoever around this time period about
11   whether Mr. Tripp's interest in these LLC's
12   would be affected by his retirement from
13   Brevet Holdings?
14        A.    I don't recall discussions but
15   the language clearly separates the two.
16        Q.    Is Brevet Capital Partners 3 an
17   entity that you are familiar with?
18        A.    I am not intimately familiar
19   with Brevet Capital Partners 3.
20        Q.    What do you know about it?
21        A.    Sitting here today, I can't
22   speak with any conviction about anything
23   related to it.
24        Q.    And how about Brevet Holdings,
25   LLC, do you know anything about that?
```

Page 308

1          MEI-LI da SILVA VINT

2     A.    I can't -- sitting here today,

3 I can't provide information about Brevet

4 Capital Partners, LLC.

5     Q.    Do you know if Brevet insisted

6 on an ink-signed original of the Letter

7 Agreement?

8     A.    I do not know why it insisted

9 on an ink-signed original.

10     Q.    Do you know why the payment for

11 computer equipment is 33 --

12          MR. DUMAIN:  Excuse me.

13     Q.    ██████████  and not the ████████

14 that was contemplated in the original

15 e-mail exchange?

16     A.    Sitting here today, I can't

17 tell you specifically why that changed.

18          To the best of my knowledge, I

19 actually, vaguely recall he was ████████ █

██ ████████████ ████████ ██ ████ ██ ████████

██ ████████

22     Q.    ████ ██████ ██████ ██████ ██ ██████

██ ██████ ██ ████ ████████

24     A.    No.

25          I did not say that.

Page 309

```
 1              MEI-LI da SILVA VINT
 2         I said the -- ████████  ████████████
 3    Q.   ███  ███████  █████████████  ███████████████  ██
██  █████ ████ █ ████████████ ████████
 5    A.   █ █████████████ █ ███ ████████████ █ ████████
██  ███████████ █ ████████ █████████ █ ██████ █ ████████████████
██  ██ ███████████ ████████████ █████████ █ ██ ██████████
██  ████████ █████████ █ ███████ █ ██ ██████████ ██ █ ████
██  ████████████ █████████ █████████ █████████
10    Q.   Got it.
11         Do  you  know  why  there  was  a
12    "████████████  ████  ████████  ██████████" stamp on
13    the bottom of the first page?
14              (Witness reviews document.)
15    A.   Sitting here today, that was a
16    mistake, in terms to the header/footer was
17    not updated with the appropriate mark.
18    Q.   Was it Brevet's practice to
19    claim copyright protection over documents
20    like these?
21              (Witness reviews document.)
22    A.   Right.
23         And I note that it says "██████
24    after the first page.
25    Q.   Yeah.  I wonder which is right.
```

Page 310

```
 1              MEI-LI da SILVA VINT
 2      A.    I don't "wonder" but --
 3              THE WITNESS:  Can I take a
 4        quick five-minute break?
 5              MR. DUMAIN:  We can take a long
 6        five-minute break.
 7              THE VIDEOGRAPHER:  The time is
 8        3:58 P.M.
 9              We are off the record.
10              (Whereupon, a short recess was
11        taken.)
12              THE VIDEOGRAPHER: The time is
13        4:04 P.M.
14              And we are back on the record.
15      Q.    Ms. da Silva Vint, we've now
16   marked a document ending in Bates Number
17   17096.
18              If you can take a look.
19              (Witness complies.)
20              (Whereupon, e-mail to Johnny
21        Lan was marked as da Silva Vint
22        Exhibit 10 for identification as of
23        this date by the Reporter.)
24              MR. UNDERWOOD:  What exhibit
25        number is that?
```

Page 311

1              MEI-LI da SILVA VINT
2              MR. DUMAIN: I will tell you
3         immediately. I think it is 10.
4              Let me confirm.
5              (Whereupon, a short recess was
6         taken.)
7              MR. DUMAIN:  Yep:  10.
8              MR. UNDERWOOD:  I am
9         refreshing.  Sorry.
10              MR. DUMAIN:  No problem.
11              (Whereupon, a short recess was
12         taken.)
13              MR. UNDERWOOD:  Okay. It's up.
14    Q.    Ms. da Silva Vint, when you
15   have had an opportunity to review the
16   document, please let me know. That would be
17   great.
18              (Witness reviews document.)
19    A.    Yes.  I can see it.
20              MR. UNDERWOOD:  Sorry about
21         that.
22    A.    Yes.
23              MR. DUMAIN:  Excuse me?
24              THE WITNESS:  Sorry.  There was
25         a message that Colin wasn't on

Page 312

```
 1              MEI-LI da SILVA VINT
 2       screen, so --
 3       A.    I see the exhibit.
 4       Q.    You see Mr. Lan's e-mail to you
 5  at the bottom of the chain?
 6              (Witness reviews document.)
 7       A.    Yes.
 8       Q.    What does "BPA" mean in the
 9  context of this e-mail?
10              (Witness reviews document.)
11       A.    BPA is Boston Purported
12  Advisors.
13              They serve -- they serve as the
14  Loan Administrator, Loan Servicer, for
15  certain Brevet funds assets.
16       Q.    What does a Loan Administrator
17  do?
18       A.    So, a Loan Servicer
19  Administrator, they ensure that borrowers
20  are adhering to their covenants. They are
21  tracking compliance with that, they're --
22  they are tracking cash coming in and out of
23  bank accounts, with respect to those loan
24  documents, and then, they also assist in
25  terms of -- from an evaluation perspective,
```

Page 313

1           MEI-LI da SILVA VINT
2    keeping track of the models that are
3    related to those assets, in conjunction
4    with the Valuation Committee.
5           Q.    With borrowers --
6                 MR. DUMAIN:  Strike that.
7           Q.    The loans that were
8    administrated by BPA, did the borrowers
9    interact with BPA and not Brevet?
10          A.    And so, typically, when you say
11   Brevet, let's be specific, they interacted
12   with BPA and, from time to time, also
13   would, um, people in working on Risk
14   Management, under FCS.
15          Q.    Was Brevet entitled to obtain
16   access to BPA's systems, to ensure that it
17   kept records relating to the loans that it
18   had originated and that were in its
19   portfolio?
20          A.    BPA didn't originate loans.
21                These were our loans and they
22   are a third-party servicer.
23          Q.    Correct.
24                That's -- sorry if I didn't
25   include that.  That is what I was asking.

Page 314

```
1              MEI-LI da SILVA VINT
2   When I said "they," I meant that Brevet had
3   originated.
4              So, let me ask it again:  Did
5   Brevet have access to BPA's system to
6   ensure that it had sufficient records
7   relating to the loans that it, Brevet, had
8   originated?
9        A.    Um, I can't sit here today and
10  speak to whether we had access to their
11  system, specifically, in order to complete
12  true and accurate copy of any records.
13       Q.    Did Brevet have access to all
14  loan-servicing documents, in connection
15  with the loans that it, Brevet, had
16  originated and BPA serviced?
17       A.    I don't know what
18  "loans-servicing documents" means.
19             And I don't -- like I can't
20  specifically answer your question, sitting
21  here today, with -- with my knowledge.
22             I know we originate loans,
23  there are servicing guidelines, BPA tracks,
24  um, compliance with those loan covenants,
25  watches bank account, money movement, they
```

Page 315

```
 1              MEI-LI da SILVA VINT
 2   don't have access to, like, take money in
 3   and out and then to get access to keep
 4   money from coming in and out and then,
 5   reporting to Brevet, if there is
 6   non-compliance with some of those
 7   covenants.
 8              I am trying to figure out what
 9   you -- what -- beyond that, what you're
10   asking.
11        Q.    If a borrower --
12              MR. DUMAIN:  Withdrawn.
13        Q.    If the borrower needed
14   forbearance from making a loan payment for
15   a loan that Brevet originated and BPA had
16   serviced, would the borrower write to BPA
17   or to Brevet?
18        A.    This is not the area that I am
19   involved in intimately.
20              So, Mark Callahan would be best
21   to answer that question.
22              Um, just speaking, though, like
23   loan documents, typically, would not have
24   BPA is not listed, a Brevet entity,
25   typically, SCS, as to where those need to
```

Page 316

1              MEI-LI da SILVA VINT

2    go.

3        Q.    Payments would be collected by

4    BPA or Brevet?

5        A.    It would go into a bank --

6    typically, it goes into a Brevet-controlled

7    bank account.

8              So, I don't know what you mean

9    by "collected."

10       Q.    Well, so -- what function did

11   BPA serve, as the loan servicer to these

12   Brevet-originated loans?

13       A.    Again, it goes to the covenant.

14   So, covenants go from loan documentation to

15   loan document.

16             You might have financial

17   reports or certain things that you have to

18   provide on an "X" basis, interest payments

19   that have to be made on "X" basis, then

20   they are watching cash moving in and out,

21   and then, releasing their -- beginning to

22   release of wires, and if there is

23   non-covenant tracking or trust -- covenants

24   that are non-tracking, they would report

25   back to the Risk Team.

Page 317

1              MEI-LI da SILVA VINT
2      Q.      When you say that they are
3  reporting covenants, if the borrower had
4  reported covenant, would it make its
5  financial reports to BPA or to Brevet?
6      A.      I don't speak to specifically
7  that -- that question.
8              I think it varies from loan to
9  loan and it is not my area of coverage, in
10  terms of what borrowers are doing.
11             It's more of a Risk Management
12  coverage.
13      Q.      Fair enough.
14             But are you able to say what
15  access rights, if any, Brevet had to BPA
16  documents relating to Brevet-originated
17  loans?
18      A.      I don't remember the
19  relationship with BPA.
20             We can -- we have all of our
21  original loan documentation.  We oversee
22  the bank accounts.
23             If you're talking about
24  BPA-specific reports and loans, I can't --
25  sitting here today, I can't speak to you

Page 318

1               MEI-LI da SILVA VINT
2    where the B -- the BPA reports go.
3         Q.    You don't think Brevet had
4    access to BPA file servers, though, to
5    download documents at its discretion, do
6    you?
7               MR. UNDERWOOD:  Object to the
8          form of the question.
9         A.    I can't speak -- I can't answer
10   that question.
11              I don't know.
12        Q.    Okay. So, looking back at this
13   e-mail.
14              (Witness complies.)
15        Q.    Did there come a time that
16   Brevet cut off BPA's BPN access to Brevet's
17   file server?
18              THE COURT REPORTER:  I -- I
19         couldn't hear you.
20              Cut off BPA's what?
21              MR. DUMAIN:  BPN access to
22         Brevet's file server.
23        A.    It appears from this e-mail
24   that we did.
25        Q.    Do you have any independant

Page 319

                    MEI-LI da SILVA VINT

1                   MEI-LI da SILVA VINT

2    recollection of this event?

3         A.    I do not, sitting here today.

4         Q.    Okay.

5               MR. DUMAIN:  We are now going

6          to look at what will be deposition

7          Exhibit 11, Evelyn.  It's our Tab 17.

8               If it's not loaded up already

9          and next, we are going to do 21, so

10         we can be prepared.

11              (Whereupon, e-mail to Mei-Li da

12         Silva Vint was marked as da Silva

13         Vint Exhibit 11 for identification as

14         of this date by the Reporter.)

15        A.    Yeah. There is an e-mail from

16   Johnny.

17              Is that what we are looking at?

18        Q.    May 1st, 2017, an e-mail from

19   Johnny Lan?

20              (Witness reviews document.)

21        A.    Correct.

22        Q.    Do you recognize this e-mail on

23   the screen?

24              (Witness reviews document.)

25        A.    Not from my own memory.

Page 320

```
 1              MEI-LI da SILVA VINT
 2      Q.    Right.
 3             So, the beginning of the
 4  e-mail, Mr. Lan writes:  "Maybe, pier --
 5  per our discussion, here are the main point
 6  on Citrix remote for compliance to use in
 7  its official proposal to Senior
 8  Management."
 9             Is that what it says?
10             (Witness reviews document.)
11      A.    Yes.
12             That is what it says.
13      Q.    Do you remember in or around
14  May of 2017 making a proposal to Senior
15  Management about remote access to Brevet's
16  systems?
17      A.    I don't remember, specifically,
18  around this time period making this
19  proposal or even specifically making the
20  proposal.
21      Q.    Do you remember ever making the
22  proposal to Senior Management about remote
23  access to Brevet systems?
24      A.    I remember making or having a
25  discussion around moving to a different
```

Page 321

```
 1              MEI-LI da SILVA VINT
 2   type of access for Brevet.
 3        Q.    "Different types" from what?
 4        A.    So, for "log me in," for
 5   example, which was not a -- it was
 6   difficult -- it was not consistent in terms
 7   if you tried to use "log me in" from home,
 8   to get into your Brevet e -- desktop or e
 9   -- um, server, it wouldn't always connect.
10              And so, you would have to wait
11   -- you might have to go back to the office
12   to get work done.  So, it was just a more
13   consistent network to load into the Brevet
14   system.
15        Q.    Did Brevet, ultimately, shift
16   to a Citrix system?
17        A.    We do not use Citrix.
18        Q.    Do you recall what Brevet
19   transitioned to, when it decided that "log
20   me in" was not a good solution?
21        A.    I can't --
22              MR. UNDERWOOD:  I object to the
23         form of the question.
24              THE WITNESS:  Sorry.
25        A.    I -- I don't remember, sitting
```

Page 322

1              MEI-LI da SILVA VINT

2    here at this time.

3         Q.    Looking at the fourth full

4    paragraph of the e-mail, it begins:  "Data

5    Loss Prevention."

6              Do you see that?

7              (Witness reviews document.)

8         A.    Yes.

9         Q.    Do you recall Brevet having any

10   concern about mass copying of files to

11   local machines?

12        A.    I don't remember there being a

13   specific concern at this time.

14        Q.    Okay. We will look now as what

15   has been marked as deposition Exhibit 21.

16              (Witness complies.)

17              MR. UNDERWOOD:  Sorry?

18              MR. DUMAIN:  Deposition Exhibit

19        12.

20              That is our internal 21.

21              Sorry.

22              (Whereupon, e-mail from Johnny

23        Lan from 6/13/17 was marked as da

24        Silva Vint Exhibit 12 for

25              identification as of this date by the

Page 323

```
 1              MEI-LI da SILVA VINT
 2         Reporter.)
 3      A.    Okay.
 4            E-mail from Johnny, again?
 5      Q.    Yeah.
 6            So, this is an e-mail from Mr.
 7  Lan that -- with a bunch of attachments.
 8            Do you see that?
 9            (Witness reviews document.)
10      A.    Yes.
11      Q.    Okay.
12            And if you can look at the
13  second page of the pdf.
14            (Witness complies.)
15      A.    Okay.
16      Q.    Do you see this is a memo from
17  compliance to technology to Senior
18  Management?
19            (Witness reviews document.)
20      A.    Yes.
21      Q.    Compliance, at that time,
22  included yourself; is that right?
23            (Witness reviews document.)
24      A.    Yes.
25      Q.    Okay. And the subject line of
```

1            MEI-LI da SILVA VINT

2    this memo is:  Remote access system

3    proposal, Citrix, xen app?

4        A.    Correct.

5              MR. DUMAIN:  Xen, with an "X."

6        Q.    And then, in "project

7    background and description," there is the

8    paragraph that reads:  "The firm's remote

9    access systems are currently comprised of

10   pulse screen, BPM, web portal and 'log me

11   in.' While convenient to use, these three

12   systems have certain technical and

13   compliance issues and thus, we began the

14   search for a remote access system that

15   mitigates the issues further into the

16   current system."

17              Do you see that?

18              (Witness reviews document.)

19       A.    Yes.

20       Q.    What were the compliance issues

21   relating to one or more of these systems

22   that you see in this paragraph?

23              (Witness reviews document.)

24       A.    Sorry.  Sitting here today, I

25   can't recall what that sentence refers to.

Page 325

```
1              MEI-LI da SILVA VINT
2       Q.    Do you know what pulse screen
3   VPN was?
4              MR. UNDERWOOD:  Sorry.  It's
5        pulse secure VPN.
6              MR. DUMAIN:  Oh.
7              Thank you for the
8        clarification.
9              Pulse secure VPN.
10      A.    I think it was VPN network that
11  we used.
12      Q.    What is a VPN?
13      A.    I am not the right person to
14  answer that question.
15      Q.    Okay.  Do you know if it stands
16  for Virtual Private Network?
17      A.    It could.
18            Sounds like an acronym that has
19  "VPN" in it.
20      Q.    Yeah.  Well, I mean I thought
21  maybe that might have refreshed your
22  recollection.
23            I am not trying to tell you.
24      A.    No.
25      Q.    Do you know the web portal,
```

Page 326

```
 1              MEI-LI da SILVA VINT
 2   what that refers to?
 3        A.    I do not know what that refers
 4   to.
 5        Q.    Okay.  We discussed "log me in"
 6   before; right?
 7        A.    Correct.
 8        Q.    Do you know what that is?
 9        A.    Yes.
10        Q.    If you scroll down to paragraph
11   -- numerated paragraph Section 4 entitled
12   "Selection Process"?
13              (Witness reviews document.)
14        A.    Yes.
15        Q.    Again, there is another
16   reference to "data loss prevention"?
17              (Witness reviews document.)
18        A.    Correct.
19        Q.    And it also says:  "This helps
20   prevent mass copying of Brevet files to the
21   local machines"?
22              (Witness reviews document.)
23        A.    Yes.  I see that.
24        Q.    At this time, June 12, 2017,
25   were you making Senior Management -- making
```

Page 327

1              MEI-LI da SILVA VINT
2    a proposal to Senior Management, to change
3    Brevet's remote access systems, in part, to
4    prevent copying of documents?
5         A.    It appears that is what this
6    document says.
7         Q.    Do you have any recollection of
8    that?
9         A.    I do not have any specific type
10   of recollection of that, sitting here
11   today.
12        Q.    Okay.
13              MR. DUMAIN:  We will now take a
14         look at da Silva Vint Deposition
15         Exhibit 13.
16              It's an e-mail ending with the
17         Bates range 11968.
18              (Whereupon, e-mail from Johnny
19         Lan 8/17/17 was marked as da Silva
20         Vint Exhibit 13 for identification as
21         of this date by the Reporter.)
22              (Witness complies.)
23              MR. DUMAIN:  Do you see it or
24         no?
25              MR. UNDERWOOD:  Not yet.

```
 1              MEI-LI da SILVA VINT
 2              (Witness reviews document.)
 3         A.   I see an e-mail from Johnny
 4    again.
 5         Q.   Um, you understand, reading
 6    this e-mail, from context, what VPM access
 7    means or still you don't?
 8         A.   Um, I'm guessing it is the
 9    Virtual Private Network.
10         Q.   Okay. Does this e-mail refresh
11    your recollection, at all, about the
12    elimination of VPN access or to the Brevet
13    network, in or around August of 2017?
14              (Witness reviews document.)
15         A.   No.
16         Q.   Do you know why --
17              MR. DUMAIN:  Well, backing up:
18         Q.   You see reference to Doug,
19    under "New York Team"?
20              (Witness reviews document.)
21         A.   Yes, I do.
22         Q.   Do you understand that that is
23    a reference to Doug Monticciolo?
24         A.   Yes, it is.
25         Q.   Do you have any recollection as
```

```
 1              MEI-LI da SILVA VINT
 2     to why Mr. Monticciolo would have been
 3     excluded from the policy of eliminating VPN
 4     access to the Brevet network?
 5          A.    Sitting here today, no. I don't
 6     know why.
 7          Q.    Is Mr. Monticciolo typically
 8     excluded from the application of policies
 9     that apply to others?
10              MR. UNDERWOOD:   Object to the
11           form of the question.
12          A.    Sitting here today, not to my
13     knowledge.
14          Q.    Can you think of any other
15     policies to which Mr. Monticciolo is
16     excluded? Policies of general possibility
17     of Brevet?
18          A.    Sitting here today?  No.
19              MR. DUMAIN:  We are going to
20           look at da Silva Vint deposition
21           Exhibit Number 14, which is a
22           document ending with the Bates Number
23           19585.
24              (Witness complies.)
25              (Whereupon, e-mail from Johnny
```

Page 330

```
 1              MEI-LI da SILVA VINT
 2        Lan with the subject:  Technology
 3        Transition was marked as Exhibit 14
 4        for identification as of this date by
 5        the Reporter.)
 6    A.    Okay.
 7              MR. DUMAIN:  Thank you.
 8    Q.    Do you recognize this document?
 9              (Witness reviews document?)
10    A.    So, to start, is it an e-mail
11  from Johnny Lan, dated 10/20/2017?
12    Q.    That's what it should be.
13    A.    I don't recognize this, without
14  seeing it here.
15    Q.    You see the subject line:
16  "Technology Transition"?
17              (Witness reviews document.)
18    A.    Yes.
19    Q.    Do you remember, at some point,
20  a transition responsibilities from Mr. Lan
21  to other people and entities?
22    A.    Um, so sitting here today, I
23  don't remember specifics.  I remember we
24  were going to be moving away from Gravitas,
25  which is our out-sourced -- out-source IT
```

Page 331

1              MEI-LI da SILVA VINT
2    provider and for getting, kind of, just a
3    general manage service provider, to provide
4    backup and assistance and support to the IT
5    function in Brevet.
6         Q.    What was the impetus of that
7    change, if you can recall?
8         A.    So, from what I can recall
9    specific -- right now, sitting here today,
10   with respect to Gravitas, I think when they
11   were onboarded originally, which predates
12   me, they were a different company.
13             They were required, at some
14   point, and service coverage dropped off,
15   and it wasn't as good as it used to be.
16             And so, we were on the market
17   to find an our-source IT provider separate
18   from Gravitas.
19             And in terms of a manage
20   service provider, having someone internal,
21   without that support, one person? From a
22   compliance perspective, was not the best
23   for business continuity reasons.
24        Q.    Do you see the final paragraph
25   of this e-mail?

Page 332

```
 1              MEI-LI da SILVA VINT
 2              (Witness reviews document.)
 3      A.    Yes.
 4      Q.    Do you understand the reference
 5   that Mr. Lan is making to papering and
 6   executing his Separation Agreement?
 7              (Witness reviews document.)
 8      A.    I understand what is written
 9   here.  I can't say I speak to the specific
10   reference, sitting here today.
11      Q.    Do you know if Mr. Lan,
12   ultimately, entered into a Separation
13   Agreement with Brevet Capital?
14      A.    Sitting here today, I can't say
15   with certainty that he did. I believe he
16   did but I can't say for certainty if he
17   did.
18      Q.    Do you know whether Mr. Lan is
19   an employee of Brevet Capital today?
20      A.    He is a consultant. He is a
21   consultant for Brevet.
22      Q.    So, he is an employee of an
23   entity that contracts with Brevet?
24      A.    Um, I don't know if he is an
25   employee.  I -- we have an LLC or something
```

Page 333

```
 1              MEI-LI da SILVA VINT
 2   that is a consultant that Johnny is a part
 3   of or owns.
 4       Q.    Okay.  And Brevet,
 5   nevertheless, holds Mr. Lan out as the Head
 6   of Technology at Brevet?
 7              MR. UNDERWOOD:  Objection.
 8       A.    I am not sure what you mean by
 9   "holds him out."
10       Q.    Are you aware that Mr. Lan had
11   submitted an affidavit in this case, in
12   September, in which he identifies himself
13   as the Head of Technology at Brevet
14   Capital?
15       A.    Yes.
16              He is in the -- he is the Head
17   of Technology at Brevet Capital.
18       Q.    That is his title?
19       A.    I don't know if he has a
20   specific title that is documented anywhere.
21              I would say that his role -- he
22   is the Head of Technology at Brevet.
23       Q.    All right. So, if in his
24   affidavit, he uses the phrase Head of
25   Technology --
```

Page 334

```
 1              MEI-LI da SILVA VINT
 2              MR. DUMAIN:  Capital H, Head,
 3         capital T, Technology.
 4       Q.    -- that is not his actual
 5   title?
 6       A.    I am not going to dispute.  I
 7   mean it -- it's -- it's not defined
 8   anywhere. Is that what you're saying?
 9              I don't think Mark, as
10   President, is defined anywhere and neither
11   is Doug, as founder and CEO.
12              But they are, in fact, those
13   functions.
14       Q.    Do you understand what he meant
15   here, by "while we still have Mei-Li?"
16       A.    What is the date of this
17   document?
18              (Witness reviews document.)
19       A.    I actually had a son on
20   November 21, 2017.
21              So, likely, I would sit here
22   today and say that is most-likely related
23   to that.
24       Q.    Sounds like a good guess.
25              Does Brevet provide you with
```

```
                                           Page 335
 1              MEI-LI da SILVA VINT
 2    any electronic devices for work purposes?
 3         A.     Yes.
 4         Q.     What devices?
 5         A.     I have many Brevet devices; I
 6    have a desktop at the office --
 7              THE COURT REPORTER:  Hold on a
 8         second.  Hold on.  Hold on.
 9         Hello?
10              (Whereupon, technical
11         difficulties disconnected connection
12         to the Zoom meeting.)
13              (Whereupon, a short recess was
14         taken.)
15         A.     I have a desktop at the office.
16    I have a laptop at the office.  I have a
17    Brevet iPad.  I have a Brevet phone.  I
18    have a laptop.  A Brevet laptop at home.
19    And I have a Brevet desktop at home.
20              (Whereupon, a short recess was
21         taken.)
22         Q.     I just want to make sure I got
23    all of that.
24              So, you have a desktop and a
25    laptop at at home?
```

Page 336

1              MEI-LI da SILVA VINT
2      A.     Yeah.
3              I have two laptops.  Sometimes
4  both laptops are at home, sometimes, one is
5  at the office and one is at home.
6      Q.     And you have an iPhone and an
7  iPad?
8      A.     Yes.
9      Q.     Does each of these --
10             THE WITNESS:  Sorry.
11     A.     And a desktop at the office.
12             MR. UNDERWOOD:  Anything else?
13             MR. DUMAIN:  Yes.
14     Q.     Each of those device have a
15  separate purpose?
16     A.     Um, they are provided for me to
17  use, with respect to Brevet activities, as
18  convenient.
19             So, they are to conduct Brevet
20  activity.
21             I have two laptops because
22  during the pandemic, I go through laptops
23  pretty quickly, in terms of they die
24  quickly.  So, one's, kind of, just a backup
25  and I am in conference rooms a lot and I

Page 337

```
 1              MEI-LI da SILVA VINT
 2   can't be sitting in front of my desk.
 3   Sometimes, a laptop is not appropriate for
 4   a meeting, so it's an iPad, so for an
 5   e-mail --
 6              So, yeah, theoretically,
 7   there's different purposes for the number
 8   of devices that I have.
 9        Q.    And when you say that the
10   laptop dies frequently, do you mean they
11   run out of batteries or you just wear them
12   out?
13        A.    I wear them out.
14        Q.    And what happens when you wear
15   out a Brevet laptop?
16        A.    I return it to Johnny and he
17   usually sends it back to Microsoft.
18              Or if it's something that he
19   can fix, he will repurpose it for another
20   employee, internally.
21        Q.    How many laptops would you say
22   you have gone through, since you came to
23   Brevet, in 2017?
24        A.    Sitting here today, I can't
25   tell you the exact amount.  But maybe,
```

Page 338

```
 1              MEI-LI da SILVA VINT
 2   like, eight, nine.
 3        Q.    In addition to your
 4   Brevet-provided iPhone, do you also have a
 5   personal iPhone?
 6        A.    I do, yes.
 7        Q.    Do you carry both of them with
 8   you all the time?
 9        A.    Yes, I do.
10        Q.    Why?
11        A.    Why do I have several devices?
12        Q.    Yes.
13        A.    I've always had separate
14   devices everywhere I have worked.
15              For the reasons that's laid out
16   in our employee handbook, at least, as a
17   first step, I don't expect to be doing and
18   will not be doing any Brevet business on my
19   personal device.  And so, I have a level of
20   expectation for privacy, not doing Brevet
21   business -- related business on my personal
22   device.
23              So, it's been separate, in the
24   hopes that the private device will not be
25   active because I am not doing
```

Page 339

1               MEI-LI da SILVA VINT
2    business-related activity on it.
3          Q.    I just want to make sure I
4    understand that:  You keep a separate
5    personal device to ensure that Brevet won't
6    be able to access your personal files and
7    e-mails?
8          A.    That is not what I said.
9                I said:  I don't do Brevet
10   business on it.  So, I have an expectation
11   of privacy, to a certainly extent, on a
12   Brevet device, other than my personal
13   device.
14               THE WITNESS:  Sorry.
15         A.    I keep a Brevet phone so that I
16   conduct other Brevet business on the phone.
17               And to the extent, like you saw
18   the employee handbook, I have an
19   expectation of privacy on my personal
20   device because there's no Brevet business
21   going on on it.
22         Q.    What apps do you have on your
23   Brevet iPhone?
24         A.    Apps?
25               I would have to look but it's

Page 340

1          MEI-LI da SILVA VINT
2    -- it's -- it's specific.  You are -- you
3    don't get to -- it's limited, in terms of
4    what apps.  The company dictates what apps
5    are on your phone.
6          Q.    Do you know whether other
7    Brevet employees have Brevet iPhones and
8    personal iPhones?
9          A.    Yes.
10              I'm -- I can't speak to exactly
11   how many and which ones.  But a large
12   number of Brevet employees have both.
13         Q.    Is someone who accepts a Brevet
14   iPhone permitted to put, for example, a
15   Gmail app on that phone?
16         A.    I don't know. I -- I don't
17   know. I haven't tried so I can't tell you
18   whether they are or not.
19         Q.    Do you know if you have access
20   to the camera on your Brevet iPhone?
21         A.    You do have access to the
22   camera on the Brevet iPhone.
23         Q.    Do you ever use it?
24         A.    I use it to take pictures if we
25   are white-boarding something.

Page 341

```
 1              MEI-LI da SILVA VINT
 2              Keep a -- like a record of it,
 3    to later type something up.
 4         Q.    Do you have -- in addition to
 5    all the Brevet-provided equipment that you
 6    identified and your personal iPhone, any
 7    other personal devices that you have
 8    purchased?
 9         A.    I have a personal laptop.
10         Q.    That is at your home?
11         A.    Yes.
12         Q.    You mentioned at least one
13    child.
14              Does your child, or any other
15    family member, ever use any of your Brevet
16    equipment?
17         A.    No.
18         Q.    Who configured your Brevet
19    laptop?
20         A.    To my knowledge, sitting here
21    today, I believe it was Johnny, possibly
22    Igor, and our out-sourced IT service
23    provider.
24         Q.    What's Igor's role at Brevet?
25         A.    He is general office
```

Page 342

1            MEI-LI da SILVA VINT

2    administration.  He, I think, supports

3    Johnny with basic things.

4            So, help with general office

5    administration things.

6        Q.    Does the desktop -- the -- the

7    Brevet desktop at your home have more than

8    one user account?

9        A.    Um, I think that you can say --

10   I know that I can log in with my name.  I

11   don't know if -- I think there is another

12   way that the Administrate -- Administrator

13   can log in.

14           And, you know, I don't know,

15   there could be a possibility.  There is

16   someone else with a Brevet account could

17   log in, specifically.

18           But, I -- I can't speak, off

19   the top of my head, because I don't usually

20   click down.

21       Q.    To your knowledge, is there a

22   family account on your Brevet desktop at

23   your home?

24       A.    There is no family account on

25   any of my desktops or Brevet laptops.

Page 343

```
 1              MEI-LI da SILVA VINT
 2       Q.    Are you aware of any Brevet
 3   employees having family accounts on
 4   Brevet-owned computers?
 5       A.    To my knowledge?  No.
 6       Q.    Would having a family account
 7   on a Brevet-owned computer be consistent
 8   with Brevet's technology-usage policies, as
 9   you understand it?
10       A.    So, I think the
11   technology-usage policies say that you can
12   do personal things that are incidental, as
13   long as they don't interfere with your job
14   and/or run afoul from our policies and
15   procedures.  These are applicable laws and
16   regulations.
17              And again, if you're doing
18   personal stuff on a Brevet-issued computer,
19   or using communication mechanisms, such as
20   software, et cetera, then there's no
21   expectation of privacy.
22              And no Brevet business should
23   be conducted on a family account.
24       Q.    Do you think the creation of a
25   family account, on a Brevet-owned computer,
```

Page 344

```
 1            MEI-LI da SILVA VINT
 2    is consistent with the incidental personal
 3    use contemplated by the technology policy?
 4         A.    To be fair, I don't know what
 5    you mean by a "Brevet family account."
 6              So, I -- I don't know that
 7    means.
 8         Q.    Oh.  Well, I -- I if I said
 9    that, I misspoke.
10              What I intended to ask was:  Do
11    you think the existence of a family
12    account, on a Brevet-owned computer, is
13    consistent with the limited incidental
14    personal use of Brevet computers that is
15    contemplated, under Brevet's
16    technology-usage policy?
17         A.    I think I have -- need more
18    detail with "family account" and what is
19    being done on that family account.
20              But again, I, kind of, laid out
21    what the policy is and use of the computer.
22              So, I'm not really sure, where
23    the -- I need clar -- clarification.
24         Q.    Sure.
25              So, as you understand it, only
```

Page 345

```
 1            MEI-LI da SILVA VINT
 2   limited and incidental personal use of --
 3            MR. DUMAIN:  Let -- let me
 4      withdraw that and try it again:
 5      Q.    Brevet permits personal use of
 6   Brevet-owned computers but only limited in
 7   incidental personal use; correct?
 8            MR. UNDERWOOD:  Objection to
 9      the form of the question.
10      A.    Yeah, I think I said it:  It's
11   incidental use, does not interfere with
12   your job, Brevet, in your -- ad -- adhering
13   to the applicable regulations and laws, not
14   running afoul of Brevet policy.  And you
15   have no expectation of privacy.
16            So, there's a lot of parameters
17   there.
18      Q.    Yeah.  I -- I understand that.
19            But you can -- you layered on a
20   bunch of other parameters, which all follow
21   from limited, incidental personal use.
22            I am not -- I'm not -- I am not
23   trying to limit you.
24            To -- to start, the amount of
25   usage of -- of Brevet computers, for
```

Page 346

1              MEI-LI da SILVA VINT

2      personal use, is only permitted to be

3      limited and incidental; correct?

4           A.    Well --

5                MR. UNDERWOOD:   Objection to

6           the form.

7           A.     I disagree that everything

8      follows from that.

9                So, I think your personal use:

10     A, cannot run afoul of any of our policies,

11     and then, if you're going to use it for

12     very limited purposes, that don't interfere

13     with your job, like, buying groceries, et

14     cetera, that's just one example, then, yes,

15     you're within policy.

16                For that, I can't sit here

17     today and give you an example of what

18     "incidental use" means.

19          Q.     I -- I'm not asking for that,

20     nor am I suggesting that limited and

21     incidental personal use is the only

22     parameter.

23                I am merely saying that:

24     Limited, in incidental use, is one of the

25     parameters for a personal use of

Page 347

```
 1            MEI-LI da SILVA VINT
 2   Brevet-owned computer equipment; correct?
 3        A.    Correct.
 4        Q.    In your view, would Brevet
 5   employees, using a Brevet-owned computer,
 6   in the home-schooling of his or her
 7   children be consisted with limited,
 8   incidental personal use?
 9        A.    I don't know that means:
10   "Using it for the home-schooling of the
11   children."
12            It looks like it takes up a
13   long time and I don't know the details of
14   that and that doesn't sound incidental, to
15   be honest.
16        Q.    Okay.
17            Do all of your Brevet-owned
18   devices have markings on them that indicate
19   they are owned by Brevet?
20        A.    Um, I can't sit here today.
21   Um, I can't tell you, with certainty.  I
22   think they do.  But I can't tell you for
23   certainty that they do.
24        Q.    Focussing on the desktop
25   computer at home:  You're not certain as to
```

Page 348

```
 1              MEI-LI da SILVA VINT
 2   whether it contains any markings that
 3   indicate that it is owned by Brevet?
 4        A.    Physically, on the actual
 5   desktop?
 6        Q.    Yeah.
 7        A.    No.
 8              Sitting here today, I can't
 9   tell you with certainty about the actual
10   desktop.
11        Q.    How about the at-home laptop?
12        A.    To the best of my knowledge,
13   yes, it does.
14        Q.    What do you think it has?
15        A.    Physically, on the device
16   itself, I think it has, like, a circular,
17   um, a circular identification on it.
18        Q.    Does your iPhone have that kind
19   of identifying mark?
20        A.    Um --
21        Q.    The Brevet iPhone?
22        A.    I -- I think so.
23        Q.    Do you have your Brevet iPhone
24   with you?
25        A.    I do.
```

Page 349

```
 1            MEI-LI da SILVA VINT
 2       Q.    Why don't you take a look at
 3   it.
 4            MR. DUMAIN:  We can mark it as
 5        Deposition Exhibit Number 15.
 6            (Whereupon, a short recess was
 7        taken.)
 8            MR. DUMAIN:  That is a joke.
 9       A.    Yes.  It does.
10       Q.    Okay.  Can you just describe
11   the mark?
12            (Witness reviews document.)
13       A.    Um, it's a silver circle
14   sticker adhesive.  It looks like a bar
15   code.  And it says "VCM" on it.
16       Q.    Do you know how long Brevet has
17   been putting these "VCM" stickers on
18   Brevet-owned computer equipment?
19            (Witness reviews document.)
20       A.    Sitting here today, I can't
21   recall.
22       Q.    While you were working at
23   Morgan Stanley, did you have a Brevet-owned
24   --
25            MR. DUMAIN:  Sorry.
```

```
                                        Page 350
 1              MEI-LI da SILVA VINT
 2      Q.    A Morgan-Stanley-owned phone?
 3      A.    I had a Morgan-Stanley-issued
 4   Blackberry.
 5      Q.    And did that Blackberry have
 6   any kind of marking, to indicate that it
 7   was owned by Morgan Stanley?
 8      A.    To the best of my recollection,
 9   sitting here today, from a physical
10   perspective, I don't recall it having a
11   marking that indicated that it belonged to
12   Morgan Stanley.
13      Q.    Do you have a
14   Morgan-Stanley-owned laptop at that time?
15      A.    No.  I did not.
16      Q.    Do you have a
17   Morgan-Stanley-owned desktop?
18      A.    No, I did not.
19      Q.    So, did you do any computing,
20   while you were at Morgan Stanley?
21      A.    Yes, I did.
22      Q.    How did you do it?
23      A.    Do you mean from home?
24      Q.    Oh, no.
25            I -- I just meant at all.
```

Page 351

```
 1              MEI-LI da SILVA VINT
 2      A.      Yes.
 3              I used a computer at Morgan
 4  Stanley.
 5      Q.      Okay.  And did it have a --
 6  some kind of label, to indicate that it was
 7  Morgan Stanley property?
 8      A.      I didn't look.
 9      Q.      And while you were at Morgan
10  Stanley, did you do work from home?
11      A.      Yes, I did.
12      Q.      And how did you gain access to
13  Morgan Stanley, the systems that you did?
14      A.      Sitting here today, I believe
15  we used Citrix.
16      Q.      Was it your understanding that
17  Morgan Stanley would be able to access your
18  personal home computer and download files
19  from its hard drive?
20              MR. UNDERWOOD:  Objection to
21        the form of the question.
22      A.      I cannot recall.
23              I can't recall what my
24  understanding would have been at the time.
25      Q.      Do you remember giving it any
```

Page 352

```
1              MEI-LI da SILVA VINT
2   thought?
3       A.    Not, specifically, to that.
4             But, I do know that I did --
5   there was an understanding that if you used
6   your personal items on premises, that there
7   was an understanding that they could have
8   access to everything on your personal
9   device.
10      Q.    Did you say "on premises"?
11      A.    At Morgan Stanley, the offices.
12      Q.    So, if you brought your phone
13  into the offices, at Morgan Stanley, you
14  were consenting to their searching your
15  phone?
16      A.    No.
17            I was responding to your
18  question about:  Did I have an
19  understanding and an expectation?
20            And my expectation is if I
21  brought the device on-site, um, yes, they
22  could have access to it.
23            THE WITNESS:  Were you putting
24       your hands up?
25            THE COURT REPORTER:  I didn't
```

Page 353

```
1            MEI-LI da SILVA VINT
2       hear you for a second, but, it came
3       back.  I heard everything
4            THE WITNESS:  Okay.
5            MR. DUMAIN:  Okay.  So, what I
6       would like to do is take one more
7       break to, kind of, take stock of what
8       is left and, then, after the break,
9       unless you want further breaks, go
10      through to the end.
11           Does that work?
12           MR. UNDERWOOD:  I guess it
13      depends what -- you think what you
14      think that entails.
15           MR. DUMAIN: You know, three to
16      six hours.
17           I -- I would not think more
18      than another forty-five minutes, it
19      could be less.
20           THE WITNESS:  Okay.
21           MR. UNDERWOOD:  We are taking
22      ten minutes now, is that --
23           MR. DUMAIN:  That sounds great.
24           MR. UNDERWOOD:  Should we just
25      start up at 5:00?  Plan to start up
```

Page 354

MEI-LI da SILVA VINT

1                  MEI-LI da SILVA VINT

2         5:00?

3                  MR. DUMAIN:  That's perfect.

4                  THE VIDEOGRAPHER:  The time is

5         4:49 P.M.

6                  We are going off the record.

7                  (Whereupon, a short recess was

8         taken.)

9                  THE VIDEOGRAPHER:  The time is

10        5:01 P.M.

11                 And we are back on the record.

12        Q.    Ms. da Silva Vint, can you

13   look, again, at Lan's Deposition Exhibit 1?

14   That is the 30(b)(6) Notice?

15                 (Witness complies.)

16                 (Witness reviews document.)

17        A.    Yes.

18        Q.    And looking at Tab Number 16,

19   which is on Page 9 of the pdf.

20                 (Witness complies.)

21        A.    Yes.

22        Q.    And so, is this a topic that

23   you are prepared to testify, as a 30(b)(6)

24   witness, on.

25                 (Witness reviews document.)

Page 355

MEI-LI da SILVA VINT

1
2
3      A.     Yes.
4      Q.     And now, I just want to focus
5   on the period between 2014 and October of
6   2016.
7           First, can you tell me:  What
8   did you do to prepare yourself to testify
9   about Brevet's backwards-looking compliance
10  practices and policies?
11     A.     Um, I would --
12           MR. UNDERWOOD:  Sorry.
13           By "backwards looking," you're
14        just -- you just mean before she
15        arrived at Brevet?
16           MR. DUMAIN:  Yeah.
17           Thanks for the clarification.
18     A.     So, I looked at, um, the
19  records that we have on file, I looked at
20  e-mail correspondence and I spoke with Mark
21  Callahan, as -- as well.
22     Q.     How long do you do you think
23  you spent preparing to give testimony about
24  these topics?
25     A.     I can't say with certainty how

Page 356

```
 1              MEI-LI da SILVA VINT
 2    long I spent.
 3         Q.    Well, was it more than five
 4    hours?
 5         A.    Again, I can't say with
 6    certainty.
 7              This is -- some of this, I have
 8    seen in the past, so, it wasn't,
 9    necessarily, getting, you know, new
10    information for me.
11         Q.    Okay.
12              In the 2014 through 2016 time
13    period, how frequently did Brevet conduct
14    compliance training?
15         A.    So, at least annually.
16         Q.    Who received that training?
17         A.    So, anyone who would have been
18    under the Registered Investment Advisor.
19              At that time, I think it would
20    be anyone employed by Brevet Holdings
21    should have been receiving that training.
22         Q.    Okay.
23              (Whereupon, a short recess was
24         taken.)
25         Q.    And how -- of -- of -- of the
```

Page 357

```
 1              MEI-LI da SILVA VINT
 2    --
 3              MR. DUMAIN:  I am trying to
 4         think of an easier way to do this.
 5         Q.    Well, were most Brevet
 6    employees were employees of Brevet
 7    Holdings, or some other entity?
 8         A.    To the best of my knowledge,
 9    Holdings.
10         Q.    What about consultants?
11              Would consultants to Brevet
12    receive this training?
13         A.    To the extent -- to the extent
14    that they are Supervisor Access Persons,
15    yes, they would have been receiving this
16    training.
17         Q.    What is a "Supervisor Access
18    Person"?
19         A.    So, they are, specifically,
20    defined under the Registered Investment
21    Advisors Act.
22              So, it would be people that
23    have access to the holdings of the -- of
24    the various clients, people that have
25    access to information around the
```

Page 358

```
 1              MEI-LI da SILVA VINT
 2    investment, specifically, or potential
 3    investment, on the underwriting side.
 4              Those are the definitions.
 5         Q.    If the Chief Compliance Officer
 6    was a consultant, would that person be
 7    required to receive these trainings?
 8         A.    Yes.
 9              They are supposed to be
10    overseeing the trainings.  So, I don't know
11    what you mean -- mean -- that by
12    "receiving."
13              I mean they are part of the
14    training.
15         Q.    Okay.
16              And do you know what the topics
17    of the compliance training were between
18    2014 and 2017?
19         A.    I don't know, specifically, the
20    topics.
21              But, typically, it's -- annual
22    compliance training is supposed to cover
23    the Registered Investment Advisors Act.
24         Q.    And how long would this
25    training -- this annual training last?
```

Page 359

1                    MEI-LI da SILVA VINT
2        A.      Typically? Probably, forty-five
3    minutes to an hour, in terms of their --
4    the annual training.
5                I think when employees are
6    onboarded, they have to review the policies
7    and procedures, including the compliance
8    manual, which is the compliance program.
9                And we are supposed to ask any
10   questions related to those policies and
11   procedures, which I -- I would actually
12   consider training.
13       Q.    Was the training provided by
14   consultants or was it provided by inside --
15   internal Brevet employees?
16       A.    Um, I can't speak with
17   certainty as to who provided the training.
18                Garreth, at some point, was a
19   consultant. So, he, as a consultant, could
20   have provided the training.
21                But I can't speak with
22   certainty as to who, specifically, provided
23   the trainings during those years.
24       Q.    Okay. And by "consultant," that
25   -- I -- that -- that's a helpful point.

Page 360

```
 1              MEI-LI da SILVA VINT
 2   When that was, like an outside organization
 3   that would come in, to provide compliance
 4   training?
 5        A.    During that time period?
 6              I'm -- I don't have
 7   confirmation that an outside consultant,
 8   external from the Brevet organization,
 9   provided the training.
10        Q.    Since you became Chief
11   Compliance Officer, have you brought in any
12   external compliance consultants, to provide
13   trainings?
14        A.    Yes.
15              We provided training in
16   conjunction with external consultants.
17        Q.    What is the name of those
18   consultants?
19        A.    So, specifically, with the
20   Registered Investment Advisors Act, we have
21   Leonard Sipperman, the external consultant
22   I mentioned before.
23              And then, with respect to, kind
24   of, cyber-training, we leveraged external
25   people, as well.
```

Page 361

```
 1              MEI-LI da SILVA VINT
 2        Q.      Okay. Does Brevet maintain
 3    copies of the materials that it uses during
 4    its compliance trainings?
 5        A.      Sitting here today, I can't say
 6    that we specifically retain all materials
 7    related to any compliance training.
 8        Q.      Were you able to find any of
 9    the materials that were used in any
10    compliance trainings between 2014 and 2016?
11        A.      Um, sitting here today, I found
12    materials but I can't say, with certainty,
13    if it was, specifically, in 2020 -- 2014 to
14    2016.
15        Q.      And where did you find them?
16        A.      In the -- our compliance drive.
17        Q.      That's like a shared drive on
18    the Brevet network?
19        A.      Yeah.
20                It's -- only compliance has
21    access to it.
22        Q.      Did Brevet maintain records of
23    which of its employees received compliance
24    training in 2014, '15 and '16?
25        A.      So, at times, it looks like
```

Page 362

```
 1              MEI-LI da SILVA VINT
 2   there are written records.  But not
 3   necessarily for every compliance training.
 4        Q.    But there was only one a year,
 5   in there; right?
 6        A.    It was one formal.
 7              But I -- I -- as of right now,
 8   there is compliance training periodically
 9   that is not necessarily -- you don't
10   necessarily record anyone who was part of
11   that conversation and that training.
12        Q.    What does -- what's an informal
13   compliance training?
14              Is that, like, a watercooler
15   chat or --
16        A.    No.
17              Like, we have firm-wide
18   meetings and we will discuss relevant
19   compliance topics during those meetings.
20   And I would consider that to be training.
21              Cyber-training, for example,
22   sometimes, it's in module.  So, we don't
23   save data materials from that module.
24        Q.    Does the Compliance Department
25   ever circulate, like, an internal
```

Page 363

```
 1              MEI-LI da SILVA VINT
 2    compliance newsletter or update?
 3         A.    We don't provide newsletters.
 4         Q.    If you can take a look at 17.
 5    Topic 17.
 6                (Witness complies.)
 7                (Witness reviews document.)
 8         A.    Yes.
 9         Q.    Are you prepared to testify
10    about Topic 17?
11                (Witness reviews document.)
12         A.    Yes.
13         Q.    Again, focussing on 2014 to
14    2016, did you do anything to familiarize
15    yourself with any annual reviews that were
16    conducted during that time period?
17         A.    So, I looked through our
18    records.
19         Q.    Were annual reviews conducted
20    in 2014, '15 and '16?
21         A.    To the best of my knowledge,
22    yes.
23         Q.    Why are you qualifying it that
24    way?
25         A.    Because I can't say, with
```

Page 364

```
 1              MEI-LI da SILVA VINT
 2   certainty, that there was a documentation,
 3   especially in the light of the way that we
 4   do it now, that documented that an annual
 5   review was conducted.
 6        Q.    So, what is the evidence that
 7   you were able to find that an annual review
 8   was conducted in each year of 2014, '15 and
 9   '16?
10        A.    There would be -- there would
11   be trainings.  There would be updates to
12   the compliance manual, um --
13        Q.    Were there updates to the
14   compliance manual in 2014?
15        A.    Um.
16              (Witness reviews document.)
17        A.    I can't say for certainty,
18   right now, that there were.
19        Q.    Were there updates to the
20   compliance manual in 2015?
21              (Witness reviews document.)
22        A.    So, I can't say, with
23   certainty, that there were specific
24   updates.
25              I -- there was a compliance
```

Page 365

1           MEI-LI da SILVA VINT
2    manual from 2015. I -- I wasn't looking for
3    a red-line; right?  So, I don't know if
4    there were specific updates to the manual.
5           Q.    So, if you can't say "with
6    certainty" that there were annual reviews
7    for any of these years, I conclude that --
8    would you, correct me, if I am wrong:  That
9    by force of logic, you can't tell me who
10   was involved with the annual reviews?
11          A.    So, I can say that -- that we
12   are required to conduct annual reviews of
13   our compliance program, as a Registered
14   Investment Advisor.
15               I can't say that I found
16   anything, in my review, that says we did
17   anything to the contrary.
18               So, no.  I can not say that I
19   -- with certainty, who would be involved in
20   annual reviews, with respect to the records
21   with respect to the company.
22          Q.    Since you joined Brevet, has
23   Brevet conducted annual reviews?
24          A.    Yes.
25          Q.    And how do you memorialize the

Page 366

```
1              MEI-LI da SILVA VINT
2   fact that such a reviews has occurred?
3        A.    We use our -- we do it in
4   conjunction with our external compliance
5   consultants.
6              So, there's a report that
7   document what was reviewed, what was done
8   and there's a report at the end of that.
9        Q.    There -- there was no such
10  report for 2014, '15, or '16; correct?
11       A.    For the year 2016, you would do
12  the review in 2017.
13             So, yes.  There would be
14  because that was a year lookback.
15             And the compliance consultant,
16  to the best of my knowledge, were not
17  engaged until right before I joined.
18       Q.    So, in 2016, there's no
19  evidence, other than a requirement, to have
20  an annual policy review.
21             MR. DUMAIN:  Sorry.
22       Q.    An annual com -- I mean --
23             MR. DUMAIN:  Withdrawn.
24       Q.    You have not found any document
25  that confirms that an annual compliance
```

Page 367

```
 1              MEI-LI da SILVA VINT
 2    review took place for the time period of
 3    calendar year 2015?
 4         A.    Sitting here today, I said I
 5    found some documentation. I can't -- I
 6    can't recall what specific year that the
 7    documentation was related to, so --
 8         Q.    Okay.
 9              Well, and -- and -- just the
10    easier way to do it is this:  What
11    documentation did you find, in connection
12    with your investigation of the annual
13    compliance reviews that occurred before you
14    joined Brevet?
15         A.    Um, so there's QT days.  There
16    was a process for elements of the
17    compliance program that were tested and
18    reviewed and that was documented.
19         Q.    Where is that documented?
20         A.    In our files.
21         Q.    On the compliance folder on the
22    Brevet server?
23         A.    Yes.
24              THE COURT REPORTER:  You broke
25       up, sir.
```

Page 368

1                    MEI-LI da SILVA VINT

2                    Say that again, please.

3                    MR. DUMAIN:  Sure.  Yes.

4         Q.    As I understand it, you found

5    evidence of particular processes that might

6    have been part of one or more annual

7    reviews?

8         A.    I found evidence documenting

9    reviews of certain parts of the -- the

10   compliance program.

11        Q.    So, you did not find a holistic

12   annual review report of the type that

13   Brevet, now, has prepared, in conjunction

14   --

15        A.    No.

16        Q.    -- with an outside consultant?

17        A.    No.

18              And there is nothing requiring

19   that.

20        Q.    Why do you do it?

21        A.    Um, why do I do it?

22              Because I want to document how

23   we did an annual review and what the

24   findings were.

25              We don't, necessarily, always

Page 369

1              MEI-LI da SILVA VINT

2    agree with the findings. And you say well,

3    we don't necessarily agree with the

4    findings and there's a record of why we

5    updated our policies, as a result of those

6    annual reviews.

7         Q.    As you sit here right now, in

8    your 30(b)(6) capacity, can you tell me of

9    any recent findings, of your annual

10   compliance review, with which Brevet

11   disagreed?

12        A.    Sitting here today, I can't

13   specifically point to anything.

14        Q.    Has Brevet ever been the

15   subject of an SEC examination?

16        A.    Yes.

17        Q.    What were the circumstances of

18   that examination?

19        A.    They were regular-scope

20   examinations.

21        Q.    What was the outcome of the

22   examination?

23        A.    Um, there had been two, to my

24   knowledge.

25              And there were findings, by the

```
                                          Page 370
 1              MEI-LI da SILVA VINT
 2    SEC, that we responded to and no further
 3    action was taken.
 4         Q.    What were the findings of the
 5    first level?
 6         A.    I can't recall exactly what the
 7    findings of the first one were.
 8         Q.    Do you recall when that was?
 9         A.    It was in 2016.
10         Q.    Those were compliance-related
11    findings?
12         A.    Define what you mean by
13    "compliance."
14              MR. DUMAIN:  Well, let me
15         withdraw that.
16         Q.    What more can you tell me about
17    the subject matter of these SEC findings,
18    in 2016?
19         A.    Nothing.
20              Just what I told you.
21         Q.    You don't remember anything
22    more about what the findings were about?
23         A.    I said:  "I can't specifically
24    recall what the findings were."
25         Q.    Where are the findings
```

Page 371

1              MEI-LI da SILVA VINT

2   memorialized?

3        A.    In a letter from the SEC.

4        Q.    And is that saved somewhere, in

5   the Brevet system?

6        A.    Yes.

7        Q.    You could pull it down?

8        A.    Yes.

9        Q.    And read it?

10       A.    Yes.

11       Q.    What about the second set of

12   findings?

13       A.    There -- that is a recent

14   audit, um, from -- that started in 2020 and

15   ended in March of 2021.

16       Q.    And there were findings?

17       A.    Yes.

18       Q.    And what were the findings?

19       A.    There were a number of

20   findings.

21             I can't speak, specifically,

22   to the findings, in the SEC letter, without

23   having it in front of me.

24       Q.    How many findings were there?

25       A.    I can't recall, sitting here

Page 372

```
 1              MEI-LI da SILVA VINT
 2   today, how many there were.
 3        Q.   Were there more than five?
 4        A.   I can't recall, sitting here
 5   today, how many findings there were.
 6        Q.   How much time did you spend on
 7   this examination, as Chief Compliance
 8   Officer?
 9        A.   Again, the exam started
10   September of 2020 and ended in March of
11   2021.
12              So, I spent a lot of time on
13   the exam.
14        Q.   Is it a matter of professional
15   concern to you?
16        A.   No.
17        Q.   Why not?
18        A.   But I also don't know what you
19   mean by "professional concern."
20        Q.   Were you indifferent to whether
21   or not the SEC came back with any findings
22   in its examination of the entity, for which
23   you were the Chief Compliance Officer?
24              MR. UNDERWOOD:  Objection to
25         the form of the question.
```

Page 373

```
 1              MEI-LI da SILVA VINT
 2       A.    I -- I -- yeah.
 3             I don't know what your intent
 4    there is.
 5             When you say -- what do you
 6    mean by "indifferent"?
 7       Q.    Did you -- what -- what -- what
 8    was your personal hope about what the
 9    outcome of the SEC's examination would be?
10       A.    Um, that we were fulfilling our
11    fiduciary duty and we had an appropriate
12    compliance program that was reasonable for
13    the business that we were in.
14       Q.    Was that what the SEC found;
15    was that a qualification?
16       A.    Um, to be quite frank:  The SEC
17    would never put something that, in those
18    terms, in writing.
19       Q.    Did the SEC identify areas
20    where Brevet's compliance was lacking or
21    could be improved?
22       A.    Um, sorry.  I am not following.
23             Compliance deficiencies?
24       Q.    Sure.
25       A.    No.
```

Page 374

1            MEI-LI da SILVA VINT

2            I am not following what you're

3   asking.

4      Q.    Did the SEC find any compliance

5   issues?

6      A.    They had findings, which we

7   responded to.

8            I can't say exactly if they

9   were compliance related, like, specific or

10  not.

11           There were a number findings

12  that we responded to.  Findings of the SEC

13  aren't, necessarily, accurate or correct

14  and that is why you responded to them.  And

15  you wait for their response, if there is

16  one.

17     Q.    Do you know whether they are

18  going to respond or you just know they

19  haven't responded yet?

20     A.    We do not know if they will

21  respond and we may never know if they will

22  respond.

23     Q.    And did you work with outside

24  counsel on this response for the SEC?

25     A.    Yes.

Page 375

1                MEI-LI da SILVA VINT
2                We worked with outside counsel
3    -- counsel and external advisors.
4        Q.    Who was your outside counsel?
5        A.    Curtis, Mallet.
6        Q.    And who was the external
7    advisor?
8        A.    It was someone at Doc & Phelps.
9        Q.    And you cannot recall the
10   substance of any of these SEC findings?
11       A.    So, I can recall some.
12                There was one, they asked us to
13   enhance our disclosures and our Form ABV,
14   in terms of fees received by affiliates, to
15   the Investment Advisor.
16                Another one -- another one they
17   asked us to review our evaluation policies
18   and make sure that they were up to date.
19                So, it was was that type of
20   thing.  Those are two specific ones I
21   remember.
22       Q.    Do you remember any other
23   specific ones?
24       A.    There was a -- one that said
25   review your compliance policy and make sure

Page 376

```
 1              MEI-LI da SILVA VINT
 2   they were adequate.
 3        Q.    Sounds helpful.
 4        A.    Yeah.
 5        Q.    Are you familiar with the term
 6   "culture of compliance"?
 7        A.    Yes.
 8        Q.    What is a "culture of
 9   compliance"?
10        A.    Um, I think it's not that you
11   just have policies and procedures in place,
12   it's that your employees, and anyone under
13   the guise of that policy, feel free to ask
14   questions, to bring things that they think
15   might be, you know, outside of policy to
16   your attention.
17              (Whereupon, technical
18         difficulties disconnected the
19         connection.)
20              (Whereupon, a short recess was
21         taken.)
22              THE COURT REPORTER:  Any time
23         you're ready.
24              THE VIDEOGRAPHER:  We are still
25         on the record.
```

Page 377

```
1              MEI-LI da SILVA VINT
2      Q.    Does -- in your view, does
3  Brevet have a culture of compliance today?
4      A.    Yes.
5            Very much so.
6      Q.    When you joined Brevet, in
7  October of 2016, was it your impression
8  that Brevet had a culture of compliance?
9      A.    Yes.
10     Q.    And what was that impression
11 based on?
12     A.    It was based on my personal
13 view.
14            There was a strong compliance
15 program in place, policies and procedures,
16 lots of employees came to me with
17 questions, if there was any confusion, and
18 I had the direct ear of Senior Management,
19 if I had questions, myself.  And they
20 supported actions I took, with respect to
21 compliance.
22     Q.    Mr. Callahan ever come to you
23 about questions about compliance?
24     A.    Um, he comes to me with
25 questions all the time.
```

Page 378

```
 1              MEI-LI da SILVA VINT
 2       Q.    About compliance?
 3       A.    If someone asks him a question
 4  and he doesn't know the answer, he will
 5  direct them to me.
 6              If he is unclear, he will run
 7  something past me.
 8              I can't think of a specific
 9  example.  But we have a pretty-open
10  dialogue about compliance and other
11  matters.
12       Q.    So, does he come to you for
13  advice about actions that he might
14  undertake?
15       A.    It depends if --
16              THE COURT REPORTER:  Hold on.
17        I -- I lost you.  Say that again.
18              It depends on what?
19       A.    If he has a specific question,
20  yes, he will come to me.
21              THE COURT REPORTER:  I -- I
22        don't know what it is.  I am losing
23        you again.
24              MR. DUMAIN:  We will get
25        through it.
```

Page 379

1             MEI-LI da SILVA VINT

2             THE WITNESS:  Can you hear us?

3             THE COURT REPORTER:  I can.

4      Q.    Does Mr. Monticciolo ever come

5   to you with questions -- with questions

6   about compliance-related issues?

7      A.    Yes.  All the time.

8      Q.    What is the last question that

9   you remember him coming to you with?

10             (Whereupon, a short recess was

11        taken.)

12      A.    I can't recall a specific

13   question.

14             And we are in the process of,

15   you know, our typical timeline of annual

16   review of all of our policies and

17   procedures.  And so, we just went through

18   the SEC audit.

19             I mean it's a lot of stuff.

20   It's the normal course.  So, I can't speak

21   -- speak a specific instance.

22      Q.    How involved was Mr.

23   Monticciolo in the recent SEC examination?

24      A.    He was involved.

25             I mean, there -- there were

Page 380

                    MEI-LI da SILVA VINT

1

2    topics that predate me.

3              So, Mark and Doug had to be

4    involved, to a certain extent, than me. The

5    response to the SEC's findings, not

6    necessarily the audit, the exam, itself.

7         Q.    What were the topics in the

8    recent examination that predate you?

9         A.    So, actually, I now recall they

10   went back to fund one, which is a very

11   Legacy Fund.

12             I can't remember if it was a

13   2007 or 2008 fund but there were stuff that

14   involved that.

15             But obviously, I -- I think

16   they were probably the only people at the

17   firm that have any knowledge of anything

18   related to that at this point.

19             So, that was a specific topic

20   that they had to get involved in, for

21   example.

22        Q.    Okay.  Does the Investment

23   Advisors Act, to your knowledge, require a

24   risk-based compliance program?

25        A.    I don't think that is a

Page 381

```
1              MEI-LI da SILVA VINT
2    specific requirement in the Advisors Act,
3    itself.
4         Q.    Does Brevet have a risk-based
5    compliance program?
6         A.    We do have a risk assessment,
7    as part of our compliance program.
8         Q.    What is "risk assessment," in
9    that context?
10        A.    Sure.
11              So, in addition to your
12   compliance program, you're supposed to
13   self-identify specific areas of risk your
14   business might have and how you will
15   attempt to mitigate that risk.
16        Q.    And you undertake that risk
17   assessment?
18        A.    Yes.
19        Q.    What do you do after you have
20   completed that risk assessment?
21        A.    So, it's a living document.
22              We try to ensure that we have
23   adequate controls around those risks we
24   found, to the extent that it -- it is
25   reasonable, within our business, and update
```

1          MEI-LI da SILVA VINT

2   those risks, as they are mitigated, or as

3   new risks arrive in the business.

4        Q.    And how often does Brevet

5   undertake a review of its compliance

6   policy?

7        A.    So, normally, it's an annual

8   review.  It's -- it's -- it could be less

9   than that.  If something significant

10  changes in the regulatory environment or in

11  the business we are doing, we will update

12  the policies, in relation to that.

13       Q.    And how frequently does Brevet

14  update its Code of Business Conduct, Ethics

15  and Insider Training Policy?

16       A.    We review it, at least

17  annually, and depending on if there are

18  changes that need to be made, they would be

19  made.

20       Q.    Did you conduct that review?

21       A.    That specific thing would be my

22  team and potentially, with assistance from

23  outside counsel.

24       Q.    Would that be Curtis, Mallet

25  again?

```
1              MEI-LI da SILVA VINT
2      A.    Um, for the most part, probably
3  yes.
4      Q.    Is the review and revision of
5  that policy, including the compliance
6  policy, the code of business conduct, other
7  policies systematically memorialized
8  somewhere?
9      A.    The review -- the actual
10 review, I can't say that was systematically
11 documented.
12          The updates are systematically
13 documented. You'll see a red-line of one
14 version versus the last and the official
15 ones are uploaded into our compliance
16 system, so you see what the most-recent
17 version is that applies.
18     Q.    When did that practice begin,
19 the uploading of the current policy into a
20 system so a person would know that he or
21 she was looking at the operative policy?
22     A.    I don't know when Schwab CT was
23 -- started being used at Brevet.
24     Q.    That's the system you were
25 referring to?
```

Page 384

```
 1              MEI-LI da SILVA VINT
 2       A.    Yeah.
 3              And I think it has a previous
 4   name, of Compliance 11.
 5       Q.    Did the use of that system,
 6   under whatever name, predate your arrival
 7   at the firm?
 8       A.    Yes.
 9       Q.    Aside from yourself and outside
10   counsel, is anyone else involved in the
11   review and revision of the compliance
12   manual?
13       A.    Yes.
14              MR. UNDERWOOD:  I object to the
15        form of the question.
16       A.    The Compliance Team is.
17              And we -- we provide a summary
18   of what the changes are to Doug and Mark,
19   as well.
20       Q.    Who is on the Compliance Team,
21   aside from yourself?
22       A.    Right now, it's Daniel Bungi,
23   it's Legal and Compliance; it's Daniel
24   Bungi and then, it's David Spinley,
25   internally.
```

Page 385

```
 1              MEI-LI da SILVA VINT
 2              And then, we have external
 3    compliance, as well, and they may provide
 4    input, in terms of language, initial
 5    language, that might make sense.
 6         Q.    Is there a separate Legal
 7    Department at Brevet?
 8         A.    No.
 9         Q.    Does Brevet have a General
10    Counsel?
11         A.    Formally known as the title of
12    of General Counsel.
13         Q.    In -- informally, do you
14    operate as General Counsel?
15         A.    I, effectively, operate as
16    In-House Counsel.
17         Q.    Aside from this litigation,
18    have you provided legal advice to Brevet on
19    any other litigations?
20         A.    Yes.
21         Q.    On how many?
22         A.    I can't recall at this time.
23         Q.    I think I asked you this
24    before, so, forgive me:  Are you the
25    day-to-day contact for Brevet, as it
```

Page 386

```
 1              MEI-LI da SILVA VINT
 2   relates to litigation with Mr. Iacovacci?
 3              Day-to-day contact with outside
 4   counsel?
 5        A.    Today?
 6        Q.    Yes.
 7        A.    Yes.
 8        Q.    And that has been for how long?
 9        A.    I'm sorry.
10              It's myself and David Spinley,
11   depending on what it is.
12              I can't tell you, with
13   certainty, when it was. I don't recall,
14   with certainty, when Anthony Moro left.
15        Q.    Does Brevet, as a Registered
16   Investment Advisor, owe fiduciary duties to
17   clients?
18        A.    Yes.
19        Q.    And remind me:  Who are --
20              THE WITNESS:  Sorry.  Sorry.
21         Sorry.
22        A.    Brevet Capital Management, LLC.
23        Q.    Yes.
24        A.    Yes.
25        Q.    And who are its clients?
```

Page 387

```
 1              MEI-LI da SILVA VINT
 2        A.    Certain fund vehicles, through
 3   investment vehicles, SMA's.
 4        Q.    Do any other Brevet entities
 5   owe fiduciary duties to third parties, as
 6   you understand it?
 7        A.    Any other Brevet parties owe
 8   fiduciary duties to their clients?
 9              "To Brevet clients," you said?
10              Can you -- can you repeat the
11   question?
12        Q.    To third parties.
13        A.    To third parties?
14              MR. UNDERWOOD:  I object to the
15         form of the question.
16              THE WITNESS:  Yeah.
17        A.    I don't understand what that
18   means.
19        Q.    Do you know whether the
20   compliance manual, for Brevet Capital
21   Management, states that Brevet owes a
22   fiduciary duty to its clients?
23        A.    Um, I think it does.
24              But I can't say, with
25   certainty, without looking at anything
```

```
 1              MEI-LI da SILVA VINT
 2    again.
 3        Q.    Do you know how the various
 4    versions of the compliance manual Code of
 5    Business Conduct and other Brevet policies
 6    that was produced in this litigation were
 7    collected?
 8        A.    No.
 9              I can't speak to that specific
10    -- I do not know.
11        Q.    Do you have any reason to
12    think, though, what was collected and
13    produced in this litigation is not a
14    comprehensive set of policies for the
15    relevant time period?
16        A.    I don't know what was
17    requested, specifically, what search terms
18    were used.
19              I can't speak to what was
20    produced.
21        Q.    Okay. Are you familiar with
22    Section 206 of the Advisers Act?
23              (Witness reviews document.)
24        A.    What section is that?
25        Q.    I think it's referred to as the
```

```
 1              MEI-LI da SILVA VINT
 2    "Anti-Fraud Provisions."
 3         A.    Yes.
 4         Q.    And, just generally, what are
 5    the Anti-Fraud Provisions?
 6         A.    I can't speak, with
 7    specificity, to the Anti-Fraud Provisions,
 8    without looking at the statute.
 9         Q.    And do you know if the Brevet
10    compliance manuals discuss the Anti-Fraud
11    Provisions, such as the Advisers Act?
12         A.    Sitting here right now, no.
13               I can't say, with certainty, if
14    they do or do not.
15         Q.    Was Brevet ever presented with
16    any questions concerning the allocation of
17    investment opportunities?
18               MR. UNDERWOOD:  I object to the
19         form of the question.
20         A.    Yeah.
21               In what context?
22         Q.    Among clients or funds.
23         A.    By who?
24         Q.    So, Brevet consists of many
25    entities; is that correct?
```

Page 390

```
 1              MEI-LI da SILVA VINT
 2      A.    Which --
 3              MR. DUMAIN:  Let me -- let me
 4        restate it:
 5      Q.    There are many affiliated
 6   Brevet entities; is that correct?
 7      A.    Um, you have to define an
 8   "affiliated," as well.
 9              Are you talking about just
10   clients or are you talking about the side
11   that originates assets?
12              I think you really have to be
13   specific, I think, with this question.
14      Q.    Okay.  How many Brevet clients
15   are there?
16      A.    There's a number.
17              And I, actually, can't tell
18   you, sitting here today, specifically.
19              We have a number of estimated
20   co-invest vehicles, in addition to the
21   funds.
22              So, I can't tell you, off the
23   top of my head, how many there were.
24              There were new ones formed this
25   year, so --
```

Page 391

1              MEI-LI da SILVA VINT
2        Q.    And how many entities are
3    there, Brevet entities, that originate
4    loans?
5        A.    Um, there's a number of them.
6        Q.    How does -- how is it
7    determined which Brevet entity would be the
8    originator of any particular loan?
9        A.    It depends what business they
10   are in.
11              All of the Brevet-originated
12   loans are allocated to Brevet clients
13   (indicating), in accordance with the
14   allocation guidelines.
15       Q.    The "allocation guidelines" are
16   drafted by whom?
17       A.    They are drafted by us.
18       Q.    Who is "us"?
19       A.    Brevet Capital Management.
20       Q.    And they provide it to the
21   clients, in advance?
22       A.    If an investor asks for it,
23   yes.
24       Q.    And who, at Brevet, is involved
25   in the drafting of these guidelines?

Page 392

```
1              MEI-LI da SILVA VINT
2        A.     Um, so, I can't speak to who
3   originally drafted them but Legal and
4   Compliance have control over that document.
5              And it's done in conjunction
6   with the CIO and with the offering
7   documents of each fund and whatever Side
8   Letters, et cetera, that are in place, with
9   respect to any underlying investor.
10       Q.     The CIO is Mr. Monticciolo?
11       A.     Yes.
12       Q.     And where are those allocation
13  guidelines memorialized?
14       A.     There's a document that is
15  memorialized and saved on the Brevet
16  computers.
17       Q.     And do those allocation
18  guidelines static or dynamic?
19       A.     They have to be dynamic.
20             If something changes, if there
21  is a new fund vehicle added, if we enter
22  into an agreement that professes to doing
23  something on a go-forward basis, that would
24  have to be updated.
25             So, it can't be static
```

Page 393

```
 1              MEI-LI da SILVA VINT
 2    (indicating.)
 3         Q.    Does Brevet have any service
 4    providers that are affiliates of Brevet?
 5              MR. UNDERWOOD:  I object to the
 6         form of the question.
 7         A.    Um, um, service providers?  In
 8    what sense?
 9         Q.    So, for example, we were
10    talking about "BPA" before.
11         A.    Right.
12              So, they are not affiliated.
13              And I don't know what you mean
14    by "service providers."
15              To whom?
16         Q.    Service providers who stand
17    between any Brevet entity and a
18    third-party.
19         A.    "Service providers that stand
20    between any Brevet entity and a
21    third-party"?
22              (Whereupon, a short recess was
23         taken.)
24         A.    I am not sure I am following.
25         Q.    Sure.
```

Page 394

```
 1              MEI-LI da SILVA VINT
 2              So, in the case of BPA, a
 3    Brevet entity originates a loan; correct?
 4    And originates a loan to a borrower?
 5              MR. DUMAIN:  Oh, that is my
 6         dog.
 7         Q.    Originates a loan to a
 8    borrower?
 9              THE COURT REPORTER:  I didn't
10         get a response.
11         A.    Yes.
12              MR. DUMAIN:  Go ahead.
13              THE WITNESS:  I am not
14         answering, I am just following, like,
15         I am just following what he is
16         saying.
17         Q.    And "BPA" is a service provider
18    that services the loan; is that correct?
19         A.    Correct.
20         Q.    So, that is an example of a
21    service provider who stands between, in
22    this case, Brevet, as the originator, and
23    the borrower.
24              Hence the borrower?
25         A.    Yeah.
```

Page 395

```
 1              MEI-LI da SILVA VINT
 2              I am not sure if "stands in
 3   between" is the correct way.
 4              There are -- some of our loan
 5   originators, like SCS, for example, may be
 6   a loan admin agent on a loan that it
 7   originates.
 8        Q.    Does the compliance manual
 9   cover any issues concerning affiliated
10   service providers?
11        A.    So, they are disclosed; right,
12   in our offering materials.
13              I think if there is some
14   conflict of interest, that is described
15   generally in our manuals.
16              But this specific service
17   provider is disclosed, specifically, in our
18   offering documents, as well as, I think, in
19   our Form ADV.
20        Q.    Okay.  Does Brevet have custody
21   of any client assets?
22        A.    Um, please describe what you
23   mean by "assets," specifically.
24        Q.    Well, so earlier today, we were
25   talking about assets that could be
```

Page 396

```
 1               MEI-LI da SILVA VINT
 2   classified as securities such that would
 3   give rise to certain requirements relating
 4   -- concerning custody.
 5               Do you recall that?
 6        A.    Yes.
 7        Q.    Does Brevet take custody of any
 8   client assets?
 9        A.    Yes.
10               I think I was specifically
11   referring to things discussed, as
12   securities.
13               And anything defined as a
14   "security" by the SEC, including cash or
15   warrants, for example, are held by a
16   qualified custodian.
17               So, I don't know what you mean
18   "assets."
19        Q.    Is Brevet a qualified
20   custodian?
21        A.    No.
22               That is why we put those with
23   qualified custodians.
24        Q.    When you put those assets with
25   qualified custodians, are there Brevet
```

Page 397

1                MEI-LI da SILVA VINT
2    employees who are then authorized to
3    interact with the custodians?
4         A.    I don't know what you mean by
5    "interact."
6               But in terms -- like, talk to
7    them?
8         Q.    Yes.
9         A.    It's the Legal and Compliance
10   Department that speaks directly with these
11   qualified custodians.
12        Q.    Are those employees rotated
13   periodically?
14        A.    It's myself and Daniel.
15              The signatory is not myself and
16   Daniel, so --
17        Q.    Who is the -- who has the
18   signatory authority?
19        A.    I don't recall exactly, right
20   now.
21              I know Mark Callahan is a
22   signatory for certain things and there are
23   various other people that are a required
24   signatory, as well.
25        Q.    Does Brevet obtain background

Page 398

1              MEI-LI da SILVA VINT
2   checks on all potential employees?
3        A.    Um, yes.
4              If it's a -- like a process
5   that is moving.  It's not all potential
6   employees.  It is if we we are going to
7   make them an offer.
8              Potentially, we would obtain a
9   background check.
10             MR. DUMAIN:  All right.
11             Well, Ms. da Silva Vint, that
12       is what I have for today.
13             So, thank you.
14             THE WITNESS:  Thank you.
15             MR. UNDERWOOD:  Thank you.
16             THE VIDEOGRAPHER:  Time is 5:45
17       P.M.
18             We are going off the record.
19             (Whereupon, at 5:45 P.M., the
20       Examination of this witness was
21       concluded.)
22
23             °         °         °         °
24
25

Page 399

1              MEI-LI da SILVA VINT
2              D E C L A R A T I O N
3

4        I hereby certify that having been
5    first duly sworn to testify to the truth, I
6    gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing
9    transcript is a true and correct transcript
10   of the testimony given by me at the time
11   and place specified hereinbefore.

12

13

14

                    _____
15                      MEI-LI da SILVA VINT

16

17

18   Subscribed and sworn to before me
19   this _____ day of _____ 20___.

20

21

        _____
22       NOTARY PUBLIC

23

24

25

Page 400

MEI-LI da SILVA VINT

E X H I B I T S

PLAINTIFF'S  EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Internal Tab 2 | 33 |
| Exhibit 2 | An organization chart from March 29, 2017 | 46 |
| Exhibit 3 | Brevet New 015121 | 81 |
| Exhibit 4 | Corporate organizational chart | 111 |
| Exhibit 5 | An e-mail dated October 25, 2016 | 132 |
| Exhibit 6 | A 2016, October 5th e-mail | 228 |
| Exhibit 7 | January, 2015 Code of Business Conduct | 249 |
| Exhibit 8 | Defendant's supplemental responses | 283 |
| Exhibit 9 | 17 CFR Section 275.204-2 | 286 |
| Exhibit 10 | E-Mail to Johnny Lan | 310 |
| Exhibit 11 | Mei-Li da Silva Vint | 319 |
| Exhibit 12 | E-Mail from Johnny Lan | |

Page 401

1           MEI-LI da SILVA VINT

2           from 6/13/17               322

3    Exhibit 13   E-mail from Johnny

4              Lan 8/17/17              327

5    Exhibit 14   E-mail from Johnny Lan

6              with the subject:

7              Technology Transition     329

8

9    (Exhibits retained by Court Reporter and attached.)

10

11              I N D E X

12

13   EXAMINATION BY                    PAGE

14   MR. DUMAIN                        6

15

16

17   INFORMATION AND/OR DOCUMENTS REQUESTED

18   INFORMATION AND/OR DOCUMENTS      PAGE

19   (None)

20

21

22        QUESTIONS MARKED FOR RULINGS

23   PAGE LINE QUESTION

24   (None)

25

Page 402

1          MEI-LI da SILVA VINT
2             C E R T I F I C A T E
3
4   STATE OF NEW YORK        )
                             :   SS.:
5   COUNTY OF NEW YORK       )
6
7        I, KARYN CHIUSANO, a Notary Public
8   for and within the State of New York, do
9   hereby certify:
10       That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14       I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 26th day of October, 2021.
21
22
23  _____
            KARYN CHIUSANO
24
25

Page 403

1                          ERRATA SHEET
                    VERITEXT/NEW YORK REPORTING, LLC
2

      CASE NAME: Iacovacci, Paul v. Brevet Holdings, LLC, 18-Cv-08048
   (S.D.N.Y.)
3     DATE OF DEPOSITION: 10/7/2021
      WITNESSES' NAME: Mei-Li  da Silva Vint
4
5      PAGE   LINE (S)        CHANGE                  REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                    _____
                                      Mei-Li  da Silva Vint
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS _____ DAY OF _____, 20__.
23
24
      _____          _____
25    (NOTARY PUBLIC)                       MY COMMISSION EXPIRES:

[& - 2020]                                                                Page 1

**&**

**&**   3:17 44:21
46:20,23 375:8

**0**

**00304**   247:13
**003049**   244:7
**003050**   244:8
247:14
**015121**   81:3,4
400:11
**06**   302:20
**08**   212:18
**08048**   1:6 403:2

**1**

**1**   3:17 30:19 33:16
33:18 34:7 185:9
185:18 190:16
255:12 354:13
400:8
**10**   310:22 311:3,7
400:23
**10/20/2017**   330:11
**10/25/2016**   134:19
**10/5/2016**   230:3
**10/7/2021**   403:3
**10001**   6:14
**10006**   2:6
**10280**   8:7
**10:15**   82:6
**10:23**   82:11
**11**   319:7,13 384:4
400:24
**111**   400:13
**113**   119:15
**115**   115:22
**11968**   327:17
**11:14**   131:20
**11:31**   132:2
**12**   46:2 206:3
230:3 322:19,24

326:24 400:25
**12/31/2017**   70:10
**120**   120:24
**128**   232:21,24
**12:13**   184:24
**12:31**   185:5
**13**   327:15,20 401:3
**130**   233:9 234:13
**132**   400:15
**13319**   228:14
**14**   185:12,24
329:21 330:3
401:5
**14th**   135:21
188:23 280:13
**15**   184:12 279:11
349:5 361:24
363:20 364:8
366:10
**150**   232:22 233:9
**15222**   2:11
**15h**   8:7
**15th**   145:8 186:10
187:7,13
**16**   31:19 354:18
361:24 363:20
364:9 366:10
**16th**   198:5 212:4
221:4,17
**17**   85:20 286:14
287:5 319:7 363:4
363:5,10 400:22
**17096**   310:17
**17th**   215:7,21
**18**   31:20 101:14
103:12 105:18
255:19 256:4,7,11
403:2
**18034**   402:22
**18th**   298:6 301:14
301:23

**1940**   52:19 53:6
55:16 56:2
**19585**   329:23
**1:00**   184:8,16
**1:14**   226:4
**1:15**   184:8,16
**1:18**   1:6
**1st**   190:4 191:8
220:15 304:8,14
306:22 319:18

**2**

**2**   33:15,17 46:6,12
206:20 207:3
208:17 212:23
214:24 400:8,9
**2,500.00**   308:13
**20**   32:6,16 199:10
199:11 210:10,13
210:15,17 399:19
403:22
**2006**   302:19
**2007**   306:23
380:13
**2008**   380:13
**2009**   306:19
**2010**   47:4
**2014**   309:12 355:5
356:12 358:18
361:10,13,24
363:13,20 364:8
364:14 366:10
**2015**   83:14,16,22
85:15,20 139:11
139:14 142:15
144:19 160:8
163:22 231:3
248:22 249:2,16
364:20 365:2
367:3 400:18
**2016**   23:25 29:12
36:4 41:16 66:20

70:10,15,21
101:14 103:12
105:18 120:9
132:5,12 136:17
137:23 139:15
141:9 158:22
161:4,4 180:15
182:11,17 186:10
187:7,13 188:22
188:23 190:4,16
191:15 193:18
198:2,10,13,21,22
199:6 201:22
216:21 218:22
219:19 220:2,15
223:5,24 225:2
226:18 227:5
228:13,23 241:6
252:13 253:13
254:17 280:13,16
355:6 356:12
361:10,14 363:14
366:11,18 370:9
370:18 377:7
400:15,16
**2017**   29:13 46:9,11
66:11 208:6,12,21
215:21 217:4
298:6 300:23
301:6,14,24 303:5
304:4,8 309:23
319:18 320:14
326:24 328:13
334:20 337:23
358:18 366:12
400:10
**2018**   66:15
**2020**   129:25
130:18,19 198:5
271:20 275:6
281:13 361:13

**[2020 - abide]**                                                     Page 2

371:14 372:10
**2021**   1:11 4:5
  57:22,23 91:8
  130:20 371:15
  372:11 402:20
**204-2**   166:7
  167:16 242:2
  247:20
**2042**   165:23
**206**   388:22
**20th**   6:13 23:25
**21**   210:18 319:9
  322:15,20 334:20
**21st**   306:19
**22**   210:17
**225**   2:11 8:6
**228**   400:17
**23**   207:10
**23rd**   301:6,14,24
**24**   286:13
**2402**   165:16
**249**   400:19
**25**   32:7,16 132:5
  132:12 303:5
  400:15
**255212**   251:11
**25th**   304:4
**26**   238:9
**26th**   402:20
**275.204-2**   286:15
  400:22
**275.204-2.**   287:5
**27th**   208:21
**283**   400:21
**286**   400:22
**29**   46:9,11 400:10
**2:01**   226:8
**2:49**   255:25

---

### 3

**3**   81:5 82:15 89:11
  132:12 161:15,23
  163:3 242:19,20
  306:18 307:16,19
  400:11
**3,837.15**   308:13
**30**   1:17 3:16 19:18
  20:3,22 30:20
  32:3,13 33:9
  185:10,25 186:7
  187:12 194:5,6
  196:13 255:13
  279:15,23 354:14
  354:23 369:8
**300**   244:3
**3049**   244:4
**31**   36:4 66:11,15
  66:20 70:10
  136:17 137:22
  158:22 182:11
**310**   400:23
**319**   400:24
**31st**   71:2 91:8
  139:15 141:9
  161:4 180:15
  198:13 201:22
  223:5,24 225:2
  252:13 253:13
  280:16
**32**   32:23 33:3,4
  195:5
**322**   401:2
**327**   401:4
**329**   401:7
**33**   32:23 33:3,4
  189:22 195:6
  308:11 400:8
**3448**   234:14
**39**   232:23

---

**3:00**   267:4
**3:09**   267:9
**3:58**   310:8
**3rd**   2:5

### 4

**4**   111:18,22 113:10
  133:22 240:21
  243:3 283:16
  326:11 400:12
**40**   234:10,11
**441**   6:13
**46**   400:10
**48**   244:12,15
**4:04**   310:13
**4:49**   354:5

### 5

**5**   120:2 132:6
  134:2 140:9 155:3
  155:4 237:24
  243:6,11,18
  297:13,15,18
  400:14
**55**   2:5
**5:00**   353:25 354:2
**5:01**   354:10
**5th**   135:21 228:13
  228:23 400:16

### 6

**6**   1:17 19:18 20:3
  20:22 30:20 32:3
  32:13 33:9 185:10
  186:7 187:12
  194:5,6 196:13
  228:25 229:6
  238:7 243:20
  255:13 279:15,23
  283:18 297:13
  302:20 354:14,23
  369:8 400:16
  401:14

---

**6/13/17**   322:23
  401:2
**624-3287**   120:24

### 7

**7**   1:11 4:5 138:23
  155:3,5 211:22
  236:14 248:25
  249:4 400:18
**7.2**   200:25 211:16
  212:9 213:11
  221:16
**772**   206:6

### 8

**8**   196:21 213:17,22
  282:23 283:4,23
  400:20
**8/17/17**   327:19
  401:4
**81**   400:11
**877**   120:24

### 9

**9**   31:15 165:6
  286:16,24 287:4
  294:5,17 354:19
  400:22
**90**   34:2
**91**   230:20
**9:00**   1:12 4:5
**9:20**   230:3
**9th**   6:13

### a

**a.m.**   1:12 4:5 82:6
  82:11 131:20
  132:2 230:3
**abide**   136:7
  156:24 193:8
  204:25 240:15
  246:18 247:7

**abiding** 202:23
**ability** 200:2
**able** 8:20 54:15
  187:9 188:25
  189:23 190:8,12
  223:9 235:9,13
  317:14 339:6
  351:17 361:8
  364:7
**abridge** 61:8
**abu** 35:8
**abuse** 101:8
**abv** 375:13
**aca** 281:2,4,7,12
**accepts** 340:13
**access** 80:3 117:21
  149:5,19 151:5
  152:8 154:14
  177:16,17 179:24
  180:8 200:4
  201:12 213:19
  215:13 217:6,15
  218:7,24 219:23
  220:19 221:8
  235:9,13 245:18
  254:14 255:6
  257:16,19,21,23
  258:17,22 261:2,7
  261:12,18,20
  268:16 272:10
  275:13 282:7
  313:16 314:5,10
  314:13 315:2,3
  317:15 318:4,16
  318:21 320:15,23
  321:2 324:2,9,14
  327:3 328:6,12
  329:4 339:6
  340:19,21 351:12
  351:17 352:8,22
  357:14,17,23,25

  361:21
**accessed** 278:19
  279:17
**accesses** 149:21
  258:5,11
**accessible** 90:14
**accessing** 106:2
  180:10 254:18
  281:17
**account** 63:2
  178:23,25 179:22
  253:21,25 266:18
  273:4,5 274:9
  275:14 276:7
  296:14,24 314:25
  316:7 342:8,16,22
  342:24 343:6,23
  343:25 344:5,12
  344:18,19
**accountants**
  251:16
**accounting** 123:15
**accounts** 115:15
  219:2 246:7 295:8
  312:23 317:22
  343:3
**accuracy** 178:12
**accurate** 115:8
  167:15 202:6
  238:21 285:20
  289:10 290:14
  291:24 292:8,9
  314:12 374:13
**accurately** 251:14
  251:24 286:11
**acronym** 325:18
**act** 17:15 52:17,19
  53:6,13 54:18
  55:15,21 56:2
  73:13 74:5,13
  96:25 97:8,20

  99:5 101:8 151:12
  153:2 157:7,16
  165:16 166:8,17
  171:8,11 172:6,10
  173:13,21,24
  174:2,20,23 175:8
  176:23 181:13
  242:2 287:24
  290:10,18 292:10
  294:10 357:21
  358:23 360:20
  380:23 381:2
  388:22 389:11
**acting** 21:13 23:6
**action** 4:16 5:12
  61:15 78:18
  164:16,22 165:2
  275:4 370:3
  402:16
**actions** 377:20
  378:13
**active** 338:25
**activities** 63:2,12
  159:7 234:22
  295:15 336:17
**activity** 59:11 63:4
  63:7 336:20 339:2
**actual** 304:23
  334:4 348:4,9
  383:9
**ad** 260:24 345:12
**add** 282:20
**added** 216:9,14,17
  217:9 392:21
**addition** 191:14
  212:23 213:7
  215:13 216:2
  338:3 341:4
  381:11 390:20
**additional** 261:6
  261:12 266:25

**address** 6:12 7:9
  7:23 149:20 179:8
  179:13
**addressed** 303:2
**addresses** 154:13
**adequate** 155:22
  376:2 381:23
**adhere** 287:25
**adhered** 143:15
**adherence** 74:12
**adhering** 312:20
  345:12
**adhesive** 349:14
**admin** 395:6
**administer** 3:11
**administrate**
  342:12
**administrated**
  313:8
**administration**
  151:17,19 342:2,5
**administrative**
  201:14
**administrator**
  151:9,12,13,22,25
  152:3,12,16,21
  154:3 312:14,16
  312:19 342:12
**administrator's**
  151:4
**admitted** 53:22
**admonition** 58:21
**adv** 67:3 99:11
  127:10,12,17,24
  128:2,3,21 395:19
**advance** 19:3
  138:17 391:21
**advertising** 167:9
**advice** 13:17,18,25
  15:13 23:15,21
  40:3 41:4,7,10,15

Page 4

51:12 52:7 57:13
99:15,20 280:10
280:12,14 281:16
295:2 378:13
385:18
**advise** 282:6
**advisement**
150:13
**advisers** 388:22
389:11
**advisor** 13:13 14:8
14:10,14,17 74:11
97:14 99:18
127:18 155:19
156:13 167:2
262:16 284:11,14
287:14,19 289:21
290:12 356:18
365:14 375:7,15
386:16
**advisor's** 285:13
**advisors** 52:16,19
53:6,13 54:18
55:15,21 56:2
73:13 74:5 96:24
97:7,20 99:4,5
118:15,17 127:15
157:7,16 166:17
173:21 176:23
181:13 242:2
270:9,21 287:9,24
290:10,18 292:10
294:10 312:12
357:21 358:23
360:20 375:3
380:23 381:2
**advisory** 122:10
210:7 237:25
238:4 242:23
244:22 245:8,21
247:4 288:24

289:7,8,16
**affect** 306:17
**affidavit** 333:11
333:24
**affiliated** 97:25
98:12 127:18
390:5,8 393:12
395:9
**affiliates** 375:14
393:4
**affiliation** 126:6
**affiliations** 4:20
**affirm** 63:20
**affirmation** 63:17
**affirmed** 204:24
205:13
**afoul** 343:14
345:14 346:10
**agent** 152:21,25
395:6
**agents** 190:14
**ago** 15:16,17 51:24
70:13 72:17
136:25 212:4
**agree** 18:11
110:21 187:5
216:19 369:2,3
**agreed** 3:5,20
220:23 275:6,19
309:9
**agreeing** 299:14
**agreement** 14:5
83:9,11,21 84:16
84:23 86:22
151:11,15,25
237:25 238:4
298:9,15,17,23
299:10 300:2
303:2,23 304:2,24
306:18,21 307:4,8
308:7 332:6,13

392:22
**agreements** 85:4
90:11 93:19
167:10 304:18
**ahead** 60:12,13
94:25 95:5 295:14
394:12
**aided** 272:4
**al** 1:8,17 2:10 4:9
**allegations** 102:5
110:21
**alleged** 106:18
**alleging** 78:19
**allocate** 113:3
**allocated** 391:12
**allocation** 389:16
391:14,15 392:12
392:17
**allotted** 252:7
**allow** 104:25
149:22
**alluded** 62:21
**alright** 213:2
**altered** 177:18
**amber** 121:23,25
**ambient** 95:19
**ambit** 235:4
**amendments**
130:20 306:23
**aml** 293:16
**amount** 81:17
129:8,11 130:14
240:12 288:2,10
291:19,22 337:25
345:24
**analogous** 212:2
**analysis** 64:21
105:7 163:25
**announce** 187:6
**announced** 187:12
187:21,25 188:10

**announcement**
186:9 188:21
189:3
**annual** 127:13
155:12,20 156:25
157:5,19 158:8,20
158:24 159:14
160:23 178:6
293:13,14,18
358:21,25 359:4
363:15,19 364:4,7
365:6,10,12,20,23
366:20,22,25
367:12 368:6,12
368:23 369:6,9
379:15 382:7
**annually** 356:15
382:17
**answer** 7:12 19:8
53:2 60:21 65:12
97:9 103:23 105:2
127:8 142:23
189:5 221:2 224:8
262:25 263:5,9,11
282:11 286:10
294:6 314:20
315:21 318:9
325:14 378:4
**answering** 180:6
288:5 394:14
**answers** 192:6
**anthony** 28:3,9,17
386:14
**anti** 389:2,5,7,10
**anticipate** 251:20
**anybody** 72:23
113:5 258:24
**apartment** 8:7
**apologies** 155:8
164:7 243:14

**app** 7:2 324:3
340:15
**appear** 22:16
**appearance** 4:20
4:24
**appeared** 21:21
**appearing** 22:5,8
**appears** 22:18
83:7 84:21 208:2
208:20,25 210:25
211:13,25 215:23
217:2 287:15
318:23 327:5
**applicable** 238:14
288:25 343:15
345:13
**application** 200:4
329:8
**applications** 210:4
**applied** 157:19
162:23 271:8
**applies** 55:22
383:17
**apply** 162:4
202:11 210:5
271:6 329:9
**appointed** 195:17
**appreciate** 19:5,7
34:4 103:15
142:22
**appropriate** 25:22
102:16 141:2,13
141:19 142:7
143:7 183:6
207:17 309:17
337:3 373:11
**approval** 77:16
78:5 87:13 147:13
149:2,8
**approve** 35:15
117:8,14

**approved** 64:13
96:15 114:21
117:24 141:2,12
142:10 143:6
148:25 209:13
**approves** 77:13
**apps** 339:22,24
340:4,4
**april** 190:4,16
191:8 298:6
300:23 301:14,23
**araj** 194:16,17
**archive** 174:13,17
174:21 175:3,22
175:23 179:3,4,15
253:8 257:11,14
257:17
**archived** 59:11
**area** 48:16 315:18
317:9
**areas** 48:17 51:5
79:10 271:3
373:19 381:13
**arises** 111:10
**arising** 201:14
**arm** 124:23
**arms** 124:25
**arrival** 384:6
**arrive** 382:3
**arrived** 69:18
92:13 142:17,19
158:21 159:20,22
159:24 160:22
161:3 181:21
182:10 355:15
**asadi** 194:16,17
**ascertain** 155:21
**aside** 12:20 57:12
73:21 88:25
101:12 105:15,15
109:8 122:3 138:8

268:3 384:9,21
385:17
**asked** 18:10 89:22
95:24 133:6 135:6
146:21 173:17
233:11 279:13
375:12,17 385:23
**asking** 19:21 44:9
54:25 68:3 89:18
101:21 122:15,16
142:14,16 143:2
144:10 193:23
218:14,17,21
220:7,9,24 290:16
298:20 313:25
315:10 346:19
374:3
**asks** 267:2 378:3
391:22
**aspect** 76:14
173:20
**aspects** 32:19 97:5
157:8
**asserted** 79:6
101:6 106:12
161:25
**assessment** 381:6
381:8,17,20
**asset** 118:19,21,23
123:10
**assets** 312:15
313:3 390:11
395:21,23,25
396:8,18,24
**assist** 312:24
**assistance** 331:4
382:22
**assists** 72:7
**associated** 124:8
**association** 4:13

**assume** 8:13
**assumed** 51:8
**attach** 276:16
**attached** 207:19
276:13 298:9
301:8 302:14
401:9
**attaching** 228:20
**attachment** 230:6
**attachments**
208:10,10 230:10
230:14 323:7
**attempt** 381:15
**attempting** 116:3
**attended** 23:3
35:13
**attention** 376:16
**attestation** 63:23
**attestations** 67:4
**attested** 96:6
204:24 205:14
**attorney** 4:25
11:12 24:15,15
101:25 107:3
**attorneys** 2:4,10
102:8
**audit** 149:20
154:15 178:6
301:20 371:14
379:18 380:6
**auditors** 251:17
**august** 328:13
**authority** 56:10
61:20,24 93:3
192:24 397:18
**authorize** 77:22
**authorized** 3:11
78:3 177:19 397:2
**avenue** 2:11 6:13
**aware** 8:19 21:5
25:8 29:9 61:14

75:11 78:17
164:15,18,20,25
198:15,19 238:24
257:21 258:15
268:4 272:19,23
280:13 281:15
333:10 343:2

**b**

**b** 1:17 19:18 20:3
20:22 30:20 32:3
32:13 33:9 85:7
154:10 185:10
186:7 187:12
194:5,6 196:13
255:13 279:15,23
318:2 354:14,23
369:8 400:2
**back** 26:18,25
30:14 47:14 53:22
54:12 55:6 81:14
81:19 82:12 95:3
107:24 108:2
132:3 163:15,17
172:25 175:23
182:5,22 183:3
185:6 186:17
190:21 191:3
192:4 213:3
214:22 215:2
223:14 226:8,9,11
232:3,5 239:12
256:2 263:9
267:10 273:11,13
274:12,16 286:21
292:6 301:5
310:14 316:25
318:12 321:11
337:17 353:3
354:11 372:21
380:10

**backdated** 304:13
**backed** 278:12,13
**background** 48:14
48:19 150:14
153:17 324:7
397:25 398:9
**backing** 178:15
198:4 278:3
328:17
**backup** 331:4
336:24
**backups** 277:16
277:24 279:7
**backwards** 355:9
355:13
**baker** 88:7
**balance** 40:23
42:11,14
**bank** 40:24 42:10
42:12,14,23 48:17
167:5 312:23
314:25 316:5,7
317:22
**bar** 53:23 349:14
**barring** 147:6
**based** 135:4
173:25 192:17
308:22 377:11,12
380:24 381:4
**bases** 186:9
**basic** 342:3
**basically** 192:7
**basis** 147:4 187:15
191:9 222:15
259:6 316:18,19
392:23
**bates** 81:2 206:5
234:14 243:25
244:17 251:11
310:16 327:17
329:22

**batteries** 337:11
**bc** 119:22,23
**becoming** 194:20
**beg** 51:9
**began** 57:20,25
69:10 135:14
136:16 137:21
138:3,7 139:21
141:7 146:2
154:21 158:22
180:14 198:21
200:22 201:21
228:19 260:19
305:13 324:13
**beginning** 4:24
53:13 57:22,23
139:24 212:22
227:6 316:21
320:3
**begins** 140:19
235:5 284:10
322:4
**begun** 145:13
**behalf** 19:19 20:20
186:15 303:14
**believe** 133:23
164:10 191:10,11
194:19 195:13
199:4 210:10
233:11 241:19
250:21 254:2,12
275:10 294:10
332:15 341:21
351:14
**belonged** 350:11
**best** 15:3,6,8 20:16
21:2 23:25 29:11
34:24 35:23 37:18
38:17 44:4 47:3,8
49:10,19,25 50:6
50:25 53:15 56:4

57:7 67:11 68:6
68:25 74:21 114:2
119:2,20 120:5,8
122:25 129:5
138:13 142:19
159:2 160:20,20
161:12 162:20
164:4 182:18
194:19,25 195:8
196:4,18 198:23
211:2 260:22
267:23 303:24
308:18 315:20
331:22 348:12
350:8 357:8
363:21 366:16
**betraying** 112:19
**better** 33:25
239:16
**beyond** 53:25
54:13 60:3 67:20
72:15,19 257:21
315:9
**big** 147:17
**billable** 146:16
**billables** 87:17
**biography** 37:21
**bit** 31:11 44:25
56:20 79:18 291:2
**blackberry** 350:4
350:5
**blah** 151:3,3,3
**blasted** 90:16
**blocked** 244:2
**blood** 402:16
**blurry** 244:2
**board** 65:7 121:14
122:8,9,11
**boarding** 340:25
**book** 148:24 149:6
247:19

**bookkeepers**
  251:16
**books** 98:13,16,22
  148:3,13 165:10
  166:15,24 176:10
  176:21 177:5,11
  251:15,24 285:15
  286:9 287:7,25
  289:23
**borrower** 315:11
  315:13,16 317:3
  394:4,8,23,24
**borrowers** 154:6
  312:19 313:5,8
  317:10
**boston** 312:11
**bottom** 207:22
  298:3 303:11
  309:13 312:5
**bought** 235:3
**bound** 175:16
**bowen** 46:21
**box** 154:8,11,16
**bpa** 312:8,11
  313:8,9,12,20
  314:16,23 315:15
  315:16,24 316:4
  316:11 317:5,15
  317:19,24 318:2,4
  393:10 394:2,17
**bpa's** 313:16
  314:5 318:16,20
**bpm** 324:10
**bpn** 318:16,21
**bracketed** 227:4
**brackets** 198:2
**breach** 192:20,23
  292:22 294:2
**breaches** 293:6
**break** 54:16 81:9
  81:15 83:12 94:15

131:14 133:4
183:24 184:2,4,7
184:12,15,17
224:20 266:25
269:21 310:4,6
353:7,8
**breakdown** 168:4
**breaks** 353:9
**brev** 73:5
**brevet** 1:8,16 2:10
2:16 4:9 7:15 8:12
8:15 12:12,13,17
12:20,21,23 13:2,4
13:7,10,11,12,14
13:17,19 14:2,7,19
14:20,22,23,24
15:5,11,11,14 16:5
16:10,14,16 17:15
17:20,23 18:2,6
20:21 21:6 22:14
23:7,9,15,22 25:5
25:16 26:2,6 27:9
27:9 28:23 29:4
36:3 39:18,22
40:7 41:8,12 45:8
45:12,15,21 47:17
47:23 48:3,12
49:3,5 50:21 51:6
51:14 52:15 53:8
53:14 54:25 55:7
55:13 56:23 57:13
58:6,6,12,13,14
59:16,18 60:4
62:22 63:19 64:8
64:15,24 66:7,9,22
67:7,22 69:4,11,23
70:14 71:10 73:13
73:21,21 74:3,7,14
74:17,18,23,24,25
75:22,24,24 76:4,6
76:10 77:5,10

78:14,17 79:3,10
79:12 81:2,4
84:18,24 85:15,19
86:11,16,22 87:15
87:17,25 88:9,11
88:12,20 89:12
90:9,18,19 91:7,9
91:12,19 92:14,15
92:17 94:3 97:16
97:17,19,24 98:4,5
98:10,12,18,19,20
99:3,7,14 100:7,25
105:22 106:7,8,11
106:16 108:10,12
109:10 114:9
115:4,15 116:10
116:11,24 117:2
118:8,19,21,23
120:6,6,10,21
121:3 122:6,21
123:18,20,22,25
124:2,6,12,15,18
124:20 125:6,8,10
125:25 126:18,20
126:25 127:3,24
128:9,13,23
129:15 133:2
135:2,15 136:16
137:7,19 138:2,3
141:3,8,10,13,20
142:7 143:7,20
144:4,21 145:13
145:22 146:3
148:25 149:5
150:5,6 151:9,10
152:13,22 153:11
153:13 154:5,22
155:18 156:2,6,12
156:16,25 157:3
158:7,22,23,25
159:13 160:22

161:3,5 162:4,9,23
163:5 164:11,14
164:16,22 165:2
167:4,11 169:3
172:14 173:10,11
173:22 174:14,20
175:6,18 176:8,20
177:9,9 178:21,22
178:24 179:6,7,8
179:10,12 180:9
180:15,15 181:21
182:10,19 183:10
183:17 186:8,9,16
187:6,12,20 188:2
188:10,21 190:4,8
190:13,15 191:11
192:11,12,13,15
192:19,20,25
194:16,18 195:12
195:15,16 196:8
196:17 197:21
198:5,9 200:3,12
200:17 201:22
202:3,12,12
203:17 204:2,18
204:21 208:22
209:18,21,23
217:5,6,13,14,22
217:23,23 218:3,6
218:6,22,23,25
219:9,16,19,21,22
219:25 220:9,15
220:18,19 221:3,5
221:7,7,25 222:9,9
223:7,9,10,25
224:3,5,15,25
225:3,4,5,12,13
226:14 227:19,24
227:25 228:19
230:4,25 231:7
232:8,14 233:4,21

| | | | |
|---|---|---|---|
| 235:2,11,13 236:8 | 321:2,8,13,15,18 | **brevet's** 25:16 | 367:24 |
| 237:2,4 238:13,24 | 322:9 326:20 | 26:7,12 29:9 56:8 | **brook** 52:24 |
| 239:2 240:5,7,16 | 328:12 329:4,17 | 61:9 73:6 75:18 | **brought** 11:11,17 |
| 241:14,24 245:2 | 331:5 332:13,19 | 79:22 80:25 85:21 | 100:5 110:22 |
| 245:15,18,20,23 | 332:21,23 333:4,6 | 86:2 87:8,10 | 352:12,21 360:11 |
| 245:24 246:2,3 | 333:13,17,22 | 111:11 129:9 | **brown** 88:6 164:3 |
| 249:13,21 250:3 | 334:25 335:5,17 | 149:4 151:14 | **browser** 243:15 |
| 250:13,25 252:13 | 335:17,18,19 | 157:8 190:2 | **budget** 77:6 |
| 252:14,25 253:11 | 336:17,19 337:15 | 193:19 202:17 | **bunch** 323:7 |
| 253:12,20 254:5,8 | 337:23 338:4,18 | 203:13,22 204:22 | 345:20 |
| 254:9,12,16,18 | 338:20 339:5,9,12 | 219:17 223:5 | **bungee** 18:4,5 |
| 255:2,2,6 256:12 | 339:15,16,20,23 | 224:25 225:17,18 | **bungi** 258:2 |
| 256:15,22 257:2,9 | 340:7,7,12,13,20 | 234:3,6,19,20 | 384:22,24 |
| 257:10 259:3 | 340:22 341:5,15 | 235:5,9,10 238:3 | **business** 55:22 |
| 260:21 262:7 | 341:18,24 342:7 | 246:20 247:3 | 59:11 62:11,25 |
| 267:21 269:18 | 342:16,22,25 | 280:4 286:5 290:8 | 63:3,7,11,21 64:9 |
| 272:8 273:2 274:5 | 343:2,4,7,18,22,25 | 292:20,23 293:4 | 64:15 65:2,6 |
| 276:5,11,16,19 | 344:5,12,14 345:5 | 303:14 309:18 | 122:5 124:15 |
| 277:8,11,14 278:7 | 345:6,12,14,25 | 318:16,22 320:15 | 125:10 159:6 |
| 278:18 279:7 | 347:2,4,5,17,19 | 327:3 343:8 | 162:4 167:4 183:7 |
| 280:5,6,7,11,13 | 348:3,21,23 | 344:15 355:9 | 194:24 203:15,22 |
| 282:5 284:16,23 | 349:16,18,23 | 373:20 | 218:10 219:3,15 |
| 285:20 286:5 | 355:15 356:13,20 | **brevetcapital.com** | 219:21 220:18 |
| 288:15,19 289:6 | 357:5,6,11 359:15 | 124:3 174:11,22 | 221:7,25 222:10 |
| 290:18 291:12,25 | 360:8 361:2,18,22 | 253:5,19 | 223:9 224:4,15 |
| 292:11 293:7 | 365:22,23 367:14 | **brevetcapital.com.** | 225:4,13,17,19 |
| 294:13 295:11 | 367:22 368:13 | 253:10 | 226:17 227:25 |
| 296:9,12,14,24 | 369:10,14 371:5 | **bring** 11:8,13 | 231:8 234:6 237:4 |
| 299:3,17,19 300:7 | 377:3,6,8 381:4 | 54:19 199:16,19 | 240:8 242:23 |
| 301:23 302:4,7 | 382:4,13 383:23 | 200:2,6 204:6 | 244:22 245:8,21 |
| 304:6 305:9,15,18 | 385:7,9,18,25 | 205:9 211:23 | 246:2 247:4 |
| 306:18,21 307:13 | 386:15,22 387:4,7 | 376:14 | 248:22 249:3,14 |
| 307:16,19,24 | 387:9,20,21 388:5 | **bringing** 192:4 | 249:22 250:5,13 |
| 308:3,5 309:12 | 389:9,15,24 390:6 | **broad** 97:21 | 250:25 252:15 |
| 312:15 313:9,11 | 390:14 391:3,7,11 | 195:20 246:14 | 254:5 255:3 257:9 |
| 313:15 314:2,5,7 | 391:12,19,24 | 257:5 | 284:18,25 285:13 |
| 314:13,15 315:5 | 392:15 393:3,4,17 | **broader** 221:13 | 285:22 286:5 |
| 315:15,17,24 | 393:20 394:3,22 | **broadly** 246:10 | 287:20 288:17,21 |
| 316:4,6,12 317:5 | 395:20 396:7,19 | **broadway** 2:5 | 288:24 289:2,7,14 |
| 317:15,16 318:3 | 396:25 397:25 | **broke** 26:14 214:9 | 289:16,22 290:20 |
| 318:16 320:23 | 400:11 403:2 | 215:9 226:12 | 291:13,15 292:3 |

292:13 331:23
338:18,21,21
339:2,10,16,20
343:22 373:13
381:14,25 382:3
382:11,14 383:6
388:5 391:9
400:19
**buying** 346:13

**c**

**c** 2:2 399:2 402:2,2
**cabinet** 177:22
**calendar** 367:3
**call** 43:12 82:2
135:7,13 232:10
232:11,13
**callahan** 49:16
71:5 77:19 78:6
134:16 135:13
187:2 230:4 258:2
258:11 263:20
267:20 268:17
269:3 278:20,21
279:19 315:20
355:21 377:22
397:21
**callahan's** 10:11
10:13 21:18
**called** 6:3 46:20
75:9 125:14,16
149:11 154:8
180:16
**calls** 231:17
**camera** 251:5
340:20,22
**capacities** 114:9
**capacity** 19:15
20:2 40:14 56:8
68:3 103:8,19
109:15,19 111:15
152:25 186:7

187:12 255:5
369:8
**capital** 12:14,17
12:21,23 13:11,12
13:15 73:13,21
74:7,14 77:5
97:19,24 98:19
99:8,14 116:11
118:8 120:7
123:19,20 124:2
124:13 126:20
127:3 151:10
156:2,6,12 157:3
158:25 162:23
169:3 174:14
178:22,24 179:12
197:21 209:18,21
209:23 230:5
241:14,24 249:14
249:21 253:11
280:5 306:18,22
307:16,19 308:4
332:13,19 333:14
333:17 334:2,3
386:22 387:20
391:19
**capture** 265:10
293:23
**captured** 179:2,6
179:9 182:8
275:24
**captures** 235:16
**care** 18:19
**carry** 338:7
**case** 1:6 8:17 9:10
9:12 11:9 20:2
21:7 25:17 30:10
100:19,24 105:12
106:13 108:14
111:12 273:16,17
273:23 274:5,19

275:2,4 333:11
394:2,22 403:2
**cases** 26:2
**cash** 167:6 312:22
316:20 396:14
**categories** 171:11
287:13 294:7
**cause** 58:7,10
67:19
**causing** 95:20
**caveat** 202:22
**cco** 161:24 238:2
238:11,15
**ceding** 246:4
**ceo** 334:11
**certain** 18:19
20:21 63:2 73:24
80:3,4 90:14,15
92:2 97:5 99:11
99:12 150:25
174:15,24 181:7
183:19 192:9
217:20 241:25
259:18,19,21
261:9 269:14,16
269:22 275:8
312:15 316:17
324:12 347:25
368:9 380:4 387:2
396:3 397:22
**certainly** 19:7
184:19 275:25
339:11
**certainty** 332:15
332:16 347:21,23
348:9 355:25
356:6 359:17,22
361:12 364:2,17
364:23 365:6,19
386:13,14 387:25
389:13

**certificates** 53:19
54:3,17 55:5
**certification** 3:8
54:7
**certify** 399:4,8
402:9,14
**cetera** 123:15
126:3 148:3
167:11,20 218:13
219:17 343:20
346:14 392:8
**cf** 2:8
**cfr** 286:14 287:5
400:22
**chain** 300:23
312:5
**change** 94:14 95:3
148:15,15 216:20
217:2 327:2 331:7
403:5
**changeable** 90:13
**changed** 27:18,21
71:9 83:21,24
84:3,3,5,7 95:2
182:23 209:6
274:7,10 308:17
308:21
**changes** 35:21
70:6 147:17
148:18 159:9
382:10,18 384:18
392:20
**changing** 148:8,9
148:11 183:4
**chapman** 88:6
**chart** 46:9,11
111:21 114:2,7,20
115:5,8,18 116:2
117:2,11,25 118:4
118:11 119:10
400:9,13

**charts** 113:24
114:10,12,14,17
117:17
**chat** 362:15
**check** 18:12,20
54:15 178:8
271:21 398:9
**checking** 88:23
**checks** 398:2
**chief** 12:14 13:9
13:14 14:25 36:2
47:23 48:4 49:22
50:3 52:14 53:7
55:13 56:9 73:4
73:10 79:14 103:8
104:2,11,12,13
129:8 137:22
139:24 141:8
146:4 161:6,17
252:24 255:5
262:11,14,23
272:7,18,25
273:22 274:4
276:4,10,18
277:10 358:5
360:10 372:7,23
**child** 18:18 341:13
341:14
**children** 347:7,11
**chiusano** 1:21
4:13 402:7,23
**choose** 175:3
247:7
**choosing** 89:2
**chose** 309:3,9
**cio** 392:6,10
**circle** 349:13
**circular** 348:16,17
**circulars** 153:17
**circulate** 362:25

**circumstance**
62:21
**circumstances**
147:7 196:7
215:25 217:21
251:20 261:19
268:15 282:7
369:17
**citrix** 320:6
321:16,17 324:3
351:15
**civil** 1:20 201:14
**claim** 101:6
309:19
**claims** 79:4 100:5
100:17
**clar** 344:23
**clarification** 19:24
23:5 55:4 227:22
275:22 325:8
344:23 355:17
**clarify** 22:12 36:6
54:24 97:9 277:4
**classified** 396:2
**cle** 15:24 53:18
55:23
**cle's** 53:16 55:2
**clean** 43:22 214:6
214:12
**clear** 36:23 45:11
52:2 62:7 70:23
93:25 95:7 96:16
97:14 103:18
183:9 206:24
218:16,19 221:11
221:14,15,21
222:2 240:14
252:21 253:18
273:20 274:3
276:25

**clearance** 59:9,19
62:3,9,13,15
**clearly** 170:17,23
172:5 219:5
220:23 240:17
241:23 307:15
**click** 342:20
**client** 22:6,15,25
24:15 100:6 149:3
149:3 167:8
168:13 270:21
395:21 396:8
**clients** 52:5 99:7
99:21,22,25
140:25,25 141:11
141:12 143:5,6,12
143:13 146:7,8
147:2,3 167:11
169:5,6,8,11
295:25 357:24
386:17,25 387:8,9
387:22 389:22
390:10,14 391:12
391:21
**closer** 239:14
**cloud** 278:9
**code** 65:20 93:16
206:14 217:17
239:22 248:22
249:2,14,22 250:5
287:11 349:15
382:14 383:6
388:4 400:18
**colin** 2:12 5:8
43:23 51:18 89:16
102:13 184:6
214:16 311:25
**collateral** 38:23
119:4
**collation** 205:4

**colleague** 5:10
**colleagues** 5:6
**collected** 316:3,9
388:7,12
**collecting** 24:8
72:4 275:15
**collection** 24:12
24:20 44:14
**collectively** 120:17
120:19
**com** 366:22
**come** 14:6 26:18
81:14 103:9,25
108:19,22 109:2
151:6 154:2
174:11 188:19
191:10,20 229:9
286:21 296:25
318:15 360:3
377:22 378:12,20
379:4
**comes** 63:4 79:20
148:5 150:22
153:23 174:21
175:24 243:23
377:24
**comfortable** 82:22
**coming** 51:14
129:2 180:9 183:5
312:22 315:4
379:9
**commercial** 48:19
**commission**
284:16 403:25
**committee** 313:4
**common** 126:8,9
126:19,24 127:6
**commonly** 209:25
**communicate**
15:12 192:19
193:3,16 236:8

245:7
**communicating**
192:3 193:11
**communication**
234:19 235:6,11
235:17 236:6
254:10 257:8
265:3 267:25
279:8 294:23
343:19
**communications**
242:21 244:19
268:14 294:24
**companies** 45:7,21
45:23 56:15
**company** 45:8,16
58:24 59:4 65:8,9
101:19 102:2,9
103:20 105:9
215:13 217:7,15
232:15 245:10
275:9 304:7
306:17,21 331:12
340:4 365:21
**company's** 56:11
244:20
**compare** 212:18
212:20
**compass** 59:4
**competent** 8:20
**complain** 222:15
**complete** 218:2
263:12 314:11
**completed** 15:21
53:11 137:18
144:21 178:10
262:24 271:22
381:20
**completion** 53:19
**complex** 38:9,14
39:4

**compliance** 12:15
13:10,14 14:25
36:3 38:3 47:18
47:21,24 48:4,5,5
48:18,22,25 49:23
50:3,22 51:5,13
52:8,10,15 53:7
54:3,7,17 55:13
56:9,25 57:8,12
62:13,15 63:15,18
63:24 65:20 66:23
66:25 67:3 68:10
68:19 69:12,16,24
70:3 73:4,6,10,11
73:16,19,23,24,25
74:4 75:18 76:10
76:18 77:4,9 78:4
79:14,19 84:24
91:25 93:17 103:9
104:2,12,14
114:18 117:8,18
129:9 137:22
139:9,13,24 141:8
142:21 146:4
148:7,14,19
155:12,20 156:14
156:17,22 157:2,5
157:23 158:8,20
158:24 159:15
160:7,23 161:6,14
161:17 167:21,25
180:25 181:2,4
182:17 183:17
236:25 237:23
246:17 252:24
255:5 262:11
265:4 270:7
271:25 272:8,18
273:2,22 274:4
276:5,11,19
277:10 280:19,23

281:11 292:20
293:4,11,13 297:2
312:21 314:24
315:6 320:6
323:17,21 324:13
324:20 331:22
355:9 356:14
358:5,17,22 359:7
359:8 360:3,11,12
361:4,7,10,16,20
361:23 362:3,8,13
362:19,24 363:2
364:12,14,20,25
365:13 366:4,15
366:25 367:13,17
367:21 368:10
369:10 370:10,13
372:7,23 373:12
373:20,23 374:4,9
375:25 376:6,9
377:3,8,14,21,23
378:2,10 379:6
380:24 381:5,7,12
382:5 383:5,15
384:4,11,16,20,23
385:3 387:20
388:4 389:10
392:4 395:8 397:9
**compliances**
237:21
**compliant** 238:13
**complied** 25:5
**complies** 5:19
31:16,23 32:8,24
82:16 83:2 111:19
113:11,17 114:25
115:23 119:18
138:24 139:7
140:11 143:18
155:9 158:4 165:7
166:21 185:11,13

199:12 201:2,6
206:4 207:5
210:11 211:17
212:10,12 229:3
230:21 231:12,21
236:17 240:22
241:21 242:10
244:13 249:7
251:2 255:14,20
298:4 302:21
303:12 310:19
318:14 322:16
323:14 327:22
329:24 354:15,20
363:6
**comply** 289:24
291:20
**comprehensive**
162:2,10 163:2,25
164:6 388:14
**comprised** 324:9
**comps** 234:3
**computer** 54:19
101:7,11,13
105:19 106:2
179:25 180:11
200:13,18 212:17
219:21,23 233:19
245:7 272:11
276:14,17,22
277:2,3,7,13 278:4
278:7,11,13,19
281:18 299:15,18
308:11,23 343:7
343:18,25 344:12
344:21 347:2,5,25
349:18 351:3,18
**computers** 232:8
234:3 279:20
343:4 344:14
345:6,25 392:16

computing 350:19
concern 322:10,13
  372:15,19
concerning 105:17
  151:16 186:7
  280:14 389:16
  395:9 396:4
concerns 84:16
conclude 365:7
concluded 398:21
conduct 108:13
  111:10 162:2
  220:18 221:7
  223:8 224:3 231:8
  240:7 242:22
  244:21 245:20
  246:2 248:23
  249:3,15,22 250:5
  250:13,25 252:14
  254:5 336:19
  339:16 356:13
  365:12 382:14,20
  383:6 388:5
  400:19
conducted 242:3
  246:9 257:10
  343:23 363:16,19
  364:5,8 365:23
conducting 222:9
  225:4,13 227:25
  237:3
conducts 255:2
confer 190:18
  282:13
conference 34:17
  35:4,6 336:25
confidential 8:2
  43:8 44:12,19
  80:12 84:17 92:8
  93:2,10 94:4 96:3
  96:11 112:24

125:16,20,23,24
  247:25 248:11,15
confidentiality
  83:8,20 84:6,8,15
  85:4 90:10 93:15
  93:16 96:9 126:5
  163:8 193:13
confidentially
  83:8
configured 341:18
confirm 6:24 7:20
  51:11 187:10,17
  189:2,12,14,17
  190:7,8 213:7
  252:11 311:4
confirmation
  187:24 360:7
confirming 89:23
  115:16
confirms 366:25
conflict 59:12 63:5
  63:16 64:7,19
  65:3 395:14
conflicts 122:10
confusing 206:16
confusion 377:17
conjunction
  161:25 201:25
  313:3 360:16
  366:4 368:13
  392:5
connect 321:9
connection 18:7
  23:7,16,22 40:4
  41:7,11 88:19
  100:5,23 102:2
  106:17 142:8
  195:4 273:23
  274:5,19 299:2
  301:15 314:14
  335:11 367:11

376:19
consent 234:20
consenting 352:14
consequence
  109:11
consider 37:22,24
  38:4 171:7 172:3
  172:7 359:12
  362:20
considered 59:12
  170:19,21 280:20
consisted 347:7
consistent 202:16
  228:7 292:10
  305:23 321:6,13
  343:7 344:2,13
consists 389:24
constituents 40:25
constitutes 234:20
consult 163:6
  172:17 270:8
  273:6 294:5
consultant 194:20
  332:20,21 333:2
  358:6 359:19,19
  359:24 360:7,21
  366:15 368:16
consultants 27:23
  67:2 70:2 270:20
  270:21 280:19,24
  281:16 357:10,11
  359:14 360:12,16
  360:18 366:5
consultation 173:3
consulted 162:21
  173:11
consulting 281:11
contact 26:11 27:9
  27:17,25 28:5,12
  28:14 385:25
  386:3

contacted 190:3
  190:15
contacts 209:3
contain 250:11
contained 306:16
contains 168:3
  348:2
contemplated
  162:11 163:3
  308:14 344:3,15
content 280:9
contest 187:11
context 14:14
  37:14 102:8
  104:22 141:20
  158:13,17 171:3
  171:23 176:18
  204:10 205:17
  248:4 276:3 312:9
  328:6 381:9
  389:21
continue 301:4
continues 244:7
continuing 15:19
  53:12 55:14
continuity 331:23
continuous 181:17
contracts 332:23
contrary 306:15
  365:17
control 119:4
  126:8,9,19,24
  127:6 159:6 181:9
  392:4
controlled 316:6
controls 181:8
  238:10 381:23
convenient 324:11
  336:18
conversation
  109:6 110:17

112:3 113:8
266:12 362:11
**conversations**
58:23 92:5 233:6
268:5 298:8,14,17
298:22 299:9
306:5
**conviction** 307:22
**coo** 195:13,15,17
195:18,22
**copies** 242:6
294:23 361:3
**copy** 3:14,17
241:9 314:12
**copying** 322:10
326:20 327:4
**copyright** 309:12
309:19
**corner** 210:23
247:23
**corporate** 21:22
22:7,9,16 23:2
39:24 40:8 47:6
47:12 53:10
111:20 114:17
255:5 400:12
**correct** 8:13 9:3
10:24 11:21 20:22
20:23 21:23,24
23:17 33:5 38:12
40:16 47:25 64:10
64:16 75:25 76:19
76:20 84:18 100:8
101:15 124:21
135:8 140:13
141:4 156:4 160:2
160:25 171:12
175:9 176:5 186:2
186:12 187:8
198:10,11 203:17
207:24 209:19,20

211:23 212:6
215:16,18,22
217:10 226:18,19
229:8 231:24
244:25 246:21
250:15 261:3
266:19 267:22
272:3 286:7 290:8
290:14 303:5
313:23 319:21
324:4 326:7,18
345:7 346:3 347:2
347:3 365:8
366:10 374:13
389:25 390:6
394:3,18,19 395:3
399:9
**correctly** 178:17
**correspondence**
257:8 355:20
**costs** 77:13
**counsel** 3:6,17
4:18 6:25 7:18 8:2
11:16 16:11 21:13
22:5 23:6,12
25:16,21 26:12
27:10 86:9,10
87:8,10,14 88:13
88:16,19 89:2
101:16 103:20
104:2,5 105:8,13
105:16,25 106:6
106:23 107:4
108:10 109:10
128:5,8,14,14
159:8,18 161:25
162:9,22 163:6,24
172:17 173:4,12
190:19 270:9
273:7 280:18
282:3,14 374:24

375:2,3,4 382:23
384:10 385:10,12
385:14,16 386:4
**counsel's** 103:15
**counselled** 102:9
**counter** 38:25
39:2 40:25 43:5
43:10
**counterclaims**
78:18,23 106:12
106:18 108:13
109:12 111:11
**counterparties**
90:20
**counterparty**
85:10 86:23 88:12
88:21 92:7,11,14
92:15 93:10 94:5
94:11 96:4 97:18
**counterparty's**
84:17
**country** 135:20
**county** 125:3
402:5
**couple** 39:14
49:11 130:20
171:19 186:22
210:2 231:14
283:19
**course** 43:9 53:5
53:10 56:6 100:4
129:21 140:18
280:10 300:3,6
379:20
**courses** 15:24
55:15,23
**coursework** 53:25
**court** 1:2,19 3:13
4:12 5:15,17,20
6:15 25:6,8,12,17
25:20 26:14,21

60:22,24 61:6
81:21 94:17 130:8
133:12 136:19
214:9 215:9 239:9
239:17 248:12
252:2 263:4
318:18 335:7
352:25 367:24
376:22 378:16,21
379:3 394:9 401:9
**covenant** 316:13
316:23 317:4
**covenants** 312:20
314:24 315:7
316:14,23 317:3
**cover** 207:14
209:18 251:19
358:22 395:9
**coverage** 317:9,12
331:14
**covered** 21:4 52:4
53:17 56:7 112:2
224:14 246:9
**covering** 56:6
**covers** 55:20
**create** 114:9
116:19 137:8
**created** 116:16
144:13 154:15
258:10
**creating** 114:2,6
114:13 118:10
**creation** 343:24
**credit** 38:10,14,23
39:4
**criminal** 201:15
**crisis** 42:16
**criteria** 295:24
**cross** 79:18
**crossing** 219:14

| | | | |
|---|---|---|---|
| ct 383:22 | 17:1 18:1,17 19:1 | 133:1,22,25 134:1 | 247:1 248:1,24 |
| culture 376:6,8 | 20:1 21:1 22:1,15 | 135:1 136:1 137:1 | 249:1,3 250:1,18 |
| 377:3,8 | 23:1 24:1 25:1 | 138:1 139:1 140:1 | 251:1 252:1,23 |
| current 12:10 | 26:1 27:1 28:1 | 141:1 142:1 143:1 | 253:1 254:1 255:1 |
| 15:18 238:20 | 29:1 30:1 31:1 | 144:1 145:1 146:1 | 256:1 257:1 258:1 |
| 264:7 296:8 | 32:1 33:1,15,18 | 147:1 148:1 149:1 | 259:1 260:1 261:1 |
| 324:16 383:19 | 34:1 35:1 36:1 | 150:1 151:1 152:1 | 262:1 263:1 264:1 |
| currently 128:6 | 37:1 38:1 39:1 | 153:1 154:1 155:1 | 265:1 266:1 267:1 |
| 258:22 271:14 | 40:1 41:1 42:1 | 156:1 157:1 158:1 | 267:11 268:1 |
| 289:11 293:17 | 43:1 44:1 45:1 | 159:1 160:1 161:1 | 269:1 270:1 271:1 |
| 324:9 | 46:1,5,12 47:1 | 162:1 163:1 164:1 | 272:1 273:1 274:1 |
| curtis 128:11,22 | 48:1 49:1 50:1 | 165:1 166:1 167:1 | 275:1,10 276:1 |
| 129:6 164:3 375:5 | 51:1 52:1 53:1 | 168:1 169:1 170:1 | 277:1 278:1 279:1 |
| 382:24 | 54:1 55:1 56:1 | 171:1 172:1 173:1 | 280:1 281:1 282:1 |
| custodian 169:16 | 57:1 58:1 59:1 | 174:1 175:1 176:1 | 282:23 283:1,4 |
| 169:23 172:13 | 60:1 61:1 62:1 | 177:1 178:1 179:1 | 284:1 285:1 286:1 |
| 396:16,20 | 63:1 64:1 65:1 | 180:1 181:1 182:1 | 286:15 287:1 |
| custodians 396:23 | 66:1 67:1 68:1 | 183:1 184:1 185:1 | 288:1 289:1 290:1 |
| 396:25 397:3,11 | 69:1 70:1 71:1 | 185:7 186:1,5 | 291:1 292:1 293:1 |
| custodied 169:22 | 72:1 73:1 74:1 | 187:1 188:1 189:1 | 294:1 295:1 296:1 |
| custody 171:4 | 75:1 76:1 77:1 | 190:1 191:1 192:1 | 297:1 298:1 299:1 |
| 395:20 396:4,7 | 78:1 79:1 80:1 | 193:1 194:1 195:1 | 300:1 301:1 302:1 |
| cut 68:15 150:20 | 81:1,5 82:1,13,14 | 196:1 197:1 198:1 | 303:1 304:1 305:1 |
| 186:20 285:25 | 83:1 84:1 85:1 | 199:1 200:1 201:1 | 306:1 307:1 308:1 |
| 296:19 318:16,20 | 86:1 87:1 88:1 | 202:1 203:1 204:1 | 309:1 310:1,15,21 |
| cutler 88:6 | 89:1 90:1 91:1 | 205:1 206:1,25 | 311:1,14 312:1 |
| cv 1:6 403:2 | 92:1 93:1 94:1 | 207:1,3 208:1 | 313:1 314:1 315:1 |
| cyber 181:6,10,20 | 95:1 96:1 97:1 | 209:1 210:1 211:1 | 316:1 317:1 318:1 |
| 182:25 281:8 | 98:1 99:1 100:1,3 | 212:1,23 213:1,23 | 319:1,11,12 320:1 |
| 293:17 360:24 | 101:1,18 102:1,21 | 214:1 215:1 216:1 | 321:1 322:1,23 |
| 362:21 | 103:1 104:1 105:1 | 217:1 218:1 219:1 | 323:1 324:1 325:1 |
| cyruliak 5:3 | 106:1 107:1 108:1 | 220:1 221:1 222:1 | 326:1 327:1,14,19 |
| cyrulnik 2:4 | 108:9 109:1 110:1 | 223:1 224:1 225:1 | 328:1 329:1,20 |
| **d** | 111:1,21 112:1 | 226:1,10 227:1 | 330:1 331:1 332:1 |
| | 113:1 114:1 115:1 | 228:1,24 229:1 | 333:1 334:1 335:1 |
| d 3:2 6:2 399:2 | 116:1 117:1 118:1 | 230:1 231:1,4 | 336:1 337:1 338:1 |
| 401:11 | 119:1 120:1 121:1 | 232:1 233:1 234:1 | 339:1 340:1 341:1 |
| da 1:17 4:7 5:13 | 122:1 123:1 124:1 | 235:1 236:1 237:1 | 342:1 343:1 344:1 |
| 6:1,11,19 7:1,7 | 125:1 126:1 127:1 | 238:1 239:1 240:1 | 345:1 346:1 347:1 |
| 8:1 9:1 10:1 11:1 | 128:1 129:1 130:1 | 241:1 242:1 243:1 | 348:1 349:1 350:1 |
| 11:15 12:1,6 13:1 | 131:1 132:1,5,9 | 244:1 245:1 246:1 | 351:1 352:1 353:1 |
| 14:1 15:1 16:1 | | | |

354:1,12 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1,11 399:1,15
400:1,24 401:1
402:1 403:3,21
**damage** 111:10
119:4
**damages** 106:16
108:6,11,16 109:8
109:9
**daniel** 18:4 71:20
86:7 128:6 384:22
384:23 397:14,16
**danielle** 258:2
**data** 215:13 217:7
217:15 278:14
322:4 326:16
362:23
**database** 259:22
**date** 1:11 33:19
46:13 70:25 81:6
83:15,16 104:16
111:23 132:7
135:2 153:9,14
164:5 190:6,10
191:8,13 197:23
227:4 229:2 249:5
281:10 283:5

286:17 304:3,13
304:22 310:23
319:14 322:25
327:21 330:4
334:16 375:18
403:3
**dated** 132:4,11
134:19 139:10
198:20 230:3
298:6 303:4,8
306:19,22 330:11
400:14
**dates** 28:7 135:4
305:6,24
**david** 2:16 28:3,4
28:8,10,14 71:22
71:23 189:19
258:2,21 384:24
386:10
**day** 138:18 147:25
147:25 385:25,25
386:3,3 399:19
402:20 403:22
**days** 3:16 367:15
**dealing** 129:9
131:2 217:21
**dean** 121:17 122:7
122:13
**december** 66:11
66:15,19
**decide** 300:8
**decided** 47:14
222:13 321:19
**dedicated** 124:19
124:24 125:2,6,8
**deemed** 172:11
173:8
**deeper** 143:16
**defendant** 1:16
30:3

**defendant's** 186:8
280:2 283:2
400:20
**defendants** 1:9
2:10 5:12 101:3
**deficiencies**
373:23
**define** 78:15
269:20 370:12
390:7
**defined** 37:19 79:9
150:13 157:6
169:14,17 170:2
170:17,23 172:5
334:7,10 357:20
396:13
**definite** 126:12
**definitely** 52:6
303:20
**definition** 126:23
127:6 169:19
173:25
**definitions** 358:4
**definitive** 66:18
**definitively** 79:11
**delegate** 262:13
**delegated** 262:11
**delete** 175:19
211:5
**deliberations**
300:15
**deliver** 11:22
**delivery** 295:4
**dell** 103:11 105:19
**department** 57:9
84:24 114:19
270:8 271:25
362:24 385:7
397:10
**departure** 106:8
188:23 196:8

299:19 305:11
**depend** 114:16
**depending** 76:13
97:6 285:10
382:17 386:11
**depends** 13:6
39:19 73:8 79:8
87:11 114:15
129:24 142:4
150:8 285:3
353:13 378:15,18
391:9
**deposed** 30:9
**deposit** 30:8,14
**deposition** 1:15
3:8,9,14 4:6 8:24
9:19,21,23,25 10:3
10:5,7,9,11,13,16
11:24,25 19:14
20:4,15 21:10
22:17 23:3 30:19
33:9,16 46:6
138:22 185:8
196:21 207:3
240:21 248:25
255:12 282:23
286:24 287:4
319:6 322:15,18
327:14 329:20
349:5 354:13
403:3
**depositions** 9:3,7
9:10 21:6,22
**describe** 27:20
41:2 52:25 62:20
63:23 64:4 69:15
112:10 299:23
349:10 395:22
**described** 17:18
64:5 65:25 66:5
92:20 125:8

259:14 260:24
295:16 395:14
**describes** 240:15
**describing** 45:13
62:2 94:2
**description** 13:21
13:23 14:4 324:7
400:7
**designate** 7:25
22:15
**designated** 20:20
22:25 31:4,13
32:17
**designed** 292:21
293:5
**designee** 161:7,18
161:24
**desk** 337:2
**desktop** 321:8
335:6,15,19,24
336:11 342:6,7,22
347:24 348:5,10
350:17
**desktops** 342:25
**destruction** 241:5
241:13
**detail** 112:18
149:13 259:17
344:18
**details** 22:23
78:22 152:19
274:22 347:13
**detect** 293:6
**determine** 44:15
61:21,24 173:22
175:15 179:10
190:12
**determined** 391:7
**determines** 64:18
**determining** 64:21

**develop** 69:17,20
**developed** 69:16
70:3
**developing** 69:23
**device** 199:16,19
200:2,5,5,7 201:11
201:12 203:22
204:6,10,14,19,20
205:9,11 211:23
215:14 218:7,9,10
219:10,16 220:18
220:20 221:6,8,20
222:2 224:16
225:14,21 228:2,4
228:5 231:10
235:2,3,8 237:4,6
246:2,6 250:13,24
252:14,17 254:4
254:19,21 255:3,7
282:8 336:14
338:19,22,24
339:5,12,13,20
348:15 352:9,21
**device's** 237:7
**devices** 201:21
202:18 203:15,16
217:8,16,24 218:4
218:25 219:3
226:16 231:9
240:7,9 335:2,4,5
337:8 338:11,14
341:7 347:18
**dhabi** 35:8
**dialogue** 378:10
**diamond** 120:24
**diamondreportin...**
120:24
**dictates** 340:4
**dictionary** 270:14
**die** 336:23

**diego** 124:24
**dies** 337:10
**difference** 214:2
**differences** 226:25
227:11
**different** 19:12
22:7 38:22 40:18
40:21,24,25 42:16
43:5 47:12 48:17
60:5 79:10 84:4
87:6 119:10 126:2
127:2 183:2
195:21,22 196:2,5
210:2 211:6 271:8
288:5 308:20
309:3,4,7 320:25
321:3 331:12
337:7
**differently** 93:7
108:24
**differs** 203:2
**difficult** 212:17
239:11 321:6
**difficulties** 335:11
376:18
**diffused** 196:2,5
**direct** 73:2 115:15
139:5 207:16
377:18 378:5
**directed** 190:8
192:18
**directing** 191:12
**directive** 191:10
**directly** 50:4
71:20 123:10
234:6 397:10
**director** 123:6
**directors** 121:14
122:3,23
**directory** 213:18
214:14

**disagree** 346:7
**disagreed** 369:11
**disappointment**
35:11
**disbursement**
295:3
**disciplinary** 59:15
61:15 164:21,25
266:16
**discipline** 58:13
58:17,19 59:5
60:5,6 61:9,21
**disclaimers** 148:6
**disclose** 62:25
64:2,12,25 102:6
104:6 223:25
250:21 265:21
266:17
**disclosed** 217:11
217:14 218:6,23
219:5 220:10,15
221:3,4 224:25
237:2 395:11,17
**discloses** 231:7
**disclosing** 43:7
217:5 280:9
**disclosure** 83:9,10
83:21 84:15,23
90:10 250:11
**disclosures** 238:6
238:22 245:24
375:13
**disclousure** 84:16
232:2 233:11
241:19 250:22
**disconnect** 291:9
**disconnected**
335:11 376:18
**discovery** 201:13
275:2,17

**discrepancy** 291:3
**discretion** 318:5
**discuss** 80:11
  300:24 362:18
  389:10
**discussed** 135:7
  158:17 309:8
  326:5 396:11
**discusses** 41:24
**discussing** 241:20
  250:22 305:10
**discussion** 82:9
  131:24 163:13
  172:21 190:23
  194:12,14 255:23
  267:7 282:18
  305:13 307:9
  320:5,25
**discussions** 307:14
**dispute** 29:2,9
  101:12 275:23
  334:6
**disputes** 28:21
**disseminate** 93:2
**disseminating**
  80:5
**distinction** 112:16
  180:4 203:14
  218:3
**distinguished**
  218:25
**distribute** 150:6
**distributed** 117:15
  140:24 141:11,25
  142:9 143:5,8,12
  146:7 147:2
  153:20
**district** 1:2,2
**doc** 375:8
**dockets** 26:2,7

**document** 24:9,12
  30:25 31:6,9,17,24
  32:4,9,14,25 33:6
  33:11 34:8,10,12
  34:15,18,19,21,23
  35:5,17,22 36:8,10
  37:11,16 38:11
  41:24 42:4 59:23
  72:5 80:25 82:17
  83:3,5,6,13 84:19
  85:2,16 86:18
  89:14 90:8 113:18
  113:21,23 114:4
  115:11,24 116:4,7
  116:16,17,23,25
  118:2 134:3,6,10
  134:17,23 135:3,9
  135:16,23 136:10
  137:5 138:4,21
  139:8,16 140:2,21
  141:5,22 142:11
  143:25 144:6,24
  147:15 149:2
  150:14,15,18
  153:21 155:14,23
  156:3,8,10 158:10
  158:14,15 159:16
  160:5,14,17
  161:10,16 162:17
  163:2 165:12,15
  165:19 166:9,22
  167:13 168:16
  176:14 177:4
  178:3 180:16
  185:16 186:4
  195:7 196:23
  197:4,5,9,12,17,24
  199:7,13 201:3,7
  201:17,23 202:19
  203:9,18 204:12
  206:12 207:6,16

  207:25 208:5,9,13
  208:18,24 209:10
  209:11 210:12,16
  210:17 211:9,18
  212:13,18,24
  213:9 214:17
  215:4,17 221:17
  229:18,23,24
  230:11,22 231:13
  233:13,14 234:15
  236:18,20,23
  237:18 238:8
  239:7,20,25
  240:13,23,25
  241:3,10,18,22
  242:19 243:7
  244:24 245:12
  247:11,15 249:11
  249:12,18,20,21
  250:19 251:3
  252:5 255:15,21
  257:4 259:8 260:3
  282:25 283:8,10
  283:12,25 284:5,6
  285:10 287:6
  293:2 294:21
  295:19 297:14,22
  298:11 301:2,10
  301:25 302:17,23
  302:24 303:6,13
  303:15 304:10
  305:24 306:8,25
  307:5 309:14,21
  310:16 311:16,18
  312:6,10 316:15
  319:20,24 320:10
  322:7 323:9,19,23
  324:18,23 326:13
  326:17,22 327:6
  328:2,14,20
  329:22 330:8,9,17

  332:2,7 334:17,18
  349:12,19 354:16
  354:25 363:7,11
  364:16,21 366:7
  366:24 368:22
  381:21 388:23
  392:4,14
**documentation**
  88:23 154:2
  163:19,21 174:4
  290:5 316:14
  317:21 364:2
  367:5,7,11
**documented**
  259:22 260:9
  333:20 364:4
  367:18,19 383:11
  383:13
**documenting**
  368:8
**documents** 7:2
  11:9,11,13,17 24:8
  72:4 86:17,20,21
  116:19,21 117:7,9
  151:16 152:11
  167:23 168:4,6,19
  168:21,23 169:4
  169:12 171:10
  233:5,25 234:5
  250:9 252:11
  285:6,7,11 287:13
  294:8 305:5
  309:19 312:24
  314:14,18 315:23
  317:16 318:5
  327:4 392:7
  395:18 401:17,18
**dog** 394:6
**doing** 39:12 40:18
  69:19 118:10
  146:11 191:6

219:15,20 221:25
224:15 262:4
264:17 265:7,8
295:10 317:10
338:17,18,20,25
343:17 382:11
392:22
**dollars** 111:8
113:3
**domain** 174:12,15
174:22 253:19
**domains** 253:6,8
**dormant** 118:25
119:5
**doubt** 134:15,18
**doug** 71:3,12,13
257:25 262:6
268:12 280:8
303:17 328:18,23
334:11 380:3
384:18
**douglas** 21:18
77:19 279:19
**download** 149:23
149:23 219:23
220:20 221:9
254:20 255:8
276:20 277:12
318:5 351:18
**downloaded**
101:14 103:13
273:3 274:2 276:6
276:12 278:20
279:18
**dozens** 109:24
**draft** 227:16
**drafted** 391:16,17
392:3
**drafting** 67:2
88:22 304:2
391:25

**draw** 218:3
**drawer** 177:22
**drawing** 180:4
203:14
**drive** 218:8 219:24
220:21 221:9
231:11 237:7
254:21 255:9
276:13,21 277:13
278:10,11 294:12
351:19 361:16,17
**drives** 80:3 177:14
178:7 228:4
240:10 246:6
252:17 276:17
278:4
**dropped** 331:14
**duly** 6:3 399:5
402:11
**dumain** 2:6 5:2,3
6:8,16,18,20 12:3
17:2,5 18:24 19:5
19:10 22:13,19
23:4 24:4 27:2
33:5,14,23 34:5
36:12,25 37:6
43:23 45:25 46:5
46:15 50:10,17
51:17,21 53:3
56:18 61:4,7 69:8
73:17 77:2 78:12
80:23 81:12,23
83:19 88:10 89:16
90:5 93:6 95:12
95:17 102:11
103:7 104:8
105:14 107:5,13
107:18 108:4,23
113:9 118:14
122:17 130:5,10
131:9 132:13,16

132:24 133:14
136:21 138:20
148:23 155:2
161:19 163:9
165:24 168:10
178:20 182:7
183:23 184:19,22
185:17 186:2
189:24 194:2,6
196:14 198:7,17
206:5,9,15,21
210:15,20 211:19
213:5,20 214:4,15
222:23 223:19
225:22 228:11
229:7,12 232:24
236:12 239:10,14
263:6 264:19
266:20 274:11
275:20 279:10
282:15 286:12,20
297:17 306:12
308:12 310:5
311:2,7,10,23
313:6 315:12
318:21 319:5
322:18 324:5
325:6 327:13,23
328:17 329:19
330:7 334:2
336:13 345:3
349:4,8,25 353:5
353:15,23 354:3
355:16 357:3
366:21,23 368:3
370:14 378:24
390:3 394:5,12
398:10 401:14
**duration** 115:16
121:8,13 122:24
123:6 126:18,25

**durmain** 185:21
**duties** 98:10
386:16 387:5,8
**duty** 71:16 97:23
98:6 238:24
262:10 263:15
373:11 387:22
**dynamic** 392:18
392:19

| e |
|---|

**e** 2:2,2 3:2,2 6:2
132:4,11 134:5,13
134:15 135:10,19
138:9 149:20
154:13 174:2,9,10
174:12,13,21,22
175:4,5,15,19,24
176:3 178:22,23
178:24,25 179:3,4
179:8,12,13,14,21
179:22 180:3,5,9
180:10 186:18,18
186:21 188:16
189:4,7,15,20
191:7,15 195:3,9
200:4 207:14,22
207:23 217:24
218:3 219:2,9,12
225:7,15 228:13
228:17,24 229:25
230:2,7,9,13
232:15 235:10
239:22 241:4,12
242:4,7,20 243:4
245:19,20 246:7
246:13,23 247:3
247:17,19 253:2,5
253:6,15,16,17,18
253:21 254:14
257:11 258:6,12
258:19 259:2,5,7

259:11,19 260:4
261:9,21,25 262:3
262:5,8,13,17,20
263:22 264:8
265:3,12,14,23,25
266:3,4,7,14
267:21 268:7,16
268:21 269:3,7,12
269:15,19,22
270:23 271:16,21
271:22 272:2
273:3,4,25 274:8,9
275:7,7,13,15
276:6,7,8 280:15
280:21 294:13
295:11,11 296:14
296:24 297:2,9,20
297:25 298:5
301:7 302:13
308:15 310:20
312:4,9 318:13,23
319:11,15,18,22
320:4 321:8,8
322:4,22 323:4,6
327:16,18 328:3,6
328:10 329:25
330:10 331:25
337:5 339:7
355:20 399:2
400:2,14,17,23,25
401:3,5,11 402:2,2
**ear**  267:15 377:18
**earlier**  186:6
250:11 304:23
395:24
**early**  29:13
**earnest**  6:24
**easier**  61:5 212:16
226:23 357:4
367:10

**eb**  119:25
**education**  15:19
53:12 55:14
**effect**  3:12,15
139:20 240:19
**effective**  83:16
155:22 304:7,13
304:22 305:6
**effectively**  385:15
**effectiveness**
209:14
**effects**  216:20
**egypt**  136:4
**eight**  161:8 338:2
**either**  27:23 28:18
38:3 172:8 256:11
**electronic**  231:16
232:7,12 233:5,25
244:19,20 245:10
245:19 246:3,20
335:2
**elements**  38:22,22
40:21 41:3 367:16
**eliminating**  329:3
**elimination**
328:12
**emery**  44:21 46:20
46:23
**employ**  67:7
**employed**  84:12
105:11 302:7
356:20
**employee**  12:25
14:4 58:7,9 59:19
65:21 76:3,11,17
94:3 95:24 114:19
148:25 164:23
165:3 178:21
179:11 194:21,23
217:18 218:10
219:19,20 220:2

220:17 221:5
222:9,11,14 223:7
225:3 227:24
228:8,20 231:2
238:24 240:18
242:5 245:6,9
246:11 250:12
252:13,20 253:2
254:4,19 255:2,7
258:18 259:5,7,10
261:21,25 262:8
264:8 265:11,22
267:21,25 268:7
268:14,23 332:19
332:22,25 337:20
338:16 339:18
**employee's**  62:22
178:24 179:14,24
218:7,9 235:2
236:5 250:23
253:15,20 254:18
263:22 265:14
266:18 272:10,11
273:3 274:9 276:6
276:14,21 278:4
282:8
**employees**  21:6
58:13 62:24 63:20
64:8,15,25 74:15
74:24 75:3,12,16
75:23 77:10 91:20
91:22 118:16,18
118:20,22 149:5
159:11 175:18
190:13 192:25
203:4 217:6,7,14
218:23 219:2
220:16 223:25
224:2 226:14
231:8 232:9,14
233:7 237:3 240:6

244:20 245:24
257:3 261:9
265:24 275:8
281:17 292:24
340:7,12 343:3
347:5 357:6,6
359:5,15 361:23
376:12 377:16
397:2,12 398:2,6
**employer**  74:19
**employers**  74:24
**employment**  12:19
12:23 93:19
132:25 193:4,11
193:16,20 302:6
304:6
**enact**  208:22
**encompassing**
65:12
**ended**  133:10
307:7 309:8
371:15 372:10
**ends**  97:12 228:13
234:14
**enforce**  56:11
**enforcement**
55:18 164:16,21
**engaged**  366:17
**engagement**
234:21
**enhance**  375:13
**enhanced**  145:10
**ensure**  143:22
176:11 177:11
238:13 312:19
313:16 314:6
339:5 381:22
**ensuring**  25:5
75:18 76:10
**entails**  353:14

**enter** 43:5 91:17
261:20 392:21
**entered** 90:19
91:15 332:12
**entering** 91:21
**enters** 11:6 91:12
**entire** 113:13
148:18 196:25
205:23 260:21
**entirely** 79:9
**entities** 13:19 14:2
15:14 16:16 20:21
45:15 73:25 74:17
74:23 75:24 97:13
100:7,25 105:22
115:9 122:6 124:5
124:18,20 125:9
125:11,12 126:9
127:19 156:17
210:2 253:13
296:9 330:21
387:4 389:25
390:6 391:2,3
**entitled** 254:3
255:6 313:15
326:11
**entity** 12:20 13:4,8
13:17 45:12 58:7
58:13 73:21 74:4
74:18 75:9 88:11
97:17 98:18
112:11 118:25
119:5 120:6
123:22,24,25
124:5,7,9 125:6,14
125:15 156:6
157:3 164:17,22
165:2 209:22,24
271:8 296:21
302:7 307:17
315:24 332:23

357:7 372:22
391:7 393:17,20
394:3
**enumerated** 161:8
177:2
**environment**
382:10
**episodically** 44:15
**equal** 238:16
**equipment** 203:3
203:6 234:4,20
235:6,11,16,17
236:3,6 254:9
279:8 299:14,15
300:5,7 308:11,20
308:20 309:2,3,7
341:5,16 347:2
349:18
**equity** 55:19
**errata** 403:1
**es** 12:5
**escalate** 59:23
**especially** 36:17
364:3
**esq** 2:6,7,7,12,12
2:17
**essentially** 150:23
159:13
**establish** 143:20
144:4 158:7,19
176:9,18
**established** 145:23
**establishing**
145:13
**establishment**
144:22
**estimated** 390:19
**et** 1:8,16 2:10 4:9
123:15 126:2
148:3 167:11,19
218:13 219:17

343:20 346:13
392:8
**ethics** 65:20 93:16
217:18 239:22
249:15,23 250:5
382:14
**evaluation** 312:25
375:17
**evelyn** 2:7 5:7
206:14 279:10
286:12 319:7
**event** 319:2
**events** 28:20
101:17 105:10,17
106:7 123:9
**eventually** 139:5
**everybody** 16:3
184:9 269:6,17
**everyday** 147:11
**evidence** 364:6
366:19 368:5,8
**evidencing** 163:2
**exact** 9:14 28:7
63:23 64:4 67:8
78:2,22,23 93:13
94:9 96:20 99:12
109:4,23 110:2
112:22 152:6
153:9,14 169:19
200:19 241:9
254:11 281:9
296:11 337:25
**exactly** 22:24
31:12 48:11 57:19
63:13 65:6,19,24
66:9 67:16 68:21
72:10 75:9 76:3
78:10 93:23 98:22
110:14 112:4
127:21 141:15
146:15,20 151:23

157:12 189:11,18
225:16 281:14
340:10 370:6
374:8 397:19
**exactness** 141:17
**exam** 372:9,13
380:6
**examination** 6:7
369:15,18,22
372:7,22 373:9
379:23 380:8
398:20 401:13
402:10,12
**examinations**
369:20
**examined** 6:5
**example** 7:18
76:23 84:9,13
130:19,25 151:2
169:20 171:24
174:3 177:21
178:4 218:8
219:18,22 222:13
223:11 224:2,8,13
225:5 235:10
247:13 253:21
258:10 263:20
270:2 271:4,5,20
274:20 321:5
340:14 346:14,17
362:21 378:9
380:21 393:9
394:20 395:5
396:15
**examples** 65:10
88:3 148:21
178:13
**exception** 127:7
179:2
**exceptions** 126:16

exchange   284:15
297:20 308:15
exclude   101:22
103:23
excluded   329:3,8
329:16
excluding   150:16
273:17 280:11
excuse   236:13
308:12 311:23
exec   77:17,18
execute   92:15,16
92:17
executed   92:2
96:15 302:15
305:7
executing   332:6
execution   295:5
304:23
executive   263:17
executives   305:10
exhibit   6:25 30:19
33:16,18 34:7
36:9,16 46:6,12
55:21 80:25 81:5
82:15 89:11,19
111:17,18,22
113:10,13 131:10
131:11 132:6
138:23 155:3,4,5
165:6 185:9,18
196:21 206:8,10
206:20 207:3
212:23 213:4,17
213:22 214:13,24
228:25 229:6
236:14 240:21
248:25 249:4
255:12 282:23
283:4 286:16,19
286:24 287:4

294:5,16 297:13
302:20 310:22,24
312:3 319:7,13
322:15,18,24
327:15,20 329:21
330:3 349:5
354:13 400:6,6,8,9
400:11,12,14,16
400:18,20,22,23
400:24,25 401:3,5
exhibits   34:3
206:18,18 213:18
213:23 400:4
401:9
existed   159:23
164:10 168:2
223:6 294:11
existence   125:20
344:11
existing   153:24
exists   213:22
expand   53:2
expanding   258:23
expect   223:10
250:14 261:23
265:24 338:17
expectation   25:15
200:25 203:5,23
204:3,6 212:11
217:20 219:6,8,9
219:14 220:22
221:12,18 222:3
222:11 224:4,12
224:14 225:11,20
226:14 228:3
231:10,17,23
232:16 237:5
240:8 246:5
250:23 252:16
338:20 339:10,19
343:21 345:15

352:19,20
expected   223:16
246:17
expenditure   77:13
77:22 78:4
experience   14:16
38:8 39:3 52:16
52:20,22 123:9,10
304:21
expert   37:10,23,25
38:3,5
expertise   87:3
280:20
experts   52:12
280:18
expires   403:25
explain   10:16
14:13 274:25
304:12,16
expressly   221:5
extensive   98:23
extent   25:21 32:20
41:13 59:25 60:2
73:24 101:20
103:18 254:3
256:19 339:11,17
357:13,13 380:4
381:24
external   117:25
160:15 276:13,16
280:19,23 281:11
360:8,12,16,21,24
366:4 375:3,6
385:2
extraordinary
147:7
eyes   161:22
271:25

**f**

f   3:2 402:2
facilities   42:21
fact   20:2 110:23
141:9 143:4
145:23 148:3
158:23 182:13
187:6 190:14
277:21 282:5
334:12 366:2
facts   101:24
109:11
failed   59:19
failing   59:10
failure   59:9 62:3
62:22
fair   55:3 317:13
344:4
fall   295:16
falls   285:15
familiar   34:11
100:16 101:5
102:4 120:10
134:9,13 250:3
307:17,18 376:5
388:21
familiarize   363:14
family   341:15
342:22,24 343:3,6
343:23,25 344:5
344:11,18,19
far   53:22 54:12
61:18 161:2 202:5
202:15
fattaruso   2:4,17
favor   85:8
fcs   313:14
february   186:10
187:7,13 208:6,11
208:21 215:7,21
215:21 217:4

306:22
**federal** 1:19 73:6,9
  100:19,19,23,24
  101:7 126:10
  275:4 287:12
**feedback** 192:4
**feel** 376:13
**feeling** 265:18
**fees** 375:14
**felt** 69:14 182:14
**fiduciary** 71:16
  97:23 98:9 262:10
  373:11 386:16
  387:5,8,22
**fifteen** 131:16
**fifth** 2:11
**figure** 315:8
**file** 59:24 127:15
  177:21,22 229:13
  230:17 271:19
  318:4,17,22
  355:19
**filed** 78:18 127:23
**files** 101:14 103:13
  167:9 168:13
  177:20 178:8
  219:24 220:20
  221:9 254:20
  276:12,20 277:12
  278:20 322:10
  326:20 339:6
  351:18 367:20
**filing** 3:7 127:25
  128:10,15 131:7
**filings** 40:9 128:9
  128:19,24 129:2
  129:10,14,19,23
  130:17,23 131:2
**fill** 127:15
**final** 41:23 136:5
  148:13 208:6,12

227:16,18 331:24
**finalized** 227:11
**finally** 32:22
**finance** 148:5,10
**financial** 167:3
  316:16 317:5
**financially** 4:16
**find** 65:17 177:20
  233:18 258:25
  266:10 331:17
  361:8,15 364:7
  367:11 368:11
  374:4
**findings** 368:24
  369:2,4,9,25 370:4
  370:7,11,17,22,24
  370:25 371:12,16
  371:18,20,22,24
  372:5,21 374:6,11
  374:12 375:10
  380:5
**fine** 104:24
**finish** 133:13
  205:22
**finishes** 43:21
**finishing** 133:2
**firm** 15:25 16:2,3
  46:20 47:2 72:9
  86:3,13 87:3
  90:15 92:3 157:23
  178:7 182:18
  188:12,17,18,24
  191:17,17 192:9
  200:5,8,10,15
  201:10 203:3,7
  204:9 215:13
  221:19 242:4
  263:18 297:8
  299:13 300:4,4,13
  305:11 362:17
  380:17 384:7

**firm's** 138:16
  203:25 204:15
  205:15 211:4
  251:13,23 324:8
**firms** 86:16,24
  87:4,6,16,24 88:3
**first** 6:3 28:8,10
  29:8 31:19 38:13
  69:22 77:15 86:6
  113:15 136:23
  137:2 138:18
  140:15 146:3
  167:3 168:12
  176:8 187:5
  201:10 207:21,22
  211:19 215:24
  222:25 229:22
  230:24 242:18
  249:10 304:5
  306:7 309:13,24
  338:17 355:7
  370:5,7 399:5
**fit** 171:10 295:23
**fitzpatrick** 2:12
  5:11 10:24
**five** 15:16,16
  70:13 81:19,25
  87:16,23 91:9,16
  136:25 184:21
  284:18,25 285:23
  286:6 288:18,21
  290:20 291:14,16
  292:4,13 310:4,6
  353:18 356:3
  359:2 372:3
**fix** 337:19
**fleishner** 195:4,10
  195:11,25
**fleishner's** 196:8
**flip** 270:14

**floor** 2:5 6:13
**focus** 140:19 355:4
**focusing** 207:21
**focussed** 70:9
  129:14
**focussing** 183:12
  244:11 284:8
  347:24 363:13
**folder** 236:16
  367:21
**follow** 91:20
  156:24 224:23
  238:25 345:20
**followed** 143:23
  176:12 177:12
  265:6
**following** 264:24
  373:22 374:2
  393:24 394:14,15
**follows** 6:6 346:8
**footer** 309:16
**forbearance**
  315:14
**force** 3:15 52:24
  365:9
**foregoing** 399:8
**forever** 176:4
**forgive** 385:24
**form** 3:21 9:5
  16:22 22:4 25:19
  27:13 48:10 51:20
  56:14 59:7 61:12
  67:3 70:15 80:17
  80:21 83:10,20
  85:3,11,15,18,21
  86:2,16 87:21
  89:6 94:7 97:4
  127:10,12,16,23
  128:2,3,17,21
  129:4,17 131:4
  145:3,15 147:10

156:20 170:11
171:14 175:12
179:17 188:14
193:6,22 202:21
216:23 222:17
235:21 254:7
292:16 293:9
294:15 295:21
299:21 300:11
306:2 318:8
321:23 329:11
345:9 346:6
351:21 372:25
375:13 384:15
387:15 389:19
393:6 395:19
**formal**   362:6
**formalized**   68:7
  183:20
**formally**   120:14
  195:17 259:8
  385:11
**formed**   120:3
  158:23 390:24
**forming**   70:19
**forms**   17:10 148:5
**formulate**   69:11
**formulates**   270:6
**formulating**
  270:11
**forth**   260:8 301:5
  402:11
**forthcoming**
  251:16
**forty**   353:18 359:2
**forward**   110:19,24
  111:3 134:20
  178:18,23 392:23
**forwarding**
  179:11

**fought**   275:18
**found**   191:9
  361:11 365:15
  366:24 367:5
  368:4,8 373:14
  381:24
**foundation**   78:13
**founder**   334:11
**four**   176:25
  177:23 252:10
**fourth**   114:23
  322:3
**framing**   103:15
**frank**   295:12
  373:16
**fraud**   101:7 389:2
  389:5,7,10
**free**   263:20 376:13
**frequently**   260:12
  337:10 356:13
  382:13
**friday**   133:18
**frivolous**   108:20
**front**   30:23 96:21
  134:7 208:18
  209:9 289:14
  337:2 371:23
**frozen**   26:16,19
  29:17 262:21
**fruchter**   2:7 5:7
**fs&c**   151:11
**fulfilling**   373:10
**full**   7:5 27:24 56:9
  134:21 194:21,22
  283:20 322:3
**fully**   158:23
  302:15
**function**   16:14
  50:22 52:21 57:6
  69:13,24 77:4
  146:6 148:10

316:10 331:5
**functions**   16:18
  17:12,19 63:5
  125:9 195:24
  334:13
**fund**   39:25 98:7,20
  98:25 99:9,11
  115:2,16 119:9,17
  119:21,22,23,25
  120:3,11,12,13,15
  120:18,21,24
  121:2,5,6,6,9,14
  122:4,8,9,24 123:7
  124:12 150:21
  151:4,9,11,12,17
  151:21,25 152:3
  152:10,11,16,21
  154:2 168:18
  380:10,11,13
  387:2 392:7,21
**fund's**   152:9
**funding**   41:25
  42:7,13,15,19,25
**funds**   44:7 55:18
  77:14 78:4 99:3
  99:12 115:4
  120:17 123:11,12
  124:16 151:19
  153:4 168:25
  169:2,8,11 235:4
  290:2 295:24
  312:15 389:22
  390:21
**fungi**   71:20 128:6
**funnel**   181:14
**further**   3:20 69:18
  69:20 324:15
  353:9 370:2 399:8
  402:14
**futtaruso**   5:4

**future**   264:14

**g**

**g**   253:22,25 273:5
**gain**   39:3 218:6,24
  220:19 221:8
  258:17 261:2,7,12
  261:19 351:12
**gained**   105:16
**gaining**   179:24
**garreth**   9:18,21
  49:18,20,22 70:17
  70:19 185:20,21
  359:18
**gather**   12:7 27:5
  38:2 279:12
**general**   53:9 167:5
  177:6 189:9 216:7
  241:4,12 281:11
  329:16 331:3
  341:25 342:4
  385:9,12,14
**generally**   59:8
  67:13,17 112:10
  114:18 156:21
  246:24 250:3
  268:3 280:17,21
  299:8 389:4
  395:15
**generated**   152:11
  152:12,15
**george**   2:7 5:7
  206:19
**getting**   138:15
  188:5 331:2 356:9
**gillespi**   122:12,16
**gillespie**   121:18
**give**   5:22 7:11 19:3
  32:2,12 33:8
  65:11 77:25 85:10
  112:18,18 152:18
  186:15 270:2

274:21 275:13
346:17 355:23
396:3
**given** 8:23 59:4
96:7 98:25 129:13
129:20 149:19
240:12 252:6
295:2 399:10
402:13
**giving** 67:23
108:13 216:2
224:7 351:25
**global** 257:13,16
258:5,11,18
263:21 264:7
267:22,25 268:16
268:17
**gls** 75:10 125:14
174:16
**gmail** 340:15
**go** 30:12 34:5 55:6
60:12,13 90:15
91:24 94:25 95:5
107:9 117:3,4,9,11
117:18 131:11
136:3 142:21
163:10 172:12
174:5,13 184:15
213:3 214:12,22
214:25 225:22
237:15 242:14,18
242:20 246:13
258:25 259:10
261:22 262:17
263:21 266:20
269:15 270:11,25
292:6 295:14
316:2,5,14 318:2
321:11 336:22
353:9 392:23
394:12

**god** 5:24
**goes** 53:22 54:12
59:24 98:14,19
128:2 148:7 202:5
202:15 215:15
247:5 269:18
316:6,13
**going** 4:4 30:17
33:14 43:17 80:10
80:23 81:10 82:7
84:11 97:12
101:22 102:6
103:5 110:24
113:3 131:10,13
131:21 138:20
140:19 146:18
147:24 149:12,15
173:19 184:18,25
194:12,14 206:9
212:21 213:6
214:12 225:9
226:4,24 228:12
229:5,16 237:15
237:19 239:5
242:14 246:13
248:21 262:2,18
267:5 269:12,23
270:17 275:5
279:11 283:16
290:4 292:15
293:23 297:12
319:5,9 329:19
330:24 334:6
339:21 346:11
354:6 374:18
398:6,18
**good** 4:2 6:19
81:16 263:6
321:20 331:15
334:24

**govern** 75:23
**governed** 157:15
**governing** 93:9
211:22
**government**
123:14
**governs** 258:16
290:12
**gp** 296:21
**granular** 168:3
**gravitas** 330:24
331:10,18
**great** 7:4 95:17
232:24 311:17
353:23
**greater** 109:21
**groceries** 346:13
**ground** 134:21
**group** 79:25
253:12 257:21,22
261:17
**growth** 51:5
**guarantee** 233:4
**guess** 209:16
334:24 353:12
**guessing** 328:8
**guidance** 181:6,15
181:19 270:20,22
**guidelines** 210:24
211:7 292:23
293:7 314:23
391:14,15,25
392:13,18
**guise** 376:13
**guys** 81:17

**h**

**h** 334:2 400:2
**half** 20:9
**hand** 5:18 210:23
247:23 402:20

**handbook** 76:4,11
76:17 180:17,21
181:23 182:13,20
183:11,14 197:22
198:20 208:6,11
208:23 209:6
212:5 217:18
224:11 227:7
228:8,20 231:2,6
232:23 234:12
240:18 252:20
338:16 339:18
**handbooks** 76:5
**hands** 352:24
**handwritten**
137:9
**hang** 273:8
**happen** 260:13
277:16,24
**happened** 59:2
62:4,12 104:18
143:4 157:24
187:10,16 272:18
277:22 301:13
**happens** 61:25
92:9 157:21
337:14
**happy** 104:25
287:21
**hard** 218:8 219:24
220:20 221:9
228:4 231:11
237:7 240:10
246:6 252:17
254:21 255:9
276:13,16,21
277:13 278:4,10
278:11 294:11
351:19
**hardware** 281:18

**harris** 56:24 66:6
66:22 67:6 68:8
68:18 69:2 230:2
236:11
**harrison's** 9:23,25
**head** 57:21 76:13
80:19 333:5,13,16
333:22,24 334:2
342:19 390:23
**header** 155:12
210:22 211:5,10
247:22 309:16
**heading** 140:16
158:2 248:5
**headphones** 94:14
**hear** 29:18 89:17
95:8,12 136:20
248:13 263:2
265:17 318:19
353:2 379:2
**heard** 106:23
353:3
**hearing** 239:12
**hedge** 55:18
**held** 1:20 35:7
47:19 82:9 131:24
163:13 169:15
172:13,21 190:23
255:23 267:7
282:18 396:15
**hello** 335:9
**help** 5:24 17:8
88:22 342:4
**helped** 66:24 67:2
67:3 174:6
**helpful** 36:18
138:17 243:24
359:25 376:3
**helps** 326:19
**hereinbefore**
399:11 402:11

**hereunto** 402:19
**hi** 5:2 132:9
226:10 267:11,12
**highlighted** 36:20
**highlighting** 36:8
36:11 41:23 214:8
214:10
**highlights** 37:8,9
**hire** 230:5
**hired** 13:24,25
15:13 41:15 57:21
67:25 70:20,24
104:13,16,18
153:3 226:18
**hiring** 87:7,9
**hitting** 134:20
**hoc** 260:25
**hold** 60:24 190:20
335:7,8,8 378:16
**holdings** 1:8,16
2:10 4:9 13:2,10
45:21 74:18,25
75:22 76:4,7 98:5
98:10 126:19,25
230:25 280:6,7
304:6 307:13,24
309:12 356:20
357:7,9,23 403:2
**holds** 333:5,9
**holistic** 368:11
**home** 7:9 101:11
103:12 105:20
200:12,18 245:7
272:10 276:14,22
277:2,3,6,13 278:5
278:7,19 299:15
321:7 335:18,19
335:25 336:4,5
341:10 342:7,23
347:6,10,25
348:11 350:23

351:10,18
**honest** 31:10
112:22 251:15
347:15
**honestly** 109:23
278:16
**hope** 373:8
**hoped** 136:23
**hopefully** 19:4
**hopes** 338:24
**hoping** 95:3
**host** 168:24
**hour** 21:3 81:10
359:3
**hours** 20:14
146:16 353:16
356:4
**house** 11:16 15:6
16:10 17:15
385:16
**hr** 57:10,14,15,18
57:21 58:2,4,6,12
59:17 62:6,18,19
76:13 93:17
**hum** 163:9 213:12
**human** 114:20
**hundred** 90:23
**hundreds** 111:7
113:2
**hung** 188:5

**i**

**iacovacci** 1:3 2:5
4:8 5:5 6:21 18:8
23:8,17,23 24:10
24:13 25:7 26:3,8
26:13 27:11 29:2
29:10 72:6 100:6
100:10,12,15,24
101:6,15 106:13
106:19 110:22
186:11 187:8,14

187:21 188:11
190:5,16 192:17
193:20 386:2
403:2
**iacovacci's** 10:7,9
101:11 103:11
105:19 106:2,8
109:3 188:23
294:11 295:17
**ian** 2:6 5:3 6:20
18:17 22:12 26:17
26:18 36:5 81:8
94:12 107:17
165:21 206:19
213:15 274:24
**ibor** 271:4
**idea** 54:5 104:9
136:14 263:6
**identification**
33:19 46:13 81:6
111:23 132:7
228:25 249:5
283:5 286:16
310:22 319:13
322:25 327:20
330:4 348:17
**identified** 99:23
102:17 105:13
240:4 261:18
271:16 341:6
**identifies** 333:12
**identify** 75:5
108:25 109:9,20
229:23 230:23
241:18 266:15
373:19 381:13
**identifying** 348:19
**idumain** 2:8
**ignite** 213:19
**igor** 341:22

**igor's** 341:24
**imagine** 138:14
  277:20
**immediately** 311:3
**immigration**
  115:2 119:22,23
**imminently**
  132:17
**impetus** 331:6
**implement** 56:11
**implementation**
  237:22
**implemented**
  153:14 154:17,19
  154:21 176:9,17
  177:10
**implicate** 97:20
**implicated** 98:17
**implication**
  204:17
**implications** 38:24
  172:10
**imposed** 61:21
**impression** 68:18
  69:7,12 70:15,19
  377:7,10
**improved** 373:21
**inaccurate** 292:18
**incident** 105:12
  109:16 110:5
  272:15 273:20
  274:22 300:9
**incidental** 343:12
  344:2,13 345:2,7
  345:11,21 346:3
  346:18,21,24
  347:8,14
**include** 41:17,19
  55:24 65:7 167:4
  167:9 168:20
  169:11 313:25

**included** 237:10
  237:13 253:6
  323:22
**includes** 215:8,10
  215:12 235:23
  236:4,7 269:17
**including** 48:17
  61:16 93:15 96:8
  105:11 228:4
  231:11 234:4
  237:6 240:10
  246:6 252:17
  306:19,23 359:7
  383:5 396:14
**incremental**
  248:18
**incumbent** 49:22
**indefinite** 175:2
**indefinitely** 285:8
  288:7
**independant**
  318:25
**independence**
  123:8
**independent** 153:3
  177:3
**indicate** 347:18
  348:3 350:6 351:6
**indicated** 350:11
**indicating** 32:10
  89:13,15 144:17
  165:8 175:17
  189:13 214:19
  391:13 393:2
**indifferent** 184:2
  372:20 373:6
**individual** 112:14
  143:9
**individuals** 100:8
  122:4,23

**indulge** 102:15
**indulgence** 51:10
**info** 120:24
**inform** 25:16
**informal** 362:12
**informally** 120:11
  385:13
**information** 43:8
  80:4,6,11 84:17
  92:8 93:2,10 94:5
  96:3,10,12 102:7
  150:22 151:5,16
  153:23 154:14
  180:16,19,21,23
  181:11,23 182:12
  182:19 183:10,13
  183:20 187:25
  197:21 198:20
  202:13 208:5,11
  208:22 230:5
  308:3 356:10
  357:25 401:17,18
**informed** 190:3,14
  226:15
**initial** 189:25
  385:4
**initially** 28:13
  39:5
**initiated** 143:20
  144:4 145:7,12
  158:7
**initiation** 144:14
**initiative** 222:5
**ink** 308:6,9
**input** 114:11
  128:2,4 385:4
**inputs** 270:10,12
**ins** 22:23
**inside** 359:14
**insider** 249:15,23
  250:6 382:15

**insisted** 308:5,8
**inspection** 243:8
  243:22
**inspections** 244:9
  247:13
**installed** 235:12
  235:18 236:4
**instance** 113:16
  173:19 229:22
  272:23 293:23
  379:21
**instances** 59:18
  268:6,19,25
**instant** 257:12
**institutional** 43:11
  43:14,25 112:12
  112:25
**instruct** 101:22
  102:6
**instrument** 171:5
**integrity** 178:8
**intend** 274:13
**intended** 214:7
  344:10
**intent** 305:18
  306:4 373:3
**interact** 202:13
  313:9 397:3,5
**interacted** 313:11
**interest** 59:12 63:6
  63:16,21 64:7,19
  65:4 150:24 271:3
  307:11 316:18
  395:14
**interested** 4:17
  402:17
**interests** 64:10,16
  65:2,6
**interfere** 63:4 64:6
  105:5 343:13
  345:11 346:12

**internal** 33:15,17
75:18 193:4
238:10 258:16
276:21 277:13
322:20 331:20
359:15 362:25
400:8
**internally** 23:18
27:23 116:21
186:23 257:12
337:20 384:25
**interpretations**
247:18
**interpreting** 291:3
**interrogatory**
283:18
**interrupted** 61:2
**intervening**
305:19
**interview** 15:10
49:2,7,21 123:3
**interviewed** 49:5
**interviewing** 29:3
29:7 47:23 49:24
**intimately** 307:18
315:19
**intralinks** 149:11
149:14 150:4
153:6,20,24 154:5
174:6
**introduced** 14:23
**introduction**
247:16
**intrude** 24:14
**invest** 96:22,22
390:20
**invested** 65:9
**investigate** 105:9
**investigated**
279:14

**investigation**
104:23 187:20
195:5 367:12
**investment** 13:13
14:17 52:16,19
53:6,13 54:18
55:15,21,25 62:23
73:12 74:5,10
75:4 96:24 97:7
97:14,20 99:4,5,15
99:18,20 110:19
110:25 111:4,6
120:7 127:14,14
127:17 151:6
155:19 156:13
157:7,16 166:17
173:20 176:23
181:13 210:7
241:25 242:23
244:21 245:8,20
247:3 262:15,16
262:23 284:11,14
285:13 287:8,14
287:19,24 288:24
289:6,8,16,21
290:9,10,12,17
292:10 294:9,10
356:18 357:20
358:2,3,23 360:20
365:14 375:15
380:22 386:16
387:3 389:17
**investments** 62:9
169:6,8,10
**investor** 109:21
110:2,7,8 112:13
112:15 113:2,6
117:3,4,5,6,12,12
117:21 147:22
149:18,19 150:21
151:2 152:15

153:23,25,25
191:22,25 192:4
192:25 391:22
392:9
**investor's** 142:2
**investors** 71:16
80:6,7 91:3,3
108:18,21,25
109:24 110:2,3,4
117:10,10 120:2
142:9 146:18,19
147:22 149:8,9
151:5 152:4,7
174:6,7 190:3,9,9
190:14 192:3,8
193:3
**invite** 154:12
**involve** 38:21
**involved** 24:11,17
24:22 40:24 47:10
52:7 85:21,23
86:2,7 87:9 88:17
89:2 123:2 225:15
253:14 289:3
303:22,25 315:19
365:10,19 379:22
379:24 380:4,14
380:20 384:10
391:24
**involvement** 28:20
**involves** 38:20
**ipad** 200:11
335:17 336:7
337:4
**iphone** 200:3
222:10 223:8
336:6 338:4,5
339:23 340:14,20
340:22 341:6
348:18,21,23

**iphones** 224:3
340:7,8
**isreal** 136:4
**issue** 18:19 62:14
62:16,18,19
100:17 266:16
**issued** 25:6,17
181:16 200:5,10
200:15 343:18
350:3
**issues** 51:13 95:21
300:16,20 324:13
324:15,20 374:5
379:6 395:9
**issuing** 181:19
**items** 167:5
177:25 352:6
**iterations** 250:4

**j**

**january** 139:11,14
144:19 145:7
160:8 188:22
248:22 249:2,16
304:8,14 306:19
400:18
**jeffrey** 121:17
**jen** 195:9
**jennifer** 195:4
**jillian** 2:12 5:11
**job** 13:20,23 14:3
16:10,14,17 17:12
17:14,19 29:4
33:25 41:16,19
47:18,22 49:3
50:5,12 52:21
53:14 57:5 63:5
64:6 69:19 105:5
133:18 138:15
146:5 147:4
195:24 261:24
262:7,9,12 263:15

296:2 343:13
345:12 346:13
**jobs**   51:13 133:16
**john**   296:5 297:25
299:4 302:14
**johnny**   10:3,5
21:13 32:17
101:10 103:10
222:12 258:3
310:20 319:16,19
322:22 323:4
327:18 328:3
329:25 330:11
333:2 337:16
341:21 342:3
400:23,25 401:3,5
**joined**   23:9 56:23
69:14 70:14 85:19
86:3,6 90:18
153:11,13 163:4
164:11,14 177:8
245:3,15 253:11
253:12 254:16
256:12,15,22
305:15 365:22
366:17 367:14
377:6
**joke**   349:8
**judge**   3:13
**judgment**   171:9
**june**   241:6 326:24

**k**

**karyn**   1:21 4:13
183:24 232:2
402:7,23
**kate**   2:7 5:7
**keep**   36:16 54:6
70:6 90:10 105:21
146:16 169:7
173:15 174:9,17
239:15 288:2,5,10

289:10,24 315:3
339:4,15 341:2
**keeping**   313:2
**kept**   54:10 114:18
151:4 177:21
213:8 313:17
115:13,18,19
**key**   209:3 269:16
269:20 271:2
**kind**   20:11 24:21
24:25 38:18 58:20
87:13 126:3
133:10 137:5
147:17 148:2,14
149:17 182:22
227:12 244:2
285:25 331:2
336:24 344:20
348:18 350:6
351:6 353:7
360:23
**knew**   14:20
177:19 179:18
**knot**   20:11
**knots**   223:18,20
**know**   7:19 9:6,14
11:5 13:22 14:9
14:20 15:9 16:19
17:9,10 18:22
22:23 25:13,14,22
26:5,9 28:18,22
31:8,21 34:22
37:12,13 40:10
43:15,16 50:2
54:12 55:9,11
58:19 59:10 65:5
66:9,13,17 67:6,8
67:13,17,18 68:7,8
70:25 72:15,16,20
72:21 75:8 76:3
77:7 78:22 79:2
80:24 81:21 82:23

85:14 86:25 91:11
94:17 95:4 97:16
97:24 100:10,11
101:10 102:19
107:11 113:5
115:13,18,19
116:2,8,10,15,18
118:7 119:9 120:4
120:23 121:10
122:22 126:7,22
127:10,16 128:19
128:25 130:3,4,15
139:12,18 142:6
143:3 144:3
145:22 146:17
147:23 150:10
151:18 152:2,5
154:17,20,24
157:12 159:7
162:8 178:11
181:15 184:4
192:5 196:15
206:18 212:16
225:16 226:21
239:11,18 243:10
258:9 261:6,8,24
262:15 263:17
264:23 267:24
268:13 270:22
272:16,22 273:15
277:22,24 278:7,9
278:18 279:9
282:4,10 288:8
290:25 291:7
296:9,17,20,23
300:9 305:8,13,16
305:17 307:20,25
308:5,8,10 309:11
311:16 314:17,22
316:8 318:11
325:2,15,25 326:3

326:8 328:16
329:6 332:11,18
332:24 333:19
340:6,16,17,19
342:10,11,14,14
344:4,6 347:9,13
349:16 352:4
353:15 356:9
358:10,16,19
365:3 372:18
373:3 374:17,18
374:20,21 376:15
378:4,22 379:15
383:20,22 387:19
388:3,10,16 389:9
393:13 396:17
397:4,21
**knowledge**   15:2,3
15:7,8 20:16 21:3
24:2 29:12 34:24
35:23 37:18 38:17
41:18 44:5 49:10
50:6,25 56:5 57:8
67:11 68:6 74:16
74:21 88:15
101:21,24 102:21
105:15,17,24
106:4,6,10,16,21
108:11 114:3
119:3,21 120:5,8
123:2 129:6
138:13 159:2
161:12 162:21
173:14,16 187:4
194:19,25 196:4
196:18 198:23
211:2 258:21
260:17,22 267:24
272:11,14 273:18
276:9,24 277:9
305:21 306:3

308:18 314:21
329:13 341:20
342:21 343:5
348:12 357:8
363:21 366:16
369:24 380:17,23
**known**  385:11
**knows**  101:24

**l**

**l**  3:2,2 6:2,2 399:2
**label**  351:6
**labeled**  283:17
**lacking**  373:20
**laid**  136:8 338:15
   344:20
**lam**  207:23
**lan**  30:18 101:10
   103:10 185:8,18
   206:18 222:12
   255:12 258:3
   310:21 319:19
   320:4 322:23
   323:7 327:19
   330:2,11,20 332:5
   332:11,18 333:5
   333:10 400:23,25
   401:4,5
**lan's**  10:3,5 21:15
   105:18,25 312:4
   354:13
**landlord**  30:7
**landscape**  70:6
   182:17,22,25
   183:5
**language**  63:24
   64:4 96:19 215:8
   215:10,12,20
   216:3,6,9,14,17,19
   216:20 227:13
   228:9 238:23
   240:5 307:3,7,15

385:4,5
**laptop**  335:16,18
   335:18,25 337:3
   337:10,15 341:9
   341:19 348:11
   350:14
**laptops**  200:15
   336:3,4,21,22
   337:21 342:25
**large**  111:5 229:13
   230:16 340:11
**late**  29:12
**law**  53:10 86:24
   87:3,16,24 88:3
**lawfirm**  39:6 52:3
**laws**  73:25 126:10
   238:15 343:15
   345:13
**lawsuit**  29:15,20
   29:25 30:5 108:20
   109:3,13 110:23
**lawyer**  12:7 15:6
   17:16 39:8 40:13
   40:15,20 44:20
   48:14
**lawyers**  16:4,8
   17:18,20 27:22
**layered**  345:19
**laymen's**  37:20
**leading**  106:7
   205:17
**learn**  95:25 103:9
   103:25 104:5,12
   187:19,23 188:9
   188:20
**learned**  102:7
   103:19 104:11
   105:25 182:11
**leave**  7:15 47:13
   66:6 174:11
   192:13 214:13

305:18
**leaves**  116:24
   117:2 174:21
**leaving**  188:12
**ledgers**  167:5
**lee**  49:18 50:12,20
   51:3 70:17 138:22
   155:5 185:20,22
   196:20 206:18
   212:18 213:17,18
   213:22 214:13
   236:14 240:20
**lee's**  9:18,21
**left**  66:9 67:6
   179:5 191:16
   192:15 210:23
   261:10 353:8
   386:14
**legacy**  122:9
   380:11
**legal**  4:11,14 13:16
   13:18,25 15:13,19
   16:15 17:23,25
   18:6 23:15,21
   37:10,23 40:3,7,11
   41:3,4,6,10 48:19
   51:12 52:7 53:12
   55:14 57:13 73:23
   79:18 88:24
   103:20 105:7
   112:20 114:18
   122:5 159:8
   161:25 162:3,8,21
   162:22 163:3,24
   209:22,24 265:2
   280:10,11,14
   282:6 296:8,11
   305:5 384:23
   385:6,18 392:3
   397:9

**legally**  297:3
**legitimate**  201:13
**lending**  14:18
   42:22
**leonard**  360:21
**letter**  301:8
   302:16 306:16
   308:6 371:3,22
**letters**  147:23
   153:18 168:22
   392:8
**level**  77:15 338:19
   370:5
**leveraged**  360:24
**li**  1:17 4:7 5:13 6:1
   6:11 7:1,7 8:1 9:1
   10:1 11:1 12:1
   13:1 14:1 15:1
   16:1 17:1 18:1
   19:1 20:1 21:1
   22:1 23:1 24:1
   25:1 26:1 27:1
   28:1 29:1 30:1
   31:1 32:1 33:1
   34:1 35:1 36:1
   37:1 38:1 39:1
   40:1 41:1 42:1
   43:1 44:1 45:1
   46:1 47:1 48:1
   49:1 50:1 51:1
   52:1 53:1 54:1
   55:1 56:1 57:1
   58:1 59:1 60:1
   61:1 62:1 63:1
   64:1 65:1 66:1
   67:1 68:1 69:1
   70:1 71:1 72:1
   73:1 74:1 75:1
   76:1 77:1 78:1
   79:1 80:1 81:1
   82:1 83:1 84:1

| | | | |
|---|---|---|---|
| 85:1 86:1 87:1 | 208:1 209:1 210:1 | 330:1 331:1 332:1 | **line** 77:6 208:4 |
| 88:1 89:1 90:1 | 211:1 212:1 213:1 | 333:1 334:1,15 | 219:15 234:25 |
| 91:1 92:1 93:1 | 214:1 215:1 216:1 | 335:1 336:1 337:1 | 323:25 330:15 |
| 94:1 95:1 96:1 | 217:1 218:1 219:1 | 338:1 339:1 340:1 | 365:3 383:13 |
| 97:1 98:1 99:1 | 220:1 221:1 222:1 | 341:1 342:1 343:1 | 401:23 403:5 |
| 100:1 101:1 102:1 | 223:1 224:1 225:1 | 344:1 345:1 346:1 | **lines** 73:2 |
| 103:1 104:1 105:1 | 226:1 227:1 228:1 | 347:1 348:1 349:1 | **liquidity** 42:2,23 |
| 106:1 107:1 108:1 | 229:1 230:1 231:1 | 350:1 351:1 352:1 | **list** 137:4 |
| 109:1 110:1 111:1 | 232:1 233:1 234:1 | 353:1 354:1 355:1 | **listed** 48:13 |
| 112:1 113:1 114:1 | 235:1 236:1 237:1 | 356:1 357:1 358:1 | 237:12 315:24 |
| 115:1 116:1 117:1 | 238:1 239:1 240:1 | 359:1 360:1 361:1 | **lists** 137:8,16 |
| 118:1 119:1 120:1 | 241:1 242:1 243:1 | 362:1 363:1 364:1 | **literally** 265:19 |
| 121:1 122:1 123:1 | 244:1 245:1 246:1 | 365:1 366:1 367:1 | **litigation** 6:22 |
| 124:1 125:1 126:1 | 247:1 248:1 249:1 | 368:1 369:1 370:1 | 11:18 18:7 23:8 |
| 127:1 128:1 129:1 | 250:1 251:1 252:1 | 371:1 372:1 373:1 | 23:16,23 24:9 |
| 130:1 131:1 132:1 | 253:1 254:1 255:1 | 374:1 375:1 376:1 | 25:6,12 27:19,25 |
| 133:1 134:1 135:1 | 256:1 257:1 258:1 | 377:1 378:1 379:1 | 72:6 100:17 102:3 |
| 136:1 137:1 138:1 | 259:1 260:1 261:1 | 380:1 381:1 382:1 | 102:10 104:22 |
| 139:1 140:1 141:1 | 262:1 263:1 264:1 | 383:1 384:1 385:1 | 276:4 280:12 |
| 142:1 143:1 144:1 | 265:1 266:1 267:1 | 386:1 387:1 388:1 | 385:17 386:2 |
| 145:1 146:1 147:1 | 268:1 269:1 270:1 | 389:1 390:1 391:1 | 388:6,13 |
| 148:1 149:1 150:1 | 271:1 272:1 273:1 | 392:1 393:1 394:1 | **litigations** 26:7,8 |
| 151:1 152:1 153:1 | 274:1 275:1 276:1 | 395:1 396:1 397:1 | 26:13 27:10 |
| 154:1 155:1 156:1 | 277:1 278:1 279:1 | 398:1 399:1,15 | 105:22 385:19 |
| 157:1 158:1 159:1 | 280:1 281:1 282:1 | 400:1,24 401:1 | **little** 44:5,25 56:20 |
| 160:1 161:1 162:1 | 283:1 284:1 285:1 | 402:1 403:3,21 | 79:17 104:9 291:2 |
| 163:1 164:1 165:1 | 286:1 287:1 288:1 | **liability** 306:17,21 | **live** 7:19 |
| 166:1 167:1 168:1 | 289:1 290:1 291:1 | **liaised** 48:16 | **living** 381:21 |
| 169:1 170:1 171:1 | 292:1 293:1 294:1 | **liaising** 66:25 | **llc** 1:8,16 2:10 4:9 |
| 172:1 173:1 174:1 | 295:1 296:1 297:1 | **liaison** 192:8 | 12:14,17,24 13:15 |
| 175:1 176:1 177:1 | 298:1 299:1 300:1 | **light** 364:3 | 118:15,17,20,21 |
| 178:1 179:1 180:1 | 301:1 302:1 303:1 | **limit** 54:13 345:23 | 118:24 126:19 |
| 181:1 182:1 183:1 | 304:1 305:1 306:1 | **limited** 204:7 | 156:12 230:25 |
| 184:1 185:1 186:1 | 307:1 308:1 309:1 | 234:4 246:20 | 241:14 249:14 |
| 187:1 188:1 189:1 | 310:1 311:1 312:1 | 253:5 258:22 | 306:19,22 307:25 |
| 190:1 191:1 192:1 | 313:1 314:1 315:1 | 306:17,20 340:3 | 308:4 332:25 |
| 193:1 194:1 195:1 | 316:1 317:1 318:1 | 344:13 345:2,6,21 | 386:22 403:1,2 |
| 196:1 197:1 198:1 | 319:1,11 320:1 | 346:3,12,20,24 | **llc's** 307:11 |
| 199:1 200:1 201:1 | 321:1 322:1 323:1 | 347:7 | **llp** 2:4,9 5:4 |
| 202:1 203:1 204:1 | 324:1 325:1 326:1 | **limits** 102:20 | **llp.com** 2:8 |
| 205:1 206:1 207:1 | 327:1 328:1 329:1 | 306:20 | |

load 321:13
loaded 132:14,20
  228:15 229:15
  282:24 319:8
loading 33:24 46:7
loan 38:14,18
  44:23,25 47:7,9
  88:12,20 89:3
  91:2 96:22,23
  97:17,19 98:11,17
  168:19 169:4,11
  169:22 170:4,8,13
  170:19 171:24
  172:3,7,15 174:4
  178:8,10 285:14
  289:25 290:5
  312:14,14,16,18
  312:23 314:14,24
  315:14,15,23
  316:11,14,15
  317:8,9,21 391:8
  394:3,4,7,18 395:4
  395:6,6
loans 38:10 39:4
  42:20 45:3,9,16,22
  45:23 97:12,15
  125:19 170:5
  295:18,23 313:7
  313:17,20,21
  314:7,15,18,22
  316:12 317:17,24
  391:4,12
local 322:11
  326:21
located 10:20
locations 1:21
locked 42:19,20
  117:19,22 177:22
log 105:21 200:12
  222:13 223:11
  224:5 225:6,12

321:4,7,19 324:10
  326:5 342:10,13
  342:17
logged 101:11
  103:10
logging 200:17
logic 365:9
login 105:18
logmein 272:9
long 20:24 23:21
  27:4 37:8 44:3
  49:7 51:23,23
  55:6 72:8 204:14
  222:19 225:25
  231:5 250:19
  310:5 343:13
  347:13 349:16
  355:22 356:2
  358:24 386:8
longer 7:17 137:13
  188:17,18 191:17
  288:6
look 30:17 31:15
  31:19 32:6,23
  65:14 82:14,20,22
  82:23 85:12 95:25
  111:16,25 113:9
  113:14 117:23
  119:15 123:8,9
  132:11 133:21
  134:20 138:21
  139:4 140:15
  143:16 157:25
  166:19 176:6
  185:8 189:4,20
  196:20 206:2
  207:2,13,14
  209:17 211:15
  212:8 222:14
  223:12 224:6
  225:6 227:10

228:7,16,21
  229:16 230:7
  236:11 239:23
  240:20 241:17
  248:21 252:19
  255:11,18 258:25
  261:8 262:2
  263:21 268:13
  269:6,11 285:5
  286:9 287:17,22
  293:15 297:12
  302:19 310:18
  319:6 322:14
  323:12 327:14
  329:20 339:25
  349:2 351:8
  354:13 363:4
lookback 366:14
looked 31:22
  186:17,21 189:8
  197:3,12 217:3
  256:17 266:14
  267:25 268:9,10
  268:16 355:18,19
  363:17
looking 14:24 15:5
  33:25 37:3 89:19
  112:15,17 115:4
  119:11,14 155:6
  155:11 156:11
  159:25 160:11,21
  165:11 179:19
  182:21 183:2
  189:6 205:6 209:4
  212:3,17 213:17
  225:15 226:23
  230:24 231:19
  256:6 264:19
  266:7 268:20
  304:3 308:19
  309:6 318:12

319:17 322:3
  354:18 355:9,13
  365:2 383:21
  387:25 389:8
looks 83:15 113:19
  113:24 115:13
  116:8 118:5
  135:10 139:9
  197:25 207:19
  209:2 227:3,16
  234:12 267:24
  285:25 297:24
  302:25 303:7,16
  303:17 347:12
  349:14 361:25
losing 378:22
loss 322:5 326:16
lost 378:17
lot 9:2,6 49:5
  279:5 336:25
  345:16 372:12
  379:19
lots 377:16
low 239:19
lp's 115:16
lunch 54:16 184:3
  184:17 225:23
  239:13

## m

m 6:2
m&a 38:8
machine 272:4
machines 322:11
  326:21
mahir 191:7,21,22
  192:10,16
mail 132:4,11
  134:5,13,15
  135:10,19 138:9
  149:20 154:13
  174:12,21,22

175:15,24 176:3
178:22,23,24,25
179:3,4,8,12,13,21
179:22 180:5,10
186:18,18,21
188:16 189:4,7,15
189:20 191:7,15
195:3 200:4
207:14,22,23
218:3 219:2,9,12
228:13,17,24
229:25 230:2,7,9
230:13 231:16
232:7,12,15
235:10 239:22
241:4,12 242:4,20
243:4 244:19,21
245:10,19,20
246:3,7,13,20
247:3,17,19 253:5
253:6,15,16,17,18
253:21,22,25
254:14 258:6
265:3,12,14 266:3
266:4,7,14 269:19
271:21 273:4,5
274:9 275:7,13
276:7 280:15
294:13 295:11,11
296:14,24 297:20
297:25 298:5
301:7 302:13
308:15 310:20
312:4,9 318:13,23
319:11,15,18,22
320:4 322:4,22
323:4,6 327:16,18
328:3,6,10 329:25
330:10 331:25
337:5 355:20
400:14,17,23,25

401:3,5
**mails** 174:2,9,10
174:13 175:4,5,19
179:14 180:3,9
195:9 217:24
225:7,15 242:7
246:23 253:2
257:11 258:12,19
259:2,5,7,11,19
260:4 261:9,21,25
262:3,5,8,13,17,20
263:22 264:8
265:23,25 267:21
268:7,16,21 269:3
269:7,12,15,22
270:23 271:16,22
272:2 273:3,25
274:8 275:7,15
276:6,8 280:21
297:2,9 339:7
**main** 17:14 320:5
**maintain** 53:18
257:2 284:16,23
285:21 287:14
288:16,19 290:19
291:12 292:2,11
361:2,22
**maintained**
166:25 287:8
**maintains** 155:19
**making** 160:14
221:10 315:14
320:14,18,19,21
320:24 326:25,25
332:5
**mallet** 128:11,22
129:6 164:3 375:5
382:24
**manage** 41:25
42:22 331:3,19

**managed** 42:11
115:15 295:8
**management**
12:14,17,21,24
13:11,12,15 42:10
73:14,22 74:7,14
77:5 97:19,24
98:19 99:8,14
116:11 118:8
120:7 123:10,19
123:20 124:13
126:20 127:3
137:20 151:10
156:2,7,12 157:4
158:25 162:24
169:4 241:14
249:14,22 280:5
313:14 317:11
320:8,15,22
323:18 326:25
327:2 377:18
386:22 387:21
391:19
**manager** 69:2
75:4 120:8
**manages** 124:13
**manual** 65:21,22
66:5 139:14
155:21 159:5,11
168:2 237:2,25
246:11,17 359:8
364:12,14,20
365:2,4 384:12
387:20 388:4
395:8
**manuals** 252:19
389:10 395:15
**marcello** 251:4
**marcelo** 2:16 4:10
26:22

**march** 46:9,11
231:2 371:15
372:10 400:10
**mark** 10:13 21:18
33:15 45:25 71:7
77:19 80:24
131:10 186:25
228:12 230:3
268:12 279:11,18
286:13 309:17
315:20 334:9
348:19 349:4,11
355:20 380:3
384:18 397:21
**marked** 30:18
33:18 36:9 46:11
81:5 82:14 111:21
132:5 133:22
138:22 206:20
207:2 213:18,23
228:24 236:15
249:3 282:22
283:3 286:15
310:16,21 319:12
322:15,23 327:19
330:3 401:22
**market** 331:16
**marketers** 150:5
**marketing** 43:3
80:5 117:19
140:12 141:24
142:20 143:21
144:16,23 145:24
146:6 147:13,18
149:6,14 150:6,9
150:11 168:20
178:12 191:23
237:21,24
**marking** 350:6,11
**markings** 347:18
348:2

| | | | |
|---|---|---|---|
| **marriage** 402:16 | **mckenzie** 88:7 | 50:15 97:11 | 34:1 35:1 36:1 |
| **mary** 2:7 5:7 | **mean** 13:22 14:13 | 167:25 179:7 | 37:1 38:1 39:1 |
| **mass** 322:10 | 16:23,24 17:11,13 | 235:2 248:18 | 40:1 41:1 42:1 |
| 326:20 | 21:25 23:11 24:16 | **meanings** 195:21 | 43:1 44:1 45:1 |
| **material** 129:8,11 | 24:19 36:15 39:19 | **means** 9:7 16:20 | 46:1 47:1 48:1 |
| 130:4,14 142:5 | 40:10 41:3 42:6 | 22:6,24 37:12,14 | 49:1 50:1 51:1 |
| 143:11 148:12 | 43:25 45:5 50:13 | 38:14 65:6 77:7 | 52:1 53:1 54:1 |
| 149:15,22 225:19 | 58:6,12,16 68:15 | 126:7 130:15 | 55:1 56:1 57:1 |
| **materially** 83:25 | 73:9 78:15 81:9 | 141:20 151:19 | 58:1 59:1 60:1 |
| **materials** 135:7 | 81:19 86:19 94:25 | 209:12 235:18 | 61:1 62:1 63:1 |
| 140:20,24 141:10 | 104:8 116:19 | 288:18 290:23 | 64:1 65:1 66:1 |
| 141:25 142:2,9,20 | 125:22 129:12 | 291:7 314:18 | 67:1 68:1 69:1 |
| 143:4 146:6,18 | 144:5,7 145:12,19 | 328:7 344:7 | 70:1 71:1 72:1 |
| 147:2,14,18 150:7 | 150:9,10 158:13 | 346:18 347:9 | 73:1 74:1 75:1 |
| 150:9,11 153:16 | 158:16 162:18 | 387:18 | 76:1 77:1 78:1 |
| 153:19 154:6 | 170:16 171:16 | **meant** 10:4 17:2 | 79:1 80:1 81:1 |
| 168:20 174:5,8 | 173:15 174:10 | 314:2 334:14 | 82:1 83:1 84:1 |
| 177:16,17 178:12 | 176:18 186:20 | 350:25 | 85:1 86:1 87:1 |
| 204:2 217:22 | 194:8 197:11 | **measure** 59:16 | 88:1 89:1 90:1 |
| 254:12 255:8 | 204:11 209:3 | 158:19 | 91:1 92:1 93:1 |
| 279:18 361:3,6,9 | 210:3 248:4 | **measures** 90:9 | 94:1 95:1 96:1 |
| 361:12 362:23 | 253:18,20 255:4 | 143:20 144:4 | 97:1 98:1 99:1 |
| 395:12 | 261:5 263:14 | 145:12 158:7 | 100:1 101:1 102:1 |
| **matter** 4:8 76:13 | 264:10 265:9 | 176:9,17 177:9 | 103:1 104:1 105:1 |
| 87:11 143:3 175:6 | 270:12 273:5 | **mechanically** 44:6 | 106:1 107:1 108:1 |
| 175:7,20 182:17 | 277:6 279:25 | **mechanisms** | 109:1 110:1 111:1 |
| 189:25 260:2 | 280:17 292:9 | 183:15 343:19 | 112:1 113:1 114:1 |
| 264:5 282:5 | 296:19 297:6 | **meeting** 335:12 | 115:1 116:1 117:1 |
| 370:17 372:14 | 300:14 302:3 | 337:4 | 118:1 119:1 120:1 |
| 402:18 | 312:8 316:8 | **meetings** 362:18 | 121:1 122:1 123:1 |
| **matters** 86:11 | 325:20 333:8 | 362:19 | 124:1 125:1 126:1 |
| 129:19 192:9 | 334:7 337:10 | **mei** 1:17 4:7 5:13 | 127:1 128:1 129:1 |
| 193:4,11,17 | 344:5 350:23 | 6:1,11 7:1,7 8:1 | 130:1 131:1 132:1 |
| 378:11 | 355:14 358:11,11 | 9:1 10:1 11:1 12:1 | 133:1 134:1 135:1 |
| **maximum** 286:2 | 358:13 366:22 | 13:1 14:1 15:1 | 136:1 137:1 138:1 |
| **mayer** 88:6 | 370:12 372:19 | 16:1 17:1 18:1 | 139:1 140:1 141:1 |
| **mayor** 164:2 | 373:6 379:19,25 | 19:1 20:1 21:1 | 142:1 143:1 144:1 |
| **mcdermott** 44:21 | 393:13 395:23 | 22:1 23:1 24:1 | 145:1 146:1 147:1 |
| 44:24 45:2 46:19 | 396:17 397:4 | 25:1 26:1 27:1 | 148:1 149:1 150:1 |
| 46:23 | **meaning** 16:18,18 | 28:1 29:1 30:1 | 151:1 152:1 153:1 |
| | 20:10 24:14 42:19 | 31:1 32:1 33:1 | 154:1 155:1 156:1 |

157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1

280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1,11 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1,15
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1,15

400:1,24 401:1
402:1 403:3,21
**member** 122:10
263:17 341:15
**membership**
15:25
**memberships** 16:2
**memo** 323:16
324:2
**memorialize**
365:25
**memorialized**
137:4 371:2 383:7
392:13,15
**memorializing**
86:21
**memorized** 31:12
**memory** 319:25
**mentioned** 29:2,6
29:6 80:9 86:8
174:16 177:25
341:12 360:22
**merely** 248:10,14
346:23
**message** 311:25
**messages** 233:5
234:2,5 257:12
**messaging** 231:16
232:8,12
**met** 100:13,15
**method** 150:4
**michael** 191:7
**microphone**
239:15
**microsoft** 337:17
**millions** 111:7
113:2
**mind** 129:3 276:2
**minimum** 286:3
288:2,10 290:22

**minute** 184:12
310:4,6
**minutes** 81:20,25
131:17 184:21
266:22 353:18,22
359:3
**misapproprian**
78:19
**misappropriation**
78:19
**misspoke** 261:15
344:9
**misstate** 166:4
**misstated** 165:22
**mistake** 210:25
211:11 309:16
**mitigate** 381:15
**mitigated** 382:2
**mitigates** 324:15
**mixed** 225:18
**model** 162:4
**models** 313:2
**modified** 34:25
**module** 362:22,23
**moment** 86:12
109:5 110:6 163:7
178:15 190:19
212:4 240:12
244:11 273:7
**momentarily**
206:10
**monday** 133:18
134:21 300:24
**money** 77:13
314:25 315:2,4
**monitor** 25:25
143:22 233:23
253:9 254:13
259:5,7,9 261:25
262:7,13,17
267:21 269:2

**monitored** 253:24
268:7
**monitoring** 26:6
26:10 143:22
144:16 159:9
176:11 177:10
178:2,5,6,14 233:3
234:21 237:23
238:3,12 252:25
253:4,7,14,16,20
257:2,5 260:13,16
262:4,19 266:18
280:2,15,21 297:3
**month** 148:9,10,16
301:13
**monthly** 259:20
**months** 49:11
**monti** 134:16
**monticciolo** 21:19
49:13 71:3 77:20
78:6 134:16
135:14 257:25
263:25 269:9
278:25 328:23
329:2,7,15 379:4
379:23 392:10
**monticciolo's**
262:7 279:19
**morgan** 39:7,9,15
40:14,19,22 41:5
41:25 42:9 43:8
43:12 44:12,13,19
48:15 133:3
349:23 350:2,3,7
350:12,14,17,20
351:3,7,9,13,17
352:11,13
**morning** 4:3 6:19
11:10,14
**moro** 28:3,17,19
386:14

**move** 47:14
110:24 239:14
303:9
**moved** 31:11
**movement** 314:25
**moving** 110:18
111:3 189:22
316:20 320:25
330:24 398:5
**muddled** 94:19
**muddy** 94:16
**multiple** 34:25
39:2 62:5 110:4
120:16,16 121:7
**mute** 252:3,4
**mutual** 85:7

**n**

**n** 2:2 3:2 6:2 99:10
399:2 401:11
**name** 4:10 5:2 6:9
6:20 7:5 18:3 75:9
87:16 109:5,23
110:2 112:22
126:2 150:2
209:25 342:10
360:17 384:4,6
403:2,3
**named** 56:24
258:17 261:6
**names** 28:2 258:25
**nature** 227:14
277:19
**nda** 79:25 80:8,13
80:15,17,18,21
91:21 92:9,10,12
92:18,21,24 94:4
94:10 96:2,13,15
**nda's** 85:22,24
86:3,6,7,11 90:19
90:25 91:2,13,15
91:23,24 96:21

**necessarily** 24:19
76:17 183:9 250:9
288:8 356:9 362:3
362:9,10 368:25
369:3 374:13
380:6
**necessary** 215:14
217:8,16
**need** 7:14,16,16,16
10:15 18:20 25:22
45:11 60:3 70:6
75:20 81:18 87:2
119:13 131:16,16
140:18 148:25
149:7 169:7 184:7
184:11 190:18
207:15 224:19
231:5 250:20
252:18 254:23
266:11,22 290:4
291:21 315:25
344:17,23 382:18
**needed** 7:13
145:10 157:10
159:5 183:10
235:12 315:13
**needs** 42:14
169:15,22
**negative** 68:22,23
**negotiate** 38:19
**negotiated** 80:20
275:18 305:20
**negotiation** 299:13
300:12,17 301:15
301:18,21
**negotiations**
300:15 303:23
**neither** 52:12
220:5 334:10
**net** 124:17

**network** 244:21
279:7 321:13
325:10,16 328:9
328:13 329:4
361:18
**never** 48:20,21,21
48:24 100:15
116:20,22 200:8
373:17 374:21
**nevertheless** 246:4
333:5
**new** 1:2,22 2:6,6
6:5,13,14 7:10,10
8:7,7 10:21 35:8
47:14 81:2,4
95:23 125:5,13
138:15 213:8
215:20,23 230:5
328:19 356:9
382:3 390:24
392:21 400:11
402:4,5,8 403:1
**newsletter** 363:2
**newsletters** 363:3
**nine** 338:2
**noise** 95:19
**non** 40:7,11 44:2
65:8 83:9,10,21
84:15,23 90:10
120:6 122:10
125:13 315:6
316:23,24
**normal** 263:18
300:3,6 379:20
**normally** 382:7
**notary** 1:22 6:4
399:22 402:7
403:25
**note** 227:2 309:23
**notice** 18:20 19:3
30:20 101:15

103:13 153:17
185:10 194:5
196:13 219:20
228:2 242:5
245:25 246:14
252:15 254:19
255:7,13 274:6
276:12,20 277:11
279:23 305:18
306:4 354:14
**noticed** 226:25
240:19
**noticing** 4:25
94:18 213:24
**notified** 240:5
**notifying** 278:21
279:20
**notwithstanding**
195:19 221:16
250:2 306:15
**november** 23:25
135:20,21 334:20
**nuance** 203:20
**nuances** 279:6
**number** 9:15
21:21 25:12 45:19
45:20 75:22 78:2
84:4 86:24 87:5
161:15,23 206:6
207:3 228:14
230:10,13 234:14
237:12 243:25
248:25 251:11
255:19 270:24
283:18 286:24
287:4 310:16,25
329:21,22 337:7
340:12 349:5
354:18 371:19
374:11 390:16,19
391:5 400:7

**numbered** 244:17
**numbers** 148:9,17
206:17
**numerated** 326:11

**o**

**o** 3:2 154:10 399:2
**oath** 3:12
**object** 9:4 16:21
22:3 25:18 27:12
48:9 51:15,19
56:13 61:11 89:5
97:3 131:3 145:2
145:3,14 156:19
170:10 171:13
175:11 179:16
188:13 193:5,21
202:20 216:22,23
222:16 235:20
254:6 292:16
293:8 294:14
295:20 299:20
300:10 318:7
321:22 329:10
384:14 387:14
389:18 393:5
**objection** 59:6
87:20 94:6 102:13
128:16 129:16
305:25 333:7
345:8 346:5
351:20 372:24
**objections** 3:21
4:22
**objectives** 137:21
238:19
**obligations** 55:25
74:4 112:20 175:8
290:9
**observed** 9:2,7,9
9:11

**obtain** 94:4 151:15
261:21 313:15
397:25 398:8
**obtaining** 78:5
94:10 96:2 147:13
**obviously** 71:15
84:2 150:16
181:11 218:16
223:23 380:15
**occur** 266:12
**occurred** 105:10
187:18 366:2
367:13
**occurring** 219:7
**october** 1:11 4:5
23:25 36:4 70:9
70:15,20 71:2
91:8 101:14
103:12 105:18
132:5,11 136:17
137:22 139:15
141:9 158:22
161:4,4 180:15
182:11 188:22
198:12,22 199:6
201:22 223:5,24
225:2 226:18
228:13,23 252:12
253:13 254:17
280:13,16 355:5
377:7 400:15,16
402:20
**oday** 12:2
**offender** 60:2
**offer** 98:6 398:7
**offered** 98:15,25
**offering** 168:21
174:5 392:6
395:12,18
**office** 10:21
124:19,24 125:2,5

125:7 321:11
335:6,15,16 336:5
336:11 341:25
342:4
**officer** 12:15
13:10,14 14:25
36:3 47:24 48:4,5
49:23 50:4 52:15
53:8 55:13 56:9
73:4,10 79:14
103:9 104:2,12,14
129:9 137:22
139:25 141:3,8,13
141:19 142:7
143:7 146:4 161:7
161:18 252:24
255:6 262:12,15
262:23 272:8,19
273:2,22 274:4
276:5,11,19
277:11 358:5
360:11 372:8,23
**offices** 125:13
190:4,15 352:11
352:13
**official** 251:19
320:7 383:14
**officially** 12:13
35:2 57:15
**offshore** 120:12,14
120:18,20,24
121:6,9,14 122:4,7
122:24 123:7
125:2
**oh** 119:19 122:18
133:25 161:19
165:24 197:10,14
206:21 214:25
236:12 325:6
344:8 350:24
394:5

**okay** 8:6 9:16
10:14 11:8 13:16
13:20 14:21,24
19:20,21 20:18,24
21:4,20 22:10,19
27:8 28:11 30:16
31:14,18,25 32:6
32:22 33:7,13
34:6 35:14,25
36:21 37:6 38:6
41:6,20 44:13,20
46:17 47:16 51:21
52:9 54:23 62:17
65:14 72:23 73:3
75:11 76:16 78:25
80:22 82:3,25
83:4 95:23 103:2
104:4,6,19 109:20
114:22 115:6
126:7 128:12,23
129:7 130:24
131:8,15,18
134:14,19 135:6
137:19 138:19,25
139:3,19 140:8,14
140:22 143:16
145:11 153:5,15
154:11,25 155:16
160:12 165:4,10
165:14 166:18
168:8 176:24
177:7 180:13
183:22 184:20
185:23 186:3
188:8 189:21
197:19 198:14
199:2,9 200:14
202:4,14 203:11
206:11,24 207:8
207:18,20 208:3
208:15 209:15

210:8 211:14
212:7,15,25
213:10,25 214:5
214:21 215:5,6
224:17 225:8
226:20 227:2
228:10 229:4,19
230:18 233:2
235:25 236:9
239:8,24 240:3,24
241:11,16 242:16
244:5,16 247:21
248:20 249:9,25
250:17 252:9
255:17 258:14
266:20 267:17
275:20 279:24
282:19 283:7,14
283:24 284:2
286:23 287:2,3
290:6 291:23
293:19 296:3
297:11,17,19
298:7 300:21
301:4 302:12
311:13 318:12
319:4 322:14
323:3,11,15,25
325:15 326:5
327:12 328:10
330:6 333:4
347:16 349:10
351:5 353:4,5,20
356:11,22 358:15
359:24 361:2
367:8 380:22
388:21 390:14
395:20
**onboarded** 138:16
331:11 359:6

**onboarding** 69:25
**once** 62:4,12 92:13
148:24 175:24
176:3 179:4
228:15,22 271:15
**one's** 219:10
336:24
**ones** 31:8,12 45:18
59:14 129:5
340:11 375:20,23
383:15 390:24
**ongoing** 18:7
23:16,22 143:22
144:16 145:5
147:4 176:11
177:10 237:23
238:12 259:5
**online** 296:22
**onshore** 75:15
121:2,6
**oop** 46:15
**open** 124:16
150:21 213:24
271:20 378:9
**opened** 213:21
**opening** 4:1 5:1
**operate** 195:18
385:14,15
**operating** 69:13
181:14
**operative** 199:4
383:21
**opinion** 38:16
**opportunities**
389:17
**opportunity** 35:20
96:7 311:15
**opposed** 192:18
248:9,10,14
**optiplex** 103:11
105:19

**order** 1:19 25:9,21
37:7 235:7 289:24
295:6 314:11
**orders** 25:6,12,17
**org** 114:17,19
117:11,17,24
118:4,11 119:10
**organization** 46:8
46:10 360:2,8
400:9
**organizational**
111:21 115:5
117:2 400:12
**orient** 211:21
**original** 3:9,17
308:6,9,14 317:21
**originally** 36:10
331:11 392:3
**originals** 294:22
**originate** 45:22
313:20 314:22
391:3
**originated** 98:18
313:18 314:3,8,16
315:15 316:12
317:16 391:11
**originates** 125:18
390:11 394:3,4,7
395:7
**origination** 98:11
124:23,25 194:18
**originator** 391:8
394:22
**originators** 395:5
**outcome** 4:17
369:21 373:9
402:17
**outlines** 60:5
**outs** 22:23
**outside** 24:21
52:24 62:25 63:3

63:7,11,21 64:9,15
65:2,5 66:25 75:3
86:9,10 87:8,10,14
88:13,15,19 89:2
104:21 105:6,24
106:6,22 108:9
109:9 124:16
128:5,8,14,14
129:4 159:7 173:3
173:11 175:16
193:3 270:9,20
276:3 282:2,14
289:22 295:11
360:2,7 368:16
374:23 375:2,4
376:15 382:23
384:9 386:3
**overlap** 196:16
**overlapped** 50:20
69:4
**overly** 68:22
**oversaw** 58:4
**oversee** 57:18
73:23 317:21
**overseeing** 57:15
58:5,11 59:17
62:5 73:11 86:6
87:13 358:10
**overseen** 57:14
**oversees** 79:25
**owe** 386:16 387:5
387:7
**owes** 387:21
**owned** 98:4 203:7
203:16 232:15
343:4,7,25 344:12
345:6 347:2,5,17
347:19 348:3
349:18,23 350:2,7
350:14,17

**owner** 262:16
**ownership** 127:2
**owns** 101:13 333:3

**p**

**p** 2:2,2 3:2
**p.m.** 184:24 185:5
226:8 255:25
267:4,9 310:8,13
354:5,10 398:17
398:19
**package** 140:6
**page** 31:15 102:25
114:23 115:22
119:15 140:9
143:17 155:3,6,11
158:3 160:16
165:5 176:7
185:12,24 199:10
199:11 200:24
207:12,22 208:17
209:18 210:10,13
210:15,17,18
230:19,24 231:19
232:18,21,23
233:8 234:9,10,11
234:13 237:24
238:7,9 242:8,19
242:20,24,24
243:3,6,10,11,17
243:18,19,20
244:8,12 247:23
251:11 270:14,14
283:15,23 309:13
309:24 323:13
354:19 400:6
401:13,18,23
403:5
**pages** 207:10
**paid** 87:17 235:8
**pandemic** 112:7,7
112:9 200:21

336:22
**papering** 332:5
**paragraph** 136:6
141:21 162:11
163:3 166:6,20
168:14 200:25
205:20,23 251:12
283:17,20 284:9
289:5 306:7 322:4
324:8,22 326:10
326:11 331:24
**paralegal** 72:2
**parameter** 346:22
**parameters**
345:16,20 346:25
**part** 9:18,20,23,24
10:3,4,7,8,11,12
11:23 13:20 15:13
113:8 126:3 140:3
140:4,6 146:5
147:4 157:6
161:13 177:25
251:12 261:24
262:6,9,12 269:5,5
274:25 275:2,16
277:15 296:20
299:13,19 327:3
333:2 358:13
362:10 368:6
381:7 383:2
**partially** 130:19
**participate** 21:9
252:25
**participated** 19:13
20:4 21:15 254:17
**participation**
170:8,14,21
171:25 172:7
**participations**
172:15

**particular** 42:13
61:22 70:8 87:2,3
89:3 124:9 171:10
188:5 220:8
229:21 246:19
260:5 268:6
270:18 271:3
300:8 368:5 391:8
**parties** 1:21 3:7
38:25 39:2 40:25
43:5,10 90:15
112:20 387:5,7,12
387:13 402:15
**partners** 116:10
118:7 306:18,22
307:16,19 308:4
**parts** 32:18 183:17
183:19 368:9
**party** 4:15 29:14
29:19,24 70:2
77:9 153:2 313:22
393:18,21
**passed** 54:8
**paul** 1:3 2:5,17 4:8
5:4 6:21 10:7,9
100:6,10,11,15
101:11 103:11
188:2,16,17
191:12,16 294:24
403:2
**paul's** 194:15
**pause** 27:4
**paying** 8:12
**payment** 123:11
123:12 308:10
315:14
**payments** 316:3
316:18
**pays** 15:24 16:2
**pdf** 31:15 114:24
140:10 207:22

208:12,17 210:14
210:19 230:20
232:22 233:9
234:13 283:16
298:5 323:13
354:19
**pdf's** 54:13
**peers** 14:19
**pending** 105:21
107:12 110:23
**pennsylvania** 2:11
**people** 16:7 17:19
17:22 34:25 49:6
58:24 84:10,11
90:14,25 92:2,17
116:19 121:20
149:23 156:23
177:15,18 183:5
186:22 196:3,6
205:23 257:20,23
258:17 260:25
261:5,6,12,17
262:3 264:24
265:7 268:10
275:12,16 313:13
330:21 357:22,24
360:25 380:16
397:23
**people's** 93:18
180:8 259:2 262:5
**perceive** 65:3
**perceives** 204:21
**percentage** 259:18
269:14,22 271:23
**perception** 68:21
**perfect** 224:21
354:3
**perfectly** 104:25
**performance**
67:23 68:9,18
70:16 148:17

151:3 152:9,10
295:7
**performed** 163:25
164:12 195:25
**performs** 152:3
195:24
**period** 46:25
50:11,14,15,19
51:23 54:2 57:17
66:21 69:3 144:20
163:4 189:9
195:14 200:16,20
256:12,14 259:19
260:5 271:8,19
284:18,25 285:23
288:18,21 290:20
290:22 291:14,16
292:4,13 296:22
305:19 307:10
320:18 355:5
356:13 360:5
363:16 367:2
388:15
**periodic** 265:11
**periodically** 67:24
238:16 259:8
260:2 362:8
397:13
**periods** 168:7
288:6
**permissible** 245:6
**permission** 274:6
276:20 277:12
**permit** 272:21
**permits** 345:5
**permitted** 64:9
150:6 175:18
242:21 244:18
340:14 346:2
**person** 14:11,12
14:16,21 23:3

57:24 61:23,25
63:6 64:20 121:19
122:2 220:4,8
225:14 235:3
271:24 278:17
325:13 331:21
357:18 358:6
383:20
**person's** 18:3
179:20 180:11
189:7
**personal** 7:23
19:15 28:19 59:20
62:23 68:2 91:3
101:21,23 102:21
105:23 106:3,5,9
106:15,20 108:11
109:15,19 111:15
178:25 179:12
193:23 200:13,18
201:11,20 202:18
203:14,21 204:10
204:14,19,20
205:11 217:7,15
218:4,7,9,24
219:10,21 220:17
220:19 221:6,8,20
221:25 222:10,14
223:8,12 224:3,6
225:5,7,15,21
226:16 228:2,3
231:9,16 232:8,13
235:2 236:5 237:4
237:6 240:7 246:2
246:6,7 250:13,24
252:14,16 253:15
253:16,17,18,21
254:4,14,18 255:3
273:4,25 274:9
275:7,13 276:7
277:6 281:17

282:8 299:16,18
305:21 306:3
338:5,19,21 339:5
339:6,12,19 340:8
341:6,7,9 343:12
343:18 344:2,14
345:2,5,7,21 346:2
346:9,21,25 347:8
351:18 352:6,8
373:8 377:12
**personally** 8:16
25:25 28:22 34:20
85:20 100:11,14
188:15 196:15
305:12
**personnel** 154:5
230:25
**persons** 127:19
357:14
**perspective** 117:9
140:25 144:8
146:7 265:2 281:8
312:25 331:22
350:10
**pf** 129:4
**phelps** 375:8
**phone** 18:12,21
135:13 200:11
222:13 223:12
224:5 225:5,6
231:17 232:10,11
232:13 235:19
236:5 264:20
335:17 339:15,16
340:5,15 350:2
352:12,15
**photographs**
223:12
**photos** 222:14
224:6 225:16

| | | | |
|---|---|---|---|
| **phrase** 254:11 | 32:23 43:20 60:25 | **policies** 56:12,15 | 158:8,19,24 |
| 333:24 | 75:21 78:15 | 58:15 61:13 65:15 | 159:14,23,23 |
| **physical** 177:21 | 100:21 110:16 | 75:19,23 76:6 | 160:2,15,23 |
| 350:9 | 112:18 113:10 | 92:24 93:4,12,14 | 161:14 162:15 |
| **physically** 348:4 | 133:13 172:18,23 | 93:20 96:6,18 | 166:6,23 168:2 |
| 348:15 | 190:19 198:3 | 138:6,10,16 | 175:7 176:9,12,18 |
| **pictures** 340:24 | 199:10 207:4 | 139:10,20,23 | 176:21 177:3,3,6 |
| **piece** 41:23 56:19 | 231:5 232:19 | 140:16 156:23 | 177:11 183:21 |
| 56:20 299:12 | 236:10 242:9 | 160:7 167:22 | 192:20,23 198:15 |
| **pier** 320:4 | 249:10 250:19 | 183:18 193:8,12 | 199:5,16,19 200:7 |
| **pitch** 148:3,13,24 | 255:12,19 273:7 | 202:2,10,23 | 201:20,25 202:6 |
| 149:6 | 274:21 277:5 | 204:15,22,25 | 202:17 203:2,13 |
| **pittsburgh** 2:11 | 292:7 302:20 | 205:15,24 211:6 | 205:4,8,9 209:14 |
| **place** 8:6 36:22 | 311:16 368:2 | 217:12 220:16 | 209:16 210:4 |
| 69:16 80:13 140:5 | 395:22 | 221:22 223:6 | 211:4,23 215:7,22 |
| 144:21 153:7 | **pli** 15:25 16:2 | 224:25 237:12,22 | 216:9,15,18,21 |
| 156:15,18,22 | 54:16 55:5 | 237:24 238:4,12 | 217:5,11 222:8 |
| 162:15 178:10,14 | **pli's** 54:10 55:17 | 238:16,25 240:16 | 236:25 237:11 |
| 179:5 181:8,9 | **point** 26:11 27:9 | 241:13 246:18 | 241:5 242:4,18 |
| 183:16 202:24 | 27:14,17,24 28:5,6 | 265:5,5,9 272:21 | 245:2,14,23 |
| 205:2 227:7 | 28:12,14,16 81:11 | 292:20 293:5,10 | 246:15,19 247:8 |
| 234:17,18 238:13 | 88:17 92:6 93:13 | 293:12,21,22,25 | 249:15,23 250:10 |
| 239:2 246:18 | 94:9 103:10 | 329:8,15,16 343:8 | 251:13,18,23 |
| 259:4 260:20 | 119:11 134:11 | 343:11,14 346:10 | 258:16,24 260:7 |
| 265:10 367:2 | 158:18 159:17 | 355:10 359:6,10 | 260:10 293:16 |
| 376:11 377:15 | 160:18 176:20 | 369:5 375:17 | 329:3 344:3,16,21 |
| 392:8 399:11 | 181:24 182:25 | 376:11 377:15 | 345:14 346:15 |
| **placed** 271:18 | 188:11 191:15 | 379:16 382:12 | 366:20 375:25 |
| **places** 195:22 | 197:8 231:6,18 | 383:7 388:5,14 | 376:13,15 382:6 |
| 207:17 233:10,18 | 236:24 237:19 | **policy** 58:24 59:4 | 382:15 383:5,6,19 |
| 241:19 250:20 | 242:8 250:20 | 60:5 61:9,22 63:9 | 383:21 |
| **placing** 295:5 | 320:5 330:19 | 63:15 64:24 65:16 | **portal** 324:10 |
| **plaintiff** 1:4,18 2:4 | 331:14 359:18,25 | 76:15,16,22 91:19 | 325:25 |
| 5:5 6:21 30:2,4 | 369:13 380:18 | 92:19,23 93:8,13 | **portfolio** 313:19 |
| 100:25 186:11 | **pointed** 240:17 | 93:18 94:9 138:2 | **portfolios** 42:22 |
| 188:2 190:10 | **pointing** 24:23 | 139:13 143:2,15 | **portions** 32:16 |
| **plaintiff's** 400:4 | 95:22 214:16 | 143:21,23 144:5 | **portray** 115:19 |
| **plan** 353:25 | **points** 177:2,23 | 144:13,15,17,20 | 116:3,9,13 |
| **please** 4:23 5:15 | **polices** 157:9 | 144:22 145:6,13 | **portrays** 115:10 |
| 5:18 6:9 7:6,8,12 | 231:2 | 145:20,21,23 | **position** 170:20 |
| 11:6 26:22 27:7 | | 155:18 157:22 | 171:2,20,23 |

172:15
**positive** 68:9,17
**possession** 11:12
  137:13
**possibility** 329:16
  342:15
**possible** 206:17
**possibly** 297:5
  341:21
**posted** 35:16,18
  228:22
**poten** 149:9
**potential** 80:6
  91:3 92:5,7 93:9
  117:4 147:21
  149:9 154:6 358:2
  398:2,5
**potentially** 24:23
  38:25 75:14 80:11
  93:17 288:6
  295:23 382:22
  398:8
**powerpoint**
  113:19
**practice** 67:23
  141:10,15,16
  142:17 143:3,10
  143:11 161:5
  162:19 176:21
  182:18 264:5
  309:18 383:18
**practices** 162:5
  238:6 280:15
  355:10
**practicing** 40:15
  40:20
**pre** 59:9,19 62:3,7
  62:9,13,15
**precisely** 102:18
**predate** 305:6
  380:2,8 384:6

**predated** 101:18
**predates** 331:11
**predecessor** 70:16
  119:22
**premises** 352:6,10
**preparation** 11:24
  19:14 20:5 21:10
  139:23
**prepare** 20:24
  34:18,20,22
  186:14 256:11,15
  256:23 355:8
**prepared** 32:2,12
  33:8 35:2 186:6
  256:3,7 319:10
  354:23 363:9
  368:13
**preparing** 20:15
  20:25 279:15
  355:23
**present** 2:15 4:18
  9:17,20,22,24 10:2
  10:6,8,10,12 64:19
**presented** 117:13
  389:15
**preserve** 284:17
  284:24 285:21
  286:6 288:16,20
  290:19 291:12,19
  291:21 292:2,12
**president** 334:10
**pretty** 27:4 336:23
  378:9
**prevent** 84:10
  292:22 294:2
  326:20 327:4
**prevention** 322:5
  326:16
**previous** 20:21
  107:23 209:5
  289:18 384:3

**previously** 47:19
  158:17 213:16
**price** 308:23 309:4
**primarily** 87:12
**principal** 16:14,17
  16:19 17:5,9 27:8
  27:17,24 28:4,12
  28:13 170:18
**principally** 283:20
**principals** 280:4,7
  305:9
**principle** 17:12
**print** 149:24,25
  233:16
**printed** 150:3
  226:22
**printout** 150:3
**prior** 163:23
  218:15
**priorities** 69:22
  136:18,23,25
  137:5
**privacy** 200:25
  201:11 203:6,24
  204:4,7,9,13,19
  205:10 212:11
  217:20 219:6,8,10
  219:14 220:23
  221:12,18,19
  222:3,12 224:12
  224:14 225:12,20
  226:14 228:3
  231:10,17,24
  232:16 233:4,5
  237:6 240:9 246:5
  250:14,24 252:16
  338:20 339:11,19
  343:21 345:15
**private** 38:10 39:4
  45:4,6,7,8,16,23
  55:19 62:9 99:12

170:5,19 172:3
  325:16 328:9
  338:24
**privilege** 24:16
  107:6 163:7
  282:16
**probably** 21:2
  147:9 184:9
  233:18 271:5
  359:2 380:16
  383:2
**problem** 95:20
  185:17 266:17
  311:10
**procedure** 1:20
  94:2 139:14
  143:17 157:22
  158:2 159:13
  168:2 176:7 237:2
  259:4
**procedures** 56:12
  56:16 61:14 76:6
  92:25 93:5,21
  96:7,18 138:2,7,11
  138:17 139:10
  156:23 157:9
  160:8 167:22
  183:18 193:8,12
  202:11,24 204:16
  204:22 205:2,15
  205:25 211:4,7
  217:12 221:23
  238:17 239:2
  240:16 265:6,10
  272:21 292:21
  293:5,10,12,21,22
  293:25 343:15
  359:7,11 376:11
  377:15 379:17
**proceeded** 50:4

proceeding 4:23
proceedings
201:15
process 15:10 49:8
49:21 80:2,8
92:21 94:3 96:2
96:14 117:18
123:3,4 142:21
145:5 147:12
148:4 178:2,5,6
227:17 259:13,17
260:15,25 271:11
275:3,14 281:13
326:12 367:16
379:14 398:4
processed 234:2
processes 368:5
produced 388:6
388:13,20
product 12:4
24:15 48:16 126:4
production 25:3
228:14
professes 392:22
professional 92:4
372:14,19
professionally
48:6
profile 34:16
35:15 37:14,17,21
profit 65:8
program 67:4
69:16 70:4 73:12
77:12,23 155:21
156:14,17,22
180:12 251:13,19
293:13,14 297:3
359:8 365:13
367:17 368:10
373:12 377:15
380:24 381:5,7,12

programs 77:10
157:20
progress 116:22
project 324:6
property 351:7
proposal 320:7,14
320:19,20,22
324:3 327:2
proprietary 80:12
227:13 247:24
248:11,15
prosean 28:3,15
28:19
prospective
117:10,12 141:11
143:5,12 146:19
147:3 149:3,18
153:22 190:9
protect 292:21
protecting 79:15
79:22
protection 309:19
protocol 275:17
275:17
provide 7:8 8:20
13:3,4,8,16,18,25
15:13 16:15 17:22
18:5 20:20 31:4
41:6 51:12 58:18
62:8 77:9 80:11
92:7 99:15,19
127:18 143:21
149:13,16,17,22
152:4,7 154:6
176:11 177:10
300:5,7 308:3
316:18 331:3
334:25 360:3,12
363:3 384:17
385:3 391:20

provided 40:3
41:10 119:3
149:19 159:11
160:7 203:3 245:9
336:16 338:4
341:5 359:13,14
359:17,20,22
360:9,15 385:18
provider 153:4
331:2,3,17,20
341:23 394:17,21
395:17
providers 393:4,7
393:14,16,19
395:10
provides 17:25
providing 7:22
23:15,21 41:4,14
57:13 137:20
147:21
provision 231:7
provisions 139:6
389:2,5,7,11
public 1:22 6:4
7:21 8:5 62:11
399:22 402:7
403:25
publically 126:5
publications
153:18
pull 371:7
pulling 25:3
pulse 324:10 325:2
325:5,9
punishment 58:21
purchase 295:6
299:14,18
purchased 277:14
341:8
purported 312:11

purpose 117:25
336:15
purposes 126:10
171:7 200:7
203:16 210:4
218:11 219:3
226:17 335:2
337:7 346:12
pursuant 1:18
92:8
purview 76:18
put 7:24 8:5 85:12
102:20 105:14
153:7 162:15
176:21 179:4
181:5 184:5
222:25 238:12
239:2 270:22
289:13 290:2
300:2 340:14
373:17 396:22,24
puts 271:25
putting 67:4
101:12 349:17
352:23

**q**

q1 271:19
qt 367:15
qualification
373:15
qualifications 48:3
123:5,14
qualified 169:16
169:23 172:12
396:16,19,23,25
397:11
qualifier 289:14
qualifying 363:23
quality 159:6
quantity 260:4

**quarterly** 147:23
259:20 260:14
271:11,14
**question** 9:5 16:22
16:25 19:6,21
22:4 23:20 25:19
27:13 43:20,21
48:10 51:16,20
56:14 59:7 60:17
61:12 65:13 78:13
87:21 89:6 94:7
97:4,21 103:6,16
104:16 105:6
107:6,11,12,22,24
108:2 128:17
129:17 131:4
145:3,15 147:20
156:20 163:14,17
170:11 171:14
172:22,25 173:19
175:12 179:17
180:7 182:3,5,8
188:14 189:5
190:25 191:3
193:6,22 195:21
202:21 212:21
216:11,24 218:20
220:11,25 221:22
221:24 222:4,6,17
222:19,19 223:14
223:22 224:19,23
232:3,5 233:12
235:21 248:7
254:7 273:11,13
274:7,10,12,16
275:24 278:24
280:3 282:11,16
286:11 288:5,13
289:12,18 292:16
293:9 294:6,15
295:21 299:21

300:11 306:2
314:20 315:21
317:7 318:8,10
321:23 325:14
329:11 345:9
351:21 352:18
372:25 378:3,19
379:8,13 384:15
387:11,15 389:19
390:13 393:6
401:23
**questions** 51:9
96:8 173:17
188:19 191:19
192:5 221:23
279:13,14 359:10
376:14 377:17,19
377:23,25 379:5,5
389:16 401:22
**quibble** 279:25
**quick** 139:4
207:13 310:4
**quickly** 233:15,20
336:23,24
**quite** 295:12
373:16

**r**

**r** 2:2 3:2 399:2
402:2
**radio** 150:16
**radium** 125:16,17
**radius** 119:9,17,21
**raise** 5:18
**rambue** 121:23,25
**range** 52:4 81:2
184:16 285:9
327:17
**rate** 295:7
**reach** 79:18 278:3
**reached** 92:6

**read** 60:17,23 61:3
96:6 107:23 108:2
134:7 159:13
163:17 172:25
177:17 182:2,5
191:3 196:24
201:5 202:2
204:25 205:19,23
207:11 223:13
229:20 232:3,5
233:22 236:21
254:20 263:5,9
273:10,13 274:16
371:9
**reading** 202:7
205:3,5 233:14,17
233:19 239:6
244:3 328:5
**reads** 324:8
**ready** 6:16,17
376:23
**really** 183:12
285:4 344:22
390:12
**reason** 8:4,4,19
92:11 111:3
134:14,18 160:10
194:10 199:3
242:18 243:25
261:2 262:19
263:22,23 388:11
403:5
**reasonable** 373:12
381:25
**reasonably** 223:10
**reasons** 67:8 186:8
259:10 264:21
285:18 331:23
338:15
**recall** 15:15 24:3
28:7,25 29:5,8

41:14 48:2,11
49:4,8 50:8 51:3
51:22 58:9 63:13
68:21,24 70:12,19
72:10 76:7 78:10
86:12 109:4,25
110:9,14,17 111:5
112:22 113:7
117:24 118:4
121:18 134:12
135:22,25 136:2
136:12,25 137:12
137:19,24,25
138:6 141:15
154:19 160:21
161:2 189:6,11,17
200:19 227:6
253:24 260:19
268:24 281:14,14
296:6 300:18,19
301:20,22 305:2
305:14 307:3,6,9
307:14 308:19
309:6 321:18
322:9 324:25
331:7,8 349:21
350:10 351:22,23
367:6 370:6,8,24
371:25 372:4
375:9,11 379:12
380:9 385:22
386:13 396:5
397:19
**recalling** 110:6
**receipt** 93:9,15
295:3
**receive** 96:11
174:8 357:12
358:7
**received** 68:9
230:9,16 281:16

294:23 356:16
361:23 375:14
**receiving**  94:4
96:3 356:21
357:15 358:12
**recess**  30:21 33:21
37:4 41:21 46:3
54:21 56:21 64:22
66:2 89:9 94:22
95:10 107:19
119:6 123:16
126:14 132:18
185:2 213:13
226:5 310:10
311:5,11 335:13
335:20 349:6
354:7 356:23
376:20 379:10
393:22
**recognize**  134:5
139:5 241:2
249:11,18,19
297:21 302:23
319:22 330:8,13
**recollect**  57:19
164:14 192:15
**recollection**  47:3,9
49:10,19,25 51:7
53:15 135:12,18
137:14 138:9
139:22 142:20
164:5 195:8
215:25 216:5,8,13
216:16 254:23
284:4 287:18
301:12 303:24
319:2 325:22
327:7,10 328:11
328:25 350:8
**recommendation**
294:25

**recommendations**
295:9
**reconciliations**
167:6
**record**  4:4,21 6:10
7:6,9,21,23 8:5
18:13 22:12,21
26:22 36:6,23
43:22 55:24 82:7
82:8,12 107:9,16
108:6 131:22,23
132:3,10 163:12
172:20 184:25
185:6 190:22
201:9 226:4,9
251:14,23 255:22
256:2 258:4,10
266:21 267:5,6,10
282:17 310:9,14
341:2 354:6,11
362:10 369:4
376:25 398:18
402:12
**recording**  234:22
**recordkeeping**
171:6 173:5 238:7
247:17
**records**  98:13,16
98:22 165:11
166:15,25 167:3,7
167:10 169:7,10
173:12,18,23
174:24 176:10,22
177:5,11 241:25
247:20 251:15,25
256:18,25 284:17
284:24 285:16,22
286:4,10 287:8,20
287:25 288:6,17
288:20 289:23
290:19 291:13,15

292:3,12 302:11
313:17 314:6,12
355:19 361:22
362:2 363:18
365:20
**rector**  8:6
**red**  163:14 365:3
383:13
**redact**  233:22
**redeem**  150:23
**reduced**  61:10
63:9
**reed**  2:9 5:9 8:14
8:14 10:20 11:10
**reference**  119:16
135:2,19 136:13
136:15 156:2,5
160:14 165:16,18
166:7,12,14
168:13 199:15
239:21 302:15
326:16 328:18,23
332:4,10
**referred**  14:21
107:25 120:11,14
120:17 163:16
172:24 182:4
191:2 232:4 263:8
273:12 274:15
388:25
**referring**  57:25
75:6 83:11 108:17
112:11 126:23
128:19 181:16
273:21 274:23
275:11 278:14
280:24 383:25
396:11
**refers**  324:25
326:2,3

**refresh**  284:3
328:10
**refreshed**  325:21
**refreshes**  287:17
**refreshing**  311:9
**refused**  30:8
**reg**  157:15,15
**regarding**  51:12
143:21 144:22
145:23 158:8,19
158:24 159:14
176:10
**registered**  13:13
74:10 99:17
127:14,17 155:19
156:13 166:16
167:2 176:23
262:16 284:11,14
285:13 287:13,18
287:24 288:24
289:6,9,9,15,21
290:9,12 294:9
356:18 357:20
358:23 360:20
365:13 386:15
**registration**  12:9
15:22 127:13
**regular**  277:16
369:19
**regularly**  148:15
**regulated**  99:4
284:14
**regulation**  96:24
289:25 291:21
**regulations**  56:3
73:7,9 74:2
238:15 287:12
289:2 290:11
343:16 345:13
**regulators**  42:17
84:11 251:17

**regulatory** 70:5
88:23 159:9 162:3
162:22 164:21,25
175:8 238:14
264:25 292:22
293:6 294:3
382:10
**relate** 11:17 167:8
168:25 221:23
234:6 271:22
**related** 4:15 11:9
11:19 34:16 52:21
55:17 56:2 57:9
73:19 99:2 100:7
107:4 120:6
124:12,14 125:23
127:19 129:19
131:7 148:12
151:6 163:7,22,22
167:24 168:18
169:2 181:2,3
202:18 217:23
219:16 225:17
242:23 245:8,21
268:22 280:12
285:12 287:20
307:23 313:3
334:22 338:21
339:2 359:10
361:7 367:7
370:10 374:9
379:6 380:18
402:15
**relates** 63:21
79:22 97:6 194:7
246:23 247:19
288:8,23 289:23
386:2
**relating** 86:11
94:10 284:17,24
285:22 286:4

288:17,20 290:19
291:13,15 292:3
292:12 294:25
313:17 314:7
317:16 324:21
396:3
**relation** 141:25
273:16 382:12
**relations** 117:21
191:23,25 192:25
**relationship** 12:20
12:23,25 14:18
71:5,9 97:13,18
122:21 151:8
296:8,12 317:19
**relationships**
115:9 122:6
**relay** 257:13,17
258:5,11,18
263:21 264:7
267:22 268:2,17
**release** 316:22
**releasing** 316:21
**relevant** 11:25
189:9 238:19
362:18 388:15
**relief** 15:23 35:10
**relies** 128:9
**rely** 128:13
**remain** 84:10
**remains** 224:8
228:6
**remember** 49:20
50:2 57:3,5 69:21
70:8,24 75:8
109:23 110:12
112:4,8 254:10,11
298:13,16,18,21
298:25 299:4,8,11
301:16,19 317:18
320:13,17,21,24

321:25 322:12
330:19,23,23
351:25 370:21
375:21,22 379:9
380:12
**remind** 237:9
386:19
**remote** 320:6,15
320:22 324:2,8,14
327:3
**remotely** 1:20 4:7
4:19 9:17 272:10
278:19 295:16
**repeat** 29:22 60:2
103:5 172:22
190:24 209:12
216:11 222:18
292:7 387:10
**rephrase** 108:4
220:6 288:13
**report** 71:7,12,17
316:24 366:6,8,10
368:12
**reported** 317:4
**reporter** 4:12 5:15
5:17,20 6:15
26:14,21 33:20
46:14 60:22,24
61:6 81:7,22
94:18 108:3
111:24 130:8
132:8 133:12
136:19 163:18
173:2 182:6 191:4
214:9 215:9 229:2
232:6 239:9,17
248:12 249:6
252:2 263:5,10
273:14 274:17
283:6 286:17
310:23 318:18

319:14 323:2
327:21 330:5
335:7 352:25
367:24 376:22
378:16,21 379:3
394:9 401:9
**reporting** 70:22
71:2,4,8,9 73:2
120:24 244:22
315:5 317:3 403:1
**reports** 71:19
153:18 316:17
317:5,24 318:2
**represent** 5:4,11
6:21 100:22
113:20,22
**representation**
8:13 115:8
**representative**
21:23 22:8,9,17
23:2
**represented** 7:18
8:9
**representing** 8:15
**reprimand** 58:20
58:20 59:22
**repurchased**
42:21
**repurpose** 337:19
**request** 92:10
201:12,13
**requested** 388:17
401:17
**requests** 24:9 72:5
**require** 62:24
84:10 99:10
127:17 181:13
380:23
**required** 42:17
63:20,25 64:25
74:12 96:14

117:14 156:14,24
173:12,23 174:20
175:17 178:10
193:7 242:6 247:2
247:6 264:25
284:16,23 285:21
286:3,6 287:19
288:16,19 289:9
290:18 291:12,25
292:11 294:8
331:13 358:7
365:12 397:23
**requirement**
53:21 65:17
127:21 142:8
173:8 176:22
366:19 381:2
**requirements**
15:19 88:24 97:15
98:14,17,23 99:2
162:3,23 166:16
167:24 171:8
173:6 174:25
241:24 243:6,23
244:7 247:9,20
285:16,17 286:10
288:9 292:23
293:6 294:3 396:3
**requires** 174:23
242:5 287:25
291:18 293:12
**requiring** 368:18
**reserved** 3:22
**reserves** 233:21
**resident** 294:12
**resign** 67:10
**resolve** 95:21
**resolved** 107:22
**resource** 42:10
**resources** 114:20

**respect** 24:12
32:15 39:25 52:7
52:20 55:2,18
73:12,20 97:7,15
108:18 148:16
152:14 156:11
157:2 162:12
174:7 177:19
181:9 193:19
194:15 195:5
201:11,20 202:3
203:22 204:9,13
204:19 205:7,10
221:19 250:14,23
290:15 295:3
301:17 312:23
331:10 336:17
360:23 365:20,21
377:20 392:9
**respective** 3:6
**respond** 201:13
374:18,21,22
**responded** 370:2
374:7,12,14,19
**responding** 352:17
**response** 24:8 72:5
283:19 284:10
289:18 295:4
374:15,24 380:5
394:10
**responses** 283:3
400:21
**responsibilities**
57:12 73:15,20
88:18 237:20
330:20
**responsibility**
24:7 25:4 56:10
72:4 79:13,21
84:25 191:24
192:2 238:2,3

295:17
**responsible** 24:19
26:6 58:2 73:5
75:17 76:9 87:7
87:12 114:13
237:22 238:11
**rest** 192:8 246:5
263:5
**restate** 133:14
161:21 182:7
198:7,18 390:4
**restrictions** 87:4
**result** 108:12
369:5
**resume** 48:14
**retail** 44:2
**retain** 77:8 88:13
89:3 173:13,23
174:2,23 241:24
242:6 247:6
285:11 287:19
361:6
**retained** 54:3
162:9 167:8 168:5
175:17 243:5
247:17 285:7
294:8 401:9
**retains** 175:6
**retention** 55:25
99:2 241:5,13
247:19
**retired** 190:5,11
190:17 191:18
**retirement** 307:12
**retiring** 186:11
187:8,14,22 188:3
188:6 191:12
**return** 30:8
337:16
**returns** 295:8

**review** 138:10
140:17 146:25
148:19 155:13,20
157:19 158:9,20
158:25 159:15
162:2,10,22 163:3
164:6 175:14
181:8 191:6 195:3
195:10 231:6
233:22 240:13
250:19 252:7
254:20 255:8
258:6,12,18
261:21 264:7
265:11,13,16
266:3,4 269:6,23
272:5 275:6 290:3
293:14,18 311:15
359:6 364:5,7
365:16 366:12,20
367:2 368:12,23
369:10 375:17,25
379:16 382:5,8,16
382:20 383:4,9,10
384:11
**reviewed** 138:6
139:22 141:2,12
143:6 145:9 157:9
159:4 164:2
178:11 208:25
209:13 252:10
259:23 265:22
271:17,21 283:12
366:7 367:18
**reviewing** 137:25
146:6,17 161:13
265:25 270:23
**reviews** 30:25 31:6
31:9,17,24 32:4,9
32:14,25 33:6,11
34:8,12,15,19,23

35:5,17,22 37:11
37:16 38:11 42:4
67:23 68:9 82:17
83:3,6,13 84:19
85:2,16 86:18
113:18,21,23
114:4 115:11,24
116:4,7,17 118:2
134:3,6,10,17,23
135:3,9,16,23
136:10 138:4
139:8,16 140:2,21
141:5,22 142:11
143:25 144:6,24
147:15 150:15,18
153:21 155:14,23
156:3,8 157:2,5
158:10,15 159:6
159:16 160:5,17
160:24 161:10,16
162:17 165:12,19
166:9,22 167:13
168:16 176:14
177:4 178:3 186:4
195:7 196:23
197:5,24 199:7,13
201:3,7,17,23
202:19 203:9,18
204:12 206:12
207:6,25 208:13
208:24 209:11
210:12 211:18
212:13,24 213:9
214:17 215:4,17
229:18,24 230:11
230:22 231:13
233:13 234:15
236:18,23 237:18
238:8 239:20
240:23 241:3,22
244:24 245:12

247:11,15 249:12
251:3 255:15,21
257:4 282:25
283:10,25 284:6
287:6 293:2
294:21 295:19
297:14,22 298:11
301:2,10,25
302:17,24 303:6
303:15 304:10
306:8,25 307:5
309:14,21 311:18
312:6,10 319:20
319:24 320:10
322:7 323:9,19,23
324:18,23 326:13
326:17,22 328:2
328:14,20 330:9
330:17 332:2,7
334:18 349:12,19
354:16,25 363:7
363:11,15,19
364:16,21 365:6
365:10,12,20,23
366:2 367:13
368:7,9 369:6
388:23
**revision** 85:21
383:4 384:11
**revisions** 139:13
**right** 5:18 19:17
21:7 33:4 40:15
46:18,24 62:20
65:18,23 72:11
75:7 76:23,24
77:24 78:20 83:24
84:6 93:12,22
96:20 98:3,5
100:20 109:22,25
111:14 112:5
113:7 121:19

127:22 129:3
134:8 142:3 145:5
145:20 151:24
157:20 160:21
182:15 185:7
189:10 190:21
197:17 203:4
208:12 215:3
225:6 233:21
235:24 237:17
243:13,17 247:6
247:23 254:13
264:15,16,18
283:21 284:20
290:22,24 292:25
294:19 297:8
300:25 302:16
309:22,25 320:2
323:22 325:13
326:6 331:9
333:23 362:5,7
364:18 365:3
366:17 369:7
384:22 389:12
393:11 395:11
397:19 398:10
**rights** 151:15
317:15
**rise** 59:4 108:13
216:2,6 396:3
**risk** 313:13 316:25
317:11 380:24
381:4,6,8,13,15,16
381:20
**risks** 381:23 382:2
382:3
**rivera** 2:16 4:10
**road** 33:25
**role** 43:2,3 48:22
48:25 56:25 66:23
68:10,19 79:14

105:16 106:6,23
107:4 108:10
109:10 113:25
114:6 137:21
252:23 333:21
341:24
**room** 11:3,6
**rooms** 336:25
**rotated** 397:12
**rule** 64:14 165:16
166:7 167:16,18
247:20
**rules** 1:19 10:16
166:24 238:14
247:17
**rulings** 401:22
**run** 271:15 337:11
343:14 346:10
378:6
**running** 345:14

s

**s** 2:2 3:2,2 6:2
400:2 403:5
**s.d.n.y.** 403:2
**sales** 43:2,3 48:18
**salt** 35:4,16,19
**san** 124:23
**save** 362:23
**saved** 371:4
392:15
**saw** 35:18 163:21
246:16 264:19
266:8 339:17
**saying** 21:17 61:25
95:7,9 118:6
135:11 157:13,14
193:10,16 230:8
260:11 301:7
302:14 334:8
346:23 394:16

**says** 38:7 140:24
143:19 155:17,17
155:18 158:6
165:10 167:19
203:2 204:18
209:18 210:23
242:21 243:4,19
245:6 247:24
284:20,21 300:24
304:4,5 309:23
320:9,12 326:19
327:6 349:15
365:16
**school** 53:10
**schooling** 347:6,10
**schwab** 383:22
**scope** 192:24
369:19
**screen** 89:23
226:24 267:14
312:2 319:23
324:10 325:2
**screwed** 206:22,23
**scripts** 147:23
**scroll** 113:12
115:21 165:5
198:3 199:11
200:24 208:16
210:9 298:2
300:22 301:5
302:12 303:10
326:10
**scs** 315:25 395:5
**se** 62:18 64:14
192:23 262:10
**sealing** 3:7
**search** 179:20
189:9,11,15,18
260:5 269:24
270:18,25 271:15
271:23 275:16

324:14 388:17
**searched** 259:21
**searching** 179:14
352:14
**season** 301:20
**sec** 55:17 128:9,15
128:19,24 129:2
129:10,14,19,22
130:17,23 131:2,7
164:15 169:15
170:3,24 181:5,19
243:7,22 244:8
247:13 270:23
291:18 369:15
370:2,17 371:3,22
372:21 373:14,16
373:19 374:4,12
374:24 375:10
379:18,23 396:14
**sec's** 247:18 373:9
380:5
**second** 107:10
136:6 167:7,20
251:12 273:9
282:14 283:20
284:8,9 286:22
323:13 335:8
353:2 371:11
**seconds** 34:2
**secret** 89:12 90:11
206:14
**secrets** 78:14,16
78:20 79:3,9,12,15
79:20,23
**section** 141:24
150:14 153:17
211:16,22,22
212:3,9 221:16
240:14 286:14
287:5,7,11 326:11
388:22,24 400:22

**secure** 150:24
325:5,9
**secured** 41:25
42:7,15,18,20
**securities** 42:22
53:9 126:10
169:25 172:16
295:9 396:2,12
**security** 30:8
62:11 169:14,17
170:3,4,9,14,20,22
170:24 171:25
172:4,6,8,11 173:9
180:16,19,21,23
181:12,23 182:12
182:19 183:11,13
183:16,20 197:22
198:20 208:5,11
208:23 284:15
295:4,7 396:14
**see** 19:21 30:23
34:7 38:7 42:3
54:16 84:14 95:20
107:14 115:2
116:20,22,23,25
117:7 119:16
134:22 135:24
136:9,11 139:4
140:23 143:19,24
144:13,15 155:16
155:24 158:6
161:15,23 162:6,7
166:6,10 167:12
167:14,19 176:7
176:13,15 191:7
197:17 199:15
201:16 202:25
203:8,10 208:9
214:18 215:19
228:17 230:8,12
233:20 244:18,22

245:11,13 247:22
249:8,13 265:15
267:14 273:9
292:25 298:10
300:23 301:9
302:13 303:4
304:9,11 306:6,24
307:2 311:19
312:3,4 322:6
323:8,16 324:17
324:22 326:23
327:23 328:3,18
330:15 331:24
383:13,16
**seeing** 302:11
330:14
**seek** 149:2,7
**seeking** 49:3
280:14
**seen** 157:23
162:25 163:19
197:8 241:9,12
283:9 284:4 356:8
**segregated** 177:13
**segregating** 80:3
**select** 275:8
**selection** 326:12
**self** 381:13
**sell** 150:22 295:6
**send** 149:8 301:7
**sending** 149:2
**sends** 337:17
**senior** 14:8,10,14
137:20 263:17
305:9 320:7,14,22
323:17 326:25
327:2 377:18
**sense** 39:21 205:5
207:15 208:8
385:5 393:8

**sent** 134:15 140:4
140:6 176:3,4
188:15 228:17
230:13 253:19
268:21 294:24
**sentence** 136:5
140:19,23 168:15
176:8,19 201:10
202:16,25 204:11
212:22 213:8
235:5 236:3 245:5
251:12 284:9,10
285:19 291:4,11
292:18,19 304:5
306:6,14 324:25
**separate** 19:22
98:8 115:15 173:7
173:8 180:12
331:17 336:15
338:13,23 339:4
385:6
**separated** 297:7
**separately** 239:23
**separates** 300:4
307:15
**separation** 194:11
194:14 298:9,15
298:17,23 299:3
299:10 301:7
302:15 304:18,24
305:20 332:6,12
**september** 198:2,5
198:10,21 212:4
216:21 218:21
219:19 220:15
221:4,17 227:5
333:12 372:10
**serve** 7:16 192:7
312:13,13 316:11
**server** 295:12
318:17,22 321:9

367:22
**servers** 318:4
**service** 3:16 153:4
331:3,14,20
341:22 393:3,7,14
393:16,19 394:17
394:21 395:10,16
**serviced** 314:16
315:16
**servicer** 312:14,18
313:22 316:11
**services** 13:5,8
16:15 17:23,25
18:6 119:4 203:3
203:7 394:18
**servicing** 210:23
285:14 314:14,18
314:23
**session** 20:11
21:16
**sessions** 19:14
20:5 21:10
**set** 6:25 136:17,22
137:6,20 153:16
161:8 171:11
371:11 388:14
402:11,20
**sets** 260:4,7
287:12
**setting** 92:20
**settle** 172:14
270:16
**seven** 81:25
**share** 7:2
**shared** 361:17
**she'll** 184:11
**sheet** 40:23 42:11
42:14 148:3 403:1
**shelf** 38:18
**sherree** 56:24 66:6
230:2

**sherri** 9:23,25
**shift** 321:15
**shoehorn** 196:12
**shore** 38:21
**short** 30:21 33:21
37:4 41:21 46:3
54:21 56:21 64:22
66:2 89:9 94:22
95:10 107:19
115:16 119:6
121:8,13 122:24
123:6,16 126:14
126:18,25 132:18
184:14 185:2
213:13 226:5
228:18 240:12
310:10 311:5,11
335:13,20 349:6
354:7 356:23
376:20 379:10
393:22
**shortly** 281:10
**show** 151:2
**shutts** 46:21
**sic** 58:18
**side** 39:25 48:18
91:2 96:17,17,22
96:23 168:22
194:18,23 210:6,7
285:15 358:3
390:10 392:7
**sign** 90:25 91:2
127:25
**signatory** 397:15
397:18,22,24
**signature** 208:18
209:9 227:12
303:19,21 402:22
**signed** 3:10,12,15
80:16 208:5
303:13,17 308:6,9

**significance** 209:8
**significant** 38:8
382:9
**signoff** 148:8,14
**silva** 1:17 4:7 5:13
6:1,11,19 7:1,7
8:1 9:1 10:1 11:1
11:15 12:1,6 13:1
14:1 15:1 16:1
17:1 18:1,18 19:1
20:1 21:1 22:1,15
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1,15,18
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1,5,12 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1,5 82:1,13,14
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1,3
101:1,18 102:1,21
103:1 104:1 105:1
106:1 107:1 108:1

| | | | |
|---|---|---|---|
| 108:9 109:1 110:1 | 223:1 224:1 225:1 | 328:1 329:1,20 | 314:9 334:21 |
| 111:1,22 112:1 | 226:1,10 227:1 | 330:1 331:1 332:1 | 346:16 347:20 |
| 113:1 114:1 115:1 | 228:1,24 229:1 | 333:1 334:1 335:1 | 369:7 |
| 116:1 117:1 118:1 | 230:1 231:1,4 | 336:1 337:1 338:1 | **site** 151:4 352:21 |
| 119:1 120:1 121:1 | 232:1 233:1 234:1 | 339:1 340:1 341:1 | **siting** 85:17 |
| 122:1 123:1 124:1 | 235:1 236:1 237:1 | 342:1 343:1 344:1 | **sits** 122:9 |
| 125:1 126:1 127:1 | 238:1 239:1 240:1 | 345:1 346:1 347:1 | **sitting** 26:9 54:4 |
| 128:1 129:1 130:1 | 241:1 242:1 243:1 | 348:1 349:1 350:1 | 54:11 55:10 57:4 |
| 131:1 132:1,6,9 | 244:1 245:1 246:1 | 351:1 352:1 353:1 | 57:20 58:8 63:13 |
| 133:1,22,25 134:1 | 247:1 248:1,24 | 354:1,12 355:1 | 63:22 65:18,23 |
| 135:1 136:1 137:1 | 249:1,4 250:1,18 | 356:1 357:1 358:1 | 66:8,12,16 67:15 |
| 138:1 139:1 140:1 | 251:1 252:1,23 | 359:1 360:1 361:1 | 68:11,20 70:12,18 |
| 141:1 142:1 143:1 | 253:1 254:1 255:1 | 362:1 363:1 364:1 | 70:24 72:10 75:7 |
| 144:1 145:1 146:1 | 256:1 257:1 258:1 | 365:1 366:1 367:1 | 75:13 76:2 77:24 |
| 147:1 148:1 149:1 | 259:1 260:1 261:1 | 368:1 369:1 370:1 | 78:23 83:23 87:19 |
| 150:1 151:1 152:1 | 262:1 263:1 264:1 | 371:1 372:1 373:1 | 87:22 90:21,24 |
| 153:1 154:1 155:1 | 265:1 266:1 267:1 | 374:1 375:1 376:1 | 91:4 93:12,21 |
| 156:1 157:1 158:1 | 267:11 268:1 | 377:1 378:1 379:1 | 94:8 98:21 109:22 |
| 159:1 160:1 161:1 | 269:1 270:1 271:1 | 380:1 381:1 382:1 | 112:5,8 114:5 |
| 162:1 163:1 164:1 | 272:1 273:1 274:1 | 383:1 384:1 385:1 | 115:12,20 116:5 |
| 165:1 166:1 167:1 | 275:1,11 276:1 | 386:1 387:1 388:1 | 118:3,8 127:4,20 |
| 168:1 169:1 170:1 | 277:1 278:1 279:1 | 389:1 390:1 391:1 | 128:20 130:6,16 |
| 171:1 172:1 173:1 | 280:1 281:1 282:1 | 392:1 393:1 394:1 | 131:5 135:18 |
| 174:1 175:1 176:1 | 282:23 283:1,4 | 395:1 396:1 397:1 | 136:14,24 137:11 |
| 177:1 178:1 179:1 | 284:1 285:1 286:1 | 398:1,11 399:1,15 | 138:5,14 139:17 |
| 180:1 181:1 182:1 | 286:15 287:1 | 400:1,24 401:1 | 141:14 143:9 |
| 183:1 184:1 185:1 | 288:1 289:1 290:1 | 402:1 403:3,21 | 145:25 146:14,23 |
| 185:7 186:1,5 | 291:1 292:1 293:1 | **silver** 349:13 | 151:24 152:17 |
| 187:1 188:1 189:1 | 294:1 295:1 296:1 | **similarly** 154:12 | 153:8,12 154:18 |
| 190:1 191:1 192:1 | 297:1 298:1 299:1 | **simple** 179:13 | 154:23 161:11 |
| 193:1 194:1 195:1 | 300:1 301:1 302:1 | **single** 61:23 76:7 | 164:8,13,18,24 |
| 196:1 197:1 198:1 | 303:1 304:1 305:1 | 143:11 157:22 | 169:18 170:12 |
| 199:1 200:1 201:1 | 306:1 307:1 308:1 | 175:15 | 173:16 180:19 |
| 202:1 203:1 204:1 | 309:1 310:1,15,21 | **sipperman** 280:25 | 181:18 182:21 |
| 205:1 206:1,25 | 311:1,14 312:1 | 281:4,5 360:21 | 192:14,21 197:7 |
| 207:1,3 208:1 | 313:1 314:1 315:1 | **sir** 6:16 97:2 | 198:25 199:8 |
| 209:1 210:1 211:1 | 316:1 317:1 318:1 | 136:20 252:3,4 | 227:9 240:11 |
| 212:1,23 213:1,23 | 319:1,12,12 320:1 | 367:25 | 241:8 253:23 |
| 214:1 215:1 216:1 | 321:1 322:1,24 | **sit** 8:3 65:7 127:4 | 254:22 257:18 |
| 217:1 218:1 219:1 | 323:1 324:1 325:1 | 197:12 216:4 | 258:7 260:18,23 |
| 220:1 221:1 222:1 | 326:1 327:1,14,19 | 264:11,13 272:12 | 264:9,15 268:8,19 |

268:25 270:5
273:18 276:23
278:6 283:13
286:8 296:10,15
297:4,23 300:20
304:15 307:21
308:2,16 309:5,15
314:20 317:25
319:3 321:25
324:24 327:10
329:5,12,18
330:22 331:9
332:10,14 337:2
337:24 341:20
348:8 349:20
350:9 351:14
361:5,11 367:4
369:12 371:25
372:4 389:12
390:18
**situation** 251:21
253:24
**six** 353:16
**size** 182:24
**slide** 115:22
**slipped** 108:6
161:22
**slow** 233:24 238:5
238:18
**sma** 99:13
**sma's** 387:3
**smith** 2:9 5:9 8:14
8:14 11:10
**smith's** 10:20
**smoothly** 262:18
**sneak** 160:10
**software** 235:16
235:18 236:4,7
272:9 343:20
**solution** 321:20

**solutions** 4:11,14
118:19,21,24
**somebody** 17:24
116:13 266:11,13
**someone's** 63:4
235:19 253:25
266:3,4
**somewhat** 68:23
**son** 334:19
**sorry** 23:10 26:24
29:21 44:11 51:17
60:10,16 68:15
72:18 82:25 89:16
89:25 94:24 103:4
106:25 115:3
118:14 121:24
122:17,19 130:5
130:11 131:12
132:23 133:25
136:21 155:4
161:20 165:21,25
185:15,19 186:19
197:16 198:6,17
200:9 207:9 209:7
211:20 215:10
216:10 221:10
224:18 232:11
234:8,17 237:8
239:5 243:9 246:9
248:12 251:7
261:14 266:23
267:18 276:25
282:13 283:22
295:13 296:18
302:2 306:12
311:9,20,24
313:24 321:24
322:17,21 324:24
325:4 336:10
339:14 349:25
355:12 366:21

373:22 386:9,20
386:20,21
**sought** 282:6
**sound** 347:14
**sounds** 95:15
142:25 229:7
325:18 334:24
353:23 376:3
**source** 42:6,24
44:7 92:5 330:25
331:17
**sourced** 42:18
330:25 341:22
**sourcer** 295:17
**sources** 44:14
125:18
**sourcing** 41:24
92:4 95:24 96:17
124:22,25 154:4
194:18,23 210:6
295:23
**southern** 1:2
**space** 123:10
124:19,24 125:2,5
125:7 280:20
**spaces** 55:20
**span** 49:9,11
**spans** 181:12
**speak** 25:23 44:15
49:12,15,18 51:18
83:23 90:7 109:18
118:9 129:18
130:2 142:12
146:2 151:23
157:20 160:19
162:18 181:18
182:14 186:24
218:12 219:25
220:3 230:15
257:19 258:8
262:3 266:11

268:9,11,18 270:4
272:13,15 277:18
277:21 278:10,22
279:2 280:17
285:4 296:4
299:23 302:9
307:22 314:10
317:6,25 318:9
332:9 340:10
342:18 359:16,21
371:21 379:20,21
388:9,19 389:6
392:2
**speaking** 20:12
59:8 109:15 121:5
125:4 147:21
159:18,19 180:2
231:22,25 280:22
281:5 285:6
315:22
**speaks** 397:10
**specific** 7:11 13:7
14:3 45:12 47:20
48:16,21,24 52:4
75:20 90:7 92:16
100:21 109:16
121:10 123:24
124:7,16,20 125:6
125:8,9 126:12
127:5 128:10
129:5 135:17
139:6 149:8
152:14 156:10
173:18 177:15
179:21 180:6
181:6 189:7 200:3
216:5,17 220:24
224:8,13 225:10
228:8 246:15
249:24 261:10
263:14 268:5,19

268:24 269:13
272:15 286:9
291:18,19 292:2
298:24 301:21
313:11 317:24
322:13 327:9
331:9 332:9
333:20 340:2
364:23 365:4
367:6 374:9
375:20,23 378:8
378:19 379:12,21
380:19 381:2,13
382:21 388:9
390:13 395:16
**specifically** 11:19
17:13 50:23 51:22
52:18 56:6 66:4
76:5 79:10 87:23
100:18 105:11
109:6,18 110:6,9
110:13,20 111:2
117:17 124:11
126:12 128:21
130:16,22 134:12
137:12 157:6,15
161:5,6 170:2
179:19 180:3
181:18 185:12
193:10,15 205:8
231:23,25 246:10
246:12 249:18,20
252:6 253:9 256:6
260:11 264:15
266:11 268:11
270:5 273:16
274:19 276:8
277:18,23 278:10
278:15,22 279:3
279:18 281:21
283:12 285:5

293:21,24 299:5
300:2 301:17
302:10 305:2
307:6 308:17
314:11,20 317:6
320:17,19 342:17
352:3 357:19
358:2,19 359:22
360:19 361:6,13
369:13 370:23
371:21 388:17
390:18 395:17,23
396:10
**specificity** 109:21
389:7
**specifics** 149:16
330:23
**specified** 219:12
279:23 399:11
**speed** 134:21
183:6
**spell** 17:9 154:9
**spelled** 293:24
**spend** 20:25 129:7
129:14,19,22
131:2,7 146:10
233:17 372:6
**spent** 130:17,22
146:17 355:23
356:2 372:12
**spf** 75:15 116:10
118:7,13
**spinley** 2:16 71:22
71:23 72:3,8
189:19 258:3
384:24 386:10
**spinley's** 71:24
258:22
**spirit** 19:6,7
**split** 226:24

**spoke** 49:20 159:7
186:22,25 281:21
281:23,25 355:20
**spoken** 25:9
281:20,24
**spv** 75:14
**ss** 402:4
**stack** 38:23
**staff** 186:9 187:6
187:13,21 188:10
188:22
**stages** 60:6
**stale** 137:18
**stamp** 309:12
**stance** 170:6,13,16
**stand** 393:16,19
**standard** 40:8
147:17 153:25
227:13
**stands** 325:15
394:21 395:2
**stanley** 39:7,9,15
40:14,19,22 41:5
42:9 43:8,12
44:12,13,19 48:15
133:3 349:23
350:2,3,7,12,14,17
350:20 351:4,7,10
351:13,17 352:11
352:13
**stanley's** 41:25
**start** 64:8 70:25
135:2 198:12
209:17 222:18
234:24 237:21
251:10 259:12
297:18 330:10
345:24 353:25,25
**started** 6:23 57:22
65:8 133:17,18
137:2,6 139:15

178:5 180:22
181:19 194:20
199:5 200:11
222:8,21 223:4
224:10 225:2
227:18,24 281:6,6
281:10,12,13
297:8 305:10
371:14 372:9
383:23
**starting** 133:2
138:15 140:5
**starts** 158:18
185:24 244:7
**state** 1:22 4:19,23
6:4,9 7:5 93:7
100:19 108:24
166:5 222:24
402:4,8
**stated** 99:10 109:6
143:2
**statement** 102:14
167:15,18 202:6
251:18 288:15
290:8,15
**statements** 4:1 5:1
151:2 152:8 167:6
167:10 168:22
192:17
**states** 1:2 136:6
140:16 161:17,24
166:23,24 176:8
201:10 221:19
241:23 244:18
284:13,15 292:19
306:10,14 387:21
**static** 392:18,25
**stating** 291:25
292:8
**status** 193:20
194:15 301:23

302:3,6,10
**statute** 53:20
  389:8
**statutory** 243:6,23
  244:6 247:8
**stay** 15:18 55:19
  107:16
**step** 63:6 338:17
**steps** 69:17,20
**steve** 206:14
**sticker** 349:14
**stickers** 349:17
**sticks** 51:25
**stipulated** 3:5,20
**stock** 353:7
**stop** 194:9
**store** 256:18
**stored** 24:25 234:2
**strategically** 20:12
**streams** 119:8,16
  119:21
**stress** 147:22
**strictly** 247:24
  248:4,17
**strike** 50:10 69:9
  306:13 313:6
**strong** 377:14
**structure** 38:14
  45:22
**structuring** 38:9
  39:4,11,12,16,17
  39:20,22,24 40:6
  40:13,22,23 41:7
  41:11,14 44:23
  45:2 47:7 96:17
**sts** 118:15,17
**stuff** 57:9 148:6
  149:25 268:9
  343:18 379:19
  380:13

**sub** 140:16 158:2
**subject** 55:24
  96:23 205:12,24
  208:4,7 230:4
  259:20 269:16
  285:17 289:3
  323:25 330:2,15
  369:15 370:17
  401:6
**submitted** 333:11
**subpoena** 7:17
**subscribed** 399:18
  403:22
**subscription**
  168:23
**subsection** 221:18
**subset** 291:18
  292:2
**subsidiaries** 75:2
  75:6 174:15
**substance** 40:17
  159:12 193:2
  298:22 299:9
  375:10
**substantive** 271:3
**suffered** 106:17
  108:12 109:11
**sufficient** 314:6
**suggested** 250:10
**suggesting** 193:24
  346:20
**summarize** 110:11
**summarized**
  167:17
**summary** 64:3
  149:18 384:17
**summer** 275:5
**supervise** 72:23
**supervision**
  238:10

**supervisor** 357:14
  357:17
**supplemental**
  283:3 400:20
**support** 187:16
  290:5 331:4,21
**supported** 377:20
**supporting** 38:8
**supports** 342:2
**supposed** 91:20
  96:10 143:15
  246:25 257:10
  264:23 265:7
  295:2 358:9,22
  359:9 381:12
**sure** 7:14 14:15
  22:13 33:13 37:2
  38:15 45:14 48:7
  61:6 63:12 81:23
  93:24 103:3,7,17
  132:24 136:7
  151:20 171:17
  178:9,16 188:4,7
  196:10 216:12
  217:25 220:13
  223:17 231:20
  238:20 242:11
  257:24 259:15
  262:18 264:24
  265:4 282:15
  286:20 290:13
  302:5 333:8
  335:22 339:3
  344:22,24 368:3
  373:24 375:18,25
  381:10 393:24,25
  395:2
**surprised** 181:25
  182:13 305:3
**surprising** 182:23

**swap** 214:6
**swear** 5:15,21
**sworn** 3:10 6:4
  399:5,18 402:11
  403:22
**system** 54:10,16
  63:18,25 149:10
  153:7 154:8,16
  179:6,7 180:10
  186:18,21 189:20
  200:12,17 217:23
  232:15 233:3
  244:21 245:10,19
  246:3,21 247:3
  258:6,8,11,18
  261:8,13,18,20,20
  263:21 264:7
  267:22 268:12,14
  269:7,12,15,19
  278:3 279:7 314:5
  314:11 321:14,16
  324:2,14,16 371:5
  383:16,20,24
  384:5
**systematic** 259:13
  259:25 260:13,16
  265:16 269:6
**systematically**
  259:4 383:7,10,12
**systems** 25:2
  202:12 204:2
  219:17 225:18
  254:9 257:10
  277:20 313:16
  320:16,23 324:9
  324:12,21 327:3
  351:13

|           t           |
| :---: |

**t** 3:2,2 6:2 334:3
  399:2 400:2 402:2
  402:2

**tab** 33:15,17 46:2
 132:12 206:2,17
 279:11 286:13
 319:7 354:18
 400:8
**tackle** 136:23
 137:6
**take** 30:17 53:16
 56:19 59:16 69:17
 69:20 81:9,13
 82:13 90:9 111:16
 113:9,14 131:14
 133:9,15,19,21
 138:21 139:3
 170:6,13,15,20
 171:2,20 184:14
 184:17,18 185:8
 196:20 206:2
 207:13 212:19
 222:5 224:20
 228:12,16,21
 229:16 231:5
 236:10 240:20
 241:17 243:16
 248:21 255:11,18
 270:13 287:16,21
 289:25 302:19
 310:3,5,18 315:2
 327:13 340:24
 349:2 353:6,7
 363:4 396:7
**taken** 1:18 4:6
 30:22 33:22 37:5
 41:22 46:4 53:5
 54:22 55:2,14,17
 55:23 56:5,22
 64:23 66:3 89:10
 94:23 95:11
 107:20 119:7
 123:17 126:15
 132:19 185:3

213:14 226:6
 310:11 311:6,12
 335:14,21 349:7
 354:8 356:24
 370:3 376:21
 379:11 393:23
**takes** 347:12
**talk** 397:6
**talked** 109:24
**talking** 94:20
 101:17 120:24
 121:11 128:21
 147:24 148:2
 150:20 152:24
 162:13,14 226:12
 257:7 289:17
 317:23 390:9,10
 393:10 395:25
**talks** 242:17
 246:12 247:12
**tank** 35:6
**task** 137:4
**tasked** 25:2 26:10
 73:11 295:22
**tasks** 152:2 161:8
**tax** 38:24 152:8
**tc** 178:7
**team** 17:25 77:17
 77:18 80:5 89:7
 117:19,21 149:6
 191:23,25 316:25
 328:19 382:22
 384:16,20
**technical** 24:20
 25:3 32:18 277:19
 324:12 335:10
 376:17
**technicalities**
 218:13
**technicality** 258:8

**technology** 205:9
 323:17 330:2,16
 333:6,13,17,22,25
 334:3 343:8,11
 344:3,16 401:7
**telephone** 233:6
**television** 150:17
**tell** 7:14 24:16
 31:11 38:13 43:9
 43:24 51:4 65:24
 66:19 67:16 68:12
 76:3 85:17 87:23
 90:22,25 91:5,15
 93:22 98:22
 110:16 113:15,16
 114:6 116:12
 127:5,21 130:6,7
 130:12,12,15,21
 131:6 141:17
 142:15 143:10,14
 146:15,23 153:9
 153:13 160:9
 164:9 169:19
 190:9 192:22
 199:23 209:2,3,5
 216:5 232:18
 236:24 247:5
 259:16 266:5,6,13
 281:9 287:17
 296:11,16 302:25
 303:18 308:17
 311:2 325:23
 337:25 340:17
 347:21,22 348:9
 355:7 365:9 369:8
 370:16 386:12
 390:17,22
**telling** 105:4
**tells** 242:22
**tempering** 238:16

**template** 211:3,4
**ten** 266:22 353:22
**tense** 264:14
**tenure** 58:5,11
 59:17 62:5 71:10
 87:15 101:19
 173:10 260:21
 272:7,25 273:22
 276:4,10,15,18
 280:11
**tenures** 42:16
**term** 79:3 120:20
 120:21 121:3
 141:19 150:12
 271:23 376:5
**terminate** 58:7
**terminated** 58:9
 67:9,12,14,19,21
 304:7
**termination** 60:6
 61:17 304:13,22
**terms** 42:15 63:14
 69:23 80:2 85:12
 87:17 104:17
 112:16 125:24
 126:23 148:6
 149:21 157:21
 183:16 187:24
 189:11,15,18
 193:2 205:14
 211:2 227:11,12
 258:24 259:21
 260:5 269:16,20
 269:21,24 270:3,6
 270:11,17,23,25
 271:2,15 279:6
 290:14 291:3
 305:20 309:16
 312:25 317:10
 321:6 331:19
 336:23 340:3

359:3 373:18
375:14 385:4
388:17 397:6
**terrific** 10:19
252:22
**tested** 367:17
**testif** 102:23
**testified** 6:5 186:6
267:19
**testify** 102:24
186:7 256:3,7,16
256:23 279:15
354:23 355:8
363:9 399:5
**testifying** 19:19
92:11 101:23
**testimony** 5:21
8:21 11:20 20:20
20:25 23:14 31:4
32:3,13 33:9
93:25 186:15
190:2 193:24
218:5 227:6,22
228:6 278:2
355:23 399:6,10
402:13
**testing** 155:20
157:18 159:10
293:13
**thank** 6:18 7:4 8:8
10:14 18:15 23:4
148:23 210:20
214:15 232:25
234:23 239:3
244:10 251:9
263:6 275:21
276:2 325:7 330:7
398:13,14,15
**thanks** 19:23,23
36:24,25 43:23
82:4 95:22 197:2

225:24 355:17
**theoretical** 115:14
**theoretically**
175:10,13 337:6
**thereto** 306:20,23
**thing** 33:13 66:18
82:21 84:12
140:17 145:8
165:11 196:25
299:11 375:20
382:21
**things** 16:23 24:23
39:15 58:25 61:15
63:2 80:14 84:3,5
103:19 123:12
137:9,18 149:22
150:25 168:24
205:13 246:15
262:18 270:24
283:19 289:4,20
293:24 316:17
342:3,5 343:12
376:14 396:11
397:22
**think** 8:4 10:15
18:17 20:3,8
24:22 25:11,20
26:19 31:10 32:15
32:17 34:25 35:6
37:17 44:11,18
53:16,21,25 56:5
57:21 61:16,18
65:11,16 66:10,14
73:8 75:14 76:21
76:23 77:15,24
79:5,8,17 81:16
84:9 85:5 86:5,13
89:11 107:21,22
111:18,25 119:3
124:2 126:11
131:9 137:3

141:16,23,24
144:12 145:6
150:19 152:15
153:12 156:21
159:18 165:22
167:17 168:17
173:18 176:25
180:18,20 183:4,5
183:8,12,15,23,25
186:25 189:8
191:8,15 193:7,9
193:12,13 194:7
194:11 195:20
197:8 202:8
203:19,23 204:3,5
204:17,23 205:7
205:16,19,22
217:13,17 219:5
219:11,13,18
220:5 221:2,15,21
222:22 227:5
228:7 231:14
240:5,13,16
248:16,19 251:5
251:10,22 252:18
252:20 258:21
262:6,22 263:16
265:24 267:19
270:19 272:17,20
273:24 275:11
277:16 278:8
279:5,7,22 280:2
281:12,19 282:22
285:24 287:23
288:4 289:13
291:8 292:17
293:20 294:5
295:22 296:2
299:17 308:22
311:3 317:8 318:3
325:10 329:14

331:10 334:9
342:2,9,11 343:10
343:24 344:11,17
345:10 346:9
347:22 348:14,16
348:22 353:13,14
353:17 355:22
356:19 357:4
359:5 376:10,14
378:8 380:15,25
384:3 385:23
387:23 388:12,25
390:12,13 395:13
395:18 396:10
**thinking** 220:2,8
**thinks** 25:21
**third** 70:2 77:9
112:20 121:18,25
153:2 168:14,14
306:6 313:22
387:5,12,13
393:18,21
**thomas** 121:17
122:7,13
**thoroughly** 233:17
**thought** 27:3
237:13 274:14
299:24 325:20
352:2
**three** 20:17 88:7
119:8,16,21
121:20 122:22
324:11 353:15
**threshold** 77:21
**tight** 136:8
**time** 1:12 3:22
4:24 6:16 15:2,6
15:15 27:14,24
28:6,8,10,24 29:3
42:8 46:22,25
49:23 50:16,19

| | | | |
|---|---|---|---|
| 51:23,24 54:2,25 | 307:10 310:7,12 | 139:17 141:14 | **told**   25:13 48:2,12 |
| 57:17,24 66:21 | 313:12,12 318:15 | 142:13 145:25 | 272:23 299:22 |
| 67:25 69:3 81:17 | 320:18 322:2,13 | 146:14,23 152:17 | 370:20 |
| 82:5,10 104:3 | 323:21 326:24 | 153:8,12 154:18 | **tool**   265:12 |
| 110:10,19 129:8 | 338:8 347:13 | 154:23 161:11 | **tools**   265:3 |
| 129:12,13,18,22 | 350:14 351:24 | 164:8,13,19,24 | **top**   80:19 87:16,23 |
| 130:9,14,17,22 | 354:4,9 356:12,19 | 168:3 169:18 | 155:13,17 230:2 |
| 131:2,6,19,25 | 360:5 363:16 | 170:12 173:16 | 242:12,15 302:13 |
| 134:11 137:9 | 367:2 372:6,12 | 180:20 181:18 | 342:19 390:23 |
| 139:21 144:20 | 376:22 377:25 | 182:21 183:3 | **topic**   53:17 56:6 |
| 145:18 146:10,13 | 379:7 385:22 | 192:14,21 195:15 | 185:25 186:15 |
| 146:15,17,21,22 | 388:15 398:16 | 195:16 197:7,13 | 189:22 194:8 |
| 158:18,21 159:17 | 399:10 | 198:25 199:8 | 224:23 255:18 |
| 159:20,22 160:18 | **timeline**   136:8 | 216:4 227:10 | 256:4,7,11 281:21 |
| 160:22 161:3 | 379:15 | 241:9 253:23 | 281:22,23,25 |
| 163:4 164:11 | **times**   62:5 79:19 | 254:22 257:18 | 354:22 363:5,10 |
| 168:6 174:24 | 146:5 171:19 | 258:7 260:18 | 380:19 |
| 176:16,20 177:8 | 259:9 361:25 | 264:9,11,13 268:8 | **topics**   20:22 31:5 |
| 180:14 182:15,20 | **title**   12:12 13:9 | 268:19,25 270:5 | 32:3,13 33:10 |
| 183:8 184:13,15 | 16:10 57:3 71:25 | 272:12 276:23 | 52:4 195:5 196:22 |
| 184:23 185:4 | 195:19,25 333:18 | 278:6 283:13 | 355:24 358:16,20 |
| 186:23 189:9 | 333:20 334:5 | 286:8 296:10,15 | 362:19 380:2,7 |
| 194:21,22 195:14 | 385:11 | 297:4,23 300:20 | **total**   20:15 259:19 |
| 199:5 200:16,20 | **titled**   287:7 | 304:15 307:21 | **track**   174:5,6 |
| 201:21 202:18 | **titles**   12:16,18 | 308:2,16 309:6,15 | 313:2 |
| 203:13 212:19 | **today**   8:10,21 | 314:9,21 317:25 | **tracking**   312:21 |
| 222:8 223:2,4,6 | 11:20 19:16 54:4 | 319:3 324:24 | 312:22 316:23,24 |
| 226:3,7,17 227:8 | 54:11 55:10 57:4 | 327:11 329:5,12 | **tracks**   149:11,14 |
| 227:23 233:17,19 | 57:20 58:8 63:13 | 329:18 330:22 | 314:23 |
| 239:11 240:6,12 | 63:22 66:8,12,16 | 331:9 332:10,14 | **trade**   59:10 78:14 |
| 245:3,15 250:4 | 67:15 68:12,20 | 332:19 334:22 | 78:16,20 79:3,9,12 |
| 252:7 255:24 | 70:18,25 75:13 | 337:24 341:21 | 79:15,20,22 89:12 |
| 256:21 258:5 | 76:2 85:5,13,17 | 346:17 347:20 | 167:9 |
| 259:20,24 260:6 | 87:22 90:21 91:4 | 348:8 349:20 | **trades**   62:8 |
| 264:10,12,16 | 94:8 95:23 98:21 | 350:9 351:14 | **trading**   249:15,23 |
| 266:3,4 267:3,8 | 100:5 114:5 | 361:5,11 367:4 | 250:6 |
| 269:23 271:7,19 | 115:12 116:6 | 369:12 372:2,5 | **trail**   149:21 |
| 285:9,17 288:3,7 | 118:3 127:5,20 | 377:3 386:5 | 154:15 |
| 288:11 291:6,19 | 128:20 131:5 | 390:18 395:24 | **training**   67:5 78:5 |
| 291:22 302:8 | 135:18 136:14,24 | 398:12 | 159:11 356:14,16 |
| 304:23 305:6,19 | 137:11 138:5,14 | | 356:21 357:12,16 |

358:14,17,22,25
358:25 359:4,12
359:13,17,20
360:4,9,15,24
361:7,24 362:3,8
362:11,13,20,21
382:15
**trainings** 358:7,10
359:23 360:13
361:4,10 364:11
**transaction** 44:16
59:20 86:17,20
88:14 89:4,8
170:16 268:23
**transaction's**
96:18
**transactional**
87:18,25 88:4,8
**transactions** 38:9
39:24 43:6 47:12
87:2,6 97:6 98:24
251:14,24
**transcript** 182:9
399:9,9
**transition** 50:11
50:13 330:3,16,20
401:7
**transitioned**
321:19
**trial** 3:22 7:17
30:12 102:24
**tried** 189:5 321:7
340:17
**trigger** 265:13
**trip** 135:20,25
136:2
**tripp** 296:5,13
297:12,25 298:14
298:23 299:2
300:17,24 302:19
302:20,20 303:3

305:8,17
**tripp's** 296:7
297:2 301:22
305:10 307:11
**trouble** 104:9
**true** 269:8 289:10
314:12 399:9
402:12
**trust** 316:23
**truth** 5:22,23,24
399:5
**try** 33:24 55:19
90:2 95:18 220:6
223:21 239:15
291:5 294:2 345:4
381:22
**trying** 102:12,18
105:5 115:19
116:9,13 130:3,13
142:24 157:17
170:25 171:18,22
196:12 261:16
288:12 290:13
291:10 315:8
325:23 345:23
357:3
**turn** 114:23 140:9
155:2 199:10
230:19 251:5
283:15
**twenty** 91:12,17
**two** 17:10 44:5
72:14 133:16
166:24 214:3,23
291:14 307:15
336:3,21 369:23
375:20
**type** 18:20 30:5
59:15 84:22
112:11 122:21
123:13 124:12

157:18 167:7,20
167:23 217:22
235:11 321:2
327:9 341:3
368:12 375:19
**types** 38:23,24
43:9 45:3 59:3
88:18 152:2
153:16,19 166:24
168:4,6 256:25
321:3
**typical** 38:18
129:21 130:25
379:15
**typically** 35:7
38:21 42:20 62:10
147:9 149:10
150:2 154:8
256:18 257:9
265:21 266:13
313:10 315:23,25
316:6 329:7
358:21 359:2

---

**u**

**u** 3:2
**ultimately** 73:5
77:17 275:19
301:6 321:15
332:12
**um** 9:20 12:13
13:6 17:24 18:9
18:18,18 20:8
21:16 23:10 24:18
24:21,22 25:8
29:11,16 34:16
35:7,12 37:12,20
37:25 38:17,18,22
39:14,23 40:6,8
41:14 43:2 44:4
45:19,20 46:8,17
47:6 49:4 51:4

54:9 55:5,8 56:4
56:15,17 57:7,14
57:14,20 58:8,9,18
59:8,10,16,21,23
59:24 62:24,25
63:3,8 66:24
68:20 69:14 70:2
70:23 71:6 73:8
74:12,25,25 75:13
77:8,15 79:17
80:19,24 83:23
84:4,9,20 85:3
86:4,19 87:9
90:13 92:14 95:19
99:9 102:5 109:4
110:21 112:12
114:11,15 115:12
120:13,22 121:17
121:17,18 125:11
126:11 127:18
130:18 137:8
141:23 144:13
150:8 151:4,23
152:8,14 154:23
157:12 159:5,17
161:15 162:9,12
162:25 163:2,6,9
163:21 164:2
165:16 167:19,21
167:22 168:9,12
168:14,17,21,21
168:22,23 169:5
170:5,6,12 172:2
172:14 173:14
174:2,4,5,6,10,11
174:13,14,24
175:6 177:13,18
177:24 178:4,5,7,9
178:11,16 180:18
180:23 181:5,21
183:3,19,23,23

186:17,18,22,25
187:19,23 188:15
189:2,5,8,10,19,25
191:5,9 192:2,3,5
192:8,9,14,19
193:4,9,13 194:10
195:3,13 196:9
197:6 199:5,8,14
199:21,24 200:8
200:11,11,19
201:5,9,24 202:2,7
202:22 203:19
204:2,18 205:21
206:15 207:14
208:21,25 209:2,4
209:13,23,25
210:5,22 211:2,3
212:3,19 213:25
216:16 217:22,23
218:12,16 219:16
220:5,5 224:17
225:12 226:13
227:3,9,11,12,15
227:21 228:12,14
228:18 229:25
230:12,13,15
231:6,14,15,15,22
232:20 233:16
234:25 235:10
237:5,20,21 238:2
238:15 239:21
240:11 241:4,8
242:11,12 243:5,5
243:21,22 245:17
246:9,10 247:14
247:18 248:6,16
249:10,13,24
250:2 251:11,22
252:6 253:8,23
254:9,10,11,12
256:17,17,18,18

257:5,9,11,11,20
258:4 259:3,7,20
259:20,24 261:4
261:24,25 262:14
262:15 263:16,16
264:9,23,25 265:2
265:4,15,19 266:2
266:9 267:20,23
268:4,8,10,18,20
269:4,5 270:7,8,10
270:19,20,21,21
271:18,20 272:8
272:12,14,20,22
274:18 275:4,6,6
276:4,8,12,15
277:9,16,19 278:6
278:9,18,20 279:5
279:11,23 280:10
280:15,16,17,18
280:25 281:7,10
281:11,12,12
283:16 284:7,22
285:3,9 286:8,20
287:16,21,23
288:9 290:7
293:11,14,14,16
294:7 295:5,7,9,22
296:7,8,10,21
297:4,5,6,8 298:16
298:21 299:14,23
301:3 302:2,9
303:25 304:25
313:13 314:9,24
315:22 321:9
328:5,8 330:22
332:24 336:16
342:9 347:20,21
348:17,20 349:13
352:21 355:11,18
359:16 361:11
364:12,15 367:15

368:21 369:23
371:14 373:10,16
373:22 376:10
377:24 383:2
387:23 390:7
391:5 392:2 393:7
393:7 395:22
398:3
**umbrella** 180:24
**un** 97:13
**unable** 187:17
**unclear** 22:21
378:6
**underlying** 28:21
109:12 111:11
392:9
**underneath** 75:2
75:15,16 230:8
**understand** 18:25
20:19 22:2 24:18
31:3 43:16 44:8
67:24 70:21 74:8
95:6 100:4 102:13
102:20,22 106:11
106:14,22 111:9
111:13 115:7
126:21 134:25
142:25 144:9,11
145:11 155:25
158:12,16 160:13
161:12 165:17
166:11 167:16
168:13 171:2,7,15
171:19,22 176:17
178:17 181:22
201:19 202:9
203:12 204:8
218:22 223:7
229:12 245:23
248:3,6,7 257:19
257:20 261:16

267:20 288:12
289:11 291:10
328:5,22 332:4,8
334:14 339:4
343:9 344:25
345:18 368:4
387:6,17
**understanding**
74:11 104:17
141:18 144:18
152:18,20 154:7
160:3,6 174:19
193:19 199:18,25
202:10,17 210:21
218:2 220:14
224:24 226:13
234:16,25 235:15
236:2 252:12
254:25 263:19
284:22 287:10
290:17 291:11
351:16,24 352:5,7
352:19
**understood** 23:13
182:16 201:24
222:7 227:23
245:15,22
**undertake** 156:25
162:10 378:14
381:16 382:5
**undertaking** 161:8
**underwood** 2:12
5:8,8 8:10 9:4
10:23 11:15,22
12:5 16:21 18:16
19:2 22:3,11,14,20
25:18 26:16,24
27:12 33:3 34:4,6
36:5,21 43:15,19
48:9 51:15,19
56:13 59:6 60:16

60:20 61:11 81:8
81:18 82:3 87:20
89:5,13,21 94:6,12
94:24 95:14 97:3
101:16 103:3,14
103:22 104:4,15
107:8,14,21 108:8
128:16 129:16
131:3 132:22
145:2,14 156:19
163:10 165:21
170:10 171:13
175:11 179:16
182:2 184:11,20
185:14,18,23
186:3 188:13
190:20 193:5,21
194:4 196:10
198:6 202:20
206:7,11,13
210:13,18 213:2
213:10,12,15,21
214:11,18,21,24
215:3 216:22
222:16 223:13
225:24 229:5,9
232:10,21 233:2,8
233:24 234:11
235:20 238:5,18
242:13,16,25
243:11,14 244:4
244:15 251:4,9
254:6 263:4
264:17 267:13
273:8 274:24
282:10 286:18
292:5,15 293:8
294:14,18 295:20
297:15 299:20
300:10 305:25
310:24 311:8,13

311:20 318:7
321:22 322:17
325:4 327:25
329:10 333:7
336:12 345:8
346:5 351:20
353:12,21,24
355:12 372:24
384:14 387:14
389:18 393:5
398:15
**underwriting**
210:6 358:3
**unfortunately**
187:9 272:6
**united** 1:2 284:15
**universe** 271:16
**unsigned** 3:14
**unwind** 59:10
62:22
**update** 217:10
363:2 381:25
382:11,14
**updated** 114:20
157:10 159:5,10
167:21 208:22
209:4 301:7
309:17 369:5
392:24
**updates** 364:11,13
364:19,24 365:4
383:12
**updating** 85:24
86:2 303:25
**uploaded** 383:15
**uploading** 383:19
**upper** 210:22
247:23
**usage** 343:8,11
344:16 345:25

**use** 85:6,7 149:10
150:12,22 154:5,8
183:24 189:15
191:18 200:13
225:21 234:19,21
235:5,7 243:24
244:20 245:19
247:2 260:10,11
265:3,12 268:12
269:21 270:3,17
299:15,16,18
320:6 321:7,17
324:11 336:17
340:23,24 341:15
344:3,14,21 345:2
345:5,7,11,21
346:2,9,11,18,21
346:24,25 347:8
366:3 384:5
**useful** 294:4
**user** 342:8
**uses** 86:11 87:25
245:9 250:12
254:8 333:24
361:3
**usually** 59:21
63:25 80:20
137:17 337:17
342:19

**v**

**v** 6:2,2 403:2
**vacation** 76:22
133:9,15,20
**vague** 52:10
**vaguely** 308:19
309:5,6
**vagueness** 145:16
**valuation** 313:4
**variables** 279:6
**varies** 79:24 317:8

**variety** 47:11
**various** 38:23,24
59:13 61:13,15
93:20 100:6 137:9
153:15 221:22
231:15 250:4
275:15 357:24
388:3 397:23
**vcm** 349:15,17
**vegas** 35:7
**vehicle** 40:2
392:21
**vehicles** 98:7,11
99:11,13 121:7
387:2,3 390:20
**vendors** 24:21
77:9
**vent** 5:13
**verbal** 58:20 59:21
**veritext** 4:11,14
6:25 403:1
**version** 36:14,20
37:3 117:22 212:4
214:6,12 216:21
217:3,5 218:15
221:17 227:18
249:20,24 250:9
383:14,17
**versions** 226:22
388:4
**versus** 4:8 40:19
183:3 278:11
286:3 383:14
**vetting** 123:4
**videographer** 2:16
4:2,12 5:14 26:23
82:5,10 131:19,25
184:23 185:4
226:3,7 251:7
255:24 267:3,8
310:7,12 354:4,9

| | | | |
|---|---|---|---|
| 376:24 398:16 | 107:1 108:1,9 | 220:1 221:1 222:1 | 326:1 327:1,14,20 |
| **videotaped**   1:15 | 109:1 110:1 111:1 | 223:1 224:1 225:1 | 328:1 329:1,20 |
| **view**   7:2 290:7 | 111:22 112:1 | 226:1,10 227:1 | 330:1 331:1 332:1 |
| 347:4 377:2,13 | 113:1 114:1 115:1 | 228:1,24 229:1 | 333:1 334:1 335:1 |
| **viewed**   51:4 | 116:1 117:1 118:1 | 230:1 231:1,5 | 336:1 337:1 338:1 |
| **vint**   1:18 4:7 6:1 | 119:1 120:1 121:1 | 232:1 233:1 234:1 | 339:1 340:1 341:1 |
| 6:11,20 7:1,7 8:1 | 122:1 123:1 124:1 | 235:1 236:1 237:1 | 342:1 343:1 344:1 |
| 9:1 10:1 11:1 12:1 | 125:1 126:1 127:1 | 238:1 239:1 240:1 | 345:1 346:1 347:1 |
| 12:6 13:1 14:1 | 128:1 129:1 130:1 | 241:1 242:1 243:1 | 348:1 349:1 350:1 |
| 15:1 16:1 17:1 | 131:1 132:1,6,9 | 244:1 245:1 246:1 | 351:1 352:1 353:1 |
| 18:1,18 19:1 20:1 | 133:1,22,25 134:1 | 247:1 248:1,24 | 354:1,12 355:1 |
| 21:1 22:1,16 23:1 | 135:1 136:1 137:1 | 249:1,4 250:1,18 | 356:1 357:1 358:1 |
| 24:1 25:1 26:1 | 138:1 139:1 140:1 | 251:1 252:1,23 | 359:1 360:1 361:1 |
| 27:1 28:1 29:1 | 141:1 142:1 143:1 | 253:1 254:1 255:1 | 362:1 363:1 364:1 |
| 30:1 31:1 32:1 | 144:1 145:1 146:1 | 256:1 257:1 258:1 | 365:1 366:1 367:1 |
| 33:1,16,18 34:1 | 147:1 148:1 149:1 | 259:1 260:1 261:1 | 368:1 369:1 370:1 |
| 35:1 36:1 37:1 | 150:1 151:1 152:1 | 262:1 263:1 264:1 | 371:1 372:1 373:1 |
| 38:1 39:1 40:1 | 153:1 154:1 155:1 | 265:1 266:1 267:1 | 374:1 375:1 376:1 |
| 41:1 42:1 43:1 | 156:1 157:1 158:1 | 267:11 268:1 | 377:1 378:1 379:1 |
| 44:1 45:1 46:1,6 | 159:1 160:1 161:1 | 269:1 270:1 271:1 | 380:1 381:1 382:1 |
| 46:12 47:1 48:1 | 162:1 163:1 164:1 | 272:1 273:1 274:1 | 383:1 384:1 385:1 |
| 49:1 50:1 51:1 | 165:1 166:1 167:1 | 275:1,11 276:1 | 386:1 387:1 388:1 |
| 52:1 53:1 54:1 | 168:1 169:1 170:1 | 277:1 278:1 279:1 | 389:1 390:1 391:1 |
| 55:1 56:1 57:1 | 171:1 172:1 173:1 | 280:1 281:1 282:1 | 392:1 393:1 394:1 |
| 58:1 59:1 60:1 | 174:1 175:1 176:1 | 282:23 283:1,4 | 395:1 396:1 397:1 |
| 61:1 62:1 63:1 | 177:1 178:1 179:1 | 284:1 285:1 286:1 | 398:1,11 399:1,15 |
| 64:1 65:1 66:1 | 180:1 181:1 182:1 | 286:15 287:1 | 400:1,24 401:1 |
| 67:1 68:1 69:1 | 183:1 184:1 185:1 | 288:1 289:1 290:1 | 402:1 403:3,21 |
| 70:1 71:1 72:1 | 185:7 186:1,5 | 291:1 292:1 293:1 | **vint's**   11:16 |
| 73:1 74:1 75:1 | 187:1 188:1 189:1 | 294:1 295:1 296:1 | 101:18 102:21 |
| 76:1 77:1 78:1 | 190:1 191:1 192:1 | 297:1 298:1 299:1 | **violated**   204:21 |
| 79:1 80:1 81:1,5 | 193:1 194:1 195:1 | 300:1 301:1 302:1 | **violation**   58:14 |
| 82:1,13,15 83:1 | 196:1 197:1 198:1 | 303:1 304:1 305:1 | 101:7 |
| 84:1 85:1 86:1 | 199:1 200:1 201:1 | 306:1 307:1 308:1 | **violations**   58:24 |
| 87:1 88:1 89:1 | 202:1 203:1 204:1 | 309:1 310:1,15,21 | 59:3 61:22 |
| 90:1 91:1 92:1 | 205:1 206:1,25 | 311:1,14 312:1 | **virtual**   1:15 |
| 93:1 94:1 95:1 | 207:1,3 208:1 | 313:1 314:1 315:1 | 325:16 328:9 |
| 96:1 97:1 98:1 | 209:1 210:1 211:1 | 316:1 317:1 318:1 | **virtue**   237:3 |
| 99:1 100:1,3 | 212:1,23 213:1,23 | 319:1,12,13 320:1 | **voice**   94:15 239:16 |
| 101:1 102:1 103:1 | 214:1 215:1 216:1 | 321:1 322:1,24 | **vonveiglight**   86:8 |
| 104:1 105:1 106:1 | 217:1 218:1 219:1 | 323:1 324:1 325:1 | |

**voting**  122:10
**vpm**  328:6
**vpn**  219:22 325:3
  325:5,9,10,12,19
  328:12 329:3

**w**

**wait**  43:20 185:14
  321:10 374:15
**waiting**  34:2
**waived**  3:9
**walk**  154:13
**walls**  288:25
**want**  7:19 19:2
  22:21 36:22 60:21
  82:20 88:2 93:24
  103:17 104:20
  110:11 113:12
  139:3 178:16
  188:4 196:24
  206:16 207:11
  213:3 218:2 220:3
  223:17 225:25
  226:25 229:20
  232:3 261:23
  287:16 292:5
  294:4 335:22
  339:3 353:9 355:4
  368:22
**wanted**  35:21
  138:10 179:10
  239:10
**wants**  92:7 107:15
  262:17
**warning**  58:21
**warrant**  169:20,21
  169:24
**warrants**  396:15
**watches**  314:25
**watching**  316:20
**water**  94:21

**watercooler**
  362:14
**way**  7:25 19:12
  52:11 58:14 85:7
  95:18 105:14
  157:24 159:12
  200:23 204:21
  221:2 243:19
  291:24 292:8
  342:12 357:4
  363:24 364:3
  367:10 395:3
  402:17
**ways**  150:20
**we've**  58:23
  130:20 173:17
  310:15
**wear**  337:11,13,14
**web**  324:10 325:25
**website**  35:16,19
  123:19,21,23,25
  124:3,4
**week**  129:13,20
  130:25 131:6
  135:14 146:11
  147:8 266:7
**weekend**  133:19
**welcome**  226:10
**went**  40:22 132:10
  136:4 168:21
  186:17 274:8
  275:14 379:17
  380:10
**whatsoever**
  307:10
**whereof**  402:19
**whisper**  90:6
**whispering**  90:3
  267:15
**white**  340:25

**wide**  52:4 362:17
**wider**  181:12
**wires**  316:22
**withdraw**  19:11
  24:5 50:17 53:4
  56:19 73:17 77:3
  168:11 178:20
  189:24 222:23
  345:4 370:15
**withdrawn**  83:19
  88:10 93:6 118:14
  315:12 366:23
**withstanding**
  306:11
**witness**  1:17 3:10
  3:16,18 5:13,16,19
  5:25 6:3 8:17
  11:21 19:16,18
  20:2,3 22:22
  29:17 30:25 31:6
  31:9,16,17,23,24
  32:4,8,9,10,14,24
  32:25 33:2,6,11
  34:8,12,15,19,23
  35:5,17,22 37:11
  37:16 38:11 42:4
  43:18 60:10,19
  82:16,17 83:2,3,6
  83:13 84:19 85:2
  85:16 86:18 89:18
  90:3,4 98:2 103:4
  103:21 104:7
  107:2,7 111:19
  113:11,17,18,21
  113:23 114:4,25
  115:11,23,24
  116:4,7,17 118:2
  119:18 121:24
  134:3,6,10,17,23
  135:3,9,16,23
  136:10 138:4,24

138:25 139:7,8,16
140:2,11,21 141:5
141:22 142:11
143:18,25 144:6
144:24 145:4
147:15 150:15,18
152:5 153:21
155:9,14,23 156:3
156:8 158:4,10,15
159:16 160:5,17
161:10,16 162:17
165:7,12,19 166:9
166:21,22 167:13
168:16 176:14
177:4 178:3 184:6
184:7 185:11,13
186:4 190:24
195:7 196:23
197:5,24 199:7,12
199:13 201:2,3,6,7
201:17,23 202:19
203:9,18 204:12
206:4,12 207:5,6
207:25 208:13,24
209:11 210:11,12
211:17,18 212:10
212:12,13,24
213:9 214:17,20
214:23,25 215:4
215:17 229:3,11
229:18,24 230:11
230:21,22 231:12
231:13,21 233:13
234:15 236:17,18
236:23 237:18
238:8 239:20
240:22,23 241:3
241:21,22 242:10
242:14 243:9,12
243:21 244:13,14
244:24 245:12

247:11,15 249:7
249:12 251:2,3
255:14,15,20,21
257:4 262:21
266:25 267:16
273:6,10 277:22
279:16 282:12,25
283:10,25 284:6
287:6 293:2
294:16,20,21
295:19 297:14,22
298:4,11 301:2,10
301:25 302:17,21
302:24 303:6,12
303:15 304:10
306:8,25 307:5
309:14,21 310:3
310:19 311:18,24
312:6,10 318:14
319:20,24 320:10
321:24 322:7,16
323:9,14,19,23
324:18,23 326:13
326:17,22 327:22
328:2,14,20
329:24 330:9,17
332:2,7 334:18
336:10 339:14
349:12,19 352:23
353:4,20 354:15
354:16,20,24,25
363:6,7,11 364:16
364:21 379:2
386:20 387:16
388:23 394:13
398:14,20 402:10
402:13,19
**witnesses**  21:11,14
**witnesses'**  403:3
**woman**  7:22 56:24

**wonder**  309:25
310:2
**word**  52:11 98:3
108:6 140:20
143:17 152:6
183:13 191:18
212:22 235:15
236:3 248:4 257:6
**words**  144:3
145:12 157:25
158:13 188:5
204:9 248:17
**work**  12:3 14:6
16:5 24:15 39:22
40:4,6,11,17 46:25
47:6,9,18,21 48:5
53:5,10 76:14
80:2,4 87:18,25
88:4,8,13 101:25
105:8 113:24
114:2,7,10,11,14
114:19 126:4
128:5,22 129:6
136:16 139:24
154:11 158:22
184:9 192:10,12
280:25 321:12
335:2 351:10
353:11 374:23
**worked**  39:23 42:9
48:15 86:16
189:19 194:17
281:7 304:17
338:14 375:2
**working**  24:21
39:8 43:4 52:5
56:24 69:10 89:7
116:21 117:5
138:3 141:7
154:22 201:21
202:12 228:19

281:3 313:13
349:22
**works**  10:17 16:9
16:13 119:25
128:6 202:9
259:17
**world**  14:18
**worry**  46:17
**wound**  307:4
**write**  177:17
315:16
**writes**  320:4
**writing**  61:10
63:10 373:18
**written**  58:19
59:23 60:4 92:19
93:5,8,12 94:2
144:13 145:21
202:8 220:16
223:23 294:24
332:8 362:2
**wrong**  36:13 116:8
118:5 185:16
365:8
**wrote**  144:8

**x**

**x**  1:3,9 154:10
316:18,19 324:5
400:2 401:11
**xen**  324:3,5

**y**

**yahoo**  253:22,25
**yeah**  9:13 18:24
19:21,25 26:19,24
27:2 36:25 60:19
81:12 83:17 88:5
92:22 94:8,20
95:14 97:10
102:11 104:7
108:8 110:15

117:16 125:21
128:18 135:4
138:12 142:18
145:4 166:2
170:12 171:15
179:19 193:14
204:5 205:21
206:15 210:15,20
213:5 222:20
229:11 235:22
243:21 288:14
309:25 319:15
323:5 325:20
336:2 337:6
345:10,18 348:6
355:16 361:19
373:2 376:4 384:2
387:16 389:20
394:25
**year**  69:22 70:5
72:12,16,22 84:4
91:13,18 129:22
129:24 130:18
162:13,16 188:16
362:4 364:8
366:11,14 367:3,6
390:25
**years**  15:16,17
27:25 44:5 54:9
70:13 72:14 84:6
84:8 91:6,10,16
136:25 163:20,23
284:19 285:2,23
286:6 288:18,22
290:21 291:14,16
292:4,14 359:23
365:7
**yep**  26:23 42:5
107:18 176:2
184:22 229:17
311:7

**[york - zoom]**

| | |
|---|---|
| **york** | 1:2,22 2:6,6 6:5,14,14 7:10,10 8:7,7 10:21 35:9 47:15 125:5,13 328:19 402:4,5,8 403:1 |
| | **z** |
| **zoom** | 335:12 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.