# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 6

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   ------------------------ X
    PAUL IACOVACCI,

4
              Plaintiff,

5
         vs.                        No.

6                                   18cv8048

7   BREVET HOLDINGS, LLC, a
    Delaware Limited Liability

8   Company, et al.,

9              Defendants.
    ------------------------ X

10

11                    November 18, 2021

12                    2:01 p.m.

13

14

15         Deposition of MEI-LI DA SILVA

16   VINT, held at the offices of Reed Smith

17   LLP, 599 Lexington Avenue, New York, New

18   York, pursuant to Notice, before Theresa

19   Tramondo, AOS, CLR, a Notary Public of the

20   State of New York.

21

22

23

24

25

Page 2

```
 1
 2   APPEARANCE OF COUNSEL:
 3   FOR PLAINTIFF:
 4       CYRULNIK FATTARUSO, LLP
 5       55 Broadway, Third Floor
 6       New York, New York  10006
 7       BY:  JASON CYRULNIK, ESQ.
 8            PAUL FATTARUSO, ESQ.
 9            ADINA LEVINE, ESQ.
10            IAN DUMAIN, ESQ.
11       Jcyrulnik@cf-llp.com
12       Pfattaruso@cf-llp.com
13       Alevine@cf-llp.com
14       Idumain@cf-llp.com
15       917-353-3005
16
17   CO-COUNSEL FOR PLAINTIFF:
18       WEISS & WEISS LLC
19       2000 Post Road, Suite LL106
20       Fairfield, Connecticut  06824-5730
21       BY:  SCOTT WEISS, ESQ.
22       Scott@weissnweiss.com
23       203-254-2707
24
25
```

Page 3

1

2    APPEARANCE OF COUNSEL (CONT'D):

3

4    FOR DEFENDANTS:

5        REED SMITH LLP

6        599 Lexington Avenue

7        New York, New York  10022

8        BY:  COLIN UNDERWOOD, ESQ.

9             RUHI BEHAL, ESQ.

10            AVERY I. NORMYLE, ESQ.

11       Cunderwood@reedsmith.com

12       Rbehal@reedsmith.com

13       Anormyle@reedsmith.com

14       212-205-6003

15

16   ALSO PRESENT:

17       HOWARD BRODSKY, VIDEOGRAPHER, VERITEXT

18   LEGAL SOLUTIONS

19

20

21

22

23

24

25

Page 4

1

2              THE VIDEOGRAPHER:  Good

3       afternoon.  Here begins Volume 2 of

4       the video recorded virtual remote

5       30(b)(6) deposition of Mei-Li da Silva

6       Vint, appearing on behalf of Brevet

7       Capital Management from her location

8       in Manhattan, New York.  This

9       deposition is taken by the plaintiff

10      in the matter of Paul Iacovacci,

11      plaintiff, versus Brevet Holding, LLC,

12      et al., defendants, Case Number

13      1188048WHP (sic) in the United States

14      District Court, Southern District of

15      New York.  Today is Thursday

16      November 18, 2021.  The time is

17      approximately 2:15 p.m. Eastern

18      Standard Time.

19              My name is Howard Brodsky.  I'm

20      the legal video specialist in

21      association with Veritext Legal

22      Solutions with offices located in New

23      York, New York.  The court reporter is

24      Theresa Tramondo in association with

25      Veritext.

                                              Page 5

 1

 2              Counsel have agreed that the

 3      court reporter has entered all

 4      appearances for this proceeding in the

 5      stenographic record and the parties

 6      have stipulated and agreed that the

 7      court reporter may take the deponent's

 8      oath remotely.

 9              Will the court reporter please

10      swear in the witness.

11  M E I - L I   D A   S I L V A   V I N T,

12  called as a witness, having been duly

13  sworn by a Notary Public, was examined and

14  testified as follows:

15  BY THE REPORTER:

16      Q.    State your name for the record,

17  please.

18      A.    Mei-Li da Silva Vint.

19      Q.    What is your address?

20      A.    I'm at my attorney's office.

21  599 Lexington Avenue New York, New York

22  EXAMINATION BY

23  MR. CYRULNIK:

24      Q.    Sounds like we're ready to

25  start.  I'll note for the record it's 2:16

Page 6

1                    da Silva Vint

2   and change.

3                Good afternoon, Ms. Da Silva

4   Vint.  How are you?

5        A.    I'm well.  How are you?

6        Q.    Doing well.  Thank you.

7                You understand you're here to

8   testify in the corporate witness capacity as

9   a 30(b)(6) witness for Brevet on the

10  designated topics?

11       A.    I do.

12       Q.    Those topics are 6 through 8, 10

13  through 14, 27 through 31 and 36 through 38,

14  right?

15       A.    Yes.

16       Q.    Can you list for me the deals,

17  transactions or prospective clients that

18  Mr. Iacovacci diverted away from Brevet?

19       A.    Speaking on behalf of the

20  company, I can point you to documents that

21  were produced including e-mails that would

22  include deals and clients that were diverted

23  away from Brevet.

24       Q.    Yeah, I appreciate that, but

25  that's not what I'm asking you.

1              da Silva Vint
2              I'm asking you if you can
3  identify any deal, transaction or a
4  prospective client that Mr. Iacovacci
5  diverted away from Brevet?
6       A.    Yes.
7       Q.    Okay, let's start --
8       A.    Sure, an example of clients
9  would be the ███████   █  ████████   ██
██   ████████  ██    An example of a transaction --
11      Q.    Let's just go slowly.
12  ██████████  █  ████████  is the first client
13  you said he diverted?
14      A.    Correct.
15      Q.    Is there another client that he
16  diverted?
17      A.    I'm giving you examples.  So,
18  yeah.  Another example is  ████████
██  ████████████  
20      Q.    ████████  ████████████.  I don't
21  want examples.  I want a list.  So I have
22  two so far on clients.
23              Any other clients you can
24  identify as clients that Mr. Iacovacci
25  diverted away from Brevet in Brevet's view?

Page 8

1              da Silva Vint

2        A.      Speaking on behalf of the

3    company, I can't sit here and list the

4    number of clients that Paul diverted away

5    from Brevet.

6        Q.      You can't tell me the number or

7    you can't identify any others than beyond

8    the ███████████ ██ ███████████ ███ ██████████

     █ ███████████; is that fair?

10       A.      If you would like to go through

11   the e-mails that we produced related to what

12   he sent from his Brevet e-mail to his

13   personal e-mail, which included client

14   lists, we can do that.

15       Q.      Ms. Da Silva Vint, I don't need

16   a deposition to walk through e-mails with

17   you.  I'm asking you questions.  If you know

18   the answers to my questions, great; if you

19   don't, you can say that as well, but please

20   just focus on the questions.

21              I asked you to identify three

22   different categories of things.  The first

23   thing I think you addressed were clients

24   that Mr. Iacovacci allegedly diverted from

25   Brevet.  Did I get that right?

Page 9

```
 1                da Silva Vint
 2        A.    So I gave you examples of types
 3    of clients which include -- I don't know how
 4    you're defining "clients," but clients can
 5    include potential investors, it can include
 6    potential borrowers.  I'm giving you an
 7    example of two clients in the investor
 8    category that he diverted away.
 9        Q.    I'm not looking for examples,
10    but let me make sure we're on the same page
11    here.
12              You identified clients of Brevet
13    as including two subcategories, investors
14    and borrowers; is that right?
15        A.    Those are two potential
16    subcategories within the definition of
17    "client."
18        Q.    Again, I don't want "potential
19    subcategories."  I want to know are there
20    any other categories of clients that you
21    would identify as clients that Mr. Iacovacci
22    diverted away from Brevet?
23        A.    Investors and borrowers are
24    types of clients that Paul diverted away
25    from Brevet.
```

```
 1                    da Silva Vint
 2        Q.      Are there any other types of
 3    clients that Paul diverted away from Brevet?
 4        A.      There could be.  We would have
 5    to turn to the e-mails and go through the
 6    e-mails, which we have produced, where there
 7    are substantial things that he forwarded to
 8    his e-mail address, his personal e-mail
 9    address, which includes things like
10    borrowers, potential borrowers, investors,
11    investor lists.
12        Q.      Ms. Da Silva Vint, there is a
13    bit of a disconnect over here.  I'm just
14    asking you questions.
15                Did you go through the e-mail
16    that you're referencing to prepare for this
17    30(b)(6) deposition?
18        A.      I came prepared by reviewing the
19    list of e-mails, which we can go through.
20    There are hundreds of e-mails that we've
21    already produced, and if you want to go
22    through a specific example, we can do that.
23        Q.      This is not about examples,
24    Ms. Da Silva Vint.  I'm here asking you
25    questions, you're representing the company,
```

```
                                              Page 11
 1                    da Silva Vint
 2     and you're going to tell me the company's
 3     positions.
 4               My question to you is:  Did you
 5     review the actual e-mails that you are
 6     referencing in order to prepare for this
 7     deposition; yes --
 8          A.    I have reviewed in the past the
 9     e-mails.
10          Q.    Did you review those e-mails to
11     prepare for this deposition; yes or no?
12          A.    I did not rereview these
13     e-mails, hundreds of e-mails to prepare for
14     this deposition.
15          Q.    Okay.  Well, sitting here today,
16     can you identify any other types of clients
17     that Mr. Iacovacci diverted from Brevet;
18     that is, other types of clients beyond
19     investors or borrowers?
20          A.    Sitting here today, I will
21     identify borrowers and investors as
22     potential clients that Paul diverted away
23     from Brevet.
24          Q.    Let's start with investors.  Can
25     you identify any investor clients that Paul
```

```
                                              Page 12
 1                      da Silva Vint
 2    diverted away from Brevet?
 3           A.     Yes.
 4           Q.     How many can you identify?
 5           A.     I have already listed two.
 6           Q.     Those are both investor clients?
 7           A.     Investor -- potential investors.
 8           Q.     Are they investors of Brevet or
 9    potential investors of Brevet?
10           A.     I said "potential investors."
11           Q.     So you have the ████████████  ██
██  ███████████  ████  ██████████  ███████████, two
13    potential investors of Brevet that you
14    contend Mr. Iacovacci diverted, correct?
15           A.     Yes.
16           Q.     Are there any actual investors
17    in Brevet that you can identify
18    Mr. Iacovacci as having diverted?
19                  MR. UNDERWOOD:  Object to the
20           form of the question.
21           A.     I actually don't understand the
22    question.
23           Q.     You qualified your
24    identification of ███████████  ███  █████████
██   ████   █████████   █████████████ as "potential
```

```
                                    Page 13
 1                  da Silva Vint
 2   investors of Brevet," not investors of
 3   Brevet; did I hear you correctly?
 4        A.    Yes.
 5        Q.    And I'm asking you whether there
 6   are any investors of Brevet as distinguished
 7   from just potential investors that
 8   Mr. Iacovacci also diverted in Brevet's
 9   opinion?
10             MR. UNDERWOOD:  Object to the
11        form of the question.
12        A.    I still don't understand.  If
13   someone is diverted, how are they a
14   potential and an actual.
15        Q.    Okay, I think I see the
16   disconnect.
17             Do you understand the difference
18   between a "potential investor" and an
19   "actual investor"?
20             MR. UNDERWOOD:  Object to the
21        form of the question.
22        Q.    Do you understand the difference
23   between those two terms?
24        A.    I don't know.  Clearly not, if
25   you're understanding it one way and we have
```

1                  da Silva Vint

2   a disconnect.  So can you explain how you

3   understand them?

