# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 7

Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      -------------------------------------------X

       PAUL IACOVACCI,

4

                              PLAINTIFF,

5

6           -against-          Case No:

                               1:18-cv-08048

7

8      BREVET HOLDINGS, LLC, et al.,

9                              DEFENDANTS.

       -------------------------------------------X

10

11                    DATE:  October 7, 2021

12                    TIME:  8:34 A.M.

13

14

15            VIRTUAL DEPOSITION of the

16     Defendant/30(b)(6) witness, DOUGLAS

17     MONTICCIOLO, taken by the Plaintiff,

18     pursuant to Stipulation and to the Federal

19     Rules of Civil Procedure, held at the above

20     date and time, remotely before Cleo

21     Shenkin, a Notary Public of the State of

22     New York.

23

24

25

Page 2

```
 1
 2     A P P E A R A N C E S:
 3
 4     CYRULNIK FATTARUSO LLP
          Attorney for the Plaintiff
 5        55 Broadway, 3rd Floor
          New York, New York 10006
 6        BY:  JASON CYRULNIK, ESQ.
 7
 8     REED SMITH LLP
          Attorneys for the Defendants
 9        599 Lexington Avenue, 22nd Floor
          New York, New York 10022
10        BY:  LOUIS SOLOMON, ESQ.
11
12
       ALSO PRESENT:
13        DAVID ROTHSTEIN, LEGAL VIDEOGRAPHER
          PAUL FATTARUSO, ESQ.
14        ADINA LEVINE, ESQ.
          SCOTT WEISS, ESQ.
15        MONICA YANG, ESQ.
16
17              *        *        *
18
19
20
21
22
23
24
25
```

Page 3

1

2     F E D E R A L   S T I P U L A T I O N S

3

4

5        IT IS HEREBY STIPULATED AND AGREED by and

6     between the counsel for the respective

7     parties herein that the sealing, filing and

8     certification of the within deposition be

9     waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20        IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24              *     *     *     *

25

Page 4

1

2              THE VIDEOGRAPHER:  Good

3      morning, we are going on the record

4      at 8:34 a.m., on October 7, 2021.

5              Please note that the

6      microphones are sensitive and may

7      pick up whispering, private

8      conversations and cellular

9      interference.  Please turn off all

10     cell phones or place them away from

11     the microphones, as they can

12     interfere with the deposition audio.

13             Audio and video recording will

14     continue to take place unless all

15     parties agree to go off the record.

16             This deposition is being held

17     remotely.  This is media unit No. 1

18     of the video-recorded deposition of

19     Douglas Monticciolo, located at

20     599 Lexington Avenue, in New York,

21     New York.

22             This deposition is being taken

23     by counsel for the plaintiff in the

24     matter of Paul Iacovacci versus

25     Brevet Holdings, LLC, et al., filed

Page 5

```
 1
 2          in the United States District Court,
 3          Southern District of New York, case
 4          No. 1:18-cv-08048.
 5              My name is David Rothstein,
 6          from the firm Veritext New York and I
 7          am the videographer.  The court
 8          reporter is Cleo Shenkin, from the
 9          firm Veritext New York.
10              I am not related to any party
11          in this action, nor am I financially
12          interested in the outcome.
13              Counsel will now please state
14          their appearances and affiliations
15          for the record; if there are any
16          objections to the proceeding, please
17          state them at the time of your
18          appearance, beginning with the
19          noticing attorney.
20              MR. CYRULNIK:  Good morning.
21          Jason Cyrulnik, Cyrulnik Fattaruso.
22          On behalf of the plaintiff.
23              With me are my colleagues Paul
24          Fattaruso and Adina Levine and
25          co-counsel Scott Weiss.
```

```
                                          Page 6
 1                      D. MONTICCIOLO
 2               MR. SOLOMON:  I am Lou Solomon.
 3          With me is Monica Weiss from Reed
 4          Smith -- Monica Yang from Reed Smith.
 5          And we are counsel to the defendants
 6          and to the witness.
 7               And I did want to thank
 8          Mr. Cyrulnik for the earlier start,
 9          which we just asked him about
10          yesterday.
11               THE VIDEOGRAPHER:  Will the
12          court reporter please swear in the
13          witness.
14     D O U G L A S    M O N T I C C I O L O,
15     called as a witness, having been first duly
16     sworn by a Notary Public of the State of
17     New York, was examined and testified as
18     follows:
19     EXAMINATION BY
20     MR. CYRULNIK:
21          Q.    Please state your name for the
22     record.
23          A.    Douglas Monticciolo.
24          Q.    What is your address?
25          A.    599 Lexington, New York, New
```

Page 7

```
 1                   D. MONTICCIOLO
 2      York.
 3           Q.    Good morning, Mr. Monticciolo.
 4      As I mentioned just a moment before we
 5      started, my name is Jason Cyrulnik and I
 6      represent Paul Iacovacci, the plaintiff in
 7      this litigation.
 8                 Before we get started, I just
 9      want to ask you a couple of questions about
10      your current circumstances there at Reed
11      Smith.  Have you had an opportunity to set
12      up the Veritext Exhibit Share program?
13                 MR. SOLOMON:  I think we did.
14            I think it's working.  We will let
15            you know.
16                 MR. CYRULNIK:  Great, okay.
17           Q.    Well, we will test that out
18      when we introduce the first exhibit today
19      and you will let me know if you are having
20      any trouble, but Mr. Solomon aptly -- or,
21      at least, his colleagues supporting him
22      aptly handled that at the last deposition,
23      so hopefully --
24                 MR. SOLOMON:  It was basically
25            Mr. Solomon by himself.
```

```
 1                    D. MONTICCIOLO
 2              MR. CYRULNIK:  Well, I thought
 3         you were giving credit to one --
 4              MR. SOLOMON:  Basically.  I
 5         said basically, basically.
 6              MR. CYRULNIK:  Okay.
 7              We will go with that cover
 8         story for now.
 9         Q.    Mr. Monticciolo, have you had
10    an opportunity to sit for deposition
11    before?
12         A.    Yes.
13         Q.    Can you give me a feel for
14    approximately how many times you have sat
15    for deposition?
16         A.    Several recent, in the last
17    couple of years.
18         Q.    Did you say several over the
19    last couple of years?
20         A.    Yes.
21         Q.    More or less than five?
22         A.    I would say less than five.
23         Q.    Okay.  And if you exclude the
24    qualifier of over the last couple of years,
25    have you sat for deposition more than five
```

Page 9

1                    D. MONTICCIOLO
2       times over the course of your lifetime?
3             A.    Yes.
4             Q.    How about more than ten?
5             A.    As I sit here, I don't think
6       so.
7             Q.    Okay.  Have you ever been a
8       party to a lawsuit?
9             A.    Yes.
10            Q.    Approximately how many times
11      have you been named as a party to a
12      lawsuit?
13            A.    Less than five times.
14            Q.    Okay.  And of those less than
15      five times, can you recall whether you were
16      the plaintiff or the defendant in the
17      lawsuits that you are thinking of?
18            A.    As I sit here, I can't recall
19      those.
20            Q.    Okay.  Have you ever been named
21      as a plaintiff in a lawsuit?
22            A.    As I sit here, I don't recall
23      that I have.
24            Q.    Okay.  So do you know how many
25      times you have been named as a defendant in

```
 1                    D. MONTICCIOLO
 2    a lawsuit?
 3          A.    I don't recall the exact number
 4    at this time, but I, like I said, I think
 5    it's, it's probably not many.
 6                I don't want to guess that.
 7          Q.    Yes, well, let's talk about
 8    active litigations.
 9                Do you know are you a defendant
10    in any litigations other than the one that
11    you are currently litigating with
12    Mr. Iacovacci?
13          A.    No.
14          Q.    Okay.  Have you ever been named
15    in a criminal lawsuit before?
16          A.    No.
17          Q.    Okay.  The depositions that you
18    recalled sitting for, were those
19    depositions that were taken in connection
20    with litigations in which you were
21    personally named as a party?
22          A.    As I sit here, I don't recall
23    specifically, I don't recall.  It's been a
24    while.
25          Q.    Have you sat for deposition in
```

```
 1                    D. MONTICCIOLO
 2     connection with litigations involving one
 3     or more of your companies as parties?
 4          A.    Yes.
 5          Q.    And have you sat for deposition
 6     in connection with litigations that named
 7     one or more of the Brevet entities as a
 8     party?
 9          A.    Yes.
10          Q.    Can you describe for me the
11     litigation that you recall in which you sat
12     for deposition that involved the Brevet
13     entities, one or more Brevet entities?
14          A.    I don't recall when.  It was a
15     long time ago.
16          Q.    If I recall your answer
17     correctly, you had testified that in recent
18     years, you sat for deposition less than
19     five times, did any of those depositions
20     involve one or more of the Brevet entities?
21          A.    Yes.
22          Q.    Can you tell me about those
23     litigations?
24          A.    I recall one that is related to
25     an asset transaction.
```

```
                                    Page 12
 1                   D. MONTICCIOLO
 2          Q.     Which asset transaction is
 3     that?
 4          A.     The exact name of it.
 5                 We have deal names for these
 6     things.  I couldn't tell you the exact deal
 7     name on it.  It's an old transaction.
 8          Q.     Yes, that's okay, if you don't
 9     recall the exact deal name, that's fine, if
10     you can just describe for me briefly what
11     the deal involved?
12          A.     Again, I am not that actively
13     involved in those actions at the business,
14     because I am the CEO and the team is doing
15     it.
16                 So it involves -- let's see if
17     I recall.  It involves a claim on, I
18     believe, an insurance company related to a
19     borrower.
20          Q.     And what is the role that one
21     or more of Brevet entities plays in that
22     litigation; are they a defendant as well?
23          A.     No, we are a plaintiff.
24          Q.     Okay.  You are asserting a
25     claim against an insurance company?
```

```
                        D. MONTICCIOLO
 1
 2         A.    You would have to ask my team
 3    on the specifics, but we are a plaintiff.
 4         Q.    So you don't know one way or
 5    the other whether as a plaintiff you are
 6    asserting a claim against an insurance
 7    company in that litigation?
 8         A.    I would think if we are a
 9    plaintiff, we are.
10         Q.    As would I.
11              Okay, are there any other
12    litigations in which you sat for deposition
13    that you -- in the recent years that you
14    can recall that involve Brevet?
15         A.    No.
16         Q.    When did you sit for deposition
17    in the litigation involving the insurance
18    company?  Approximately.
19         A.    Sometime in the last couple of
20    months.
21         Q.    Were you asked questions about
22    your role in connection with the
23    transaction at issue?
24         A.    As I sit here, I don't recall
25    specifically.
```

```
 1                  D. MONTICCIOLO
 2        Q.    Well, it sounds like you have
 3   enough experience with depositions that we
 4   can cut the ground rules relatively short.
 5             I take it the last deposition
 6   you sat for in the last couple of months
 7   was a remote deposition that was conducted
 8   via videoconference.
 9        A.    Yes.
10        Q.    Okay.  So you have the
11   distinction amongst the many witnesses we
12   have deposed to be one of the few who has
13   had that experience, so that will make this
14   hopefully more efficient than usual.  But
15   let me just quickly review the ground
16   rules, you will tell me if there are any
17   that you don't understand.
18             I will be asking you some
19   questions today, if you can't hear me, if
20   you need me to repeat a question or you
21   otherwise don't understand a question that
22   I have asked, you will let me know, okay?
23        A.    Okay.
24        Q.    After I ask a question, your
25   counsel, Mr. Solomon, may state an
```

Page 15

D. MONTICCIOLO

1

2     objection for the record, usually using

3     words like objection or objection to form,

4     you should allow him to get that on the

5     record and then go ahead and answer the

6     question after the objection, unless you

7     are specifically instructed not to answer

8     the question; does that make sense?

9          A.    Yes.

10         Q.    Okay.  And the court reporter

11    is typing everything that you are saying in

12    order to generate a transcript, so it's

13    important that you provide verbal responses

14    instead of, say, nodding your head or

15    something like that, okay?

16         A.    Yes.

17         Q.    And, finally, if you would like

18    to take a break, please just say so, I am

19    happy to try to accommodate that; if there

20    is a question pending or a line of

21    questioning that I am trying to finish, I

22    would ask to try and finish that up and

23    then we will break, but otherwise I am

24    happy to try to work within the constraints

25    of your own needs and scheduling over

```
                                            Page 16
                        D. MONTICCIOLO
 1
 2      there, subject to the caveat that my
 3      understanding is that, as Mr. Solomon
 4      communicated to us yesterday, you would
 5      like to be out of here by a set time, so we
 6      are going to do our best to try to get
 7      through the deposition before then, but
 8      that probably will mean trying to keep
 9      breaks to a minimum.
10          A.    Okay.
11          Q.    Is there any reason that you
12      are aware of that you would be unable to
13      provide competent, truthful testimony
14      today?
15          A.    No.
16          Q.    Any medications or conditions
17      that affect your memory?
18          A.    No.
19          Q.    I think we said this at the
20      outset, I just don't recall whether it was
21      on the record, so just to make sure that it
22      is, because this is a remote deposition, I
23      want to just clarify for the record your
24      surroundings, you are located at Reed
25      Smith's New York City offices today; is
```

Page 17

                    D. MONTICCIOLO

1    that right?

2         A.    Yes.

3         Q.    And you are in a conference

4    room with your counsel, Mr. Lou Solomon and

5    Monica Yang; is that right?

6         A.    Yes.

7         Q.    Is there anybody else in the

8    room with you today?

9         A.    No.

10         Q.    Okay.  Do you have any

11    documents relating to this case in the room

12    with you today?

13         A.    No.

14         Q.    Okay.  Can you agree to refrain

15    from checking or using your phone or

16    computer to communicate with anybody while

17    we are on the record?

18         A.    Yes.

19         Q.    Okay.  And you understand that

20    you are here both as a defendant in this

21    action and as a 30(b)(6) witness?

22         A.    Yes.

23         Q.    Okay.  And who is paying your

24    attorneys' fees as a defendant in this

```
                                        Page 18
 1                    D. MONTICCIOLO
 2      action?
 3           A.    Brevet is.
 4           Q.    Is your counsel the Reed Smith
 5      firm?
 6           A.    Yes.
 7           Q.    Any other attorneys
 8      representing you in your personal capacity
 9      in connection with this action?
10           A.    No.
11           Q.    Do you know which Brevet entity
12      is paying Reed Smith's fees?
13           A.    It's one of the Brevet
14      entities.
15           Q.    I understand that, do you know
16      which one in particular?
17           A.    No.
18           Q.    Who would make that
19      determination?
20           A.    Our finance department.
21           Q.    And on what basis would your
22      finance department decide which of the
23      Brevet entities would be actually covering
24      the attorneys' fees for your defense of
25      this action?
```

```
 1                    D. MONTICCIOLO
 2         A.    You would have to ask them.
 3         Q.    They wouldn't be consulting
 4    with you on that question?
 5         A.    There is policies and
 6    procedures for how it's done.
 7         Q.    What are the policies and
 8    procedures that you are aware of that would
 9    determine which Brevet entity would cover
10    the attorneys' fees for you or for
11    Mr. Callahan who are named individually in
12    a lawsuit?
13         A.    It would be in our broad firm
14    policies about expenses and allegations,
15    which you could -- would have to ask the
16    finance people on the details of that.
17         Q.    So your finance people consult
18    with whatever policies you just referenced
19    and they make the determination without
20    your involvement as to what entity is going
21    to be paying the attorneys' fee that you
22    incur in connection with this lawsuit; is
23    that a summary of what your testimony was?
24              MR. SOLOMON:  I object to the
25         question.
```

```
                                        Page 20
 1                    D. MONTICCIOLO
 2          A.    Could you say the question
 3     again?
 4          Q.    Sure.  So your finance
 5     department would consult the policies and
 6     procedures that you just referenced and
 7     make a determination as to which Brevet
 8     entity is covering the attorneys' fees for
 9     individual defendants like yourself who are
10     named in a lawsuit; is that a fair summary
11     of your testimony?
12               MR. SOLOMON:  Same objection.
13          A.    I can't specifically answer
14     that, that question.  They do their job
15     according to their professionalism, skills.
16          Q.    Yes, I am not asking you to
17     assess their performance.  Let me try to
18     rephrase, it maybe it wasn't clear.  I am
19     just trying to make sure I understood what
20     you had responded to me.
21               You are not involved in the
22     determination of which entity is covering
23     the attorneys' fees that are incurred in
24     connection with Reed Smith's defense of
25     this action on your behalf, correct?
```

```
                                          Page 21
 1                   D. MONTICCIOLO
 2          A.      Yes.
 3          Q.      And it's your understanding
 4     that that determination is made by the
 5     Brevet finance department, correct?
 6          A.      And with whatever resources
 7     they require to make that proper decision.
 8          Q.      And the resources that you are
 9     aware of, sitting here today, would be a
10     policies and procedures manual that would
11     speak to this issue?
12          A.      And whatever third-party
13     consultants, lawyers, regulators that they
14     would have to check with.
15          Q.      Is it fair to say that there
16     are many different Brevet entities that
17     might be covering your attorneys' fees
18     today?
19          A.      I couldn't answer that
20     question.  I don't know.
21          Q.      Well, is there one specific
22     entity that you think is covering your
23     attorneys' fees today?
24          A.      I don't want to guess.
25          Q.      Well, as between there being
```

Page 22

```
                              D. MONTICCIOLO
 1
 2     one that you are aware of or being many
 3     options that you are not aware of, which
 4     one is the correct one, which of those is
 5     the correct statement of your understanding
 6     as to who is covering your attorneys' fees
 7     for the defense of your -- the action
 8     against you?
 9                MR. SOLOMON:  I object to the
10         question.
11         A.    I don't understand the
12     question, could you say that again?
13         Q.    I am trying to understand
14     whether you do know that there is a
15     particular entity that is covering your
16     attorneys' fees or whether in your mind
17     there are many different Brevet entities
18     that are candidates for covering your
19     attorneys' fees and you don't know which it
20     is?
21         A.    Correct, there are Brevet
22     entities that are paying the legal fees.
23         Q.    And you don't know which Brevet
24     entity is doing so, correct?
25         A.    I am not in the finance
```

```
 1                    D. MONTICCIOLO
 2      department.
 3           Q.    So you don't know, sitting here
 4      today, which Brevet entity is covering your
 5      attorneys' fees, correct?
 6                  MR. SOLOMON:  Asked and
 7             answered.
 8                  MR. CYRULNIK:  I think it's
 9             true, but the answer was there are
10             many different Brevet entities, I
11             think, so that really didn't respond
12             to my question, that is why I had to
13             ask it again.
14           Q.    Mr. Monticciolo, is that right,
15      you don't know which of the Brevet
16      entities, sitting here today, is covering
17      your attorneys' fees?
18           A.    I don't know which specific
19      Brevet entity is covering the legal fees.
20           Q.    Okay.  What did you do to
21      prepare for today's deposition?
22           A.    I reviewed some of our policies
23      and procedures and just skimmed through the
24      pleadings and court materials.
25           Q.    When you say court materials,
```

```
 1                    D. MONTICCIOLO
 2     are you referring to documents that were
 3     filed on the dockets in the various court
 4     proceedings?
 5          A.     Yes.
 6          Q.     Okay.  And did you review those
 7     documents that you just described on your
 8     own?
 9          A.     Yes.
10          Q.     Okay.  How did you select the
11     documents that you were going to review on
12     your own?
13          A.     We -- I actually -- we had a
14     composition of documents that -- with all
15     the court filings, what do you call it, the
16     pleadings.
17          Q.     And did you go through all of
18     them or how did you go about selecting
19     which ones you would review and which ones
20     you wouldn't?
21          A.     I had our internal counsel help
22     me choose which ones.
23          Q.     Okay.  And same thing with
24     respect to policies and procedures, did you
25     review all Brevet policies and procedures
```

```
                        D. MONTICCIOLO
 1
 2      from all different time periods or only a
 3      select subset of the policies and
 4      procedures?
 5           A.    As I said, I had a -- I
 6      reviewed, I didn't extensively investigate
 7      them.
 8           Q.    Were there particular sections
 9      of the policies and procedures that you did
10      review that you were focussing on?
11           A.    Yes.
12           Q.    And what were those sections?
13      And if you don't recall the section number,
14      that is fine, you can just describe to me
15      the subject matter.
16           A.    Policies related to compliance,
17      code of ethics, handbook confidentiality,
18      company assets, nondisclosure rights,
19      e-mail retention, amongst others.
20           Q.    Okay.  And any others come to
21      mind, specific ones?
22           A.    We have a lot of policies and
23      procedures.
24           Q.    Sure, I appreciate that.  My --
25      I am just asking, you provided me,
```

Page 26

                    D. MONTICCIOLO
1    helpfully provide me a list of the specific
2    topics that you recall looking to review,
3    were there any others, because you said at
4    the end amongst others, I just want to make
5    sure, were there any others that you,
6    sitting here today, recall looking at in
7    particular?
8         A.    Yes.
9         Q.    What were those?
10        A.    Transaction policies.
11        Q.    Transaction policies meaning
12   policies -- I'm sorry, I didn't mean to cut
13   you off, I just wanted to make it
14   efficient.
15              When you say transaction
16   policies, are you referring to the policies
17   Brevet has in connection with onboarding a
18   transaction?
19        A.    They are called transaction
20   policies, which is -- covers more than
21   that, transaction policies.
22        Q.    Can you briefly describe what
23   transaction policies means in your mind?
24        A.    Not in my mind.  They're

Page 27

                    D. MONTICCIOLO

1

2    transaction policies about how we do our

3    transaction.

4         Q.    Okay, where are those

5    transaction policies generally found?

6         A.    They are available on a shared

7    drive to all employees.

8         Q.    And is it its own standalone

9    document or is it part of a broader manual

10   or a compilation of documents?

11        A.    It stands alone as part of a

12   compilation of policies and procedures.

13        Q.    Okay.  And is it in a folder on

14   a shared drive that houses other policies

15   and procedures for the company?

16        A.    Yes.

17        Q.    And what is the name of that

18   folder, if you recall?

19        A.    I don't recall.

20        Q.    And is the name of the file

21   that you are referring to transaction

22   policies or something to that effect?

23        A.    I don't recall.

24              I am quite sure we produced

25   those for you.

```
 1                    D. MONTICCIOLO
 2          Q.    Okay.  Yeah, it's certainly
 3    possible.  I just want to know which one
 4    you have in mind so that we can look at it.
 5               Okay, do those transaction
 6    policies, for example, set forth the size
 7    of the transactions that Brevet is looking
 8    to consider and the size of the
 9    transactions that it's not looking to
10    consider?
11          A.    They are policies and
12    procedures.  We don't have things like size
13    limits.
14          Q.    Well, so it does not -- the
15    transaction policies that you are referring
16    to do not identify, for example, criteria
17    that Brevet is looking for in connection
18    with its consideration of various
19    prospective transactions; is that right?
20          A.    Correct.
21          Q.    Okay.  They refer more towards
22    the logistics and various steps that
23    employees of Brevet are supposed to take in
24    connection with considering and onboarding
25    a prospective opportunity?
```

```
                                          Page 29
 1                    D. MONTICCIOLO
 2         A.     As I sit here, I would say that
 3     is correct.
 4                 And we have produced those, as
 5     I said.
 6         Q.     Okay.  You don't have any
 7     written policies, manuals or the like that
 8     describe the different criteria that Brevet
 9     is looking for in connection with
10     prospective investments?
11         A.     We do.
12         Q.     What would the name of that
13     document or compilation be that would
14     contain those criteria?
15         A.     We have a credit policy and we
16     have an investment committee.
17         Q.     Okay, a credit policy is a
18     written set of policies; is that correct?
19         A.     Correct.
20                 And I am sure we have produced
21     those for you, as well.
22         Q.     Okay.  And when you referenced
23     the second thing, investment committee,
24     that is not a written set of policies, you
25     are just referring to the fact that you
```

```
                                          Page 30
 1                    D. MONTICCIOLO
 2     have a committee that was formed for the
 3     purpose of applying -- I guess implementing
 4     and applying the criteria that I was asking
 5     you about, that is the criteria that Brevet
 6     would be looking to use in considering
 7     whether to invest in a particular
 8     opportunity?
 9          A.    No.
10          Q.    Did you say no?
11          A.    I said no.
12          Q.    So that's not what you meant
13     when you were referring to an investment
14     committee, can you describe to me what you
15     did mean when you responded to my prior
16     question by listing the investment
17     committee in addition to the other
18     document?
19          A.    Yes.  And I believe we provided
20     information on this as, well.
21               The investment committee makes
22     the investment decisions, suitability
23     (inaudible).
24               MR. CYRULNIK:  Sorry, I'm
25          getting some background noise.
```

```
 1                    D. MONTICCIOLO
 2                THE VIDEOGRAPHER:  Ms. Levine,
 3         can you please mute.
 4                MS. LEVINE:  My apologies.
 5         Q.    Can you repeat the end of your
 6    answer, Mr. Monticciolo?  Sorry, it was
 7    inaudible for me.
 8         A.    If I can remember.
 9                The investment committee makes
10    the suitability and investment decision.
11         Q.    So, the investment committee
12    that you referenced, you did intend to
13    reference the fact that you had a
14    committee, not a particular set of
15    documents that are called investment
16    committee, correct?
17         A.    There are definitions of
18    various committees and what they do in our
19    policies and procedures, which we produced
20    for you, but you asked me what the
21    committee does.
22         Q.    Okay.  I think we may have just
23    asked slightly different questions, but
24    that is fine, I appreciate your efforts to
25    answer the question that you thought I was
```

```
 1                    D. MONTICCIOLO
 2      asking.
 3                    Can you describe for me what
 4      you mean by suitability?
 5           A.     The investment committee makes
 6      the decision is the investment suitable
 7      consistent with the fund's investment
 8      pieces.
 9           Q.     Would one of the factors that
10      the investment committee would consider in
11      making those decisions be the profitability
12      of a prospective transaction?
13           A.     It could be.
14           Q.     What about the size of the
15      prospective transaction?
16           A.     It could be.
17           Q.     What about the costs associated
18      with, the transaction costs associated with
19      the prospective transaction?
20           A.     It could be.
21           Q.     Okay.  Did you speak to anyone
22      other than your counsel about today's
23      deposition?
24           A.     Other than telling my wife that
25      I was going to it.
```

```
                                          Page 33
 1                    D. MONTICCIOLO
 2        Q.    Common answer.  Yes, other than
 3   telling your wife that you were going to be
 4   deposed today, did you speak to anybody
 5   about today's deposition other than your
 6   counsel?
 7        A.    No.
 8        Q.    It's always good for our wives
 9   to know where we are.
10             Did you attend any depositions
11   in this matter apart from the one you are
12   attending today?
13        A.    No.
14        Q.    Have you reviewed any
15   transcripts from depositions that were
16   taken in this matter?
17        A.    No.
18        Q.    Have you received any summaries
19   of testimony that has been given in this
20   matter to date?
21        A.    No.
22        Q.    Do you know who has been
23   deposed in this matter other than you?
24        A.    As I sit here, I can't recall
25   who has been deposed yet, but.
```

```
 1                    D. MONTICCIOLO
 2          Q.     Do you know whether Mark
 3     Callahan has been deposed?
 4          A.     Yes.
 5          Q.     And how do you know that?
 6          A.     Because he was unavailable.
 7          Q.     Because he was unavailable
 8     when?
 9          A.     That is a good question.
10                 Monday earlier this week.
11          Q.     Oh, I see.  He was unavailable
12     and the reason he was unavailable was
13     because he was sitting for deposition?
14          A.     His calendar said he was
15     sitting for a deposition, yes.
16          Q.     Got it, okay.
17                 Did you speak to Mr. Callahan
18     about his deposition, either before, during
19     or after his deposition?
20          A.     No.
21          Q.     Do you know whether
22     Mr. Iacovacci has been deposed in this
23     litigation?
24          A.     Yes.
25          Q.     And how do you know that?
```

```
                                           Page 35
                        D. MONTICCIOLO
 1
 2          A.     Because I know that it was in
 3      the calendar, as well, that mine couldn't
 4      be yesterday so it had to be today because
 5      Paul was being deposed yesterday.
 6          Q.     Got it.
 7                 And have you seen any accounts
 8      of any of the testimony that Mr. Iacovacci
 9      gave yesterday, either a transcript,
10      summaries or anything else?
11          A.     No.
12          Q.     Okay.  I think you had briefly
13      described what you did to prepare for the
14      deposition by way of reference to certain
15      documents that you reviewed, can you also
16      tell me apart from the documents that you
17      described reviewing what else you did to
18      prepare for today's deposition, for
19      example, meeting with your attorneys?
20          A.     Prepare for the deposition.
21                 Just speak with the attorneys
22      about when, where (inaudible) and things
23      like that.
24          Q.     Okay.  Did you have multiple
25      meetings with your attorneys in preparation
```

```
                                    Page 36
 1                  D. MONTICCIOLO
 2      for today's deposition?
 3           A.     Around scheduling and juggling
 4      stuff, yes.
 5           Q.     Okay, approximately how many
 6      meetings did you have with your attorneys
 7      in preparation for today's deposition?
 8           A.     If you consider an e-mail and
 9      talking about calendar appointments and
10      scheduling, a couple.
11           Q.     Okay, if you exclude e-mails
12      concerning the scheduling of today's
13      deposition, how many times did you meet
14      with your attorneys to prepare for today's
15      deposition, if at all?
16           A.     As I say, I can't recall the
17      exact number.
18           Q.     What is your best, best
19      recollection?
20           A.     Maybe twice.
21           Q.     Okay.  Let's start with the
22      first one that you recall, did you meet
23      with your attorneys yesterday, for example,
24      to prepare for today's deposition?
25           A.     Yes.
```

1                    D. MONTICCIOLO
2          Q.    Okay.  Was that an in-person
3     meeting, a videoconference, a
4     teleconference or some other option that I
5     am not thinking of?
6          A.    A videoconference.
7          Q.    Okay.  And roughly how long did
8     that videoconference session last?
9          A.    As I sit here, I can't tell you
10    exactly how long.
11         Q.    More or less than three hours?
12         A.    Less than three hours.
13         Q.    More or less than two hours?
14         A.    I, I would be guessing, but
15    shorter.
16         Q.    Sorry, I missed the last word,
17    you said you would be guessing but you
18    thought it was shorter than two hours?
19         A.    Correct.
20         Q.    Okay, was it longer than an
21    hour?
22         A.    Again, I, as I sit here, I
23    can't recall that.
24         Q.    Okay.  Who was present for that
25    meeting, apart from yourself?

```
 1                    D. MONTICCIOLO
 2         A.     Lou Solomon and Monica Yang.
 3         Q.     Okay.  What time did that
 4    meeting take place?
 5         A.     Sometime in the morning, I
 6    believe.
 7         Q.     Okay.
 8         A.     I don't recall exactly.
 9         Q.     Okay.  Apart from the three
10    people that we just mentioned, yourself,
11    Lou and Monica, anyone else present for
12    that meeting, to your knowledge?
13         A.     As I sit here, I don't recall.
14         Q.     Okay.  Apart from the meeting
15    you described yesterday with Mr. Solomon
16    and Ms. Yang via videoconference, what
17    other meetings, if any, do you recall
18    having with your attorneys to prepare the
19    for today's deposition?
20         A.     There were meetings around the
21    calendar scheduling.
22         Q.     Yes, thanks for reminding me.
23    Let's exclude those.
24                With the exception of -- you
25    know, if you take out of the equation
```

```
1                    D. MONTICCIOLO
2     meetings that exclusively concerned
3     scheduling, what, if any, other meetings
4     did you have with your counsel to prepare
5     for today's deposition?
6          A.    As I sit here, I don't recall
7     if it was anything about; it was more just
8     scheduling and processes, like where we go,
9     what we do.
10          Q.    Okay.  Did you review documents
11     during the meeting or meetings that you
12     recall having with your counsel?
13          A.    I -- let's see.  I think so.
14          Q.    Okay.
15          A.    I don't recall.
16          Q.    And you are thinking of the
17     meeting that you had, you know, less than
18     24 hours ago, you don't recall whether you
19     reviewed documents?
20          A.    I have a very busy schedule and
21     I review lots of materials and documents
22     every day, this is not the top of my list.
23          Q.    Understood.  So the answer to
24     my question is yes, you don't recall
25     whether you reviewed documents in the
```

```
                                       Page 40
                      D. MONTICCIOLO
 1

 2   meeting that you had yesterday morning?

 3        A.    Again, I don't recall, as I sit

 4   here.

 5        Q.    Okay.  I would like to just

 6   briefly go through the structure of the

 7   Brevet companies and we will try to do this

 8   as efficiently as possible.  Before I do, I

 9   want to make sure we are on the same page.

10            Do you understand that you have

11   been designated as a corporate

12   representative to testify on behalf of

13   Brevet, various Brevet entities in

14   connection with five topics that were

15   listed on our 30(b)(6) notice?

16        A.    Yes.

17        Q.    Okay.  And what did you do to

18   prepare to serve as the company's corporate

19   representative in connection with that

20   30(b)(6) representation?

21        A.    I think that is the same

22   question you asked before, which was I

23   reviewed some of the policies and

24   procedures and things related to those five

25   items.
```

Page 41

D. MONTICCIOLO

1      Q.    Did you speak with anyone other
2   than your counsel about those five topics,
3   did you do any investigations or anything
4   to that effect?
5      A.    As I sit here, I don't think
6   so.
7      Q.    Okay.  Do you recall the topics
8   that you prepared to be a 30(b)(6) witness
9   on?
10     A.    Off the top of my head, you
11  know, not all five.
12     Q.    That is fair.  Can you describe
13  for me the ones that you do recall or the
14  general subject matter in which you
15  prepared to serve as a 30(b)(6) witness
16  today?
17     A.    As I said earlier, I reviewed
18  things related to the policies, procedures,
19  the handbooks, things like code of ethics,
20  retention policies, et cetera.
21     Q.    Yes, thanks.  I wasn't asking
22  what you reviewed, my question was a little
23  different.  I am just asking do you recall
24  the topics for which you prepared to serve

```
                                            Page 42
 1                    D. MONTICCIOLO
 2      as a 30(b)(6) witness today.
 3           A.    Yes, I recall that the topics
 4      were encompassed in part in those policies,
 5      things like trade secrets and policies and
 6      procedures around how to handle Brevet
 7      information.
 8           Q.    I see, okay.  Anything else you
 9      recall about the topics in which you
10      prepared to be a 30(b)(6) witness today?
11           A.    Not as I sit here.
12           Q.    Okay.  Prior to starting the
13      Brevet companies, you were at Lehman
14      Brothers for a period of time; is that
15      right?
16           A.    Yes.
17           Q.    And what was your position at
18      Lehman Brothers?
19           A.    I was -- as I sit here, I don't
20      actually recall my exact title,
21      interestingly.  I think I was the managing
22      director in fixed income.  I am guessing.
23           Q.    That's what resumes are for.
24                 Okay.  And do you recall the
25      circumstances that gave rise to your
```

```
                                              Page 43
 1                     D. MONTICCIOLO
 2      leaving Lehman Brothers?
 3           A.    Yes.
 4           Q.    Can you briefly describe those?
 5           A.    I had a job offer from Deutsche
 6      Bank.
 7           Q.    Okay.  And did that involve a
 8      promotion of sorts from the position you
 9      had at Lehman?
10           A.    I would think so.
11           Q.    Okay.  You met Mr. Callahan at
12      Lehman Brothers; is that right?
13           A.    Yes.
14           Q.    Okay.  And do you recall the
15      position that you took when you left Lehman
16      to join Deutsche?
17           A.    As I sit here, I can't recall
18      the exact title, but it was to apply my
19      skills in a similar but broader area than
20      Lehman.
21           Q.    Do you recall any of the titles
22      that you held at Deutsche Bank?
23           A.    As I sit here, it was 20 plus,
24      almost 25 years ago, I couldn't tell you
25      the exact title without guessing.
```

                          D. MONTICCIOLO
1
2        Q.     Okay.   Did you bring
3    Mr. Callahan over with you from Lehman
4    Brothers to Deutsche Bank?
5        A.     No.
6        Q.     Did he follow you to Deutsche
7    Bank?
8        A.     He came to Deutsche Bank, yes.
9        Q.     Is the distinction you are
10   drawing that you didn't have a role in
11   Mr. Callahan's leaving Lehman and joining
12   Deutsche Bank, to your knowledge?
13       A.     I didn't say I didn't have a
14   role; I didn't actively recruit him.
15       Q.     Okay.   Did he actively seek out
16   a job with you once you moved over to
17   Deutsche?
18       A.     As I sit here, it's 25 years
19   ago, if I recall, he was interested in
20   leaving Lehman.
21       Q.     And he reached out to you?
22       A.     Again, it was 25 years ago, as
23   I sit here, I can't remember who called
24   whom first.   He was a friend.
25       Q.     Okay.   But you do recall that

```
                                      Page 45
  1                D. MONTICCIOLO
  2    you were his point of contact, whether it
  3    was you calling him or him calling you, you
  4    were his point of contact for his
  5    prospective move over from Lehman to
  6    Deutsche?
  7         A.    As I sit here, I think that
  8    would be speculation; I don't know if he
  9    had other contacts.
 10         Q.    Okay.  How long were you at
 11    Deutsche Bank?
 12         A.    Again, it's 25 years ago, so as
 13    I sit here, I would say two to three years.
 14         Q.    Okay.  Would you describe your
 15    relationship with Mr. Callahan at Deutsche
 16    Bank as close; were you close with
 17    Mr. Callahan during that period?
 18         A.    Could you clarify what close
 19    would be?
 20         Q.    Sure.  I am just asking for
 21    your, sort of your characterization, would
 22    you characterize your relationship as you
 23    and Mr. Callahan were close during that
 24    period?
 25         A.    I would characterize that as we
```

```
 1                   D. MONTICCIOLO
 2    had a known working relationship, so he was
 3    someone I knew better than others, yes.
 4         Q.    Okay.  Were you friendly with
 5    him?
 6         A.    Yes.
 7         Q.    Okay.  And what were the --
 8    what was the reason you decided to leave
 9    Deutsche Bank?
10         A.    Deutsche Bank restructured.
11         Q.    Okay.  Was your department or
12    position being eliminated?
13         A.    Yes.
14         Q.    Was it the department or the
15    position or both?
16         A.    It was, you know, it's 25 years
17    ago, I don't recall if they -- which it
18    was.
19         Q.    Okay.  Was Mr. Callahan working
20    in your department at that time?
21         A.    Again, as I sit here, I don't
22    recall the details, but I don't believe so.
23         Q.    Okay.  And when you left
24    Deutsche Bank, had you been offered other
25    positions in other departments at Deutsche
```

Page 47

```
 1                D. MONTICCIOLO
 2    Bank?
 3         A.    Again, this is a long time ago.
 4    There was a lot of interest for my
 5    employment.
 6         Q.    But you don't recall whether
 7    any of that interest was at a different
 8    department at Deutsche Bank or whether it
 9    was from other prospective employers?
10         A.    Correct.
11         Q.    Okay.  And you decided to start
12    your own company at that point in time?
13         A.    Correct.
14         Q.    And that is a company that
15    ultimately led to the Brevet family of
16    companies?
17         A.    Yes.
18         Q.    It wasn't called Brevet at
19    first; the first entity you started had a
20    different name, right?
21         A.    Yes.
22         Q.    What was that name?
23         A.    As I sit here, I can't tell you
24    exactly which the first name was, because
25    there were several as we initially grew.
```

```
                                    Page 48
 1                    D. MONTICCIOLO
 2         Q.    Okay.  Do you know the first
 3    Brevet company that you started with the
 4    name Brevet?
 5         A.    As I sit here, I can't tell you
 6    exactly which one we started first.
 7         Q.    How did you come up with the
 8    name Brevet?
 9         A.    I believe it was more than the
10    one hundredth name that we had tried.
11              It's --
12         Q.    Okay.
13         A.    -- a bicycling term.
14         Q.    Apart from just trying a bunch
15    of names, any other explanation as to how
16    the letters B, R, E, V, E, T got put in
17    that order and fit your company?
18         A.    Brevet is a term used in a
19    group called -- a road bicycling group
20    called de Randonneurs, a French
21    organization that rides -- precedes the
22    Tour de France, which does a 1200-mile ride
23    every four years called the
24    Paris-Brest-Paris of which to qualify for
25    that you have to meet certain goals and
```

Page 49

```
 1                    D. MONTICCIOLO
 2     achievements called brevets.
 3          Q.    Okay.  The mystery has been
 4     cleared up, many years into this
 5     litigation.
 6                 Okay, did you start Brevet on
 7     your own or did you have partners when you
 8     first started it?
 9          A.    It was a long time ago.
10                 As I sit here, I believe I
11     started it initially.
12          Q.    So, initially, you were the
13     sole owner of the companies that you
14     initiated?
15          A.    Yeah, as I sit here, I can't
16     recall.  It was 23 years ago.
17          Q.    So you don't know one way or
18     the other whether or not you were the
19     100 percent owner of the first entity that
20     you created?
21          A.    Correct.
22                 We have had a lot of entities
23     over the years.
24          Q.    You are familiar with the
25     entity Brevet Holdings, LLC?
```

```
                                              Page 50
 1                    D. MONTICCIOLO
 2         A.    Yes.
 3         Q.    And that entity is owned by
 4    whom?
 5         A.    ████ ██████ ████ ███ █████.
 6         Q.    And what is the equity split?
 7         A.    ████ ██████ ██████ ███ █ ██████
 █    ███ ███.
 9         Q.    Has that always been the split
10    of that particular entity, ███ ████████ ████
██    ██ ████ █ ████████ █████ ████ ████ ████?
12         A.    As I sit here, I believe so.
13         Q.    What is your ██████ █████
██    ██████████?
15         A.    Yes.
16         Q.    How did it come to be that ████
██    █████████ ███ ████████ ████ █ ███████ ████
██    ██████ ████████ ███?
19         A.    As I sit here, if I recall,
20    it's for simplicity of tax filings.
21         Q.    Can you describe how the
22    ██ █████████ ████████████ ownership makes the
23    tax filings simpler?
24         A.    As I sit here, I am not a tax
25    specialist, ████ ████████ ███, but it just
```

```
                                        Page 51

 1                   D. MONTICCIOLO
 2      makes it so that it's simpler to file
 3      taxes, from my recollection.
 4            Q.    Was that her idea?
 5            A.    As I sit here, I couldn't tell
 6      you that.
 7            Q.    Is she a tax -- is she an
 8      accountant?
 9            A.    No.
10            Q.    What's -- I think you described
11      her as a tax specialist, unless I
12      misunderstood, ████ ███ ████ ████ ██?
13            A.    ███ ██████ ██ █ ████████ ███
        ███ ████████ ███ ██ ███
15            Q.    Got it, okay.
16                  And Brevet Holdings, LLC owns a
17      subsidiary called Brevet Capital
18      Management, LLC; is that right?
19            A.    As I sit here, I couldn't tell
20      you if it directly owns it or not.
21            Q.    You don't know, one way or the
22      other, whether Brevet Holdings directly
23      owns Brevet Capital Management?
24            A.    As I said, I can't tell you as
25      I sit here.
```

```
                                        Page 52
 1                    D. MONTICCIOLO
 2                    I am sure we have produced
 3          those materials for you, how the entities
 4          are owned.
 5               Q.    Yeah, I am just asking for your
 6          understanding or recollection, so if you
 7          don't know, that's fine, just let me know.
 8                    Brevet Capital Management is
 9          the investment manager for various funds in
10          the Brevet family of companies; is that
11          right?
12               A.    Yes.
13               Q.    And what is your role in, let's
14          start with Brevet Holdings, do you have a
15          role or title in Brevet Holdings, LLC?
16               A.    Yes.
17               Q.    And what is it?
18               A.    As I sit here, I would have to
19          confirm to be sure, but I believe it's
20          managing member.
21               Q.    Okay.  Do you know if there are
22          any other managing members of Brevet
23          Holdings, LLC?
24               A.    As I sit here, I couldn't tell
25          you.
```

```
                                        Page 53
 1                    D. MONTICCIOLO
 2          Q.    So there could be?
 3                MR. SOLOMON:   I object to the
 4           question.
 5          A.    As I said, right now, as I sit
 6     here, I couldn't tell you.  But I am sure
 7     we have produced this for you.
 8          Q.    The only other member of Brevet
 9     Holdings, LLC would be your wife Michelle,
10     correct?
11          A.    I -- actually, as I sit here, I
12     couldn't tell you.
13          Q.    Are you certain, then, just
14     going back to your last set of answers, are
15     you certain that Brevet Holdings, LLC is
16     owned 99 percent by you and 1 percent by
17     Mrs. Monticciolo?
18          A.    As I sit here, I believe that
19     to be correct.
20          Q.    Okay, so as you sit here, you
21     believe that you and Mrs. Monticciolo are
22     the only two members of Brevet Holdings,
23     LLC; is that right?
24          A.    Correct.
25                But, again, as I sit here,
```

```
                          D. MONTICCIOLO
 1
 2      there are people in the firm whose job it
 3      is to maintain things like corporate
 4      structure.
 5           Q.     Yeah, thanks for flagging that.
 6      I did want to ask you, who is in charge of
 7      maintaining the organizational charts at
 8      Brevet?
 9           A.     Could you repeat the question?
10           Q.     Sure.  Who is in charge of
11      maintaining the organizational charts at
12      Brevet?
13           A.     As I sit here, I recall it's
14      the ████████████  department.
15           Q.     Okay.  And has that -- has the
16      department charged with maintaining the
17      company's corporate or organizational
18      structures, has that changed over the years
19      or, to your recollection, it's always been
20      the compliance department?
21           A.     As I sit here, I couldn't tell
22      you, because the company has grown and
23      evolved.
24           Q.     Do you recall any department
25      other than the ████████████  department being
```

```
 1                  D. MONTICCIOLO
 2      tasked with maintaining Brevet's
 3      organizational charts?
 4           A.     As I said, we have been around
 5      for 23 years, as I sit here, I couldn't
 6      tell you specifically.
 7           Q.     So, just to make sure I have
 8      your testimony correct, Mr. Monticciolo,
 9      sitting here today, to your knowledge, the
10      only department that you recall being
11      tasked with maintaining Brevet's
12      organizational charts has been the
13      ███████████ department, correct?
14           A.     I did not say that.
15           Q.     Okay.  I am glad I followed up.
16                  So, sitting here today, you do
17      remember a department other than the
18      ███████████ department being tasked with
19      maintaining Brevet's organizational charts?
20           A.     No.  That is not what I said.
21           Q.     I think I just covered the only
22      two options that I could think of, so why
23      don't I just ask it more open ended and you
24      can give me your answer.
25                  Sitting here --
```

```
                                            Page 56
 1                    D. MONTICCIOLO
 2         A.    The --
 3         Q.    Oh, sorry, go ahead.
 4         A.    Please.
 5         Q.    Sitting here today, can you
 6    identify all of the departments that you
 7    recall being tasked with maintaining
 8    Brevet's organizational charts?
 9         A.    As I sit here today, I cannot
10    identify all of the departments that have
11    been responsible for that over the 23 years
12    of our business.
13         Q.    Yeah, maybe it's a phrasing
14    thing.  I would like you to please identify
15    the departments that you are aware of,
16    sitting here today, or that you recall,
17    sitting here today, having been involved
18    with maintaining Brevet's organization
19    charts.
20               And I believe you have already
21    identified the ███████ department,
22    correct?
23         A.    Correct.
24               So, as I sit here today, over
25    time, there has been a ████ department and
```

Page 57

                    D. MONTICCIOLO

1

2    there have been others; I do not recall if

3    they were charged specifically with

4    maintaining the organizational chart back

5    that many years ago.

6         Q.    Okay.  Your best guess is that

7    in, say, 2016 time period, the department

8    that would have been tasked with

9    maintaining the company's organizational

10   charts was the ████████ department; is

11   that fair?

12        A.    Again, I did not say that.  I

13   am not going to guess.  You can ask our

14   compliance people.  I think you said you

15   deposed other people.

16        Q.    Yeah, I am only asking for your

17   recollection.  So if the answer is I don't

18   know, you will tell me you don't know.

19             My question is, to the best of

20   your knowledge, was the ████████

21   department the department that was tasked

22   with maintaining the company's

23   organizational charts in or about the 2016

24   time period.

25                  MR. SOLOMON:  Asked and

```
                                        Page 58
 1                    D. MONTICCIOLO
 2          answered.
 3          A.    Yes, as I've said, I don't
 4    recall, as I sit here today, back five,
 5    six years ago who was specifically in
 6    charge of that.
 7          Q.    So you don't know?
 8          A.    I said I don't recall.
 9          Q.    Sitting here today, you can't
10    tell me who was tasked with maintaining the
11    company's organizational charts in 2016?
12          A.    Correct.
13          Q.    Okay.  What's your -- do you
14    have a role or a title at Brevet Capital
15    Management, LLC?
16          A.    Yes.
17          Q.    And what is your role or title?
18          A.    CEO and CIO.
19          Q.    And Brevet Capital Management
20    receives payments from numerous other
21    Brevet entities; is that right?
22          A.    That's a very vague question,
23    can you repeat or clarify?
24          Q.    Sure, I can certainly repeat
25    it.  If there is any particular
```

```
                                        Page 59
 1                  D. MONTICCIOLO
 2     clarification that would be helpful, please
 3     let me know.
 4                  But I am just asking generally
 5     whether or not Brevet Capital Management,
 6     as an investment manager, receives payments
 7     from other Brevet-affiliated entities.
 8          A.    In a vague statement of Brevet,
 9     yes.
10          Q.    Okay.  It receives, for
11     example, fees from various funds, Brevet
12     funds?
13          A.    Yes.
14          Q.    Okay.  Does it receive payments
15     from Brevet's onshore funds?
16          A.    Yes.
17          Q.    Does it receive payments from
18     Brevet's offshore funds?
19          A.    Yes.
20          Q.    Okay.  Is it your understanding
21     that you owe a fiduciary duty to each of
22     the Brevet entities with which -- with
23     respect to which you hold a title?
24          A.    I'm sorry, could you repeat the
25     question?
```

```
                                           Page 60
```

D. MONTICCIOLO

1

2      Q.     Sure.   Is it your understanding

3   that you owe fiduciary duties to each of

4   the Brevet entities for which you hold a

5   title?

6      A.     For each of the fiduciary

7   duties related to those entities, yes.

8      Q.     And can you tell me your

9   understanding of what it means to owe

10   fiduciary duties?

11      A.     It means I have a fiduciary

12   duty to an entity.

13      Q.     What is your understanding of

14   what it means to have a fiduciary duty?

15      A.     It means I have an obligation

16   to follow certain rules and follow certain

17   guidelines that are consistent with that

18   organization.

19      Q.     Does it involve the duty to be

20   honest to whomever you owe fiduciary

21   duties?

22      A.     As I sit here, I couldn't tell

23   you if that is specifically one of them; I

24   would venture to say as a guess, yes.

25      Q.     Okay, well, yeah, I don't want

```
 1                    D. MONTICCIOLO
 2     you to guess, that's fair.  I am just
 3     asking whether your understanding of the
 4     duties that you owe includes the duty to be
 5     honest with the counterparties or entities
 6     to whom you owe fiduciary duties.
 7               MR. SOLOMON:  I object to the
 8          question.  That was not the question
 9          at all.  You asked about fiduciary
10          duty.  I object to the question.
11               MR. CYRULNIK:  Yeah, I think I
12          asked a follow-up question in which
13          you may have missed; but either way,
14          that is fine.  That is my question
15          now.
16          Q.    You are free to answer it.
17          A.    Actually, now I have forgotten
18     the question; could you repeat it?  Sorry.
19          Q.    Yes, sure.  My question is is
20     it your understanding that you owe a duty
21     to be open and honest with anyone, an
22     entity or an individual, to whom you owe
23     fiduciary duty?
24          A.    I would say that is part of
25     what a fiduciary duty is.
```

Page 62

                    D. MONTICCIOLO
1
2        Q.     Okay.  That's fair.
3               And is it your understanding
4    that you owe fiduciary duties to your
5    comembers of the various LLCs in which you
6    own a stake?
7        A.     Again, I think I said it's one
8    of the things that is a duty.  It's -- I
9    wouldn't say one is more important than
10   others.
11       Q.     Maybe I should rephrase the
12   question.
13              In addition to owing fiduciary
14   duties to various companies, which I think
15   you said you understood to have owed, I
16   just wanted to confirm that did you also
17   understand that you owe fiduciary duties to
18   your comembers of various LLCs.
19       A.     There are some degree of
20   fiduciary duties to comembers amongst the
21   other fiduciary duties in various roles,
22   yes.
23       Q.     In 2015, Mr. Iacovacci was a
24   comember of yours in several LLCs; is that
25   right?

```
                                           Page 63
 1                    D. MONTICCIOLO
 2          A.     No.
 3          Q.     You don't recall being a
 4     comember with Mr. Iacovacci in any LLCs?
 5          A.     I do.
 6          Q.     Okay.  Which LLCs do you recall
 7     being a comember of Mr. Iacovacci's?
 8          A.     As I sit here, I don't recall
 9     the exact names, but the two entities above
10     the onshore fund that ended in Partners and
11     Holdings.
12          Q.     Okay, short --
13          A.     Those two.
14          Q.     Sorry, I didn't mean to cut you
15     off.  But Brevet Short Duration Partners,
16     LLC and Brevet Short Duration Holdings,
17     LLC, do those sound like the two entities
18     that you had in mind?
19          A.     Yes.
20          Q.     Okay.  And you recall being a
21     comember of Mr. Iacovacci at each of those
22     LLCs, correct?
23          A.     Yes.
24          Q.     Okay.  And so in, let's say,
25     2015, you would agree that it was your
```

```
                        D. MONTICCIOLO
 1
 2      understanding that you owed a fiduciary
 3      duty to Mr. Iacovacci, as a comember of his
 4      in those two entities, correct?
 5            A.     No, I wouldn't agree with that.
 6                   I would say I owed fiduciary
 7      duties to a number of parties amongst
 8      Mr. Iacovacci.
 9            Q.     Okay.  Yeah, I didn't mean to
10      exclude from, you know, by way of my
11      question owing fiduciary duties to one or
12      more other parties.  I am just focusing,
13      for obvious reasons, Mr. Monticciolo, on
14      the duties you understood to have owed to
15      Mr. Iacovacci.
16                   So, with that qualification,
17      you would agree with me that in 2015, it
18      was your understanding that you owed Paul
19      Iacovacci fiduciary duties in connection
20      with your respective comembership interests
21      in Brevet Short Duration Partners, LLC and
22      Brevet Short Duration Holdings, LLC, right?
23            A.     Yes, I believe I had the same
24      fiduciary duties that he did.
25                   MR. CYRULNIK:  All right, I am
```

```
                                    Page 65
```

D. MONTICCIOLO

```
 1
 2          going to introduce an exhibit, so we
 3          can get our feet wet with respect to
 4          the Exhibit Share program.  So let's
 5          hope this goes well, on my end as
 6          well as yours.
 7               And I am going to add the stamp
 8          and introduce the exhibit.  We have a
 9          bunch of my colleagues occupied at a
10          bunch of depositions today, so I am
11          going to be doing this myself.
12               (Whereupon, the aforementioned
13          document entitled "Corporate
14          Organizational Chart" was marked as
15          Plaintiff(s)' Exhibit 1 for
16          identification as of this date.)
17               THE WITNESS:  So we have the
18          Solomon technology here.
19               MR. CYRULNIK:  Yes, you guys
20          are in good hands.  All right,
21          well -- yeah, that's fair.
22               So I think I just introduced
23          Exhibit 1.  You tell me whether I was
24          successful.  If you take a look at
25          the marked exhibits folder and
```

```
                                              Page 66
 1                        D. MONTICCIOLO
 2              refresh it by clicking on the title
 3              bar on the left, that should be the
 4              best way of refreshing that folder.
 5                   And please tell me whether or
 6              not Exhibit 1 has popped into your
 7              list of exhibits.
 8                   MR. SOLOMON:  I think it's
 9              opened on the screen.
10                   MR. CYRULNIK:  Excellent.  All
11              right, I am impressed with myself.
12         Q.     And, Mr. Monticciolo, I will
13     ask you to take a moment to review this
14     organizational chart which was produced by
15     Brevet with metadata that labels it
16     March 1st of 2016 and tell me whether you
17     recognize this chart.
18         A.     As I sit here, I don't
19     recognize or recall this exact chart.
20         Q.     Okay, does it look like one of
21     the many organizational charts you recall
22     seeing over the years?
23         A.     It has the format of one of our
24     charts.
25         Q.     Okay.  And if you scroll down
```

Page 67

D. MONTICCIOLO

1          to page -- well, let's start with page one,
2     you have Brevet Holdings, LLC, 99 percent
3     owned by yourself and 1 percent owned by
4     your wife, as you had previously described,
5     does that seem consistent with the
6     ownership interest of Brevet Holdings, LLC
7     in March of 2016?
8              A.    Again, as I can't -- sitting
9     here, I can't tell you exactly if that was
10    the case in 2016 and I don't think this
11    chart says 2016 on it.
12             Q.    Yeah, so just to make sure that
13    you heard me on that one, I just wanted to
14    make the representation that this chart was
15    produced by Brevet and that in its
16    production, it has metadata that labels it
17    March 1, 2016.
18             A.    Okay, so I can see that this
19    is, from what you are saying, this was a
20    file from 2016 that is a version of the
21    organizational chart.
22             Q.    Okay.  That is fine.
23                   And you will see that it
24    indicates that Brevet Capital Management,

Page 68

1              D. MONTICCIOLO
2    LLC, which I believe was an entity we were
3    talking about a few minutes ago, was
4    100 percent owned by its parent Brevet
5    Holdings, LLC; is that right?
6         A.    That appears to be what the
7    chart is showing.
8         Q.    Okay.  Any reason to doubt that
9    in March of 2016, Brevet Capital Management
10   was 100 percent owned by Brevet Holdings?
11        A.    I can't answer.  As I sit here,
12   I don't know what the corporate ownership
13   was or if this was a draft or an old
14   version.  But I am sure we have produced
15   that for you already.
16        Q.    Yeah, I am just asking, as you
17   sit here today, do you have any reason to
18   doubt -- any reason to believe that Brevet
19   Capital Management was not owned
20   100 percent by Brevet Holdings?
21        A.    I do.  Because, as I said
22   before, our organization has evolved over
23   the last 23 years based on counsels' input
24   and tax and a number of other things, so I
25   don't have specific memory of exactly this

```
                                      Page 69
 1                     D. MONTICCIOLO
 2      in 2016.
 3            Q.     Yeah, and I --
 4            A.     I believe we have produced
 5      that.
 6            Q.     Yes, thank you.  And I
 7      understand you are testifying that you
 8      don't have specific memory to corroborate
 9      the particular structure that we are
10      looking at as of March 1st of 2016.  My
11      question is intentionally coming at it from
12      the other direction because of the
13      testimony that you just gave about your
14      specific recollection.
15                   Do you have any specific reason
16      to doubt that Brevet Capital Management was
17      owned 100 percent by Brevet Holdings on
18      March 1st of 2016; recognizing that you
19      don't have any, you know, independent
20      recollection to corroborate that that was
21      the case, do you have any specific reason
22      to doubt that that was the case, that the
23      corporate structure we are looking at on
24      this page would have been inaccurate as of
25      March 1st of 2016?
```

Page 70

1                    D. MONTICCIOLO

2          A.     Yes, I do.

3          Q.     Okay, can you explain to me why

4    you think that this page incorrectly

5    describes the corporate structure of the

6    four entities listed here, of one or more

7    of the four entities listed here?

8          A.     As I have already answered, the

9    structure is constantly evolving, we are

10   always trying to be as tax efficient and

11   structure efficient, regulations are

12   changing.  I can't recall a specific point

13   in time if back five plus years ago this

14   was the structure, because things are

15   changing.  That is why I have professionals

16   to do this.

17         Q.     Other than what you have just

18   described, that there were changes over the

19   course of 23 years of Brevet's history, do

20   you have any other reason to doubt the

21   accuracy of the corporate structure

22   depicted on page one of Exhibit 1?

23         A.     No.

24                But I find it hard to believe

25   that there are any other reasons that, that

Page 71

                    D. MONTICCIOLO

1

2     there could be doubt.  I believe that's why

3     there would be doubt.

4          Q.    Okay.  Scroll down to the last

5     page of the exhibit, page four, you will

6     see a slide entitled "Brevet Funds

7     Organizational Chart," do you see that?

8          A.    Just to confirm, which page are

9     you on?

10         Q.    I am on the final page of

11    the -- oh, sorry, is it the final page,

12    hold on.  It's the last page of the

13    exhibit.  Is it page three?

14         A.    Is the number at the bottom

15    different; do you know?

16         Q.    Yeah, so if you scroll down to

17    the very end of the exhibit, the easiest

18    way to identify it for the record would be

19    if you look at the bottom right-hand corner

20    of the page, there is a Bates stamp that

21    ends in 23.

22         A.    Hold on.  Our technology person

23    here is doing something else.

24              MR. SOLOMON:   Technology

25         expert.

```
                                          Page 72
 1                    D. MONTICCIOLO
 2          A.    Expert.  Sorry, technology
 3     expert.  Mouse issues.
 4                 There it is, 7723?
 5                 MR. CYRULNIK:  I am glad I am
 6           winning the battle for now, Lou, but
 7            I am not sure that I am betting on
 8            myself.
 9          Q.    Yeah, 23.
10          A.    Yes, I see the chart.  Give me
11     a moment to review it.
12                 Okay.  Sorry, I am dyslexic, so
13     it's just a little slow there.
14          Q.    No problem.
15          A.    I'm sorry, I am done, I looked
16     at it.
17          Q.    Okay.  So you will see on this
18     page where it describes, I am focusing in
19     particular on the left-hand side of the
20     page, to the middle of the page, that is
21     the portion that is entitled "Short
22     Duration Fund" together with the middle
23     entity, Brevet Capital Management, LLC, I
24     would like to review what I am looking at
25     together with you and you will tell me if I
```

Page 73

1                    D. MONTICCIOLO
2      am understanding it correctly and whether
3      or not this comports with your recollection
4      of the corporate structure of Brevet with
5      respect to at least these entities in March
6      of 2017, okay?
7            A.    Okay.
8            Q.    Okay.  So I see Brevet Capital
9      Management listed as the investment manager
10     in the middle of the page and then I see
11     some lines drawn to two different funds,
12     there is a Brevet Direct Lending Short
13     Duration Fund, LP and Brevet Direct Lending
14     Short Duration Fund, Ltd., do you see those
15     two entities and the lines connecting them
16     to Brevet Capital Management, LLC?
17           A.    Yes.
18           Q.    And is it your recollection
19     that Brevet Capital Management served as
20     the investment manager for each of those
21     two short duration funds?
22                 In 2016.
23           A.    In 2016, I don't recall if we
24     did.
25           Q.    Okay.  Do those two entities,

```
                                   Page 74
 1                    D. MONTICCIOLO
 2       the Short Duration Fund, LP and the Short
 3       Duration Fund, Ltd., exist today?
 4            A.    They exist today, yes.
 5            Q.    You just don't remember whether
 6       they were both in existence in 2016; is
 7       that right?
 8            A.    Correct.
 9            Q.    And is the Short Duration Fund,
10       LP, that's another way of referring to what
11       you would call the onshore short duration
12       fund; is that a fair nomenclature?
13            A.    Yes.
14            Q.    And Short Duration Fund, Ltd.,
15       can we refer to that as the offshore short
16       duration fund; is that a nomenclature that
17       makes sense to you?
18            A.    Yes.
19            Q.    Okay.  Sitting here today, is
20       it your understanding that Brevet Capital
21       Management serves as the investment manager
22       for both the onshore short duration fund
23       and the offshore short duration fund?
24            A.    As depicted in this chart, I am
25       not certain, but I don't believe that's
```

Page 75

```
 1                    D. MONTICCIOLO
 2     correct.
 3          Q.    So setting aside this chart,
 4     which is a 2016 chart, I am just asking
 5     about your -- the way things currently are
 6     set up, is it your understanding that
 7     Brevet Capital Management serves as the
 8     investment manager for the onshore short
 9     duration fund?
10          A.    To clarify, I think you said
11     the onshore short duration fund.
12                Yes.
13          Q.    And how about the offshore
14     fund, sitting here today, is it your
15     understanding that Brevet Capital
16     Management currently serves as the
17     investment manager for the offshore short
18     duration fund?
19          A.    As I am sitting here today,
20     without checking with our -- with the
21     compliance people, I don't believe we are
22     direct investment manager for that vehicle.
23     This isn't the structure that we have.
24          Q.    Okay, what is your best
25     recollection or understanding of the
```

```
 1                     D. MONTICCIOLO
 2      relationship between Brevet Capital
 3      Management investment manager on the one
 4      hand and Brevet Direct Lending Short
 5      Duration Fund, Ltd. on the other?
 6           A.   As I sit here, without -- and,
 7      again, we have produced these materials for
 8      you.  But there are -- the offshore is not
 9      as simple as this picture and that is why I
10      can't exactly answer that.
11                It's something you would have
12      to ask our compliance parties.  Or I am
13      sure it's something we have produced
14      already.
15           Q.   Is there more than one
16      investment manager entity at Brevet?
17           A.   No.
18           Q.   The only investment manager
19      entity is Brevet Capital Management, LLC,
20      right?
21           A.   Yes.
22           Q.   And that's an entity that is
23      registered under the Investment Advisers
24      Act?
25           A.   Correct.
```

Page 77

D. MONTICCIOLO

1

2          Q.     Okay.   Does each fund at Brevet

3     have an investment manager?

4          A.     It does.

5          Q.     Okay.   Am I correct in

6     inferring from your answers to the last two

7     questions that each fund at Brevet would

8     have Brevet Capital Management, LLC serving

9     as its investment manager?

10         A.     No.

11         Q.     Okay.   So can you explain to me

12     what I am missing; if the only investment

13     manager at Brevet is Brevet Capital

14     Management and each fund has an investment

15     manager, can you tell me how it is that one

16     or more funds would have an -- would not

17     have Brevet Capital Management serving as

18     its investment manager?

19         A.     Yes.   And, again, to the best

20     of my recollection and knowledge.   Again,

21     you have been produced these materials, you

22     should speak with our compliances people or

23     legal people on this.

24               But there are vehicles

25     particularly for offshore that the manager

```
                         D. MONTICCIOLO
 1
 2      manages which may not be specifically the
 3      offshore fund.
 4           Q.    So it's possible it's your
 5      understanding that --
 6                 MR. CYRULNIK:  Withdrawn.
 7           Q.    It's your understanding that
 8      the offshore fund does not have an
 9      investment manager but that, instead, it
10      has various vehicles that have Brevet
11      Capital Management serving as their
12      investment manager; is that -- did I
13      understand you correctly?
14           A.    I hate to ask you to repeat
15      that, sorry.
16           Q.    No problem.  I just want to
17      make sure I understood you correctly.
18                 Is it your testimony that, to
19      the best of your knowledge, the offshore
20      fund, the offshore short duration fund does
21      not have an investment manager itself but
22      instead has various vehicles that have
23      Brevet Capital Management serving as their
24      investment managers?
25           A.    What I said was you should
```

```
                        D. MONTICCIOLO
 1
 2      check with the materials we have produced
 3      and our compliance and legal people to get
 4      the exact structure, but I, as I sit here,
 5      am not confident that Brevet's investment
 6      manager is directly at the Ltd., but
 7      potentially at -- again, you have to look
 8      at the structures from the people on what
 9      it's managing maybe on behalf of the Ltd.
10           Q.     I understand.  And just to save
11      you some time and save some time on the
12      record, I appreciate that you may believe
13      that there are other witnesses or
14      departments that may have more knowledge
15      about certain topics and, you know, with
16      the exception of the 30(b)(6) topics, I
17      understand that you are not the be all and
18      end all in terms of testimony that we are
19      getting on some of the questions I am
20      asking.
21                That said, as I am sure
22      Mr. Solomon explained to you, I am entitled
23      to ask you questions about your
24      understanding of all of these topics.  And
25      so I am only asking for your best, you
```

D. MONTICCIOLO

1
2    know, and honest testimony on these things.
3    If you think that there are others who
4    might have more knowledge, that's fine.
5              If I ask you who might know
6    that, that would a great time for you to,
7    you know, flag for me who else you think I
8    should be talking to.  But, otherwise, I
9    really just want to get your understanding,
10   recognizing that there are going to be some
11   things that you may not understand or may
12   not recall, okay?
13        A.    Okay.
14        Q.    Okay.  So with that
15   clarification, I appreciate that you are
16   not sure whether Brevet Capital Management,
17   LLC is the investment manager for the Ltd.
18   itself, but am I correct in understanding
19   you to say that Brevet Capital Management,
20   LLC is either the investment manager for
21   the Ltd. itself or, alternatively, the
22   investment manager for various vehicles,
23   investment vehicles that flow up to the
24   Short Duration Fund, Ltd.?
25        A.    As I said, the best of my

```
                             D. MONTICCIOLO
 1
 2      knowledge, I believe that's a good high
 3      level description of it.
 4           Q.    Okay.   Thanks.
 5                 I would like to talk to you for
 6      a couple of minutes about the short
 7      duration loan business.   Could you briefly
 8      describe for me the type of business that
 9      Brevet is engaged in with respect to short
10      duration loans?
11           A.    We are a lender for special
12      opportunities to make loans for a variety
13      of businesses that are collateralized and
14      we believe have good risk/reward
15      characteristics.
16           Q.    Okay.   And in that description,
17      did you reference the duration of the loan
18      at all or was that a general description of
19      all of Brevet's lines of business?
20           A.    That is a general description
21      for Brevet's lines of business.
22           Q.    Okay, so if we focus on the
23      short duration piece of the business, can
24      you describe sort of what that part of the
25      business is as distinguished from any other
```

Page 82

D. MONTICCIOLO

1  parts of the business?

3       A.    As I sit here, I believe the

4  allocation guidelines or guidelines for

5  that vehicle are that the assets have a

6  liquidity duration target and a portfolio

7  liquidity duration target.

8       Q.    And is the liquidity duration

9  target and portfolio liquidity duration

10  target for the short-term loan business a

11  particular number of years?

12      A.    It is a number of months.

13      Q.    Okay.  Can you tell me what

14  that number of months is or what the

15  maximum duration would be?

16      A.    The liquidity duration maximum

17  would be 12 months for the assets and

18  18 months for the portfolio.

19      Q.    Got it.  And that's for the

20  short-term duration loan business?

21      A.    Correct.

22      Q.    And what about the intermediate

23  duration piece of the business, is there a

24  similar liquidity duration term and

25  portfolio liquidity duration term

Page 83

```
1                    D. MONTICCIOLO
2      associated with that business?
3           A.    No.
4           Q.    Okay.  So intermediate, does
5      that just mean longer than something that
6      would qualify for the short-term duration
7      loan business?
8           A.    It could.
9           Q.    Okay.  Could intermediate
10     duration fund be engaging in a transaction
11     involving a liquidity duration target of
12     less than 12 months?
13          A.    Yes.
14          Q.    Okay.  So, whereas, short
15     duration has a maximum liquidity duration
16     target and intermediate has neither a
17     minimum nor a maximum liquidity duration
18     target; is that fair?
19          A.    That's fair.
20          Q.    Okay.  And can you just briefly
21     describe for me the difference between the
22     liquidity duration target and the portfolio
23     liquidity duration target?
24                I know that you described the
25     actual number of months as 12 versus 18,
```

Page 84

1                     D. MONTICCIOLO
2     but if you could just describe what it
3     means to have a liquidity duration target
4     versus the portfolio liquidity duration
5     target.
6          A.    Portfolio liquidity duration
7     target is at the, at the time of
8     origination of assets that the portfolio,
9     the funds.  Liquidity duration for its
10    assets on a weighted average basis would be
11    less than 18 months or equal to.
12         Q.    The portfolio is describing a
13    variety of different deals or is it
14    describing a variety of different deals
15    with a variety of different counterparties?
16         A.    I'm sorry, could you clarify
17    your question?
18         Q.    Yeah, sorry, maybe I should
19    just ask you to qualify your answer
20    instead.  But I am just trying to
21    understand, when you refer to the
22    portfolio, can you give me a little bit
23    more detail as to what that refers to?
24         A.    Yes.  It would be synonymous
25    with the fund.

```
                                    Page 85
 1                   D. MONTICCIOLO
 2        Q.     I see.
 3        A.     (Inaudible.)
 4        Q.     Yes, go ahead.  More clarity
 5    would be helpful for me to formulate the
 6    right -- use the right terminology when
 7    going forward.
 8        A.     So a fund is a portfolio of
 9    assets, right?
10        Q.     Right.
11        A.     So they are synonymous.
12        Q.     Got it.
13        A.     So it's a portfolio of assets.
14               The investments, how's that?
15        Q.     Yes.  Understood.
16               So short duration -- let me
17    just try to tease this out a little bit
18    more.
19               So short duration fund, one of
20    the assets that short duration fund would
21    have or one of the investments that short
22    duration fund would have would be -- would
23    it be a note from or the equivalent
24    documentation from an entity that borrowed
25    money from the fund for a particular
```

Page 86

D. MONTICCIOLO

1    purpose; is that one of the assets, for
2    example, that the short duration fund would
3    have?
4
5         A.    Yes.
6         Q.    Okay.  And so there are various
7    assets that the fund would have at any
8    given moment in time and the portfolio
9    would be a way of describing all of those
10   assets together, all of those notes
11   together, for example?
12        A.    Yes.
13        Q.    Okay.  So when we talk about
14   the portfolio liquidity duration target,
15   are we talking about the fund divesting of
16   or liquidating all of those assets within
17   18 months of their respective originations?
18        A.    No.
19        Q.    Okay, can you take the piece of
20   information that I did get right and link
21   it up to the 18-month portfolio liquidity
22   duration target for me?
23        A.    Yes, so liquidity duration is
24   the liquidity of the underlying collateral,
25   the time of which money comes back on an

Page 87

                        D. MONTICCIOLO
1
2    asset.  And it doesn't necessarily mean
3    that the asset itself has finished or the
4    relationship has finished, it just means
5    that the cash went out and the cash came
6    back; whereas, we may have a much longer
7    relationship in various forms.
8         Q.    Okay.  That's helpful.
9              So once the cash goes out and
10   comes back, which I take it has to happen
11   within 12 months based on the liquidity
12   duration target, can you describe for me
13   what the continuing up to six-month
14   relationship might involve?
15        A.    That's not correct, it's not up
16   to six months.  We -- the --
17              We put cash out into a
18   particular transaction with a particular
19   borrower, it may come back in a day or it
20   may come back in 12 months or more.
21              Again, duration is not
22   maturity.  And the relationship might be to
23   do that with a third party that brings us
24   many other borrowers that are individual
25   transactions.

Page 88

D. MONTICCIOLO

1   Q.   The relationship describes the
2   overarching deal between Brevet and a third
3   party and there may be a whole bunch of
4   other transactions that are occurring
5   underneath the rubric of that relationship;
6   is that right?
7
8   A.   That is close enough, yes.
9   Q.   Okay.  What qualifies as a sort
10  of relationship; is it just that there is
11  one counterparty or one third party that is
12  serving as your counterparty in order for
13  that to be described as a relationship?
14  A.   It is usually not describing a
15  counterparty.  It's describing an agreement
16  or relationship.
17  Q.   Okay.  Is it fair to say one
18  agreement per relationship or is that also
19  not a fair description?
20  A.   For these purposes, that can
21  work.
22  Q.   Okay.  I think I understand
23  what you are explaining to me.
24       And then are there additional
25  agreements that are executed in connection

                    D. MONTICCIOLO

1
2    with the transactions that occur within the
3    rubric of the relationship you just
4    described?
5         A.    Yes, typically.
6         Q.    Okay.  And they are united by
7    the fact that it is one overall
8    relationship with one type of financing
9    that is involved?
10        A.    That's vague, but mostly
11   correct.
12        Q.    Okay, can you tell me -- and I
13   appreciate that I may not be using the same
14   terminology that I would use if I had the
15   same level of experience in the business
16   that you are in, but if you can identify
17   for me anything that you think needs to be
18   clarified about that to make sure that it
19   is completely accurate, that would be
20   helpful.
21        A.    So it's through the
22   relationship that transactions that have
23   independent and distinct counterparties
24   and, in many cases, loans or financings
25   that are coming through or because of that

Page 90

```
1                    D. MONTICCIOLO
2       relationship.
3                 Did that clarify?
4            Q.    I think so.  Thanks.
5                 MR. CYRULNIK:  Okay, I think we
6            have been going for about an hour and
7            a half and I know that in addition to
8            you and Mr. Solomon, there is also a
9            court reporter, so why don't we go
10           off the record for a few minutes.
11                THE WITNESS:  You are a mind
12           reader.
13                THE VIDEOGRAPHER:  The time is
14           10:05 and we are going off the
15           record.  This is the end of media
16           unit No. 1.
17                (Whereupon, a brief recess was
18           taken.)
19                THE VIDEOGRAPHER:  The time is
20           10:15 and we are back on the record.
21           This is the beginning of media unit
22           No. 2.
23      CONTINUED EXAMINATION
24      BY MR. CYRULNIK:
25           Q.    Welcome back, Mr. Monticciolo.
```

Page 91

```
 1              D. MONTICCIOLO
 2              Brevet Holdings, Brevet Capital
 3    Management and the short duration entities,
 4    Short Duration Partners, LLC and the Short
 5    Duration Holdings, LLC, would you describe
 6    those all as operating as a single
 7    enterprise under common control?
 8         A.    I, I don't know how to answer
 9    that question.  I, I wouldn't.
10         Q.    You would not.  Well, let's
11    break it down.
12              Would you describe them as
13    operating under a common control?
14         A.    Could you repeat your original
15    question, to make sure I understand it?
16         Q.    Sure, I am breaking down the
17    original question, just to make it easier,
18    given your response.
19         A.    Sure.
20         Q.    The new question is would
21    you -- starting with the basic building
22    blocks here, would you describe Brevet
23    Holdings, Brevet Capital Management, Brevet
24    Short Duration Partners, LLC and Brevet
25    Short Duration Holdings, LLC as operating
```

```
 1                    D. MONTICCIOLO
 2     under common control?
 3          A.    Can you explain what common
 4     control would mean?
 5          Q.    Sure, what does that term mean
 6     to you?
 7          A.    I don't have a clear single
 8     view of what that means.
 9          Q.    You have never heard the term
10     common control?
11          A.    I have heard the term common
12     control.
13          Q.    And what --
14          A.    It's in many different
15     contexts.
16          Q.    Okay, what contexts have you
17     heard common control used in?
18          A.    I don't recall.
19          Q.    Well, have you ever used it in
20     the context -- have you heard it used or
21     used it yourself in the context of
22     describing various businesses?
23          A.    Myself, I -- no, as I sit here,
24     I don't recall.  I, I don't recall.
25          Q.    Okay.  Well, does it mean
```

```
                                        Page 93
 1                 D. MONTICCIOLO
 2    anything to you in the context of
 3    describing various businesses that are
 4    separate entities but, nonetheless,
 5    operating at the direction of some common
 6    group of people?
 7         A.    I'm sorry, could you repeat the
 8    question again?
 9              MR. CYRULNIK:  Can the court
10         reporter read back the question,
11         please.
12         A.    Sorry.
13              (Whereupon, the referred to
14         question was read back by the
15         Reporter.)
16         A.    I don't think it's a simple
17    description or simple answer.
18         Q.    So is the answer no, you
19    wouldn't view the Brevet entities that I
20    just listed as operating under common
21    control?
22         A.    Correct.
23         Q.    And why not?
24              MR. SOLOMON:  Object to the
25         question.
```

Page 94

                    D. MONTICCIOLO
1
2          A.    Because of what I answered
3      already, it's not a simple question.
4          Q.    Well, you are not just
5      answering no to all questions that are not
6      simple, so I just want to understand why
7      you answered no as opposed to yes.
8              MR. SOLOMON:   I object to the
9          question.
10         A.    Because I don't think it's a
11     yes-no question.
12         Q.    Okay, what factors do you think
13     you would want to know in order to be able
14     to decide whether to describe two or more
15     businesses as operating under common
16     control?
17         A.    I would seek experts, lawyers,
18     others to help, you know, identify what
19     those conditions are based on the
20     situation.
21         Q.    You would need to seek the help
22     of lawyers and experts to decide whether or
23     not you viewed businesses as operating
24     under common control; is that what you are
25     saying?

```
                                        Page 95
 1                  D. MONTICCIOLO
 2        A.     Yes.
 3        Q.     Mr. Monticciolo, is it fair to
 4    say that no material decision happens at
 5    Brevet without you having a say in the
 6    decision?
 7               MR. SOLOMON:  I object to the
 8          question; no foundation.
 9        A.     I would not agree with that.
10        Q.     Okay.  Do you think that the
11    buck stops at you when it comes to Brevet?
12        A.     I would not agree with that.
13        Q.     Okay, and why not?
14        A.     Because it doesn't.
15        Q.     Well, apart from yourself, who
16    else do you think is able to make
17    decisions, material decisions affecting
18    Brevet without getting your blessing?
19        A.     We have a large organization
20    with professionals that are empowered to
21    make material decisions.
22        Q.     And all of those professionals
23    ultimately answer to you, right?
24        A.     No.
25        Q.     Which professionals at Brevet
```

```
 1                    D. MONTICCIOLO
 2      don't ultimately answer to Doug
 3      Monticciolo?
 4            A.    Again, as I sit here, I can't
 5      answer specifically; it's a large
 6      organization.
 7            Q.    Can you identify one?
 8            A.    Yes.
 9            Q.    Please go ahead.
10            A.    By name?
11            Q.    I'm sorry?
12            A.    By name?
13            Q.    Yes.
14            A.    Manuel.
15            Q.    Does Manuel have a last name?
16            A.    I'm sure, yes.
17            Q.    You don't know Manuel's last
18      name?
19            A.    As I sit here.
20            Q.    As you as you sit here, you
21      don't?
22            A.    No.
23            Q.    Okay, do you know Manuel's
24      position?
25            A.    He is a senior person in our
```

Page 97

                        D. MONTICCIOLO

1
2    risk management group.
3          Q.    Okay, and why is it that you
4    believe Manuel, senior position in your
5    risk management group, does not ultimately
6    answer to you?
7          A.    Because he doesn't.
8          Q.    Well, what entity does he work
9    for?
10         A.    I, as I sit here, I don't know
11   specifically.
12         Q.    You don't even know what entity
13   he works for?
14         A.    Correct.
15         Q.    Okay.  Do you know that it's an
16   entity where you have no title?
17         A.    I'm sorry, repeat the question,
18   I have no?
19         Q.    Notwithstanding the fact that
20   you don't know the entity that employs
21   Manuel, do you know that the entity that
22   employs him is an entity in which you hold
23   no position?
24         A.    I don't know.
25         Q.    Then how is it that you are

```
 1                    D. MONTICCIOLO
 2     able to testify today that Manuel doesn't
 3     ultimately answer to you?
 4          A.     Because he reports to Mark.
 5          Q.     Okay, does Mark report to you?
 6          A.     No.
 7          Q.     In your view, Mr. Callahan
 8     doesn't report to you in any way?
 9          A.     I didn't say in any way.
10          Q.     Well, what did you mean when
11     you said no to my previous question does
12     Mark Callahan report to you?
13          A.     Mark Callahan does not report
14     to me as an employee in the sign of report.
15          Q.     And I appreciate that he may
16     not be reporting to you as an employee, I
17     am asking much more generally, is it your
18     view that Mark Callahan is able to make
19     decisions that affect the business of
20     Brevet without consulting you or against
21     your wishes?
22                 MR. SOLOMON:  Object to the
23           form.
24          A.     As I sit here, I would say yes.
25          Q.     So you don't think you have
```

```
1                    D. MONTICCIOLO
2     ultimate authority over Mark Callahan?
3          A.    We have policies and procedures
4     that legislate how things work.
5          Q.    I appreciate that; if you can
6     answer my question, though.
7          A.    If it's within those policies
8     and procedures, yes.
9          Q.    If you wanted to get rid of
10    Mark Callahan, do you have the ability to
11    do that?
12         A.    I don't know.
13         Q.    You don't know whether you can
14    terminate Mr. Callahan in his various
15    positions at Brevet?
16         A.    I didn't say that.
17         Q.    Okay.  Do you know whether you
18    can terminate Mr. Callahan's various
19    positions at Brevet?
20         A.    I would have to consult our
21    compliance and HR people.
22         Q.    Well, then back to my last
23    question, you don't know, sitting here
24    today, whether you can terminate
25    Mr. Callahan's various positions at Brevet?
```

Page 100

```
  1                    D. MONTICCIOLO
  2         A.    Again, I answered that
  3    question.
  4         Q.    I thought you did answer it,
  5    but then you gave me an answer to the next
  6    question which, at least, I understand to
  7    be in conflict to that, which is why I am
  8    returning to it.  So if there is a
  9    misperception there, my apologies in
 10    advance, but if you could answer the
 11    question again, that would be helpful.
 12         A.    So what is the question again?
 13         Q.    Sitting here today, is it your
 14    view that you are able to effectuate a
 15    termination of Mr. Callahan from the
 16    various Brevet entities if you wanted to?
 17         A.    I don't know.
 18         Q.    To put it colloquially,
 19    Mr. Monticciolo, you are the boss, right?
 20         A.    I wouldn't -- this is -- I
 21    wouldn't call it that.  I am the CEO.
 22         Q.    Well, I know you are the CEO.
 23               You don't think that you are in
 24    charge and ultimately accountable for
 25    everything that happens at the Brevet
```

Page 101

D. MONTICCIOLO

1              D. MONTICCIOLO

2    entities?

3                MR. SOLOMON:   Asked and

4          answered.

5          A.    I said no.

6          Q.    If somebody at Brevet violates

7    a criminal statute, say, related to hacking

8    into a computer, is it your view that as

9    the CEO, you are not ultimately responsible

10   for that act of misconduct?

11               MR. SOLOMON:   I object to the

12         question.

13         A.    I don't know how to answer that

14   question.

15         Q.    Well, yes or no would be fine,

16   or I don't know.   Those are the --

17         A.    I don't know.

18         Q.    -- three answers.

19               You don't know.

20               Do you accept responsibilities

21   for those who are acting at Brevet in their

22   various capacities?

23         A.    Not on a broad basis, no.

24         Q.    Interesting.

25               Does every fund have a separate

Page 102

                        D. MONTICCIOLO

1

2     offshore fund?

3          A.    I don't know.

4          Q.    With respect to the short

5     duration piece of Brevet, are there any

6     funds other than the Short Duration Fund,

7     LP and the Short Duration Fund, Ltd.?

8          A.    At Brevet?

9          Q.    Correct.

10         A.    Yes.

11         Q.    What are the other funds in the

12    short duration side of Brevet?

13         A.    I'm sorry, I thought you said

14    just at Brevet in general?

15         Q.    Yeah, my question was, and I

16    don't have the transcript in front of me,

17    but my question was within the short

18    duration side of Brevet, are there any

19    funds other than the onshore fund we talked

20    about earlier, which was the Short Duration

21    Fund, LP, and the offshore fund that we

22    talked about earlier, which was the Short

23    Duration Fund, Ltd.?

24         A.    To the best of my knowledge,

25    no.

```
 1                    D. MONTICCIOLO
 2          Q.    Okay.  And your answer to my
 3     last question was referring to the fact
 4     that in addition to the short duration
 5     onshore fund and the short duration
 6     offshore fund, there are also intermediate
 7     duration fund, onshore funds and -- there
 8     is also an intermediate onshore fund and an
 9     intermediate duration offshore fund,
10     correct?
11          A.    Correct.
12          Q.    Okay.  And those are the four
13     funds at Brevet in toto?
14          A.    Correct.
15          Q.    Okay.  When was the Short
16     Duration Fund, Ltd., the offshore short
17     duration fund, first created, to your
18     knowledge?
19          A.    I don't know.
20          Q.    Do you know if it was before or
21     after 2016?
22          A.    I don't recall.
23          Q.    Do you recall whether it was
24     before or after 2013?
25          A.    As I said, I don't recall.
```

```
 1                    D. MONTICCIOLO
 2         Q.    So you don't know whether it
 3    predated 2013?
 4         A.    I do not.
 5         Q.    Were you involved in the
 6    creation of the short duration fund
 7    offshore?
 8         A.    Yes.
 9         Q.    And can you tell me was it your
10    idea to create an offshore fund?
11         A.    I don't know if it was my idea.
12         Q.    You just don't remember?
13         A.    I don't know if it was my idea.
14         Q.    You don't remember whether it
15    was your idea?
16         A.    I don't remember.
17         Q.    The offshore fund was created
18    after the onshore fund had been in
19    existence, correct?
20         A.    I don't recall.
21         Q.    So sitting here today, in your
22    mind, it's possible that the onshore fund
23    and the offshore fund were created at the
24    exact same time?
25         A.    Again, I don't recall.
```

                    D. MONTICCIOLO
1
2        Q.    So yes, sitting here today,
3     it's possible, in your mind, that the two
4     funds were created at the same time?
5        A.    I just don't recall.
6        Q.    Do you remember why it is that
7     you created an offshore fund?
8        A.    For offshore investors.
9        Q.    What does that mean?
10        A.    For offshore investors.
11        Q.    Does that mean that Brevet
12     Direct Lending Short Duration Fund, LP, the
13     onshore fund, never took on investors that
14     lived outside of the United States?
15        A.    I don't know the answer to
16     that.
17        Q.    Well, then what do you mean
18     that the offshore fund was created for
19     offshore investors; were offshore investors
20     allowed to invest in Short Duration Fund,
21     LP?
22        A.    I don't know.  You have to...
23        Q.    Who do I have to ask?
24        A.    Compliance.
25        Q.    So you don't know whether

Page 106

```
                            D. MONTICCIOLO
 1
 2     offshore entities or individuals are
 3     permitted to invest in Brevet Direct
 4     Lending Short Duration Fund, LP?
 5          A.    Correct.
 6          Q.    So if to your knowledge you are
 7     not aware of anything that precluded
 8     entities or individuals located outside of
 9     the United States from investing in the
10     onshore fund, why is --
11          A.    I didn't said that.
12          Q.    You didn't say that you said?
13          A.    Correct.
14          Q.    Well, then let me ask you the
15     question directly.
16               To your knowledge, is there
17     anything that precludes individuals or
18     entities that are not located in the United
19     States from investing in Brevet Direct
20     Lending Short Duration Fund, LP?
21          A.    To my knowledge, there are many
22     reasons.
23          Q.    To your knowledge, yes, there
24     are things that prevent entities or
25     individuals living outside the United
```

Page 107

                    D. MONTICCIOLO

1
2      States from investing in the onshore

3      duration fund?

4                MR. SOLOMON:  Object to the

5            form.

6            A.    I didn't say prevent.  There

7      could be prevent.

8            Q.    Yeah, I am struggling a little

9      bit with this line.  I am not trying to,

10     you know, get you to say anything in

11     particular, I am just trying to understand

12     your answer.

13                To put it as squarely as I can,

14     I am trying to understand, Mr. Monticciolo,

15     to your mind, in your mind, sitting here

16     today, were individuals or entities located

17     outside of United States permitted to

18     invest in the onshore short duration fund,

19     yes or no?

20           A.    I don't know.  No, I don't know

21     if they are permitted.

22           Q.    Okay.  Now, moving on from

23     permitted to what actually happened, to

24     your knowledge, can you tell me one way or

25     the other whether or not individuals or

```
 1                    D. MONTICCIOLO
 2    entities located outside of the United
 3    States did in fact at any point in time
 4    invest in the onshore duration fund, short
 5    duration fund?
 6          A.    I am not aware of offshore
 7    investors investing in the onshore funds.
 8          Q.    Okay.  So you are not aware of
 9    any offshore investors that have ever
10    invested in the short duration fund onshore
11    and you are not sure whether there was
12    anything that prohibited them from
13    investing in that fund; is that a fair
14    summary of your last two answers?
15          A.    I said I don't believe I know
16    if offshore investors did in invest, I
17    don't believe they did, and I don't know if
18    they are prevented from investing in the
19    onshore.
20          Q.    Does Brevet have any policies
21    or procedures in place to vet investors in
22    the onshore short duration fund to ensure
23    that those investors are not located
24    outside of the United States?
25          A.    I don't know if that -- if it's
```

```
 1                    D. MONTICCIOLO
 2      that specific.
 3           Q.    You don't know whether you have
 4      any policies or procedures in place to vet
 5      investors who are seeking to invest in the
 6      onshore short duration fund to ensure that
 7      they are not located outside of the United
 8      States; is that right?
 9           A.    What I am saying, I am not the
10      person who is responsible for that, there
11      are independent parties and internal people
12      in policies.
13           Q.    And I appreciate that.   I
14      assume the internal people you are talking
15      about are, again, the compliance
16      department?
17           A.    At least.
18           Q.    Okay.   Separate and apart from
19      who you might direct me to to get
20      additional information, I am just asking
21      you about your understanding as the CEO,
22      CIO, whatever other roles that you play at
23      Brevet, sitting here today at your
24      deposition, under oath, can you tell me
25      whether or not you are aware of any
```

Page 110

```
                              D. MONTICCIOLO
 1
 2       policies and procedures that are in place
 3       at Brevet to ensure that investors
 4       investing in the onshore short duration
 5       fund are all located within the United
 6       States?
 7             A.    I am sure that I have hired the
 8       right professionals to ensure the proper
 9       screening, or whatever you want to call it,
10       is complete.
11             Q.    Yes, that doesn't answer the
12       question.  I really, I just want to know
13       the answer to my question, which is,
14       sitting here today, do you --
15       Mr. Monticciolo, can you, Mr. Monticciolo,
16       identify for me any policy or procedure
17       that is in fact in place at Brevet to
18       ensure that investors who are investing in
19       the onshore short duration fund are all
20       located within the United States, yes or
21       no?
22             A.    No.
23             Q.    Okay.  So going back to the
24       creation of the offshore fund, am I correct
25       in recalling that you testified that the
```

```
 1                 D. MONTICCIOLO
 2    reason for creating the offshore fund was
 3    to facilitate or allow offshore investors
 4    to invest in Brevet?
 5          A.    Yes.
 6          Q.    Okay.  Do you recall there
 7    being a problem whereby offshore investors
 8    were not able to invest in Brevet prior to
 9    the creation of the Short Duration Fund,
10    Ltd.?
11          A.    Yes.
12          Q.    Okay.  Was there a specific
13    incident or a specific investor or a
14    specific event that you can recall that
15    prompted you or others to say we should
16    create an offshore fund to allow offshore
17    investors to invest in our company?
18          A.    Yes.
19          Q.    Can you describe for me the
20    event or events that you recall prompting
21    that decision or that discussion?
22          A.    The one that comes to mind is
23    taxes.
24          Q.    Did you say Texas?
25          A.    Taxes.
```

```
 1                    D. MONTICCIOLO
 2              MR. SOLOMON:   Taxes.
 3        Q.    Oh, taxes.  They are similar.
 4              Okay, if you can describe for
 5     me the events that you have in mind?
 6        A.    It's tax efficient.
 7        Q.    Sorry?
 8        A.    An offshore fund is tax
 9     efficient.
10        Q.    Did you say tax efficient?
11        A.    Correct.
12        Q.    Okay.  Yeah, I am just asking,
13     if I understood your answer to my last
14     question, you do recall there being a
15     particular event that took place that
16     prompted the creation or, at least, the
17     discussion of the creation of the offshore
18     fund, right?
19        A.    No.  I would say it's a topic,
20     not a specific event.
21        Q.    Okay.  Did somebody tell you, I
22     am just trying to -- I am not trying to put
23     words in your mouth, I am just trying to
24     move this line of questioning along, did
25     somebody tell you, in sum or in substance,
```

```
                                    Page 113
 1                D. MONTICCIOLO
 2     that, you know, without having an offshore
 3     fund, there are tax inefficiencies that
 4     offshore investors are encountering or
 5     would encounter if they want to invest in
 6     Brevet?
 7          A.    Yes, it's common knowledge.
 8          Q.    Okay.  So you understood at
 9     some point in time that if an offshore
10     investor wanted to invest in Brevet, that
11     it would be tax, at a minimum, tax
12     inefficient for that investor if you didn't
13     create an offshore fund, right?
14          A.    Amongst other things, yes.
15          Q.    What are the other things that
16     you have in mind?
17          A.    I don't know.  That's why we
18     have professionals.
19          Q.    Okay, but the tax
20     inefficiencies, you are saying that you did
21     know, that you were aware of?
22          A.    Yes.
23          Q.    And were you aware of that from
24     prior work that you had done at other
25     companies?
```

Page 114

1                    D. MONTICCIOLO
2          A.    I don't know the source of that
3     knowledge.
4          Q.    Okay.  Did you have offshore
5     investors that were looking to invest in
6     Brevet that had flagged for you that there
7     would be tax inefficiencies with their
8     doing so if you didn't create an offshore
9     fund?
10         A.    I don't recall.
11         Q.    You don't recall whether any
12    offshore investors had approached you about
13    investing but flagged for you that they had
14    concerns about the tax implications of
15    doing so unless an offshore fund was
16    created?
17         A.    Are you referring specifically
18    to 2000-something at Brevet or just that's
19    common knowledge?
20         Q.    Yes, that is a fair
21    clarification.
22                I am not referring to a
23    particular year, I am only referring to the
24    period preceding the creation of the
25    offshore fund, which I think you testified

```
1                    D. MONTICCIOLO
2     you didn't recall when that was, but
3     without, you know, honing in on a
4     particular year by name or by number, in
5     the lead up to the creation of the offshore
6     fund, do you recall any investors, offshore
7     investors approaching you about their
8     desire to invest in Brevet but their
9     concerns about doing so unless Brevet
10    created an offshore fund?
11           A.    I don't recall if it came from
12    investors.
13           Q.    Okay.  Apart from the
14    distinction between the investors in the LP
15    and the Ltd., the onshore fund and the
16    offshore fund, is there a distinction in
17    the types of assets that the two funds own?
18           A.    There can be.
19           Q.    Well, I am just asking if there
20    is, in other words, particular types of
21    investments that are done only within the
22    onshore fund and particular types of
23    investments that are done only within the
24    offshore fund.
25           A.    They have the same investment
```

```
 1                    D. MONTICCIOLO
 2      pieces but the offshore has a separate
 3      board.
 4           Q.    Okay.  So I am happy to talk to
 5      you about the -- and that is a helpful
 6      clarification, I appreciate it.  I am happy
 7      to talk to you about the personnel piece in
 8      a minute, but just focusing on the
 9      investment thesis and the types of
10      investments, the two funds invest in the
11      same types of assets, in the same types of
12      opportunities; is that fair?
13                   MR. SOLOMON:  Objection.
14           A.    Could you repeat the question?
15           Q.    Sure.  Setting aside the
16      personnel question, which we will get to
17      shortly, my question is the two funds, the
18      onshore short duration fund and the
19      offshore short duration fund, invest in the
20      same types of investments and the same
21      types of opportunities, correct?
22           A.    They can.
23           Q.    Okay.  Is it fair to say
24      that --
25                   MR. CYRULNIK:  Withdrawn.  Let
```

```
1                    D. MONTICCIOLO
2           me rephrase.
3           Q.    Is it fair to say that with
4      respect to a given investment opportunity,
5      say a given financing deal, you would often
6      have the choice of doing that financing,
7      engaging in that transaction, through
8      either the Short Duration Fund, LP or the
9      Short Duration Fund, Ltd.?
10          A.    No.
11          Q.    So what is it about a
12     particular opportunity that would earmark
13     the opportunity for only one of the funds
14     that Brevet owned?
15          A.    There are -- it's not because
16     of that.
17          Q.    Sorry, can you explain your
18     answer, and maybe just using different
19     words, because I didn't understand it?
20          A.    It's not because of a criteria.
21          Q.    Going back to my prior
22     question, the short duration fund --
23               MR. CYRULNIK:  Withdrawn.
24          Q.    With respect to a particular
25     financing transaction, would you agree with
```

```
 1                    D. MONTICCIOLO
 2      me that such a transaction can often be
 3      entered into or such a financing can often
 4      be extended by either the LP or the Ltd.,
 5      that is that you have a choice between
 6      those two entities to serve as a
 7      counterparty in a transaction in which
 8      Brevet is engaging?
 9           A.    No.
10           Q.    Why not?
11           A.    ████████  ███  ██████  █████
        ██████████  ███  ██████
13           Q.    ████  ████████  █████  ██████  ███
        █████
        ██   ███   ████  ██  ██  ████████
16           Q.    And by originates, that is the
17      same term as sources?
18           A.    No.
19           Q.    Originates and sources are two
20      different concepts?
21           A.    Yes.
22           Q.    Can you help me understand what
23      origination means versus sources?
24           A.    Sourcing is sources and
25      originates is funds owned.
```

D. MONTICCIOLO

1

2      Q.     Funds owned.  Okay, so I will

3  get back to sourcing then later, but let me

4  just focus on originating.

5            So is originating a formal term

6  for extending the financing, like where the

7  funds are coming from?

8      A.     The first funds for the asset.

9      Q.     The first funds for the asset

10  is what you said?

11      A.     Correct.

12      Q.     What do you mean by the first

13  funds for the asset?

14      A.     The initial funding.

15      Q.     So each asset could have

16  multiple tranches of funding; is that a --

17  is that what you mean to capture when you

18  talk about the first funding?

19            And I don't want to use -- if

20  tranche is a loaded term, feel free to

21  correct me and tell me what term you would

22  use, but I am just trying to understand

23  your testimony.

24      A.     No, that is not what I mean.

25      Q.     Okay.  Can you help me

Page 120

D. MONTICCIOLO

1
2      understand what you mean by ███████  ██████████

███  █████████  █████████  █████████  █████████  ████?

4          A.    The first funding, initial
5      funding.  I think I answered that.
6          Q.    Yeah, I guess I am struggling
7      with initial funding and not be -- probably
8      not for any fault of yours, just because I
9      am trying to understand.
10               So we are talking about a
11     transaction, I guess initial --
12               MR. CYRULNIK:  Withdrawn.
13         Q.    Initial to me implies that
14     there are subsequent financings and so I am
15     trying to understand what you are referring
16     to when you refer to initial funding.
17               Am I correct in understanding
18     that initial funding is referring to a
19     situation where there are going to be
20     subsequent fundings?
21         A.    No.
22         Q.    Okay.  Then I am definitely
23     lost, so why don't you help me understand
24     what you mean by initial funding.
25         A.    I think you need to know how

Page 121

D. MONTICCIOLO

1
2  the business works.

3         Q.    Okay.  Got it.  That is a

4  probably a better question, so go right

5  ahead, can you explain to me a little

6  bit -- what I need to know how the business

7  works in order to understand what you ████

█  ████ ██ ████ ████ ████ ████ ████ ████

█  ████ ██ ████

10        A.    ████ ████ ████ ████ ████

█  ████ ████ ████ ██ ██ ████.

12        Q.    Right.  Well, I thought you

13 were going to explain to me how the

14 business works so that I could understand

15 what that means.

16        A.    You asked me on the onshore

17 fund and I believe I correctly answered.

18        Q.    Yes, that may be the case, but

19 I am trying to understand your answer, so

20 can you explain to me how the business

21 works in a way that can help me understand

22 what you mean by initial funding in your

23 last answer?

24        A.    ████ ████ ████ ██ ██ ████

█  ████ ██ ████ ████ ████

Page 122

1                    D. MONTICCIOLO

2          Q.     Is there a second party to fund

3     the asset?

4          A.     There could be.

5          Q.     Okay.  Can you describe to me

6     the circumstances whereby a second party

7     would be funding the asset?

8          A.     Someone participates or

9     purchases an asset.

10          Q.     The onshore fund extends

11     financing to a counterparty, right, that is

12     the situation we are talking about?

13          A.     Correct.

14          Q.     Okay.  I am going to use some

15     raw numbers, just to facilitate the

16     discussion here.

17                 So let's say a counterparty is

18     looking for $10 million worth of financing,

19     the onshore fund -- does the onshore fund

20     take $10 million from an account that it

21     controls, directly or indirectly, and

22     extend that money, transfer that money over

23     to the counterparty in a typical

24     transaction?

25          A.     That's one of the ways, yes.

```
 1                    D. MONTICCIOLO
 2         Q.    Okay.  And in exchange for
 3    doing so, the counterparty would obviously
 4    be entering into various agreements that
 5    include providing sufficient collateral for
 6    the onshore fund to be extending that
 7    initial transfer, correct?
 8         A.    Yes, amongst many things, yes.
 9         Q.    Okay.  So now the counterparty
10    has the $10 million in its account, the
11    onshore fund has whatever collateral and
12    whatever interest it received in return, in
13    exchange for that transfer, is that
14    transfer what you would characterize as the
15    initial funding for the asset?
16         A.    Yes.
17         Q.    Okay.  And in this example that
18    we are talking about -- which I acknowledge
19    that is a hypothetical that I am making up
20    together with you, with your help -- can
21    you tell me how there would be something
22    that postdates the initial financing that
23    would qualify as another financing?
24         A.    Yes.
25         Q.    Please go ahead.
```

Page 124

1                    D. MONTICCIOLO
2          A.    Another funding or a sale of
3     participation of the asset.
4          Q.    So the counterparty needs more
5     funds than the initial $10 million; is that
6     what happens in this example?
7          A.    That is an example.
8          Q.    Okay.  Does the initial funding
9     amount generally correlate to the
10    counterparty's expected capital needs at
11    the time of the transaction?
12         A.    It's a general question.
13               Depending on the transaction.
14         Q.    So sometimes it does, but
15    sometimes it's the case that the
16    counterparty needs $20 million but the
17    agreement and the plan from the outset is
18    to extend $10 million in an initial funding
19    and then for the subsequent gap between the
20    funding needs and the initial funding
21    amount to be filled by subsequent fundings?
22         A.    That's a possibility.  Most are
23    just one funding up front.
24         Q.    Okay.  When there is one
25    funding up front, does that then get --

Page 125

```
 1                     D. MONTICCIOLO
 2               MR. CYRULNIK:   Withdrawn.
 3          Q.    I can ask you about that
 4     afterward.
 5     ████████  ████  ████  ████  ██████  ████████
 ██    ██  ██  ██  ███  ███  ████  ████  █████  ██
 ██    █████  █████  ██  ███  ████  ████
 █      ██████
 9          A.    I believe so.
10          Q.    Okay.  And then how -- would
11     the onshore fund ever extend post initial
12     funding fundings?
13          A.    It could, yes.
14          Q.    Okay.  And sometimes the
15     offshore fund would be the entity that
16     extends the post initial funding funds?
17          A.    As I sit here, I would say no.
18          Q.    What about an entity that is
19     owned or controlled by the offshore fund,
20     would that be an entity that would extend
21     the post initial funding funding?
22          A.    As I sit here, I would say no.
23          Q.    Okay.  Does the offshore fund
24     ever extend post initial funding fundings?
25          A.    Again, as I sit here, I don't
```

```
                                      Page 126
 1                     D. MONTICCIOLO
 2      believe so.
 3           Q.    Does the offshore fund control
 4      any entities that ever extend post initial
 5      funding fundings?
 6           A.    Same answer.
 7           Q.    Okay.  So what does the
 8      offshore fund do vis-a-vis third parties or
 9      financings?
10           A.    It invests in assets consistent
11      with the investment strategy of the short
12      duration fund.
13           Q.    And it invests in assets that
14      are owned by who prior to the offshore
15      funds' investment?
16           A.    A variety -- it could be a
17      variety of parties.
18           Q.    Would those parties include the
19      ███████████  ████████
20           A.         ████████
21           Q.    What other parties might own
22      assets in which the offshore fund invests?
23           A.    Other parties that create
24      assets.
25           Q.    Other Brevet-owned parties that
```

```
 1                D. MONTICCIOLO
 2    create assets?
 3         A.     Not necessarily.
 4         Q.     The offshore fund -- well,
 5    let's start with the Brevet-owned parties,
 6    does the offshore fund typically invest in
 7    assets that are owned prior to the
 8    investment by Brevet-owned or -controlled
 9    entities?
10         A.     Yes.
11         Q.     And in addition to investing in
12    assets that are owned or controlled by
13    Brevet entities, the offshore fund also
14    invests in assets that are not -- that are
15    neither owned nor controlled by Brevet
16    entities; is that right?
17         A.     Yes.
18         Q.     Okay.  Roughly -- and if this
19    varies over time, feel free to tell me that
20    and give me your best answer over time, but
21    roughly what percentage of the investments
22    made by the offshore fund are investments
23    in assets that are initially owned by
24    Brevet-owned or -controlled entities?
25         A.     I don't recall the percentages.
```

```
 1                     D. MONTICCIOLO
 2          Q.    I understand that you are not
 3     going to have an exact number for me,
 4     Mr. Monticciolo, can you give me your best
 5     estimate?
 6                MR. SOLOMON:  He is not asking
 7           you to guess.  Don't guess, if you
 8            have a reasonable answer, you can
 9            give it to him.
10          A.    I don't know.
11          Q.    Greater or less than
12     75 percent?
13          A.    I am not going to guess.
14          Q.    Greater or less than
15     50 percent?
16          A.    Same answer.
17          Q.    So, sitting here today, you
18     don't know whether the Brevet Short
19     Duration Fund, Ltd. invests more than half
20     of its investment funds in assets that are
21     owned by non-Brevet entities?
22          A.    As I sit here, without looking
23     at the information, I don't want to guess
24     what percentage.
25          Q.    I appreciate that, but I am
```

Page 129

D. MONTICCIOLO

1

2    entitled to an answer to my question, is it

3    fair for me to characterize your answer the

4    way that I just did, which is, sitting here

5    today, you don't know whether Brevet Short

6    Duration Fund, Ltd. invests more than

7    50 percent of its funds in assets that are

8    not owned by Brevet?

9         A.    That's a vague question.

10        Q.    What's vague about it?

11        A.    Is it at a point in time?

12        Q.    Well, let's start with as of a

13   month ago.

14        A.    Can you repeat your question?

15        Q.    Yes.  My question was, sitting

16   here today, can you tell me whether or not

17   the offshore fund as of one month ago, in

18   September of 2021, invested more than

19   50 percent of its funds in assets that were

20   not owned by Brevet.

21        A.



Page 130

1                      D. MONTICCIOLO



.

11          Q.    Yes.  And I appreciate those

12     qualifications and that is all I am asking

13     for.  I recognize this is a deposition, you

14     don't have all of the documents in front of

15     you.

16              Let me ask you the same

17     question about 75 percent, can you tell me,

18     to the best of your knowledge, whether as

19     of a month ago, 75 percent or more of the

20     offshore fund's invested capital was in

21     assets that were owned by Brevet?

22          A.    I would have the same answer.

23          Q.    Okay.  And what about

24     90 percent, I can repeat the whole question

25     or I can just ask you, would you have the

```
 1                    D. MONTICCIOLO
 2      same answer if I asked you about 90 percent
 3      as of a month ago?
 4           A.    I would have to look.
 5           Q.    Okay.  So, sitting here today,
 6      without looking, you wouldn't know whether
 7      that number is above -- is 90 percent?
 8           A.    Yes.
 9           Q.    Okay.  Do you know what
10      percentage over time of the Short Duration
11      Fund, Ltd.'s investments were in assets
12      that had been owned by Short Duration Fund,
13      LP?
14           A.    I, I don't.  I would be
15      guessing.
16           Q.    Would you say a substantial
17      portion of the Ltd.'s investments were in
18      assets that were owned by the LP?
19                 MR. SOLOMON:  Object to the
20            form.
21           A.    Can you repeat the question?
22           Q.    Sure.  Would you say that a
23      substantial portion of Short Duration
24      Fund's assets -- Short Duration Fund Ltd.'s
25      assets -- funds were invested in assets
```

Page 132

                    D. MONTICCIOLO

1

2       that had been owned by the Short Duration

3       Fund, LP?

4                   MR. SOLOMON:   Objection to

5            form.

6            A.    Without looking, I couldn't say

7       if it was substantial all the time.

8            Q.    Okay.  At times, it was

9       substantial, you just don't know whether it

10      was substantial for the entire period of

11      its existence?

12           A.    Yes.

13           Q.    Okay.  Was there a gap of time

14      between when you created the offshore fund

15      and when you started using the offshore

16      fund?

17           A.    I don't recall.

18           Q.    Okay.  Do you have an interest

19      in the offshore fund?

20           A.    Can you clarify interest?

21           Q.    Do you have a financial

22      interest in the offshore fund?  Do you hold

23      any --

24           A.    I am not a limited partner in

25      the offshore fund.

D. MONTICCIOLO

1    Q.    Okay.  Setting aside whether

2    you are a limited partner in the offshore

3    fund, do you hold a financial interest in

4    the offshore fund, directly or indirectly?

5            MR. SOLOMON:  Object to the

6      question.

7    A.    I don't know.

8    Q.    Well, let me ask the question

9    differently, Mr. Monticciolo, how do you

10   make money off the offshore fund's success?

11   A.    By Brevet increasing its

12   invested capital with investors.

13   Q.    By Brevet increasing its

14   investing capital with investors, what does

15   that mean?

16   A.    We are a fund manager, we make

17   money from investing assets, thus making

18   investments.

19   Q.    Are you referring to fees that

20   you are paid, that the investment manager

21   is paid?

22   A.    That is one way.

23   Q.    Okay, so increasing the funds

24   that Short Duration Fund, Ltd. is investing

```
 1                    D. MONTICCIOLO
 2     or taking on from investors increases
 3     Brevet Capital Management's investment
 4     management fees and, therefore, inures to
 5     your benefit given the interest that you
 6     hold in Brevet Capital Management; is that
 7     a fair summary?
 8          A.     It can.
 9          Q.     It can or it does?
10          A.     Well, inures would mean it's a
11     positive benefit.
12          Q.     Well, do you get paid as an
13     investment manager based on the success of
14     the offshore fund?
15          A.     Are you asking a 30(b)(6)
16     question or a personal question?
17          Q.     Let's start with personal.
18          A.     I don't get paid by any vehicle
19     or fund directly.
20          Q.     Okay.  And if you include the
21     entities in which you hold a director
22     indirect interest, including Brevet Capital
23     Management, as we had seen when we looked
24     at the organizational charts, returning to
25     my question, would you agree that you
```

Page 135

1                    D. MONTICCIOLO

2      benefit financially through your

3      participation interest in Brevet Capital

4      Management's profitability through the

5      success of the offshore fund, given the

6      investment fees that Brevet Capital

7      Management stands to gain?

8                    MR. SOLOMON:   Object to the

9           question.

10          A.    Brevet Capital Management

11     benefits.   I can't, sitting here today, say

12     I directly benefit.

13          Q.    You --

14          A.    I could.

15          Q.    Okay.   Anybody -- so Brevet

16     Capital Management benefits from Brevet

17     offshore fund's success, correct?

18          A.    Say that one more time?

19          Q.    Brevet Capital Management

20     benefits from Brevet offshore fund's

21     success, correct?

22          A.    Benefits in the broad

23     definition, yes.

24          Q.    What about in the sense that it

25     gets investment management fees from those

```
 1                    D. MONTICCIOLO
 2      investments, correct?
 3           A.    Yes, that's part of the
 4      benefit.
 5           Q.    Okay.  And those benefits that
 6      Brevet Capital Management then enjoys also
 7      inure to the benefit of anyone who holds
 8      direct or indirect interest in the Brevet
 9      Capital Management; you would agree with me
10      on that, right?
11           A.    It could.
12           Q.    Is there a world in which it
13      could not?
14           A.    A world in which Brevet Capital
15      Management doesn't give its moneys to the
16      people who -- solely to the people who own
17      it, yes.
18           Q.    A world in which Brevet Capital
19      Management benefits, earns fees but those
20      fees do not inure to the benefit of Brevet
21      Capital Management's stakeholders?
22           A.    Yes.
23           Q.    Can you describe that world to
24      me?
25           A.    An unprofitable company.
```

1                    D. MONTICCIOLO

2          Q.     Did you say a non-profitable

3     company?

4          A.     An unprofitable company.

5          Q.     So you are saying if Brevet

6     Capital Management earns fees but

7     ultimately Brevet Capital Management's

8     bottom line is that it is not

9     profitability, then your view would be that

10    the stakeholders in Brevet Capital

11    Management don't ultimately enjoy any

12    benefit from the funds that Brevet Capital

13    Management had earned from its investment

14    services; is that a fair summary of what

15    you are trying to say or what you said?

16         A.     I am saying it's a possibility.

17         Q.     Has that ever happened in your

18    experience with respect to the Brevet

19    Capital Management entity, that is, has it

20    ever -- is Brevet --

21              MR. CYRULNIK:  Withdrawn.

22         Q.     Is Brevet Capital Management a

23    profitable entity?

24         A.     Over what time period, when?

25         Q.     Let's say since inception, do

```
1                    D. MONTICCIOLO
2      you recall there being a year in which
3      Brevet Capital Management was not
4      profitable?
5           A.    Yes.
6           Q.    And what about over the last
7      six years, has Brevet Capital Management
8      been a profitable entity over the last six
9      years?
10          A.    I would have to look to answer
11     that.
12          Q.    Sitting here today, can you
13     think of any year in which Brevet Capital
14     Management was not a profitable entity?
15          A.    Not specifically.
16          Q.    And I see that on this chart,
17     Brevet Short Duration Partners -- I still
18     have Exhibit 1 in front of me -- is listed
19     as the general partner of Brevet Direct
20     Lending Short Duration Fund, LP, do you see
21     that?
22          A.    Yes.
23          Q.    What is a general partner,
24     Mr. Monticciolo?
25          A.    The managing member.
```

1          D. MONTICCIOLO

2          Q.     As the managing member, does

3     Brevet Short Duration Partners make

4     decisions with respect to the various

5     investments that the onshore short duration

6     fund engages in?

7          A.     No.

8          Q.     Who makes those decisions?

9          A.     It hires an investment manager.

10         Q.     And in the case of the onshore

11    fund, the investment manager that it hires

12    is the Brevet Capital Management entity?

13         A.     Yes.

14         Q.     So what types of things does

15    the managing member, the general partner,

16    like Brevet Short Duration Partners, do if

17    it's not involved in the decision making

18    with respect to the investments?

19         A.     It manages on behalf of

20    investors, to make sure that it is a

21    properly running fund vehicle.

22         Q.     Let's say, for example, the

23    onshore short duration fund wanted to sell

24    an asset, who would be making that

25    decision?

```
1                   D. MONTICCIOLO
2        A.     The investment manager.
3        Q.     Okay.  Would the general
4   partner or the managing member play a role
5   in making that decision?
6        A.     No.
7        Q.     Switching to the offshore fund,
8   I don't see a line between Short Duration
9   Partners, LLC and the offshore fund, is
10  there a general partner in the offshore
11  fund?
12       A.     Yeah, I don't know -- this is
13  not our structure, I don't know where this
14  chart came from.  This is not what we do.
15       Q.     Well, this chart came from, as
16  I said, it came from your company, Brevet.
17  But is there anything about --
18              Can you describe to me how your
19  structure differs from the page that we are
20  looking at here with respect to the middle
21  to the left side of the page, that is
22  excluding the intermediate duration fund?
23       A.     It's, it's substantially
24  different.  Again, you would have to -- I
25  couldn't give specifics without counsel and
```

                         D. MONTICCIOLO
1
2      internal folks, but we don't do master
3      funds and it's not structured this way.
4           Q.    Well, do you recall there being
5      a time where it was structured this way?
6           A.    No.
7           Q.    Do you recall there being a
8      time where there was a proposal to
9      structure the funds this way?
10          A.    Not that I recall.
11          Q.    So you have no idea why Brevet
12     would be in possession of an organizational
13     chart that depicts the short duration fund
14     in the way that's described in Exhibit 1,
15     page four?
16          A.    I have no idea why this would
17     exist.
18          Q.    Okay.  If you take out the
19     master fund, are the other aspects of this
20     exhibit, the left-hand side of the page to
21     the middle, are the other aspects accurate,
22     that is, starting from the top down, Brevet
23     Short Duration Holdings is the managing
24     member of Brevet Short Duration Partners,
25     is that an accurate depiction of the

```
 1                 D. MONTICCIOLO
 2    relationship as it exists, to your
 3    knowledge?
 4              MR. SOLOMON:  So why don't we
 5         have him answer just the last of the
 6         questions that you asked on that,
 7         okay.
 8              MR. CYRULNIK:  Sorry, I didn't
 9         follow that, Lou, what was that?
10              MR. SOLOMON:  Well, the first
11         part you have said everything is
12         accurate and then you gave him
13         specifics, so I was just suggesting
14         that he answer the specific question
15         that you asked; otherwise, I object
16         to the form of the question.
17              MR. CYRULNIK:  Oh, yeah, sure.
18         No, I was transitioning to explain to
19         him what we are going to be doing and
20         I asked him a very specific question.
21              I am going through the various
22         pieces because I think the witness
23         identified the master fund as being
24         inconsistent with the way that the
25         fund is currently structured and so I
```

```
                          D. MONTICCIOLO
 1
 2              figured I would just confirm what
 3              else about this is inaccurate and
 4              what about this would be accurate.
 5         Q.    So I am starting with the top
 6    of the page, Mr. Monticciolo, Brevet Short
 7    Duration Holdings is identified as the
 8    managing member of Brevet Short Duration
 9    Partners, is that an accurate depictions,
10    to your knowledge, of the structure that
11    exists?
12         A.    As I sit here, I believe that's
13    correct.
14         Q.    Okay.  I see Brevet Short
15    Duration Partners identified as the general
16    partner of Brevet Direct Lending the
17    onshore fund, is that an accurate depiction
18    of the way things are currently structured?
19         A.    As I sit here, I believe that's
20    correct.
21         Q.    Okay.  I see Brevet Capital
22    Management depicted as the investment
23    manager for the onshore fund, is that an
24    accurate depiction of the way things
25    currently stand, to your knowledge?
```

```
 1                    D. MONTICCIOLO
 2         A.    Same answer.
 3         Q.    Okay.  Now, moving slightly to
 4    the right, I am looking at the offshore
 5    fund, let's start with the piece that I do
 6    see, I see that Brevet Capital Management
 7    is identified as the investment manager for
 8    the offshore fund, is that an accurate
 9    depiction of the way things currently
10    stand, to your knowledge?
11         A.    As I sit here, I don't believe
12    that's how it's structured.
13         Q.    So you don't believe that
14    Brevet Capital Management functions as an
15    investment manager for the offshore fund?
16         A.    Correct.
17         Q.    And that's because you believe
18    that the way the offshore fund receives its
19    investment management services is through
20    other entities that are advised by Brevet
21    Capital Management?
22         A.    As I sit here, I believe that's
23    correct.
24         Q.    Okay.  And, sitting here today,
25    do you know the name of any or all of those
```

```
                              D. MONTICCIOLO
 1
 2      other vehicles or entities that are -- for
 3      which Brevet Capital Management serves as
 4      investment manager and then indirectly
 5      passes those services along to the Short
 6      Duration Fund, Ltd.?
 7           A.    I don't recall the names of
 8      those entities.
 9           Q.    Do you know, roughly, how many
10      entities exist that are clients of Brevet
11      Capital Management that then ultimately
12      turn around and are affiliated with the
13      offshore fund?
14           A.    I don't recall.
15           Q.    More or less than five?
16           A.    I would be guessing.
17           Q.    You don't know if it's more or
18      less than five, okay.
19                 Would you know if it's greater
20      or fewer than ten?
21           A.    Again, I would be guessing.  I
22      am not the one who structures those.
23           Q.    Okay.  Where would those
24      entities, those vehicles be listed on a
25      chart like this?
```

```
 1                    D. MONTICCIOLO
 2              MR. CYRULNIK:  I'm sorry, I am
 3          hearing some interference.  If
 4          everyone -- whoever is not on mute
 5          can go on mute.
 6         Q.    Sorry, Mr. Monticciolo, where
 7    would those vehicles that you have in mind,
 8    recognizing that you don't know the number
 9    or the names of those vehicles, where would
10    those appear or where would you put those
11    on a chart like this, just to help me
12    understand their relationship to the
13    offshore fund?
14         A.    Again, as I sit here, without
15    looking at the materials, below the
16    limited.
17         Q.    Okay.  So it's your
18    understanding that vehicles that are owned
19    or controlled by the Ltd. would be the
20    vehicles that get direct investment
21    management services from Brevet Capital
22    Management?
23         A.    Again, as I sit here, I can't
24    tell you whether they are owned or
25    controlled.  These are details that are for
```

```
 1                    D. MONTICCIOLO
 2      the structure people.
 3           Q.    Okay.  Does -- are there
 4      similar vehicles -- well, sorry, if
 5      those --
 6                  MR. CYRULNIK:  Withdrawn.
 7           Q.    If those vehicles are not owned
 8      or controlled by the Ltd., what would be
 9      their relationship with the Ltd.?
10           A.    Again, as I sit here, I can't
11      specifically answer that.
12           Q.    Can you think of any other
13      relationship other than, you know, the Ltd.
14      owning or controlling those vehicles?
15           A.    Yes.
16           Q.    Okay, can you tell me what you
17      can think of?
18           A.    A variety of financial
19      agreements.
20           Q.    An example would be, I think,
21      helpful.
22           A.    Swaps, participations, it could
23      be a direct ownership, I don't know.
24           Q.    Okay.  With respect to the
25      various relationships that you -- possible
```

```
 1                     D. MONTICCIOLO
 2      relationships that you just identified and
 3      that I identified between the offshore fund
 4      and the vehicles that we were discussing,
 5      let me just ask you, are there similar
 6      vehicles on the left side of this chart,
 7      that is are there similar vehicles that
 8      have such relationships with the onshore
 9      fund?
10           A.    As I sit here, I'd say no.
11           Q.    Do you know why it is the case
12      that the onshore fund doesn't have those
13      types of vehicles for their investments but
14      the offshore fund does?
15           A.    I think I answered that before.
16                 Because of the complexities
17      with offshore investors.
18           Q.    I see.  So it's your
19      understanding that the existence of that
20      additional layer of vehicles that have
21      relationships with the offshore fund is
22      related to the desire to have tax
23      efficiencies on the offshore fund's side of
24      this equation; is that a fair general
25      description of your understanding?
```

Page 149

                    D. MONTICCIOLO

1

2       A.    As I sit here, I would say at

3  least that.

4       Q.    Got it.  As a practical matter,

5  you would agree with me that Brevet Capital

6  Management as investment manager is

7  providing similar services directly to

8  Short Duration Fund, LP and indirectly to

9  Short Duration Fund, Ltd. by way of its

10  various vehicles --

11            MR. SOLOMON:  Object to the

12       form.

13       Q.    -- would you not?

14       A.    It depends on the definition of

15  similar.

16       Q.    Okay, can you tell me whether

17  you would characterize those as similar

18  services?

19       A.    They have similar investment

20  strategies, I can't tell you if that means

21  similar services.

22       Q.    Is there any other entity that

23  you would identify for me that I would need

24  to know about in terms of understanding the

25  organizational structure of the offshore

Page 150

1                    D. MONTICCIOLO

2      fund and the onshore fund other than the

3      ones that we have discussed in the last few

4      minutes?

5           A.    The governance is quite a bit

6      different.

7           Q.    Okay, can you help me

8      understand the governance of the offshore

9      fund versus the onshore fund?

10          A.    As I sit here, not detailed,

11     but there is a separate independent board

12     that runs the offshore fund.

13          Q.    As opposed to the GP that runs

14     the onshore fund?

15          A.    Correct.

16          Q.    And do you know who sits on the

17     board that runs the offshore fund?

18          A.    No.

19          Q.    Do you sit on that board?

20          A.    I do not.

21          Q.    Does Mr. Callahan sit on that

22     board?

23          A.    As I sit here, I don't believe

24     so.

25          Q.    Can you identify anybody who

```
 1                    D. MONTICCIOLO
 2      sits on the board that runs the offshore
 3      fund?
 4           A.    Not as I sit here.
 5           Q.    Who makes the decisions for the
 6      offshore fund with respect to what assets
 7      to invest in?
 8           A.    That board.
 9           Q.    Okay.  And who makes the
10      decisions for the onshore fund with respect
11      to what assets to invest or to sell?
12           A.    The investment committee.
13           Q.    And ███ ███ ██ ████ ████████
        ██ ██████████, correct?
15           A.    Correct.
16           Q.    Are there any people on the
17      investment committee for the onshore fund
18      who also play a role in the offshore fund's
19      governance?
20           A.    As I sit here, I don't believe
21      so.
22           Q.    Has that always been the case,
23      to your knowledge?
24           A.    I don't recall.
25           Q.    Why would the onshore fund sell
```

Page 152

1                    D. MONTICCIOLO
2     an asset or a piece of an asset --
3                 MR. CYRULNIK:  Well, withdrawn.
4          Q.    Let me ask you, when the
5     onshore fund sells assets to, say, the
6     offshore fund, does it sell the entire
7     asset, does it sell, you know, an interest
8     in the asset or sometimes it does the
9     entire asset, sometimes it does a piece of
10    the asset?
11         A.    It varies.
12         Q.    Okay.  Why would the onshore
13    fund sell an asset or a piece of an asset
14    to the offshore fund?
15         A.    Because it looks for
16    diversification.  Amongst many other
17    reasons.
18         Q.    If an asset that the onshore
19    fund owns is profitable, how does that
20    ultimately inure to the benefit of Brevet
21    Short Duration Partners, LLC?
22         A.    If an individual asset is
23    profitable, it could.
24         Q.    And how --
25         A.    With fees.  As in through fees.

```
 1                    D. MONTICCIOLO
 2         Q.    If --
 3         A.    Or, actually, through
 4    incentive.
 5         Q.    Could you describe to me how
 6    that works, the incentive?
 7         A.    It's based on the performance
 8    of the fund.
 9         Q.    So Brevet Short Duration
10    Partners' profitability is tied to the
11    performance of the onshore short duration
12    fund, right?
13         A.    It could be.
14         Q.    I appreciate that it could be,
15    I am asking you whether it is.
16         A.    I believe it is partially.
17         Q.    Okay.  And the Brevet short
18    duration fund's, onshore short duration
19    fund's performance is tied to the
20    profitability of the various assets that
21    the onshore fund owns, correct?
22         A.    Correct.
23         Q.    So if you have an asset that is
24    particularly profitability, that is, say, a
25    financing deal that is particularly
```

```
 1               D. MONTICCIOLO
 2      profitability, and that financing deal,
 3      that asset is owned by Short Duration Fund,
 4      LP, then that profitability will ultimately
 5      translate into incentives, I believe was
 6      the term that you used, that would be
 7      enjoyed by Short Duration Partners and its
 8      members, correct?
 9          A.     No.
10          Q.     Why is that incorrect?
11          A.     Because you would have to look
12      at what the agreements are at the vehicles
13      of who gets paid what.
14          Q.     At the vehicles, what are you
15      referring to by the vehicles?
16          A.     Brevet Capital Management,
17      Short Duration Partners, et cetera.
18          Q.     Well, yeah, to be clear, I
19      wasn't suggesting that all of the
20      profitability of a particular asset goes
21      right up the chain to Brevet Short Duration
22      Partners, LLC, so to the extent you
23      understood me to be asking that, then I
24      would make that clarification.
25               My question is you would agree
```

Page 155

```
 1                    D. MONTICCIOLO
 2      that if an asset that is owned by Short
 3      Duration Fund, LP is profitability, is
 4      generating profits, that that profitability
 5      to some extent trickles up, if that's even
 6      a term, to the Brevet Short Duration
 7      Partners, LLC level and to its members;
 8      would you agree with me on that?
 9           A.    Again, my answer is it could.
10           Q.    Can you describe for me a
11      circumstance in which it could not or would
12      not?
13           A.    There are a lot of complex
14      agreements that control where moneys --
15      where profits and payments go for services,
16      et cetera.
17           Q.    Subject to that clarification,
18      can you give me any example of an instance
19      in which an asset owned by the onshore fund
20      was profitable but that profitability did
21      not in any way trickle up to the Brevet
22      Short Duration Partners level in any way?
23           A.    Sure.
24           Q.    Go right ahead.
25           A.    All of the other assets lost
```

```
 1                    D. MONTICCIOLO
 2     money, so there is no profits to be shared.
 3          Q.    Well, wouldn't it be fair to
 4     say that the profitability of that asset
 5     still has trickled up but it was offset by
 6     losses that would have otherwise been
 7     experienced as a result of other assets?
 8          A.    Again --
 9                MR. SOLOMON:  Could you --
10                I object to the use of trickled
11           up now that it means what you are --
12                MR. CYRULNIK:  Too late, Lou.
13           The statute of limitations on that
14           objection has run.
15                MR. SOLOMON:  It was of
16           rational use when you first said it.
17                MR. CYRULNIK:  That is now a
18           term of art that you are going to
19           have to use in your questioning too.
20                THE WITNESS:  The digital era
21           statute of limitations is measured by
22           seconds.
23          A.    It could.  It's -- there is a
24     million permutations.
25          Q.    Apart from being canceled out
```

```
 1                  D. MONTICCIOLO
 2     by losses that other assets experience and
 3     then push up to the Partners level, would
 4     you agree with me that profits experienced
 5     as a result of a particular asset that is
 6     owned by the onshore fund do make their way
 7     up to the Partners level and then would
 8     make their way up to the members of that
 9     Partners, LLC level, as well, subject to
10     potential offsetting by way of -- you know,
11     as a result of losses experienced with
12     respect to other assets owned by that
13     entity?
14               MR. SOLOMON:  Object to the
15          question.
16          A.    And, again, my answer is it
17     could.
18          Q.    I appreciate that, but I guess
19     I am struggling with -- I am not seeing an
20     example that you have provided, and I would
21     appreciate if you could help me see it if
22     you have one in mind, whereby profitability
23     at the asset level, that is an asset owned
24     by Short Duration Fund, LP, doesn't
25     ultimately make its way up in some way to
```

```
 1                    D. MONTICCIOLO
 2      the Brevet Short Duration Partners, LLC
 3      level, can you help me understand why that
 4      would happen?
 5               Again, I am not asking you to
 6      account for the possible offsetting of
 7      those profits or the portion of those
 8      profits that have made their way up, I am
 9      not asking you to account for the
10      offsetting of that by other assets, but I
11      am just asking you to focus, for the
12      purposes of the question, on the profitable
13      asset and confirm for me whether you mean
14      to tell me that there is a world in which
15      that profitability does not make its ways
16      up in some way to the Partners level?
17           A.    Yes I am saying.
18           Q.    Yes, can you give me an example
19      of when that would be the case?
20           A.     There could be other
21      obligations or contracts that prevent
22      profit from being, you know, up -- did you
23      say trickle up?
24           Q.    Upstream, how does upstream
25      sound?
```

```
 1                    D. MONTICCIOLO
 2        A.      Upstream is a word.
 3        Q.      Okay.   There could be other
 4   obligations that prevent those profits from
 5   being upstreamed?
 6        A.      Correct.
 7        Q.      Where would those profits go if
 8   they weren't upstreamed to the various --
 9   to the partners of the short duration fund,
10   including its GP?
11        A.      Amongst others, as I sit here,
12   I would probably say the investment
13   manager.
14        Q.      I see, okay.
15              Let's say you have an asset
16   that does generate profits and make their
17   way -- which then make their way up to
18   Brevet Short Duration Partners, LLC, you
19   would agree with me, Mr. Monticciolo, that
20   the various members of Brevet Short
21   Duration Partners, LLC would then
22   themselves have a pro rata interest in the
23   profits that were generated in that
24   example, correct?
25        A.      If there weren't other expenses
```

```
 1                    D. MONTICCIOLO
 2      or costs, they could -- in your
 3      hypothetical, there would be profits that
 4      come up; it doesn't mean that it's
 5      profitable.
 6          Q.    Okay.  How about Brevet Short
 7      Duration Holdings, LLC, I see it's the
 8      managing member of Partners, so do -- how
 9      does the profitability of Partners affect
10      the profitability of Holdings?
11          A.    As I sit here, I recall there
12      is a profit in contract or interest between
13      the two.
14          Q.    So the profits of Partners are
15      distributed amongst --
16              MR. CYRULNIK:  Withdrawn.
17          Q.    Were there -- apart from Brevet
18      Short Duration Holdings, who else had an
19      interest in Partners?
20          A.    Say that one more time, sorry.
21          Q.    Yeah, I can ask you a different
22      question.
23              MR. CYRULNIK:  Withdrawn.
24          Q.    I see Holdings is identified as
25      the managing member of Brevet Short
```

Page 161

```
 1                      D. MONTICCIOLO
 2      Duration Partners, do you see that?
 3            A.     Yes.
 4            Q.     And that's accurate, to your
 5      knowledge?
 6            A.     To my knowledge.
 7            Q.     Are there non-managing members
 8      of Partners, as well?
 9            A.     As I sit here, I couldn't tell
10      you.
11                   MR. SOLOMON:  I'm sorry, did
12            you say non-managing members of
13            Partners?
14                   MR. CYRULNIK:  Yes.
15                   THE WITNESS:  Oh.
16                   MR. SOLOMON:  That wasn't the
17            question that you asked, I object to
18            the question.
19                   MR. CYRULNIK:  I think that was
20            the question I asked.
21                   THE WITNESS:  Yes, sorry.
22                   MR. SOLOMON:  No, you asked if
23            Holdings was the managing member and
24            then you asked if there are
25            non-managing members of Partners.
```

```
 1                    D. MONTICCIOLO
 2               MR. CYRULNIK:  You got it.
 3          That's the question I asked, exactly.
 4          A.    As I sit here, I don't recall.
 5          Q.    Do you have a membership
 6     interest in Partners?
 7          A.    I believe I do.
 8          Q.    And you are not a managing
 9     member, are you?
10          A.    I don't know.
11          Q.    Do you think there is more than
12     one managing member of Partners; that is,
13     do you think there is a managing member of
14     Partners other than Holdings?
15          A.    As I sit here, I would have to
16     look at the documents, I -- the chart
17     doesn't say that.
18          Q.    Okay, so can we describe you as
19     a non -- would you describe yourself as a
20     non-managing member of Partners?
21          A.    I don't know how to describe
22     myself in that.
23          Q.    Do you know what percentage
24     interest you hold in Partners?
25          A.    I do not.
```

```
                      D. MONTICCIOLO
1
2         Q.     Roughly?
3         A.     As I sit here, I have to look
4    at documents.
5         Q.     Do you know who else -- do you
6    know if anyone else holds an interest in
7    Partners?
8         A.     As I sit here, I would have to
9    look at who else does.
10        Q.     Do you know whether Mark
11   Callahan owns an interest in Partners?
12        A.     As of today, I would have to
13   look at if he -- if he is.
14        Q.     So you don't know, sitting here
15   today, one way or the other, whether
16   Mr. Callahan owns an interest in Partners?
17        A.     Again, I would have to go look,
18   because things are always evolving.
19               My recollection is that there
20   were other members in there.
21        Q.     That I understand, but you
22   don't have a recollection, one way or the
23   other, as to the last time you checked
24   whether Mark Callahan was one of them?
25        A.     The last time my people have
```

```
 1                    D. MONTICCIOLO
 2     checked and who do work for me would know,
 3     it's not something I look at every day.
 4          Q.    How about John Tripp, do you
 5     know whether he is a comember of yours at
 6     Brevet Short Duration Partners?
 7          A.    I, again, as I sit here, I
 8     don't know.
 9          Q.    How about Paul Iacovacci?
10          A.    As I sit here, I don't know.
11          Q.    Okay.  With respect to the
12     profitability of Brevet Short Duration
13     Partners --
14               MR. CYRULNIK:  Withdrawn.  Let
15          me ask it a different way.
16          Q.    Mr. Monticciolo, what happens
17     if you take a profitable asset from the
18     onshore fund and move it over, you sell a
19     piece or all of that asset to the offshore
20     fund, does that affect -- does that
21     transaction affect the identity of the
22     individual entities or people who could
23     participate in the profitability or benefit
24     from the profitability of that asset?
25          A.    It could.
```

```
 1                    D. MONTICCIOLO
 2        Q.    And if you have an individual,
 3    let's talk about a specific individual for
 4    now, who has an interest in -- a direct or
 5    indirect interest in the onshore fund but
 6    does not hold an interest, directly or
 7    indirectly, in the offshore fund, is it
 8    your -- you would agree with me that
 9    transferring an asset away from the onshore
10    fund and to the offshore fund could be
11    harming or being done to the detriment of
12    that individual; would you agree with me on
13    that?
14              MR. SOLOMON:  I object to the
15          question.
16        A.    Unlikely.
17        Q.    Did you say un --
18        A.    But possible.
19              Unlikely but possible.
20        Q.    Okay.
21        A.    It could be tremendously
22    beneficial to them.
23        Q.    Okay, so let's talk about the
24    various pieces of that answer.  So I think
25    you said possible, unlikely and then you
```

Page 166

```
 1                    D. MONTICCIOLO
 2      also added that it could be tremendously
 3      beneficial.
 4              Let's start with the unlikely
 5      piece, could you explain the basis for your
 6      understanding that taking a profitable
 7      asset out of the onshore fund and moving it
 8      to a different fund in which the individual
 9      who has an interest in the onshore fund
10      does not have an interest in that other
11      entity, how that would -- how it's unlikely
12      that that transaction would not be to the
13      detriment of that individual?
14          A.    Because you take that cash and
15      put it in a much more profitability asset.
16          Q.    Say that again.
17          A.    You would take the cash from
18      selling that asset and, as you know,
19      originate a much more profitable asset as a
20      possibility.
21          Q.    I see.  So the point is if
22      there was another asset that was more
23      profitable than the one that is being sold,
24      then in that scenario, the sale would not
25      be to the detriment of the individual that
```

Page 167

D. MONTICCIOLO

1   we are talking about?

2

3          A.     That is one possibility.

4          Q.     In the same way,

5   Mr. Monticciolo, that my selling stock in,

6   say, General Motors, assuming that it's

7   been profitable for me over the course of

8   the last year, would not be to my detriment

9   if I then took those funds and put them in

10  stock of Apple, which say has, you know,

11  appreciated by a greater percentage or is

12  appreciating by a greater percentage than

13  General Motors' stock over the course of

14  the ensuing period; is that a fair general

15  analogy to capture the concept that you had

16  in mind?

17         A.     If you only owned one asset,

18  that would be a concept but not applicable.

19         Q.     Sorry, that is not a good

20  analogy, in your view?

21         A.     Not at all.

22         Q.     Then maybe you could help me

23  understand what you meant.  Why would it be

24  unlikely that divesting of a profitable

25  asset would not be to the detriment of

Page 168

                        D. MONTICCIOLO

1
2      those individuals who hold an interest in
3      the asset prior to the divestment?
4                  MR. SOLOMON:   I object to the
5           word divestment.
6           A.    Again, it's basic investment
7      theory; diversification, reducing
8      concentration risk, improving risk
9      profiles.
10          Q.    Anything else?
11          A.    I'm sure the list goes on.
12          Q.    The only way to ensure the list
13     goes on is if you keep on talking.
14          A.    I think you would have to learn
15     about portfolio management to understand
16     that.
17          Q.    Well, do you know about
18     portfolio management; isn't that one of
19     your areas of expertise?
20          A.    Yes.
21          Q.    So can you complete the list
22     for me, please?
23          A.    The list is extensive and very
24     situation specific.
25          Q.    Well, is there anything else

Page 169

                    D. MONTICCIOLO
1
2    that you would add to the list that you
3    have already broken out for me?
4         A.    I would, but not given the
5    specificity you have provided.
6         Q.    What else would you need to
7    know?
8         A.    Everything about all of the
9    other investments that you're in and your
10   history, your experience, the markets you
11   are in, everything.
12        Q.    You would need to know
13   everything about all of the other
14   investments to tell me whether or not
15   taking an asset out -- a profitable asset
16   out of the onshore fund would ultimately
17   inure to the detriment of the members of an
18   entity that held an interest in the onshore
19   fund?
20        A.    Absolutely.  Because that is
21   most likely an improper characterization.
22        Q.    What is most likely an improper
23   characterization?
24        A.    What if it wasn't the most
25   profitable asset and the another more

```
 1                      D. MONTICCIOLO
 2      profitable asset was available but you are
 3      holding them back from investing in that
 4      because you are holding that less
 5      profitable asset?
 6            Q.    Okay.  Is it your testimony
 7      that the only time the short duration,
 8      onshore short duration sells an asset to
 9      the offshore fund or a piece of an asset to
10      the offshore fund, that that is a decision
11      that would be made by the investment
12      manager, Brevet Capital Management,
13      correct?
14            A.    Yes.
15            Q.    So is it your testimony that
16      the only times that the investment manager
17      for Short Duration Fund, LP sells an asset
18      or a piece of an asset to the offshore
19      fund, that is Short Duration Fund, Ltd., is
20      when doing so is beneficial to the
21      stakeholders in the onshore fund as a
22      result of one or more of the factors that
23      you just described for me?
24            A.    No.
25            Q.    You would agree that the
```

```
 1                   D. MONTICCIOLO
 2    investment manager sometimes has Short
 3    Duration Fund, LP sell assets or pieces of
 4    assets that it owns to the offshore fund
 5    even though that sale may not be for the
 6    benefit of the stakeholders in Short
 7    Duration Fund, LP?
 8         A.    No.
 9         Q.    No, you would not agree or no,
10    they wouldn't do that?
11         A.    I would not agree with you.
12         Q.    So, back to my last question, I
13    meant to give diametrically opposed
14    opposites so that the answer would have to
15    be yes to one of them, but maybe I misspoke
16    or you misunderstood.
17              Either way, when Brevet Capital
18    Management causes the onshore fund to sell
19    an asset or a piece of an asset to the
20    offshore fund, does it do so solely on the
21    basis -- let me rephrase that.
22              When Brevet Capital Management
23    causes the onshore fund to sell an asset or
24    a piece of an asset to the offshore fund,
25    does it do so only if it believes that
```

D. MONTICCIOLO

1
2    selling that asset is going to inure to the
3    benefit of the Short Duration Fund, LP's
4    stakeholders?
5         A.    No, without clarification of
6    stakeholders.
7         Q.    Those who hold a direct or
8    indirect membership interest in the fund,
9    including its general partner.
10        A.    Then no.
11        Q.    So sometimes Brevet Capital
12   Management, as investment manager, causes
13   the onshore fund to sell an asset or a
14   piece of an asset to the offshore fund
15   notwithstanding the fact that the sale of
16   that asset might not inure to the benefit
17   of Brevet onshore short duration fund's
18   general partner, Brevet Short Duration
19   Partners, for example; is that correct?
20        A.    An investment manager manages
21   to the best interests of all of its
22   investors.
23        Q.    If you could just answer my
24   question, I think it would be a little
25   easier.  I appreciate that general rule of

```
 1                    D. MONTICCIOLO
 2     thumb.
 3              MR. SOLOMON:  I think he did,
 4          so maybe ask another question.
 5              MR. CYRULNIK:  Well, I
 6          certainly wouldn't ask another
 7          question; I can have that question
 8          read back, but I assure you --
 9              MR. SOLOMON:  Go on, he
10          answered your question.
11              MR. CYRULNIK:  We could debate
12          that, but I don't think it's going to
13          be unclear from the record.
14       Q.    My question --
15              MR. CYRULNIK:  Can you please
16          read back my question.
17       A.    The answer is investment
18     manager, we -- it manages to the best
19     interests of all of the investors.
20     Stakeholders is your term.
21       Q.    That I -- I appreciate that
22     general rule of thumb, my question is a yes
23     or no question, does Brevet Capital
24     Management as investment manager for
25     onshore funds ever effect the sale of an
```

Page 174

D. MONTICCIOLO

1

2    asset that onshore fund owned even though

3    the sale of that asset would not inure to

4    the benefit of short duration fund's

5    general partner, Short Duration Partners?

6         A.    It is not a rule of thumb.  It

7    never puts the general partner above the

8    best interests of all of the investors.

9         Q.    So the answer to my question is

10   yes, sometimes the investment manager will

11   cause the onshore fund to sell an asset to

12   the offshore fund even though the sale of

13   that asset is not in the interest of the

14   general partner?

15        A.    Yes.

16        Q.    Okay.  Let's say somebody on

17   the investment management side, someone

18   who --

19             You would agree with me that

20   you play a role in the investment manager's

21   decisions, Brevet Capital Management,

22   right?

23        A.    ██ ██ █ ██ ████████

██    ████████ .

25        Q.    Okay, so I am going to use you

Page 175

                         D. MONTICCIOLO

1
2    just for simplicity's sake.
3              If you, Doug Monticciolo, hold
4    an interest in the offshore fund as well,
5    direct or indirectly, in the success of the
6    offshore fund, would you agree with me that
7    there would be circumstances under which --
8              Let me change the hypothetical.
9    So I am going to withdraw that initial lead
10   up.
11             I want you to assume for
12   purposes of my next couple of questions
13   that you own an interest in the offshore
14   fund that is greater than your interest in
15   the onshore fund.  And by interest, I am
16   referring to the totality of benefits that
17   you, Doug Monticciolo, might realize from
18   the success of those two entities.
19             So you, for purposes of my next
20   few questions, you are going to assume that
21   you get more out of profit, out of a dollar
22   of profit that is earned at the offshore
23   fund than you would out of a dollar of
24   profit that is generated at the onshore
25   fund, okay?

Page 176

D. MONTICCIOLO

1
2      A.      Okay.

3      Q.      Okay.  Assuming that's the

4      case, would you agree with me that if we

5      focus on your own personal interests, ██ █

       █ ████ ██ ████ ████ ████

       █ █████ █████, you would be

8      incentivized to sell profitable performing

9      assets from the onshore fund to the

10     offshore fund?

11             MR. SOLOMON:  Have you

12        completed your question?

13             MR. CYRULNIK:  I did, I

14        completed my question.

15             MR. SOLOMON:  I object to the

16        question and I object to the

17        hypothetical.

18             MR. CYRULNIK:  Okay.

19     Q.     Mr. Monticciolo.

20     A.     It's a nonrealistic,

21     nonapplicable hypothetical, but if that

22     existed, yes.

23     Q.      Okay.  Let's say there was

24     somebody who held an interest in the

25     onshore short duration fund that you really

Page 177

1              D. MONTICCIOLO

2    didn't like and that individual did not

3    hold an interest in the offshore fund,

4    would you agree with me that you would

5    similarly be incentivized, ██ █ ██████ ██ █

     █ ██████ ██████ █████████ ███████ █ ██████ ██████

     █ ████████, to sell profitable assets held

8    by the onshore fund to the offshore fund,

9    including because doing so would preclude

10   said individual from realizing any benefit

11   from the profitability of those assets?

12              MR. SOLOMON:  I object to the

13        question and I object to the

14        hypothetical.

15        A.    It's a hypothetical,

16   unrealistic and nonapplicable scenario, as

17   I previously had stated, and the answer

18   would be I guess yes, but it's a

19   hypothetical.

20        Q.    Is it unrealistic because there

21   is nobody that fits the bill that you

22   really dislike and you don't want to

23   benefit from profitability?

24        A.    Not at all.

25        Q.    Okay.  There is somebody like

```
                              D. MONTICCIOLO
 1
 2    that, right?
 3         A.    Not at all.
 4         Q.    Do you dislike Paul Iacovacci?
 5         A.    No, not at all.
 6         Q.    You like him?
 7         A.    He was a long-time friend.
 8         Q.    How about now, do you like him
 9    now?
10         A.    I haven't talked to him in a
11    long time.
12         Q.    That would be responsive if I
13    asked you when the last time you spoke to
14    him is.
15              Do you like Mr. Iacovacci now?
16         A.    I don't hold grudges.
17         Q.    Is it your view that
18    Mr. Iacovacci's participation interest in
19    Brevet success or profitability, assuming
20    that he does hold interests in one or more
21    entities based on a finding that he had
22    left the company voluntary or not been
23    terminated, is it your view that the only
24    entities in which he would be able to
25    participate in their profitability would be
```

```
 1                    D. MONTICCIOLO
 2     Short Duration Partners and Short Duration
 3     Holdings?
 4          A.    As I sit here, I believe those
 5     are the only entities that he is a part of.
 6          Q.    And so if you were trying to --
 7                And you understand that
 8     Mr. Iacovacci is currently -- has asserted
 9     claims against Brevet and a bunch of
10     individuals seeking moneys that have not
11     been paid to him as a result of his alleged
12     interests in the Brevet entities that you
13     just mentioned, correct?
14          A.    Correct.
15          Q.    Would you agree with me that ███
       █ █████████ █ ██ █  ████████  ████████ ███
       █     █████████  ████████ , if you could somehow
18     divert profitable assets from the entities
19     in which Partners and Holdings hold an
20     interest to another Brevet entity in which
21     Partners and Holdings don't hold an
22     interest, that you would be able to
23     artificially depress the potential damages
24     that Mr. Iacovacci would be entitled to if
25     a court agreed with his position regarding
```

Page 180

```
 1                D. MONTICCIOLO
 2    his participation interests in Partners and
 3    Holdings?
 4              MR. SOLOMON:  Object to the
 5          question.  Object to the
 6          hypothetical.  It also misstates the
 7          witness's testimony.
 8         Q.    The one thing I can quibble
 9    with there, I am not going to respond to
10    the other two, I didn't purport to state
11    your testimony, so I couldn't have
12    misstated it.  But go ahead,
13    Mr. Monticciolo, I think you have the
14    question in your head.
15         A.    It's a hypothetical.
16              And no.
17         Q.    No.
18              Why not?
19         A.    As I described the structure,
20    no.
21         Q.    Why?
22         A.    Because we don't have that
23    ability.
24         Q.    You don't have the ability,
```

                                     D. MONTICCIOLO

1

2   ███   ████████   █████   , to cause the

3   onshore fund to divest of profitable assets

4   that would otherwise have inured to the

5   benefit of its general partner, Partners,

6   and to their partners as members, including

7   Mr. Iacovacci.

8        A.    I didn't say that.

9        Q.    Okay.  You do have the ability

10  to do that, right?

11       A.    Again, if it's in the best

12  interest of all of the investors, that's

13  the job.

14       Q.    Yes.  You do have the ability

15  to do that, right?

16       A.    If it's in the best interest of

17  all of the investors, yes.

18       Q.    Have you ever done that?

19       A.    I -- sitting here, I couldn't

20  tell you.

21            MR. CYRULNIK:  Why don't we go

22        off the record for a minute.

23            THE VIDEOGRAPHER:  The time is

24        11:55 and we are going off the

25        record.  This is the end of media

Page 182

```
 1                    D. MONTICCIOLO
 2          unit No. 2.
 3                  (Whereupon, a brief recess was
 4          taken.)
 5                  THE VIDEOGRAPHER:  The time is
 6          12:12 and we are back on record.
 7          This is the beginning of media unit
 8          No. 3.
 9     CONTINUED EXAMINATION
10     BY MR. CYRULNIK:
11          Q.    Welcome back, Mr. Monticciolo.
12     Before the break, we were talking about
13     through the various scenarios in which the
14     onshore fund was selling assets to the
15     offshore fund, do you generally recall that
16     discussion?
17          A.    Yes.  A bunch of hypotheticals.
18          Q.    There were some hypotheticals
19     in there as well, yes.
20                  Let me ask you, to your
21     knowledge, has the onshore fund ever sold
22     an asset or a piece of an asset to the
23     offshore fund without simultaneously
24     replacing that asset?
25          A.    As I sit here, I couldn't tell
```

1                    D. MONTICCIOLO

2      you.

3            Q.    So it's possible that they

4      have?

5            A.    Anything is possible.

6            Q.    Well, beyond anything being

7      possible, can you tell me that the onshore

8      fund never sold an asset to the offshore

9      fund without replacing that asset?

10                 MR. SOLOMON:  In the increasing

11              question, you added --

12                 I object to the question.

13                 MR. CYRULNIK:  Thank you.

14           A.    Again, that could mean for five

15     minutes or an hour, so I don't think that's

16     a realistic question.

17           Q.    Well, why don't we eliminate

18     any ambiguity there.

19                 Would you be able to tell me

20     whether or not the onshore fund ever sold

21     an asset to the offshore fund without

22     replacing that asset?

23                 MR. SOLOMON:  And I object to

24              the question.

25           A.    Yeah, can you repeat the

```
 1                    D. MONTICCIOLO
 2    question?
 3          Q.    Did the onshore fund ever sell
 4    an asset or a piece of an asset to the
 5    offshore fund without replacing that asset?
 6          A.    Not to the best of my
 7    knowledge.
 8          Q.    And what is the gap of time
 9    between selling an asset and replacing an
10    asset, in your experience?
11          A.    I couldn't answer that
12    accurately without looking.
13          Q.    Did the onshore fund ever sell
14    an asset or a piece of an asset to the
15    offshore fund without replacing that asset
16    within, say, a period of time of a week or
17    less?
18          A.    Again, I couldn't answer that
19    question.
20          Q.    Is it possible that they did?
21          A.    Again, I couldn't answer that
22    question.
23          Q.    What about a month, did the
24    onshore fund ever sell an asset or a piece
25    of an asset to the offshore fund without
```

Page 185

```
                          D. MONTICCIOLO
 1
 2      replacing that asset within a month?
 3           A.    Again, I can't answer that
 4      question; I would need to look.
 5           Q.    Is it possible that they did?
 6           A.    Again, I can't answer that
 7      question.
 8           Q.    Did the onshore fund ever sell
 9      an asset or a piece of an asset to the
10      offshore fund without having a specific
11      replacement asset in mind at the time of
12      the sale?
13           A.    I think you are
14      mischaracterizing how fund management or
15      the management of the fund works.
16           Q.    In what way?
17           A.    There are hundreds of assets
18      coming and going at all times and I can't
19      determine if the offshore fund and its
20      independent board is going to buy an asset,
21      so I can't control if I am selling assets
22      that they want to buy.
23                 I am not controlling whether or
24      not there is a sale to be done there.  We
25      are managing for the best interests of all
```

```
 1                    D. MONTICCIOLO
 2      of the investors on the onshore to
 3      basically maximize the returns and do the
 4      best thing to meet the investment strategy.
 5           Q.    Well, I want to set the buy
 6      side apart.  Would you agree with me that
 7      all of the transfers of assets or pieces of
 8      assets from the onshore fund to the
 9      offshore fund were effectuated via a sale?
10                MR. SOLOMON:  You asked that a
11           while ago.
12                I object to the question; it
13           misstates his testimony.
14           Q.    Yeah, I certainly -- just to be
15      clear, I am not mistaking your testimony,
16      because I didn't state your testimony one
17      way or the other; I just asked you a
18      question, so I don't understand --
19                MR. SOLOMON:  We don't actually
20           agree on that.  Okay, when a witness
21           tells you something and then in the
22           subsequent answer you misstate, I
23           consider it misstating testimony.  I
24           think it's a proper objection.
25                MR. CYRULNIK:  Yeah, Lou, I
```

Page 187

```
                        D. MONTICCIOLO
 1
 2          would I would consider that
 3          misstating testimony, also, because I
 4          am stating testimony.  My question
 5          was a question.
 6      Q.    And, Mr. Monticciolo, if you
 7   understood it otherwise, then you are
 8   misunderstanding my question.
 9          I didn't purport to say
10   something that you said, I asked you a
11   question and the question I asked you is
12   whether or not the onshore fund ever
13   effectuated a transfer of an asset to the
14   offshore fund through a transactional
15   method other than a sale.
16          MR. SOLOMON:  Asked and
17       answered.
18      A.    We only sell transactions on --
19   assets on arm's length sales.
20      Q.    Did you say the only sales
21   transactions are arm's length sales or did
22   you mean to say the only transactions are
23   arm's length sales?
24      A.    I don't know that -- can you
25   clarify what you are trying to clarify?
```

```
                                        Page 188
 1                  D. MONTICCIOLO
 2         Q.    I just want to make sure I am
 3    using the terminology that is going to
 4    cover all of the transfers.
 5              Was there anything other than a
 6    sale that would account for the transfer of
 7    an asset or a piece of an asset from the
 8    onshore fund to the offshore fund?
 9         A.    There are no transfers.  It's
10    not -- that's completely incorrect.  There
11    are sales; no transfers, sales.
12         Q.    You don't view a sale as a type
13    of transfer?
14         A.    Absolutely not.
15         Q.    What is the difference between
16    a sale and a transfer?
17         A.    Willing party, willing seller,
18    willing buyer.
19         Q.    That's it?
20         A.    Substantially different than
21    transfer.
22         Q.    So you don't view a sale as a
23    subcategory of a type of transfer?  I just
24    want to get your nomenclature down pat
25    here.
```

```
 1                  D. MONTICCIOLO
 2        A.     I wouldn't.
 3        Q.     That is fine.  So let's use
 4   your terminology of sale.  Willing seller,
 5   willing buyer, what was the third piece?
 6        A.     Arm's length, willing seller,
 7   willing buyer.
 8        Q.     Arm's length is a necessary
 9   component of a sale, in your view?
10        A.     My view, yes.
11        Q.     Okay, let's take your
12   definition.  With your definition, would
13   you agree with me that the only way that
14   assets moved from the onshore fund to the
15   offshore fund was through a sale process?
16        A.     I would not say it was moved.
17               So I would say no.
18        Q.     It's your position that no
19   assets moved from the onshore fund to the
20   offshore fund?
21        A.     If you continue to use the word
22   moved, I would say no.
23        Q.     I am using the word moved.
24               So it's your position that no
25   assets were moved from the onshore fund to
```

Page 190

```
                        D. MONTICCIOLO
1
2      the offshore fund?
3           A.    Assets were sold from the
4      onshore fund to the offshore fund.
5           Q.    Is there any other transaction
6      other than a sale process through which an
7      asset that was originally under the
8      ownership or control of the onshore fund
9      ended up under the ownership or control of
10     the offshore fund or one of its vehicles?
11          A.    Not that I am aware of.  You
12     would have to ask the offshore board.
13          Q.    Okay, well, I am asking you and
14     I appreciate that there is no other
15     mechanism for that other than sale that you
16     are aware of, so let me use sale now going
17     forward.
18          A.    And I would like to qualify it
19     to be arm's length sale.
20          Q.    That's fine.  I mean, I didn't
21     give you what type of sale, but if that is
22     the qualification you would like to add --
23          A.    It does matter.
24          Q.    No problem.
25                Why does it matter?
```

```
 1                    D. MONTICCIOLO
 2        A.    Because we don't control it.
 3        Q.    Who is we?
 4        A.    Brevet or the investment
 5   manager.
 6        Q.    You don't control what?
 7        A.    We don't control if the onshore
 8   is going to buy the asset.
 9              MR. SOLOMON:  You just said
10        onshore.
11        Q.    You do control whether --
12        A.    The offshore, sorry.
13              MR. SOLOMON:  Just let him
14        clarify.
15        A.    Sorry.  If the offshore is
16   going to buy the asset.
17        Q.    And I understand that you are
18   testifying that you don't control whether
19   the offshore is going to buy the asset, you
20   do control whether the onshore is going to
21   be willing to sell the asset, right?
22        A.    Correct.
23        Q.    Who sits on the investment
24   committee of the investment manager; is it
25   just ████ ███ ███ ███████?
```

Page 192

D. MONTICCIOLO

1

2     A.    At the current moment, yes.

3     Q.    So it's fair to say that the

4  decisions that are made with respect to the

5  onshore fund's desire or willingness to

6  sell an asset to the offshore fund are made

7  by either ███  █  ████  ████████  or a

8  combination of the two?

9     A.    No.

10    Q.    Why is it unfair to say what I

11  just said?

12    A.    Because you made it -- you said

13  one or the other.

14    Q.    Well, I had a third disjunctive

15  in there, which was or the two of you, to

16  make sure I was covering everything.  At

17  least I thought.  But if you are not

18  comfortable with that, why don't you state

19  it in your words.

20    A.    It's unanimous approval from

21  Mark and myself.

22    Q.    So every time every decision

23  that is made by the onshore fund to sell an

24  asset or a piece of an asset to the

25  offshore fund is made by both ████  ████

Page 193

1            D. MONTICCIOLO
2    ████  ██████████ unanimously, correct?
3         A.    At the recommendation of the
4    investment teams, correct.
5         Q.    With the decisions made by ████
6    ████  ████  ████████ together?
7         A.    Yes.
8         Q.    Unanimously?
9         A.    Fair.
10        Q.    Okay.  Have you ever sold an
11   asset, have you ever effected the sale of
12   an asset by the onshore fund -- and by you,
13   I mean ████ ████ ████ ████████ ████ █████████
14   ████████████ ████ ████ ███████████ ████████, have
15   you ever effected the sale of an asset from
16   the onshore fund to the offshore fund
17   without having in mind at the time of the
18   sale a different asset in which you wanted
19   to invest the funds that were being
20   liquidated in connection with that sale?
21        A.    As I sit here, and as I have
22   answered before, we don't do it asset by
23   asset, because there are hundreds of assets
24   that are being funded and being recommended
25   to be sold.

Page 194

                    D. MONTICCIOLO

1

2        Q.     So if I am understanding your

3    answer, and I don't mean to put words in

4    your mouth, but I just want to dumb it down

5    for myself, there have been times and maybe

6    many times, because it's just not the way

7    you do things, there have been times where

8    you have effected the sale of an asset from

9    the onshore fund to the offshore fund

10   without having in mind that the funds that

11   were going to be generated by that sale for

12   the onshore fund would be invested in a

13   particular alternative asset or opportunity

14   at the time that you made the decision to

15   sell; is that a fair description of your

16   recollection?

17       A.     That is not a fair description.

18              As I said, there are many

19   assets, we are not identifying a specific

20   asset, so I would say that's not a fair

21   depiction.

22       Q.     Then I am having trouble, when

23   you say there are many assets, I am talking

24   a particular asset, right, I am talking

25   about an asset that ▇▇ ▇▇ ▇▇▇ ▇▇▇▇▇

                        D. MONTICCIOLO

1
2      decided to sell from the onshore fund to
3      the offshore fund, okay, you are with me so
4      far?
5            A.    Yes.
6            Q.    Okay.  That has happened,
7      right, ███ ███ ███  ██████  have decided to
8      sell many assets from the onshore fund to
9      the offshore fund?
10                 And I am talking only about the
11     selling piece of this, not who made the
12     decision to buy it.
13           A.    No, we have approved the
14     recommendation of our investment teams to
15     sell assets.
16           Q.    What do you mean to distinguish
17     between my phrasing of you have effected
18     the sale to you have approved the
19     recommendation of your investment teams,
20     what are you trying to capture?
21           A.    It's not ████  ███ █ choosing
22     them nor designating them.
23           Q.    As the sole members of the
24     investment committee at the investment
25     manager for the onshore fund, is it your

Page 196

D. MONTICCIOLO

1

2  testimony, sir, that ████ ████ ████ ██████████

3  do not make the decisions to sell a

4  particular asset from the onshore fund to

5  any other entity?

6      A.    What I have said is we approve

7  or deny recommendations to make investments

8  or sell investments.

9      Q.    Would you characterize the role

10 that you play as investment manager as the

11 sole members of the investment committee at

12 the investment manager as making the

13 decision to sell or buy an asset?

14     A.    We are making the decision

15 based on the recommendations that certain

16 actions should be taken to buy or sell or

17 originate assets.

18     Q.    That is fine and I am glad that

19 there are other factors that you say factor

20 into what you do.  I am focusing on what

21 you do.

22         You would agree with me that

23 you, ultimately, ████ ████ ████ ██████████

24 unanimously make the decision of whether or

25 not to sell an asset from the onshore

Page 197

```
                        D. MONTICCIOLO
1
2    fund's portfolio, fair?
3         A.    To qualify it, we don't choose
4    which assets; we make the decision upon a
5    recommendation, yes.
6         Q.    The recommendations that you
7    are alluding to come from who?
8         A.    They come from either portfolio
9    management, investment team or even the
10   finance and compliance team.
11        Q.    Where would I find the identity
12   of those various people that you just
13   referenced?
14        A.    You could read the investment
15   memos or recommendations.
16        Q.    And every time ███ ███
     ███ ████████ decide to sell an asset from
18   the onshore fund, it is based on a written
19   investment memo that you have received from
20   one or more members of the committees you
21   just described?
22        A.    There are recommendations,
23   investment memos, yes.
24        Q.    So, the answer to my question
25   was yes?
```

Page 198

                    D. MONTICCIOLO

1

2       A.      Yes.

3       Q.      Okay.  Ultimately, none of

4   those individuals and none of those

5   committees have the ability to decide

6   whether to sell an asset from the onshore

7   fund's portfolio to the offshore fund,

8   correct?

9       A.      Correct.

10      Q.      Only ███ ███ ██ ████████ have

11  the ability to make that decision, correct?

12      A.      No.

13      Q.      Who else?

14      A.      You mischaracterize it that we

15  have the ability to sell to the offshore.

16  We have the ability to take the

17  recommendation that certain assets should

18  be sold and if we agree and if it's

19  reasoned and in the best interest of all of

20  the investors in the fund, being the

21  onshore investors, the LPs, then maybe or

22  maybe not the offshore will buy.  I have no

23  control of that.

24      Q.      And as I mentioned at the

25  outset of this line of questioning, I am

```
                                    Page 199
 1                   D. MONTICCIOLO
 2      excluding the buy side of this thing.  I
 3      recognize that it's your view that you also
 4      need a willing buyer and so I am assuming
 5      that you have a willing buyer for purposes
 6      of my question.
 7                   My question to you is focused
 8      on the decision to sell, those are
 9      decisions that are not made by people who
10      are working on the recommendations
11      committees or any of the other committees
12      that you identified a few moments ago,
13      correct?
14           A.    I don't understand your
15      question.
16           Q.    The decision to sell an asset
17      from the onshore fund is made by ███  ███
        ███    ████████ , yes or no?
19           A.    As we said, the investment
20      committee approves or denies
21      recommendations for investment decisions
22      based on the recommendations that is in the
23      best interest of all of the investors, the
24      LPs of the onshore.
25           Q.    It's your duty to ensure that
```

D. MONTICCIOLO

1
2      any sale of an asset from the onshore fund
3      is in the best interests of your investors,
4      correct?
5           A.    Of all of the investors,
6      correct.
7           Q.    If you had a personal
8      motivation, a personal incentive to sell an
9      asset that was performing, that is
10     performing, for example, because you held
11     an interest in the entity, direct or
12     indirect, in the entity that was purchasing
13     the asset, would you agree with me that
14     there is a conflict of interest that you
15     face as a member of the investment
16     committee that is deciding whether or not
17     to sell an asset that the onshore fund
18     holds an interest in?
19          A.    No.  There is no conflict of
20     interest.  But that is not a possibility,
21     that is a hypothetical, that is not
22     possible.
23          Q.    Why is that not possible,
24     Mr. Monticciolo?
25          A.    I have answered this question

```
 1                    D. MONTICCIOLO
 2    repeatedly.
 3         Q.    Well, I apologize if I missed,
 4    but I don't think I even asked this
 5    question before, so if you answered it in
 6    anticipation, my apologies, but you will
 7    have to answer it again.
 8         A.    Again, the investment committee
 9    does not choose to sell, to buy, other
10    people do whose job it is to make those
11    recommendations and the offshore makes its
12    own arm's length, independent decision to
13    buy.  So you have created a hypothetical
14    that I believe could not exist.
15         Q.    Well, Mr. Monticciolo, you
16    understand the difference between making a
17    recommendation and making a decision,
18    right?
19         A.    No.  I think they are
20    distinctly different.
21         Q.    I think that is what I just
22    asked, but maybe you misheard.
23         A.    Okay.
24         Q.    I said you understand the
25    difference between -- yeah, my question was
```

                    D. MONTICCIOLO

1
2    you understand the difference between
3    making a recommendation and making a
4    decision, correct?
5         A.    Correct.
6         Q.    Lots of people make
7    recommendations to you, as the CEO, right?
8         A.    Correct.
9         Q.    But, ultimately, you are the
10   one that's charged and allowed to make the
11   decisions based on the various
12   recommendations that you have gotten and
13   the various considerations that factor into
14   your calculus, correct?
15        A.    If those decisions are based on
16   recommendations that I believe are
17   reasoned, that my staff and the
18   professionals, such as compliance, agree
19   that they are within the applicable rules,
20   laws and guidelines of how we operate, and
21   that I believe that it is correct, as well,
22   then I may approve it.
23        Q.    Can you think of any decision
24   ▮ made as a member of the investment
25   committee at the investment manager that

```
 1                   D. MONTICCIOLO
 2    was not recommended by somebody else?
 3         A.    Not to the best of my
 4    recollection.
 5         Q.    You can't think of a single
 6    decision you made on the investment
 7    committee that had not been previously
 8    recommended by somebody else; is that
 9    right?
10              MR. SOLOMON:  Asked and
11          answered.
12         A.    I answered that question.
13         Q.    Yeah, I think you did also, I
14    am just clarifying to make sure I got it
15    right, so it would be helpful --
16         A.    Yes.
17         Q.    -- if you confirmed.
18              Yes.  Okay.
19         A.    Correct.
20         Q.    Would you agree with me that it
21    is important for the people who are
22    ultimately making the decisions, based on
23    recommendations or otherwise, that those
24    people, those individuals be -- not be
25    conflicted or have ulterior motives that
```

```
                         D. MONTICCIOLO
 1
 2     would incentivize them to potentially make
 3     decisions that were not in the interests of
 4     the partners in the onshore fund?
 5                  MR. SOLOMON:   I object to the
 6              question; I object to its form.
 7           A.    I can't tell whether that's a
 8     hypothetical question or not.
 9           Q.    It's not a hypothetical
10     question, it's just a question.  There is
11     no hypothetical, there is no set of facts
12     that I am asking you to confirm or deny.
13                  I am asking you whether or not
14     you would agree with me that it is
15     important to ensure that the decision
16     makers on an investment committee for a
17     registered investment adviser are not
18     conflicted in making decisions for an
19     entity.
20           A.    I would think that -- I am not
21     an expert in that, but I would think that
22     would be part of some guidelines.
23           Q.    And would you agree with me
24     that having personal incentives, that is
25     financial incentives that you could
```

```
 1              D. MONTICCIOLO
 2    potentially benefit from either by
 3    transferring assets because you hold an
 4    interest in the -- direct or indirect, in
 5    the acquiring entity or financial interests
 6    in the form of trying to depress the value
 7    of somebody else's interests in the selling
 8    entity, would you agree with me that you,
 9    whether you acted on them or not, possess
10    incentives that are not entirely consistent
11    with the incentives that an individual
12    making investment decisions for the onshore
13    fund should possess?
14              MR. SOLOMON:  Object to the
15         question.
16         A.    I don't believe so, because of
17    the structure and the way the business
18    is -- the way the operation works that I
19    don't believe that that can happen.
20         Q.    Well, maybe you can help me
21    understand why that is, Mr. Monticciolo, I
22    guess I am struggling.
23              You don't have a rule that the
24    onshore fund is not permitted to sell
25    assets to any entity in which you hold an
```

```
 1                    D. MONTICCIOLO
 2     interest, correct?
 3                MR. SOLOMON:  I object to the
 4          question.
 5          A.    I think we do have a rule that
 6     says we can't do that, if I --
 7                Could you repeat the question,
 8     to make sure I got it right?
 9          Q.    Yes.  Do you have a rule that
10     prevents the onshore fund from selling
11     assets to an entity in which you personally
12     hold a direct or indirect financial stake?
13          A.    We have a rule that, as in all
14     funds do, that you need to have arm's
15     length sales.
16          Q.    I am not sure what that means,
17     I just -- if you could just answer my
18     question.
19                Do you have a rule that
20     precludes the onshore fund from selling an
21     asset to an entity in which you hold a
22     direct or indirect interest?
23          A.    I believe the answer to your
24     thing is you don't understand what that
25     means, which means that there is -- a
```

```
 1                    D. MONTICCIOLO
 2     separate part of it makes sure that that
 3     doesn't exist, that there is no conflict.
 4           Q.    I think you are jumping ahead a
 5     couple of steps.  My question is pretty
 6     simple, do you have a rule that precludes
 7     the onshore fund from selling assets to an
 8     entity in which you, Douglas Monticciolo,
 9     hold a direct or indirect interest, yes or
10     no?
11           A.    I don't know we have that rule.
12                 We have a rule that all sales
13     must be arm's length sales.
14           Q.    Okay.  So you don't have a rule
15     that precludes the onshore fund from
16     selling assets to an entity in which you
17     personally have a direct or indirect
18     financial stake; which would explain why,
19     for example, the onshore fund, based on
20     your view, is permitted to sell assets to
21     the offshore fund in which you do have a
22     direct or indirect financial stake,
23     correct?
24                 MR. SOLOMON:  I object to the
25           question; it misstates the testimony.
```

Page 208

1                    D. MONTICCIOLO
2          A.    That is not accurate.  That is
3     not what I said.  We do not sell, we offer.
4     That is -- a sale takes two parties.  We
5     offer.
6          Q.    Sorry, what part of what I said
7     was inaccurate, Mr. Monticciolo?
8          A.    You said that we sell those
9     assets.  They could be sold, but they are
10    bought by an independent arm's length
11    party.
12         Q.    And, again, to the extent you
13    keep on retreating to the question of
14    buying, I appreciate the fact that there
15    has to be a buyer and so I am not -- I am
16    building that into my question, I am
17    focusing exclusively on the rules that
18    exist within Brevet on the sell side.
19              And so, on the sell side,
20    unlike on the buy side, where you are
21    telling me that there are independent
22    people who ultimately make the call as to
23    whether to buy, the people who ultimately
24    make the call as to whether to sell include
25    people like you, who are permitted to hold

```
                              D. MONTICCIOLO
 1
 2     financial interests in the buyer, correct?
 3          A.     Incorrect.
 4                 You are not clarifying only
 5     under the conditions that the sale or any
 6     other activity could be executed under an
 7     arm's length condition, which eliminates
 8     your, you know, conflict.
 9          Q.     What do you mean by arm's
10     length condition in the answer that you
11     just gave?
12          A.     It has to be an arm's length
13     sale.
14          Q.     What does that mean?
15          A.     Fully independent, as we have
16     said before, I have answered this question,
17     independent, willing buyer, willing seller.
18          Q.     That's it, that's what you mean
19     by arm's length sale, that the buyer is
20     fully willing and that the seller is fully
21     willing?
22          A.     Again --
23                 MR. SOLOMON:  I though he
24            said -- I'm sorry.
25                 You just misstated -- maybe you
```

Page 210

```
 1                    D. MONTICCIOLO
 2          didn't hear, but you have not
 3          included something that the witness
 4          said in his answer.
 5                    MR. CYRULNIK:  Okay, if I
 6          didn't include it, I am sure he will
 7          answer; that's why I asked him the
 8          follow-up question.
 9      Q.    Is that what you mean by arm's
10   length, Mr. Monticciolo, that there is a
11   willing buyer and a willing seller?
12      A.    No.  I didn't say that.
13                I said there is independent
14   willing buyer and willing seller amongst --
15   and we can go into how that is decided,
16   because it's not decided by me --
17   independent parties that ensure that there
18   is an independent willing buyer in these
19   transactions.
20      Q.    Who are the independent parties
21   that ensure that there is an independent
22   buyer in these transactions?
23      A.    I answered that question
24   already earlier.
25      Q.    Perhaps you did, but that is
```

```
  1                   D. MONTICCIOLO
  2    not going to advance the ball here.  I
  3    assure you that have no interest in asking
  4    you questions that I have already heard the
  5    answer to, so I would just appreciate if
  6    you could answer my question, especially if
  7    it's not obvious what the answer was
  8    previously.
  9         A.    The answer was obvious, it's
 10    the independent board of the offshore that
 11    makes the buy decisions.
 12         Q.    Yeah, this is where I am
 13    getting hung up, Mr. Monticciolo, I get on
 14    the buy side that there is an independent
 15    board, according to you, that makes the
 16    decisions as to whether to buy, I am
 17    focusing right now exclusively on the
 18    decision of whether to sell.
 19         A.    And I am clarifying that one
 20    doesn't exist without the other.
 21         Q.    Someone can't decide to sell
 22    without someone deciding to buy; is that
 23    what you mean by that?
 24         A.    It would be foolish otherwise,
 25    wouldn't it?
```

Page 212

                    D. MONTICCIOLO

1

2        Q.    I don't know, I am not here to

3   answer your questions.  I am not sure that

4   it would, but if that's your view, that's

5   your view.

6             Whether or not you think the

7   two exist -- need to both exist at the same

8   time, my question is about the sell side,

9   Mr. Monticciolo.

10             On the sell side and only the

11  sell side, would you agree with me that if

12  the individual making the decision of

13  whether to sell holds a financial interest

14  in the buying side, assuming someone else

15  decides that the buying side is going to

16  accept the sale offer, would you agree with

17  me that potential conflicts of interest

18  exist for the investment manager making the

19  decision to sell, yes or no?

20             MR. SOLOMON:  Object to the

21        question.

22        A.    No.

23        Q.    And why would you disagree with

24  that?

25        A.    Again, because it's an

```
 1                    D. MONTICCIOLO
 2      independent arm's length buyer.
 3            Q.     Apart from the fact that there
 4      is an independent arm's length buyer, is
 5      there anything else that is constraining
 6      your ability to make a decision to sell an
 7      asset from the onshore fund?
 8            A.     Absolutely.
 9            Q.     What's that?
10            A.     It's got to be in the best
11      interest of all of the investors in the
12      onshore.
13            Q.     Because if it's not in the best
14      interest of the all of the investors, you
15      could face massive liabilities from your
16      investors, correct?
17            A.     I wouldn't speculate.
18            Q.     You don't know, one way or the
19      other, if you were selling assets from the
20      onshore fund that were not in the interest,
21      those sales were not in the interest of
22      those investors, you don't know one way or
23      the other if you could face massive
24      liabilities as the investment manager for
25      that fund?
```

Page 214

                    D. MONTICCIOLO
1
2        A.    If that one thing of selling
3    that asset was a cause for our problem.
4    It's a hypothetical question.  I really
5    think it's not realistic.
6        Q.    If you were selling funds from
7    the onshore fund, ████ ██████████ █ ████
     ████████████ ███████████, with the goal of
9    depressing the amount of damages that you
10   thought Mr. Iacovacci could retrieve in
11   this litigation, you would agree with me
12   that you could face massive liabilities to
13   your many limited partners in the onshore
14   fund, correct?
15             MR. SOLOMON:  I object to the
16         question.  I object to the complete
17         hypothetical.
18       A.    That is a hypothetical
19   question, I can't answer that.
20       Q.    You don't know?
21       A.    I couldn't tell.
22       Q.    Do you think it's consistent
23   with your fiduciary duties to your
24   investors to sell assets from the onshore
25   fund to the offshore fund without either

Page 215

```
                         D. MONTICCIOLO
 1
 2      simultaneously replacing the asset or
 3      having in mind a particular use for the
 4      funds that would be generated from the sale
 5      of the asset?
 6           A.    I have answered this question
 7      already, yes.
 8           Q.    What if the asset was a
 9      profit-generating, performing asset, same
10      answer?
11           A.    Again, it's a hypothetical
12      question, taken out of context.
13                 It could be, yes.
14           Q.    And with respect to what
15      actually happened, you would agree with me
16      that as the investment committee, ███  ███
        ███    ███     ███       have approved or effectuated
18      the sale of many assets over the years,
19      over the last five years that were
20      performing well, the sale of those assets
21      from the onshore fund to the offshore fund,
22      fair?
23           A.    No.
24           Q.    You have not?
25           A.    No.
```

```
 1                    D. MONTICCIOLO
 2                   That's not what you asked,
 3      though.
 4          Q.    You have not approved the sale
 5      or effectuated the sale of assets that were
 6      performing well, the sale from the onshore
 7      fund to the offshore fund over the last
 8      five years?
 9          A.    If you are limiting it to just
10      that, then the answer is no.
11          Q.    Why is that?  What am I leaving
12      out of the question to make the answer yes?
13          A.    Performing well.
14          Q.    I am leaving out performing
15      well, you are saying?
16          A.    You are conditioning the answer
17      on performing well.
18          Q.    Okay, so it's your testimony
19      that you have not sold assets from the
20      onshore fund to the offshore fund where
21      those assets had been performing well at
22      the onshore fund level?
23                    MR. SOLOMON:  I object to the
24          phrase selling assets, given the
25          witness has now said 15 times.
```

1                    D. MONTICCIOLO

2          Q.    Mr. Monticciolo, do you

3     understand what I mean by selling assets?

4          A.    Assets regardless of their

5     performing status if there is a willing

6     buyer.

7          Q.    No, but my question was

8     specifically -- I mean, I was asking you

9     what I just asked you, because I didn't

10    understand Mr. Solomon's objection.  But I

11    was not building into the word assets the

12    performance, I actually had a separate part

13    of the question that described their

14    performance, so let me try it again.

15               Yes or no, have you approved or

16    effectuated the sale of assets that were

17    performing well for onshore funds to

18    offshore funds?

19         A.    We may have, I have to look.

20         Q.    Okay.  Do you know whether you

21    have done that dozens and dozens of times

22    over the last five years?

23         A.    I don't know, I would have to

24    look.

25         Q.    Mr. Monticciolo, where does the

```
 1                    D. MONTICCIOLO
 2     bulk of your compensation from Brevet come?
 3     From where does the bulk of your
 4     compensation from Brevet come?
 5          A.     From Brevet Capital Management.
 6          Q.     That's the investment manager?
 7          A.     Correct.
 8          Q.     And how is your compensation
 9     determined at the Brevet Capital Management
10     level?
11          A.     My compensation is determined
12     after the various teams, HR, et cetera
13     determine compensation for the rest of the
14     firm.
15          Q.     Is your compensation a
16     percentage of some metric like
17     profitability or performance or is it
18     not --
19          A.     No.
20          Q.     -- not that formulaic?
21          A.     Not that formulaic.
22          Q.     Is your compensation tied to
23     the performance of the assets or the funds
24     who you provide investment management
25     services to?
```

Page 219

```
                              D. MONTICCIOLO
 1
 2          A.    Given we are in the investment
 3    management business, tied to would mean
 4    that's our source of revenue.
 5          Q.    So --
 6          A.    Then yes.
 7          Q.    Okay, I -- can you just repeat?
 8    Maybe there was something loud over here, I
 9    just missed one word from your answer.
10          A.    Sure.  So if tied to means
11    that's our only source of revenue because
12    we are in the investment management
13    business, then I would say yes, tied to.
14          Q.    What I meant by tied to is is
15    it a function of, that is, does your
16    compensation get determined on the basis of
17    the performance of the assets that you
18    are -- and funds to which you are providing
19    investment advisory services?
20          A.    Not directly, but obviously
21    indirectly; if it doesn't perform well,
22    then there is nothing to be paid on.
23          Q.    Do you get -- is the
24    compensation that you get based on the
25    total value of assets under management?
```

```
 1                    D. MONTICCIOLO
 2        A.    No.
 3        Q.    That doesn't play a role in
 4   the --
 5        A.    Again, tied to, yes.
 6        Q.    Okay.  Can you give me a feel
 7   for what your total compensation has been,
 8   say, last year?
 9             MR. SOLOMON:  No.
10             Why is that relevant?
11        Q.    Mr. Monticciolo, can you --
12             MR. SOLOMON:  I am not going to
13          let him answer that question until
14          you tell me why that's relevant.
15             MR. CYRULNIK:  Well, I am sure
16          you can understand why it's relevant,
17          but I'm happy to explain it on the
18          record, Mr. Solomon.
19             We are here talking about the
20          profitability of Brevet and how
21          various incentives for
22          Mr. Monticciolo may affect the
23          decision making that was made and I
24          think a basic question is to
25          understand how his compensation works
```

```
1                    D. MONTICCIOLO
2          and what it looks like.  So I will
3          ask the --
4                MR. SOLOMON:  I think in
5          respect to the entities in which your
6          client had an interest, I am not
7          going to instruct him not to answer,
8          but I don't see how anything else is
9          relevant and I think it's completely
10         intrusive and improper.
11               MR. CYRULNIK:  Well, you are
12         entitled to your opinion and I think
13         you have expressed your opinion, with
14         all due respect, Mr. Solomon, many
15         times to the courts and I don't think
16         any of them have agreed.
17               But setting aside the question
18         of whether you have your opinion, I
19         am asking the question to the
20         witness; if you want to instruct the
21         witness not to answer the question,
22         you know, that's your call and,
23         obviously, we will proceed
24         accordingly and if we need to raise
25         the issue for the court, that's fine.
```

Page 222

```
 1                    D. MONTICCIOLO
 2              I simply asked a basic question
 3         that, candidly, I didn't expect you
 4         to object to.
 5              MR. SOLOMON:  First of you all,
 6         I don't know what you are talking
 7         about, I have no -- I think you are
 8         just wrong.  But, in any event,
 9         misphrased.  I am instructing him not
10         to answer the question.
11         Q.   Mr. Monticciolo, are you going
12    to follow that instruction and decline to
13    tell me what your total compensation was
14    last year from the Brevet entities?
15         A.   I am going to follow the
16    instruction of my attorneys.
17         Q.   Okay.
18              MR. CYRULNIK:  Well, we are
19         going to need to -- we are going to
20         reserve rights on that.  Because I
21         see no basis at all for instructing
22         the witness not to answer.
23              MR. SOLOMON:  I instructed on
24         the question that you asked.
25         Q.   Well, it sounds like there may
```

```
 1                    D. MONTICCIOLO
 2    be some game being played, so let me make
 3    sure that the question I asked is the
 4    question that I just asked you,
 5    Mr. Monticciolo.
 6              My question to you is can you
 7    tell me what your total compensation from
 8    the Brevet entities was in 2020?
 9              MR. SOLOMON:  By the way, by
10         the way, lay a foundation that he has
11         any knowledge, okay.  Because I do
12         intend to instruct -- but I am not
13         sure we have to fight over it if he
14         doesn't know.
15              MR. CYRULNIK:  Okay, well,
16         that's my question.  If you want to
17         object on foundation grounds, that's
18         fine.
19         Q.    But that's my question,
20    Mr. Monticciolo.
21              MR. SOLOMON:  There is no
22         foundation, unless you can establish
23         (inaudible) --
24              MR. CYRULNIK:  Mr. Solomon, as
25         you know, objections on foundation
```

Page 224

```
                       D. MONTICCIOLO
1
2           grounds are to be preserved with
3           objection to form or I have --
4                MR. SOLOMON:  I don't need it.
5           I don't need it.
6                MR. CYRULNIK:  If I could just
7           finish speaking and then you can say
8           your piece.
9                You made an objection on
10          foundation grounds I have allowed you
11          to state, but that doesn't in any way
12          implicate the witness's answer to the
13          question.
14               So if you want to make an
15          objection to the form of the question
16          or to the foundation issues, feel
17          free, but my question stands and
18          unless you are giving the witness an
19          instruction not to answer the
20          question I asked, I would ask
21          Mr. Monticciolo to please provide me
22          with his answer.
23               MR. SOLOMON:  In answering the
24          question, I want you to state whether
25          you have knowledge --
```

Page 225

```
 1                    D. MONTICCIOLO
 2            MR. CYRULNIK:  Mr. Solomon,
 3         that's inappropriate.
 4            MR. SOLOMON:  (Inaudible.)
 5            MR. CYRULNIK:  It's
 6         inappropriate, Mr. Solomon.
 7            MR. SOLOMON:  You can't avoid,
 8         you can't avoid --
 9            MR. CYRULNIK:  Mr. Solomon,
10         it's inappropriate --
11            MR. SOLOMON:  I said what I
12         said, if you want to go take it to
13         the judge, let's go.
14            MR. CYRULNIK:  Mr. Solomon,
15         it's inappropriate for you to be
16         interacting with the witness on what
17         you want his answer to include in the
18         middle of a deposition and you know
19         that, please.
20            MR. SOLOMON:  Okay, that is not
21         what I did.
22      Q.    The question was
23   straightforward, I am asking you if you can
24   tell me how much compensation you received
25   from Brevet-related entities in 2020.
```

```
 1                  D. MONTICCIOLO
 2        A.    As I sit here, I don't know.
 3        Q.    Can you give me your best
 4   estimate?
 5        A.    As sit here, no.
 6        Q.    More or less than a million
 7   dollars?
 8        A.    Again, that would be an
 9   estimate.
10             MR. SOLOMON:  Don't guess.
11        Q.    You don't know, sitting here
12   today, whether your total compensation from
13   Brevet-related entities in 2020 exceeded a
14   million dollars?
15        A.    Without looking, I am telling
16   you I don't know.
17        Q.    And you understand that you are
18   under oath?
19        A.    Yes, sir.
20        Q.    Do you know whether your total
21   compensation from Brevet-related entities
22   in 2020 exceeded $50 million?
23        A.    I don't have to guess on that,
24   no.
25        Q.    Okay.  Do you know whether it
```

```
 1                    D. MONTICCIOLO
 2      exceeded $10 million?
 3           A.    Again, I don't know.
 4           Q.    Do you know whether it exceeded
 5      $500,000?
 6           A.    Again, I would be guessing, I
 7      don't know.
 8           Q.    Do you know whether it exceeded
 9      $250,000?
10           A.    Again, are you including my
11      salary?
12           Q.    I am including all forms of
13      funds that were paid to you by one or more
14      Brevet-related entities, salary, profits,
15      interest, incentives, whatever you could
16      think of that you received from
17      Brevet-related entities in 2020.
18           A.    As I said, I don't know.
19           Q.    Do you have a salary,
20      Mr. Monticciolo?
21           A.    I do not.
22           Q.    Can I ask why you asked me
23      whether I was including salary if you don't
24      have one?
25           A.    I was trying to figure out what
```

Page 228

```
 1                    D. MONTICCIOLO
 2      would be in your total compensation
 3      conversation question.
 4            Q.    You understand what total
 5      compensation means now, at least as I used
 6      it, right?
 7            A.    Vaguely, but yes.
 8            Q.    Do you know how much you
 9      received as an investment manager from the
10      investment management entity?
11            A.    No, I do not.
12            Q.    Do you know what the total
13      assets under management for Brevet was in
14      2020?
15            A.    I would have to look.  No.
16            Q.    Would you have a ballpark
17      figure for me?
18            A.    I would -- I would have to be
19      guessing.
20            Q.    Well, would you know if it was
21      greater or less than $500 million?
22            A.    I would have to ask the
23      question of what do you mean by under
24      management?
25            Q.    Have you ever spoken with
```

                        D. MONTICCIOLO
1
2     investors who have asked you what is the
3     total AUM or assets under management of
4     Brevet?
5          A.    As I sit here, I don't recall.
6     Not the person who has those types of
7     conversations.
8          Q.    You don't recall ever having
9     such a conversation?
10         A.    Specifically that conversation?
11         Q.    Not specifically that
12    conversation, do you recall ever being
13    asked by a prospective investor or an
14    investor what the total AUM or assets under
15    management of Brevet is?
16         A.    I would say possibly.
17         Q.    Okay.  Well, if someone asked
18    you that question now, what would you
19    answer?
20         A.    I mean, I would have to go
21    look, because I would want to be accurate.
22         Q.    If a prospective investor
23    followed up your answer along those lines
24    with well, Mr. Monticciolo, can you just
25    give me a feel for the total AUM without

Page 230

                    D. MONTICCIOLO

1

2    holding you to it, what is your best

3    understanding of the total assets under

4    management figure for Brevet, sitting here

5    today?

6         A.    I wouldn't guess in a regulated

7    business to put that answer out.

8         Q.    Who are you meeting with

9    tonight?

10        A.    I can't disclose that.

11        Q.    Well, is it a prospective

12   investor?

13        A.    No.

14        Q.    No.

15             MR. SOLOMON:  Did you ask who

16        he's meeting with tonight?

17             MR. CYRULNIK:  Yes, I did.

18             MR. SOLOMON:  I object to the

19        question.

20        Q.    If the individual with whom you

21   are meeting with today sits down to dinner

22   and says Doug, curious how Brevet is doing,

23   can you give me a feel for ballpark what

24   are the total assets under management, what

25   would you tell that individual?

```
 1                   D. MONTICCIOLO
 2        A.    I would say if you are
 3    interested in learning about Brevet, you
 4    can talk to my marketing people.
 5        Q.    Truly remarkable.  Okay.
 6             MR. SOLOMON:  You know, you
 7          shouldn't comment like that, that's
 8          improper.
 9             MR. CYRULNIK:  What did you
10          say, Lou?
11             MR. SOLOMON:  I said your
12          commenting is improper.
13             MR. CYRULNIK:  I will withdraw
14          my comment if you found that
15          problematic or --
16        Q.    I didn't mean to offend you in
17    any way, Mr. Monticciolo.  Were you
18    offended by the fact that I found it
19    remarkable that you didn't know the total
20    assets under management?
21        A.    I think you are adversely
22    assuming who the conversation was with and,
23    potentially, yes.
24        Q.    What do you mean by that?
25        A.    What I said.
```

Page 232

```
                              D. MONTICCIOLO
 1
 2         Q.    Well, and what I said doesn't
 3    help me, can you explain what you meant by
 4    I was assuming who the conversation was
 5    with?
 6         A.    Again, no, I would rather not
 7    comment.
 8         Q.    I understand that, but if
 9    deponents were able to answer questions
10    with I would rather not answer, we wouldn't
11    have very effective depositions.
12              MR. SOLOMON:  I don't think
13         this has anything to do with this
14         case at all.  Now you want to ask him
15         questions about whether you offended
16         him.
17              MR. CYRULNIK:  Oh, no, I
18         already asked him that question based
19         on your comment and I wanted to make
20         sure that there was no offense
21         intended and the witness understood
22         that.  But then he gave --
23              MR. SOLOMON:  Whether it was
24         intended, I made the comment that I
25         did.  If you have any other
```

Page 233

```
                            D. MONTICCIOLO
 1
 2          questions, we should move on.
 3                  MR. CYRULNIK:  No, I just
 4          wanted to understand what the witness
 5          meant when he said what he said about
 6          thinking that who I was talking to.
 7       Q.    Or whatever you had in mind, I
 8   wanted to understand that.  Because it may
 9   facilitate some of the follow-up questions
10   here.  It sounds like you have something in
11   mind that I may not be appreciating.
12              So what did you mean when you
13   said that?
14       A.    That that wouldn't even be a
15   question.
16       Q.    That the total assets under
17   management --
18              Oh, you mean that you would
19   never get that question tonight?
20       A.    Possibly.
21       Q.    Oh, I see what you mean.  Okay.
22   Yeah, that's possible.  You didn't tell me
23   who you were meeting with, so I was only
24   left to guess and to use it as an example.
25              It's fair to say, sitting here
```

```
 1                    D. MONTICCIOLO
 2      today, you can't tell me within
 3      $250 million your best guess of what the
 4      total assets under management at Brevet is?
 5           A.     Correct.
 6           Q.     Okay.
 7           A.     Without looking, I would not do
 8      that; that would be a guess.
 9           Q.     And if I told you that I
10      expressly understand that you are giving me
11      your best estimate and that I am not
12      seeking to hold you to any obligations
13      under the Investment Advisers Act or
14      otherwise, would you feel more comfortable
15      giving me an estimate of what the total
16      assets under management is or would you
17      still be unable to do so?
18           A.     You can't waive that, so I
19      would not.
20           Q.     Okay.  Have the assets under
21      management figure gone up from -- year over
22      year from 2015 to 2016?
23           A.     So the years 2015 to 2016?
24           Q.     Yes.
25           A.     I couldn't tell you, I would
```

D. MONTICCIOLO

1
2       have to look.
3               Q.      How about from 2015 to 2018?
4               A.      Again, I couldn't tell you, I
5       would have to look.
6               Q.      How about from 2015 until
7       today, 2020, let's say, do you know whether
8       the AUM figure has gone up between those
9       years year over year?
10              A.      Yes.
11              Q.      Okay.  Is there a document that
12      I would be able to look at that would
13      accurately report Brevet's total assets
14      under management as of, say, now or another
15      given date?
16              A.      There are public filings.
17              Q.      What public filing in
18      particular would I look at if I wanted to
19      know the AUM figure for any given year?
20              A.      You would have to talk to
21      compliance.  I don't recall the global name
22      for it, but it's true for every manager.
23              Q.      Sorry, the first part of the
24      answer got robotic over there, what was
25      that?

D. MONTICCIOLO

1

2      A.     You would have to speak to our

3   compliance folks or get the documents, but

4   there are filings every year.

5      Q.     Fair enough.  But, sitting here

6   today, you don't know what document I could

7   consult to find out the total AUM, assets

8   under management, for Brevet on any given

9   date or year?

10      A.     Correct, as I sit here, I do

11   not know the specific name of the document

12   that you are looking for.

13      Q.     Yeah, I just want to account --

14   I am not saying that you are doing this,

15   but sometimes witnesses do, I am not

16   holding you to a specific name, if you

17   could give me the general description of

18   the document that you have in mind, even if

19   the name is slightly different, that would

20   be fine, too.

21           Do you have a particular

22   document in mind that you would be able to

23   direct me to, even if you don't know what

24   it's formally called?

25      A.     It would be on our SEC

```
1                    D. MONTICCIOLO
2      registration materials.
3           Q.    Those are filed annually?
4           A.    As I sit here, I don't know,
5      but I believe that at least annually.
6           Q.    We talked a little bit about
7      criteria for investments, I want to just
8      understand a little bit about Brevet's
9      business.
10               Did Brevet extend financing --
11               MR. CYRULNIK:  Withdrawn.  Let
12        me ask a different question first.
13          Q.    Are you familiar with the term
14     family office?
15          A.    In the words that it's a very
16     vague concept, but yes.
17          Q.    Have you used that term or
18     heard that term used at Brevet to describe
19     the need to have capital invested by an
20     originator in addition to financing that
21     was being extended from Brevet?
22               MR. SOLOMON:  I object to the
23        question.
24          A.    Yeah, actually, I don't
25     understand the question.  Sorry.
```

1              D. MONTICCIOLO
2        Q.    Would Brevet extend financing,
3    if someone came to you with a deal, with a
4    prospective financing, would Brevet require
5    that sourcing source, for lack of a better
6    term, and I am sure you will tell me --
7              I was going to call it an
8    originator, because I think that was the
9    term that was used in a different
10   deposition, but it sounded to me like you
11   distinguish between origination and
12   sourcing and so I don't want to use the
13   term origination for that reason, so you
14   will excuse me for using the awkward phrase
15   sourcing source until you tell me what you
16   would call this individual.
17             But if a sourcing source
18   approached Brevet with a prospective
19   financing opportunity, would Brevet want
20   that sourcing source to be involved in --
21   to have skin in the game, to have its own
22   financing -- piece of that financing
23   transaction in order for Brevet to be
24   willing to get involved in the underlying
25   deal?

```
 1                    D. MONTICCIOLO
 2               MR. SOLOMON:   I object to the
 3         question.
 4         A.    So ex -- so could you clarify
 5    who was supposed to have skin in the game?
 6         Q.    Yeah, so maybe we should just
 7    start with some terminology that you can
 8    tell me that you are comfortable with, so I
 9    can use that in the question.
10               If someone comes to you, if
11    someone comes to -- you had a department
12    that was in charge of souring at Brevet; is
13    that right?
14         A.    Correct.
15         Q.    And those are people who would
16    find opportunities for financing deals that
17    through which Brevet could deploy its
18    capital?
19         A.    Amongst others, yes.
20         Q.    Okay.  Those sourcing people
21    would be approached by, sometimes by
22    individuals who had potential
23    opportunities; is that fair?  Do you
24    understand what I mean by that?
25         A.    That's a little vague.  Can you
```

```
 1                    D. MONTICCIOLO
 2    clarify that?
 3         Q.    Potential financing
 4    transactions that Brevet might -- that they
 5    thought Brevet might be interested in.
 6         A.    So someone who is not a Brevet
 7    sourcing person is being -- has something
 8    from someone else that is being brought to
 9    our sourcing person?
10         Q.    That's right.
11               Would that happen with some
12    frequency?
13         A.    I -- well, as I sit here, I
14    could tell you, you know, not definitively,
15    but I would be surprised if it doesn't.
16         Q.    Right.  What would you refer to
17    that person as; a broker, a sourcing
18    source?  I am sure you wouldn't refer to
19    them as a sourcing source, but you will
20    tell me what word is appropriate for
21    your parlance.
22         A.    I like the new phrase.
23         Q.    What did you say?
24         A.    I like the new phrase, sourcing
25    source.
```

```
 1                    D. MONTICCIOLO
 2              It depends on what role they
 3    are playing.
 4         Q.    In the transaction?
 5         A.    Yes.
 6         Q.    Okay.  Let's say you have just
 7    a third party who has lots of contacts with
 8    businesses that are interested in financing
 9    and he knocks on the door of one of your
10    sourcing people at Brevet and says I have a
11    company that needs financing, what term can
12    we use for purposes of the ensuing
13    questions to refer to that individual?
14         A.    Someone who is presenting a
15    deal to Brevet.
16         Q.    Nice and pithy.
17         A.    There's many, there's many
18    distinct titles of people who could bring
19    those deals.
20              MR. SOLOMON:  You are talking
21         about the third party that you
22         mentioned in your question?
23              MR. CYRULNIK:  I am.
24         Q.    Would broker be one way of
25    referring to the individual I just
```

```
 1                    D. MONTICCIOLO
 2    described, Mr. Monticciolo?
 3          A.    That could be one of the
 4    categories.
 5          Q.    Okay.  So let's use a broker
 6    for example.  I will use the term --
 7                Actually, you know what, I will
 8    use your non-pithy term, just so that we
 9    are covering all of our bases.  If you
10    think of a pithier term, you will let me
11    know, because it might get us out of here
12    quicker.  Or more quickly.
13                So someone who has a source --
14    who has a -- I forgot your lengthy term
15    now.  Is it someone who had a --
16                MR. SOLOMON:  Presenting a
17          deal.
18                MR. CYRULNIK:  What was --
19          someone who is presenting a deal?
20                MR. SOLOMON:  Presenting a
21          deal.
22                MR. CYRULNIK:  Yes, all right.
23          Q.    If someone was presenting a
24    deal --
25                What is the difference between
```

```
 1                    D. MONTICCIOLO
 2     someone who is presenting deal and a
 3     broker; is a broker a subcategory of the
 4     broader category of someone who is
 5     presenting a deal?
 6          A.     It's an attribute of a broker.
 7          Q.     An attribute of a broker is
 8     that he's presenting deals?
 9          A.     That's one attribute that could
10     describe a broker.
11          Q.     Okay, can you caption for me
12     what other key attributes would make the
13     individual that I'm talking qualify as a
14     broker?
15          A.     They're a broker dealer.
16     They're a registered broker dealer.
17          Q.     Okay.  If someone is presenting
18     a deal to Brevet for potential financing,
19     would Brevet have a requirement that that
20     someone also have skin in the game in the
21     form of extending some portion of the
22     financing themselves or through an entity
23     in which they had an interest?
24          A.     That's a very hypothetical,
25     general question.
```

1                    D. MONTICCIOLO

2          Q.     Well, I didn't mean it to be

3     hypothetical.  I mean, I was just asking

4     whether or not Brevet had that criteria as

5     something that it wanted or demanded in

6     terms of potential financing.  If the

7     answer is no, the answer is not.  I wasn't

8     giving you a hypothetical.

9          A.     It's very -- I would have to

10    see the specific transaction.  So, as I sit

11    here, I couldn't tell you if that is in our

12    policies or not or if that is something

13    that is standard.

14         Q.     Well, let me ask it the other

15    way, can you think of any time that Brevet

16    was presented with a potential financing

17    that in response to which Brevet said to

18    the third party who had presented that

19    financing that it would only proceed with a

20    deal if the third party also invested some

21    of its own funds in the transaction?

22         A.     I don't recall.

23         Q.     One way or the other, you don't

24    know whether Brevet ever did that?

25         A.     I don't.

```
 1              D. MONTICCIOLO
 2              We do literally thousands of
 3    deals.
 4         Q.    And the thousands of deals, you
 5    wouldn't know whether you have ever
 6    demanded that a third party who brought you
 7    a deal demonstrate skin in the game or that
 8    they have an interest that is aligned with
 9    yours with respect to extending financing
10    to the borrower?
11         A.    Again, you said third party
12    versus broker, I don't recall specifically
13    any scenario.  We do a lot of transactions.
14         Q.    How about broker, if I use the
15    term broker for the question, would your
16    answer be different?
17         A.    Again, I don't know.
18         Q.    You don't know one way or the
19    other whether you have ever demanded that a
20    broker have skin in the game or be part of
21    a transaction in order for Brevet to be
22    willing to extend the financing at issue?
23         A.    Again, I don't know.
24         Q.    Okay.  And I take it the term
25    family office to describe the third party
```

                        D. MONTICCIOLO

1
2      or broker having skin in the game, that is
3      having an aligned financial interest with
4      Brevet's in the transaction and the payback
5      of the financing is not a term that you are
6      familiar with?
7           A.    That doesn't -- the way that
8      you are presenting or stating it seems --
9      it's confusing and vague.
10          Q.    I am just asking whether you
11     have ever used or heard the term family
12     office used in the general context that I
13     just described.
14          A.    I don't recall.
15          Q.    Okay.  That's fair enough.
16                When did you first meet
17     Mr. Iacovacci?
18          A.    I, actually, don't specifically
19     recall.
20          Q.    Did you recruit him to join
21     Brevet?
22          A.    In my sole capacity, no.
23          Q.    What do you mean by in my sole
24     capacity?
25          A.    You said did I approve him, the

```
                        D. MONTICCIOLO
 1
 2      answer is --
 3           Q.    Oh, I didn't say approve.  I
 4      said did you recruit.
 5           A.    Oh, recruit.
 6           Q.    Yeah.
 7           A.    I don't think we were -- we do
 8      things like recruit like that, I don't
 9      think.
10           Q.    Did you recruit Mr. Callahan to
11      join Brevet?  Or the Brevet family of
12      companies.  I don't mean to limit it to a
13      particular entity.
14           A.    I don't recall.
15           Q.    Okay.  Back to Mr. Iacovacci,
16      do you recall whether you recruited him?
17           A.    I, I don't recall.
18           Q.    Do you recall how soon after
19      you cofounded or founded Brevet
20      Mr. Iacovacci joined the company?
21           A.    I don't recall.
22           Q.    Does 2004 sound right as to
23      when Paul first started working at Brevet?
24           A.    I, I would be guessing.
25           Q.    Do you know whether when
```

Page 248

D. MONTICCIOLO

1    Mr. Iacovacci first started working at

2    Mr. Iacovacci first started working at

3    Brevet he also was a member of one or more

4    of the companies?

5        A.    I don't recall.

6        Q.    Do you remember him being made

7    a member of one or more of the Brevet

8    companies?

9        A.    The event of making him a

10   member, I don't recall.

11       Q.    Do you know whether he was made

12   a member based on his performance?

13       A.    I don't recall.

14       Q.    Can you give me a feel for

15   roughly how many individuals have been

16   named members since Brevet's founding?

17       A.    I would be guessing on the

18   number.

19       Q.    What is your best guess?

20       A.    Less than ten.

21       Q.    All right, yourself,

22   Mr. Callahan, Mr. Tripp, Mr. Iacovacci, any

23   others come to mind?

24       A.    I just don't recall.

25       Q.    So, sitting here today, no

                    D. MONTICCIOLO
1
2    other names come to mind?
3         A.    Again, I don't recall.
4         Q.    Did Mr. Iacovacci's role at
5    Brevet change over time?
6         A.    I believe it did.
7         Q.    Can you describe for me the
8    evolution of his role over time?
9         A.    I don't recall exactly the
10   evolution or change in those roles.
11        Q.    If you don't recall exactly,
12   that's okay, I just want your best
13   recollection.
14        A.    I recall we were just trying
15   to -- we were trying to work it out
16   somewhere that he could be productive
17   within the firm.
18        Q.    I am not sure that is what I
19   had in mind.
20              Can you describe for me the
21   role he played at Brevet when he first
22   started or as early as you can remember and
23   then whatever point in time you remember
24   that changing or evolving, that new role?
25        A.    I don't recall the specifics

Page 250

D. MONTICCIOLO

1
2    on, on those transitions.  I know the role
3    changed, but it was -- I think it was
4    because something wasn't working out and
5    we, we wanted to -- we liked Paul, so.
6         Q.    Did you say you liked Paul?
7         A.    I like Paul.
8         Q.    Yeah, he seems like a good guy.
9               What is your best recollection
10   of the various departments in which
11   Mr. Iacovacci worked at Brevet?
12        A.    As I sit here, I couldn't tell
13   you.
14        Q.    Do you remember him working on
15   the sourcing side of the Brevet business?
16        A.    I, I recall that was one of the
17   roles he played.
18        Q.    Did he ever get involved in the
19   intermediate duration loan business or just
20   the short duration loan business?
21        A.    I don't recall.
22        Q.    You recall that he was involved
23   in the short duration loan business, right?
24        A.    I, I would have to go back and
25   look.

```
                        D. MONTICCIOLO
 1
 2         Q.    Okay.  Would you say
 3     Mr. Iacovacci was an integral member of the
 4     Brevet team over the years?
 5         A.    I would say he was part of the
 6     Brevet team.
 7         Q.    That's easy enough.
 8               Would you say he was an
 9     integral member?
10         A.    I, again, would say he was part
11     of the Brevet team.
12         Q.    And I, again, would say can you
13     please answer my question?
14         A.    I couldn't answer that
15     question.
16         Q.    Okay.  Did he interact with
17     investors?
18         A.    I don't recall.
19         Q.    You don't recall one way or the
20     other whether Mr. Iacovacci interacted with
21     investors?
22         A.    In the context of as his job --
23         Q.    Yes.
24         A.    -- or --
25         Q.    Yeah, let me make that clear.
```

```
 1              D. MONTICCIOLO
 2              In the context of his job at
 3    Brevet, was he interacting with investors?
 4         A.   So investors call people, they
 5    are sometimes people you know, so
 6    interacting could mean just seeing your
 7    friends.
 8         Q.   It could.  And my question to
 9    you is, to your knowledge, did
10    Mr. Iacovacci interact with investors at
11    Brevet.
12         A.   Everybody at Brevet interacts
13    with investors.
14         Q.   What do you mean by that?
15         A.   Investors talk to, you know,
16    numerous people throughout the firm.
17         Q.   Do the compliance people at
18    Brevet interact with investors?
19         A.   I believe they do.
20         Q.   For what purpose?
21         A.   Talking about
22    compliance-related stuff.
23         Q.   Okay.  Did Mr. Iacovacci work
24    with investors?  Maybe that would narrow
25    the question down.
```

Page 253

1                    D. MONTICCIOLO
2        A.    I don't know what work with
3    would mean.
4        Q.    Well, is that a term you are
5    not familiar with, working?
6        A.    We don't work with investors.
7        Q.    Nobody at Brevet works with
8    investors?
9        A.    They invest in us, we don't go
10   to work with them.
11       Q.    Mr. Monticciolo, are you
12   telling me that you don't have an
13   understanding as to which of the people at
14   Brevet are designated for working with,
15   interacting with in the investors' side of
16   this business versus the many other pieces
17   of this business?
18       A.    I am not saying that.
19       Q.    You understand what I mean by
20   working with the investors as distinguished
21   from working with, say, the borrowers, the
22   brokers, the regulators, right?
23       A.    I think you are trying to make
24   a distinction that is not accurate to the
25   business.

Page 254

```
                              D. MONTICCIOLO
 1
 2         Q.     What do you mean by that?
 3         A.     We are an investment manager,
 4    we work for investors; they work with, talk
 5    to numerous people throughout the
 6    organization.
 7              MR. CYRULNIK:  Let's take a
 8         look at an exhibit that I am going to
 9         introduce.  It will be marked as
10         Exhibit 2 and it's an affidavit from
11         Mr. Callahan.
12              (Whereupon, the aforementioned
13         affidavit from Mr. Callahan was
14         marked as Plaintiff(s)' Exhibit 2 for
15         identification as of this date.)
16              MR. CYRULNIK:  It should pop up
17         on your list.
18              Success?
19              MS. YANG:  One second.
20              MR. SOLOMON:  I opened Exhibit
21         2, is it a website page?
22              MR. CYRULNIK:  A website page,
23         no.  It's --
24              THE WITNESS:  Actually, while
25         we are looking for this, can I take
```

                    D. MONTICCIOLO

1
2          two seconds and use of the restroom
3          and be right back?
4               MR. CYRULNIK:  Sure.
5               Let's go off the record.
6               THE VIDEOGRAPHER:  The time is
7          1:24 and we are going off the record.
8          This is the end of media unit No. 3.
9               (Whereupon, a brief recess was
10         taken.)
11              THE VIDEOGRAPHER:  The time is
12         1:31 and we are back on the record.
13         This is the beginning of media unit
14         No. 4.
15   CONTINUED EXAMINATION
16   BY MR. CYRULNIK:
17        Q.    Mr. Monticciolo, were you able
18   to pull up Mr. Callahan's affirmation,
19   Exhibit 2?
20              MR. SOLOMON:  It's on the
21          screen.
22        Q.    If you can scroll down to
23   paragraph seven of Mr. Callahan's
24   affirmation, and you see the --
25              MR. SOLOMON:  One second.

```
 1                    D. MONTICCIOLO
 2              MR. CYRULNIK:  I'm sorry.
 3              MR. SOLOMON:  Hold on one
 4         second.
 5              Paragraph seven, go ahead.
 6         Q.    You will see the second
 7    sentence of the paragraph, Mr. Callahan
 8    states, "Thus, from 2011 up to the time of
 9    his termination on October 14, 2016,
10    plaintiff did not work with Brevet
11    investors," do you see that language?
12         A.    Where, you are looking at
13    paragraph seven?
14         Q.    I am looking at the second
15    sentence in paragraph seven, correct.
16         A.    So would you just read the
17    intro to it?  So I know we are looking at
18    the right thing.
19         Q.    Thus, from 2011 up to the time
20    of his termination on October 14, 2016,
21    plaintiff did not work with Brevet
22    investors, do you see that?
23         A.    I see that.
24         Q.    You agree with Mr. Callahan's
25    statement?
```

Page 257

D. MONTICCIOLO

1

2      A.     Again, work with means like
3  really full-time working with.  I see that,
4  yes.

5      Q.     Well, I know you see it, do you
6  agree with Mr. Callahan's statement?

7      A.     I agree with it.

8      Q.     But you agree with it only if
9  you add in the words full time, did not
10  work full time with Brevet investors?

11      A.     That would be a different
12  characterization of what I am saying.

13            I would say predominantly or,
14  you know, actively.

15            Or predominantly probably
16  characterizes it.  We are a small firm.

17      Q.     So you would disagree with the
18  statement that from 2011 to the time of his
19  termination on October 14, 2016,
20  Mr. Iacovacci did not work with Brevet
21  investors at all; is that fair?

22            MR. SOLOMON:  I object to the
23         question.  You are misstating the
24         document.

25      A.     Right, that is not what it

1                    D. MONTICCIOLO

2       says.

3            Q.    And to be extraordinarily

4       clear, although it's hard to imagine that

5       it wasn't, I am not purporting to read the

6       document, I am asking you whether you would

7       agree or disagree with the statement that I

8       just made and I will make it again.

9                 Would you disagree with the

10      statement that Mr. Iacovacci did not work

11      with Brevet investors at all from 2011 up

12      until the time of his termination?

13           A.    I would not agree with that

14      statement.

15           Q.    Okay.  So to the extent

16      Mr. Callahan did not qualify his

17      representation that plaintiff Mr. Iacovacci

18      did not work with Brevet investors with any

19      other qualifications that you included, for

20      example, predominantly or full time, is it

21      fair to say that you and Mr. Callahan

22      disagree with respect to whether

23      Mr. Iacovacci worked with Brevet investors?

24                MR. SOLOMON:  I object to the

25           question.

Page 259

```
 1                   D. MONTICCIOLO
 2        A.     No.
 3        Q.     Sorry, did you say no,
 4   Mr. Monticciolo?
 5        A.     I said no, I would not
 6   disagree.
 7        Q.     Without any additional words or
 8   qualifications or phrases, would you agree
 9   with the statement that from 2011 until
10   2016, Mr. Iacovacci did not work with
11   Brevet investors?
12        A.     Say that one more time.  I'm
13   sorry.
14        Q.     Without any qualifications or
15   additional phrases, would you agree or
16   disagree with the statement that from 2011
17   through 2016, Mr. Iacovacci did not work
18   with Brevet investors?
19        A.     Yes.  I would agree with that.
20        Q.     You would agree with that,
21   without any qualifications?
22        A.     I don't think I need to qualify
23   what work means.
24        Q.     Okay.  I think we were talking
25   about Mr. Iacovacci's role at Brevet, do
```

```
 1                    D. MONTICCIOLO
 2     you recall him being predominantly involved
 3     with the sourcing activities associated
 4     with the Brevet short duration loan
 5     business?
 6          A.    I recall that he was involved
 7     as one of his -- one of the more important
 8     roles or priority roles, you might say.
 9          Q.    Okay.  Was he the main person
10     at Brevet that was working on sourcing
11     transactions for Brevet's short duration
12     loan funds?
13          A.    I, I, I don't recall.
14                The fund's been around for a
15     long time.
16          Q.    Do you recall whether there was
17     anybody else who you would have turned to
18     about sourcing other than Mr. Iacovacci
19     during the 2011 to 2016 time period?
20          A.    I don't recall the specific
21     people, but yes.
22          Q.    You can't identify anybody but
23     you can recall that there were other
24     people?
25          A.    There has always been other
```

```
 1                    D. MONTICCIOLO
 2    people.
 3         Q.    Did you interact with
 4    Mr. Iacovacci on a daily basis?
 5         A.    I don't recall.
 6         Q.    Did you interact with him on a
 7    weekly basis?
 8         A.    I don't recall.
 9         Q.    You don't recall whether you
10    interacted with him at least once a week on
11    average over the course of his time at
12    Brevet from 2011 to 2016?
13         A.    I am not going to speculate.
14         Q.    Did Mr. Iacovacci keep his time
15    in some way, record his time?
16         A.    I don't know, I don't recall.
17         Q.    Do you recall whether he was
18    supposed to be recording his time?
19         A.    I don't recall.
20         Q.    Is it fair to say you didn't
21    have any real direct oversight of
22    Mr. Iacovacci's activities at Brevet?
23         A.    I -- the word oversight is kind
24    of vague.
25         Q.    Well, were you his boss?
```

Page 262

1                    D. MONTICCIOLO

2        A.    We were a team.

3        Q.    So no?

4        A.    We were a team.

5        Q.    Were you anybody's boss at

6    Brevet?

7        A.    You would have to ask HR.

8        Q.    Oh.  I may be able to ask HR,

9    but I am certainly able to ask you that

10   question, so I would like an answer,

11   please.

12       A.    A boss is a phrase or role that

13   is not commonly used at Brevet.

14       Q.    So you wouldn't feel

15   comfortable describing yourself as

16   anybody's boss at Brevet?

17       A.    Boss without what it means, I

18   wouldn't.

19       Q.    Did Mr. Iacovacci report to

20   you?

21       A.    Again, I answered that

22   question.  We were a team.

23       Q.    Yes or no, would you feel

24   comfortable describing Mr. Iacovacci as

25   reporting to you at Brevet?

```
 1                    D. MONTICCIOLO
 2        A.     Again, that's not the structure
 3   that I would say describes Brevet.
 4        Q.     Okay.  Would you feel
 5   comfortable describing anybody at Brevet as
 6   reporting to you?
 7        A.     Again, it depends on the
 8   context.
 9        Q.     Do you have any idea as to how
10   much capital Mr. Iacovacci was responsible
11   for deploying while he was at Brevet over
12   the years?
13        A.     No.
14        Q.     Do you have any idea how much
15   money, investment money, Mr. Iacovacci was
16   responsible for bringing into Brevet over
17   the years?
18        A.     As I sit here, no.
19        Q.     Would you consider
20   Mr. Iacovacci as a valued member of the
21   team?
22        A.     As I sit here, it's a long time
23   ago, I don't recall.
24        Q.     You don't recall whether you
25   considered Mr. Iacovacci a valued member of
```

Page 264

```
                              D. MONTICCIOLO
 1
 2      the Brevet team; is that what you are
 3      testifying to?
 4                  MR. SOLOMON:  As of when?
 5                  MR. CYRULNIK:  As of any point
 6          in time.
 7          A.    I -- that would be speculating,
 8      I can't recall.
 9          Q.    Do you recall there coming a
10      point in time --
11                  MR. CYRULNIK:  Withdrawn.
12          Q.    Do you recall there coming a
13      point in time when Mr. Iacovacci got sick?
14          A.    Which time?
15          Q.    I take it from your answer that
16      there were multiple points in time when you
17      recall Mr. Iacovacci having health issues?
18          A.    You said being sick?
19          Q.    Yes.
20          A.    Okay, yes.
21          Q.    Do you recall him having
22      significant health issues towards the end
23      of 2015?
24          A.    I recall him saying he was
25      having significant health issues.
```

Page 265

```
 1                    D. MONTICCIOLO
 2          Q.    Should I understand from your
 3     answer that you doubt whether in fact
 4     Mr. Iacovacci had significant health issues
 5     at the end of 2015?
 6          A.    I am saying I am not a doctor.
 7          Q.    So you don't know one way or
 8     the other whether or not Mr. Iacovacci had
 9     health issues but you have no reason to
10     doubt that he did; is that a fair
11     description of your testimony?
12          A.    Could you repeat that?
13          Q.    Sure.  I am trying to just
14     understand what you are testifying to.
15                Are you saying you --
16                You recall Mr. Iacovacci
17     informing you of significant health issues
18     at the end of 2015, correct?
19          A.    Significant health issues of
20     his -- I think it was his knees bothering
21     him, if that is what you mean by
22     significant health issues, yes.
23          Q.    Yes, significant health issues
24     relating to his knees.
25          A.    Yes.
```

                          D. MONTICCIOLO

1
2          Q.     You recall him reporting that
3      he had to have surgery or surgeries in
4      connection with those health issues?
5          A.     I believe he used my doctors,
6      because I have had something similar.
7          Q.     Oh, that is interesting, okay.
8                 So, then, do you know that he
9      had surgeries -- surgery or surgeries?
10         A.     I do not.
11         Q.     Okay.  But you do know that he
12     used your doctors?
13         A.     I don't know if he used them in
14     the end.
15         Q.     You just recommended doctors to
16     him to help him with his knee issues?
17         A.     As well as many other ways of
18     assisting.
19         Q.     What other ways?
20         A.     Offered him things that might
21     help relieve knee pain that I found worked
22     for me.  Offered my crutches, my walker and
23     other things.
24         Q.     Did he take you up on those
25     offers?

```
 1                    D. MONTICCIOLO
 2         A.     In a limited basis, yes.
 3         Q.     Did he borrow your crutches?
 4         A.     I don't recall.  I don't think
 5    he did.
 6         Q.     Did you see him in a cast?
 7         A.     I don't believe I did.
 8         Q.     Did you visit him at any
 9    hospitals?
10         A.     I did not.
11         Q.     Did you visit him at home when
12    he wasn't able to come into the office or
13    when he told you he wasn't able to come
14    into the office?
15         A.     I wasn't invited.
16         Q.     Paul had a meeting with you and
17    Mark Callahan on January 6th of 2016; is
18    that right?
19         A.     I don't recall specifically the
20    date.
21         Q.     Do you recall having a meeting
22    in the office with Paul Iacovacci and Mark
23    Callahan towards the beginning of January
24    of 2016, even if you don't remember the
25    particular date?
```

                        D. MONTICCIOLO
1
2          A.     I do.

3          Q.     Okay.  And at that meeting,

4     Mr. Iacovacci informed you and Mr. Callahan

5     of his intention to retire from Brevet; is

6     that right?

7          A.     No.

8          Q.     Mr. Iacovacci didn't inform you

9     that he was intending to retire?

10         A.     No.

11         Q.     I'm sorry, I am not sure if we

12    got that for the record, did you say no?

13         A.     I said no.

14         Q.     He discussed with you the topic

15    of retirement at that meeting?

16         A.     He did.

17                I remember it was, it was a not

18    very coherent meeting.  Maybe he was still

19    on -- I don't know the specifics, but still

20    taking opioids or something.

21         Q.     Okay.  Why don't you tell me

22    what you remember from that meeting.

23         A.     That he said he was having

24    challenges with like the fact that his

25    knees were hurting.

Page 269

D. MONTICCIOLO

1
2          Q.     Okay.   And what did he discuss
3     about leaving Brevet?
4          A.     He didn't discuss leaving
5     Brevet.  He said he might -- that this
6     might challenge him, that he would have to
7     consider retiring and permanently leaving
8     the workforce.
9          Q.     And you distinguish between
10    leaving Brevet and what you just described
11    as potentially retiring?
12         A.     No.  Having been in the
13    business for a long time, I know the word
14    retiring means permanently leaving the
15    workforce.  That's why we characterize it
16    with death and permanent disability.
17         Q.     You are familiar with -- are
18    you a football fan?
19         A.     I am not.  Sorry.
20         Q.     I take it you don't know who
21    Rob Gronkowski is?
22         A.     I don't.  Sorry.
23         Q.     You never heard of anybody
24    retiring and yet going back to work after
25    the retirement?

```
 1                    D. MONTICCIOLO
 2          A.    I can't say that I know that
 3     specifically or not.  I can't say I have
 4     experienced that.
 5          Q.    So, in your view, retiring
 6     means never to return; is that right?  To
 7     the workforce.
 8          A.    It does.  And I am sure
 9     probably in every dictionary too.
10          Q.    I'm sorry, did you say it does
11     and or it doesn't?
12          A.    I am saying -- I'm sorry, ask
13     the question again, so I can -- please.
14          Q.    Yeah, I had asked whether in
15     your view retiring means leaving the
16     workforce never to return.
17          A.    It does to me.  And, again, in
18     my experience, that's what it means.
19          Q.    And so what did Mr. Iacovacci
20     tell you about retiring during that
21     January, early January meeting in
22     Mr. Callahan's office?
23               MR. SOLOMON:  By the way,
24          Jason, I see -- I think Mr. Iacovacci
25          has joined us.  I am sure you would
```

```
 1                    D. MONTICCIOLO
 2        want to note that for the record.
 3             MR. CYRULNIK:  I wouldn't care
 4        to, but I am more than happy for you
 5        to do so, so so noted.
 6        Q.    Please continue.
 7        A.    So what I recall that he was
 8   unsure and trying to figure things out.
 9        Q.    What --
10        A.    What he should do.
11        Q.    So he flagged for you that he
12   might want to retire but was unsure whether
13   he would want to retire; is that a fair?
14             (Whereupon, at 1:49 p.m., the
15        court reporter temporarily lost their
16        Internet connection and a 40-minute
17        luncheon recess was taken.)
18             THE VIDEOGRAPHER:  The time is
19        2:30 and we are back on the record.
20             MR. CYRULNIK:  Mr. Monticciolo,
21        you were going to answer the last
22        question, because the court had
23        gotten dropped from the room, can you
24        provide your answer to the last
25        question.
```

Page 272

```
 1                    D. MONTICCIOLO
 2               THE WITNESS:  Right, just can
 3          you repeat it again, just so I'm real
 4          clear what I am answering?
 5               (Whereupon, the referred to
 6          question was read back by the
 7          Reporter.)
 8          A.    Yes.
 9          Q.    Okay, what did you tell
10     Mr. Iacovacci in response to his
11     communicating that to you at the early
12     January meeting in Mr. Callahan's office?
13          A.    I don't remember the exact
14     words, but it was -- it was probably along
15     the lines -- or it was along the lines of
16     or just stay in touch with us, we are here,
17     keep us posted.
18          Q.    You understood that he had the
19     right to leave Brevet at the time?
20          A.    Everyone has the right to leave
21     Brevet.
22          Q.    Did you understand that
23     Mr. Iacovacci had the right to leave
24     Brevet?
25          A.    Yes.
```

```
 1                    D. MONTICCIOLO
 2          Q.    And you understood that if he
 3      left Brevet, he would have continuing
 4      interests and payments that were due to him
 5      under the LLC agreements?
 6          A.    Yes.
 7          Q.    Had you had anybody leave
 8      Brevet previously who had continuing
 9      interests or payments due to them under one
10      or more of the LLC agreements?
11          A.    Yes.
12          Q.    And who was that?
13          A.    John Tripp.
14              MR. CYRULNIK:  By the way, just
15           for the record, I am going to be
16           trying to go on mute while
17           Mr. Monticciolo is talking, because
18           the landscapers are downstairs and I
19           can imagine that it's loud, so if you
20           see me go on mute, that is the reason
21           why.  Hopefully they will be done
22           soon.
23          Q.    But I think you just told me it
24      was Mr. Tripp, in addition to Mr. Tripp,
25      had anybody else left Brevet with payments
```

Page 274

```
                         D. MONTICCIOLO
 1
 2     due on one or more of the LLC agreements?
 3            A.     To be clear, when you mean LLC
 4     agreements, you mean the Short Duration
 5     Partners and Short Duration Holdings?
 6            Q.     I do.
 7            A.     And if you do, the answer is
 8     yes.
 9            Q.     Who else left Brevet with
10     payments due under those agreements?
11            A.     Sorry, I thought I was making
12     an affirmative that it was just John Tripp.
13            Q.     Oh, okay.
14            A.     It was John Tripp, sorry.
15            Q.     That could be what you were
16     doing and I misremembered the question, but
17     we are clear now.
18                   Do you recall how close in
19     proximity to the time that you were
20     discussing with Mr. Iacovacci his
21     prospective retirement Mr. Tripp had left
22     Brevet?
23            A.     I -- best of my recollection,
24     they weren't at the same time, but they
25     were within, you know, some -- you know,
```

```
 1                    D. MONTICCIOLO
 2     probably a couple years of each other.
 3          Q.    Mr. Tripp had left Brevet prior
 4     to Mr. Iacovacci's discussion with you in
 5     January of 2016; is that right?
 6          A.    I did hear the gardening guys,
 7     sorry.
 8                Actually, could you repeat it?
 9          Q.    Sure.  Mr. Tripp had left
10     Brevet prior to the time that you discussed
11     in January 2016 with Mr. Iacovacci his
12     prospective retirement?
13          A.    If I recall, that's correct.
14          Q.    Okay.  So when Mr. Iacovacci
15     flagged for you whatever he did flag for
16     you, however you want to characterize it,
17     prospective retirement, impending
18     retirement, whatever he flagged for you, do
19     you recall thinking about or talking with
20     anybody about the potential amounts that
21     Mr. -- that would be owed to Mr. Iacovacci
22     if he indeed left Brevet?
23          A.    I don't recall having those
24     conversations.
25          Q.    Do you recall directing anybody
```

1                    D. MONTICCIOLO

2      to calculate roughly or to investigate what

3      the LLC agreements provided for by way of

4      payments to Mr. Iacovacci in the event that

5      he left the company?

6          A.    I don't recall specifically who

7      would be doing it, but there are --

8      obviously, we have a firm and people would,

9      you know, look at the agreements.

10         Q.    Do you recall anybody actually

11     doing that for you?

12         A.    Doing that for me, no.

13         Q.    Doing that for Brevet?

14         A.    I don't recall specifically.

15         Q.    Do you recall Ms. Karina

16     Dinershteyn undertaking an analysis of how

17     much would be owed to Mr. Iacovacci under

18     the LLC agreements?

19         A.    Karina Dinershteyn, our CFO.

20               I do recall she does that or

21     did that on an annual basis.

22         Q.    You mean that you recall that

23     she calculated everyone's -- what was owed

24     to everybody each year when she was the

25     CFO?

Page 277

D. MONTICCIOLO

1

2          A.      Correct.

3          Q.      And my question is do you

4     recall either asking someone to ask

5     Ms. Dinershteyn or asking Ms. Dinershteyn

6     directly to undertake an analysis of what

7     would be owed to Mr. Iacovacci in the event

8     that he left Brevet in 2016?

9          A.      I don't recall having a

10    conversation.

11             MR. SOLOMON:  Jason, it's not

12         the outside noise, we are getting an

13         echo when you do speak.  It's not the

14         outside noise at all.

15             MR. CYRULNIK:  Oh.  Is anyone

16         else getting an echo?  I am not

17         getting an echo, I am just getting

18         outside noise.

19             THE WITNESS:  Yeah, I heard it

20         in that last.

21             MR. SOLOMON:  Let's carry on.

22             MR. CYRULNIK:  You will let me

23         know if you hear an echo and I will

24         know whether you are hearing loud

25         blowers.

D. MONTICCIOLO

1    Q.    Did you have a rough estimate
2    as to how much money would be owed to
3    Mr. Iacovacci if he followed through on
4    retiring from the company in 2016?
5
6    A.    I don't recall looking at that.
7    Q.    Do you recall having any
8    discussions with Mr. Callahan about the
9    potential amounts of money that
10   Mr. Iacovacci might be entitled to if he
11   followed through on a requirement in 2016?
12   A.    I don't recall.
13   Q.    You don't recall one way or the
14   other?
15   A.    Correct.
16   Q.    Do you recall expressing
17   concerns about the impact that
18   Mr. Iacovacci's departure from the company
19   might have on the business overall?
20   A.    I -- as concerns, I don't
21   recall that.
22   Q.    Do you recall expressing
23   concerns to anybody about Mr. Iacovacci's
24   departure potentially concerning investors
25   in Brevet?

Page 279

D. MONTICCIOLO

1
2      A.      No, I don't recall those
3   conversations.
4      Q.      Do you recall expressing any
5   concerns to anyone about who would fill the
6   role that Mr. Iacovacci had played with
7   respect to sourcing transactions while at
8   Brevet?
9      A.      Outside of the normal course
10  when anybody leaves and, if I am not
11  mistaken, I think Paul was barely, you
12  know, functioning at his job.
13     Q.      Did I hear you correctly in
14  saying that Paul Iacovacci was barely
15  functioning at his job?
16     A.      If I recall that it -- that his
17  performance had dropped precipitously over
18  the time period before his surgeries.
19     Q.      You mean when his health
20  problems first started or were reported to
21  have started until the time that you had
22  the discussion in January of 2012 about his
23  prospective retirement, it's your
24  recollection that Mr. Iacovacci's job
25  performance had dropped in terms of

Page 280

                              D. MONTICCIOLO

2     quality?

3              MR. SOLOMON:   Objection.

4        A.    No.

5              What I am saying is it was

6     around that time when he said he was having

7     problems that it was clear that his

8     performance had dropped substantially over

9     the year or so prior.

10       Q.    And what are you referring to

11    in terms of his job performance having

12    dropped substantially?

13       A.    His job was to source assets

14    and, you know, I can't give you the

15    specifics, but I recall that we were no

16    longer relying on Paul for the type of

17    business that he had been bringing in the

18    past, that it seemed to have disappeared.

19       Q.    So you do recall there being a

20    time when you were relying on Paul

21    Iacovacci for a significant percentage of

22    the sourcing of business opportunities for

23    Brevet?

24              MR. SOLOMON:   Object to the

25         question.

Page 281

D. MONTICCIOLO

1    Q.    Is that right?
2    A.    I rely on it as much as I do my
3    shoes to keep me dry, knowing it's just
4    part of the role.
5    Q.    That may be an expression that
6    I am uniquely not familiar with, but you do
7    recall there being a period of time where
8    you did rely on Mr. Iacovacci for sourcing
9    a substantial percentage of the
10   transactions that Brevet was engaging in;
11   is that a fair characterization?
12                MR. SOLOMON:  Object to the
13         form.
14   A.    Definitely not.
15   Q.    Okay.  So what did you mean to
16   say when in describing his drop in
17   performance as saying we were no longer
18   relying on him?
19   A.    I didn't say that I was relying
20   on him.  I said his job performance had
21   dropped precipitously and, as a team
22   member, not carrying his weight or his part
23   of the role.
24   Q.    And what I am asking is can you
25

Page 282

1              D. MONTICCIOLO

2      explain to me what you mean by his job

3      performance had dropped as a team member

4      not carrying his role?  What metrics were

5      you using to --

6          A.    His, his -- as you mentioned,

7      it was, he was deal sourcing and, as I

8      recall, the deal sourcing was brought to my

9      attention that it had dropped significant

10     enough for people to say, you know, is he,

11     is he doing his job.

12         Q.    Who brought that to your

13     attention?

14         A.    You know, I don't recall.

15         Q.    So you recall somebody coming

16     and bringing -- to bring to your attention

17     that Mr. Iacovacci was no longer sourcing

18     deals but you don't recall who it was?

19         A.    There is quite a few people in

20     the firm who watch how we are doing and

21     make sure that we are doing well.

22         Q.    I could imagine there are.

23               In response to my question, did

24     I get that right, you recall somebody

25     reporting that to you but you don't recall

Page 283

                         D. MONTICCIOLO
1
2    who it was?
3        A.    Correct.
4        Q.    Do you recall when that took
5    place?
6        A.    I recall it was before he had
7    the knee problems, because I was, I was, I
8    would say, surprised that somebody was
9    having knee problems and, you know, that
10   that was, you know, interesting it was
11   occurring at the same time when performance
12   had dropped so much.
13       Q.    You found that surprising that
14   somebody's performance might have dropped
15   around the same time they were having
16   health issues?
17             MR. SOLOMON:  Object to the
18         question.  You misstated his
19         testimony.
20       Q.    Did I misstate your testimony,
21   Mr. Monticciolo?
22       A.    Yes, you did.
23       Q.    In what way?
24       A.    In what way.  I said before and
25   I would venture to say substantially

Page 284

```
                              D. MONTICCIOLO
 1
 2    before, a year or more before and so it was
 3    not while he was having them, it was
 4    substantially before.
 5         Q.    So let me make sure I got this
 6    straight, now you are remembering that
 7    Mr. Iacovacci, the reports that you got
 8    about Mr. Iacovacci's performance, which
 9    you previously said you didn't remember
10    when that took place, other than that it
11    was prior to the knee issues, you are now
12    remembering that it was at least one year
13    prior to your hearing about Mr. Iacovacci's
14    knee problems; is that right?
15              MR. SOLOMON:   Object to the
16          question.  It misstated his
17          testimony.
18         A.    That isn't what I said.
19         Q.    Okay.
20         A.    I said it was surprising to me
21    that when it became apparent that he had
22    been having job issues for quite a while
23    before it, a year or more, from what I
24    recollect, that it was convenient that
25    suddenly he was having knee problems.
```

D. MONTICCIOLO

1
2      Q.    Well, I want to break down that
3      answer, but I am first trying to focus on
4      the year or more piece.
5             Do you or do you not have a
6      specific recollection as to when you got
7      reports of Mr. Iacovacci's job performance
8      having dropped?
9      A.    I can't give you the specific
10     date.
11     Q.    I would imagine that that is
12     reasonable.  Can you give me the specific
13     time frame, that is month, year, whatever
14     it is you can tell me that you do
15     specifically recall, if anything?
16     A.    I recall that it, it had been
17     brewing as a problem and was coming to a
18     head about the same time when he started
19     stating that he was having knee problems.
20     Q.    When you say brewing as a
21     problem, do you mean that multiple
22     different sources came to report to you
23     that Mr. Iacovacci's job performance had
24     slipped?
25     A.    I didn't say that.

D. MONTICCIOLO

1
2              It's easy to observe and so,
3       you know, a lack of sourcing is a lack of
4       sourcing, so you don't really need to have
5       a lot of people come and tell you.
6           Q.    Is it your testimony,
7       Mr. Monticciolo, that you personally
8       observed Mr. Iacovacci's job performance
9       slipping for a lack of sourcing?
10          A.    It was brought to my attention.
11          Q.    By whom?
12          A.    Again, I can't tell you
13      specifically who.  We have a lot of
14      meetings in the firm.
15          Q.    I am just trying to make sure I
16      know what you saw personally, what was
17      brought to your attention and whether I am
18      mixing up two different things.
19              So let's start with your own
20      personal observations, you didn't have any
21      personal observations with respect to
22      Mr. Iacovacci's job performance prior to
23      2016?
24          A.    I didn't say that, no.
25          Q.    I didn't ask you whether you

```
 1                 D. MONTICCIOLO
 2     said that, I asked you whether it's
 3     correct.
 4          A.    It's not correct.
 5          Q.    Okay, you did have personal
 6     observations about Mr. Iacovacci's job
 7     performance dropping prior to 2016?
 8          A.    Correct.
 9          Q.    Okay, what were those personal
10     observations?
11          A.    Sourcing was floundering and
12     not keeping up with the expectations.
13          Q.    Starting when did sourcing
14     flounder at Brevet?
15          A.    It doesn't happen overnight.
16     So again, it, it felt like to me the year
17     or so before.
18          Q.    It felt to you like a year or
19     so before what sourcing started
20     floundering?
21               MR. SOLOMON:  I object to the
22          question.  You are not even --
23               I object to the question.
24               MR. CYRULNIK:  You can object
25          to the question, no problem.
```

Page 288

```
 1                  D. MONTICCIOLO
 2        Q.    Go ahead, Mr. Monticciolo.
 3        A.    Go back to -- I was surprised
 4    that Paul said he was having knee problems
 5    and I -- it just struck me as interesting
 6    that it was convenient when it was becoming
 7    apparent that he was no longer successful
 8    or being as effective, for some reason, in
 9    sourcing.
10        Q.    And I am happy to address a
11    couple of questions to the correlation that
12    you just drew, but I don't want to get
13    there; I want to first understand what it
14    is that you do remember and what it is that
15    you are guessing at and what it is that you
16    heard from other sources.  So I don't mean
17    to make this tedious, but I am trying
18    really break apart your testimony.
19             I am focusing in the first
20    instance, Mr. Monticciolo, on your own
21    personal observations and I have heard you
22    account for one particular observation,
23    that sourcing was floundering at Brevet,
24    do -- is that right?
25                  MR. SOLOMON:  You keep
```

Page 289

```
                              D. MONTICCIOLO
 1
 2          misstating his testimony.
 3                MR. CYRULNIK:  Mr. Solomon, if
 4          you are going to keep on
 5          characterizing how I state his
 6          testimony, this deposition is
 7          certainly going to go past 5:25, so I
 8          am just going to ask you to object
 9          and Mr. Monticciolo can handle
10          himself.  If I am misstating his
11          testimony, he will let me know.
12                Right now, I am trying to
13          understand what it is he told me, so
14          I am asking him questions, not
15          stating his testimony.
16          Q.    Mr. Monticciolo, do you recall
17     telling me that you had a personal
18     observation with respect to a drop-off in
19     Mr. Iacovacci's performance in the form of
20     observing that sourcing was floundering at
21     Brevet?
22          A.    I said that Paul's sourcing was
23     floundering at Brevet, to clarify the last
24     part, but then yes.
25          Q.    Oh, I don't think that is what
```

Page 290

                    D. MONTICCIOLO

1
2    you said last time.

3              Did you just clarify that what

4    you meant to say was not that sourcing was

5    floundering at Brevet, but that Paul

6    Iacovacci's sourcing was floundering at

7    Brevet?

8              MR. SOLOMON:  I object to the

9         question.

10       A.    Correct, Paul was a part of

11   sourcing, so it's part and parcel the same

12   thing.

13       Q.    Okay, but did you observe

14   sourcing floundering at Brevet or

15   specifically only Mr. Iacovacci's sourcing

16   floundering at Brevet?

17       A.    Both.

18       Q.    I don't think it possibly could

19   be both, because one of them had the word

20   only in it, but I think I know what you

21   mean.  So it sounds like both were

22   occurring if you take out the word only.

23       A.    One was occurring probably

24   because of the other.

25       Q.    Which one was occurring because

Page 291

```
                        D. MONTICCIOLO
 1
 2      of the other?
 3          A.    Paul's sourcing is a subset of
 4      our overall sourcing, so draw your own
 5      conclusions.
 6          Q.    Well, I am not here to draw
 7      conclusions, I can do that after the
 8      deposition, but you can connect the dots
 9      for me.
10              Is it fair to say that you
11      observed that Mr. Iacovacci's sourcing was
12      floundering and that Brevet's sourcing was
13      floundering as a result of Mr. Iacovacci's
14      sourcing floundering?
15          A.    Yes.
16          Q.    Okay.  How did you observe --
17              What metric did you use to
18      observe Mr. Iacovacci's sourcing
19      floundering?
20          A.    Amongst the many that are
21      reported, such as deals sourced and then a
22      pyramid of how they get down to closed
23      transactions, by person sourcing.  So
24      standard metrics for sourcing.
25          Q.    Did you request these reports
```

```
 1                    D. MONTICCIOLO
 2     from people about Mr. Iacovacci's numbers
 3     or were they provided to you in the
 4     ordinary course?
 5          A.    They are provided in the
 6     ordinary course.
 7          Q.    So you got reports about
 8     sourcing, you reviewed those reports and
 9     you concluded, huh, Mr. Iacovacci's
10     sourcing is floundering, fair?
11          A.    Fair.
12          Q.    When did that take place, when
13     did you reach that conclusion?
14          A.    Again, it happens over a time
15     period, because everybody has seasons,
16     sometimes they are going down, going up.
17     It just appeared that his were just going
18     down.
19          Q.    I understand that it takes time
20     to reach a conclusion, my question is when
21     did you reach that conclusion?
22          A.    That conclusion started to
23     become clear, from what I recall, sometime
24     before, in the probably -- it felt to be
25     not that long before he then announced he
```

Page 293

```
 1                    D. MONTICCIOLO
 2      was having knee problems.
 3            Q.    Okay, so you don't have a
 4      particular time period that you can refer
 5      me to objectively now, but you can tell me
 6      that you recall reaching that conclusion
 7      sometime shortly before he reported to you
 8      that he was having medical issues with
 9      respect to his knees, fair?
10            A.    That is not what I said.  And,
11      as I answered before, it surprised me that
12      there was a conversation that -- I didn't
13      say medical issues -- that he said his
14      knees were hurting.
15            Q.    Okay, I don't see a difference
16      between those two.  I am happy to replace
17      my question, the reference to medical
18      issues with his knees to his knees hurting
19      him; if I do that, did I fairly
20      characterize your testimony?
21            A.    I'm sorry, could you repeat it?
22            Q.    Oh, boy.  My question was you
23      can't tell me by way of reference to any
24      month, day or year when you reached the
25      conclusion that Mr. Iacovacci's sourcing
```

Page 294

                    D. MONTICCIOLO

1
2      was floundering, but you can tell me
3      relative to when Mr. Iacovacci reported
4      having knee issues that that took place
5      shortly before -- that the conclusion you
6      reached was reached shortly before
7      Mr. Iacovacci reported his knee issues; is
8      that a fair summary of what you have
9      testified to?
10          A.    It's, it's not exactly what I
11     said.  Because you, you are asking for
12     dates or weeks and I repeatedly have said
13     it's not that black and white of a date
14     that is suddenly is apparent, it's more of
15     a longer trend.
16          Q.    Yeah, I wasn't asking for dates
17     or weeks, but that's okay.
18                Apart from the dates or weeks
19     reference that you just referred to, did I
20     accurately summarize the testimony that you
21     have given with respect to your
22     recollection?
23                MR. SOLOMON:  I object to
24          the -- there is no question pending,
25          I object.

Page 295

```
                                       D. MONTICCIOLO
 1
 2                    MR. CYRULNIK:  Well, there is a
 3            question pending now, I just asked
 4            it.
 5                    MR. SOLOMON:  I object.
 6        A.    Yeah, I am not sure I know what
 7    the question is anymore.
 8        Q.    I tried to summarize your
 9    testimony, you told me that you had some --
10    it was not exactly what you said because I
11    referenced days or weeks and I said if you
12    take out the reference to days or weeks,
13    did I accurately summarize your testimony
14    with respect to your recollection.
15                    MR. SOLOMON:  I object to the
16            question.
17        A.    If that summary was that we
18    were seeing a trend and that trend became
19    apparent and something to discuss and that
20    was before Paul then said he had knee
21    problems, that's what I am saying.  I can't
22    follow your question.
23        Q.    And you don't know by way of
24    reference to a day, week or month or year
25    when that took place but you do know by way
```

```
 1              D. MONTICCIOLO
 2    of relative reference to when Mr. Iacovacci
 3    reported to you his knee problems; is that
 4    fair?
 5         A.    Of amongst many of the things
 6    that, that were going on, obviously the
 7    answer is yes.
 8         Q.    Okay.  You have no idea when
 9    Mr. Iacovacci started having knee problems,
10    do you?
11         A.    I don't recall a specific day.
12         Q.    Well, have no doubt that you
13    don't recall a specific day.  I am asking
14    whether you have any idea or ever knew when
15    Mr. Iacovacci's knee problems started.
16         A.    That it -- that I was made
17    aware of it?
18         Q.    No, I am not asking you about
19    when you were made aware of it; I am asking
20    you whether you know when Mr. Iacovacci's
21    knee problems actually started.
22         A.    I do not.
23         Q.    Did it ever dawn on you that
24    you reached conclusions about
25    Mr. Iacovacci's job performance
```

D. MONTICCIOLO

1
2      deteriorating, then heard about knee
3      problems and did you ever think, huh, maybe
4      these knee problems started when the job
5      performance started deteriorating and that
6      explains what's going on, anything to that
7      effect dawn on you?
8          A.    That would be surprising to me,
9      because I would have thought it seemed so
10     out of character for observations of like
11     him jogging or running and doing other
12     activities.
13              Just, again, I said it was
14     surprising to me that suddenly he had knee
15     problems.  The only way it could have been
16     surprising to me was observations that it
17     wasn't a problem.
18         Q.    So am I understanding your
19     testimony correctly when I ask are you
20     telling me now that the reason that you
21     were surprised that he reported knee
22     problems in the first place is because you
23     had observed him doing activities that
24     were, in your view, inconsistent with
25     having knee problems?

Page 298

                    D. MONTICCIOLO

1

2       A.      No.

3               Just when you work with someone

4    every day, one would think if somebody was

5    having knee problems of such a medical

6    nature, that it might have come up in

7    conversation.

8       Q.      Did you work with Mr. Iacovacci

9    every day?

10      A.      We have a very small office.

11      Q.      Is that a yes?

12      A.      I would say it implies a yes.

13   I can't say every day or not.

14      Q.      Certainly every week?

15      A.      Frequently enough to be

16   effective.

17      Q.      That doesn't answer my

18   question.

19      A.      I don't know.

20      Q.      The reason you were surprised

21   that Mr. Iacovacci reported knee problems

22   was because based on your observations from

23   your frequent working together with him,

24   you evaluated his lack of reporting to you

25   any such problems previously and you

```
 1                    D. MONTICCIOLO
 2     observed activities that you thought were
 3     inconsistent with his having such issues;
 4     is that fair?
 5          A.    No.
 6          Q.    I didn't get that right?
 7          A.    No.
 8          Q.    Are you a doctor,
 9     Mr. Monticciolo?
10          A.    No.
11          Q.    Do you think you are qualified
12     to observe whether somebody is having knee
13     issues based on observing their activities?
14          A.    Given I have had a more severe
15     issue, absolutely, in my view.
16          Q.    Okay.  So you think based on
17     the fact that you had some type of knee
18     problem that you are qualified to observe
19     whether somebody else has any other type of
20     knee problem; is that your view?
21          A.    No.  Not at all.
22          Q.    Then why do you think you are
23     qualified to observe whether somebody had a
24     knee problem based on your own experiences?
25          A.    I didn't say I was observing, I
```

Page 300

```
                                D. MONTICCIOLO
 1
 2      was saying -- as I said, was one would have
 3      thought he would have mentioned it or said
 4      something.  Or his wife or children, who I
 5      frequently cross paths with as well.
 6          Q.    You frequently cross paths with
 7      his wife and children, why is that?
 8          A.    Because they went to my doctor
 9      and I babysat his kids while they were
10      there and Paul was not.
11          Q.    His wife and kids went to your
12      doctor; is that what you said?
13          A.    Correct.
14          Q.    What type of doctor?
15          A.    General practitioner.
16          Q.    Okay.  And how often did you
17      happen to have appointments at the same
18      time as one of the Iacovaccis?
19          A.    It wasn't a planned event but
20      it did happen.
21          Q.    More or less than ten times?
22          A.    As I recall, less than ten
23      times.
24          Q.    Any other occasions to interact
25      with Mr. Iacovacci's wife and children,
```

                          D. MONTICCIOLO
1
2    apart from suing them?
3         A.    We have a lot of, just lot of
4    friends and a lot of relationships that all
5    know each other.  At least from my
6    experience, if there was something,
7    somebody would have said something.
8         Q.    Any other basis for concluding
9    that Mr. Iacovacci didn't have knee
10   problems at the time that you were
11   observing a drop in his job performance?
12        A.    Not that I can recall.
13        Q.    Did you have -- did your
14   compliance department have annual reviews
15   for your employees and executives?
16        A.    Explain what you mean by
17   reviews.
18        Q.    Well, did you have any formal
19   process for providing feedback to employees
20   or executives about their job performance
21   on a regular basis?
22        A.    Over the years, we have had
23   numerous different forms of reviews.
24        Q.    In 2014, '15 and '16, what were
25   those forms, as you recall?

                    D. MONTICCIOLO

1

2          A.    I, as I sit here, I couldn't

3     tell you.

4          Q.    Did you have performance review

5     meetings scheduled at least once a year?

6          A.    As I said, I said I couldn't

7     tell you what we were doing in that time

8     period.

9          Q.    Did you provide any written

10    feedback on an employee or executive's job

11    performance annually?

12         A.    Again, as I sit here, I

13    couldn't tell you what we were doing back

14    then.

15         Q.    Did you ever provide

16    Mr. Iacovacci feedback with respect to your

17    observations or conclusions about his job

18    performance having dropped or his deal

19    sourcing having floundered?

20         A.    As a team, we all see each

21    other's performance and pride ourselves on

22    being able to comment and be constructive

23    to each other.

24         Q.    That doesn't answer my

25    question, Mr. Monticciolo; I would ask for

Page 303

```
                         D. MONTICCIOLO
 1
 2      a response.
 3           A.    So I don't recall specifically
 4      but it would have been fairly obvious.
 5           Q.    Well, I am not asking you
 6      whether it was obvious; I want to
 7      understand whether or not you called
 8      Mr. Iacovacci into your office or you in
 9      some other way communicated to
10      Mr. Iacovacci that you or Brevet was
11      dissatisfied with his job performance in
12      2014, '15 or the beginning of 2016.
13           A.    Again, as I sit here, I don't
14      recall that and -- yeah.
15           Q.    Do you recall asking
16      Mr. Callahan to discuss -- in the aftermath
17      of your meeting with Mr. Iacovacci, do you
18      recall asking Mr. Callahan to have a
19      discussion with Mr. Iacovacci and report
20      back to you about Mr. Iacovacci's plans for
21      transitioning out of Brevet?
22           A.    I do not.
23                 MR. CYRULNIK:  Let's take a
24           look at Exhibit 4.
25                    (Whereupon, the aforementioned
```

Page 304

```
 1                D. MONTICCIOLO
 2         January 12, 2016 e-mail chain was
 3         marked as Plaintiff(s)' Exhibit 4 for
 4         identification as of this date.)
 5              MR. CYRULNIK:  Do you have that
 6         pulled up?
 7              THE WITNESS:  No, not yet.
 8              MR. SOLOMON:  It has Exhibit 1
 9         on the front?
10              MR. CYRULNIK:  Yes, Exhibit I
11         or Exhibit 1.
12              MR. SOLOMON:  Oh, maybe I.
13         It's on the screen.
14         Q.   If you scroll down to the
15    bottom of that exhibit, Mr. Monticciolo,
16    you will see an e-mail chain that begins
17    with Paul Iacovacci e-mailing you and
18    Mr. Callahan on January 12th, with the
19    subject line, "I wanted to follow up last
20    week's retirement discussion that we had
21    while I was in the office," do you see
22    that?
23         A.   It's at the bottom of the
24    e-mail, yes.
25         Q.   Do you recall receiving this
```

```
 1                      D. MONTICCIOLO
 2     e-mail from Mr. Iacovacci?
 3          A.    I do not.
 4          Q.    Have you seen this e-mail in
 5     the last few months?
 6          A.    Yes.
 7          Q.    Okay.  So you are aware that
 8     Mr. Iacovacci had written to you to follow
 9     up on the oral discussion that you three
10     had about retirement in early January of
11     2016?
12          A.    I remember that at that time,
13     he was -- Paul was very unclear about his
14     intensions.  And, again, I think it was
15     probably around this time I was asking him
16     how he was doing and I don't know if he was
17     challenged with pain or opioids but it was
18     not clear to me.
19          Q.    Would you agree that you had
20     had a retirement discussion the week prior
21     to this e-mail?
22          A.    Absolutely not.
23          Q.    Why not?
24          A.    Because it was absolutely not.
25     That was not the discussion.
```

```
 1                    D. MONTICCIOLO
 2              It was a trying to figure out
 3    what to do with his life and his knees and
 4    could he do what he was going to do, but
 5    very uncertain.
 6         Q.    Well, did you respond to
 7    Mr. Iacovacci's e-mail saying no clue what
 8    you are talking about, what retirement
 9    discussion did we have last week or
10    anything to that effect?
11         A.    I don't think that would be a
12    very compassionate or partner-like thing to
13    do.
14         Q.    Why is that?
15         A.    Because it wouldn't be.
16         Q.    You don't think it would be
17    compassionate or partner-like to clarify
18    what retirement discussion Mr. Iacovacci
19    was referring to when in your view you had
20    never had one?
21         A.    As I said, he -- probably not
22    seen on this e-mail -- was in the midst of
23    saying he was in pain and having issues and
24    we wanted to be considerate of his
25    condition and understood that we are always
```

Page 307

```
                              D. MONTICCIOLO
 1
 2      here to be available to him.
 3           Q.    So you thought it was more
 4      considerate to let Mr. Iacovacci think that
 5      he communicated to you that you had a
 6      retirement discussion than to actually tell
 7      him that you weren't going to treat that
 8      discussion as a retirement discussion at
 9      all and that you had no plans to facilitate
10      his retirement at this point in time?
11           A.    Absolutely not.
12                 MR. SOLOMON:  Yeah, I object.
13           A.    No.
14                 If he was planning to retire,
15      he would have done what other people do,
16      speak to HR, compliance or the right
17      people.
18           Q.    Well, is it your position that
19      he wasn't able to communicate his
20      retirement decision to you or to Mark
21      Callahan, who were in charge of Brevet?
22                 MR. SOLOMON:  Object to the
23           question.
24           A.    He is intimately aware of our
25      policy and procedures, given he wrote and
```

```
 1                    D. MONTICCIOLO
 2     approved them, of how it works.
 3          Q.    Are you testifying, sir, that
 4     there was a policy or procedure that
 5     requires an employee who is intending to
 6     retire or a member who is intending to
 7     leave Brevet, that they communicate with HR
 8     and not yourself and Mr. Callahan?
 9          A.    As I sit here, I can't tell you
10     that exact policy or procedure, but this
11     was very unusual.
12          Q.    Well, is there a policy or
13     procedure that you are aware of that
14     requires informing Brevet about the intents
15     to retire, informing them via HR, as
16     opposed to via yourself or Mr. Callahan?
17                MR. SOLOMON:   Object to the
18          question.
19          A.    As I said before, I will answer
20     the question again, there was never a
21     mention to me of his intent to retire,
22     there was discussion that he doesn't know
23     what to do and he might be retiring and,
24     again, maybe this was his painful knees or
25     opioids speaking.
```

```
 1                    D. MONTICCIOLO
 2         Q.    That wasn't my question.
 3               My question was whether you are
 4    aware of a policy or procedure that
 5    requires a retiring employee or member to
 6    go speak with HR instead of speaking with
 7    you or Mr. Callahan.
 8         A.    Again, as I said, as I sit
 9    here, I do not know if there is a specific
10    policy to that.
11         Q.    Did you understand that
12    Mr. Iacovacci was interested in discussing
13    transitioning and helping Brevet transition
14    on from the role that he played to some
15    other individual who might fill that role?
16         A.    What I understood was that we
17    were -- he was asking to get a transition
18    for his accounts while I believe he said
19    was going for another surgery and would be
20    out longer than expected.
21         Q.    So is it your testimony that
22    Mr. Iacovacci had asked you for a leave of
23    absence?
24         A.    No.
25         Q.    Then I am not understanding
```

Page 310

                    D. MONTICCIOLO

1

2    what you are saying.

3              What is your position as to

4    what Mr. Iacovacci had asked you for that

5    would have resulted in a discussion about

6    transition?

7        A.    He was sourcing.  So if he was

8    incapacitated or unavailable or maybe some

9    other distraction, it is best practices

10   and, actually, I probably believe his duty

11   to make sure that those relationships are

12   maintained and to have someone be available

13   to pick them up.

14       Q.    So it's your testimony that

15   your understanding of his reference to

16   transition in this Exhibit 4 has nothing to

17   do with retiring or leaving Brevet but,

18   instead, had to do with temporarily

19   fulfilling his sourcing obligations while

20   he was out on medical -- tending to his

21   medical needs?

22       A.    I am not referencing my

23   response to this Exhibit 4, because I only

24   looked at the bottom part of it, but if

25   it's related to transition, it would not be

                    D. MONTICCIOLO
1
2    unusual, say, for somebody going on
3    maternity leave to ask the same thing.
4         Q.    I am referencing only the
5    bottom part of it, as well, when I ask you
6    about transition.
7              Do you see the words when we
8    can discuss transition in the e-mail that
9    we just read together?
10        A.    Yes, I do.
11        Q.    Okay.  What did you understand
12   Mr. Iacovacci to be referring to when he
13   asked you about timing on when we can
14   discuss transition in the e-mail with the
15   subject line last's weeks retirement
16   discussion?
17        A.    Again, as I said, it's
18   transition of the accounts to make sure
19   that we don't drop any balls, to make sure
20   that the sourcing is covered, just as you
21   would for somebody going on maternity, and
22   if he was still unsure about what he wanted
23   to do in the future, given he had told us
24   that he had more surgeries, this seemed
25   completely logical to me.

Page 312

1        D. MONTICCIOLO
2        Q.    What accounts -- I think you
3   used the word accounts, transitioning
4   accounts, what accounts do you have in
5   mind, Mr. Iacovacci was overseeing
6   accounts?
7        A.    Well, sourcing relationships.
8   We spend a lot of money building sourcing
9   relationships that are unique that we want
10   to make sure are preserved because they are
11   proprietary to the firm.
12        Q.    And to whom did you transition
13   Mr. Iacovacci's sourcing relationships in
14   response to this e-mail or discussion?
15        A.    Without looking, as I sit here,
16   I couldn't tell you that.
17        Q.    You have no idea?
18        A.    We have quite a large firm, it
19   could have been a number of people.
20        Q.    Do you recall transitioning
21   Mr. Iacovacci's sourcing relationships in
22   or about January of 2016 in response to
23   this e-mail?
24        A.    Again, I am the CEO, other
25   people have been responsible for doing

D. MONTICCIOLO

1  that.

2

3       Q.    I appreciate the fact that you

4  are a CEO, but I also would note that he is

5  talking to you and to Mr. Callahan, so

6  Mr. Iacovacci wanted to talk to the two of

7  you about transition, it sounds like you

8  don't think that would be an appropriate

9  thing for you to be involved in, that there

10  would be some other level employee that

11  would be more appropriately situated to

12  handle transition of sourcing

13  relationships; is that your view?

14             MR. SOLOMON:   Object to the

15         question.

16       A.    I think the question is not

17  exactly worded, but I would think a person

18  who does sourcing would be transitioning

19  their relationships to another sourcing

20  person.

21       Q.    Did you tell him that; did you

22  respond to Mr. Iacovacci and say Paul, I

23  think you should be dealing with person X

24  or somebody from a different department,

25  not the CEO of the company, on the

```
 1                 D. MONTICCIOLO
 2     temporary transition of sourcing
 3     relationships?
 4          A.    I wouldn't think I would need
 5     to tell him that, he is a seasoned
 6     professional and knows that.  This is a
 7     role he has played in the majority of his
 8     career and we had a team of people to do
 9     it.
10          Q.    So Mr. Iacovacci sends an
11     e-mail to the CEO of the company, asking
12     him to talk about transition, your view is
13     you are not going to be involved in that,
14     that is something that a sourcing person
15     should talk about, but you are confident
16     that Mr. Iacovacci knows that,
17     notwithstanding the fact that he sent the
18     e-mail to you and so, therefore, you don't
19     say a word to Mr. Iacovacci about the
20     appropriate people in your view he should
21     be dealing with on the transition of
22     sourcing relationships for the period of
23     time that he had in mind; is that right?
24               MR. SOLOMON:  Object to the
25          question.
```

                         D. MONTICCIOLO

1

2          A.      So I think the question is

3     misguided.

4               The answer is yes and that's

5     because I am the CEO, I would look for the

6     recommendation from others like Paul and

7     the other sourcing people of which Paul was

8     intimately involved with of how they would

9     do the transition and they make

10    recommendations, as I think I previously

11    answered.

12         Q.      Moving ahead past January of

13    2016, when is the first time that you

14    recall concluding that Mr. Iacovacci was

15    retiring?

16         A.      I don't ever think I heard him

17    say he was retiring.

18         Q.      That wasn't my question.

19               When did you first reach the

20    conclusion that Mr. Iacovacci had an

21    intention to retire from Brevet?

22         A.      I have never reached that

23    conclusion.

24         Q.      Did you ever authorize anybody

25    to change Mr. Iacovacci's designation at

```
 1                    D. MONTICCIOLO
 2    Brevet to retired?
 3         A.    It's a question I couldn't
 4    answer, because I don't -- I am not the one
 5    who makes that decision.
 6         Q.    I am asking whether you ever
 7    did that.
 8         A.    I did not.
 9         Q.    Would you be surprised if
10    Mr. Iacovacci's designation was changed in
11    any way indicating that he was retired from
12    Brevet?
13         A.    Without seeing the appropriate
14    policies, procedures and compliance process
15    being done before that or knowing it was
16    done, I would.
17         Q.    Would you think there would be
18    compliance concerns that you would have as
19    a regulated entity if you were representing
20    to investors that Mr. Iacovacci had retired
21    when, in fact, he had not?
22         A.    I think that that -- you know,
23    again, that question is, A, I am sure we
24    never did that, but, B, I think that is a
25    question with a million other
```

Page 317

D. MONTICCIOLO

1
2     circumstantial facts around it.
3          Q.    Why are you sure you never did
4     that, Mr. Monticciolo?
5          A.    Because I am sure I never
6     acknowledged or was aware Paul was retiring
7     or retired.
8          Q.    You didn't announce to the firm
9     at one of the Monday meetings that
10    Mr. Iacovacci was retiring?
11         A.    No.
12         Q.    Ever?
13         A.    I didn't announce that he was
14    retiring.  I may have announced, based on
15    this, an intention of retiring, because
16    maybe he was not around anymore and people
17    were asking questions.
18              But retirement, as maybe we did
19    with John Tripp, would have things like a
20    large party and other events that would
21    really be very visible in that event.
22         Q.    I want to make sure I
23    understood the caveat there, you do recall
24    announcing that Mr. Iacovacci had expressed
25    his intention to retire?

```
1                        D. MONTICCIOLO
2           A.      No.  Oh, intention; I said
3      considering.  I am not sure if they are the
4      same thing.
5           Q.      Sorry, you announced to the
6      firm that Mr. Iacovacci was considering
7      retiring; is that right?
8           A.      Correct.
9           Q.      And why did you do that?
10          A.      Because people were asking why
11     he wasn't in the office anymore and we said
12     we were waiting to see what Paul was
13     considering to do.
14          Q.      Well, why did you say that he
15     was considering retiring rather than say
16     that he was unable to perform his job
17     duties because of his situation?
18          A.      That's not what I said.  Those
19     are unrelated things.  He could have been
20     not doing his job for a million reasons, it
21     was really our position to, you know,
22     separate different thoughts, right, of just
23     he is not there and separately announcing
24     he is considering retiring.
25          Q.      Why did you think it was
```

```
 1                   D. MONTICCIOLO
 2      important to announce at a firm-wide
 3      meeting that Mr. Iacovacci was simply
 4      considering he was retiring?
 5           A.    Because we are a small firm and
 6      people noticed he wasn't in the office.
 7           Q.    I want to make sure I have your
 8      testimony straight, are you a small firm or
 9      a large firm?  Because I think I have heard
10      both today.
11           A.    We are a larger firm now.
12           Q.    You were a small firm back in
13      2016?
14           A.    We had a much smaller office
15      space.
16           Q.    So Mr. Iacovacci comes to you
17      in January and tells you he was considering
18      retiring and you think that is an important
19      enough event to announce to other Brevet
20      employees that Mr. Iacovacci is considering
21      retiring rather than wait for Mr. Iacovacci
22      to make any decision and announce it then;
23      is that right?
24           A.    No, that's not what I said.
25           Q.    What's wrong about what I just
```

```
 1                    D. MONTICCIOLO
 2    said?
 3         A.    You say I said that because of
 4    this January discussion or e-mail.  I said
 5    it because people were questioning where he
 6    is and I said he is considering retiring
 7    probably amongst a number of other things.
 8         Q.    When did Mr. Iacovacci stop
 9    coming to the office?
10         A.    I have no idea.
11         Q.    Was it in 2015?
12         A.    I don't recall.
13         Q.    Is it possible that it was?
14         A.    I don't recall.
15         Q.    How long after Mr. Iacovacci
16    stopped coming to the office did you
17    announce that he was considering retiring?
18         A.    I don't recall.
19         Q.    Best recollection?
20         A.    I, honestly, I just don't
21    recall.
22         Q.    Days after?
23         A.    I don't recall.
24         Q.    Weeks?
25         A.    I don't recall.
```

Page 321

D. MONTICCIOLO

1

2          It's the same question.

3     Q.    Do you know if it took months

4    for you to announce to Brevet that

5    Mr. Iacovacci was considering retiring,

6    that is months after he had stopped coming

7    into the office?

8     A.    The characterization of

9    announcing I think is a

10   mischaracterization; I was answering

11   questions in a meeting, not announcing.

12    Q.    What do you mean to distinguish

13   between announcing and being in a meeting?

14    A.    I think it's pretty clear.

15    Q.    You may think so, but I can

16   assure you, it's not to me.

17    A.    Well, then, ask more questions.

18    Q.    Yeah, what do you mean to

19   distinguish between when you say it wasn't

20   an announcement, it was in a meeting?

21          Do you not make announcements

22   at meetings; is that what you mean to say?

23    A.    No, we make announcements and

24   then we answer questions; those separate

25   things sometimes don't occur at the same

Page 322

                    D. MONTICCIOLO

1
2    time or in the same meeting.
3         Q.    Okay, is it your view that you
4    answered a question with respect to
5    Mr. Iacovacci at a meeting rather than make
6    an announcement?
7         A.    Best of my recollection that it
8    was an announcement.
9         Q.    That it was an announcement or
10   that it was not an announcement?
11        A.    Sorry, was not an announcement.
12        Q.    So, to the best of your
13   recollection, you were asked a question at
14   one of the Monday meetings about
15   Mr. Iacovacci and it was in response to
16   that question that you responded that he
17   was considering retiring?
18        A.    That is the best of my
19   recollection.
20        Q.    That took place in February of
21   2016?
22        A.    I don't recall exactly when.
23        Q.    Who asked you the question?
24        A.    I don't recall.
25        Q.    Do you recall what the question

1                    D. MONTICCIOLO

2    was?

3         A.    I do not recall the specifics

4    of the question.

5         Q.    But you do recall that there

6    was a particular question that was asked of

7    you, to which you responded that

8    Mr. Iacovacci was considering retiring

9    publically?

10        A.    I recall that there was

11   questions around one of the partners of the

12   firm not being in the office for a while.

13        Q.    When you say questions, I just

14   want to make sure I am understanding you,

15   you recall somebody asking that question

16   out loud during one of the Monday meetings;

17   is that right?

18        A.    I don't know the format, the

19   context, who said it, exactly how it was

20   said.

21             It would be fairly obvious in a

22   small firm if one of the four partners, I

23   think you noted, were not there.

24        Q.    Did you direct Mr. Callahan to

25   tell Mr. Iacovacci that he needed to

```
 1                    D. MONTICCIOLO
 2      execute a separation agreement in order to
 3      leave Brevet?
 4           A.    I don't direct people to do
 5      that.
 6           Q.    Sorry, what was the end of your
 7      answer, you don't direct people to do what?
 8           A.    To do that.
 9                 We have departments and people
10      who handle separation and exiting.
11           Q.    Is the answer to my question
12      no, you did not direct Mr. Callahan to tell
13      Mr. Iacovacci that he needed to execute a
14      separation agreement in order to leave
15      Brevet?
16           A.    I don't recall conversations
17      around that topic or anything about that.
18           Q.    Do you recall whether
19      Mr. Callahan ever reported to you that he
20      did inform Mr. Iacovacci that he should be
21      executing a separation agreement if he
22      intends to leave the company?
23           A.    I don't recall specifics.  I
24      wouldn't be surprised, it's what we do with
25      all departing employees and even a
```

Page 325

D. MONTICCIOLO

1    withdrawal notice if you are withdrawing

2    from the LLCs.

3        Q.    Is it your understanding that a

4    separation agreement is a required

5    mechanism for either leaving Brevet as a

6    member or as an employee?

7        A.    No.

8        Q.    So why would you tell

9    Mr. Iacovacci that it was?

10       A.    Because you said as a member,

11   which would be incorrect?

12       Q.    What do you mean by that?

13       A.    As a member, you withdraw; as

14   an employee, you exit with a separation

15   agreement.  I can't say if a hundred

16   percent of the time, I would be surprised

17   if it wasn't.

18       Q.    Well, let's focus on the

19   withdrawal piece, you would agree with me

20   that no separation agreement is required in

21   order to withdraw from one of the LLCs,

22   correct?

23       A.    There are very specific terms

24   laid out in the LLCs agreements that I

Page 326

D. MONTICCIOLO

1
2    don't -- you know, sitting here now, I
3    can't recite exactly what they are.
4         Q.   To the best of your knowledge,
5    is a separation agreement required for a
6    member to withdraw from one of the LLCs?
7         A.   To the best of my knowledge, a
8    separation agreement is typically required
9    for exiting employees.
10        Q.   And that is why I am asking
11   about withdrawing from the membership
12   interest, to the best of your knowledge is
13   a separation agreement required in order
14   for a member of one of the LLCs to
15   withdraw?
16        A.   And, again, I don't recall the
17   specifics, but you don't separate from
18   LLCs, you withdraw.
19        Q.   So no?
20        A.   If that's your conclusion.
21        Q.   I am asking to the best of your
22   knowledge is a separation agreement
23   required to withdraw from an LLC.
24        A.   Again, as I sit here, without
25   reviewing them, I can't state specific

```
 1                    D. MONTICCIOLO
 2      language whether the withdrawal is labeled
 3      a separation agreement.
 4           Q.    Do you recall Mr. Tripp
 5      withdrawing from one or more LLCs?
 6           A.    Again, I don't recall the
 7      specifics; I know he did retire, we can go
 8      and look at the documents and see exactly
 9      how that was done.
10           Q.    So, sitting here today, you
11      don't know one way or the other whether
12      Mr. Tripp withdrew from one or more LLCs?
13           A.    As I sit here, I would have to
14      go look at the documents to see exactly how
15      it was done.
16           Q.    And do you know whether he
17      executed a separation agreement?
18           A.    Again, as I sit here, I have
19      reviewed materials, I am quite certain that
20      all employees leaving who may also be LLC
21      members do execute separation agreements in
22      the firm.
23           Q.    You would never authorize
24      someone working at Brevet to remove
25      Mr. Iacovacci from the list of sourcing
```

```
 1                    D. MONTICCIOLO
 2      people working at Brevet unless he had
 3      retired from the company or otherwise left,
 4      correct?
 5           A.    Incorrect.  I don't authorize
 6      those changes.
 7           Q.    If one came to you and asked
 8      you whether Mr. Iacovacci could be removed
 9      from the organizational chart, what would
10      you tell him?
11           A.    What is the appropriate thing
12      to do, please check with your either
13      experience, outside counsel, regulators, et
14      cetera.
15           Q.    Do you know one way or the
16      other whether Mr. Iacovacci was removed
17      from the organizational charts prior to
18      October of 2016?
19           A.    As I sit here, no.
20           Q.    What would you expect the
21      answer to be?
22           A.    I have no idea.
23           Q.    No idea.  You wouldn't have any
24      expectation that Mr. Iacovacci would remain
25      on the organizational charts until after he
```

```
1                    D. MONTICCIOLO
2    left the company?
3         A.   I don't know how we would treat
4    somebody on an organizational chart on
5    maternity leave to the equivalent.
6              So the answer is I don't know,
7    it's not my job.
8         Q.   Did you view Mr. Iacovacci as
9    on maternity leave or the equivalent
10   thereof?
11        A.   It seemed similar to me.
12        Q.   I assume you mean minus the
13   baby.
14        A.   Hopefully.
15        Q.   Yes.
16              Mr. Monticciolo, who decided to
17   terminate Mr. Iacovacci's employment?
18        A.   I don't recall.
19        Q.   Was it you?
20        A.   I don't recall.
21        Q.   You don't recall whether you
22   decided to terminate Mr. Iacovacci's
23   employment?
24        A.   Again, I said I don't recall.
25        Q.   Was it Mr. Callahan?
```

```
 1                    D. MONTICCIOLO
 2         A.    I don't recall.
 3         Q.    Do you recall being involved in
 4    the decision to terminate Mr. Iacovacci's
 5    employment?
 6         A.    I don't recall.
 7         Q.    Would you view that decision as
 8    a momentous one?
 9         A.    I, I don't -- it's the first
10    time that we have had a partner with a
11    termination.  So, I don't know momentous,
12    you would have to ask the compliance, HR
13    people if that is considered momentous.
14         Q.    As the first time to have a
15    partner with a termination, would you be
16    surprised if that decision was made without
17    your signing off on it?
18         A.    Again, the process is
19    recommendations based on experience,
20    counsel, guidance, regulatory input, the
21    right recommendation, I would question it
22    and if that was the recommendation, I would
23    either approve or deny.  And I don't know
24    if it would be conjunction with multiple
25    processes on that, multiple proposals.
```

Page 331

                         D. MONTICCIOLO
1
2          Q.     Do you recall any of the
3    processes you just described having
4    occurred with the respect to the company's
5    decision to send Mr. Iacovacci a
6    termination letter on October 14, 2016?
7          A.     I recall there was an extensive
8    process coming to that conclusion.
9          Q.     Why don't you describe it to
10   me, please.
11         A.     I can't give you the specifics,
12   but I know it involved an investigation by
13   our counsel of material matter, I know it
14   resulted in confirmation of material
15   matter.  Those are the types of things that
16   would come to my attention, which is why it
17   sticks out in my memory.
18         Q.     What was the material matter to
19   which you are referring?
20         A.     Again, I don't remember the
21   specifics as I sit here, but some material
22   breach of the firm's policies, secrets, et
23   cetera, know-how.
24         Q.     Well, maybe you can help me,
25   what material breach are you referring to

Page 332

```
 1                      D. MONTICCIOLO
 2      as the basis for Brevet's decision to
 3      terminate Mr. Iacovacci on October 14th of
 4      2016?
 5           A.    It sticks out in my mind
 6      because it seemed so egregiously large and
 7      clear of breaching the code of ethics, the
 8      handbook, the compliance policies, all of
 9      the basic things we know of being a
10      regulated entity with our trade secrets and
11      know-how leaving the firm and the firm's
12      systems.
13           Q.    You have described breaches and
14      you have described, you know, various
15      documents, policies, I am asking you to
16      tell me about the conduct that you had
17      concluded Mr. Iacovacci had engaged in that
18      gave Brevet the right to terminate his
19      employment for cause, what did he do?
20                 MR. SOLOMON:   Asked and
21            answered.
22           A.    Yes, I think I have already
23      said that, answered that question.
24           Q.    If you think that, we have a
25      difference of opinion; either way, I am
```

Page 333

```
                              D. MONTICCIOLO
 1
 2      going to ask you that question again,
 3      respectfully, so please just provide the
 4      answer.
 5                  MR. SOLOMON:  Asked and
 6            answered.
 7                  MR. CYRULNIK:  Your objection
 8            is noted, Mr. Solomon.
 9           Q.    Mr. Monticciolo --
10           A.    Yes, actually --
11           Q.    -- could you answer the
12      question?
13           A.    I apologize, could you repeat
14      the question?
15           Q.    I am asking you about the
16      conduct in which Mr. Iacovacci in your view
17      had engaged on which basis you sent him a
18      termination letter on October 14th of 2016.
19           A.    It's not based on my view, it's
20      based on the recommendation of the people
21      inside of firm whose job it is, whether it
22      be compliance, HR.
23                  I know there was an independent
24      investigation and that there were material
25      breaches of our policies, procedures which
```

Page 334

                          D. MONTICCIOLO
1
2    I recall represented as being egregious.
3         Q.    Okay, let's go through those.
4               I think you mentioned
5    compliance, what was the recommendation of
6    the compliance department?
7         A.    I don't remember the specifics.
8         Q.    I don't need the specifics if
9    you don't remember them, I would like to
10   know the general recommendation that they
11   made.
12        A.    If the decision was to
13   terminate him, then it was obviously
14   sufficient and probably more than
15   sufficient, from my recollection, for
16   termination.
17        Q.    Yeah, rather than sort of
18   drawing logical trees for me, if this then
19   that, I am just asking for you to give me
20   your best recollection of what actually
21   happened.
22              Do you recall the compliance
23   department making a recommendation with
24   respect to whether Mr. Iacovacci should be
25   terminated?

Page 335

                         D. MONTICCIOLO

1
2                MR. SOLOMON:   Object to the

3        question.

4        A.    I don't recall who made the

5   specific recommendation.

6        Q.    Okay, so you don't recall the

7   compliance department making such a

8   recommendation?

9        A.    I didn't say that.

10       Q.    You do recall the compliance

11   department making such a recommendation?

12       A.    I said I don't recall who did

13   it.

14       Q.    I know, that is why I am asking

15   you a specific question.

16             Do you recall the compliance

17   department making a recommendation to

18   terminate Mr. Iacovacci, yes or no?

19       A.    No.

20       Q.    Do you recall the HR department

21   making a recommendation to terminate

22   Mr. Iacovacci?

23       A.    Again, it's the same answer, I

24   do not recall who made the recommendation,

25   any department.

```
 1                    D. MONTICCIOLO
 2        Q.    I understand that, that's why I
 3   am asking you the specific question the
 4   same way I did with compliance.
 5              Do you recall the HR department
 6   making a recommendation to terminate
 7   Mr. Iacovacci?
 8              MR. SOLOMON:  I think the
 9        record is not clear on compliance, so
10        I, therefore, object to the preamble.
11        Q.    We can leave off the preamble
12   and if you could just answer my question,
13   do you recall the HR department making a
14   recommendation to terminate Mr. Iacovacci?
15        A.    I do not recall that they did
16   not make that recommendation.
17        Q.    That is a different question
18   that I am not going to ask you, so you
19   don't need to answer it.
20              My question is do you recall
21   the HR department making a recommendation
22   to terminate Mr. Iacovacci.
23        A.    No.
24        Q.    You mentioned an independent
25   investigation, who was retained to conduct
```

```
 1                    D. MONTICCIOLO
 2      an independent investigation with respect
 3      to Mr. Iacovacci?
 4           A.    I don't recall who specifically
 5      was retained.  I know that's -- I recall
 6      that that is our process.
 7           Q.    Do you specifically recall that
 8      an independent investigation was indeed
 9      conducted with respect to Mr. Iacovacci
10      prior to his termination in 2016?
11           A.    I recall that the
12      recommendation included that they -- that
13      it was investigated and concluded that it
14      was a material breach.
15           Q.    I am asking you a specific
16      question, Mr. Monticciolo, and I am trying
17      very hard to get through as much as I can
18      here before I know your time constraints
19      kick in, so if we could try focus on the
20      questions, I would appreciate it.
21                 I know you have been trying at
22      various points in time, I think right now,
23      we are straying from the questions a little
24      bit more than we need to.
25                 My question is do you have a
```

```
 1              D. MONTICCIOLO
 2   specific recollection that an independent
 3   investigation was conducted prior to Brevet
 4   terminating Mr. Iacovacci in 2016, yes or
 5   no?
 6              MR. SOLOMON:  Asked and
 7        answered.
 8        A.    Yes.
 9        Q.    Okay.  And what is that
10   specific recollection; yes, you recall that
11   there was an independent investigation that
12   was conducted?
13        A.    Yes, that our compliance or
14   whoever made the recommendations, that it
15   was inclusive of a separate investigation.
16        Q.    It was inclusive of a separate
17   investigation, did you say?
18        A.    Included an investigation,
19   correct.
20        Q.    Well, when you say independent
21   investigation, what do you mean to capture
22   with the word independent; did you hire a
23   third party to conduct an investigation
24   with respect to some issue pertaining to
25   Mr. Iacovacci?
```

```
 1                    D. MONTICCIOLO
 2         A.     Again, I am the CEO, I don't
 3    hire the people.  Did someone at Brevet
 4    hire them, to the best of my recollection
 5    that somebody did.
 6         Q.     To the best of your
 7    recollection, Brevet hired a third party to
 8    conduct an investigation of what?
 9         A.     As to whether or not there was
10    a -- I don't know, you could go check, I
11    got to look at the record and what we
12    actually did, but I think the topic is
13    related to a potential breach of our
14    policies, procedures.
15         Q.     Where would I find this record?
16         A.     I don't know off the top of my
17    head.
18         Q.     Do you know whether you have
19    produced all of the records that were
20    provided to you by the independent
21    investigation entity?
22         A.     I have no idea.
23         Q.     And you don't even know who the
24    independent investigator was, right?
25         A.     I didn't say that.
```

```
 1                    D. MONTICCIOLO
 2         Q.     Okay.  Do you know who the
 3    independent investigator was?
 4         A.     To the best of my recollection,
 5    it was Greenberg Traurig.
 6         Q.     So it's your testimony that
 7    you, Brevet retained Greenberg Traurig to
 8    conduct an independent investigation of
 9    Mr. Iacovacci's violations of policies and
10    procedures at Brevet; is that right?
11         A.     No, what I said was I know my
12    team made a recommendation; who, I don't
13    know specifically and it included the fact
14    that they had used counsel Greenberg
15    Traurig as our employment counsel to do an
16    investigation of a potential material
17    breach by Paul.
18         Q.     If Greenberg Traurig is your
19    employment counsel, how long have you used
20    Greenberg Traurig?
21         A.     I have been using Greenberg
22    Traurig for 25 years.
23         Q.     But why is it that you think
24    that they would be a qualified entity to
25    conduct an independent investigation?
```

```
                        D. MONTICCIOLO
 1
 2          A.      That is a question that they
 3     are independent and they are counsel.
 4          Q.      Have you ever been involved in
 5     selecting a law firm to conduct an
 6     independent investigation?
 7          A.      I have not myself.
 8          Q.      Do you know whether an entity
 9     that has had long-standing counsel
10     relationship with a law firm can select
11     that law firm to be in charge of an
12     independent investigation?
13          A.      Yes.
14          Q.      And how do you know that?
15          A.      Because, as I recall, we
16     brought in Greenberg specifically for
17     everything related to Paul.
18          Q.      So your view is that it would
19     qualify as an independent investigation
20     notwithstanding the fact that you had a
21     long-standing relationship with the law
22     firm that was being asked to conduct it?
23          A.      I did no business relationship
24     and no firm relationship with Greenberg
25     before that point.
```

1                    D. MONTICCIOLO

2          Q.    I'm sorry?

3          A.    There was no firm relationship

4    nor personal relationship in a business

5    context.  So they were not our counsel

6    until Paul's scenario, Paul's situation.

7          Q.    I'm sorry, I must have

8    misunderstood, what did you testify to you

9    had a long-standing relationship for

10   25 years; can you explain what I

11   misunderstood there?

12         A.    If I needed to hire employment

13   counsel or in various other areas, I knew

14   the firm and would call them.

15         Q.    Had they represented you or one

16   your entities prior to 2016?

17               Greenberg Traurig, that is.

18         A.    I don't -- well, we haven't had

19   any employment issues prior to that.

20         Q.    So yes or no, had you, anyone

21   at Brevet, yourself included, ever used

22   Greenberg Traurig to represent them prior

23   to 2000 -- to the independent investigation

24   that was conducted in 2016?

25         A.    To, as I sit here, the best of

Page 343

```
                              D. MONTICCIOLO
 1
 2      my knowledge is no.
 3           Q.    Who did you use to draft your
 4      transactional documents?
 5           A.    A variety of law firms.
 6           Q.    Not Greenberg Traurig?
 7           A.    Curtis Mallet does at lot --
 8                 The documents that I have seen
 9      is Curtis Mallet.
10           Q.    So you don't recall ever using
11      Greenberg Traurig prior to this independent
12      investigation in 2016?
13           A.    Again, I would have to look, as
14      I sit here; I am not the person documenting
15      or doing the transactions.
16           Q.    Is there an engagement letter
17      with Greenberg Traurig memorializing the
18      engagement for purposes of conducting an
19      independent investigation?
20           A.    As I sit here, I don't know.
21           Q.    Would you expect there to be
22      one?
23           A.    If they were already involved
24      in the case, I don't know.
25           Q.    In what case?
```

Page 344

1                    D. MONTICCIOLO

2          A.     In the negotiation of Paul's

3     separation or whatever he was doing.

4          Q.     If Greenberg Traurig was

5     already involved in negotiating a

6     separation agreement with Mr. Iacovacci,

7     why do you think they would be an

8     appropriate choice to conduct an

9     independent investigation into potential

10    violations of policies and procedures?

11         A.     It's not my decision nor my

12    role in the firm to make those

13    determinations; I trust that the people who

14    made that made them on sound basis.

15         Q.     Apart from trusting that the

16    people who made that made that on sound

17    basis, exercising your own independent

18    analysis and judgment, sitting here today

19    at deposition, under oath, can you tell me

20    whether or not you would agree that a law

21    firm that was actively engaged in

22    negotiating a separation agreement with

23    Mr. Iacovacci for several months would not

24    be an appropriate candidate in your view to

25    play the role of independent investigator

Page 345

```
                          D. MONTICCIOLO
 1
 2     with respect to potential violations of
 3     policies and procedures by that same
 4     individual?
 5                MR. SOLOMON:  I object to the
 6           question.
 7           A.     No.
 8           Q.     No what?  You think they would
 9     be an appropriate choice?
10           A.     I don't, I don't -- it -- I
11     don't see --
12                I don't have a definitive view
13     as to whether or not they would or would
14     not be; that's why we have experts to
15     determine those things.
16           Q.     You don't have a view one way
17     or the other whether or not such an entity,
18     such a law firm involved in negotiating a
19     separation agreement for months with that
20     employee wouldn't be an appropriate choice
21     for the role of independent investigator
22     with respect to conduct alleged regarding
23     that employee; did I understand you
24     correctly?
25           A.     Correct.
```

Page 346

D. MONTICCIOLO

1
2      Q.      Why was an independent
3    investigation commenced?
4      A.      You would have to ask my team
5    on the specifics, but the best of my
6    recollection, it rose to some type of, as I
7    mentioned, some type of egregious material
8    concern.
9      Q.      I didn't follow that answer,
10   maybe you can try it again or give me some
11   more clarity.
12     A.      The people whose job it is to
13   make those determinations determined that
14   it was necessary to do.
15     Q.      Who made the determination,
16   Mr. Monticciolo; who are you identifying as
17   the individual or individuals who made the
18   determination to commence an independent
19   investigation into Mr. Iacovacci?
20     A.      Again, as I said, that's not my
21   job, I am not aware of specifically who.
22     Q.      So you don't know who made the
23   decision, you just know that the decision
24   was made, fair?
25     A.      Correct.

```
 1                    D. MONTICCIOLO
 2         Q.    Were you involved in making the
 3    decision?
 4         A.    Again, I don't remember who
 5    made the decision, so how would I know?
 6         Q.    Well, you may not remember who
 7    made it, I am asking whether you were
 8    involved and, presumably, you would
 9    remember whether you were involved in
10    making the decision.  You can strike the
11    last part of my comment.
12              The question is do you recall
13    whether you were involved in any way in
14    making the decision to commence an
15    independent investigation into
16    Mr. Iacovacci in 2016?
17         A.    As I sit here, I don't recall
18    that I was.
19         Q.    Was it cleared with you?
20         A.    As I sit here, I don't think I
21    am the right party for me to be cleared
22    with me.
23         Q.    Do you know what was being
24    investigated specifically, that is what
25    violations in particular Greenberg Traurig
```

```
1                    D. MONTICCIOLO
2      was asked to look at?
3           A.    No.
4           Q.    Did you report the findings of
5      the independent investigation to any
6      regulatory authorities or to your
7      investors?
8           A.    I, as I sit here, I don't know.
9           Q.    You are a regulated entity, you
10     hired a law firm to conduct an independent
11     investigation, you got their findings and
12     you didn't report those to investors or the
13     regulatory authorities; is that your
14     testimony?
15          A.    It's not my job to make that
16     determination.
17          Q.    Mr. Monticciolo, you understand
18     that you are CEO of the company?
19          A.    Correct.
20          Q.    You understand that you are
21     ultimately responsible for the decisions
22     that those who work for the company make?
23                MR. SOLOMON:   I object to the
24           question.
25          Q.    Do you understand that, yes or
```

```
                          D. MONTICCIOLO
 1
 2    no?
 3           A.     I do.
 4                  And I understand the
 5    obligations of compliance officers and
 6    legal counsel, as well.
 7           Q.     Did you consult with legal
 8    counsel as to whether or not you were
 9    permitted to not report to investors or to
10    the regulatory authorities either, one,
11    that an independent investigation had been
12    conducted or, two, what the results of that
13    independent investigation were?
14                  MR. SOLOMON:  Objection to the
15             question.
16           A.     Again, as I sit here, that
17    would likely not be the process.
18           Q.     What do you mean by that would
19    likely not be the process?
20           A.     Compliance has obligations
21    beyond and above me to regulators.  So does
22    the lawyers.
23           Q.     I don't see how that is
24    responsive to my question.  My question is
25    whether or not the results of the
```

Page 350

```
                          D. MONTICCIOLO
 1
 2      investigation or the fact of the
 3      investigation were reported to the
 4      regulators or to investors.
 5                 MR. SOLOMON:  That wasn't the
 6            question and that is the fifth time
 7            you asked that question and I object
 8            to the question.  That wasn't the
 9            question.
10                 MR. CYRULNIK:  I can't imagine
11            that you actually mean fifth, but if
12            you do, I think you are wrong.
13      Q.     Regardless, Mr. Monticciolo --
14                 MR. SOLOMON:  Can I compromise
15            on third?
16                 MR. CYRULNIK:  I mean, I can't
17            compromise on it, because I don't
18            think I asked that question before.
19            But I may have asked it once before,
20            so we can compromise on two, if you
21            want.
22      Q.     Mr. Monticciolo.
23      A.     I'm sorry, could you repeat the
24      question again?
25      Q.     Sitting here today, you can't
```

Page 351

D. MONTICCIOLO

1
2    tell me whether or not the company over
3    which you preside as CEO bothered to report
4    the fact or the results of the independent
5    investigation that it thought it needed to
6    conduct into Mr. Iacovacci in 2016; is that
7    correct?
8              MR. SOLOMON:  I object to the
9         question.
10        A.    That is categorically
11   incorrect.
12        Q.    Sitting here today, you can
13   tell me whether or not Brevet bothered to
14   report the fact or the results of the
15   investigation into Mr. Iacovacci to either
16   its investors or regulators?
17             MR. SOLOMON:  Object to the
18        question.
19        A.    I think I have answered it.
20             Brevet doesn't bother to do
21   something; it has policies, procedures and
22   regulations that professional and outside
23   parties are hired to follow.
24        Q.    Yes or no, did you report the
25   fact or the results of the investigation to

Page 352

```
 1                    D. MONTICCIOLO
 2      either your investors or to your
 3      regulators?
 4                  MR. SOLOMON:  Are we up to
 5            three now?
 6                  MR. CYRULNIK:  I think so.
 7                  MR. SOLOMON:  Object to the
 8            question.
 9          A.    Again, I am not the one who
10      would report that, so.
11          Q.    Yes, to be clear, when I say
12      you in that question, I just mean Brevet,
13      anyone at Brevet.
14                  Do you need me to re-ask the
15      question or can you answer with that
16      clarification?
17          A.    I do not know or recall if the
18      firm or the compliance people or others
19      felt that it should -- rose to that
20      occasion.
21          Q.    What were the results of the
22      investigation, Mr. Monticciolo?
23          A.    I didn't receive the specific
24      results.
25          Q.    There was no report provided to
```

```
 1                    D. MONTICCIOLO
 2       you?
 3              A.     To me, that's not my job.
 4              Q.     Was there a report provided to
 5       someone else at Brevet from the independent
 6       investigators at Greenberg Traurig?
 7              A.     As I sit here, I couldn't tell
 8       you.
 9              Q.     Would you expect that there
10       would be such a report when an independent
11       investigation is commissioned?
12              A.     As I sit here, I don't know
13       what that process is.
14              Q.     Do you know whether such a
15       report has been produced in this
16       litigation?
17              A.     Again, as I sit here, I don't
18       know.
19              Q.     Sitting here today, do you know
20       what the independent investigation
21       concluded?
22              A.     Again, I was not the recipient
23       of the report or results.
24              Q.     I get all of the caveats and
25       all of the disclaimers, I am just asking
```

```
 1                    D. MONTICCIOLO
 2      you, sitting here today, whether you know
 3      what the conclusions of the investigation
 4      were.
 5           A.    I specifically do not know what
 6      the results were because I did not see them
 7      myself.  I know they rose to whatever
 8      degree that people felt that would need to
 9      be addressed.
10           Q.    So you didn't bother to look at
11      the results of this independent
12      investigation, fair?
13                 MR. SOLOMON:  Not fair.
14                 Objection.
15                 MR. CYRULNIK:  Lou, he doesn't
16            need your help.
17           A.    Bother is not something that a
18      regulated entity does or we do.  There are
19      roles and responsibilities, I don't know if
20      I was privileged to it or not.
21           Q.    Did you --
22           A.    I --
23           Q.    I'm sorry.
24           A.    They are professionals whose
25      job it is to make those determinations.
```

D. MONTICCIOLO

1
2      Q.     Did you ask for it?
3      A.     I don't recall.
4      Q.     Do you recall whether somebody
5   declined to provide it to you?
6      A.     I don't recall.
7      Q.     Can you imagine that you would
8   have asked for it and somebody would have
9   declined to provide it to you?
10     A.     I can't imagine I would ask for
11  it and I can't imagine any hypothetical why
12  somebody would provide it if I never asked
13  for it.
14     Q.     How could you go ahead and sign
15  off on the termination of Mr. Iacovacci
16  without having reviewed the report or the
17  results or the conclusions of the
18  independent investigator that was hired to
19  investigate Mr. Iacovacci's conduct?
20     A.     Why would I then -- why would
21  the process be to have an independent if it
22  could then be not decided by an independent
23  person?
24     Q.     Is it your view that the
25  independent investigators at Greenberg

Page 356

```
 1                    D. MONTICCIOLO
 2    Traurig are the ones who decided to
 3    terminate Mr. Iacovacci?
 4         A.    I have no idea.
 5         Q.    Is that your view, yes or no?
 6         A.    I, as I sit here, I have no
 7    idea.
 8         Q.    Mr. Monticciolo, what is your
 9    best answer to the question of who decided
10    to terminate Mr. Iacovacci?
11         A.    Brevet decided to terminate
12    Mr. Iacovacci.
13         Q.    Well, Brevet is not a person,
14    right, Mr. Monticciolo?  I am asking you
15    specifically who made that decision.
16              MR. SOLOMON:  Asked and
17         answered.
18              MR. CYRULNIK:  Asked but not
19         answered.
20         Q.    Go ahead.
21              MR. SOLOMON:  This is
22         25 minutes ago you have been at this,
23         come on.  I object to the question.
24         A.    I think I have answered this.
25              Recommendations are made and
```

Page 357

```
 1                    D. MONTICCIOLO
 2    approved or denied.  The recommendation is
 3    made and, again, I believe it has merit and
 4    it's professionals that are doing it and
 5    they follow the proper process, then
 6    whatever the action is, then it's pursued.
 7         Q.    Lengthy answer notwithstanding,
 8    you don't know who made the recommendation,
 9    you don't know who approved the
10    recommendation or who acted on the
11    recommendation; is that fair?
12         A.    I didn't say that, I just don't
13    recall at this time.
14         Q.    Yeah, I mean sitting here
15    today, you don't know the answer to any of
16    those three questions, right?
17         A.    I am definitely not going to
18    guess on that.
19         Q.    So no?
20         A.    I am not going to guess.
21         Q.    Okay, so sitting here today,
22    subject to your disclaimer that you don't
23    want to guess, the answer is no, you don't
24    know who made the recommendation, whether
25    the recommendation was made, who accepted
```

Page 358

                    D. MONTICCIOLO

1

2      the recommendation if there was one made

3      and who acted on the recommendation if

4      there was one made, correct?

5              MR. SOLOMON:   I object to the

6          question.

7          A.    I can't answer that question

8      that way.   I specifically do not know the

9      events and the specific people.

10         Q.    Did you say you specifically --

11     you do not know the events; is that what

12     you said?

13         A.    I do not remember the

14     specifics.

15         Q.    And you don't know what

16     prompted the investigation, either,

17     correct?

18         A.    I didn't say that.

19         Q.    Do you know what prompted the

20     investigation?

21         A.    As best as I recall, as I sit

22     here, was a concern during our -- in our

23     review of compliance materials that there

24     was a concern.

25         Q.    There was a concern that what?

```
 1                    D. MONTICCIOLO
 2        A.    There was a concern that
 3    something didn't seem consistent or
 4    potentially was a breach of our policies
 5    and procedures in the handbook.
 6        Q.    Do you hire an independent
 7    investigation firm to conduct an
 8    independent investigation anytime you
 9    believe that somebody may have done
10    something inconsistent with one of your
11    policies and procedures?
12        A.    It's not my decision as to when
13    to do that.
14        Q.    I didn't ask you whether you --
15    again, maybe I need to clarify, by you in
16    that question, I meant Brevet.
17              Does Brevet hire a firm to
18    conduct an independent investigation
19    anytime Brevet believes that there is a
20    possibility that somebody acted in a way
21    that is inconsistent with one of the
22    policies or procedures?
23        A.    I don't know the specifics, as
24    I sit here; I know that has been mentioned
25    as the process.
```

Page 360

```
 1              D. MONTICCIOLO

 2         Q.     Have you ever seen that happen

 3    before?

 4         A.     Again, I don't -- I am not

 5    involved in that part of the process.  You

 6    would have to look at our HR or compliance.

 7         Q.     I don't want to look at either

 8    of those things right now, I just want to

 9    get your answer to my question.

10              Have you, Doug Monticciolo,

11    ever seen an independent investigation that

12    was ordered and conducted at Brevet other

13    than the one that you have described to me

14    with respect to Mr. Iacovacci?

15         A.     To be consistent, I never said

16    I saw Paul's.  And I am not sure, as I sit

17    here, that I have ever seen any of them,

18    because that is not my -- that is not how

19    the process works.

20         Q.     I don't want to conflate the

21    results of the investigation with the

22    investigation.  You are testifying that you

23    are aware that an independent investigation

24    was conducted with respect to Mr. Iacovacci

25    in 2016, yes?
```

Page 361

D. MONTICCIOLO

1

2        A.     Again, I do not remember the

3    specifics; I do remember that there was

4    mention that that was done.  I -- my memory

5    is that as part of the recommendation or

6    support was that an investigation was done.

7        Q.     Okay.  Then I am asking a

8    similar question, not about any findings or

9    written results, I am asking you whether or

10   not you are aware of any other independent

11   investigation that was commissioned or

12   done, commissioned by Brevet or done for

13   Brevet during your many, many years

14   overseeing the company?

15       A.     As I sit here, I don't recall.

16       Q.     Was an independent

17   investigation conducted with respect to

18   Fred Schlosser?

19       A.     Again, as I sit here, I don't

20   recall.

21       Q.     Is it possible that it was?

22       A.     Again, as I said, I am not

23   going to speculate.

24       Q.     Sitting here today, can you

25   identify any other independent

Page 362

```
                              D. MONTICCIOLO
 1
 2       investigation that you are aware of that
 3       has been conducted at the request of Brevet
 4       since, say, 2004?
 5                    MR. SOLOMON:  Asked and
 6              answered.
 7            A.    As I said, I wouldn't be
 8       involved in that process.  So, as I sit
 9       here, I don't recall.
10            Q.    The independent investigation
11       you described was prompted by Mr. Callahan
12       snooping on Mr. Iacovacci's e-mails through
13       your Global Relay system, correct?
14                    MR. SOLOMON:  Object to the
15              question.
16            A.    No.
17            Q.    Are you aware that Mr. Callahan
18       snooped on Mr. Iacovacci's e-mails through
19       the Global Relay system in 2016?
20                    MR. SOLOMON:  Object to the
21              question.
22            A.    No.
23            Q.    Did Mr. Callahan discuss with
24       you prior to his doing so that he was going
25       to be searching through Mr. Iacovacci's
```

Page 363

```
 1                    D. MONTICCIOLO
 2     e-mail in the middle of 2016 on the Global
 3     Relay system?
 4                 MR. SOLOMON:  Object to the
 5            question; no foundation.
 6            A.     No.
 7                 And, repeat, we don't snoop.
 8            Q.     Prior to my asking the
 9     questions that I just asked, had you
10     ever -- had you been aware that
11     Mr. Callahan had searched through
12     Mr. Iacovacci's e-mails on the Brevet
13     Global Relay system in 2016?
14            A.     Sorry, repeat the question.
15            Q.     Prior to today, were you aware
16     that Mr. Callahan searched through
17     Mr. Iacovacci's e-mails on the Global Relay
18     system in the middle of 2016?
19            A.     I am aware that Mr. Callahan
20     was performing quarterly compliance in
21     review of e-mails, as the firm does, that
22     may have included Paul's and that may have
23     included how this came about.
24                 MR. SOLOMON:  Jason, is this a
25            new topic?  Can we take a two-minute
```

Page 364

D. MONTICCIOLO

1  
2       break?  When you are at a new topic,
3       please.
4            MR. CYRULNIK:  It's not -- I am
5       happy to take a two-minute break.
6       Why don't we go off the record.
7            THE VIDEOGRAPHER:  The time is
8       3:56 and we are going off the record.
9       This is the end of media unit No. 4.
10            (Whereupon, a brief recess was
11       taken.)
12            THE VIDEOGRAPHER:  The time is
13       4:03 and we are back on the record.
14       This is the beginning of media unit
15       No. 5.
16  CONTINUED EXAMINATION
17  BY MR. CYRULNIK:
18       Q.   Mr. Callahan, can you identify
19  for me any action that Mr. Iacovacci
20  engaged in prior to October 14th of 2016 on
21  which basis you sent him a termination --
22  Brevet sent him a termination letter
23  terminating in his employment?
24            MR. SOLOMON:  Asked and
25       answered.

Page 365

```
                           D. MONTICCIOLO
 1
 2        A.     And can I say correction?  You
 3    asked Mr. Callahan.
 4        Q.     Oh, I'm sorry.
 5             MR. SOLOMON:  And you said
 6         Callahan.
 7             MR. CYRULNIK:  That's even
 8         worse.  I will replace it with
 9         Mr. Monticciolo but, otherwise, the
10         question remains the same.
11        Q.     Sitting here today, can you
12    identify any action that Mr. Iacovacci
13    undertook that on which basis you sent him
14    a termination letter, by you I mean Brevet,
15    on October 14th of 2016?
16        A.     As I sit here today, I don't
17    recall the specifics.
18        Q.     Did you review the termination
19    letter before it was sent out?
20        A.     As I sit here, I don't recall.
21        Q.     Do you know who sent and signed
22    the termination letter?
23        A.     I don't recall.
24        Q.     Do you remember Brevet seeking
25    to obtain evidence of potential violations
```

Page 366

```
 1                    D. MONTICCIOLO
 2       in which Mr. Iacovacci engaged after
 3       sending out the termination letter in order
 4       to justify his termination?
 5                    MR. SOLOMON:   Object to the
 6               question.
 7            A.     No.
 8            Q.     Were you involved in the
 9       decision to have Mr. Johnny Lan log in to
10       the Dell OptiPlex computer at
11       Mr. Iacovacci's home to obtain documents
12       and communications for Brevet in the middle
13       of the night on October 17th and
14       October 18th of 2016?
15            A.     I don't recall if I asked him
16       to go into our computer at Paul's home.
17            Q.     Is it possible that you did?
18            A.     I don't recall.
19            Q.     In all candor, Mr. Monticciolo,
20       there is no chance that Mr. Lan would log
21       in to the Dell OptiPlex at Mr. Iacovacci's
22       home to download materials without first
23       making sure that that is what you wanted
24       him to do, correct?
25            A.     Categorically incorrect.
```

```
 1                     D. MONTICCIOLO
 2              It is his job to do what he
 3     thinks is correct and we are a regulated
 4     entity, we are also regulated by not just
 5     SEC but Homeland Security and preserving
 6     the record is, as everybody, particularly
 7     Paul would know, is very important.
 8          Q.    Is it your view that Mr. Lan
 9     would have done that on his own without
10     checking with you?
11          A.    He is a professional, I would
12     hope he would have.
13          Q.    I want to make sure I have your
14     testimony clear, yes or no, did you know
15     that Mr. Lan was going to be logging in to
16     the Dell OptiPlex computer at
17     Mr. Iacovacci's home before he did it?
18          A.    Again, I don't recall.
19          Q.    You don't recall either way?
20          A.    Either way what?
21          Q.    You don't recall either way
22     whether you knew or didn't know before he
23     did it?
24          A.    Correct.
25          Q.    And you don't recall either way
```

```
1                    D. MONTICCIOLO
2      whether or not you authorized him to do it?
3           A.    Correct.
4           Q.    And, Mr. Monticciolo, were you
5      aware that Mr. Lan downloaded materials
6      from the Dell OptiPlex, from the family
7      account on the Dell OptiPlex, that is
8      materials that had nothing to do with
9      Brevet at all?
10                    MR. SOLOMON:   Object to the
11             question.
12          A.    As I sit here, I am not aware
13     of the specifics of what he did to do his
14     job to protect the preservation of the SEC
15     materials.
16          Q.    So no, you are not aware of
17     whether he actually downloaded materials
18     from the family account on that machine?
19          A.    As I sit here, I don't recall.
20          Q.    Do you know whether he
21     downloaded privileged communications that
22     Mr. Iacovacci was having with his counsel?
23          A.    Again, as I sit here, I don't
24     recall.
25          Q.    Do you know whether he
```

Page 369

                    D. MONTICCIOLO

1
2       downloaded medical records of Mr. Iacovacci
3       or one of his family members when he
4       downloaded materials from the machine?
5             A.    Again, as I sit here, I don't
6       recall.
7             Q.    You would agree with me that
8       pictures, medical records, privileged
9       communications, none of those things are
10      things that you are obligated to keep as a
11      regulated entity under the SEC rules,
12      correct?
13            A.    I can't answer that
14      specifically.  We have a records
15      preservation requirement.
16            Q.    Are you telling me that it's
17      your understanding, Mr. Monticciolo, that
18      you don't know one way or the other whether
19      as part of your records preservation
20      requirements from the SEC you are required
21      to preserve the medical records of
22      independent executives, family members,
23      their children's pictures or their
24      privileged communications with their
25      attorneys?

Page 370

1                      D. MONTICCIOLO

2          A.      Again, I will repeat, our

3      requirement is preserve, not -- regardless

4      of what it is.  It's on our computer.

5          Q.      So it's your understanding that

6      you are indeed required to preserve all

7      documents, communications and records on a

8      machine that you, Brevet, owns regardless

9      of whether those documents, communications

10     or records concern Brevet or concern family

11     members or communications that do not

12     belong to Brevet?

13              MR. SOLOMON:  I object to the

14          question.

15         A.      Again, we are required to

16     preserve files on record; unclear of what

17     they would be if we are just preserving

18     them.

19         Q.      Did you say unclear what they

20     would be if we were just preserving them?

21         A.      Correct.

22              Our requirement is preserve the

23     record.

24         Q.      I guess the question I am

25     asking you, Mr. Monticciolo, I want to

```
 1                   D. MONTICCIOLO
 2    understand your understanding of the
 3    record.
 4             Is it your view that if a
 5    Brevet employee has a file with their
 6    child's medical records saved on a machine
 7    that belonged to Brevet that it is Brevet's
 8    obligation under the SEC rules to preserve
 9    that file?
10             MR. SOLOMON:  Do you know?
11        A.    I have no way of knowing that.
12        Q.    Well, I am asking you, sitting
13    here today, is it your view that there is
14    such an obligation.  The answer would be
15    either yes, no or I don't know.
16        A.    Yes, to preserve the record.
17        Q.    Okay.  So it's your view that
18    any communication, document or file that
19    appears on a machine that is owned by
20    Brevet, that you are required to preserve
21    those records regardless of whether they
22    have anything to do with Brevet, fair?
23        A.    Not fair.
24             Clear that the policies and
25    procedures say that you should have no
```

D. MONTICCIOLO

1    guarantee of privacy and if someone put

2    non-work stuff on a work computer or used

3    work stuff on a non-Brevet computer that

4    is, as Paul would know for his entire

5    career, and as obligation as all of us know

6    who work on Wall Street that that

7    preservation is critical.  How else would

8    you know if there was insider trading?

9        Q.    Mr. Monticciolo, you are not

10   telling me that Mr. Lan was directed to

11   download Mr. Iacovacci's medical records or

12   privileged communications in order to

13   ensure that there was no insider trading,

14   right?

15       A.    I never said that.  I said

16   Mr. Lan, in his professional judgment,

17   maybe he sought outside counsel, would be

18   expected to preserve the record.

19       Q.    Do you believe Mr. Lan, is it

20   your understanding that Mr. Lan sought

21   outside counsel before down -- secretly

22   downloading materials from the Dell

23   OptiPlex machine in Mr. Iacovacci's home?

24                  MR. SOLOMON:  I object to the

Page 373

1                    D. MONTICCIOLO
2          question.
3          A.    The Dell OptiPlex being
4    Brevet's computer, we have policies and
5    procedures and professionals who have
6    experience; whether he sought outside
7    counsel, I have no idea.
8                I have no idea when Paul, I
9    don't know, gave in his phone.  It was the
10   same thing.
11         Q.    Would you expect Mr. Lan to
12   have sought outside counsel prior to
13   downloading materials from the Dell
14   OptiPlex machine in Mr. Iacovacci's home?
15         A.    I have no expectation of how I
16   would do Johnny's job.
17         Q.    No expectation one way or the
18   other whether or not you would consult with
19   counsel prior to logging in to a machine in
20   somebody's home?
21         A.    That is not what I said.
22                I am not an IT professional in
23   this area trying to enforce preservation
24   rules.
25         Q.    I am asking whether you would

```
 1                    D. MONTICCIOLO
 2     have had an expectation one way or the
 3     other as to whether the IT professional
 4     would be consulting with counsel prior to
 5     downloading materials from the computer in
 6     Mr. Iacovacci's home.
 7          A.    Again, he is a professional, if
 8     he needed to seek, you know, counsel or
 9     check something to do his job, that's why
10     he is a professional to do his job.
11          Q.    Sitting here today (inaudible).
12               MR. SOLOMON:  You broke up.
13               MR. CYRULNIK:  Did you say I
14          broke up?
15               MR. SOLOMON:  Yes, we just
16          didn't hear the first part of what
17          you were saying, the first part of
18          the question, you just broke up.
19          Q.    The question was, sitting here
20     today, are you aware of whether Mr. Lan
21     downloaded materials from devices other
22     than the Dell OptiPlex machine that was
23     located in Mr. Iacovacci's home?
24          A.    Sitting here today, I am -- I
25     don't know either way.
```

Page 375

1                    D. MONTICCIOLO

2          Q.     Would it surprise you to learn

3     that Mr. Lan downloaded materials from

4     Mr. Iacovacci's external hard drives

5     during his -- during Mr. Lan's download of

6     information from the Dell OptiPlex on the

7     night of October 17th and October 18th?

8          A.     If Mr. Lan felt that that was

9     in accordance with preserving the record

10    for the SEC and even Homeland Security,

11    then I am sure he would have done what he

12    thought was the right thing to do.

13         Q.     Mr. Monticciolo, is it your

14    intention to walk into court and justify

15    the download of data from Mr. Iacovacci's

16    external hard drives by saying that you

17    were doing so, Brevet was engaging in that

18    conduct because they thought the SEC

19    required them to preserve materials

20    secretly downloaded from Paul Iacovacci's

21    hard drive at home?

22               MR. SOLOMON:   I object to the

23          question.

24         A.     I have no idea -- if they were

25    Paul's hard drives or ours, I have no idea

Page 376

D. MONTICCIOLO

1    what that context is; I am not the IT

2    person, I can't answer that question.

3         Q.    So is the answer to my question

4    yes, that's your plan?

5              MR. SOLOMON:   I object to the

6         question.

7         A.    I rely on the professionals in

8    the firm to do what is required.

9         Q.    Have you ever discussed with

10   the SEC or with an SEC compliance person

11   whether or not you are obligated to take

12   data from employees' homes and external

13   hard drives and preserve it in order to

14   comply with your regulations as a regulated

15   entity?

16        A.    As a regulated entity, I

17   personally have not had that direct

18   discussion.  I have observed several

19   insider trading cases of which I have

20   observed that that is the standard.  I am

21   not saying that that is our standard nor

22   that we pursued that, but that would not

23   surprise me.

24        Q.    Well, is it your standard?

Page 377

D. MONTICCIOLO

1   A.   Our standard, you would have to

2   look at our policies and procedures and

3   speak to the people whose job it is.

4

5   Q.   Well, is it your contention

6   that Mr. Lan, everything he did was

7   consistent with Brevet's policies and

8   procedures?

9   A.   I hire professionals and

10  surround them with other professionals to

11  make sure that they do their best.

12  Q.   But the buck stops with you,

13  Mr. Monticciolo, right; if your

14  professional is acting at your direction,

15  hacked into somebody's computer, in

16  violation of 18 USC, you understand that

17  you are going ultimately to have some level

18  of responsibility for that misconduct,

19  right?

20          MR. SOLOMON:  I object to the

21      question.  That's not even a

22      question.

23  A.   Again, as we said, that's -- we

24  have policies, procedures, we have

25  professionals that implements those, we

Page 378

```
                        D. MONTICCIOLO
 1
 2    believe what we do is necessary for our
 3    business.
 4         Q.    No, that wasn't my question.
 5              My question is do you think you
 6    are insulated individually as CEO of a
 7    company by having other professionals do
 8    various things and saying that they were
 9    the ones who made those decisions or do you
10    think that you are responsible, at the end
11    of the day, for the decisions that are made
12    underneath your supervision?
13              MR. SOLOMON:  I object to the
14         question.
15         A.    Again, we have professionals
16    and policies and procedures, we -- I
17    believe that we do a thorough job to make
18    sure that they are in compliance.  If I am
19    grossly negligent, then there is a
20    possibility, but I am not saying that I
21    believe that we are.
22         Q.    Was Mr. Iacovacci --
23              MR. CYRULNIK:  Withdrawn.
24         Q.    Have you ever logged on to a
25    website that was unrelated to Brevet
```

```
                        D. MONTICCIOLO
 1
 2      business while you were using a computer
 3      owned by Brevet?
 4           A.    Any website?
 5           Q.    Any website.
 6           A.    Google Maps, to find my way to
 7      a hotel for a meeting.
 8           Q.    Okay, we can use that one.  I
 9      am just asking whether you have ever logged
10      on to any website with a Brevet machine
11      that didn't have anything to do with Brevet
12      business.
13           A.    Well, that was with Brevet
14      business, then.
15           Q.    Got it.
16           A.    I don't believe there is
17      anything I do that is not with Brevet
18      business, because we are in a regulated
19      business and I have no expectation or
20      guarantee of privacy.  That is what
21      everybody in the industry knows.
22           Q.    So it's your sworn testimony,
23      Mr. Monticciolo, that you don't recall ever
24      doing anything with your Brevet computer,
25      including visiting a website, where that
```

```
                                    Page 380
 1                    D. MONTICCIOLO
 2     action was unrelated to Brevet business;
 3     did I get that right?
 4          A.    I did not say that.  I said I
 5     have no expectation of privacy.
 6          Q.    But I wasn't asking you any
 7     questions about expectation of privacy.  So
 8     let me ask my question again.
 9                Yes or no, have you ever used a
10     Brevet computer for any activities that was
11     unrelated to Brevet business?
12          A.    I think virtually, as the CEO,
13     virtually all of my life is related to
14     Brevet business, so I'd find it to be
15     unlikely.
16          Q.    Do you have a view as to
17     whether or not using a Brevet computer for
18     any activity other than Brevet business,
19     say, for example, visiting a news website
20     or checking personal e-mail, is a violation
21     of Brevet's policies and procedures?
22          A.    I don't know the specifics, but
23     incidental use, I would expect to be
24     understandable, but consistent use, I would
25     have to go and review the policies.  As I
```

Page 381

                              D. MONTICCIOLO

1

2      sit here, I couldn't tell you.

3           Q.    Sitting here today, you don't

4      know one way or the other whether or not an

5      employee is allowed to use their Brevet

6      computer for any personal activities under

7      the policies and procedures unrelated to

8      Brevet business?

9           A.    I don't know the specifics in

10     the policies about that.  It is a work

11     computer for work purposes, incidental use

12     happens, but given it's a regulated

13     business, everybody attests, they

14     understand there is no assurance or

15     guarantee of privacy and that everything

16     that is done is part of the record for our

17     business.

18          Q.    You reviewed the policies and

19     procedures to prepare for today's

20     deposition, right; you remember testify to

21     that?

22          A.    I, I -- as I said, I perused

23     through them.

24          Q.    And did you see anything that

25     addressed the question of whether or not an

Page 382

```
 1                    D. MONTICCIOLO
 2    employee was allowed to use a Brevet
 3    computer for any personal use?
 4         A.    I remember seeing something
 5    that said that employees can use it for
 6    incidental use, a Brevet-supplied computer,
 7    a Brevet-owned computer, for incidental
 8    use.
 9         Q.    What is your understanding of
10    incidental use?
11         A.    Incidental, not consistent,
12    occasional, in a pinch necessity.
13         Q.    So it's your view that under
14    the policies and procedures, Brevet
15    employees were permitted to use Brevet
16    machines for personal use provided that
17    that personal use was not consistent but
18    was instead occasional; is that fair?
19         A.    No.
20               That's not what I said.
21         Q.    Well, then, tell me yes or no,
22    do you think that a Brevet employee was
23    permitted to use a Brevet computer for
24    personal use if that personal use was only
25    occasional and not consistent?
```

1              D. MONTICCIOLO

2         A.    No.  I said incidental.

3         Q.    I know you said incidental, but

4    then when I asked you to explain to me what

5    you meant by incidental, I think you told

6    me that it wasn't -- and I don't want to

7    get the word wrong, so you will accept my

8    apology in advance if I am getting it

9    wrong, but I think you said it wasn't

10   consistent.  Either way, I am asking you

11   the question afresh.

12             My question is is it your

13   understanding, yes or no, that a Brevet

14   employee is permitted to use a Brevet

15   computer for personal use, for example,

16   sending a personal e-mail or visiting a

17   non-Brevet-business-related website

18   provided that the use happens only

19   occasionally and not frequently?

20        A.    Again, as I recall our

21   policies, the best of my knowledge, it says

22   incidental use and there is no guarantee of

23   privacy.

24        Q.    Can you answer my question?  I

25   am not asking you about privacy, I am

Page 384

```
1                     D. MONTICCIOLO
2       asking you about acting in accordance with
3       the Brevet policies and procedures.
4            A.    I don't view the definition of
5       incidental being consistent with the words
6       you used.
7            Q.    Do you think occasional use is
8       incidental use?
9            A.    No.
10           Q.    So you think occasional use
11      would still be prohibited, occasional
12      personal use, non-Brevet business use would
13      still be prohibited by the policies and
14      procedures?
15           A.    Correct.
16                 That's why we provide computers
17      to people, phones to people, laptops to
18      people, so that it should only be
19      incidental.
20           Q.    So what is -- what makes use
21      incidental if it's not a way of capturing
22      the frequency of that use?
23           A.    I am not an English literate
24      person, but, you know, incidental seems to
25      be like there is an incident, in a pinch
```

```
1                   D. MONTICCIOLO
2    you need to use it, but not to consider it
3    to rely upon or use it occasionally, as you
4    stated it.
5               MR. CYRULNIK:  I am going to
6          introduce another exhibit.
7               And this is going to be marked
8          as exhibit -- I am waiting for it to
9          load up.
10              (Whereupon, the aforementioned
11         Brevet Direct Lending - Short
12         Duration Fund, L.P. and Subsidiaries
13         Consolidated Financial Statements
14         Year Ended December 31, 2016 was
15         marked as Plaintiff(s)' Exhibit 5 for
16         identification as of this date.)
17              I think we are up to Exhibit 5
18         here, hold on.  Yes, Exhibit 5.
19              Do you see that?
20              THE WITNESS:  Not yet.
21              MR. SOLOMON:  I am not seeing
22         anything.
23              THE WITNESS:  We have a circle.
24              MR. CYRULNIK:  Okay.
25              MR. SOLOMON:  Is that the
```

Page 386

1                    D. MONTICCIOLO

2            financial statement?

3                 MR. CYRULNIK:  Yes.

4                 MR. SOLOMON:  It's open on the

5            screen.

6                 MR. CYRULNIK:  Okay.  I think I

7            may have downloaded -- I may have

8            uploaded the 2016 document, is that

9            what you have as Exhibit 5?

10                MR. SOLOMON:  Year ending

11           December 31, '16, yes.

12                MR. CYRULNIK:  All right, so my

13           apologies, if you can go back and

14           open up Exhibit 6, we will start with

15           that one and then we will go back to

16           Exhibit 5.

17                (Whereupon, the aforementioned

18           2015 Brevet Short Duration Partners,

19           LLC Profit and Loss Statement was

20           marked as Plaintiff(s)' Exhibit 6 for

21           identification as of this date.)

22                MR. CYRULNIK:  Any luck?

23                MR. SOLOMON:  We are back at

24           the circle.  When we went out -- hold

25           on.  You want Exhibit 6?

```
 1                    D. MONTICCIOLO
 2              MR. CYRULNIK:  Yes, we are
 3          going to start with Exhibit 6, the
 4          2015 Partners P&L.
 5              MR. SOLOMON:  It's on the
 6          screen.
 7              MR. CYRULNIK:  All right.
 8         Q.    Mr. Monticciolo, do you
 9    recognize Exhibit 6 as the Brevet Short
10    Duration Partners, LLC profit and loss
11    statement from 2015?
12         A.    I don't specifically know this
13    statement, but -- so no.
14         Q.    Okay.  Do you generally
15    recognize the format of Exhibit 6 to be a
16    profit and loss statement for Partners?
17         A.    I do not.  This is -- I can't
18    say I recall this.
19         Q.    Okay.
20         A.    This format.
21         Q.    Okay.  Well, we are going to
22    look at it together.
23              If you take a look at the top
24    few lines, it does identify this document
25    as the Brevet Short Duration Partners, LLC
```

Page 388

1                    D. MONTICCIOLO

2    profit and loss January through

3    December 2015, right?

4         A.    Yes.

5         Q.    Okay.  And if you take a look

6    at the first line item there that has a

7    figure next to it under income, there is an

8    SDF performance income of roughly ███████

     █ ████████, do you see that?

10        A.    I do.

11        Q.    And is that consistent with

12   your -- well, do you understand that to

13   mean that Brevet Short Duration Partners

14   received ████████  ████████ in performance

15   fees from the SDF, the short duration fund

16   would be the onshore fund, in 2015?

17        A.    I can't specifically say if

18   it's the onshore fund, but it says it's the

19   SDF performance income.

20        Q.    Okay.  Do you recall the

21   offshore fund ever sending investment --

22   performance fees to Brevet Short Duration

23   Partners?

24        A.    I do not.

25              And I notice this says

Page 389

D. MONTICCIOLO

1

2  Partners, LLC at the top, so, I mean, that

3  confirms it would be the onshore.

4       Q.    Okay.  Does that generally

5  comport with your recollection that

6  Partners realized roughly ██████ ████████ in

7  fees from the onshore short duration fund

8  in 2015?

9       A.    It appears that that's what it

10 reports.

11      Q.    Okay.  Do you know how those

12 fees were calculated, how did the short

13 duration fund calculate the ████ ████████

14 that it paid to Partners?

15      A.    As I sit here, no.  You would

16 have to look at the specifics.

17      Q.    Do you have any general sense

18 of what formulas are used to calculate

19 those incentive fees?

20      A.    As I sit here, it's, it's, you

21 know, something that finance does, so it's

22 complicated.

23      Q.    Do you have any general sense

24 of what is used to calculate the fees, the

25 amount?

```
 1                    D. MONTICCIOLO
 2        A.    I would be guessing.
 3        Q.    What is your best guess?
 4              MR. SOLOMON:  Don't guess.
 5        A.    Yeah, I'm not going to guess.
 6        Q.    Well, I am asking for your best
 7   understanding, so.
 8        A.    It says performance income, I
 9   don't know what's being calculated into
10   that.  I would have to go look and get the
11   specifics from finance to be sure.
12        Q.    So finance has a breakdown of
13   how that performance income fee is
14   calculated?
15        A.    I am assuming, as I sit here,
16   that this was actually produced by our
17   finance department.
18        Q.    So yes?
19        A.    It's more of a maybe.
20        Q.    Okay.
21        A.    Sorry.
22        Q.    Would you expect that finance
23   has the breakdown?
24        A.    I would expect that finance or
25   the accountants have the ability to produce
```

Page 391

1                    D. MONTICCIOLO
2       similar numbers of -- again, I am not
3       familiar with this statement.
4            Q.    Okay.  Let's take a look at --
5                  Well, do you recall there being
6       a precipitous drop-off in the fees that
7       Partners received from the short duration
8       onshore fund between 2015 and 2016, the
9       year that Mr. Iacovacci left the company?
10           A.    I don't recall that.
11                 I don't specifically look at
12      Partners or Holdings on the -- you know, as
13      an individual thing, this P&L or anything.
14                 MR. CYRULNIK:  Let's take a
15           look at Exhibit 7, please.
16                 (Whereupon, the aforementioned
17           2016 Brevet Short Duration Partners,
18           LLC Profit and Loss Statement was
19           marked as Plaintiff(s)' Exhibit 7 for
20           identification as of this date.)
21                 MR. CYRULNIK:  Are you okay
22           over there?
23                 MR. SOLOMON:  We are just fine,
24           thank you.
25                 Exhibit 7 on the screen.

```
 1              D. MONTICCIOLO
 2              MR. CYRULNIK:  I won't let
 3          these blips affect my evaluation of
 4          your stellar performance, Lou, on the
 5          technology front, don't worry.
 6              MR. SOLOMON:  Expert.  Expert.
 7          Q.    Mr. Monticciolo, I am looking
 8      at the 2016 Brevet Short Duration Partners
 9      profit and loss statement, do you see that,
10      as Exhibit 7?
11          A.    Yes, I do.
12          Q.    And this is the same setup as
13      the exhibit that we just looked at, except
14      this pertains to January through
15      December 2016 rather than 2015; do you see
16      that?
17          A.    I see that.
18          Q.    And would you agree with me
19      that there is a conspicuous precipitous
20      decline in the numbers that were reported
21      as short duration fund performance income
22      between 2015 and 2016, that is, instead of
23      ███████   ██████ paid to Partners, only
24      █████████ is reported as income paid to
25      Partners in 2016 under the performance
```

Page 393

```
                        D. MONTICCIOLO
 1
 2      income line; do you see that?
 3           A.    Yes.
 4           Q.    Can you explain to me why it is
 5      that the SDF performance income dropped
 6      from █████████  █████████  ████  █████  █████
        █    █████████  year over year from 2015 to 2016?
 8           A.    I don't recall the specifics of
 9      what happened in that year.
10           Q.    Do you have any explanation
11      whatsoever as to why █  ███  █████████  ███  █████████
12      disappears here and this drops by roughly
13      █████████ percent?
14           A.    I would be guessing on it.
15                 MR. SOLOMON:  Don't guess.
16           Q.    You have no idea?
17           A.    I am not going to guess.
18           Q.    If you are not going to guess,
19      you have no idea?
20           A.    I don't recall.
21           Q.    So, sitting here today, you do
22      not know why that number changed so
23      dramatically, correct?
24           A.    Correct.
25           Q.    Does that reflect to you that
```

Page 394

D. MONTICCIOLO

1
2          the short duration fund was underperforming
3          as between 2016 relative to 2015?
4               A.    I would be guessing without
5          seeing other information.
6               Q.    Well, if the performance of the
7          fund didn't change, would it make any sense
8          to you whatsoever that the incentive fees
9          paid to Partners would change?
10               A.    I can think of a number of
11          scenarios that that can change.
12               Q.    Care to share?
13               A.    I can't think of the specifics,
14          maybe the fund got smaller.  Hypotheticals,
15          I am not going to guess.
16               Q.    If the fund got smaller between
17          2015 and 2016, would the incentive fee
18          change?
19               A.    Again, we would have to look at
20          the finance calculations and how this is
21          calculated.
22               Q.    So, sitting here today, you
23          don't know the answer to that question?
24               A.    Without looking at all of the
25          information, I would just be guessing.

Page 395

D. MONTICCIOLO

1

2    Q.    I want to understand what you

3    mean by guessing.  Do you have an

4    explanation as to why this number ████  █

5    ██████  percent the year that Mr. Iacovacci

6    leaves Brevet?

7    A.    I don't recall this regardless

8    of whether it's the year that Mr. Iacovacci

9    left.

10   Q.    So no?

11   MR. SOLOMON:  He said he didn't

12   recall.

13   THE WITNESS:  Thank you.

14   Q.    So you don't know?

15   MR. SOLOMON:  I object to the

16   question.

17   A.    I don't recall.

18   Q.    Can you give me any explanation

19   at all as to why that number of fees that

20   are paid to Partners, the entity in which

21   Mr. Iacovacci -- one of the entities in

22   which Mr. Iacovacci holds an interest, goes

23   from ████████ ███████ ███ ████ ████████

     ████████ ███████ in just one year, can you

25   give me any explanation whatsoever as to

Page 396

                         D. MONTICCIOLO

1

2     why that happened?

3          A.    Without looking at the

4     specifics of each year, I just don't

5     recall.

6          Q.    Did you know at one point and

7     you just don't recall or do you not know at

8     all?

9          A.    Again, I don't recall, I need

10    to look at the specifics.  There is a lot

11    of things that impact funds and things like

12    profits and loss.

13         Q.    And, sitting here today, you

14    can't provide me with any explanation as to

15    why that number changed so dramatically,

16    right?

17         A.    I am not going to guess as to

18    whether there was something in January to

19    December of 2016 that I could recall

20    sitting here right now.

21         Q.    Well, there was something that

22    took place between January and December of

23    2016 and that is that Mr. Iacovacci left

24    the company.

25                    Isn't it true, Mr. Monticciolo,

```
                                         D. MONTICCIOLO
 1
 2          that the reason why the short duration fund
 3          paid far fewer fees to Partners in 2016
 4          than it did in 2015 was because you and
 5          your comembers were concerned that paying
 6          more money to Short Duration Partners meant
 7          that Mr. Iacovacci was going to participate
 8          in those and, therefore, you had every
 9          incentive in the world to redirect those
10          payments to entities in which you held
11          interest and you believed Mr. Iacovacci
12          didn't?
13                    MR. SOLOMON:   Object to the
14               question.
15               A.    Absolutely not.
16               Q.    How do you say that
17          definitively but not have any explanation
18          for why the numbers changed?
19               A.    Because I know we would never
20          make a decision like that.
21               Q.    Out of character?
22               A.    Out of fiber and the essence of
23          our firm.
24               Q.    If you had artificially
25          depressed the payments that were going to
```

D. MONTICCIOLO

1
2    Partners, you would agree with me that that
3    would constitute a breach of fiduciary duty
4    in your view towards your comembers at the
5    Partners level, correct?
6         A.    No.
7         Q.    You think that would be
8    consistent with your fiduciary duties, if
9    you had artificially depressed the payments
10   that were being made to Short Duration
11   Partners, LLC?
12        A.    No.
13        Q.    Well, how could it be both,
14   consistent and inconsistent?
15        A.    I'm sorry, I may have missed
16   the second question.
17        Q.    Yeah, I just asked an open
18   ended.  Would you think that --
19              Do you think that would be
20   consistent with your fiduciary duties to
21   your comembers at the Partners level?
22        A.    If, if conjecturally,
23   hypothetical that is only the thing that
24   happens or something.  It's a hypothetical
25   question, I can't answer that.

```
 1                    D. MONTICCIOLO
 2        Q.    Altering the fees that are paid
 3   pay short duration fund would be something
 4   that would concern the SEC, in your view,
 5   correct?
 6        A.    I am not qualified to answer
 7   that question.  Especially as I sit here
 8   now, no, I don't know.
 9        Q.    You don't know the answer to
10   that question one way or the other?
11        A.    Correct.
12        Q.    Did you have any discussions
13   whatsoever with anybody about wanting to
14   limit the amount of fees that the onshore
15   short duration fund would pay Partners in
16   connection with or in anyway related to
17   Mr. Iacovacci's departure from Brevet in
18   2016?
19        A.    To the best of my recollection,
20   no.
21        Q.    You don't recall any
22   discussions at all on this topic with
23   anybody, right?
24        A.    To the best of my recollection,
25   I do not recall any conversation like that.
```

```
 1                    D. MONTICCIOLO
 2              MR. CYRULNIK:  Why don't we go
 3         off the record for a moment.
 4              THE VIDEOGRAPHER:  The time is
 5         4:39 and we are going off the record.
 6              (Whereupon, an off-the-record
 7         discussion was held.)
 8              THE VIDEOGRAPHER:  The time is
 9         4:46 and we are back on the record.
10    CONTINUED EXAMINATION
11    BY MR. CYRULNIK:
12         Q.    Mr. Callahan, when did you
13    first become aware that Mr. Lan had taken
14    materials from the Dell OptiPlex computer
15    in Mr. Iacovacci's home?
16         A.    When would I have learned, I
17    don't know exactly when I learned of it.
18         Q.    Do you know if it was within
19    days of his having done it?
20         A.    I don't want to guess that it
21    was days.
22         Q.    Would you say it was shortly
23    thereafter?
24         A.    I would say likely.
25         Q.    And did you or were you
```

Page 401

D. MONTICCIOLO

1
2    involved with what was ultimately done with
3    the materials that were taken from the Dell
4    OptiPlex computer in Mr. Iacovacci's home?
5              MR. SOLOMON:  I didn't hear the
6         question.
7         Q.    Were you personally involved
8    with reviewing or maintaining the materials
9    that were taken from the Dell OptiPlex
10   computer in Mr. Iacovacci's home by
11   Mr. Lan?
12        A.    No, not that I recall.
13        Q.    What happened to the
14   physical --
15             MR. CYRULNIK:  Withdrawn.
16        Q.    What happened to those
17   materials that were taken, to your
18   knowledge; were they put on a hard drive
19   and stored?  Were you involved in any way
20   with that piece of the aftermath of the
21   download of those materials?
22        A.    I was not involved in that.
23             MR. CYRULNIK:  If you could
24        take a look at Exhibit 9, please.
25             (Whereupon, the aforementioned

1          D. MONTICCIOLO

2          January 25, 2016 e-mail chain was

3          marked as Plaintiff(s)' Exhibit 9 for

4          identification as of this date.)

5               MR. CYRULNIK:  There is no way

6          you can get credit for Doug's

7          technical prowess, Lou, so this is

8          going to require an entire new

9          examination of what role he played.

10              THE WITNESS:  I am in training.

11              MR. SOLOMON:  And I asked him

12         to say this just as a decoy.

13              MR. CYRULNIK:  Well

14         choreographed.

15              MR. SOLOMON:  Exhibit 9 is on

16          the screen.

17     Q.    All right, do you recognize

18     this document, Mr. Monticciolo?

19     A.    I am reading it here.  I don't

20     recognize, it looks like an e-mail.

21     Q.    If you scroll down, you will

22     see Mr. Lan e-mails on January 25th of

23     2016, at 3:41 p.m. -- well, sorry, scroll

24     down further, you will see that there is an

25     e-mail exchange from you to Mr. Lan on

```
 1                    D. MONTICCIOLO
 2     January 25th, where you wrote subject line
 3     "what did you learn on the PC front," do
 4     you see that?
 5          A.    I do.
 6          Q.    Do you recall asking Mr. Lan
 7     what he learned on the PC front?
 8          A.    I do not.
 9          Q.    Do you know whether this refers
10     to the PC that is the Dell OptiPlex
11     computer that was in Mr. Iacovacci's home
12     that you are asking about?
13          A.    Let me read through this.
14               I -- drawing from Lanny's --
15     Lanny's -- Johnny Lan's first sentence is
16     Paul's old machine, I presume it does not.
17          Q.    Do you know what it refers to,
18     then?
19          A.    It says, "We found the drive
20     that was in Paul's old home computer."
21          Q.    And what does that refer to?
22          A.    Paul's old home computer drive.
23          Q.    Do you remember that
24     Mr. Iacovacci had a home computer?
25          A.    Yes.
```

```
 1              D. MONTICCIOLO
 2        Q.    Okay.  And is that different
 3    from the Dell OptiPlex that we have been
 4    talking about?
 5        A.    I can't answer that
 6    definitively.
 7        Q.    Okay.  Do you see Mr. Lan says
 8    to you that he found or we found the drive
 9    that was in Paul's old home computer.  It's
10    still intact with the original files, do
11    you see that?
12        A.    Correct.
13        Q.    Do you recall Mr. Lan reporting
14    to you that he found a drive that was in
15    Paul's old home computer that was still
16    intact with original files?
17        A.    I don't recall specifics, you
18    know, of that conversation or e-mail.
19        Q.    Okay.  Mr. Lan asks you what he
20    should do with the old -- with the drive
21    from Mr. Iacovacci's old home computer, do
22    you see that?
23        A.    I do.
24        Q.    And you told him to drop it in
25    your office, right?
```

```
 1                    D. MONTICCIOLO
 2         A.     That is what the e-mail says,
 3     yes.
 4         Q.     Why did you tell him to drop it
 5     in your office?
 6         A.     I am the one with the most room
 7     in the office and that is where I believe
 8     at the time all the old computers and stuff
 9     was dumped.
10         Q.     You told him to drop it in your
11     office because you thought that drive might
12     not fit in another office, like one by the
13     IT department, for example?
14         A.     We were in very small space
15     with very limited space, so I think if I
16     read down here, it's the same thing I
17     believe we did with other computers.
18         Q.     Do you recall how large
19     physically the drive was, how much space it
20     took up?
21         A.     No.
22         Q.     Would you think it would be
23     more than several square inches?
24         A.     I would think it's not a space
25     question, it could be several inches, it's
```

Page 406

                    D. MONTICCIOLO

1
2      a matter of just a place to put it where it
3      doesn't get lost.
4           Q.    What did you do with it,
5      Mr. Monticciolo?
6           A.    I have no recollection of it
7      even being in my office.
8           Q.    Did you review it?
9           A.    I would have no ability to
10     review a disk drive.
11          Q.    You asked for the old drive to
12     be dropped off in your office and you did
13     nothing with it, as you recall?
14          A.    Yes.
15               MR. CYRULNIK:  All right, let's
16           take a look at the next exhibit,
17           Exhibit 10.  And this is the 30(b)(6)
18           notice that we served and that we
19           referenced earlier today.
20               (Whereupon, the aforementioned
21           30(b)(6) Notice was marked as
22           Plaintiff(s)' Exhibit 10 for
23           identification as of this date.)
24               MR. CYRULNIK:  Please tell me
25           when you have that up on your screen.

Page 407

```
 1                  D. MONTICCIOLO
 2            MR. SOLOMON:  I observe that I
 3        did not have to -- I did not have to
 4        refresh.
 5               It's on the screen.
 6            THE WITNESS:  We are getting
 7        better.
 8            MR. SOLOMON:  The page one is
 9        on the screen, is that what you want?
10            MR. CYRULNIK:  Yeah, that's
11        fine, we can start there.  Let me
12        just ask a couple of other quick
13        questions before we get to the
14        document.
15        Q.    In 2014, Mr. Monticciolo, you
16     instructed Karina Dinershteyn to eliminate
17     Mr. Iacovacci's interests at the fund
18     level, do you recall that?
19        A.    No.
20        Q.    Do you recall having any
21     discussions with Ms. Dinershteyn about that
22     subject matter?
23        A.    No.
24        Q.    You don't recall there coming a
25     time when you needed to do something with
```

Page 408

D. MONTICCIOLO

1   respect to your house that you thought

2   would benefit from eliminating

3   Mr. Iacovacci's interest at the fund level?

4
5          A.     No.

6          Q.     Who is Robert Nokley?

7          A.     One of our sourcing business

8   relationships.

9          Q.     When you say our, you mean

10  Brevet's?

11         A.     Correct.

12         Q.     Is it your testimony that

13  Brevet has engaged in deals with respect to

14  which Mr. Nokley served as a sourcing -- as

15  a sourcer?

16         A.     I don't know if he was a

17  sourcer or principal or counterparty.  It's

18  a name that's been around the firm for

19  years.

20         Q.     Do you know whether Brevet has

21  ever done a transaction that involved

22  Mr. Nokley?

23         A.     As I sit here, without looking,

24  I couldn't tell you.

25         Q.     Where would you look to confirm

```
1                      D. MONTICCIOLO
2      that?
3           A.    I would look in the history of
4      all of the assets that we have done.
5           Q.    You have like a centralized
6      database that sort of catalogs all of the
7      assets that you have done?
8           A.    In sorts, yes.
9           Q.    Did you say in source?
10          A.    In form, yes.
11          Q.    Okay.  Is there a name for
12     that?
13          A.    I am not the person who knows
14     the name.
15          Q.    Okay.  There is a name but you
16     just don't know it?
17          A.    Yeah, I don't know what they
18     call it.
19          Q.    Okay.  You have easy access to
20     that database?
21          A.    I, I don't believe I know where
22     it is.
23          Q.    Is it accessible on the Brevet
24     server?
25          A.    I, I would have to ask the
```

```
 1                    D. MONTICCIOLO
 2      people who have access to those materials.
 3           Q.    Have you ever accessed it
 4      through the Brevet server?
 5           A.    I don't recall over the years
 6      if I have.
 7           Q.    Have you ever spoken with Bob
 8      Nokley?
 9           A.    Yes.
10           Q.    About how many times over the
11      years?
12           A.    I don't recall.
13           Q.    Would you say more or less than
14      ten?
15           A.    I don't recall.
16           Q.    What do you think of
17      Mr. Nokley?
18           A.    I don't profess opinions of
19      people.
20           Q.    Brevet many times rejected
21      deals that Mr. Nokley had proposed Brevet
22      consider; do you recall that?
23           A.    I do not.
24           Q.    You don't recall Mr. Nokley
25      proposing deals and Brevet turning them
```

                    D. MONTICCIOLO

1
2   down multiple times?

3        A.    I would have to look to see if
4   we did that.

5              We see --

6        Q.    Do you recall --

7        A.    -- a lot deals.

8        Q.    Sorry, I didn't mean to cut you
9   off.  Finish your answer, please.

10       A.    It's all right, I was done.

11       Q.    You don't recall ever rejecting
12  a deal that was brought to you by
13  Mr. Nokley?

14       A.    I don't recall.

15       Q.    Do you recall whether
16  Mr. Nokley ever brought you a deal?

17       A.    Given I have spoken to him, I
18  don't recall a specific deal, but I would
19  say yes.

20       Q.    So sitting here today, you
21  don't recall whether Brevet ever did one of
22  his deals, whether Brevet ever rejected one
23  of his deals, whether Brevet did all of his
24  deals or whether Brevet rejected all of his
25  deals, fair?

```
1                    D. MONTICCIOLO
2          A.      Fair.
3          Q.      Do you recall Mr. Iacovacci
4    once bringing you a deal that would have
5    been sourced by Mr. Nokley and you raising
6    your voice towards Mr. Iacovacci and
7    telling him not to ever bring a Nokley deal
8    to you again?
9          A.      No.
10         Q.      In substance, do you recall an
11   episode like that?
12         A.      No.
13         Q.      Do you recall ever expressing
14   the sentiment to Mr. Iacovacci that you had
15   no intention of doing any deals that
16   involves Robert Nokley?
17         A.      I do not recall.
18         Q.      What is the smallest deal that
19   Brevet has done, what is the smallest
20   amount of financing that Brevet has ever
21   extended to a counterparty in your
22   recollection?
23         A.      We really don't have a minimum.
24   It's got to be in the few thousands.
25         Q.      But you don't recall how many
```

1                    D. MONTICCIOLO
2      thousands would have been the smallest deal
3      that you have ever done?
4           A.    We do a lot of transactions,
5      no.
6           Q.    So if someone came to you with
7      a deal for, say, $50,000, is it your
8      testimony that Brevet would have diligenced
9      that deal, subject to it meeting other
10     criteria?
11          A.    Yes.
12          Q.    Can you tell me, sitting here
13     today, whether Brevet ever looked at --
14     diligenced a deal that was below $50,000 in
15     financing?
16          A.    Yes.
17          Q.    What deal are you thinking of?
18          A.    I can't give you the specific
19     name.
20                Many.
21          Q.    Many deals, Brevet has
22     diligenced many deals under $50,000?
23          A.    Yes.
24          Q.    And has that happened since,
25     say, 2016?

```
 1                    D. MONTICCIOLO
 2         A.    Since, it's --
 3               Since and before.
 4         Q.    Yeah, I appreciate that; I am
 5    focusing on period of 2000 -- say, 2016 and
 6    beyond.
 7               It's your testimony that Brevet
 8    has diligenced deals that were less than
 9    $50,000 in financing since 2016, right?
10         A.    Yes.
11         Q.    Has Brevet ever entered into
12    any of those deals?
13         A.    Yes.
14         Q.    Sitting here today, can you
15    identify any deal that Brevet has entered
16    into since 2016 where the total financing
17    amount or total closing amount was less
18    than $50,000?
19         A.    Sitting here right now, I can't
20    give you the specifics.  As I said, we do a
21    lot of deals.
22         Q.    Where would you go to find that
23    information for me?
24         A.    Again, I would go to the
25    origination finance, other people in the
```

Page 415

1                    D. MONTICCIOLO

2     firm.

3          Q.     That they have a catalog of

4     those deals?

5          A.     Yes.

6          Q.     How about a $20 deal, would

7     Brevet extent a $20 loan or financing to a

8     counterparty?

9          A.     Of financing $20 has happened.

10         Q.     What do you mean by that; you

11    are saying Brevet has done a deal for where

12    the total amount that was requested and

13    expended was a $20 financing?

14         A.     Yes.

15         Q.     What was that deal?

16         A.     I don't recall the specific

17    deal.

18         Q.     But why would Brevet, a

19    sophisticated, regulated hedge fund, extend

20    a $20 loan to another entity without any

21    other amounts anticipated?

22         A.     Probably because it was related

23    to a deal that was already funded and it

24    was an additional funding, maybe to

25    reimburse a water fee or to fund a water

```
 1                    D. MONTICCIOLO
 2      fee.
 3           Q.     Well, thanks for clarifying.
 4                  So Brevet wouldn't engage in a
 5      transaction that was in total a $20
 6      financing, it would only do so if it was
 7      part of a larger transaction that had much
 8      greater numbers; is that a fair account of
 9      your testimony?
10           A.     For $20, yes.
11           Q.     Okay.  Who is Michael
12      Szymanski?
13           A.     He is a consultant in the hedge
14      fund industry.
15           Q.     Did you hire Mr. Szymanski as a
16      consultant with the hope of having him take
17      over the role of Brevet's COO?
18           A.     No.
19                  I hired him to review our --
20      look at our systems and technology.
21           Q.     Okay.  And did Mr. Szymanski,
22      in fact, conduct an assessment of Brevet's
23      operational and compliance issues when he
24      came to Brevet?
25           A.     Unfortunately, we exited our
```

1                    D. MONTICCIOLO
2      relationship -- terminated our relationship
3      with Mr. Szymanski early.
4           Q.    So did you terminate your
5      relationship with Mr. Szymanski prior to
6      his conducting an assessment of Brevet's
7      operational and compliance issues?
8           A.    I believe he had not even begun
9      to complete or formulate that assessment.
10          Q.    Well, setting aside whether he
11     completed it, did he provide you with an
12     assessment, even in preliminary form, of
13     Brevet's operational and compliance issues?
14          A.    I don't recall.  He wasn't
15     there that long.
16          Q.    Do you recall any of his
17     conclusions?
18                MR. SOLOMON:  Object to form.
19          A.    I do not.
20          Q.    Did he make any recommendations
21     to you?
22          A.    I don't recall.
23          Q.    You don't recall whether he
24     made any recommendations to you,
25     Mr. Monticciolo?

Page 418

D. MONTICCIOLO

1

2       A.      Correct.

3       Q.      Did he raise any concerns about

4   Brevet's operational and compliance issues

5   with respect to its obligations under the

6   SEC rules?

7       A.      I don't recall.

8       Q.      Do you recall terminating the

9   engagement early, as you described

10  previously, because he expressed concerns

11  to you about Brevet's offering documents?

12      A.      I very clearly recall

13  terminating him because he had engaged a

14  third party without following our policies

15  and procedures and without our authority.

16      Q.      So you don't recall any

17  concerns he raised to you about Brevet's

18  offering documents?

19      A.      I don't recall that.

20      Q.      How about its investor decks?

21      A.      I don't recall that.

22      Q.      Did he raise concerns to you

23  about any other representations that Brevet

24  was making to investors?

25      A.      I don't recall.

```
 1                    D. MONTICCIOLO
 2          Q.    It's fair to say that you an
 3    Mr. Szymanski had gotten into several
 4    heated discussions?
 5          A.    Yes.  Over almost committing
 6    the firm through a third party we hadn't
 7    agreed to, yes.
 8          Q.    How soon after hiring
 9    Mr. Szymanski to conduct the review do you
10    recall his being terminated or being asked
11    to leave Brevet?
12          A.    I don't recall.
13          Q.    Was he looking at Brevet's
14    compliance with retentions of records, for
15    example?
16          A.    I don't recall.  Not that I am
17    aware of.
18          Q.    Given the time left, let's take
19    a look at the exhibit.
20                First topic, which you can find
21    on page 6 of the exhibit.
22                I am going to ask you -- you
23    can read that and tell me when you are
24    ready, I am going to ask you a question or
25    two on that to topic.
```

Page 420

                              D. MONTICCIOLO

1

2          A.      And where specifically?

3                  MR. SOLOMON:   Page six, under

4           topics is up.

5          Q.      Do you see topic one,

6      identification of each of defendants'

7      claimed trade secrets?

8          A.      Identification of each of

9      defendants' claimed trade secrets, okay.

10         Q.      Okay.

11         A.      Read this.

12                 How much are you going to

13     reference?

14         Q.      Yes, I will ask you the

15     question; if you need to read anything, you

16     let me know.   Are you ready?

17         A.      Just one second.   Sorry.

18                 I read the first paragraph

19     there.

20         Q.      Okay.   So I am going to ask you

21     to identify each of the trades secrets you

22     claim, and by you I mean Brevet, and the

23     defendants in this litigation claim that

24     Mr. Iacovacci misappropriated, but to make

25     things a little easier going forward and

Page 421

```
 1                    D. MONTICCIOLO
 2      more efficient, given the time, I am going
 3      to ask you to place them into one or the
 4      other of two categories.
 5                 Category one is trade secrets
 6      for which you have identified some harm to
 7      Brevet from the alleged misappropriation
 8      and category two is trade secrets for which
 9      you have not been able to identify to
10      Brevet from the alleged misappropriation,
11      okay?
12           A.    Okay.
13           Q.    Okay.  So let's start, can you
14      identify the trade secrets that you claim
15      Mr. Iacovacci has misappropriated by way of
16      reference to the two categories that I just
17      asked you to place them into?
18           A.    So the first one was identified
19      damage, the second one is not yet
20      identified damage, correct?
21           Q.    Yes.  The first one would be
22      trade secrets for which you have identified
23      some damage to the Brevet from the alleged
24      misappropriation.
25           A.    And we are going to do this
```

```
                        D. MONTICCIOLO
 1
 2     before 5:30, okay.
 3          Q.    We are going to do our best.
 4          A.    Okay.  So, first, is all of our
 5     investor lists, our sourcing clients.
 6          Q.    Is that one thing, investor
 7     lists, sourcing clients, or is that two
 8     things?
 9          A.    Those are two things.
10          Q.    Okay.
11          A.    Our unique materials, our
12     formats, our track record.
13          Q.    I just want to make sure I have
14     the categories, Mr. Monticciolo.
15                So I have all investors lists;
16     all sourcing clients, that is number two;
17     number three, unique -- and I can't even
18     read my own writing, unique what?
19          A.    Our presentation materials.
20          Q.    Presentation materials.
21                And then you said something
22     about formats, the formats of your
23     presentation materials?
24          A.    The format, the content, work
25     product that we had numerous third parties
```

Page 423

```
 1                    D. MONTICCIOLO
 2      and internal people work on.
 3           Q.    Okay, anything else?
 4           A.    The track record.
 5                 The valuation methodologies,
 6      our principles and policies.
 7           Q.    Is that one thing or three
 8      things?
 9           A.    Those are two separate things.
10           Q.    Valuation methodologies is one
11      and then the next one is your principles
12      and methodologies?
13           A.    Uh-huh.
14                 MR. SOLOMON:  Principles and
15             policies.
16           A.    I'm sorry, principles and
17      procedures.
18           Q.    Okay.
19           A.    Our deal sourcing strategy and
20      process.
21           Q.    Okay.
22           A.    Brevet's underwriting
23      documentation, closing transaction
24      policies.
25           Q.    Is that one thing or three
```

D. MONTICCIOLO

1       things or two things?

2            A.     We can make that one.

3            Q.     Underwriting documentation,

4       closing and what?

5            A.     Transaction policies.

6                   Our fund structure.

7                   And all -- I want to be clear,

8       and all of the related documents that that

9       encompasses; which, for time, we can just

10      encompass it as fund structure.

11                  Our tax strategy.

12           Q.     Okay.

13           A.     Our tax opinion.

14           Q.     Your tax opinion, you said?

15           A.     Correct.

16           Q.     What tax opinion?

17           A.     We have a tax opinion for the

18      fund.

19           Q.     That Mr. Iacovacci has

20      misappropriated?

21           A.     I believe I have been informed

22      that he copied that, took it out of the

23      premises of Brevet.  Without written

24      permission.

```
                                      Page 425
 1                  D. MONTICCIOLO
 2           Q.     Anything else?
 3           A.     Our professionals or methods we
 4      use for recovering or producing the
 5      performance we have on our assets.
 6           Q.     Sorry, did you say
 7      professionals?
 8           A.     The professionals and how we
 9      use them to achieve the performance that we
10      do on our assets.
11           Q.     That's one thing, that is one
12      trade secret, your professionals and how
13      you use them?
14           A.     It's a category or group of
15      stuff.
16           Q.     Professionals and how we use
17      them for what?
18           A.     For recovering performing on
19      our assets.  Our investments.
20           Q.     Okay.
21           A.     Our documents on our loans.
22           Q.     Okay.
23           A.     Our sourcing strategy and
24      structure.
25           Q.     Is that different from number
```

```
                         D. MONTICCIOLO
1
2    seven, deal sourcing strategy and process?
3         A.    Yes.
4         Q.    What is the difference between
5    category sixteen and category seven?
6         A.    The first one is once you have
7    the asset and move it through and the
8    second one is how do you even identify
9    where to get the asset and through what
10   mechanisms you get it to up number seven.
11        Q.    Okay.
12        A.    Our regulatory framework.
13              That includes SEC, Homeland
14   Security.
15              Our various board structures,
16   including our independent conflicts board,
17   and how they operate.
18        Q.    Okay.
19        A.    You want me to keep going?
20        Q.    I want you to give me a
21   complete list, so if there is more on the
22   list.
23        A.    Okay.  How we --
24        Q.    Let me ask you a question, are
25   you reading from something or this is just
```

Page 427

```
 1                    D. MONTICCIOLO
 2    off?
 3          A.     This is the essence of our
 4    firm.  It's why we are unique.
 5                 MR. SOLOMON:  I'm sorry, he
 6            asked if you are reading from
 7            something.
 8          A.     No, I'm not reading from
 9    something.
10                 MR. SOLOMON:  Because he can't
11            see, because we are not --
12          A.     No, no, no.
13                 MR. SOLOMON:  He is not reading
14            from anything.
15          A.     This is --
16          Q.     Unless you can provide me with
17    a document, I am going to need you to just
18    answer the question orally, so the answer
19    is yes.  I mean, if there is more --
20          A.     I am not reading from
21    something.  Yes, sorry.
22                 So the legal structure that we
23    use to originate those assets in the
24    various ways, the various mechanisms and
25    vehicles, entities we use to do that.
```

D. MONTICCIOLO

1

2    Q.    Those are trade secrets too, in
3    your view?

4    A.    Oh, definitively.

5    Q.    Okay.

6    A.    The methods we use to create
7    competitive barriers in our investment
8    strategy is one category, in our asset an
9    origination, sourcing.  Keep it simple,
10   sourcing.  And our operations of how we
11   keep it unique.

12   Q.    Anything else?

13   A.    Which third parties we use for
14   the management and administration of the
15   fund.  And how they are engaged and their
16   roles.

17         The technology that we use to
18   keep all of our trade secrets secure and
19   secret, protected, how we use them.

20         Our cyber security framework.
21   Our compliance procedures.  And our
22   corporate structure.

23   Q.    Okay, did I get everything
24   here?

25   A.    I think that is sufficient.

```
 1                 D. MONTICCIOLO
 2          Q.    Mr. Monticciolo, it's fair to
 3     say you are not a trade secrets lawyer?
 4          A.    What was that again?
 5          Q.    Is it fair to say you are not a
 6     trade secrets lawyer?
 7          A.    I am not myself, but we are one
 8     of the largest people involved in things
 9     like intellectual property.
10          Q.    Okay.  It's your contention, is
11     it not, that each of the -- and I counted
12     26 -- categories of things that you just
13     identified in your view is a trade secret
14     that is owned by Brevet, correct?
15          A.    Correct.
16          Q.    And it's your view that
17     Mr. Iacovacci misappropriated each and
18     every one of the 26 categories of trade
19     secrets that you claimed to have identified
20     in response to my last question?
21          A.    From what I have been made
22     aware, yes.
23          Q.    Who told you that?
24          A.    In the materials I have seen
25     produced in the case.
```

Page 430

1                    D. MONTICCIOLO
2          Q.    The materials you have seen
3     produced in the case, what types of
4     materials are you referring to when you say
5     that?
6          A.    The, the --
7                THE WITNESS:  (Inaudible.)
8                Interrogatory, thank you.
9          A.    The interrogatory.  Sorry.
10         Q.    Which interrogatory do you have
11    in mind?
12         A.    I can't answer that
13    specifically in front of me.
14         Q.    Is it an interrogatory that was
15    from the Brevet side or from Mr. Iacovacci?
16         A.    I would have to go look to be
17    able to tell you.
18         Q.    It's your understanding that
19    there is an interrogatory that provides the
20    information that we just went through?
21         A.    I can't tell you that without
22    looking at them.
23         Q.    Okay, but that's -- sitting
24    here today, that's your best recollection
25    as to the basis for your last answer, some

Page 431

1                     D. MONTICCIOLO
2      interrogatory in this case, you just don't
3      know which one?
4              A.      Correct.
5                      I am not a lawyer.
6              Q.      Okay.  All of the 26 categories
7      you listed are designed to fit into the
8      first of the two categories that I asked
9      you to identify, that is alleged trade
10     secrets that were allegedly misappropriated
11     by Mr. Iacovacci and that caused damage to
12     Brevet?
13             A.      Correct.
14             Q.      Okay, are there any trade
15     secrets that would fit into the second
16     category that I asked you about?
17             A.      Yes.
18             Q.      All right, let's get that list,
19     please.
20             A.      Which recruiters we use.  How
21     we recruit people.  Various forms of how,
22     you know, payroll is done, benefits.
23             Q.      Is that two different
24     categories there, payroll and benefits, or
25     is that one set of trade secrets?

Page 432

1                    D. MONTICCIOLO

2         A.    They -- I believe they are

3    separate.

4         Q.    Separate, okay.

5              So you have proprietary methods

6    for dealing with payroll and for dealing

7    with benefits?

8         A.    They are specific to us, yes.

9         Q.    What do you mean by specific to

10   you?

11        A.    They are -- they are

12   specifically our benefits and our payroll

13   process.

14        Q.    Okay, and they are proprietary,

15   in your view?

16        A.    In my view, yes.

17        Q.    In your view, and, again, by

18   you with respect to these questions, at

19   least, I am referring to the corporate

20   entities that you are representing in

21   giving this testimony?

22        A.    Yes.

23        Q.    Okay.  Keep going.

24        A.    Vacation policies.

25        Q.    Vacation policies, what --

```
 1                    D. MONTICCIOLO
 2        A.    Vacation days, what the
 3   holidays are.
 4        Q.    What the holidays are, yeah.  I
 5   get that.  So that's proprietary to you,
 6   okay.  What else?
 7        A.    Which --
 8        Q.    And there any proprietary
 9   holidays that you haven't informed the rest
10   of the world about?
11        A.    Which ones Brevet views to be
12   holidays and how we handle holidays.
13        Q.    How does Rosh Hashanah fit on
14   that list; is that a proprietary holiday in
15   your view?
16        A.    I didn't say that the holiday
17   is proprietary, I said the holidays and how
18   we manage them.
19        Q.    Okay.
20        A.    Make them available.
21        Q.    My mistake, sorry.  Keep going.
22        A.    Which, which countries our
23   funds are in.
24        Q.    The countries are trade
25   secrets, the list of countries that your
```

```
 1                    D. MONTICCIOLO
 2      funds are in?
 3           A.    Again, trade secret is
 4      something that's unique and proprietary to
 5      us.
 6           Q.    So yes?
 7           A.    Correct.
 8           Q.    As an aside, as a regulated
 9      entity, you don't disclose publically where
10      your funds are located, what countries your
11      funds are located in?
12           A.    No.
13           Q.    Okay.
14           A.    And, similarly, the -- I think
15      this is probably under the first one of the
16      geography of our investors, so we will keep
17      that under our first category.
18                 I am trying to think of what
19      else is under the second category.
20           Q.    Okay.  Take your time.
21           A.    At this time, I am sure there
22      are more, but I don't recall them off the
23      top of my head.
24           Q.    Well, you understand that you
25      are here as a 30(b)(6) witness, so you
```

```
 1                    D. MONTICCIOLO
 2    presumably prepared to provide the list
 3    that I just asked you for, are there any
 4    other categories that you have identified
 5    or trade secrets that you have not listed
 6    in response to my question?
 7          A.    To the best that I can
 8    remember, these are the ones that I
 9    remember.
10          Q.    Did that second list in
11    response to what I will call question 1B
12    that I asked you, did that also come from
13    interrogatory responses?
14          A.    I don't recall.
15          Q.    You don't know where that came
16    from?
17          A.    I didn't differentiate them
18    that way in my mind.
19          Q.    That is fair, but do you know
20    where it came from, the list?
21          A.    I don't, because I wasn't
22    looking to do that differentiation.
23          Q.    What did Mr. Iacovacci do to
24    misappropriate Brevet's holiday policies?
25          A.    I don't know specifically.
```

Page 436

```
 1                     D. MONTICCIOLO
 2               Did he?
 3        Q.    I don't know, you're the
 4   witness.
 5               Do you know whether he
 6   misappropriated Brevet's proprietary
 7   vacation policies?
 8               MR. SOLOMON:  Just, by the way,
 9          it's 5:25 (Inaudible.)
10               THE WITNESS:  I do.  I do have
11          five more minutes.
12        A.    Again, I said our holiday
13   policy approach or policy, not the specific
14   holidays.  I don't recall specifically what
15   he did with those.
16        Q.    Well, you are here in the
17   30(b)(6) capacity, Mr. Monticciolo, I
18   believe your testimony is that you are
19   alleging that Mr. Iacovacci misappropriated
20   the proprietary trade secrets contained in
21   Brevet's vacation policies, if I understood
22   your testimony correctly, and I am asking
23   you are you asserting that Mr. Iacovacci
24   did, in fact, misappropriate your --
25   Brevet's vacation policies?
```

```
                      D. MONTICCIOLO
 1
 2        A.     If he copied Brevet materials
 3   outside of Brevet, that is a violation of
 4   our policies and procedures protecting our
 5   trade secrets, then yes.
 6        Q.     Okay, well, the two follow-up
 7   questions I have to that answer,
 8   Mr. Monticciolo, are, number one, I would
 9   like an answer that doesn't start with the
10   word if, because I am asking you for your
11   view.
12             I don't want a contingent view,
13   I want to know whether or not, sitting here
14   today, Brevet is contending and asserting
15   claims in a federal lawsuit that
16   Mr. Iacovacci misappropriated the trade
17   secrets contained in Brevet's vacation
18   policy, yes or no?
19        A.     Yes, amongst many others.
20        Q.     What is the basis for your
21   assertion that Mr. Iacovacci
22   misappropriated Brevet's confidential,
23   proprietary trade secret vacation policies,
24   policies concerning holidays?
25        A.     The policies clearly state
```

Page 438

D. MONTICCIOLO

1    
2    Brevet material cannot be copied outside of
3    the Brevet environment without written
4    authorization, they need to be protected,
5    destroyed if they leave the firm and
6    numerous other policies and procedures that
7    were violated.
8         Q.    Are the vacation policies and
9    trade secrets that you are referring to
10   written down?
11        A.    Yes.
12        Q.    And are they in the form of an
13   e-mail or a document, what is it?
14        A.    The employee manual, which is
15   attested to, including by Paul, and
16   reviewed and approved by him.
17        Q.    The vacation policies and the
18   trade secrets associated with them are
19   written down in the employee manual; did I
20   get that right?
21        A.    Amongst others, but yes.
22        Q.    Amongst other things that are
23   written down in the employee manual?
24        A.    You asked about the vacation
25   policy.

```
 1                    D. MONTICCIOLO
 2          Q.    Yeah, I just wanted to clarify
 3     what you meant when you added the words
 4     amongst others; you were saying amongst
 5     other things that are in that manual or
 6     amongst other places where your trade
 7     secrets concerning vacation are written
 8     down?
 9          A.    There are other places that are
10     part of our trade secrets where those
11     vacation policies are also available.
12          Q.    And what is the basis for
13     alleging that Mr. Iacovacci misappropriated
14     them?
15          A.    From what I am aware, he copied
16     all of our policies and procedures and
17     handbook outside of Brevet, in violation of
18     our code of ethics, our e-mail policies,
19     our handbook and our right to maintain
20     everything confidential proprietary.
21          Q.    Are your allowed to take your
22     employee handbooks outside of the office?
23          A.    No.
24          Q.    Have you ever done it?
25          A.    No.
```

Page 440

D. MONTICCIOLO

1        

2        Q.    Is it your position that any

3        employee at Brevet who has carried an

4        employee handbook outside of the Brevet

5        office has engaged in federal trade secret

6        misappropriation?

7        A.    We have protected that trade

8        secret by not making our physical handbook

9        and it's on a protected website that only a

10       Brevet employee can access.

11       Q.    Is the answer to my question

12       yes or no, is it your position that any

13       Brevet employee who has carried a Brevet

14       employee manual outside of the Brevet

15       offices has engaged in the violation of

16       federal trade secrets laws?

17       A.    In the hypothetical that there

18       was a manual that you could carry outside

19       our office, it would be in violation of our

20       policies and procedures protecting our

21       trade secrets and proprietary information

22       of Brevet, yes.

23       Q.    I want to make sure that we are

24       not talking past each other.  I appreciate

25       the fact that you are also telling me that

```
 1                    D. MONTICCIOLO
 2      you believe that doing certain things
 3      violates your own policies and procedures,
 4      you understand the difference between
 5      violating a policy or procedure in an
 6      employee handbook or a code of ethics and
 7      engaging in misappropriation of trade
 8      secrets under federal law, right?
 9                MR. SOLOMON:  That question is
10           actually beyond the scope of the
11           30(b)(6) and so I am just going do
12           renew the objection that we made.
13                MR. CYRULNIK:  Yeah, I don't
14           know see how this could possibly be
15           objected to on the grounds that it is
16           beyond the scope of a 30(b)(6) --
17                MR. SOLOMON:  You are asking a
18           30(b)(6) witness whether something
19           violates federal law, do we have to
20           have a long discussions about whether
21           that's a proper question?  It's
22           totally improper and you know that.
23                MR. CYRULNIK:  We certainly
24           don't need to have a long discussion
25           about it, the question was entirely
```

```
 1                    D. MONTICCIOLO
 2          proper, but I don't think it's going
 3          to be decided here, so why don't we
 4          leave it aside and your objection is
 5          noted for the record, Mr. Solomon.
 6        Q.    Mr. Monticciolo, do you
 7    appreciate the difference between violating
 8    a code of ethics or an employee policy or
 9    procedure on the one hand and engaging in
10    misappropriation of trade secrets under
11    federal law on the other, yes or no?
12        A.    No.
13        Q.    Okay.
14             MR. CYRULNIK:  Why don't we do
15          this, I am respectful of your time
16          and your commitments and
17          Mr. Solomon's, as well.  As I said at
18          the beginning of this deposition, I
19          think.  We were informed yesterday
20          that you had a hard cutoff of 5:25,
21          which I know you have graciously
22          extended to 5:31 and I know you have
23          an important meeting today or tonight
24          with an unidentified CEO.
25             I think I have covered, you
```

Page 443

                    D. MONTICCIOLO

1
2          know, most of the material I wanted
3          to cover, if not all of the material,
4          on the personal side.
5               I am sure Mr. Solomon and you
6          can appreciate that having gotten a
7          list of some 30-plus trade secrets
8          that are allegedly misappropriated,
9          including having learned the
10         responses that you gave me to my last
11         set of questions over the last few
12         minutes, that how we are in a
13         position where I do have additional
14         questions on the 30(b)(6) topics and
15         so what I would propose is that we,
16         in light of your schedule, break,
17         hold the 30(b)(6) component of the
18         deposition open to try to finish this
19         line of discussion at a time that
20         Mr. Solomon and I can work out and --
21              MR. SOLOMON:  You know what, I
22         am not going to agree to -- I am not
23         going to agree.  You made your
24         statement, I don't agree with it.
25              But I think we were moving a

1            D. MONTICCIOLO
2      little bit more constructively when
3      you told me you were going to go
4      through Mark's stuff and tell me what
5      actually you still needed.  I
6      would --
7            Please do that, so that we can
8      see whether we are going to have
9      something to disagree on or not,
10     okay.  But I think we can let the
11     witness go.
12           MR. CYRULNIK:  Yes.  And, to be
13     clear, I am fine with that approach,
14     just to make sure we are on the same
15     page.
16           I will go through both the
17     30(b)(6) topics in which you were
18     designated, Mr. Monticciolo, and
19     those that Mr. Callahan was
20     designated on together with the
21     transcripts that we are being
22     provided by the court reporters in an
23     effort to try and really cull through
24     and identify which topics we still
25     have questions on.  There certainly

Page 445

```
                        D. MONTICCIOLO
 1
 2        are a few.  And then I will work with
 3        Mr. Solomon to see if we can reach
 4        agreement on who will be siting to
 5        address those topics or the remaining
 6        questions on those topics at a time
 7        that we can both work out and
 8        hopefully we could do that, so.
 9             MR. SOLOMON:  We are repeating
10        ourselves.  I don't agree, but I
11        don't think we have to decide.
12             MR. CYRULNIK:  That is fine,
13        you can state your position on the
14        record, you can just say you don't
15        agree, that's fine.  I want to be
16        clear for the record as to what we
17        plan to do and we certainly plan to
18        try to work together with you, Lou,
19        to work out both --
20             MR. SOLOMON:  Too late.
21             MR. CYRULNIK:  -- a time --
22             MR. SOLOMON:  We are not
23        waiving any of our objections as a
24        result of that, okay.
25             MR. CYRULNIK:  -- mutually
```

Page 446

```
                        D. MONTICCIOLO
 1
 2          agreeable time and witness to address
 3          the remaining 30(b)(6) topics and to
 4          address the Mr. Callahan questions.
 5                 So, with that, I suppose we can
 6          go off the record.  And I will thank
 7          you for your time today,
 8          Mr. Monticciolo.  And --
 9                 MR. SOLOMON:  And the court
10          reporter and the videographer, thank
11          you all very much.
12                 THE VIDEOGRAPHER:  We are off
13          the record at 5:34 p.m. and this
14          concludes today's testimony given by
15          Douglas Monticciolo.
16                 The total number of media units
17          used was five and will be retained by
18          Veritext New York.
19                 (Whereupon, at 5:34 P.M., the
20          Examination of this witness was
21          concluded.)
22
23
24
25
```

Page 447

1                    D. MONTICCIOLO

2                D E C L A R A T I O N

3

4        I hereby certify that having been

5    first duly sworn to testify to the truth, I

6    gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10    of the testimony given by me at the time

11    and place specified hereinbefore.

12

13

14

                _____

15                    DOUGLAS MONTICCIOLO

16

17

18    Subscribed and sworn to before me

19    this _____ day of _____ 20____.

20

21

        _____

22        NOTARY PUBLIC

23

24

25

```
                                        Page 448
 1                  D. MONTICCIOLO
 2                E X H I B I T S
 3
 4     PLAINTIFF EXHIBITS
 5
 6     EXHIBIT    EXHIBIT                    PAGE
 7     NUMBER     DESCRIPTION
 8     Exh 1      Document entitled
                  "Corporate Organizational
 9                Chart"                      65
10     Exh 2      Affidavit from
                  Mr. Callahan               254
11
       Exh 3      Termination letter,
12                dated October 14, 2016    N/A
13     Exh 4      January 12, 2016 e-mail
                  chain                      303
14
       Exh 5      Brevet Direct Lending -
15                Short Duration Fund, L.P.
                  and Subsidiaries
16                Consolidated Financial
                  Statements Year Ended
17                December 31, 2016          385
18     Exh 6      2015 Brevet Short Duration
                  Partners, LLC Profit and
19                Loss Statement             386
20     Exh 7      2016 Brevet Short Duration
                  Partners, LLC Profit and
21                Loss Statement             391
22
23
                  (CONTINUED ON NEXT PAGE.)
24
25
```

Page 449

1                    D. MONTICCIOLO

2      PLAINTIFF EXHIBITS (Cont'd)

3

4      EXHIBIT    EXHIBIT                    PAGE

5      NUMBER     DESCRIPTION

6      Exh 8      Brevet Direct Lending -
                  Short Duration Fund, L.P.
7                 and Subsidiaries
                  Consolidated Financial
8                 Statements Year Ended
                  December 31, 2015        N/A

9

        Exh 9     January 25, 2016 e-mail
10                chain                    401
11     Exh 10     30(b)(6) Notice          406

12

13

14

15                    I N D E X

16

17     EXAMINATION BY                      PAGE
18     MR. CYRULNIK                        6

19

20

21       INFORMATION AND/OR DOCUMENTS REQUESTED
22     INFORMATION AND/OR DOCUMENTS        PAGE
23     (None)

24

25

Page 450

1                    D. MONTICCIOLO

2                 C E R T I F I C A T E

3

4      STATE OF NEW YORK          )
                                  :   SS.:
5      COUNTY OF KINGS            )

6

7           I, CLEO SHENKIN, a Notary Public for

8      and within the State of New York, do hereby

9      certify:

10          That the witness whose examination is

11     hereinbefore set forth was duly sworn and

12     that such examination is a true record of

13     the testimony given by that witness.

14          I further certify that I am not

15     related to any of the parties to this

16     action by blood or by marriage and that I

17     am in no way interested in the outcome of

18     this matter.

19          IN WITNESS WHEREOF, I have hereunto

20     set my hand this 21st day of October 2021.

21

22

23     CLEO SHENKIN

24

25

Page 451

1                        ERRATA SHEET
                    VERITEXT LEGAL SOLUTIONS
2
     CASE NAME: Iacovacci, Paul v. Brevet Holdings, LLC, 18-Cv-08048
   (S.D.N.Y.)
3    DATE OF DEPOSITION: 10/7/2021
     WITNESSES' NAME: Douglas Monticciolo
4
5      PAGE   LINE (S)        CHANGE              REASON
       ____|_____|_____|_____
6
       ____|_____|_____|_____
7
       ____|_____|_____|_____
8
       ____|_____|_____|_____
9
       ____|_____|_____|_____
10
       ____|_____|_____|_____
11
       ____|_____|_____|_____
12
       ____|_____|_____|_____
13
       ____|_____|_____|_____
14
       ____|_____|_____|_____
15
       ____|_____|_____|_____
16
       ____|_____|_____|_____
17
       ____|_____|_____|_____
18
       ____|_____|_____|_____
19
       ____|_____|_____|_____
20
21                                      _____
                                        Douglas Monticciolo
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS _____ DAY OF _____, 20__.
23
24
     _____              _____
25   (NOTARY PUBLIC)                     MY COMMISSION EXPIRES:

**&**

**&**   3:17

**0**

**08048**   1:6 5:4
  451:2

**1**

**1**   3:17 4:17 50:7
  50:11,17,22 53:16
  65:15,23 66:6
  67:4,18 70:22
  90:16 138:18
  141:14 304:8,11
  448:8
**10**   122:18,20
  123:10 124:5,18
  227:2 406:17,22
  449:11
**10/7/2021**   451:3
**100**   49:19 68:4,10
  68:20 69:17
**10006**   2:5
**10022**   2:9
**10:05**   90:14
**10:15**   90:20
**11:55**   181:24
**12**   82:17 83:12,25
  87:11,20 304:2
  448:13
**1200**   48:22
**12:12**   182:6
**12th**   304:18
**14**   256:9,20 257:19
  331:6 448:12
**14th**   332:3 333:18
  364:20 365:15
**15**   216:25 301:24
  303:12
**16**   301:24 386:11
**17th**   366:13 375:7

**18**   82:18 83:25
  84:11 86:17,21
  377:16 451:2
**18th**   366:14 375:7
**1:18**   1:6 5:4
**1:24**   255:7
**1:31**   255:12
**1:49**   271:14
**1b**   435:11
**1st**   66:16 69:10,18
  69:25

**2**

**2**   90:22 182:2
  254:10,14,21
  255:19 448:10
**20**   43:23 124:16
  415:6,7,9,13,20
  416:5,10 447:19
  451:22
**2000**   114:18
  342:23 414:5
**2004**   247:22 362:4
**2011**   256:8,19
  257:18 258:11
  259:9,16 260:19
  261:12
**2012**   279:22
**2013**   103:24 104:3
**2014**   301:24
  303:12 407:15
**2015**   62:23 63:25
  64:17 234:22,23
  235:3,6 264:23
  265:5,18 320:11
  386:18 387:4,11
  388:3,16 389:8
  391:8 392:15,22
  393:7 394:3,17
  397:4 448:18
  449:8

**2016**   57:7,23 58:11
  66:16 67:8,11,12
  67:18,21 68:9
  69:2,10,18,25
  73:22,23 74:6
  75:4 103:21
  234:22,23 256:9
  256:20 257:19
  259:10,17 260:19
  261:12 267:17,24
  275:5,11 277:8
  278:5,11 286:23
  287:7 303:12
  304:2 305:11
  312:22 315:13
  319:13 322:21
  328:18 331:6
  332:4 333:18
  337:10 338:4
  342:16,24 343:12
  347:16 351:6
  360:25 362:19
  363:2,13,18
  364:20 365:15
  366:14 385:14
  386:8 391:8,17
  392:8,15,22,25
  393:7 394:3,17
  396:19,23 397:3
  399:18 402:2,23
  413:25 414:5,9,16
  448:12,13,17,20
  449:9
**2017**   73:6
**2018**   235:3
**2020**   223:8 225:25
  226:13,22 227:17
  228:14 235:7
**2021**   1:11 4:4
  129:18 450:20

**21st**   450:20
**22nd**   2:9
**23**   49:16 55:5
  56:11 68:23 70:19
  71:21 72:9
**24**   39:18
**240**   395:23
**240,000**   392:24
**24399**   450:22
**25**   43:24 44:18,22
  45:12 46:16
  340:22 342:10
  356:22 402:2
  449:9
**250**   234:3
**250,000**   227:9
  393:7
**254**   448:10
**25th**   402:22 403:2
**26**   429:12,18 431:6
**2:30**   271:19

**3**

**3**   182:8 255:8
  393:11,11 448:11
**3.1**   388:8,14 389:6
  389:13 392:23
  393:6 395:23
**30**   1:16 3:16 17:22
  40:15,20 41:9,16
  42:2,10 79:16
  134:15 406:17,21
  434:25 436:17
  441:11,16,18
  443:7,14,17
  444:17 446:3
  449:11
**303**   448:13
**31**   385:14 386:11
  448:17 449:8
**385**   448:17

[386 - additional]

**386** 448:19
**391** 448:21
**3:41** 402:23
**3:56** 364:8
**3rd** 2:5

**4**

**4** 255:14 303:24
304:3 310:16,23
364:9 448:13
**40** 271:16
**401** 449:10
**406** 449:11
**4:03** 364:13
**4:39** 400:5
**4:46** 400:9

**5**

**5** 364:15 385:15,17
385:18 386:9,16
448:14
**50** 128:15 129:7,19
226:22
**50,000** 413:7,14,22
414:9,18
**500** 228:21
**500,000** 227:5
**55** 2:5
**599** 2:9 4:20 6:25
**5:25** 289:7 436:9
442:20
**5:30** 422:2
**5:31** 442:22
**5:34** 446:13,19

**6**

**6** 1:16 17:22 40:15
40:20 41:9,16
42:2,10 79:16
134:15 386:14,20
386:25 387:3,9,15
406:17,21 419:21
434:25 436:17

441:11,16,18
443:14,17 444:17
446:3 448:18
449:11,18
**65** 448:9
**6th** 267:17

**7**

**7** 1:11 4:4 391:15
391:19,25 392:10
448:20
**75** 128:12 130:17
130:19
**7723** 72:4

**8**

**8** 449:6
**8:34** 1:12 4:4

**9**

**9** 401:24 402:3,15
449:9
**90** 130:24 131:2,7
393:13 395:5
**99** 50:7,10,22
53:16 67:3

**a**

**a.m.** 1:12 4:4
**ability** 99:10
180:23,24 181:9
181:14 198:5,11
198:15,16 213:6
390:25 406:9
**able** 94:13 95:16
98:2,18 100:14
111:8 178:24
179:22 183:19
232:9 235:12
236:22 255:17
262:8,9 267:12,13
302:22 307:19
421:9 430:17

**absence** 309:23
**absolutely** 169:20
188:14 213:8
299:15 305:22,24
307:11 397:15
**accept** 101:20
212:16 383:7
**accepted** 357:25
**access** 409:19
410:2 440:10
**accessed** 410:3
**accessible** 409:23
**accommodate**
15:19
**account** 122:20
123:10 158:6,9
188:6 236:13
288:22 368:7,18
416:8
**accountable**
100:24
**accountant** 51:8
**accountants**
390:25
**accounts** 35:7
309:18 311:18
312:2,3,4,4,6
**accuracy** 70:21
**accurate** 89:19
141:21,25 142:12
143:4,9,17,24
144:8 161:4 208:2
229:21 253:24
**accurately** 184:12
235:13 294:20
295:13
**achieve** 425:9
**achievements** 49:2
**acknowledge**
123:18

**acknowledged**
317:6
**acquired** 50:17
**acquiring** 205:5
**act** 76:24 101:10
234:13
**acted** 205:9
357:10 358:3
359:20
**acting** 101:21
377:14 384:2
**action** 5:11 17:22
18:2,9,25 20:25
22:7 357:6 364:19
365:12 380:2
450:16
**actions** 12:13
196:16
**active** 10:8
**actively** 12:12
44:14,15 257:14
344:21
**activities** 260:3
261:22 297:12,23
299:2,13 380:10
381:6
**activity** 209:6
380:18
**actual** 83:25
**add** 65:7 169:2
190:22 257:9
**added** 166:2
183:11 439:3
**addition** 30:17
62:13 90:7 103:4
127:11 237:20
273:24
**additional** 88:24
109:20 148:20
259:7,15 415:24
443:13

**address** 6:24
288:10 445:5
446:2,4
**addressed** 354:9
381:25
**adina** 2:14 5:24
**administer** 3:11
**administration**
428:14
**advance** 100:10
211:2 383:8
**adversely** 231:21
**advised** 144:20
**adviser** 204:17
**advisers** 76:23
234:13
**advisory** 219:19
**affect** 16:17 98:19
160:9 164:20,21
220:22 392:3
**affidavit** 254:10
254:13 448:10
**affiliated** 59:7
145:12
**affiliations** 5:14
**affirmation**
255:18,24
**affirmative** 274:12
**aforementioned**
65:12 254:12
303:25 385:10
386:17 391:16
401:25 406:20
**afresh** 383:11
**aftermath** 303:16
401:20
**afterward** 125:4
**ago** 11:15 39:18
43:24 44:19,22
45:12 46:17 47:3
49:9,16 57:5 58:5

68:3 70:13 129:13
129:17 130:2,5,19
131:3 186:11
199:12 263:23
356:22
**agree** 4:15 17:15
63:25 64:5,17
95:9,12 117:25
134:25 136:9
149:5 154:25
155:8 157:4
159:19 165:8,12
170:25 171:9,11
174:19 175:6
176:4 177:4
179:15 186:6,20
189:13 196:22
198:18 200:13
202:18 203:20
204:14,23 205:8
212:11,16 214:11
215:15 256:24
257:6,7,8 258:7,13
259:8,15,19,20
305:19 325:20
344:20 369:7
392:18 398:2
443:22,23,24
445:10,15
**agreeable** 446:2
**agreed** 3:5,20
179:25 221:16
419:7
**agreement** 88:15
88:18 124:17
324:2,14,21 325:5
325:16,21 326:5,8
326:13,22 327:3
327:17 344:6,22
345:19 445:4

**agreements** 88:25
123:4 147:19
154:12 155:14
273:5,10 274:2,4
274:10 276:3,9,18
325:25 327:21
**ahead** 15:5 56:3
85:4 96:9 121:5
123:25 155:24
180:12 207:4
256:5 288:2
315:12 355:14
356:20
**al** 1:8 4:25
**aligned** 245:8
246:3
**allegations** 19:14
**alleged** 179:11
345:22 421:7,10
421:23 431:9
**allegedly** 431:10
443:8
**alleging** 436:19
439:13
**allocation** 82:4
**allow** 15:4 111:3
111:16
**allowed** 105:20
202:10 224:10
381:5 382:2
439:21
**alluding** 197:7
**altering** 399:2
**alternative** 194:13
**alternatively**
80:21
**ambiguity** 183:18
**amount** 124:9,21
214:9 389:25
399:14 412:20
414:17,17 415:12

**amounts** 275:20
278:9 415:21
**analogy** 167:15,20
**analysis** 276:16
277:6 344:18
**announce** 317:8
317:13 319:2,19
319:22 320:17
321:4
**announced** 292:25
317:14 318:5
**announcement**
321:20 322:6,8,9
322:10,11
**announcements**
321:21,23
**announcing**
317:24 318:23
321:9,11,13
**annual** 276:21
301:14
**annually** 237:3,5
302:11
**answer** 11:16 15:5
15:7 20:13 21:19
23:9 31:6,25 33:2
39:23 55:24 57:17
61:16 68:11 76:10
84:19 91:8 93:17
93:18 95:23 96:2
96:5 97:6 98:3
99:6 100:4,5,10
101:13 103:2
105:15 107:12
110:11,13 112:13
117:18 121:19,23
126:6 127:20
128:8,16 129:2,3
130:22 131:2
138:10 142:5,14
144:2 147:11

155:9 157:16
165:24 171:14
172:23 173:17
174:9 177:17
184:11,18,21
185:3,6 186:22
194:3 197:24
201:7 206:17,23
209:10 210:4,7
211:5,6,7,9 212:3
214:19 215:10
216:10,12,16
219:9 220:13
221:7,21 222:10
222:22 224:12,19
224:22 225:17
229:19,23 230:7
232:9,10 235:24
244:7,7 245:16
247:2 251:13,14
262:10 264:15
265:3 271:21,24
274:7 285:3 296:7
298:17 302:24
308:19 315:4
316:4 321:24
324:7,11 328:21
329:6 333:4,11
335:23 336:12,19
346:9 352:15
356:9 357:7,15,23
358:7 360:9
369:13 371:14
376:3,4 383:24
394:23 398:25
399:6,9 404:5
411:9 427:18,18
430:12,25 437:7,9
440:11
**answered** 23:7
58:2 70:8 94:2,7

100:2 101:4 120:5
121:17 148:15
173:10 187:17
193:22 200:25
201:5 203:11,12
209:16 210:23
215:6 262:21
293:11 315:11
322:4 332:21,23
333:6 338:7
351:19 356:17,19
356:24 362:6
364:25
**answering** 94:5
224:23 272:4
321:10
**answers** 53:14
77:6 101:18
108:14
**anticipated** 415:21
**anticipation** 201:6
**anybody** 17:8,17
33:4 135:15
150:25 260:17,22
263:5 269:23
273:7,25 275:20
275:25 276:10
278:23 279:10
315:24 399:13,23
**anybody's** 262:5
262:16
**anymore** 295:7
317:16 318:11
**anytime** 359:8,19
**anyway** 399:16
**apart** 33:11 35:16
37:25 38:9,14
48:14 95:15
109:18 115:13
156:25 160:17
186:6 213:3

288:18 294:18
301:2 344:15
**apologies** 31:4
100:9 201:6
386:13
**apologize** 201:3
333:13
**apology** 383:8
**apparent** 284:21
288:7 294:14
295:19
**appear** 146:10
**appearance** 5:18
**appearances** 5:14
**appeared** 292:17
**appears** 68:6
371:19 389:9
**apple** 167:10
**applicable** 167:18
202:19
**apply** 43:18
**applying** 30:3,4
**appointments**
36:9 300:17
**appreciate** 25:24
31:24 79:12 80:15
89:13 98:15 99:5
109:13 116:6
128:25 130:11
153:14 157:18,21
172:25 173:21
190:14 208:14
211:5 313:3
337:20 414:4
440:24 442:7
443:6
**appreciated**
167:11
**appreciating**
167:12 233:11

**approach** 436:13
444:13
**approached**
114:12 238:18
239:21
**approaching**
115:7
**appropriate**
240:20 313:8
314:20 316:13
328:11 344:8,24
345:9,20
**appropriately**
313:11
**approval** 192:20
**approve** 196:6
202:22 246:25
247:3 330:23
**approved** 195:13
195:18 215:17
216:4 217:15
308:2 357:2,9
438:16
**approves** 199:20
**approximately**
8:14 9:10 13:18
36:5
**aptly** 7:20,22
**area** 43:19 373:23
**areas** 168:19
342:13
**arm's** 187:19,21
187:23 189:6,8
190:19 201:12
206:14 207:13
208:10 209:7,9,12
209:19 210:9
213:2,4
**art** 156:18
**artificially** 179:23
397:24 398:9

**aside** 75:3 116:15
133:2 221:17
417:10 434:8
442:4
**asked** 6:9 13:21
14:22 23:6 31:20
31:23 40:22 57:25
61:9,12 101:3
121:16 131:2
142:6,15,20
161:17,20,22,24
162:3 178:13
186:10,17 187:10
187:11,16 201:4
201:22 203:10
210:7 216:2 217:9
222:2,24 223:3,4
224:20 227:22
229:2,13,17
232:18 270:14
287:2 295:3
309:22 310:4
311:13 322:13,23
323:6 328:7
332:20 333:5
338:6 341:22
348:2 350:7,18,19
355:8,12 356:16
356:18 362:5
363:9 364:24
365:3 366:15
383:4 398:17
402:11 406:11
419:10 421:17
427:6 431:8,16
435:3,12 438:24
**asking** 14:18
20:16 25:25 30:4
32:2 41:22,24
45:20 52:5 57:16
59:4 61:3 68:16

75:4 79:20,25
98:17 109:20
112:12 115:19
128:6 130:12
134:15 153:15
154:23 158:5,9,11
190:13 204:12,13
211:3 217:8
221:19 225:23
244:3 246:10
258:6 277:4,5
281:25 289:14
294:11,16 296:13
296:18,19 303:5
303:15,18 305:15
309:17 314:11
316:6 317:17
318:10 323:15
326:10,21 332:15
333:15 334:19
335:14 336:3
337:15 347:7
353:25 356:14
361:7,9 363:8
370:25 371:12
373:25 379:9
380:6 383:10,25
384:2 390:6 403:6
403:12 436:22
437:10 441:17
**asks** 404:19
**aspects** 141:19,21
**asserted** 179:8
**asserting** 12:24
13:6 436:23
437:14
**assertion** 437:21
**assess** 20:17
**assessment** 416:22
417:6,9,12

**asset** 11:25 12:2
87:2,3 119:8,9,13
119:15 121:11,25
122:3,7,9 123:15
124:3 139:24
152:2,2,7,8,9,10
152:13,13,18,22
153:23 154:3,20
155:2,19 156:4
157:5,23,23
158:13 159:15
164:17,19,24
165:9 166:7,15,18
166:19,22 167:17
167:25 168:3
169:15,15,25
170:2,5,8,9,17,18
171:19,19,23,24
172:2,13,14,16
174:2,3,11,13
182:22,22,24
183:8,9,21,22
184:4,4,5,9,10,14
184:14,15,24,25
185:2,9,9,11,20
187:13 188:7,7
190:7 191:8,16,19
191:21 192:6,24
192:24 193:11,12
193:15,18,22,23
194:8,13,20,24,25
196:4,13,25
197:17 198:6
199:16 200:2,9,13
200:17 206:21
213:7 214:3 215:2
215:5,8,9 426:7,9
428:8
**assets** 25:18 82:5
82:17 84:8,10
85:9,13,20 86:2,7

86:10,16 115:17
116:11 118:12,14
126:10,13,22,24
127:2,7,12,14,23
128:20 129:7,19
130:2,3,7,8,21
131:11,18,24,25
131:25 133:18
151:6,11 152:5
153:20 155:25
156:7 157:2,12
158:10 171:3,4
176:9 177:7,11
179:18 181:3
182:14 185:17,21
186:7,8 187:19
189:14,19,25
190:3 193:23
194:19,23 195:8
195:15 196:17
197:4 198:17
205:3,25 206:11
207:7,16,20 208:9
213:19 214:24
215:18,20 216:5
216:19,21,24
217:3,4,11,16
218:23 219:17,25
228:13 229:3,14
230:3,24 231:20
233:16 234:4,16
234:20 235:13
236:7 280:13
409:4,7 425:5,10
425:19 427:23
**assisting** 266:18
**associated** 32:17
32:18 83:2 260:3
438:18
**assume** 109:14
175:11,20 329:12

**assuming** 167:6
176:3 178:19
199:4 212:14
231:22 232:4
390:15
**assurance** 381:14
**assure** 173:8 211:3
321:16
**attend** 33:10
**attending** 33:12
**attention** 282:9,13
282:16 286:10,17
331:16
**attested** 438:15
**attests** 381:13
**attorney** 2:4 5:19
51:14
**attorneys** 2:8
17:25 18:7,24
19:10,21 20:8,23
21:17,23 22:6,16
22:19 23:5,17
35:19,21,25 36:6
36:14,23 38:18
222:16 369:25
**attribute** 243:6,7,9
**attributes** 243:12
**audio** 4:12,13
**aum** 229:3,14,25
235:8,19 236:7
**authorities** 348:6
348:13 349:10
**authority** 99:2
418:15
**authorization**
438:4
**authorize** 315:24
327:23 328:5
**authorized** 3:11
368:2

**available** 27:6
170:2 307:2
310:12 433:20
439:11
**avenue** 2:9 4:20
**average** 84:10
261:11
**avoid** 225:7,8
**aware** 16:12 19:8
21:9 22:2,3 56:15
106:7 108:6,8
109:25 113:21,23
190:11,16 296:17
296:19 305:7
307:24 308:13
309:4 317:6
346:21 360:23
361:10 362:2,17
363:10,15,19
368:5,12,16
374:20 400:13
419:17 429:22
439:15
**awkward** 238:14

**b**

**b** 1:16 17:22 40:15
40:20 41:9,16
42:2,10 48:16
79:16 134:15
316:24 406:17,21
434:25 436:17
441:11,16,18
443:14,17 444:17
446:3 448:2
449:11
**baby** 329:13
**babysat** 300:9
**back** 53:14 57:4
58:4 70:13 86:25
87:6,10,19,20
90:20,25 93:10,14

99:22 110:23
117:21 119:3
170:3 171:12
173:8,16 182:6,11
247:15 250:24
255:3,12 269:24
271:19 272:6
288:3 302:13
303:20 319:12
364:13 386:13,15
386:23 400:9
**background** 30:25
**ball** 211:2
**ballpark** 228:16
230:23
**balls** 311:19
**bank** 43:6,22 44:4
44:7,8,12 45:11,16
46:9,10,24 47:2,8
**bar** 66:3
**barely** 279:11,14
**barriers** 428:7
**based** 68:23 87:11
94:19 134:13
153:7 178:21
196:15 197:18
199:22 202:11,15
203:22 207:19
219:24 232:18
248:12 298:22
299:13,16,24
317:14 330:19
333:19,20
**bases** 242:9
**basic** 91:21 168:6
220:24 222:2
332:9
**basically** 7:24 8:4
8:5,5 186:3
**basis** 18:21 84:10
101:23 166:5

171:21 219:16
222:21 261:4,7
267:2 276:21
301:8,21 332:2
333:17 344:14,17
364:21 365:13
430:25 437:20
439:12
**bates** 71:20
**battle** 72:6
**becoming** 288:6
**beginning** 5:18
90:21 182:7
255:13 267:23
303:12 364:14
442:18
**begins** 304:16
**begun** 417:8
**behalf** 5:22 20:25
40:12 79:9 139:19
**believe** 12:18
30:19 38:6 46:22
48:9 49:10 50:12
52:19 53:18,21
56:20 64:23 68:2
68:18 69:4 70:24
71:2 74:25 75:21
79:12 81:2,14
82:3 97:4 108:15
108:17 121:17
125:9 126:2
143:12,19 144:11
144:13,17,22
150:23 151:20
153:16 154:5
162:7 179:4
201:14 202:16,21
205:16,19 206:23
237:5 249:6
252:19 266:5
267:7 309:18

310:10 357:3
359:9 372:20
378:2,17,21
379:16 405:7,17
409:21 417:8
424:22 432:2
436:18 441:2
**believed** 397:11
**believes** 171:25
359:19
**belong** 370:12
**belonged** 371:7
**beneficial** 165:22
166:3 170:20
**benefit** 134:5,11
135:2,12 136:4,7
136:20 137:12
152:20 164:23
171:6 172:3,16
174:4 177:10,23
181:5 205:2 408:3
**benefits** 135:11,16
135:20,22 136:5
136:19 175:16
431:22,24 432:7
432:12
**best** 16:6 36:18,18
57:6,19 66:4
75:24 77:19 78:19
79:25 80:25
102:24 118:15
127:20 128:4
129:21 130:6,9,18
172:21 173:18
174:8 181:11,16
184:6 185:25
186:4 198:19
199:23 200:3
203:3 213:10,13
226:3 230:2 234:3
234:11 248:19

249:12 250:9
274:23 310:9
320:19 322:7,12
322:18 326:4,7,12
326:21 334:20
339:4,6 340:4
342:25 346:5
356:9 358:21
377:11 383:21
390:3,6 399:19,24
422:3 430:24
435:7
**better** 46:3 121:4
238:5 407:7
**betting** 72:7
**beyond** 183:6
349:21 414:6
441:10,16
**bicycling** 48:13,19
**bill** 177:21
**bit** 84:22 85:17
107:9 121:6 150:5
237:6,8 337:24
444:2
**black** 294:13
**blessing** 95:18
**blips** 392:3
**blocks** 91:22
**blood** 450:16
**blowers** 277:25
**board** 116:3
150:11,17,19,22
151:2,8 185:20
190:12 211:10,15
426:15,16
**bob** 410:7
**borrow** 267:3
**borrowed** 85:24
**borrower** 12:19
87:19 245:10

**borrowers** 87:24
253:21
**boss** 100:19
261:25 262:5,12
262:16,17
**bother** 351:20
354:10,17
**bothered** 351:3,13
**bothering** 265:20
**bottom** 71:14,19
137:8 304:15,23
310:24 311:5
**bought** 208:10
**boy** 293:22
**breach** 331:22,25
337:14 339:13
340:17 359:4
398:3
**breaches** 332:13
333:25
**breaching** 332:7
**break** 15:18,23
91:11 182:12
285:2 288:18
364:2,5 443:16
**breakdown**
390:12,23
**breaking** 91:16
**breaks** 16:9
**brest** 48:24
**brevet** 1:8 4:25
11:7,12,13,20
12:21 13:14 18:3
18:11,13,23 19:9
20:7 21:5,16
22:17,21,23 23:4
23:10,15,19 24:25
26:18 28:7,17,23
29:8 30:5 40:7,13
40:13 42:6,13
47:15,18 48:3,4,8

48:18 49:6,25
50:18 51:16,17,22
51:23 52:8,10,14
52:15,22 53:8,15
53:22 54:8,12
58:14,19,21 59:5,7
59:8,11,22 60:4
63:15,16 64:21,22
66:15 67:3,7,16,25
68:4,9,10,18,20
69:16,17 71:6
72:23 73:4,8,12,13
73:16,19 74:20
75:7,15 76:2,4,16
76:19 77:2,7,8,13
77:13,17 78:10,23
80:16,19 81:9
88:3 91:2,2,22,23
91:23,24 93:19
95:5,11,18,25
98:20 99:15,19,25
100:16,25 101:6
101:21 102:5,8,14
102:14,18 103:13
105:11 106:3,19
108:20 109:23
110:3,17 111:4,8
113:6,10 114:6,18
115:8,9 117:14
118:8 126:25
127:5,8,13,15,24
128:18,21 129:5,8
129:20 130:4,8,21
133:12,14 134:3,6
134:22 135:3,6,10
135:15,16,19,20
136:6,8,14,18,20
137:5,7,10,12,18
137:20,22 138:3,7
138:13,17,19
139:3,12,16

140:16 141:11,22
141:24 143:6,8,14
143:16,21 144:6
144:14,20 145:3
145:10 146:21
149:5 152:20
153:9,17 154:16
154:21 155:6,21
158:2 159:18,20
160:6,17,25 164:6
164:12 170:12
171:17,22 172:11
172:17,18 173:23
174:21 176:6
177:6 178:19
179:9,12,20 191:4
208:18 218:2,4,5,9
220:20 222:14
223:8 225:25
226:13,21 227:14
227:17 228:13
229:4,15 230:4,22
231:3 234:4 236:8
237:10,18,21
238:2,4,18,19,23
239:12,17 240:4,5
240:6 241:10,15
243:18,19 244:4
244:15,17,24
245:21 246:21
247:11,11,19,23
248:3,7 249:5,21
250:11,15 251:4,6
251:11 252:3,11
252:12,18 253:7
253:14 256:10,21
257:10,20 258:11
258:18,23 259:11
259:18,25 260:4
260:10 261:12,22
262:6,13,16,25

263:3,5,11,16
264:2 268:5 269:3
269:5,10 272:19
272:21,24 273:3,8
273:25 274:9,22
275:3,10,22
276:13 277:8
278:25 279:8
280:23 281:11
287:14 288:23
289:21,23 290:5,7
290:14,16 303:10
303:21 307:21
308:7,14 309:13
310:17 315:21
316:2,12 319:19
321:4 324:3,15
325:6 327:24
328:2 332:18
338:3 339:3,7
340:7,10 342:21
351:13,20 352:12
352:13 353:5
356:11,13 359:16
359:17,19 360:12
361:12,13 362:3
363:12 364:22
365:14,24 366:12
368:9 370:8,10,12
371:5,7,20,22
372:4 375:17
378:25 379:3,10
379:11,13,17,24
380:2,10,11,14,17
380:18 381:5,8
382:2,6,7,14,15,22
382:23 383:13,14
383:17 384:3,12
385:11 386:18
387:9,25 388:13
388:22 391:17

392:8 395:6
399:17 408:13,20
409:23 410:4,20
410:21,25 411:21
411:22,23,24
412:19,20 413:8
413:13,21 414:7
414:11,15 415:7
415:11,18 416:4
416:24 418:23
419:11 420:22
421:7,10,23
424:24 429:14
430:15 431:12
433:11 437:2,3,14
438:2,3 439:17
440:3,4,10,13,13
440:14,22 448:14
448:18,20 449:6
451:2
**brevet's** 55:2,11
55:19 56:8,18
59:15,18 70:19
79:5 81:19,21
235:13 237:8
246:4 248:16
260:11 291:12
332:2 371:7 373:4
377:7 380:21
408:10 416:17,22
417:6,13 418:4,11
418:17 419:13
423:22 435:24
436:6,21,25
437:17,22
**brevets** 49:2
**brewing** 285:17,20
**brief** 90:17 182:3
255:9 364:10
**briefly** 12:10
26:23 35:12 40:6

43:4 81:7 83:20
**bring** 44:2 241:18
282:16 412:7
**bringing** 263:16
280:17 282:16
412:4
**brings** 87:23
**broad** 19:13
101:23 135:22
**broader** 27:9
43:19 243:4
**broadway** 2:5
**broke** 374:12,14
374:18
**broken** 169:3
**broker** 240:17
241:24 242:5
243:3,3,6,7,10,14
243:15,16 245:12
245:14,15,20
246:2
**brokers** 253:22
**brothers** 42:14,18
43:2,12 44:4
**brought** 240:8
245:6 282:8,12
286:10,17 341:16
411:12,16
**buck** 95:11 377:12
**building** 91:21
208:16 217:11
312:8
**bulk** 218:2,3
**bunch** 48:14 65:9
65:10 88:4 179:9
182:17
**business** 12:13
56:12 81:7,8,19,21
81:23,25 82:2,10
82:20,23 83:2,7
89:15 98:19 121:2

121:6,14,20
205:17 219:3,13
230:7 237:9
250:15,19,20,23
253:16,17,25
260:5 269:13
278:19 280:17,22
341:23 342:4
378:3 379:2,12,14
379:18,19 380:2
380:11,14,18
381:8,13,17
383:17 384:12
408:7
**businesses** 81:13
92:22 93:3 94:15
94:23 241:8
**busy** 39:20
**buy** 185:20,22
186:5 191:8,16,19
195:12 196:13,16
198:22 199:2
201:9,13 208:20
208:23 211:11,14
211:16,22
**buyer** 188:18
189:5,7 199:4,5
208:15 209:2,17
209:19 210:11,14
210:18,22 213:2,4
217:6
**buying** 208:14
212:14,15

**c**

**c** 2:2 6:14,14 447:2
450:2,2
**calculate** 276:2
389:13,18,24
**calculated** 276:23
389:12 390:9,14
394:21

**calculations**
394:20
**calculus** 202:14
**calendar** 34:14
35:3 36:9 38:21
**call** 24:15 74:11
100:21 110:9
208:22,24 221:22
238:7,16 252:4
342:14 409:18
435:11
**callahan** 19:11
34:3,17 43:11
44:3 45:15,17,23
46:19 98:7,12,13
98:18 99:2,10,14
100:15 150:21
163:11,16,24
191:25 192:7
193:2,6,13 194:25
195:7 196:2,23
197:17 198:10
199:18 215:17
247:10 248:22
254:11,13 256:7
258:16,21 267:17
267:23 268:4
278:8 303:16,18
304:18 307:21
308:8,16 309:7
313:5 323:24
324:12,19 329:25
362:11,17,23
363:11,16,19
364:18 365:3,6
400:12 444:19
446:4 448:10
**callahan's** 44:11
99:18,25 255:18
255:23 256:24
257:6 270:22

272:12
**called** 6:15 26:20
31:15 44:23 47:18
48:19,20,23 49:2
51:17 236:24
303:7
**calling** 45:3,3
**canceled** 156:25
**candidate** 344:24
**candidates** 22:18
**candidly** 222:3
**candor** 366:19
**capacities** 101:22
**capacity** 18:8
246:22,24 436:17
**capital** 51:17,23
52:8 58:14,19
59:5 67:25 68:9
68:19 69:16 72:23
73:8,16,19 74:20
75:7,15 76:2,19
77:8,13,17 78:11
78:23 80:16,19
91:2,23 124:10
130:20 133:13,15
134:3,6,22 135:3,6
135:10,16,19
136:6,9,14,18,21
137:6,7,10,12,19
137:22 138:3,7,13
139:12 143:21
144:6,14,21 145:3
145:11 146:21
149:5 154:16
170:12 171:17,22
172:11 173:23
174:21 176:6
177:6 218:5,9
237:19 239:18
263:10

**caption** 243:11
**capture** 119:17
167:15 195:20
338:21
**capturing** 384:21
**care** 271:3 394:12
**career** 314:8 372:6
**carried** 440:3,13
**carry** 277:21
440:18
**carrying** 281:23
282:4
**case** 1:6 5:3 17:12
67:11 69:21,22
121:18 124:15
139:10 148:11
151:22 158:19
176:4 232:14
343:24,25 429:25
430:3 431:2 451:2
**cases** 89:24 376:20
**cash** 87:5,5,9,17
166:14,17
**cast** 267:6
**catalog** 415:3
**catalogs** 409:6
**categorically**
351:10 366:25
**categories** 242:4
421:4,16 422:14
429:12,18 431:6,8
431:24 435:4
**category** 243:4
421:5,8 425:14
426:5,5 428:8
431:16 434:17,19
**cause** 174:11
181:2 214:3
332:19
**caused** 431:11

causes 171:18,23
172:12
caveat 16:2 317:23
caveats 353:24
cell 4:10
cellular 4:8
centralized 409:5
ceo 12:14 58:18
100:21,22 101:9
109:21 202:7
312:24 313:4,25
314:11 315:5
339:2 348:18
351:3 378:6
380:12 442:24
certain 35:14
48:25 53:13,15
60:16,16 74:25
79:15 196:15
198:17 327:19
441:2
certainly 28:2
58:24 173:6
186:14 262:9
289:7 298:14
441:23 444:25
445:17
certification 3:8
certify 447:4,8
450:9,14
cetera 41:21
154:17 155:16
218:12 328:14
331:23
cfo 276:19,25
chain 154:21
304:2,16 402:2
448:13 449:10
challenge 269:6
challenged 305:17

challenges 268:24
chance 366:20
change 175:8
249:5,10 315:25
394:7,9,11,18
451:5
changed 54:18
250:3 316:10
393:22 396:15
397:18
changes 70:18
328:6
changing 70:12,15
249:24
character 297:10
397:21
characteristics
81:15
characterization
45:21 169:21,23
257:12 281:12
321:8
characterize 45:22
45:25 123:14
129:3 149:17
196:9 269:15
275:16 293:20
characterizes
257:16
characterizing
289:5
charge 54:6,10
58:6 100:24
239:12 307:21
341:11
charged 54:16
57:3 202:10
chart 57:4 65:14
66:14,17,19 67:12
67:15,22 68:7
71:7 72:10 74:24

75:3,4 138:16
140:14,15 141:13
145:25 146:11
148:6 162:16
328:9 329:4 448:9
charts 54:7,11
55:3,12,19 56:8,19
57:10,23 58:11
66:21,24 134:24
328:17,25
check 21:14 79:2
328:12 339:10
374:9
checked 163:23
164:2
checking 17:16
75:20 367:10
380:20
child's 371:6
children 300:4,7
300:25
children's 369:23
choice 117:6 118:5
344:8 345:9,20
choose 24:22
197:3 201:9
choosing 195:21
choreographed
402:14
cio 58:18 109:22
circle 385:23
386:24
circumstance
155:11
circumstances
7:10 42:25 122:6
175:7
circumstantial
317:2
city 16:25

civil 1:19
claim 12:17,25
13:6 420:22,23
421:14
claimed 420:7,9
429:19
claims 179:9
437:15
clarification 59:2
80:15 114:21
116:6 154:24
155:17 172:5
352:16
clarified 89:18
clarify 16:23
45:18 58:23 75:10
84:16 90:3 132:20
187:25,25 191:14
239:4 240:2
289:23 290:3
306:17 359:15
439:2
clarifying 203:14
209:4 211:19
416:3
clarity 85:4
346:11
clear 20:18 92:7
154:18 186:15
251:25 258:4
272:4 274:3,17
280:7 292:23
305:18 321:14
332:7 336:9
352:11 367:14
371:24 424:8
444:13 445:16
cleared 49:4
347:19,21
clearly 418:12
437:25

cleo   1:20 5:8 450:7
　450:23
clicking   66:2
client   221:6
clients   145:10
　422:5,7,16
close   45:16,16,18
　45:23 88:8 274:18
closed   291:22
closing   414:17
　423:23 424:5
clue   306:7
code   25:17 41:20
　332:7 439:18
　441:6 442:8
cofounded   247:19
coherent   268:18
collateral   86:24
　123:5,11
collateralized
　81:13
colleagues   5:23
　7:21 65:9
colloquially
　100:18
combination
　192:8
come   25:20 48:7
　50:16 87:19,20
　160:4 197:7,8
　218:2,4 248:23
　249:2 267:12,13
　286:5 298:6
　331:16 356:23
　435:12
comember   62:24
　63:4,7,21 64:3
　164:5
comembers   62:5
　62:18,20 397:5
　398:4,21

comembership
　64:20
comes   86:25 87:10
　95:11 111:22
　120:3 121:8
　239:10,11 319:16
comfortable
　192:18 234:14
　239:8 262:15,24
　263:5
coming   69:11
　89:25 119:7
　185:18 264:9,12
　282:15 285:17
　320:9,16 321:6
　331:8 407:24
commence   346:18
　347:14
commenced   346:3
comment   231:7,14
　232:7,19,24
　302:22 347:11
commenting
　231:12
commission
　451:25
commissioned
　353:11 361:11,12
commitments
　442:16
committee   29:16
　29:23 30:2,14,17
　30:21 31:9,11,14
　31:16,21 32:5,10
　151:12,14,17
　174:24 176:7
　177:6 179:16
　180:25 191:24
　193:14 195:24
　196:11 199:20
　200:16 201:8

202:25 203:7
　204:16 214:8
　215:16
committees   31:18
　197:20 198:5
　199:11,11
committing   419:5
common   33:2 91:7
　91:13 92:2,3,10,11
　92:17 93:5,20
　94:15,24 113:7
　114:19
commonly   262:13
communicate
　17:17 307:19
　308:7
communicated
　16:4 303:9 307:5
communicating
　272:11
communication
　371:18
communications
　366:12 368:21
　369:9,24 370:7,9
　370:11 372:13
companies   11:3
　40:7 42:13 47:16
　49:13 52:10 62:14
　113:25 247:12
　248:4,8
company   12:18,25
　13:7,18 25:18
　27:15 47:12,14
　48:3,17 54:22
　111:17 136:25
　137:3,4 140:16
　178:22 241:11
　247:20 276:5
　278:5,18 313:25
　314:11 324:22

328:3 329:2
　348:18,22 351:2
　361:14 378:7
　391:9 396:24
company's   40:18
　54:17 57:9,22
　58:11 331:4
compassionate
　306:12,17
compensation
　218:2,4,8,11,13,15
　218:22 219:16,24
　220:7,25 222:13
　223:7 225:24
　226:12,21 228:2,5
competent   16:13
competitive   428:7
compilation   27:10
　27:12 29:13
complete   110:10
　168:21 214:16
　417:9 426:21
completed   176:12
　176:14 417:11
completely   89:19
　188:10 221:9
　311:25
complex   155:13
complexities
　148:16
compliance   25:16
　54:14,20,25 55:13
　55:18 56:21 57:10
　57:14,20 75:21
　76:12 79:3 99:21
　105:24 109:15
　197:10 202:18
　235:21 236:3
　252:17,22 301:14
　307:16 316:14,18
　330:12 332:8

333:22 334:5,6,22
335:7,10,16 336:4
336:9 338:13
349:5,20 352:18
358:23 360:6
363:20 376:11
378:18 416:23
417:7,13 418:4
419:14 428:21
**compliances** 77:22
**complicated**
389:22
**comply** 376:15
**component** 189:9
443:17
**comport** 389:5
**comports** 73:3
**composition** 24:14
**compromise**
350:14,17,20
**computer** 17:17
101:8 366:10,16
367:16 370:4
372:3,4 373:4
374:5 377:15
379:2,24 380:10
380:17 381:6,11
382:3,6,7,23
383:15 400:14
401:4,10 403:11
403:20,22,24
404:9,15,21
**computers** 384:16
405:8,17
**concentration**
168:8
**concept** 167:15,18
237:16
**concepts** 118:20
**concern** 346:8
358:22,24,25

359:2 370:10,10
399:4
**concerned** 39:2
397:5
**concerning** 36:12
278:24 437:24
439:7
**concerns** 114:14
115:9 278:17,20
278:23 279:5
316:18 418:3,10
418:17,22
**concluded** 292:9
332:17 337:13
353:21 446:21
**concludes** 446:14
**concluding** 301:8
315:14
**conclusion** 292:13
292:20,21,22
293:6,25 294:5
315:20,23 326:20
331:8
**conclusions** 291:5
291:7 296:24
302:17 354:3
355:17 417:17
**condition** 209:7,10
306:25
**conditioning**
216:16
**conditions** 16:16
94:19 209:5
**conduct** 332:16
333:16 336:25
338:23 339:8
340:8,25 341:5,22
344:8 345:22
348:10 351:6
355:19 359:7,18
375:18 416:22

419:9
**conducted** 14:7
337:9 338:3,12
342:24 349:12
360:12,24 361:17
362:3
**conducting** 343:18
417:6
**conference** 17:4
**confident** 79:5
314:15
**confidential**
437:22 439:20
**confidentiality**
25:17
**confirm** 52:19
62:16 71:8 143:2
158:13 204:12
408:25
**confirmation**
331:14
**confirmed** 203:17
**confirms** 389:3
**conflate** 360:20
**conflict** 100:7
200:14,19 207:3
209:8
**conflicted** 203:25
204:18
**conflicts** 212:17
426:16
**confusing** 246:9
**conjecturally**
398:22
**conjunction**
330:24
**connect** 291:8
**connecting** 73:15
**connection** 10:19
11:2,6 13:22 18:9
19:22 20:24 26:18

28:17,24 29:9
40:14,19 64:19
88:25 193:20
266:4 271:16
399:16
**consider** 28:8,10
32:10 36:8 186:23
187:2 263:19
269:7 385:2
410:22
**considerate**
306:24 307:4
**consideration**
28:18
**considerations**
202:13
**considered** 263:25
330:13
**considering** 28:24
30:6 318:3,6,13,15
318:24 319:4,17
319:20 320:6,17
321:5 322:17
323:8
**consistent** 32:7
60:17 67:6 126:10
205:10 214:22
359:3 360:15
377:7 380:24
382:11,17,25
383:10 384:5
388:11 398:8,14
398:20
**consolidated**
385:13 448:16
449:7
**conspicuous**
392:19
**constantly** 70:9
**constitute** 398:3

**constraining**
213:5

**constraints** 15:24
337:18

**constructive**
302:22

**constructively**
444:2

**consult** 19:17 20:5
99:20 236:7 349:7
373:18

**consultant** 416:13
416:16

**consultants** 21:13

**consulting** 19:3
98:20 374:4

**cont'd** 449:2

**contact** 45:2,4

**contacts** 45:9
241:7

**contain** 29:14

**contained** 436:20
437:17

**contending** 437:14

**content** 422:24

**contention** 377:5
429:10

**context** 92:20,21
93:2 215:12
246:12 251:22
252:2 263:8
323:19 342:5
376:2

**contexts** 92:15,16

**contingent** 437:12

**continue** 4:14
189:21 271:6

**continued** 90:23
182:9 255:15
364:16 400:10
448:23

**continuing** 87:13
273:3,8

**contract** 160:12

**contracts** 158:21

**control** 91:7,13
92:2,4,10,12,17
93:21 94:16,24
126:3 155:14
185:21 190:8,9
191:2,6,7,11,18,20
198:23

**controlled** 125:19
127:8,12,15,24
146:19,25 147:8

**controlling** 147:14
185:23

**controls** 122:21

**convenient** 284:24
288:6

**conversation**
228:3 229:9,10,12
231:22 232:4
277:10 293:12
298:7 399:25
404:18

**conversations** 4:8
229:7 275:24
279:3 324:16

**coo** 416:17

**copied** 424:23
437:2 438:2
439:15

**copy** 3:14,17

**corner** 71:19

**corporate** 40:11
40:18 54:3,17
65:13 68:12 69:23
70:5,21 73:4
428:22 432:19
448:8

**correct** 20:25 21:5
22:4,5,21,24 23:5
28:20 29:3,18,19
31:16 37:19 47:10
47:13 49:21 53:10
53:19,24 55:8,13
56:22,23 58:12
63:22 64:4 74:8
75:2 76:25 77:5
80:18 82:21 87:15
89:11 93:22 97:14
102:9 103:10,11
103:14 104:19
106:5,13 110:24
112:11 116:21
119:11,21 120:17
122:13 123:7
125:8 129:22,23
130:8,10 135:17
135:21 136:2
143:13,20 144:16
144:23 150:15
151:14,15 153:21
153:22 154:8
159:6,24 170:13
172:19 179:13,14
191:22 193:2,4
198:8,9,11 199:13
200:4,6 202:4,5,8
202:14,21 203:19
206:2 207:23
209:2 213:16
214:14 218:7
234:5 236:10
239:14 256:15
265:18 275:13
277:2 278:15
283:3 287:3,4,8
290:10 300:13
318:8 325:23
328:4 338:19

345:25 346:25
348:19 351:7
358:4,17 362:13
366:24 367:3,24
368:3 369:12
370:21 384:15
393:23,24 398:5
399:5,11 404:12
408:11 418:2
421:20 424:16
429:14,15 431:4
431:13 434:7
447:9

**correction** 365:2

**correctly** 11:17
73:2 78:13,17
121:17 279:13
297:19 345:24
436:22

**correlate** 124:9

**correlation** 288:11

**corroborate** 69:8
69:20

**costs** 32:17,18
160:2

**counsel** 3:6,17
4:23 5:13,25 6:5
14:25 17:5 18:4
24:21 32:22 33:6
39:4,12 41:3
140:25 328:13
330:20 331:13
340:14,15,19
341:3,9 342:5,13
349:6,8 368:22
372:18,22 373:7
373:12,19 374:4,8

**counsels** 68:23

**counted** 429:11

**counterparties**
61:5 84:15 89:23

**counterparty**
88:11,12,15 118:7
122:11,17,23
123:3,9 124:4,16
408:17 412:21
415:8
**counterparty's**
124:10
**countries** 433:22
433:24,25 434:10
**county** 450:5
**couple** 7:9 8:17,19
8:24 13:19 14:6
36:10 81:6 175:12
207:5 275:2
288:11 407:12
**course** 9:2 70:19
167:7,13 261:11
279:9 292:4,6
**court** 1:2 3:13 5:2
5:7 6:12 15:10
23:24,25 24:3,15
90:9 93:9 179:25
221:25 271:15,22
375:14 444:22
446:9
**courts** 221:15
**cover** 8:7 19:9
188:4 443:3
**covered** 55:21
311:20 442:25
**covering** 18:23
20:8,22 21:17,22
22:6,15,18 23:4,16
23:19 192:16
242:9
**covers** 26:21
**create** 104:10
111:16 113:13
114:8 126:23
127:2 428:6

**created** 49:20
103:17 104:17,23
105:4,7,18 114:16
115:10 132:14
201:13
**creating** 111:2
**creation** 104:6
110:24 111:9
112:16,17 114:24
115:5
**credit** 8:3 29:15,17
402:6
**criminal** 10:15
101:7
**criteria** 28:16 29:8
29:14 30:4,5
117:20 237:7
244:4 413:10
**critical** 372:8
**cross** 300:5,6
**crutches** 266:22
267:3
**cull** 444:23
**curious** 230:22
**current** 7:10 192:2
**currently** 10:11
75:5,16 142:25
143:18,25 144:9
179:8
**curtis** 343:7,9
**cut** 14:4 26:13
63:14 411:8
**cutoff** 442:20
**cv** 1:6 5:4 451:2
**cyber** 428:20
**cyrulnik** 2:4,6
5:20,21,21 6:8,20
7:5,16 8:2,6 23:8
30:24 61:11 64:25
65:19 66:10 72:5
78:6 90:5,24 93:9

116:25 117:23
120:12 125:2
137:21 142:8,17
146:2 147:6 152:3
156:12,17 160:16
160:23 161:14,19
162:2 164:14
173:5,11,15
176:13,18 181:21
182:10 183:13
186:25 210:5
220:15 221:11
222:18 223:15,24
224:6 225:2,5,9,14
230:17 231:9,13
232:17 233:3
237:11 241:23
242:18,22 254:7
254:16,22 255:4
255:16 256:2
264:5,11 271:3,20
273:14 277:15,22
287:24 289:3
295:2 303:23
304:5,10 333:7
350:10,16 352:6
354:15 356:18
364:4,17 365:7
374:13 378:23
385:5,24 386:3,6
386:12,22 387:2,7
391:14,21 392:2
400:2,11 401:15
401:23 402:5,13
406:15,24 407:10
441:13,23 442:14
444:12 445:12,21
445:25 449:18

| **d** |
| --- |

**d** 3:2 6:1,14 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1

| | | | |
|---|---|---|---|
| 126:1 127:1 128:1 | 249:1 250:1 251:1 | 372:1 373:1 374:1 | 391:20 402:4 |
| 129:1 130:1 131:1 | 252:1 253:1 254:1 | 375:1 376:1 377:1 | 406:23 451:3 |
| 132:1 133:1 134:1 | 255:1 256:1 257:1 | 378:1 379:1 380:1 | **dated** 448:12 |
| 135:1 136:1 137:1 | 258:1 259:1 260:1 | 381:1 382:1 383:1 | **dates** 294:12,16,18 |
| 138:1 139:1 140:1 | 261:1 262:1 263:1 | 384:1 385:1 386:1 | **david** 2:13 5:5 |
| 141:1 142:1 143:1 | 264:1 265:1 266:1 | 387:1 388:1 389:1 | **dawn** 296:23 |
| 144:1 145:1 146:1 | 267:1 268:1 269:1 | 390:1 391:1 392:1 | 297:7 |
| 147:1 148:1 149:1 | 270:1 271:1 272:1 | 393:1 394:1 395:1 | **day** 39:22 87:19 |
| 150:1 151:1 152:1 | 273:1 274:1 275:1 | 396:1 397:1 398:1 | 164:3 293:24 |
| 153:1 154:1 155:1 | 276:1 277:1 278:1 | 399:1 400:1 401:1 | 295:24 296:11,13 |
| 156:1 157:1 158:1 | 279:1 280:1 281:1 | 402:1 403:1 404:1 | 298:4,9,13 378:11 |
| 159:1 160:1 161:1 | 282:1 283:1 284:1 | 405:1 406:1 407:1 | 447:19 450:20 |
| 162:1 163:1 164:1 | 285:1 286:1 287:1 | 408:1 409:1 410:1 | 451:22 |
| 165:1 166:1 167:1 | 288:1 289:1 290:1 | 411:1 412:1 413:1 | **days** 3:16 295:11 |
| 168:1 169:1 170:1 | 291:1 292:1 293:1 | 414:1 415:1 416:1 | 295:12 320:22 |
| 171:1 172:1 173:1 | 294:1 295:1 296:1 | 417:1 418:1 419:1 | 400:19,21 433:2 |
| 174:1 175:1 176:1 | 297:1 298:1 299:1 | 420:1 421:1 422:1 | **de** 48:20,22 |
| 177:1 178:1 179:1 | 300:1 301:1 302:1 | 423:1 424:1 425:1 | **deal** 12:5,6,9,11 |
| 180:1 181:1 182:1 | 303:1 304:1 305:1 | 426:1 427:1 428:1 | 88:3 117:5 153:25 |
| 183:1 184:1 185:1 | 306:1 307:1 308:1 | 429:1 430:1 431:1 | 154:2 238:3,25 |
| 186:1 187:1 188:1 | 309:1 310:1 311:1 | 432:1 433:1 434:1 | 241:15 242:17,19 |
| 189:1 190:1 191:1 | 312:1 313:1 314:1 | 435:1 436:1 437:1 | 242:21,24 243:2,5 |
| 192:1 193:1 194:1 | 315:1 316:1 317:1 | 438:1 439:1 440:1 | 243:18 244:20 |
| 195:1 196:1 197:1 | 318:1 319:1 320:1 | 441:1 442:1 443:1 | 245:7 282:7,8 |
| 198:1 199:1 200:1 | 321:1 322:1 323:1 | 444:1 445:1 446:1 | 302:18 411:12,16 |
| 201:1 202:1 203:1 | 324:1 325:1 326:1 | 447:1,2 448:1 | 411:18 412:4,7,18 |
| 204:1 205:1 206:1 | 327:1 328:1 329:1 | 449:1,15 450:1 | 413:2,7,9,14,17 |
| 207:1 208:1 209:1 | 330:1 331:1 332:1 | **daily** 261:4 | 414:15 415:6,11 |
| 210:1 211:1 212:1 | 333:1 334:1 335:1 | **damage** 421:19,20 | 415:15,17,23 |
| 213:1 214:1 215:1 | 336:1 337:1 338:1 | 421:23 431:11 | 423:19 426:2 |
| 216:1 217:1 218:1 | 339:1 340:1 341:1 | **damages** 179:23 | **dealer** 243:15,16 |
| 219:1 220:1 221:1 | 342:1 343:1 344:1 | 214:9 | **dealing** 313:23 |
| 222:1 223:1 224:1 | 345:1 346:1 347:1 | **data** 375:15 | 314:21 432:6,6 |
| 225:1 226:1 227:1 | 348:1 349:1 350:1 | 376:13 | **deals** 84:13,14 |
| 228:1 229:1 230:1 | 351:1 352:1 353:1 | **database** 409:6,20 | 239:16 241:19 |
| 231:1 232:1 233:1 | 354:1 355:1 356:1 | **date** 1:11,20 33:20 | 243:8 245:3,4 |
| 234:1 235:1 236:1 | 357:1 358:1 359:1 | 65:16 235:15 | 282:18 291:21 |
| 237:1 238:1 239:1 | 360:1 361:1 362:1 | 236:9 254:15 | 408:13 410:21,25 |
| 240:1 241:1 242:1 | 363:1 364:1 365:1 | 267:20,25 285:10 | 411:7,22,23,24,25 |
| 243:1 244:1 245:1 | 366:1 367:1 368:1 | 294:13 304:4 | 412:15 413:21,22 |
| 246:1 247:1 248:1 | 369:1 370:1 371:1 | 385:16 386:21 | 414:8,12,21 415:4 |

**death** 269:16
**debate** 173:11
**december** 385:14
  386:11 388:3
  392:15 396:19,22
  448:17 449:8
**decide** 18:22 94:14
  94:22 197:17
  198:5 211:21
  445:11
**decided** 46:8
  47:11 195:2,7
  210:15,16 329:16
  329:22 355:22
  356:2,9,11 442:3
**decides** 212:15
**deciding** 200:16
  211:22
**decision** 21:7
  31:10 32:6 95:4,6
  111:21 139:17,25
  140:5 170:10
  192:22 194:14
  195:12 196:13,14
  196:24 197:4
  198:11 199:8,16
  201:12,17 202:4
  202:23 203:6
  204:15 211:18
  212:12,19 213:6
  220:23 307:20
  316:5 319:22
  330:4,7,16 331:5
  332:2 334:12
  344:11 346:23,23
  347:3,5,10,14
  356:15 359:12
  366:9 397:20
**decisions** 30:22
  32:11 95:17,17,21
  98:19 139:4,8

151:5,10 174:21
  192:4 193:5 196:3
  199:9,21 202:11
  202:15 203:22
  204:3,18 205:12
  211:11,16 348:21
  378:9,11
**decks** 418:20
**decline** 222:12
  392:20
**declined** 355:5,9
**decoy** 402:12
**defendant** 1:16
  9:16,25 10:19
  12:22 17:21,25
**defendants** 1:9 2:8
  6:5 20:9 420:6,9
  420:23
**defense** 18:24
  20:24 22:7
**definitely** 120:22
  281:15 357:17
**definition** 135:23
  149:14 189:12,12
  384:4
**definitions** 31:17
**definitive** 345:12
**definitively**
  240:14 397:17
  404:6 428:4
**degree** 62:19
  354:8
**dell** 366:10,21
  367:16 368:6,7
  372:23 373:3,13
  374:22 375:6
  400:14 401:3,9
  403:10 404:3
**demanded** 244:5
  245:6,19

**demonstrate**
  245:7
**denied** 357:2
**denies** 199:20
**deny** 196:7 204:12
  330:23
**departing** 324:25
**department** 18:20
  18:22 20:5 21:5
  23:2 46:11,14,20
  47:8 54:14,16,20
  54:24,25 55:10,13
  55:17,18 56:21,25
  57:7,10,21,21
  109:16 239:11
  301:14 313:24
  334:6,23 335:7,11
  335:17,20,25
  336:5,13,21
  390:17 405:13
**departments**
  46:25 56:6,10,15
  79:14 250:10
  324:9
**departure** 278:18
  278:24 399:17
**depending** 124:13
**depends** 149:14
  241:2 263:7
**depicted** 70:22
  74:24 143:22
**depiction** 141:25
  143:17,24 144:9
  194:21
**depictions** 143:9
**depicts** 141:13
**deploy** 239:17
**deploying** 263:11
**deponents** 232:9
**deposed** 14:12
  33:4,23,25 34:3,22

35:5 57:15
**deposition** 1:15
  3:8,9,14 4:12,16
  4:18,22 7:22 8:10
  8:15,25 10:25
  11:5,12,18 13:12
  13:16 14:5,7 16:7
  16:22 23:21 32:23
  33:5 34:13,15,18
  34:19 35:14,18,20
  36:2,7,13,15,24
  38:19 39:5 109:24
  130:13 225:18
  238:10 289:6
  291:8 344:19
  381:20 442:18
  443:18 451:3
**depositions** 10:17
  10:19 11:19 14:3
  33:10,15 65:10
  232:11
**depress** 179:23
  205:6
**depressed** 397:25
  398:9
**depressing** 214:9
**describe** 11:10
  12:10 25:14 26:23
  29:8 30:14 32:3
  41:13 43:4 45:14
  50:21 81:8,24
  83:21 84:2 87:12
  91:5,12,22 94:14
  111:19 112:4
  122:5 136:23
  140:18 153:5
  155:10 162:18,19
  162:21 237:18
  243:10 245:25
  249:7,20 331:9

described 24:7
35:13,17 38:15
51:10 67:5 70:18
83:24 88:13 89:4
141:14 170:23
180:19 197:21
217:13 242:2
246:13 269:10
331:3 332:13,14
360:13 362:11
418:9
describes 70:5
72:18 88:2 263:3
describing 84:12
84:14 86:9 88:14
88:15 92:22 93:3
262:15,24 263:5
281:17
description 81:3
81:16,18,20 88:19
93:17 148:25
194:15,17 236:17
265:11 448:7
449:5
designated 40:11
253:14 444:18,20
designating
195:22
designation
315:25 316:10
designed 431:7
desire 115:8
148:22 192:5
destroyed 438:5
detail 84:23
detailed 150:10
details 19:16
46:22 146:25
deteriorating
297:2,5

determination
18:19 19:19 20:7
20:22 21:4 346:15
346:18 348:16
determinations
344:13 346:13
354:25
determine 19:9
185:19 218:13
345:15
determined 218:9
218:11 219:16
346:13
detriment 165:11
166:13,25 167:8
167:25 169:17
deutsche 43:5,16
43:22 44:4,6,8,12
44:17 45:6,11,15
46:9,10,24,25 47:8
devices 374:21
diametrically
171:13
dictionary 270:9
difference 83:21
188:15 201:16,25
202:2 242:25
293:15 332:25
426:4 441:4 442:7
different 21:16
22:17 23:10 25:2
29:8 31:23 41:24
47:7,20 71:15
73:11 84:13,14,15
92:14 117:18
118:20 140:24
150:6 160:21
164:15 166:8
188:20 193:18
201:20 236:19
237:12 238:9

245:16 257:11
285:22 286:18
301:23 313:24
318:22 336:17
404:2 425:25
431:23
differentiate
435:17
differentiation
435:22
differently 133:10
differs 140:19
digital 156:20
diligenced 413:8
413:14,22 414:8
dinershteyn
276:16,19 277:5,5
407:16,21
dinner 230:21
direct 73:12,13
75:22 76:4 105:12
106:3,19 109:19
136:8 138:19
143:16 146:20
147:23 165:4
172:7 175:5
200:11 205:4
206:12,22 207:9
207:17,22 236:23
261:21 323:24
324:4,7,12 376:18
385:11 448:14
449:6
directed 372:11
directing 275:25
direction 69:12
93:5 377:14
directly 51:20,22
79:6 106:15
122:21 133:5
134:19 135:12

149:7 165:6
219:20 277:6
director 42:22
134:21
disability 269:16
disagree 212:23
257:17 258:7,9,22
259:6,16 444:9
disappeared
280:18
disappears 393:12
disclaimer 357:22
disclaimers
353:25
disclose 230:10
434:9
discuss 269:2,4
295:19 303:16
311:8,14 362:23
discussed 150:3
268:14 275:10
376:10
discussing 148:4
274:20 309:12
discussion 111:21
112:17 122:16
182:16 275:4
279:22 303:19
304:20 305:9,20
305:25 306:9,18
307:6,8,8 308:22
310:5 311:16
312:14 320:4
376:19 400:7
441:24 443:19
discussions 278:8
399:12,22 407:21
419:4 441:20
disjunctive 192:14
disk 406:10

**dislike** 177:22
178:4
**dissatisfied** 303:11
**distinct** 89:23
241:18
**distinction** 14:11
44:9 115:14,16
253:24
**distinctly** 201:20
**distinguish** 195:16
238:11 269:9
321:12,19
**distinguished**
81:23 253:20
**distraction** 310:9
**distributed** 160:15
**district** 1:2,2 5:2,3
**diversification**
152:16 168:7
**divert** 179:18
**divest** 181:3
**divesting** 86:15
167:24
**divestment** 168:3
168:5
**dockets** 24:3
**doctor** 265:6
299:8 300:8,12,14
**doctors** 266:5,12
266:15
**document** 27:9
29:13 30:18 65:13
235:11 236:6,11
236:18,22 257:24
258:6 371:18
386:8 387:24
402:18 407:14
427:17 438:13
448:8
**documentation**
85:24 423:23

424:4
**documenting**
343:14
**documents** 17:12
24:2,7,11,14 27:10
31:15 35:15,16
39:10,19,21,25
130:14 162:16
163:4 236:3 327:8
327:14 332:15
343:4,8 366:11
370:7,9 418:11,18
424:9 425:21
449:21,22
**doing** 12:14 22:24
65:11 71:23 114:8
114:15 115:9
117:6 123:3
142:19 170:20
177:9 230:22
236:14 274:16
276:7,11,12,13
282:11,20,21
297:11,23 302:7
302:13 305:16
312:25 318:20
343:15 344:3
357:4 362:24
375:17 379:24
412:15 441:2
**dollar** 175:21,23
**dollars** 226:7,14
395:24
**door** 241:9
**dots** 291:8
**doubt** 68:8,18
69:16,22 70:20
71:2,3 265:3,10
296:12
**doug** 96:2 175:3
175:17 230:22

360:10
**doug's** 402:6
**douglas** 1:16 4:19
6:23 207:8 446:15
447:15 451:3,21
**download** 366:22
372:12 375:5,15
401:21
**downloaded** 368:5
368:17,21 369:2,4
374:21 375:3,20
386:7
**downloading**
372:23 373:13
374:5
**downstairs** 273:18
**dozens** 217:21,21
**draft** 68:13 343:3
**dramatically**
393:23 396:15
**draw** 291:4,6
**drawing** 44:10
334:18 403:14
**drawn** 73:11
**drew** 288:12
**drive** 27:7,14
375:21 401:18
403:19,22 404:8
404:14,20 405:11
405:19 406:10,11
**drives** 375:4,16,25
376:14
**drop** 281:17
289:18 301:11
311:19 391:6
404:24 405:4,10
**dropped** 271:23
279:17,25 280:8
280:12 281:22
282:3,9 283:12,14
285:8 302:18

393:5 406:12
**dropping** 287:7
**drops** 393:12
395:4
**dry** 281:4
**due** 221:14 273:4
273:9 274:2,10
**duly** 6:15 447:5
450:11
**dumb** 194:4
**dumped** 405:9
**duration** 63:15,16
64:21,22 72:22
73:13,14,21 74:2,3
74:9,11,14,16,22
74:23 75:9,11,18
76:5 78:20 80:24
81:7,10,17,23 82:6
82:7,8,9,15,16,20
82:23,24,25 83:6
83:10,11,15,15,17
83:22,23 84:3,4,6
84:9 85:16,19,20
85:22 86:3,14,22
86:23 87:12,21
91:3,4,5,24,25
102:5,6,7,12,18,20
102:23 103:4,5,7,9
103:16,17 104:6
105:12,20 106:4
106:20 107:3,18
108:4,5,10,22
109:6 110:4,19
111:9 116:18,19
117:8,9,22 126:12
128:19 129:6
131:10,12,23,24
132:2 133:25
138:17,20 139:3,5
139:16,23 140:8
140:22 141:13,23

141:24 143:7,8,15
145:6 149:8,9
152:21 153:9,11
153:18,18 154:3,7
154:17,21 155:3,6
155:22 157:24
158:2 159:9,18,21
160:7,18 161:2
164:6,12 170:7,8
170:17,19 171:3,7
172:3,17,18 174:4
174:5 176:25
179:2,2 250:19,20
250:23 260:4,11
274:4,5 385:12
386:18 387:10,25
388:13,15,22
389:7,13 391:7,17
392:8,21 394:2
397:2,6 398:10
399:3,15 448:15
448:18,20 449:6
**duties**  60:3,7,10
60:21 61:4,6 62:4
62:14,17,20,21
64:7,11,14,19,24
214:23 318:17
398:8,20
**duty**  59:21 60:12
60:14,19 61:4,10
61:20,23,25 62:8
64:3 199:25
310:10 398:3
**dyslexic**  72:12

**e**

**e**  2:2,2 3:2,2 25:19
36:8,11 48:16,16
304:2,16,17,24
305:2,4,21 306:7
306:22 311:8,14
312:14,23 314:11
314:18 320:4
362:12,18 363:2
363:12,17,21
380:20 383:16
402:2,20,22,25
404:18 405:2
438:13 439:18
447:2 448:2,13
449:9,15 450:2,2
**earlier**  6:8 34:10
41:18 102:20,22
210:24 406:19
**early**  249:22
270:21 272:11
305:10 417:3
418:9
**earmark**  117:12
**earned**  137:13
175:22
**earns**  136:19
137:6
**easier**  91:17
172:25 420:25
**easiest**  71:17
**easy**  251:7 286:2
409:19
**echo**  277:13,16,17
277:23
**effect**  3:12,15
27:22 41:5 173:25
297:7 306:10
**effected**  193:11,15
194:8 195:17
**effective**  232:11
288:8 298:16
**effectuate**  100:14
**effectuated**  186:9
187:13 215:17
216:5 217:16
**efficiencies**  148:23
**efficient**  14:14
26:15 70:10,11
112:6,9,10 421:2
**efficiently**  40:8
**effort**  444:23
**efforts**  31:24
**egregious**  334:2
346:7
**egregiously**  332:6
**either**  34:18 35:9
61:13 80:20 117:8
118:4 171:17
192:7 197:8 205:2
214:25 277:4
325:6 328:12
330:23 332:25
349:10 351:15
352:2 358:16
360:7 367:19,20
367:21,25 371:15
374:25 383:10
**eliminate**  183:17
407:16
**eliminated**  46:12
**eliminates**  209:7
**eliminating**  408:3
**else's**  205:7
**employee**  98:14,16
302:10 308:5
309:5 313:10
325:7,15 345:20
345:23 371:5
381:5 382:2,22
383:14 438:14,19
438:23 439:22
440:3,4,10,13,14
441:6 442:8
**employees**  27:7
28:23 301:15,19
319:20 324:25
326:9 327:20
376:13 382:5,15
**employers**  47:9
**employment**  47:5
329:17,23 330:5
332:19 340:15,19
342:12,19 364:23
**employs**  97:20,22
**empowered**  95:20
**encompass**  424:11
**encompassed**  42:4
**encompasses**
424:10
**encounter**  113:5
**encountering**
113:4
**ended**  55:23 63:10
190:9 385:14
398:18 448:16
449:8
**ends**  71:21
**enforce**  373:23
**engage**  416:4
**engaged**  81:9
332:17 333:17
344:21 364:20
366:2 408:13
418:13 428:15
440:5,15
**engagement**
343:16,18 418:9
**engages**  139:6
**engaging**  83:10
117:7 118:8
281:11 375:17
441:7 442:9
**english**  384:23
**enjoy**  137:11
**enjoyed**  154:7
**enjoys**  136:6
**ensuing**  167:14
241:12

**ensure** 108:22
109:6 110:3,8,18
168:12 199:25
204:15 210:17,21
372:14
**entered** 118:3
414:11,15
**entering** 123:4
**enterprise** 91:7
**entire** 132:10
152:6,9 372:5
402:8
**entirely** 205:10
441:25
**entities** 11:7,13,13
11:20 12:21 18:14
18:23 21:16 22:17
22:22 23:10,16
40:13 49:22 52:3
58:21 59:7,22
60:4,7 61:5 63:9
63:17 64:4 70:6,7
73:5,15,25 91:3
93:4,19 100:16
101:2 106:2,8,18
106:24 107:16
108:2 118:6 126:4
127:9,13,16,24
128:21 134:21
144:20 145:2,8,10
145:24 164:22
175:18 178:21,24
179:5,12,18 221:5
222:14 223:8
225:25 226:13,21
227:14,17 342:16
395:21 397:10
427:25 432:20
**entitled** 65:13 71:6
72:21 79:22 129:2
179:24 221:12

278:10 448:8
**entity** 18:11 19:9
19:20 20:8,22
21:22 22:15,24
23:4,19 47:19
49:19,25 50:3,10
60:12 61:22 68:2
72:23 76:16,19,22
85:24 97:8,12,16
97:20,21,22
125:15,18,20
137:19,23 138:8
138:14 139:12
149:22 157:13
166:11 169:18
179:20 196:5
200:11,12 204:19
205:5,8,25 206:11
206:21 207:8,16
228:10 243:22
247:13 316:19
332:10 339:21
340:24 341:8
345:17 348:9
354:18 367:4
369:11 376:16,17
395:20 415:20
434:9
**environment**
438:3
**episode** 412:11
**equal** 84:11
**equation** 38:25
148:24
**equity** 50:6
**equivalent** 85:23
329:5,9
**era** 156:20
**errata** 451:1
**especially** 211:6
399:7

**esq** 2:6,10,13,14
2:14,15
**essence** 397:22
427:3
**establish** 223:22
**estates** 51:13
**estimate** 128:5
226:4,9 234:11,15
278:2
**et** 1:8 4:25 41:21
154:17 155:16
218:12 328:13
331:22
**ethics** 25:17 41:20
332:7 439:18
441:6 442:8
**evaluated** 298:24
**evaluation** 392:3
**event** 111:14,20
112:15,20 222:8
248:9 276:4 277:7
300:19 317:21
319:19
**events** 111:20
112:5 317:20
358:9,11
**everybody** 252:12
276:24 292:15
367:6 379:21
381:13
**everyone's** 276:23
**evidence** 365:25
**evolution** 249:8,10
**evolved** 54:23
68:22
**evolving** 70:9
163:18 249:24
**ex** 239:4
**exact** 10:3 12:4,6,9
36:17 42:20 43:18
43:25 63:9 66:19

79:4 104:24 128:3
272:13 308:10
**exactly** 37:10 38:8
47:24 48:6 67:10
68:25 76:10 162:3
249:9,11 294:10
295:10 313:17
322:22 323:19
326:3 327:8,14
400:17
**examination** 6:19
90:23 182:9
255:15 364:16
400:10 402:9
446:20 449:17
450:10,12
**examined** 6:17
**example** 28:6,16
35:19 36:23 59:11
86:3,11 123:17
124:6,7 139:22
147:20 155:18
157:20 158:18
159:24 172:19
200:10 207:19
233:24 242:6
258:20 380:19
383:15 405:13
419:15
**exceeded** 226:13
226:22 227:2,4,8
**excellent** 66:10
**exception** 38:24
79:16
**exchange** 123:2,13
402:25
**exclude** 8:23 36:11
38:23 64:10
**excluding** 140:22
199:2

**exclusively** 39:2
208:17 211:17
**excuse** 238:14
**execute** 324:2,13
327:21
**executed** 88:25
209:6 327:17
**executing** 324:21
**executive's** 302:10
**executives** 301:15
301:20 369:22
**exercising** 344:17
**exh** 448:8,10,11,13
448:14,18,20
449:6,9,11
**exhibit** 7:12,18
65:2,4,8,15,23
66:6 70:22 71:5
71:13,17 138:18
141:14,20 254:8
254:10,14,20
255:19 303:24
304:3,8,10,11,15
310:16,23 385:6,8
385:15,17,18
386:9,14,16,20,25
387:3,9,15 391:15
391:19,25 392:10
392:13 401:24
402:3,15 406:16
406:17,22 419:19
419:21 448:6,6
449:4,4
**exhibits** 65:25
66:7 448:4 449:2
**exist** 74:3,4 141:17
145:10 201:14
207:3 208:18
211:20 212:7,7,18
**existed** 176:22

**existence** 74:6
104:19 132:11
148:19
**exists** 142:2
143:11
**exit** 325:15
**exited** 416:25
**exiting** 324:10
326:9
**expect** 222:3
328:20 343:21
353:9 373:11
380:23 390:22,24
**expectation**
328:24 373:15,17
374:2 379:19
380:5,7
**expectations**
287:12
**expected** 124:10
309:20 372:19
**expended** 415:13
**expenses** 19:14
159:25
**experience** 14:3
14:13 89:15
137:18 157:2
169:10 184:10
270:18 301:6
328:13 330:19
373:6
**experienced** 156:7
157:4,11 270:4
**experiences**
299:24
**expert** 71:25 72:2
72:3 204:21 392:6
392:6
**expertise** 168:19
**experts** 94:17,22
345:14

**expires** 451:25
**explain** 70:3 77:11
92:3 117:17 121:5
121:13,20 142:18
166:5 207:18
220:17 232:3
282:2 301:16
342:10 383:4
393:4
**explained** 79:22
**explaining** 88:23
**explains** 297:6
**explanation** 48:15
393:10 395:4,18
395:25 396:14
397:17
**expressed** 221:13
317:24 418:10
**expressing** 278:16
278:22 279:4
412:13
**expression** 281:6
**expressly** 234:10
**extend** 122:22
124:18 125:11,20
125:24 126:4
237:10 238:2
245:22 415:19
**extended** 118:4
125:7 237:21
412:21 442:22
**extending** 119:6
123:6 243:21
245:9
**extends** 122:10
125:16
**extensive** 168:23
331:7
**extensively** 25:6
**extent** 154:22
155:5 208:12

258:15 415:7
**external** 375:4,16
376:13
**extraordinarily**
258:3

**f**

**f** 3:2 450:2
**face** 200:15 213:15
213:23 214:12
**facilitate** 111:3
122:15 233:9
307:9
**fact** 29:25 31:13
89:7 97:19 103:3
108:3 110:17
172:15 208:14
213:3 231:18
265:3 268:24
299:17 313:3
314:17 316:21
340:13 341:20
350:2 351:4,14,25
416:22 436:24
440:25
**factor** 196:19
202:13
**factors** 32:9 94:12
170:22 196:19
**facts** 204:11 317:2
**fair** 20:10 21:15
41:13 57:11 61:2
62:2 65:21 74:12
83:18,19 88:17,19
95:3 108:13
114:20 116:12,23
117:3 129:3 134:7
137:14 148:24
156:3 167:14
192:3 193:9
194:15,17,20
197:2 215:22

233:25 236:5
239:23 246:15
257:21 258:21
261:20 265:10
271:13 281:12
291:10 292:10,11
293:9 294:8 296:4
299:4 346:24
354:12,13 357:11
371:22,23 382:18
411:25 412:2
416:8 419:2 429:2
429:5 435:19
**fairly** 293:19
303:4 323:21
**familiar** 49:24
237:13 246:6
253:5 269:17
281:7 391:3
**family** 47:15 52:10
237:14 245:25
246:11 247:11
368:6,18 369:3,22
370:10
**fan** 269:18
**far** 195:4 397:3
**fattaruso** 2:4,13
5:21,24
**fault** 120:8
**february** 322:20
**federal** 1:18
437:15 440:5,16
441:8,19 442:11
**fee** 19:21 390:13
394:17 415:25
416:2
**feedback** 301:19
302:10,16
**feel** 8:13 119:20
127:19 220:6
224:16 229:25

230:23 234:14
248:14 262:14,23
263:4
**fees** 17:25 18:12
18:24 19:10 20:8
20:23 21:17,23
22:6,16,19,22 23:5
23:17,19 59:11
133:20 134:4
135:6,25 136:19
136:20 137:6
152:25,25 388:15
388:22 389:7,12
389:19,24 391:6
394:8 395:19
397:3 399:2,14
**feet** 65:3
**felt** 287:16,18
292:24 352:19
354:8 375:8
**fewer** 145:20
397:3
**fiber** 397:22
**fiduciary** 59:21
60:3,6,10,11,14,20
61:6,9,23,25 62:4
62:13,17,20,21
64:2,6,11,19,24
214:23 398:3,8,20
**fifth** 350:6,11
**fight** 223:13
**figure** 227:25
228:17 230:4
234:21 235:8,19
271:8 306:2 388:7
**figured** 143:2
**file** 27:20 51:2
67:21 371:5,9,18
**filed** 4:25 24:3
237:3

**files** 370:16 404:10
404:16
**filing** 3:7 235:17
**filings** 24:15 50:20
50:23 235:16
236:4
**fill** 279:5 309:15
**filled** 124:21
**final** 71:10,11
**finally** 15:17
**finance** 18:20,22
19:16,17 20:4
21:5 22:25 197:10
389:21 390:11,12
390:17,22,24
394:20 414:25
**financial** 132:21
133:4 147:18
204:25 205:5
206:12 207:18,22
209:2 212:13
246:3 385:13
386:2 448:16
449:7
**financially** 5:11
135:2
**financing** 89:8
117:5,6,25 118:3
119:6 122:11,18
123:22,23 153:25
154:2 237:10,20
238:2,4,19,22,22
239:16 240:3
241:8,11 243:18
243:22 244:6,16
244:19 245:9,22
246:5 412:20
413:15 414:9,16
415:7,9,13 416:6
**financings** 89:24
120:14 126:9

**find** 70:24 197:11
236:7 239:16
339:15 379:6
380:14 414:22
419:20
**finding** 178:21
**findings** 348:4,11
361:8
**fine** 12:9 25:14
31:24 52:7 61:14
67:23 80:4 101:15
189:3 190:20
196:18 221:25
223:18 236:20
391:23 407:11
444:13 445:12,15
**finish** 15:21,22
224:7 411:9
443:18
**finished** 87:3,4
**firm** 5:6,9 18:5
19:13 54:2 218:14
249:17 252:16
257:16 276:8
282:20 286:14
312:11,18 317:8
318:6 319:2,5,8,9
319:11,12 323:12
323:22 327:22
332:11 333:21
341:5,10,11,22,24
342:3,14 344:12
344:21 345:18
348:10 352:18
359:7,17 363:21
376:9 397:23
408:18 415:2
419:6 427:4 438:5
**firm's** 331:22
332:11

**firms** 343:5
**first** 6:15 7:18
  36:22 44:24 47:19
  47:19,24 48:2,6
  49:8,19 103:17
  119:8,9,12,18
  120:2,4 121:24
  142:10 156:16
  222:5 235:23
  237:12 246:16
  247:23 248:2
  249:21 279:20
  285:3 288:13,19
  297:23 315:13,19
  330:9,14 366:22
  374:16,17 388:6
  400:13 403:15
  419:20 420:18
  421:18,21 422:4
  426:6 431:8
  434:15,17 447:5
**fit** 48:17 405:12
  431:7,15 433:13
**fits** 177:21
**five** 8:21,22,25
  9:13,15 11:19
  40:14,24 41:3,12
  58:4 70:13 145:15
  145:18 183:14
  215:19 216:8
  217:22 436:11
  446:17
**fixed** 42:22
**flag** 80:7 275:15
**flagged** 114:6,13
  271:11 275:15,18
**flagging** 54:5
**floor** 2:5,9
**flounder** 287:14
**floundered** 302:19

**floundering**
  287:11,20 288:23
  289:20,23 290:5,6
  290:14,16 291:12
  291:13,14,19
  292:10 294:2
**flow** 80:23
**focus** 81:22 119:4
  158:11 176:5
  285:3 325:19
  337:19
**focused** 199:7
**focusing** 64:12
  72:18 116:8
  196:20 208:17
  211:17 288:19
  414:5
**focussing** 25:10
**folder** 27:13,18
  65:25 66:4
**folks** 141:2 236:3
**follow** 44:6 60:16
  60:16 61:12 142:9
  210:8 222:12,15
  233:9 295:22
  304:19 305:8
  346:9 351:23
  357:5 437:6
**followed** 55:15
  229:23 278:4,11
**following** 418:14
**follows** 6:18
**foolish** 211:24
**football** 269:18
**force** 3:15
**foregoing** 447:8
**forgot** 242:14
**forgotten** 61:17
**form** 3:21 15:3
  98:23 107:5
  131:20 132:5

142:16 149:12
  204:6 205:6 224:3
  224:15 243:21
  281:14 289:19
  409:10 417:12,18
  438:12
**formal** 119:5
  301:18
**formally** 236:24
**format** 66:23
  323:18 387:15,20
  422:24
**formats** 422:12,22
  422:22
**formed** 30:2
**forms** 87:7 227:12
  301:23,25 431:21
**formulaic** 218:20
  218:21
**formulas** 389:18
**formulate** 85:5
  417:9
**forth** 28:6 450:11
**forward** 85:7
  190:17 420:25
**found** 27:5 231:14
  231:18 266:21
  283:13 403:19
  404:8,8,14
**foundation** 95:8
  223:10,17,22,25
  224:10,16 363:5
**founded** 247:19
**founding** 248:16
**four** 48:23 70:6,7
  71:5 103:12
  141:15 323:22
**frame** 285:13
**framework**
  426:12 428:20

**france** 48:22
**fred** 361:18
**free** 61:16 119:20
  127:19 224:17
**french** 48:20
**frequency** 240:12
  384:22
**frequent** 298:23
**frequently** 298:15
  300:5,6 383:19
**friend** 44:24 178:7
**friendly** 46:4
**friends** 252:7
  301:4
**front** 102:16
  124:23,25 130:14
  138:18 304:9
  392:5 403:3,7
  430:13
**fulfilling** 310:19
**full** 257:3,9,10
  258:20
**fully** 209:15,20,20
**function** 219:15
**functioning**
  279:12,15
**functions** 144:14
**fund** 63:10 72:22
  73:13,14 74:2,3,9
  74:12,14,16,22,23
  75:9,11,14,18 76:5
  77:2,7,14 78:3,8
  78:20,20 80:24
  83:10 84:25 85:8
  85:19,20,22,25
  86:3,7,15 101:25
  102:2,6,7,19,21,21
  102:23 103:5,6,7,8
  103:9,16,17 104:6
  104:10,17,18,22
  104:23 105:7,12

105:13,18,20
106:4,10,20 107:3
107:18 108:4,5,10
108:13,22 109:6
110:5,19,24 111:2
111:9,16 112:8,18
113:3,13 114:9,15
114:25 115:6,10
115:15,16,22,24
116:18,19 117:8,9
117:22 118:11,13
120:3 121:9,10,17
121:24,25 122:2
122:10,19,19
123:6,11 125:7,11
125:15,19,23
126:3,8,12,19,22
127:4,6,13,22
128:19 129:6,17
131:11,12,24
132:3,14,16,19,22
132:25 133:4,5,17
133:25 134:14,19
135:5 138:20
139:6,11,21,23
140:7,9,11,22
141:13,19 142:23
142:25 143:17,23
144:5,8,15,18
145:6,13 146:13
148:3,9,12,14,21
149:8,9 150:2,2,9
150:9,12,14,17
151:3,6,10,17,25
152:5,6,13,14,19
153:8,12,21 154:3
155:3,19 157:6,24
159:9 164:18,20
165:5,7,10,10
166:7,8,9 169:16
169:19 170:9,10

170:17,19,19,21
171:3,4,7,18,20,23
171:24 172:3,8,13
172:14 174:2,11
174:12 175:4,6,14
175:15,23,25
176:9,10,25 177:3
177:8,8 181:3
182:14,15,21,23
183:8,9,20,21
184:3,5,13,15,24
184:25 185:8,10
185:14,15,19
186:8,9 187:12,14
188:8,8 189:14,15
189:19,20,25
190:2,4,4,8,10
192:6,23,25
193:12,16,16
194:9,9,12 195:2,3
195:8,9,25 196:4
197:18 198:7,20
199:17 200:2,17
204:4 205:13,24
206:10,20 207:7
207:15,19,21
213:7,20,25 214:7
214:14,25,25
215:21,21 216:7,7
216:20,20,22
385:12 388:15,16
388:18,21 389:7
389:13 391:8
392:21 394:2,7,14
394:16 397:2
399:3,15 407:17
408:4 415:19,25
416:14 424:7,11
424:19 428:15
448:15 449:6

**fund's** 32:7 130:20
131:24 133:11
135:17,20 148:23
151:18 153:18,19
172:17 174:4
192:5 197:2 198:7
260:14
**funded** 193:24
415:23
**funding** 119:14,16
119:18 120:2,4,5,7
120:16,18,24
121:8,11,22 122:7
123:15 124:2,8,18
124:20,20,23,25
125:5,6,12,16,21
125:21,24 126:5
415:24
**fundings** 120:20
124:21 125:12,24
126:5
**funds** 52:9 59:11
59:12,15,18 71:6
73:11,21 77:16
84:9 102:6,11,19
103:7,13 105:4
108:7 115:17
116:10,17 117:13
118:25 119:2,7,8,9
119:13 124:5
125:16 126:15
128:20 129:7,19
131:25 133:24
137:12 141:3,9
167:9 173:25
193:19 194:10
206:14 214:6
215:4 217:17,18
218:23 219:18
227:13 244:21
260:12 396:11

433:23 434:2,10
434:11
**further** 3:20
402:24 447:8
450:14
**future** 311:23

**g**

**g** 6:14
**gain** 135:7
**game** 223:2
238:21 239:5
243:20 245:7,20
246:2
**gap** 124:19 132:13
184:8
**gardening** 275:6
**general** 41:15
81:18,20 102:14
124:12 138:19,23
139:15 140:3,10
143:15 148:24
167:6,13,14 172:9
172:18,25 173:22
174:5,7,14 181:5
236:17 243:25
246:12 300:15
334:10 389:17,23
**generally** 27:5
59:4 98:17 124:9
182:15 387:14
389:4
**generate** 15:12
159:16
**generated** 159:23
175:24 194:11
215:4
**generating** 155:4
215:9
**geography** 434:16
**getting** 30:25
79:19 95:18

211:13 277:12,16
277:17,17 383:8
407:6
**give** 8:13 55:24
72:10 84:22
127:20 128:4,9
136:15 140:25
155:18 158:18
171:13 190:21
220:6 226:3
229:25 230:23
236:17 248:14
280:14 285:9,12
331:11 334:19
346:10 395:18,25
413:18 414:20
426:20
**given** 33:19 86:8
91:18 117:4,5
134:5 135:5 169:4
216:24 219:2
235:15,19 236:8
294:21 299:14
307:25 311:23
381:12 411:17
419:18 421:2
446:14 447:10
450:13
**giving** 8:3 224:18
234:10,15 244:8
432:21
**glad** 55:15 72:5
196:18
**global** 235:21
362:13,19 363:2
363:13,17
**go** 4:15 8:7 15:5
24:17,18 39:8
40:6 56:3 85:4
90:9 96:9 121:4
123:25 146:5

155:15,24 159:7
163:17 173:9
180:12 181:21
210:15 225:12,13
229:20 250:24
253:9 255:5 256:5
273:16,20 288:2,3
289:7 309:6 327:7
327:14 334:3
339:10 355:14
356:20 364:6
366:16 380:25
386:13,15 390:10
400:2 414:22,24
430:16 444:3,11
444:16 446:6
**goal** 214:8
**goals** 48:25
**goes** 65:5 87:9
154:20 168:11,13
395:22
**going** 4:3 16:6
19:20 24:11 32:25
33:3 53:14 57:13
65:2,7,11 80:10
85:7 90:6,14
110:23 117:21
120:19 121:13
122:14 128:3,13
142:19,21 156:18
172:2 173:12
174:25 175:9,20
180:9 181:24
185:18,20 188:3
190:16 191:8,16
191:19,20 194:11
211:2 212:15
220:12 221:7
222:11,15,19,19
238:7 254:8 255:7
261:13 269:24

271:21 273:15
289:4,7,8 292:16
292:16,17 296:6
297:6 306:4 307:7
309:19 311:2,21
314:13 333:2
336:18 357:17,20
361:23 362:24
364:8 367:15
377:17 385:5,7
387:3,21 390:5
393:17,18 394:15
396:17 397:7,25
400:5 402:8
419:22,24 420:12
420:20,25 421:2
421:25 422:3
426:19 427:17
432:23 433:21
441:11 442:2
443:22,23 444:3,8
**good** 4:2 5:20 7:3
33:8 34:9 65:20
81:2,14 167:19
250:8
**google** 379:6
**gotten** 202:12
271:23 419:3
443:6
**governance** 150:5
150:8 151:19
**gp** 150:13 159:10
**graciously** 442:21
**great** 7:16 80:6
**greater** 128:11,14
145:19 167:11,12
175:14 228:21
416:8
**greenberg** 340:5,7
340:14,18,20,21
341:16,24 342:17

342:22 343:6,11
343:17 344:4
347:25 353:6
355:25
**grew** 47:25
**gronkowski**
269:21
**grossly** 378:19
**ground** 14:4,15
**grounds** 223:17
224:2,10 441:15
**group** 48:19,19
93:6 97:2,5
425:14
**grown** 54:22
**grudges** 178:16
**guarantee** 372:2
379:20 381:15
383:22
**guess** 10:6 21:24
30:3 57:6,13
60:24 61:2 120:6
120:11 128:7,7,13
128:23 157:18
177:18 205:22
226:10,23 230:6
233:24 234:3,8
248:19 357:18,20
357:23 370:24
390:3,4,5 393:15
393:17,18 394:15
396:17 400:20
**guessing** 37:14,17
42:22 43:25
131:15 145:16,21
227:6 228:19
247:24 248:17
288:15 390:2
393:14 394:4,25
395:3

guidance 330:20
guidelines 60:17
82:4,4 202:20
204:22
guy 250:8
guys 65:19 275:6

**h**

h 448:2
hacked 377:15
hacking 101:7
half 90:7 128:19
130:3,7
hand 71:19 72:19
76:4 141:20 442:9
450:20
handbook 25:17
332:8 359:5
439:17,19 440:4,8
441:6
handbooks 41:20
439:22
handle 42:6 289:9
313:12 324:10
433:12
handled 7:22
hands 65:20
happen 87:10
158:4 205:19
240:11 287:15
300:17,20 360:2
happened 107:23
137:17 195:6
215:15 334:21
393:9 396:2
401:13,16 413:24
415:9
happens 95:4
100:25 124:6
164:16 292:14
381:12 383:18
398:24

happy 15:19,24
116:4,6 220:17
271:4 288:10
293:16 364:5
hard 70:24 258:4
337:17 375:4,16
375:21,25 376:14
401:18 442:20
harm 421:6
harming 165:11
hashanah 433:13
hate 78:14
head 15:14 41:11
180:14 285:18
339:17 434:23
health 264:17,22
264:25 265:4,9,17
265:19,22,23
266:4 279:19
283:16
hear 14:19 210:2
275:6 277:23
279:13 374:16
401:5
heard 67:14 92:9
92:11,17,20 211:4
237:18 246:11
269:23 277:19
288:16,21 297:2
315:16 319:9
hearing 146:3
277:24 284:13
heated 419:4
hedge 415:19
416:13
held 1:19 4:16
43:22 169:18
176:24 177:7
200:10 397:10
400:7

help 24:21 94:18
94:21 118:22
119:25 120:23
121:21 123:20
146:11 150:7
157:21 158:3
167:22 205:20
232:3 266:16,21
331:24 354:16
helpful 59:2 85:5
87:8 89:20 100:11
116:5 147:21
203:15
helpfully 26:2
helping 309:13
hereinbefore
447:11 450:11
hereunto 450:19
high 81:2
hire 338:22 339:3
339:4 342:12
359:6,17 377:9
416:15
hired 110:7 339:7
348:10 351:23
355:18 416:19
hires 139:9,11
hiring 419:8
history 70:19
169:10 409:3
hold 59:23 60:4
71:12,22 97:22
132:22 133:4
134:6,21 162:24
165:6 168:2 172:7
175:3 177:3
178:16,20 179:19
179:21 205:3,25
206:12,21 207:9
208:25 234:12
256:3 385:18

386:24 443:17
holding 170:3,4
230:2 236:16
holdings 1:8 4:25
49:25 50:18 51:16
51:22 52:14,15,23
53:9,15,22 63:11
63:16 64:22 67:3
67:7 68:5,10,20
69:17 91:2,5,23,25
141:23 143:7
160:7,10,18,24
161:23 162:14
179:3,19,21 180:3
274:5 391:12
451:2
holds 136:7 163:6
200:18 212:13
395:22
holiday 433:14,16
435:24 436:12
holidays 433:3,4,9
433:12,12,17
436:14 437:24
home 267:11
366:11,16,22
367:17 372:24
373:14,20 374:6
374:23 375:21
400:15 401:4,10
403:11,20,22,24
404:9,15,21
homeland 367:5
375:10 426:13
homes 376:13
honest 60:20 61:5
61:21 80:2
honestly 320:20
honing 115:3
hope 65:5 367:12
416:16

hopefully   7:23
  14:14 273:21
  329:14 445:8
hospitals   267:9
hotel   379:7
hour   37:21 90:6
  183:15
hours   37:11,12,13
  37:18 39:18
house   408:2
houses   27:14
how's   85:14
hr   99:21 218:12
  262:7,8 307:16
  308:7,15 309:6
  330:12 333:22
  335:20 336:5,13
  336:21 360:6
huh   292:9 297:3
  423:13
hundred   325:16
hundreds   185:17
  193:23
hundredth   48:10
hung   211:13
hurting   268:25
  293:14,18
hypothetical
  123:19 160:3
  175:8 176:17,21
  177:14,15,19
  180:6,15 200:21
  201:13 204:8,9,11
  214:4,17,18
  215:11 243:24
  244:3,8 355:11
  398:23,24 440:17
hypotheticals
  182:17,18 394:14

**i**

iacovacci   1:3 4:24
  7:6 10:12 34:22
  35:8 62:23 63:4
  63:21 64:3,8,15,19
  164:9 178:4,15
  179:8,24 181:7
  214:10 246:17
  247:15,20 248:2
  248:22 250:11
  251:3,20 252:10
  252:23 257:20
  258:10,17,23
  259:10,17 260:18
  261:4,14 262:19
  262:24 263:10,15
  263:20,25 264:13
  264:17 265:4,8,16
  267:22 268:4,8
  270:19,24 272:10
  272:23 274:20
  275:11,14,21
  276:4,17 277:7
  278:4,10 279:6,14
  280:21 281:9
  282:17 284:7
  294:3,7 296:2,9
  298:8,21 301:9
  302:16 303:8,10
  303:17,19 304:17
  305:2,8 306:18
  307:4 309:12,22
  310:4 311:12
  312:5 313:6,22
  314:10,16,19
  315:14,20 316:20
  317:10,24 318:6
  319:3,16,20,21
  320:8,15 321:5
  322:5,15 323:8,25
  324:13,20 325:10

  327:25 328:8,16
  328:24 329:8
  331:5 332:3,17
  333:16 334:24
  335:18,22 336:7
  336:14,22 337:3,9
  338:4,25 344:6,23
  346:19 347:16
  351:6,15 355:15
  356:3,10,12
  360:14,24 364:19
  365:12 366:2
  368:22 369:2
  378:22 391:9
  395:5,8,21,22
  396:23 397:7,11
  403:24 412:3,6,14
  420:24 421:15
  424:20 429:17
  430:15 431:11
  435:23 436:19,23
  437:16,21 439:13
  451:2
iacovacci's   63:7
  178:18 249:4
  259:25 261:22
  275:4 278:18,23
  279:24 284:8,13
  285:7,23 286:8,22
  287:6 289:19
  290:6,15 291:11
  291:13,18 292:2,9
  293:25 296:15,20
  296:25 300:25
  303:20 306:7
  312:13,21 315:25
  316:10 329:17,22
  330:4 340:9
  355:19 362:12,18
  362:25 363:12,17
  366:11,21 367:17

  372:12,24 373:14
  374:6,23 375:4,15
  375:20 399:17
  400:15 401:4,10
  403:11 404:21
  407:17 408:4
iacovaccis   300:18
idea   51:4 104:10
  104:11,13,15
  141:11,16 263:9
  263:14 296:8,14
  312:17 320:10
  328:22,23 339:22
  356:4,7 373:7,8
  375:24,25 393:16
  393:19
identification
  65:16 254:15
  304:4 385:16
  386:21 391:20
  402:4 406:23
  420:6,8
identified   56:21
  142:23 143:7,15
  144:7 148:2,3
  160:24 199:12
  421:6,18,20,22
  429:13,19 435:4
identify   28:16
  56:6,10,14 71:18
  89:16 94:18 96:7
  110:16 149:23
  150:25 260:22
  361:25 364:18
  365:12 387:24
  414:15 420:21
  421:9,14 426:8
  431:9 444:24
identifying   194:19
  346:16

**identity** 164:21
197:11
**imagine** 258:4
273:19 282:22
285:11 350:10
355:7,10,11
**impact** 278:17
396:11
**impending** 275:17
**implementing**
30:3
**implements**
377:25
**implicate** 224:12
**implications**
114:14
**implies** 120:13
298:12
**important** 15:13
62:9 203:21
204:15 260:7
319:2,18 367:7
442:23
**impressed** 66:11
**improper** 169:21
169:22 221:10
231:8,12 441:22
**improving** 168:8
**inaccurate** 69:24
143:3 208:7
**inappropriate**
225:3,6,10,15
**inaudible** 30:23
31:7 35:22 85:3
223:23 225:4
374:11 430:7
436:9
**incapacitated**
310:8
**incentive** 153:4,6
200:8 389:19

394:8,17 397:9
**incentives** 154:5
204:24,25 205:10
205:11 220:21
227:15
**incentivize** 204:2
**incentivized** 176:8
177:5
**inception** 137:25
**inches** 405:23,25
**incident** 111:13
384:25
**incidental** 380:23
381:11 382:6,7,10
382:11 383:2,3,5
383:22 384:5,8,19
384:21,24
**include** 123:5
126:18 134:20
208:24 210:6
225:17
**included** 210:3
258:19 337:12
338:18 340:13
342:21 363:22,23
**includes** 61:4
426:13
**including** 134:22
159:10 172:9
177:9 181:6
227:10,12,23
379:25 426:16
438:15 443:9
**inclusive** 338:15
338:16
**income** 42:22
388:7,8,19 390:8
390:13 392:21,24
393:2,5
**inconsistent**
142:24 297:24

299:3 359:10,21
398:14
**incorrect** 154:10
188:10 209:3
325:12 328:5
351:11 366:25
**incorrectly** 70:4
**increases** 134:2
**increasing** 133:12
133:14,24 183:10
**incur** 19:22
**incurred** 20:23
**independent** 69:19
89:23 109:11
150:11 185:20
201:12 208:10,21
209:15,17 210:13
210:17,18,20,21
211:10,14 213:2,4
333:23 336:24
337:2,8 338:2,11
338:20,22 339:20
339:24 340:3,8,25
341:3,6,12,19
342:23 343:11,19
344:9,17,25
345:21 346:2,18
347:15 348:5,10
349:11,13 351:4
353:5,10,20
354:11 355:18,21
355:22,25 359:6,8
359:18 360:11,23
361:10,16,25
362:10 369:22
426:16
**indicates** 67:25
**indicating** 316:11
**indirect** 134:22
136:8 165:5 172:8
200:12 205:4

206:12,22 207:9
207:17,22
**indirectly** 122:21
133:5 145:4 149:8
165:7 175:5
219:21
**individual** 20:9
61:22 87:24
152:22 164:22
165:2,3,12 166:8
166:13,25 177:2
177:10 205:11
212:12 230:20,25
238:16 241:13,25
243:13 309:15
345:4 346:17
391:13
**individually** 19:11
378:6
**individuals** 106:2
106:8,17,25
107:16,25 168:2
179:10 198:4
203:24 239:22
248:15 346:17
**industry** 379:21
416:14
**inefficiencies**
113:3,20 114:7
**inefficient** 113:12
**inferring** 77:6
**inform** 268:8
324:20
**information** 30:20
42:7 86:20 109:20
128:23 375:6
394:5,25 414:23
430:20 440:21
449:21,22
**informed** 268:4
424:22 433:9

442:19
**informing** 265:17
308:14,15
**initial** 119:14
120:4,7,11,13,16
120:18,24 121:8
121:11,22 123:7
123:15,22 124:5,8
124:18,20 125:5,6
125:11,16,21,24
126:4 175:9
**initially** 47:25
49:11,12 127:23
**initiated** 49:14
**input** 68:23
330:20
**inside** 333:21
**insider** 372:9,14
376:20
**instance** 155:18
288:22
**instruct** 221:7,20
223:12
**instructed** 15:7
222:23 407:16
**instructing** 222:9
222:21
**instruction** 222:12
222:16 224:19
**insulated** 378:6
**insurance** 12:18
12:25 13:6,17
**intact** 404:10,16
**integral** 251:3,9
**intellectual** 429:9
**intend** 31:12
223:12
**intended** 232:21
232:24
**intending** 268:9
308:5,6

**intends** 324:22
**intensions** 305:14
**intent** 308:21
**intention** 268:5
315:21 317:15,25
318:2 375:14
412:15
**intentionally**
69:11
**intents** 308:14
**interact** 251:16
252:10,18 261:3,6
300:24
**interacted** 251:20
261:10
**interacting** 225:16
252:3,6 253:15
**interacts** 252:12
**interest** 47:4,7
67:7 123:12
132:18,20,22
133:4 134:5,22
135:3 136:8 152:7
159:22 160:12,19
162:6,24 163:6,11
163:16 165:4,5,6
166:9,10 168:2
169:18 172:8
174:13 175:4,13
175:14,15 176:24
177:3 178:18
179:20,22 181:12
181:16 198:19
199:23 200:11,14
200:18,20 205:4
206:2,22 207:9
211:3 212:13,17
213:11,14,20,21
221:6 227:15
243:23 245:8
246:3 326:12

395:22 397:11
408:4
**interested** 5:12
44:19 231:3 240:5
241:8 309:12
450:17
**interesting** 101:24
266:7 283:10
288:5
**interestingly**
42:21
**interests** 64:20
172:21 173:19
174:8 176:5
178:20 179:12
180:2 185:25
200:3 204:3 205:5
205:7 209:2 273:4
273:9 407:17
**interfere** 4:12
**interference** 4:9
146:3
**intermediate**
82:22 83:4,9,16
103:6,8,9 140:22
250:19
**internal** 24:21
109:11,14 141:2
423:2
**internet** 271:16
**interrogatory**
430:8,9,10,14,19
431:2 435:13
**intimately** 307:24
315:8
**intro** 256:17
**introduce** 7:18
65:2,8 254:9
385:6
**introduced** 65:22

**intrusive** 221:10
**inure** 136:7,20
152:20 169:17
172:2,16 174:3
**inured** 181:4
**inures** 134:4,10
**invest** 30:7 105:20
106:3 107:18
108:4,16 109:5
111:4,8,17 113:5
113:10 114:5
115:8 116:10,19
127:6 151:7,11
193:19 253:9
**invested** 108:10
129:18,25 130:8
130:20 131:25
133:13 194:12
237:19 244:20
**investigate** 25:6
276:2 355:19
**investigated**
337:13 347:24
**investigation**
331:12 333:24
336:25 337:2,8
338:3,11,15,17,18
338:21,23 339:8
339:21 340:8,16
340:25 341:6,12
341:19 342:23
343:12,19 344:9
346:3,19 347:15
348:5,11 349:11
349:13 350:2,3
351:5,15,25
352:22 353:11,20
354:3,12 358:16
358:20 359:7,8,18
360:11,21,22,23
361:6,11,17 362:2

362:10
**investigations**
41:4
**investigator**
339:24 340:3
344:25 345:21
355:18
**investigators**
353:6 355:25
**investing** 106:9,19
107:2 108:7,13,18
110:4,18 114:13
127:11 133:15,18
133:25 170:3
**investment** 29:16
29:23 30:13,16,21
30:22 31:9,10,11
31:15 32:5,6,7,10
52:9 59:6 73:9,20
74:21 75:8,17,22
76:3,16,18,23 77:3
77:9,12,14,18 78:9
78:12,21,24 79:5
80:17,20,22,23
115:25 116:9
117:4 126:11,15
127:8 128:20
133:21 134:3,13
135:6,25 137:13
139:9,11 140:2
143:22 144:7,15
144:19 145:4
146:20 149:6,19
151:12,13,17
159:12 168:6
170:11,16 171:2
172:12,20 173:17
173:24 174:10,17
174:20,23 176:7
177:6 179:16,17
180:25 181:2

186:4 191:4,23,24
193:4,13,14
195:14,19,24,24
196:10,11,12
197:9,14,19,23
199:19,21 200:15
201:8 202:24,25
203:6 204:16,17
205:12 212:18
213:24 214:8
215:16 218:6,24
219:2,12,19 228:9
228:10 234:13
254:3 263:15
388:21 428:7
**investments** 29:10
85:14,21 115:21
115:23 116:10,20
127:21,22 131:11
131:17 133:19
136:2 139:5,18
148:13 169:9,14
196:7,8 237:7
425:19
**investor** 111:13
113:10,12 229:13
229:14,22 230:12
418:20 422:5,6
**investors** 105:8,10
105:13,19,19
108:7,9,16,21,23
109:5 110:3,18
111:3,7,17 113:4
114:5,12 115:6,7
115:12,14 133:13
133:15 134:2
139:20 148:17
172:22 173:19
174:8 181:12,17
186:2 198:20,21
199:23 200:3,5

213:11,14,16,22
214:24 229:2
251:17,21 252:3,4
252:10,13,15,18
252:24 253:6,8,15
253:20 254:4
256:11,22 257:10
257:21 258:11,18
258:23 259:11,18
278:24 316:20
348:7,12 349:9
350:4 351:16
352:2 418:24
422:15 434:16
**invests** 126:10,13
126:22 127:14
128:19 129:6
**invited** 267:15
**involve** 11:20
13:14 43:7 60:19
87:14
**involved** 11:12
12:11,13 20:21
56:17 89:9 104:5
139:17 238:20,24
250:18,22 260:2,6
313:9 314:13
315:8 330:3
331:12 341:4
343:23 344:5
345:18 347:2,8,9
347:13 360:5
362:8 366:8 401:2
401:7,19,22
408:21 429:8
**involvement** 19:20
**involves** 12:16,17
412:16
**involving** 11:2
13:17 83:11

**issue** 13:23 21:11
221:25 245:22
299:15 338:24
**issues** 72:3 224:16
264:17,22,25
265:4,9,17,19,22
265:23 266:4,16
283:16 284:11,22
293:8,13,18 294:4
294:7 299:3,13
306:23 342:19
416:23 417:7,13
418:4
**item** 388:6
**items** 40:25

**j**

**january** 267:17,23
270:21,21 272:12
275:5,11 279:22
304:2,18 305:10
312:22 315:12
319:17 320:4
388:2 392:14
396:18,22 402:2
402:22 403:2
448:13 449:9
**jason** 2:6 5:21 7:5
270:24 277:11
363:24
**job** 20:14 43:5
44:16 54:2 181:13
201:10 251:22
252:2 279:12,15
279:24 280:11,13
281:21 282:2,11
284:22 285:7,23
286:8,22 287:6
296:25 297:4
301:11,20 302:10
302:17 303:11
318:16,20 329:7

333:21 346:12,21
348:15 353:3
354:25 367:2
368:14 373:16
374:9,10 377:4
378:17
**jogging** 297:11
**john** 164:4 273:13
274:12,14 317:19
**johnny** 366:9
403:15
**johnny's** 373:16
**join** 43:16 246:20
247:11
**joined** 247:20
270:25
**joining** 44:11
**judge** 3:13 225:13
**judgment** 344:18
372:17
**juggling** 36:3
**jumping** 207:4
**justify** 366:4
375:14

**k**

**karina** 276:15,19
407:16
**keep** 16:8 168:13
208:13 261:14
272:17 281:4
288:25 289:4
369:10 426:19
428:9,11,18
432:23 433:21
434:16
**keeping** 287:12
**key** 243:12
**kick** 337:19
**kids** 300:9,11
**kind** 261:23

**kings** 450:5
**knee** 266:16,21
283:7,9 284:11,14
284:25 285:19
288:4 293:2 294:4
294:7 295:20
296:3,9,15,21
297:2,4,14,21,25
298:5,21 299:12
299:17,20,24
301:9
**knees** 265:20,24
268:25 293:9,14
293:18,18 306:3
308:24
**knew** 46:3 296:14
342:13 367:22
**knocks** 241:9
**know** 7:15,19 9:24
10:9 13:4 14:22
18:11,15 21:20
22:14,19,23 23:3
23:15,18 28:3
33:9,22 34:2,5,21
34:25 35:2 38:25
39:17 41:12 45:8
46:16 48:2 49:17
51:21 52:7,7,21
57:18,18 58:7
59:3 64:10 68:12
69:19 71:15 79:15
80:2,5,7 83:24
90:7 91:8 94:13
94:18 96:17,23
97:10,12,15,20,21
97:24 99:12,13,17
99:23 100:17,22
101:13,16,17,19
102:3 103:19,20
104:2,11,13
105:15,22,25

107:10,20,20
108:15,17,25
109:3 110:12
113:2,17,21 114:2
115:3 120:25
121:6 128:10,18
129:5 131:6,9
132:9 133:8
140:12,13 144:25
145:9,17,19 146:8
147:13,23 148:11
149:24 150:16
152:7 157:10
158:22 162:10,21
162:23 163:5,6,10
163:14 164:2,5,8
164:10 166:18
167:10 168:17
169:7,12 187:24
207:11 209:8
212:2 213:18,22
214:20 217:20,23
221:22 222:6
223:14,25 225:18
226:2,11,16,20,25
227:3,4,7,8,18
228:8,12,20 231:6
231:19 235:7,19
236:6,11,23 237:4
240:14 242:7,11
244:24 245:5,17
245:18,23 247:25
248:11 250:2
252:5,15 253:2
256:17 257:5,14
261:16 265:7
266:8,11,13
268:19 269:13,20
270:2 274:25,25
276:9 277:23,24
279:12 280:14

282:10,14 283:9
283:10 286:3,16
289:11 290:20
295:6,23,25
296:20 298:19
301:5 305:16
308:22 309:9
316:22 318:21
321:3 323:18
326:2 327:7,11,16
328:15 329:3,6
330:11,23 331:12
331:13,23 332:9
332:11,14 333:23
334:10 335:14
337:5,18,21
339:10,16,18,23
340:2,11,13 341:8
341:14 343:20,24
346:22,23 347:5
347:23 348:8
352:17 353:12,14
353:18,19 354:2,5
354:7,19 357:8,9
357:15,24 358:8
358:11,15,19
359:23,24 365:21
367:7,14,22
368:20,25 369:18
371:10,15 372:5,6
372:9 373:9 374:8
374:25 380:22
381:4,9 383:3
384:24 387:12
389:11,21 390:9
391:12 393:22
394:23 395:14
396:6,7 397:19
399:8,9 400:17,18
403:9,17 404:18
408:16,20 409:16

409:17,21 420:16
431:3,22 435:15
435:19,25 436:3,5
437:13 441:14,22
442:21,22 443:2
443:21
**knowing** 281:4
316:15 371:11
**knowledge** 38:12
44:12 55:9 57:20
77:20 78:19 79:14
80:4 81:2 102:24
103:18 106:6,16
106:21,23 107:24
113:7 114:3,19
118:15 130:7,9,18
142:3 143:10,25
144:10 151:23
161:5,6 182:21
184:7 223:11
224:25 252:9
326:4,7,12,22
343:2 383:21
401:18
**known** 46:2
**knows** 314:6,16
379:21 409:13

**l**

**l** 3:2,2 6:14,14
447:2
**l.p.** 385:12 448:15
449:6
**labeled** 327:2
**labels** 66:15 67:17
**lack** 238:5 286:3,3
286:9 298:24
**laid** 325:25
**lan** 366:9,20 367:8
367:15 368:5
372:11,17,20,21
373:11 374:20

375:3,8 377:6
400:13 401:11
402:22,25 403:6
404:7,13,19
**lan's** 375:5 403:15
**landscapers**
273:18
**language** 256:11
327:2
**lanny's** 403:14,15
**laptops** 384:17
**large** 95:19 96:5
312:18 317:20
319:9 332:6
405:18
**larger** 319:11
416:7
**largest** 429:8
**last's** 311:15
**late** 156:12 445:20
**law** 341:5,10,11,21
343:5 344:20
345:18 348:10
441:8,19 442:11
**laws** 202:20
440:16
**lawsuit** 9:8,12,21
10:2,15 19:12,22
20:10 437:15
**lawsuits** 9:17
**lawyer** 429:3,6
431:5
**lawyers** 21:13
94:17,22 349:22
**lay** 223:10
**layer** 148:20
**lead** 115:5 175:9
**learn** 168:14 375:2
403:3
**learned** 400:16,17
403:7 443:9

**learning** 231:3
**leave** 46:8 272:19
272:20,23 273:7
308:7 309:22
311:3 324:3,14,22
329:5,9 336:11
419:11 438:5
442:4
**leaves** 279:10
395:6
**leaving** 43:2 44:11
44:20 216:11,14
269:3,4,7,10,14
270:15 310:17
325:6 327:20
332:11
**led** 47:15
**left** 43:15 46:23
66:3 72:19 140:21
141:20 148:6
178:22 233:24
273:3,25 274:9,21
275:3,9,22 276:5
277:8 328:3 329:2
391:9 395:9
396:23 419:18
**legal** 2:13 22:22
23:19 56:25 77:23
79:3 349:6,7
427:22 451:1
**legislate** 99:4
**lehman** 42:13,18
43:2,9,12,15,20
44:3,11,20 45:5
**lender** 81:11
**lending** 73:12,13
76:4 105:12 106:4
106:20 138:20
143:16 385:11
448:14 449:6

**length** 187:19,21
187:23 189:6,8
190:19 201:12
206:15 207:13
208:10 209:7,10
209:12,19 210:10
213:2,4
**lengthy** 242:14
357:7
**letter** 331:6
333:18 343:16
364:22 365:14,19
365:22 366:3
448:11
**letters** 48:16
**level** 81:3 89:15
155:7,22 157:3,7,9
157:23 158:3,16
216:22 218:10
313:10 377:17
398:5,21 407:18
408:4
**levine** 2:14 5:24
31:2,4
**lexington** 2:9 4:20
6:25
**liabilities** 213:15
213:24 214:12
**life** 306:3 380:13
**lifetime** 9:2
**light** 443:16
**liked** 250:5,6
**limit** 247:12
399:14
**limitations** 156:13
156:21
**limited** 132:24
133:3 146:16
214:13 267:2
405:15

**limiting** 216:9
**limits** 28:13
**line** 15:20 107:9
  112:24 137:8
  140:8 198:25
  304:19 311:15
  388:6 393:2 403:2
  443:19 451:5
**lines** 73:11,15
  81:19,21 229:23
  272:15,15 387:24
**link** 86:20
**liquidated** 193:20
**liquidating** 86:16
**liquidity** 82:6,7,8
  82:9,16,24,25
  83:11,15,17,22,23
  84:3,4,6,9 86:14
  86:21,23,24 87:11
**list** 26:2 39:22
  66:7 168:11,12,21
  168:23 169:2
  254:17 327:25
  426:21,22 431:18
  433:14,25 435:2
  435:10,20 443:7
**listed** 40:15 70:6,7
  73:9 93:20 138:18
  145:24 431:7
  435:5
**listing** 30:16
**lists** 422:5,7,15
**literally** 245:2
**literate** 384:23
**litigating** 10:11
**litigation** 7:7
  11:11 12:22 13:7
  13:17 34:23 49:5
  214:11 353:16
  420:23

**litigations** 10:8,10
  10:20 11:2,6,23
  13:12
**little** 41:23 72:13
  84:22 85:17 107:8
  121:5 172:24
  237:6,8 239:25
  337:23 420:25
  444:2
**lived** 105:14
**living** 106:25
**llc** 1:8 4:25 49:25
  50:18 51:16,18
  52:15,23 53:9,15
  53:23 58:15 63:16
  63:17 64:21,22
  67:3,7 68:2,5
  72:23 73:16 76:19
  77:8 80:17,20
  91:4,5,24,25 140:9
  152:21 154:22
  155:7 157:9 158:2
  159:18,21 160:7
  273:5,10 274:2,3
  276:3,18 326:23
  327:20 386:19
  387:10,25 389:2
  391:18 398:11
  448:18,20 451:2
**llcs** 62:5,18,24
  63:4,6,22 325:3,22
  325:25 326:6,14
  326:18 327:5,12
**llm** 51:14
**llp** 2:4,8
**load** 385:9
**loaded** 119:20
**loan** 81:7,17 82:10
  82:20 83:7 250:19
  250:20,23 260:4
  260:12 415:7,20

**loans** 81:10,12
  89:24 425:21
**located** 4:19 16:24
  106:8,18 107:16
  108:2,23 109:7
  110:5,20 374:23
  434:10,11
**log** 366:9,20
**logged** 378:24
  379:9
**logging** 367:15
  373:19
**logical** 311:25
  334:18
**logistics** 28:22
**long** 11:15 37:7,10
  45:10 47:3 49:9
  178:7,11 260:15
  263:22 269:13
  292:25 320:15
  340:19 341:9,21
  342:9 417:15
  441:20,24
**longer** 37:20 83:5
  87:6 280:16
  281:18 282:17
  288:7 294:15
  309:20
**look** 28:4 65:24
  66:20 71:19 79:7
  131:4 138:10
  154:11 162:16
  163:3,9,13,17
  164:3 185:4
  217:19,24 228:15
  229:21 235:2,5,12
  235:18 250:25
  254:8 276:9
  303:24 315:5
  327:8,14 339:11
  343:13 348:2

  354:10 360:6,7
  377:3 387:22,23
  388:5 389:16
  390:10 391:4,11
  391:15 394:19
  396:10 401:24
  406:16 408:25
  409:3 411:3
  416:20 419:19
  430:16
**looked** 72:15
  134:23 310:24
  392:13 413:13
**looking** 26:3,7
  28:7,9,17 29:9
  30:6 69:10,23
  72:24 114:5
  122:18 128:22
  131:6 132:6
  140:20 144:4
  146:15 184:12
  226:15 234:7
  236:12 254:25
  256:12,14,17
  278:6 312:15
  392:7 394:24
  396:3 408:23
  419:13 430:22
  435:22
**looks** 152:15 221:2
  402:20
**loss** 386:19 387:10
  387:16 388:2
  391:18 392:9
  396:12 448:19,21
**losses** 156:6 157:2
  157:11
**lost** 120:23 155:25
  271:15 406:3
**lot** 25:22 47:4
  49:22 155:13

245:13 286:5,13
301:3,3,4 312:8
343:7 396:10
411:7 413:4
414:21
**lots**  39:21 202:6
241:7
**lou**  6:2 17:5 38:2
38:11 72:6 142:9
156:12 186:25
231:10 354:15
392:4 402:7
445:18
**loud**  219:8 273:19
277:24 323:16
**louis**  2:10
**lp**  73:13 74:2,10
102:7,21 105:12
105:21 106:4,20
115:14 117:8
118:4 131:13,18
132:3 138:20
149:8 154:4 155:3
157:24 170:17
171:3,7
**lp's**  172:3
**lps**  198:21 199:24
**ltd.'s**  131:11,17,24
**luck**  386:22
**luncheon**  271:17

**m**

**m**  6:14
**machine**  368:18
369:4 370:8 371:6
371:19 372:24
373:14,19 374:22
379:10 403:16
**machines**  382:16
**mail**  25:19 36:8
304:2,16,24 305:2
305:4,21 306:7,22

311:8,14 312:14
312:23 314:11,18
320:4 363:2
380:20 383:16
402:2,20,25
404:18 405:2
438:13 439:18
448:13 449:9
**mailing**  304:17
**mails**  36:11
362:12,18 363:12
363:17,21 402:22
**main**  260:9
**maintain**  54:3
439:19
**maintained**
310:12
**maintaining**  54:7
54:11,16 55:2,11
55:19 56:7,18
57:4,9,22 58:10
401:8
**majority**  314:7
**makers**  204:16
**making**  32:11
123:19 133:18
139:17,24 140:5
196:12,14 201:16
201:17 202:3,3
203:22 204:18
205:12 212:12,18
220:23 248:9
274:11 334:23
335:7,11,17,21
336:6,13,21 347:2
347:10,14 366:23
418:24 440:8
**mallet**  343:7,9
**manage**  433:18
**management**
51:18,23 52:8

58:15,19 59:5
67:25 68:9,19
69:16 72:23 73:9
73:16,19 74:21
75:7,16 76:3,19
77:8,14,17 78:11
78:23 80:16,19
91:3,23 97:2,5
134:4,6,23 135:7
135:10,16,19,25
136:6,9,15,19
137:6,11,13,19,22
138:3,7,14 139:12
143:22 144:6,14
144:19,21 145:3
145:11 146:21,22
149:6 154:16
168:15,18 170:12
171:18,22 172:12
173:24 174:17,21
177:7 185:14,15
197:9 218:5,9,24
219:3,12,25
228:10,13,24
229:3,15 230:4,24
231:20 233:17
234:4,16,21
235:14 236:8
428:14
**management's**
134:3 135:4
136:21 137:7
176:6
**manager**  52:9
59:6 73:9,20
74:21 75:8,17,22
76:3,16,18 77:3,9
77:13,15,18,25
78:9,12,21 79:6
80:17,20,22
133:17,21 134:13

139:9,11 140:2
143:23 144:7,15
145:4 149:6
159:13 170:12,16
171:2 172:12,20
173:18,24 174:10
179:17 181:2
191:5,24 193:14
195:25 196:10,12
202:25 212:18
213:24 218:6
228:9 235:22
254:3
**manager's**  174:20
**managers**  78:24
**manages**  78:2
139:19 172:20
173:18
**managing**  42:21
52:20,22 79:9
138:25 139:2,15
140:4 141:23
143:8 160:8,25
161:7,12,23,25
162:8,12,13,20
185:25
**manual**  21:10 27:9
438:14,19,23
439:5 440:14,18
**manuals**  29:7
**manuel**  96:14,15
97:4,21 98:2
**manuel's**  96:17,23
**maps**  379:6
**march**  66:16 67:8
67:18 68:9 69:10
69:18,25 73:5
**mark**  34:2 98:4,5
98:12,13,18 99:2
99:10 163:10,24
192:21 194:25

195:21 267:17,22
307:20
**mark's** 444:4
**marked** 65:14,25
254:9,14 304:3
385:7,15 386:20
391:19 402:3
406:21
**marketing** 231:4
**markets** 169:10
**marriage** 450:16
**massive** 213:15,23
214:12
**master** 141:2,19
142:23
**material** 95:4,17
95:21 331:13,14
331:18,21,25
333:24 337:14
340:16 346:7
438:2 443:2,3
**materials** 23:24,25
39:21 52:3 76:7
77:21 79:2 146:15
237:2 327:19
358:23 366:22
368:5,8,15,17
369:4 372:23
373:13 374:5,21
375:3,19 400:14
401:3,8,17,21
410:2 422:11,19
422:20,23 429:24
430:2,4 437:2
**maternity** 311:3
311:21 329:5,9
**matter** 4:24 25:15
33:11,16,20,23
41:15 149:4
190:23,25 331:13
331:15,18 406:2

407:22 450:18
**maturity** 87:22
**maximize** 186:3
**maximum** 82:15
82:16 83:15,17
**mean** 16:8 26:13
30:15 32:4 63:14
64:9 83:5 87:2
92:4,5,25 98:10
105:9,11,17
119:12,17,24
120:2,24 121:22
133:16 134:10
158:13 160:4
183:14 187:22
190:20 193:13
194:3 195:16
209:9,14,18 210:9
211:23 217:3,8
219:3 228:23
229:20 231:16,24
233:12,18,21
239:24 244:2,3
246:23 247:12
252:6,14 253:3,19
254:2 265:21
274:3,4 276:22
279:19 281:16
282:2 285:21
288:16 290:21
301:16 321:12,18
321:22 325:13
329:12 338:21
349:18 350:11,16
352:12 357:14
365:14 388:13
389:2 395:3 408:9
411:8 415:10
420:22 427:19
432:9

**meaning** 26:12
**means** 26:24 60:9
60:11,14,15 84:3
87:4 92:8 118:23
121:15 149:20
156:11 206:16,25
206:25 219:10
228:5 257:2
259:23 262:17
269:14 270:6,15
270:18
**meant** 30:12 121:7
167:23 171:13
219:14 232:3
233:5 290:4
359:16 383:5
397:6 439:3
**measured** 156:21
**mechanism**
190:15 325:6
**mechanisms**
426:10 427:24
**media** 4:17 90:15
90:21 181:25
182:7 255:8,13
364:9,14 446:16
**medical** 293:8,13
293:17 298:5
310:20,21 369:2,8
369:21 371:6
372:12
**medications** 16:16
**meet** 36:13,22
48:25 186:4
246:16
**meeting** 35:19
37:3,25 38:4,12,14
39:11,17 40:2
230:8,16,21
233:23 267:16,21
268:3,15,18,22

270:21 272:12
303:17 319:3
321:11,13,20
322:2,5 379:7
413:9 442:23
**meetings** 35:25
36:6 38:17,20
39:2,3,11 286:14
302:5 317:9
321:22 322:14
323:16
**member** 52:20
53:8 138:25 139:2
139:15 140:4
141:24 143:8
160:8,25 161:23
162:9,12,13,20
176:6 177:5
179:16 180:25
200:15 202:24
248:3,7,10,12
251:3,9 263:20,25
281:23 282:3
308:6 309:5 325:7
325:11,14 326:6
326:14
**members** 52:22
53:22 154:8 155:7
157:8 159:20
161:7,12,25
163:20 169:17
181:6 195:23
196:11 197:20
248:16 327:21
369:3,22 370:11
**membership**
162:5 172:8
326:11
**memo** 197:19
**memorializing**
343:17

**memory**  16:17
68:25 69:8 331:17
361:4
**memos**  197:15,23
**mention**  308:21
361:4
**mentioned**  7:4
38:10 179:13
198:24 241:22
282:6 300:3 334:4
336:24 346:7
359:24
**merit**  357:3
**met**  43:11
**metadata**  66:15
67:17
**method**  187:15
**methodologies**
423:5,10,12
**methods**  425:3
428:6 432:5
**metric**  218:16
291:17
**metrics**  282:4
291:24
**michael**  416:11
**michelle**  50:14
53:9
**microphones**  4:6
4:11
**middle**  72:20,22
73:10 140:20
141:21 225:18
363:2,18 366:12
**midst**  306:22
**mile**  48:22
**million**  122:18,20
123:10 124:5,16
124:18 156:24
226:6,14,22 227:2
228:21 234:3

316:25 318:20
388:9,14 389:6,13
392:23 393:6,11
395:23
**mind**  22:16 25:21
26:24,25 28:4
63:18 90:11
104:22 105:3
107:15,15 111:22
112:5 113:16
146:7 157:22
167:16 185:11
193:17 194:10
215:3 233:7,11
236:18,22 248:23
249:2,19 312:5
314:23 332:5
430:11 435:18
**mine**  35:3
**minimum**  16:9
83:17 113:11
412:23
**minus**  329:12
**minute**  116:8
181:22 271:16
363:25 364:5
**minutes**  68:3 81:6
90:10 150:4
183:15 356:22
436:11 443:12
**misappropriate**
435:24 436:24
**misappropriated**
420:24 421:15
424:21 429:17
431:10 436:6,19
437:16,22 439:13
443:8
**misappropriation**
421:7,10,24 440:6
441:7 442:10

**mischaracterizat...**
321:10
**mischaracterize**
198:14
**mischaracterizing**
185:14
**misconduct**
101:10 377:18
**misguided**  315:3
**misheard**  201:22
**misperception**
100:9
**misphrased**  222:9
**misremembered**
274:16
**missed**  37:16
61:13 201:3 219:9
398:15
**missing**  77:12
**misspoke**  171:15
**misstate**  186:22
283:20
**misstated**  180:12
209:25 283:18
284:16
**misstates**  180:6
186:13 207:25
**misstating**  186:23
187:3 257:23
289:2,10
**mistake**  433:21
**mistaken**  279:11
**mistaking**  186:15
**misunderstanding**
187:8
**misunderstood**
51:12 171:16
342:8,11
**mixing**  286:18
**moment**  7:4 66:13
72:11 86:8 192:2

400:3
**momentous**  330:8
330:11,13
**moments**  199:12
**monday**  34:10
317:9 322:14
323:16
**money**  85:25
86:25 122:22,22
133:11,18 156:2
263:15,15 278:3,9
312:8 397:6
**moneys**  136:15
155:14 179:10
**monica**  2:15 6:3,4
17:6 38:2,11
**month**  86:21
87:13 129:13,17
130:2,5,19 131:3
184:23 185:2
285:13 293:24
295:24
**months**  13:20 14:6
82:12,14,17,18
83:12,25 84:11
86:17 87:11,16,20
305:5 321:3,6
344:23 345:19
**monticciolo**  1:17
4:19 6:1,23 7:1,3
8:1,9 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1,14 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1,6
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1

| | | | |
|---|---|---|---|
| 41:1 42:1 43:1 | 153:1 154:1 155:1 | 249:1 250:1 251:1 | 352:1,22 353:1 |
| 44:1 45:1 46:1 | 156:1 157:1 158:1 | 252:1 253:1,11 | 354:1 355:1 356:1 |
| 47:1 48:1 49:1 | 159:1,19 160:1 | 254:1 255:1,17 | 356:8,14 357:1 |
| 50:1 51:1 52:1 | 161:1 162:1 163:1 | 256:1 257:1 258:1 | 358:1 359:1 360:1 |
| 53:1,17,21 54:1 | 164:1,16 165:1 | 259:1,4 260:1 | 360:10 361:1 |
| 55:1,8 56:1 57:1 | 166:1 167:1,5 | 261:1 262:1 263:1 | 362:1 363:1 364:1 |
| 58:1 59:1 60:1 | 168:1 169:1 170:1 | 264:1 265:1 266:1 | 365:1,9 366:1,19 |
| 61:1 62:1 63:1 | 171:1 172:1 173:1 | 267:1 268:1 269:1 | 367:1 368:1,4 |
| 64:1,13 65:1 66:1 | 174:1 175:1,3,17 | 270:1 271:1,20 | 369:1,17 370:1,25 |
| 66:12 67:1 68:1 | 176:1,19 177:1 | 272:1 273:1,17 | 371:1 372:1,10 |
| 69:1 70:1 71:1 | 178:1 179:1 180:1 | 274:1 275:1 276:1 | 373:1 374:1 375:1 |
| 72:1 73:1 74:1 | 180:13 181:1 | 277:1 278:1 279:1 | 375:13 376:1 |
| 75:1 76:1 77:1 | 182:1,11 183:1 | 280:1 281:1 282:1 | 377:1,13 378:1 |
| 78:1 79:1 80:1 | 184:1 185:1 186:1 | 283:1,21 284:1 | 379:1,23 380:1 |
| 81:1 82:1 83:1 | 187:1,6 188:1 | 285:1 286:1,7 | 381:1 382:1 383:1 |
| 84:1 85:1 86:1 | 189:1 190:1 191:1 | 287:1 288:1,2,20 | 384:1 385:1 386:1 |
| 87:1 88:1 89:1 | 192:1 193:1 194:1 | 289:1,9,16 290:1 | 387:1,8 388:1 |
| 90:1,25 91:1 92:1 | 195:1 196:1 197:1 | 291:1 292:1 293:1 | 389:1 390:1 391:1 |
| 93:1 94:1 95:1,3 | 198:1 199:1 200:1 | 294:1 295:1 296:1 | 392:1,7 393:1 |
| 96:1,3 97:1 98:1 | 200:24 201:1,15 | 297:1 298:1 299:1 | 394:1 395:1 396:1 |
| 99:1 100:1,19 | 202:1 203:1 204:1 | 299:9 300:1 301:1 | 396:25 397:1 |
| 101:1 102:1 103:1 | 205:1,21 206:1 | 302:1,25 303:1 | 398:1 399:1 400:1 |
| 104:1 105:1 106:1 | 207:1,8 208:1,7 | 304:1,15 305:1 | 401:1 402:1,18 |
| 107:1,14 108:1 | 209:1 210:1,10 | 306:1 307:1 308:1 | 403:1 404:1 405:1 |
| 109:1 110:1,15,15 | 211:1,13 212:1,9 | 309:1 310:1 311:1 | 406:1,5 407:1,15 |
| 111:1 112:1 113:1 | 213:1 214:1,7 | 312:1 313:1 314:1 | 408:1 409:1 410:1 |
| 114:1 115:1 116:1 | 215:1 216:1 217:1 | 315:1 316:1 317:1 | 411:1 412:1 413:1 |
| 117:1 118:1 119:1 | 217:2,25 218:1 | 317:4 318:1 319:1 | 414:1 415:1 416:1 |
| 120:1 121:1 122:1 | 219:1 220:1,11,22 | 320:1 321:1 322:1 | 417:1,25 418:1 |
| 123:1 124:1 125:1 | 221:1 222:1,11 | 323:1 324:1 325:1 | 419:1 420:1 421:1 |
| 126:1 127:1 128:1 | 223:1,5,20 224:1 | 326:1 327:1 328:1 | 422:1,14 423:1 |
| 128:4 129:1 130:1 | 224:21 225:1 | 329:1,16 330:1 | 424:1 425:1 426:1 |
| 131:1 132:1 133:1 | 226:1 227:1,20 | 331:1 332:1 333:1 | 427:1 428:1 429:1 |
| 133:10 134:1 | 228:1 229:1,24 | 333:9 334:1 335:1 | 429:2 430:1 431:1 |
| 135:1 136:1 137:1 | 230:1 231:1,17 | 336:1 337:1,16 | 432:1 433:1 434:1 |
| 138:1,24 139:1 | 232:1 233:1 234:1 | 338:1 339:1 340:1 | 435:1 436:1,17 |
| 140:1 141:1 142:1 | 235:1 236:1 237:1 | 341:1 342:1 343:1 | 437:1,8 438:1 |
| 143:1,6 144:1 | 238:1 239:1 240:1 | 344:1 345:1 346:1 | 439:1 440:1 441:1 |
| 145:1 146:1,6 | 241:1 242:1,2 | 346:16 347:1 | 442:1,6 443:1 |
| 147:1 148:1 149:1 | 243:1 244:1 245:1 | 348:1,17 349:1 | 444:1,18 445:1 |
| 150:1 151:1 152:1 | 246:1 247:1 248:1 | 350:1,13,22 351:1 | 446:1,8,15 447:1 |

447:15 448:1
449:1 450:1 451:3
451:21
**morning** 4:3 5:20
7:3 38:5 40:2
**motivation** 200:8
**motives** 203:25
**motors** 167:6,13
**mouse** 72:3
**mouth** 112:23
194:4
**move** 45:5 112:24
164:18 233:2
426:7
**moved** 44:16
189:14,16,19,22
189:23,25
**moving** 107:22
144:3 166:7
315:12 443:25
**multiple** 35:24
119:16 264:16
285:21 330:24,25
411:2
**mute** 31:3 146:4,5
273:16,20
**mutually** 445:25
**mystery** 49:3

**n**

**n** 2:2 3:2 6:14
447:2 448:12
449:8,15
**name** 5:5 6:21 7:5
12:4,7,9 27:17,20
29:12 47:20,22,24
48:4,8,10 50:13
96:10,12,15,18
115:4 144:25
235:21 236:11,16
236:19 408:18
409:11,14,15

413:19 451:2,3
**named** 9:11,20,25
10:14,21 11:6
19:11 20:10
248:16
**names** 12:5 48:15
63:9 145:7 146:9
249:2
**narrow** 252:24
**nature** 298:6
**necessarily** 87:2
127:3
**necessary** 189:8
346:14 378:2
**necessity** 382:12
**need** 14:20 94:21
120:25 121:6
149:23 169:6,12
185:4 199:4
206:14 212:7
221:24 222:19
224:4,5 237:19
259:22 286:4
314:4 334:8
336:19 337:24
352:14 354:8,16
359:15 385:2
396:9 420:15
427:17 438:4
441:24
**needed** 323:25
324:13 342:12
351:5 374:8
407:25 444:5
**needs** 15:25 89:17
124:4,10,16,20
241:11 310:21
**negligent** 378:19
**negotiating** 344:5
344:22 345:18

**negotiation** 344:2
**neither** 83:16
127:15
**never** 92:9 105:13
174:7 183:8
233:19 269:23
270:6,16 306:20
308:20 315:22
316:24 317:3,5
327:23 355:12
360:15 372:16
397:19
**new** 1:2,22 2:5,5,9
2:9 4:20,21 5:3,6
5:9 6:17,25,25
16:25 91:20
240:22,24 249:24
363:25 364:2
402:8 446:18
450:4,8
**news** 380:19
**nice** 241:16
**night** 366:13 375:7
**nodding** 15:14
**noise** 30:25 277:12
277:14,18
**nokley** 408:6,14
408:22 410:8,17
410:21,24 411:13
411:16 412:5,7,16
**nomenclature**
74:12,16 188:24
**non** 128:21 137:2
161:7,12,25
162:19,20 242:8
372:3,4 383:17
384:12
**nonapplicable**
176:21 177:16
**nondisclosure**
25:18

**nonrealistic**
176:20
**normal** 279:9
**notary** 1:21 6:16
447:22 450:7
451:25
**note** 4:5 85:23
271:2 313:4
**noted** 271:5
323:23 333:8
442:5
**notes** 86:10
**notice** 40:15 325:2
388:25 406:18,21
449:11
**noticed** 319:6
**noticing** 5:19
**notwithstanding**
97:19 172:15
314:17 341:20
357:7
**number** 10:3
25:13 36:17 64:7
68:24 71:14 82:11
82:12,14 83:25
115:4 128:3 131:7
146:8 248:18
312:19 320:7
393:22 394:10
395:4,19 396:15
422:16,17 425:25
426:10 437:8
446:16 448:7
449:5
**numbers** 122:15
292:2 391:2
392:20 397:18
416:8
**numerous** 58:20
252:16 254:5
301:23 422:25

438:6

**o**

**o**   3:2 6:14,14,14,14
447:2
**oath**   3:12 109:24
226:18 344:19
**object**   19:24 22:9
53:3 61:7,10
93:24 94:8 95:7
98:22 101:11
107:4 131:19
133:6 135:8
142:15 149:11
156:10 157:14
161:17 165:14
168:4 176:15,16
177:12,13 180:4,5
183:12,23 186:12
204:5,6 205:14
206:3 207:24
212:20 214:15,16
216:23 222:4
223:17 230:18
237:22 239:2
257:22 258:24
280:24 281:13
283:17 284:15
287:21,23,24
289:8 290:8
294:23,25 295:5
295:15 307:12,22
308:17 313:14
314:24 335:2
336:10 345:5
348:23 350:7
351:8,17 352:7
356:23 358:5
362:14,20 363:4
366:5 368:10
370:13 372:25
375:22 376:6

377:20 378:13
395:15 397:13
417:18
**objected**   441:15
**objection**   15:2,3,3
15:6 20:12 116:13
132:4 156:14
186:24 217:10
224:3,9,15 280:3
333:7 349:14
354:14 441:12
442:4
**objections**   3:21
5:16 223:25
445:23
**objectively**   293:5
**obligated**   369:10
376:12
**obligation**   60:15
371:8,14 372:6
**obligations**   158:21
159:4 234:12
310:19 349:5,20
418:5
**observation**
288:22 289:18
**observations**
286:20,21 287:6
287:10 288:21
297:10,16 298:22
302:17
**observe**   286:2
290:13 291:16,18
299:12,18,23
407:2
**observed**   286:8
291:11 297:23
299:2 376:19,21
**observing**   289:20
299:13,25 301:11

**obtain**   365:25
366:11
**obvious**   64:13
211:7,9 303:4,6
323:21
**obviously**   123:3
219:20 221:23
276:8 296:6
334:13
**occasion**   352:20
**occasional**   382:12
382:18,25 384:7
384:10,11
**occasionally**
383:19 385:3
**occasions**   300:24
**occupied**   65:9
**occur**   89:2 321:25
**occurred**   331:4
**occurring**   88:5
283:11 290:22,23
290:25
**october**   1:11 4:4
256:9,20 257:19
328:18 331:6
332:3 333:18
364:20 365:15
366:13,14 375:7,7
448:12 450:20
**offend**   231:16
**offended**   231:18
232:15
**offense**   232:20
**offer**   43:5 208:3,5
212:16
**offered**   46:24
266:20,22
**offering**   418:11,18
**offers**   266:25
**office**   237:14
245:25 246:12

267:12,14,22
270:22 272:12
298:10 303:8
304:21 318:11
319:6,14 320:9,16
321:7 323:12
404:25 405:5,7,11
405:12 406:7,12
439:22 440:5,19
**officers**   349:5
**offices**   16:25
440:15
**offset**   156:5
**offsetting**   157:10
158:6,10
**offshore**   59:18
74:15,23 75:13,17
76:8 77:25 78:3,8
78:19,20 102:2,21
103:6,9,16 104:7
104:10,17,23
105:7,8,10,18,19
105:19 106:2
108:6,9,16 110:24
111:2,3,7,16,16
112:8,17 113:2,4,9
113:13 114:4,8,12
114:15,25 115:5,6
115:10,16,24
116:2,19 125:15
125:19,23 126:3,8
126:14,22 127:4,6
127:13,22 129:17
130:20 132:14,15
132:19,22,25
133:3,5,11 134:14
135:5,17,20 140:7
140:9,10 144:4,8
144:15,18 145:13
146:13 148:3,14
148:17,21,23

149:25 150:8,12
150:17 151:2,6,18
152:6,14 164:19
165:7,10 170:9,10
170:18 171:4,20
171:24 172:14
174:12 175:4,6,13
175:22 176:10
177:3,8 182:15,23
183:8,21 184:5,15
184:25 185:10,19
186:9 187:14
188:8 189:15,20
190:2,4,10,12
191:12,15,19
192:6,25 193:16
194:9 195:3,9
198:7,15,22
201:11 207:21
211:10 214:25
215:21 216:7,20
217:18 388:21
**oh** 34:11 56:3
71:11 112:3
142:17 161:15
232:17 233:18,21
247:3,5 262:8
266:7 274:13
277:15 289:25
293:22 304:12
318:2 365:4 428:4
**okay** 7:16 8:6,23
9:7,14,20,24 10:14
10:17 12:8,24
13:11 14:10,22,23
15:10,15 16:10
17:11,15,20,24
23:20 24:6,10,23
25:20 27:4,13
28:2,5,21 29:6,17
29:22 31:22 32:21

34:16 35:12,24
36:5,11,21 37:2,7
37:20,24 38:3,7,9
38:14 39:10,14
40:5,17 41:8 42:8
42:12,24 43:7,11
43:14 44:2,15,25
45:10,14 46:4,7,11
46:19,23 47:11
48:2,12 49:3,6
51:15 52:21 53:20
54:15 55:15 57:6
58:13 59:10,14,20
60:25 62:2 63:6
63:12,20,24 64:9
66:20,25 67:19,23
68:8 70:3 71:4
72:12,17 73:6,7,8
73:25 74:19 75:24
77:2,5,11 80:12,13
80:14 81:4,16,22
82:13 83:4,9,14,20
86:6,13,19 87:8
88:9,17,22 89:6,12
90:5 92:16,25
94:12 95:10,13
96:23 97:3,15
98:5 99:17 103:2
103:12,15 107:22
108:8 109:18
110:23 111:6,12
112:4,12,21 113:8
113:19 114:4
115:13 116:4,23
119:2,25 120:22
121:3 122:5,14
123:2,9,17 124:8
124:24 125:10,14
125:23 126:7
127:18 130:23
131:5,9 132:8,13

132:18 133:2,24
134:20 135:15
136:5 140:3
141:18 142:7
143:14,21 144:3
144:24 145:18,23
146:17 147:3,16
147:24 149:16
150:7 151:9
152:12 153:17
159:3,14 160:6
162:18 164:11
165:20,23 170:6
174:16,25 175:25
176:2,3,18,23
177:25 181:9
186:20 189:11
190:13 193:10
195:3,6 198:3
201:23 203:18
207:14 210:5
216:18 217:20
219:7 220:6
222:17 223:11,15
225:20 226:25
229:17 231:5
233:21 234:6,20
235:11 239:20
241:6 242:5
243:11,17 245:24
246:15 247:15
249:12 251:2,16
252:23 258:15
259:24 260:9
263:4 264:20
266:7,11 268:3,21
269:2 272:9
274:13 275:14
281:16 284:19
287:5,9 290:13
291:16 293:3,15

294:17 296:8
299:16 300:16
305:7 311:11
322:3 334:3 335:6
338:9 340:2
357:21 361:7
371:17 379:8
385:24 386:6
387:14,19,21
388:5,20 389:4,11
390:20 391:4,21
404:2,7,19 409:11
409:15,19 416:11
416:21 420:9,10
420:20 421:11,12
421:13 422:2,4,10
423:3,18,21
424:13 425:20,22
426:11,18,23
428:5,23 429:10
430:23 431:6,14
432:4,14,23 433:6
433:19 434:13,20
437:6 442:13
444:10 445:24
**old** 12:7 68:13
403:16,20,22
404:9,15,20,21
405:8 406:11
**onboarding** 26:18
28:24
**once** 44:16 87:9
261:10 302:5
350:19 412:4
426:6
**ones** 24:19,19,22
25:21 41:14 150:3
356:2 378:9
433:11 435:8
**onshore** 59:15
63:10 74:11,22

75:8,11 102:19
103:5,7,8 104:18
104:22 105:13
106:10 107:2,18
108:4,7,10,19,22
109:6 110:4,19
115:15,22 116:18
118:11,13 120:3
121:9,10,16,24
122:10,19,19
123:6,11 125:7,11
126:19 139:5,10
139:23 143:17,23
148:8,12 150:2,9
150:14 151:10,17
151:25 152:5,12
152:18 153:11,18
153:21 155:19
157:6 164:18
165:5,9 166:7,9
169:16,18 170:8
170:21 171:18,23
172:13,17 173:25
174:2,11 175:15
175:24 176:9,25
177:8 181:3
182:14,21 183:7
183:20 184:3,13
184:24 185:8
186:2,8 187:12
188:8 189:14,19
189:25 190:4,8
191:7,10,20 192:5
192:23 193:12,16
194:9,12 195:2,8
195:25 196:4,25
197:18 198:6,21
199:17,24 200:2
200:17 204:4
205:12,24 206:10
206:20 207:7,15

207:19 213:7,12
213:20 214:7,13
214:24 215:21
216:6,20,22
217:17 388:16,18
389:3,7 391:8
399:14
**open** 55:23 61:21
386:4,14 398:17
443:18
**opened** 66:9
254:20
**operate** 202:20
426:17
**operating** 91:6,13
91:25 93:5,20
94:15,23
**operation** 205:18
**operational**
416:23 417:7,13
418:4
**operations** 428:10
**opinion** 221:12,13
221:18 332:25
424:14,15,17,18
**opinions** 410:18
**opioids** 268:20
305:17 308:25
**opportunities**
81:12 116:12,21
239:16,23 280:22
**opportunity** 7:11
8:10 28:25 30:8
117:4,12,13
194:13 238:19
**opposed** 94:7
150:13 171:13
308:16
**opposites** 171:14
**option** 37:4

**options** 22:3 55:22
**optiplex** 366:10,21
367:16 368:6,7
372:24 373:3,14
374:22 375:6
400:14 401:4,9
403:10 404:3
**oral** 305:9
**orally** 427:18
**order** 15:12 48:17
88:12 94:13 121:7
238:23 245:21
324:2,14 325:22
326:13 366:3
372:13 376:14
**ordered** 360:12
**ordinary** 292:4,6
**organization**
48:21 56:18 60:18
68:22 95:19 96:6
254:6
**organizational**
54:7,11,17 55:3,12
55:19 56:8 57:4,9
57:23 58:11 65:14
66:14,21 67:22
71:7 134:24
141:12 149:25
328:9,17,25 329:4
448:8
**original** 3:9,17
91:14,17 404:10
404:16
**originally** 190:7
**originate** 166:19
196:17 427:23
**originates** 118:12
118:13,16,19,25
**originating** 119:4
119:5

**origination** 84:8
118:23 238:11,13
414:25 428:9
**originations** 86:17
**originator** 237:20
238:8
**outcome** 5:12
450:17
**outset** 16:20
124:17 198:25
**outside** 105:14
106:8,25 107:17
108:2,24 109:7
277:12,14,18
279:9 328:13
351:22 372:18,22
373:6,12 437:3
438:2 439:17,22
440:4,14,18
**overall** 89:7
278:19 291:4
**overarching** 88:3
**overnight** 287:15
**overseeing** 312:5
361:14
**oversight** 261:21
261:23
**owe** 59:21 60:3,9
60:20 61:4,6,20,22
62:4,17
**owed** 62:15 64:2,6
64:14,18 275:21
276:17,23 277:7
278:3
**owing** 62:13 64:11
**owned** 50:3,10,11
52:4 53:16 67:4,4
68:4,10,19 69:17
117:14 118:25
119:2 125:19
126:14,25 127:5,7

127:8,12,15,23,24
128:21 129:8,20
130:21 131:12,18
132:2 146:18,24
147:7 154:3 155:2
155:19 157:6,12
157:23 167:17
174:2 371:19
379:3 382:7
429:14
**owner** 49:13,19
**ownership** 50:22
67:7 68:12 147:23
190:8,9
**owning** 147:14
**owns** 50:17 51:16
51:20,23 152:19
153:21 163:11,16
171:4 370:8

**p**

**p** 2:2,2 3:2
**p&l** 387:4 391:13
**p.m.** 271:14
402:23 446:13,19
**page** 40:9 67:2,2
69:24 70:4,22
71:5,5,8,10,11,12
71:13,20 72:18,20
72:20 73:10
140:19,21 141:15
141:20 143:6
254:21,22 407:8
419:21 420:3
444:15 448:6,23
449:4,17,22 451:5
**paid** 133:21,22
134:12,18 154:13
179:11 219:22
227:13 389:14
392:23,24 394:9
395:20 397:3

399:2
**pain** 266:21
305:17 306:23
**painful** 308:24
**paragraph** 255:23
256:5,7,13,15
420:18
**parcel** 290:11
**parent** 68:4
**paris** 48:24,24
**parlance** 240:21
**part** 27:9,11 42:4
61:24 81:24 136:3
142:11 179:5
204:22 207:2
208:6 217:12
235:23 245:20
251:5,10 281:5,23
289:24 290:10,11
310:24 311:5
347:11 360:5
361:5 369:19
374:16,17 381:16
416:7 439:10
**partially** 153:16
**participate** 164:23
178:25 397:7
**participates** 122:8
**participation**
124:3 135:3
178:18 180:2
**participations**
147:22
**particular** 18:16
22:15 25:8 26:8
30:7 31:14 50:10
58:25 69:9 72:19
82:11 85:25 87:18
87:18 107:11
112:15 114:23
115:4,20,22

117:12,24 154:20
157:5 194:13,24
196:4 215:3
235:18 236:21
247:13 267:25
288:22 293:4
323:6 347:25
**particularly** 77:25
153:24,25 367:6
**parties** 3:7 4:15
11:3 64:7,12
76:12 109:11
126:8,17,18,21,23
126:25 127:5
208:4 210:17,20
351:23 422:25
428:13 450:15
**partner** 132:24
133:3 138:19,23
139:15 140:4,10
143:16 172:9,18
174:5,7,14 181:5
306:12,17 330:10
330:15
**partners** 49:7
63:10,15 64:21
91:4,24 138:17
139:3,16 140:9
141:24 143:9,15
152:21 153:10
154:7,17,22 155:7
155:22 157:3,7,9
158:2,16 159:9,18
159:21 160:8,9,14
160:19 161:2,8,13
161:25 162:6,12
162:14,20,24
163:7,11,16 164:6
164:13 172:19
174:5 179:2,19,21
180:2 181:5,6

204:4 214:13
274:5 323:11,22
386:18 387:4,10
387:16,25 388:13
388:23 389:2,6,14
391:7,12,17 392:8
392:23,25 394:9
395:20 397:3,6
398:2,5,11,21
399:15 448:18,20
**parts** 82:2
**party** 5:10 9:8,11
10:21 11:8 21:12
87:23 88:4,11
121:25 122:2,6
188:17 208:11
241:7,21 244:18
244:20 245:6,11
245:25 317:20
338:23 339:7
347:21 418:14
419:6
**passes** 145:5
**pat** 188:24
**paths** 300:5,6
**paul** 1:3 2:13 4:24
5:23 7:6 35:5
64:18 164:9 178:4
247:23 250:5,6,7
267:16,22 279:11
279:14 280:16,20
288:4 290:5,10
295:20 300:10
304:17 305:13
313:22 315:6,7
317:6 318:12
340:17 341:17
367:7 372:5 373:8
375:20 438:15
451:2

**paul's** 289:22
291:3 342:6,6
344:2 360:16
363:22 366:16
375:25 403:16,20
403:22 404:9,15
**pay** 399:3,15
**payback** 246:4
**paying** 17:24
18:12 19:21 22:22
397:5
**payments** 58:20
59:6,14,17 155:15
273:4,9,25 274:10
276:4 397:10,25
398:9
**payroll** 431:22,24
432:6,12
**pc** 403:3,7,10
**pending** 15:20
294:24 295:3
**people** 19:16,17
38:10 54:2 57:14
57:15 75:21 77:22
77:23 79:3,8 93:6
99:21 109:11,14
136:16,16 147:2
151:16 163:25
164:22 197:12
199:9 201:10
202:6 203:21,24
208:22,23,25
231:4 239:15,20
241:10,18 252:4,5
252:16,17 253:13
254:5 260:21,24
261:2 276:8
282:10,19 286:5
292:2 307:15,17
312:19,25 314:8
314:20 315:7

317:16 318:10
319:6 320:5 324:4
324:7,9 328:2
330:13 333:20
339:3 344:13,16
346:12 352:18
354:8 358:9 377:4
384:17,17,18
410:2,19 414:25
423:2 429:8
431:21
**percent** 49:19 50:7
50:7,10,11,17,22
50:22 53:16,16
67:3,4 68:4,10,20
69:17 128:12,15
129:7,19 130:17
130:19,24 131:2,7
325:17 393:13
395:5
**percentage** 127:21
128:24 131:10
162:23 167:11,12
218:16 280:21
281:10
**percentages**
127:25
**perform** 219:21
318:16
**performance**
20:17 153:7,11,19
217:12,14 218:17
218:23 219:17
248:12 279:17,25
280:8,11 281:18
281:21 282:3
283:11,14 284:8
285:7,23 286:8,22
287:7 289:19
296:25 297:5
301:11,20 302:4

302:11,18,21
303:11 388:8,14
388:19,22 390:8
390:13 392:4,21
392:25 393:5
394:6 425:5,9
**performing** 176:8
200:9,10 215:9,20
216:6,13,14,17,21
217:5,17 363:20
425:18
**period** 42:14
45:17,24 57:7,24
114:24 132:10
137:24 167:14
184:16 260:19
279:18 281:8
292:15 293:4
302:8 314:22
414:5
**periods** 25:2
**permanent** 269:16
**permanently**
269:7,14
**permission** 424:25
**permitted** 106:3
107:17,21,23
205:24 207:20
208:25 349:9
382:15,23 383:14
**permutations**
156:24
**person** 37:2 71:22
96:25 109:10
229:6 240:7,9,17
260:9 291:23
313:17,20,23
314:14 343:14
355:23 356:13
376:3,11 384:24
409:13

**personal** 18:8
134:16,17 176:5
200:7,8 204:24
286:20,21 287:5,9
288:21 289:17
342:4 380:20
381:6 382:3,16,17
382:24,24 383:15
383:16 384:12
443:4
**personally** 10:21
206:11 207:17
286:7,16 376:18
401:7
**personnel** 116:7
116:16
**pertaining** 338:24
**pertains** 392:14
**perused** 381:22
**phone** 17:16 373:9
**phones** 4:10
384:17
**phrase** 216:24
238:14 240:22,24
262:12
**phrases** 259:8,15
**phrasing** 56:13
195:17
**physical** 401:14
440:8
**physically** 405:19
**pick** 4:7 310:13
**picture** 76:9
**pictures** 369:8,23
**piece** 81:23 82:23
86:19 102:5 116:7
144:5 152:2,9,13
164:19 166:5
170:9,18 171:19
171:24 172:14
182:22 184:4,14

184:24 185:9
188:7 189:5
192:24 195:11
224:8 238:22
285:4 325:20
401:20
**pieces** 32:8 116:2
142:22 165:24
171:3 186:7
253:16
**pinch** 382:12
384:25
**pithier** 242:10
**pithy** 241:16 242:8
**place** 4:10,14 38:4
108:21 109:4
110:2,17 112:15
283:5 284:10
292:12 294:4
295:25 297:22
322:20 396:22
406:2 421:3,17
447:11
**places** 439:6,9
**plaintiff** 1:4,17 2:4
4:23 5:22 7:6 9:16
9:21 12:23 13:3,5
13:9 65:15 254:14
256:10,21 258:17
304:3 385:15
386:20 391:19
402:3 406:22
448:4 449:2
**plan** 124:17 376:5
445:17,17
**planned** 300:19
**planning** 307:14
**plans** 303:20
307:9
**play** 109:22 140:4
151:18 174:20

196:10 220:3
344:25
**played** 223:2
249:21 250:17
279:6 309:14
314:7 402:9
**playing** 241:3
**plays** 12:21
**pleadings** 23:24
24:16
**please** 4:5,9 5:13
5:16 6:12,21
15:18 31:3 56:4
56:14 59:2 66:5
93:11 96:9 123:25
168:22 173:15
224:21 225:19
251:13 262:11
270:13 271:6
328:12 331:10
333:3 364:3
391:15 401:24
406:24 411:9
431:19 444:7
**plus** 43:23 70:13
388:8,14 392:23
393:6,13 395:5,23
443:7
**point** 45:2,4 47:12
70:12 108:3 113:9
129:11 166:21
249:23 264:5,10
264:13 307:10
341:25 396:6
**points** 264:16
337:22
**policies** 19:5,7,14
19:18 20:5 21:10
23:22 24:24,25
25:3,9,16,22 26:11
26:12,13,17,17,21

26:22,24 27:2,5,12
27:14,22 28:6,11
28:15 29:7,18,24
31:19 40:23 41:19
41:21 42:4,5 99:3
99:7 108:20 109:4
109:12 110:2
244:12 316:14
331:22 332:8,15
333:25 339:14
340:9 344:10
345:3 351:21
359:4,11,22
371:24 373:4
377:3,7,24 378:16
380:21,25 381:7
381:10,18 382:14
383:21 384:3,13
418:14 423:6,15
423:24 424:6
432:24,25 435:24
436:7,21,25 437:4
437:23,24,25
438:6,8,17 439:11
439:16,18 440:20
441:3
**policy** 29:15,17
110:16 307:25
308:4,10,12 309:4
309:10 436:13,13
437:18 438:25
441:5 442:8
**pop** 254:16
**popped** 66:6
**portfolio** 82:6,9,18
82:25 83:22 84:4
84:6,8,12,22 85:8
85:13 86:8,14,21
168:15,18 197:2,8
198:7

**portion** 72:21
131:17,23 158:7
243:21
**position** 42:17
43:8,15 46:12,15
96:24 97:4,23
179:25 189:18,24
307:18 310:3
318:21 440:2,12
443:13 445:13
**positions** 46:25
99:15,19,25
**positive** 134:11
**possess** 205:9,13
**possession** 141:12
**possibility** 124:22
137:16 166:20
167:3 200:20
359:20 378:20
**possible** 28:3 40:8
78:4 104:22 105:3
147:25 158:6
165:18,19,25
183:3,5,7 184:20
185:5 200:22,23
233:22 320:13
361:21 366:17
**possibly** 229:16
233:20 290:18
441:14
**post** 125:11,16,21
125:24 126:4
**postdates** 123:22
**posted** 272:17
**potential** 157:10
179:23 212:17
239:22 240:3
243:18 244:6,16
275:20 278:9
339:13 340:16
344:9 345:2

365:25
**potentially** 79:7
  204:2 205:2
  231:23 269:11
  278:24 359:4
**practical** 149:4
**practices** 310:9
**practitioner**
  300:15
**preamble** 336:10
  336:11
**precedes** 48:21
**preceding** 114:24
**precipitous** 391:6
  392:19
**precipitously**
  279:17 281:22
**preclude** 177:9
**precluded** 106:7
**precludes** 106:17
  206:20 207:6,15
**predated** 104:3
**predominantly**
  257:13,15 258:20
  260:2
**preliminary**
  417:12
**premises** 424:24
**preparation** 35:25
  36:7
**prepare** 23:21
  35:13,18,20 36:14
  36:24 38:18 39:4
  40:18 381:19
**prepared** 41:9,16
  41:25 42:10 435:2
**present** 2:12 37:24
  38:11
**presentation**
  422:19,20,23

**presented** 244:16
  244:18
**presenting** 241:14
  242:16,19,20,23
  243:2,5,8,17 246:8
**preservation**
  368:14 369:15,19
  372:8 373:23
**preserve** 369:21
  370:3,6,16,22
  371:8,16,20
  372:19 375:19
  376:14
**preserved** 224:2
  312:10
**preserving** 367:5
  370:17,20 375:9
**preside** 351:3
**presumably** 347:8
  435:2
**presume** 403:16
**pretty** 207:5
  321:14
**prevent** 106:24
  107:6,7 158:21
  159:4
**prevented** 108:18
**prevents** 206:10
**previous** 98:11
**previously** 67:5
  177:17 203:7
  211:8 273:8 284:9
  298:25 315:10
  418:10
**pride** 302:21
**principal** 408:17
**principles** 423:6
  423:11,14,16
**prior** 30:15 42:12
  111:8 113:24
  117:21 126:14

127:7 168:3 275:3
  275:10 280:9
  284:11,13 286:22
  287:7 305:20
  328:17 337:10
  338:3 342:16,19
  342:22 343:11
  362:24 363:8,15
  364:20 373:12,19
  374:4 417:5
**priority** 260:8
**privacy** 372:2
  379:20 380:5,7
  381:15 383:23,25
**private** 4:7
**privileged** 354:20
  368:21 369:8,24
  372:13
**pro** 159:22
**probably** 10:5
  16:8 120:7 121:4
  159:12 257:15
  270:9 272:14
  275:2 290:23
  292:24 305:15
  306:21 310:10
  320:7 334:14
  415:22 434:15
**problem** 72:14
  78:16 111:7
  190:24 214:3
  285:17,21 287:25
  297:17 299:18,20
  299:24
**problematic**
  231:15
**problems** 279:20
  280:7 283:7,9
  284:14,25 285:19
  288:4 293:2
  295:21 296:3,9,15

296:21 297:3,4,15
  297:22,25 298:5
  298:21,25 301:10
**procedure** 1:19
  110:16 308:4,10
  308:13 309:4
  441:5 442:9
**procedures** 19:6,8
  20:6 21:10 23:23
  24:24,25 25:4,9,23
  27:12,15 28:12
  31:19 40:24 41:19
  42:6 99:3,8
  108:21 109:4
  110:2 307:25
  316:14 333:25
  339:14 340:10
  344:10 345:3
  351:21 359:5,11
  359:22 371:25
  373:5 377:3,8,24
  378:16 380:21
  381:7,19 382:14
  384:3,14 418:15
  423:17 428:21
  437:4 438:6
  439:16 440:20
  441:3
**proceed** 221:23
  244:19
**proceeding** 5:16
**proceedings** 24:4
**process** 189:15
  190:6 301:19
  316:14 330:18
  331:8 337:6
  349:17,19 353:13
  355:21 357:5
  359:25 360:5,19
  362:8 423:20
  426:2 432:13

**processes** 39:8
330:25 331:3
**produce** 390:25
**produced** 27:24
29:4,20 31:19
52:2 53:7 66:14
67:16 68:14 69:4
76:7,13 77:21
79:2 339:19
353:15 390:16
429:25 430:3
**producing** 425:4
**product** 422:25
**production** 67:17
**productive** 249:16
**profess** 410:18
**professional** 314:6
351:22 367:11
372:17 373:22
374:3,7,10 377:14
**professionalism**
20:15
**professionals**
70:15 95:20,22,25
110:8 113:18
202:18 354:24
357:4 373:5 376:8
377:9,10,25 378:7
378:15 425:3,7,8
425:12,16
**profiles** 168:9
**profit** 158:22
160:12 175:21,22
175:24 215:9
386:19 387:10,16
388:2 391:18
392:9 448:18,20
**profitability** 32:11
135:4 137:9
153:10,20,24
154:2,4,20 155:3,4

155:20 156:4
157:22 158:15
160:9,10 164:12
164:23,24 166:15
177:11,23 178:19
178:25 218:17
220:20
**profitable** 137:2
137:23 138:4,8,14
152:19,23 155:20
158:12 160:5
164:17 166:6,19
166:23 167:7,24
169:15,25 170:2,5
176:8 177:7
179:18 181:3
**profits** 155:4,15
156:2 157:4 158:7
158:8 159:4,7,16
159:23 160:3,14
227:14 396:12
**program** 7:12
65:4
**prohibited** 108:12
384:11,13
**promotion** 43:8
**prompted** 111:15
112:16 358:16,19
362:11
**prompting** 111:20
**proper** 21:7 110:8
186:24 357:5
441:21 442:2
**properly** 139:21
**property** 429:9
**proposal** 141:8
**proposals** 330:25
**propose** 443:15
**proposed** 410:21
**proposing** 410:25

**proprietary**
312:11 432:5,14
433:5,8,14,17
434:4 436:6,20
437:23 439:20
440:21
**prospective** 28:19
28:25 29:10 32:12
32:15,19 45:5
47:9 229:13,22
230:11 238:4,18
274:21 275:12,17
279:23
**protect** 368:14
**protected** 428:19
438:4 440:7,9
**protecting** 437:4
440:20
**provide** 15:13
16:13 26:2 218:24
224:21 271:24
302:9,15 333:3
355:5,9,12 384:16
396:14 417:11
427:16 435:2
**provided** 25:25
30:19 157:20
169:5 276:3 292:3
292:5 339:20
352:25 353:4
382:16 383:18
444:22
**provides** 430:19
**providing** 123:5
149:7 219:18
301:19
**prowess** 402:7
**proximity** 274:19
**public** 1:21 6:16
235:16,17 447:22
450:7 451:25

**publically** 323:9
434:9
**pull** 255:18
**pulled** 304:6
**purchases** 122:9
**purchasing** 200:12
**purport** 180:10
187:9
**purporting** 258:5
**purpose** 30:3 86:2
252:20
**purposes** 88:20
158:12 175:12,19
199:5 241:12
343:18 381:11
**pursuant** 1:18
**pursued** 357:6
376:23
**push** 157:3
**put** 48:16 87:17
100:18 107:13
112:22 146:10
166:15 167:9
194:3 230:7 372:2
401:18 406:2
**puts** 174:7
**pyramid** 291:22

**q**

**qualification**
64:16 190:22
**qualifications**
130:12 258:19
259:8,14,21
**qualified** 299:11
299:18,23 340:24
399:6
**qualifier** 8:24
**qualifies** 88:9
**qualify** 48:24 83:6
84:19 123:23
190:18 197:3

| | | | |
|---|---|---|---|
| 243:13 258:16 | 184:2,19,22 185:4 | 316:25 321:2 | 212:3 232:9,15 |
| 259:22 341:19 | 185:7 186:12,18 | 322:4,13,16,23,25 | 233:2,9 241:13 |
| **quality** 280:2 | 187:4,5,8,11,11 | 323:4,6,15 324:11 | 288:11 289:14 |
| **quarterly** 363:20 | 197:24 199:6,7,15 | 330:21 332:23 | 317:17 321:11,17 |
| **question** 14:20,21 | 200:25 201:5,25 | 333:2,12,14 335:3 | 321:24 323:11,13 |
| 14:24 15:6,8,20 | 203:12 204:6,8,10 | 335:15 336:3,12 | 337:20,23 357:16 |
| 19:4,25 20:2,14 | 204:10 205:15 | 336:17,20 337:16 | 363:9 380:7 |
| 21:20 22:10,12 | 206:4,7,18 207:5 | 337:25 341:2 | 407:13 432:18 |
| 23:12 30:16 31:25 | 207:25 208:13,16 | 345:6 347:12 | 437:7 443:11,14 |
| 34:9 39:24 40:22 | 209:16 210:8,23 | 348:24 349:15,24 | 444:25 445:6 |
| 41:23 53:4 54:9 | 211:6 212:8,21 | 349:24 350:6,7,8,9 | 446:4 |
| 57:19 58:22 59:25 | 214:4,16,19 215:6 | 350:18,24 351:9 | **quibble** 180:8 |
| 61:8,8,10,12,14,18 | 215:12 216:12 | 351:18 352:8,12 | **quick** 407:12 |
| 61:19 62:12 64:11 | 217:7,13 220:13 | 352:15 356:9,23 | **quicker** 242:12 |
| 69:11 84:17 91:9 | 220:24 221:17,19 | 358:6,7 359:16 | **quickly** 14:15 |
| 91:15,17,20 93:8 | 221:21 222:2,10 | 360:9 361:8 | 242:12 |
| 93:10,14,25 94:3,9 | 222:24 223:3,4,6 | 362:15,21 363:5 | **quite** 27:24 150:5 |
| 94:11 95:8 97:17 | 223:16,19 224:13 | 363:14 365:10 | 282:19 284:22 |
| 98:11 99:6,23 | 224:15,17,20,24 | 366:6 368:11 | 312:18 327:19 |
| 100:3,6,11,12 | 225:22 228:3,23 | 370:14,24 373:2 | |
| 101:12,14 102:15 | 229:18 230:19 | 374:18,19 375:23 | **r** |
| 102:17 103:3 | 232:18 233:15,19 | 376:3,4,7 377:21 | **r** 2:2 3:2 48:16 |
| 106:15 110:12,13 | 237:12,23,25 | 377:22 378:4,5,14 | 447:2 450:2 |
| 112:14 116:14,16 | 239:3,9 241:22 | 380:8 381:25 | **raise** 221:24 418:3 |
| 116:17 117:22 | 243:25 245:15 | 383:11,12,24 | 418:22 |
| 121:4 124:12 | 251:13,15 252:8 | 394:23 395:16 | **raised** 418:17 |
| 129:2,9,14,15 | 252:25 257:23 | 397:14 398:16,25 | **raising** 412:5 |
| 130:17,24 131:21 | 258:25 262:10,22 | 399:7,10 401:6 | **randonneurs** |
| 133:7,9 134:16,16 | 270:13 271:22,25 | 405:25 419:24 | 48:20 |
| 134:25 135:9 | 272:6 274:16 | 420:15 426:24 | **rata** 159:22 |
| 142:14,16,20 | 277:3 280:25 | 427:18 429:20 | **rational** 156:16 |
| 154:25 157:15 | 282:23 283:18 | 435:6,11 440:11 | **raw** 122:15 |
| 158:12 160:22 | 284:16 287:22,23 | 441:9,21,25 | **reach** 292:13,20 |
| 161:17,18,20 | 287:25 290:9 | **questioning** 15:21 | 292:21 315:19 |
| 162:3 165:15 | 292:20 293:17,22 | 112:24 156:19 | 445:3 |
| 171:12 172:24 | 294:24 295:3,7,16 | 198:25 320:5 | **reached** 44:21 |
| 173:4,7,7,10,14,16 | 295:22 298:18 | **questions** 7:9 | 293:24 294:6,6 |
| 173:22,23 174:9 | 302:25 307:23 | 13:21 14:19 31:23 | 296:24 315:22 |
| 176:12,14,16 | 308:18,20 309:2,3 | 77:7 79:19,23 | **reaching** 293:6 |
| 177:13 180:5,14 | 313:15,16 314:25 | 94:5 142:6 175:12 | **read** 93:10,14 |
| 183:11,12,16,24 | 315:2,18 316:3,23 | 175:20 211:4 | 173:8,16 197:14 |
| | | | 256:16 258:5 |

272:6 311:9
403:13 405:16
419:23 420:11,15
420:18 422:18
**reader** 90:12
**reading** 402:19
426:25 427:6,8,13
427:20
**ready** 419:24
420:16
**real** 261:21 272:3
**realistic** 183:16
214:5
**realize** 175:17
**realized** 389:6
**realizing** 177:10
**really** 23:11 80:9
110:12 176:25
177:22 214:4
257:3 286:4
288:18 317:21
318:21 412:23
444:23
**reason** 16:11
34:12 46:8 68:8
68:17,18 69:15,21
70:20 111:2
238:13 265:9
273:20 288:8
297:20 298:20
397:2 451:5
**reasonable** 128:8
285:12
**reasoned** 198:19
202:17
**reasons** 64:13
70:25 106:22
152:17 318:20
**recall** 9:15,18,22
10:3,22,23 11:11
11:14,16,24 12:9

12:17 13:14,24
16:20 25:13 26:3
26:7 27:18,19,23
33:24 36:16,22
37:23 38:8,13,17
39:6,12,15,18,24
40:3 41:8,14,24
42:3,9,20,24 43:14
43:17,21 44:19,25
46:17,22 47:6
49:16 50:19 54:13
54:24 55:10 56:7
56:16 57:2 58:4,8
63:3,6,8,20 66:19
66:21 70:12 73:23
80:12 92:18,24,24
103:22,23,25
104:20,25 105:5
111:6,14,20
112:14 114:10,11
115:2,6,11 127:25
132:17 138:2
141:4,7,10 145:7
145:14 151:24
160:11 162:4
182:15 229:5,8,12
235:21 244:22
245:12 246:14,19
247:14,16,17,18
247:21 248:5,10
248:13,24 249:3,9
249:11,14,25
250:16,21,22
251:18,19 260:2,6
260:13,16,20,23
261:5,8,9,16,17,19
263:23,24 264:8,9
264:12,17,21,24
265:16 266:2
267:4,19,21 271:7
274:18 275:13,19

275:23,25 276:6
276:10,14,15,20
276:22 277:4,9
278:6,7,12,13,16
278:21,22 279:2,4
279:16 280:15,19
281:8 282:8,14,15
282:18,24,25
283:4,6 285:15,16
289:16 292:23
293:6 296:11,13
300:22 301:12,25
303:3,14,15,18
304:25 312:20
315:14 317:23
320:12,14,18,21
320:23,25 322:22
322:24,25 323:3,5
323:10,15 324:16
324:18,23 326:16
327:4,6 329:18,20
329:21,24 330:2,3
330:6 331:2,7
334:2,22 335:4,6
335:10,12,16,20
335:24 336:5,13
336:15,20 337:4,5
337:7,11 338:10
341:15 343:10
347:12,17 352:17
355:3,4,6 357:13
358:21 361:15,20
362:9 365:17,20
365:23 366:15,18
367:18,19,21,25
368:19,24 369:6
379:23 383:20
387:18 388:20
391:5,10 393:8,20
395:7,12,17 396:5
396:7,9,19 399:21

399:25 401:12
403:6 404:13,17
405:18 406:13
407:18,20,24
410:5,12,15,22,24
411:6,11,14,15,18
411:21 412:3,10
412:13,17,25
415:16 417:14,16
417:22,23 418:7,8
418:12,16,19,21
418:25 419:10,12
419:16 434:22
435:14 436:14
**recalled** 10:18
**recalling** 110:25
**receive** 59:14,17
352:23
**received** 33:18
123:12 197:19
225:24 227:16
228:9 388:14
391:7
**receives** 58:20
59:6,10 144:18
**receiving** 304:25
**recess** 90:17 182:3
255:9 271:17
364:10
**recipient** 353:22
**recite** 326:3
**recognize** 66:17
66:19 130:13
199:3 387:9,15
402:17,20
**recognizing** 69:18
80:10 146:8
**recollect** 284:24
**recollection** 36:19
51:3 52:6 54:19
57:17 69:14,20

73:3,18 75:25
77:20 129:22
163:19,22 194:16
203:4 249:13
250:9 274:23
279:24 285:6
294:22 295:14
320:19 322:7,13
322:19 334:15,20
338:2,10 339:4,7
340:4 346:6 389:5
399:19,24 406:6
412:22 430:24
**recommendation**
193:3 195:14,19
197:5 198:17
201:17 202:3
315:6 330:21,22
333:20 334:5,10
334:23 335:5,8,11
335:17,21,24
336:6,14,16,21
337:12 340:12
357:2,8,10,11,24
357:25 358:2,3
361:5
**recommendations**
196:7,15 197:6,15
197:22 199:10,21
199:22 201:11
202:7,12,16
203:23 315:10
330:19 338:14
356:25 417:20,24
**recommended**
193:24 203:2,8
266:15
**record**  4:3,15 5:15
6:22 15:2,5 16:21
16:23 17:18 71:18
79:12 90:10,15,20

173:13 181:22,25
182:6 220:18
255:5,7,12 261:15
268:12 271:2,19
273:15 336:9
339:11,15 364:6,8
364:13 367:6
370:16,23 371:3
371:16 372:19
375:9 381:16
400:3,5,6,9 422:12
423:4 442:5
445:14,16 446:6
446:13 450:12
**recorded**  4:18
**recording**  4:13
261:18
**records**  339:19
369:2,8,14,19,21
370:7,10 371:6,21
372:12 419:14
**recovering**  425:4
425:18
**recruit**  44:14
246:20 247:4,5,8
247:10 431:21
**recruited**  247:16
**recruiters**  431:20
**redirect**  397:9
**reducing**  168:7
**reed**  2:8 6:3,4 7:10
16:24 18:4,12
20:24
**refer**  28:21 74:15
84:21 120:16
240:16,18 241:13
293:4 403:21
**reference**  31:13
35:14 81:17
293:17,23 294:19
295:12,24 296:2

310:15 420:13
421:16
**referenced**  19:18
20:6 29:22 31:12
197:13 295:11
406:19
**referencing**
310:22 311:4
**referred**  93:13
272:5 294:19
**referring**  24:2
26:17 27:21 28:15
29:25 30:13 74:10
103:3 114:17,22
114:23 120:15,18
133:20 154:15
175:16 241:25
280:10 306:19
311:12 331:19,25
430:4 432:19
438:9
**refers**  84:23 403:9
403:17
**reflect**  393:25
**refrain**  17:15
**refresh**  66:2 407:4
**refreshing**  66:4
**regarding**  179:25
345:22
**regardless**  217:4
350:13 370:3,8
371:21 395:7
**registered**  76:23
204:17 243:16
**registration**  237:2
**regular**  301:21
**regulated**  230:6
316:19 332:10
348:9 354:18
367:3,4 369:11
376:15,17 379:18

381:12 415:19
434:8
**regulations**  70:11
351:22 376:15
**regulators**  21:13
253:22 328:13
349:21 350:4
351:16 352:3
**regulatory**  330:20
348:6,13 349:10
426:12
**reimburse**  415:25
**rejected**  410:20
411:22,24
**rejecting**  411:11
**related**  5:10 11:24
12:18 25:16 40:24
41:19 60:7 101:7
148:22 225:25
226:13,21 227:14
227:17 252:22
310:25 339:13
341:17 380:13
383:17 399:16
415:22 424:9
450:15
**relating**  17:12
265:24
**relationship**  45:15
45:22 46:2 76:2
87:4,7,14,22 88:2
88:6,10,13,16,18
89:3,8,22 90:2
142:2 146:12
147:9,13 341:10
341:21,23,24
342:3,4,9 417:2,2
417:5
**relationships**
147:25 148:2,8,21
301:4 310:11

312:7,9,13,21
313:13,19 314:3
314:22 408:8
**relative** 294:3
296:2 394:3
**relatively** 14:4
**relay** 362:13,19
363:3,13,17
**relevant** 220:10,14
220:16 221:9
**relieve** 266:21
**rely** 281:3,9 376:8
385:3
**relying** 280:16,20
281:19,20
**remain** 328:24
**remaining** 445:5
446:3
**remains** 365:10
**remarkable** 231:5
231:19
**remember** 31:8
44:23 55:17 74:5
104:12,14,16
105:6 248:6
249:22,23 250:14
267:24 268:17,22
272:13 284:9
288:14 305:12
331:20 334:7,9
347:4,6,9 358:13
361:2,3 365:24
381:20 382:4
403:23 435:8,9
**remembering**
284:6,12
**reminding** 38:22
**remote** 14:7 16:22
**remotely** 1:20
4:17

**remove** 327:24
**removed** 328:8,16
**renew** 441:12
**repeat** 14:20 31:5
54:9 58:23,24
59:24 61:18 78:14
91:14 93:7 97:17
116:14 129:14
130:24 131:21
183:25 206:7
219:7 265:12
272:3 275:8
293:21 333:13
350:23 363:7,14
370:2
**repeatedly** 201:2
294:12
**repeating** 445:9
**rephrase** 20:18
62:11 117:2
171:21
**replace** 293:16
365:8
**replacement**
185:11
**replacing** 182:24
183:9,22 184:5,9
184:15 185:2
215:2
**report** 98:5,8,12
98:13,14 235:13
262:19 285:22
303:19 348:4,12
349:9 351:3,14,24
352:10,25 353:4
353:10,15,23
355:16
**reported** 279:20
291:21 293:7
294:3,7 296:3
297:21 298:21

324:19 350:3
392:20,24
**reporter** 5:8 6:12
15:10 90:9 93:10
93:15 271:15
272:7 446:10
**reporters** 444:22
**reporting** 98:16
262:25 263:6
266:2 282:25
298:24 404:13
**reports** 98:4 284:7
285:7 291:25
292:7,8 389:10
**represent** 7:6
342:22
**representation**
40:20 67:15
258:17
**representations**
418:23
**representative**
40:12,19
**represented** 334:2
342:15
**representing** 18:8
316:19 432:20
**request** 291:25
362:3
**requested** 415:12
449:21
**require** 21:7 238:4
402:8
**required** 325:5,21
326:5,8,13,23
369:20 370:6,15
371:20 375:19
376:9
**requirement**
243:19 278:11
369:15 370:3,22

**requirements**
369:20
**requires** 308:5,14
309:5
**reserve** 222:20
**reserved** 3:22
**resources** 21:6,8
**respect** 24:24
59:23 65:3 73:5
81:9 102:4 117:4
117:24 137:18
139:4,18 140:20
147:24 151:6,10
157:12 164:11
192:4 215:14
221:5,14 245:9
258:22 279:7
286:21 289:18
293:9 294:21
295:14 302:16
322:4 331:4
334:24 337:2,9
338:24 345:2,22
360:14,24 361:17
408:2,13 418:5
432:18
**respectful** 442:15
**respectfully** 333:3
**respective** 3:6
64:20 86:17
**respond** 23:11
180:9 306:6
313:22
**responded** 20:20
30:15 322:16
323:7
**response** 91:18
244:17 272:10
282:23 303:2
310:23 312:14,22
322:15 429:20

435:6,11
responses 15:13
435:13 443:10
responsibilities
101:20 354:19
responsibility
377:18
responsible 56:11
101:9 109:10
263:10,16 312:25
348:21 378:10
responsive 178:12
349:24
rest 218:13 433:9
restroom 255:2
restructured
46:10
result 156:7 157:5
157:11 170:22
179:11 291:13
445:24
resulted 310:5
331:14
results 349:12,25
351:4,14,25
352:21,24 353:23
354:6,11 355:17
360:21 361:9
resumes 42:23
retained 336:25
337:5 340:7
446:17
retention 25:19
41:21
retentions 419:14
retire 268:5,9
271:12,13 307:14
308:6,15,21
315:21 317:25
327:7

retired 316:2,11
316:20 317:7
328:3
retirement 268:15
269:25 274:21
275:12,17,18
279:23 304:20
305:10,20 306:8
306:18 307:6,8,10
307:20 311:15
317:18
retiring 269:7,11
269:14,24 270:5
270:15,20 278:5
308:23 309:5
310:17 315:15,17
317:6,10,14,15
318:7,15,24 319:4
319:18,21 320:6
320:17 321:5
322:17 323:8
retreating 208:13
retrieve 214:10
return 123:12
270:6,16
returning 100:8
134:24
returns 186:3
revenue 219:4,11
review 14:15 24:6
24:11,19,25 25:10
26:3 39:10,21
66:13 72:11,24
302:4 358:23
363:21 365:18
380:25 406:8,10
416:19 419:9
reviewed 23:22
25:6 33:14 35:15
39:19,25 40:23
41:18,23 292:8

327:19 355:16
381:18 438:16
reviewing 35:17
326:25 401:8
reviews 301:14,17
301:23
reward 81:14
rid 99:9
ride 48:22
rides 48:21
right 17:2,6 23:14
28:19 42:15 43:12
47:20 51:18 52:11
53:5,23 58:21
62:25 64:22,25
65:20 66:11 68:5
71:19 74:7 76:20
85:6,6,9,10 86:20
88:7 95:23 100:19
109:8 110:8
112:18 113:13
121:4,12 122:11
127:16 136:10
144:4 153:12
154:21 155:24
174:22 178:2
181:10,15 191:21
194:24 195:7
201:18 202:7
203:9,15 206:8
211:17 228:6
239:13 240:10,16
242:22 247:22
248:21 250:23
253:22 255:3
256:18 257:25
267:18 268:6
270:6 272:2,19,20
272:23 275:5
281:2 282:24
284:14 288:24

289:12 299:6
307:16 314:23
318:7,22 319:23
323:17 330:21
332:18 337:22
339:24 340:10
347:21 356:14
357:16 360:8
372:15 375:12
377:13,19 380:3
381:20 386:12
387:7 388:3
396:16,20 399:23
402:17 404:25
406:15 411:10
414:9,19 431:18
438:20 439:19
441:8
rights 25:18
222:20
rise 42:25
risk 81:14 97:2,5
168:8,8
road 48:19
rob 269:21
robert 408:6
412:16
robotic 235:24
role 12:20 13:22
44:10,14 52:13,15
58:14,17 140:4
151:18 174:20
196:9 220:3 241:2
249:4,8,21,24
250:2 259:25
262:12 279:6
281:5,24 282:4
309:14,15 314:7
344:12,25 345:21
402:9 416:17

**roles**  62:21 109:22
  249:10 250:17
  260:8,8 354:19
  428:16
**room**  17:5,9,12
  271:23 405:6
**rose**  346:6 352:19
  354:7
**rosh**  433:13
**rothstein**  2:13 5:5
**rough**  278:2
**roughly**  37:7
  127:18,21 145:9
  163:2 248:15
  276:2 388:8 389:6
  393:12
**rubric**  88:6 89:3
**rule**  172:25 173:22
  174:6 205:23
  206:5,9,13,19
  207:6,11,12,14
**rules**  1:19 14:4,16
  60:16 202:19
  208:17 369:11
  371:8 373:24
  418:6
**run**  156:14
**running**  139:21
  297:11
**runs**  150:12,13,17
  151:2

**s**

**s**  2:2 3:2,2 6:14
  65:15 254:14
  304:3 385:15
  386:20 391:19
  402:3 406:22
  448:2 451:5
**s.d.n.y.**  451:2
**sake**  175:2

**salary**  227:11,14
  227:19,23
**sale**  124:2 166:24
  171:5 172:15
  173:25 174:3,12
  185:12,24 186:9
  187:15 188:6,12
  188:16,22 189:4,9
  189:15 190:6,15
  190:16,19,21
  193:11,15,18,20
  194:8,11 195:18
  200:2 208:4 209:5
  209:13,19 212:16
  215:4,18,20 216:4
  216:5,6 217:16
**sales**  187:19,20,21
  187:23 188:11,11
  206:15 207:12,13
  213:21
**sat**  8:14,25 10:25
  11:5,11,18 13:12
  14:6
**save**  79:10,11
**saved**  371:6
**saw**  286:16 360:16
**saying**  15:11 67:20
  94:25 109:9
  113:20 125:6
  137:5,16 158:17
  216:15 236:14
  253:18 257:12
  264:24 265:6,15
  270:12 279:14
  280:5 281:18
  295:21 300:2
  306:7,23 310:2
  374:17 375:16
  376:22 378:8,20
  415:11 439:4

**says**  67:12 206:6
  230:22 241:10
  258:2 383:21
  388:18,25 390:8
  403:19 404:7
  405:2
**scenario**  166:24
  177:16 245:13
  342:6
**scenarios**  182:13
  394:11
**schedule**  39:20
  443:16
**scheduled**  302:5
**scheduling**  15:25
  36:3,10,12 38:21
  39:3,8
**schlosser**  361:18
**scope**  441:10,16
**scott**  2:14 5:25
**screen**  66:9 255:21
  304:13 386:5
  387:6 391:25
  402:16 406:25
  407:5,9
**screening**  110:9
**scroll**  66:25 71:4
  71:16 255:22
  304:14 402:21,23
**sdf**  388:8,15,19
  393:5
**sealing**  3:7
**searched**  363:11
  363:16
**searching**  362:25
**seasoned**  314:5
**seasons**  292:15
**sec**  236:25 367:5
  368:14 369:11,20
  371:8 375:10,18
  376:11,11 399:4

  418:6 426:13
**second**  29:23
  122:2,6 254:19
  255:25 256:4,6,14
  398:16 420:17
  421:19 426:8
  431:15 434:19
  435:10
**seconds**  156:22
  255:2
**secret**  425:12
  428:19 429:13
  434:3 437:23
  440:5,8
**secretly**  372:22
  375:20
**secrets**  42:5
  331:22 332:10
  420:7,9,21 421:5,8
  421:14,22 428:2
  428:18 429:3,6,19
  431:10,15,25
  433:25 435:5
  436:20 437:5,17
  438:9,18 439:7,10
  440:16,21 441:8
  442:10 443:7
**section**  25:13
**sections**  25:8,12
**secure**  428:18
**security**  367:5
  375:10 426:14
  428:20
**see**  12:16 34:11
  39:13 42:8 67:19
  67:24 71:6,7
  72:10,17 73:8,10
  73:14 85:2 138:16
  138:20 140:8
  143:14,21 144:6,6
  148:18 157:21

159:14 160:7,24
161:2 166:21
221:8 222:21
233:21 244:10
255:24 256:6,11
256:22,23 257:3,5
267:6 270:24
273:20 293:15
302:20 304:16,21
311:7 318:12
327:8,14 345:11
349:23 354:6
381:24 385:19
388:9 392:9,15,17
393:2 402:22,24
403:4 404:7,11,22
411:3,5 420:5
427:11 441:14
444:8 445:3
**seeing** 66:22
157:19 252:6
295:18 316:13
382:4 385:21
394:5
**seek** 44:15 94:17
94:21 374:8
**seeking** 109:5
179:10 234:12
365:24
**seen** 35:7 134:23
305:4 306:22
343:8 360:2,11,17
429:24 430:2
**select** 24:10 25:3
341:10
**selecting** 24:18
341:5
**sell** 139:23 151:11
151:25 152:6,7,13
164:18 171:3,18
171:23 172:13

174:11 176:8
177:7 184:3,13,24
185:8 187:18
191:21 192:6,23
194:15 195:2,8,15
196:3,8,13,16,25
197:17 198:6,15
199:8,16 200:8,17
201:9 205:24
207:20 208:3,8,18
208:19,24 211:18
211:21 212:8,10
212:11,13,19
213:6 214:24
**seller** 188:17
189:4,6 209:17,20
210:11,14
**selling** 166:18
167:5 172:2
182:14 184:9
185:21 195:11
205:7 206:10,20
207:7,16 213:19
214:2,6 216:24
217:3
**sells** 152:5 170:8
170:17
**send** 331:5
**sending** 366:3
383:16 388:21
**sends** 314:10
**senior** 96:25 97:4
**sense** 15:8 74:17
135:24 389:17,23
394:7
**sensitive** 4:6
**sent** 314:17 333:17
364:21,22 365:13
365:19,21
**sentence** 256:7,15
403:15

**sentiment** 412:14
**separate** 93:4
101:25 109:18
116:2 150:11
207:2 217:12
318:22 321:24
326:17 338:15,16
423:9 432:3,4
**separately** 318:23
**separation** 324:2
324:10,14,21
325:5,15,21 326:5
326:8,13,22 327:3
327:17,21 344:3,6
344:22 345:19
**september** 129:18
**serve** 40:18 41:16
41:25 118:6
**served** 73:19
406:18 408:14
**server** 409:24
410:4
**serves** 74:21 75:7
75:16 145:3
**service** 3:16
**services** 137:14
144:19 145:5
146:21 149:7,18
149:21 155:15
218:25 219:19
**serving** 77:8,17
78:11,23 88:12
**session** 37:8
**set** 7:11 16:5 28:6
29:18,24 31:14
53:14 75:6 186:5
204:11 431:25
443:11 450:11,20
**setting** 75:3
116:15 133:2
221:17 417:10

**setup** 392:12
**seven** 255:23
256:5,13,15 426:2
426:5,10
**severe** 299:14
**share** 7:12 65:4
394:12
**shared** 27:6,14
156:2
**sheet** 451:1
**shenkin** 1:21 5:8
450:7,23
**shoes** 281:4
**short** 14:4 63:12
63:15,16 64:21,22
72:21 73:12,14,21
74:2,2,9,11,14,15
74:22,23 75:8,11
75:17 76:4 78:20
80:24 81:6,9,23
82:10,20 83:6,14
85:16,19,20,21
86:3 91:3,4,4,24
91:25 102:4,6,7,12
102:17,20,22
103:4,5,15,16
104:6 105:12,20
106:4,20 107:18
108:4,10,22 109:6
110:4,19 111:9
116:18,19 117:8,9
117:22 126:11
128:18 129:5
131:10,12,23,24
132:2 133:25
138:17,20 139:3,5
139:16,23 140:8
141:13,23,24
143:6,8,14 145:5
149:8,9 152:21
153:9,11,17,18

154:3,7,17,21
155:2,6,22 157:24
158:2 159:9,18,20
160:6,18,25 164:6
164:12 170:7,8,17
170:19 171:2,6
172:3,17,18 174:4
174:5 176:25
179:2,2 250:20,23
260:4,11 274:4,5
385:11 386:18
387:9,25 388:13
388:15,22 389:7
389:12 391:7,17
392:8,21 394:2
397:2,6 398:10
399:3,15 448:15
448:18,20 449:6
**shorter** 37:15,18
**shortly** 116:17
293:7 294:5,6
400:22
**showing** 68:7
**sick** 264:13,18
**side** 72:19 102:12
102:18 140:21
141:20 148:6,23
174:17 186:6
199:2 208:18,19
208:20 211:14
212:8,10,11,14,15
250:15 253:15
430:15 443:4
**sign** 98:14 355:14
**signature** 450:22
**signed** 3:10,12,15
365:21
**significant** 264:22
264:25 265:4,17
265:19,22,23
280:21 282:9

**signing** 330:17
**similar** 43:19
82:24 112:3 147:4
148:5,7 149:7,15
149:17,19,21
266:6 329:11
361:8 391:2
**similarly** 177:5
434:14
**simple** 76:9 93:16
93:17 94:3,6
207:6 428:9
**simpler** 50:23 51:2
**simplicity** 50:20
**simplicity's** 175:2
**simply** 222:2
319:3
**simultaneously**
182:23 215:2
**single** 91:6 92:7
203:5
**sir** 196:2 226:19
308:3
**sit** 8:10 9:5,18,22
10:22 13:16,24
29:2 33:24 37:9
37:22 38:13 39:6
40:3 41:6 42:11
42:19 43:17,23
44:18,23 45:7,13
46:21 47:23 48:5
49:10,15 50:12,19
50:24 51:5,19,25
52:18,24 53:5,11
53:18,20,25 54:13
54:21 55:5 56:9
56:24 58:4 60:22
63:8 66:18 68:11
68:17 76:6 79:4
82:3 92:23 96:4
96:19,20 97:10

98:24 125:17,22
125:25 128:22
143:12,19 144:11
144:22 146:14,23
147:10 148:10
149:2 150:10,19
150:21,23 151:4
151:13,20 159:11
160:11 161:9
162:4,15 163:3,8
164:7,10 179:4
182:25 193:21
226:2,5 229:5
236:10 237:4
240:13 244:10
250:12 263:18,22
302:2,12 303:13
308:9 309:8
312:15 326:24
327:13,18 328:19
331:21 342:25
343:14,20 347:17
347:20 348:8
349:16 353:7,12
353:17 356:6
358:21 359:24
360:16 361:15,19
362:8 365:16,20
368:12,19,23
369:5 381:2
389:15,20 390:15
399:7 408:23
**siting** 354:2 445:4
**sits** 150:16 151:2
191:23 230:21
**sitting** 10:18 21:9
23:3,16 26:7
34:13,15 55:9,16
55:25 56:5,16,17
58:9 67:9 74:19
75:14,19 99:23

100:13 104:21
105:2 107:15
109:23 110:14
128:17 129:4,15
131:5 135:11
138:12 144:24
163:14 181:19
226:11 230:4
233:25 236:5
248:25 326:2
327:10 344:18
350:25 351:12
353:19 357:14,21
361:24 365:11
371:12 374:11,19
374:24 381:3
393:21 394:22
396:13,20 411:20
413:12 414:14,19
430:23 437:13
**situated** 313:11
**situation** 94:20
120:19 122:12
168:24 318:17
342:6
**six** 58:5 87:13,16
138:7,8 420:3
**sixteen** 426:5
**size** 28:6,8,12
32:14
**skills** 20:15 43:19
**skimmed** 23:23
**skin** 238:21 239:5
243:20 245:7,20
246:2
**slide** 71:6
**slightly** 31:23
144:3 236:19
**slipped** 285:24
**slipping** 286:9

**[slow - sourced]**                                                    Page 55

**slow**  72:13
**small**  257:16
  298:10 319:5,8,12
  323:22 405:14
**smaller**  319:14
  394:14,16
**smallest**  412:18,19
  413:2
**smith**  2:8 6:4,4
  7:11 18:4
**smith's**  16:25
  18:12 20:24
**snoop**  363:7
**snooped**  362:18
**snooping**  362:12
**sold**  166:23 182:21
  183:8,20 190:3
  193:10,25 198:18
  208:9 216:19
**sole**  49:13 195:23
  196:11 246:22,23
**solely**  136:16
  171:20
**solomon**  2:10 6:2
  6:2 7:13,20,24,25
  8:4 14:25 16:3
  17:5 19:24 20:12
  22:9 23:6 38:2,15
  53:3 57:25 61:7
  65:18 66:8 71:24
  79:22 90:8 93:24
  94:8 95:7 98:22
  101:3,11 107:4
  112:2 116:13
  128:6 131:19
  132:4 133:6 135:8
  142:4,10 149:11
  156:9,15 157:14
  161:11,16,22
  165:14 168:4
  173:3,9 176:11,15

177:12 180:4
183:10,23 186:10
186:19 187:16
191:9,13 203:10
204:5 205:14
206:3 207:24
209:23 212:20
214:15 216:23
220:9,12,18 221:4
221:14 222:5,23
223:9,21,24 224:4
224:23 225:2,4,6,7
225:9,11,14,20
226:10 230:15,18
231:6,11 232:12
232:23 237:22
239:2 241:20
242:16,20 254:20
255:20,25 256:3
257:22 258:24
264:4 270:23
277:11,21 280:3
280:24 281:13
283:17 284:15
287:21 288:25
289:3 290:8
294:23 295:5,15
304:8,12 307:12
307:22 308:17
313:14 314:24
332:20 333:5,8
335:2 336:8 338:6
345:5 348:23
349:14 350:5,14
351:8,17 352:4,7
354:13 356:16,21
358:5 362:5,14,20
363:4,24 364:24
365:5 366:5
368:10 370:13
371:10 372:25

374:12,15 375:22
376:6 377:20
378:13 385:21,25
386:4,10,23 387:5
390:4 391:23
392:6 393:15
395:11,15 397:13
401:5 402:11,15
407:2,8 417:18
420:3 423:14
427:5,10,13 436:8
441:9,17 442:5
443:5,20,21 445:3
445:9,20,22 446:9
**solomon's**  217:10
  442:17
**solutions**  451:1
**somebody**  101:6
  112:21,25 174:16
  176:24 177:25
  203:2,8 205:7
  282:15,24 283:8
  298:4 299:12,19
  299:23 301:7
  311:2,21 313:24
  323:15 329:4
  339:5 355:4,8,12
  359:9,20
**somebody's**
  283:14 373:20
  377:15
**somewhat**  395:23
**soon**  247:18
  273:22 419:8
**sophisticated**
  415:19
**sorry**  26:13 30:24
  31:6 37:16 56:3
  59:24 61:18 63:14
  71:11 72:2,12,15
  78:15 84:16,18

93:7,12 96:11
97:17 102:13
112:7 117:17
142:8 146:2,6
147:4 160:20
161:11,21 167:19
191:12,15 208:6
209:24 235:23
237:25 256:2
259:3,13 268:11
269:19,22 270:10
270:12 274:11,14
275:7 293:21
318:5 322:11
324:6 342:2,7
350:23 354:23
363:14 365:4
390:21 398:15
402:23 411:8
420:17 423:16
425:6 427:5,21
430:9 433:21
**sort**  45:21 81:24
  88:9 334:17 409:6
**sorts**  43:8 409:8
**sought**  372:18,21
  373:6,12
**sound**  63:17
  158:25 247:22
  344:14,16
**sounded**  238:10
**sounds**  14:2
  222:25 233:10
  290:21 313:7
**source**  114:2
  219:4,11 238:5,15
  238:17,20 240:18
  240:19,25 242:13
  280:13 409:9
**sourced**  291:21
  412:5

**sourcer** 408:15,17
**sources** 118:17,19
  118:23,24 285:22
  288:16
**sourcing** 118:24
  119:3 238:5,12,15
  238:17,20 239:20
  240:7,9,17,19,24
  241:10 250:15
  260:3,10,18 279:7
  280:22 281:9
  282:7,8,17 286:3,4
  286:9 287:11,13
  287:19 288:9,23
  289:20,22 290:4,6
  290:11,14,15
  291:3,4,11,12,14
  291:18,23,24
  292:8,10 293:25
  302:19 310:7,19
  311:20 312:7,8,13
  312:21 313:12,18
  313:19 314:2,14
  314:22 315:7
  327:25 408:7,14
  422:5,7,16 423:19
  425:23 426:2
  428:9,10
**souring** 239:12
**southern** 1:2 5:3
**space** 319:15
  405:14,15,19,24
**speak** 21:11 32:21
  33:4 34:17 35:21
  41:2 77:22 236:2
  277:13 307:16
  309:6 377:4
**speaking** 224:7
  308:25 309:6
**special** 81:11

**specialist** 50:25
  51:11
**specific** 21:21
  23:18 25:21 26:2
  68:25 69:8,14,15
  69:21 70:12 109:2
  111:12,13,14
  112:20 142:14,20
  165:3 168:24
  185:10 194:19
  236:11,16 244:10
  260:20 285:6,9,12
  296:11,13 309:9
  325:24 326:25
  335:5,15 336:3
  337:15 338:2,10
  352:23 358:9
  411:18 413:18
  415:16 432:8,9
  436:13
**specifically** 10:23
  13:25 15:7 20:13
  55:6 57:3 58:5
  60:23 78:2 96:5
  97:11 114:17
  138:15 147:11
  217:8 229:10,11
  245:12 246:18
  267:19 270:3
  276:6,14 285:15
  286:13 290:15
  303:3 337:4,7
  340:13 341:16
  346:21 347:24
  354:5 356:15
  358:8,10 369:14
  387:12 388:17
  391:11 420:2
  430:13 432:12
  435:25 436:14

**specificity** 169:5
**specifics** 13:3
  140:25 142:13
  249:25 268:19
  280:15 323:3
  324:23 326:17
  327:7 331:11,21
  334:7,8 346:5
  358:14 359:23
  361:3 365:17
  368:13 380:22
  381:9 389:16
  390:11 393:8
  394:13 396:4,10
  404:17 414:20
**specified** 447:11
**speculate** 213:17
  261:13 361:23
**speculating** 264:7
**speculation** 45:8
**spend** 312:8
**split** 50:6,9
**spoke** 178:13
**spoken** 228:25
  410:7 411:17
**square** 405:23
**squarely** 107:13
**ss** 450:4
**staff** 202:17
**stake** 62:6 206:12
  207:18,22
**stakeholders**
  136:21 137:10
  170:21 171:6
  172:4,6 173:20
**stamp** 65:7 71:20
**stand** 143:25
  144:10
**standalone** 27:8
**standard** 244:13
  291:24 376:21,22

  376:25 377:2
**standing** 341:9,21
  342:9
**stands** 27:11 135:7
  224:17
**start** 6:8 36:21
  47:11 49:6 52:14
  67:2 127:5 129:12
  134:17 144:5
  166:4 239:7
  286:19 386:14
  387:3 407:11
  421:13 437:9
**started** 7:5,8 47:19
  48:3,6 49:8,11
  132:15 247:23
  248:2 249:22
  279:20,21 285:18
  287:19 292:22
  296:9,15,21 297:4
  297:5
**starting** 42:12
  91:21 141:22
  143:5 287:13
**state** 1:21 5:13,17
  6:16,21 14:25
  180:10 186:16
  192:18 224:11,24
  289:5 326:25
  437:25 445:13
  450:4,8
**stated** 177:17
  385:4
**statement** 22:5
  59:8 256:25 257:6
  257:18 258:7,10
  258:14 259:9,16
  386:2,19 387:11
  387:13,16 391:3
  391:18 392:9
  443:24 448:19,21

**statements** 385:13
448:16 449:8
**states** 1:2 5:2
105:14 106:9,19
107:2,17 108:3,24
109:8 110:6,20
256:8
**stating** 187:4
246:8 285:19
289:15
**status** 217:5
**statute** 101:7
156:13,21
**stay** 272:16
**stellar** 392:4
**steps** 28:22 207:5
**sticks** 331:17
332:5
**stipulated** 3:5,20
**stipulation** 1:18
**stock** 167:5,10,13
**stop** 320:8
**stopped** 320:16
321:6
**stops** 95:11 377:12
**stored** 401:19
**story** 8:8
**straight** 284:6
319:8
**straightforward**
225:23
**strategies** 149:20
**strategy** 126:11
186:4 423:19
424:12 425:23
426:2 428:8
**straying** 337:23
**street** 372:7
**strike** 347:10
**struck** 288:5

**structure** 40:6
54:4 69:9,23 70:5
70:9,11,14,21 73:4
75:23 79:4 140:13
140:19 141:9
143:10 147:2
149:25 180:19
205:17 263:2
424:7,11 425:24
427:22 428:22
**structured** 141:3,5
142:25 143:18
144:12
**structures** 54:18
79:8 145:22
426:15
**struggling** 107:8
120:6 157:19
205:22
**stuff** 36:4 252:22
372:3,4 405:8
425:15 444:4
**subcategory**
188:23 243:3
**subject** 16:2 25:15
41:15 155:17
157:9 304:19
311:15 357:22
403:2 407:22
413:9
**subscribed** 447:18
451:22
**subsequent** 120:14
120:20 124:19,21
186:22
**subset** 25:3 291:3
**subsidiaries**
385:12 448:15
449:7
**subsidiary** 51:17

**substance** 112:25
412:10
**substantial** 131:16
131:23 132:7,9,10
281:10
**substantially**
140:23 188:20
280:8,12 283:25
284:4
**success** 133:11
134:13 135:5,17
135:21 175:5,18
178:19 254:18
**successful** 65:24
288:7
**suddenly** 284:25
294:14 297:14
**sufficient** 123:5
334:14,15 428:25
**suggesting** 142:13
154:19
**suing** 301:2
**suitability** 30:22
31:10 32:4
**suitable** 32:6
**sum** 112:25
**summaries** 33:18
35:10
**summarize** 294:20
295:8,13
**summary** 19:23
20:10 108:14
134:7 137:14
294:8 295:17
**supervision**
378:12
**supplied** 382:6
**support** 361:6
**supporting** 7:21
**suppose** 446:5

**supposed** 28:23
239:5 261:18
**sure** 16:21 20:4,19
25:24 26:6 27:24
29:20 40:9 45:20
52:2,19 53:6
54:10 55:7 58:24
60:2 61:19 67:13
68:14 72:7 76:13
78:17 79:21 80:16
89:18 91:15,16,19
92:5 96:16 108:11
110:7 116:15
131:22 139:20
142:17 155:23
168:11 188:2
192:16 203:14
206:8,16 207:2
210:6 212:3
219:10 220:15
223:3,13 232:20
238:6 240:18
249:18 255:4
265:13 268:11
270:8,25 275:9
282:21 284:5
286:15 295:6
310:11 311:18,19
312:10 316:23
317:3,5,22 318:3
319:7 323:14
360:16 366:23
367:13 375:11
377:11 378:18
390:11 422:13
434:21 440:23
443:5 444:14
**surgeries** 266:3,9
266:9 279:18
311:24

**surgery** 266:3,9
309:19
**surprise** 375:2
376:24
**surprised** 240:15
283:8 288:3
293:11 297:21
298:20 316:9
324:24 325:17
330:16
**surprising** 283:13
284:20 297:8,14
297:16
**surround** 377:10
**surroundings**
16:24
**swaps** 147:22
**swear** 6:12
**switching** 140:7
**sworn** 3:10 6:16
379:22 447:5,18
450:11 451:22
**synonymous**
84:24 85:11
**system** 362:13,19
363:3,13,18
**systems** 332:12
416:20
**szymanski** 416:12
416:15,21 417:3,5
419:3,9

**t**

**t** 3:2,2 6:14 48:16
447:2 448:2 450:2
450:2
**take** 4:14 14:5
15:18 28:23 38:4
38:25 65:24 66:13
86:19 87:10
122:20 141:18
164:17 166:14,17

189:11 198:16
225:12 245:24
254:7,25 264:15
266:24 269:20
290:22 292:12
295:12 303:23
363:25 364:5
376:12 387:23
388:5 391:4,14
401:24 406:16
416:16 419:18
434:20 439:21
**taken** 1:17 4:22
10:19 33:16 90:18
182:4 196:16
215:12 255:10
271:17 364:11
400:13 401:3,9,17
**takes** 208:4 292:19
**talk** 10:7 81:5
86:13 116:4,7
119:18 165:3,23
231:4 235:20
252:15 254:4
313:6 314:12,15
**talked** 102:19,22
178:10 237:6
**talking** 36:9 68:3
80:8 86:15 109:14
120:10 122:12
123:18 167:2
168:13 182:12
194:23,24 195:10
220:19 222:6
233:6 241:20
243:13 252:21
259:24 273:17
275:19 306:8
313:5 404:4
440:24

**target** 82:6,7,9,10
83:11,16,18,22,23
84:3,5,7 86:14,22
87:12
**tasked** 55:2,11,18
56:7 57:8,21
58:10
**tax** 50:20,23,24
51:7,11,14,14
68:24 70:10 112:6
112:8,10 113:3,11
113:11,19 114:7
114:14 148:22
424:12,14,15,17
424:18
**taxes** 51:3 111:23
111:25 112:2,3
**team** 12:14 13:2
197:9,10 251:4,6
251:11 262:2,4,22
263:21 264:2
281:22 282:3
302:20 314:8
340:12 346:4
**teams** 193:4
195:14,19 218:12
**tease** 85:17
**technical** 402:7
**technology** 65:18
71:22,24 72:2
392:5 416:20
428:17
**tedious** 288:17
**teleconference**
37:4
**tell** 11:22 12:6
14:16 35:16 37:9
43:24 47:23 48:5
51:5,19,24 52:24
53:6,12 54:21
55:6 57:18 58:10

60:8,22 65:23
66:5,16 67:10
72:25 77:15 82:13
89:12 104:9
107:24 109:24
112:21,25 119:21
123:21 127:19
129:16,24 130:6
130:17 146:24
147:16 149:16,20
158:14 161:9
169:14 181:20
182:25 183:7,19
204:7 214:21
220:14 222:13
223:7 225:24
230:25 233:22
234:2,25 235:4
238:6,15 239:8
240:14,20 244:11
250:12 268:21
270:20 272:9
285:14 286:5,12
293:5,23 294:2
302:3,7,13 307:6
308:9 312:16
313:21 314:5
323:25 324:12
325:9 328:10
332:16 344:19
351:2,13 353:7
381:2 382:21
405:4 406:24
408:24 413:12
419:23 430:17,21
444:4
**telling** 32:24 33:3
208:21 226:15
253:12 289:17
297:20 369:16
372:11 412:7

440:25
**tells** 186:21 319:17
**temporarily**
271:15 310:18
**temporary** 314:2
**ten** 9:4 145:20
248:20 300:21,22
410:14
**tending** 310:20
**term** 48:13,18
82:10,20,24,25
83:6 92:5,9,11
118:17 119:5,20
119:21 154:6
155:6 156:18
173:20 237:13,17
237:18 238:6,9,13
241:11 242:6,8,10
242:14 245:15,24
246:5,11 253:4
**terminate** 99:14
99:18,24 329:17
329:22 330:4
332:3,18 334:13
335:18,21 336:6
336:14,22 356:3
356:10,11 417:4
**terminated** 178:23
334:25 417:2
419:10
**terminating** 338:4
364:23 418:8,13
**termination**
100:15 256:9,20
257:19 258:12
330:11,15 331:6
333:18 334:16
337:10 355:15
364:21,22 365:14
365:18,22 366:3,4
448:11

**terminology** 85:6
89:14 188:3 189:4
239:7
**terms** 79:18
149:24 244:6
279:25 280:11
325:24
**test** 7:17
**testified** 6:17
11:17 110:25
114:25 294:9
**testify** 40:12 98:2
342:8 381:20
447:5
**testifying** 69:7
191:18 264:3
265:14 308:3
360:22
**testimony** 16:13
19:23 20:11 33:19
35:8 55:8 69:13
78:18 79:18 80:2
119:23 170:6,15
180:7,11 186:13
186:15,16,23
187:3,4 196:2
207:25 216:18
265:11 283:19,20
284:17 286:6
288:18 289:2,6,11
289:15 293:20
294:20 295:9,13
297:19 309:21
310:14 319:8
340:6 348:14
367:14 379:22
408:12 413:8
414:7 416:9
432:21 436:18,22
446:14 447:6,10
450:13

**texas** 111:24
**thank** 6:7 69:6
183:13 391:24
395:13 430:8
446:6,10
**thanks** 38:22
41:22 54:5 81:4
90:4 416:3
**theory** 168:7
**thereof** 329:10
**thesis** 116:9
**thing** 24:23 29:23
56:14 180:8 186:4
199:2 206:24
214:2 256:18
290:12 306:12
311:3 313:9 318:4
328:11 373:10
375:12 391:13
398:23 405:16
422:6 423:7,25
425:11
**things** 12:6 28:12
35:22 40:24 41:19
41:20 42:5 54:3
62:8 68:24 70:14
75:5 80:2,11 99:4
106:24 113:14,15
123:8 139:14
143:18,24 144:9
163:18 194:7
247:8 266:20,23
271:8 286:18
296:5 317:19
318:19 320:7
321:25 331:15
332:9 345:15
360:8 369:9,10
378:8 396:11,11
420:25 422:8,9
423:8,9 424:2,2

429:8,12 438:22
439:5 441:2
**think** 7:13,14 9:5
10:4 13:8 16:19
21:22 23:8,11
31:22 35:12 39:13
40:21 41:6 42:21
43:10 45:7 51:10
55:21,22 57:14
61:11 62:7,14
65:22 66:8 67:11
70:4 75:10 80:3,7
88:22 89:17 90:4
90:5 93:16 94:10
94:12 95:10,16
98:25 100:23
114:25 120:5,25
138:13 142:22
147:12,17,20
148:15 161:19
162:11,13 165:24
168:14 172:24
173:3,12 180:13
183:15 185:13
186:24 201:4,19
201:21 202:23
203:5,13 204:20
204:21 206:5
207:4 212:6 214:5
214:22 220:24
221:4,9,12,15
222:7 227:16
231:21 232:12
238:8 242:10
244:15 247:7,9
250:3 253:23
259:22,24 265:20
267:4 270:24
273:23 279:11
289:25 290:18,20
297:3 298:4

299:11,16,22
305:14 306:11,16
307:4 312:2 313:8
313:16,17,23
314:4 315:2,10,16
316:17,22,24
318:25 319:9,18
321:9,14,15
323:23 332:22,24
334:4 336:8
337:22 339:12
340:23 344:7
345:8 347:20
350:12,18 351:19
352:6 356:24
378:5,10 380:12
382:22 383:5,9
384:7,10 385:17
386:6 394:10,13
398:7,18,19
405:15,22,24
410:16 428:25
434:14,18 442:2
442:19,25 443:25
444:10 445:11
**thinking**  9:17 37:5
39:16 233:6
275:19 413:17
**thinks**  367:3
**third**  21:12 87:23
88:3,11 126:8
189:5 192:14
241:7,21 244:18
244:20 245:6,11
245:25 338:23
339:7 350:15
418:14 419:6
422:25 428:13
**thorough**  378:17
**thought**  8:2 31:25
37:18 100:4

102:13 121:12
192:17 214:10
240:5 274:11
297:9 299:2 300:3
307:3 351:5
375:12,18 405:11
408:2
**thoughts**  318:22
**thousand**  395:24
**thousands**  245:2,4
412:24 413:2
**three**  37:11,12
38:9 45:13 71:13
101:18 305:9
352:5 357:16
422:17 423:7,25
**thumb**  173:2,22
174:6
**tied**  153:10,19
218:22 219:3,10
219:13,14 220:5
**time**  1:12,20 3:22
5:17 10:4 11:15
16:5 25:2 38:3
42:14 46:20 47:3
47:12 49:9 56:25
57:7,24 70:13
79:11,11 80:6
84:7 86:8,25
90:13,19 104:24
105:4 108:3 113:9
124:11 127:19,20
129:11 131:10
132:7,13 135:18
137:24 141:5,8
160:20 163:23,25
170:7 178:7,11,13
181:23 182:5
184:8,16 185:11
192:22 193:17
194:14 197:16

212:8 244:15
249:5,8,23 255:6
255:11 256:8,19
257:3,9,10,18
258:12,20 259:12
260:15,19 261:11
261:14,15,18
263:22 264:6,10
264:13,14,16
269:13 271:18
272:19 274:19,24
275:10 279:18,21
280:6,20 281:8
283:11,15 285:13
285:18 290:2
292:14,19 293:4
300:18 301:10
302:7 305:12,15
307:10 314:23
315:13 322:2
325:17 330:10,14
337:18,22 350:6
357:13 364:7,12
400:4,8 405:8
407:25 419:18
421:2 424:10
434:20,21 442:15
443:19 445:6,21
446:2,7 447:10
**times**  8:14 9:2,10
9:13,15,25 11:19
36:13 132:8
170:16 185:18
194:5,6,7 216:25
217:21 221:15
300:21,23 410:10
410:20 411:2
**timing**  311:13
**title**  42:20 43:18
43:25 52:15 58:14
58:17 59:23 60:5

66:2 97:16
**titles**  43:21 241:18
**today**  7:18 14:19
16:14,25 17:9,13
21:9,18,23 23:4,16
26:7 33:4,12 35:4
41:17 42:2,10
55:9,16 56:5,9,16
56:17,24 58:4,9
65:10 68:17 74:3
74:4,19 75:14,19
98:2 99:24 100:13
104:21 105:2
107:16 109:23
110:14 128:17
129:5,16 131:5
135:11 138:12
144:24 163:12,15
226:12 230:5,21
234:2 235:7 236:6
248:25 319:10
327:10 344:18
350:25 351:12
353:19 354:2
357:15,21 361:24
363:15 365:11,16
371:13 374:11,20
374:24 381:3
393:21 394:22
396:13 406:19
411:20 413:13
414:14 430:24
437:14 442:23
446:7
**today's**  23:21
32:22 33:5 35:18
36:2,7,12,14,24
38:19 39:5 381:19
446:14
**told**  234:9 267:13
273:23 289:13

295:9 311:23
383:5 404:24
405:10 429:23
444:3
**tonight** 230:9,16
233:19 442:23
**top** 39:22 41:11
141:22 143:5
339:16 387:23
389:2 434:23
**topic** 112:19
268:14 324:17
339:12 363:25
364:2 399:22
419:20,25 420:5
**topics** 26:3 40:14
41:3,8,25 42:3,9
79:15,16,24 420:4
443:14 444:17,24
445:5,6 446:3
**total** 219:25 220:7
222:13 223:7
226:12,20 228:2,4
228:12 229:3,14
229:25 230:3,24
231:19 233:16
234:4,15 235:13
236:7 414:16,17
415:12 416:5
446:16
**totality** 175:16
**totally** 441:22
**toto** 103:13
**touch** 272:16
**tour** 48:22
**track** 422:12
423:4
**trade** 42:5 332:10
420:7,9 421:5,8,14
421:22 425:12
428:2,18 429:3,6

429:13,18 431:9
431:14,25 433:24
434:3 435:5
436:20 437:5,16
437:23 438:9,18
439:6,10 440:5,7
440:16,21 441:7
442:10 443:7
**trades** 420:21
**trading** 372:9,14
376:20
**training** 402:10
**tranche** 119:20
**tranches** 119:16
**transaction** 11:25
12:2,7 13:23
26:11,12,16,19,20
26:22,24 27:2,3,5
27:21 28:5,15
32:12,15,18,19
83:10 87:18 117:7
117:25 118:2,7
120:11 122:24
124:11,13 164:21
166:12 190:5
238:23 241:4
244:10,21 245:21
246:4 408:21
416:5,7 423:23
424:6
**transactional**
187:14 343:4
**transactions** 28:7
28:9,19 87:25
88:5 89:2,22
187:18,21,22
210:19,22 240:4
245:13 260:11
279:7 281:11
291:23 343:15
413:4

**transcript** 15:12
35:9 102:16 447:9
447:9
**transcripts** 33:15
444:21
**transfer** 122:22
123:7,13,14
187:13 188:6,13
188:16,21,23
**transferring** 165:9
205:3
**transfers** 186:7
188:4,9,11
**transition** 309:13
309:17 310:6,16
310:25 311:6,8,14
311:18 312:12
313:7,12 314:2,12
314:21 315:9
**transitioning**
142:18 303:21
309:13 312:3,20
313:18
**transitions** 250:2
**translate** 154:5
**traurig** 340:5,7,15
340:18,20,22
342:17,22 343:6
343:11,17 344:4
347:25 353:6
356:2
**treat** 307:7 329:3
**trees** 334:18
**tremendously**
165:21 166:2
**trend** 294:15
295:18,18
**trial** 3:22
**trickle** 155:21
158:23

**trickled** 156:5,10
**trickles** 155:5
**tried** 48:10 295:8
**tripp** 164:4 248:22
273:13,24,24
274:12,14,21
275:3,9 317:19
327:4,12
**trouble** 7:20
194:22
**true** 23:9 235:22
396:25 447:9
450:12
**truly** 231:5
**trust** 51:13 344:13
**trusting** 344:15
**truth** 447:5
**truthful** 16:13
**try** 15:19,22,24
16:6 20:17 40:7
85:17 217:14
337:19 346:10
443:18 444:23
445:18
**trying** 15:21 16:8
20:19 22:13 48:14
70:10 84:20 107:9
107:11,14 112:22
112:22,23 119:22
120:9,15 121:19
137:15 179:6
187:25 195:20
205:6 227:25
249:14,15 253:23
265:13 271:8
273:16 285:3
286:15 288:17
289:12 306:2
337:16,21 373:23
434:18

**turn** 4:9 145:12
**turned** 260:17
**turning** 410:25
**twice** 36:20
**two** 37:13,18
45:13 53:22 55:22
63:9,13,17 64:4
73:11,15,21,25
77:6 94:14 105:3
108:14 115:17
116:10,17 118:6
118:19 160:13
175:18 180:10
192:8,15 208:4
212:7 255:2
286:18 293:16
313:6 349:12
350:20 363:25
364:5 419:25
421:4,8,16 422:7,9
422:16 423:9
424:2 431:8,23
437:6
**type** 81:8 89:8
188:12,23 190:21
280:16 299:17,19
300:14 346:6,7
**types** 115:17,20,22
116:9,11,11,20,21
139:14 148:13
229:6 331:15
430:3
**typical** 122:23
**typically** 89:5
127:6 326:8
**typing** 15:11

**u**

**u** 3:2 6:14
**uh** 423:13
**ulterior** 203:25

**ultimate** 99:2
**ultimately** 47:15
95:23 96:2 97:5
98:3 100:24 101:9
137:7,11 145:11
152:20 154:4
157:25 169:16
196:23 198:3
202:9 203:22
208:22,23 348:21
377:17 401:2
**un** 165:17
**unable** 16:12
234:17 318:16
**unanimous** 192:20
**unanimously**
193:2,8 196:24
**unavailable** 34:6,7
34:11,12 310:8
**uncertain** 306:5
**unclear** 173:13
305:13 370:16,19
**underlying** 86:24
238:24
**underneath** 88:6
378:12
**underperforming**
394:2
**understand** 14:17
14:21 17:20 18:15
22:11,13 40:10
62:17 69:7 78:13
79:10,17 80:11
84:21 88:22 91:15
94:6 100:6 107:11
107:14 117:19
118:22 119:22
120:2,9,15,23
121:7,14,19,21
128:2 146:12
150:8 158:3

163:21 167:23
168:15 179:7
186:18 191:17
199:14 201:16,24
202:2 205:21
206:24 217:3,10
220:16,25 226:17
228:4 232:8 233:4
233:8 234:10
237:8,25 239:24
253:19 265:2,14
272:22 288:13
289:13 292:19
303:7 309:11
311:11 336:2
345:23 348:17,20
348:25 349:4
371:2 377:16
381:14 388:12
395:2 434:24
441:4
**understandable**
380:24
**understanding**
16:3 21:3 22:5
52:6 59:20 60:2,9
60:13 61:3,20
62:3 64:2,18 73:2
74:20 75:6,15,25
78:5,7 79:24 80:9
80:18 109:21
120:17 146:18
148:19,25 149:24
166:6 194:2 230:3
253:13 297:18
309:25 310:15
323:14 325:4
369:17 370:5
371:2 372:21
382:9 383:13
390:7 430:18

**understood** 20:19
39:23 62:15 64:14
78:17 85:15
112:13 113:8
154:23 187:7
232:21 272:18
273:2 306:25
309:16 317:23
436:21
**undertake** 277:6
**undertaking**
276:16
**undertook** 365:13
**underwriting**
423:22 424:4
**unfair** 192:10
**unfortunately**
416:25
**unidentified**
442:24
**unique** 312:9
422:11,17,18
427:4 428:11
434:4
**uniquely** 281:7
**unit** 4:17 90:16,21
182:2,7 255:8,13
364:9,14
**united** 1:2 5:2 89:6
105:14 106:9,18
106:25 107:17
108:2,24 109:7
110:5,20
**units** 446:16
**unprofitable**
136:25 137:4
**unrealistic** 177:16
177:20
**unrelated** 318:19
378:25 380:2,11
381:7

**unsigned**  3:14
**unsure**  271:8,12
  311:22
**unusual**  308:11
  311:2
**uploaded**  386:8
**upstream**  158:24
  158:24 159:2
**upstreamed**  159:5
  159:8
**usc**  377:16
**use**  30:6 85:6
  89:14 119:19,22
  122:14 156:10,16
  156:19 174:25
  189:3,21 190:16
  215:3 233:24
  238:12 239:9
  241:12 242:5,6,8
  245:14 255:2
  291:17 343:3
  379:8 380:23,24
  381:5,11 382:2,3,5
  382:6,8,10,15,16
  382:17,23,24,24
  383:14,15,18,22
  384:7,8,10,12,12
  384:20,22 385:2,3
  425:4,9,13,16
  427:23,25 428:6
  428:13,17,19
  431:20
**usual**  14:14
**usually**  15:2 88:14

**v**

**v**  48:16 451:2
**vacation**  432:24
  432:25 433:2
  436:7,21,25
  437:17,23 438:8
  438:17,24 439:7

**439**:11
**vague**  58:22 59:8
  89:10 129:9,10
  237:16 239:25
  246:9 261:24
**vaguely**  228:7
**valuation**  423:5,10
**value**  205:6
  219:25
**valued**  263:20,25
**varies**  127:19
  152:11
**variety**  81:12
  84:13,14,15
  126:16,17 147:18
  343:5
**various**  24:3 28:18
  28:22 31:18 40:13
  52:9 59:11 62:5
  62:14,18,21 78:10
  78:22 80:22 86:6
  87:7 92:22 93:3
  99:14,18,25
  100:16 101:22
  123:4 139:4
  142:21 147:25
  149:10 153:20
  159:8,20 165:24
  182:13 197:12
  202:11,13 218:12
  220:21 250:10
  332:14 337:22
  342:13 378:8
  426:15 427:24,24
  431:21
**vehicle**  75:22 82:5
  134:18 139:21
**vehicles**  77:24
  78:10,22 80:22,23
  145:2,24 146:7,9
  146:18,20 147:4,7

**147**:14 148:4,6,7
  148:13,20 149:10
  154:12,14,15
  190:10 427:25
**venture**  60:24
  283:25
**verbal**  15:13
**verifying**  130:10
**veritext**  5:6,9 7:12
  446:18 451:1
**version**  67:21
  68:14
**versus**  4:24 83:25
  84:4 118:23 150:9
  245:12 253:16
**vet**  108:21 109:4
**video**  4:13,18
**videoconference**
  14:8 37:3,6,8
  38:16
**videographer**  2:13
  4:2 5:7 6:11 31:2
  90:13,19 181:23
  182:5 255:6,11
  271:18 364:7,12
  400:4,8 446:10,12
**view**  92:8 93:19
  98:7,18 100:14
  101:8 137:9
  167:20 178:17,23
  188:12,22 189:9
  189:10 199:3
  207:20 212:4,5
  270:5,15 297:24
  299:15,20 306:19
  313:13 314:12,20
  322:3 329:8 330:7
  333:16,19 341:18
  344:24 345:12,16
  355:24 356:5
  367:8 371:4,13,17

**380**:16 382:13
  384:4 398:4 399:4
  428:3 429:13,16
  432:15,16,17
  433:15 437:11,12
**viewed**  94:23
**views**  433:11
**violated**  438:7
**violates**  101:6
  441:3,19
**violating**  441:5
  442:7
**violation**  377:16
  380:20 437:3
  439:17 440:15,19
**violations**  340:9
  344:10 345:2
  347:25 365:25
**virtual**  1:15
**virtually**  380:12
  380:13
**vis**  126:8,8
**visible**  317:21
**visit**  267:8,11
**visiting**  379:25
  380:19 383:16
**voice**  412:6
**voluntary**  178:22

**w**

**wait**  319:21
**waiting**  318:12
  385:8
**waive**  234:18
**waived**  3:9
**waiving**  445:23
**walk**  375:14
**walker**  266:22
**wall**  372:7
**want**  6:7 7:9 10:6
  16:23 21:24 26:5
  28:3 40:9 54:6

| | | | |
|---|---|---|---|
| 60:25 78:16 80:9 | 74:10 75:5 86:9 | 427:24 | 210:18 217:5 |
| 94:6,13 110:9,12 | 98:8,9 107:24 | **website** 254:21,22 | 238:24 245:22 |
| 113:5 119:19 | 121:21 129:4 | 378:25 379:4,5,10 | **willingness** 192:5 |
| 128:23 175:11 | 133:23 141:3,5,9 | 379:25 380:19 | **winning** 72:6 |
| 177:22 185:22 | 141:14 142:24 | 383:17 440:9 | **wishes** 98:21 |
| 186:5 188:2,24 | 143:18,24 144:9 | **week** 34:10 184:16 | **withdraw** 175:9 |
| 194:4 221:20 | 144:18 149:9 | 261:10 295:24 | 231:13 325:14,22 |
| 223:16 224:14,24 | 155:21,22 157:6,8 | 298:14 305:20 | 326:6,15,18,23 |
| 225:12,17 229:21 | 157:10,25,25 | 306:9 | **withdrawal** 325:2 |
| 232:14 236:13 | 158:8,16 159:17 | **week's** 304:20 | 325:20 327:2 |
| 237:7 238:12,19 | 159:17 163:15,22 | **weekly** 261:7 | **withdrawing** |
| 249:12 271:2,12 | 164:15 167:4 | **weeks** 294:12,17 | 325:2 326:11 |
| 271:13 275:16 | 168:12 171:17 | 294:18 295:11,12 | 327:5 |
| 285:2 288:12,13 | 185:16 186:17 | 311:15 320:24 | **withdrawn** 78:6 |
| 303:6 312:9 | 189:13 194:6 | **weight** 281:23 | 116:25 117:23 |
| 317:22 319:7 | 205:17,18 213:18 | **weighted** 84:10 | 120:12 125:2 |
| 323:14 350:21 | 213:22 223:9,10 | **weiss** 2:14 5:25 | 137:21 147:6 |
| 357:23 360:7,8,20 | 224:11 231:17 | 6:3 | 152:3 160:16,23 |
| 367:13 370:25 | 241:24 244:15,23 | **welcome** 90:25 | 164:14 237:11 |
| 383:6 386:25 | 245:18 246:7 | 182:11 | 264:11 378:23 |
| 395:2 400:20 | 251:19 261:15 | **went** 87:5 300:8 | 401:15 |
| 407:9 422:13 | 265:7 270:23 | 300:11 386:24 | **withdrew** 327:12 |
| 424:8 426:19,20 | 273:14 276:3 | 430:20 | **witness** 1:16 3:10 |
| 437:12,13 440:23 | 278:13 283:23,24 | **wet** 65:3 | 3:16,18 6:6,13,15 |
| 445:15 | 293:23 295:23,25 | **whatsoever** | 17:22 41:9,16 |
| **wanted** 26:14 | 297:15 303:9 | 393:11 394:8 | 42:2,10 65:17 |
| 62:16 67:14 99:9 | 316:11 327:11 | 395:25 399:13 | 90:11 142:22 |
| 100:16 113:10 | 328:15 332:25 | **whereof** 450:19 | 156:20 161:15,21 |
| 139:23 193:18 | 336:4 345:16 | **whispering** 4:7 | 186:20 210:3 |
| 232:19 233:4,8 | 347:13 358:8 | **white** 294:13 | 216:25 221:20,21 |
| 235:18 244:5 | 359:20 367:19,20 | **wide** 319:2 | 222:22 224:18 |
| 250:5 304:19 | 367:21,25 369:18 | **wife** 32:24 33:3 | 225:16 232:21 |
| 306:24 311:22 | 371:11 373:17 | 50:5,8,11 51:12,13 | 233:4 254:24 |
| 313:6 366:23 | 374:2,25 379:6 | 53:9 67:5 300:4,7 | 272:2 277:19 |
| 439:2 443:2 | 381:4 383:10 | 300:11,25 | 304:7 385:20,23 |
| **wanting** 399:13 | 384:21 399:10 | **wife's** 50:13 | 395:13 402:10 |
| **watch** 282:20 | 401:19 402:5 | **willing** 188:17,17 | 407:6 430:7 |
| **water** 415:25,25 | 421:15 435:18 | 188:18 189:4,5,6,7 | 434:25 436:4,10 |
| **way** 13:4 35:14 | 436:8 450:17 | 191:21 199:4,5 | 441:18 444:11 |
| 49:17 51:21 61:13 | **ways** 122:25 | 209:17,17,20,21 | 446:2,20 450:10 |
| 64:10 66:4 71:18 | 158:15 266:17,19 | 210:11,11,14,14 | 450:13,19 |

**witness's** 180:7
224:12
**witnesses** 14:11
79:13 236:15
**witnesses'** 451:3
**wives** 33:8
**word** 37:16 159:2
168:5 189:21,23
217:11 219:9
240:20 261:23
269:13 290:19,22
312:3 314:19
338:22 383:7
437:10
**worded** 313:17
**words** 15:3 112:23
115:20 117:19
192:19 194:3
237:15 257:9
259:7 272:14
311:7 384:5 439:3
**work** 15:24 88:21
97:8 99:4 113:24
164:2 249:15
252:23 253:2,6,10
254:4,4 256:10,21
257:2,10,20
258:10,18 259:10
259:17,23 269:24
298:3,8 348:22
372:3,3,4,7 381:10
381:11 422:24
423:2 443:20
445:2,7,18,19
**worked** 250:11
258:23 266:21
**workforce** 269:8
269:15 270:7,16
**working** 7:14 46:2
46:19 199:10
247:23 248:2

250:4,14 253:5,14
253:20,21 257:3
260:10 298:23
327:24 328:2
**works** 97:13 121:2
121:7,14,21 153:6
185:15 205:18
220:25 253:7
308:2 360:19
**world** 136:12,14
136:18,23 158:14
397:9 433:10
**worry** 392:5
**worse** 365:8
**worth** 122:18
**writing** 422:18
**written** 29:7,18,24
197:18 302:9
305:8 361:9
424:24 438:3,10
438:19,23 439:7
**wrong** 222:8
319:25 350:12
383:7,9
**wrote** 307:25
403:2

**x**

**x** 1:3,9 313:23
448:2 449:15

**y**

**yang** 2:15 6:4 17:6
38:2,16 254:19
**yeah** 28:2 49:15
52:5 54:5 56:13
57:16 60:25 61:11
64:9 65:21 67:13
68:16 69:3 71:16
72:9 84:18 102:15
107:8 112:12
120:6 140:12

142:17 154:18
160:21 183:25
186:14,25 201:25
203:13 211:12
233:22 236:13
237:24 239:6
247:6 250:8
251:25 270:14
277:19 294:16
295:6 303:14
307:12 321:18
334:17 357:14
390:5 398:17
407:10 409:17
414:4 433:4 439:2
441:13
**year** 114:23 115:4
138:2,13 167:8
220:8 222:14
234:21,22 235:9,9
235:19 236:4,9
276:24 280:9
284:2,12,23 285:4
285:13 287:16,18
293:24 295:24
302:5 385:14
386:10 391:9
393:7,7,9 395:5,8
395:24 396:4
448:16 449:8
**years** 8:17,19,24
11:18 13:13 43:24
44:18,22 45:12,13
46:16 48:23 49:4
49:16,23 54:18
55:5 56:11 57:5
58:5 66:22 68:23
70:13,19 82:11
138:7,9 215:18,19
216:8 217:22
234:23 235:9

251:4 263:12,17
275:2 301:22
340:22 342:10
361:13 408:19
410:5,11
**yesterday** 6:10
16:4 35:4,5,9
36:23 38:15 40:2
442:19
**york** 1:2,22 2:5,5
2:9,9 4:20,21 5:3
5:6,9 6:17,25 7:2
16:25 446:18
450:4,8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.