# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 8

```
                                        Page 452

 1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------------- x

 4

     PAUL IACOVACCI,

 5

                         Plaintiff,

 6

          -against-              Case No.

 7                               1:18-cv-08048

 8   BREVET HOLDINGS, LLC, et al.,

 9                    Defendants.

10   ------------------------------------------- x

11

12                  November 1, 2021
                    10:04 a.m.

13

14

15          CONTINUED VIRTUAL DEPOSITION of the

16   Defendant/30(b)(6) witness, DOUGLAS

17   MONTICCIOLO, taken pursuant to Stipulation,

18   held before Fran Insley, a Notary Public of the

19   States of New York and New Jersey.

20

21

22

23

24

25
```

Page 453

```
 1
 2   A P P E A R A N C E S:
 3         CYRULNIK FATTARUSO LLP
 4               Attorneys for Plaintiff
 5               55 Broadway, 3rd floor
                 New York, New York  10006
 6
           BY:   JASON CYRULNIK, ESQ.
 7               PAUL FATTARUSO, ESQ.
                 IAN DUMAIN, ESQ.
 8
 9
10         REED SMITH LLP
11               Attorneys for Defendants
12               599 Lexington Avenue, 22nd floor
                 New York, New York  10022
13
           BY:   LOUIS SOLOMON, ESQ.
14               COLIN UNDERWOOD, ESQ.
                 ADINA LEVINE, ESQ.
15               SCOTT WEISS, ESQ.
                 MONICA YANG, ESQ.
16
17   ALSO PRESENT:
18         MARCELO RIVERA, Videographer
19         MEI-LI DA SILVA VINT
20         DAVID SPINLEY, Brevet Capital
21
22
23
24
25
```

Page 454

1

2  --------------- I N D E X ----------------

3  WITNESS                  EXAMINATION BY        PAGE

4  DOUGLAS MONTICCIOLO   MR. CYRULNIK        464

5

6  -------------E X H I B I T S----------------

7  MONTICCIOLO         DESCRIPTION              PAGE

8  Exhibit 11  9/25/18 Affidavit            544

9  Exhibit 12  1/2018 Affidavit             544

10  Exhibit 13  Limited Liability Agreement  595

11  Exhibit 14  BREVET013260                 --

12  Exhibit 15  BREVET205010                 632

13  Exhibit 16  Page 8 of Exhibit 11         642

14      (EXHIBITS TO BE PRODUCED.)

15  --------- PREVIOUSLY MARKED EXHIBITS----------

16  Exhibit 10  30(b)(6) Notice              465

17  Exhibit 3   Termination Letter           590

18                      xxxx

19

20

21

22

23

24

25

Page 455

1

2                S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND AGREED

5    by and between the attorneys for the respective

6    parties herein, that filing, sealing and

7    certification, and the same are, hereby waived.

8

9            IT IS FURTHER STIPULATED AND AGREED

10   that all objections except as to the form of

11   the question, shall be reserved to the time of

12   the trial.

13

14           IT IS FURTHER STIPULATED AND AGREED

15   that the within deposition may be signed and

16   sworn to by an officer authorized to administer

17   an oath, with the same force and effect as if

18   signed and sworn to before the Court.

19

20                      xxxxx

21

22

23

24

25

```
                                          Page 456
 1                    Monticciolo
 2            THE VIDEOGRAPHER:  Good morning.  We
 3       are going on the record at 10:04 a.m. on
 4       November 1st, 2021.
 5            This deposition is being taken
 6       remotely of Mr. Douglas Monticciolo in the
 7       matter of Iacovacci versus Brevet Holdings
 8       LLC.
 9            My name is Marcelo Rivera from
10       Veritext Legal Solutions.  I am the
11       videographer.  The court reporter is Fran
12       Insley in association with Veritext Legal
13       Solutions.  I'm am not related to any
14       party in this action nor am I financially
15       interested in the outcome.
16            Counsel and all present remotely
17       will now state their appearance and
18       affiliations for the record.  If there are
19       any objections to proceeding, please state
20       them at the time of your appearance
21       beginning with noticing attorney.
22            MR. CYRULNIK:  This is Jason
23       Cyrulnik from Cyrulnik Fattaruso on behalf
24       of the plaintiff.
25            MR. SOLOMON:  Lou Solomon for the
```

```
 1                        Monticciolo
 2        defendants and the witness.  And just to
 3        be clear, I think it is fine to start with
 4        page 452, but as I understand it, Jason,
 5        we are in the 30(b)(6) section of this
 6        deposition?
 7               MR. CYRULNIK:  That's right.
 8               MR. SOLOMON:  And with me by the way
 9        in the room are Colin Underwood and Monica
10        Yang along with the witness.  That's all.
11               MR. CYRULNIK:  Okay.
12               THE VIDEOGRAPHER:  Will the court
13        reporter please swear in the witness.
14    D O U G L A S   M O N T I C C I O L O,
15    the Witness herein, having first been duly
16    sworn by the Notary Public, was examined and
17    testified as follows:
18               MR. CYRULNIK:  Before I start, Lou,
19        just for my benefit, I see there are two
20        corporate representatives listening in to
21        the deposition on behalf of the
22        defendants?
23               MR. SOLOMON:  I don't know who is
24        listening in.  If what you mean is Ms. da
25        Silva Vint, she is counsel for the
```

```
                                        Page 458
 1                    Monticciolo
 2      company.  We've also identified her as
 3      corporate representative for some of the
 4      other topics, but I don't understand what
 5      you mean.
 6           MR. CYRULNIK:  I'm referring to the
 7      fact that there are two Brevet
 8      representatives.
 9           MR. SOLOMON:  David Spinley is with
10      Brevet also.
11           MR. CYRULNIK:  My understanding is
12      that there was one corporate
13      representative who could attend
14      depositions.
15           I don't know if you had a different
16      understanding, but if you do, I'm happy to
17      sort that out during a break rather than
18      take time now.  Do you have a view on
19      that, Lou?
20           MR. SOLOMON:  Corporate
21      representatives?  I'm not sure what you
22      are talking about.  Ms. da Silva Vint --
23           THE COURT REPORTER:  You are talking
24      at the same time, sorry.
25           MR. CYRULNIK:  What I'm referring to
```

Page 459

```
 1                    Monticciolo
 2      is, Lou, is that there are two
 3      representatives of the corporation, as I
 4      understand it, who are not being deposed
 5      right now who are listening in.
 6            If I am misunderstanding that state
 7      of play, let me know, but I heard two
 8      people.  I see two people on the list,
 9      David Spinley and Mei-Li da Silva Vint,
10      who are both there presumably as
11      representatives of the company attending
12      the deposition.
13            MR. SOLOMON:  Mr. Spinley is not
14      going to be deposed.  He is acting in the
15      capacity as a paralegal and what I want to
16      say about him:  Ms. da Silva Vint is here
17      as counsel and then when you have
18      questions later on in the day, we are
19      going to be starting her 30(b)(6) and she
20      will then be the corporate representative.
21      She is not attending this deposition as a
22      corporate representative.
23            MR. CYRULNIK:  I think you're
24      misunderstanding me, Lou.  There are two
25      people that are attending from Brevet
```

```
 1                    Monticciolo
 2      apart from the witness.  Am I wrong or
 3      right?
 4           MR. SOLOMON:  I'm not familiar with
 5      the rule that precludes corporate
 6      employees from attending this deposition.
 7           MR. CYRULNIK:  This is why I asked
 8      you the question.  Is it your
 9      understanding that you are permitted to
10      have more than one representative of the
11      company, of the corporation attending a
12      deposition that they are not being deposed
13      in?
14           MR. SOLOMON:  I don't think they are
15      representatives of the company.  One is
16      counsel for the company and one is a
17      paralegal.
18           MR. CYRULNIK:  When you say they are
19      not representatives of the company, are
20      they simply here for the sport, to watch a
21      deposition?  Why are they listening in to
22      a deposition if they are not here on
23      behalf of the company?
24           MR. SOLOMON:  They are certainly
25      here on behalf of the company.  You said
```

Page 461

1                    Monticciolo
2       that they were representatives of the
3       company.  As you would explain,
4       Mr. Monticciolo is here as a corporate
5       representative.  I don't want to get those
6       confused, but I don't think there is
7       anything wrong with them attending the
8       deposition.  If you do, then you should
9       assert an objection and we can then figure
10      out what we want to do.  I don't think
11      there is anything wrong with counsel
12      attending deposition.
13           MR. CYRULNIK:  Number one, I don't
14      want to get caught up in semantics about
15      whether they are here on behalf of the
16      company or representing the company.  I'm
17      not quite sure what distinction you are
18      drawing.  Being here as a representative
19      of the company, it has nothing to do with
20      the fact that they are or are not
21      designated to be testifying in response to
22      a 30(b)(6) deposition notice if that is
23      what you had in mind.
24           Again, notwithstanding all of that,
25      it sounds to me like your position is that

Page 462

```
 1                    Monticciolo
 2        more than one, and it sounds like an
 3        unlimited number of representatives of the
 4        company, employees of the company,
 5        whatever term you want to use, are
 6        permitted to attend depositions in this
 7        matter.  If that is your position, as I
 8        said, we are happy to take it under
 9        advisement and deal with it at a break if
10        we have a contrary position.
11             It was my understanding and it's
12        been the practice to date to my knowledge
13        that one representative or employee of the
14        company attended the deposition apart from
15        the deponent themselves.  So that's why I
16        asked.  So did I get your position
17        correct?
18             MR. SOLOMON:  No, no, you didn't get
19        my position correct and I'm not going to
20        make any big speeches about it.
21             You asked questions of parties
22        before in their representative capacity
23        and people have been attending those
24        depositions who have been and I heard no
25        objection from you.  I am not aware of an
```

Page 463

1              Monticciolo

2    objection that is a valid one, that

3    counsel for the company can't attend a

4    deposition and that a paralegal in-house

5    at the company can't attend a deposition.

6         So if you have questions for this

7    witness in this 30(b)(6) capacity, I think

8    you should ask them.  If you want to then

9    raise an objection, you should then raise

10   an objection.

11        MR. CYRULNIK:  The irony of you

12   saying you are not going to give speeches

13   and then engaging in a 60 second speech

14   that didn't address my question is not

15   lost on anybody attending.

16        We will address this at the break if

17   there is something to address, but it

18   sounds like for the record, we have two

19   people here that are not being deposed,

20   apart from Mr. Monticciolo, who are not

21   being deposed who are associated with

22   Brevet apart from their outside counsel at

23   Reed Smith and they're attending the

24   deposition and to the extent there are any

25   issues with that, we will raise it

```
                                       Page 464
 1                      Monticciolo
 2        separately with Mr. Solomon because, at
 3        least as I understood his statement on the
 4        record, he believes that that is
 5        consistent with the rules.
 6   EXAMINATION BY MR. CYRULNIK:
 7        Q.    Good morning, Mr. Monticciolo.
 8        A.    Good morning.
 9        Q.    The purpose of today's deposition as
10   you know is to continue the 30(b)(6) deposition
11   that we started with you on October 7, 2021.
12             Do you recall you have been
13   designated to testify on Topics 1 through 5 and
14   Topic 26 of the 30(b)(6) notice that we had
15   served on the company?
16        A.    Yes.
17        Q.    That 30(b)(6) notice for your
18   reference is going to be in your Exhibit Share.
19   We introduced it at the last deposition.  The
20   Exhibit Share folder that we will be using
21   today has a new date on it, so there will be
22   two Doug Monticciolo folders.  One has the
23   11/1/2021 title.  That is the one we will be
24   using and you will see in that folder is an
25   Exhibit 10 which was previously marked at your
```

Page 465

Monticciolo

1

2       first deposition, which is the 30(b)(6) notice

3       that I just referenced.

4               We don't need to go to it right now.

5       I just wanted to orient you both to the Exhibit

6       Share setup and to the fact that to the extent

7       you or I deem it useful, that deposition

8       notice, 30(b)(6) deposition notice, listing out

9       the topics can be found in the folder that you

10      should be using today.  Okay?

11              MR. SOLOMON:  I think we actually

12          would like to take a look at it although

13          if you're clear with your questions, what

14          number you're up to or what number you are

15          on I think that would be helpful, but we

16          are not seeing anything.  It just says --

17          it says it's empty.  So I've ask -- got

18          it.

19              MR. CYRULNIK:  Are you telling me

20          that your marked exhibits folder for

21          deposition of Douglas Monticciolo

22          11/1/2021 is empty?

23              MR. SOLOMON:  No, I'm saying that

24          the screen said it was empty.  I think we

25          have the 30(b)(6) notice on the screen now

                            Monticciolo

1
2       if you want us to look at that.
3               MR. CYRULNIK:  I don't, Lou.  I'm
4       deposing Doug.  If you have a problem with
5       the logistics --
6               MR. SOLOMON:  That's why I asked it.
7               MR. CYRULNIK:  But the problem has
8       been resolved.  You are now seeing
9       Exhibit 10 in the marked exhibits folder
10      for today's deposition?
11              MR. SOLOMON:  Yes.
12              MR. CYRULNIK:  Okay, great.
13      Q.    Mr. Monticciolo, did you do anything
14  to prepare for today's deposition apart from
15  what you did to prepare for the October 7,
16  30(b)(6) portion of the deposition?
17      A.    I don't recall exactly what I said
18  on the prior, but we met with counsel, reviewed
19  the topics with the relevant documents.  I
20  spoke to people inside the firm to get some
21  additional information.
22      Q.    So in between the October 7th date
23  and today's date of November 1st, you spoke to
24  people in the company and to outside counsel to
25  prepare for the 30(b)(6) portion of the

```
                                           Page 467
 1                      Monticciolo
 2    deposition; is that correct?
 3         A.     Correct.
 4         Q.     Let's start with meetings with
 5    counsel.  How many times did you meet with
 6    counsel to prepare for the deposition today?
 7         A.     Maybe twice.
 8         Q.     When did those meetings take place
 9    to the best of your recollection?
10         A.     Throughout the last week.
11         Q.     So twice last week; is that right?
12         A.     Yes.
13         Q.     When you say with counsel, are you
14    referring to Mr. Solomon?
15         A.     Yes.
16         Q.     Were other members of your counsel
17    team present for either/or both of those
18    meetings?
19         A.     Yes.
20         Q.     And who would those have been?
21         A.     Monica and Ellen.
22         Q.     For both meetings it was you and
23    three -- the three Reed Smith attorneys that
24    you just identified?
25         A.     To the best of my recollection.
```

Page 468

```
 1                       Monticciolo
 2        Q.    Anybody else attend any of -- a part
 3   or all of any of those meetings?
 4        A.    I don't recall if Mei-Li da Silva
 5   Vint was on those calls.
 6        Q.    So each of the meetings you
 7   described were phone calls?
 8        A.    Yes.
 9        Q.    You don't recall whether Ms. da
10   Silva Vint was on either/or both of those
11   calls, correct?
12        A.    Correct.
13        Q.    Anyone else that may have been on
14   those calls apart from yourself, the three Reed
15   Smith attorneys you identified and possibly Ms.
16   da Silva Vint?
17        A.    Not that I recall at this moment.
18        Q.    Were those teleconference meetings
19   or video conference meetings?
20        A.    I would describe them as attempted
21   video conference usually turns to be
22   telephonic.
23        Q.    So you attempted to do video
24   conferences, but neither -- that didn't work
25   either time, so you resolved yourselves to have
```

1                    Monticciolo

2    teleconference meetings.  Did I get that right?

3         A.    I can't recall if it was

4    specifically both times or not, but it's always

5    problematic.

6         Q.    Did you look at documents or because

7    it was telephonic that was too difficult?

8         A.    I don't recall if we looked at

9    documents specifically on those calls, during

10   those calls.

11        Q.    Roughly how long did those meetings

12   last?

13        A.    I would be guessing.

14        Q.    They both happened last week, right?

15   Can you give me your best recollection?

16        A.    I would again be guessing.  They

17   weren't dramatic.

18        Q.    Sorry?

19        A.    They weren't significant in my

20   recollection.

21        Q.    Let's go with the first one.  When

22   was the first one?  Do you know what day of the

23   week it was?

24        A.    I don't, sorry.

25        Q.    Do you know when the second one was?

```
                                          Page 470
 1                    Monticciolo
 2        A.    More recent than that, but I don't
 3   recall.  I have had a lot going on, so in a
 4   brief touch base this weekend, Saturday and
 5   Sunday if I think that through.
 6        Q.    The brief touch base that you
 7   described is separate and apart from the two
 8   conferences you previously testified to or is
 9   that one of the two?
10        A.    No, it's one of the two.
11        Q.    Cumulatively would you say you spent
12   more or less than five hours preparing for this
13   deposition over the course of the last week and
14   by week I mean including dating back to last
15   week?
16        A.    I don't keep a general amount of
17   hours I spent on this.
18        Q.    So you don't know?  You have no way
19   of telling me whether it was more or less than
20   five hours?
21        A.    I have a very busy schedule.
22             THE COURT REPORTER:  I'm sorry.
23        Could you speak louder?  I'm having
24        trouble hearing you.
25             MR. CYRULNIK:  Me too.
```

Page 471

1                         Monticciolo

2                (Brief discussion held off the

3         record.)

4         A.    I have a busy schedule and I wasn't

5    recording hours, but I spent a reasonable

6    amount of time preparing.

7         Q.    So you don't know whether it was

8    more or less than five hours, is that right,

9    cumulatively?

10        A.    Right.

11        Q.    How about ten hours?  Do you know

12   whether it was more or less than ten hours?

13        A.    I answered that question.

14        Q.    Sorry?

15        A.    I answered that question already.

16        Q.    How could you have answered that

17   question?  I just asked it.

18        A.    Again, I don't.  I wasn't keeping

19   track of the hours.  I spent a reasonable

20   amount of time getting comfortable with the

21   materials.

22        Q.    How about 20 hours, Mr. Monticciolo?

23   Do you know whether it was more or less than 20

24   hours that you spent over the course of the

25   last week preparing for the 30(b)(6)

```
                                       Page 472
 1                     Monticciolo
 2   deposition?
 3        A.    The same answer.
 4        Q.    How about 50 hours?
 5              MR. SOLOMON:   The question keeps
 6        being more or less than 50 you are going
 7        to get the same answer.
 8        A.    Same answer.
 9        Q.    How about 100 hours,
10   Mr. Monticciolo, do you know whether you spent
11   more or less than 100 hours over the course of
12   the last week preparing for this deposition?
13        A.    Same answer.
14        Q.    How about 168 hours,
15   Mr. Monticciolo, do you know whether you spent
16   or more less than 168 hours over the course of
17   the last week preparing for this deposition?
18        A.    The same answer.
19        Q.    You understand that you are under
20   oath today?
21        A.    Yes.
22        Q.    And that you have to answer my
23   questions truthfully?
24        A.    Yes.
25        Q.    You understand that you are
```

Page 473

1                     Monticciolo
2      testifying today as a corporate representative
3      on behalf of Brevet?
4          A.    Yes.
5          Q.    Do you need to change anything about
6      the testimony that you gave at the last
7      deposition on October 7th?
8          A.    No, not as I sit here.
9          Q.    Did you have any discussions about
10     the substance of your testimony since your last
11     deposition?
12         A.    Nothing that I can recall in depth
13     or time.
14         Q.    Sorry, I didn't hear the answer.
15     Can you try that again?  I am getting a very
16     fuzzy, I don't know if anyone else is hearing a
17     very fuzzy sound when you speak in the
18     background, but it's hard to hear.  I'll do my
19     best if that's the best you could do.
20         A.    Sure.  No, not of any depth or time
21     on it.
22         Q.    When you say not of any depth, did
23     you have any discussions at all about the
24     substance of your testimony since your last
25     deposition?

Page 474

                              Monticciolo
1
2        A.    Yes.
3        Q.    Were those with anyone other than
4   counsel?
5        A.    No.
6        Q.    You did have discussions about the
7   substance of your testimony with your counsel
8   from Reed Smith; is that right?
9        A.    Yes.
10       Q.    Did you review your deposition
11  transcript?
12       A.    No.
13       Q.    Are you aware of any reason why you
14  would be unable to provide competent testimony
15  today?
16       A.    No.
17       Q.    Let's start with Topic 26.  Who was
18  responsible for the decision to terminate
19  Mr. Iacovacci from Brevet?
20            MR. SOLOMON:  Jason, I'm going to
21        pull up 26 or can we show the witness the
22        topic or can you read it to him?
23            MR. CYRULNIK:  I mean if you need
24        the topic for some reason, you will let me
25        know, but right now I'm just asking

Page 475

Monticciolo

1
2       questions.  I was orienting you primarily,
3       Lou, but you can strike the reference to
4       the topic and just focus on the question,
5       Mr. Monticciolo.
6       Q.    Who was responsible for the decision
7   to terminate Mr. Iacovacci from Brevet?
8       A.    Brevet was.
9       Q.    When you say Brevet was, are you
10  referring to anybody in particular or are you
11  referring to the corporate entity?
12      A.    I'm referring to the corporate
13  entity.
14      Q.    Well, how does the corporate entity
15  make decisions?
16      A.    We have policies and procedures that
17  we follow.
18      Q.    Who follows those policies and
19  procedures to make the decisions?
20      A.    So in the fall scenario, it was a
21  long process.  As I recall in May, Mark had
22  identified in his periodic e-mail reviews that
23  there was some suspicious activity,
24  recommendations were made that we would pursue
25  it further, which in my capacity as CEO I

Page 476

1                         Monticciolo
2    agreed with.   I pursued that with outside
3    counsel.
4                During that time we continued to
5    negotiate in good faith, and I would say there
6    was a turning point some time in -- I remember
7    in August or so, the end of the summer where
8    the negotiations had returned to being a
9    discussion around noncompete.
10               Our firm really looks to determine
11   that that was the objective as a permanent
12   exiting from the workforce.   That's why we
13   listed it with death and permanent disability.
14   So there was a bit of a heightened awareness of
15   what was really going on and I believe in -- I
16   think in early October there was a
17   recommendation made by Mark, the outside
18   counsel, in support of folks like the IT, HR
19   compliance to recommend the termination of Paul
20   for what I believe was termed egregious
21   corporate policies and procedures.
22               This was a little bit of a surprise
23   to us because things had been going on a course
24   and you know, while that process was proceeding
25   and we felt pretty comfortable enough to this

Page 477

```
                              Monticciolo
 1
 2     point that our trade secrets and be protected.
 3     We have clear policies and procedures about
 4     that.
 5              If there was a termination, that
 6     Paul would abide by those policies and
 7     procedures, protect all the materials and all
 8     the various sort of manuals that legislate how
 9     we do that and that recommendation was made to
10     terminate him and I agreed with it.
11              I recall and I know that the letter
12     was signed by Mark Callahan for Paul's
13     termination.
14        Q.    Let me try to break up some pieces
15     of your answer.  I know you a couple of times
16     referenced decisions being made or
17     recommendations being made in the past, so I
18     want to better understand who made the actual
19     recommendation, not that it was made.
20              Let's start with the May review.  I
21     believe you said you -- that there were
22     periodic reviews including one that was in May.
23     Can you describe to me what you mean by
24     periodic reviews of Mr. Iacovacci's e-mails?
25                   MR. SOLOMON:  I object to the form.
```

```
                                          Page 478
 1                      Monticciolo
 2        There is no foundation.
 3        A.    Yes, I would say that is a question
 4    that is for Mark Callahan and the people who do
 5    those reviews.
 6        Q.    Well, you testified that there were
 7    periodic reviews.  Is that -- are you recanting
 8    that testimony?
 9        A.    No.  I'm saying they presented it to
10    me as part of their periodic reviews.
11        Q.    When you say as part of their
12    periodic reviews, were you aware that they --
13    Mr. Callahan was conducting periodic reviews of
14    Mr. Iacovacci's e-mail prior to May of 2016?
15        A.    I am aware that he was doing what he
16    had to do in his job to be able to properly
17    follow the policies and procedures --
18        Q.    I appreciate that --
19        A.    -- under the advice that it included
20    periodic reviews of the e-mails.
21        Q.    I appreciate that.  And this
22    deposition is going to go a lot longer if we
23    can't stick the questions I am asking.  I don't
24    want to know whether you would be surprised.  I
25    don't want to know whether you were aware of
```

212-267-6868                    www.veritext.com                    516-608-2400

Page 479

1                        Monticciolo

2      something else.  I just want to know whether or

3      not prior to May of 2016 you were aware that

4      Mr. Callahan was conducting periodic reviews of

5      Mr. Iacovacci's e-mail?

6              MR. SOLOMON:  I object to the

7          question.  It's beyond the 30(b)(6)

8          statement as well.

9          Q.    Go ahead, Mr. Monticciolo.

10         A.    Again, my response is I don't know

11     if -- you know, it is just not Paul Iacovacci's

12     e-mails that are reviewed.  It is one of the

13     ways that I understand our compliance efforts

14     are done to review e-mails and correspondence

15     in accordance under our regulations with the

16     SEC.

17         Q.    Let me ask the question again.  Were

18     you aware, prior to May 2016, that Mr. Callahan

19     was engaging in periodic reviews of

20     Mr. Iacovacci's e-mail?

21             MR. SOLOMON:  Same objection as

22         before.

23         A.    I cannot say that I was aware

24     specifically of Paul Iacovacci's.  As part of

25     our role it is to review all correspondence and

```
                                        Page 480
 1                      Monticciolo
 2    all e-mails periodically.
 3         Q.    Okay.  I believe you said, so you --
 4    withdrawn.
 5              You were aware that Mr. Callahan was
 6    engaging in periodic reviews of employees'
 7    e-mails even if you didn't know which specific
 8    employees were included in that prior to May of
 9    2016; is that right?
10              MR. SOLOMON:  I object to the
11         question as beyond the scope of the
12         30(b)(6) statement.
13         A.    The answer is we are required to
14    review correspondence periodically, including
15    e-mails and other forms having produced and our
16    manuals and our policies that outlined those
17    guidelines and what we do there.
18         Q.    So you were aware, prior to
19    May 2016, that Mr. Callahan was engaging in
20    periodic reviews of employees' e-mails; yes or
21    no?
22              MR. SOLOMON:  Same objection.
23         A.    As part of his job I would agree,
24    yes, that he was doing that, amongst other
25    things.
```

```
                                        Page 481
 1                      Monticciolo
 2        Q.    I know you would agree he was doing
 3    that.  I am asking whether you are aware of
 4    that prior to May of 2016; yes or no?
 5             MR. SOLOMON:  Same objection.
 6        A.    Yes, I was aware that was part of
 7    the role of maintaining a compliance with the
 8    regulators.
 9        Q.    Was Mr. Callahan a member of the
10    compliance team?
11        A.    He was one of the senior executives
12    of the firm, partner.  We all have a
13    responsibility including wearing multiple hats
14    at times.
15        Q.    Once again was Mr. Callahan part of
16    the compliance team?
17        A.    The compliance team would involve
18    the specific people as well as the senior
19    management and the partners of the firm.  Those
20    are responsible to be a registered advisor.
21        Q.    So, yes, Mr. Callahan also worked as
22    part of the compliance team in addition to his
23    other roles?
24        A.    That is not what I said.  I said we
25    all have the responsibility.  How we pursue it,
```

Page 482

                              Monticciolo

1

2    if he feels that is to be part and to assist

3    with compliance, then yes.

4         Q.    Do you know whether Mr. Callahan was

5    asked by compliance to be engaging in the

6    periodic reviews of employees' e-mails that you

7    referenced a few moments ago?

8              MR. SOLOMON:   I object.  It goes

9         beyond the scope of the 30(b)(6) notice.

10        A.    I do not know if he was asked nor do

11   I believe he would need to be.

12        Q.    Why do you not believe he would need

13   to be?

14        A.    Again, we are all part of a

15   registered investment advisor and responsible

16   parties and that was part of the duty.

17        Q.    How periodic were the reviews that

18   you were referring to?

19        A.    Again, I don't know.  I'm not the

20   one who does them.

21        Q.    Do you know whether -- is it your

22   view that periodic reviews are required by the

23   relevant regulations, that is periodic reviews

24   of employees' e-mails?

25              MR. SOLOMON:   I'm going to continue

```
 1                      Monticciolo
 2         to object as being beyond the scope of the
 3         30(b)(6) notice.
 4         A.    It's a requirement to sufficiently
 5    be aware and monitor.  I'm not going to tell
 6    you if I believe that that is periodic or not.
 7    It could be more frequent than what could be
 8    periodic.  It could be less sufficient in the
 9    eyes of the manager.
10         Q.    So, you can't tell me how often the
11    periodic reviews that you referenced took
12    place?
13         A.    Correct.  That is not my job in the
14    company.  We have people, obviously policy and
15    procedures and responsibilities who would
16    determine what is sufficient.
17         Q.    Who can tell me how often the
18    periodic reviews that you referenced of
19    employees' e-mails took place?
20              MR. SOLOMON:  Objection.  This goes
21         beyond the scope of the 30(b)(6) notice.
22         A.    Mei-Li da Silva Vint.
23         Q.    Anyone else?
24         A.    I'm sure there have been many people
25    over the history of the firm.  I don't have
```

Page 484

                        Monticciolo
1
2    their names off the top of my head that have
3    that responsibility.
4        Q.    Did you look into that issue to
5    prepare for this 30(b)(6) deposition?
6        A.    I did not.  It was not part of one
7    of the questions.
8        Q.    Mr. Monticciolo, is it your
9    testimony that Mark Callahan was not
10   specifically looking through Paul Iacovacci's
11   e-mails in May 2016, but that instead it was
12   part of just a general periodic review that was
13   taking place irrespective of Mr. Iacovacci's
14   announced intentions with respect to leaving
15   the company?
16             MR. SOLOMON:  I object to the
17        question because it goes beyond the scope
18        and I object to this form.  Go ahead.
19       A.    I did not say that and I do not know
20   if he was looking at others as part of that
21   review.
22       Q.    Well, if you didn't say that, then I
23   totally misunderstood your prior testimony, so
24   you'll forgive me for going back to it, but you
25   referenced in your answer to my first question

```
                                        Page 485
 1                     Monticciolo
 2    or one of my earliest questions today to the
 3    fact that a recommendation was made based on
 4    Mr. Callahan's periodic reviews of
 5    Mr. Iacovacci's e-mails in May of 2016.  Do you
 6    generally recall that testimony?
 7              MR. SOLOMON:  I think that misstates
 8         his testimony.  I object to the form of
 9         the question.
10              MR. CYRULNIK:  Lou, I asked him
11         whether he recalls it.  He can answer it
12         for himself.  You don't need to try to
13         answer every question for him.
14         Q.    Go ahead, Mr. Monticciolo.
15              MR. SOLOMON:  You shouldn't misstate
16         his testimony.  By the way, you shouldn't
17         be repeating testimony anyway, okay?
18         That's not your job.
19              MR. CYRULNIK:  Thanks for the
20         advice.  Lou, I am going to ask you to
21         please try and keep yourself in check.
22              MR. SOLOMON:  Okay and I am going to
23         ask you to please keep your tone in check
24         in terms of asking me to keep myself in
25         check.  These are proper objections.  I
```

```
                                          Page 486
 1                      Monticciolo
 2        continue and I will continue to make them.
 3              MR. CYRULNIK:  I have no doubt.
 4        Q.    Mr. Monticciolo?
 5        A.    So, again I believe if my testimony
 6   was understood to be that it was -- Mark was
 7   doing it specifically for Mr. Iacovacci, I do
 8   not know that it was specifically for
 9   Mr. Iacovacci.  I know that it was -- it seemed
10   to me at least, it was part of Brevet's
11   periodic reviews of e-mails produced by Mr.
12   Callahan.
13        Q.    Who told you that it was part of a
14   periodic review of e-mails as opposed to a
15   specific review undertaken for the purpose of
16   analyzing or assessing Mr. Iacovacci's role
17   with the company and work with the company?
18        A.    I think it was Mr. Callahan.
19        Q.    So you do know that Mr. Callahan
20   represented the May 2016 review of
21   Mr. Iacovacci's e-mails to be part of a
22   periodic review, but you don't know in your
23   corporate representative capacity whether that
24   is accurate or whether a specific review was
25   indeed undertaken with respect to
```

Page 487

                         Monticciolo

1
2    Mr. Iacovacci?  Did I understand the
3    distinction you are drawing between what you do
4    know and what you don't know?
5              MR. SOLOMON:  I object to the
6         question.  It misstates the testimony.
7         A.    To be clear, I don't know if it was
8    part of a broad period e-mail review.
9         Q.    But you do know that Mr. Callahan
10   told you that it was, right?
11        A.    I do know that he said during his
12   periodic review of e-mails he came across these
13   e-mails with Paul.
14        Q.    And that was in May of 2016, right?
15        A.    I believe that's correct.
16        Q.    How did he describe the suspicious
17   e-mails that he came across during that review?
18        A.    I don't recall the exact words, but
19   concern and suspicious.
20        Q.    Did you ask him what he meant?
21        A.    I probably did.  I recall I did.
22        Q.    What did he tell you?
23        A.    It is concerning.
24        Q.    Well, I appreciate that he told you
25   it's concerning and they are suspicious, but

```
                                        Page 488
                        Monticciolo
1
2    did you ask him to explain what he was talking
3    about?
4         A.    Yes.
5         Q.    What did he tell you?
6         A.    It appeared that a large number of
7    our trade secrets and critical confidential
8    information appeared to be being sent outside
9    of Brevet, which is very concerning.
10        Q.    When you say appear to be sent
11   outside of Brevet, are you referring to the
12   fact that these e-mails or other materials were
13   being sent to Mr. Iacovacci at a non-Brevet
14   e-mail address or are you referring to
15   something else?
16        A.    I think our policies are clear on
17   what you are allowed to do with the documents.
18   Anything outside of Brevet is a violation of
19   numerous of our policies without written prior
20   approval.  So yes, that would include his
21   personal e-mail and any other places that he
22   may have put them outside of Brevet.
23        Q.    I appreciate that and once again,
24   I'm happy to go as long as you want to go, but
25   if you want this deposition to be a little bit
```

Page 489

Monticciolo

1

2    more concise, it's going to be useful to focus

3    on the question that I'm asking and so with

4    respect to the last question I had asked, I

5    heard a partial answer included in the lengthy

6    answer that you gave, but I want to make sure

7    that I'm understanding.

8              When you say that you came to learn

9    that some of your confidential materials or

10   trade secrets or whatever, however you refer to

11   them, were being sent quote "outside of

12   Brevet," are you referring to the fact that

13   they were being sent to Mr. Iacovacci or being

14   kept by Mr. Iacovacci outside of his Brevet

15   e-mail and related accounts or machines or are

16   you referring to the fact that they were being

17   sent outside of Brevet to somebody other than

18   Mr. Iacovacci?  I'm talking about May 2016 in

19   particular.

20         A.    I think it was both, but definitely

21   to his personal e-mail.

22         Q.    Setting aside his personal e-mail,

23   what did you learn in May 2016 was being done

24   with Brevet confidential material?

25         A.    I believe the company produced

Page 490

                          Monticciolo

1   numerous documents on this topic and
2   Mr. Callahan enumerated extensively a list of
3   those e-mails.  He enumerated a small subset.
4        Q.    I'm sorry, I didn't know you were
5   done.  You said he enumerated extensively.
6   You're referring to what he did when he
7   discussed this with you in May of 2016 or are
8   you referring to something else?
9        A.    I'm referring to one of his
10  affidavits.
11       Q.    Which affidavit are you referring
12  to, Mr. Monticciolo?
13       A.    I would have to go and check which
14  one, but there was one in September of 2018 and
15  there was another one in January of 2018.
16            There is a numeration of what I
17  understand to be a very small subset of the
18  thousands of e-mails that are on this topic,
19  but I believe there are maybe several hundred
20  there.
21       Q.    It's your testimony that the list of
22  a subset of -- a small subset of thousands of
23  e-mails that you discovered were being sent out
24  outside of Brevet, that is a list that was

Page 491

```
 1                       Monticciolo
 2    discovered in May of 2016; is that right?
 3         A.    As I recall, yes.
 4         Q.    Sitting here today as the corporate
 5    representative of Brevet, do you know one way
 6    or the other whether that list contained any
 7    e-mails that were sent outside of Brevet not to
 8    Mr. Iacovacci?
 9         A.    I recall that it did.
10         Q.    Can you identify for me which
11    e-mails were sent -- containing alleged Brevet
12    proprietary information were sent outside of
13    Brevet, not to Mr. Iacovacci, as you came to
14    learn in May of 2016?
15         A.    Again, when I believe we produced
16    these materials and you have Mark's affidavits.
17    If you want to go through it or you haven't
18    read them, we can do that.
19         Q.    Well, I'm asking you a very specific
20    question.  So if you need the affidavits I'm
21    happy to show them to you.  We will get them
22    uploaded and my colleague will tell me when
23    they are there and we can go back to that
24    question.
25         A.    Perfect.
```

```
                                        Page 492
 1                      Monticciolo
 2       Q.    Why didn't you fire him then and
 3    there, May 2016, Mr. Monticciolo?
 4       A.    As we have policies and procedures,
 5    we will investigate things to make sure that we
 6    are making proper decisions.  We were
 7    negotiating his departure.  We thought it was
 8    in good faith at that point in time.
 9             We have great protections, trade
10    secrets, confidential information that are
11    returned or destroyed by anybody who leaves
12    Brevet.  Our expectation was that this would
13    never leave the firm and were unsure as to
14    whether or not that was really a breach at that
15    point in time.
16       Q.    I didn't follow the answer.  Let me
17    start with the end.
18             Why were you unsure whether or not
19    Mr. Iacovacci sending e-mails outside of Brevet
20    to others and to himself was a breach of his
21    obligations to the company in May 2016?
22       A.    As I said, we have policies and
23    procedures.  We don't knee jerk things.  There
24    is a process.  The process is properly
25    followed.  We want to make sound decisions
```

Page 493

1                        Monticciolo
2    particularly with a partner who is quite
3    surprising if that was true.  We weren't going
4    to knee jerk.
5         Q.   Mr. Monticciolo, would you
6    characterize sending Brevet trade secrets and
7    confidential information outside of Brevet as
8    an egregious breach of a partner's obligations
9    to the company?
10        A.   If it were true, yes.
11        Q.   You had learned in May of 2016 that
12   Mr. Iacovacci had done just that, right, that
13   he had sent Brevet trade secrets and
14   confidential information outside of Brevet,
15   right?
16        A.   Again, we have a process to ensure
17   that we do things properly.  We double-check.
18   We bring in independent parties.  We take, you
19   know, something of this seriousness very
20   seriously.  We don't knee jerk.
21        Q.   I appreciate that and if the plan
22   here is to reference policies and procedures as
23   much as possible without putting any meat on
24   the bone, this is going to be a very long day.
25   My question to you is very straightforward.

Page 494

Monticciolo

1
2          You had seen or Mr. Callahan had
3    reported to you directly that thousands and
4    thousands of breaches had occurred whereby
5    Mr. Iacovacci was sending Brevet confidential
6    materials and trade secrets outside of Brevet.
7          What else did you need to know in
8    order to figure out whether you should be
9    terminating him?
10         MR. SOLOMON:  I object to the
11      question.
12      A.    May 2016.
13         MR. SOLOMON:  I object to the
14      question.  It misstates the testimony.
15      A.    Again, I think something this
16   important we always follow a process of making
17   sure that we will investigate to make sure that
18   it isn't just, you know, coincidence,
19   particularly with something like termination
20   and particularly with Paul as the partner
21   should have known and did know, was involved in
22   all these policies and procedures.  Spent his
23   entire career knowing the rules.
24          It was initially shocking that he
25   would break rules that he knew his entire

Page 495

```
                              Monticciolo
 1
 2     career to be critical.  So, of course, we would
 3     take a double look and make sure we were right.
 4              First, it was surprising and
 5     shocking and second, it had to be confirmed.
 6     It is the right process.  It's best practices
 7     is what we do.
 8         Q.    Mr. Monticciolo, what did you need
 9     to confirm?  You see not one, not ten, not a
10     hundred, but thousands of instances with your
11     own eyes or with Mr. Callahan's eyes of
12     Mr. Iacovacci taking Brevet confidential trade
13     secrets and materials and sending them outside
14     of Brevet.
15              Did you have one scintilla of a
16     doubt that the information that Mr. Callahan
17     was reporting to you was accurate?
18              MR. SOLOMON:  Object to the
19         question.  It misstates the testimony.
20         A.    It's not what I said.  I didn't say
21     anything about accuracy.  It's proper process.
22     It was shocking.  It's important.  It's a
23     partner.  But I had to make sure.  The firm
24     always needs to make sure it's right about such
25     a material decision and that is the right thing
```

```
                                      Page 496
 1                    Monticciolo
 2   to do, was to just make sure that they were
 3   right.
 4        Q.    What was the firm unsure about in
 5   May 2016 after Mr. Callahan had reported
 6   observing thousands of instances of breaches of
 7   Brevet's trade secret and confidential
 8   information policies?
 9              MR. SOLOMON:  Object to the
10        question.  Misstating the testimony.
11        A.    I'm sure that Paul would have been
12   that disregarding of everything that he has
13   lived under to have actually done that as
14   egregiously as it appeared.  It had to be
15   confirmed.
16        Q.    I'm not following.  What were you
17   unsure about?  I get that you were surprised.
18   What were you unsure about?
19              MR. SOLOMON:  Object to the
20        question.
21        A.    Just to make sure that what we were
22   missing was accurate, that someone
23   independently looked over our shoulder and said
24   could a partner really do this?  Shocking that
25   this was the case.  We didn't want to jump to
```

Page 497

1                         Monticciolo
2     any conclusions.  We wanted to make sure we
3     were right.
4          Q.    For example, Mr. Monticciolo, were
5     you unsure whether or not Mr. Iacovacci was
6     sending these e-mails to his own personal
7     address for reasons like he needed to print
8     those things at home?  Is that one thing you
9     wanted to double-check and make sure that
10    wasn't what was going on?
11         A.    No, that was not one of the reasons.
12         Q.    Sorry, I didn't mean to cut you off.
13    Go ahead.
14         A.    Well, no, because company policy is
15    very clear that that is not what you do and
16    without prior written approval, of course, and
17    obviously, you know, I can see if there is a
18    panic once or twice, but we had to understand
19    what was going on here and make sure we had a
20    full assessment of it.  This is a material
21    regulatory violation.
22              How do we know that Paul wasn't
23    using the information for insider trading?  How
24    do we know that Paul wasn't using material
25    nonconfidential information of private

Page 498

1                        Monticciolo
2    companies to his advantage.  These are very
3    serious issues that needed to be looked at
4    beyond just our internal people.  We need to
5    make sure that it couldn't actually be true
6    that Paul was doing this.  It was quite a
7    surprise.
8              It's a very uncommon thing that
9    people in these positions know better and Paul
10   knew better and it was surprising to us.  We
11   wanted to make sure, confirm it separately.
12        Q.    I guess the trouble I'm having,
13   Mr. Monticciolo, is understanding how it is you
14   are jumping from we were so surprised, what a
15   terrible thing, I couldn't believe it, I
16   couldn't believe my eyes, in all of that piece
17   of your answer, the entire piece of your answer
18   and how that translates into we needed time to
19   confirm that this was happening.
20              Do you appreciate the difference
21   between being surprised about something and
22   being unsure about what actually transpired?
23        A.    I think you're having a very linear
24   single point of view of this that it was just
25   dealing with materials.  What happens if he was

```
                                   Monticciolo
 1
 2     doing criminal activities, insider trading,
 3     theft of private company information?  We need
 4     to be sure.  We only -- I'm pretty sure Mark
 5     only looked at a small subset.  It needed to be
 6     reviewed.  This could have been a major
 7     regulatory problem.  We had no idea what Paul
 8     may have been doing.
 9          Q.    I appreciate that you may have
10     wanted to look or may have felt the need to
11     look more into this in terms of your own
12     regulatory compliance issues.  That's not my
13     question though.
14              My question is, why did you not
15     terminate Mr. Iacovacci in May after you had
16     learned that he had sent thousands of e-mails
17     containing Brevet proprietary information or
18     trade secrets outside of Brevet?
19              MR. SOLOMON:  Object to the
20          question.  It misstates the testimony and
21          it also was asked and answered.
22          Q.    Mr. Monticciolo, let me just break
23     in with my own question.  Did I just misstate
24     your testimony?
25          A.    I don't believe that was exactly
```

```
                                            Page 500
 1                      Monticciolo
 2    what I said correct.
 3       Q.    What did I misstate?  I didn't
 4    purport to quote your testimony.  I tried to
 5    summarize it as best I could, but what did I
 6    misstate about your testimony in my last
 7    question from your view, if anything?
 8             MR. SOLOMON:  I object to the
 9         question.
10       A.    I think you characterized that we
11    viewed thousands of e-mails at that point.  I
12    think the affidavits are much more clear on
13    that, but the fact that it was conclusive is
14    not the point.  I said it was concerning and
15    potentially egregious.  That needs to be
16    confirmed.  This is no small matter that
17    anybody would be making a knee jerk decision
18    on.  He was a partner.  We had trust in him.
19    We knew his experience.  He had been on the
20    street as long as me, if not longer.
21             We all know the rules.  We all know
22    you don't do this anywhere, any time, any
23    reason and yet it appeared that maybe there was
24    the complete, you know, neglect for that.  So
25    it needed to be looked into and we thought it
```

Page 501

1                          Monticciolo
2    was significant enough that it be pursued
3    outside of Brevet to make sure we have a clear
4    view on it.  Obviously we knew it was going to
5    be quite a bit of work.  It had to be done.
6         Q.    You said that maybe -- it appeared
7    that maybe he had done the exact opposite.  I'm
8    not following why this was a question for you.
9    It sounds like you saw these e-mails either
10   with your own eyes or Mr. Callahan saw them
11   with his.
12              What else did you need to know in
13   order to feel that Mr. Iacovacci needed to be
14   terminated from Brevet?
15        A.    As I said before, we do not knee
16   jerk.  We would not knee jerk with something
17   this material.  It is best practice.  It is --
18   our approach on this that if Mr. Callahan -- if
19   Mr. Iacovacci was doing this, we wanted to
20   confirm it definitively and we wanted to make
21   sure that we weren't going to have go to the
22   regulators with something more egregious like
23   insider trading or theft of private company
24   information.
25        Q.    Well, you can confirm all those

```
                                          Page 502
                          Monticciolo
  1
  2    things after you terminated him, right?
  3         A.    That would not be good business
  4    practice.
  5         Q.    Why not?
  6         A.    Because it's always best to know
  7    where we stand definitively and we are not
  8    going to knee jerk with a partner.  This is a
  9    partner of the firm.  You wouldn't do that with
 10    your law partners, would you?
 11         Q.    Well, Mr. Monticciolo, did you need
 12    to understand why Mr. Iacovacci was sending
 13    these materials to his personal e-mail address
 14    in order to determine whether or not you should
 15    terminate him?
 16         A.    Amongst the many things we were to
 17    determine as I have stated previously, yes.
 18         Q.    So you didn't feel comfortable
 19    terminating him simply because he had forwarded
 20    these e-mails to his personal e-mail address.
 21    You wanted to know what the purpose of
 22    forwarding these e-mails was before you made a
 23    determination as to whether or not that purpose
 24    gave rise to grounds for termination; is that
 25    fair?
```

1              Monticciolo

2      A.     That is not fair.   That is not what

3  I said.   I said why and what I mean by why on

4  that is why so many, why this process, why

5  violate the basic rules.   Not why was there a

6  business purpose or that I wasn't clear that

7  there was a business purpose.   Just why so

8  many?   Why were they, you know, in this scope?

9  Were they limited to just our trade secrets?

10 Were there, like as I said, nonpublic

11 information in there?

12     Q.     What reason could you possibly have

13 discovered for it that would have been

14 sufficient for you to determine that the fact

15 that he had e-mailed all these documents to

16 himself was not sufficient grounds for

17 termination?

18     A.     Again, as I said, at that stage we

19 were looking to understand the scope and

20 magnitude and why terminate him?   We were

21 trying to determine which of the many

22 violations and the magnitude of those

23 violations if they were worse than just trade

24 secrets which could be criminal stuff and

25 insider trading and that is I believe our duty

```
                                      Page 504
 1                     Monticciolo
 2   and best practices.
 3        Q.    Well, they didn't need to be
 4   criminal violations in order for you to
 5   terminate him, right?
 6        A.    I believe it is the best practice
 7   and our practice to make sure that we are
 8   confident and that it is checked with something
 9   of this magnitude that it be true and accurate,
10   that it be properly assessed by preferably
11   somebody independent who, you know, can look at
12   it and say yeah, I see the same thing or assess
13   it.  The lawyer has probably better assessment
14   capabilities than just employees do.
15        Q.    You need a lawyer to confirm that
16   Mr. Iacovacci sending e-mails to himself was,
17   in fact, Mr. Iacovacci sending e-mails outside
18   of Brevet?
19        A.    No, that's not what I said.  I said
20   we needed lawyers to confirm the magnitude, the
21   depth, the complexity, the implications, the
22   clarity of the theft and/or the regulatory
23   violations.
24        Q.    Let's start with the clarity of the
25   theft.  I mean was there anything about what
```

```
                                            Page 505
 1                        Monticciolo
 2    Mr. Callahan had reported to you in May of 2016
 3    that was unclear with respect to whether trade
 4    secrets had been stolen by Mr. Iacovacci?
 5         A.    You know, you are trying to ask the
 6    fine line between someone stealing the formula
 7    for a Coke and someone stealing kind of how the
 8    process of making Coke is done.  I don't know
 9    which of those Mark identified in his first
10    review.  There was a precursory review.  I did
11    want to know did he steal the Coke formula or
12    just how we make Coke.
13         Q.    The reason you wanted to know that
14    is because if he just stole how we make Coke,
15    you might have kept him around; is that right?
16         A.    No, he still violated our policies
17    and procedures for distributing our trade
18    secrets outside of Brevet and our policies are
19    very clear on how you do this.  They are
20    followed throughout the firm.
21         Q.    So if he just violated your
22    policies, that alone was sufficient grounds for
23    you to say we are not going to keep this
24    partner around; is that right?  Is that your
25    testimony?
```

```
 1                    Monticciolo
 2            MR. SOLOMON:  Object to the
 3         misstatement of his testimony.
 4         A.    What I said was, you asked me
 5    explicitly would that be grounds for it.  That
 6    could be grounds for it.  Obviously we would
 7    have to debate it and the team would make a
 8    recommendation, but if it was the Coke formula,
 9    that is the essence of Brevet, it's the essence
10    of Coca-Cola.  Some may say we protect it like
11    the what is it, the true static equation, you
12    know inside of a safe, inside of a vault,
13    inside of a volcano, that is a good analogy of
14    what Brevet does because if you take our secret
15    and how we do what we do, you take the full
16    value of Brevet, today and tomorrow, and that
17    we need to know, was it full damage of the
18    firm?  Was all of our differentiations, secrets
19    suddenly being taken outside the firm?  Was it
20    a portion?  Was it -- how bad was it?  These
21    are material items.
22               That's why we have the safe in the
23    vault in the volcano.  That is why we do it
24    because that's our business.
25         Q.    Mr. Monticciolo, yes or no, did you
```

1      Monticciolo

2  need to know how close to Brevet's secret

3  formula the materials that Mr. Iacovacci had

4  sent himself were in order to determine whether

5  or not he would be terminated from the company?

6       A.    Again, I can't answer that without

7  being that is a very specific facts and

8  circumstances and threshold question.  You know

9  we would have to look at whether it rose to a

10 point where that would be the only course.  It

11 seems very hypothetical.

12      Q.    Well, what were the other courses

13 that you might have pursued if you found out

14 that he had stolen things that were less than

15 the secret formula?

16      A.    I would have to consult with my team

17 and lawyers on what the possibilities are to

18 the protection of our trade secrets.

19      Q.    I'm not following.  I'm trying to

20 understand what information you lacked in May

21 of 2016 that would have caused you to delay a

22 decision as to whether or not you could

23 terminate Mr. Iacovacci from his position at

24 Brevet?

25           MR. SOLOMON:  Asked and answered.

```
                                              Page 508
 1                     Monticciolo
 2        Asked and answered.
 3        A.    And again yes, I answered that
 4   question.  It is very clear, it is not best
 5   practice to knee jerk.  It was shocking if a
 6   partner of the firm with the knowledge and
 7   experience of Paul could have so grossly and
 8   blatantly violated the most common basic
 9   premises of our business and the regulations
10   that we were not going to knee jerk and just
11   confirm and also determine for the protection
12   of Brevet as to whether or not it actually rose
13   to a much larger regulatory problem.  It would
14   be unwise to do anything but.
15        Q.    The question certainly has been
16   asked.  I can assure, at least as I understand
17   it, it hasn't been answered.  I appreciate the
18   fact that you have certain things you want to
19   say about why it is you waited.  That's why I'm
20   trying to formulate much more specific
21   questions so that I can better understand what
22   it is you are trying to say.
23              The question I asked you last time
24   and I will ask you again --
25              MR. SOLOMON:  I object.
```

```
                                                      Page 509
 1                        Monticciolo
 2              MR. CYRULNIK:  You object all you
 3         want to, Lou.  Please try and keep it in
 4         check.
 5              MR. SOLOMON:  Now I object to your
 6         offensive statement made for the second
 7         time today.
 8              MR. CYRULNIK:  Done?
 9      Q.    Mr. Monticciolo, I want to know
10   whether there was any information that you were
11   missing in May of 2016 that was necessary in
12   your view to determine whether or not Brevet
13   had the right to terminate Mr. Iacovacci?
14              I don't want to know what other
15   information you were interested in getting.  I
16   don't want to know what you think best
17   practices would be.  I'm asking you about the
18   data, the information.
19              Was there any information that you
20   did not have in May of 2016 that precluded
21   Brevet from determining that it had the right
22   to terminate Mr. Iacovacci; yes or no?
23              MR. SOLOMON:  Objection.  Objection.
24         Asked and answered.
25      A.    I'll repeat the information without
```

Page 510

```
 1                        Monticciolo
 2    confirmation of something of this magnitude is
 3    not sufficient in our minds until we confirm
 4    it.
 5         Q.    So you didn't confirm.  You needed
 6    to confirm what?  May 2016 you know that he is
 7    sending all these e-mails to himself with these
 8    trade secrets, confidential information, but
 9    you needed to confirm what?
10              MR. SOLOMON:  Object to the
11         question.  Misstated his testimony.
12         A.    We confirmed that that was true and
13    accurate.  Things happen, computer systems,
14    maybe the search was done wrong.  Maybe things
15    weren't right.  Something of this magnitude of
16    a partner, you know, had to double-check
17    everything.
18         Q.    So you weren't sure after
19    Mr. Callahan reported to you the results of his
20    review of Mr. Iacovacci's e-mail, you weren't
21    sure whether or not the thousands of instances
22    or hundreds of instances of e-mails
23    Mr. Iacovacci sent with proprietary trade
24    secret information had, in fact, been sent or
25    whether there was some computer error that was
```

Page 511

                         Monticciolo
1
2    showing you hundreds or thousands of instances
3    of such e-mails being sent; is that right?
4              MR. SOLOMON:  I object to the
5         question.  You've misstated his testimony
6         and you now have misstated when he
7         corrected you.
8              MR. CYRULNIK:  Mr. Solomon, I would
9         like to try and make this simple.  I would
10        like you to limit your objections to
11        objection to form.  Every time you say
12        misstated testimony, number one, it
13        underscores the fact that you don't know
14        what it means to misstate testimony.  I'm
15        not stating testimony.  I'm asking a
16        question.
17             And number two, it interferes with
18        this deposition.  Number three, it
19        prolongs this deposition.  So please do us
20        both a favor.  I'm happy for you to get
21        your objection to form on the record as
22        many times as you want to, you'll preserve
23        all your rights.  Just say objection to
24        form and please allow the witness to
25        answer the question without interference.

```
                                    Page 512
 1                      Monticciolo
 2           MR. SOLOMON:  I object to the
 3      question.  I object to you misstating his
 4      testimony and I object to the fact that he
 5      has already corrected your misstatement
 6      and you should be listening to his answers
 7      too.
 8           MR. CYRULNIK:  Mr. Solomon, you are
 9      not permitted to coach a witness in the
10      middle of a deposition telling him what he
11      did state or did not state.  I'm not
12      purporting to characterize or state his
13      testimony.
14           I am asking the witness questions.
15      You know it.  You're an experienced
16      lawyer.  Please stop interfering with this
17      deposition and coaching the witness.
18           MR. SOLOMON:  I think you're being
19      abusive, so I'm going to put my objections
20      on the record.
21           MR. CYRULNIK:  Put your objections
22      on the record and stop talking.  It's
23      objection to form and then the witness can
24      answer the question if he understands it.
25      Q.    Mr. Monticciolo, do you understand
```

Page 513

```
 1                    Monticciolo
 2  the question I asked?
 3       A.    Can you repeat it?
 4       Q.    I want to know whether or not you
 5  are telling us that you had some doubt in May
 6  of 2016 as to whether or not the hundreds or
 7  thousands of instances that you saw
 8  Mr. Iacovacci sending e-mails outside of Brevet
 9  were potentially bad search results or
10  misinformation?
11            MR. SOLOMON:  I think you're
12       misstating testimony to the time.  I'm
13       going to object on that basis.
14            MR. CYRULNIK:  Lou, you have to stop
15       coaching the witness.  This is totally
16       impermissible.
17            MR. SOLOMON:  You are not entitled
18       to misstate his testimony like you are.
19            MR. CYRULNIK:  Mr. Solomon, I'm
20       entitled to ask the witness whatever
21       question I want to ask.  I'm not
22       purporting to characterize his testimony.
23       You know it.  I said it on the record four
24       times.  So please stop.
25            MR. SOLOMON:  Go ahead.
```

Page 514

1                    Monticciolo
2      A.    So my testimony didn't say doubt.  I
3  said it needs to be confirmed to be sure, to
4  confirm.  I'm sure that you doubt when you
5  confirm.
6      Q.    Mr. Monticciolo, you don't need to
7  confirm something that you know already, right?
8      A.    It is best practice to measure
9  twice, cut once and that is what we do.  That
10  is what every firm who has good corporate
11  practice does.
12      Q.    Mr. Monticciolo, you don't need to
13  confirm something that you already know, right?
14      A.    I don't see how that is relevant to
15  this point.
16      Q.    That's fair.  Thankfully you're not
17  taking the deposition, so you don't need to see
18  the relevance.  That's for the court to decide.
19            MR. SOLOMON:  Object to the form.
20      Q.    I'm asking a straightforward
21  question.  Do you need to confirm something
22  that you already know; yes, no or I have no
23  idea?
24      A.    One more time on the question.
25      Q.    Do you need to confirm something

Page 515

1                       Monticciolo

2    that you already know; yes, no or I don't know?

3              MR. SOLOMON:  You don't have to

4         limit yourself to his -- I object to the

5         form.

6              MR. CYRULNIK:  Lou, this is all on

7         the record.  The court will see the

8         coaching.  It will see the colloquy.

9              MR. SOLOMON:  Then I can't wait.

10             MR. CYRULNIK:  In the middle of the

11        deposition you're not allowed to talk to

12        the witness telling him what to say.  You

13        are not allowed to be trying to lead

14        whatever it is you want him to say.  Your

15        job is to sit there, object to the form of

16        a question if you think it's objectionable

17        and to instruct on privilege.  So I'm

18        asking you for the fifth time in the last

19        ten minutes to please stop.  (cross talk).

20        It needs to stop, Lou.

21        Q.    Go ahead, Mr. Monticciolo.

22        A.    I would say, yes.  It's not a black

23   and white, yes, no answer.  It's yes based on

24   the magnitude and implications.

25        Q.    So even though you knew that

```
 1                         Monticciolo
 2    Mr. Iacovacci sent hundreds or thousands of
 3    e-mails to himself containing Brevet
 4    confidential information, that was not enough
 5    for you to terminate Mr. Iacovacci, fair?
 6                MR. SOLOMON:  Object to the form of
 7          the question.  You're misstating his
 8          testimony.
 9                MR. CYRULNIK:  You're doing it
10          again.
11          A.    Completely unfair.  That is not what
12    I said.  I did not say I knew.  I did not have
13    firsthand knowledge of it.  I didn't do it.
14    You know that.  It was very clear in the
15    affidavits of Mr. Callahan.
16                Mr. Callahan presented that he had
17    these results.  So it is not to say that I
18    knew.  It's the right thing to check something
19    of this magnitude.  Again, it was something
20    that would be quite surprising just as if one
21    of your partners was caught embezzling escrow
22    accounts, you would be shocked.  Well, that was
23    kind of the same feeling and that's where we
24    were.  You would want to kind of double-check
25    and that was the right thing to do and we did.
```

Page 517

```
                            Monticciolo
 1
 2        Q.    You didn't personally know because
 3    Mr. Callahan was the one who performed the
 4    searches.  So then following May 2016 did you
 5    undertake personally to review the e-mails that
 6    Mr. Callahan had reported to you he had found?
 7        A.    No, not my job.
 8              MR. SOLOMON:  I object to your
 9        laughing at the witness.
10              MR. CYRULNIK:  Lou, you really don't
11        need to object to anything other than the
12        form of a question.  I don't understand.
13        This is like the first time you are in a
14        deposition.
15              MR. SOLOMON:  You are laughing at
16        him.  I object.
17              MR. CYRULNIK:  Mr. Solomon, please
18        keep yourself under control.  You need to
19        limit your objections to objections to
20        form.
21              MR. SOLOMON:  Mr. Cyrulnik, please
22        keep yourself under control.
23              MR. CYRULNIK:  Creative.
24        Q.    Mr. Monticciolo, to make sure you
25    had everything right, to make sure you
```

Page 518

```
 1                    Monticciolo
 2   understood this shocking revelation was what
 3   you thought it was, you then reached out to
 4   Mr. Iacovacci and asked him to explain himself;
 5   is that the next step that you undertook?
 6        A.     Well, that would be a bizarre step
 7   if you're unsure about something.  You would
 8   want to confirm it first.
 9        Q.     Well, if you're unsure about
10   something, you wouldn't want to ask the person
11   that was your partner for so many years that
12   you couldn't believe was engaging in what you
13   were looking at to explain to you what it is
14   you were looking at?
15        A.     Correct.  I wouldn't want to make a
16   false accusation or assumption, have a
17   discussion on something.  I think that would
18   be, you know, just as you would with your
19   partner who may be perceived to be selling
20   escrow accounts.  You want to make sure before
21   you approach somebody or make a decision as to
22   whether or not maybe you should have a
23   discussion.
24             Again, that wouldn't be my position.
25   That would be guidance from outside counsel,
```

Page 519

1                       Monticciolo
2    with our HR, our compliance team.  So there
3    would be quite a process there.
4           Q.    But you didn't want to ask
5    Mr. Iacovacci because you didn't want to offend
6    him in case you were wrong, right?
7           A.    What I said, I want to make sure
8    that I'm right.
9           Q.    You want to know that you are right
10   before you went to Mr. Iacovacci and said what
11   is going on here, right?
12          A.    Yeah.  Maybe there was a computer
13   glitch.
14          Q.    Maybe a computer glitch?
15          A.    Maybe the e-mail recording was
16   wrong.
17          Q.    Maybe the e-mail recording was
18   wrong.  So you wanted to confirm all those
19   things before you asked Mr. Iacovacci about it,
20   right?
21          A.    I believe it's best practice to
22   presume someone is innocent until proven
23   guilty.  We wanted to make sure that we were
24   right about something of this magnitude.
25          Q.    At which point in time did you end

Page 520

Monticciolo

1   up reaching the level of comfort that you were

2   sure you had it right, that you had understood

3   what had happened and that you were now ready

4   to confront Mr. Iacovacci and ask him about it?

5           MR. SOLOMON:  Object to the

6       question.  Asked and answered.

7       A.    Again, that wasn't my decision.  I

8   think I have already given testimony on this.

9   It was Mr. Callahan, outside counsel, our IT

10  department, our HR, our compliance to make the

11  recommendation as to what the next steps are.

12      Q.    Mr. Monticciolo, you understand that

13  you are here as a 30(b)(6) representative of a

14  company?

15      A.    Yes.

16      Q.    I'm asking my question again.  I'm

17  not talking about you, Mr. Monticciolo.  I'm

18  talking about you, Brevet, the company.

19          At what point did Brevet reach its

20  comfort level that it knew -- sufficiently knew

21  what happened so that it was ready to approach

22  Mr. Iacovacci to ask him what was going on?

23          MR. SOLOMON:  Object to the

24      question.

```
                                          Page 521
 1                    Monticciolo
 2        A.    I don't believe that that was a path
 3    that was applicable in this situation given the
 4    egregiousness of this.
 5        Q.    Let me get this straight.  I thought
 6    you just told me that you were so careful as a
 7    company you didn't want to even approach
 8    Mr. Iacovacci to ask him about this because you
 9    still wanted to do more and more confirmation;
10    did I get that right?
11        A.    No, I think you mischaracterized
12    that.
13        Q.    What did I get wrong there?
14        A.    Again, we wanted to make sure that
15    we were correct, that it was checked
16    independently because potentially it was
17    egregious and we confirmed that it was
18    egregious.  And as the outside counsel and
19    people I mentioned come to their conclusion as
20    to what the right measure is, I'm not going to
21    second guess the decision process there.  It
22    was what was felt to be the right process for
23    the situation.
24        Q.    Whose decision process did you need,
25    did you not want to second guess?
```

```
                                              Page 522
 1                      Monticciolo
 2         A.     The firm's procedures for making
 3     recommendations for outside counsel,
 4     Mr. Callahan, HR, compliance, supportive IT.
 5         Q.     You're going to need to be more
 6     specific than that, Mr. Monticciolo, if you
 7     would like this deposition to go anywhere.  I
 8     want to know whose decision you said you didn't
 9     want to second guess?
10         A.     Again, it is not an individual.
11     It's a recommendation by a group of people,
12     just to make sure that, you know, everything is
13     being done appropriately and properly and
14     thoroughly thought through.
15         Q.     I want to know who made the decision
16     that you didn't want to second guess.
17               MR. SOLOMON:   Objection.  Asked and
18          answered.
19         A.     Again, Mr. Callahan, outside
20     counsel, HR, compliance, and probably in
21     support of the information from IT.
22         Q.     What Brevet entity was Mr. Iacovacci
23     terminated from?
24         A.     He was terminated from the Brevet
25     Holdings, which is the place where he was an
```

```
                                        Page 523

1                       Monticciolo
2    employee and FD, LLC as a member.
3         Q.    All at the same time?
4         A.    Yes.
5         Q.    Let's throw out Brevet Holdings.
6    Was there a meeting to discuss Mr. Iacovacci's
7    termination from Brevet Holdings?
8         A.    I'm not sure if there was a meeting
9    or a phone call, but I recall a recommendation
10   being made and questioning the support,
11   listening to what was provided to Mr. Callahan,
12   outside counsel, HR, compliance and I'm sure IT
13   was providing any input they had and I agreed
14   with that.
15        Q.    We are back to using the passive
16   voice, Mr. Monticciolo, a recommendation was
17   made you're a 30(b)(6) witness.  I want to know
18   who made the recommendation to terminate Mr.
19   Iacovacci from Brevet Holdings?
20        A.    Individuals don't make a
21   recommendation.  A recommendation is provided
22   by a group of people on behalf of those people
23   recommendations to do something.  It's called
24   best practice.  It's not an individual makes a
25   recommendation.  That wouldn't be corporate
```

Page 524

                    Monticciolo
1                   Monticciolo
2   practice.
3        Q.    Did they all say in unison?  I mean
4   somebody had to actually make the
5   recommendation if it was being done on behalf
6   of somebody else, right?
7        A.    Somebody may have been speaking, but
8   speaking on behalf of the whole team.  To the
9   best of my recollection, it was all those
10  people speaking.
11       Q.    Let's start with who was speaking.
12  What does that mean it was all those people?
13  Who said to you, in words or in substance, we
14  recommend terminating Mr. Iacovacci from Brevet
15  Holdings?
16       A.    I answered this question.  I will
17  repeat it for you.  Mr. Callahan, outside
18  counsel, HR, compliance.
19       Q.    Let's go one by one because
20  otherwise I think it's going to get unwieldy.
21  I'm going to write down we've got Mr. Callahan,
22  outside counsel, HR, compliance.  Anyone else
23  by the way?
24       A.    Not that I recall.
25       Q.    Let's start with Mr. Callahan

Page 525

1                    Monticciolo
2  because he's the only individual at least that
3  we can talk about.
4            Mr. Callahan made the recommendation
5  to you, Doug Monticciolo, or to some entity to
6  terminate Mr. Iacovacci's employment with
7  Brevet Holdings?
8       A.    Made the recommendation to the CEO
9  of Brevet Holdings for approval based on their
10  recommendation.
11      Q.    And you are the CEO of Brevet
12  Holdings, right?
13      A.    I am.
14      Q.    So Mr. Callahan made the
15  recommendation to you for your approval to
16  terminate Mr. Iacovacci from Brevet Holdings;
17  did I get that right?
18      A.    Say that one more time.  There was
19  some noise.
20      Q.    Mr. Callahan made a recommendation
21  to you as a CEO of Brevet Holdings to terminate
22  Mr. Iacovacci from Brevet Holdings; did I get
23  that right?
24      A.    No, Mr. Callahan on behalf of the
25  various roles that were represented made the

Page 526

```
1                        Monticciolo
2    recommendation for approval or denial to
3    terminate Mr. Iacovacci.
4         Q.    I don't think that is inconsistent
5    with what I asked, but if it makes you more
6    comfortable, that's fine.
7              I was going to ask you who he was
8    speaking on behalf of other than himself.  I'm
9    really trying to break this into baby steps
10   because I think it's the only way to get
11   through this deposition in a reasonable period
12   of time.
13             So Mr. Callahan was the voice.  It
14   was Mr. Callahan's voice that made the
15   recommendation to you, Mr. Monticciolo, for
16   approval or denial of the termination of
17   Mr. Iacovacci from Brevet Holdings; did I get
18   that right?
19        A.    I don't recall that it was solely
20   his voice.
21        Q.    I didn't say solely in my question.
22   I'm asking right now about Mr. Callahan's voice
23   making that recommendation to you.  If there
24   are other voices or if you made it on behalf of
25   other people or departments, we will get to
```

Page 527

                        Monticciolo

1    that next.

2           Mr. Callahan's voice made a

3    recommendation to you to terminate

4    Mr. Iacovacci from Brevet Holdings and it was

5    submitted to you for approval or denial; did I

6    get that piece right?

7           A.    I don't believe that's a fair

8    characterization of how the process works.  I'm

9    confused that you don't understand committees

10   and processes.  A team of people, somebody

11   might be speaking for them, but I believe they

12   would be speaking as the whole, not the

13   individual, and that's why we have almost all

14   the processes at Brevet work this way.  One

15   person may be the spokesperson, but it's not

16   their sole decision.

17          Q.    We can call it voice.  We can call

18   it spokesperson.  You pick the term you want

19   to.  I am trying to focus on words coming out

20   of somebody's mouth.  So let's use spokesperson

21   because you just used that in your answer.

22          I don't want to imply one way or the

23   other whether the spokesperson was speaking on

24   behalf of himself or one or more other

```
                                         Page 528
 1                      Monticciolo
 2   entities.  I just want to focus on the actual
 3   spokesperson's recommendations.
 4            Did Mr. Callahan, as spokesperson
 5   for one or more people or entities recommend to
 6   you, Doug Monticciolo as CEO of Brevet
 7   Holdings, that the company terminate
 8   Mr. Iacovacci's employment?
 9       A.    Yes.
10       Q.    When did that event take place?
11            MR. SOLOMON:  Asked and answered.
12       A.    As I said, I think that was early
13   October.
14       Q.    Can you be more specific than early
15   October?
16       A.    No, I can't unfortunately.
17       Q.    Do you know when it was relative to
18   when a termination letter was sent to
19   Mr. Iacovacci?
20       A.    Before.
21       Q.    Was it days before, weeks before?
22       A.    Within a week or two as I recall.
23       Q.    So you recall there being a gap of
24   time, but that the gap of time was not more
25   than a couple of weeks?
```

```
                                        Page 529
 1                    Monticciolo
 2       A.    Enough time to write the letter I
 3   believe.
 4       Q.    So just enough time to write the
 5   letter.  So pretty close in time to when the
 6   letter was sent?
 7       A.    I was using that as a metric to try
 8   to measure the time.
 9       Q.    So you don't know if it could have
10   been earlier that day, earlier the day that the
11   letter was sent?
12       A.    I don't believe it was that close
13   because we do -- we are careful about things we
14   do.  We don't like to knee jerk something of
15   this importance remember.
16       Q.    I forgot for a second.  I forgot who
17   I was dealing with.  So did Mr. Callahan make
18   that -- again we are talking about
19   Mr. Callahan, the spokesperson, did he make
20   that recommendation to you in person or over
21   the phone or in writing?
22       A.    I don't recall whether it was in
23   person or over the phone.
24       Q.    Did you check with him before this
25   deposition?
```

Page 530
```
 1                    Monticciolo
 2        A.    I did not.
 3        Q.    Do you know it was oral, not in
 4   writing; is that right?
 5        A.    I believe that's correct.
 6        Q.    Did Mr. Callahan tell you when he
 7   made the recommendation to you whether he was
 8   speaking on behalf of one or more individuals
 9   or entities other than himself?
10        A.    In this context he doesn't need to
11   specifically tell me which context.  It's part
12   of our policy to be representing all those that
13   are supporting or involved.
14        Q.    There is a policy, a Brevet policy,
15   that when you speak, you're speaking on behalf
16   of all Brevet entities?
17        A.    It's not exactly what I said or
18   intended.  What I mean is he was speaking on
19   behalf of the results of a group of people.
20        Q.    What group of people?
21              MR. SOLOMON:  Asked and answered.
22        A.    Again, outside counsel, HR,
23   compliance, et cetera.
24        Q.    So if I'm understanding you
25   correctly, Mr. Callahan made the recommendation
```

Page 531

Monticciolo

1
2    to you as a spokesperson on behalf of outside
3    counsel, HR and compliance; is that right?
4         A.    Ask your question one more time.
5         Q.    If I understood what you said
6    correctly, Mr. Callahan made the recommendation
7    that you referenced a few moments ago as a
8    spokesperson on behalf of outside counsel, HR
9    and compliance.  Did I get that right?
10        A.    As I sit here I believe that to be
11   correct.
12        Q.    And he didn't tell you that he was
13   speaking on behalf of any of those departments;
14   you just understood that based on general
15   policies is that -- did I get that part right?
16        A.    I don't recall if he specifically
17   said that or not.
18        Q.    But you know for a fact that he was
19   speaking on behalf of those three departments,
20   right?
21        A.    Again, I think we already answered
22   that this was, if not was the culmination of
23   the prior May activities which culminated in
24   all those entities coming back with the result
25   of their recommendation to study further and

```
                                      Page 532
 1                    Monticciolo
 2   assess the situation.
 3        Q.    Sorry, I missed part of what you
 4   said.  It was a little fuzzy.  Did you say each
 5   of these departments made a recommendation?
 6        A.    No.
 7        Q.    Did each of these departments make a
 8   recommendation?
 9        A.    No.
10        Q.    Was each of these departments
11   involved in the post May 2016 activity that you
12   described to confirm or learn more about what
13   had happened?
14        A.    I don't know.  You have to ask them
15   or Mr. Callahan.
16        Q.    Well, I'm asking their corporate
17   representative.  I take it you didn't have a
18   chance or didn't understand that you were
19   supposed to be checking with each of those
20   entities to confirm whether or not each of them
21   or all of them made a recommendation with
22   respect to Mr. Iacovacci's termination?
23        A.    Right.  I thought it was clear
24   already in the record from Mr. Callahan's
25   affidavits.
```

1                    Monticciolo
2        Q.    We will have to talk to you and your
3    counsel about that afterwards, but we are
4    asking you questions that we are entitled to
5    ask irrespective of what you think is in the
6    interrogatory responses.
7                So, sitting here today in your
8    capacity as corporate representative, you don't
9    know which of the departments you identified,
10   that is outside counsel, HR or compliance did,
11   in fact, make a recommendation to terminate
12   Mr. Iacovacci's employment with Brevet
13   Holdings; is that right?
14                MR. SOLOMON:  I think that misstates
15        his testimony.  Objection.
16                MR. CYRULNIK:  I'm asking him, not
17        you.
18        A.    That is not what I said.  I said I
19   don't know, but that is not the process.
20   Again, we went through this, as a spokesman on
21   behalf of.
22        Q.    I think that you just said that is
23   not what I said, but then you repeated what I
24   said.  Did you or did you not know, do you or
25   do you not know, sitting here today, whether or

Page 534

Monticciolo

1   not each of the three departments you just
2   identified, compliance, HR, outside counsel,
3   made a recommendation to terminate
4   Mr. Iacovacci, yes or no?
5
6        A.    I do not know because there would be
7   no reason for them to make a separate
8   recommendation, so you're asking a question
9   which I thought I clearly laid out our process
10  which if you understood that would not be our
11  process and it would not be separate
12  recommendations.
13           So again I mentioned who was looking
14  into it as a group and you represented that --
15  you reiterated that Mr. Callahan was the
16  spokesperson for those people.
17       Q.    We will get to Mr. Callahan, but let
18  me just try and make sure we are on the same
19  page.  When I ask you do you know X, do you
20  know whether they made a recommendation, if you
21  know, but you have a very good explanation in
22  your mind as to why they didn't, the answer to
23  my question is still no and if you know they
24  did make a recommendation, the answer would be
25  yes.

```
                                           Page 535
  1                       Monticciolo
  2              I will endeavor to do my best,
  3     Mr. Monticciolo, to allow you to give the whys
  4     if I think those are relevant and I'm sure your
  5     very competent counsel sitting by your side is
  6     going to ask whatever follow-up questions he
  7     wants to if he feels there is something he
  8     thinks he wants to get into the record or you
  9     want to get into the record and you didn't get
 10     an opportunity to testify to during my cross.
 11              I simply asked you whether or not
 12     you know, sitting here today, whether each of
 13     these three departments or any of these three
 14     departments made a recommendation and I just
 15     want to know whether the answer is yes, I do
 16     know or no, I don't know.
 17              MR. SOLOMON:  I object to the
 18         question because it misstates his
 19         testimony.  You can clarify if you want
 20         to.
 21              MR. CYRULNIK:  Lou, if you read back
 22         that question and identify for me how it's
 23         possible for that question to misstate any
 24         testimony because it's just a question, we
 25         are going to have a lot more efficient
```

```
                                             Page 536
 1                   Monticciolo
 2        time getting through this deposition.
 3        Please pay attention to the question
 4        instead --
 5              MR. SOLOMON:  I don't need your
 6        remonstration, Jason.  Okay.  You don't
 7        need to tell me what to do.
 8              MR. CYRULNIK:  I think I do, Lou.
 9              MR. SOLOMON:  You can ask a clear
10        question right now if you wanted and you
11        are not.
12              MR. CYRULNIK:  Mr. Solomon, read the
13        question.  Do you have real time?
14              MR. SOLOMON:  Do you have any more
15        questions for this witness?  You're
16        running out of time.
17              MR. CYRULNIK:  Do you have real
18        time?
19              MR. SOLOMON:  I'm not answering your
20        questions.  Do you have real time?
21              MR. CYRULNIK:  You're refusing to
22        tell me whether you have a live transcript
23        of this deposition?
24              MR. SOLOMON:  You mean is the court
25        reporter streaming it into us?  She is
```

                                        Page 537

1                    Monticciolo

2        not.

3              MR. CYRULNIK:  That's what I mean,

4        yeah.  Well, I think that would probably

5        be a useful investment for the future

6        because I think if you read the question

7        on the page, there was no attempt to

8        characterize any testimony.  And so an

9        objection to mischaracterize the

10       testimony, which itself is objectionable

11       because all you need to do is object to

12       form, is even more unfounded when it comes

13       to a question like the one that I just

14       asked.

15       Q.    Getting back to the question,

16   Mr. Monticciolo.  The question for you was, do

17   you or -- do you know, sitting here today,

18   whether or not each of the departments that you

19   identified outside counsel, HR and compliance

20   made a recommendation to terminate

21   Mr. Iacovacci?

22       A.    Given the guidance that you just

23   gave me a few minutes ago, no.

24       Q.    Okay.

25       A.    Can we take a restroom break?

```
                                        Page 538
 1                       Monticciolo
 2       Q.     Absolutely.
 3              THE VIDEOGRAPHER:  The time is
 4       11:33 a.m. and we are going off the
 5       record.
 6              (Brief recess taken.)
 7              THE VIDEOGRAPHER:  The time is
 8       11:48 a.m. and we are back on the record.
 9       Q.     Mr. Monticciolo, before the break we
10   were talking about the recommendation made to
11   terminate Mr. Iacovacci.  I want to make sure
12   that I'm clear on your testimony today.
13              Yes or no, did Mr. Callahan make
14   that recommendation on behalf of HR?
15       A.     Alone?
16       Q.     No, not alone.
17       A.     Yes, I mean it's on behalf of --
18       Q.     HR?
19       A.     As I said before -- so the answer to
20   that is yes.
21       Q.     Did he make that recommendation on
22   behalf of compliance as well?
23       A.     I believe so, yes.
24       Q.     What is the basis for your testimony
25   that Mr. Callahan made the recommendation on
```

Page 539

```
 1                    Monticciolo
 2   behalf of HR and compliance?
 3        A.    As I recall that they were involved
 4   in the process as I stated before and it
 5   would -- he was the spokesperson of that
 6   effort.
 7        Q.    I appreciate that those two
 8   departments were involved in the process that
 9   you described.  I'm specifically trying to
10   focus in on the recommendation at the end of
11   that period of time that Mr. Callahan made to
12   you to terminate Mr. Iacovacci and I want to
13   understand the basis for your testimony, if I'm
14   getting this right, that Mr. Callahan made that
15   recommendation to terminate on behalf of both
16   HR and compliance; that is that compliance was
17   asking Mr. Callahan to recommend
18   Mr. Iacovacci's termination and that HR was
19   asking Mr. Callahan to recommend
20   Mr. Iacovacci's termination?
21              MR. SOLOMON:  Object to the form of
22         the question.
23        A.    To use the word on behalf of?
24        Q.    Yes.
25        A.    So I would say solely on behalf of,
```

```
                                          Page 540
 1                      Monticciolo
 2    no.
 3         Q.    Not solely.  You put the word solely
 4    in.  That's why this deposition is going to
 5    take longer than it needs to.  I'm just asking
 6    whether it was on behalf of, whether it was in
 7    addition to others or whether it was solely
 8    both of those would be on behalf of.  That's
 9    why I'm trying to be careful with my questions.
10              So if you take, with that
11    clarification, Mr. Monticciolo, whether it was
12    solely or not is factored into my question.  So
13    solely or not solely are both fine.
14              Did Mr. Callahan -- is it your
15    testimony Mr. Callahan made the recommendation
16    to terminate Mr. Iacovacci on behalf of
17    compliance and on behalf of HR?
18              MR. SOLOMON:  Object to the form.
19         A.    Yes.
20         Q.    Did he tell you that?
21         A.    I do not recall.
22         Q.    How do you know, what did you do to
23    determine that Mr. Callahan was making that
24    recommendation on behalf of the two departments
25    you just identified?
```

```
                                            Page 541
 1                      Monticciolo
 2        A.    I think I answered that question.
 3   The recommendation was made in conjunction with
 4   Mark as well as these other parties.
 5        Q.    I don't understand what that means.
 6   Can you explain that a little differently
 7   please or a little more clearly?
 8              MR. SOLOMON:   I object to the
 9        question.
10        A.    Sure.   Whether it was in a single
11   conversation or multiple, it was clear to me
12   that Mark was pursuing his recommendation
13   either based on or in conjunction with HR,
14   compliance and outside counsel for
15   recommendations.
16        Q.    Okay.   Let's get to outside counsel.
17   So it's similarly clear to you that
18   Mr. Callahan was spokesperson on behalf of
19   outside counsel in connection with
20   recommendation to terminate Mr. Iacovacci's
21   employment?
22        A.    No.
23        Q.    That's not similarly clear to you?
24        A.    Not similarly clear.   He was a
25   spokesperson for outside counsel.   They were
```

```
 1                      Monticciolo
 2   counsel.  They provided guidance and
 3   counseling.
 4        Q.    Did they make the recommendation to
 5   terminate Mr. Iacovacci's employment?
 6        A.    I don't have firsthand knowledge,
 7   but that was my understanding.
 8        Q.    What was the basis for that
 9   understanding?
10        A.    The meeting and communications with
11   Mr. Callahan.
12        Q.    What about those communications
13   forms the basis for your testimony that outside
14   counsel made the recommendation to terminate
15   Mr. Iacovacci's employment?
16            MR. SOLOMON:  I'm going to instruct
17        you not to give any of the substance of
18        the --
19            THE COURT REPORTER:  I can't hear
20        you, Mr. Solomon.
21            MR. SOLOMON:  I'm instructing the
22        witness not to communicate the substance
23        of any attorney/client discussions.
24        Q.    Well, that is going to be a little
25   difficult because I think he already told me
```

Page 543

Monticciolo

1                      Monticciolo
2    that they did make the recommendation.  So I
3    will limit my question to what you have already
4    spoken about for now.  It's your
5    understanding -- strike that.
6              As the 30(b)(6) corporate
7    representative of Brevet, it is your testimony
8    that outside counsel made a recommendation to
9    terminate Mr. Iacovacci's employment; is that
10   right?
11             MR. SOLOMON:  Object to the
12        question.
13        A.    No.
14        Q.    As a 30(b)(6) corporate
15   representative, is it your understanding that
16   outside counsel did not make a recommendation
17   to terminate Mr. Iacovacci's employment?
18        A.    Correct.
19        Q.    So it was Mr. Callahan, on behalf of
20   or in conjunction with HR and compliance; is
21   that right?
22        A.    Yes.
23        Q.    Anyone else make the recommendation
24   to terminate Mr. Iacovacci?
25        A.    I'm not aware, but there might have

Page 544

1                     Monticciolo
2   been.
3         Q.    And the recommendation was made to
4   you as CEO of Brevet Holdings for your approval
5   or your denial of the recommendation; is that
6   right?
7         A.    Yes.
8         Q.    You chose to approve it?
9         A.    Yes.
10        Q.    With a heavy heart?
11        A.    Always.
12        Q.    Mr. Monticciolo, you have referenced
13  Mr. Callahan's affidavits earlier.  If you
14  could take a look at the marked exhibits
15  folder.  We've put as Exhibits 11 and 12, the
16  affidavits of Mr. Callahan.  Exhibit 11 is the
17  September 25, 2018 affidavit and Exhibit 12 is
18  the January 2018 affidavit.
19             (Whereupon affidavits were marked
20        Exhibits 11 and 12 for identification as
21        of this date.)
22        Q.    If you could please take a look at
23  those exhibits and tell us what you were
24  referring to earlier that would be useful?  So
25  why don't we start with Exhibit 11 which is the

1                    Monticciolo

2    September 25, 2018 Callahan affidavit and

3    confirm for me that is one of the two

4    affidavits you were referring to earlier?

5         A.    (Witness reviewing documents).

6    Okay.

7         Q.    Is this one of the two affidavits

8    you were referring to in your testimony

9    earlier?

10        A.    Yes.

11        Q.    And can you tell me, is there a

12   particular portion of this affidavit that you

13   had in mind when you were talking about the

14   description of what Mr. Callahan had uncovered

15   during his periodic review in May of 2016?

16        A.    It is a good portion.  We could go

17   through it.  I'll cite by paragraph.

18        Q.    Okay.

19        A.    Paragraph 10.

20        Q.    Okay?

21        A.    Paragraph 11, 12, 15, 16, and the

22   relevance of 18.

23        Q.    What did you say before 18?

24        A.    And 18.

25        Q.    Okay.

                                              Page 546

1                        Monticciolo
2          A.     19, 20, 21, 23 and 24.
3          Q.     Anything else?
4          A.     I'm working on it.  Twenty-nine.
5          Q.     I want to make sure we are talking
6    about the same thing as you're going along,
7    Mr. Monticciolo.  You're telling me the things
8    that you were referring to earlier as to what
9    Mr. Callahan had discovered in May of 2016,
10   right?
11         A.     Clarification on that then, so
12   probably not 28 then.
13         Q.     Okay.
14         A.     The dates on the rest of these
15   items, but I assume they are throughout the
16   whole time period.
17         Q.     So I have 23, 24.  Did you want 29
18   in there?
19         A.     No.
20         Q.     Okay.  Anything else?
21         A.     I think that's sufficient for this
22   quick review.
23         Q.     Take your time.
24         A.     Okay then.  I think 30.  I think
25   that's good.

Page 547

                        Monticciolo

1

2        Q.      Let's go back to 10.  I see there a

3   description of documents that Mr. Iacovacci

4   e-mailed to himself.  Do you see that?

5        A.      Where are you looking?

6        Q.      I'm looking at the first paragraph

7   you identified, paragraph 10.

8        A.      That starts with "Iacovacci,

9   however, breached his obligations under the LLC

10  Agreements?"

11       Q.      Yes.

12       A.      Yes.

13       Q.      These are the lists of documents

14  that Mr. Callahan discovered in May 2016

15  Mr. Iacovacci was e-mailing to himself,

16  correct?  I'm looking at the description in the

17  parenthetical.  Do you see that?

18       A.      The parenthetical?

19       Q.      At the end of the list you'll see

20  reference to Exhibit A, "Examples of Plaintiff

21  e-mailing confidential Brevet documents to

22  himself."  Do you see that?

23              MR. SOLOMON:  Object to the

24       question.

25       A.      Yes, could the court reporter just

Page 548

```
 1                    Monticciolo
 2   repeat the question.
 3              (Whereupon the record was read back
 4       by the reporter.)
 5       A.    Answer, yes I see that.
 6       Q.    So the list here in paragraph 10,
 7   Exhibit 11 is a list of documents that
 8   Mr. Callahan had discovered in May 2016 that
 9   Mr. Iacovacci was e-mailing to himself,
10   correct?
11       A.    I don't know if this was that exact
12   list back in 2016.
13       Q.    Oh, you don't know whether this is
14   the list?
15       A.    No, I missed your qualification of
16   2016 when looking at this.
17       Q.    Oh, that's okay.  I asked you
18   previously to tell me what it is that
19   Mr. Callahan had discovered in May 2016 and you
20   had directed me, among other things, in terms
21   of what you gave me whatever answers you could
22   and then you directed me to two affidavits and
23   we are looking at the first of those two and I
24   think the first one you mentioned was this one,
25   so that's why I presented this to you.
```

Page 549

                              Monticciolo

1                                    Monticciolo

2              Do you not know whether the

3    materials listed in paragraph 10 here were

4    indeed discovered in May 2016 as having been

5    e-mails by Mr. Iacovacci to himself?

6         A.    I do not know.

7         Q.    So let's then back off and go back

8    to the question I had asked you.  Can you tell

9    me what Mr. Callahan had presented to you or

10   discovered in May 2016 that you found to be

11   very suspicious and concerning and whatever

12   other adjectives you used to describe it?

13        A.    Sure, if I remember in early 2000 --

14   in early May it was that he found a few e-mails

15   that were concerning and that it should be

16   pursued further.

17        Q.    Oh, he found only a few in May 2016?

18        A.    At the beginning of May, yeah.  I'm

19   sorry if I wasn't clear on that.  I believe as

20   it went on is when it really became clear that

21   it was one of just a few.

22        Q.    Did you have an opportunity to speak

23   with your counsel during the break about this

24   deposition?

25        A.    No.

```
                                          Page 550
 1                      Monticciolo
 2        Q.     You didn't speak with your counsel
 3   during the break about this deposition at all?
 4        A.     Other than when we were going back
 5   in and I was using the restroom.
 6        Q.     Yeah, other than that.
 7        A.     No.
 8        Q.     It's your testimony now,
 9   Mr. Monticciolo, that in May 2016, only a few
10   documents were discovered that Mr. Iacovacci
11   had e-mailed to himself during the periodic
12   review that Mr. Callahan had conducted?
13              MR. SOLOMON:   I object to the
14        question.
15        A.     That's not what I said.  I said in
16   early May when Mark first brought it up, you
17   asked, it was a few.  In May, yes, I recall
18   that later did find many more, but that was I
19   believe after the process had started with
20   taking a further look.
21        Q.     When in May did Mr. Callahan conduct
22   his periodic review?
23        A.     I don't have the specific date in
24   front of me.
25        Q.     Well, did you do anything to
```

Page 551

                        Monticciolo

1    determine that in preparation for this 30(b)(6)

2    deposition?

3        A.    I didn't think that that would be a

4    material point.

5        Q.    So, no, you didn't?

6        A.    Not specifically for that item.

7        Q.    But you know --

8        A.    I'm sorry, I don't recall the

9    specific date.

10       Q.    And just for reference for this

11   question and for others, if I ask you about a

12   specific date and you don't know, I would ask

13   for your best, you know, best recollection or

14   even if it requires a range, your best

15   recollection of what the date is.

16              So if you don't know the particular

17   date, can you give me a best recollection as to

18   when Mr. Callahan performed the periodic review

19   in May 2016?

20              MR. SOLOMON:  Object to the

21       question.

22       A.    I recall early May.  I don't have a

23   specific date.  Previously you had not asked a

24   specific date in May.

```
                                                  Page 552
 1                         Monticciolo
 2        Q.     Okay, that's probably true.  You
 3   recall that after Mr. Callahan had reported his
 4   findings to you, he then continued to look for
 5   additional e-mails or instances of what he had
 6   found and the numbers increased; is that a fair
 7   description of what you were trying to say?
 8        A.     I don't have specific knowledge if
 9   it was before or after bringing in outside
10   counsel, but it did include -- yes, after
11   initial May dates.
12        Q.     By the end of May there were
13   hundreds or thousands of instances that you
14   had, that you, meaning Brevet, had discovered
15   of these improper forwarding confidential
16   information from Mr. Iacovacci's Brevet e-mail
17   address to his home e-mail address?
18             MR. SOLOMON:  Object to the
19        question.
20        A.     Can you repeat the question?
21        Q.     And by the end of May there were
22   hundreds or thousands of instances of
23   Mr. Iacovacci sending Brevet proprietary or
24   confidential information or trade secrets
25   outside of Brevet; is that right?
```

```
                                          Page 553
 1                    Monticciolo
 2            MR. SOLOMON:   I object to the
 3      question.
 4      A.    To the best of my understanding,
 5  yes.
 6      Q.    When did Brevet make the decision to
 7  retain outside counsel to assist in reviewing
 8  the Mr. Iacovacci situation?
 9      A.    As I recall, that was in May.
10      Q.    And that's Greenberg Traurig?
11      A.    I believe so.
12      Q.    What were their charge -- did you
13  ask them to conduct an independent
14  investigation?
15      A.    I wasn't the one who engaged them.
16      Q.    Who did?
17      A.    I believe it was Mr. Callahan or the
18  compliance department.
19      Q.    You don't know which one?
20      A.    I did not review that engagement
21  letter.
22      Q.    Do you know who signed the
23  engagement letter?
24      A.    I do not.
25      Q.    Do you know what the engagement
```

Page 554

1                        Monticciolo
2    letter identifies as Greenberg Traurig's, as
3    the scope of the Greenberg Traurig engagement
4    with respect to this investigation?
5         A.    I do not.
6         Q.    I take it you did not do anything to
7    prepare to respond to those questions in
8    preparation for this deposition?
9         A.    Right.  I believe those were already
10   discussed in prior depositions and I said I
11   think given the recommendations and the process
12   we pursued was not necessary.
13        Q.    Was Greenberg Traurig hired to
14   determine whether or not Brevet had grounds to
15   terminate Mr. Iacovacci's employment?
16        A.    I don't know.
17        Q.    How was Greenberg Traurig selected?
18        A.    I don't know.  I would have to look
19   at your process.
20        Q.    Who would know the answers to these
21   questions that I am asking?
22        A.    Mr. Callahan and our compliance.
23              MR. CYRULNIK:  Well, we are going to
24        have to, Lou, obviously reserve rights on
25        these questions.  We think these are

Page 555

```
               Monticciolo
 1
 2      covered by the scope of the 30(b)(6) topic
 3      and it sounds like Mr. Monticciolo did not
 4      have an opportunity or at least the
 5      understanding that he should have the
 6      answers to those questions for us.
 7           MR. SOLOMON:  We obviously don't
 8      agree that they were covered as he did his
 9      homework with respect to the topics that
10      were covered.
11      Q.    Has the engagement letter with
12   Greenberg Traurig been produced?
13           MR. SOLOMON:  Jason, Ms. da Silva
14      Vint has entered the room.
15           MR. CYRULNIK:  Thank you, Lou.  Do
16      you mean she has entered the physical
17      room?
18           MR. SOLOMON:  Yes, you mean the
19      room?  She just entered the deposition
20      room.  She is now in the room.  I'm sorry
21      she was in the Zoom room.  Now she is in
22      the physical room.
23           MR. CYRULNIK:  That was my question.
24      I'm looking forward to meeting you Ms. da
25      Silva Vint, but go ahead.
```

```
                                          Page 556

 1                     Monticciolo
 2            MR. SOLOMON:  So am I.
 3            MR. CYRULNIK:  You never met Ms. da
 4       Silva Vint?
 5            MR. SOLOMON:  I'm looking forward to
 6       you meeting her.
 7       A.    Could the court reporter repeat the
 8  question?
 9       Q.    The question was, do you know
10  whether the engagement letter with Greenberg
11  Traurig was produced?
12       A.    I don't recall.  I didn't think that
13  would be something I would need to prepare for
14  this.  That would be the questions I have.
15       Q.    Have you ever seen the engagement
16  letter with Greenberg Traurig?
17       A.    I'm sure I have in review of this
18  lengthy process, but I don't recall.
19       Q.    Well, I would ask you to -- after
20  this deposition, to please see to it that --
21  either confirm that it was produced and tell us
22  what it is or else if you could arrange with
23  Mr. Solomon who is going to have his own
24  thoughts on the request, but arrange with
25  Mr. Solomon to have that produced promptly.
```

```
                                            Page 557
 1                      Monticciolo
 2            MR. SOLOMON:  We will consider it.
 3       Q.    Over what time period did Greenberg
 4   Traurig conduct the investigation?
 5       A.    I don't know.  I wasn't directly
 6   involved in it, but I know the conclusion was
 7   before the early October meeting.
 8       Q.    So you know it started in May.  It
 9   ended before the October meeting, but you don't
10   know whether it was a one month investigation,
11   two month investigation, three month
12   investigation, fair?
13       A.    Fair.
14       Q.    Did they interview witnesses?
15       A.    I do not know.
16       Q.    Did they interview you?
17       A.    I do not recall.
18       Q.    Did they produce a report of their
19   findings either formal or informal?
20       A.    I don't know.
21       Q.    Sitting here today, you don't know
22   whether there was a report of their findings?
23       A.    I am not sure if there was a report
24   or verbal communication of their findings.  I
25   know it was support for the recommendation from
```

```
                                      Page 558
 1                   Monticciolo
 2    the team in early October.
 3         Q.    Did Brevet rely on Greenberg
 4    Traurig's investigation or recommendation in
 5    making the decision to terminate
 6    Mr. Iacovacci's employment?
 7         A.    Not solely.
 8         Q.    I'm sorry?
 9         A.    Not solely, no.
10         Q.    Not solely you said?
11         A.    Correct.
12         Q.    I appreciate that.  Once again, I'll
13    clarify that unless I say solely, I'm not
14    asking you to limit your answers to my version
15    of the question with the word solely inserted
16    in it.
17              Did Brevet rely on Greenberg's
18    Traurig's investigations, either its finding or
19    its recommendations, in deciding to terminate
20    Mr. Iacovacci's employment?
21         A.    Yes.
22         Q.    Can you summarize for me
23    specifically what Greenberg -- withdrawn.
24              Can you summarize for me the results
25    of either the written or unwritten findings
```

```
                                        Page 559
 1                      Monticciolo
 2   that Greenberg Traurig made in connection with
 3   its investigation?
 4            MR. SOLOMON:  I'm going to instruct
 5        the witness not to disclose the substance
 6        of any advice that Greenberg or counsel
 7        made in connection with this.
 8        Q.   Let me make sure I'm understanding
 9   the state of play here.  Mr. Monticciolo,
10   Greenberg Traurig was doing a factual
11   investigation into what had transpired in
12   connection with the potential misappropriation
13   of trade secrets or other Brevet confidential
14   documents by Mr. Iacovacci; is that right?
15            MR. SOLOMON:  Who are you asking
16        that question of, of the witness?
17            MR. CYRULNIK:  Yes, almost all of my
18        questions are to the witness.
19        A.   Not as a 30(b)(6)?
20        Q.   No, you're a 30(b)(6)
21   representative.
22        A.   Okay.  So could you repeat the
23   question?
24        Q.   Yes.  Greenberg Traurig conducted an
25   investigation into the facts surrounding the
```

```
                                    Page 560
```

                                Monticciolo

1       alleged misappropriation of confidential

2       information or trade secrets by Mr. Iacovacci,

3       right?

4                   MR. SOLOMON:   Object to the

5               question.

6           A.     I'm sorry, could you repeat it one

7       more time?

8           Q.     Greenberg Traurig conducted an

9       investigation into the factual events related

10      to the alleged misappropriation of confidential

11      information or trade secrets by Mr. Iacovacci,

12      correct?

13                  MR. SOLOMON:   I object.

14          A.     I'm not going to comment on

15      Greenberg's results.

16          Q.     You're refusing to tell me whether

17      Greenberg Traurig looked at the facts

18      surrounding the suspicions that you identified

19      earlier that Brevet had with respect to

20      Mr. Iacovacci's alleged misappropriations of

21      trade secrets or confidential information?

22          A.     Our team made a decision and

23      recommendation based on a variety of

24      information.  If there was information provided

Page 561

1                      Monticciolo

2    by our counsel in their privilege, then that is

3    something I would say went into their decision.

4         Q.    Well, the problem is that is an

5    unclear answer.  You said if there was

6    information that was provided it would have

7    gone to their decision and I want to know

8    whether there was information provided that

9    went to their decision?

10        A.    That was a recommendation.  The

11   recommendation is based on, as I previously

12   stated, with the input of outside counsel and

13   other members of Brevet.

14        Q.    I want to understand the factual

15   component of the Greenberg Traurig

16   investigation separate and apart from any legal

17   advice that they may or may not have been

18   provided with respect to Brevet's rights or

19   Ms. Iacovacci's rights or obligations, et

20   cetera.

21             With respect to the factual piece,

22   was Greenberg Traurig charged with

23   investigating what Mr. Iacovacci did?

24             MR. SOLOMON:  I object to the

25        question.

```
                                      Page 562
 1                       Monticciolo
 2        A.    That's a very vague question.  Could
 3   you be a little more precise?
 4        Q.    I could try.  I don't think it's
 5   particularly vague, but I want to know whether
 6   Greenberg Traurig was tasked with putting
 7   together an assessment or summary of what
 8   Mr. Iacovacci did in connection with the
 9   allegations that he misappropriated
10   confidential information or trade secrets?
11        A.    As I stated previously, they were
12   involved to help us confirm the initial, based
13   on the initial findings of Mr. Callahan,
14   exactly how they did that, what they did is,
15   you know, their work product.
16        Q.    I think your counsel would advise
17   you with respect to the application of the
18   privilege, but I'm trying to understand the
19   facts of what they did before I get to the
20   actual findings.  They, for example, were given
21   access to Mr. Iacovacci's e-mails.  They were
22   able to look into what he was forwarding to
23   himself or outside of Brevet or any of that,
24   correct?
25        A.    Again, I'm not the one who would be
```

Page 563

```
 1                    Monticciolo
 2    specifically involved in doing that nor was
 3    that something that I thought would be relevant
 4    to the questions that I was asked as a
 5    30(b)(6).
 6         Q.    We all make mistakes.  So you don't
 7    know?
 8              MR. SOLOMON:  I object to your
 9         comments.
10              MR. CYRULNIK:  Well, I mean, Lou, to
11         be fair this is clearly directly related
12         to Topic 26A and B and the witness has
13         told me two or three times that he just
14         didn't look into this stuff.  So I'm not
15         taking him to task for it, but it clearly
16         is a problem that we need to address.
17              MR. SOLOMON:  I appreciate that is
18         your view.  You can use the word clear as
19         many times as you want.  It's absolutely
20         clear to me that questions you are asking
21         now have nothing to do with this topic.  I
22         think we came prepared to give you the
23         company's position with respect to each of
24         these topics.
25         Q.    Mr. Monticciolo, let me ask you a
```

```
1                    Monticciolo
2    question.  Did Greenberg Traurig's
3    investigation relate to plaintiff's termination
4    from Brevet?
5         A.    Say that one more time.
6         Q.    Did Greenberg Traurig's
7    investigation relate to plaintiff's,
8    Mr. Iacovacci's termination from Brevet?
9         A.    Yes.
10        Q.    Did Greenberg Traurig's
11   investigation relate to the reasons underlying
12   Brevet's decision to terminate Mr. Iacovacci?
13        A.    Explain what you mean by reasons.
14        Q.    What do you understand reasons to
15   be?
16        A.    I'm not the one asking the
17   questions.  Reasons?  Like --
18        Q.    Let me ask you this,
19   Mr. Monticciolo.  Brevet had reasons for
20   terminating Mr. Iacovacci's employment, right?
21        A.    Had causes.
22        Q.    Did it have reasons for terminating
23   it?
24        A.    I think causes, breaches and reasons
25   are different things.
```

                         Monticciolo

1

2        Q.    Would you say Mr. Iacovacci's

3   breaches of various obligations were one or

4   more of the reasons why Brevet terminated his

5   employment?

6        A.    Yes.

7        Q.    I'm just trying to confirm, because

8   I don't have that much clarity on this

9   Greenberg Traurig investigation.  I take it

10  that Greenberg Traurig's investigation and the

11  findings therefrom and the recommendations they

12  made, one or all of those things were related

13  to the reasons why plaintiff proceeded to

14  terminate Mr. Iacovacci's employment from

15  Brevet Holdings?

16             MR. SOLOMON:  Object to the

17        question.

18        Q.    Is that a fair high level summary?

19        A.    Do you want to repeat the question?

20        Q.    Sure.

21             MR. CYRULNIK:  Can the court

22        reporter please read back my question.

23             (Whereupon the record was read back

24        by the reporter.)

25        A.    No, it doesn't agree with the word

```
                                      Page 566
 1                      Monticciolo
 2    recommendations.
 3         Q.    If you take the word recommendations
 4    out, is it a fair summary?
 5              MR. SOLOMON:  I object to the
 6         question.
 7         A.    Repeat the question.
 8         Q.    The question is whether Greenberg
 9    Traurig's investigation or findings constituted
10    one or more of the reasons why Brevet proceeded
11    to terminate Mr. Iacovacci's employment from
12    Brevet Holdings?
13              MR. SOLOMON:  I will object to the
14         question.
15         A.    I wouldn't characterize it as
16    constituting a reason.  It was support and
17    findings.
18         Q.    Support for the termination
19    decision?
20              MR. SOLOMON:  No, I'm not going to
21         let him testify to the substance of the
22         legal advice.
23         Q.    I didn't ask him about the substance
24    of it.
25              MR. SOLOMON:  You said support.
```

```
                                    Page 567
```

1                    Monticciolo

2          MR. CYRULNIK:  He said support.

3          MR. SOLOMON:  By the way, before you

4     were so quick to say I didn't object in a

5     timely way.  I don't want him getting into

6     the substance of any advice that Greenberg

7     Traurig made.

8          MR. CYRULNIK:  First of all, I don't

9     think I ever criticized you for not

10     objecting in a timely way.  If I did, you

11     can show it to me, but not that it's

12     impossible.  I just don't remember doing

13     it.

14          More importantly, I literally just

15     rephrased what he said.  I believe he said

16     support, not I.  I shouldn't say not I.

17     He said support and then I was clarifying

18     it in my follow-up question, so I'm not

19     quite sure for the basis of the objection,

20     but I think the question on the table is

21     were Greenberg Traurig's investigation

22     findings, did they provide support in the

23     witness' view or in the company's view for

24     its decision to terminate Mr. Iacovacci's

25     employment?

```
                                          Page 568
1                         Monticciolo
2              MR. SOLOMON:  I'm going to instruct
3         you not to disclose the substance of any
4         legal advice that Greenberg Traurig made.
5         Q.    Setting aside legal advice,
6    Mr. Monticciolo, did Greenberg Traurig's
7    factual findings or analysis in your view
8    support Brevet's decision to terminate
9    Mr. Iacovacci's employment?
10             MR. SOLOMON:  Object to the
11        question.  Assumes a fact not in evidence.
12        A.    Yeah, I can't comment one way or
13   another on that.
14        Q.    Why is that?
15        A.    Because I wasn't the person involved
16   in receiving it.
17        Q.    So sitting here today as Brevet's
18   corporate representative, you don't know
19   whether Greenberg Traurig's investigation
20   supported plaintiff's decision to terminate
21   Mr. Iacovacci's employment?
22             MR. SOLOMON:  I object to the
23        question and I reiterate my instruction.
24        A.    That is not what I am saying.
25        Q.    Well, I think I just gave you two
```

Page 569

                         Monticciolo
1
2    literally polarized spectrums.  One of them has
3    to be true.  Why don't you tell me what you are
4    trying to say?
5              MR. SOLOMON:  Object to the
6         question.
7         A.    I think I was clear.
8         Q.    I can assure you you weren't clear.
9    Mr. Monticciolo, I want to know whether or not
10   Greenberg Traurig's factual findings or factual
11   analysis as provided to Brevet supported
12   Brevet's decision to terminate Mr. Iacovacci's
13   employment in your view?
14             MR. SOLOMON:  Same objection.  Same
15        instruction.
16        A.    I have to say no, I wasn't directly
17   involved in that, no.
18        Q.    No, as in you don't know because you
19   weren't directly involved in it or no as in no,
20   it didn't support it?
21        A.    No, as I was not directly involved.
22        Q.    So this is again one of those things
23   where you don't know the answer because this is
24   not something that you understood you needed to
25   get up to speed on it in order to testify on

1                     Monticciolo
2     Topic 26; is that fair?
3          A.     It seems pretty clear to be
4     consistent with question 26 which is where we
5     are.
6          Q.     Sorry, what did you say?
7          A.     I prepared for question 26.  I
8     didn't think that would be a reasonable thing
9     to practice I thought.
10         Q.     Your counsel and I will hopefully
11    reach an agreement on how to address that, but
12    I appreciate the clarity on at least that
13    topic.
14                Did you ever review Greenberg
15    Traurig's recommendations or findings whether
16    they were in writing or communicated orally
17    prior to your decision to approve the
18    recommendation made by Mr. Callahan to
19    terminate Mr. Iacovacci's employment from
20    Brevet Holdings?
21                MR. SOLOMON:  Object to the form.
22         A.     We've already answered this
23    question.
24         Q.     Okay, well what is the answer?  No?
25         A.     Are you telling me it's no?

```
                                             Page 571
 1                       Monticciolo
 2        Q.     I'm sorry?
 3        A.     Are you telling me it's no?
 4        Q.     No, I'm trying to ask you what the
 5   answer is.  Is it yes or is it no or I don't
 6   know?
 7        A.     Would you repeat the question one
 8   more time?
 9        Q.     The question, Mr. Monticciolo, was
10   whether you reviewed the findings or
11   recommendations from Greenberg Traurig, whether
12   they were written or oral prior to your
13   agreeing with or accepting Mr. Callahan's
14   recommendation to terminate Mr. Iacovacci from
15   Brevet Holdings?
16        A.     No, not to the best of my
17   recollection.
18        Q.     Why not?
19        A.     Because it seems that Mr. Callahan
20   and others were presenting a recommendation.
21        Q.     Wasn't it important for you to know
22   what Greenberg Traurig's view was?
23        A.     It is important that I have a team
24   that can be trusted to follow rigor and process
25   and I trust them in doing their jobs.
```

Page 572

1                          Monticciolo
2        Q.    Well, Mr. Monticciolo, the buck
3   stops with you, right?  You're the CEO of
4   Brevet Holdings, right?
5              MR. SOLOMON:  I object to the
6        question.
7        A.    I would not say that.  There is a
8   process for virtually everything.
9        Q.    Well, if there is a process,
10  Mr. Monticciolo, why is it that you had to
11  approve the recommendation of all of the other
12  departments that you mentioned to terminate
13  Mr. Iacovacci?  If you said no, what would have
14  happened?
15       A.    A number of things.
16       Q.    Care to share?
17       A.    I don't want to hypothesize.
18       Q.    You may not want to hypothesize, but
19  my question is what would have happen if you
20  did not accept their recommendation?
21       A.    We could sit here for hours going
22  through the hypothetical next steps if I
23  denied.
24       Q.    I prefer not to sit here for hours.
25  I just prefer to get an answer to my question.

Page 573

```
                             Monticciolo
 1
 2    If you had not accepted the recommendation that
 3    Mr. Callahan had made on behalf of whomever he
 4    was making it to terminate Mr. Iacovacci's
 5    employment, what would have happened?
 6         A.    I'm not going to -- I can conjecture
 7    as to exactly what would have happened.
 8         Q.    How about generally without the word
 9    exactly in there?
10         A.    Generally I'm not going to
11    conjecture.
12         Q.    Well, that's unfortunate.
13    Mr. Monticciolo, did you have an understanding
14    that absent your acceptance of the
15    recommendation, Mr. Iacovacci's employment was
16    not going to be terminated; yes or no?
17         A.    No.
18         Q.    So you -- was it your understanding
19    that regardless of what you thought once
20    Mr. Callahan communicated the recommendation to
21    terminate Mr. Iacovacci's employment, the
22    decision was made and that action was going to
23    be undertaken one way or the other regardless
24    of your view?
25         A.    That's not what I said, no.
```

```
                                    Page 574
 1                 Monticciolo
 2       Q.    Well then you're going to need to
 3  help me understand what the middle ground there
 4  is.  What was your role in the termination of
 5  Mr. Iacovacci after you received the
 6  recommendation from Mr. Callahan?
 7       A.    Approved based on verification and
 8  review and deny if I think it didn't rise to
 9  doing the best practices.
10       Q.    You understood that you had the
11  ability to deny the recommendation and that
12  Mr. Iacovacci would not have been fired, right?
13            MR. SOLOMON:  Asked and answered.
14       A.    That is -- I didn't say that.  I
15  said no.  I can deny it.
16       Q.    Mr. Monticciolo, when I ask you a
17  question, I'm not really asking you whether you
18  said it or not.  Generally speaking, if you
19  said it already, I'm probably not asking you
20  that question anyway or at least I didn't
21  understand you had said it.  So rather than
22  quibble with whether you said it or didn't
23  answer it, if you could just please try and
24  focus on the question.
25            I want to understand your view.  Did
```

```
                                        Page 575
                            Monticciolo
 1
 2   you have an understanding in 2016 that you had
 3   the ability to approve or deny the
 4   recommendation by Mr. Callahan to terminate
 5   Mr. Iacovacci's employment from Brevet
 6   Holdings?
 7             MR. SOLOMON:  Object to the
 8        question.  Asked and answered.
 9        A.    I'm sorry, repeat the question.
10        Q.    Did you have an understanding in
11   2016 that you had the ability to accept or deny
12   Mr. Callahan's recommendation to terminate
13   Mr. Iacovacci's employment with Brevet
14   Holdings?
15        A.    Yes.
16        Q.    Did you have an understanding that
17   if you were to accept the recommendation that
18   Mr. Iacovacci would then be fired?
19        A.    Yes.
20        Q.    Did you have an understanding if you
21   were to reject or deny the recommendation that
22   Mr. Iacovacci was not then going to be fired?
23        A.    No.
24        Q.    So why is it that you are being
25   presented with the opportunity -- withdrawn.
```

```
                                         Page 576
 1                     Monticciolo
 2              What did you understand it to mean
 3    if you rejected or denied the recommendation to
 4    fire Mr. Iacovacci?
 5         A.    What I understood that maybe the
 6    recommendation didn't rise to either acceptance
 7    or denial and maybe if there was a denial,
 8    maybe it needed to have further support and
 9    come back for a new recommendation.
10         Q.    Okay, but in order for the
11    recommendation to fire Mr. Iacovacci to be
12    acted on, you understood that one way or
13    another you, Doug Monticciolo, would need to
14    accept such a recommendation; is that fair?
15         A.    I would need to not deny the
16    recommendation.
17         Q.    You would need to not deny it?
18         A.    As I previously stated.  It's we
19    accept the recommendation as stated, which is
20    either it's a non-denial or a denial.
21         Q.    So the two options are you don't
22    deny or you deny?
23         A.    Right.
24         Q.    If you don't deny, then it's acted
25    on, right?
```

```
                                              Page 577
 1                      Monticciolo
 2        A.    Yes.
 3        Q.    And if you deny it, then it is not
 4   acted on and they can either abandon the whole
 5   thing or come back to you with a revised
 6   recommendation or an updated recommendation or
 7   whatever it is for you to again either non-deny
 8   or deny, right?
 9        A.    That's a possibility.
10        Q.    In order for you to decide whether
11   or not you should deny the recommendation, you
12   did not feel it was important for you to review
13   Greenberg Traurig's findings or recommendations
14   directly; is that right?
15        A.    It is not my job to second guess the
16   professionals in the firm.
17        Q.    Well, isn't second guessing the
18   professionals in the firm the whole purpose of
19   the deny or non-deny procedure you just
20   described?
21             MR. SOLOMON:  Object to the
22        question.
23        A.    Second guessing would be
24   mischaracterizing of what that process is.  It
25   is confirming whether or not the firm believed
```

```
                                                Page 578
 1                       Monticciolo
 2     what to be best practices, not second guessing.
 3          Q.    Well, if you denied the
 4     recommendation and they made the
 5     recommendation, you wouldn't characterize that
 6     as you second guessing what they were
 7     recommending?
 8          A.    Absolutely not.
 9          Q.    Why didn't you sign the termination
10     letter that was sent to Mr. Iacovacci?
11               MR. SOLOMON:  Object to the
12          question.
13          A.    I don't know.  That is not my job.
14          Q.    Whose job is it to fire a partner?
15          A.    It's -- if it's related to LLC, it's
16     one of the partners which would be in this case
17     either I believe Mark Callahan, maybe John
18     Tripp, but probably Mark Callahan.
19               THE COURT REPORTER:  I'm sorry, what
20          was the second name?
21          A.    Mark Callahan or John Tripp with two
22     Ps.
23          Q.    What is the basis for your assertion
24     that it is their job to sign termination
25     letters?
```

Page 579

Monticciolo

1

2        A.    At the LLC you need to be one of the

3    partners.   I recall the specifics need to be

4    one of the -- there is a name for it, but one

5    of the managing partners that's why I corrected

6    and said Mark Callahan and at the company it's

7    just wherever corporate policies legislate.

8        Q.    You never signed termination

9    letters, right?

10       A.    Not to the best of my knowledge.

11       Q.    You typically ask other people to

12   sign things instead of you to minimize

13   accountability?

14       A.    I never asked somebody to sign

15   something on behalf of me.   It's not corporate

16   policy.   There are authorities that are in

17   place to make sure the appropriate people and

18   the appropriate policies -- the appropriate

19   signatures are on documents.

20       Q.    Signature of the CEO of Brevet

21   Holdings would not be an appropriate signature

22   on a termination letter for someone who has

23   been with the company for as long as Paul

24   Iacovacci was?

25       A.    Again, you're trying to make it

```
                                    Page 580
 1                   Monticciolo
 2   something other than just a process.  It's a
 3   corporate process.
 4        Q.    Can I get the answer to my question?
 5        A.    I think your question wasn't
 6   relevant.
 7        Q.    I appreciate that.  We've gone
 8   through this before.  Your view on the
 9   relevance of my questions is really not going
10   to dictate how this deposition goes.  That's
11   for the court to decide.
12        A.    True.
13        Q.    Can you answer my question, please?
14        A.    Can you have the court reporter
15   repeat it?
16        Q.    We can.
17        A.    I can't remember what the question
18   was.
19              (Whereupon the record was read back
20        by the reporter.)
21        A.    The answer is correct, it is not the
22   length of time that legislates who signs a
23   letter.
24        Q.    Prior to Mr. Callahan engaging in
25   the May 2016 review of Mr. Iacovacci's e-mails,
```

1                         Monticciolo
2    were you involved in any discussions whatsoever
3    with anybody regarding the desire to
4    investigate whether the company had grounds for
5    terminating Mr. Iacovacci from his employment
6    or from his partnership?
7         A.    I don't believe so.
8         Q.    You believe so you said?
9         A.    I do not believe so.
10        Q.    You don't believe so?
11        A.    Right.
12        Q.    You didn't ask Mr. Callahan to look
13   through Mr. Iacovacci's e-mails or see whether
14   or not the company had any grounds to proceed
15   with the termination rather than a negotiated
16   retirement?
17        A.    I answered this question before.
18   Unequivocally absolutely not.
19        Q.    It's just coincidence that in
20   May 2016 the thick of the negotiations for the
21   terms of the separation agreement that you had
22   been negotiating with Mr. Iacovacci,
23   Mr. Callahan engaged in a periodic review of
24   Mr. Iacovacci's e-mails and identified grounds
25   for potential termination; is that your

Page 582

```
 1                      Monticciolo
 2   testimony?
 3              MR. SOLOMON:  I object to the
 4        question.
 5        A.    I don't believe that's my testimony.
 6   I never said it was grounds for his
 7   termination.
 8        Q.    What Mr. Callahan found during that
 9   periodic review did not constitute grounds for
10   Mr. Iacovacci's termination?
11              MR. SOLOMON:  I object to the
12        question.  Asked and answered.
13        A.    I believe I've answered this as
14   concerns.  I didn't jump to conclusions.
15        Q.    Did you ever give Mr. Iacovacci
16   notice that you were concerned about things
17   that you had found and that you were
18   considering -- and/or you were considering
19   terminating him prior to sending him the
20   termination letter of October of 2016?
21        A.    I don't know the answer to that.  I
22   don't believe so.
23        Q.    You're a 30(b)(6) witness on behalf
24   of Brevet in connection with Topic 26.  You
25   don't know whether or not you provided notice
```

```
                          Monticciolo
 1
 2    to Mr. Iacovacci of his prospective termination
 3    or the concerns you had that led to it?
 4         A.    I don't think either one of those
 5    rose to the occasion until October.
 6         Q.    Can you explain what you mean with
 7    your last answer?  I didn't follow that.
 8         A.    I don't think we -- I don't think
 9    there was a concern of either of those things
10    until we were sure there was a concern.
11         Q.    So in May you learned that
12    Mr. Iacovacci is sending things outside of
13    Brevet, confidential information trade secrets,
14    but you have no concern about potentially
15    needing to terminate his employment; is that
16    your testimony?
17              MR. SOLOMON:   Objection.   Misstates
18         the testimony.
19         A.    I didn't say that.  I said we just
20    had concerns that needed to be looked into
21    further.
22         Q.    And I'm asking whether you ever
23    provided Mr. Iacovacci notice of your concerns
24    prior to terminating his employment in
25    October 2016?
```

```
 1                    Monticciolo
 2             MR. SOLOMON:  Asked and answered.
 3       A.    Again, we don't knee jerk things.
 4   We don't do things off of potential conjecture
 5   especially of this magnitude without being
 6   sure.  Why would we?
 7       Q.    Again, I'm going to keep on asking
 8   the question until I get an answer to my
 9   question.
10             My question is, did you ever provide
11   notice to Mr. Iacovacci, whether it was in May
12   or June or July or August or September or the
13   beginning of October, that you had concerns
14   about things that you thought he was doing or
15   that you were considering terminating his
16   employment?
17             MR. SOLOMON:  I object to the
18        question.  Asked and answered.
19       A.    I answered this question.  I don't
20   think we had any clear view until early October
21   and you know the decision or recommendation was
22   followed at that point.
23       Q.    When did you finally have a clear
24   view on whether Mr. Iacovacci had engaged in
25   misconduct?
```

1                    Monticciolo

2            MR. SOLOMON:  I object to the

3      question.  Asked and answered.

4      A.    Again, this is -- I answered this

5   already.  This was early October when the

6   recommendation was made.

7      Q.    Until Mr. Callahan made his

8   recommendation or the recommendation you made

9   on behalf of those other entities to you, you

10   didn't have a clear view; is that a fair

11   summary of what your position is?

12      A.    Correct.

13      Q.    Okay.  Well, when Mr. Callahan made

14   the recommendation to you in early October, did

15   you contact Mr. Iacovacci immediately and

16   provide him notice of the concerns that you had

17   or the prospective termination that you were

18   going to be acting on?

19      A.    I don't believe we did contact him

20   and I believe that the recommendation was that

21   this was beyond a simple resolution.

22      Q.    When you say the recommendation was

23   I am hearing more passive voices.  Whose

24   recommendation was it that this was beyond a

25   and I'm forgetting your words anyway, but who

```
                                        Page 586

 1                      Monticciolo
 2      were you referring to?
 3           A.    Again, we answered this question.
 4      The recommendation was spokesperson Mark
 5      Callahan to terminate Paul.
 6           Q.    I see.  So when Mr. Callahan made
 7      the recommendation to terminate Paul, it was
 8      accompanied by a recommendation not to tell
 9      him, not to tell Paul, not to give Paul any
10      notice?
11           A.    I didn't say that.  I don't believe
12      there was, you know, any discussion on that
13      specific point.  Again, that would be handled
14      by either HR or compliance.
15           Q.    Paul was your partner for how many
16      years at that point in time, Mr. Monticciolo?
17           A.    What was that again?
18           Q.    Paul was your partner for how many
19      years at that point in time?
20           A.    I don't know.  Just a few.  I mean
21      he was in -- the company is 23 years old.
22      Maybe 10, 15, maybe at that point.  Not even.
23      Maybe 10 plus, half the life of the firm.
24           Q.    Ten plus years your partner.  This
25      is the first time you were terminating a
```

```
                                  Page 587
 1                   Monticciolo
 2   partner?
 3        A.    You know, if there is a situation
 4   where there is potentially a regulatory
 5   violation, courtesies and you know time periods
 6   really don't matter.
 7        Q.    Mr. Monticciolo, I think it will be
 8   useful, instead of trying to anticipate my next
 9   question, you just focus on the question I'm
10   asking, okay.  I don't mean to say that with
11   any level of disrespect.  I'm just concerned
12   with your time and candidly my time and
13   Mr. Solomon's ongoing expressed concerns about
14   timing.
15             The question I asked you was,
16   Mr. Iacovacci was a partner of yours for 10
17   plus years by the point in time that you
18   decided to terminate him, correct?
19        A.    Yes.
20        Q.    And you had never terminated a
21   partner before, right?
22        A.    No.
23        Q.    And you didn't feel that it was
24   appropriate to provide Mr. Iacovacci any notice
25   about the concerns that led to his termination
```

Page 588

                          Monticciolo
1
2   or about the plan to act on the termination
3   recommendation prior to sending him the letter
4   terminating his employment on October 14th of
5   2016, right?
6         A.    This is a business.  My feelings
7   don't come into business decisions particularly
8   when it's of a regulatory nature.
9         Q.    Mr. Monticciolo, didn't you just
10  testify for 25, 30 minutes earlier today that
11  your feelings about how long Mr. Iacovacci had
12  been a partner of yours contributed to the
13  desire to act very, very carefully and no knee
14  jerk reactions and look into everything with
15  investigations and months and months; do you
16  remember that general testimony?
17              MR. SOLOMON:  I object to the
18         question.
19        A.    I would say misstatement of what I
20  said.  I never said because he had been a
21  partner for 10 years.  He's a partner.  He has
22  regulatory responsibility, of a responsibility
23  he is well aware of.  That is the only reason
24  why and the fact that it is best practice that
25  we would do that, not that he has been here 10

```
                                      Page 589
 1                    Monticciolo
 2    years.
 3         Q.    Is it your understanding that there
 4    is a regulatory requirement that you not
 5    provide notice to a partner or employee prior
 6    to their termination when the concern driving
 7    the termination is regulatory violation
 8    related?
 9         A.    I don't know the answer to that.  I
10    wasn't told I need to prepare on the regulatory
11    law.
12         Q.    You're not testifying that the
13    reason you didn't provide any notice to
14    Mr. Iacovacci of his impending termination was
15    because there were regulatory violations
16    involved, are you?
17         A.    I did not say that.
18         Q.    You're welcome to add, but I was
19    asking a yes or no question, but that's fine.
20    Did you understand the LLC agreements to
21    provide that you were supposed to give notice
22    to an employee, to a partner before
23    terminating?
24         A.    Not that I'm aware of.
25         Q.    Let's take a look at the next
```

```
 1                    Monticciolo
 2   exhibit.  Exhibit -- we are going to go back to
 3   an exhibit that was previously shown.  It's the
 4   termination letter.  Let me know when you have
 5   that up, please.
 6             MR. SOLOMON:  What exhibit number?
 7             MR. CYRULNIK:  Exhibit 3.
 8             MR. SOLOMON:  It references Exhibit
 9        M.
10        A.    Yes, it's on the screen.
11        Q.    Is this the termination letter that
12   was sent to Mr. Iacovacci signed by
13   Mr. Callahan that we were referring to
14   previously?
15        A.    Yes.
16        Q.    Who drafted this termination letter?
17        A.    I don't know.  I wasn't involved.
18        Q.    You didn't research that for
19   purposes of this deposition?
20        A.    I did not, no.  This was probably
21   work product of counsel.
22        Q.    Well, I want to make sure I'm
23   getting this.  I thought you just told me you
24   didn't know who drafted it.  Now you're telling
25   me it's work product of counsel?
```

```
                                      Page 591

 1                    Monticciolo
 2            MR. SOLOMON:  He speculated.  You
 3        didn't hear his full question.
 4        A.    I said probably work product of
 5     counsel.  I will speak up for you.
 6        Q.    Do you know one way or the other
 7     whether this was drafted by counsel?
 8        A.    I do not.
 9        Q.    So you didn't research who drafted
10     this letter in preparation for this 30(b)(6)
11     deposition on the subject of Mr. Iacovacci's
12     termination, right?
13        A.    From the questions, the topics that
14     I was asked to read, I think that would be a
15     reasonable thing to do.  This letter has been
16     produced, right?
17        Q.    Sorry?
18        A.    This letter has been produced?
19        Q.    Yes, the Bates number indicates that
20     it is a production and you'll see it's a Brevet
21     Bates number, so it was produced from Brevet's
22     files.
23            By this point in time October 14,
24     2016, Brevet had finally confirmed whatever it
25     wanted to confirm from its suspicions back in
```

```
                                          Page 592
 1                       Monticciolo
 2   May of 2016, correct?
 3               MR. SOLOMON:  Object to the
 4         question.
 5         A.    Yes.  Can you repeat the question?
 6         Q.    By this point in time, October 14,
 7   2016, Brevet had finally confirmed whatever it
 8   wanted to confirm as raised back in May of
 9   2016, correct?
10               MR. SOLOMON:  Object to the
11         question.
12         A.    I wouldn't say finally, but I would
13   say we have drawn that conclusion at or before
14   then.
15         Q.    You were drawing conclusions about
16   Mr. Iacovacci sending Brevet confidential
17   materials or trade secrets outside of Brevet,
18   right?
19         A.    No.  It would be to the point where
20   the firm was willing to or prepared to make a
21   recommendation for his termination as I
22   previously stated.
23         Q.    I'm not sure I followed your answer
24   to my question.  My question was, by this point
25   in time you had confirmed that Mr. Iacovacci
```

```
                                        Page 593
                            Monticciolo
 1
 2    had sent Brevet confidential materials or trade
 3    secrets outside of Brevet hundreds or thousands
 4    of times, right?
 5         A.    That would be part of that
 6    recommendation.
 7         Q.    Can you show me where in the
 8    termination letter you identified that as the
 9    findings that contributed to your decision to
10    terminate Mr. Iacovacci?
11              MR. SOLOMON:  I object to the
12         question.
13         A.    I'm not a lawyer that can tell you
14    how this termination letter refers to the
15    specifics.  There are sections mentioned here.
16         Q.    I appreciate that there are sections
17    mentioned here.  I'm asking if you can identify
18    anywhere in this letter where it tells
19    Mr. Iacovacci that Brevet had concluded that he
20    had sent hundreds or thousands of iterations of
21    Brevet confidential materials and/or trade
22    secrets outside of Brevet and that those are
23    the grounds -- those are one or more of the
24    grounds for his termination?
25         A.    I again point you to the paragraph
```

```
                                      Page 594
 1                    Monticciolo
 2    that says your conduct and I believe that's
 3    encapsulated and violated numerous Brevet
 4    policies.
 5         Q.     So you didn't bother to tell
 6    Mr. Iacovacci that he had sent Brevet
 7    confidential materials outside of Brevet
 8    thousands of times and that that was part of
 9    the reason you were terminating him, instead
10    resting on the very summary sentence that you
11    identify beginning with the words "your
12    conduct" and ending with the words "trade
13    secrets," right?
14              MR. SOLOMON:  Object to the
15         question.
16         A.     I don't write the employment
17    letters, but if I read this and I was Paul, I
18    would know what they are talking about.
19         Q.     But you're not Paul and I'm asking
20    you a question.
21         A.     I think I answered it.
22         Q.     I don't think you did, so I'll ask
23    it again.  You didn't tell Paul that you had
24    found thousands of iterations of his sending
25    Brevet confidential materials or trade secrets
```

Page 595

                              Monticciolo

1                            Monticciolo
2     outside of Brevet and if that was one of the
3     grounds for terminating his employment, did
4     you?
5              MR. SOLOMON:  Object to the
6         question.  Asked and answered.
7         A.    I didn't tell Paul anything.  There
8     is this letter.  It seems pretty clear that to
9     me numerous Brevet policies given the industry
10    that we are in, given his years in the
11    industry, that would be, if not obvious, then
12    you know coming to a conclusion.
13        Q.    Let's take a look at Exhibit 13.
14              (Whereupon document was marked
15        Exhibit 13 for identification as of this
16        date.)
17        Q.    Do you recognize this document, Mr.
18    Monticciolo?
19        A.    It's not up yet.
20        Q.    That's why I ask.  We have Exhibit
21    13 of Tab 1.  Let me pull it up.  That's one.
22        A.    After we review this document, can
23    we take a restroom break?
24        Q.    We can take a break after these
25    questions, yeah, sure.

                          Monticciolo

1

2       A.    This is the Limited Liability
3  Company Agreement.
4       Q.    Yes.  Do you recognize it?
5       A.    Yes.
6       Q.    If you scroll down to page 10?
7       A.    Document page 10?
8       Q.    Internal pagination page 10.  It's
9  Article 7, Section 7.1B.
10      A.    It starts on page 9?
11      Q.    It does, yes.  I'm going to
12  specifically direct you to the end of the first
13  full sentence which continues onto page 10.
14  you'll see a little Roman 5 or a V before the
15  words "a Member's material breach."  Just tell
16  me when you are ready.
17      A.    Okay.
18      Q.    Do you see the LLC Agreement
19  provides that a Member can be terminated for
20  cause if, and I'm looking at 5 as I said, "a
21  Member's material breach of any provision of
22  this Agreement and such Member's failure to
23  remedy such breach within ten days after
24  receiving written notice from the Company of
25  the evidence of such breach;" do you see that?

```
                                       Page 597
 1                     Monticciolo
 2        A.    I do.
 3        Q.    Did you provide Mr. Iacovacci with
 4   written notice of the evidence of a breach and
 5   offer him ten days to cure it?
 6        A.    I didn't research that.  I could go
 7   look.
 8        Q.    Well, you're the 30(b)(6) corporate
 9   representative on the subject of
10   Mr. Iacovacci's termination.  I want to know
11   whether or not you provided Mr. Iacovacci
12   written notice from the company of the evidence
13   of material breach and whether or not you gave
14   him ten days to cure such a breach or remedy
15   such a breach.
16        A.    I don't have that in front of me.  I
17   think that was something I would need to
18   prepare for this.
19        Q.    I'm sorry?
20        A.    I didn't think that would be
21   something that I would have to prepare for
22   this.  Well, I can check.
23        Q.    You didn't think that would be
24   appropriate material for you to get up to speed
25   on prior to offering your testimony as the
```

Page 598

                              Monticciolo

1

2  corporate representative on the subject of

3  Mr. Iacovacci's termination, right?

4       A.    I believe I did a reasonable job to

5  prepare for this, yes.

6       Q.    Sitting here right now as Brevet's

7  corporate representative, do you know one way

8  or the other whether you either provided

9  written notice from the company of the evidence

10  of material breach that Mr. Iacovacci had

11  engaged in prior to sending him the October 14

12  termination letter or whether you had given him

13  10 days to remedy such a breach?

14       A.    Sitting here right now I do not

15  know.

16       Q.    Any idea why you would not have

17  given Mr. Iacovacci written notice of a breach

18  and/or an opportunity to remedy such a breach

19  within 10 days?

20       A.    I'm not going to conjecture.

21       Q.    You're the CEO of the company,

22  right?

23       A.    Right.

24       Q.    Do you think you should have given

25  Mr. Iacovacci notice of this before sending him

```
                                          Page 599
 1                      Monticciolo
 2   the October 14th letter terminating his
 3   employment and membership interest?
 4        A.    I'm not going to conjecture.  I'm
 5   not a lawyer.
 6        Q.    I'm not asking you to conjecture.
 7   I'm not asking you to give me a legal opinion.
 8   I'm asking you for your opinion as the
 9   corporate representative of Brevet.
10             Do you think you should have given
11   him notice of this?
12        A.    I don't know.
13        Q.    Do you think you should have given
14   him an opportunity to remedy a breach within 10
15   days at least?
16        A.    If a breach is remediable, that
17   would be -- make sense but a remediable breach,
18   that's a question for the lawyers.
19        Q.    Did you have a view one way or the
20   other prior to sending this October 14
21   termination letter that we were just looking at
22   as to whether or not the material breaches that
23   you believed you had uncovered on behalf of
24   Mr. Iacovacci were amenable?
25        A.    I believe the recommendation made
```

```
                                       Page 600
 1                        Monticciolo
 2     from the team took into account many
 3     considerations and factors and I would expect
 4     that our decision would stand as to upon my
 5     approval.
 6          Q.    I don't know if that answered my
 7     question.  Did you and the team ever discuss
 8     the question of whether or not to provide
 9     Mr. Iacovacci notice of material breaches that
10     he had engaged in?
11          A.    Again, me and the team wouldn't be
12     involved in that discussion.  That is the job
13     of other folks in the firm.
14          Q.    Mr. Callahan came to you with the
15     recommendation on behalf of either himself or
16     several other departments to terminate
17     Mr. Iacovacci's employment.
18                Did you and Mr. Callahan discuss the
19     question of whether or not you should give
20     Mr. Iacovacci any notice of the termination
21     that was being recommended prior to sending him
22     the October 14th letter?
23          A.    If it wasn't expressly part of the
24     recommendation, then I would assume the
25     recommendation was accurate.
```

```
                                        Page 601
 1                     Monticciolo
 2        Q.    You just do what you are told; you
 3   don't ask questions, right?
 4               MR. SOLOMON:  Object to the
 5        question.
 6        A.    I don't do everybody's job in the
 7   firm if that's what you're trying to insinuate.
 8        Q.    Whose job was it to ensure that
 9   Mr. Iacovacci got notice of any alleged
10   material breaches of this agreement in your
11   view?
12        A.    That's assuming that your question
13   is relevant and that decision is made by again,
14   I answered this question, Mark, guidance of
15   outside counsel, HR, compliance to make the
16   right recommendation that they feel is
17   appropriate.
18        Q.    Did Brevet know at the time that
19   Mr. Iacovacci was doing business with
20   Mr. Robert Nokley?
21        A.    At the time I do not know if it was
22   in one of those e-mails.
23        Q.    I know you asked for a break for a
24   bathroom.  Let's go off the record.
25               THE VIDEOGRAPHER:  The time is
```

Page 602

1                    Monticciolo
2        1:05 p.m.  We are going off the record.
3                (Lunch recess taken.)
4                   AFTERNOON SESSION
5                THE VIDEOGRAPHER:  It's 1:37 p.m.
6        and we are back on the record.
7    BY MR. CYRULNIK:
8        Q.    Welcome back, Mr. Monticciolo.  Did
9    Mr. Iacovacci attempt to execute any business
10   transactions using Brevet's trade secrets?
11       A.    Yes.
12       Q.    What business transactions did
13   Mr. Iacovacci attempt to execute using Brevet's
14   trade secrets?
15       A.    From what we are aware of, the
16   ██████████████████████, as we noted, activities
17   with the ██████████████████████, the entering
18   into Non-Disclosure Agreements, our
19   Non-Disclosure Agreements with third parties
20   without bringing them in as part of Brevet when
21   he was here in '15 and '16.
22                We have using our trade secrets, our
23   processing, binding the firm to nondisclosures
24   without recording them as our materials and I
25   could go on through the list of the impact of

Page 603

Monticciolo

1
2   trade secrets which anything leaving the firm
3   through a personal e-mail is the use of our
4   trade secrets because it takes them out of the
5   Brevet control environment.
6        Q.   You'll certainly have your
7   opportunity to go through, I think the last
8   part of what you wanted to cover.  Let me just
9   be specific on these questions and again I'll
10  remind you that I'm doing my best to try to get
11  through this important material methodically
12  and efficiently so I'm going to try to ask
13  targeted questions and none of those are to the
14  exclusion of asking other questions that you
15  may want to cover and of course Mr. Solomon
16  will allow you to cover more if he wants to as
17  well.
18           I want to focus on the business
19  transactions that Mr. Iacovacci attempted to
20  execute using Brevet's trade secrets.  I heard
21  you mention the ███████████████ and the
22  ████████████████████████████.  I want to
23  ask you some questions about those, but just
24  let me make sure.
25           Are there any other specific

```
                                          Page 604
 1                     Monticciolo
 2   business transactions, transactions that
 3   Mr. Iacovacci attempted to execute using
 4   Brevet's trade secrets?
 5        A.    I believe it's related to ████████
     ████████, I forget its second name for a minute,
 7   which is a related transaction.  Obviously I
 8   mentioned the ███████████████████.  There
 9   was a company called █████████████████████████
     █████████████████████████████████.  That is
11   just a good example of a few that are
12   significant financial impact and damages to us.
13        Q.    And I appreciate that.  I don't want
14   examples.  I want to have the complete list.
15   So I heard you mention now the ████████
     ████████████ and you think that's associated
17   with ██████████████████████; is that what
18   you are thinking of?
19        A.    Yes, correct.
20        Q.    Let's call that one and I'll ask you
21   some questions about that.  You mentioned the
22   █████████████████████████ and I heard you mention
23   a third one, was it ████████████████  Can you spell
24   that?
25        A.    It's █████████████████████████████████
```

```
                                          Page 605

 1                    Monticciolo

 2      ■

 3         Q.    And that's a third business

 4    transaction that you contend Mr. Iacovacci

 5    attempted to execute using Brevet's trade

 6    secrets?

 7         A.    Those are the ones that are listed

 8    there.  As I mentioned previously, there

 9    were -- trade secrets are included on

10    Non-Disclosure Agreements which we previously

11    produced under affidavits from Mr. Callahan on

12    numerous times when our NDAs were being used by

13    Mr. Iacovacci outside of his role as an

14    employee or partner of Brevet.

15         Q.    Are you referring to NDAs that

16    Mr. Iacovacci entered into binding Brevet

17    without authorization; is that what you are

18    referring to?

19         A.    Correct.

20         Q.    But, you don't contend that those --

21    you may contend those are improper, but you

22    don't contend that those are business

23    transactions that Mr. Iacovacci was attempting

24    to execute?

25         A.    I am contending that those likely
```

                                                        Page 606

1                          Monticciolo

2    led into business transactions that I don't

3    have in front of me here because I didn't think

4    that was the goal here, but a substantial

5    number of them would be materials being sent

6    back and forth.  Those were business

7    transactions that did not come to Brevet that

8    were lost opportunities.

9         Q.    I'm not asking you about lost

10   opportunities.  Again, I would ask you politely

11   to please focus on my question because there is

12   a fair amount of subject matter.

13              There is lost opportunities.  There

14   is damages.  There is business transactions

15   Mr. Iacovacci attempted to execute.  I'm going

16   methodically over here, but in order to do

17   that, I am going to need your help.  If you can

18   focus on my question, I want a complete list,

19   sitting here right now as Brevet's corporate

20   representative on the Topics 1 through 5, I

21   want a list of the business transactions that

22   Mr. Iacovacci attempted to execute using

23   Brevet's trade secrets if any.

24              I heard you list so far

25   ███████████████████████████████████████████

Page 607

1                        Monticciolo
2      ████████████████████████████.  Are there any other
3   business transactions that you can identify
4   sitting here now that Mr. Iacovacci attempted
5   to execute using Brevet's trade secrets?
6             MR. SOLOMON:  I object to the
7        question and I object to your personal
8        definition.
9        Q.     Thank you.  Go ahead.
10       A.     And attempted to execute, I would
11   reference then what has been produced at least
12   through affidavits and through the e-mails, all
13   those transactions where NDAs were executed and
14   no -- with Mr. Iacovacci and then directed to
15   his personal e-mail.  There are too many to
16   just sit here and list off of memory, but they
17   were produced.  They are in the affidavits.
18       Q.     You don't need to use memory,
19   Mr. Monticciolo.  If there is a list you want
20   to provide us, that's fine.  I'm happy to go
21   through those if you have it in front of you,
22   but I want to know what business transactions
23   you contend Mr. Iacovacci attempted to execute
24   using Brevet's trade secrets.
25       A.     I believe that that was already

```
                                      Page 608
 1                    Monticciolo
 2    produced in Mr. Callahan's affidavit, at least
 3    a subset of those.
 4        Q.    Mr. Monticciolo, I don't want
 5    subsets.  I don't want examples.  This is a
 6    30(b)(6) deposition.  I want answers.  I want
 7    to know what business transactions
 8    Mr. Iacovacci attempted to execute using
 9    Brevet's trade secrets.
10              You can refer to whatever materials
11    you want to refer to as long as you tell me
12    what they are, but I want that list so I can
13    ask you about them.
14        A.    So I believe off the top of my head
15    we then have to go to affidavit from
16    Mr. Callahan dated I believe it's the
17    January 17th one.  So I'm going to do this off
18    the top of my head.
19        Q.    Is it the 2018 affidavit because if
20    so, I'm happy to provide that to you.  It's
21    Exhibit 12 in your folder.
22        A.    No, it's not that one.  There is a
23    defense's response as well from April, I
24    believe.
25              MR. CYRULNIK:  Let me ask your
```

```
                                      Page 609

 1                    Monticciolo

 2      counsel.  Do you have the document that

 3      Mr. Monticciolo is cross referencing for

 4      me?

 5              MR. SOLOMON:  Just give me a minute.

 6              MR. CYRULNIK:  Let's go off the

 7      record.

 8              THE VIDEOGRAPHER:  The time is

 9      1:45 p.m.  Going off the record.

10              (Brief recess taken.)

11              THE VIDEOGRAPHER:  The time is

12      1:46 p.m.  We are back on the record.

13   BY MR. CYRULNIK:

14      Q.    We are back on.  Mr. Monticciolo,

15   did you have an opportunity to locate the

16   document that you had in mind with the list of

17   business transactions that you attempted --

18   that Mr. Iacovacci attempted to execute using

19   Brevet's trade secrets?

20      A.    Let's start with the defendant's

21   responses objected to by the plaintiffs dated

22   9/25/2018.  I believe it's already number 6.

23      Q.    Okay.  9/25/2018, number 6?

24      A.    Yes.

25      Q.    Do you have that in front of you?
```

```
                                        Page 610
 1                      Monticciolo
 2        A.     No.
 3              MR. SOLOMON:   I can put it in front
 4        of him.
 5        A.     Are you going to post it?
 6        Q.     It's Exhibit 11.  I think what you
 7   are referring to is Exhibit 11.  You'll tell me
 8   if that's what you had in mind.  Is that what
 9   you are talking about, Mr. Monticciolo?
10        A.     No, that's an affidavit.
11              MR. SOLOMON:  So I put in front of
12        him the answer to interrogatory number 6
13        of the third set of interrogatories.
14              MR. CYRULNIK:   Okay.  If you would
15        like that to help you, Mr. Monticciolo,
16        can you tell me when you are ready to
17        respond to the question?
18        A.     Sure.  So you would like to go down
19   the list?
20        Q.     I just want to get a list from you.
21   Let me be clear about the question.  I want you
22   to tell me as Brevet's corporate
23   representative, 30(b)(6) representative at this
24   deposition, what business transactions
25   Mr. Iacovacci attempted to execute using
```

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

```
                                        Page 611
 1                     Monticciolo
 2    Brevet's trade secrets?
 3         A.    Yes.
 4         Q.    Okay, go for it?
 5         A.    We can enumerate them or we can
 6    reference the list on the document we just
 7    referenced.
 8         Q.    The document you are referencing,
 9    just to be clear for the record, is an
10    interrogatory response from Brevet dated what?
11         A.    September 25, 2018.  It's index
12    number 158735/2016.  Is that helpful?
13         Q.    Is this in the State Court or in the
14    Federal Court?
15         A.    State Court.
16              MR. SOLOMON:  State Court.  I'm also
17         going to put in front of him the
18         supplemental responses and objections to
19         the first set of interrogatories in the
20         State Court.
21         Q.    Well, let's go one by one, but okay.
22              MR. SOLOMON:  That's number 23.  Go
23         ahead.
24              MR. CYRULNIK:  Do you have the
25         ability to put these on Exhibit Share,
```

```
                                        Page 612
 1                    Monticciolo
 2        Lou?
 3              MR. SOLOMON:  If we do.  If we
 4        don't, we can't do it.  We can't do it,
 5        but we are going to e-mail it to you.
 6              MR. CYRULNIK:  Let's go off the
 7        record just so we can get them and then we
 8        will go back on.
 9              MR. SOLOMON:  Let's not go off the
10        record.
11              MR. CYRULNIK:  I would like to go
12        off the record.
13              MR. SOLOMON:  We are going to keep
14        our own time.
15              MR. CYRULNIK:  Mr. Solomon is
16        objecting to going off the record because
17        apparently he wants to use the time it
18        takes for him to send the exhibit that the
19        witness was looking for and is now going
20        to reference to us.
21              We will just stay on the record and
22        we will note that of course this doesn't
23        count against our time for the 30(b)(6)
24        deposition, but if it makes Lou happy, we
25        can all do it while the videographer and
```

```
                                            Page 613
 1                      Monticciolo
 2        court reporter are looking on.
 3               We will tell you when we get the
 4        e-mails.
 5               MR. SOLOMON:   We sent both
 6        documents.
 7               MR. CYRULNIK:   Okay, I have the
 8        documents in front of me.   Take it away.
 9        A.     So the one from 9/25.
10        Q.     I have that one up.
11        A.     Page 8.   The paragraph starting,
12    "Defendants also discovered that Plaintiff was
13    diverting business opportunities," that
14    paragraph.
15        Q.     Let's take a look at the first
16    bullet point there.   Can you describe to me the
17    business transaction that Mr. Iacovacci was
18    attempting to execute using Brevet's trade
19    secrets that is in your view referenced or
20    alluded to in the first bullet points on page 8
21    following the word "Defendants?"
22        A.     I can't recall that exact one.   As
23    you can tell, there are pages of these.   This
24    has been produced as a Bates stamp, the
25    specifics of it, but we should go through each
```

Page 614

1                       Monticciolo
2    one of these under pulling up all the Bates
3    stamps if that is necessary.
4         Q.    I don't want to do that,
5    Mr. Monticciolo.  This is a 30(b)(6)
6    deposition.  I would have thought that you
7    would be prepared to answer these questions.
8    Rather than cross referencing a list that I
9    don't understand, your job is to be prepared to
10   address these topics through testimony.  You're
11   welcome to use, you know, interrogatory
12   responses if they will help you to respond to
13   those questions, but if they don't give you
14   sufficient information, then that's not
15   adequate preparation in our view for this topic
16   on the 30(b)(6) notice.
17             Let me just short circuit the
18   lengthy inquiry that would be necessitated.
19   I'm looking at a list of bullet points on page
20   8, 9, 10, 11, 12, 13 which appear to all be
21   referencing an e-mail, "Plaintiff's e-mail on"
22   with a date, et cetera and I believe every
23   single one of them starts with that, but I
24   can't make the representation with a hundred
25   percent certainty because I'm scrolling through

```
                                      Page 615
                        Monticciolo
 1
 2     this quickly, but do any of these bullet points
 3     identify business transactions that you are
 4     testifying Mr. Iacovacci attempted to execute
 5     using Brevet's trade secrets?
 6          A.    Yes.  This list very clearly of
 7     which I think would be unreasonable to
 8     memorize, hundreds of these as you just pointed
 9     out, hundreds of pages, I know I can't remember
10     more than 11 cards in a deck of cards, so I
11     think it would be unreasonable to think I can
12     memorize every one of these, but I think it's
13     already been in this response shown that these
14     are discovered to be diverting business
15     opportunities of deal information of his
16     personal account and maybe as you say are
17     potential off market real estate opportunity,
18     documents related to a potential Brevet client,
19     an NDA for a potential Brevet client.  These
20     are documents representing transactions that
21     are being diverted away from Brevet.
22          Q.    I'll try this again,
23     Mr. Monticciolo.  I'm not quite sure why this
24     is so challenging.  I'm not talking about
25     diverting corporate opportunities right now.
```

se

```
                                    Page 616
 1                     Monticciolo
 2              I'm asking you about business
 3    transactions that Mr. Iacovacci attempted to
 4    execute.  Do you understand the difference?
 5              MR. SOLOMON:  I object to the
 6         question.
 7         A.    No, I don't.
 8         Q.    If you don't understand the
 9    difference, let me explain to you what I mean.
10    I don't want to know right now about potential
11    corporate opportunities that you think Brevet
12    had that Mr. Iacovacci diverted.  I want to
13    know whether or not Brevet is contending that
14    Mr. Iacovacci attempted to execute a business
15    transaction using Brevet's trade secrets.
16         A.    What I am very clearly saying is
17    that the actions denoted here are exactly the
18    attempt.  It's the action that you use to do a
19    business transaction.  Each one of these is an
20    action that you take to attempt to do a
21    business transaction.
22         Q.    I'm asking you to identify the
23    business transaction, not the action you
24    undertake to do a business transaction.  Not
25    some bullet point list of corporate
```

Page 617

1                    Monticciolo
2      opportunities.
3               I want to know what you can tell me,
4      as Brevet's corporate representative on these
5      topics, as to what business transaction
6      Mr. Iacovacci attempted to execute using
7      Brevet's trade secrets and if the answer is I
8      don't know, all I know is that he sent e-mails
9      to himself, then tell me that, but if you're
10     contending that there are business transactions
11     that you know of that Mr. Iacovacci attempted
12     to execute himself, I want to know what they
13     are.
14          A.     ████████████████████████████████
15     ████████████████████████████████████████████
16     ██████████████
17          Q.    Which one are we talking about?
18          A.    I think you can find it yourself on
19     the first page.  It's unreasonable to be
20     prepared to look at every one of these e-mails.
21     I think it's unreasonable to think that
22     hundreds of these would be things that would be
23     specific.  We've already done that.  That is
24     what has been produced.
25               There are other ones.  An

Page 618

1                       Monticciolo

2  ████████████████████████████████████████

3  ████████████████████████████████████████████

4  ███████████████████████       ████████████████████

5  ██████████████████████       I don't think these are

6  conjecturing or the way you make it sound.

7  These are business transactions that we looked

8  into previously and I did my homework which I

9  think was reasonable to confirm that this was a

10 list of business transactions that were

11 previously put together and sent under a

12 court's submission and to memorize them all I

13 think would be an unreasonable preparation for

14 this.

15         I don't have that kind of memory.  I

16 don't think you do or anybody else does.  You

17 wanted a few examples and I think I did that

18 already.

19     Q.    Mr. Monticciolo, if you could please

20 focus on the question.  I'm not asking you

21 about memorization.  I told you now at least

22 two times, probably more, that you are welcome

23 to refer to whatever materials you want to

24 refer to as long as you identify what you are

25 referring to if you don't have a memory that

Page 619

```
 1                      Monticciolo
 2   can actually cover the material.
 3            What I don't want you to do is cross
 4   reference interrogatory responses that we found
 5   to be completely deficient or unclear and try
 6   and use those to get out of your obligations to
 7   provide 30(b)(6) deposition testimony and so my
 8   question to you is, is it your position that
 9   every single one of the bullet points that you
10   just referenced, that is every bullet point on
11   page 8 beginning on the third bullet point from
12   the top of the page going all the way down to
13   the last bullet point on page 13 is an example
14   of a business transaction that Mr. Iacovacci
15   attempted to execute using Brevet's trade
16   secrets; yes or no?
17        A.    Yes.
18        Q.    What did you do to determine that
19   each of these was a -- an example of a business
20   transaction Mr. Iacovacci attempted to execute
21   using Brevet's trade secrets?
22        A.    We looked at all of these e-mails.
23   If they contained any of our trade secret
24   materials which is noted on all of these, then
25   that would be the use of our trade secret
```

```
                                      Page 620
 1                      Monticciolo
 2     materials.
 3          Q.    What did you do to determine that
 4     each of these bullet points is a business
 5     transaction that Mr. Iacovacci was attempting
 6     to execute?
 7          A.    Again, I answered that question.
 8          Q.    I know that you feel that you did,
 9     but obviously I feel that you didn't.  So try
10     again.
11          A.    I'll stand on my point.  I answered
12     that question.
13          Q.    What did you do to determine that
14     each of these bullet points identifies a
15     business transaction Mr. Iacovacci was
16     attempting to execute?
17          A.    Are you asking a slightly different
18     question?  I think I answered that as part of
19     my prior question.
20          Q.    Mr. Monticciolo, rather than use
21     time to tell me whether you think you answered
22     a question, whether you didn't answer a
23     question, just answer the question, please.
24          A.    I did answer the question.  We
25     looked at the e-mails.  We looked at the
```

Page 621

1                    Monticciolo

2   materials attached.  If they are related to our

3   trade secrets, the action of the e-mail is an

4   attempt to do the business.  That's why we

5   chose them.

6        Q.    Mr. Monticciolo, is each of these

7   bullet points reflective of a different

8   business transaction Mr. Iacovacci attempted to

9   execute using Brevet's trade secrets in your

10  view?

11       A.    I didn't look to see if they were

12  unique, but I believe they are.

13       Q.    What is the basis for that belief?

14       A.    Because my quick review of them

15  appears that they were unique.

16       Q.    I'm having trouble understanding

17  what it is you are reviewing and what it is you

18  are referring to, so let's try this a different

19  way.

20            Can you tell me with respect to the

21  first bullet point on page 8 under the word

22  "Defendants", can you describe to me the

23  business transaction that you contend

24  Mr. Iacovacci was attempting to execute using

25  Brevet's trade secrets?

```
                                        Page 622
 1                     Monticciolo
 2        A.    Let's pull up Bates number 025010
 3    again.  I don't have the ability.  I think it's
 4    unreasonable to memorize every one of these.
 5        Q.    So you're unable to do that without
 6    looking at the referenced document; is that
 7    what you are telling me?
 8        A.    Yes.  There are hundreds of them.
 9    It is unreasonable that I can remember all of
10    these.  The ones that stood out that have
11    damages that appear to be in the hundreds of
12    millions of dollars we provided as examples.
13    That we thought that was sufficient and
14    reasonable for this line of questioning.
15        Q.    Look, we're don't need to debate the
16    efficiency or the relevance or any of those
17    things.  I'm sure Mr. Solomon will have your
18    back when it comes time for the court to make
19    those decisions, Mr. Monticciolo.
20            Let me make sure I am understanding
21    one piece of what you just testified to.  Is
22    page -- are the pages that we just talked about
23    in this interrogatory response only examples of
24    the business transactions that Mr. Iacovacci
25    attempted to execute using Brevet's trade
```

```
                                          Page 623
 1                      Monticciolo
 2    secrets as an incomplete list; is that right?
 3              MR. SOLOMON:  So I object to the
 4         question.  We identified a couple of
 5         different ones.  You want to just put
 6         those both together?
 7              MR. CYRULNIK:  You're talking about
 8         the supplemental response, Mr. Solomon?
 9              MR. SOLOMON:  I am.
10         Q.    You're welcome to -- I will include
11    the supplemental response in the question.
12    Between the September 25, 2018, pages 8 through
13    pages 13 list and the supplemental response
14    that Mr. Solomon just I think put in front of
15    you --
16              MR. CYRULNIK:  What date is that
17         from, Lou?
18              MR. SOLOMON:  Hold on.
19         September 29, 2007.  Then to complete it
20         although I don't think -- I think it's
21         cumulative is the affidavit that we have
22         not sent you and will in opposition to the
23         Motion for Entry of Declaratory Judgment
24         and that is September 17, 2018.  So if you
25         put all those together, you want to ask
```

```
                                        Page 624
 1                    Monticciolo
 2        whether --
 3              MR. CYRULNIK:  I want to make sure I
 4        got the dates there.  I have a
 5        September 24, 2018 interrogatory response
 6        number 6 we have been talking about.  Did
 7        you say there was a supplemental response?
 8        What was the date of that?
 9              MR. SOLOMON:  September 28, 2017.
10        It's a supplemental response.  I can give
11        you the full name.  Didn't we send this to
12        you?
13              MR. CYRULNIK:  It's not a
14        supplemental response to this
15        interrogatory number 7.
16              MR. SOLOMON:  It is not.  It's
17        Supplemental Responses and Objections to
18        Plaintiff's First Set of Interrogatories.
19              MR. CYRULNIK:  Which pages on that
20        one are you referencing?
21              MR. SOLOMON:  13 --
22              MR. CYRULNIK:  That's a question for
23        Mr. Monticciolo.  He doesn't need your
24        help on that.
25        A.    I'm sorry, I missed that.
```

Page 625

1                     Monticciolo
2         Q.    Which pages on the September 29,
3    2017 document that Mr. Solomon just provided
4    you are you referencing as a list of
5    transactions, business transactions
6    Mr. Iacovacci attempted to engage in using
7    Brevet's trade secrets?
8         A.    Page 13 response to 23.
9         Q.    Is it your testimony each of those
10   Bates numbers actually is a reference to a
11   business transaction in which Mr. Iacovacci
12   attempted to engage using Brevet's trade
13   secrets?
14        A.    Yes.
15        Q.    So I have a list in response to
16   interrogatory number 23 on the 9/29/17
17   responses to interrogatories.  Then I have the
18   list on pages 8 through 13 that you identified
19   in the 9/25/18 responses to interrogatories and
20   what else did you want me to look at?
21        A.    Page 15 answer the question 29, the
22   bottom of the response, the last part of it
23   subject to without waiver further goes into
24   clarification of what those documents were that
25   were attached to those e-mails.

```
                            Monticciolo
1
2          Q.     I think your counsel is going to be
3    sending that one to us as well.  Between those
4    three --
5                MR. SOLOMON:  Wait.  Stop, stop.
6          A.     I got more.
7                MR. SOLOMON:  Stop.  He's now on the
8          same document you were just on.  He just
9          gave you subsequent pages.
10         Q.     What pages were you referring to on
11   the 9/29/17 response to 23?
12         A.     What I'm referencing is on the
13   document page 16.  It's a response to question
14   29 and it's the bottom half of the response,
15   starting with the word "Subject to and without
16   waiver."
17         Q.     Are you looking at the response to
18   30 perhaps?
19         A.     No, right above it and the response
20   to 30.  The response to 30 --
21         Q.     Let's slow down.  Let's look at 29.
22   I'm on 29.  I don't know -- what sentence are
23   you referring to?
24         A.     Where like, approximately 10 up from
25   the bottom beginning with "Subject to."
```

```
                                      Page 627
 1                    Monticciolo
 2       Q.    "Subject to and without waiver of
 3   the aforegoing projections, Defendants identify
 4   Brevet's sourcing network."  Is that one?
 5       A.    Yes, right.  This is the
 6   clarification of what some of the attachments
 7   were on the e-mails, but if you want to go and
 8   just give Bates numbers of the e-mails, we can
 9   just move on to question 30.
10       Q.    I don't want to move on 30 while I'm
11   in the middle of 29.  Is it your contention
12   that the response to number 29 identifying
13   Brevet's sourcing network and then there is a
14   bunch of other things which we will go through,
15   let's start with sourcing network.  Is that a
16   business transaction in which Mr. Iacovacci was
17   attempting to engage?
18       A.    No.  Again, I was clarifying that
19   that could be helpful on those e-mails.  We
20   could then -- so I retract that.  To help
21   clarify let's go to question 30.
22       Q.    Okay.
23       A.    Our response, which is, I think,
24   maybe where you were already.  Which is in the
25   middle of that response toward the bottom of
```

Page 628

1                    Monticciolo
2    page 16 is "Subject to and without waiver."
3         Q.    Okay.  Is it your contention that
4    each of the documents listed there by Bates
5    number identifies a different business
6    transaction in which Mr. Iacovacci attempted to
7    engage using Brevet's trade secrets?
8         A.    Yes.
9         Q.    So we got 23 and 30?
10        A.    And we have 31 on the next page.
11        Q.    Okay.  Same thing.  Every one of
12   those pages or series of pages Bates ranges
13   identifies different business transactions in
14   which Mr. Iacovacci was attempting to engage
15   using Brevet's trade secrets in your view,
16   right?
17        A.    It seems like you know which ones
18   I'm talking about already.  It's the ones
19   towards the bottom of the response of question
20   31 beginning with "Defendants further refer
21   Plaintiff ."
22        Q.    Okay.  Anything else?
23        A.    Yes, so there is a third document
24   that was provided.
25        Q.    Okay.  Is this a document that is

```
                                        Page 629
 1                    Monticciolo
 2   dated 1/17 of 2018?  It's an affirmation from
 3   Callahan?
 4        A.    Correct.
 5        Q.    Where are you looking there?
 6        A.    I am -- again this is a summary of
 7   the results that we pull the specific e-mail.
 8   It's a reference to some are specifically noted
 9   here.  On page 5, question 12 and so this
10   relates to the monthly transactions we
11   mentioned previously.
12        Q.    That's number 12.
13        A.    On question 13, which again
14   references e-mails to his personal Yahoo!
15   e-mail address.
16        Q.    Okay.  So that also identifies
17   business transaction in which transactions in
18   which Mr. Iacovacci was attempting to engage
19   using Brevet's trade secrets?
20        A.    Yes, right in the middle there,
21   "Devin Scott of Stealth Power, a prospective
22   client for Brevet's EB-5 visa funding program."
23   So 14 outlines further e-mails of which are
24   Bates numbered here.
25        Q.    What are the transactions, business
```

```
 1                       Monticciolo
 2    transactions in which Mr. Iacovacci attempted
 3    to engage as identified in 14 that you are
 4    referring to?
 5         A.    Sure.  So, I'll read this carefully.
 6    So there aren't details in here while I'm
 7    pulling additional information, so let's move
 8    on to 15.
 9         Q.    Are you retracting 14?
10         A.    Yes.
11         Q.    Okay.  You want me to look at 15
12    now?
13         A.    Yes.  We will look at that together.
14         Q.    I would have preferred if you had
15    looked at these ahead of time, but I am happy
16    to sit here while you are doing it.
17         A.    It's unfortunate I don't have an
18    infinite memory, so I did my best to be aware
19    as you pointed out hundreds of e-mails that I
20    was supposed to be immediately aware of.  So in
21    here is noted the models being sent to Sproutt
22    Financial.  It is mentioned here as
23    S-P-R-O-U-T-T Financial, which is provided
24    under exhibit on this agreement as has been
25    produced here.
```

```
                                              Page 631

 1                       Monticciolo

 2        Q.     So the Sproutt Financial, that is a

 3   transaction, a business transaction in which

 4   Mr. Iacovacci attempted to engage Brevet's

 5   trade secrets in your view; is that right?

 6        A.     Yes, there are others listed on this

 7   page.  So a -- let me read this carefully.

 8   I'll take 15 to be just capsulating that one,

 9   just that one reference on paragraph 15.

10        Q.     Sproutt Financial reference; is that

11   right?

12        A.     Correct.  There are exhibits that

13   give more detail, but I don't have them in

14   front of me.

15        Q.     Let's take a look at the first

16   bullet point on the 9/25/18 list that you

17   started with.  That's page 8.  Can you and

18   we've put up as Exhibit 15 the Bates number

19   that you asked for Bates stamp 205010 and if

20   you can tell me after reviewing the document

21   that you asked for if you can describe for me

22   the business transaction in which Mr. Iacovacci

23   attempted to execute using Brevet's trade

24   secrets.

25                 (Whereupon document was marked
```

                                              Page 632

1                      Monticciolo

2          Exhibit 15 for identification as of this

3          date.)

4               MR. SOLOMON:  I will object because

5          I think it goes beyond the scope of your

6          questions on the 30(b)(6) notice.

7               MR. CYRULNIK:  I don't see how that

8          is possibly true, but okay, your objection

9          is noted for the record.

10               MR. SOLOMON:  Well, it's possibly

11          true because I don't (inaudible).

12          Q.    We posted as Exhibit 15 a document

13     you said you needed access to in order to

14     explain how the first bullet point on page 8 of

15     the 9/25/18 list that you identified is in fact

16     identifying a business transaction that

17     Mr. Iacovacci attempted to execute using

18     Brevet's trade secrets.

19          A.    Well, he's sending to himself

20     material information about one of the most

21     proprietary programs of Brevet, Brevet

22     information about these transactions, specific

23     company names and specific information about

24     these transactions which --

25          Q.    Go ahead?

Page 633

1                        Monticciolo

2        A.    Which is, you know, it's the essence

3   of Brevet.  This is a backbone business of

4   Brevet.

5        Q.    I think we are talking past each

6   other.  Mr. Monticciolo, I want you to explain

7   to me the nature of the business transaction

8   that Mr. Iacovacci attempted to execute using

9   Brevet's trade secrets.  I don't want you to

10  talk to me about how important the trade

11  secrets are on this question or backbones of

12  Brevet.

13            I want you to explain to me what was

14  the business transaction that Mr. Iacovacci

15  attempted to execute.  You referenced this

16  bullet point.  I provided you with all the

17  information you asked for.

18            MR. SOLOMON:  Note my continuing

19       objection.  It goes beyond the scope of

20       the 30(b)(6) notice.

21       A.    The business transaction is to

22  utilize our documents, our policies, customer

23  names and participants we used, potentially

24  with third parties for himself.

25       Q.    Potentially with third parties.  Is

```
                                              Page 634
 1                      Monticciolo
 2    it your position that Mr. Iacovacci attempted
 3    to execute a business transaction potentially
 4    with third parties, potentially without third
 5    parties?
 6              MR. SOLOMON:  Same objection.  It
 7         goes beyond the scope.
 8         A.    It's not my place to conjecture.  I
 9    could find no other reason why somebody would
10    send this to their personal directory or home
11    outside of Brevet with one of the most critical
12    parts of the firm.
13         Q.    Let's talk basic details.
14    Mr. Monticciolo, who is the third-party?
15         A.    The third-party is this transaction
16    ██████████████
17         Q.    I'm sorry?
18         A.    ████████████████
19         Q.    ██████████████████████
20         A.    ████████████████████████████████████
21    ███████████████████████████████████████
22    ██████████████████████████████████████████████
23    ██████████████████████████████
24         Q.    Well, I don't want to know who is
25    mentioned.  I'm trying to understand the
```

 1                      Monticciolo

 2   transaction.  Let's start with ███████.  What

 3   was the nature of the transaction that

 4   Mr. Iacovacci attempted to execute with

 5   █████████?

 6        A.    He was attempting to do a financing

 7   similar to what we do with R&D, which is

 8   probably why he needs these documents, but this

 9   is conjecture because it doesn't say

10   specifically on here, but this is confidential

11   information and transactions and borrowers that

12   we did execute business with regarding this.

13        Q.    I don't want conjecture.  I want

14   answers.  You're a corporate representative

15   here.  Your job is not to sit here

16   conjecturing.  I want to know whether or not

17   your position is that Mr. Iacovacci did, in

18   fact, attempt to execute business transactions

19   with ███████████ using Brevet trade secrets or

20   whether you think that Mr. Iacovacci might have

21   attempted to execute a business transaction

22   with ██████████ using Brevet's trade secrets?

23             MR. SOLOMON:  I object to the

24        question going beyond the scope of the

25        30(b)(6) notice.

Monticciolo

1

2      A.    I can't answer that from the
3  definition of reviewed.  I would see no other
4  reason why this would be taken outside of
5  Brevet.
6      Q.    You could appreciate that I can't
7  rely on whether the fact that you can't see any
8  other purpose is going to convince anybody that
9  this is actually an example of a business
10  transaction that Mr. Iacovacci attempted to
11  execute.  You understand that, right?
12      A.    I understand that this is
13  misappropriation of our trade secrets of the
14  essence of Brevet.
15      Q.    If I asked you questions about
16  misappropriation of trade secrets in particular
17  that would have been an appropriate response.
18  What I have been asking you about for the last
19  25 or 30 minutes is for you to identify the
20  business transactions that Mr. Iacovacci
21  attempted to execute using Brevet's trade
22  secrets, not the trade secrets themselves, and
23  instead I have gotten cross references to
24  lengthy lists that appear to be different from
25  business transactions.

1               Monticciolo
2          That's why I am presenting you with
3     just the first one, the very first one, Mr.
4     Monticciolo, you pointed me to.  You said you
5     couldn't answer my question when I showed you
6     the bullet point that you referenced.  You
7     needed the document.  I gave you the underlying
8     document and now I'm asking you the question
9     again.
10          So for a clear cut question, the
11    question is:  Sitting here right now as
12    Brevet's corporate representative, do you know
13    one way or the other whether or not
14    Mr. Iacovacci was attempting to execute a
15    business transaction in the document that is
16    referenced here currently marked as Doug
17    Monticciolo Exhibit 15?
18               MR. SOLOMON:  Object to the
19          question.  It goes beyond the scope of the
20          30(b)(6) notice.
21          A.    I'm not taking conjecture, but if
22    you want to because it would be a long answer,
23    we can chose others on this list.  The one I
24    pointed out as the first one I pointed out
25    which goes to potential market real estate

Page 638

                          Monticciolo

1

2    opportunity.

3        Q.    Mr. Monticciolo, you're spinning.

4    I'm asking you a question.  Do you know one way

5    or the other with respect to the first bullet

6    point that you identified and the underlying

7    document that I provided you with at your

8    request, whether or not, yes or no, do you know

9    whether or not Mr. Iacovacci was attempting to

10   execute a business transaction using Brevet's

11   trade secrets from this document?

12            MR. SOLOMON:  I want a continuing

13        objection.

14            MR. CYRULNIK:  Lou, a standing

15        objection on follow-up questions regarding

16        the same topic is all you need.  I get it.

17        You made your objection.  Please let try

18        to keep this moving.

19        Q.    Go ahead, Mr. Monticciolo.

20        A.    I can't determine from this one

21   document.  I would have to look further.

22        Q.    So you don't know, sitting here

23   right now, whether this, in fact, is an example

24   of a business transaction Mr. Iacovacci

25   attempted to execute using Brevet's trade

Page 639

```
 1                    Monticciolo
 2   secrets, right?
 3        A.    I gave my answer.  That wasn't my
 4   answer.
 5        Q.    You do know or you don't know; yes
 6   or no?
 7        A.    I said I would have to look further.
 8        Q.    Because you haven't looked further,
 9   you don't know, sitting here today, whether
10   this is an example of a business transaction
11   Mr. Iacovacci attempted to execute using
12   Brevet's trade secrets, right?
13        A.    It's one of the hundreds I pointed
14   out, right.
15        Q.    First one, exactly.  In fact, the
16   lists that you pointed me to, Mr. Monticciolo,
17   those are lists of e-mails that Mr. Iacovacci
18   sent not of business transactions per se that
19   he was engaging in, right?
20        A.    No, that's not.  These are attempts
21   to do business.
22        Q.    How do you know that?
23        A.    Sending an NDA is the first step in
24   attempting to do business, in your definition.
25   In my definition, attempting to do business
```

```
                                    Page 640
 1                  Monticciolo
 2   starts with sending an NDA.  So there is just
 3   that list of those that we can point out.
 4        Q.    Right now I'm focusing on the ones
 5   you pointed to initially.  Do you want to
 6   retract your testimony that pages 8 through 13
 7   of the 9/25/18 interrogatory response?  Each
 8   one of those bullets identifies a business
 9   transaction in which Mr. Iacovacci attempted to
10   engage using Brevet's trade secrets or do you
11   want to stick by that testimony?
12        A.    I want to stick by that testimony.
13        Q.    You're going to stick by that
14   testimony?
15        A.    Yes, sir.
16        Q.    All right.  Let's take a look at the
17   second bullet point.  You reference an e-mail
18   October 7, 2015.  Do you see that?
19        A.    On page 8?
20        Q.    Yes.  We are still on page 8, page 8
21   of the 9/25/18 interrogatory responses, the
22   list there, second bullet point.  Can you tell
23   me what business transaction Mr. Iacovacci
24   attempted to execute using Brevet's trade
25   secrets as described in the second bullet point
```

Page 641

1                      Monticciolo
2    on page 8 under the words "Defendants?"
3              MR. SOLOMON:  I object to the
4         question as beyond the scope of the
5         30(b)(6) notice and I'll continue to
6         object on that basis for any question on
7         this second one.
8         A.     My response is the same as before.
9    If you want, let's pull up the Bates number and
10   look at the documents that were received for a
11   potential Brevet filing.
12        Q.     Before looking at the document
13   sitting here today, do you know one way or the
14   other whether, in fact, the second bullet point
15   we are looking at reflects a business
16   transaction in which Mr. Iacovacci attempted to
17   engage using Brevet's trade secrets?
18        A.     And I answered this question before.
19   I cannot be expected -- it's beyond reasonable
20   to have knowledge of every one of these e-mails
21   back five years.
22        Q.     I am sure the court will have its
23   view on reasonableness.  That's fine.  I just
24   want to have a clear answer to my question.  Do
25   you know sitting here today?

                                        Page 642

1                          Monticciolo

2        A.      Sitting here today what?

3        Q.      Whether or not the second bullet

4    point on page 8 here under the word

5    "Defendants" identifies a business transaction

6    that Mr. Iacovacci attempted to execute using

7    Brevet's trade secrets?

8        A.      Given that this list is already

9    selected to be that and it says "Attaching

10   documents received from a potential Brevet

11   client," I would say it more likely than not

12   does.  It's conjecture.  We can pull the Bates

13   and look at it.

14       Q.      Go for it.  Exhibit 16 all yours.

15               (Whereupon document was marked

16       Exhibit 16 for identification as of this

17       date.)

18       Q.      I pulled for you the reference Bates

19   number, Mr. Monticciolo, and you're welcome to

20   use this to help conform your answer.

21               Sitting here today, do you know one

22   way or the other whether the second bullet

23   point on page 8 identifies a business

24   transaction which Mr. Iacovacci attempted to

25   engage using Brevet's confidential trade

Page 643

1                      Monticciolo

2     secrets?

3          A.     Give me a second.   And your question

4     again?

5          Q.     Sitting here today as Brevet's

6     corporate representative, do you know one way

7     or the other whether the second bullet point on

8     page 8 identifies a business transaction which

9     Mr. Iacovacci attempted to execute using

10    Brevet's trade secrets?

11         A.     It looks like he was attempting to

12    utilize this business outside of Brevet.

13         Q.     Again, I know you have testimony

14    that you want to give on trade secrets and

15    taking it and misappropriation and all that.

16    I'm asking you a specific question.

17               Is there a business transaction

18    Mr. Iacovacci attempted to execute using

19    Brevet's trade secrets that is identified in

20    the second bullet point on page 8 or in the

21    e-mail that you asked me to pull up?

22         A.     It appears that there was a business

23    opportunity that he was attempting to pursue

24    because there would be no other reason to

25    forward these materials outside of Brevet.

```
                                          Page 644
1                        Monticciolo
2         Q.      Can you describe to me the business
3    transaction Mr. Iacovacci was attempting to
4    execute?  Who was the counterparty?
5         A.      ████████████████████████████████
6    ███████████████████████████    ████████████
7    ███████████████████████████████    ██████████
8    █████████████████████████████████████████████
9    ██████████████████████████████████████████████
10   ███████████████████████████████████████████████
11   ██████████████████████████████████████████████
12   █████████████████████████████████████████████
13   █████████████████████████████████████████████
14   ██████████████████████████████████████████████
15        Q.      So tell me about the business
16   transaction Mr. Iacovacci was attempting to
17   execute using Brevet's trade secrets?  Who were
18   the counterparties?  ████████████████  and
19   Mr. Iacovacci; is that the deal?
20        A.      It would be, and this is just
21   conjecturing from these materials.
22        Q.      I don't want you to conjecture.  I
23   want you to tell me what you know.
24        A.      What I know I don't recall the
25   details of this, of the one several hundred,
```

```
                                        Page 645
 1                     Monticciolo
 2    but the document seems to stand on its own.
 3         Q.     When you say you don't recall, is it
 4    your testimony that you once knew the nature of
 5    the business transaction, but you no longer
 6    recall it or that you never knew whether there
 7    was a business transaction that Mr. Iacovacci
 8    was attempting to execute here using Brevet's
 9    trade secrets?
10         A.     I don't recall.  This has been six
11    years.
12         Q.     You don't know one way or the other;
13    is that right?
14         A.     My response stands.
15         Q.     The last time you identified a list
16    of trade secrets that Brevet contends
17    Mr. Iacovacci appropriated; do you recall that?
18         A.     I'm sorry, say the question again.
19         Q.     At the last deposition in October,
20    you provided a lengthy list of trade secrets
21    that Brevet contends Mr. Iacovacci
22    appropriated.  Do you recall that?
23         A.     Yes.
24         Q.     Do you have anything to add or
25    subtract to the list you provided at the
```

Page 646

1                    Monticciolo
2   deposition?
3        A.    I do.
4        Q.    Okay.  Let's start with
5   subtractions.  Anything you want to take off
6   the list?
7        A.    No.
8        Q.    Let's go to additions.  You want to
9   add things to the list of what I think were 32
10  different trade secrets that you referenced; is
11  that right?
12       A.    I think you pointed out 26, but I
13  haven't counted them.
14       Q.    Maybe my team did a better job.  I'm
15  sorry, you're right, 26.
16       A.    So to be clear, our offering
17  materials, our memoranda, so our offering
18  materials are important.  Our limited
19  partnership agreements, our subscription
20  agreements, our asset structures, the legal
21  opinions related to those asset structures, all
22  alternative investment vehicles and any related
23  opinions.  Our board compositions and our board
24  types, our accounting policies and their use
25  and our tax opinions and tax structure.

1                   Monticciolo

2            Those are things that I think should

3   be explicitly stated because those are

4   important to the trade secrets of Brevet.

5        Q.    How did you get this list of

6   supplemental items?

7        A.    It's from protecting my business.

8        Q.    No, how did you come up with this

9   list of supplemental items between the October

10  deposition and today's deposition?

11       A.    I just thought more.  I went back

12  and looked at the lists of everything that had

13  been provided in detail and I wanted to make

14  sure that these documents were clearly denoted.

15  I did it myself.

16       Q.    You did it yourself?

17       A.    I did it myself.

18       Q.    Did you speak with counsel about it?

19       A.    No.

20       Q.    You identified tax opinions last

21  time, right?

22       A.    I don't recall.  I may have.  I

23  wanted to be clear that these additions -- I'm

24  sorry if they were duplicative.

25       Q.    No problem.  Are these additional

1                    Monticciolo

2   categories or categories you listed today, the

3   categories that are supposed to go on the list

4   of 26 trade secret categories with damages or a

5   list of six categories without damages?

6        A.    These are definitely with damages.

7        Q.    Let's start with all of our investor

8   lists.  Do you recall identifying that as a

9   trade secret?

10       A.    Yes.

11       Q.    Please describe this purported trade

12  secret?

13       A.    Investor lists are one of the most

14  confidential proprietary items protected under

15  regulatory rules as well.  This goes under who

16  Brevet's investors are.

17       Q.    Where is this list located?  Is it

18  one list or is it a series of lists?  What are

19  we talking about?

20       A.    There are lists maintained for each

21  of the investment vehicles.

22       Q.    So each investment vehicle has its

23  own list of investors?

24       A.    Yes.

25       Q.    Where is each investor list

Monticciolo

1
2   maintained?  Where is it located?
3       A.    It's maintained by the third-party
4   administrator.
5       Q.    Who is that?
6       A.    ████████████████████████████████
7   ████████████
8       Q.    Each of the investment vehicles
9   houses its investor list with ████?
10      A.    Correct.
11      Q.    And how does a Brevet employee go
12  about accessing that investor list?
13      A.    You would have to be in compliance
14  or in a need to know request situation to get
15  that access to that list.
16      Q.    Where is that, the need to know
17  request access list, maintained?
18      A.    It is maintained again at ████.
19  That's the formal books and records.  I believe
20  there is a shadow copy kept by compliance, but
21  the master list, the definitive list is
22  maintained by the administrator.
23      Q.    Where is the list that you are
24  referring to or the lists that you are
25  referring to?  Where are they located in the

```
                                        Page 650
 1                    Monticciolo
 2   parties' document production or other discovery
 3   responses in this litigation?
 4        A.    I would have to go back and look
 5   through all these e-mails, but there were
 6   e-mails with specific investor name -- the
 7   contact information provided.
 8        Q.    Was the list that you were referring
 9   to misappropriated or are you talking about the
10   misappropriation of individualized contact
11   information for certain investors?
12        A.    The list informs -- I don't believe
13   it was the complete list, but maybe Paul's
14   rendition of it and the contact information for
15   those investors.
16        Q.    I didn't understand your answer.
17   Say that again, please, the first part.
18        A.    It was a list that may have been put
19   together by Paul and the contact information
20   separately.
21        Q.    You said a list that was put
22   together by Paul?  I'm not following.  Who puts
23   together the investor list that you are
24   identifying as trade secrets and that you say
25   were housed with          ?
```

```
                                            Page 651

 1                      Monticciolo
 2         A.     So, it's put together and maintained
 3    there.  I do not know if Paul accessed a
 4    version of it as a partner or had access.  That
 5    would probably not be easily traceable.
 6         Q.     You don't know whether Paul was on
 7    the list of need to know people for the
 8    investor lists that were housed at ████?
 9         A.     Correct.
10         Q.     Okay.  Do you know whether Paul ever
11    reviewed those investor lists that were housed
12    at ████?
13         A.     I don't know.
14         Q.     Is it fair to say that you don't
15    have any reason -- withdrawn.
16              Is it fair to say that you don't
17    know whether Paul took those investor lists
18    from ████ or from the shadow copy housed with
19    compliance and kept it for himself, do you?
20         A.     That would be conjecture by the way.
21         Q.     To what extent is this trade secret
22    known within Brevet?
23         A.     Which trade secret are you talking
24    about?
25         Q.     The investor lists.
```

```
                                        Page 652

 1                    Monticciolo
 2        A.    No one.  It's limited.
 3        Q.    Can you elaborate on that, to what
 4   extent is it known?
 5        A.    I answered the question already.
 6   It's a need to know.
 7        Q.    How many people have access to the
 8   investor lists?
 9        A.    You would have to ask compliance to
10   give the exact number at any exact point in
11   time.
12        Q.    Give me a rough estimate.
13        A.    Two or three.
14        Q.    Two or three people had access to
15   the investor list and you don't know whether
16   Paul Iacovacci was one of them?
17        A.    Correct.
18        Q.    Do you have any -- were you one of
19   those two or three people?
20        A.    No, I'm on a need to know, no.
21        Q.    You said you are on the need to
22   know?
23        A.    If I need to see it, I can get
24   access, but I'm not one of the people that
25   holds that access.
```

                                          Page 653

1                          Monticciolo
2        Q.    So you're saying two or three people
3    have regular access and then a bunch of other
4    people would be able to access it if they say
5    they need to; is that right?
6              MR. SOLOMON:   Object to the
7        question.
8        A.    I didn't say that.  Your
9    characterization of say they need to would not
10   be a proper representation of the process.
11       Q.    What would be a proper
12   representation of the process for the need to
13   know people?
14       A.    They would have to justify a need to
15   know, not just say they want it.
16       Q.    I see.  They have to justify a need
17   to know to whom?
18       A.    To compliance.
19       Q.    You don't have any evidence that
20   Paul actually -- withdrawn.
21             What has Brevet done to quantify the
22   value of this purported trade secret investor
23   list?
24       A.    Obviously investors are critical
25   part of Brevet.  So knowledge of who our

Page 654

                    Monticciolo

1
2    investors are, if someone wanted to disrupt or
3    tried to convince our investors to leave, the
4    value could easily be looked at as being the
5    entire value of Brevet.
6         Q.    Right, but if -- did you quantify
7    the value of the actual list?
8         A.    Again, I would say it's the value of
9    Brevet.
10        Q.    The entire value of Brevet is housed
11   within this investor list?
12        A.    It's the source of all of our
13   revenue.  It's not just the sole source of
14   value.
15        Q.    What did Mr. Iacovacci do to
16   misappropriate this purported trade secret?
17        A.    Took it outside of Brevet's domain.
18        Q.    I guess I'm not following.  I
19   thought you testified a few moments ago that
20   you don't know whether he took it outside of
21   the Brevet domain or whether he even accessed
22   it.  Did I get that right?
23        A.    No, I said I would have to look at
24   the e-mails to see where he did copy it because
25   I do recall in my review of the affidavits and

```
                                         Page 655
 1                        Monticciolo
 2    responses.
 3              Again, I can't point to specifically
 4    which one that mentioned that those were --
 5    that the investor list and investors were
 6    specifically identified as the e-mail by Paul.
 7         Q.    Mr. Monticciolo, you're the 30(b)(6)
 8    corporate representative of Brevet here to
 9    testify on Topics 1 through 5.
10              Can you identify whether
11    Mr. Iacovacci misappropriated the investor
12    lists that you just described; yes or no?
13         A.    As I sit here without reviewing the
14    hundreds of e-mails, I cannot point to the
15    specific one, but I can testify that he did in
16    part or in whole.  I cannot answer that right
17    now as I sit here.
18         Q.    When did he misappropriate the
19    investor list?
20         A.    Again, we are going back on this
21    question of going to have to look through the
22    hundreds of e-mails to identify which one was
23    which date.
24         Q.    You're saying there are multiple
25    investor lists that he misappropriated; you
```

```
                                        Page 656
 1                     Monticciolo
 2    just don't know which dates he misappropriated
 3    which lists?
 4         A.     I clarified and said in part or in
 5    whole.  Whether he sent individual investor
 6    information or lists, I would have to go back
 7    and look at the e-mails.
 8         Q.     Did Paul deal with the investors,
 9    the Brevet investors?
10         A.     At one point in his career early in.
11         Q.     How early?
12         A.     Early.  My recollection is much
13    before the 2015 timeframe.
14         Q.     But in the 2014, 2015, 2016 time
15    period Paul wasn't dealing with investors,
16    right?
17         A.     I would have to go back and check
18    those specific dates to be accurate.
19         Q.     If Mr. -- well, withdrawn.
20                If somebody e-mails to himself an
21    electronic business card of a single investor,
22    would that count as misappropriating the
23    investor list in your view?
24         A.     I am not in the position to make
25    that judgment.  That is why lawyers are here.
```

```
                                    Page 657
 1                    Monticciolo
 2    It depends what is in that information.
 3        Q.    I appreciate the fact that you
 4    delegated that to your lawyers.  I'm trying to
 5    understand your testimony.  You told me that
 6    you do know that Mr. Iacovacci misappropriated
 7    in whole or in part investor lists to some
 8    extent and I'm trying to understand what you
 9    have in mind.  Is Mr. Iacovacci forwarding to
10    himself a business card that had contact
11    information for an investor or whether you have
12    something else in mind?  Is my question clear?
13        A.    Our investors are confidential.  Any
14    of that information leaving the firm is
15    confidential information leaving the firm.
16        Q.    So is the answer to my question yes
17    if Mr. Iacovacci e-mailed himself a business
18    card that had the contact information for one
19    of Brevet's many investors, you would
20    understand that to be an example of
21    Mr. Iacovacci misappropriating the investor
22    lists in part that you were referring to as a
23    Brevet trade secret; is that right?
24        A.    Again there is many -- the reason
25    what was sent home in that card, but again our
```

Page 658

Monticciolo

1  investor list is confidential and so, yes.

3       Q.    What harm or damages resulted from

4  Mr. Iacovacci's e-mailing himself one or more

5  electronic business cards that had contact

6  information for one or more of Brevet's

7  investors, if any?

8       A.    If any, contacting those investors

9  in trying to divert business away from us or

10 attract them to the ████████████████████████,

11 ████████████  others.

12      Q.    I'll ask my question again.  What

13 harm or damages, if any, resulted from

14 Mr. Iacovacci's e-mailing himself a business

15 card containing contact information from one or

16 more investors?

17      A.    The harm is that some investors did

18 not invest with us.

19      Q.    Which investors -- I'm sorry, I

20 didn't mean to cut you off.  I thought you were

21 done.

22      A.    I just mentioned them.  I mentioned

23 the two off of the top of my head.

24      Q.    I heard ███████████████████████████

25 ████████████████      Let's go through each of those.

```
                                              Page 659
 1                        Monticciolo
 2    Let's start with the ████████████████████ .
 3              It's your contention that the reason
 4    ████████ did not invest with you, Brevet, is
 5    because Mr. Iacovacci misappropriated the
 6    contact information for the ████████████████
 7    ████████████ is that -- did I summarize that
 8    correctly?
 9         A.    No, I think you just conflated those
10    two.  Can you ask your question again?
11         Q.    If I did, I didn't mean to.  Is it
12    your testimony that the ██████████████████████
13    did not invest with Brevet because
14    Mr. Iacovacci had misappropriated its contact
15    information?
16         A.    It's our belief and our sales
17    force's belief that the ████████████████████
18    acted in a way as if they were no longer
19    pursuing us in light of the possibility to
20    pursue Mr. Iacovacci and there are others.
21         Q.    Let's just go one by one because
22    otherwise it is going to get wieldy.  So on
23    ██████████████████████████████ , when did you first
24    reach out to ██████████████████████████████ ?
25         A.    I have to go back and check the call
```

Page 660

                              Monticciolo

1

2    logs, but we have been talking to them for a

3    very long time.

4        Q.    What does that mean?

5        A.    Pretty confidently before the

6    2015/16 time period.

7        Q.    When did you stop talking to them?

8        A.    I don't think we ever stopped

9    talking to them per se, but the ability to then

10   pursue investing with us from conversations

11   with our sales team ended on or about the time

12   period that Paul was reaching out to them.

13       Q.    Which was when?

14       A.    I'd have to go back and look at

15   those call logs.

16       Q.    Well, can you give me your best

17   recollection as a 30(b)(6) witness here?

18       A.    Over the last couple of years.  It

19   doesn't happen like in a single phone call.

20       Q.    What is it that you draw as the

21   causal link between Mr. Iacovacci taking

22   contact information from the ████████████

23   ████████  and the fact that the ██████████████

24   ████████  refused to invest with Brevet?

25       A.    So this is trade secrets right and

```
                                              Page 661
 1                       Monticciolo
 2    there are others like I mentioned which is a
 3    concern of people that they could -- someone
 4    has access to our trade secrets which is a
 5    backbone, the essence of differentiation as a
 6    manager.  So who knows what Paul will be doing
 7    or saying to do that.
 8          Q.    Did ████████████████████ tell you
 9    we are not investing with you because
10    Mr. Iacovacci had access to your investor list
11    and so we don't think that you guys are
12    properly maintaining your investor lists as
13    trade secrets?
14          A.    That isn't what I said.
15          Q.    I'm trying to understand then what
16    is it that you viewed Mr. Iacovacci as the
17    reason for --
18          A.    One second.  Sorry, would you repeat
19    your question?
20          Q.    Yes.  The question was what is
21    the -- how did Mr. Iacovacci taking -- let me
22    actually take one step back.  When did
23    Mr. Iacovacci take the ████████████████
24    ██████████ misappropriated ████████████████
25    ████████████ contact information?
```

```
                                        Page 662
 1                    Monticciolo
 2        A.     I would have to go back and look at
 3   that.  That is -- there is a lot of contacts
 4   that were sent to the e-mail.
 5        Q.     Do you know sitting here today
 6   whether he took the ████████████████████████
 7   contact information from Brevet?
 8        A.     Yes.
 9        Q.     You do.  Can you get that on his
10   own?  No chance he got the ████████████████████
11   ████████████   contact information on his own?
12        A.     Given that we were talking to them
13   when he was at the firm?
14        Q.     Given whatever you like to.  Is
15   there any chance Mr. Iacovacci got ███████████
16   ████████████   contact information on his own?
17        A.      In getting the details, I would say
18   unlikely.
19        Q.     Getting what details?
20        A.     Phone numbers, e-mail addresses.
21        Q.     You say unlikely, but you really
22   don't know sitting here one way or the other
23   for certain whether or not Mr. Iacovacci got
24   those details from Brevet or from his own
25   research, right?
```

```
                                   Page 663
 1                    Monticciolo
 2        A.    I'm saying that we know that he had
 3   it when he was here.  I don't know what the
 4   difference would be if he took it or, you know,
 5   and e-mailed it, wrote it down.
 6        Q.    Well, let me make sure I understand.
 7   Mr. Iacovacci had the ████████████████████████
 8   contact information while he was working for
 9   Brevet and then three, four, five years later
10   he reached out to the ████████████████████
11   using some other source for the phone number
12   that he would reach out to or the e-mail he
13   would send an e-mail to.
14              Is it your view that Mr. Iacovacci
15   misappropriated a trade secret in the form of
16   Brevet's investor lists?
17        A.    If that is the only thing he did, it
18   would have to be very fact and circumstanced
19   based as to the details around that.  I would
20   have to see it myself.
21        Q.    Fair enough.  So without knowing --
22   sitting here today, without knowing the details
23   of when and how Mr. Iacovacci reached out to
24   the ████████████████████ post his employment
25   with Brevet, you would agree with me that he
```

Page 664

```
                              Monticciolo
 1
 2    misappropriated ██████████████████████████████
 3    contact information with Brevet; is that fair?
 4         A.    No, I believe that we know that he
 5    did send his contact information from the
 6    ████████████████████████████  contact information
 7    to his personal e-mail address.  I don't know
 8    if we can confirm it.
 9         Q.    When you say you have to confirm it,
10    you are sitting here today as a 30(b)(6)
11    witness.  Are you for certain that
12    Mr. Iacovacci got the ████████████████████████
13    information from Brevet or is it possible he
14    got it on his own?
15         A.    I think it's unreasonable to ask me
16    to look at the as noted thousand contacts that
17    were e-mailed and memorize every one.  I did
18    give you some examples of transactions and
19    other specifics that there is clear cut
20    communication, but I am not going to sit here
21    and say I remember the exact e-mail date.
22         Q.    Mr. Monticciolo, in all fairness, I
23    think this was the first example.  So I'm just
24    asking you about the first one you mentioned.
25               I'm asking you with respect to the
```

Page 665

1                    Monticciolo
2   █████████████████████████, do you know for
3   certain, yes or no, that Mr. Iacovacci
4   misappropriated ████████████████████████
5   contact information from Brevet?
6        A.    I know that my team has told me that
7   he has.  Do I have the specific e-mail in front
8   of me?  No.  There are other firms, ███
9   ██████████████████████████████████████████
10       Q.    We are going one by one here.
11             MR. SOLOMON:  We are going one by
12       one although even given the few extra
13       minutes, I would like the court reporter
14       to let us know when we are at four hours
15       for the day.
16       Q.    Who on your team told you for
17   certain that Mr. Iacovacci misappropriated
18   ███████████████████████████ contact information?
19       A.    Our salespeople.
20       Q.    Who?
21       A.    Chris Hurd.
22       Q.    Chris Hurd.  When did he tell you
23   that?
24       A.    He said that -- I don't remember the
25   exact details, but I remember a conversation

```
 1                        Monticciolo
 2   back during that time during that period that,
 3   you know, that was a concern that came up that
 4   run a bell as a contact that had been sent to
 5   Paul's old e-mail and I remember Chris Hurd
 6   responding a concern on that because we were
 7   talking to him.
 8        Q.    Is it your view that ██████████
 9   ████████████ phone number or e-mail address
10   constitutes a trade secret?
11             MR. SOLOMON:  Asked and answered.
12        A.    I answered that.  It's very fact and
13   circumstance.  What else was there?
14        Q.    I don't think you answered that, and
15   if you did, my apologies for missing it.  I
16   don't think I asked it, so if you answered it,
17   it would have been an anticipatory answer which
18   is possible because there have been a few of
19   those, but I want to know whether it is your
20   view whether ██████████████████████ phone
21   number or e-mail address constitutes a trade
22   secret.
23        A.    Well, no, if you generalize it to be
24   the ██████████████████████ no.
25        Q.    How about the individual or
```

                                                      Page 667

 1                         Monticciolo
 2       individuals at the █████████████████████ that
 3       Mr. Iacovacci contacted, are those contact
 4       information, e-mail addresses or phone numbers
 5       for those individuals in your view trade
 6       secrets?
 7            A.    Again, the trade secrets involves
 8       that information plus the fact that we were
 9       talking to them and the details of that
10       conversation.  So if you want to limit it to
11       just that, I can't tell.
12                 THE VIDEOGRAPHER:  You're already at
13            four hours.
14                 MR. SOLOMON:  If you want to go
15            another five minutes, please do.
16            Otherwise, we are going to conclude.
17                 MR. CYRULNIK:  To be clear, I'm
18            going through the trade secrets that your
19            client identified and I'm asking him
20            questions about them.
21                 It's taking an extraordinarily long
22            time because I ask yes and no questions
23            and I never get yes or no answers or
24            almost never get them and I get answers to
25            other questions.

```
 1                      Monticciolo
 2            MR. SOLOMON:  I disagree about this.
 3       I think you spent an hour on something he
 4       couldn't possibly prepare for.  It wasn't
 5       even in the subject matters of your
 6       30(b)(6) notices.  And you spent an hour
 7       on it so, of course, he is going to give
 8       you I don't knows.
 9            MR. CYRULNIK:  He didn't give me I
10       don't knows.  The problem is he gave me
11       lengthy answers to other questions.
12            MR. SOLOMON:  Tell me one place
13       where you asked for actual specific
14       business transactions and you didn't.
15            MR. CYRULNIK:  We got to go one at a
16       time.  This is also not a good use of
17       time.  I'm sure you're counting it against
18       my time on the record as you give your
19       soliloquy.
20            MR. SOLOMON:  That's why we are
21       going an extra five minutes because I want
22       to be even more than fair.  Listen, we
23       have a difference of opinion on this.  We
24       haven't even started Ms. da Silva Vint.
25       We think this is your tenth deposition and
```

```
 1                    Monticciolo
 2      you can't expand and expand and expand by
 3      asking 39 or however many categories you
 4      asked for in your 30(b)(6) notice.  Take
 5      five minutes if you want to finish up,
 6      please, otherwise --
 7            MR. CYRULNIK:  We are in the middle
 8      of a deposition.  If you're going to pull
 9      the witness in the middle of his going
10      through his list of trade secrets, that is
11      for you to do and we will deal with the
12      consequences, but I'm trying to go through
13      his list.
14      Q.    So yes or no, do you know whether or
15 not Mr. Iacovacci misappropriated a
16 confidential phone number or confidential
17 e-mail address or confidential information
18 before the ████████████████████?
19      A.    I know that he e-mailed contact
20 information which may have included just those
21 limited items or more to himself.
22      Q.    You just don't know one way or the
23 other sitting here whether it included anything
24 beyond that?
25      A.    Correct.
```

```
                                          Page 670
  1                      Monticciolo
  2        Q.     If I went onto the ███████████
  3   ███████████website or the internet, would I be
  4   able to find the phone number and e-mail
  5   address for the individual or individuals that
  6   Mr. Iacovacci reached out to at the ███████████
  7   ███████████?
  8        A.     I don't think that would be easy to
  9   do.
 10        Q.     Why not?
 11        A.     Because they don't want everybody
 12   under the sun calling them.
 13        Q.     Apart from believing that they don't
 14   want everybody under the sun calling them, is
 15   there any other basis for you contending that I
 16   could not get ███████████████████ contact
 17   information, e-mail address or phone number for
 18   the individuals that Mr. Iacovacci reached out
 19   to on my own using the internet and some
 20   resourceful phone calling to their main
 21   numbers?
 22        A.     I think it's substantially more
 23   difficult than just commonly try to find
 24   somebody using those techniques for a reason as
 25   I mentioned.
```

Page 671

1                     Monticciolo
2        Q.    Do you know one way or another
3   whether I would be able to get those contact
4   information details, whether it's a phone
5   number, an e-mail address or both for one or
6   more of the individuals Mr. Iacovacci reached
7   out to on my own without ever having worked for
8   Brevet or accessing their investor list; yes or
9   no?
10       A.    I didn't think I needed to prepare
11  for this to go and do web searches to find that
12  information.  I haven't done it myself.
13       Q.    How about the -- let's go with the
14  methods you used to create competitive barriers
15  in your investment strategy.  Can you identify
16  for me where those methods are located or
17  housed in the Brevet information systems?
18       A.    That's extensive.  That's the
19  essence of the firm.  Yes, they are in our
20  policies and procedures and our loan documents,
21  in our fund structures of the items I
22  enumerated a while ago.  What we do is unique.
23  So there is not -- there are not competitors
24  doing what we do.  It is all of them trade
25  secrets that I mentioned.

Page 672

1                   Monticciolo

2           MR. SOLOMON:  We need to go off the

3      record just for a second, Jason.  The

4      witness can stay.

5           MR. CYRULNIK:  I'm sorry, what was

6      that?

7           MR. SOLOMON:  I need to go off

8      record for a second.  The witness can stay

9      right there.

10          THE VIDEOGRAPHER:  The time is

11     3:01 p.m.  We are going off the record.

12          (Brief recess taken.)

13          THE VIDEOGRAPHER:  The time is

14     3:06 p.m.  We are back on the record.

15          MR. CYRULNIK:  Before the break you

16     were telling us about, you were

17     answering -- Mr. Solomon had to get up in

18     the middle.  I think he is back.  I know

19     he wants to say something on the record

20     with respect to ending this deposition in

21     our view prematurely.

22          We will do that if that's what he

23     wants to, but I would like to return to

24     the category of trade secrets you

25     identified if he will allow me to do so

```
                                           Page 673
 1                     Monticciolo
 2        and ask you how vacation policies
 3        constitute trade secrets in your view.
 4              MR. SOLOMON:  Mr. Cyrulnik, thank
 5        you.  Because I think improperly you asked
 6        the question when I told you that we were
 7        going to be closing the deposition and
 8        seeking some guidance from the court.  I'm
 9        going to let the witness answer the
10        question and then I would like to
11        reiterate that before the deposition
12        began, we counted the number of hours that
13        you had for 30(b)(6) witnesses and you
14        needed three hours left and that's all you
15        had.
16              We have gone now over an hour beyond
17        the three hours and we think that is all
18        the rules entitled you to.  So we are
19        going to finish this because you have
20        asked the question.  I'll let the witness
21        answer that question and then we are going
22        to be in our view shutting the deposition
23        down.  Go ahead.
24     BY MR. CYRULNIK:
25        Q.    Let's start with the answer to my
```

Page 674

1                    Monticciolo
2    question.  We can talk about the rest of that
3    in a minute.  Mr. Monticciolo?
4        A.    So you used the word vacation
5    policies.  I believe I said holidays.  And
6    holidays matter because we are what is called
7    an open-ended fund.  Open-ended fund has notice
8    periods.  Notice periods are how many days
9    before you have to send the notice before we
10   have to do things and how many days we have to
11   respond.
12            One of the unique things about
13   Brevet and any trade secret of Brevet is how do
14   we calculate those because they are not
15   calculated the way the industry norm is.  They
16   are calculated using a cumulative global set.
17            I don't want to give all our trade
18   secrets on it, but the net result is we get a
19   very big advantage and have historically for
20   the fact that we count holidays differently,
21   which gives you a simple synopsis.  If it is
22   something where someone has to tell us 90 days
23   in advance, there may only be 60 days that they
24   can actually do that, which is tremendously
25   valuable to the type of fund that we run and

```
 1                    Monticciolo
 2   how much time we have in a similar fashion to
 3   actually respond to that.
 4            These are material advantages of
 5   which we know no one else who takes the
 6   position that we do and have always taken it.
 7            MR. SOLOMON:  We feel that we are
 8        done.  You've gone beyond your time.  You
 9        don't have any time left and we believe
10        that this deposition and the 30(b)(6)
11        notice is now satisfied and the deposition
12        is concluded.
13            MR. CYRULNIK:  So obviously I'm --
14        first of all, I want to understand the
15        witness' last answer and follow up on that
16        but before I do, I will respond to
17        Mr. Solomon's statement on the record.
18            Obviously we believe that are in the
19        middle of a 30(b)(6) deposition.  We have
20        accommodated this witness and several
21        other witnesses left and right in terms of
22        their own schedules.  We weren't able to
23        complete the 30(b)(6) deposition testimony
24        October 7th with this witness and on a
25        prior October date I believe it was with a
```

Page 676

1             Monticciolo

2       different witness.  In fact, we have

3       allowed Brevet to designate different

4       witnesses to cover those topics for this

5       follow-up day of deposition.

6             Ms. da Silva Vint is supposed to be

7       going on certain topics instead of

8       Mr. Callahan for unidentified reasons, but

9       we accepted that.  Mr. Monticciolo is

10      supposed to be covering on some of the

11      ones he was designated on.  We believe we

12      have time to complete those depositions.

13            Mr. Solomon has again, I don't want

14      to characterize it in a way that he is

15      going to take offense to, but I believe he

16      is threatening to pull the witness in the

17      middle and I take it from his statement

18      that he is threatening not putting Ms. da

19      Silva Vint up for her topics, which is

20      remarkable as well.

21            We are prepared to continue to

22      complete these depositions today with the

23      designated witnesses that Brevet has

24      identified to cover the remaining topics

25      of the 30(b)(6) which we think are

Page 677

1                    Monticciolo
2      important.
3             We are also prepared to reach out to
4      the court to the extent Mr. Solomon wants
5      to stand on whatever contrary view he has
6      to seek the court's guidance rather than
7      to cut a deposition short by having the
8      witness walk out in the middle and having
9      the other witness who is scheduled to be
10     deposed who I believe is in the room with
11     Mr. Solomon not go on camera.
12            So I would invite Mr. Solomon to
13     either allow us to complete the
14     deposition, particularly given the amount
15     of leeway we have given this witness in
16     terms of the types of answers we have
17     gotten to some straightforward questions
18     and the fact that we have many hours
19     remaining under the rules.
20            We are at a minimum if he feels he
21     is not prepared to do that without
22     guidance from the court reach out jointly
23     with the court right now so that we can
24     get the court's guidance to complete these
25     depositions today.

```
                                          Page 678
 1                    Monticciolo
 2           MR. SOLOMON:  Thank you very much.
 3           MR. CYRULNIK:  We are not off the
 4      record.  We are not going off the record.
 5      If you want to walk out in the middle of
 6      the deposition.
 7           MR. SOLOMON:  Forgive me.  From my
 8      perspective we are off the record.  Thank
 9      you very much.
10           MR. CYRULNIK:  I don't know what
11      that means.
12      Q.    But Mr. Monticciolo --
13           MR. CYRULNIK:  Well, do you want to
14      reach out to the court with me then,
15      Mr. Solomon?
16           MR. SOLOMON:  I'm not able to do it
17      now.  It's not appropriate to do it now,
18      but we will certainly be willing to do
19      that.  Thank you.
20           MR. CYRULNIK:  Mr. Solomon, I'm able
21      to reach out to the court right now if
22      you're unable to do that now.
23           MR. SOLOMON:  Jason, I'm not able to
24      do it now nor do I think it's appropriate
25      to do it now.  You keep promising us that
```

Page 679

Monticciolo

1                    Monticciolo
2        you are going to send us cases.  You
3        haven't.
4              MR. CYRULNIK:  Mr. Solomon, no one
5        has promised to send you cases.  That is
6        not what happened at all.  I'm happy to
7        tell you what the case law says.  If you
8        didn't do the research ahead of time,
9        you're not prepared to explain to the
10       court why you're pulling a witness in the
11       middle of the deposition, that's your
12       problem.  But I'm prepared to call the
13       court if you insist on reaching out to the
14       court.
15             I'm prepared to continue these
16       depositions and finish them today and
17       there are at least several hours of
18       depositions that are scheduled, so I don't
19       know what conflict you have with reaching
20       out to the court now.
21             I will note for the record that
22       Mr. Solomon and Mr. Monticciolo have
23       turned off their cameras.  I believe on
24       camera they stood up and were starting to
25       walk out in the middle of the deposition.

Page 680

1                      Monticciolo

2           My best guess is that they've

3      completed that exercise and that they are

4      no longer here.  We think that's wholly

5      improper and we're intend to raise that

6      with the court and unfortunately there is

7      nothing more we can do.

8           We are not in the same room with the

9      witness.  Even if we were, there would be

10     very little we could do apart from

11     reaching out to the court, which we would

12     like to do.  And so we will have to do

13     that and complete this deposition whenever

14     the court orders the witness to show back

15     up and we will obviously ask for the

16     appropriate costs associated with having

17     to engage in that exercise.

18          I'll give Mr. Solomon and the

19     witness another minute to come back.  We

20     have given Mr. Solomon and the witness

21     time to return.  It's now 3:15 p.m. and

22     they still haven't returned.  So I don't

23     think we can reach out to the court ex

24     parte.

25          I think the proper thing to do would

Page 681

Monticciolo

1

2          be to reach out to the court at this point

3          after the deposition and we will obviously

4          provide the court with the appropriate

5          transcript and video if necessary of

6          Mr. Monticciolo leaving the deposition in

7          the middle of the 30(b)(6) questioning on

8          Topics 1 through 5.

9               I will also make a record because I

10         believe we were going to continue this

11         deposition transcript and recording with

12         the remainder of the topics being covered

13         by Ms. da Silva Vint.

14              I will separately confirm, but it

15         seems like she is being pulled from

16         today's deposition slate and not going to

17         sit down and appear to address those

18         topics which is quite unfortunate as well.

19              So I guess I'll let the court

20         reporter and the videographer off the hook

21         at this point.  Just to make clear, we are

22         sitting here roughly five minutes after

23         the witness walked off of the deposition.

24         No sign of either the witness or his

25         counsel.  No sign of the next witness who

```
                                        Page 682
 1                       Monticciolo
 2        is supposed to be deposed as well and a
 3        refusal by opposing counsel to reach out
 4        to the court together with us to get
 5        whatever guidance is needed to ensure that
 6        these depositions get completed today.
 7              And so let me just note for the
 8        record the topics that have not been
 9        completed, and then we will close it up I
10        suppose unless they show back up.
11              Just in terms of the topics, I want
12        to make sure this is clear.
13              Mr. Monticciolo was designated on
14        Topics 1 through 5 and 26 for today.  He
15        has covered 26, which was the first half
16        of the deposition.  We transitioned to 1
17        through 5 and we are in the middle of
18        those.  He has listed roughly 32
19        categories of purported trade secrets and
20        then purported to add more today to that
21        list.
22              We went through I believe one and a
23        half of them and then he got up in the
24        middle of the deposition.  So we have 1
25        through 5 remaining trade secrets
```

Page 683

Monticciolo

1
2      categories that need to be covered for Ms.
3      da Silva Vint.  Again, just for the record
4      and I'll see whether we need to make this
5      record on another transcript, but Ms. da
6      Silva Vint was designated on Topics 6
7      through 8, 10 through 14, 27 through 31
8      and 36 through 38 and we haven't gotten to
9      those today.  So those are the open topics
10     from the 30(b)(6) deposition notice that
11     is Exhibit 3 to this deposition.  I
12     believe it's Exhibit 3.  And I'm sorry,
13     it's Exhibit 10 to this deposition.  And
14     we will deal with that at the appropriate
15     time with the court.
16          Thanks to the court reporter and to
17     the videographer for their time and if you
18     can stay on after we go off the record,
19     let me know whether you think there is
20     another court reporter or videographer to
21     take the nonappearance of Ms. da Silva
22     Vint that will be appreciated.
23          THE VIDEOGRAPHER:  The time is
24     3:18 p.m. going off the record.
25          (Time noted:  3:18 p.m.)

Page 684

1

2          A C K N O W L E D G M E N T

3

4   STATE OF              :

                          :ss

5   COUNTY OF             :

6

7           I, DOUGLAS MONTICCIOLO, hereby certify

8   that I have read the transcript of my testimony

9   taken under oath in my deposition on the 1st

10  day of November, 2021; that the transcript is a

11  true, complete record of my testimony and that

12  the answers on the record as given by me are

13  true and correct.

14

15                 ------------------------

                     DOUGLAS MONTICCIOLO

16

17  Signed and subscribed to before

    me this                    day of

18                      , 2021.

19

20  -------------------------------------

    Notary Public of the State of

21

22

23

24

25

Page 685

1

2

3                    C E R T I F I C A T E

4            I, FRAN INSLEY, hereby certify that the

5    Deposition of DOUGLAS MONTICCIOLO was held

6    before me on the 1st day of November, 2021;

7    that said witness was duly sworn before the

8    commencement of testimony; that the testimony

9    was taken stenographically by myself and then

10   transcribed by myself; that the party was

11   represented by counsel as appears herein;

12           That the within transcript is a true

13   record of the Deposition of said witness;

14           That I am not connected by blood or

15   marriage with any of the parties; that I am not

16   interested directly or indirectly in the

17   outcome of this matter; that I am not in the

18   employ of any of the counsel.

19           IN WITNESS WHEREOF, I have hereunto set

20   my hand this 10th day of November, 2021.

21

22                              FRAN INSLEY

23

24

25

Page 686

1

2                    VERITEXT LEGAL SOLUTIONS

3    NAME OF CASE: IACOVACCI v. BREVET

     DATE OF DEPOSITION: November 1, 2021

4    NAME OF DEPONENT:  DOUGLAS MONTICCIOLO

5    PAGE    LINE(S)       CHANGE              REASON

6    ____|_____|_____|_____

7    ____|_____|_____|_____

8    ____|_____|_____|_____

9    ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18   ____|_____|_____|_____

19   ____|_____|_____|_____

20                     _____

21   SUBSCRIBED AND SWORN TO BEFORE ME

     THIS___DAY OF _____, 20__.

22

23

24   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

25

**0**

**025010**   622:2
**08048**   452:7

**1**

**1**   452:12 464:13
  595:21 606:20
  655:9 681:8
  682:14,16,24
  686:3
**1/17**   629:2
**1/2018**   454:9
**10**   454:16 464:25
  466:9 545:19
  547:2,7 548:6
  549:3 586:22,23
  587:16 588:21,25
  596:6,7,8,13
  598:13,19 599:14
  614:20 626:24
  683:7,13
**100**   472:9,11
**10006**   453:5
**10022**   453:12
**10:04**   452:12
  456:3
**10th**   685:20
**11**   454:8,13 544:15
  544:16,20,25
  545:21 548:7
  610:6,7 614:20
  615:10
**11/1/2021**   464:23
  465:22
**11:33**   538:4
**11:48**   538:8
**12**   454:9 544:15,17
  544:20 545:21
  608:21 614:20
  629:9,12

**12112**   685:22
**13**   454:10 595:13
  595:15,21 614:20
  619:13 623:13
  624:21 625:8,18
  629:13 640:6
**14**   454:11 591:21
  592:6 598:11
  599:20 629:23
  630:3,9 683:7
**14th**   588:4 599:2
  600:22
**15**   454:12 545:21
  586:22 602:21
  625:21 630:8,11
  631:8,9,18 632:2
  632:12 637:17
**158735/2016**
  611:12
**16**   454:13 545:21
  602:21 626:13
  628:2 642:14,16
**168**   472:14,16
**17**   623:24
**17th**   608:17
**18**   545:22,23,24
**19**   546:2
**1:05**   602:2
**1:18**   452:7
**1:37**   602:5
**1:45**   609:9
**1:46**   609:12
**1st**   456:4 466:23
  684:9 685:6

**2**

**20**   471:22,23 546:2
  686:21
**2000**   549:13
**2007**   623:19
**2014**   656:14

**2015**   640:18
  656:13,14
**2015/16**   660:6
**2016**   478:14 479:3
  479:18 480:9,19
  481:4 484:11
  485:5 486:20
  487:14 489:18,23
  490:8 491:2,14
  492:3,21 493:11
  494:12 496:5
  505:2 507:21
  509:11,20 510:6
  513:6 517:4
  532:11 545:15
  546:9 547:14
  548:8,12,16,19
  549:4,10,17 550:9
  551:20 575:2,11
  580:25 581:20
  582:20 583:25
  588:5 591:24
  592:2,7,9 656:14
**2017**   624:9 625:3
**2018**   490:15,16
  544:17,18 545:2
  608:19 611:11
  623:12,24 624:5
  629:2
**2021**   452:12 456:4
  464:11 684:10,18
  685:6,20 686:3
**205010**   631:19
**21**   546:2
**22nd**   453:12
**23**   546:2,17 586:21
  611:22 625:8,16
  626:11 628:9
**24**   546:2,17 624:5
**25**   544:17 545:2
  588:10 611:11

  623:12 636:19
**26**   464:14 474:17
  474:21 570:2,4,7
  582:24 646:12,15
  648:4 682:14,15
**26a**   563:12
**27**   683:7
**28**   546:12 624:9
**29**   546:17 623:19
  625:2,21 626:14
  626:21,22 627:11
  627:12

**3**

**3**   454:17 590:7
  683:11,12
**30**   452:16 454:16
  457:5 459:19
  461:22 463:7
  464:10,14,17
  465:2,8,25 466:16
  466:25 471:25
  479:7 480:12
  482:9 483:3,21
  484:5 520:14
  523:17 543:6,14
  546:24 551:2
  555:2 559:19,20
  563:5 582:23
  588:10 591:10
  597:8 608:6
  610:23 612:23
  614:5,16 619:7
  626:18,20,20
  627:9,10,21 628:9
  632:6 633:20
  635:25 636:19
  637:20 641:5
  655:7 660:17
  664:10 668:6
  669:4 673:13
  675:10,19,23

676:25 681:7
683:10
**31**   628:10,20 683:7
**32**   646:9 682:18
**36**   683:8
**38**   683:8
**39**   669:3
**3:01**   672:11
**3:06**   672:14
**3:15**   680:21
**3:18**   683:24,25
**3rd**   453:5

**4**

**452**   457:4
**464**   454:4
**465**   454:16

**5**

**5**   464:13 596:14,20
606:20 629:9,22
655:9 681:8
682:14,17,25
**50**   472:4,6
**544**   454:8,9
**55**   453:5
**590**   454:17
**595**   454:10
**599**   453:12

**6**

**6**   452:16 454:16
457:5 459:19
461:22 463:7
464:10,14,17
465:2,8,25 466:16
466:25 471:25
479:7 480:12
482:9 483:3,21
484:5 520:14
523:17 543:6,14
551:2 555:2
559:19,20 563:5

582:23 591:10
597:8 608:6
609:22,23 610:12
610:23 612:23
614:5,16 619:7
624:6 632:6
633:20 635:25
637:20 641:5
655:7 660:17
664:10 668:6
669:4 673:13
675:10,19,23
676:25 681:7
683:6,10
**60**   463:13 674:23
**632**   454:12
**642**   454:13

**7**

**7**   464:11 466:15
596:9 624:15
640:18
**7.1b.**   596:9
**7th**   466:22 473:7
675:24

**8**

**8**   454:13 613:11,20
614:20 619:11
621:21 623:12
625:18 631:17
632:14 640:6,19
640:20,20 641:2
642:4,23 643:8,20
683:7

**9**

**9**   596:10 614:20
**9/25**   613:9
**9/25/18**   454:8
625:19 631:16
632:15 640:7,21

**9/25/2018**   609:22
609:23
**9/29/17**   625:16
626:11
**90**   674:22

**a**

**a.m.**   452:12 456:3
538:4,8
**abandon**   577:4
**abide**   477:6
**ability**   574:11
575:3,11 611:25
622:3 660:9
**able**   478:16
562:22 653:4
670:4 671:3
675:22 678:16,20
678:23
**absent**   573:14
**absolutely**   538:2
563:19 578:8
581:18
**abusive**   512:19
**accept**   572:20
575:11,17 576:14
576:19
**acceptance**   573:14
576:6
**accepted**   573:2
676:9
**accepting**   571:13
**access**   562:21
632:13 649:15,17
651:4 652:7,14,24
652:25 653:3,4
661:4,10
**accessed**   651:3
654:21
**accessing**   649:12
671:8

**accommodated**
675:20
**accompanied**
586:8
**account**   600:2
615:16
**accountability**
579:13
**accounting**   646:24
**accounts**   489:15
516:22 518:20
**accuracy**   495:21
**accurate**   486:24
495:17 496:22
504:9 510:13
600:25 656:18
**accusation**   518:16
**act**   588:2,13
**acted**   576:12,24
577:4 659:18
**acting**   459:14
585:18
**action**   456:14
573:22 616:18,20
616:23 621:3
**actions**   616:17
**activities**   499:2
531:23 602:16
**activity**   475:23
532:11
**actual**   477:18
528:2 562:20
654:7 668:13
**add**   589:18 645:24
646:9 682:20
**addition**   481:22
540:7 634:22
**additional**   466:21
552:5 630:7
647:25

additions 646:8
647:23
address 463:14,16
463:17 488:14
497:7 502:13,20
552:17,17 563:16
570:11 614:10
629:15 664:7
666:9,21 669:17
670:5,17 671:5
681:17
addresses 662:20
667:4
adequate 614:15
adina 453:14
adjectives 549:12
administer 455:16
administrator
649:4,22
advance 674:23
advantage 498:2
674:19
advantages 675:4
advice 478:19
485:20 559:6
561:17 566:22
567:6 568:4,5
advise 562:16
advisement 462:9
advisor 481:20
482:15
affidavit 454:8,9
490:12 544:17,18
545:2,12 608:2,15
608:19 610:10
623:21
affidavits 490:11
491:16,20 500:12
516:15 532:25
544:13,16,19
545:4,7 548:22

605:11 607:12,17
654:25
affiliations 456:18
affirmation 629:2
aforegoing 627:3
afternoon 602:4
ago 482:7 531:7
537:23 654:19
671:22
agree 480:23
481:2 555:8
565:25 663:25
agreed 455:4,9,14
476:2 477:10
523:13
agreeing 571:13
agreement 454:10
570:11 581:21
596:3,18,22
601:10 630:24
agreements
547:10 589:20
602:18,19 605:10
646:19,20
ahead 479:9
484:18 485:14
497:13 513:25
515:21 555:25
607:9 611:23
630:15 632:25
638:19 673:23
679:8
al 452:8
allegations 562:9
alleged 491:11
560:2,11,21 601:9
allow 511:24
535:3 603:16
672:25 677:13
allowed 488:17
515:11,13 676:3

alluded 613:20
alternative 646:22
amenable 599:24
amount 470:16
471:6,20 606:12
677:14
ampersand 649:6
analogy 506:13
analysis 568:7
569:11
analyzing 486:16
announced 484:14
answer 472:3,7,8
472:13,18,22
473:14 477:15
480:13 484:25
485:11,13 489:5,6
492:16 498:17,17
507:6 511:25
512:24 515:23
527:22 534:22,24
535:15 538:19
548:5 561:5
569:23 570:24
571:5 572:25
574:23 580:4,13
580:21 582:21
583:7 584:8 589:9
592:23 610:12
614:7 617:7
620:22,23,24
625:21 636:2
637:5,22 639:3,4
641:24 642:20
650:16 655:16
657:16 666:17
673:9,21,25
675:15
answered 471:13
471:15,16 499:21
507:25 508:2,3,17

509:24 520:7
522:18 524:16
528:11 530:21
531:21 541:2
570:22 574:13
575:8 581:17
582:12,13 584:2
584:18,19 585:3,4
586:3 594:21
595:6 600:6
601:14 620:7,11
620:18,21 641:18
652:5 666:11,12
666:14,16
answering 536:19
672:17
answers 512:6
548:21 554:20
555:6 558:14
608:6 635:14
667:23,24 668:11
677:16 684:12
anticipate 587:8
anticipatory
666:17
anybody 463:15
468:2 475:10
492:11 500:17
581:3 618:16
636:8
anyway 485:17
574:20 585:25
apart 460:2
462:14 463:20,22
466:14 468:14
470:7 561:16
670:13 680:10
apologies 666:15
apparently 612:17
appear 488:10
614:20 622:11

636:24 681:17
**appearance**
456:17,20
**appeared** 488:6,8
496:14 500:23
501:6
**appears** 621:15
643:22 685:11
**applicable** 521:3
**application** 562:17
**appreciate** 478:18
478:21 487:24
488:23 493:21
498:20 499:9
508:17 539:7
558:12 563:17
570:12 580:7
593:16 604:13
636:6 657:3
**appreciated**
683:22
**approach** 501:18
518:21 520:22
521:7
**appropriate**
579:17,18,18,21
587:24 597:24
601:17 636:17
678:17,24 680:16
681:4 683:14
**appropriated**
645:17,22
**appropriately**
522:13
**approval** 488:20
497:16 525:9,15
526:2,16 527:6
544:4 600:5
**approve** 544:8
570:17 572:11
575:3

**approved** 574:7
**approximately**
626:24
**april** 608:23
**arrange** 556:22,24
**article** 596:9
**aside** 489:22 568:5
**asked** 460:7
462:16,21 466:6
471:17 482:5,10
485:10 489:4
499:21 506:4
507:25 508:2,16
508:23 509:24
513:2 518:4
519:19 520:7
522:17 526:5
528:11 530:21
535:11 537:14
548:17 549:8
550:17 551:24
563:4 574:13
575:8 579:14
582:12 584:2,18
585:3 587:15
591:14 595:6
601:23 631:19,21
633:17 636:15
643:21 666:11,16
668:13 669:4
673:5,20
**asking** 474:25
478:23 481:3
485:24 489:3
491:19 509:17
511:15 512:14
514:20 515:18
520:17 526:22
532:16 533:4,16
534:8 539:17,19
540:5 554:21

558:14 559:15
563:20 564:16
574:17,19 583:22
584:7 587:10
589:19 593:17
594:19 599:6,7,8
603:14 606:9
616:2,22 618:20
620:17 636:18
637:8 638:4
643:16 664:24,25
667:19 669:3
**assert** 461:9
**assertion** 578:23
**assess** 504:12
532:2
**assessed** 504:10
**assessing** 486:16
**assessment** 497:20
504:13 562:7
**asset** 646:20,21
**assist** 482:2 553:7
**associated** 463:21
604:16 680:16
**association** 456:12
**assume** 546:15
600:24
**assumes** 568:11
**assuming** 601:12
**assumption**
518:16
**assure** 508:16
569:8
**attached** 621:2
625:25
**attaching** 642:9
**attachments** 627:6
**attempt** 537:7
602:9,13 616:18
616:20 621:4
635:18

**attempted** 468:20
468:23 603:19
604:3 605:5
606:15,22 607:4
607:10,23 608:8
609:17,18 610:25
615:4 616:3,14
617:6,11 619:15
619:20 621:8
622:25 625:6,12
628:6 630:2 631:4
631:23 632:17
633:8,15 634:2
635:4,21 636:10
636:21 638:25
639:11 640:9,24
641:16 642:6,24
643:9,18
**attempting** 605:23
613:18 620:5,16
621:24 627:17
628:14 629:18
635:6 637:14
638:9 639:24,25
643:11,23 644:3
644:16 645:8
**attempts** 639:20
**attend** 458:13
462:6 463:3,5
468:2
**attended** 462:14
**attending** 459:11
459:21,25 460:6
460:11 461:7,12
462:23 463:15,23
**attention** 536:3
**attorney** 456:21
542:23
**attorneys** 453:4,11
455:5 467:23
468:15

**attract** 658:10
**august** 476:7
  584:12
**australia** 634:20
**authorities** 579:16
**authorization**
  605:17
**authorized** 455:16
**available** 644:14
**avenue** 453:12
**aware** 462:25
  474:13 478:12,15
  478:25 479:3,18
  479:23 480:5,18
  481:3,6 483:5
  543:25 588:23
  589:24 602:15
  630:18,20
**awareness** 476:14

**b**

**b** 452:16 454:6,16
  457:5 459:19
  461:22 463:7
  464:10,14,17
  465:2,8,25 466:16
  466:25 471:25
  479:7 480:12
  482:9 483:3,21
  484:5 520:14
  523:17 543:6,14
  551:2 555:2
  559:19,20 563:5
  563:12 582:23
  591:10 597:8
  608:6 610:23
  612:23 614:5,16
  619:7 632:6
  633:20 635:25
  637:20 641:5
  644:8 655:7
  660:17 664:10

668:6 669:4
673:13 675:10,19
675:23 676:25
681:7 683:10
**baby** 526:9
**back** 470:14
  484:24 491:23
  523:15 531:24
  535:21 537:15
  538:8 547:2 548:3
  548:12 549:7,7
  550:4 565:22,23
  576:9 577:5
  580:19 590:2
  591:25 592:8
  602:6,8 606:6
  609:12,14 612:8
  622:18 641:21
  647:11 650:4
  655:20 656:6,17
  659:25 660:14
  661:22 662:2
  666:2 672:14,18
  680:14,19 682:10
**backbone** 633:3
  661:5
**backbones** 633:11
**background**
  473:18
**bad** 506:20 513:9
**barriers** 671:14
**base** 470:4,6
**based** 485:3
  515:23 525:9
  531:14 541:13
  560:24 561:11
  562:12 574:7
  663:19
**basic** 503:5 508:8
  634:13

**basis** 513:13
  538:24 539:13
  542:8,13 567:19
  578:23 621:13
  641:6 670:15
**bates** 591:19,21
  613:24 614:2
  622:2 625:10
  627:8 628:4,12
  629:24 631:18,19
  641:9 642:12,18
**bathroom** 601:24
**began** 673:12
**beginning** 456:21
  549:18 584:13
  594:11 619:11
  626:25 628:20
**behalf** 456:23
  457:21 460:23,25
  461:15 473:3
  523:22 524:5,8
  525:24 526:8,24
  527:25 530:8,15
  530:19 531:2,8,13
  531:19 533:21
  538:14,17,22
  539:2,15,23,25
  540:6,8,16,17,24
  541:18 543:19
  573:3 579:15
  582:23 585:9
  599:23 600:15
**belief** 621:13
  659:16,17
**believe** 476:15,20
  477:21 480:3
  482:11,12 483:6
  486:5 487:15
  489:25 490:20
  491:15 498:15,16
  499:25 503:25

504:6 518:12
519:21 521:2
527:8,12 529:3,12
530:5 531:10
538:23 549:19
550:19 553:11,17
554:9 567:15
578:17 581:7,8,9
581:10 582:5,13
582:22 585:19,20
586:11 594:2
598:4 599:25
604:5 607:25
608:14,16,24
609:22 614:22
621:12 649:19
650:12 664:4
674:5 675:9,18,25
676:11,15 677:10
679:23 681:10
682:22 683:12
**believed** 577:25
  599:23
**believes** 464:4
**believing** 670:13
**bell** 666:4
**benefit** 457:19
**best** 467:9,25
  469:15 473:19,19
  495:6 500:5
  501:17 502:6
  504:2,6 508:4
  509:16 514:8
  519:21 523:24
  524:9 535:2
  551:14,15,18
  553:4 571:16
  574:9 578:2
  579:10 588:24
  603:10 630:18
  660:16 680:2

**better** 477:18
  498:9,10 504:13
  508:21 646:14
**beyond** 479:7
  480:11 482:9
  483:2,21 484:17
  498:4 585:21,24
  632:5 633:19
  634:7 635:24
  637:19 641:4,19
  669:24 673:16
  675:8
**big** 462:20 674:19
**binding** 602:23
  605:16
**bit** 476:14,22
  488:25 501:5
**bizarre** 518:6
**black** 515:22
**blatantly** 508:8
**blood** 685:14
**board** 646:23,23
**bofi** 644:7
**bone** 493:24
**books** 649:19
**borrowers** 635:11
**bother** 594:5
**bottom** 625:22
  626:14,25 627:25
  628:19
**breach** 492:14,20
  493:8 596:15,21
  596:23,25 597:4
  597:13,14,15
  598:10,13,17,18
  599:14,16,17
**breached** 547:9
**breaches** 494:4
  496:6 564:24
  565:3 599:22
  600:9 601:10

**break** 458:17
  462:9 463:16
  477:14 494:25
  499:22 526:9
  537:25 538:9
  549:23 550:3
  595:23,24 601:23
  672:15
**brevet** 452:8
  453:20 456:7
  458:7,10 459:25
  463:22 473:3
  474:19 475:7,8,9
  488:9,11,13,18,22
  489:12,14,17,24
  490:25 491:5,7,11
  491:13 492:12,19
  493:6,7,13,14
  494:5,6 495:12,14
  499:17,18 501:3
  501:14 504:18
  505:18 506:9,14
  506:16 507:24
  508:12 509:12,21
  513:8 516:3
  520:19,20 522:22
  522:24 523:5,7,19
  524:14 525:7,9,11
  525:16,21,22
  526:17 527:5,15
  528:6 530:14,16
  533:12 543:7
  544:4 547:21
  552:14,16,23,25
  553:6 554:14
  558:3,17 559:13
  560:20 561:13
  562:23 564:4,8,19
  565:4,15 566:10
  566:12 569:11
  570:20 571:15

572:4 575:5,13
  579:20 582:24
  583:13 591:20,24
  592:7,16,17 593:2
  593:3,19,21,22
  594:3,6,7,25 595:2
  595:9 599:9
  601:18 602:20
  603:5 605:14,16
  606:7 611:10
  615:18,19,21
  616:11,13 632:21
  632:21 633:3,4,12
  634:11 635:19
  636:5,14 641:11
  642:10 643:12,25
  645:16,21 647:4
  649:11 651:22
  653:21,25 654:5,9
  654:10,21 655:8
  656:9 657:23
  659:4,13 660:24
  662:7,24 663:9,25
  664:3,13 665:5
  671:8,17 674:13
  674:13 676:3,23
  686:3
**brevet's** 486:10
  496:7 507:2
  561:18 564:12
  568:8,17 569:12
  591:21 598:6
  602:10,13 603:20
  604:4 605:5
  606:19,23 607:5
  607:24 608:9
  609:19 610:22
  611:2 613:18
  615:5 616:15
  617:4,7 619:15,21
  621:9,25 622:25

625:7,12 627:4,13
  628:7,15 629:19
  629:22 631:4,23
  632:18 633:9
  635:22 636:21
  637:12 638:10,25
  639:12 640:10,24
  641:17 642:7,25
  643:5,10,19
  644:17 645:8
  648:16 654:17
  657:19 658:6
  663:16
**brevet013260**
  454:11
**brevet205010**
  454:12
**brick** 618:4
**brief** 470:4,6
  471:2 538:6
  609:10 672:12
**bring** 493:18
**bringing** 552:9
  602:20
**broad** 487:8
**broadway** 453:5
**brought** 550:16
**buck** 572:2
**bullet** 613:16,20
  614:19 615:2
  616:25 619:9,10
  619:11,13 620:4
  620:14 621:7,21
  631:16 632:14
  633:16 637:6
  638:5 640:17,22
  640:25 641:14
  642:3,22 643:7,20
**bullets** 640:8
**bunch** 627:14
  653:3

**business** 502:3
503:6,7 506:24
508:9 588:6,7
601:19 602:9,12
603:18 604:2
605:3,22 606:2,6
606:14,21 607:3
607:22 608:7
609:17 610:24
613:13,17 615:3
615:14 616:2,14
616:19,21,23,24
617:5,10 618:4,7
618:10 619:14,19
620:4,15 621:4,8
621:23 622:24
625:5,11 627:16
628:5,13 629:17
629:25 631:3,22
632:16 633:3,7,14
633:21 634:3
635:12,18,21
636:9,20,25
637:15 638:10,24
639:10,18,21,24
639:25 640:8,23
641:15 642:5,23
643:8,12,17,22
644:2,12,15 645:5
645:7 647:7
656:21 657:10,17
658:5,9,14 668:14
**businesses** 644:11
**busy** 470:21 471:4

**c**

**c** 453:2 457:14,14
604:25 649:6
684:2 685:3,3
**calculate** 674:14
**calculated** 674:15
674:16

**call** 523:9 527:18
527:18 604:20
659:25 660:15,19
679:12
**callahan** 477:12
478:4,13 479:4,18
480:5,19 481:9,15
481:21 482:4
484:9 486:12,18
486:19 487:9
490:3 494:2
495:16 496:5
501:10,18 505:2
510:19 516:15,16
517:3,6 520:10
522:4,19 523:11
524:17,21,25
525:4,14,20,24
526:13 528:4
529:17,19 530:6
530:25 531:6
532:15 534:15,17
538:13,25 539:11
539:14,17,19
540:14,15,23
541:18 542:11
543:19 544:16
545:2,14 546:9
547:14 548:8,19
549:9 550:12,21
551:19 552:3
553:17 554:22
562:13 570:18
571:19 573:3,20
574:6 575:4
578:17,18,21
579:6 580:24
581:12,23 582:8
585:7,13 586:5,6
590:13 600:14,18
605:11 608:16

629:3 676:8
**callahan's** 485:4
495:11 526:14,22
527:3 532:24
544:13 571:13
575:12 608:2
**called** 523:23
604:9 649:6 674:6
**calling** 670:12,14
670:20
**calls** 468:5,7,11,14
469:9,10
**camera** 677:11
679:24
**cameras** 679:23
**candidly** 587:12
**capabilities**
504:14
**capacity** 459:15
462:22 463:7
475:25 486:23
533:8
**capital** 453:20
604:25 644:8,8
**capsulating** 631:8
**card** 656:21
657:10,18,25
658:15
**cards** 615:10,10
658:5
**care** 572:16
**career** 494:23
495:2 656:10
**careful** 521:6
529:13 540:9
**carefully** 588:13
630:5 631:7
**case** 452:6 496:25
519:6 578:16
644:8,11 679:7
686:3

**cases** 679:2,5
**catalina** 604:9,23
607:2
**categories** 648:2,2
648:3,4,5 669:3
682:19 683:2
**category** 672:24
**caught** 461:14
516:21
**causal** 660:21
**cause** 596:20
**caused** 507:21
**causes** 564:21,24
**center** 618:2
**ceo** 475:25 525:8
525:11,21 528:6
544:4 572:3
579:20 598:21
**certain** 508:18
650:11 662:23
664:11 665:3,17
676:7
**certainly** 460:24
508:15 603:6
678:18
**certainty** 614:25
**certification** 455:7
**certify** 684:7
685:4
**cetera** 530:23
561:20 614:22
**challenging**
615:24
**chance** 532:18
662:10,15
**change** 473:5
686:5
**characterization**
527:9 653:9
**characterize** 493:6
512:12 513:22

537:8 566:15
578:5 676:14
**characterized**
500:10
**charge** 553:12
**charged** 561:22
**check** 485:21,23
485:25 490:14
493:17 497:9
509:4 510:16
516:18,24 529:24
597:22 656:17
659:25
**checked** 504:8
521:15
**checking** 532:19
**chose** 544:8 621:5
637:23
**chris** 665:21,22
666:5
**circuit** 614:17
**circumstance**
666:13
**circumstanced**
663:18
**circumstances**
507:8
**cite** 545:17
**clarification**
540:11 546:11
625:24 627:6
**clarified** 656:4
**clarify** 535:19
558:13 627:21
**clarifying** 567:17
627:18
**clarity** 504:22,24
565:8 570:12
**clear** 457:3 465:13
477:3 487:7
488:16 497:15

500:12 501:3
503:6 505:19
508:4 516:14
532:23 536:9
538:12 541:11,17
541:23,24 549:19
549:20 563:18,20
569:7,8 570:3
584:20,23 585:10
595:8 610:21
611:9 617:14
637:10 641:24
646:16 647:23
657:12 664:19
667:17 681:21
682:12
**clearly** 534:9
541:7 563:11,15
615:6 616:16
647:14
**client** 542:23
615:18,19 629:22
642:11 667:19
**close** 507:2 529:5
529:12 682:9
**closing** 673:7
**coach** 512:9
**coaching** 512:17
513:15 515:8
**coca** 506:10
**coincidence**
494:18 581:19
**coke** 505:7,8,11,12
505:14 506:8
**cola** 506:10
**colin** 453:14 457:9
**colleague** 491:22
**colloquy** 515:8
**come** 521:19 576:9
577:5 588:7 606:7
647:8 680:19

**comes** 537:12
622:18
**comfort** 520:2,21
**comfortable**
471:20 476:25
502:18 526:6
**coming** 527:20
531:24 595:12
**commencement**
685:8
**comment** 560:15
568:12
**comments** 563:9
**commission**
686:24
**committees**
527:10
**common** 508:8
**commonly** 670:23
**communicate**
542:22
**communicated**
570:16 573:20
**communication**
557:24 664:20
**communications**
542:10,12
**companies** 498:2
634:23
**company** 458:2
459:11 460:11,15
460:16,19,23,25
461:3,16,16,19
462:4,4,14 463:3,5
464:15 466:24
483:14 484:15
486:17,17 489:25
492:21 493:9
497:14 499:3
501:23 507:5
520:15,19 521:7

528:7 579:6,23
581:4,14 586:21
596:3,24 597:12
598:9,21 604:9
632:23 634:20
**company's** 563:23
567:23
**competent** 474:14
535:5
**competitive**
671:14
**competitors**
671:23
**complete** 500:24
604:14 606:18
623:19 650:13
675:23 676:12,22
677:13,24 680:13
684:11
**completed** 680:3
682:6,9
**completely** 516:11
619:5
**complexity** 504:21
**compliance**
476:19 479:13
481:7,10,16,17,22
482:3,5 499:12
519:2 520:11
522:4,20 523:12
524:18,22 530:23
531:3,9 533:10
534:3 537:19
538:22 539:2,16
539:16 540:17
541:14 543:20
553:18 554:22
586:14 601:15
649:13,20 651:19
652:9 653:18

component 561:15
compositions
  646:23
computer 510:13
  510:25 519:12,14
concern 487:19
  583:9,10,14 589:6
  661:3 666:3,6
concerned 582:16
  587:11
concerning 487:23
  487:25 488:9
  500:14 549:11,15
concerns 582:14
  583:3,20,23
  584:13 585:16
  587:13,25
concise 489:2
conclude 667:16
concluded 593:19
  675:12
conclusion 521:19
  557:6 592:13
  595:12
conclusions 497:2
  582:14 592:15
conclusive 500:13
conduct 550:21
  553:13 557:4
  594:2,12
conducted 550:12
  559:24 560:9
conducting 478:13
  479:4
conference 468:19
  468:21
conferences
  468:24 470:8
confident 504:8
confidential 488:7
  489:9,24 492:10

493:7,14 494:5
495:12 496:7
510:8 516:4
547:21 552:15,24
559:13 560:2,11
560:22 562:10
583:13 592:16
593:2,21 594:7,25
635:10 642:25
648:14 657:13,15
658:2 669:16,16
669:17
confidently 660:5
confirm 495:9
  498:11,19 501:20
  501:25 504:15,20
  508:11 510:3,5,6,9
  514:4,5,7,13,21,25
  518:8 519:18
  532:12,20 545:3
  556:21 562:12
  565:7 591:25
  592:8 618:9 664:8
  664:9 681:14
confirmation
  510:2 521:9
confirmed 495:5
  496:15 500:16
  510:12 514:3
  521:17 591:24
  592:7,25
confirming 577:25
conflated 659:9
conflict 679:19
conform 642:20
confront 520:5
confused 461:6
  527:10
conjecture 573:6
  573:11 584:4
  598:20 599:4,6

634:8 635:9,13
637:21 642:12
644:22 651:20
conjecturing
  618:6 635:16
  644:21
conjunction 541:3
  541:13 543:20
connected 685:14
connection 541:19
  559:2,7,12 562:8
  582:24
consequences
  669:12
consider 557:2
considerations
  600:3
considering
  582:18,18 584:15
consistent 464:5
  570:4
constitute 582:9
  673:3
constituted 566:9
constitutes 666:10
  666:21
constituting
  566:16
consult 507:16
consumer 644:12
contact 585:15,19
  650:7,10,14,19
  657:10,18 658:5
  658:15 659:6,14
  660:22 661:25
  662:7,11,16 663:8
  664:3,5,6 665:5,18
  666:4 667:3
  669:19 670:16
  671:3

contacted 667:3
contacting 658:8
contacts 662:3
  664:16
contained 491:6
  619:23
containing 491:11
  499:17 516:3
  658:15
contend 605:4,20
  605:21,22 607:23
  621:23
contending 605:25
  616:13 617:10
  670:15
contends 645:16
  645:21
contention 627:11
  628:3 659:3
context 530:10,11
  482:25 486:2,2
  641:5 676:21
  679:15 681:10
continued 452:15
  476:4 552:4
continues 596:13
continuing 633:18
  638:12
contrary 462:10
  677:5
contributed
  588:12 593:9
control 517:18,22
  603:5
conversation
  541:11 665:25
  667:10
conversations
  660:10

convince 636:8
654:3
copy 649:20
651:18 654:24
corporate 457:20
458:3,12,20
459:20,22 460:5
461:4 473:2
475:11,12,14
476:21 486:23
491:4 514:10
523:25 532:16
533:8 543:6,14
568:18 579:7,15
580:3 597:8 598:2
598:7 599:9
606:19 610:22
615:25 616:11,25
617:4 635:14
637:12 643:6
655:8
corporation 459:3
460:11
correct 462:17,19
467:2,3 468:11,12
483:13 487:15
500:2 518:15
521:15 530:5
531:11 543:18
547:16 548:10
558:11 560:13
562:24 580:21
585:12 587:18
592:2,9 604:19
605:19 629:4
631:12 649:10
651:9 652:17
669:25 684:13
corrected 511:7
512:5 579:5

correctly 530:25
531:6 659:8
correspondence
479:14,25 480:14
costs 680:16
counsel 456:16
457:25 459:17
460:16 461:11
463:3,22 466:18
466:24 467:5,6,13
467:16 474:4,7
476:3,18 518:25
520:10 521:18
522:3,20 523:12
524:18,22 530:22
531:3,8 533:3,10
534:3 535:5
537:19 541:14,16
541:19,25 542:2
542:14 543:8,16
549:23 550:2
552:10 553:7
559:6 561:2,12
562:16 570:10
590:21,25 591:5,7
601:15 609:2
626:2 647:18
681:25 682:3
685:11,18
counseling 542:3
count 612:23
656:22 674:20
counted 646:13
673:12
counterparties
644:18
counterparty
644:4,5
counting 668:17
county 684:5

couple 477:15
528:25 623:4
660:18
course 470:13
471:24 472:11,16
476:23 495:2
497:16 507:10
603:15 612:22
668:7
courses 507:12
court 452:2
455:18 456:11
457:12 458:23
470:22 514:18
515:7 536:24
542:19 547:25
556:7 565:21
578:19 580:11,14
611:13,14,15,16
611:20 613:2
622:18 641:22
665:13 673:8
677:4,22,23
678:14,21 679:10
679:13,14,20
680:6,11,14,23
681:2,4,19 682:4
683:15,16,20
court's 618:12
677:6,24
courtesies 587:5
cover 603:8,15,16
619:2 676:4,24
covered 555:2,8
555:10 681:12
682:15 683:2
covering 676:10
create 671:14
creative 517:23
criminal 499:2
503:24 504:4

critical 488:7
495:2 634:11
653:24
criticized 567:9
cross 515:19
535:10 609:3
614:8 619:3
636:23
culminated 531:23
culmination
531:22
cumulative 623:21
674:16
cumulatively
470:11 471:9
cure 597:5,14
currently 637:16
customer 633:22
cut 497:12 514:9
637:10 658:20
664:19 677:7
cv 452:7
cyrulnik 453:3,6
454:4 456:22,23
456:23 457:7,11
457:18 458:6,11
458:25 459:23
460:7,18 461:13
463:11 464:6
465:19 466:3,7,12
470:25 474:23
485:10,19 486:3
509:2,8 511:8
512:8,21 513:14
513:19 515:6,10
516:9 517:10,17
517:21,23 533:16
535:21 536:8,12
536:17,21 537:3
554:23 555:15,23
556:3 559:17

563:10 565:21
567:2,8 590:7
602:7 608:25
609:6,13 610:14
611:24 612:6,11
612:15 613:7
623:7,16 624:3,13
624:19,22 632:7
638:14 667:17
668:9,15 669:7
672:5,15 673:4,24
675:13 678:3,10
678:13,20 679:4

**d**

**d**  454:2 457:14
684:2
**da**  453:19 457:24
458:22 459:9,16
468:4,9,16 483:22
555:13,24 556:3
668:24 676:6,18
681:13 683:3,5,21
**damage**  506:17
**damages**  604:12
606:14 622:11
648:4,5,6 658:3,13
**data**  509:18
**date**  462:12
464:21 466:22,23
544:21 550:23
551:10,13,16,18
551:24,25 595:16
614:22 623:16
624:8 632:3
642:17 655:23
664:21 675:25
686:3
**dated**  608:16
609:21 611:10
629:2

**dates**  546:14
552:11 624:4
656:2,18
**dating**  470:14
**david**  453:20
458:9 459:9
**day**  459:18 469:22
493:24 529:10,10
665:15 676:5
684:10,17 685:6
685:20 686:21
**days**  528:21
596:23 597:5,14
598:13,19 599:15
674:8,10,22,23
**deal**  462:9 615:15
644:19 656:8
669:11 683:14
**dealing**  498:25
529:17 656:15
**death**  476:13
**debate**  506:7
622:15
**decide**  514:18
577:10 580:11
**decided**  587:18
**deciding**  558:19
**decision**  474:18
475:6 495:25
500:17 507:22
518:21 520:8
521:21,24 522:8
522:15 527:17
553:6 558:5
560:23 561:3,7,9
564:12 566:19
567:24 568:8,20
569:12 570:17
573:22 584:21
593:9 600:4
601:13

**decisions**  475:15
475:19 477:16
492:6,25 588:7
622:19
**deck**  615:10
**declaratory**
623:23
**deem**  465:7
**defendant**  452:16
**defendant's**
609:20
**defendants**  452:9
453:11 457:2,22
613:12,21 621:22
627:3 628:20
641:2 642:5
**defense's**  608:23
**deficient**  619:5
**definitely**  489:20
648:6
**definition**  607:8
636:3 639:24,25
**definitive**  649:21
**definitively**
501:20 502:7
**delay**  507:21
**delegated**  657:4
**denial**  526:2,16
527:6 544:5 576:7
576:7,20,20
**denied**  572:23
576:3 578:3
**denoted**  616:17
647:14
**deny**  574:8,11,15
575:3,11,21
576:15,17,22,22
576:24 577:3,7,8
577:11,19,19
**department**
520:11 553:18

**departments**
526:25 531:13,19
532:5,7,10 533:9
534:2 535:13,14
537:18 539:8
540:24 572:12
600:16
**departure**  492:7
**depends**  657:2
**deponent**  462:15
686:4
**deposed**  459:4,14
460:12 463:19,21
677:10 682:2
**deposing**  466:4
**deposition**  452:15
455:15 456:5
457:6,21 459:12
459:21 460:6,12
460:21,22 461:8
461:12,22 462:14
463:4,5,24 464:9
464:10,19 465:2,7
465:8,21 466:10
466:14,16 467:2,6
470:13 472:2,12
472:17 473:7,11
473:25 474:10
478:22 484:5
488:25 511:18,19
512:10,17 514:17
515:11 517:14
522:7 526:11
529:25 536:2,23
540:4 549:24
550:3 551:3 554:8
555:19 556:20
580:10 590:19
591:11 608:6
610:24 612:24
614:6 619:7

645:19 646:2
647:10,10 668:25
669:8 672:20
673:7,11,22
675:10,11,19,23
676:5 677:7,14
678:6 679:11,25
680:13 681:3,6,11
681:16,23 682:16
682:24 683:10,11
683:13 684:9
685:5,13 686:3
**depositions** 458:14
462:6,24 554:10
676:12,22 677:25
679:16,18 682:6
**depth** 473:12,20
473:22 504:21
**describe** 468:20
477:23 487:16
549:12 613:16
621:22 631:21
644:2 648:11
**described** 468:7
470:7 532:12
539:9 577:20
640:25 655:12
**description** 454:7
545:14 547:3,16
552:7
**designate** 676:3
**designated** 461:21
464:13 676:11,23
682:13 683:6
**desire** 581:3
588:13
**destroyed** 492:11
**detail** 631:13
647:13
**details** 630:6
634:13 644:25

662:17,19,24
663:19,22 665:25
667:9 671:4
**determination**
502:23
**determine** 476:10
483:16 502:14,17
503:14,21 507:4
508:11 509:12
540:23 551:2
554:14 619:18
620:3,13 638:20
**determining**
509:21
**development**
618:5
**devin** 629:21
**dictate** 580:10
**difference** 498:20
616:4,9 663:4
668:23
**different** 458:15
564:25 620:17
621:7,18 623:5
628:5,13 636:24
646:10 676:2,3
**differentiation**
661:5
**differentiations**
506:18
**differently** 541:6
674:20
**difficult** 469:7
542:25 670:23
**direct** 596:12
**directed** 548:20,22
607:14
**directly** 494:3
557:5 563:11
569:16,19,21
577:14 685:16

**directory** 634:10
**disability** 476:13
**disagree** 668:2
**disclose** 559:5
568:3
**disclosure** 602:18
602:19 605:10
**discovered** 490:24
491:2 503:13
546:9 547:14
548:8,19 549:4,10
550:10 552:14
613:12 615:14
**discovery** 650:2
**discuss** 523:6
600:7,18
**discussed** 490:8
554:10
**discussion** 471:2
476:9 518:17,23
586:12 600:12
**discussions** 473:9
473:23 474:6
542:23 581:2
**disregarding**
496:12
**disrespect** 587:11
**disrupt** 654:2
**distinction** 461:17
487:3
**distributing**
505:17
**district** 452:2,3
**divert** 658:9
**diverted** 615:21
616:12
**diverting** 613:13
615:14,25
**document** 595:14
595:17,22 596:7
609:2,16 611:6,8

622:6 625:3 626:8
626:13 628:23,25
631:20,25 632:12
637:7,8,15 638:7
638:11,21 641:12
642:15 645:2
650:2
**documents** 466:19
469:6,9 488:17
490:2 503:15
545:5 547:3,13,21
548:7 550:10
559:14 579:19
613:6,8 615:18,20
625:24 628:4
633:22 635:8
641:10 642:10
647:14 671:20
**doing** 478:15
480:24 481:2
486:7 498:6 499:2
499:8 501:19
516:9 559:10
563:2 567:12
571:25 574:9
584:14 601:19
603:10 630:16
661:6 671:24
**dollars** 622:12
**domain** 654:17,21
**double** 493:17
495:3 497:9
510:16 516:24
**doubt** 486:3
495:16 513:5
514:2,4
**doug** 464:22 466:4
525:5 528:6
576:13 637:16
**douglas** 452:16
454:4 456:6

465:21 684:7,15
685:5 686:4
**drafted** 590:16,24
591:7,9
**dramatic** 469:17
**draw** 660:20
**drawing** 461:18
487:3 592:15
**drawn** 592:13
**driving** 589:6
**duly** 457:15 685:7
**dumain** 453:7
**duplicative** 647:24
**duty** 482:16
503:25

**e**

**e** 453:2,2 454:2,6
475:22 477:24
478:14,20 479:5
479:12,14,20
480:2,7,15,20
482:6,24 483:19
484:11 485:5
486:11,14,21
487:8,12,13,17
488:12,14,21
489:15,21,22
490:4,19,24 491:7
491:11 492:19
497:6 499:16
500:11 501:9
502:13,20,20,22
503:15 504:16,17
510:7,20,22 511:3
513:8 516:3 517:5
519:15,17 547:4
547:15,21 548:9
549:5,14 550:11
552:5,16,17
562:21 580:25
581:13,24 601:22

603:3 605:2
607:12,15 612:5
613:4 614:21,21
617:8,20 619:22
620:25 621:3
625:25 627:7,8,19
629:7,14,15,23
630:19 639:17
640:17 641:20
643:21 644:6
650:5,6 654:24
655:6,14,22 656:7
656:20 657:17
658:4,14 662:4,20
663:5,12,13 664:7
664:17,21 665:7
666:5,9,21 667:4
669:17,19 670:4
670:17 671:5
684:2,2 685:3,3
**earlier** 529:10,10
544:13,24 545:4,9
546:8 560:20
588:10
**earliest** 485:2
**early** 476:16
528:12,14 549:13
549:14 550:16
551:23 557:7
558:2 584:20
585:5,14 656:10
656:11,12
**easily** 651:5 654:4
**easy** 670:8
**eb** 629:22
**effect** 455:17
**efficiency** 622:16
**efficient** 535:25
**efficiently** 603:12
**effort** 539:6

**efforts** 479:13
**egregious** 476:20
493:8 500:15
501:22 521:17,18
**egregiously**
496:14
**egregiousness**
521:4
**either** 467:17
468:10,25 501:9
541:13 556:21
557:19 558:18,25
576:6,20 577:4,7
578:17 583:4,9
586:14 598:8
600:15 677:13
681:24
**elaborate** 652:3
**electronic** 656:21
658:5
**ellen** 467:21
**embezzling** 516:21
**employ** 685:18
**employee** 462:13
523:2 589:5,22
605:14 649:11
**employees** 460:6
462:4 480:6,8,20
482:6,24 483:19
504:14
**employment** 525:6
528:8 533:12
541:21 542:5,15
543:9,17 554:15
558:6,20 564:20
565:5,14 566:11
567:25 568:9,21
569:13 570:19
573:5,15,21 575:5
575:13 581:5
583:15,24 584:16

588:4 594:16
595:3 599:3
600:17 663:24
**empty** 465:17,22
465:24
**encapsulated**
594:3
**endeavor** 535:2
**ended** 557:9
660:11 674:7,7
**engage** 625:6,12
627:17 628:7,14
629:18 630:3
631:4 640:10
641:17 642:25
680:17
**engaged** 553:15
581:23 584:24
598:11 600:10
**engagement**
553:20,23,25
554:3 555:11
556:10,15
**engaging** 463:13
479:19 480:6,19
482:5 518:12
580:24 639:19
**ensure** 493:16
601:8 682:5
**entered** 555:14,16
555:19 605:16
**entering** 602:17
**entire** 494:23,25
498:17 654:5,10
**entities** 528:2,5
530:9,16 531:24
532:20 585:9
**entitled** 513:17,20
533:4 673:18
**entity** 475:11,13
475:14 522:22

525:5
**entry** 623:23
**enumerate** 611:5
**enumerated** 490:3
490:4,6 671:22
**environment**
603:5
**equation** 506:11
**error** 510:25
**escrow** 516:21
518:20
**especially** 584:5
**esq** 453:6,7,7,13
453:14,14,15,15
**essence** 506:9,9
633:2 636:14
661:5 671:19
**estate** 615:17
617:15 618:3,5
637:25 644:11
**estimate** 652:12
**et** 452:8 530:23
561:19 614:22
**event** 528:10
**events** 560:10
**everybody** 670:11
670:14
**everybody's** 601:6
**evidence** 568:11
596:25 597:4,12
598:9 653:19
**ex** 680:23
**exact** 487:18 501:7
548:11 613:22
652:10,10 664:21
665:25
**exactly** 466:17
499:25 530:17
562:14 573:7,9
616:17 639:15

**examination** 454:3
464:6
**examined** 457:16
**example** 497:4
562:20 604:11
619:13,19 636:9
638:23 639:10
657:20 664:23
**examples** 547:20
604:14 608:5
618:17 622:12,23
664:18
**exclusion** 603:14
**execute** 602:9,13
603:20 604:3
605:5,24 606:15
606:22 607:5,10
607:23 608:8
609:18 610:25
613:18 615:4
616:4,14 617:6,12
619:15,20 620:6
620:16 621:9,24
622:25 631:23
632:17 633:8,15
634:3 635:4,12,18
635:21 636:11,21
637:14 638:10,25
639:11 640:24
642:6 643:9,18
644:4,17 645:8
**executed** 607:13
**executives** 481:11
**exercise** 680:3,17
**exhibit** 454:8,9,10
454:11,12,13,13
454:16,17 464:18
464:20,25 465:5
466:9 544:16,17
544:25 547:20
548:7 590:2,2,3,6

590:7,8 595:13,15
595:20 608:21
610:6,7 611:25
612:18 630:24
631:18 632:2,12
637:17 642:14,16
683:11,12,13
**exhibits** 454:14,15
465:20 466:9
544:14,15,20,23
631:12
**exiting** 476:12
**expand** 669:2,2,2
**expect** 600:3
**expectation**
492:12
**expected** 641:19
**experience** 500:19
508:7
**experienced**
512:15
**expires** 686:24
**explain** 461:3
488:2 518:4,13
541:6 564:13
583:6 616:9
632:14 633:6,13
679:9
**explanation**
534:21
**explicitly** 506:5
647:3
**expressed** 587:13
**expressly** 600:23
**extensive** 671:18
**extensively** 490:3
490:6
**extent** 463:24
465:6 651:21
652:4 657:8 677:4

**extra** 665:12
668:21
**extraordinarily**
667:21
**eyes** 483:9 495:11
495:11 498:16
501:10

**f**

**f** 644:8 685:3
**fact** 458:7 461:20
465:6 485:3
488:12 489:12,16
500:13 503:14
504:17 508:18
510:24 511:13
512:4 531:18
533:11 568:11
588:24 632:15
635:18 636:7
638:23 639:15
641:14 657:3
660:23 663:18
666:12 667:8
674:20 676:2
677:18
**factored** 540:12
**factors** 600:3
**facts** 507:7 559:25
560:18 562:19
**factual** 559:10
560:10 561:14,21
568:7 569:10,10
**failure** 596:22
**fair** 502:25 503:2
514:16 516:5
527:8 552:6
557:12,13 563:11
565:18 566:4
570:2 576:14
585:10 606:12
651:14,16 663:21

664:3 668:22
**fairness** 664:22
**faith** 476:5 492:8
**fall** 475:20
**false** 518:16
**familiar** 460:4
**far** 606:24
**fashion** 675:2
**fattaruso** 453:3,7
  456:23
**favor** 511:20
**fd** 523:2
**federal** 611:14
**feel** 501:13 502:18
  577:12 587:23
  601:16 620:8,9
  675:7
**feeling** 516:23
**feelings** 588:6,11
**feels** 482:2 535:7
  677:20
**felt** 476:25 499:10
  521:22
**fifth** 515:18
**figure** 461:9 494:8
**files** 591:22
**filing** 455:6 641:11
**finally** 584:23
  591:24 592:7,12
**finance** 644:9
**financial** 604:12
  630:22,23 631:2
  631:10
**financially** 456:14
**financing** 635:6
  644:10
**find** 550:18 617:18
  634:9 670:4,23
  671:11
**finding** 558:18

**findings** 552:4
  557:19,22,24
  558:25 562:13,20
  565:11 566:9,17
  567:22 568:7
  569:10 570:15
  571:10 577:13
  593:9
**fine** 457:3 505:6
  526:6 540:13
  589:19 607:20
  641:23
**finish** 669:5
  673:19 679:16
**fire** 492:2 576:4,11
  578:14
**fired** 574:12
  575:18,22
**firm** 466:20
  476:10 481:12,19
  483:25 492:13
  495:23 496:4
  502:9 505:20
  506:18,19 508:6
  514:10 577:16,18
  577:25 586:23
  592:20 600:13
  601:7 602:23
  603:2 634:12
  657:14,15 662:13
  671:19
**firm's** 522:2
**firms** 665:8
**first** 457:15 465:2
  469:21,22 484:25
  495:4 505:9
  517:13 518:8
  547:6 548:23,24
  550:16 567:8
  586:25 596:12
  611:19 613:15,20

617:19 621:21
  624:18 631:15
  632:14 637:3,3,24
  638:5 639:15,23
  650:17 659:23
  664:23,24 675:14
  682:15
**firsthand** 516:13
  542:6
**five** 470:12,20
  471:8 641:21
  663:9 667:15
  668:21 669:5
  681:22
**floor** 453:5,12
**focus** 475:4 489:2
  527:20 528:2
  539:10 574:24
  587:9 603:18
  606:11,18 618:20
**focusing** 640:4
**folder** 464:20,24
  465:9,20 466:9
  544:15 608:21
**folders** 464:22
**folks** 476:18
  600:13
**follow** 475:17
  478:17 492:16
  494:16 535:6
  567:18 571:24
  583:7 638:15
  675:15 676:5
**followed** 492:25
  505:20 584:22
  592:23
**following** 496:16
  501:8 507:19
  517:4 613:21
  650:22 654:18

**follows** 457:17
  475:18
**force** 455:17
**force's** 659:17
**forget** 604:6
**forgetting** 585:25
**forgive** 484:24
  678:7
**forgot** 529:16,16
**form** 455:10
  477:25 484:18
  485:8 511:11,21
  511:24 512:23
  514:19 515:5,15
  516:6 517:12,20
  537:12 539:21
  540:18 570:21
  663:15
**formal** 557:19
  649:19
**forms** 480:15
  542:13
**formula** 505:6,11
  506:8 507:3,15
**formulate** 508:20
**forth** 606:6
**forward** 555:24
  556:5 643:25
**forwarded** 502:19
**forwarding**
  502:22 552:15
  562:22 657:9
**found** 465:9
  507:13 517:6
  549:10,14,17
  552:6 582:8,17
  594:24 619:4
**foundation** 478:2
**four** 513:23 663:9
  665:14 667:13

**fran** 452:18
  456:11 685:4,22
**frequent** 483:7
**front** 550:24
  597:16 606:3
  607:21 609:25
  610:3,11 611:17
  613:8 623:14
  631:14 665:7
**full** 497:20 506:15
  506:17 591:3
  596:13 624:11
**fund** 671:21 674:7
  674:7,25
**funding** 629:22
**further** 455:9,14
  475:25 531:25
  549:16 550:20
  576:8 583:21
  625:23 628:20
  629:23 638:21
  639:7,8
**future** 537:5
**fuzzy** 473:16,17
  532:4

**g**

**g** 457:14 684:2
**gap** 528:23,24
**general** 470:16
  484:12 531:14
  588:16
**generalize** 666:23
**generally** 485:6
  573:8,10 574:18
**getting** 471:20
  473:15 509:15
  536:2 537:15
  539:14 567:5
  590:23 662:17,19
**give** 463:12 469:15
  535:3 542:17

551:18 563:22
582:15 586:9
589:21 599:7
600:19 609:5
614:13 624:10
627:8 631:13
643:3,14 652:10
652:12 660:16
664:18 668:7,9,18
674:17 680:18
**given** 520:9 521:3
  537:22 554:11
  562:20 595:9,10
  598:12,17,24
  599:10,13 642:8
  662:12,14 665:12
  677:14,15 680:20
  684:12
**gives** 674:21
**glitch** 519:13,14
**global** 674:16
**go** 465:4 469:21
  478:22 479:9
  484:18 485:14
  488:24,24 490:14
  491:17,23 497:13
  501:21 513:25
  515:21 522:7
  524:19 545:16
  547:2 549:7
  555:25 590:2
  597:6 601:24
  602:25 603:7
  607:9,20 608:15
  609:6 610:18
  611:4,21,22 612:6
  612:8,9,11 613:25
  617:15 627:7,14
  627:21 632:25
  638:19 642:14
  646:8 648:3

649:11 650:4
656:6,17 658:25
659:21,25 660:14
662:2 667:14
668:15 669:12
671:11,13 672:2,7
673:23 677:11
683:18
**goal** 606:4
**goes** 482:8 483:20
  484:17 580:10
  625:23 632:5
  633:19 634:7
  637:19,25 648:15
**going** 456:3
  459:14,19 462:19
  463:12 464:18
  470:3 472:6
  474:20 476:15,23
  478:22 482:25
  483:5 484:24
  485:20,22 489:2
  493:3,24 497:10
  497:19 501:4,21
  502:8 505:23
  508:10 512:19
  513:13 519:11
  520:23 521:20
  522:5 524:20,21
  526:7 535:6,25
  538:4 540:4
  542:16,24 546:6
  550:4 554:23
  556:23 559:4
  560:15 566:20
  568:2 572:21
  573:6,10,16,22
  574:2 575:22
  580:9 584:7
  585:18 590:2
  596:11 598:20

599:4 602:2
603:12 606:15,17
608:17 609:9
610:5 611:17
612:5,13,16,19
619:12 626:2
635:24 636:8
640:13 655:20,21
659:22 664:20
665:10,11 667:16
667:18 668:7,21
669:8,9 672:11
673:7,9,19,21
676:7,15 678:4
679:2 681:10,16
683:24
**good** 456:2 464:7
  464:8 476:5 492:8
  502:3 506:13
  514:10 534:21
  545:16 546:25
  604:11 668:16
**gotten** 636:23
  677:17 683:8
**great** 466:12 492:9
**greenberg** 553:10
  554:2,3,13,17
  555:12 556:10,16
  557:3 558:3,23
  559:2,6,10,24
  560:9,18 561:15
  561:22 562:6
  564:2,6,10 565:9
  565:10 566:8
  567:6,21 568:4,6
  568:19 569:10
  570:14 571:11,22
  577:13
**greenberg's**
  558:17 560:16

grossly  508:7
ground  574:3
grounds  502:24
  503:16 505:22
  506:5,6 554:14
  581:4,14,24 582:6
  582:9 593:23,24
  595:3
group  522:11
  523:22 530:19,20
  534:14 644:9,9
guess  498:12
  521:21,25 522:9
  522:16 577:15
  654:18 680:2
  681:19
guessing  469:13
  469:16 577:17,23
  578:2,6
guidance  518:25
  537:22 542:2
  601:14 673:8
  677:6,22,24 682:5
guidelines  480:17
guilty  519:23
guys  661:11

**h**

h  454:6
half  586:23 626:14
  682:15,23
hand  685:20
handled  586:13
happen  510:13
  572:19 660:19
happened  469:14
  520:4,22 532:13
  572:14 573:5,7
  679:6
happening  498:19
happens  498:25

happy  458:16
  462:8 488:24
  491:21 511:20
  607:20 608:20
  612:24 630:15
  679:6
hard  473:18
harm  658:3,13,17
harvest  604:6,17
  606:25
hats  481:13
head  484:2 608:14
  608:18 658:23
healthcare  618:2
hear  473:14,18
  542:19 591:3
heard  459:7
  462:24 489:5
  603:20 604:15,22
  606:24 658:24
hearing  470:24
  473:16 585:23
heart  544:10
heavy  544:10
heightened  476:14
held  452:18 471:2
  685:5
help  562:12 574:3
  606:17 610:15
  614:12 624:24
  627:20 642:20
helpful  465:15
  611:12 627:19
hereunto  685:19
high  565:18
hired  554:13
historically
  674:19
history  483:25
hold  623:18

holdings  452:8
  456:7 522:25
  523:5,7,19 524:15
  525:7,9,12,16,21
  525:22 526:17
  527:5 528:7
  533:13 544:4
  565:15 566:12
  570:20 571:15
  572:4 575:6,14
  579:21
holds  652:25
holidays  674:5,6
  674:20
holland  665:9
home  497:8
  552:17 634:10
  657:25
homework  555:9
  618:8
hook  681:20
hopefully  570:10
hour  668:3,6
  673:16
hours  470:12,17
  470:20 471:5,8,11
  471:12,19,22,24
  472:4,9,11,14,16
  572:21,24 665:14
  667:13 673:12,14
  673:17 677:18
  679:17
house  463:4
housed  650:25
  651:8,11,18
  654:10 671:17
houses  649:9
hr  476:18 519:2
  520:11 522:4,20
  523:12 524:18,22
  530:22 531:3,8

533:10 534:3
  537:19 538:14,18
  539:2,16,18
  540:17 541:13
  543:20 586:14
  601:15
hundred  490:20
  495:10 614:24
  644:25
hundreds  510:22
  511:2 513:6 516:2
  552:13,22 593:3
  593:20 615:8,9
  617:22 622:8,11
  630:19 639:13
  655:14,22
hurd  665:21,22
  666:5
hypothesize
  572:17,18
hypothetical
  507:11 572:22

**i**

iacovacci  452:4
  456:7 474:19
  475:7 486:7,9
  487:2 488:13
  489:13,14,18
  491:8,13 492:19
  493:12 494:5
  495:12 497:5
  499:15 501:13,19
  502:12 504:16,17
  505:4 507:3,23
  509:13,22 510:23
  513:8 516:2,5
  518:4 519:5,10,19
  520:5,23 521:8
  522:22 523:19
  524:14 525:16,22
  526:3,17 527:5

528:19 534:5
537:21 538:11
539:12 540:16
543:24 547:3,8,15
548:9 549:5
550:10 552:23
553:8 559:14
560:3,12 561:23
562:8 564:12
571:14 572:13
574:5,12 575:18
575:22 576:4,11
578:10 579:24
581:5,22 582:15
583:2,12,23
584:11,24 585:15
587:16,24 588:11
589:14 590:12
592:16,25 593:10
593:19 594:6
597:3,11 598:10
598:17,25 599:24
600:9,20 601:9,19
602:9,13 603:19
604:3 605:4,13,16
605:23 606:15,22
607:4,14,23 608:8
609:18 610:25
613:17 615:4
616:3,12,14 617:6
617:11 619:14,20
620:5,15 621:8,24
622:24 625:6,11
627:16 628:6,14
629:18 630:2
631:4,22 632:17
633:8,14 634:2
635:4,17,20
636:10,20 637:14
638:9,24 639:11
639:17 640:9,23

641:16 642:6,24
643:9,18 644:3,16
644:19 645:7,17
645:21 652:16
654:15 655:11
657:6,9,17,21
659:5,14,20
660:21 661:10,16
661:21,23 662:15
662:23 663:7,14
663:23 664:12
665:3,17 667:3
669:15 670:6,18
671:6 686:3
**iacovacci's** 477:24
478:14 479:5,11
479:20,24 484:10
484:13 485:5
486:16,21 510:20
523:6 525:6 528:8
532:22 533:12
539:18,20 541:20
542:5,15 543:9,17
552:16 554:15
558:6,20 560:21
561:19 562:21
564:8,20 565:2,14
566:11 567:24
568:9,21 569:12
570:19 573:4,15
573:21 575:5,13
580:25 581:13,24
582:10 591:11
597:10 598:3
600:17 658:4,14
**ian** 453:7
**idea** 499:7 514:23
598:16
**identification**
544:20 595:15
632:2 642:16

**identified** 458:2
467:24 468:15
475:22 505:9
533:9 534:3
537:19 540:25
547:7 560:19
581:24 593:8
623:4 625:18
630:3 632:15
638:6 643:19
645:15 647:20
655:6 667:19
672:25 676:24
**identifies** 554:2
620:14 628:5,13
629:16 640:8
642:5,23 643:8
**identify** 491:10
535:22 593:17
594:11 607:3
615:3 616:22
618:24 627:3
636:19 655:10,22
671:15
**identifying** 627:12
632:16 648:8
650:24
**immediately**
585:15 630:20
**impact** 602:25
604:12
**impending** 589:14
**impermissible**
513:16
**implications**
504:21 515:24
**imply** 527:23
**importance**
529:15
**important** 494:16
495:22 571:21,23

577:12 603:11
633:10 646:18
647:4 677:2
**importantly**
567:14
**impossible** 567:12
**improper** 552:15
605:21 680:5
**improperly** 673:5
**inaudible** 632:11
**include** 488:20
552:10 623:10
**included** 478:19
480:8 489:5 605:9
669:20,23
**including** 470:14
477:22 480:14
481:13
**incomplete** 623:2
**inconsistent** 526:4
**increased** 552:6
**independent**
493:18 504:11
553:13
**independently**
496:23 521:16
**index** 611:11
**indicates** 591:19
**indirectly** 685:16
**individual** 522:10
523:24 525:2
527:14 656:5
666:25 670:5
**individualized**
650:10
**individuals** 523:20
530:8 667:2,5
670:5,18 671:6
**industry** 595:9,11
674:15

**infinite** 630:18
**informal** 557:19
**information**
466:21 488:8
491:12 492:10
493:7,14 495:16
496:8 497:23,25
499:3,17 501:24
503:11 507:20
509:10,15,18,19
509:25 510:8,24
516:4 522:21
552:16,24 560:3
560:12,22,25,25
561:6,8 562:10
583:13 614:14
615:15 630:7
632:20,22,23
633:17 635:11
650:7,11,14,19
656:6 657:2,11,14
657:15,18 658:6
658:15 659:6,15
660:22 661:25
662:7,11,16 663:8
664:3,5,6,13 665:5
665:18 667:4,8
669:17,20 670:17
671:4,12,17
**informs** 650:12
**initial** 552:11
562:12,13
**initially** 494:24
640:5
**innocent** 519:22
**input** 523:13
561:12
**inquiry** 614:18
**inserted** 558:15
**inside** 466:20
506:12,12,13

**insider** 497:23
499:2 501:23
503:25
**insinuate** 601:7
**insist** 679:13
**insley** 452:18
456:12 685:4,22
**instances** 495:10
496:6 510:21,22
511:2 513:7 552:5
552:13,22
**instruct** 515:17
542:16 559:4
568:2
**instructing** 542:21
**instruction** 568:23
569:15
**intend** 680:5
**intended** 530:18
**intentions** 484:14
**interest** 599:3
**interested** 456:15
509:15 685:16
**interference**
511:25
**interferes** 511:17
**interfering** 512:16
**internal** 498:4
596:8
**internet** 670:3,19
**interrogatories**
610:13 611:19
624:18 625:17,19
**interrogatory**
533:6 610:12
611:10 614:11
619:4 622:23
624:5,15 625:16
640:7,21
**interview** 557:14
557:16

**introduced** 464:19
**invest** 658:18
659:4,13 660:24
**investigate** 492:5
494:17 581:4
**investigating**
561:23
**investigation**
553:14 554:4
557:4,10,11,12
558:4 559:3,11,25
560:10 561:16
564:3,7,11 565:9
565:10 566:9
567:21 568:19
**investigations**
558:18 588:15
**investing** 660:10
661:9
**investment** 482:15
537:5 646:22
648:21,22 649:8
671:15
**investor** 648:7,13
648:25 649:9,12
650:6,23 651:8,11
651:17,25 652:8
652:15 653:22
654:11 655:5,11
655:19,25 656:5
656:21,23 657:7
657:11,21 658:2
661:10,12 663:16
671:8
**investors** 604:10
648:16,23 650:11
650:15 653:24
654:2,3 655:5
656:8,9,15 657:13
657:19 658:7,8,16
658:17,19

**invite** 677:12
**involve** 481:17
**involved** 494:21
530:13 532:11
539:3,8 557:6
562:12 563:2
568:15 569:17,19
569:21 581:2
589:16 590:17
600:12
**involves** 667:7
**irony** 463:11
**irrespective**
484:13 533:5
**issue** 484:4
**issues** 463:25
498:3 499:12
**item** 551:7
**items** 506:21
546:15 647:6,9
648:14 669:21
671:21
**iterations** 593:20
594:24

**j**

**january** 490:16
544:18 608:17
**jason** 453:6
456:22 457:4
474:20 536:6
555:13 672:3
678:23
**jerk** 492:23 493:4
493:20 500:17
501:16,16 502:8
508:5,10 529:14
584:3 588:14
**jersey** 452:19
**job** 478:16 480:23
483:13 485:18
515:15 517:7

577:15 578:13,14
578:24 598:4
600:12 601:6,8
614:9 635:15
646:14
**jobs** 571:25
**john** 578:17,21
**jointly** 677:22
**judgment** 623:23
656:25
**july** 584:12
**jump** 496:25
582:14
**jumping** 498:14
**june** 584:12
**justify** 653:14,16

**k**

**k** 684:2
**keep** 470:16
485:21,23,24
505:23 509:3
517:18,22 584:7
612:13 638:18
678:25
**keeping** 471:18
**keeps** 472:5
**kept** 489:14
505:15 649:20
651:19
**kind** 505:7 516:23
516:24 618:15
**knee** 492:23 493:4
493:20 500:17
501:15,16 502:8
508:5,10 529:14
584:3 588:13
**knew** 494:25
498:10 500:19
501:4 515:25
516:12,18 520:21
520:21 645:4,6

**know** 457:23
458:15 459:7
464:10 469:22,25
470:18 471:7,11
471:23 472:10,15
473:16 474:25
476:24 477:11,15
478:24,25 479:2
479:10,11 480:7
481:2 482:4,10,19
482:21 484:19
486:8,9,19,22
487:4,4,7,9,11
490:5 491:5
493:19 494:7,18
494:21 497:17,22
497:24 498:9
500:21,21,24
501:12 502:6,21
503:8 504:11
505:5,8,11,13
506:12,17 507:2,8
509:9,14,16 510:6
510:16 511:13
512:15 513:4,23
514:7,13,22 515:2
515:2 516:14
517:2 518:18
519:9 522:8,12,15
523:17 528:17
529:9 530:3
531:18 532:14
533:9,19,24,25
534:6,19,20,21,23
535:12,15,16,16
537:17 540:22
548:11,13 549:2,6
551:8,13,14,17
553:19,22,25
554:16,18,20
556:9 557:5,6,8,10

557:15,20,21,25
561:7 562:5,15
563:7 568:18
569:9,18,23 571:6
571:21 578:13
582:21,25 584:21
586:12,20 587:3,5
589:9 590:4,17,24
591:6 594:18
595:12 597:10
598:7,15 599:12
600:6 601:18,21
601:23 607:22
608:7 614:11
615:9 616:10,13
617:3,8,8,11,12
620:8 626:22
628:17 633:2
634:24 635:16
637:12 638:4,8,22
639:5,5,9,22
641:13,25 642:21
643:6,13 644:23
644:24 645:12
649:14,16 651:3,6
651:7,10,13,17
652:6,15,20,22
653:13,15,17
654:20 656:2
657:6 662:5,22
663:2,3,4 664:4,7
665:2,6,14 666:3
666:19 669:14,19
669:22 671:2
672:18 675:5
678:10 679:19
683:19
**knowing** 494:23
663:21,22
**knowledge** 462:12
508:6 516:13

542:6 552:8
579:10 641:20
653:25
**known** 494:21
651:22 652:4
**knows** 661:6 668:8
668:10

**l**

**l** 455:2 457:14,14
604:25 644:6,7,7,7
684:2
**lacked** 507:20
**laid** 534:9
**large** 488:6
**larger** 508:13
**laughing** 517:9,15
**law** 502:10 589:11
679:7
**lawyer** 504:13,15
512:16 593:13
599:5
**lawyers** 504:20
507:17 599:18
656:25 657:4
**lead** 515:13
**learn** 489:8,23
491:14 532:12
**learned** 493:11
499:16 583:11
**leave** 492:13 654:3
**leaves** 492:11
**leaving** 484:14
603:2 657:14,15
681:6
**led** 583:3 587:25
606:2
**leeway** 677:15
**left** 673:14 675:9
675:21
**legal** 456:10,12
561:16 566:22

568:4,5 599:7
646:20 686:2
**legislate** 477:8
579:7
**legislates** 580:22
**lender** 644:10
**length** 580:22
**lengthy** 489:5
556:18 614:18
636:24 645:20
668:11
**letter** 454:17
477:11 528:18
529:2,5,6,11
553:21,23 554:2
555:11 556:10,16
578:10 579:22
580:23 582:20
588:3 590:4,11,16
591:10,15,18
593:8,14,18 595:8
598:12 599:2,21
600:22
**letters** 578:25
579:9 594:17
**level** 520:2,21
565:18 587:11
**levine** 453:14
**lexington** 453:12
**li** 453:19 459:9
468:4 483:22
**liability** 454:10
596:2
**life** 586:23
**light** 659:19
**limit** 511:10 515:4
517:19 543:3
558:14 667:10
**limited** 454:10
503:9 596:2
646:18 652:2

669:21
**line** 505:6 622:14
686:5
**linear** 498:23
**link** 660:21
**list** 459:8 490:3,22
490:25 491:6
547:19 548:6,7,12
548:14 602:25
604:14 606:18,21
606:24 607:16,19
608:12 609:16
610:19,20 611:6
614:8,19 615:6
616:25 618:10
623:2,13 625:4,15
625:18 631:16
632:15 637:23
640:3,22 642:8
645:15,20,25
646:6,9 647:5,9
648:3,5,17,18,23
648:25 649:9,12
649:15,17,21,21
649:23 650:8,12
650:13,18,21,23
651:7 652:15
653:23 654:7,11
655:5,19 656:23
658:2 661:10
669:10,13 671:8
682:21
**listed** 476:13
549:3 605:7 628:4
631:6 648:2
682:18
**listen** 668:22
**listening** 457:20
457:24 459:5
460:21 512:6
523:11

**listing** 465:8
**lists** 547:13 636:24
639:16,17 647:12
648:8,13,18,20
649:24 651:8,11
651:17,25 652:8
655:12,25 656:3,6
657:7,22 661:12
663:16
**literally** 567:14
569:2
**litigation** 650:3
**little** 476:22
488:25 532:4
541:6,7 542:24
562:3 596:14
680:10
**live** 536:22
**lived** 496:13
**llc** 452:8 456:8
523:2 547:9
578:15 579:2
589:20 596:18
**llp** 453:3,10
**loan** 671:20
**loans** 644:12
**locate** 609:15
**located** 648:17
649:2,25 671:16
**logistics** 466:5
**logs** 660:2,15
**long** 469:11
475:21 488:24
493:24 500:20
579:23 588:11
608:11 618:24
637:22 660:3
667:21
**longer** 478:22
500:20 540:5
645:5 659:18

680:4
**look** 465:12 466:2
469:6 484:4 495:3
499:10,11 504:11
507:9 544:14,22
550:20 552:4
554:18 562:22
563:14 581:12
588:14 589:25
595:13 597:7
613:15 617:20
621:11 622:15
625:20 626:21
630:11,13 631:15
638:21 639:7
640:16 641:10
642:13 650:4
654:23 655:21
656:7 660:14
662:2 664:16
**looked** 469:8
496:23 498:3
499:5 500:25
560:18 583:20
618:7 619:22
620:25,25 630:15
639:8 647:12
654:4
**looking** 484:10,20
503:19 518:13,14
534:13 547:5,6,16
548:16,23 555:24
556:5 596:20
599:21 612:19
613:2 614:19
622:6 626:17
629:5 641:12,15
**looks** 476:10
643:11
**lost** 463:15 606:8,9
606:13

**lot** 470:3 478:22
535:25 662:3
**lou** 456:25 457:18
458:19 459:2,24
466:3 475:3
485:10,20 509:3
513:14 515:6,20
517:10 535:21
536:8 554:24
555:15 563:10
612:2,24 623:17
638:14
**louder** 470:23
**louis** 453:13
**lower** 644:8
**lunch** 602:3

**m**

**m** 457:14 590:9
684:2
**machines** 489:15
**magnitude** 503:20
503:22 504:9,20
510:2,15 515:24
516:19 519:24
584:5
**mail** 475:22
478:14 479:5,20
487:8 488:14,21
489:15,21,22
502:13,20 510:20
519:15,17 552:16
552:17 603:3
607:15 612:5
614:21,21 621:3
629:7,15 640:17
643:21 655:6
662:4,20 663:12
663:13 664:7,21
665:7 666:5,9,21
667:4 669:17
670:4,17 671:5

**mailed** 503:15
547:4 550:11
657:17 663:5
664:17 669:19
**mailing** 547:15,21
548:9 658:4,14
**mails** 477:24
478:20 479:12,14
480:2,7,15,20
482:6,24 483:19
484:11 485:5
486:11,14,21
487:12,13,17
488:12 490:4,19
490:24 491:7,11
492:19 497:6
499:16 500:11
501:9 502:20,22
504:16,17 510:7
510:22 511:3
513:8 516:3 517:5
549:5,14 552:5
562:21 580:25
581:13,24 601:22
607:12 613:4
617:8,20 619:22
620:25 625:25
627:7,8,19 629:14
629:23 630:19
639:17 641:20
650:5,6 654:24
655:14,22 656:7
656:20
**main** 670:20
**maintained**
648:20 649:2,3,17
649:18,22 651:2
**maintaining** 481:7
661:12
**major** 499:6

**making** 492:6
494:16 500:17
505:8 522:2
526:23 540:23
558:5 573:4
**management**
481:19
**manager** 483:9
661:6
**managing** 579:5
**manuals** 477:8
480:16
**marcelo** 453:18
456:9
**mark** 475:21
476:17 477:12
478:4 484:9 486:6
499:4 505:9 541:4
541:12 550:16
578:17,18,21
579:6 586:4
601:14
**mark's** 491:16
**marked** 454:15
464:25 465:20
466:9 544:14,19
595:14 631:25
637:16 642:15
**market** 615:17
617:15 634:22
637:25
**marriage** 685:15
**master** 649:21
**material** 489:24
495:25 497:20,24
501:17 506:21
551:5 596:15,21
597:13,24 598:10
599:22 600:9
601:10 603:11
619:2 632:20

675:4
**materials** 471:21
477:7 488:12
489:9 491:16
494:6 495:13
498:25 502:13
507:3 549:3
592:17 593:2,21
594:7,25 602:24
606:5 608:10
618:23 619:24
620:2 621:2
643:25 644:13,21
646:17,18
**matter** 456:7
462:7 500:16
587:6 606:12
674:6 685:17
**matters** 668:5
**mean** 457:24
458:5 470:14
474:23 477:23
497:12 503:3
504:25 524:3,12
530:18 536:24
537:3 538:17
555:16,18 563:10
564:13 576:2
583:6 586:20
587:10 616:9
658:20 659:11
660:4
**meaning** 552:14
**means** 511:14
541:5 678:11
**meant** 487:20
**measure** 514:8
521:20 529:8
**meat** 493:23
**meet** 467:5

**meeting** 523:6,8
542:10 555:24
556:6 557:7,9
**meetings** 467:4,8
467:18,22 468:3,6
468:18,19 469:2
469:11
**mei** 453:19 459:9
468:4 483:22
**member** 481:9
523:2 596:19
**member's** 596:15
596:21,22
**members** 467:16
561:13
**membership**
599:3
**memoranda**
646:17
**memorization**
618:21
**memorize** 615:8
615:12 618:12
622:4 664:17
**memory** 607:16
607:18 618:15,25
630:18
**mention** 603:21
604:15,22
**mentioned** 521:19
534:13 548:24
572:12 593:15,17
604:8,21 605:8
629:11 630:22
634:23,25 655:4
658:22,22 661:2
664:24 670:25
671:25
**met** 466:18 556:3
**methodically**
603:11 606:16

**methods** 671:14
671:16
**metric** 529:7
**mexico** 665:9,9
**middle** 512:10
515:10 574:3
627:11,25 629:20
669:7,9 672:18
675:19 676:17
677:8 678:5
679:11,25 681:7
682:17,24
**millions** 622:12
**mind** 461:23
534:22 545:13
609:16 610:8
657:9,12
**minds** 510:3
**minimize** 579:12
**minimum** 677:20
**minnesota** 602:17
603:22 604:8,22
607:2 658:10,25
659:2,7,12,17,23
659:24 660:23,24
661:8 662:6,16
663:10,24 664:12
665:2 666:24
667:2 669:18
670:7
**minnesota's**
661:24,25 662:11
663:7 664:2,6
665:4,18 666:9,20
670:3,16
**minute** 604:6
609:5 674:3
680:19
**minutes** 515:19
537:23 588:10
636:19 665:13

667:15 668:21
669:5 681:22
**misappropriate**
654:16 655:18
**misappropriated**
562:9 650:9
655:11,25 656:2
657:6 659:5,14
661:24 663:15
664:2 665:4,17
669:15
**misappropriating**
656:22 657:21
**misappropriation**
559:12 560:2,11
636:13,16 643:15
650:10
**misappropriations**
560:21
**mischaracterize**
537:9
**mischaracterized**
521:11
**mischaracterizing**
577:24
**misconduct**
584:25
**misinformation**
513:10
**missed** 532:3
548:15 624:25
**missing** 496:22
509:11 666:15
**misstate** 485:15
499:23 500:3,6
511:14 513:18
535:23
**misstated** 510:11
511:5,6,12
**misstatement**
506:3 512:5

588:19
**misstates** 485:7
487:6 494:14
495:19 499:20
533:14 535:18
583:17
**misstating** 496:10
512:3 513:12
516:7
**mistakes** 563:6
**misunderstanding**
459:6,24
**misunderstood**
484:23
**models** 630:21
**moment** 468:17
**moments** 482:7
531:7 654:19
**monica** 453:15
457:9 467:21
**monitor** 483:5
**month** 557:10,11
557:11
**monthly** 629:10
**months** 588:15,15
**monticciolo**
452:17 454:4,7
456:1,6 457:1
458:1 459:1 460:1
461:1,4 462:1
463:1,20 464:1,7
464:22 465:1,21
466:1,13 467:1
468:1 469:1 470:1
471:1,22 472:1,10
472:15 473:1
474:1 475:1,5
476:1 477:1 478:1
479:1,9 480:1
481:1 482:1 483:1
484:1,8 485:1,14

486:1,4 487:1
488:1 489:1 490:1
490:13 491:1
492:1,3 493:1,5
494:1 495:1,8
496:1 497:1,4
498:1,13 499:1,22
500:1 501:1 502:1
502:11 503:1
504:1 505:1 506:1
506:25 507:1
508:1 509:1,9
510:1 511:1 512:1
512:25 513:1
514:1,6,12 515:1
515:21 516:1
517:1,24 518:1
519:1 520:1,13,18
521:1 522:1,6
523:1,16 524:1
525:1,5 526:1,15
527:1 528:1,6
529:1 530:1 531:1
532:1 533:1 534:1
535:1,3 536:1
537:1,16 538:1,9
539:1 540:1,11
541:1 542:1 543:1
544:1,12 545:1
546:1,7 547:1
548:1 549:1 550:1
550:9 551:1 552:1
553:1 554:1 555:1
555:3 556:1 557:1
558:1 559:1,9
560:1 561:1 562:1
563:1,25 564:1,19
565:1 566:1 567:1
568:1,6 569:1,9
570:1 571:1,9
572:1,2,10 573:1

573:13 574:1,16
575:1 576:1,13
577:1 578:1 579:1
580:1 581:1 582:1
583:1 584:1 585:1
586:1,16 587:1,7
588:1,9 589:1
590:1 591:1 592:1
593:1 594:1 595:1
595:18 596:1
597:1 598:1 599:1
600:1 601:1 602:1
602:8 603:1 604:1
605:1 606:1 607:1
607:19 608:1,4
609:1,3,14 610:1,9
610:15 611:1
612:1 613:1 614:1
614:5 615:1,23
616:1 617:1 618:1
618:19 619:1
620:1,20 621:1,6
622:1,19 623:1
624:1,23 625:1
626:1 627:1 628:1
629:1 630:1 631:1
632:1 633:1,6
634:1,14 635:1
636:1 637:1,4,17
638:1,3,19 639:1
639:16 640:1
641:1 642:1,19
643:1 644:1 645:1
646:1 647:1 648:1
649:1 650:1 651:1
652:1 653:1 654:1
655:1,7 656:1
657:1 658:1 659:1
660:1 661:1 662:1
663:1 664:1,22
665:1 666:1 667:1

668:1 669:1 670:1
671:1 672:1 673:1
674:1,3 675:1
676:1,9 677:1
678:1,12 679:1,22
680:1 681:1,6
682:1,13 683:1
684:7,15 685:5
686:4
**morning**   456:2
  464:7,8
**motion**   623:23
**mouth**   527:21
**move**   627:9,10
  630:7
**moving**   638:18
**multiple**   481:13
  541:11 655:24

### n

**n**   453:2 454:2
  455:2 457:14
  604:25 684:2,2
**name**   456:9
  578:20 579:4
  604:6 624:11
  644:6 650:6 686:3
  686:4
**names**   484:2
  632:23 633:23
**nature**   588:8
  633:7 635:3 645:4
**nda**   615:19 639:23
  640:2
**ndas**   605:12,15
  607:13
**necessary**   509:11
  554:12 614:3
  681:5
**necessitated**
  614:18

**need**   465:4 473:5
  474:23 482:11,12
  485:12 491:20
  494:7 495:8 498:4
  499:3,10 501:12
  502:11 504:3,15
  506:17 507:2
  514:6,12,17,21,25
  517:11,18 521:24
  522:5 530:10
  536:5,7 537:11
  556:13 563:16
  574:2 576:13,15
  576:17 579:2,3
  589:10 597:17
  606:17 607:18
  622:15 624:23
  638:16 649:14,16
  651:7 652:6,20,21
  652:23 653:5,9,12
  653:14,16 672:2,7
  683:2,4
**needed**   497:7
  498:3,18 499:5
  500:25 501:13
  504:20 510:5,9
  569:24 576:8
  583:20 632:13
  637:7 671:10
  673:14 682:5
**needing**   583:15
**needs**   495:24
  500:15 514:3
  515:20 540:5
  635:8
**neglect**   500:24
**negotiate**   476:5
**negotiated**   581:15
**negotiating**   492:7
  581:22

**negotiations** 476:8
581:20
**neither** 468:24
**net** 674:18
**network** 627:4,13
627:15
**never** 492:13
556:3 579:8,14
582:6 587:20
588:20 645:6
667:23,24
**new** 452:3,19,19
453:5,5,12,12
464:21 576:9
665:8,9,9
**nine** 546:4
**noise** 525:19
**nokley** 601:20
602:16 603:21
604:5,15 606:25
**non** 488:13 576:20
577:7,19 602:18
602:19 605:10
**nonappearance**
683:21
**noncompete** 476:9
**nonconfidential**
497:25
**nondisclosures**
602:23
**nonpublic** 503:10
**norm** 674:15
**notary** 452:18
457:16 684:20
686:24
**note** 612:22
633:18 679:21
682:7
**noted** 602:16
619:24 629:8
630:21 632:9

644:11 664:16
683:25
**notice** 454:16
461:22 464:14,17
465:2,8,8,25 482:9
483:3,21 582:16
582:25 583:23
584:11 585:16
586:10 587:24
589:5,13,21
596:24 597:4,12
598:9,17,25
599:11 600:9,20
601:9 614:16
632:6 633:20
635:25 637:20
641:5 669:4 674:7
674:8,9 675:11
683:10
**notices** 668:6
**noticing** 456:21
**notwithstanding**
461:24
**november** 452:12
456:4 466:23
684:10 685:6,20
686:3
**number** 461:13
462:3 465:14,14
488:6 511:12,17
511:18 572:15
590:6 591:19,21
606:5 609:22,23
610:12 611:12,22
622:2 624:6,15
625:16 627:12
628:5 629:12
631:18 641:9
642:19 652:10
663:11 666:9,21
669:16 670:4,17

671:5 673:12
**numbered** 629:24
**numbers** 552:6
625:10 627:8
662:20 667:4
670:21
**numeration**
490:17
**numerous** 488:19
490:2 594:3 595:9
605:12

---

**o**

**o** 455:2 457:14,14
457:14,14 630:23
644:6,7,8 684:2
**oath** 455:17
472:20 684:9
**object** 477:25
479:6 480:10
482:8 483:2
484:16,18 485:8
487:5 494:10,13
495:18 496:9,19
499:19 500:8
506:2 508:25
509:2,5 510:10
511:4 512:2,3,4
513:13 514:19
515:4,15 516:6
517:8,11,16 520:6
520:24 535:17
537:11 539:21
540:18 541:8
543:11 547:23
550:13 551:21
552:18 553:2
560:5,14 561:24
563:8 565:16
566:5,13 567:4
568:10,22 569:5
570:21 572:5

575:7 577:21
578:11 582:3,11
584:17 585:2
588:17 592:3,10
593:11 594:14
595:5 601:4 607:6
607:7 616:5 623:3
632:4 635:23
637:18 641:3,6
653:6
**objected** 609:21
**objecting** 567:10
612:16
**objection** 461:9
462:25 463:2,9,10
479:21 480:22
481:5 483:20
509:23,23 511:11
511:21,23 512:23
522:17 533:15
537:9 567:19
569:14 583:17
632:8 633:19
634:6 638:13,15
638:17
**objectionable**
515:16 537:10
**objections** 455:10
456:19 485:25
511:10 512:19,21
517:19,19 611:18
624:17
**objective** 476:11
**obligations** 492:21
493:8 547:9
561:19 565:3
619:6
**observing** 496:6
**obvious** 595:11
**obviously** 483:14
497:17 501:4

506:6 554:24
555:7 604:7 620:9
653:24 675:13,18
680:15 681:3
**occasion** 583:5
**occurred** 494:4
**oceanlinx** 634:16
634:18,19,20
635:2,5,19,22
**october** 464:11
466:15,22 473:7
476:16 528:13,15
557:7,9 558:2
582:20 583:5,25
584:13,20 585:5
585:14 588:4
591:23 592:6
598:11 599:2,20
600:22 640:18
645:19 647:9
675:24,25
**offend** 519:5
**offense** 676:15
**offensive** 509:6
**offer** 597:5
**offering** 597:25
646:16,17
**officer** 455:16
**oh** 548:13,17
549:17
**okay** 457:11
465:10 466:12
480:3 485:17,22
536:6 537:24
541:16 545:6,18
545:20,25 546:13
546:20,24 548:17
552:2 559:22
570:24 576:10
585:13 587:10
596:17 609:23

610:14 611:4,21
613:7 627:22
628:3,11,22,25
629:16 630:11
632:8 646:4
651:10
**old** 586:21 666:5
**once** 481:15
488:23 497:18
514:9 558:12
573:19 645:4
**ones** 605:7 617:25
622:10 623:5
628:17,18 640:4
676:11
**ongoing** 587:13
**open** 674:7,7
683:9
**opinion** 599:7,8
668:23
**opinions** 646:21
646:23,25 647:20
**opportunities**
606:8,10,13
613:13 615:15,25
616:11 617:2
644:13
**opportunity**
535:10 549:22
555:4 575:25
598:18 599:14
603:7 609:15
615:17 617:16
618:2,3 638:2
643:23
**opposed** 486:14
**opposing** 682:3
**opposite** 501:7
**opposition** 623:22
**options** 576:21

**oral** 530:3 571:12
**orally** 570:16
**order** 494:8
501:13 502:14
504:4 507:4
569:25 576:10
577:10 606:16
632:13
**orders** 680:14
**orient** 465:5
**orienting** 475:2
**outcome** 456:15
685:17
**outlined** 480:16
**outlines** 629:23
**outside** 463:22
466:24 476:2,17
488:8,11,18,22
489:11,14,17
490:25 491:7,12
492:19 493:7,14
494:6 495:13
499:18 501:3
504:17 505:18
506:19 513:8
518:25 520:10
521:18 522:3,19
523:12 524:17,22
530:22 531:2,8
533:10 534:3
537:19 541:14,16
541:19,25 542:13
543:8,16 552:9,25
553:7 561:12
562:23 583:12
592:17 593:3,22
594:7 595:2
601:15 605:13
634:11 636:4
643:12,25 654:17
654:20

**p**

**p** 453:2,2 455:2
630:23
**p.m.** 602:2,5 609:9
609:12 672:11,14
680:21 683:24,25
**page** 454:3,7,13
457:4 534:19
537:7 596:6,7,8,10
596:13 613:11,20
614:19 617:19
619:11,12,13
621:21 622:22
625:8,21 626:13
628:2,10 629:9
631:7,17 632:14
640:19,20,20
641:2 642:4,23
643:8,20 686:5
**pages** 613:23
615:9 622:22
623:12,13 624:19
625:2,18 626:9,10
628:12,12 640:6
**pagination** 596:8
**panic** 497:18
**paragraph** 545:17
545:19,21 547:6,7
548:6 549:3
593:25 613:11,14
631:9
**paralegal** 459:15
460:17 463:4
**parenthetical**
547:17,18
**part** 468:2 478:10
478:11 479:24
480:23 481:6,15
481:22 482:2,14
482:16 484:6,12
484:20 486:10,13

486:21 487:8
530:11 531:15
532:3 593:5 594:8
600:23 602:20
603:8 620:18
625:22 650:17
653:25 655:16
656:4 657:7,22
**parte** 680:24
**partial** 489:5
**participants**
633:23
**particular** 475:10
489:19 545:12
551:17 636:16
**particularly** 493:2
494:19,20 562:5
588:7 677:14
**parties** 455:6
462:21 482:16
493:18 541:4
602:19 633:24,25
634:4,5 650:2
685:15
**partner** 481:12
493:2 494:20
495:23 496:24
500:18 502:8,9
505:24 508:6
510:16 518:11,19
578:14 586:15,18
586:24 587:2,16
587:21 588:12,21
588:21 589:5,22
605:14 651:4
**partner's** 493:8
**partners** 481:19
502:10 516:21
578:16 579:3,5
604:17 606:25

**partnership** 581:6
646:19
**parts** 634:12
**party** 456:14
634:14,15 649:3
685:10
**passive** 523:15
585:23
**path** 521:2
**paul** 452:4 453:7
476:19 477:6
479:11,24 484:10
487:13 494:20
496:11 497:22,24
498:6,9 499:7
508:7 579:23
586:5,7,9,9,15,18
594:17,19,23
595:7 650:19,22
651:3,6,10,17
652:16 653:20
655:6 656:8,15
660:12 661:6
**paul's** 477:12
650:13 666:5
**pay** 536:3
**people** 459:8,8,25
462:23 463:19
466:20,24 478:4
481:18 483:14,24
498:4,9 521:19
522:11 523:22,22
524:10,12 526:25
527:11 528:5
530:19,20 534:16
579:11,17 651:7
652:7,14,19,24
653:2,4,13 661:3
**perceived** 518:19
**percent** 614:25

**perfect** 491:25
**performed** 517:3
551:19
**period** 487:8
526:11 539:11
546:16 557:3
656:15 660:6,12
666:2
**periodic** 475:22
477:22,24 478:7
478:10,12,13,20
479:4,19 480:6,20
482:6,17,22,23
483:6,8,11,18
484:12 485:4
486:11,14,22
487:12 545:15
550:11,22 551:19
581:23 582:9
**periodically** 480:2
480:14
**periods** 587:5
674:8,8
**permanent** 476:11
476:13
**permitted** 460:9
462:6 512:9
**person** 518:10
527:16 529:20,23
568:15
**personal** 488:21
489:21,22 497:6
502:13,20 603:3
607:7,15 615:16
629:14 634:10
664:7
**personally** 517:2,5
**perspective** 678:8
**phone** 468:7 523:9
529:21,23 660:19
662:20 663:11

666:9,20 667:4
669:16 670:4,17
670:20 671:4
**physical** 555:16,22
**pick** 527:19
**piece** 498:16,17
527:7 561:21
622:21
**pieces** 477:14
**place** 467:8 483:12
483:19 484:13
522:25 528:10
579:17 634:8
668:12
**places** 488:21
**plaintiff** 452:5
453:4 456:24
547:20 565:13
613:12 628:21
**plaintiff's** 564:3,7
568:20 614:21
624:18
**plaintiffs** 609:21
**plan** 493:21 588:2
618:4
**play** 459:7 559:9
**please** 456:19
457:13 485:21,23
509:3 511:19,24
512:16 513:24
515:19 517:17,21
536:3 541:7
544:22 556:20
565:22 574:23
580:13 590:5
606:11 618:19
620:23 638:17
648:11 650:17
667:15 669:6
**plus** 586:23,24
587:17 667:8

point   476:6 477:2
  492:8,15 498:24
  500:11,14 507:10
  514:15 519:25
  520:20 551:5
  584:22 586:13,16
  586:19,22 587:17
  591:23 592:6,19
  592:24 593:25
  613:16 616:25
  619:10,11,13
  620:11 621:21
  631:16 632:14
  633:16 637:6
  638:6 640:3,17,22
  640:25 641:14
  642:4,23 643:7,20
  652:10 655:3,14
  656:10 681:2,21
pointed   615:8
  630:19 637:4,24
  637:24 639:13,16
  640:5 646:12
points   613:20
  614:19 615:2
  619:9 620:4,14
  621:7
polarized   569:2
policies   475:16,18
  476:21 477:3,6
  478:17 480:16
  488:16,19 492:4
  492:22 493:22
  494:22 496:8
  505:16,18,22
  531:15 579:7,18
  594:4 595:9
  633:22 646:24
  671:20 673:2
  674:5

policy   483:14
  497:14 530:12,14
  530:14 579:16
politely   606:10
portion   466:16,25
  506:20 545:12,16
position   461:25
  462:7,10,16,19
  507:23 518:24
  563:23 585:11
  619:8 634:2
  635:17 656:24
  675:6
positions   498:9
possibilities
  507:17
possibility   577:9
  659:19
possible   493:23
  535:23 664:13
  666:18
possibly   468:15
  503:12 632:8,10
  668:4
post   532:11 610:5
  663:24
posted   632:12
potential   559:12
  581:25 584:4
  615:17,18,19
  616:10 637:25
  641:11 642:10
potentially   500:15
  513:9 521:16
  583:14 587:4
  633:23,25 634:3,4
power   629:21
practice   462:12
  501:17 502:4
  504:6,7 508:5
  514:8,11 519:21

523:24 524:2
  570:9 588:24
practices   495:6
  504:2 509:17
  574:9 578:2
precise   562:3
precluded   509:20
precludes   460:5
precursory   505:10
prefer   572:24,25
preferably   504:10
preferred   630:14
prematurely
  672:21
premises   508:9
preparation   551:2
  554:8 591:10
  614:15 618:13
prepare   466:14,15
  466:25 467:6
  484:5 554:7
  556:13 589:10
  597:18,21 598:5
  668:4 671:10
prepared   563:22
  570:7 592:20
  614:7,9 617:20
  676:21 677:3,21
  679:9,12,15
preparing   470:12
  471:6,25 472:12
  472:17
present   453:17
  456:16 467:17
presented   478:9
  516:16 548:25
  549:9 575:25
presenting   571:20
  637:2
preserve   511:22

presumably
  459:10
presume   519:22
pretty   476:25
  499:4 529:5 570:3
  595:8 617:14
  660:5
previously   454:15
  464:25 470:8
  502:17 548:18
  551:24 561:11
  562:11 576:18
  590:3,14 592:22
  605:8,10 618:8,11
  629:11
primarily   475:2
print   497:7
prior   466:18
  478:14 479:3,18
  480:8,18 481:4
  484:23 488:19
  497:16 531:23
  554:10 570:17
  571:12 580:24
  582:19 583:24
  588:3 589:5
  597:25 598:11
  599:20 600:21
  620:19 675:25
private   497:25
  499:3 501:23
privilege   515:17
  561:2 562:18
probably   487:21
  504:13 522:20
  537:4 546:12
  552:2 574:19
  578:18 590:20
  591:4 618:22
  635:8 651:5

**problem** 466:4,7
  499:7 508:13
  561:4 563:16
  647:25 668:10
  679:12
**problematic** 469:5
**procedure** 577:19
**procedures** 475:16
  475:19 476:21
  477:3,7 478:17
  483:15 492:4,23
  493:22 494:22
  505:17 522:2
  671:20
**proceed** 581:14
**proceeded** 565:13
  566:10
**proceeding** 456:19
  476:24
**process** 475:21
  476:24 492:24,24
  493:16 494:16
  495:6,21 503:4
  505:8 519:3
  521:21,22,24
  527:9 533:19
  534:9,11 539:4,8
  550:19 554:11,19
  556:18 571:24
  572:8,9 577:24
  580:2,3 653:10,12
**processes** 527:11
  527:15
**processing** 602:23
**produce** 557:18
**produced** 454:14
  480:15 486:11
  489:25 491:15
  555:12 556:11,21
  556:25 591:16,18
  591:21 605:11

607:11,17 608:2
  613:24 617:24
  630:25
**product** 562:15
  590:21,25 591:4
**production** 591:20
  650:2
**professionals**
  577:16,18
**program** 629:22
**programs** 632:21
**projections** 627:3
**prolongs** 511:19
**promised** 679:5
**promising** 678:25
**promptly** 556:25
**proper** 485:25
  492:6 495:21
  653:10,11 680:25
**properly** 478:16
  492:24 493:17
  504:10 522:13
  661:12
**proprietary**
  491:12 499:17
  510:23 552:23
  632:21 648:14
**prospective** 583:2
  585:17 629:21
**protect** 477:7
  506:10
**protected** 477:2
  648:14
**protecting** 647:7
**protection** 507:18
  508:11
**protections** 492:9
**proven** 519:22
**provide** 474:14
  567:22 584:10
  585:16 587:24

589:5,13,21 597:3
  600:8 607:20
  608:20 619:7
  681:4
**provided** 523:11
  523:21 542:2
  560:25 561:6,8,18
  569:11 582:25
  583:23 597:11
  598:8 622:12
  625:3 628:24
  630:23 633:16
  638:7 645:20,25
  647:13 650:7
**provides** 596:19
  644:10
**providing** 523:13
**provision** 596:21
**ps** 578:22
**public** 452:18
  457:16 684:20
  686:24
**pull** 474:21 595:21
  622:2 629:7 641:9
  642:12 643:21
  669:8 676:16
**pulled** 642:18
  681:15
**pulling** 614:2
  630:7 679:10
**purport** 500:4
**purported** 648:11
  653:22 654:16
  682:19,20
**purporting** 512:12
  513:22
**purpose** 464:9
  486:15 502:21,23
  503:6,7 577:18
  636:8

**purposes** 590:19
**pursuant** 452:17
**pursue** 475:24
  481:25 643:23
  659:20 660:10
**pursued** 476:2
  501:2 507:13
  549:16 554:12
**pursuing** 541:12
  659:19
**put** 488:22 512:19
  512:21 540:3
  544:15 610:3,11
  611:17,25 618:11
  623:5,14,25
  631:18 650:18,21
  651:2
**puts** 650:22
**putting** 493:23
  562:6 676:18

**q**

**qualification**
  548:15
**quantify** 653:21
  654:6
**question** 455:11
  460:8 463:14
  471:13,15,17
  472:5 475:4 478:3
  479:7,17 480:11
  484:17,25 485:9
  485:13 487:6
  489:3,4 491:20,24
  493:25 494:11,14
  495:19 496:10,20
  499:13,14,20,23
  500:7,9 501:8
  507:8 508:4,15,23
  510:11 511:5,16
  511:25 512:3,24
  513:2,21 514:21

514:24 515:16
516:7 517:12
520:7,17,25
524:16 526:21
531:4 534:8,23
535:18,22,23,24
536:3,10,13 537:6
537:13,15,16
539:22 540:12
541:2,9 543:3,12
547:24 548:2
549:8 550:14
551:12,22 552:19
552:20 553:3
555:23 556:8,9
558:15 559:16,23
560:6 561:25
562:2 564:2
565:17,19,22
566:6,7,8,14
567:18,20 568:11
568:23 569:6
570:4,7,23 571:7,9
572:6,19,25
574:17,20,24
575:8,9 577:22
578:12 580:4,5,13
580:17 581:17
582:4,12 584:8,9
584:10,18,19
585:3 586:3 587:9
587:9,15 588:18
589:19 591:3
592:4,5,11,24,24
593:12 594:15,20
595:6 599:18
600:7,8,19 601:5
601:12,14 606:11
606:18 607:7
610:17,21 616:6
618:20 619:8

620:7,12,18,19,22
620:23,23,24
623:4,11 624:22
625:21 626:13
627:9,21 628:19
629:9,13 633:11
635:24 637:5,8,10
637:11,19 638:4
641:4,6,18,24
643:3,16 645:18
652:5 653:7
655:21 657:12,16
658:12 659:10
661:19,20 673:6
673:10,20,21
674:2
**questioning**
523:10 622:14
681:7
**questions** 459:18
462:21 463:6
465:13 472:23
475:2 478:23
484:7 485:2
508:21 512:14
533:4 535:6
536:15,20 540:9
554:7,21,25 555:6
556:14 559:18
563:4,20 564:17
580:9 591:13
595:25 601:3
603:9,13,14,23
604:21 614:7,13
632:6 636:15
638:15 667:20,22
667:25 668:11
677:17
**quibble** 574:22
**quick** 546:22
567:4 621:14

**quickly** 615:2
**quite** 461:17 493:2
498:6 501:5
516:20 519:3
567:19 615:23
681:18
**quote** 489:11
500:4

**r**

**r** 453:2 604:25
630:23 644:6
685:3
**r&d** 635:7
**raise** 463:9,9,25
680:5
**raised** 592:8
**range** 551:15
**ranges** 628:12
**reach** 520:20
570:11 659:24
663:12 677:3,22
678:14,21 680:23
681:2 682:3
**reached** 518:3
663:10,23 670:6
670:18 671:6
**reaching** 520:2
660:12 679:13,19
680:11
**reactions** 588:14
**read** 474:22
491:18 535:21
536:12 537:6
548:3 565:22,23
580:19 591:14
594:17 630:5
631:7 684:8
**ready** 520:4,22
596:16 610:16
**real** 536:13,17,20
615:17 617:15

618:3,4 637:25
644:11
**really** 476:10,15
492:14 496:24
517:10 526:9
549:20 574:17
580:9 587:6
662:21
**reason** 474:13,24
500:23 503:12
505:13 534:7
566:16 588:23
589:13 594:9
634:9 636:4
643:24 651:15
657:24 659:3
661:17 670:24
686:5
**reasonable** 471:5
471:19 526:11
570:8 591:15
598:4 618:9
622:14 641:19
**reasonableness**
641:23
**reasons** 497:7,11
564:11,13,14,17
564:19,22,24
565:4,13 566:10
676:8
**recall** 464:12
466:17 468:4,9,17
469:3,8 470:3
473:12 475:21
477:11 485:6
487:18,21 491:3,9
523:9 524:24
526:19 528:22,23
529:22 531:16
539:3 540:21
550:17 551:9,23

552:3 553:9
556:12,18 557:17
579:3 613:22
644:24 645:3,6,10
645:17,22 647:22
648:8 654:25
**recalls** 485:11
**recanting** 478:7
**received** 574:5
641:10 642:10
**receiving** 568:16
596:24
**recess** 538:6 602:3
609:10 672:12
**recognize** 595:17
596:4
**recollection** 467:9
467:25 469:15,20
524:9 551:14,16
551:18 571:17
656:12 660:17
**recommend**
476:19 524:14
528:5 539:17,19
**recommendation**
476:17 477:9,19
485:3 506:8
520:12 522:11
523:9,16,18,21,21
523:25 524:5
525:4,8,10,15,20
526:2,15,23 527:4
529:20 530:7,25
531:6,25 532:5,8
532:21 533:11
534:4,8,20,24
535:14 537:20
538:10,14,21,25
539:10,15 540:15
540:24 541:3,12
541:20 542:4,14

543:2,8,16,23
544:3,5 557:25
558:4 560:24
561:10,11 570:18
571:14,20 572:11
572:20 573:2,15
573:20 574:6,11
575:4,12,17,21
576:3,6,9,11,14,16
576:19 577:6,6,11
578:4,5 584:21
585:6,8,8,14,20,22
585:24 586:4,7,8
588:3 592:21
593:6 599:25
600:15,24,25
601:16
**recommendations**
475:24 477:17
522:3 523:23
528:3 534:12
541:15 554:11
558:19 565:11
566:2,3 570:15
571:11 577:13
**recommended**
600:21
**recommending**
578:7
**record** 456:3,18
463:18 464:4
471:3 511:21
512:20,22 513:23
515:7 532:24
535:8,9 538:5,8
548:3 565:23
580:19 601:24
602:2,6 609:7,9,12
611:9 612:7,10,12
612:16,21 632:9
668:18 672:3,8,11

672:14,19 675:17
678:4,4,8 679:21
681:9 682:8 683:3
683:5,18,24
684:11,12 685:13
**recording** 471:5
519:15,17 602:24
681:11
**records** 649:19
**recovery** 604:17
606:25
**reed** 453:10
463:23 467:23
468:14 474:8
**refer** 489:10
608:10,11 618:23
618:24 628:20
**reference** 464:18
475:3 493:22
547:20 551:11
607:11 611:6
612:20 619:4
625:10 629:8
631:9,10 640:17
642:18
**referenced** 465:3
477:16 482:7
483:11,18 484:25
531:7 544:12
611:7 613:19
619:10 622:6
633:15 637:6,16
646:10
**references** 590:8
629:14 636:23
**referencing** 609:3
611:8 614:8,21
624:20 625:4
626:12
**referring** 458:6,25
467:14 475:10,11

475:12 482:18
488:11,14 489:12
489:16 490:7,9,10
490:12 544:24
545:4,8 546:8
586:2 590:13
605:15,18 610:7
618:25 621:18
626:10,23 630:4
649:24,25 650:8
657:22
**refers** 593:14
**reflective** 621:7
**reflects** 641:15
**refusal** 682:3
**refused** 660:24
**refusing** 536:21
560:17
**regarding** 581:3
618:2 635:12
638:15
**regardless** 573:19
573:23
**registered** 481:20
482:15
**regular** 653:3
**regulations** 479:15
482:23 508:9
**regulators** 481:8
501:22
**regulatory** 497:21
499:7,12 504:22
508:13 587:4
588:8,22 589:4,7
589:10,15 648:15
**reiterate** 568:23
673:11
**reiterated** 534:15
**reject** 575:21
**rejected** 576:3

**relate** 564:3,7,11
**related** 456:13
  489:15 560:10
  563:11 565:12
  578:15 589:8
  604:5,7 615:18
  621:2 644:13
  646:21,22
**relates** 629:10
**relative** 528:17
**relevance** 514:18
  545:22 580:9
  622:16
**relevant** 466:19
  482:23 514:14
  535:4 563:3 580:6
  601:13
**rely** 558:3,17
  636:7
**remainder** 681:12
**remaining** 676:24
  677:19 682:25
**remarkable**
  676:20
**remediable** 599:16
  599:17
**remedy** 596:23
  597:14 598:13,18
  599:14
**remember** 476:6
  529:15 549:13
  567:12 580:17
  588:16 615:9
  622:9 664:21
  665:24,25 666:5
**remind** 603:10
**remonstration**
  536:6
**remotely** 456:6,16
**rendition** 650:14

**repeat** 509:25
  513:3 524:17
  548:2 552:20
  556:7 559:22
  560:7 565:19
  566:7 571:7 575:9
  580:15 592:5
  661:18
**repeated** 533:23
**repeating** 485:17
**rephrased** 567:15
**report** 557:18,22
  557:23
**reported** 494:3
  496:5 505:2
  510:19 517:6
  552:3
**reporter** 456:11
  457:13 458:23
  470:22 536:25
  542:19 547:25
  548:4 556:7
  565:22,24 578:19
  580:14,20 613:2
  665:13 681:20
  683:16,20
**reporting** 495:17
**representation**
  614:24 653:10,12
**representative**
  458:3,13 459:20
  459:22 460:10
  461:5,18 462:13
  462:22 473:2
  486:23 491:5
  520:14 532:17
  533:8 543:7,15
  559:21 568:18
  597:9 598:2,7
  599:9 606:20
  610:23,23 617:4

  635:14 637:12
  643:6 655:8
**representatives**
  457:20 458:8,21
  459:3,11 460:15
  460:19 461:2
  462:3
**represented**
  486:20 525:25
  534:14 685:11
**representing**
  461:16 530:12
  615:20
**request** 556:24
  638:8 649:14,17
**required** 480:13
  482:22
**requirement**
  483:4 589:4
**requires** 551:15
**research** 590:18
  591:9 597:6
  662:25 679:8
**reserve** 554:24
**reserved** 455:11
**resolution** 585:21
**resolved** 466:8
  468:25
**resourceful**
  670:20
**respect** 484:14
  486:25 489:4
  505:3 532:22
  554:4 555:9
  560:20 561:18,21
  562:17 563:23
  621:20 638:5
  664:25 672:20
**respective** 455:5
**respond** 554:7
  610:17 614:12

  674:11 675:3,16
**responding** 666:6
**response** 461:21
  479:10 608:23
  611:10 615:13
  622:23 623:8,11
  623:13 624:5,7,10
  624:14 625:8,15
  625:22 626:11,13
  626:14,17,19,20
  627:12,23,25
  628:19 636:17
  640:7 641:8
  645:14
**responses** 533:6
  609:21 611:18
  614:12 619:4
  624:17 625:17,19
  640:21 650:3
  655:2
**responsibilities**
  483:15
**responsibility**
  481:13,25 484:3
  588:22,22
**responsible**
  474:18 475:6
  481:20 482:15
**rest** 546:14 674:2
**resting** 594:10
**restroom** 537:25
  550:5 595:23
**result** 531:24
  674:18
**resulted** 658:3,13
**results** 510:19
  513:9 516:17
  530:19 558:24
  560:16 629:7
**retain** 553:7

**retirement** 581:16
**retract** 627:20
  640:6
**retracting** 630:9
**return** 672:23
  680:21
**returned** 476:8
  492:11 680:22
**revelation** 518:2
**revenue** 654:13
**review** 474:10
  477:20 479:14,25
  480:14 484:12,21
  486:14,15,20,22
  486:24 487:8,12
  487:17 505:10,10
  510:20 517:5
  545:15 546:22
  550:12,22 551:19
  553:20 556:17
  570:14 574:8
  577:12 580:25
  581:23 582:9
  595:22 621:14
  654:25
**reviewed** 466:18
  479:12 499:6
  571:10 636:3
  651:11
**reviewing** 545:5
  553:7 621:17
  631:20 655:13
**reviews** 475:22
  477:22,24 478:5,7
  478:10,12,13,20
  479:4,19 480:6,20
  482:6,17,22,23
  483:11,18 485:4
  486:11
**revised** 577:5

**right** 457:7 459:5
  460:3 465:4
  467:11 469:2,14
  471:8,10 474:8,25
  480:9 487:10,14
  491:2 493:12,15
  495:3,6,24,25
  496:3 497:3 502:2
  504:5 505:15,24
  509:13,21 510:15
  511:3 514:7,13
  516:18,25 517:25
  519:6,8,9,11,20,24
  520:3 521:10,20
  521:22 524:6
  525:12,17,23
  526:18,22 527:7
  530:4 531:3,9,15
  531:20 532:23
  533:13 536:10
  539:14 543:10,21
  544:6 546:10
  552:25 554:9
  559:14 560:4
  564:20 572:3,4
  574:12 576:23,25
  577:8,14 579:9
  581:11 587:21
  588:5 591:12,16
  592:18 593:4
  594:13 598:3,6,14
  598:22,23 601:3
  601:16 606:19
  615:25 616:10
  623:2 626:19
  627:5 628:16
  629:20 631:5,11
  636:11 637:11
  638:23 639:2,12
  639:14,19 640:4
  640:16 645:13

646:11,15 647:21
  653:5 654:6,22
  655:16 656:16
  657:23 660:25
  662:25 672:9
  675:21 677:23
  678:21
**rights** 511:23
  554:24 561:18,19
**rigor** 571:24
**rise** 502:24 574:8
  576:6
**rivera** 453:18
  456:9
**robert** 601:20
**role** 479:25 481:7
  486:16 574:4
  605:13
**roles** 481:23
  525:25
**roman** 596:14
**room** 457:9
  555:14,17,19,20
  555:20,21,22
  677:10 680:8
**rose** 507:9 508:12
  583:5
**rough** 652:12
**roughly** 469:11
  681:22 682:18
**rule** 460:5
**rules** 464:5 494:23
  494:25 500:21
  503:5 648:15
  673:18 677:19
**run** 666:4 674:25
**running** 536:16

**s**

**s** 453:2 454:6
  455:2,2 457:14
  630:23 644:6,7

686:5
**safe** 506:12,22
**sales** 659:16
  660:11
**salespeople** 665:19
**salvatore** 644:5
**salzillo** 644:6,14
  644:18
**satisfied** 675:11
**saturday** 470:4
**saw** 501:9,10
  513:7
**saying** 463:12
  465:23 478:9
  568:24 616:16
  653:2 655:24
  661:7 663:2
**says** 465:16,17
  594:2 642:9 679:7
**scenario** 475:20
**schedule** 470:21
  471:4
**scheduled** 677:9
  679:18
**schedules** 675:22
**scintilla** 495:15
**scope** 480:11
  482:9 483:2,21
  484:17 503:8,19
  554:3 555:2 632:5
  633:19 634:7
  635:24 637:19
  641:4
**scott** 453:15
  629:21
**screen** 465:24,25
  590:10
**scroll** 596:6
**scrolling** 614:25
**se** 639:18 660:9

sealing   455:6
search   510:14
   513:9
searches   517:4
   671:11
sec   479:16
second   463:13
   469:25 495:5
   509:6 521:21,25
   522:9,16 529:16
   577:15,17,23
   578:2,6,20 604:6
   640:17,22,25
   641:7,14 642:3,22
   643:3,7,20 661:18
   672:3,8
secret   496:7
   506:14 507:2,15
   510:24 619:23,25
   648:4,9,12 651:21
   651:23 653:22
   654:16 657:23
   663:15 666:10,22
   674:13
secrets   477:2
   488:7 489:10
   492:10 493:6,13
   494:6 495:13
   499:18 503:9,24
   505:4,18 506:18
   507:18 510:8
   552:24 559:13
   560:3,12,22
   562:10 583:13
   592:17 593:3,22
   594:13,25 602:10
   602:14,22 603:2,4
   603:20 604:4
   605:6,9 606:23
   607:5,24 608:9
   609:19 611:2

613:19 615:5
616:15 617:7
619:16,21 621:3,9
621:25 623:2
625:7,13 628:7,15
629:19 631:5,24
632:18 633:9,11
635:19,22 636:13
636:16,22,22
638:11 639:2,12
640:10,25 641:17
642:7 643:2,10,14
643:19 644:17
645:9,16,20
646:10 647:4
650:24 660:25
661:4,13 667:6,7
667:18 669:10
671:25 672:24
673:3 674:18
682:19,25
section   457:5
   596:9
sections   593:15,16
see   457:19 459:8
   464:24 495:9
   497:17 504:12
   514:14,17 515:7,8
   547:2,4,17,19,22
   548:5 556:20
   581:13 586:6
   591:20 596:14,18
   596:25 621:11
   632:7 636:3,7
   640:18 652:23
   653:16 654:24
   663:20 683:4
seeing   465:16
   466:8
seek   677:6

seeking   673:8
seen   494:2 556:15
selected   554:17
   642:9
selling   518:19
semantics   461:14
send   612:18
   624:11 634:10
   663:13 664:5
   674:9 679:2,5
sending   492:19
   493:6 494:5
   495:13 497:6
   502:12 504:16,17
   510:7 513:8
   552:23 582:19
   583:12 588:3
   592:16 594:24
   598:11,25 599:20
   600:21 626:3
   632:19 639:23
   640:2
senior   481:11,18
sense   599:17
sent   488:8,10,13
   489:11,13,17
   490:24 491:7,11
   491:12 493:13
   499:16 507:4
   510:23,24 511:3
   516:2 528:18
   529:6,11 578:10
   590:12 593:2,20
   594:6 606:5 613:5
   617:8 618:11
   623:22 630:21
   639:18 656:5
   657:25 662:4
   666:4
sentence   594:10
   596:13 626:22

separate   470:7
   534:7,11 561:16
separately   464:2
   498:11 650:20
   681:14
separation   581:21
september   490:15
   544:17 545:2
   584:12 611:11
   623:12,19,24
   624:5,9 625:2
series   628:12
   648:18
serious   498:3
seriously   493:20
seriousness   493:19
served   464:15
session   602:4
set   610:13 611:19
   624:18 674:16
   685:19
setting   489:22
   568:5
setup   465:6
shadow   649:20
   651:18
share   464:18,20
   465:6 572:16
   611:25
shocked   516:22
shocking   494:24
   495:5,22 496:24
   508:5 518:2
short   614:17 677:7
shoulder   496:23
show   474:21
   491:21 567:11
   593:7 680:14
   682:10
showed   637:5

showing 511:2
shown 590:3
  615:13
shutting 673:22
side 535:5
sign 578:9,24
  579:12,14 681:24
  681:25
signature 579:20
  579:21 685:22
signatures 579:19
signed 455:15,18
  477:12 553:22
  579:8 590:12
  684:17
significant 469:19
  501:2 604:12
signs 580:22
silva 453:19
  457:25 458:22
  459:9,16 468:4,10
  468:16 483:22
  555:13,25 556:4
  668:24 676:6,19
  681:13 683:3,6,21
similar 635:7
  675:2
similarly 541:17
  541:23,24
simple 511:9
  585:21 674:21
simply 460:20
  502:19 535:11
single 498:24
  541:10 614:23
  619:9 656:21
  660:19
sir 640:15
sit 473:8 515:15
  531:10 572:21,24
  607:16 630:16

635:15 655:13,17
  664:20 681:17
sitting 491:4 533:7
  533:25 535:5,12
  537:17 557:21
  568:17 598:6,14
  606:19 607:4
  637:11 638:22
  639:9 641:13,25
  642:2,21 643:5
  662:5,22 663:22
  664:10 669:23
  681:22
situation 521:3,23
  532:2 553:8 587:3
  649:14
six 645:10 648:5
slate 681:16
slightly 620:17
slow 626:21
small 490:4,18,23
  499:5 500:16
  644:12
smith 453:10
  463:23 467:23
  468:15 474:8
sole 527:17 654:13
solely 526:19,21
  539:25 540:3,3,7
  540:12,13,13
  558:7,9,10,13,15
soliloquy 668:19
solomon 453:13
  456:25,25 457:8
  457:23 458:9,20
  459:13 460:4,14
  460:24 462:18
  464:2 465:11,23
  466:6,11 467:14
  472:5 474:20
  477:25 479:6,21

480:10,22 481:5
  482:8,25 483:20
  484:16 485:7,15
  485:22 487:5
  494:10,13 495:18
  496:9,19 499:19
  500:8 506:2
  507:25 508:25
  509:5,23 510:10
  511:4,8 512:2,8,18
  513:11,17,19,25
  514:19 515:3,9
  516:6 517:8,15,17
  517:21 520:6,24
  522:17 528:11
  530:21 533:14
  535:17 536:5,9,12
  536:14,19,24
  539:21 540:18
  541:8 542:16,20
  542:21 543:11
  547:23 550:13
  551:21 552:18
  553:2 555:7,13,18
  556:2,5,23,25
  557:2 559:4,15
  560:5,14 561:24
  563:8,17 565:16
  566:5,13,20,25
  567:3 568:2,10,22
  569:5,14 570:21
  572:5 574:13
  575:7 577:21
  578:11 582:3,11
  583:17 584:2,17
  585:2 588:17
  590:6,8 591:2
  592:3,10 593:11
  594:14 595:5
  601:4 603:15
  607:6 609:5 610:3

610:11 611:16,22
  612:3,9,13,15
  613:5 616:5
  622:17 623:3,8,9
  623:14,18 624:9
  624:16,21 625:3
  626:5,7 632:4,10
  633:18 634:6
  635:23 637:18
  638:12 641:3
  653:6 665:11
  666:11 667:14
  668:2,12,20 672:2
  672:7,17 673:4
  675:7 676:13
  677:4,11,12 678:2
  678:7,15,16,20,23
  679:4,22 680:18
  680:20
solomon's 587:13
  675:17
solutions 456:10
  456:13 686:2
somebody 489:17
  504:11 518:21
  524:4,6,7 527:11
  579:14 634:9
  649:6 656:20
  670:24
somebody's
  527:21
sorry 458:24
  469:18,24 470:22
  471:14 473:14
  490:5 497:12
  532:3 549:19
  551:9 555:20
  558:8 560:7 570:6
  571:2 575:9
  578:19 591:17
  597:19 624:25

634:17 645:18
646:15 647:24
658:19 661:18
672:5 683:12
**sort**  458:17 477:8
**sound**  473:17
492:25 618:6
**sounds**  461:25
462:2 463:18
501:9 555:3
**source**  654:12,13
663:11
**sourcing**  627:4,13
627:15
**southern**  452:3
**speak**  470:23
473:17 530:15
549:22 550:2
591:5 647:18
**speaking**  524:7,8
524:10,11 526:8
527:12,13,24
530:8,15,18
531:13,19 574:18
**specific**  480:7
481:18 486:15,24
491:19 507:7
508:20 522:6
528:14 550:23
551:10,13,24,25
552:8 586:13
603:9,25 617:23
629:7 632:22,23
643:16 650:6
655:15 656:18
665:7 668:13
**specifically**  469:4
469:9 479:24
484:10 486:7,8
530:11 531:16
539:9 551:7

558:23 563:2
596:12 629:8
635:10 655:3,6
**specifics**  579:3
593:15 613:25
664:19
**spectrums**  569:2
**speculated**  591:2
**speech**  463:13
**speeches**  462:20
463:12
**speed**  569:25
597:24
**spell**  604:23
**spent**  470:11,17
471:5,19,24
472:10,15 494:22
668:3,6
**spinley**  453:20
458:9 459:9,13
**spinning**  638:3
**spoke**  466:20,23
**spoken**  543:4
**spokesman**  533:20
**spokesperson**
527:16,19,21,24
528:4 529:19
531:2,8 534:16
539:5 541:18,25
586:4
**spokesperson's**
528:3
**sport**  460:20
**sproutt**  630:21
631:2,10 658:11
658:24
**ss**  649:6 684:4
**ss&c**  649:6,9,18
650:25 651:8,12
651:18

**stage**  503:18
**stamp**  613:24
631:19
**stamps**  614:3
**stand**  502:7 600:4
620:11 645:2
677:5
**standing**  638:14
**stands**  645:14
**start**  457:3,18
467:4 474:17
477:20 492:17
504:24 524:11,25
544:25 609:20
627:15 635:2
646:4 648:7 659:2
673:25
**started**  464:11
550:19 557:8
631:17 668:24
**starting**  459:19
613:11 626:15
679:24
**starts**  547:8
596:10 614:23
640:2
**state**  456:17,19
459:6 512:11,11
512:12 559:9
611:13,15,16,20
665:9 684:4,20
**stated**  502:17
539:4 561:12
562:11 576:18,19
592:22 647:3
**statement**  464:3
479:8 480:12
509:6 675:17
676:17
**states**  452:2,19

**static**  506:11
**stating**  511:15
**stay**  612:21 672:4
672:8 683:18
**steal**  505:11
**stealing**  505:6,7
**stealth**  629:21
**stenographically**
685:9
**step**  518:5,6
639:23 661:22
**steps**  520:12 526:9
572:22
**stick**  478:23
640:11,12,13
**stipulated**  455:4,9
455:14
**stipulation**  452:17
**stole**  505:14
**stolen**  505:4
507:14
**stood**  622:10
679:24
**stop**  512:16,22
513:14,24 515:19
515:20 626:5,5,7
660:7
**stopped**  660:8
**stops**  572:3
**straight**  521:5
**straightforward**
493:25 514:20
677:17
**strategy**  671:15
**streaming**  536:25
**street**  500:20
**strike**  475:3 543:5
**stroutt**  659:4
**structure**  646:25
**structures**  646:20
646:21 671:21

study  531:25
stuff  503:24
  563:14
subject  591:11
  597:9 598:2
  606:12 625:23
  626:15,25 627:2
  628:2 668:5
submission  618:12
submitted  527:6
subscribed  684:17
  686:21
subscription
  646:19
subsequent  626:9
subset  490:4,18,23
  490:23 499:5
  608:3
subsets  608:5
substance  473:10
  473:24 474:7
  524:13 542:17,22
  559:5 566:21,23
  567:6 568:3
substantial  606:4
substantially
  670:22
subtract  645:25
subtractions  646:5
suddenly  506:19
sufficient  483:8,16
  503:14,16 505:22
  510:3 546:21
  614:14 622:13
sufficiently  483:4
  520:21
summarize  500:5
  558:22,24 659:7
summary  562:7
  565:18 566:4
  585:11 594:10

629:6
summer  476:7
sun  670:12,14
sunday  470:5
supplemental
  611:18 623:8,11
  623:13 624:7,10
  624:14,17 647:6,9
support  476:18
  522:21 523:10
  557:25 566:16,18
  566:25 567:2,16
  567:17,22 568:8
  569:20 576:8
supported  568:20
  569:11
supporting  530:13
supportive  522:4
suppose  682:10
supposed  532:19
  589:21 630:20
  648:3 676:6,10
  682:2
sure  458:21
  461:17 473:20
  483:24 489:6
  492:5 494:17,17
  495:3,23,24 496:2
  496:11,21 497:2,9
  497:19 498:5,11
  499:4,4 501:3,21
  504:7 510:18,21
  514:3,4 517:24,25
  518:20 519:7,23
  520:3 521:14
  522:12 523:8,12
  534:18 535:4
  538:11 541:10
  546:5 549:13
  556:17 557:23
  559:8 565:20

567:19 579:17
  583:10 584:6
  590:22 592:23
  595:25 603:24
  610:18 615:23
  622:17,20 624:3
  630:5 641:22
  647:14 663:6
  668:17 682:12
surprise  476:22
  498:7
surprised  478:24
  496:17 498:14,21
surprising  493:3
  495:4 498:10
  516:20
surrounding
  559:25 560:19
suspicions  560:19
  591:25
suspicious  475:23
  487:16,19,25
  549:11
swear  457:13
sworn  455:16,18
  457:16 685:7
  686:21
synopsis  674:21
systems  510:13
  671:17

**t**

t  454:6 455:2,2
  457:14 604:25
  630:23,23 644:6
  684:2 685:3,3
tab  595:21
table  567:20
take  458:18 462:8
  465:12 467:8
  493:18 495:3
  506:14,15 528:10

532:17 537:25
  540:5,10 544:14
  544:22 546:23
  554:6 565:9 566:3
  589:25 595:13,23
  595:24 613:8,15
  616:20 631:8,15
  640:16 646:5
  661:22,23 669:4
  676:15,17 683:21
taken  452:17
  456:5 506:19
  538:6 602:3
  609:10 636:4
  672:12 675:6
  684:9 685:9
takes  603:4 612:18
  675:5
talk  515:11,19
  525:3 533:2
  633:10 634:13
  674:2
talked  622:22
talking  458:22,23
  488:2 489:18
  512:22 520:18,19
  529:18 538:10
  545:13 546:5
  594:18 610:9
  615:24 617:17
  623:7 624:6
  628:18 633:5
  648:19 650:9
  651:23 660:2,7,9
  662:12 666:7
  667:9
target  634:22
targeted  603:13
task  563:15
tasked  562:6

**tax** 646:25,25
  647:20
**team** 467:17
  481:10,16,17,22
  506:7 507:16
  519:2 524:8
  527:11 558:2
  560:23 571:23
  600:2,7,11 646:14
  660:11 665:6,16
**techniques** 670:24
**technologies** 649:7
**teleconference**
  468:18 469:2
**telephonic** 468:22
  469:7
**tell** 483:5,10,17
  487:22 488:5
  491:22 530:6,11
  531:12 536:7,22
  540:20 544:23
  545:11 548:18
  549:8 556:21
  560:17 569:3
  586:8,9 593:13
  594:5,23 595:7
  596:15 608:11
  610:7,16,22 613:3
  613:23 617:3,9
  620:21 621:20
  631:20 640:22
  644:15,23 661:8
  665:22 667:11
  668:12 674:22
  679:7
**telling** 465:19
  470:19 512:10
  513:5 515:12
  546:7 570:25
  571:3 590:24
  622:7 672:16

**tells** 593:18
**ten** 471:11,12
  495:9 515:19
  586:24 596:23
  597:5,14
**tenth** 668:25
**term** 462:5 527:19
**termed** 476:20
**terminate** 474:18
  475:7 477:10
  499:15 502:15
  503:20 504:5
  507:23 509:13,22
  516:5 523:18
  525:6,16,21 526:3
  527:4 528:7
  533:11 534:4
  537:20 538:11
  539:12,15 540:16
  541:20 542:5,14
  543:9,17,24
  554:15 558:5,19
  564:12 565:14
  566:11 567:24
  568:8,20 569:12
  570:19 571:14
  572:12 573:4,21
  575:4,12 583:15
  586:5,7 587:18
  593:10 600:16
**terminated** 501:14
  502:2 507:5
  522:23,24 565:4
  573:16 587:20
  596:19
**terminating** 494:9
  502:19 524:14
  564:20,22 581:5
  582:19 583:24
  584:15 586:25
  588:4 589:23

594:9 595:3 599:2
**termination**
  454:17 476:19
  477:5,13 494:19
  502:24 503:17
  523:7 526:16
  528:18 532:22
  539:18,20 564:3,8
  566:18 574:4
  578:9,24 579:8,22
  581:15,25 582:7
  582:10,20 583:2
  585:17 587:25
  588:2 589:6,7,14
  590:4,11,16
  591:12 592:21
  593:8,14,24
  597:10 598:3,12
  599:21 600:20
**terms** 485:24
  499:11 548:20
  581:21 675:21
  677:16 682:11
**terrible** 498:15
**testified** 457:17
  470:8 478:6
  622:21 654:19
**testify** 464:13
  535:10 566:21
  569:25 588:10
  655:9,15
**testifying** 461:21
  473:2 589:12
  615:4
**testimony** 473:6
  473:10,24 474:7
  474:14 478:8
  484:9,23 485:6,8
  485:16,17 486:5
  487:6 490:22
  494:14 495:19

496:10 499:20,24
  500:4,6 505:25
  506:3 510:11
  511:5,12,14,15
  512:4,13 513:12
  513:18,22 514:2
  516:8 520:9
  533:15 535:19,24
  537:8,10 538:12
  538:24 539:13
  540:15 542:13
  543:7 545:8 550:8
  582:2,5 583:16,18
  588:16 597:25
  614:10 619:7
  625:9 640:6,11,12
  640:14 643:13
  645:4 657:5
  659:12 675:23
  684:8,11 685:8,8
**thank** 555:15
  607:9 673:4 678:2
  678:8,19
**thankfully** 514:16
**thanks** 485:19
  683:16
**theft** 499:3 501:23
  504:22,25
**therefrom** 565:11
**thick** 581:20
**thing** 495:25 497:8
  498:8,15 504:12
  516:18,25 546:6
  570:8 577:5
  591:15 628:11
  663:17 680:25
**things** 476:23
  480:25 492:5,23
  493:17 497:8
  502:2,16 507:14
  508:18 510:13,14

519:19 529:13
546:7 548:20
564:25 565:12
569:22 572:15
579:12 582:16
583:9,12 584:3,4
584:14 617:22
622:17 627:14
646:9 647:2
674:10,12
**think**   457:3
459:23 460:14
461:6,10 463:7
465:11,15,24
470:5 476:16
485:7 486:18
488:16 489:20
494:15 498:23
500:10,12 509:16
512:18 513:11
515:16 518:17
520:9 521:11
524:20 526:4,10
528:12 531:21
533:5,14,22 535:4
536:8 537:4,6
541:2 542:25
546:21,24,24
548:24 551:4
554:11,25 556:12
562:4,16 563:22
564:24 567:9,20
568:25 569:7
570:8 574:8 580:5
583:4,8,8 584:20
587:7 591:14
594:21,22 597:17
597:20,23 598:24
599:10,13 603:7
604:16 606:3
610:6 615:7,11,11

615:12 616:11
617:14,18,21,21
618:5,9,13,16,17
620:18,21 622:3
623:14,20,20
626:2 627:23
632:5 633:5
635:20 646:9,12
647:2 659:9 660:8
661:11 664:15,23
666:14,16 668:3
668:25 670:8,22
671:10 672:18
673:5,17 676:25
678:24 680:4,23
680:25 683:19
**thinking**   604:18
**thinks**   535:8
**third**   602:19
604:23 605:3
610:13 619:11
628:23 633:24,25
634:4,4,14,15
649:3
**thoroughly**   522:14
**thought**   492:7
500:25 518:3
521:5 522:14
532:23 534:9
563:3 570:9
573:19 584:14
590:23 614:6
622:13 647:11
654:19 658:20
**thoughts**   556:24
**thousand**   664:16
**thousands**   490:19
490:23 494:3,4
495:10 496:6
499:16 500:11
510:21 511:2

513:7 516:2
552:13,22 593:3
593:20 594:8,24
**threatening**
676:16,18
**three**   467:23,23
468:14 511:18
531:19 534:2
535:13,13 557:11
563:13 626:4
652:13,14,19
653:2 663:9
673:14,17
**threshold**   507:8
**throw**   523:5
**time**   455:11
456:20 458:18,24
468:25 471:6,20
473:13,20 476:4,6
492:8,15 498:18
500:22 508:23
509:7 511:11
513:12 514:24
515:18 517:13
519:25 523:3
525:18 526:12
528:24,24 529:2,4
529:5,8 531:4
536:2,13,16,18,20
538:3,7 539:11
546:16,23 557:3
560:8 564:5 571:8
580:22 586:16,19
586:25 587:5,12
587:12,17 591:23
592:6,25 601:18
601:21,25 609:8
609:11 612:14,17
612:23 620:21
622:18 630:15
645:15 647:21

652:11 656:14
660:3,6,11 666:2
667:22 668:16,17
668:18 672:10,13
675:2,8,9 676:12
679:8 680:21
683:15,17,23,25
**timeframe**   656:13
**timely**   567:5,10
**times**   467:5 469:4
477:15 481:14
511:22 513:24
563:13,19 593:4
594:8 605:12
618:22
**timing**   587:14
**title**   464:23
**today**   464:21
465:10 467:6
472:20 473:2
474:15 485:2
491:4 506:16
509:7 533:7,25
535:12 537:17
538:12 557:21
568:17 588:10
639:9 641:13,25
642:2,21 643:5
648:2 662:5
663:22 664:10
676:22 677:25
679:16 682:6,14
682:20 683:9
**today's**   464:9
466:10,14,23
647:10 681:16
**told**   486:13 487:10
487:24 521:6
542:25 563:13
589:10 590:23
601:2 618:21

657:5 665:6,16
673:6
**tomorrow** 506:16
**tone** 485:23
**top** 484:2 608:14
608:18 619:12
658:23
**topic** 464:14
474:17,22,24
475:4 490:2,19
555:2 563:12,21
570:2,13 582:24
614:15 638:16
**topics** 458:4
464:13 465:9
466:19 555:9
563:24 591:13
606:20 614:10
617:5 655:9 676:4
676:7,19,24 681:8
681:12,18 682:8
682:11,14 683:6,9
**totally** 484:23
513:15
**touch** 470:4,6
**traceable** 651:5
**track** 471:19
**trade** 477:2 488:7
489:10 492:9
493:6,13 494:6
495:12 496:7
499:18 503:9,23
505:3,17 507:18
510:8,23 552:24
559:13 560:3,12
560:22 562:10
583:13 592:17
593:2,21 594:12
594:25 602:10,14
602:22 603:2,4,20
604:4 605:5,9

606:23 607:5,24
608:9 609:19
611:2 613:18
615:5 616:15
617:7 619:15,21
619:23,25 621:3,9
621:25 622:25
625:7,12 628:7,15
629:19 631:5,23
632:18 633:9,10
635:19,22 636:13
636:16,21,22
638:11,25 639:12
640:10,24 641:17
642:7,25 643:10
643:14,19 644:17
645:9,16,20
646:10 647:4
648:4,9,11 650:24
651:21,23 653:22
654:16 657:23
660:25 661:4,13
663:15 666:10,21
667:5,7,18 669:10
671:24 672:24
673:3 674:13,17
682:19,25
**trading** 497:23
499:2 501:23
503:25
**transaction**
603:21,22 604:7
604:16 605:4
613:17 616:15,19
616:21,23,24
617:5 619:14,20
620:5,15 621:8,23
625:11 627:16
628:6 629:17
631:3,3,22 632:16
633:7,14,21 634:3

634:15 635:2,3,21
636:10 637:15
638:10,24 639:10
640:9,23 641:16
642:5,24 643:8,17
644:3,16 645:5,7
**transactions**
602:10,12,16
603:19 604:2,2,9
605:23 606:2,7,14
606:21 607:3,13
607:22 608:7
609:17 610:24
615:3,20 616:3
617:10 618:7,10
622:24 625:5,5
628:13 629:10,17
629:25 630:2
632:22,24 635:11
635:18 636:20,25
639:18 664:18
668:14
**transcribed**
685:10
**transcript** 474:11
536:22 681:5,11
683:5 684:8,10
685:12
**transitioned**
682:16
**translates** 498:18
**transpired** 498:22
559:11
**traurig** 553:10
554:3,13,17
555:12 556:11,16
557:4 559:2,10,24
560:9,18 561:15
561:22 562:6
565:9 567:7 568:4
571:11

**traurig's** 554:2
558:4,18 564:2,6
564:10 565:10
566:9 567:21
568:6,19 569:10
570:15 571:22
577:13
**tremendously**
674:24
**trial** 455:12
**tried** 500:4 654:3
**tripp** 578:18,21
**trouble** 470:24
498:12 621:16
**true** 493:3,10
498:5 504:9
506:11 510:12
552:2 569:3
580:12 632:8,11
684:11,13 685:12
**trust** 500:18
571:25
**trusted** 571:24
**truthfully** 472:23
**try** 473:15 477:14
485:12,21 509:3
511:9 529:7
534:18 562:4
574:23 603:10,12
615:22 619:5
620:9 621:18
638:17 670:23
**trying** 503:21
505:5 507:19
508:20,22 515:13
526:9 527:20
539:9 540:9 552:7
562:18 565:7
569:4 571:4
579:25 587:8
601:7 634:25

657:4,8 658:9
661:15 669:12
**turned**  679:23
**turning**  476:6
**turns**  468:21
**twenty**  546:4
**twice**  467:7,11
497:18 514:9
**two**  457:19 458:7
459:2,7,8,24
463:18 464:22
470:7,9,10 511:17
528:22 539:7
540:24 545:3,7
548:22,23 557:11
563:13 568:25
576:21 578:21
618:22 634:23
652:13,14,19
653:2 658:23
659:10
**type**  674:25
**types**  644:10
646:24 677:16
**typically**  579:11

**u**

**u**  455:2 457:14
630:23
**unable**  474:14
622:5 678:22
**unclear**  505:3
561:5 619:5
**uncommon**  498:8
**uncovered**  545:14
599:23
**underlying**  564:11
637:7 638:6
**underscores**
511:13
**understand**  457:4
458:4 459:4

472:19,25 477:18
479:13 487:2
490:18 497:18
502:12 503:19
507:20 508:16,21
512:25 517:12
520:13 527:10
532:18 539:13
541:5 561:14
562:18 564:14
574:3,21,25 576:2
589:20 614:9
616:4,8 634:25
636:11,12 650:16
657:5,8,20 661:15
663:6 675:14
**understanding**
458:11,16 460:9
462:11 489:7
498:13 530:24
542:7,9 543:5,15
553:4 555:5 559:8
573:13,18 575:2
575:10,16,20
589:3 621:16
622:20
**understands**
512:24
**understood**  464:3
486:6 518:2 520:3
531:5,14 534:10
569:24 574:10
576:5,12
**undertake**  517:5
616:24
**undertaken**
486:15,25 573:23
**undertook**  518:5
**underwood**
453:14 457:9

**unequivocally**
581:18
**unfair**  516:11
**unfortunate**
573:12 630:17
681:18
**unfortunately**
528:16 680:6
**unfounded**  537:12
**unidentified**  676:8
**unique**  621:12,15
671:22 674:12
**unison**  524:3
**united**  452:2
**university**  602:17
603:22 604:8,22
606:25 658:10,24
659:2,6,12,17,23
659:24 660:22,23
661:8,23,24 662:6
662:10,15 663:7
663:10,24 664:2,6
664:12 665:2,4,18
666:8,20,24 667:2
669:18 670:2,6,16
**unlimited**  462:3
**unreasonable**
615:7,11 617:19
617:21 618:13
622:4,9 664:15
**unsure**  492:13,18
496:4,17,18 497:5
498:22 518:7,9
**unwieldy**  524:20
**unwise**  508:14
**unwritten**  558:25
**updated**  577:6
**uploaded**  491:22
**use**  462:5 527:21
539:23 563:18
603:3 607:18

612:17 614:11
616:18 619:6,25
620:20 642:20
646:24 668:16
**useful**  465:7 489:2
537:5 544:24
587:8
**usually**  468:21
**utilize**  633:22
643:12

**v**

**v**  596:14 644:6
686:3
**vacation**  673:2
674:4
**vague**  562:2,5
**valid**  463:2
**valuable**  674:25
**value**  506:16
653:22 654:4,5,7,8
654:10,14
**variety**  560:24
**various**  477:8
525:25 565:3
644:10
**vault**  506:12,23
**vehicle**  648:22
**vehicles**  646:22
648:21 649:8
**verbal**  557:24
**verification**  574:7
**veritext**  456:10,12
686:2
**version**  558:14
651:4
**versus**  456:7
**video**  468:19,21,23
681:5
**videographer**
453:18 456:2,11
457:12 538:3,7

601:25 602:5
609:8,11 612:25
667:12 672:10,13
681:20 683:17,20
683:23
**view**   458:18
482:22 498:24
500:7 501:4
509:12 563:18
567:23,23 568:7
569:13 571:22
573:24 574:25
580:8 584:20,24
585:10 599:19
601:11 613:19
614:15 621:10
628:15 631:5
641:23 656:23
663:14 666:8,20
667:5 672:21
673:3,22 677:5
**viewed**   500:11
661:16
**vint**   453:19 457:25
458:22 459:9,16
468:5,10,16
483:22 555:14,25
556:4 668:24
676:6,19 681:13
683:3,6,22
**violate**   503:5
**violated**   505:16,21
508:8 594:3
**violation**   488:18
497:21 587:5
589:7
**violations**   503:22
503:23 504:4,23
589:15
**virtual**   452:15

**virtually**   572:8
**visa**   629:22
**voice**   523:16
526:13,14,20,22
527:3,18
**voices**   526:24
585:23
**volcano**   506:13,23

**w**

**w**   684:2
**wait**   515:9 626:5
**waited**   508:19
**waived**   455:7
**waiver**   625:23
626:16 627:2
628:2
**walk**   677:8 678:5
679:25
**walked**   681:23
**want**   459:15 461:5
461:10,14 462:5
463:8 466:2
477:18 478:24,25
479:2 488:24,25
489:6 491:17
492:25 496:25
505:11 508:18
509:3,9,14,16
511:22 513:4,21
515:14 516:24
518:8,10,15,20
519:4,5,7,9 521:7
521:25 522:8,9,15
522:16 523:17
527:19,23 528:2
535:9,15,19
538:11 539:12
546:5,17 561:7,14
562:5 563:19
565:19 567:5
569:9 572:17,18

574:25 590:22
597:10 603:15,18
603:22 604:13,14
606:18,21 607:19
607:22 608:4,5,6,6
608:11,12 610:20
610:21 614:4
616:10,12 617:3
617:12 618:23
619:3 623:5,25
624:3 625:20
627:7,10 630:11
633:6,9,13 634:24
635:13,13,16
637:22 638:12
640:5,11,12 641:9
641:24 643:14
644:22,23 646:5,8
653:15 666:19
667:10,14 668:21
669:5 670:11,14
674:17 675:14
676:13 678:5,13
682:11
**wanted**   465:5
497:2,9 498:11
499:10 501:19,20
502:21 505:13
519:18,23 521:9
521:14 536:10
591:25 592:8
603:8 618:17
647:13,23 654:2
**wants**   535:7,8
603:16 612:17
672:19,23 677:4
**watch**   460:20
**way**   457:8 470:18
485:16 491:5
524:23 526:10
527:15,23 567:3,5

567:10 568:12
573:23 576:12
591:6 598:7
599:19 618:6
619:12 621:19
637:13 638:4
641:13 642:22
643:6 645:12
651:20 659:18
662:22 669:22
671:2 674:15
676:14
**ways**   479:13
**we've**   458:2
524:21 544:15
570:22 580:7
617:23 631:18
**wearing**   481:13
**web**   671:11
**website**   670:3
**week**   467:10,11
469:14,23 470:13
470:14,15 471:25
472:12,17 528:22
**weekend**   470:4
**weeks**   528:21,25
**weiss**   453:15
**welcome**   589:18
602:8 614:11
618:22 623:10
642:19
**went**   519:10
533:20 549:20
561:3,9 647:11
670:2 682:22
**whatsoever**   581:2
**whereof**   685:19
**white**   515:23
**wholly**   680:4
**whys**   535:3

**[wieldy - zoom]**                                                        Page 43

**wieldy**  659:22
**willing**  592:20
  678:18
**withdrawn**  480:4
  558:23 575:25
  651:15 653:20
  656:19
**witness**  452:16
  454:3 457:2,10,13
  457:15 460:2
  463:7 474:21
  511:24 512:9,14
  512:17,23 513:15
  513:20 515:12
  517:9 523:17
  536:15 542:22
  545:5 559:5,16,18
  563:12 567:23
  582:23 612:19
  660:17 664:11
  669:9 672:4,8
  673:9,20 675:15
  675:20,24 676:2
  676:16 677:8,9,15
  679:10 680:9,14
  680:19,20 681:23
  681:24,25 685:7
  685:13,19
**witnesses**  557:14
  673:13 675:21
  676:4,23
**word**  539:23 540:3
  558:15 563:18
  565:25 566:3
  573:8 613:21
  621:21 626:15
  642:4 674:4
**words**  487:18
  524:13 527:20
  585:25 594:11,12
  596:15 641:2

**work**  468:24
  486:17 501:5
  527:15 562:15
  590:21,25 591:4
**worked**  481:21
  671:7
**workforce**  476:12
**working**  546:4
  663:8
**works**  527:9
**worse**  503:23
**write**  524:21 529:2
  529:4 594:16
**writing**  529:21
  530:4 570:16
**written**  488:19
  497:16 558:25
  571:12 596:24
  597:4,12 598:9,17
**wrong**  460:2 461:7
  461:11 510:14
  519:6,16,18
  521:13
**wrote**  663:5

| x |
| --- |

**x**  452:3,10 454:2,6
  534:19
**xxxx**  454:18
**xxxxx**  455:20

| y |
| --- |

**yahoo**  629:14
**yang**  453:15
  457:10
**yeah**  504:12
  519:12 537:4
  549:18 550:6
  568:12 595:25
**years**  518:11
  586:16,19,21,24
  587:17 588:21

589:2 595:10
  641:21 645:11
  660:18 663:9
**york**  452:3,19
  453:5,5,12,12

| z |
| --- |

**z**  644:7
**zoom**  555:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.