# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 9

Page 687

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK
     -------------------------------------------- x

4

     PAUL IACOVACCI,

5

                         Plaintiff,

6

         -against-              Case No.

7                               1:18-cv-08048

8    BREVET HOLDINGS, LLC, et al.,

9                         Defendants.

10   -------------------------------------------- x

11

12                   November 17, 2021
                     9:32 a.m.

13

14

15         CONTINUED VIRTUAL DEPOSITION of the

16   Defendant/30(b)(6) witness, DOUGLAS

17   MONTICCIOLO, taken pursuant to Stipulation,

18   held before Fran Insley, a Notary Public of the

19   States of New York and New Jersey.

20

21

22

23

24

25

Page 688

1
2   A P P E A R A N C E S:
3         CYRULNIK FATTARUSO LLP
4               Attorneys for Plaintiff
5               55 Broadway, 3rd floor
                New York, New York  10006
6
          BY:   JASON CYRULNIK, ESQ.
7               PAUL FATTARUSO, ESQ.
                IAN DUMAIN, ESQ.
8               ADINA LEVINE, ESQ.
9
10        REED SMITH LLP
11              Attorneys for Defendants
12              599 Lexington Avenue, 22nd floor
                New York, New York  10022
13
          BY:   LOUIS SOLOMON, ESQ.
14              MONICA YANG, ESQ.
                AVERY NORMYLE, ESQ.
15              RUHL BEHAL, ESQ.
16
17  ALSO PRESENT:
18        SCOTT WEISS, ESQ.
19        DAVID SPINLEY
20        NEIL LIBROCK
21        MARCO SOZIO, Videographer
22
23              xxxxx
24
25

Page 689

1

2    -------------- I N D E X -----------------

3    WITNESS                EXAMINATION BY      PAGE

4    DOUGLAS MONTICCIOLO  MR. CYRULNIK        692

5

6    -------------E X H I B I T S----------------

7    MONTICCIOLO         DESCRIPTION           PAGE

8    Exhibit 17  Marked Exhibit Folder         755

9

10       (EXHIBITS TO BE PRODUCED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 690

1

2                S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the respective

6     parties herein, that filing, sealing and

7     certification, and the same are, hereby waived.

8

9            IT IS FURTHER STIPULATED AND AGREED

10    that all objections except as to the form of

11    the question, shall be reserved to the time of

12    the trial.

13

14            IT IS FURTHER STIPULATED AND AGREED

15    that the within deposition may be signed and

16    sworn to by an officer authorized to administer

17    an oath, with the same force and effect as if

18    signed and sworn to before the Court.

19

20                      xxxxx

21

22

23

24

25

```
                                        Page 691
 1                  Monticciolo
 2          THE VIDEOGRAPHER:  Good morning.  We
 3     are going on the record at 9:32 a.m. on
 4     November 17, 2021.
 5          This is media unit one of the video
 6     recorded deposition of Douglas Monticciolo
 7     taken by counsel for the plaintiff in the
 8     matter of Paul Iacovacci versus Brevet
 9     Holdings LLC et al. filed in the United
10     States District Court, Southern District
11     of New York.  Case number 1:18-cv-08048.
12          The deposition is being held remote
13     virtual Zoom located at 599 Lexington
14     Avenue, New York, New York 10022.
15          My name is Marco Sozio from the firm
16     Veritext New York.  I'm the videographer.
17     The court reporter is Fran Insley from the
18     firm Veritext New York.
19          I am not authorized to administer an
20     oath.  I'm not related to any party in
21     this action nor am I financially
22     interested in the outcome.  Everyone
23     attending remotely will now state their
24     appearances and affiliations for the
25     record.
```

Page 692

1                        Monticciolo

2              If there are any objections to the

3        proceeding, please state them at the time

4        of your appearance beginning with the

5        noticing attorney.

6              MR. CYRULNIK:  Good morning.  Jason

7        Cyrulnik, Cyrulnik Fattaruso, on behalf of

8        the plaintiff.

9              MR. SOLOMON:  Lou Solomon here on

10       behalf of the defendants and the witness.

11             MR. WEISS:  Also Scott Weiss, Weiss

12       & Weiss, co-counsel to the Cyrulnik

13       Fattaruso firm.

14   D O U G L A S   M O N T I C C I O L O, the

15   Witness herein, having first been duly sworn by

16   the Notary Public, was examined and testified

17   as follows:

18   EXAMINATION BY MR. CYRULNIK:

19       Q.   Good morning, Mr. Monticciolo.  Nice

20   to see you again.  The purpose of today's

21   deposition, as you know, is to continue the

22   30(b)(6) deposition that we started with you

23   back in October -- on October 7th and then

24   continued on November 1st, at the end of which

25   you had walked out, but I think we reached an

Page 693

```
 1                    Monticciolo
 2   agreement to continue the deposition and
 3   complete it today.  Is that consistent with
 4   your understanding?
 5            MR. SOLOMON:  I object to the
 6        statement and I would ask you to just ask
 7        him questions so we can get through this.
 8            MR. CYRULNIK:  I'll ask you at the
 9        outset, Lou, our agreement on time does
10        not account for your speaking objections
11        and any evasive answers.  So I would ask
12        you to please be mindful --
13            MR. SOLOMON:  Nor does it account
14        for your abusive conduct from the getgo.
15        We didn't walk out.  That's a
16        misstatement.
17            MR. CYRULNIK:  Lou, let me finish
18        talking.  Our agreement on time
19        specifically did not include speaking
20        objections or coaching from you or evasive
21        answers from Mr. Monticciolo.  That was
22        part of the reason we had trouble I think
23        completing this deposition last time.
24            I asked Mr. Monticciolo a question
25        whether that was with his understanding.
```

Page 694

                        Monticciolo

1              I did not ask you a question.  I did not

2        ask you to interject.  If you want to

3        instruct the witness, based on privilege

4        or otherwise, object to the form of the

5        question.  You're free to do so, but

6        please try to limit your objections so we

7        don't get into the same mess we got into

8        last time.

9        Q.    Mr. Monticciolo, is what I described

10  consistent with your understanding of today's

11  deposition?

12              MR. SOLOMON:  I object to the

13        statement.

14        A.    Could you repeat the question?

15        Q.    Yes.  The question was the purpose

16  of today's deposition is to continue with the

17  30(b)(6) deposition that we started with you

18  back in October and then continued in

19  November 1st, but we were unable to complete

20  this on November 1st including -- based on the

21  fact that you walked out of the deposition

22  after a certain amount of time?  Is that

23  consistent with your understanding?

24              MR. SOLOMON:  I object.  I think it

```
                                        Page 695
 1                    Monticciolo
 2        misstates the record.
 3        A.    No.
 4        Q.    What is inconsistent with your
 5   understanding?
 6        A.    Do you have a question about that?
 7        Q.    I want to know why you answered no.
 8   You said what I just recounted was inconsistent
 9   with your understanding.  I'm asking what is it
10   that I just said that is inconsistent with your
11   understanding?
12        A.    I came here prepared to talk about
13   the topics that were asked.  If we want to go
14   back to that, I guess we can go back to the
15   court reporting record.
16        Q.    I didn't understand your answer
17   again.  What is it about what I just said is
18   inconsistent with your understanding?
19        A.    Again, I didn't come prepared to
20   recap the last meeting and your perception of
21   it or what it was.  So that is not in the topic
22   of questions I'm aware of.
23        Q.    You're unprepared to speak to the
24   testimony that you gave about two minutes ago
25   that what I just said was inconsistent with
```

Page 696

```
 1                     Monticciolo
 2    your understanding?
 3        A.    Again, I'm here to talk about the
 4    topics that have been requested of me as the
 5    corporate representative.
 6             MR. CYRULNIK:  I will note for the
 7        record the witness has not answered that
 8        question.  It doesn't need to be a
 9        30(b)(6) topic to explain an answer that
10        you gave, Mr. Monticciolo, but we will
11        deal with that if you we have time at the
12        end.
13             MR. SOLOMON:  I object to your
14        stating things on the record.
15             MR. CYRULNIK:  You made that
16        objection already, Lou.  You can have a
17        standing objection to statements made on
18        the record.
19        Q.    You have been designated to testify
20    on Topics 1 through 5 in a deposition notice
21    that was previously marked as Exhibit 10.  Do
22    you recall that?
23        A.    Yes.
24        Q.    What did you do to prepare for
25    today's deposition apart from which you already
```

Page 697

1                    Monticciolo

2    identified you've done with respect to

3    preparation for the prior days of testimony?

4            I see you're writing something down,

5    Mr. Monticciolo.  Can you tell me what you are

6    writing?

7        A.    I will in a second.  I just wanted

8    to make sure I have a comprehensive answer for

9    you.  I spent 20 to 30 hours, in that ballpark,

10   preparing for this since our last deposition.

11   That is combined with approximately an estimate

12   of another 20 to 30 hours by indirect people

13   doing searches for me, doing additional

14   research on materials.

15           I reviewed files that were in our

16   possession.  I spoke to people that have

17   relevant information.  I spoke with our counsel

18   in person and telephonically.

19       Q.    Let me just first make sure I

20   understand.  Are you reading off of notes that

21   you just wrote for yourself?  Is that what you

22   are doing?

23       A.    Yes.

24       Q.    And did your notes differ in any way

25   with what you just recounted?

Page 698

1                         Monticciolo

2          A.    They were complete sentences versus

3     these are just the facts that I just presented.

4          Q.    The notes, you wrote down complete

5     sentences on the page?

6          A.    No, I did not write down complete

7     sentences on the page.

8          Q.    Oh, okay.  You wrote down for

9     example 20 to 30 hours on the page?

10         A.    I did.

11         Q.    The 20 to 30 hours that you

12    described, that was doing what?

13         A.    That was reading through the topics,

14    looking at affidavits, refreshing myself with

15    them, looking at responses, objections, et

16    cetera, interrogatories, looking through things

17    that I thought were relevant.  Speaking to

18    people who may have been directly involved or

19    have relevant information and working with

20    having conversations with counsel

21    telephonically and in person.

22         Q.    All of that is -- all of those

23    things were things you did, including the

24    amount of time that you identified time that

25    you spent since the November 1st deposition

Page 699

```
 1                    Monticciolo
 2   completed, correct?
 3        A.    Correct.
 4        Q.    I want to make sure I understand
 5   what you did.  So the 20 to 30 hours, is that
 6   the total estimate of time you spent doing all
 7   the things that you identified or did you have
 8   two different 20 to 30 hour estimates that you
 9   provided?  I just didn't appreciate the point
10   that you made when gave your first answer.
11              MR. SOLOMON:  Object to the form.
12        A.    Could we maybe have the court
13   reporter read it back?
14        Q.    I can ask you the question again.  I
15   want to understand.
16              Did you spend a total of 20 to 30
17   hours since the last deposition preparing or
18   did you mention a second window of time that
19   you spent preparing in your initial answer?
20        A.    There were indirect 20 to 30 hours
21   of other people assisting me doing, gathering
22   documents and files.  So my 20 to 30 hours,
23   plus an estimate of 20 to 30 hours of people
24   preparing stuff for me.
25        Q.    Who are those other people?
```

```
                                        Page 700
 1                     Monticciolo
 2         A.    As I mentioned, our counsel.
 3         Q.    When you say your counsel, are you
 4   referring to Reed Smith or anyone else?
 5         A.    I'm sure it included our fund
 6   counsel.
 7         Q.    I'm sorry, your fund counsel?
 8         A.    Our fund counsel because they were
 9   in our office or on the phone and I could have
10   mentioned something to them.  I don't recall
11   the specifics of that.
12         Q.    Who is your fund counsel?
13         A.    Curtis Mallet and we use two or
14   three others.  I could get you their names.
15         Q.    So you had fund counsel preparing
16   materials for you in preparation for this
17   deposition?
18         A.    No, I said I may have spoken to them
19   about the topic.  I wanted to be comprehensive.
20         Q.    About the trade secrets topic, you
21   spoke to your fund counsel in the last two
22   weeks or so?
23         A.    As I said, I had conversations with
24   our counsel, what those topics were between us
25   and our counsel.
```

Monticciolo

1

2      Q.    Well, I'm not asking you to divulge

3   the substance of any legal advice,

4   Mr. Monticciolo.  I just want to understand

5   what topics you discussed with whom.

6            If it gets beyond that, I'm sure

7   Mr. Salomon will ably guide you, but at a

8   threshold level, I don't think there is any --

9   going to be any instruction from Mr. Solomon

10  with respect to the question I just asked.

11           Did you discuss the trade secrets

12  30(b)(6) deposition topics with Curtis Mallet?

13     A.    I don't recall what specific topics

14  we talked with them.  We was just our ordinary

15  course and we tend to talk about things that

16  are going on in the firm.  So I didn't keep

17  track of those specific conversations.

18     Q.    Were you just listing out for me

19  things you had done over the last two weeks or

20  were you listing things that you've done

21  specifically to prepare for the continuation of

22  this deposition?

23     A.    To prepare for the deposition.

24     Q.    Can I get a clear answer?  Yes or

25  no?  Did you speak with Curtis Mallet or any of

Page 702

Monticciolo

1
2          your other fund counsel for the purposes of
3          preparing for the topics that you are
4          testifying about today?
5                    MR. SOLOMON:  Objection.  Asked and
6               answered.
7                    MR. CYRULNIK:  It was asked, but I
8               certainly don't have a clear answer.
9                    MR. SOLOMON:  You know I object to
10              your commenting about -- (cross talk)
11                   MR. CYRULNIK:  You have a standing
12              objection on comments.
13                   MR. SOLOMON:  I don't need or want a
14              standing objection unless I ask for one.
15              I thank you for that in advance.  I put my
16              objection on the record.
17                   MR. CYRULNIK:  If you don't want a
18              standing objection, that's fine, but if we
19              have a time issue, we are going to have to
20              add up all the times that you refused to
21              have a standing objection, try to cut this
22              time short and every time you try to
23              interject with a comment about anything
24              that I say.
25                   It's my deposition.  I can say what

```
                                          Page 703
 1                    Monticciolo
 2      I want to.  I can ask what I want to.  I'm
 3      treating the witness with respect.  You
 4      don't need to jump in every single time
 5      and comment about my responses to your
 6      objections or my questions to your
 7      witness.  You can have a standing
 8      objection to any comments.
 9           If you want to make an objection
10      about a particular question, you can
11      object to the form or you can talk about
12      privilege and that's it.
13           MR. SOLOMON:  I object to the
14      statements that you're making on the
15      record and not asking questions.
16           MR. CYRULNIK:  You did it again.
17      Q.   Mr. Monticciolo?
18      A.   I don't even remember what the
19  question was.
20      Q.   Of course you don't.  That's why
21  these depositions take as long as they do.
22           MR. CYRULNIK:  Mr. Salomon?
23           MR. SOLOMON:  I object to the
24      statements you're making.  Ask questions
25      of the witness.
```

1                    Monticciolo

2          MR. CYRULNIK:  You did it again.

3     Q.    The question was yes or no.  Did you

4  speak with fund counsel, including Curtis

5  Mallet, for purposes of preparing for the

6  topics that you are going to be addressing

7  today as the corporate 30(b)(6) representative?

8          MR. SOLOMON:  Objection.

9     A.    Yes.

10    Q.    What subject matter, without

11  disclosing the substance of any legal advice

12  they gave you, what subject matter did you

13  discuss with Curtis Mallet for purposes of

14  preparing for this deposition?

15    A.    Our fund documents.

16    Q.    Anything else?

17    A.    I don't recall anything else.  It

18  was a broad conversation.

19    Q.    When you say fund documents, are you

20  referring to the -- any particular agreements

21  or other documents?  Can you specify for me

22  what you mean by fund documents?

23    A.    I don't recall specifically which

24  ones.

25    Q.    Well, when you say fund documents

Page 705

1                    Monticciolo
2    generally, what do you have in mind?
3        A.    The fund documents.  The documents
4    that legislate our funds and our business.
5        Q.    Is there a -- can you give me an
6    example of a fund document?
7        A.    Yes, I think we pointed out many of
8    those as responses to this suit and affidavits
9    and testimony.  I didn't come prepared to go
10   through what the answer is to that specific
11   question.
12       Q.    You're not prepared to tell me what
13   you mean by fund documents, Mr. Monticciolo?
14       A.    Relevant to a topic I did, but as a
15   generic question, no.  I want to be time
16   efficient, but I also want to be comprehensive.
17       Q.    Mr. Monticciolo, I think in terms of
18   scope objections we are going to be best served
19   by having your counsel make whatever objection
20   he thinks is necessary.  You're here to sit for
21   a deposition.
22                You used the term fund documents in
23   responding to a question.  I want to know what
24   you are talking about and talking about whether
25   or not you remember that being in the 30(b)(6)

                              Monticciolo

1

2   topics or whether you're prepared to speak to

3   it.  It's a term that you used and I want to

4   understand what you meant.

5             Can you explain to me, by way of

6   example, what you mean when you say fund

7   documents?

8             MR. SOLOMON:  Object to the

9        statement.

10       A.    Again, I responded to this question.

11  I said it's the documents that legislate our --

12  what our funds are and their structure and I

13  think I was clear on that.

14       Q.    Well, can you give me an example of

15  one such document, one example?

16       A.    Yes, a limited partnership

17  agreement.

18       Q.    Apart from the LP agreement for any

19  particular fund, can you give me any other

20  examples of fund documents or is that what we

21  are talking about, the LP agreements governing

22  any funds that Brevet is currently operating?

23       A.    Again, there are numerous documents

24  and to be comprehensive this could take quite a

25  long time.  So, you know, how would you like me

                              Monticciolo

1
2    to answer that?

3        Q.    Just truthfully.  Just tell me what

4    fund documents you are aware of.  If it is the

5    same group of fund documents that you know

6    apply to each fund and there are just many of

7    them because there are multiple funds, I don't

8    need you to tell me you're talking about short

9    duration fund, onshore, offshore.  I just want

10   to know what group of documents you're

11   referring to when you refer to fund documents.

12       A.    I don't think I could limit it that

13   way because they are unique and it would

14   require remuneration, so I'm not going to

15   generalize on it.  As I think you mentioned,

16   they are different by fund.

17       Q.    So, each of these documents is

18   unique; you don't use the same documents for

19   each of your funds, is that a fair statement?

20       A.    That is fair.

21       Q.    Apart from speaking with Curtis

22   Mallet and your counsel at Reed Smith, who else

23   did you speak with to prepare for the

24   deposition?

25       A.    So, I don't know the names of the

Page 708

                              Monticciolo
1
2    other firms that we use, unfortunately, but I
3    know there were folks in our office that were
4    working with people preparing and determined
5    whether or not they were responsive.
6        Q.    Did you speak with anyone else apart
7    from -- let's start with counsel.  Any other
8    counsel apart from the ones that I just
9    identified, Curtis Mallet folks and Reed Smith
10   counsel in this litigation to prepare for
11   today's deposition?
12       A.    As I said, there are other lawyers
13   that we use in our business and they're in
14   office or on teleconferences.  So I can't put
15   the specifics on it, the exact amount of time,
16   but if something came up that may have been
17   relevant because we were looking to prepare
18   comprehensively for this, we could go and look
19   at who they were.  They are not our main
20   counsel like CMP.
21       Q.    Let me make sure you're
22   understanding my question.  I'm talking about
23   you, you're a person, Mr. Monticciolo, and you
24   prepared for the deposition over the course of
25   20 to 30 hours over the course of the last two

Page 709

1                         Monticciolo
2    weeks or so, 16 or 17 days.  I'm asking you
3    questions about that preparation.
4              I want to know whether you, Doug
5    Monticciolo, spoke with counsel, other than
6    counsel from Curtis Mallet and Reed Smith, in
7    preparation for this deposition.  That's a yes
8    or no question.
9        A.    I answered that question already.
10       Q.    If you're going to spend the time
11   telling me that you answered a question
12   previously, you didn't answer a question
13   previously, we are not going to get anywhere
14   and we are going to need to take more time
15   trying to count up how much time we wasted
16   doing that.
17             I don't mean to be rude in any way,
18   shape or form.  I just need to encourage you
19   for purposes of efficiency and to avoid having
20   to call you back.  I really don't think it's
21   useful to have you tell me that you think you
22   answered a question already.
23             Your counsel will probably do it
24   anyway, which I don't think is particularly
25   useful anyway, but that's his decision.

```
                                           Page 710
 1                       Monticciolo
 2    Certainly not something I am looking for you to
 3    do.  If you could just answer the question
 4    without referencing whether you did so already
 5    or not in your mind.
 6                MR. SOLOMON:  Object to the
 7         statement.
 8         A.    I'm sorry, could we just have the
 9    court reporter repeat what I said previously?
10         Q.    That's going to take longer, so I'm
11    going to ask the question again because every
12    time you ask the court reporter to read it back
13    we have to stop.  She has to go back and so on
14    and so forth.
15                The question was, did you speak with
16    any counsel, other than Curtis Mallet or Reed
17    Smith, in the last 17 days to prepare for this
18    deposition?
19                MR. SOLOMON:  Objection.
20         A.    Again, I answered that question.  If
21    you have a question about my answer, I will be
22    more than glad to answer that.
23         Q.    I will note for the record that we
24    are approximately 20 minutes into this
25    deposition and I don't think I have gotten any
```

Page 711

```
 1                    Monticciolo
 2   real straightforward answers and this is --
 3   does not go well for the continuation of this
 4   deposition.
 5              MR. SOLOMON:  I object to your
 6        statement and I think you're misstating
 7        what happened.
 8              MR. CYRULNIK:  I'm sure you do and
 9        the record speaks for itself, Mr. Salomon.
10        Q.    I asked you a question.  Did you or
11   did you not speak with any other counsel from
12   Curtis Mallet or Reed Smith in preparation for
13   this deposition in the last 17 days?
14              MR. SOLOMON:  The "you" in that
15        statement is the witness personally?
16        Q.    The you, as I said at the beginning
17   of the last question, is Doug Monticciolo.
18              MR. SOLOMON:  So you are repeating
19        the last question?
20              MR. CYRULNIK:  Yes, I am repeating
21        the last question and the question before
22        that because I haven't gotten an answer,
23        other than I think I answered that
24        already.
25              MR. SOLOMON:  I don't agree with
```

Page 712

1                       Monticciolo
2       that.
3               MR. CYRULNIK:  I know you don't.
4       A.      I believe I've answered that
5    question already.  Then I just want to be
6    consistent.
7       Q.      The way to be consistent,
8    Mr. Monticciolo, is to tell the truth.  If you
9    tell the truth and you hear a question that you
10   think you heard before, I don't think you have
11   to worry about that.  Your counsel can counsel
12   you about that during a break.
13              Please just answer the questions
14   truthfully.  Yes or no, did you or did you not
15   speak with counsel, other than Curtis Mallet or
16   Reed Smith, in preparation for this deposition
17   in the last 17 days?
18              MR. SOLOMON:  Object to the
19       question.
20       A.      I am going to repeat I answered that
21   question.  If you did not understand it, then
22   please let's have the court reporter repeat it
23   and you can ask me a question on that answer.
24   I would appreciate that.
25       Q.      So you're refusing to answer my

1                    Monticciolo

2    question; is that right?

3         A.    No, I am saying I answered it

4    already.

5         Q.    I didn't ask you a question as to

6    whether you answered a question already.  I

7    have asked you a question.

8              Are you or are you not going to

9    answer the question I asked you now?

10        A.    I'm not going to repeat my answer.

11             MR. CYRULNIK:  I will note for the

12        record that I have just spent

13        approximately four minutes trying to get

14        an answer to the question that the witness

15        refused to answer.

16             MR. SOLOMON:  Object to the

17        statement.

18        Q.    We will move on.  Who did you speak

19    with, apart from counsel, with respect to

20    preparing for this deposition since

21    November 1st?

22        A.    I spoke with, apart from counsel,

23    Mei-Li da Silva Vint, the compliance officer

24    counsel, internal.  I spoke with David Spinley

25    who works with her and I spoke with my finance

```
 1                    Monticciolo
 2   department.
 3        Q.    Who at your finance department?
 4        A.    Van, V-A-N.  He is our interim CFO.
 5   I can't remember his last name.  He's got a
 6   very long Greek last name, and Aaron Walsh.
 7        Q.    What did you speak to those two
 8   people about?
 9        A.    Information relevant to answering
10   these topics.
11        Q.    Can you be more specific?  What
12   information did you speak to Van, Greek last
13   name that is too long for you to remember, and
14   Mr. Walsh in preparation for this deposition?
15        A.    Specifics again for just answering
16   questions, there is a lot of questions on these
17   five or six topics.
18        Q.    Mr. Monticciolo, which questions,
19   which topics?  I'm asking you a specific
20   question.  A generic answer like I just talked
21   to them about these topics is not answering my
22   question.
23              What topics, subject matter, did you
24   speak with Van and Mr. Walsh about?
25        A.    As I said, there are many questions
```

```
 1                    Monticciolo
 2    and sub questions in these topics and I asked
 3    them about information that is relevant to
 4    these topics as there are many.  We could
 5    narrow it if necessary.
 6         Q.    It's necessary.  The question I
 7    asked you is what subject matter you spoke with
 8    these people about.  So it's necessary for you
 9    to narrow your answer to a clear answer rather
10    than cross referencing.
11              MR. SOLOMON:  I object to you
12         raising your voice.  If you have any
13         recollection.
14              THE COURT REPORTER:  I think Jason
15         froze.
16              THE VIDEOGRAPHER:  Jason froze, yes.
17              MR. SOLOMON:  Let's pause.
18              THE VIDEOGRAPHER:  We are now off
19         the record.  The time is 9:58 a.m.
20              (Brief recess taken.)
21              THE VIDEOGRAPHER:  We are now on the
22         record.  The time is 9:58 a.m.
23              MR. SOLOMON:  Jason, I wasn't sure
24         whether you were on the record or not.  I
25         thought you were, but I had said to the
```

Page 716

1                    Monticciolo
2         witness that even if he can't remember
3         everything, he can remember any of the
4         subject matters, that he should tell you.
5             MR. CYRULNIK:  I appreciate the
6         guidance.
7         Q.    Mr. Monticciolo, can you answer my
8    question, please, with Mr. Salomon's guidance?
9         A.    And without Mr. Solomon's guidance
10   as well, yes.  The topics that I recall were
11   around salary and compensation numbers paid to
12   Mr. Iacovacci and costs related to what we
13   identify as our trade secrets.  I appreciate
14   that you not raise your voice, please.
15        Q.    I'm sorry.
16        A.    I would appreciate that you not
17   raise your voice at me.
18        Q.    That I not raise my voice at you?
19   I'm not sure what you mean.  Let me make sure I
20   understand.
21             Did you understand Mr. Iacovacci's
22   salary and compensation to be a topic that
23   you're designated as the corporate
24   representative for?
25        A.    In the company's perspective we

Page 717

                              Monticciolo
1
2    believe that is relevant to answering one of
3    the topics, yes.
4         Q.    Which of the topics do you believe
5    it's relevant to answering?
6         A.    At least related to Topic 5.
7         Q.    So you believe that the punitive
8    harm or damages resulting from plaintiff's
9    alleged misappropriation of trade secrets
10   relates to the salary that Mr. Iacovacci
11   received; is that right?
12        A.    Again, the company's position is
13   that that is relevant to our belief of the
14   damages as described in Topic 5.
15        Q.    Please explain how Mr. Iacovacci's
16   salary or compensation relates to the punitive
17   harm that the defendant is claiming resulted
18   from alleged misappropriation or trade secrets?
19        A.    Again, we provided affidavits and
20   other materials on this topic and the company
21   believes that is relevant to our position on
22   the damages.
23        Q.    First of all, when you start an
24   answer with the word again, it probably means
25   that you're not answering my question because

1              Monticciolo
2  I'm endeavoring not to ask you the same
3  question.
4              Number two, instead of cross
5  referencing affidavits, you are here as a
6  deponent to answer questions.  I would
7  appreciate it if you would focus on the
8  questions rather than on focusing on what you
9  can refer me to instead of answering the
10  question.
11              The question was, please explain to
12  me how Mr. Iacovacci's salary or compensation
13  factors into or relates to defendants' punitive
14  harm or damages resulting from defendants'
15  alleged misappropriation of trade secrets?
16      A.    And I will state that I am adopting
17  those affidavits as my answer on behalf of the
18  company and I can point those out to you
19  because we have provided those and I will point
20  out that the company believes that the
21  compensation that he was provided for the years
22  of 2014 to '16 are part of our damages.
23      Q.    So the company believes that the
24  damages it suffered as a result of alleged
25  misappropriation of trade secrets includes the

1          Monticciolo
2    salary that Mr. Iacovacci received from Brevet
3    from 2014 to 2016; did I get that right?
4          A.    Yes.
5          Q.    How did Mr. Iacovacci's alleged
6    misappropriation of trade secrets cause harm in
7    the form of Mr. Iacovacci's compensation in
8    your view?
9          A.    I'm sorry, could you repeat that
10   question?
11         Q.    How did Mr. Iacovacci's alleged
12   misappropriation of trade secrets cause harm to
13   Brevet in the form of the salary or
14   compensation he received from 2014 to 2016 in
15   your view?
16         A.    Again, as the company we believe
17   that we were damaged.  We provided that
18   compensation and it's our position that we were
19   damaged by providing it.
20         Q.    Anything else that you can explain
21   as to how you think Mr. Iacovacci's
22   compensation from 2014 to 2016 constitutes
23   damage that was suffered as a result of his
24   alleged misappropriation of trade secrets?
25         A.    I'm not an attorney to draw those

Page 720

1                    Monticciolo
2   conclusions on that position.
3        Q.   I didn't ask -- I'm asking for your
4   position.  I'm not asking for you to give me a
5   legal opinion.  Anything else you can tell me
6   about your position as to how those damages
7   follow from the allegations of
8   misappropriations of trade secrets?
9        A.   We believe that they are relevant to
10  our damages and the support of how we were
11  damaged in a dollar amount.
12       Q.   Anything else you can tell me about
13  how those dollar amounts in damages follow from
14  the alleged misappropriation of trade secrets?
15       A.   I can again adopt as part of my
16  answer Callahan's affidavit dated 9/25/2018,
17  paragraphs 4, paragraphs 13 to 15.  Also adopt
18  affidavit dated March 24, 2021 paragraphs 10 to
19  12 and paragraph 17.
20       Q.   Anything else you can tell me about
21  how the damages that you are claiming in the
22  form of Mr. Iacovacci's compensation from 2014
23  to 2016 follow from the alleged
24  misappropriation of trade secrets or did you
25  cover everything?

Page 721

                          Monticciolo

1

2        A.    Again, I'm stating that this is our

3   position that this is relevant to our

4   calculation of the damages.

5        Q.    Anything else?

6        A.    And I have done a lot of homework on

7   this.  I'm sure there are other things that we

8   may have missed or may not have risen to part

9   of being as comprehensive as I could be and I

10  think I am.  Again, this is what I think is

11  relevant here.

12       Q.    I didn't follow your answer.  Is

13  there anything else, apart from what you just

14  testified to and adopted, that you can tell me

15  about defendants' punitive harm or damages

16  resulting from plaintiff's alleged

17  misappropriation of trade secrets?

18            MR. SOLOMON:  I'm sorry.  I object

19       to the question.  Relating to Iacovacci's

20       compensation or more generally?

21            MR. CYRULNIK:  Mr. Solomon, the

22       question was -- the question I asked the

23       witness whether he had anything else to

24       tell me about defendants' punitive harm or

25       damages resulting from plaintiff's alleged

Page 722

```
 1                    Monticciolo
 2      misappropriation of trade secrets.
 3      A.    Yes.
 4      Q.    Please share.
 5      A.    Damages we calculate to exceed over
 6   a hundred million dollars, including various
 7   components on that.
 8      Q.    Mr. Monticciolo, I see you looking
 9   down for each of these answers.  Are you
10   reading from something?
11      A.    Yes.  I said I prepared notes from
12   my review.
13      Q.    Can you make copies of those notes
14   and have those produced to us immediately,
15   please?  I'm happy to go off the record for it.
16           MR. SOLOMON:  No, you don't have to
17      go off the record.  We will send it to
18      you.
19      Q.    Okay.  With respect in the first
20   instance, before we talk about your total
21   damages calculation, with respect to
22   Mr. Iacovacci's compensation from 2014 to 2016,
23   what was the amount of that compensation?
24      A.    I'm sorry, can you repeat that?  You
25   broke up a bit there.
```

Page 723

                          Monticciolo

1

2        Q.    I asked how much compensation

3   Mr. Iacovacci received from 2014 to 2016?

4        A.    Just over ████████.   Approximately

5   ██████████.   I can get the specifics on the

6   paperwork.

7        Q.    I assume I'll get those specifics

8   from the paper you are looking at?

9        A.    Yes.   I'll make it easier.   We will

10  provide the information.   Approximately

11  █████████.

12       Q.    How many pages of notes do you have

13  in front of you right now?

14       A.    Two.

15       Q.    So all of the information you've

16  been recounting from notes has been included on

17  those two pages?

18       A.    On these two pages.

19       Q.    Anything else you can tell me about

20  how the ██████████████ that Mr. Iacovacci

21  received in salary or compensation from Brevet

22  from 2014 to 2016 constitutes harm that was

23  suffered as a result of his alleged

24  misappropriation of trade secrets?

25             MR. SOLOMON:   Asked and answered.

Page 724

Monticciolo

1

2       A.      I'm not a lawyer.  We believe that
3   that is a part of the damage that we feel that
4   we've incurred.

5       Q.      Okay.  Who prepared the notes you
6   are reading from?

7       A.      They are from my reviewing and as I
8   said, during the preparation with counsel and
9   the internal folks.

10      Q.      I didn't get the answer.  Who
11  prepared the notes that we are looking at --
12  that you are looking at and that I am going to
13  be looking at?

14      A.      It was a joint effort to prepare it.

15      Q.      A joint effort between whom?

16      A.      Again, counsel Reed Smith and my
17  internal teams, the people I mentioned
18  previously.

19      Q.      In terms of the two pages that you
20  just referenced, who actually drafted those two
21  pages of notes?

22              MR. SOLOMON:  Asked and answered.

23      A.      The drafting as -- do you have a
24  question about what I answered?

25      Q.      Yes, my question is who drafted the

Page 725

```
 1                    Monticciolo
 2   two pages that you are referencing?  Was it
 3   you?  Was it Lou?  Was it Reed Smith?  Was it
 4   internal?  Who drafted them?
 5        A.    Again, we can have the court
 6   reporter read my answer to that question.
 7        Q.    Mr. Monticciolo, please don't waste
 8   time suggesting that we have court reporters
 9   read answers.  I'm asking you a question.  Just
10   answer it truthfully.
11             Who prepared the two pages of notes
12   that you just referenced that are in front of
13   you?  Who drafted them?
14             MR. SOLOMON:  Asked and answered.
15        A.    I answered that question.  If you
16   have a question about my answer, then please
17   ask that.
18        Q.    The question I had about your answer
19   is who drafted those two pages?  Are you
20   refusing to answer that question as well,
21   Mr. Monticciolo?
22        A.    No, I thought I was very clear in my
23   previous answer.
24        Q.    Great.  If it's very clear, you can
25   just answer the question rather than waste 60
```

```
                              Monticciolo
 1
 2    to 90 seconds going back and forth as to
 3    whether or not you previously answered the
 4    question in your view.  So who drafted them?
 5         A.    I'm not going to go recant my
 6    deposition or testimony without seeing it to
 7    make sure that it is clear for you.
 8         Q.    So you are refusing to answer my
 9    question as to who drafted the two pages in
10    front of you?
11              MR. SOLOMON:  Asked and answered.
12         A.    No, I answered your question
13    already.
14         Q.    Let me be clear.  I'm asking you the
15    question again because I don't think I got an
16    answer.  You may think you're right.  You may
17    think you answered it.
18              My question to you now is, are you
19    refusing to answer the question that I just
20    asked you, whether it's on grounds because you
21    don't know or because you already briefly
22    answered it?  I don't really care.  I just want
23    to make clear for the record that you are
24    refusing to answer the question that I am
25    currently asking you and that question is -- I
```

```
 1                      Monticciolo
 2   think I see you interacting with Mr. Solomon on
 3   camera.  Can you please focus on the question,
 4   Mr. Monticciolo?
 5              MR. SOLOMON:  I don't know what you
 6          are talking about, but the camera will
 7          show what the camera will show.  What are
 8          you talking about interact?
 9              MR. CYRULNIK:  I'm talking about the
10          fact that Mr. Monticciolo is looking to
11          you for answers to questions that I'm
12          asking him as a 30(b)(6) witness.
13              MR. SOLOMON:  I don't agree with
14          that.
15              MR. CYRULNIK:  We all have the
16          video, Lou.
17              MR. SOLOMON:  Yeah, I don't know
18          what you are talking about.  We are just
19          sitting here.  And I do not agree with
20          your view of what you are entitled to do
21          with the witness.  I think you've asked
22          and answered the question already.  He's
23          doing the best he can.
24       Q.   Mr. Monticciolo, yes or no, are you
25   going to answer the question as to who drafted
```

```
                              Monticciolo
1
2    the notes in front of you for today's
3    deposition?
4         A.    I answered that question already.
5              MR. CYRULNIK:  Okay.  We will let
6         the record speak for itself, but again, I
7         will note for the record, because I'm sure
8         we will be going back to this at some
9         point in the future, that Mr. Monticciolo
10        refuses to answer a straightforward
11        question about notes that he has in front
12        of him for today's deposition.
13             MR. SOLOMON:  I object to your
14        misstatement for the record.  I object to
15        your statement.
16             MR. CYRULNIK:  Your objection is
17        noted.
18        Q.    In your prior testimony,
19   Mr. Monticciolo, you identified a list of trade
20   secrets that Brevet contends Mr. Iacovacci
21   misappropriated.  Do you recall that?
22        A.    Yes.
23        Q.    Do you recall that list consisting
24   of some 35 categories of purported trade
25   secrets that you identified Brevet having some
```

Page 729

1                    Monticciolo
2   damage from Mr. Iacovacci's alleged
3   misappropriation and then a separate list of
4   six other categories for which Brevet has not
5   identified damage; is that right?
6        A.    I recall the topics.  I don't have
7   the exact counts in front of me.
8        Q.    So you don't know whether or not you
9   identified a total of 41 categories, 36 of
10  which were -- 35 of which you claim to have
11  suffered damage from and 6 of which you claim
12  you did not identify damage from?
13       A.    I did not count them.
14       Q.    So sitting here today, you don't
15  know whether or not there are 41 categories of
16  trade secrets that Brevet believes
17  Mr. Iacovacci misappropriated?
18       A.    I don't know if there is 39 or 41.
19  I don't know if you counted them properly.  If
20  you would like to present them, then I can
21  count them along with you.
22       Q.    We are going to go through them.  I
23  just want to know whether or not you know,
24  sitting here today, what the number is?
25       A.    I did not count the exact number.  I

```
 1                    Monticciolo
 2   didn't think that was relevant to my
 3   preparation.
 4        Q.    Do you have a ballpark number for
 5   me?
 6        A.    Many.
 7        Q.    Many is that your answer?
 8        A.    Many.
 9        Q.    I'm asking for a ballpark number.
10        A.    I didn't specifically count them.  A
11   lot on the page.  Many is a good ballpark for
12   that.
13        Q.    More or less than ten?
14        A.    More than ten.
15        Q.    More or less than 20?
16        A.    Could you produce the list so we
17   don't have to guess about somebody counting the
18   number of topics on a piece of paper, please?
19        Q.    I don't know how that is relevant to
20   answering my questions, but Topic 10 or -- I'm
21   sorry, any one of these five or six topics.
22        A.    More or less than 20.  Again, I'm
23   not going to guess.
24        Q.    I didn't ask you to guess.  Do you
25   know, sitting here today, whether or not Brevet
```

Page 731

                            Monticciolo

1   is contending that Mr. Iacovacci

2   misappropriated more or less than 20 categories

3   of trade secrets?

4        A.    I know that I did not accurately

5   count the number that were there.  I know that

6   is probably many which could be 20 to 50 if you

7   put a ballpark on it, but I'm not going to say

8   definitively because I haven't sat here and

9   counted them as my preparation.

10       Q.    So your best understanding right

11  now, sitting here today without having a list

12  in front of you, is that Mr. Iacovacci,

13  according to Brevet, misappropriated somewhere

14  between 20 and 50 trade secrets?  Did I get

15  that right?

16       A.    Again, that is my guess of what the

17  number would be without counting them.

18       Q.    Okay, helpful.  Let's start with

19  your -- all of your investor lists.

20            Do you recall identifying all of

21  your investor lists as a category of trade

22  secrets that you allege Mr. Iacovacci

23  misappropriated?

24            MR. SOLOMON:  I object to the

```
                                        Page 732
 1                    Monticciolo
 2        question.  I think you're misstating the
 3        record.
 4        A.    Which topic is this related to?
 5        Q.    Let's try this again.  Do you recall
 6   identifying all of Brevet's investor lists as a
 7   category of trade secrets that Mr. Iacovacci
 8   misappropriated; yes or no?
 9             MR. SOLOMON:  Object to the form.
10        A.    I came prepared to answer specific
11   topics that were given to me.  If you could
12   just please tell me which one so I could just
13   prepare myself or reference it?  It's a
14   voluminous amount.  I want to be comprehensive
15   for you.
16        Q.    What I think you need to make sure
17   you're doing is paying attention to the
18   question and answering it truthfully.  I
19   appreciate the desire to be comprehensive, but
20   it appears that that desire is interfering with
21   your ability to do what is most important here
22   which is truthfully answer questions that are
23   being asked of you.  This is not a tough
24   question.  I'm going to ask it again.
25             Yes or no, Mr. Monticciolo, do you
```

```
                                      Page 733
 1                    Monticciolo
 2    recall testifying that one of the categories of
 3    trade secrets that Mr. Iacovacci
 4    misappropriated according to Brevet is all of
 5    Brevet's investor lists?
 6              MR. SOLOMON:  Object to the
 7         statement.
 8         A.    I take offense of you telling me how
 9    to answer my questions and accusing me of not
10    answering it truthfully.  I will answer the
11    question and to the best of my recollection, I
12    have asked you to produce the list.  I recall
13    that that was one of the items.
14         Q.    For future reference, a yes would
15    have sufficed and saved us at least a minute
16    and the reason I'm saying that is because I
17    know your counsel is particularly keen on
18    getting you out of here before a certain amount
19    of time is allotted and spending 60 seconds
20    answering a question that could have simply
21    said yes would have been a heck a lot more
22    efficient and a heck of a lot more appropriate.
23              So I'm not trying to cut your
24    answers short.  I'm happy to give you whatever
25    time you want to pontificate, talk about
```

```
                                            Page 734
 1                      Monticciolo
 2   anything you want to, topics, cross references,
 3   but the time that counts against us is the time
 4   that you spend actually answering the question
 5   I ask.  So I'm going to ask you some follow-up
 6   questions.
 7              MR. SOLOMON:  I object to your
 8         statement and I object to your offensive
 9         remark.
10              MR. CYRULNIK:  Objections are noted,
11         Mr. Solomon.  I have already said that
12         previously.
13         Q.    Which Brevet entity owned all of
14   Brevet's investor lists?
15         A.    There is more than one entity that
16   owns the list with that broad definition.  I'm
17   here on behalf of Brevet Capital Management,
18   which is one of those entities.
19         Q.    What other entities -- well, let
20   me -- withdrawn.
21              Brevet Capital Management in your
22   view owns the investor lists that you contend
23   Mr. Iacovacci misappropriated; is that right?
24         A.    It's ownership under holdings, yes.
25   Brevet Capital Management is one of the owners.
```

Page 735

```
 1                     Monticciolo
 2       Q.    Who are the other owners?
 3       A.    The relevant funds.
 4       Q.    When you say relevant funds, what do
 5   you mean by relevant?
 6       A.    There are some investor lists that
 7   are investor lists of who is invested in the
 8   fund.  Those are confidential books and records
 9   of that fund.
10       Q.    So if you have an investor list of
11   investors who are investing in Fund X, let's
12   call it the Short Duration Fund LP, okay, do
13   you contend that Mr. Iacovacci misappropriated
14   that list to investors?
15       A.    Again, your question is specifically
16   on a specific list.  I could go and look into
17   and reference and incorporate here our
18   responses on these affidavits of the specific
19   lists and information that were already
20   provided under those affidavits and
21   interrogatories.  I can't remember them all.
22   As I mentioned, there is a voluminous amount of
23   information here.
24       Q.    Mr. Monticciolo, I know that Brevet
25   has served discovery responses.  I know that
```

Page 736

                              Monticciolo

1
2    Brevet has produced some documents.  This is a
3    deposition.  I'm asking you questions and I'm
4    asking you to give me your best truthful
5    answer.  For many of these questions they are
6    very specific and the answer should be yes, no
7    or I don't know.  I'm not limiting you to that.
8            If there is a necessary explanation,
9    but for most of these questions, at least the
10   next few, I'm asking you yes or no questions
11   because I'm trying to avoid having disputes
12   with your counsel about how much time we get
13   remaining to have our questions answered.
14           So the question I asked you was with
15   respect to the investor lists for short
16   duration fund LP and my question to you was do
17   you contend that Mr. Iacovacci misappropriated
18   that investor list?
19           MR. SOLOMON:  Object to the
20       statements.
21       A.   If you're telling me my answers have
22   to be short even though your questions may be
23   incorrect, then I will answer them accurately.
24   No.
25       Q.   Are you done or are you going to

Page 737

                              Monticciolo

1

2     answer the question accurately?

3          A.     I did.

4          Q.     What is the answer?

5          A.     I said no.

6          Q.     Oh, I missed that.  I didn't hear

7     the no part, but I appreciate the clarity and

8     the brevity.

9          A.     So to clarify, he did misappropriate

10    the investor list of our funds of which he did

11    not name one.

12         Q.     Of which he did not what?

13         A.     He did not name one of our funds.

14         Q.     You're talking about short duration

15    fund?  You're saying it's not the proper name?

16    Is that why you answered the question the way

17    you did?

18         A.     Correct.

19         Q.     Which funds investor list did

20    Mr. Iacovacci misappropriate?

21         A.     Again, we've answered this question

22    in the affidavits and interrogatories and I

23    would like to adopt those as my answer to that

24    because that is a voluminous question and that

25    is not something I could do off of memory.

```
 1                     Monticciolo
 2      Q.    Sitting here today, you don't know
 3  which investor lists Mr. Iacovacci
 4  misappropriated?
 5      A.    I want to be comprehensive for you,
 6  sir.  I don't want to misrepresent that I may
 7  miss something in my memory.
 8      Q.    I appreciate, as I said, the desire
 9  to be comprehensive, but most important is the
10  desire to be truthful and clear.  So my
11  question to you is, sitting here today, do you
12  know which investor lists Mr. Iacovacci
13  misappropriated?
14           MR. SOLOMON:  Object to the
15      statements.
16      A.    I was being truthful and clear in my
17  prior response and I repeat that response here.
18      Q.    Mr. Monticciolo, sitting here today
19  as Brevet's corporate representative on Topics
20  1 through 5 of the 30(b)(6) notice, do you know
21  which investor lists Mr. Iacovacci allegedly
22  misappropriated?
23      A.    Again, I could adopt and I will
24  point out to you the affidavits and
25  interrogatory responses which we already
```

Page 739

```
 1                    Monticciolo
 2   provided to answer that question.
 3       Q.    Is it your position that
 4   interrogatory responses that were provided
 5   previously respond to the question of whether
 6   or not Doug Monticciolo, sitting here today in
 7   his corporate representative capacity, knows
 8   which investor lists Mr. Iacovacci
 9   misappropriated?
10       A.    I'm sorry, I told you I'm looking to
11   be comprehensive and it's beyond my memory to
12   be able to remember all those places in the
13   breath of which you asked.  It is voluminous
14   and that's why I'm referencing and adopting as
15   my answer the answers we provided previously.
16       Q.    Mr. Monticciolo, you prepared notes
17   or someone prepared notes.  You didn't tell us
18   who, for this deposition.
19            Do you have notes that identify the
20   investor lists that Mr. Iacovacci allegedly
21   misappropriated; yes or no?
22            MR. SOLOMON:  I object to your
23        misstatement.
24       A.    I'm prepared to identify where you
25   can find the answers to your questions.
```

1                      Monticciolo

2        Q.    Well, I'm asking you for the answer

3    to my question.  Do you have notes -- did you

4    prepare notes or did someone else prepare notes

5    for you identifying the investor lists that

6    Mr. Iacovacci allegedly misappropriated?

7        A.    I'm prepared to provide you an

8    identification of where you can find the answer

9    to that and I will adopt that as my answer to

10   your question.

11       Q.    I'm happy to get to that after you

12   answer my question.  Yes or no, do the notes

13   that were prepared by you or for you list out

14   the investor lists that Brevet claims

15   Mr. Iacovacci misappropriated?

16       A.    Again, I answered that question.

17       Q.    I assure you, you didn't.

18       A.    Well, again I will adopt my answer

19   to be and I could specifically reference them

20   if you want, go to my notes where there are

21   voluminous places where that is.  I'm not

22   expected to memorize all those places.

23            MR. CYRULNIK:  Well, I'll again note

24       for the record that with respect to two

25       extraordinarily straightforward questions,

Page 741

```
 1                    Monticciolo
 2      Mr. Monticciolo, has refused to provide a
 3      straightforward answer, but it sounds like
 4      Mr. Monticciolo wants to cross reference
 5      or identify places in some other materials
 6      that supposedly identify the specific
 7      investor lists that Mr. Iacovacci
 8      allegedly misappropriated, so I'll ask you
 9      to go ahead and do so now after noting
10      that we don't believe you answered the
11      question that we asked you as a deponent
12      and corporate representative who is
13      sitting here today to give testimony on
14      this very topic.
15            MR. SOLOMON:  I object to your
16      misstatements.
17      Q.    Mr. Monticciolo, where --
18            MR. SOLOMON:  Instead of making the
19      statements, what is the question?
20            MR. CYRULNIK:  I mean the question
21      was asked three or four times.  It was,
22      sitting here today, do you know what
23      investor list Mr. Iacovacci
24      misappropriated was question one that he
25      didn't answer and question two was are
```

```
                                        Page 742
 1                      Monticciolo
 2         there notes?  Do any of the notes that you
 3         have list out the investor list that
 4         Mr. Iacovacci allegedly misappropriated?
 5              Both of those questions were
 6         responded to by way of references to other
 7         materials as opposed to yes, I know; yes,
 8         they are in the notes; no, I don't know.
 9         No, they are not in the notes, but the
10         record will speak for itself on that.
11              I'm happy to move on to what
12         Mr. Monticciolo wants to testify to and
13         deal with the stuff he doesn't want to
14         deal with separately.  So can you tell me
15         what place you want to point me to that
16         identifies the specific investor lists
17         that Mr. Iacovacci allegedly
18         misappropriated?
19              MR. SOLOMON:  I object to your
20         misstatements.
21         A.   Right and I -- you seem to have a
22    view of how far I was supposed to prepare, but
23    I prepared to identify for you where you can
24    find those answers.
25              MR. SOLOMON:  He's just asking you
```

Page 743

Monticciolo

1

2      now where.  He wants you to now point to

3      where.

4          A.    If you can point me to which topic

5    under which you're asking me that question,

6    then I can reference notes or anything else

7    that can be helpful to that.

8              I can reference my notes on that and

9    I have done my homework to identify for you my

10   answers to that which have been provided in

11   affidavits and interrogatory responses because

12   they are voluminous and I want to be

13   comprehensive because they are not something

14   that you could just memorize a list on a single

15   piece of paper.

16       Q.    Mr. Monticciolo, please just listen

17   to the question.  The question was, where are

18   the investor lists that you, Brevet, claims

19   Mr. Iacovacci misappropriated specifically

20   identified if you can't tell me them directly

21   at this deposition?

22       A.    Again, if you can tell me which

23   topic you're asking questions for?  I came

24   prepared to answer, as you requested me, to a

25   series of topics.  That's what you said at the

1                        Monticciolo

2      beginning.  I did that.  We did that

3      extensively.  I can, based on those topics, I

4      can definitely point you to my answers which

5      will be answers that we provided in other

6      affidavits.

7                   If there is something to add, I

8      would add it, but unless you can tell me which

9      topic it is related to, it will be hard for me

10     to use my notes to reference that.

11          Q.     Mr. Monticciolo, I don't know what

12     you want me to do, but you have been designated

13     as Brevet's corporate representative today to

14     respond to questions with respect to its claims

15     about trade secrets.

16                   Those topics are listed out in

17     Topics 1 through 5.  I don't need to repeat a

18     topic for you.  I'm allowed to ask you a

19     question and I'm sure your counsel has guided

20     you appropriately.  The question I asked you

21     and have been trying to get an answer to for

22     the last ten minutes is the investor lists that

23     you claim Mr. Iacovacci misappropriated.

24                   I want to know which lists you are

25     talking about.  If you can answer the question

Page 745

1                       Monticciolo

2   directly, do so.  If the answer is in a list of

3   notes that you have, then go ahead and read

4   them.  If the answer is in some other place,

5   then go ahead and identify it, but talking to

6   me back and forth about well what topic, I'm

7   asking you a question.  Where are the investor

8   lists identified, the investor lists that

9   Mr. Iacovacci allegedly misappropriated?

10       A.    Okay.  I can refer to the topics

11   which I will look at the topics and read them

12   through.  It may take some time to figure out

13   which topic.  I have the topics requested in

14   front of me.  I will read through them so that

15   I can refresh myself as to where my notes are

16   for that specific question.

17       Q.    I will note for the record that if

18   you are unprepared to answer this question

19   either to actually identify the investor lists

20   you claim Mr. Iacovacci misappropriated or to

21   tell me where in your notes they are or to

22   identify where in some other material they are,

23   that I don't want to spend my time at your

24   deposition with you reading over topics.

25             So my question to you is, do you

```
                                            Page 746
 1                         Monticciolo
 2    know, Mr. Monticciolo, which investor lists
 3    Brevet claims Mr. Iacovacci misappropriated?
 4              MR. SOLOMON:  The witness has said
 5         several times, Jason, that he has sorted
 6         the work that he has done by topic.  I
 7         thought it was a pretty reasonable request
 8         to just tell him what topic.  You have it
 9         in Topic 1, so point him to Topic 1 and
10         then he said it's beyond his memory and he
11         has it listed, but then he'll go look at
12         what he has listed under Topic 1.
13              I think this would all have been
14         finished already and you would have your
15         answer.  Just tell him what topic.  I
16         think it's Topic 1.  At least it's in part
17         Topic 1.
18              MR. CYRULNIK:  Mr. Solomon, it's
19         completely inappropriate for you to be
20         guiding the witness for what you want him
21         to look at to answer a question.  That
22         would be appropriate if you were the
23         30(b)(6) witness.  You are not.  You are
24         interrupting a deposition and you are
25         testifying or helping a witness in the
```

Page 747

1                        Monticciolo
2        middle of a pending question and it's
3        inappropriate and you know it.
4             I'm going to ask you politely to
5        stop.  We have a problem.  This witness is
6        not prepared to serve as a corporate
7        representative and it's abundantly clear
8        from the fact that he can't answer a
9        simple question that I have asked him now
10       for the last probably going on 12 to 15
11       minutes and we have many such topics
12       because this is the first of some 40 plus
13       topics that he purported to identify as
14       trade secrets that Mr. Iacovacci
15       misappropriated.
16            If the idea is let's run out the
17       clock while this witness needs to
18       understand what topic it relates to, he
19       needs to look at some notes that were
20       prepared by somebody, but he won't
21       identify whom.  That is not the way this
22       deposition is going to go and we are going
23       to obviously have to seek the court's
24       intervention.
25            I would encourage you and we are

Page 748

1                        Monticciolo

2      going to take a break for five minutes.  I

3      would encourage you to speak with your

4      witness during that deposition and to get

5      us these notes and if the idea here was

6      let's get this witness some notes so that

7      he can run out the clock and cross

8      reference things and talk in circles while

9      I'm asking him a straightforward question

10     about what lists somebody misappropriated,

11     that is not going to work.

12          MR. SOLOMON:  I object to every

13     single misstatement that you just made.

14     You want to go off the record briefly,

15     please, let's do that.

16          THE VIDEOGRAPHER:  Take us off,

17     counselor?

18          MR. CYRULNIK:  Yes.  Just to be

19     clear, we are going off the record so that

20     Mr. Solomon can talk to his witness about

21     his responsibilities and so that

22     Mr. Solomon can get us all of the notes

23     that Mr. Monticciolo has referenced or has

24     in front of him at the table.

25          Once we have that and Mr. Solomon

Page 749

```
 1                    Monticciolo
 2      has an opportunity to confer with his
 3      client about his responsibilities as a
 4      witness today, we can go back on the
 5      record.
 6           MR. SOLOMON:  I would rather use the
 7      time telling you how to take a proper
 8      deposition.  I'm not going to do that.  I
 9      don't need time to talk to the witness.
10      If you want to take five minutes, we can
11      take five minutes.
12           If you want him to supply you with
13      the other notes that he has, that go topic
14      by topic, not unreasonably, then we are
15      prepared to do that also.
16           MR. CYRULNIK:  I definitely want you
17      to supply those notes to us.  I asked you
18      for those earlier.  And candidly, based on
19      the way the deposition is -- I'm sorry.
20           MR. SOLOMON:  No, no.  No, these are
21      different issues.  You asked him for the
22      summary of damages and we supplied that to
23      you.  We haven't withheld anything.
24           MR. CYRULNIK:  Let me make sure we
25      are talking about the same thing.  So
```

```
                                                    Page 750
 1                       Monticciolo
 2          let's not go off the record just yet.  I
 3          need to clarify.  I apologize to the
 4          videographer.  We will be off the record
 5          shortly.
 6   BY MR. CYRULNIK:
 7          Q.    Mr. Monticciolo, how many pages of
 8   notes do you have available to you in the room
 9   for your reference at today's deposition?
10          A.    Available?  Five or six.
11          Q.    Two of those pages concern damages;
12   is that right?
13          A.    Yes, those are the two I
14   specifically looked at before.
15          Q.    And there is three or four other
16   pages that concern other topics, right?
17          A.    Yes.
18          Q.    I would like those notes sent over
19   immediately so we can take a break so that your
20   counsel can do that.  Is there anything else
21   that you are referencing?  Do you have a binder
22   in front of you?
23          A.    There is a binder with the -- what
24   do you call it -- the affidavits and responses,
25   but I'm not using it.  It is on the table.
```

```
                                             Page 751
 1                        Monticciolo
 2       Q.    That binder has clean copies or
 3  marked up copies of affidavits and responses?
 4       A.    Clean copies.
 5       Q.    The entire binder is clean copies of
 6  discovery responses in this action?
 7       A.    It's an entire binder of clean
 8  copies.
 9       Q.    So we have the binder of clean
10  copies.  We have the six pages, five or six
11  pages of notes that you referenced.  What else
12  do you have in front of you for today's
13  deposition?
14       A.    Two blank pads and air pen and some
15  beverages.
16       Q.    Are there any other materials that
17  you intend to have available to you that are
18  not currently in front of you for purposes of
19  responding to questions during today's
20  deposition?
21       A.    Not that I'm aware of at this point.
22            MR. CYRULNIK:  Why don't we go off
23       the record get those notes and we can go
24       on after we have looked at them.
25            THE VIDEOGRAPHER:  Stand by to go
```

Page 752

```
 1                         Monticciolo
 2           off the record, please.
 3                  MR. SOLOMON:  Let's do this briefly,
 4           please.  We can e-mail them to you.
 5                  THE VIDEOGRAPHER:  I'm sorry, can I
 6           take us off the record?  This is the end
 7           of media unit number one.
 8                  MR. SOLOMON:  I still want an
 9           answer.
10                  MR. CYRULNIK:  I want to let the
11           videographer and court reporter do their
12           thing.
13                  MR. SOLOMON:  That's fine.  I would
14           like that to be brief.  I'm saying, did
15           you receive the e-mail?
16                  MR. CYRULNIK:  Can we let the
17           videographer finish his sentence?
18                  THE VIDEOGRAPHER:  Thank you.  This
19           is the end of media unit number one.  We
20           are now off the record at 10:38 a.m.
21                  (Brief recess taken.)
22                  THE VIDEOGRAPHER:  This is the
23           beginning of media unit number two.  We
24           are now on the record at 10:57 a.m.  Back
25           from break.
```

Page 753

1                        Monticciolo
2              MR. CYRULNIK:  I'll note for the
3         record that counsel for the witness and
4         Brevet has sent us copies of certain
5         notes, which I will ask the witness about,
6         but I believe I understand what they are
7         and in addition to that, we requested the
8         index of the binder in front of the
9         witness rather than having them send us a
10        copy of that binder, which seems to be
11        thick, and Mr. Solomon indicated that
12        there is no index, but I believe he is
13        prepared to identify.
14             MR. SOLOMON:  So just so that you
15        will know, if you want to look at any of
16        them, in the pieces of paper that we
17        supplied to you are references from the
18        record and in the binder are the documents
19        that are referred to there.
20             MR. CYRULNIK:  I see.  So the binder
21        consists of only documents that are
22        referenced on the -- in the notes that you
23        sent us a few minutes ago; is that right?
24             MR. SOLOMON:  That's right.
25             MR. CYRULNIK:  If that is the case,

```
 1                    Monticciolo
 2        if it corresponds to the record side of
 3        the pages that you sent us, then an
 4        additional listing of that is not
 5        necessary.  There is nothing else in the
 6        binder other than what is identified on
 7        the record side of those pages; is that
 8        right?
 9             MR. SOLOMON:  By topic, that's
10        right.
11   BY MR. CYRULNIK:
12        Q.    Why don't we continue along then.
13   We were talking about investor lists that
14   Mr. Iacovacci allegedly misappropriated before
15   the break.  Do you recall that,
16   Mr. Monticciolo?
17        A.    Yes.
18        Q.    You don't have -- you can't give me
19   a list of which investor list Mr. Iacovacci
20   misappropriated, right?
21             MR. SOLOMON:  Objection.  I object
22        to the form of the question.
23        A.    I can direct you to places where we
24   have identified those investor lists.  I
25   haven't gone through and memorized exactly
```

Page 755

1                     Monticciolo
2   which of those e-mails have that, but I can
3   point you to the materials that will identify
4   that for you.  I did not enumerate a list
5   specifically.
6        Q.    I'm just asking you whether or
7   not -- I'm going to get to your notes and
8   whatever you want to point me to there later.
9   Right now, sitting here today, can you identify
10  the investor list that you allege Mr. Iacovacci
11  misappropriated?
12       A.    Sitting here today, I cannot
13  identify that list.  I have identified them in
14  our previous responses which we can -- which we
15  provided just because there is a lot of
16  information to memorize here.
17       Q.    Okay.  Why don't you tell me, I'm
18  going to introduce Exhibit 17.  Take a look at
19  the Exhibit Share, Exhibit 17.  I believe that
20  is the totality of the notes that you testified
21  a few moments ago you had in front of you.  If
22  you can confirm that for me?
23            (Whereupon document was marked
24       Exhibit 17 for identification as of this
25       date.)

```
                                  Page 756
 1                    Monticciolo
 2        Q.    I'm sorry, I'm looking at the
 3   November 1st folder mark, continuing the same
 4   to folder.  So Exhibit 17 in the November 1st
 5   Marked Exhibits folder.
 6             Mr. Monticciolo, are you able to
 7   pull up Exhibit 17 and confirm that is the
 8   totality of the notes that you have available
 9   to you today for the purposes of this
10   deposition?
11        A.    Yes, I see that.
12        Q.    Is Exhibit 17 the totality of the
13   notes that you have available for you today for
14   purposes of this 30(b)(6) deposition?
15        A.    Yes.
16        Q.    When did you first see these notes?
17        A.    These notes?  The final form this
18   morning.  Last night we put it together,
19   prepared them over the last week or so with
20   counsel and my team.
21        Q.    Your counsel, when did you first see
22   the first draft of these notes?
23        A.    I don't know.  Sometime over the
24   last week or two.
25        Q.    Did you provide comments on the
```

Page 757

1                        Monticciolo

2   first draft of the notes?

3        A.    Yes, it was the results of our joint

4   getting everything organized for this.

5        Q.    Counsel provided you the first draft

6   and you marked it up; is that a fair statement?

7        A.    No, a bit more collaborative, each

8   providing different parts of looking at

9   materials for the record.

10       Q.    I'm sorry, I want to make sure I

11  understand.  Counsel didn't provide you the

12  first daft of these notes?

13       A.    I think of the topics just so we

14  knew what they were, but it was -- the drafts

15  were a joint effort.

16       Q.    Who drafted the record portion of

17  the pages we are looking at, for example?  Was

18  that you personally?

19       A.    I need a clarification of the words

20  prepared versus drafted.  I think you

21  differentiate so drafted means write it.  We

22  let the lawyers write it.

23       Q.    Did you tell them what to write?

24       A.    Myself, my team, all of us

25  collaboratively put a lot into this.

Page 758

1                        Monticciolo
2        Q.     I understand, but I'm asking you
3    did -- I'm starting with you, Mr. Monticciolo,
4    did you identify bullet points for example on
5    page one of Exhibit 17 that your counsel needed
6    to write on this page or did they provide you
7    with this list?
8        A.     No, I provided bullet points.
9        Q.     And that is the same for the -- for
10   all of the pages we are looking at over here?
11       A.     Yep.
12       Q.     Do you know why some of the pages
13   that were sent over to me have Bates stamps and
14   some of them don't?  We compiled the ones that
15   don't and put them as Exhibit 17, but some of
16   the ones that were sent over to us had Bates
17   stamps.  Do you know why that is?
18       A.     I'm not sure --
19             MR. SOLOMON:  I object to the
20        question.  What we are looking at there is
21        no production numbers on these.
22             MR. CYRULNIK:  You can object to the
23        question.  I'm asking the witness a
24        question.
25       Q.     Mr. Monticciolo, do you know why

1                     Monticciolo

2    some of the notes that were sent over to us by

3    Ms. Yang have Bates stamps on the bottom

4    right-hand corner?

5         A.    I don't see any Bates stamps or know

6    what you are talking about.

7         Q.    I will represent to you that some of

8    the notes that were sent over by Ms. Yang had

9    Bates stamps on them and I'm asking whether or

10   not you know why that is?

11        A.    No.

12        Q.    Is it your understanding that these

13   notes had previously been produced in this

14   litigation?

15        A.    I have no recollection as I sit

16   here.

17        Q.    You're free to reference the

18   materials in front of you.  My question to you

19   is, which investor list do you contend

20   Mr. Iacovacci misappropriated?

21        A.    So, in answer to this question, we

22   identify in Callahan's affidavit from

23   January 17, 2018 paragraphs 6 to 8 and then

24   noted in 14 as well.  There is a very large

25   number of e-mails in this and succeeding

Page 760

1                    Monticciolo
2      affidavit.  In there I can't recall exactly
3      which ones have the investor lists, but that's
4      my reference for where those were included.
5           Q.    Mr. Monticciolo, sitting here today,
6      with or without the notes or the binder in
7      front of you, can you tell me which investor
8      lists Mr. Iacovacci allegedly misappropriated;
9      yes or no?
10          A.    As I sit here right now, I can't
11     name the specific ones.
12          Q.    Let's move on to sourcing clients.
13     Do you recall identifying sourcing clients as a
14     trade secret for which Brevet has identified
15     Mr. Iacovacci misappropriated?
16          A.    Yes.
17          Q.    Which sourcing; are you referring to
18     a list of sourcing clients or are you actually
19     referring to misappropriating the sourcing
20     clients themselves?  What do you mean by
21     misappropriating sourcing clients?
22          A.    The clients that we sourced.
23          Q.    Is it a list of sourcing clients
24     that he misappropriated or do you mean
25     something other than that?

```
                                      Page 761
 1                  Monticciolo
 2        A.    As I sit here, I believe we meant to
 3   say the list of sourcing clients.
 4        Q.    Is there one master list of sourcing
 5   clients or are there multiple lists of sourcing
 6   clients?
 7        A.    There are multiple lists.
 8        Q.    How are those divided up?  Are they
 9   divided up by fund or some other division?
10        A.    They are divided up by -- it varies.
11   Sometimes by person or by activity that we are
12   doing.
13        Q.    What do you mean by person?
14        A.    Individual.
15        Q.    The sourcing client lists are
16   divided up by individual.  What would that
17   mean?
18        A.    It would mean that we have broad
19   lists and some people have a subset of it.
20        Q.    I guess my question is, I'm trying
21   to understand what people you are talking
22   about.  Are you talking about Brevet employees?
23        A.    Yes.
24        Q.    How many?  Roughly how many sourcing
25   client lists does Brevet have?
```

Page 762

Monticciolo

1
2      A.    I would have to count them, but I
3  would say a handful.
4      Q.    Of those sourcing client lists how
5  many do you allege Mr. Iacovacci
6  misappropriated?
7      A.    Again, we would have to -- I can
8  point you to the affidavit of the specific
9  e-mails, but I think our position is a
10  majority, if not all.
11      Q.    Well, which ones?  Why don't you
12  identify for me which sourcing client lists
13  Mr. Iacovacci misappropriated?
14      A.    Again, I didn't come prepared to
15  give you the specific referencing of those
16  entire lists other than I can point out where
17  they were misappropriated through -- amongst
18  the various e-mails.
19      Q.    I'm not asking about e-mails.  I'm
20  just asking about the actual lists that you are
21  identifying as the trade secret.  So if you
22  don't know, you don't know, but I just want to
23  make sure I'm clear.
24           Sitting here today, can you identify
25  for me any sourcing client list that

Page 763

1                    Monticciolo
2     Mr. Iacovacci misappropriated?
3         A.    As I sit here, I can't enumerate
4     that, but we pointed out, identified for you
5     where they can be found.
6         Q.    What are you referring to when you
7     say we've pointed out to you where they can be
8     found?  Where can this list be found?
9         A.    The lists of what was
10    misappropriated are in the Callahan affidavits
11    from 1/17/2018, 9/25/2018 and then defendants'
12    responses.
13        Q.    Well, why don't you tell me where
14    Mr. Callahan puts this list in his affidavits?
15        A.    Again, I didn't go through and
16    memorize exactly which of those e-mails are the
17    ones that have those lists.  I came prepared to
18    identify for you where we believe they are, but
19    we identified the lists which is voluminous
20    that would contain those lists.
21        Q.    Let me make sure I got that.  You
22    don't have the list in your mind.  You don't
23    have the list on this page.  Mr. Callahan
24    doesn't have the list in his affidavit, but you
25    do have a list of something else that contains

Page 764

```
                              Monticciolo
 1
 2   the list of sourcing clients?  Did I get that
 3   right?
 4            MR. SOLOMON:  I object to the
 5        question.
 6        A.    No, that's not what I said.  I said
 7   I could point you to the affidavit that points
 8   to where Mr. Callahan identified or had found
 9   e-mails that would contain those lists as he
10   noted in his affidavit.
11        Q.    Can you tell me which lists we are
12   talking about is the question.  I don't want to
13   know about, you know when it was
14   misappropriated.  I want to know about what
15   sourcing client lists you are referring to.  Do
16   you know that?
17        A.    They are the sourcing lists for
18   Brevet.  As I mentioned, we have lists for the
19   firm of sourcing people that we utilize.
20        Q.    Right, and you said there was, you
21   know, several of those lists and I asked you
22   which ones Mr. Iacovacci misappropriated and
23   you didn't know that offhand, correct?
24        A.    I didn't enumerate it in my due
25   diligence for preparing for this.
```

Page 765

```
 1                        Monticciolo
 2        Q.    Mr. Iacovacci was involved in
 3   sourcing for Brevet, correct?
 4        A.    Yes.
 5        Q.    When you said sourcing, you had
 6   multiple -- Brevet has multiple sourcing lists.
 7   Does it give access to some of those --
 8   withdrawn.
 9              Are some of those sourcing lists
10   provided to some employees and other sourcing
11   lists provided to other employees or are they
12   all sort of housed in the same spot?
13        A.    They are not provided in the spot
14   for everyone to access.  They are segregated.
15        Q.    Which ones did Mr. Iacovacci have
16   access to?
17        A.    As a partner of the firm, he could
18   have access to all of those lists.
19        Q.    I may have misheard you.  Did you
20   say he could have had access or he did have
21   access to all those lists?
22        A.    I didn't have a way of determining
23   if he had access to them.  I believe we have
24   access to them.
25        Q.    What is the basis for your belief
```

Page 766

1                          Monticciolo

2       that he would have had access to all of

3       Brevet's sourcing lists?

4            A.     As a partner of the firm, he has a

5       much higher standard of need to know knowledge,

6       so I respect him to have had access to all of

7       those lists.

8            Q.     How is the access to these lists --

9       let's start with where these lists are kept.

10      Where are these lists kept?

11           A.     They are maintained on what we call

12      network drives.

13           Q.     Are they Excel spreadsheets, Word

14      documents or some other file form?

15           A.     They are a combination of -- some

16      are in Word, some are in Excel and even parts

17      are in Sales Force.

18           Q.     We are talking about less than five

19      or six lists, right?

20           A.     I can enumerate them.  I would say

21      probably five to ten.

22           Q.     Setting aside -- well, describe to

23      me how access is restricted to these lists.

24      They are on the network drive, so who can just

25      open up the network drive and click on the file

Page 767

1                      Monticciolo
2    and open it and who can't?
3         A.    So there are levels of access.
4    There are restrictions of who can even see
5    whether or not a drive exists.  So sourcing
6    would be a drive that only sourcing people can
7    see and then within that we have password
8    protected files or restricted directories for
9    obviously each of these lines of business or
10   sourcing lists.
11        Q.    So there is a global sourcing folder
12   on the network drive that has these different
13   lists that you described or --
14        A.    It's bigger than a folder.  It's a
15   drive.  It has folders in it.
16        Q.    So you have the sourcing drive and
17   in order to access that drive, roughly how many
18   employees had access just to the drive?
19        A.    Just a handful.
20        Q.    Who are those?
21        A.    That would be the sourcing team.
22   Senior management and compliance.
23        Q.    It's your view that is just a
24   handful of individual people working for those
25   or carrying those titles or working for those

Page 768

                        Monticciolo

1

2   departments?

3        A.    Yes.

4        Q.    So if it's less than a handful, can

5   you give me some names?  I assume you are one

6   of them, right?

7        A.    The executive team is the -- yes,

8   myself included, Mark Callahan, the compliance

9   officer.

10       Q.    At the time?

11       A.    At the time, right, and then the two

12  or three sourcing people as it varied over

13  time.

14       Q.    One of whom was Mr. Iacovacci until

15  2016?

16       A.    I don't recall.  Let's see.  So yes,

17  he was doing sourcing in 2016.

18       Q.    And then there was one or two other

19  people apart from Mr. Iacovacci who had access

20  to the sourcing drive?

21       A.    I think, to the best of my

22  recollection, that's approximately accurate.

23       Q.    So once you access the sourcing

24  drive, did Mr. Iacovacci have access because he

25  was on the sourcing team or because he was a

Page 769

```
                            Monticciolo
 1
 2    partner?
 3         A.    I would say both.
 4         Q.    And then within that sourcing drive
 5    I think you said the various lists are in
 6    different -- and I don't want to put words in
 7    your mouth -- are they in different folders?
 8         A.    I don't recall going all the way
 9    back to 2016 if they were in separate folders
10    or separate files.
11         Q.    But each of the files had its own
12    password protection; is that right?
13         A.    Some form of separation protection,
14    whether it was again a drive, like a directory
15    or a separate file.
16         Q.    And to which -- how were the
17    passwords distributed to employees?
18         A.    So it's much less.  It is just the
19    password you can restrict directories by users.
20    So while there may have been one or two that
21    had like a classic password, you can restrict
22    the subdirectory from users and I believe
23    that's how that was done.
24         Q.    To which subdirectories did
25    Mr. Iacovacci have the regular access and to
```

```
 1                    Monticciolo
 2   which did he not have access, he was restricted
 3   without getting some sort of special permission
 4   to access it?
 5        A.    Again, he was a partner.  So I don't
 6   recall which specific privileges or rights he
 7   had, but he had the authority to demand access,
 8   particularly with his role.
 9        Q.    I understand that he had the
10   authority to demand or access the list that he
11   wouldn't have had automatic, we will call it
12   access too for lack of a better term, but I'm
13   asking in the first instance, can you tell me
14   which of the subdirectories or lists he would
15   have had access to without demanding specific,
16   you know, authorization for a password or for
17   access to a restricted subfolder?
18              MR. SOLOMON:  Object to the form.
19        A.    In my preparation for this, I didn't
20   specifically look into which ones, but as a
21   partner, he should have the highest level of
22   access.
23        Q.    Well, so is it your testimony that
24   he had default access to all of the sourcing
25   client lists?
```

1                          Monticciolo

2         A.     I, as I sit here, I would believe

3    that to be true.

4         Q.     What is the basis for that belief?

5    Do you know one way or the other or are you

6    just guessing?

7         A.     No, as a partner he could demand it,

8    but also as a need to know person because he is

9    a partner.

10        Q.     And that's what I'm trying to

11   distinguish between, Mr. Monticciolo.  I

12   appreciate the point that he could have asked

13   for access based on his status as a partner and

14   I'm happy to ask you about that if you know

15   anything about him doing so.

16              My first question is, do you know

17   one way or the other, without asking for

18   specific access, he had access to all of the

19   Brevet client sourcing lists?

20              MR. SOLOMON:  Object to the form of

21        the question.

22        A.     Again, in my preparation I didn't

23   look into that exact question, but I would

24   expect him to have had access.

25        Q.     Why do you expect him to have had

Page 772

                         Monticciolo

 1
 2    access?   That's my question.
 3        A.    Because he was a partner of the
 4    firm.
 5        Q.    Okay, and because he was a partner
 6    at the firm, all partners at the firm had
 7    default access to all of the subdirectories and
 8    subfolders on the sourcing drive?
 9        A.    I believe they did.
10        Q.    Okay.  So who was it that did not --
11    who was it that had access to the sourcing
12    drive, but had access to only some of the
13    sourcing client lists?
14        A.    People who were in the other
15    businesses that are not the sourcing -- we have
16    several I would say lines of business and so if
17    you're in one, you don't have access to the
18    others.
19        Q.    Mr. Monticciolo, you identified I
20    think four or five people that had access to
21    the sourcing drive, right, and to the sourcing
22    lists?
23             Did any of those four or five people
24    have access to only some of the sourcing lists
25    or did all of the people you identified have

```
                                    Page 773
 1                    Monticciolo
 2   access to all of the sourcing lists?
 3        A.    I believe that people that are in
 4   the different businesses have access to just
 5   theirs, which would be some, not all.
 6        Q.    So give me an example of somebody
 7   who fits that category?
 8        A.    I don't have the specific name of
 9   who was in that role at that time, but it would
10   be, for example, the person who was doing
11   sourcing on the ████████████.
12        Q.    So the person who was doing sourcing
13   on the ████████████, for example, would have
14   only the sourcing list for the ████████████?
15        A.    Correct.
16        Q.    And Mr. Iacovacci, was he doing
17   sourcing on a subset of Brevet's businesses or
18   is he doing sourcing for all of Brevet's
19   businesses?
20        A.    While he had a primary focus as a
21   partner, he had the ability to go broader and
22   go across businesses.
23        Q.    Well, I'm just asking -- I'm not
24   asking what he had the ability to do, I'm
25   asking what he did.  Did he do sourcing for all
```

```
                                          Page 774
 1                       Monticciolo
 2   of Brevet's line of businesses or just for a
 3   subset of their lines of business?
 4        A.    If by doing you mean did he bring in
 5   something that wasn't in the core business that
 6   he was in and say in the ██████████, I would
 7   say yes he brought in business across the
 8   multiple audits.
 9        Q.    So in that capacity, not in his
10   capacity as partner, but in his capacity as
11   doing sourcing for all of Brevet's lines of
12   business, he had access to all of Brevet's
13   sourcing lists, right?
14        A.    No, as a partner he had access to
15   them.  He wasn't in the ████ line of business
16   per se.
17        Q.    If he wasn't in the ████ line of
18   business, why was he included among those users
19   who could access the ████ sourcing list?
20        A.    Because he is a partner of the firm.
21        Q.    Why did that mean that he should
22   have access to all of these lists if he wasn't
23   working in that line of business?
24        A.    As a partner of the firm, he has a
25   higher responsibility and need to know.
```

```
                                        Page 775
 1                     Monticciolo
 2        Q.    When you say need to know, are you
 3   referring to the fact that a partner at the
 4   firm can request access to something because
 5   they need to know?
 6        A.    Amongst the possibilities, yes.
 7        Q.    Okay, but do you know whether
 8   Mr. Iacovacci ever requested access to a
 9   sourcing list that he didn't have access to in
10   his capacity as a member of the sourcing team?
11        A.    As I sit here, I don't know if he
12   requested or needed to request.
13        Q.    Is the sourcing list known to anyone
14   outside of the sourcing teams and the Brevet
15   employees that you previously identified?
16        A.    No.
17        Q.    I'm sorry?
18        A.    No.
19        Q.    You said no?
20        A.    I said no.
21        Q.    Did Mr. Iacovacci help develop the
22   sourcing list?
23        A.    To the best of my knowledge, yes.
24        Q.    Did he help develop all the sourcing
25   lists or only some of the sourcing lists?
```

Page 776

                              Monticciolo
1
2        A.     Again, to the degree that I have
3    researched it, I would say some of the sourcing
4    lists.
5        Q.     Which ones?
6        A.     I can't tell you exactly which ones
7    as I sit here.
8        Q.     Can you tell me which sourcing list
9    Mr. Iacovacci did not help develop?
10       A.     It's not a question of an absolute
11   one whole thing or not one whole thing, but
12   whether he was a minor or a major contributor I
13   think would be the distinction.
14       Q.     So he was a contributor to
15   developing all the sourcing lists, but you
16   think it would vary between sourcing lists as
17   to whether or not he was a major or minor
18   contributor?  Did I get that right?
19       A.     Yes.
20       Q.     How often do those sourcing lists
21   get updated or changed?
22       A.     Frequently.
23       Q.     How frequently, every year?
24       A.     And updated is maybe a little bit
25   more specificity of updated to help answer that

Page 777

1                       Monticciolo

2      question.

3          Q.    You have a list and then it changes

4      at some point in time.  That's what I'm

5      referring to, right, either names get added,

6      deleted?

7          A.    So changes of that nature probably

8      monthly or a little less frequently.

9          Q.    Monthly?

10         A.    At worst, yes.

11         Q.    What do you mean at worst?

12         A.    Sometimes it could be more frequent.

13     Sometimes it could be less frequent.

14         Q.    You might update -- your testimony

15     is that you might update those lists more

16     frequently than monthly?

17         A.    Yes.

18         Q.    You're talking about adding names?

19         A.    Updating is a broad topic, so

20     updating deleting, updating phone numbers,

21     addresses, people change companies.

22         Q.    What is the process for adding a

23     name to the sourcing list?

24         A.    You know, I couldn't tell you the

25     details of that, but each salesman is

Page 778

1                      Monticciolo
2    responsible for maintaining the list as current
3    as possible.
4         Q.    When you say each salesman, you are
5    referring to members of the sourcing team that
6    had access to these lists?
7         A.    Sourcing, I think whatever you want
8    to call them.  I think business development
9    officer is the word used in the industry.
10        Q.    There are only one or two of those
11   apart from Mr. Iacovacci?
12        A.    There is per the lines of business
13   in 2016 in particular, yes.
14        Q.    Would they go to you for approval
15   for adding or deleting a name, adding to or
16   deleting from that list or can anyone, any of
17   those people who had access just go in and add
18   or delete?
19        A.    They had the discussion depending on
20   their seniority.
21        Q.    Who made the ultimate decision as to
22   whether or not a name could be added or deleted
23   to or from the sourcing lists?
24        A.    I couldn't tell you the specific
25   name, but again the senior person in each line

Page 779

1                       Monticciolo
2    of business.
3         Q.    Was Mr. Iacovacci the senior person
4    in one or more lines of business for Brevet?
5         A.    As a partner he was senior in all
6    regards.
7         Q.    So yes?
8         A.    That would be a subset, yes.
9         Q.    When did Mr. Iacovacci
10   misappropriate Brevet's sourcing lists?
11        A.    From -- again from the materials
12   that we provided and the affidavits that detail
13   that explicitly, but that date range is in
14   the -- and we can go to a specific affidavit
15   for that -- but 2014 to '16.
16        Q.    What do you mean by that?  I'm
17   asking for you to identify when he actually
18   misappropriated one of the sourcing lists.
19        A.    So again, I have to point you to the
20   affidavits where there is the voluminous number
21   of e-mails and references made, but there were
22   unfortunately too many for me to just memorize
23   for this.
24        Q.    I don't need memorization and I
25   don't want a long list of e-mails.  I just want

Page 780

                          Monticciolo
1
2    an answer to my question.  Can you give me an
3    example on one date when Mr. Iacovacci
4    misappropriated a sourcing list?
5         A.    As I sit here right now, without
6    referencing the specific materials, no.
7         Q.    Can you give me one date on which
8    Mr. Iacovacci misappropriated an investor list?
9         A.    As I sit here right now, we provided
10   materials and identified that, no.
11        Q.    I'm sorry I missed the last word?
12        A.    No.
13        Q.    What about the content of
14   presentation materials and the format of
15   presentation materials; do you recall
16   identifying that as one of the trade secrets
17   that Mr. Iacovacci allegedly misappropriated?
18        A.    Yes.
19        Q.    Can you tell me what type of
20   presentation, what presentation materials are
21   you referring to?
22        A.    I know it at least includes our
23   track record, our -- we call it our PowerPoint
24   are the ones that come to mind amongst others.
25        Q.    When you say amongst others, are

```
                                      Page 781
 1                   Monticciolo
 2   those the two that come to mind, your track
 3   record and your PowerPoint?
 4        A.    Those are the two that come to mind
 5   that are significant.
 6        Q.    So let's talk about those two to
 7   start off with.  When you say the track record,
 8   is there a document that you are picturing in
 9   your mind that is entitled Brevet's Track
10   Record?
11        A.    It is stored and there is a document
12   referred to as the track record.  It is
13   communicated or presented in several ways.
14   There is a track record document.
15        Q.    I want to make sure I got that.
16   There is a document called track record that
17   you have in mind when you talk about the
18   presentation materials that Mr. Iacovacci
19   misappropriated, right?
20        A.    Correct.
21        Q.    Where is that document housed?
22        A.    That is housed within the finance
23   department.
24        Q.    When you say within the finance
25   department, are you referring to it being
```

Page 782

                        Monticciolo

1

2    housed as a hard copy or within the finance

3    department's electronic folders or something

4    else?

5         A.    An electronic document.

6         Q.    So the finance department has its

7    own drive or --

8         A.    Yes.

9         Q.    Who is responsible for maintaining

10   the track record document that you are

11   referring to?

12        A.    Members of the finance team.  It

13   changes over time who the person was.  It's not

14   like a title.

15        Q.    And that track record refers to

16   Brevet's performance for its investors?

17        A.    Amongst other things, yes.

18        Q.    What else?

19        A.    It contains the performance of every

20   asset that we've originated, how it's

21   performed, how it's produced, its performance,

22   the measures of that performance which

23   obviously then results in what we stated which

24   I think was investors' performance.

25        Q.    Any asset you've ever invested in?

Monticciolo

1

2       A.      Every asset that we invested in in

3    the funds which goes back prior to even the

4    short duration fund, but only as a registered

5    fund.

6       Q.      Are those assets grouped together in

7    some way or is it just a chronological listing

8    of investments?

9       A.      It has multiple references to it,

10   but the primary order is chronological.

11      Q.      How large is this document?  Is it

12   an Excel spreadsheet?

13      A.      It's big.

14      Q.      I would imagine.  Is it an Excel

15   spreadsheet?

16      A.      It is.

17      Q.      Do you know how many gigabytes that

18   spreadsheet is?

19      A.      I do not.  It crashes many a

20   computer.

21      Q.      Are you able to sort that track

22   record spreadsheet by say example if you're

23   looking for certain types of transactions or

24   certain metrics for a transaction, are you able

25   to use it for those purposes?

Page 784

1                          Monticciolo

2              MR. SOLOMON:   I did not hear the

3        first part of your question.

4        Q.     Are you able to sort the track

5    record spreadsheet in order to filter or

6    identify certain types of investments by

7    category, by size, by whatever it is?

8        A.     Yeah.  I'm not the expert on that

9    particular file.  Obviously it's something that

10   we have finance group maintained, but it is in

11   a spreadsheet, so it would be an assumption,

12   but I think a good one to say probably.

13       Q.     Do you know whether that file was

14   produced in this litigation?

15       A.     As I sit here I couldn't tell you if

16   it was, but we can check.

17       Q.     We can.  Well, I'll ask you to do

18   that so I know whether we are referring to a

19   document that we have or a document that we

20   don't.

21              Have you ever seen a copy of that

22   hard copy of that track record file?

23       A.     Yes.

24       Q.     Is that one you keep in your office?

25       A.     It's something that we guard very

```
                                        Page 785
 1                     Monticciolo
 2    carefully, so we try not to print it out.
 3         Q.    But you have printed it out, right?
 4         A.    I have printed it out for audit
 5    purposes, yes.
 6         Q.    Do you keep copies of it in your
 7    office?
 8         A.    I do not.
 9         Q.    Does anyone keep hard copies of the
10    track record file?
11         A.    Not that I'm aware of.
12         Q.    Do you know whether anyone keeps
13    hard copies of that file?
14         A.    I would be surprised because they
15    are -- they are aware that it is a critical
16    document to the firm to not be printed out or
17    available around.
18         Q.    Has it ever been printed out your --
19    has it ever been printed out apart from audit
20    purposes?
21         A.    I'm sure it has.
22         Q.    Do you know what the people who
23    printed it out did to protect it?
24         A.    They obviously kept it in their
25    possession so that they could reference it if
```

Page 786

                        Monticciolo
1
2    they were to answer a question on a call.
3         Q.    Did Brevet individual employees who
4    printed it out have locks on their offices,
5    individual offices?
6         A.    They do currently in our new office
7    space where they are actually in the process of
8    being installed.
9         Q.    The locks are in the process of
10   being installed?
11        A.    In the new office for some fire code
12   issues, but the space is fully locked down.
13        Q.    That I understand, but setting aside
14   the new installation, the current space that
15   you occupy does not have individual locks for
16   the individual employee's offices, correct?
17        A.    In the few months that we've been in
18   our new office, not yet.  Historically that has
19   been.
20        Q.    How about in 2015, 2016, the office
21   of Brevet --
22        A.    Yes.
23        Q.    Is it your testimony that the
24   individual employee's offices had individual
25   locks?

```
                                          Page 787
 1                    Monticciolo
 2         A.    For the areas of finance and
 3    compliance that would have this, myself, yes.
 4         Q.    So every employee in finance who
 5    might have access to the track record
 6    spreadsheet had a lock on their office?
 7         A.    I believe that's correct.
 8         Q.    Who are those employees?
 9         A.    So back in those days it was likely
10    Karina Dinershtyn.
11               THE COURT REPORTER:  Can you spell
12         that, please?
13         Q.    D-I-N-E-R-S-H-T-Y-N.
14         A.    I'm impressed.
15         Q.    Anybody else apart from Karina?
16         A.    Whoever may have been in compliance
17    at that time.
18         Q.    Anyone in compliance also have
19    individual locks on their offices?
20         A.    Yes.
21         Q.    Did they lock those offices on a
22    nightly basis?
23         A.    They were supposed to.
24         Q.    Do you know whether they did or
25    didn't?
```

1                      Monticciolo

2          A.      I didn't go around and audit that

3     myself.

4          Q.      Was there a company policy that you

5     are thinking of when you say they are supposed

6     to lock their offices at night, individual

7     offices?

8          A.      I don't know if there is a specific

9     policy on that, but there is a confidentiality

10    requirement which we do emphasize through

11    training.  Most importantly, don't print this

12    stuff out and lock your computer.

13         Q.      So, in your view, the

14    confidentiality requirements required finance

15    and compliance people to lock their offices

16    every night?

17         A.      I would have to go look at

18    specifics, but it seems to use best practices

19    to protect that confidential information.

20         Q.      In your view best practices would

21    include locking individual offices each night,

22    fair?

23         A.      As one of the things you could do,

24    yes.

25         Q.      You say you don't know how large the

```
                                            Page 789
 1                      Monticciolo
 2   file is.  Can you give me a ballpark?
 3        A.    I never looked at the size actually.
 4        Q.    Is it the kind of file you can
 5   e-mail me for example or is it much bigger than
 6   that?
 7        A.    I would doubt that you could.
 8        Q.    Did Mr. Iacovacci have access to
 9   this file?
10        A.    Again, as a partner of the firm, he
11   had access to everything.
12        Q.    I want to make sure I understand
13   what you mean when you say that because I tried
14   to make this point clear earlier through a
15   question, but I'm not sure I understood your
16   answer.
17            I understand that when you have a
18   certain position at the firm you can request
19   access to files or whatever it is because you
20   just have that level of seniority.  I want to
21   distinguish between being able to request
22   access or demand access or however it is versus
23   having access without a special request.
24            So with that clarification in mind,
25   it is not your testimony that Mr. Iacovacci had
```

```
                                    Page 790
 1                   Monticciolo
 2   access without special request, had access to
 3   the Brevet track record file, is it?
 4        A.    As I sit here I couldn't tell you
 5   specifically on that file, but as a partner,
 6   you have access to all the drives,
 7   administrative.  There could be situations
 8   where somebody is restricting say a sub drive
 9   like we mentioned those lines of business and
10   it was just overlooked that had to also go back
11   and include the partners.
12              So that's when you might have to
13   request it or somebody did password protect the
14   file and then they would have to go and get
15   that, but by default he would have, in my
16   recollection, had access to all the files.
17        Q.    Were there any folders, files or
18   drives that you had access to that
19   Mr. Iacovacci didn't?  Again, default access.
20        A.    Again, as I sit here, I haven't
21   looked specifically into that, but I would be
22   surprised if we didn't have the same access.
23        Q.    Were the track record files password
24   protected?
25        A.    I actually don't know the answer to
```

```
 1                    Monticciolo
 2  that because I have never opened it myself.
 3       Q.    You've never opened the track record
 4  file?
 5       A.    I don't know.
 6       Q.    Did Mr. Iacovacci ever open it?
 7       A.    I don't know.
 8       Q.    Did Mr. Iacovacci ever e-mail it to
 9  anyone, including himself?
10       A.    I don't -- as I sit here, I could go
11  back and look at the e-mail discovery that
12  we've done to determine that, but I haven't
13  reviewed every one of those to confirm that or
14  not.
15       Q.    So, do you know whether
16  Mr. Iacovacci actually did misappropriate that
17  track record file?
18       A.    I do not know specifically without
19  reviewing all those e-mail references that we
20  gave, whether it was the track record file or a
21  digital version of the track record.
22       Q.    What do you mean by digital version
23  of the track record?  So in addition to the
24  track record file, there is a digital version
25  of the track record?
```

Page 792

                        Monticciolo

1

2       A.     No, you mentioned printing.  So

3    sometimes to do that it could have been printed

4    to a PDF file and then removed that way.

5       Q.     You don't know whether that happened

6    either is your point?

7       A.     I haven't memorized whether or not

8    that was one of the things attached to those

9    e-mails.

10       Q.     Fair enough.  Let's talk about the

11    other presentation materials.  I think you

12    talked about PowerPoints.  Are you referring to

13    pitch materials?

14       A.     We have materials that wouldn't be

15    called necessarily pitch materials, but a

16    communication of presentation materials, yes.

17       Q.     Was the first word communication?

18       A.     Yes.

19       Q.     Is it fair to say those would be

20    colloquially described as pitch materials,

21    materials that you would show perspective

22    investors?

23       A.     We don't use the word pitch because

24    that is a different context.  In a regulated

25    fund it is a technicality that matters in our

Page 793

Monticciolo

1
2  business, but presentation of our business and
3  our investments, the investment strategy, yes.
4        Q.    I don't want to trip on any SEC
5  regulations, so I'll try to be careful with the
6  question.
7        A.    We are just heavily trained, sorry.
8        Q.    That's fine.  So we are talking
9  about PowerPoints that sort of demonstrate
10 Brevet's success and the reasons why investors
11 should want to invest their money with Brevet.
12 Is that a fair, innocuous enough, nonregulatory
13 violating description of the PowerPoint
14 materials that you have in mind?
15       A.    Amongst other things, that is what
16 it includes.
17       Q.    And these are the kinds of
18 materials -- do you contend that the entire
19 PowerPoint presentation is a trade secret or
20 that certain portions of the PowerPoint
21 presentation that you have in mind is a trade
22 secret?
23       A.    We view it as a trade secret and,
24 you know, we've had that confirmed with counsel
25 over the years that it's our -- materials that

```
 1                   Monticciolo
 2   communicate our strategy.
 3        Q.    So it's your understanding that the
 4   entire PowerPoint presentation that you are
 5   referring to is a trade secret?
 6        A.    Yes.
 7        Q.    And I think you identified
 8   previously that the content and the format of
 9   these presentation materials in your view
10   constitute trade secrets.  Does that sound
11   right to you?
12        A.    I can't confirm whether I testified
13   specifically to that, but the content of that
14   message seems correct.
15        Q.    Do these materials identify the
16   names of Brevet's principals?
17        A.    In some presentations, it does.
18        Q.    You don't think that the names of
19   Brevet's principals are trade secrets, do you?
20        A.    No.  Maybe their contact info.
21        Q.    Do you think their contact info for
22   Brevet's principals constitute a trade secret?
23        A.    Or confidential information.
24        Q.    I'm not asking you about
25   confidential information.  I'm specifically
```

                         Monticciolo

1    asking you about trade secrets because that is
2    a claim in this case.  Is it your view,
3    Brevet's view, that the contact information for
4    principals constitute a trade secret?
5         A.    I do include confidential
6    information in trade secrets, but for that
7    information, I would say no.
8         Q.    No, it's not.  So, when you say the
9    presentation is, you know, is all a trade
10   secret, you don't really mean all, right?  You
11   understand there are portions of the
12   presentation that are clearly not trade
13   secrets, right?
14        A.    What I mean is the presentation, its
15   format, its flow, its sections, how we present
16   and who we present is developed over years to
17   have the type of success that we do that is
18   something that is unique to us on how we
19   developed that.
20        Q.    I appreciate that your description
21   of what you've done over the years is unique to
22   you.  My question is much more specific,
23   Mr. Monticciolo.
24             Let's talk about the format for a

Page 796

                              Monticciolo

1

2    second.   Are these PowerPoints?

3        A.     They are PowerPoints.

4        Q.     You don't mean that having a slide

5    deck and PowerPoint is a format that you

6    believe constitutes a trade secret, do you?

7        A.     Not a generic PowerPoint and slide

8    deck and PowerPoint, no.

9        Q.     Is there something special about the

10   slide deck that you have that makes its format

11   a trade secret?

12       A.     We believe so.

13       Q.     Can you identify that for me?

14       A.     We've hired professionals to design

15   it specifically for us to communicate that

16   message, to craft it so that it has the highest

17   success in our industry.

18       Q.     You hired third-party professionals

19   to create PowerPoints of your presentation

20   materials to prospective investors?

21       A.     Yes.

22       Q.     Like whom?

23       A.     There is one that comes to mind,

24   just because I saw it in my review, a group

25   called JB King.

Page 797

1                          Monticciolo

2          Q.     JB King?

3          A.     JB King.

4          Q.     And they came up with a format for

5     some of your presentation materials?

6          A.     That's -- yes, that's what we've

7     done over the years, yes.

8          Q.     Are you referring to colors, fonts,

9     you know, title?

10         A.     All of the above, content, flow,

11    style.

12         Q.     How many clients does JB King have?

13         A.     I don't know.

14         Q.     Would it surprise you if JB King

15    uses similar colors, fonts, styles for other

16    clients for whom it creates PowerPoint

17    presentations?

18         A.     It would surprise me.

19         Q.     Why is that?

20         A.     Because they are hired to create the

21    unique file format presentation for Brevet.

22         Q.     Do you have an agreement with JB

23    King that it is not allowed to use the fonts,

24    styles or colors that it uses for Brevet

25    presentations on other presentations that it

Page 798

1                    Monticciolo

2    creates?

3        A.    As I sit here, that is not something

4    that I had diligence to prep for this, sorry.

5        Q.    So why would it surprise you then if

6    they, you know, used their expertise to create

7    a nice very presentable PowerPoint for you and

8    then used the same expertise to generate

9    similarly shaded colored fonts and styles for

10   other presentations that they are retained to

11   prepare?

12       A.    Again, I didn't come prepared to

13   answer that question, but they are

14   professionals and I would expect a unique

15   product for a unique fund.  That's a worthy

16   expectation.

17       Q.    Anything else that serves as a basis

18   for that expectation other than your own views?

19       A.    My almost 40 years of experience

20   working with parties that do that.  I would

21   feel pretty comfortable with that.

22       Q.    To whom does Brevet show or

23   distribute the presentation materials that you

24   are referring to?

25       A.    To qualified investors.

```
 1                    Monticciolo
 2       Q.    How many qualified investors?
 3       A.    I don't have that number
 4  specifically at hand.
 5       Q.    Can you give me a ballpark?  What is
 6  your best estimate?
 7             MR. SOLOMON:  I object to the
 8       question.
 9       A.    Yeah, I'm not sure I can give you an
10  accurate number.  We've been around for a long
11  time.
12       Q.    Thousands would you say?
13       A.    I wouldn't say thousands.  We are
14  very particular for some reason.
15       Q.    So you think over the years you have
16  not shown your presentation materials to
17  thousands of prospective investors?
18       A.    Correct.
19       Q.    How about hundreds?
20       A.    Over the years that we've been in
21  business, possibly.
22       Q.    Only possibly?  You wouldn't even
23  say that with certainty?  It could have been
24  less than a hundred investors total in all the
25  years that Brevet has been around that you've
```

                        Monticciolo
1
2   shown your presentation materials to?
3       A.    You said hundreds, so more than a
4   hundred, probably.  Could I tell you between
5   that and a thousand?  I couldn't.  I would have
6   to go look.
7       Q.    Where would you look for that if you
8   have a catalog of all investors to whom you
9   have shown materials?
10      A.    We do.
11      Q.    Where is that housed?
12      A.    That is housed within the marketing
13  group.
14      Q.    Has that been produced in this
15  litigation?
16      A.    I would have to look.  I don't know
17  the answer to that as I sit here.
18      Q.    Before you show a presentation about
19  what Brevet does or any of the presentations we
20  are talking about to a prospective investor, do
21  you mandate that the investor sign an NDA?
22      A.    At the stage of the presentation, we
23  did not.  We require confirmation of qualified
24  investor status which, you know, a certain
25  standard of confidentiality comes along with

Page 801

1                    Monticciolo

2    that as well as institutionalization.

3         Q.    Do all of the qualified investors to

4    whom you have showed these presentation

5    materials end up investing in Brevet's

6    business, one of Brevet's businesses?

7         A.    No.

8         Q.    At what point do they sign an NDA?

9         A.    When they want to learn more than

10   the PowerPoint.

11        Q.    Why is it that you require them to

12   sign an NDA at that point?

13        A.    Because the information beyond that

14   point is critical to Brevet.  It's our -- we

15   use the phrase here trade secrets.

16        Q.    I see.  Okay, are third parties --

17   are those -- withdrawn.

18             Are prospective investors required

19   to return materials to Brevet, materials they

20   received from Brevet?  Are they required to

21   return them to Brevet if the materials were

22   received prior to the NDA stage that you just

23   described?

24        A.    Beyond the PowerPoint, no.

25        Q.    Are they required to return the

```
                                        Page 802
 1                        Monticciolo
 2     PowerPoint?
 3          A.     No.   Although in this communication,
 4     there are confidentiality restrictions attached
 5     to all of our e-mails which are private and
 6     confidential as well as descriptions in the
 7     actual presentation itself about its care.
 8                  And if within ten minutes or so we
 9     can take a break to use the restroom.
10          Q.     Never want to keep anybody waiting
11     for that.   Why don't we take ten minutes?
12                  THE VIDEOGRAPHER:   This the end of
13          media unit number two.   We are now off the
14          record at 12:00 p.m. for break.
15                  (Brief recess taken.)
16                  THE VIDEOGRAPHER:   This is the
17          beginning of media unit number three.   We
18          are now on the record at 12:11 p.m.   Back
19          from break.
20     BY MR. CYRULNIK:
21          Q.     Mr. Monticciolo, do you recall
22     identifying the Brevet fund structure as one of
23     the trade secrets that you are alleging
24     Mr. Iacovacci misappropriated?
25          A.     Yes.
```

Page 803

                    Monticciolo

1

2       Q.    Can you describe to me how the fund

3   structure, where the fund structure is housed?

4       A.    Could you explain -- just clarify

5   what you mean by the word housed?

6       Q.    Sure.   Where is it kept?   Where is

7   this trade secret maintained within the Brevet

8   network or otherwise?

9       A.    Like physically, like digitally?

10  I'm sorry, are you thinking people or are you

11  thinking departments or like files?

12      Q.    Well, you tell me.   Are you

13  referring to files or are you referring to

14  something else when you characterize this as a

15  trade secret?

16      A.    I'm characterizing a legal structure

17  which is obviously a document in the form of

18  files.

19      Q.    So where is the documentation of the

20  legal structure housed?

21      A.    That is maintained within the

22  legal/compliance area.

23      Q.    That is its own drive, the legal

24  compliance drive?

25      A.    Yes.

Page 804

1                    Monticciolo

2      Q.    And who has access to that?

3      A.    Obviously legal compliance and a

4   partnership.

5      Q.    How did you come up with this

6   structure?

7      A.    This was the conclusion of the

8   culmination of my career of various structures

9   and forms in conjunction with our outside

10  counsel and a lot of development over time.

11     Q.    The outside counsel you're referring

12  to, is that the Curtis Mallet?

13     A.    Correct.

14     Q.    And other firms were they also

15  involved in creating the fund structure?

16     A.    They were not.

17     Q.    Was it just Curtis Mallet?

18     A.    Just Curtis Mallet.

19     Q.    How long have they been your

20  counsel?

21     A.    For 15 plus years.  Longer probably.

22     Q.    What is unique about the fund

23  structure that you've created with Curtis

24  Mallet for Brevet in your view relative to

25  other funds in this business, if anything?

Page 805

1                    Monticciolo

2         A.    There are many unique features.  I

3    can highlight a few that are pointed out by our

4    fund counsel as we developed them, but also by

5    investors.  ███████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████████

     ██████████████      ███████████████████████

     ████████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████████████████████████████

     ███████████████████████████████████████████

     ███████████████████████████████████

     ████████████████████████

15             It's a very unique structure.  We

16   are not aware of anyone else that has been able

17   to figure out a similar concept.  We can go

18   into a number of reasons why that is, but what

19   it allows us to do is have tremendous

20   flexibility of having an open end fund for 13

21   plus years yet have the flexibility to address

22   various investor needs which others handle in a

23   variety of ways which we think are nearly not

24   as attractive as we do is what our fund

25   structure gives us.

Page 806

1               Monticciolo

2      Q.    Is it your view that you are the

3 only fund that you are aware of that has that

4 structure?

5      A.    We are pretty certain that we are.

6      Q.    Can you describe to me in a little

7 more detail so I understand it; can you explain

8 to me what you're doing versus what everyone

9 else is doing?

10     A.    Sure.  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████  That is just one of the

24 features that is unique about what Brevet does.

25     Q.    What other fund structures, did you

Page 807

Monticciolo

1
2    examine to reach the conclusion that you're not
3    aware of any other funds that has the fund
4    structure trade secret that you are referring
5    to?
6        A.    So, we've done two things.  One is
7    in conversations with counsel typically for our
8    investors, there is quite a bit of discussion
9    of how does it work.  This is different.  We
10   know in our regulatory reviews that has been
11   consistent and understood as to the uniqueness
12   of what we do.  But I think the best is the
13   fact that we have large global institutional
14   investors who confirm it virtually every time
15   they invest.
16       Q.    You say virtually every time.  Are
17   there exceptions?
18       A.    Some don't comment, but it's their
19   prerogative to say whether or not it's unique
20   or not.
21       Q.    But, your testimony sitting here
22   today under oath as Brevet's corporate
23   representative is that you're not aware of any
24   other fund that has the trade secret fund
25   structure that you're referring to?

```
                                          Page 808
 1                     Monticciolo
 2        A.    Correct.  Not that we are aware of.
 3        Q.    Let's talk about -- well, Curtis
 4   Mallet, who is aware of the fund structure that
 5   you are referring to?
 6        A.    Obviously the critical people inside
 7   of Brevet, legal compliance, our outside
 8   counsel, Curtis Mallet and our auditors and our
 9   tax preparers.
10        Q.    Your investors are all aware of it,
11   right?
12        A.    Our investors are aware of it.  I
13   can't attest for them of their depth of their
14   awareness.
15        Q.    But you disclose it to them; they
16   are aware of it?
17        A.    They agree to it hopefully, yes.
18        Q.    And do you -- are there any
19   obligations that you are aware of that prevent
20   Brevet from sharing that strategy, that
21   structure, outside of their discussions with
22   you?
23        A.    Yes.
24        Q.    And what is that?
25        A.    There are confidentiality
```

Page 809

Monticciolo

1                              Monticciolo
2      restrictions within all of our materials.  They
3      are provided under confidentiality.  They are
4      provided under NDAs and we go through a number
5      of measures to make sure that they are not
6      shared.
7           Q.    So it's your understanding that your
8      investors signed Confidentiality Agreements or
9      NDAs by which they promise not to disclose the
10     fund structure idea that you just identified?
11          A.    That's not my understanding.  I
12     believe it's my knowledge.
13          Q.    So if I asked one of your investors
14     randomly is it your understanding that you are
15     not permitted to share the fund structure idea
16     that you just described, your expectation would
17     be that their answer would be that's right, we
18     think we have to keep that fund structure a
19     secret?
20          A.    Again, there are conditions with
21     regulatory inquiries and, you know, that are
22     probably there or even their auditors, I guess
23     it's our auditors.  Other than those legal
24     exceptions, I would say no.  They know they are
25     not to share it.

```
                                          Page 810
 1                     Monticciolo
 2        Q.    So if an investor liked that
 3   strategy and used that structure with another
 4   fund with which it was investing, it's your
 5   belief that that investor understands it is not
 6   permitted to propose that structure to another
 7   fund, fair?
 8        A.    Fair.
 9        Q.    You disclose the structure to your
10   regulators?
11        A.    We do.
12        Q.    Do you have any agreement with
13   Curtis Mallet that they are not allowed to use
14   the structure for advising other funds with
15   respect to which they do corporate work?
16        A.    Beyond the professionalism and work
17   product that we've created with them, I would
18   have to go look at that.  I have not researched
19   that.
20        Q.    Well, you understand that Curtis
21   Mallet advises hundreds of clients, right, a
22   large firm?
23        A.    I'm aware that they advise broadly
24   hundreds of clients.
25        Q.    And they advise many hedge funds,
```

Page 811

                              Monticciolo

1
2    right?
3        A.    I am not --
4        Q.    You don't know one way or the other?
5        A.    No, they are not primarily a hedge
6    fund firm.
7        Q.    Is it your view that they don't have
8    any other hedge fund clients?
9        A.    It's my view that they are -- I do
10   not know the number, but we chose them -- one
11   of the reasons was that they were not prevalent
12   in the space.
13       Q.    The structure you described would be
14   something that could be applied outside of the
15   particular space you're in, right, the trade
16   secret fund structure that you described?  It
17   could be beneficial to all sorts of different
18   entities or funds; is that fair in your view?
19       A.    I don't know how you would draw that
20   conclusion.
21       Q.    I'm asking.
22       A.    I don't know.  It's very effective
23   for what we do.  I can't comment on other
24   industries or spaces.
25       Q.    Let's talk about tax strategy.  Do

```
 1                     Monticciolo
 2   you recall identifying tax strategy as --
 3   Brevet's tax strategy as a trade secret?
 4        A.    Yes, I do.
 5        Q.    That Brevet alleges was
 6   misappropriated?
 7        A.    Hmm-hmm.
 8              MR. SOLOMON:  Could you say yes?
 9        A.    Yes, sorry.
10        Q.    Where are these tax strategies
11   housed?  Are they written down in some format
12   and housed in the Brevet network?
13        A.    Tax strategy is typically
14   incorporated in the policies and procedures of
15   how you do business and tax opinions we receive
16   about tax application to those.
17        Q.    So, the -- who develops the tax
18   strategies that you consider to be trade
19   secrets?
20        A.    The tax strategy that we used was
21   developed in-house obviously with the advice
22   and consultation from counsel.
23        Q.    Outside counsel?
24        A.    Outside counsel.
25        Q.    Which outside counsel helped develop
```

```
                                      Page 813
 1                    Monticciolo
 2    Brevet's tax strategies?
 3         A.    Curtis Mallet.
 4         Q.    Anyone else?
 5         A.    Not that I'm aware of as I sit here.
 6         Q.    Which in-house Brevet people helped
 7    develop Brevet's tax strategies?
 8         A.    So, it would be and this is over a
 9    number of years, but myself, general counsel
10    over the years, experts that have been at the
11    firm.
12         Q.    Some of those other individuals
13    apart from yourself obviously are no longer at
14    Brevet, correct?
15         A.    Some people who may have contributed
16    some ideas may not be at Brevet any longer,
17    yes.
18         Q.    The people who help develop those
19    strategies in-house commit to not using
20    those -- deploying those strategies in
21    connection with any future work that they were
22    going to do or any future employment they were
23    going to undertake?
24         A.    To the best of my knowledge, they
25    did.
```

```
                                            Page 814
 1                      Monticciolo
 2        Q.    How so; in what form?
 3        A.    In the form of our various
 4   agreements, Employment Agreements, employee
 5   manuals, et cetera.
 6        Q.    But where are the employee manuals
 7   or employee agreements?  Do you have Brevet
 8   personnel commit that tax strategies that were
 9   effective for Brevet cannot be deployed for any
10   future -- in the context of any future work
11   that that individual might do?
12        A.    I'm not a lawyer to point out
13   exactly which of the terms relates to that, but
14   it's work product and confidential and
15   proprietary information and I believe we
16   identify it as what we would consider to be a
17   trade secret.
18        Q.    Well, I understand you have
19   identified that you consider it to be a trade
20   secret.  I'm asking where you would point me to
21   to see that Brevet employees who help develop
22   those strategies or who were aware of those
23   strategies are not permitted to deploy similar
24   strategies in the context of other work that
25   they do in the future?
```

Page 815

Monticciolo

1

2       A.     So we identify that as work product,

3   confidential information, private information

4   and those people who work on this I'm sure are

5   well aware that these are trade secrets and as

6   we point it out, the employee manual is very

7   aware of how to treat them, so it's the Code of

8   Conduct as well as the employee agreements, as

9   well as the compliance manuals.

10      Q.     None of the documents you just

11  referenced have any discussions about tax

12  strategies, right?

13      A.     Anything developed at Brevet is a

14  trade secret that is confidential, proprietary

15  and meets what we view to be a trade secret.

16  I'm not saying it says tax strategies and I

17  think that would be too narrow as a business

18  practice to describe it that way.

19      Q.     You understand that a person who

20  works at Brevet is free to go work at another

21  similarly situated fund and that they -- you

22  don't expect them to be ignoring all of what

23  they learned in working in this line of

24  business and not contributing to, you know,

25  that knowledge to the work that they do going

Page 816

Monticciolo

1
2  forward outside of Brevet; is that fair?
3       A.    That is not correct.  I would say
4  work product, things that were developed for
5  the benefit of Brevet, that benefit Brevet,
6  would be considered things that they should not
7  use in their next job.  Knowledge of how to use
8  Excel and other things like that, common
9  knowledge, I wouldn't have a problem with that.
10      Q.    Well, so if someone in the tax
11  department moves on from Brevet and goes to
12  work at another fund similarly situated and is
13  presented with the question of what is the best
14  tax strategy, is it your testimony that
15  Brevet's view is that that person is not
16  allowed to say well, I think the best strategy
17  is X, X being the strategy that that person
18  either recommended or deployed in the context
19  of his work while at Brevet?
20      A.    I would say that that would be
21  something we would be concerned about and that
22  we do take measures to protect those minute
23  things as we mentioned and we've identified for
24  you.  We also go to the measure of not having
25  it be just one person knowing all the answers.

Page 817

                           Monticciolo
1
2    This is why we use outside counsel and have the
3    partners and myself involved.
4         Q.    Well, let's talk about outside
5    counsel for a second.  Curtis Mallet has a tax
6    department; is that right?
7         A.    Yes.
8         Q.    And they advise many clients,
9    correct?
10        A.    Yep, probably.
11        Q.    Is it your testimony that it's your
12   understanding that Curtis Mallet has agreed not
13   to deploy any of the strategies that they
14   recommended for Brevet in connection with their
15   counseling other clients with respect to tax
16   issues?
17        A.    Broadly tax issues, I couldn't
18   comment on broadly tax issues.  They are a tax
19   department.
20        Q.    Well, I'm asking whether it's your
21   understanding that a person is not allowed to
22   recommend tax strategies that they recommended
23   Brevet use to other clients who are asking for
24   tax strategies?
25        A.    I would say correct because you laid

Page 818

1                        Monticciolo

2      the assumption there that they recommended the

3      tax strategy, so it would be theirs to

4      recommend to us.  That is not how Brevet

5      operates.

6          Q.   So let me make sure there was no

7      signals crossed on the yes' and no's.  I think

8      I understand what you were saying.

9               You would agree with me that any tax

10     strategy that Curtis Mallet recommended to

11     Brevet is a tax strategy that you understand

12     they can recommend to any other clients that

13     they have, right?

14         A.   If it was work product for us that

15     we paid for, I would consider that to be an

16     issue, but if it was their work product, then

17     they are free to do what they want.

18         Q.   Well, I'm talking about the tax

19     strategy that you testified several weeks ago

20     was a trade secret.  You would agree that part

21     of that tax strategy came from recommendations

22     that Curtis Mallet made to you, to Brevet,

23     correct?

24         A.   Yes.

25         Q.   And I'm asking about that portion of

Page 819

1                         Monticciolo
2      the tax strategy that Brevet used, the portion
3      that came from recommendations from Curtis
4      Mallet, that Curtis Mallet is free to make the
5      same recommendations with respect to tax
6      strategy to its other clients if it feels that
7      those clients would benefit from such a
8      strategy, correct?
9           A.    If the parts they provided were
10     nominal or minimal and I would not say are
11     material to the trade secret aspect of the tax
12     strategy.
13          Q.    So anything Curtis Mallet
14     recommended that is not what you are claiming
15     is a trade secret; do I got that right?
16          A.    I am not saying that because, again,
17     the recommendation could be as a result of our
18     work product and request specifically on a
19     topic that is unique to us.
20          Q.    I don't understand what that means.
21     Yes or no, tax strategies recommended by Curtis
22     Mallet to Brevet, it's your understanding that
23     Curtis Mallet is free to use those same
24     strategies that they recommended to Brevet in
25     advising other clients?

Page 820

1                    Monticciolo
2          MR. SOLOMON:  I object to the
3       statement.  If you understand the
4       question, you can answer.
5       A.    The answer is yes, regardless of we
6    probably didn't use those tax strategies, but
7    fine.
8       Q.    Well, did you use Curtis Mallet's
9    recommended tax strategies or not?
10      A.    Tax strategies is a broad
11   definition.  I would say the tax strategy that
12   Brevet uses was created inside of Brevet.
13      Q.    Well, was it created on the basis of
14   recommendations made by your tax outside
15   counsel or not?
16      A.    No.
17      Q.    So the tax strategy trade secrets
18   that you are referring to are only those that
19   were developed in-house without Curtis Mallet
20   or other outside counsel, fair?
21      A.    The strategy was developed at Brevet
22   and counsel provides advice to make sure that
23   we do it right.
24      Q.    Who came up with the strategy if it
25   wasn't Curtis Mallet?

Page 821

```
1                      Monticciolo
2       A.     It was predominantly me.
3       Q.     What is the strategy that you came
4  up with that you think is unique to Brevet?
5            MR. SOLOMON:  So I want to instruct
6       you that, insofar this is confidential,
7       you can tell it over.  Insofar that it
8       implicates any issue of legal advice, then
9       I'm instructing you not to tell it over.
10           MR. CYRULNIK:  I think the witness
11      just identified his tax strategy as the
12      trade secret.  That's why I'm asking the
13      question I'm asking.
14           MR. SOLOMON:  No, my instruction
15      stands.
16      Q.     Mr. Monticciolo?
17      A.     As the corporate representative, we
18  prefer not to, in detail, communicate our tax
19  strategy out of its end result which is what is
20  necessary for our business and so it is based
21  on my experience and advice of counsel.
22      Q.     I'm confused.  I thought we said
23  your tax strategy was your tax strategy, Doug
24  Monticciolo's tax strategy, not one that Curtis
25  Mallet recommended to you, right?
```

```
                                          Page 822
  1                      Monticciolo
  2        A.    Wrong.  I said it is my strategy and
  3   they give advice to make sure we implement it
  4   properly.  Strategy and implementation are how
  5   you implement the strategy is what I would
  6   consider to be legal advice.
  7        Q.    Fair enough.  I appreciate the
  8   clarification.  The implementation strategies
  9   are not the things that you are claiming are
 10   trade secrets.  Those are the things that
 11   Curtis Mallet advised you on, correct?
 12        A.    No, I'm not sitting here to be able
 13   to enumerate all of those, if any of those,
 14   were common advice items from counsel.  That
 15   was readily available.  It's advice on our
 16   strategy.
 17        Q.    I'm not following.
 18        A.    Ask me a question to help clarify.
 19        Q.    Let's go back.  You identified the
 20   tax strategy that you are claiming to be tax
 21   strategy, not implementation strategy that you
 22   claim to be a trade secret as a strategy that
 23   you, Doug Monticciolo, had devised?  I got that
 24   right, right?
 25        A.    Yes.
```

Page 823

1          Monticciolo

2     Q.    And I'm asking you to explain to me

3  what that tax strategy is.

4          MR. SOLOMON:  And I'm instructing

5      you, as I did before, the strategies to

6      the extent that they have legal

7      implications and you needed to get legal

8      advice with respect to them, I don't want

9      you to speak about them.

10          To the extent that they are just

11      confidential, then as you could with the

12      others, then you can speak about it.

13     A.    So --

14     Q.    Can you answer my question with that

15  instruction or are you unable to?

16     A.    I'm sorry.  Could you just repeat

17  the question again?

18     Q.    Yes.  I'm asking you to explain to

19  me what the tax strategy that you previously

20  testified was a trade secret that you came up

21  with was?

22     A.    █████████████████████████████

   █████████████████████████████████████████

   █████████████████████████████████████

25     Q.    Did you say ███████████████?

Page 824

1                         Monticciolo

2         A.

Obviously with the

8   advice of counsel how to implement it properly.

9         Q.    So I guess it would be helpful if

10  you could be a little more specific.  Where did

11  you learn these strategies?  Were they from

12  other businesses that use them or do not use

13  them, in the fund business or did you come up

14  with them on your own?

15        A.    I'm very well known for tax

16  strategies in my history and career and this is

17  one I created on my own.

18        Q.    When did you create it?

19        A.    I couldn't tell you the exact date,

20  because it's evolved to come to this point.

21        Q.    You can't tell me when you created

22  it?

23        A.    No.  There wasn't a specific day.

24        Q.    Has it changed over the years?

25        A.    It's refined over the years.

Monticciolo

1

2      Q.      When did you first come up with the

3   strategy?

4      A.      I don't remember the specific dates,

5   but if I recall, it was in the 2004 to 2006

6   time period.

7      Q.      Have you seen the strategy that

8   you're referring to implemented by any other

9   entities?

10      A.      No, none.

11      Q.      I'm including entities outside of

12   the hedge fund business.   Have you ever seen

13   the tax strategy that you claim to be a trade

14   secret implemented by any other entity

15   whatsoever?

16      A.      I have never seen another entity

17   implement this tax strategy.

18      Q.      Could you explain how the strategy

19   differs from the -- ███████████████████████

███████████████████████████████████████████████

███████████████████████████████? 

22      A.      ██████████   ████████████████████████

23      Q.      Can you please just give me a brief

24   primer on the difference between the ████████████

███████████████████████ that other funds used and the

1                    Monticciolo

2  Doug Monticciolo trade secret strategy that

3  Brevet uses and only Brevet?

4           MR. SOLOMON:  And you still have my

5       instruction in mind.

6       A.    Yes. ███████████████████████████

   ██████████████████████████████████████████

   ██████████████████████████████████████████

   ██████████████████████████████████████████

   ███████████████████████████████████████████

   ████████████████████████████

12      Q.    I understand what the benefit that

13  you are describing it as more beneficial.  I'm

14  asking you to describe what the difference is.

15      A.   ████████████████████████████████

   ████████████████████████     ████████████████

   █████████████████████████████████

   ██████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ██████████████████████████████████████████

   ██████████████████████████

23      Q.    I know that it's more dynamic.  I

24  want to understand what it is. ███████████████

   ████████████████████████████████

Page 827

1                    Monticciolo

2        A.    So again I could describe --

3        Q.    I'm sorry, I didn't mean to

4   interrupt, but I thought of a different way of

5   approaching it. ████████████████████████████████

█   ████████████████████████████████████████.

7        A.    Sure. ████████████████████████████

█   ████████████████████████████████████████████

█   ██████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ███████████████████████████████████████████████

█   ██████████████████████████████████████████

█   ██████████████████████████████████████████

█   ███████████████████████████████████████████

█   ██████████████████████████████████████████████████

█   ████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ██████████████████████████████████████████████

█   ██████████████████████████████████████████████

█   ██████████████████████████████████████████████████

█   ████████████████████████████████████████████

█   ██████████████████████████

Page 828

1                           Monticciolo

2

10        Q.    Does the tax structure that you are

11   referring to, strategy that you are referring

12   to,

15        A.

17        Q.

19        A.        █████    It's so that a US investor can

20   or US company or entity, Apple, could create a

21   product here and at some point in time in the

22   near distant future have a foreign investor

23   involved in some way or another.

24        Q.    Do you recall identifying tax

25   opinion or opinions as another trade secret or

Page 829

Monticciolo

1                      Monticciolo

2      was that -- or was the tax opinion trade secret

3      locked up with the tax strategy trade secret

4      you just addressed?

5          A.    The tax opinion is an opinion on the

6      tax treatment of the strategy.

7          Q.    Okay.  The tax opinion pertains only

8      to Brevet because it's the only entity that has

9      implemented a tax strategy; is that fair?

10         A.    That's our position.

11         Q.    Let's talk about Brevet's

12     investments.  Do you recall identifying

13     Brevet's investments as one of the trade

14     secrets at issue in this case?

15         A.    I do.

16         Q.    Which investments are you referring

17     to?

18         A.    There is a large number of them.

19         Q.    Is there a list -- is there a list

20     of the investments that you contend to be a

21     trade secret that list or are you referring to

22     something else?

23         A.    Again, we've identified those in the

24     materials.  I could -- enumerating them would

25     be difficult because it's -- there are many.

Page 830

```
                           Monticciolo
 1
 2    We've been in business for a long time.
 3         Q.    Well, is there a list of investments
 4    that is housed in the Brevet computer network?
 5         A.    Yes.  That would be the same list
 6    that is on the track record we mentioned
 7    previously.
 8         Q.    Okay.  Okay.  So the investments
 9    trade secret is wrapped up with the track
10    record trade secret we talked about?
11         A.    They are different things.  The
12    performance and how we perform and how we
13    generate those returns and outcomes is the
14    result of the investment trade secrets that we
15    use which are the legal methods, processing,
16    monitoring, managing the assets to achieve the
17    outcomes that are on the track record.
18         Q.    What is the secret way in which you
19    manage or whatever else you just described
20    doing to the investment that is unique to
21    Brevet that you believe constitutes a trade
22    secret?
23         A.    ████████████████      ███████████████
      ██ ███████████████████████████████████████████
      ██ ███████████████████████████████████████████
```

1                    Monticciolo

2    ████████████████████

     ███████████████████████████████

     ██████████████████████████  ████

     █████████████████████████████

     ████████████████████████████████

     █████████████████████████ .

8         Q.    I didn't completely understand.  My

9    apologies.  I get the fact that you claim trade

10   secrets in the list of investments that you

11   have, which is included in the track record

12   document we previously referred to, right, we

13   have that?

14        A.    Well, that is a list of the names of

15   the investments, yes.

16        Q.    Does that list do anything other

17   than describe the names of the investments?

18   Does it describe the investment by how much is

19   invested and what type of an investment it is

20   or is it just names?

21        A.    It's more than that.  It tells you

22   mechanisms that we are using to achieve those

23   returns, features.

24        Q.    Okay.  That's what the track record

25   document does.

```
                                        Page 832
 1                       Monticciolo
 2         A.     So we transition from list of the
 3    investments to track record.  The track record
 4    again is the results of what we list in the --
 5    when we list our investments which takes many
 6    forms, which in some cases describe the
 7    features of what we are doing.
 8         Q.     Apart from the information on the
 9    track record document that we talked about
10    earlier in the deposition, is there some other
11    trade secret that you are identifying for
12    purposes of this case, that Mr. Iacovacci is
13    misappropriating in connection with your
14    investments?
15         A.     Yes.
16         Q.     What is it?
17         A.     It is how we structure and how we
18    manage the investments to achieve what is on
19    the track record.
20         Q.     Where is how you structure and how
21    you manage the investments memorialized or
22    contained within the Brevet network?  Is it
23    listed out in a document or are you just
24    referring to the general understanding or
25    knowledge of what Brevet does?
```

Page 833

1                    Monticciolo

2         A.    It is listed.  It is both.  It is

3    our knowledge obviously, but it is listed very

4    ███████████████████████████████████

     ████████████████████████████████

     ██████████████████████████████████████

     ██████████████████████████████

     ████████████████████████████████████████

     ████████████████.

10        Q.    With respect to each of the

11   documents you just identified, is it your

12   testimony that you -- let's take underwriting

13   guidelines for the moment.  What is unique

14   about the underwriting guidelines that Brevet

15   employs versus what other hedge funds employ in

16   your view?

17        A.    Sure.  ██████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

     ██████████████████████████████████

     ██████████████████████████████████████████

     █████████████████████████

23        Q.    Well, you're talking about ████████

24        A.    That's one of them.

25        Q.    But you have already identified

1                 Monticciolo

2 separately the structure as a trade secret.

3 Are you saying that the guideline is a trade

4 secret as well or that it's a trade secret and

5 unique to Brevet because the underlying

6 structure is unique to Brevet?  Do you

7 understand my question?

8        A.    I did.  You're conflating a couple

9 of ideas and it's understandable.  What we do

10 is complex.  ███████████████████████████

     ███████████████████████████████████████

     █████████████████████████████████████

     ███████████████████████████████████████████

     ██████████████████████████████

     ████████████████████████████████████

     ██████████████████████ █████████████████

     ██████████████████████ ██████████

     ████████████████████████████████████████

     ████████████████████████████████████

     █████

21        Q.    Sitting here today, is it your

22 testimony that the investment that you just

23 described or the investments that you just

24 described are unique to Brevet in that you are

25 not aware of any other fund or entity that does

Page 835

                          Monticciolo

1       those investments?

2          A.    For that transaction we are

3       confident that we are the only people who do

4       that and do that in the way that we do it.

5          Q.    What other funds did you examine in

6       order to or analyze in order to reach the

7       conclusion that you are the only fund, only

8       entity to do it the way you just described?

9          A.    So amongst other things, I'm not

10      prepared to answer that question specifically,

11      but I'll give you our position which is the ▮

12      space is a limited space as it publicly

13      disclosed the participants and we know from the

14      regulators that we are the unique party that

15      does it this way, pretty definitive.

16         Q.    When did you most recently confirm

17      that?

18         A.    Within the last several months.

19         Q.    The last several months?

20         A.    Yes.

21         Q.    The regulators told you no one else

22      is doing this?

23         A.    Correct.

24         Q.    Let's talk about your documents on

Page 836

1                        Monticciolo

2    your loans.

3         A.    Yes.

4         Q.    Do you recall identifying your

5    documents on your loans as trade secrets?

6         A.    Correct.

7         Q.    Are those similar to what you just

8    described; the documents on the loans are going

9    to be unique to you because the underlying

10   strategy is unique to you?

11        A.    In some cases that is the case.

12        Q.    Is there any other way in which

13   these documents on your loans are unique?

14        A.    Yes.  By construct they are. ███

███ ███████████████████████████████████  █████████████

███ ██████████████████████████  █████████████████

███ ███████████████████████████  ███████████████

███ █████████████████████████████  █████████████████

███ ██████████████████████████████████

███ █████████████████████████████████

███ ██████████████████████████████████████

███ ████████████████████████████████████

███ ████████████████████████████████████

███ █████████████████████████████████████████

███ ███████████████████████████████████

Page 837

1                    Monticciolo

2

6        Q.    Sure.

7        A.

17       Q.    Now, sitting here today, are you

18  aware of any other entity that uses the trade

19  secrets that you are thinking of or referring

20  to when you say that your documents on your

21  loans contain trade secrets or are trade

22  secrets?

23       A.    I am not the infinite source of

24  knowledge.  I believe in the Heisenberg

25  uncertainty principles.  So anything is

```
                                    Page 838
 1                     Monticciolo
 2   possible, but my career has been made and known
 3   for creating products, many of which have been
 4   service mark and trademark in places like
 5   Goldman Sachs and Deutsche Bank.  It's what I
 6   do, unique one of a kind products, including
 7   filing patents on them.
 8        Q.    The documents you're referring to,
 9   the documents on your loan, those are not
10   trademark or otherwise protected through some
11   formal process, are they?
12        A.    Well, we do cover your notice on
13   materials for good measure, but we do have
14   terms in our agreements that is a violation to
15   share those agreements.  They are confidential
16   to the borrower, not in industry practice and
17   it is usually much stricter than industry
18   standards.
19        Q.    That I understand, but you didn't
20   trademark any of these documents, anything
21   related to these documents, right?
22        A.    We have a lot -- I have a lot of
23   experience in that space.  Trademarking is not
24   something you would do with a loan agreement.
25   You can file another processes, but that's a
```

Page 839

                          Monticciolo
1
2    bit of a diversion from this topic.
3         Q.    I was just a little confused why you
4    mentioned trademarking.
5         A.    I said copywriting.  That's our
6    trademark in terms of my track record, my
7    experience, my personal trademark, but not --
8    but at Goldman, it's public record of the
9    service marks which is what you would use on
10   the process which can be found on the service
11   marks on the products that I have created that
12   are unique, one of a kind, one party's entire
13   departments and trading desks were created from
14   products that I have created over my career.
15        Q.    Which materials at issue here do you
16   believe are protected by copyright?
17        A.    I'm not a lawyer to specifically say
18   which.  As I said, we do it for good measure,
19   but I'm not in a position to sort of research
20   that.
21        Q.    So sitting here today, you don't
22   know one way or the other which, if any, of the
23   materials you claim are misappropriated here
24   are protected by copyright; is that right?
25        A.    As I sit here, correct.

Page 840

Monticciolo

1

2       Q.     Just back to my question.   I think
3   we got on bit of a tangent, but sitting here
4   today, you're not aware of any other entity
5   that uses the trade secrets in the form of or
6   contained in the documents on your loans that
7   you just described for us?
8       A.     For the ones I described to you,
9   correct.
10      Q.     How about any of the other trade
11  secrets with respect to documents on your loans
12  that you didn't describe to us?  Are there
13  other trade secrets and documents on your loans
14  that you didn't describe?
15      A.     While I'm trying to be
16  comprehensive, I haven't looked at every single
17  one to absolutely confirm that, but it is the
18  essence of Brevet to be distinct in unique
19  loans of which other lenders are not involved
20  in or other funds or other people in the
21  industry.
22      Q.     Who else is aware of your -- you
23  mentioned that the regulators were aware of
24  your strategy here and your loan documents.
25  Who else do you disclose this to?

1                    Monticciolo

2        A.    Our lawyers, our accountants, tax

3   preparers who need to know.  We do not

4   communicate or provide loan documentation to

5   investors.

6        Q.    You don't provide loan documentation

7   to investors, you said?

8        A.    Or investments.  We don't provide

9   the documentation behind investments to

10  investors.

11       Q.    Why not?

12       A.    Because we view those to be, you

13  know, our trade secrets and we keep as

14  confidential as we can.

15       Q.    Why can't you provide them to the

16  investors under NDA?

17       A.    Because we think it's just an extra

18  good measure not to have those distributed.

19       Q.    How did you identify those materials

20  as the kinds of materials you were not going to

21  distribute to investors?

22       A.    It's amongst the many things that we

23  view to be the essence and the differentiation

24  of Brevet and we look to secure them all.

25       Q.    You can't trust investors with that

Page 842

                    Monticciolo

1
2   information?

3       A.    I didn't say we didn't trust

4   investors.  We just like to keep it to our

5   standard and if we don't have to, then we

6   don't.

7       Q.    Do you recall previously testifying

8   about the NDAs that you thought protected some

9   of your materials?  You generally recall that?

10      A.    Yes.

11      Q.    What period do the NDAs cover?  That

12  is, after how long -- how long after a

13  counterparty signs an NDA, a prospective

14  investor signs an NDA, are they required to

15  keep the information confidential?

16      A.    For confidential information there

17  is no term.  There is a requirement to, and I

18  could, as I sit here I don't have one in front

19  of me and have reviewed it, but return or

20  destroy materials at the end of the term.

21      Q.    Your NDAs typically have a two year

22  period though, right?

23      A.    It depends on the transaction or the

24  counterparty.

25      Q.    Well, in terms of disclosing the

```
                                    Page 843
 1                   Monticciolo
 2   fund structure to respective investors, that
 3   NDA protects that information for two years,
 4   right?
 5        A.    If it is a two year confidentiality
 6   of protecting the information, again there
 7   should be no information to protect because it
 8   should be either returned or destroyed.
 9        Q.    Well, when you say returned or
10   destroyed, what about sort of the investor's
11   familiarity with the fund structure that you
12   just described to him, that is not going to be
13   returned or destroyed, right, the investor's
14   knowledge of what you disclosed to him?
15        A.    I can't comment on how good people's
16   memories or knowledge is.
17        Q.    What do you mean by that?
18        A.    I can't determine whether or not
19   someone remembers a structure, but I think our
20   confidentialities -- our confidentiality
21   agreements are clear that work product or the
22   results of Brevet are structures, which again
23   we say is the essence of Brevet, is protected.
24              I think it's in the best interest of
25   investors to uphold that as well because that's
```

```
 1                     Monticciolo
 2   why they invest in Brevet.
 3        Q.    But that information, that is the
 4   knowledge of whatever it is they learned
 5   through this disclosure process, that is
 6   protected for a period of two years, and I'm
 7   separating between the information they have in
 8   their heads versus the documents that you
 9   addressed a moment ago in terms of having been
10   returned to you or destroyed.
11        A.    I didn't prepare to look at the
12   detailed language in the confidentiality on
13   this topic, sorry.
14        Q.    Sitting here today, do you know one
15   way or the other whether or not the information
16   they learned, apart from the documents they
17   have to return or destroy, the information they
18   learned through the process is protected for
19   more than two years?
20        A.    I would believe it is.
21        Q.    What is the basis for that belief?
22        A.    It's the way we do our business.
23        Q.    Anything else?
24        A.    It's best practice.  It's what we
25   do.
```

Page 845

1                      Monticciolo

2        Q.    Is it your testimony that the NDA

3    says that the information that a prospective

4    investor learned through reviewing documents

5    after they returned those documents needs to be

6    somehow eliminated from their mind forever?

7        A.    I didn't say that.  I said that the

8    confidentialities should protect our

9    information from its use or work product.  I

10   can't tell you the specifics sitting here right

11   now.

12              MR. CYRULNIK:  Why don't we go off

13        the record?

14              THE VIDEOGRAPHER:  This is the end

15        of media unit number three.  We are now

16        off the record at 1:07 p.m.

17              (Lunch recess taken.)

18                   AFTERNOON SESSION

19              THE VIDEOGRAPHER:  This is the

20        beginning of media unit number four.  We

21        are now on the record at 1:38 p.m.  Back

22        from break.

23   BY MR. CYRULNIK:

24        Q.    Welcome back, Mr. Monticciolo.  I'm

25   going to go through some of the other

Page 846

1                      Monticciolo

2    categories that I think were listed in your

3    prior deposition testimony.

4           If one of the ones that I'm asking

5    you about is something that you've already

6    covered because there was overlap in some of

7    those categories, just let me know and I'm

8    happy to sort of account for that and move on.

9           I thought in reading through the

10   list that there may have been some overlap in a

11   bunch of the categories, so I don't want to

12   draw my own conclusions.  I want to confirm

13   that with you.  But I don't mean to be going

14   over any of these a second time if any of the

15   ones I'm asking you about were the same as

16   something we've previously discussed.

17        A.    Okay.

18        Q.    Let start with our various board

19   structures, including our independent conflicts

20   board and how they operate.  Do you recall

21   identifying that category as a category of

22   trade secrets that you are alleging

23   Mr. Iacovacci misappropriated?

24        A.    Yes.

25        Q.    What is -- what board structures and

Page 847

1                        Monticciolo

2    independent conflicts board and how they

3    operate are you referring to when you say that

4    those are trade secrets?

5         A.

16

Page 848

1                    Monticciolo

7        Q.    That's helpful.  Suffice it to say

8   that with respect to the various board

9   structures and how they operate, you're not

10  aware of any other entity that employs those

11  structures at all sitting here today, correct?

12       A.    Correct.  With the caveat that I

13  would include with structures, the roles that

14  they play.  So structure includes how they

15  operate, the roles that they operate.  So

16  having an independent board per se would be a

17  common thing.

20       Q.    Yeah.

Page 849

1                        Monticciolo

2   ████████████████████████

3          ████████████████████████████████

█   ██████████████████████████████████████████

█   ██████████████████████████████████████████

█   ████████████████████████████████████████

█   ██████████████████████████████?

8      ██  ██████████████████████████████████

█   █████████████████████████████████████

█  ████████████████████████████  ████████████████

█  ███████████████████████████████

12       Q.      The thing you claim to be unique and

13   trade secret?

14       A.      Right.

15       Q.     ██████████████████████████████████

█  █████████████████████████████████████████

█  ██████████████████████████████████████

█  ██████████████████████████████████

█  ████████████████████████████████?

20       A.      Correct.

21       Q.     But what is it about ████████████████

█   ████████████████    that you believe is indeed a

23   trade secret here?

24       A.     █████████████████████████████████

█  █████████████████████████████████████

Page 850

1                      Monticciolo

2   ███████████████████████████████████████

    ████████████████████████████████████

    ██████████████      ██████████████████████

    █████████████████████████████████     ███

    ███████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████

    ███████████████████████████████████

    ████████████████████████████████

    ██████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████

    ████████████████████████████████████

16      Q.    Is it fair to say that there are

17  many employees at Brevet who are aware of

18  Brevet as various board structures, █████████

    ████████████████████████████████?

20      A.    I wouldn't use the word many,

21  existence of it, but how it operates in the

22  roles is pretty limited.

23      Q.    To whom is how it operates in the

24  roles limited?

25      A.    It's primarily limited to finance

```
                                        Page 851
 1                    Monticciolo
 2    and compliance.  Even I don't participate.
 3        Q.    Really?
 4        A.    Really.
 5        Q.    So you think there are trade secrets
 6    at Brevet concerning the board structures that
 7    even you are not privy to?
 8        A.    I didn't say not privy to.  I said
 9    not involved in.
10        Q.    Oh, okay.
11        A.    Sorry, to clarify.
12        Q.    None of the trade secrets you are
13    identifying are trade secrets to which Doug
14    Monticciolo is not privy to, right?
15        A.    I can't answer that absolutely
16    because, you know, I would have to exhaustively
17    go through every single one, but I would be
18    surprised if not the vast majority might be
19    aware of.
20        Q.    The structures, the various board
21    structures that you have identified, those are
22    things that are known to people who are senior
23    firm managers, right?
24        A.    At Brevet or generically?
25        Q.    At Brevet.
```

Page 852

1              Monticciolo
2      A.    Again, that is a very tightly held
3  process, so there are few people who know that
4  process.
5      Q.    Who knows that process apart from, I
6  think you identified compliance and finance?
7      A.    Right.  Within that it would be
8  just -- even within those subsets, a limited
9  number of people.
10      Q.    I mean are we talking about a
11  handful of people?
12      A.    Probably less.  Maybe a few.
13      Q.    And then outside of those
14  departments, who else would know about that?
15  You would know about it?
16      A.    I would know of its existence, but
17  actions and activities I would not.
18      Q.    You would not know about actions and
19  activities?
20      A.    Correct.
21      Q.    But you're in charge of Brevet,
22  right?
23      A.    I am.
24      Q.    So how would there be unique
25  structures that are trade secrets that you

Page 853

1                         Monticciolo

2   would not be aware of?

3        A.    Again, you asked the question of who

4   is aware of it and blurred between structured

5   and usage or its activity.  I am not involved

6   in its activities of what, how, when it's used

7   or how it is used.

8        Q.    I see.  So you're distinguishing

9   between the existence of a structure and the

10  activities as to how they are used?

11       A.    Correct.

12       Q.    And it's the activities to how they

13  are used that you are saying are the trade

14  secrets that are not known, unique to Brevet?

15       A.    No, what I'm saying is that is a

16  usage of the trade secret. ██████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████

    ████████████████████████████████████.

21       Q.    You do know that in your personal

22  capacity?

23       A.    That I know, yes.

24       Q.    Who else knows that?

25       A.    Me-Li would know that specific level

Page 854

```
 1                    Monticciolo
 2   of structure and Mark Callahan would.
 3        Q.    Who else?
 4        A.    I would not say that the rest of the
 5   team knows the exact structure or designated
 6   purpose.  Maybe there is someone in compliance
 7   as well, but not that I'm aware of.
 8        Q.    Mr. Iacovacci knew that, how they
 9   operated, right?
10        A.    He did, again as a partner of the
11   firm.
12        Q.    Mr. Iacovacci knew it?
13        A.    Yes.
14        Q.    He knew that because he was involved
15   in the operations of these various board
16   structures?
17        A.    He knew that because he was involved
18   in the meetings where we would talk about what
19   we need to do in order for these things to
20   work.
21        Q.    Who else was at those meetings?
22        A.    Those would typically just be
23   myself, Mark, you know, Paul and compliance
24   person.
25        Q.    How about the things that you
```

```
                                   Page 855
 1                    Monticciolo
 2   identified that you didn't know, that the
 3   specifics as to how some of these structures
 4   operate, are those things that Mr. Callahan
 5   would know?
 6        A.    In preparing for this I haven't
 7   looked specifically.  He is responsible for
 8   risk, so I don't know, again I'm not involved
 9   in the application to maintain independence, so
10   I just -- I couldn't tell you.
11        Q.    But I'm trying to -- Mr. Callahan is
12   a senior partner at the firm, so wouldn't he be
13   involved and have knowledge of the operation of
14   these various broad structures, unique broad
15   structures?
16        A.    So there is a difference between
17   knowing activities of the fund that are
18   investment responsibility and mechanics or
19   procedures that are done to comply with laws
20   and regulations, which may be outside of
21   Brevet.
22        Q.    Let's talk about legal structure
23   that Brevet uses to originate assets in the
24   various ways, the various mechanisms and
25   vehicles, the entities that Brevet uses to do
```

Page 856

1                          Monticciolo

2       that.

3              Do you generally recall referring to

4       that category as one of the trade secrets at

5       issue in this case?

6          A.    It's a subset or overlap with

7       structure and investments, but it is of merit

8       on its own.

9          Q.    So apart from what we have talked

10      about already with respect to the structure,

11      what else is a trade secret that you were

12      alleging is at issue in this case with respect

13      to the legal structure that you use to

14      originate assets in the various ways and the

15      various mechanisms and vehicles and entities

16      you use to do that?

17         A.    ██████████████████████████████

██    ████████████████████████████████████████████

██    ████████████████████████████████████████████

██    ████████████████████████████████████████████

██    ███████████████████████████████████████

██    ████████████████████████████████████████████

██    ██████████████████████████████████████

██    ████████████

██              ██████████████████████████████████

Page 857

1                          Monticciolo

2

9          Q.    Who came up with that structure?

10         A.    This is a Doug Monticciolo special.

11         Q.    When did you come up with that

12    structure?

13         A.    Why did I come up with the structure

14    or when?

15         Q.    When?

16         A.    When?  At the launch of this fund.

17         Q.    So back in 2008?

18         A.    Yes, '08, '09.

19         Q.    How did you come up with the

20    structure?

21         A.    A, I have got again almost 40 years

22    of experience, but I studied the challenges

23    that are faced by funds that were failing in

24    the market.

25               I remember we were launching a fund

Page 858

                        Monticciolo

1
2    in the middle of the financial crisis and it
3    was a good time to learn where people failed
4    and I used my experience on ways to achieve
5    solutions to what I saw as failures in a lot of
6    existing funds.
7         Q.    Sitting here today, it's your
8    contention that there is no other entity that
9    employs those legal structures, the type of
10   legal structure that Brevet uses to originate
11   assets or the various mechanisms and vehicles
12   or entities that Brevet uses to do that?
13        A.    Sitting here today, to the best of
14   my knowledge, given the feedback that we
15   received from investors, regulators, tax
16   authorities, I believe it to be unique.
17        Q.    Unique as in you're not aware of
18   anyone else who deployed those global
19   strategies?
20        A.    Yes, that is what I am saying.  I am
21   not the world knowledge.  Again, there is
22   always the Heisenberg uncertainty that somebody
23   recreated it in some foreign land, but I think
24   that would be unlikely given again the
25   confirmations that we get from investors,

```
 1                    Monticciolo
 2   regulators that obviously need to be aware of
 3   it.
 4        Q.   Let's talk about the methods Brevet
 5   uses to -- one last question on the legal
 6   structure that we just talked about.  Is that
 7   reduced to some sort of a written document or
 8   series of documents that are housed in the
 9   Brevet network or is that just the knowledge
10   associated with how things are run at Brevet?
11        A.   I'm correct you said legal
12   structure, correct?
13        Q.   The legal structure and the various
14   mechanisms and vehicles that we were just
15   talking about.
16        A.   That is started within our legal
17   department.
18        Q.   So there is a document that you have
19   in mind that has that structure enumerated or
20   you're just saying that the knowledge is housed
21   within the legal department?
22        A.
```

Page 860

1                      Monticciolo

2    ███████████████████████████████████

     ███████████████████████████████████████

     ████████████████████████████████████

     █████████████████████████

6         Q.    The methods Brevet uses to create

7    competitive barriers in its investment

8    strategy, do you recall identifying that as one

9    of the trade secrets at issue in this

10   litigation?

11        A.    I do.

12        Q.    And is that different from some of

13   the things we -- from the things we've already

14   talked about?

15        A.    It is.

16        Q.    Can you describe to me what you are

17   referring to there?

18        A.    █████████████████████████████████

     ████████████████████    ████████████████████

     █████████████████████████████████████

     ████████████████████████    ████████████████

     ██████████████████████████████

     █████████████████████████████████

     ████████████████████    ████████████████████

     ████████████████████████████████████████████

```
                                      Page 861
```

1              Monticciolo
2   ████████████████████████████████████████████
█ ████████████████████████████████████████
█ ████████████████████████████████████████████
█ ████████████████████████████████████████.

6        Q.    Are you aware of any other entity
7   that uses the methods that you are referring to
8   with respect to creating competitive barriers
9   in your investment strategy?
10       A.    As a -- to be as complete as
11  possible, I can't again answer for everything,
12  but I can say in the areas that come to mind, I
13  can be fairly confident to say no, not in our
14  strategy and can confirm that because we
15  acquired almost all of them and they do not.
16       Q.    You acquired almost all of them.
17  What do you mean by them?
18       A.    Anybody who was in a related type of
19  product, trying to achieve the goals that we
20  do, but unsuccessfully.
21       Q.    Are you saying you have no
22  competitors?
23       A.    I'm not saying we have no
24  competitors, but I'm not quite sure what it
25  means when a government hires us to be the

Page 862

1                        Monticciolo
2    exclusive party to do it.
3        Q.    And you're saying that is what
4    happened as a result of these unique
5    strategies, the government hires you to be the
6    exclusive provider for these strategies?
7        A.    In one example I said there are
8    numerous things that we do for barriers to
9    entry.  That is one example.
10       Q.    When you say the government hires
11   you to be the exclusive provider, are you
12   saying you are currently the exclusive provider
13   to the government for these strategies?
14       A.    Yes.
15       Q.    Since when?
16       A.    Within the last year.
17       Q.    In 2020, the government made you the
18   exclusive provider of these, with respect to
19   these strategies?
20       A.    Yes.  It's a strategy we started in
21   2015 and the government has chosen us to be the
22   people that do it for them as a cost savings
23   and a recognition of the uniqueness and the
24   skills that we have.
25       Q.    How long does that exclusivity run?

Page 863

Monticciolo

1
2      A.    I would have to go look at that
3  agreement.
4      Q.    Is it a trade secret that your
5  clients include the government?
6      A.    I'm sorry, say that one more time.
7      Q.    One of the trade secrets that your
8  clients include the government as a client?
9      A.    Is one of my trade secrets of
10  clients -- I'm sorry I don't understand that
11  question.
12      Q.    Is one of the trade secrets that
13  among your clients is the government itself?
14      A.    No, they are not a client.
15      Q.    The government is not a client?
16      A.    Clients are borrowers.  Investors
17  are investors.
18      Q.    What role is the government playing
19  in that structure?
20      A.    What we call a sourcing channel
21  partner.
22      Q.    Sourcing channel partner.  What do
23  you mean by that?
24      A.    So, they facilitate us with
25  sourcing, which is how we find claims,

Page 864

Monticciolo

1    borrowers and a channel means it is for a

2    specific line of activity and partner means

3    they have a contractual agreement with us to do

4    that.

5        Q.    So does Brevet speak with the

6    government and work with the government to

7    figure out what the government wants and then

8    Brevet goes out and finds the contracts for the

9    government?

10       A.    That is something we have done and

11   it's slightly different than that.  That is not

12   this specific example.

13       Q.    Is that a trade secret in your view,

14   the working with the government the way that I

15   just described?

16       A.    What you described was vague and I

17   said not really what we do.

18       Q.    It's not really what you do?

19       A.    It's a consensus of 30,000-foot

20   description of basically saying if you breathe

21   the air and I breathe the air, it's the same

22   thing, but if I sell scuba tanks, it's a

23   different kind of air.

24       Q.    So you wouldn't describe the manner

Page 865

1                        Monticciolo
2     in which -- the high level manner which I just
3     described the relationship between Brevet and
4     the government as unique to Brevet or trade
5     secret, would you?
6          A.     Generically working with the
7     government I would not consider to be a trade
8     secret.
9          Q.     Is there something specific about
10    how you work with the government that you think
11    transforms it into a trade secret?
12         A.     Specifically working on specific
13    programs to specifically provide financing for
14    those programs is a trade secret of how we do
15    it, yes.
16         Q.     You use third parties to manage and
17    administer your funds?
18         A.     We use third parties to administer
19    the funds.  Manage is what we do.
20         Q.     Where do you find those third
21    parties?
22         A.     They are an industry licensed group,
23    a handful of them who do that.
24         Q.     And you engage those third parties
25    as administrators for the funds?

Page 866

1                            Monticciolo

2          A.    Correct.

3          Q.    Is your engagement of those third

4    parties or the identity of those third parties

5    a trade secret that you think is at issue in

6    this litigation?

7          A.    I do not.

8          Q.    How about the technology that you

9    used to keep trade secrets secure or protected;

10   is that technology something you are claiming,

11   the technology itself that you are claiming to

12   use, is that something you are claiming to be a

13   trade secret at issue in this litigation?

14         A.    Yes.

15         Q.    Is that different or the same as

16   your cyber security framework?

17         A.    That is different.

18         Q.    Let's start with the first one, the

19   technology that you used to keep your trade

20   secrets secure.  Describe for me what that

21   technology is and what it is unique about it.

22         A.    Actually I correct that answer.  I

23   didn't realize you were specifically saying

24   that on cyber security.  I thought you were

25   saying it back on the origination sourcing,

Page 867

Monticciolo

1          just technology in general.  Sorry.

2          Q.    Oh, sorry.  This is a new question.

3                MR. SOLOMON:  Do you want to change

4          an answer?

5          A.    Yeah.  I'm not sure if I answered

6     maybe even the prior question right because I

7     didn't realize you switched topics, sorry.

8          Q.    I'm happy to ask it again.  The

9     technology that Brevet uses to keep its trade

10    secrets secure, is there something about that

11    technology that you are claiming is unique or

12    trade secret at issue in this litigation?

13         A.    Not the technology.  The use and

14    application or policies and procedures, not the

15    technology specifically.

16         Q.    Is there something about your

17    policies as they pertain to the technology that

18    you use to keep your trade secrets secure that

19    is in your view a trade secret itself?

20         A.    I'm sorry, I'm just getting caught

21    up in the -- I want to make sure I get that

22    clear.

23         Q.    Well, I heard you to say you're not

24    claiming the technology that you used to keep

Page 868

Monticciolo

1   your trade secrets secure is a --(inaudible)

2   But I thought you qualified that with, but the

3   policies and procedures that we use, I thought

4   you were saying you do claim to be a trade

5   secret, policies and procedures that you use to

6   keep your trade secrets secure.  Did I

7   understand you correctly?

8        A.    Yes, you did.  Thank you for

9   clarifying.

10        Q.    Sure.  What is it about the policies

11   and procedures that you use to keep your trade

12   secrets secure that you think is itself unique

13   and trade secret?

14        A.    ███████████████████████████

15   ████████████████████████████████████████████

16   ███████████████████████████████████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████████

21   ███████████████████████████████████

22   ██████████████████████████████████████████.

23        Q.    My question is what is it that you

24   think is unique in the way in which you use the

Page 869

Monticciolo

1    technology you just identified or other

2    technologies to maintain your trade secret

3    secure?  Is there anything you are doing with

4    respect to Box, Microsoft or anything else that

5    you think is trade secret in and of itself as

6    opposed to what other companies are doing with

7    those technologies?

8         A.    I think it is a trade secret to us.

9    It's not available or public of how we are

10   protecting.  We just spoke about barriers to

11   entry and loan products and things like that.

12   How we have been able to protect that so well

13   is implemented through how we apply those

14   technologies and how we use those technologies,

15   the restrictions we put in.

16

17

```
                                        Page 870

1                      Monticciolo

2    ████████████████████████████

     ████████████████████████████

     ████████████████████████████

     ██████████████████████████████

     ████████████████████████████

7         Q.    I want to make sure we are talking

8    about the same thing, Mr. Monticciolo.  If you

9    have an actual trade secret, you want to

10   talk -- let's say we are talking about an

11   actual trade secret that you have on your

12   network.

13             The way in which you restrict access

14   to that and keep it secure is by housing that

15   trade secret on a drive that has restricted

16   access or in a folder that has restricted

17   access or in a document that is password

18   protected, fair?

19        A.    That's one part, yes.  That's fair.

20        Q.    The fact that you do that to keep

21   your confidential documents or trade secret

22   documents secure, are you claiming that that,

23   the way in which you put those passwords,

24   password protections in place or restrict

25   access to various drives, folders or subfolders
```

Page 871

1                    Monticciolo

2    is a trade secret itself?

3        A.    In and of itself, no, it's only a

4    subset of technology, 

25        Q.    I understand the thought that goes

Page 872

```
                                Monticciolo
1
2    into you doing the thing that you are
3    describing, that is, you know, protecting the
4    trade secrets.  What I'm trying to understand
5    is what it is you are claiming is unique to the
6    way in which you at Brevet do it or does it.
7              Can you identify for me what the
8    unique way in which Brevet protects its trade
9    secrets is as distinguished from all of the
10   other entities, for example, that use the
11   technologies you described?
12        A.    And so to the extent that the
13   homework that I have done I can't go into that
14   detail.  But you have -- you have deposed
15   Johnny Lan and Mei-Li da Silva Vint who would
16   be able to give much more detail and much more
17   depth onto that specific question.
18        Q.    So apart from what Mr. Lan may have
19   covered or Ms. da Silva Vint covered, you can't
20   identify for me what is particularly unique
21   about the way in which Brevet protects its
22   trade secrets as compared with other entities
23   that protect their trade secrets using the same
24   technologies you described, fair?
25        A.    I came prepared to answer a lot of
```

Page 873

Monticciolo

1
2  questions.  That is one that I didn't dig that

3  deep on given the amount of time I had.

4      Q.    Fair enough.  What about the cyber

5  security framework, do you believe that the

6  Brevet cyber security framework is a trade

7  secret?

8      A.    Again, █████████████████████████

█  ████████████████████████████████████████

█  ████████████████████████████████████

█  █████████████████████████████████████████

█  ████████████████████████████████

█  █████████████████████████████████████

█  █████████████████████████████████████

█  █████████████████████.

16      ████████████████████████████

█  ██████████████████████████████████████████

█  ████████████████████      █████████████████

█  ██████████  █████████████████████████

█  █████████████████████████████.  And I

21  think that has been answered by Me-Li or by

22  others here, but I did not go into the detail

23  of answering those.

24      Q.    Let me make sure I got that.  You

25  believe there is something unique about the way

```
                                          Page 874
 1                       Monticciolo
 2    in which Brevet's cyber security framework
 3    operates, but you think Me-Li da Silva Vint or
 4    Johnny Lan would be the ones who would know
 5    what that is; is that fair?
 6         A.    Amongst other things, yes.
 7         Q.    When you say amongst other things, I
 8    need to have clear answers, so you'll forgive
 9    me for wanting to understand what you are
10    trying to exclude by saying "amongst other
11    things."
12              You don't know what is unique about
13    the way in which Brevet's cyber security
14    framework operates; is that fair?
15         A.    I did not prepare for this to go
16    into the uniqueness of the trade secret of the
17    cyber security policy and procedures.  I also
18    did not read the transcripts of Me-Li or Johnny
19    Lan to prepare for this, so I think that is why
20    I almost viscerally do not know exactly what
21    those answers were.
22         Q.    What about compliance procedures?
23    Do you believe that Brevet's compliance
24    procedures are themselves trade secrets that
25    are at issue in this litigation?
```

Page 875

```
 1                    Monticciolo
 2       A.    I believe they are.
 3       Q.    What is unique about the Brevet
 4  compliance procedures as compared with other
 5  parties' compliance procedures?
 6       A.    So you asked about overlaps and
 7  answers.  I would say that you've asked about
 8  strategies.  ████████████████████████████
    ████████████    ████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████████
    ██████████████████████████████████████████████
    ████████████████████████████████████████████
    ███████████████████████████████████████████████
    ████████████████████████████████████████████
    ██████████    ████████████████████████████
    ████████████████████████████████████████████
    ██████████████████████████████████████████████
    ██████████████████████████████
20       Q.    Understood, but there is nothing
21  additive about compliance, the procedures
22  themselves beyond what you have already
23  described at some length today with respect to
24  the various underlying unique aspects of the
25  business that you just referred to is that --
```

1                    Monticciolo

2     am I understanding you correctly?

3          A.    No, that's not correct.  It's

4     similar to what I'm trying to think of we were

5     talking about this before, ███████████████

██████████████████████████████████████████████

██████████████████████████      ████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████        ██████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████     ███████████████████████████

████████████████████████████████████████████

██████████████████████████████

17          Q.    I guess what I'm struggling with,

18    Mr. Monticciolo, I'm trying to understand what

19    is unique about either the procedure or the way

20    in which the compliance procedure itself or the

21    way in which the compliance procedure is

22    implemented at Brevet and I appreciate the fact

23    you've identified how Brevet's business in your

24    view is unique and all those other things and

25    the compliance procedures are designed to

Page 877

Monticciolo

1

2 protect those other unique aspects of business

3 in your view, but I'm trying to zero in on the

4 compliance procedures themselves and I'm

5 including within that the way in which the

6 compliance procedures are implemented at Brevet

7 and asking you to identify how, if at all, you

8 believe those compliance procedures or their

9 implementation is trade secret and unique?

10     A.    Sure.



21     Q.    So they would only be used by

22 someone who is doing what you do in terms of

23 implementing the unique board structures or the

24 unique strategies or all those other things

25 that we talked about earlier today; is that

Page 878

1                          Monticciolo

2    right?

3         A.    It wouldn't be fair to say that they

4    are just limited to uniqueness.  I can assure

5    you I haven't, as I said, read the prior

6    depositions, looked at materials, but there are

7    a wide breadth of compliance things that are

8    regulatory required that there is a baseline of

9    stuff that is included in there as well and how

10   we do those could be unique as well, but it's

11   more than just our specific structures.  It

12   includes compliance of how we wrote our

13   business.

14        Q.    I understand, but you said how you

15   do those could be unique as well.  I'm asking

16   you how you do those basic regulatory things

17   that you just described as distinguished from

18   the unique things you previously described?  Is

19   how you do the basic compliance also in your

20   view trade secret and if so, how?

21        A.    As I said, I couldn't give you the

22   specifics on that.  You would have to go to

23   Me-Li on that aspect of it.  That is sort of a

24   subniche of the compliance effort.

25        Q.    Corporate structure I think was a

```
 1                      Monticciolo
 2    category that you had previously identified.
 3    Is that the same as the fund structure we
 4    talked about as a trade secret category or is
 5    that different?
 6          A.    That is different.
 7          Q.    Do you believe that Brevet's
 8    corporate structure is a trade secret?
 9          A.    I believe our corporate structure is
10    a trade secret.
11          Q.    What is unique and trade secret
12    about Brevet's corporate structure?
13          A.    Again, what we've learned from
14    regulators and investors is that what is unique
15    about Brevet is how we own and how we create
16    the ownership of our sourcing and our fund
17    management business and that is unique in the
18    way we do it.
19          Q.    I'm sorry, I didn't follow that.
20    Can you give me maybe an example of what is
21    unique and trade secret about Brevet's
22    corporate structure?
23          A.    ███████████████████████████████
██    ████████████████████████████████████
██    ██████████████████████████████████████████
```

Page 880

1                    Monticciolo

2   ████████        ████████████████████████

   █ ██████████████████████████████████████

   █ ███████████████████████████████████████

   █ ████████████████████████

6        Q.    Isn't that what you previously

7   described with respect to the methods you used

8   to create competitive barriers and the legal

9   structures that you used to originate assets?

10        A.    It's related.  Unfortunately, Brevet

11   does believe in this threading which is what we

12   think makes this unique, so it's part of that,

13   but it's not solely that.

14        Q.    What is -- what can you identify as

15   corporate structure trade secret that would not

16   fall into the category you previously described

17   with respect to legal structure, trade secret

18   legal structures that Brevet uses to originate

19   assets and the various mechanisms and vehicles

20   they use to do that?

21        A.    Sure.  So just a little set the

22   stage of it, so loan structures and loan

23   transactions are actually the activity of

24   closing a loan or funding a loan or owning a

25   loan, et cetera.  These are different than

Page 881

1                      Monticciolo

2    that.

3              This is before that point in time

4    how we talked about sourcing.  So this is how

5    are loans sourced, how are they underwritten.

6    That process is done in a structurally

7    different way than other funds.

8         Q.    How so?

9         A.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███    ██████████████████████████████████████████

█████████████████████    █████████████████████

█████████████████    ████████████████████████

████████████    ███████████████████████████

███████████████████    ██████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

22         Q.    I think I understand what you are

23    saying, but isn't that what you described for

24    me, I don't know a half hour ago or so, with

25    respect to when you and I were talking about

Page 882

1                     Monticciolo
2   legal structures that you used to originate
3   assets and the various mechanisms and vehicles
4   that you used to do that, it sounded to me like
5   you're describing the same thing.  I want to
6   make sure I'm not missing something here.
7         A.    Sure, and you are missing something
8   not to be rude.  They are different, but
9   reaching an asset and this is a technical
10  space, so originating an asset is act of
11  signing loan agreements for people funding
12  money, transacting on the transaction, that is
13  the origination.  So very legal process in a
14  whole world of its own.
15             This is everything you do before you
16  get to that point.  Sourcing and underwriting
17  is kind of broadly under that concept of
18  sourcing.  That is done much differently at
19  Brevet than in other places.
20        Q.    You're not aware of any other entity
21  that does the sourcing and underwriting in the
22  way we just described in the trade secrets that
23  you referred to?
24        A.    You're breaking up a bit.
25        Q.    In the trade secrets that you are

Page 883

1                           Monticciolo

2    referring to?

3         A.    To the best of our knowledge, given

4    we are active in these spaces and I would say

5    while I can't guarantee it, I'm pretty sure we

6    know everybody who has been in or does some of

7    these niches.  We do not know of anyone that we

8    are aware of that does it this way.

9         Q.    Okay.  Earlier you mentioned

10   offering materials being identified as trade

11   secrets.  Are those the same materials we were

12   talking about earlier today, the presentations

13   that we previously discussed about materials

14   provided to investors?

15        A.    No, the context there is typically

16   more the package of the PPM, the Offering

17   Memorandum, the limited partnership agreement

18   and the subscription document.  That is

19   typically what I think we refer to as offering

20   materials, the actual offering of the

21   investment.

22        Q.    So are those documents we previously

23   talked about at the beginning of this

24   deposition?

25        A.    We touched on them, on the topic of

Page 884

1                        Monticciolo
2    the subscription agreement and its uniqueness.
3    We touched on it at our previous deposition on
4    the concept of why holidays matter so much to
5    us.  Those are some of the aspects of one of
6    those agreements.
7                 They are kind of a package.  Again,
8    a lot of things at Brevet we intertwine things.
9    So they operate amongst each other.  For
10   example, the holiday concept that goes
11   through -- the holiday concept would be
12   described in the limited partnership agreement
13   yet the concept of the ability to define terms
14   and offer best fitting structures to meet
15   various investor needs without side letters and
16   those mechanics are actually in the
17   subscription agreement, but it's enabled you
18   might say because of the PPM, the Offering
19   Memorandum, so they are close.
20        Q.    Are the offering materials the same
21   for each of the investments or are they
22   different for each of these?
23        A.    Again, offering documents are
24   related to funds.  So they are different by
25   fund.  So that is like separation onshore,

Page 885

1           Monticciolo

2     offshore, intermediate, et cetera.  Those are

3     different by fund.

4          Q.    But it's the same for every investor

5     in the fund?

6          A.    ████  ███████████████████████████

█  ██████████████  ████████████████████  ██

█  ██████████████████████████████

█  ████████████████████████████████████

█  █████████████████████████████████████

█  ███████████████████████████████

█  ████████████████████████████████

█  █████████████████████████████████████

█  ██████████████████████████████

█  ██████████████████████████████

█  ███████████████████████████████████████

█  ███████████████████████████████████████

█  ███████████████████████████████████████

█  ██████████████████████████████████████

█  ████████████████████████████████████████

█  ███████████████████████████████████████

█  ██████████████████

23          Q.    Is it your testimony that every time

24     another fund wants to, another competitor of

25     yours wants to do what you just described that

Page 886

1                      Monticciolo
2     they have to launch a new fund or enter into a
3     side letter, is that what you are telling me?
4         A.    It's a broad based question.  I
5     would say not exclusively given any one of
6     those terms is very specific, but there are
7     very clear rules and guidelines around how you
8     could do that with various fund vehicles, but
9     you don't achieve in our mind and from what
10    we've learned over the years, the benefits that
11    we get.
12        Q.    You're not saying that you are --
13    you are not saying that you are the only fund
14    that is structured in a way that does not
15    require launching a new fund or entering into a
16    side letter every time you want to welcome new
17    investors or do whatever it is you were
18    describing that necessitated that, right?
19        A.    What I was saying is our fund is
20    unique in the way we do it.  Again, with that
21    Heisenberg uncertainty principle, somebody came
22    up with something that seemed similar from
23    where we stand we believe what we have is
24    unique.
25        Q.    Where are the offering materials

```
                                     Page 887
 1                    Monticciolo
 2    housed within Brevet?
 3         A.    They are housed within the legal
 4    department.
 5         Q.    In the legal department's drive?
 6         A.    Yes.
 7         Q.    Is there a folder called offering
 8    materials?
 9         A.    Of similar name or equivalent?
10         Q.    Yes?
11         A.    Yes.
12         Q.    Are you asserting that Mr. Iacovacci
13    took those offering materials?
14         A.    From the materials that again I
15    mentioned from the various affidavits or
16    anything on the e-mails, it is, I believe, that
17    it is contained in those materials.
18         Q.    When did Mr. Iacovacci take the
19    offering materials?
20         A.    I don't have the specific date for
21    which e-mail on that document again.  That
22    would be voluminous to go through.
23         Q.    Give me a general ballpark.  What
24    month, what year did he take the offering
25    materials?
```

Page 888

1                        Monticciolo
2         A.    I would say between 2014 and 2016.
3         Q.    It's a long period?
4         A.    It's a long period and it's a lot of
5    e-mails to be prepared and memorized for this
6    meeting.
7         Q.    Well, sitting here today, do you
8    know whether he actually took the offering
9    materials?
10        A.    I believe we've answered in your
11   depositions and our affidavits that he has.
12        Q.    I'm not asking you what you believe
13   you've said in your affidavits.  I'm asking you
14   as a corporate representative of Brevet,
15   sitting here today, are you certain that
16   Mr. Iacovacci took the offering materials you
17   just described?
18        A.    I am certain that those materials
19   were taken, but I cannot put a date on
20   specifically when they were taken.
21        Q.    How are you certain they were taken
22   if you can't tell me when they were taken?
23        A.    Because I reviewed the affidavits
24   and I reviewed our responses of which we
25   identified that they were.

Page 889

1                    Monticciolo
2        Q.    You can point me where in the
3   affidavits you are identifying Mr. Iacovacci
4   misappropriating the offering materials you
5   just described; which affidavit?
6        A.    So we provided the answers to these
7   topics, the sheets that I can point to.  I can
8   just point you to the affidavits.  I can either
9   read them or get them off the list.
10       Q.    I don't want you to read me a
11  lengthy list of affidavits.  I want you to
12  answer my question truthfully, Mr. Monticciolo.
13  If you can't answer my question directly as to
14  when Mr. Iacovacci misappropriated it or how
15  you know he misappropriated it, I'm going to
16  ask you to point me to where in the affidavits
17  it identifies Mr. Iacovacci taking the offering
18  materials you just described.
19       A.    Sure.  So I will reference
20  Mr. Callahan's affidavit dated January 17,
21  2018.
22       Q.    Okay.  What paragraph am I looking
23  at in that affidavit to identify the instance
24  where Mr. Iacovacci misappropriated the
25  offering materials you just described?

Page 890

1                    Monticciolo

2       A.     Paragraphs 6 to 8.

3       Q.     Where in paragraphs 6 to 8 am I

4  looking at?

5       A.     We can read this separately, but

6  this identifies here all the confidential

7  information related to our lending operations,

8  our methodologies, processes, strategies,

9  relating to our structuring documenting, and

10 closing of materials as well as our proprietary

11 and confidential information which I take to

12 believe includes that.  Also I include

13 paragraph 14 in my response.

14      Q.     Hold on one second, Mr. Monticciolo.

15 I am hearing a lot of just paragraph references

16 instead of understanding what it is you are

17 referring to.  I'm looking at Exhibit 12, which

18 is the Callahan January 17, 2018 affidavit.

19           Was it your testimony Mr. Callahan

20 tells us when and where Mr. Iacovacci

21 misappropriated the offering materials we were

22 just talking about?

23      A.     What I'm talking about, I'll

24 identify for you places where I identified

25 materials this sort.  I did not go through each

Page 891

                    Monticciolo
1
2     one of these and did not go through
3     Mr. Callahan's deposition transcript.  But I
4     can point out to you the sections that I think
5     are responsive to your question.
6          Q.     I don't want to know -- this is not
7     an exercise in you helping me understand what
8     sections you think are responsive to my
9     question.
10              This is an exercise in getting
11    answers to very clear, specific questions.  My
12    question was, do you, sitting here today as
13    Brevet's corporate representative, know for
14    certain that Mr. Iacovacci misappropriated the
15    offering materials that you were just
16    describing?  I believe your answer was yes.
17              My question to you was when did he
18    do it?  Let's start with that.  When did he
19    misappropriate that?
20         A.     As I sit here, there is a voluminous
21    amount of materials to be reviewing and
22    remembering which one.  I can't sit here and
23    tell you exactly which one.
24         Q.     Mr. Monticciolo, I appreciate that
25    there is a lot of material, but you understand

Page 892

                              Monticciolo

1    that you're the corporate representative and

2    this is a topic that we identify with respect

3    to a category that you identified to be an

4    instance of trade secret misappropriation.

5             I want to know the basis for your

6    testimony and telling me that you're not

7    prepared because you weren't able to memorize

8    anything is a little weak given the fact that

9    you brought to this deposition volumes of

10   affidavits and notes galore and you are

11   entitled to look at any of those, but I want

12   you to point me to where it is you can show me

13   that Mr. Iacovacci misappropriated the offering

14   materials?

15            MR. SOLOMON:  He is answering his

16        question the way he did several others and

17        you are raising your voice.

18            MR. CYRULNIK:  Thanks for your

19        comment, Lou.

20        A.    I believe I prepared sufficiently

21   for this.  I believe I -- you know, it would be

22   difficult for me to memorize exactly where all

23   this is.  I did go through the work to be able

24   to provide a record of those references so that

Page 893

Monticciolo

1    I didn't get them wrong by memory, so that you

2    can have them so you can go and look at those

3    as well and identify them because I believe it

4    was responsive to that question.

5        Q.    Mr. Monticciolo, I don't want to

6    look at a big series of affidavits to find the

7    answer to a very straightforward question.

8            Can you identify for us today any

9    instance in which Mr. Iacovacci misappropriated

10   the offering materials that you just described;

11   yes or no?

12       A.    As I sit here and have stated

13   previously, no.

14       Q.    How about the -- let's talk about

15   the memoranda.  Do you recall identifying

16   memoranda as things that constitute trade

17   secrets that are at issue in this case in your

18   November 1st deposition?

19       A.    Yes.

20       Q.    Were you referring to documents that

21   were different from some of the other ones we

22   discussed already or did those overlap with

23   other documents that we discussed?

24       A.    They are different.

```
 1                    Monticciolo
 2       Q.    What are the memoranda you are
 3   referring to?
 4       A.    So the memoranda that we are
 5   referring to is primarily credit memoranda.
 6       Q.    What is a credit memoranda?
 7       A.    A credit memoranda is a memo that
 8   details everything about why we are -- why we
 9   should make a or invest in a certain
10   transaction, typically put together by the deal
11   team, making a recommendation to the investment
12   committee or similar to pursue or not a
13   transaction.
14       Q.    Where are those memorandum housed
15   within Brevet?
16       A.    They are housed within the
17   origination drives.
18       Q.    Who has access to those drives?
19       A.    The origination people.
20       Q.    Is Mr. Iacovacci an originator?
21       A.    He tried to be at times.
22       Q.    So, yes?
23       A.    I will say yes.
24       Q.    He had access to these materials?
25       A.    He did.
```

```
                                        Page 895
 1                     Monticciolo
 2        Q.    Did Mr. Iacovacci misappropriate the
 3   memoranda that you just described?
 4        A.    It is the company's position that he
 5   did.
 6        Q.    Well, did you identify for me when
 7   Mr. Iacovacci misappropriated the memoranda you
 8   just described?
 9        A.    Again, I would point to the
10   affidavits I provided.  I did not go through
11   and memorize each specific one related to each
12   specific topic.  It was just voluminous to try
13   to do.
14        Q.    Again, this is not -- I'm trying to
15   save us time.  I'm not asking you to go by
16   memory alone.  You have the affidavits in front
17   of you.  You have the notes that you and your
18   counsel put together in front of you.
19             Can you identify, yes or no, can you
20   identify the date on which or any instance in
21   which Mr. Iacovacci misappropriated the
22   memoranda that you just described sitting here
23   today?
24        A.    So, I refer you to Mark Callahan's
25   deposition of September 25, 2018.  Amongst
```

```
 1                      Monticciolo
 2    other paragraphs, 10 is what I would focus
 3    on -- but 4, 10 --
 4         Q.    I'm sorry to interrupt.  You're
 5    referring to a deposition or a declaration?
 6         A.    I'm sorry, an affidavit.
 7         Q.    Oh, you said deposition.  What date
 8    are we looking at?
 9         A.    September 25, 2018.  That is
10    Exhibit 11.
11         Q.    Where are we looking for the
12    identity of Mr. Iacovacci misappropriating
13    memoranda?
14         A.    I want to make sure you got that
15    date right, September 25, 2018.
16         Q.    Exhibit 11?
17         A.    Paragraph 10.
18         Q.    I'm looking at paragraph 10.  Can
19    you show me where it is that Mr. Callahan
20    identifies the date on which Mr. Iacovacci
21    misappropriated the memoranda you just
22    described?
23         A.    The specific date is not listed,
24    which I can reference you to another e-mail
25    that contains that.  The items that he has
```

Page 897

Monticciolo

1    broken out here are the segments of what is

2    within the credit memoranda.

3         Q.    Which one of the bullet points are

4    within the segments of the credit memoranda?

5         A.    The transaction summaries, the

6    transaction studies and examples, the

7    background checks.  There is the credit policy

8    framework which is used here and these

9    transactions are -- the credit memoranda follow

10   the policy and procedures outlined in the

11   transaction process and procedures manual.

12        Q.    Transaction process and procedures

13   manual?

14        A.    It's on the second page.

15        Q.    I'm looking at it.  Did

16   Mr. Iacovacci misappropriate each one of the

17   five different bullets that you just

18   identified?

19        A.    It is our understanding that he has.

20        Q.    When you say it is our understanding

21   that he has, do you know whether or not he

22   misappropriated each of the bullet points that

23   you just identified; yes or no?

24        A.    Yes.

Page 898

1                       Monticciolo

2        Q.    How do you know that Mr. Iacovacci

3   misappropriated Brevet's credit policy?

4        A.    I answer that again by reference to

5   Mr. Callahan's affidavit stating such.

6        Q.    So apart from Mr. Callahan writing

7   that he did it, that Mr. Iacovacci

8   misappropriated it, is there any basis for

9   Brevet's view that Mr. Iacovacci

10  misappropriated this material?

11       A.    The basis that it was extensively

12  reviewed and I have the upmost confidence and

13  trust that Mr. Callahan did a thorough job

14  preparing for that affidavit, yes.

15       Q.    Well, tell me when Mr. Callahan

16  observed Mr. Iacovacci misappropriating

17  Brevet's credit policy?

18       A.    I can't speak for Mr. Callahan on

19  this.

20       Q.    You appreciate the problem, right?

21  You're the corporate representative for Brevet.

22  Rather than answer my question, you're

23  referring me to Mr. Callahan's affidavit.

24            I'm asking you for the basis of

25  Mr. Callahan's affidavit and you're telling me

```
 1                        Monticciolo
 2    you can't speak for Mr. Callahan.  How are we
 3    supposed to get answers to these very basic
 4    questions if you don't have the answers here as
 5    a corporate representative and you're not
 6    prepared to speak to the basis for
 7    Mr. Callahan's affidavit on which you are
 8    purporting to rely?
 9              MR. SOLOMON:  There is no question.
10         A.    Is there a question?  Is there a
11    question?
12         Q.    Yes, there is a question.
13         A.    I didn't understand it.
14         Q.    How are we supposed to understand
15    the allegations in this lawsuit that
16    Mr. Iacovacci misappropriated Brevet's credit
17    policy if you don't know -- if you can't point
18    me to when or how that happened?  You referred
19    me to an affidavit you told me you're not
20    prepared to speak to, so what are we supposed
21    to do?
22              MR. SOLOMON:  Object to the
23         question.  I object to misstating the
24         record.
25         A.    Again, I pointed you to affidavits
```

Page 900

                        Monticciolo
1
2    and materials of which I can continue pointing
3    to additional ones which I believe answer your
4    question.  I'm not in a position nor do I think
5    it is appropriate for me to be prepared to the
6    degree of understanding the voluminous amounts
7    of specifics that you are asking.
8              What I have done is ensure that
9    Brevet has provided and I can point you to
10   those particular documents, affidavits and
11   responses, where we have answered those
12   questions.
13       Q.    I want you to point me to the
14   document or documents which show that
15   Mr. Iacovacci misappropriated Brevet's credit
16   policy.
17       A.    I'm going to point you to
18   Mr. Callahan's.  This is a response dated, the
19   25th of September 2018, defendants' responses
20   and objections.  And I am pointing you to
21   paragraph 6.
22       Q.    Okay.  Which -- go ahead?
23       A.    Of which it is unrealistic for me to
24   have memorized each and every one of these
25   which would have that specific answer for you,

```
                                        Page 901
 1                     Monticciolo
 2   but I am pointing you to where they are.
 3        Q.    I'm not asking you to memorize
 4   anything.  I'm asking you where in this
 5   paragraph 6 is a document identified evidencing
 6   Mr. Iacovacci misappropriating Brevet's credit
 7   policy, which document or documents?
 8        A.    Again, I prepared rigorously for
 9   this and spent many hours memorizing and
10   identifying exactly what of these e-mails
11   answers that question.  I am not prepared to
12   answer here.
13            I have confidence that it is
14   contained within this and the other materials
15   we provided you for the record.
16        Q.    Mr. Monticciolo, you understand that
17   Brevet is asserting misappropriation of trade
18   secret claims against Mr. Iacovacci, correct?
19        A.    Correct.
20        Q.    You understand that amongst those
21   claims you are talking into court saying that
22   Mr. Iacovacci stole Brevet's credit policy,
23   right?
24        A.    Correct.
25        Q.    I'm asking you show it to me.
```

Page 902

1                         Monticciolo
2     Where, when, how did Mr. Iacovacci steal
3     Brevet's credit policy?  Can you identify for
4     me even a single instance in which
5     Mr. Iacovacci took Brevet's credit policy; yes
6     or no?
7          A.    And the answer is yes and we have
8     done so.  I don't think that it is expected of
9     me, as the corporate witness, to be able to
10    point to every specific for -- as you pointed
11    out 40 some odd topics which have many
12    subtopics, but I did come prepared to point you
13    to places where those can be found where we've
14    answered them in the past.
15         Q.    I think we can all agree, your
16    counsel and we can agree that the court can
17    make determinations as to whether or not it's
18    appropriate or inappropriate for you to be
19    expected to come to a deposition about these
20    topics prepared to answer the questions that
21    I've asked.
22              I appreciate the fact that you're
23    unable to answer or identify for me a single
24    instance in which Mr. Iacovacci misappropriated
25    the Brevet credit policy that you just alleged

Page 903

```
                          Monticciolo
 1
 2   he misappropriated other than to refer vaguely
 3   to a list of documents that is included in an
 4   affidavit that does not purport to be
 5   identifying instances of Mr. Iacovacci's
 6   misappropriation of Brevet's credit policy.
 7             That said, why don't we take a break
 8   and see what else we have left to do, so let's
 9   go off the record.
10             MR. SOLOMON:  I need the
11        videographer to tell us how long we are
12        going.
13             THE VIDEOGRAPHER:  Yes.  We are
14        exactly four hours and 14 minutes.  Let me
15        take us off the record.  This is the end
16        of media unit number four.
17             We are now off the record at
18        2:48 p.m.
19             (Brief recess taken.)
20             THE VIDEOGRAPHER:  This is the
21        beginning of media unit number five.  We
22        are now on the record at 3:08 p.m.  Back
23        from break.
24   BY MR. CYRULNIK:
25        Q.   Can you identify for me,
```

Page 904

                        Monticciolo
1
2    Mr. Monticciolo, any loan documents, specific
3    loan documents that you claim were trade
4    secrets by Bates number or otherwise?
5         A.    I can refer to them by name versus
6    Bates statement.
7         Q.    You can't identify by Bates number
8    wherein one of the affidavits such a document
9    is identified?
10        A.    Again, I could point you to as what
11   I prepared for was the affidavit where that can
12   be found.  If not, I can't go through the
13   specifies.  I wasn't prepared to link those
14   specific two things together.
15        Q.    Can you tell me which paragraph I
16   can look at where I can find trade secrets that
17   are misappropriated?
18        A.    Let's start with amongst the number.
19   Defendants' response Mark Callahan, Third Set
20   of Interrogatories dated 9/25/2018, paragraph
21   number 6.
22        Q.    Can you tell me of the documents
23   referenced in that paragraph are loan documents
24   or attached to loan documents?
25        A.    Again, as I said, I cannot.  I did

```
                                          Page 905
 1                    Monticciolo
 2   not prepare to link the specific items.
 3        Q.    Anything else?
 4        A.    As I mentioned, they are referenced
 5   in the deposition, the affidavit by
 6   Mr. Callahan.  I'll tell you which one, an
 7   affidavit from Mr. Callahan dated September 25,
 8   2018.
 9        Q.    Okay.  What paragraph?
10        A.    Paragraphs number 4.
11        Q.    Paragraph 4 identifies loan
12   documents that were misappropriated?  I'm not
13   seeing it.  Can you tell me what you are
14   talking about?
15        A.    Again, I would point out, to protect
16   our work product, loan documents are considered
17   work product.
18        Q.    I'm asking you to point me to the
19   loan documents that you are referring to.  You
20   are pointing me to paragraph 4 that describes
21   "Brevet working tirelessly to develop
22   specialized knowledge and to produce work
23   product?"
24        A.    Correct.  And then I will point you
25   to paragraph number 10.
```

Page 906

1              Monticciolo

2      Q.    Which are the loan documents in

3  paragraph 10?

4      A.    So loan documents are described in

5  these transaction summaries in the example

6  transactions.  It is voluminous.  The number of

7  specific transactions.  Again, I wasn't

8  prepared to put specific references.  I don't

9  think I was asked to enumerate them, but I made

10  sure that I was able to identify for you where

11  in our previous testimony you can find those

12  linkages and the last link in this one as well

13  as several other instances.

14      Q.    Hold on.  That's what I'm trying to

15  understand.  Where in the previous testimony

16  can I find the linkages between loan documents

17  and Mr. Iacovacci's misappropriation?

18      A.    Again, I am telling you in my

19  preparation I did not go through each and every

20  underlying e-mail.  I thought I was asked to

21  identify for you where these trade secrets are

22  and where to locate them, not to actually link

23  it to the specific points or specific e-mails

24  that are done.  That is something we could have

25  done if I thought that was something being

Page 907

```
                              Monticciolo
 1
 2    asked, but that is voluminous.
 3         Q.    Well, as I said, the court will
 4    determine whether you should have done that,
 5    but sitting here today, it's fair to say you
 6    can't identify any loan document that was
 7    actually misappropriated by Mr. Iacovacci
 8    specifically, correct?
 9         A.    Within the breath of the
10    preparation, I did for this, correct.
11         Q.    Let me ask you generally, I think
12    this will probably allow us to get closer to
13    closing it out.
14              Is it fair to say that Brevet has no
15    testimony to offer about how it knows that
16    Mr. Iacovacci misappropriated trade secrets
17    beyond what the affidavits identified in the
18    notes that you produced as Exhibit 17 identify?
19         A.    It is the company's testimony that
20    those are inclusive of the items that we have
21    produced to date and did not believe that we
22    were being asked to provide further linkages.
23         Q.    I appreciate that, but let me just
24    make sure my question is correct.  I think I
25    understand your answer.
```

1                    Monticciolo
2            If I want to understand what Brevet
3    is relying on with respect to its claim that
4    Mr. Iacovacci misappropriated trade secrets,
5    the place I look is whatever you've said today
6    or in the prior two days of deposition
7    testimony and the notes or documents referenced
8    in the notes that you provided and that we
9    aggregated as Exhibit 17; is that the totality
10   of it?  Is that fair?
11       A.    I think you're restating what I said
12   and I'm saying is that's what we've identified
13   of the various materials where you can find it.
14   If I was asked to provide that linkage, that is
15   not something I was prepared or did prepare for
16   this, which I couldn't have prepared for it.
17       Q.    I don't want to know what you
18   couldn't have prepared.  I want to know whether
19   or not the place I look to find out what Brevet
20   is relying on for its claim that Mr. Iacovacci
21   misappropriated trade secrets would be
22   something that you said during your testimony
23   as Brevet's 30(b)(6) witness to date on these
24   topics or the notes and the source column
25   referenced in the notes that you provided and

1                    Monticciolo

2    that we aggregated as Exhibit 17; is that

3    right?

4              MR. SOLOMON:   Prior testimony I

5         think you left out.

6              MR. CYRULNIK:   I said prior

7         testimony.

8              MR. SOLOMON:   You said today.   The

9         last time you just asked the question you

10        said today.   I may have misunderstood.   I

11        may have misheard.

12             MR. CYRULNIK:   If I did, prior

13        testimony meant to include the 30(b)(6)

14        testimony you gave on these topics

15        including back in October and

16        November 1st.

17   A.     To be clear, it is the records to be

18   provided in whatever we call this Exhibit 17

19   today and the prior testimony as you described,

20   the answer is yes.

21             MR. CYRULNIK:   Okay.   With that, let

22        me just quickly say on the record, first

23        of all, we appreciate your time.

24             We believe we have some more time

25        that should be available to us given some

```
                                      Page 910
 1                    Monticciolo
 2        of the time that was, in our view, spent
 3        doing things that shouldn't have been done
 4        at a 30(b)(6) deposition that should have
 5        been prepared for or colloquy both between
 6        counsel and witness and myself that didn't
 7        allow us -- that didn't really address the
 8        substantive questions we were getting at.
 9             I'm happy to work with Mr. Solomon
10        to review the transcript and the videos to
11        figure out what that is like and hopefully
12        we will be able to reach an agreement,
13        whether additional time is appropriate,
14        but we wanted to reserve, as I said, an
15        hour for Ms. da Silva Vint given the
16        number of topics we need to cover in a
17        short period of time with her.
18             So we will end the deposition with
19        that Reservation of Rights and we thank
20        you for the time today.
21             MR. SOLOMON:  And my response I
22        think will be much briefer.  I don't agree
23        with a word of it.  You don't have an hour
24        left, but if you want to talk after all
25        this is over, we are prepared to talk.  We
```

Page 911

1                     Monticciolo

2        have a very different view.  Thank you

3        very much.

4             THE VIDEOGRAPHER:  Should I take us

5        off the record?  Can I take us off the

6        record?

7             MR. SOLOMON:  In our view we are

8        concluding.  Yes, you can take us off.

9             THE VIDEOGRAPHER:  We are off the

10       record at 3:17 p.m. and this is today's --

11       this is the end of today's testimony given

12       by Douglas Monticciolo.

13            Total number of media units used was

14       five and will be retained by Veritext New

15       York.

16            (Time noted:  3:17 p.m.)

17

18

19

20

21

22

23

24

25

Page 912

1

2            A C K N O W L E D G M E N T

3

4    STATE OF                 :
                              :ss
5    COUNTY OF                :

6

7            I, DOUGLAS MONTICCIOLO, hereby certify

8    that I have read the transcript of my testimony

9    taken under oath in my deposition on the 17th

10   day of November, 2021; that the transcript is a

11   true, complete record of my testimony and that

12   the answers on the record as given by me are

13   true and correct.

14

15                    -------------------------
                           DOUGLAS MONTICCIOLO
16

17   Signed and subscribed to before
     me this                    day of
18                           , 2021.

19

20   --------------------------------------
     Notary Public of the State of

21

22

23

24

25

Page 913

1

2

              C E R T I F I C A T E

3

4          I, FRAN INSLEY, hereby certify that the

5     Deposition of DOUGLAS MONTICCIOLO was held

6     before me on the 17th day of November, 2021;

7     that said witness was duly sworn before the

8     commencement of testimony; that the testimony

9     was taken stenographically by myself and then

10    transcribed by myself; that the party was

11    represented by counsel as appears herein;

12         That the within transcript is a true

13    record of the Deposition of said witness;

14         That I am not connected by blood or

15    marriage with any of the parties; that I am not

16    interested directly or indirectly in the

17    outcome of this matter; that I am not in the

18    employ of any of the counsel.

19         IN WITNESS WHEREOF, I have hereunto set

20    my hand this 19th day of November, 2021.

21

22                - - - - - - - - - - - -

                       FRAN INSLEY

23

24

25

Page 914

```
 1

 2                VERITEXT LEGAL SOLUTIONS

 3    NAME OF CASE: IACOVACCI v. BREVET

      DATE OF DEPOSITION: November 17, 2021

 4    NAME OF DEPONENT:  DOUGLAS MONTICCIOLO

 5    PAGE    LINE(S)        CHANGE            REASON

 6    ____|_____|_____|_____

 7    ____|_____|_____|_____

 8    ____|_____|_____|_____

 9    ____|_____|_____|_____

10    ____|_____|_____|_____

11    ____|_____|_____|_____

12    ____|_____|_____|_____

13    ____|_____|_____|_____

14    ____|_____|_____|_____

15    ____|_____|_____|_____

16    ____|_____|_____|_____

17    ____|_____|_____|_____

18    ____|_____|_____|_____

19    ____|_____|_____|_____

20                         _____

21    SUBSCRIBED AND SWORN TO BEFORE ME

      THIS___DAY OF _____, 20__.

22

23

24    (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

25
```

**&**

**&**   692:12

**0**

**08**   857:18
**08048**   687:7
691:11
**09**   857:18

**1**

**1**   696:20 738:20
744:17 746:9,9,12
746:16,17
**1,000,000**   723:4
**1.2**   723:20
**1.3**   723:5,11,20
**1/17/2018**   763:11
**10**   696:21 720:18
730:20 896:2,3,17
896:18 905:25
906:3
**10006**   688:5
**10022**   688:12
691:14
**10:38**   752:20
**10:57**   752:24
**11**   896:10,16
**12**   720:19 747:10
890:17
**12112**   913:21
**12:00**   802:14
**12:11**   802:18
**13**   720:17 805:20
**14**   759:24 890:13
903:14
**15**   720:17 747:10
804:21
**16**   709:2 718:22
779:15
**17**   687:12 689:8
691:4 709:2
710:17 711:13

712:17 720:19
755:18,19,24
756:4,7,12 758:5
758:15 759:23
889:20 890:18
907:18 908:9
909:2,18 914:3
**17th**   912:9 913:6
**19th**   913:20
**1:07**   845:16
**1:18**   687:7 691:11
**1:38**   845:21
**1st**   692:24 694:20
694:21 698:25
713:21 756:3,4
893:19 909:16

**2**

**20**   697:9,12 698:9
698:11 699:5,8,16
699:20,22,23
708:25 710:24
730:15,22 731:3,7
731:15 914:21
**2004**   825:5
**2006**   825:5
**2008**   857:17
**2014**   718:22 719:3
719:14,22 720:22
722:22 723:3,22
779:15 888:2
**2015**   786:20
862:21
**2016**   719:3,14,22
720:23 722:22
723:3,22 768:15
768:17 769:9
778:13 786:20
888:2
**2018**   759:23
889:21 890:18
895:25 896:9,15

900:19 905:8
**2020**   862:17
**2021**   687:12 691:4
720:18 912:10,18
913:6,20 914:3
**22nd**   688:12
**24**   720:18
**25**   895:25 896:9,15
905:7
**25th**   900:19
**2:48**   903:18

**3**

**30**   687:16 692:22
694:18 696:9
697:9,12 698:9,11
699:5,8,16,20,22
699:23 701:12
704:7 705:25
708:25 727:12
738:20 746:23
756:14 908:23
909:13 910:4
**30,000**   864:20
**35**   728:24 729:10
**36**   729:9
**39**   729:18
**3:08**   903:22
**3:17**   911:10,16
**3rd**   688:5

**4**

**4**   720:17 896:3
905:10,11,20
**40**   747:12 798:19
857:21 902:11
**41**   729:9,15,18

**5**

**5**   696:20 717:6,14
738:20 744:17
**50**   731:7,15

**55**   688:5
**599**   688:12 691:13

**6**

**6**   687:16 692:22
694:18 696:9
701:12 704:7
705:25 727:12
729:11 738:20
746:23 756:14
759:23 890:2,3
900:21 901:5
904:21 908:23
909:13 910:4
**60**   725:25 733:19
**692**   689:4

**7**

**755**   689:8
**7th**   692:23

**8**

**8**   759:23 890:2,3

**9**

**9/25/2018**   720:16
763:11 904:20
**90**   726:2
**9:32**   687:12 691:3
**9:58**   715:19,22

**a**

**a.m.**   687:12 691:3
715:19,22 752:20
752:24
**aaron**   714:6
**ability**   732:21
773:21,24 806:19
847:9 884:13
885:13
**able**   739:12 756:6
783:21,24 784:4
789:21 805:16
822:12 850:7

869:13 872:16
873:15 892:8,24
902:9 906:10
910:12
**ably** 701:7
**absolute** 776:10
**absolutely** 840:17
851:15
**abundantly** 747:7
**abusive** 693:14
**access** 765:7,14,16
765:18,20,21,23
765:24 766:2,6,8
766:23 767:3,17
767:18 768:19,23
768:24 769:25
770:2,4,7,10,12,15
770:17,22,24
771:13,18,18,24
772:2,7,11,12,17
772:20,24 773:2,4
774:12,14,19,22
775:4,8,9 778:6,17
787:5 789:8,11,19
789:22,22,23
790:2,2,6,16,18,19
790:22 804:2
870:13,16,17,25
871:17 873:15,17
894:18,24
**account** 693:10,13
846:8
**accountants** 841:2
**accredited** 833:5
**accurate** 768:22
799:10
**accurately** 731:5
736:23 737:2
**accusing** 733:9
**achieve** 824:6
830:16 831:22

832:18 847:9
858:4 861:19
868:20 871:9
886:9
**achieved** 836:24
**achieving** 850:14
**acquired** 861:15
861:16
**act** 871:19,23,23
882:10
**acting** 877:14
**action** 691:21
751:6
**actions** 852:17,18
**active** 883:4
**actively** 827:18,21
**activities** 827:13
852:17,19 853:6
853:10,12 855:17
860:3
**activity** 761:11
827:16,19 834:11
853:5 864:3
880:23
**actual** 762:20
802:7 870:9,11
883:20 885:10
**add** 702:20 744:7
744:8 778:17
**added** 777:5
778:22
**adding** 777:18,22
778:15,15
**addition** 753:7
791:23
**additional** 697:13
754:4 847:8
876:15 900:3
910:13
**additive** 875:21

**address** 805:21
806:19 910:7
**addressed** 829:4
844:9
**addresses** 777:21
**addressing** 704:6
**adina** 688:8
**administer** 690:16
691:19 865:17,18
**administrative**
790:7
**administrators**
865:25
**adopt** 720:15,17
737:23 738:23
740:9,18
**adopted** 721:14
**adopting** 718:16
739:14
**advance** 702:15
**advice** 701:3
704:11 812:21
820:22 821:8,21
822:3,6,14,15
823:8,23 824:8
826:8,18
**advise** 810:23,25
817:8
**advised** 822:11
**advises** 810:21
**advising** 810:14
819:25
**affidavit** 720:16
720:18 759:22
760:2 762:8
763:24 764:7,10
779:14 889:5,20
889:23 890:18
896:6 898:5,14,23
898:25 899:7,19
903:4 904:11

905:5,7
**affidavits** 698:14
705:8 717:19
718:5,17 735:18
735:20 737:22
738:24 743:11
744:6 750:24
751:3 763:10,14
779:12,20 887:15
888:11,13,23
889:3,8,11,16
892:11 893:7
895:10,16 899:25
900:10 904:8
907:17
**affiliate** 857:3
880:2
**affiliations** 691:24
**afternoon** 845:18
**aggregated** 908:9
909:2
**ago** 695:24 753:23
755:21 818:19
844:9 881:24
**agree** 711:25
727:13,19 808:17
818:9,20 902:15
902:16 910:22
**agreed** 690:4,9,14
817:12
**agreement** 693:2,9
693:18 706:17,18
797:22 805:14
806:13 810:12
838:24 857:6,7
863:3 864:4
883:17 884:2,12
884:17 885:14
910:12
**agreements**
704:20 706:21

806:23 809:8
814:4,4,7 815:8
838:14,15 843:21
882:11 884:6
**ahead** 741:9 745:3
745:5 900:22
**air** 751:14 864:22
864:22,24
**al** 687:8 691:9
**allegations** 720:7
899:15
**allege** 731:23
755:10 762:5
**alleged** 717:9,18
718:15,24 719:5
719:11,24 720:14
720:23 721:16,25
723:23 729:2
902:25
**allegedly** 738:21
739:20 740:6
741:8 742:4,17
745:9 754:14
760:8 780:17
**alleges** 812:5
**alleging** 802:23
846:22 856:12
**allotted** 733:19
**allow** 907:12
910:7
**allowed** 744:18
797:23 810:13
816:16 817:21
**allows** 805:19
**amount** 694:23
698:24 708:15
720:11 722:23
732:14 733:18
735:22 873:3
891:21

**amounts** 720:13
900:6
**analogy** 873:12
877:18
**analyze** 835:7
**answer** 695:16
696:9 697:8
699:10,19 701:24
702:8 705:10
707:2 709:12
710:3,21,22
711:22 712:13,23
712:25 713:9,10
713:14,15 714:20
715:9,9 716:7
717:24 718:6,17
720:16 721:12
724:10 725:6,10
725:16,18,20,23
725:25 726:8,16
726:19,24 727:25
728:10 730:7
732:10,22 733:9
733:10 736:5,6,23
737:2,4,23 739:2
739:15 740:2,8,9
740:12,18 741:3
741:25 743:24
744:21,25 745:2,4
745:18 746:15,21
747:8 752:9
759:21 776:25
780:2 786:2
789:16 790:25
798:13 800:17
809:17 820:4,5
823:14 835:11
851:15 861:11
866:22 867:5
872:25 889:12,13
891:16 893:8

898:4,22 900:3,25
901:12 902:7,20
902:23 907:25
909:20
**answered** 695:7
696:7 702:6 709:9
709:11,22 710:20
711:23 712:4,20
713:3,6 723:25
724:22,24 725:14
725:15 726:3,11
726:12,17,22
727:22 728:4
736:13 737:16,21
740:16 741:10
867:6 873:21
877:10 888:10
900:11 902:14
**answering** 714:9
714:15,21 717:2,5
717:25 718:9
730:20 732:18
733:10,20 734:4
873:23 892:16
**answers** 693:11,21
711:2 722:9 725:9
727:11 733:24
736:21 739:15,25
742:24 743:10
744:4,5 816:25
874:8,21 875:7
889:6 891:11
899:3,4 901:11
912:12
**anybody** 787:15
802:10 861:18
**anyway** 709:24,25
**apart** 696:25
706:18 707:21
708:6,8 713:19,22
721:13 768:19

778:11 785:19
787:15 813:13
832:8 844:16
852:5 856:9
872:18 898:6
**apologies** 831:9
**apologize** 750:3
**appearance** 692:4
**appearances**
691:24
**appears** 732:20
913:11
**appetites** 806:21
**apple** 827:11
828:20
**application** 812:16
855:9 867:15
**applied** 811:14
**apply** 707:6
869:14
**applying** 877:12
**appreciate** 699:9
712:24 716:5,13
716:16 718:7
732:19 737:7
738:8 771:12
795:21 822:7
876:22 891:24
898:20 902:22
907:23 909:23
**approaching**
827:5
**appropriate**
733:22 746:22
900:5 902:18
910:13
**appropriately**
744:20
**approval** 778:14
**approximately**
697:11 710:24

713:13 723:4,10
768:22
**area**  803:22
**areas**  787:2
861:12
**arm**  881:14
**aside**  766:22
786:13
**asked**  693:24
695:13 701:10
702:5,7 711:10
713:7,9 715:2,7
721:22 723:2,25
724:22 725:14
726:11,20 727:21
732:23 733:12
736:14 739:13
741:11,21 744:20
747:9 749:17,21
764:21 771:12
809:13 853:3
875:6,7,8,9,10
902:21 906:9,20
907:2,22 908:14
909:9
**asking**  695:9
701:2 703:15
709:2 714:19
720:3,4 725:9
726:14,25 727:12
730:9 736:3,4,10
740:2 742:25
743:5,23 745:7
748:9 755:6 758:2
758:23 759:9
762:19,20 770:13
771:17 773:23,24
773:25 779:17
794:24 795:2
811:21 814:20
817:20,23 818:25

821:12,13 823:2
823:18 826:14
846:4,15 877:7
878:15 888:12,13
895:15 898:24
900:7 901:3,4,25
905:18
**aspect**  819:11
878:23
**aspects**  875:24
877:2 884:5
**asserting**  887:12
901:17
**asset**  782:20,25
783:2 806:14
882:9,10
**assets**  783:6
805:12 830:16
855:23 856:14,24
856:25 857:4,4
858:11 860:4
875:10 880:9,19
882:3
**assisting**  699:21
**associated**  859:10
**assume**  723:7
768:5
**assumption**
784:11 818:2
**assure**  740:17
878:4
**attached**  792:8
802:4 904:24
**attending**  691:23
**attention**  732:17
**attest**  808:13
**attorney**  692:5
719:25
**attorneys**  688:4,11
690:5

**attractive**  805:24
**audit**  785:4,19
788:2 871:21
**auditors**  808:8
809:22,23
**audits**  774:8
**authorities**  858:16
**authority**  770:7,10
**authorization**
770:16
**authorized**  690:16
691:19
**automatic**  770:11
**available**  750:8,10
751:17 756:8,13
785:17 822:15
869:10 909:25
**avenue**  688:12
691:14
**avery**  688:14
**avoid**  709:19
736:11
**aware**  695:22
707:4 751:21
785:11,15 805:16
806:3 807:3,23
808:2,4,10,12,16
808:19 810:23
813:5 814:22
815:5,7 831:4
834:25 837:18
840:4,22,23
848:10 849:4
850:17 851:19
853:2,4 854:7
858:17 859:2
860:22 861:6
882:20 883:8
**awareness**  808:14
**axises**  871:7

**b**

**b**  687:16 689:6
692:22 694:18
696:9 701:12
704:7 705:25
727:12 738:20
746:23 756:14
908:23 909:13
910:4
**back**  692:23
694:19 695:14,14
699:13 709:20
710:12,13 726:2
728:8 745:6 749:4
752:24 769:9
783:3 787:9
790:10 791:11
802:18 822:19
840:2 845:21,24
857:17 866:25
903:22 909:15
**background**  897:8
**backing**  827:15
**ballpark**  697:9
730:4,9,11 731:8
789:2 799:5
887:23
**bank**  838:5
**banks**  837:14
**barrier**  870:5
**barriers**  860:7
861:8 862:8
869:11 875:15
880:8
**based**  694:4,21
744:3 749:18
771:13 821:20
833:19 886:4
**baseline**  878:8
**basic**  878:16,19
899:3

**basically** 864:21
**basis** 765:25 771:4
  787:22 798:17
  820:13 844:21
  892:6 898:8,11,24
  899:6
**bates** 758:13,16
  759:3,5,9 904:4,6
  904:7
**beauty** 885:6
**beget** 847:16
**beginning** 692:4
  711:16 744:2
  752:23 802:17
  845:20 883:23
  903:21
**behal** 688:15
**behalf** 692:7,10
  718:17 734:17
**belief** 717:13
  765:25 771:4
  810:5 844:21
**believe** 712:4
  717:2,4,7 719:16
  720:9 724:2
  741:10 753:6,12
  755:19 761:2
  763:18 765:23
  769:22 771:2
  772:9 773:3 787:7
  796:6,12 809:12
  814:15 830:21
  837:24 839:16
  844:20 849:22
  858:16 873:5,18
  873:25 874:23
  875:2,19 877:8
  879:7,9 880:11
  886:23 887:16
  888:10,12 890:12
  891:16 892:21,22

893:4 900:3
  907:21 909:24
**believes** 717:21
  718:20,23 729:16
**beneficial** 811:17
  826:10,13
**benefit** 816:5,5
  819:7 826:12
  885:14
**benefits** 886:10
**best** 705:18 727:23
  731:11 733:11
  736:4 768:21
  775:23 788:18,20
  799:6 807:12
  813:24 816:13,16
  843:24 844:24
  858:13 883:3
  884:14
**better** 770:12
**beverages** 751:15
**beyond** 701:6
  739:11 746:10
  801:13,24 810:16
  826:18 871:14,18
  875:22 907:17
**big** 783:13 893:7
**bigger** 767:14
  789:5
**binder** 750:21,23
  751:2,5,7,9 753:8
  753:10,18,20
  754:6 760:6
**bit** 722:25 757:7
  776:24 807:8
  839:2 840:3
  882:24
**blank** 751:14
**blind** 873:13
**blood** 913:14

**blurred** 853:4
**board** 846:18,20
  846:25 847:2
  848:8,16,18,19,23
  848:25 849:4,6,16
  849:18,22 850:7
  850:11,18,19
  851:6,20 853:19
  854:15 876:6
  877:23
**boards** 847:18,19
  848:3,3
**books** 735:8
**borrower** 838:16
**borrowers** 863:16
  864:2
**bottom** 759:3
**box** 868:22 869:5
**brands** 881:17
**breadth** 878:7
**break** 712:12
  748:2 750:14
  752:25 754:15
  802:9,14,19
  845:22 903:7,23
**breaking** 882:24
**breath** 739:13
  907:9
**breathe** 864:21,22
**brevet** 687:8 691:8
  706:22 719:2,13
  723:21 728:20,25
  729:4,16 730:25
  731:14 733:4
  734:13,17,21,25
  735:24 736:2
  740:14 743:18
  746:3 753:4
  760:14 761:22,25
  764:18 765:3,6
  771:19 775:14

779:4 786:3,21
  790:3 793:11
  797:21,24 798:22
  799:25 800:19
  801:14,19,20,21
  802:22 803:7
  804:24 805:7
  806:24 808:7,20
  812:5,12 813:6,14
  813:16 814:7,9,21
  815:13,20 816:2,5
  816:5,11,19
  817:14,23 818:4
  818:11,22 819:2
  819:22,24 820:12
  820:12,21 821:4
  826:3,3 829:8
  830:4,21 831:7
  832:22,25 833:14
  834:5,6,24 840:18
  841:24 843:22,23
  844:2 847:9 849:6
  850:17,18 851:6
  851:24,25 852:21
  853:14 855:21,23
  855:25 858:10,12
  859:4,9,10 860:6
  864:6,9 865:3,4
  867:10 869:23
  872:6,8,21 873:6
  875:3 876:22
  877:6 879:15
  880:10,18 881:19
  882:19 884:8
  887:2 888:14
  894:15 898:21
  900:9 901:17
  902:25 905:21
  907:14 908:2,19
  914:3

Veritext Legal Solutions
www.veritext.com
212-267-6868    516-608-2400

**brevet's** 732:6
733:5 734:14
738:19 744:13
766:3 773:17,18
774:2,11,12
779:10 781:9
782:16 793:10
794:16,19,22
795:4 801:5,6
807:22 812:3
813:2,7 816:15
829:11,13 874:2
874:13,23 876:23
879:7,12,21
891:13 898:3,9,17
899:16 900:15
901:6,22 902:3,5
903:6 908:23
**brevity** 737:8
**brief** 715:20
752:14,21 802:15
825:23 903:19
**briefer** 910:22
**briefly** 726:21
748:14 752:3
**bring** 774:4
**broad** 704:18
734:16 761:18
777:19 820:10
855:14,14 886:4
**broader** 773:21
**broadly** 810:23
817:17,18 882:17
**broadway** 688:5
**broke** 722:25
**broken** 897:2
**brought** 774:7
892:10
**built** 850:3
**bullet** 758:4,8
897:4,23

**bullets** 897:18
**bunch** 846:11
**business** 705:4
708:13 767:9
772:16 773:11,13
773:14 774:3,5,6,7
774:12,15,18,23
778:8,12 779:2,4
790:9 793:2,2
799:21 801:6
804:25 806:20
812:15 815:17,24
821:20 824:13
825:12 827:9,21
830:2 831:6
834:10,12 837:12
844:22 847:7,22
850:4,4 856:19
875:25 876:23
877:2 878:13
879:17
**businesses** 772:15
773:4,17,19,22
774:2 801:6
824:12

**c**

**c** 688:2 692:14,14
912:2 913:3,3
**calculate** 722:5
**calculation** 721:4
722:21
**call** 709:20 735:12
750:24 766:11
770:11 778:8
780:23 786:2
863:20 909:18
**callahan** 763:10
763:14,23 764:8
768:8 854:2 855:4
855:11 890:18,19
896:19 898:6,13

898:15,18 899:2
904:19 905:6,7
**callahan's** 720:16
759:22 889:20
891:3 895:24
898:5,23,25 899:7
900:18
**called** 781:16
792:15 796:25
828:5 887:7
**camera** 727:3,6,7
**candidly** 749:18
**capacity** 739:7
774:9,10,10
775:10 853:22
**capital** 734:17,21
734:25 805:7
881:19
**care** 726:22 802:7
**career** 804:8
824:16 838:2
839:14
**careful** 793:5
**carefully** 785:2
**carrying** 767:25
**case** 687:6 691:11
753:25 795:3
829:14 832:12
836:11 856:5,12
893:18 914:3
**cases** 832:6 836:11
881:18
**catalog** 800:8
**categories** 728:24
729:4,9,15 731:3
733:2 846:2,7,11
**category** 731:22
732:7 773:7 784:7
846:21,21 856:4
879:2,4 880:16
892:4

**caught** 867:21
**cause** 719:6,12
**caveat** 848:12
849:8
**certain** 694:23
733:18 753:4
783:23,24 784:6
789:18 793:20
800:24 806:5
860:20 888:15,18
888:21 891:14
894:9
**certainly** 702:8
710:2
**certainty** 799:23
**certification** 690:7
**certify** 912:7
913:4
**cetera** 698:16
814:5 847:6,7,18
848:3 880:25
885:2
**cfo** 714:4
**challenges** 857:22
**change** 777:21
867:4 871:8 914:5
**changed** 776:21
824:24
**changes** 777:3,7
782:13
**channel** 863:20,22
864:2
**characterize**
803:14
**characterized**
871:16
**characterizing**
803:16
**charge** 852:21
**check** 784:16

checked  875:18
checks  897:8
chose  811:10
chosen  862:21
chronological
    783:7,10
circles  748:8
claim  729:10,11
    744:23 745:20
    795:3 822:22
    825:13 831:9
    839:23 849:12
    868:5 904:3 908:3
    908:20
claiming  717:17
    720:21 819:14
    822:9,20 866:10
    866:11,12 867:12
    867:25 870:22
    872:5
claims  740:14
    743:18 744:14
    746:3 849:7
    863:25 901:18,21
clarification
    757:19 789:24
    822:8
clarify  737:9
    750:3 803:4
    822:18 849:11
    851:11 868:16
clarifying  868:10
clarity  737:7
classic  769:21
clean  751:2,4,5,7,9
clear  701:24 702:8
    706:13 715:9
    725:22,24 726:7
    726:14,23 738:10
    738:16 747:7
    748:19 762:23

789:14 843:21
    867:23 874:8
    886:7 891:11
    909:17
clearly  795:13
    833:4
click  766:25
client  749:3
    761:15,25 762:4
    762:12,25 764:15
    770:25 771:19
    772:13 863:8,14
    863:15
clients  760:12,13
    760:18,20,21,22
    760:23 761:3,5,6
    764:2 797:12,16
    810:21,24 811:8
    817:8,15,23
    818:12 819:6,7,25
    863:5,8,10,13,16
clock  747:17 748:7
close  884:19
closer  907:12
closing  833:7
    880:24 890:10
    907:13
cmp  708:20
coaching  693:20
code  786:11 815:7
collaborative
    757:7
collaboratively
    757:25
colloquially
    792:20
colloquy  910:5
color  847:8
colored  798:9
colors  797:8,15,24

column  908:24
combination
    766:15 824:5
    853:17
combined  697:11
    859:23
come  695:19 705:9
    762:14 780:24
    781:2,4 798:12
    804:5 824:13,20
    825:2 857:11,13
    857:19 861:12
    873:11 885:15
    902:12,19
comes  796:23
    800:25
comfortable
    798:21 826:18
commencement
    913:8
comment  702:23
    703:5 807:18
    811:23 817:18
    843:15 892:20
commenting
    702:10
comments  702:12
    703:8 756:25
commission
    914:24
commit  813:19
    814:8
committee  894:12
common  816:8
    822:14 848:17
    869:23
communicate
    794:2 796:15
    821:18 841:4
communicated
    781:13

communication
    792:16,17 802:3
companies  777:21
    869:7 881:14,16
    881:20
company  717:20
    718:18,20,23
    719:16 788:4
    827:11 828:20
    879:24 880:5
company's  716:25
    717:12 895:4
    907:19
compared  872:22
    875:4
compensation
    716:11,22 717:16
    718:12,21 719:7
    719:14,18,22
    720:22 721:20
    722:22,23 723:2
    723:21
competitive  860:7
    861:8 880:8
competitor  885:24
competitors
    861:22,24
compiled  758:14
complete  693:3
    694:20 698:2,4,6
    861:10 912:11
completed  699:2
completely  746:19
    831:8
completing  693:23
complex  834:10
compliance
    713:23 767:22
    768:8 787:3,16,18
    788:15 803:22,24
    804:3 808:7 815:9

833:6 851:2 852:6
854:6,23 874:22
874:23 875:4,5,12
875:16,21 876:8
876:11,20,21,25
877:4,6,8 878:7,12
878:19,24
**comply** 855:19
**components** 722:7
**comprehensive**
697:8 700:19
705:16 706:24
721:9 732:14,19
738:5,9 739:11
743:13 840:16
**comprehensively**
708:18
**computer** 783:20
788:12 830:4
**concept** 805:17
824:4 826:16
876:6,6 882:17
884:4,10,11,13
885:20
**concepts** 847:17
**conceptually**
826:6
**concern** 750:11,16
**concerned** 816:21
**concerning** 851:6
**concluding** 911:8
**conclusion** 804:7
807:2 811:20
835:8
**conclusions** 720:2
846:12
**conditions** 809:20
**conduct** 693:14
815:8
**confer** 749:2

**confidence** 898:12
901:13
**confident** 835:4
861:13
**confidential** 735:8
788:19 794:23,25
795:6 802:6
814:14 815:3,14
821:6 823:11
826:7 838:15
841:14 842:15,16
870:21 890:6,11
**confidentialities**
843:20 845:8
**confidentiality**
788:9,14 800:25
802:4 808:25
809:3,8 843:5,20
844:12
**confirm** 755:22
756:7 791:13
794:12 807:14
835:17 840:17
846:12 848:22
861:14
**confirmation**
800:23
**confirmations**
858:25
**confirmed** 793:24
833:18 837:10
**conflating** 834:8
**conflict** 847:19,24
848:21 849:16
850:5 853:19
**conflicting** 823:22
**conflicts** 846:19
847:2,21 848:3,18
848:25 849:3,18
849:22 850:7,11
850:19

**confused** 821:22
839:3
**conjunction** 804:9
**connected** 828:6
913:14
**connection** 813:21
817:14 832:13
**consensus** 864:20
**consider** 812:18
814:16,19 818:15
822:6 865:7
**considered** 816:6
905:16
**consistent** 693:3
694:11,24 712:6,7
807:11
**consisting** 728:23
**consists** 753:21
**constitute** 794:10
794:22 795:5
893:17
**constitutes** 719:22
723:22 796:6
830:21
**construct** 836:14
**constructed**
834:15
**constructing**
871:8
**consultation**
812:22
**contact** 794:20,21
795:4
**contain** 763:20
764:9 837:21
**contained** 832:22
840:6 887:17
901:14
**contains** 763:25
782:19 896:25

**contend** 734:22
735:13 736:17
759:19 793:18
829:20
**contending** 731:2
**contends** 728:20
**content** 780:13
794:8,13 797:10
**contention** 858:8
**context** 792:24
814:10,24 816:18
883:15
**continuation**
701:21 711:3
**continue** 692:21
693:2 694:17
754:12 806:19
900:2
**continued** 687:15
692:24 694:19
**continuing** 756:3
**contracting** 861:5
**contracts** 864:9
**contractual** 864:4
**contrast** 826:20
**contributed**
813:15
**contributing**
815:24
**contributor**
776:12,14,18
**control** 871:21
**conversation**
704:18
**conversations**
698:20 700:23
701:17 807:7
**copies** 722:13
751:2,3,4,5,8,10
753:4 785:6,9,13

**copy** 753:10 782:2
784:21,22 836:17
**copyright** 839:16
839:24
**copywriting** 839:5
**core** 774:5
**corner** 759:4
**corporate** 696:5
704:7 716:23
738:19 739:7
741:12 744:13
747:6 807:22
810:15 821:17
878:25 879:8,9,12
879:22 880:15
888:14 891:13
892:2 898:21
899:5 902:9
**correct** 699:2,3
737:18 764:23
765:3 773:15
781:20 786:16
787:7 794:14
799:18 804:13
808:2 813:14
816:3 817:9,25
818:23 819:8
822:11 835:24
836:6 839:25
840:9 848:11,12
849:8,20 852:20
853:11 859:11,12
866:2,22 876:3
901:18,19,24
905:24 907:8,10
907:24 912:13
**correctly** 868:8
876:2
**corresponds** 754:2
**cost** 862:22

**costs** 716:12
**counsel** 691:7
692:12 697:17
698:20 700:2,3,6,7
700:8,12,15,21,24
700:25 702:2
704:4 705:19
707:22 708:7,8,10
708:20 709:5,6,23
710:16 711:11
712:11,11,15
713:19,22,24
724:8,16 733:17
736:12 744:19
750:20 753:3
756:20,21 757:5
757:11 758:5
793:24 804:10,11
804:20 805:4
807:7 808:8
812:22,23,24,25
813:9 817:2,5
820:15,20,22
821:21 822:14
824:8 826:8
895:18 902:16
910:6 913:11,18
**counseling** 817:15
**counselor** 748:17
**count** 709:15
729:13,21,25
730:10 731:6
762:2
**counted** 729:19
731:10
**counterparty**
842:13,24
**counting** 730:17
731:18
**countries** 827:25
881:17,21

**country** 881:19
**counts** 729:7
734:3
**county** 912:5
**couple** 834:8
**course** 701:15
703:20 708:24,25
**court** 687:2
690:18 691:10,17
695:15 699:12
710:9,12 712:22
715:14 725:5,8
752:11 787:11
901:21 902:16
907:3
**court's** 747:23
**cover** 720:25
838:12 842:11
910:16
**covered** 846:6
872:19,19
**craft** 796:16
**crashes** 783:19
**create** 796:19
797:20 798:6
824:18 828:20
847:17,23 859:25
860:6 876:10
879:15 880:8
**created** 804:23
810:17 820:12,13
824:17,21 831:7
839:11,13,14
847:21
**creates** 797:16
798:2 870:2
**creating** 804:15
806:17 838:3
861:8
**credit** 837:14
894:5,6,7 897:3,5

897:8,10 898:3,17
899:16 900:15
901:6,22 902:3,5
902:25 903:6
**crisis** 858:2
**critical** 785:15
801:14 808:6
**cross** 702:10
715:10 718:4
734:2 741:4 748:7
**crossed** 818:7
**culminated** 861:2
**culmination** 804:8
**current** 778:2
786:14
**currently** 706:22
726:25 751:18
786:6 862:12
**curtis** 700:13
701:12,25 704:4
704:13 707:21
708:9 709:6
710:16 711:12
712:15 804:12,17
804:18,23 808:3,8
810:13,20 813:3
817:5,12 818:10
818:22 819:3,4,13
819:21,23 820:8
820:19,25 821:24
822:11
**cut** 702:21 733:23
**cv** 687:7 691:11
**cyber** 866:16,24
871:6 873:4,6
874:2,13,17
**cyrulnik** 688:3,6
689:4 692:6,7,7,12
692:18 693:8,17
696:6,15 702:7,11
702:17 703:16,22

704:2 711:8,20
712:3 713:11
716:5 721:21
727:9,15 728:5,16
734:10 740:23
741:20 746:18
748:18 749:16,24
750:6 751:22
752:10,16 753:2
753:20,25 754:11
758:22 802:20
821:10 845:12,23
892:19 903:24
909:6,12,21

**d**

**d** 689:2 692:14
787:13 912:2
**da** 713:23 872:15
872:19 874:3
910:15
**daft** 757:12
**damage** 719:23
724:3 729:2,5,11
729:12
**damaged** 719:17
719:19 720:11
**damages** 717:8,14
717:22 718:14,22
718:24 720:6,10
720:13,21 721:4
721:15,25 722:5
722:21 749:22
750:11
**date** 755:25
779:13 780:3,7
824:19 887:20
888:19 895:20
896:7,15,20,23
907:21 908:23
914:3

**dated** 720:16,18
889:20 900:18
904:20 905:7
**dates** 825:4
**david** 688:19
713:24
**day** 824:23 912:10
912:17 913:6,20
914:21
**days** 697:3 709:2
710:17 711:13
712:17 787:9
908:6
**deal** 696:11
742:13,14 894:10
**dear** 837:3
**decision** 709:25
778:21
**deck** 796:5,8,10
**declaration** 896:5
**deemed** 827:14
828:5 837:15
**deep** 873:3
**default** 770:24
772:7 790:15,19
**defendant** 687:16
717:17
**defendants** 687:9
688:11 692:10
718:13,14 721:15
721:24 763:11
900:19 904:19
**define** 860:4
884:13
**defined** 805:13
**defines** 806:13
**definitely** 744:4
749:16
**definition** 734:16
805:9 820:11

**definitive** 835:16
**definitively** 731:9
**degree** 776:2
900:6
**delete** 778:18
**deleted** 777:6
778:22
**deleting** 777:20
778:15,16
**demand** 770:7,10
771:7 789:22
**demanding** 770:15
**demonstrate**
793:9
**department** 714:2
714:3 781:23,25
782:6 816:11
817:6,19 859:17
859:21 887:4
**department's**
782:3 887:5
**departments**
768:2 803:11
839:13 852:14
**depending** 778:19
**depends** 842:23
**deploy** 814:23
817:13
**deployed** 814:9
816:18 858:18
**deploying** 813:20
**deponent** 718:6
741:11 914:4
**deposed** 872:14
**deposition** 687:15
690:15 691:6,12
692:21,22 693:2
693:23 694:12,17
694:18,22 696:20
696:25 697:10
698:25 699:17

700:17 701:12,22
701:23 702:25
704:14 705:21
707:24 708:11,24
709:7 710:18,25
711:4,13 712:16
713:20 714:14
726:6 728:3,12
736:3 739:18
743:21 745:24
746:24 747:22
748:4 749:8,19
750:9 751:13,20
756:10,14 832:10
846:3 883:24
884:3 891:3
892:10 893:19
895:25 896:5,7
902:19 905:5
908:6 910:4,18
912:9 913:5,13
914:3
**depositions** 703:21
878:6 888:11
**depth** 808:13
872:17
**describe** 766:22
803:2 806:6
815:18 826:14
827:2 831:17,18
832:6 840:12,14
860:16 864:25
866:20
**described** 694:10
698:12 717:14
767:13 792:20
801:23 809:16
811:13,16 830:19
834:17,23,24
835:9 836:8 840:7
840:8 843:12

864:16,17 865:3
872:11,24 875:23
878:17,18 880:7
880:16 881:23
882:22 884:12
885:25 888:17
889:5,18,25
893:11 895:3,8,22
896:22 906:4
909:19
**describes**  905:20
**describing**  826:13
872:3 882:5
886:18 891:16
**description**  689:7
793:13 795:21
864:21
**descriptions**  802:6
**design**  796:14
**designated**  696:19
716:23 744:12
854:5
**designed**  847:20
876:25
**desire**  732:19,20
738:8,10
**desks**  839:13
**destroy**  842:20
844:17
**destroyed**  843:8
843:10,13 844:10
**detail**  779:12
806:7 821:18
850:13 872:14,16
873:22
**detailed**  844:12
**details**  777:25
850:6 894:8
**determinations**
902:17

**determine**  791:12
843:18 907:4
**determined**  708:4
837:11
**determining**
765:22
**deutsche**  838:5
**develop**  775:21,24
776:9 812:25
813:7,18 814:21
905:21
**developed**  795:17
795:20 805:4
812:21 815:13
816:4 820:19,21
**developing**  776:15
827:11
**development**
778:8 804:10
**develops**  812:17
**devised**  822:23
**differ**  697:24
**difference**  825:24
826:14,15 855:16
**different**  699:8
707:16 749:21
757:8 767:12
769:6,7 773:4
792:24 807:9
811:17 827:4
830:11 834:16
848:19 849:2
860:12 864:12,24
866:15,17 879:5,6
880:25 881:7,10
881:17,18 882:8
884:22,24 885:3
893:22,25 897:18
911:2
**differentiate**
757:21 828:5

**differentiation**
841:23
**differently**  882:18
**differs**  825:19
**difficult**  829:25
892:23
**dig**  873:2
**digital**  791:21,22
791:24
**digitally**  803:9
**diligence**  764:25
798:4
**dinershtyn**  787:10
**direct**  754:23
**directly**  698:18
743:20 745:2
889:13 913:16
**directories**  767:8
769:19 871:9
**directory**  769:14
**disclose**  808:15
809:9 810:9
840:25
**disclosed**  835:14
843:14
**disclosing**  704:11
842:25
**disclosure**  844:5
**discovery**  735:25
751:6 791:11
**discuss**  701:11
704:13
**discussed**  701:5
846:16 883:13
893:23,24
**discussion**  778:19
807:8
**discussions**  808:21
815:11
**disk**  869:17

**disputes**  736:11
**distance**  827:13
**distancing**  828:3
**distant**  828:22
**distinct**  840:18
**distinction**  776:13
**distinguish**  771:11
789:21
**distinguished**
872:9 878:17
**distinguishing**
853:8
**distribute**  798:23
841:21
**distributed**  769:17
841:18
**district**  687:2,3
691:10,10
**diversion**  839:2
**divided**  761:8,9,10
761:16
**division**  761:9
**divulge**  701:2
**document**  705:6
706:15 755:23
781:8,11,14,16,21
782:5,10 783:11
784:19,19 785:16
803:17 831:12,25
832:9,23 859:7,18
870:17 883:18
887:21 900:14
901:5,7 904:8
907:6
**documentation**
803:19 841:4,6,9
**documenting**
890:9
**documents**  699:22
704:15,19,21,22
704:25 705:3,3,13

705:22 706:7,11
706:20,23 707:4,5
707:10,11,17,18
736:2 753:18,21
766:14 806:18
815:10 831:4
833:11 835:25
836:5,8,13,15,17
836:21 837:20
838:8,9,20,21
840:6,11,13,24
844:8,16 845:4,5
859:8 860:4
868:18 870:21,22
883:22 884:23
885:9 893:21,24
900:10,14 901:7
903:3 904:2,3,22
904:23,24 905:12
905:16,19 906:2,4
906:16 908:7
**doing** 697:13,13
697:22 698:12
699:6,21 709:16
727:23 732:17
761:12 768:17
771:15 773:10,12
773:16,18 774:4
774:11 806:8,9
827:9 830:20
832:7 835:23
869:4,7 871:23
872:2 877:22
910:3
**dollar** 720:11,13
885:17
**dollars** 722:6
**doors** 873:17
**doubt** 789:7
**doug** 709:4 711:17
739:6 821:23

822:23 826:2
851:13 857:10
**douglas** 687:16
689:4 691:6
911:12 912:7,15
913:5 914:4
**draft** 756:22 757:2
757:5
**drafted** 724:20,25
725:4,13,19 726:4
726:9 727:25
757:16,20,21
**drafting** 724:23
**drafts** 757:14
**draw** 719:25
811:19 846:12
**drive** 766:24,25
767:5,6,12,15,16
767:17,18 768:20
768:24 769:4,14
772:8,12,21 782:7
790:8 803:23,24
870:15 887:5
**drives** 766:12
790:6,18 869:17
870:25 871:17
894:17,18
**due** 764:24 847:25
**duly** 692:15 913:7
**dumain** 688:7
**duration** 707:9
735:12 736:16
737:14 783:4
805:6,7
**dynamic** 826:21
826:23

**e**

**e** 688:2,2 689:2,6
752:4,15 755:2
759:25 762:9,18
762:19 763:16

764:9 779:21,25
787:13 789:5
791:8,11,19 792:9
802:5 824:2
825:22 887:16,21
888:5 896:24
901:10 906:20,23
912:2,2 913:3,3
**earlier** 749:18
789:14 825:20
832:10 877:25
883:9,12
**easier** 723:9
**economics** 806:14
**effect** 690:17
**effective** 811:22
814:9 871:22
**effectively** 828:6
**efficiency** 709:19
850:14
**efficient** 705:24
733:22
**effort** 724:14,15
757:15 878:24
**either** 745:19
777:5 792:6
816:18 843:8
847:14 856:18
876:19 889:8
**electronic** 782:3,5
**eliminated** 845:6
**emphasize** 788:10
**employ** 833:15
849:5 913:18
**employed** 856:18
**employee** 787:4
814:4,6,7 815:6,8
**employee's** 786:16
786:24
**employees** 761:22
765:10,11 767:18

769:17 775:15
786:3 787:8
814:21 850:17
**employment**
813:22 814:4
**employs** 833:15
848:10 858:9
**enable** 824:6
**enabled** 884:17
**enables** 806:16
**encourage** 709:18
747:25 748:3
**endeavoring** 718:2
**energy** 836:24
**enforce** 871:20
**engage** 865:24
**engagement** 866:3
**ensure** 900:8
**ensures** 875:14
876:16
**ensuring** 871:24
**enter** 885:19 886:2
**entering** 886:15
**entire** 751:5,7
762:16 793:18
794:4 839:12
**entities** 734:18,19
811:18 825:9,11
849:5 855:25
856:15 858:12
872:10,22 880:3
**entitled** 727:20
781:9 892:12
**entity** 734:13,15
825:14,16 827:8
828:20 829:8
834:25 835:9
837:18 840:4
848:10 858:8
861:6 882:20

entry 862:9
869:12 870:5
875:16
enumerate 755:4
763:3 764:24
766:20 822:13
906:9
enumerated
859:19
enumerating
829:24
environment
871:6
equity 827:11
equivalent 876:7
887:9
esq 688:6,7,7,8,13
688:14,14,15,18
essence 840:18
841:23 843:23
estimate 697:11
699:6,23 799:6
estimates 699:8
et 687:8 691:9
698:15 814:5
847:6,7,18 848:3
880:25 885:2
ev 847:10
ev5 773:11,13,14
774:6,15,17,19
833:23 834:10,13
835:12 847:6
850:4,4 856:19
875:8
evasive 693:11,20
everybody 873:8
873:14 883:6
evidencing 901:5
evolved 824:20
exact 708:15 729:7
729:25 771:23

824:19 854:5
exactly 754:25
760:2 763:16
776:6 814:13
874:20 891:23
892:23 901:10
903:14
examination 689:3
692:18
examine 807:2
835:6
examined 692:16
example 698:9
705:6 706:6,14,15
757:17 758:4
773:6,10,13 780:3
783:22 789:5
833:17 836:20
860:19 862:7,9
864:13 870:6
872:10 879:20
881:9 884:10
906:5
examples 706:20
837:4 897:7
exceed 722:5
excel 766:13,16
783:12,14 816:8
exceptions 807:17
809:24
exclude 874:10
exclusive 862:2,6
862:11,12,18
exclusively 886:5
exclusivity 862:25
executive 768:7
exercise 891:7,10
exhaustively
851:16
exhibit 689:8,8
696:21 755:18,19

755:19,24 756:4,7
756:12 758:5,15
890:17 896:10,16
907:18 908:9
909:2,18
exhibits 689:10
756:5
existence 850:21
852:16 853:9
existing 858:6
exists 767:5
exited 837:3
expect 771:24,25
798:14 815:22
expectation
798:16,18 809:16
expected 740:22
902:8,19
expense 885:17
experience 798:19
821:21 838:23
839:7 857:22
858:4 885:21
expert 784:8
expertise 798:6,8
experts 806:11
813:10
expires 914:24
explain 696:9
706:5 717:15
718:11 719:20
803:4 806:7 823:2
823:18 825:18
explanation 736:8
explicitly 779:13
extensively 744:3
898:11
extent 823:6,10
872:12
extra 841:17

extraordinarily
740:25

**f**

f 913:3
faced 857:23
facilitate 863:24
fact 694:22 727:10
747:8 775:3
807:13 831:9
847:12 849:25
870:20 876:22
892:9 902:22
factors 718:13
facts 698:3
failed 858:3
failing 857:23
failures 858:5
fair 707:19,20
757:6 788:22
792:10,19 793:12
810:7,8 811:18
816:2 820:20
822:7 829:9
850:16 870:18,19
872:24 873:4
874:5,14 878:3
907:5,14 908:10
fairly 861:13
fall 880:16
familiar 873:13
familiarity 843:11
far 742:22
fattaruso 688:3,7
692:7,13
features 805:2,5
806:24 831:23
832:7
feedback 858:14
feeder 856:22
feel 724:3 798:21

feels 819:6
fees 805:11
figure 745:12
  805:17 864:8
  910:11
file 766:14,25
  769:15 784:9,13
  784:22 785:10,13
  789:2,4,9 790:3,5
  790:14 791:4,17
  791:20,24 792:4
  797:21 838:25
filed 691:9
files 697:15 699:22
  767:8 769:10,11
  789:19 790:16,17
  790:23 803:11,13
  803:18
filing 690:6 838:7
filter 784:5
final 756:17
finance 713:25
  714:3 781:22,24
  782:2,6,12 784:10
  787:2,4 788:14
  850:25 852:6
financial 858:2
financially 691:21
financing 865:13
find 739:25 740:8
  742:24 863:25
  865:20 893:7
  904:16 906:11,16
  908:13,19
finds 864:9
fine 702:18 752:13
  793:8 820:7
finish 693:17
  752:17
finished 746:14

fire 786:11
firm 691:15,18
  692:13 701:16
  764:19 765:17
  766:4 772:4,6,6
  774:20,24 775:4
  785:16 789:10,18
  810:22 811:6
  813:11 851:23
  854:11 855:12
firms 708:2
  804:14
first 692:15
  697:19 699:10
  717:23 722:19
  747:12 756:16,21
  756:22 757:2,5,12
  770:13 771:16
  784:3 792:17
  825:2 836:22
  848:23 866:18
  909:22
fits 773:7
fitting 884:14
five 714:17 730:21
  748:2 749:10,11
  750:10 751:10
  766:18,21 772:20
  772:23 897:18
  903:21 911:14
flaws 885:22
flexibility 805:20
  805:21
flexible 826:10
floor 688:5,12
flow 795:16
  797:10
focus 718:7 727:3
  773:20 805:6
  896:2

focusing 718:8
folder 689:8 756:3
  756:4,5 767:11,14
  870:16 887:7
folders 767:15
  769:7,9 782:3
  790:17 870:25
folks 708:3,9
  724:9
follow 720:7,13,23
  721:12 734:5
  869:24 879:19
  897:10
following 822:17
follows 692:17
fonts 797:8,15,23
  798:9
foot 864:20
force 690:17
  766:17
foreign 827:14,18
  827:23 828:3,17
  828:22 858:23
forever 845:6
forgive 874:8
form 690:10 694:5
  699:11 703:11
  709:18 719:7,13
  720:22 732:9
  754:22 756:17
  766:14 769:13
  770:18 771:20
  803:17 814:2,3
  840:5 847:12,14
formal 838:11
format 780:14
  794:8 795:16,25
  796:5,10 797:4,21
  812:11
forms 804:9 832:6
  837:9

forth 710:14 726:2
  745:6
forum 857:5
forward 816:2
found 763:5,8,8
  764:8 839:10
  902:13 904:12
four 713:13
  741:21 750:15
  772:20,23 845:20
  903:14,16
fractionalization
  857:7
framework
  866:16 871:19
  873:5,6 874:2,14
  885:8,10 897:9
fran 687:18
  691:17 913:4,22
free 694:6 759:17
  815:20 818:17
  819:4,23
frequent 777:12
  777:13
frequently 776:22
  776:23 777:8,16
front 723:13
  725:12 726:10
  728:2,11 729:7
  731:13 745:14
  748:24 750:22
  751:12,18 753:8
  755:21 759:18
  760:7 842:18
  895:16,18
frowned 885:20
froze 715:15,16
fulfill 869:20
fully 786:12
fund 700:5,7,8,12
  700:15,21 702:2

704:4,15,19,22,25
705:3,6,13,22
706:6,19,20 707:4
707:5,6,9,11,16
735:8,9,11,12
736:16 737:15
761:9 783:4,5
792:25 798:15
802:22 803:2,3
804:15,22 805:4,6
805:7,20,24 806:3
806:17,25 807:3
807:24,24 808:4
809:10,15,18
810:4,7 811:6,8,16
815:21 816:12
824:5,13 825:12
828:13 834:10,16
834:25 835:8
843:2,11 847:5,10
847:13 849:19
855:17 857:2,16
857:25 875:15
879:3,16 884:25
885:3,5,17,24
886:2,8,13,15,19
**funding** 833:7
880:24 882:11
**funds** 705:4
706:12,22 707:7
707:19 735:3,4
737:10,13,19
783:3 804:25
805:9 806:21
807:3 810:14,25
811:18 825:25
828:12,14,16,18
833:15 834:13,13
835:6 837:15
840:20 857:23
858:6 859:22

865:17,19,25
881:7,12 884:24
**further** 690:9,14
868:16 907:22
**future** 728:9
733:14 813:21,22
814:10,10,25
828:22

**g**

**g** 692:14 912:2
**galore** 892:11
**gas** 836:23
**gathering** 699:21
**general** 813:9
823:22 832:24
867:2 887:23
**generalize** 707:15
**generally** 705:2
721:20 842:9
856:3 907:11
**generate** 798:8
830:13
**generic** 705:15
714:20 796:7
**generically** 851:24
865:6
**getgo** 693:14
**getting** 733:18
757:4 770:3
850:13 867:21
891:10 910:8
**gigabytes** 783:17
**give** 705:5 706:14
706:19 720:4
733:24 736:4
741:13 754:18
762:15 765:7
768:5 773:6 780:2
780:7 789:2 799:5
799:9 822:3
825:23 827:5

835:12 847:7
860:19 872:16
878:21 879:20
881:9 887:23
**given** 732:11
826:18,19 858:14
858:24 873:3
877:13 883:3
886:5 892:9
909:25 910:15
911:11 912:12
**gives** 805:25
**glad** 710:22
**global** 767:11
807:13 858:18
**go** 695:13,14 705:9
708:18 710:13
711:3 722:15,17
726:5 729:22
735:16 740:20
741:9 745:3,5
746:11 747:22
748:14 749:4,13
750:2 751:22,23
751:25 763:15
773:21,22 778:14
778:17 779:14
788:2,17 790:10
790:14 791:10
800:6 805:17
806:12 809:4
810:18 815:20
816:24 822:19
845:12,25 850:6
851:17 860:25
863:2 871:14
872:13 873:22
874:15 878:22
887:22 890:25
891:2 892:24
893:3 895:10,15

900:22 903:9
904:12 906:19
**goal** 868:20
869:20
**goals** 861:19 871:9
**goes** 783:3 816:11
864:9 869:18
871:18,25 884:10
**going** 691:3 701:9
701:16 702:19
704:6 705:18
707:14 709:10,13
709:14 710:10,11
712:20 713:8,10
724:12 726:2,5
727:25 728:8
729:22 730:23
731:8 732:24
734:5 736:25
747:4,10,22,22
748:2,11,19 749:8
755:7,18 769:8
813:22,23 815:25
826:17 836:8
841:20 843:12
845:25 846:13
848:20 889:15
900:17 903:12
**goldman** 838:5
839:8
**good** 691:2 692:6
692:19 730:11
784:12 836:19
838:13 839:18
841:18 843:15
858:3 877:17
**gotten** 710:25
711:22
**governing** 706:21
**government**
833:19 837:8

860:23,24 861:3
861:25 862:5,10
862:13,17,21
863:5,8,13,15,18
864:7,7,8,10,15
865:4,7,10
**governments**
837:8,10
**great** 725:24
**greek** 714:6,12
**grounds** 726:20
**group** 707:5,10
784:10 796:24
800:13 806:16
865:22
**grouped** 783:6
**grow** 806:19
**guarantee** 883:5
**guard** 784:25
**guess** 695:14
730:17,23,24
731:17 761:20
809:22 824:9
876:17
**guessing** 771:6
**guidance** 716:6,8
716:9
**guide** 701:7 860:2
**guided** 744:19
**guideline** 833:21
834:3
**guidelines** 833:6,6
833:8,13,14 886:7
**guiding** 746:20

**h**

**h** 689:6 787:13
**half** 881:24
**hand** 759:4 799:4
913:20
**handful** 762:3
767:19,24 768:4

852:11 865:23
**handle** 805:22
**happened** 711:7
792:5 862:4
899:18
**happens** 871:24
**happy** 722:15
733:24 740:11
742:11 771:14
846:8 867:9 910:9
**hard** 744:9 782:2
784:22 785:9,13
**harm** 717:8,17
718:14 719:6,12
721:15,24 723:22
**he'll** 746:11
**heads** 844:8
**hear** 712:9 737:6
784:2
**heard** 712:10
867:24
**hearing** 890:15
**heavily** 793:7
**heck** 733:21,22
**hedge** 810:25
811:5,8 825:12
833:15
**heisenberg** 837:24
858:22 886:21
**held** 687:18
691:12 852:2
913:5
**help** 775:21,24
776:9,25 813:18
814:21 822:18
**helped** 812:25
813:6
**helpful** 731:19
743:7 824:9 837:5
848:7

**helping** 746:25
891:7
**helps** 869:19
876:13
**hereunto** 913:19
**high** 865:2 879:23
**higher** 766:5
774:25
**highest** 770:21
796:16
**highlight** 805:3
**hired** 796:14,18
797:20
**hires** 861:25 862:5
862:10
**historically**
786:18
**history** 824:16
**hmm** 812:7,7
**hold** 890:14
906:14
**holdings** 687:8
691:9 734:24
**holiday** 884:10,11
**holidays** 884:4
**homework** 721:6
743:9 872:13
**hopefully** 808:17
910:11
**hour** 699:8 881:24
910:15,23
**hours** 697:9,12
698:9,11 699:5,17
699:20,22,23
708:25 901:9
903:14
**house** 812:21
813:6,19 820:19
**housed** 765:12
781:21,22 782:2
800:11,12 803:3,5

803:20 812:11,12
830:4 859:8,20
887:2,3 894:14,16
**housing** 870:14
**hundred** 722:6
799:24 800:4
**hundreds** 799:19
800:3 810:21,24
**hybrid** 824:3

**i**

**iacovacci** 687:4
691:8 716:12
717:10 719:2
723:3,20 728:20
729:17 731:2,13
731:23 732:7
733:3 734:23
735:13 736:17
737:20 738:3,12
738:21 739:8,20
740:6,15 741:7,23
742:4,17 743:19
744:23 745:9,20
746:3 747:14
754:14,19 755:10
759:20 760:8,15
762:5,13 763:2
764:22 765:2,15
768:14,19,24
769:25 773:16
775:8,21 776:9
778:11 779:3,9
780:3,8,17 781:18
789:8,25 790:19
791:6,8,16 802:24
832:12 836:21
846:23 854:8,12
887:12,18 888:16
889:3,14,17,24
890:20 891:14
892:14 893:10

894:20 895:2,7,21
896:12,20 897:17
898:2,7,9,16
899:16 900:15
901:6,18,22 902:2
902:5,24 907:7,16
908:4,20 914:3
**iacovacci's** 716:21
717:15 718:12
719:5,7,11,21
720:22 721:19
722:22 729:2
903:5 906:17
**ian** 688:7
**idea** 747:16 748:5
809:10,15
**ideas** 813:16 834:9
**identification**
740:8 755:24
**identified** 697:2
698:24 699:7
708:9 728:19,25
729:5,9 743:20
745:8 754:6,24
755:13 760:14
763:4,19 764:8
772:19,25 775:15
780:10 794:7
809:10 814:19
816:23 821:11
822:19 825:20
829:23 833:11,25
851:21 852:6
855:2 869:2
876:23 879:2
883:10 888:25
890:24 892:4
897:19,24 901:5
904:9 907:17
908:12

**identifies** 742:16
889:17 890:6
896:20 905:11
**identify** 716:13
729:12 739:19,24
741:5,6 742:23
743:9 745:5,19,22
747:13,21 753:13
755:3,9,13 758:4
759:22 762:12,24
763:18 779:17
784:6 794:15
796:13 814:16
815:2 841:19
872:7,20 877:7
880:14 889:23
890:24 892:3
893:4,9 895:6,19
895:20 902:3,23
903:25 904:7
906:10,21 907:6
907:18
**identifying** 731:21
732:6 740:5
760:13 762:21
780:16 802:22
812:2 828:24
829:12 832:11
836:4 846:21
851:13 860:8
861:4 889:3
893:16 901:10
903:5
**identity** 866:4
896:12
**ignoring** 815:22
**imagine** 783:14
**immediately**
722:14 750:19
**impacts** 856:23

**implement** 822:3
822:5 824:8
825:17 873:9
**implementation**
822:4,8,21 877:9
**implemented**
825:8,14 829:9
869:14 876:13,22
877:6
**implementing**
877:23
**implicates** 821:8
**implication**
847:12
**implications** 823:7
**important** 732:21
738:9 827:17
850:13
**importantly**
788:11
**impressed** 787:14
**inappropriate**
746:19 747:3
902:18
**inaudible** 868:2
**include** 693:19
788:21 790:11
795:6 848:13
863:5,8 890:12
909:13
**included** 700:5
723:16 760:4
768:8 774:18
831:11 878:9
903:3
**includes** 718:25
780:22 793:16
826:8 848:14
878:12 890:12
**including** 694:21
698:23 704:4

722:6 791:9
825:11 826:19
838:6 846:19
850:18 877:5
885:12 909:15
**inclusive** 907:20
**income** 828:6
**inconsistent** 695:4
695:8,10,18,25
**incorporate**
735:17
**incorporated**
812:14
**incorrect** 736:23
**incurred** 724:4
**independence**
855:9
**independent**
846:19 847:2
848:2,16,18,25
849:3,15,18,21
850:7,11,19
853:18 876:6
**independents**
847:19
**index** 753:8,12
**indicated** 753:11
**indirect** 697:12
699:20
**indirectly** 913:16
**individual** 761:14
761:16 767:24
786:3,5,15,16,24
786:24 787:19
788:6,21 814:11
**individuals** 813:12
**industries** 811:24
**industry** 778:9
796:17 806:11
823:24 824:3,5
831:2 836:18,25

838:16,17 840:21
865:22 871:13
**infinite** 837:23
**info** 794:20,21
**information**
697:17 698:19
714:9,12 715:3
723:10,15 735:19
735:23 755:16
788:19 794:23,25
795:4,7,8 801:13
814:15 815:3,3
832:8 842:2,15,16
843:3,6,7 844:3,7
844:15,17 845:3,9
868:17 890:7,11
**inherent** 847:22
**inherently** 847:24
850:5
**initial** 699:19
**innocuous** 793:12
**inquiries** 809:21
**inside** 808:6
820:12
**insley** 687:18
691:17 913:4,22
**insofar** 821:6,7
**installation** 786:14
**installed** 786:8,10
**instance** 722:20
770:13 889:23
892:5 893:10
895:20 902:4,24
**instances** 903:5
906:13
**institutional**
807:13
**institutionalizati...**
801:2
**instruct** 694:4
821:5

**instructing** 821:9
823:4
**instruction** 701:9
821:14 823:15
826:5
**insures** 875:17
**integrated** 856:17
**intend** 751:17
**interact** 727:8
**interacting** 727:2
**interest** 843:24
**interested** 691:22
913:16
**interfering** 732:20
**interim** 714:4
**interject** 694:3
702:23
**interlinks** 868:22
**intermediate**
885:2
**internal** 713:24
724:9,17 725:4
**interrogatories**
698:16 735:21
737:22 904:20
**interrogatory**
738:25 739:4
743:11
**interrupt** 827:4
896:4
**interrupting**
746:24
**intertwine** 884:8
**intervention**
747:24
**intimately** 836:21
**intrinsic** 850:2
853:19
**introduce** 755:18
**invest** 793:11
807:15 844:2

885:11 894:9
**invested** 735:7
782:25 783:2
831:19
**investing** 735:11
801:5 810:4
827:15
**investment** 793:3
830:14,20 831:18
831:19 834:18,22
855:18 860:7
861:9 883:21
894:11
**investments** 783:8
784:6 793:3
829:12,13,16,20
830:3,8 831:10,15
831:17 832:3,5,14
832:18,21 834:23
835:2 841:8,9
856:7 884:21
**investor** 731:20,22
732:6 733:5
734:14,22 735:6,7
735:10 736:15,18
737:10,19 738:3
738:12,21 739:8
739:20 740:5,14
741:7,23 742:3,16
743:18 744:22
745:7,8,19 746:2
754:13,19,24
755:10 759:19
760:3,7 780:8
800:20,21,24
805:10,22 806:15
806:20 810:2,5
827:14,18 828:19
828:22 842:14
845:4 868:19
884:15 885:4,11

**investor's** 843:10
843:13
**investors** 735:11
735:14 782:16,24
792:22 793:10
796:20 798:25
799:2,17,24 800:8
801:3,18 805:5
806:16 807:8,14
808:10,12 809:8
809:13 827:23
828:3,4,17 841:5,7
841:10,16,21,25
842:4 843:2,25
858:15,25 863:16
863:17 879:14
883:14 886:17
**involved** 698:18
765:2 804:15
817:3 827:19,21
828:23 834:11
836:22 837:7
840:19 851:9
853:5 854:14,17
855:8,13 860:21
**issue** 702:19
818:16 821:8
826:9,20 829:14
839:15 856:5,12
860:9 866:5,13
867:13 874:25
893:18
**issues** 749:21
786:12 817:16,17
817:18
**items** 733:13
822:14 896:25
905:2 907:20

**j**

**january** 759:23
889:20 890:18
**jason** 688:6 692:6
715:14,16,23
746:5
**jb** 796:25 797:2,3
797:12,14,22
**jersey** 687:19
**job** 816:7 898:13
**johnny** 872:15
874:4,18
**joint** 724:14,15
757:3,15
**jump** 703:4

**k**

**k** 912:2
**karina** 787:10,15
**keen** 733:17
**keep** 701:16
784:24 785:6,9
802:10 809:18
837:2 841:13
842:4,15 866:9,19
867:10,19,25
868:7,12 870:14
870:20 879:23
**keeps** 785:12
**kept** 766:9,10
785:24 803:6
837:3
**kind** 789:4 838:6
839:12 864:24
882:17 884:7
**kinds** 793:17
841:20
**king** 796:25 797:2
797:3,12,14,23
**knew** 757:14
854:8,12,14,17

**know** 692:21
695:7 702:9
705:23 706:25
707:5,10,25 708:3
709:4 712:3
726:21 727:5,17
729:8,15,18,19,23
729:23 730:19,25
731:5,6 733:17
735:24,25 736:7
738:2,12,20
741:22 742:7,8
744:11,24 746:2
747:3 753:15
756:23 758:12,17
758:25 759:5,10
762:22,22 764:13
764:13,14,16,21
764:23 766:5
770:16 771:5,8,14
771:16 774:25
775:2,5,7,11
777:24 780:22
783:17 784:13,18
785:12,22 787:24
788:8,25 790:25
791:5,7,15,18
792:5 793:24
795:10 797:9,13
798:6 800:16,24
807:10 809:21,24
811:4,10,19,22
815:24 826:7,16
826:23 834:14
835:14 839:22
841:3,13 844:14
846:7 851:16
852:3,14,15,16,18
853:21,23,25
854:23 855:2,5,8
872:3 873:11

874:4,12,20
877:17 881:24
883:6,7 888:8
889:15 891:6,13
892:6,22 897:22
898:2 899:17
908:17,18
**knowing** 816:25
855:17
**knowledge** 766:5
775:23 809:12
813:24 815:25
816:7,9 832:25
833:3 837:24
843:14,16 844:4
855:13 858:14,21
859:9,20 883:3
905:22
**known** 775:13
824:15 838:2
851:22 853:14
**knows** 739:7 852:5
853:24 854:5
907:15

**l**

**l** 690:2 692:14,14
824:2,2 912:2
**lack** 770:12
**laid** 817:25
**lan** 872:15,18
874:4,19
**land** 858:23
**language** 844:12
**large** 759:24
783:11 788:25
807:13 810:22
829:18
**launch** 806:21
857:16 885:16
886:2

**launching** 857:25
886:15
**laws** 855:19
**lawsuit** 899:15
**lawyer** 724:2
814:12 839:17
**lawyers** 708:12
757:22 836:25
841:2
**layer** 876:15
**learn** 801:9 824:11
858:3
**learned** 815:23
844:4,16,18 845:4
879:13 886:10
**left** 848:21 903:8
909:5 910:24
**legal** 701:3 704:11
720:5 803:16,20
803:22,23 804:3
808:7 809:23
821:8 822:6 823:6
823:7 830:15
855:22 856:13
858:9,10 859:5,11
859:13,16,21,24
860:3 880:8,17,18
882:2,13 887:3,5
914:2
**legislate** 705:4
706:11
**lend** 833:18
836:16
**lender** 830:24
834:13
**lenders** 831:3
840:19
**lending** 830:25
834:15 857:5,6
890:7

**length**  875:23
**lengthy**  889:11
**letter**  885:19
  886:3,16
**letters**  806:22
  884:15
**level**  701:8 770:21
  789:20 853:25
  865:2 879:23
**levels**  767:3
**levers**  869:19
**levine**  688:8
**lexington**  688:12
  691:13
**li**  713:23 853:25
  872:15 873:21
  874:3,18 878:23
**librock**  688:20
**licensed**  865:22
**liked**  810:2
**limit**  694:7 707:12
**limited**  706:16
  805:13 835:13
  850:22,24,25
  852:8 878:4
  883:17 884:12
**limiting**  736:7
**line**  774:2,15,17
  774:23 778:25
  815:23 864:3
  914:5
**lines**  767:9 772:16
  774:3,11 778:12
  779:4 790:9 831:5
**link**  904:13 905:2
  906:12,22
**linkage**  908:14
**linkages**  906:12,16
  907:22
**liquidity**  805:11
  806:14

**list**  728:19,23
  729:3 730:16
  731:12 733:12
  734:16 735:10,14
  735:16 736:18
  737:10,19 740:13
  741:23 742:3,3
  743:14 745:2
  754:19,19 755:4
  755:10,13 758:7
  759:19 760:18,23
  761:3,4 762:25
  763:8,14,22,23,24
  763:25 764:2
  770:10 773:14
  774:19 775:9,13
  775:22 776:8
  777:3,23 778:2,16
  779:25 780:4,8
  829:19,19,21
  830:3,5 831:10,14
  831:16 832:2,4,5
  846:10 889:9,11
  903:3
**listed**  744:16
  746:11,12 832:23
  833:2,3 846:2
  896:23
**listen**  743:16
**listing**  701:18,20
  754:4 783:7
**lists**  731:20,22
  732:6 733:5
  734:14,22 735:6,7
  735:19 736:15
  738:3,12,21 739:8
  739:20 740:5,14
  741:7 742:16
  743:18 744:22,24
  745:8,8,19 746:2
  748:10 754:13,24

760:3,8 761:5,7,15
  761:19,25 762:4
  762:12,16,20
  763:9,17,19,20
  764:9,11,15,17,18
  764:21 765:6,9,11
  765:18,21 766:3,7
  766:8,9,10,19,23
  767:10,13 769:5
  770:14,25 771:19
  772:13,22,24
  773:2 774:13,22
  775:25,25 776:4
  776:15,16,20
  777:15 778:6,23
  779:10,18
**litigation**  708:10
  759:14 784:14
  800:15 860:10
  866:6,13 867:13
  874:25
**little**  776:24 777:8
  806:6 824:10
  839:3 880:21
  892:9
**llc**  687:8 691:9
**llp**  688:3,10
**loan**  827:10 838:9
  838:24 840:24
  841:4,6 869:12
  880:22,22,24,24
  880:25 882:11
  904:2,3,23,24
  905:11,16,19
  906:2,4,16 907:6
**loans**  836:2,5,8,13
  837:21 840:6,11
  840:13,19 881:5
**locate**  906:22
**located**  691:13

**lock**  787:6,21
  788:6,12,15
  834:18
**locked**  786:12
  829:3
**locking**  788:21
**locks**  786:4,9,15
  786:25 787:19
  873:17
**long**  703:21
  706:25 714:6,13
  779:25 799:10
  804:19 830:2
  842:12,12 862:25
  888:3,4 903:11
**longer**  710:10
  804:21 813:13,16
**look**  708:18
  735:16 745:11
  746:11,21 747:19
  753:15 755:18
  770:20 771:23
  788:17 791:11
  800:6,7,16 810:18
  841:24 844:11
  859:25 863:2
  868:17 892:12
  893:3,7 904:16
  908:5,19
**looked**  750:14
  751:24 789:3
  790:21 837:14
  840:16 855:7
  878:6
**looking**  698:14,15
  698:16 708:17
  710:2 722:8 723:8
  724:11,12,13
  727:10 739:10
  756:2 757:8,17
  758:10,20 783:23

889:22 890:4,17
896:8,11,18
897:16
**lost**  836:20
**lot**  714:16 721:6
730:11 733:21,22
755:15 757:25
804:10 838:22,22
858:5 872:25
884:8 888:4
890:15 891:25
**lou**  692:9 693:9,17
696:16 725:3
727:16 892:20
**louis**  688:13
**lp**  706:18,21
735:12 736:16
805:8
**lpa**  885:9
**lunch**  845:17

**m**

**m**  692:14 912:2
**mail**  752:4,15
789:5 791:8,11,19
887:21 896:24
906:20
**mails**  755:2
759:25 762:9,18
762:19 763:16
764:9 779:21,25
792:9 802:5
887:16 888:5
901:10 906:23
**main**  708:19
**maintain**  855:9
869:3 871:20
876:13
**maintained**
766:11 784:10
803:7,21 875:14
875:18

**maintaining**  778:2
782:9 871:7
**maintains**  875:13
**major**  776:12,17
**majority**  762:10
851:18 871:13
**making**  703:14,24
741:18 827:10
853:19 894:11
**mallet**  700:13
701:12,25 704:5
704:13 707:22
708:9 709:6
710:16 711:12
712:15 804:12,17
804:18,24 808:4,8
810:13,21 813:3
817:5,12 818:10
818:22 819:4,4,13
819:22,23 820:19
820:25 821:25
822:11
**mallet's**  820:8
**manage**  830:19
832:18,21 865:16
865:19
**management**
734:17,21,25
767:22 833:7
879:17 880:5
881:19
**manager**  826:10
881:13
**managers**  851:23
**managing**  830:16
879:24
**mandate**  800:21
**manner**  864:25
865:2
**manual**  815:6
897:12,14

**manuals**  814:5,6
815:9
**march**  720:18
**marco**  688:21
691:15
**mark**  756:3 768:8
838:4 854:2,23
895:24 904:19
**marked**  689:8
696:21 751:3
755:23 756:5
757:6
**market**  857:24
885:22
**marketing**  800:12
**marks**  839:9,11
**marriage**  913:15
**master**  761:4
856:22
**material**  745:22
819:11 891:25
898:10
**materials**  697:14
700:16 717:20
741:5 742:7
751:16 755:3
757:9 759:18
779:11 780:6,10
780:14,15,20
781:18 792:11,13
792:14,15,16,20
792:21 793:14,18
793:25 794:9,15
796:20 797:5
798:23 799:16
800:2,9 801:5,19
801:19,21 809:2
829:24 838:13
839:15,23 841:19
841:20 842:9,20
878:6 883:10,11

**883:13,20 884:20**
886:25 887:8,13
887:14,17,19,25
888:9,16,18 889:4
889:18,25 890:10
890:21,25 891:15
891:21 892:15
893:11 894:24
900:2 901:14
908:13
**matter**  691:8
704:10,12 714:23
715:7 884:4
913:17
**matters**  716:4
792:25 868:22
**mean**  704:22
705:13 706:6
709:17 716:19
735:5 741:20
760:20,24 761:13
761:17,18 774:4
774:21 777:11
779:16 789:13
791:22 795:11,15
796:4 803:5 827:3
843:17 846:13
852:10 861:17
863:23
**means**  717:24
757:21 819:20
850:3 861:25
864:2,3
**meant**  706:4 761:2
909:13
**measure**  816:24
838:13 839:18
841:18
**measures**  782:22
809:5 816:22

**mechanics** 855:18
884:16
**mechanisms**
831:22 855:24
856:15 858:11
859:14 880:19
882:3
**media** 691:5 752:7
752:19,23 802:13
802:17 845:15,20
903:16,21 911:13
**meet** 884:14
**meeting** 695:20
888:6
**meetings** 854:18
854:21
**meets** 815:15
**mei** 713:23 872:15
**member** 775:10
**members** 778:5
782:12
**memo** 894:7
**memoranda**
893:16,17 894:2,4
894:5,6,7 895:3,7
895:22 896:13,21
897:3,5,10
**memorandum**
883:17 884:19
885:9 894:14
**memorialized**
832:21
**memories** 843:16
**memorization**
779:24
**memorize** 740:22
743:14 755:16
763:16 779:22
892:8,23 895:11
901:3

**memorized** 754:25
792:7 888:5
900:24
**memorizing** 901:9
**memory** 737:25
738:7 739:11
746:10 893:2
895:16
**mention** 699:18
**mentioned** 700:2
700:10 707:15
724:17 735:22
764:18 790:9
792:2 816:23
830:6 831:6 839:4
840:23 849:24
850:15 853:18
868:15 875:15
880:2 881:11
883:9 887:15
905:4
**mentioning**
847:13
**merit** 856:7
**mess** 694:8
**message** 794:14
796:16
**method** 828:2
**methodologies**
890:8
**methodology**
827:8
**methods** 830:15
859:4 860:6 861:7
880:7
**metrics** 783:24
**microsoft** 868:21
869:5
**middle** 747:2
858:2

**million** 722:6
723:5,11,20
885:17
**mind** 705:2 710:5
763:22 780:24
781:2,4,9,17
789:24 793:14,21
796:23 826:5
845:6 859:19
861:12 886:9
**mindful** 693:12
**minimal** 819:10
**minor** 776:12,17
**minute** 733:15
816:22
**minutes** 695:24
710:24 713:13
744:22 747:11
748:2 749:10,11
753:23 802:8,11
903:14
**misappropriate**
737:9,20 779:10
791:16 891:19
895:2 897:17
**misappropriated**
728:21 729:17
731:3,14,24 732:8
733:4 734:23
735:13 736:17
738:4,13,22 739:9
739:21 740:6,15
741:8,24 742:4,18
743:19 744:23
745:9,20 746:3
747:15 748:10
754:14,20 755:11
759:20 760:8,15
760:24 762:6,13
762:17 763:2,10
764:14,22 779:18

780:4,8,17 781:19
802:24 812:6
839:23 846:23
889:14,15,24
890:21 891:14
892:14 893:10
895:7,21 896:21
897:23 898:3,8,10
899:16 900:15
902:24 903:2
904:17 905:12
907:7,16 908:4,21
**misappropriating**
760:19,21 832:13
889:4 896:12
898:16 901:6
**misappropriation**
717:9,18 718:15
718:25 719:6,12
719:24 720:14,24
721:17 722:2
723:24 729:3
892:5 901:17
903:6 906:17
**misappropriations**
720:8
**misheard** 765:19
909:11
**misrepresent**
738:6
**missed** 721:8
737:6 780:11
**missing** 882:6,7
**misstatement**
693:16 728:14
739:23 748:13
**misstatements**
741:16 742:20
**misstates** 695:2
**misstating** 711:6
732:2 899:23

**misunderstood**
909:10
**moment** 833:13
844:9
**moments** 755:21
**money** 793:11
882:12
**monica** 688:14
**monitoring** 830:16
**month** 887:24
**monthly** 777:8,9
777:16
**months** 786:17
835:19,20
**monticciolo**
687:17 689:4,7
691:1,6 692:1,19
693:1,21,24 694:1
694:10 695:1
696:1,10 697:1,5
698:1 699:1 700:1
701:1,4 702:1
703:1,17 704:1
705:1,13,17 706:1
707:1 708:1,23
709:1,5 710:1
711:1,17 712:1,8
713:1 714:1,18
715:1 716:1,7
717:1 718:1 719:1
720:1 721:1 722:1
722:8 723:1 724:1
725:1,7,21 726:1
727:1,4,10,24
728:1,9,19 729:1
730:1 731:1 732:1
732:25 733:1
734:1 735:1,24
736:1 737:1 738:1
738:18 739:1,6,16
740:1 741:1,2,4,17

742:1,12 743:1,16
744:1,11 745:1
746:1,2 747:1
748:1,23 749:1
750:1,7 751:1
752:1 753:1 754:1
754:16 755:1
756:1,6 757:1
758:1,3,25 759:1
760:1,5 761:1
762:1 763:1 764:1
765:1 766:1 767:1
768:1 769:1 770:1
771:1,11 772:1,19
773:1 774:1 775:1
776:1 777:1 778:1
779:1 780:1 781:1
782:1 783:1 784:1
785:1 786:1 787:1
788:1 789:1 790:1
791:1 792:1 793:1
794:1 795:1,24
796:1 797:1 798:1
799:1 800:1 801:1
802:1,21 803:1
804:1 805:1 806:1
807:1 808:1 809:1
810:1 811:1 812:1
813:1 814:1 815:1
816:1 817:1 818:1
819:1 820:1 821:1
821:16 822:1,23
823:1 824:1 825:1
826:1,2 827:1
828:1 829:1 830:1
831:1 832:1 833:1
834:1 835:1 836:1
837:1 838:1 839:1
840:1 841:1 842:1
843:1 844:1 845:1
845:24 846:1

847:1 848:1 849:1
850:1 851:1,14
852:1 853:1 854:1
855:1 856:1 857:1
857:10 858:1
859:1 860:1 861:1
862:1 863:1 864:1
865:1 866:1 867:1
868:1 869:1 870:1
870:8 871:1 872:1
873:1 874:1 875:1
876:1,18 877:1
878:1 879:1 880:1
881:1 882:1 883:1
884:1 885:1 886:1
887:1 888:1 889:1
889:12 890:1,14
891:1,24 892:1
893:1,6 894:1
895:1 896:1 897:1
898:1 899:1 900:1
901:1,16 902:1
903:1 904:1,2
905:1 906:1 907:1
908:1 909:1 910:1
911:1,12 912:7,15
913:5 914:4
**monticciolo's**
821:24
**morning** 691:2
692:6,19 756:18
**mouth** 769:7
**move** 713:18
742:11 760:12
836:19 846:8
**moves** 816:11
**multiple** 707:7
761:5,7 765:6,6
774:8 783:9

**n**

**n** 688:2 689:2
690:2 692:14
714:4 787:13,13
825:22 912:2,2
**name** 691:15
714:5,6,13 737:11
737:13,15 760:11
773:8 777:23
778:15,22,25
887:9 904:5 914:3
914:4
**names** 700:14
707:25 768:5
777:5,18 794:16
794:18 831:14,17
831:20 881:16
**narrow** 715:5,9
815:17
**nature** 777:7
**nda** 800:21 801:8
801:12,22 841:16
842:13,14 843:3
845:2
**ndas** 809:4,9 842:8
842:11,21
**near** 828:22 837:3
**nearly** 805:23
**necessarily** 792:15
847:9
**necessary** 705:20
715:5,6,8 736:8
754:5 821:20
**necessitated**
886:18
**need** 696:8 702:13
703:4 707:8
709:14,18 732:16
744:17 749:9
750:3 757:19
766:5 771:8

774:25 775:2,5
779:24 841:3
854:19 859:2
874:8 875:15
903:10 910:16
**needed** 758:5
775:12 823:7
**needs** 747:17,19
805:22 845:5
884:15
**neil** 688:20
**neither** 847:14
**network** 766:12
766:24,25 767:12
803:8 812:12
830:4 832:22
859:9 870:12
**never** 789:3 791:2
791:3 802:10
806:11 825:16
836:25
**new** 687:3,19,19
688:5,5,12,12
691:11,14,14,16
691:18 786:6,11
786:14,18 806:17
806:17,18,21
827:11 847:17
867:3 885:17
886:2,15,16
911:14
**news** 827:20
**nice** 692:19 798:7
**niches** 883:7
**night** 756:18 788:6
788:16,21
**nightly** 787:22
**no's** 818:7
**nominal** 819:10
**nonregulatory**
793:12

**normyle** 688:14
**notary** 687:18
692:16 912:20
914:24
**note** 696:6 710:23
713:11 728:7
740:23 745:17
753:2
**noted** 728:17
734:10 759:24
764:10 911:16
**notes** 697:20,24
698:4 722:11,13
723:12,16 724:5
724:11,21 725:11
728:2,11 739:16
739:17,19 740:3,4
740:4,12,20 742:2
742:2,8,9 743:6,8
744:10 745:3,15
745:21 747:19
748:5,6,22 749:13
749:17 750:8,18
751:11,23 753:5
753:22 755:7,20
756:8,13,16,17,22
757:2,12 759:2,8
759:13 760:6
892:11 895:17
907:18 908:7,8,24
908:25
**notice** 696:20
738:20 838:12
**noticing** 692:5
**noting** 741:9
**november** 687:12
691:4 692:24
694:20,21 698:25
713:21 756:3,4
893:19 909:16
912:10 913:6,20

914:3
**number** 691:11
718:4 729:24,25
730:4,9,18 731:6
731:18 752:7,19
752:23 759:25
779:20 799:3,10
802:13,17 805:18
809:4 811:10
813:9 829:18
845:15,20 852:9
903:16,21 904:4,7
904:18,21 905:10
905:25 906:6
910:16 911:13
**numbers** 716:11
758:21 777:20
**numerous** 706:23
836:18 860:18,25
862:8

**o**

**o** 690:2 692:14,14
692:14,14 825:22
912:2
**oath** 690:17
691:20 807:22
912:9
**object** 693:5 694:5
694:13,25 696:13
699:11 702:9
703:11,13,23
706:8 710:6 711:5
712:18 713:16
715:11 721:18
728:13,14 731:25
732:9 733:6 734:7
734:8 736:19
738:14 739:22
741:15 742:19
748:12 754:21
758:19,22 764:4

770:18 771:20
799:7 820:2
899:22,23
**objection** 696:16
696:17 702:5,12
702:14,16,18,21
703:8,9 704:8
705:19 710:19
728:16 754:21
**objections** 690:10
692:2 693:10,20
694:7 698:15
703:6 705:18
734:10 900:20
**obligations** 808:19
**observed** 898:16
**observing** 885:21
**obviously** 747:23
767:9 782:23
784:9 785:24
803:17 804:3
808:6 812:21
813:13 824:7
833:3 847:20
859:2 860:5
**occupy** 786:15
**occur** 880:4,4
**october** 692:23,23
694:19 909:15
**odd** 902:11
**offense** 733:8
**offensive** 734:8
**offer** 884:14
907:15
**offering** 805:13
806:18 883:10,16
883:19,20 884:18
884:20,23 885:9
886:25 887:7,13
887:19,24 888:8
888:16 889:4,17

889:25 890:21
891:15 892:14
893:11
**offhand** 764:23
**office** 700:9 708:3
708:14 784:24
785:7 786:6,11,18
786:20 787:6
**officer** 690:16
713:23 768:9
778:9
**offices** 786:4,5,16
786:24 787:19,21
788:6,7,15,21
**offshore** 707:9
828:14 847:18
885:2
**oh** 698:8 737:6
851:10 867:3
896:7
**oil** 836:23
**okay** 698:8 722:19
724:5 728:5
731:19 735:12
745:10 755:17
772:5,10 775:7
801:16 829:7
830:8,8 831:24
846:17 851:10
883:9 889:22
900:22 905:9
909:21
**once** 748:25
768:23
**ones** 704:24 708:8
758:14,16 760:3
760:11 762:11
763:17 764:22
765:15 770:20
776:5,6 780:24
840:8 846:4,15

874:4 893:22
900:3
**onshore** 707:9
828:13,15,18
884:25
**open** 766:25 767:2
791:6 805:20
**opened** 791:2,3
**operate** 846:20
847:3 848:9,15,15
850:8 855:4 884:9
**operated** 854:9
**operates** 818:5
850:21,23 874:3
874:14
**operating** 706:22
849:19
**operation** 855:13
**operational** 860:3
**operations** 854:15
890:7
**opinion** 720:5
828:25 829:2,5,5,7
**opinions** 812:15
828:25
**opportunity** 749:2
**opposed** 742:7
869:7
**order** 767:17
783:10 784:5
835:7,7 850:7
854:19
**ordinary** 701:14
**organized** 757:4
**originally** 875:10
**originate** 855:23
856:14,23 858:10
880:9,18 881:12
882:2
**originated** 782:20
857:2,3

**originating** 882:10
**origination** 866:25
879:25,25 881:13
881:21 882:13
894:17,19
**originations** 880:3
**originator** 894:20
**outcome** 691:22
824:7 836:24
870:2 913:17
**outcomes** 830:13
830:17 859:25
**outlined** 897:11
**outset** 693:9
**outside** 775:14
804:9,11 808:7,21
811:14 812:23,24
812:25 816:2
817:2,4 820:14,20
825:11 852:13
855:20
**overlap** 846:6,10
856:6 893:23
**overlaps** 875:6
**overlooked** 790:10
**owned** 734:13
857:5
**owners** 734:25
735:2
**ownership** 734:24
857:4 879:16
**owning** 880:24
**owns** 734:16,22

**p**

**p** 688:2,2 690:2
**p.m.** 802:14,18
845:16,21 903:18
903:22 911:10,16
**package** 883:16
884:7

**pads** 751:14
**page** 689:3,7 698:5
698:7,9 730:11
758:5,6 763:23
897:15 914:5
**pages** 723:12,17
723:18 724:19,21
725:2,11,19 726:9
750:7,11,16
751:10,11 754:3,7
757:17 758:10,12
**paid** 716:11
818:15
**paper** 723:8
730:18 743:15
753:16
**paperwork** 723:6
**paragraph** 720:19
889:22 890:13,15
896:17,18 900:21
901:5 904:15,20
904:23 905:9,11
905:20,25 906:3
**paragraphs**
720:17,17,18
759:23 890:2,3
896:2 905:10
**parcel** 848:5
849:11
**part** 693:22
718:22 720:15
721:8 724:3 737:7
746:16 784:3
818:20 847:10,22
848:4 849:10
850:2 870:19
875:12 880:12
**participants**
835:14 836:25
**participate** 851:2

participating
  827:15 830:25
particular  703:10
  704:20 706:19
  778:13 784:9
  799:14 806:15
  811:15 827:16
  833:19 900:10
particularly
  709:24 733:17
  770:8 872:20
parties  690:6
  798:20 801:16
  865:16,18,21,24
  866:4,4 875:5
  913:15
partner  765:17
  766:4 769:2 770:5
  770:21 771:7,9,13
  772:3,5 773:21
  774:10,14,20,24
  775:3 779:5
  789:10 790:5
  854:10 855:12
  863:21,22 864:3
partners  772:6
  790:11 817:3
partnership
  706:16 804:4
  805:14 883:17
  884:12
partnerships
  806:18
parts  757:8 766:16
  819:9
party  691:20
  796:18 830:24
  835:15 862:2
  913:10
party's  839:12

password  767:7
  769:12,19,21
  770:16 790:13,23
  870:17,24
passwords  769:17
  870:23 871:18
patents  838:7
paul  687:4 688:7
  691:8 854:23
  860:21
pause  715:17
pay  828:7
paying  732:17
  827:22
payment  805:12
  860:23
pdf  792:4
pen  751:14
pending  747:2
people  697:12,16
  698:18 699:21,23
  699:25 708:4
  714:8 715:8
  724:17 761:19,21
  764:19 767:6,24
  768:12,19 772:14
  772:20,23,25
  773:3 777:21
  778:17 785:22
  788:15 803:10
  808:6 813:6,15,18
  815:4 833:18
  835:4 836:16,17
  837:13 840:20
  851:22 852:3,9,11
  858:3 862:22
  869:25 882:11
  894:19
people's  836:15
  843:15

perception  695:20
perform  830:12
performance
  782:16,19,21,22
  782:24 830:12
performed  782:21
period  825:6
  842:11,22 844:6
  888:3,4 910:17
permission  770:3
permitted  809:15
  810:6 814:23
person  697:18
  698:21 708:23
  761:11,13 771:8
  773:10,12 778:25
  779:3 782:13
  815:19 816:15,17
  816:25 817:21
  854:24
personal  839:7
  853:21
personally  711:15
  757:18
personnel  814:8
perspective
  716:25 792:21
pertain  828:12,13
  867:18
pertains  828:15
  829:7
phone  700:9
  777:20
phrase  801:15
physically  803:9
picturing  781:8
piece  730:18
  743:15
pieces  753:16
pitch  792:13,15,20
  792:23

place  742:15 745:4
  870:24 908:5,19
places  739:12
  740:21,22 741:5
  754:23 838:4
  882:19 890:24
  902:13
plaintiff  687:5
  688:4 691:7 692:8
plaintiff's  717:8
  721:16,25
play  848:14,17
  850:11
playing  863:18
plays  848:18
  849:25 850:12
please  692:3
  693:12 694:7
  712:13,22 716:8
  716:14 717:15
  718:11 722:4,15
  725:7,16 727:3
  730:18 732:12
  743:16 748:15
  752:2,4 787:12
  825:23
plus  699:23
  747:12 804:21
  805:21
point  699:9 718:18
  718:19 728:9
  738:24 742:15
  743:2,4 744:4
  746:9 751:21
  755:3,8 762:8,16
  764:7 771:12
  777:4 779:19
  789:14 792:6
  801:8,12,14
  814:12,20 815:6
  824:20 828:4,21

881:3 882:16
889:2,7,8,16 891:4
892:13 895:9
899:17 900:9,13
900:17 902:10,12
904:10 905:15,18
905:24
**pointed** 705:7
763:4,7 805:3
899:25 902:10
**pointing** 900:2,20
901:2 905:20
**points** 758:4,8
764:7 897:4,23
906:23
**policies** 812:14
833:4,8 860:2
867:15,18 868:4,6
868:11 871:5
876:8
**policy** 788:4,9
874:17 876:11
897:8,11 898:3,17
899:17 900:16
901:7,22 902:3,5
902:25 903:6
**politely** 747:4
**pontificate** 733:25
**portion** 757:16
818:25 819:2
**portions** 793:20
795:12
**position** 717:12,21
719:18 720:2,4,6
721:3 739:3 762:9
789:18 829:10
835:12 839:19
895:4 900:4
**possession** 697:16
785:25

**possibilities** 775:6
**possible** 778:3
838:2 861:11
**possibly** 799:21,22
**powerpoint**
780:23 781:3
793:13,19,20
794:4 796:5,7,8
797:16 798:7
801:10,24 802:2
**powerpoints**
792:12 793:9
796:2,3,19
**ppm** 883:16
884:18
**practice** 815:18
838:16 844:24
**practices** 788:18
788:20
**predominantly**
821:2
**prefer** 821:18
**prep** 798:4
**preparation** 697:3
700:16 709:3,7
711:12 712:16
714:14 724:8
730:3 731:10
770:19 771:22
906:19 907:10
**prepare** 696:24
701:21,23 707:23
708:10,17 710:17
724:14 732:13
740:4,4 742:22
798:11 844:11
874:15,19 905:2
908:15
**prepared** 695:12
695:19 705:9,12
706:2 708:24

722:11 724:5,11
725:11 732:10
739:16,17,24
740:7,13 742:23
743:24 747:6,20
749:15 753:13
756:19 757:20
762:14 763:17
798:12 835:11
872:25 888:5
892:8,21 899:6,20
900:5 901:8,11
902:12,20 904:11
904:13 906:8
908:15,16,18
910:5,25
**preparers** 808:9
841:3
**preparing** 697:10
699:17,19,24
700:15 702:3
704:5,14 708:4
713:20 764:25
855:6 898:14
**prerogative**
807:19
**present** 688:17
729:20 795:16,17
**presentable** 798:7
**presentation**
780:14,15,20,20
781:18 792:11,16
793:2,19,21 794:4
794:9 795:10,13
795:15 796:19
797:5,21 798:23
799:16 800:2,18
800:22 801:4
802:7
**presentations**
794:17 797:17,25

797:25 798:10
800:19 883:12
**presented** 698:3
781:13 816:13
**presenting** 868:19
**pretty** 746:7
798:21 806:5
833:17 835:16
850:22 883:5
**prevalent** 811:11
**prevent** 808:19
**previous** 725:23
755:14 884:3
906:11,15
**previously** 696:21
709:12,13 710:9
724:18 726:3
734:12 739:5,15
759:13 775:15
794:8 823:19
830:7 831:6,12
834:17 842:7
846:16 850:15
868:16 878:18
879:2 880:6,16
883:13,22 893:14
**primarily** 811:5
828:15 850:25
885:13 894:5
**primary** 773:20
783:10
**primer** 825:24
**principals** 794:16
794:19,22 795:5
**principle** 886:21
**principles** 837:25
**print** 785:2 788:11
**printed** 785:3,4,16
785:18,19,23
786:4 792:3

**printing** 792:2
**prior** 697:3 728:18
  738:17 783:3
  801:22 846:3
  867:7 877:20
  878:5 908:6 909:4
  909:6,12,19
**private** 802:5
  815:3 827:10
**privilege** 694:4
  703:12
**privileges** 770:6
**privy** 851:7,8,14
**probably** 709:23
  717:24 731:7
  747:10 766:21
  777:7 784:12
  800:4 804:21
  809:22 817:10
  820:6 852:12
  907:12
**problem** 747:5
  816:9 885:20
  898:20
**procedure** 859:23
  876:12,19,20,21
**procedures** 812:14
  833:5,8 855:19
  860:2 867:15
  868:4,6,12 871:5
  874:17,22,24
  875:4,5,21 876:8
  876:10,25 877:4,6
  877:8 897:11,12
  897:13
**proceeding** 692:3
**process** 777:22
  786:7,9 838:11
  839:10 844:5,18
  847:25 852:3,4,5
  859:23 877:16

881:6 882:13
  897:12,13
**processes** 838:25
  890:8
**processing** 830:15
**produce** 730:16
  733:12 905:22
**produced** 689:10
  722:14 736:2
  759:13 782:21
  784:14 800:14
  833:9 907:18,21
**product** 798:15
  810:17 814:14
  815:2 816:4
  818:14,16 819:18
  827:12 828:21
  843:21 845:9
  861:19 905:16,17
  905:23
**production** 758:21
**products** 838:3,6
  839:11,14 869:12
**professionalism**
  810:16
**professionals**
  796:14,18 798:14
**program** 833:19
**programs** 860:24
  865:13,14
**promise** 809:9
**proper** 737:15
  749:7
**properly** 729:19
  822:4 824:8
**propose** 810:6
**proprietary**
  814:15 815:14
  890:10
**prospective**
  796:20 799:17

800:20 801:18
  842:13 845:3
**protect** 785:23
  788:19 790:13
  816:22 843:7
  845:8 868:17
  869:13 870:5
  871:15 872:23
  873:10,19,20
  877:2 905:15
**protected** 767:8
  790:24 838:10
  839:16,24 842:8
  843:23 844:6,18
  866:9 869:18
  870:18
**protecting** 843:6
  868:23 869:11,20
  871:10 872:3
**protection** 769:12
  769:13
**protections** 870:24
**protects** 843:3
  872:8,21 873:9
**provide** 723:10
  740:7 741:2
  756:25 757:11
  758:6 841:4,6,8,15
  847:8 865:13
  892:25 907:22
  908:14
**provided** 699:9
  717:19 718:19,21
  719:17 735:20
  739:2,4,15 743:10
  744:5 755:15
  757:5 758:8
  765:10,11,13
  779:12 780:9
  809:3,4 819:9
  883:14 889:6

895:10 900:9
  901:15 908:8,25
  909:18
**provider** 860:20
  861:4 862:6,11,12
  862:18
**provides** 820:22
**providing** 719:19
  757:8
**public** 687:18
  692:16 839:8
  869:10 912:20
  914:24
**publicly** 835:13
**pull** 756:7
**punitive** 717:7,16
  718:13 721:15,24
**purport** 903:4
**purported** 728:24
  747:13
**purporting** 899:8
**purpose** 692:20
  694:16 854:6
**purposes** 702:2
  704:5,13 709:19
  751:18 756:9,14
  783:25 785:5,20
  832:12
**pursuant** 687:17
**pursue** 894:12
**pushed** 885:13
**put** 702:15 708:14
  731:8 756:18
  757:25 758:15
  769:6 850:10
  869:16 870:23
  885:13 888:19
  894:10 895:18
  906:8
**puts** 763:14

**putting**  871:17

**q**

**qualified**  798:25
799:2 800:23
801:3 868:3
**question**  690:11
693:24 694:2,6,15
694:16 695:6
696:8 699:14
701:10 703:10,19
704:3 705:11,15
705:23 706:10
708:22 709:8,9,11
709:12,22 710:3
710:11,15,20,21
711:10,17,19,21
711:21 712:5,9,19
712:21,23 713:2,5
713:6,7,9,14
714:20,22 715:6
716:8 717:25
718:3,10,11
719:10 721:19,22
721:22 724:24,25
725:6,9,15,16,18
725:20,25 726:4,9
726:12,15,18,19
726:24,25 727:3
727:22,25 728:4
728:11 732:2,18
732:24 733:11,20
734:4 735:15
736:14,16 737:2
737:16,21,24
738:11 739:2,5
740:3,10,12,16
741:11,19,20,24
741:25 743:5,17
743:17 744:19,20
744:25 745:7,16
745:18,25 746:21

747:2,9 748:9
754:22 758:20,23
758:24 759:18,21
761:20 764:5,12
771:16,21,23
772:2 776:10
777:2 780:2 784:3
786:2 789:15
793:6 795:23
798:13 799:8
816:13 820:4
821:13 822:18
823:14,17 834:7
835:11 840:2
848:22 853:3
859:5 863:11
867:3,7 868:24
872:17 877:11
886:4 889:12,13
891:5,9,12,17
892:17 893:5,8
898:22 899:9,10
899:11,12,23
900:4 901:11
907:24 909:9
**questions**  693:7
695:22 703:6,15
703:24 709:3
712:13 714:16,16
714:18,25 715:2
718:6,8 727:11
730:20 732:22
733:9 734:6 736:3
736:5,9,10,13,22
739:25 740:25
742:5 743:23
744:14 751:19
870:6 873:2
877:20 891:11
899:4 900:12
902:20 910:8

**quick**  827:5
**quickly**  909:22
**quite**  706:24 807:8
861:24

**r**

**r**  688:2 787:13
913:3
**raise**  716:14,17,18
**raising**  715:12
892:18
**randomly**  809:14
**range**  779:13
**reach**  807:2 835:7
910:12
**reached**  692:25
**reaching**  882:9
**read**  699:13
710:12 725:6,9
745:3,11,14
874:18 878:5
889:9,10 890:5
912:8
**readily**  822:15
**reading**  697:20
698:13 722:10
724:6 745:24
846:9
**real**  711:2
**realize**  866:23
867:8
**really**  709:20
726:22 795:11
851:3,4 864:18,19
910:7
**reason**  693:22
733:16 799:14
827:16 914:5
**reasonable**  746:7
**reasons**  793:10
805:18 811:11
850:8

**recall**  696:22
700:10 701:13
704:17,23 716:10
728:21,23 729:6
731:21 732:5
733:2,12 754:15
760:2,13 768:16
769:8 770:6
780:15 802:21
812:2 825:5
828:24 829:12
836:4 842:7,9
846:20 856:3
860:8 893:16
**recant**  726:5
**recap**  695:20
**receive**  752:15
812:15
**received**  717:11
719:2,14 723:3,21
801:20,22 828:9
858:15
**recess**  715:20
752:21 802:15
845:17 903:19
**recognition**
862:23
**recollection**
715:13 733:11
759:15 768:22
790:16
**recommend**
817:22 818:4,12
**recommendation**
819:17 894:11
**recommendations**
818:21 819:3,5
820:14
**recommended**
816:18 817:14,22
818:2,10 819:14

819:21,24 820:9
821:25
**record**  691:3,25
695:2,15 696:7,14
696:18 702:16
703:15 710:23
711:9 713:12
715:19,22,24
722:15,17 726:23
728:6,7,14 732:3
740:24 742:10
745:17 748:14,19
749:5 750:2,4
751:23 752:2,6,20
752:24 753:3,18
754:2,7 757:9,16
780:23 781:3,7,10
781:12,14,16
782:10,15 783:22
784:5,22 785:10
787:5 790:3,23
791:3,17,20,21,23
791:24,25 802:14
802:18 830:6,10
830:17 831:11,24
832:3,3,9,19 839:6
839:8 845:13,16
845:21 892:25
899:24 901:15
903:9,15,17,22
909:22 911:5,6,10
912:11,12 913:13
**recorded**  691:6
**records**  735:8
909:17
**recounted**  695:8
697:25
**recounting**  723:16
**recreated**  858:23
**reduced**  859:7

**reed**  688:10 700:4
707:22 708:9
709:6 710:16
711:12 712:16
724:16 725:3
**refer**  707:11 718:9
745:10 883:19
895:24 903:2
904:5
**reference**  732:13
733:14 735:17
740:19 741:4
743:6,8 744:10
748:8 750:9
759:17 760:4
785:25 889:19
896:24 898:4
**referenced**  724:20
725:12 748:23
751:11 753:22
815:11 904:23
905:4 908:7,25
**references**  734:2
742:6 753:17
779:21 783:9
791:19 890:15
892:25 906:8
**referencing**  710:4
715:10 718:5
725:2 739:14
750:21 762:15
780:6
**referred**  753:19
781:12 831:12
875:25 882:23
899:18
**referring**  700:4
704:20 707:11
760:17,19 763:6
764:15 775:3
777:5 778:5

780:21 781:25
782:11 784:18
792:12 794:5
797:8 798:24
803:13,13 804:11
807:4,25 808:5
820:18 825:8
828:11,11 829:16
829:21 832:24
837:19 838:8
847:3 856:3
860:17 861:7
883:2 890:17
893:21 894:3,5
896:5 898:23
905:19
**refers**  782:15
**refined**  824:25
**refresh**  745:15
**refreshing**  698:14
**refused**  702:20
713:15 741:2
**refuses**  728:10
**refusing**  712:25
725:20 726:8,19
726:24
**regardless**  820:5
**regards**  779:6
**registered**  783:4
834:13
**regular**  769:25
873:16,17
**regulated**  792:24
**regulations**  793:5
855:20
**regulators**  810:10
835:15,22 840:23
850:9 858:15
859:2 879:14
**regulatory**  807:10
809:21 847:25

878:8,16
**relate**  847:5 871:4
**related**  691:20
716:12 717:6
732:4 744:9
838:21 861:18
880:10 884:24
890:7 895:11
**relates**  717:10,16
718:13 747:18
814:13 826:15
827:12 828:6
**relating**  721:19
890:9
**relationship**  865:3
**relative**  804:24
**relevant**  697:17
698:17,19 705:14
708:17 714:9
715:3 717:2,5,13
717:21 720:9
721:3,11 730:2,19
735:3,4,5
**rely**  899:8
**relying**  908:3,20
**remaining**  736:13
**remark**  734:9
**remember**  703:18
705:25 714:5,13
716:2,3 735:21
739:12 825:4
857:25
**remembering**
891:22
**remembers**
843:19
**remote**  691:12
**remotely**  691:23
**removed**  792:4
**removing**  871:7

**remuneration**
707:14
**repeat** 694:15
710:9 712:20,22
713:10 719:9
722:24 738:17
744:17 823:16
**repeating** 711:18
711:20
**reporter** 691:17
699:13 710:9,12
712:22 715:14
725:6 752:11
787:11
**reporters** 725:8
**reporting** 695:15
**represent** 759:7
**representative**
696:5 704:7
716:24 738:19
739:7 741:12
744:13 747:7
807:23 821:17
888:14 891:13
892:2 898:21
899:5
**represented**
913:11
**request** 746:7
775:4,12 789:18
789:21,23 790:2
790:13 819:18
**requested** 696:4
743:24 745:13
753:7 775:8,12
**require** 707:14
800:23 801:11
886:15
**required** 788:14
801:18,20,25
842:14 878:8

**requirement**
788:10 842:17
848:2
**requirements**
788:14
**requires** 850:6
**research** 697:14
839:19
**researched** 776:3
810:18
**reservation**
910:19
**reserve** 910:14
**reserved** 690:11
**respect** 697:2
701:10 703:3
713:19 722:19,21
736:15 740:24
744:14 766:6
810:15 817:15
819:5 823:8
833:10 840:11
848:8 849:15
856:10,12 861:8
862:18 869:5
875:23 880:7,17
881:25 892:3
908:3
**respective** 690:5
843:2
**respond** 739:5
744:14
**responded** 706:10
742:6
**responding** 705:23
751:19
**response** 738:17
738:17 890:13
900:18 904:19
910:21

**responses** 698:15
703:5 705:8
735:18,25 738:25
739:4 743:11
750:24 751:3,6
755:14 763:12
888:24 900:11,19
**responsibilities**
748:21 749:3
**responsibility**
774:25 855:18
**responsible** 778:2
782:9 855:7
**responsive** 708:5
891:5,8 893:5
**rest** 854:4
**restating** 908:11
**restrict** 769:19,21
870:13,24
**restricted** 766:23
767:8 770:2,17
870:15,16
**restricting** 790:8
871:17
**restrictions** 767:4
802:4 809:2
869:16
**restroom** 802:9
**result** 718:24
719:23 723:23
819:17 821:19
830:14 862:4
**resulted** 717:17
**resulting** 717:8
718:14 721:16,25
**results** 757:3
782:23 832:4
843:22
**retained** 798:10
911:14

**return** 801:19,21
801:25 842:19
844:17
**returned** 843:8,9
843:13 844:10
845:5
**returns** 828:8
830:13 831:23
**review** 722:12
796:24 910:10
**reviewed** 697:15
791:13 842:19
888:23,24 898:12
**reviewing** 724:7
791:19 845:4
891:21
**reviews** 807:10
**revolving** 806:20
806:20
**right** 713:2 717:11
719:3 723:13
726:16 729:5
731:11,16 734:23
742:21 750:12,16
753:23,24 754:8
754:10,20 755:9
759:4 760:10
764:3,20 766:19
768:6,11 769:12
772:21 774:13
776:18 777:5
780:5,9 781:19
785:3 794:11
795:11,14 808:11
809:17 810:21
811:2,15 815:12
817:6 818:13
819:15 820:23
821:25 822:24,24
831:12 838:21
839:24 842:22

843:4,13 845:10
849:7,14,19
851:14,23 852:7
852:22 854:9
867:7 877:16
878:2 886:18
896:15 898:20
901:23 909:3
**rights**  770:6
910:19
**rigorously**  901:8
**risen**  721:8
**risk**  833:7 855:8
**role**  770:8 773:9
848:17,18 863:18
**roles**  848:13,15
849:10,25 850:22
850:24
**room**  750:8
**roughly**  761:24
767:17
**rude**  709:17 882:8
**ruhl**  688:15
**rules**  886:7
**run**  747:16 748:7
859:10 862:25
875:10 881:15

**s**

**s**  688:2 689:6
690:2,2 692:14
787:13 824:2
825:22,22 914:5
**sachs**  838:5
**salary**  716:11,22
717:10,16 718:12
719:2,13 723:21
**sales**  766:17
**salesman**  777:25
778:4
**salomon**  701:7
703:22 711:9

**salomon's**  716:8
**sat**  731:9
**save**  895:15
**saved**  733:15
**savings**  862:22
**saw**  796:24 858:5
**saying**  713:3
733:16 737:15
752:14 815:16
818:8 819:16
834:3 853:13,15
858:20 859:20
861:21,23 862:3
862:12 864:21
866:23,25 868:5
874:10 881:23
886:12,13,19
901:21 908:12
**says**  815:16 845:3
873:12
**scope**  705:18
**scott**  688:18
692:11
**scuba**  864:23
**se**  774:16 848:16
**sealing**  690:6
**searches**  697:13
**season**  823:24,25
824:2 825:22,24
826:11,21,22,24
827:6,7 828:2
**sec**  793:4
**second**  697:7
699:18 796:2
817:5 846:14
849:4 890:14
897:15
**seconds**  726:2
733:19
**secret**  760:14
762:21 793:19,22

793:23 794:5,22
795:5,11 796:6,11
803:7,15 807:4,24
809:19 811:16
812:3 814:17,20
815:14,15 818:20
819:11,15 821:12
822:22 823:20
825:14 826:2
828:25 829:2,3,21
830:9,10,18,22
832:11 834:2,4,4
849:13,18,23
853:16,16 856:11
863:4 864:14
865:5,8,11,14
866:5,13 867:13
867:20 868:6,14
869:3,6,9 870:4,9
870:11,15,21
871:2 873:7,9,19
874:16 875:19
877:9 878:20
879:4,8,10,11,21
880:15,17 892:5
901:18
**secrets**  700:20
701:11 716:13
717:9,18 718:15
718:25 719:6,12
719:24 720:8,14
720:24 721:17
722:2 723:24
728:20,25 729:16
731:4,15,23 732:7
733:3 744:15
747:14 780:16
794:10,19 795:2,7
795:14 801:15
802:23 812:19
815:5 820:17

822:10 829:14
830:14 831:10
836:5 837:19,21
837:22 840:5,11
840:13 841:13
846:22 847:4
849:7 851:5,12,13
852:25 853:14
856:4 860:9 863:7
863:9,12 866:9,20
867:11,19 868:2,7
868:13,23 869:21
871:10,15 872:4,9
872:22,23 873:11
874:24 877:13
882:22,25 883:11
893:18 904:4,16
906:21 907:16
908:4,21
**sections**  795:16
891:4,8
**secure**  841:24
866:9,20 867:11
867:19 868:2,7,13
869:4 870:14,22
**security**  866:16,24
873:5,6 874:2,13
874:17
**see**  692:20 697:4
722:8 727:2
753:20 756:11,16
756:21 759:5
767:4,7 768:16
801:16 814:21
853:8 903:8
**seeing**  726:6
905:13
**seek**  747:23
860:19
**seen**  784:21
806:11 825:7,12

825:16 837:2
**segments** 897:2,5
**segregated** 765:14
**selections** 806:15
**sell** 823:24,25
  824:2 825:21,22
  825:25 826:11,21
  826:22,25 827:6,7
  828:2 864:23
**send** 722:17 753:9
**senior** 767:22
  778:25 779:3,5
  851:22 855:12
**seniority** 778:20
  789:20
**sent** 750:18 753:4
  753:23 754:3
  758:13,16 759:2,8
**sentence** 752:17
**sentences** 698:2,5
  698:7
**separate** 729:3
  769:9,10,15
  881:14,15,16
**separately** 742:14
  834:2 890:5
**separating** 844:7
**separation** 769:13
  884:25
**september** 895:25
  896:9,15 900:19
  905:7
**series** 743:25
  859:8 870:6 893:7
**serve** 747:6
**served** 705:18
  735:25
**serves** 798:17
**service** 838:4
  839:9,10

**session** 845:18
**set** 880:21 885:8
  885:10 904:19
  913:19
**setting** 766:22
  786:13
**shaded** 798:9
**shape** 709:18
**share** 722:4
  755:19 809:15,25
  836:16 838:15
**shared** 809:6
**sharing** 808:20
**sheets** 889:7
**shelf** 869:24
**short** 702:22 707:8
  733:24 735:12
  736:15,22 737:14
  783:4 805:6,7
  910:17
**shortly** 750:5
**show** 727:7,7
  792:21 798:22
  800:18 892:13
  896:19 900:14
  901:25
**showed** 801:4
**showing** 868:18
**shown** 799:16
  800:2,9
**side** 754:2,7
  806:22 834:20
  884:15 885:19
  886:3,16
**sides** 834:15
**sign** 800:21 801:8
  801:12
**signals** 818:7
**signature** 913:21
**signed** 690:15,18
  809:8 912:17

**significant** 781:5
**signing** 882:11
**signs** 842:13,14
**silva** 713:23
  872:15,19 874:3
  910:15
**similar** 797:15
  805:17 814:23
  836:7 876:4
  886:22 887:9
  894:12
**similarly** 798:9
  815:21 816:12
**simple** 747:9
  871:12 879:23
**simply** 733:20
  871:16
**single** 703:4
  743:14 748:13
  840:16 851:17
  902:4,23
**sir** 738:6
**sit** 705:20 759:15
  760:10 761:2
  763:3 771:2
  775:11 776:7
  780:5,9 784:15
  790:4,20 791:10
  798:3 800:17
  813:5 839:25
  842:18 891:20,22
  893:13
**sitting** 727:19
  729:14,24 730:25
  731:12 738:2,11
  738:18 739:6
  741:13,22 755:9
  755:12 760:5
  762:24 807:21
  822:12 834:21
  837:17 839:21

840:3 844:14
  845:10 848:11
  849:5 858:7,13
  888:7,15 891:12
  895:22 907:5
**situated** 815:21
  816:12
**situations** 790:7
**six** 714:17 729:4
  730:21 750:10
  751:10,10 766:19
**size** 784:7 789:3
**skills** 862:24
**slide** 796:4,7,10
**slightly** 864:12
**slowly** 806:12
**smith** 688:10
  700:4 707:22
  708:9 709:6
  710:17 711:12
  712:16 724:16
  725:3
**sole** 860:19 861:4
**solely** 880:13
**solomon** 688:13
  692:9,9 693:5,13
  694:13,25 696:13
  699:11 701:9
  702:5,9,13 703:13
  703:23 704:8
  706:8 710:6,19
  711:5,14,18,25
  712:18 713:16
  715:11,17,23
  721:18,21 722:16
  723:25 724:22
  725:14 726:11
  727:2,5,13,17
  728:13 731:25
  732:9 733:6 734:7
  734:11 736:19

738:14 739:22
741:15,18 742:19
742:25 746:4,18
748:12,20,22,25
749:6,20 752:3,8
752:13 753:11,14
753:24 754:9,21
758:19 764:4
770:18 771:20
784:2 799:7 812:8
820:2 821:5,14
823:4 826:4 867:4
892:16 899:9,22
903:10 909:4,8
910:9,21 911:7
**solomon's** 716:9
**solution** 876:10
**solutions** 858:5
860:20 914:2
**solved** 885:20
**somebody** 730:17
747:20 748:10
773:6 790:8,13
858:22 886:21
**sorry** 700:7 710:8
716:15 719:9
721:18 722:24
730:21 739:10
749:19 752:5
756:2 757:10
775:17 780:11
793:7 798:4
803:10 812:9
823:16 827:3
844:13 851:11
863:6,10 867:2,3,8
867:21 879:19
896:4,6
**sort** 765:12 770:3
783:21 784:4
793:9 839:19

843:10 846:8
859:7 878:23
890:25
**sorted** 746:5
**sorts** 811:17
**sound** 794:10
**sounded** 882:4
**sounds** 741:3
**source** 837:23
908:24
**sourced** 760:22
881:5
**sourcer** 881:15
**sourcing** 760:12
760:13,17,18,19
760:21,23 761:3,4
761:5,15,24 762:4
762:12,25 764:2
764:15,17,19
765:3,5,6,9,10
766:3 767:5,6,10
767:11,16,21
768:12,17,20,23
768:25 769:4
770:24 771:19
772:8,11,13,15,21
772:21,24 773:2
773:11,12,14,17
773:18,25 774:11
774:13,19 775:9
775:10,13,14,22
775:24,25 776:3,8
776:15,16,20
777:23 778:5,7,23
779:10,18 780:4
863:20,22,25
866:25 879:16
880:4 881:4,21
882:16,18,21
**southern** 687:3
691:10

**sozio** 688:21
691:15
**space** 786:7,12,14
811:12,15 830:24
835:13,13 836:23
836:24 837:4,8
838:23 882:10
**spaces** 811:24
837:14 883:4
**speak** 695:23
701:25 704:4
706:2 707:23
708:6 710:15
711:11 712:15
713:18 714:7,12
714:24 728:6
742:10 748:3
823:9,12 864:6
898:18 899:2,6,20
**speaking** 693:10
693:19 698:17
707:21
**speaks** 711:9
**special** 770:3
789:23 790:2
796:9 857:10
**specialized** 905:22
**specific** 701:13,17
705:10 714:11,19
732:10 735:16,18
736:6 741:6
742:16 745:16
760:11 762:8,15
770:6,15 771:18
773:8 778:24
779:14 780:6
788:8 795:23
806:10 824:10,23
825:4 826:19
831:5 853:25
860:23,24 864:3

864:13 865:9,12
872:17 878:11
886:6 887:20
891:11 895:11,12
896:23 900:25
902:10 904:2,14
905:2 906:7,8,23
906:23
**specifically** 693:19
701:21 704:23
730:10 735:15
740:19 743:19
750:14 755:5
770:20 790:5,21
791:18 794:13,25
796:15 799:4
819:18 835:11
839:17 855:7
865:12,13 866:23
867:16 888:20
907:8
**specificity** 776:25
**specifics** 700:11
708:15 714:15
723:5,7 788:18
845:10 855:3
878:22 900:7
**specifies** 904:13
**specify** 704:21
**spell** 787:11
**spend** 699:16
709:10 734:4
745:23 875:17
**spending** 733:19
**spent** 697:9
698:25 699:6,19
713:12 901:9
910:2
**spinley** 688:19
713:24

**spoke** 697:16,17
700:21 709:5
713:22,24,25
715:7 869:11
**spoken** 700:18
**spot** 765:12,13
**spreadsheet**
783:12,15,18,22
784:5,11 787:6
**spreadsheets**
766:13
**ss** 912:4
**stage** 800:22
801:22 880:22
**stamps** 758:13,17
759:3,5,9
**stand** 751:25
886:23
**standard** 766:5
800:25 823:24
824:3 825:19
842:5 847:12,14
**standards** 838:18
**standing** 696:17
702:11,14,18,21
703:7
**stands** 821:15
**start** 708:7 717:23
731:19 766:9
781:7 846:18
866:18 891:18
904:18
**started** 692:22
694:18 859:16
862:20
**starting** 758:3
**state** 691:23 692:3
718:16 912:4,20
**stated** 782:23
893:13

**statement** 693:6
694:14 706:9
707:19 710:7
711:6,15 713:17
728:15 733:7
734:8 757:6 820:3
904:6
**statements** 696:17
703:14,24 736:20
738:15 741:19
**states** 687:2,19
691:10 827:9
**stating** 696:14
721:2 898:5
**status** 771:13
800:24
**steal** 902:2
**stenographically**
913:9
**steps** 834:18
**stipulated** 690:4,9
690:14
**stipulation** 687:17
**stole** 901:22
**stop** 710:13 747:5
**stored** 781:11
**straightforward**
711:2 728:10
740:25 741:3
748:9 893:8
**strategies** 812:10
812:18 813:2,7,19
813:20 814:8,22
814:23,24 815:12
815:16 817:13,22
817:24 819:21,24
820:6,9,10 822:8
823:5 824:11,16
847:6,11 858:19
860:24 862:5,6,13
862:19 875:8

877:24 890:8
**strategy** 793:3
794:2 808:20
810:3 811:25
812:2,3,13,20
816:14,16,17
818:3,10,11,19,21
819:2,6,8,12
820:11,17,21,24
821:3,11,19,23,23
821:24 822:2,4,5
822:16,20,21,21
822:22 823:3,19
823:23 825:3,7,13
825:17,18,20,25
826:2,11 828:11
829:3,6,9 836:10
840:24 847:15
850:3,12,15
856:18,20 860:8
861:9,14 862:20
875:9,9,11 885:12
**stricter** 838:17
**structurally** 881:6
**structure** 706:12
802:22 803:3,3,16
803:20 804:6,15
804:23 805:8,9,11
805:15,25 806:4
807:4,25 808:4,21
809:10,15,18
810:3,6,9,14
811:13,16 828:10
832:17,20 833:20
834:2,6,16,19
836:23 843:2,11
843:19 847:5,10
848:5,14 849:9,10
853:9 854:2,5
855:22 856:7,10
856:13,23,25

857:8,9,12,13,20
858:10 859:6,12
859:13,19 863:19
878:25 879:3,8,9
879:12,22 880:15
880:17 885:7,16
**structured** 853:4
886:14
**structures** 804:8
806:25 831:4
843:22 846:19,25
847:13,23 848:9
848:11,13,23
849:6 850:2,18
851:6,20,21
852:25 853:17,20
854:16 855:3,14
855:15 858:9
859:24,24 875:11
877:23 878:11
880:9,18,22 882:2
884:14
**structuring** 890:9
**struggling** 876:17
**studied** 857:22
**studies** 897:7
**stuff** 699:24
742:13 788:12
878:9
**style** 797:11
**styles** 797:15,24
798:9
**sub** 715:2 790:8
**subdirectories**
769:24 770:14
772:7 869:18
**subdirectory**
769:22
**subfolder** 770:17
**subfolders** 772:8
870:25

**subject** 704:10,12
  714:23 715:7
  716:4
**subniche** 878:24
**subscribed** 912:17
  914:21
**subscription**
  806:13 883:18
  884:2,17 885:14
**subset** 761:19
  773:17 774:3
  779:8 856:6 871:4
**subsets** 852:8
**substance** 701:3
  704:11
**substantial** 826:16
**substantially**
  868:23
**substantive** 910:8
**subtopics** 902:12
**succeeded** 837:2
**succeeding** 759:25
**success** 793:10
  795:18 796:17
**successful** 853:20
**successfully**
  856:19
**suffered** 718:24
  719:23 723:23
  729:11
**suffice** 848:7
**sufficed** 733:15
**sufficiently** 892:21
**suggesting** 725:8
**suit** 705:8
**summaries** 897:6
  906:5
**summary** 749:22
  827:6
**supplied** 749:22
  753:17

**supply** 749:12,17
**support** 720:10
**supposed** 742:22
  787:23 788:5
  899:3,14,20
**supposedly** 741:6
**sure** 697:8,19
  699:4 700:5 701:6
  708:21 711:8
  715:23 716:19,19
  721:7 726:7 728:7
  732:16 744:19
  749:24 757:10
  758:18 762:23
  763:21 781:15
  785:21 789:12,15
  799:9 803:6
  806:10 809:5
  815:4 818:6
  820:22 822:3
  825:22 827:7
  833:17 837:6
  848:24 861:24
  867:6,22 868:11
  870:7 873:24
  877:10 880:21
  882:6,7 883:5
  889:19 896:14
  906:10 907:24
**surface** 847:25
**surprise** 797:14,18
  798:5
**surprised** 785:14
  790:22 851:18
**suspected** 848:25
**swiss** 873:13,19
**switched** 867:8
**sworn** 690:16,18
  692:15 913:7
  914:21

**syndication** 857:6
**systems** 860:23

**t**

**t** 689:6 690:2,2
  692:14 787:13
  912:2 913:3,3
**table** 748:24
  750:25
**take** 703:21
  706:24 709:14
  710:10 733:8
  745:12 748:2,16
  749:7,10,11
  750:19 752:6
  755:18 802:9,11
  816:22 833:12
  869:23 887:18,24
  890:11 903:7,15
  911:4,5,8
**taken** 687:17
  691:7 715:20
  752:21 802:15
  845:17 888:19,20
  888:21,22 903:19
  912:9 913:9
**takes** 832:5
**talk** 695:12 696:3
  701:15 702:10
  703:11 722:20
  733:25 748:8,20
  749:9 781:6,17
  792:10 795:25
  808:3 811:25
  817:4 829:11
  835:25 854:18
  855:22 859:4
  870:10 893:15
  910:24,25
**talked** 701:14
  714:20 792:12
  830:10 832:9

856:9 859:6
  860:14 869:17
  877:25 879:4
  881:4 883:23
**talking** 693:18
  705:24,24 706:21
  707:8 708:22
  727:6,8,9,18
  737:14 744:25
  745:5 749:25
  754:13 759:6
  761:21,22 764:12
  766:18 777:18
  793:8 800:20
  818:18 833:23
  852:10 859:15
  870:7,10 876:5
  877:19 881:25
  883:12 890:22,23
  901:21 905:14
**tangent** 840:3
**tanks** 864:23
**tax** 808:9 811:25
  812:2,3,10,13,15
  812:16,17,20
  813:2,7 814:8
  815:11,16 816:10
  816:14 817:5,15
  817:17,18,18,22
  817:24 818:3,9,11
  818:18,21 819:2,5
  819:11,21 820:6,9
  820:10,11,14,17
  821:11,18,23,23
  821:24 822:20,20
  823:3,19 824:6,15
  825:13,17 826:9
  826:19 828:10,24
  829:2,3,5,6,7,9
  841:2 847:6,10,14
  848:6 850:12,14

850:15 856:20
858:15 859:22
875:11
**taxation** 827:24
**taxed** 827:23
**taxes** 827:22 828:7
**team** 756:20
757:24 767:20
768:7,25 775:10
778:5 782:12
854:5 894:11
**teams** 724:17
775:14
**technical** 848:4
882:9
**technicality**
792:25
**technique** 824:4
**techniques** 824:6
**technologies** 869:3
869:8,15,15
872:11,24
**technology** 866:8
866:10,11,19,21
867:2,10,12,14,16
867:18,25 868:20
869:2,19 871:4
**teleconferences**
708:14
**telephonically**
697:18 698:21
**tell** 697:5 705:12
707:3,8 709:21
712:8,9 716:4
720:5,12,20
721:14,24 723:19
732:12 739:17
742:14 743:20,22
744:8 745:21
746:8,15 755:17
757:23 760:7

763:13 764:11
770:13 776:6,8
777:24 778:24
780:19 784:15
790:4 800:4
803:12 821:7,9
824:19,21 845:10
855:10 888:22
891:23 898:15
903:11 904:15,22
905:6,13
**telling** 709:11
733:8 736:21
749:7 886:3 892:7
898:25 906:18
**tells** 831:21 890:20
**ten** 730:13,14
744:22 766:21
802:8,11
**tend** 701:15
**term** 705:22 706:3
770:12 842:17,20
**terms** 705:17
724:19 805:10
806:14 814:13
838:14 839:6
842:25 844:9
877:22 884:13
885:10 886:6
**testified** 692:16
721:14 755:20
794:12 818:19
823:20
**testify** 696:19
742:12
**testifying** 702:4
733:2 746:25
842:7
**testimony** 695:24
697:3 705:9 726:6
728:18 741:13

770:23 777:14
786:23 789:25
807:21 816:14
817:11 833:12
834:22 845:2
846:3 849:16
885:23 890:19
892:7 906:11,15
907:15,19 908:7
908:22 909:4,7,13
909:14,19 911:11
912:8,11 913:8,8
**thank** 702:15
752:18 868:9
910:19 911:2
**thanks** 892:19
**theirs** 773:5 818:3
**theme** 869:23
**thick** 753:11
**thing** 749:25
752:12 776:11,11
848:17 849:12
864:23 870:8
872:2 873:18
875:13 876:7
882:5
**things** 696:14
698:16,23,23
699:7 701:15,19
701:20 721:7
748:8 782:17
788:23 792:8
793:15 807:6
816:4,6,8,23 822:9
822:10 830:11,23
835:10 841:22
847:20 848:2
851:22 854:19,25
855:4 856:21,22
859:10 860:13,13
860:21 862:8

869:12,22 870:2
871:4 874:6,7,11
875:17 876:14,16
876:24 877:24
878:7,16,18 884:8
884:8 893:17
904:14 910:3
**think** 692:25
693:22 694:25
701:8 705:7,17
706:13 707:12,15
709:20,21,24
710:25 711:6,23
712:10,10 715:14
719:21 721:10,10
726:15,16,17
727:2,21 730:2
732:2,16 746:13
746:16 757:13,20
762:9 768:21
769:5 772:20
776:13,16 778:7,8
782:24 784:12
792:11 794:7,18
794:21 799:15
805:23 806:11
807:12 809:18
815:17 816:16
818:7 821:4,10
840:2 841:17
843:19,24 846:2
851:5 852:6
858:23 865:10
866:5 868:13,25
869:6,9 870:3
871:12 873:8,21
874:3,19 876:4,5
877:10,17 878:25
880:12 881:22
883:19 891:4,8
900:4 902:8,15

906:9 907:11,24
908:11 909:5
910:22
**thinking** 788:5
803:10,11 837:19
**thinks** 705:20
**third** 796:18
801:16 865:16,18
865:20,24 866:3,4
904:19
**thorough** 898:13
**thought** 698:17
715:25 725:22
746:7 821:22
827:4 842:8 846:9
866:24 868:3,4
871:25 906:20,25
**thousand** 800:5
**thousands** 799:12
799:13,17
**threading** 880:11
**three** 700:14
741:21 750:15
768:12 802:17
845:15
**threshold** 701:8
**tightly** 852:2
**time** 690:11 692:3
693:9,18,23 694:9
694:23 696:11
698:24,24 699:6
699:18 702:19,22
702:22 703:4
705:15 706:25
708:15 709:10,14
709:15 710:12
715:19,22 725:8
733:19,25 734:3,3
736:12 745:12,23
749:7,9 768:10,11
768:13 773:9

777:4 782:13
787:17 799:11
804:10 807:14,16
825:6 827:12
828:4,21 830:2
836:22 846:14
858:3 863:6 873:3
875:18 881:3
885:17,18,23
886:16 895:15
909:9,23,24 910:2
910:13,17,20
911:16
**times** 702:20
741:21 746:5
836:19 871:7
894:21
**tirelessly** 905:21
**title** 782:14 797:9
848:19
**titles** 767:25
**today** 693:3 702:4
704:7 729:14,24
730:25 731:12
738:2,11,18 739:6
741:13,22 744:13
749:4 755:9,12
756:9,13 760:5
762:24 807:22
834:21 837:17
839:21 840:4
844:14 848:11
849:5 858:7,13
875:23 877:25
883:12 888:7,15
891:12 893:9
895:23 907:5
908:5 909:8,10,19
910:20
**today's** 692:20
694:11,17 696:25

708:11 728:2,12
750:9 751:12,19
911:10,11
**told** 739:10 835:22
899:19
**tool** 869:19,21
875:16
**tools** 868:21 870:3
871:11
**topic** 695:21 696:9
700:19,20 705:14
716:22 717:6,14
717:20 730:20
732:4 741:14
743:4,23 744:9,18
745:6,13 746:6,8,9
746:9,12,15,16,17
747:18 749:13,14
754:9 777:19
819:19 839:2
844:13 883:25
892:3 895:12
**topics** 695:13
696:4,20 698:13
700:24 701:5,12
701:13 702:3
704:6 706:2
714:10,17,19,21
714:23 715:2,4
716:10 717:3,4
729:6 730:18,21
732:11 734:2
738:19 743:25
744:3,16,17
745:10,11,13,24
747:11,13 750:16
757:13 867:8
889:7 902:11,20
908:24 909:14
910:16

**total** 699:6,16
722:20 729:9
799:24 911:13
**totality** 755:20
756:8,12 908:9
**touched** 883:25
884:3
**tough** 732:23
**track** 701:17
780:23 781:2,7,9
781:12,14,16
782:10,15 783:21
784:4,22 785:10
787:5 790:3,23
791:3,17,20,21,23
791:24,25 830:6,9
830:17 831:11,24
832:3,3,9,19 839:6
871:21
**trade** 700:20
701:11 716:13
717:9,18 718:15
718:25 719:6,12
719:24 720:8,14
720:24 721:17
722:2 723:24
728:19,24 729:16
731:4,15,22 732:7
733:3 744:15
747:14 760:14
762:21 780:16
793:19,21,23
794:5,10,19,22
795:2,5,7,10,13
796:6,11 801:15
802:23 803:7,15
807:4,24 811:15
812:3,18 814:17
814:19 815:5,14
815:15 818:20
819:11,15 820:17

821:12 822:10,22
823:20 825:13
826:2 828:25
829:2,3,13,21
830:9,10,14,21
831:9 832:11
834:2,3,4 836:5
837:18,21,21
840:5,10,13
841:13 846:22
847:4 849:7,13,17
849:23 851:5,12
851:13 852:25
853:13,16,16
856:4,11 860:9
863:4,7,9,12
864:14 865:4,7,11
865:14 866:5,9,13
866:19 867:10,13
867:19,20 868:2,5
868:7,12,14,23
869:3,6,9,20 870:4
870:9,11,15,21
871:2,10,15 872:4
872:8,22,23 873:6
873:9,10,18
874:16,24 875:19
877:9,12 878:20
879:4,8,10,11,21
880:15,17 882:22
882:25 883:10
892:5 893:17
901:17 904:3,16
906:21 907:16
908:4,21
**trademark**  838:4
838:10,20 839:6,7
**trademarking**
838:23 839:4
**trading**  839:13

**trained**  793:7
**training**  788:11
**transacting**
882:12
**transaction**
783:24 835:3
842:23 882:12
894:10,13 897:6,7
897:12,13 906:5
**transactions**
783:23 833:4
880:23 897:10
906:6,7
**transcribed**
913:10
**transcript**  891:3
910:10 912:8,10
913:12
**transcripts**  874:18
**transforms**  865:11
**transition**  832:2
**treat**  815:7
**treating**  703:3
**treatment**  829:6
**tremendous**
805:19
**trial**  690:12
**tried**  789:13
894:21
**tries**  827:17
**trip**  793:4
**trouble**  693:22
**true**  771:3 876:16
912:11,13 913:12
**trust**  841:25 842:3
898:13
**truth**  712:8,9
**truthful**  736:4
738:10,16
**truthfully**  707:3
712:14 725:10

732:18,22 733:10
889:12
**try**  694:7 702:21
702:22 732:5
785:2 793:5
871:15 895:12
**trying**  709:15
713:13 733:23
736:11 744:21
761:20 771:10
840:15 855:11
861:19 872:4
874:10 876:4,18
877:3 895:14
906:14
**turning**  837:12
861:3
**twice**  827:23
**two**  695:24 699:8
700:13,21 701:19
708:25 714:7
718:4 723:14,17
723:18 724:19,20
725:2,11,19 726:9
740:24 741:25
750:11,13 751:14
752:23 756:24
768:11,18 769:20
778:10 781:2,4,6
802:13 807:6
830:23 842:21
843:3,5 844:6,19
849:25 904:14
908:6
**type**  780:19
795:18 831:19
858:9 861:18
885:19
**types**  783:23 784:6
805:12 806:23
831:5 860:20

**typical**  806:11
**typically**  807:7
812:13 842:21
854:22 883:15,19
894:10

|  u  |

**u**  690:2 692:14
**ultimate**  778:21
**unable**  694:20
823:15 902:23
**uncertainty**
837:25 858:22
886:21
**underlying**  834:5
836:9 875:24
906:20
**understand**
695:16 697:20
699:4,15 701:4
706:4 712:21
716:20,21 747:18
753:6 757:11
758:2 761:21
770:9 786:13
789:12,17 795:12
806:7 810:20
814:18 815:19
818:8,11 819:20
820:3 826:12,24
831:8 834:7
838:19 863:10
868:8 871:25
872:4 874:9
876:18 877:16
878:14 881:22
891:7,25 899:13
899:14 901:16,20
906:15 907:25
908:2
**understandable**
834:9

**understanding**
693:4,25 694:11
694:24 695:5,9,11
695:18 696:2
708:22 731:11
759:12 794:3
809:7,11,14
817:12,21 819:22
832:24 876:2
890:16 897:20,21
900:6
**understands** 810:5
**understood**
789:15 807:11
875:20
**undertake** 813:23
**underwriting**
833:5,12,14,21
882:16,21
**underwritten**
881:5
**unfortunately**
708:2 779:22
836:19 880:10
**unique** 707:13,18
795:19,22 797:21
798:14,15 804:22
805:2,8,15 806:24
807:19 819:19
821:4 830:20
831:5 833:13
834:5,6,12,18,24
835:15 836:9,10
836:13,23 837:11
838:6 839:12
840:18 849:12,17
850:9 852:24
853:14 855:14
858:16,17 861:4
862:4 865:4
866:21 867:12

868:13,25 870:4
872:5,8,20 873:10
873:25 874:12
875:3,10,24
876:11,19,24
877:2,9,11,12,14
877:15,16,18,19
877:23,24 878:10
878:15,18 879:11
879:14,17,21
880:12 885:7,16
886:20,24
**uniquely** 834:14
**uniqueness** 807:11
848:5 862:23
874:16 875:13
878:4 884:2
**unit** 691:5 752:7
752:19,23 802:13
802:17 845:15,20
903:16,21
**united** 687:2 691:9
827:9
**units** 911:13
**unprepared**
695:23 745:18
**unrealistic** 900:23
**unreasonably**
749:14
**unsuccessfully**
861:20
**update** 777:14,15
**updated** 776:21,24
776:25
**updating** 777:19
777:20,20
**uphold** 843:25
**upmost** 898:12
**usage** 853:5,16
**use** 700:13 707:18
708:2,13 744:10

749:6 783:25
788:18 792:23
797:23 801:15
802:9 810:13
816:7,7 817:2,23
819:23 820:6,8
823:24 824:3,12
824:12 830:15
833:20 836:15
839:9 845:9 848:2
849:25 850:20
856:13,16,22,25
860:25 865:16,18
866:12 867:14,19
868:4,6,12,19,21
868:22,25 869:15
870:3 871:6,12
872:10 873:14,16
880:20
**useful** 709:21,25
**users** 769:19,22
774:18
**uses** 797:15,24
820:12 826:3
837:18 840:5
855:23,25 858:10
858:12 859:5
860:6 861:7
867:10 873:14
880:18
**usually** 838:17
**utilize** 764:19

**v**

**v** 714:4 914:3
**vague** 864:17
**vaguely** 903:2
**van** 714:4,12,24
**variance** 885:12
**variant** 885:18
**varied** 768:12

**varies** 761:10
**variety** 805:23
**various** 722:6
762:18 769:5
804:8 805:22
814:3 837:9
846:18 848:8,23
849:6 850:18
851:20 854:15
855:14,24,24
856:14,15 858:11
859:13 860:22
869:25 870:25
875:11,24 880:19
882:3 884:15
886:8 887:15
908:13
**vary** 776:16
**vast** 851:18 871:13
**vaults** 873:13,20
**vehicle** 806:17
834:16
**vehicles** 855:25
856:15 858:11
859:14 880:19
882:3 886:8
**veritext** 691:16,18
911:14 914:2
**version** 791:21,22
791:24
**versus** 691:8 698:2
757:20 789:22
806:8 826:25
833:15 844:8
904:5
**viable** 853:20
**video** 691:5
727:16
**videographer**
688:21 691:2,16
715:16,18,21

748:16 750:4
751:25 752:5,11
752:17,18,22
802:12,16 845:14
845:19 903:11,13
903:20 911:4,9
**videos** 910:10
**view** 719:8,15
726:4 727:20
734:22 742:22
767:23 788:13,20
793:23 794:9
795:3,4 804:24
806:2 811:7,9,18
815:15 816:15
833:16 841:12,23
848:24 864:14
867:20 876:24
877:3 878:20
898:9 910:2 911:2
911:7
**views** 798:18
**vint** 713:23 872:15
872:19 874:3
910:15
**violating** 793:13
**violation** 838:14
**virtual** 687:15
691:13
**virtually** 807:14
807:16
**viscerally** 874:20
**voice** 715:12
716:14,17,18
892:18
**volumes** 892:10
**voluminous**
732:14 735:22
737:24 739:13
740:21 743:12
763:19 779:20

887:22 891:20
895:12 900:6
906:6 907:2

**w**

**w** 912:2
**waiting** 802:10
**waived** 690:7
**walk** 693:15
**walked** 692:25
694:22
**walsh** 714:6,14,24
**want** 694:3 695:7
695:13 699:4,15
701:4 702:13,17
703:2,2,9 705:15
705:16,23 706:3
707:9 709:4 712:5
726:22 729:23
732:14 733:25
734:2 738:5,6
740:20 742:13,15
743:12 744:12,24
745:23 746:20
748:14 749:10,12
749:16 752:8,10
753:15 755:8
757:10 762:22
764:12,14 769:6
778:7 779:25,25
781:15 789:12,20
793:4,11 801:9
802:10 818:17
821:5 823:8 824:7
826:24 846:11,12
867:4,22 870:7,9
882:5 886:16
889:10,11 891:6
892:6,12 893:6
896:14 900:13
908:2,17,18
910:24

**wanted** 697:7
700:19 848:22
910:14
**wanting** 874:9
**wants** 741:4
742:12 743:2
864:8 885:24,25
**waste** 725:7,25
**wasted** 709:15
**watched** 827:20
**way** 697:24 706:5
707:13 709:17
712:7 737:16
742:6 747:21
749:19 765:22
769:8 771:5,17
783:7 792:4 811:4
815:18 827:4
828:23 830:18
835:5,9,16 836:12
837:11 839:22
844:15,22 850:4
856:19 864:15
868:25 870:13,23
872:6,8,21 873:10
873:19,25 874:13
876:19,21 877:5
879:18 881:7
882:22 883:8
886:14,20 892:17
**ways** 781:13
805:23 855:24
856:14 858:4
871:12,14 881:10
881:11
**we've** 724:4
737:21 763:7
782:20 786:17
791:12 793:24
796:14 797:6
799:10,20 807:6

810:17 816:23
826:18 829:23
830:2 833:8
836:20 846:16
850:10,10,10
860:13 879:13
886:10 888:10
902:13 908:12
**weak** 892:9
**weave** 869:22
**weaved** 856:20
**weaving** 869:25
**week** 756:19,24
**weeks** 700:22
701:19 709:2
818:19
**weiss** 688:18
692:11,11,11,12
**welcome** 845:24
886:16
**whatsoever**
825:15
**whereof** 913:19
**wide** 878:7
**window** 699:18
**withdrawn** 734:20
765:8 801:17
**withheld** 749:23
**withholding** 828:8
**witness** 687:16
689:3 692:10,15
694:4 696:7 703:3
703:7,25 711:15
713:14 716:2
721:23 727:12,21
746:4,20,23,25
747:5,17 748:4,6
748:20 749:4,9
753:3,5,9 758:23
821:10 902:9
908:23 910:6

913:7,13,19
**word** 717:24
766:13,16 778:9
780:11 792:17,23
803:5 825:21
850:20 910:23
**words** 757:19
769:6
**work** 746:6 748:11
807:9 810:15,16
813:21 814:10,14
814:24 815:2,4,20
815:25 816:4,12
816:19 818:14,16
819:18 830:24
837:8 843:21
845:9 854:20
864:7 865:10
892:24 905:16,17
905:22 910:9
**working** 698:19
708:4 767:24,25
774:23 798:20
815:23 827:10
864:15 865:6,12
905:21
**works** 713:25
815:20
**world** 858:21
882:14
**worry** 712:11
**worst** 777:10,11
**worthy** 798:15
**wrapped** 830:9
**write** 698:6 757:21
757:22,23 758:6
**writing** 697:4,6
898:6
**written** 812:11
859:7

**wrong** 822:2 893:2
**wrote** 697:21
698:4,8 878:12

| x |
|---|

**x** 687:3,10 689:2,6
735:11 816:17,17
**xxxxx** 688:23
690:20

| y |
|---|

**y** 787:13
**yang** 688:14 759:3
759:8
**yeah** 727:17 784:8
799:9 848:20
867:6
**year** 776:23
842:21 843:5
862:16 887:24
**years** 718:21
793:25 795:17,22
797:7 798:19
799:15,20,25
804:21 805:21
813:9,10 824:24
824:25 843:3
844:6,19 857:21
886:10
**yep** 758:11 817:10
**york** 687:3,19
688:5,5,12,12
691:11,14,14,16
691:18 911:15

| z |
|---|

**zero** 877:3
**zoom** 691:13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.