# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 10

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------X
   PAUL IACOVACCI,

4
                               PLAINTIFF,

5

6        -against-          Case No.:
                            1:18-cv-08048

7

8  BREVET HOLDINGS, LLC, et al.,

9                               DEFENDANTS.
   ------------------------------------------X

10

11               DATE: October 5, 2021

12               TIME: 9:00 A.M.

13

14

15        VIDEOTAPED VIRTUAL DEPOSITION of

16  the Defendant, BREVET HOLDINGS, LLC, et

17  al., by a 30(b)(6) Witness, MARK CALLAHAN,

18  taken by the Plaintiff, pursuant to a Court

19  Order and to the Federal Rules of Civil

20  Procedure, held remotely, at all parties'

21  locations, before KARYN CHIUSANO, a Notary

22  Public of the State of New York.

23

24

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   CYRULNIK FATTARUSO, LLP
        Attorneys for the Plaintiff
 5      PAUL IACOVACCI
        55 Broadway ~ 3rd Floor
 6      New York, New York 10006
        BY: JASON CYRULNIK, ESQ.
 7          MARY KATE GEORGE, ESQ.
        jcyrulnik@cf-llp.com
 8
 9   REED SMITH, LLP
        Attorneys for the Defendants
10      BREVET HOLDINGS, LLC, et al.
        225 Fifth Avenue
11      Pittsburgh, Pennsylvania 15222
        BY: LOUIS SOLOMON, ESQ.
12      trea@reedsmith.com
13
14
15   ALSO PRESENT:
        ROBERT RUDIS, Videographer
16      IAN DUMAIN, CYRULNIK FATTARUSO, LLP
        PAUL FATTARUSO, ESQ.,
17          CYRULNIK FATTARUSO, LLP
        MONICA YANG, REED SMITH, LLP
18      MEL-LI da SILVA VINT, BREVET
        DAVID SPINLEY, BREVET
19      COLIN UNDERWOOD, ESQ., REED SMITH, LLP
        ADINA LEVINE, ESQ.
20      RUNI BEHAL, ESQ.
21
22              *         *         *
23
24
25
```

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *     *     *     *

25

Page 4

1

2          THE VIDEOGRAPHER:  Good

3     morning.  We are now going on the

4     record at 9:08 Eastern Daylight Time

5     on October 5, 2021.

6          Please note that microphones

7     are sensitive and may pick up

8     whispering and private conversations.

9     Please mute your microphone whenever

10    possible.  Audio and video recording

11    will continue to take place unless

12    all parties agree to go off the

13    record.

14          This is Media Unit 1 of the --

15    this is Media Unit 1 of the video

16    deposition taken by counsel for the

17    Plaintiff in the matter of Paul

18    Iacovacci versus Brevet Holdings,

19    LLC, et al, filed in the United

20    States District Court, Southern

21    District of New York, Case Number

22    1:18-cv-08048.

23          This deposition is being held

24    remotely.

25          My name is Robert Rudis and I

Page 5

```
 1

 2        am the videographer, the Court

 3        Reporter is Karyn Chiusano, and we

 4        represent the firm Veritext Legal

 5        Solutions, New York.

 6            I am not related to any party

 7        in this action, nor am I financially

 8        interested in the outcome.

 9            Counsel will please now state

10        their appearances and affiliations

11        for the record.

12            If there are any objections to

13        proceeding, please state them at the

14        time of your appearance, beginning

15        with the noticing attorney.

16            MR. CYRULNIK:  Good morning.

17            My name is Jason Cyrulnik from

18        from Cyrulnik Fattaruso, and I

19        represent the Plaintiff.

20            With me are several colleagues,

21        who I don't think need to make

22        appearances on the record.

23            MR. SOLOMON:  The witness is

24        here in one of Reed Smith's offices.

25            I am Lou Solomon.  With me in
```

```
                                              Page 6
 1                   MARK CALLAHAN
 2          the room is Monica Yang, and there
 3          are some other, some other attorneys
 4          that have called in.
 5                  And we are all nice and cozy
 6          here getting COVID.
 7                  So, ready when you are.
 8                  THE VIDEOGRAPHER:  Is that all
 9          of us?  I imagine that is.
10                  Will the Court Reporter please
11          swear in the witness?
12   M A R K    C A L L A H A N, called as a
13   witness, having been first duly sworn by a
14   Notary Public of the State of New York, was
15   examined and testified as follows:
16                  THE VIDEOGRAPHER:  All right.
17                  MR. CYRULNIK:  Thank you.
18   EXAMINATION BY
19   MR. CYRULNIK:
20       Q.    Good morning, Mr. Callahan.
21              My name is Jason Cyrulnik.  I
22   represent the Plaintiff in this action,
23   Paul Iacovacci.
24              Before we get started, let me
25   ask you a couple of logistics questions.
```

```
 1                    MARK CALLAHAN
 2              You're in Reed Smith's office
 3    with Mr. Solomon; is that correct?
 4        A.     That is correct.
 5        Q.     Did you have an opportunity to
 6    set up your Veritext Exhibit Share
 7    software?
 8        A.     It is, Monica Yang has set that
 9    up next to me here.
10        Q.     All right.  Well, when we
11    introduce our first exhibit, we'll test it
12    out.  I think yesterday we took a
13    deposition, there were some technical
14    issues on one of the ends, so hopefully
15    we'll all be able to set up and we'll be
16    able to do exhibits that way, if not, we'll
17    will figure out an alternate mechanism, but
18    I'm glad you were able to set it up.
19              Have you ever sat for a
20    deposition before, Mr. Callahan?
21        A.     Yes, I have.
22        Q.     Approximately, how many times
23    have you sat for deposition?
24        A.     Um, probably more than three,
25    less than six.
```

```
 1                    MARK CALLAHAN
 2       Q.    Okay.  That -- that's helpful.
 3             Were those in connection with
 4  litigations to which you were a party?
 5       A.    They were in connection to
 6  litigations for which a Brevet entity was
 7  -- was a party.
 8       Q.    Okay.  So, all of the
 9  depositions that you can recall were
10  depositions that you sat for in which you
11  were not personally named as a party, but
12  one or more of the Brevet entities were
13  named as a party?
14       A.    I believe that is true, yes.
15       Q.    Okay.  Have you ever sat for a
16  virtual deposition before?
17       A.    Yes.  I have.
18       Q.    Okay.  And when was that?
19       A.    In -- during COVID, over the
20  last year and a half.
21       Q.    And in connection with what
22  litigation was that deposition taken?
23       A.    That was in connection with a
24  litigation for a borrower of one of the,
25  um, one of the Brevet funds.
```

MARK CALLAHAN

1

2      Q.      What was the name of that

3  borrower?

4      A.      I think there were a number of

5  borrower names, but I think the main one

6  was ███████

7      Q.      And where was that litigation

8  taking place?

9      A.      I -- I -- I don't know.  I

10  don't recall whether or not that was --

11  what the court was.  I think it was in New

12  York Court.

13      Q.      Do you know if it was Federal

14  Court or State Court?

15      A.      I -- I don't recall.

16      Q.      Is that -- is that still an

17  active litigation?

18      A.      That is -- I believe that's

19  still an active litigation, yes.

20      Q.      Okay.  Is that the only time

21  that you sat for a virtual deposition?

22      A.      I believe that's the only time

23  I sat for a virtual deposition.

24      Q.      Okay.  I'll go through just a

25  new ground rules, but they'll go much more

```
                                    Page 10
 1                  MARK CALLAHAN
 2   quickly given that you sat for both
 3   depositions and virtual depositions
 4   previously.  Um, if you can't hear me or if
 5   you need me to repeat a question, you'll
 6   let me know; is that okay?
 7        A.    Yes.
 8        Q.    If I ask you a question that
 9   you don't understand, also please let me
10   know, all right?
11        A.    Yes.
12        Q.    Otherwise, I will assume that
13   you understood my question and I will wait
14   for your answer.
15              After I ask a question, Mr.
16   Solomon may state an objection for the
17   record.  Um, you should go ahead and answer
18   the question after Mr. Solomon's objection
19   unless you are specifically instructed not
20   to answer the question.
21              Do you understand that?
22        A.    Yes.
23        Q.    Okay.  And as you likely know,
24   the Court Reporter here is typing
25   everything that you are saying in order to
```

                        MARK CALLAHAN

1    generate a transcript of this deposition.

2    As a result, it's important that you

3    provide verbal responses instead of

4    non-verbal responses like nodding of your

5    head.

6                Does that make sense?

7         A.    Yes, it does.

8         Q.    And finally, if you'd like to

9    take a break at any point during this

10   deposition, please just let me know.  I

11   will generally try to finish my line of

12   questioning and schedule that break.  If

13   it's more urgent than that, you'll let me

14   know, we can break at that point in time.

15   The only caveat being that if there's a

16   question that I asked that's pending, that

17   is a question to which you have not fully

18   provided a response, I will ask you to

19   answer that question before we break, okay?

20        A.    Yes.

21        Q.    Okay.  Are you aware of any

22   reason why you would be unable to provide

23   confident testimony here today?

24        A.    No.

Page 12

```
 1                    MARK CALLAHAN
 2            MR. CYRULNIK:  I am hearing
 3         some background noise.  I don't know
 4         if it's someone who's not on mute,
 5         but I just wanted like to flag that
 6         for whoever may be off mute.
 7         Q.    Are you on any medications or
 8   do you have any medical conditions that
 9   might effect your memory?
10         A.    I am not on any medications and
11   I don't have any -- I am not on any
12   medications that would effect my memory and
13   I don't have any conditions that would
14   effect --
15            THE COURT REPORTER:  I can't
16         hear you, sir.
17            THE VIDEOGRAPHER:  You had
18         trouble hearing the witness?
19            THE COURT REPORTER:  Yes, he's
20         very low at the end, I can't really
21         hear him.
22            THE VIDEOGRAPHER:  Would it be
23         close possible to bring his mic a
24         little closer, the conference room,
25         mic, please.
```

Page 13

```
 1              MARK CALLAHAN
 2         Thank you.
 3    A.    Should I repeat that?
 4         THE COURT REPORTER:  The
 5     ending.
 6         (Whereupon, the referred to
 7     answer was read back by the
 8     Reporter.)
 9    A.    -- effect my memory.
10         MR. CYRULNIK:  Okay.
11    Q.    Because this is a remote
12 deposition, I just have a few questions
13 about your environment and your
14 surroundings.
15         I know Mr. Solomon is with you.
16         Can you describe who, if
17 anyone, is in the room aside from the two
18 of you?
19    A.    In addition to the two of us,
20 Monica Yang.
21    Q.    Okay.  And is that everyone.
22    A.    That's everybody in the room.
23    Q.    Okay.  Do you have any
24 documents related to this case in the room
25 with you?
```

```
 1                    MARK CALLAHAN
 2              MR. SOLOMON:  I brought some
 3         documents.  But as of now, the
 4         witness has them.
 5              MR. CYRULNIK:  Well, I am
 6         asking the witness.
 7         Q.    Do you have any documents
 8    related to this case in the room with you
 9    that you're aware of?  And you can now take
10    account of what your counselor just
11    testified to.
12         A.    There are documents in the
13    room.
14         Q.    Are you aware --
15         A.    Right now in front of me is
16    just a blank pad of paper.
17         Q.    Okay.  Are you aware of what
18    documents are in the room with you today?
19         A.    I am aware that there are some
20    policies and procedures for Brevet, an
21    employee handbook for Brevet and I believe
22    an LLC agreement.
23              MR. SOLOMON:  We don't have to
24         be obscure, Mr. Cyrulnik.  We have --
25         but the witness has nothing with
```

```
 1              MARK CALLAHAN
 2      respect to his personal deposition.
 3           MR. CYRULNIK:  Mr. Solomon, I
 4      think I got the answer from the
 5      witness.  I would just, at the
 6      outset, please limit your
 7      interjections to objections to form.
 8           MR. SOLOMON:  But I'm gonna
 9      finish my sentence.
10           MR. CYRULNIK:  I mean, you're
11      gonna --
12           MR. SOLOMON:  You brought some
13      documents insofar you may ask the 30
14      (b)(6) question, and so if as of when
15      you will make that clear, then we may
16      have some documents for that.
17           Thank you.
18           MR. CYRULNIK:  Thanks.  And
19      again, Mr. Solomon, just so we can
20      get off on the right foot here, I'm
21      gonna ask you to please be vigilant
22      about your obligations in this
23      deposition and not interrupt the
24      questioning.  You're allowed to
25      object to the form of a question.  If
```

Page 16

MARK CALLAHAN

1
2      something comes up related to
3      privilege, you're allowed consult the
4      witness.  But please these are
5      questions for Mr. Callahan, not for
6      you.
7           MR. SOLOMON:  I don't need your
8      advice about what I can answer and
9      what I can't.  So, I think I gave you
10     a proper answer.
11          Thank you, continue.
12          MR. CYRULNIK:  Mr. Solomon,
13     just to be clear:  You didn't give me
14     a proper answer 'cause nobody asked
15     you a question.  And if you don't
16     know that, you might need advice
17     about what you're allowed to do.
18          But I'm asking you to please
19     refrain from interrupting the
20     deposition, 'cause it's 10 minutes
21     into the deposition and we have had
22     two times you interjected for no
23     reason other than to preempt an
24     answer for the witness.
25          So, please, I know that you're

```
 1                MARK CALLAHAN
 2        anxious to get involved, please limit
 3        your objections to objection to form
 4        --
 5             MR. SOLOMON:  You know, you're
 6        misstating the record.  I'm not
 7        preempting, I'm not getting involved.
 8        I answered the question with respect
 9        to documents in the room because
10        they're under my -- my custody right
11        now.
12             MR. CYRULNIK:  Mr. Solomon,
13        nobody asked you a question.  These
14        questions are directed only to Mr.
15        Callahan.  Going forward, if there's
16        a question directed to you, it will
17        preceded by the words Lou or Mr.
18        Solomon, just for clarity.
19        Q.    So, Mr. Callahan, I think you
20   had mentioned some policies and procedures.
21             And what were the other
22   documents that you were aware that you had
23   in the room with you or your counsel had in
24   the room with him?
25        A.    I believe the employee handbook
```

```
                                      Page 18
 1                  MARK CALLAHAN
 2   and, um, some 30(b)(6) materials.
 3        Q.    Okay.  And what do you mean by
 4   30(b)(6) materials?
 5        A.    The topics related to 30(b)(6).
 6        Q.    Got it.
 7              Anything else that you're aware
 8   of?
 9        A.    Not that I'm aware of.
10        Q.    Okay.  Aside from the computer
11   in front of you, are there any electronic
12   devices in the room with you to your
13   knowledge?
14        A.    There's a computer in front of
15   me, there's a computer to the left of me,
16   which I believe is for the -- the, um, your
17   posting of exhibits.  There's another
18   computer further to the left of me, which
19   has the picture for -- for me and Lou
20   Solomon and then there is a computer in
21   front of Monica Yang.  There are cell
22   phones, three cell phones that I see in the
23   room.
24        Q.    Okay, thanks.
25              Anything else?
```

```
                                         Page 19
1                   MARK CALLAHAN
2        A.     There are phones.
3        Q.     What was that?
4        A.     There are phones.  I -- that's
5    all I can see right now.  I am not sure if
6    there's anything else.
7        Q.     Can you agree to refrain from
8    checking or using your phone to communicate
9    with anyone while we are on the record?
10       A.     Yes.
11       Q.     Okay.  You understand that you
12   are a Defendant in this action, correct?
13       A.     Yes.
14       Q.     And you're represented by the
15   Reed Smith's firm; is that right?
16       A.     Yes.  That is correct.
17       Q.     Any other firms represent you
18   in your personal capacity?
19       A.     I -- I have not gotten separate
20   counsel in my personal capacity.
21       Q.     So, just the Reed Smith firm?
22       A.     I -- I believe that's the case.
23       Q.     Okay.  And is Brevet paying the
24   fees that you are incurring from Reed
25   Smith?
```

```
                                          Page 20
 1                    MARK CALLAHAN
 2        A.      Brevet is paying the Reed Smith
 3   fees, yes.
 4        Q.      Did you speak to anyone about
 5   today's deposition?
 6        A.      I -- I spoke to Reed Smith
 7   about today's deposition.
 8        Q.      With the exception of your
 9   counsel, did you speak to anyone else about
10   today's deposition?
11        A.      Not any -- not in any detail.
12   I told my wife I was coming for a
13   deposition.
14        Q.      Okay.
15        A.      And then in terms of scheduling
16   of the deposition, I believe I spoke with
17   Mei-Li da Silva Vint in our office
18   regarding when -- when the deposition would
19   occur.
20        Q.      Okay.  Anyone else?
21        A.      I can't -- I can't recall
22   speaking to anybody else about the
23   deposition.
24        Q.      Any conversations with
25   Mr. Monticiollo about the deposition?
```

1                    MARK CALLAHAN
2          A.    I did not have any
3    conversations with Mr. Monticciolo about
4    the deposition.
5          Q.    To your knowledge, does
6    Mr. Monticciolo know that you are being
7    deposed as we speak?
8          A.    I don't know.
9          Q.    Okay.  Can you tell me which of
10   the Brevet entities is paying the
11   attorneys' fees that you referenced a
12   couple of minutes ago?
13         A.    As I sit here right now, I
14   don't know which actual entity is paying
15   those fees.
16         Q.    Who would know the answer to
17   that question?
18         A.    Our finance department.
19         Q.    And -- and who in particular
20   would you direct me to if I wanted to know
21   the answer to that question?
22         A.    Um, probably Aaron.
23         Q.    Aaron who?
24         A.    Um, I am blanking on Aaron's
25   last name.

```
                                          Page 22
 1                    MARK CALLAHAN
 2        Q.      Okay.
 3        A.      Aaron in our finance
 4   department.
 5        Q.      I thought you were just being
 6   coy.  I didn't want to call you out on a
 7   memory lapse.  That's fine, I forget
 8   people's names all the time.
 9                Aaron, in your finance
10   department.
11        A.      I believe so.  That is correct.
12        Q.      Would Aaron be the one which
13   determines which entity pays the fees or he
14   would just be aware of which entity is
15   actually having the money come out of its
16   account?
17        A.      Aaron would be aware of which
18   entity had the money coming out of the
19   account.
20        Q.      And who would be in charge of
21   deciding which Brevet entity actually paid
22   the fees?
23        A.      As I sit here right now, I
24   don't know.
25        Q.      Well, would you be involved in
```

```
                                    Page 23
 1               MARK CALLAHAN
 2   making that decision?
 3        A.    As I sit here right now, I
 4   don't believe so.
 5        Q.    Your -- your -- do you think
 6   Mr. Monticciolo is the one who decides
 7   which Brevet entity pays for what?
 8        A.    As I sit here right now, I
 9   still don't -- I don't know.  It could be a
10   number of people.
11        Q.    And it could be a number of
12   Brevet entities that are actually paying
13   for the fees incurred in connection with
14   the Defense in your personal capacity?
15        A.    As I sit here right now, I
16   believe that, yes, it can be a number of
17   entities that are paying the fees.
18        Q.    Do you know why the entity that
19   you can't identify, but that you know is a
20   Brevet entity is paying for your legal
21   bills?
22        A.    As I sit here right now, I
23   don't know why that is -- that -- the
24   specific entity is paying the legal bills.
25        Q.    Did you ask anyone to cover
```

Page 24

1                    MARK CALLAHAN
2    your legal fees?
3         A.    I -- as I sit here right now, I
4    don't believe -- I don't recall asking
5    anybody to cover my legal fees.
6         Q.    So, why do you think your legal
7    fees are being covered by some other
8    entity?
9         A.    As I sit here right now, I
10   believe legal fees are being covered
11   because I am an employee of one of those
12   entities and they member in others.
13        Q.    And as between the entities in
14   which you are a member and the entities in
15   which you are an employee or the entities
16   in which you have both, you don't know
17   which of those would be the ones that is
18   covering your attorneys fees in this
19   litigation; is that correct?
20        A.    As I sit here right now, I
21   don't know which entity is covering.  There
22   also are no entities for which I am both an
23   employee and a member.
24        Q.    All right.  Thanks for that
25   clarification.

Page 25

MARK CALLAHAN

1
2           Okay.  But you don't know
3    whether it's an entity for which you are an
4    employee or an entity for which you are a
5    member?
6        A.    As I sit here right now, I
7    don't believe it's an entity for which I am
8    a member.  But I don't know if it's an
9    employ -- if it's an entity for which I am
10   an employee.
11       Q.    Would there be another option
12   -- if you don't think it is an entity for
13   which you are a member and if it was not an
14   entity for which you are an employee, is
15   there another entity that might be covering
16   your legal fees?
17           MR. SOLOMON:  I object to the
18       form.
19       A.    Sorry.  Can you repeat the
20   question?
21       Q.    Sure, yeah.
22           I am just trying to understand
23   if I am missing a third option.  As I
24   understood your testimony, you candidly
25   testified that you didn't think that one of

```
                                              Page 26
 1                    MARK CALLAHAN
 2    the entities for which you are a member was
 3    covering the legal fees and that you
 4    weren't sure whether it was an entity for
 5    which you are an employee.  So, I am asking
 6    whether there was another entity for which
 7    you are neither an employee nor a member
 8    that might be covering your attorneys fees,
 9    to your knowledge?
10             MR. SOLOMON:  I object to the
11         form.
12         A.    I believe that there are other
13    entities for which I am neither a member or
14    an employee and one of those entities could
15    be the entity that is ultimately paying
16    this expense.  But as I said earlier, I
17    don't know which entity is paying the
18    expense.
19         Q.    I understand.
20             Can you identify the Brevet
21    entity for which you are neither an
22    employee or a member, just as an example?
23    ███      ███   █████████
24         Q.    Okay.  And if you were neither
25    an employee nor a member of a certain
```

```
 1                   MARK CALLAHAN
 2   Brevet entity, can you tell me why you
 3   think that entity might still be paying
 4   your attorneys' fees?
 5              MR. SOLOMON:  Object to form.
 6        It calls for speculation.
 7        A.    As I sit here right now, I
 8   think I've already answered that that I
 9   don't know why.
10        Q.    Okay.  But you think it's
11   possible that a Brevet entity for which you
12   were neither an employee nor a member might
13   be paying your legal fees?
14              MR. SOLOMON:  Objection.  Same.
15        A.    As I sit here right now, since
16   I don't know which entity is paying, it's
17   possible that an entity that you described
18   could be paying.
19        Q.    Understood, okay.
20              What did you do to prepare for
21   today's deposition?
22        A.    I had participated in
23   conference calls with my lawyers.
24        Q.    Okay.  Apart from conference
25   calls with lawyers, did you do anything
```

```
                                              Page 28
 1                    MARK CALLAHAN
 2  else to prepare for your deposition today?
 3        A.    I reviewed my affidavits and
 4  some of the other documentation that has
 5  been produced in this case.
 6        Q.    Okay.  Can you -- can you tell
 7  me -- we'll get to the preparation sessions
 8  with your attorneys in just a moment, but
 9  let me focus for a moment on the documents
10  that you reviewed in your testimony.
11             Apart from those documents, do
12  you recall any other documents you reviewed
13  outside of the prep sessions with your
14  lawyers?
15        A.    I recall that I reviewed some
16  of the -- some of the filings.  I don't
17  recall what they're -- what they're called,
18  some of the claimed counterclaims and that
19  sort of stuff.
20             Again, I am not a lawyer and I
21  don't recall what those are specifically
22  called.
23        Q.    Fair enough, okay.
24        A.    I reviewed some of Brevet's
25  policies and procedures.  I reviewed
```

Page 29

1                    MARK CALLAHAN
2    Brevet's employee handbook.  I reviewed
3    some e-mails.  I don't -- I don't recall
4    what else I -- what else I reviewed.
5          Q.    The e-mails that you reviewed,
6    were those all e-mails that your attorneys
7    sent to you or provided -- provided you, or
8    did you review any e-mails on your own?
9          A.    I believe I -- I reviewed
10   e-mails from my attorneys as well as on my
11   own.
12         Q.    Okay.  Focussing on the e-mails
13   that you reviewed on your own:  Can you
14   recall for me, and feel free to take a
15   moment to think about it, and I know I am
16   asking you some detailed questions, but can
17   you recall for me which e-mails you
18   reviewed on your own either by date or just
19   by general description?
20         A.    As I sit here right now, I
21   don't recall any specific e-mails that I --
22   that I reviewed on my own.
23         Q.    Okay.  Roughly how much time
24   did you spend reviewing documents on your
25   own, that is separate from counsel, to

```
                                          Page 30
 1                   MARK CALLAHAN
 2   prepare for today's deposition?
 3         A.    Um, I would -- as I sit here
 4   right now, I am just trying to count in my
 5   head, how many -- you know, it was a matter
 6   of hours.  Um, maybe it's five hours
 7   reviewing documents.
 8         Q.    Okay.  And anything else?
 9         A.    Sorry, I missed that?
10               MR. SOLOMON:  What was that?
11         Q.    That's your best estimate?
12         A.    That's my best estimate, yes.
13         Q.    For the e-mails that you
14   reviewed separate from counsel, did you
15   perform any searches in your e-mail
16   mailbox, to find those e-mails?
17         A.    I don't recall doing any
18   searches in my e-mail mailbox.
19         Q.    So -- sorry, I didn't mean to
20   cut you off.
21               Were you done?
22         A.    Yes.
23         Q.    Okay.  So, apart from e-mails
24   that were furnished to you by counsel, the
25   other e-mails that you would have reviewed
```

```
                                          Page 31
 1                    MARK CALLAHAN
 2    would have been e-mails that you were
 3    specifically pulling up by scrolling
 4    through your -- your -- your mail files and
 5    knowing what you were looking for as
 6    opposed to using a search protocol of some
 7    sort; is that right?
 8         A.    Um, I don't believe that is
 9    correct.  I -- I -- I said I did not do a
10    search of my mailbox.
11         Q.    Okay.  Thanks for that
12    clarification.
13               What -- did you do any search
14    of any kind?
15         A.    I did a search of Global Relay.
16         Q.    And what's Global Relay?
17         A.    Global Relay is the, um -- is
18    the company that we utilize, I guess the
19    service that we utilize, in order to comply
20    with SEC requirements given the fact that
21    Brevet Capital Management, one of the
22    Brevet entities is a registered investment
23    advisor, and so we are required to maintain
24    all -- all files, all materials, and that
25    includes e-mails.
```

```
                                            Page 32
 1                      MARK CALLAHAN
 2              And so, the Global Relay system
 3    is the system by which we -- we maintain
 4    all of our -- our e-mail correspondence in
 5    order to comply with those regulations.
 6         Q.    Understood.
 7              So, if you wanted to pull an
 8    e-mail, the -- the most efficient way of
 9    doing that would be to deploy searches
10    within Global Relay rather than within a
11    traditional mailbox, via Outlook or an
12    online G-mail or Yahoo or anything like
13    that, right?
14              MR. SOLOMON:  Object to form.
15         A.    I don't -- I don't know what
16    you mean by most efficient.  It would
17    really depend on -- on what you're looking
18    for.
19         Q.    Well, are there times that you
20    do search your mailbox as opposed to
21    searching Global Relay for an e-mail?
22         A.    Yes.  There are times when I
23    search my -- my Outlook e-mail inbox for
24    e-mails for documents and something I am
25    looking for.
```

                           MARK CALLAHAN

1

2          Q.     How would you go about deciding

3     whether or not you wanted to search your

4     mailbox as opposed to searching Global

5     Relay for a particular e-mail?

6          A.     As I sit here right now, I

7     would say that, you know, I probably would

8     -- would think about what the timing was of

9     an e-mail.

10         Q.     Okay.  Can you elaborate on

11    that, how would the timing impact your

12    decision?

13         A.     The -- there is a -- with

14    respect to the Outlook e-mail inbox, the

15    Outlook e-mail inbox doesn't have, um --

16    doesn't maintain all of the e-mails in

17    that -- in that inbox if it goes back for

18    an extended period of time.

19              So, for example, if you're

20    looking for e-mails from 10 years ago, that

21    would not be contained, not be found in a

22    search of your Outlook e-mail inbox.

23    Whereas if you were looking for a, um,

24    something that you had expected you

25    received a week prior, a month prior, a

1                    MARK CALLAHAN
2    year prior, um, that is something that, um,
3    perhaps future work would be more efficient
4    to use the -- the Outlook e-mail search box
5    versus going to the Global Relay system
6    which is, um, a little bit more cumbersome,
7    but more exhaustive.
8        Q.    Got it.  That's helpful
9    clarification, thank you.
10                So, I take it that the e-mails
11   that you were searching for and ultimately
12   reviewed independent of the ones that you
13   reviewed with counsel in preparation for
14   this deposition, were e-mails that predated
15   that time period that you just referenced
16   with respect to which your local Outlook,
17   um, goes back that far.
18                Is that a fair -- fair
19   deduction on my part?
20                MR. SOLOMON:  Object to the
21        form.
22        A.    I -- I believe that it's fair
23   to say that for -- looking for -- for
24   e-mails that are more than a year old, I
25   would -- it would be more likely that I

```
 1                    MARK CALLAHAN
 2   would review them on Global Relay than it
 3   was for me to review them Outlook.
 4        Q.    In connection with this case,
 5   you and the Brevet entities received many
 6   document requests, correct?
 7        A.    It -- it's my understanding
 8   that we received many document requests,
 9   that's correct.
10        Q.    Do you know what role Global
11   Relay played in the document production
12   process?
13        A.    As I sit here right now, I
14   don't know what specific role Global Relay
15   played in that process.
16        Q.    Did you give access to your
17   Global Relay over to your attorneys or did
18   you just give them access to separate
19   inboxes or other files?
20        A.    I -- I was not -- you know, as
21   I sit here right now, I don't know because
22   I was not involved in -- in the granting of
23   access for the production of that
24   information.  But it would be, um -- it's
25   highly likely that they were given reports
```

```
 1                    MARK CALLAHAN
 2   in order -- access or, you know,
 3   communicated with Global Relay.
 4        Q.    And that's highly likely
 5   because that's where most of your data from
 6   the period that you were producing
 7   documents were stored?
 8        A.    That is one of the locations
 9   that it would, you know -- as I sit here
10   right now, that's one of the locations
11   where it would be stored.
12        Q.    And just because I don't have
13   Global Relay, I want to make sure I
14   understand a little bit about the database
15   or the system.
16             The way that Brevet stores
17   data, there are documents and other
18   communications that are stored in its
19   Global Relay system that would not be found
20   anywhere else at Brevet, correct?
21        A.    As I sit here right now, I
22   don't -- I don't know what you mean by
23   documents.
24        Q.    Well --
25        A.    Global Relay is a system that
```

```
                                          Page 37
 1                  MARK CALLAHAN
 2   -- that tracks -- that -- that -- that
 3   captures all e-mails.  So, to the extent
 4   that you're saying there is a document
 5   contained within an e-mail then -- then I
 6   -- you know, I defer to our technology
 7   group to determine whether or not that
 8   would not be cap- -- that document
 9   literally would not be captured somewhere
10   else on the system.
11        Q.    And just to be clear, I
12   appreciate the clarification question:
13             When I refer to documents, I am
14   including e-mails throughout this
15   deposition or otherwise.
16             So, with that clarification:  I
17   take it you would say that there are many
18   documents that are found exclusively on the
19   Global Relay system at Brevet; is that
20   fair?
21        A.    It's my understanding that --
22   that if you're using the term "documents"
23   to -- to refer to e-mails, there -- it is
24   my understanding that there are, um,
25   e-mails that may or may not, I don't know,
```

1                    MARK CALLAHAN
2   but may be also stored on -- on Brevet's
3   system.
4              Again, that's for the
5   technology department.  I don't -- I do not
6   know whether or not a backup of Global
7   Relay is saved onto, um, the network, the
8   systems of Brevet separately.
9        Q.   So, you don't know if there is
10  a backup of the Global Relay system or you
11  do know that there us a backup, but you
12  don't know whether it's saved on Brevet's
13  systems?
14       A.   It is my understanding that
15  Global Relay itself has backups, but that's
16  separate and apart from whether or not any
17  of those backups on are Brevet's system
18  which -- which, again, I do not know that
19  answer.
20       Q.   Okay.  And did you, um -- when
21  I say "you," I am referring to Brevet.
22              Did Brevet, um, start using
23  Global Relay after it had lost a fair
24  amount of data back in the 2005 to 2008
25  time period?

Page 39

```
 1                  MARK CALLAHAN
 2            Does that ring a bell?
 3       A.    As I sit here right now, that
 4  does not ring a bell at all.
 5       Q.    When -- when do you recall
 6  starting to use Global Relay?
 7       A.    My recollection of -- of, um,
 8  starting to use Global Relay is -- as I sit
 9  here right now, is that it was, um, done in
10  conjunction with requirement to do so,
11  similar to our reg- -- registration as a
12  registered investment advisor.
13            As I sit here right now, I
14  don't know what the date of that
15  registration was, but I would imagine that
16  the adoption of Global Relay took place
17  prior to the date of registration of Brevet
18  Capital Management as a registered
19  investment advisor.
20       Q.    What's your best estimate or
21  best recollection of the year in which
22  Brevet Capital Management registered as a
23  registered investment advisor?
24       A.    As I sit here right now?  Best
25  estimate would be, you know, probably 10
```

```
                                            Page 40
 1                     MARK CALLAHAN
 2    years ago.  So, I'd say, you know, 2010 to
 3    2012, somewhere in there would be my best
 4    guess.
 5         Q.    Okay.  And if I -- just to make
 6    sure I understood your testimony a moment
 7    ago, you believe that Brevet adopted Global
 8    Relay, either shortly before or
 9    contemporaneously with its Brevet Capital
10    Management Team entity becoming a
11    registered investment advisor; is that
12    right?
13              MR. SOLOMON:  Object to form.
14         A.    As I sit here right now, I
15    believe -- I believe that -- that it was
16    required prior to.  So, I believe that it
17    was Global Relay was -- was engaged or
18    purchased, whatever phrase you want to call
19    it, prior to the, um, the date of
20    registration.  I -- I don't know whether or
21    not it was -- at the time, I think it was,
22    you know, perhaps a year or two before, but
23    I don't know.
24         Q.    Okay.  But you do recall there
25    being a period of time during which Brevet
```

```
                                             Page 41
```

1                      MARK CALLAHAN
2    operated that it didn't have an e-mail
3    backup system in place prior to Brevet
4    becoming -- one of its entities becoming a
5    registered investment advisor?
6        A.    I -- as I sit here right now, I
7    do recall there was a time where we didn't
8    have Global Relay.  However, at that point
9    in time, there were frequent back --
10   backups of what I believe were PST files to
11   each of the -- each of the, um, employees'
12   e-mails, um, were backed up, um, into those
13   PST files so that you could go back to PST
14   files to identify older e-mails.
15            I also recall that, um, there
16   were no restrictions on the amount of
17   e-mails that would be saved in your system
18   so that a search of your Outlook system
19   would identify older e-mails.
20       Q.    Got it.
21            And that changed when you --
22   when you switched over to Global Relay?
23       A.    As I sit here right now, I
24   don't know when that changed.  I do know
25   that for me, personally, there are times

Page 42

MARK CALLAHAN

1
2    when the -- the number of e-mails and the
3    size of the e-mails in my Outlook, um,
4    reaches a -- whatever Microsoft's capacity
5    is or, you know, it makes my computer slow
6    and, um, our tech department has to do
7    something to -- to free up space.
8              But -- in terms of specifics, I
9    don't have any of those.
10       Q.    Okay.  And you testified that
11   you don't recall there ever being an
12   occurrence of a loss of e-mail data at
13   Brevet since its inception?
14             MR. SOLOMON:  I object to the
15        question.
16       A.    As I sit here right now, I
17   don't recall any loss of e-mail data.
18             However, I am not sure what
19   you're -- what you're -- what you're
20   referring to.  There is never -- I don't
21   recall there ever being an instance where
22   we couldn't find an e-mail that -- that we
23   needed.
24       Q.    All right.  And do you recall
25   -- just to clarify your last answer, and I

```
                                          Page 43
 1                    MARK CALLAHAN
 2   think you did get my intended question
 3   correct, but, do you ever recall there
 4   being a point in time when somebody wanted
 5   to retrieve an e-mail from your inbox, but
 6   the e-mail was no longer available because
 7   it had unintentionally gotten deleted?
 8        A.    As I sit here right now, I
 9   don't recall any situation like that where
10   an e-mail was unintentionally deleted.  And
11   with respect to -- since we have had Global
12   Relay, I don't think that's physically
13   possible.
14        Q.    Okay.  Does Global Relay do
15   anything other than e-mail backups?  Does
16   it backup text messages or other forms of
17   communication, for example?
18        A.    As I sit here right now, I
19   don't know what else Global Relay does.
20        Q.    Is it your understanding that
21   as a registered investment advisor that all
22   Brevet entities associated with Brevet
23   Capital Management are required to use a
24   service like Global Relay in order to
25   preserve their e-mails?
```

```
                                        Page 44
 1                  MARK CALLAHAN
 2             MR. SOLOMON:   Object to the
 3        question.
 4        A.    As I sit here right now, I am
 5   not an expert in -- in what -- how broad
 6   the SEC's, um, mandate is.  However, we --
 7   we -- if we're not required to, we still
 8   do, um, maintain e-mails for all -- all
 9   Brevet entities.
10        Q.    Okay.  So, just to have an
11   abundance of caution?
12        A.    As I said, I -- as I sit here
13   right now, I don't know whether or not
14   it's -- whether or not it's out of abundane
15   of caution or whether it's required.
16        Q.    Okay.  And same question with
17   respect to non-e-mail for- -- communication
18   platforms or -- or communications; sitting
19   here today, you don't know one way or the
20   other whether or not the SEC requires
21   Brevet Capital Management, for example, to
22   keep some sort of a backup in place for
23   non-e-mail communications; is that fair?
24        A.    Yeah.  As I sit here right now,
25   again, I am not an expert in SEC
```

Page 45

1                        MARK CALLAHAN
2    requirements and -- and what exactly the
3    SEC requires or doesn't require.
4         Q.    So, you don't know one way or
5    the other?
6         A.    As I sit here right now, I
7    don't know one way or the other because I'm
8    not an expert with respect to what the SEC
9    and registered investment advisor
10   requirements are.
11        Q.    Does Brevet have a resident
12   expert on that subject matter, SEC or
13   registered advisor -- investment advisor
14   requirements?
15              Do you understand?
16        A.    As I sit here right now, my
17   understanding is that there are main -- our
18   expertise lays with outside counsel and the
19   person internally at Brevet that interfaces
20   with outside counsel would be Mel Li da
21   Silva Vint.
22        Q.    Okay.  And who's that outside
23   counsel?
24        A.    As I sit here right now, I
25   believe that the outside counsel with

Page 46

                    MARK CALLAHAN
1
2    respect to any SEC registered investment
3    advisor matters would be Curtis Mallet.
4         Q.    Okay.  And prior to Ms. Da
5    Silva Vint, did you have a resident expert
6    on SEC and registered investment advisor
7    related issues that was in-house at Brevet?
8              MR. SOLOMON:  Object to the
9          question.
10        A.    As I said before, our -- our
11   main expertise was Curtis Mallet and we
12   have had utilized Curtis Mallet I believe
13   since -- since prior to -- deciding to and
14   during the registration process as a
15   registered investment advisor.
16             I believe that I said that Mel
17   Li was a -- was the internal person who
18   interfaced with Curtis Mallet versus being
19   the internal, you know, expert, however you
20   described it.
21        Q.    Okay.  Yeah, I didn't mean to
22   imply otherwise, and if my question did,
23   thanks for the clarification.
24             But prior to Ms. Da Silva Vint
25   entering the role that you just described,

```
                                           Page 47
  1                  MARK CALLAHAN
  2   was somebody else serving the role of
  3   interface with your outside counsel at
  4   Curtis Mallet?
  5        A.    As I sit here right now, I
  6   believe that there has been a number of
  7   people over the years that have interfaced
  8   with -- with Curtis Mallet.  That could
  9   be -- you know, there's a lot of people.
 10        Q.    Was it one person at any given
 11   period?
 12        A.    As I sit here right now, I
 13   don't know because I wasn't -- wasn't the
 14   one involved as to whether or not -- at
 15   some points in time it was one and at other
 16   points in time it was more than one.
 17        Q.    Do you know who filled that
 18   role immediately prior to Ms. Da Silva
 19   Vint?
 20        A.    As I sit here right now, I
 21   don't know who fulfilled that role
 22   immediately prior to Ms. Da Silva Vint.
 23        Q.    Okay.  I think you had
 24   described for me your preparation separate
 25   from your sessions or -- or conferences
```

```
                                      Page 48
 1              MARK CALLAHAN
 2   with counsel.
 3              Can you now just summarize for
 4   me, apart from the approximately five hours
 5   that you spent reviewing documents on your
 6   own to prepare for today's deposition,
 7   roughly how much time did you spend to
 8   prepare for today's deposition in meetings
 9   with counsel?
10              MR. SOLOMON:  I object to the
11         question.
12              Go ahead.
13       A.    My -- as I sit here right now,
14   my recollection is that, um, perhaps had
15   four conference calls.
16       Q.    Okay.
17       A.    The shortest of which may have
18   been an hour and the longest of which may
19   have been three hours.
20       Q.    Okay.  Cumulatively safe to say
21   you had roughly 10 hours of prep, or is
22   that too -- too high?
23       A.    It would be -- I -- as I sit
24   here right now, without going back to my
25   calendar, I'd say 10 hours, give or take a
```

```
                                              Page 49
 1                    MARK CALLAHAN
 2    couple of hours either way.
 3         Q.    Okay.  Those four sessions,
 4    were those in person, over the phone, over
 5    a video conferencing platform?
 6         A.    Those sessions were all over,
 7    um, you know, either -- either a conference
 8    call or video call.  There were there
 9    meetings in person.
10         Q.    Okay.  And who attended each of
11    those sessions; was it the same group of
12    people or did it differ based on which
13    session we're talking about?
14         A.    You know, as I sit here right
15    now, I'm not exactly sure who was on each
16    of the calls.  I would imagine it differed.
17              The people that were on similar
18    to this, where you can't actually see
19    everybody that's on, the people that were
20    on video on probably all the calls were Lou
21    Solomon, um, Monica Yang, Collin Underwood.
22    And I believe there were some other people
23    on, but we were the ones who were doing the
24    majority of the talking.
25         Q.    Understood.
```

```
 1                   MARK CALLAHAN
 2              And apart from your -- the
 3    lawyers that you just identified and maybe
 4    some other lawyers at Reed Smith, were
 5    there any other lawyers or non-lawyers
 6    involved in those discussions that you are
 7    aware?
 8         A.    As I sit here right now, I
 9    believe that, um, Mel Li da Silva Vint
10    might have been on of the -- one or a
11    couple of those calls.  I don't believe she
12    was on all of them.
13              And I believe that David
14    Spinley was on, again, not all of them, but
15    may have been on one of the calls.
16         Q.    And who's David Spinley?
17         A.    Um, I believe David Spinley is
18    in our -- he's in our compliance legal
19    department.  He's -- I -- I don't believe
20    he's a lawyer, I think he's a paralegal or
21    something like that.
22         Q.    Okay.  And Ms. Da Silva Vint,
23    is she an attorney?
24         A.    I believe that Ms. Da Silva
25    Vint is an attorney.
```

```
                                            Page 51
 1                  MARK CALLAHAN
 2        Q.    Did your lawyer show you any
 3   documents that refreshed your recollection
 4   of events that transpired in connection
 5   with this case?
 6        A.    Yes, my lawyers provided
 7   documents to me that refreshed my memory.
 8        Q.    And can you describe for me
 9   which documents they showed you that
10   refreshed your memory?
11        A.    The documents that -- that
12   refreshed my memory that I spent the most
13   time on, as I said before, were the -- were
14   my affidavits over the years as -- you
15   know, as some of them have been four or
16   five years since the, um, since they --
17   they were reviewed.  So, that was helpful
18   in refreshing my memory.
19        Q.    Okay.  Any other documents that
20   they showed you -- that refreshed your
21   recollection apart from your affidavits?
22        A.    I believe my lawyers showed me,
23   as I said before, the, um, complaints, the
24   documents going back and forth between
25   Plaintiffs and Defendants.
```

Page 52

MARK CALLAHAN

1
2          Um, they showed me policies and
3  procedures, employee handbook.
4          That's what I recall, as of
5  right now.
6      Q.    Okay.  And Ms. Da Silva Vint,
7  she's not providing you legal advice in
8  connection with this proceeding, correct?
9      A.    I don't believe she's providing
10  me legal advice in connection with this.
11      Q.    Okay.  Did you attend any
12  depositions in this matter apart from the
13  one that you are currently giving?
14      A.    As I sit here right now, I
15  believe the only deposition that I attended
16  in this matter was related to -- was Bob
17  Nobley.
18      Q.    Okay.  Did you attend that
19  deposition in person?
20      A.    Sorry, I didn't catch that.
21      Q.    Yeah, sorry.
22          Did you attend that deposition
23  in person as you recall?
24      A.    My recollection is that I
25  attended that -- that deposition in person.

```
                                              Page 53
 1                  MARK CALLAHAN
 2        Q.     The good old days when we had
 3   in-person depositions.
 4        A.     Yep.
 5        Q.     Okay.  And do you know, apart
 6   from Mr. Nobley, do you know anyone else --
 7   do you know whether anyone else has been
 8   deposed in this case?
 9        A.     It's my understanding that
10   early on Jamie Wing, Sam Schuster, Steve
11   O'Keefe were all deposed.  And then it's my
12   understanding that there are a lot of
13   depositions last week and this week.  I do
14   know -- I -- I believe that Johnny Lamb was
15   deposed last week.  And I am just not
16   certain as to others as to whether they've
17   been deposed or gonna be deposed in the
18   next few days.
19        Q.     And how do you know Mr. Lan was
20   deposed?
21        A.     Um, it's my understanding, you
22   know, that -- I understood that he was
23   deposed based on our Monday morning meeting
24   this week because he was sitting on a
25   balcony with a beach behind him, so I made
```

```
 1                    MARK CALLAHAN
 2   the assumption that he was done and on
 3   vacation.
 4        Q.    Is that your --
 5        A.    Rather than being with us.
 6        Q.    Do you have your ticket booked
 7   for tonight?
 8        A.    Yeah.
 9        Q.    I understand.
10              Did you speak with Mr. Lan
11   about his deposition at all?
12        A.    No, I have not spoken to Mr.
13   Lan about his deposition at all.
14        Q.    Have you reviewed any
15   deposition transcripts in this matter that
16   is separate from the depositions you
17   attended or deposition you attended?
18        A.    As I sit here right now, I have
19   not reviewed any deposition transcripts of
20   any recent depositions.  My recollection is
21   that I -- you know, I guess as you said
22   when I attended, I believe I reviewed that
23   -- parts of that transcript and I believe
24   that, you know, a long time ago, I also
25   reviewed, um, parts of the depositions for
```

Page 55

```
 1                    MARK CALLAHAN
 2    Mr. O'Keefe, Schuster, and Wing.
 3         Q.    Okay.  But no -- did you -- did
 4    you receive any summaries of depositions
 5    that were taken say last week in this
 6    matter?
 7         A.    No, I have not received any
 8    summaries of any depositions taken last
 9    week --
10         Q.    Okay.
11         A.    -- in this matter.
12         Q.    Great, okay.
13               Are you familiar with the
14    entity Brevet Holdings, LLC?
15         A.    Yes, I am -- I am familiar with
16    the entity Brevet Holdings, LLC.
17         Q.    And can you describe for me
18    what Brevet Holdings, LLC, is?
19
```

Page 56

                    MARK CALLAHAN

1          Q.     And one thing I wanted to

2    clarify before I get into some of the

3    substance with respect to Brevet:  So, you

4    understand that you are sitting here today

5    in your capacity as an individual witness

6    in your personal capacity and also in a

7    30(b)(6) capacity with respect to certain

8    topics; is that right?

9          A.     Yes.  That is my understanding.

10          Q.     Okay.  And this will give us a

11    good chance to test out the Exhibit Share

12    Software Engineer, this is an easy one.  If

13    you can try to pull up what we've marked as

14    exhibit --

15               MR. CYRULNIK:  Let me actually

16          ask:  What exhibit number are we up

17          to or do we start with 1?

18               MS. LEVINE:  We start with 1

19          again.

20               MR. CYRULNIK:  Okay.

21               (Whereupon, 30(b)(6) Notice of

22          Deposition was marked as Exhibit 1

23          for identification as of this date by

24          the Reporter.)

```
 1                    MARK CALLAHAN
 2       Q.     If you will look at your marked
 3   Exhibits folder, Mr. Callahan, and see if
 4   you're able to pull up what's been marked
 5   as Exhibit 1.
 6                MR. SOLOMON:  It's on the
 7          screen.
 8                MR. CYRULNIK:  Great.
 9       Q.     And just tell me whether you
10   recognize that document.
11                (Witness reviews document.)
12       Q.     Have you had a chance to review
13   that?
14       A.     I am still going through it.
15                This is something that you
16   would like me to read the whole thing?
17       Q.     No.  I'll direct your attention
18   to specific parts.  First I want to ask
19   whether you recognize the document.
20       A.     As I sit here right now, I
21   don't necessarily recognize the document,
22   but I can see from the title of the
23   documents, and then from only reviewing a
24   little bit of it, it looks like it's the
25   topics related to the, um, to the 30(b)(6)
```

```
                                       Page 58
 1                     MARK CALLAHAN
 2   deposition.
 3        Q.    Okay.  You've seen this
 4   document before, right?
 5              (Witness reviews document.)
 6        A.    As I sit here right now, I
 7   don't know if I've actually seen this
 8   document before.
 9        Q.    When you testified earlier
10   today about reviewing -- and I don't mean
11   to misstate your testimony, so tell me
12   whether I'm misremembering, but did you
13   testify earlier that you reviewed a
14   30(b)(6) Deposition Notice in preparation
15   with this deposition?
16              MR. SOLOMON:  Object to the
17         question.
18        A.    As I sit here right now, I
19   don't believe I -- I testified that I
20   reviewed a 30(b)(6) notice.
21        Q.    Okay.  Take a look at Topic 6
22   on Page 8, please.
23              (Witness complies.)
24        Q.    Do you see that sentence, "The
25   manner in which Plaintiffs violated --
```

```
                                         Page 59
 1                    MARK CALLAHAN
 2            MR. SOLOMON:   He's just turning
 3        to Page 8.
 4            MR. CYRULNIK:   Can we have it
 5        up?
 6            MR. SOLOMON:   He's on one of
 7        the instructions on Page 8.
 8            Go down.
 9            (Indicating.)
10       Q.    Looking for Paragraph 6 on Page
11   8.
12            (Witness complies.)
13       A.    "The manner by which Plaintiff
14   violated any non-compete or
15   non-solicitation provisions as alleged in,
16   among others Paragraphs 2, 63, 70 and 72 of
17   the amended counterclaims"?
18       Q.    Yes.  Is that one of the topics
19   that you are prepared to testify to --
20   testify with respect to today on behalf of
21   the company?
22            (Witness reviews document.)
23       A.    This Topic 6 is one of the
24   items that investigated and I am prepared
25   to, um, um, prepared to respond on.
```

Page 60

MARK CALLAHAN

1

2      Q.     Okay.  And would you need to

3    review, um -- if you can take a quick look

4    at 7 through 14 as well and confirm that

5    those are topics that you are prepared to

6    testify to on behalf of the company today?

7              (Witness reviews document.)

8      A.     Yeah, I have a list that I --

9    of the topics.

10     Q.     Okay.

11     A.     I'd have to look back at my

12   list, if that's okay.

13     Q.     Yeah, absolutely.  I just want

14   to make sure that we are on the same page

15   in terms of which topics you are covering.

16   So, if you could take a look at that list,

17   I'm really just wanting to confirm that you

18   are prepared to testify on Topics 6 through

19   14 and 26 through 38 and whether or not

20   there are any exceptions.

21     A.     I have on my list Topics 6, 7,

22   8, 9, 10, 11, 12, 13, 14.  So, 6 through

23   14.

24     Q.     Okay.

25     A.     And then I have, I believe, 26

```
                                          Page 61
 1                    MARK CALLAHAN
 2     through 31.
 3          Q.     Okay.
 4          A.     And then I have 34 through 38.
 5          Q.     Okay.
 6          A.     Is that -- is that what you
 7     see?
 8          Q.     We are on the same page,
 9     thanks.
10                 You're looking at -- is it just
11     like an annotated version of this list that
12     identifies which topics were for you?
13                 (Witness reviews document.)
14          A.     Yes.  It -- the -- I am looking
15     at a table that has 30(b)(6) topics with
16     the -- with -- it looks like it's the, um,
17     the -- I am just comparing it against
18     what's on the screen here, it looks like
19     it's the topics directly out of the, um,
20     this Notice of Deposition along with, um, a
21     list of documents that are responsive to
22     it.
23          Q.     Okay.  And that list was
24     provided to you by counsel?
25          A.     This list was -- was, um --
```

Page 62

1                    MARK CALLAHAN
2             (Witness reviews document.)
3        A.    This list was provided to me by
4   counsel at my request and -- and, um, we
5   collaborated on it.
6        Q.    And can you tell me which
7   documents are designated for the topics
8   that you identified 6 through 14 and 26
9   through 38, excluding 32 and 33?
10            And if I am referring to
11  collectively to all of those topics for
12  ease of reference, I'll refer to the topics
13  on which you were designated; is that okay?
14            So, 6 through 14, 26 through 31
15  and 34 through 38, I think, matches up with
16  the list you just provided.  So, I will
17  just refer to those by shorthand as the
18  topics for which you were designated today,
19  okay?
20        A.    Okay.
21        Q.    So, are there documents that
22  are listed out for each topic by number, or
23  is it just a group of documents for a group
24  of topics?
25        A.    There are documents listed out

```
                                              Page 63
 1                  MARK CALLAHAN
 2   for each of the topics, um, but not all of
 3   the topics.
 4        Q.   Okay.  Well, when we get to the
 5   topics, we will talk more about that, but
 6   that's helpful, thanks.
 7             Are there any other notes on
 8   that, um, document that you are looking at,
 9   other than the 30(b)(6) topics and the
10   documents and witnesses that are being
11   designated for each?
12        A.   The first couple of things you
13   said there, there's topics and then there
14   are documents, but there's not a
15   designation as to which person is
16   designated to as this is a list just of my
17   --
18        Q.   I see.
19        A.   -- topics.
20        Q.   Got it.  Okay.
21             Brevet Holdings, LLC, that's
22   owned -- what's the ownership structure of
23   that?
24        A.   ████ ██████ █████ ██████ ███████
     ████ ███████ ████ █████████ ████ █████ █████
```

Page 64

1                    MARK CALLAHAN

2  ███████████████████ ██ ████████ ██████████ █████ ████

3  █ ██████████ ██ █████████ ████████████

4        Q.    Do you know why that split

5  exists?

6        A.    As I sit here right now, I

7  don't -- I do not know why that split

8  exists.

9        Q.    That split has been in place

10 ever since you were involved with Brevet,

11 to your knowledge?

12       A.    As I sit here right now, I

13 don't know whether or not that split has

14 been around since -- since the entity was

15 created.

16       Q.    When was the entity created?

17       A.    As I sit here right now, I

18 don't know when that entity was created.

19       Q.    Do you know if it was created

20 before or after you were a part of Brevet?

21       A.    As I sit here right now, I

22 believe it was created after I was part of

23 Brevet.

24       Q.    Do you know what the original

25 Brevet entity was called, the first Brevet

Page 65

                        MARK CALLAHAN

1
2    entity that was -- that was formed?
3        A.    Can you -- can you please
4    clarify; are you asking the question as to
5    sort of the initial entity that, you know,
6    including all affiliates, or are you
7    talking about the first entity with Brevet
8    in its name?
9        Q.    That's a fair clarification.
10            Let's start with the first
11   version of the question, the first --
12   including all of its affiliates.
13       A.    I believe, as I sit here right
14   now, I believe the first entity that was
15   created was called the Franchise Capital
16   Source.
17       Q.    And were you involved with that
18   entity from its -- from inception?
19       A.    As I sit here right now, I
20   believe I was involved since its inception.
21   If not from its inception, then shortly
22   after its inception.
23       Q.    Was it just you and Doug
24   Monticciolo, or was anyone else involved in
25   the very initial stages of that entity's

Page 66

1                    MARK CALLAHAN
2  formation?
3       A.   As I sit here right now, my
4  recollection is that there were two other
5  people involved in the early stages of that
6  company.
7       Q.   Who are those people?
8       A.   As I sit here right now, I
9  believe they were ███████  ████████  █████  █████
   ██  ████████
11      Q.   Okay.  Were they involved with,
12 um, the Brevet entities for a sustained
13 period of time?
14      A.   As I sit here right now, my
15 recollection is -- is that they were not
16 involved in, um, the ████████  ███████
   ██  ████████  for -- no.  I don't know what you
18 define as a sustained period of time, but
19 my recollection is that they maybe were
20 involved with it for a year or so.
21      Q.   And then just you and Doug were
22 the other -- other two individuals involved
23 and you stayed on and remained involved
24 with the Brevet entities until this day,
25 correct?

Page 67

1                    MARK CALLAHAN
2          A.    Yes.  Doug and I have been, um,
3   working together on -- on various, um --
4   various businesses since that point in time
5   and prior to that time, as well.
6          Q.    How did you first meet Doug?
7          A.    As I sit here right now, I
8   believe the first time I met him was in a
9   job interview.
10         Q.    Can you describe the
11  circumstances for me a little bit?
12         A.    I -- I believe that, um -- I
13  believe that it was probably in 1995 or so,
14  um, I -- I was employed at the Chase
15  Manhattan Bank and the Chase Manhattan Bank
16  was being, um, acquired by, um, um --
17  acquired at the time and it was uncertainty
18  as to what any ongoing role I would have
19  there.  So, I started interviewing for jobs
20  and one of those interviews took me to
21  Lehman Brothers, um, which is when I, um,
22  believe met with Doug in the -- in the
23  courtyard of the World Financial Center and
24  he conducted an interview there.
25         Q.    He was working for Lehman

Page 68

1                    MARK CALLAHAN
2     Brothers at the time?
3          A.    My recollection is that he was
4     working for Lehman Brothers.
5          Q.    And were you hired by Lehman
6     Brothers?
7          A.    Yes, I was hired subsequent to
8     that by Lehman Brothers.
9          Q.    Did you work for Doug?
10         A.    While I was at Lehman Brothers,
11    I had a number of bosses.  My -- my
12    ultimate boss was John Hunt.  John Hunt
13    headed up an industry strategies group for
14    which there were two industries; it was
15    insurance and it was banking.  Doug headed
16    up the banking side of it and, um, you
17    know, a fellow by the name of David Harris
18    headed up the insurance side of it.  And as
19    a junior member of that -- that overall
20    team, um -- actually, there was a third
21    part, there was a research part of it where
22    John Tierney was the head of that one, so
23    as a junior person, I essentially worked
24    for everybody above me, which was a lot of
25    people.

```
                                      Page 69
 1                   MARK CALLAHAN
 2        Q.     Got it.
 3               And then, did there come a
 4   point in time when Doug decided to leave
 5   Lehman Brothers?
 6        A.     Sorry, I missed the beginning
 7   of that question.
 8        Q.     Did there come a point in time
 9   when Doug Monticciolo decided to leave
10   Lehman Brothers?
11        A.     Yes, there came a point in time
12   where Doug left Lehman Brothers.
13        Q.     He left voluntarily?
14        A.     My understanding is that he
15   left voluntarily.
16        Q.     And was that to start the
17   initial entity that you referenced a few
18   moments ago as the first Brevet affiliate?
19        A.     No, it was not.
20        Q.     Do you know what he left to do?
21        A.     Doug left Brevet and joined --
22        Q.     Yeah.
23        A.     Sorry about that.
24               Doug left Lehman and, um, was
25   subsequently or -- or simultaneously, I
```

Page 70

1                        MARK CALLAHAN

2       don't know the timing -- was hired by, um,

3       a Deutsche entity.  I believe at the time

4       it was Deutsche Morgan Grenfell.  I think

5       that entity ended up somehow getting

6       eliminated.  He ended up, I believe,

7       working for Deutsche Bank Securities.

8            Q.    And did you go over with him to

9       Deutsche Bank or did you stay at Lehman

10      Brothers?

11           A.    I recall that I stayed at

12      Lehman Brothers for a time period such that

13      I could, um, um, put or have on my resume

14      that I stayed at Lehman for at least a

15      year, so I waited for the completion of a

16      year at Lehman Brothers and then I was

17      hired by Deutsche.

18           Q.    By Doug?

19           A.    Doug -- Doug was certainly

20      involved in the hiring process.  I don't

21      know, you know, technically who made the

22      hiring decision there.

23           Q.    Got it.

24                 So, Doug left Lehman Brothers

25      shortly after you joined; is that right?

1               MARK CALLAHAN

2       A.    My recollection is that I

3   really don't recall -- yes, it was less

4   than a year.  Um, my recollection is

5   probably more than six months, less than a

6   year, but I don't recall exactly the dates.

7   It was, um, um, I think -- you know, that

8   was 26 years ago.

9       Q.    Right.  Did you reach out to

10  Doug or did he reach out to you about the

11  prospect of your leaving Lehman Brothers

12  and joining Deutsche?

13      A.    My recollection is that, um,

14  that I reached out to Doug.

15      Q.    Okay.  And he was obviously

16  receptive to that overture, correct?

17      A.    Um, my recollection is that he

18  was receptive to the overture as well as

19  others.  There were -- there were a lot of

20  people going from, um -- there were a lot

21  of people that went from Lehmann to

22  Deutsche at the time.

23      Q.    Um-hum.

24      A.    For example, one of my bosses I

25  mentioned earlier, John Tierney, also went

Page 72

1                     MARK CALLAHAN
2  to Deutsche around the same time.
3        Q.    Got it.
4              And then, did you work directly
5  for Doug at Deutsche or was there also sort
6  of a lengthy chain of command that
7  ultimately lead to Doug being one of your
8  bosses, but not direct?
9        A.    My recollection is that it --
10 at various points in time, I was either --
11 certainly it was the same sort of thing,
12 where there were -- there were -- may have
13 been fewer levels, but there were still
14 levels of people between myself and Doug.
15 And then there were other times when I
16 didn't even -- it didn't even roll up to
17 Doug as Doug moved on to a separate effort
18 than what we were originally in.
19       Q.    And then, did Doug leave
20 Deutsche and start the Brevet affiliate
21 that you referenced earlier, or is there
22 another step or more in between those two
23 positions?
24       A.    I -- my understanding is that
25 when -- when he left, um -- when he left

Page 73

1                     MARK CALLAHAN
2    Deutsche, almost said Brevet again, when he
3    left Deutsche, he started the, um, the
4    relationships and ultimately -- I don't --
5    I don't recall whether or not -- when the
6    entity was set up.  If he immediately set
7    up the entity or if he developed an idea
8    first and then set up the entity.
9         Q.    Okay.  And how shortly -- well,
10   did he reach out to you prior to his
11   leaving Deutsche to invite you to partner
12   with him in -- in connection with forming
13   some sort of business venture that
14   ultimately resulted in Brevet?
15        A.    Um, my recollection is that I,
16   um, had reached out to him.  We -- the
17   group that we had started at Deutsche had
18   been -- so, Doug at some point had moved
19   from that group to head up all of
20   asset-backed securities, I believe, at
21   Deutsche.  And then the gentleman that took
22   over the, um, the business that I was
23   working in ultimately made a determination
24   to eliminate that business and essentially
25   eliminating the job and had asked whether

Page 74

1                     MARK CALLAHAN
2    or not I wanted to work in either
3    asset-backed securities or commercial
4    mortgage-backed securities.
5              And so, at that point in time,
6    I, um, started interviewing for a number of
7    different opportunities and I approached
8    Doug about what he was doing as well.
9         Q.    I see.
10             So, he was still at Lehman when
11   you had that discussion -- I'm sorry, still
12   at Deutsche when you had that discussion
13   with him?
14        A.    No.
15        Q.    He had already left?
16        A.    He had already left.
17        Q.    But he had not yet formed the
18   entity that was the first Brevet affiliate?
19        A.    That, again, I do not recall
20   what the timing was with respect to setting
21   up of -- of that entity.
22        Q.    Okay.
23             MR. CYRULNIK:  I think we've
24        been going for a little while.  Would
25        now be a good time for a short break

```
 1                    MARK CALLAHAN
 2        and give the Court Reporter --
 3             MR. SOLOMON:  That's fine.  I
 4        would want to request that we have
 5        keep the breaks short so we don't
 6        have any issue at the end of the day.
 7        We're fine if you want to take a
 8        break.
 9             MR. CYRULNIK:  Let's go off the
10        record.
11             THE VIDEOGRAPHER:  Off the
12        record at 10:27.
13             This marks the end of Media
14        Unit Number 1.
15             (Whereupon, an off-the-record
16        discussion was held.)
17             THE VIDEOGRAPHER:  We are on
18        the record at 10:38.
19             This marks the beginning of
20        Media Unit Number 2.
21             Please proceed.
22    Q.    Welcome back, Mr. Callahan.
23             We were talking shortly before
24  the break about some of the entities, the
25  Brevet entities, and I think we started
```

```
                                          Page 76
 1                    MARK CALLAHAN
 2   with Brevet Holdings, LLC.
 3                Do you have a role or title
 4   with respect to Brevet Holdings, LLC?
 5        A.    It's my understanding that my
 6   title at Brevet Holdings, LLC, and I
 7   believe other -- the other Brevet entities
 8   is managing director.
 9        Q.    You're a managing director.
10                How many managing directors
11   does Brevet, LLC have?
12        A.    As I sit here right now, I
13   don't know.
14        Q.    Do you know whether there are
15   more than two?
16        A.    As I sit here right now, I
17   believe there's more than two.
18        Q.    Can you tell me any other
19   managing directors that you are aware of
20   for Brevet Holdings, LLC?
21        A.    Well, Brevet Holdings, LLC, I
22   believe that I am a managing director;
23   Ms. Monticciolo is a managing director,
24   Mel-Li da Silva Vint, Mark Dunschee, Abtine
25   Bazeree.  I don't remember off the top of
```

Page 77

1                    MARK CALLAHAN

2    my head here.

3         Q.    Okay.  Do you hold any

4    interests, direct or indirect, in Brevet

5    Holdings, LLC?

6         A.    I don't believe that I hold any

7    interest in Brevet Holdings, LLC.

8         Q.    Are you familiar with the

9    entity Brevet Capital Management, LLC?

10        A.    Yes, I am familiar with the

11   entity Brevet Capital Management, LLC.

12        Q.    And what's that entity?

13        A.    That entity is an LLC.

14        Q.    Is the investment manager for

15   several funds?

16        A.    That entity is a registered

17   investment advisor which enables it to be

18   an investment manager --

19              THE COURT REPORTER:  I can't

20        hear you.  I'm sorry.

21              Which is what?

22              THE WITNESS:  Which enables it

23        to be an investment manager

24        Q.    For which funds does it

25   currently serve as an investment manager?

Page 78

1              MARK CALLAHAN

2        A.    As I sit here right now, I

3   don't know the formal names of those funds

4   or even a comprehensive list of -- of which

5   entities it is the investment manager for.

6        Q.    Well, can you give me the names

7   of the entities whether they are formal or

8   informal that you're aware of, sitting here

9   today for which Brevet Capital Management

10  serves as the investment manager?

11       A.    I am aware that Brevet Capital

12  Management is an investment advisor for a

13  Short Duration Fund.

14       Q.    One Short Duration Fund?

15       A.    Excuse me?

16       Q.    Was that one Short Duration

17  Fund or more than one Short Duration Fund?

18       A.    For a Short Duration Fund and

19  for an intermediate duration fund.

20       Q.    So, sitting here today, you are

21  aware of two funds for which Brevet Capital

22  Management serves as an investment advisor?

23       A.    As I said, I am not sure how

24  many there are, but I believe that for

25  those two funds which are onshore funds, I

1                    MARK CALLAHAN
2   believe that Brevet Capital Management is
3   the investment manager for those two funds.
4   And it may be investment manager for other
5   entities as well, but I don't know who --
6   what those names are at this point.
7        Q.    Do you know whether it serves
8   as an investment manager for any offshore
9   funds?
10       A.    As I sit here right now, I
11  don't know it's the investment manager for
12  any offshore funds.
13       Q.    What does an investment manager
14  do?
15       A.    As I sit here right now, that's
16  a very broad question, but the investment
17  manager is typically responsible for
18  carrying out the, um -- the duties that are
19  set forth in an investment management role.
20       Q.    Does it make all the decisions
21  with respect to what investments a fund
22  invests in?
23       A.    My understanding is that
24  investment managers, to the extent that an
25  investment manager -- management agreement

```
                                        Page 80
 1                  MARK CALLAHAN
 2    calls for them to make all decisions, that
 3    they would do that because it's in the
 4    investment management agreement.
 5         Q.    Is it your understanding that's
 6    the role that Brevet Capital Management was
 7    asked to fulfill with respect to the two
 8    funds that you identified a couple of
 9    moments ago?
10         A.    As I sit here right now, I
11    don't know what -- what limitations there
12    are on what has been delegated to the -- to
13    Brevet Capital Management, pursuant to
14    those investment management groups.
15         Q.    What -- what is your role in
16    Brevet Capital Management, LLC?
17         A.    I am an employee of Brevet
18    Holdings, LLC.
19         Q.    I can't tell, were you done
20    with your answer?
21         A.    Yes.
22         Q.    I am just asking, I understand
23    that you're an employee of Brevet Holdings.
24    My question is:  Do you have a role with
25    respect to Brevet Capital Management, LLC?
```

                    MARK CALLAHAN
1
2        A.     With respect to Brevet Holdings
3   and Brevet Capital Management, my -- my
4   main role is that I am responsible for
5   overseeing the risk aspects of the assets
6   that Brevet Capital Management manages on
7   behalf of fund vehicles.
8        Q.     Do you have a title at Brevet
9   Capital Management, LLC?
10       A.     As I sit here right now, as I
11  believe I told you previously, I believe
12  I'm a managing director in all of the
13  Brevet entities.
14       Q.     So, you're a managing director
15  of Brevet Capital Management, LLC, but you
16  don't know whether or not Brevet Capital
17  Management makes the investment decisions
18  for one of the two funds that you
19  identified it as being the investment
20  manager for?
21            MR. SOLOMON:  Objection to the
22       question.
23       A.     As I sit here right now, that's
24  not at all what I said.  I believe you
25  asked, you know, relative to, you know,

```
                                      Page 82
 1                  MARK CALLAHAN
 2   whether the Brevet Capital Management had
 3   all the rights associated with managing
 4   assets, and I just deferred you to -- to
 5   the investment management agreement to
 6   determine what limitations there might be
 7   on the -- associated with that.
 8        Q.    And I appreciate that there's a
 9   document that lays out the nitty gritty
10   details on those restrictions and
11   limitations.
12             My question is a more practical
13   one, practically speaking:  As a managing
14   director of Brevet Capital Management, can
15   you tell me whether or not functionally
16   Brevet Capital Management is making all of
17   the investment decisions with respect to
18   the Short Duration Fund that you referenced
19   earlier?
20        A.    As I sit here right now,
21   functionally, there are aspects of the
22   decision making that occur at both the
23   Brevet Capital Management and at the
24   partner entities of the funds.
25        Q.    Thanks.
```

Page 83

```
 1                    MARK CALLAHAN
 2             So, can you help me understand
 3    the breakdown there:  When you say the
 4    "partner entities," are you referring to
 5    the GP entity?
 6        A.    Yes, that is correct.
 7        Q.    Can you help me understand with
 8    respect to the Short Duration Fund, the
 9    onshore Short Duration Fund that you
10    referenced a few minutes ago, and I'll call
11    that the Short Duration Fund, onshore Short
12    Duration Fund.  Can you help me understand
13    and breakdown of responsibility between the
14    investment manager, Brevet Capital
15    Management, LLC, on the one hand, and the
16    general partner on the other?
17        A.    As I sit here right now, as
18    I've said, I would refer you to the
19    investment management agreement.  There are
20    a significant number of -- of -- of duties
21    in terms of day-to-day management of assets
22    that gets done at Brevet Capital
23    Management.  There are times when the
24    general partner of a fund may also have to
25    be involved.  That's not a decision that --
```

```
                                    Page 84
 1              MARK CALLAHAN
 2   that risk would make, that's a decision
 3   that we would work in concert with our
 4   counsel to determine when that was
 5   appropriate.
 6       Q.    I want to make sure I
 7   understand your testimony.
 8              When you say that's not a
 9   decision risk would make, you're referring
10   to the fact that Brevet Capital Management
11   was involved with risk-related decisions
12   for the funds that it advised?
13              Is that a fair statement?
14       A.    No, I -- I'm referring to the
15   fact that, as I told you, I am responsible
16   for all of the risk function at Brevet
17   Capital Management.
18       Q.    Let me go back to my prior
19   question again.
20              I'm trying to understand and,
21   again, I appreciate that there are
22   documents that you can refer me to to get
23   all the Ts and Cs with respect to these
24   question.
25              I am asking for your
```

```
                                    Page 85
 1                  MARK CALLAHAN
 2   understanding, Mr. Callahan, your
 3   understanding and with respect to any topic
 4   on which you are designated as a 30(b)(6),
 5   I am asking for Brevet's understanding.
 6            Right now I am asking for your
 7   understanding of the breakdown in
 8   responsibility with respect to managing the
 9   short duration onshore fund as between its
10   investment advisor, Brevet Capital
11   Management, and its general partner, Brevet
12   Short Duration Partners.
13        A.    And I believe as I told you,
14   that's not something that is the focus of
15   what I work on on a day-to-day basis.  I am
16   focused on the actual assets that are owned
17   by the fund vehicles, the management of
18   those assets and the -- and -- and to
19   mitigate risk associated with any -- any
20   risk associated with those assets.  And
21   that is something that is done as part of
22   Brevet -- you know, as Brevet Capital
23   Management as the investment manager --
24        Q.    So --
25        A.    -- and there are certain
```

Page 86

1                    MARK CALLAHAN
2     decisions that are made and documents -- in
3     documenting those decisions, certain of
4     those decisions may ultimately be done or
5     be made by Brevet Capital Management and
6     others will be made by the general partner.
7              But, again, that is not
8     something when I say that risk is involved
9     with that, that's not something that I am
10    involved with in determining in going -- in
11    determining whether that decision is made
12    by which entity.
13         Q.    Well, maybe it would help to
14    take a step back and you can help me
15    understand what types of decisions we are
16    talking about.
17              And we will focus on the short
18    duration -- the onshore Short Duration Fund
19    for purposes of this set of questions.
20              The onshore Short Duration
21    Fund, summarize for me what it is they do,
22    how it is that they invest funds that they
23    have and then we can talk about how that
24    relates to the various entities that we
25    were just referring to.

Page 87

MARK CALLAHAN

2          So, walk me through what the
3   Short Duration Fund is doing with its
4   funds.
5          MR. SOLOMON:   Object to the
6      question.
7      A.    It's my understanding that the
8   Short Duration Fund owns assets.
9      Q.    And those assets, can you --
10  can you describe the type of assets that
11  they own.
12     A.    It's my understanding that the
13  Short Duration Fund has tremendous
14  flexibility on the assets that it can own.
15  So, there's a wide variety of assets.
16     Q.    Can you tell me the main types
17  of assets the Short Duration Fund holds an
18  interest in?
19     A.    With respect to what timing are
20  you asking that question?
21     Q.    Well, let's start with now.
22     A.    It's my understanding that --
23  that now the, um, majority of the Short
24  Duration Fund assets ███ ███ ██████  ███████
██  ████████████

Page 88

```
 1                    MARK CALLAHAN
 2        Q.     Okay.  And what's a ████  ████████
 █  ████████████  ██████████████?
 4        A.     It's my understanding that
 5   those assets are related to, um, ████████████
 █  ██████ ██████ ██████ ████████████ ██████ ████ ████
 █  ██ ██████ ██████ ████████ ██████████ ████ ██ ██
 █  ████████████ ████ █ ██████ ██████ ██████████
 █  ████████████ ██████ ████████████ ██████████ ████ ████████
 █  ████████████████████
11        Q.     So, the counterparty would --
12   would it be fair to call the counterparty a
13   borrower, given the fact that you're
14   providing financing to them?
15        A.     The -- depending -- it's my
16   understanding, depending on the type of
17   transaction, whether it's a factory
18   transaction or whether it's a -- a -- a
19   loan, yes.  They can be characterized as a
20   borrower or they can be characterized as
21   just a counterparty.
22        Q.     For ease of reference, um, I'll
23   refer to them as borrower for the next few
24   questions, okay?
25        A.     Okay.
```

```
                                          Page 89

 1                  MARK CALLAHAN
 2         Q.     Okay.  So, you have one or more
 3    borrowers is that, um, is ████████ ████ █:
      █ ███ ████ ██ █ ███ ████ ███ █
      █ ████ ███ █ ████ ████ ████ ████ ██
      █ ████ ████ ███████ is that right?
 7         A.     It's my understanding that for
 8    the most part that's -- that's correct.
 9         Q.     Okay.  And that entity, the
10    borrower, needs to -- needs financing from
11    another -- from an outside source like
12    Brevet.
13                Is that also right?
14         A.     It's difficult for me to say
15    what that company needs, I'm not at that
16    company.
17         Q.     Fair enough, fair enough.  I'll
18    rephrase the question.  That's a fair
19    point.
20                That borrower is looking to
21    borrow funds or for some financing from
22    another outside source, correct?
23         A.     My understanding is that
24    company has approached Brevet regarding
25    obtaining financing.
```

Page 90

1                     MARK CALLAHAN
2        Q.    And the significance of the
3    fact that that company is eligible for a
4    tax rebate or tax credit is that the
5    forthcoming tax rebate or tax credit can
6    be -- can serve as collateral for financing
7    that Brevet would extend to the borrower;
8    is that right?
9        A.    It's my understanding that
10   the -- that counter-parties with a payment
11   receivable from a government entity would
12   be utilized as part of the collateral
13   package in a transaction.
14       Q.    Is there anything else about
15   the fact that that borrower qualifies for a
16   tax rebate or a tax credit apart from that
17   tax rebate or tax credit serving as
18   collateral for a loan or a financing, is
19   there anything else that is significant
20   about that fact as it pertains to Brevet's
21   decision to extend financing to that type
22   of borrower?
23            MR. SOLOMON:  Object to the
24       question.
25       A.    Sorry.  Can you -- can you

1                    MARK CALLAHAN
2   repeat to me what that fact is?
3        Q.    Sure.  The fact that the
4   borrower qualifies for a tax rebate or a
5   tax credit?
6              MR. SOLOMON:  Same objection.
7        A.    So, you're asking whether or
8   not there's anything else that's -- that's
9   taken into consideration with respect to --
10       Q.    Yeah.  I am just trying to
11  understand the significance of the fact
12  that this borrower has qualified for a tax
13  rebate or a tax credit apart from the fact
14  that the tax rebate or tax credit for which
15  it qualified can serve as collateral for
16  Brevet's financing.
17             Is there anything else that
18  Brevet views as significant about the the
19  fact that that borrower qualified for the
20  tax rebate or tax credit?
21       A.    It's my understanding that
22  there are underwriting policies,
23  underwriting, you know, approach for those
24  transactions, and the tax credit would be
25  one aspect of -- of that underwriting.

```
                                         Page 92
 1                 MARK CALLAHAN
 2        Q.    Okay.  So, the -- in connection
 3   with the financing, there are, I take it,
 4   documents that are executed between the
 5   borrower and the -- the Short Duration
 6   Fund; is that right?
 7        A.    It's my understanding that
 8   there are documents that are entered into.
 9   However, they're not entered into by Brevet
10   Short Duration Fund.
11        Q.    Okay.  Who enters -- who's the
12   counterparty on the documents?  Who enters
13   into the documents on the lender or
14   financer side?
15        A.    It's my understanding that
16   there are various counter-parties that
17   would enter into those agreements and some
18   of which are -- are subsidiaries of Brevet
19   Holdings and others may be entities owned
20   by the Short Duration Fund.
21        Q.    Who decides which Brevet entity
22   would enter into a particular transaction
23   with a borrow?
24        A.    It's my understanding that the
25   entity that funds a transaction is the
```

```
                                            Page 93
 1                   MARK CALLAHAN
 2    entity that originates such transaction.
 3         Q.    And what do you mean by
 4    "originates" when you use that term?
 5         A.    In this context where I use
 6    "originate" to mean that the -- the
 7    counterparty, the company that -- that
 8    sourced the potential borrower.
 9         Q.    I'll ask you the same question
10    with respect to sourcing then.
11                What do you mean by sourcing in
12    the context that you just used it?
13         A.    I am just trying to think about
14    another word that you're not gonna ask me
15    about.  It's -- it's the person who finds
16    -- it's the company that finds the, um, the
17    borrower.
18         Q.    Okay.  So, I guess this is what
19    I am struggling with:  There are a bunch of
20    Brevet entities that have common
21    individuals, common employees or executives
22    that are acting on their behalf; is that --
23    is that a fair statement?
24         A.    I believe that there are --
25    there -- the employees are Brevet Holdings.
```

```
                                            Page 94
 1                    MARK CALLAHAN
 2   And those employees at Brevet Holdings also
 3   have -- have some authority at other
 4   entities.
 5         Q.    Right.  So, if -- if Mark
 6   Callahan sources a transaction -- sources a
 7   particular deal in the way that you just
 8   used sourcing, he finds a particular deal,
 9   that is, a borrower approaches Mark
10   Callahan for financing and the borrower
11   qualifies, say as a borrower, with a
12   profile that -- that Brevet is interested
13   in, how does Mark Callahan decide which hat
14   he was wearing or which entity he was
15   representing when he sourced that
16   particular deal for purposes of identifying
17   the counterparty to the transaction and the
18   entity from which the fund -- the financing
19   would be extended?
20         A.    Mark Callahan doesn't originate
21   transactions, doesn't originate tax
22   credits, in essence.
23         Q.    Well, in my example, he does.
24   So, I -- you can view it as pure
25   coincidence that it has the same name that
```

```
                                            Page 95
 1                    MARK CALLAHAN
 2    you do, but you can also call him John Doe
 3    if that's easier for you.
 4          A.    It's my understanding that John
 5    Doe, in your example, would actually be
 6    employed by the counterparty that
 7    ultimately made the financing -- ultimately
 8    made the loan.  So, it's the -- there are
 9    people employed at an entity and that
10    entity, it finds sources, originates,
11    whatever you want to call it, transactions.
12    And then, ultimately, after diligence,
13    after underwriting, it funds -- getting --
14    getting appropriate approvals, it then
15    funds the transactions.
16          Q.    It's your understanding that
17    the people working at Brevet are each
18    affiliated with -- who are sourcing
19    transactions are each affiliated with one
20    and only one Brevet entity on whose behalf
21    they are acting when they source a
22    transaction?
23          A.    It's my understanding based on
24    what we're talking about, which is you're
25    asking about the tax credit financing.
```

1                    MARK CALLAHAN
2    There are people specifically in those --
3    in those businesses and they exclusively
4    originate transaction into those entities
5    within certain geographic parameters.
6          Q.    So, you're not aware of anyone
7    who's involved in sourcing that acts on
8    behalf of more than one Brevet entity; is
9    that right?
10         A.    That's not correct.  That's not
11   at all what I just said.
12         Q.    Well, I am glad I asked.
13               Can you tell me where I went
14   wrong on that?
15         A.    It is my understanding that you
16   are asking about tax credit financing.
17         Q.    Well --
18         A.    Based on the tax credit
19   financing, we have specific people that are
20   tasked with finding, sourcing, originating
21   transactions.
22               Those people are compensated
23   for transactions for -- compensated by
24   those entities, those transactions
25   ultimately may or may not get funded by

Page 97

1                      MARK CALLAHAN
2      that entity, but won't get funded
3      elsewhere.
4           Q.    What was the last thing you
5      said?  I didn't hear.  Those transactions
6      may or may not get funded by that entity,
7      but what?
8           A.    But they won't get funded
9      elsewhere.  If they're not getting funded,
10     it's because they were turned down.
11          Q.    Okay.
12          A.    It's not that they're gonna go
13     and get funded by another entity.
14          Q.    Okay.  And those individuals
15     that you were just referring to, are acting
16     exclusively on behalf of one particular
17     entity at any given moment.  They are not
18     employed by or affiliated with or acting on
19     behalf of multiple Brevet entities, right?
20          A.    The individuals that are
21     employed in our tax credit platforms are
22     tasked with originating transactions for
23     one and only one entity.
24          Q.    Have you ever originated a
25     transaction?

Page 98

1                     MARK CALLAHAN
2         A.    I don't know what you mean by
3    originated.
4         Q.    Well, what do you mean by
5    originated?  I think you explained it a
6    couple of minutes ago.  I meant the same
7    thing that you did, but you can explain it
8    again if you want to make sure we're on the
9    same page.
10        A.    If you're asking whether or not
11   I go out and find, source, originate
12   transactions, that is not something that I
13   do.  Have there been situations where as
14   part of existing transactions, there have
15   been follow-on transactions with existing
16   counter-parties.  I wouldn't characterize
17   that as originated them 'cause they were
18   previously originated, but it depends on
19   your definition.
20        Q.    Would you characterize what you
21   just described as sourcing a transaction or
22   you similarly wouldn't characterize that as
23   sourcing a transaction because it was
24   associated with an existing transaction?
25        A.    I wouldn't characterize it as

```
                                          Page 99
 1                   MARK CALLAHAN
 2   sourcing a transaction, if that transaction
 3   had already been sourced.
 4        Q.    If a transaction leads to a --
 5   to another transaction with the same
 6   counterparty, you view that as one overall
 7   larger transaction that was sourced by the
 8   original sourcer; is that correct?
 9        A.    It's my understanding.  It
10   depends on your definition.  I -- I don't
11   -- I don't necessarily have a view as to
12   how you want to characterize it.  I am just
13   explaining to you there are situations that
14   -- that follow-on transactions happen and
15   if you want to characterize them as
16   sourcing, then that's fine, but it can go
17   either way.
18        Q.    That's fine.  And I am not
19   trying to get you to characterize in any
20   particular way.  I am just trying to make
21   sure that we're using language in a similar
22   way and I know that you were telling me
23   you're not involved in sourcing and
24   excluding from that what you just
25   described.  So, I'm just trying to make
```

```
 1                    MARK CALLAHAN
 2    sure that we're on the same page, but let
 3    me make sure I got it.
 4               When you talk about follow-on
 5    transaction, are you referring to a
 6    financing that involves multiple stages of
 7    disbursements whereby, you know, you have
 8    $10 million deal that gets disbursed in
 9    tranches and, you know, the second, third
10    and fourth tranche is a follow-on
11    transaction?
12         A.    No.
13         Q.    How would you describe the
14    second third or fourth tranche of a deal
15    that involved up to $10 million of funding
16    not as an follow-on transaction?
17         A.    I would characterize that as
18    part of the original transaction.
19         Q.    Part of one transaction that
20    Brevet does.
21         A.    I would characterize it
22    depending on whatever the legal documents
23    are.  If the initial legal document called
24    for five "follow-on transactions," that's
25    one transaction, if the original legal
```

```
                                    Page 101

 1                  MARK CALLAHAN
 2   document called for one transaction and
 3   then there were subsequent legal
 4   transactions that did four more
 5   transactions, that would be a different
 6   kind of follow-on, but there would be
 7   different -- it depends on how you want to
 8   characterize sources, I guess I'm back to
 9   that.
10        Q.    Got it, okay.
11              And in the example that you
12   just described, do you ever enter into
13   deals that calls for sort of a maximum
14   financing amount that is up to X million
15   dollars as opposed to a finite amount
16   that's gonna be dispensed in a -- in a
17   predetermined number of disbursements?
18        A.    It is my understanding that we
19   have probably put in the term maximum
20   financing amount in -- in certain
21   transactions, but it's a -- that -- that
22   term is not really, um -- it's not what we
23   focus on.  We're more focused on whether or
24   not there's a commitment amount.
25        Q.    I see.  And.
```

Page 102

```
 1                  MARK CALLAHAN
 2           What is a commitment amount?
 3      A.    My understanding that a
 4 commitment amount is an amount that -- that
 5 a lender has committed to fund a borrower.
 6      Q.    I see.  And if the borrower
 7 ultimately does not take the full amount of
 8 the commitment amount, you would still
 9 consider that transaction to be, you know,
10 labeled as to whatever the commitment
11 amount is?
12      A.    I -- I don't -- I would view
13 that as being two different pieces of
14 information.
15      Q.    Was the commitment amount a key
16 factor in Brevet determining what types of
17 transactions it would be interested in
18 involving itself with?
19      A.    It's my understanding that the
20 commitment amount is -- is not a key
21 factor, if you're asking about size.
22           THE COURT REPORTER:  If you
23      were asking about what?  I didn't get
24      that.
25           THE WITNESS:  Size.
```

```
 1                    MARK CALLAHAN
 2        Q.    So, commitment amount is not,
 3   in your view, a factor that Brevet
 4   considered in deciding whether or not a
 5   particular transaction was the kind of
 6   transaction Brevet would get involved in?
 7                MR. SOLOMON:   Objection to
 8         form.
 9        A.    If you understand, that's not
10   what I said.
11        Q.    I can assure you, I don't.  I'm
12   happy for you to clarify.
13                Most of the time when I'm
14   rephrasing what you said and asking you,
15   it's not to mischaracterize, it's to make
16   sure I got it right.  And if the answer is
17   no, you can go ahead and explain to me what
18   you did mean, because I genuinely
19   understood you to mean what I just asked.
20        A.    So, the answer is no.
21        Q.    So, the commitment amount is a
22   relevant factor that is considered by
23   Brevet in connection with deciding whether
24   or not to engage in a particular
25   transaction?
```

1                    MARK CALLAHAN

2        A.    With -- with -- if you're

3   asking whether the size of a commitment

4   amount is a relevant factor, I -- you know,

5   I -- Brevet's preference is not to commit,

6   period, because with commitment comes

7   liability.

8              So, having a larger commitment

9   is -- that's why I clarified size being the

10  key factor there.  Having a larger

11  commitment brings with it more liability.

12       Q.    Was it -- when Brevet enters

13  into a transaction, are you saying that it

14  doesn't necessarily need to commit to a

15  particular amount of financing that it's

16  going to be extending?

17       A.    It is my understanding that

18  Brevet does a lot of transactions and in a

19  lot of them, doesn't have to commit.

20       Q.    So, if it doesn't commit, how

21  does it get determined and when does it get

22  determined; when does the amount of the

23  transaction get determined?

24       A.    Every transaction that Brevet

25  does is its own -- its own transaction and

```
                                      Page 105
 1                   MARK CALLAHAN
 2    the amount gets determined with respect to
 3    each transaction individually.
 4         Q.    But with respect to each
 5    transaction, there comes a point in time
 6    when there's an amount that Brevet is
 7    committing to finance, correct?
 8         A.    It is my understanding that
 9    that's not correct.
10         Q.    Well, isn't there an amount of
11    money specified -- an amount of financing
12    specified in each of the deal docs?
13         A.    It is my understanding that not
14    all deal documents have a specified amount.
15    Some of them have a specified methodology.
16         Q.    Can you give me an example what
17    you mean by a "specified methodology" as
18    opposed to specified amount?
19         A.    Specified amount would be, this
20    is the $100 loan.  A specified methodology
21    would be, we will purchase your finance
22    assets that look like A and give you a --
23    you know, an X percent advance against
24    those.
25         Q.    Okay.  So, it describes the
```

                                        Page 106

                          MARK CALLAHAN

1    types of assets that they're -- that Brevet

2    is purchasing and is financing based on a

3    percentage of the value of those assets?

4          A.    It's my understanding that

5    in -- in situations, yes, whether it's

6    purchasing or financing, whatever you want

7    to call it, there are situations where

8    those advances or purchase prices are

9    calculated based on formula.

10         Q.    Is there any significance to

11   whether you characterize the role that you

12   described earlier with respect to a -- that

13   you would play with respect to a follow-up

14   transaction, whether you would characterize

15   that as sourcing or not; are there any

16   financial consequences to that with respect

17   to compensation or otherwise?

18         A.    To whom are you talking about

19   compensation?

20         Q.    Well, I -- I'm -- I'm returning

21   to the exchange that you and I had about

22   five minutes ago when you told me that you

23   don't source transactions, although there

24   may have been sometimes that you were

```
 1                    MARK CALLAHAN
 2   involved in getting a follow-on transaction
 3   put in place.
 4            Do you remember that general
 5   exchange?
 6        A.    I believe so.
 7        Q.    And so, my question to you is
 8   just, I want to make sure I am not missing
 9   the significance of the characterization.
10            Is it -- would it make a
11   difference whether or not one would
12   characterize the role that you played in
13   the follow-on transaction as origination or
14   sourcing versus not characterizing as
15   origination or sourcing?
16        A.    I don't believe it makes any
17   difference, which is why I was happy for
18   you to call it either way.
19        Q.    Okay.  I just wanted to make
20   sure.
21            So, you don't get a percentage
22   of the transaction that you tech -- that
23   you are characterized as having sourced at
24   Brevet; is that right?
25        A.    That is correct.  That is --
```

Page 108

```
 1                    MARK CALLAHAN
 2    that is a, um, getting -- getting
 3    compensated for sourcing transactions, you
 4    know, I guess you're referring to as a
 5    commission basis, it would be for employees
 6    of -- related to the -- to an IRA, that
 7    would be in direct conflict to the SEC.
 8         Q.    Got it.
 9              So, you're saying Brevet has a
10    strict policy against paying what you just
11    described as commissions for sourcing or
12    originating a transaction, a financing
13    transaction?
14         A.    It is my understanding that
15    Brevet Holdings doesn't pay any -- doesn't
16    pay employees' commissions on what they
17    originate.
18         Q.    Doesn't play -- doesn't pay
19    non-employees commissions based on what
20    they originate or finder's fees or anything
21    like that?
22         A.    I'm not -- as I sit here right
23    now, I'm not aware of any -- of any third
24    parties that are getting paid to originate
25    transactions for a Short Duration Fund.
```

Page 109

1                    MARK CALLAHAN
2          Q.     That I understand.   My question
3    was just slightly different:   Does Brevet
4    have a policy against paying a third-party
5    a finders fee or an origination percentage?
6          A.     As I sit here right now, I
7    would imagine that there's a -- there's
8    likely something that states that, given
9    the fact that the, um, payment of --
10   payment of that, especially without
11   disclosing to the SEC would jeopardize our
12   RA status.
13         Q.     Okay.   The only thing I think I
14   am missing the picture that you were
15   painting for me with respect to the Short
16   Duration Fund, the onshore Short Duration
17   Fund and what it does is if the originator
18   was, say, employed by a different Brevet
19   entity, called it entity X, and I believe
20   you testified earlier that the originator's
21   employer is typically the entity that would
22   extend the financing to the counterparty.
23                Did I get that right?
24         A.     It is my understanding that
25   there are subsidiaries of -- of Brevet

```
 1                    MARK CALLAHAN
 2   Holdings as well as subsidiaries of the
 3   Short Duration Fund that have employees
 4   that source transactions and those
 5   subsidiaries originate loans.
 6        Q.    If a subsidiary of Brevet
 7   Capital -- sorry.  The second entity that
 8   you said has subsidiaries was which entity?
 9   Not the Short Duration Fund.  What was it?
10        A.    Brevet Holdings.
11        Q.    If a subsidiary of Brevet
12   Holdings sourced a transaction, would that
13   transaction have anything to do with the
14   Short Duration Fund, the onshore Short
15   Duration Fund?
16        A.    It could.
17        Q.    What was the relationship
18   between Brevet Holdings and the onshore
19   Short Duration Fund?
20        A.    I -- I didn't -- I didn't -- I
21   said it could be related.  The transaction
22   that gets originated could be related to
23   the Short Duration Fund.  I didn't say that
24   Brevet Holdings has a relationship with the
25   Short Duration Fund, I thought we were
```

```
 1                    MARK CALLAHAN
 2    talking about the asset that gets
 3    originated.
 4         Q.    No, we were.  You got that
 5    right.  I was just asking you a follow-up
 6    question.
 7              Is there a relationship between
 8    Brevet Holdings and the Short Duration
 9    Fund?
10         A.    My understanding is that Brevet
11    Holdings is a parent to Brevet Capital
12    Management which is the investment manager
13    to the Short Duration Fund.
14         Q.    So, is it your understanding
15    that there are instances in which Brevet
16    Holdings or one of its subsidiaries
17    originates a transaction in the way that
18    you described previously and, yet, that
19    transaction, that financing, is extended by
20    the Short Duration Fund?
21         A.    I -- I would -- um, it's my
22    understanding that -- I -- as I sit here
23    right now, I've changed the way you asked
24    that question, whether or not that Short
25    Duration Fund extends.  We talked about
```

```
 1                    MARK CALLAHAN
 2   earlier the Short Duration Fund assets,
 3   it's more likely the Short Duration Fund
 4   purchases those assets rather than extend
 5   the funding.
 6        Q.    I see, that's a helpful
 7   clarification.  I want to make sure I
 8   understand what you're saying, although I
 9   think I do.
10             So, the Short Duration Fund
11   would purchase the asset from the entity
12   that extended the funding?
13        A.    It's my understanding that
14   that's -- that is sometimes how it happens.
15        Q.    I see.  And so, it would -- the
16   Short Duration Fund purchases assets from
17   other Brevet entities, correct?
18        A.    It's my understanding that the
19   Short Duration Fund purchases assets from,
20   um, related parties to Brevet, yes.
21        Q.    And is it your understanding
22   that the Short Duration Fund sometimes
23   extends the financing itself, as well?
24        A.    It's my understanding that the
25   Short Duration Fund does -- does directly
```

1                    MARK CALLAHAN
2  extend the financing, as well.
3       Q.    And would the question of
4  whether or not the funding is extended
5  directly by the Short Duration Fund as
6  opposed to being extended by another Brevet
7  entity, is that determined by whether or
8  not originator of the transaction was an
9  employee who was working on behalf of the
10 Short Duration Fund in sourcing the loan
11 versus an employee of one of the other
12 Brevet entities that therefore ended up
13 sourcing the transaction?
14      A.    It's my understanding that --
15 that for subsidiaries -- a subsidiary of
16 the Short Duration Fund that originates the
17 transaction and then funds that transaction
18 so it's extended within the Short Duration
19 Fund, you know, that's done, we talked
20 about earlier, right, that's done -- that
21 phase related to the counter-parties that
22 had bound sourced, originated a
23 transaction.
24      Q.    And there are employees of
25 subsidiaries of a Short Duration Fund who

Page 114

1                    MARK CALLAHAN
2    are charged with origination and sourcing,
3    looking for deals?
4         A.    It's my understanding there's
5    an entity that's a subsidiary of the Short
6    Duration Fund that originates.  I am -- I
7    don't know -- as I sit here right now,
8    whether there are employees of that entity
9    or how that's done.
10        Q.    If it didn't -- if that entity
11   didn't have employees, how would the entity
12   go about sourcing the transaction?
13        A.    As I sit here right now,
14   companies without employees can enter into
15   service agreements, but I'm not sure what's
16   the situation of that entity.
17        Q.    Is it your understanding that
18   one or more subsidiaries of the Short
19   Duration Fund has a servicing agreement
20   with another Brevet -- one or more Brevet
21   entities?
22        A.    As I sit here right now, that's
23   not what I said and that's not my
24   understanding.
25        Q.    Okay.  So, you are not aware of

                        MARK CALLAHAN

1  
2  any service agreement that a subsidiary of
3  the Short Duration Fund has with another
4  Brevet entity?
5        A.    As I sit here right now, I am
6  not aware of any such agreement.
7        Q.    So, absent a Service Agreement
8  another Brevet entity and absent having its
9  own employees who are charged with sourcing
10  transactions, how would a subsidiary of a
11  Short Duration Fund originate a
12  transaction?
13        A.    As I sit here right now, I -- I
14  will repeat that it can be a service
15  agreement.  I did not say it was a service
16  agreement with a Brevet entity.
17             In general, companies without
18  employees can operate through service
19  agreements engaging with other
20  counter-parties.
21        Q.    So, is a subsidiary of a Short
22  Duration Fund, to your knowledge, does it
23  have a service agreement in place with a
24  non-Brevet affiliated entity for purposes
25  of identifying or sourcing transactions?

                    MARK CALLAHAN

1

2        A.    As I sit here right now, I

3   don't know.

4        Q.    Are you aware of whether or not

5   any Brevet affiliated entity ever had a

6   service agreement in place with an outside

7   entity, a non-Brevet entity for purposes of

8   sourcing a transaction?

9        A.    Can you repeat that?  I'm

10  trying to see -- are you asking about --

11       Q.    I am asking whether you are

12  aware of -- to your knowledge, has any

13  Brevet entity ever used -- entered into a

14  service agreement with an outside party, a

15  non-Brevet affiliate for purposes of using

16  that outside party or its employees to

17  source or originate a transaction?

18       A.    As I sit here right now, I

19  can't think of any.

20       Q.    Okay.  Short duration -- Brevet

21  Short Duration Partners, LLC is the general

22  partner of the onshore Brevet Short

23  Duration Fund; is that right?

24       A.    As I sit here right now, I

25  believe the Brevet Short Duration Partners,

```
1                    MARK CALLAHAN
2     LLC is the general partner of the onshore
3     funding that we've been talking about.
4               THE COURT REPORTER:  Onshore
5          funding?  I didn't hear the last
6          part, onshore funding what?
7               THE WITNESS:  That we've
8          talking about.
9          Q.    And Brevet Short Duration
10    Holdings, LLC, is that the managing member
11    of Brevet Short Duration Partners?
12         A.    As I sit here right now, I
13    believe that's the case.
14         Q.    And do you hold an interest in
15    both of those entities, Brevet Short
16    Duration Holdings and Brevet Short Duration
17    Partners?
18         A.    As I sit here right now, I
19    believe I have an interest in both of those
20    entities.
21         Q.    Do you have any interest in
22    Brevet Short Duration Funds, the onshore
23    fund itself?
24         A.    The -- by interest, if you're
25    -- if you're asking whether or not, um, I
```

Page 118

1                      MARK CALLAHAN
2    have any money invested in that fund
3    through -- through the general partner and
4    -- and its managing member, I have an
5    interest in, um, in the short duration
6    onshore fund.  It's an investment.
7         Q.    Meaning your direct interest is
8    in either holdings or part -- partners or
9    both, but that interest in one or both of
10   those in your view gives you an interest in
11   the fund, the onshore fund?
12              Did I get that right?
13        A.    I believe that's mostly right.
14   It's not the -- it's not the existence of
15   those entities that creates the interest,
16   it's the cash that gets invested into the
17   fund that I view as being the -- the -- the
18   interest, right, besides being -- besides
19   being the general partner there's also cash
20   invested into fund.
21        Q.    I see.  So, separate and apart
22   from the cash invested, do you view
23   yourself as having an interest in the Short
24   Duration Fund through the general partner
25   relationship that your entity, Brevet Short

```
 1                    MARK CALLAHAN
 2   Duration Partners, has with Brevet Short
 3   Duration Fund?
 4        A.    If you're defining as
 5   relationship being ownership in an entity
 6   that is the general partner of another
 7   entity, then, yes, that's what it is.
 8        Q.    Okay.  Is it your understanding
 9   that you owe a fiduciary duty to Brevet?
10        A.    Yes.
11        Q.    Is it your understanding that
12   you owe fiduciary duties to your partners
13   at, say, the Brevet Short Duration Partners
14   entity?
15        A.    Yes.
16        Q.    And what is your understanding
17   of what it means to owe fiduciary duties to
18   your partners?
19        A.    And by partners, you're
20   referring to members?
21        Q.    Your co-members.
22        A.    I -- I -- I view fiduciary duty
23   in layman's terms to be -- to be ethical,
24   honest, follow -- follow the documents,
25   don't be deceitful.
```

```
 1                    MARK CALLAHAN
 2        Q.     Okay.
 3        A.     Just pretty -- pretty basic
 4   from -- from a layman non-lawyer is how I
 5   look at it.  Doing the right thing.
 6        Q.     Great.  And would you agree
 7   with me that in 2016 you owed a fiduciary
 8   duty to Paul Iacovacci?
 9        A.     When in 2016 are you talking
10   about?
11        Q.     Well, that's a fair question.
12               Can you break it down for me?
13   Do you think you owed a fiduciary duties up
14   to a certain point and then you ceased
15   owing fiduciary duties to Mr. Iacovacci?
16        A.     My understanding is that my
17   fiduciary duty is throughout is not just
18   Mr. Iacovacci, it's all members, investors,
19   and that any fiduciary duty would have
20   terminated with Mr. Iacovacci's termination
21   in October of 2016.
22        Q.     And I appreciate that you may
23   owe multiple fiduciary duties to multiple
24   parties.  I'm focusing, for obvious
25   reasons, for purposes of this question at
```

Page 121

1                    MARK CALLAHAN
2    least, on the ones that you owed
3    Mr. Iacovacci.
4              Was it your understanding in,
5    let's say, January of 2016, that you owed
6    fiduciary duties to Mr. Iacovacci?
7         A.    As I sit here right now,
8    it's -- it's my understanding that -- that
9    all the members would have fiduciary duties
10   to each other at that point in time.
11        Q.    So, yes?
12        A.    All members would have
13   fiduciary duties to each other, so, me to
14   Doug to John to Paul, you know, vice versa.
15        Q.    Great.  And what about as of
16   February of 2016, same answer?  Would you
17   view yourself as owing fiduciary duties to
18   Paul Iacovacci in February of 2016?
19        A.    I would view that fiduciary
20   duty, the same answer as before, with
21   fiduciaries to all investors as well as
22   all members to extend through January
23   through -- actually.  Wait, no.  All
24   investors, all members, to extend
25   throughout time.  It just so happens that

```
 1                    MARK CALLAHAN
 2   in October, Paul ceased to be a member.
 3        Q.    All right.  So, just to
 4   short-circuit it:  You would agree with me
 5   that in your view you owed fiduciary duties
 6   to Paul Iacovacci up through at least the
 7   beginning of October of 2016; is that
 8   right?
 9        A.    I agree, fiduciary duties were
10   needed to be followed by all members at all
11   times.
12        Q.    As I understand, I am again
13   asking you about one particular fiduciary
14   duty towards one particular individual, if
15   you can focus on that one just for purposes
16   of my question, I think it will go a little
17   more efficiently.
18             But would you agree with me at
19   least through October 1st of 2016, it was
20   your view that you owed fiduciary duties
21   Paul Iacovacci?
22        A.    As I sit here right now?  I --
23   I -- I would say that the -- potentially be
24   a fiduciary duty, I'm not sure -- I am not
25   sure the definitive definition of what
```

```
 1                    MARK CALLAHAN
 2   fiduciary duty is to be able to tell you
 3   when or if -- when that fiduciary duty
 4   ends.
 5        Q.    I want to make sure I
 6   understand your testimony:  Mr. Iacovacci
 7   told you that he was gonna retire from the
 8   fund in January of 2016, correct?
 9        A.    It's my understanding that
10   that's not correct.
11        Q.    Mr. Iacovacci didn't tell you
12   he was retiring from Brevet in January of
13   2016?
14        A.    It's my understanding that, you
15   know, and you've now -- you've now
16   flip-flopped between two things, right?
17   You're saying -- you first said he was
18   retiring from the fund and now you're said
19   he's retiring from Brevet.  It's my
20   understanding that Paul was incapacitated
21   and physically unable to work and was --
22   wanted to talk about potentially retiring.
23   There was no definitive retirement in --
24   whatever date it says.
25        Q.    We'll get back to that, but
```

```
                              MARK CALLAHAN
 1
 2    that's fine.
 3                   Is it your view that somebody
 4    who was incapacitated but had not retired
 5    from --
 6                   MR. CYRULNIK:  Well, let me
 7          just withdraw that and start again.
 8          Q.    It was your view that in 2016,
 9    prior to October, Mr. Iacovacci was someone
10    who was incapacitated, but had not yet
11    withdrawn from Brevet?
12          A.    It was my understanding that
13    Paul had said he was incapacitated and it
14    was my understanding that he had not
15    withdrawn from Brevet Short Duration
16    Partners or Brevet Short Duration Holdings.
17          Q.    Until when?
18          A.    I -- to my understanding that
19    there is no when.
20          Q.    What do you mean by "there is
21    no when?"
22          A.    I don't have an understanding
23    as to first when he was no longer
24    incapacitated or whether he was ever
25    incapacitated, and I don't believe that he
```

```
 1                    MARK CALLAHAN
 2   ever withdrew from Brevet Short Duration
 3   Partners or Short Duration Holdings.
 4        Q.   Okay.  Do you doubt that he was
 5   incapacitated?
 6        A.   As I sit here right now, I have
 7   no reason to believe one way or the other.
 8        Q.   Well, if he told you he was
 9   incapacitated, you didn't have any basis
10   for disputing that, right?
11        A.   As I sit here right now, I
12   don't have a basis to dispute that, except
13   for the fact that he hasn't been the most
14   truthful person.
15        Q.   Well, so, sitting here today,
16   do you doubt that Mr. Iacovacci was
17   severely medically challenged during the
18   2015, 2016 period to the point of
19   incapacitated in that capacity?
20        A.   As I sit here right now, I
21   don't believe he was incapacitated in 2015,
22   if you're talking about the full year.
23        Q.   I'm not, I am saying at any
24   point in 2015.
25        A.   Excuse me?
```

```
 1                    MARK CALLAHAN
 2        Q.     To clarify, I don't -- I'm not
 3   asking you whether you thought he was
 4   incapacitated for the entire year.
 5              I'm asking you whether or not,
 6   sitting here today, it is your testimony
 7   under oath that you doubt that
 8   Mr. Iacovacci was incapacitated towards the
 9   end of 2015 and the beginning of 2016?
10        A.     And no, that's not at all what
11   I said.  I don't -- I don't doubt, I just
12   have no reason -- you're asking me whether
13   or not I have a view as to whether he was
14   or wasn't.  I don't have a view.
15        Q.     Okay.  That's -- that's fine.
16              And you said it's your view
17   that -- your understanding that
18   Mr. Iacovacci never withdrew from being a
19   member of either holdings or partners?
20              Did I get that right?
21        A.     It's my understanding that
22   Mr. Iacovacci never formally withdrew from
23   either Brevet Short Duration Partners, LLC,
24   or Brevet Short Duration Holdings, LLC.
25        Q.     That's what I want to really
```

Page 127

```
1                    MARK CALLAHAN
2   draw down on.
3             What do you mean by "formally
4   withdrew" as distinguished by withdrawing?
5        A.    It's my understanding from
6   counsel that the withdrawal of -- from
7   those entities would take place in
8   conjunction with a Separation Agreement.
9        Q.    I understand.  So, when you
10  referred to his not having formally
11  withdrawn from either of those entities,
12  you're referring to the fact that it is
13  your understanding that he never executed a
14  Separation Agreement with either of those
15  entities?
16       A.    It is my understanding that the
17  withdrawal from those entities was gonna be
18  part of the Separation Agreement, but it's
19  not the, you know, it didn't have to be a
20  part of the Separation Agreement.
21       Q.    What do you mean by that?
22       A.    It's my understanding that the
23  -- the withdrawal of -- from the entities
24  could have occurred without the -- without
25  the need for a Separation Agreement.
```

```
 1                    MARK CALLAHAN
 2      Q.    Oh, okay.
 3            Well, that -- that's different
 4  from what I understood previously, so I'm
 5  glad I asked the follow-up question.
 6            So, you understood that a
 7  member, including Mr. Iacovacci, could
 8  withdraw from Partners, Holdings or both
 9  without executing a Separation Agreement,
10  right?
11      A.    It was my understanding that
12  pursuant to those LLC agreements, that one
13  could withdraw so long as they followed
14  that agreement.
15      Q.    What do you mean by "so long as
16  they followed that agreement?"
17      A.    It's my understanding that it's
18  set forth in the LLC agreement how one
19  withdraws from the entity.
20      Q.    All right.  I am going to --
21            MR. CYRULNIK:  We're gonna post
22         one of the LLC agreements there so
23         that maybe you can help me understand
24         what you're referring to.  I think I
25         do know, but let's post the -- the,
```

```
 1                   MARK CALLAHAN
 2        um, the 2009, January 21st Partners
 3        Agreement to Exhibit Share, and that
 4        will be marked -- that's gonna be
 5        marked, Mr. Callahan, there's a
 6        couple of other exhibits there that
 7        we're gonna either get to or skip so
 8        we can move things along.
 9             But Exhibit 5 is gonna be the
10        LLC Agreement and I'll let you know
11        when it's posted so I can save you
12        the -- you or your counsel the finger
13        clicking associated with knowing when
14        -- when the -- when the process has
15        been completed.
16             MS. LEVINE:  One minute
17             Partners, you said?
18             MR. CYRULNIK:  Yeah.  We are
19        doing Partners.
20             (Whereupon, Partners, LLC
21        Agreement was marked as Exhibit 5 for
22        identification as of this date by the
23        Reporter.)
24             MR. CYRULNIK:  Okay, that
25        should be up now.  And Exhibit 5 is
```

```
                                          Page 130
 1                    MARK CALLAHAN
 2         the limit --
 3              You can go back on mute.  I
 4         think we will be better off.
 5      Q.    Exhibit 5, Mr. Callahan, is the
 6  Limited Liability Company agreement of
 7  Brevet Capital Partners, III, LLC.
 8              Do you recognize this document?
 9  And I will ask you --
10              MR. CYRULNIK:  Yeah, sorry.  Go
11         ahead.
12              MR. SOLOMON:  It's on the
13         screen.
14              MR. CYRULNIK:  Okay.
15      Q.    Mr. Callahan, you generally
16  recognize the LLC Agreement for Partners?
17      A.    I generally recognize this
18  document.
19      Q.    And can you direct me to the
20  provision or provisions to which you were
21  referring to a couple of moments ago when
22  you said it was your understanding that a
23  member could withdraw provided they
24  followed the LLC agreement?
25      A.    Would you like me to read the
```

```
 1                    MARK CALLAHAN
 2   whole document or --
 3        Q.    No, let me ask you this:
 4              Do you know what you were
 5   referring to, what provision you were
 6   referring to, when you referenced the LLC
 7   agreement, a few moments ago?
 8        A.    It's my understanding that it's
 9   in here, but I don't know where it's in
10   clear.
11        Q.    Let me direct your attention to
12   Section 7.1 and you'll tell me whether or
13   not that's what you had in mind.  That can
14   be found on Page 9 of the document.
15              (Witness reviews document.)
16        A.    Sorry 7.?
17        Q.    7.1.
18        A.    Okay.
19        Q.    Is that the provision that you
20   had in mind when you testified a couple of
21   minutes about the withdrawal terms?
22              (Witness reviews document.)
23        A.    And if you're referring to
24   7.1A, my understanding that that would be
25   -- I haven't -- I haven't read the rest of
```

```
 1                    MARK CALLAHAN
 2   this document, but 7.1A would be that
 3   topic.
 4        Q.    Okay.  And so, it was your
 5   understanding and it is your -- remains
 6   your understanding that a member, including
 7   Paul Iacovacci, was permitted to
 8   voluntarily withdraw from the company at
 9   any time provided that he gave you 180 days
10   prior written notice of his intention to
11   withdraw, correct?
12        A.    It's my understanding that 7.1A
13   --
14             THE COURT REPORTER:  You have
15         to speak up, sir.  Section 7.1A says
16         what?
17        A.    Says that a member may
18   voluntarily withdraw from the company at
19   any time provided that the member provide
20   180 days prior written notice to the
21   company of such member's intention to
22   withdraw.
23        Q.    And is it your testimony --
24             MR. CYRULNIK:  Well, withdrawn.
25        Q.    And the member need not execute
```

```
 1                    MARK CALLAHAN
 2  any Separation Agreement in order to effect
 3  the withdrawal; is that correct?
 4        A.    It is my understanding, based
 5  on this Section 7.1A, that there is no
 6  reference to a Separation Agreement.
 7  However, the parties were negotiating a
 8  Separation Agreement with -- with
 9  withdrawal notices as part of the
10  Separation Agreement.
11        Q.    Just answer my question.
12              So, you would agree with me
13  that there's no requirement that a member
14  execute a Separation Agreement in order
15  to effect the withdrawal from the company,
16  correct?
17        A.    It is my understanding subject
18  to the caveat that I just gave you about
19  the Separation Agreements, that's correct.
20        Q.    That is why I'm asking the
21  question the way I am asking it, I don't
22  want any caveats in the answer.  I'm asking
23  you whether or not it is your understanding
24  that a member could withdraw from the
25  company without executing a Separation
```

```
1                    MARK CALLAHAN
2    Agreement?
3              MR. SOLOMON:  I object to the
4         question.
5         A.    I'm not sure I have anything
6    further.  I think I've answered that
7    question.
8         Q.    Is the answer yes?
9         A.    Yes, pursuant Section 7.1A, a
10   member may withdraw voluntarily at any time
11   providing that the member provides 180 days
12   prior notice to the company of such
13   member's intention to withdraw and with the
14   caveat that that's why the withdrawal
15   notices were included in the Separation
16   Agreement.
17        Q.    Okay.  So, if we've established
18   that Mr. Iacovacci as a member could
19   voluntarily withdraw from the company at
20   any time without executing a Separation
21   Agreement, I'd like to turn to your prior
22   answer to one of my questions.
23              I believe you said that
24   Mr. Iacovacci never formally withdrew.
25              Do you recall giving that
```

```
 1                    MARK CALLAHAN
 2   testimony?
 3        A.    I recall that.
 4        Q.    And when I asked you, and I am
 5   not trying to mischaracterize your
 6   testimony, but I am pretty sure I heard you
 7   correctly, when I asked you what you meant
 8   by formally withdrawing, I believe you then
 9   referenced the Separation Agreement.
10              Do you recall doing that?
11              MR. SOLOMON:  Objection to the
12         form.
13        A.    I recall referencing the
14   Separation Agreement.
15        Q.    And my question is with the
16   understanding that the Separation Agreement
17   need not be executed in order to effect a
18   withdrawal from the company pursuant to its
19   LLC agreement.
20              My question to you is:  Apart
21   from executing a Separation Agreement, did
22   you have anything else in mind when you
23   said Mr. Iacovacci didn't formally withdraw
24   from Brevet?
25        A.    With respect to the Separation
```

```
                                        Page 136
 1                      MARK CALLAHAN
 2    Agreement my understanding is that
 3    Mr. Iacovacci never executed the withdrawal
 4    notices.
 5         Q.    When you say "executed the
 6    withdrawal notices," are you thinking of a
 7    particular form withdrawal notice that
 8    needs to be sent to Brevet in order to
 9    withdraw from the company?
10         A.    It's my understanding that it's
11    is the withdrawal notices that had been
12    negotiated between our counsel and Paul's
13    counsel.
14         Q.    So, it's your understand that
15    even if a member tells you that they intend
16    to withdraw and does so in writing, that
17    unless they execute some formal withdrawal
18    notice that was attached to a draft
19    Separation Agreement, that member has not
20    effected a withdrawal pursuant Section
21    7.1A.
22               Is that -- is that a fair -- is
23    that a fair characterization in your view,
24    Mr. Callahan?
25               MR. SOLOMON:  I object to the
```

MARK CALLAHAN

1
2       question.
3          A.    It's my understanding if you're
4    asking the hypothetical, that may be the
5    case.  But in this case, if you're asking
6    about Mr. Iacovacci -- in the hypothetical
7    yes, if somebody had actually done that,
8    had actually, um, provided written notice
9    to withdraw, then in the hypothetical, I
10   would agree with you.
11         Q.    Okay.  And so, turning to
12   Mr. Iacovacci, let me just ask you:  Is it
13   your contention that Mr. Iacovacci did not
14   provide written notice that he was
15   intending to withdraw from the company in
16   January of 2016?
17         A.    It's my recollection and it's
18   my understanding that -- that Mr. Iacovacci
19   never provided notice about a withdrawal
20   from any company.
21         Q.    Okay.  Well, we'll get to the
22   documents a little later, but I appreciate
23   you clarifying your position.
24              MR. CYRULNIK:  I think we've
25         been going a little while and, again,

```
 1               MARK CALLAHAN
 2          I want to give both you and your
 3          counsel and most importantly the
 4          court reporter a quick opportunity to
 5          use the restroom or stretch your
 6          legs.  Why don't we take six or seven
 7          minutes and come back at noon, if
 8          that works for you, Mr. Callahan.
 9               THE WITNESS:  Yes
10               THE VIDEOGRAPHER:  Off the
11          record at 11:52 and this marks the
12          end of Media Unit Number 2.
13               (Whereupon, a short recess was
14          taken.)
15               THE VIDEOGRAPHER:  On the
16          record at 12:02, marking the
17          beginning of Media Unit Number 3.
18               Thank you.
19     Q.     Welcome back, Mr. Callahan.
20               We were talking before the
21   break about whether or not Mr. Iacovacci
22   had provided notice about his intent to
23   withdraw from Brevet in January of 2016.
24               Do you recall that general
25   subject matter?
```

                    MARK CALLAHAN

1
2      A.    I recall the general subject
3  matter.
4      Q.    Mr. Iacovacci spoke with you
5  directly separate and apart from any
6  written communications about his intent to
7  withdraw from the company in January of
8  2016, correct?
9            MR. SOLOMON:  I object to the
10        question.
11     A.    At this time I don't recall any
12  conversation where he discussed withdrawing
13  from any company.
14     Q.    You don't recall having any
15  conversations with Mr. Iacovacci about his
16  intent to withdraw from Brevet?
17     A.    That's correct.
18     Q.    Do you recall any written
19  communications about that subject matter?
20     A.    As I sit here right now, I
21  don't recall any written communications
22  about withdrawal from any of the company.
23     Q.    Would you -- is it your
24  testimony --
25            MR. CYRULNIK:  Withdrawn.

1                    MARK CALLAHAN

2        Q.    Mr. Callahan, you had no doubt

3    by the end of January, 2016 that

4    Mr. Iacovacci had no intention of

5    continuing to work at Brevet; is that

6    correct?

7        A.    As I sit here right now, I

8    don't -- I don't know what Mr. Iacovacci's

9    intention was.

10       Q.    Well, I'm asking you something

11   slightly different:  I'm asking you about

12   your understanding, your mindset.

13             You're telling us -- is it --

14   would you agree that as of the end of

15   January, 2016, you clearly understood that

16   Mr. Iacovacci intended to retire from

17   Brevet?

18       A.    As I sit here right now, I

19   recall now you have switched from talking

20   about withdrawal to retire, that he had

21   expressed reservations about his ability to

22   ever work again and wanted to talk about

23   the potential for retiring.

24       Q.    Can you explain to me your view

25   as to the difference between retiring from

```
 1                    MARK CALLAHAN
 2   Brevet and withdrawing from Brevet?
 3        A.    It's my understanding that when
 4   somebody talks about withdraw -- when
 5   somebody talks about retiring, they're
 6   talking about retiring from their employer,
 7   whereas withdrawing from a membership and
 8   an interest in an LLC is separate.
 9        Q.    So, it's your understanding
10   that notice of intent to retire from Brevet
11   refers only to ceasing to work in the
12   capacity of an employee, but is entirely
13   unrelated from withdrawing from the
14   entities in which that individual served as
15   a member?
16             MR. SOLOMON:  Object to the
17        question.
18        A.    It's difficult for me to answer
19   that question because it's based on the
20   premise that there was a notice of intent
21   to retire.
22        Q.    Yeah.  And I don't mean to
23   imbed into the question any such premise.
24             So, let's go back to talking
25   about this divorce from any particular fact
```

```
                                        Page 142
 1                    MARK CALLAHAN
 2    for the moment.
 3            I'm just -- I want to
 4    understand your view as to, you know, some
 5    of the terms that we're talking about,
 6    because if I understood you correctly just
 7    a couple of minutes ago, you drew a
 8    distinction between retiring and
 9    withdrawing from the company.
10            Did I understand you correctly?
11            MR. SOLOMON:  I object to the
12        question.  It misstates the
13        testimony.
14        A.    It's my understanding that you
15    can't use company in that, you're dealing
16    with separate corporate entities.
17            So, retirement with respect to
18    employment at Brevet Holdings would be
19    separate and distinct from withdrawing from
20    a membership interest in an LLC.
21        Q.    So, is it your understanding
22    that you can retire from a company that
23    employs you, but you can't retire from a
24    company in which you are a member?
25            Is that what you're testifying
```

                    MARK CALLAHAN
1
2    to?
3         A.     That is not what I'm testifying
4    to.
5         Q.     Do you disagree with what I
6    just said; that one can retire from a
7    company that employees them, but cannot
8    retire from a company in which they are
9    serving as a member?
10        A.     As long as one follows --
11   follows the procedures, so long as the
12   documents allow for it, one can do that.
13        Q.     Okay.  And the procedures
14   you're referring to are the procedures that
15   we looked at in Section 7.1A, for example,
16   of the Partners LLC Agreement as it
17   pertains to withdrawing from Partners?
18        A.     That would be some of them.
19        Q.     Are there any --
20        A.     That does not encompass his --
21   anything related to Brevet Holdings to
22   Brevet Holdings where -- right.
23        Q.     Meaning, in order to withdraw
24   from -- what -- what -- what do you mean by
25   that would not encompass anything related

```
                    MARK CALLAHAN
1
2    to Brevet Holdings?
3         A.    Brevet Holdings is not a party
4    to the document you referenced.
5         Q.    So, Brevet Holdings is not a
6    party to the Partners LLC Agreement; is
7    that what you mean?
8         A.    That's correct.
9         Q.    Okay.  So, apart from the fact
10   that Brevet Holdings would have its own
11   section identifying whatever requirements
12   there are for withdrawal or retirement, did
13   you have anything else in mind when you
14   clarified that -- when you -- when you --
15   when you made the clarification that you
16   made a couple minutes ago?
17              MR. SOLOMON:  Object to the
18          question.
19        A.    As I sit here right now, I
20   don't recall anything else.  I was just
21   highlighting the fact that when you're
22   talking about entities outside of the
23   entities in the -- in the LLC agreement,
24   Section 7.1 would have nothing to do with
25   those entities.
```

Page 145

1                    MARK CALLAHAN
2       Q.    Let's take a look at, um, the
3    next exhibit, which has been marked Exhibit
4    6.
5                 (Whereupon, calender entry for
6            January 6, 2016 was marked as Exhibit
7            6 for identification as of this date
8            by the Reporter.)
9                 (Witness complies.)
10      Q.    Tell me when you have that
11   pulled up, please.
12                MR. SOLOMON:  Not yet.  We are
13          not seeing 6.
14                (Witness reviews document.)
15                MR. SOLOMON:  6 is on the
16          screen.
17                MR. CYRULNIK:  Great.
18      Q.    Mr. Callahan, do you recognize
19   the document that is in front of you on
20   your screen?
21                (Witness reviews document.)
22      A.    As I sit here right now, I
23   don't necessarily recognize it.
24      Q.    Do you have any reason to doubt
25   that you received a calendar invite to a

```
                                     Page 146
 1                   MARK CALLAHAN
 2    meeting with Mr. Iacovacci regarding his
 3    health update and personal discussion for
 4    January 6th of 2016 at 8:30 a.m. to which
 5    you and Doug Monticciolo were invited as
 6    well?
 7         A.    As I sit here right now, that's
 8    what this looks like.
 9         Q.    Do you recall attending such a
10    meeting?
11              (Witness reviews document.)
12         A.    As I sit here right now, I
13    don't -- I don't really recall the -- that
14    meeting itself.
15         Q.    Do you have any recollection of
16    sitting down and you see the location there
17    is listed as DM office, I take it that --
18    what does that refer to in your view?  Is
19    that what -- is that one way of referring
20    to Mr. Monticello's office?
21              (Witness reviews document.)
22         A.    It -- it seems reasonable that
23    DM office would be Doug Monticello's
24    office.
25         Q.    I'd agree.
```

```
 1                    MARK CALLAHAN
 2            So, looking at this document,
 3    does it refresh your recollection at all,
 4    do you have any general recollection of
 5    sitting down with Mr. Iacovacci and
 6    Monticciolo in the -- in the morning of
 7    January 6th to discuss Mr. Iacovacci's
 8    health situation and to have a personal
 9    discussion?
10        A.    As I sit here right now, I
11    don't recall that meeting.
12        Q.    Um, any reason to doubt that at
13    that meeting Mr. Iacovacci informed you
14    that he was planning to retire from Brevet?
15            MR. SOLOMON:  I object to the
16        question.
17            (Witness reviews document.)
18        A.    As I sit here right now, the --
19            (Witness reviews document.)
20        A.    -- given the -- follow -- the
21    meeting we had after this, where it didn't
22    even come up in that meeting, yes, there
23    would be reason to dispute that he was
24    talking about retirement.
25        Q.    Okay.  And what was the meeting
```

```
                        MARK CALLAHAN
 1
 2   that we had after this?
 3        A.    It was really about his health.
 4        Q.    Okay.  What was the meeting
 5   that you had after that you had in mind?
 6        A.    I -- I recall a meeting at a
 7   restaurant or a diner somewhere near
 8   Tribeca.
 9        Q.    Okay.  And do you know when
10   that meeting took place?
11        A.    As I sit here right now, I
12   don't recall when that meeting took place.
13        Q.    And it's your testimony that
14   the meeting that took place in the Tribeca
15   area at that meeting the topic of
16   Mr. Iacovacci's retirement or withdrawal
17   from Brevet did not come up?
18        A.    As I sit here right now, I
19   recall that again, he was talking about the
20   fact that he was physically unable to work
21   and wasn't sure whether or not he would
22   ever be able to physically be able to work.
23   And the conversation was expanded to a
24   little bit of discussion around -- about
25   the fact that he was looking for health
```

                    MARK CALLAHAN

1
2    insurance, looking to, um, you know, remain
3    an employee for as long as possible, to --
4    to maintain that health insurance and that
5    we would -- you know, that's my
6    recollection.
7         Q.    So, you recall discussing with
8    him at the meeting in Tribeca his desire to
9    try to keep health insurance in place for
10   as long as possible given his medical
11   situation; is that right?
12        A.    As I sit here right now, that's
13   my recollection.
14        Q.    And you understood that the
15   reason he was raising the question of how
16   long Brevet could provide him with health
17   insurance was because he had communicated
18   to you that he was unable to continue
19   working and that he intended to retire,
20   correct?
21        A.    It's my intention that he
22   wanted to maintain an employee for as long
23   as possible so that he would maintain that
24   health insurance regardless of whether or
25   not he was doing any work.

```
                                        Page 150
 1                    MARK CALLAHAN
 2         Q.    Right.  So, when you say he
 3    wanted to remain an employee, you mean he
 4    wanted to qualify for as long as possible
 5    for health insurance given his medical
 6    situation; is that right?
 7         A.    That's not my understanding.
 8         Q.    Your understanding is that he
 9    wanted to continue working for as long as
10    possible?
11         A.    It is my understanding that he
12    wanted to remain an employee for as long as
13    possible.
14         Q.    Right.  And that's what I am
15    trying to drill down on you -- with you,
16    Mr. Callahan.  When you say "remain an
17    employee," you're referring to the fact
18    that an employee status would allow him to
19    have health insurance coverage from Brevet,
20    correct?
21         A.    It's my understanding that
22    employee status is -- is one way that one
23    could have health insurance from Brevet.
24         Q.    Is it your understanding that
25    another way to have health insurance from
```

1                    MARK CALLAHAN
2    Brevet is for someone to cease being an
3    employee, but for Brevet to continue to
4    allow them to keep their medical coverage
5    for a period of time after they ceased
6    working?
7          A.    No, that's not my
8    understanding.
9          Q.    Is it your understanding that
10   at whatever point in time someone would
11   cease to be an employee, that person would
12   necessarily lose their medical coverage
13   from Brevet?
14         A.    That's not my understanding
15   either.
16         Q.    Okay.  What is your
17   understanding about the relationship
18   between health coverage and being an
19   employee?
20         A.    My understanding is that when
21   you're an employee of Brevet, Brevet
22   provides -- provides for the options to opt
23   into health coverage.
24         Q.    Okay.  Is there any other way
25   to get Brevet health coverage if you're not

Page 152

1                    MARK CALLAHAN
2    a Brevet employee through Brevet?
3         A.    My understanding is that if you
4    are no longer an employee, you can opt into
5    COBRA.
6         Q.    Okay.  And separate and apart
7    from COBRA, are you aware of any other way
8    that Brevet could provide medical insurance
9    for an individual who was an employee, but
10   ceased functioning as an employee?
11        A.    As I sit here right now, I
12   don't know of any other way besides having
13   -- I believe that in order to be on the
14   health plan, you need to be an employee.
15        Q.    And COBRA was only available
16   for a finite period of time following
17   the end of an employee's employment,
18   correct?
19        A.    It's my understanding that yes,
20   it's a finite period of time -- finite
21   amount of time, but I don't know the amount
22   of time, and I believe that amount of time
23   continues to change.
24        Q.    So, you understood when
25   Mr. Iacovacci was talking to you about how

```
 1                    MARK CALLAHAN
 2    long he could remain an employee of Brevet,
 3    he was asking you how long Brevet would be
 4    able to keep him on his medical insurance,
 5    correct?
 6         A.    That's not correct.
 7         Q.    What's not correct about what I
 8    just said?
 9         A.    If you're implying that how
10    long -- are you implying that how long he
11    could utilize health insurance inclusive of
12    COBRA?
13         Q.    I'm not, I'm not including
14    COBRA.
15         A.    It's my understanding that Paul
16    was looking for him to be employed as long
17    as possible.
18         Q.    Because he wanted health
19    insurance for as long as possible?
20         A.    I -- I can't -- -- I don't know
21    what his -- what his, um -- what his
22    reasoning was.  But I believe that he
23    talked about health coverage.  He also
24    received expense coverage and salary
25    throughout that time period.
```

```
 1                  MARK CALLAHAN
 2        Q.     Okay.  And was Brevet open to
 3   providing Mr. Iacovacci with those
 4   benefits, some or all of those benefits
 5   even though he was unable to work?
 6        A.     As long as Mr. Iacovacci was an
 7   employee for Brevet Holdings, he was
 8   entitled to all of those.
 9        Q.     I understand that.
10               My question is:  Was Brevet
11   open to allowing Mr. Iacovacci to remain an
12   employee of Brevet Holdings notwithstanding
13   the fact that Mr. Iacovacci could no longer
14   perform his job duties?
15        A.     As I sit here right now, he did
16   remain an employee.
17        Q.     So, is the answer to my
18   question yes?
19        A.     Can you ask the question again?
20        Q.     Sure.
21               MR. CYRULNIK:  Can the court
22          reporter please read back the
23          question?
24               (Whereupon, the referred to
25          question was read back by the
```

```
 1                    MARK CALLAHAN
 2        Reporter.)
 3             THE WITNESS:  I just lost you
 4        for a moment.  You dropped off there
 5        for a second.
 6             So, the key -- just going back
 7        to -- that was a little choppy in how
 8        it was read back.  The key part of
 9        the question is, from the beginning,
10        can you read that part again?
11             (Whereupon, the referred to
12        question was read back by the
13        Reporter.)
14        A.    My understanding is that --
15   that -- I guess the question was whether or
16   not we were open to it?
17             I mean, Brevet continued --
18   Brevet Holdings continued to pay
19   Mr. Iacovacci and include him in all of his
20   -- all the firm benefits from January
21   through October of 2016.
22        Q.    So, yes?
23        A.    That's -- I don't have anything
24   else to add.
25        Q.    Well, you're not claiming that
```

```
                                        Page 156
 1                    MARK CALLAHAN
 2    Mr. Iacovacci somehow coerced you into
 3    doing that, right?
 4              MR. SOLOMON:  I object to the
 5         question.
 6         A.    You're asking whether or not I
 7    think Mr. Iacovacci coerced us into it?
 8         Q.    Well, I am trying to understand
 9    what you meant by, I have nothing to add to
10    the question -- to the answer when I asked
11    you a straightforward yes or no question
12    whether Brevet was open to allowing Mr.
13    Iavocacci to remain on as an employee,
14    notwithstanding the fact that he wasn't
15    able to work.  And I believe your answer
16    concerned what they ultimately did as
17    opposed to answering whether they were open
18    to doing so, and so I am trying to clarify.
19         A.    Yeah.  I guess I would clarify
20    by saying, it was uncertain at that point
21    in time as to whether or not he was or
22    wasn't able to work.
23         Q.    Did you think he was working
24    full-time from January until October of
25    2016 for Brevet?
```

Page 157

1                   MARK CALLAHAN
2          A.    It was my understanding that he
3   wasn't working full-time for Brevet during
4   that time period.
5          Q.    At the time, did you believe
6   that he was working full-time for Brevet
7   during that time period?
8               MR. SOLOMON:  I object to the
9          question.
10         A.    During that can time period,
11  I -- my understanding is that he was not
12  working full-time for Brevet, when he was,
13  um -- when he was undergoing his surgeries
14  and shortly thereafter his surgeries.
15              My understanding also was that
16  during that time period, I guess to get
17  back to some of our earlier topics about
18  being incapacitated, he wasn't
19  incapacitated, but clearly wasn't working
20  full-time for Brevet because it appeared
21  that he was starting to do other things,
22  um, um, counter to Brevet and counter to
23  Brevet's investors.
24         Q.    When are you referring to
25  having had knowledge that Mr. Iacovacci was

1                    MARK CALLAHAN

2    engaging in the activities you just

3    described?

4         A.     With respect to his activities,

5    I -- I don't recall, you know, in terms of

6    his -- his athletic activities, his hikes,

7    his traveling, his amusement parks, I

8    believe that we learned that in the midst

9    of litigation.

10                 With respect to his potentially

11   acting against or to the detriment of

12   Brevet and to the detriment of Brevet's

13   investors, that's something that we

14   investigated over a time period from

15   probably May of '16 through October.

16        Q.     Okay.  So, we are gonna get to

17   that.  But before we get into the date,

18   let's talk about prior to May of '16 then.

19                 Prior to May of '16, you

20   understood, it was your understanding that

21   Mr. Brevet was employing Mr. Iacovacci,

22   that is, providing him benefits and salary

23   and reimbursements notwithstanding the fact

24   that Mr. Iacovacci was not working

25   full-time for Brevet.

1                    MARK CALLAHAN
2                Is that a fair statement?
3        A.    It is my understanding that
4   Mr. Iacovacci was receiving everything you
5   just said, salary, benefits and he wasn't
6   working full-time at that point in time.
7        Q.    And the reason why Brevet
8   agreed to pay him and provide him those
9   benefits and salary notwithstanding the
10  fact that he was not working full-time was
11  what?
12       A.    As I sit here right now, I -- I
13  -- I -- I think that, um, I'm appreciative
14  that Brevet does things like that.  I
15  haven't been working full-time over the
16  last four months and I've received salary
17  and benefits and I am very appreciative of
18  that.
19       Q.    Understood.
20                And so, fair to say that Brevet
21  was a company that appreciated its
22  long-time contributors and was flexible
23  with respect to providing salary or
24  benefits to those individuals in certain
25  circumstances even though those individuals

```
 1                    MARK CALLAHAN
 2   couldn't work full-time?
 3              MR. SOLOMON:  Object to the
 4         question.
 5        A.    It's my understanding it has
 6   nothing to do whether or not somebody's a
 7   long-standing contributor to Brevet.
 8        Q.    So, what -- what then is the
 9   reason for Brevet providing full salary and
10   benefits to be it Mr. Iacovacci or be it
11   you in a circumstance where you are not
12   working full-time?
13        A.    It is my understanding that
14   that, you know, call it what you want,
15   Brevet has a heart, I guess, if somebody
16   has some medical issues, it's not something
17   that Brevet looks to terminate people.
18              Unfortunately, there are times
19   such as these that employees take advantage
20   of that.
21        Q.    And so, I take it when you were
22   referring to the last four months for you,
23   is that also a situation where you're not
24   working full-time for a personal medical
25   reason?
```

```
 1                    MARK CALLAHAN
 2        A.     That is correct.
 3        Q.     Okay.  Did you have a
 4   discussion with anybody at Brevet about
 5   how long they will -- they would be
 6   agreeing to employ you fully in the face
 7   of an inability to work the same hours that
 8   you had been working traditionally?
 9        A.     I don't recall any -- any
10   conversations that went into that detail,
11   but there were certainly conversations
12   about availability and amount of time
13   working.
14        Q.     And those were conversations
15   you had with Mr. Monticiollo?
16        A.     It's -- it's my recollection
17   that I had those conversations with the,
18   um, the HR Department and as well as more
19   periphery with Mr. Monticciolo and Ms. Da
20   Silva Vint.
21        Q.     We wish you all the best with
22   respect to that medical situation.
23        A.     Thank you.
24        Q.     Returning to Mr. Iacovacci
25   then.
```

                    MARK CALLAHAN

1

2              So, in light of his health

3    situation, is it fair to say --

4              MR. CYRULNIK:  Let me reverse

5       those, so I'll withdraw the question.

6       Q.    Is it fair to say that in light

7    of his health situation, Brevet wanted to

8    accommodate him as best they could to

9    continue to employ him and provide him

10   benefits notwithstanding the fact that they

11   understood he would not be able to devote

12   his full-time and attention to working at

13   the company in 2016?

14       A.    It's my recollection that that

15   -- that Brevet understood that the --

16   excuse me, his ability to work would be

17   curtailed early on in the year surrounding

18   a couple of surgeries that he was having,

19   uncertain as to what it would mean for the

20   latter part of the year.

21       Q.    So, at least with respect to

22   the first part of the year, what I asked

23   was correct?

24       A.    With respect to whether or not

25   he would be -- have limitations on his

```
 1                    MARK CALLAHAN
 2   availability while he was undergoing
 3   surgery and rehab, that's correct.
 4         Q.    When you met with him, I know
 5   you said you didn't recall the January 6th
 6   meeting, but you did recall another
 7   in-person meeting in Tribeca, when you met
 8   with him, he was in a cast?
 9         A.    It's my recollection that he
10   was -- I don't know what you mean whether
11   it was -- I don't believe it was a hard
12   cast, but he had something -- it was
13   something.
14         Q.    Did you know that his leg was
15   bleeding?
16         A.    I don't recall seeing a leg
17   bleeding.
18         Q.    Do you recall him telling you
19   that his legs were bleeding?
20         A.    I don't recall whether or not
21   -- I mean -- I don't recall whether he did
22   or didn't say that his leg was bleeding.
23         Q.    And is it your -- is it your
24   testimony that Mr. Iacovacci never told you
25   any time in January that he intended to
```

Page 164

                    MARK CALLAHAN

 1

 2    retire from Brevet?

 3        A.    It's my recollection that Mr.

 4    Iacovacci told us he was unable to continue

 5    to work and he was uncertain as to whether

 6    or not he'd ever be able to work, given he

 7    wasn't sure he'd ever be able to travel due

 8    to his leg -- or the issues with his legs.

 9        Q.    And I understand that and I

10    appreciate that.  But I do want to zero in

11    on the question that I'm asking --

12        A.    I wasn't --

13            MR. SOLOMON:  He wasn't

14         finished with the answer.

15        Q.    Oh.  Please continue.

16        A.    Oh, sorry.  I'm just trying to

17    get my train of thought back.

18            I can't remember now.

19        Q.    My apologies.  I didn't know

20    you were in the middle of the answer.

21    Maybe my follow-up with jog your answer:

22    What I was following up with was I

23    appreciate the testimony you gave about

24    your recollection regarding his describing

25    his medical condition and his uncertainty

Page 165

```
 1                    MARK CALLAHAN
 2   with respect to his prognosis.
 3             My question is specifically
 4   with respect to the subject of retiring or
 5   withdrawing from Brevet.
 6             Is it your testimony, Mr.
 7   Callahan, under oath that Mr. Iacovacci did
 8   not discuss with you in January of 2016 the
 9   subject of his retiring or withdrawing from
10   Brevet?
11             MR. SOLOMON:  I object to the
12        question.  It has been asked several
13        times.
14        A.   Yeah.  As I sit here right now,
15   my recollection is that he certainly never
16   brought up withdrawal and in conversations,
17   never brought up retiring, it was more of a
18   general, I don't think I'm able to continue
19   the work because flying is such an
20   important part of what he did and he didn't
21   think he'd ever be able to get on a plane
22   again.
23        Q.   Going with your recollection
24   for a minute:  Let's assume he talks to you
25   about his concern that he'll never be able
```

```
 1                    MARK CALLAHAN
 2   to continue to work, did you think that his
 3   -- his view was that he was gonna continue
 4   to remain on in his capacity as member and
 5   employee of the various Brevet entities
 6   even though he couldn't work?
 7        A.    As I sit here right now, I
 8   don't have a recollection as to what I
 9   was -- what I thought about what he was
10   asking at that point.
11        Q.    But you're certain that he
12   didn't mention to you that because of his
13   concerns about his medical condition that
14   he wanted to discuss retiring or
15   withdrawing from Brevet, right?
16             MR. SOLOMON:  I object to the
17         question.
18        A.    Yeah, I don't have anything
19   further to add on that.
20        Q.    So, is the answer yes, you're
21   certain that those subject matters didn't
22   come up?
23        A.    That is not what I previously
24   said.  As I sit here right now, my
25   recollection is that he never brought up
```

Page 167

```
1                    MARK CALLAHAN
2    withdrawing and that he never brought up
3    retiring, he just brought up not being able
4    to physically work.
5         Q.    Okay.  Let's take a look at the
6    next exhibit, which is Exhibit 7 in your
7    folder.
8              (Whereupon, e-mail chain
9         following up on retiring was marked
10        as Exhibit 7 for identification as of
11        this date by the Reporter.)
12             (Witness reviews document.)
13             MR. SOLOMON:  Exhibit 1, it's
14        the first page.
15             MR. CYRULNIK:  It's Exhibit --
16        yeah, the first page says either
17        Exhibit 1 or I.
18             MR. SOLOMON:  It's on the
19        screen.
20        Q.    If you can take a look at that
21   document and tell me whether you recognize
22   that e-mail chain and we're gonna start at
23   the bottom of the final page, which is Page
24   3 of the pdf, Page 2 of the internal
25   pagination.
```

```
 1                    MARK CALLAHAN
 2              (Witness reviews document.)
 3       Q.    Do you have that e-mail in
 4  front of you?  It's an e-mail from Paul
 5  Iacovacci to Doug Monticciolo and yourself
 6  dated January 12th of 2016, at 5 p.m.
 7              Do you see that?
 8       A.    I see that.
 9       Q.    And the subject line, can you
10  read that into the record, please?
11       A.    Subject:  I wanted to follow-up
12  on last week's retirement discussion that
13  we had while I was in the office.
14       Q.    Mr. Callahan, would you agree
15  with me that the subject line of this
16  e-mail indicates that you, Doug and
17  Mr. Iacovacci did, in fact, meet in the
18  office earlier in January of 2016 and that
19  there was a discussion about
20  Mr. Iacovacci's retirement.
21              (Witness reviews document.)
22       A.    Again, as I sit here right now,
23  I would agree with you that this e-mail
24  would -- would, um, infer that there was a
25  meeting earlier in January.  But I -- I
```

```
                              MARK CALLAHAN
 1
 2    don't believe that it infers what was
 3    discussed in that meeting simply because of
 4    the subject line that Mr. Iacovacci used
 5    there
 6         Q.   I want to make sure I
 7    understand your testimony, Mr. Callahan.
 8              Paul Iacovacci sends you an
 9    e-mail on January 12th referencing a
10    retirement discussion from the week before
11    and it's your testimony that that subject
12    line does not suggest that you in fact had
13    a retirement discussion with Mr. Iacovacci
14    the prior week?
15         A.   What I am saying is -- is -- as
16    I sit here right now, based on my
17    recollection, he didn't use the terms
18    retirement or withdrawal.
19         Q.   Well, you would agree with me,
20    Mr. Callahan, that he used them here,
21    right?  He used the term retirement in the
22    subject line of this e-mail to you,
23    correct?
24              (Witness reviews document.)
25         A.   That's correct.
```

1                    MARK CALLAHAN

2        Q.    So, if you had any doubt about

3   what his intentions were after meeting with

4   him in person prior to this e-mail, would

5   you agree with me that it was clear that at

6   least from his perspective what he was

7   trying to communicate to you was that he

8   wanted to retire?

9              (Witness reviews document.)

10       A.    It is my understanding even

11  from this e-mail that perhaps he wanted to

12  follow up on the discussion.  Whether or

13  not it was his intention was for him to

14  retire is not clear from this e-mail.

15       Q.    Do you see your response, the

16  next link in the chain up on January 12th

17  at 2:59 p.m., which I am guessing is a

18  different time zone, where you respond to

19  his e-mail with the subject line that we

20  just read?

21             (Witness reviews document.)

22       A.    I see that e-mail.

23       Q.    And do you see in response to

24  the subject line, I wanted to follow up on

25  last week's retirement discussion that we

```
 1                    MARK CALLAHAN
 2   had while I was in the office where
 3   Mr. Iacovacci asks you when we can discuss
 4   transition.
 5              Do you see that you respond:
 6   "How are you feeling?  Are you able to get
 7   around at all yet without severe pain?  The
 8   rest of the week is packed solid.  Monday
 9   is MLK Day, so I will not be in.  And
10   Tuesday, I am likely going to Engage Point
11   in Maryland.  So, can we say Wednesday of
12   next week?  I spent most of the day dealing
13   with your best friend, Dean.  He misses
14   you."
15              Do you see that?
16        A.    I see that e-mail.
17        Q.    Mr. Callahan, why didn't you
18   respond to Mr. Iacovacci -- what retirement
19   discussion are you talking about?
20              (Witness reviews document.)
21        A.    As I sit here right now, I
22   don't -- I don't know what I was thinking
23   at that point in time.
24        Q.    Well, would you agree with me
25   that if he referenced a retirement
```

Page 172

1                        MARK CALLAHAN
2    discussion that didn't in fact take place
3    the prior week, you would have naturally
4    asked him what he was talking about in
5    response to that e-mail?
6         A.    Again, as I sit here right now,
7    especially, you know, you highlighted that
8    this is a different time zone, so clearly I
9    was traveling, I don't know what I was
10   thinking when I received this or where I
11   was when I received this.
12        Q.    What did you understand
13   Mr. Iacovacci to mean when he asked you
14   about discussing the transition?
15              (Witness reviews document.)
16        A.    As I sit here right now, it's
17   my understanding that transition would be
18   that he was unable to do certain of his
19   functions and required to -- he needed to
20   transition some of the work he was working
21   on.
22        Q.    Do you recall discussing the
23   prospect of transitioning his job
24   responsibilities to another Brevet
25   individual?

1              MARK CALLAHAN

2       A.     As I sit here right now, I

3   don't -- I don't recall having any specific

4   discussions about transitioning.

5       Q.     Mr. Callahan, in light of this

6   e-mail chain, is there anything about your

7   prior testimony in response to my questions

8   about discussions with Mr. Iacovacci

9   regarding retirement or withdrawal in

10  January of 2016 that you would like to

11  revise?

12             (Witness reviews document.)

13      A.     As I sit here right now, no,

14  there is nothing that I would like to

15  advise in terms of those questions were

16  whether or not there were any discussions

17  about it and I don't believe that there

18  were any discussions where retirement or

19  withdrawal was communicated.  This is a

20  separate -- this is an e-mail, which I

21  don't view as a discussion.

22      Q.     So, when you were referring to

23  discussions, you were excluding e-mail

24  communications?

25      A.     My understanding of discussions

```
 1              MARK CALLAHAN
 2   is talking.
 3        Q.    So, is the answer to my
 4   question, yes?
 5        A.    Yes.
 6        Q.    When -- okay.
 7              Was there anything else you
 8   were excluding from your answer when you
 9   answered my question about discussions --
10              MR. CYRULNIK:  Withdrawn.  Let
11         me phrase it differently.
12        Q.    Are there any other forms of
13   communication other than talking that you
14   meant to exclude from your answer when I
15   asked you my question previously about
16   discussions regarding retirement or
17   withdrawal in January of 2016?
18              MR. SOLOMON:  I object to the
19         question.
20        A.    As I sit here right now, I
21   don't know of any other forms of
22   communications that you'd be talking about.
23        Q.    Did you retain counsel to
24   negotiate a retirement package with
25   Mr. Iacovacci or his attorney?
```

MARK CALLAHAN

A. It is my understanding that I personally did not en- -- engage counsel, but and -- and this is counsel that we already had, I guess had engaged, but we had -- we enlisted counsel to prepare and negotiate and Separation Agreement with Mr. Iacovacci.

Q. Why did you do that?

A. Counsel was engaged -- it's my understanding that counsel was engaged to prepare a Separation Agreement because there was going to be a separation.

Q. What's the basis for your assumption that there was going to be a separation with Mr. Iacovacci.

(Witness reviews document.)

A. It's my recollection that there was a subsequent conversation to -- to these, um, subsequent -- subsequent to this e-mail and subsequent to the two conversations we've spoken about, there was another conversation.

Q. Okay. And was that other conversation about retiring or withdrawing

MARK CALLAHAN

from Brevet?
A. It's my recollection that that conversation was about a Separation Agreement.
Q. When did this conversation that you are referring to take place?
A. As I sit here right now, I don't recall, but it would be -- I would -- I don't recall.
Q. What's your best recollection? Give me a time period that you can pinpoint for me.
MR. SOLOMON: I object to the question.
Q. Was it after January of 2016?
(Witness reviews document.)
A. As I sit here right now, I believe it would be after January 12th, 2016.
Q. Do you know if it was after January 20th of 2016?
A. I don't know.
Q. Was it after the Tribeca meeting that you were referencing earlier?

```
 1                  MARK CALLAHAN
 2      A.    What was the date of the
 3  Tribeca meeting?
 4      Q.    I can't make a representation
 5  about it, but I can ask you whether January
 6  20th rings a bell?
 7      A.    As I sit here right now,
 8  January 20th doesn't ring a bell.
 9      Q.    Okay.  Do you know whether just
10  from a sequencing perspective the
11  conversation that you are now recalling
12  took place before or after the in-person
13  meeting in TriBeCa?
14      A.    As I sit here right, now my
15  recollection is that it took place after
16  the TriBeCa meeting.
17      Q.    Okay.  And is it your testimony
18  that this conversation that you recall --
19  this is a phone conversation?
20      A.    As I sit here right now, it is
21  my recollection that it was a phone
22  conversation.
23      Q.    Okay.  So, I am asking you
24  questions about that conversation.  Given
25  that you don't have the precise date, I
```

```
 1                    MARK CALLAHAN
 2   will refer to it as the conversation that
 3   took place after the meeting in TriBeCa.
 4              Is that a fair way of
 5   describing it based on your recollection?
 6        A.    Yes.
 7        Q.    So, with respect to the
 8   conversation that took place after the
 9   meeting in Tribeca, I want to make sure I
10   am clear on your testimony:  Is it your
11   testimony that during this conversation the
12   subject of Paul retiring or withdrawing
13   from Brevet also did not arise?
14              MR. SOLOMON:  I object to the
15         question.
16        A.    As I sit here right now, it is
17   my recollection as I've already stated that
18   that -- what was discussed was the
19   Separation Agreement and that there was no
20   discussion of -- that, you know, the use of
21   the word of retirement or withdrawal.
22        Q.    That's an important switch
23   there, so I want to make sure that I am not
24   missing -- we are not appreciating what
25   you're saying.
```

```
 1                    MARK CALLAHAN
 2             I heard you, in giving your
 3    answer, talk about referencing the word
 4    "retirement" or "withdrawal."  I'm
 5    asking you a slightly broader question,
 6    Mr. Callahan.
 7             Did the subject, whatever words
 8    were used during that phone conversation,
 9    did the subject of Mr. Iacovacci retiring
10    or withdrawing from Brevet come up at all
11    during that call?
12             MR. SOLOMON:  I object to the
13         question, it's a mischaracterization.
14       A.    Yeah.  As I sit here right now,
15    my recollection is that as I have stated
16    already, the -- you know, the retirement
17    and withdrawal were not discussed.
18       Q.    Why was a Separation Agreement
19    being prepared for somebody who was neither
20    retiring nor withdrawing from Brevet?
21       A.    I didn't state that the -- that
22    he was -- the Separation Agreement was --
23    as I sit here right now, I recall that the
24    Separation Agreement was being drafted to
25    address the potential for Paul no longer
```

```
                              MARK CALLAHAN
 1
 2    working for Brevet due to potential health
 3    issues.
 4         Q.    You gotta to help me out here:
 5               So, Paul had been working for
 6    Brevet for more than a decade or I think
 7    more than a decade at this period of time;
 8    is that right?  Am I off by a couple of
 9    years?
10         A.    As I sit here right now, I
11    don't -- I don't know those dates.
12         Q.    Okay.  Paul had been working
13    for Brevet for many years as of 2016,
14    correct?
15         A.    I -- as I sit here right now, I
16    believe that to be the case.
17         Q.    Do you agree with me that the
18    only way that that ceases to be the case,
19    that is that Mr. Iacovacci is no longer
20    working for Brevet, is either he withdraws
21    or retires, option one; two, Brevet
22    terminates his employment, or three, God
23    forbid, he dies?
24               Am I missing any other option
25    for how that relationship ceases to exist?
```

```
 1                 MARK CALLAHAN
 2      A.    As I sit here right now?
 3      Q.    Yes.
 4      A.    With respect to the
 5   relationship with Brevet being many
 6   entities, you can have a -- I am not aware
 7   of any other options except for the fact
 8   that you can have options within those
 9   options because there's multiple entities.
10      Q.    Fair enough.
11            So, let's stick with those
12   three options which strike me as the
13   logical ones too.
14            You weren't asking your counsel
15   to prepare a perspective Separation
16   Agreement because you were predicting that,
17   God forbid, there'd be a death that would
18   cause the separation of Mr. Iacovacci from
19   Brevet, right?
20      A.    As I sit here right now, I
21   believe that's correct.
22      Q.    And when did you ask your
23   counsel -- when do you first recall asking
24   your counsel to prepare a draft Separation
25   Agreement; was that in February of 2016?
```

1                    MARK CALLAHAN

2        A.    As I sit here right now, I

3    don't recall the date when -- when we went

4    -- when Brevet asked counsel to prepare a

5    Separation Agreement.

6        Q.    Okay.  You would agree with me

7    it was sometime before April of 2016,

8    right?

9        A.    As I sit here right now, I

10   think I just know that it was after the

11   January 12th or 20th date that we were

12   previously talking about it.

13       Q.    Okay.  I think we're left with

14   two options, if I'm remembering where we

15   were.

16       A.    The only other two ways that

17   Mr. Iacovacci would be separating from

18   Brevet, now that we've taken death out of

19   the picture, was that Brevet anticipated

20   his desire to leave, withdrawn, retire or

21   whatever suboptions you have, or that

22   Brevet was asking his counsel to prepare a

23   separation for somebody that they were

24   intending to terminate.

25              Would you agree with me that as

```
 1                    MARK CALLAHAN
 2   of the time that you had engaged counsel to
 3   prepare a first draft Separation Agreement
 4   that it was not Brevet's intention to be
 5   terminating Mr. Iacovacci from Brevet.
 6        A.    As I sit here right now, that's
 7   correct.
 8              THE COURT REPORTER:  I didn't
 9        get that answer.
10        A.    As I sit here right now, that's
11   correct
12        Q.    Okay.  So, that leaves us,
13   process of elimination, with one option:
14   You would agree with me that the reason
15   that Brevet engaged counsel to draft a
16   Separation Agreement is because Brevet
17   understood that Mr. Iacovacci wanted to
18   leave Brevet, be it by -- via retirement,
19   withdrawal, whatever term you want to use,
20   that he was going to be voluntarily exiting
21   the company.
22              Is that fair?
23              MR. SOLOMON:  Note my
24        objection, please.
25        A.    As I sit here right now, it --
```

1                     MARK CALLAHAN

2    it's -- it's my understanding that -- that

3    Paul had expressed to us a -- a -- a desire

4    to leave because he was incapable of ever

5    working again.

6         Q.    Understood.

7               When did he first express that

8    to you?

9         A.    As I sit here right now, I

10   don't recall.

11        Q.    Could it have been in January

12   6th, in that meeting that was referenced in

13   that January 12th e-mail?

14               MR. SOLOMON:   I object to the

15          question.

16        A.    As I sit here right now, I

17   don't recall.

18        Q.    Could have been January 6th?

19               MR. SOLOMON:   Objection; calls

20          for speculation.

21        A.    As I sit here right now, I

22   don't recall.

23        Q.    Well, you saw the reference to

24   a meeting that took place in the week prior

25   to January 12th in the e-mail that we

```
 1                    MARK CALLAHAN
 2    looked at together, that was Exhibit 7,
 3    that was the meeting that was described in
 4    the subject line of Mr. Iacovacci's January
 5    12th e-mail to you; do you recall that
 6    reference?
 7              MR. SOLOMON:  I object to your
 8         testifying.
 9              MR. CYRULNIK:  My testifying?
10         I am just asking whether he recalls
11         the reference.
12         A.   I see the -- the, um, the
13    Exhibit 7.
14         Q.   Okay.  Could the discussion,
15    retirement discussion that is referenced in
16    the subject line, last week's retirement
17    discussion, could that be the first time
18    that Mr. Iacovacci expressed his desire
19    leave as a result of his medical situation?
20         A.   As I have said, I don't recall.
21         Q.   So, could that have been the
22    first time Mr. Iacovacci had referenced
23    that to you?
24         A.   That could have been or any
25    other time could have been.  I don't
```

                                                      Page 186

1                        MARK CALLAHAN

2    recall.

3          Q.    Yes.

4                So, it is possible that in

5    January of 2012, you did have a discussion

6    with Mr. Iocavacci, in which he

7    communicated his desire to leave Brevet as

8    a result of his medical situation; is that

9    correct?

10               MR. SOLOMON:  Same objection.

11         A.    Yeah.  I mean, I think as I sit

12   here right now, I think you throw a lot

13   into that.  Again, I think I've told you

14   that Mr. Iacovacci was talking about the

15   inability to work.

16         Q.    And I understand that

17   Mr. Iacovacci reason, in your view, for

18   wanting to leave may have been associated

19   with his medical condition or inability

20   work and I am trying to isolate what he

21   communicated to you about what he wanted to

22   happen as distinct from what he

23   communicated to you as the reason for him

24   wanting something to happen.  So, I totally

25   understand that you're telling me about

```
 1              MARK CALLAHAN
 2   what you recall by way of the reason that
 3   he provided for you for whatever it is that
 4   he was talking to you about, but I just
 5   want to focus on the sort of therefore part
 6   of what he told you.
 7              He told you he was unable to
 8   work or concerned that he was unable to
 9   work and therefore he wanted to leave
10   Brevet.
11              Is that a fair summary of your
12   recollection of one or more of your
13   discussions with Mr. Iacovacci?
14              MR. SOLOMON:  Same objection.
15      A.    As I sit here right now, it's
16   my recollection that that occurred after
17   these January events.
18      Q.    Okay.  How long after these
19   January events?
20      A.    As I sit here right now, I
21   think as I have already answered, I don't
22   recall.
23      Q.    Do you know if it was prior to
24   May of 2016 that he communicated his desire
25   to leave?
```

```
                                        Page 188
 1                  MARK CALLAHAN
 2       A.    As I sit here right now, I
 3  believe it was prior to May.
 4       Q.    Okay.
 5       A.    Prior to May, where he -- where
 6  we had discussions around the need for a
 7  comprehensive Separation Agreement.
 8       Q.    Whose view was it that you
 9  needed a comprehensive Separation
10  Agreement; his or yours?
11       A.    As I sit here right now, I
12  believe it was Counsel's view.
13       Q.    His counsel or your counsel?
14       A.    I believe it was -- as I sit
15  here right now, I believe it was both.
16       Q.    Did Mr. Iacovacci ever tell you
17  that he wanted to have a Separation
18  Agreement in place?
19       A.    As I sit here right now, I
20  don't recall.
21            MR. CYRULNIK:  Well, why don't
22       we go off the record?
23            THE VIDEOGRAPHER:  Off the
24       record at 1:01.
25            This marks the end of Media
```

```
 1                    MARK CALLAHAN
 2          Unit Number 3.
 3                    Thank you.
 4                    (Whereupon, an off-the-record
 5          discussion was held.)
 6                    THE VIDEOGRAPHER:  We are on
 7          the record at 1:41.
 8                    This marks the beginning of
 9          Media Unit Number 4.
10                    Please proceed.
11          Q.    Welcome back, Mr. Callahan.
12                    Before lunch, we were talking
13   about your discussions about Mr. Iacovacci
14   in connection with his illness and his
15   potential departure from Brevet.
16                    Do you recall those general
17   discussions?
18          A.    I recall the discussions around
19   having this -- having discussions with
20   Mr. Iacovacci about a -- potentially
21   leaving, yes.
22          Q.    Okay.  I want to make sure that
23   I am not misunderstanding one thing that
24   you are saying:  It's not your testimony
25   that you did discuss with Mr. Iacovacci
```

```
 1                    MARK CALLAHAN
 2   retirement, but you didn't discuss
 3   withdrawal?
 4        A.    I am trying to follow the
 5   double negative there.  You're asking --
 6   can you rephrase that?
 7                (Whereupon, an off-the-record
 8           discussion was held.)
 9                THE VIDEOGRAPHER:   We are off
10           the record at 1:43.
11                (Whereupon, a recess was
12           taken.)
13                THE VIDEOGRAPHER:  On the
14           record at 1:47.
15                Please proceed.
16                MR. CYRULNIK:   Thanks.
17        Q.    Yeah.  The question, Mr.
18   Callahan, is:  Are you distinguishing
19   between discussions about retirement and
20   the discussions about withdrawal that you
21   had with Mr. Iacovacci?
22        A.    I -- I -- I naturally
23   distinguish between those if they're in the
24   context of different entities.
25        Q.    So, is there a different answer
```

                    MARK CALLAHAN

1 to the question that I would ask you

2 whether you had any discussions with

3 Mr. Iacovacci about withdrawal versus my

4 question, did you have any discussions with

5 Mr. Iacovacci about retirement in January

6 of 2016?

7 A.    No.

8 Q.    Okay.  How about in February of

9 2016; is there a distinction between

10 discussions -- is there a distinction

11 between your answers to my question about

12 whether you had discussions with

13 Mr. Iacovacci about withdrawal or about

14 retirement in February of 2016?

15         MR. SOLOMON:  I object to the

16     question.

17 A.    As I sit here right now, I

18 don't recall conversations in February of

19 2016.

20 Q.    So, both January and February

21 of 2016, the answer to both my questions

22 would be, no, I don't recall discussions

23 about either retirement or withdrawal?

24 A.    As I sit here right now, I

1                          MARK CALLAHAN
2    don't recall conversations with
3    Mr. Iacovacci regarding retirement or
4    withdrawal.
5         Q.    Okay.  Same question as we move
6    on to March of 2016.
7         A.    As I sit here right now, I
8    don't recall, but it's -- I don't recall
9    any discussions really from that point
10   forward.
11        Q.    Okay.  So, I'm not gonna bother
12   wasting your time going through each of the
13   months.  The answer to my question, do you
14   recall any conversations with Mr. Iacovacci
15   about retirement or about withdrawal, the
16   answer to my question is, no, you don't
17   recall any conversations about either of
18   those two things from January of 2016 all
19   the way of October of 2016?
20        A.    As I sit here right now, I
21   don't recall any conversations regarding
22   specifically retirement or withdrawal
23   during that time period.
24              However, I do recall, and I
25   don't know the time period, a conversation

```
 1                    MARK CALLAHAN
 2   with Mr. Iacovacci -- Iacovacci whereby it
 3   was a discussion of the potential depending
 4   on how things go, depending on whether or
 5   not surgeries are debilitate- -- lifetime
 6   debilitating or not, but the discussion
 7   about the potential for leaving Brevet.
 8        Q.    Are you thinking of a
 9   particular conversation that you do recall
10   on that subject?
11        A.    As I sit here right now, I
12   think it's a conversation that I already
13   referenced that took place sometime after
14   January 20, 2016.  But as I sit here right
15   now, I don't recall when that took place.
16        Q.    And is it a single conversation
17   that you are thinking of?
18        A.    As I sit here right now, I
19   believe it was a single conversation, but
20   it was a long time ago.
21        Q.    And was it a conversation
22   involving just the two of you, you and
23   Mr. Iacovacci?
24        A.    As I sit here right now, I
25   don't recall whether or not there was
```

                           MARK CALLAHAN

1

2    anybody else on the phone.

3         Q.    And that was a phone

4    conversation, right, I think as you had

5    testified to earlier?

6         A.    As I sit here right now and as

7    I said before, I believe that was a phone

8    conversation.

9         Q.    And that was a conversation --

10               MR. CYRULNIK:   Withdrawn.

11        Q.    With respect to that

12   conversation, you still would not

13   characterize that conversation as

14   concerning either retirement or withdrawal

15   because neither of those words to your

16   recollection were used; is that right?

17        A.    As I sit here right now, my

18   recollection is that neither of those words

19   was used, correct.

20        Q.    And that's why you wouldn't

21   characterize it as about retirement or

22   withdrawal?

23        A.    As I sit here right now, I -- I

24   wouldn't -- I'm not characterizing it, I am

25   just stating a fact that my recollection

```
 1                    MARK CALLAHAN
 2  that I don't believe that either retirement
 3  or withdrawal was discussed.
 4       Q.    You -- you don't believe that
 5  either of those two topics was discussed?
 6       A.    As I sit here right now, that's
 7  -- that's my recollection.
 8       Q.    Okay.  And shifting from
 9  conversations or at least just to clarify,
10  if I included in my question, you know,
11  non-oral conversations, that is, including
12  the written medium, would your answers to
13  my questions about discussions with
14  Mr. Iacovacci concerning retirement or
15  withdrawal change at all?
16            MR. SOLOMON:  I object to the
17       question.
18       Q.    Do you understand what I mean
19  by that?
20       A.    Um, are you asking whether or
21  not the -- there are e-mails between myself
22  Mr. Iacovacci.
23       Q.    I'm asking whether or not if I
24  asked you whether or not you had any
25  discussions including e-mails or other --
```

                          MARK CALLAHAN

1
2    or letters between January and October of
3    2016 with respect to the subject matter of
4    retirement or withdrawal of Mr. Iacovacci,
5    would you say that you did or did not have
6    such exchanges?
7              MR. SOLOMON:   I object to the
8         question.
9         A.    As I sit here right now, I
10   don't recall any -- I don't recall whether
11   there were e-mails between myself and
12   Mr. Iacovacci.
13        Q.    So, you don't recall either
14   way, there could have been conversations
15   about retirement or withdrawal, or maybe
16   there were not discussions about retirement
17   or withdrawal, you just don't know either
18   way sitting here today?
19        A.    As I sit here right now, that's
20   not correct.  I'm responding to your
21   question as to whether or not there were
22   any e-mails between us during that time
23   period, and I am not -- I don't recall
24   whether there were any e-mails between
25   myself and Mr. Iacovacci during that time

```
 1                    MARK CALLAHAN
 2   period.
 3         Q.    So, you don't know either way
 4   whether or not you discussed via the
 5   written medium the subject matter of
 6   retirement or withdrawal with
 7   Mr. Iacovacci?
 8         A.    As I sit here right now, I
 9   don't know whether there are any e-mails
10   between myself and Mr. Iacovacci between, I
11   guess, it's January -- January and October
12   of 2016, besides the e-mails that you've
13   shown me earlier today.
14         Q.    How about text messages?
15         A.    As I sit here right now, I
16   don't recall which -- whether there are
17   text messages during that time period or
18   not, but those text messages were, um, um,
19   provided pursuant to Discovery, so happy to
20   go through them if you'd like.
21         Q.    So, sitting here today, you
22   can't think -- you're not aware of any
23   e-mail communications on the subject matter
24   of retirement or withdrawal that you had
25   with Mr. Iacovacci during the time period
```

1                   MARK CALLAHAN

2    over January through October of 2016.

3                   Is that a fair summary of your

4    view?

5          A.    As I sit here today, I don't

6    recall whether there are any of those

7    communications.

8          Q.    Okay.  Would you be surprised

9    if there were?

10                 MR. SOLOMON:   I object to the

11          question.

12         A.    As I sit here today, I don't

13   recall whether there are any.  You know,

14   I --

15         Q.    I understand.

16         A.    I don't know if I would be

17   surprised or not surprised.

18         Q.    Okay.  So, you wouldn't be

19   surprised if Mr. Iacovacci and you had

20   discussed retirement or withdrawal and you

21   just didn't remember, sitting here today?

22         A.    As I sit here right now, that's

23   a different, um, the way you just

24   characterized it as different than what we

25   just were talking about.  I don't -- you

                    MARK CALLAHAN
 1
 2   asked whether or not I recalled whether
 3   there was any written communication between
 4   myself and Mr. Iacovacci during that time
 5   period, I don't recall whether there is.
 6   I'm happy to review anything if you'd like
 7   me to.
 8        Q.    How about discussions that you
 9   had outside of Mr. Iacovacci's presence;
10   did you have discussions with Doug
11   Monticciolo in the January to March time
12   period about perspective retirement or
13   withdrawal or departure of Mr. Iacovacci
14   from Brevet?
15        A.    As I sit here right now, I
16   don't recall any specific conversations
17   with Mr. Monticciolo.
18        Q.    Okay.  Do you recall reviewing
19   the LLC agreement to determine what
20   Mr. Iacovacci would be entitled to if he
21   were to leave Brevet in or about the first
22   quarter of 2016 time period?
23        A.    As I sit here right now, I
24   don't recall reviewing the LLC agreement
25   regarding -- regarding a, you know,

1                    MARK CALLAHAN
2    whatever you just said, I guess regarding
3    compensation.
4         Q.    To the best of your
5    recollection, did you ever undertake or
6    direct someone to undertake an analysis of
7    how much compensation Mr. Iacovacci might
8    be entitled to if he were to leave Brevet
9    in 2016?
10              MR. SOLOMON:  I object to the
11         question.  And if I'm understanding,
12         is it time limited at the back end?
13              MR. CYRULNIK:  Um, I am not
14         sure what you're asking, Mr. Solomon,
15         but let me -- let me rephrase the
16         question and make sure that the
17         witness understands.
18         Q.    My question is:  Did you or --
19    did you undertake or direct someone to
20    undertake, or were you aware that anyone
21    undertook, an analysis of how much
22    compensation Mr. Iacovacci might be
23    entitled to under the LLC Agreements if he
24    were to withdraw from Brevet?
25              And I am asking whether this

```
 1                   MARK CALLAHAN
 2   analysis was undertaken in 2016.
 3             MR. CYRULNIK:  If that answers
 4        your question, Lou.
 5             MR. SOLOMON:  It does.  Thank
 6        you.
 7        A.    As I sit here right now, I'm
 8   not aware of any analysis that I did or
 9   anybody else did.  Um, I am not aware of
10   directing anybody to perform such analysis
11   in that 2016 timeframe.
12        Q.    Would that have mattered to
13   you, Mr. Callahan?  Did you care about what
14   compensation Mr. Iacovacci might be
15   entitled to if he were to withdraw from the
16   LLC's under the LLC Agreements?
17             MR. SOLOMON:  I object to the
18        word compensation.
19             You can answer the question.
20        A.    As I sit here right now, I
21   don't recall having that be a
22   consideration.
23        Q.    So, it's your testimony that
24   whether the formula provided for in the LLC
25   agreement would have yielded $5,000 for
```

```
 1                    MARK CALLAHAN
 2   Mr. Iacovacci versus $50 million, that
 3   didn't matter to you in terms of what steps
 4   you -- Brevet was going to undertake in
 5   response to the discussions they were
 6   having with Mr. Iacovacci about his
 7   perspective departure from Brevet?
 8             MR. SOLOMON:  I object to the
 9          question.
10        A.    As I sit here right now, I
11   don't believe that has any bearing, except
12   for the fact that if -- I would've hoped
13   that it would be $50 million because then I
14   would be getting paid extremely well as
15   well.  So, I would have been much happier
16   if such an analysis was done and we're
17   happy if it came to fruition and I got paid
18   a lot of money.
19        Q.    Yeah.  Well, we will talk about
20   your compensation in a bit, but I
21   appreciate your point.
22             Let's take a look at your next
23   exhibit that's been marked in your folder
24   as Exhibit 8.
25             (Whereupon, 2/9/2016 Meeting
```

Page 203

                    MARK CALLAHAN
 1
 2          between Mark and Doug was marked as
 3          Exhibit 8 for identification as of
 4          this date by the Reporter.)
 5                  (Witness reviews document.)
 6          Q.    Do you have that up on your
 7     screen?
 8                  MR. SOLOMON:  I think if you
 9          hit refresh.
10                  2/9/16?
11                  MR. CYRULNIK:  Um --
12                  MR. SOLOMON:  It's on the
13          screen.
14                  MR. CYRULNIK:  Great.
15          Q.    Do you see a calendar
16     appointment from February 9th of 2016 for a
17     LLC Agreement/Iacovacci between yourself
18     and Doug Monticciolo?
19                  (Witness reviews document.)
20          A.    I see that Exhibit 8, yes.
21          Q.    And you would agree with me,
22     Mr. Callahan, that you and Mr. Monticciolo
23     did, in fact, have a meeting on February
24     11th of 2016 at which you reviewed the LLC
25     agreements and how they -- provisions

1                    MARK CALLAHAN
2   therein pertained to Mr. Iacovacci's
3   perspective departure from Brevet, would
4   you not?
5         A.    As I sit here right now, I
6   don't recall whether or not that meeting
7   happened and I don't recall what was
8   discussed in -- in that meeting, if it did
9   happen.
10        Q.    So, this doesn't refresh your
11  recollection at all about having that
12  meeting with Mr. Monticciolo, correct?
13        A.    No.
14             MR. SOLOMON:  I have a
15         question.  For clarification, on the
16         document that's being displayed up on
17         the top, it says Exhibit 00008 and
18         then there's some language across the
19         page, that's not part of the
20         document, is it?
21             MR. CYRULNIK:  No, that's not
22         part of the document.  The document
23         --
24             MR. SOLOMON:  Is that how you
25         marked it?

```
                                          Page 205

 1                  MARK CALLAHAN

 2            MR. CYRULNIK:  Yeah.

 3            MR. SOLOMON:  All right.

 4       Q.    Did you have a view one way or

 5   the other as to whether or not Mr. -- did

 6   you have an understanding one way or the

 7   other as to what Mr. Iacovacci would be

 8   entitled as to a member -- a departing

 9   member of one or more of the LLC's?

10       A.    As I sit here right now, it's

11   my understanding that that's covered by the

12   LLC Agreements.

13       Q.    Right, that I understand.

14            My question is:  Were you

15   aware, were you cognizant to what the LLC

16   Agreements provided in that regard in 2016?

17       A.    As I sit here right now, my

18   recollection is that that time I -- I

19   understood because that's how we were, um,

20   treating and paying out, um, Mr. Tripp.

21       Q.    When did Mr. Tripp, um, depart

22   as a member of Brevet, the various Brevet

23   entities?

24       A.    As I sit here right now, I

25   don't recall.
```

```
 1                    MARK CALLAHAN
 2        Q.    Well, can you tell me whether
 3   it was before or after 2016?
 4        A.    As I sit here right now, I
 5   believe it was prior to 2016.
 6        Q.    Do you know if it was in 2015?
 7        A.    As I sit here right now, I
 8   don't recall.
 9        Q.    And what was the reason for Mr.
10   Tripp's departure?
11        A.    As I sit here right now, I
12   don't recall.
13        Q.    You don't recall whether he
14   just decided he was leaving for no
15   particular reason or whether there was
16   something that he communicated to you as
17   motivating his desire to leave?
18        A.    As -- as I sit here right now,
19   I don't recall.  I don't recall whether I
20   had those discussions.  I believe those
21   discussions would have -- would have been
22   had with Mr. Monticciolo.
23        Q.    And you did, in fact,
24   understand that a departing member was
25   entitled to receive a percentage of Brevet
```

```
 1              MARK CALLAHAN
 2   Short Duration Partners' net profits for a
 3   period of five years; is that right?
 4        A.   As I sit here right now, I -- I
 5   recall that one of the entities is five
 6   years and the other is ten years, I don't
 7   recall which is which.
 8        Q.   Fair enough.
 9             So, one of Partners is five
10   years and the other -- one of Partners and
11   Holdings is five years and the other one is
12   ten years, correct?
13        A.   As I sit here right now, that's
14   my understanding.
15        Q.   And did you in fact pay those
16   net profits and percentages to Mr. Tripp?
17        A.   As I sit here right now, I
18   believe that Mr. Tripp was -- was paid
19   his -- was paid out, pursuant to that
20   agreement.
21        Q.   And is he still being paid out
22   pursuant to at least the agreement that has
23   a ten-year tail?
24        A.   As I sit here right now, I
25   don't know whether or not he's still being
```

```
1                 MARK CALLAHAN
2    paid or whether or not the ten years
3    surpassed.
4         Q.    So, it's possible he retired
5    prior to 2011?
6         A.    As I sit here right now, I
7    don't know.
8         Q.    You don't know one way or the
9    other?
10        A.    If he -- if he is -- as I sit
11   here right now, and he is still being paid,
12   it was after -- theoretically after 2011,
13   or if he's no longer getting paid, it would
14   be before, but I don't know.
15        Q.    Did Mr. Tripp and Brevet enter
16   into a Separation Agreement?
17        A.    As I sit here right now, I
18   believe that Mr. Tripp entered into a
19   Separation Agreement.
20        Q.    With Brevet?
21        A.    With a Brevet entity?
22              I am not sure which entity.
23        Q.    Were you involved in the
24   negotiation of that agreement?
25        A.    As I sit here right now, I
```

```
 1                    MARK CALLAHAN
 2   don't recall being involved in that
 3   Negotiation Agreement.
 4        Q.    Has that agreement been
 5   produced in this litigation?
 6        A.    As I sit here right now, I
 7   don't have a -- I don't know.
 8        Q.    Do you know where you have a
 9   copy -- do you have a copy of that
10   agreement that you can locate?
11        A.    As I sit here right now, I
12   don't have a copy and -- and, um, to the --
13   to the extent that such a document exists
14   because I said I don't know whether or not
15   it exists, but I think it does.  If it
16   exists and it hasn't been produced, I'm
17   sure -- I don't know.
18        Q.    What was that, if it has not --
19   if it exists --
20        A.    If counsel says it's okay, you
21   know, it's -- I don't make the decisions on
22   production.
23        Q.    Okay.  Where would you -- where
24   would you go to look for a copy of that
25   agreement, if it did exist?
```

```
 1                    MARK CALLAHAN
 2        A.    As I sit here right now, I
 3   would ask our HR Department.
 4        Q.    Okay.  Are you prepared to do
 5   that for us?
 6             MR. SOLOMON:  We will take it
 7         under advisement.
 8             MR. CYRULNIK:  Okay.
 9        Q.    Do you know whether Mr. Tripp's
10   separation terms, whether it was
11   memorialized in any agreement or not
12   deviated from the amounts that were
13   provided for in the LLC Agreements?
14        A.    As I sit here right now, I
15   don't know.
16        Q.    Do you have -- can you give me
17   any estimate as to how much Brevet has paid
18   Mr. Tripp, pursuant to the terms of his
19   departure whether it's a Separation
20   Agreement or otherwise from Brevet,
21   cumulatively?
22        A.    As I sit here right now, I
23   don't know.
24        Q.    Do you know if it was more or
25   less than $10 million?
```

```
 1              MARK CALLAHAN
 2        A.    As I sit here right now, I
 3   would -- I don't know. █ █████ ████ █
     █ █████ █ ████ ████ ████ ████ ██████
 5        Q.    But you don't know?
 6        A.    I don't know.
 7        Q.    How about ███ ██████  do you
 8   know whether it's cumulatively over the
 9   course of five or ten-year period if it was
10   more or less than ███ ██████ that Mr.
11   Tripp received pursuant to the terms of his
12   Separation Agreement?
13        A.    As I sit here right now, I
14   still don't know what he was paid, but ███
     █████ ███ █████████ ███ ██████ is, you
16   know, in the archeveche (sic) absurd range.
17        Q.    So, is it your testimony that,
18   you know, it was ████ ████ █ ██████ or
19   that you're not sure?
20        A.    As I sit here right now, my
21   testimony would be both: █ █████ ████ █ █
     █ █████ ████ █████ █████ █████ ████ █ █████
     █ █ █ █ ████ █████ ███ ██████
24        Q.    But you're not certain that it
25   was less than ██ ██ ███ ██████ or you are
```

Page 212

1                    MARK CALLAHAN
2    certain that it was less than ███   ████████
3              MR. SOLOMON:   I object to the
4         question.
5         A.    As I sit here right now, I
6    don't know how much Mr. Tripp has been
7    paid.
8         Q.    Do you know whether it was ████
█    ████ ████ ████████
10        A.    As I sit here right now, I
11   don't know how much Mr. Tripp has been
12   paid.
13        Q.    Understood.
14              Do you know whether or not --
15   yes or no, do you know whether it was ████
█   ████ ████ ████████
17              MR. SOLOMON:   I object to the
18        question.
19        A.    As I sit here right now, since
20   I don't know how much he's been paid, I
21   can't comment as to whether or not it was
22   above or below any number.
23        Q.    Okay, thanks.
24              At the time that you -- that
25   we're looking at here right at this meeting

                    MARK CALLAHAN
1   February of 2016, had you -- had Brevet
2   concluded that Paul Iacovacci had breached
3   any provision of the LLC agreements?
4        A.    As I sit here right now, I
5   don't recall this meeting and I don't
6   recall any discussions around the
7   agreement.
8        Q.    Do you recall discussing with
9   anybody, Mr. Monticciolo included, the
10  possibility of terminating Mr. Iacovacci
11  rather than acceding to a withdrawal,
12  retirement or other departure from Brevet?
13       A.    As I sit here right now --
14       Q.    Um-hum?
15       A.    -- with respect to the timing
16  that you are talking about, I don't recall
17  any discussions about the termination of
18  Mr. Iacovacci.
19       Q.    When was the first time that
20  you discussed with anybody the point of
21  terminating Mr. Iacovacci?
22       A.    As I sit here right now, my
23  recollection is that that would have been
24  in October of 2016.

```
 1                   MARK CALLAHAN
 2        Q.    And was it your idea?
 3        A.    As I sit here --
 4              MR. SOLOMON:  I object to the
 5         form of the question.
 6        A.    As I sit here right now, I
 7   don't recall whose idea it was, um, except
 8   that it was ultimately a recommendation
 9   from counsel.
10        Q.    Okay.  Do you know whether --
11              MR. CYRULNIK:  Withdrawn.
12        Q.    In sum or substance or in words
13   or in substance, at any point in 2016,
14   prior to October, did somebody at Brevet
15   communicate that Brevet might be better off
16   terminating Mr. Iacovacci rather than
17   allowing him to leave without a termination
18   and thereby be entitled to whatever rights
19   the LLC Agreements provided him?
20        A.    As I sit here right now, I
21   don't recall any conversations about the
22   termination of Mr. Iacovacci related to
23   money.  They were related to his, um, acts
24   and misdeeds against all the companies.
25        Q.    We will talk about those.
```

Page 215

```
 1                    MARK CALLAHAN
 2              But, so, it's your sworn
 3   testimony that nobody, you, Mr. Monticciolo
 4   anybody else on the Brevet side, nobody
 5   ever said, "hey, maybe we're better off
 6   terminating Mr. Iacovacci's employment
 7   rather than allowing him to withdraw or
 8   retire or depart the company triggering
 9   some tail payments under the LLC
10   Agreements;" is that correct?
11       A.    No.  As I sit here right now, I
12   don't recall any conversations of that
13   kind.
14       Q.    Is it possible those
15   conversations happened?
16              MR. SOLOMON:  I object to the
17        form of the question.
18       A.    As I sit here right now, I
19   don't recall any -- any such conversations
20   happening.
21       Q.    That, I understand.
22              My question is:  Is it possible
23   that those conversations happened, but you
24   just don't recall them right now?
25       A.    As I sit here right now, I
```

```
 1                    MARK CALLAHAN
 2   don't believe those conversations happened
 3   -- I don't believe they happened with me.
 4        Q.    You don't believe that you were
 5   involved in any such conversations?
 6        A.    As I sit here right now, I
 7   don't believe I was involved in any such
 8   conversations.
 9        Q.    And you don't know one way or
10   the other whether those conversations
11   happened outside of your presence?
12        A.    As I sit here right now, I
13   don't know how I would know whether or not
14   a conversation happened that I wasn't privy
15   to.
16        Q.    Well, somebody can tell you
17   about a conversation, right?
18        A.    But as I sit here right now, if
19   they told me about a conversation then I
20   would -- that would be a conversation in
21   and of itself.
22        Q.    Okay.  Let's take a look at --
23             MR. CYRULNIK:  Let's introduce
24          this next exhibit.  Hold on one
25          second.
```

```
1                    MARK CALLAHAN
2              Can we go off the record for
3         one moment just to address a
4         technical issue?
5              THE VIDEOGRAPHER:   Off the
6         record at 2:17.
7              (Whereupon, a short recess was
8         taken.)
9              THE VIDEOGRAPHER:   We are on
10        the record at 2:21.
11             Thank you.
12       Q.   Mr. Callahan, do you recall
13  having a discussion with Mr. Iacovacci in
14  February of 2016 about a prospective
15  Separation Agreement?
16       A.   As I sit here right now, I
17  recall having a conversation as you
18  discussed earlier with Mr. Iacovacci
19  sometime after that January 20th date that
20  we previously talked about.
21       Q.   And do you recall Mr. Iacovacci
22  telling you that he didn't think a
23  Separation Agreement was necessary because
24  the LLC Agreements already address his
25  withdrawal from the company?
```

1                    MARK CALLAHAN

2        A.    As I sit here right now, I

3   recall Mr. Iacovacci failing to consider

4   that he was also an employee, which thus

5   necessitated a Separation Agreement, to

6   ensure that the -- to ensure that we were

7   capturing all aspects of the relationship.

8        Q.    What was the basis for your

9   view that because Mr. Iacovacci was also an

10  employee, a Separation Agreement was

11  necessary and the LLC agreements were not

12  sufficient to accommodate his prospective

13  departure from the company?

14       A.    As I sit here right now, I

15  believe the basis was a lawyer's

16  recommendation.

17       Q.    Okay.  Do you recall discussing

18  that issue with your attorney prior to

19  speaking with Mr. Iacovacci?

20             MR. SOLOMON:  Hold on --

21             THE COURT REPORTER:  I can't

22        hear you, sir.

23             MR. SOLOMON:  I said, I object

24        to the question.  I don't know if I

25        want him to go further than what the

```
 1                    MARK CALLAHAN
 2         witness has already told Mr.
 3         Cyrulnik.
 4         Q.    Well, I am just asking whether
 5   or not you recall having the conversation
 6   before you had the conversation with
 7   Mr. Iacovacci.
 8              MR. SOLOMON:  You can answer
 9         that, over objection.
10         A.    As I sit here right now, I
11   don't recall the timing of conversations
12   from more than five years ago.
13         Q.    You would agree with me that if
14   you did not have a conversation with a
15   lawyer prior to speaking to Mr. Iacovacci
16   about this topic that the basis for your
17   telling Mr. Iacovacci that he needed a
18   separation agreement couldn't possibly have
19   been the counsel recommendation, right?
20              MR. SOLOMON:  I object to the
21         question.
22         Q.    Mr. Callahan?
23         A.    As I sit here right now?
24         Q.    Yes.
25         A.    My recollection is that --
```

Page 220

1                    MARK CALLAHAN
2    sorry?
3         Q.    Yes.  I am asking you based on
4    your understanding right now.
5         A.    As I sit here right now, my
6    recollection is that -- that -- that --
7    that -- that general advice from counsel is
8    something that we'd received well before
9    Mr. Iacovacci.
10        Q.    Well, before your meeting --
11   your conversation with Mr. Iacovacci you
12   mean?
13        A.    As I sit here right now, my
14   understanding is that counsel had, you
15   know, legal advice and had recommended that
16   we always have Separation Agreements.
17        Q.    Did you take the same position
18   when Mr. Tripp informed you he was
19   intending to depart Brevet?
20        A.    As I sit here right now, I
21   don't know.
22        Q.    Well, why -- why -- why don't
23   you know?  Why would you have ha
24   potentially a different position vis-à-vis
25   Mr. Tripp's departure and Mr. Iacovacci's

Page 221

1                        MARK CALLAHAN
2    departure?
3         A.    As I sit here right now, I can
4    recall that I was not involved in Mr.
5    Tripp's departure.
6         Q.    So, the reason why you're not
7    sure whether or not the same position was
8    taken with respect to Mr. Tripp was because
9    you weren't consulted with respect to
10   Mr. Tripp's departure?
11              Is that -- is that a fair
12   summary of what you just explained to me?
13        A.    As I sit here right now, I
14   don't recall what happened with respect to
15   Mr. Tripp's departure.
16        Q.    Do you know one way or the
17   other whether you were consulted with
18   respect to Mr. Tripp's departure and
19   whether he needed a Separation Agreement?
20        A.    As I sit here right now, I
21   don't recall whether I was or was not
22   consulted with respect to Mr. Tripp's --
23        Q.    Fair to say that if you had
24   been consulted with respect to Mr. Tripp,
25   your view was that you need a Separation

Page 222

                    MARK CALLAHAN
1
2    Agreement to consummate a departure?
3             MR. SOLOMON:  And I object to
4         the question.
5         A.    As I sit here right now, my
6    recollection is that there was a large gap
7    between the dates that we're talking about
8    with respect to Mr. Tripp and
9    Mr. Iacovacci's departures.  And my
10   recollection is that the legal advice
11   pursuant to Separation Agreements came
12   after Mr. Tripp's departure.
13        Q.    I see.  Do you know whether the
14   legal advice that you're thinking of came
15   in connection with a particular
16   individual's departure from Brevet?
17        A.    As I sit here right now, I
18   don't know.
19        Q.    Did anybody else -- did any
20   other members of the Brevet, LLCs depart
21   during your time there?
22             And by "else," I mean -- I am
23   referring to other than Mr. Tripp or
24   Mr. Iacovacci.
25        A.    As I sit here right now, I

```
 1              MARK CALLAHAN
 2  don't believe any other members departed
 3  those two LLCs.
 4       Q.    So, just to go back to the
 5  conversation that we were talking about a
 6  couple of minutes ago:  So, I think I
 7  understood your testimony to be that the
 8  position that you were taking vis-a-vis a
 9  separation agreement with Mr. Iacovacci was
10  fueled by the fact that he was also an
11  employee in addition to being a member of
12  the LLCs; is that right?
13       A.    As I sit here right now, my
14  recollection is that what was done was on
15  the advice of Counsel.
16       Q.    That I understand.  I asked a
17  different question.
18            My question was, I want to get
19  back into the discussion you had with
20  Mr. Iacovacci.
21            I understood you to tell me
22  that your position vis-a-vis a Separation
23  Agreement that you had communicated to
24  Mr. Iacovacci during the conversation was
25  motivated by the fact Mr. Iacovacci didn't
```

```
 1                    MARK CALLAHAN
 2   appreciate that because he was also an
 3   employee, a Separation Agreement became
 4   necessary.
 5              Am I understanding your
 6   testimony, correctly?
 7        A.    As I sit here right now, it --
 8   it -- it's my recollection that counsel was
 9   looking for a Separation Agreement.
10        Q.    But is it your recollection
11   that the reason you told Mr. Iacovacci a
12   separation agreement was necessary was
13   because he was also an employee?
14              MR. SOLOMON:   Objection.
15         Misstates the testimony.
16        Q.    Did I misstate your testimony,
17   Mr. Callahan?
18        A.    Ask the question again, please.
19        Q.    You communicated during the
20   call that a Separation Agreement was also
21   necessary because he was an employee,
22   correct?
23        A.    As I sit here right now, I
24   don't recall the contents of that
25   conversation.
```

Page 225

1                    MARK CALLAHAN
2        Q.    Do you recall having a
3   discussion about a Separation Agreement?
4        A.    As I sit here right now, I
5   don't recall the contents of that
6   conversation.
7        Q.    Didn't you tell me about ten
8   minutes ago that you recalled having a
9   conversation and that you pointed out to
10  Mr. Iacovacci that he was also an employee
11  and that that had something to do with the
12  Separation Agreement?
13            MR. SOLOMON:   I object to the
14         question.  It misstates the
15         testimony.
16       A.    As I sit here right now, I
17  think I was responding to a hypothetical
18  question from you as to why I would have
19  done something, I don't believe and I'm
20  sorry if I did relayed that that was
21  definitively what happened on that call.
22       Q.    Okay.  So, you have no
23  recollection, sitting here right now, you
24  have no recollection of discussing with
25  Mr. Iacovacci the fact that he was also an

```
 1              MARK CALLAHAN
 2   employee and that the fact that he was also
 3   an employee meant that he should have a
 4   Separation Agreement instead of just
 5   relying on the LLC agreements, you have no
 6   recollection of that?
 7       A.    As I sit here right now, I have
 8   no specific recollection with respect to
 9   the conversation with Mr. Iacovacci in, I
10   think I believe you said in February of
11   2016.
12       Q.    How many Separation Agreements
13   has Brevet entered into over the last say
14   five years?
15       A.    As I sit here right now, I
16   don't know.
17       Q.    Do you think there were many?
18       A.    I don't know --
19            MR. CYRULNIK:  Let me withdraw
20        that.
21       Q.    Let me ask you this:  Can you
22   think of any Separation Agreements that you
23   are aware of Brevet having entered into in
24   the last five years?
25       A.    As I sit here right now, I
```

Page 227

MARK CALLAHAN

1    can't tell you any one specific definitive

2    Separation Agreement.  However, I know

3    there to be Separation Agreements.  It is

4    not my -- that is not something -- that is

5    something that is handled by HR at this

6    point.

7        Q.    Understood.

8             Do you know one way or the

9    other whether you would characterize

10   Separation Agreements as a standard

11   practice at Brevet for departing employees?

12       A.    As I sit here right now, I

13   believe that it is a standard practice for

14   Brevet employees.

15       Q.    But you can't think of any

16   specific ones that were specifically

17   entered into within the last five years?

18       A.    As I sit here right now, I

19   can't speculate to something definitive as

20   there was definitively an agreement with

21   person X without having that document in

22   front of me to confirm.

23            I would assume that it exists,

24   but you're asking me if I definitively

MARK CALLAHAN

1
2   know, and as I sit here right now, without
3   the document in front of me to review, I
4   don't know whether or not it definitively
5   exists.
6       Q.    Okay.  Did you express concerns
7   to Mr. Iacovacci about the effect that his
8   departure from the company might have on
9   Brevet either in terms of how it would be
10  perceived by investors or the market,
11  generally?
12      A.    As I sit here right now, I
13  don't recall any -- any conversations um,
14  regarding um, investors caring about
15  Mr. Iacovacci's departure.  I -- I --
16  knowing -- knowing the environment at that
17  point in time, it was highly unlikely that
18  any investors would care.
19      Q.    Why is that?
20      A.    As I sit here right now, my
21  recollection is that Mr. Iacovacci was --
22  was not involved in the origination of the
23  larger opportunities at Brevet.
24      Q.    At what point in time are you
25  referring to?

```
                                          Page 229
 1                  MARK CALLAHAN
 2        A.    I guess, as I sit here right
 3   now, I believe it would be 2015 and 2016.
 4        Q.    So, Mr. Iacovacci was involved
 5   in the larger transactions sourcing the
 6   larger transactions at Brevet up until
 7   2015.
 8             Is that -- am I understanding
 9   you correctly?
10        A.    As I sit here right now, I
11   believe Mr. Iacovacci's overall production
12   declined over time.  So, I believe -- I
13   believe that you are talking about 14 being
14   better than 15.  I would agree with that's
15   probably the case, but I don't specifically
16   recall.
17        Q.    Well, I -- I heard you say that
18   in 2015 and '16 he wasn't involved in the
19   larger transactions.  I'm just asking
20   whether he was involved in larger
21   transactions in 2014, in your view.
22        A.    As I sit here right now, I
23   think I said larger opportunities as
24   opposed to --
25        Q.    Okay.
```

1                    MARK CALLAHAN

2        A.     -- larger transactions.  And --

3   and by opportunities, it's more along the

4   lines of -- of setting up of platforms and

5   subsidiaries focussed on flow originations.

6        Q.     What -- can you explain what

7   you mean by that, the distinction between

8   opportunities and transactions?

9        A.     As I sit here right now, in

10  this context, I'd say a transaction is just

11  an individual transaction and I view an

12  opportunity as sort of a -- as a sector

13  opportunity.

14        Q.     I see.  Were there many

15  different sectors that you were expanding

16  into in 2015?

17        A.     As I sit here right now, I

18  recall that there were sectors that we were

19  focused on in 2015 and I don't recall which

20  sectors they were at that point in time.

21        Q.     What were the bigger sectors or

22  the bigger opportunities that you were

23  involved in in 2015 and '16?

24        A.     You know, as I sit here right

25  now, I don't recall specifically which

```
 1              MARK CALLAHAN
 2   sectors we were in.  I'd have to go and
 3   look at the assets that we owned at that
 4   point to determine what sectors they were
 5   in.
 6        Q.   So, you don't recall what
 7   sectors you were in, but you do recall that
 8   Mr. Iacovacci was not involved in any of
 9   the big ones?
10        A.   As I sit here right now, I
11   recall that -- that Mr. Iacovacci wasn't
12   involved in opportunities in general,
13   period.  He was more involved in one off
14   transactions.
15        Q.   And for what period of time is
16   that accurate, as of when did you view him
17   as being involved more in one off
18   transactions than in opportunities?
19        A.   As I sit here right now, I
20   don't recall that -- as I sit here right
21   now, I guess Paul may have been --
22   Mr. Iacovacci might have been involved in
23   opportunities prior to 2010, but I don't --
24   I don't recall specifics.
25        Q.   But for the most part,
```

Page 232

                         MARK CALLAHAN
1
2    post-2010, you viewed Mr. Iacovacci as
3    being involved in one off transactions
4    rather than in larger opportunities; is
5    that fair?
6         A.    As I sit here right now, my
7    recollection is that Mr. Iacovacci was
8    involved in -- in -- in one off transaction
9    opportunity -- transactions.
10        Q.    And when you say one off
11   transactions, does that speak to their
12   profitability, the profitability of that
13   transaction?
14        A.    As I sit here right now, I
15   don't believe I made any -- I don't think
16   there's any -- I haven't made any comments
17   about profitability.
18        Q.    How about just the sheer size
19   of the financing?  Does -- does the fact
20   that you source a one off opportunity
21   versus being involved -- sorry, one off
22   financing or transaction versus being
23   involved in an opportunity, does that speak
24   one way or the other as to whether or not
25   that your involvement is in the larger

Page 233

1                          MARK CALLAHAN
2     transactions in which Brevet engaged?
3          A.    As I sit here right now, I
4     don't think I talked about larger
5     transactions.
6          Q.    Yeah, I don't think you did
7     either.  I'm just asking you the question.
8     I am asking you whether not your comments
9     distinguishing between opportunities and
10    one off transactions has anything to do
11    with the magnitude or the profitability of
12    a transaction.  I'm not suggesting that you
13    did address that already, I'm asking you
14    the question because I don't think you did
15    address it.
16         A.    As I sit here right now, I
17    don't believe there's a direct link to
18    profitability.  It is more of an indirect
19    link.
20         Q.    And how does the indirect link
21    work?
22         A.    As I sit here right now, my
23    recollection is that if you do a series of
24    transactions, one off versus a series of
25    transactions within a -- within an

```
 1                    MARK CALLAHAN
 2   opportunity, there is more demand for
 3   investor capital to do the latter.
 4        Q.    Okay.
 5        A.    More investor capital you end
 6   up having the more -- theoretically, the
 7   more profitable that you become.  Typically
 8   in an opportunity, your -- your expenses
 9   are cost of originating is typically lower
10   as well and therefore it -- it -- it ends
11   up being ultimately more profitable.
12        Q.    Got it.
13              To be clear:  Your testimony
14   under oath is that you don't recall ever
15   telling Mr. Iacovacci that you were
16   concerned about how investors might react
17   to his departure; is that right?
18        A.    As I sit here right now, I
19   don't recall telling Mr. Iacovacci that I
20   was concerned about -- concerns that
21   investors might have.
22        Q.    And separate and apart from
23   whether you have a specific recollection of
24   having told him that, my next question is
25   slightly different:  Sitting here right
```

```
 1                    MARK CALLAHAN
 2   now, can you tell me definitively that you
 3   did not express any such concerns to
 4   Mr. Iacovacci, that is concerns about how
 5   investors would react or might react to his
 6   departure from Brevet?
 7        A.    As I sit here right now, I
 8   can't tell probably anything of definitive
 9   about what happened five and a half years
10   ago, but that in particular item would be
11   highly unlikely, just given -- given the
12   circumstances.
13        Q.    Highly unlikely, but you're not
14   certain that didn't happen.
15              Is that a fair description of
16   your bottom line?
17        A.    As I sit here right now, I'm
18   saying that I don't know how anybody can be
19   certain about anything that happened five
20   and a half years ago.
21        Q.    Well, I mean, are you really
22   not certain about anything that happened
23   five and a half years ago; for example, are
24   you not certain that Mr. Iacovacci didn't
25   definitively communicate to you that he was
```

```
 1                    MARK CALLAHAN
 2   retiring in January of 2016?
 3              MR. SOLOMON:  I object to the
 4         question.
 5         A.    As I sit here right now, there
 6   are -- there are likely things that I could
 7   be definitive about with respect to
 8   something that happened in a conversation
 9   five and a half years ago.  But, you know,
10   I don't recall what you were asking, but --
11         Q.    Okay.  Well, the question that
12   I was asking you about whether or not you
13   communicated to Mr. Iacovacci concerns
14   about how investors might react to his
15   departure, is that one of those things that
16   you cannot be definitive about or is that
17   one of those things that you can be
18   definitive about?
19              MR. SOLOMON:  Asked and
20         answered several times, and I object
21         to the question.
22         A.    Yeah.  As I sit here right now,
23   I still -- I still find it difficult to say
24   anything definitive about a short
25   conversation from five and a half years
```

Page 237

1                        MARK CALLAHAN

2    ago.

3          Q.     Fair enough.

4                 (Whereupon, e-mail dated

5           2/12/2016 was marked as Plaintiff's

6           Exhibit 9 for identification as of

7           this date by the Reporter.)

8          Q.    Let's take a look at Exhibit 8.

9    I'm sorry, Exhibit 9.  Can you pull that

10   up?  That's an e-mail that is dated

11   February 12th of 2016.  It's from your --

12   from you to Doug Monticciolo with the

13   subject line:  Paul update.

14                Do you see that?

15                (Witness reviews document.)

16                MR. SOLOMON:  We don't have it

17        yet.

18          A.    Not yet.

19          Q.    If you can take a moment to

20   review --

21                MR. SOLOMON:  I said not yet.

22                MR. CYRULNIK:  Oh.

23                MR. SOLOMON:  Exhibit 9 --

24        Exhibit 9 is on the screen.

25                (Witness reviews document.)

```
 1                    MARK CALLAHAN
 2        Q.    Let me know when you've taken a
 3   look at that document, and then I will
 4   follow up with some specific questions.
 5        A.    Okay.  I have read it.
 6        Q.    Okay.  Does this refresh your
 7   recollection about the conversation that I
 8   was asking you questions a few moments ago?
 9             MR. SOLOMON:  I object to the
10        question.
11        A.    As I sit here right now, it
12   doesn't refresh my memory in the specific
13   contents of that conversation.
14        Q.    Well, does it refresh your
15   general recollection that you did in fact
16   have a general conversation with Paul
17   Iacovacci sometime prior to February 12th
18   of 2016 at 12:24 p.m. in which you
19   discussed some things relating to his
20   potential departure from the company?
21             (Witness reviews document.)
22        A.    As I sit here right now,
23   looking at this e-mail, it -- it looks like
24   I had a conversation with Paul, summarized
25   by this e-mail (indicating.)
```

```
 1                    MARK CALLAHAN
 2      Q.    Any reason to doubt the
 3  accuracy of your summary?
 4             (Witness revise document.)
 5      A.    As I sit here right now, I
 6  don't believe there is any reason to doubt
 7  the accuracy of the summary.
 8      Q.    Okay. You wrote:  Paul was
 9  thinking --
10             MR. CYRULNIK: Third bullet
11       point.
12      Q.    -- "Paul was thinking that he
13  would be an employee, to help out, until
14  the end of March."
15             Do you see that?
16             (Witness reviews document.)
17      A.    I see that bullet.
18      Q.    During your conversation,
19  Mr. Iacovacci communicated to you that he
20  was intending to leave Brevet but was
21  willing to stay on until the end of March,
22  to help out; isn't that right?
23             (Witness reviews document.)
24      A.    As I sit here right now,
25  looking at just that bullet, I -- I think
```

```
 1                     MARK CALLAHAN
 2  you have to look at the entire e-mail
 3  context.
 4              This is -- he is always looking
 5  to have -- essentially to have his cake and
 6  eat it, too.
 7              He would like to have -- to be
 8  an employee for as long as possible, under
 9  the auspices of helping us out, meanwhile,
10  he gets paid and he wants benefits for even
11  longer, while there is a -- an ongoing
12  negotiation of the -- the separation
13  agreement.
14      Q.   So, is the answer to my
15  question:  Yes?
16              MR. SOLOMON:  I object to the
17       question.
18      A.   Can you repeat the question,
19  please?
20              MR. CYRULNIK:  Can the Court
21       Reporter read the question -- my
22       question, please?
23              THE COURT REPORTER:  Sure.
24              (Whereupon, the referred to
25       question was read back by the
```

```
 1                    MARK CALLAHAN
 2        Reporter.)
 3        A.    As I sit here right now,
 4   reading that bullet, it indicates -- it
 5   says that "Paul is thinking that he would
 6   be an employee, to help out until the end
 7   of March."
 8             It -- it -- it's specific, with
 9   respect to him being an employee until the
10   end of March.
11             What ended up happening is that
12   he continued to extend things out and got
13   paid for much longer.
14        Q.    Yeah.  And I understand that we
15   can talk about what ended up happening.  I
16   am, right now, focusing on what was
17   communicated to you, by Mr. Iacovacci,
18   during the phone conversation that
19   pre-dated this e-mail on February 12th.
20             During that phone conversation,
21   Mr. Coo -- Iacovacci communicated to you,
22   Mr. -- Mr. Callahan, that "he was going to
23   be an employee, to help out until the end
24   of March, not beyond that;" correct?
25             MR. SOLOMON:  I object to the
```

```
 1                    MARK CALLAHAN
 2       question.
 3               States it wrong.
 4       A.    As I sit here right now,
 5  looking at this, I don't -- I don't see
 6  that to be correct.
 7               I believe that this is -- this
 8  is part of an ongoing discussion that is --
 9  that is relating to him, potentially, no
10  longer being an employee.
11       Q.    When you say "potentially, no
12  longer being an employee," are you,
13  intentionally, trying to avoid using the
14  words:  "Leaving Brevet"?
15               MR. SOLOMON:  I don't
16         understand.
17               I object to the question.
18       Q.    Mr. Callahan, you can answer
19  the question.
20       A.    As I sit here right now, I -- I
21  wasn't, specifically, trying to avoid any
22  language.
23       Q.    Okay. And so, my question to
24  you is:  You -- you -- you have testified,
25  as recently as a couple of answers ago,
```

Page 243

                    MARK CALLAHAN
1
2   that, typical, Paul, was trying to stay on,
3   as an employee, for as long as he could.
4             But I am reading your words and
5   these are your words on the page; right?
6             (Witness reviews document.)
7        A.    This is an e-mail that I wrote.
8        Q.    Right.
9        A.    Concerning a conversation, with
10  Paul, at what -- the words that I wrote
11  may, or may not, be what Paul is saying, as
12  opposed to words that I came up with.
13       Q.    Well, you weren't sending this
14  to Paul; right?  You were sending this to
15  your boss, Doug Monticciolo; right?
16            (Witness reviews document.)
17       A.    That is correct.
18            This is an e-mail to Douglas
19  Monticciolo.
20       Q.    And you -- you selected the
21  words that you were going to use, to
22  communicate to Mr. Monticciolo, the
23  substance of your conversation with
24  Mr. Iacovacci; right?
25       A.    As I sit here right now, I

Page 244

MARK CALLAHAN

1
2    don't recall how I selected words to put
3    into this e-mail.
4              But as I look at this, right
5    now, it looks to be me -- especially the
6    early bullet points, me regurgitating what
7    Paul has told me.
8         Q.   So, fair -- fair -- fair to
9    conclude that Paul did tell you that he was
10   thinking that he would be an employee to
11   help out, until the end of March; right?
12        A.   As I sit here right now, as
13   part of the discussion, Paul communicated
14   that he was looking for salary
15   compensation, at Brevet Holdings, until the
16   end of March, and benefits beyond that.
17        Q.   Okay. And the end of March, was
18   only a month and a half after the
19   conversation; right?
20              He wasn't looking to stay on
21   for many, many months, as an employee; is
22   that correct?
23        A.   As I sit here right now, I
24   don't know what he was expecting.
25        Q.   Well, fair enough.

Page 245

                    MARK CALLAHAN

 1

 2              If you were drawing a

 3    distinction as to what -- what he was

 4    actually expecting as to what he was

 5    telling you what he was expecting, you

 6    would agree with me that he told you that

 7    he was not expecting, for example, for

 8    Brevet to cover benefits beyond the period

 9    of his employ; is that correct?

10              MR. SOLOMON:  I object to the

11         question.

12              It misstates the document and

13         it misstates the witness' testimony.

14              MR. CYRULNIK:  I am certainly

15         not misstating your testimony because

16         I am not trying to characterize your

17         testimony.

18         Q.   I am asking you whether or not

19    you would agree that Mr. Iacovacci

20    communicated to you that he was not

21    expecting Brevet to cover his benefits past

22    the period that he was employed by Brevet.

23              (Witness reviews document.)

24         A.   As I sit here right now,

25    reading the bullet, it says:  "He would

```
 1                    MARK CALLAHAN
 2   like it if we paid for benefits beyond then
 3   and he would still help out but he was not
 4   expecting this. For instance: Parenthetical
 5   (us to cover benefits.)"
 6         Q.      Right.
 7                 That was the bullet point that
 8   I was referring to.
 9                 Mr. Iacovacci told you that he
10   was not expecting Brevet to cover his
11   benefits past the period that he was
12   employed; is that correct?
13         A.    I would say it's a big -- I
14   believe that I just -- just answered that.
15         Q.    How?
16         A.    He would like us to pay for
17   benefits beyond that but he is not
18   expecting this.
19         Q.    I am focussing on the second
20   half.  I am not asking about what he would
21   have liked.  I am asking what he
22   communicated to you about his expectations.
23         A.    That is what I just answered.
24         Q.    So, is the answer to my
25   question:  Yes? He communicated to you that
```

Page 247

                    MARK CALLAHAN
1
2    is not expecting that Brevet would cover
3    his benefits past the period of his employ?
4              MR. SOLOMON: Object to the
5         question.
6         A.    As I sit here right now, with
7    respect to this one e-mail and this one
8    conversation, which was one part of a
9    negotiation over a long period of time be
10   -- between counsel and a -- many other
11   discussions, where many things that changed
12   overtime.
13             This, obviously, being one of
14   them because he happily expected --
15   accepted compensation and benefits for many
16   months, beyond this.
17        Q.    Do you view that happy
18   acceptance of compensation and benefits
19   beyond March as inconsistent with what he
20   communicated to you, on this phone call,
21   that is referenced, in Exhibit 9?
22             (Witness reviews document.)
23        A.    You're asking whether or not
24   him -- in -- in -- in some discussion
25   saying that he'd like to be an employee

MARK CALLAHAN

1

2    through the end of March and other

3    discussions and other actions, where he

4    continued to get paid well beyond then, if

5    they are inconsistent with each other?

6        Q.    I am asking you whether or not

7    his acceptance of salary and benefits past

8    the period of March is inconsistent with

9    what he communicated to you about him not

10   expecting Brevet to cover benefits past the

11   period of his employ, in your view?

12       A.    As I sit here right now, I

13   don't know. I don't know what you mean by

14   that.

15       Q.    You don't -- you don't

16   understand my question, you are saying?

17            Do you want me to rephrase?

18       A.    I don't know what you mean by

19   "inconsistent."

20       Q.    Well, I think you -- I think

21   your -- your wording was that "things

22   changed."

23            I want to understand why you're

24   saying that.

25            He didn't tell you, in this

Page 249

                    MARK CALLAHAN

1

2   e-mail, that he did not want to accept

3   benefits beyond March.  He actually told

4   you he would like to receive benefits

5   beyond March but that he was not expecting

6   Brevet to do so; correct?

7               (Witness reviews document.)

8       A.    As I sit here right now, I

9   think -- you started that off by saying

10   that I said that I said that "things

11   change" and I don't believe -- I don't

12   think I said "things changed."

13               But what I said was that from

14   this point forward, there were a lot of

15   other discussions. It was -- it was an

16   ongoing process of discussions, with a lot

17   of different things being thrown out during

18   that time period.  This being one of them,

19   where at that point in time, it looks like

20   Paul was thinking about being employed, to

21   help out, until the end of.

22               It doesn't say definitively

23   that it is done at that point.  Well, it

24   may or may not be consistent, I -- I don't

25   know, to your earlier question.  And it

```
 1                    MARK CALLAHAN
 2   says:  He would like it, if we paid for
 3   benefits beyond that and he would still
 4   help out but he is not expecting this.
 5               Again, that is part of the
 6   ongoing discussions that were happening
 7   from -- from this point forward, through
 8   counsel, is to, ultimately -- you know,
 9   ultimately what happened.
10       Q.    You say "from this point
11   forward through counsel."
12               Mr. Iacovacci was not
13   represented by counsel when he had a
14   discussion with you in February of 2015,
15   prior to this e-mail; correct?
16               MR. SOLOMON:  Objection.
17               Calls for speculation.
18       Q.    To your knowledge, was
19   Mr. Iacovacci represented by counsel prior
20   to you having a discussion with him --
21       A.    As I say:  As I sit here right
22   now, I believe he was represented by
23   counsel.
24       Q.    What is the basis for that
25   belief?
```

```
 1                    MARK CALLAHAN
 2        A.    As I sit here right now, I
 3   believe he had been -- engaged Mr. Weiss
 4   well before this date.
 5        Q.    When do you believe he engaged
 6   Mr. Weiss?
 7        A.    As I sit here right now, I
 8   don't know.
 9        Q.    Well, it sounds like you had
10   some understanding because you testified it
11   was "well beyond this."
12              What is your best understanding
13   of when he engaged Mr. Weiss?
14        A.    Well, as I sit here right now,
15   I believe it was prior to 2016.
16        Q.    Do you believe that
17   Mr. Iacovacci engaged Mr. Weiss, to advise
18   him in connection with a departure from
19   Brevet before 2016?
20              Is that your testimony?
21        A.    As -- as I sit here right now,
22   that is my belief.
23        Q.    And what is the basis for your
24   belief that Mr. Iacovacci engaged counsel,
25   with respect to a prospective departure
```

```
 1                  MARK CALLAHAN
 2   from Brevet prior to 2016?
 3             Did he tell you that?
 4        A.    As I sit here right now, I
 5   don't -- I don't believe he ever told me
 6   that.
 7        Q.    Did someone else tell you that?
 8        A.    As I sit here right now, I
 9   don't -- I don't know. I don't know.  I
10   don't believe --
11        Q.    Did you -- did you --
12             MR. CYRULNIK: Sorry.
13             I didn't mean to cut you off.
14        A.    I don't -- I don't know, you
15   know, I -- as I sit here right now, I don't
16   know why I have that, um, belief.
17             I am happy to go back and go
18   back to documents, to try to figure out how
19   I have that belief.
20             But my belief is that he had
21   counsel prior to that point. And now,
22   whether or not he was -- is certainly --
23   certainly related to -- yeah.  I don't know
24   what it's related to.
25        Q.    Thanks for clarifying.
```

Page 253

```
  1                    MARK CALLAHAN
  2               So, you -- you -- you can tell
  3   me you have the belief, you don't know the
  4   basis for it?
  5       A.    As I sit here right now, I
  6   don't recall what that basis is.
  7       Q.    Had you ever discussed, in any
  8   way, shape or form, a prospective departure
  9   of Paul Iacovacci from Brevet prior to
 10   2016?
 11       A.    As I sit here right now, I
 12   don't -- I don't recall.
 13               Are you saying whether or not
 14   Paul had -- Paul had broached de --
 15   departing?
 16       Q.    Whether the subject matter of
 17   Paul potentially leaving Brevet had ever
 18   come up, prior to 2016?
 19       A.    As I sit here right now, I
 20   don't recall.
 21       Q.    Okay. So, Mr. Iacovacci tells
 22   you that he didn't think a separation
 23   agreement was necessary because the LLC
 24   agreements provided for the course of
 25   action that would follow from his
```

```
 1                    MARK CALLAHAN
 2  withdrawal from the LLC's; is that correct?
 3              MR. SOLOMON:  Object.
 4              I object to the question.
 5              You're misstating the
 6         testimony.
 7       A.   As I sit here right now, where
 8  I don't recall the actual conversation, but
 9  I can see the -- this e-mail.
10       Q.   Okay. Well, based on what this
11  e-mail can trigger, in your memory, my
12  question is --
13              MR. CYRULNIK: I am getting to
14         the last bullet.
15       Q.   -- where you retort to him that
16  he is also an employee.
17              And I am asking you to try to
18  remember, what you can, about what he
19  communicated to you, when you say here:
20  "He said that we probably don't need one,
21  referring to a separation agreement,
22  because our documents already address
23  this."
24              So, do you recall Mr. Iacovacci
25  telling you that the LLC agreements already
```

1              MARK CALLAHAN

2    address what happens, when a Member

3    withdraws, and so, you don't -- he doesn't

4    need to negotiate a separate separation

5    agreement with Brevet.

6              Do you recall Mr. Iacovacci

7    communicating that basic position, in words

8    or in substance, during the call that is

9    being summarized here?

10        A.    As I sit here right now, I

11   still do not recall the call.

12        Q.    Okay. And, then, you respond

13   that you thought the separation agreement

14   was necessary because he is not accounting

15   for the fact that he is -- in addition to

16   being a Member of the LLC's, he is also an

17   employee of Brevet Holdings; right?

18              MR. SOLOMON:  I object.

19              You're misstating the document.

20              MR. CYRULNIK:  I am not

21        misstating any document.

22              Thanks.  I am --

23              MR. SOLOMON:  You're asking for

24        his independant recollection?

25              MR. CYRULNIK:  I am asking for

```
                          MARK CALLAHAN
 1
 2          Mr. Callahan's recollection of the
 3          conversation that is referenced here,
 4          based on whatever he is using to
 5          refresh his memory, if he needs it.
 6                 The question again is:
 7          Q.    In response to Mr. Iacovacci
 8  communicating to you that the LLC
 9  agreements already provided for what needs
10  to occur, if he were to leave Brevet, as a
11  Member.
12                 You pointed out to him that he
13  is also an employee and as a result of
14  that, you thought a separation agreement
15  was appropriate.
16                 Is that a fair, general summary
17  of that exchange?
18          A.    As I sit here right now, I
19  don't recall the contents of that
20  conversation.
21          Q.    Okay. What did you mean when
22  you say:  "We need to make sure that we do
23  everything right by our investors, on the
24  GP side"?
25                 (Witness reviews document.)
```

Page 257

1                    MARK CALLAHAN
2        A.    As I sit here right now, I
3    don't recall what I meant five-and-a-half
4    years ago, when I said that.
5        Q.    Well, reading your words now,
6    in writing, can you tell me what your best
7    understanding of what you meant was or is?
8              (Witness reviews document.)
9        A.    As I sit here right now, it --
10   it looks like just trying to make sure that
11   everything is done properly.
12       Q.    What do you mean by that?
13       A.    As I sit here right now, it
14   probably would be whatever -- what the
15   lawyers are advising us to do.
16       Q.    Are you telling me that the
17   responses that you had to Mr. Iacovacci, on
18   this phone call, were really responses that
19   were informed by the advice you had
20   received from attorneys prior to this phone
21   call?
22       A.    As I sit here right now, I
23   don't recall whether or not I had any
24   discussions with attorneys, relating to
25   this, prior to this point in time.

1                     MARK CALLAHAN

2              As we discussed previously, the

3    need for general -- general need for

4    separation, or Separation agreements, is

5    something that counsel generally had

6    discuss advised us of prior to this.

7         Q.    Why were you reporting this all

8    to Mr. Callahan?

9              MR. SOLOMON:   No.

10             I object to the question.

11             MR. CYRULNIK:  Oh, I don't mean

12        that.

13             You're right.

14        Q.    Why were you reporting this all

15   to Mr. Monticciolo?

16             MR. CYRULNIK:  Thank you.

17        A.    As I sit here right now, I

18   believe I was reporting this to Mr.

19   Monticciolo because he was the owner of

20   Brevet Holdings and a -- the largest Member

21   of each of the -- each of the LLC's.

22        Q.    Did Mr. Monticciolo ask you to

23   have the call with Mr. Iacovacci?

24        A.    As I sit here right now, I

25   don't recall whether or not Mr. Monticciolo

1                    MARK CALLAHAN
2    asked me to have a conversation with
3    Mr. Iacovacci.
4         Q.    Did Mr. Monticciolo ask you to
5    report back to him on any discussions you
6    had with Mr. Iacovacci?
7         A.    As I sit here right now, I
8    don't recall whether or not Mr. Monticciolo
9    asked me to report back on any
10   conversations with Mr. Iacovacci.
11        Q.    Would you characterize the
12   discussion you had with Mr. Iacovacci,
13   referenced here, as a friendly conversation
14   about his prospective departure from
15   Brevet?
16        A.    As I sit here right now, I
17   still don't recall the specifics of this
18   conversation.
19        Q.    You didn't tell Paul that you
20   were considering firing him during this
21   conversation, did you?
22        A.    As I sit here right now, I
23   don't recall the specifics of the
24   conversation.
25        Q.    So, you don't know one way or

```
 1                    MARK CALLAHAN
 2   the other whether you informed Paul that
 3   you were considering firing him during this
 4   conversation?
 5        A.    As I sit here right now, I
 6   would -- I would --
 7              (Witness reviews document.)
 8        A.    I would venture that if that
 9   had been discussed, it would have been
10   reported in the e-mail to Mr. Monticciolo.
11        Q.    Okay.  So, you don't think you
12   told that to Mr. Iacovacci; right?
13        A.    As I sit here right now, I
14   don't know.  But it is not in the summary
15   provided to Mr. Monticciolo.
16        Q.    Did you tell Mr. Iacovacci that
17   you were going to contest his retirement or
18   withdrawal from the company in any way?
19              (Witness reviews document.)
20        A.    As I sit here right now, I
21   don't recall the contents of the
22   conversation.
23        Q.    Did you object to Mr. Iacovacci
24   sending out an e-mail to all of his
25   sourcing contacts, as he expressed to you
```

```
 1                    MARK CALLAHAN
 2   during that phone call, based on the fourth
 3   bullet point -- fifth bullet point of your
 4   summary?
 5              (Witness reviews document.)
 6        A.    As I sit here right now, I
 7   don't recall the contents of the
 8   conversation.
 9        Q.    So, you don't know one way or
10   the other?
11        A.    As I sit here right now, all I
12   can do is read this e-mail.  And it doesn't
13   say he is going to, it says "he would like
14   to send out an e-mail."
15        Q.    You didn't put down, in the
16   bullet points, that you responded to him
17   that he should not do -- that he should not
18   do so; correct?
19        A.    As I sit here right now,
20   looking at this e-mail, I don't see that in
21   the e-mail but I don't recall the contents
22   of the conversation, to know whether or not
23   that happened.
24        Q.    Fair to say that if you had
25   responded that way, you, likely, would have
```

Page 262

1                    MARK CALLAHAN
2    communicated that in the summary to Mr.
3    Monticciolo; right?
4         A.    As I sit here right now, I
5    think it's fair to say that these bullets
6    don't represent a hundred percent of what
7    was discussed on that call because it
8    rarely is the case that summaries are --
9    are a hundred percent inclusive of what was
10   discussed.
11             But I don't recall what else
12   was discussed.
13        Q.    Yeah.  My question was,
14   actually, the opposite:  Was it -- would
15   you agree with me that it is fair to say
16   that had you responded to Mr. Iacovacci
17   that he should not be contacting his
18   sourcing contacts, you likely would have
19   put that in the e-mail summary to Mr.
20   Monticciolo; "yes" or "no"?
21        A.    As I sit here right now, I
22   think I was responsive to the question:
23   That not everything is likely to have been
24   captured by this e-mail.
25        Q.    Yeah.  That would have been

```
 1                    MARK CALLAHAN
 2   responsive to a question:  Do you think
 3   everything is captured by this e-mail?
 4             My question was very specific.
 5   I want you to know whether you agree with
 6   me that had you responded to Mr. Iacovacci:
 7   "I don't want you contacting any of your
 8   sourcing contacts," you would have put that
 9   in your e-mail summary to Mr. Monticciolo?
10             Do you agree with me that you
11   likely would have done so, if you said
12   that?
13             MR. SOLOMON:  I will object to
14        the question.
15        A.    As I sit here right now, I
16   don't know what I would have done
17   five-and-a-half years ago.
18        Q.    Okay.
19             Do you recall a company
20   announcement, in February of 2016, that
21   Mr. Iacovacci would be retiring from the
22   company?
23        A.    As I sit here right now, I
24   don't recall a company announcement
25   regarding that.
```

Page 264

```
 1                    MARK CALLAHAN
 2        Q.    Do you recall a company
 3   announcement about Mr. Iacovacci retiring
 4   from Brevet at any point in time, in 2016?
 5        A.    As I sit here right now, I
 6   don't recall any company announcement
 7   regarding his retirement during 2016.
 8        Q.    Can you tell me one way or the
 9   other whether or not such a company
10   announcement was made?
11              And I know you don't recall so
12   I just want to be clear: You don't know one
13   way or the other whether a company
14   announcement, with respect to Mr.
15   Iacovacci's retirement, was made, in
16   February of 2016; is that correct?
17        A.    As I sit here right now?
18        Q.    Yes.
19        A.    I -- I don't -- I don't recall
20   whether a -- a retirement announcement was
21   made.
22              However, it would have been
23   unlikely to have announced that, without
24   determining what those parameters would
25   look like.
```

```
 1                   MARK CALLAHAN
 2        Q.    You don't recall but you think
 3   it's unlikely it did happen; is that an
 4   accurate summary of your answer?
 5        A.    Is that an inaccurate --
 6   inaccurate summary?
 7        Q.    No.
 8              MR. CYRULNIK:  Sorry.
 9        Q.    Is that an accurate summary of
10   your answer?
11        A.    That, I -- that, I don't
12   recall.
13        Q.    That you don't know for certain
14   but that you suspect that it didn't happen?
15        A.    That is correct.
16        Q.    Okay. Do you recall taking away
17   Mr. Iacovacci's access to company servers?
18        A.    Actually, when I say I don't --
19   to -- to the prior one, I don't recall. I
20   -- you know, it's that I don't know, you
21   know. It's not that I don't recall, not
22   that I don't know.
23        Q.    What do you mean by that:  Do
24   you know?
25        A.    I don't recall whether or not
```

1                    MARK CALLAHAN
2    that would have happened throughout 2016.
3         Q.    And because you don't recall
4    you don't know; right?
5         A.    And I am not -- I am not sure
6    what you're talking about, when you refer
7    to, as a "company announcement."
8              I believe that there were, you
9    know, it's very much a rumor mill of what
10   was going on, very much started by
11   Mr. Iacovacci, himself.
12        Q.    It's your position that
13   Mr. Iacovacci started the rumor that he was
14   retiring?
15        A.    To my recollection, that at
16   some point during the, um, during the
17   negotiation period of the separation
18   agreement, employees had been told by, um,
19   Mr. Iacovacci that he is -- he was retiring
20   as of some date.
21        Q.    Why would Mr. Iacovacci tell
22   people that he was retiring and not retire?
23        A.    As I sit here right now, I
24   can't explain anything that Mr. Iacovacci
25   has done.

```
 1                    MARK CALLAHAN
 2       Q.    Okay. I think you expressed
 3  some lack of clarity as to what I was
 4  referring to by a "company announcement" so
 5  let me be clear and then, repeat the
 6  question, just so we have a clear record,
 7  Mr. Callahan.
 8            By "company announcement," I
 9  mean did anybody from Brevet --
10            MR. CYRULNIK: And I am
11        excluding Mr. Iacovacci.
12       Q.    -- anybody from -- anybody from
13  Brevet, in a -- in the executive position,
14  communicating to other Members, employees,
15  investors that Mr. Iacovacci was retiring
16  from Brevet?
17            That is what I am referring to,
18  by company -- that is what I mean by
19  "company announcement."
20            So, with the benefit of that
21  clarification:  Does your answer remain the
22  same?
23       A.    As I sit here right now, I am
24  not aware of any -- any such announcements.
25       Q.    You had weekly meetings at
```

```
 1                MARK CALLAHAN
 2  Brevet?
 3       A.    Is that a statement or a
 4  question?
 5       Q.    Oh, sorry.
 6             Almost everything I am doing is
 7  a question.
 8             Did you have weekly meetings,
 9  at Brevet?
10       A.    That we are -- as I recall, at
11  that time, there were -- there were, um,
12  likely weekly meetings.
13             But many other meetings, as
14  well.
15       Q.    Understood.
16             Did you have Monday meetings,
17  does that ring a bell?
18       A.    As I recall, there were
19  meetings on Monday mornings.
20       Q.    A standing meeting every
21  Monday, obviously, with exceptions?
22       A.    As I recall, there were
23  generally meetings on Monday mornings.
24       Q.    Do you recall whether or not
25  the subject of Mr. Iacovacci retiring came
```

1                    MARK CALLAHAN
2    up at any of those Monday meetings?
3         A.    As I sit here right now, I -- I
4    don't recall and I don't believe the topic
5    of his retirement came up in those Monday
6    meetings.
7         Q.    So, you both don't recall but
8    you don't believe that the topic came up in
9    any of the Monday meetings; is that what
10   you are testifying to?
11        A.    As I sit here right now, I
12   believe that is what I just said.
13        Q.    You took away Mr. Iacovacci's
14   access to company servers at some point in
15   2016; is that correct?
16        A.    As I sit here right now, I
17   believe Mr. Iacovacci's access was
18   terminated in -- upon his termination, in
19   October of 2016.
20        Q.    Is it your testimony that Mr.
21   Iacovacci's access to the company's servers
22   remain constant and unchanged up until
23   October of 2016?
24        A.    As I sit here right now, it is
25   my understanding that his -- his access and

```
 1                   MARK CALLAHAN
 2   what was the other word you used?
 3        Q.    I think "access" is fine.  I
 4   don't have the transcript in front of me
 5   but "access."
 6        A.    I believe his "access" remained
 7   unchanged.
 8              I believe that there, perhaps,
 9   was changeover of service providers, where
10   all employees had to reset up -- I am not a
11   technology guy.  So, there is a changeover
12   time period so there may have been a time
13   when Paul, like all other employees, was
14   down during that transition.
15        Q.    Apart from that, you're not
16   aware of any -- anybody authorizing the
17   reduction or restriction of Mr. Iacovacci's
18   access to the company servers prior to
19   October of 2016; is that correct?
20        A.    As I sit here right now, I am
21   not aware of any circumstances where his
22   access to the servers was limited --
23   limited.
24              MR. CYRULNIK:  We have been
25         going a little while.
```

```
 1                MARK CALLAHAN
 2           I want to keep our breaks
 3      somewhat limited.
 4           I want to go off the record.
 5           THE VIDEOGRAPHER:  Off the
 6      record at 3:18.
 7           This ends Media Unit Number 4.
 8           (Whereupon, an off-the-record
 9      discussion was held.)
10           THE VIDEOGRAPHER:  We are on
11      the record at 3:25.
12           This marks the beginning of
13      Media Unit Number 5.
14           Thank you.
15      Q.   Mr. Callahan, investors were
16 told, by Brevet, that Paul Iacovacci had
17 retired as of April 1, 2016; isn't that
18 right?
19      A.   As I sit here right now, I
20 don't know whether that is the case.
21      Q.   It's possible that it is?
22      A.   As -- as I sit here right now,
23 I don't know what and when investors were
24 communicated.
25           I don't deal with investors,
```

```
                                        Page 272
 1                  MARK CALLAHAN
 2   generally.
 3        Q.    Okay. Would communicating to
 4   investors that Mr. Iacovacci had retired,
 5   as of April 1, 2016, be inconsistent with
 6   your recollection of what happened?
 7        A.    As I sit here right now, again,
 8   given that I don't interact with investors,
 9   to the -- to the -- for the most part, I --
10   I wouldn't have a view as to whether or not
11   it was consistent or inconsistent as --
12   that would be something that would be
13   better asked of people that deal with
14   investors.
15        Q.    Why is that?  Wouldn't --
16   wouldn't you know whether it was consistent
17   to communicate the retirement of an
18   individual, based on your review as to
19   whether that individual had, in fact,
20   retired?
21        A.    As I sit here right now, I
22   don't know what and when information was
23   communicated to investors, whether
24   consistent or inconsistent.  I don't know
25   what information was communicated.
```

Page 273

```
1                    MARK CALLAHAN
2        Q.    That, I understand that and I
3    appreciate that piece of your testimony.
4               I am asking you to assume, for
5    purposes of this question, that investors
6    were told that Mr. Iacovacci had retired,
7    as of April 1, 2016.
8               If that happened, would that be
9    consistent, or inconsistent, with your
10   recollection of what transpired?
11       A.    As I sit here right now, that
12   would be inconsistent with what transpired
13   because the -- Mr. Iacovacci wasn't
14   retired, he was still getting paid, still a
15   Member of the LLC's, still receiving
16   benefits.
17       Q.    You're required to accurately
18   report things to investors and not to
19   provide them with false information; is
20   that right?
21       A.    As I sit here right now, I
22   believe that providing, you know, best
23   efforts, to provide information, as
24   accurate as possible, to investors, is what
25   we endeavor to do.
```

1              MARK CALLAHAN

2      Q.     Do you know who Mike Mahar is?

3             MR. CYRULNIK: M-A-H-A-R.

4      A.     I do know who Mike Mahar is.

5      Q.     And can you tell me who he is?

6      A.     As -- as I sit here right now,

7  I recall that he was a former employee of

8  Brevet.

9      Q.     Okay. And what was his

10 position, at Brevet, if you recall?

11     A.     As I sit here right now, I

12 don't recall what his position was.

13     Q.     Do you recognize the name █████

14 ████████?

15            MR. CYRULNIK:      ██████  █████████

16          ████████████████

17     A.     As I sit here right now, I do

18 not recognize the name, ██████  ████████.

19     Q.     Okay. Can you take a look at

20 Exhibit 10, please?

21            (Witness complies.)

22            MR. SOLOMON:  Let me see.

23            THE WITNESS:  It seems like

24      Number 13.

25            MR. SOLOMON:  Pull it down just

```
 1                    MARK CALLAHAN
 2        a -- that is 18 (indicating.)
 3        Q.    Do you have that pulled up?
 4              MR. SOLOMON:   "10" is on the
 5         screen.
 6              MR. CYRULNIK:   Great.
 7        Q.    And Mr. Callahan, if you look
 8    at the middle e-mail on the page, towards
 9    the bottom, you will see that ███  █████████
10    writes to Mr. Mahar, asking him to provide
11    "home addresses and approximate age for the
12    below Brevet management so that he can
13    complete background checks."
14              Do you see that?
15              (Witness reviews document.)
16        A.    I see that, along with his
17    request for an in -- a non-NDA dec and a
18    fax sheet.
19        Q.    Yep.
20              And you see the three people he
21    identified are yourself, Mr. Monticciolo
22    and Mr. Iacovacci?
23              (Witness reviews document.)
24        A.    I see that.
25        Q.    Okay. And do you see that Mr.
```

```
 1                    MARK CALLAHAN
 2    Mahar responds, on behalf of Brevet, F --
 3    last paragraph to mid-sentence, in his
 4    e-mail:  "FYI, Paul Iacovacci retired from
 5    Brevet, as of April 1, 2016.  Let me know
 6    if you would still like to have his
 7    details."
 8               Do you see that?
 9               (Witness reviews document.)
10               I see that statement.
11        Q.    Was Mr. Mahar accurately
12    representing to ████  ██████  the state of
13    play, with respect to Mr. Iacovacci, in
14    this May 9th e-mail?
15               (Witness reviews document.)
16        A.    As I sit here right now,
17    looking at this e-mail, it appears it was
18    not an accurate statement, as Mr. Iacovacci
19    was still employed by Brevet, as of the
20    date this have e-mail.
21        Q.    Are you surprised that Mr.
22    Mahar was misrepresenting the state of
23    play, with respect to Mr. Iacovacci, in
24    writing?
25               MR. SOLOMON:  I object to the
```

Page 277

```
 1                    MARK CALLAHAN
 2        question.
 3        A.    As I sit here right now, I -- I
 4   am not surprised. I am not not surprised.
 5              I -- I -- I -- there is not --
 6   I guess I don't really feel anything.
 7        Q.    You're not surprised that Mr.
 8   Mahar was, in writing, misrepresenting the
 9   employment status of one of your
10   executives?
11        A.    As I sit here right now, I am
12   -- I am surprised and disappointed that
13   this information would have gone to an
14   investor.
15        Q.    And --
16        A.    And I would want -- and I would
17   want to go and determine where that
18   information came from.
19        Q.    That was my next question.
20        A.    I am still talking.
21              My concern being whether or not
22   that information originated from
23   Mr. Iacovacci, himself.
24        Q.    I see.
25              Any idea where Mr. Mahar got
```

1                    MARK CALLAHAN
2    the information that he put down, in
3    writing, to ████  ███████  that Mr. Iacovacci
4    had retired?
5         A.    As I sit here right now, I
6    would -- um --
7                 (Witness reviews document.)
8         A.    I would believe that
9    Mr. Iacovacci was the source of that
10   information.
11        Q.    What is the basis for that?
12        A.    As I sit here right now, my
13   recollection is that Mr. Iacovacci was
14   talking to a lot of people at Brevet.
15        Q.    Do you recall Mr. Iacovacci
16   talking to people at Brevet about his
17   retirement?
18        A.    As I sit here right now, I
19   don't recall Mr. Iacovacci talking to
20   people. I recall people commenting that
21   Mr. Iacovacci was calling them.
22        Q.    Calling them and telling them
23   what?
24        A.    As I sit here right -- as I sit
25   here right now, my recollection is that

```
 1                    MARK CALLAHAN
 2   they were -- that he was telling them about
 3   retirement.
 4        Q.    So, you recall people
 5   confirming for you, at Brevet, that
 6   Mr. Iacovacci had called them and told them
 7   that he had retired?
 8        A.    As I sit here right now, I
 9   recall that Mr. Iacovacci had called me --
10   employees at Brevet, whether or not he said
11   he had -- he had retired or was retiring, I
12   am not certain as to, um, the timing of
13   those -- those conversations.
14              But my recollection is that
15   there was -- that April 1, 2016 date is a
16   date that I recall being a date that --
17   that we had to address employees'
18   questions, as to the status of
19   Mr. Iacovacci.
20        Q.    What employee questions did you
21   need to address, with respect to the April
22   1, 2016 status of Mr. Iacovacci?
23        A.    As I sit here right now, my
24   recollection is that the status as to
25   whether or not he was retired, as of that
```

```
                                    Page 280
 1                  MARK CALLAHAN
 2   date.
 3        Q.    Do you recall employees asking
 4   you whether or not Mr. Iacovacci was
 5   retired, as of that date?
 6        A.    As I sit here right now, I
 7   don't recall employees asking me.
 8             My recollection is with respect
 9   to employees asking, I believe, it was our
10   COO at the time.
11        Q.    And who was that?
12        A.    As I sit here right now, I
13   believe it was Jennifer Fleischner at that
14   time.
15        Q.    And what did Mrs. -- Ms.
16   Fleischner tell the people who asked her
17   that question?
18        A.    As I sit here right now, I
19   don't know what Ms. Fleischner told
20   employees.
21        Q.    How do you know that employees
22   were talking to Ms. Fleischner about it?
23        A.    As I sit here right now, my
24   recollection is that Ms. Fleischner
25   informed us -- informed myself and Mr.
```

1                     MARK CALLAHAN
2    Monticciolo of these discussions.
3         Q.    What did you say to Ms.
4    Fleischner about the discussions?
5         A.    As I sit here right now, I
6    don't -- I don't recall the specifics of
7    exactly what she was told, besides the fact
8    that he is still an employee, as she knew,
9    as she oversaw compensation, you know,
10   salary.
11        Q.    So, you recall telling Ms.
12   Fleischner, very clearly, that
13   Mr. Iacovacci was not retired, as of April
14   1, 2016?
15        A.    As I sit here right now, my
16   recollection is that there was a
17   conversation with Mr. Fleischner.
18             What the specifics, or whether
19   it was a specific statement that that --
20   that he was not retired, as of April 1,
21   2016, or whether it was a conversation
22   about the process is ongoing, with respect
23   to a separation agreement, I don't recall
24   the specifics.
25        Q.    I didn't follow your testimony,

```
 1                    MARK CALLAHAN
 2   with respect to what you communicated to
 3   Ms. Fleischner.
 4              Did you communicate to Ms.
 5   Fleischner that Mr. Iacovacci was not
 6   retiring?
 7        A.    As I sit here right now, my
 8   recollection is that it was communicated to
 9   Ms. Fleischner that there was an ongoing
10   process of negotiating the separation
11   agreement.
12        Q.    When you say "negotiating a
13   separation agreement," do you mean to say
14   that it was communicated to Ms. Fleischner
15   that Mr. Iacovacci was not retiring from
16   Brevet?
17        A.    As I sit here right now, my
18   recollection is that the conversation was
19   about a separation agreement, not a
20   conversation about retiring.
21        Q.    Okay. Who keeps the org -- the
22   organization charts, at Brevet?
23        A.    As I sit here right now, a -- a
24   -- a -- I am not sure who keeps them.
25        Q.    You have no idea?
```

1                  MARK CALLAHAN

2              (Witness reviews document.)

3        A.    As I sit here right now, I

4    don't have a definitive view as to who

5    keeps them.

6        Q.    Okay.  Was Mr. Iacovacci

7    removed from the org charts, in 2016?

8        A.    As I sit here right now, I

9    don't -- I don't know when and/or if

10   Mr. Iacovacci was or wasn't removed from an

11   org chart.

12       Q.    Well, what would you expect,

13   based on your recollection of the events?

14             MR. SOLOMON:  I object to the

15        question.

16       A.    As I sit here right now, I

17   don't know what my expectation was at that

18   point in time.

19       Q.    Why is that?

20             Why wouldn't you expect for him

21   to not be touched on the organizational

22   charts, if your position is that he didn't

23   leave Brevet until October?

24       A.    As I sit here right now --

25       Q.    Yes.

1                    MARK CALLAHAN

2                As you sit here right now, why

3    don't you have --

4         A.    I don't have --

5                THE WITNESS:  I -- I am

6          answering the question.

7         A.    As I sit here right now, my

8    recollection, back to that time period,

9    something that we discussed earlier, I

10   wasn't interfacing with investors.  I

11   didn't have a need for work charts, with

12   respect to -- of -- of Brevet, with respect

13   to dealing with our credit counterparties

14   or -- or transactions, our borrowers.

15        Q.    Who did do that interfacing?

16        A.    This timeframe?  As I sit here

17   right now, I believe that was -- I think --

18   I believe Brian Lippy headed up that group.

19        Q.    Okay. Did Mr. Monticciolo

20   interface with investors?

21              (Witness reviews document.)

22        A.    As I sit here right now, there

23   were many people that interfaced with

24   investors, if investors had certain

25   questions.

Page 285

1                    MARK CALLAHAN
2              So, Mr. Monticciolo could have
3    interfaced with investors, as well as
4    others.
5         Q.    But you weren't aware of those
6    people.  You did not interface with
7    investors; is that right?
8         A.    As -- as I've said before, my
9    recollection, at this point in time, is
10   that my -- the majority of my time was not
11   spent doing that.
12             However, if investors had a
13   specific need, I would -- I would meet with
14   them, to discuss whatever that specific
15   need was.
16             But that was quite infrequent.
17        Q.    Do you think it's important for
18   a regulated entity, like Brevet, to keep
19   accurate organizational charts, Mr.
20   Callahan?
21        A.    I -- as I sit here right now, I
22   believe that it's important for a regulated
23   institution, like Brevet, to -- to ensure
24   that it -- that it provides the information
25   that is as accurate and -- as possible,

```
 1                    MARK CALLAHAN
 2   when dealing with the regulators.  Sure.
 3        Q.    With the benefit of that
 4   clarification, can I ask again:  Wouldn't
 5   your expectation be that Mr. Iacovacci
 6   would appear on Brevet's organizational
 7   charts all the way through October of 2016?
 8        A.    As I sit here right now, I
 9   don't have an expectation as to what I
10   would have thought back then and I would
11   imagine that -- that, um, the team would
12   have consulted with counsel, as to how to
13   best deal with whether or not -- and -- how
14   Mr. Iacovacci should or shouldn't be
15   included.
16        Q.    Why would counsel need to be
17   involved?
18              Do you think that counsel needs
19   to be involved, in order for the Brevet
20   executives to understand that they need to
21   report accurately on their organizational
22   charts the various positions that people
23   hold?
24        A.    In terms of the question as to
25   why would counsel need to be involved?  I --
```

```
 1                     MARK CALLAHAN
 2   as I sit here right now, I would think that
 3   counsel would need to be involved because
 4   you wouldn't want to have a -- a situation
 5   of a bait and switch, where an investor,
 6   who was looking to come in and was provided
 7   information in, let's say, in October of
 8   2016 and that it was, you know, came in,
 9   call it, November of 2016 and it -- it
10   would appear like a misrepresentation.
11               That is why, you know, we are
12   always looking at what is in the best
13   interest of out investors.  And, to me,
14   that would be a logical conversation to --
15   to have, with counsel.
16        Q.    Take a look at Exhibit 2,
17   please.
18               (Witness complies.)
19               (Whereupon, a short recess was
20         taken.)
21               MR. SOLOMON:  Exhibit 2 is on
22         the screen.
23        Q.    Do you see this organizational
24   chart?
25               Do you recognize it, Mr.
```

```
                                          Page 288
 1                    MARK CALLAHAN

 2     Callahan?

 3               (Witness reviews document.)

 4        A.    Are you asking about all of

 5     them or --

 6        Q.    I am just asking whether you

 7     recognize the document.

 8               Does this lag -- look like a

 9     Brevet organizational chart?

10               (Witness reviews document.)

11        A.    As I sit here right now, this

12     is -- this is a document that I feel like I

13     have seen in the past, yes.

14        Q.    Can you scroll down to Page 2?

15               (Witness complies.)

16        Q.    Take a look at ██████████

       ████████████   █████████  you will see that

18     yourself and Mr. Monticciolo are identified

19     as ████  ███████████   ██████████████

20               Do you see that at the top?

21               (Witness reviews document.)

22        A.    Um, yes.  I see that.

23        Q.    Is that accurate; the two of

24     you were ████  █████  ███████  ███  ██████  ██████████

       ████████████   in 2016?
```

Page 289

1              MARK CALLAHAN

2         (Witness reviews document.)

3     A.    As I sit here right now I -- I

4  -- I don't recall, specifically.  But it

5  very well could be the case.

6     Q.    At any point in time, when you

7  were at Brevet, did the ███████████

8  ██████████ ████████ █ ███ ████████ █████

9  ███████ ██ ██ ████████████

10    A.    As I sit here right now, I

11  recall ███ ██████████ ██ ██████████ ██ ██

12 █ ███████ ██ ████ ██████ ███████ █ ████

13 █ ██████ █ █████ ████████ ████ ████ ███████

14 █ ██ ██ █████████ ████████

15    Q.    Okay. If you take a look at the

16  next line, or a set of lines down, you see,

17  on the left side of the page: ██████████

18 █ ███ ██ ██ ██ ████ ████████ ██████████

19 █ ██████ ██ ███ ████████ ███ ██ ██████

20 █ ████████

21              Do you see that?

22         (Witness reviews document.)

23    A.    I see Paul Iacovacci's name.

24    Q.    And he is identified as a

25  Member of the Investment Team, on the

Page 290

```
 1                  MARK CALLAHAN
 2  sourcing side.
 3             Is that an accurate depiction
 4  of Mr. Iacovacci's position, as of March
 5  1st of 2016?
 6             (Witness reviews document.)
 7      A.    As I sit here right now,
 8  looking at this on the date of March 1st,
 9  he is still an employee of Brevet and that
10  was his function.
11             So, I would say yes, that, to
12  me, that looks to be accurate.
13      Q.    Okay. So, when do you think
14  that slide should have changed, to reflect
15  the deletion of Mr. Iacovacci from this
16  portion of the Brevet organizational chart?
17             (Witness reviews document.)
18      A.    Well, a couple of things.  So,
19  one is:  I don't know what this org chart
20  is.  It looks to me -- this is not a
21  document that I believe would ever be
22  produced to anybody outside of Brevet.
23             It looks to me, to be a, sort
24  of, the -- the -- a sandbox, the work area,
25  of -- of a Brevet employee. That it would
```

```
 1                    MARK CALLAHAN
 2   use to then likely copy and paste them into
 3   an actual investor presentation or
 4   something else.
 5        Q.    Can you tell me what, about the
 6   document that we are looking at, leads you
 7   to believe that?  What markings or whatever
 8   else you're looking at that suggests that
 9   this is part of the sandbox of an
10   individual employee of Brevet?
11              (Witness reviews document.)
12        A.    Having -- you know, as -- as I
13   sit here looking at this, right now, it's
14   -- the -- there are four -- what -- what
15   you're referring to as "org charts;" right?
16              But there's no -- they don't
17   make any sense, four pages in a row, like
18   this.
19              These would be something that
20   would be used individually, in response to,
21   I would imagine, investor questions. This
22   is not something -- this -- this -- these
23   four pages?
24              I would -- I would highly doubt
25   whether or not this was ever used with
```

Page 292

                    MARK CALLAHAN

1    anybody.

2        Q.    Because the pages are together

3    and you view them as addressing separate

4    types of inquiries?

5              (Witness reviews document.)

6        A.    This would be -- because they

7    are together.  Because there are no

8    explanations.  Because there's a level of

9    detail that isn't, typically, provided.

10       Q.    Okay.

11       A.    You know, and because it's not

12   in a presentation that -- that is listed

13   out, like it's not a formal presentation,

14   like we would typically have; with a cover

15   page, with disclaimers on it, which is why

16   it is, my view, it would be highly unlikely

17   that this went out.

18       Q.    Regardless of whether this went

19   out or not, given that this would form the

20   basis for responses to investment

21   inquiries, you would agree with me that

22   it's important that this remain accurate;

23   correct?

24             (Witness reviews document.)

```
 1                    MARK CALLAHAN
 2       A.    As I sit here right now, I
 3  believe it's important to make sure that
 4  information that goes to investors remains
 5  accurate.
 6            This document is not part of
 7  something that went to investors. That it,
 8  theoretically, wouldn't have gone through a
 9  compliance process and the compliance
10  process would -- would do what we talked
11  about earlier:  Determine whether or not
12  somebody in the situation, like
13  Mr. Iacovacci, should or shouldn't be in,
14  so as not to mislead investors.
15       Q.    Well, you would agree that
16  regardless of whether this actual document
17  was sent outside of Brevet, its goal is to
18  inform people who are responding to
19  investor inquiries about the status of
20  various things and the organizational
21  structure of Brevet; correct?
22       A.    No.
23       Q.    You were -- you were
24  circulating draft -- drafts of these
25  organizational charts, that were
```

```
 1                    MARK CALLAHAN
 2  inaccurate, and that wouldn't concern you
 3  because it wasn't going straight to
 4  investors, Mr. Callahan?
 5              (Witness reviews document.)
 6       A.    As I sit here right now, you're
 7  -- I am not sure exactly what you're asking
 8  but I wouldn't view this as being -- you
 9  know, this is not something that -- drafts?
10  You're talking about drafts, internally,
11  that -- that a -- that there is an
12  employee, of Brevet, who is working on
13  this?
14       Q.    That is not my question.
15            My question is:  Would you be
16  concerned, as the President of Brevet,
17  would you be concerned that inaccurate,
18  erroneous organizational charts were being
19  circulated within Brevet?
20       A.    As I sit here right now, I
21  would be concerned if inaccurate work
22  charts made it through a compliance process
23  and were circulated outside of Brevet.
24       Q.    I would --
25       A.    I would expect -- I would
```

1                    MARK CALLAHAN
2    expect that that the compliance process is
3    a process that is there for a reason and
4    the compliance process is meant to fix
5    mistakes and there are mistakes that get
6    fixed in our compliance process.
7         Q.    What is the compliance process
8    that was used, to correct mistakes, on
9    organizational charts, such as this?
10        A.    As I sit here right now, I
11   don't believe there was a compliance
12   process on the charts I am looking at.
13        Q.    My question to you, Mr.
14   Callahan, is: When do you think this page
15   of the organizational chart should have
16   changed, to reflect the deletion of Mr.
17   Iacovacci's presence, on the sourcing side
18   of the Investment Team, and similarly, on
19   the next page, under the managing director
20   list, under "source," you will see Mr.
21   Iacovacci's name, as well.
22             When, according to you, should
23   that have changed?
24        A.    As I sit here right now, I
25   believe I have already answered that. My --

```
 1                    MARK CALLAHAN
 2   my view would be that I would have had a
 3   conversation with counsel, as to whether,
 4   you know, what is the best way to
 5   communicate this, given the circumstances
 6   as to what is going on, so as to not
 7   mislead investors.
 8        Q.    I guess I -- I am -- I am
 9   struggling to understand why counsel gets
10   involved here.
11              When somebody leaves Brevet, do
12   you need to have counsel involved, in order
13   to approve the deletion of that individual
14   from the organizational chart?
15              MR. SOLOMON:   I object to the
16         hypothetical.
17              There's no foundation.
18        A.    As I sit here right now, the --
19   the -- the difference between what you just
20   talked about is when somebody leaves Brevet
21   whether or not they get removed, if they
22   are -- if they have left Brevet, I would
23   imagine they would be removed from the org
24   chart prior to it being utilized in any
25   external correspondence.
```

```
 1                    MARK CALLAHAN
 2            To the extent that there is
 3   knowledge of somebody, potentially,
 4   leaving, that is where I think it would be
 5   better practice to consult with a
 6   securities' lawyer, to get advice, as to
 7   what one would typically do, what it would
 8   be expected of, in an RIA, in such a
 9   situation.
10        Q.    Are you referring to consulting
11   counsel to resolve an ambiguity, with
12   respect to whether somebody was, or was
13   not, a Brevet employee at any particular
14   point in time?
15        A.    No.
16        Q.    Then you are going to have to
17   help me understand what you're saying.
18            Why is counsel getting involved
19   in the organizational chart process, based
20   on what you're testifying?
21        A.    I am not -- I am not saying,
22   you're asking me what -- you know, what do
23   I think?
24            I am not certain what happened
25   because I wasn't involved in this -- in
```

```
 1                    MARK CALLAHAN
 2   this work chart.
 3        Q.    Yeah, I didn't ask --
 4              MR. CYRULNIK:  I'm sorry.
 5        A.    I am just saying that with
 6   respect to whether or not, or when, to
 7   remove Paul, because you asked for my view
 8   as to when Paul should have been be
 9   removed?
10        Q.    Yes.
11        A.    My view is:  I don't have a
12   view.
13              And given the facts and
14   circumstances, I think it would make sense
15   to have gone to counsel, and given those
16   facts and circumstances, and ask for
17   advice.
18        Q.    Well, my question is:  Why
19   don't you have a view, Mr. Callahan?
20              If your view is that
21   Mr. Iacovacci remained with Brevet up until
22   October of 2016, why don't you have a view
23   as to whether or not Mr. Iacovacci should
24   have been removed from the organizational
25   chart in, say, May?
```

Page 299

```
 1                MARK CALLAHAN
 2           MR. SOLOMON:  I object to the
 3      question.
 4      A.    As I sit here right now, you
 5 know, my question -- my answer doesn't
 6 change.
 7           It's -- it's -- I don't have a
 8 view because of the facts and circumstances
 9 related to what was going on and we would
10 always look to not mislead investors.
11           So, in the -- in the interest
12 of not misleading investors, one would
13 think that the -- there should be
14 consideration, as to what should happen.
15      Q.    "Not mislead investors," as in,
16 for example, sending them an e-mail saying
17 that Mr. Iacovacci is retired, as of April
18 of 2016?
19           MR. SOLOMON:  I object to the
20      question.
21      A.    As -- as I sit here right now,
22 that e-mail, it's disappointing that that
23 e-mail went out.
24           Unfortunate that, potentially,
25 Mr. Iacovacci used his influence to -- to
```

Page 300

```
 1                    MARK CALLAHAN
 2   provide that back-hand information.
 3        Q.    Mr. Callahan, you have no
 4   basis, whatsoever, to accuse Mr. Iacovacci
 5   of orchestrating Mr. Mahr's -- Mahar's
 6   e-mail; correct?
 7        A.    As I sit here right now, based
 8   on conversations with Ms. Fleischner, I
 9   believe that to be the case.
10        Q.    You believe what to be the
11   case?  That Mr. Iacovacci orchestrated Mr.
12   Mahar's e-mail?
13        A.    As I sit here right now, based
14   on conversations with Ms. Fleischner, I
15   believe that the information about a April
16   1, 2016 retirement date came from
17   Mr. Iacovacci.
18        Q.    You're not accusing
19   Mr. Iacovacci of telling Mr. Mahar to send
20   an e-mail that indicated that he had
21   retired, as of April, 2016, are you?
22        A.    As I sit here right now, that
23   is not at all what I am saying.
24        Q.    Okay. That is just what I
25   wanted to clarify.
```

Page 301

                         MARK CALLAHAN

1                      MARK CALLAHAN

2                    You talked about being

3         disappointed in the distribution of that

4         e-mail.

5                    Mr. Callahan, would you be

6         disappointed if the Brevet organizational

7         chart was reflect -- was updated prior to

8         October of 2016, to include the deletion,

9         of Mr. Iacovacci, from the Investment Team?

10            A.    As I sit here right now, based

11        on everything that we just discussed, I --

12        I would not be disappointed.

13                   I would -- I would of expected

14        there to be a process, to go through and

15        determine -- and to remove him and -- and

16        it looks like that was done.

17            Q.    So, you believe it is

18        consistent, with your view, of what

19        happened here for Mr. Iacovacci to be

20        removed from the Brevet organizational

21        chart in, say, May of 2016; is that fair?

22                   MR. SOLOMON:  I object to the

23              question.

24            A.    As I sit here right now, I'm --

25        I'm not providing an opinion as to

```
                                        Page 302
 1                   MARK CALLAHAN
 2    consistency.
 3              I'm -- I simply am -- stated
 4    that I would have expected, that given the
 5    facts and circumstances, it -- it would
 6    have been useful to get advice of counsel,
 7    to determine what to do in that
 8    circumstance.
 9         Q.    In what circumstance?
10         A.    So as to not to misrepresent
11    anything to investors.
12         Q.    Why would you be
13    misrepresenting something to investors, in
14    May of 2016, by reporting Mr. Iacovacci, as
15    a Member of the Investment Team?
16         A.    Which org chart are you looking
17    at?
18         Q.    I am not looking at an org
19    chart.
20              I mean you are looking at the
21    May -- let's start with the March one.
22              In March of 2016; right? March
23    1, 2016, org chart, you see "Mr. Iacovacci"
24    listed there.
25              Am I understanding you
```

Page 303

```
 1                   MARK CALLAHAN
 2   correctly to be testifying that you think
 3   that that might be misleading to investors
 4   because Mr. Iacovacci had announced a
 5   potential intention to retire from the
 6   company.
 7               Is that a --
 8               MR. SOLOMON:  Objection.
 9         A.    I don't know what org chart I
10   am looking at.
11               MR. SOLOMON:  I object to the
12          question.
13               It misstates his testimony
14          about this very document.
15               Do you want him to look at
16          Exhibit 2?
17               MR. CYRULNIK:  Yeah.  One
18          second.
19         Q.    We are looking at Exhibit 2 and
20   once again, I am not -- I can't be
21   misstating your testimony because I am not
22   stating your testimony, I am asking you a
23   question.
24               My question is:  Do you believe
25   that it could be potentially misleading for
```

```
 1                      MARK CALLAHAN
 2    the March 1, 2016 organizational chart to
 3    list "Paul Iacovacci," under "sourcing" and
 4    the "investment committee," given whatever
 5    conversations he had with you about a
 6    prospective departure from Brevet; "yes" or
 7    "no"?
 8         A.    So, first of all, I don't know
 9    what -- am I looking at the March org
10    chart?
11         Q.    I can represent to you that
12    you're looking at an organizational chart
13    that was produced by Brevet, with metadata
14    that is labelled "2016" -- "March 1, 2016."
15    Yes.
16                (Witness reviews document.)
17         A.    And sorry, so, now that I am
18    looking at the right document, I am looking
19    at Page 2 of that pdf?
20         Q.    We looked at Pages 2 and pages
21    -- and Page 3, both of which list that
22    Mr. Iacovacci on the left side.
23         A.    And -- and I believe you made
24    it reference in that question, to him being
25    part of the Investment Team and on the
```

Page 305

```
 1                    MARK CALLAHAN
 2   investment committee.
 3        Q.     No.
 4               I listed -- I made reference to
 5   him being listed under the sourcing side of
 6   the Investment Team, on Page 2, and under
 7   the sourcing side, listed as a "managing
 8   director," on Page 3.
 9        A.     Okay.
10        Q.     My question is:  Do you believe
11   that it is, potentially, misleading to list
12   Mr. Iacovacci, in this March 1st
13   organizational chart, given his stated
14   intention to potentially separate from
15   Brevet?
16               MR. SOLOMON:  And I object to
17          the question.
18        A.     Yeah.  As I sit here right now,
19   I don't see how this document can be
20   misleading to anybody because it's not
21   going to anybody.
22        Q.     Oh.  How do you know that?
23        A.     As I sit here right now, I look
24   at this and there are no disclaimers,
25   there's no title page, there's no who it's
```

```
                                          Page 306
 1                    MARK CALLAHAN
 2   going to.
 3              It's not a standard-form
 4   presentation.
 5        Q.    Well, that, I understand.
 6              But it doesn't need to be
 7   disseminated outside of Brevet, in order to
 8   be misleading; right?
 9        A.    As I sit here right now, I --
10   I, you know, I don't know -- I am not sure.
11   I am not a lawyer.
12              But, to me, in order to be
13   misleading, you have to mislead somebody.
14        Q.    Well, is it your testimony that
15   this document existed on some system but
16   was not viewed by anybody?
17              (Witness reviews document.)
18        A.    As I sit here right now, I -- I
19   would imagine that this was on our network.
20        Q.    Okay.
21        A.    And -- and -- and our network
22   isn't open to outsiders.
23        Q.    Okay. But it is open to Brevet
24   people?
25              (Witness reviews document.)
```

Page 307

MARK CALLAHAN

1
2          A.    There are -- as I sit here
3    right now, my recollection is at that point
4    in time, there were various approvals for
5    various drives, depending on what drive and
6    what your employee, um, group that you were
7    in, your employee status, you would, or
8    wouldn't, have access to certain drives.
9          Q.    Mr. Callahan, you would agree
10   with me that this organizational chart,
11   whether or not it was disseminated outside
12   of Brevet, whether it was stored on the
13   Brevet drive, whether ten people had access
14   to it or whether 50 people had access to
15   it, that it was proper practice, for
16   Brevet's executives, to ensure that its
17   organizational charts contain accurate
18   information about the various employees
19   that are working on its Investment Team.
20              Is that fair?
21              MR. SOLOMON:  I object to the
22         question.
23              And asked and answered several
24         times.
25         A.    As I sit here right now, I --

Page 308

                        MARK CALLAHAN
 1
 2   you know, no -- nothing -- nothing changes.
 3        Q.    Is the answer to my question
 4   "yes" or "no;" is that accurate or not?
 5                  MR. SOLOMON:  Objection.
 6        A.    Your -- I don't agree with the
 7   way that you characterize the question.
 8        Q.    I don't know what you mean by
 9   that.
10                  I am asking you whether or not
11   you agree that this needs to be accurate?
12        A.    I don't believe that this needs
13   to be accurate.
14                  As I sit here right now,
15   looking at a draft document, draft
16   documents are, by their nature, normally
17   not accurate.
18                  So, if you say that every draft
19   of every document on every folder on every
20   Brevet server has to be accurate is,
21   frankly, absurd.
22        Q.    Mr. Callahan, what is the basis
23   for your testimony that this is a draft
24   document?
25                  (Witness reviews document.)

```
 1                    MARK CALLAHAN
 2       A.    As I sit here right now,
 3   looking at this document, it is not in the
 4   form of a final document, to go out to
 5   anybody.
 6       Q.    What is it missing? A stamp
 7   that says:  Do not rely on this?  Or what
 8   -- what -- what -- what exactly, are you
 9   claiming is missing from this document?
10            MR. SOLOMON:  Asked and
11        answered.
12            And therefore, I object.
13       A.    Yeah, as I sit here right now,
14   among other things, it's -- it's missing
15   disclaimers.  It's missing a title page.
16   It's missing context, as to what is on each
17   of the -- what is on each of the slides and
18   there could be other things that its
19   missing, as well.
20       Q.    And so, if it's missing those
21   things, is it your testimony that it need
22   not be accurate -- it's not important for
23   Brevet to be keeping accurate lists of its
24   Investment Team Members, for example?
25       A.    As I sit here right now, that
```

Page 310

1                       MARK CALLAHAN
2    is not my testimony.
3                My testimony is that this is a
4    draft document and that not all draft
5    documents are, by their nature, a hundred
6    percent quote/unquote accurate.
7         Q.    Do you have any idea why the
8    people listed over here, under "sourcing,"
9    in this functional organizational chart,
10   would change between March and May of 2016;
11   "yes" or "no"?
12                (Witness reviews document.)
13        A.    As I sit here right now, as I
14   wasn't involved in these charts, no.
15        Q.    And, specifically, with respect
16   to Mr. Iacovacci, any idea why
17   Mr. Iacovacci would appear on this chart,
18   in March of 2016, but disappear from this
19   chart in May of 2016; "yes" or "no"?
20        A.    As I sit here right now, as I
21   wasn't involved with these charts, I don't
22   know.
23        Q.    Any chance that Mr. Mahar
24   consulted this chart, in providing the
25   information, the false information,

1                    MARK CALLAHAN

2    according to you, that he provided the

3    investor, in the exhibit that we looked at

4    previously?

5              MR. SOLOMON:   I object to the

6         question.

7         A.    As I sit here right now, I

8    don't know whether or not Mr. Mahar had

9    access this chart or whether or not he

10   consulted this chart.

11        Q.    Fair to say that if you had

12   received a copy of a chart that removed

13   Mr. Iacovacci, prior to October of 2016,

14   you would have taken issue with that and

15   sought to correct that error?

16        A.    As I sit here right now, I

17   don't know what I would have, or wouldn't

18   have, done, if I would have seen a chart

19   with, or without, Mr. Iacovacci in that

20   time period.

21              And as -- as I have talked to

22   you about previously, I wasn't involved

23   with putting out these charts anyway.

24        Q.    Well, if you saw documentation

25   that was identifying Mr. Iacovacci, as

                          MARK CALLAHAN

1

2    "retired," prior to October of 2016, would

3    you have sought to correct information --

4    that misinformation?

5         A.    As I sit here right now, in

6    this -- in this exhibit that you are

7    showing, I don't see any reference to

8    Mr. Iacovacci being "retired."

9         Q.    I am not asking you about an

10   exhibit, I am asking you, generally,

11   because I think you said you weren't

12   involved in the creation of this exhibit.

13            If you saw information that

14   indicated Mr. Iacovacci retiring, prior to

15   October of 2016, would you have sought to

16   correct that?

17        A.    As I sit here right now, and,

18   you know, speculating as to whether or not

19   I would have done anything, if I saw a

20   document that said definitively that

21   Mr. Iacovacci was retired, I would -- I

22   would -- I would question that document.

23            Knowing that that had-- that,

24   in fact, wasn't the case at that point in

25   time doesn't mean that the document had to

```
                                        Page 313
 1                  MARK CALLAHAN
 2   be changed, it just means a question as to
 3   why it was -- why it was communicated in
 4   the way it was.
 5              And again, what we are looking
 6   at now, are draft documents.
 7       Q.    Let's take a look at the next
 8   document, please.
 9              (Witness complies.)
10              MR. SOLOMON:  What does that
11         mean?
12              MR. CYRULNIK: What are you
13         asking?
14              MR. SOLOMON:  What does that
15         mean?
16              We were just on 2.  Should we
17         go to 3?
18              MR. CYRULNIK:  No.
19              It doesn't mean go to 3.  It
20         means look at the next exhibit that
21         was added at the bottom of the list,
22         which is Exhibit 11.
23       Q.    Tell me when you have that
24   pulled up.
25              (Witness complies.)
```

```
                                      Page 314
 1                   MARK CALLAHAN
 2            MR. SOLOMON:  Exhibit 11?
 3            MR. CYRULNIK:  That is right.
 4            (Whereupon, a short recess was
 5       taken.)
 6            MR. SOLOMON:  It's on the
 7       screen.
 8       Q.    Who is Sherree Harris?
 9            (Witness reviews document.)
10       A.    As I sit here right now, I
11  believe that point in time, Sherree Harris
12  was a -- was an employee, at Brevet
13  Holdings.
14       Q.    Do you know what her position
15  was?
16       A.    As I sit here right now, I
17  don't recall what her position was.
18       Q.    And do you see that she is
19  sending you an e-mail here:  "Mark, as
20  requested, please find a list of current
21  employees, along with their titles."
22            (Witness reviews document.)
23       A.    I see that statement.
24       Q.    Do you recall requesting a list
25  of current employees, along with their
```

Page 315

1                    MARK CALLAHAN
2  titles?
3       A.    As I sit here right now, I
4  don't recall requesting that.
5       Q.    Any reason to doubt that you
6  did?
7       A.    As I sit here right now, I
8  don't have any reason to doubt that I
9  requested it.
10      Q.    Would it surprise you that the
11  list attached to this e-mail indicated that
12  Paul Iacovacci had been retired?
13      A.    As I sit here right now, I -- I
14  guess I would be disappointed that
15  something that Sherree sent was wrong.  But
16  I don't know that I would be surprised.
17      Q.    Did Sherree make many mistakes?
18      A.    I didn't say that.
19      Q.    Please look at Exhibit 12?
20            (Witness complies.)
21      Q.    That is going to be an Excel
22  spreadsheet and this is the attachment to
23  that e-mail that we just looked at.
24            It will pull up a little
25  differently, in all likelihood, in your

Page 316

1                    MARK CALLAHAN
2    Exhibit Share, because it is going to pull
3    up, in data form.
4              So, let me know when you have
5    it up on the screen.
6              (Witness complies.)
7              (Whereupon, a short recess was
8         taken.)
9              MR. CYRULNIK:  Do you have that
10        up?
11             MR. SOLOMON:  Exhibit 12 is
12        open.
13             (Witness reviews document.)
14        Q.   Well, I am sure you can
15   anticipate my next question because towards
16   the bottom of the page, but Mr. Callahan,
17   do you see that the document that was sent
18   to you, with a list of 34 employees with
19   their titles lists "Paul Iacovacci," as
20   "retired"?
21             (Witness reviews document.)
22        A.   Looking at this spreadsheet,
23   there's a column that lists "Mr. Iacovacci"
24   as -- as "retired," despite him continuing.
25             But it also says that his

```
 1                    MARK CALLAHAN
 2   current status is "employee."
 3        Q.    And what does that mean to you?
 4              How can you be "retired" and
 5   "employee" at the same time?
 6        A.    That is a great question.
 7              But the employee, clearly,
 8   demonstrates that he is still an employee
 9   and still getting paid.
10        Q.    So, employee -- "current
11   status" refers to whether he is still
12   getting paid or not; right?
13        A.    As I sit here right now, I
14   don't know what -- what the rational or
15   what the current status was used for --
16        Q.    Mr. --
17        A.    -- based on looking at this, it
18   -- it appears that -- just scrolling down,
19   to see if there is anything other -- any
20   other, um, items in that column, it looks
21   like all of those columns are -- are listed
22   as "employees."
23              And I believe, from the prior
24   exhibit you showed, this was a request for
25   current employees.
```

Page 318

```
 1              MARK CALLAHAN
 2          So, that would be consistent
 3   that this list would just contain current
 4   employees and it would also include
 5   Mr. Iacovacci.
 6       Q.    Does the designation
 7   Mr. Iacovacci, as "retired," does that
 8   strike you as an accurate designation?
 9             (Witness reviews document.)
10       A.    The, um -- as this -- as I sit
11   here right now, I don't believe that is an
12   accurate designation.
13       Q.    Did you tell Ms. --
14       A.    It also -- it also lists him as
15   being "retired," with respect to his I9
16   documentation.
17             I don't understand that.
18             MR. SOLOMON:  Is that it.  They
19      will go back over that.
20             Is that John Tripp?
21             THE WITNESS:  Oh, that is John
22      Tripp.
23             Never mind.
24       A.    It's hard to follow this --
25   right to left, of this document.
```

1                    MARK CALLAHAN
2        Q.    Why is that?
3        A.    Because it doesn't fit on the
4    screen.
5        Q.    Oh, okay.
6              Well, you can -- you can
7    probably demagnify it. That is fine, for
8    the purposes of my question.
9              Did you tell Ms. Harris, when
10   you received this chart from her, that it
11   needed to be updated, that it was
12   inaccurate, because some of the information
13   reflected therein was misleading?
14       A.    As I sit here right now, I
15   don't know whether or not I opened this
16   file and reviewed this file, had a
17   conversation with -- with Ms. Harris or
18   this file went to someone else because it
19   was from somebody else's request.
20             I -- I don't have a rec -- a
21   recollection as to what would have happened
22   with this document.
23       Q.    Any recollection of telling Ms.
24   Harris that she had it all wrong,
25   Mr. Iacovacci had not, in fact, retired,

```
 1                    MARK CALLAHAN
 2   prior to June of 2016?
 3              (Witness reviews document.)
 4        A.    As I sit here right now, I
 5   don't recall that I had any conversations
 6   because I don't recall if I even reviewed
 7   this document that -- that Ms. Harris sent
 8   and I guess I would refer you back, too, to
 9   fact that I believe one of the people that
10   Ms. Fleischner had indicated had asked
11   about the -- Paul retiring because she
12   heard it from Paul was Ms. Harris.
13        Q.    And Ms. Fleischner heard it
14   from Paul, you said?
15              Did she hear it from anybody
16   else that Paul had retired?
17        A.    I mis --
18              THE WITNESS:  Sorry.  I
19         misstated that.
20        A.    I believe that it was -- my
21   understanding is that Ms. Fleischner heard
22   it from a number of people, including Ms.
23   Harris.
24        Q.    Who else?
25        A.    And that Ms. Harris had heard
```

Page 321

MARK CALLAHAN

1
2     it from Mr. Iacovacci.

3         Q.    Apart from Ms. Harris, who else
4     did Ms. Fleischner hear that Mr. Iacovacci
5     had retired from?

6              MR. SOLOMON:  I object to the
7         question.

8         Q.    To your knowledge.

9         A.    As I sit here right now, I
10    believe it was Ms. Harris. I believe it was
11    Mr. Mahir.

12             I don't -- I don't recall who
13    else.

14        Q.    Okay. Thanks.

15             MR. CYRULNIK:  Let's go off the
16        record

17             THE VIDEOGRAPHER:  Off the
18        record at 4:16.

19             This marks the end of Media
20        Unit Number 5.

21             Thank you.

22             (Whereupon, an off-the-record
23        discussion was held.)

24             THE VIDEOGRAPHER:  We are on
25        the record at 4:25.

Page 322

```
 1              MARK CALLAHAN
 2              This marks the beginning of
 3         Media Unit Number 6.
 4              Thank you.
 5       Q.    Mr. Callahan, do you have a
 6  computer that you have in your Brevet
 7  office?
 8       A.    There is a Brevet work computer
 9  in -- in Brevet's office that I utilize.
10       Q.    Is that your work computer?
11              Is that -- is that -- are you
12  the only Brevet employee who uses that work
13  computer?
14              MR. SOLOMON:  I object to the
15         form.
16       A.    It is -- it is not -- it is not
17  my computer, it's Brevet computer.
18              And -- and, um, there are
19  others that can utilize that computer.
20       Q.    So, does Brevet have these
21  shared computers, as opposed to dedicated
22  computers, for individual employees, or
23  executives, in the work -- in the
24  workplace?
25       A.    It's my understanding that
```

```
 1                    MARK CALLAHAN
 2   computers are all hooked up to a network
 3   and -- and a username and -- and password
 4   can be utilized to -- to log into that
 5   network from -- from a computer that may
 6   not be at your desk or in your office.
 7          Q.    So, if another Brevet employee
 8   wanted to use the pinnacle machine that you
 9   had used yesterday, they can go into your
10   -- into -- into that machine, type in their
11   username and password and use it the same
12   way that you did the day before?
13          A.    As I sit here right now, I -- I
14   am not a tech guy, I don't -- I don't know
15   if that is the case.  I -- I believe that
16   it's the case, where you can log into other
17   computers and whether or not they can use
18   it the same way I used it?  I don't know if
19   they used it the same way because they --
20   they can't access my files because it's --
21   they are logging in to their specific
22   login, would be my understanding.
23                But, again, I am not a tech
24   guy.
25          Q.    When you use a computer in the
```

```
 1                    MARK CALLAHAN
 2   office, are you using the same machine each
 3   time or are you just choosing whatever
 4   machine that your eyes happen to spot and
 5   logging in with your credentials?
 6        A.    The -- I haven't been to the
 7   office in a long time. When I -- when I go
 8   to the office, I have utilized computers --
 9   I have a computer in my office and I have
10   utilized computers in conference rooms and
11   logged into them, in both places.
12        Q.    Do you know whether anyone else
13   used a computer that was in your office,
14   apart from you?
15        A.    As I sit here right now, I
16   don't know whether or not somebody has been
17   -- has utilized my computer.
18             But having not been to the
19   office in, probably, five months and -- and
20   I know that I have offered other people to
21   use my office, in my absence, so, I don't
22   know whether or not they have or they
23   haven't.
24             But it's certainly possible
25   that they have.
```

1                    MARK CALLAHAN

2        Q.    Is that a desk-top machine or a

3    -- or a laptop computer, that you are

4    referring to?

5        A.    I believe that it's a desk top.

6    A Brevet desk-top computer that is sitting

7    in my office.

8        Q.    Okay. What about working from

9    home? I know we were talking back in the

10   2016 time period.  I don't know if anything

11   has changed, since COVID.

12             But:  Back in 2016, did you

13   also have a computer that you used at home?

14       A.    It is my recollection that I

15   have had a -- a Brevet computer that I have

16   utilized for -- for work, when I had been

17   at home for quite some time.

18       Q.    You said "Brevet computer."

19             Do you mean that that computer

20   is dedicated to Brevet and only Brevet

21   work?

22       A.    When I say "Brevet computer," I

23   -- I -- my intention is to clarify that it

24   is -- is a computer that was purchased by,

25   maintained, owned, all of the software on

```
                                        Page 326
 1                    MARK CALLAHAN
 2   it is -- is, um, is, as well, purchased by
 3   and owned by, um, by Brevet.
 4        Q.    Okay. Thanks for the
 5   clarification.
 6              Do you use that computer for
 7   non-Brevet purposes?
 8              MR. CYRULNIK:  Let me
 9        re-phrase.
10        Q.    Have you used that computer for
11   non-Brevet-work purposes?
12        A.    Are you talking about a 2016
13   computer?
14        Q.    Well, thanks for -- for
15   clarifying that.  I didn't get really into
16   the details.
17              Have you had more than one
18   computer at your house that was purchased
19   by Brevet?
20        A.    Yes.
21        Q.    How many have you had over the
22   years?
23        A.    As I sit here right now, I
24   don't know how many that I have had.
25        Q.    More or less than five?
```

Page 327

1                    MARK CALLAHAN
2          A.     As I sit here right now, I
3     would say that it would probably be five or
4     more.
5          Q.     Do you think it's more than
6     ten?
7          A.     As I sit here right now, I
8     don't believe it's more than ten.
9          Q.     Have you ever had more than one
10    such computer in your house at one time?
11         A.     Yes.
12                During COVID, I -- I -- I have
13    a desk top, which does not have video
14    functionality.  So, I also have a laptop,
15    which allows me to do, um, video calls from
16    my home.
17         Q.     So, the computers that you had
18    at your house that were purchased by
19    Brevet, prior to COVID, had been desk-top
20    computers?
21         A.     As I sit here right now, that
22    is my recollection.
23         Q.     And then, with the advent of
24    COVID --
25         A.     Sorry. I -- I -- let me -- let

                    MARK CALLAHAN

1    me correct.

2            As I sit here right now, prior

3    to COVID, it was -- yes, it was a desk-top

4    computer.

5            I believe one of the computers

6    over the years, meaning, you know, fifteen,

7    for twenty years, I believe one of the

8    computers that I used at home was a laptop

9    some years ago.

10       Q.    Okay.  Who -- who selected the

11   -- the specs and the specifics of the

12   computer that Brevet purchased for your use

13   at home?

14       A.    It's my understanding that --

15   that depending on the time period, it would

16   be Mr. Tripp or Mr. Lan.

17       Q.    You didn't have any involvement

18   in identifying, say, the specs of a

19   computer that you were looking for or any

20   particular features that you wanted or they

21   would just send you a computer of their

22   choice; is that right?

23       A.    Um, unfortunately, I am not

24   sophisticated enough to under -- to -- to

```
                                          Page 329
  1                    MARK CALLAHAN
  2   know what features to request.
  3        Q.    All right. So, the answer, I
  4   take it is no, you were not involved in the
  5   selection at all?
  6        A.    I don't know who "we" is but I
  7   -- I had not been involved in -- in
  8   determining what features, what models,
  9   what types, what setup of -- of computers.
 10        Q.    Okay. Did you ever use that --
 11   well, so, when would you -- apart from the
 12   COVID situation, you described, where you
 13   had two at one time, is it the case that
 14   you had one of these computers for a period
 15   of time and, then, you would swap it out
 16   for a new one?
 17        A.    It's my recollection that that
 18   -- yes, when a new computer is provided,
 19   the old computer is returned.
 20        Q.    And you would upgrade to a new
 21   computer when -- was it a set interval or
 22   was it based on, you know, the request that
 23   you were feeling the computer was obsolete
 24   or what was the criteria for getting a new
 25   one?
```

```
                                    Page 330
 1               MARK CALLAHAN
 2       A.    It's -- it's my recollection
 3  that -- I -- I -- I -- that Mr. Tripp, or
 4  Mr. Lan, would, um, inform me that it was
 5  time for a new one and ask me to bring the
 6  old one in and they would provide me with a
 7  new one.
 8       Q.    Do you know what happened to
 9  the old one, when you brought it in?
10       A.    As I sit here right now, I
11  don't know what happened to the old
12  computers.
13       Q.    Did you ever use these old
14  computers --
15            MR. CYRULNIK:  Withdrawn.
16       Q.    Did -- did all Brevet employees
17  get a similar setup, with a computer that
18  Brevet purchased, for the employee's home
19  use, prior to COVID?
20       A.    As I sit here right now, I --
21  I, you know, I don't -- I don't know, prior
22  to COVID, whether all employees had a -- a,
23  um, a setup.
24            But I believe that, um, prior
25  to COVID, all employees had laptops and so,
```

```
 1                    MARK CALLAHAN
 2   which allowed them to bring them home, if
 3   they didn't have a -- a setup.
 4        Q.    Meaning as opposed to the desk
 5   top, that you described, in your office,
 6   other employees had laptops that, in
 7   theory, could be used both, in the office
 8   and at home?
 9        A.    That is -- that is my
10   recollection.
11        Q.    Did anyone else have, um, um,
12   this setup, where you had two computers;
13   one at the office and one that they
14   purchased at home, separate from the one
15   that was being used in the office?
16        A.    I believe that to be the case.
17        Q.    Was that setup reserved for the
18   high -- high-level executives, at Brevet?
19        A.    No. It was not.
20        Q.    Approximately how many Brevet
21   employees, or executives, had, in addition
22   to a computer that was -- they used in the
23   office, had a computer that Brevet had
24   purchased for their use at home?
25        A.    As I sit here right now, I
```

```
                                          Page 332
 1                    MARK CALLAHAN
 2    don't know that number.
 3         Q.    More or less than two or
 4    greater than ten?
 5         A.    As -- as -- as I sit here right
 6    now, I don't know.
 7               However, ten seems like a low
 8    number, given the time we are talking
 9    about.
10         Q.    You had that setup.
11               Did Mr. Monticciolo have that
12    setup, to your knowledge?
13         A.    It is my understanding that
14    Mr. Monticello has a set up at home, as
15    well.
16         Q.    How about Mr. Iacovacci?
17               Did he have a computer that was
18    purchased by Brevet for his use at home?
19         A.    Yes.
20               Mr. Iacovacci had a computer,
21    purchased by Brevet, owned by Brevet, that
22    he utilized at home.
23         Q.    How about Mr. Lan, did he?
24         A.    I don't -- as I sit here right
25    now, I don't know whether or not Mr. Lan
```

```
 1                    MARK CALLAHAN
 2   had a computer.
 3              It was -- I would assume so but
 4   I don't know.
 5        Q.    How about Mr. Tripp?
 6              Do you know one way or the
 7   other whether Mr. Tripp had the same setup?
 8        A.    As I sit here right now, I
 9   would say the same for Mr. Tripp.
10              I -- I haven't been there, to
11   determine whether or not he has the same
12   setup.
13        Q.    Apart from yourself, Mr.
14   Monticciolo and Mr. Iacovacci, is there
15   anyone else, as you are sitting here today,
16   that you are aware of, has a similar setup;
17   that had a computer that was purchased by
18   Brevet, for use at home, separate and apart
19   from the computer that the employee had at
20   the office?
21        A.    What time period are you
22   talking about?
23        Q.    I would say up until 2017.
24        A.    Um, can I go back and look at
25   that exhibit, to see some of those employee
```

Page 334

1                        MARK CALLAHAN

2      names?

3                I just -- as I sit here right

4      now, I don't recall who the employees were,

5      at that time, regardless of whether or not,

6      you know, they had a computer.

7          Q.    That is fair.  I -- I want to

8      try to keep it efficient.  So, it's fine.

9                It's fair to say sitting here

10     now the only way you could tell me, with

11     any level of certainty, that you know had a

12     similar setup, where yourself, Mr.

13     Monticciolo and Mr. Iacovacci, subject to

14     looking at any other org charts or lists of

15     people?

16         A.    As I sit here right now, if I

17     were given a list of employees, I know,

18     certainly, there were a number of junior

19     people at the firm, who worked long hours,

20     who had setups at home which enabled them

21     to work those long hours.

22               I just don't know, sitting here

23     right now, which junior employees were

24     employed, in the 2017 and prior timeframe

25     that you're referring to.

Page 335

1                      MARK CALLAHAN
2         Q.     Got it.
3                Okay. Let -- let's -- let's
4    talk about your use of the computer that --
5    that was purchased by Brevet for your use
6    at home.
7                Did you ever use that computer
8    for any purpose, other than Brevet-related
9    work?
10        A.     As I sit here right now, I am
11   sure that I have done, um, you know,
12   personal work on that computer, as it, you
13   know, as I was working and simultaneously,
14   perhaps, looking at a personal document or
15   -- or the such.
16               I am sure that I have used it
17   for personal reasons.  I don't recall
18   anything specific.
19        Q.     Is it your understanding that
20   using that computer for personal work or
21   personal reasons was consistent with your
22   Employee's Practices and Guidelines.
23        A.     It's my understanding that --
24   that utilizing a computer is, you know, I
25   -- especially at that point in time,

Page 336

```
                            MARK CALLAHAN
 1
 2   utilizing a computer is, for personal
 3   items, would be consistent, so long as it
 4   wasn't in contravention of Brevet's, um,
 5   policies and procedures.
 6        Q.    That kind of assumes the
 7   question:  What do you mean "so long as it
 8   wasn't in contravention of Brevet's
 9   policies and procedures"?
10        A.    As I sit here right now, I
11   could think of -- of the extent that you're
12   -- you are utilizing that computer in a
13   personal manner, to the detriment of -- of
14   Brevet, whether it be by sharing
15   information, taking information, that would
16   be something that would be in contravention
17   of the policies and procedures of Brevet.
18        Q.    What about watching a movie?
19             Is it your understanding that
20   you are permitted to watch a personal
21   movie, that Brevet purchased, for your use
22   at home?
23        A.    I -- I don't -- um -- as I sit
24   here right now, I am not sure how one would
25   watch a personal movie on a computer but
```

```
                                            Page 337
 1                    MARK CALLAHAN
 2    maybe that is because I am not that
 3    sophisticated.  Because this -- I think of
 4    a DVD being used to watch a movie and the
 5    DVD drives, I am not even sure they are in
 6    them now but they have been disabled, when
 7    they were in them.
 8         Q.    You have heard of Netflix, for
 9    example, or YouTube?
10         A.    I've -- I've heard of Netflix
11    and YouTube.
12         Q.    And you had internet access on
13    -- through a browser on your, um, um,
14    computer that was purchased by Brevet for
15    your use at home?
16         A.    I have internet access at home
17    on the computer that Brevet is hooked up
18    to.
19         Q.    Is it your understanding would
20    it be inconsistent with Brevet's policies
21    and procedures for you to have gone to a
22    web browser and logged on to YouTube or
23    Netflix to watch a movie?
24         A.    As I sit here right now, I
25    don't know.
```

                    MARK CALLAHAN

1

2              But I have never logged in to

3    YouTube, to watch movies, and I have never

4    logged in to Netflix on my -- my work

5    computer.

6         Q.   Do you have a separate home

7    computer that you purchased with your own

8    funds?

9         A.   Yes, I do.

10        Q.   Is that a laptop or a desk top

11   or do you have more than one?

12        A.   More than one.

13        Q.   And did you, generally, use

14   those computers for personal work and the

15   Brevet computer for business activities?

16        A.   That is correct.

17             I use one of the many -- we

18   have many laptops in the house, I believe

19   at least four laptops that are -- that we

20   use.

21        Q.   Did any of your other household

22   members ever use your Brevet-purchased

23   computer?

24        A.   As I sit here right now, I am

25   not aware of any other members of the house

Page 339

1                    MARK CALLAHAN
2    using the Brevet-purchased computer.
3        Q.    Did they use the other -- one
4    of the other four laptops or whatever
5    other personal devices that you purchased,
6    as what -- what the other household members
7    used, if they wanted to use a computer?
8        A.    The rest of my household would
9    util -- utilize, um, the com -- the laptops
10   that -- that we separately purchased, that
11   we owned, or that my children would use
12   laptops that were provided from their
13   school, which is more -- more frequently
14   what they do.
15       Q.    In order to use the Brevet
16   computer that you had at home, did you have
17   to log in with your -- with a password, a
18   Brevet cre -- a set of -- a Brevet set of
19   credentials?
20       A.    Again, are we talking about --
21   yes.  You would have to log in with -- with
22   Brevet credentials.
23            I am not clear as to what
24   timing you are -- you are asking about but
25   it's -- the answer is yes, in cross time.

```
 1                    MARK CALLAHAN
 2        Q.    Yeah.  And that -- and that's
 3   -- that's a fair clarification.
 4              If -- if any of the questions I
 5   am asking vary across time, please let me
 6   know.  I'm -- I'm trying to ask -- I am
 7   trying to flag a particular timeframe,
 8   where it's obvious to me that -- that it
 9   wouldn't matter and if I am not flagging
10   it, at least, you know, my view is that it
11   -- it probably does not but just let me
12   know if your answer is going to change,
13   based on the time period.
14              Um, who chose the log-in
15   credentials for your -- for your log in to
16   that computer; you or someone at Brevet or
17   a combination?
18        A.    It's -- it's -- it's my
19   recollection that I am the one who chose --
20   choses my password, the username is -- is
21   -- my recollection is that it has always
22   been selected by the technology person at
23   the firm.
24              But the password, itself, is
25   something that -- that, um, my recollection
```

```
                                        Page 341
 1                   MARK CALLAHAN
 2    -- that is the way it is now.
 3              My recollection, historically,
 4    is that I have chosen the password.
 5         Q.    Okay. And is there a separate
 6    username and password that is needed or a
 7    separate password that is needed to access
 8    any particular functions on the computer
 9    after you log into the computer?
10              For example, to access e-mail
11    -- work e-mail, or otherwise, are there
12    particular passwords or usernames or
13    credentials that are needed beyond that
14    initial set?
15              (Whereupon, a short recess was
16         taken.)
17         A.    You know, I am thinking about
18    every time, so, if it's -- if you're
19    talking about now, there is a -- it is my
20    understanding there would, for example, be
21    a Microsoft Office, or whatever it is
22    called now, um, credential that would need
23    to be signed in to.
24              I am trying to think of the
25    different things that come up on the
```

Page 342

```
 1                    MARK CALLAHAN
 2   computer that -- that, perhaps,
 3   periodically would need to be re-logged
 4   into; that it can be Microsoft, it can be
 5   Adobe.
 6              You know, there -- there's
 7   various systems that Brevet utilizes that
 8   -- that would require -- that could require
 9   additional passwords.
10              It's pretty synchronized now
11   but it may not have been as synchronized,
12   historically.
13        Q.    And how would you access your
14   work e-mail, would that be on a native
15   application or would you be, essentially,
16   channelling into your work computer's
17   desktop, in order to access your work
18   e-mail, back, let's say, in 2015, 2016?
19        A.    In 2015/2016, my recollection
20   is that I could access e-mail through a web
21   browser, through my iPad, through a phone,
22   a cell phone, through my desktop in the
23   office and through my computer at home.
24              But when I used it at home, my
25   recollection is that I would -- I would
```

1                     MARK CALLAHAN
2    utilize the web browser to access e-mail.
3        Q.    So, you wouldn't be using a
4    program, like "go to my P.C.," to tunnel
5    into a work desktop, in order to access
6    your e-mail; right?
7        A.    My recollection, as I sit here
8    right now, is that that is something that
9    you could do.
10            But the -- it wouldn't reflect
11   the -- the fastest way at that -- in those
12   dates or in that timeframe, to be able to
13   access e-mails.
14       Q.    And were there any markings, on
15   the physical machine, that indicated that
16   the computer was Brevet property, any of
17   the computers at home?
18       A.    As I sit here right now, I
19   don't have a recollection as to whether
20   there were or weren't markings on -- on any
21   computers in the, you know, in the 2015/'16
22   timeframe, which, I think, is what you're
23   asking about.
24       Q.    How about now?
25            I was asking about the cross

```
                                                    Page 344
  1                        MARK CALLAHAN
  2    period.  So, if that has changed overtime,
  3    I would like to know.
  4         A.    It is my understanding that
  5    there are markings on -- on computers at
  6    this point in time.
  7         Q.    Does your computer that you
  8    have at your house, that Brevet purchased
  9    for you, does that have the markings that
 10    you just referenced?
 11         A.    As I sit here right now, I
 12    believe it does.
 13               It sits -- the desktop sits in
 14    a drawer of the desk, so I haven't --
 15    haven't looked at it in quite some time.
 16         Q.    Do you know when Brevet started
 17    putting such markings, or insignia, on the
 18    computers?
 19         A.    As I sit here right now, I
 20    don't know when that happened.
 21         Q.    Was it before or after 2016?
 22         A.    As -- as I sit here right now,
 23    I don't know when it happened.
 24         Q.    So, it could have been before,
 25    it could have been after?
```

Page 345

                    MARK CALLAHAN

1

2        A.    As I sit here now, I don't know

3   when it happened.

4        Q.    Were you involved in the

5   decision to institute the placement of

6   markings, or insignia, of Brevet, on its

7   new machines that it's purchased?

8        A.    As I sit here now, I don't

9   recall being involved in -- in -- in the

10  technology side of things or -- or the

11  decision to mark, or not mark, computers.

12       Q.    What type of monitoring was

13  done of the Brevet employee's usage of --

14  of the computers that Brevet purchased for

15  use at home?

16       A.    It is my understanding that --

17  that I can speak to, my computers, that I

18  -- that I was provided, periodically, I

19  would be asked to bring it in -- bring in a

20  computer and -- and for -- for updates or

21  -- or, frankly, I don't know what the

22  technology folks were doing.  But that

23  would be part of it.

24             At certain times, it was

25  logging in remotely, into my computer.

                          MARK CALLAHAN
 1
 2   Again, I am not sure exactly what the
 3   technology folks were doing.  They had
 4   access, to be able to -- to log in to the
 5   computer.
 6        Q.    The technology folks had access
 7   to log in to your computer for the purpose
 8   of monitoring activity or for the purpose
 9   of maintaining your computer, with updates
10   and the like?
11        A.    All of the above.
12        Q.    Let's --
13        A.    And -- and, potentially, more.
14              I mean, frankly, it was a
15   Brevet computer.  And the -- that computer
16   is -- is -- would be something that -- that
17   Brevet would have an obligation to
18   preserve, anything that was on there, that
19   that wasn't already, um, saved on the
20   network in the office or the network in the
21   cloud.
22        Q.    Well, what -- what -- what is
23   the basis for your statement that Brevet
24   had an obligation to maintain anything on
25   that computer?

Page 347

1                    MARK CALLAHAN
2        A.    It is my understanding that --
3    that similar to the discussion where we
4    were talking about earlier, where, with
5    respect to Global Relay and the -- the
6    requirement to maintain all e-mail
7    documentation, or e-mail communication,
8    Brevet, similarly, has a requirement to
9    maintain all documents related to Brevet
10   materials.
11       Q.    Oh.   Related to Brevet
12   materials?   I understand.
13             My -- I guess my question
14   wasn't clear enough.
15             Brevet didn't have any
16   obligation to maintain, um, any files, um,
17   on the computer, that you are talking
18   about, to the extent those files were not
19   business files; right?
20       A.    As I sit here right now, I am
21   not sure how Brevet would determine whether
22   or not a file was a business file or not a
23   business file, without -- without looking
24   at it.
25             I -- I -- I don't believe for

```
 1                  MARK CALLAHAN
 2  -- you're asking about me.  I didn't
 3  maintain personal files on -- on that -- on
 4  the Brevet computer.
 5               But still, if -- if they are
 6  doing -- they are looking -- looking at a
 7  computer and trying to determine what to
 8  back up?  I don't know how one determines
 9  what is or isn't personal.
10       Q.    Well, who is in charge of doing
11  that, at Brevet?
12       A.    Who is in charge of doing what?
13       Q.    Of maintaining the backups of
14  the files that you are talking about.
15       A.    It's my understanding that that
16  is something that is, um, coordinated with
17  compliance and technology.
18       Q.    Do you make those decisions?
19       A.    It's -- it's my under -- as I
20  sit here right now?
21       Q.    Yeah.
22       A.    I did not make those decisions.
23       Q.    What about as you sat there, in
24  2016?
25       A.    There -- over time?  There have
```

```
                                        Page 349
 1                  MARK CALLAHAN
 2    been times when I have made those -- those
 3    decisions.
 4             At times, when there were fewer
 5    people at Brevet or fewer, um -- yeah,
 6    fewer people at Brevet.
 7        Q.    What qualifications, Mr.
 8    Callahan, with all due respect, did you
 9    have to make the determination with respect
10    to what backups needed to be kept of files
11    that were housed on the machines that
12    employees had at home, purchased by Brevet,
13    if you just told us that you didn't even
14    know how you would go about determining
15    what files were Brevet-related and what
16    files were personal-related?
17        A.    As -- as I sit here, you know,
18    right now and I think about okay, how do
19    you determine whether something is personal
20    or business-related, I -- it's -- it's
21    unclear to me how one determines that,
22    without first looking at the file or -- or,
23    um, you know, or -- or copying the file, to
24    look at it at a -- at a later time.
25             One can endeavor to do it's
```

```
                                   Page 350
 1                  MARK CALLAHAN
 2    best to, um, try but it's a -- it's
 3    something where the personal files
 4    shouldn't be on Brevet's computer, you
 5    know, that is really the first thing.
 6              The -- the second thing is that
 7    it's -- it's clear to Brevet's employees
 8    that they should have absolutely no
 9    expectation of privacy, with respect to any
10    computer, with respect to any -- any
11    systems that -- that Brevet utilizes, with
12    respect to any -- any Brevet materials, um,
13    and -- and -- and I would say furthermore,
14    the employees understand that -- that
15    there's, you know, no expectation that it
16    -- that it is okay for them to be copying,
17    distributing, stealing documentation of
18    Brevet materials.
19         Q.    What is the basis for your
20    testimony about what employees understand,
21    apart from yourself?
22         A.    It's my understanding that --
23    that Brevet employees respect the rules. It
24    is my understanding that Brevet employees,
25    um, take seriously policies and procedures.
```

```
 1                  MARK CALLAHAN
 2   It is my understanding that -- that Brevet
 3   employees appreciate that when they are
 4   asked to review and understand a document
 5   and -- and when they are asked to
 6   acknowledge their review of a document, my
 7   understand -- my belief is that -- is that
 8   Brevet employees take that, um -- take that
 9   seriously.
10              And -- and by -- by doing that,
11   it's -- it is -- it is clear to Brevet
12   employees that there is no expectation of
13   privacy.
14        Q.    When you say "it is my
15   understanding," do you mean to say you
16   would hope or are you telling me that you
17   have a basis for your understanding,
18   separate and apart from your hope or
19   expectation?
20        A.    As I sit here right now, I
21   believe I have a basis for my -- for my
22   understanding.
23        Q.    What is that basis?
24        A.    The basis is, you know, as I
25   sit here right now, that basis is in
```

1                    MARK CALLAHAN
2    Brevet's policies/procedures employee
3    handbook.
4         Q.    Your employee handbook and
5    policies and procedure have statements with
6    respect to whether or not employees do,
7    indeed, have expectations or don't have
8    expectations of privacy, for example?
9         A.    It is my understanding that --
10   that whether it's using those words, it's,
11   certainly, um, it's certainly, um, the
12   topic is certainly in there and the fact
13   that, um, that Brevet has the -- the right
14   to -- to access their, um -- the -- access
15   its computers, its systems, its -- its
16   materials is something that I believe is
17   incorporated those documents.
18        Q.    I believe you testified that it
19   was improper for an employee, such as
20   yourself, to store any personal work
21   documents, personal documents on the
22   computer.
23             Did I get that right?
24             MR. SOLOMON:  I object to the
25        question.

MARK CALLAHAN

1

2        A.     Yeah.  I -- I -- my

3    recollection is that I -- yeah.  I -- I

4    already answered it but didn't answer it in

5    that manner.

6             I -- I believe that it was -- I

7    believe that I had stated -- yeah, I don't

8    recall exactly what the question was but

9    the -- the -- it was more along the lines

10   of to the extent that you are using the

11   computer for any personal matters?

12            My -- my focus was on the --

13   was that you weren't doing it to the

14   detriment of Brevet.  And most importantly,

15   doing it to the detriment of Brevet's

16   investors.

17       Q.     Set -- setting aside doing

18   whatever it is you are referring to, to the

19   detriment of Brevet; "yes" or "no," was it

20   fine -- was it in compliance with Brevet

21   policies and procedures, in your view, for

22   an employee to store, say, a personal poem

23   that they drafted on the computer that

24   Brevet had purchased for use at home?

25       A.     Yeah.  As I sit here right now,

```
 1                   MARK CALLAHAN
 2    without you showing me the -- the policies
 3    and procedures, you know, the specifics of
 4    that, I -- I wouldn't -- I wouldn't know
 5    whether or not that was, or wasn't, within
 6    the -- within those policies and
 7    procedures.
 8          Q.    What about personal e-mail
 9    accounts; G mail, AOL, Yahoo, e-mail
10    accounts that can be accessed through a
11    browser; "yes" or "no," was it in
12    compliance with Brevet policies and
13    procedures for employees, such as yourself,
14    to access their personal e-mail
15    communications using a browser on the
16    machine that Brevet had purchased?
17          A.    It's -- it's -- as I sit here
18    right now, it is my understanding that that
19    -- I am not even sure that is still the
20    case today.
21                But at some point, yes, it was
22    -- it was permissible, for Brevet
23    employees, to access their personal e-mail,
24    um, um, accounts through a web browser and,
25    you know, it was -- I believe it's clear to
```

Page 355

1                    MARK CALLAHAN
2    Brevet employees that accessing those --
3    those, um, e-mails through the computer,
4    through the Brevet computer, also generates
5    some -- some files on that computer, which
6    -- which could -- could provide -- provide
7    for some personal information being on the
8    -- being on the Brevet computer, which is
9    something that -- that, um, I believe
10   Brevet -- I believe it's clear to Brevet
11   employees that that is the case.
12        Q.    Why do you believe that?
13        A.    As I sit here right now, as we
14   discussed, I believe it's in the policies,
15   procedures and the employee handbook.
16        Q.    You believe that the policies,
17   procedures and employee handbook state that
18   if an employee accesses a personal e-mail
19   file, using a browser on their computer
20   that any temporary or other files that are
21   generated, in connection with that access,
22   are things that are going to be stored on
23   their computer and accessible by Brevet?
24        A.    As I sit here right now, that
25   is not at all what I just said.

Page 356

1                    MARK CALLAHAN

2        Q.    Well, do you believe what I

3    just said?

4        A.    Do I believe that -- that what

5    you said is specifically in Brevet's

6    policies and procedures?  No.

7              Do I believe that,

8    conceptually, if that -- that any file, no

9    matter where it comes from, that ends up on

10   a Brevet computer, employees should have an

11   expectation that Brevet has a right and an

12   obligation to review it, to determine

13   whether or not it's something that should

14   be preserved.

15       Q.    Who told you that Brevet has an

16   obligation to review any file that appears

17   on its machine?

18       A.    As I sit here right now, I

19   guess I wouldn't say it has to -- has to

20   review but I would change that to be "has

21   to preserve."

22       Q.    Who told you that Brevet has an

23   obligation to preserve any file that

24   appears on a Brevet computer?

25       A.    As I sit here right now, I

```
 1                    MARK CALLAHAN
 2   believe that is -- when you say "every file
 3   that is on a Brevet computer," to the
 4   extent that Brevet doesn't preserve
 5   something, one -- I believe that one would
 6   have to review it, to determine they didn't
 7   have to preserve it.
 8            But my understanding of the
 9   requirements of the SEC, with respect to
10   the registered -- being a registered
11   Investment Advisor, is that all documents
12   are required to be preserved for some time
13   period.  I don't know how many years but
14   for some time period.
15            As to who communicated that?  I
16   -- I don't recall specifically but it would
17   have included chief Compliance Officers and
18   outside counsel and outside service
19   providers.
20       Q.    Is it your testimony that one
21   or more CCO's informed you that files that
22   appeared on machines owned by Brevet,
23   regardless of whether those files had
24   anything to do with Brevet business, they
25   needed to be preserved by Brevet, in order
```

1                    MARK CALLAHAN
2    to comply with their obligations under the
3    Registered Advisement Law?
4         A.    As I sit here right now, it is
5    my recollection that -- I am not sure who
6    it is from, it is my recollection that it
7    has been communicated to me, as I
8    understand it, that all -- all files
9    related to the business have to be
10   preserved for some time period that I don't
11   know and to the extent that a file is not
12   being preserved, I believe that -- and I
13   don't know what the process is, I believe
14   there would be a process to determine,
15   definitively, as to that -- that that
16   document or that file should not be
17   preserved.
18        Q.    If your child went on to your
19   computer, while you stepped out to use the
20   restroom, and typed a one -- you know, a
21   shopping list and saved it on the computer,
22   is it your view that Brevet has an
23   obligation to store that file until it
24   determines that that file has nothing to do
25   with Brevet business just because that file

Page 359

1                    MARK CALLAHAN
2   was stored on a machine owned by Brevet?
3        A.    It's my understanding that
4   Brevet looks to do everything to the -- to
5   the -- to the best of its abilities.
6              And so, therefore, in that
7   situation, I -- I think it would make sense
8   to preserve everything.
9              You don't have to review it but
10  why not preserve everything.  And to the
11  extent it's needed in the future, to the
12  extent that the SEC requests something, it
13  would be an available file to be reviewed.
14             At which point, if it came
15  across as hitting a key word, at that point
16  in time, it would, likely, get determined
17  that it was, obviously, not relevant.
18             It seems to me that it would be
19  a waste of time to be making those
20  decisions, in realtime, and it would be a
21  better use of time to -- to just backup
22  everything.
23        Q.    Is that your own judgment that
24  --
25        A.    And --

```
 1                    MARK CALLAHAN
 2       Q.    Let me just finish the
 3  question.
 4              Is it your own judgment that in
 5  the interest of the most efficient use of
 6  time, you're going to err on the side of
 7  preserving communications regardless of
 8  whether they have anything to do with
 9  Brevet business because you think that
10  would be a better way to plant vis-à-vis
11  the rules and regulations?
12       A.    It is my understanding, as I
13  sit here right now, that the rules and
14  regulations require the preservation of --
15  of documents.
16              I was --
17       Q.    Do you have an understanding
18  that the --
19       A.    I was making a follow-on
20  observation, which I probably shouldn't
21  have, that it would seem to be that it
22  would be burdensome to be reviewing all --
23  all documents, in -- in realtime, to
24  determine yes, no, by document, whether or
25  not it should be preserved or not and
```

Page 361

                    MARK CALLAHAN

1  wouldn't it be the, um, most-conservative

2  approach just to backup everything.

3       Q.    Well, you understand, when you

4  say:  The "most-conservative approach" that

5  from the perspective of the individual

6  whose files they are, be it theirs or their

7  family's, that would, actually, be the

8  most-liberal approach; right?

9            MR. SOLOMON:  I object to the

10           question.

11      A.    Yeah.  As I sit here right now,

12 if -- that is -- these are files that

13 shouldn't be on Brevet's computers and

14 clearly, employees understand that they

15 have no expectation of privacy.

16           So, why would you be putting

17 files, on Brevet's computers, that you felt

18 were personal or that you didn't want to

19 allow Brevet to see, if you knew that

20 Brevet had an obligation to preserve and --

21 and potentially, in the future, review

22 those documents.

23      Q.    I'll apologize in advance for

24 retreading but I believe you just gave me a

```
                                        Page 362
 1                    MARK CALLAHAN
 2  different answer, which is a question that
 3  I had asked a few minutes ago, so let me
 4  make sure I can clarify:  "Yes" or "no," is
 5  there something wrong with you, or any
 6  other Brevet employee, storing a personal
 7  file; a shopping list, a recipe, a picture,
 8  on the computer that Brevet purchased for
 9  that employee's use at home?
10              MR. SOLOMON:  Asked and
11         answered.
12              THE WITNESS:  Sorry.
13       A.    And I can hear you, Mr.
14  Cyrulnik, you don't have to raise your
15  voice.
16              The, um -- and now I can't
17  remember. I was listening to the tone of
18  your voice and I missed the question.
19       Q.    Yeah, I would ask you to,
20  please, focus on the substance.
21              The tone is just meant to make
22  sure that you are answering the question
23  because I believe I got two different
24  answers to this question.
25              So, I would agree with Mr.
```

```
 1                    MARK CALLAHAN
 2   Solomon's objection, which is rare, that it
 3   was asked and answered.  But I believe you
 4   gave me a different answer the last time we
 5   spoke, which is why I am asking it and I am
 6   asking ask it a little more slowly than
 7   usual.
 8              My question is a yes-or-no
 9   question.
10              "Yes" or "no," is it your view
11   that there is something wrong with a Brevet
12   employee storing a personal file; a
13   shopping list, a recipe, a picture, on the
14   computer that Brevet purchased for that
15   employee's use at home?
16              MR. SOLOMON:  Asked and
17         answered.
18              MR. CYRULNIK:  Agreed;
19         sustained.
20       A.    It is my understanding that in
21   order to determine whether it is right or
22   wrong, you go to the policies and
23   procedures.
24              But the point, in my second
25   response, was that if it's a document that
```

```
1                    MARK CALLAHAN
2    an employee doesn't want to have reviewed
3    by Brevet, it shouldn't put it on a Brevet
4    computer or a Brevet machine.
5         Q.    I appreciate that point but
6    that is not the question I asked you.
7              I want to know, "yes" or "no,"
8    whether or not you think there is something
9    wrong with doing it.  Do you think it is or
10   is not a violation of some rule,
11   regulation, policy or procedure for a
12   Brevet employee to store a personal file on
13   the machine that we are talking about.
14             Yes or no?
15             MR. SOLOMON:  Asked and
16        answered.
17             THE WITNESS:  Yeah.
18        A.    As -- as I sit here right now,
19   I would -- I am happy to go through the
20   policies and procedure with you, to figure
21   out if it -- if there is something specific
22   that makes that not permissible.
23             I don't know.  It doesn't seem
24   to me that having a grocery list on the --
25   on the computer would be something that
```

Page 365

                    MARK CALLAHAN

1
2   there would be a policy for but I am happy
3   to look with you.
4        Q.    You and Mr. Monticciolo had
5   your own independent access to Brevet's
6   entire e-mail system; correct?
7        A.    At various -- as I sit here
8   right now, at various points in time, I
9   have had various access rights, with
10  respect to Brevet e-mail system.
11       Q.    Have you had full access to
12  view any e-mail that was ever sent or that
13  was received on the Brevet e-mail system?
14       A.    As I sit here right now, I
15  believe at times, I have had full access to
16  Global Relay, which is the e-mails --
17  e-mail depository to be utilized.
18       Q.    Do you currently have that
19  access?
20       A.    As I sit here right now, I have
21  access to Global Relay.  I don't know the
22  level of that access.
23       Q.    Do you know whether anybody,
24  apart from yourself or Mr. Monticciolo, had
25  that level of access, to view any e-mail

```
 1                     MARK CALLAHAN
 2   through the Global Relay system?
 3        A.    As I sit here right now, I
 4   don't know, over time, who has had access
 5   but I believe it would be compliance and
 6   legal personnel that would also have access
 7   such as that.
 8        Q.    And if you -- when -- when you
 9   had that access, you had the capability of
10   reviewing any Brevet e-mail that you wanted
11   to review, without anybody knowing about
12   it; right?
13        A.    As I sit here right now, I
14   believe when I had full access, I would
15   have the ability to review, um, all e-mails
16   -- e-mails to and from Brevet e-mail
17   addresses.
18             I don't know whether or not
19   there is an ability for others to know
20   whether I have done it.
21        Q.    Have you exercised that ability
22   at any point in time?
23        A.    Have I exercised the ability to
24   review Brevet e-mails?
25        Q.    Yeah.
```

Page 367

```
 1                    MARK CALLAHAN
 2             Have you secretly gone and
 3   looked at people's e-mails, in the Global
 4   Relay system, without them knowing about
 5   it?
 6             MR. SOLOMON:  I object to the
 7        question.
 8        A.    Yeah.  As I sit here right now,
 9   I wouldn't characterize it as secretly.
10             It's something, again, if you
11   go back to the policies and procedures and
12   the handbook, it is clear to -- to, um, to
13   employees that they have no expectation of
14   privacy, with respect to anything that they
15   have sent to or from a Brevet e-mail
16   address.
17        Q.    Let me clarify the question.
18             What I mean by "secretly" is:
19   Have you gone without informing a
20   particular Brevet employee, have you gone
21   into their e-mails, using Global Relay, to
22   review one or more of their communications,
23   without their knowledge, that you were
24   doing so?
25        A.    As I sit here right now, I
```

1                    MARK CALLAHAN
2    believe I -- I have -- utilized Global
3    Relay, to search various, um, e-mail
4    addresses, with various searches, and, you
5    know, authorization or or not,
6    authorization is not required to do so.
7         Q.    Can you describe for me the
8    frequency and the circumstances under which
9    you use that access, to look through
10   people's e-mails?
11              MR. SOLOMON:  I object to the
12        question.
13              MR. CYRULNIK:  It's compound so
14        I will break it down.
15              Mr. Solomon's right.
16        Q.    Let's start with the frequency:
17   Can you describe for me the frequency with
18   which you use the access that you just
19   described, to look through one or more
20   Brevet employee's e-mails, other than your
21   own?
22        A.    Well, as I sit here right now,
23   the -- you know, I would say I used that --
24   I don't know.  I don't know.  I would say
25   that I use it frequently. I don't know how

```
 1                    MARK CALLAHAN
 2  to describe what "frequently" is.
 3            It is something that I would
 4  say gets used a couple -- few times a
 5  month, at lest.
 6      Q.    Okay. And with respect to the
 7  circumstances that would prompt you to do
 8  so, can you describe those circumstances to
 9  me? Is it just -- is it anything ranging
10  from shared curiosity as to what an
11  employee is talking about to a particular
12  subject matter you were interested in
13  looking at?
14      A.    As I sit here now, with respect
15  to what I would look at, as to what
16  compliance would have a different --
17  different view, I would be looking for -- I
18  can be utilizing it, to find any -- any --
19  as we discussed earlier, time -- timeframe
20  of e-mails.
21            So, if I am looking for e-mails
22  that, perhaps, predate what is saved in
23  Outlook files or if employees come to me
24  and ask for a search of -- of folder
25  e-mails or if we have had employees that
```

```
 1                    MARK CALLAHAN
 2   have left and -- and e-mail correspondence,
 3   with respect to a transaction is -- is
 4   related to -- is -- is in their e-mails and
 5   new -- new employees are looking for -- for
 6   that information.
 7             Or it can be looking for
 8   deceitful activities.
 9        Q.    Have you ever gone to an
10   employee's e-mail account, without their
11   knowledge, through the Global Relay system,
12   to view messages just because you were
13   curious to find out what they were talking
14   about?
15        A.    As I sit here right now, I
16   believe that most of the instances would be
17   without the -- you know, the sender or
18   receiver's knowledge.
19        Q.    And how about the impetus for
20   doing so?
21             Have you ever done so just
22   because you were curious as to what types
23   of communications the employee was having?
24        A.    As I sit here right now, I
25   don't know what you mean by "curious," as
```

Page 371

                        MARK CALLAHAN

1
2    it makes it -- you're, kind of, implying
3    that there is -- that there is -- that
4    there is -- it's baseless and, I guess, my
5    -- my view is that there is no reason -- I
6    don't need a justification, a reason,
7    permission to review any, you know, Brevet
8    e-mail correspondence.
9              That is something that it is
10   made clear to -- to employees:  That all
11   communications, e-mail or otherwise, we are
12   able to -- to, um, view, monitor, you know,
13   and that is something that -- that is done
14   often.
15        Q.    Okay.
16              MR. SOLOMON:  Can we just get a
17         time of how long have we been going?
18              MR. CYRULNIK:  We can take a
19         break in about ten minutes.
20              MR. SOLOMON:  No.  No.  No.  I
21         am just wondering on -- on -- on the
22         clock how long we have been going?
23              THE VIDEOGRAPHER:  We have been
24         going -- stand by.
25              (Whereupon, a short recess was

Page 372

```
 1                   MARK CALLAHAN
 2        taken.)
 3              THE VIDEOGRAPHER:  We have
 4        another fifteen minutes on the record
 5        and that would be seven hours.
 6              So, we have been going for six
 7        hours and forty-five minutes, give or
 8        take a few seconds.
 9              MR. SOLOMON:  No.  I wasn't
10        asking for a break.
11        Q.    Have you ever -- separate and
12   apart from the Global -- Global Relay --
13              MR. CYRULNIK:  Withdrawn.
14        Q.    The Global Relay system would
15   allow you to view conversations or -- or
16   exchanges that Brevet employees were having
17   over their Brevet e-mail addresses only; is
18   that correct?
19        A.    It is my understanding that the
20   Global Relay system captures any e-mail
21   sent to or from a Brevet Capital e-mail
22   address.
23        Q.    Okay. So, with the exception --
24   you know, setting apart e-mails sent to or
25   from Brevet e-mail addresses, the Global
```

```
                                    Page 373
 1                 MARK CALLAHAN
 2    Relay system doesn't give you, Mr.
 3    Callahan, the ability to view any other
 4    communications that Brevet employees are
 5    engaged in, without -- without the
 6    knowledge of that employee; is that
 7    correct?
 8         A.    It is my understanding that the
 9    Global Relay system has some sort of a
10    database of all of the e-mails, from and
11    to, a Brevet e-mail address and it, thus,
12    enables -- enables users to be able to
13    search parameters related to the e-mails
14    that are in -- in that database.
15         Q.    What about a Brevet employees
16    personal e-mails?
17               Do you have the ability to read
18    those, without their knowledge?
19         A.    It is my understanding that any
20    e-mails that are personal, in nature, that
21    are sent, from or to a Brevet e-mail
22    address, would be reviewable by -- would be
23    eligible to be reviewed by Brevet, as well
24    as any e-mail that's on a Brevet computer
25    or -- or other equipment.
```

1                    MARK CALLAHAN

2        Q.    When you say "e-mail that is on

3   a Brevet e-mail or other equipment," are

4   you referring to any e-mail that -- system

5   that is accessed, via a web browser, that

6   is open on a Brevet computer?

7             Is it your understanding that

8   you have free reign to read those e-mails,

9   as well?

10       A.    It's -- what I was referring to

11  is if there is an e-mail that is somehow

12  saved on to a computer, that is what I was

13  referring to.

14       Q.    Why is it significant that the

15  e-mail be saved on the Brevet computer?

16       A.    As I sit here right now, I

17  don't -- I don't know what makes it

18  significant, except for the fact that if

19  it's -- I -- I -- again, I am not the tech

20  guy.  But I believe -- I --

21            THE WITNESS:  Excuse me.

22       A.    If the file isn't saved, does

23  it -- does it exist on it? I don't -- I

24  don't know.

25       Q.    What about e-mails that are not

```
                                        Page 375
 1                MARK CALLAHAN
 2    saved on the computer but are accessible
 3    via a browser?
 4              Right?  You go to yahoo.com,
 5    you go to gmail.com and you access your
 6    e-mails, it's not -- is it your
 7    understanding that all of those e-mails
 8    immediately become saved on the machine
 9    which has the browser that is accessing
10    them?
11       A.   As I sit here right now, again,
12    I am not the tech guy, I don't know what
13    happens in the inner-workings of a
14    computer, to know what happens when
15    somebody opens a -- you know, a personal G
16    mail or whatever -- whatever e-mail, as to
17    what happens, whether or not a file may, or
18    may not, get saved, just somewhere on -- on
19    the computer.
20              That is -- that is beyond my
21    knowledge.
22       Q.   Okay. So, you wouldn't know
23    whether or not, in your view, you can read
24    those e-mails until you find out whether or
25    not they are, indeed, being saved on a
```

```
 1                    MARK CALLAHAN
 2   computer.
 3               Is that fair?
 4        A.    It's my understanding that --
 5   again, I don't know -- I don't know when a
 6   -- I don't know what happens in the
 7   network's computer.
 8               Right?  In my layman's term,
 9   what I understand, when you save a file to
10   the computer, then, that -- then that file
11   you can go to and -- and look at.
12               I don't know what happens in
13   the intricacies of web browsers and G mail
14   and all of that stuff.
15        Q.    Now, in October of 2016, did
16   you bother to find out the intricacies of
17   what exactly happens with personal e-mails
18   and documents that are accessed on a
19   machine, in order to determine what you
20   were permitted to and what you were not
21   permitted to do, vis-à-vis Paul Iacovacci's
22   computer, or the computer that Brevet had
23   purchased for Paul Iacovacci's use at home
24   in June of 2016?
25               MR. SOLOMON:  I object to the
```

Page 377

```
 1              MARK CALLAHAN
 2      question.
 3          If you were kind enough to fix
 4      the compounding before, you want to
 5      do it to this one or no?
 6          MR. CYRULNIK:  The other
 7      compounding was clear to me.  This
 8      one was not.
 9          But I am happy to restate the
10      question.
11          MR. SOLOMON:  Just be clear:
12      What computer you're clear about?
13          MR. CYRULNIK:  What did you
14      say?
15          MR. SOLOMON:  Just be clear
16      what computer you're talking about.
17          It's not clear from your
18      question and, therefore, I am
19      objecting.
20          MR. CYRULNIK:  No.
21          I am not going to restate it,
22      to make sure we're -- we are talking
23      about the same thing.
24          I am referring Mr. Callahan to
25      Paul Iacovacci -- the computer that
```

```
 1                    MARK CALLAHAN
 2         Paul Iacovacci was using at home, the
 3         one that was purchased by Brevet.
 4              I believe we can refer to it as
 5         the Dell OptiPlex.
 6              Does that work for you?
 7    A.    Um, that is fine.
 8    Q.    Okay. And my question is:  You
 9  were talking about not having a full grasp
10  of the details as to what exactly happens
11  with respect to certain files that are
12  accessed on a computer because you were not
13  the tech guy.
14              And my question to you was:
15  Before you, either, reviewed or directed
16  someone to review Mr. Iacovacci's files, on
17  the Dell OptiPlex, did you bother to get a
18  full understanding of the nitty-gritty
19  details associated with what files he was
20  accessing, via a browser, what -- what
21  files were being stored on the machine and
22  any other related issues that you thought
23  were important to know before you reviewed
24  his files?
25              MR. SOLOMON:  I object to the
```

Page 379

MARK CALLAHAN

2    question.

3    A.   As I sit here right now, I -- I
4    recall that Mr. Lan, upon preserving
5    documents on the -- on Brevet's Dell
6    OptiPlex, that he highlighted that he had
7    carefully and intentionally tried to avoid
8    any of the -- what looked like personal
9    documents on Brevet's Dell OptiPlex and
10   focused on preserving Brevet materials;
11   right?  The same Brevet materials that I
12   was talking about earlier that -- that all
13   employees, including Mr. Iacovacci, had --
14   had -- had -- understood that there's no
15   expectation of privacy.

16   Q.   Let's see if we can take a step
17   back.

18        Mr. Callahan, you directed Mr.
19   Lan to log in to the Dell OptiPlex, in
20   October of 2016, to download files for
21   purposes of copying those files; is that
22   correct?

23   A.   As I sit here right now, my --
24   my recollection is that, you know, the --
25   the -- the intention was not to -- it

```
                                           Page 380
 1                    MARK CALLAHAN
 2   wasn't search and destroy.  It was
 3   preservation.
 4              It was preserving Brevet
 5   materials and my -- my recollection is that
 6   Mr. Lan had had conversations with others
 7   at Brevet, about the need to -- to backup,
 8   to preserve those files and -- and Mr. Lan
 9   asked if he should do it, which I -- which
10   I told him "yes."
11       Q.    And Mr. Callahan, the buck
12   stopped with you?  You were the one who
13   ordered the intrusion into the computer?
14              MR. SOLOMON: I object to the
15         question.
16       Q.    Do you agree or disagree?
17       A.    As I sit here right now, the --
18   as -- as -- as I just said, my recollection
19   is that there were conversations that were
20   happening away from me about the need to do
21   it and then, ultimately, I gave the final,
22   affirmative response to Mr. Lan, to
23   preserve Brevet's materials, as, you know,
24   as we have gone through before; right?
25              That on Brevet's Dell OptiPlex
```

```
 1                    MARK CALLAHAN
 2   and that -- and that Paul had -- had
 3   acknowledged, as well as all employees had
 4   acknowledged that they had no expectation
 5   of privacy, with respect to -- to anything
 6   on their computer and I believe that Mr.
 7   Lan had, you know, when -- went above and
 8   beyond, in trying to avoid any of the
 9   personal materials that were -- that --
10   that sounds like we are on the -- we are on
11   Brevet's Dell OptiPlex.
12        Q.    Well, we will get to that.
13              But, please, describe for me
14   the conversations that you were just
15   referencing that happened outside of your
16   presence, with respect to Mr. Lan logging
17   in to -- the need for Mr. Lan to log in to
18   Mr. Iacovacci's computer without his
19   knowledge?
20              MR. SOLOMON:   I object to the
21         question.
22              You're misstating the record.
23              You're saying Mr. Iacovacci's
24         computer.
25              Be careful as to what you're
```

```
 1                    MARK CALLAHAN
 2        saying.
 3                MR. CYRULNIK:  Yeah.
 4                That -- that is just going to
 5        be a natural step.
 6                You can replace Mr. Iacovacci's
 7        computer with the Dell OptiPlex for
 8        that question.
 9        Q.    Do you need me to ask you that
10   again?
11        A.    Yes, please.
12        Q.    You referenced a few moments
13   ago conversations that, ultimately, lead to
14   your ultimate decision to authorize Mr. Lan
15   to download materials.
16                Do you recall, generally,
17   testifying about those conversations?
18        A.    As -- as I sit here right now,
19   I recall him communicating that to you,
20   yes.
21        Q.    Can you tell me what
22   conversations you are referring to?
23                I am asking for what other
24   individuals were involved with that
25   decision, when those conversations took
```

1                     MARK CALLAHAN
2   place, relative to your ultimate say so and
3   what the substance of those conversations
4   were?
5              Whatever you're aware of.
6        A.    As -- as I sit here right now,
7   my recollection is that Mr. Lan had
8   conversations with Mr. Monticciolo and I
9   don't know the timing of those
10  conversations but I -- I know that -- that
11  Mr. Lan, um, approached me about -- about,
12  um, I guess, that final decision to
13  preserve our documents and, um, it was part
14  of the conversation that it was something,
15  as well, that Mr. Monticciolo was
16  expecting, pursuant to our obligations,
17  with respect to preserving files.
18       Q.    Did you have ultimate authority
19  and preventative --
20              (Whereupon, a short recess was
21       taken.)
22              MR. CYRULNIK:   I'm sorry about
23       that.
24              Hold on.
25              (Whereupon, a short recess was

Page 384

1                      MARK CALLAHAN

2          taken.)

3          Q.    Did you have ultimate

4    authority, at Brevet, relative to the

5    authority that Mr. Monticciolo had?

6          A.    As -- as I sit here right now,

7    it's -- it's, um, um, my recollection is

8    that it would depend on -- on what

9    authority you would be talking about,

10   depending on what -- what is being asked

11   but I would say that for the most part, at

12   that point in time, we would prefer to do

13   things that we were both supportive of.

14         Q.    I guess what I am struggling

15   with and I'm trying to understand:  If Mr.

16   Monticciolo had discussed this with Mr. Lan

17   and told him his view as to what he needed

18   to download from Mr. -- from the Dell

19   OptiPlex, without Mr. Iacovacci's

20   knowledge, why did Mr. Lan need to get the

21   ultimate consent, or say so, from you?

22         A.    As I sit here right now, it's

23   not -- I wasn't -- it wasn't -- my under --

24   my understanding is that -- my recollection

25   is that he was not coming, to me, for the

```
 1                    MARK CALLAHAN
 2   ultimate final sign off.
 3              It was to -- to ensure
 4   consistency, amongst myself and Doug.
 5        Q.    I see.
 6              So, it's your view that it
 7   wasn't really you who gave the ultimate --
 8   who made the ultimate decision but that Mr.
 9   Lan did check in with you, prior to
10   engaging in the activity, to ensure that
11   your view was consistent with the one that
12   Doug Monticello had expressed to Mr. Lan?
13              Is that a fair summary?
14        A.    As I sit here right now, it's
15   -- you know, I guess it's depending on --
16   on what ult -- what you mean by "ultimate"?
17              But was my decision the final?
18   Was it the last decision? Yes.
19        Q.    Would you have made that
20   decision without Mr. Monticciolo -- without
21   knowing Mr. Monticciolo's view?
22        A.    As I sit here right now, I
23   don't believe I -- I would have made that
24   decision, without -- without Mr.
25   Monticciolo, um, being in agreement.
```

```
 1              MARK CALLAHAN
 2         MR. CYRULNIK:  Okay.  I -- I
 3    wanted to finish this line of
 4    questioning but I just got a note
 5    from the Court Reporter that she
 6    needs a break and I'm happy to give
 7    everyone a break.
 8         Let's go off the record for a
 9    second.
10         THE VIDEOGRAPHER:  Going off
11    the record at 5:36.
12         This marks the end of Media
13    Unit Number 6.
14         Stand by.  Stand by.
15         (Whereupon, a short recess was
16    taken.)
17         THE VIDEOGRAPHER:  We are on
18    the record at 5:48.
19         This marks the beginning of
20    Media Unit Number 7.
21         Thank you.
22         MR. SOLOMON:  Can you see,
23    Jason?
24         THE WITNESS:  He is there.
25         MR. SOLOMON:  Are we waiting
```

Page 387

1                    MARK CALLAHAN

2          for anything else?

3               THE VIDEOGRAPHER:  We are on

4          the record.

5               MR. SOLOMON:  Okay.  Thank you.

6               MR. CYRULNIK:  Very good.

7               My audio was off.

8               Can everyone hear me?

9               MR. SOLOMON:  Yeah.

10              MR. CYRULNIK:  Okay.  Are we

11         ready to go?

12              You wanted -- you wanted a

13         little bit of a -- of an update?

14              So, yeah, look, I have -- I

15         think we have gone through a good

16         portion of the outline.  I have, you

17         know, a few things left on this

18         subject and then, I have the

19         30(b)(6).  I want to go to the

20         30(b)(6) topics and see what, you

21         know, hasn't been addressed, through

22         this testimony, although I think we

23         have covered most of the topics

24         already.

25              But that is -- that is what my

```
 1                  MARK CALLAHAN
 2        plan is.  My plan is to finish this
 3        up and, then, you know, run through
 4        the 30(b)(6) topics and see what
 5        specific questions I -- I need to get
 6        the witness' view on, in the 30(b)(6)
 7        capacity, on -- on anything that he
 8        hasn't already covered.
 9             MR. SOLOMON:  Okay. Let's --
10        let's -- let's be reasonable.
11             We have -- we have a person who
12        has been sitting here all day.  You
13        are done with your seven hours.
14             Can you give us a time -- how
15        much time -- how much more time do
16        you need?
17             I think you have a sense of the
18        cadence here.
19             MR. CYRULNIK:  Yeah, I do.
20             I am just -- I am reluctant to
21        do it because I -- I always find that
22        if -- if that ends up being
23        inaccurate, it ends up setting the
24        wrong expectations.
25             My goal would be to try to
```

Page 389

1                   MARK CALLAHAN
2          complete the deposition in the next
3          hour and fifteen minutes.
4                MR. SOLOMON:  You know, I think
5          that's not -- that -- maybe you
6          should turn to the 30(b)(6) topics
7          because this doesn't feel reasonable.
8                And that brings us to after
9          7:00 and if you're going to be --
10         well, I don't want to be taking time
11         doing this, either, and I appreciate
12         that.
13               I thought if you could finish
14         -- finish in thirty minutes but
15         finish, we would be happy to sit.
16               But otherwise, maybe we should
17         just complete the deposition and
18         schedule a time for you to talk to
19         about the 30(b)(6) topics, insofar as
20         you haven't already.
21               I -- I -- I just -- I looked
22         through them on the break, too, to
23         see what you covered.
24               MR. CYRULNIK:  I think -- I
25         think -- I think you're probably

1                    MARK CALLAHAN

2         right, although, I just -- I -- I

3         have to go through them.

4              I am happy to do whatever you

5         think is best for Mr. Callahan and

6         for you.

7              As I said, I think I can

8         complete the -- the non-30(b)(6)

9         pieces, in approximately the next,

10        you know, thirty to thirty-five

11        minutes.

12             So, why don't we do that and

13        see where we are and you will tell me

14        how you would like to finish, whether

15        you want to designate someone else on

16        some of the topics, that we didn't

17        cover.

18             And again, I agree with you.  I

19        don't think it's voluminous but I am

20        trying to multi-task and, you know,

21        make sure --

22             MR. SOLOMON:  No. Fair enough.

23             Fair enough and also, it's Zoom

24        and colleagues aren't even there.

25             But I do get all of that but I

```
 1                    MARK CALLAHAN
 2          -- I have a witness who -- who has
 3          put himself out and he is still here.
 4               I am going to let him go in
 5          thirty minutes and we will figure out
 6          if there is anything more to do.
 7               Please continue.
 8               Go ahead. A Catskill joke:
 9          Answer as fast as you can.
10               MR. CYRULNIK:  Are we ready to
11          go back on the record?
12               THE VIDEOGRAPHER:  We have been
13          on the record.
14               MR. CYRULNIK:  Oh. I didn't
15          even know that. Okay.
16          Q.    Well, Mr. Callahan, we are
17     talking about the decision to log into Mr.
18     Iacovacci's -- to -- to the Dell OptiPlex
19     and download the materials that were --
20     that -- that Mr. Lan came across.
21               I believe that you testified
22     that Mr. Lan, in your view, or to your
23     knowledge, undertook steps to ensure that
24     he wasn't downloading anything that was not
25     Brevet related or wasn't personal.
```

```
 1                    MARK CALLAHAN
 2              Did I hear you correctly?
 3        A.    Two things there; it's the
 4    computers -- Brevet Dell OptiPlex and, um,
 5    it's my understanding that Mr. Iacovacci
 6    did not preserve all documents on Brevet's
 7    -- from Brevet's Dell OptiPlex.
 8              It's -- it's my understanding
 9    that he attempted to identify items that
10    were -- that may have been personal  and
11    did not --
12              MR. SOLOMON:  You said
13         "Mr. Iacovacci."
14              Do you mean that?
15              THE WITNESS: Sorry, no.
16              MR. SOLOMON:  Why don't you, if
17         you can remember the question, answer
18         the question.
19              THE WITNESS:  Sorry.
20        A.    With respect to, um, the, you
21    know, this is coming from what Mr. Lan
22    informed me is that he -- in reviewing
23    Brevet's Dell OptiPlex, he attempted to
24    evaluate whether certain of -- of the files
25    that Brevet was entitled to -- to preserve
```

```
 1                    MARK CALLAHAN
 2   all of them, he tried to -- attempted to
 3   identify files that appeared to him to be
 4   clearly personal and made an attempt not to
 5   preserve those personal files that were --
 6   that were on Brevet's Dell OptiPlex and
 7   that Brevet had an entitled -- an entitled
 8   -- was entitled to be able to preserve them
 9   but did not.
10        Q.    I want to make sure I got this.
11             So, what -- what was your
12   directive to Mr. Lan:  Download everything
13   or download only the business-related
14   materials?
15             MR. SOLOMON:  Asked and
16        answered.
17             THE WITNESS:  Yes.
18        A.    As I sit here right now, it's
19   -- it's my recollection that I had no
20   expectation that there were going to be
21   personal files, certainly, of the magnitude
22   that it sounds like were there. I don't
23   know the directive.
24             My recollection would be to go
25   ahead and execute on the -- on the
```

```
 1                    MARK CALLAHAN
 2   preservation of Brevet materials that we're
 3   entitled to.
 4        Q.    Yeah.  I just want to make sure
 5   that my question's clear.
 6              I am not asking what your
 7   directive would have been, I am asking what
 8   was your direction to Mr. Lan?
 9              Did you tell him "Johnny, log
10   into the Dell OptiPlex and download
11   everything" or did you tell him "Johnny,
12   log onto the Dell OptiPlex and download
13   'X'"?
14              And by "X," I am -- I would be
15   asking you to fill in the scope of the
16   directive, if it wasn't everything.
17              MR. SOLOMON:   I object to the
18         question.
19              Just answer it.
20        Q.    And I apologize if you have
21   answered it already. I -- I can assure you
22   that I have zero interest in hearing the
23   same answer again.
24              So, the -- the only reason I am
25   asking is because I -- I don't under -- I
```

MARK CALLAHAN

1
2      don't know the answer to that question.
3               So, if you answered it again,
4      you will forgive me for asking it again.
5      It's simply because I didn't hear the
6      answer to that question.
7          A.    As I sit here right now, my
8      recollection is that the -- that I -- that
9      I didn't know that there was -- that there
10     were none.
11              There were personal materials
12     on that computer.
13         Q.    Okay.
14         A.    And so, it -- it would have
15     been a -- you know, my recollection is that
16     it is just a general backup of Brevet's
17     materials.  It wasn't a backup Brevet's
18     materials and don't -- don't go after the
19     personal files.
20              I had no expectation that there
21     were going to be personal files and -- and
22     my recollection is that I didn't learn that
23     there may have been personal files until
24     afterwards, when Mr. Lan had informed me of
25     such.

Page 396

                              MARK CALLAHAN
1
2          Q.      Well, what files did you have
3     an expectation you would be downloading
4     from the Dell OptiPlex?
5               And I ask because I want to
6     make sure that I got this straight but all
7     e-mails that involved Mr. Iacovacci's
8     Brevet e-mail business address, those are
9     e-mails you did not need Mr. Lan to be
10    downloading from the Dell OptiPlex because
11    you already had those backed up in the
12    Global Relay system.
13              Is that right?
14         A.      As I sit rear right now, it is
15    my understanding that we -- we had e-mails,
16    to and from, um, Paul's Brevet e-mail
17    address in the Global Relay system.
18         Q.      Okay. So -- so, you didn't need
19    Mr. Lan to be downloading those, in order
20    to preserve those e-mails; right?
21         A.      As I sit here right now, it's
22    my -- it's my understanding that -- that --
23    that in preserving all Brevet materials,
24    it's my understanding that that would also
25    include Brevet's PSC file, if that is what

```
                                        Page 397
 1                   MARK CALLAHAN
 2   you're asking.
 3        Q.    Well, the Brevet PSC file that
 4   you are referencing was just another
 5   iteration of the e-mails that had already
 6   been preserved on the Global Relay system;
 7   right?
 8        A.    As I sit here right now I -- I
 9   don't know what is in a PSC that is not in
10   a, um -- that is not in a Global Relay
11   backup, for example.
12              I don't believe that --
13              THE WITNESS:  Excuse me.
14        A.    -- calendar appointments or
15   drafts are backed up, in Global Relay.
16              Calendar appointments without
17   -- that hadn't been sent to others and
18   draft e-mails that haven't been sent to
19   others.
20              Global Relay is just tracking
21   the -- the exchange of those e-mails.
22        Q.    Did you tell Mr. Lan to go to
23   the non-inbox and non-sent items portions
24   of the e-mail and save those because you
25   didn't already have a backup on the Global
```

Page 398

                    MARK CALLAHAN

1

2    Relay system?

3         A.    As I sit here right now, it's

4    my recollection that there was not a

5    detailed conversation about that.  If it

6    was -- as I have already disclosed, it was

7    a general discussion of backup Brevet's --

8    preserve Brevet's -- Brevet materials and

9    as we discussed previously; right?  That

10   pursuant to our handbook policies and

11   procedures, Brevet is entitled.

12        Q.    How long was the discussion

13   that you had with Mr. Lan?

14              Are you talking about a quick

15   conversation, are you talking about more or

16   less than ten minutes long; do you know? Do

17   you remember?

18        A.    As I sit here right now, my

19   recollection is that the conversation was

20   less than ten minutes.

21        Q.    Was it less than five minutes?

22              To the best of your

23   recollection, as you sit here right now?

24        A.    As I sit here right now, I

25   don't know how long the conversation was.

Page 399

MARK CALLAHAN

1

2       Q.      Did you have any discussion
3    directly with Mr. Monticciolo about his
4    view, with respect to this undertaking or
5    were you relying on what Mr. Lan had
6    communicated Mr. Monticciolo told him?
7       A.      As I sit here right now, I
8    don't recall if there was a conversation
9    with Mr. Monticciolo on the -- the day of
10   -- the date of the meeting with Mr. Lan but
11   I do recall conversations prior to that,
12   with Mr. Monticciolo, where the topic of --
13   of preserving Brevet materials was a topic.
14      Q.      "Preserving Brevet materials"
15   specifically to Mr. Iacovacci and the Dell
16   OptiPlex?
17      A.      As I sit here right right now,
18   I have a recollection of conversations with
19   Mr. Monticciolo about preserving Brevet
20   materials on computers that were in
21   employee -- on Brevet's computers, in
22   employees' homes, in general.
23      Q.      The conversations that you were
24   recalling with Mr. Monticello didn't have
25   anything to do specifically with

```
 1                      MARK CALLAHAN
 2   Mr. Iacovacci or the Dell OptiPlex that was
 3   in his home; is that right?
 4        A.    As I sit here right now, my
 5   recollection is that the conversations were
 6   about all Brevet computers, in employees'
 7   homes, including Mr. Iacovacci's.
 8        Q.    Do you know how far back those
 9   conversations went back in time and what
10   prompted you to have those discussions?
11        A.    As I sit here right now, I do
12   not recall the timing or the prompt of
13   those conversations.
14        Q.    Do you think they were in the
15   weeks leading up to the decision that was
16   made in October of 2016?
17        A.    As I sit here right now, I
18   don't recall the timing of those
19   discussions.
20        Q.    What was Mr. Monticell's view,
21   as he expressed it to you, with respect to
22   preserving materials on the machines that
23   Brevet had purchased for Brevet employees,
24   to use at home?
25        A.    As I sit here right now, my
```

MARK CALLAHAN

recollection is that things that Mr. Monticciolo believed that -- that Brevet was entitled to preserve Brevet materials on Brevet computers in employees' homes.

And -- and -- and -- my recollection is that he was of the opinion that it was a best practice, um, to do that.

Q. And did you share his view?

A. As I sit here right now, my -- my recollection is that -- that -- I had no reason to disagree with his view.

Q. Did you express agreement with his view as you recall or did you just remain silent?

A. As I sit here right now, I don't recall the back and forth conversation regarding that.

Q. In order to retrieve downloaded materials from these machines, that is machines, like the Dell OptiPlex, that were in employees' homes, you needed to log in or have someone, like Mr. Lan, log in, using credentials that employees were not

```
 1                    MARK CALLAHAN
 2   required to share with Brevet; is that
 3   correct?
 4        A.    As I sit here right now, I do
 5   not believe that that is correct.
 6        Q.    So, it's your understanding
 7   that you could log in and download those
 8   materials, without the employee's
 9   knowledge, even without using credentials
10   that had not been shared with Brevet?
11             MR. SOLOMON:   I object to the
12        question.
13        A.    As I sit here right now, my
14   understanding is that your two prior
15   questions are a little bit different.
16        Q.    Okay.
17        A.    But it -- it -- you implied
18   that the first question, I believe you
19   said, that Brevet -- that employees were
20   not, um, required to provide maybe log-in
21   information or something you said.
22             But it is my understanding that
23   it was required and it was my understanding
24   that -- that Mr. Lan had had, you know, the
25   highest level of -- of rights, with respect
```

```
 1                    MARK CALLAHAN
 2   to Brevet's Dell OptiPlex that was in --
 3   that was in Mr. Iacovacci's apartment.
 4        Q.    Is it your understanding that
 5   -- that the only reason Mr. Lan was able to
 6   get the access that he got, when he logged
 7   into Mr. Iacovacci's machine, is that
 8   Mr. Iacovacci had previously provided Mr.
 9   Lan with log-in credentials to a program
10   known as "log me in," for the purpose of
11   facilitating Mr. Lan's technical assistance
12   with configuring or maintaining his machine
13   periodically?
14        A.    No.
15        Q.    Sitting here today, are you
16   aware, one way or the other, as to whether
17   or not Mr. Lan used credentials that
18   Mr. Iacovacci had shared with Mr. Lan for
19   the sole purpose of facilitating Mr. Lan's
20   technical assistance, at times prior to
21   October, 2015, that Mr. Lan used his
22   credentials the night that you directed him
23   to log in to the Dell OptiPlex, to download
24   the materials?
25        A.    Are you asking me if I know
```

Page 404

1                    MARK CALLAHAN
2    when -- are you asking me what Mr. Lan --
3         Q.    I am asking you whether you
4    were aware -- whether you are aware,
5    sitting here today, that Mr. Lan used
6    log-in credentials that Mr. Iacovacci had
7    provided him for the sole -- that
8    Mr. Iacovacci had previously provided him
9    for the sole purpose of enlisting Mr. Lan's
10   technical assistance, which credentials Mr.
11   Lan still had stored on some document, that
12   he used those credentials the night that
13   you had directed him to log in to the Dell
14   OptiPlex?
15        A.    As I sit here now, I am not
16   aware of -- of any instructions that --
17   that Mr. Iacovacci gave to Mr. Lan
18   regarding a limitation of -- of what -- of
19   log-in credentials could, or couldn't, be
20   used for and -- and I would say that -- it
21   goes back, again, to -- to the -- to the
22   employee handbook and the -- and the
23   policies and procedures in that.
24             This was something that -- that
25   was something that Brevet was entitled to

```
 1                    MARK CALLAHAN
 2  and that all employees had -- had
 3  acknowledged and, you know, is contained in
 4  there that there's no expectation of -- of
 5  privacy.
 6             And I think that -- my view is
 7  that that extends throughout this.
 8       Q.    And did you know --
 9             MR. CYRULNIK:  Withdrawn.
10       Q.    Did you direct Mr. Lan to
11  download e-mails from Mr. Iacovacci's
12  personal e-mail system, at Yahoo or a
13  personal e-mail account, the Yahoo account?
14       A.    As I sit here right now, my
15  recollection is that I didn't, um, request
16  that that Mr. Iacovacci --
17             THE WITNESS:  Not
18        Mr. Iacovacci.
19             Sorry.
20       A.    Mr. Lan.
21             Go into, what you say, go into
22  the Yahoo account and download?
23             That is not what I requested,
24  as I think we have gone through.  I
25  requested that he preserve Brevet
```

```
 1                    MARK CALLAHAN
 2   materials.
 3        Q.    Did Mr. Lan check with you
 4   before downloading any materials concerning
 5   Mr. Iacovacci's Yahoo e-mail account?
 6        A.    As I sit here right now, my
 7   recollection is that Mr. Lan updated me as
 8   to what he had done but not in realtime.
 9        Q.    Did he update you that night,
10   in the middle of the night?  Did he update
11   you the next day?
12        A.    As I sit here right now, I --
13   my recollection is that probably -- I
14   wasn't a night owl, like Johnny, so, I
15   probably got an update, when the sun was
16   up.
17        Q.    Okay. Did you express a view,
18   one way or the other, on the propriety of
19   what he had done, with respect to the Yahoo
20   e-mail account?
21        A.    And I am not sure -- I am not
22   certain what you're talking about, with
23   respect to "the Yahoo e-mail account."
24        Q.    Did -- did -- did he -- did Mr.
25   Lan report to you that he had downloaded
```

```
1                    MARK CALLAHAN
2    e-mails from Mr. Iacovacci's personal
3    e-mail account, in addition to what he had
4    downloaded from the Brevet e-mail account?
5              MR. SOLOMON:  Objection; lacks
6         foundation.
7         A.    As I sit here right now, Mr.
8    Lan communicated that he had downloaded
9    Brevet materials and he communicated, as we
10   discussed that he made an effort to avoid
11   any -- any personal documentation.
12              Mr. Lan had not -- I -- I --
13   you know, I believe he communicated that he
14   hadn't had an opportunity to -- to review
15   the tremendous quantity of stolen documents
16   that existed on the -- on the Brevet Dell
17   OptiPlex.
18        Q.    How did Mr. Lan know there was
19   a "tremendous quantity of stolen documents
20   on the Dell OptiPlex" if he didn't have an
21   opportunity to review them?
22        A.    My understanding, as I sit here
23   right now, based on my recollection, is
24   that Mr. Lan -- in -- in -- in attempting
25   to identify which folders were personal, he
```

```
 1                  MARK CALLAHAN
 2  had done reviews, he reviewed some
 3  opportunities, which were, clearly, Brevet
 4  documents that had been modified in -- in a
 5  nature to, potentially, compete with
 6  Brevet.
 7       Q.    Your understanding is that
 8  while he was logged in to Mr. Iacovacci's
 9  --
10            MR. CYRULNIK:  Sorry.
11       Q.    While he was logged in to the
12  Dell OptiPlex, Mr. Lan was able to conclude
13  that there was a tremendous number of
14  Brevet documents that Mr. Iacovacci had
15  altered, for potential competing business,
16  before he downloaded those documents to the
17  USB drive?
18       A.    As I sit here right now, that
19  is not my understanding.
20            My understanding is that he
21  identified some of those documents.
22       Q.    So, you -- he didn't tell you
23  there was "a tremendous amount of
24  documents" that had been stolen from
25  Brevet, did he?
```

```
 1                  MARK CALLAHAN
 2       A.    At this point -- as I sit here
 3  right now, I don't recall specifically what
 4  he -- what he communicated.
 5            But he did communicate which --
 6  um, which folders to focus on in a review
 7  and those folders had a tremendous number
 8  of Brevet documents in it.
 9       Q.    How did you know the documents
10  had been altered?
11       A.    How did I?
12       Q.    How did he?
13            MR. SOLOMON:  I object.
14            I object to the statement.
15            There's no foundation.
16       Q.    Did you testify that he had
17  viewed the documents and had reported back
18  to you that there were documents that had
19  been altered for a potentially-competing
20  business?
21       A.    It's my -- as I sit here right
22  now, it is my recollection that he
23  identified documents that -- in which
24  Brevet logo had been removed.
25       Q.    Why would Mr. Lan be looking at
```

```
 1                    MARK CALLAHAN
 2   whether the logo was in or not in the
 3   document if his -- in directive from you
 4   was to preserve all of the documents?
 5            MR. SOLOMON:  I object.
 6            I object to the question.
 7            Jason, you're totally
 8        misstating what the witness said.
 9            I object to this statement.
10     Q.    Did I misstate what you said?
11            MR. SOLOMON:  "Preserve all of
12        the documents"?
13            Is that your question?
14            MR. CYRULNIK:  I am asking the
15        witness whether I misstated what he
16        said.
17     A.    I -- I believe so.
18            I -- I -- I, um --
19     Q.    What was the misstatement?
20     A.    My recollection is that I -- I
21   -- I had previously answered to you that --
22   that Mr. Lan went above and beyond, trying
23   to determine what folders in -- in -- you
24   know, the file system, and this is my
25   understanding as to what he did, were --
```

```
                                    Page 411
 1                  MARK CALLAHAN
 2   contained personal information.
 3              In order to do that, my
 4   understanding is that he may have had to
 5   open certain files in the folders to
 6   determine "okay, yeah, this is likely a
 7   personal folder, this is not something that
 8   would be -- that he was going to preserve"
 9   versus another folder, open the file, take
10   a quick look at it and go okay, this is --
11   this -- this looks to him like Brevet
12   materials.
13              Again, this is something he
14   went above and beyond and it wasn't a
15   blanket "preserve everything."
16              It was -- it was quite the
17   opposite.
18       Q.    When you just communicated to
19   me -- is that what Mr. Lan told you he did;
20   that he went above and beyond opening
21   files, to determine whether or not they
22   were personal?
23       A.    It -- it's -- as I sit here
24   right now, it is my recollection that that
25   is something that Mr. Lan has told me.
```

Page 412

1                    MARK CALLAHAN

2              I don't recall whether or not

3     he told me the -- the next day or that is

4     something that he has told me in the -- in

5     the process of litigation.

6          Q.    I understand.

7              For -- for how --

8              MR. CYRULNIK:  Withdrawn.

9          Q.    For how long had you been

10    monitoring Mr. Iacovacci's e-mails prior to

11    October 17th of 2016?

12         Q.    What do you mean by

13    "monitoring"?

14         Q.    Well, were you reviewing,

15    without Mr. Iacovacci's knowledge, were you

16    reviewing these e-mail communications

17    through the Global Relay system, or

18    otherwise, prior to October 14th of 2016?

19         A.    As I sit here right now, I

20    recall that in May of 2016, I reviewed -- I

21    did a search of Global Relay and, again, as

22    we previously talked about, there is --

23    there is no expectation of privacy.

24    There's no need for any authorization.

25              So -- but I did -- I did a

```
                                         Page 413
 1                    MARK CALLAHAN
 2   review of -- of Global Relay and in that
 3   review, was -- was, um, was undertaken as a
 4   result of actions that Mr. Iacovacci and
 5   his counsel or positions that his counsel
 6   was taken, assuming it was Mr. Iacovacci,
 7   regarding the overall separation agreement.
 8            It was -- it was my
 9   understanding, in speaking with -- with
10   counsel, that -- that Mr. Iacovacci or Mr.
11   Weiss, I don't know which -- which you want
12   to talk about was -- was -- was taking
13   positions that -- that didn't really make a
14   lot of sense and caused us to have a
15   concern as to what his -- his true
16   intentions were.
17            My recollection was at the
18   time, he was, um -- Mr. Weiss was disputing
19   whether or not Mr., um, Iacovacci was even
20   an employee. It seems that Mr. Iacovacci
21   failed to disclose that to Mr. Weiss.
22            It was -- it was -- it was a
23   time when they were -- Mr. Weiss was trying
24   to remove any reference to Brevet Capital
25   Management to -- from the --
```

```
 1                MARK CALLAHAN
 2           THE WITNESS:  Sorry.
 3      A.     Brevet Holdings, his
 4   employment, from the separation agreement,
 5   which was, I guess, find interesting, as
 6   well, with respect to our earlier
 7   conversation, with respect to, you know,
 8   whether or not a separation agreement was
 9   needed because of the -- of the -- of the
10   terms of the LLC Agreement but it was -- it
11   was -- my understanding from speaking to
12   counsel is that Mr. Weiss was looking for a
13   separation agreement to just have the LLC
14   agreements in it.
15      Q.     So, it was based on that and
16   based on the, um, you know, and I don't --
17   I don't remember the timing as to when Mr.
18   Weiss had committed to our counsel and my
19   understanding from counsel is that the --
20   was that there was pushback on -- on the
21   Non-Compete or -- or the -- you know,
22   certain terms, which started to lead --
23   lead counsel to ask whether or not Paul,
24   potentially, could be disingenuous in his
25   potential to -- to, you know, sort of, ride
```

Page 415

1                       MARK CALLAHAN
2     away in the sunset and, instead, was
3     looking to compete with Brevet.
4          Q.    And so, in the ending of 2016,
5     in response to those concerns, you initiate
6     what -- what -- did you, personally, engage
7     in searches of Mr. Iacovacci's e-mails,
8     through the Global Relay SYSTEM, to see if
9     you could identify any supporting evidence
10    for the -- the theory that you just
11    described?
12                MR. SOLOMON:  We are now going,
13           I think, a little more than a half an
14           hour.
15                So, I would like to finish up.
16                Just finish this last question.
17         A.    It's -- it's my, um,
18    recollection that I did a search and I
19    wasn't looking to support any theory.  It
20    was simply just a factfinding search of
21    Global Relay, for which I, then, forwarded
22    on certain of those results to counsel.
23    Um, ultimately -- ultimately sought advice
24    from counsel and -- and at that point in
25    time, the -- the -- the view was that, um,

```
 1                MARK CALLAHAN
 2  while he had --
 3            MR. SOLOMON:  Sorry.  I'm
 4        sorry, you -- counsel?
 5            Just be careful with that.
 6            THE WITNESS:  Yeah.
 7            MR. SOLOMON:  I think we are
 8        beyond the -- the Court Reporter will
 9        confirm this is way beyond a half an
10        hour.
11            MR. CYRULNIK:  Just to finish
12        your last answer and I -- I
13        appreciate Mr. Solomon's instruction.
14      Q.    Can you tell me what your vow
15  was at that point in time?
16      A.    As I sit here right now, my
17  recollection is that it was a massive
18  quantity of -- of Brevet materials,
19  confidential information, proprietary
20  information, frayed secrets, whatever you
21  want to call it, that Paul had, um,
22  nefariously forwarded to personal e-mail --
23  various personal e-mail addresses.
24      Q.    When you say "nefariously
25  forwarded," how do you know that the
```

```
 1                      MARK CALLAHAN
 2    forwarding was nefarious?
 3         A.    As I sit here right now, I
 4    understand that it was nefarious.  I might
 5    not have known it was nefarious at the time
 6    and I likely did not know it was nefarious
 7    in the -- in the timeframe of -- of May,
 8    into 2016, as, at that point in time, we
 9    didn't have any -- we didn't have a view
10    yet as to whether or not he was doing
11    anything to the detriment of Brevet or
12    Brevet investors.
13         Q.    When did you first formulate
14    the view that he was --
15              MR. SOLOMON:  Jason?  Jason?
16         Jason?  This is four questions
17         beyond. I am not a happy -- I -- I --
18         I don't like this. It's
19         inappropriate.
20              We had an understanding. We had
21         an understanding.
22              MR. CYRULNIK: It's a follow up
23         to, um, to -- to Mr. Callahan's last
24         -- last answer.
25              I want to understand what he
```

1                    MARK CALLAHAN
2         did.
3              He said likely not --
4              MR. SOLOMON:   This is the last
5         question. This is the last question;
6         okay?
7              We are concluding the
8         deposition at this point.
9              Ask your last question.
10        Q.    Mr. Callahan, when did you just
11   formulate the view that you just described?
12        A.    Are you asking when did I have
13   -- when did I form the view of what?
14              MR. CYRULNIK:   Can the Court
15         Reporter read back the -- the last
16         exchange, so, we can have a very
17         clear question and answer?
18              THE COURT REPORTER:   Sure.
19              (Whereupon, the referred to
20         testimony was read back by the
21         Reporter.)
22        A.    As I sit here right now, with
23   respect to when we learned of -- what we --
24   what -- I guess what is being characterized
25   as "nefariousness," I -- I don't -- I don't

```
 1                   MARK CALLAHAN
 2   recall specifically.
 3             But I -- I would say it's
 4   around -- the beginnings of it?  Around
 5   October of 2016.
 6             MR. SOLOMON:  All right.
 7             Thank you.
 8             MR. SOLOMON:  Madam Court
 9        Reporter for some reason, I am going
10        to need to ask you for the rough
11        transcript.
12             MR. CYRULNIK:  Let -- let me --
13        let me just -- let me just finish.
14             First of all, one -- half a
15        question follow up:
16        Q.    How did you formulate that view
17   in the time period that you just described
18   it, around October of 2016?
19             MR. SOLOMON:  Listen, this is
20        not appropriate. This is not -- this
21        is not appropriate.
22             This is -- there is no 30(b)(6)
23        addressed to it.  We went more than a
24        half an hour, just as an accomodation
25        to you.
```

Page 420

```
 1              MARK CALLAHAN
 2         We have a witness, who has been
 3     sitting here all day and is tired.
 4     This is just not appropriate.
 5         You said "okay, we will go for
 6     another half hour and that would be
 7     it."
 8         That -- that is to say that we
 9     need to talk about the 30(b)(6)
10     because I think he has covered many
11     of them.
12         But I think he has -- he has
13     completed his personal deposition.
14         MR. CYRULNIK:  Yeah.  Look, I
15     am happy to discuss with you the --
16     the -- the issue that you are talking
17     about.
18         Obviously, we are going to have
19     different views.  But I -- I respect
20     yours and I am happy to try to work
21     this out in a way that works for you,
22     for Mr. Callahan and obviously, I
23     have no interest in taking more time
24     than we need.  I think -- I don't
25     think we need that much time.
```

```
 1              MARK CALLAHAN
 2         But I -- I -- I think it -- I
 3    think we can both agree that with
 4    respect to a question that I asked,
 5    where he -- where I have a, you know,
 6    a clarification to the answer he just
 7    gave, it would be a minimal intrusion
 8    to ask Mr. Callahan to explain the
 9    basis for his last answer.
10         MR. SOLOMON:  It -- it was a
11    minimal intrusion four questions ago.
12         I really would like to finish
13    this up.  If you can answer this last
14    question, please do. And we can
15    conclude today.
16    Q.   Can you clarify:  I think you
17 said that you -- you think that you first
18 formulated the view in October of 2016.
19         Can you tell me how you
20 formulated the view that it was nefarious?
21         MR. SOLOMON:  Right.
22         And -- and you added some stuff
23    to the question, so, I am going to
24    object to the question.
25         MR. CYRULNIK:  I didn't mean --
```

1                    MARK CALLAHAN
2          I didn't mean to.  But, okay. I was
3          just trying to streamline the --
4          getting the question in Mr.
5          Callahan's head.
6       A.    As I sit here right now, it is
7    my recollection was that it was on -- on
8    advice of counsel.
9       Q.    So, you -- you -- you
10   determined, not through any additional
11   reviews of any additional e-mails, you
12   determined, sometime between May of 2016
13   and October of 2016, that Mr. Iacovacci's
14   forwarding of certain e-mails to his
15   personal e-mail address was nefarious,
16   based on the advice of counsel.
17             Is that your answer?
18       A.    No.
19       Q.    Okay.  I'm sorry.  I
20   misunderstood.
21             Can you please tell me again
22   what the answer to my question is:  How you
23   first formulated the view that you did not
24   think or expect to have been nefarious in
25   May of 2016 was, in fact, nefarious by

1                     MARK CALLAHAN
2    October of 2016?
3              MR. SOLOMON:  And I object to
4         the form.
5         A.    The, um, as I -- as I sit here
6    right now, my recollection is that my
7    understanding, from our counsel, was that
8    the actions of the -- of Mr. Weiss and
9    Mr. Iacovacci and the inability of Mr.
10   Weiss to control Mr. Iacovacci, in -- in
11   combination, with various information
12   provided to counsel, resulted in them
13   providing that -- that advice.
14        Q.    Did you say -- Mr. Callahan,
15   did you say:  "The inability of Mr. Weiss
16   to control Mr. Iacovacci"?
17        A.    Yes.
18             MR. SOLOMON:  That is what he
19        said.
20        Q.    What do you mean by "control"?
21        A.    It's my recollection that Mr.
22   -- from my understanding, from our counsel,
23   was that every time our counsel and Mr.
24   Weiss felt like they were close,
25   Mr. Iacovacci changed his demands.

```
                        MARK CALLAHAN
 1
 2      Q.     I see.
 3             And it was that -- that --
 4             MR. SOLOMON:  He has now
 5      answered your question and he has
 6      answered the second and the third and
 7      the fourth.  Please move on.  Move
 8      on.
 9             MR. CYRULNIK:  I understand.
10             MR. SOLOMON:  Great. Okay.
11      Please.
12             MR. CYRULNIK:  Okay.
13             MR. SOLOMON:  Thank you.
14             MR. CYRULNIK:  All right.
15             Let me just state for the
16      record:  First of all, I appreciate
17      your time, Mr. Callahan, and I know
18      it has been a long time and I
19      appreciate both your time and, of
20      course -- of course, Lou's.
21             Obviously, we have a lot -- we
22      started to get through because you
23      were designated not only as a
24      30(b)(6) witness on, you know, more
25      than a dozen topics but -- but also
```

Page 425

1                    MARK CALLAHAN

2          you're an important witness in your

3          personal capacity.

4               So, I -- I think, you know, we

5          endeavor to try to streamline the

6          deposition with the two different

7          parts of this deposition together.

8               And I think we largely

9          succeeded in doing so in the sense

10         that I think I was able to cover, you

11         know, a substantial portion of the

12         30(b)(6) portion of this deposition

13         through discussion through having on

14         some topics I was asking you about,

15         initially, in your personal capacity.

16              But as I indicated earl --

17         previously, I -- I believe there are,

18         you know, likely still, am, a -- a

19         few topics that -- that still war --

20         warrant some -- some questions.

21              So, obviously, my preference

22         would be to finish but my -- I -- I

23         completely respect your -- your time

24         and how lengthy this deposition has

25         been.

MARK CALLAHAN

1

2          I also recognize that if I have

3      the luxury of looking through those

4      topics, you know, sort of, off line,

5      it would likely result in even fewer

6      questions that I need to ask.

7          And so, I'm -- I'm happy to

8      arrange with Mr. Solomon for a short

9      conclusion to this deposition, once

10     he and I touch base on our schedules

11     and your schedule and once I am able

12     to review, likely tonight, the

13     remaining topics that -- that we

14     weren't able to cover.

15         So, I am assuming that is okay

16     with you, Lou, that is what I would

17     plan to do and we can touch base on

18     that.

19         MR. SOLOMON:  It is -- it is

20     and -- and I really don't think we

21     are going to find anybody else to

22     cover any of the topics.

23         On the other hand, if we do, we

24     will let you know.

25         So, if you could, look at it

1                    MARK CALLAHAN

2          tonight.  And if you could identify

3          topics that -- I was reading it at

4          the break, it looks like we covered

5          these, many of these.

6               MR. CYRULNIK:  Yeah.

7               MR. SOLOMON:  We identified the

8          balance and we will see if we can

9          find anybody else.  I -- I am not

10          confident of that and then, we will

11          find an appropriate time and an

12          appropriate number of minutes to make

13          sure he is available, if we don't

14          find another witness.

15               I am not sure.

16               MR. CYRULNIK:  Sounds good.

17               And, Mr. Callahan, I think is

18          suffering from the need to -- from

19          withdrawal from -- from sitting in

20          the deposition chair.

21               I am happy to get him back up

22          there, even if there is another

23          candidate for the 30(b)(6) piece.

24               So, thanks you for your time.

25               I will be in touch with you,

```
                                    Page 428
 1                  MARK CALLAHAN
 2          Lou.
 3               And for now, we will hold the
 4          deposition open, on those grounds.
 5               MR. SOLOMON:  Okay.
 6               THE VIDEOGRAPHER:  This
 7          concludes today's testimony, given by
 8          Mark Callahan, as stipulated by all
 9          parties.
10               The total number of Media Units
11          used was seven and we will be
12          retained by Veritext Legal Solutions.
13               We are off the record at 6:35.
14               Thank you.
15               THE COURT REPORTER:  Mr.
16          Solomon, would you like a copy of the
17          transcript?
18               MR. SOLOMON:  Yes, please.
19               (Whereupon, at 6:36 p.m., the
20          Examination of this witness was
21          concluded.)
22
23            °         °         °         °
24
25
```

1                    MARK CALLAHAN
2                D E C L A R A T I O N
3

4        I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7

8        I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14

                _____
15                    MARK CALLAHAN
16
17

18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21

     _____
22       NOTARY PUBLIC
23
24
25

```
                                              Page 430

 1                      MARK CALLAHAN

 2                    E X H I B I T S

 3

 4     PLAINTIFF'S  EXHIBITS

 5

 6     EXHIBIT   EXHIBIT                    PAGE

 7     NUMBER    DESCRIPTION

 8     Exhibit 1  30(b)(6) Notice of

 9                Deposition               56

10     Exhibit 5  Partners, LLC Agreement   129

11     Exhibit 6  Calender entry for

12                January 6, 2016          145

13     Exhibit 7  E-Mail chain following

14                up on retiring           167

15     Exhibit 8  2/9/2016 Meeting between

16                Mark and Doug            202

17     Exhibit 9  E-Mail dated 2/12/2016   237

18

19        (Exhibits attached.)

20

21

22

23

24

25
```

Page 431

1                    MARK CALLAHAN

2                    I N D E X

3

4    EXAMINATION BY                          PAGE

5    MR. CYRULNIK                            6

6

7    INFORMATION AND/OR DOCUMENTS REQUESTED

8    INFORMATION AND/OR DOCUMENTS        PAGE

9    (None)

10

11

12        QUESTIONS MARKED FOR RULINGS

13   PAGE LINE QUESTION

14   (None)

15

16

17

18

19

20

21

22

23

24

25

Page 432

1                    MARK CALLAHAN

2              C E R T I F I C A T E

3

4  STATE OF NEW YORK        )

                           :  SS.:

5  COUNTY OF NEW YORK       )

6

7         I, KARYN CHIUSANO, a Notary Public

8  for and within the State of New York, do

9  hereby certify:

10        That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14        I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19        IN WITNESS WHEREOF, I have hereunto

20  set my hand this 19th day of October, 2021.

21

22

23  _____
                KARYN CHIUSANO

24

25

Page 433

1                        ERRATA SHEET
                  VERITEXT/NEW YORK REPORTING, LLC
2
        CASE NAME: Iacovacci, Paul v. Brevet Holdings, LLC, 18-Cv-08048
      (S.D.N.Y.)
3       DATE OF DEPOSITION: 10/5/2021
        WITNESSES' NAME: Mark Callahan
4
5        PAGE    LINE (S)         CHANGE                REASON
        ____|_____|_____|_____
6
        ____|_____|_____|_____
7
        ____|_____|_____|_____
8
        ____|_____|_____|_____
9
        ____|_____|_____|_____
10
        ____|_____|_____|_____
11
        ____|_____|_____|_____
12
        ____|_____|_____|_____
13
        ____|_____|_____|_____
14
        ____|_____|_____|_____
15
        ____|_____|_____|_____
16
        ____|_____|_____|_____
17
        ____|_____|_____|_____
18
        ____|_____|_____|_____
19
        ____|_____|_____|_____
20
21                                    _____
                                      Mark Callahan
22     SUBSCRIBED AND SWORN TO BEFORE ME
       THIS _____ DAY OF _____, 20__.
23
24
       _____          _____
25     (NOTARY PUBLIC)               MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   3:17 |

| 0 |
| --- |
| **00008**   204:17 |
| **08048**   1:6 4:22 |
| 433:2 |

| 1 |
| --- |

**1**   3:17 4:14,15
56:18,19,23 57:5
75:14 167:13,17
271:17 272:5
273:7 276:5
279:15,22 281:14
281:21 300:16
302:23 304:2,14
430:8
**10**   16:20 33:20
39:25 48:21,25
60:22 100:8,15
210:25 211:4,14
274:20 275:4
**10/5/2021**   433:3
**100**   105:20
**10006**   2:6
**10:27**   75:12
**10:38**   75:18
**11**   60:22 313:22
314:2
**11:52**   138:11
**11th**   203:24
**12**   60:22 315:19
316:11
**129**   430:10
**12:02**   138:16
**12:24**   238:18
**12th**   168:6 169:9
170:16 176:19
182:11 184:13,25
185:5 237:11
238:17 241:19

**13**   60:22 274:24
**14**   60:4,19,22,23
62:8,14 229:13
**145**   430:12
**14th**   412:18
**15**   229:14
**15222**   2:11
**16**   158:15,18,19
229:18 230:23
343:21
**167**   430:14
**17th**   412:11
**18**   275:2 433:2
**180**   132:9,20
134:11
**18034**   432:22
**1995**   67:13
**19th**   432:20
**1:01**   188:24
**1:18**   1:6 4:22
**1:41**   189:7
**1:43**   190:10
**1:47**   190:14
**1st**   122:19 290:5,8
305:12

| 2 |
| --- |

**2**   59:16 75:20
138:12 167:24
287:16,21 288:14
303:16,19 304:19
304:20 305:6
313:16
**2/12/2016**   237:5
430:17
**2/9/16**   203:10
**2/9/2016**   202:25
430:15
**20**   193:14 429:19
433:22
**2005**   38:24

**2008**   38:24
**2009**   129:2
**2010**   40:2 231:23
232:2
**2011**   208:5,12
**2012**   40:3 186:5
**2014**   229:21
**2015**   125:18,21,24
126:9 206:6 229:3
229:7,18 230:16
230:19,23 250:14
342:18 343:21
403:21
**2015/2016**   342:19
**2016**   120:7,9,21
121:5,16,18 122:7
122:19 123:8,13
124:8 125:18
126:9 137:16
138:23 139:8
140:3,15 145:6
146:4 155:21
156:25 162:13
165:8 168:6,18
173:10 174:17
176:16,20,22
180:13 181:25
182:7 187:24
191:7,10,15,20,22
192:6,18,19
193:14 196:3
197:12 198:2
199:22 200:9
201:2,11 203:16
203:24 205:16
206:3,5 213:2,25
214:13 217:14
226:11 229:3
236:2 237:11
238:18 251:15,19
252:2 253:10,18

263:20 264:4,7,16
266:2 269:15,19
269:23 270:19
271:17 272:5
273:7 276:5
279:15,22 281:14
281:21 283:7
286:7 287:8,9
288:25 290:5
298:22 299:18
300:16,21 301:8
301:21 302:14,22
302:23 304:2,14
304:14 310:10,18
310:19 311:13
312:2,15 320:2
325:10,12 326:12
342:18 344:21
348:24 376:15,24
379:20 400:16
412:11,18,20
415:4 417:8 419:5
419:18 421:18
422:12,13,25
423:2 430:12
**2017**   333:23
334:24
**202**   430:16
**2021**   1:11 4:5
432:20
**20th**   176:22 177:6
177:8 182:11
217:19
**21st**   129:2
**225**   2:10
**237**   430:17
**26**   60:19,25 62:8
62:14 71:8
**2:17**   217:6
**2:21**   217:10

**2:59**  170:17

**3**

**3**  138:17 167:24
189:2 304:21
305:8 313:17,19
**30**  1:17 3:16 15:13
18:2,4,5 56:8,22
57:25 58:14,20
61:15 63:9 85:4
387:19,20 388:4,6
389:6,19 390:8
419:22 420:9
424:24 425:12
427:23 430:8
**31**  61:2 62:14
**32**  62:9
**33**  62:9
**34**  61:4 62:15
316:18
**38**  60:19 61:4 62:9
62:15
**3:18**  271:6
**3:25**  271:11
**3rd**  2:5

**4**

**4**  189:9 271:7
**4:16**  321:18
**4:25**  321:25

**5**

**5**  1:11 4:5 129:9
129:21,25 130:5
168:6 271:13
321:20 430:10
**5,000**  201:25
**50**  202:2,13 211:7
211:10,15,18,23
211:25 212:2,9,16
307:14
**55**  2:5

**56**  430:9
**5:36**  386:11
**5:48**  386:18

**6**

**6**  1:17 15:14 18:2
18:4,5 56:8,22
57:25 58:14,20,21
59:10,23 60:18,21
60:22 61:15 62:8
62:14 63:9 85:4
145:4,6,7,13,15
322:3 386:13
387:19,20 388:4,6
389:6,19 390:8
419:22 420:9
424:24 425:12
427:23 430:8,11
430:12 431:5
**60**  211:25
**63**  59:16
**6:35**  428:13
**6:36**  428:19
**6th**  146:4 147:7
163:5 184:12,18

**7**

**7**  60:4,21 131:16
167:6,10 185:2,13
386:20 430:13
**7.1**  131:12 144:24
**7.1.**  131:17
**7.1a**  131:24 132:2
132:12,15 133:5
134:9 143:15
**7.1a.**  136:21
**70**  59:16
**72**  59:16
**7:00**  389:9

**8**

**8**  58:22 59:3,7,11
60:22 202:24
203:3,20 237:8
430:15
**8:30**  146:4

**9**

**9**  60:22 131:14
237:6,9,23,24
247:21 430:17
**99**  63:25
**9:00**  1:12
**9:08**  4:4
**9th**  203:16 276:14

**a**

**a.m.**  1:12 146:4
**aaron**  21:22,23
22:3,9,12,17
**aaron's**  21:24
**abilities**  359:5
**ability**  88:7 140:21
162:16 366:15,19
366:21,23 373:3
373:17
**able**  7:15,16,18
57:4 123:2 148:22
148:22 153:4
156:15,22 162:11
164:6,7 165:18,21
165:25 167:3
171:6 343:12
346:4 371:12
373:12 393:8
403:5 408:12
425:10 426:11,14
**absence**  324:21
**absent**  115:7,8
**absolutely**  60:13
350:8

**absurd**  211:16
308:21
**abtine**  76:24
**abundance**  44:11
**abundane**  44:14
**acceding**  213:12
**accept**  249:2
**acceptance**  247:18
248:7
**accepted**  247:15
**access**  35:16,18,23
36:2 265:17
269:14,17,21,25
270:3,5,6,18,22
307:8,13,14 311:9
323:20 337:12,16
341:7,10 342:13
342:17,20 343:2,5
343:13 346:4,6
352:14,14 354:14
354:23 355:21
365:5,9,11,15,19
365:21,22,25
366:4,6,9,14 368:9
368:18 375:5
403:6
**accessed**  354:10
374:5 376:18
378:12
**accesses**  355:18
**accessible**  355:23
375:2
**accessing**  355:2
375:9 378:20
**accommodate**
162:8 218:12
**accomodation**
419:24
**account**  14:10
22:16,19 370:10
405:13,13,22

406:5,20,23 407:3
407:4
**accounting** 255:14
**accounts** 354:9,10
354:24
**accuracy** 239:3,7
**accurate** 231:16
265:4,9 273:24
276:18 285:19,25
288:23 290:3,12
292:23 293:5
307:17 308:4,11
308:13,17,20
309:22,23 310:6
318:8,12
**accurately** 273:17
276:11 286:21
**accuse** 300:4
**accusing** 300:18
**acknowledge**
351:6
**acknowledged**
381:3,4 405:3
**acquired** 67:16,17
**acting** 93:22 95:21
97:15,18 158:11
**action** 5:7 6:22
19:12 253:25
432:16
**actions** 248:3
413:4 423:8
**active** 9:17,19
**activities** 158:2,4,6
338:15 370:8
**activity** 346:8
385:10
**acts** 96:7 214:23
**actual** 21:14 85:16
254:8 291:3
293:16

**add** 155:24 156:9
166:19
**added** 313:21
421:22
**addition** 13:19
223:11 255:15
331:21 407:3
**additional** 342:9
422:10,11
**address** 179:25
217:3,24 233:13
233:15 254:22
255:2 279:17,21
367:16 372:22
373:11,22 396:8
396:17 422:15
**addressed** 387:21
419:23
**addresses** 275:11
366:17 368:4
372:17,25 416:23
**addressing** 292:4
**adina** 2:19
**administer** 3:11
**adobe** 342:5
**adopted** 40:7
**adoption** 39:16
**advance** 105:23
361:24
**advances** 106:9
**advantage** 160:19
**advent** 327:23
**advice** 16:8,16
52:7,10 220:7,15
222:10,14 223:15
257:19 297:6
298:17 302:6
415:23 422:8,16
423:13
**advise** 173:15
251:17

**advised** 84:12
258:6
**advisement** 210:7
358:3
**advising** 257:15
**advisor** 31:23
39:12,19,23 40:11
41:5 43:21 45:9
45:13,13 46:3,6,15
77:17 78:12,22
85:10 357:11
**advisors** 26:23
**affidavits** 28:3
51:14,21
**affiliate** 69:18
72:20 74:18
116:15
**affiliated** 95:18,19
97:18 115:24
116:5
**affiliates** 65:6,12
**affiliations** 5:10
**affirmative** 380:22
**age** 275:11
**ago** 21:12 33:20
40:2,7 54:24
69:18 71:8 80:9
83:10 98:6 106:23
130:21 131:7
142:7 144:16
193:20 219:12
223:6 225:8
235:10,20,23
236:9 237:2 238:8
242:25 257:4
263:17 328:10
362:3 382:13
421:11
**agree** 4:12 19:7
120:6 122:4,9,18
133:12 137:10

140:14 146:25
168:14,23 169:19
170:5 171:24
180:17 182:6,25
183:14 203:21
219:13 229:14
245:6,19 262:15
263:5,10 292:22
293:15 307:9
308:6,11 362:25
380:16 390:18
421:3
**agreed** 3:5,20
159:8 363:18
**agreeing** 161:6
**agreement** 14:22
79:25 80:4 82:5
83:19 114:19
115:2,6,7,15,16,23
116:6,14 127:8,14
127:18,20,25
128:9,14,16,18
129:3,10,21 130:6
130:16,24 131:7
133:2,6,8,10,14
134:2,16,21 135:9
135:14,16,19,21
136:2,19 143:16
144:6,23 175:7,12
176:5 178:19
179:18,22,24
181:16,25 182:5
183:3,16 188:7,10
188:18 199:19,24
201:25 203:17
207:20,22 208:16
208:19,24 209:3,4
209:10,25 210:11
210:20 211:12
213:8 217:15,23
218:5,10 219:18

221:19 222:2
223:9,23 224:3,9
224:12,20 225:3
225:12 226:4
227:3,21 240:13
253:23 254:21
255:5,13 256:14
266:18 281:23
282:11,13,19
385:25 401:14
413:7 414:4,8,10
414:13 430:10
**agreements** 92:17
114:15 115:19
128:12,22 133:19
200:23 201:16
203:25 205:12,16
210:13 213:4
214:19 215:10
217:24 218:11
220:16 222:11
226:5,12,22 227:4
227:11 253:24
254:25 256:9
258:4 414:14
**ahead** 10:17 48:12
103:17 130:11
391:8 393:25
**al** 1:8,17 2:10 4:19
**alleged** 59:15
**allow** 143:12
150:18 151:4
361:20 372:15
**allowed** 15:24
16:3,17 331:2
**allowing** 154:11
156:12 214:17
215:7
**allows** 327:15
**altered** 408:15
409:10,19

**alternate** 7:17
**ambiguity** 297:11
**amended** 59:17
**amount** 38:24
41:16 101:14,15
101:20,24 102:2,4
102:4,7,8,11,15,20
103:2,21 104:4,15
104:22 105:2,6,10
105:11,14,18,19
152:21,21,22
161:12 408:23
**amounts** 210:12
**amusement** 158:7
**analysis** 200:6,21
201:2,8,10 202:16
**annotated** 61:11
**announced** 264:23
303:4
**announcement**
263:20,24 264:3,6
264:10,14,20
266:7 267:4,8,19
**announcements**
267:24
**answer** 10:14,17
10:20 11:20 13:7
15:4 16:8,10,14,24
21:16,21 38:19
42:25 80:20
103:16,20 121:16
121:20 133:11,22
134:8,22 141:18
154:17 156:10,15
164:14,20,21
166:20 174:3,8,14
179:3 183:9
190:25 191:22
192:13,16 201:19
219:8 240:14
242:18 246:24

265:4,10 267:21
299:5 308:3 329:3
339:25 340:12
353:4 362:2 363:4
391:9 392:17
394:19,23 395:2,6
416:12 417:24
418:17 421:6,9,13
422:17,22
**answered** 17:8
27:8 134:6 174:9
187:21 236:20
246:14,23 295:25
307:23 309:11
353:4 362:11
363:3,17 364:16
393:16 394:21
395:3 410:21
424:5,6
**answering** 156:17
284:6 362:22
**answers** 191:12
195:12 201:3
242:25 362:24
**anticipate** 316:15
**anticipated** 182:19
**anxious** 17:2
**anybody** 20:22
24:5 161:4 194:2
201:9,10 213:10
213:21 215:4
222:19 235:18
267:9,12,12
270:16 290:22
292:2 305:20,21
306:16 309:5
320:15 365:23
366:11 426:21
427:9
**anyway** 311:23

**aol** 354:9
**apart** 27:24 28:11
30:23 38:16 48:4
50:2 51:21 52:12
53:5 90:16 91:13
118:21 135:20
139:5 144:9 152:6
234:22 270:15
321:3 324:14
329:11 333:13,18
350:21 351:18
365:24 372:12,24
**apartment** 403:3
**apologies** 164:19
**apologize** 361:24
394:20
**appear** 286:6
287:10 310:17
**appearance** 5:14
**appearances** 5:10
5:22
**appeared** 157:20
357:22 393:3
**appears** 276:17
317:18 356:16,24
**application** 342:15
**appointment**
203:16
**appointments**
397:14,16
**appreciate** 37:12
82:8 84:21 120:22
137:22 164:10,23
202:21 224:2
273:3 351:3 364:5
389:11 416:13
424:16,19
**appreciated**
159:21
**appreciating**
178:24

**appreciative**
159:13,17
**approach** 91:23
361:3,5,9
**approached** 74:7
89:24 383:11
**approaches** 94:9
**appropriate** 84:5
95:14 256:15
419:20,21 420:4
427:11,12
**approvals** 95:14
307:4
**approve** 296:13
**approximate**
275:11
**approximately**
7:22 48:4 331:20
390:9
**april** 182:7 271:17
272:5 273:7 276:5
279:15,21 281:13
281:20 299:17
300:15,21
**archeveche** 211:16
**area** 148:15
290:24
**arrange** 426:8
**aside** 13:17 18:10
353:17
**asked** 11:17 16:14
17:13 73:25 80:7
81:25 96:12
103:19 111:23
128:5 135:4,7
156:10 162:22
165:12 172:4,13
174:15 182:4
195:24 199:2
223:16 236:19
259:2,9 272:13

280:16 298:7
307:23 309:10
320:10 345:19
351:4,5 362:3,10
363:3,16 364:6,15
380:9 384:10
393:15 421:4
**asking** 14:6 16:18
24:4 26:5 29:16
65:4 80:22 84:25
85:5,6 87:20 91:7
95:25 96:16 98:10
102:21,23 103:14
104:3 111:5
116:10,11 117:25
122:13 126:3,5,12
133:20,21,22
137:4,5 140:10,11
153:3 156:6
164:11 166:10
177:23 179:5
181:14,23 182:22
185:10 190:5
195:20,23 200:14
200:25 219:4
220:3 227:25
229:19 233:7,8,13
236:10,12 238:8
245:18 246:20,21
247:23 248:6
254:17 255:23,25
273:4 275:10
280:3,7,9 288:4,6
294:7 297:22
303:22 308:10
312:9,10 313:13
339:24 340:5
343:23,25 348:2
363:5,6 372:10
382:23 394:6,7,15
394:25 395:4

397:2 403:25
404:2,3 410:14
418:12 425:14
**asks** 171:3
**aspect** 91:25
**aspects** 81:5 82:21
218:7
**asset** 73:20 74:3
111:2 112:11
**assets** 81:5 82:4
83:21 85:16,18,20
87:8,9,10,14,15,17
87:24 88:5 105:22
106:2,4 112:2,4,16
112:19 231:3
**assistance** 403:11
403:20 404:10
**associated** 43:22
82:3,7 85:19,20
98:24 129:13
186:18 378:19
**assume** 10:12
165:24 227:24
273:4 333:3
**assumes** 336:6
**assuming** 413:6
426:15
**assumption** 54:2
175:15
**assure** 103:11
394:21
**athletic** 158:6
**attached** 136:18
315:11 430:19
**attachment**
315:22
**attempt** 393:4
**attempted** 392:9
392:23 393:2
**attempting** 407:24

**attend** 52:11,18,22
**attended** 49:10
52:15,25 54:17,17
54:22
**attending** 146:9
**attention** 57:17
131:11 162:12
**attorney** 5:15
50:23,25 174:25
218:18
**attorneys** 2:4,9
6:3 21:11 24:18
26:8 27:4 28:8
29:6,10 35:17
257:20,24
**audio** 4:10 387:7
**auspices** 240:9
**authority** 94:3
383:18 384:4,5,9
**authorization**
368:5,6 412:24
**authorize** 382:14
**authorized** 3:11
**authorizing**
270:16
**availability**
161:12 163:2
**available** 43:6
152:15 359:13
427:13
**avenue** 2:10
**avoid** 242:13,21
379:7 381:8
407:10
**aware** 11:22 14:9
14:14,17,19 17:22
18:7,9 22:14,17
50:7 76:19 78:8
78:11,21 96:6
108:23 114:25
115:6 116:4,12

152:7 181:6
197:22 200:20
201:8,9 205:15
226:23 267:24
270:16,21 285:5
333:16 338:25
383:5 403:16
404:4,4,16

**b**

**b**   1:17 15:14 18:2
18:4,5 56:8,22
57:25 58:14,20
61:15 63:9 85:4
387:19,20 388:4,6
389:6,19 390:8
419:22 420:9
424:24 425:12
427:23 430:2,8
**back**   13:7 33:17
34:17 38:24 41:9
41:13 48:24 51:24
60:11 75:22 84:18
86:14 101:8
123:25 130:3
138:7,19 141:24
154:22,25 155:6,8
155:12 157:17
164:17 189:11
200:12 223:4,19
240:25 252:17,18
259:5,9 284:8
286:10 300:2
318:19 320:8
325:9,12 333:24
342:18 348:8
367:11 379:17
391:11 400:8,9
401:18 404:21
409:17 418:15,20
427:21

**backed**   41:12
73:20 74:3,4
396:11 397:15
**background**   12:3
275:13
**backup**   38:6,10,11
41:3 43:16 44:22
359:21 361:3
380:7 395:16,17
397:11,25 398:7
**backups**   38:15,17
41:10 43:15
348:13 349:10
**bait**   287:5
**balance**   427:8
**balcony**   53:25
**bank**   67:15,15
70:7,9
**banking**   68:15,16
**base**   426:10,17
**based**   49:12 53:23
89:4 95:23 96:18
106:3,10 108:19
133:4 141:19
169:16 178:5
220:3 254:10
256:4 261:2
272:18 283:13
297:19 300:7,13
301:10 317:17
329:22 340:13
407:23 414:15,16
422:16
**baseless**   371:4
**basic**   120:3 255:7
**basis**   85:15 108:5
125:9,12 175:14
218:8,15 219:16
250:24 251:23
253:4,6 278:11
292:21 300:4

308:22 346:23
350:19 351:17,21
351:23,24,25
421:9
**bazeree**   76:25
**beach**   53:25
**bearing**   202:11
**becoming**   40:10
41:4,4
**beginning**   5:14
69:6 75:19 122:7
126:9 138:17
155:9 189:8
271:12 322:2
386:19
**beginnings**   419:4
**behal**   2:20
**behalf**   59:20 60:6
81:7 93:22 95:20
96:8 97:16,19
113:9 276:2
**belief**   250:25
251:22,24 252:16
252:19,20 253:3
351:7
**believe**   8:14 9:18
9:22 14:21 17:25
18:16 19:22 20:16
22:11 23:4,16
24:4,10 25:7
26:12 29:9 31:8
34:22 40:7,15,15
40:16 41:10 45:25
46:12,16 47:6
49:22 50:9,11,13
50:17,19,24 51:22
52:9,15 53:14
54:22,23 58:19
60:25 63:24 64:22
65:13,14,20 66:9
67:8,12,13,22 70:3

70:6 73:20 76:7
76:17,22 77:6
78:24 79:2 81:11
81:11,24 85:13
93:24 107:6,16
109:19 116:25
117:13,19 118:13
124:25 125:7,21
134:23 135:8
152:13,22 153:22
156:15 157:5
158:8 163:11
169:2 173:17
176:19 180:16
181:21 188:3,12
188:14,15 193:19
194:7 195:2,4
202:11 206:5,20
207:18 208:18
211:22 216:2,3,4,7
218:15 223:2
225:19 226:10
227:14 229:3,11
229:12,13 232:15
233:17 239:6
242:7 246:14
249:11 250:22
251:3,5,15,16
252:5,10 258:18
266:8 269:4,8,12
269:17 270:6,8
273:22 278:8
280:9,13 284:17
284:18 285:22
290:21 291:7
293:3 295:11,25
300:9,10,15
301:17 303:24
304:23 305:10
308:12 314:11
317:23 318:11

320:9,20 321:10
321:10 323:15
325:5 327:8 328:6
328:8 330:24
331:16 338:18
344:12 347:25
351:21 352:16,18
353:6,7 354:25
355:9,10,12,14,16
356:2,4,7 357:2,5
358:12,13 361:25
362:23 363:3
365:15 366:5,14
368:2 370:16
374:20 378:4
381:6 385:23
391:21 397:12
402:5,18 407:13
410:17 425:17
**believed** 401:3
**bell** 39:2,4 177:6,8
268:17
**benefit** 267:20
286:3
**benefits** 154:4,4
155:20 158:22
159:5,9,17,24
160:10 162:10
240:10 244:16
245:8,21 246:2,5
246:11,17 247:3
247:15,18 248:7
248:10 249:3,4
250:3 273:16
**best** 30:11,12
39:20,21,24 40:3
161:21 162:8
171:13 176:11
200:4 251:12
257:6 273:22
286:13 287:12

296:4 350:2 359:5
390:5 398:22
401:8
**better** 130:4
214:15 215:5
229:14 272:13
297:5 359:21
360:10
**beyond** 241:24
244:16 245:8
246:2,17 247:16
247:19 248:4
249:3,5 250:3
251:11 341:13
375:20 381:8
410:22 411:14,20
416:8,9 417:17
**big** 231:9 246:13
**bigger** 230:21,22
**bills** 23:21,24
**bit** 34:6 36:14
57:24 67:11
148:24 202:20
387:13 402:15
**blank** 14:16
**blanket** 411:15
**blanking** 21:24
**bleeding** 163:15
163:17,19,22
**blood** 432:16
**bob** 52:16
**booked** 54:6
**borrow** 89:21
92:23
**borrower** 8:24 9:3
9:5 88:13,20,23
89:10,20 90:7,15
90:22 91:4,12,19
92:5 93:8,17 94:9
94:10,11 102:5,6

**borrowers** 89:3
284:14
**boss** 68:12 243:15
**bosses** 68:11 71:24
72:8
**bother** 192:11
376:16 378:17
**bottom** 167:23
235:16 275:9
313:21 316:16
**bound** 113:22
**box** 34:4
**breached** 213:3
**break** 11:10,13,15
11:20 74:25 75:8
75:24 120:12
138:21 368:14
371:19 372:10
386:6,7 389:22
427:4
**breakdown** 83:3
83:13 85:7
**breaks** 75:5 271:2
**brevet** 1:8,16 2:10
2:18,18 4:18 8:6
8:12,25 14:20,21
19:23 20:2 21:10
22:21 23:7,12,20
26:20 27:2,11
31:21,22 35:5
36:16,20 37:19
38:8,21,22 39:17
39:22 40:7,9,25
41:3 42:13 43:22
43:22 44:9,21
45:11,19 46:7
55:14,16,18,20,21
55:24,25 56:4
63:21,24 64:10,20
64:23,25,25 65:7
66:12,24 69:18,21

72:20 73:2,14
74:18 75:25 76:2
76:4,6,7,11,20,21
77:4,7,9,11 78:9
78:11,21 79:2
80:6,13,16,17,23
80:25 81:2,3,6,8
81:13,15,16 82:2
82:14,16,23 83:14
83:22 84:10,16
85:10,11,22,22
86:5 89:6,12,24
90:7 91:18 92:9
92:18,21 93:20,25
94:2,12 95:17,20
96:8 97:19 100:20
102:16 103:3,6,23
104:12,18,24
105:6 106:2
107:24 108:9,15
109:3,18,25 110:6
110:10,11,18,24
111:8,10,11,15
112:17,20 113:6
113:12 114:20,20
115:4,8,16,24
116:5,7,13,15,20
116:22,25 117:9
117:11,15,16,22
118:25 119:2,9,13
123:12,19 124:11
124:15,16 125:2
126:23,24 130:7
135:24 136:8
138:23 139:16
140:5,17 141:2,2
141:10 142:18
143:21,22 144:2,3
144:5,10 147:14
148:17 149:16
150:19,23 151:2,3

| | | | |
|---|---|---|---|
| 151:13,21,21,25 | 276:2,5,19 278:14 | 357:24,25 358:22 | 395:16,17 396:25 |
| 152:2,2,8 153:2,3 | 278:16 279:5,10 | 358:25 359:2,4 | 398:7,8 399:21 |
| 154:2,7,10,12 | 282:16,22 283:23 | 360:9 361:20,21 | 403:2 |
| 155:17,18 156:12 | 284:12 285:18,23 | 362:6,8 363:11,14 | **brian** 284:18 |
| 156:25 157:3,6,12 | 286:19 288:9 | 364:3,3,4,12 | **bring** 12:23 330:5 |
| 157:20,22 158:12 | 289:7 290:9,16,22 | 365:10,13 366:10 | 331:2 345:19,19 |
| 158:21,25 159:7 | 290:25 291:10 | 366:16,24 367:15 | **brings** 104:11 |
| 159:14,20 160:7,9 | 293:17,21 294:12 | 367:20 368:20 | 389:8 |
| 160:15,17 161:4 | 294:16,19,23 | 371:7 372:16,17 | **broached** 253:14 |
| 162:7,15 164:2 | 296:11,20,22 | 372:21,25 373:4 | **broad** 44:5 79:16 |
| 165:5,10 166:5,15 | 297:13 298:21 | 373:11,15,21,23 | **broader** 179:5 |
| 172:24 176:2 | 301:6,20 304:6,13 | 373:24 374:3,6,15 | **broadway** 2:5 |
| 178:13 179:10,20 | 305:15 306:7,23 | 376:22 378:3 | **brothers** 67:21 |
| 180:2,6,13,20,21 | 307:12,13 308:20 | 379:10,11 380:4,7 | 68:2,4,6,8,10 69:5 |
| 181:5,19 182:4,18 | 309:23 314:12 | 384:4 391:25 | 69:10,12 70:10,12 |
| 182:19,22 183:5 | 322:6,8,12,17,20 | 392:4,25 393:7 | 70:16,24 71:11 |
| 183:15,16,18 | 323:7 325:6,15,18 | 394:2 396:8,16,23 | **brought** 14:2 |
| 186:7 187:10 | 325:20,20,22 | 397:3 398:8,11 | 15:12 165:16,17 |
| 189:15 193:7 | 326:3,7,11,19 | 399:13,14,19 | 166:25 167:2,3 |
| 199:14,21 200:8 | 327:19 328:13 | 400:6,23,23 401:3 | 330:9 |
| 200:24 202:4,7 | 330:16,18 331:18 | 401:4,5 402:2,10 | **browser** 337:13,22 |
| 204:3 205:22,22 | 331:20,23 332:18 | 402:19 404:25 | 342:21 343:2 |
| 206:25 208:15,20 | 332:21,21 333:18 | 405:25 407:4,9,16 | 354:11,15,24 |
| 208:21 210:17,20 | 335:5,8 336:14,17 | 408:3,6,14,25 | 355:19 374:5 |
| 213:2,13 214:14 | 336:21 337:14,17 | 409:8,24 411:11 | 375:3,9 378:20 |
| 214:15 215:4 | 338:15,22 339:2 | 413:24 414:3 | **browsers** 376:13 |
| 220:19 222:16,20 | 339:15,18,18,22 | 415:3 416:18 | **bruncan** 66:9 |
| 226:13,23 227:12 | 340:16 342:7 | 417:11,12 433:2 | **buck** 380:11 |
| 227:15 228:9,23 | 343:16 344:8,16 | **brevet's** 28:24 | **bullet** 239:10,17 |
| 229:6 233:2 235:6 | 345:6,13,14 | 29:2 38:2,12,17 | 239:25 241:4 |
| 239:20 242:14 | 346:15,17,23 | 85:5 90:20 91:16 | 244:6 245:25 |
| 244:15 245:8,21 | 347:8,9,11,15,21 | 104:5 157:23 | 246:7 254:14 |
| 245:22 246:10 | 348:4,11 349:5,6 | 158:12 183:4 | 261:3,3,16 |
| 247:2 248:10 | 349:12,15 350:11 | 286:6 307:16 | **bullets** 262:5 |
| 249:6 251:19 | 350:12,18,23,24 | 322:9 336:4,8 | **bunch** 93:19 |
| 252:2 253:9,17 | 351:2,8,11 352:13 | 337:20 350:4,7 | **burdensome** |
| 255:5,17 256:10 | 353:14,19,20,24 | 352:2 353:15 | 360:22 |
| 258:20 259:15 | 354:12,16,22 | 356:5 361:14,18 | **business** 73:13,22 |
| 264:4 267:9,13,16 | 355:2,4,8,10,10,23 | 365:5 379:5,9 | 73:24 338:15 |
| 268:2,9 271:16 | 356:10,11,15,22 | 380:23,25 381:11 | 347:19,22,23 |
| 274:8,10 275:12 | 356:24 357:3,4,22 | 392:6,7,23 393:6 | 349:20 357:24 |

| | | | |
|---|---|---|---|
| 358:9,25 360:9 393:13 396:8 408:15 409:20 | 48:1 49:1 50:1 | 161:1 162:1 163:1 | 268:1 269:1 270:1 271:1,15 272:1 |
| **businesses** 67:4 96:3 | 51:1 52:1 53:1 | 164:1 165:1,7 | 273:1 274:1 275:1 |
| | 54:1 55:1 56:1 | 166:1 167:1 168:1 | 275:7 276:1 277:1 |
| **c** | 57:1,3 58:1 59:1 | 168:14 169:1,7,20 | 278:1 279:1 280:1 |
| **c** 2:2 6:12 274:16 429:2 432:2,2 | 60:1 61:1 62:1 | 170:1 171:1,17 | 281:1 282:1 283:1 |
| **cadence** 388:18 | 63:1 64:1 65:1 | 172:1 173:1,5 | 284:1 285:1,20 |
| **cake** 240:5 | 66:1 67:1 68:1 | 174:1 175:1 176:1 | 286:1 287:1 288:1 |
| **calculated** 106:10 | 69:1 70:1 71:1 | 177:1 178:1 179:1 | 288:2 289:1 290:1 |
| **calendar** 48:25 145:25 203:15 397:14,16 | 72:1 73:1 74:1 | 179:6 180:1 181:1 | 291:1 292:1 293:1 |
| **calender** 145:5 430:11 | 75:1,22 76:1 77:1 | 182:1 183:1 184:1 | 294:1,4 295:1,14 |
| **call** 22:6 40:18 49:8,8 83:10 88:12 95:2,11 106:8 107:18 160:14 179:11 224:20 225:21 247:20 255:8,11 257:18,21 258:23 261:2 262:7 287:9 416:21 | 78:1 79:1 80:1 | 185:1 186:1 187:1 | 296:1 297:1 298:1 |
| | 81:1 82:1 83:1 | 188:1 189:1,11 | 298:19 299:1 |
| | 84:1 85:1,2 86:1 | 190:1,18 191:1 | 300:1,3 301:1,5 |
| | 87:1 88:1 89:1 | 192:1 193:1 194:1 | 302:1 303:1 304:1 |
| | 90:1 91:1 92:1 | 195:1 196:1 197:1 | 305:1 306:1 307:1 |
| | 93:1 94:1,6,10,13 | 198:1 199:1 200:1 | 307:9 308:1,22 |
| | 94:20 95:1 96:1 | 201:1,13 202:1 | 309:1 310:1 311:1 |
| | 97:1 98:1 99:1 | 203:1,22 204:1 | 312:1 313:1 314:1 |
| | 100:1 101:1 102:1 | 205:1 206:1 207:1 | 315:1 316:1,16 |
| | 103:1 104:1 105:1 | 208:1 209:1 210:1 | 317:1 318:1 319:1 |
| | 106:1 107:1 108:1 | 211:1 212:1 213:1 | 320:1 321:1 322:1 |
| | 109:1 110:1 111:1 | 214:1 215:1 216:1 | 322:5 323:1 324:1 |
| | 112:1 113:1 114:1 | 217:1,12 218:1 | 325:1 326:1 327:1 |
| | 115:1 116:1 117:1 | 219:1,22 220:1 | 328:1 329:1 330:1 |
| | 118:1 119:1 120:1 | 221:1 222:1 223:1 | 331:1 332:1 333:1 |
| | 121:1 122:1 123:1 | 224:1,17 225:1 | 334:1 335:1 336:1 |
| **callahan** 1:17 6:1 6:20 7:1,20 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,5 17:1,15,19 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 | 124:1 125:1 126:1 | 226:1 227:1 228:1 | 337:1 338:1 339:1 |
| | 127:1 128:1 129:1 | 229:1 230:1 231:1 | 340:1 341:1 342:1 |
| | 129:5 130:1,5,15 | 232:1 233:1 234:1 | 343:1 344:1 345:1 |
| | 131:1 132:1 133:1 | 235:1 236:1 237:1 | 346:1 347:1 348:1 |
| | 134:1 135:1 136:1 | 238:1 239:1 240:1 | 349:1,8 350:1 |
| | 136:24 137:1 | 241:1,22 242:1,18 | 351:1 352:1 353:1 |
| | 138:1,8,19 139:1 | 243:1 244:1 245:1 | 354:1 355:1 356:1 |
| | 140:1,2 141:1 | 246:1 247:1 248:1 | 357:1 358:1 359:1 |
| | 142:1 143:1 144:1 | 249:1 250:1 251:1 | 360:1 361:1 362:1 |
| | 145:1,18 146:1 | 252:1 253:1 254:1 | 363:1 364:1 365:1 |
| | 147:1 148:1 149:1 | 255:1 256:1 257:1 | 366:1 367:1 368:1 |
| | 150:1,16 151:1 | 258:1,8 259:1 | 369:1 370:1 371:1 |
| | 152:1 153:1 154:1 | 260:1 261:1 262:1 | 372:1 373:1,3 |
| | 155:1 156:1 157:1 | 263:1 264:1 265:1 | 374:1 375:1 376:1 |
| | 158:1 159:1 160:1 | 266:1 267:1,7 | |

377:1,24 378:1
379:1,18 380:1,11
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1,5 391:1,16
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
418:10 419:1
420:1,22 421:1,8
422:1 423:1,14
424:1,17 425:1
426:1 427:1,17
428:1,8 429:1,15
430:1 431:1 432:1
433:3,21
**callahan's** 256:2
417:23 422:5
**called** 6:4,12 28:17
28:22 64:25 65:15
100:23 101:2
109:19 279:6,9
341:22
**calling** 278:21,22
**calls** 27:6,23,25
48:15 49:16,20
50:11,15 80:2
101:13 184:19
250:17 327:15
**candidate** 427:23
**candidly** 25:24
**cap** 37:8
**capability** 366:9

**capacity** 19:18,20
23:14 42:4 56:6,7
56:8 125:19
141:12 166:4
388:7 425:3,15
**capital** 31:21
39:18,22 40:9
43:23 44:21 65:15
66:16 77:9,11
78:9,11,21 79:2
80:6,13,16,25 81:3
81:6,9,15,16 82:2
82:14,16,23 83:14
83:22 84:10,17
85:10,22 86:5
110:7 111:11
130:7 234:3,5
372:21 413:24
**captured** 37:9
262:24 263:3
**captures** 37:3
372:20
**capturing** 218:7
**care** 201:13
228:18
**careful** 381:25
416:5
**carefully** 379:7
**caring** 228:14
**carrying** 79:18
**case** 1:6 4:21
13:24 14:8 19:22
28:5 35:4 51:5
53:8 117:13 137:5
137:5 180:16,18
229:15 262:8
271:20 289:5
300:9,11 312:24
323:15,16 329:13
331:16 354:20
355:11 433:2

**cash** 118:16,19,22
**cast** 163:8,12
**catch** 52:20
**catskill** 391:8
**cause** 16:14,20
98:17 181:18
**caused** 413:14
**caution** 44:11,15
**caveat** 11:16
133:18 134:14
**caveats** 133:22
**cco's** 357:21
**cease** 151:2,11
**ceased** 120:14
122:2 151:5
152:10
**ceases** 180:18,25
**ceasing** 141:11
**cell** 18:21,22
342:22
**center** 67:23
**certain** 26:25
53:16 56:8 85:25
86:3 96:5 101:20
120:14 159:24
166:11,21 172:18
211:24 212:2
235:14,19,22,24
265:13 279:12
284:24 297:24
307:8 345:24
378:11 392:24
406:22 411:5
414:22 415:22
422:14
**certainly** 70:19
72:11 161:11
165:15 245:14
252:22,23 324:24
334:18 352:11,11
352:12 393:21

**certainty** 334:11
**certification** 3:8
**certify** 429:4,8
432:9,14
**cf** 2:7
**chain** 72:6 167:8
167:22 170:16
173:6 430:13
**chair** 427:20
**challenged** 125:17
**chance** 56:12
57:12 310:23
**change** 152:23
195:15 249:11
299:6 310:10
340:12 356:20
433:5
**changed** 41:21,24
111:23 247:11
248:22 249:12
290:14 295:16,23
313:2 325:11
344:2 423:25
**changeover** 270:9
270:11
**changes** 308:2
**channelling**
342:16
**characterization**
107:9 136:23
**characterize** 98:16
98:20,22,25 99:12
99:15,19 100:17
100:21 101:8
106:12,15 107:12
194:13,21 227:10
245:16 259:11
308:7 367:9
**characterized**
88:19,20 107:23
198:24 418:24

characterizing 107:14 194:24
charge 22:20 348:10,12
charged 114:2 115:9
chart 283:11 287:24 288:9 290:16,19 295:15 296:14,24 297:19 298:2,25 301:7,21 302:16,19,23 303:9 304:2,10,12 305:13 307:10 310:9,17,19,24 311:9,10,12,18 319:10
charts 282:22 283:7,22 284:11 285:19 286:7,22 291:15 293:25 294:18,22 295:9 295:12 307:17 310:14,21 311:23 334:14
chase 67:14,15
check 385:9 406:3
checking 19:8
checks 275:13
chief 357:17
child 358:18
children 339:11
chiusano 1:21 5:3 432:7,23
choice 328:23
choosing 324:3
choppy 155:7
chose 340:14,19
chosen 341:4
choses 340:20

circuit 122:4
circulated 294:19 294:23
circulating 293:24
circumstance 160:11 302:8,9
circumstances 67:11 159:25 235:12 270:21 296:5 298:14,16 299:8 302:5 368:8 369:7,8
civil 1:19
claimed 28:18
claiming 155:25 309:9
clarification 24:25 31:12 34:9 37:12 37:16 46:23 65:9 112:7 144:15 204:15 267:21 286:4 326:5 340:3 421:6
clarified 104:9 144:14
clarify 42:25 56:3 65:4 103:12 126:2 156:18,19 195:9 300:25 325:23 362:4 367:17 421:16
clarifying 137:23 252:25 326:15
clarity 17:18 267:3
clear 15:15 16:13 37:11 131:10 170:5,14 178:10 234:13 264:12 267:5,6 339:23 347:14 350:7

351:11 354:25 355:10 367:12 371:10 377:7,11 377:12,15,17 394:5 418:17
clearly 140:15 157:19 172:8 281:12 317:7 361:15 393:4 408:3
clicking 129:13
cliff 274:13,15,18
clock 371:22
close 12:23 423:24
closer 12:24
cloud 346:21
cobra 152:5,7,15 153:12,14
coerced 156:2,7
cognizant 205:15
coincidence 94:25
colin 2:19
collaborated 62:5
collateral 90:6,12 90:18 91:15
colleagues 5:20 390:24
collectively 62:11
collin 49:21
column 316:23 317:20
columns 317:21
com 339:9
combination 340:17 423:11
come 22:15 69:3,8 138:7 147:22 148:17 166:22 179:10 253:18 287:6 341:25 369:23

comes 16:2 104:6 105:5 356:9
coming 20:12 22:18 384:25 392:21
command 72:6
comment 212:21
commenting 278:20
comments 232:16 233:8
commercial 74:3
commission 108:5 433:25
commissions 108:11,16,19
commit 104:5,14 104:19,20
commitment 101:24 102:2,4,8 102:10,15,20 103:2,21 104:3,6,8 104:11
committed 102:5 414:18
committee 288:19 288:25 289:8,14 304:4 305:2
committing 105:7
common 93:20,21
communicate 19:8 170:7 214:15 235:25 243:22 272:17 282:4 296:5 409:5
communicated 36:3 149:17 173:19 186:7,21 186:23 187:24 206:16 223:23 224:19 236:13

239:19 241:17,21
244:13 245:20
246:22,25 247:20
248:9 254:19
262:2 271:24
272:23,25 282:2,8
282:14 313:3
357:15 358:7
399:6 407:8,9,13
409:4 411:18
**communicating**
255:7 256:8
267:14 272:3
382:19
**communication**
43:17 44:17
174:13 199:3
347:7
**communications**
36:18 44:18,23
139:6,19,21
173:24 174:22
197:23 198:7
354:15 360:7
367:22 370:23
371:11 373:4
412:16
**companies** 88:5
114:14 115:17
214:24
**company** 31:18
55:20 59:21 60:6
66:6 89:15,16,24
90:3 93:7,16
130:6 132:8,18,21
133:15,25 134:12
134:19 135:18
136:9 137:15,20
139:7,13,22 142:9
142:15,22,24
143:7,8 159:21

162:13 183:21
215:8 217:25
218:13 228:8
238:20 260:18
263:19,22,24
264:2,6,9,13
265:17 266:7
267:4,8,18,19
269:14 270:18
303:6
**company's** 269:21
**comparing** 61:17
**compensated**
96:22,23 108:3
**compensation**
106:18,20 200:3,7
200:22 201:14,18
202:20 244:15
247:15,18 281:9
**compete** 59:14
408:5 414:21
415:3
**competing** 408:15
409:19
**complaints** 51:23
**complete** 275:13
389:2,17 390:8
**completed** 129:15
420:13
**completely** 425:23
**completion** 70:15
**compliance** 50:18
293:9,9 294:22
295:2,4,6,7,11
348:17 353:20
354:12 357:17
366:5 369:16
**complies** 58:23
59:12 145:9
274:21 287:18
288:15 313:9,25

315:20 316:6
**comply** 31:19 32:5
358:2
**compound** 368:13
**compounding**
377:4,7
**comprehensive**
78:4 188:7,9
**computer** 18:10
18:14,15,18,20
42:5 322:6,8,10,13
322:17,17,19
323:5,25 324:9,13
324:17 325:3,6,13
325:15,18,19,22
325:24 326:6,10
326:13,18 327:10
328:5,13,20,22
329:18,19,21,23
330:17 331:22,23
332:17,20 333:2
333:17,19 334:6
335:4,7,12,20,24
336:2,12,25
337:14,17 338:5,7
338:15,23 339:2,7
339:16 340:16
341:8,9 342:2,23
343:16 344:7
345:20,25 346:5,7
346:9,15,15,25
347:17 348:4,7
350:4,10 352:22
353:11,23 355:3,4
355:5,8,19,23
356:10,24 357:3
358:19,21 362:8
363:14 364:4,25
373:24 374:6,12
374:15 375:2,14
375:19 376:2,7,10

376:22,22 377:12
377:16,25 378:12
380:13 381:6,18
381:24 382:7
395:12
**computer's** 342:16
**computers** 322:21
322:22 323:2,17
324:8,10 327:17
327:20 328:6,9
329:9,14 330:12
330:14 331:12
338:14 343:17,21
344:5,18 345:11
345:14,17 352:15
361:14,18 392:4
399:20,21 400:6
401:5
**conceptually**
356:8
**concern** 165:25
277:21 294:2
413:15
**concerned** 156:16
187:8 234:16,20
294:16,17,21
**concerning** 194:14
195:14 243:9
406:4
**concerns** 166:13
228:6 234:20
235:3,4 236:13
415:5
**concert** 84:3
**conclude** 244:9
408:12 421:15
**concluded** 213:3
428:21
**concludes** 428:7
**concluding** 418:7

| | | | |
|---|---|---|---|
| conclusion 426:9 | consist 289:8 | 166:2,3 391:7 | conversations 4:8 |
| condition 164:25 | consistency 302:2 | continued 155:17 | 20:24 21:3 139:15 |
| 166:13 186:19 | 385:4 | 155:18 241:12 | 161:10,11,14,17 |
| conditions 12:8,13 | consistent 249:24 | 248:4 | 165:16 175:22 |
| conducted 67:24 | 272:11,16,24 | continues 152:23 | 191:19 192:2,14 |
| conference 12:24 | 273:9 301:18 | continuing 140:5 | 192:17,21 195:9 |
| 27:23,24 48:15 | 318:2 335:21 | 316:24 | 195:11 196:14 |
| 49:7 324:10 | 336:3 385:11 | contravention | 199:16 214:21 |
| conferences 47:25 | constant 269:22 | 336:4,8,16 | 215:12,15,19,23 |
| conferencing 49:5 | consult 16:3 297:5 | contributor 160:7 | 216:2,5,8,10 |
| confident 11:24 | consulted 221:9 | contributors | 219:11 228:13 |
| 427:10 | 221:17,22,24 | 159:22 | 259:10 279:13 |
| confidential | 286:12 310:24 | control 423:10,16 | 300:8,14 304:5 |
| 416:19 | 311:10 | 423:20 | 320:5 372:15 |
| configuring | consulting 297:10 | conversation | 380:6,19 381:14 |
| 403:12 | consummate | 139:12 148:23 | 382:13,17,22,25 |
| confirm 60:4,17 | 222:2 | 175:19,23,25 | 383:3,8,10 399:11 |
| 227:23 416:9 | contacting 262:17 | 176:4,6 177:11,18 | 399:18,23 400:5,9 |
| confirming 279:5 | 263:7 | 177:19,22,24 | 400:13 |
| conflict 108:7 | contacts 260:25 | 178:2,8,11 179:8 | coo 241:21 280:10 |
| conjunction 39:10 | 262:18 263:8 | 192:25 193:9,12 | coordinated |
| 127:8 | contain 307:17 | 193:16,19,21 | 348:16 |
| connection 8:3,5 | 318:3 | 194:4,8,9,12,13 | copy 3:14,17 |
| 8:21,23 23:13 | contained 33:21 | 216:14,17,19,20 | 209:9,9,12,24 |
| 35:4 51:4 52:8,10 | 37:5 55:24 405:3 | 217:17 219:5,6,14 | 291:2 311:12 |
| 73:12 92:2 103:23 | 411:2 | 220:11 223:5,24 | 428:16 |
| 189:14 222:15 | contemporaneou... | 224:25 225:6,9 | copying 349:23 |
| 251:18 355:21 | 40:9 | 226:9 236:8,25 | 350:16 379:21 |
| consent 384:21 | contention 137:13 | 238:7,13,16,24 | corporate 142:16 |
| consequences | contents 224:24 | 239:18 241:18,20 | correct 7:3,4 |
| 106:17 | 225:5 238:13 | 243:9,23 244:19 | 19:12,16 22:11 |
| conservative | 256:19 260:21 | 247:8 254:8 256:3 | 24:19 31:9 35:6,9 |
| 361:2,5 | 261:7,21 | 256:20 259:2,13 | 36:20 43:3 52:8 |
| consider 102:9 | contest 260:17 | 259:18,21,24 | 66:25 71:16 83:6 |
| 218:3 | context 93:5,12 | 260:4,22 261:8,22 | 89:8,22 96:10 |
| consideration 91:9 | 190:24 230:10 | 281:17,21 282:18 | 99:8 105:7,9 |
| 201:22 299:14 | 240:3 309:16 | 282:20 287:14 | 107:25 112:17 |
| considered 103:4 | continue 4:11 | 296:3 319:17 | 123:8,10 132:11 |
| 103:22 | 16:11 149:18 | 383:14 398:5,15 | 133:3,16,19 139:8 |
| considering | 150:9 151:3 162:9 | 398:19,25 399:8 | 139:17 140:6 |
| 259:20 260:3 | 164:4,15 165:18 | 401:19 414:7 | 144:8 149:20 |

150:20 152:18
153:5,6,7 161:2
162:23 163:3
169:23,25 180:14
181:21 183:7,11
186:9 194:19
196:20 204:12
207:12 215:10
224:22 241:24
242:6 243:17
244:22 245:9
246:12 249:6
250:15 254:2
261:18 264:16
265:15 269:15
270:19 292:24
293:21 295:8
300:6 311:15
312:3,16 328:2
338:16 365:6
372:18 373:7
379:22 402:3,5
429:9
**correctly** 135:7
142:6,10 224:6
229:9 303:2 392:2
**correspondence**
32:4 296:25 370:2
371:8
**cost** 234:9
**counsel** 3:6,17
4:16 5:9 17:23
19:20 20:9 29:25
30:14,24 34:13
45:18,20,23,25
47:3 48:2,9 61:24
62:4 84:4 127:6
129:12 136:12,13
138:3 174:23
175:3,4,6,10,11
181:14,23,24

182:4,22 183:2,15
188:13,13 209:20
214:9 219:19
220:7,14 223:15
224:8 247:10
250:8,11,13,19,23
251:24 252:21
258:5 286:12,16
286:18,25 287:3
287:15 296:3,9,12
297:11,18 298:15
302:6 357:18
413:5,5,10 414:12
414:18,19,23
415:22,24 416:4
422:8,16 423:7,12
423:22,23
**counsel's** 188:12
**counselor** 14:10
**count** 30:4
**counter** 90:10
92:16 98:16
113:21 115:20
157:22,22
**counterclaims**
28:18 59:17
**counterparties**
88:10 284:13
**counterparty**
88:11,12,21 92:12
93:7 94:17 95:6
99:6 109:22
**county** 432:5
**couple** 6:25 21:12
49:2 50:11 63:12
80:8 98:6 129:6
130:21 131:20
142:7 144:16
162:18 180:8
223:6 242:25
290:18 369:4

**course** 211:9
253:24 424:20,20
**court** 1:2,18 3:13
4:20 5:2 6:10 9:11
9:12,14,14 10:24
12:15,19 13:4
75:2 77:19 102:22
117:4 132:14
138:4 154:21
183:8 218:21
240:20,23 386:5
416:8 418:14,18
419:8 428:15
**courtyard** 67:23
**cover** 23:25 24:5
245:8,21 246:5,10
247:2 248:10
292:15 390:17
425:10 426:14,22
**coverage** 150:19
151:4,12,18,23,25
153:23,24
**covered** 24:7,10
205:11 387:23
388:8 389:23
420:10 427:4
**covering** 24:18,21
25:15 26:3,8
60:15
**covid** 6:6 8:19
325:11 327:12,19
327:24 328:4
329:12 330:19,22
330:25
**coy** 22:6
**cozy** 6:5
**cre** 339:18
**created** 64:15,16
64:18,19,22 65:15
**creates** 118:15

**creation** 312:12
**credential** 341:22
**credentials** 324:5
339:19,22 340:15
341:13 401:25
402:9 403:9,17,22
404:6,10,12,19
**credit** 87:24 88:2
89:4 90:4,5,16,17
91:5,13,14,20,24
95:25 96:16,18
97:21 284:13
**credits** 94:22
**criteria** 329:24
**cross** 339:25
343:25
**cs** 84:23
**cumbersome** 34:6
**cumulatively**
48:20 210:21
211:8
**curiosity** 369:10
**curious** 370:13,22
370:25
**current** 314:20,25
317:2,10,15,25
318:3
**currently** 52:13
77:25 365:18
**curtailed** 162:17
**curtis** 46:3,11,12
46:18 47:4,8
**custody** 17:10
**cut** 30:20 252:13
**cv** 1:6 4:22 433:2
**cyrulnik** 2:4,6,16
2:17 5:16,17,18
6:17,19,21 12:2
13:10 14:5,24
15:3,10,18 16:12
17:12 56:16,21

57:8 59:4 74:23
75:9 124:6 128:21
129:18,24 130:10
130:14 132:24
137:24 139:25
145:17 154:21
162:4 167:15
174:10 185:9
188:21 190:16
194:10 200:13
201:3 203:11,14
204:21 205:2
210:8 214:11
216:23 219:3
226:19 237:22
239:10 240:20
245:14 252:12
254:13 255:20,25
258:11,16 265:8
267:10 270:24
274:3,15 275:6
298:4 303:17
313:12,18 314:3
316:9 321:15
326:8 330:15
362:14 363:18
368:13 371:18
372:13 377:6,13
377:20 382:3
383:22 386:2
387:6,10 388:19
389:24 391:10,14
405:9 408:10
410:14 412:8
416:11 417:22
418:14 419:12
420:14 421:25
424:9,12,14 427:6
427:16 431:5

**d**

**d** 3:2 429:2 431:2
**da** 2:18 20:17
45:20 46:4,24
47:18,22 50:9,22
50:24 52:6 76:24
161:19
**data** 36:5,17 38:24
42:12,17 316:3
**database** 36:14
373:10,14
**date** 1:11 29:18
39:14,17 40:19
56:24 123:24
129:22 145:7
158:17 167:11
177:2,25 182:3,11
203:4 217:19
237:7 251:4
266:20 276:20
279:15,16,16
280:2,5 290:8
300:16 399:10
433:3
**dated** 168:6 237:4
237:10 241:19
430:17
**dates** 71:6 180:11
222:7 343:12
**david** 2:18 50:13
50:16,17 68:17
289:19
**day** 66:24 75:6
83:21,21 85:15,15
171:9,12 323:12
388:12 399:9
406:11 412:3
420:3 429:19
432:20 433:22
**daylight** 4:4

**days** 3:16 53:2,18
132:9,20 134:11
**de** 253:14
**deal** 94:7,8,16
100:8,14 105:12
105:14 271:25
272:13 286:13
**dealing** 142:15
171:12 284:13
286:2
**deals** 101:13 114:3
**dean** 171:13
**death** 181:17
182:18
**debilitate** 193:5
**debilitating** 193:6
**dec** 275:17
**decade** 180:6,7
**deceitful** 119:25
370:8
**decide** 94:13
**decided** 69:4,9
206:14
**decides** 23:6 92:21
**deciding** 22:21
33:2 46:13 103:4
103:23
**decision** 23:2
33:12 70:22 82:22
83:25 84:2,9
86:11 90:21 345:5
345:11 382:14,25
383:12 385:8,17
385:18,20,24
391:17 400:15
**decisions** 79:20
80:2 81:17 82:17
84:11 86:2,3,4,15
209:21 348:18,22
349:3 359:20

**declined** 229:12
**dedamo** 66:10
**dedicated** 322:21
325:20
**deduction** 34:19
**defendant** 1:16
19:12
**defendants** 1:9 2:9
51:25
**defense** 23:14
**defer** 37:6
**deferred** 82:4
**define** 66:18
**defining** 119:4
**definition** 98:19
99:10 122:25
**definitive** 122:25
123:23 227:2,20
235:8 236:7,16,18
236:24 283:4
**definitively**
225:21 227:21,25
228:4 235:2,25
249:22 312:20
358:15
**delegated** 80:12
**deleted** 43:7,10
**deletion** 290:15
295:16 296:13
301:8
**dell** 378:5,17
379:5,9,19 380:25
381:11 382:7
384:18 391:18
392:4,7,23 393:6
394:10,12 396:4
396:10 399:15
400:2 401:22
403:2,23 404:13
407:16,20 408:12

**demagnify** 319:7
**demand** 234:2
**demands** 423:25
**demonstrates**
  317:8
**depart** 205:21
  215:8 220:19
  222:20
**departed** 223:2
**departing** 205:8
  206:24 227:12
  253:15
**department** 21:18
  22:4,10 38:5 42:6
  50:19 161:18
  210:3
**departure** 189:15
  199:13 202:7
  204:3 206:10
  210:19 213:13
  218:13 220:25
  221:2,5,10,15,18
  222:2,12,16 228:8
  228:15 234:17
  235:6 236:15
  238:20 251:18,25
  253:8 259:14
  304:6
**departures** 222:9
**depend** 32:17
  384:8
**depending** 88:15
  88:16 100:22
  193:3,4 307:5
  328:16 384:10
  385:15
**depends** 98:18
  99:10 101:7
**depiction** 290:3
**deploy** 32:9

**deposed** 21:7 53:8
  53:11,15,17,17,20
  53:23
**deposition** 1:15
  3:8,9,14 4:16,23
  7:13,20,23 8:16,22
  9:21,23 11:2,11
  13:12 15:2,23
  16:20,21 20:5,7,10
  20:13,16,18,23,25
  21:4 27:21 28:2
  30:2 34:14 37:15
  48:6,8 52:15,19,22
  52:25 54:11,13,15
  54:17,19 56:23
  58:2,14,15 61:20
  389:2,17 418:8
  420:13 425:6,7,12
  425:24 426:9
  427:20 428:4
  430:9 433:3
**depositions** 8:9,10
  10:3,3 52:12 53:3
  53:13 54:16,20,25
  55:4,8
**depository** 365:17
**describe** 13:16
  51:8 55:17 67:10
  87:10 100:13
  368:7,17 369:2,8
  381:13
**described** 27:17
  46:20,25 47:24
  98:21 99:25
  101:12 106:13
  108:11 111:18
  158:3 185:3
  329:12 331:5
  368:19 415:11
  418:11 419:17

**describes** 105:25
**describing** 164:24
  178:5
**description** 29:19
  235:15 430:7
**designate** 390:15
**designated** 62:7
  62:13,18 63:11,16
  85:4 424:23
**designation** 63:15
  318:6,8,12
**desire** 149:8
  182:20 184:3
  185:18 186:7
  187:24 206:17
**desk** 323:6 325:2,5
  325:6 327:13,19
  328:4 331:4
  338:10 344:14
**desktop** 342:17,22
  343:5 344:13
**despite** 316:24
**destroy** 380:2
**detail** 20:11
  161:10 292:10
**detailed** 29:16
  398:5
**details** 82:10
  276:7 326:16
  378:10,19
**determination**
  73:23 349:9
**determine** 37:7
  82:6 84:4 199:19
  231:4 277:17
  293:11 301:15
  302:7 333:11
  347:21 348:7
  349:19 356:12
  357:6 358:14
  360:24 363:21

**describes** 376:19 410:23
  411:6,21
**determined**
  104:21,22,23
  105:2 113:7
  359:16 422:10,12
**determines** 22:13
  348:8 349:21
  358:24
**determining** 86:10
  86:11 102:16
  264:24 329:8
  349:14
**detriment** 158:11
  158:12 336:13
  353:14,15,19
  417:11
**deutsche** 70:3,4,7
  70:9,17 71:12,22
  72:2,5,20 73:2,3
  73:11,17,21 74:12
**developed** 73:7
**deviated** 210:12
**devices** 18:12
  339:5
**devote** 162:11
**dies** 180:23
**differ** 49:12
**differed** 49:16
**difference** 107:11
  107:17 140:25
  296:19
**different** 74:7
  101:5,7 102:13
  109:3,18 128:3
  140:11 170:18
  172:8 190:24,25
  198:23,24 220:24
  223:17 230:15
  234:25 249:17
  341:25 362:2,23

363:4 369:16,17
402:15 420:19
425:6
**differently** 174:11
315:25
**difficult** 89:14
141:18 236:23
**diligence** 95:12
**diner** 148:7
**direct** 21:20 57:17
72:8 77:4 108:7
118:7 130:19
131:11 200:6,19
233:17 405:10
**directed** 17:14,16
378:15 379:18
403:22 404:13
**directing** 201:10
**direction** 394:8
**directive** 393:12
393:23 394:7,16
410:3
**directly** 61:19
72:4 112:25 113:5
139:5 399:3
**director** 76:8,9,22
76:23 81:12,14
82:14 295:19
305:8
**directors** 76:10,19
**disabled** 337:6
**disagree** 143:5
380:16 401:13
**disappear** 310:18
**disappointed**
277:12 301:3,6,12
315:14
**disappointing**
299:22
**disbursed** 100:8

**disbursements**
100:7 101:17
**disclaimers**
292:16 305:24
309:15
**disclose** 413:21
**disclosed** 398:6
**disclosing** 109:11
**discovery** 197:19
**discuss** 147:7
165:8 166:14
171:3 189:25
190:2 258:6
285:14 420:15
**discussed** 139:12
169:3 178:18
179:17 195:3,5
197:4 198:20
204:8 213:21
217:18 238:19
253:7 258:2 260:9
262:7,10,12 284:9
301:11 355:14
369:19 384:16
398:9 407:10
**discussing** 149:7
172:14,22 213:9
218:17 225:24
**discussion** 74:11
74:12 75:16 146:3
147:9 148:24
161:4 168:12,19
169:10,13 170:12
170:25 171:19
172:2 173:21
178:20 185:14,15
185:17 186:5
189:5 190:8 193:3
193:6 217:13
223:19 225:3
242:8 244:13

247:24 250:14,20
259:12 271:9
321:23 347:3
398:7,12 399:2
425:13
**discussions** 50:6
173:4,8,16,18,23
173:25 174:9,16
187:13 188:6
189:13,17,18,19
190:19,20 191:3,5
191:11,13,23
192:9 195:13,25
196:16 199:8,10
202:5 206:20,21
213:7,18 247:11
248:3 249:15,16
250:6 257:24
259:5 281:2,4
400:10,19
**disingenuous**
414:24
**dispensed** 101:16
**displayed** 204:16
**dispute** 125:12
147:23
**disputing** 125:10
413:18
**disseminated**
306:7 307:11
**distinct** 142:19
186:22
**distinction** 142:8
191:10,11 230:7
245:3
**distinguish** 190:23
**distinguished**
127:4
**distinguishing**
190:18 233:9

**distributing**
350:17
**distribution** 301:3
**district** 1:2,2 4:20
4:21
**divorce** 141:25
**dm** 146:17,23
**docs** 105:12
**document** 35:6,8
35:11 37:4,8
57:10,11,19,21
58:4,5,8 59:22
60:7 61:13 62:2
63:8 82:9 100:23
101:2 130:8,18
131:2,14,15,22
132:2 144:4
145:14,19,21
146:11,21 147:2
147:17,19 167:12
167:21 168:2,21
169:24 170:9,21
171:20 172:15
173:12 175:17
176:17 203:5,19
204:16,20,22,22
209:13 227:22
228:3 237:15,25
238:3,21 239:4,16
239:23 243:6,16
245:12,23 247:22
249:7 255:19,21
256:25 257:8
260:7,19 261:5
275:15,23 276:9
276:15 278:7
283:2 284:21
288:3,7,10,12,21
289:2,22 290:6,17
290:21 291:6,11
292:6,25 293:6,16

294:5 303:14
304:16,18 305:19
306:15,17,25
308:15,19,24,25
309:3,4,9 310:4,12
312:20,22,25
313:8 314:9,22
316:13,17,21
318:9,25 319:22
320:3,7 335:14
351:4,6 358:16
360:24 363:25
404:11 410:3
**documentation**
28:4 311:24
318:16 347:7
350:17 407:11
**documenting** 86:3
**documents** 13:24
14:3,7,12,18 15:13
15:16 17:9,22
28:9,11,12 29:24
30:7 32:24 36:7
36:17,23 37:13,18
37:22 48:5 51:3,7
51:9,11,19,24
57:23 61:21 62:7
62:21,23,25 63:10
63:14 84:22 86:2
92:4,8,12,13
100:22 105:14
119:24 137:22
143:12 252:18
254:22 308:16
310:5 313:6 347:9
352:17,21,21
357:11 360:15,23
361:23 376:18
379:5,9 383:13
392:6 407:15,19
408:4,14,16,21,24

409:8,9,17,18,23
410:4,12 431:7,8
**doe** 95:2,5
**doing** 30:17 32:9
49:23 74:8 87:3
120:5 129:19
135:10 149:25
156:3,18 268:6
285:11 345:22
346:3 348:6,10,12
351:10 353:13,15
353:17 364:9
367:24 370:20
389:11 417:10
425:9
**dollars** 101:15
**double** 190:5
**doubt** 125:4,16
126:7,11 140:2
145:24 147:12
170:2 239:2,6
291:24 315:5,8
**doug** 65:23 66:21
67:2,6,22 68:9,15
69:4,9,12,21,24
70:18,19,19,24
71:10,14 72:5,7,14
72:17,17,19 73:18
74:8 121:14 146:5
146:23 168:5,16
199:10 203:2,18
237:12 243:15
385:4,12 430:16
**douglas** 64:2
243:18
**download** 379:20
382:15 384:18
391:19 393:12,13
394:10,12 402:7
403:23 405:11,22

**downloaded** 380:15
401:20 406:25
407:4,8 408:16
**downloading** 390:3,10
391:24 396:3,10
396:19 406:4
**dozen** 424:25
**draft** 136:18
181:24 183:3,15
293:24 308:15,15
308:18,23 310:4,4
313:6 397:18
**drafted** 179:24
353:23
**drafts** 293:24
294:9,10 397:15
**draw** 127:2
**drawer** 344:14
**drawing** 245:2
**drew** 142:7
**drill** 150:15
**drive** 307:5,13
408:17
**drives** 307:5,8
337:5
**dropped** 155:4
**due** 164:7 180:2
349:8
**duly** 6:13 429:5
432:11
**dumain** 2:16
**dunschee** 76:24
**duration** 78:13,14
78:16,17,18,19
82:18 83:8,9,11,12
85:9,12 86:18,18
86:20 87:3,8,13,17
87:24 92:5,10,20
108:25 109:16,16
110:3,9,14,15,19
110:23,25 111:8

111:13,20,25
112:2,3,10,16,19
112:22,25 113:5
113:10,16,18,25
114:6,19 115:3,11
115:22 116:20,21
116:23,25 117:9
117:11,16,16,22
118:5,24 119:2,3
119:13 124:15,16
125:2,3 126:23,24
207:2
**duties** 79:18 83:20
119:12,17 120:13
120:15,23 121:6,9
121:13,17 122:5,9
122:20 154:14
**duty** 119:9,22
120:8,17,19
121:20 122:14,24
123:2,3
**dvd** 337:4,5

**e**

**e** 2:2,2 3:2,2 29:3,5
29:6,8,10,12,17,21
30:13,15,16,18,23
30:25 31:2,25
32:4,8,21,23,24
33:5,9,14,15,16,20
33:22 34:4,10,14
34:24 37:3,5,14,23
37:25 41:2,12,14
41:17,19 42:2,3,12
42:17,22 43:5,6,10
43:15,25 44:8,17
44:23 167:8,22
168:3,4,16,23
169:9,22 170:4,11
170:14,19,22
171:16 172:5
173:6,20,23

175:21 184:13,25
185:5 195:21,25
196:11,22,24
197:9,12,23 237:4
237:10 238:23,25
240:2 241:19
243:7,18 244:3
247:7 249:2
250:15 254:9,11
260:10,24 261:12
261:14,20,21
262:19,24 263:3,9
275:8 276:4,14,17
276:20 299:16,22
299:23 300:6,12
300:20 301:4
314:19 315:11,23
341:10,11 342:14
342:18,20 343:2,6
343:13 347:6,7
354:8,9,14,23
355:3,18 365:6,10
365:12,13,16,17
365:25 366:10,15
366:16,16,24
367:3,15,21 368:3
368:10,20 369:20
369:21,25 370:2,4
370:10 371:8,11
372:17,20,21,24
372:25 373:10,11
373:13,16,20,21
373:24 374:2,3,4,8
374:11,15,25
375:6,7,16,24
376:17 396:7,8,9
396:15,16,20
397:5,18,21,24
405:11,12,13
406:5,20,23 407:2
407:3,4 412:10,16

415:7 416:22,23
422:11,14,15
429:2 430:2,13,17
431:2 432:2,2
**earl**  425:16
**earlier**  26:16 58:9
  58:13 71:25 72:21
  82:19 106:13
  109:20 112:2
  113:20 157:17
  168:18,25 176:25
  194:5 197:13
  217:18 249:25
  284:9 293:11
  347:4 369:19
  379:12 414:6
**early**  53:10 66:5
  162:17 244:6
**ease**  62:12 88:22
**easier**  95:3
**eastern**  4:4
**easy**  56:13
**eat**  240:6
**effect**  3:12,15 12:9
  12:12,14 13:9
  133:2,15 135:17
  228:7
**effected**  136:20
**efficient**  32:8,16
  34:3 334:8 360:5
**efficiently**  122:17
**effort**  72:17
  407:10
**efforts**  273:23
**either**  29:18 40:8
  49:2,7,7 72:10
  74:2 99:17 107:18
  118:8 126:19,23
  127:11,14 129:7
  151:15 167:16
  180:20 191:24

192:17 194:14
  195:2,5 196:13,17
  197:3 228:9 233:7
  378:15 389:11
**elaborate**  33:10
**electronic**  18:11
**eligible**  88:8 89:3
  90:3 373:23
**eliminate**  73:24
**eliminated**  70:6
**eliminating**  73:25
**elimination**
  183:13
**else's**  319:19
**employ**  25:9 161:6
  162:9 245:9 247:3
  248:11
**employed**  67:14
  95:6,9 97:18,21
  109:18 153:16
  245:22 246:12
  249:20 276:19
  334:24
**employee**  14:21
  17:25 24:11,15,23
  25:4,10,14 26:5,7
  26:14,22,25 27:12
  29:2 52:3 80:17
  80:23 113:9,11
  141:12 149:3,22
  150:3,12,17,18,22
  151:3,11,19,21
  152:2,4,9,10,14
  153:2 154:7,12,16
  156:13 166:5
  218:4,10 223:11
  224:3,13,21
  225:10 226:2,3
  239:13 240:8
  241:6,9,23 242:10
  242:12 243:3

244:10,21 247:25
  254:16 255:17
  256:13 274:7
  279:20 281:8
  290:9,25 291:10
  294:12 297:13
  307:6,7 314:12
  317:2,5,7,8,10
  322:12 323:7
  333:19,25 352:2,4
  352:19 353:22
  355:15,17,18
  362:6 363:12
  364:2,12 367:20
  369:11 370:23
  373:6 399:21
  404:22 413:20
**employee's**  152:17
  330:18 335:22
  345:13 362:9
  363:15 368:20
  370:10 402:8
**employees**  41:11
  55:23,24 93:21,25
  94:2 108:5,16,19
  110:3 113:24
  114:8,11,14 115:9
  115:18 116:16
  143:7 160:19
  227:12,15 266:18
  267:14 270:10,13
  279:10,17 280:3,7
  280:9,20,21
  307:18 314:21,25
  316:18 317:22,25
  318:4 322:22
  330:16,22,25
  331:6,21 334:4,17
  334:23 349:12
  350:7,14,20,23,24
  351:3,8,12 352:6

354:13,23 355:2
355:11 356:10
361:15 367:13
369:23,25 370:5
371:10 372:16
373:4,15 379:13
381:3 399:22
400:6,23 401:5,23
401:25 402:19
405:2
**employer**  109:21
141:6
**employing**  158:21
**employment**
142:18 152:17
180:22 215:6
277:9 414:4
**employs**  142:23
**en**  175:3
**enabled**  334:20
**enables**  77:17,22
373:12,12
**encompass**  143:20
143:25
**endeavor**  273:25
349:25 425:5
**ended**  70:5,6
113:12 241:11,15
**ends**  7:14 123:4
234:10 271:7
356:9 388:22,23
**engage**  89:5
103:24 171:10
175:3 415:6
**engaged**  40:17
175:5,10,11 183:2
183:15 233:2
251:3,5,13,17,24
373:5
**engaging**  115:19
158:2 385:10

**engineer**  56:13
**enlisted**  175:6
**enlisting**  404:9
**ensure**  218:6,6
285:23 307:16
385:3,10 391:23
**enter**  92:17,22
101:12 114:14
208:15
**entered**  92:8,9
116:13 208:18
226:13,23 227:18
**entering**  46:25
**enters**  92:11,12
104:12
**entire**  126:4 240:2
365:6
**entirely**  141:12
**entities**  8:12 21:10
23:12,17 24:12,13
24:14,15,22 26:2
26:13,14 31:22
35:5 41:4 43:22
44:9 55:21 66:12
66:24 75:24,25
76:7 78:5,7 79:5
81:13 82:24 83:4
86:24 92:19 93:20
94:4 96:4,24
97:19 112:17
113:12 114:21
117:15,20 118:15
127:7,11,15,17,23
141:14 142:16
144:22,23,25
166:5 181:6,9
190:24 205:23
207:5
**entitled**  154:8
199:20 200:8,23
201:15 205:8

206:25 214:18
392:25 393:7,7,8
394:3 398:11
401:4 404:25
**entity**  8:6 21:14
22:13,14,18,21
23:7,18,20,24 24:8
24:21 25:3,4,7,9
25:12,14,15 26:4,6
26:15,17,21 27:2,3
27:11,16,17 40:10
55:14,16,22 64:14
64:16,18,25 65:2,5
65:7,14,18 69:17
70:3,5 73:6,7,8
74:18,21 77:9,11
77:12,13,16 83:5
86:12 89:9 90:11
92:21,25 93:2
94:14,18 95:9,10
95:20 96:8 97:2,6
97:13,17,23
109:19,19,21
110:7,8 112:11
113:7 114:5,8,10
114:11,16 115:4,8
115:16,24 116:5,7
116:7,13 118:25
119:5,7,14 128:19
208:21,22 285:18
**entity's**  65:25
**entry**  145:5
430:11
**environment**
13:13 228:16
**equipment**  373:25
374:3
**err**  360:6
**errata**  433:1
**erroneous**  294:18

**error**  311:15
**especially**  109:10
172:7 244:5
335:25
**esq**  2:6,7,11,16,19
2:19,20
**essence**  94:22
**essentially**  68:23
73:24 240:5
342:15
**established**  134:17
**estimate**  30:11,12
39:20,25 210:17
**et**  1:8,16 2:10 4:19
**ethical**  119:23
**evaluate**  392:24
**events**  51:4 187:17
187:19 283:13
**everybody**  13:22
49:19 68:24
**evidence**  415:9
**exactly**  45:2 49:15
71:6 281:7 294:7
309:8 346:2 353:8
376:17 378:10
**examination**  6:18
428:20 431:4
432:10,12
**examined**  6:15
**example**  26:22
33:19 43:17 44:21
71:24 94:23 95:5
101:11 105:16
143:15 235:23
245:7 299:16
309:24 337:9
341:10,20 352:8
397:11
**excel**  315:21
**exception**  20:8
372:23

exceptions   60:20
  268:21
excessive   211:15
exchange   106:22
  107:5 256:17
  397:21 418:16
exchanges   196:6
  372:16
exclude   174:14
excluding   62:9
  99:24 173:23
  174:8 267:11
exclusively   37:18
  96:3 97:16
excuse   78:15
  125:25 162:16
  374:21 397:13
execute   132:25
  133:14 136:17
  393:25
executed   92:4
  127:13 135:17
  136:3,5
executing   128:9
  133:25 134:20
  135:21
executive   267:13
executives   93:21
  277:10 286:20
  307:16 322:23
  331:18,21
exercised   366:21
  366:23
exhaustive   34:7
exhibit   7:6,11
  56:12,15,17,23
  57:5 129:3,9,21,25
  130:5 145:3,3,6
  167:6,6,10,13,15
  167:17 185:2,13
  202:23,24 203:3

203:20 204:17
216:24 237:6,8,9
237:23,24 247:21
274:20 287:16,21
303:16,19 311:3
312:6,10,12
313:20,22 314:2
315:19 316:2,11
317:24 333:25
430:6,6,8,10,11,13
430:15,17
exhibits   7:16
  18:17 57:3 129:6
  430:4,19
exist   180:25
  209:25 374:23
existed   306:15
  407:16
existence   118:14
existing   98:14,15
  98:24
exists   64:5,8
  209:13,15,16,19
  227:24 228:5
exiting   183:20
expanded   148:23
expanding   230:15
expect   283:12,20
  294:25 295:2
  422:24
expectation
  283:17 286:5,9
  350:9,15 351:12
  351:19 356:11
  361:16 367:13
  379:15 381:4
  393:20 395:20
  396:3 405:4
  412:23
expectations
  246:22 352:7,8

388:24
expected   33:24
  247:14 297:8
  301:13 302:4
expecting   244:24
  245:4,5,7,21 246:4
  246:10,18 247:2
  248:10 249:5
  250:4 383:16
expense   26:16,18
  153:24
expenses   234:8
expert   44:5,25
  45:8,12 46:5,19
expertise   45:18
  46:11
expires   433:25
explain   98:7
  103:17 140:24
  230:6 266:24
  421:8
explained   98:5
  221:12
explaining   99:13
explanations
  292:9
express   184:7
  228:6 235:3
  401:14 406:17
expressed   140:21
  184:3 185:18
  260:25 267:2
  385:12 400:21
extend   90:7,21
  109:22 112:4
  113:2 121:22,24
  241:12
extended   33:18
  94:19 111:19
  112:12 113:4,6,18

extending   104:16
extends   111:25
  112:23 405:7
extent   37:3 79:24
  209:13 297:2
  336:11 347:18
  353:10 357:4
  358:11 359:11,12
external   296:25
extremely   202:14
eyes   324:4

**f**

f   3:2 276:2 432:2
face   161:6
facilitating   403:11
  403:19
fact   31:20 84:10
  84:15 88:13 90:3
  90:15,20 91:2,3,11
  91:13,19 109:9
  125:13 127:12
  141:25 144:9,21
  148:20,25 150:17
  154:13 156:14
  158:23 159:10
  162:10 168:17
  169:12 172:2
  181:7 194:25
  202:12 203:23
  206:23 207:15
  223:10,25 225:25
  226:2 232:19
  238:15 255:15
  272:19 281:7
  312:24 319:25
  320:9 352:12
  374:18 422:25
factfinding   415:20
factor   102:16,21
  103:3,22 104:4,10

factory 88:17
facts 298:13,16
  299:8 302:5
failed 413:21
failing 218:3
fair 28:23 34:18
  34:18,22 37:20
  38:23 44:23 65:9
  84:13 88:12 89:17
  89:17,18 93:23
  120:11 136:22,23
  159:2,20 162:3,6
  178:4 181:10
  183:22 187:11
  198:3 207:8
  221:11,23 232:5
  235:15 237:3
  244:8,8,8,25
  256:16 261:24
  262:5,15 301:21
  307:20 311:11
  334:7,9 340:3
  376:3 385:13
  390:22,23
false 273:19
  310:25
familiar 55:13,15
  77:8,10
family's 361:8
far 34:17 400:8
fast 391:9
fastest 343:11
fattaruso 2:4,16
  2:16,17 5:18
fax 275:18
features 328:21
  329:2,8
february 121:16
  121:18 181:25
  191:9,15,19,21
  203:16,23 213:2

217:14 226:10
237:11 238:17
241:19 250:14
263:20 264:16
federal 1:19 9:13
  88:8
fee 109:5
feel 29:14 277:6
  288:12 389:7
feeling 171:6
  329:23
fees 19:24 20:3
  21:11,15 22:13,22
  23:13,17 24:2,5,7
  24:10,18 25:16
  26:3,8 27:4,13
  108:20
fellow 68:17
felt 361:18 423:24
fewer 72:13 349:4
  349:5,6 426:5
fiduciaries 121:21
fiduciary 119:9,12
  119:17,22 120:7
  120:13,15,17,19
  120:23 121:6,9,13
  121:17,19 122:5,9
  122:13,20,24
  123:2,3
fifteen 328:7 372:4
  389:3
fifth 2:10 261:3
figure 7:17 252:18
  364:20 391:5
file 319:16,16,18
  347:22,22,23
  349:22,23 355:19
  356:8,16,23 357:2
  358:11,16,23,24
  358:25 359:13
  362:7 363:12

364:12 374:22
375:17 376:9,10
396:25 397:3
410:24 411:9
filed 4:19
files 31:4,24 35:19
  41:10,13,14
  323:20 347:16,18
  347:19 348:3,14
  349:10,15,16
  350:3 355:5,20
  357:21,23 358:8
  361:7,13,18
  369:23 378:11,16
  378:19,21,24
  379:20,21 380:8
  383:17 392:24
  393:3,5,21 395:19
  395:21,23 396:2
  411:5,21
filing 3:7
filings 28:16
fill 394:15
filled 47:17
final 167:23 309:4
  380:21 383:12
  385:2,17
finally 11:9
finance 21:18 22:3
  22:9 105:7,21
financer 92:14
financial 67:23
  106:17
financially 5:7
financing 87:25
  88:3,9,14 89:10,21
  89:25 90:6,18,21
  91:16 92:3 94:10
  94:18 95:7,25
  96:16,19 100:6
  101:14,20 104:15

105:11 106:3,7
108:12 109:22
111:19 112:23
113:2 232:19,22
find 30:16 42:22
  98:11 236:23
  314:20 369:18
  370:13 375:24
  376:16 388:21
  414:5 426:21
  427:9,11,14
finder's 108:20
finders 109:5
finding 96:20
finds 93:15,16
  94:8 95:10
fine 22:7 75:3,7
  99:16,18 124:2
  126:15 270:3
  319:7 334:8
  353:20 378:7
finger 129:12
finish 11:12 15:9
  360:2 386:3 388:2
  389:13,14,15
  390:14 415:15,16
  416:11 419:13
  421:12 425:22
finished 164:14
finite 101:15
  152:16,20,20
firing 259:20
  260:3
firm 5:4 19:15,21
  155:20 334:19
  340:23
firms 19:17
first 6:13 7:11
  57:18 63:12 64:25
  65:7,10,11,14 67:6
  67:8 69:18 73:8

74:18 123:17
124:23 162:22
167:14,16 181:23
183:3 184:7
185:17,22 199:21
213:20 304:8
349:22 350:5
402:18 417:13
419:14 421:17
422:23 424:16
429:5
**fit** 319:3
**five** 30:6 48:4
51:16 100:24
106:23 207:3,5,9
207:11 211:9
219:12 226:14,24
227:18 235:9,19
235:23 236:9,25
257:3 263:17
324:19 326:25
327:3 372:7
390:10 398:21
**fix** 295:4 377:3
**fixed** 295:6
**flag** 12:5 340:7
**flagging** 340:9
**fleischner** 280:13
280:16,19,22,24
281:4,12,17 282:3
282:5,9,14 300:8
300:14 320:10,13
320:21 321:4
**flexibility** 87:14
**flexible** 159:22
**flip** 123:16
**floor** 2:5
**flopped** 123:16
**flow** 230:5
**flying** 165:19

**focus** 28:9 85:14
86:17 101:23
122:15 187:5
353:12 362:20
409:6
**focused** 85:16
101:23 230:19
379:10
**focusing** 120:24
241:16
**focussed** 230:5
**focussing** 29:12
246:19
**folder** 57:3 167:7
202:23 308:19
369:24 411:7,9
**folders** 407:25
409:6,7 410:23
411:5
**folks** 345:22 346:3
346:6
**follow** 98:15 99:14
100:4,10,16,24
101:6 106:14
107:2,13 111:5
119:24,24 128:5
147:20 164:21
168:11 170:12,24
190:4 238:4
253:25 281:25
318:24 360:19
417:22 419:15
**followed** 122:10
128:13,16 130:24
**following** 152:16
164:22 167:9
430:13
**follows** 6:15
143:10,11
**foot** 15:20

**forbid** 180:23
181:17
**force** 3:15
**foregoing** 429:8
**forget** 22:7
**forgive** 395:4
**form** 3:21 15:7,25
17:3 25:18 26:11
27:5 32:14 34:21
40:13 103:8
135:12 136:7
214:5 215:17
253:8 292:20
306:3 309:4 316:3
322:15 418:13
423:4
**formal** 78:3,7
136:17 292:14
**formally** 126:22
127:3,10 134:24
135:8,23
**formation** 66:2
**formed** 65:2 74:17
**former** 274:7
**forming** 73:12
**forms** 43:16
174:12,21
**formula** 106:10
201:24
**formulate** 417:13
418:11 419:16
**formulated** 421:18
421:20 422:23
**forth** 51:24 79:19
128:18 401:18
432:11
**forthcoming** 90:5
**forty** 372:7
**forward** 17:15
192:10 249:14
250:7,11

**forwarded** 415:21
416:22,25
**forwarding** 417:2
422:14
**fouir** 339:4
**found** 33:21 36:19
37:18 131:14
**foundation** 296:17
407:6 409:15
**four** 48:15 49:3
51:15 101:4
159:16 160:22
291:14,17,23
338:19 417:16
421:11
**fourth** 100:10,14
261:2 424:7
**franchise** 65:15
66:16
**frankly** 308:21
345:21 346:14
**frayed** 416:20
**free** 29:14 42:7
374:8
**frequency** 368:8
368:16,17
**frequent** 41:9
**frequently** 339:13
368:25 369:2
**friend** 171:13
**friendly** 259:13
**front** 14:15 18:11
18:14,21 145:19
168:4 227:23
228:3 270:4
**fruition** 202:17
**fueled** 223:10
**fulfill** 80:7
**fulfilled** 47:21
**full** 102:7 125:22
156:24 157:3,6,12

157:20 158:25
159:6,10,15 160:2
160:9,12,24
162:12 365:11,15
366:14 378:9,18
**fully** 11:18 161:6
**function** 84:16
290:10
**functional** 288:16
310:9
**functionality**
327:14
**functionally** 82:15
82:21
**functioning**
152:10
**functions** 172:19
341:8
**fund** 78:13,14,17
78:17,18,19 79:21
81:7 82:18 83:8,9
83:11,12,24 85:9
85:17 86:18,21
87:3,8,13,17,24
92:6,10,20 94:18
102:5 108:25
109:16,17 110:3,9
110:14,15,19,23
110:25 111:9,13
111:20,25 112:2,3
112:10,16,19,22
112:25 113:5,10
113:16,19,25
114:6,19 115:3,11
115:22 116:23
117:23 118:2,6,11
118:11,17,20,24
119:3 123:8,18
**funded** 96:25 97:2
97:6,8,9,13

**funding** 100:15
112:5,12 113:4
117:3,5,6
**funds** 8:25 77:15
77:24 78:3,21,25
78:25 79:3,9,12
80:8 81:18 82:24
84:12 86:22 87:4
89:21 92:25 95:13
95:15 113:17
117:22 338:8
**furnished** 30:24
**further** 3:20 18:18
134:6 166:19
218:25 429:8
432:14
**furthermore**
350:13
**future** 34:3 359:11
361:22
**fyi** 276:4

**g**

**g** 32:12 354:9
375:15 376:13
**gap** 222:6
**general** 29:19
83:16,24 85:11
86:6 107:4 115:17
116:21 117:2
118:3,19,24 119:6
138:24 139:2
147:4 165:18
189:16 220:7
231:12 238:15,16
256:16 258:3,3
395:16 398:7
399:22
**generally** 11:12
130:15,17 228:11
258:5 268:23
272:2 312:10

338:13 382:16
**generate** 11:2
**generated** 355:21
**generates** 355:4
**gentleman** 73:21
**genuinely** 103:18
**geographic** 96:5
**george** 2:7
**getting** 6:6 17:7
70:5 95:13,14
97:9 107:2 108:2
108:2,24 202:14
208:13 254:13
273:14 297:18
317:9,12 329:24
422:4
**give** 16:13 35:16
35:18 48:25 56:11
75:2 78:6 105:16
105:22 138:2
176:12 210:16
372:7 373:2 386:6
388:14
**given** 10:2 31:20
35:25 47:10 88:7
88:13 97:17 109:8
147:20 149:10
150:5 164:6
177:24 235:11,11
272:8 292:20
296:5 298:13,15
302:4 304:4
305:13 332:8
334:17 428:7
429:10 432:13
**gives** 118:10
**giving** 52:13
134:25 179:2
**glad** 7:18 96:12
128:5

**global** 31:15,16,17
32:2,10,21 33:4
34:5 35:2,10,14,17
36:3,13,19,25
37:19 38:6,10,15
38:23 39:6,8,16
40:7,17 41:8,22
43:11,14,19,24
347:5 365:16,21
366:2 367:3,21
368:2 370:11
372:12,12,14,20
372:25 373:9
396:12,17 397:6
397:10,15,20,25
412:17,21 413:2
415:8,21
**gmail.com** 375:5
**go** 4:12 9:24,25
10:17 33:2 41:13
48:12 59:8 70:8
75:9 84:18 97:12
98:11 99:16
103:17 114:12
122:16 130:3,10
141:24 188:22
193:4 197:20
209:24 217:2
218:25 223:4
231:2 252:17,17
271:4 277:17
301:14 309:4
313:17,19 318:19
321:15 323:9
324:7 333:24
343:4 349:14
363:22 364:19
367:11 375:4,5
376:11 386:8
387:11,19 390:3
391:4,8,11 393:24

395:18 397:22
405:21,21 411:10
420:5
**goal** 293:17
388:25
**god** 180:22 181:17
**goes** 33:17 34:17
293:4 404:21
**going** 4:3 17:15
34:5 48:24 51:24
57:14 71:20 74:24
86:10 104:16
128:20 137:25
155:6 165:23
171:10 175:13,15
183:20 192:12
202:4 241:22
243:21 260:17
261:13 266:10
270:25 294:3
296:6 297:16
299:9 305:21
306:2 315:21
316:2 340:12
355:22 360:6
371:17,22,24
372:6 377:21
382:4 386:10
389:9 391:4
393:20 395:21
411:8 415:12
419:9 420:18
421:23 426:21
**gonna** 15:8,11,21
53:17 93:14 97:12
101:16 123:7
127:17 128:21
129:4,7,9 158:16
166:3 167:22
192:11

**good** 4:2 5:16 6:20
53:2 56:12 74:25
387:6,15 427:16
**gotta** 180:4
**gotten** 19:19 43:7
**government** 90:11
**gp** 83:5 256:24
**granting** 35:22
**grasp** 378:9
**great** 55:12 57:8
120:6 121:15
145:17 203:14
275:6 317:6
424:10
**greater** 332:4
**grenfell** 70:4
**gritty** 82:9 378:18
**grocery** 364:24
**ground** 9:25
**grounds** 428:4
**group** 37:7 49:11
62:23,23 68:13
73:17,19 284:18
307:6
**groups** 80:14
**guess** 31:18 40:4
54:21 93:18 101:8
108:4 155:15
156:19 157:16
160:15 175:5
197:11 200:2
211:3 229:2
231:21 277:6
296:8 315:14
320:8 347:13
356:19 371:4
383:12 384:14
385:15 414:5
418:24
**guessing** 170:17

**guidelines** 335:22
**guy** 270:11 323:14
323:24 374:20
375:12 378:13

**h**

**h** 6:12 274:3 430:2
**ha** 220:23
**half** 8:20 235:9,20
235:23 236:9,25
244:18 246:20
257:3 263:17
415:13 416:9
419:14,24 420:6
**hand** 83:15 300:2
426:23 432:20
**handbook** 14:21
17:25 29:2 52:3
352:3,4 355:15,17
367:12 398:10
404:22
**handled** 227:6
**happen** 99:14
186:22,24 204:9
235:14 265:3,14
299:14 324:4
**happened** 204:7
215:15,23 216:2,3
216:11,14 221:14
225:21 235:9,19
235:22 236:8
250:9 261:23
266:2 272:6 273:8
297:24 301:19
319:21 330:8,11
344:20,23 345:3
381:15
**happening** 215:20
241:11,15 250:6
380:20
**happens** 112:14
121:25 255:2

375:13,14,17
376:6,12,17
378:10
**happier** 202:15
**happily** 247:14
**happy** 103:12
107:17 197:19
199:6 202:17
247:17 252:17
364:19 365:2
377:9 386:6
389:15 390:4
417:17 420:15,20
426:7 427:21
**hard** 163:11
318:24
**harris** 68:17 314:8
314:11 319:9,17
319:24 320:7,12
320:23,25 321:3
321:10
**hat** 94:13
**he'll** 165:25
**head** 11:6 30:5
68:22 73:19 77:2
422:5
**headed** 68:13,15
68:18 284:18
**health** 146:3 147:8
148:3,25 149:4,9
149:16,24 150:5
150:19,23,25
151:18,23,25
152:14 153:11,18
153:23 162:2,7
180:2
**hear** 10:4 12:16,21
77:20 97:5 117:5
218:22 320:15
321:4 362:13
387:8 392:2 395:5

**heard** 135:6 179:2 229:17 320:12,13 320:21,25 337:8 337:10

**hearing** 12:2,18 394:22

**heart** 160:15

**held** 1:20 4:23 75:16 189:5 190:8 271:9 321:23

**help** 83:2,7,12 86:13,14 128:23 180:4 239:13,22 241:6,23 244:11 246:3 249:21 250:4 297:17

**helpful** 8:2 34:8 51:17 63:6 112:6

**helping** 240:9

**hereinbefore** 429:11 432:11

**hereunto** 432:19

**hey** 215:5

**high** 48:22 331:18 331:18

**highest** 402:25

**highlighted** 172:7 379:6

**highlighting** 144:21

**highly** 35:25 36:4 228:17 235:11,13 291:24 292:17

**hikes** 158:6

**hired** 68:5,7 70:2 70:17

**hiring** 70:20,22

**historically** 341:3 342:12

**hit** 203:9

**hitting** 359:15

**hold** 77:3,6 117:14 216:24 218:20 286:23 383:24 428:3

**holdings** 1:8,16 2:10 4:18 55:14 55:16,18,20,25 63:21,24 76:2,4,6 76:20,21 77:5,7 80:18,23 81:2 92:19 93:25 94:2 108:15 110:2,10 110:12,18,24 111:8,11,16 117:10,16 118:8 124:16 125:3 126:19,24 128:8 142:18 143:21,22 144:2,3,5,10 154:7 154:12 155:18 207:11 244:15 255:17 258:20 314:13 414:3 433:2

**holds** 87:17

**home** 275:11 325:9,13,17 327:16 328:9,14 330:18 331:2,8,14 331:24 332:14,18 332:22 333:18 334:20 335:6 336:22 337:15,16 338:6 339:16 342:23,24 343:17 345:15 349:12 353:24 362:9 363:15 376:23 378:2 400:3,24

**homes** 399:22 400:7 401:5,23

**honest** 119:24

**hooked** 323:2 337:17

**hope** 351:16,18

**hoped** 202:12

**hopefully** 7:14

**hour** 48:18 389:3 415:14 416:10 419:24 420:6

**hours** 30:6,6 48:4 48:19,21,25 49:2 161:7 334:19,21 372:5,7 388:13

**house** 46:7 326:18 327:10,18 338:18 338:25 344:8

**housed** 349:11

**household** 338:21 339:6,8

**hr** 161:18 210:3 227:6

**hum** 71:23 213:15

**hundred** 262:6,9 310:5

**hunt** 68:12,12

**hypothetical** 137:4,6,9 225:17 296:16

**i**

**i9** 318:15

**iacovacci** 1:3 2:5 4:18 6:23 120:8 120:15,18 121:3,6 121:18 122:6,21 123:6,11 124:9 125:16 126:8,18 126:22 128:7 132:7 134:18,24 135:23 136:3

137:6,12,13,18 138:21 139:4,15 140:4,16 146:2 147:5,13 152:25 154:3,6,11,13 155:19 156:2,7 157:25 158:21,24 159:4 160:10 161:24 163:24 164:4 165:7 168:5 168:17 169:4,8,13 171:3,18 172:13 173:8 174:25 175:8,16 179:9 180:19 181:18 182:17 183:5,17 185:18,22 186:14 186:17 187:13 188:16 189:13,20 189:25 190:21 191:4,6,14 192:3 192:14 193:2,2,23 195:14,22 196:4 196:12,25 197:7 197:10,25 198:19 199:4,13,20 200:7 200:22 201:14 202:2,6 203:17 205:7 213:3,11,19 213:22 214:16,22 217:13,18,21 218:3,9,19 219:7 219:15,17 220:9 220:11 222:24 223:9,20,24,25 224:11 225:10,25 226:9 228:7,21 229:4 231:8,11,22 232:2,7 234:15,19 235:4,24 236:13 238:17 239:19

241:17,21 243:24
245:19 246:9
250:12,19 251:17
251:24 253:9,21
254:24 255:6
256:7 257:17
258:23 259:3,6,10
259:12 260:12,16
260:23 262:16
263:6,21 264:3
266:11,13,19,21
266:24 267:11,15
268:25 271:16
272:4 273:6,13
275:22 276:4,13
276:18,23 277:23
278:3,9,13,15,19
278:21 279:6,9,19
279:22 280:4
281:13 282:5,15
283:6,10 286:5,14
289:11,18 290:15
293:13 298:21,23
299:17,25 300:4
300:11,17,19
301:9,19 302:14
302:23 303:4
304:3,22 305:12
310:16,17 311:13
311:19,25 312:8
312:14,21 315:12
316:19,23 318:5,7
319:25 321:2,4
332:16,20 333:14
334:13 377:25
378:2 379:13
392:5,13 399:15
400:2 403:8,18
404:6,8,17 405:16
405:18 408:14
413:4,6,10,19,20

423:9,10,16,25
433:2
**iacovacci's** 120:20
140:8 147:7
148:16 168:20
185:4 199:9 204:2
215:6 220:25
222:9 228:15
229:11 264:15
265:17 269:13,17
269:21 270:17
289:23 290:4
295:17,21 376:21
376:23 378:16
381:18,23 382:6
384:19 391:18
396:7 400:7 403:3
403:7 405:11
406:5 407:2 408:8
412:10,15 415:7
422:13
**ian** 2:16
**iavocacci** 156:13
**idea** 73:7 214:2,7
277:25 282:25
310:7,16
**identification**
56:24 129:22
145:7 167:10
203:3 237:6
**identified** 50:3
62:8 80:8 81:19
275:21 288:18
289:18,24 408:21
409:23 427:7
**identifies** 61:12
**identify** 23:19
26:20 41:14,19
392:9 393:3
407:25 415:9
427:2

**identifying** 94:16
115:25 144:11
311:25 328:19
**iii** 130:7
**illness** 189:14
**imagine** 6:9 39:15
49:16 109:7
286:11 291:21
296:23 306:19
**imbed** 141:23
**immediately** 47:18
47:22 73:6 375:8
**impact** 33:11
**impetus** 370:19
**implied** 402:17
**imply** 46:22
**implying** 153:9,10
371:2
**important** 11:3
165:20 178:22
285:17,22 292:23
293:3 309:22
378:23 425:2
**importantly** 138:3
353:14
**improper** 352:19
**inability** 161:7
186:15,19 423:9
423:15
**inaccurate** 265:5,6
294:2,17,21
319:12 388:23
**inappropriate**
417:19
**inbox** 32:23 33:14
33:15,17,22 43:5
397:23
**inboxes** 35:19
**incapable** 184:4
**incapacitated**
123:20 124:4,10

124:13,24,25
125:5,9,19,21
126:4,8 157:18,19
**inception** 42:13
65:18,20,21,22
**include** 155:19
301:8 318:4
396:25
**included** 134:15
195:10 213:10
286:15 357:17
**includes** 31:25
**including** 37:14
65:6,12 128:7
132:6 153:13
195:11,25 320:22
379:13 400:7
**inclusive** 153:11
262:9
**inconsistent**
247:19 248:5,8,19
272:5,11,24 273:9
273:12 337:20
**incorporated**
352:17
**incurred** 23:13
**incurring** 19:24
**independant**
255:24
**independent** 34:12
365:5
**indicated** 300:20
312:14 315:11
320:10 343:15
425:16
**indicates** 168:16
241:4
**indicating** 59:9
238:25 275:2
**indirect** 77:4
233:18,20

**individual** 56:6 122:14 141:14 152:9 172:25 230:11 272:18,19 291:10 296:13 322:22 361:6
**individual's** 222:16
**individually** 105:3 291:20
**individuals** 66:22 93:21 97:14,20 159:24,25 382:24
**industries** 68:14
**industry** 68:13
**infer** 168:24
**infers** 169:2
**influence** 299:25
**inform** 293:18 330:4
**informal** 78:8
**information** 35:24 102:14 272:22,25 273:19,23 277:13 277:18,22 278:2 278:10 285:24 287:7 293:4 300:2 300:15 307:18 310:25,25 312:3 312:13 319:12 336:15,15 355:7 370:6 402:21 411:2 416:19,20 423:11 431:7,8
**informed** 147:13 220:18 257:19 260:2 280:25,25 357:21 392:22 395:24
**informing** 367:19

**infrequent** 285:16
**initial** 65:5,25 69:17 100:23 341:14
**initially** 425:15
**initiate** 415:5
**inner** 375:13
**inquiries** 292:5,22 293:19
**insignia** 344:17 345:6
**insofar** 15:13 389:19
**instance** 42:21 246:4
**instances** 111:15 370:16
**institute** 345:5
**institution** 285:23
**instructed** 10:19
**instruction** 416:13
**instructions** 59:7 404:16
**insurance** 68:15 68:18 149:2,4,9,17 149:24 150:5,19 150:23,25 152:8 153:4,11,19
**intend** 136:15
**intended** 43:2 140:16 149:19 163:25
**intending** 137:15 182:24 220:19 239:20
**intent** 138:22 139:6,16 141:10 141:20
**intention** 132:10 132:21 134:13 140:4,9 149:21

170:13 183:4 303:5 305:14 325:23 379:25
**intentionally** 242:13 379:7
**intentions** 170:3 413:16
**interact** 272:8
**interest** 77:7 87:18 117:14,19,21,24 118:5,7,9,10,15,18 118:23 141:8 142:20 287:13 299:11 360:5 394:22 420:23
**interested** 5:8 94:12 102:17 369:12 432:17
**interesting** 414:5
**interests** 77:4
**interface** 47:3 284:20 285:6
**interfaced** 46:18 47:7 284:23 285:3
**interfaces** 45:19
**interfacing** 284:10 284:15
**interjected** 16:22
**interjections** 15:7
**intermediate** 78:19
**internal** 46:17,19 167:24
**internally** 45:19 294:10
**internet** 337:12,16
**interrupt** 15:23
**interrupting** 16:19
**interval** 329:21
**interview** 67:9,24

**interviewing** 67:19 74:6
**interviews** 67:20
**intricacies** 376:13 376:16
**introduce** 7:11 216:23
**intrusion** 380:13 421:7,11
**invest** 86:22
**invested** 118:2,16 118:20,22
**investigated** 59:24 158:14
**investment** 31:22 39:12,19,23 40:11 41:5 43:21 45:9 45:13 46:2,6,15 77:14,17,18,23,25 78:5,10,12,22 79:3 79:4,8,11,13,16,19 79:24,25 80:4,14 81:17,19 82:5,17 83:14,19 85:10,23 111:12 118:6 288:19,24 289:7 289:14,25 292:21 295:18 301:9 302:15 304:4,25 305:2,6 307:19 309:24 357:11
**investments** 79:21 88:6
**investor** 234:3,5 277:14 287:5 291:3,21 293:19 311:3
**investors** 120:18 121:21,24 157:23 158:13 228:10,14 228:18 234:16,21

235:5 236:14
256:23 267:15
271:15,23,25
272:4,8,14,23
273:5,18,24
284:10,20,24,24
285:3,7,12 287:13
293:4,7,14 294:4
296:7 299:10,12
299:15 302:11,13
303:3 353:16
417:12
**invests** 79:22
**invite** 73:11
145:25
**invited** 146:5
**involve** 89:6
**involved** 17:2,7
22:25 35:22 47:14
50:6 64:10 65:17
65:20,24 66:5,11
66:16,20,22,23
70:20 83:25 84:11
86:8,10 96:7
99:23 100:15
103:6 107:2
208:23 209:2
216:5,7 221:4
228:22 229:4,18
229:20 230:23
231:8,12,13,17,22
232:3,8,21,23
286:17,19,25
287:3 296:10,12
297:18,25 310:14
310:21 311:22
312:12 329:4,7
345:4,9 382:24
396:7
**involvement**
232:25 328:18

**involves** 100:6
**involving** 102:18
193:22
**iocavacci** 186:6
**ipad** 342:21
**ira** 108:6
**isolate** 186:20
**issue** 75:6 217:4
218:18 311:14
420:16
**issues** 7:14 46:7
160:16 164:8
180:3 378:22
**item** 235:10
**items** 59:24
317:20 336:3
392:9 397:23
**iteration** 397:5

## j

**jamie** 53:10
**january** 121:5,22
123:8,12 129:2
137:16 138:23
139:7 140:3,15
145:6 146:4 147:7
155:20 156:24
163:5,25 165:8
168:6,18,25 169:9
170:16 173:10
174:17 176:16,19
176:22 177:5,8
182:11 184:11,13
184:18,25 185:4
186:5 187:17,19
191:6,21 192:18
193:14 196:2
197:11,11 198:2
199:11 217:19
236:2 430:12
**jason** 2:6 5:17
6:21 386:23 410:7

417:15,15,16
**jcyrulnik** 2:7
**jennifer** 280:13
**jeopardize** 109:11
**job** 67:9 73:25
154:14 172:23
**jobs** 67:19
**jog** 164:21
**john** 68:12,12,22
71:25 95:2,4
121:14 318:20,21
**johnny** 53:14
394:9,11 406:14
**joined** 69:21 70:25
**joining** 71:12
**joke** 391:8
**judge** 3:13
**judgment** 359:23
360:4
**june** 320:2 376:24
**junior** 68:19,23
334:18,23
**justification** 371:6

## k

**k** 6:12 274:16
**karyn** 1:21 5:3
432:7,23
**kate** 2:7
**keep** 44:22 75:5
149:9 151:4 153:4
271:2 285:18
334:8
**keeping** 309:23
**keeps** 282:21,24
283:5
**kept** 349:10
**key** 102:15,20
104:10 155:6,8
359:15
**kind** 31:14 101:6
103:5 215:13

336:6 371:2 377:3
**knew** 281:8
361:20
**know** 9:9,13 10:6
10:10,23 11:11,15
12:3 13:15 16:16
16:25 17:5 21:6,8
21:14,16,20 22:24
23:9,18,19,23
24:16,21 25:2,8
26:17 27:9,16
29:15 30:5 32:15
33:7 35:10,14,20
35:21 36:2,9,22
37:6,25 38:6,9,11
38:12,18 39:14,25
40:2,20,22,23
41:24,24 42:5
43:19 44:13,19
45:4,7 46:19 47:9
47:13,17,21 49:7
49:14 51:15 53:5
53:6,7,14,19,22
54:21,24 58:7
64:4,7,13,18,19,24
65:5 66:17 68:17
69:20 70:2,21,21
71:7 76:13,14
78:3 79:5,7,11
80:11 81:16,25,25
85:22 91:23 98:2
99:22 100:7,9
102:9 104:4
105:23 108:4
113:19 114:7
116:3 121:14
123:15 127:19
128:25 129:10
131:4,9 140:8
142:4 148:9 149:2
149:5 152:12,21

153:20 158:5
160:14 163:4,10
163:14 164:19
171:22 172:7,9
174:21 176:21,23
177:9 178:20
179:16 180:11
182:10 187:23
192:25 195:10
196:17 197:3,9
198:13,16 199:25
206:6 207:25
208:7,8,14 209:7,8
209:14,17,21
210:9,15,23,24
211:3,5,6,8,14,16
211:18,21 212:6,8
212:11,14,15,20
214:10 216:9,13
216:13 218:24
220:15,21,23
221:16 222:13,18
226:16,18 227:3,9
228:2,4 230:24
235:18 236:9
238:2 244:24
248:13,13,18
249:25 250:8
251:8 252:9,9,14
252:15,16,23
253:3 259:25
260:14 261:9,22
263:5,16 264:11
264:12 265:13,20
265:20,21,22,24
266:4,9 271:20,23
272:16,22,24
273:22 274:2,4
276:5 280:19,21
281:9 283:9,17
287:8,11 290:19

291:12 292:12
294:9 296:4
297:22 299:5
303:9 304:8
305:22 306:10,10
308:2,8 310:22
311:8,17 312:18
314:14 315:16
316:4 317:14
319:15 323:14,18
324:12,16,20,22
325:9,10 326:24
328:7 329:2,6,22
330:8,11,21,21
332:2,6,25 333:4,6
334:6,11,17,22
335:11,13,24
337:25 340:6,10
340:12 341:17
342:6 343:21
344:3,16,20,23
345:2,21 348:8
349:14,17,23
350:5,15 351:24
354:3,4,25 357:13
358:11,13,20
364:7,23 365:21
365:23 366:4,18
366:19 368:5,23
368:24,24,25
370:17,25 371:7
371:12 372:24
374:17,24 375:12
375:14,15,22
376:5,5,6,12
378:23 379:24
380:23 381:7
383:9,10 385:15
387:17,21 388:3
389:4 390:10,20
391:15 392:21

393:23 395:2,9,15
397:9 398:16,25
400:8 402:24
403:25 405:3,8
407:13,18 409:9
410:24 413:11
414:7,16,21,25
416:25 417:6
421:5 424:17,24
425:4,11,18 426:4
426:24
**knowing** 31:5
129:13 228:16,16
312:23 366:11
367:4 385:21
**knowledge** 18:13
21:5 26:9 64:11
115:22 116:12
157:25 250:18
297:3 321:8
332:12 367:23
370:11,18 373:6
373:18 375:21
381:19 384:20
391:23 402:9
412:15
**known** 403:10
417:5

**l**

**l** 3:2,2 6:12,12
429:2
**labeled** 102:10
**labelled** 304:14
**lack** 267:3
**lacks** 407:5
**lag** 288:8
**lamb** 53:14
**lan** 53:19 54:10,13
328:17 330:4
332:23,25 379:4
379:19 380:6,8,22

381:7,16,17
382:14 383:7,11
384:16,20 385:9
385:12 391:20,22
392:21 393:12
394:8 395:24
396:9,19 397:22
398:13 399:5,10
401:24 402:24
403:5,9,17,18,21
404:2,5,11,17
405:10,20 406:3,7
406:25 407:8,12
407:18,24 408:12
409:25 410:22
411:19,25
**lan's** 403:11,19
404:9
**language** 99:21
204:18 242:22
**lapse** 22:7
**laptop** 325:3
327:14 328:9
338:10
**laptops** 330:25
331:6 338:18,19
339:4,9,12
**large** 222:6
**largely** 425:8
**larger** 99:7 104:8
104:10 228:23
229:5,6,19,20,23
230:2 232:4,25
233:4
**largest** 258:20
**law** 358:3
**lawyer** 28:20
50:20 51:2 120:4
219:15 297:6
306:11

**lawyer's** 218:15
**lawyers** 27:23,25
28:14 50:3,4,5,5
51:6,22 257:15
**layman** 120:4
**layman's** 119:23
376:8
**lays** 45:18 82:9
**lead** 72:7 382:13
414:22,23
**leading** 400:15
**leads** 99:4 291:6
**learn** 395:22
**learned** 158:8
418:23
**leave** 69:4,9 72:19
182:20 183:18
184:4 185:19
186:7,18 187:9,25
199:21 200:8
206:17 214:17
239:20 256:10
283:23
**leaves** 183:12
296:11,20
**leaving** 71:11
73:11 189:21
193:7 206:14
242:14 253:17
297:4
**left** 18:15,18 69:12
69:13,15,20,21,24
70:24 72:25,25
73:3 74:15,16
182:13 289:17
296:22 304:22
318:25 370:2
387:17
**leg** 163:14,16,22
164:8

**legal** 5:4 23:20,24
24:2,5,6,10 25:16
26:3 27:13 50:18
52:7,10 100:22,23
100:25 101:3
220:15 222:10,14
366:6 428:12
**legs** 138:6 163:19
164:8
**lehman** 67:21,25
68:4,5,8,10 69:5
69:10,12,24 70:9
70:12,14,16,24
71:11 74:10
**lehmann** 71:21
**lender** 92:13 102:5
**lengthy** 72:6
425:24
**lest** 369:5
**letters** 196:2
**level** 292:9 331:18
334:11 365:22,25
402:25
**levels** 72:13,14
**levine** 2:19 56:19
129:16
**li** 2:18 20:17 45:20
46:17 50:9 76:24
**liability** 104:7,11
130:6
**liberal** 361:9
**lifetime** 193:5
**light** 162:2,6 173:5
**liked** 246:21
**likelihood** 315:25
**limit** 15:6 17:2
130:2
**limitation** 404:18
**limitations** 80:11
82:6,11 162:25

**limited** 130:6
200:12 270:22,23
271:3
**line** 11:12 168:9
168:15 169:4,12
169:22 170:19,24
185:4,16 235:16
237:13 289:16
386:3 426:4
431:13 433:5
**lines** 230:4 289:16
353:9
**link** 170:16 233:17
233:19,20
**lippy** 284:18
289:12
**list** 60:8,12,16,21
61:11,21,23,25
62:3,16 63:16
78:4 295:20 304:3
304:21 305:11
313:21 314:20,24
315:11 316:18
318:3 334:17
358:21 362:7
363:13 364:24
**listed** 62:22,25
146:17 292:13
302:24 305:4,5,7
310:8 317:21
**listen** 419:19
**listening** 362:17
**lists** 309:23 316:19
316:23 318:14
334:14
**literally** 37:9
**litigation** 8:22,24
9:7,17,19 24:19
158:9 209:5 412:5
**litigations** 8:4,6

**little** 12:24 34:6
36:14 57:24 67:11
74:24 122:16
137:22,25 148:24
155:7 270:25
315:24 363:6
387:13 402:15
415:13
**llc** 1:8,16 2:10
4:19 14:22 55:14
55:16,18,20,25
63:21,25 76:2,4,6
76:11,20,21 77:5,7
77:9,11,13 80:16
80:18,25 81:9,15
83:15 116:21
117:2,10 126:23
126:24 128:12,18
128:22 129:10,20
130:7,16,24 131:6
135:19 141:8
142:20 143:16
144:6,23 199:19
199:24 200:23
201:16,24 203:17
203:24 205:12,15
210:13 213:4
214:19 215:9
217:24 218:11
226:5 253:23
254:25 256:8
414:10,13 430:10
433:1,2
**llc's** 201:16 205:9
254:2 255:16
258:21 273:15
**llcs** 222:20 223:3
223:12
**llp** 2:4,9,16,17,17
2:19

**[llp.com - mail]**                                                      Page 32

**llp.com** 2:7
**loan** 88:19 90:18
  95:8 105:20
  113:10
**loans** 110:5
**local** 34:16
**locate** 209:10
**location** 146:16
**locations** 1:21
  36:8,10
**log** 323:4,16
  339:17,21 340:14
  340:15 341:9
  346:4,7 379:19
  381:17 391:17
  394:9,12 401:23
  401:24 402:7,20
  403:9,10,23 404:6
  404:13,19
**logged** 324:11
  337:22 338:2,4
  342:3 403:6 408:8
  408:11
**logging** 323:21
  324:5 345:25
  381:16
**logical** 181:13
  287:14
**login** 323:22
**logistics** 6:25
**logo** 409:24 410:2
**long** 54:24 128:13
  128:15 143:10,11
  149:3,10,16,22
  150:4,9,12 153:2,3
  153:10,10,16,19
  154:6 159:22
  160:7 161:5
  187:18 193:20
  240:8 243:3 247:9
  324:7 334:19,21

336:3,7 371:17,22
398:12,16,25
412:9 424:18
**longer** 43:6 124:23
  152:4 154:13
  179:25 180:19
  208:13 240:11
  241:13 242:10,12
**longest** 48:18
**look** 57:2 58:21
  60:3,11,16 105:22
  120:5 145:2 167:5
  167:20 202:22
  209:24 216:22
  231:3 237:8 238:3
  240:2 244:4
  264:25 274:19
  275:7 287:16
  288:8,16 289:15
  299:10 303:15
  305:23 313:7,20
  315:19 333:24
  349:24 365:3
  368:9,19 369:15
  376:11 387:14
  411:10 420:14
  426:25
**looked** 143:15
  185:2 304:20
  311:3 315:23
  344:15 367:3
  379:8 389:21
**looking** 31:5 32:17
  32:25 33:20,23
  34:23 59:10 61:10
  61:14 63:8 89:20
  114:3 147:2
  148:25 149:2
  153:16 212:25
  224:9 238:23
  239:25 240:4

242:5 244:14,20
261:20 276:17
287:6,12 290:8
291:6,8,13 295:12
302:16,18,20
303:10,19 304:9
304:12,18,18
308:15 309:3
313:5 316:22
317:17 328:20
334:14 335:14
347:23 348:6,6
349:22 369:13,17
369:21 370:5,7
409:25 414:12
415:3,19 426:3
**looks** 57:24 61:16
  61:18 146:8
  160:17 238:23
  244:5 249:19
  257:10 290:12,20
  290:23 301:16
  317:20 359:4
  411:11 427:4
**lose** 151:12
**loss** 42:12,17
**lost** 38:23 155:3
**lot** 47:9 53:12
  68:24 71:19,20
  104:18,19 186:12
  202:18 249:14,16
  278:14 413:14
  424:21
**lou** 5:25 17:17
  18:19 49:20 201:4
  426:16 428:2
**lou's** 424:20
**louis** 2:11
**low** 12:20 332:7
**lower** 234:9

**lunch** 189:12
**luxury** 426:3

**m**

**m** 6:12 274:3
**machine** 323:8,10
  324:2,4 325:2
  343:15 354:16
  356:17 359:2
  364:4,13 375:8
  376:19 378:21
  403:7,12
**machines** 345:7
  349:11 357:22
  400:22 401:21,22
**madam** 419:8
**magnitude** 233:11
  393:21
**mahar** 274:2,4
  275:10 276:2,11
  276:22 277:8,25
  300:19 310:23
  311:8
**mahar's** 300:5,12
**mahir** 321:11
**mahr's** 300:5
**mail** 30:15,18 31:4
  32:4,8,12,21,23
  33:5,9,14,15,22
  34:4 37:5 41:2
  42:12,17,22 43:5,6
  43:10,15 44:17,23
  167:8,22 168:3,4
  168:16,23 169:9
  169:22 170:4,11
  170:14,19,22
  171:16 172:5
  173:6,20,23
  175:21 184:13,25
  185:5 197:23
  237:4,10 238:23
  238:25 240:2

| | | | |
|---|---|---|---|
| 241:19 243:7,18 | 197:12 343:13 | 84:10,17 85:11,17 | 39:1 40:1 41:1 |
| 244:3 247:7 249:2 | 355:3 365:16 | 85:23 86:5 111:12 | 42:1 43:1 44:1 |
| 250:15 254:9,11 | 366:15,16,24 | 275:12 413:25 | 45:1 46:1 47:1 |
| 260:10,24 261:12 | 367:3,21 368:10 | **manager** 77:14,18 | 48:1 49:1 50:1 |
| 261:14,20,21 | 368:20 369:20,21 | 77:23,25 78:5,10 | 51:1 52:1 53:1 |
| 262:19,24 263:3,9 | 369:25 370:4 | 79:3,4,8,11,13,17 | 54:1 55:1 56:1 |
| 275:8 276:4,14,17 | 372:24 373:10,13 | 79:25 81:20 83:14 | 57:1 58:1 59:1 |
| 276:20 299:16,22 | 373:16,20 374:8 | 85:23 111:12 | 60:1 61:1 62:1 |
| 299:23 300:6,12 | 374:25 375:6,7,24 | **managers** 79:24 | 63:1 64:1 65:1 |
| 300:20 301:4 | 376:17 396:7,9,15 | **manages** 81:6 | 66:1 67:1 68:1 |
| 314:19 315:11,23 | 396:20 397:5,18 | **managing** 76:8,9 | 69:1 70:1 71:1 |
| 341:10,11 342:14 | 397:21 405:11 | 76:10,19,22,23 | 72:1 73:1 74:1 |
| 342:18,20 343:2,6 | 407:2 412:10 | 81:12,14 82:3,13 | 75:1 76:1,24 77:1 |
| 347:6,7 354:8,9,9 | 415:7 422:11,14 | 85:8 117:10 118:4 | 78:1 79:1 80:1 |
| 354:14,23 355:18 | **main** 9:5 45:17 | 295:19 305:7 | 81:1 82:1 83:1 |
| 365:6,10,12,13,17 | 46:11 81:4 87:16 | **mandate** 44:6 | 84:1 85:1 86:1 |
| 365:25 366:10,16 | **maintain** 31:23 | **manhattan** 67:15 | 87:1 88:1 89:1 |
| 367:15 368:3 | 32:3 33:16 44:8 | 67:15 | 90:1 91:1 92:1 |
| 370:2,10 371:8,11 | 149:4,22,23 | **manner** 58:25 | 93:1 94:1,5,9,13 |
| 372:17,20,21,25 | 346:24 347:6,9,16 | 59:13 336:13 | 94:20 95:1 96:1 |
| 373:11,21,24 | 348:3 | 353:5 | 97:1 98:1 99:1 |
| 374:2,3,4,11,15 | **maintained** | **march** 192:6 | 100:1 101:1 102:1 |
| 375:16,16 376:13 | 325:25 | 199:11 239:14,21 | 103:1 104:1 105:1 |
| 396:8,16 397:24 | **maintaining** 346:9 | 241:7,10,24 | 106:1 107:1 108:1 |
| 405:12,13 406:5 | 348:13 403:12 | 244:11,16,17 | 109:1 110:1 111:1 |
| 406:20,23 407:3,4 | **majority** 49:24 | 247:19 248:2,8 | 112:1 113:1 114:1 |
| 412:16 416:22,23 | 87:23 285:10 | 249:3,5 290:4,8 | 115:1 116:1 117:1 |
| 422:15 430:13,17 | **making** 23:2 82:16 | 302:21,22,22 | 118:1 119:1 120:1 |
| **mailbox** 30:16,18 | 82:22 359:19 | 304:2,9,14 305:12 | 121:1 122:1 123:1 |
| 31:10 32:11,20 | 360:19 | 310:10,18 | 124:1 125:1 126:1 |
| 33:4 | **mallet** 46:3,11,12 | **mark** 1:17 6:1 7:1 | 127:1 128:1 129:1 |
| **mails** 29:3,5,6,8,10 | 46:18 47:4,8 | 8:1 9:1 10:1 11:1 | 130:1 131:1 132:1 |
| 29:12,17,21 30:13 | **management** | 12:1 13:1 14:1 | 133:1 134:1 135:1 |
| 30:16,23,25 31:2 | 31:21 39:18,22 | 15:1 16:1 17:1 | 136:1 137:1 138:1 |
| 31:25 32:24 33:16 | 40:10 43:23 44:21 | 18:1 19:1 20:1 | 139:1 140:1 141:1 |
| 33:20 34:10,14,24 | 77:9,11 78:9,12,22 | 21:1 22:1 23:1 | 142:1 143:1 144:1 |
| 37:3,14,23,25 | 79:2,19,25 80:4,6 | 24:1 25:1 26:1 | 145:1 146:1 147:1 |
| 41:12,14,17,19 | 80:13,14,16,25 | 27:1 28:1 29:1 | 148:1 149:1 150:1 |
| 42:2,3 43:25 44:8 | 81:3,6,9,15,17 | 30:1 31:1 32:1 | 151:1 152:1 153:1 |
| 195:21,25 196:11 | 82:2,5,14,16,23 | 33:1 34:1 35:1 | 154:1 155:1 156:1 |
| 196:22,24 197:9 | 83:15,19,21,23 | 36:1 37:1 38:1 | 157:1 158:1 159:1 |

| | | | |
|---|---|---|---|
| 160:1 161:1 162:1 | 282:1 283:1 284:1 | 401:1 402:1 403:1 | 396:23 398:8 |
| 163:1 164:1 165:1 | 285:1 286:1 287:1 | 404:1 405:1 406:1 | 399:13,14,20 |
| 166:1 167:1 168:1 | 288:1 289:1 290:1 | 407:1 408:1 409:1 | 400:22 401:4,21 |
| 169:1 170:1 171:1 | 291:1 292:1 293:1 | 410:1 411:1 412:1 | 402:8 403:24 |
| 172:1 173:1 174:1 | 294:1 295:1 296:1 | 413:1 414:1 415:1 | 406:2,4 407:9 |
| 175:1 176:1 177:1 | 297:1 298:1 299:1 | 416:1 417:1 418:1 | 411:12 416:18 |
| 178:1 179:1 180:1 | 300:1 301:1 302:1 | 419:1 420:1 421:1 | **matter** 4:17 30:5 |
| 181:1 182:1 183:1 | 303:1 304:1 305:1 | 422:1 423:1 424:1 | 45:12 52:12,16 |
| 184:1 185:1 186:1 | 306:1 307:1 308:1 | 425:1 426:1 427:1 | 54:15 55:6,11 |
| 187:1 188:1 189:1 | 309:1 310:1 311:1 | 428:1,8 429:1,15 | 138:25 139:3,19 |
| 190:1 191:1 192:1 | 312:1 313:1 314:1 | 430:1,16 431:1 | 196:3 197:5,23 |
| 193:1 194:1 195:1 | 314:19 315:1 | 432:1 433:3,21 | 202:3 253:16 |
| 196:1 197:1 198:1 | 316:1 317:1 318:1 | **marked** 56:14,23 | 340:9 356:9 |
| 199:1 200:1 201:1 | 319:1 320:1 321:1 | 57:2,4 129:4,5,21 | 369:12 432:18 |
| 202:1 203:1,2 | 322:1 323:1 324:1 | 145:3,6 167:9 | **mattered** 201:12 |
| 204:1 205:1 206:1 | 325:1 326:1 327:1 | 202:23 203:2 | **matters** 46:3 |
| 207:1 208:1 209:1 | 328:1 329:1 330:1 | 204:25 237:5 | 166:21 353:11 |
| 210:1 211:1 212:1 | 331:1 332:1 333:1 | 431:12 | **maximum** 101:13 |
| 213:1 214:1 215:1 | 334:1 335:1 336:1 | **market** 228:10 | 101:19 |
| 216:1 217:1 218:1 | 337:1 338:1 339:1 | **marking** 138:16 | **mean** 15:10 18:3 |
| 219:1 220:1 221:1 | 340:1 341:1 342:1 | **markings** 291:7 | 30:19 32:16 36:22 |
| 222:1 223:1 224:1 | 343:1 344:1 345:1 | 343:14,20 344:5,9 | 46:21 58:10 93:3 |
| 225:1 226:1 227:1 | 345:11,11 346:1 | 344:17 345:6 | 93:6,11 98:2,4 |
| 228:1 229:1 230:1 | 347:1 348:1 349:1 | **marks** 75:13,19 | 103:18,19 105:17 |
| 231:1 232:1 233:1 | 350:1 351:1 352:1 | 138:11 188:25 | 124:20 127:3,21 |
| 234:1 235:1 236:1 | 353:1 354:1 355:1 | 189:8 271:12 | 128:15 141:22 |
| 237:1 238:1 239:1 | 356:1 357:1 358:1 | 321:19 322:2 | 143:24 144:7 |
| 240:1 241:1 242:1 | 359:1 360:1 361:1 | 386:12,19 | 150:3 155:17 |
| 243:1 244:1 245:1 | 362:1 363:1 364:1 | **marriage** 432:16 | 162:19 163:10,21 |
| 246:1 247:1 248:1 | 365:1 366:1 367:1 | **mary** 2:7 | 172:13 186:11 |
| 249:1 250:1 251:1 | 368:1 369:1 370:1 | **maryland** 171:11 | 195:18 220:12 |
| 252:1 253:1 254:1 | 371:1 372:1 373:1 | **massive** 416:17 | 222:22 230:7 |
| 255:1 256:1 257:1 | 374:1 375:1 376:1 | **matches** 62:15 | 235:21 248:13,18 |
| 258:1 259:1 260:1 | 377:1 378:1 379:1 | **materials** 18:2,4 | 252:13 256:21 |
| 261:1 262:1 263:1 | 380:1 381:1 382:1 | 31:24 347:10,12 | 257:12 258:11 |
| 264:1 265:1 266:1 | 383:1 384:1 385:1 | 350:12,18 352:16 | 265:23 267:9,18 |
| 267:1 268:1 269:1 | 386:1 387:1 388:1 | 379:10,11 380:5 | 282:13 302:20 |
| 270:1 271:1 272:1 | 389:1 390:1 391:1 | 380:23 381:9 | 308:8 312:25 |
| 273:1 274:1 275:1 | 392:1 393:1 394:1 | 382:15 391:19 | 313:11,15,19 |
| 276:1 277:1 278:1 | 395:1 396:1 397:1 | 393:14 394:2 | 317:3 325:19 |
| 279:1 280:1 281:1 | 398:1 399:1 400:1 | 395:11,17,18 | 336:7 346:14 |

351:15 367:18
370:25 385:16
392:14 412:12
421:25 422:2
423:20
**meaning** 118:7
143:23 328:7
331:4
**means** 119:17
313:2,20
**meant** 98:6 135:7
156:9 174:14
226:3 257:3,7
295:4 362:21
**mechanism** 7:17
**media** 4:14,15
75:13,20 138:12
138:17 188:25
189:9 271:7,13
321:19 322:3
386:12,20 428:10
**medical** 12:8
149:10 150:5
151:4,12 152:8
153:4 160:16,24
161:22 164:25
166:13 185:19
186:8,19
**medically** 125:17
**medications** 12:7
12:10,12
**medium** 195:12
197:5
**meet** 67:6 168:17
285:13
**meeting** 53:23
146:2,10,14
147:11,13,21,22
147:25 148:4,6,10
148:12,14,15
149:8 163:6,7

168:25 169:3
170:3 176:25
177:3,13,16 178:3
178:9 184:12,24
185:3 202:25
203:23 204:6,8,12
212:25 213:6
220:10 268:20
399:10 430:15
**meetings** 48:8
49:9 267:25 268:8
268:12,13,16,19
268:23 269:2,6,9
**mei** 20:17
**mel** 2:18 45:20
46:16 50:9 76:24
**member** 24:12,14
24:23 25:5,8,13
26:2,7,13,22,25
27:12 68:19
117:10 118:4
122:2 126:19
128:7 130:23
132:6,17,19,25
133:13,24 134:10
134:11,18 136:15
136:19 141:15
142:24 143:9
166:4 205:8,9,22
206:24 223:11
255:2,16 256:11
258:20 273:15
289:25 302:15
**member's** 132:21
134:13
**members** 119:20
119:21 120:18
121:9,12,22,24
122:10 222:20
223:2 267:14
288:24 309:24

338:22,25 339:6
**membership**
141:7 142:20
**memorialized**
210:11
**memory** 12:9,12
13:9 22:7 51:7,10
51:12,18 238:12
254:11 256:5
**mention** 166:12
**mentioned** 17:20
71:25
**messages** 43:16
197:14,17,18
370:12
**met** 67:8,22 163:4
163:7
**metadata** 304:13
**methodology**
105:15,17,20
**mic** 12:23,25
**michelle** 64:3
**microphone** 4:9
**microphones** 4:6
**microsoft** 341:21
342:4
**microsoft's** 42:4
**mid** 276:3
**middle** 164:20
275:8 406:10
**midst** 158:8
**mike** 274:2,4
**mill** 266:9
**million** 100:8,15
101:14 202:2,13
210:25 211:4,7,10
211:15,15,18,23
211:25 212:2,9,16
**mind** 131:13,20
135:22 144:13
148:5 318:23

**mindset** 140:12
**minimal** 421:7,11
**minute** 129:16
165:24
**minutes** 16:20
21:12 83:10 98:6
106:23 131:21
138:7 142:7
144:16 223:6
225:8 362:3
371:19 372:4,7
389:3,14 390:11
391:5 398:16,20
398:21 427:12
**mis** 320:17
**mischaracterizat...**
179:13
**mischaracterize**
103:15 135:5
**misdeeds** 214:24
**misinformation**
312:4
**mislead** 293:14
296:7 299:10,15
306:13
**misleading** 299:12
303:3,25 305:11
305:20 306:8,13
319:13
**misremembering**
58:12
**misrepresent**
302:10
**misrepresentation**
287:10
**misrepresenting**
276:22 277:8
302:13
**missed** 30:9 69:6
362:18

misses 171:13
missing 25:23
  107:8 109:14
  178:24 180:24
  309:6,9,14,15,16
  309:19,20
misstate 58:11
  224:16 410:10
misstated 320:19
  410:15
misstatement
  410:19
misstates 142:12
  224:15 225:14
  245:12,13 303:13
misstating 17:6
  245:15 254:5
  255:19,21 303:21
  381:22 410:8
mistakes 295:5,5,8
  315:17
misunderstanding
  189:23
misunderstood
  422:20
mitigate 85:19
mlk 171:9
models 329:8
modified 408:4
moment 28:8,9
  29:15 40:6 97:17
  142:2 155:4 217:3
  237:19
moments 69:18
  80:9 130:21 131:7
  238:8 382:12
monday 53:23
  171:8 268:16,19
  268:21,23 269:2,5
  269:9

money 22:15,18
  105:11 118:2
  202:18 214:23
monica 2:17 6:2
  7:8 13:20 18:21
  49:21
monitor 371:12
monitoring 345:12
  346:8 412:10,13
month 33:25
  244:18 369:5
months 71:5
  159:16 160:22
  192:13 244:21
  247:16 324:19
monticciolo 21:3,6
  23:6 64:2,3 65:24
  69:9 76:23 146:5
  147:6 161:19
  168:5 199:11,17
  203:18,22 204:12
  206:22 213:10
  215:3 237:12
  243:15,19,22
  258:15,19,22,25
  259:4,8 260:10,15
  262:3,20 263:9
  275:21 281:2
  284:19 285:2
  288:18 289:9
  332:11 333:14
  334:13 365:4,24
  383:8,15 384:5,16
  385:20,25 399:3,6
  399:9,12,19 401:3
monticciolo's
  385:21
monticell's 400:20
monticello 332:14
  385:12 399:24

monticello's
  146:20,23
monticiollo 20:25
  161:15
morgan 70:4
morning 4:3 5:16
  6:20 53:23 147:6
mornings 268:19
  268:23
mortgage 74:4
motivated 223:25
motivating 206:17
move 129:8 192:5
  424:7,7
moved 72:17
  73:18
movie 336:18,21
  336:25 337:4,23
movies 338:3
multi 390:20
multiple 97:19
  100:6 120:23,23
  181:9
muriel 66:9
mute 4:9 12:4,6
  130:3

**n**

n 2:2 3:2 6:12
  274:16 429:2
  431:2
name 4:25 5:17
  6:21 9:2 21:25
  65:8 68:17 94:25
  274:13,18 289:23
  295:21 433:2,3
named 8:11,13
names 9:5 22:8
  78:3,6 79:6 334:2
native 342:14
natural 382:5

naturally 172:3
  190:22
nature 308:16
  310:5 373:20
  408:5
nda 275:17
near 148:7
necessarily 57:21
  99:11 104:14
  145:23 151:12
necessary 217:23
  218:11 224:4,12
  224:21 253:23
  255:14
necessitated 218:5
need 5:21 10:5
  16:7,16 60:2
  104:14 127:25
  132:25 135:17
  152:14 188:6
  221:25 254:20
  255:4 256:22
  258:3,3 279:21
  284:11 285:13,15
  286:16,20,25
  287:3 296:12
  306:6 309:21
  341:22 342:3
  371:6 380:7,20
  381:17 382:9
  384:20 388:5,16
  396:9,18 412:24
  419:10 420:9,24
  420:25 426:6
  427:18
needed 42:23
  122:10 172:19
  188:9 219:17
  221:19 319:11
  341:6,7,13 349:10
  357:25 359:11

384:17 401:23
414:9
**needs** 89:10,10,15
136:8 256:5,9
286:18 308:11,12
386:6
**nefarious** 417:2,4
417:5,6 421:20
422:15,24,25
**nefariously**
416:22,24
**nefariousness**
418:25
**negative** 190:5
**negotiate** 174:24
175:7 255:4
**negotiated** 136:12
**negotiating** 133:7
282:10,12
**negotiation** 208:24
209:3 240:12
247:9 266:17
**neither** 26:7,13,21
26:24 27:12
179:19 194:15,18
**net** 207:2,16
**netflix** 337:8,10,23
338:4
**network** 38:7
306:19,21 323:2,5
346:20,20
**network's** 376:7
**never** 42:20
126:18,22 127:13
134:24 136:3
137:19 163:24
165:15,17,25
166:25 167:2
318:23 338:2,3
**new** 1:2,22 2:6,6
4:21 5:5 6:14 9:11

9:25 329:16,18,20
329:24 330:5,7
345:7 370:5,5
432:4,5,8 433:1
**nice** 6:5
**night** 403:22
404:12 406:9,10
406:14
**nitty** 82:9 378:18
**nobley** 52:17 53:6
**nodding** 11:5
**noise** 12:3
**non** 11:5 44:17,23
50:5 59:14,15
108:19 115:24
116:7,15 120:4
195:11 275:17
326:7,11 390:8
397:23,23 414:21
**noon** 138:7
**normally** 308:16
**notary** 1:21 6:14
429:22 432:7
433:25
**note** 4:6 183:23
386:4
**notes** 63:7
**notice** 56:22 58:14
58:20 61:20
132:10,20 134:12
136:7,18 137:8,14
137:19 138:22
141:10,20 430:8
**notices** 133:9
134:15 136:4,6,11
**noticing** 5:15
**notwithstanding**
154:12 156:14
158:23 159:9
162:10

**november** 287:9
**number** 4:21 9:4
23:10,11,16 42:2
47:6 55:21 56:17
62:22 68:11 74:6
75:14,20 83:20
101:17 138:12,17
189:2,9 212:22
271:7,13 274:24
320:22 321:20
322:3 332:2,8
334:18 386:13,20
408:13 409:7
427:12 428:10
430:7

**o**

**o** 3:2 274:16 429:2
**o'keefe** 53:11 55:2
289:19
**oath** 3:12 126:7
165:7 234:14
**object** 15:25 25:17
26:10 27:5 32:14
34:20 40:13 42:14
44:2 46:8 48:10
58:16 87:5 90:23
134:3 136:25
139:9 141:16
142:11 144:17
147:15 156:4
157:8 160:3
165:11 166:16
174:18 176:14
178:14 179:12
184:14 185:7
191:16 195:16
196:7 198:10
200:10 201:17
202:8 212:3,17
214:4 215:16
218:23 219:20

222:3 225:13
236:3,20 238:9
240:16 241:25
242:17 245:10
247:4 254:3,4
255:18 258:10
260:23 263:13
276:25 283:14
296:15 299:2,19
301:22 303:11
305:16 307:21
309:12 311:5
321:6 322:14
352:24 361:10
367:6 368:11
376:25 378:25
380:14 381:20
394:17 402:11
409:13,14 410:5,6
410:9 421:24
423:3
**objecting** 377:19
**objection** 10:16,18
17:3 27:14 81:21
91:6 103:7 135:11
183:24 184:19
186:10 187:14
219:9 224:14
250:16 303:8
308:5 363:2 407:5
**objections** 3:21
5:12 15:7 17:3
**obligation** 346:17
346:24 347:16
356:12,16,23
358:23 361:21
**obligations** 15:22
358:2 383:16
**obscure** 14:24
**observation**
360:20

obsolete 329:23
obtaining 89:25
obvious 120:24
  340:8
obviously 71:15
  247:13 268:21
  359:17 420:18,22
  424:21 425:21
occur 20:19 82:22
  256:10
occurred 127:24
  187:16
occurrence 42:12
october 1:11 4:5
  120:21 122:2,7,19
  124:9 155:21
  156:24 158:15
  192:19 196:2
  197:11 198:2
  213:25 214:14
  269:19,23 270:19
  283:23 286:7
  287:7 298:22
  301:8 311:13
  312:2,15 376:15
  379:20 400:16
  403:21 412:11,18
  419:5,18 421:18
  422:13 423:2
  432:20
offered 324:20
office 7:2 20:17
  146:17,20,23,24
  168:13,18 171:2
  322:7,9 323:6
  324:2,7,8,9,13,19
  324:21 325:7
  331:5,7,13,15,23
  333:20 341:21
  342:23 346:20

officers 357:17
offices 5:24
offshore 79:8,12
oh 128:2 164:15
  164:16 237:22
  258:11 268:5
  305:22 318:21
  319:5 347:11
  391:14
okay 8:2,8,15,18
  9:20,24 10:6,23
  11:20,22 13:10,21
  13:23 14:17 18:3
  18:10,24 19:11,23
  20:14,20 21:9
  22:2 25:2 26:24
  27:10,19,24 28:6
  28:23 29:12,23
  30:8,23 31:11
  33:10 38:20 40:5
  40:24 42:10 43:14
  44:10,16 45:22
  46:4,21 47:23
  48:16,20 49:3,10
  50:22 51:19 52:6
  52:11,18 53:5
  55:3,10,12 56:11
  56:21 58:3,21
  60:2,10,12,24 61:3
  61:5,23 62:13,19
  62:20 63:4,20
  66:11 71:15 73:9
  74:22 77:3 88:2
  88:24,25 89:2,9
  92:2,11 93:18
  97:11,14 101:10
  105:25 107:19
  109:13 114:25
  116:20 119:8
  120:2 125:4
  126:15 128:2

129:24 130:14
131:18 132:4
134:17 137:11,21
143:13 144:9
147:25 148:4,9
151:16,24 152:6
154:2 158:16
161:3 167:5 174:6
175:24 177:9,17
177:23 180:12
182:6,13 183:12
185:14 187:18
188:4 189:22
191:9 192:5,11
195:8 198:8,18
199:18 209:20,23
210:4,8 212:23
214:10 216:22
218:17 225:22
228:6 229:25
234:4 236:11
238:5,6 239:8
242:23 244:17
253:21 254:10
255:12 256:21
260:11 263:18
265:16 267:2
272:3 274:9,19
275:25 282:21
283:6 284:19
289:15 290:13
292:11 300:24
305:9 306:20,23
319:5 321:14
325:8 326:4
328:11 329:10
335:3 341:5
349:18 350:16
369:6 371:15
372:23 375:22
378:8 386:2 387:5

387:10 388:9
391:15 395:13
396:18 402:16
406:17 411:6,10
418:6 420:5 422:2
422:19 424:10,12
426:15 428:5
old 34:24 53:2
  329:19 330:6,9,11
  330:13
older 41:14,19
once 303:20 426:9
  426:11
ones 24:17 34:12
  49:23 121:2
  181:13 227:17
  231:9
ongoing 67:18
  240:11 242:8
  249:16 250:6
  281:22 282:9
online 32:12
onshore 78:25
  83:9,11 85:9
  86:18,20 109:16
  110:14,18 116:22
  117:2,4,6,22 118:6
  118:11
open 154:2,11
  155:16 156:12,17
  306:22,23 316:12
  374:6 411:5,9
  428:4
opened 319:15
opening 411:20
opens 375:15
operate 115:18
operated 41:2
opinion 301:25
  401:7

**opportunities** 74:7
228:23 229:23
230:3,8,22 231:12
231:18,23 232:4
233:9 408:3
**opportunity** 7:5
138:4 230:12,13
232:9,20,23 234:2
234:8 407:14,21
**opposed** 31:6
32:20 33:4 101:15
105:18 113:6
156:17 229:24
243:12 322:21
331:4
**opposite** 262:14
411:17
**opt** 151:22 152:4
**option** 25:11,23
180:21,24 183:13
**options** 151:22
181:7,8,9,12
182:14
**optiplex** 378:5,17
379:6,9,19 380:25
381:11 382:7
384:19 391:18
392:4,7,23 393:6
394:10,12 396:4
396:10 399:16
400:2 401:22
403:2,23 404:14
407:17,20 408:12
**oral** 195:11
**orchestrated**
300:11
**orchestrating**
300:5
**order** 1:19 10:25
31:19 32:5 36:2
43:24 133:2,14

135:17 136:8
143:23 152:13
286:19 296:12
306:7,12 339:15
342:17 343:5
357:25 363:21
376:19 396:19
401:20 411:3
**ordered** 380:13
**org** 282:21 283:7
283:11 290:19
291:15 296:23
302:16,18,23
303:9 304:9
334:14
**organization**
282:22
**organizational**
283:21 285:19
286:6,21 287:23
288:9,17 290:16
293:20,25 294:18
295:9,15 296:14
297:19 298:24
301:6,20 304:2,12
305:13 307:10,17
310:9
**original** 3:9,17
64:24 99:8 100:18
100:25
**originally** 72:18
**originate** 93:6
94:20,21 96:4
98:11 108:17,20
108:24 110:5
115:11 116:17
**originated** 97:24
98:3,5,17,18
110:22 111:3
113:22 277:22

**originates** 93:2,4
95:10 111:17
113:16 114:6
**originating** 96:20
97:22 108:12
234:9
**origination** 107:13
107:15 109:5
114:2 228:22
**originations** 230:5
**originator** 109:17
113:8
**originator's**
109:20
**outcome** 5:8
432:17
**outline** 387:16
**outlook** 32:11,23
33:14,15,22 34:4
34:16 35:3 41:18
42:3 369:23
**outset** 15:6
**outside** 28:13
45:18,20,22,25
47:3 89:11,22
116:6,14,16
144:22 199:9
216:11 290:22
293:17 294:23
306:7 307:11
357:18,18 381:15
**outsiders** 306:22
**overall** 68:19 99:6
229:11 413:7
**oversaw** 281:9
**overseeing** 81:5
**overtime** 247:12
344:2
**overture** 71:16,18
**owe** 119:9,12,17
120:23

**owed** 120:7,13
121:2,5 122:5,20
**owing** 120:15
121:17
**owl** 406:14
**owned** 63:22,25
85:16 92:19 231:3
325:25 326:3
332:21 339:11
357:22 359:2
**owner** 258:19
**ownership** 63:22
119:5
**owns** 87:8

**p**

**p** 2:2,2 3:2
**p.c.** 343:4
**p.m.** 168:6 170:17
238:18 428:19
**package** 90:13
174:24
**packed** 171:8
**pad** 14:16
**page** 58:22 59:3,7
59:10 60:14 61:8
98:9 100:2 131:14
167:14,16,23,23
167:24 204:19
243:5 275:8
288:14 289:17
292:16 295:14,19
304:19,21 305:6,8
305:25 309:15
316:16 430:6
431:4,8,13 433:5
**pages** 291:17,23
292:3 304:20,20
**pagination** 167:25
**paid** 22:21 108:24
202:14,17 207:18
207:19,21 208:2

208:11,13 210:17
211:14,22 212:7
212:12,20 240:10
241:13 246:2
248:4 250:2
273:14 317:9,12
**pain** 171:7
**painting** 109:15
**paper** 14:16
**paragraph** 59:10
276:3
**paragraphs** 59:16
**paralegal** 50:20
**parameters** 96:5
264:24 373:13
**parent** 55:20
111:11
**parenthetical**
246:4
**parks** 158:7
**part** 34:19 64:20
64:22 68:21,21
85:21 89:8 90:12
98:14 100:18,19
117:6 118:8
127:18,20 133:9
155:8,10 162:20
162:22 165:20
187:5 204:19,22
231:25 242:8
244:13 247:8
250:5 272:9 291:9
293:6 304:25
345:23 383:13
384:11
**participated** 27:22
**particular** 21:19
33:5 92:22 94:7,8
94:16 97:16 99:20
103:5,24 104:15
122:13,14 136:7

141:25 193:9
206:15 222:15
235:10 297:13
328:21 340:7
341:8,12 367:20
369:11
**parties** 1:20 3:7
4:12 90:10 92:16
98:16 108:24
112:20 113:21
115:20 120:24
133:7 428:9
432:15
**partner** 73:11
82:24 83:4,16,24
85:11 86:6 116:22
117:2 118:3,19,24
119:6
**partners** 85:12
116:21,25 117:11
117:17 118:8
119:2,12,13,18,19
124:16 125:3
126:19,23 128:8
129:2,17,19,20
130:7,16 143:16
143:17 144:6
207:2,9,10 430:10
**parts** 54:23,25
57:18 425:7
**party** 5:6 8:4,7,11
8:13 109:4 116:14
116:16 144:3,6
**password** 323:3
323:11 339:17
340:20,24 341:4,6
341:7
**passwords** 341:12
342:9
**paste** 291:2

**paul** 1:3 2:5,16
4:17 6:23 66:9
120:8 121:14,18
122:2,6,21 123:20
124:13 132:7
153:15 168:4
169:8 178:12
179:25 180:5,12
184:3 213:3
231:21 237:13
238:16,24 239:8
239:12 241:5
243:2,10,11,14
244:7,9,13 249:20
253:9,14,14,17
259:19 260:2
270:13 271:16
276:4 289:18,23
298:7,8 304:3
315:12 316:19
320:11,12,14,16
376:21,23 377:25
378:2 381:2
414:23 416:21
433:2
**paul's** 136:12
396:16
**pay** 108:15,16,18
155:18 159:8
207:15 246:16
**paying** 19:23 20:2
21:10,14 23:12,17
23:20,24 26:15,17
27:3,13,16,18
108:10 109:4
205:20
**payment** 90:10
109:9,10
**payments** 215:9
**pays** 22:13 23:7

**pdf** 167:24 304:19
**pending** 11:17
**pennsylvania** 2:11
**people** 23:10 47:7
47:9 49:12,17,19
49:22 66:5,7
68:25 71:20,21
72:14 95:9,17
96:2,19,22 160:17
266:22 272:13
275:20 278:14,16
278:20,20 279:4
280:16 284:23
285:6 286:22
293:18 306:24
307:13,14 310:8
320:9,22 324:20
334:15,19 349:5,6
**people's** 22:8
367:3 368:10
**perceived** 228:10
**percent** 63:25
105:23 262:6,9
310:6
**percentage** 106:4
107:21 109:5
206:25
**percentages**
207:16
**perform** 30:15
154:14 201:10
**period** 33:18
34:15 36:6 38:25
40:25 47:11 66:13
66:18 70:12 104:6
125:18 151:5
152:16,20 153:25
157:4,7,10,16
158:14 176:12
180:7 192:23,25
196:23 197:2,17

197:25 199:5,12
199:22 207:3
211:9 231:13,15
245:8,22 246:11
247:3,9 248:8,11
249:18 266:17
270:12 284:8
311:20 325:10
328:16 329:14
333:21 340:13
344:2 357:13,14
358:10 419:17
**periodically** 342:3
345:18 403:13
**periphery** 161:19
**permissible**
354:22 364:22
**permission** 371:7
**permitted** 132:7
336:20 376:20,21
**person** 45:19
46:17 47:10 49:4
49:9 52:19,23,25
53:3 63:15 68:23
93:15 125:14
151:11 163:7
170:4 177:12
227:22 340:22
388:11
**personal** 15:2
19:18,20 23:14
56:7 146:3 147:8
160:24 335:12,14
335:17,20,21
336:2,13,20,25
338:14 339:5
348:3,9 349:16,19
350:3 352:20,21
353:11,22 354:8
354:14,23 355:7
355:18 361:19

362:6 363:12
364:12 373:16,20
375:15 376:17
379:8 381:9
391:25 392:10
393:4,5,21 395:11
395:19,21,23
405:12,13 407:2
407:11,25 411:2,7
411:22 416:22,23
420:13 422:15
425:3,15
**personally** 8:11
41:25 175:3 415:6
**personnel** 366:6
**perspective** 170:6
177:10 181:15
199:12 202:7
204:3 361:6
**pertained** 204:2
**pertains** 90:20
143:17
**phase** 113:21
**phone** 19:8 49:4
177:19,21 179:8
194:2,3,7 241:18
241:20 247:20
257:18,20 261:2
342:21,22
**phones** 18:22,22
19:2,4
**phrase** 40:18
174:11 326:9
**physical** 343:15
**physically** 43:12
123:21 148:20,22
167:4
**pick** 4:7
**picture** 18:19
109:14 182:19
362:7 363:13

**piece** 273:3 427:23
**pieces** 102:13
390:9
**pinnacle** 323:8
**pinpoint** 176:12
**pittsburgh** 2:11
**place** 4:11 9:8
39:16 41:3 44:22
64:9 107:3 115:23
116:6 127:7
148:10,12,14
149:9 172:2 176:7
177:12,15 178:3,8
184:24 188:18
193:13,15 383:2
429:11
**placement** 345:5
**places** 324:11
**plaintiff** 1:4,18 2:4
4:17 5:19 6:22
59:13
**plaintiff's** 237:5
430:4
**plaintiffs** 51:25
58:25
**plan** 152:14 388:2
388:2 426:17
**plane** 165:21
**planning** 147:14
**plant** 360:10
**platform** 49:5
**platforms** 44:18
97:21 230:4
**play** 106:14
108:18 276:13,23
**played** 35:11,15
107:12
**please** 4:6,9 5:9,13
6:10 10:9 11:11
12:25 15:6,21
16:4,18,25 17:2

58:22 65:3 75:21
145:11 154:22
164:15 168:10
183:24 189:10
190:15 224:18
240:19,22 274:20
287:17 313:8
314:20 315:19
340:5 362:20
381:13 382:11
391:7 421:14
422:21 424:7,11
428:18
**poem** 353:22
**point** 11:10,15
41:8 43:4 67:4
69:4,8,11 73:18
74:5 79:6 89:19
105:5 120:14
121:10 125:18,24
151:10 156:20
159:6 166:10
171:10,23 192:9
202:21 213:21
214:13 227:7
228:17,24 230:20
231:4 239:11
246:7 249:14,19
249:23 250:7,10
252:21 257:25
261:3,3 264:4
266:16 269:14
283:18 285:9
289:6 297:14
307:3 312:24
314:11 335:25
344:6 354:21
359:14,15 363:24
364:5 366:22
384:12 409:2
415:24 416:15

417:8 418:8
**pointed** 225:9
256:12
**points** 47:15,16
72:10 244:6
261:16 365:8
**policies** 14:20
17:20 28:25 52:2
91:22 336:5,9,17
337:20 350:25
352:2,5 353:21
354:2,6,12 355:14
355:16 356:6
363:22 364:20
367:11 398:10
404:23
**policy** 108:10
109:4 364:11
365:2
**portion** 290:16
387:16 425:11,12
**portions** 397:23
**position** 137:23
220:17,24 221:7
223:8,22 255:7
266:12 267:13
274:10,12 283:22
290:4 314:14,17
**positions** 72:23
286:22 413:5,13
**possibility** 213:11
**possible** 4:10
12:23 27:11,17
43:13 149:3,10,23
150:4,10,13
153:17,19 186:4
208:4 215:14,22
240:8 271:21
273:24 285:25
324:24

**possibly** 219:18
**post** 128:21,25
232:2
**posted** 129:11
**posting** 18:17
**potential** 93:8
140:23 179:25
180:2 189:15
193:3,7 238:20
303:5 408:15
414:25
**potentially** 122:23
123:22 158:10
189:20 220:24
242:9,11 253:17
297:3 299:24
303:25 305:11,14
346:13 361:22
408:5 409:19
414:24
**practical** 82:12
**practically** 82:13
**practice** 227:12,14
297:5 307:15
401:8
**practices** 335:22
**pre** 241:19
**preceded** 17:17
**precise** 177:25
**predate** 369:22
**predated** 34:14
**predetermined**
101:17
**predicting** 181:16
**preempt** 16:23
**preempting** 17:7
**prefer** 384:12
**preference** 104:5
425:21
**premise** 141:20,23

**prep** 28:13 48:21
**preparation** 28:7
34:13 47:24 58:14
**prepare** 27:20
28:2 30:2 48:6,8
175:6,12 181:15
181:24 182:4,22
183:3
**prepared** 59:19,24
59:25 60:5,18
179:19 210:4
**presence** 199:9
216:11 295:17
381:16
**present** 2:15
**presentation**
291:3 292:13,14
306:4
**preservation**
360:14 380:3
394:2
**preserve** 43:25
346:18 356:21,23
357:4,7 359:8,10
361:21 380:8,23
383:13 392:6,25
393:5,8 396:20
398:8 401:4
405:25 410:4,11
411:8,15
**preserved** 356:14
357:12,25 358:10
358:12,17 360:25
397:6
**preserving** 360:7
379:4,10 380:4
383:17 396:23
399:13,14,19
400:22
**president** 294:16

**pretty** 120:3,3
135:6 342:10
**preventative**
383:19
**previously** 10:4
81:11 98:18
111:18 128:4
166:23 174:15
182:12 217:20
258:2 311:4,22
398:9 403:8 404:8
410:21 412:22
425:17
**prices** 106:9
**prior** 33:25,25
34:2 39:17 40:16
40:19 41:3 46:4
46:13,24 47:18,22
67:5 73:10 84:18
124:9 132:10,20
134:12,21 158:18
158:19 169:14
170:4 172:3 173:7
184:24 187:23
188:3,5 206:5
208:5 214:14
218:18 219:15
231:23 238:17
250:15,19 251:15
252:2,21 253:9,18
257:20,25 258:6
265:19 270:18
296:24 301:7
311:13 312:2,14
317:23 320:2
327:19 328:3
330:19,21,24
334:24 385:9
399:11 402:14
403:20 412:10,18

**privacy** 350:9
351:13 352:8
361:16 367:14
379:15 381:5
405:5 412:23
**private** 4:8
**privilege** 16:3
**privy** 216:14
**probably** 7:24
21:22 33:7 39:25
49:20 67:13 71:5
101:19 158:15
229:15 235:8
254:20 257:14
319:7 324:19
327:3 340:11
360:20 389:25
406:13,15
**procedure** 1:20
352:5 364:11,20
**procedures** 14:20
17:20 28:25 52:3
143:11,13,14
336:5,9,17 337:21
350:25 352:2
353:21 354:3,7,13
355:15,17 356:6
363:23 367:11
398:11 404:23
**proceed** 75:21
189:10 190:15
**proceeding** 5:13
52:8
**process** 35:12,15
46:14 70:20
129:14 183:13
249:16 281:22
282:10 293:9,10
294:22 295:2,3,4,6
295:7,12 297:19
301:14 358:13,14

412:5
**produced** 28:5
209:5,16 290:22
304:13
**producing** 36:6
**production** 35:11
35:23 209:22
229:11
**profile** 94:12
**profitability**
232:12,12,17
233:11,18
**profitable** 234:7
234:11
**profits** 207:2,16
**prognosis** 165:2
**program** 343:4
403:9
**prompt** 369:7
400:12
**prompted** 400:10
**proper** 16:10,14
307:15
**properly** 257:11
**property** 343:16
**proprietary**
416:19
**propriety** 406:18
**prospect** 71:11
172:23
**prospective**
217:14 218:12
251:25 253:8
259:14 304:6
**protocol** 31:6
**provide** 11:4,23
88:9 132:19
137:14 149:16
152:8 159:8 162:9
273:19,23 275:10
300:2 330:6 355:6

355:6 402:20
**provided** 11:19
29:7,7 51:6 61:24
62:3,16 130:23
132:9,19 137:8,19
138:22 187:3
197:19 201:24
205:16 210:13
214:19 253:24
256:9 260:15
287:6 292:10
311:2 329:18
339:12 345:18
403:8 404:7,8
423:12
**providers** 270:9
357:19
**provides** 134:11
151:22,22 285:24
**providing** 52:7,9
88:14 134:11
154:3 158:22
159:23 160:9
273:22 301:25
310:24 423:13
**provision** 130:20
131:5,19 213:4
**provisions** 59:15
130:20 203:25
**psc** 396:25 397:3,9
**pst** 41:10,13,13
**public** 1:22 6:14
429:22 432:7
433:25
**pull** 32:7 56:14
57:4 237:9 274:25
315:24 316:2
**pulled** 145:11
275:3 313:24
**pulling** 31:3

**purchase** 105:21
106:9 112:11
**purchased** 40:18
325:24 326:2,18
327:18 328:13
330:18 331:14,24
332:18,21 333:17
335:5 336:21
337:14 338:7,22
339:2,5,10 344:8
345:7,14 349:12
353:24 354:16
362:8 363:14
376:23 378:3
400:23
**purchases** 112:4
112:16,19
**purchasing** 106:3
106:7
**pure** 94:24
**purpose** 335:8
346:7,8 403:10,19
404:9
**purposes** 86:19
94:16 115:24
116:7,15 120:25
122:15 273:5
319:8 326:7,11
379:21
**pursuant** 1:18
80:13 128:12
134:9 135:18
136:20 197:19
207:19,22 210:18
211:11 222:11
383:16 398:10
**pushback** 414:20
**put** 70:13 101:19
107:3 244:2
261:15 262:19
263:8 278:2 364:3

391:3
**putting** 311:23
344:17 361:17

## q

**qualifications**
349:7
**qualified** 91:12,15
91:19
**qualifies** 90:15
91:4 94:11
**qualify** 150:4
**quantity** 407:15
407:19 416:18
**quarter** 199:22
**question** 10:5,8,13
10:15,18,20 11:17
11:18,20 15:14,25
16:15 17:8,13,16
21:17,21 25:20
37:12 42:15 43:2
44:3,16 46:9,22
48:11 58:17 65:4
65:11 69:7 79:16
80:24 81:22 82:12
84:19,24 87:6,20
89:18 90:24 93:9
107:7 109:2 111:6
111:24 113:3
120:11,25 122:16
128:5 133:11,21
134:4,7 135:15,20
137:2 139:10
141:17,19,23
142:12 144:18
147:16 149:15
154:10,18,19,23
154:25 155:9,12
155:15 156:5,10
156:11 157:9
160:4 162:5
164:11 165:3,12

166:17 174:4,9,15
174:19 176:15
178:15 179:5,13
184:15 190:17
191:2,5,12,17
192:5,13,16
195:10,17 196:8
196:21 198:11
200:11,16,18
201:4,19 202:9
204:15 205:14
212:4,18 214:5
215:17,22 218:24
219:21 222:4
223:17,18 224:18
225:14,18 233:7
233:14 234:24
236:4,11,21
238:10 240:15,17
240:18,21,22,25
242:2,17,19,23
245:11 246:25
247:5 248:16
249:25 254:4,12
256:6 258:10
262:13,22 263:2,4
263:14 267:6
268:4,7 273:5
277:2,19 280:17
283:15 284:6
286:24 294:14,15
295:13 298:18
299:3,5,20 301:23
303:12,23,24
304:24 305:10,17
307:22 308:3,7
311:6 312:22
313:2 316:15
317:6 319:8 321:7
336:7 347:13
352:25 353:8

360:3 361:11
362:2,18,22,24
363:8,9 364:6
367:7,17 368:12
377:2,10,18 378:8
378:14 379:2
380:15 381:21
382:8 392:17,18
394:18 395:2,6
402:12,18 410:6
410:13 415:16
418:5,5,9,17
419:15 421:4,14
421:23,24 422:4
422:22 424:5
431:13
**question's** 394:5
**questioning** 11:13
15:24 386:4
**questions** 6:25
13:12 16:5 17:14
29:16 86:19 88:24
134:22 173:7,15
177:24 191:22
195:13 238:4,8
279:18,20 284:25
291:21 340:4
388:5 402:15
417:16 421:11
425:20 426:6
431:12
**quick** 60:3 138:4
398:14 411:10
**quickly** 10:2
**quite** 285:16
325:17 344:15
411:16
**quote** 310:6

## r

**r** 2:2 3:2 6:12
274:3,16 429:2
432:2
**ra** 109:12
**rackson** 274:14,15
275:9 276:12
278:3
**raise** 362:14
**raising** 149:15
**range** 211:16
**ranging** 369:9
**rare** 363:2
**rarely** 262:8
**raskson** 274:18
**rational** 317:14
**reach** 71:9,10
73:10
**reached** 71:14
73:16
**reaches** 42:4
**react** 234:16 235:5
235:5 236:14
**read** 13:7 57:16
130:25 131:25
154:22,25 155:8
155:10,12 168:10
170:20 238:5
240:21,25 261:12
373:17 374:8
375:23 418:15,20
**reading** 241:4
243:4 245:25
257:5 427:3
**ready** 6:7 387:11
391:10
**really** 12:20 32:17
60:17 71:3 101:22
126:25 146:13
148:3 192:9
235:21 257:18

277:6 326:15
350:5 385:7
413:13 421:12
426:20
**realtime** 359:20
360:23 406:8
**rear** 396:14
**reason** 11:23
16:23 125:7
126:12 145:24
147:12,23 149:15
159:7 160:9,25
183:14 186:17,23
187:2 206:9,15
221:6 224:11
239:2,6 295:3
315:5,8 371:5,6
394:24 401:13
403:5 419:9 433:5
**reasonable** 146:22
388:10 389:7
**reasoning** 153:22
**reasons** 120:25
335:17,21
**rebate** 88:9 89:4
90:4,5,16,17 91:4
91:13,14,20
**rec** 319:20
**recall** 8:9 9:10,15
20:21 24:4 28:12
28:15,17,21 29:3
29:14,17,21 30:17
39:5 40:24 41:7
41:15 42:11,17,21
42:24 43:3,9 52:4
52:23 70:11 71:3
71:6 73:5 74:19
134:25 135:3,10
135:13 138:24
139:2,11,14,18,21
140:19 144:20

146:9,13 147:11
148:6,12,19 149:7
158:5 161:9 163:5
163:6,16,18,20,21
172:22 173:3
176:9,10 177:18
179:23 181:23
182:3 184:10,17
184:22 185:5,20
186:2 187:2,22
188:20 189:16,18
191:19,23 192:2,8
192:8,14,17,21,24
193:9,15,25
196:10,10,13,23
197:16 198:6,13
199:5,16,18,24
201:21 204:6,7
205:25 206:8,12
206:13,19,19
207:5,7 209:2
213:6,7,9,17 214:7
214:21 215:12,19
215:24 217:12,17
217:21 218:3,17
219:5,11 221:4,14
221:21 224:24
225:2,5 228:13
229:16 230:18,19
230:25 231:6,7,11
231:20,24 234:14
234:19 236:10
244:2 253:6,12,20
254:8,24 255:6,11
256:19 257:3,23
258:25 259:8,17
259:23 260:21
261:7,21 262:11
263:19,24 264:2,6
264:11,19 265:2
265:12,16,19,21

265:25 266:3
268:10,18,22,24
269:4,7 274:7,10
274:12 278:15,19
278:20 279:4,9,16
280:3,7 281:6,11
281:23 289:4,11
314:17,24 315:4
320:5,6 321:12
334:4 335:17
345:9 353:8
357:16 379:4
382:16,19 399:8
399:11 400:12,18
401:15,18 409:3
412:2,20 419:2
**recalled** 199:2
225:8
**recalling** 177:11
399:24
**recalls** 185:10
**receivable** 90:11
**receive** 55:4
206:25 249:4
**received** 33:25
35:5,8 55:7
145:25 153:24
159:16 172:10,11
211:11 220:8
257:20 311:12
319:10 365:13
**receiver's** 370:18
**receiving** 159:4
273:15
**receptive** 71:16,18
**recess** 138:13
190:11 217:7
287:19 314:4
316:7 341:15
371:25 383:20,25
386:15

**recipe** 362:7
363:13
**recognize** 57:10
57:19,21 130:8,16
130:17 145:18,23
167:21 274:13,18
287:25 288:7
426:2
**recollection** 39:7
39:21 48:14 51:3
51:21 52:24 54:20
66:4,15,19 68:3
71:2,4,13,17 72:9
73:15 137:17
146:15 147:3,4
149:6,13 161:16
162:14 163:9
164:3,24 165:15
165:23 166:8,25
169:17 175:18
176:3,11 177:15
177:21 178:5,17
179:15 187:12,16
194:16,18,25
195:7 200:5
204:11 205:18
213:24 219:25
220:6 222:6,10
223:14 224:8,10
225:23,24 226:6,8
228:21 232:7
233:23 234:23
238:7,15 255:24
256:2 266:15
272:6 273:10
278:13,25 279:14
279:24 280:8,24
281:16 282:8,18
283:13 284:8
285:9 307:3
319:21,23 325:14

327:22 329:17
330:2 331:10
340:19,21,25
341:3 342:19,25
343:7,19 353:3
358:5,6 379:24
380:5,18 383:7
384:7,24 393:19
393:24 395:8,15
395:22 398:4,19
398:23 399:18
400:5 401:2,7,12
405:15 406:7,13
407:23 409:22
410:20 411:24
413:17 415:18
416:17 422:7
423:6,21
**recommendation**
214:8 218:16
219:19
**recommended**
220:15
**record** 4:4,13 5:11
5:22 10:17 17:6
19:9 75:10,12,15
75:18 138:11,16
168:10 188:22,24
189:4,7 190:7,10
190:14 217:2,6,10
267:6 271:4,6,8,11
321:16,18,22,25
372:4 381:22
386:8,11,18 387:4
391:11,13 424:16
428:13 432:12
**recording** 4:10
**reduction** 270:17
**reed** 2:9,17,19
5:24 7:2 19:15,21
19:24 20:2,6 50:4

reedsmith.com
2:12
**refer** 37:13,23
62:12,17 83:18
84:22 88:23
146:18 178:2
266:6 320:8 378:4
**reference** 62:12
88:22 133:6
184:23 185:6,11
304:24 305:4
312:7 413:24
**referenced** 21:11
34:15 69:17 72:21
82:18 83:10 131:6
135:9 144:4
171:25 184:12
185:15,22 193:13
247:21 256:3
259:13 344:10
382:12
**referencing**
135:13 169:9
176:25 179:3
381:15 397:4
**referred** 13:6
127:10 154:24
155:11 240:24
418:19
**referring** 38:21
42:20 62:10 83:4
84:9,14 86:25
97:15 100:5 108:4
119:20 127:12
128:24 130:21
131:5,6,23 143:14
146:19 150:17
157:24 160:22
173:22 176:7
222:23 228:25
246:8 254:21

267:4,17 291:15
297:10 325:4
334:25 353:18
374:4,10,13
377:24 382:22
**refers** 141:11
317:11
**reflect** 290:14
295:16 301:7
343:10
**reflected** 319:13
**refrain** 16:19 19:7
**refresh** 147:3
203:9 204:10
238:6,12,14 256:5
**refreshed** 51:3,7
51:10,12,20
**refreshing** 51:18
**refund** 88:8
**reg** 39:11
**regard** 205:16
**regarding** 20:18
89:24 146:2
164:24 173:9
174:16 192:3,21
199:25,25 200:2
228:14 263:25
264:7 401:19
404:18 413:7
**regardless** 149:24
292:19 293:16
334:5 357:23
360:7
**registered** 31:22
39:12,18,22,23
40:11 41:5 43:21
45:9,13 46:2,6,15
77:16 357:10,10
358:3
**registration** 39:11
39:15,17 40:20

46:14
**regulated** 285:18
285:22
**regulation** 364:11
**regulations** 32:5
360:11,14
**regulators** 286:2
**regurgitating**
244:6
**rehab** 163:3
**reign** 374:8
**reimbursements**
158:23
**related** 5:6 13:24
14:8 16:2 18:5
46:7 52:16 57:25
84:11 87:24 88:3
88:5 108:6 110:21
110:22 112:20
113:21 143:21,25
214:22,23 252:23
252:24 299:9
335:8 347:9,11
349:15,16,20
358:9 370:4
373:13 378:22
391:25 393:13
432:15
**relates** 86:24
**relating** 238:19
242:9 257:24
**relationship**
110:17,24 111:7
118:25 119:5
151:17 180:25
181:5 218:7
**relationships** 73:4
**relative** 81:25
383:2 384:4
**relay** 31:15,16,17
32:2,10,21 33:5

34:5 35:2,11,14,17
36:3,13,19,25
37:19 38:7,10,15
38:23 39:6,8,16
40:8,17 41:8,22
43:12,14,19,24
347:5 365:16,21
366:2 367:4,21
368:3 370:11
372:12,14,20
373:2,9 396:12,17
397:6,10,15,20
398:2 412:17,21
413:2 415:8,21
**relayed** 225:20
**relevant** 103:22
104:4 359:17
**reluctant** 388:20
**rely** 309:7
**relying** 226:5
399:5
**remain** 149:2
150:3,12,16 153:2
154:11,16 156:13
166:4 267:21
269:22 292:23
401:16
**remained** 66:23
270:6 298:21
**remaining** 64:3
426:13
**remains** 132:5
293:4
**remember** 76:25
107:4 164:18
198:21 254:18
362:17 392:17
398:17 414:17
**remembering**
182:14

**remote** 13:11
**remotely** 1:20
4:24 345:25
**remove** 298:7
301:15 413:24
**removed** 283:7,10
296:21,23 298:9
298:24 301:20
311:12 409:24
**repeat** 10:5 13:3
25:19 91:2 115:14
116:9 240:18
267:5
**rephrase** 89:18
190:6 200:15
248:17
**rephrasing** 103:14
**replace** 382:6
**report** 259:5,9
273:18 286:21
406:25
**reported** 260:10
409:17
**reporter** 5:3 6:10
10:24 12:15,19
13:4,8 56:25 75:2
77:19 102:22
117:4 129:23
132:14 138:4
145:8 154:22
155:2,13 167:11
183:8 203:4
218:21 237:7
240:21,23 241:2
386:5 416:8
418:15,18,21
419:9 428:15
**reporting** 258:7
258:14,18 302:14
433:1

**reports** 35:25
**represent** 5:4,19
6:22 19:17 262:6
304:11
**representation**
177:4
**represented** 19:14
250:13,19,22
**representing**
94:15 276:12
**request** 62:4 75:4
275:17 317:24
319:19 329:2,22
405:15
**requested** 314:20
315:9 405:23,25
431:7
**requesting** 314:24
315:4
**requests** 35:6,8
359:12
**require** 45:3 342:8
342:8 360:14
**required** 31:23
40:16 43:23 44:7
44:15 172:19
273:17 357:12
368:6 402:2,20,23
**requirement**
39:10 133:13
347:6,8
**requirements**
31:20 45:2,10,14
144:11 357:9
**requires** 44:20
45:3
**research** 68:21
**reservations**
140:21
**reserved** 3:22
331:17

**reset** 270:10
**resident** 45:11
46:5
**resolve** 297:11
**respect** 15:2 17:8
33:14 34:16 43:11
44:17 45:8 46:2
56:4,8 59:20
74:20 76:4 79:21
80:7,25 81:2
82:17 83:8 84:23
85:3,8 87:19 91:9
93:10 105:2,4
106:13,14,17
109:15 135:25
142:17 158:4,10
159:23 161:22
162:21,24 165:2,4
178:7 181:4
194:11 196:3
213:16 221:8,9,14
221:18,22,24
222:8 226:8 236:7
241:9 247:7
251:25 264:14
276:13,23 279:21
280:8 281:22
282:2 284:12,12
297:12 298:6
310:15 318:15
347:5 349:8,9
350:9,10,12,23
352:6 357:9
365:10 367:14
369:6,14 370:3
378:11 381:5,16
383:17 392:20
399:4 400:21
402:25 406:19,23
414:6,7 418:23
420:19 421:4

425:23
**respective** 3:6
**respond** 59:25
170:18 171:5,18
255:12
**responded** 261:16
261:25 262:16
263:6
**responding** 196:20
225:17 293:18
**responds** 276:2
**response** 11:19
170:15,23 172:5
173:7 202:5 256:7
291:20 363:25
380:22 415:5
**responses** 11:4,5
257:17,18 292:21
**responsibilities**
172:24
**responsibility**
83:13 85:8
**responsible** 79:17
81:4 84:15
**responsive** 61:21
262:22 263:2
**rest** 131:25 171:8
339:8
**restate** 377:9,21
**restaurant** 148:7
**restriction** 270:17
**restrictions** 41:16
82:10
**restroom** 138:5
358:20
**result** 11:3 185:19
186:8 256:13
413:4 426:5
**resulted** 73:14
423:12

**results** 415:22
**resume** 70:13
**retain** 174:23
**retained** 428:12
**retire** 123:7
140:16,20 141:10
141:21 142:22,23
143:6,8 147:14
149:19 164:2
170:8,14 182:20
215:8 266:22
303:5
**retired** 124:4
208:4 271:17
272:4,20 273:6,14
276:4 278:4 279:7
279:11,25 280:5
281:13,20 299:17
300:21 312:2,8,21
315:12 316:20,24
317:4 318:7,15
319:25 320:16
321:5
**retirement** 123:23
142:17 144:12
147:24 148:16
168:12,20 169:10
169:13,18,21
170:25 171:18,25
173:9,18 174:16
174:24 178:21
179:4,16 183:18
185:15,16 190:2
190:19 191:6,15
191:24 192:3,15
192:22 194:14,21
195:2,14 196:4,15
196:16 197:6,24
198:20 199:12
213:13 260:17
264:7,15,20 269:5

272:17 278:17
279:3 300:16
**retires** 180:21
**retiring** 123:12,18
123:19,22 140:23
140:25 141:5,6
142:8 165:4,9,17
166:14 167:3,9
175:25 178:12
179:9,20 236:2
263:21 264:3
266:14,19,22
267:15 268:25
279:11 282:6,15
282:20 312:14
320:11 430:14
**retort** 254:15
**retreading** 361:25
**retrieve** 43:5
401:20
**returned** 329:19
**returning** 106:21
161:24
**reverse** 162:4
**review** 29:8 35:2,3
57:12 60:3 199:6
228:3 237:20
272:18 351:4,6
356:12,16,20
357:6 359:9
361:22 366:11,15
366:24 367:22
371:7 378:16
407:14,21 409:6
413:2,3 426:12
**reviewable** 373:22
**reviewed** 28:3,10
28:12,15,24,25
29:2,4,5,9,13,18
29:22 30:14,25
34:12,13 51:17

54:14,19,22,25
58:13,20 203:24
319:16 320:6
359:13 364:2
373:23 378:15,23
408:2 412:20
**reviewing** 29:24
30:7 48:5 57:23
58:10 199:18,24
360:22 366:10
392:22 412:14,16
**reviews** 57:11 58:5
59:22 60:7 61:13
62:2 131:15,22
145:14,21 146:11
146:21 147:17,19
167:12 168:2,21
169:24 170:9,21
171:20 172:15
173:12 175:17
176:17 203:5,19
237:15,25 238:21
239:16,23 243:6
243:16 245:23
247:22 249:7
256:25 257:8
260:7,19 261:5
275:15,23 276:9
276:15 278:7
283:2 284:21
288:3,10,21 289:2
289:22 290:6,17
291:11 292:6,25
294:5 304:16
306:17,25 308:25
310:12 314:9,22
316:13,21 318:9
320:3 408:2
422:11
**revise** 173:11
239:4

**ria** 297:8

**ride** 414:25

**right** 6:16 7:10
10:10 14:15 15:20
17:10 19:5,15
21:13 22:23 23:3
23:8,15,22 24:3,9
24:20,24 25:6
27:7,15 29:20
30:4 31:7 32:13
33:6 35:13,21
36:10,21 39:3,9,13
39:24 40:12,14
41:6,23 42:16,24
43:8,18 44:4,13,24
45:6,16,24 47:5,12
47:20 48:13,24
49:14 50:8 52:5
52:14 54:18 56:9
57:20 58:4,6,18
64:6,12,17,21
65:13,19 66:3,8,14
67:7 70:25 71:9
76:12,16 78:2
79:10,15 80:10
81:10,23 82:20
83:17 85:6 89:6
89:13 90:8 92:6
94:5 96:9 97:19
103:16 107:24
108:22 109:6,23
111:5,23 113:20
114:7,13,22 115:5
115:13 116:2,18
116:23,24 117:12
117:18 118:12,13
118:18 120:5
121:7 122:3,8,22
123:16 125:6,10
125:11,20 126:20
128:10,20 139:20

140:7,18 143:22
144:19 145:22
146:7,12 147:10
147:18 148:11,18
149:11,12 150:2,6
150:14 152:11
154:15 156:3
159:12 165:14
166:7,15,24
168:22 169:16,21
171:21 172:6,16
173:2,13 174:20
176:8,18 177:7,14
177:20 178:16
179:14,23 180:8
180:10,15 181:2
181:19,20 182:2,8
182:9 183:6,10,25
184:9,16,21
186:12 187:15,20
188:2,11,15,19
191:18,25 192:7
192:20 193:11,14
193:18,24 194:4,6
194:16,17,23
195:6 196:9,19
197:8,15 198:22
199:15,23 201:7
201:20 202:10
204:5 205:3,10,13
205:17,24 206:4,7
206:11,18 207:3,4
207:13,17,24
208:6,11,17,25
209:6,11 210:2,14
210:22 211:2,13
211:20 212:5,10
212:19,25 213:5
213:14,23 214:6
214:20 215:11,18
215:24,25 216:6

216:12,17,18
217:16 218:2,14
219:10,19,23
220:4,5,13,20
221:3,13,20 222:5
222:17,25 223:12
223:13 224:7,23
225:4,16,23 226:7
226:15,25 227:13
227:19 228:2,12
228:20 229:2,10
229:22 230:9,17
230:24 231:10,19
231:20 232:6,14
233:3,16,22
234:17,18,25
235:7,17 236:5,22
238:11,22 239:5
239:22,24 241:3
241:16 242:4,20
243:5,8,14,15,24
243:25 244:4,11
244:12,19,23
245:24 246:6
247:6 248:12
249:8 250:21
251:2,7,14,21
252:4,8,15 253:5
253:11,19 254:7
255:10,17 256:18
256:23 257:2,9,13
257:22 258:13,17
258:24 259:7,16
259:22 260:5,12
260:13,20 261:6
261:11,19 262:3,4
262:21 263:15,23
264:5,17 266:4,23
267:23 269:3,11
269:16,24 270:20
271:18,19,22

272:7,21 273:11
273:20,21 274:6
274:11,17 276:16
277:3,11 278:5,12
278:18,24,25
279:8,23 280:6,12
280:18,23 281:5
281:15 282:7,17
282:23 283:3,8,16
283:24 284:2,7,17
284:22 285:7,21
286:8 287:2
288:11 289:3,10
290:7 291:13,15
293:2 294:6,20
295:10,24 296:18
299:4,21 300:7,13
300:22 301:10,24
302:22 304:18
305:18,23 306:8,9
306:18 307:3,25
308:14 309:2,13
309:25 310:13,20
311:7,16 312:5,17
314:3,10,16 315:3
315:7,13 317:12
317:13 318:11,25
319:14 320:4
321:9 323:13
324:15 326:23
327:2,7,21 328:3
328:23 329:3
330:10,20 331:25
332:5,24 333:8
334:3,16,23
335:10 336:10,24
337:24 338:24
343:6,8,18 344:11
344:19,22 347:19
347:20 348:20
349:18 351:20,25

352:13,23 353:25
354:18 355:13,24
356:11,18,25
358:4 360:13
361:9,12 363:21
364:18 365:8,14
365:20 366:3,12
366:13 367:8,25
368:15,22 370:15
370:24 374:16
375:4,11 376:8
379:3,11,23
380:17,24 382:18
383:6 384:6,22
385:14,22 390:2
393:18 395:7
396:13,14,20,21
397:7,8 398:3,9,18
398:23,24 399:7
399:17,17 400:3,4
400:11,17,25
401:11,17 402:4
402:13 405:14
406:6,12 407:7,23
408:18 409:3,21
411:24 412:19
416:16 417:3
418:22 419:6
421:21 422:6
423:6 424:14
**rights** 82:3 214:18
365:9 402:25
**ring** 39:2,4 177:8
268:17
**rings** 177:6
**risk** 81:5 84:2,9,11
84:16 85:19,20
86:8
**robert** 2:15 4:25
**role** 35:10,14
46:25 47:2,18,21

67:18 76:3 79:19
80:6,15,24 81:4
106:12 107:12
**roll** 72:16
**room** 6:2 12:24
13:17,22,24 14:8
14:13,18 17:9,23
17:24 18:12,23
**rooms** 324:10
**rough** 419:10
**roughly** 29:23
48:7,21
**row** 291:17
**rudis** 2:15 4:25
**rule** 364:10
**rules** 1:19 9:25
350:23 360:11,13
**rulings** 431:12
**rumor** 266:9,13
**run** 388:3
**runi** 2:20

**s**

**s** 2:2 3:2,2 274:16
430:2 433:5
**s.d.n.y.** 433:2
**sabrini** 289:20
**safe** 48:20
**salary** 153:24
158:22 159:5,9,16
159:23 160:9
244:14 248:7
281:10
**sam** 53:10
**sandbox** 290:24
291:9
**sat** 7:19,23 8:10,15
9:21,23 10:2
348:23
**save** 129:11 376:9
397:24

**saved** 38:7,12
41:17 346:19
358:21 369:22
374:12,15,22
375:2,8,18,25
**saw** 184:23 311:24
312:13,19
**saying** 10:25 37:4
104:13 108:9
112:8 123:17
125:23 156:20
169:15 178:25
189:24 235:18
243:11 247:25
248:16,24 249:9
253:13 297:17,21
298:5 299:16
300:23 381:23
382:2
**says** 123:24
132:15,17 167:16
204:17 209:20
241:5 245:25
250:2 261:13
309:7 316:25
**schedule** 11:13
389:18 426:11
**schedules** 426:10
**scheduling** 20:15
**school** 339:13
**schuster** 53:10
55:2
**scope** 394:15
**screen** 57:7 61:18
130:13 145:16,20
167:19 203:7,13
237:24 275:5
287:22 314:7
316:5 319:4
**scroll** 288:14

**scrolling** 31:3
317:18
**scs** 26:23
**sealing** 3:7
**search** 31:6,10,13
31:15 32:20,23
33:3,22 34:4
41:18 368:3
369:24 373:13
380:2 412:21
415:18,20
**searches** 30:15,18
32:9 368:4 415:7
**searching** 32:21
33:4 34:11
**sec** 31:20 44:20,25
45:3,8,12 46:2,6
108:7 109:11
357:9 359:12
**sec's** 44:6
**second** 100:9,14
110:7 155:5
216:25 246:19
303:18 350:6
363:24 386:9
424:6
**seconds** 372:8
**secretly** 367:2,9
367:18
**secrets** 416:20
**section** 131:12
132:15 133:5
134:9 136:20
143:15 144:11,24
**sector** 230:12
**sectors** 230:15,18
230:20,21 231:2,4
231:7
**securities** 70:7
73:20 74:3,4
297:6

**see** 18:22 19:5
   49:18 57:3,22
   58:24 61:7 63:18
   74:9 101:25 102:6
   112:6,15 116:10
   118:21 146:16
   168:7,8 170:15,22
   170:23 171:5,15
   171:16 185:12
   203:15,20 222:13
   230:14 237:14
   239:15,17 242:5
   254:9 261:20
   274:22 275:9,14
   275:16,20,24,25
   276:8,10 277:24
   287:23 288:17,20
   288:22 289:16,18
   289:21,23 295:20
   302:23 305:19
   312:7 314:18,23
   316:17 317:19
   333:25 361:20
   379:16 385:5
   386:22 387:20
   388:4 389:23
   390:13 415:8
   424:2 427:8
**seeing** 145:13
   163:16
**seen** 58:3,7 288:13
   311:18
**selected** 243:20
   244:2 328:11
   340:22
**selection** 329:5
**send** 261:14
   300:19 328:22
**sender** 370:17
**sending** 243:13,14
   260:24 299:16

314:19
**sends** 169:8
**sense** 11:7 291:17
   298:14 359:7
   388:17 413:14
   425:9
**sensitive** 4:7
**sent** 29:7 136:8
   293:17 315:15
   316:17 320:7
   365:12 367:15
   372:21,24 373:21
   397:17,18,23
**sentence** 15:9
   58:24 276:3
**separate** 19:19
   29:25 30:14 35:18
   38:16 47:24 54:16
   72:17 118:21
   139:5 141:8
   142:16,19 152:6
   173:20 234:22
   255:4 292:4
   305:14 331:14
   333:18 338:6
   341:5,7 351:18
   372:11
**separately** 38:8
   339:10
**separating** 182:17
**separation** 127:8
   127:14,18,20,25
   128:9 133:2,6,8,10
   133:14,19,25
   134:15,20 135:9
   135:14,16,21,25
   136:19 175:7,12
   175:13,16 176:4
   178:19 179:18,22
   179:24 181:15,18
   181:24 182:5,23

183:3,16 188:7,9
   188:17 208:16,19
   210:10,19 211:12
   217:15,23 218:5
   218:10 219:18
   220:16 221:19,25
   222:11 223:9,22
   224:3,9,12,20
   225:3,12 226:4,12
   226:22 227:3,4,11
   240:12 253:22
   254:21 255:4,13
   256:14 258:4,4
   266:17 281:23
   282:10,13,19
   413:7 414:4,8,13
**sequencing** 177:10
**series** 233:23,24
**seriously** 350:25
   351:9
**serve** 77:25 90:6
   91:15
**served** 141:14
**server** 308:20
**servers** 265:17
   269:14,21 270:18
   270:22
**serves** 78:10,22
   79:7
**service** 3:16 31:19
   43:24 114:15
   115:2,7,14,15,18
   115:23 116:6,14
   270:9 357:18
**servicing** 114:19
**serving** 47:2 90:17
   143:9
**session** 49:13
**sessions** 28:7,13
   47:25 49:3,6,11

**set** 7:6,8,15,18
   73:6,6,8 79:19
   86:19 128:18
   289:16 329:21
   332:14 339:18,18
   341:14 353:17
   432:11,20
**setting** 74:20
   230:4 353:17
   372:24 388:23
**setup** 329:9
   330:17,23 331:3
   331:12,17 332:10
   332:12 333:7,12
   333:16 334:12
**setups** 334:20
**seven** 138:6 372:5
   388:13 428:11
**severe** 171:7
**severely** 125:17
**shape** 253:8
**share** 7:6 56:12
   129:3 316:2
   401:10 402:2
**shared** 322:21
   369:10 402:10
   403:18
**sharing** 336:14
**sheer** 232:18
**sheet** 275:18 433:1
**sherman** 289:12
**sherree** 314:8,11
   315:15,17
**sheuster** 289:11
**shifting** 195:8
**shopping** 358:21
   362:7 363:13
**short** 74:25 75:5
   78:13,14,16,17,18
   82:18 83:8,9,11,11
   85:9,12 86:17,18

86:20 87:3,8,13,17
87:23 92:5,10,20
108:25 109:15,16
110:3,9,14,14,19
110:23,25 111:8
111:13,20,24
112:2,3,10,16,19
112:22,25 113:5
113:10,16,18,25
114:5,18 115:3,11
115:21 116:20,21
116:22,25 117:9
117:11,15,16,22
118:5,23,25 119:2
119:13 122:4
124:15,16 125:2,3
126:23,24 138:13
207:2 217:7
236:24 287:19
314:4 316:7
341:15 371:25
383:20,25 386:15
426:8
**shortest** 48:17
**shorthand** 62:17
**shortly** 40:8 65:21
70:25 73:9 75:23
157:14
**show** 51:2
**showed** 51:9,20,22
52:2 317:24
**showing** 312:7
354:2
**shown** 197:13
**sic** 211:16
**side** 68:16,18
92:14 215:4
256:24 289:17
290:2 295:17
304:22 305:5,7
345:10 360:6

**sign** 385:2
**signature** 432:22
**signed** 3:10,12,15
341:23
**significance** 90:2
91:11 106:11
107:9
**significant** 83:20
90:19 91:18
374:14,18
**silent** 401:16
**silva** 2:18 20:17
45:21 46:5,24
47:18,22 50:9,22
50:24 52:6 76:24
161:20
**similar** 39:11
49:17 99:21
330:17 333:16
334:12 347:3
**similarly** 98:22
295:18 347:8
**simply** 169:3
302:3 395:5
415:20
**simultaneously**
69:25 335:13
**single** 193:16,19
**sir** 12:16 132:15
218:22
**sit** 21:13 22:23
23:3,8,15,22 24:3
24:9,20 25:6 27:7
27:15 29:20 30:3
33:6 35:13,21
36:9,21 39:3,8,13
39:24 40:14 41:6
41:23 42:16 43:8
43:18 44:4,12,24
45:6,16,24 47:5,12
47:20 48:13,23

49:14 50:8 52:14
54:18 57:20 58:6
58:18 64:6,12,17
64:21 65:13,19
66:3,8,14 67:7
76:12,16 78:2
79:10,15 80:10
81:10,23 82:20
83:17 108:22
109:6 111:22
114:7,13,22 115:5
115:13 116:2,18
116:24 117:12,18
121:7 122:22
125:6,11,20
139:20 140:7,18
144:19 145:22
146:7,12 147:10
147:18 148:11,18
149:12 152:11
154:15 159:12
165:14 166:7,24
168:22 169:16
171:21 172:6,16
173:2,13 174:20
176:8,18 177:7,14
177:20 178:16
179:14,23 180:10
180:15 181:2,20
182:2,9 183:6,10
183:25 184:9,16
184:21 186:11
187:15,20 188:2
188:11,14,19
191:18,25 192:7
192:20 193:11,14
193:18,24 194:6
194:17,23 195:6
196:9,19 197:8,15
198:5,12,22
199:15,23 201:7

201:20 202:10
204:5 205:10,17
205:24 206:4,7,11
206:18 207:4,13
207:17,24 208:6
208:10,17,25
209:6,11 210:2,14
210:22 211:2,13
211:20 212:5,10
212:19 213:5,14
213:23 214:3,6,20
215:11,18,25
216:6,12,18
217:16 218:2,14
219:10,23 220:5
220:13,20 221:3
221:13,20 222:5
222:17,25 223:13
224:7,23 225:4,16
226:7,15,25
227:13,19 228:2
228:12,20 229:2
229:10,22 230:9
230:17,24 231:10
231:19,20 232:6
232:14 233:3,16
233:22 234:18
235:7,17 236:5,22
238:11,22 239:5
239:24 241:3
242:4,20 243:25
244:12,23 245:24
247:6 248:12
249:8 250:21
251:2,7,14,21
252:4,8,15 253:5
253:11,19 254:7
255:10 256:18
257:2,9,13,22
258:17,24 259:7
259:16,22 260:5

260:13,20 261:6
261:11,19 262:4
262:21 263:15,23
264:5,17 266:23
267:23 269:3,11
269:16,24 270:20
271:19,22 272:7
272:21 273:11,21
274:6,11,17
276:16 277:3,11
278:5,12,18,24,24
279:8,23 280:6,12
280:18,23 281:5
281:15 282:7,17
282:23 283:3,8,16
283:24 284:2,7,16
284:22 285:21
286:8 287:2
288:11 289:3,10
290:7 291:13
293:2 294:6,20
295:10,24 296:18
299:4,21 300:7,13
300:22 301:10,24
305:18,23 306:9
306:18 307:2,25
308:14 309:2,13
309:25 310:13,20
311:7,16 312:5,17
314:10,16 315:3,7
315:13 317:13
318:10 319:14
320:4 321:9
323:13 324:15
326:23 327:2,7,21
328:3 330:10,20
331:25 332:5,24
333:8 334:3,16
335:10 336:10,23
337:24 338:24
343:7,18 344:11

344:19,22 345:2,8
347:20 348:20
349:17 351:20,25
353:25 354:17
355:13,24 356:18
356:25 358:4
360:13 361:12
364:18 365:7,14
365:20 366:3,13
367:8,25 368:22
369:14 370:15,24
374:16 375:11
379:3,23 380:17
382:18 383:6
384:6,22 385:14
385:22 389:15
393:18 395:7
396:14,21 397:8
398:3,18,23,24
399:7,17 400:4,11
400:17,25 401:11
401:17 402:4,13
404:15 405:14
406:6,12 407:7,22
408:18 409:2,21
411:23 412:19
416:16 417:3
418:22 422:6
423:5
**sits** 344:13,13
**sitting** 44:18 53:24
56:5 78:8,20
125:15 126:6
146:16 147:5
196:18 197:21
198:21 225:23
234:25 325:6
333:15 334:9,22
388:12 403:15
404:5 420:3
427:19

**situation** 43:9
114:16 147:8
149:11 150:6
160:23 161:22
162:3,7 185:19
186:8 287:4
293:12 297:9
329:12 359:7
**situations** 98:13
99:13 106:6,8
**six** 7:25 71:5 138:6
372:6
**size** 42:3 102:21
102:25 104:3,9
232:18
**skip** 129:7
**slide** 288:17
290:14
**slides** 309:17
**slightly** 109:3
140:11 179:5
234:25
**slow** 42:5
**slowly** 363:6
**smith** 2:9,17,19
19:21,25 20:2,6
50:4
**smith's** 5:24 7:2
19:15
**software** 7:7 56:13
325:25
**sole** 288:24 403:19
404:7,9
**solicitation** 59:15
**solid** 171:8
**solomon** 2:11 5:23
5:25 7:3 10:16
13:15 14:2,23
15:3,8,12,19 16:7
16:12 17:5,12,18
18:20 25:17 26:10

27:5,14 30:10
32:14 34:20 40:13
42:14 44:2 46:8
48:10 49:21 57:6
58:16 59:2,6 75:3
81:21 87:5 90:23
91:6 103:7 130:12
134:3 135:11
136:25 139:9
141:16 142:11
144:17 145:12,15
147:15 156:4
157:8 160:3
164:13 165:11
166:16 167:13,18
174:18 176:14
178:14 179:12
183:23 184:14,19
185:7 186:10
187:14 191:16
195:16 196:7
198:10 200:10,14
201:5,17 202:8
203:8,12 204:14
204:24 205:3
210:6 212:3,17
214:4 215:16
218:20,23 219:8
219:20 222:3
224:14 225:13
236:3,19 237:16
237:21,23 238:9
240:16 241:25
242:15 245:10
247:4 250:16
254:3 255:18,23
258:9 263:13
274:22,25 275:4
276:25 283:14
287:21 296:15
299:2,19 301:22

303:8,11 305:16
307:21 308:5
309:10 311:5
313:10,14 314:2,6
316:11 318:18
321:6 322:14
352:24 361:10
362:10 363:16
364:15 367:6
368:11 371:16,20
372:9 376:25
377:11,15 378:25
380:14 381:20
386:22,25 387:5,9
388:9 389:4
390:22 392:12,16
393:15 394:17
402:11 407:5
409:13 410:5,11
415:12 416:3,7
417:15 418:4
419:6,8,19 421:10
421:21 423:3,18
424:4,10,13 426:8
426:19 427:7
428:5,16,18
**solomon's** 10:18
363:2 368:15
416:13
**solutions** 5:5
428:12
**somebody** 43:4
47:2 124:3 137:7
141:4,5 160:15
179:19 182:23
214:14 216:16
293:12 296:11,20
297:3,12 306:13
319:19 324:16
375:15

**somebody's** 160:6
**somewhat** 271:3
**sophisticated**
328:25 337:3
**sorry** 25:19 30:9
30:19 52:20,21
69:6,23 74:11
77:20 90:25 110:7
130:10 131:16
164:16 220:2
225:20 232:21
237:9 252:12
265:8 268:5 298:4
304:17 320:18
327:25 362:12
383:22 392:15,19
405:19 408:10
414:2 416:3,4
422:19
**sort** 28:19 31:7
44:22 65:5 72:5
72:11 73:13
101:13 187:5
230:12 290:23
373:9 414:25
426:4
**sought** 311:15
312:3,15 415:23
**sounds** 251:9
381:10 393:22
427:16
**source** 65:16
66:17 89:11,22
95:21 98:11
106:24 110:4
116:17 232:20
278:9 295:20
**sourced** 93:8
94:15 99:3,7
107:23 110:12
113:22

**sourcer** 99:8
**sources** 94:6,6
95:10 101:8
**sourcing** 93:10,11
94:8 95:18 96:7
96:20 98:21,23
99:2,16,23 106:16
107:14,15 108:3
108:11 113:10,13
114:2,12 115:9,25
116:8 229:5
260:25 262:18
263:8 289:17
290:2 295:17
304:3 305:5,7
310:8
**southern** 1:2 4:20
**space** 42:7
**speak** 20:4,9 21:7
54:10 132:15
232:11,23 345:17
**speaking** 20:22
82:13 218:19
219:15 413:9
414:11
**specific** 23:24
29:21 35:14 57:18
96:19 173:3
199:16 226:8
227:2,17 234:23
238:4,12 241:8
263:4 281:19
285:13,14 323:21
335:18 364:21
388:5
**specifically** 10:19
28:21 31:3 96:2
165:3 192:22
227:17 229:15
230:25 242:21
289:4 310:15

356:5 357:16
399:15,25 409:3
419:2
**specifics** 42:8
231:24 259:17,23
281:6,18,24
328:12 354:3
**specified** 105:11
105:12,14,15,17
105:18,19,20
429:11
**specs** 328:12,19
**speculate** 227:20
**speculating**
312:18
**speculation** 27:6
184:20 250:17
**spend** 29:24 48:7
**spent** 48:5 51:12
171:12 285:11
**spinley** 2:18 50:14
50:16,17
**split** 64:4,7,9,13
**spoke** 20:6,16
139:4 363:5
**spoken** 54:12
175:22
**spot** 324:4
**spreadsheet**
315:22 316:22
**ss** 432:4
**stages** 65:25 66:5
100:6
**stamp** 309:6
**stand** 371:24
386:14,14
**standard** 227:11
227:14 306:3
**standing** 160:7
268:20

| | | | |
|---|---|---|---|
| **start** 38:22 56:18 56:19 65:10 69:16 72:20 87:21 124:7 167:22 302:21 368:16 | **stell** 9:6 **step** 72:22 86:14 379:16 382:5 **stepped** 358:19 **steps** 202:3 391:23 **steve** 53:10 289:19 | 139:2,19 165:4,9 166:21 168:9,11 168:15 169:4,11 169:22 170:19,24 178:12 179:7,9 185:4,16 193:10 | **summarized** 238:24 255:9 **summary** 187:11 198:3 221:12 239:3,7 256:16 260:14 261:4 |

**start** 38:22 56:18
  56:19 65:10 69:16
  72:20 87:21 124:7
  167:22 302:21
  368:16
**started** 6:24 67:19
  73:3,17 74:6
  75:25 249:9
  266:10,13 344:16
  414:22 424:22
**starting** 39:6,8
  157:21
**state** 1:22 5:9,13
  6:14 9:14 10:16
  179:21 276:12,22
  355:17 424:15
  432:4,8
**stated** 178:17
  179:15 302:3
  305:13 353:7
**statement** 84:13
  93:23 159:2 268:3
  276:10,18 281:19
  314:23 346:23
  409:14 410:9
**statements** 352:5
**states** 1:2 4:20
  109:8 242:3
**stating** 194:25
  303:22
**status** 109:12
  150:18,22 277:9
  279:18,22,24
  293:19 307:7
  317:2,11,15
**stay** 70:9 239:21
  243:2 244:20
**stayed** 66:23 70:11
  70:14
**stealing** 350:17

**stell** 9:6
**step** 72:22 86:14
  379:16 382:5
**stepped** 358:19
**steps** 202:3 391:23
**steve** 53:10 289:19
**stick** 181:11
**stipulated** 3:5,20
  428:8
**stolen** 407:15,19
  408:24
**stopped** 380:12
**store** 352:20
  353:22 358:23
  364:12
**stored** 36:7,11,18
  38:2 307:12
  355:22 359:2
  378:21 404:11
**stores** 36:16
**storing** 362:6
  363:12
**straight** 294:3
  396:6
**straightforward** 156:11
**strategies** 68:13
**streamline** 422:3
  425:5
**stretch** 138:5
**strict** 108:10
**strike** 181:12
  318:8
**structure** 63:22
  293:21
**struggling** 93:19
  296:9 384:14
**stuff** 28:19 376:14
  421:22
**subject** 45:12
  133:17 138:25

139:2,19 165:4,9
166:21 168:9,11
168:15 169:4,11
169:22 170:19,24
178:12 179:7,9
185:4,16 193:10
196:3 197:5,23
237:13 253:16
268:25 334:13
369:12 387:18
**suboptions** 182:21
**subscribed** 429:18
  433:22
**subsequent** 68:7
  101:3 175:19,20
  175:20,21
**subsequently** 69:25
**subsidiaries** 92:18
  109:25 110:2,5,8
  111:16 113:15,25
  114:18 230:5
**subsidiary** 110:6
  110:11 113:15
  114:5 115:2,10,21
**substance** 56:4
  214:12,13 243:23
  255:8 362:20
  383:3
**substantial** 425:11
**succeeded** 425:9
**suffering** 427:18
**sufficient** 218:12
**suggest** 169:12
**suggesting** 233:12
**suggests** 291:8
**sum** 214:12
**summaries** 55:4,8
  262:8
**summarize** 48:3
  86:21

**summarized** 238:24 255:9
**summary** 187:11
  198:3 221:12
  239:3,7 256:16
  260:14 261:4
  262:2,19 263:9
  265:4,6,9 385:13
**sun** 406:15
**sunset** 415:2
**support** 415:19
**supporting** 415:9
**supportive** 384:13
**sure** 19:5 25:21
  26:4 36:13 40:6
  42:18 49:15 60:14
  78:23 84:6 91:3
  98:8 99:21 100:2
  100:3 103:16
  107:8,20 112:7
  114:15 122:24,25
  123:5 134:5 135:6
  148:21 154:20
  164:7 169:6 178:9
  178:23 189:22
  200:14,16 208:22
  209:17 211:19
  221:7 240:23
  256:22 257:10
  266:5 282:24
  286:2 293:3 294:7
  306:10 316:14
  335:11,16 336:24
  337:5 346:2
  347:21 354:19
  358:5 362:4,22
  377:22 390:21
  393:10 394:4
  396:6 406:21
  418:18 427:13,15

surgeries   157:13
  157:14 162:18
  193:5
surgery   163:3
surpassed   208:3
surprise   315:10
surprised   198:8
  198:17,17,19
  276:21 277:4,4,7
  277:12 315:16
surrounding
  162:17
surroundings
  13:14
suspect   265:14
sustained   66:12,18
  363:19
swap   329:15
swear   6:11
switch   178:22
  287:5
switched   41:22
  140:19
sworn   3:10 6:13
  215:2 429:5,18
  432:11 433:22
synchronized
  342:10,11
system   32:2,3 34:5
  36:15,19,25 37:10
  37:19 38:3,10,17
  41:3,17,18 306:15
  365:6,10,13 366:2
  367:4 370:11
  372:14,20 373:2,9
  374:4 396:12,17
  397:6 398:2
  405:12 410:24
  412:17 415:8
systems   38:8,13
  342:7 350:11

352:15

**t**

t   3:2,2 429:2 430:2
  432:2,2
table   61:15
tail   207:23 215:9
take   4:11 11:10
  14:9 29:14 34:10
  37:17 48:25 58:21
  60:3,16 75:7
  86:14 92:3 102:7
  127:7 138:6 145:2
  146:17 160:19,21
  167:5,20 172:2
  176:7 202:22
  210:6 216:22
  220:17 237:8,19
  274:19 287:16
  288:16 289:15
  313:7 329:4
  350:25 351:8,8
  371:18 372:8
  379:16 411:9
taken   1:18 4:16
  8:22 55:5,8 91:9
  138:14 182:18
  190:12 217:8
  221:8 238:2
  287:20 311:14
  314:5 316:8
  341:16 372:2
  383:21 384:2
  386:16 413:6
talk   63:5 86:23
  100:4 123:22
  140:22 158:18
  179:3 202:19
  214:25 241:15
  335:4 389:18
  413:12 420:9

talked   111:25
  113:19 153:23
  217:20 233:4
  293:10 296:20
  301:2 311:21
  412:22
talking   49:13,24
  65:7 75:23 86:16
  95:24 106:19
  111:2 117:3,8
  120:9 125:22
  138:20 140:19
  141:6,24 142:5
  144:22 147:24
  148:19 152:25
  171:19 172:4
  174:2,13,22
  182:12 186:14
  187:4 189:12
  198:25 213:17
  222:7 223:5
  229:13 266:6
  277:20 278:14,16
  278:19 280:22
  294:10 325:9
  326:12 332:8
  333:22 339:20
  341:19 347:4,17
  348:14 364:13
  369:11 370:13
  377:16,22 378:9
  379:12 384:9
  391:17 398:14,15
  406:22 420:16
talks   141:4,5
  165:24
task   390:20
tasked   96:20
  97:22
tax   87:24 88:2,8
  89:4,4 90:4,4,5,5

90:16,16,17,17
  91:4,5,12,13,14,14
  91:20,20,24 94:21
  95:25 96:16,18
  97:21
team   40:10 68:20
  286:11 289:25
  295:18 301:9
  302:15 304:25
  305:6 307:19
  309:24
tech   42:6 107:22
  323:14,23 374:19
  375:12 378:13
technical   7:13
  217:4 403:11,20
  404:10
technically   70:21
technology   37:6
  38:5 270:11
  340:22 345:10,22
  346:3,6 348:17
tell   21:9 27:2 28:6
  57:9 58:11 62:6
  76:18 80:19 82:15
  87:16 96:13 123:2
  123:11 131:12
  145:10 167:21
  188:16 206:2
  216:16 223:21
  225:7 227:2 235:2
  235:8 244:9
  248:25 252:3,7
  253:2 257:6
  259:19 260:16
  264:8 266:21
  274:5 280:16
  291:5 313:23
  318:13 319:9
  334:10 382:21
  390:13 394:9,11

397:22 408:22
416:14 421:19
422:21
**telling** 99:22
140:13 163:18
186:25 217:22
219:17 234:15,19
245:5 254:25
257:16 278:22
279:2 281:11
300:19 319:23
351:16
**tells** 136:15 253:21
**temporary** 355:20
**ten** 207:6,12,23
208:2 211:9 225:7
307:13 327:6,8
332:4,7 371:19
398:16,20
**term** 37:22 93:4
101:19,22 169:21
183:19 376:8
**terminate** 160:17
182:24
**terminated** 120:20
269:18
**terminates** 180:22
**terminating** 183:5
213:11,22 214:16
215:6
**termination**
120:20 213:18
214:17,22 269:18
**terms** 20:15 42:8
60:15 83:21
119:23 131:21
142:5 158:5
169:17 173:15
202:3 210:10,18
211:11 228:9
286:24 414:10,22

**test** 7:11 56:12
**testified** 6:15
14:11 25:25 42:10
58:9,19 109:20
131:20 194:5
242:24 251:10
352:18 391:21
**testify** 58:13 59:19
59:20 60:6,18
409:16 429:5
**testifying** 142:25
143:3 185:8,9
269:10 297:20
303:2 382:17
**testimony** 11:24
25:24 28:10 40:6
58:11 84:7 123:6
126:6 132:23
135:2,6 139:24
142:13 148:13
163:24 164:23
165:6 169:7,11
173:7 177:17
178:10,11 189:24
201:23 211:17,21
215:3 223:7 224:6
224:15,16 225:15
234:13 245:13,15
245:17 251:20
254:6 269:20
273:3 281:25
303:13,21,22
306:14 308:23
309:21 310:2,3
350:20 357:20
387:22 418:20
428:7 429:6,10
432:13
**text** 43:16 197:14
197:17,18

**thank** 6:17 13:2
15:17 16:11 34:9
138:18 161:23
189:3 201:5
217:11 258:16
271:14 321:21
322:4 386:21
387:5 419:7
424:13 428:14
**thanks** 15:18
18:24 24:24 31:11
46:23 61:9 63:6
82:25 190:16
212:23 252:25
255:22 321:14
326:4,14 427:24
**theirs** 361:7
**theoretically**
208:12 234:6
293:8
**theory** 331:7
415:10,19
**thereabouts** 64:2
**thing** 56:2 57:16
72:11 97:4 98:7
109:13 120:5
189:23 350:5,6
377:23
**things** 63:12
123:16 129:8
157:21 159:14
192:18 193:4
236:6,15,17
238:19 241:12
247:11 248:21
249:10,12,17
273:18 290:18
293:20 309:14,18
309:21 341:25
345:10 355:22
384:13 387:17

392:3 401:2
**think** 5:21 7:12
9:4,5,11 15:4 16:9
17:19 23:5 24:6
25:12,25 27:3,8,10
29:15 33:8 40:21
43:2,12 47:23
50:20 62:15 70:4
71:7 74:23 75:25
93:13 98:5 109:13
112:9 116:19
120:13 122:16
128:24 130:4
134:6 137:24
156:7,23 159:13
165:18,21 166:2
180:6 182:10,13
186:11,12,13
187:21 193:12
194:4 197:22
203:8 209:15
217:22 223:6
225:17 226:10,17
226:22 227:16
229:23 232:15
233:4,6,14 239:25
248:20,20 249:9
249:12 253:22
260:11 262:5,22
263:2 265:2 267:2
270:3 284:17
285:17 286:18
287:2 290:13
295:14 297:4,23
298:14 299:13
303:2 312:11
327:5 336:11
337:3 341:24
343:22 349:18
359:7 360:9 364:8
364:9 387:15,22

388:17 389:4,24
389:25,25 390:5,7
390:19 400:14
405:6,24 415:13
416:7 420:10,12
420:24,25 421:2,3
421:16,17 422:24
425:4,8,10 426:20
427:17
**thinking** 136:6
171:22 172:10
193:8,17 222:14
239:9,12 241:5
244:10 249:20
341:17
**third** 25:23 68:20
100:9,14 108:23
109:4 239:10
424:6
**thirty** 389:14
390:10,10 391:5
**thought** 22:5
110:25 126:3
164:17 166:9
255:13 256:14
286:10 378:22
389:13
**three** 7:24 18:22
48:19 180:22
181:12 275:20
**throw** 186:12
**thrown** 249:17
**ticket** 54:6
**tierney** 68:22
71:25
**time** 1:12 3:22 4:4
5:14 9:20,22
11:15 22:8 29:23
33:18 34:15 38:25
40:21,25 41:7,9
43:4 47:15,16

48:7 51:13 54:24
66:13,18 67:4,5,8
67:17 68:2 69:4,8
69:11 70:3,12
71:22 72:2,10
74:5,25 103:13
105:5 121:10,25
132:9,19 134:10
134:20 139:11
151:5,10 152:16
152:20,21,22,22
153:25 156:21,24
157:3,4,5,6,7,10
157:12,16,20
158:14,25 159:6,6
159:10,15,22
160:2,12,24
161:12 162:12
163:25 170:18
171:23 172:8
176:12 180:7
183:2 185:17,22
185:25 192:12,23
192:25 193:20
196:22,25 197:17
197:25 199:4,11
199:22 200:12
205:18 212:24
213:20 222:21
228:17,24 229:12
230:20 231:15
247:9 249:18,19
257:25 264:4
268:11 270:12,12
280:10,14 283:18
284:8 285:9,10
289:6 297:14
307:4 311:20
312:25 314:11
317:5 324:3,7
325:10,17 327:10

328:16 329:13,15
330:5 332:8
333:21 334:5
335:25 339:25
340:5,13 341:18
344:6,15 348:25
349:24 357:12,14
358:10 359:16,19
359:21 360:6
363:4 365:8 366:4
366:22 369:19
371:17 384:12
388:14,15,15
389:10,18 400:9
413:18,23 415:25
416:15 417:5,8
419:17 420:23,25
423:23 424:17,18
424:19 425:23
427:11,24 429:10
**timeframe** 201:11
284:16 334:24
340:7 343:12,22
369:19 417:7
**times** 7:22 16:22
32:19,22 41:25
72:15 83:23
122:11 160:18
165:13 236:20
289:13 307:24
345:24 349:2,4
365:15 369:4
403:20
**timing** 33:8,11
70:2 74:20 87:19
213:16 219:11
279:12 339:24
383:9 400:12,18
414:17
**tired** 420:3

**title** 57:22 76:3,6
81:8 305:25
309:15
**titles** 314:21 315:2
316:19
**today** 11:24 14:18
28:2 44:19 56:5
58:10 59:20 60:6
62:18 78:9,20
125:15 126:6
196:18 197:13,21
198:5,12,21
333:15 354:20
403:15 404:5
421:15
**today's** 20:5,7,10
27:21 30:2 48:6,8
428:7
**told** 20:12 81:11
84:15 85:13
106:23 123:7
125:8 163:24
164:4 186:13
187:6,7 216:19
219:2 224:11
234:24 244:7
245:6 246:9 249:3
252:5 260:12
266:18 271:16
273:6 279:6
280:19 281:7
349:13 356:15,22
380:10 384:17
399:6 411:19,25
412:3,4
**tone** 362:17,21
**tonight** 54:7
426:12 427:2
**top** 76:25 204:17
288:20 325:2,5,6
327:13,19 328:4

331:5 338:10
**topic**  58:21 59:23
 62:22 85:3 132:3
 148:15 219:16
 269:4,8 352:12
 399:12,13
**topics**  18:5 56:9
 57:25 59:18 60:5
 60:9,15,18,21
 61:12,15,19 62:7
 62:11,12,18,24
 63:2,3,5,9,13,19
 157:17 195:5
 387:20,23 388:4
 389:6,19 390:16
 424:25 425:14,19
 426:4,13,22 427:3
**total**  428:10
**totally**  186:24
 410:7
**touch**  426:10,17
 427:25
**touched**  283:21
**tracking**  397:20
**tracks**  37:2
**traditional**  32:11
**traditionally**
 161:8
**train**  164:17
**tranche**  100:10,14
**tranches**  100:9
**transaction**  88:17
 88:18 90:13 92:22
 92:25 93:2 94:6
 94:17 95:22 96:4
 97:25 98:21,23,24
 99:2,2,4,5,7 100:5
 100:11,16,18,19
 100:25 101:2
 102:9 103:5,6,25
 104:13,23,24,25

105:3,5 106:15
107:2,13,22
108:12,13 110:12
110:13,21 111:17
111:19 113:8,13
113:17,17,23
114:12 115:12
116:8,17 230:10
230:11 232:8,13
232:22 233:12
370:3
**transactions**  89:5
 91:24 94:21 95:11
 95:15,19 96:21,23
 96:24 97:5,22
 98:12,14,15 99:14
 100:24 101:4,5,21
 102:17 104:18
 106:24 108:3,25
 110:4 115:10,25
 229:5,6,19,21
 230:2,8 231:14,18
 232:3,9,11 233:2,5
 233:10,24,25
 284:14
**transcript**  11:2
 54:23 270:4
 419:11 428:17
 429:9,9
**transcripts**  54:15
 54:19
**transition**  171:4
 172:14,17,20
 270:14
**transitioning**
 172:23 173:4
**transpired**  51:4
 273:10,12
**travel**  164:7
**traveling**  158:7
 172:9

**trea**  2:12
**treating**  205:20
**tremendous**  87:13
 407:15,19 408:13
 408:23 409:7
**trial**  3:22
**tribeca**  148:8,14
 149:8 163:7
 176:24 177:3,13
 177:16 178:3,9
**tried**  379:7 393:2
**trigger**  254:11
**triggering**  215:8
**tripp**  205:20,21
 207:16,18 208:15
 208:18 210:18
 211:11,22 212:6
 212:11 220:18
 221:8,24 222:8,23
 318:20,22 328:17
 330:3 333:5,7,9
**tripp's**  206:10
 210:9 220:25
 221:5,10,15,18,22
 222:12
**trouble**  12:18
**true**  8:14 413:15
 429:9 432:12
**truth**  429:5
**truthful**  125:14
**try**  11:12 56:14
 149:9 252:18
 254:17 334:8
 350:2 388:25
 420:20 425:5
**trying**  25:22 30:4
 84:20 91:10 93:13
 99:19,20,25
 116:10 135:5
 150:15 156:8,18
 164:16 170:7

186:20 190:4
242:13,21 243:2
245:16 257:10
340:6,7 341:24
348:7 381:8
384:15 390:20
410:22 413:23
422:3
**ts**  84:23
**tuesday**  171:10
**tunnel**  343:4
**turn**  134:21 389:6
**turned**  97:10
**turning**  59:2
 137:11
**twenty**  328:8
**two**  13:17,19
 16:22 40:22 66:4
 66:22 68:14 72:22
 76:15,17 78:21,25
 79:3 80:7 81:18
 102:13 123:16
 175:21 180:21
 182:14,16 192:18
 193:22 195:5
 223:3 288:23
 329:13 331:12
 332:3 362:23
 392:3 402:14
 425:6
**type**  87:10 88:16
 90:21 323:10
 345:12
**typed**  358:20
**types**  86:15 87:16
 102:16 106:2
 292:5 329:9
 370:22
**typical**  243:2
**typically**  79:17
 109:21 234:7,9

[typically - understanding]                                                                 Page 60

292:10,15 297:7
**typing**   10:24

**u**

**u**   3:2
**ult**   385:16
**ultimate**   68:12
  382:14 383:2,18
  384:3,21 385:2,7,8
  385:16
**ultimately**   26:15
  34:11 72:7 73:4
  73:14,23 86:4
  95:7,7,12 96:25
  102:7 156:16
  214:8 234:11
  250:8,9 380:21
  382:13 415:23,23
**um**   7:24 8:25 10:4
  10:17 18:2,16
  21:22,24 30:3,6
  31:8,17 33:15,23
  34:2,2,6,17 35:24
  37:24 38:7,20,22
  39:7,9 40:19
  41:11,12,12,15
  42:3,6 44:6,8
  48:14 49:7,21
  50:9,17 51:16,23
  52:2 53:21 54:25
  57:25 59:25,25
  60:3 61:16,19,20
  61:25 62:4 63:2,8
  66:12,16 67:2,3,12
  67:14,16,16,16,21
  67:21 68:16,20
  69:24 70:2,13,13
  71:4,7,7,13,17,20
  71:23 72:25 73:3
  73:15,16,22 74:6
  79:18 87:23 88:5
  88:22 89:3 93:16

101:22 108:2
109:9 111:21
112:20 117:25
118:5 129:2 137:8
145:2 147:12
149:2 153:21
157:13,22,22
159:13 161:18
168:24 175:20
185:12 195:20
197:18,18 198:23
200:13 201:9
203:11 205:19,20
205:21 209:12
213:15 214:7,23
228:13,14 252:16
266:16,18 268:11
278:6 279:12
286:11 288:22
289:11 307:6
317:20 318:10
322:18 326:2,3
327:15 328:24
330:4,23,24
331:11,11 333:24
335:11 336:4,23
337:13,13 339:9
340:14,25 341:22
346:19 347:16,16
348:16 349:5,23
350:2,12,25 351:8
352:11,11,13,14
354:24,24 355:3,9
361:2 362:16
366:15 367:12
368:3 371:12
378:7 383:11,12
383:13 384:7,7
385:25 392:4,20
396:16 397:10
401:8 402:20

405:15 409:6
410:18 413:3,18
413:19 414:16
415:17,23,25
416:21 417:23
423:5
**unable**   11:23
  123:21 148:20
  149:18 154:5
  164:4 172:18
  187:7,8
**uncertain**   156:20
  162:19 164:5
**uncertainty**   67:17
  164:25
**unchanged**   269:22
  270:7
**unclear**   349:21
**undergoing**
  157:13 163:2
**understand**   10:9
  10:21 19:11 25:22
  26:19 36:14 45:15
  54:9 56:5 80:22
  83:2,7,12 84:7,20
  86:15 91:11 103:9
  109:2 112:8
  122:12 123:6
  127:9 128:23
  136:14 142:4,10
  154:9 156:8 164:9
  169:7 172:12
  186:16,25 195:18
  198:15 205:13
  206:24 215:21
  223:16 241:14
  242:16 248:16,23
  273:2 286:20
  296:9 297:17
  306:5 318:17
  347:12 350:14,20

351:4,7 358:8
361:4,15 376:9
384:15 412:6
417:4,25 424:9
**understanding**
  35:7 37:21,24
  38:14 43:20 45:17
  53:9,12,21 55:19
  56:10 69:14 72:24
  76:5 79:23 80:5
  85:2,3,5,7 87:7,12
  87:22 88:4,16
  89:7,23 90:9
  91:21 92:7,15,24
  95:4,16,23 96:15
  99:9 101:18 102:3
  102:19 104:17
  105:8,13 106:5
  108:14 109:24
  111:10,14,22
  112:13,18,21,24
  113:14 114:4,17
  114:24 119:8,11
  119:16 120:16
  121:4,8 123:9,14
  123:20 124:12,14
  124:18,22 126:17
  126:21 127:5,13
  127:16,22 128:11
  128:17 130:22
  131:8,24 132:5,6
  132:12 133:4,17
  133:23 135:16
  136:2,10 137:3,18
  140:12 141:3,9
  142:14,21 150:7,8
  150:11,21,24
  151:8,9,14,17,20
  152:3,19 153:15
  155:14 157:2,11
  157:15 158:20

159:3 160:5,13
170:10 172:17
173:25 175:2,11
184:2 200:11
205:6,11 207:14
220:4,14 224:5
229:8 251:10,12
257:7 269:25
302:25 320:21
322:25 323:22
328:15 332:13
335:19,23 336:19
337:19 341:20
344:4 345:16
347:2 348:15
350:22,24 351:2
351:15,17,22
352:9 354:18
357:8 359:3
360:12,17 363:20
372:19 373:8,19
374:7 375:7 376:4
378:18 384:24
392:5,8 396:15,22
396:24 402:6,14
402:22,23 403:4
407:22 408:7,19
408:20 410:25
411:4 413:9
414:11,19 417:20
417:21 423:7,22
**understands**
200:17
**understood**  10:13
25:24 27:19 32:6
40:6 49:25 53:22
103:19 128:4,6
140:15 142:6
149:14 152:24
158:20 159:19
162:11,15 183:17

184:6 205:19
212:13 223:7,21
227:8 268:15
379:14
**undertake**  200:5,6
200:19,20 202:4
**undertaken**  201:2
413:3
**undertaking**  399:4
**undertook**  200:21
391:23
**underwood**  2:19
49:21
**underwriting**
91:22,23,25 95:13
**unfortunate**
299:24
**unfortunately**
160:18 328:24
**unintentionally**
43:7,10
**unit**  4:14,15 75:14
75:20 138:12,17
189:2,9 271:7,13
321:20 322:3
386:13,20
**united**  1:2 4:19
**units**  428:10
**unquote**  310:6
**unrelated**  141:13
**unsigned**  3:14
**update**  146:3
237:13 387:13
406:9,10,15
**updated**  301:7
319:11 406:7
**updates**  345:20
346:9
**upgrade**  329:20
**urgent**  11:14

**usage**  345:13
**usb**  408:17
**use**  34:4 39:6,8
43:23 93:4,5
138:5 142:15
169:17 178:20
183:19 243:21
291:2 323:8,11,17
323:25 324:21
326:6 328:13
329:10 330:13,19
331:24 332:18
333:18 335:4,5,7
336:21 337:15
338:13,17,20,22
339:3,7,11,15
345:15 353:24
358:19 359:21
360:5 362:9
363:15 368:9,18
368:25 376:23
400:24
**useful**  302:6
**username**  323:3
323:11 340:20
341:6
**usernames**  341:12
**users**  373:12
**uses**  322:12
**usual**  363:7
**util**  339:9
**utilize**  31:18,19
153:11 322:9,19
339:9 343:2
**utilized**  46:12
90:12 296:24
323:4 324:8,10,17
325:16 332:22
365:17 368:2
**utilizes**  342:7
350:11

**utilizing**  335:24
336:2,12 369:18

| v |
| --- |

**v**  433:2
**vacation**  54:3
**value**  106:4
**variety**  87:15
**various**  67:3,4
72:10 86:24 92:16
166:5 205:22
286:22 289:13
293:20 307:4,5,18
342:7 365:7,8,9
368:3,4 416:23
423:11
**vary**  340:5
**vehicles**  81:7
85:17
**venture**  73:13
260:8
**verbal**  11:4,5
**veritext**  5:4 7:6
428:12 433:1
**versa**  121:14
**version**  61:11
65:11
**versus**  4:18 34:5
46:18 107:14
113:11 191:4
202:2 232:21,22
233:24 411:9
**vice**  121:14
**video**  4:10,15 49:5
49:8,20 327:13,15
**videographer**  2:15
4:2 5:2 6:8,16
12:17,22 75:11,17
138:10,15 188:23
189:6 190:9,13
217:5,9 271:5,10
321:17,24 371:23

**[videographer - weiss]**

372:3 386:10,17
387:3 391:12
428:6
**videotaped** 1:15
**view** 94:24 99:6,11
102:12 103:3
118:10,17,22
119:22 121:17,19
122:5,20 124:3,8
126:13,14,16
136:23 140:24
142:4 146:18
166:3 173:21
186:17 188:8,12
198:4 205:4 218:9
221:25 229:21
230:11 231:16
247:17 248:11
272:10 283:4
292:4,17 294:8
296:2 298:7,11,12
298:19,20,22
299:8 301:18
340:10 353:21
358:22 363:10
365:12,25 369:17
370:12 371:5,12
372:15 373:3
375:23 384:17
385:6,11,21 388:6
391:22 399:4
400:20 401:10,13
401:15 405:6
406:17 415:25
417:9,14 418:11
418:13 419:16
421:18,20 422:23
**viewed** 232:2
306:16 409:17
**views** 91:18
420:19

**vigilant** 15:21
**vint** 2:18 20:17
45:21 46:5,24
47:19,22 50:9,22
50:25 52:6 76:24
161:20
**violated** 58:25
59:14
**violation** 364:10
**virtual** 1:15 8:16
9:21,23 10:3
**vis** 220:24,24
223:8,8,22,22
360:10,10 376:21
376:21
**voice** 362:15,18
**voluminous**
390:19
**voluntarily** 69:13
69:15 132:8,18
134:10,19 183:20
**vow** 416:14

**w**

**wait** 10:13 121:23
**waited** 70:15
**waiting** 386:25
**waived** 3:9
**walk** 87:2
**want** 22:6 36:13
40:18 57:18 60:13
75:4,7 84:6 95:11
98:8 99:12,15
101:7 106:7 107:8
112:7 123:5
126:25 133:22
138:2 142:3
160:14 164:10
169:6 178:9,23
183:19 187:5
189:22 218:25
223:18 248:17,23

249:2 263:5,7
264:12 271:2,4
277:16,17 287:4
303:15 334:7
361:19 364:2,7
377:4 387:19
389:10 390:15
393:10 394:4
396:5 413:11
416:21 417:25
**wanted** 12:5 21:20
32:7 33:3 43:4
56:2 74:2 107:19
123:22 140:22
149:22 150:3,4,9
150:12 153:18
162:7 166:14
168:11 170:8,11
170:24 183:17
186:21 187:9
188:17 300:25
323:8 328:21
339:7 366:10
386:3 387:12,12
**wanting** 60:17
186:18,24
**wants** 240:10
**war** 425:19
**warrant** 425:20
**waste** 359:19
**wasting** 192:12
**watch** 336:20,25
337:4,23 338:3
**watching** 336:18
**way** 7:16 32:8
36:16 44:19 45:4
45:7 49:2 94:7
99:17,20,22
107:18 111:17,23
125:7 133:21
146:19 150:22,25

151:24 152:7,12
178:4 180:18
187:2 192:19
196:14,18 197:3
198:23 205:4,6
208:8 216:9
221:16 227:9
232:24 253:8
259:25 260:18
261:9,25 264:8,13
286:7 296:4 308:7
313:4 323:12,18
323:19 333:6
334:10 341:2
343:11 360:10
403:16 406:18
416:9 420:21
432:17
**ways** 182:16
**we've** 56:14 74:23
117:3,7 134:17
137:24 175:22
182:18
**wearing** 94:14
**web** 337:22 342:20
343:2 354:24
374:5 376:13
**wednesday** 171:11
**week** 33:25 53:13
53:13,15,24 55:5,9
169:10,14 171:8
171:12 172:3
184:24
**week's** 168:12
170:25 185:16
**weekly** 267:25
268:8,12
**weeks** 400:15
**weiss** 251:3,6,13
251:17 413:11,18
413:21,23 414:12

414:18 423:8,10
423:15,24
**welcome**  75:22
138:19 189:11
**went**  71:21,25
96:13 161:10
182:3 292:18,19
293:7 299:23
319:18 358:18
381:7 400:9
410:22 411:14,20
419:23
**whatsoever**  300:4
**whereof**  432:19
**whispering**  4:8
**wide**  87:15
**wife**  20:12
**willing**  239:21
**wing**  53:10 55:2
**wish**  161:21
**withdraw**  124:7
128:8,13 130:23
132:8,11,18,22
133:24 134:10,13
134:19 135:23
136:9,16 137:9,15
138:23 139:7,16
141:4 143:23
162:5 200:24
201:15 215:7
226:19
**withdrawal**  127:6
127:17,23 131:21
133:3,9,15 134:14
135:18 136:3,6,7
136:11,17,20
137:19 139:22
140:20 144:12
148:16 165:16
169:18 173:9,19
174:17 178:21

179:4,17 183:19
190:3,20 191:4,14
191:24 192:4,15
192:22 194:14,22
195:3,15 196:4,15
196:17 197:6,24
198:20 199:13
213:12 217:25
254:2 260:18
427:19
**withdrawing**
127:4 135:8
139:12 141:2,7,13
142:9,19 143:17
165:5,9 166:15
167:2 175:25
178:12 179:10,20
**withdrawn**  124:11
124:15 127:11
132:24 139:25
174:10 182:20
194:10 214:11
330:15 372:13
405:9 412:8
**withdraws**  128:19
180:20 255:3
**withdrew**  125:2
126:18,22 127:4
134:24
**witness**  1:17 3:10
3:16,18 5:23 6:11
6:13 12:18 14:4,6
14:25 15:5 16:4
16:24 56:6 57:11
58:5,23 59:12,22
60:7 61:13 62:2
77:22 102:25
117:7 131:15,22
138:9 145:9,14,21
146:11,21 147:17
147:19 155:3

167:12 168:2,21
169:24 170:9,21
171:20 172:15
173:12 175:17
176:17 200:17
203:5,19 219:2
237:15,25 238:21
239:4,16,23 243:6
243:16 245:13,23
247:22 249:7
256:25 257:8
260:7,19 261:5
274:21,23 275:15
275:23 276:9,15
278:7 283:2 284:5
284:21 287:18
288:3,10,15,21
289:2,22 290:6,17
291:11 292:6,25
294:5 304:16
306:17,25 308:25
310:12 313:9,25
314:9,22 315:20
316:6,13,21 318:9
318:21 320:3,18
362:12 364:17
374:21 386:24
388:6 391:2
392:15,19 393:17
397:13 405:17
410:8,15 414:2
416:6 420:2
424:24 425:2
427:14 428:20
432:10,13,19
**witnesses**  63:10
**witnesses'**  433:3
**wondering**  371:21
**word**  93:14 178:21
179:3 201:18
270:2 359:15

**wording**  248:21
**words**  17:17 179:7
194:15,18 214:12
242:14 243:4,5,10
243:12,21 244:2
255:7 257:5
352:10
**work**  34:3 68:9
72:4 74:2 84:3
85:15 123:21
140:5,22 141:11
148:20,22 149:25
154:5 156:15,22
160:2 161:7
162:16 164:5,6
165:19 166:2,6
167:4 172:20
186:15,20 187:8,9
233:21 284:11
290:24 294:21
298:2 322:8,10,12
322:23 325:16,21
326:11 334:21
335:9,12,20 338:4
338:14 341:11
342:14,16,17
343:5 352:20
378:6 420:20
**worked**  68:23
334:19
**working**  67:3,25
68:4 70:7 73:23
95:17 113:9
149:19 150:9
151:6 156:23
157:3,6,12,19
158:24 159:6,10
159:15 160:12,24
161:8,13 162:12
172:20 180:2,5,12
180:20 184:5

**[working - à]** Page 64

294:12 307:19
325:8 335:13
**workings** 375:13
**workplace** 322:24
**works** 138:8
420:21
**world** 67:23
**would've** 202:12
**writes** 275:10
**writing** 136:16
257:6 276:24
277:8 278:3
**written** 132:10,20
137:8,14 139:6,18
139:21 195:12
197:5 199:3
**wrong** 96:14 242:3
315:15 319:24
362:5 363:11,22
364:9 388:24
**wrote** 239:8 243:7
243:10

**x**

**x** 1:3,9 101:14
105:23 109:19
227:22 394:13,14
430:2 431:2

**y**

**yahoo** 32:12 354:9
405:12,13,22
406:5,19,23
**yahoo.com** 375:4
**yang** 2:17 6:2 7:8
13:20 18:21 49:21
**yeah** 25:21 44:24
46:21 52:21 54:8
60:8,13 69:22
91:10 129:18
130:10 141:22
156:19 165:14

166:18 167:16
179:14 186:11
190:17 202:19
205:2 233:6
236:22 241:14
252:23 262:13,25
298:3 303:17
305:18 309:13
340:2 348:21
349:5 353:2,3,7,25
361:12 362:19
364:17 366:25
367:8 382:3 387:9
387:14 388:19
394:4 411:6 416:6
420:14 427:6
**year** 8:20 34:2,24
39:21 40:22 66:20
70:15,16 71:4,6
125:22 126:4
162:17,20,22
207:23 211:9
**years** 33:20 40:2
47:7 51:14,16
71:8 180:9,13
207:3,6,6,10,11,12
208:2 219:12
226:14,24 227:18
235:9,20,23 236:9
236:25 257:4
263:17 326:22
328:7,8,10 357:13
**yep** 53:4 275:19
**yesterday** 7:12
323:9
**yielded** 201:25
**york** 1:2,22 2:6,6
4:21 5:5 6:14 9:12
432:4,5,8 433:1
**youtube** 337:9,11
337:22 338:3

**z**

**zero** 164:10
394:22
**zone** 170:18 172:8
**zoom** 390:23

**à**

**à** 220:24 360:10
376:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.