# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 11

Page 1

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------X

   PAUL IACOVACCI,

4

                              PLAINTIFF,

5

6       -against-          Case No.:

                           1:18-cv-08048

7

8  BREVET HOLDINGS, LLC, et al.,

9                          DEFENDANTS.

   -------------------------------------------X

10

11            DATE:  October 6, 2021

12            TIME:  10:02 A.M.

13

14        VIRTUAL DEPOSITION of the

15  Defendant, JOHN TRIPP, taken by the

16  Plaintiff, pursuant to a Court Order and to

17  the Federal Rules of Civil Procedure, held

18  at the above date and time, before Jamie

19  Willis, a Notary Public of the State of New

20  York.

21

22

23

24

25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    CYRULNIK FATTARUSO LLP
         Attorneys for the Plaintiff
 5       PAUL IACOVACCI
         55 Broadway, 3rd Floor
 6       New York, New York 10006
         BY:  ADINA LEVINE, ESQ.
 7            IAN DUMAIN, ESQ.
              JASON CYRULNIK, ESQ.
 8       e-mail: alevine@cf-llp.com
 9
10    REED SMITH LLP
         Attorneys for the Defendants
11       BREVET HOLDINGS, LLC, et al.
         225 Fifth Avenue
12       Pittsburgh, Pennsylvania 15222
         BY:  COLIN UNDERWOOD, ESQ.
13            JILLIAN FITZPATRICK, ESQ.
         e-mail: cunderwood@reedsmith.com
14               jfitzpatrick@reedsmith.com
15
16    WEISS & WEISS
         Attorneys for the Plaintiff
17       PAUL IACOVACCI
         2000 Post Road, Suite 106
18       Fairfield, Connecticut 06824-5730
         BY:  SCOTT WEISS, ESQ.
19       e-mail: scott@weissnweiss
20
21    ALSO PRESENT:
         ORLANDO JIMENEZ
22       Videographer
         VERITEXT LEGAL SOLUTIONS
23
24
              *         *         *
25
```

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24              *     *     *     *

25

Page 4

```
 1
 2              THE VIDEOGRAPHER:  Good
 3      morning.  The time is 10:02 A.M.
 4      We're going on the record on October
 5      6th, 2021.  This is media unit one of
 6      the video deposition of John Tripp,
 7      taken in the matter of Paul Iacovacci
 8      versus Brevet Holdings, LLC, et al.,
 9      filed in the United States District
10      Court Southern District of New York,
11      Case No.: 1:18-CV-08048.
12              This deposition is being held
13      remotely via Zoom.  My name is
14      Orlando Jimenez, from the firm
15      Veritext Legal Solutions.  I'm the
16      videographer.  The Court Reporter is
17      Jamie Willis, from the firm Veritext
18      Legal Solutions.
19              Will counsel please state their
20      appearance and affiliation for the
21      record, starting with Plaintiff's
22      attorney, please.
23              MS. LEVINE:  Sure.  My name is
24      Adina Levine.  I'm an attorney for
25      Cyrulnik Fattaruso, and I represent
```

Page 5

```
 1
 2        Paul Iacovacci, the plaintiff in this
 3        case.
 4            MR. DUMAIN:  And this is Ian
 5        Dumain, also with Cyrulnik Fattaruso,
 6        for the plaintiff.
 7            MR. WEISS:  Scott Weiss of
 8        Weiss & Weiss, LLC, co-counsel to
 9        Cyrulnik Fattaruso.  And I also
10        represent the plaintiff.
11            MR. UNDERWOOD:  Colin
12        Underwood, with Reed Smith.  I'm here
13        with my colleague, Jillian
14        Fitzpatrick.  We represent the
15        defendants in this action and we also
16        represent John Tripp, individually.
17            (Whereupon, Lending
18        Presentation was pre-marked as
19        Plaintiff's Exhibit 1 for
20        identification as of this date by
21        Counsel.)
22            (Whereupon, Organizational
23        Chart was pre-marked as Plaintiff's
24        Exhibit 2 for identification as of
25        this date by Counsel.)
```

Page 6

1

2              (Whereupon, LLC Agreements were

3         pre-marked as Plaintiff's Exhibit 3-4

4         for identification as of this date by

5         Counsel.)

6              (Whereupon, E-mail was

7         pre-marked as Plaintiff's Exhibit 5

8         for identification as of this date by

9         Counsel.)

10              (Whereupon, Separation

11         Agreement was pre-marked as

12         Plaintiff's Exhibit 6 for

13         identification as of this date by

14         Counsel.)

15              (Whereupon, E-mails were

16         pre-marked as Plaintiff's Exhibit 7-8

17         for identification as of this date by

18         Counsel.)

19              (Whereupon, Response was

20         pre-marked as Plaintiff's Exhibit 9

21         for identification as of this date by

22         Counsel.)

23              (Whereupon, List was pre-marked

24         as Plaintiff's Exhibit 10 for

25         identification as of this date by

```
 1                    J. TRIPP
 2        Counsel.)
 3              (Whereupon, E-mail was
 4        pre-marked as Plaintiff's Exhibit 11
 5        for identification as of this date by
 6        Counsel.)
 7   J O H N    T R I P P, called as a witness,
 8   having been first duly sworn by a Notary
 9   Public of the State of New York via Zoom,
10   was examined and testified as follows:
11   EXAMINATION BY.
12   MS. LEVINE:
13        Q.    Please state your name for the
14   record.
15        A.    John Tripp.
16        Q.    What is your address?
17        A.    ███ ████████  ██████
18   ████████ ███ ████████ ███ ████ ████████
19        Q.    Good morning, Mr. Tripp.  I'm
20   going to be asking you some questions
21   today.  If you can't hear me or if you
22   don't understand the question or if you
23   need me to repeat a question, just let me
24   know.  Is that okay?
25        A.    Yes.
```

```
                                         Page 8

 1                    J. TRIPP
 2        Q.     Have you ever been deposed
 3   before?
 4        A.     Yes.
 5        Q.     So you understand how it works.
 6   Have you ever been deposed remotely?
 7        A.     Yes.
 8        Q.     What were the contexts for when
 9   you were deposed?
10        A.     It's a landlord-tenant issue in
11   Pennsylvania.
12        Q.     Were you being deposed in your
13   individual capacity, or for Brevet or some
14   other company?
15        A.     No, as a private citizen
16   landlord.
17        Q.     And were you a party in that
18   suit -- in that case?
19        A.     Yes.
20        Q.     Have you ever otherwise been a
21   party in a suit?
22        A.     Not that I can remember.
23        Q.     Have you ever otherwise been
24   deposed?
25        A.     Not that I can remember.
```

Page 9

1                    J. TRIPP

2         Q.    This is review for you, but I'm

3   just going to go through the rules of a

4   deposition, even though it sounds like you

5   already know it.

6              After I ask a question, your

7   attorney may object for the record.  You

8   have to go ahead and answer the question,

9   to the extent you understand it, unless

10  you're instructed by your counsel not to

11  answer; do you understand that?

12        A.    Yes.

13        Q.    The Court Reporter is going to

14  be typing everything we say.  So

15  particularly, because this is remote, it's

16  important that we don't talk over each

17  other.  So I'm going to wait for you to

18  finish.  If you could please wait for me to

19  finish, before you start answering.  Is

20  that okay?

21        A.    Okay.

22        Q.    If you want to take a break,

23  just let me know.  But if there's a

24  question pending, I'm going to ask you to

25  answer it first, and then we'll take the

```
                                    Page 10
 1                  J. TRIPP
 2   break.  Is that okay?
 3        A.    Yes.
 4        Q.    Is there any reason you're not
 5   able to provide testimony here today?
 6        A.    No.
 7        Q.    So I just want to state what we
 8   discussed ahead of time for the record.
 9   There's no reason you're not able to read
10   documents and see documents today, right?
11        A.    No.
12        Q.    And so the reason you're
13   wearing these glasses, does not interfere
14   with your ability to read and review
15   documents?
16        A.    I wouldn't be able to read them
17   without.
18        Q.    Okay.  Are you represented by
19   counsel here today?
20        A.    Yes.
21        Q.    That's Reed Smith?
22        A.    Yes.
23        Q.    Is there anyone else in the
24   room with you?
25        A.    Just Reed Smith and me.
```

```
                                              Page 11
 1                    J. TRIPP
 2        Q.     If anyone else joins the room,
 3   can you let us know?
 4        A.     Okay.
 5        Q.     Do you have any documents
 6   related to this case in the room with you?
 7        A.     I have no documents.
 8        Q.     Aside from the computer that's
 9   in front of you, are there any other
10   electronic devices in the room with you?
11   Phones, other computers?
12        A.     Yes.
13        Q.     Can you agree to refrain from
14   checking or using your phone to communicate
15   with anyone while we're on the record?
16        A.     Yes.
17        Q.     So how did you prepare for
18   today's deposition?
19        A.     I'm sorry?
20        Q.     How did you prepare for today's
21   deposition?  Can you hear me?
22        A.     Yes.  I don't understand the
23   question.
24        Q.     Did you meet with counsel
25   before today's deposition?
```

```
                                       Page 12
 1                  J. TRIPP
 2        A.     Yes.
 3        Q.     How many times?
 4        A.     Twice.
 5        Q.     Who was there?
 6        A.     Reed Smith and me.
 7        Q.     Was anyone else in the room, or
 8   just you and Reed Smith?
 9        A.     I think for a minute or two,
10   there was a Brevet -- but they were just
11   there for a couple of minutes and then they
12   went away.  I think they were there to
13   check that I was there.  That's all.  They
14   didn't talk.
15        Q.     Did you review documents before
16   today's deposition?
17        A.     No.
18        Q.     Which lawyers from Reed Smith
19   were in the room?
20        A.     I don't recall.  I know Colin
21   was there.  There were a couple of other
22   attorneys, but I don't know who they were.
23   I don't remember.
24        Q.     Have you reviewed any
25   deposition testimony by any other witness
```

Page 13

```
1                    J. TRIPP
2   to prepare for today's deposition?
3        A.    No.
4        Q.    How much total time did you
5   spend preparing for today's deposition?
6        A.    Two to three hours.
7        Q.    That was meeting with your
8   attorney?
9        A.    Yes.
10       Q.    Anything else, outside of
11  meeting with your attorney?
12       A.    No.
13       Q.    Did you discuss today's
14  deposition with anyone, besides your
15  lawyer?  Maybe a friend or colleague?
16       A.    I told my wife I was coming.
17  That's all.
18       Q.    What about Mark Callahan; did
19  you speak with him about it?
20       A.    No.
21       Q.    How about Doug Monticciolo?
22       A.    No.
23       Q.    Anyone else from Brevet?
24       A.    I did not discuss it with
25  anybody else.
```

```
                                        Page 14
 1                  J. TRIPP
 2       Q.    Can you go through with me your
 3   educational history, starting with college?
 4       A.    I got my bachelor's degree from
 5   Saint Francis College in 1988 and my
 6   master's from Columbia in 1990.
 7       Q.    Did you go straight from
 8   college to your master's program or did you
 9   work in between?
10       A.    I slept a long time.  I went
11   1988 for my bachelor's.  I'm 80 years old.
12   So there was a gap.
13       Q.    What did you do before then, in
14   terms of employment?
15       A.    Before?
16       Q.    So you --
17       A.    I was continuously employed
18   since 1957.
19       Q.    What were you employed as?
20       A.    Once I got out of high school,
21   I was in computer systems since 1959.
22       Q.    Where?  Same company?
23   Different companies?
24       A.    Eleven years at State of
25   Michigan.  And then company called Realtime
```

```
1                    J. TRIPP
2   Systems, here in New York.  Chase Manhattan
3   Bank.  I had a small consulting firm for a
4   few years.  And then I went to company
5   called Structured Methods, which was a
6   corporate technology training company.
7   From there I went to Goldman Sachs.  That's
8   when I got my degrees, while I was at
9   Goldman Sachs.  After Goldman Sachs, again
10  was on my own for a couple of years.  Then
11  I joined Doug and Mark in 1990.
12       Q.    What was your bachelor's in?
13       A.    My bachelor's was in business
14  and finance.
15       Q.    What was your master's in?
16       A.    Management and finance.
17       Q.    Your previous employment, was
18  it all in computer systems or were there
19  different --
20       A.    No.  Once I started computers
21  in '59, it was continuously in computers.
22            MR. UNDERWOOD:  Mr. Tripp, just
23       try to make sure that you wait until
24       Ms. Levine finishes her question.
25       Just so you don't talk over one
```

Page 16

```
 1                    J. TRIPP
 2      another.
 3              THE WITNESS:  Okay.
 4      Q.     From 1959 to 1988, you were
 5  working in computers; is that fair to say?
 6      A.     I would say 1959 until forever.
 7  I was always with computers.  The reason I
 8  went to Goldman Sachs was for computers.  I
 9  was the senior IT manager at Goldman Sachs.
10      Q.     When you said you were on your
11  own, what was that?  What was your company?
12      A.     What was the company's name?
13  Tripp Technology.
14      Q.     What did it do?
15      A.     Consulting, primarily in
16  corporate training in technology.
17      Q.     Does it still exist or no?
18      A.     No.
19      Q.     Did you stop working at Tripp
20  Technology when you joined Brevet?
21      A.     It wasn't Brevet then.  It was
22  Turing Capital.  It was a technology
23  company first and they absorbed Tripp
24  Technology at that time.
25      Q.     How did you first come to
```

```
                                              Page 17
 1                    J. TRIPP
 2   Brevet?  At this point it was called Turing
 3   Capital, right?
 4        A.    It was called FCS Advisors
 5   first.
 6        Q.    This is in 1999, we're talking?
 7        A.    1999, yeah.
 8        Q.    How did you come to meet them?
 9        A.    One of the founding principals
10   was secretary of the board -- it was a
11   co-op board.  I was the president of the
12   board -- and mentioned they were starting
13   this new business, and I was intrigued and
14   that's how I joined.
15        Q.    Who was that?
16        A.    I'm sorry?
17        Q.    Who was that?  What was their
18   name?
19        A.    Ron Davidow.
20        Q.    Is he still at Brevet?
21        A.    No.
22        Q.    Mr. Davidow told you there was
23   this opportunity for you and you thought
24   you were interested?
25        A.    Not really.  He told me what he
```

```
 1                    J. TRIPP
 2   was doing.  And I said, "I'd be happy to
 3   advise you guys, if you needed some help."
 4   And we had some meetings with Doug and
 5   Mark.  And that led to me just joining
 6   them.  So he didn't recruit me.
 7        Q.    After this conversation with
 8   Mr. Davidow, you then met with Doug and
 9   Mark?
10        A.    Yes.
11        Q.    What was your original role in
12   this new company?
13        A.    To oversee the development of
14   the supporting technology of what they were
15   trying to do.
16        Q.    What did that entail?  Did you
17   have a staff?
18        A.    Yeah, I had -- the most I got
19   to was four, I think.
20        Q.    And that was not right away?
21        A.    No.  It started out with just
22   me and we added staff.
23        Q.    Did you have a title when you
24   first started?
25        A.    We were all managing directors.
```

```
 1                   J. TRIPP
 2        Q.    So when you first started, it
 3   was you, Doug, Mark and Mr. Davidow?
 4        A.    Yes.
 5        Q.    Anyone else?
 6        A.    No.
 7        Q.    So you were all managing
 8   directors; but presumably you each had
 9   different roles in the company?
10        A.    Yeah, I guess.
11        Q.    If you were in charge of
12   overseeing the development of the
13   supporting technology, what would be Doug's
14   role?  What was Mark's role?  And what was
15   Mr. Davidow's role originally?
16        A.    They were the front office and
17   I was the back office.  I mean their job
18   was to figure out the strategy.  My job was
19   to try to support technology to do that
20   strategy.  As far as how they divided the
21   work, I don't know who did what.  It was
22   the four of us.
23        Q.    When you say to develop the
24   strategy, at this point, when it was FCS
25   Advisors in 1999, what was the vision of
```

```
                                        Page 20
 1                  J. TRIPP
 2    the company?
 3        A.    To provide a platform for small
 4    businesses that were larger than SBA-type
 5    eligible businesses, to quickly get loans
 6    via Internet support.  Automation -- a lot
 7    of the application process being automated.
 8    Speed it up.
 9        Q.    At that time in 1999, was this
10    a unique idea, or were there other business
11    models that all of you together were
12    modeling after?
13        A.    The way we were trying to do it
14    was pretty unique.  Some of the technology
15    was not unique.  But how we applied our
16    technology was unique.  There were early
17    artificial intelligence proponents.
18        Q.    Would you say at that time you
19    were a unique player in the space or you
20    already had other competitors?
21        A.    To my knowledge, we had no
22    competitors at that time.
23        Q.    Did the vision of the company
24    change over time?  Did it change when it
25    changed its name?  Or did it otherwise
```

```
                                              Page 21
 1                      J. TRIPP
 2   change even when it was still FCS Advisors?
 3               MR. UNDERWOOD:  Could you read
 4           the question back?
 5               (Whereupon, a portion of the
 6           record was read back.)
 7               MR. UNDERWOOD:  I think the
 8           name of the entity -- I'm not sure
 9           whether you have it right.  What's
10           the name?
11               THE WITNESS:  FCS Advisors.
12               MS. LEVINE:  Great.
13       A.    The name changed first.
14       Q.    What year did the name change?
15       A.    I'm not sure.  Before 197 --
16   before the World Trade.  What's that 2001?
17   It changed probably in 2000.
18       Q.    What did it change to?
19       A.    Turing Capital.
20       Q.    With that changed name, a
21   vision change as well?
22       A.    No.
23       Q.    So it still maintained the same
24   vision?
25       A.    Yes.
```

Page 22

1                    J. TRIPP

2       Q.    Did you expand to include more

3   employees at that time?

4       A.    No.  We were adding a person

5   here or there, but not at the time we made

6   the change.

7       Q.    At that point, Turing Capital

8   was not a registered investment advisor,

9   was it?

10      A.    No.

11      Q.    When did the vision change or

12  expand from what it was originally?

13      A.    Six months after 9/11.

14      Q.    What did it change to or did it

15  expand and still maintain the original

16  vision and then add others?  What was now

17  the new vision?

18      A.    The original vision was

19  changed.

20      Q.    So now what was the new

21  strategy of the company?

22      A.    To provide funding advice to

23  smaller companies seeking capital.

24      Q.    Why the change?

25      A.    As the result of 9/11, the

Page 23

```
 1                    J. TRIPP
 2   funding for the original idea was dried up.
 3   So the staff was -- the company as it was,
 4   was dissolved.  The employees were all let
 5   go.  Just the founders, the four of us,
 6   went on to the advisory role.  And so the
 7   original direction was totally changed.
 8        Q.    So who was still there?  Was it
 9   still you --
10        A.    Doug, Mark, Ron and I.
11        Q.    Was this space one where Brevet
12   was unique or were there others in this
13   space?
14        A.    I don't know.
15        Q.    How long did Brevet keep this
16   vision of funding smaller companies that
17   were seeking capital?
18        A.    You mean the original idea?
19        Q.    Yeah.
20        A.    So mid 2002.  I don't know the
21   exact day.
22        Q.    Okay.  Then what happened?
23        A.    That's when we went to the
24   advisory service.  That's when the whole
25   technology employment was eliminated,
```

Page 24

```
 1                    J. TRIPP
 2  period.
 3       Q.    What do you mean by that, the
 4  whole technology employment was eliminated?
 5       A.    The whole idea of developing a
 6  new technology was gone.
 7       Q.    Why?  It wasn't working?
 8       A.    The funding for the project
 9  disappeared, because of 9/11.  A lot of
10  funding came from insurance companies.  And
11  at that point, they were very reluctant to
12  do anything.
13       Q.    From mid 2002 until when was
14  the new vision of Turing Capital of
15  advising smaller companies?  How long did
16  that vision last?  Is that still the vision
17  today or it stopped?  It changed over time?
18       A.    It's changed over time.  I
19  don't know when.
20       Q.    When did Brevet become Brevet
21  and not Turing Capital?
22       A.    I don't remember.
23       Q.    Approximately?  2010?
24       A.    Before 2010.  But I don't
25  remember when.  After Paul joined.
```

Page 25

1                    J. TRIPP
2        Q.    While it was still Turing
3   Capital, did the vision change or did the
4   vision only change when it became Brevet?
5        A.    Turing Capital was dissolved --
6   declared bankruptcy.  And it went back to
7   FCS Advisors to do the advisory work.  That
8   was 2002.  FCS Advisors never went away.
9        Q.    How did you first meet Paul?
10       A.    I walked in one morning and
11  there was Paul sitting at the desk.  And I
12  was introduced to him.
13       Q.    So you weren't involved in his
14  hiring?
15       A.    No.
16       Q.    Just so I understand the
17  division of work between you, Ron, Mark and
18  Mr. Davidow, At what point did Mr. Davidow
19  leave?
20       A.    I don't know.  Six months to a
21  year after Paul joined.  But I don't know
22  when it was.
23       Q.    And you were not involved in
24  how many employees were hired and fired
25  throughout; is that a fair statement?  Or

Page 26

```
 1                 J. TRIPP
 2  you were consulted?
 3            MR. UNDERWOOD:  Objection to
 4       form.
 5            MS. LEVINE:  You can still
 6       answer.
 7       A.    Can you restate the question?
 8            MS. LEVINE:  Can you read it
 9       back?
10            (Whereupon, a portion of the
11       record was read back.)
12       A.    I was not consulted.
13       Q.    What is your role with
14  decision-making vis-a-vis Mark and Doug,
15  from let's say from the time it became
16  Brevet?  What was your involvement in
17  decision-making?
18            MR. UNDERWOOD:  Objection to
19       the form of the question.
20       Q.    And if it changed over time,
21  let me know.
22       A.    I gave my opinion.  It was not
23  a vote-taking.  Doug decided what we did.
24  I gave my opinion.
25       Q.    Were you mostly technology at
```

Page 27

```
 1                    J. TRIPP
 2  Brevet or something else?
 3        A.    Well, I was mostly doing back
 4  office stuff.  Technology, but facilities
 5  management, monitoring one of the
 6  investments.
 7        Q.    Which one?
 8        A.    Back office accounting.  Which
 9  one?
10        Q.    Yes.
11        A.    ████████   ███████████   ██████████.
12        Q.    And that was the investment
13  that you were monitoring?
14        A.    Yes.
15        Q.    Did you monitor any others?
16        A.    No.
17        Q.    Why were you monitoring that
18  one?
19        A.    To free up Doug and Mark and
20  Paul to get business.  They reviewed what I
21  did, but I was in charge on a daily basis
22  to manage that one.
23        Q.    Did you have to manage other
24  employees?
25        A.    No.
```

Page 28

1                     J. TRIPP

2        Q.    When Brevet originally

3   started -- and maybe it goes back even

4   further.  So when FCS Advisors originally

5   started, was there any understanding that

6   you had with Paul and Doug and Mr. Davidow

7   about sharing profits?

8        A.    Not that I recall.

9        Q.    Were you paid like an employee

10  or you had a stake in the company?

11            MR. UNDERWOOD:  Objection to

12       the form of the question.

13       Q.    Or something else?

14       A.    I was paid as an employee,

15  number one.  I had some stake.  I don't

16  recall exactly how that worked.  But I did

17  get profit distribution.

18       Q.    When it switched to becoming

19  Turing Capital, was your compensation

20  changed or was it the same as with FCS

21  Advisors?

22       A.    Absolutely no change.

23       Q.    When it became Brevet, was

24  there any change then?

25       A.    No.

Page 29

1                        J. TRIPP

2          Q.    While you were at Brevet, was

3     there any change?

4          A.    Not that I recall.

5          Q.    Is it fair to say that

6     throughout the time that you've been

7     working with Doug and Mark you've been paid

8     as an employee and you have some stake in

9     the company?

10         A.    Yes.

11         Q.    Okay.  Did you have any

12    understanding when you originally started

13    with FCS Advisors about what would be the

14    arrangement if you would leave or if anyone

15    would leave FCS Advisors?

16         A.    No.

17         Q.    Was there any agreement that

18    you guys signed, like a noncompete, if you

19    leave?

20         A.    I don't recall.

21         Q.    Same question about Turing

22    Capital.  Was there any understanding about

23    what the arrangement would be if you left

24    or if anyone left Turing Capital?

25         A.    I don't recall.

```
                                       Page 30
 1                      J. TRIPP
 2        Q.     What about at Brevet?
 3        A.     There was something about it.
 4   But I, again, don't recall what the details
 5   are.
 6        Q.     Okay.  Do you remember any
 7   conversations you had with Doug and Mark at
 8   the beginning when Brevet first started
 9   about, "Hey, we're in this for the long
10   haul.  We're not leaving," or anything
11   like, "If I leave, I can go to a different
12   fund"; anything like that?
13                MR. UNDERWOOD:  Objection to
14          the form of the question.
15        A.     I don't recall.
16        Q.     Can you describe for me
17   Brevet's business?
18        A.     Today?
19        Q.     Let's do from 2004 to 2016.
20                MR. UNDERWOOD:  Objection to
21          the form of the question.
22        A.     I guess to find unusual
23   opportunities for deploying capital and
24   getting returns that were consistent with
25   the risk being taken.
```

```
                                        Page 31
 1                    J. TRIPP
 2        Q.    Was it specifically a lending
 3   business?
 4              MR. UNDERWOOD:  Objection to
 5        the form of the question.
 6        A.    I don't think so.
 7        Q.    What was your title from 2004
 8   to 2016?
 9        A.    Managing director.
10        Q.    Managing director?
11        A.    Yes.
12        Q.    And what was your role; what
13   was your responsibilities?
14        A.    Probably 70 percent technology.
15   30 percent other back office duties.  Like
16   I said, facilities management.  Very small
17   amount of time spent on that one --
18   monitoring that one investment.  Probably
19   less than 2 percent of the time.
20        Q.    How many employees would you
21   say Brevet had from 2004 to 2016?  And if
22   it changed over time, let me know.
23              MR. UNDERWOOD:  Objection to
24        the form of the question.
25        A.    Well, employees that were -- I
```

```
                                        Page 32
 1                  J. TRIPP
 2   guess in 2004, we were maybe at 5.  By the
 3   time I left, probably 30.  25.  I don't
 4   know the exact number.  And that's a hard
 5   question, because some of those people are
 6   not employees, but consultants.  So I don't
 7   know.  I don't really know how many
 8   employees exactly, because I wasn't
 9   involved in that aspect.
10        Q.    When you say you weren't
11   involved in this aspect, do you mean the
12   hiring and firing of employees?
13        A.    Hiring and firing, deciding if
14   we needed people or not.  Because they were
15   all hired to support specific things in the
16   company and I wasn't involved in that part
17   of it.
18        Q.    What's the difference between
19   an employee and consultant?
20              MR. UNDERWOOD:  Object to the
21        form of the question.
22        A.    A consultant is hired to do a
23   specific task and was compensated for doing
24   that task.  As oppose to an employee hired
25   to do what's necessary to make the firm
```

```
                                      Page 33
 1                      J. TRIPP
 2   work.
 3        Q.    Was Paul Iacovacci the fifth
 4   one in?  Meaning, there was Doug, you, Mark
 5   and Mr. Davidow; was Paul the next guy who
 6   came into Brevet?
 7        A.    I think he was the next
 8   employee.  But I don't know.
 9        Q.    What was his role?
10        A.    Finding clients.  Cold calling
11   clients.
12        Q.    Do you know if he came in with
13   any clients?
14        A.    I don't know.  Came in with
15   clients?  That I don't know at all.
16        Q.    Do you know if he came in with
17   any contacts?
18             MR. UNDERWOOD:  Objection to
19         the form of the question.
20        A.    Don't know.
21        Q.    How much did you interact with
22   him while he was there?
23             MR. UNDERWOOD:  I couldn't hear
24         that question very clearly.
25        Q.    Sure.  My question was:  How
```

1                    J. TRIPP
2   much did you interact with Mr. Iacovacci at
3   Brevet?
4        A.    Just make sure he kept his feet
5   off of kicking the monitors, kicking the
6   plugs.  I was just supporting technology
7   when he was there.  I didn't interact -- we
8   had meetings and he said things and I said
9   things.  But I just -- that was in the
10  normal course of the business.  As far as
11  interacting directing with Paul, little to
12  no contact.
13       Q.    It sounds like a lot of what
14  you were doing, you had a lot of
15  independence; is that fair to say?
16       A.    That's fair to say.
17       Q.    And a lot of what Paul was
18  doing, was a little bit in a separate
19  realm; so he also had independence?
20            MR. UNDERWOOD:  Objection to
21       the form.
22       A.    I don't know how independent he
23  was from Doug and Mark.  He was independent
24  from me.
25       Q.    I guess that was my question.

Page 35

```
 1                    J. TRIPP
 2   Did you have an understanding of how much
 3   Paul was working with Doug and Mark?
 4        A.    Well, the three of them sat in
 5   the same area.  They were continuously
 6   interacting.
 7        Q.    Were they also cold calling
 8   clients or that was specific to Paul?
 9        A.    I believe that was specific to
10   Paul.
11        Q.    So from 2004 to 2016, did your
12   role basically remain the same?
13        A.    It remained the same until
14   2012 -- 2013.
15        Q.    And what happened in 2013?
16        A.    I, at that time, gave up my
17   day-to-day required responsibilities.  Sent
18   out -- I had -- I was going to -- I told
19   the staff I was going to a new level of
20   semiretirement, where I'd still be there,
21   but I would take six to eight weeks
22   vacation.  And the big difference was they
23   couldn't call me while I was on vacation.
24   So I went on to more of a support-as-needed
25   role, rather than a day-to-day
```

Page 36

1                      J. TRIPP
2    responsibility role in 2013.
3        Q.    Did your title still stay
4    managing director?
5        A.    Yes.
6        Q.    Was anyone else hired to do the
7    day to day?
8        A.    People had been hired over
9    time.  We segmented the work.  In other
10   words, there was no one person hired to do
11   my job.  Different pieces were given to
12   different people on the day to day stuff.
13   The only thing that I continued to do at
14   that point was the facilities stuff.  We
15   were going to do a move.  So I did the move
16   -- the plan for the move and oversaw the
17   move.  But that was my last day to day
18   responsibility type stuff.
19       Q.    When was Johnny Lan hired?
20       A.    I have no idea.
21       Q.    Did you -- you weren't involved
22   in hiring him, I'm guessing?
23       A.    No.
24       Q.    Did you supervise him?
25       A.    No.

```
                                            Page 37
 1                      J. TRIPP
 2        Q.     Your day to day responsibility
 3   included 70 percent technology.  Mr. Lan
 4   also worked in technology.  How did that
 5   work?  You guys were working independently
 6   in technology?
 7                MR. UNDERWOOD:  Objection to
 8           the form of the question.
 9        A.     Basically not -- we talked with
10   each other.  But he basically did the
11   mobile stuff, which I didn't know anything
12   about.  And he was directly supporting --
13   at that time, the company had grown a bit.
14   And he was directly supporting a couple of
15   people building their spreadsheets.  He was
16   more business technology, rather than
17   computer technology.  That's as far as that
18   goes.  Building large spreadsheets and
19   modifying to -- to put together a deal, you
20   need a spreadsheet to show possible returns
21   and so on.  So he did that kind of thing.
22   That was not something that I did.
23        Q.     And what was the mobile stuff
24   that you said he did?
25        A.     You know, we had phones and --
```

```
                                        Page 38
 1                    J. TRIPP
 2    so he would help people get their phones
 3    configured properly and make sure they were
 4    using corporate protocols for e-mail and so
 5    forth.  He did all that kind of stuff.
 6    Plus he decided when somebody needed a
 7    phone or fixed the phone.  That kind of
 8    thing.
 9          Q.    When you say mobile stuff,
10    would you include laptops as part of that?
11          A.    Not really.  The laptops were
12    still under the framework of "technology."
13          Q.    So that was still your
14    responsibility?
15          A.    Until 2013, yes.
16          Q.    After 2013, did that become
17    more Mr. Lan's responsibility?
18          A.    That became Johnny's
19    responsibility, yes.  He was doing --
20    supporting these model people.  Building
21    these models.  So he was clearly giving
22    them some advice on other things.  They
23    didn't always come to me, because Johnny
24    was right there with them with the
25    modeling.  As far as responsibility goes,
```

```
                                        Page 39
 1                    J. TRIPP
 2   his responsibility was primarily the mobile
 3   phones.
 4        Q.    Until 2013, you would be in
 5   charge of setting up peoples laptops; and
 6   after 2013, that would be Mr. Lan's
 7   responsibility?
 8        A.    I think that's pretty fair.
 9   I'm not sure that's exactly correct, but
10   it's close.  Obviously he could have given
11   them some advice.  I don't know.
12        Q.    That's okay.  Because when you
13   were in the office, when you weren't on
14   vacation, you would still be involved?
15              MR. UNDERWOOD:  Objection to
16          the form of the question.
17        Q.    After 2013.
18        A.    What's the question then?
19        Q.    So after 2013, when you were
20   still in the office, would you be involved
21   in helping set up people's laptops?
22        A.    No.
23        Q.    So that would mostly be
24   Mr. Lan?
25        A.    Right.
```

```
                                        Page 40
 1                    J. TRIPP
 2        Q.    When did Paul Iacovacci become
 3   a managing director of Brevet Capital
 4   Management?
 5        A.    I don't know.  I had nothing to
 6   do with it, so I don't know.
 7        Q.    Was it a couple of years after
 8   he had been there?
 9        A.    I don't know.
10        Q.    Do you know if he started in
11   that role?
12        A.    I don't know.
13        Q.    Do you know when he became a
14   member of the Short Duration Companies?
15        A.    I don't know.
16        Q.    Do you know when he became a
17   member of the board of directors of Short
18   Duration Holding?
19              MR. UNDERWOOD:  Objection to
20        the form of the question.
21        A.    I have no idea.
22        Q.    Were you a member of the board
23   directors of any of the Brevet entities?
24        A.    I don't know if we called it
25   that.  We had a -- the four of us had
```

```
 1                   J. TRIPP
 2  meetings, but I don't know what we called
 3  it exactly.  I don't know if it was called
 4  board of directors.
 5       Q.    When you say the four of us,
 6  who were the four?
 7       A.    Paul, Mark, Doug and I.
 8       Q.    Before Brevet Capital
 9  Management -- Brevet Capital Management is
10  a registered investment advisor, right?
11       A.    I don't know.
12       Q.    My question to you is:  Was any
13  other entity a registered investment
14  advisor?
15       A.    I don't know.
16       Q.    Were you involved at all in the
17  compliance aspects of the company?
18            MR. UNDERWOOD:  Object to the
19       form of the question.
20       A.    Not the formal compliance, no.
21       Q.    Can you describe the formal
22  compliance of the company?
23       A.    No, that was Sheree's job.  I
24  just did what she told me to do.
25       Q.    Sheree, you mean Sheree Harris?
```

```
 1                    J. TRIPP
 2       A.    Yes.
 3       Q.    When did she come to Brevet; do
 4   you know?
 5       A.    I don't know for sure.
 6       Q.    Approximately?
 7       A.    '11 or '12.  I'm not positive.
 8       Q.    Before her, there was no one;
 9   is that fair?
10            MR. UNDERWOOD:  Object to the
11        form of the question.
12       A.    I don't know.  There was
13   compliance things that we did.  I don't
14   think we had any SEC compliance
15   requirements at that time.  So there was
16   not this formal process that Sheree was
17   following.
18       Q.    When Ms. Harris came to Brevet,
19   she instituted some formal compliance; is
20   that fair to say?
21       A.    Yes.
22       Q.    What was part of that formal
23   compliance; do you know?  Was there annual
24   trainings?
25       A.    There was an annual training.
```

```
                                        Page 43
 1                    J. TRIPP
 2    Annual reviews of the employee handbook.
 3    And other documents that she would send out
 4    and say, "Please, read these.  Sign that
 5    you read them and return the
 6    acknowledgement form."  That was formalized
 7    under Sheree.
 8         Q.    Anything else?
 9         A.    I don't know.
10         Q.    Nothing you remember?
11         A.    Nothing that I -- I mean, I
12    always just remember the process we went
13    through once you went through all the
14    documents.  You read them all and say, "I
15    sign these and I agree that it's part of my
16    employment conditions."
17         Q.    And this happened like once a
18    year?
19         A.    As I recall, yes.
20         Q.    And the annual trainings, were
21    they official like that?  Is it fair to
22    call them annual trainings?  Or it was more
23    like everyone come to a meeting?
24         A.    It was more like everyone come
25    to a meeting.  We're going to discuss what
```

```
                                        Page 44
 1                    J. TRIPP
 2   we have to do to go through with the
 3   process.  But it was not what you might
 4   think of as a formal -- here's what
 5   compliance is and this is what" -- the kind
 6   of training that you would get that says,
 7   "the SEC says this."  This was just, this
 8   is what we do.
 9        Q.    I think I got it.
10              So we'll call it a meeting.
11   And it would happen like once a year maybe,
12   or whenever it came up, it came up?
13        A.    I would say it was once a year.
14        Q.    And it would be company wide?
15        A.    Yes.
16        Q.    So were people required to
17   come?
18        A.    Yes.
19        Q.    So like Doug and Mark would be
20   there?  Paul would be there?
21        A.    Yes.
22        Q.    Do you remember if you had to
23   sign in or anything like that?
24        A.    I don't remember.
25        Q.    Do you remember if there were
```

Page 45

```
 1                    J. TRIPP
 2   materials that were part of this meeting?
 3        A.    No, it wasn't really that.  It
 4   was to tell you why you had to go through
 5   all these documents, The importance.
 6        Q.    And that was Ms. Harris's role
 7   from whenever she came in 2011 or '12 until
 8   when?
 9        A.    I don't know.  She left after
10   me.
11        Q.    Did the process ever become
12   more formal over time?
13             MR. UNDERWOOD:  Object to the
14         form of the question.
15        A.    I don't know.
16        Q.    Meaning, while you were there,
17   it was pretty much consistent?
18        A.    Once we started doing it.  We
19   didn't do it in 2001.  We were a different
20   type of company.
21        Q.    About the business side of
22   Brevet, you were involved at all in
23   Brevet's evaluation of transactions?
24        A.    No.
25        Q.    Were you aware of any policies
```

