# CONSOLIDATED SUMMARY JUDGMENT EXHIBITS

# EXHIBIT 20

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------------X
    PAUL IACOVACCI,
4

                                    PLAINTIFF,
5

6           -against-           Case No.:
                                1:18-cv-08048
7

8   BREVET HOLDINGS, LLC, et al,
9                               DEFENDANTS.
    -------------------------------------------X
10

11                  DATE: October 7, 2021
12                  TIME: 11:30 A.M
13

14

15          DEPOSITION of the Defendant,
16  BREVET HOLDINGS, LLC, by DAVID CIBRIAN,
17  taken by the Plaintiff, pursuant to a
18  Court Order and to the Federal Rules of
19  Civil Procedure, held via Veritext Virtual
20  Services, before Edith Tirado-Plaza, a
21  Notary Public of the State of New York.
22

23

24

25

```
 1
 2   A P P E A R A N C E S:
 3
 4   CYRULNIK FATTARUSO, LLP
        Attorneys for the Plaintiff
 5      55 Broadway, Third Floor
        New York, New York  10006
 6      BY: PAUL FATTARUSO, ESQ.
            JASON CYRULNIK, ESQ.
 7
 8
     REED SMITH LLP
 9      Attorneys for the Defendant
        225 Fifth Avenue
10      Pittsburgh, Pennsylvania  15222
        BY: TRACI REA, ESQ.
11
12
     KATZ MARSHALL & BANKS, LLP
13      Attorneys for the Witness
        1845 Walnut Street, 25th Floor
14      Philadelphia, Pennsylvania  19103
        BY: AVI KUMIN, ESQ.
15
16
17
     ALSO PRESENT:
18      RUHI BEHAL, ESQ. - REED SMITH
        MARY BETH GEORGE, ESQ. - REED SMITH
19
20            *        *        *
21
22
23
24
25
```

Page 3

1

2    F E D E R A L   S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20   IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24          *     *     *     *

25

```
 1                    D. CIBRIAN

 2

 3          THE VIDEOGRAPHER:  Good,

 4     morning.  We're going on the record

 5     at approximately 11:34 a.m. on

 6     October 7, 2021.  Please silence any

 7     cell phones, computers, phones or

 8     other electronic devices, audio and

 9     video recording.  We'll continue to

10     take place unless all parties will

11     agree to go off the record.

12          This is media unit number one

13     of the remote video recorded

14     deposition of David Cibrian taken by

15     counsel for plaintiff in the matter

16     of Paul Iacovacci versus Brevet

17     Holdings LLC filed in the US District

18     Court, Southern District of New York

19     case, case number 1:18-cv-80848.

20          My name is Jim Roberts in

21     association with Veritext New York.

22     I'm the videographer.  The court

23     reporter is Edith Plaza, also with

24     Veritext.

25          All counsel consent to this
```

                    D. CIBRIAN

1
2    remote video arrangement, waive
3    objections to this matter of
4    recording and to the remote swearing
5    in of the witness.
6         Counsel, please state their
7    appearances beginning with noticing
8    counsel.
9         MR. FATTARUSO:   This is Paul
10   Fattaruso on behalf of plaintiff Paul
11   Iacovacci.  With me is Mary Beth
12   George.
13        THE VIDEOGRAPHER:  Opposing
14   counsel please identify yourselves.
15        MS. REA:  My name is Traci Rea
16   on behalf of defendants in this
17   action.  With me is my colleague Ruhi
18   Behal.
19        THE VIDEOGRAPHER:   And counsel
20   for the witness.
21        Mr. KUMIN:   Good morning, this
22   is Avi Kumin from Katz, Marshall and
23   Banks and I represent the deponent
24   David Cibrian.
25        THE VIDEOGRAPHER:  Court

```
                                    Page 6
 1                    D. CIBRIAN
 2        reporter please wear in the witness.
 3             COURT REPORTER:  May I get the
 4        witnesses name and address?
 5             THE WITNESS:  David Cibrian,
 6   ███████ ████████████ ██████████ ████████ █████████ ███████
 7        ██████████ ████████ ████████ ██████████
 8   D A V I D    C I B R I A N, called as a
 9   witness, having been first duly sworn by a
10   Notary Public of the State of New York, was
11   examined and testified as follows:
12   EXAMINATION BY
13   MR. FATTARUSO:
14        Q.    Good morning, Mr. Cibrian.
15        A.    Good morning.
16        Q.    My name Paul Fattaruso.  I
17   represent plaintiff Paul Iacovacci in this
18   matter.
19             Have you been deposed before?
20        A.    I have.
21        Q.    Well, I'll try to be brief then
22   on the ground rules so that we can move
23   things along.
24             You understand that you're
25   under oath and that oath requires you to
```

```
 1                    D. CIBRIAN
 2   tell the truth in response to all the
 3   questions you will be asked?
 4        A.    Yes.
 5        Q.    And are you represented by
 6   counsel today?
 7        A.    I am.
 8        Q.    Who is that counsel?
 9        A.    Avi Kumin.
10        Q.    During the course of this
11   deposition your counsel may object to any
12   questions, but unless you're instructed not
13   to answer you should go ahead and answer
14   the question anyway; okay?
15        A.    Understood.
16        Q.    And for the sake of the court
17   reporter we should try to avoid talking
18   over one another so please wait for me to
19   finish the questions and I'll wait for you
20   to finish your answers; okay?
21        A.    Okay.
22        Q.    If you don't understand a
23   question or need a question repeated please
24   let me know.
25        A.    Will do.
```

D. CIBRIAN

1
2       Q.     And we'll plan to take regular
3   breaks during the deposition but if you
4   need a break at any point let me know and
5   we can take a break after you've answered
6   my question or completed a line of
7   questions to accommodate your break needs.
8   Is that okay?
9       A.     Of course.  Thank you.
10      Q.     And is there any reason today
11  that you cannot give truthful and competent
12  testimony?
13      A.     No, there's not.
14      Q.     You don't have any medications
15  or conditions that may affect your memory?
16      A.     No.
17      Q.     Is there anyone in the room
18  with you today?
19      A.     In this room, no.
20      Q.     Do you have any documents
21  related to the case with you?
22      A.     No.
23      Q.     How did you prepare for today's
24  deposition?
25      A.     I reviewed the pleadings.  I

```
 1                    D. CIBRIAN
 2   believe they were the second amended
 3   pleadings.  I might have that wrong.  I
 4   reviewed my declaration and a motion to
 5   quash this proceeding that was given some
 6   time ago and I had a conversation with
 7   counsel who is present today.
 8        Q.    Did you have any conversations
 9   with Brevet's counsel?
10        A.    No, I have not, not since the
11   motion to quash proceeding of some time
12   ago.  That was really the last interaction
13   with Brevet's counsel.
14        Q.    Very good.  So, let's take a
15   run at the Exhibit Share program if we can.
16   Did you get credentials and were you able
17   to log into the Exhibit Share?
18        A.    I believe so.  I opened it
19   before I opened this link so let me -- if
20   you permit me unless you want to instruct
21   me otherwise I'll try to go over there.
22        Q.    Please do.
23        A.    Let's see here.  Okay, I'm in.
24   I believe I am seeing a PDF that says
25   Exhibit 1 and it's dated today I believe.
```

```
 1                    D. CIBRIAN
 2        Q.    That's correct.  Can you click
 3   on that exhibit?  This is a document we've
 4   marked as Exhibit 1.
 5        A.    Okay, I am doing that now.
 6   Okay, I see my name and some background
 7   material.  Is that the document?
 8        Q.    That's correct.  Do you
 9   recognize that document?
10        A.    Yes, it seems to be a Linked In
11   profile.
12        Q.    And to your knowledge, is this
13   Linked In profile accurate?
14        A.    Let me scroll down if I could
15   just for a minute.  Yes, it seems to be up
16   to date.
17        Q.    So, just very briefly to touch
18   on starting at the bottom with educational
19   history, you received a BS from Loyola
20   Marymount University in 1985; is that
21   correct?
22        A.    Correct.
23        Q.    And a JD with honors from
24   Georgetown University Law Center?
25        A.    Yes.
```

Page 11

D. CIBRIAN

1

2      Q.      And can you walk me through a

3   brief history of your employment prior to

4   joining Brevet?

5      A.      So, prior to joining Brevet I

6   had been with a private sector company in

7   the energy efficiency business.  They were

8   headquartered in Boca Raton, Florida.  I

9   joined that -- it's listed there on my

10  profile as MotorWise Inc.  I became

11  acquainted with that company through my

12  corporate law practice.  I was with a

13  Dallas based firm working out of the San

14  Antonio office by the name of Strasburger

15  and Price.  The investors behind MotorWise

16  were clients of the firm, clients of mine,

17  and I left my longtime corporate law

18  practice to join MotorWise.

19     Q.      What was your next position

20  after MotorWise?

21     A.      So, my next position which is

22  not listed on here actually because I

23  overlapped with -- you'll see there's a

24  Civitas Capital Group January to December

25  of 2014.  Senior advisor there.  In

```
                                      Page 12
 1                    D. CIBRIAN
 2   addition to that I was -- during that same
 3   time period with the law firm by the name
 4   Chamberland and Hrdlicka, a Houston based
 5   firm.   I was also in their San Antonio
 6   Texas office and that is where I first
 7   started with Brevet Capital.
 8         Q.    How did you first start to work
 9   with Brevet Capital while you were -- was
10   that while you were with Civitas or while
11   you were with the law firm?
12         A.    While I was with the law firm.
13         Q.    What was your working
14   relationship with Brevet Capital?
15         A.    I was an advisor to Brevet.   I
16   was doing legal work and also some business
17   element work for them for one of the
18   programs that I eventually ended up leading
19   when I joined Brevet Capital as a full-time
20   employee.
21         Q.    And what was that program?
22         A.    The first -- it was government
23   financing in general.   The first program
24   was related to a federal program that is
25   referred to in the industry as EB-5.   EB-5
```

```
                                      Page 13
  1                   D. CIBRIAN
  2   is a visa program of the US federal
  3   government.
  4        Q.    How did you come to join
  5   Brevet?
  6        A.    Doug Monticciolo and Mark
  7   Callahan had approached me during the end
  8   of this 2014 period and began speaking to
  9   me about the possibility that I would join
 10   Brevet, you know, as an employee as a
 11   partner full-time in the firm.  We had
 12   several discussions around that.  The
 13   principle motivator was to come in-house
 14   and dedicate my full time and energy to
 15   developing, again, what was first the EB-5
 16   finances program at Brevet Capital and I
 17   believe I joined shortly after the first of
 18   the year in 2015, January of 2015.
 19        Q.    So, what was your title and
 20   your role at Brevet when you started?
 21        A.    Managing director and while my
 22   role evolved during the time I was there I
 23   really came in on the business development
 24   side, ▆▆ ▆▆ ▆▆▆▆▆ ▆▆ ▆▆ ▆ ▆▆▆▆ ▆▆
 25   ▆▆▆▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆▆▆ ▆▆▆▆ ▆▆▆ ▆
```

```
 1              D. CIBRIAN
 2  ████████ ████████ ████ ███ ███.  Again,
 3  from a business development standpoint
 4  opportunities that could avail themselves
 5  of this new program at Brevet Capital.
 6       Q.    You mentioned that your role
 7  evolved over time.  How did it evolve?
 8       A.    Well, you know, █ ███
 9  ███████ ███ ███ ████.  We did
10  identify opportunities that were
11  financeable through the criteria of the
12  Brevet program but then in addition to just
13  sort of bringing in the opportunity, ended
14  up becoming very involved in negotiating
15  with the counter parties, structuring the
16  deal, working with outside counsel to
17  document.  So, it went really from sort of
18  business development sourcing to also
19  becoming involved on the investment team
20  and the structuring team.
21       Q.    Did you have a role in investor
22  relations in any way?
23       A.    No, not really.  I was never
24  part of the distribution team as the firm
25  called it or the investor relations team.
```

```
1                    D. CIBRIAN
2    I would occasionally be in broader meetings
3    where there might be a perspective investor
4    or a consultant but I was not in the IR
5    side of the firm.
6         Q.    Was there a different set of
7    practices and a different set of rules that
8    governed the investigator phasing side of
9    the business as opposed to the sort of
10   business development side of the business
11   that you were involved in?
12        A.    So, by rules do you mean
13   internal Brevet policies, procedures,
14   rules?  Are you talking about rules that
15   govern the firm as a regulated entity?
16        Q.    Let's talk about both in that
17   order.
18        A.    So, there was clearly a
19   segregation internally between the folks
20   that were on the fundraising investor side
21   and those of us who were on the deal side
22   as would commonly be referred to.  So, I
23   was seen as a deal side professional not an
24   investor oriented professional.
25        Q.    What was the reason for that
```

Page 16

```
 1                    D. CIBRIAN
 2   internal separation, as best as you
 3   understand?
 4        A.     I think it was just expertise
 5   driven.   Individuals who had certain --
 6   developed certain skill sets over their
 7   careers were in a particular role and
 8   responsibility at the firm, whether it be,
 9   you know, front office, mid office, back
10   office.   It was just based on people's
11   previous experience and expertise.
12        Q.     What about the second category
13   that you mentioned, differences that were a
14   function of Brevet status as a regulated
15   entity?
16        A.     Well, very significant, very
17   complex regulatory frame work.   Brevet in
18   the time I was there was always a
19   registered investment advisor regulated by
20   the Securities Exchange Commission and at
21   times by state securities authorities.   So,
22   the investor side in particular what was
23   represented, what materials were used, all
24   of that was subject to very strict and very
25   longstanding regulatory rules.
```

```
1                    D. CIBRIAN
2         Q.      When you say it was
3    represented, are you referring to things
4    that were represented to investors or
5    potential investors?
6         A.      Yes, as would be the case with
7    any investment advisor -- registered
8    investment advisor.
9         Q.      Did that heavily regulated
10   aspect of Brevet's business affect the deal
11   side that you were on to a significant
12   extent or was that an issue that governed
13   the investor relations group?
14        A.      Well, certainly the external
15   phasing conversations with investors,
16   either existing or perspective investors,
17   was really run through the investor
18   relations group not through the deal side.
19   We may have occasionally been asked to
20   provide documents or status updates on a
21   transaction, whether in process or closed,
22   but that was really to the extent that
23   those of us, again, on the deal side would
24   interphase internally with the investor
25   relations side.
```

```
                                    Page 18
 1                   D. CIBRIAN
 2        Q.     How did you come to leave
 3   Brevet?
 4        A.     So, discussions to leave Brevet
 5   started in around August -- July, August of
 6   2018. ████ ████ ███ ████ █████. I had
 7   looked and was working on some other,
 8   again, sort of government finance or
 9   operating ideas, concepts, opportunities at
10   Brevet but, you know, kind of what I was
11   accomplishing -- how I was accomplishing I
12   felt things had really run its course so
13   began conversations initially with Mark
14   Callahan about finding a way to transition
15   out of the firm and we were able to reach
16   agreement on that at the end of January of
17   2019.
18        Q.     While you were at Brevet would
19   you ever go to the Brevet website?
20        A.     Yes, I would go there fairly
21   frequently from the standpoint of since I
22   was on the business development side I
23   always had to make sure that we were using
24   the web page to send to business investment
25   opportunity.  So, I would get on there,
```