4        Q.    Well, I'm asking you based on

5   your usage of the term, so it's much more

6   important to me to understand what you mean

7   than for you to understand what my view

8   would be.

9              So in your view, when you say

10  "investor in Brevet" versus "potential

11  investor in Brevet," can you explain to me

12  what you mean by those two terms?

13       A.    They're not invested in Brevet.

14       Q.    Let's use someone who is not

15  invested in Brevet, but might invest in

16  Brevet as "potential investor in Brevet" for

17  purposes of the question and someone who

18  actually has invested with Brevet as "actual

19  investor," okay?

20       A.    Okay.

21       Q.    Okay, with those terms in mind,

22  I take it you don't have any actual

23  investors in Brevet that you can identify as

24  having been diverted away from Brevet by

25  Mr. Iacovacci; is that fair?

```
                                          Page 15
 1                  da Silva Vint
 2                  MR. UNDERWOOD:  Object to the
 3           form of the question.
 4           A.    From the company's perspective,
 5   we wouldn't know.  There's voluminous
 6   production that hasn't been made by the
 7   plaintiff, so we don't know definitively.
 8           Q.    I understand that and I
 9   appreciate your positions as to why you
10   don't know, but the answer is:  Sitting here
11   today based on what has been produced,
12   whatever has not been produced, you can't
13   identify any actual investors who
14   Mr. Iacovacci diverted away from Brevet,
15   fair?
16                  MR. UNDERWOOD:  Object to the
17           form of the question.
18           A.    Yes.
19           Q.    And with respect to potential
20   investors, sitting here today, again, and
21   subject to all of the caveats that you have,
22   whatever you have, and whatever has been
23   produced has been produced, I get it, but
24   sitting here today, you can identify two,
25   but only two specific potential investors
```

Page 16

```
 1                  da Silva Vint
 2    that Brevet contends were diverted away from
 3    Brevet by Mr. Iacovacci, and that would be
 4    ████████  ██  ████████  ██  ████████
 ▮    ████████; did I get that correct as well?
 6         A.    In the "potential investor"
 7    category, correct.
 8         Q.    Let's go to borrowers, if we
 9    can, and I will use the same distinction
10    between "potential borrowers" and "actual
11    borrowers"; that is, "actual borrowers"
12    would be a term I use to refer to someone
13    who actually has borrowed from Brevet, an
14    entity or individual who has borrowed from
15    Brevet, and I'll use the term "borrower" to
16    describe someone -- a "potential borrower"
17    to describe someone that has not actually
18    borrowed from Brevet.
19              With that in mind, can you
20    identify any borrowers, actual borrowers of
21    Brevet that Mr. Iacovacci has diverted?
22         A.    I will broaden that to be deals
23    or potential deals that were diverted away
24    in the sense of someone who would be
25    borrowing and including someone who would be
```

```
                                         Page 17
 1                 da Silva Vint
 2    bringing that transaction to us, and yes.
 3         Q.    So on the borrower side, you
 4    would equate that with deals or transactions
 5    that Mr. Iacovacci diverted?
 6         A.    Yes.
 7         Q.    So let's go through that list.
 8    We have a complete list on the client side;
 9    is that fair, with the exception of
10    borrowers who you are linking up
11    with -- withdrawn.
12                Let's talk about the borrower
13    investors -- I'm sorry, the borrower clients
14    and the deals.  Can you identify for me the
15    deals, transactions or borrower investors
16    that Mr. Iacovacci diverted away from
17    Brevet?
18                MR. UNDERWOOD:  Object to the
19         form of the question.
20         A.    Yes, ██████   ██████.
21         Q.    Okay.
22         A.    There was a ██████  ██.
23         Q.    Did you say a ██████  ██   ██?
24         A.    Yes.
25         Q.    Okay.
```

```
                                          Page 18
 1                     da Silva Vint
 2          A.     And various transactions related
 3    to █████  █████████
 4          Q.     The various transactions related
 5    to █████ ████████.  Anything else?
 6          A.     Not at this moment.
 7          Q.     So if we could just go through
 8    those quickly.
 9                  When did Mr. -- the three deals
10    that you just identified ██████████  ████████████
██    █ ██████████  ████  ██████  and transactions related
12    to ██████ ████████, I take it --
13          A.     Sorry, there is one more.
14    There's ████████.
15          Q.     There is another one.  What was
16    the other deal?
17          A.     ████████████
18          Q.     ████████████  okay.
19                  Do you have any papers in front
20    of you, Ms. Da Silva Vint?
21          A.     I do.  I have something that was
22    produced, I think, yesterday, a damages
23    summary.
24          Q.     Is that a two-page summary?
25          A.     Yes.
```

Page 19

```
 1                    da Silva Vint
 2               (Exhibit 15, two-page damages
 3          summary, marked for identification, as
 4          of this date.)
 5          Q.     Can you take a look at
 6   Exhibit 15 on the Exhibit Share.  Is that
 7   what you're describing as the document in
 8   front of you?
 9          A.     Yes.
10          Q.     Anything else in front of you?
11          A.     I have nothing else open in
12   front of me.
13          Q.     How about closed; what else do
14   you have that is not open in front of you?
15          A.     I have a binder related to the
16   topics.
17          Q.     And that binder is a binder of
18   discovery responses in this action that are
19   referenced on the damage summary or on some
20   other or --
21          A.     It's stuff that has been
22   produced related to the topics that you may
23   ask me about today.
24          Q.     Who prepared that binder?
25          A.     It was prepared in conjunction
```

```
                                            Page 20

 1                    da Silva Vint

 2    with counsel.

 3         Q.    They selected the documents that

 4    they wanted to have in front you?

 5         A.    It was prepared jointly, so we

 6    selected documents together.

 7         Q.    So you were selecting documents.

 8    How did you identify documents that you

 9    wanted to bring with you to this deposition?

10         A.    In working with counsel around

11    the topics.

12         Q.    How did you do it; what did you

13    do to identify which documents you wanted to

14    bring into the deposition room?

15         A.    We talked about documents that

16    related to supporting our claims and what

17    you were going to be asking about to be able

18    to fully answer the facts, statements you

19    need answered on these topics.

20         Q.    (**RQ)Fair enough.

21               I'll ask during the break for

22    someone to send me either an index of that

23    binder you brought with you to the

24    deposition or else to list it out, as

25    Mr. Solomon did yesterday, so that we can
```

```
                                    Page 21
 1                  da Silva Vint
 2    have a list of that, okay?
 3         A.    Yes.
 4              MR. UNDERWOOD:  So far she
 5         hasn't even opened the binder.  I'm
 6         not going to go ahead and give you a
 7         list of documents that she isn't even
 8         looking at.
 9              MR. CYRULNIK:  Mr. Underwood,
10         she brought a binder of documents in
11         the deposition room.  If I was in the
12         deposition room there with you, I
13         would be entitled to ask you for it.
14         I'm on Zoom and I'm asking you --
15              MR. UNDERWOOD:  Not if she
16         didn't open it.
17              MR. CYRULNIK:  Well, we disagree
18         with that.  And if you're going to
19         refuse --
20              MR. UNDERWOOD:  Okay.
21              MR. CYRULNIK:  If you're going
22         to refuse to provide us with that
23         list, let us know now on the record.
24              MR. UNDERWOOD:  I'm going to
25         take your request under advisement,
```

```
                                            Page 22
 1                da Silva Vint
 2          and at the end of your 36 minutes of
 3          this deposition, I will let you know
 4          whether we're going to provide a
 5          listing of all the documents in that
 6          binder.
 7          Q.    Well, Ms. Da Silva Vint, could
 8   you list for me the documents in that binder
 9   because counsel --
10          A.    Like I said, it's voluminous.
11                MR. UNDERWOOD:  If that's how
12          you choose to use 36 minutes in this
13          deposition, Ms. Da Silva Vint can turn
14          pages in the binder and list them for
15          you.
16                MR. CYRULNIK:  Mr. Underwood, to
17          be clear for the record, you have
18          refused to provide us with a list of
19          the documents that she brought to this
20          deposition.  We think that's improper.
21          If you're going to force us to use
22          time to have the witness give it to us
23          rather than you providing us with an
24          index --
25                MR. UNDERWOOD:  She hasn't
```

```
                                      Page 23
 1               da Silva Vint

 2        looked at any of them during the

 3        deposition.

 4             MR. CYRULNIK:  Mr. Underwood,

 5        I'm still talking.

 6             If you're going to refuse to

 7        provide us with an index or to list

 8        that out, as Mr. Solomon, your own

 9        colleague, did yesterday, prior to any

10        of them being used in the deposition,

11        that creates a problem for us and

12        necessitates asking Ms. Da Silva Vint

13        to read them into the record herself.

14        I don't think that's an efficient use

15        of anybody's time, but that's for you

16        to decide as to whether or not you're

17        going to ask us to waste time doing

18        that.  We obviously take the position

19        that you requiring us to have the

20        witness read them into the record,

21        rather than giving us the information,

22        as your own colleague did yesterday,

23        and as is your obligation, is

24        something that does not count towards

25        our time with Ms. Da Silva Vint.
```

```
 1              da Silva Vint
 2         So do you want us to use our
 3    time asking that question to the
 4    witness or can you commit to giving us
 5    that list at some point voluntarily
 6    either off the record or via e-mail?
 7         MR. UNDERWOOD:  Mr. Cyrulnik,
 8    the witness hasn't looked at a single
 9    document from the binder as part of
10    the deposition.  I know of no
11    obligation to identify for you
12    documents that the witness assembled
13    in case she wanted to look at them, in
14    case you asked a question that
15    implicated the documents.
16         (**RQ)MR. CYRULNIK:  The
17    obligation, Mr. Underwood, is to
18    respond to a question that is
19    obviously related to these 30(b)(6)
20    topics.  The question is what
21    documents did you bring with you to
22    the deposition.  They were identified
23    by way of reference to a binder.  I
24    don't have that binder in front of me.
25    You do.  That is improper.  And I've
```

Page 25

```
 1              da Silva Vint

 2       asked you to provide us with

 3       either -- I'm only asking you for a

 4       copy of the index or a listing of the

 5       documents.  It would be reasonable for

 6       me to ask you to send me all of the

 7       documents themselves.  And so that's

 8       the request on the table.

 9            And my question to you is:  Are

10       you going to refuse to provide us with

11       even a listing of the documents that

12       this 30(b)(6) witness has brought with

13       her to this deposition in the

14       deposition room in front of her?

15            MR. UNDERWOOD:  If the witness

16       looks at documents, we will identify

17       the documents to you.

18            MR. CYRULNIK:  We will --

19            MR. UNDERWOOD:  We can spend the

20       rest of this time arguing over this,

21       we can spend the rest of the time with

22       her reading you a list of the

23       documents, which are discovery

24       responses, affidavits, just similar to

25       the ones used by Mr. Monticciolo
```

Page 26

```
 1                  da Silva Vint
 2        yesterday.  You can spend your time in
 3        the deposition however you choose.
 4             You could ask her questions or
 5        you could ask her to identify
 6        documents, but she hasn't looked at
 7        those documents yet, and I'm not going
 8        to commit to giving you a listing of
 9        those documents unless and until she
10        finds a need to look at those
11        documents.
12             MR. CYRULNIK:  I'll note for the
13        record that Mr. Underwood's colloquy
14        has taken approximately three or four
15        minutes of the time that we have and
16        obviously does not count against our
17        deposition questioning time.
18             I'll also note for the record
19        that Mr. Underwood just likened these
20        documents to the ones that
21        Mr. Monticciolo brought yesterday,
22        but, of course, did not do what his
23        colleague Mr. Solomon did, which is to
24        provide us with a complete listing of
25        those documents.
```