```
                                        Page 46
 1                    J. TRIPP
 2    that Brevet had regarding what type of
 3    transactions to do?
 4         A.    No.
 5         Q.    If someone would approach you
 6    and say, "Hey, I have a deal for Brevet,"
 7    would you be able to know whether that's
 8    not the type of deal we would even consider
 9    or would -- meaning, do you have enough
10    familiarity with those transactions to
11    answer that?
12                MR. UNDERWOOD:  Object to the
13           form of the question.
14         A.    I wouldn't answer it that way.
15    I might refer them to Doug or Mark.  But I
16    would not answer the question.
17         Q.    Are you able to tell me what
18    type of transactions Brevet undertook from
19    2004 to 2016?
20                MR. UNDERWOOD:  Object to the
21           form of the question.
22         A.    Just that they were unusual.
23    They were not stuff that you could go to
24    the bank and borrow money on.  That's why
25    they were called special opportunities.
```

Page 47

```
1                      J. TRIPP
2        Q.    Why not?  Why couldn't you go
3   to the bank for these?
4        A.    Most of the them didn't have --
5   banks like history.  They like to be able
6   to say these six companies did X.  We're
7   going to try to do X plus Y.  The banks
8   don't like to finance companies that say
9   we're going to do X and Y and nobody's done
10  either.  That kind of financing.
11       Q.    Was there any minimum amount
12  which Brevet would not entertain a
13  transaction?
14            MR. UNDERWOOD:  Objection to
15        the form of the question.
16       A.    I really have no idea.
17       Q.    Do you know if there was any
18  typical amount that Brevet did, like --
19       A.    I have no idea.
20       Q.    Who would you describe are
21  Brevet's main competitors?
22            MR. UNDERWOOD:  Object to the
23        form of the question.
24       A.    I don't know of any
25  competitors.
```

Page 48

```
 1                    J. TRIPP
 2      Q.    Would you say Brevet is now
 3  doing well overall?  Would you say it's
 4  profitable?
 5             MR. UNDERWOOD:  Object to the
 6        form.
 7      A.    I don't know.
 8      Q.    You don't know if Brevet is
 9  profitable?
10             MR. UNDERWOOD:  Object to the
11        form of the question.  What time
12        frame are you talking about?
13             MS. LEVINE:  Now.
14      Q.    You don't know if Brevet is
15  profitable?
16      A.    I don't know.  I get the
17  impression they are, because they keep
18  expanding.  But that costs money.  Whether
19  or not they're profitable yet, I don't
20  know.  They just took new space.  It costs
21  money.  We had 18 months of that space
22  being not used.  I don't know how that
23  affected the bottom line.
24      Q.    From 2004 to 2016, would you
25  have said Brevet is profitable?
```

Page 49

```
 1                    J. TRIPP
 2             MR. UNDERWOOD:  Object to the
 3        form of the question.
 4        A.    Some deals were profitable.
 5   Some weren't.  That's all I know.
 6        Q.    Are you getting profit
 7   distribution?
 8        A.    I'm not sure exact -- I'm not
 9   sure how much I'm getting in profit
10   distribution.  Eligible for it, but I
11   haven't looked to see what I'm getting.
12        Q.    Meaning it goes straight to
13   your bank account and you haven't looked at
14   it?
15        A.    Meaning my distributions are
16   reinvested.  Any distributions I get are
17   reinvested into the company for the profit
18   and whatever distribution came form it.
19        Q.    How often do you get
20   distributions?
21        A.    Don't know.
22        Q.    Can you find out?
23        A.    I guess.
24        Q.    How would you go about finding
25   that out?
```

```
                                      Page 50
 1                    J. TRIPP
 2          A.      Probably go into the office and
 3     sit down with accounting and ask them.   I
 4     don't know.
 5          Q.      Do you get K-1s?
 6          A.      Yes.
 7          Q.      Do you check those K-1s?
 8          A.      No.
 9          Q.      So you're telling me you have
10     no idea how much distributions you're
11     getting from Brevet?
12          A.      I know it's not a lot.
13          Q.      What's not a lot?
14              MR. UNDERWOOD:   Object to the
15           form of the question.
16          A.      I don't pay any estimated
17     tax -- my accountant doesn't pay any
18     estimated tax during the year.   So it's got
19     to be less than that, Or it would be a
20     problem.   But I don't know what that is.
21          Q.      So less than how much would you
22     guess;  ███████     █   ████████
23          A.      Definitely less than ██████.
24          Q.      So your understanding is that
25     you're getting less than  ████████    in
```

```
                                        Page 51
 1                    J. TRIPP
 2   distributions from Brevet; is that fair to
 3   say?
 4        A.     That's fair to say.
 5        Q.     And is that consistent --
 6   that's currently, right, 2021?
 7        A.     Yes.
 8        Q.     Is that the same amount that
 9   you've been -- is that statement true for
10   2020, as well?
11        A.     That the distribution was less
12   than ████████ and I don't know what it was?
13   Yes.
14        Q.     Meaning, is your understanding
15   that you got less than ████████ in 2020?
16        A.     Yes.
17        Q.     Is your understanding that you
18   got less than ████████ in 2018?
19        A.     Yes.
20        Q.     Was there ever a point that you
21   got more than ████████?
22        A.     No.
23        Q.     So from 2004 till 2021, your
24   understanding is that you've never gotten
25   more than ████████ in distributions from
```

```
                                        Page 52
 1                    J. TRIPP
 2    Brevet?
 3         A.    Not that I recall.  Not
 4    counting salary.
 5         Q.    Correct.  Right now I'm just
 6    focusing on your understanding of Brevet's
 7    profitability, because you said you didn't
 8    know.  So I'm trying to figure out, is
 9    there a point which you did know?  So while
10    you were there, from let's say 2004 to
11    2013, while you were still there day to
12    day, at that point, would you say Brevet
13    was profitable?
14         A.    No.
15         Q.    You would not say it was
16    profitable?  You would say it was not
17    profitable?
18              MR. UNDERWOOD:  Object to the
19         form.
20         A.    I wouldn't say either one.  You
21    said, can I say.  I said no, I can't say.
22         Q.    Would you have asked anyone?
23              MR. UNDERWOOD:  Objection to
24         the form of the question.
25         Q.    Let me rephrase.  Did you ever
```

```
                                      Page 53
 1                   J. TRIPP
 2   hear anyone talk about how Brevet was
 3   doing?
 4              MR. UNDERWOOD:  Object to the
 5         form of the question.
 6        A.    I don't -- it's not how you
 7   talk.  Everybody likes to talk positively.
 8   So I mean, I'm not sure.
 9        Q.    Were there meetings where
10   people discussed the profitability of
11   Brevet?
12        A.    Not specifically, that I
13   recall.  I mean, they would say, "We're
14   doing well."  But was that profitable?  I
15   don't know.
16        Q.    Did you ever check the math on
17   your distributions, to make sure you were
18   getting the right amount?
19        A.    No.
20        Q.    In your meetings with Brevet
21   from 2004 to 2016, did you ever hear people
22   talk about net profits?
23        A.    No.
24        Q.    Assets under management?
25              MR. UNDERWOOD:  Sorry.  The
```

Page 54

```
 1                    J. TRIPP
 2       question?
 3             THE WITNESS:  AUM.
 4             MR. UNDERWOOD:  You have a
 5       question about assets under
 6       management?
 7             MS. LEVINE:  Yes.
 8             MR. UNDERWOOD:  Well, she
 9       didn't ask a question.  I would like
10       her to ask a question.
11             MS. LEVINE:  You can object to
12       form, Counsel.  And the witness
13       understood my question.
14             MR. UNDERWOOD:  It wasn't a
15       question.  It was a statement.  I
16       would like you to ask a complete
17       question, so the witness can answer.
18       Even if you think that he thinks he
19       knows what you're thinking for the
20       question, I would like to have a
21       clear question on the record.
22             MS. LEVINE:  Counsel, you're
23       aware that your role is to say
24       objection to form.  And you're
25       allowed to say objection to form and
```

```
                                            Page 55
 1                    J. TRIPP
 2        that's it.  You're not allowed to
 3        coach the witness.
 4              MR. UNDERWOOD:  I'm allowed to
 5        object to improperly formed
 6        questions.
 7              MS. LEVINE:  You're allowed to
 8        say objection to form.  You are not
 9        allowed to coach the witness.  The
10        witness can answer my question.
11              MR. UNDERWOOD:  I'm trying to
12        make a clear record.  If you have a
13        question, ask the witness a question.
14        Q.    You can answer my question.
15        A.    What is exactly the question?
16        Q.    Did they -- in your meetings
17   with Brevet, did they ever discuss assets
18   under management?
19        A.    Yes.
20        Q.    Could you tell me how many
21   assets under management Brevet had in 2016?
22              MR. UNDERWOOD:  Objection to
23         the form of the question.
24        A.    No.
25        Q.    At the time you were at Brevet
```

```
                                          Page 56
 1                  J. TRIPP
 2    from 2004 until 2013, were the assets under
 3    management going up or down?
 4              MR. UNDERWOOD:  Objection to
 5         the form of the question.
 6         A.    Both.
 7         Q.    Was there a pattern in one
 8    direction or the other or at times it went
 9    up and times it went down and it didn't
10    consistently do one or the other?
11         A.    While I was there, it didn't --
12              MR. UNDERWOOD:  Objection to
13         the form of the question.
14         A.    I forgot what the question was.
15    Was there a general direction?
16         Q.    Correct.
17         A.    Ask me the question.
18              MS. LEVINE:  Can you read it
19         back?
20              (Whereupon, a portion of the
21         record was read back.)
22         A.    There were times it went up and
23    times it went down.  I don't know there was
24    an actual pattern.
25              MR. UNDERWOOD:  Counsel, we've
```

```
                                      Page 57
 1                    J. TRIPP
 2         been going for more than an hour.
 3         Would this be a good time to take a
 4         break?
 5              MS. LEVINE:  That's fine with
 6         me.  Do you want to take a ten-minute
 7         break?  Come back at 11:15?  A little
 8         less than ten minutes.
 9              THE VIDEOGRAPHER:  The time is
10         11:08 A.M.  We're going off the
11         record.  Please hold.
12              (Whereupon, a recess was
13         taken.)
14              THE VIDEOGRAPHER:  The time is
15         11:21 A.M.  We're back on the record.
16      Q.    One thing -- I was just looking
17   over my notes and I wanted to clarify the
18   timeline of the name of the entity.
19              At first, it was FCS Advisors.
20   Then it became Turing Capital.  And then
21   Turing Capital went bankrupt.  And then it
22   went back to FCS Advisors.  And then it
23   became Brevet.  Or did it mess that up?
24              MR. UNDERWOOD:  Objection to
25         the form of the question.
```

```
                                    Page 58
 1                   J. TRIPP
 2         A.    I don't know.  That's my
 3   recollection of the order, yes.
 4         Q.    Now, I'm not sure if you're
 5   going to know this, given your prior
 6   testimony.  But can you explain to me
 7   Brevet's corporate structure?
 8         A.    I've not got the foggiest idea.
 9         Q.    Do you know which entity
10   employed you?
11         A.    No.
12         Q.    Do you know which entity is the
13   parent entity?
14         A.    Not sure.
15         Q.    Do you know if Brevet Holdings,
16   LLC, is the parent company of Brevet
17   Capital Management LLC?
18         A.    That I would think is true.
19         Q.    Do you know that Brevet
20   Holdings, LLC, is owned ███ ████ ██ ████
█   ████ ███ ██████ ██ ███████? 
22         A.    Correct.
23         Q.    Do you have a title at Brevet
24   Holdings, LLC?
25                   MR. UNDERWOOD:  Objection to
```

```
                                        Page 59
 1                    J. TRIPP
 2          the form of the question.
 3          A.    I don't know.  I don't think
 4   so.
 5          Q.    And you don't have any
 6   membership interest in Brevet Holdings,
 7   LLC, as far as you know?
 8          A.    I'm not sure who pays what.
 9          Q.    Do you know that Brevet Capital
10   Management is the investment manager for
11   different funds?
12          A.    I do not know the structure.
13          Q.    Do you have a title president
14   of Brevet Capital Management?
15          A.    Do I have the title of
16   president?
17          Q.    Yes.
18          A.    No.
19          Q.    Who is the president of Brevet
20   Capital Management?
21               MR. UNDERWOOD:  Objection to
22          the form of the question.  You're
23          asking about today?
24               MS. LEVINE:  Yes.
25          A.    I don't know.
```

```
                                        Page 60
 1                  J.  TRIPP
 2       Q.    Were you ever president of
 3  Brevet Capital Management?
 4       A.    No.
 5       Q.    Did you ever know who was the
 6  president of Brevet Capital Management?
 7       A.    I thought it was Mark, but I
 8  don't know.
 9       Q.    Do you know the difference
10  between the onshore funds and the offshore
11  funds?
12            MR. UNDERWOOD:  Objection to
13        the form.
14       A.    Just that I had nothing to do
15  with the offshore funds.
16       Q.    Do you know when the offshore
17  fund was started?
18       A.    No.
19       Q.    Do you know if it was before or
20  after 2016?
21       A.    Before.
22       Q.    Do you know if it was before or
23  after 2013?
24       A.    I don't know.
25       Q.    What do you recall about it
```

```
                                    Page 61
 1              J. TRIPP
 2   starting?  How do you know it was before
 3   2016?
 4        A.    How do I know?  Just because
 5   they talked about it.
 6        Q.    What were those conversations?
 7        A.    I don't know.  I just heard
 8   talk about the offshore.  I don't remember
 9   any of the content.
10        Q.    Do you remember why it was
11   started?
12              MR. UNDERWOOD:  Objection to
13         the form of the question.
14        A.    I was not there to decide that.
15   I don't know.
16        Q.    When you say you were not there
17   to decide that, where were you?
18        A.    I was not in the meeting to
19   decide an offshore fund.
20        Q.    Who was in those meetings?
21        A.    I don't know.
22              MR. UNDERWOOD:  Objection to
23         the form of the question.
24        Q.    Do you know that there were
25   meetings?
```

Page 62

1                    J. TRIPP
2        A.    I do not know of a meeting.
3        Q.    What do you know about the
4    offshore fund?
5              MR. UNDERWOOD:  Object to the
6         form of the question.
7        A.    I guess I know that it was a
8    vehicle for people outside of the United
9    States to invest.
10       Q.    Okay.  So I see you just
11   checked your phone.  Was that --
12       A.    ███  ███  ███  █ ███     ███
    █  ███  ███  ███     I was just seeing if it
14   was her.  I just can't glance down, because
15   of my vision.
16       Q.    That's okay.  I just want to
17   make sure:  Was it related at all to this
18   case?
19       A.    No.
20       Q.    Back to the offshore funds.
21   You had nothing to do with the offshore
22   funds; that's what you said?
23       A.    That's what I said.
24       Q.    Did Doug have anything to do
25   with the offshore funds, to the best of

Page 63

1                    J. TRIPP
2    your knowledge?
3         A.    To the best of my knowledge, I
4    don't know.
5         Q.    Does he have something to do
6    with every fund at Brevet; is that fair?
7               MR. UNDERWOOD:  Objection to
8          the form of the question.
9         A.    I do not know the answer to
10   that.
11        Q.    Okay.  Do you know if Paul had
12   anything to do with the offshore fund?
13        A.    No, not for a fact.
14        Q.    When you say no, not for a
15   fact, does that mean no, he had nothing to
16   do with the offshore fund, or no, you don't
17   know?
18        A.    No, I don't know.
19        Q.    When you say not for a fact,
20   did you have an understanding?
21              MR. UNDERWOOD:  Object to the
22         form of the question.
23        A.    No, I have no understanding
24   with anybody.  I have opinions, but no
25   understanding.

Page 64

                        J. TRIPP

1

2        Q.     What was your opinion based on,

3    things you had heard?

4        A.     No, just assuming that's how

5    the company works.

6        Q.     What was your opinion?  Did

7    Paul have anything to do with the offshore

8    fund in your opinion?

9               MR. UNDERWOOD:  Object to the

10        form of the question.

11       A.     I don't know.

12       Q.     Do you know anything about the

13   relationship between Paul and the offshore

14   funds that you haven't told --

15       A.     No.

16       Q.     What about the onshore fund;

17   did you have anything to do with the

18   onshore fund?

19               MR. UNDERWOOD:  Object to the

20        form of the question.

21       A.     I told you.  I oversaw that one

22   investment.

23       Q.     What about the intermediate

24   durations of the fund; do you anything to

25   do with that?

```
                                        Page 65
 1                      J.  TRIPP
 2       A.     No.
 3       Q.     That one investment that you
 4   oversaw, what was the name of that again?
 5       A.     ████████   ██████████
 6       Q.     That was the onshore funds that
 7   you had to do with?
 8       A.     Yes.
 9       Q.     Did that name change at all,
10   ████████   ██████████?
11       A.     I don't know.  Not while I
12   managed it.
13       Q.     Does that fund still exist?
14       A.     No.
15       Q.     When did it stop existing?
16       A.     I don't -- before 2013.
17       Q.     Besides that one fund, you
18   didn't manage any other fund?
19       A.     No.
20              MR. UNDERWOOD:  Sorry.  I'm not
21         clear what you're talking about when
22         you're talking about fund.  Are you
23         talking about intermediate duration
24         or are you talking about ████████
█          ██████████   I want to make sure I'm
```

```
                                    Page 66
 1                    J. TRIPP
 2        clear on what the record is here.
 3        You used the term fund in there.
 4        What were you referring to?
 5            MS. LEVINE:  I don't understand
 6        your question and the witness already
 7        answered my question.  So I think we
 8        should move on.
 9            MR. UNDERWOOD:  Can you read it
10        back the prior -- I'm asking the
11        court reporter to read the record.
12        Could you read back the question
13        about whether that -- I think whether
14        that fund was still in existence.
15            (Whereupon, a portion of the
16        record was read back.)
17     A.    I'll clarify.  I under -- I put
18  some of my understanding into what you
19  asked.  It was not a fund.  I managed an
20  investment.  That investment was off our
21  books by -- before 2013.  I didn't manage
22  any other investment.  I never managed any
23  fund.
24     Q.    You have an equity interest in
25  Brevet Short Duration Partners, LLC, right?
```

Page 67

1                          J. TRIPP
2          A.     I don't know.
3          Q.     You don't know your equity
4      interest?
5          A.     In each individual thing, no.
6          Q.     You don't monitor your equity
7      interest?
8          A.     No.
9          Q.     Is it that you don't know the
10     name of the entity or is it that you don't
11     know the amount of your equity interest?
12                 MR. UNDERWOOD:   Objection to
13          the form of the question.
14         A.     Both.
15         Q.     If I told you you have a █
16     percent equity interest in Brevet, would
17     you be able to tell me whether that's true
18     or not true?
19                 MR. UNDERWOOD:   Object to the
20          form of the question.
21         A.     No.
22         Q.     No, you wouldn't be able to
23     tell me whether that's true or not true?
24         A.     No, I would not.
25         Q.     What if I told you you had a █

```
 1                    J. TRIPP
 2   percent equity interest in Brevet; would
 3   you be able to tell me that's not true?
 4              MR. UNDERWOOD:  Objection.
 5        A.    I would be able to tell you
 6   that.
 7        Q.    So you have some understanding
 8   about the outer limits of your equity
 9   interests, right?
10        A.    Yes.
11        Q.    And if I told you you had no
12   equity interest in Brevet, is that also not
13   true?
14              MR. UNDERWOOD:  Object to the
15        form of the question.
16        A.    I don't know.
17        Q.    Is it possible you have no
18   equity interest in Brevet?
19              MR. UNDERWOOD:  Object to the
20        form of the question.
21        A.    I do not believe that's true.
22        Q.    So you have some equity
23   interest; is that fair?
24        A.    That's right.
25        Q.    Does anyone monitor your equity
```

```
                                          Page 69
 1                    J. TRIPP
 2   interest?  Your accountant?  Your wife?
 3              MR. UNDERWOOD:  Sorry.  You
 4         were putting your hand in front of
 5         your face and made that question hard
 6         to understand.  Could you repeat it?
 7              MS. LEVINE:  Could you read it
 8         back?
 9              (Whereupon, a portion of the
10         record was read back.)
11       A.    Not specifically.
12       Q.    What do you mean not
13   specifically?
14       A.    I told you I got a K-1.  So
15   obviously the accountant sees something.
16       Q.    The different Brevet
17   entities -- I understand from your
18   testimony, you don't know the difference
19   between the different Brevet entities; is
20   that fair?
21       A.    That's fair.
22       Q.    Is there any administrative
23   difference?  Like is one administration --
24   certain personnel belong to certain Brevet
25   entities and certain personnel go to some
```

```
                                    Page 70
 1                    J. TRIPP
 2   other Brevet entities, to your knowledge?
 3              MR. UNDERWOOD:  Objection to
 4          the form of the question.
 5       A.    I don't know.
 6       Q.    There's only one Brevet office
 7   though, right?
 8       A.    I'm not sure of the answer to
 9   that question.
10       Q.    When you would go to the
11   office, is there different offices for
12   Brevet Capital Holdings and Brevet Capital
13   Management?
14       A.    No.
15       Q.    Are there different offices
16   between Brevet Short Duration Partners and
17   Brevet Intermediate Duration Partners?
18       A.    No.
19       Q.    Any difference in the
20   management between the different Brevet
21   entities?
22              MR. UNDERWOOD:  Objection to
23          the form of the question.
24       A.    I do not know.
25       Q.    What's your current status
```

```
                                      Page 71
 1                 J.  TRIPP
 2   vis-a-vis Brevet?   Are you retired?
 3        A.     Yes.
 4        Q.     When did that happen?
 5        A.     I'm not sure the exact date.
 6   In 2016, toward the end, or 2017.
 7        Q.     Do you know if it was before or
 8   after October 2016?
 9        A.     Not sure.
10        Q.     Could you tell me the process
11   of when you decided to retire and how it
12   went about happening?
13               MR.  UNDERWOOD:   Object to the
14          form of the question.
15        A.     As I said, in 2013 I stepped
16   back from the day to day operations.   So I
17   was kind of semiretired until 2016, 2017,
18   when I terminated employment.   How did it
19   happen?
20        Q.     Sorry.   Say that again.
21        A.     What?
22        Q.     I couldn't hear what you just
23   said.
24        A.     I said in 2013, I stepped back
25   from the day to day operations.   But I was
```

```
                                    Page 72
```

1                    J. TRIPP

2  employed.  The end of 2016 or early 2017, I

3  terminated being an employee.  Not sure the

4  exact date when I did that.  It was --

5  other than -- other than terminating

6  salary, there was no real impact to me.  At

7  that time, I was still going in once a week

8  or so.  That's it.

9       Q.    You say you terminated being an

10 employee; is that the same thing as

11 retiring?

12      A.    Yeah.

13      Q.    Why did you decide to retire?

14            MR. UNDERWOOD:  Objection to

15       the form of the question.

16      A.    I don't know.  It was time.

17      Q.    Do you still go in once a week?

18      A.    I haven't been in since they

19 moved, which was March of last year.

20      Q.    Do you still do work for

21 Brevet --

22      A.    No.

23      Q.    -- even without going in?

24      A.    Pardon?

25      Q.    Even without going in?

```
                                      Page 73
 1                    J.  TRIPP
 2        A.    No.
 3        Q.    So since March of last year,
 4   you -- let me ask it like this:  Between
 5   the time you retired until March of last
 6   year, what were your responsibilities?
 7        A.    None.
 8        Q.    Would you say it was
 9   volunteering?
10             MR. UNDERWOOD:  Object to the
11        form of the question.
12        A.    I don't know what that means.
13        Q.    Were you doing work for Brevet,
14   without getting paid?
15        A.    No.
16        Q.    Were you doing any work for
17   Brevet?
18        A.    No.
19        Q.    So when you would go into the
20   office after you retired -- did I mishear
21   you?  Did you say you went in after you
22   retired?
23        A.    Yes.
24        Q.    What did you do when you went
25   in?
```

Page 74

1                        J. TRIPP

2          A.      I was using it as a base to

3    attend external meetings of my other

4    interests that were in the city.  And it

5    was a place for me to hang my coat and say

6    hi to everybody.

7          Q.      Did you have an office?

8          A.      No.

9          Q.      What type of external meetings?

10         A.      Go have lunch with company.  It

11   was a company in the city to do something.

12   Whatever it was.  Go to the doctor.

13         Q.      Did you ever use Brevet's

14   computers at that time?

15         A.      Not really.  I can't think of

16   any real times.

17         Q.      Did you still have a Brevet

18   e-mail?

19         A.      I still have a Brevet, yes.

20         Q.      Do you still even today have a

21   Brevet e-mail?

22         A.      Yes.

23         Q.      Do you use it?

24         A.      Just because there are certain

25   -- I don't use it.  I don't send stuff from

```
                                    Page 75
 1                  J. TRIPP
 2   it.  I mean, other than -- yes, I use it.
 3   But not for any Brevet business.  It's all
 4   tracked in the system.  But I don't use it
 5   for any Brevet business.
 6        Q.    What do you use it for?
 7        A.    Over time, there are people
 8   that -- I use it to receive basically
 9   messages from -- alert type messages.
10   Stock went up or down or something like
11   that.  I'm planning to -- once this
12   pandemic is over and I can get into the
13   office, I'm planning on doing away with it.
14   I have to have someone to take the settings
15   off, so I still get a few e-mails from like
16   my bank or something, that says, you know,
17   did you really make this transaction?  It's
18   that type of e-mail.
19        Q.    So something like your bank is
20   connected to your Brevet e-mail and so
21   that's the type of e-mails you're getting?
22            MR. UNDERWOOD:  Objection to
23         the form of the.
24        A.    Basically, yes.
25        Q.    And that's your personal bank
```

Page 76

1                        J. TRIPP
2    account?  So you have to switch it to your
3    personal e-mail; is that the idea?
4         A.    I just see the notice and
5    usually delete it.
6         Q.    Do you have a personal e-mail?
7         A.    I do, since 2020, That I use.
8         Q.    Before 2020, your Brevet e-mail
9    was your personal e-mail, as well?
10        A.    I was -- yeah, I was still
11   tracking everything.  All of my e-mails
12   went there.  I before that time, I did not
13   send e-mail from anything but Brevet.
14        Q.    So how do you -- if you're not
15   going into the office, how do you check
16   your Brevet e-mails?
17        A.    That's what I'm trying to do
18   when I -- once the pandemic is over, I'll
19   go in and get them to take it off my iPad.
20   But right now it comes on my iPad.  Brevet
21   has got that configured with special
22   software.
23        Q.    Is that your personal iPad?
24        A.    It's my personal iPad, yes.
25        Q.    Did you buy it yourself?

```
                                    Page 77
 1                  J. TRIPP
 2       A.     Yes.
 3       Q.     Did Brevet pay for it at all?
 4       A.     I don't remember, to be honest.
 5       Q.     But they are the ones who set
 6   up their e-mail system on your iPad?
 7       A.     Yes.
 8       Q.     Was that Mr. Lan who set that
 9   up or you?
10       A.     Johnny Lan set that up.
11       Q.     Any idea how old your iPad is?
12   Like when he set it up?
13       A.     It's old.  I don't know.  I can
14   probably look it up.
15       Q.     Before 2013?
16       A.     No.
17       Q.     Not that old?
18       A.     No.
19       Q.     If so, you have a miracle iPad.
20   Mine don't last that long.
21              Any idea, was it before you
22   retired?
23       A.     It was probably early 2016.
24   Like I said, I don't know for sure.
25       Q.     Do you also have a computer
```

```
                                        Page 78
 1                    J. TRIPP
 2   that you can log into your Brevet e-mails?
 3        A.    No.
 4        Q.    Only on your iPad?
 5        A.    No, just my iPad.
 6        Q.    What about on the phone?  Can
 7   you do it on a phone or you don't have a
 8   phone?
 9        A.    Same setup on the phone.
10        Q.    It's an iPhone?
11        A.    Yes.
12        Q.    And it's also hooked up to your
13   Brevet e-mail?
14        A.    Yes.
15        Q.    And that's your personal
16   iPhone?
17        A.    Yes.
18        Q.    Did Brevet pay for it?
19        A.    Yes.  2016.
20        Q.    Also 2016.  Where did -- so now
21   you have a personal e-mail account since
22   2020.  Is that also hooked up to your iPad
23   or some other device?
24        A.    Also only hooked up to my
25   desktop.
```

Page 79

                          J. TRIPP

1        Q.      That's on your desktop.  Okay.

2   Can you access it from your iPhone?

3        A.      Not from my iPhone.

4        Q.      Can you access it from your

5   iPad?

6        A.      I guess I could.  I never tried

7   it.  It's not set up for it.

8        Q.      Okay.  So now back to the

9   retirement process.  How did it work that

10  you decided to retire -- when you decided

11  to retire, what was the process?  Did you

12  tell Doug and Mark?  How did it work?

13       A.      Doug and Mark -- Doug and I

14  went to lunch one day and I said I thought

15  it was time.  Wanted to do more travel.  I

16  was planning at that time on taking a

17  six-month vacation and I said it was time.

18  He thought that was a good idea.

19       Q.      He didn't give you a hard time

20  about retiring?

21       A.      No.  Like I said, we started

22  the process years before that.  2013.

23       Q.      Did you then have any

24  subsequent conversations with him about it?

```
                                        Page 80
 1                    J. TRIPP
 2        A.     No.
 3        Q.     Did you have any subsequent
 4   conversations with Mark about it?
 5        A.     No.
 6        Q.     After you went to lunch, were
 7   you retired the next day or was there a
 8   process --
 9        A.     End of the year.  I think we
10   went to a lunch in July or something like
11   that.
12        Q.     July 2016?
13        A.     Yes.  I think it was 2016.
14        Q.     And then you stayed on until
15   the end of the year 2016?
16        A.     Yes.
17        Q.     Did you have to hire a lawyer
18   to negotiate your retirement?
19        A.     No.
20        Q.     Did you have to sign anything?
21        A.     I signed the fact that I was
22   leaving, yeah.
23        Q.     What was that?
24        A.     I don't know what it was
25   called, a termination or something.
```

```
                                            Page 81
 1                       J. TRIPP
 2        Q.     Separation agreement?
 3        A.     But I don't remember exactly
 4   what the document was titled.
 5        Q.     You didn't go over it with a
 6   lawyer or anything?
 7        A.     No.
 8        Q.     Was it very straightforward?
 9   You were able to just understand it?
10        A.     Yes.
11        Q.     Did you send like a companywide
12   e-mail saying goodbye or anything?
13        A.     No.
14        Q.     Did you send a formal written
15   notice that you were leaving to anyone?
16        A.     No.
17        Q.     Did you get any payments as
18   part of retiring, like a retirement
19   package?
20        A.     No.  I mean, I think I told you
21
```

Page 82

1                        J. TRIPP

16        Q.    But they installed Brevet's

17  e-mails on it before you left?

18        A.    No, that computer has nothing

19  of Brevet's on it.

23        Q.    But that they installed

24  Brevet's e-mails on?

25        A.    Yes.

Page 83

```
 1                    J. TRIPP
 2       Q.    Did they think you were going
 3  to continue working after you left?
 4             MR. UNDERWOOD:  Object to the
 5        form of the question.
 6       A.    Do I think they thought I would
 7  continue working on Brevet things, no.
 8       Q.    So then why did they install
 9  Brevet's e-mails on your iPad and iPhone?
10  That's my question, as far as you know.
11       A.    I don't know.  I wouldn't
12  have -- I mean, I have no idea.  I guess to
13  be able to track any e-mails I got, that I
14  had left, as far as --
15       Q.    Did they -- because did you
16  tell them that it was your only e-mail
17  address, so that's why you needed it?
18       A.    No.
19       Q.    ████ ████ ████ ████ ████ ██████
██  ██████████ ████ ███████ ███████ █████
21             MR. UNDERWOOD:  Objection to
22        the form of the question.
23       A.    Clarify, please.
24          ███   ██████ ██████ ██████ █████
██  ████ ██████ ███ ████ █████ ██ █ ███ █████ █████
```

Page 84

1                          J. TRIPP

2    ████████ █████ ██████ ████ ██████ █████ ██████ ████ ████

█  █████ █████ ██████

4         A.     Yes.

5         Q.     And that's the one that has

6    your personal e-mail address on it?

7         A.     Yes.

8         Q.     ████████ █████ ████ ██████ ██████

█  ██████ █████ ████ ██████ ██████ █████ ████ █████

█  ██████ █████ ████ ██████

11        A.     Correct.

12        Q.     Do you know whether you were

13   owed any retirement package under the, LLC,

14   agreement?

15             MR. UNDERWOOD:  Objection to

16        the form of the question.

17        A.     No.

18        Q.     Did you ever ask for any

19   accounting to ask how much Brevet is making

20   compared to how much they're paying you?

21        A.     No.

22        Q.     Have you been getting any

23   payments from Brevet since you retired?

24        A.     Yes.

25        Q.     What are those payments?

Page 85

1                    J. TRIPP
2        A.    They're payments on my share --
3  I never took distributions.  I had them put
4  back into the fund.  So I have interests
5  in -- whatever payments I got, they went
6  back to be reinvested.  So there's several
7  things theoretically paying out income.  I
8  don't know which ones are which.
9        Q.    And you've been receiving those
10 since you left since the end of 2016,
11 correct?
12       A.    Yes.
13       Q.    Has the amount changed over
14 time?
15       A.    I don't know.
16       Q.    Has it changed drastically over
17 time?
18       A.    I don't think so, but I don't
19 know.
20       Q.    Do you physically receive a
21 K-1?
22       A.    Yeah.  Well, the accountant
23 does.
24       Q.    Does it go directly to the
25 accountant or through you?

Page 86

```
 1                    J. TRIPP
 2      A.    It goes directly to the
 3 accountant.
 4      Q.    When was the last K-1 you saw?
 5      A.    For Brevet?
 6      Q.    Yes.
 7      A.    I don't know.
 8      Q.    Do you know what company the
 9 K-1 comes from?
10      A.    No.
11      Q.    On your iPad, do you have any
12 personal files, as well?
13      A.    On my iPad?
14      Q.    Yes.
15      A.    Yes.  I don't have any Brevet
16 files.
17      Q.    Only personal?
18      A.    Yes.
19      Q.    But you have your Brevet
20 e-mail, right?
21      A.    I'm sorry, what?
22      Q.    Never mind.  I think you
23 answered that already.  Okay.
24            Just walking through again when
25 you -- the timing of when you were leaving.
```

Page 87

1                    J. TRIPP

2    So around approximately July 2016, you have

3    lunch with Doug and you tell him that it's

4    time.  And after that, it was a pretty

5    smooth process?

6         A.    Yeah.

7         Q.    Did you --

8         A.    No changes.

9         Q.    No what?

10        A.    Nothing changed.

11        Q.    Did you have like a box of

12   stuff you took with you from your office?

13        A.    I don't think so.  I mean, I

14   shouldn't say that.  Probably a small box

15   of Michigan State paraphernalia.

16        Q.    And you're happy with how

17   Brevet handled your retirement, right?

18        A.    Yes.

19        Q.    Did Brevet have a lawyer that

20   you dealt with?

21        A.    No.

22        Q.    So it was just Doug that you

23   had to deal with or Mark?

24        A.    I think Mai Lee or somebody was

25   doing something, the technical stuff.  But

Page 88

```
 1                   J. TRIPP
 2   Doug and Mark were the only ones I talked
 3   to about things.
 4        Q.   Mai Lee came in just as you
 5   were leaving, right?
 6        A.   I think so.  About that time,
 7   yes.
 8        Q.   What do you say that she
 9   handled that was technical, if you recall?
10        A.   The separation agreement.
11   Nothing else.
12        Q.   Did you have any files that had
13   been stored on your Brevet computer that
14   you had to take with you?
15        A.   No.
16        Q.   When you had come back in after
17   you had retired and you used Brevet as a
18   base, were you doing anything work related?
19        A.   No.  I mean, other than you
20   know, hey, that looks good.
21        Q.   Do you consider Mark a friend?
22        A.   Yes.
23        Q.   Doug also?
24        A.   Huh?
25        Q.   Doug also?
```

Page 89

1                    J. TRIPP

2       A.    Yes.

3       Q.    Are you still in touch with

4  them?

5       A.    Yes.

6       Q.    How often do you see them?

7       A.    I haven't seen them since March

8  of last year.

9       Q.    How often do you talk to them?

10      A.    Every couple of months.    ██████

██  ████████ ██ ██  ████████████  █████████

12      Q.    Are you family friends?  Do

13  your families get together?

14      A.    Well --

15      Q.    In the pre-COVID world.

16      A.    In a pre-COVID, we would go out

17  to Mark's for Christmas, out to his house.

18  Not so much Doug, as far as seeing each

19  other outside.

20      Q.    Is there anyone else at Brevet

21  who you're still in touch with?

22      A.    Again, it's COVID.  Before

23  COVID, I was in touch with them all.  I was

24  friends with everybody.

25      Q.    Were you friends with Paul?

Page 90

1                        J. TRIPP

2          A.     Sort of.  Acquaintances, I
3     would call it.

4          Q.     When's the last time you spoke
5     with Paul?

6          A.     While he was sick.  2015, 2016.
7     Sometime like that.  Might have been end of
8     2015.  It was while he was sick.  Before he
9     had left the firm.

10         Q.     Do you remember the
11    conversation?

12         A.     "How are you feeling?  How does
13    it feel trying to walk around with two bum
14    knees?"  That was probably the extent of
15    the conversation.

16         Q.     From what I understand, it was
17    very hard for him during that time; is that
18    what you recall also?

19         A.     I really don't know.

20                MR. UNDERWOOD:  Objection.

21         Q.     What did he say to you about
22    how he was feeling?

23         A.     Crappy.  That's about it.

24         Q.     Since you've retired, do you
25    ever have to ask Johnny Lan or anyone else

Page 91

```
 1                     J. TRIPP
 2   from Brevet, to assist with any technical
 3   issues related to the iPad or the iPhone or
 4   your desktop?
 5        A.    No.
 6             MS. LEVINE:  Let's take another
 7        ten minutes and then we'll go to
 8        1:00.  Sound good?  We'll come back
 9        at 12:15.
10             THE VIDEOGRAPHER:  The time is
11        12:04 P.M.  We're going off the
12        record.
13             (Whereupon, a recess was
14        taken.)
15             THE VIDEOGRAPHER:  The time is
16        12:15 P.M.  We are back on the
17        record.
18        Q.    Besides for the dispute in this
19   litigation, do you know of anyone who has
20   been terminated for cause at Brevet?
21        A.    No, not that I recall.
22        Q.    You never heard of anyone being
23   fired for violating the employee handbook;
24   have you?
25        A.    No.
```

Page 92