                         D. CIBRIAN
1
2    send a link to people, yes.
3         Q.    Let's go back over to Exhibit
4    Share and just a minute here.  I'm marking
5    what should come up in your folder as
6    Exhibit 2.  That should appear if you click
7    the marked exhibits folder and just to
8    refresh.
9         A.    Yeah, let me see how I can
10   refresh here.  All I'm seeing is Exhibit 1
11   right now.
12        Q.    I think if you hover over the
13   folder that says marked exhibits and click
14   it should refresh the contents.
15        A.    Yes, you're right.  Exhibit 2.
16   Let me open it.  Okay I have something up
17   here.
18        Q.    Do you recognize this as a
19   representation of Brevet's website around
20   the 2016 time period?
21        A.    Yes, it looks about right.  I
22   remember the bikers, yes.
23        Q.    If you scroll down to page
24   three of the document do you see this is a
25   section that represents the executive team

Page 20

```
 1                    D. CIBRIAN
 2   at Brevet?
 3        A.    Yes.
 4        Q.    If you look through this
 5   executive team, is this consistent with
 6   what you generally recall the executive
 7   team to have been in the early 2016 time
 8   period?
 9        A.    Yes, correct.
10        Q.    And if you scroll further down
11   still to around pages ten and eleven, do
12   you see a section called solutions
13   overview?
14        A.    Let me head down.  Just from a
15   technology standpoint are you able to see
16   what I'm scrolling or no?
17        Q.    I can't see what you're
18   scrolling.  I have my own independent
19   version of the document.
20        A.    So, what I see is page ten is
21   two people shaking hands.  Is that where
22   you'd like me to be?
23        Q.    That's right.
24        A.    Go ahead.
25        Q.    In this section you see there
```

```
                                    Page 21
 1                    D. CIBRIAN
 2   appears to be a brief description at a high
 3   level of Brevet's business and I want to
 4   ask you a question about the sentence at
 5   the end of this section at the top of page
 6   11.  You see the sentence we seek
 7   transactions of 10 to 75 million dollars
 8   with the capacity to participate in larger
 9   transactions up to 150 million dollars?
10        A.    I see it.
11        Q.    Is that consistent with your
12   understanding of the transaction size that
13   Brevet was interested in during that time
14   period?
15        A.    Yes, it is.  From what I recall
16   that's what the firm was targeting as let's
17   say an ideal sized transaction.
18        Q.    Are those the sorts of
19   transactions you were looking to source or
20   develop in your business development role?
21        A.    Generally, yes.  There were a
22   couple of transactions that were closed in
23   my area that were a bit smaller than ten
24   million.  There were others that fell right
25   in the 10 to 75 range exactly.
```

```
                                      Page 22
 1                    D. CIBRIAN
 2        Q.    In terms of the nature of the
 3   transactions, is it right that Brevet was
 4   looking for potential lending
 5   opportunities?
 6        A.    Yes.
 7        Q.    Did Brevet have any interest or
 8   any business in making equity investments?
 9        A.    No, Brevet was a private
10   credit, private debt firm.  So, the focus
11   was on debt not really on equity.  At least
12   not while I was there from what I remember.
13        Q.    I'll try not to talk over your
14   answers going forward.
15             So, while if a business
16   opportunity had come to your attention for
17   say a 150,000 equity investment, would it
18   even cross your mind that was a potential
19   opportunity you would consider developing
20   for Brevet?
21             MS. REA:  Objection to form.
22        A.    So, your question was 150,000?
23   Did you mean thousand or million?
24        Q.    Thousand.
25        A.    So, no, I would not have
```

```
 1                    D. CIBRIAN
 2   pursued that.  I think you also mentioned
 3   equity, do I remember that correctly?
 4        Q.    That's right.
 5        A.    I would not have pursued it
 6   both because of the size and the investment
 7   type being equity.
 8        Q.    Did you work with Mr. Iacovacci
 9   in your role as managing director?
10        A.    We had interaction, but we were
11   not -- I didn't report to him.  He didn't
12   report to me but we did work and
13   collaborate.
14        Q.    And were you in different
15   offices as well?
16        A.    Well, I was resident in the San
17   Antonio Texas office, but when I was in New
18   York I actually sat -- I had an office but
19   it was a different private office from the
20   one Paul had.
21        Q.    And what was the San Antonio
22   office?
23        A.    The San Antonio office was
24   myself and eventually grew to be two other
25   employees in San Antonio.
```

```
                                        Page 24
 1                    D. CIBRIAN
 2        Q.    Did you have a separate office
 3   building there?
 4        A.    Yes, we were in one of these
 5   office share arrangements.  It was like a
 6   Regis or something to that affect.
 7        Q.    Did you have office computers
 8   in the San Antonio office?
 9        A.    Yes, we had printers,
10   computers, etcetera.
11        Q.    Were those connected to
12   Brevet's network?
13        A.    Yes.
14        Q.    So, you would boot up the
15   computer and instantly have access to
16   Brevet files without having to go through
17   any further login process to get into the
18   Brevet network; is that an accurate
19   characterization?
20        A.    Generally, yes.  I'd have to
21   log into my equipment first.  There was
22   login credentials and there would be login
23   credentials to get on the let's call it the
24   Brevet server.
25        Q.    And do you know if Brevet had
```

Page 25

                              D. CIBRIAN
 1
 2   access and ability to monitor those
 3   computers?
 4        A.    My understanding is yes.  For
 5   example, if there was some sort of IT issue
 6   or I needed support for something they were
 7   able to remote into that company laptop or
 8   desktop.  I think I had a laptop.
 9        Q.    And would they need your
10   approval to log into the laptop or desktop
11   or could they just do that as a matter of
12   course?
13              MS. REA:  Object to form.
14        A.    Whenever I had somebody
15   remotely access the equipment is because I
16   was calling for help, but my assumption is
17   that it was company equipment so, yes, they
18   could access it.  They had the ability to
19   access it.
20        Q.    Let's take a look at another
21   exhibit.  This one should come into your
22   folder as Exhibit 3.
23        A.    Okay.  Refreshing now.
24        Q.    I'll tell you when I think it's
25   in so that I can spare you from the

```
                                        Page 26
 1                    D. CIBRIAN
 2   multiple refresh clicks.
 3        A.    Yeah.
 4        Q.    Okay, you should have it.
 5        A.    Work chart?
 6        Q.    Yes.
 7        A.    It's opening.  I'm on page one.
 8        Q.    Great.  Do you recognize this
 9   document?
10        A.    I've seen it before, yes.
11        Q.    I'll represent to you that the
12   file name for this document has the date
13   March 1, 2016 in the file name to give you
14   a sense of the document's properties.
15              Did you review work charts like
16   this in the course of your work at Brevet?
17        A.    Not really in the ordinary
18   course but I would occasionally look at
19   them, for example, if we were preparing
20   some sort of business development
21   presentation or something like that.
22   Sometimes we would look at them, sometimes
23   we would use part of them.
24        Q.    So, would these be documents
25   that were kept on the system for access to
```

```
 1                      D. CIBRIAN
 2  include in presentations for --
 3        A.    I don't think it was readily
 4  available to just anyone.  If I had a need
 5  for these even at my level I would usually
 6  get it from somebody in the compliance
 7  department, for example, or I frankly would
 8  go to Doug or Mark and tell them what I
 9  needed and we'd figure it out.  I don't
10  think I would have just gone into the
11  system and pulled up materials like this.
12        Q.    Looking at page two of this
13  chart, that describes the functional
14  organization?
15        A.    Right, investment committee is
16  at the top I believe.
17        Q.    That's right.  Investment
18  committee.
19              Were you aware there was an
20  ████████████  ████████████  ███  ████  ███████████
21  ██████  ██████  ████████████
22        A.    Yes.
23        Q.    Do you know what the role of
24  the investment committee was?
25        A.    Yes, the investment committee
```

```
 1                    D. CIBRIAN
 2   in an investment firm like Brevet is sort
 3   of the principle governing entity.  Its
 4   mandate normally resolves around making
 5   decisions on what opportunities to invest
 6   in, what opportunities to fund or not fund.
 7        Q.    So, in your business
 8   development role would you be identifying
 9   potential investment opportunities and then
10   presenting those to the investment
11   committee?
12        A.    We had an intake committee so
13   an early opportunity would actually be
14   presented to intake.  It would be required
15   to present some material, some verbal
16   report on why it was a fit for the
17   investment strategy of Brevet and then it
18   was either approved or rejected at what was
19   called the intake level.
20        Q.    Who was on the intake
21   committee, as you recall?
22        A.    I'm doing this from memory,
23   but, again, that committee kind of grew and
24   shrank over time.  It was definitely Doug
25   and Mark.  I don't think Paul was on it.  I
```

```
1                    D. CIBRIAN
2    don't even remember.  I couldn't tell you
3    100 percent whether I was on it or not
4    frankly, but I don't think I was as a
5    source person, but it was at least Doug and
6    Mark that were in the intake committee
7    itself.
8         Q.    A potential transaction would
9    get to the investment committee only having
10   cleared the intake committee; is that
11   right?
12        A.    Correct, correct.  It would
13   have to get intake approval and then the
14   team that was staffed on that opportunity
15   which is usually the source and
16   professional so if I had brought it, it
17   would be me.  If Peter Sherman had brought
18   it, it would be Peter and then you pull a
19   couple of names from your second box there
20   that you have and then you would get to a
21   letter of intent.  That's the point the
22   investment committee would become involved.
23        Q.    Did you have familiarity with
24   the organization of the Brevet funds?
25        A.    I'm sorry, Paul, I don't fully
```

```
                                              Page 30
 1                     D. CIBRIAN
 2  understand the question.  Did I have?
 3       Q.    Sure, maybe it will make more
 4  sense if we take a look at page four of
 5  this document which is called a Brevet
 6  funds organizational chart.
 7       A.    Yes, I see it there.  Go ahead.
 8       Q.    Are these charts that you would
 9  evaluate in the course of your work?
10       A.    No, not really.  I may have
11  looked at something like this once or twice
12  just to understand the fund structure, but
13  not anything I would have been involved in
14  really in implementing or looking at
15  regularly.  I didn't really have a reason
16  to.
17       Q.    Got it.
18             Did you have a high level sense
19  of the fund structure at Brevet?
20       A.    Yes.
21       Q.    What was your overall high
22  level sense?
23       A.    ████ ████ █ ████ ████ ██
24  ████ ████ ████ ██ ██ ███ ███ ████
25  ███ ████ ██ ███ ███ ████ ██
```

```
                                              Page 31
```

 1                    D. CIBRIAN

 2  ████████  ████ ██ ██  ██████  ██████ ██  ██████

 3  ██ █ ██ █ ████████ ██ █ ██ ██ █ █████ ██

 4  ██ ██ ██ ██ ██  ██████ ████ ██ ██ █

 5  ██ ██ ████ ████ ████ ██ ██ ██ █

 6  ████████  ████ ██████ ██████ █

 7  ████████ ████ ██ ██████ ██████████

 8  ██████ █████ ████

 9       Q.    So, fair to say that when you

10  started the focus of Brevet's business was

11  on the short duration fund?

12       A.    Correct.

13       Q.    Did you understand that the

14  short duration fund had a general partner?

15       A.    Yes.

16       Q.    Were you ever a member of the

17  general partner?

18       A.    No, I was not formally

19  documented to be a member of the general

20  partner.  That was the intent and

21  understanding when I joined but we never

22  got to document that.

23       Q.    Was there any informal --

24       A.    I believe there was a reference

25  in my employment letter or offer letter,

```
1                    D. CIBRIAN
2    however we describe it, where there was
3    going to be a share of profits or a share
4    in general partner interests at some
5    percentage.
6         Q.    Did you get maybe if you call
7    it a phantom or a simulated general partner
8    profit interest?
9         A.    Yeah, that would be a fair way
10   in industry vocabulary to describe it at
11   that point since it never got documented
12   into a direct interest in the GP.  You're
13   correct.
14        Q.    Was there any point in time
15   when you went through a calculation or
16   received compensation that was in the form
17   of a phantom payment on a general partner
18   interest?
19        A.    There were distributions done
20   at the end of the year so, yes, there was a
21   distribution based on whatever my
22   percentage represented.
23        Q.    Was the phantom interest
24   documented in any way other than through
25   the documentation reflecting those
```

Page 33

```
 1                    D. CIBRIAN
 2  distributions?
 3        A.    It was documented in my --
 4  again, the joining letter, offer letter.  I
 5  believe again I'm working from memory so I
 6  apologize.  I believe at the end of 2015 or
 7  -- not at the end.  For the year ending
 8  2015 and the year ending 2016 I received a
 9  K-1 for that, which is a sort of a
10  partnership information return, and then
11  there was a change in how the firm decided
12  to account and structure things so I think
13  for the year ending 2017 and beyond they
14  were really just sort of more like bonus
15  payments so there was no K-1 issue.
16        Q.    What's your understanding of
17  the change between 2016 and 2017 in the way
18  that the firm decided to account and
19  structure things?
20        A.
21
22
23
24
25        Q.    Do you know whether the firm
```



```
 1                    D. CIBRIAN
 2   shifted profits away from the general
 3   partners of the funds?
 4        A.    I'm not aware that that
 5   happened, no.
 6        Q.    Do you know how the change in
 7   the accounting affected your payments?
 8        A.    The change affected my having
 9   to treat them differently on my personal
10   tax return and I worked with my personal
11   tax advisor to make sure that was done and
12   correct and compliant but I can't tell you
13   exactly kind of what the impact was
14   positive, negative or neutral to me.
15        Q.    Did you have a certain
16   identified percentage interest phantom
17   interest in the general partner profits?
18        A.    I did.  I want to say it was
19   maybe a ████    ████████    ██████████ but, again,
20   if that percentage is correct in my mind
21   it would be in that offer letter.
22        Q.    Apart from the change in the
23   ██████  ██████████ between 2016 and 2017 there
24   was no change in the percentage of your
25   share of general partner fees that you were
```