Page 27

```
 1              da Silva Vint
 2          I do not want to spend our time
 3      asking the witness, who has better
 4      things to do with her time, to read me
 5      the Bates numbers of all the documents
 6      she brought with her to the
 7      deposition; however, you are
 8      necessitating some other way of doing
 9      it because of your blatant refusal to
10      provide us with basic information that
11      any person who comes into a deposition
12      room should be prepared to provide.
13          We will give you the opportunity
14      to consider that during the next
15      break, and if that persists to be your
16      position, we're going to ask the
17      witness to provide those Bates numbers
18      to us.
19      Q.   Continuing along the line of our
20  questioning, you identify four different
21  transactions or borrower clients.  I take it
22  each of those are prospective borrower
23  clients or prospective transactions that
24  Brevet is contending were diverted away, not
25  actual transactions that they were expecting
```

```
                                        Page 28
 1                    da Silva Vint
 2     to get; is that a fair characterization of
 3     those four?
 4           A.     No.
 5           Q.     Okay.  Well, why don't you tell
 6     me what's incorrect about that?
 7           A.     The last piece where you say
 8     Brevet was not expecting to get.
 9           Q.     Let's start with ██████   Brevet
10     was expecting to enter into a transaction
11     with ███████
12           A.     In the company's position, yes.
13           Q.     When did Brevet first engage in
14     discussions with █████ about a prospective
15     transaction?
16           A.     I do not recall exactly sitting
17     here right now.
18           Q.     Did you look at that to prepare
19     for this deposition?
20           A.     The discussions I believe began
21     around 2014, but I don't know exactly when
22     the discussions started.
23           Q.     So in or about 2014, who from
24     Brevet engaged in discussions with ███████
25     regarding a prospective transaction for
```

```
                                      Page 29
 1                    da Silva Vint
 2   Brevet?
 3          A.    I think there were a number of
 4   people throughout the years that had
 5   discussions with ████████  around a potential
 6   transaction.
 7          Q.    Can you describe for me -- are
 8   we talking about multiple transactions or
 9   one transaction?
10          A.    It was around a white labeling
11   of Brevet, so it would have involved both
12   investing money in and then white labeling
13   products that Brevet was investing in.
14          Q.    What do you mean by "white
15   labeling"?
16          A.    Meaning that ████████ would
17   potentially put their name on -- alongside
18   Brevet's, which is usually what "white
19   labeling" means in the fund world.
20          Q.    Okay.  Did Brevet enter into a
21   term sheet with ████████  regarding this
22   prospective white labeling transaction?
23          A.    I can't recall exactly sitting
24   here today if it got to a term sheet or if
25   it was e-mail discussions around terms
```

```
                                        Page 30
 1                da Silva Vint
 2   around the potential transaction.
 3        Q.    Can you describe to me the terms
 4   of the transaction that Brevet was expecting
 5   to enter into with ███████████
 6        A.    ███████████ would help raise money
 7   from their clients and Brevet would deploy
 8   that money.
 9        Q.    How much money was Brevet going
10   to deploy?
11        A.    Sorry.  I think the range was
12   between 25 to hundreds of millions of
13   dollars.
14        Q.    The range was between 25 million
15   and hundreds of millions?
16        A.    Correct.
17        Q.    Well, did the parties reach
18   agreement on where along that continuum they
19   were going to land?
20        A.    No.
21        Q.    Why not?
22        A.    It was ongoing discussions.
23        Q.    Was there any specific
24   transaction that the parties were discussing
25   or was it just a general discussion about
```

```
                                        Page 31
 1                  da Silva Vint
 2   potential business?
 3        A.     No.
 4               MR. UNDERWOOD:   Object to the
 5        form of the question.
 6        A.     It's pretty standard what I'm
 7   describing.   They were talking about white
 8   labeling, which is to deploy money with
 9   Brevet into what Brevet is an expert at in
10   terms of lending money out in their
11   programs.
12        Q.     Did Brevet approve this
13   potential transaction as something that it
14   was prepared to engage in with █████████
15        A.     I don't know what you mean by
16   "approve."
17        Q.     Before Brevet enters into a
18   transaction, I assume there is an approval
19   process by which some individual or
20   committee needs to approve the potential
21   transaction; is that right?
22        A.     No.   I mean, it depends what
23   you're talking about.
24        Q.     I'm talking about this type of
25   transaction where Brevet takes on money, as
```

Page 32

```
 1              da Silva Vint
 2    I describe it, and then deploys it.  Does
 3    Brevet just take on money from anybody who
 4    wants to offer it and then deploy it?
 5          A.    No.  But I wouldn't say that
 6    there is -- like that there is an approval
 7    process specific to this type of deal.
 8          Q.    What type of process would
 9    be -- typically be followed in order to move
10    forward with a deal like the one that you're
11    describing?
12          A.    It would likely be discussed at
13    senior management, there would be legal
14    documentation, and then in terms of
15    investments, the transaction would likely
16    have to go through the investment committee.
17          Q.    Did the investment committee
18    consider the potential ████ investment
19    transaction?
20          A.    You have that order wrong.  I
21    said that because they would be investing
22    money, once the money was invested, then it
23    would go into transactions that Brevet does.
24    So once you -- we were getting ready to
25    deploy the money that ████ had given us,
```

Page 33

1              da Silva Vint

2    then it would go into transactions.  Those

3    types of transactions would be approved by

4    an investment committee.

5         Q.      ████  giving money to Brevet

6    would not require any approval process; is

7    that what you're telling me?

8         A.     No, I did not say that.

9              MR. UNDERWOOD:   Object to the

10         form of the question.

11        A.     I didn't not say that.

12        Q.     What approval process would be

13   required for Brevet to take on ████  money?

14        A.     As I stated, there would be

15   discussions among senior management, there

16   would be legal documentation.  Depending on

17   what entity was entering into this

18   transaction with ████  the money would

19   come in, and then depending on whatever the

20   process that ████  came into agreement with

21   Brevet in terms of deploying the money, the

22   deployment into those underlying loans would

23   have to be approved by the investment

24   committee.

25        Q.     How far along did this

Page 34

1                       da Silva Vint
2     particular transaction get; do we have
3     agreements, draft agreements with ████?
4          A.    Sitting here today, I don't know
5     if we have draft agreements.  Like I said
6     before, I think there were e-mails and
7     discussions of the potential term sheet, and
8     ████  had multiple conversations, there was
9     diligence, there were materials provided.
10         Q.    Did ████ ultimately break off
11    discussions with Brevet?
12         A.    Yes.
13         Q.    When did that happen?
14         A.    I don't recall exactly sitting
15    here today when discussions stopped.
16         Q.    Can you tell me approximately
17    when?
18         A.    I believe it was in 2016
19    sometime, maybe --
20         Q.    Who was involved --
21         A.    -- 2017.
22         Q.    Okay.
23               Who was involved in the
24    discussions on the Brevet side and who was
25    involved on the ████ side?

```
                                        Page 35

 1                   da Silva Vint

 2         A.    I don't recall the exact name of

 3    the person at ████     It might have been

 4    the CEO, a man named ███  ███████.  There was

 5    another individual that I can't remember the

 6    name exactly of, who I know that we sought

 7    discovery from during this case.  On the

 8    Brevet side, it would have been Doug, who is

 9    (phonetic) Monticciolo, at some point Brian

10    Lippey was involved, at one point I had a

11    discussions with them as well when they came

12    into our offices.

13         Q.    What was the reason that the

14    ████-Brevet discussions stopped?

15         A.    From the company's position, we

16    believe it was because Paul was having

17    parallel conversations with them about

18    products that he said was his, but were

19    Brevet's.

20         Q.    What is the basis for your

21    belief that the reason the ██████

22    discussions stopped was because

23    Mr. Iacovacci was having conversations with

24    them?

25         A.    I believe that we have e-mails
```

Page 36

```
 1              da Silva Vint
 2  showing that he was having discussions with
 3  them and we don't have a reason to believe,
 4  after they were very interested and excited
 5  about working with us, that they stopped for
 6  any other reason.
 7       Q.    Any other basis for your belief
 8  that the reasons ███████ stopped the
 9  discussions with Brevet was because
10  Mr. Iacovacci was having separate
11  discussions with them beyond what --
12       A.    The company's position is that
13  discussions stopped because of
14  Mr. Iacovacci.
15       Q.    I understand that.  I'm asking
16  you about the basis for that position and
17  you've identified the fact that you have
18  seen side discussions with Mr. Iacovacci and
19  that you couldn't come up with any other
20  explanation for why ███████ would stop
21  discussions with Brevet.  I have that
22  testimony.
23              I want to make sure that there
24  is nothing else, there is no other basis for
25  your position or your belief that the reason
```

```
                                              Page 37
 1                      da Silva Vint
 2      that the discussions stopped was because
 3      Mr. Iacovacci was having side discussions
 4      with them.
 5              A.     In his own capacity?
 6              Q.     In his own capacity, right.
 7                     Any other basis?
 8              A.     No.
 9              Q.     Let's talk about ████████
        ██████████  ████████████.  Was ████████  ████████
        █████████  a potential transaction that Brevet
12      was going to engage in?
13              A.     It could have been.
14              Q.     I'm not asking whether it could
15      have been.  I'm asking whether it was.
16              A.     It was diverted.  So had it been
17      properly brought to Brevet as it should have
18      been, it is a potential transaction that
19      Brevet would have engaged in.
20              Q.     Was ████████  ████████  ████████
21      ever in discussions with Brevet with respect
22      to a prospective transaction?
23              A.     Sitting here today, I do not
24      know.
25              Q.     Did ████████  ████████  ████████
```

```
                                        Page 38
 1                    da Silva Vint
 2   ever engage in any transaction with Brevet?
 3        A.    Like I said, sitting here today,
 4   I do not know.
 5        Q.    What is the basis for your
 6   position that ███████  ████████   ████████  was
 7   a transaction that Brevet would have engaged
 8   in but for Mr. Iacovacci's involvement?
 9        A.    Because we had -- Brevet has
10   done this type of transaction in the past,
11   it is the type of transaction that we would
12   look at and evaluate and determine if we
13   wanted to enter.
14        Q.    What do you mean by "this type
15   of transaction"?
16        A.    Medical receivables, recovery of
17   medical receivables.
18        Q.    Brevet does medical receivable
19   recovery transactions, is that what you're
20   describing?
21        A.    The company has done medical
22   receivable recovery transactions in the
23   past.
24        Q.    And describe to me what those
25   transactions involved?
```

```
                                          Page 39
 1                    da Silva Vint
 2         A.    They involved potentially late
 3    invoices or receivables, and you buy them at
 4    a discount, and you work -- you hire -- work
 5    with people who are recovering them and you
 6    finance those.
 7         Q.    Who is the "you"; is that -- I
 8    heard a bunch of "you"?
 9         A.    Brevet, the company.
10         Q.    Brevet would buy medical
11    receivables at a discount and then do what?
12         A.    Or we would work with someone
13    and we finance that person who was buying
14    them at a discount to recover them.
15         Q.    How many times has Brevet done
16    that type of deal?
17         A.    Sitting here today, I do not
18    know the exact number.  I know that Brevet
19    has done them in the past.
20         Q.    Could you give me an estimate as
21    to how many times Brevet has done that type
22    of transaction?
23         A.    No.
24         Q.    Is it more or less than two?
25         A.    Again, I do not know sitting
```

Page 40

```
 1                    da Silva Vint
 2   here today.
 3        Q.    Can you identify any instance
 4   where Brevet has engaged in that type of
 5   transaction?
 6        A.    Yes.
 7        Q.    Which one can you identify for
 8   me or ones?
 9        A.    Sitting here today, I can't
10   recall the name of the transaction, but I am
11   aware of a transaction where receivables
12   were financed, medical receivables.
13        Q.    What was the volume of the
14   transaction?
15        A.    Millions.
16        Q.    How many millions?
17        A.    Like sitting here today, I don't
18   have that exact detail with me right now.
19        Q.    Does Brevet have -- does the
20   amount of the potential receivable pool
21   matter to Brevet in terms of whether it's
22   something that Brevet wants to get involved
23   in?
24        A.    No, it does not.
25        Q.    So if I came to Brevet and I had
```

                                        Page 41

1                      da Silva Vint

2    a $200 receivable from someone who owes me

3    money in the medical space, Brevet would

4    give serious thought to financing that $200

5    receivable or buying it itself and trying to

6    collect?