```
 1                    J. TRIPP
 2      Q.     Failing to execute an NDA, as
 3  grounds for termination?
 4             MR. UNDERWOOD:  Objection to
 5        the form of the question.
 6      A.     Not that I recall.
 7      Q.     While you were at Brevet
 8  working in technology, do you know if
 9  Brevet Capital Management, LLC, backed up
10  its e-mails to the server, Global Relay?
11             MR. UNDERWOOD:  Objection to
12        form.
13      A.     Yes.
14      Q.     Yes, you do know?
15      A.     Yes.
16      Q.     And that was for compliance
17  purposes, right?
18             MR. UNDERWOOD:  Objection to
19        the form of the question.
20      A.     It was done before we were
21  required to do that.  But we did it for our
22  own purposes, as well.  You know, for
23  employees being able to go back in the
24  records.  It was mostly for recording
25  purposes.  Not just because it's good
```

```
                                      Page 93
 1                    J. TRIPP
 2    compliance.   It's good business practice.
 3         Q.    When did Brevet start backing
 4    up its e-mails to Global Relay; do you
 5    recall?
 6         A.    I don't recall the year.   2010
 7    or before.
 8         Q.    So it was before Brevet Capital
 9    Management, LLC, was a registered
10    investment advisor?
11         A.    Yes.
12         Q.    So the reason it started was
13    not for compliance with the Independent
14    Advisors Act; it started for just good
15    business practice and then it also was
16    complaint?
17         A.    Correct.
18         Q.    So the other entities for
19    Brevet, which are not registered investment
20    advisors; they're also backed up on Global
21    Relay, but not for compliance purposes?
22    They're just for good business practice?
23              MR. UNDERWOOD:   Objection to
24         the form.
25         A.    Correct.
```

Page 94

1                    J. TRIPP
2        Q.    Did you ever access and review
3    employee e-mails, without notice to the
4    employee?
5              MR. UNDERWOOD:  Objection to
6          the form of the question.
7        A.    If you do a search for X in
8    Global Relay, you're going to get e-mails
9    about X from any employee.  So, in that
10   context of what I just said, of course I
11   saw other e-mails -- I saw other employee's
12   e-mails.  We don't have any e-mails that go
13   from nobody.  They come from somebody.
14       Q.    Got it.  Did you ever
15   intentionally look for an employee's
16   personal e-mails?
17       A.    No.
18       Q.    Okay.  Now, in 2016, you said
19   you had a conversation with Mr. Iacovacci
20   about his medical issues; is that right?
21       A.    It might have been around
22   Christmas of 2015.  I don't remember
23   exactly.
24       Q.    So at the time, you knew that
25   he was undergoing surgery on his leg in

Page 95

1                        J. TRIPP
2     December 2015?
3          A.    That's the way I recall it.
4          Q.    Did you learn around that time
5     that Mr. Iacovacci had decided to retire
6     from Brevet?
7          A.    No.
8          Q.    Did you ever discuss with Paul
9     about his retirement?
10         A.    No.
11         Q.    Did you ever hear from anyone
12    else that Paul was planning on retiring?
13         A.    No.
14         Q.    Did Brevet have regular
15    meetings, weekly meetings in 2016?
16         A.    Pretty regular.
17         Q.    Did you attend every meeting?
18         A.    Can't tell you whether I
19    attended every meeting.
20         Q.    Do you recall that
21    Mr. Monticciolo announced Mr. Iacovacci's
22    retirement at an internal Brevet staff
23    meeting on February 25th, 2016?
24              MR. UNDERWOOD:   Objection to
25         the form of the question.

Page 96

1                    J. TRIPP
2       A.    I don't recall.  I don't even
3   recall if I was in that one.
4       Q.    Did you ever hear that
5   Mr. Iacovacci was planning on retiring?
6       A.    Not that I recall.
7       Q.    Were you involved in Brevet
8   disconnecting and removing Paul's access to
9   the Brevet office servers?
10      A.    No.
11      Q.    Who would have been involved in
12  that?
13            MR. UNDERWOOD:  Objection to
14       the form.
15      A.    I assume Johnny Lan.  But
16  that's all I know.
17      Q.    Have you ever spoken with
18  anyone at Brevet about the possibility of
19  Brevet terminating Mr. Iacovacci?
20      A.    No.
21      Q.    Did you ever witness
22  Mr. Iacovacci doing anything that you
23  viewed as ground for termination?
24      A.    Not that I recall.
25      Q.    Did you ever witness

```
                                    Page 97
1                    J. TRIPP
2   Mr. Iacovacci doing anything that concerned
3   you from a compliance perspective?
4             MR. UNDERWOOD:   Objection to
5        the form of the question.
6        A.    Not that I recall.
7        Q.    Did you ever witness
8   Mr. Iacovacci doing anything that concerned
9   you from a business ethics perspective?
10       A.    Not that I can recall.
11       Q.    When you had your conversation
12  with Doug about your retiring, was there
13  any discussion that you would be retiring
14  as an employee, but still staying as a
15  member of the Brevet LLCs?
16       A.    Not specifically.
17       Q.    What do you mean not
18  specifically?
19       A.    I mean, I don't remember exact
20  wording of anything.  I was still going to
21  have my investments.  That's -- I don't
22  recall the terminology that you used, being
23  used.  It was very informal.
24       Q.    Meaning, from your
25  understanding, is there an option for you
```

Page 98

```
 1                    J. TRIPP
 2    to retire from the company, but still be a
 3    member of the LLCs?
 4                MR. UNDERWOOD:   Objection to
 5           the form of the question.
 6         A.    I'm not sure I understand.
 7         Q.    So I'll strike that.
 8                When did you learn that Brevet
 9    purported to terminate Mr. Iacovacci?
10                MR. UNDERWOOD:   Objection to
11           the form.
12         A.    I don't know.  Sometime middle
13    2016.  Sometime around there, but I don't
14    know when exactly.  I don't know if it was
15    summer or fall.
16         Q.    Did you know of it before it
17    happened or only after it happened?
18         A.    Only after.
19         Q.    How did you find out about it?
20         A.    I don't know.  Somebody said
21    something.
22         Q.    Do you recall who?
23         A.    No.
24         Q.    Do you recall what they said?
25         A.    No, not exactly.
```

```
 1                    J. TRIPP
 2       Q.    Do you recall if it was Mark?
 3       A.    No.
 4       Q.    Doug?
 5       A.    No.
 6       Q.    Someone else?
 7       A.    It may have been.  I don't
 8  know.
 9       Q.    Do you remember if they told
10  you why Brevet had purported to terminate
11  Mr. Iacovacci?
12       A.    No.
13       Q.    What was your understanding of
14  why Brevet purported to terminate
15  Mr. Iacovacci?
16       A.    I don't know.  Doug, Mark and
17  -- he couldn't make an agreement on how to
18  leave, so they terminated.  I don't know.
19  I don't know that I knew.  So I only know
20  now.  I don't know that I knew in 2016.
21       Q.    What's your understanding now
22  based on?
23       A.    Based on, I mean, named in a
24  legal stating, that Paul was terminated.
25       Q.    Have you had subsequent
```

```
 1                  J. TRIPP
 2  conversations with Doug and Mark about it?
 3       A.    No.
 4       Q.    Has it ever come up at the
 5  Christmas parties, this lawsuit?
 6       A.    No.
 7       Q.    Did you think Doug and Mark
 8  were originally planning on accepting
 9  Paul's retirement and then they changed
10  their minds because they couldn't agree?
11       A.    How would I know what they
12  think?
13       Q.    So no one ever talked to you
14  about it?
15       A.    No.
16       Q.    Do you know that on
17  October 17th, 2016, three days after
18  terminating Mr. Iacovacci, Brevet remotely
19  accessed his computer and downloaded files
20  from his computer?
21       A.    I only know that that's what
22  the lawsuit says.  I don't know.
23       Q.    Did you know it at that time?
24       A.    No.
25       Q.    When did you learn that?  From
```

Page 101

```
 1                    J. TRIPP
 2   reading the documents?
 3        A.    That particular thing -- that
 4   particular item, I didn't know until
 5   sometime later.  I don't know -- not
 6   reading the documents, but somebody said
 7   something.  But I don't remember how I
 8   heard about it.  I was not around at that
 9   time.  I was away from the office.
10        Q.    Do you recall what someone said
11   to you about it?
12             MR. UNDERWOOD:  Mr. Tripp, I'm
13          going to caution you that in
14          answering questions related to the
15          litigation, you should refrain from
16          disclosing communications you've had
17          with your attorneys in connection
18          with the defense of this matter.
19        Q.    And that's fair.  I'm not
20   interested in your conversations with your
21   attorneys.  I want to know if someone,
22   beside your attorneys, had any
23   conversations with you about this?
24        A.    About what?
25        Q.    About Brevet's accessing
```

```
                                        Page 102
 1                  J. TRIPP
 2   Mr. Iacovacci's computer on October 17th,
 3   2016, at midnight.
 4        A.    No.
 5        Q.    Do you know where those
 6   documents that were obtained from
 7   Mr. Iacovacci's computer were stored on
 8   Brevet's system?
 9        A.    No.
10        Q.    In your involvement in
11   technology, do you have access to all parts
12   of Brevet's computers?
13             MR. UNDERWOOD:  Objection to
14        the form of the question.
15        A.    Do I have?  No.
16        Q.    Meaning, are there parts that
17   are walled off from you?
18             MR. UNDERWOOD:  Objection to
19        the form of the question.  You're
20        talking about now?
21             MS. LEVINE:  No.
22        Q.    So before you retired in your
23   role as -- working in Brevet's technology,
24   did you have access to all parts of
25   Brevet's computer system network?
```

Page 103

```
 1                    J. TRIPP
 2       A.    Before 2013, yes.
 3       Q.    Before 20 -- before you
 4  retired, between 2013 and the end of 2016,
 5  did you have access to all parts of
 6  Brevet's network?
 7       A.    No.
 8       Q.    There were parts that Mr. Lan
 9  had access to, that you did not?
10       A.    Yes.
11       Q.    Were you ever told that
12  personal e-mails are subject to
13  investigation by the SEC when used for
14  business purposes by anyone at Brevet?
15            MR. UNDERWOOD:  Objection to
16       form of the question.
17       A.    I was told that all e-mails of
18  any kind from the Brevet system or to the
19  Brevet system, were subject to
20  investigation.  I didn't know if it was SEC
21  or the office or whatever.  It was all --
22  none of it was private information.  That's
23  what I'm trying to say.
24       Q.    My question was specifically
25  about personal e-mails.  Were you ever told
```

```
 1                    J. TRIPP
 2   that personal e-mails were subject to being
 3   investigated by the SEC, when used for
 4   business purposes at Brevet?
 5        A.    I was told that all e-mails --
 6   I didn't say anything -- I don't remember
 7   anything specific that said, oh, by the
 8   way.
 9        Q.    Was there any distinction drawn
10   between e-mails used on Brevet e-mail
11   address and personal e-mail addresses?
12              MR. UNDERWOOD:   Objection to
13         the form of the question.
14        A.    I was not aware of anyone using
15   Brevet's e-mail system to set up some kind
16   of personal account in the e-mail system.
17        Q.    So my question is a little
18   different.  And I understand you didn't
19   have a personal e-mail address.  So maybe
20   that's where the distinction didn't come up
21   for you.  But for people who had a personal
22   e-mail address, do you recall anyone being
23   told that their personal e-mail addresses
24   are subject to being investigated by the
25   SEC, if they're being used for business
```

1                    J. TRIPP

2    purposes?

3         A.    I don't recall that specific

4    conversation, no.

5         Q.    Do you know if Brevet saved

6    money by firing Paul, instead of allowing

7    him to retire?

8         A.    I have no idea.

9         Q.    Are you aware of any business

10   opportunity that Mr. Iacovacci ever took

11   away from Brevet?

12        A.    I have no idea.

13        Q.    You never heard of any, did

14   you?

15        A.    No.

16        Q.    Do you know if Brevet sued

17   Mr. Iacovacci's wife in Connecticut?

18        A.    No.

19        Q.    You were not involved in that?

20        A.    No.

21        Q.    You ever hear Mark or Doug talk

22   about it?

23        A.    No.

24        Q.    Were you involved when Doug at

25   some point tried to restructure the company

```
 1                    J. TRIPP
 2   to have the members have less interest;
 3   were you involved in that?
 4        A.    No.
 5        Q.    Maybe because he needed money
 6   for his house or something?
 7              MR. UNDERWOOD:  Objection to
 8         the form of the question.
 9        A.    No.
10        Q.    Or some fight between Doug and
11   Paul and that; you don't remember that?
12              MR. UNDERWOOD:  Objection to
13         the form of the question.
14        A.    I have no knowledge.
15        Q.    Did you ever speak with Robert
16   Knoakley?
17        A.    Never heard of him.  Not that I
18   know.
19        Q.    I'm going to show you a
20   document.  So it should be up, Exhibit 1.
21   Tell me when it's up.  Do you see it?
22              MR. UNDERWOOD:  I'll handle it.
23        A.    I see it.
24        Q.    Okay.  So this is Brevet's
25   lending presentation.  Do you know if this
```

```
 1                    J. TRIPP
 2   was the type of document that was routinely
 3   sent out to potential investors and
 4   borrowers?
 5        A.    I do not know.
 6        Q.    This is information about how
 7   Brevet is structured, right?
 8        A.    I know there were some
 9   documents.  I don't know whether these were
10   the documents.
11        Q.    Who at Brevet was in charge of
12   creating these types of documents?
13        A.    Doug, Mark and our legal
14   counsel.  I guess some marketing people.  I
15   had nothing to do with it.
16        Q.    Were these saved in a central
17   place on the Brevet network?
18             MR. UNDERWOOD:  Objection to
19        the form of the question.
20        A.    They were saved in a protected
21   directory that -- in a read-only directory,
22   that is where the documents were then
23   gathered to be distributed.  But it was
24   from a read-only directory, after it had
25   been approved and signed off as available
```

```
 1                    J. TRIPP
 2   for distribution.
 3        Q.    When you say it was a protected
 4   directory, you mean it was protected
 5   because it was read-only?
 6        A.    No, because people couldn't add
 7   files to there without going through the
 8   compliance department.
 9        Q.    Could they access the documents
10   that were already there?
11        A.    I'm not sure how that was
12   protected in that sense, of being able to
13   read the document.  I'm not sure how it was
14   protected.  Of there was a limited audience
15   or not.  I don't remember.
16        Q.    That's my question.  Is whether
17   there were certain folders that even if
18   people couldn't edit it, were there folders
19   that people couldn't see or only that they
20   couldn't edit?  And you don't know?
21        A.    I'm not sure.  All that was set
22   up by Johnny Lan.  I don't know.
23        Q.    Looking at this document, If
24   you look at page 20, There's an org chart
25   here.  It's page 20 of the PDF, but really
```

1                    J. TRIPP

2    it's in the -- it's page 19.  So if that

3    helps.

4         A.    You're talking about the thing

5    that says organizational chart at the top?

6    Doug Monticciolo?

7         Q.    It says organizational chart at

8    the top.

9         A.    Okay.

```
 1                    J. TRIPP
 2      A.    Yes.
 3      Q.    And no one else has that
 4  asterisk that says they're a member of the
 5  investment committee; is that right?
 6      A.    That's what the chart says.
 7      Q.    Were you ever a member of an
 8  investment committee?
 9      A.    No.
10      Q.    Do you know how an investment
11  committee at Brevet worked?
12            MR. UNDERWOOD:  Objection to
13       the form of the question.
14      A.    Not really.
15      Q.    Were there any official
16  meetings that you recall hearing about?
17            MR. UNDERWOOD:  Objection to
18       the form of the question.
19      A.    They met every week.
20      Q.    The investment committee meet
21  every week?
22      A.    Yes.
23      Q.    And how did you know that?
24      A.    Because I see it on the
25  calendar, "Investment committee on
```

1                  J. TRIPP

2  Thursdays," or whatever day it was.  Did

3  they actually show up every week?  I don't

4  know.

5        Q.    Did you ever attend an

6  investment committee meeting?

7        A.    No.

8        Q.    Do you know if there were

9  minutes of the investment committee

10  meeting?

11        A.    No.

12        Q.    Do you know what types of

13  decisions need to go through the investment

14  committee?

15        A.    I wasn't there.  I don't know.

16  They decided whether to do an investment or

17  not.

18        Q.    What about hiring or firing

19  employees; does that go through the

20  investment committee?

21        A.    I don't know.  I think that

22  went through Doug.

23        Q.    Did the decisions -- in terms

24  of decision-making at Brevet, the decision

25  to hire or fire an employee; was that a

```
 1                    J. TRIPP
 2    joint decision between Doug and Mark, as
 3    far as you know, or was it ultimately up to
 4    Doug?
 5              MR. UNDERWOOD:  Objection to
 6         the form of the question.
 7         A.    I wasn't there, I don't know.
 8         Q.    Mr. Iacovacci is listed under
 9    opportunistic sales; do you see that?
10         A.    Yes.
11         Q.    Do you understand what -- what
12    does that mean?
13         A.    I don't know.
14         Q.    You don't know what it means
15    that he was in charge of opportunistic
16    sales?
17              MR. UNDERWOOD:  Objection to
18         the form of the question.
19         A.    I don't know.
20         Q.    You don't have any
21    understanding?
22         A.    No.
23         Q.    Sheree Harris is listed under
24    compliance?
25         A.    Yes.
```

J. TRIPP

1

2      Q.     She's the only one on

3   compliance at that time, right?

4      A.     To my knowledge, that's

5   correct.

6      Q.     So that's the end of this

7   document.  I'll show you the next document.

8   It should be up.  Tell me when you have it.

9      A.     Yeah.

10      Q.     Okay.  So if you look at --

11   this is another org chart; do you see that?

12      A.     Yes.

13      Q.     Now if you look at page 4, that

14   shows the relationship between the Brevet

15   entities; is that right?

16      A.     Yes.

17      Q.     As far as you understood the

18   relationship between -- does this

19   represent, as far as you understood, the

20   relationship between the Brevet Short

21   Duration Holdings, LLC is the managing

22   member of the Short Duration Fund, et

23   cetera?

24          MR. UNDERWOOD:  Objection to

25       the form of the question.

1                    J. TRIPP

2        A.     I have no idea whether this

3    chart is correct.  I mean I know that there

4    were these various relationships set up.

5    But I don't know which one goes where.  And

6    I could take this chart and study it for

7    two weeks and I still wouldn't know without

8    talking to them.  I wouldn't know from

9    looking at the chart whether it was correct

10   or not.

11       Q.     Okay.  You can put that one

12   away.  I'm going to bring you the next one.

13   Okay.  The next one should be up.  So this

14   is the LLC agreement of Brevet Capital

15   Holdings III.

16            MR. UNDERWOOD:  Where are we

17         looking at this document?  I see

18         Exhibit A is the declaration of Jason

19         Cyrulnik.

20            MS. LEVINE:  If you look down

21         the next page.  You got it?

22            MR. UNDERWOOD:  It's up on the

23         screen.

24       Q.     It's the LLC agreement of

25   Brevet Capital Holdings III, LLC.  And it's

Page 115

```
 1                    J. TRIPP
 2   from January 21st, 2009.
 3        A.    Yes.
 4        Q.    And you signed this document,
 5   right?
 6        A.    I don't know.  It was 12 years
 7   ago.
 8        Q.    If you look at the -- if you
 9   scroll down to page 19, do you see your
10   signature?
11        A.    That looks like my signature.
12        Q.    So this is the LLC agreement
13   for Brevet Capital Holdings III, between
14   you, Mark, Paul and Doug, right?
15        A.    That's my signature.
16        Q.    Do you recall this agreement at
17   all?
18        A.    That looks like everybody
19   else's signatures.  But I don't know.  It
20   looks like it.
21        Q.    Do you recall this agreement at
22   all?
23        A.    I don't know.  Let's go up a
24   little bit.
25        Q.    I couldn't hear you.
```

```
 1                    J. TRIPP
 2        A.    I said I'm looking at it.  To
 3   be honest, I don't really recall the
 4   document.  But it's kind of familiar.  I
 5   don't really recall it, the detail lines
 6   here.  Like I said, I haven't seen this
 7   document in 12 years, so I don't remember
 8   the details completely.  But it looks like
 9   something that was done around that time.
10        Q.    So, do you remember the
11   negotiation of this agreement?
12        A.    I don't remember any
13   negotiation, no.
14        Q.    Do you remember who drafted
15   this?
16        A.    No idea who drafted it.
17        Q.    Is it something -- it's not
18   something you drafted, right?
19        A.    No.  I definitely -- that's one
20   question I can answer with certainty.  I
21   had nothing to do with drawing up this
22   document.
23        Q.    Do you remember if you had
24   attorneys at the time this document was
25   being drafted?
```

```
 1                      J. TRIPP
 2        A.    I think the company had
 3   attorneys.  But I can't remember for sure.
 4        Q.    Did you individually have an
 5   attorney that you hired?
 6        A.    No.
 7        Q.    Do you believe it was drafted
 8   by one of the company's attorneys and it
 9   was done mutually?
10        A.    I don't know.
11        Q.    Do you recall if Paul had
12   separate counsel?
13        A.    I do not.
14        Q.    Do you recall if the Doug had
15   separate counsel?
16        A.    I don't know.  Doug had
17   Michelle.
18        Q.    Is she an attorney?
19        A.    Yes.
20        Q.    Do you recall if Mark had
21   separate counsel?
22        A.    No, I don't know.
23        Q.    Do you recall any of the
24   negotiations of the terms of the agreement?
25   Like, I'll give you an example:  Do you
```

```
 1                    J. TRIPP
 2   recall any discussion about of what the
 3   different percentage ownership would be?
 4   Do you see the page after your signature?
 5   It's Exhibit A, the different percentage
 6   ownership?
 7        A.    That I remember.
 8        Q.    What do you remember about
 9   that?
10        A.    Just the distribution -- the
11   approximate distribution numbers I
12   remember.  It was --
13        Q.    Do you remember any discussion
14   about how those numbers came to be?
15        A.    No.
16        Q.    How about your number?  Do you
17   recall any discussion about how your number
18   came to be?
19        A.    No.
20        Q.    Did Doug, Paul and Mark just
21   tell you, "Hey, this is your number," and
22   you said okay?
23        A.    Basically.
24        Q.    Were there any meetings where
25   there was a discussion about who was going
```

```
 1                    J. TRIPP
 2   to get how much?
 3        A.    Not that I recall.
 4        Q.    Do you recall any negotiation
 5   about any of these numbers at all?
 6        A.    No.
 7        Q.    Do you think it was ultimately
 8   Doug's call and everyone said okay?
 9        A.    I can't tell you what I thought
10   at that time.
11        Q.    That's what I'm asking.  I'm
12   asking you what did you think?
13        A.    I said I can't tell you what I
14   thought 12 years ago.
15        Q.    What do you think now?
16             MR. UNDERWOOD:  Objection to
17        the form of the question.
18        A.    I don't think anything.  I
19   don't think anything about how these
20   numbers were derived then or now.
21        Q.    Do you recall any discussions
22   about how these numbers were derived?
23        A.    No.
24        Q.    Do you recall any meetings
25   between you, Mark, Paul and Doug about
```

Page 120

```
 1                    J. TRIPP

 2   these numbers?

 3        A.    No.

 4        Q.    So I don't understand how this

 5   agreement came to be, without any meetings.

 6   Someone just said to you, "We're starting a

 7   new company.  Here's an agreement.  Sign"?

 8             MR. UNDERWOOD:  Objection to

 9        the form of the question.

10        A.    I don't know what I was

11   thinking 12 years ago.  I can't tell you.

12        Q.    I'm asking you about your

13   recollection.  What do you remember about

14   how you came to be a member of Brevet

15   Capital Holdings III?

16             MR. UNDERWOOD:  Objection to

17        the form of the question.

18        A.    I don't remember.  I really

19   don't remember how the process worked.  I

20   remember signing it basically.  That's all.

21   I remember I did not attend any meetings.

22   That much, I know.  Did the other three

23   have meetings?  I don't know.

24             MS. LEVINE:  Let's go off the

25        record for a second.
```

```
 1                    J. TRIPP
 2        A.    If we're going off the
 3   record --
 4             THE VIDEOGRAPHER:  The time is
 5        12:58 P.M.  We're going off the
 6        record.  Please hold.
 7             (Whereupon, a recess was
 8        taken.)
 9             THE VIDEOGRAPHER:  The time is
10        1:31 P.M.  We are back on the record.
11        Q.    Good afternoon, Mr. Tripp.  I
12   want to go back to the exhibit we were
13   looking at, the LLC agreement.  So if you
14   still have that up on your screen, can you
15   turn your attention to section 7.1C?  Do
16   you see under section 7.1C, that you were
17   entitled to certain payments upon
18   retirement?  I'll let you read it.
19        A.    Okay.
20        Q.    Do you see that under the LLC
21   agreement, you were entitled to certain
22   payments upon retirement?
23             MR. UNDERWOOD:  Objection to
24        the form of the question.
25        A.    I read it as termination
```

```
                                    Page 122
 1                 J. TRIPP
 2   date -- from the way I read it, it's a
 3   termination from holding company.
 4        Q.    What?
 5        A.    The way I read it was my
 6   termination from the holding company, not
 7   as an employee.  That's how I interpreted
 8   it.  I didn't ask an attorney.  That's how
 9   I interpreted it.
10        Q.    Can I ask you what you mean by
11   that?
12             MR. UNDERWOOD:  Objection to
13        the form of the question.
14        A.    In my mind, I did not leave the
15   founding group.  I left the company -- the
16   LLC.  Not -- they did not make these
17   payments yet.  I'm still -- have this
18   status.  That's how I interpret it.
19        Q.    So when you signed the
20   separation agreement from Brevet, what was
21   your understanding of what you were
22   signing?
23        A.    I was signing the termination
24   of employment.  Not the termination of my
25   participation in the holding companies.
```

Page 123

1                    J. TRIPP

2        Q.    Do you have a copy of that

3   separation agreement?

4        A.    No.

5        Q.    Is it in your Brevet e-mails?

6        A.    I doubt it -- that that would

7   be in the e-mail.

8        Q.    Say that again?

9        A.    I doubt that it would be in an

10  e-mail.

11       Q.    You're saying you signed a

12  separation agreement that you don't have a

13  copy of?

14       A.    I don't recall where it would

15  be.

16       Q.    But it's likely Brevet gave you

17  a copy, right?

18       A.    Likely, yes.

19       Q.    Have you done a search through

20  your Brevet e-mail?

21       A.    No.

22       Q.    Have you done any search

23  through your Brevet e-mail in connection

24  with this case?

25       A.    No.

Page 124

1                     J. TRIPP

2        Q.    So it's possible it is in your

3    Brevet e-mail?

4        A.    I don't know.  Anything is

5    possible.

6        Q.    During your break, did you

7    discuss this case with your counsel?

8        A.    No.

9        Q.    Did you discuss this case with

10   anyone?

11       A.    No.

12       Q.    Was there an electronic folder

13   in Brevet's network where they would save

14   all the LLC agreements?

15       A.    I don't know.

16       Q.    Who would know that?

17       A.    I don't know.

18       Q.    When you were working at

19   Brevet, before you retired in technology,

20   would you have known the answer to that

21   question then?

22       A.    No.

23       Q.    So you were not familiar where

24   on the network things were stored?

25       A.    No.

Page 125

```
 1                    J. TRIPP
 2      Q.    Who would know the answer to
 3  where on the network things were stored?
 4             MR. UNDERWOOD:  Objection to
 5        the form of the question.
 6      A.    I don't know.
 7      Q.    Were you involved in creating
 8  any restrictions to where -- who had access
 9  to different parts of the network?
10             MR. UNDERWOOD:  Object to the
11        form of the question.
12      A.    Yes.
13      Q.    Did you create any restrictions
14  for different parts of the network?
15      A.    Yes.
16      Q.    Which parts of the network were
17  restricted, to the best of your
18  recollection?
19      A.    Every employee had a U drive,
20  which was a storage area where the users
21  work in progress or users files.  That was
22  only accessible by technology and Doug,
23  Mark and the specific user.
24      Q.    Any other restrictions you can
25  recall?
```

Page 126

J. TRIPP

1

2      A.      There are other drives that
3  were restricted to accounting, and you
4  know, drives that were restricted to
5  compliance.  Again, only technology, Doug
6  and Mark, plus the responsible
7  individual -- like in the case of
8  compliance, Sheree.  In the case of
9  accounting, the accounting department.
10  Those types of things.
11      Q.      Did technology have access to
12  all drives?
13      A.      Pardon?
14      Q.      Did technology have access to
15  all drives?
16      A.      To the best of my knowledge,
17  yes.
18      Q.      To the best of your knowledge,
19  Doug and Mark also had access to all
20  drives, right?
21      A.      To the best of my knowledge,
22  yes.
23      Q.      Besides the U drive that was
24  employee specific, were there other letter
25  drives that had definite functions?

```
                                    Page 127

 1                  J. TRIPP
 2        A.    The restricted ones were
 3   accounting and compliance.  There was
 4   letter drives, but I don't know if there
 5   was any other ones with those kind of
 6   restrictions.
 7        Q.    Do you recall if like the L
 8   drive stood for the legal drive?
 9        A.    I have no idea.  I do not
10   recall.
11        Q.    Do you recall any letter that
12   was specific to a function?
13        A.    Accounting and compliance.
14        Q.    What was the letter drive for
15   accounting?
16        A.    I have no idea.
17        Q.    Do you recall the letter drive
18   for compliance?
19        A.    I'm sorry?
20        Q.    Do you recall the letter drive
21   for compliance?
22        A.    No.
23        Q.    This LLC agreement that you
24   signed --
25        A.    Yes.
```

```
 1                    J. TRIPP
 2      Q.     -- do you have a physical
 3   hardcopy anywhere in your house?
 4      A.     Not that I know of.
 5      Q.     Do you have an electronic copy
 6   saved anywhere?
 7      A.     Not that I can recall.
 8      Q.     Do you generally sign
 9   agreements and then not save a copy of
10   them?
11            MR. UNDERWOOD:  Objection to
12      the form of the question.
13      A.     I don't know.
14      Q.     Do you have any paperwork that
15   is related to your employment at Brevet,
16   where you've saved in a folder in your
17   house?
18      A.     No.
19      Q.     Do you have any electronic
20   folder related to your employment at Brevet
21   that you've saved anywhere?
22      A.     No, not that I can recall.
23      Q.     Does anyone else have a copy of
24   your paperwork related to your employment
25   at Brevet, whether your accountant and/or
```

```
 1                    J. TRIPP
 2   your wife?
 3        A.    No.
 4        Q.    Your accountant has all your
 5   K-1s though, right?
 6        A.    Yes.
 7        Q.    Are you prepared to produce all
 8   those K-1s?
 9               MR. UNDERWOOD:  Objection to
10        the form.  For what purpose?
11        A.    What do you mean?  You can get
12   my K-1s, I presume.  It's a company
13   document, that I get a copy of.  The
14   company also has copies.  I obviously can't
15   object.  They company have copies of all
16   that.
17        Q.    In connection with your
18   retirement, did Doug ever tell you that you
19   would be subject to a noncompete?
20        A.    I don't recall.
21        Q.    You don't recall him telling
22   you that you would be?
23        A.    No, I don't recall either way.
24   I don't recall discussing it.
25        Q.    When we got back from the break
```

```
 1                    J. TRIPP
 2  and you said that your opinion was that you
 3  were retiring from your employment, but you
 4  were not withdrawing from this LLC, did
 5  anyone ever tell you that?
 6       A.    I believe that was in the
 7  separation agreement.  I can't remember.
 8       Q.    You think the separation
 9  agreement makes it clear that you're
10  retiring from an employee, but still part
11  of the LLC?
12       A.    I believe so, yes.
13       Q.    Do you recall having any
14  conversation to that effect with Doug or
15  Mark?
16       A.    I can't answer that.  I don't
17  know.
18       Q.    So my question was:  Do you
19  recall having any conversation with that
20  with Doug or Mark?
21       A.    No.
22       Q.    Do you recall having any
23  conversation about that with Mr. Desilva
24  Vint or anyone else at Brevet?
25       A.    I'm not positive.
```

Page 131

```
 1                    J. TRIPP
 2       Q.    What do you recall?
 3       A.    I'm not positive of exactly
 4  what the conversations were at that time
 5  with Mai Lee.
 6       Q.    What's your general
 7  recollection?
 8       A.    I don't have one.
 9       Q.    Tell me, what you do remember
10  about the discussion of the separation
11  agreement?
12       A.    I don't remember the
13  conversation.  It's been too long for me.
14       Q.    What is the basis for your
15  saying that you retired from an employee,
16  but you're still a member of the LLCs, if
17  you don't remember anything?
18       A.    That's my recollection.  I
19  don't remember why I have that
20  recollection, but that's what I remember.
21  I don't remember what the conversation was
22  or when it was.  It was my understanding.
23  That's all.  I don't know why.
24       Q.    And you don't remember any
25  conversations about that understanding?
```

```
 1                    J. TRIPP
 2        A.     No.  And I don't remember any
 3   conversation about anything -- anything
 4   along those lines, about the pay out or any
 5   of that stuff.
 6        Q.    And you didn't save a copy of
 7   the separation agreement?
 8        A.    I do not believe so.  I don't
 9   have any idea where I would look right now.
10        Q.    You could look in your e-mails,
11   right?
12        A.    I don't have e-mails going back
13   that far.  I would have to have them do a
14   Global Relay search for me.
15        Q.    How far back do the e-mails on
16   your iPad or your phone go?
17        A.    I don't know.  I don't know.
18        Q.    More than two years?
19        A.    Probably.  I would have to go
20   look.  I don't know.
21        Q.    But that would be easy to look,
22   right?
23        A.    I don't know.  I haven't tried
24   it.  I don't know how much they save in the
25   active e-mail directory.  And if it's in
```

Page 133

```
 1                   J. TRIPP
 2   the archives, I wouldn't be able to get
 3   there.
 4        Q.    How do the archives work?  Are
 5   you able to see the archived e-mail or
 6   you're not even able to see the archived
 7   e-mail on your phone?
 8             MR. UNDERWOOD:  Objection to
 9         the form.
10        A.    I can see archives of stuff
11   that I put out there.  If I specifically
12   put it in an archive folder, then I can see
13   that.  If I didn't and it goes to the dead
14   e-mail archive, I don't know how far back I
15   can go to.
16        Q.    Did you usually save the
17   agreements that you signed in an archive
18   folder?
19             MR. UNDERWOOD:  Objection to
20         the form of the question.
21        A.    I don't know.  I probably did,
22   but I can't remember.
23        Q.    Have you checked your archive
24   folder in connection with this case?
25        A.    No.
```

1                    J. TRIPP

2        Q.     Looking at the LLC agreement

3    again.

4        A.     Yup.

5        Q.     Can you turn to the section

6    3.1B?

7               MR. UNDERWOOD:  Can you tell me

8         what page that's on?

9               MS. LEVINE:  It's page 3 or 54

10        of 81.

11              MR. UNDERWOOD:  Which section?

12              MS. LEVINE:  3.1B.

13       Q.     Tell me when you're ready.

14       A.     I'm reading it.  Okay.

15       Q.     It says the that initial

16   members of the board will be Mark Callahan,

17   Paul Iacovacci, Doug and you, the founding

18   members; do you see that?

19       A.     Yes.

20       Q.     And that you're going to be a

21   non-voting board member?

22       A.     Yes.

23       Q.     What did that mean?

24       A.     At that time, the four of us

25   would consider ourselves founding members,

1                    J. TRIPP
2   and we always talked things out.  I didn't
3   get to vote on anything.  I was always
4   involved in those meetings.  This is back
5   in 2010.  Sometime around there.  We used
6   to meet occasionally, the four of us, and
7   discuss things.  Usually there was no
8   agenda or anything.  We just got together
9   and talked about what was going on.  There
10  were action items.  I didn't have any input
11  into the final decision.  I just said what
12  I thought and that was it.
13       Q.    What type of items would you be
14  a non-voting member on?
15            MR. UNDERWOOD:  Objection to
16       the form of the question.
17       Q.    What type of questions would
18  you not have a vote?
19       A.    I don't know that it ever came
20  up.
21       Q.    Meaning there were --
22       A.    No, I mean that in any meeting
23  that I was in, there was never a vote that
24  I wasn't able to give my opinion on.  We
25  didn't take minutes and like three yays and

1                    J. TRIPP

2   and one nay or anything like that.   Meaning

3   any meeting that I was in.

4        Q.    So no one ever took minutes of

5   these meetings?

6        A.    I just said there were no

7   minutes.

8        Q.    Did you discuss at these

9   meetings the assets of the LLC?

10        A.    Can you rephrase that?

11        Q.    What did you discuss in these

12   meetings?

13        A.    We discussed things like should

14   we move the office?  Can we redeploy things

15   better?  Can somebody support somebody

16   else?  More organizational issues of day to

17   day mechanics.

18        Q.    Besides day to day mechanics,

19   what about the finances of Brevet Capital

20   Holdings III, LLC; did that come up in the

21   meeting?

22        A.    Not that I can recall.

23        Q.    Any discussion about -- what

24   about the corporate structure; did that

25   come up in any of these meetings?

Page 137

```
 1                      J. TRIPP
 2        A.     Not that I can recall.
 3        Q.     Even though this LLC is being
 4   run by a board -- by the board of
 5   directors, you're saying that you don't
 6   remember any board meeting in which you
 7   discussed any of the finances of the LLC;
 8   is that correct?
 9               MR. UNDERWOOD:   Object to the
10         form of the question.
11        A.     That's correct.
12        Q.     Did you ever discuss moving any
13   investments or assets of the different
14   Brevet entities with anyone?
15        A.     No.
16        Q.     Did you ever discuss any --
17   which transactions Brevet Capital Holdings
18   III would enter into?
19        A.     No.
20        Q.     Do you see the sentence that
21   says that "Each board member shall continue
22   to serve on the board until his death,
23   permanent disability, resignation or
24   removal for cause, provided however that
25   Mr. Monticciolo cannot be removed from the
```

```
                                  Page 138
 1                    J. TRIPP
 2   board"?
 3        A.    Yes.
 4        Q.    What is your understanding of
 5   resignation in that sentence?
 6        A.    That I choose to resign from
 7   that entity.
 8        Q.    And your testimony is that you
 9   haven't resigned?
10        A.    My testimony is I do not
11   believe I resigned from that entity.
12        Q.    Is it your understanding that
13   you're going to be getting profit
14   distributions in perpetuity, until you
15   withdraw, die or suffer permanent
16   disability?
17        A.    Yes.
18        Q.    If Mark Callahan testified that
19   your separation agreement terminated your
20   interest under the LLC agreements, you
21   believe that testimony is incorrect?
22             MR. UNDERWOOD:  Objection to
23         the form of the question.
24        A.    I answered the question that I
25   believe I did not resign from the holding
```

Page 139

J. TRIPP

1

2    company.  The LLCs were the deals where I

3    resigned from -- where I was an employee, I

4    resigned.  That's my testimony.  I did not

5    receive any payments that they mentioned in

6    this situation.

7         Q.    You know for sure that you

8    didn't receive a payment?

9         A.    I did not receive the --

10   whatever it was -- 70 percent or 30 percent

11   or whatever -- I cannot remember the exact

12   number.  I didn't receive the distribution

13   of capital.

14        Q.    Is the reason you think you

15   didn't withdraw from the LLC, because you

16   didn't get those payments or are those two

17   separate, unrelated facts?

18             MR. UNDERWOOD:  Objection to

19        the form of the question.

20        A.    No, I think that -- I did not

21   think I resigned.  And I'm also saying I

22   did not get these "termination payments" or

23   whatever they're supposed to be.

24        Q.    Were you aware before today

25   that you were entitled to those termination

Page 140

1                    J. TRIPP

2   payments?

3        A.    I wasn't entitled to them,

4   because I hadn't resigned.

5        Q.    Let me rephrase.  Were you

6   aware, before you looked at the agreement

7   now, that you would be entitled to those

8   payments, if you would resign?

9        A.    I was aware that I would be

10   entitled to payments if I had resigned,

11   yes.

12        Q.    Did you consider withdrawing?

13        A.    No.

14        Q.    Why not?

15        A.    What do you mean why not?

16        Q.    I'm asking you why you didn't

17   consider withdrawing?

18        A.    Because I helped build the firm

19   and I wanted to stay involved.

20        Q.    What does it mean to you to be

21   involved?

22        A.    I wanted to be -- to feel a

23   part of it.

24        Q.    How have you been --

25        A.    It's purely psychological.