Page 35

```
 1                    D. CIBRIAN
 2   participating in; is that right?
 3        A.    To my understanding, no.   The
 4   target percentage was supposed to be the
 5   same each year.
 6        Q.    And were you provided any
 7   documents accounting for the general
 8   partner fees that had been collected for
 9   that year to understand what your
10   percentage payment was?
11        A.    It was normally an e-mail that
12   the CFO sent during the end of the year
13   that was very brief.  It was sort of just a
14   snapshot of sort of numbers what was called
15   I believe the incentive fee total, you
16   know, my percentage and therefore this is
17   the amount you're supposed to get, but it
18   was not anything detailed.  It was not my
19   reviewing accounting books and records or a
20   big complex spread sheet.  It was really
21   sort of a snapshot this is what we've
22   calculated and this is what you'll be
23   receiving.
24        Q.    So, going back to page two of
25   this flow chart in March of 2016.  You see
```

```
                                   Page 36
 1                   D. CIBRIAN
 2   the sourcing group includes yourself, Steve
 3   O'Keefe, Paul Iacovacci, Peter Sherman,
 4   John Henkel and Michael Aldrich; is that
 5   right?
 6        A.    Correct, I see that.
 7        Q.    Is that generally consistent
 8   with what you understood to be the sourcing
 9   group around this period?
10        A.    Yes.
11        Q.    Let's look at another work
12   chart now from a slightly later date.  I'll
13   let you know when it's up.
14        A.    Okay.
15        Q.    That should be up on Exhibit 4
16   in your folder now.  I'll represent this is
17   a document that has the date May 1, 2016 in
18   the title and for the record this is a
19   document beginning bates stamp
20   Brevet-Repro-0068231.
21        A.    I'm there.  I see it.
22        Q.    You see the first page looks
23   basically the same as the page that we saw
24   in the last?
25        A.    It seems like it, yes.
```

```
                                              Page 37
                          D. CIBRIAN
 1
 2         Q.     And then if you scroll down to
 3    the sourcing or the Brevet organization
 4    page on page two, the sourcing group on
 5    this May 1st version of the chart now shows
 6    yourself, Steve O'Keefe and Peter Sherman.
 7    Do you see that?
 8         A.     I do.
 9         Q.     Now, do you recall somewhere
10    around this time period learning that Paul
11    Iacovacci was retiring from Brevet?
12         A.     I can't remember exactly the
13    time period but this looks about right but,
14    yes, I knew that he was retiring.
15         Q.     Do you recall it being
16    relatively early in 2016 that there was an
17    announcement of his retirement?
18         A.     That sounds right, yes.
19         Q.     Possibly even before the March
20    document that we looked at?
21         A.     I don't know.  I really don't
22    know.
23         Q.     Do you recall how you learned
24    that Mr. Iacovacci was retiring?
25         A.     I first picked up on it
```

```
                                        Page 38
 1                  D. CIBRIAN
 2   verbally while I was in the New York office
 3   at one point that Paul was going to be
 4   retiring.
 5        Q.    Was it at a firm meeting?
 6        A.    No, it may have been just a
 7   one-on-one conversation somewhat in
 8   passing.  I struggle to remember exactly
 9   who it was with, but it wasn't -- you know,
10   if by firm meeting you mean people gathered
11   in a conference room being told.  That
12   wasn't the first time that I became aware
13   that he was moving on.
14        Q.    Did you participate in Monday
15   morning firm wide meetings at Brevet?
16        A.    Yes.
17        Q.    Would you be in the New York
18   office for those?
19        A.    Not always.  I would either be
20   patched in by phone or video from
21   elsewhere, San Antonio or I travelled a
22   good bit on firm business but if I was in
23   New York I would be there in person.
24        Q.    Do you recall Mr. Iacovacci's
25   retirement being discussed at a Monday
```

```
 1                    D. CIBRIAN
 2    morning firm wide meeting?
 3         A.    I do not.
 4         Q.    Did you know around that time
 5    that Mr. Iacovacci was experiencing health
 6    issues?
 7         A.    Yes, he had been out.  He had
 8    had some medical procedures, I want to say
 9    something orthopedic is what I remember, a
10    knee or something like that but, yes, he
11    was in and out.
12         Q.    Did you understand that to be
13    the reason for his planned retirement?
14         A.    I did not.
15         Q.    Did you have a different
16    understanding as to what the reason for his
17    retirement was?
18         A.    I didn't think it was health
19    driven.  I thought this just sort of
20    happened at sort of the same time but, you
21    know, just kind of the feel was that, you
22    know, he just was going to move on.  That
23    there had been sort of disagreements about
24    the course of sourcing and some other
25    things with others at the firm and when I
```

```
 1              D. CIBRIAN
 2   first heard I heard he was retired.
 3        Q.    Did there come a point in time
 4   when you learned that Brevet had terminated
 5   Mr. Iacovacci?
 6        A.    The first that I may have heard
 7   definitively that this would have been a
 8   termination was when we were advised there
 9   was a lawsuit from Paul against the firm.
10        Q.    How did you learn about the
11   lawsuit?
12        A.    There was a formal what lawyers
13   refer to I believe as litigation hold
14   e-mail or letter that was sent out to all
15   firm personnel after the lawsuit was filed.
16        Q.    Do you recall approximately
17   when you received that litigation hold?
18        A.    I do not.
19        Q.    That's the first you heard
20   about the dispute between Mr. Iacovacci and
21   the company?
22        A.    I believe it's the first I
23   heard that it had become formal litigation.
24   As I alluded to earlier there had been
25   rumblings that the separation had not gone
```

Page 41

```
 1                    D. CIBRIAN
 2   well, the retirement, however it was
 3   phrased, that it had become difficult but I
 4   was not aware there was litigation.  The
 5   best I can remember I wasn't aware there
 6   was litigation until the formal kind of
 7   notice came out.
 8        Q.    Did you speak with Mr. Callahan
 9   about that?
10        A.    Most likely I would have at
11   least once or twice, yes.
12        Q.    What did Mr. Callahan tell you?
13        A.    Along the lines -- not specific
14   in depth details, but along the lines of
15   what I just relayed.  That there were still
16   ongoing discussions.  It was difficult.  It
17   was dragging on etcetera, etcetera,
18   etcetera.  So, something to that affect and
19   it would have been in the context of a
20   broader conversation on other issues.
21        Q.    Did you speak to Mr.
22   Monticciolo about Mr. Iacovacci's
23   departure?
24        A.    Yeah, I may have spoken to him
25   once or twice, but again just in the
```

```
                                          Page 42
 1                    D. CIBRIAN
 2    context of firm, you know, is Paul coming
 3    back, etcetera, things of that nature.
 4         Q.    Did you use -- I think I know
 5    the answer to this question already, but
 6    did you use computers or other electronic
 7    devises to conduct your work with Brevet?
 8         A.    Yes.
 9         Q.    What computers did you use?
10         A.    I had a laptop that I received
11    from the firm and that was it.  So, it's
12    not like I had machines in different
13    places.  It was just a laptop that would
14    travel with me.
15         Q.    Was that laptop marked to show
16    that it was a Brevet property?
17         A.    I believe it was.  I think it
18    had some sort of property tag on the bottom
19    of it, something to that effect.
20         Q.    Did you use that computer
21    exclusively for work?
22         A.    I mean I may have occasionally
23    used a Brevet Capital e-mail address to do
24    something personal.  I may have like
25    entered, you know, a kid's school
```

```
 1                    D. CIBRIAN
 2   commitment on my Brevet calender, things
 3   along those lines.
 4        Q.    Did you have any non Brevet
 5   e-mail accounts?
 6        A.    I did.
 7        Q.    Would you access non Brevet
 8   e-mail accounts from the laptop?
 9        A.    No, I wouldn't.  For that I
10   normally would use my at home desktop
11   machine to access my personal e-mail
12   address or my phone.
13        Q.    Did you use your at home
14   desktop to do Brevet work?
15        A.    Yes, I did.  It was configured
16   by IT to be able to access the Brevet
17   network.
18        Q.    Did Brevet have the right to go
19   into that home computer without your
20   permission?
21             MS. REA:  Objection to form.
22             MR. KUMIN:   Me as well.
23        A.    So, no, I was not aware and
24   frankly didn't think about them having
25   access to that home computer.  I mean I
```

```
 1                    D. CIBRIAN
 2   knew they would have access to Brevet's
 3   Outlook on that computer when I accessed
 4   it, but did not anticipate they would have
 5   access to anything non Brevet on that
 6   desktop.
 7        Q.     By Brevet Outlook, do you mean
 8   the Brevet e-mail system?
 9        A.     Correct.
10        Q.     Did Brevet have an employee
11   handbook?
12        A.     Yes.
13        Q.     Do you know whether the
14   handbook covered computer usage?
15        A.     It did.
16        Q.     Do you recall the terms of the
17   computer usage?
18        A.     Not exactly.  There were
19   references to limiting personal use on
20   company equipment I believe.  Also there
21   was some discussion about personal devices
22   like cell phones and then that policy
23   during the time I was there it would change
24   as did other policies.
25        Q.     This might be a good time.  I
```

Page 45

```
 1                    D. CIBRIAN
 2   think we're about an hour and I'm going to
 3   be changing topics shortly.  It maybe a
 4   good time for us to take a quick break if
 5   that's convenient for you.
 6         A.    That would be good.  Thank you.
 7               THE VIDEOGRAPHER:   We're going
 8           off the record at 12:24 P M.  This is
 9           the end of media unit one.
10               (Whereupon, a brief break was
11           taken.)
12               THE VIDEOGRAPHER:  We're going
13           back on the record at 12:41.  This is
14           the beginning of media unit two.  You
15           may proceed.
16         Q.    Welcome back, Mr. Cibrian.
17         A.    Thank you.
18         Q.    While we were on break I marked
19   another exhibit.  This is Exhibit 5.  You
20   let me know when you have that.
21         A.    Okay, it's come up.  I'm
22   opening it.
23         Q.    So, we were talking -- and for
24   the record this is a document bates
25   labelled P-01-0009976.
```

```
 1                    D. CIBRIAN
 2              We were talking a moment ago
 3    about regulatory compliance issues and did
 4    I have it right that the regulatory
 5    compliance issues centered principally on
 6    Brevet's status as a registered investment
 7    advisor?
 8         A.    Yes, that's my understanding.
 9         Q.    Do you know which Brevet entity
10    had the status of registered investment
11    advisor?
12         A.    I believe it was on the work
13    chart that you showed me earlier.  I
14    believe it was the Brevet Capital
15    management entity.
16         Q.    Now, do you recall when you
17    came on at Brevet who was in charge of
18    regulatory compliance?
19         A.    Yes, there was a person by the
20    name of Cherie Harris that was compliance
21    at that time.
22         Q.    Looking at this document in
23    front of you, you can flip to the first
24    page of the attachment.  Do you recognize
25    this document?
```

```
 1                 D. CIBRIAN
 2        A.    I don't recall ever seeing it.
 3   Again, intermediate duration was created
 4   after I had joined.  If you give me a
 5   second to scroll through the other pages
 6   quickly.
 7        Q.    Sure.
 8        A.    There are portions of it in the
 9   first few pages that's just general
10   background on Brevet that I recognize some
11   of that from other materials, not
12   necessarily this precise presentation, but
13   I don't recall specifically seeing this
14   intermediate duration fund brochure or
15   whatever it's called.
16        Q.    Do you recognize sort of the
17   general category of documents that this
18   falls into?  Is this a category of
19   documents that Brevet prepares?
20        A.    Yes, I mean marketing materials
21   or decks like this were prepared
22   frequently.
23        Q.    Would these be referred to as
24   marketing decks or presenter presentation?
25   Is there a term for this kind of document?
```

```
 1                    D. CIBRIAN
 2        A.     Yeah, investor presentation
 3   would be a subset of marketing decks.   For
 4   example, there could be a marketing
 5   presentation or deck used on the deal
 6   sourcing side, the business development
 7   side that might not ever be seen by an
 8   investor and vice versa.
 9        Q.     And would marketing decks for
10   the sourcing side differ from marketing
11   decks on the investor side?
12        A.     Yes, they generally would.
13        Q.     How so?
14        A.     The investor deck would tend to
15   focus on fund performance, portfolio
16   construction, diversification within
17   certain regulatory parameters.   The
18   investor decks would have things like prior
19   return performance and things of that
20   nature.
21        Q.     Can you turn to the back of
22   this document to the disclaimer page?
23        A.     Okay.
24        Q.     Actually, if you turn one page
25   up before that.
```

                         D. CIBRIAN

1

2        A.      Okay.

3        Q.      The contact details page, do

4   you see that?

5        A.      I'm there now, yes.

6        Q.      It's internal page 22 of the

7   power point for the record.

8                Does this contact details page

9   suggest to you that this is an investor

10  phasing presentation?

11       A.      It would, yes.

12       Q.      Now, were investor phasing

13  marketing decks subject to the regulatory

14  restrictions that Brevet faced as a

15  registered investment advisor in a way that

16  was different from the marketing decks that

17  would be pitched to potential borrowers?

18       A.      So, I'm sorry, I almost heard

19  that as a compound question.  So, would

20  these investor presentations be subject to

21  the regulatory requirements; was that your

22  question?