7                  MR. UNDERWOOD:  Object to the

8           form of the question.

9           A.    We don't do consumer

10   receivables.

11          Q.    What about medical receivables?

12          A.    If it's a consumer medical

13   receivable, we wouldn't have done it.

14          Q.    Let's say it's a nonconsumer

15   medical receivable.

16                  MR. UNDERWOOD:  Object to the

17          form of the question.

18          A.    So I think your example is very

19   narrow, and I'm not sure is it one $200

20   receivable or part of a program of

21   receivables, multiples receivables?

22          Q.    It's one $200 receivable.

23          A.    Potentially if we had worked

24   with you in the past, and there was a

25   reason, we wanted to test the market, we may

```
                                              Page 42
 1                    da Silva Vint
 2   have done it.
 3         Q.    Has Brevet ever done a
 4   transaction which involved a potential $200
 5   receivable?
 6         A.    Perhaps.  I don't -- sitting
 7   here today, that's not something I looked
 8   at.
 9         Q.    How about the ███████ ████ deal,
10   what was that?
11         A.    It was around financing and ███
12   eligible deal.
13         Q.    For whom?
14         A.    I believe the --
15         Q.    Are you looking at something or
16   talking to someone?
17         A.    I'm looking at the exhibit.
18         Q.    Okay.
19               MR. UNDERWOOD:  Exhibit 15.
20         A.    So there was another deal
21   related to, I think -- I can't recall the
22   individual's name, but it was an ███ deal
23   that Paul diverted away from Brevet.
24         Q.    Sorry.  Are you saying the ███
25   deal that you're testifying to is not listed
```

```
                                          Page 43
 1                 da Silva Vint
 2   on the damages summary that you have
 3   provided us?
 4         A.    Correct, I don't see it on here.
 5         Q.    Why is that not listed?
 6         A.    I don't know why it's not
 7   listed.
 8         Q.    Did you prepare this damages
 9   summary?
10         A.    I did not prepare this damages
11   summary.
12         Q.    Who prepared it?
13         A.    I took part in preparing this
14   damages summary, but I did not necessarily
15   prepare the entire thing by myself.
16         Q.    I didn't ask you if you prepared
17   it by yourself, but you were involved in
18   preparing this damages summary, right?
19         A.    I was, and what I said was it
20   was a deal that was diverted away.  I didn't
21   say that it went into this specific damages
22   summary.
23         Q.    Well, why not; if this was a
24   deal that was diverted away, why does it not
25   appear on the damages summary that you
```

```
                                        Page 44
 1              da Silva Vint
 2   prepared?
 3        A.    Because I don't think everything
 4   that relates to the damages of Paul's
 5   misconduct appears specifically on this
 6   damages summary.
 7        Q.    Well, how did you select what
 8   you were going to put on this damages
 9   summary and what you were going to leave
10   out?
11              MR. UNDERWOOD:  Object to the
12        form of the question.
13        A.    I think we had specific examples
14   of potential investors, real investors who
15   we have a track record with, those type of
16   investors and the size and the types of
17   investments that they would make, we had
18   specific examples of ███████ and the types of
19   transactions, based on the discovery that we
20   have, ████████ et cetera.  I'm not really
21   sure why the ████ deal I'm talking about
22   specifically right now is not on this
23   damages sheet, but I'm just talking about a
24   deal that was diverted away.
25        Q.    I guess I'm not following,
```

```
                                        Page 45
 1                    da Silva Vint
 2   Ms. Da Silva Vint.  You were involved in
 3   preparing this damages summary and you were
 4   involved in answering the question that I
 5   asked you at the beginning of this
 6   deposition.  And when I asked you for
 7   examples, the second thing that you gave me
 8   was the ███████  ███ deal, and yet when I
 9   look at the damages summary that you
10   prepared, it doesn't appear anywhere, and
11   I'm asking you to explain to me why.
12        A.    I just did, and I told you --
13   your question was around clients -- or
14   clients that had been diverted away from
15   Brevet.  And ████████ was one of the examples
16   I gave as clients that had been diverted
17   away from Brevet.
18        Q.    Well, Ms. Da Silva Vint, I don't
19   think that's right.  I think I asked you
20   about clients initially, we talked about
21   investor clients, and then we talked about
22   the borrower clients, we moved on to talking
23   about transactions that you claimed were
24   diverted.  Do you remember you were
25   clarifying that?
```

Page 46

1                    da Silva Vint
2        A.    Yes, and that's actually what I
3    just said.
4        Q.    Well, my apologies if I
5    misunderstood that.  But you understood that
6    the second transaction you identified as
7    Mr. Iacovacci having diverted from Brevet
8    was a ███████  ████ deal that doesn't appear
9    anywhere on the damages summary, two-page
10   Exhibit 15?
11       A.    I'm not understanding the
12   connection you're trying to make.  You asked
13   me about potential clients or investors had
14   been diverted away, examples.  So those are
15   the examples that I remembered.  I'm not
16   sure how that relates to the damages page
17   that you're looking at.
18       Q.    Did you remember the ████████ ████
19   deal in between the time that you were
20   involved in preparing Exhibit 15 and the
21   time that I asked you the questions this
22   afternoon?
23       A.    Did I remember the ███████ ████
24   deal when we were preparing the damages
25   summary, no.

Page 47

```
 1              da Silva Vint
 2         As I was preparing for my
 3    topics, I went to things that have been
 4    produced, affidavits, et cetera, and I
 5    remembered the ████████ ████ deal.
 6         Q.    When did you prepare the damages
 7    summary?
 8         A.    It was weeks ago.  Actually,
 9    when I was supposed to be deposed
10    originally.
11         Q.    Did you think to update the
12    damages summary before you gave it to us or
13    brought it to this deposition?
14         A.    I literally was reviewing stuff
15    right before I walked in here.  There was
16    voluminous information.  And the ████████ ████
17    deal was something I reviewed right before
18    this deposition started.
19         Q.    So you're saying until today you
20    hadn't remembered that there was a ████████
    ████  deal that Brevet contends Mr. Iacovacci
22    diverted; is that fair?
23         A.    I was -- no, my memory is
24    refreshed today.
25              MR. UNDERWOOD:  We are at
```

Page 48

```
 1              da Silva Vint
 2      36 minutes on the record, so I think
 3      the deposition is completed.
 4           MR. CYRULNIK:  The deposition is
 5      not completed.  I'm happy to go -- I'm
 6      happy to talk about this on the record
 7      also.
 8           First of all, Mr. Underwood,
 9      counting deposition time where you're
10      makings speeches or your colleague is
11      making speeches is not deposition time
12      and you know that.  Counting
13      deposition time about trying to
14      educate you about what your
15      obligations to share with us the
16      identity of materials that are brought
17      into a deposition room is not
18      deposition time.  Time spent swearing
19      in the witness is not deposition time.
20      And we already made this record
21      yesterday.
22           We are trying, as you can
23      probably tell, to quickly and
24      efficiently get through the many
25      topics that Ms. Da Silva Vint was
```

Page 49

```
 1              da Silva Vint
 2       designated to serve as a 30(b)(6)
 3       witness on.  We've had some trouble
 4       doing that for reasons that are
 5       obvious.  There has been some
 6       interruptions, there have been
 7       colloquy about what is in the
 8       deposition room, and yesterday there
 9       was more than an hour worth of time
10       that was not spent answering
11       questions, and we made that clear.
12              So our intention is to try and
13       get through these questions with this
14       witness.  It's important for purposes
15       of developing a record in this case.
16              I think the Court would
17       appreciate having Brevet's position at
18       deposition that set forth these types
19       of questions, which again are very
20       targeted and very clear answered.  We
21       think that's what the rules allow and
22       provide for.
23              I obviously can't prevent you or
24       this witness from doing what you're
25       going to do apart from being able to
```

Page 50

```
 1              da Silva Vint
 2       address it by then going to the Court
 3       and explaining what happened and what
 4       didn't happen.
 5            So our intention is to move
 6       extremely quickly as you can tell,
 7       much to the chagrin of the court
 8       reporter, to get through as much of
 9       this material as we can.  We would
10       appreciate your being cooperative in
11       that regard.
12            This witness appears to have
13       prepared for this deposition with the
14       intention of giving us answers to
15       these questions, and I think the most
16       efficient and wise way to go about
17       this would be try to get through this
18       material quickly, which I think we can
19       do.
20            MR. UNDERWOOD:  Mr. Cyrulnik, we
21       have a stipulation that calls for the
22       deposition of Mr. Monticciolo and
23       Ms. Da Silva Vint shall be limited to
24       a total of five hours on the record.
25       Yesterday's deposition was four hours
```

Page 51

```
 1              da Silva Vint
 2         and 24 minutes, which would leave
 3         36 minutes.  We have gone over the
 4         36 minutes today.  It is our view that
 5         the deposition is closed.
 6              MR. CYRULNIK:  Number one, we
 7         reserved an hour yesterday for
 8         Ms. Da Silva Vint's deposition, so
 9         that's just flatout not true.  Number
10         two, you're telling me it was four
11         hours and 24 minutes on the record,
12         that is including portions of the
13         deposition that was not questioning at
14         all, but instead lengthy colloquy that
15         your colleague insisted in putting on
16         the record in order to make sure that
17         record time was increased as much as
18         possible, and that obviously doesn't
19         count against our time.
20              So what we would propose to do,
21         once again, is to continue asking
22         these questions to this witness and
23         getting through them relatively
24         quickly.  I'm hopeful that we would
25         get through these questions within the
```

```
                                    Page 52
 1                 da Silva Vint
 2          next hour, quite hopeful, especially
 3          if we keep up the pace that we're
 4          going at.  That's what we would like
 5          to do.
 6                 MR. UNDERWOOD:  You know as well
 7          as I do that the time on the record
 8          yesterday was four hours and
 9          24 minutes.  Notwithstanding your
10          intent to reserve an hour for
11          Ms. Da Silva Vint, you ate into that
12          hour by going to four hours and
13          24 minutes.  Now, that leaves
14          36 minutes on the record.  On the
15          record.  Not 36 of questioning.  Not
16          36 minutes of answering.  The
17          stipulation is clear, 36 minutes on
18          the record today, four hours and
19          24 minutes on the record yesterday,
20          five hours.
21                 The deposition is closed.  We
22          don't need to go -- we don't need to
23          waste another ten minutes with you
24          stating your position again and me
25          stating my position again.  The reason
```

```
                                       Page 53
 1               da Silva Vint
 2       we asked for and got a stipulation is
 3       so we wouldn't have to have this
 4       argument.
 5               Five hours on the record, five
 6       hours is complete.  We're closing the
 7       deposition.
 8               MR. CYRULNIK:  As I said, your
 9       position reduces the proposition that
10       you and your colleague can take up as
11       much time as you'd like to on the
12       record by insisting that the
13       videographer not turn off the camera
14       while you make long speeches or engage
15       in lengthy attempts to access
16       documents that you brought with you to
17       the deposition.  That obviously is not
18       consistent with the spirit of any
19       agreement to take meaningful 30(b)(6)
20       deposition testimony with respect to
21       important topics concerning Brevet's
22       claims in this case and otherwise.
23               So as I said, we think we can do
24       this relatively quickly.  We don't
25       think there is any world in which
```

Page 54

1              da Silva Vint

2       reviewing the record from yesterday

3       will confirm that there was anything

4       close to four hours and 24 minutes

5       used asking questions to

6       Mr. Monticciolo.  And if your position

7       is that you intended to include in

8       that time that you didn't identify you

9       were going to insist on putting on the

10      record, then we obviously strongly

11      disagree and would think the Court

12      would have the same position.