```
 1                    J. TRIPP
 2       Q.    I just want to make sure I get
 3  it right.  You didn't resign from this LLC,
 4  because you wanted to be involved for
 5  psychological reasons; is that right?
 6       A.    Not for psychological reasons.
 7  I wanted to stay involved with the company,
 8  because I felt that I had helped build it
 9  and I wanted to be around the company.
10       Q.    Did it come with any work
11  responsibilities?
12       A.    No.
13       Q.    You don't recall ever
14  discussing this understanding with Doug?
15            MR. UNDERWOOD:  Objection to
16       the form of the question.
17       A.    When Doug and I had our lunch
18  meeting, I said I wanted to stay involved.
19  That's the extent of the conversations, I
20  believe.
21       Q.    But you didn't say that that
22  meant to stay a member of the LLC?
23       A.    Specifically, no.
24       Q.    Before you saw this LLC
25  agreement right now, you were aware that if
```

```
                                          Page 142
 1                    J. TRIPP
 2   you stopped being a member of the LLC, you
 3   would be entitled to payments?
 4         A.    Yes.
 5         Q.    Did you ever contribute any
 6   capital to the LLC?
 7         A.    Yes.
 8         Q.    How much?
 9         A.    As I said, I had distributions
10   that I reinvested, rather than take.
11         Q.    How much was that?
12         A.    I don't know.
13         Q.    Ballpark?
14         A.    I don't know.
15         Q.    ██ ███████  ██████
16         A.    No.
17         Q.    Less?  More?
18         A.    Less.
19         Q.    ████████
20         A.    I don't know.
21         Q.    Could it be ███████?
22         A.    I don't think so.
23         Q.    You think it's probably less?
24         A.    I don't know.
25         Q.    When you tell me you haven't
```

1                    J. TRIPP

2   been paid under this agreement, do you know

3   how much you've been paid from Brevet?

4              MR. UNDERWOOD:  Objection to

5         the form of the question.

6        A.    Since 2016, you mean?

7        Q.    Yes.

8        A.    I really don't know.

9        Q.    How do you know for sure that

10  you haven't been paid under this agreement?

11       A.    Because I assume that they

12  would tell me.

13       Q.    But you never discussed it with

14  them, that you can recall?

15       A.    I never got a payment from them

16  for this two items.

17       Q.    So when do you plan on getting

18  that payment?  After you die?

19              MR. UNDERWOOD:  Objection to

20         the form of the question.

21       A.    I don't know.  I haven't

22  thought about it.

23       Q.    Who has a copy of this

24  agreement?  Does Brevet?

25       A.    Yes.  I shouldn't say that.  I

```
 1                    J. TRIPP
 2   assume so.  I don't know.  I didn't file
 3   it.
 4        Q.    How are you going to ask Brevet
 5   to make payments to you under an agreement
 6   that you don't have?  That's my question.
 7              MR. UNDERWOOD:  Objection to
 8         the form of the question.
 9        A.    I have no reason to doubt it.
10        Q.    No reason to doubt what?
11        A.    That they would do what was
12   correct.  What was right.
13        Q.    Did you look at this agreement
14   when you were retiring?
15        A.    I don't remember.
16        Q.    Might you have?
17              MR. UNDERWOOD:  Objection to
18         the form of the question.
19        A.    What was the question?
20        Q.    Did you look at this agreement
21   when you were retiring?
22        A.    I said I don't know.
23        Q.    Might you have looked at this
24   agreement when you were retiring?
25        A.    I don't know.
```

Page 145

```
 1                     J. TRIPP
 2        Q.    Let me ask it this way:  How
 3   could you have looked at the agreement when
 4   you were retiring, if you don't have a copy
 5   of the agreement?
 6        A.    I just said I don't know if I
 7   looked at this agreement.  Did I look at
 8   the separation agreement?  Yes.  Did I look
 9   at this particular document?  I don't know.
10        Q.    But how could you have --
11        A.    I knew there were payments on
12   termination from the holding company and I
13   wasn't getting those right now.  I knew
14   that.  I didn't know how much they were.
15        Q.    My question is:  To the best of
16   your knowledge, you do not have a copy of
17   this agreement anywhere; is that right?
18        A.    To the best of my knowledge.
19        Q.    And in 2016, when you were
20   retiring, to the best of your knowledge,
21   you did not have a copy of this agreement
22   then; is that true?
23        A.    To the best of my knowledge, I
24   do not remember having it at that time, no.
25        Q.    Isn't it safe to assume you
```

Page 146

```
 1                     J. TRIPP
 2   that did not look at this agreement, unless
 3   Brevet gave you a copy of this agreement in
 4   2016, when you were retiring?
 5             MR. UNDERWOOD:  Objection to
 6        the form of the question.
 7        A.    No.
 8        Q.    How else would you have looked
 9   at a copy of this agreement if you didn't
10   have a copy?
11        A.    When I signed it back in 2009.
12        Q.    In 2016, when you were
13   retiring, how would you have looked at this
14   agreement?
15             MR. UNDERWOOD:  Objection to
16        the form of the question.
17        A.    I just said I didn't look at it
18   then.
19        Q.    Okay.
20        A.    To the best of my knowledge.
21        Q.    So Brevet has agreed to produce
22   a copy of your separation agreement.  Would
23   that qualify for you whether you were
24   indeed retiring from both the LLC and from
25   being an employee?
```

```
 1                    J. TRIPP
 2               MR. UNDERWOOD:  Object to the
 3       form of the question.
 4       A.    I don't know.
 5       Q.    I think we can be done with
 6  this agreement.  Give me one second.  I'm
 7  pulling up the next exhibit.
 8               While it's loading, Mr. Tripp,
 9  I just want to ask:  You seem very trusting
10  of Brevet that they would just give you
11  whatever you are due; is that fair to say?
12       A.    That's fair to say.
13       Q.    Why is that?
14       A.    Because I worked with them
15  since 1999.  I had no reason to doubt it.
16       Q.    So you were under the
17  impression they would follow their
18  obligations under the agreement, so you
19  didn't have to double-check it?
20       A.    Basically.
21       Q.    I think we're going to move on
22  from the separation agreement.  I just want
23  to flag, Brevet has agreed to produce the
24  separation agreement later today.  So I'm
25  going to ask you about it.  Hopefully it
```

```
 1                      J. TRIPP
 2   won't mean that we have to hold you late.
 3   But hopefully they're going to produce it
 4   soon and we can ask you about it.
 5             So it should be up for you
 6   right now for you to look at.  Do you see
 7   it on your screen?
 8             MS. LEVINE:  Before we get into
 9          this document, I am going to make a
10          request on the record to Counsel that
11          they produce the K-1s for Mr. Tripp
12          immediately.  And to the extent that
13          they refuse to, we're going to make
14          the same request of Mr. Tripp
15          directly, if not of his accountant.
16          So I think I'm also going to leave
17          open the request to ask Mr. Tripp
18          questions about the amount that he
19          has received from Brevet from those
20          K-1s.
21       Q.    Tell me when you're ready,
22   Mr. Tripp.  Are you ready?
23       A.    No.
24       Q.    Let me ask you generally:  Have
25   you read this LLC agreement before?
```

```
 1                    J. TRIPP
 2        A.    I believe so.
 3        Q.    When was that?  When was the
 4   most recent time?
 5        A.    I don't know.
 6        Q.    Do you recall reading it in
 7   2016, before you retired?
 8        A.    No.
 9        Q.    Do you recall reading it before
10   you signed it?
11        A.    Yes.
12        Q.    Do you recall negotiating the
13   terms of the agreement?
14        A.    No.
15        Q.    Do you recall having counsel
16   for this agreement?
17        A.    No.
18        Q.    On the page, Exhibit A, at the
19   bottom, the different percentage ownership,
20   Do you recall negotiating the amount of the
21   percentage ownership?
22        A.    No.
23        Q.    In section 7.1 --
24        A.    Just one second.  Okay.
25        Q.    Section 7.1C talks about the
```

```
 1                    J. TRIPP
 2   payments that are due to a member, when
 3   they withdraw from being a member of the
 4   LLC; do you see that?
 5         A.    I don't remember the exact
 6   wording.  But I do remember seeing this
 7   concept at the time, yes.
 8         Q.    At the time, meaning in 2009?
 9         A.    Yes.
10         Q.    Do you have a copy of this
11   agreement somewhere in your house?
12         A.    No.  Again, I shouldn't say no.
13   Not that I know of.
14         Q.    Do you have a copy of this
15   somewhere electronically?
16         A.    Not that I know of.
17         Q.    Do you recall if you read it
18   anytime after 2009, when you signed it?
19         A.    No, do not remember.
20         Q.    Do you recall any negotiation
21   of the terms of section 7.1C --
22         A.    No.
23         Q.    -- about the payment that would
24   be due to a member, after they withdraw
25   from being a member?
```

Page 151

                              J. TRIPP

1

2        A.     No.

3        Q.     Is it your understanding that

4   under section 7.1C, you would be entitled

5   to certain payments, if you would withdraw

6   from being a member?

7        A.     Yes.

8        Q.     And those payments would be for

9   a share of net profits, yes?

10       A.     Yes.

11       Q.     And a capital account balance?

12       A.     Yes.

13       Q.     And some additional payments,

14  as well?

15       A.     Yes.

16       Q.     And it's your understanding

17  that you have not been paid those amounts?

18       A.     It's my understanding, yes.

19       Q.     In section 7.5 -- can you look

20  there?  It's a noncompetition; do you see

21  there?

22       A.     Yes.

23       Q.     Do you recall any negotiation

24  over that term?

25       A.     No.

                    J. TRIPP

1

2       Q.     Do you recall any discussion

3   with Doug or Mark or Paul about the terms

4   of the noncompete?

5       A.     Not specific to this document,

6   no.

7       Q.     What do you recall about a

8   noncompete?

9       A.     That we would -- we talked

10  about having to have such a thing many

11  years ago.  Back in 2004 or something,

12  after we started going with this.  But I

13  don't remember the specifics.  We had to

14  put together stuff to protect us in that

15  sense.  It was a conversation.  I don't

16  remember -- we didn't have any -- here's a

17  document.  Is this good enough; do you

18  think?  Not that kind of a thing.  Just

19  general comment.  General discussion about

20  noncompetes, as we brought in new people

21  particularly.

22      Q.     So the noncompetes that you

23  recall discussing, were not between the

24  four of you, but about bringing in new

25  people?

Page 153

1                    J. TRIPP

2      A.    Also the four of us.  Any

3  employee.  We had to make sure that we had

4  -- we did it right.

5      Q.    What do you recall about the

6  discussion?  What was the purpose of the

7  noncompete?

8      A.    To protect ourselves from the

9  kinds of things that could happen, if

10  somebody left and took stuff with them.

11  That's been 15 years ago.  I don't remember

12  the conversations exactly.  We just talked

13  about the things that had to be in employee

14  handbooks and agreements and so on and so

15  forth.  Nothing to the specifics.

16      Q.    Is it fair to say that in your

17  conversations with Doug and Paul and Mark,

18  that a lot of them would not relate to

19  specific documents; it would be just ideas,

20  without pointing at particular documents?

21      A.    A lot of times we just talked

22  about ideas, yes.

23      Q.    The noncompete that's in here

24  in section 7.5, is for a 24-month period;

25  do you see that?

```
 1                    J. TRIPP
 2        A.    I don't remember the exact
 3   amount of months.  I saw a time period,
 4   yes.  I see it, yes.
 5        Q.    It says, "After such member
 6   ceases to be a member, for any reason other
 7   than his death, permanent disability,
 8   retirement or involuntary termination
 9   without cause"; do you see that?
10        A.    Yes.
11        Q.    Do you remember any discussions
12   about that?
13        A.    No.
14        Q.    What do you understand the
15   retirement in that sentence to be?
16             MR. UNDERWOOD:  Objection to
17        the form of the question.
18        A.    I don't really understand.
19        Q.    Did you not read it before you
20   signed it?
21        A.    Yes.  I saw no problem with it.
22        Q.    But you don't understand what
23   it means?
24        A.    That's not my point.  I had no
25   problem with this paragraph, as it referred
```

```
                                    Page 155
 1                     J. TRIPP
 2   to me.
 3        Q.    Okay.  Do you recall any
 4   discussions or meetings with the other
 5   members of Brevet Capital Partners III, LLC
 6   regarding the finances of this LLC?
 7        A.    No.
 8             MS. LEVINE:  We've been going
 9        about an hour.  Why don't we take
10        another ten-minute break and then
11        come back?
12             THE VIDEOGRAPHER:  The time is
13        3:28 P.M.  We're going off the
14        record.
15             (Whereupon, a recess was
16        taken.)
17             THE VIDEOGRAPHER:  The time is
18        3:50 P.M.  We're back on the record.
19        Q.    Mr. Tripp, during the break,
20   Brevet produced a copy of your separation
21   agreement.  So I'm just going to mark this
22   as an exhibit.  So that -- two exhibits
23   should now be on your screen.  The first
24   one is a cover e-mail; the second one is
25   the attachment.
```

```
                                      Page 156
 1                    J. TRIPP
 2              MR. UNDERWOOD:  We've got
 3         Exhibit 5 up.  Do you want to us
 4         to --
 5              MS. LEVINE:  Let's start with
 6         Exhibit 5.
 7         Q.    Do you recognize this?
 8         A.    Yes.
 9         Q.    This is an e-mail from Mai Lee
10    Dasilva Vint.  And it's to you, re.
11    separation letter; do you see that?
12         A.    Yes.
13         Q.    My initial question is:  Are
14    you aware -- did you personally do any
15    searches through your e-mails, in relation
16    to this litigation?
17         A.    No.
18         Q.    Are you aware whether counsel
19    did any searches through your e-mails in
20    relation to this litigation?
21         A.    No.
22         Q.    So regarding this e-mail, do
23    you recall getting this e-mail?
24         A.    No.
25         Q.    Did you read the e-mail when
```

1                    J. TRIPP
2    you got it?
3         A.    Of course.  I replied to it.
4         Q.    I'm talking about the e-mail on
5    the top that's from Mai Lee Dasilva Vint to
6    you, that's dated May 25th, 2017.  That
7    says, "Hi, John.  Attached for your
8    reference is the fully executed separation
9    letter."  Is it your testimony that you
10   replied to that e-mail?
11        A.    No, I didn't say that.  I said
12   I replied to these e-mails.  I did not say
13   that I replied to this specific e-mail.
14        Q.    Do you recall getting this
15   specific e-mail or no?
16        A.    I don't doubt that I got it.
17   But I don't recall.  I got it four and a
18   half years ago.
19        Q.    Now let's open Exhibit 6, which
20   is the attachment.  Tell me when you're
21   ready.
22        A.    It's still refreshing.  I have
23   it open.
24        Q.    This is a copy of your
25   separation agreement you were testifying

                    J. TRIPP

1
2   about; is that right?
3       A.    I'm sorry.  What was your
4   question?
5       Q.    This is a copy of the
6   separation agreement that you were
7   testifying about?
8       A.    I don't know.  I have to read
9   it.  I don't know what it is.
10      Q.    I'll give you a few minutes.
11           MR. UNDERWOOD:  While the
12       witness is reading the document, I'm
13       going to step out for a second.  I'll
14       be right here.
15      Q.    Tell us when you're ready.
16      A.    Okay.
17      Q.    Is this a copy of the
18  separation agreement you were talking
19  about?
20      A.    As I recall it, yes.
21      Q.    Who signed it behalf of Brevet?
22      A.    Sorry, what?
23      Q.    Who signed this on behalf of
24  Brevet?
25      A.    I don't know.  I can't read

Page 159

                         J. TRIPP

1

2    that.  It looks like maybe ████    I don't

3    know -- I can't remember if that's ████

4    signature or not.  It looks like ████

5         Q.    Nowhere in here does it say

6    you're retiring, does it?

7         A.    I don't recall seeing that

8    word, but I don't know.  I don't recall

9    seeing the actual word retirement, no.

10        Q.    Why wouldn't it say the word

11   retire, if you were retiring?

12        A.    I don't know.

13        Q.    Did they tell you you were

14   being terminated?

15        A.    No.

16        Q.    Is says your employment with

17   Brevet holdings, the company, is being

18   terminated; is that consistent with your

19   conversation?

20        A.    To me, there's no difference in

21   my mind, the meaning of the two.  I think

22   it says cessation of employment.  It didn't

23   say termination.

24        Q.    The second sentence says

25   cessation.  That is true.  It says, ████

Page 160

1                          J. TRIPP

2   ████████  ██  ██  ████████  ████  ████████  ████████  ██

3   ██  ████  ████████  ██  ██████  ██████████        This

4   letter is dated ████  ████  ████; do you see

5   that?

6          A.    Yes.

7          Q.    And your employment is being

8   terminated effective as of ████████  ████████

9   ██  ██████?

10         A.    That's correct.

11         Q.    Why the change in dates?  Why

12  are they backdating when you are being

13  terminated effective as of?

14         A.    I assume -- that was the

15  agreement.  And I assume it was so they

16  didn't have an obligation for -- I don't

17  know.  I assume they didn't want to pay me

18  for the months that I wasn't supposed to be

19  working.

20         Q.    What happened between

21  ████████  ██████  ██████  █████  █████  ████████  ██████; were

22  you working for Brevet or were you already

23  retired?

24         A.    I was not actively working for

25  Brevet at that time.

Page 161

1                       J. TRIPP

2          Q.       Were you negotiating this

3     agreement between ████ ███ ███ ███

   █ ███ ████ ███?

5          A.       I think some of that time I was

6     on vacation.   Maybe two months of that time

7     I was on vacation.

8          Q.       Was this agreement negotiated

9     at all by you?

10         A.       We talked about certain items.

11    ████ ███ ████ ████ ████  ████ ███ ████

   █ ███ ██ ████ ████ ███  ███ ██ ████

   █ ████ ████ ████ ███ ███ ████ ████

14         Q.       Where did the amount of

15    ████████ --

16         A.       █ █ ████ █████ █ ████████

   █ ████ ████████ ████ █ ████ █

   █ ████ █ █ ██████ ███ █ ██ ████ █ ██

   █ ████ █ █ ███ ████ █ ███ ████

   █ █████ ███ ███ █ ██ █████ ████ █

   █ ████ ██ ████ ████ ███ ███

22         ██ ████ ████ █ ████ ████ ███

   █ ████ ████ ███ ████ ██ ███ ██

   █ ███ ████ ███ █ ████ ████

   █ ████ ███ ███ ████ ████

Page 162

```
1                        J. TRIPP
2         Q.     What about the amount of
3  ████████████ ████ ██████████ ███████████, that's
4  in paragraph one?   Where did that amount
5  come from?
6         A.     ████████ █████████ ████████ █████████
   ███████████ ███████ █████ █████████████
8         Q.     ████████ ██████ ████████ ███████████ ███████
   ████████ ████ ████ █████████
   ██  ██████ ████████ █████████ ████████ █████████
   ██  ██████ ████████ ████████ █████████ █████ ████████
   ██  ██████ ████████ ████████ █████████ ████████ ████████
   ██  ████████ ██████ ████████ █████████████ █████████ █████████
   ██  ████████ ██████ █████████ ████████ █████████ █████████
   ██  ██████ ████████ ████████ █████████ ████████ █████████
   ██  ████████ ███████ ████████ █████████ ████████ ████████
   ██  ████████
18        Q.     It was informal?
19        A.     Yes.
20        Q.     Did you negotiate that amount,
21 ███████████?
22               MR. UNDERWOOD:   Object to the
23      form of the question.
24        A.     I didn't negotiate it.   It
25 started out it was going to be about
```

Page 163

```
 1                         J. TRIPP
 2  ████████████   ████   ████████   ████   ████   ████   ███
    █  ████████   █████   ██████████   ███   █   ████   █   ████
    █  ██████████   ███   █   ████   █████████   ██   █   █████   █
    █  ████████   ████   ████████   ███   █████████   ████   ███
    █  ████████   ████   █████   ████   ██████   ████   █████   ██
    █  ██████   ████   █████   █████   ████████   ██████
 8        ████     ████████   █████   ████████   ██████
    █  ██████   ██████   ████   was there a prior computer
10  that you had that you were using?
11        A.     Yes.
12        Q.     That they paid for that?
13        A.     It was their computer.
14        Q.     The one at the office?
15               MR. UNDERWOOD:  Sorry?
16        Q.     The computer at the office?
17        A.     No, no.  It was an old computer
18  from the office, yes.  I used it to go to
19  my PC, so I could work at the office.
20        Q.     What items in this letter do
21  you feel that you negotiated with Brevet
22  and which items here, did they just --
23  which items did you negotiate with Brevet?
24        A.     █   ████████   ██████   █████   ██
    ██  ██████████   █   ████████   █   ████████   ███
```

Page 164

1          J. TRIPP

2 ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

13          Q.     Who put in that sentence?

14          A.     I don't know who put it in.   I

15 asked to make sure that it was there.   I

16 don't know whether the attorney put it in

17 or Mai Lee.   I have no idea.

18          Q.     About that sentence, That

19 sentence refers to the limited liability

20 company agreement of Brevet Capital

21 Partners III, LLC dated January 21st, 2009,

22 right?

23          A.     Yes.

24          Q.     And that is -- I believe that

25 was Exhibit 4 that we saw?

Page 165

```
 1                      J. TRIPP
 2        A.    Yes.  I don't know which
 3   exhibit it was, but it was the one shown
 4   before, yes.
 5        Q.    If you look it up, it's Exhibit
 6   4.  You can click on it.
 7              MR. UNDERWOOD:  Can I click
 8         away from this exhibit?
 9              MS. LEVINE:  We're going to
10         come back to it.  But there's a way
11         to have more than one tab open.
12              MR. UNDERWOOD:  Exhibit 4?
13              MS. LEVINE:  Yes.
14        A.    We've got them both open.  No,
15   we don't.  So we're in -- okay.
16        Q.    Do you see that it refers to
17   the limited liability company agreement of
18   Brevet Capital Partners III, LLC, dated
19   January 21st, 2009, which is Exhibit 4 that
20   we looked at?
21        A.    Yes.
22        Q.    In the second limited liability
23   company agreement that it refers to, is --
24   in your separation agreement, is the
25   limited liability company agreement of
```

Page 166

```
 1                    J. TRIPP
 2   Brevet Capital Partners, LLC, dated
 3   February 1st, 2007?
 4        A.    Yes.
 5        Q.    Now that is not in the
 6   agreement that we saw; is that correct?
 7              MR. UNDERWOOD:  Can you repeat
 8        that question?
 9        Q.    The sentence refers to the
10   limited liability company agreement of
11   Brevet Capital Partners, LLC dated
12   February 1st, 2007.  And that is not the
13   LLC agreement that we saw, correct?
14        A.    Correct.
15        Q.    So in Exhibit 3 that we saw,
16   which is the LLC agreement of Brevet
17   Capital Holdings III, LLC, dated
18   January 21st, 2009, is not in here,
19   correct?
20        A.    Yeah.
21        Q.    Okay.  On the bottom of page
22   one in Exhibit 6, ███ ██████████ ██████
     ██ ███████ ████████
24        A.    Yes.
25        Q.    Why is it ██████████ ████?
```

1            J. TRIPP

2       A.    You have to ask Mai Lee.   I

3  don't know.

4       Q.    Meaning this letter is dated

5  ███████ ██████ ████ ████ █ ██ ██████████

   █ █████

7       A.    I said you'll have to ask Mai

8  Lee.  I don't know.

9       Q.    Doesn't it strike you as odd?

10      A.    She made a mistake.  I don't

11 know.

12      Q.    At the bottom it says,

13 "proprietary and confidential"; do you see

14 on the same line?  Oh, it's covered by the

15 exhibit tab.  You can see it on the

16 following page, as well.

17      A.    Yeah.

18      Q.    What's proprietary and

19 confidential about this document to your

20 understanding?

21      A.    You're not supposed to share it

22 with other people.

23      Q.    So that's your understanding of

24 proprietary and confidential?

25      A.    Yes.

```
 1                    J. TRIPP
 2       Q.    Is that the same thing;
 3   proprietary and confidential?  Do they mean
 4   the same things to you?
 5                 MR. UNDERWOOD:  Objection to
 6           the form of the question.
 7       A.    To me, they do not mean the
 8   same thing.
 9       Q.    What does proprietary mean as
10   distinct from confidential to you?
11       A.    Proprietary to me implies
12   ownership.  Confidential implies what I can
13   do with the information.  So let's say a --
14       Q.    I didn't mean to cut you off.
15   Go ahead.
16       A.    It's okay.
17       Q.    Were you finished?
18       A.    Yes.
19       Q.    When you say that you weren't
20   supposed to share it, is that confidential,
21   rather than proprietary?
22       A.    Yes.
23       Q.    What part of this was
24   proprietary, in the phrase proprietary and
25   confidential, according to you?
```

```
 1                     J. TRIPP
 2              MR. UNDERWOOD:  Objection to
 3         the form of the question.
 4      A.    I would say I couldn't use this
 5   form as a boilerplate for something else.
 6   Different than confidential, where I can't
 7   go out on the street and say, "Hey, here's
 8   what happened."
 9      Q.    So your understanding is that
10   this document that you and Brevet both
11   signed, belonged to Brevet?
12              MR. UNDERWOOD:  Objection to
13         the form of the question.
14      A.    I don't know.  That's between
15   Brevet and I.  It's to be kept that way.
16   It belongs to Brevet and it belonged to me,
17   too.
18      Q.    So the notwithstanding anything
19   to the contrary language, which talks about
20   the LLC agreement -- that's language that
21   you asked them to put in; is that right?
22      A.    Correct.
23      Q.    And you didn't include all the
24   LLC agreements; is that right?  You left
25   that up to them?
```

```
                                          Page 170
 1                    J. TRIPP
 2       A.    Yes.
 3       Q.    The computer that you had been
 4  working on, that was Brevet's old computer;
 5  did you have to return that?
 6       A.    No, I returned the disks.  I
 7  did not return the physical computer.  That
 8  was old and we destroyed it.
 9       Q.    Did you consult an attorney
10  before signing this letter?
11       A.    No.
12       Q.    Did you ask for a termination
13  letter from Brevet or was it was their
14  idea?
15            MR. UNDERWOOD:  Objection to
16        the form of the question.
17       A.    I don't know.
18       Q.    Do you recall asking for this
19  document?
20       A.    I do not recall the document
21  itself, no.
22       Q.    Do you recall asking for any
23  form of a formal document?
24       A.    No.
25       Q.    Is that the type of thing that
```

Page 171

```
 1                    J. TRIPP
 2   you were basically retired at this point,
 3   and then afterwards, Mai Lee said that they
 4   needed a formal document?
 5               MR. UNDERWOOD:  Objection to
 6         the form of the question.
 7        A.    I don't remember that.
 8        Q.    You weren't negotiating a
 9   separation agreement between ███████  █████
██  ██████ ████  ██████
11              MR. UNDERWOOD:  Can you read
12         the question back?
13              (Whereupon, a portion of the
14         record was read back.)
15        A.    Certainly not that whole
16   period, no.  Probably for a couple of days.
17   A few days.  All that was, was she gave me
18   a letter and I looked at it and I said do,
19   do, do.  And she said do, do, do.  And that
20   was it.  It wasn't like a negotiation.  It
21   was clarifying a couple of issues.
22        Q.  ████  ██████  ██████  █████  █████  █████
██  ██████  ███  █████  ████  ████  ███████
██  █████████  █████  ████  █████  █████  ████
██  ██████  ██
```

Page 172

1                    J. TRIPP

2        A.      That was never an issue.  The

3    ████████ █ ██  ███████████ ███ ██ █ ████████████

     █ ████ █ ███ ██████████████ █ ████████ ██ ██

     █ ██ ██████████      And that was it.  That I

6    remember.  I don't remember any other

7    negotiations.

8        Q.      While you were at Brevet before

9    this time period, did you ever invest your

10   personal funds in an investment outside of

11   Brevet?

12       A.      Yes.

13       Q.      What were the circumstances?

14       A.      Sorry?

15       Q.      What were the circumstances?

16       A.      I bought stock.  I mean it was

17   cleared by compliance, but I bought stock.

18   I didn't do a lot of investing while I was

19   with Brevet.  So some stock and some

20   options, pre-approved by the compliance

21   group.  And personal -- I had -- like I

22   said earlier, I did invest distributions

23   back into the company.

24       Q.      As far as the distributions you

25   invested back into the company, can you

```
 1                     J. TRIPP
 2   tell me the timing and circumstances of the
 3   other investments you made?
 4        A.    Not really.  There were
 5   occasional -- there was one investment that
 6   was with Brevet -- with Brevet personnel,
 7   Doug, myself, Ron Davidow.  That was an
 8   investment off of -- outside of Brevet
 9   Capital.  It was an investment the three of
10   us made with a fourth party, because the
11   investment was outside the mission of
12   Brevet Capital.  That was way back in the
13   beginning, before we were -- I don't even
14   think Paul had joined the firm by that
15   time.  That was a small investment the
16   three of us made.  Me, Doug, John and Ron
17   Davidow made with a fourth party.
18        Q.    How much did you invest?
19        A.    I think like -- I'm not sure.
20   I would say in the neighborhood of 20,000.
21        Q.    Do you recall how much Doug
22   invested?
23        A.    We all invested the same
24   amount.  I think it was 20,000.
25        Q.    What happened with that
```

1          J. TRIPP
2   investment; do you still hold that
3   investment?
4        A.    No.  We sold that company and
5   cashed out, maybe right after Paul came.
6   Way back in the early 2000s.  2005 maybe.
7   I don't know the date.  That was a little
8   thing we did.  I'm sorry.  And Ron and I
9   also invested in a company that was doing
10  business, that we thought we might be
11  interested in.  And we did it as a trial
12  with Doug and Ron and I.  And that was a
13  small investment.  That was -- again,
14  between the four of us, it was less than
15  $100,000.
16       Q.    So there was two different
17  investments that you made at the beginning
18  with Doug that were outside the mission of
19  Brevet; is that right?
20       A.    Yes.
21       Q.    And at the time there, was no
22  one to ask, right; there was no compliance
23  team or you didn't have to ask anyone?
24       A.    No.
25       Q.    Meaning as long as it was

```
 1                    J. TRIPP
 2   outside the mission, it was okay, right?
 3              MR. UNDERWOOD:  Objection to
 4        the form of the question.
 5        A.    I don't know what you mean by
 6   that.  We made the investment.  We agreed
 7   on it.  We were the guys -- we decided what
 8   we wanted to invest in, whether it was --
 9   we didn't put it inside the Brevet Capital
10   -- for whatever reason.  I don't remember.
11   Maybe for ease of simplicity.  I don't
12   know.  But the short answer to your
13   question is, yes, we did a couple of
14   investments of our personal capital outside
15   the firm.  But it was the members of the
16   firm making the investment.
17        Q.    Basically you guys got to
18   decide whether it was in or out?
19        A.    Pardon?
20        Q.    So it was you who got to decide
21   whether it was in or out, because you were
22   the members; is that right?
23        A.    Yes.
24        Q.    Since the early days, when you
25   made these two investments you just told me
```

Page 176

```
 1                    J. TRIPP
 2   about, have you made any other investments
 3   of your personal funds outside of Brevet?
 4        A.    No.  Well, three things.  Other
 5   than the occasional stock purchase.
 6        Q.    And occasional stock purchases
 7   are between 2004 and 2016 or they were also
 8   old?
 9        A.    Most of them were before 2010.
10   But I can't say when.  You have to look it
11   up.
12        Q.    And you run every single stock
13   purchase you make by compliance?
14        A.    Yes.
15        Q.    Who is that from compliance?
16        A.    I don't remember who was in
17   there at the time.  They had -- ███████
18   was monitoring our accounts.  And they --
19   if you didn't get it approved, even if you
20   got it approved, they got a notice you
21   bought the stock.  And it was pre-approved
22   or wasn't, so compliance could take action.
23   I don't remember who all was in that office
24   at the time of the purchase.  They would
25   come through that department and say -- I
```

```
                          J. TRIPP
 1
 2    don't know what they would say if you did
 3    an invalid trade, because I never did that.
 4    But they would be notified by ██████ that
 5    I made the trade.  ███████ monitored all
 6    of your accounts.
 7        Q.    How were the investments that
 8    you made with Doug outside the mission of
 9    Brevet?
10             MR. UNDERWOOD:  Objection to
11         the form of the question.
12        A.    This was before we were a fund.
13    We were an advisory service.  There wasn't
14    a mechanism inside of Brevet to do these
15    investments at the time.  Mark was not in a
16    position to invest.  And like I said, it
17    was Ron Davidow, Doug and I.  So we weren't
18    a real fund at that time.  We didn't make
19    investments.  We were an advisory firm at
20    that time.
21        Q.    Have you ever investigated how
22    the assets are allocated between the LLCs
23    that you have an interest in and the other
24    Brevet LLCs?
25        A.    Not really.
```

Page 178

```
 1                        J. TRIPP
 2        Q.     What do you mean by not really?
 3        A.     I know that some funds were set
 4   up to do one kind of investment versus
 5   another kind of investment.  I don't know
 6   which ones are which.  Back when they were
 7   formed, there was a reason for forming that
 8   structure.  I don't know the legal reasons
 9   or whatever.  But they decided that it was
10   necessary.  But I don't know why.
11        Q.     Do you have a membership
12   interest in the Intermediate Duration Fund?
13        A.     Not that I remember.  I might
14   have, but I don't recall.  I don't
15   remember.
16        Q.     What's your understanding as to
17   why you have a membership interest from in
18   the Short Duration Fund, but not in the
19   Intermediate Duration Fund?
20        A.     I don't know.  I never thought
21   about it.
22        Q.     Is it a question of timing,
23   that one was started before the other one?
24        A.     They definitely were started at
25   different times.  But I don't know if that
```

```
 1                    J. TRIPP
 2   was a reason.  I do not know the reason.
 3        Q.    Do you recall any discussion
 4   about whether you would have a membership
 5   interest in the Intermediate Duration Fund?
 6        A.    No.
 7        Q.    How does your relationship with
 8   Doug and Mark work, in the sense of, do
 9   they tell you when you get a membership
10   interest and you just say okay?  Or is
11   there some negotiation, where you try to
12   get more of a membership interest?  Or
13   something else?
14             MR. UNDERWOOD:  Objection to
15         the form of the question.
16        A.    I would say they say, "We need
17   to set this up, sign here."  I didn't
18   negotiate what my percentages would be.
19        Q.    Do you recall ever having
20   negotiations with Mark and Doug, like about
21   your salary or anything else?
22        A.    In 1999.  And then probably we
23   talked about something after we -- when we
24   reformed the company.  But in the
25   beginning, there was -- when we reformed,
```

Page 180

```
 1                   J. TRIPP
 2   there was no salaries.  Then one day we
 3   decided we could start paying salaries.
 4   There was no negotiations at that time.
 5        Q.    Has your salary stayed the same
 6   since 1999?
 7        A.    No.  Since reforming --
 8   initially, it was a start-up.  So that
 9   really -- a technology start-up really was
10   a different animal.  Stock and all that
11   kind of stuff, which I didn't negotiate in
12   back 1999.  As far as when we reformed and
13   started paying salaries, in the beginning,
14   we all took the same salary.  Later on, I
15   kept my salary down, to keep our 401(k) --
16   what do they -- the testing they do for the
17   401(k), to keep that between high and low
18   and pay the employees.  To keep that below
19   the threshold.  Those are the only two
20   things that I did.
21        Q.    Other than that, you did have
22   the same salary as Mark and Doug?
23        A.    At the beginning, yes.
24        Q.    When did that change?
25        A.    I don't know.
```

Page 181

1                     J. TRIPP
2        Q.    Was there a conversation with
3   you when it changed?
4        A.    I wouldn't say it was a
5   conversation.
6        Q.    What would you say; that you
7   were just told?
8        A.    Basically.  I'm not even sure I
9   was told.  That wasn't one of the things I
10   was privy to.
11        Q.    So you didn't have transparency
12   on how much Mark and Doug were being paid?
13        A.    I didn't have transparency on
14   how anybody was being paid.
15        Q.    You're a member of these LLCs;
16   did you have transparency about the
17   finances of the LLCs and the expenses and
18   the profits?
19        A.    Not that kind of detail.  The
20   bottom line distribution.
21        Q.    Did you ever ask for the backup
22   for those bottom line distributions?
23        A.    No.
24        Q.    Who provided you with the
25   bottom line distribution?

Page 182

1                    J. TRIPP

2        A.      Karina.

3        Q.      Binershyn?

4        A.      Yes.

5        Q.      As a member, did you understand

6    that you had fiduciary duties to the LLC?

7        A.      I'm not sure the scope of that

8    question.

9        Q.      Did you believe that you had

10   fiduciary duties to the LLC, as a member?

11       A.      I believe that I had a

12   fiduciary responsibility to do my best to

13   support the areas that I was supporting for

14   those LLCs, yes.  If you mean fiduciary

15   responsibility, in the sense that I had to

16   review finances or financials for other

17   potential people, no.

18       Q.      I'm not talking about other

19   potential people.  I'm talking about the

20   LLC itself.  Did you review any financials

21   for the LLC itself?

22              MR. UNDERWOOD:  You cut out in

23         the middle of that question.

24       Q.      Did you review any financials

25   for the LLC itself?

Page 183