23       Q.      Yes.

24       A.      Yes, it would.

25       Q.      Is that also true of the decks

```
                                        Page 50
 1                    D. CIBRIAN
 2   that would go to potential borrowers?
 3        A.    If they were going only to
 4   borrowers it would be less likely that they
 5   would be subject to the same side of
 6   regulatory scrutiny.
 7        Q.    And is this page of disclaimers
 8   part of the regulatory compliance process
 9   for communications that Brevet would send
10   out to investors?
11        A.    That is the next page here
12   after the context?
13        Q.    Yes, page 23 of the power
14   point.
15        A.    So, just looking at it have not
16   read all of the words, but, yes, this would
17   be very standard in an investor phasing
18   presentation to have this type of
19   disclaimer language included.
20        Q.    Scrolling up to the
21   organizational chart on page 18 of this
22   deck.
23        A.    Okay.  This is the one that
24   Doug is listed at the top with an asterisk
25   CIO?
```

```
                                              Page 51

 1                   D. CIBRIAN
 2        Q.     Yes.
 3        A.     I'm there.
 4        Q.     Over here in the compliance
 5   section I think this is consistent with
 6   what you testified to before Cherie Harris
 7   is identified as the compliance department
 8   for Brevet?
 9        A.     Yes, that's the person I
10   referenced to.
11        Q.     Do you know what Miss Harris's
12   qualifications were to handle regulatory
13   compliance?
14        A.     My memory is a little strained.
15   I believe she came from some sort of
16   paralegal background perhaps but that's the
17   extent of what I know.
18        Q.     Do you have a sense that her
19   paralegal background qualified her to
20   handle regulatory compliance for Brevet?
21        A.     You know, I really wasn't
22   familiar with what she did in the past so I
23   just know that when I arrived that's what
24   her role was, but don't really have much
25   more insight into her background before
```

Page 52

```
1                    D. CIBRIAN
2    then.
3         Q.    While you were at Brevet, did
4    Brevet do anything to take a closer look at
5    its compliance practices?
6         A.    So, Brevet always had outside
7    counsel.  They had what was called -- what
8    we called in the industry fund counsel
9    tended to be securities regulatory counsel.
10   I believe that work was done in the time I
11   was there by the Curtis Malette firm.
12        Q.    Was Cherie Harris the point
13   person for liaising with Curtis Malette?
14        A.    It was a combination of Miss
15   Harris and Doug and Mark primarily at that
16   time.
17        Q.    Other than engaging Curtis
18   Malette as counsel, was there anything else
19   that Brevet did during the time you were
20   there to evaluate its regulatory
21   compliance?
22        A.    So, at some point I'm saying
23   maybe in the 2017 range general counsel was
24   brought on as a full-time employee.  Some
25   time after she joined she added to her
```

Page 53

```
 1                    D. CIBRIAN
 2    staff.  There was another attorney that was
 3    brought on to do compliance oriented work
 4    and then the firm as is required -- as is
 5    custom worked with a fund administration
 6    firm that was a third-party firm that did a
 7    variety of administrative investor
 8    reporting tasks for Brevet in its capacity
 9    as registered investment advisor.  I think
10    those were the components.
11              Miss Harris when I arrived
12    general counsel then effectively some sort
13    of lawyer reporting to the general counsel
14    and then reliance on outside counsel,
15    reliance on the fund administer as well.
16              Near the end there was an
17    individual that was brought on to help with
18    operational matters.  There was some
19    discussions about the fact that he was
20    coming on to serve as the new chef
21    operating officer of the firm.  My
22    understanding he was a consultant for a
23    short time and was looking at a variety of
24    things including compliance.  So, I think
25    that's all of it.
```

```
 1                    D. CIBRIAN
 2        Q.    Starting with the general
 3   counsel you mentioned, who was that?
 4        A.    May Lee DaSilva (phonetic).
 5        Q.    Do you know when she came on?
 6        A.    I don't know exactly.  That was
 7   a sort of 2017 time frame that I was
 8   struggling with.  Maybe near the end of
 9   2017.  I'm not sure.
10        Q.    Did May Lee DaSilva take over
11   Cherie Harris's role?
12        A.    They overlapped for a time and
13   then Miss Harris left the firm.  I think it
14   was a few months, maybe less than a year.
15        Q.    Was that sort of a transition
16   period to your understanding or was there
17   another circumstance that caused Miss
18   Harris to leave the firm?
19        A.    I don't know that --
20              MS. REA:  Objection to form.
21         Go ahead.
22        A.    I don't know if there was a
23   specific incident or situation but my
24   recollection is that she was asked to leave
25   the firm.
```

```
                                    Page 55
 1                     D. CIBRIAN
 2        Q.     Now, you mentioned I think
 3   another attorney that Miss DaSilva brought
 4   in to handle other issues or other
 5   compliance issues?
 6        A.     Yeah, I think it was mainly
 7   compliance issues.  I believe his name was
 8   Daniel with a B.  Maybe Bunge (phonetic) or
 9   something like that.
10        Q.     Do you know the timing of Mr.
11   Bunge's --
12        A.     Not exactly.  I would be
13   guessing but it was definitely --  she
14   hired him.  She brought him in so it was
15   definitely a good bit after her arrival.
16        Q.     And did you have a sense of
17   what Mr. Bunge's responsibilities were?
18        A.     It was sort of more of the
19   day-to-day routine compliance policies,
20   procedures, assurance thereto, monitoring,
21   etcetera, and he definitely reported up to
22   DaSilva then.
23        Q.     Did you have frequent
24   interaction with compliance in your day to
25   day in your role at Brevet?
```

Page 56

                        D. CIBRIAN
1
2       A.    I would say medium.  Again,
3  since I was more on the structuring
4  sourcing underwriting side sort of, you
5  know, occasional, not constant.
6       Q.    Now, the fund administrator
7  that you referenced, who was that?
8       A.    I think they went through a
9  name change but let's say ███ █████ █
10 was the name of the firm or the combined
11 firms.
12      Q.    Was the ███ █████ █ role
13 consistent throughout the time that you
14 were with the firm or did that change over
15 time?
16      A.    Yeah, that was -- the bulk of
17 that fell to the accounting financing CFO
18 area.  They had more of the day to day but
19 I think it was consistent.  I don't recall
20 there sort of being a change in fund
21 administration responsibilities or
22 outsourcing.  I think it was consistent.
23      Q.    Did the fund administrator have
24 a role or responsibilities in setting
25 practices and procedures for regulatory

```
                                          Page 57
 1                  D. CIBRIAN
 2    compliance at Brevet?
 3          A.    They didn't have a role in
 4    setting them, requiring them.  They were --
 5    you know, they operated within them.  They
 6    knew generally what was required.  So, my
 7    understanding is if there was something
 8    that they picked up on they would have
 9    flagged it, but they were not hired to be
10    responsible for the compliance
11    infrastructure of the firm.
12          Q.    Got it.  That's helpful.
13                And then I think you mentioned
14    that someone was brought in as a candidate
15    for a new COO --
16          A.    Yes.
17          Q.    -- at a certain point in time?
18          A.    Yes.
19          Q.    Do you recall what time frame
20    that was?
21          A.    That would have been early
22    2018, so let's say I think he was under a
23    consulting arrangement from January to June
24    2018 I would say.
25          Q.    Had somebody exited the role of
```

```
                                    Page 58
 1                  D. CIBRIAN
 2   COO?
 3        A.    Yes, I believe Jennifer
 4   Fleisner (phonetic) had served in the COO
 5   role for some time in 2017.
 6        Q.    And she had left the firm?
 7        A.    Yes, she had.
 8        Q.    Do you recall the circumstances
 9   of that departure?
10        A.    I believe it was her decision.
11   She resigned voluntarily and she went on to
12   pursue other opportunities.
13        Q.    And who was the individual who
14   was identified to serve as the new COO?
15        A.    Michael Sismansky.
16        Q.    I think you said he looked at a
17   variety of compliance issues.  What
18   compliance issues specifically do you know
19   Mr. Sismansky looked at?
20        A.    I don't know specifically if
21   there was a certain direction or
22   instruction he was given by the firm to
23   look at this versus look at that.  It
24   seemed -- again, from what I can gather
25   from the sidelines it was just more of a
```

Page 59

```
 1              D. CIBRIAN
 2  general take a look, how are we doing, let
 3  us know, make recommendations.
 4       Q.    What did Mr. Sismansky find
 5  from his look at the company?
 6       A.    I don't know.  I did not -- I
 7  was not part of the group that was working
 8  with him.  I did talk to him at the request
 9  of Doug on several occasions to sort of get
10  him up to speed on my areas of
11  responsibilities and a variety of things
12  but I never saw a report.  I was not in a
13  meeting where he reported on or made
14  recommendations as to compliance.
15       Q.    Do you know one way or the
16  other whether he did make any
17  recommendations as to compliance?
18       A.    I had heard that he had made
19  recommendations because when his consulting
20  assignment wrapped up it may have been in
21  discussions with May Lee or Mark Callahan
22  or both that, you know, he had rendered his
23  report and his consulting engagement had
24  been terminated.
25       Q.    Did you have a sense of why his
```

```
 1                    D. CIBRIAN
 2  consulting arrangement had been terminated?
 3       A.    Did I have a sense?
 4       Q.    Yes.
 5       A.    Yes, the sense was that it
 6  became a tense and contentious relationship
 7  between him and Doug and I believe May Lee
 8  during that time period -- that short time
 9  period.  So, that was the feeling and it
10  was sort of the rumor in the office and in
11  the firm that things had gotten difficult
12  between them during that assignment.
13       Q.    Do you have an understanding of
14  why things became difficult?
15       A.    Again, this is sort of, you
16  know, hearing through others, but it was
17  that it was a difference of opinion on
18  recommendations and courses of action, but
19  I don't know what exactly those were.
20  Either the recommendations or the courses
21  of actions or differences of opinion.
22       Q.    Do you know what aspects of
23  Brevet's business differences of opinion
24  centered on?
25       A.    I believe it was what he was
```

Page 61

1                      D. CIBRIAN
2    asked to look at which was operational and
3    compliance.
4         Q.    In terms of operational issues,
5    do you know what operational issues he was
6    asked to look at?
7         A.    Not specifically, no.
8         Q.    Do you know generally what
9    operational issues he was asked to look at?
10        A.    Yeah, I recall that there was
11   some discussion about bringing in -- I may
12   get this wrong, but sort of an outsourced
13   document management service provider and I
14   believe Michael was charged with trying to
15   run that process.  That would be, again,
16   kind of the more operational side.
17        Q.    What would an outside
18   outsourced document management service
19   provider be designed to do?
20        A.    So, generally creating the
21   infrastructure for a firm like Brevet to
22   manage its documents, its materials, where
23   to keep them, where to keep them
24   safeguarded and secure, all of those
25   things.

```
                          D. CIBRIAN
 1
 2        Q.     Do you know whether Mr.
 3   Sismansky, Doug and May Lee had differing
 4   views on whether to outsource document
 5   management?
 6        A.     I don't.
 7        Q.     Do you know whether the
 8   operational issues related to document
 9   management were one of the sources of
10   conflict?
11        A.     I don't.
12        Q.     On the compliance side, do you
13   have a sense of the issues that Mr.
14   Sismansky was asked to take a look at?
15        A.     At Brevet, no, I do not.
16        Q.     Do you have any understanding
17   of the topics on which Mr. Sismansky gave
18   recommendations?
19             MS. REA:  Objection to form.
20        A.     So, not specifically, but you
21   know in part as we were discussing earlier
22   if you're going to look at registered
23   investor's compliance sort of overall
24   comprehensively you spend a good deal of
25   time looking at things like what's in the
```

Page 63

```
 1                    D. CIBRIAN
 2   offering documents which includes the
 3   private placement memorandum.  What is in
 4   those investor decks like the ones we were
 5   talking about earlier.  You'd take a look
 6   at what you're doing with investor
 7   reporting, how are you reporting your past
 8   performance as a firm and a fund.  So, it's
 9   a whole host of compliance oriented matters
10   much of which is, again, investor phasing,
11   what's being communicated to perspective
12   investors or existing investors about the
13   firm and the funds that it manages.
14        Q.    Is it your understanding that
15   Mr. Sismansky had concerns about Brevet's
16   practices with respect to offering docs and
17   investor decks and related materials?
18             MS. REA:  Object to form.
19        A.    So, again, my basis for that
20   there was a difference of opinion is what
21   was going around the firm and the office
22   about interactions between them while he
23   was doing his work.  You know, things were
24   relayed in the office, things got heated.
25   There was a loud meeting, so it was the
```

```
 1                    D. CIBRIAN
 2   scuttlebutt, if you will, that things were
 3   not going smoothly during that consulting
 4   assignment.
 5         Q.    What did you hear about heated
 6   interactions or a loud meeting?
 7         A.    What did I hear?
 8         Q.    Yes.
 9         A.    That there had been
10   disagreements and kind of short tempers.
11         Q.    Were those disagreements and
12   short tempers that were witnessed by others
13   in Brevet's office?
14         A.    Again, not always being in the
15   New York office I wasn't present for any of
16   those, but what was being discussed is
17   there was behind closed door meetings where
18   you could hear the discussion out in the
19   common area.
20         Q.    Do you recall where you heard
21   that?
22         A.    No, I don't.  Likely it would
23   have been during a visit to New York
24   catching up with people.
25         Q.    Do you know how Mr. Sismansky's
```

Page 65

```
 1                    D. CIBRIAN
 2    relationship with Brevet ended?
 3         A.    I don't other than, again, I
 4    picked up from someone and, again, my
 5    inclination it was either Mark Callahan or
 6    May Lee DaSilva that they had terminated
 7    his consulting agreement.
 8         Q.    Did the termination of his
 9    consulting agreement follow shortly after
10    the heated conversations you'd heard about?
11         A.    Not necessarily.  I think,
12    again, he was there six months and from,
13    again, the sound of it not anything I
14    witnessed per se, there were various kinds
15    of difficult conversations during that
16    period.  So, I can't tell you they decided
17    to terminate him in May and terminated him
18    in June and there was a conversation a day
19    before, a week before, a month before, but
20    the sense was he was terminated.
21         Q.    We talked or I think you
22    mentioned that there were terms that you
23    were unable to recall about your phantom
24    stock or interest in the general partner
25    but that might have been in your employment
```

Page 66

```
                         D. CIBRIAN
 1
 2    letter; is that right?
 3         A.    Correct.
 4         Q.    Why don't I mark this for you
 5    to have a look at?
 6         A.    Sure.
 7         Q.    You should be able to find it
 8    as Exhibit 6 in your folder a document with
 9    the beginning bates Cibrian 000001.
10         A.    Yes, I have it open.  It came
11    up.
12         Q.    Do you recognize this document?
13         A.    I do.
14         Q.    What is it?
15         A.    It is my employment letter
16    between Brevet Holdings and myself.
17         Q.    And if you look at paragraph
18    1-C of that letter, is this the provision
19    you were thinking of that refers to your
20    partner participation or profit
21    participation I should say?
22         A.    Yes, 1-C, correct.
23         Q.    Does this contemplate that your
24    interest would ultimately be through a
25    direct membership interest in one or more
```

Page 67

```
 1                    D. CIBRIAN
 2   of the general partners?
 3        A.    Yes.
 4        Q.    Do I understand correctly from
 5   what you described before that that direct
 6   interest did not come to pass?
 7        A.    Correct.
 8        Q.    But you did reach a different
 9   arrangement for a phantom interest in the
10   general partner?
11        A.    Yes, it was not a new
12   arrangement or a different arrangement.  It
13   was in essence the interest in the first
14   sentence where you'll see the word partner
15   in quotation marks.
16        Q.    Okay.
17        A.    Right, so there's a profit
18   participation given to me as I described
19   earlier at the end of the year through this
20   1-C understanding, but as far as being in
21   the general partner which was the intent
22   and my expectation that as you just
23   described it did not come to pass.
24        Q.    And can you point me to
25   anything in the letter that indicates what
```

```
                                          Page 68
 1                    D. CIBRIAN
 2   the percentage interest is?
 3        A.    Yeah, I'm not seeing it in here
 4   so that just maybe may have been agreed to
 5   verbally between Doug Monticciolo and
 6   myself.  I'm scrolling through but if it
 7   was it would have been there and I'm not
 8   seeing it there.
 9        Q.    So, that may have been agreed
10   to separately -- your best recollection
11   that was approximately ████  ██████, do I
12   have that right?
13        A.    That's what I recall, yes.
14        Q.    Do you recall that being an
15   agreement between you and Doug?
16        A.    Correct.
17        Q.    Did Mr. Callahan join in that
18   agreement?
19        A.    Yes, we had at least one or two
20   conversations leading up to the signing of
21   this letter but Mark would have also been
22   involved in and Mark actually as you can
23   see is the signatory on the letter.
24        Q.    Yes.
25              Did Paul Iacovacci join in that
```