13          So you can either walk out of

14      the deposition and necessitate

15      judicial intervention or whatever

16      other consequences or we can try to

17      finish this cooperatively.  We

18      obviously prefer the latter, but can't

19      prevent you from taking the former.

20      So I will ask my next --

21          MR. UNDERWOOD:  We're not

22      walking out of the deposition.  We are

23      enforcing the terms of the

24      stipulation, five hours.  It's done.

25      We are concluding the deposition at

```
                                          Page 55
 1               da Silva Vint
 2        this point.
 3               Lengthy recitations of positions
 4        and arguments and things you wished
 5        you had gotten maybe in the
 6        stipulation aren't going to help us.
 7        We're done.
 8               (Continued on following page.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 56

```
 1            da Silva Vint
 2        MR. CYRULNIK:  You can play
 3    technical games, Mr. Underwood, but we
 4    are not closing the deposition.  I'm
 5    asking questions --
 6            (All Reed Smith participants
 7    depart the Zoom deposition.)
 8            (The Court reporter goes off
 9    stenographic record.)
10            THE VIDEOGRAPHER:  Okay,
11    Counsel, I'm going to have to conclude
12    the video recording.
13            (Time noted:  3:01 p.m.)
14                    _____
15                    MEI-LI DA SILVA
16
17  Subscribed and sworn to before me
18  this ___ day of _____, 202_.
19
20  _____
21        Notary Public
22
23
24
25
```

Page 57

1

2              C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                            : ss.

5    COUNTY OF NEW YORK     )

6

7              I, THERESA TRAMONDO, a Notary

8    Public within and for the State of New

9    York, do hereby certify:

10             That MEI-LI DA SILVA, the witness

11   whose deposition is hereinbefore set

12   forth, was duly sworn by me and that such

13   deposition is a true record of the

14   testimony given by the witness.

15             I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I am

18   in no way interested in the outcome of

19   this matter.

20             IN WITNESS WHEREOF, I have

21   hereunto set my hand this 29th day of

22   November, 2021.

23

24

25   THERESA TRAMONDO

Page 58

1

2  ------------ I N D E X --------------

3  WITNESS       EXAMINATION BY        PAGE

4  M. DA SILVA     MR. CYRULNIK         5

5  VINT

6  -------- INFORMATION REQUESTS ---------

7  DIRECTIONS:  (NONE)

8  RULINGS:  (NONE)

9  TO BE FURNISHED:  (NONE)

10  REQUESTS:  20, 24

11  MOTIONS:  (NONE)

12  CONFIDENTIAL:  (NONE)

13

14  ------------- EXHIBITS ---------------

15  EXHIBIT                       FOR ID.

16

17  Exhibit 15, two-page damages        19

18  summary

19

20

21

22

23

24

25

Page 59