```
 1                    J. TRIPP
 2      A.      No.
 3      Q.      Did you believe it your
 4  fiduciary responsibility, to have an
 5  understanding of the financials of the LLC
 6  itself?
 7      A.      No.
 8      Q.      Why not?
 9      A.      Because I wasn't in charge of
10  finances.   That was Mark's responsibility.
11      Q.      What did you view were your
12  fiduciary responsibilities to the LLC?
13              MR. UNDERWOOD:  Objection to
14        the form of the question.
15      A.      Provide the best support for
16  the back office that I could, to support
17  the LLC's operations.
18      Q.      Since 2017, what have you done
19  to fulfill your fiduciary duties to the
20  LLC?
21      A.      Since 2017, I don't believe I
22  have any.
23      Q.      You don't believe you have any
24  fiduciary responsibilities since 2017 to
25  the LLCs?
```

Page 184

1                        J. TRIPP

2          A.     Other than things like

3    confidentiality and proprietary --

4    protection of anything I think that the

5    firm is doing.  I don't have a lot of

6    information in that sense, but I would -- I

7    certainly have a responsibility of a

8    confidentiality and proprietary nature of

9    any document I may have in my possession or

10   anything I might hear while I'm in the

11   office.

12         Q.     It's your testimony that you're

13   still a member of the LLCs, right?

14         A.     Not all of them.  I wasn't a

15   member of all of them.  You said LLCs

16   plural.  I'm still a member of the ones

17   that I'm a member of.

18         Q.     And those are the two that we

19   saw here today in Exhibits 3 and 4?

20         A.     Yes.

21         Q.     Any other ones?

22         A.     No.

23         Q.     So for those two LLCs, your

24   understanding is that you don't have any

25   fiduciary responsibilities to those LLCs?

Page 185

```
1                    J. TRIPP
2           MR. UNDERWOOD:  Objection.
3      A.    I answered that question when I
4  said I have a responsibility of a
5  confidential and proprietary nature.
6  Anything I have or happen to come in
7  contact with.
8      Q.    Nothing else?
9      A.    No.
10     Q.    As a member of the LLCs, is it
11  it your understanding that you have a
12  fiduciary responsibility to the other
13  members of the LLC?
14     A.    I don't understand what that
15  means.  I think I answered the question.
16     Q.    My question to you is whether
17  you believe you have any other fiduciary
18  responsibilities to the other members as to
19  the LLC?
20     A.    In the sense that I described
21  before.  I don't share their -- anything
22  that they discuss with me, that might be
23  proprietary or confidential.
24     Q.    Before 2017, when you were
25  still working at Brevet, did you believe
```

1                    J. TRIPP

2    that you had fiduciary responsibilities to

3    the other members of the LLCs, to Doug,

4    Paul and Mark?

5              MR. UNDERWOOD:  Object to the

6         form of the question.

7         A.    In the sense that I had agreed

8    to perform certain duties.  And I had a

9    fiduciary responsibility to perform those

10   to the best of my ability.

11        Q.    Do you believe that they had

12   fiduciary responsibilities to you?

13        A.    Yes.

14        Q.    What were those?

15              MR. UNDERWOOD:  Object to the

16         form of the question.

17        A.    I don't know specifically.  I

18   mean, I believe that we were to treat each

19   other as partners and be above board and

20   honest with each other.

21        Q.    Does that include

22   transparencies to profits?

23              MR. UNDERWOOD:  Object to the

24         form of the question.

25        A.    I'm not sure what you mean by

Page 187

```
 1                    J. TRIPP
 2    that.
 3        Q.    Do you believe that Doug and
 4    Mark had an obligation to be transparent
 5    with you about their profits, as part of
 6    their fiduciary responsibility to you as a
 7    member of the LLC?
 8             MR. UNDERWOOD:  Object to the
 9          form of the question.
10        A.    I believe they had a fiduciary
11    responsibility to make sure accounting
12    provided the right documentation to people
13    relative to these things, yes.
14        Q.    Do you recall if accounting did
15    provide the right documentation to you?
16        A.    They provided to me
17    documentation that I thought was
18    sufficient.
19        Q.    You never recall asking for
20    something and not getting it; is that fair
21    to say?
22        A.    I did not request something and
23    not get it.
24             MS. LEVINE:  I have a few more
25          documents to show you.  But I think
```

```
                                      Page 188
 1                     J.  TRIPP
 2          now is a good time to take a break.
 3                THE VIDEOGRAPHER:   The time is
 4          4:43 P.M.  We are going off the
 5          record.
 6                (Whereupon, a recess was
 7          taken.)
 8                THE VIDEOGRAPHER:  Time is
 9          4:55 P.M.  We are back on the record.
10          Q.    I'm uploading another exhibit
11   for you.  Let me know when you have it in
12   front of you.  Do you see it?
13          A.    Yes.
14          Q.    So Exhibit 7 is an e-mail from
15   Jennifer Fleissner to several people,
16   including you.  Subject to Paul Iacovacci.
17   And it says, "Hi, all.  I am going to
18   handle the logistics of Paul Iacovacci's
19   retirement from this point forward."  Do
20   you see that?
21          A.    Yes.
22          Q.    This e-mail is dated May 23rd,
23   2016, right?
24          A.    Yes.
25          Q.    Does this refresh your
```

```
 1                  J. TRIPP
 2   recollection that Mr. Iacovacci was going
 3   to retire in the spring of 2016?
 4        A.    End of May.  Summer.  Early
 5   spring.
 6        Q.    Was this the first you had
 7   heard about Mr. Iacovacci's retirement?
 8        A.    I don't know if it was the very
 9   first time I heard about it.  But it was
10   the first time I heard about it in writing.
11        Q.    Meaning before that you had a
12   conversation regarding --
13        A.    Before that, I might have heard
14   he was thinking about it.  I don't know.  I
15   can't say that this is the first time that
16   I heard about it.  It's the first time I
17   saw it in writing.
18        Q.    You don't recall being
19   surprised when you read this, did you?
20        A.    No, because I knew he wasn't
21   feeling good.  So I wasn't surprised.
22        Q.    Who is Jennifer Fleissner?
23        A.    I think she was a short term --
24   she wasn't there that long.  She was in --
25   kind of in the role that Mai Lee was in.
```

```
 1                    J. TRIPP
 2   I'm not sure what her official title was.
 3   She was an enabler for the firm to get
 4   things done.  I'm not sure what her formal
 5   title was.  It says chief operating
 6   officer.  So I guess her formal title was
 7   chief operating officer.  But I never
 8   thought of her as that.
 9        Q.    What did you think of her as?
10   HR?
11        A.    Her getting the job done.  We
12   were too small to think about titles.
13        Q.    Do you recall responding to
14   this e-mail, either orally or in writing?
15        A.    No.
16        Q.    Do you remember having
17   conversations with anyone about this e-mail
18   or the content?
19        A.    No.
20        Q.    Was this typical of how Brevet
21   handled retirement from your experience at
22   this point?
23              MR. UNDERWOOD:  Objection to
24         the form of the question.
25        A.    I can't think of anybody else
```

1                    J. TRIPP
2    that worked for the firm that was retiring,
3    other than me.
4          Q.    What is Mai Lee's job?
5          A.    I don't know.  I guess she's
6    the chief operating officer.  I don't know.
7          Q.    Give me one second.  I'm
8    introducing another exhibit.  Okay.  You
9    should have it up.  So this is an e-mail
10   from Sheree Harris to Mark Callahan, dated
11   June 24th, 2016.  You are not copied on
12   this e-mail.  I want to ask you about the
13   content.  Do you see that?
14         A.    Yes.
15         Q.    It says, "Mark, as requested,
16   attached please find list of current
17   employees, along with their titles.  Let me
18   know if you need anything else."  Do you
19   see that?
20         A.    Yes.
21         Q.    Then if you scroll down to the
22   attachment, there's a list of employees.
23   And it has -- you're the fourth one down;
24   do you see that?  John Tripp?
25         A.    Yes.

Page 192

```
 1                    J. TRIPP
 2        Q.     Next to you, it says, "retired,
 3   employee, partner," right?
 4        A.     Yup.
 5        Q.     Above you is Paul Iacovacci.
 6   And it's the same thing.  He's retired,
 7   employee and partner; do you see that?
 8        A.     Yes.
 9        Q.     Is that consistent with your
10   understanding that he had retired?
11              MR. UNDERWOOD:  Objection to
12          the form.
13        A.     I have no idea whether this is
14   accurate or not.  This is put together by
15   somebody and I don't have any idea whether
16   it's accurate from an HR standpoint or not.
17        Q.     Sheree Harris put this
18   together, right?
19        A.     Who did?
20        Q.     Sheree Harris.
21        A.     I think that's what it says,
22   yeah.
23        Q.     Do you have a reason to doubt
24   that she would put something together that
25   was inaccurate?
```

```
 1                    J. TRIPP
 2        A.     No, I have no idea why she
 3   would do it.  But it's clear that there's a
 4   mistake here, because it shows me as
 5   retired.  But we have the other document
 6   that shows I didn't retire -- cessation of
 7   employment until 2017.  So there's
 8   something wrong here.  Paul hadn't retired
 9   either, I don't think, by that time.  I
10   don't know
11        Q.     When she writes that -- so you
12   think this document is inaccurate; is that
13   what you're saying?
14        A.     I don't know.  I don't know
15   what it was intended to do.
16        Q.     Well, it says next to you, John
17   Tripp, retired?
18        A.     I understand that's what it
19   says.
20        Q.     What does that mean to you?
21        A.     What it means to me is that
22   there's a mistake.  We know from the other
23   document that that's not correct.  She may
24   have had that, because as I told you, I had
25   cut way back on the work and I was
```

```
 1                    J. TRIPP
 2   semiretired and she might have just put it
 3   in as retired.  But I have no idea what she
 4   did.  I didn't make this form.  We know
 5   Paul wasn't retired yet.
 6        Q.    When you say you were
 7   semiretired; the difference between
 8   semiretired and retired is what?
 9        A.    I was still collecting a
10   salary, but I had very limited
11   responsibilities.
12        Q.    So you're still an employee,
13   right?
14        A.    That's what it says.
15        Q.    Meaning you're still drawing a
16   salary?
17        A.    I'm still drawing a salary.
18        Q.    Even though you were
19   semiretired and had less work
20   responsibility?
21        A.    Yes.
22        Q.    I'm going to show you another
23   exhibit.  Tell me when it's on your screen.
24        A.    Okay.
25        Q.    So this is an e-mail from Igor
```

Page 195

```
 1                    J. TRIPP
 2   Koyfman; who is Igor Koyfman?
 3        A.    He's an office gopher.  He did
 4   everything from stock the refrigerators to
 5   move computers around.
 6        Q.    And it's to Mr. Iacovacci,
 7   copying you, forward, "I came home from the
 8   hospital," dated March 31st, 2016; do you
 9   see that?
10        A.    Yes.
11        Q.    If you scroll down, Paul sends
12   an e-mail to Johnny Lan at the bottom, that
13   says, "I came home from the hospital.  I
14   went to play my only message, which said
15   restricted.  When I hit play, my phone went
16   berserk.  The light started flashing and it
17   never stopped, so I unplugged it."  Do you
18   see that?
19        A.    I see it.
20        Q.    And then Johnny Lan forwards it
21   to you and Igor Koyfman; do you see that?
22        A.    Yes.
23        Q.    Then Igor responds, "Paul, have
24   you tried plugging the phone in to see what
25   happens?"
```

```
 1                    J.  TRIPP
 2       A.    Yes.
 3       Q.    Do you recall this exchange at
 4  all?
 5       A.    No.
 6       Q.    Did you have any conversations
 7  with Paul Iacovacci about this?
 8       A.    No.
 9       Q.    Did you know why he was in the
10  hospital?
11       A.    Yeah, he had two knee
12  operations.
13       Q.    So you weren't surprised; this
14  wasn't the first time you were hearing
15  about --
16       A.    That he was ill, no.
17       Q.    I'm going to show you another
18  document.
19             And it's your understanding
20  that's why he was retiring; because he was
21  suffering medical issues?
22             MR. UNDERWOOD:  Objection to
23        the form of the question.
24       A.    I have no firsthand knowledge
25  of that.
```

```
 1                    J. TRIPP
 2       Q.    Was that your understanding?
 3       A.    My understanding was he was
 4  going to retire, because he was not well.
 5       Q.    I'm going to bring up another
 6  document.
 7             Do you have an understanding
 8  why Mr. Lan would have forwarded it to you
 9  and Igor?
10       A.    Probably so the three of us
11  knew that Paul was having a problem with
12  his phone, in case he couldn't fix it and
13  one of us wasn't around.  It was standard
14  procedure when someone had a problem, to
15  let everyone that could help know.
16       Q.    Was Igor involved in the IT
17  side?
18       A.    As I said, he was a gopher.  He
19  moved machines around.  He plugged them in.
20  He didn't have anything to do with
21  configuring machines or anything like that.
22  But at that time, he was somebody good to
23  lug things around.
24       Q.    Were you his supervisor?
25       A.    No.
```

```
 1                   J. TRIPP
 2       Q.    Was Johnny Lan his supervisor?
 3       A.    No.
 4       Q.    Did you work with Mr. Lan in
 5   solving Mr. Iacovacci's problem?
 6             MR. UNDERWOOD:  Objection to
 7        the form of the question.
 8       A.    Who knows?  I just don't know.
 9   Simple answer, I don't know.
10       Q.    Take a look at the next
11   exhibit.  Let me know when you have it up.
12             Do you see this says
13   defendant's responses to plaintiff's
14   amended fifth set of interrogatories; do
15   you see that?
16       A.    Yes.
17       Q.    If you scroll down to page 4,
18   there's a chart listing the time the
19   defendant's remotely accessed sections of
20   the computer.  Do you see that?
21       A.    Yeah.
22       Q.    So if you scroll down the
23   chart, one of the times is on March 31st,
24   2016 -- two of the times are March 31st,
25   2016.  Do you see that?
```

```
 1                    J. TRIPP
 2        A.    Yes.
 3        Q.    The e-mail that you just saw,
 4   the prior exhibit, is dated March 31st,
 5   2016.  Do you see that?
 6        A.    What am I supposed to see
 7   again?
 8        Q.    The e-mail from the prior
 9   exhibit was dated March 31st, 2016?
10        A.    Yes.
11        Q.    My question to you was:  Were
12   you the one who accessed Mr. Iacovacci's
13   computer on March 31st, 2016?
14        A.    From what I see there, nobody
15   accessed it.  I don't know.
16        Q.    Do you recall ever accessing
17   Mr. Iacovacci's computer remotely?
18        A.    I don't recall.
19        Q.    Of this list -- I'm now back to
20   Exhibit 10 -- there are about two dozen
21   times approximately that Mr. Iacovacci's
22   computer was accessed remotely.  Do you
23   recall being the one to access his computer
24   on any of these?
25        A.    No, I do not recall that.
```

```
                                    Page 200
 1                   J. TRIPP
 2        Q.    Do you recall -- some of these
 3   refer to a plaintiff request via phone.  Do
 4   you see that?
 5        A.    Yes.
 6        Q.    Do you recall Mr. Iacovacci
 7   ever requesting you via phone to access his
 8   computer remotely?
 9        A.    I can't recall.
10        Q.    Do you recall ever accessing
11   any employees computer remotely?
12        A.    No.
13        Q.    That was not something you
14   typically did?
15        A.    No.
16        Q.    Was that something you ever did
17   that you can recall?
18        A.    I cannot recall logging into
19   anybody's computer outside the office.
20        Q.    Going to the next exhibit.
21        A.    We've got it up, if that's what
22   you're asking.
23        Q.    Before we move off the prior
24   exhibit, the question of remotely logging
25   on, Did you ever hear of Johnny Lan
```

```
                                      Page 201
  1                   J. TRIPP
  2   remotely logging on to Mr. Iacovaccis
  3   computer?
  4        A.    No.
  5        Q.    Did you sit near Mr. Lan?
  6        A.    No.
  7        Q.    Are you aware of anyone ever
  8   remotely logging onto your computer?
  9        A.    Yes.
 10        Q.    Which computer would that be?
 11        A.    It would be the firm's
 12   computer.
 13        Q.    You mean the one that sat in
 14   your house?
 15        A.    The one that sat at home, yes.
 16        Q.    How did the firm go about
 17   remotely logging on to your computer?
 18        A.    It would go to my PC.
 19        Q.    Did the firm have your
 20   password?
 21        A.    Yes.
 22        Q.    Because you gave it to them?
 23        A.    Yeah.
 24        Q.    Did they tell you, before they
 25   would remotely log into your PC?
```

```
 1                     J. TRIPP
 2        A.     I don't recall.
 3        Q.     How did you know that they
 4   remotely logged in?
 5        A.     The time I remember they did
 6   it, they were doing some maintenance that
 7   had to go on our machines.
 8        Q.     So they told you, "Don't be on
 9   your machine, because we're about to do
10   some maintenance"?
11        A.     Yeah, something to that effect.
12   They needed to update something.  I don't
13   remember.  It was a long time ago.  I
14   remember they did it at least once.
15        Q.     And they told you about it in
16   advance?
17        A.     Yes.
18        Q.     When you say they logged into
19   your PC, who would be the they?
20        A.     The technical support staff.  I
21   don't know the rules.  I don't know whether
22   it was Johnny Lan or one of the outside
23   vendor people.  I think it was Johnny.  It
24   was just a short log in.  I don't remember.
25   I mean it's literally six or seven years
```

```
1                    J. TRIPP
2   ago.
3        Q.    Is that the type of thing that
4   you oversaw?
5        A.    No.
6        Q.    So it was Johnny Lan who
7   oversaw it?
8        A.    Yup.
9        Q.    And it wasn't just your PC at
10  that time; it was all the firm's PCs?
11       A.    As best I can recall, yes.
12       Q.    Was there ever a time that you
13  recall the firm just remotely logging into
14  your PC?
15       A.    Not that I know of.
16       Q.    Are you aware of anyone ever
17  remotely logging into Mr. Iacovacci's PC,
18  just his and not the firm, as a firm log
19  in?
20       A.    Just the allegation in the
21  documents that you've given me so far.
22       Q.    Separate from the documents, do
23  you have any independent recollection of
24  it?
25       A.    No, no independent
```

```
                                        Page 204
 1                  J. TRIPP
 2   verification.
 3        Q.    Turning to Exhibit 11.
 4        A.    Yeah.
 5        Q.    This is an e-mail from Sheree
 6   Harris on October 5th, to several people,
 7   including you.  Subject, Paul Iacovacci.
 8   It says, "Going forward, please direct any
 9   request or communications you receive from
10   Paul, to Doug and Mark's attention.  If you
11   are currently performing any ongoing
12   functions for Paul, please let Doug or Mark
13   know that, as well."  Do you see that?
14        A.    Yeah.
15        Q.    It says from Sheree Harris this
16   time, and not Jennifer Fleissner; is that
17   right?
18        A.    This is from Sheree, yes.
19        Q.    So the prior e-mail we had seen
20   from Jen Fleissner, said that she would be
21   handling Paul's retirement going forward;
22   do you recall that?
23        A.    Yes.
24        Q.    Now there's this e-mail from
25   Sheree Harris, saying that you should refer
```

```
 1                   J. TRIPP
 2   all communications from Paul to Doug and
 3   Mark; do you see that?
 4        A.    Yes.
 5        Q.    My question is:  Do you recall
 6   why there was a change?
 7        A.    No idea.
 8        Q.    What did you understand
 9   happened between in the spring of 2016,
10   when Jen Fleissner was handling his
11   retirement, and October 5th, 2016, when
12   Doug and Mark needed to be involved with
13   all the communications involving Paul?
14             MR. UNDERWOOD:  Objection to
15        the form of the question.
16        A.    I have no recollection of the
17   exact events.
18        Q.    I'm not asking about exact
19   events.  I'm asking about your general
20   understanding of what happened between
21   those two times?
22        A.    I just said I have no idea.
23        Q.    Were you on vacation from the
24   spring of 2016 through the fall?
25        A.    I don't know exactly which days
```

```
 1                    J. TRIPP
 2    I was on vacation.  I was in the office
 3    some of those days.  But I was not privy to
 4    the Paul situation at that time.
 5         Q.    When you received this e-mail,
 6    did you have any conversations with Doug or
 7    Mark about the contents of this e-mail?
 8         A.    No.
 9         Q.    Did you have any conversations
10    with Doug or Mark about Paul at all?
11         A.    No, not that I recall.
12         Q.    Do you recall any conversations
13    with Doug or Mark at all about Paul in
14    2016?
15         A.    I'm sure we talked about that
16    Paul was going to retire.  We did not have
17    any extensive conversation about it.  It
18    would have been in passing.
19         Q.    Then when Paul was instead
20    fired, did you have a conversation with
21    Doug and/or Mark about why the change?
22         A.    No.
23         Q.    Did you have any conversation
24    with Doug or Mark about why Paul was fired?
25         A.    No.
```

Page 207

                    J. TRIPP

1
2       Q.    Did you have any conversation
3   with Doug or Mark about that Paul was
4   fired?
5       A.    No.
6       Q.    Did anyone approach you about
7   disconnecting Paul's electronic access or
8   anything?
9       A.    No.
10      Q.    Did you have any conversation
11  with Doug or Mark about Paul since 2016?
12      A.    Did I have any conversation
13  with Doug or Mark; is that what you're
14  asking me?
15      Q.    Regarding Paul, yes.
16      A.    Just that he was suing us.
17      Q.    What was said in that
18  conversation?
19      A.    "Don't worry about it.  The
20  attorneys will be dealing with it.  Don't
21  talk to anybody.  Follow your attorney's
22  advice."
23      Q.    Was that one conversation or
24  was that more than one conversation?
25      A.    I think it was basically one

```
 1                     J. TRIPP
 2   conversation.
 3        Q.    And was that recently?
 4        A.    They knew me well enough to
 5   know that I would follow that process.
 6        Q.    Was that conversation recently?
 7        A.    No, no, no.  This was way back.
 8   I don't know.  Late 2016.  Early 2017.  I
 9   don't know when the suit was.  I have no
10   recollection of that.  When the suit was
11   filed, I was told not to worry about it,
12   because the attorneys would be taking care
13   of it.
14        Q.    Did you discuss with Mark or
15   Doug, the allegations in the lawsuit?
16        A.    Not really.
17        Q.    Without revealing anything that
18   your attorney told you, did you discuss
19   with them, "Hey, this is what Paul is
20   claiming; is it true?"
21              MR. UNDERWOOD:  Objection to
22         the form of the question.
23        A.    No such question was asked.
24        Q.    So what was the -- to the best
25   of your recollection, what was the
```

```
 1                    J. TRIPP
 2   discussion about the lawsuit?
 3             MR. UNDERWOOD:  I really think
 4        you've exhausted what you're entitled
 5        to know about conversations between
 6        codefendants about a lawsuit.  I will
 7        invite you to move on.  I will
 8        instruct the witness not to disclose
 9        anything further about the details of
10        his communications with co-parties
11        who are defendant's in a lawsuit.
12             MS. LEVINE:  We're going to
13        reserve our rights on that.  But I
14        will move on for the sake of this
15        deposition.  But while reserving my
16        rights, I'll come back to it.
17        Q.   Do you recall any conversation
18   with anyone at Brevet about Paul in 2016
19   retiring?
20        A.   No.
21        Q.   Do you recall any conversations
22   with anyone at Brevet in 2017, about Paul's
23   termination?
24        A.   When?
25        Q.   In 2016.
```

Page 210

```
 1                    J. TRIPP
 2       A.    About Paul's termination, no.
 3             MS. LEVINE:  Let's take another
 4       five-minute break and then we can
 5       wrap up.
 6             THE VIDEOGRAPHER:  The time is
 7       5:32 P.M.  We're going off the
 8       record.  Please hold.
 9             (Whereupon, a recess was
10       taken.)
11             THE VIDEOGRAPHER:  The time is
12       5:36 P.M.  We are back on the record.
13       Q.    Mr. Tripp, I just want to make
14   my record, so I can easily access what to
15   fight about with counsel.
16             Do you recall any conversations
17   with Doug or Mark that did not involve
18   counsel and was not directed by counsel,
19   regarding the allegations in this action?
20       A.    No.
21       Q.    In the course of business, did
22   Brevet receive confidential information
23   from its investors?
24       A.    I can't -- I don't know.  I
25   have no idea.
```

1                    J. TRIPP
2        Q.    You never heard of Brevet
3    receiving confidential information from its
4    investors?
5        A.    I mean, unpublished financial
6    documents, I suppose came through on deals.
7    But I was not aware of when they came or
8    who sent them or anything like that.  I'm
9    sure that something happened.  But not on
10    my watch.  I didn't see the documents.
11        Q.    Were you aware that Brevet
12    typically would execute NDAs, in order to
13    receive confidential information from
14    investors?
15        A.    Yes.
16        Q.    Did Brevet have any IT systems
17    to monitor correspondence for e-mails that
18    would contain confidential client or
19    investor information?
20                MR. UNDERWOOD:  Objection to
21          the form of the question.
22        A.    Just the Global Relay logging
23    system.
24        Q.    How would you maintain the
25    confidentiality of information from these

```
 1                    J. TRIPP
 2  other parties that came into Brevet; was
 3  there any password encryption set up on
 4  e-mails that you recall?
 5              MR. UNDERWOOD:  Objection to
 6        the form of the question.
 7       A.    I don't recall.
 8       Q.    Did Brevet have a system in
 9  place, to ensure that confidential client
10  information was not disseminated outside of
11  Brevet, that you know of?
12       A.    I don't know of any.
13       Q.    Do you know where the
14  confidential client information was stored?
15       A.    No.
16       Q.    Do you know if it was stored on
17  a Brevet location or a Brevet drive, that
18  all employees had access to?
19              MR. UNDERWOOD:  Objection to
20        the form of the question.
21       A.    No, it's not.  If it was, it
22  was not stored on a common file space.
23       Q.    So it was segregated from
24  nonconfidential information, as far as you
25  know?
```

```
 1                    J. TRIPP
 2        A.    Yes.
 3        Q.    And did you go about assisting
 4   in that segregation?
 5        A.    I don't understand the
 6   question.
 7        Q.    What was your role in ensuring
 8   the confidentiality of such information?
 9             MR. UNDERWOOD:   Objection to
10         the form of the question.
11        A.    That would have been Johnny
12   Lan's responsibility by then.  I don't know
13   what the process was.
14        Q.    Before 2013, was it also your
15   responsibility?
16        A.    I don't recall doing anything
17   special, other than creating the folder
18   they would put stuff in and locking it down
19   to the deals team.  And that's it.  I
20   didn't do anything, as far as monitoring
21   that or anything like that.  They put deal
22   stuff in and then I would have protected it
23   for that deal.
24        Q.    Did the Brevet computers also
25   house documents that contained confidential
```

Page 214

```
 1                    J. TRIPP
 2   or proprietary Brevet information, as
 3   opposed to the client's information?
 4        A.    Yes.
 5        Q.    Where was that information
 6   stored?
 7        A.    In the compliance drive and the
 8   accounting drive.
 9        Q.    And those drives, you testified
10   before, were limited about who could access
11   them; is that right?
12        A.    Yes.
13        Q.    And the other drives that were
14   not limited, did not have the confidential
15   information; is that right?
16        A.    To the best of my knowledge,
17   that's true.
18        Q.    To best of your knowledge, were
19   the confidential documents encrypted by
20   some password or otherwise?
21             MR. UNDERWOOD:  Objection to
22        the form of the question.
23        A.    I often saw documents come in
24   that were password protected.  I can't
25   guarantee that all of them were.
```

```
 1                    J. TRIPP
 2       Q.    When you say the documents that
 3  come in; are you talking about documents
 4  that did not belong to Brevet?  Documents
 5  that belonged to a third party?
 6       A.    Yes.
 7       Q.    Within Brevet, are you aware of
 8  documents being password protected --
 9       A.    The documents going out were
10  also password protected.
11       Q.    What about within Brevet, on
12  Brevet's computers?
13       A.    You mean, documents for use
14  within Brevet?
15       Q.    Yes, the documents that were
16  stored on the common drive.  Were those --
17  were any of these documents, to the best of
18  your recollection, password protected or
19  otherwise encrypted?
20       A.    I can't answer that.  I don't
21  know.  That would have been between the
22  deals people.  I don't know what they did.
23       Q.    Documents that went out to the
24  third parties that contained Brevet
25  confidential or proprietary information.
```

1                    J. TRIPP
2   Your understanding was that those were
3   password protected or encrypted; is that
4   right?
5        A.    Yes.
6        Q.    Were they otherwise marked
7   confidential or proprietary or otherwise
8   somehow marked?
9        A.    Sorry?
10       Q.    Were they also marked
11  confidential or proprietary or had some
12  other marking?
13       A.    As far as I know, every
14  document that went outside had a
15  confidential or proprietary statement at
16  the bottom.
17       Q.    So it wasn't your understanding
18  that every document that Brevet sent out,
19  was confidential or proprietary?
20            MR. UNDERWOOD:  Objection to
21         the form of the question.
22       A.    I don't know if every
23  document -- there might have been some kind
24  of generic documents that went out without
25  that.  But anything that pertained to a

```
 1                  J. TRIPP
 2   deal, certainly had confidential or
 3   proprietary on it.  As far as I know, every
 4   document that went out of the firm had it.
 5        Q.    I guess that's my question.
 6   Did Brevet have a footer on every e-mail
 7   that it sent out, that said confidential
 8   and proprietary to the best of your
 9   knowledge?
10        A.    That was kind of my point.
11   Every single e-mail that went out, even if
12   I sent a personal e-mail to my wife, had
13   that footer on it.  It was automatically
14   applied by the system going out.  It's not
15   something optional.
16        Q.    Let's say in the case where you
17   sent an e-mail to your wife that says, "Hi,
18   I'll be late for supper," and it has on the
19   bottom, confidential and proprietary.
20   Obviously that's not confidential and
21   proprietary; is that right?
22        A.    I don't want people to know
23   when I'm going home.  I think it says
24   unauthorized use or something of this is
25   prohibited.  I don't know what it said
```

```
 1                    J. TRIPP
 2  exactly.  It was a -- you could not bypass
 3  that in the system.  It was done at the
 4  server level, so you had no choice.  It
 5  went out, whether you wanted it to or not.
 6       Q.    But it wasn't your
 7  understanding that just because did said on
 8  it confidential and proprietary, that
 9  indeed your wife couldn't tell other people
10  what time you were coming home for --
11            MR. UNDERWOOD:  Objection.
12       Q.    Just because it said
13  confidential or proprietary, didn't mean
14  actually mean confidential or proprietary
15  if it wasn't?
16            MR. UNDERWOOD:  Objection to
17       the form of the question.
18       A.    As I said, I don't know the
19  exact wording.
20       Q.    But that's not my question.  My
21  question is.
22       A.    I know that's not your
23  question, but I'm giving you my answer.  My
24  answer is, there's a statement at the
25  bottom, "there may be proprietary
```

Page 219

```
1                    J. TRIPP
2  confidential information included with this
3  e-mail."  But I don't know exactly the
4  wording.  That's my answer.
5       Q.    My question was about your
6  understanding.  Just because it said on it,
7  confidential and proprietary, you didn't
8  think that made it confidential and
9  proprietary, if it wasn't otherwise
10  confidential or proprietary; isn't that
11  right?
12                MR. UNDERWOOD:  Objection to
13         the form of the question.
14       A.    I can't answer the question.
15       Q.    Why can't you answer that
16  question?
17       A.    Because I told you what I said.
18  I don't know what the wording was.
19       Q.    Putting aside the wording.  My
20  question to you is --
21       A.    I can't put aside the wording.
22       Q.    Let me state my question again
23  and you'll tell me why you can't answer the
24  question.
25                If the e-mail went out with an
```

```
                                          Page 220
 1                    J. TRIPP
 2    automatic footer, right?  That footer,
 3    whatever it said on it, if it used the
 4    words confidential and proprietary, that
 5    did not transform something that was not
 6    otherwise confidential and proprietary into
 7    something that was confidential and
 8    proprietary to your understanding; isn't
 9    that your understanding?
10             MR. UNDERWOOD:  Objection to
11         the form.  If you have anything to
12         add, go ahead.
13        A.    I can't add anymore to what I
14    said.
15        Q.    Well, I'm going to stay here
16    until you answer this question, because
17    this is not a tough question.  This is one
18    that you can answer and you have not
19    answered yet.
20             MR. UNDERWOOD:  He told you
21         what he believed to be the answer and
22         you're lecturing him --
23        Q.    When you said that you sent out
24    an e-mail to your wife, if the
25    automatically generated footer said
```

Page 221

```
1                    J. TRIPP
2    confidential and proprietary, did you
3    understand it to be confidential and
4    proprietary?
5              MR. UNDERWOOD:  He's not
6         accepting your premise, so he can't
7         tell you what he understood, if he
8         doesn't accept the premise.  And your
9         refusal to accept his best attempt to
10        answer your question, doesn't mean he
11        has to give you a different answer.
12        So I suggest we all move on.  You're
13        trying to get him to accept an
14        assumption that he's told you he
15        can't accept.  That there was e-mails
16        that went out with certain language
17        on them.  And he's told you that
18        several times and you keep insisting
19        that he make an assumption that he's
20        not comfortable making and that you
21        tell him what he would have meant, if
22        that assumption were in effect.  He
23        told you he doesn't realize that that
24        assumption is valid.  He doesn't
25        recognize it as valid, so he's not
```

Page 222

```
  1                    J. TRIPP

  2         going to tell you what he would think

  3         if that assumption were valid.  Now,

  4         he's answered your question several

  5         times.  He's not going to do it

  6         anymore.  If you have anything

  7         further, I suggest we do it.

  8         Otherwise, we can finish the

  9         deposition.

 10              MS. LEVINE:  Counsel, as you

 11         know, that was a lot of testimony,

 12         instead of the witness testimony.

 13         You're allowed to object to form and

 14         I am entitled to answers to my

 15         question.  So for the sake of ending

 16         this deposition, I would ask the

 17         witness to just answer my question

 18         and not to avoid prolonging this

 19         deposition.  It was his hypothetical

 20         and I am asking him about his

 21         hypothetical.

 22      Q.    Mr. Tripp, can you please

 23   answer my question?

 24      A.    I believe that the footer says,

 25   "May contain confidential information and
```

Page 223

```
 1                    J. TRIPP
 2   proprietary information."  That's all I
 3   know.
 4        Q.    My question was:  Was it then
 5   your understanding that every e-mail that
 6   went out, even if it didn't contain
 7   something confidential, like an e-mail to
 8   your wife, therefore, became confidential
 9   and proprietary?
10        A.    No.
11             MS. LEVINE:  Okay.  I think I
12        am almost done.  Give me one minute.
13        That's it.  Thank you very much,
14        Mr. Tripp, for your time.  I really
15        appreciate it.
16             MR. UNDERWOOD:  And we are off
17        the record.  Thank you.
18             THE VIDEOGRAPHER:  Time is
19        5:51 P.M.  This concludes today's
20        testimony given by John Tripp.  Total
21        media units used is one.  It will be
22        retained by Veritext Legal Solutions.
23             (Whereupon, at 5:52 P.M., the
24        examination of this witness was
25        concluded.)
```

Page 224

1                          J. TRIPP

2                    D E C L A R A T I O N

3

4        I hereby certify that having been

5    first duly sworn to testify to the truth, I

6    gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9    transcript is a true and correct transcript

10   of the testimony given by me at the time

11   and place specified hereinbefore.

12

13

14

                    _____

15                       JOHN TRIPP

16

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21

     _____

22       NOTARY PUBLIC

23

24

25

Page 225

```
 1                    J. TRIPP

 2                E X H I B I T S

 3

 4   PLAINTIFF'S EXHIBITS

 5   EXHIBIT    EXHIBIT                    PAGE

 6   NUMBER     DESCRIPTION

 7   Exh 1       Lending presentation      5

 8   Exh 2       Organizational chart      5

 9   Exh 3       LLC agreement             6

10   Exh 4       LLC agreement             6

11   Exh 5       E-mail                    6

12   Exh 6       Separation agreement      6

13   Exh 7       E-mail                    6

14   Exh 8       E-mail                    6

15   Exh 9       Response                  6

16   Exh 10      List                      6

17   Exh 11      E-mail                    7

18

19        (Exhibits retained by Counsel.)