Page 69

```
1                    D. CIBRIAN
2    agreement, to your knowledge?
3         A.    No.
4         Q.    Did John Tripp join in that
5    agreement, to your knowledge?
6         A.    Not any conversations with me,
7    no.
8         Q.    I think I'm getting close to
9    the end of my questions.  If we take
10   another break I maybe able to just round up
11   any last questions that I want to ask and
12   we can end your day hopefully earlier with
13   a break by keeping you on the record if
14   that works for you.
15        A.    I'm not going to turn down a
16   break or finishing earlier.  I vote in
17   favor.
18             THE VIDEOGRAPHER:   Off the
19        record at 1:14 p.m.
20             (Whereupon, a brief break was
21        taken.)
22             THE VIDEOGRAPHER:   Going back
23        on the record at 1:37 p.m. Okay, you
24        may proceed.
25        Q.    Welcome back, Mr. Cibrian.
```

Page 70

```
                        D. CIBRIAN
 1
 2         A.      Thank you.
 3         Q.      Couple of questions about the
 4   hiring and termination of Mr. Sismansky.
 5   Do you know why Mr. Sismansky was being
 6   brought on as a potential new COO?
 7         A.      Well, the position had become
 8   vacant when Miss Fleisner had left the firm
 9   so it seemed like there was a need for
10   somebody to fill that position.  Sismansky
11   was introduced at a meeting -- I want to
12   say he started January of 2018, probably
13   December of 2017 that sort of management
14   meeting that we had he was introduced as he
15   was coming in as an interim COO with the
16   hope of becoming the eventual COO.
17         Q.      Did you have an understanding
18   of his qualifications for that position?
19         A.      When he was introduced to us at
20   that management meeting management offsite
21   in December Doug had introduced him and
22   talked about how he had been in fund
23   management most of his career.  He had
24   served in other C sweet roles in registered
25   investment advisors and fund management
```

Page 71

                    D. CIBRIAN

1

2    firms and that Doug was very excited to

3    have persuaded him to join the firm and

4    help out and come on board.

5         Q.    Did you regard him as well

6    qualified for the position?

7         A.    Yes, I got to know him during

8    that short time he was there, six, seven

9    months and as I testified earlier Doug had

10   asked me to talk to Mike to make myself

11   available to him, to share information with

12   him.  So, I had a little bit of interaction

13   with him during that time period and he

14   very much seemed to know his fund

15   management business.

16             MR. FATTARUSO:   That's all the

17        questions I have.  Thank you very

18         much for your time.

19        A.    Thank you.

20             MS. REA:  We have no questions

21        on behalf of Brevet.

22             THE VIDEOGRAPHER:   We are

23        completed; correct?

24             MR. FATTARUSO:  Yes.

25             THE VIDEOGRAPHER:   Stand by.

Page 72

1               D. CIBRIAN

2      We're going off the record at 1:39

3      p.m.  This concludes today's

4      testimony given by Mr. David Cibrian.

5      There are two media units.  They will

6      be retained by Veritext.

7           (Whereupon, at 1:40 P.M., the

8      Examination of this witness was

9      concluded.)

10

11              °         °         °         °

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                          D. CIBRIAN

2                    D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                    _____

15                        DAVID CIBRIAN

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____

22      NOTARY PUBLIC

23

24

25

Page 74

1                    D. CIBRIAN

2                  E X H I B I T S

3

4

5   EXHIBIT    EXHIBIT                    PAGE

6   NUMBER     DESCRIPTION

7   (None)

8

9                   I N D E X

10

11  EXAMINATION BY                        PAGE

12  MR. FATTARUSO                          6

13

14    INFORMATION AND/OR DOCUMENTS REQUESTED

15  INFORMATION AND/OR DOCUMENTS         PAGE

16  (None)

17

18      QUESTIONS MARKED FOR RULINGS

19  PAGE LINE QUESTION

20  (None)

21

22

23

24

25

Page 75

1                         D. CIBRIAN
2                 C E R T I F I C A T E
3
4   STATE OF NEW YORK        )
                             :   SS.:
5   COUNTY OF NEW YORK       )
6
7          I, EDITH TIRADO-PLAZA, a Notary
8   Public for and within the State of New
9   York, do hereby certify:
10         That the witness whose examination is
11  hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14         I further certify that I am not
15  related to any of the parties to this
16  action by blood or by marriage and that I
17  am in no way interested in the outcome of
18  this matter.
19         IN WITNESS WHEREOF, I have hereunto
20  set my hand this 13th day of October 2021.
21
22
23
                     EDITH TIRADO-PLAZA
24
25

Page 76

**ERRATA SHEET**

**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Iacovacci, Paul v. Brevet Holdings, Llc, 18-Cv-08048 (S.D.N.Y.)

DATE OF DEPOSITION: 10/7/2021

WITNESSES' NAME: David Cibrian

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
                                          David Cibrian

SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 20__.

_____                    _____
(NOTARY PUBLIC)                           MY COMMISSION EXPIRES:

| & |
|---|
| **&**   2:12 3:17 |

| 0 |
|---|
| **000001**   66:9 |
| **0068231**   36:20 |
| **01-0009976**   45:25 |
| **08048**   1:6 76:2 |

| 1 |
|---|
| **1**   3:17 9:25 10:4 |
| 19:10 26:13 33:9 |
| 33:15 36:17 66:18 |
| 66:22 67:20 |
| **10**   21:7,25 |
| **10/7/2021**   76:3 |
| **100**   29:3 |
| **10006**   2:5 |
| **10174**   6:7 |
| **11**   21:6 |
| **11:30**   1:12 |
| **11:34**   4:5 |
| **12:24**   45:8 |
| **12:41**   45:13 |
| **13th**   75:20 |
| **150**   21:9 |
| **150,000**   22:17,22 |
| **15222**   2:10 |
| **18**   50:21 76:2 |
| **1845**   2:13 |
| **19103**   2:14 |
| **1985**   10:20 |
| **1:14**   69:19 |
| **1:18**   1:6 4:19 |
| **1:37**   69:23 |
| **1:40**   72:7 |
| **1st**   37:5 |

| 2 |
|---|
| **2**   19:6,15 |
| **20**   73:19 76:22 |
| **2014**   11:25 13:8 |

**2015**   13:18,18 31:4
33:6,8
**2016**   19:20 20:7
26:13 33:8,17
34:23 35:25 36:17
37:16
**2017**   33:13,17
34:23 52:23 54:7
54:9 58:5 70:13
**2018**   18:6 57:22,24
70:12
**2019**   18:17
**2021**   1:11 4:6
75:20
**22**   49:6
**225**   2:9
**23**   50:13
**24594**   75:23
**25th**   2:13

| 3 |
|---|
| **3**   25:22 |
| **30**   3:16 |
| **33rd**   6:6 |

| 4 |
|---|
| **4**   36:15 |
| **405**   6:6 |

| 5 |
|---|
| **5**   12:25,25 13:15 |
| 13:25 14:9 18:6 |
| 45:19 |
| **55**   2:5 |

| 6 |
|---|
| **6**   66:8 74:12 |

| 7 |
|---|
| **7**   1:11 4:6 |
| **75**   21:7,25 |

| 8 |
|---|
| **80848**   4:19 |

| a |
|---|
| **a.m**   1:12 |
| **a.m.**   4:5 |
| **ability**   25:2,18 |
| **able**   9:16 18:15 |
| 20:15 25:7 43:16 |
| 66:7 69:10 |
| **access**   24:15 25:2 |
| 25:15,18,19 26:25 |
| 43:7,11,16,25 44:2 |
| 44:5 |
| **accessed**   44:3 |
| **accommodate**   8:7 |
| **accomplishing** |
| 18:11,11 |
| **account**   33:12,18 |
| **accounting**   34:7 |
| 35:7,19 56:17 |
| **accounts**   43:5,8 |
| **accurate**   10:13 |
| 24:18 |
| **acquainted**   11:11 |
| **action**   5:17 60:18 |
| 75:16 |
| **actions**   60:21 |
| **added**   52:25 |
| **addition**   12:2 |
| 14:12 |
| **address**   6:4 42:23 |
| 43:12 |
| **administer**   3:11 |
| 53:15 |
| **administration** |
| 53:5 56:21 |
| **administrative** |
| 53:7 |
| **administrator** |
| 56:6,23 |

**advised**   40:8
**advisor**   11:25
12:15 16:19 17:7
17:8 34:11 46:7
46:11 49:15 53:9
**advisors**   70:25
**affect**   8:15 17:10
24:6 41:18
**ago**   9:6,12 46:2
**agree**   4:11
**agreed**   3:5,20 68:4
68:9
**agreement**   18:16
65:7,9 68:15,18
69:2,5
**ahead**   7:13 20:24
30:7 54:21
**al**   1:8
**aldrich**   36:4
**alluded**   40:24
**amended**   9:2
**amount**   35:17
**announcement**
37:17
**answer**   7:13,13
42:5
**answered**   8:5
**answers**   7:20
22:14
**anticipate**   44:4
**antonio**   11:14 12:5
23:17,21,23,25
24:8 38:21
**anyway**   7:14
**apart**   34:22
**apologize**   33:6
**appear**   19:6
**appearances**   5:7
**appears**   21:2
**approached**   13:7

**approval** 25:10
  29:13
**approved** 28:18
**approximately** 4:5
  40:16 68:11
**area** 21:23 56:18
  64:19
**areas** 59:10
**arrangement** 5:2
  57:23 60:2 67:9
  67:12,12
**arrangements**
  24:5
**arrival** 55:15
**arrived** 51:23
  53:11
**asked** 7:3 17:19
  54:24 61:2,6,9
  62:14 71:10
**aspect** 17:10
**aspects** 60:22
**assignment** 59:20
  60:12 64:4
**association** 4:21
**assumption** 25:16
**assurance** 55:20
**asterisk** 50:24
**attachment** 46:24
**attention** 22:16
**attorney** 53:2 55:3
**attorneys** 2:4,9,13
**audio** 4:8
**august** 18:5,5
**authorities** 16:21
**authorized** 3:11
**avail** 14:4
**available** 27:4
  71:11
**avenue** 2:9 6:6
**avi** 2:14 5:22 7:9

**avoid** 7:17
**aware** 27:19 34:4
  38:12 41:4,5
  43:23

**b**

**b** 6:8 55:8 74:2
**back** 16:9 19:3
  35:24 42:3 45:13
  45:16 48:21 69:22
  69:25
**background** 10:6
  47:10 51:16,19,25
**banks** 2:12 5:23
**based** 11:13 12:4
  16:10 32:21
**basically** 36:23
**basis** 63:19
**bates** 36:19 45:24
  66:9
**becoming** 14:14
  14:19 70:16
**began** 13:8 18:13
**beginning** 5:7
  36:19 45:14 66:9
**behal** 2:18 5:18
**behalf** 5:10,16
  71:21
**believe** 9:2,18,24
  9:25 13:17 27:16
  31:24 33:5,6
  35:15 40:13,22
  42:17 44:20 46:12
  46:14 51:15 52:10
  55:7 58:3,10 60:7
  60:25 61:14
**best** 16:2 41:5
  68:10
**beth** 2:18 5:11
**beyond** 33:13
**big** 35:20

**bikers** 19:22
**bit** 21:23 38:22
  55:15 71:12
**blood** 75:16
**board** 71:4
**boca** 11:8
**bonus** 33:14
**books** 35:19
**boot** 24:14
**borrowers** 49:17
  50:2,4
**bottom** 10:18
  42:18
**box** 29:19
**break** 8:4,5,7 45:4
  45:10,18 69:10,13
  69:16,20
**breaks** 8:3
**brevet** 1:8,16 4:16
  11:4,5 12:7,9,14
  12:15,19 13:5,10
  13:16,20 14:5,12
  15:13 16:14,17
  18:3,4,10,18,19
  20:2 21:13 22:3,7
  22:9,20 24:16,18
  24:24,25 26:16
  28:2,17 29:24
  30:5,19 36:20
  37:3,11 38:15
  40:4 42:7,16,23
  43:2,4,7,14,16,18
  44:5,7,8,10 46:9
  46:14,17 47:10,19
  49:14 50:9 51:8
  51:20 52:3,4,6,19
  53:8 55:25 57:2
  61:21 62:15 65:2
  66:16 71:21 76:2
**brevet's** 9:9,13
  17:10 19:19 21:3

24:12 31:10 44:2
  46:6 60:23 63:15
  64:13
**brief** 6:21 11:3
  21:2 35:13 45:10
  69:20
**briefly** 10:17
**bringing** 14:13
  61:11
**broader** 15:2
  41:20
**broadway** 2:5
**brochure** 47:14
**brought** 29:16,17
  52:24 53:3,17
  55:3,14 57:14
  70:6
**bs** 10:19
**building** 24:3
**built** 18:6
**bulk** 56:16
**bunge** 55:8
**bunge's** 55:11,17
**business** 11:7
  12:16 13:23 14:3
  14:18 15:9,10,10
  17:10 18:22,24
  21:3,20 22:8,15
  26:20 28:7 31:10
  38:22 48:6 60:23
  71:15

**c**

**c** 2:2 6:8 66:18,22
  67:20 70:24 73:2
  75:2,2
**calculated** 35:22
**calculation** 32:15
**calender** 43:2
**call** 24:23 32:6
**callahan** 13:7
  18:14 27:21 41:8

41:12 59:21 65:5
68:17
**called** 6:8 14:25
20:12 28:19 30:5
35:14 47:15 52:7
52:8
**calling** 25:16
**candidate** 57:14
**capacity** 21:8 53:8
**capital** 11:24 12:7
12:9,14,19 13:16
14:5 42:23 46:14
**career** 70:23
**careers** 16:7
**case** 1:6 4:19,19
8:21 17:6 76:2
**catching** 64:24
**category** 16:12
47:17,18
**caused** 54:17
**cell** 4:7 44:22
**center** 10:24
**centered** 46:5
60:24
**certain** 16:5,6
34:15 48:17 57:17
58:21
**certainly** 17:14
**certification** 3:8
**certify** 73:4,8 75:9
75:14
**cfo** 35:12 56:17
**chamberland** 12:4
**change** 33:11,17
33:23 34:6,8,22,24
44:23 56:9,14,20
76:5
**changing** 45:3
**characterization**
24:19

**charge** 46:17
**charged** 61:14
**chart** 26:5 27:13
30:6 31:2 35:25
36:12 37:5 46:13
50:21
**charts** 26:15 30:8
**chef** 53:20
**cherie** 46:20 51:6
52:12 54:11
**cibrian** 1:16 4:1
4:14 5:1,24 6:1,5
6:14 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1,16
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1,9
67:1 68:1 69:1,25
70:1 71:1 72:1,4
73:1,15 74:1 75:1
76:3,21
**cio** 50:25
**circumstance**
54:17
**circumstances**
58:8