```
1                         ERRATA SHEET
                     VERITEXT LEGAL SOLUTIONS
2
       CASE NAME: Iacovacci, Paul v. Brevet Holdings, LLC, 18-Cv-08048
     (S.D.N.Y.)
3      DATE OF DEPOSITION: 11/18/2021
       WITNESSES' NAME: Mei-Li da Silva Vint
4
5      PAGE    LINE (S)        CHANGE                REASON
       ____|_____|_____|_____
6
       ____|_____|_____|_____
7
       ____|_____|_____|_____
8
       ____|_____|_____|_____
9
       ____|_____|_____|_____
10
       ____|_____|_____|_____
11
       ____|_____|_____|_____
12
       ____|_____|_____|_____
13
       ____|_____|_____|_____
14
       ____|_____|_____|_____
15
       ____|_____|_____|_____
16
       ____|_____|_____|_____
17
       ____|_____|_____|_____
18
       ____|_____|_____|_____
19
       ____|_____|_____|_____
20
21                                    _____
                                      Mei-Li da Silva Vint
22     SUBSCRIBED AND SWORN TO BEFORE ME
       THIS ____ DAY OF _____, 20__.
23
24
       _____            _____
25     (NOTARY PUBLIC)                 MY COMMISSION EXPIRES:
```

| & | 3 | ago  47:8 | approved  33:3,23 |

**&**

**&**  2:18

**0**

**06824-5730**  2:20
**08048**  59:2

**1**

**10**  6:12
**10006**  2:6
**10022**  3:7
**11/18/2021**  59:3
**1188048whp**  4:13
**14**  6:13
**15**  19:2,6 42:19
  46:10,20 58:17
**17432**  57:24
**18**  1:11 4:16 59:2
**18cv8048**  1:6
**19**  58:17

**2**

**2**  4:3
**20**  58:10 59:22
**200**  41:2,4,19,22
  42:4
**2000**  2:19
**2014**  28:21,23
**2016**  34:18
**2017**  34:21
**202**  56:18
**2021**  1:11 4:16
  57:22
**203-254-2707**  2:23
**212-205-6003**  3:14
**24**  51:2,11 52:9,13
  52:19 54:4 58:10
**25**  30:12,14
**27**  6:13
**29th**  57:21
**2:01**  1:12
**2:15**  4:17

**3**

**30**  4:5 6:9 10:17
  24:19 25:12 49:2
  53:19
**31**  6:13
**36**  6:13 22:2,12
  48:2 51:3,4 52:14
  52:15,16,17
**38**  6:13
**3:01**  56:13

**5**

**5**  58:4
**55**  2:5
**599**  1:17 3:6 5:21

**6**

**6**  4:5 6:9,12 10:17
  24:19 25:12 49:2
  53:19

**8**

**8**  6:12

**9**

**917-353-3005**  2:15

**a**

**able**  20:17 49:25
**access**  53:15
**action**  19:18 57:17
**actual**  11:5 12:16
  13:14,19 14:18,22
  15:13 16:10,11,20
  27:25
**address**  5:19 10:8
  10:9 50:2
**addressed**  8:23
**adina**  2:9
**advisement**  21:25
**affidavits**  25:24
  47:4
**afternoon**  4:3 6:3
  46:22

ago  47:8
**agreed**  5:2,6
**agreement**  30:18
  33:20 53:19
**agreements**  34:3,3
  34:5
**ahead**  21:6
**al**  1:8 4:12
**alevine**  2:13
**allegedly**  8:24
**allow**  49:21
**alongside**  29:17
**amount**  40:20
**anormyle**  3:13
**answer**  15:10
  20:18
**answered**  20:19
  49:20
**answering**  45:4
  49:10 52:16
**answers**  8:18
  50:14
**anybody**  32:3
**anybody's**  23:15
**aos**  1:19
**apart**  49:25
**apologies**  46:4
**appear**  43:25
  45:10 46:8
**appearance**  2:2
  3:2
**appearances**  5:4
**appearing**  4:6
**appears**  44:5
  50:12
**appreciate**  6:24
  15:9 49:17 50:10
**approval**  31:18
  32:6 33:6,12
**approve**  31:12,16
  31:20

**approved**  33:3,23
**approximately**
  4:17 26:14 34:16
**arguing**  25:20
**argument**  53:4
**arguments**  55:4
**asked**  8:21 24:14
  25:2 45:5,6,19
  46:12,21 53:2
**asking**  6:25 7:2
  8:17 10:14,24
  13:5 14:4 20:17
  21:14 23:12 24:3
  25:3 27:3 36:15
  37:14,15 45:11
  51:21 54:5 56:5
**assembled**  24:12
**association**  4:21
  4:24
**assume**  31:18
**ate**  52:11
**attempts**  53:15
**attorney's**  5:20
**avenue**  1:17 3:6
  5:21
**avery**  3:10
**aware**  40:11

**b**

**b**  4:5 6:9 10:17
  24:19 25:12 49:2
  53:19
**based**  14:4 15:11
  44:19
**basic**  27:10
**basis**  35:20 36:7
  36:16,24 37:7
  38:5
**bates**  27:5,17
**began**  28:20
**beginning**  45:5

**begins** 4:3
**behal** 3:9
**behalf** 4:6 6:19 8:2
**belief** 35:21 36:7
  36:25
**believe** 28:20
  34:18 35:16,25
  36:3 42:14
**better** 27:3
**beyond** 8:7 11:18
  36:11
**binder** 19:15,17
  19:17,24 20:23
  21:5,10 22:6,8,14
  24:9,23,24
**bit** 10:13
**blatant** 27:9
**blood** 57:17
**bob** 18:3,5
**borrowed** 16:13
  16:14,18
**borrower** 16:15
  16:16 17:3,12,13
  17:15 27:21,22
  45:22
**borrowers** 9:6,14
  9:23 10:10,10
  11:19,21 16:8,10
  16:11,11,20,20
  17:10
**borrowing** 16:25
**break** 20:21 27:15
  34:10
**brevet** 1:7 4:6,11
  6:9,18,23 7:5,25
  8:5,12,25 9:12,22
  9:25 10:3 11:17
  11:23 12:2,8,9,13
  12:17 13:2,3,6
  14:10,11,13,15,16
  14:16,18,23,24

15:14 16:2,3,13,15
  16:18,21 17:17
  27:24 28:8,9,13,24
  29:2,11,13,20 30:4
  30:7,9 31:9,9,12
  31:17,25 32:3,23
  33:5,13,21 34:11
  34:24 35:8,14
  36:9,21 37:11,17
  37:19,21 38:2,7,9
  38:18 39:9,10,15
  39:18,21 40:4,19
  40:21,22,25 41:3
  42:3,23 45:15,17
  46:7 47:21 59:2
**brevet's** 7:25 13:8
  29:18 35:19 49:17
  53:21
**brian** 35:9
**bring** 20:9,14
  24:21
**bringing** 17:2
**broaden** 16:22
**broadway** 2:5
**brodsky** 3:17 4:19
**brought** 20:23
  21:10 22:19 25:12
  26:21 27:6 37:17
  47:13 48:16 53:16
**bunch** 39:8
**business** 31:2
**buy** 39:3,10
**buying** 39:13 41:5

**c**

**c** 57:2,2
**called** 5:12
**calls** 50:21
**camera** 53:13
**capacity** 6:8 37:5
  37:6

**capital** 4:7
**case** 4:12 24:13,14
  35:7 49:15 53:22
  59:2
**catalina** 7:10,18
  7:20 8:8 12:12,25
  16:4
**categories** 8:22
  9:20
**category** 9:8 16:7
**caveats** 15:21
**ceo** 35:4
**certify** 57:9,15
**cetera** 44:20 47:4
**cf** 2:11,12,13,14
**chagrin** 50:7
**change** 6:2 59:5
**characterization**
  28:2
**choose** 22:12 26:3
**claimed** 45:23
**claims** 20:16 53:22
**clarifying** 45:25
**clear** 22:17 49:11
  49:20 52:17
**clearly** 13:24
**client** 7:4,12,15
  8:13 9:17 17:8
**clients** 6:17,22 7:8
  7:22,23,24 8:4,23
  9:3,4,4,7,12,20,21
  9:24 10:3 11:16
  11:18,22,25 12:6
  17:13 27:21,23
  30:7 45:13,14,16
  45:20,21,22 46:13
**close** 54:4
**closed** 19:13 51:5
  52:21
**closing** 53:6 56:4

**clr** 1:19
**colin** 3:8
**colleague** 23:9,22
  26:23 48:10 51:15
  53:10
**collect** 41:6
**colloquy** 26:13
  49:7 51:14
**come** 33:19 36:19
**comes** 27:11
**commission** 59:25
**commit** 24:4 26:8
**committee** 31:20
  32:16,17 33:4,24
**company** 1:8 6:20
  8:3 10:25 38:21
  39:9
**company's** 11:2
  15:4 28:12 35:15
  36:12
**complete** 17:8
  26:24 53:6
**completed** 48:3,5
**concerning** 53:21
**conclude** 56:11
**concluding** 54:25
**confidential** 58:12
**confirm** 54:3
**conjunction** 19:25
**connecticut** 2:20
**connection** 46:12
**consequences**
  54:16
**consider** 27:14
  32:18
**consistent** 53:18
**consumer** 41:9,12
**cont'd** 3:2
**contend** 12:14
**contending** 27:24

**contends** 16:2
  47:21
**continue** 51:21
**continued** 55:8
**continuing** 27:19
**continuum** 30:18
**conversations**
  34:8 35:17,23
**cooperative** 50:10
**cooperatively**
  54:17
**copy** 25:4
**corporate** 6:8
**correct** 7:14 12:14
  16:5,7 30:16 43:4
**correctly** 13:3
**counsel** 2:2,17 3:2
  5:2 20:2,10 22:9
  56:11
**count** 23:24 26:16
  51:19
**counting** 48:9,12
**county** 57:5
**course** 26:22
**court** 1:2 4:14,23
  5:3,7,9 49:16 50:2
  50:7 54:11 56:8
**creates** 23:11
**cunderwood** 3:11
**cv** 59:2
**cyrulnik** 2:4,7
  5:23 21:9,17,21
  22:16 23:4 24:7
  24:16 25:18 26:12
  48:4 50:20 51:6
  53:8 56:2 58:4

**d**

**d** 5:11 58:2
**da** 1:15 4:5 5:18
  6:1,3 7:1 8:1,15
  9:1 10:1,12,24

11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1,20 19:1
20:1 21:1 22:1,7
22:13 23:1,12,25
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1,2,18 46:1
47:1 48:1,25 49:1
50:1,23 51:1,8
52:1,11 53:1 54:1
55:1 56:1,15
57:10 58:4 59:3
59:21
**damage** 19:19
**damages** 18:22
  19:2 43:2,8,10,14
  43:18,21,25 44:4,6
  44:8,23 45:3,9
  46:9,16,24 47:6,12
  58:17
**date** 19:4 59:3
**day** 56:18 57:21
  59:22
**deal** 7:3 17:23
  18:11,16 32:7,10
  39:16 42:9,12,20
  42:22,25 43:20,24
  44:21,24 45:8
  46:8,19,24 47:5,17
  47:21
**deals** 6:16,22
  16:22,23 17:4,14
  17:15 18:9
**decide** 23:16

**defendants** 1:9 3:4
  4:12
**defining** 9:4
**definition** 9:16
**definitively** 15:7
**delaware** 1:7
**depart** 56:7
**depending** 33:16
  33:19
**depends** 31:22
**deploy** 30:7,10
  31:8 32:4,25
**deploying** 33:21
**deployment** 33:22
**deploys** 32:2
**deponent's** 5:7
**deposed** 47:9
**deposition** 1:15
  4:5,9 8:16 10:17
  11:7,11,14 20:9,14
  20:24 21:11,12
  22:3,13,20 23:3,10
  24:10,22 25:13,14
  26:3,17 27:7,11
  28:19 45:6 47:13
  47:18 48:3,4,9,11
  48:13,17,18,19
  49:8,18 50:13,22
  50:25 51:5,8,13
  52:21 53:7,17,20
  54:14,22,25 56:4,7
  57:11,13 59:3
**describe** 16:16,17
  29:7 30:3 32:2
  38:24
**describing** 19:7
  31:7 32:11 38:20
**designated** 6:10
  49:2
**detail** 40:18

**determine** 38:12
**developing** 49:15
**difference** 13:17
  13:22
**different** 8:22
  27:20
**diligence** 34:9
**directions** 58:7
**disagree** 21:17
  54:11
**disconnect** 10:13
  13:16 14:2
**discount** 39:4,11
  39:14
**discovery** 19:18
  25:23 35:7 44:19
**discussed** 32:12
**discussing** 30:24
**discussion** 30:25
**discussions** 28:14
  28:20,22,24 29:5
  29:25 30:22 33:15
  34:7,11,15,24
  35:11,14,22 36:2,9
  36:11,13,18,21
  37:2,3,21
**distinction** 16:9
**distinguished** 13:6
**district** 1:2,2 4:14
  4:14
**diverted** 6:18,22
  7:5,13,16,25 8:4
  8:24 9:8,22,24
  10:3 11:17,22
  12:2,14,18 13:8,13
  14:24 15:14 16:2
  16:21,23 17:5,16
  27:24 37:16 42:23
  43:20,24 44:24
  45:14,16,24 46:7
  46:14 47:22

**document** 19:7
24:9
**documentation**
32:14 33:16
**documents** 6:20
20:3,6,7,8,13,15
21:7,10 22:5,8,19
24:12,15,21 25:5,7
25:11,16,17,23
26:6,7,9,11,20,25
27:5 53:16
**doing** 6:6 23:17
27:8 49:4,24
**dollars** 30:13
**doug** 35:8
**draft** 34:3,5
**duly** 5:12 57:12
**dumain** 2:10

**e**

**e** 5:11 6:21 8:11,12
8:13,16 10:5,6,8,8