20

21                I N D E X

22

23   EXAMINATION BY                        PAGE

24   MS. LEVINE                            5

25
```

Page 226

1                    J. TRIPP

2      INFORMATION AND/OR DOCUMENTS REQUESTED

3   INFORMATION AND/OR DOCUMENTS          PAGE

4   K-1s for Mr. Tripp                     146

5

6

7         QUESTIONS MARKED FOR RULINGS

8   PAGE LINE QUESTION

9   (None)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 227

1                    J. TRIPP

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                             :  SS.:

5    COUNTY OF RICHMOND       )

6

7         I, JAMIE WILLIS, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 15th day of October 2021.

21

22                       *Jamie Willis*

23

              JAMIE WILLIS

24

25

**Page 228**

1                           **ERRATA SHEET**
                    **VERITEXT/NEW YORK REPORTING, LLC**
2

   **CASE NAME: Iacovacci v. Brevet Holdings, LLC**
3  **DATE OF DEPOSITION: 10/6/2021**
   **WITNESSES' NAME: John Tripp**
4
5    **PAGE    LINE (S)        CHANGE              REASON**
    ____|_____|_____|_____
6
    ____|_____|_____|_____
7
    ____|_____|_____|_____
8
    ____|_____|_____|_____
9
    ____|_____|_____|_____
10
    ____|_____|_____|_____
11
    ____|_____|_____|_____
12
    ____|_____|_____|_____
13
    ____|_____|_____|_____
14
    ____|_____|_____|_____
15
    ____|_____|_____|_____
16
    ____|_____|_____|_____
17
    ____|_____|_____|_____
18
    ____|_____|_____|_____
19
    ____|_____|_____|_____
20
21                                    _____
                                      John Tripp
22  **SUBSCRIBED AND SWORN TO BEFORE ME**
    **THIS ____ DAY OF _____, 20__.**
23
24
    _____          _____
25  **(NOTARY PUBLIC)**              **MY COMMISSION EXPIRES:**

**[& - 4:55]**                                                                                                Page 1

| | |
|---|---|
| **&** | |

**&**   2:16 3:17 5:8

**0**

**06824-5730**   2:18
**08048**   1:6 4:11

**1**

**1**   3:17 5:19 69:14
  85:21 86:4,9
  106:20 225:7
**10**   6:24 199:20
  225:16
**10/6/2021**   228:3
**100,000**   50:22,23
  50:25 51:12,15,18
  51:21,25 174:15
**10006**   2:6
**106**   2:17
**10:02**   1:12 4:3
**11**   7:4 42:7 204:3
  225:17
**11201**   7:18
**11:08**   57:10
**11:15**   57:7
**11:21**   57:15
**12**   42:7 45:7 115:6
  116:7 119:14
  120:11
**12:04**   91:11
**12:15**   91:9,16
**12:58**   121:5
**146**   226:4
**15**   67:15 153:11
**15222**   2:12
**15th**   227:20
**17th**   100:17 102:2
**18**   48:21
**19**   109:2 115:9
**1957**   14:18
**1959**   14:21 16:4,6

**197**   21:15
**1988**   14:5,11 16:4
**1990**   14:6 15:11
**1999**   17:6,7 19:25
  20:9 147:15
  179:22 180:6,12
**1:00**   91:8
**1:18**   1:6 4:11
**1:31**   121:10
**1s**   50:5,7 129:5,8
  129:12 148:11,20
  226:4
**1st**   160:8,21 161:3
  166:3,12 171:9

**2**

**2**   5:24 31:19 225:8
**20**   103:3 108:24,25
  224:19 228:22
**20,000**   173:20,24
**2000**   2:17 21:17
**2000s**   174:6
**2001**   21:16 45:19
**2002**   23:20 24:13
  25:8
**2004**   30:19 31:7,21
  32:2 35:11 46:19
  48:24 51:23 52:10
  53:21 56:2 152:11
  176:7
**2005**   174:6
**2007**   166:3,12
**2009**   115:2 146:11
  150:8,18 164:21
  165:19 166:18
**2010**   24:23,24 93:6
  135:5 176:9
**2011**   45:7
**2012**   35:14
**2013**   35:14,15 36:2
  38:15,16 39:4,6,17
  39:19 52:11 56:2

**60**:23 65:16 66:21
  71:15,24 77:15
  79:23 103:2,4
  213:14
**2014**   166:22,25
  167:6
**2015**   90:6,8 94:22
  95:2
**2016**   30:19 31:8,21
  35:11 46:19 48:24
  53:21 55:21 60:20
  61:3 71:6,8,17
  72:2 77:23 78:19
  78:20 80:12,13,15
  84:2 85:10 87:2
  90:6 94:18 95:15
  95:23 98:13 99:20
  100:17 102:3
  103:4 143:6
  145:19 146:4,12
  149:7 176:7
  188:23 189:3
  191:11 195:8
  198:24,25 199:5,9
  199:13 205:9,11
  205:24 206:14
  207:11 208:8
  209:18,25
**2017**   71:6,17 72:2
  157:6 160:4,9,21
  160:21 161:3,4,20
  167:5 171:10
  183:18,21,24
  185:24 193:7
  208:8 209:22
**2018**   51:18
**2020**   51:10,15 76:7
  76:8 78:22
**2021**   1:11 4:5 51:6
  51:23 227:20

**21st**   115:2 164:21
  165:19 166:18
**225**   2:11
**23rd**   188:22
**24**   153:24
**24744**   227:23
**24th**   191:11
**25**   32:3
**25th**   95:23 157:6
  160:4,21 161:4
  167:5
**26th**   164:3

**3**

**3**   134:9 166:15
  184:19 225:9
**3,500**   163:2
**3,800**   163:24
**3,827.15**   162:3
**3,837.15**   162:21
**3-4**   6:3
**3.1b**   134:6
**3.1b.**   134:12
**30**   3:16 31:15 32:3
  139:10
**31st**   195:8 198:23
  198:24 199:4,9,13
**3:28**   155:13
**3:50**   155:18
**3rd**   2:5

**4**

**4**   113:13 164:25
  165:6,12,19
  184:19 198:17
  225:10
**401**   161:19 180:15
  180:17
**41,166.67**   161:15
**4:43**   188:4
**4:55**   188:9

**5**

**5**  6:7 32:2 156:3,6
  225:7,8,11,24
**50**  67:25
**500,000**  142:19,21
**54**  134:9
**55**  2:5
**59**  15:21
**5:32**  210:7
**5:36**  210:12
**5:51**  223:19
**5:52**  223:23
**5th**  204:6 205:11

**6**

**6**  1:11 6:12 157:19
  166:22 225:9,10
  225:11,12,12,13
  225:14,15,16
**6th**  4:5

**7**

**7**  188:14 225:13,17
**7-8**  6:16
**7.1**  149:23
**7.1c**  121:15,16
  149:25 150:21
  151:4
**7.5**  151:19 153:24
**70**  31:14 37:3
  139:10
**7a**  7:18

**8**

**8**  225:14
**80**  14:11
**81**  134:10

**9**

**9**  6:20 225:15
**9/11**  22:13,25 24:9
**96**  7:17

**99**  58:20

**a**

**a.m.**  1:12 4:3
  57:10,15
**ability**  10:14
  186:10
**able**  10:5,9,16
  46:7,17 47:5
  67:17,22 68:3,5
  81:9 83:13 92:23
  108:12 133:2,5,6
  135:24
**absolutely**  28:22
**absorbed**  16:23
**accept**  221:8,9,13
  221:15
**accepting**  100:8
  221:6
**access**  79:3,5 94:2
  96:8 102:11,24
  103:5,9 108:9
  125:8 126:11,14
  126:19 199:23
  200:7 207:7
  210:14 212:18
  214:10
**accessed**  100:19
  198:19 199:12,15
  199:22
**accessible**  125:22
**accessing**  101:25
  199:16 200:10
**account**  49:13
  76:2 78:21 104:16
  151:11
**accountant**  50:17
  69:2,15 85:22,25
  86:3 128:25 129:4
  148:15
**accounting**  27:8
  50:3 84:19 126:3

**126:9,9 127:3,13
  127:15 187:11,14
  214:8
**accounts**  176:18
  177:6
**accurate**  192:14
  192:16
**acknowledgement**
  43:6
**acquaintances**
  90:2
**act**  93:14
**action**  5:15 135:10
  176:22 210:19
  227:16
**active**  132:25
**actively**  160:24
**actual**  56:24 159:9
  162:6 163:6,7
**add**  22:16 108:6
  220:12,13
**added**  18:22
**adding**  22:4
**additional**  151:13
**address**  7:16
  83:17 84:6 104:11
  104:19,22
**addresses**  104:11
  104:23
**adina**  2:6 4:24
**adjusted**  163:4
  172:3,5
**administer**  3:11
**administration**
  69:23
**administrative**
  69:22
**advance**  202:16
**advice**  22:22 38:22
  39:11 207:22

**advise**  18:3
**advising**  24:15
**advisor**  22:8 41:10
  41:14 93:10
**advisors**  17:4
  19:25 21:2,11
  25:7,8 28:4,21
  29:13,15 57:19,22
  93:14,20
**advisory**  23:6,24
  25:7 177:13,19
**affiliation**  4:20
**afternoon**  121:11
**agenda**  135:8
**ago**  115:7 119:14
  120:11 152:11
  153:11 157:18
  202:13 203:2
**agree**  11:13 43:15
  100:10
**agreed**  3:5,20
  146:21 147:23
  175:6 186:7
**agreement**  6:11
  29:17 81:2 84:14
  88:10 99:17
  114:14,24 115:12
  115:16,21 116:11
  117:24 120:5,7
  121:13,21 122:20
  123:3,12 127:23
  130:7,9 131:11
  132:7 134:2
  138:19 140:6
  141:25 143:2,10
  143:24 144:5,13
  144:20,24 145:3,5
  145:7,8,17,21
  146:2,3,9,14,22
  147:6,18,22,24
  148:25 149:13,16

150:11 155:21 157:25 158:6,18 160:15 161:3,8 164:20 165:17,23 165:24,25 166:6 166:10,13,16 169:20 171:9 225:9,10,12

**agreements** 6:2 124:14 128:9 133:17 138:20 153:14 169:24

**ahead** 9:8 10:8 168:15 220:12

**al** 1:8 2:11 4:8

**alert** 75:9

**alevine** 2:8

**allegation** 203:20

**allegations** 208:15 210:19

**allocated** 177:22

**allowed** 54:25 55:2,4,7,9 222:13

**allowing** 105:6

**amended** 198:14

**amount** 31:17 47:11,18 51:8 53:18 67:11 85:13 148:18 149:20 154:3 161:14,22 161:23 162:2,4,20 163:6,7 172:3 173:24

**amounts** 151:17

**animal** 180:10

**announced** 95:21

**annual** 42:23,25 43:2,20,22

**answer** 9:8,11,25 26:6 46:11,14,16 54:17 55:10,14

63:9 70:8 116:20 124:20 125:2 130:16 175:12 198:9 215:20 218:23,24 219:4 219:14,15,23 220:16,18,21 221:10,11 222:17 222:23

**answered** 66:7 86:23 138:24 185:3,15 220:19 222:4

**answering** 9:19 101:14

**answers** 222:14

**anxiety** 62:13

**anybody** 13:25 63:24 181:14 190:25 207:21

**anybody's** 200:19

**anymore** 220:13 222:6

**anytime** 150:18

**apartment** 7:18

**appearance** 4:20

**application** 20:7

**applied** 20:15 217:14

**appreciate** 223:15

**approach** 46:5 207:6

**approved** 107:25 172:20 176:19,20 176:21

**approximate** 118:11

**approximately** 24:23 42:6 87:2 199:21

**archive** 133:12,14 133:17,23

**archived** 133:5,6

**archives** 133:2,4 133:10

**area** 35:5 125:20

**areas** 182:13

**arrangement** 29:14,23

**artificial** 20:17

**aside** 11:8 219:19 219:21

**asked** 52:22 66:19 163:25 164:15 169:21 208:23

**asking** 7:20 59:23 66:10 119:11,12 120:12 140:16 170:18,22 187:19 200:22 205:18,19 207:14 222:20

**aspect** 32:9,11

**aspects** 41:17

**assets** 53:24 54:5 55:17,21 56:2 136:9 137:13 177:22

**assist** 91:2

**assisting** 213:3

**assume** 96:15 143:11 144:2 145:25 160:14,15 160:17

**assuming** 64:4

**assumption** 221:14,19,22,24 222:3

**asterisk** 109:20,23 110:4

**attached** 157:7 191:16

**attachment** 155:25 157:20 191:22

**attempt** 221:9

**attend** 74:3 95:17 111:5 120:21

**attended** 95:19

**attention** 121:15 204:10

**attorney** 4:22,24 9:7 13:8,11 117:5 117:18 122:8 164:16 170:9 208:18

**attorney's** 207:21

**attorneys** 2:4,10 2:16 12:22 101:17 101:21,22 116:24 117:3,8 207:20 208:12

**audience** 108:14

**aum** 54:3

**authorized** 3:11

**automated** 20:7

**automatic** 220:2

**automatically** 217:13 220:25

**automation** 20:6

**available** 107:25

**avenue** 2:11

**avoid** 222:18

**aware** 45:25 54:23 104:14 105:9 139:24 140:6,9 141:25 156:14,18 201:7 203:16 211:7,11 215:7

**b**

**b** 225:2

**bachelor's** 14:4,11 15:12,13

**back** 19:17 21:4,6
25:6 26:9,11 27:3
27:8 28:3 31:15
56:19,21 57:7,15
57:22 62:20 66:10
66:12,16 69:8,10
71:16,24 79:9
85:4,6 88:16 91:8
91:16 92:23
121:10,12 129:25
132:12,15 133:14
135:4 146:11
152:11 155:11,18
165:10 171:12,14
172:23,25 173:12
174:6 178:6
180:12 183:16
188:9 193:25
199:19 208:7
209:16 210:12
**backdating** 160:12
**backed** 92:9 93:20
**backing** 93:3
**backup** 181:21
**balance** 151:11
**ballpark** 142:13
**bank** 15:3 46:24
47:3 49:13 75:16
75:19,25
**bankrupt** 57:21
**bankruptcy** 25:6
**banks** 47:5,7
**base** 74:2 88:18
**based** 64:2 99:22
99:23
**basically** 35:12
37:9,10 75:8,24
118:23 120:20
147:20 171:2
175:17 181:8
207:25

**basis** 27:21 131:14
**becoming** 28:18
**beginning** 30:8
173:13 174:17
179:25 180:13,23
**behalf** 158:21,23
**believe** 35:9 68:21
117:7 130:6,12
132:8 138:11,21
138:25 141:20
149:2 164:24
182:9,11 183:3,21
183:23 185:17,25
186:11,18 187:3
187:10 222:24
**believed** 220:21
**belong** 69:24
215:4
**belonged** 169:11
169:16 215:5
**belongs** 169:16
**berserk** 195:16
**best** 62:25 63:3
125:17 126:16,18
126:21 145:15,18
145:20,23 146:20
182:12 183:15
186:10 203:11
208:24 214:16,18
215:17 217:8
221:9
**better** 136:15
**big** 35:22
**bill** 82:5,6,8,8
83:25
**binershyn** 182:3
**bit** 34:18 37:13
115:24
**blood** 227:16
**board** 17:10,11,12
40:17,22 41:4

134:16,21 137:4,4
137:6,21,22 138:2
186:19
**boilerplate** 169:5
**books** 66:21
**borrow** 46:24
**borrowers** 107:4
**bottom** 48:23
149:19 166:21
167:12 181:20,22
181:25 195:12
216:16 217:19
218:25
**bought** 83:20
172:16,17 176:21
**box** 87:11,14
**break** 9:22 10:2
57:4,7 124:6
129:25 155:10,19
188:2 210:4
**brevet** 1:8 2:11 4:8
8:13 12:10 13:23
16:20,21 17:2,20
23:11,15 24:20,20
25:4 26:16 27:2
28:2,23 29:2 30:2
30:8 31:21 33:6
34:3 40:3,23 41:8
41:9 42:3,18
45:22 46:2,6,18
47:12,18 48:2,8,14
48:25 50:11 51:2
52:2,12 53:2,11,20
55:17,21,25 57:23
58:15,16,19,23
59:6,9,14,19 60:3
60:6 63:6 66:25
67:16 68:2,12,18
69:16,19,24 70:2,6
70:12,12,16,17,20
71:2 72:21 73:13

73:17 74:17,19,21
75:3,5,20 76:8,13
76:16,20 77:3
78:2,13,18 83:7,20
83:25 84:19,23
86:5,15,19 87:17
87:19 88:13,17
89:20 91:2,20
92:7,9 93:3,8,19
95:6,14,22 96:7,9
96:18,19 97:15
98:8 99:10,14
100:18 103:14,18
103:19 104:4,10
105:5,11,16 107:7
107:11,17 110:11
111:24 113:14,20
114:14,25 115:13
120:14 122:20
123:5,16,20,23
124:3,19 128:15
128:20,25 130:24
136:19 137:14,17
143:3,24 144:4
146:3,21 147:10
147:23 148:19
155:5,20 158:21
158:24 159:17
160:22,25 163:21
163:23 164:11,20
165:18 166:2,11
166:16,23 169:10
169:11,15,16
170:13 172:8,11
172:19 173:6,6,8
173:12 174:19
175:9 176:3 177:9
177:14,24 185:25
190:20 209:18,22
210:22 211:2,11
211:16 212:2,8,11

212:17,17 213:24
214:2 215:4,7,11
215:14,24 216:18
217:6 228:2
**brevet's** 30:17
45:23 47:21 52:6
58:7 74:13 82:16
82:19,24 83:9
101:25 102:8,12
102:23,25 103:6
104:15 106:24
124:13 170:4
215:12
**bring** 114:12
197:5
**bringing** 152:24
**broadway** 2:5
**brooklyn** 7:18
**brought** 152:20
**build** 140:18 141:8
**building** 37:15,18
38:20
**bum** 90:13
**business** 15:13
17:13 20:10 27:20
30:17 31:3 34:10
37:16 45:21 75:3
75:5 93:2,15,22
97:9 103:14 104:4
104:25 105:9
174:10 210:21
**businesses** 20:4,5
**buy** 76:25 82:8
164:2
**bypass** 218:2

**c**

**c** 2:2 224:2 227:2,2
**calendar** 110:25
**call** 35:23 43:22
44:10 90:3 119:8

**callahan** 13:18
134:16 138:18
191:10
**called** 7:7 14:25
15:5 17:2,4 40:24
41:2,3 46:25
80:25
**calling** 33:10 35:7
**cambridge** 27:11
65:5,10,24
**capacity** 8:13
**capital** 16:22 17:3
21:19 22:7,23
23:17 24:14,21
25:3,5 28:19
29:22,24 30:23
40:3 41:8,9 57:20
57:21 58:17 59:9
59:14,20 60:3,6
70:12,12 92:9
93:8 114:14,25
115:13 120:15
136:19 137:17
139:13 142:6
151:11 155:5
164:11,11,20
165:18 166:2,11
166:17 173:9,12
175:9,14
**care** 208:12
**case** 1:6 4:11 5:3
8:18 11:6 62:18
123:24 124:7,9
126:7,8 133:24
197:12 217:16
228:2
**cashed** 174:5
**cause** 91:20
137:24 154:9
**caution** 101:13

**ceases** 154:6
**central** 107:16
**certain** 69:24,24
69:25 74:24
108:17 121:17,21
151:5 161:10
186:8 221:16
**certainly** 171:15
184:7 217:2
**certainty** 116:20
**certification** 3:8
**certify** 224:4,8
227:9,14
**cessation** 159:22
159:25 160:3
193:6
**cetera** 113:23
**cf** 2:8
**change** 20:24,24
21:2,14,18,21 22:6
22:11,14,24 25:3,4
28:22,24 29:3
65:9 160:11
180:24 205:6
206:21 228:5
**changed** 20:25
21:13,17,20 22:19
23:7 24:17,18
26:20 28:20 31:22
85:13,16 87:10
100:9 181:3
**changes** 87:8
**charge** 19:11
27:21 39:5 107:11
112:15 183:9
**chart** 5:23 108:24
109:5,7,10 110:6
113:11 114:3,6,9
198:18,23 225:8
**chase** 15:2

**check** 12:13 50:7
53:16 76:15
147:19
**checked** 62:11
133:23
**checking** 11:14
**chief** 190:5,7
191:6
**choice** 218:4
**choose** 138:6
**christmas** 89:17
94:22 100:5
**circumstances**
172:13,15 173:2
**citizen** 8:15
**city** 74:4,11
**civil** 1:17
**claiming** 208:20
**clarification** 164:8
**clarify** 57:17
66:17 83:23
**clarifying** 171:21
**clear** 54:21 55:12
65:21 66:2 130:9
193:3
**cleared** 172:17
**clearly** 33:24
38:21
**click** 165:6,7
**client** 211:18
212:9,14
**client's** 214:3
**clients** 33:10,11,13
33:15 35:8
**close** 39:10
**cmg** 27:11
**coach** 55:3,9
**coat** 74:5
**codefendants**
209:6

**cold** 33:10 35:7
**colin** 2:12 5:11
  12:20
**colleague** 5:13
  13:15
**collecting** 194:9
**college** 14:3,5,8
**columbia** 14:6
**come** 16:25 17:8
  38:23 42:3 43:23
  43:24 44:17 57:7
  88:16 91:8 94:13
  100:4 104:20
  136:20,25 141:10
  155:11 162:5
  165:10 176:25
  185:6 209:16
  214:23 215:3
**comes** 76:20 86:9
**comfortable**
  221:20
**coming** 13:16
  218:10
**comment** 152:19
**commission**
  228:25
**committee** 109:12
  109:17,22,24
  110:5,8,11,20,25
  111:6,9,14,20
**committees**
  109:15
**common** 212:22
  215:16
**communicate**
  11:14
**communications**
  101:16 204:9
  205:2,13 209:10
**companies** 14:23
  22:23 23:16 24:10

24:15 40:14 47:6
  47:8 122:25
**company** 8:14
  14:22,25 15:4,6
  16:11,23 18:12
  19:9 20:2,23
  22:21 23:3 28:10
  29:9 32:16 37:13
  41:17,22 44:14
  45:20 49:17 58:16
  64:5 74:10,11
  86:8 98:2 105:25
  117:2 120:7 122:3
  122:6,15 129:12
  129:14,15 139:2
  141:7,9 145:12
  159:17 164:20
  165:17,23,25
  166:10 172:23,25
  174:4,9 179:24
**company's** 16:12
  117:8
**companywide**
  81:11
**compared** 84:20
**compensated**
  32:23
**compensation**
  28:19 161:13,17
  171:24
**competitors** 20:20
  20:22 47:21,25
**complaint** 93:16
**complete** 54:16
**completely** 116:8
**compliance** 41:17
  41:20,22 42:13,14
  42:19,23 44:5
  92:16 93:2,13,21
  97:3 108:8 112:24
  113:3 126:5,8

127:3,13,18,21
  172:17,20 174:22
  176:13,15,22
  214:7
**computer** 11:8
  14:21 15:18 37:17
  77:25 81:21,22,25
  82:18 83:19,24
  84:10 88:13
  100:19,20 102:2,7
  102:25 161:12
  162:3,7 163:5,8,9
  163:13,16,17
  164:2 170:3,4,7
  172:3 198:20
  199:13,17,22,23
  200:8,11,19 201:3
  201:8,10,12,17
**computers** 11:11
  15:20,21 16:5,7,8
  74:14 102:12
  195:5 213:24
  215:12
**concept** 150:7
**concerned** 97:2,8
**concluded** 223:25
**concludes** 223:19
**conditions** 43:16
**confidential**
  167:13,19,24
  168:3,10,12,20,25
  169:6 185:5,23
  210:22 211:3,13
  211:18 212:9,14
  213:25 214:14,19
  215:25 216:7,11
  216:15,19 217:2,7
  217:19,20 218:8
  218:13,14 219:2,7
  219:8,10 220:4,6,7
  221:2,3 222:25

223:7,8
**confidentiality**
  184:3,8 211:25
  213:8
**configured** 38:3
  76:21
**configuring**
  197:21
**confirm** 160:2
**connected** 75:20
**connecticut** 2:18
  105:17
**connection** 101:17
  123:23 129:17
  133:24
**consider** 46:8
  88:21 134:25
  140:12,17 163:24
**consistent** 30:24
  45:17 51:5 159:18
  192:9
**consistently** 56:10
**consult** 170:9
**consultant** 32:19
  32:22
**consultants** 32:6
**consulted** 26:2,12
**consulting** 15:3
  16:15
**contact** 34:12
  185:7
**contacts** 33:17
**contain** 211:18
  222:25 223:6
**contained** 213:25
  215:24
**content** 61:9
  190:18 191:13
**contents** 206:7
**context** 94:10

contexts 8:8
continue 83:3,7
  137:21
continued 36:13
continuously
  14:17 15:21 35:5
contrary 169:19
contribute 142:5
conversation 18:7
  90:11,15 94:19
  97:11 105:4
  130:14,19,23
  131:13,21 132:3
  152:15 159:19
  181:2,5 189:12
  206:17,20,23
  207:2,10,12,18,23
  207:24 208:2,6
  209:17
conversations
  30:7 61:6 79:25
  80:4 100:2 101:20
  101:23 131:4,25
  141:19 153:12,17
  190:17 196:6
  206:6,9,12 209:5
  209:21 210:16
copied 191:11
copies 129:14,15
copy 3:14,17
  123:2,13,17 128:5
  128:9,23 129:13
  132:6 143:23
  145:4,16,21 146:3
  146:9,10,22
  150:10,14 155:20
  157:24 158:5,17
copying 195:7
copyright 166:22
  166:25 167:5

corporate 15:6
  16:16 38:4 58:7
  136:24
correct 39:9 52:5
  56:16 58:22 84:11
  85:11 93:17,25
  113:5 114:3,9
  137:8,11 144:12
  160:10 166:6,13
  166:14,19 169:22
  193:23 224:9
correspondence
  211:17
cost 163:2
costs 48:18,20
counsel 3:6,17
  4:19 5:8,21,25 6:5
  6:9,14,18,22 7:2,6
  9:10 10:19 11:24
  54:12,22 56:25
  107:14 117:12,15
  117:21 124:7
  148:10 149:15
  156:18 210:15,18
  210:18 222:10
  225:19
counting 52:4
county 227:5
couple 12:11,21
  15:10 37:14 40:7
  89:10 171:16,21
  175:13
course 34:10
  94:10 157:3
  210:21
court 1:2,16 3:13
  4:10,16 9:13
  66:11
cover 155:24
covered 167:14

covid 89:15,16,22
  89:23
crappy 90:23
create 125:13
creating 107:12
  125:7 213:17
cunderwood 2:13
current 70:25
  191:16
currently 51:6
  204:11
cut 168:14 182:22
  193:25
cv 1:6 4:11
cyrulnik 2:4,7
  4:25 5:5,9 114:19

**d**

d 3:2 224:2 225:21
daily 27:21
dasilva 156:10
  157:5
date 1:11,18 5:20
  5:25 6:4,8,13,17
  6:21,25 7:5 71:5
  72:4 122:2 162:15
  164:3 174:7 228:3
dated 157:6 160:4
  164:21 165:18
  166:2,11,17 167:4
  188:22 191:10
  195:8 199:4,9
dates 160:11
davidow 17:19,22
  18:8 19:3 25:18
  25:18 28:6 33:5
  173:7,17 177:17
davidow's 19:15
day 23:21 35:17
  35:17,25,25 36:7,7
  36:12,12,17,17
  37:2,2 52:11,12

71:16,16,25,25
  79:15 80:7 111:2
  136:16,17,18,18
  164:4 180:2
  224:19 227:20
  228:22
days 3:16 100:17
  171:16,17 175:24
  205:25 206:3
dead 133:13
deal 37:19 46:6,8
  87:23 213:21,23
  217:2
dealing 207:20
deals 49:4 139:2
  211:6 213:19
  215:22
dealt 87:20
death 137:22
  154:7
december 95:2
decide 61:14,17,19
  72:13 175:18,20
decided 26:23
  38:6 71:11 79:11
  79:11 95:5 111:16
  175:7 178:9 180:3
deciding 32:13
decision 26:14,17
  111:24,24 112:2
  135:11
decisions 111:13
  111:23
declaration
  114:18
declared 25:6
defendant 1:15
defendant's
  198:13,19 209:11
defendants 1:9
  2:10 5:15

**defense** 101:18
**deferred** 161:13
  161:16,20,21
  171:23
**definite** 126:25
**definitely** 50:23
  116:19 178:24
**degree** 14:4
**degrees** 15:8
**delete** 76:5
**department** 108:8
  126:9 176:25
**deploying** 30:23
**deposed** 8:2,6,9,12
  8:24
**deposition** 1:14
  3:8,9,14 4:6,12
  9:4 11:18,21,25
  12:16,25 13:2,5,14
  209:15 222:9,16
  222:19 228:3
**derived** 119:20,22
**describe** 30:16
  41:21 47:20
**described** 185:20
**description** 225:6
**desilva** 130:23
**desk** 25:11
**desktop** 78:25
  79:2 81:25 83:20
  84:2 91:4 162:8
  162:10
**destroyed** 170:8
**detail** 116:5
  181:19
**details** 30:4 116:8
  209:9
**develop** 19:23
**developing** 24:5
**development**
  18:13 19:12

**device** 78:23
**devices** 11:10
**die** 138:15 143:18
**difference** 32:18
  35:22 60:9 69:18
  69:23 70:19
  159:20 194:7
**different** 14:23
  15:19 19:9 30:11
  36:11,12 45:19
  59:11 69:16,19
  70:11,15,20 81:22
  104:18 109:14,15
  118:3,5 125:9,14
  137:13 149:19
  169:6 174:16
  178:25 180:10
  221:11
**direct** 204:8
**directed** 210:18
**directing** 34:11
**direction** 23:7
  56:8,15
**directly** 37:12,14
  85:24 86:2 148:15
**director** 31:9,10
  36:4 40:3
**directors** 18:25
  19:8 40:17,23
  41:4 137:5
**directory** 107:21
  107:21,24 108:4
  132:25
**disability** 137:23
  138:16 154:7
**disappeared** 24:9
**disclose** 209:8
**disclosing** 101:16
**disconnecting**
  96:8 207:7

**discuss** 13:13,24
  43:25 55:17 95:8
  124:7,9 135:7
  136:8,11 137:12
  137:16 185:22
  208:14,18
**discussed** 10:8
  53:10 136:13
  137:7 143:13
**discussing** 129:24
  141:14 152:23
**discussion** 97:13
  118:2,13,17,25
  131:10 136:23
  152:2,19 153:6
  179:3 209:2
**discussions** 119:21
  154:11 155:4
**disks** 170:6
**dispute** 91:18
**disseminated**
  212:10
**dissolved** 23:4
  25:5
**distinct** 168:10
**distinction** 104:9
  104:20
**distributed** 107:23
**distribution** 28:17
  49:7,10,18 51:11
  108:2 118:10,11
  139:12 181:20,25
**distributions**
  49:15,16,20 50:10
  51:2,25 53:17
  85:3 138:14 142:9
  172:22,24 181:22
**district** 1:2,2 4:9
  4:10
**divided** 19:20

**division** 25:17
**doctor** 74:12
**document** 81:4
  106:20 107:2
  108:13,23 113:7,7
  114:17 115:4
  116:4,7,22,24
  129:13 145:9
  148:9 152:5,17
  158:12 167:19
  169:10 170:19,20
  170:23 171:4
  184:9 193:5,12,23
  196:18 197:6
  216:14,18,23
  217:4
**documentation**
  187:12,15,17
**documents** 10:10
  10:10,15 11:5,7
  12:15 43:3,14
  45:5 101:2,6
  102:6 107:9,10,12
  107:22 108:9
  153:19,20 164:12
  187:25 203:21,22
  211:6,10 213:25
  214:19,23 215:2,3
  215:4,8,9,13,15,17
  215:23 216:24
  226:2,3
**doing** 18:2 27:3
  32:23 34:14,18
  38:19 45:18 48:3
  53:3,14 73:13,16
  75:13 87:25 88:18
  96:22 97:2,8
  174:9 184:5 202:6
  213:16
**dollars** 142:15

**double** 147:19
**doubt** 123:6,9
    144:9,10 147:15
    157:16 192:23
**doug** 13:21 15:11
    18:4,8 19:3 23:10
    26:14,23 27:19
    28:6 29:7 30:7
    33:4 34:23 35:3
    41:7 44:19 46:15
    58:20 62:24 79:13
    79:14,14 87:3,22
    88:2,23,25 89:18
    97:12 99:4,16
    100:2,7 105:21,24
    106:10 107:13
    109:6,11,21
    111:22 112:2,4
    115:14 117:14,16
    118:20 119:25
    125:22 126:5,19
    129:18 130:14,20
    134:17 141:14,17
    152:3 153:17
    159:2,4 173:7,16
    173:21 174:12,18
    177:8,17 179:8,20
    180:22 181:12
    186:3 187:3
    204:10,12 205:2
    205:12 206:6,10
    206:13,21,24
    207:3,11,13
    208:15 210:17
**doug's** 19:13
    89:10 119:8 159:3
**downloaded**
    100:19
**dozen** 199:20
**drafted** 116:14,16
    116:18,25 117:7

**drastically** 85:16
**drawing** 116:21
    194:15,17
**drawn** 104:9
**dried** 23:2
**drive** 125:19
    126:23 127:8,8,14
    127:17,20 212:17
    214:7,8 215:16
**drives** 126:2,4,12
    126:15,20,25
    127:4 214:9,13
**due** 147:11 150:2
    150:24
**duly** 7:8 224:5
    227:11
**dumain** 2:7 5:4,5
**duration** 40:14,18
    65:23 66:25 70:16
    70:17 113:21,22
    178:12,18,19
    179:5
**durations** 64:24
**duties** 31:15 182:6
    182:10 183:19
    186:8

**e**

**e** 2:2,2,8,13,19 3:2
    3:2 6:6,15 7:3
    38:4 74:18,21
    75:15,18,20,21
    76:3,6,8,9,11,13
    76:16 77:6 78:2
    78:13,21 81:12
    82:17,24 83:9,13
    83:16 84:6 86:20
    92:10 93:4 94:3,8
    94:11,12,12,16
    103:12,17,25
    104:2,5,10,10,11
    104:15,16,19,22

    104:23 123:5,7,10
    123:20,23 124:3
    132:10,12,15,25
    133:5,7,14 155:24
    156:9,15,19,22,23
    156:25 157:4,10
    157:12,13,15
    188:14,22 190:14
    190:17 191:9,12
    194:25 195:12
    199:3,8 204:5,19
    204:24 206:5,7
    211:17 212:4
    217:6,11,12,17
    219:3,25 220:24
    221:15 223:5,7
    224:2 225:2,11,13
    225:14,17,21
    227:2,2
**earlier** 172:22
**early** 20:16 72:2
    77:23 174:6
    175:24 189:4
    208:8
**ease** 175:11
**easily** 210:14
**easy** 132:21
**edit** 108:18,20
**educational** 14:3
**effect** 3:12,15
    130:14 202:11
    221:22
**effective** 160:8,13
**eight** 35:21
**either** 47:10 52:20
    129:23 190:14
    193:9
**electronic** 11:10
    124:12 128:5,19
    207:7

**electronically**
    150:15
**eleven** 14:24
**eligible** 20:5 49:10
**eliminated** 23:25
    24:4
**else's** 115:19
**employed** 14:17
    14:19 58:10 72:2
**employee** 28:9,14
    29:8 32:19,24
    33:8 43:2 72:3,10
    91:23 94:3,4,9
    97:14 111:25
    122:7 125:19
    126:24 130:10
    131:15 139:3
    146:25 153:3,13
    192:3,7 194:12
**employee's** 94:11
    94:15
**employees** 22:3
    23:4 25:24 27:24
    31:20,25 32:6,8,12
    92:23 111:19
    180:18 191:17,22
    200:11 212:18
**employment** 14:14
    15:17 23:25 24:4
    43:16 71:18
    122:24 128:15,20
    128:24 130:3
    159:16,22 160:3,7
    193:7
**enabler** 190:3
**encrypted** 214:19
    215:19 216:3
**encryption** 212:3
**ensure** 212:9
**ensuring** 213:7

entail 18:16
enter 137:18
entertain 47:12
entities 40:23
69:17,19,25 70:2
70:21 93:18
113:15 137:14
entitled 121:17,21
139:25 140:3,7,10
142:3 151:4 209:4
222:14
entity 21:8 41:13
57:18 58:9,12,13
67:10 138:7,11
equipment 162:3
equity 66:24 67:3
67:6,11,16 68:2,8
68:12,18,22,25
errata 228:1
esq 2:6,7,7,12,13
2:18
estimated 50:16
50:18
et 1:8 2:11 4:8
113:22
ethics 97:9
evaluation 45:23
events 205:17,19
everybody 53:7
74:6 89:24 115:18
exact 23:21 32:4
49:8 71:5 72:4
97:19 139:11
150:5 154:2
205:17,18 218:19
exactly 28:16 32:8
39:9 41:3 55:15
81:3 94:23 98:14
98:25 131:3
153:12 205:25
218:2 219:3

examination 7:11
223:24 225:23
227:10,12
examined 7:10
example 117:25
exchange 196:3
execute 92:2
211:12
executed 157:8
exh 225:7,8,9,10
225:11,12,13,14
225:15,16,17
exhausted 209:4
exhibit 5:19,24 6:3
6:7,12,16,20,24
7:4 106:20 114:18
118:5 121:12
147:7 149:18
155:22 156:3,6
157:19 164:25
165:3,5,8,12,19
166:15,22 167:15
188:10,14 191:8
194:23 198:11
199:4,9,20 200:20
200:24 204:3
225:5,5
exhibits 155:22
184:19 225:4,19
exist 16:17 65:13
existence 66:14
existing 65:15
expand 22:2,12,15
expanding 48:18
expenses 181:17
experience 190:21
expires 228:25
explain 58:6
extensive 206:17
extent 9:9 90:14