**civil** 1:19
**civitas** 11:24 12:10
**cleared** 29:10
**clearly** 15:18
**click** 10:2 19:6,13
**clicks** 26:2
**clients** 11:16,16
**close** 69:8
**closed** 17:21 21:22
64:17
**closer** 52:4
**collaborate** 23:13
**colleague** 5:17
**collected** 35:8
**combination**
52:14
**combined** 56:10
**come** 13:4,13 18:2
19:5 22:16 25:21
40:3 45:21 67:6
67:23 71:4
**coming** 42:2 53:20
70:15
**commission** 16:20
76:25
**commitment** 43:2
**committee** 27:15
27:18,20,24,25
28:11,12,21,23
29:6,9,10,22
**common** 64:19
**commonly** 15:22
**communicated**
63:11
**communications**
50:9
**company** 11:6,11
25:7,17 40:21
44:20 59:5
**compensation**
32:16

**competent** 8:11
**completed** 8:6
71:23
**complex** 16:17
35:20
**compliance** 27:6
46:3,5,18,20 50:8
51:4,7,13,20 52:5
52:21 53:3,24
55:5,7,19,24 57:2
57:10 58:17,18
59:14,17 61:3
62:12,23 63:9
**compliant** 34:12
**components** 53:10
**compound** 49:19
**comprehensively**
62:24
**computer** 24:15
42:20 43:19,25
44:3,14,17
**computers** 4:7
24:7,10 25:3 42:6
42:9
**concepts** 18:9
**concerns** 63:15
**concluded** 72:9
**concludes** 72:3
**conditions** 8:15
**conduct** 42:7
**conference** 38:11
**configured** 43:15
**conflict** 62:10
**connected** 24:11
**consent** 4:25
**consider** 22:19
**consistent** 20:5
21:11 36:7 51:5
56:13,19,22
**constant** 56:5

construction 48:16

consultant 15:4 53:22

consulting 57:23 59:19,23 60:2 64:3 65:7,9

contact 49:3,8

contemplate 66:23

contentious 60:6

contents 19:14

context 41:19 42:2 50:12

continue 4:9

convenient 45:5

conversation 9:6 38:7 41:20 65:18

conversations 9:8 17:15 18:13 65:10 65:15 68:20 69:6

coo 57:15 58:2,4 58:14 70:6,15,16

copy 3:14,17

corporate 11:12 11:17

correct 10:2,8,21 10:22 20:9 29:12 29:12 31:12 32:13 34:12,20 36:6 44:9 66:3,22 67:7 68:16 71:23 73:9

correctly 23:3 67:4

counsel 3:6,17 4:15,25 5:6,8,14 5:19 7:6,8,11 9:7 9:9,13 14:16 52:7 52:8,9,18,23 53:12 53:13,14 54:3

counter 14:15

county 75:5

couple 21:22 29:19 70:3

course 7:10 8:9 18:12 25:12 26:16 26:18 30:9 39:24

courses 60:18,20

court 1:2,18 3:13 4:18,22 5:25 6:3 7:16

covered 44:14

create 33:21

created 47:3

creating 61:20

credentials 9:16 24:22,23

credit 22:10

criteria 14:11

cross 22:18

curtis 52:11,13,17

custom 53:5

cv 1:6 4:19 76:2

cyrulnik 2:4,6

**d**

d 3:2 4:1 5:1 6:1,8 6:8 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1

55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,2 74:1,9 75:1

dallas 11:13

daniel 55:8

dasilva 54:4,10 55:3,22 65:6

date 1:11 10:16 26:12 36:12,17 76:3

dated 9:25

david 1:16 4:14 5:24 6:5 72:4 73:15 76:3,21

day 55:19,19,24 55:25 56:18,18 65:18 69:12 73:19 75:20 76:22

days 3:16

deal 14:16 15:21 15:23 17:10,18,23 48:5 62:24

debt 22:10,11

december 11:24 70:13,21

decided 33:11,18 65:16

decision 58:10

decisions 28:5

deck 48:5,14 50:22

decks 47:21,24 48:3,9,11,18 49:13 49:16,25 63:4,17

declaration 9:4

dedicate 13:14

defendant 1:15 2:9

defendants 1:9 5:16

definitely 28:24 55:13,15,21

definitively 40:7

department 27:7 51:7

departure 41:23 58:9

deponent 5:23

deposed 6:19

deposition 1:15 3:8,9,14 4:14 7:11 8:3,24 76:3

depth 41:14

describe 32:2,10

described 67:5,18 67:23

describes 27:13

description 21:2 74:6

designed 61:19

desktop 25:8,10 43:10,14 44:6

detailed 35:18

details 41:14 49:3 49:8

develop 13:25 21:20

developed 16:6

developing 13:15 22:19

development 13:23 14:3,18 15:10 18:22 21:20 26:20 28:8 48:6

devices 4:8 44:21

devises 42:7

differ 48:10

difference 60:17 63:20

**differences** 16:13 60:21,23

**different** 15:6,7 23:14,19 39:15 42:12 49:16 67:8 67:12

**differently** 34:9

**differing** 62:3

**difficult** 41:3,16 60:11,14 65:15

**direct** 32:12 66:25 67:5

**direction** 58:21

**director** 13:21 23:9

**disagreements** 39:23 64:10,11

**disclaimer** 48:22 50:19

**disclaimers** 50:7

**discussed** 38:25 64:16

**discussing** 62:21

**discussion** 44:21 61:11 64:18

**discussions** 13:12 18:4 41:16 53:19 59:21

**dispute** 40:20

**distribution** 14:24 32:21

**distributions** 32:19 33:2

**district** 1:2,2 4:17 4:18

**diversification** 48:16

**docs** 63:16

**document** 10:3,7,9 14:17 19:24 20:19 26:9,12 30:5

31:22 36:17,19 37:20 45:24 46:22 46:25 47:25 48:22 61:13,18 62:4,8 66:8,12

**document's** 26:14

**documentation** 32:25

**documented** 31:19 32:11,24 33:3

**documents** 8:20 17:20 26:24 35:7 47:17,19 61:22 63:2 74:14,15

**doing** 10:5 12:16 28:22 59:2 63:6 63:23

**dollars** 21:7,9

**door** 64:17

**doug** 13:6 27:8,20 28:24 29:5 50:24 52:15 59:9 60:7 62:3 68:5,15 70:21 71:2,9

**dragging** 41:17

**driven** 16:5 33:21 39:19

**duly** 6:9 73:5 75:11

**duration** 30:24 31:5,6,11,14 47:3 47:14

---
**e**
---

**e** 2:2,2 3:2,2 35:11 40:14 42:23 43:5 43:8,11 44:8 73:2 74:2,9 75:2,2

**earlier** 40:24 46:13 62:21 63:5 67:19 69:12,16 71:9

**early** 20:7 28:13 37:16 57:21

**eb** 12:25,25 13:15 13:25 14:9 18:6

**edith** 1:20 4:23 75:7,23

**educational** 10:18

**effect** 3:12,15 42:19

**effectively** 53:12

**efficiency** 11:7

**efficient** 33:22

**either** 17:16 28:18 38:19 60:20 65:5

**electronic** 4:8 42:6

**element** 12:17

**eleven** 20:11

**employee** 12:20 13:10 44:10 52:24

**employees** 23:25

**employment** 11:3 31:25 65:25 66:15

**ended** 12:18 14:13 65:2

**energy** 11:7 13:14

**engagement** 59:23

**engaging** 52:17

**entered** 42:25

**entity** 15:15 16:15 28:3 46:9,15

**equipment** 24:21 25:15,17 44:20

**equity** 22:8,11,17 23:3,7

**errata** 76:1

**esq** 2:6,6,10,14,18 2:18

**essence** 67:13

**et** 1:8

**etcetera** 24:10 41:17,17,18 42:3

55:21

**evaluate** 30:9 52:20

**eventual** 70:16

**eventually** 12:18 23:24

**evolve** 14:7

**evolved** 13:22 14:7

**exactly** 21:25 34:13 37:12 38:8 44:18 54:6 55:12 60:19

**examination** 6:12 72:8 74:11 75:10 75:12

**examined** 6:11

**example** 25:5 26:19 27:7 48:4

**exchange** 16:20

**excited** 71:2

**exclusively** 42:21

**executive** 19:25 20:5,6

**exhibit** 9:15,17,25 10:3,4 19:3,6,10 19:15 25:21,22 36:15 45:19,19 66:8 74:5,5

**exhibits** 19:7,13

**existence** 31:6

**existing** 17:16 63:12

**exited** 57:25

**expectation** 67:22

**experience** 16:11

**experiencing** 39:5

**expertise** 16:4,11

**expires** 76:25

**extent** 17:12,22 51:17

**external**  17:14

**f**

**f**  3:2 75:2
**faced**  49:14
**fact**  53:19
**fair**  31:9 32:9
**fairly**  18:20
**falls**  47:18
**familiar**  51:22
**familiarity**  29:23
**far**  67:20
**fattaruso**  2:4,6 5:9
    5:10 6:13,16
    71:16,24 74:12
**favor**  69:17
**federal**  1:18 12:24
    13:2
**fee**  35:15
**feel**  39:21
**feeling**  60:9
**fees**  34:25 35:8
**fell**  21:24 56:17
**felt**  18:12
**fifth**  2:9
**figure**  27:9
**file**  26:12,13
**filed**  4:17 40:15
**files**  24:16
**filing**  3:7
**fill**  70:10
**finance**  18:8
**financeable**  14:11
**finances**  13:16
**financing**  12:23
    13:25 56:17
**find**  59:4 66:7
**finding**  18:14
**finish**  7:19,20
**finishing**  69:16
**firm**  11:13,16 12:3
    12:5,11,12 13:11

14:2,24 15:5,15
16:8 18:15 21:16
22:10 28:2 33:11
33:18,25 38:5,10
38:15,22 39:2,25
40:9,15 42:2,11
52:11 53:4,6,6,21
54:13,18,25 56:10
56:14 57:11 58:6
58:22 60:11 61:21
63:8,13,21 70:8
71:3
**firms**  56:11 71:2
**first**  6:9 12:6,8,22
    12:23 13:15,17
    24:21 36:22 37:25
    38:12 40:2,6,19,22
    46:23 47:9 67:13
    73:5
**fit**  28:16
**five**  34:19 68:11
**flagged**  57:9
**fleisner**  58:4 70:8
**flip**  46:23
**floor**  2:5,13 6:6
**florida**  11:8
**flow**  35:25
**focus**  22:10 31:10
    48:15
**folder**  19:5,7,13
    25:22 36:16 66:8
**folks**  15:19
**follow**  65:9
**follows**  6:11
**force**  3:15
**foregoing**  73:8
**form**  3:21 22:21
    25:13 32:16 43:21
    54:20 62:19 63:18
**formal**  40:12,23
    41:6

**formally**  31:18
**forth**  75:11
**forward**  22:14
**four**  30:4
**frame**  16:17 54:7
    57:19
**frankly**  27:7 29:4
    43:24
**frequent**  55:23
**frequently**  18:21
    47:22
**front**  16:9 46:23
**full**  12:19 13:11,14
    52:24
**fully**  29:25
**function**  16:14
**functional**  27:13
**fund**  28:6,6 30:12
    30:19,24,25,25
    31:5,11,14 47:14
    48:15 52:8 53:5
    53:15 56:6,20,23
    63:8 70:22,25
    71:14
**fundraising**  15:20
    31:7
**funds**  29:24 30:6
    34:3 63:13
**further**  3:20 20:10
    24:17 73:8 75:14

**g**

**gather**  58:24
**gathered**  38:10
**general**  12:23
    31:14,17,19 32:4,7
    32:17 34:2,17,25
    35:7 47:9,17
    52:23 53:12,13
    54:2 59:2 65:24
    67:2,10,21

**generally**  20:6
    21:21 24:20 36:7
    48:12 57:6 61:8
    61:20
**generate**  14:2
**george**  2:18 5:12
**georgetown**  10:24
**getting**  69:8
**give**  8:11 26:13
    47:4
**given**  9:5 58:22
    67:18 72:4 73:10
    75:13
**global**  56:9,12
**go**  4:11 7:13 9:21
    18:19,20 19:3
    20:24 24:16 27:8
    30:7 43:18 50:2
    54:21
**going**  4:4 22:14
    32:3 35:24 38:3
    39:22 45:2,7,12
    50:3 62:22 63:21
    64:3 69:15,22
    72:2
**good**  4:3 5:21 6:14
    6:15 9:14 38:22
    44:25 45:4,6
    55:15 62:24
**gotten**  60:11
**govern**  15:15
**governed**  15:8
    17:12
**governing**  28:3
**government**  12:22
    13:3 18:8
**gp**  32:12
**great**  26:8
**grew**  23:24 28:23
**ground**  6:22

**group**  11:24 17:13
17:18 36:2,9 37:4
59:7
**guessing**  55:13

**h**

**h**  74:2
**hand**  75:20
**handbook**  44:11
44:14
**handle**  51:12,20
55:4
**hands**  20:21
**happened**  34:5
39:20
**harris**  46:20 51:6
52:12,15 53:11
54:13,18
**harris's**  51:11
54:11
**head**  20:14
**headquartered**
11:8
**health**  39:5,18
**hear**  64:5,7,18
**heard**  40:2,2,6,19
40:23 49:18 59:18
64:20 65:10
**hearing**  60:16
**heated**  63:24 64:5
65:10
**heavily**  17:9
**held**  1:19
**help**  25:16 53:17
71:4
**helpful**  57:12
**henkel**  36:4
**hereinbefore**
73:11 75:11
**hereunto**  75:19
**high**  21:2 30:18,21

**hired**  55:14 57:9
**hiring**  70:4
**history**  10:19 11:3
**hold**  40:13,17
**holdings**  1:8,16
4:17 66:16 76:2
**home**  43:10,13,19
43:25
**honors**  10:23
**hope**  70:16
**hopefully**  69:12
**host**  63:9
**hour**  45:2
**house**  13:13
**houston**  12:4
**hover**  19:12
**hrdlicka**  12:4

**i**

**iacovacci**  1:3 4:16
5:11 6:17 23:8
36:3 37:11,24
39:5 40:5,20
68:25 76:2
**iacovacci's**  38:24
41:22
**ideal**  21:17
**ideas**  18:9
**identified**  34:16
51:7 58:14
**identify**  5:14
14:10
**identifying**  28:8
**impact**  34:13
**impetus**  33:23
**implementing**
30:14
**incentive**  35:15
**incident**  54:23
**inclination**  65:5
**include**  27:2