10:15,19,20 11:5,9
11:10,13,13 24:6
29:25 34:6 35:25
57:2,2 58:2
**eastern** 4:17
**eb5** 17:22,23 18:11
42:9,11,22,24
44:21 45:8 46:8
46:18,23 47:5,16
47:21
**educate** 48:14
**efficient** 23:14
50:16
**efficiently** 48:24
**either** 20:22 24:6
25:3 54:13
**eligible** 42:12
**enforcing** 54:23
**engage** 28:13
31:14 37:12 38:2

53:14
**engaged** 28:24
37:19 38:7 40:4
**enter** 28:10 29:20
30:5 38:13
**entered** 5:3
**entering** 33:17
**enters** 31:17
**entire** 43:15
**entitled** 21:13
**entity** 16:14 33:17
**equate** 17:4
**errata** 59:1
**especially** 52:2
**esq** 2:7,8,9,10,21
3:8,9,10
**estimate** 39:20
**et** 1:8 4:12 44:20
47:4
**evaluate** 38:12
**exact** 35:2 39:18
40:18
**exactly** 28:16,21
29:23 34:14 35:6
**examination** 5:22
58:3
**examined** 5:13
**example** 7:8,10,18
9:7 10:22 41:18
**examples** 7:17,21
9:2,9 10:23 44:13
44:18 45:7,15
46:14,15
**exception** 17:9
**excited** 36:4
**exhibit** 19:2,6,6
42:17,19 46:10,20
58:15,17
**exhibits** 58:14
**expecting** 27:25
28:8,10 30:4

**expert** 31:9
**expires** 59:25
**explain** 14:2,11
45:11
**explaining** 50:3
**explanation** 36:20
**extremely** 50:6

**f**

**f** 57:2
**fact** 36:17
**facts** 20:18
**fair** 8:9 14:25
15:15 17:9 20:20
28:2 47:22
**fairfield** 2:20
**far** 7:22 21:4
33:25
**fattaruso** 2:4,8
**finance** 39:6,13
**financed** 40:12
**financing** 41:4
42:11
**finds** 26:10
**finish** 54:17
**first** 7:12 8:22
28:13 48:8
**five** 50:24 52:20
53:5,5 54:24
**flatout** 51:9
**floor** 2:5
**focus** 8:20
**followed** 32:9
**following** 44:25
55:8
**follows** 5:14
**force** 22:21
**form** 12:20 13:11
13:21 15:3,17
17:19 31:5 33:10
41:8,17 44:12

**former** 54:19
**forth** 49:18 57:12
**forward** 32:10
**forwarded** 10:7
**four** 26:14 27:20
28:3 50:25 51:10
52:8,12,18 54:4
**front** 18:19 19:8
19:10,12,14 20:4
24:24 25:14
**fully** 20:18
**fund** 29:19
**furnished** 58:9
**further** 57:15

**g**

**games** 56:3
**general** 30:25
**getting** 32:24
51:23
**give** 21:6 22:22
27:13 39:20 41:4
**given** 32:25 57:14
**giving** 7:17 9:6
23:21 24:4 26:8
33:5 50:14
**go** 7:11 8:10 10:5
10:15,19,21 16:8
17:7 18:7 21:6
32:16,23 33:2
48:5 50:16 52:22
**goes** 56:8
**going** 11:2 20:17
21:6,18,21,24 22:4
22:21 23:6,17
25:10 26:7 27:16
30:9,19 37:12
44:8,9 49:25 50:2
52:4,12 54:9 55:6
56:11
**good** 4:2 6:3

**gotten** 55:5
**great** 8:18
**guess** 44:25

**h**

**hand** 57:21
**happen** 34:13 50:4
**happened** 50:3
**happy** 48:5,6
**harvest** 17:20
  18:10 37:9,10,20
  37:25 38:6
**hear** 13:3
**heard** 39:8
**held** 1:16
**help** 30:6 55:6
**hereinbefore**
  57:11
**hereunto** 57:21
**hire** 39:4
**holding** 4:11
**holdings** 1:7 59:2
**hopeful** 51:24 52:2
**hour** 49:9 51:7
  52:2,10,12
**hours** 50:24,25
  51:11 52:8,12,18
  52:20 53:5,6 54:4
  54:24
**howard** 3:17 4:19
**hundreds** 10:20
  11:13 30:12,15

**i**

**iacovacci** 1:3 4:10
  6:18 7:4,24 8:24
  9:21 11:17 12:14
  12:18 13:8 14:25
  15:14 16:3,21
  17:5,16 35:23
  36:10,14,18 37:3
  46:7 47:21 59:2

**iacovacci's** 38:8
**ian** 2:10
**identification**
  12:24 19:3
**identified** 9:12
  18:10 24:22 36:17
  46:6
**identify** 7:3,24 8:7
  8:21 9:21 11:16
  11:21,25 12:4,17
  14:23 15:13,24
  16:20 17:14 20:8
  20:13 24:11 25:16
  26:5 27:20 40:3,7
  54:8
**identity** 48:16
**idumain** 2:14
**implicated** 24:15
**important** 14:6
  49:14 53:21
**improper** 22:20
  24:25
**include** 6:22 9:3,5
  9:5 54:7
**included** 8:13
**includes** 10:9
**including** 6:21
  9:13 16:25 51:12
**incorrect** 28:6
**increased** 51:17
**index** 20:22 22:24
  23:7 25:4
**individual** 16:14
  31:19 35:5
**individual's** 42:22
**information** 23:21
  27:10 47:16 58:6
**initially** 45:20
**insist** 54:9
**insisted** 51:15

**insisting** 53:12
**instance** 40:3
**intended** 54:7
**intent** 52:10
**intention** 49:12
  50:5,14
**interested** 36:4
  57:18
**interruptions** 49:6
**intervention** 54:15
**invest** 14:15
**invested** 14:13,15
  14:18 32:22
**investing** 29:12,13
  32:21
**investment** 32:16
  32:17,18 33:4,23
**investments** 32:15
  44:17
**investor** 9:7 10:11
  11:25 12:6,7
  13:18,19 14:10,11
  14:16,19 16:6
  45:21
**investors** 9:5,13
  9:23 10:10 11:19
  11:21,24 12:7,8,9
  12:10,13,16 13:2,2
  13:6,7 14:23
  15:13,20,25 17:13
  17:15 44:14,14,16
  46:13
**invoices** 39:3
**involved** 29:11
  34:20,23,25 35:10
  38:25 39:2 40:22
  42:4 43:17 45:2,4
  46:20
**involvement** 38:8

**j**

**jason** 2:7
**jcyrulnik** 2:11
**jointly** 20:5
**judicial** 54:15

**k**

**kapoor** 35:4
**keep** 52:3
**know** 8:17 9:3,19
  13:24 15:5,7,10
  21:23 22:3 24:10
  28:21 31:15 34:4
  35:6 37:24 38:4
  39:18,18,25 43:6
  48:12 52:6

**l**

**l** 5:11,11
**labeling** 29:10,12
  29:15,19,22 31:8
**land** 30:19
**late** 39:2
**leave** 44:9 51:2
**leaves** 52:13
**legal** 3:18 4:20,21
  32:13 33:16 59:1
**lending** 31:10
**lengthy** 51:14
  53:15 55:3
**levine** 2:9
**lexington** 1:17 3:6
  5:21
**li** 1:15 4:5 5:18
  56:15 57:10 59:3
  59:21
**liability** 1:7
**likened** 26:19
**limited** 1:7 50:23
**line** 27:19 59:5
**linking** 17:10

**lippey**  35:10
**list**  6:16 7:21 8:3
  10:19 17:7,8
  20:24 21:2,7,23
  22:8,14,18 23:7
  24:5 25:22
**listed**  12:5 42:25
  43:5,7
**listing**  22:5 25:4
  25:11 26:8,24
**lists**  8:14 10:11
**literally**  47:14
**ll106**  2:19
**llc**  1:7 2:18 4:11
  59:2
**llp**  1:17 2:4 3:5
**llp.com**  2:11,12,13
  2:14
**loans**  33:22
**located**  4:22
**location**  4:7
**long**  53:14
**look**  19:5 24:13
  26:10 28:18 38:12
  45:9
**looked**  23:2 24:8
  26:6 42:7
**looking**  9:9 21:8
  42:15,17 46:17
**looks**  25:16

**m**

**m**  5:11 58:4
**mail**  8:12,13 10:8
  10:8,15 24:6
  29:25
**mails**  6:21 8:11,16
  10:5,6,19,20 11:5
  11:9,10,13,13 34:6
  35:25
**making**  48:11

**makings**  48:10
**man**  35:4
**management**  4:7
  32:13 33:15
**manhattan**  4:8
**marked**  19:3
**market**  41:25
**marriage**  57:17
**material**  50:9,18
**materials**  34:9
  48:16
**matter**  4:10 40:21
  57:19
**mean**  14:6,12
  29:14 31:15,22
  38:14
**meaning**  29:16
**meaningful**  53:19
**means**  29:19
**medical**  38:16,17
  38:18,21 39:10
  40:12 41:3,11,12
  41:15
**mei**  1:15 4:5 5:18
  56:15 57:10 59:3
  59:21
**memory**  47:23
**million**  30:14
**millions**  30:12,15
  40:15,16
**mind**  14:21 16:19
**minnesota**  7:9,12
  8:8 12:12,24 16:4
**minutes**  22:2,12
  26:15 48:2 51:2,3
  51:4,11 52:9,13,14
  52:16,17,19,23
  54:4
**misconduct**  44:5
**misunderstood**
  46:5

**moment**  18:6
**money**  29:12 30:6
  30:8,9 31:8,10,25
  32:3,22,22,25 33:5
  33:13,18,21 41:3
**monticciolo**  25:25
  26:21 35:9 50:22
  54:6
**motions**  58:11
**move**  32:9 50:5
**moved**  45:22
**multiple**  29:8 34:8
**multiples**  41:21

**n**

**n**  5:11 58:2
**name**  4:19 5:16
  29:17 35:2,6
  40:10 42:22 59:2
  59:3
**named**  35:4
**narrow**  41:19
**necessarily**  43:14
**necessitate**  54:14
**necessitates**  23:12
**necessitating**  27:8
**need**  8:15 20:19
  26:10 52:22,22
**needs**  31:20
**new**  1:2,17,17,20
  2:6,6 3:7,7 4:8,15
  4:22,23 5:21,21
  57:3,5,8
**nokley**  18:3,5,12
  44:18
**nonconsumer**
  41:14
**normyle**  3:10
**notary**  1:19 5:13
  56:21 57:7 59:25
**note**  5:25 26:12,18

**noted**  56:13
**notice**  1:18
**notwithstanding**
  52:9
**november**  1:11
  4:16 57:22
**number**  4:12 8:4,6
  29:3 39:18 51:6,9
**numbers**  27:5,17

**o**

**oath**  5:8
**object**  12:19 13:10
  13:20 15:2,16
  17:18 31:4 33:9
  41:7,16 44:11
**obligation**  23:23
  24:11,17
**obligations**  48:15
**obvious**  49:5
**obviously**  23:18
  24:19 26:16 49:23
  51:18 53:17 54:10
  54:18
**offer**  32:4
**office**  5:20
**offices**  1:16 4:22
  35:12
**okay**  7:7 11:15
  13:15 14:19,20,21
  17:21,25 18:18
  21:2,20 28:5
  29:20 34:22 42:18
  56:10
**once**  32:22,24
  51:21
**ones**  25:25 26:20
  40:8
**ongoing**  30:22
**open**  19:11,14
  21:16

**opened**  21:5
**opinion**  13:9
**opportunity**  27:13
**order**  11:6 32:9,20
  51:16
**originally**  47:10
**outcome**  57:18
**owes**  41:2

**p**

**p.m.**  1:12 4:17
  56:13
**pace**  52:3
**page**  9:10 18:24
  19:2 46:9,16 55:8
  58:3,17 59:5
**pages**  22:14
**papers**  18:19
**parallel**  35:17
**part**  24:9 41:20
  43:13
**participants**  56:6
**particular**  34:2
**parties**  5:5 30:17
  30:24 57:16
**partners**  37:10,11
  37:20,25 38:6
**paul**  1:3 2:8 4:10
  8:4 9:24 10:3
  11:22,25 35:16
  42:23 59:2
**paul's**  44:4
**people**  29:4 39:5
**persists**  27:15
**person**  27:11 35:3
  39:13
**personal**  8:13 10:8
**perspective**  15:4
**pfattaruso**  2:12
**phonetic**  35:9
**piece**  28:7

**plaintiff**  1:4 2:3,17
  4:9,11 15:7
**play**  56:2
**please**  5:9,17 8:19
**point**  6:20 24:5
  35:9,10 55:2
**pool**  40:20
**portions**  51:12
**position**  23:18
  27:16 28:12 35:15
  36:12,16,25 38:6
  49:17 52:24,25
  53:9 54:6,12
**positions**  11:3
  15:9 55:3
**possible**  51:18
**post**  2:19
**potential**  9:5,6,15
  9:18 10:10 11:22
  12:7,9,10,13,25
  13:7,14,18 14:10
  14:16 15:19,25
  16:6,10,16,23 29:5
  30:2 31:2,13,20
  32:18 34:7 37:11
  37:18 40:20 42:4
  44:14 46:13
**potentially**  29:17
  39:2 41:23
**prefer**  54:18
**prepare**  10:16
  11:6,11,13 28:18
  43:8,10,15 47:6
**prepared**  10:18
  19:24,25 20:5
  27:12 31:14 43:12
  43:16 44:2 45:10
  50:13
**preparing**  43:13
  43:18 45:3 46:20
  46:24 47:2

**present**  3:16
**pretty**  31:6
**prevent**  49:23
  54:19
**prior**  23:9
**probably**  48:23
**problem**  23:11
**proceeding**  5:4
**process**  31:19 32:7
  32:8 33:6,12,20
**produced**  6:21
  8:11 10:6,21
  15:11,12,23,23
  18:22 19:22 47:4
**production**  15:6
**products**  29:13
  35:18