141:19 148:12

external 74:3,9

**f**

f 3:2 227:2
face 69:5
facilities 27:4
31:16 36:14
fact 63:13,15,19
80:21
facts 139:17
failing 92:2
fair 16:5 25:25
29:5 34:15,16
39:8 42:9,20
43:21 51:2,4 63:6
68:23 69:20,21
101:19 147:11,12
153:16 187:20
fairfield 2:18
fall 98:15 205:24
familiar 116:4
124:23
familiarity 46:10
families 89:13
family 89:12
far 19:20 34:10
37:17 38:25 59:7
83:10,14 89:18
112:3 113:17,19
132:13,15 133:14
172:24 180:12
203:21 212:24
213:20 216:13
217:3
fattaruso 2:4 4:25
5:5,9
fcs 17:4 19:24 21:2
21:11 25:7,8 28:4
28:20 29:13,15
57:19,22
february 95:23
166:3,12

federal 1:17
feel 90:13 140:22
163:21
feeling 90:12,22
189:21
feet 34:4
felt 141:8
fidelity 176:17
177:4,5
fiduciary 182:6,10
182:12,14 183:4
183:12,19,24
184:25 185:12,17
186:2,9,12 187:6
187:10
fifth 2:11 33:3
198:14
fight 106:10
210:15
figure 19:18 52:8
file 144:2 212:22
filed 4:9 208:11
files 86:12,16
88:12 100:19
108:7 125:21
filing 3:7
final 135:11
finance 15:14,16
47:8
finances 136:19
137:7 155:6
181:17 182:16
183:10
financial 211:5
financials 182:16
182:20,24 183:5
financing 47:10
find 30:22 49:22
98:19 191:16
finding 33:10
49:24

fine   57:5
finish   9:18,19
  222:8
finished   168:17
finishes   15:24
fire   111:25
fired   25:24 91:23
  206:20,24 207:4
firing   32:12,13
  105:6 111:18
firm   4:14,17 15:3
  32:25 90:9 140:18
  173:14 175:15,16
  177:19 184:5
  190:3 191:2
  201:16,19 203:13
  203:18,18 217:4
firm's   201:11
  203:10
first   7:8 9:25
  16:23,25 17:5
  18:24 19:2 21:13
  25:9 30:8 57:19
  155:23 164:9
  189:6,9,10,15,16
  196:14 224:5
firsthand   196:24
fitzpatrick   2:13
  5:14
five   210:4
fix   197:12
fixed   38:7
flag   147:23
flashing   195:16
fleissner   188:15
  189:22 204:16,20
  205:10
floor   2:5
focusing   52:6
foggiest   58:8

folder   124:12
  128:16,20 133:12
  133:18,24 213:17
folders   108:17,18
follow   147:17
  207:21 208:5
following   42:17
  167:16
follows   7:10
footer   217:6,13
  220:2,2,25 222:24
force   3:15
foregoing   224:8
forever   16:6
forgot   56:14
form   3:21 26:4,19
  28:12 30:14,21
  31:5,24 32:21
  33:19 34:21 37:8
  39:16 40:20 41:19
  42:11 43:6 45:14
  46:13,21 47:15,23
  48:6,11 49:3,18
  50:15 52:19,24
  53:5 54:12,24,25
  55:8,23 56:5,13
  57:25 59:2,22
  60:13 61:13,23
  62:6 63:8,22
  64:10,20 67:13,20
  68:15,20 70:4,23
  71:14 72:15 73:11
  75:23 83:5,22
  84:16 92:5,12,19
  93:24 94:6 95:25
  96:14 97:5 98:5
  98:11 102:14,19
  103:16 104:13
  106:8,13 107:19
  110:13,18 112:6
  112:18 113:25

119:17 120:9,17
121:24 122:13
125:5,11 128:12
129:10 133:9,20
135:16 137:10
138:23 139:19
141:16 143:5,20
144:8,18 146:6,16
147:3 154:17
162:23 168:6
169:3,5,13 170:16
170:23 171:6
175:4 177:11
179:15 183:14
186:6,16,24 187:9
190:24 192:12
194:4 196:23
198:7 205:15
208:22 211:21
212:6,20 213:10
214:22 216:21
218:17 219:13
220:11 222:13
formal   41:20,21
  42:16,19,22 44:4
  45:12 81:14
  170:23 171:4
  190:4,6
formalized   43:6
formed   55:5 178:7
forming   178:7
forth   38:5 153:15
  227:11
forward   188:19
  195:7 204:8,21
forwarded   197:8
forwards   195:20
founders   23:5
founding   17:9
  122:15 134:17,25

four   18:19 19:22
  23:5 40:25 41:5,6
  134:24 135:6
  152:24 153:2
  157:17 174:14
fourth   173:10,17
  191:23
frame   48:12
framework   38:12
francis   14:5
free   27:19
friend   13:15 88:21
friends   89:12,24
  89:25
front   11:9 19:16
  69:4 188:12
fulfill   183:19
fully   157:8
function   127:12
functions   126:25
  204:12
fund   30:12 60:17
  61:19 62:4 63:6
  63:12,16 64:8,16
  64:18,24 65:13,17
  65:18,22 66:3,14
  66:19,23 85:4
  113:22 177:12,18
  178:12,18,19
  179:5
funding   22:22
  23:2,16 24:8,10
funds   59:11 60:10
  60:11,15 62:20,22
  62:25 64:14 65:6
  172:10 176:3
  178:3
further   3:20 28:4
  209:9 222:7 224:8
  227:14

**g**

gap  14:12
gathered  107:23
general  56:15
  131:6 152:19,19
  205:19
generally  128:8
  148:24
generated  220:25
generic  216:24
getting  30:24 49:6
  49:9,11 50:11,25
  53:18 73:14 75:21
  84:22 138:13
  143:17 145:13
  156:23 157:14
  187:20 190:11
gift  82:13,21
give  79:20 82:5,7,8
  83:25 117:25
  135:24 147:6,10
  158:10 191:7
  221:11 223:12
given  36:11 39:10
  58:5 203:21
  223:20 224:10
  227:13
giving  38:21
  218:23
glance  62:14
glasses  10:13
global  92:10 93:4
  93:20 94:8 132:14
  211:22
go  9:3,8 14:2,7
  23:5 30:11 44:2
  45:4 46:23 47:2
  49:24 50:2 69:25
  70:12 72:17 73:19
  74:10,12 76:19
  81:5 85:24 89:11

89:16 91:7 92:23
94:12 111:13,19
115:23 120:24
121:12 132:16,19
133:15 163:18
168:15 169:7
201:16,18 202:7
213:3 220:12
goes  28:3 37:18
  38:25 49:12 86:2
  114:5 133:13
going  4:4 7:20 9:3
  9:13,17,24 35:18
  35:19 36:15 43:25
  47:7,9 56:3 57:2
  57:10 58:5 72:7
  72:23,25 76:15
  82:13,21 83:2
  91:11 94:8 97:20
  101:13 106:19
  108:7 114:12
  118:25 121:2,5
  132:12 134:20
  135:9 138:13
  144:4 147:21,25
  148:3,9,13,16
  152:12 155:8,13
  155:21 158:13
  161:18 162:25
  163:6 165:9 188:4
  188:17 189:2
  194:22 196:17
  197:4,5 200:20
  204:8,21 206:16
  209:12 210:7
  215:9 217:14,23
  220:15 222:2,5
goldman  15:7,9,9
  16:8,9
good  4:2 7:19 57:3
  79:19 88:20 91:8

92:25 93:2,14,22
121:11 152:17
188:2 189:21
197:22
goodbye  81:12
gopher  195:3
  197:18
gotten  51:24
great  21:12
ground  96:23
grounds  92:3
group  122:15
  172:21
grown  37:13
guarantee  214:25
guess  19:10 30:22
  32:2 34:25 49:23
  50:22 62:7 79:7
  83:12 107:14
  190:6 191:5 217:5
guessing  36:22
guy  33:5
guys  18:3 29:18
  37:5 175:7,17

**h**

h  7:7 225:2
half  157:18
hand  69:4 227:20
handbook  43:2
  91:23
handbooks  153:14
handle  106:22
  188:18
handled  87:17
  88:9 190:21
handling  204:21
  205:10
hang  74:5
happen  44:11 71:4
  71:19 153:9 185:6

happened  23:22
  35:15 43:17 98:17
  98:17 160:20
  169:8 173:25
  205:9,20 211:9
happening  71:12
happens  195:25
happy  18:2 87:16
hard  32:4 69:5
  79:20 90:17
hardcopy  128:3
harris  41:25 42:18
  112:23 191:10
  192:17,20 204:6
  204:15,25
harris's  45:6
haul  30:10
hear  7:21 11:21
  33:23 53:2,21
  71:22 95:11 96:4
  105:21 115:25
  184:10 200:25
heard  61:7 64:3
  91:22 101:8
  105:13 106:17
  189:7,9,10,13,16
  211:2
hearing  110:16
  196:14
held  1:17 4:12
help  18:3 38:2
  197:15
helped  140:18
  141:8
helping  39:21
helps  109:3
hereinbefore
  224:11 227:11
hereunto  227:19
hey  30:9 46:6
  88:20 118:21

169:7 208:19
**hi**  74:6 157:7
  188:17 217:17
**high**  14:20 180:17
**higher**  163:4
**hire**  80:17 111:25
**hired**  25:24 32:15
  32:22,24 36:6,8,10
  36:19 117:5
**hiring**  25:14 32:12
  32:13 36:22
  111:18
**history**  14:3 47:5
**hit**  195:15
**hold**  57:11 121:6
  148:2 174:2 210:8
**holding**  40:18
  122:3,6,25 138:25
  145:12
**holdings**  1:8 2:11
  4:8 58:15,20,24
  59:6 70:12 113:21
  114:15,25 115:13
  120:15 136:20
  137:17 159:17
  166:17,23 228:2
**home**  195:7,13
  201:15 217:23
  218:10
**honest**  77:4 116:3
  186:20
**hooked**  78:12,22
  78:24
**hopefully**  147:25
  148:3
**hospital**  195:8,13
  196:10
**hour**  57:2 155:9
**hours**  13:6
**house**  89:17 106:6
  128:3,17 150:11

201:14 213:25
**hr**  190:10 192:16
**huh**  88:24
**hypothetical**
  222:19,21

**i**

**iacovacci**  1:3 2:5
  2:17 4:7 5:2 33:3
  34:2 40:2 94:19
  95:5 96:5,19,22
  97:2,8 98:9 99:11
  99:15 100:18
  105:10 112:8
  134:17 188:16
  189:2 192:5 195:6
  196:7 200:6 204:7
  228:2
**iacovacci's**  95:21
  102:2,7 105:17
  188:18 189:7
  198:5 199:12,17
  199:21 203:17
**iacovaccis**  201:2
**ian**  2:7 5:4
**idea**  20:10 23:2,18
  24:5 36:20 40:21
  47:16,19 50:10
  58:8 76:3 77:11
  77:21 79:19 83:12
  105:8,12 114:2
  116:16 127:9,16
  132:9 164:17
  170:14 192:13,15
  193:2 194:3 205:7
  205:22 210:25
**ideas**  153:19,22
**identification**  5:20
  5:24 6:4,8,13,17
  6:21,25 7:5
**igor**  194:25 195:2
  195:21,23 197:9

197:16
**iii**  114:15,25
  115:13 120:15
  136:20 137:18
  155:5 164:21
  165:18 166:17
**immediately**
  148:12
**impact**  72:6
**implies**  168:11,12
**importance**  45:5
**important**  9:16
**impression**  48:17
  147:17
**improperly**  55:5
**inaccurate**  192:25
  193:12
**include**  22:2 38:10
  169:23 171:25
  186:21
**included**  37:3
  219:2
**including**  188:16
  204:7
**income**  85:7
**incorrect**  138:21
**independence**
  34:15,19
**independent**  34:22
  34:23 93:13
  203:23,25
**independently**
  37:5
**individual**  8:13
  67:5 126:7
**individually**  5:16
  117:4
**informal**  97:23
  162:18
**information**
  103:22 107:6

168:13 184:6
  210:22 211:3,13
  211:19,25 212:10
  212:14,24 213:8
  214:2,3,5,15
  215:25 219:2
  222:25 223:2
  226:2,3
**initial**  134:15
  156:13
**initially**  180:8
**input**  135:10
**inside**  175:9
  177:14
**insisting**  221:18
**install**  83:8
**installed**  82:16,23
**instituted**  42:19
**instruct**  209:8
**instructed**  9:10
**insurance**  24:10
**intelligence**  20:17
**intended**  193:15
**intentionally**
  94:15
**interact**  33:21
  34:2,7
**interacting**  34:11
  35:6
**interest**  59:6 66:24
  67:4,7,11,16 68:2
  68:12,18,23 69:2
  106:2 138:20
  177:23 178:12,17
  179:5,10,12
**interested**  17:24
  101:20 174:11
  227:17
**interests**  68:9 74:4
  85:4

**interfere** 10:13
**intermediate**
  64:23 65:23 70:17
  178:12,19 179:5
**internal** 95:22
**internet** 20:6
**interpret** 122:18
**interpreted** 122:7
  122:9
**interrogatories**
  198:14
**intrigued** 17:13
**introduced** 25:12
**introducing** 191:8
**invalid** 177:3
**invest** 62:9 172:9
  172:22 173:18
  175:8 177:16
**invested** 172:25
  173:22,23 174:9
**investigated** 104:3
  104:24 177:21
**investigation**
  103:13,20
**investing** 172:18
**investment** 22:8
  27:12 31:18 41:10
  41:13 59:10 64:22
  65:3 66:20,20,22
  93:10,19 109:12
  109:15,16,18,22
  109:24 110:5,8,10
  110:20,25 111:6,9
  111:13,16,20
  172:10 173:5,8,9
  173:11,15 174:2,3
  174:13 175:6,16
  178:4,5
**investments** 27:6
  97:21 137:13
  173:3 174:17

175:14,25 176:2
  177:7,15,19
**investor** 211:19
**investors** 107:3
  210:23 211:4,14
**invite** 209:7
**invoice** 162:7
**involuntary** 154:8
**involve** 210:17
**involved** 25:13,23
  32:9,11,16 36:21
  39:14,20 41:16
  45:22 96:7,11
  105:19,24 106:3
  125:7 135:4
  140:19,21 141:4,7
  141:18 197:16
  205:12
**involvement** 26:16
  102:10
**involving** 205:13
**ipad** 76:19,20,23
  76:24 77:6,11,19
  78:4,5,22 79:6
  81:23,24 82:20
  83:9 86:11,13
  91:3 132:16 162:9
  162:11
**iphone** 78:10,16
  79:3,4 82:20 83:9
  91:3 162:9,11
**issue** 8:10 172:2
**issues** 91:3 94:20
  136:16 171:21,22
  196:21
**item** 101:4
**items** 135:10,13
  143:16 161:10
  163:20,22,23

**j**

**j** 7:1,7 8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  107:1 108:1 109:1
  110:1 111:1 112:1
  113:1 114:1 115:1
  116:1 117:1 118:1
  119:1 120:1 121:1
  122:1 123:1 124:1
  125:1 126:1 127:1

128:1 129:1 130:1
  131:1 132:1 133:1
  134:1 135:1 136:1
  137:1 138:1 139:1
  140:1 141:1 142:1
  143:1 144:1 145:1
  146:1 147:1 148:1
  149:1 150:1 151:1
  152:1 153:1 154:1
  155:1 156:1 157:1
  158:1 159:1 160:1
  161:1 162:1 163:1
  164:1 165:1 166:1
  167:1 168:1 169:1
  170:1 171:1 172:1
  173:1 174:1 175:1
  176:1 177:1 178:1
  179:1 180:1 181:1
  182:1 183:1 184:1
  185:1 186:1 187:1
  188:1 189:1 190:1
  191:1 192:1 193:1
  194:1 195:1 196:1
  197:1 198:1 199:1
  200:1 201:1 202:1
  203:1 204:1 205:1
  206:1 207:1 208:1
  209:1 210:1 211:1
  212:1 213:1 214:1
  215:1 216:1 217:1
  218:1 219:1 220:1
  221:1 222:1 223:1
  224:1 225:1 226:1
  227:1
**jamie** 1:18 4:17
  227:7,23
**january** 115:2
  160:8,21 161:3
  164:21 165:19
  166:18 171:9

**jason**  2:7 114:18
**jen**  204:20 205:10
**jennifer**  188:15
  189:22 204:16
**jfitzpatrick**  2:14
**jillian**  2:13 5:13
**jimenez**  2:21 4:14
**job**  19:17,18 36:11
  41:23 190:11
  191:4
**john**  1:15 4:6 5:16
  7:15 157:7 173:16
  191:24 193:16
  223:20 224:15
  228:3,21
**johnny**  36:19
  38:23 77:10 90:25
  96:15 108:22
  195:12,20 198:2
  200:25 202:22,23
  203:6 213:11
**johnny's**  38:18
**joined**  15:11 16:20
  17:14 24:25 25:21
  173:14
**joining**  18:5
**joins**  11:2
**joint**  112:2
**judge**  3:13
**july**  80:10,12 87:2
**june**  191:11

**k**

**k**  50:5,7 69:14
  85:21 86:4,9
  129:5,8,12 148:11
  148:20 161:19
  180:15,17 226:4
**karina**  182:2
**keep**  23:15 48:17
  162:12,14 180:15
  180:17,18 221:18

**kept**  34:4 169:15
  180:15
**kicking**  34:5,5
**kids**  89:11
**kind**  37:21 38:5,7
  44:5 47:10 71:17
  103:18 104:15
  116:4 127:5
  152:18 178:4,5
  180:11 181:19
  189:25 216:23
  217:10
**kinds**  153:9
**knee**  196:11
**knees**  90:14
**knew**  94:24 99:19
  99:20 145:11,13
  161:17 163:6
  189:20 197:11
  208:4
**knoakley**  106:16
**know**  7:24 9:5,23
  11:3 12:20,22
  19:21 23:14,20
  24:19 25:20,21
  26:21 31:22 32:4
  32:7,7 33:8,12,14
  33:15,16,20 34:22
  37:11,25 39:11
  40:5,6,9,10,12,13
  40:15,16,24 41:2,3
  41:11,15 42:4,5,12
  42:23 43:9 45:9
  45:15 46:7 47:17
  47:24 48:7,8,14,16
  48:20,22 49:5,21
  50:4,12,20 51:12
  52:8,9 53:15
  56:23 58:2,5,9,12
  58:15,19 59:3,7,9
  59:12,25 60:5,8,9

60:16,19,22,24
61:2,4,7,15,21,24
62:2,3,7 63:4,9,11
63:17,18 64:11,12
65:11 67:2,3,9,11
68:16 69:18 70:5
70:24 71:7 72:16
73:12 75:16 77:13
77:24 80:24 82:14
83:10,11 84:12
85:8,15,19 86:7,8
88:20 90:19 91:19
92:8,14,22 96:16
98:12,14,14,16,20
99:8,16,18,19,19
99:20 100:11,16
100:21,22,23
101:4,5,21 102:5
103:20 105:5,16
106:18,25 107:5,8
107:9 108:20,22
109:17,18 110:10
110:23 111:4,8,12
111:15,21 112:3,7
112:13,14,19
114:3,5,7,8 115:6
115:19,23 117:10
117:16,22 120:10
120:22,23 124:4
124:15,16,17
125:2,6 126:4
127:4 128:4,13
130:17 131:23
132:17,17,20,23
132:24 133:14,21
135:19 139:7
142:12,14,20,24
143:2,8,9,21 144:2
144:22,25 145:6,9
145:14 147:4
149:5 150:13,16

158:8,9,25 159:3,8
159:12 160:17
164:14,16 165:2
167:3,8,11 169:14
170:17 174:7
175:5,12 177:2
178:3,5,8,10,20,25
179:2 180:25
186:17 188:11
189:8,14 191:5,6
191:18 193:10,14
193:14,22 194:4
196:9 197:15
198:8,9,11 199:15
202:3,21,21
203:15 204:13
205:25 208:5,8,9
209:5 210:24
212:11,12,13,16
212:25 213:12
215:21,22 216:13
216:22 217:3,22
217:25 218:18,22
219:3,18 222:11
223:3
**knowledge**  20:21
  63:2,3 70:2
  106:14 113:4
  126:16,18,21
  145:16,18,20,23
  146:20 196:24
  214:16,18 217:9
**known**  124:20
**knows**  54:19 198:8
**koyfman**  195:2,2
  195:21

**l**

**l**  3:2,2 127:7 224:2
**lan**  36:19 37:3
  39:24 77:8,10
  90:25 96:15 103:8

108:22 195:12,20
197:8 198:2,4
200:25 201:5
202:22 203:6
**lan's** 38:17 39:6
213:12
**landlord** 8:10,16
**language** 169:19
169:20 221:16
**laptops** 38:10,11
39:5,21
**large** 37:18
**larger** 20:4
**late** 148:2 208:8
217:18
**lawsuit** 100:5,22
208:15 209:2,6,11
**lawyer** 13:15
80:17 81:6 87:19
**lawyers** 12:18
**learn** 95:4 98:8
100:25
**leave** 25:19 29:14
29:15,19 30:11
99:18 122:14
148:16
**leaving** 30:10
80:22 81:15 86:25
88:5 161:18
**lecturing** 220:22
**led** 18:5
**lee** 87:24 88:4
131:5 156:9 157:5
164:17 167:2,8
171:3 189:25
**lee's** 191:4
**left** 29:23,24 32:3
45:9 82:4,17 83:3
83:14 85:10 90:9
122:15 153:10
169:24

**leg** 94:25
**legal** 2:22 4:15,18
99:24 107:13
127:8 178:8
223:22
**lending** 5:17 31:2
106:25 225:7
**letter** 126:24
127:4,11,14,17,20
156:11 157:9
160:2,4 163:20
167:4 170:10,13
171:18
**level** 35:19 218:4
**levine** 2:6 4:23,24
7:12 15:24 21:12
26:5,8 48:13 54:7
54:11,22 55:7
56:18 57:5 59:24
66:5 69:7 91:6
102:21 114:20
120:24 134:9,12
148:8 155:8 156:5
165:9,13 187:24
209:12 210:3
222:10 223:11
225:24
**liability** 164:19
165:17,22,25
166:10
**light** 195:16
**likes** 53:7
**limited** 108:14
164:19 165:17,22
165:25 166:10
194:10 214:10,14
**limits** 68:8
**line** 48:23 167:14
181:20,22,25
226:8 228:5

**lines** 116:5 132:4
**list** 6:23 191:16,22
199:19 225:16
**listed** 112:8,23
**listing** 198:18
**literally** 202:25
**litigation** 91:19
101:15 156:16,20
**little** 34:11,18 57:7
104:17 115:24
163:3 174:7
**llc** 1:8 2:11 4:8 5:8
6:2 58:16,17,20,24
59:7 66:25 84:13
92:9 93:9 113:21
114:14,24,25
115:12 121:13,20
122:16 124:14
127:23 130:4,11
134:2 136:9,20
137:3,7 138:20
139:15 141:3,22
141:24 142:2,6
146:24 148:25
150:4 155:5,6
164:21 165:18
166:2,11,13,16,17
169:20,24 182:6
182:10,20,21,25
183:5,12,20
185:13,19 187:7
225:9,10 228:1,2
**llc's** 183:17
**llcs** 97:15 98:3
131:16 139:2
177:22,24 181:15
181:17 182:14
183:25 184:13,15
184:23,25 185:10
186:3

**llp** 2:4,10
**llp.com** 2:8
**loading** 147:8
**loans** 20:5
**location** 212:17
**locking** 213:18
**log** 78:2 201:25
202:24 203:18
**logged** 202:4,18
**logging** 200:18,24
201:2,8,17 203:13
203:17 211:22
**logistics** 188:18
**long** 14:10 23:15
24:15 30:9 77:20
131:13 174:25
189:24 202:13
**look** 77:14 94:15
108:24 113:10,13
114:20 115:8
132:9,10,20,21
144:13,20 145:7,8
146:2,17 148:6
151:19 165:5
176:10 198:10
**looked** 49:11,13
140:6 144:23
145:3,7 146:8,13
165:20 171:18
**looking** 57:16
108:23 114:9,17
116:2 121:13
134:2
**looks** 88:20 109:10
115:11,18,20
116:8 159:2,4
**lot** 20:6 24:9 34:13
34:14,17 50:12,13
153:18,21 172:18
184:5 222:11

**low** 180:17

**lug** 197:23

**lunch** 74:10 79:15
80:6,10 87:3
141:17

**m**

**machine** 202:9

**machines** 197:19
197:21 202:7

**mai** 87:24 88:4
131:5 156:9 157:5
164:17 167:2,7
171:3 189:25
191:4

**mail** 2:8,13,19 6:6
7:3 38:4 74:18,21
75:18,20 76:3,6,8
76:9,13 77:6
78:13,21 81:12
83:16 84:6 86:20
104:10,11,15,16
104:19,22,23
123:7,10,20,23
124:3 132:25
133:5,7,14 155:24
156:9,22,23,25
157:4,10,13,15
188:14,22 190:14
190:17 191:9,12
194:25 195:12
199:3,8 204:5,19
204:24 206:5,7
217:6,11,12,17
219:3,25 220:24
223:5,7 225:11,13
225:14,17

**mails** 6:15 75:15
75:21 76:11,16
78:2 82:17,24
83:9,13 92:10
93:4 94:3,8,11,12

94:12,16 103:12
103:17,25 104:2,5
104:10 123:5
132:10,12,15
156:15,19 157:12
211:17 212:4
221:15

**main** 47:21

**maintain** 22:15
211:24

**maintained** 21:23

**maintenance**
202:6,10

**making** 26:14,17
84:19 111:24
175:16 221:20

**manage** 27:22,23
65:18 66:21

**managed** 65:12
66:19,22

**management**
15:16 27:5,11
31:16 40:4 41:9,9
53:24 54:6 55:18
55:21 56:3 58:17
59:10,14,20 60:3,6
65:5,10,25 70:13
70:20 92:9 93:9

**manager** 16:9
59:10

**managing** 18:25
19:7 31:9,10 36:4
40:3 113:21

**manhattan** 15:2

**march** 72:19 73:3
73:5 89:7 195:8
198:23,24 199:4,9
199:13

**mark** 13:18 15:11
18:5,9 19:3 23:10
25:17 26:14 27:19

29:7 30:7 33:4
34:23 35:3 41:7
44:19 46:15 60:7
79:13,14 80:4
87:23 88:2,21
99:2,16 100:2,7
105:21 107:13
109:11,23 112:2
115:14 117:20
118:20 119:25
125:23 126:6,19
130:15,20 134:16
138:18 152:3
153:17 155:21
177:15 179:8,20
180:22 181:12
186:4 187:4
191:10,15 204:12
205:3,12 206:7,10
206:13,21,24
207:3,11,13
208:14 210:17

**mark's** 19:14
89:17 183:10
204:10

**marked** 5:18,23
6:3,7,11,16,20,23
7:4 216:6,8,10
226:7

**marketing** 107:14

**marking** 216:12

**marriage** 227:16

**master's** 14:6,8
15:15

**materials** 45:2

**math** 53:16

**matter** 4:7 101:18
227:18

**mean** 19:17 23:18
24:3 32:11 41:25
43:11 53:8,13

63:15 69:12 75:2
81:20 83:12 87:13
88:19 97:17,19
99:23 108:4
112:12 114:3
122:10 129:11
134:23 135:22
140:15,20 143:6
148:2 168:3,7,9,14
172:16 175:5
178:2 182:14
186:18,25 193:20
201:13 202:25
211:5 215:13
218:13,14 221:10

**meaning** 33:4
45:16 46:9 49:12
49:15 51:14 97:24
102:16 135:21
136:2 150:8
159:21 167:4
174:25 189:11
194:15

**means** 73:12
112:14 154:23
185:15 193:21

**meant** 141:22
221:21

**mechanics** 136:17
136:18

**mechanism**
177:14

**media** 4:5 223:21

**medical** 94:20
196:21

**meet** 11:24 17:8
25:9 110:20 135:6

**meeting** 13:7,11
43:23,25 44:10
45:2 61:18 62:2
95:17,19,23 111:6

111:10 135:22
136:3,21 137:6
141:18
**meetings** 18:4
34:8 41:2 53:9,20
55:16 61:20,25
74:3,9 95:15,15
110:16 118:24
119:24 120:5,21
120:23 135:4
136:5,9,12,25
155:4
**member** 40:14,17
40:22 97:5 98:3
109:14,16,21,24
110:4,7 113:22
120:14 131:16
134:21 135:14
137:21 141:22
142:2 150:2,3,24
150:25 151:6
154:5,6 181:15
182:5,10 184:13
184:15,16,17
185:10 187:7
**members** 106:2
109:11 134:16,18
134:25 155:5
175:15,22 185:13
185:18 186:3
**membership** 59:6
178:11,17 179:4,9
179:12
**mentioned** 17:12
139:5
**mess** 57:23
**message** 195:14
**messages** 75:9,9
**met** 18:8 110:19
**methods** 15:5

**michelle** 58:21
117:17
**michigan** 14:25
87:15 89:11
**mid** 23:20 24:13
**middle** 98:12
182:23
**midnight** 102:3
**million** 50:22
142:15
**mind** 86:22 122:14
159:21
**minds** 100:10
**mine** 77:20
**minimum** 47:11
**minute** 12:9 57:6
155:10 210:4
223:12
**minutes** 12:11
57:8 91:7 111:9
135:25 136:4,7
158:10
**miracle** 77:19
**mishear** 73:20
**mission** 173:11
174:18 175:2
177:8
**mistake** 167:10
193:4,22
**mobile** 37:11,23
38:9 39:2
**model** 38:20
**modeling** 20:12
38:25
**models** 20:11
38:21
**modifying** 37:19
**money** 46:24
48:18,21 105:6
106:5 161:11,19

**monitor** 27:15
67:6 68:25 211:17
**monitored** 177:5
**monitoring** 27:5
27:13,17 31:18
176:18 213:20
**monitors** 34:5
163:2
**month** 79:18
153:24
**months** 22:13
25:20 48:21 89:10
154:3 160:18
161:6
**monticciolo** 13:21
95:21 109:6
137:25
**morning** 4:3 7:19
25:10
**move** 36:15,15,16
36:17 66:8 136:14
147:21 195:5
200:23 209:7,14
221:12
**moved** 72:19
197:19
**moving** 137:12
**mutually** 117:9

**n**

**n** 2:2 3:2 7:7 224:2
225:21
**name** 4:13,23 7:13
16:12 17:18 20:25
21:8,10,13,14,20
57:18 65:4,9
67:10 228:2,3
**named** 99:23
**nature** 184:8
185:5
**nay** 136:2

**nda** 92:2
**ndas** 211:12
**near** 201:5
**necessary** 32:25
178:10
**need** 7:23 37:20
111:13 179:16
191:18
**needed** 18:3 32:14
35:24 38:6 83:17
106:5 171:4
202:12 205:12
**negotiate** 80:18
161:23 162:20,24
163:23 179:18
180:11
**negotiated** 161:8
163:21 164:4
**negotiating** 149:12
149:20 161:2
171:8
**negotiation** 116:11
116:13 119:4
150:20 151:23
162:13 163:25
164:6,7 171:20
179:11
**negotiations**
117:24 172:7
179:20 180:4
**neighborhood**
173:20
**net** 53:22 151:9
**network** 102:25
103:6 107:17
124:13,24 125:3,9
125:14,16
**never** 25:8 51:24
66:22 79:7 85:3
86:22 91:22
105:13 106:17

135:23 143:13,15
172:2 177:3
178:20 187:19
190:7 195:17
211:2
**new**   1:2,19 2:6,6
4:10 7:9,18 15:2
17:13 18:12 22:17
22:20 24:6,14
35:19 48:20 81:25
120:7 152:20,24
162:15 163:8
227:4,8 228:1
**nobody's**   47:9
**non**   134:21 135:14
**noncompete**   29:18
129:19 152:4,8
153:7,23
**noncompetes**
152:20,22
**noncompetition**
151:20
**nonconfidential**
212:24
**normal**   34:10
**notary**   1:19 7:8
224:22 227:7
228:25
**notes**   57:17
**notice**   76:4 81:15
94:3 176:20
**notified**   177:4
**notwithstanding**
164:10 169:18
172:4
**number**   28:15
32:4 118:16,17,21
139:12 225:6
**numbers**   118:11
118:14 119:5,20
119:22 120:2

**o**

**o**   3:2 7:7 224:2
**oath**   3:12
**object**   9:7 32:20
41:18 42:10 45:13
46:12,20 47:22
48:5,10 49:2
50:14 52:18 53:4
54:11 55:5 62:5
63:21 64:9,19
67:19 68:14,19
71:13 73:10 83:4
125:10 129:15
137:9 147:2
162:22 186:5,15
186:23 187:8
222:13
**objection**   26:3,18
28:11 30:13,20
31:4,23 33:18
34:20 37:7 39:15
40:19 47:14 52:23
54:24,25 55:8,22
56:4,12 57:24
58:25 59:21 60:12
61:12,22 63:7
67:12 68:4 70:3
70:22 72:14 75:22
83:21 84:15 90:20
92:4,11,18 93:23
94:5 95:24 96:13
97:4 98:4,10
102:13,18 103:15
104:12 106:7,12
107:18 110:12,17
112:5,17 113:24
119:16 120:8,16
121:23 122:12
125:4 128:11
129:9 133:8,19
135:15 138:22

139:18 141:15
143:4,19 144:7,17
146:5,15 154:16
168:5 169:2,12
170:15 171:5
175:3 177:10
179:14 183:13
185:2 190:23
192:11 196:22
198:6 205:14
208:21 211:20
212:5,19 213:9
214:21 216:20
218:11,16 219:12
220:10
**objections**   3:21
**obligation**   160:16
187:4
**obligations**   147:18
**obtained**   102:6
**obviously**   39:10
69:15 129:14
217:20
**occasional**   173:5
176:5,6
**occasionally**   135:6
**october**   1:11 4:4
71:8 100:17 102:2
204:6 205:11
227:20
**odd**   167:9
**office**   19:16,17
27:4,8 31:15
39:13,20 50:2
70:6,11 73:20
74:7 75:13 76:15
87:12 96:9 101:9
103:21 136:14
163:14,16,18,19
164:5 176:23
183:16 184:11

195:3 200:19
206:2
**officer**   190:6,7
191:6
**offices**   70:11,15
**official**   43:21
110:15 190:2
**offshore**   60:10,15
60:16 61:8,19
62:4,20,21,25
63:12,16 64:7,13
**oh**   104:7 167:14
**okay**   7:24 9:20,21
10:2,18 11:4 16:3
23:22 29:11 30:6
39:12 62:10,16
63:11 79:2,9
86:23 94:18
106:24 109:9
113:10 114:11,13
118:22 119:8
121:19 134:14
146:19 149:24
155:3 158:16
165:15 166:21
168:16 175:2
179:10 191:8
194:24 223:11
**old**   14:11 77:11,13
77:17 163:17
170:4,8 176:8
**once**   14:20 15:20
43:13,17 44:11,13
45:18 72:7,17
75:11 76:18
202:14
**ones**   77:5 85:8
88:2 127:2,5
178:6 184:16,21
**ongoing**   204:11

onshore  60:10
64:16,18 65:6
op  17:11
open  148:17
157:19,23 165:11
165:14
operating  190:5,7
191:6
operations  71:16
71:25 183:17
196:12
opinion  26:22,24
64:2,6,8 130:2
135:24
opinions  63:24
opportunistic
112:9,15
opportunities
30:23 46:25
opportunity  17:23
105:10
oppose  32:24
opposed  214:3
option  97:25
optional  217:15
options  172:20
orally  190:14
order  1:16 58:3
211:12
ordered  163:5
org  108:24 113:11
organizational
5:22 109:5,7
136:16 225:8
original  3:9,17
18:11 22:15,18
23:2,7,18
originally  19:15
22:12 28:2,4
29:12 100:8

orlando  2:21 4:14
outcome  227:17
outer  68:8
outside  13:10 62:8
89:19 172:10
173:8,11 174:18
175:2,14 176:3
177:8 200:19
202:22 212:10
216:14
overall  48:3
oversaw  36:16
64:21 65:4 203:4
203:7
oversee  18:13
overseeing  19:12
owed  84:13
owned  58:20
ownership  118:3,6
149:19,21 168:12

**p**

p  2:2,2 3:2 7:7,7
p.m.  91:11,16
121:5,10 155:13
155:18 188:4,9
210:7,12 223:19
223:23
package  81:19
82:15 84:8,13
page  108:24,25
109:2 113:13
114:21 115:9
118:4 134:8,9
149:18 166:21
167:16 198:17
225:5,23 226:3,8
228:5
paid  28:9,14 29:7
73:14 143:2,3,10
151:17 161:20,25
163:9,12 171:23

181:12,14
pandemic  75:12
76:18
paperwork  128:14
128:24
paragraph  154:25
162:4 164:9 172:4
paraphernalia
87:15
pardon  72:24
126:13 175:19
parent  58:13,16
part  32:16 38:10
42:22 43:15 45:2
81:18 82:2,5,10,14
82:21 130:10
140:23 162:13
168:23 187:5
participation
122:25
particular  101:3,4
145:9 153:20
particularly  9:15
152:21
parties  3:7 100:5
209:10 212:2
215:24 227:15
partner  192:3,7
partners  66:25
70:16,17 155:5
164:11,21 165:18
166:2,11 186:19
parts  102:11,16,24
103:5,8 125:9,14
125:16
party  8:17,21
173:10,17 215:5
passing  206:18
password  201:20
212:3 214:20,24
215:8,10,18 216:3

pattern  56:7,24
paul  1:3 2:5,17 4:7
5:2 24:25 25:9,11
25:21 27:20 28:6
33:3,5 34:11,17
35:3,8,10 40:2
41:7 44:20 63:11
64:7,13 89:25
90:5 95:8,12
99:24 105:6
106:11 115:14
117:11 118:20
119:25 134:17
152:3 153:17
173:14 174:5
186:4 188:16,18
192:5 193:8 194:5
195:11,23 196:7
197:11 204:7,10
204:12 205:2,13
206:4,10,13,16,19
206:24 207:3,11
207:15 208:19
209:18
paul's  96:8 100:9
204:21 207:7
209:22 210:2
pay  50:16,17 77:3
78:18 84:2 132:4
160:17 180:18
paying  84:20 85:7
180:3,13
payment  139:8
143:15,18 150:23
161:12
payments  81:17
84:23,25 85:2,5
121:17,22 122:17
139:5,16,22 140:2
140:8,10 142:3
144:5 145:11

150:2 151:5,8,13
**pays** 59:8
**pc** 163:19 201:18
  201:25 202:19
  203:9,14,17
**pcs** 203:10
**pdf** 108:25
**pending** 9:24
**pennsylvania** 2:12
  8:11
**people** 32:5,14
  36:8,12 37:15
  38:2,20 44:16
  53:10,21 62:8
  75:7 104:21
  107:14 108:6,18
  108:19 152:20,25
  167:22 182:17,19
  187:12 188:15
  202:23 204:6
  215:22 217:22
  218:9
**people's** 39:21
**peoples** 39:5
**percent** 31:14,15
  31:19 37:3 58:20
  58:21 67:16 68:2
  139:10,10
**percentage** 118:3
  118:5 149:19,21
**percentages**
  179:18
**perform** 186:8,9
**performing**
  204:11
**period** 24:2
  153:24 154:3
  171:16 172:9
**permanent** 137:23
  138:15 154:7

**perpetuity** 138:14
**person** 22:4 36:10
**personal** 75:25
  76:3,6,9,23,24
  78:15,21 84:6
  86:12,17 94:16
  103:12,25 104:2
  104:11,16,19,21