**included**  50:19
**includes**  36:2 63:2
**including**  53:24
**independent**  20:18
**indicates**  67:25
**individual**  53:17
58:13
**individuals**  16:5
**industry**  12:25
32:10 52:8
**informal**  31:23
**information**  33:10
71:11 74:14,15
**infrastructure**
57:11 61:21
**initially**  18:13
**insight**  51:25
**instantly**  24:15
**instruct**  9:20
**instructed**  7:12
**instruction**  58:22
**intake**  28:12,14,19
28:20 29:6,10,13
**intent**  29:21 31:20
67:21
**interaction**  9:12
23:10 55:24 71:12
**interactions**  63:22
64:6
**interest**  22:7 32:8
32:12,18,23 34:16
34:17,19 65:24
66:24,25 67:6,9,13
68:2
**interested**  21:13
75:17
**interests**  32:4
**interim**  70:15
**intermediate**  31:6
47:3,14

**internal**  15:13
16:2 49:6
**internally**  15:19
17:24
**interphase**  17:24
**introduced**  70:11
70:14,19,21
**invest**  28:5
**investigator**  15:8
**investment**  14:19
16:19 17:7,8
18:24 22:17 23:6
27:15,17,20,24,25
28:2,9,10,17 29:9
29:22 46:6,10
49:15 53:9 70:25
**investments**  22:8
**investor**  14:21,25
15:3,20,24 16:22
17:13,17,24 48:2,8
48:11,14,18 49:9
49:12,20 50:17
53:7 63:4,6,10,17
**investor's**  62:23
**investors**  11:15
17:4,5,15,16 50:10
63:12,12
**involved**  14:14,19
15:11 29:22 30:13
68:22
**ir**  15:4
**issue**  17:12 25:5
33:15
**issues**  39:6 41:20
46:3,5 55:4,5,7
58:17,18 61:4,5,9
62:8,13

**j**

**january**  11:24
13:18 18:16 31:4
57:23 70:12

| | | | m |
|---|---|---|---|

**jason** 2:6
**jd** 10:23
**jennifer** 58:3
**jim** 4:20
**john** 36:4 69:4
**join** 11:18 13:4,9
68:17,25 69:4
71:3
**joined** 11:9 12:19
13:17 30:23 31:3
31:21 47:4 52:25
**joining** 11:4,5 33:4
**judge** 3:13
**july** 18:5
**june** 57:23 65:18

**k**

**k** 33:9,15
**katz** 2:12 5:22
**keep** 61:23,23
**keeping** 69:13
**kept** 26:25
**kid's** 42:25
**kind** 18:10 28:23
34:13 39:21 41:6
47:25 61:16 64:10
**kinds** 65:14
**knee** 39:10
**knew** 37:14 44:2
57:6
**know** 7:24 8:4
13:10 14:8 16:9
18:10 24:25 27:23
33:25 34:6 35:16
36:13 37:21,22
38:9 39:4,21,22
42:2,4,25 44:13
45:20 46:9 51:11
51:17,21,23 54:5,6
54:19,22 55:10
56:5 57:5 58:18
58:20 59:3,6,15,22

60:16,19,22 61:5,8
62:2,7,21 63:23
64:25 70:5 71:7
71:14
**knowledge** 10:12
69:2,5
**kumin** 2:14 5:21
5:22 7:9 43:22

**l**

**l** 3:2,2 73:2
**labelled** 45:25
**language** 50:19
**laptop** 25:7,8,10
42:10,13,15 43:8
**larger** 21:8
**launched** 31:7
**law** 10:24 11:12
11:17 12:3,11,12
**lawsuit** 40:9,11,15
**lawyer** 53:13
**lawyers** 40:12
**leading** 12:18
68:20
**learn** 40:10
**learned** 37:23 40:4
**learning** 37:10
**leave** 18:2,4 54:18
54:24
**lee** 54:4,10 59:21
60:7 62:3 65:6
**left** 11:17 54:13
58:6 70:8
**legal** 12:16
**lending** 22:4
**letter** 29:21 31:25
31:25 33:4,4
34:21 40:14 66:2
66:15,18 67:25
68:21,23
**level** 21:3 27:5
28:19 30:18,22

**lexington** 6:6
**liaising** 52:13
**limited** 33:20
**limiting** 44:19
**line** 8:6 74:19 76:5
**lines** 41:13,14 43:3
**link** 9:19 19:2
**linked** 10:10,13
**listed** 11:9,22
50:24
**litigation** 40:13,17
40:23 41:4,6
**little** 51:14 71:12
**llc** 1:8,16 4:17
76:1,2
**llp** 2:4,8,12
**log** 9:17 24:21
25:10
**login** 24:17,22,22
**longstanding**
16:25
**longtime** 11:17
**look** 20:4 25:20
26:18,22 30:4
36:11 52:4 58:23
58:23 59:2,5 61:2
61:6,9 62:14,22
63:5 66:5,17
**looked** 18:7 30:11
37:20 58:16,19
**looking** 13:24
21:19 22:4 27:12
30:14 46:22 50:15
53:23 62:25
**looks** 19:21 36:22
37:13
**loud** 63:25 64:6
**loyola** 10:19

**m** 45:8
**machine** 43:11
**machines** 42:12
**mail** 35:11 40:14
42:23 43:5,8,11
44:8
**making** 22:8 28:4
**malette** 52:11,13
52:18
**manage** 61:22
**management**
46:15 61:13,18
62:5,9 70:13,20,20
70:23,25 71:15
**manages** 63:13
**managing** 13:21
23:9
**mandate** 28:4
**march** 26:13
35:25 37:19
**mark** 13:6 18:13
27:8,21 28:25
29:6 52:15 59:21
65:5 66:4 68:21
68:22
**marked** 10:4 19:7
19:13 42:15 45:18
74:18
**marketing** 47:20
47:24 48:3,4,9,10
49:13,16
**marking** 19:4
**marks** 67:15
**marriage** 75:16
**marshall** 2:12
5:22
**mary** 2:18 5:11
**marymount** 10:20
**material** 10:7
28:15

materials 16:23 27:11 47:11,20 61:22 63:17
matter 4:15 5:3 6:18 25:11 75:18
matters 53:18 63:9
mean 15:12 22:23 38:10 42:22 43:25 44:7 47:20
media 4:12 45:9 45:14 72:5
medical 39:8
medications 8:14
medium 56:2
meeting 38:5,10 39:2 59:13 63:25 64:6 70:11,14,20
meetings 15:2 38:15 64:17
member 31:16,19
membership 66:25
memorandum 63:3
memory 8:15 28:22 33:5 51:14
mentioned 14:6 16:13 23:2 54:3 55:2 57:13 65:22
michael 36:4 58:15 61:14
mid 16:9
mike 71:10
million 21:7,9,24 22:23
mind 22:18 34:20
mine 11:16
minute 10:15 19:4
moment 46:2

monday 38:14,25
monitor 25:2
monitoring 55:20
month 65:19
months 54:14 65:12 71:9
monticciolo 13:6 27:20 41:22 68:5
morning 4:4 5:21 6:14,15 38:15 39:2
motion 9:4,11
motivator 13:13
motorwise 11:10 11:15,18,20
move 6:22 39:22
moving 38:13
multiple 26:2

**n**

n 2:2 3:2 6:8 73:2 74:9
name 4:20 5:15 6:4,16 10:6 11:14 12:3 26:12,13 46:20 55:7 56:9 56:10 76:2,3
names 29:19
nature 22:2 42:3 48:20
near 53:16 54:8
necessarily 47:12 65:11
need 7:23 8:4 25:9 27:4 70:9
needed 25:6 27:9
needs 8:7
negative 34:14
negotiating 14:14
network 24:12,18 43:17

neutral 34:14
never 14:23 31:21 32:11 59:12
new 1:2,21 2:5,5 4:18,21 6:6,7,10 14:5 23:17 38:2 38:17,23 53:20 57:15 58:14 64:15 64:23 67:11 70:6 75:4,5,8 76:1
non 43:4,7 44:5
normally 28:4 35:11 43:10
notary 1:21 6:10 73:22 75:7 76:25
notice 41:7
noticing 5:7
number 4:12,19 74:6
numbers 35:14

**o**

o 3:2 73:2
o'keefe 36:3 37:6
oath 3:12 6:25,25
object 7:11 25:13 63:18
objection 22:21 43:21 54:20 62:19
objections 3:21 5:3
occasional 56:5
occasionally 15:2 17:19 26:18 42:22
occasions 59:9
october 1:11 4:6 75:20
offer 31:25 33:4 34:21
offering 63:2,16
office 11:14 12:6 16:9,9,10 23:17,18

23:19,22,23 24:2,5 24:7,8 38:2,18 60:10 63:21,24 64:13,15
officer 53:21
offices 23:15
offsite 70:20
okay 7:14,20,21 8:8 9:23 10:5,6 19:16 25:23 26:4 36:14 45:21 48:23 49:2 50:23 67:16 69:23
once 30:11 41:11 41:25
ones 63:4
ongoing 41:16
open 19:16 66:10
opened 9:18,19
opening 26:7 45:22
operated 57:5
operating 18:9 53:21
operational 53:18 61:2,4,5,9,16 62:8
opinion 60:17,21 60:23 63:20
opportunities 14:4 14:10 18:9 22:5 28:5,6,9 58:12
opportunity 14:2 14:13 18:25 22:16 22:19 28:13 29:14
opposed 15:9
opposing 5:13
ops 56:9,12
order 1:18 15:17
ordinary 26:17
organization 27:14 29:24 37:3

**organizational** 30:6 50:21
**oriented** 15:24 53:3 63:9
**original** 3:9,17
**orthopedic** 39:9
**outcome** 75:17
**outlook** 44:3,7
**outside** 14:16 52:6 53:14 61:17
**outsource** 62:4
**outsourced** 61:12 61:18
**outsourcing** 56:22
**overall** 30:21 62:23
**overlapped** 11:23 54:12
**overseeing** 14:9
**overview** 20:13

**p**

**p** 2:2,2 3:2 45:8,25
**p.m.** 69:19,23 72:3 72:7
**page** 18:24 19:23 20:20 21:5 26:7 27:12 30:4 35:24 36:22,23 37:4,4 46:24 48:22,24 49:3,6,8 50:7,11 50:13,21 74:5,11 74:15,19 76:5
**pages** 20:11 47:5,9
**paragraph** 66:17
**paralegal** 51:16,19
**parameters** 48:17
**part** 14:24 26:23 50:8 59:7 62:21
**participate** 21:8 38:14

**participating** 35:2
**participation** 66:20,21 67:18
**particular** 16:7,22
**parties** 3:7 4:10 14:15 75:15
**partner** 13:11 31:14,17,20 32:4,7 32:17 34:17,25 35:8 65:24 66:20 67:10,14,21
**partners** 34:3 67:2
**partnership** 33:10
**party** 53:6
**pass** 67:6,23
**passing** 38:8
**patched** 38:20
**paul** 1:3 2:6 4:16 5:9,10 6:16,17 23:20 28:25 29:25 36:3 37:10 38:3 40:9 42:2 68:25 76:2
**payment** 32:17 35:10
**payments** 33:15 34:7
**pdf** 9:24
**pennsylvania** 2:10 2:14
**people** 19:2 20:21 38:10 64:24
**people's** 16:10
**percent** 29:3 34:19 68:11
**percentage** 32:5 32:22 34:16,20,24 35:4,10,16 68:2
**performance** 48:15,19 63:8

**period** 12:3 13:8 19:20 20:8 21:14 36:9 37:10,13 54:16 60:8,9 65:16 71:13
**permission** 43:20
**permit** 9:20
**person** 29:5 38:23 46:19 51:9 52:13
**personal** 34:9,10 42:24 43:11 44:19 44:21
**personnel** 40:15
**perspective** 15:3 17:16 63:11
**persuaded** 71:3
**peter** 29:17,18 36:3 37:6
**phantom** 32:7,17 32:23 34:16 65:23 67:9
**phasing** 15:8 17:15 49:10,12 50:17 63:10
**philadelphia** 2:14
**phone** 38:20 43:12
**phones** 4:7,7 44:22
**phonetic** 54:4 55:8 58:4
**phrased** 41:3
**picked** 37:25 57:8 65:4
**pitched** 49:17
**pittsburgh** 2:10
**place** 4:10 73:11
**placement** 63:3
**places** 42:13
**plaintiff** 1:4,17 2:4 4:15 5:10 6:17
**plan** 8:2

**planned** 39:13
**plaza** 1:20 4:23 75:7,23
**pleadings** 8:25 9:3
**please** 4:6 5:6,14 6:2 7:18,23 9:22
**point** 8:4 29:21 32:11,14 38:3 40:3 49:7 50:14 52:12,22 57:17 67:24
**policies** 15:13 44:24 55:19
**policy** 44:22
**portfolio** 48:15
**portions** 47:8
**position** 11:19,21 70:7,10,18 71:6
**positive** 34:14
**possibility** 13:9
**possibly** 37:19
**potential** 17:5 22:4,18 28:9 29:8 49:17 50:2 70:6
**power** 49:7 50:13
**practice** 11:12,18
**practices** 15:7 52:5 56:25 63:16
**precise** 47:12
**prepare** 8:23
**prepared** 47:21
**prepares** 47:19
**preparing** 26:19
**present** 2:17 9:7 28:15 64:15
**presentation** 26:21 47:12,24 48:2,5 49:10 50:18
**presentations** 27:2 49:20

presented 28:14
presenter 47:24
presenting 28:10
previous 16:11
price 11:15
primarily 52:15
principally 46:5
principle 13:13
28:3
printers 24:9
prior 11:3,5 48:18
private 11:6 22:9
22:10 23:19 63:3
probably 70:12
procedure 1:19
procedures 15:13
39:8 55:20 56:25
proceed 45:15
69:24
proceeding 9:5,11
process 17:21
24:17 50:8 61:15
professional 15:23
15:24 29:16
profile 10:11,13
11:10
profit 32:8 66:20
67:17
profits 32:3 34:2
34:17
program 9:15
12:21,23,24 13:2
13:16,25 14:5,9,12
18:6
programs 12:18
properties 26:14
property 42:16,18
provide 17:20
provided 35:6
provider 61:13,19

provision 66:18
public 1:21 6:10
73:22 75:8 76:25
pull 29:18
pulled 27:11
pursuant 1:17
pursue 58:12
pursued 23:2,5

**q**

qualifications
51:12 70:18
qualified 51:19
71:6
quash 9:5,11
question 7:14,23
7:23 8:6 21:4
22:22 30:2 42:5
49:19,22 74:19
questions 7:3,12
7:19 8:7 69:9,11
70:3 71:17,20
74:18
quick 45:4
quickly 47:6
quotation 67:15