**program**  41:20
**programs**  31:11
**properly**  37:17
**propose**  51:20
**proposition**  53:9
**prospective**  6:17
  7:4 27:22,23
  28:14,25 29:22
  37:22
**provide**  21:22
  22:4,18 23:7 25:2
  25:10 26:24 27:10
  27:12,17 49:22
**provided**  34:9
  43:3
**providing**  22:23
**public**  1:19 5:13
  56:21 57:8 59:25
**purposes**  14:17
  49:14
**pursuant**  1:18
**put**  29:17 44:8
**putting**  51:15 54:9

**q**

**qualified**  12:23
**question**  11:4
  12:20,22 13:11,21
  14:17 15:3,17
  17:19 24:3,14,18
  24:20 25:9 31:5
  33:10 41:8,17
  44:12 45:4,13
**questioning**  26:17
  27:20 51:13 52:15
**questions**  8:17,18
  8:20 10:14,25
  26:4 46:21 49:11
  49:13,19 50:15
  51:22,25 54:5
  56:5
**quickly**  18:8 48:23
  50:6,18 51:24
  53:24
**quite**  52:2

**r**

**r**  57:2
**raise**  30:6
**range**  30:11,14
**rbehal**  3:12
**reach**  30:17
**read**  23:13,20 27:4
**reading**  25:22
**ready**  5:24 32:24
**real**  44:14
**really**  44:20
**reason**  35:13,21
  36:3,6,25 41:25
  52:25 59:5
**reasonable**  25:5
**reasons**  36:8 49:4
**recall**  28:16 29:23
  34:14 35:2 40:10
  42:21

**receivable** 38:18 38:22 40:20 41:2 41:5,13,15,20,22 42:5
**receivables** 38:16 38:17 39:3,11 40:11,12 41:10,11 41:21,21
**recitations** 55:3
**record** 5:5,16,25 21:23 22:17 23:13 23:20 24:6 26:13 26:18 44:15 48:2 48:6,20 49:15 50:24 51:11,16,17 52:7,14,15,18,19 53:5,12 54:2,10 56:9 57:13
**recorded** 4:4
**recording** 56:12
**recover** 39:14
**recoveries** 18:10
**recovering** 39:5
**recovery** 17:20 37:10,10,20,25 38:6,16,19,22
**reduces** 53:9
**reed** 1:16 3:5 56:6
**reedsmith.com** 3:11,12,13
**refer** 16:12
**reference** 24:23
**referenced** 19:19
**referencing** 10:16 11:6
**refreshed** 47:24
**refusal** 27:9
**refuse** 21:19,22 23:6 25:10
**refused** 22:18

**regard** 50:11
**regarding** 28:25 29:21
**reinsurance** 7:19 7:20 8:9 12:12,25 16:5
**related** 8:11 18:2,4 18:11 19:15,22 20:16 24:19 42:21 57:16
**relates** 44:4 46:16
**relatively** 51:23 53:24
**remember** 35:5 45:24 46:18,23
**remembered** 46:15 47:5,20
**remote** 4:4
**remotely** 5:8
**reporter** 4:23 5:3 5:7,9,15 50:8 56:8
**representing** 10:25
**request** 21:25 25:8
**requests** 58:6,10
**require** 33:6
**required** 33:13
**requiring** 23:19
**rereview** 11:12
**reserve** 52:10
**reserved** 51:7
**respect** 15:19 37:21 53:20
**respond** 24:18
**responses** 19:18 25:24
**rest** 25:20,21
**review** 11:5,10
**reviewed** 11:8 47:17

**reviewing** 10:18 47:14 54:2
**right** 6:14 8:25 9:14 28:17 31:21 37:6 40:18 43:18 44:22 45:19 47:15 47:17
**road** 2:19
**robert** 18:12
**room** 20:14 21:11 21:12 25:14 27:12 48:17 49:8
**rq** 20:20 24:16
**ruhi** 3:9
**rules** 49:21
**rulings** 58:8

## s

**s** 5:11 59:5
**s.d.n.y.** 59:2
**saying** 42:24 47:19
**scott** 2:21,22
**second** 45:7 46:6
**see** 13:15 43:4
**seen** 36:18
**select** 44:7
**selected** 20:3,6
**selecting** 20:7
**send** 20:22 25:6
**senior** 32:13 33:15
**sense** 16:24
**sent** 8:12
**separate** 36:10
**serious** 41:4
**serve** 49:2
**set** 49:18 57:11,21
**share** 19:6 48:15
**sheet** 29:21,24 34:7 44:23 59:1
**showing** 36:2
**sic** 4:13

**side** 17:3,8 34:24 34:25 35:8 36:18 37:3
**signature** 57:24
**silva** 1:15 4:5 5:18 6:1,3 7:1 8:1,15 9:1 10:1,12,24 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,20 19:1 20:1 21:1 22:1,7 22:13 23:1,12,25 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1,2,18 46:1 47:1 48:1,25 49:1 50:1,23 51:1,8 52:1,11 53:1 54:1 55:1 56:1,15 57:10 58:4 59:3 59:21
**similar** 25:24
**single** 24:8
**sit** 8:3
**sitting** 11:15,20 15:10,20,24 28:16 29:23 34:4,14 37:23 38:3 39:17 39:25 40:9,17 42:6
**size** 44:16
**slowly** 7:11
**smith** 1:16 3:5 56:6
**solomon** 20:25 23:8 26:23

| | | | |
|---|---|---|---|
| **solutions** 3:18 | **states** 1:2 4:13 | **t** | **things** 8:22 10:7,9 |
| 4:22 59:1 | **stating** 52:24,25 | | 27:4 47:3 55:4 |
| **sorry** 17:13 18:13 | **stealth** 17:22,23 | **t** 5:11 57:2,2 | **think** 8:23 13:15 |
| 30:11 42:24 | 18:11 42:9 45:8 | **table** 25:8 | 18:22 22:20 23:14 |
| **sought** 35:6 | 45:15 46:8,18,23 | **take** 5:7 14:22 | 29:3 30:11 34:6 |
| **sounds** 5:24 | 47:5,16,20 | 18:12 19:5 21:25 | 41:18 42:21 44:3 |
| **southern** 1:2 4:14 | **stenographic** 5:5 | 23:18 27:21 32:3 | 44:13 45:19,19 |
| **space** 41:3 | 56:9 | 33:13 53:10,19 | 47:11 48:2 49:16 |
| **speaking** 6:19 8:2 | **stipulated** 5:6 | **taken** 4:9 26:14 | 49:21 50:15,18 |
| **specialist** 4:20 | **stipulation** 50:21 | **takes** 31:25 | 53:23,25 54:11 |
| **specific** 10:22 | 52:17 53:2 54:24 | **talk** 17:12 37:9 | **third** 2:5 |
| 15:25 30:23 32:7 | 55:6 | 48:6 | **thought** 41:4 |
| 43:21 44:13,18 | **stop** 36:20 | **talked** 20:15 45:20 | **three** 8:21 18:9 |
| **specifically** 44:5 | **stopped** 34:15 | 45:21 | 26:14 |
| 44:22 | 35:14,22 36:5,8,13 | **talking** 23:5 29:8 | **thursday** 4:15 |
| **speeches** 48:10,11 | 37:2 | 31:7,23,24 42:16 | **time** 4:16,18 22:22 |
| 53:14 | **strongly** 54:10 | 44:21,23 45:22 | 23:15,17,25 24:3 |
| **spend** 25:19,21 | **stuff** 19:21 47:14 | **targeted** 49:20 | 25:20,21 26:2,15 |
| 26:2 27:2 | **subcategories** 9:13 | **technical** 56:3 | 26:17 27:2,4 |
| **spent** 48:18 49:10 | 9:16,19 | **tell** 8:6 11:2 28:5 | 46:19,21 48:9,11 |
| **spirit** 53:18 | **subject** 15:21 | 34:16 48:23 50:6 | 48:13,18,18,19 |
| **sprott** 18:14,17,18 | **subscribed** 56:17 | **telling** 33:7 51:10 | 49:9 51:17,19 |
| 28:9,11,14,24 29:5 | 59:22 | **ten** 52:23 | 52:7 53:11 54:8 |
| 29:16,21 30:5,6 | **substantial** 10:7 | **term** 14:5 16:12 | 56:13 |
| 31:14 32:18,25 | **suite** 2:19 | 16:15 29:21,24 | **times** 39:15,21 |
| 33:5,13,18,20 34:3 | **summary** 18:23 | 34:7 | **today** 4:15 11:15 |
| 34:8,10,25 35:3,14 | 18:24 19:3,19 | **terms** 13:23 14:12 | 11:20 15:11,20,24 |
| 35:21 36:8,20 | 43:2,9,11,14,18,22 | 14:21 29:25 30:3 | 19:23 29:24 34:4 |
| 44:20 | 43:25 44:6,9 45:3 | 31:10 32:14 33:21 | 34:15 37:23 38:3 |
| **ss** 57:4 | 45:9 46:9,25 47:7 | 40:21 54:23 | 39:17 40:2,9,17 |
| **standard** 4:18 | 47:12 58:18 | **test** 41:25 | 42:7 47:19,24 |
| 31:6 | **supporting** 20:16 | **testified** 5:14 | 51:4 52:18 |
| **start** 5:25 7:7 | **supposed** 47:9 | **testify** 6:8 | **told** 45:12 |
| 11:24 28:9 | **sure** 7:8 9:10 | **testifying** 42:25 | **topics** 6:10,12 |
| **started** 28:22 | 36:23 41:19 44:21 | **testimony** 36:22 | 19:16,22 20:11,19 |
| 47:18 | 46:16 51:16 | 53:20 57:14 | 24:20 47:3 48:25 |
| **state** 1:20 5:16 | **swear** 5:10 | **thank** 6:6 | 53:21 |
| 57:3,8 | **swearing** 48:18 | **theresa** 1:18 4:24 | **total** 50:24 |
| **stated** 33:14 | **sworn** 5:13 56:17 | 57:7,25 | **track** 44:15 |
| **statements** 20:18 | 57:12 59:22 | **thing** 8:23 43:15 | **tramondo** 1:19 |
| | | 45:7 | 4:24 57:7,25 |

**transaction** 7:3,10
  17:2 28:10,15,25
  29:6,9,22 30:2,4
  30:24 31:13,18,21
  31:25 32:15,19
  33:18 34:2 37:11
  37:18,22 38:2,7,10
  38:11,15 39:22
  40:5,10,11,14 42:4
  46:6
**transactions** 6:17
  17:4,15 18:2,4,11
  27:21,23,25 29:8
  32:23 33:2,3
  38:19,22,25 44:19
  45:23
**trouble** 49:3
**true** 51:9 57:13
**try** 49:12 50:17
  54:16
**trying** 41:5 46:12
  48:13,22
**turn** 10:5 22:13
  53:13
**two** 7:22 9:7,13,15
  12:5,12 13:23
  14:12 15:24,25
  18:24 19:2 39:24
  46:9 51:10 58:17
**type** 31:24 32:7,8
  38:10,11,14 39:16
  39:21 40:4 44:15
**types** 9:2,24 10:2
  11:16,18 33:3
  44:16,18 49:18
**typically** 32:9

**u**

**ultimately** 34:10
**underlying** 33:22
**understand** 6:7
  12:21 13:12,17,22

14:3,6,7 15:8
  36:15
**understanding**
  13:25 46:11
**understood** 46:5
**underwood** 3:8
  12:19 13:10,20
  15:2,16 17:18
  21:4,9,15,20,24
  22:11,16,25 23:4
  24:7,17 25:15,19
  26:19 31:4 33:9
  41:7,16 42:19
  44:11 47:25 48:8
  50:20 52:6 54:21
  56:3
**underwood's**
  26:13
**united** 1:2 4:13
**university** 7:9,12
  8:8 12:11,24 16:4
**update** 47:11
**usage** 14:5
**use** 14:14 16:9,12
  16:15 22:12,21
  23:14 24:2
**usually** 29:18

**v**

**v** 5:11,11 59:2
**various** 18:2,4
**veritext** 3:17 4:21
  4:25 59:1
**versus** 4:11 14:10
**video** 4:4,20 56:12
**videographer** 3:17
  4:2 53:13 56:10
**view** 7:25 14:7,9
  51:4
**vik** 35:4
**vint** 1:16 4:6 5:18
  6:1,4 7:1 8:1,15

9:1 10:1,12,24
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1,20 19:1
  20:1 21:1 22:1,7
  22:13 23:1,12,25
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1,2,18 46:1
  47:1 48:1,25 49:1
  50:1,23 51:1 52:1
  52:11 53:1 54:1
  55:1 56:1 58:5
  59:3,21
**vint's** 51:8
**virtual** 4:4
**volume** 4:3 40:13
**voluminous** 15:5
  22:10 47:16
**voluntarily** 24:5
**vs** 1:5

**w**

**walk** 8:16 54:13
**walked** 47:15
**walking** 54:22
**want** 7:21,21 9:18
  9:19 10:21 24:2
  27:2 36:23
**wanted** 20:4,9,13
  24:13 38:13 41:25
**wants** 32:4 40:22
**waste** 23:17 52:23
**way** 13:25 24:23
  27:8 50:16 57:18
**we've** 10:20 49:3

**weeks** 47:8
**weiss** 2:18,18,21
**weissnweiss.com**
  2:22
**went** 43:21 47:3
**whereof** 57:20
**white** 29:10,12,14
  29:18,22 31:7
**wise** 50:16
**wished** 55:4
**withdrawn** 17:11
**witness** 5:10,12
  6:8,9 22:22 23:20
  24:4,8,12 25:12,15
  27:3,17 48:19
  49:3,14,24 50:12
  51:22 57:10,14,20
  58:3
**witnesses'** 59:3
**work** 39:4,4,12
**worked** 41:23
**working** 20:10
  36:5
**world** 29:19 53:25
**worth** 49:9
**wrong** 32:20

**x**

**x** 1:3,9 58:2

**y**

**yeah** 6:24 7:18
**years** 29:4
**yesterday** 18:22
  20:25 23:9,22
  26:2,21 48:21
  49:8 51:7 52:8,19
  54:2
**yesterday's** 50:25
**york** 1:2,17,18,20
  2:6,6 3:7,7 4:8,15
  4:23,23 5:21,21

**[york - zoom]**                                                    Page 11

| 57:3,5,9 |
| :---: |
| **z** |
| **zoom**   21:14 56:7 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.