  104:23 172:10,21
  175:14 176:3
  217:12
**personally** 156:14
**personnel** 69:24
  69:25 173:6
**perspective** 97:3,9
**pertained** 216:25
**phone** 11:14 38:7
  38:7 62:11 78:6,7
  78:8,9 81:24
  132:16 133:7
  195:15,24 197:12
  200:3,7
**phones** 11:11
  37:25 38:2 39:3
**phrase** 168:24
**physical** 128:2
  170:7
**physically** 85:20
**picked** 164:4
**pieces** 36:11
**pittsburgh** 2:12
**place** 74:5 107:17
  212:9 224:11
**plaintiff** 1:4,16 2:4
  2:16 5:2,6,10
  200:3
**plaintiff's** 4:21
  5:19,23 6:3,7,12
  6:16,20,24 7:4
  198:13 225:4

**plan** 36:16 143:17
**planning** 75:11,13
  79:17 95:12 96:5
  100:8
**platform** 20:3
**play** 195:14,15
**player** 20:19
**please** 4:19,22
  7:13 9:18 43:4
  57:11 83:23 121:6
  191:16 204:8,12
  210:8 222:22
**plugged** 197:19
**plugging** 195:24
**plugs** 34:6
**plural** 184:16
**plus** 38:6 47:7
  126:6
**point** 17:2 19:24
  22:7 24:11 25:18
  36:14 51:20 52:9
  52:12 105:25
  154:24 171:2
  188:19 190:22
  217:10
**pointing** 153:20
**policies** 45:25
**portion** 21:5 26:10
  56:20 66:15 69:9
  171:13
**position** 177:16
**positive** 42:7
  130:25 131:3
**positively** 53:7
**possession** 184:9
**possibility** 96:18
**possible** 37:20
  68:17 124:2,5
**post** 2:17
**potential** 107:3
  182:17,19

**practice** 93:2,15
  93:22
**pre** 5:18,23 6:3,7
  6:11,16,20,23 7:4
  89:15,16 172:20
  176:21
**premise** 221:6,8
**prepare** 11:17,20
  13:2
**prepared** 129:7
**preparing** 13:5
**present** 2:21
**presentation** 5:18
  106:25 225:7
**president** 17:11
  59:13,16,19 60:2,6
**presumably** 19:8
**presume** 129:12
**pretty** 20:14 39:8
  45:17 87:4 95:16
  162:14
**previous** 15:17
**primarily** 16:15
  39:2
**principals** 17:9
**prior** 58:5 66:10
  161:13,16,21,25
  163:9 199:4,8
  200:23 204:19
**private** 8:15
  103:22
**privy** 181:10
  206:3
**probably** 21:17
  31:14,18 32:3
  50:2 77:14,23
  87:14 90:14
  132:19 133:21
  142:23 171:16
  179:22 197:10

**problem** 50:20
62:12 154:21,25
197:11,14 198:5
**procedure** 1:17
197:14
**process** 20:7 42:16
43:12 44:3 45:11
71:10 79:10,12,23
80:8 87:5 120:19
208:5 213:13
**produce** 129:7
146:21 147:23
148:3,11
**produced** 155:20
**profit** 28:17 49:6,9
49:17 138:13
**profitability** 52:7
53:10
**profitable** 48:4,9
48:15,19,25 49:4
52:13,16,17 53:14
**profits** 28:7 53:22
151:9 181:18
186:22 187:5
**program** 14:8
**progress** 125:21
**prohibited** 217:25
**project** 24:8
**prolonging** 222:18
**properly** 38:3
**proponents** 20:17
**proprietary**
167:13,18,24
168:3,9,11,21,24
168:24 184:3,8
185:5,23 214:2
215:25 216:7,11
216:15,19 217:3,8
217:19,21 218:8
218:13,14,25
219:7,9,10 220:4,6

220:8 221:2,4
223:2,9
**protect** 152:14
153:8
**protected** 107:20
108:3,4,12,14
213:22 214:24
215:8,10,18 216:3
**protection** 184:4
**protocols** 38:4
**provide** 10:5 20:3
22:22 183:15
187:15
**provided** 137:24
181:24 187:12,16
**psychological**
140:25 141:5,6
**public** 1:19 7:9
224:22 227:7
228:25
**pulling** 147:7
**purchase** 176:5,13
176:24
**purchases** 176:6
**purely** 140:25
**purported** 98:9
99:10,14
**purpose** 129:10
153:6
**purposes** 92:17,22
92:25 93:21
103:14 104:4
105:2
**pursuant** 1:16
**put** 37:19 66:17
85:3 114:11
133:11,12 152:14
164:13,14,16
169:21 175:9
192:14,17,24
194:2 213:18,21

219:21
**putting** 69:4
219:19

**q**

**qualify** 146:23
**question** 7:22,23
9:6,8,24 11:23
15:24 21:4 26:7
26:19 28:12 29:21
30:14,21 31:5,24
32:5,21 33:19,24
33:25 34:25 37:8
39:16,18 40:20
41:12,19 42:11
45:14 46:13,16,21
47:15,23 48:11
49:3 50:15 52:24
53:5 54:2,5,9,10
54:13,15,17,20,21
55:10,13,13,14,15
55:23 56:5,13,14
56:17 57:25 59:2
59:22 61:13,23
62:6 63:8,22
64:10,20 66:6,7,12
67:13,20 68:15,20
69:5 70:4,9,23
71:14 72:15 73:11
83:5,10,22 84:16
92:5,19 94:6
95:25 97:5 98:5
102:14,19 103:16
103:24 104:13,17
106:8,13 107:19
108:16 110:13,18
112:6,18 113:25
116:20 119:17
120:9,17 121:24
122:13 124:21
125:5,11 128:12
130:18 133:20

135:16 137:10
138:23,24 139:19
141:16 143:5,20
144:6,8,18,19
145:15 146:6,16
147:3 154:17
156:13 158:4
162:23 166:8
168:6 169:3,13
170:16 171:6,12
175:4,13 177:11
178:22 179:15
182:8,23 183:14
185:3,15,16 186:6
186:16,24 187:9
190:24 196:23
198:7 199:11
200:24 205:5,15
208:22,23 211:21
212:6,20 213:6,10
214:22 216:21
217:5 218:17,20
218:21,23 219:5
219:13,14,16,20
219:22,24 220:16
220:17 221:10
222:4,15,17,23
223:4 226:8
**questions** 7:20
55:6 101:14
135:17 148:18
226:7
**quickly** 20:5

**r**

**r** 2:2 3:2 7:7 224:2
227:2
**read** 10:9,14,16
21:3,6 26:8,11
43:4,5,14 56:18,21
66:9,11,12,16 69:7
69:10 107:21,24

108:5,13 121:18
121:25 122:2,5
148:25 150:17
154:19 156:25
158:8,25 171:11
171:14 189:19
**reading** 101:2,6
134:14 149:6,9
158:12
**ready** 134:13
148:21,22 157:21
158:15
**real** 72:6 74:16
177:18
**realize** 221:23
**really** 17:25 32:7
38:11 45:3 47:16
74:15 75:17 90:19
108:25 110:14
116:3,5 120:18
143:8 154:18
164:7 173:4
177:25 178:2
180:9,9 208:16
209:3 223:14
**realm** 34:19
**realtime** 14:25
**reason** 10:4,9,12
16:7 93:12 139:14
144:9,10 147:15
154:6 175:10
178:7 179:2,2
192:23 228:5
**reasons** 141:5,6
178:8
**recall** 12:20 28:8
28:16 29:4,20,25
30:4,15 43:19
52:3 53:13 60:25
88:9 90:18 91:21
92:6 93:5,6 95:3

95:20 96:2,3,6,24
97:6,10,22 98:22
98:24 99:2 101:10
104:22 105:3
110:16 115:16,21
116:3,5 117:11,14
117:20,23 118:2
118:17 119:3,4,21
119:24 123:14
125:25 127:7,10
127:11,17,20
128:7,22 129:20
129:21,23,24
130:13,19,22
131:2 136:22
137:2 141:13
143:14 149:6,9,12
149:15,20 150:17
150:20 151:23
152:2,7,23 153:5
155:3 156:23
157:14,17 158:20
159:7,8 170:18,20
170:22 173:21
178:14 179:3,19
187:14,19 189:18
190:13 196:3
199:16,18,23,25
200:2,6,9,10,17,18
202:2 203:11,13
204:22 205:5
206:11,12 209:17
209:21 210:16
212:4,7 213:16
**receive** 75:8 85:20
139:5,8,9,12 204:9
210:22 211:13
**received** 148:19
206:5
**receiving** 85:9
211:3

**recess** 57:12 91:13
121:7 155:15
188:6 210:9
**recognize** 156:7
221:25
**recollection** 58:3
120:13 125:18
131:7,18,20 189:2
203:23 205:16
208:10,25 215:18
**record** 4:4,21 7:14
9:7 10:8 11:15
21:6 26:11 54:21
55:12 56:21 57:11
57:15 66:2,11,16
69:10 91:12,17
120:25 121:3,6,10
148:10 155:14,18
171:14 188:5,9
210:8,12,14
223:17 227:12
**recording** 92:24
**records** 92:24
**recruit** 18:6
**redeploy** 136:14
**reed** 2:10 5:12
10:21,25 12:6,8,18
**reedsmith.com**
2:13,14
**refer** 46:15 200:3
204:25
**reference** 157:8
**referred** 154:25
**referring** 66:4
**refers** 164:19
165:16,23 166:9
**reformed** 179:24
179:25 180:12
**reforming** 180:7
**refrain** 11:13
101:15

**refresh** 188:25
**refreshing** 157:22
**refrigerators**
195:4
**refusal** 221:9
**refuse** 148:13
**regarding** 46:2
155:6 156:22
189:12 207:15
210:19
**registered** 22:8
41:10,13 93:9,19
**regular** 95:14,16
**reinvested** 49:16
49:17 85:6 142:10
**relate** 153:18
**related** 11:6 62:17
88:18 91:3 101:14
128:15,20,24
160:2 227:15
**relation** 156:15,20
**relationship** 64:13
113:14,18,20
179:7
**relationships**
114:4
**relative** 187:13
**relay** 92:10 93:4
93:21 94:8 132:14
211:22
**releases** 162:16
**reluctant** 24:11
**remain** 35:12
**remained** 35:13
**remember** 8:22,25
12:23 24:22,25
30:6 43:10,12
44:22,24,25 61:8
61:10 77:4 81:3
82:4 90:10 94:22
97:19 99:9 101:7

104:6 106:11
108:15 109:13
116:7,10,12,14,23
117:3 118:7,8,12
118:13 120:13,18
120:19,20,21
130:7 131:9,12,17
131:19,20,21,24
132:2 133:22
137:6 139:11
144:15 145:24
150:5,6,19 152:13
152:16 153:11
154:2,11 159:3
171:7 172:6,6
175:10 176:16,23
178:13,15 190:16
202:5,13,14,24
**remote**  9:15
**remotely**  4:13 8:6
100:18 198:19
199:17,22 200:8
200:11,24 201:2,8
201:17,25 202:4
203:13,17
**removal**  137:24
**removed**  137:25
**removing**  96:8
**repeat**  7:23 69:6
166:7
**rephrase**  52:25
136:10 140:5
**replied**  157:3,10
157:12,13
**reporter**  4:16 9:13
66:11
**reporting**  228:1
**represent**  4:25
5:10,14,16 113:19
**represented**  10:18

**represents**  109:19
**request**  148:10,14
148:17 187:22
200:3 204:9
**requested**  191:15
226:2
**requesting**  200:7
**required**  35:17
44:16 92:21
**requirements**
42:15
**reserve**  209:13
**reserved**  3:22
**reserving**  209:15
**resign**  138:6,25
140:8 141:3
**resignation**  137:23
138:5
**resigned**  138:9,11
139:3,4,21 140:4
140:10
**respective**  3:6
**responding**  190:13
**responds**  195:23
**response**  6:19
225:15
**responses**  198:13
**responsibilities**
31:13 35:17 73:6
141:11 183:12,24
184:25 185:18
186:2,12 194:11
**responsibility**
36:2,18 37:2
38:14,17,19,25
39:2,7 182:12,15
183:4,10 184:7
185:4,12 186:9
187:6,11 194:20
213:12,15

**responsible**  126:6
**restate**  26:7
**restricted**  125:17
126:3,4 127:2
195:15
**restrictions**  125:8
125:13,24 127:6
**restructure**
105:25
**result**  22:25
**retained**  223:22
225:19
**retire**  71:11 72:13
79:11,12 95:5
98:2 105:7 159:11
189:3 193:6 197:4
206:16
**retired**  71:2 73:5
73:20,22 77:22
80:7 84:23 88:17
90:24 102:22
103:4 124:19
131:15 149:7
160:23 171:2
192:2,6,10 193:5,8
193:17 194:3,5,8
**retirement**  79:10
80:18 81:18 82:11
84:8,13 87:17
95:9,22 100:9
121:18,22 129:18
154:8,15 159:9
188:19 189:7
190:21 204:21
205:11
**retiring**  72:11
79:21 81:18 95:12
96:5 97:12,13
130:3,10 144:14
144:21,24 145:4
145:20 146:4,13

146:24 159:6,11
191:2 196:20
209:19
**return**  43:5 170:5
170:7
**returned**  170:6
**returns**  30:24
37:20
**revealing**  208:17
**review**  9:2 10:14
12:15 94:2 182:16
182:20,24
**reviewed**  12:24
27:20
**reviews**  43:2
**richmond**  227:5
**right**  10:10 17:3
18:20 21:9 38:24
39:25 41:10 51:6
52:5 53:18 66:25
68:9,24 70:7
76:20 82:11 84:9
86:20 87:17 88:5
92:17 94:20 107:7
109:12 110:5
113:3,15 115:5,14
116:18 123:17
126:20 129:5
132:9,11,22 141:3
141:5,25 144:12
145:13,17 148:6
153:4 158:2,14
164:22 169:21,24
171:10 174:5,19
174:22 175:2,22
184:13 187:12,15
188:23 192:3,18
194:13 204:17
214:11,15 216:4
217:21 219:11
220:2

**rights** 209:13,16
**risk** 30:25
**road** 2:17
**robert** 106:15
**role** 18:11 19:14
  19:14,15 23:6
  26:13 31:12 33:9
  35:12,25 36:2
  40:11 45:6 54:23
  102:23 189:25
  213:7
**roles** 19:9
**ron** 17:19 23:10
  25:17 173:7,16
  174:8,12 177:17
**room** 10:24 11:2,6
  11:10 12:7,19
**routinely** 107:2
**rules** 1:17 9:3
  202:21
**rulings** 226:7
**run** 137:4 176:12

**s**

**s** 2:2 3:2,2 225:2
  228:5
**sachs** 15:7,9,9
  16:8,9
**safe** 145:25
**saint** 14:5
**sake** 209:14
  222:15
**salaries** 180:2,3,13
**salary** 52:4 72:6
  161:20 179:21
  180:5,14,15,22
  194:10,16,17
**sales** 112:9,16
**sat** 35:4 201:13,15
**save** 124:13 128:9
  132:6,24 133:16

**saved** 105:5
  107:16,20 128:6
  128:16,21
**saw** 86:4 94:11,11
  141:24 154:3,21
  164:25 166:6,13
  166:15 184:19
  189:17 199:3
  214:23
**saying** 81:12
  123:11 131:15
  137:5 139:21
  193:13 204:25
**says** 44:6,7 75:16
  100:22 109:5,7,21
  109:23 110:4,6
  134:15 137:21
  154:5 157:7
  159:16,22,24,25
  166:22 167:12
  188:17 190:5
  191:15 192:2,21
  193:16,19 194:14
  195:13 198:12
  204:8,15 217:17
  217:23 222:24
**sba** 20:4
**schermerhorn**
  7:17
**school** 14:20
**scope** 182:7
**scott** 2:18,19 5:7
**screen** 114:23
  121:14 148:7
  155:23 194:23
**scroll** 115:9
  191:21 195:11
  198:17,22
**sealing** 3:7
**search** 94:7
  123:19,22 132:14

**searches** 156:15
  156:19
**sec** 42:14 44:7
  103:13,20 104:3
  104:25
**second** 120:25
  147:6 149:24
  155:24 158:13
  159:24 164:8
  165:22 191:7
**secretary** 17:10
**section** 121:15,16
  134:5,11 149:23
  149:25 150:21
  151:4,19 153:24
**sections** 198:19
**see** 10:10 49:11
  62:10 76:4 89:6
  106:21,23 108:19
  109:20,25 110:24
  112:9 113:11
  114:17 115:9
  118:4 121:16,20
  133:5,6,10,12
  134:18 137:20
  148:6 150:4
  151:20 153:25
  154:4,9 156:11
  160:4 165:16
  167:13,15 188:12
  188:20 191:13,19
  191:24 192:7
  195:9,18,19,21,24
  198:12,15,20,25
  199:5,6,14 200:4
  204:13 205:3
  211:10
**seeing** 62:13 89:18
  150:6 159:7,9
**seeking** 22:23
  23:17

**seen** 89:7 116:6
  204:19
**sees** 69:15
**segmented** 36:9
**segregated** 212:23
**segregation** 213:4
**semiretired** 71:17
  194:2,7,8,19
**semiretirement**
  35:20
**send** 43:3 74:25
  76:13 81:11,14
**sends** 195:11
**senior** 16:9
**sense** 108:12
  152:15 179:8
  182:15 184:6
  185:20 186:7
**sent** 35:17 107:3
  211:8 216:18
  217:7,12,17
  220:23
**sentence** 137:20
  138:5 154:15
  159:24 164:9,13
  164:18,19 166:9
**separate** 34:18
  117:12,15,21
  139:17 203:22
**separation** 6:10
  81:2 88:10 122:20
  123:3,12 130:7,8
  131:10 132:7
  138:19 145:8
  146:22 147:22,24
  155:20 156:11
  157:8,25 158:6,18
  165:24 171:9
  225:12
**serve** 137:22

**server**  92:10 218:4
**servers**  96:9
**service**  3:16 23:24
   177:13
**set**  39:21 77:5,8,10
   77:12 79:8 104:15
   108:21 114:4
   178:3 179:17
   198:14 212:3
   227:11,20
**setting**  39:5
**settings**  75:14
**setup**  78:9
**seven**  202:25
**share**  85:2 151:9
   167:21 168:20
   185:21
**sharing**  28:7
**sheet**  228:1
**sheree**  41:25,25
   42:16 43:7 112:23
   126:8 191:10
   192:17,20 204:5
   204:15,18,25
**sheree's**  41:23
**short**  40:14,17
   66:25 70:16
   113:20,22 175:12
   178:18 189:23
   202:24
**show**  37:20 106:19
   111:3 113:7
   187:25 194:22
   196:17
**shown**  165:3
**shows**  113:14
   193:4,6
**sick**  90:6,8
**side**  45:21 197:17
**sign**  43:4,15 44:23
   80:20 120:7 128:8

164:6 179:17
**signature**  115:10
   115:11,15 118:4
   159:4 227:23
**signatures**  115:19
**signed**  3:10,12,15
   29:18 80:21
   107:25 115:4
   122:19 123:11
   127:24 133:17
   146:11 149:10
   150:18 154:20
   158:21,23 169:11
**signing**  120:20
   122:22,23 170:10
**similar**  109:23
**simple**  198:9
**simplicity**  175:11
**single**  176:12
   217:11
**sit**  50:3 201:5
**sitting**  25:11
**situation**  139:6
   206:4
**six**  22:13 25:20
   35:21 47:6 79:18
   202:25
**slept**  14:10
**small**  15:3 20:3
   31:16 87:14
   173:15 174:13
   190:12
**smaller**  22:23
   23:16 24:15
**smith**  2:10 5:12
   10:21,25 12:6,8,18
**smooth**  87:5
**software**  76:22
**sold**  174:4
**solutions**  2:22
   4:15,18 223:22

**solving**  198:5
**somebody**  38:6
   87:24 94:13 98:20
   101:6 136:15,15
   153:10 192:15
   197:22
**soon**  148:4
**sorry**  11:19 17:16
   53:25 65:20 69:3
   71:20 86:21
   127:19 158:3,22
   163:15 172:14
   174:8 216:9
**sort**  90:2
**sound**  91:8
**sounds**  9:4 34:13
**southern**  1:2 4:10
**space**  20:19 23:11
   23:13 48:20,21
   212:22
**speak**  13:19
   106:15
**special**  46:25
   76:21 213:17
**specific**  32:15,23
   35:8,9 104:7
   105:3 125:23
   126:24 127:12
   152:5 153:19
   157:13,15
**specifically**  31:2
   53:12 69:11,13
   97:16,18 103:24
   133:11 141:23
   163:25 186:17
**specifics**  152:13
   153:15
**specified**  224:11
**speed**  20:8
**spend**  13:5

**spent**  31:17
**spoke**  90:4
**spoken**  96:17
**spreadsheet**  37:20
**spreadsheets**
   37:15,18
**spring**  189:3,5
   205:9,24
**ss**  227:4
**staff**  18:17,22 23:3
   35:19 95:22
   202:20
**stake**  28:10,15
   29:8
**standard**  197:13
**standpoint**  192:16
**start**  9:19 93:3
   156:5 180:3,8,9
**started**  15:20
   18:21,24 19:2
   28:3,5 29:12 30:8
   40:10 45:18 60:17
   61:11 79:22 93:12
   93:14 152:12
   162:25 178:23,24
   180:13 195:16
**starting**  4:21 14:3
   17:12 61:2 120:6
**state**  1:19 4:19 7:9
   7:13 10:7 14:24
   87:15 89:11
   219:22 227:4,8
**statement**  25:25
   51:9 54:15 216:15
   218:24
**states**  1:2 4:9 62:9
**stating**  99:24
**status**  70:25
   122:18
**stay**  36:3 140:19
   141:7,18,22

220:15
**stayed** 80:14 180:5
**staying** 97:14
**step** 158:13
**stepped** 71:15,24
**stipulated** 3:5,20
**stock** 75:10 172:16
172:17,19 176:5,6
176:12,21 180:10
195:4
**stood** 127:8
**stop** 16:19 65:15
**stopped** 24:17
142:2 195:17
**storage** 125:20
**stored** 88:13 102:7
124:24 125:3
212:14,16,22
214:6 215:16
**straight** 14:7
49:12
**straightforward**
81:8
**strategy** 19:18,20
19:24 22:21
**street** 7:17 169:7
**strike** 98:7 167:9
**structure** 58:7
59:12 136:24
178:8
**structured** 15:5
107:7
**study** 114:6
**stuff** 27:4 36:12,14
36:18 37:11,23
38:5,9 46:23
74:25 87:12,25
132:5 133:10
152:14 153:10
180:11 213:18,22

**subject** 103:12,19
104:2,24 129:19
188:16 204:7
**subscribed** 224:18
228:22
**subsequent** 79:25
80:3 99:25
**sued** 105:16
**suffer** 138:15
**suffering** 196:21
**sufficient** 187:18
**suggest** 221:12
222:7
**suing** 207:16
**suit** 8:18,21 208:9
208:10
**suite** 2:17
**summer** 98:15
189:4
**supervise** 36:24
**supervisor** 197:24
198:2
**supper** 217:18
**support** 19:19
20:6 32:15 35:24
136:15 182:13
183:15,16 202:20
**supporting** 18:14
19:13 34:6 37:12
37:14 38:20
182:13
**suppose** 211:6
**supposed** 139:23
160:18 167:21
168:20 199:6
**sure** 4:23 15:23
21:8,15 33:25
34:4 38:3 39:9
42:5 49:8,9 53:8
53:17 58:4,14
59:8 62:17 65:25

70:8 71:5,9 72:3
77:24 98:6 108:11
108:13,21 117:3
139:7 141:2 143:9
153:3 161:11
164:15 173:19
181:8 182:7
186:25 187:11
190:2,4 206:15
211:9
**surgery** 94:25
**surprised** 189:19
189:21 196:13
**switch** 76:2
**switched** 28:18
**sworn** 3:10 7:8
224:5,18 227:11
228:22
**system** 75:4 77:6
102:8,25 103:18
103:19 104:15,16
211:23 212:8
217:14 218:3
**systems** 14:21
15:2,18 211:16

**t**

**t** 3:2,2 7:7 224:2
225:2 227:2,2
**tab** 165:11 167:15
**take** 9:22,25 35:21
57:3,6 75:14
76:19 88:14 91:6
114:6 135:25
142:10 155:9
176:22 188:2
198:10 210:3
**taken** 1:15 4:7
30:25 57:13 91:14
121:8 155:16
188:7 210:10

**talk** 9:16 12:14
15:25 53:2,7,7,22
61:8 89:9 105:21
207:21
**talked** 37:9 61:5
88:2 100:13 135:2
135:9 152:9
153:12,21 161:10
179:23 206:15
**talking** 17:6 48:12
65:21,22,23,24
102:20 109:4
114:8 157:4
158:18 182:18,19
215:3
**talks** 149:25
164:10 169:19
**task** 32:23,24
**tax** 50:17,18
**team** 174:23
213:19
**teams** 109:18
**technical** 87:25
88:9 91:2 202:20
**technology** 15:6
16:13,16,20,22,24
18:14 19:13,19
20:14,16 23:25
24:4,6 26:25 27:4
31:14 34:6 37:3,4
37:6,16,17 38:12
92:8 102:11,23
124:19 125:22
126:5,11,14 180:9
**tell** 45:4 46:17
55:20 67:17,23
68:3,5 71:10
79:13 83:16 87:3
95:18 106:21
113:8 118:21
119:9,13 120:11

129:18 130:5
131:9 134:7,13
142:25 143:12
148:21 157:20
158:15 159:13
173:2 179:9
194:23 201:24
218:9 219:23
221:7,21 222:2
**telling** 50:9 129:21
**ten** 57:6,8 91:7
155:10
**tenant** 8:10
**term** 66:3 151:24
189:23
**terminate** 98:9
99:10,14
**terminated** 71:18
72:3,9 91:20
99:18,24 138:19
159:14,18 160:8
160:13
**terminating** 72:5
96:19 100:18
**termination** 80:25
92:3 96:23 121:25
122:3,6,23,24
139:22,25 145:12
154:8 159:23
170:12 209:23
210:2
**terminology** 97:22
**terms** 14:14
111:23 117:24
149:13 150:21
152:3 160:2
**testified** 7:10
84:10 138:18
214:9
**testify** 224:5

**testifying** 157:25
158:7
**testimony** 10:5
12:25 58:6 69:18
138:8,10,21 139:4
157:9 184:12
222:11,12 223:20
224:6,10 227:13
**testing** 180:16
**thank** 223:13,17
**theoretically** 85:7
**thing** 36:13 37:21
38:8 57:16 67:5
72:10 101:3 109:4
152:10,18 168:2,8
170:25 174:8
192:6 203:3
**things** 32:15 34:8
34:9 38:22 42:13
64:3 83:7 85:7
88:3 109:15
124:24 125:3
126:10 135:2,7
136:13,14 153:9
153:13 168:4
176:4 180:20
181:9 184:2
187:13 190:4
197:23
**think** 12:9,12
18:19 21:7 31:6
33:7 39:8 42:14
44:4,9 54:18
58:18 59:3 66:7
66:13 74:15 80:9
80:13 81:20 82:14
83:2,6 85:18
86:22 87:13,24
88:6 100:7,12
109:14 111:21
117:2 119:7,12,15

119:18,19 130:8
139:14,20,21
142:22,23 147:5
147:21 148:16
152:18 159:21
161:5 164:3,4
173:14,19,24
184:4 185:15
187:25 189:23
190:9,12,25
192:21 193:9,12
202:23 207:25
209:3 217:23
219:8 222:2
223:11
**thinking** 54:19
120:11 189:14
**thinks** 54:18
**third** 164:9 215:5
215:24
**thought** 17:23
60:7 79:15,19
83:6 119:9,14
135:12 143:22
163:3 174:10
178:20 187:17
190:8
**three** 13:6 35:4
100:17 120:22
135:25 173:9,16
176:4 197:10
**threshold** 180:19
**thursdays** 111:2
**till** 51:23
**time** 1:12,18 3:22
4:3 10:8 13:4
14:10 16:24 20:9
20:18,22,24 22:3,5
24:17,18 26:15,20
29:6 31:17,19,22
32:3 35:16 36:9

37:13 42:15 45:12
48:11 55:25 57:3
57:9,14 72:7,16
73:5 74:14 75:7
76:12 79:16,17,18
79:20 82:12 85:14
85:17 87:4 88:6
90:4,17 91:10,15
94:24 95:4 100:23
101:9 113:3 116:9
116:24 119:10
121:4,9 131:4
134:24 145:24
149:4 150:7,8
154:3 155:12,17
160:25 161:5,6
172:9 173:15
174:21 176:17,24
177:15,18,20
180:4 188:2,3,8
189:9,10,15,16
193:9 196:14
197:22 198:10
202:5,13 203:10
203:12 204:16
206:4 210:6,11
218:10 223:14,18
224:10
**timeline** 57:18
**times** 12:3 56:8,9
56:22,23 74:16
153:21 178:25
198:23,24 199:21
205:21 221:18
222:5
**timing** 86:25
173:2 178:22
**title** 18:23 31:7
36:3 58:23 59:13
59:15 190:2,5,6

**titled** 81:4
**titles** 190:12
  191:17
**today** 7:21 10:5,10
  10:19 24:17 30:18
  59:23 74:20
  139:24 147:24
  184:19
**today's** 11:18,20
  11:25 12:16 13:2
  13:5,13 223:19
**told** 13:16 17:22
  17:25 35:18 41:24
  64:14,21 67:15,25
  68:11 69:14 81:20
  99:9 103:11,17,25
  104:5,23 162:12
  175:25 181:7,9
  193:24 202:8,15
  208:11,18 219:17
  220:20 221:14,17
  221:23
**top** 109:5,8 157:5
**total** 13:4 223:20
**totally** 23:7
**touch** 89:3,21,23
**tough** 220:17
**track** 83:13
**tracked** 75:4
**tracking** 76:11
**trade** 21:16 177:3
  177:5
**training** 15:6
  16:16 42:25 44:6
**trainings** 42:24
  43:20,22
**transaction** 47:13
  75:17
**transactions** 45:23
  46:3,10,18 137:17

**transcript** 224:9,9
**transform** 220:5
**transparencies**
  186:22
**transparency**
  181:11,13,16
**transparent** 187:4
**travel** 79:16
**treat** 186:18
**trial** 3:22 174:11
**tried** 79:7 105:25
  132:23 195:24
**tripp** 1:15 4:6 5:16
  7:1,15,19 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1,22
  16:1,13,19,23 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1 85:1 86:1
  87:1 88:1 89:1

90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
101:12 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1,11 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1,8 148:1,11
148:14,17,22
149:1 150:1 151:1
152:1 153:1 154:1
155:1,19 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1,24
192:1 193:1,17
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1

203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1,13
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
222:22 223:1,14
223:20 224:1,15
225:1 226:1,4
227:1 228:3,21
**true** 51:9 58:18
  67:17,18,23,23
  68:3,13,21 145:22
  159:25 208:20
  214:17 224:9
  227:12
**trusting** 147:9
**truth** 224:5
**try** 15:23 19:19
  47:7 179:11
**trying** 18:15 20:13
  52:8 55:11 76:17
  90:13 103:23
  221:13
**turing** 16:22 17:2
  21:19 22:7 24:14
  24:21 25:2,5
  28:19 29:21,24
  57:20,21
**turn** 121:15 134:5
**turning** 204:3
**twice** 12:4
**two** 12:9 13:6
  90:13 114:7
  132:18 139:16
  143:16 155:22
  159:21 161:6
  164:12 174:16
  175:25 180:19
  184:18,23 196:11

198:24 199:20
205:21
**type** 20:4 36:18
45:20 46:2,8,18
74:9 75:9,18,21
107:2 135:13,17
170:25 203:3
**types** 107:12
111:12 126:10
**typical** 47:18
190:20
**typically** 200:14
211:12
**typing** 9:14

**u**

**u** 3:2 125:19
126:23
**ultimately** 112:3
119:7
**unauthorized**
217:24
**undergoing** 94:25
**understand** 7:22
8:5 9:9,11 11:22
25:16 66:5 69:6
69:17 81:9 90:16
98:6 104:18
112:11 120:4
154:14,18,22
182:5 185:14
193:18 205:8
213:5 221:3
**understanding**
28:5 29:12,22
35:2 50:24 51:14
51:17,24 52:6
63:20,23,25 66:18
68:7 97:25 99:13
99:21 112:21
122:21 131:22,25
138:4,12 141:14

151:3,16,18
167:20,23 169:9
178:16 183:5
184:24 185:11
192:10 196:19
197:2,3,7 205:20
216:2,17 218:7
219:6 220:8,9
223:5
**understood** 54:13
113:17,19 221:7
**undertook** 46:18
**underwood** 2:12
5:11,12 15:22
21:3,7 26:3,18
28:11 30:13,20
31:4,23 32:20
33:18,23 34:20
37:7 39:15 40:19
41:18 42:10 45:13
46:12,20 47:14,22
48:5,10 49:2
50:14 52:18,23
53:4,25 54:4,8,14
55:4,11,22 56:4,12
56:25 57:24 58:25
59:21 60:12 61:12
61:22 62:5 63:7
63:21 64:9,19
65:20 66:9 67:12
67:19 68:4,14,19
69:3 70:3,22
71:13 72:14 73:10
75:22 83:4,21
84:15 90:20 92:4
92:11,18 93:23
94:5 95:24 96:13
97:4 98:4,10
101:12 102:13,18
103:15 104:12
106:7,12,22

107:18 110:12,17
112:5,17 113:24
114:16,22 119:16
120:8,16 121:23
122:12 125:4,10
128:11 129:9
133:8,19 134:7,11
135:15 137:9
138:22 139:18
141:15 143:4,19
144:7,17 146:5,15
147:2 154:16
156:2 158:11
162:22 163:15
165:7,12 166:7
168:5 169:2,12
170:15 171:5,11
175:3 177:10
179:14 182:22
183:13 185:2
186:5,15,23 187:8
190:23 192:11
196:22 198:6
205:14 208:21
209:3 211:20
212:5,19 213:9
214:21 216:20
218:11,16 219:12
220:10,20 221:5
223:16
**unique** 20:10,14
20:15,16,19 23:12
**unit** 4:5
**united** 1:2 4:9 62:8
**units** 223:21
**unplugged** 195:17
**unpublished** 211:5
**unrelated** 139:17
**unsigned** 3:14
**unusual** 30:22
46:22

**update** 202:12
**uploading** 188:10
**use** 74:13,23,25
75:2,4,6,8 76:7
169:4 215:13
217:24
**user** 125:23
**users** 125:20,21
**usually** 76:5
133:16 135:7

**v**

**v** 228:2
**vacation** 35:22,23
39:14 79:18 161:6
161:7 205:23
206:2
**valid** 221:24,25
222:3
**various** 114:4
**vehicle** 62:8
**vendor** 202:23
**verification** 204:2
**veritext** 2:22 4:15
4:17 223:22 228:1
**versus** 4:8 178:4
**video** 4:6
**videographer** 2:22
4:2,16 57:9,14
91:10,15 121:4,9
155:12,17 188:3,8
210:6,11 223:18
**view** 183:11
**viewed** 96:23
**vint** 130:24 156:10
157:5
**violating** 91:23
**virtual** 1:14
**vis** 26:14,14 71:2,2
**vision** 19:25 20:23
21:21,24 22:11,16
22:17,18 23:16

24:14,16,16 25:3,4
62:15
**volunteering** 73:9
**vote** 26:23 135:3
135:18,23
**voting** 134:21
135:14

**w**

**wait** 9:17,18 15:23
**waived** 3:9
**walk** 90:13
**walked** 25:10
**walking** 86:24
**walled** 102:17
**want** 9:22 10:7
57:6 62:16 65:25
101:21 121:12
141:2 147:9,22
156:3 160:17
191:12 210:13
217:22
**wanted** 57:17
79:16 140:19,22
141:4,7,9,18
161:18,19 175:8
218:5
**watch** 211:10
**way** 20:13 46:14
95:3 104:8 122:2
122:5 129:23
145:2 165:10
169:15 173:12
174:6 193:25
208:7 227:17
**we've** 56:25 155:8
156:2 165:14
200:21
**wearing** 10:13
**week** 72:7,17
110:19,21 111:3

**weekly** 95:15
**weeks** 35:21 114:7
**weiss** 2:16,16,18
5:7,7,8,8
**weissnweiss** 2:19
**went** 12:12 14:10
15:4,7 16:8 23:6
23:23 25:6,8
35:24 43:12,13
56:8,9,22,23 57:21
57:22 71:12 73:21
73:24 75:10 76:12
79:15 80:6,10
85:5 111:22
195:14,15 215:23
216:14,24 217:4
217:11 218:5
219:25 221:16
223:6
**when's** 90:4
**whereof** 227:19
**wide** 44:14
**wife** 13:16 62:12
69:2 105:17 129:2
217:12,17 218:9
220:24 223:8
**willis** 1:19 4:17
227:7,23
**withdraw** 138:15
139:15 150:3,24
151:5
**withdrawing**
130:4 140:12,17
**witness** 3:10,16,18
7:7 12:25 16:3
21:11 54:3,12,17
55:3,9,10,13 66:6
96:21,25 97:7
158:12 209:8
222:12,17 223:24
227:10,13,19

**witnesses'** 228:3
**word** 159:8,9,10
**wording** 97:20
150:6 218:19
219:4,18,19,21
**words** 36:10 220:4
**work** 14:9 19:21
25:7,17 33:2 36:9
37:5 72:20 73:13
73:16 79:10,13
88:18 125:21
133:4 141:10
163:19 179:8
193:25 194:19
198:4
**worked** 28:16 37:4
110:11 120:19
147:14 191:2
**working** 16:5,19
24:7 29:7 35:3
37:5 83:3,7 92:8
102:23 124:18
160:19,22,24
170:4 185:25
**works** 8:5 64:5
**world** 21:16 89:15
**worry** 207:19
208:11
**wrap** 210:5
**writes** 193:11
**writing** 189:10,17
190:14
**written** 81:14
162:16
**wrong** 193:8

**x**

**x** 1:3,9 47:6,7,9
94:7,9 225:2,21

**y**

**y** 47:7,9
**yays** 135:25
**yeah** 17:7 18:18
19:10 23:19 72:12
76:10 80:22 85:22
87:6 113:9 166:20
167:17 192:22
196:11 198:21
201:23 202:11
204:4,14
**year** 21:14 25:21
43:18 44:11,13
50:18 72:19 73:3
73:6 80:9,15 89:8
93:6 161:13,16,21
161:25 171:24
**years** 14:11,24
15:4,10 40:7
79:23 115:6 116:7
119:14 120:11
132:18 152:11
153:11 157:18
202:25
**york** 1:2,20 2:6,6
4:10 7:9,18 15:2
227:4,8 228:1
**yup** 134:4 192:4
203:8

**z**

**zoom** 4:13 7:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.