**r**

r 2:2 3:2 6:8 73:2
75:2
range 21:25 52:23
raton 11:8
rea 2:10 5:15,15
22:21 25:13 43:21
54:20 62:19 63:18
71:20
reach 18:15 67:8
read 50:16
readily 27:3
really 9:12 13:23
14:17,23 17:17,22
18:12 22:11 26:17

30:10,14,15 33:14
35:20 37:21 51:21
51:24
reason 8:10 15:25
30:15 39:13,16
76:5
recall 20:6 21:15
28:21 37:9,15,23
38:24 40:16 44:16
46:16 47:2,13
56:19 57:19 58:8
61:10 64:20 65:23
68:13,14
received 10:19
32:16 33:8 40:17
42:10
receiving 35:23
recognize 10:9
19:18 26:8 46:24
47:10,16 66:12
recollection 54:24
68:10
recommendations
59:3,14,17,19
60:18,20 62:18
record 4:4,11
36:18 45:8,13,24
49:7 69:13,19,23
72:2 75:12
recorded 4:13
recording 4:9 5:4
records 35:19
reed 2:8,18,18
refer 13:24 40:13
reference 31:24
referenced 51:10
56:7
references 44:19
referred 12:25
15:22 47:23

referring 17:3
refers 66:19
reflecting 32:25
refresh 19:8,10,14
26:2
refreshing 25:23
regard 71:5
regis 24:6
registered 16:19
17:7 46:6,10
49:15 53:9 62:22
70:24
regular 8:2
regularly 30:15
regulated 15:15
16:14,19 17:9
regulatory 16:17
16:25 46:3,4,18
48:17 49:13,21
50:6,8 51:12,20
52:9,20 56:25
rejected 28:18
related 8:21 12:24
62:8 63:17 75:15
relations 14:22,25
17:13,18,25
relationship 12:14
60:6 65:2
relatively 37:16
relayed 41:15
63:24
reliance 53:14,15
remember 19:22
22:12 23:3 29:2
33:24 37:12 38:8
39:9 41:5
remote 4:13 5:2,4
25:7
remotely 25:15
rendered 59:22

**repeated** 7:23
**report** 23:11,12
28:16 59:12,23
**reported** 55:21
59:13
**reporter** 4:23 6:2
6:3 7:17
**reporting** 53:8,13
63:7,7 76:1
**represent** 5:23
6:17 26:11 36:16
**representation**
19:19
**represented** 7:5
16:23 17:3,4
32:22
**represents** 19:25
**repro** 36:20
**request** 59:8
**requested** 74:14
**required** 28:14
53:4 57:6
**requirements**
49:21
**requires** 6:25
**requiring** 57:4
**reserved** 3:22
**resident** 23:16
**resigned** 58:11
**resolves** 28:4
**respect** 63:16
**respective** 3:6
**response** 7:2
**responsibilities**
55:17 56:21,24
59:11
**responsibility**
16:8
**responsible** 57:10
**restrictions** 49:14

**results** 33:22
**retained** 72:6
**retired** 40:2
**retirement** 37:17
38:25 39:13,17
41:2
**retiring** 37:11,14
37:24 38:4
**return** 33:10
34:10 48:19
**review** 26:15
**reviewed** 8:25 9:4
**reviewing** 35:19
**right** 19:11,15,21
20:23 21:24 22:3
23:4 27:15,17
29:11 35:2 36:5
37:13,18 43:18
46:4 66:2 67:17
68:12
**roberts** 4:20
**role** 13:20,22 14:6
14:21 16:7 21:20
23:9 27:23 28:8
51:24 54:11 55:25
56:12,24 57:3,25
58:5
**roles** 70:24
**room** 8:17,19
38:11
**round** 69:10
**routine** 55:19
**ruhi** 2:18 5:17
**rules** 1:18 6:22
15:7,12,14,14
16:25
**rulings** 74:18
**rumblings** 40:25
**rumor** 60:10
**run** 9:15 17:17
18:12 61:15

**s**

**s** 2:2 3:2,2 74:2
76:5
**s.d.n.y.** 76:2
**safeguarded** 61:24
**sake** 7:16
**san** 11:13 12:5
23:16,21,23,25
24:8 38:21
**sat** 23:18
**saw** 36:23 59:12
**saying** 52:22
**says** 9:24 19:13
**school** 42:25
**scroll** 10:14 19:23
20:10 37:2 47:5
**scrolling** 20:16,18
50:20 68:6
**scrutiny** 50:6
**scs** 56:9,12
**scuttlebutt** 64:2
**se** 65:14
**sealing** 3:7
**second** 9:2 16:12
29:19 47:5
**section** 19:25
20:12,25 21:5
51:5
**sector** 11:6
**secure** 61:24
**securities** 16:20,21
52:9
**see** 9:23 10:6
11:23 19:9,24
20:12,15,17,20,25
21:6,10 30:7
35:25 36:6,21,22
37:7 49:4 67:14
68:23
**seeing** 9:24 19:10
47:2,13 68:3,8

**seek** 21:6
**seen** 15:23 26:10
48:7
**segregation** 15:19
**send** 18:24 19:2
50:9
**senior** 11:25
**sense** 26:14 30:4
30:18,22 51:18
55:16 59:25 60:3
60:5 62:13 65:20
**sent** 35:12 40:14
**sentence** 21:4,6
67:14
**separate** 24:2
**separately** 68:10
**separation** 16:2
40:25
**serve** 53:20 58:14
**served** 58:4 70:24
**server** 24:24
**service** 3:16 61:13
61:18
**services** 1:20
**set** 15:6,7 75:11,20
**sets** 16:6
**setting** 56:24 57:4
**seven** 71:8
**shaking** 20:21
**share** 9:15,17 19:4
24:5 32:3,3 34:25
71:11
**sheet** 35:20 76:1
**sherman** 29:17
36:3 37:6
**shifted** 34:2
**short** 30:24 31:5
31:11,14 53:23
60:8 64:10,12
71:8

shortly  13:17 45:3
  65:9
show  42:15
showed  46:13
shows  37:5
shrank  28:24
side  13:24 15:5,8
  15:10,20,21,23
  16:22 17:11,18,23
  17:25 18:22 48:6
  48:7,10,11 50:5
  56:4 61:16 62:12
sidelines  58:25
signatory  68:23
signature  75:23
signed  3:10,12,15
significant  16:16
  17:11
signing  68:20
silence  4:6
simulated  32:7
sismansky  58:15
  58:19 59:4 62:3
  62:14,17 63:15
  70:4,5,10
sismansky's  64:25
situation  54:23
six  65:12 71:8
size  21:12 23:6
sized  21:17
skill  16:6
slightly  36:12
smaller  21:23
smith  2:8,18,18
smoothly  64:3
snapshot  35:14,21
solutions  20:12
somebody  25:14
  27:6 57:25 70:10
somewhat  38:7

sorry  29:25 49:18
sort  14:13,17 15:9
  18:8 25:5 26:20
  28:2 33:9,14
  35:13,14,21 39:19
  39:20,23 42:18
  47:16 51:15 53:12
  54:7,15 55:18
  56:4,20 59:9
  60:10,15 61:12
  62:23 70:13
sorts  21:18
sound  65:13
sounds  37:18
source  21:19 29:5
  29:15
sources  62:9
sourcing  14:18
  36:2,8 37:3,4
  39:24 48:6,10
  56:4
southern  1:2 4:18
spare  25:25
speak  41:8,21
speaking  13:8
specific  41:13
  54:23
specifically  47:13
  58:18,20 61:7
  62:20
specified  73:11
speed  59:10
spend  62:24
spoken  41:24
spread  35:20
ss  75:4
staff  53:2
staffed  29:14
stamp  36:19
stand  71:25

standard  50:17
standpoint  14:3
  18:21 20:15
start  12:8
started  12:7 13:20
  18:5 31:8,10
  70:12
starting  10:18
  54:2
state  1:21 5:6 6:10
  16:21 75:4,8
states  1:2
status  16:14 17:20
  46:6,10
steve  36:2 37:6
stipulated  3:5,20
stock  65:24
strained  51:14
strasburger  11:14
strategy  28:17
street  2:13
strict  16:24
structure  30:12,19
  33:12,19,22
structuring  14:15
  14:20 56:3
struggle  38:8
struggling  54:8
subject  16:24
  49:13,20 50:5
subscribed  73:18
  76:22
subset  48:3
suggest  49:9
support  25:6
supposed  35:4,17
sure  18:23 30:3
  34:11 47:7 54:9
  66:6
swearing  5:4

sweet  70:24
sworn  3:10 6:9
  73:5,18 75:11
  76:22
system  26:25
  27:11 44:8

**t**

t  3:2,2 73:2 74:2
  75:2,2
tag  42:18
take  4:10 8:2,5
  9:14 25:20 30:4
  45:4 52:4 54:10
  59:2 62:14 63:5
  69:9
taken  1:17 4:14
  45:11 69:21
talk  15:16 22:13
  59:8 71:10
talked  65:21 70:22
talking  7:17 15:14
  45:23 46:2 63:5
target  35:4
targeting  21:16
tasks  53:8
tax  33:21,22 34:10
  34:11,23
team  14:19,20,24
  14:25 19:25 20:5
  20:7 29:14
technology  20:15
tell  7:2 25:24 27:8
  29:2 34:12 41:12
  65:16
tempers  64:10,12
ten  20:11,20 21:23
tend  48:14
tended  52:9
tense  60:6
term  47:25

**terminate** 65:17
**terminated** 40:4 59:24 60:2 65:6 65:17,20
**termination** 40:8 65:8 70:4
**terms** 22:2 44:16 61:4 65:22
**testified** 6:11 51:6 71:9
**testify** 73:5
**testimony** 8:12 72:4 73:6,10 75:13
**texas** 12:6 23:17
**thank** 8:9 45:6,17 70:2 71:17,19
**thereto** 55:20
**things** 6:23 17:3 18:12 33:12,19 39:25 42:3 43:2 48:18,19 53:24 59:11 60:11,14 61:25 62:25 63:23 63:24 64:2
**think** 16:4 19:12 23:2 25:8,24 27:3 27:10 28:25 29:4 33:12 39:18 42:4 42:17 43:24 45:2 51:5 53:9,24 54:13 55:2,6 56:8 56:19,22 57:13,22 58:16 65:11,21 69:8
**thinking** 66:19
**third** 2:5 53:6
**thought** 39:19
**thousand** 22:23,24
**three** 19:24

**time** 1:12 3:22 9:6 9:11 12:3,19 13:11,14,22 14:7 16:18 19:20 20:7 21:13 28:24 32:14 37:10,13 38:12 39:4,20 40:3 44:23,25 45:4 46:21 52:10,16,19 52:24,25 53:23 54:7,12 56:13,15 57:17,19 58:5 60:8,8 62:25 71:8 71:13,18 73:10
**times** 16:21
**timing** 55:10
**tirado** 1:20 75:7 75:23
**title** 13:19 36:18
**today** 7:6 8:10,18 9:7,25
**today's** 8:23 72:3
**told** 38:11
**top** 21:5 27:16 50:24
**topics** 45:3 62:17
**total** 35:15
**touch** 10:17
**traci** 2:10 5:15
**transaction** 17:21 21:12,17 29:8
**transactions** 21:7 21:9,19,22 22:3
**transcript** 73:9,9
**transition** 18:14 54:15
**travel** 42:14
**travelled** 38:21
**treat** 34:9
**treatment** 34:23

**trial** 3:22
**tripp** 69:4
**true** 49:25 73:9 75:12
**truth** 7:2 73:5
**truthful** 8:11
**try** 6:21 7:17 9:21 22:13
**trying** 61:14
**turn** 48:21,24 69:15
**twice** 30:11 41:11 41:25
**two** 20:21 23:24 27:12 35:24 37:4 45:14 68:19 72:5
**type** 23:7 50:18

## u

**u** 3:2
**ultimately** 66:24
**unable** 65:23
**understand** 6:24 7:22 16:3 30:2,12 31:13 35:9 39:12 67:4
**understanding** 21:12 25:4 31:21 33:16,20 35:3 39:16 46:8 53:22 54:16 57:7 60:13 62:16 63:14 67:20 70:17
**understood** 7:15 36:8
**underwriting** 56:4
**unit** 4:12 45:9,14
**united** 1:2
**units** 72:5
**university** 10:20 10:24

**unsigned** 3:14
**updates** 17:20
**usage** 44:14,17
**use** 26:23 42:4,6,9 42:20 43:10,13 44:19
**usually** 27:5 29:15

## v

**v** 6:8 76:2
**vacant** 70:8
**variety** 53:7,23 58:17 59:11
**various** 65:14
**verbal** 28:15
**verbally** 38:2 68:5
**veritext** 1:19 4:21 4:24 72:6 76:1
**versa** 48:8
**version** 20:19 37:5
**versus** 4:16 58:23
**vice** 48:8
**video** 4:9,13 5:2 38:20
**videographer** 4:3 4:22 5:13,19,25 45:7,12 69:18,22 71:22,25
**views** 62:4
**virtual** 1:19
**visa** 13:2
**visit** 64:23
**vocabulary** 32:10
**voluntarily** 58:11
**vote** 69:16

## w

**wait** 7:18,19
**waive** 5:2
**waived** 3:9
**walk** 11:2

**walnut**  2:13
**want**  9:20 21:3
  34:18 39:8 69:11
  70:11
**way**  14:22 18:14
  32:9,24 33:17
  49:15 59:15 75:17
**we've**  10:3 35:21
**wear**  6:2
**web**  18:24
**website**  18:19
  19:19
**week**  65:19
**welcome**  45:16
  69:25
**went**  14:17 32:15
  56:8 58:11
**whereof**  75:19
**wide**  38:15 39:2
**witness**  2:13 3:10
  3:16,18 5:5,20 6:2
  6:5,9 72:8 75:10
  75:13,19
**witnessed**  64:12
  65:14
**witnesses**  6:4
**witnesses'**  76:3
**word**  67:14
**words**  50:16
**work**  12:8,16,17
  16:17 23:8,12
  26:5,15,16 30:9
  36:11 42:7,21
  43:14 46:12 52:10
  53:3 63:23
**worked**  34:10 53:5
**working**  11:13
  12:13 14:16 18:7
  33:5 59:7
**works**  69:14

**wrapped**  31:3
  59:20
**wrapping**  31:2
**wrong**  9:3 61:12

|   x   |
| --- |

**x**  1:3,9 74:2,9

|   y   |
| --- |

**yeah**  19:9 26:3
  32:9 41:24 48:2
  55:6 56:16 61:10
  68:3
**year**  13:18 32:20
  33:7,8,13 35:5,9
  35:12 54:14 67:19
**york**  1:2,21 2:5,5
  4:18,21 6:7,7,10
  23:18 38:2,17,23
  64:15,23 75:4,5,9
  76:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.