USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/24/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL IACOVACCI,

                    Plaintiff,

          -against-

BREVET HOLDINGS, LLC, et al.,

                    Defendants.

1:18-cv-08048-MKV

**OPINION AND ORDER
GRANTING IN PART
AND DENYING IN PART
MOTIONS FOR SUMMARY
JUDGMENT AND DENYING
MOTIONS _IN LIMINE_**

MARY KAY VYSKOCIL, United States District Judge:

   Plaintiff Paul Iacovacci brings this suit against his former employers, Brevet Holdings, LLC; Brevet Capital Management, LLC; Brevet Short Duration Partners, LLC; and Brevet Short Duration Holdings, LLC; and his former business partners, Douglas Monticciolo, Mark Callahan, and Johnny Lan.  Pending before this Court is a motion for summary judgment by Defendants, a motion for partial summary judgment by Iacovacci, and motions _in limine_ to exclude expert testimony by both sides.  For the reasons below, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART, Iacovacci's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART, and the motions _in limine_ are DENIED without prejudice.

## BACKGROUND

### I.      Factual Background

   Iacovacci is a co-founder and former member of Brevet Short Duration Partners, LLC and Brevet Short Duration Holdings, LLC, and a former employee of Brevet Holdings, LLC.  _See_ Plaintiff's and Defendants' Amended Consolidated Rule 56.1 Counterstatement Resp. to Pl. ¶ 1

[ECF No. 297] ("Resp. to Pl. ¶" or "Resp. to Def. ¶").[1]  Defendants Brevet Holdings, LLC; Brevet Capital Management, LLC ("BCM"); Brevet Short Duration Partners, LLC; and Brevet Short Duration Holdings, LLC, (collectively, "Brevet"), are Delaware limited liability companies with their principal places of business in New York.  Resp. to Pl. ¶ 2.

Defendant Monticciolo is a managing director of Brevet Holdings, LLC and a member of other Brevet entities.  Resp. to Def. ¶¶ 8, 9.  Defendant Callahan is a managing director and employee of Brevet Holdings and a member of other Brevet entities.  Resp. to Def. ¶¶ 10, 11. Defendant Lan is the head of technology at BCM.  Resp. to Def. ¶ 12.

Iacovacci began working at a predecessor entity of Brevet in 2004.  Resp. to Pl. ¶ 5.  Brevet employees are provided with a Personnel Policies and Employee Handbook ("the Handbook") that broadly defines the terms and conditions of employment.  *See* Resp. to Def. ¶¶ 112–121; Exhibit 113 [ECF No. 279-69] ("Handbook").  Iacovacci "acknowledged . . . receipt of" the Handbook. Resp. to Def. ¶ 113.

On October 14, 2016, Brevet terminated Iacovacci, purportedly for cause.  Resp. to Def. ¶¶ 60, 61.  Upon delivery of the termination letter, Lan requested that Iacovacci return his company-issued cellphone and a Dell Optiplex desktop computer ("the computer" or "Iacovacci's computer"), both of which Brevet had purchased for Iacovacci.  Resp. to Def. ¶¶ 22, 23, 64. Iacovacci returned the phone but refused to return the computer.  Resp. to Def. ¶¶ 65, 66.

On October 17, 2016, Iacovacci commenced an action in New York Supreme Court ("the State Action") asserting state law claims arising out of his termination.  Resp. to Pl. ¶ 24; *see Iacovacci v. Brevet Holdings, LLC*, No. 158735/2016 (N.Y. Sup. Ct.).  The following evening, on October 18, 2016, at or around 12:59 AM and 2:37 AM, Lan remotely logged into Iacovacci's

---

[1] All citations to "Resp. to Pl. ¶" or "Resp. to Def. ¶" refer to ECF No. 297, which collates both parties' Rule 56.1 Statements in support of their motions for summary judgment and the opposing party's responses.

computer.  Resp. to Pl. ¶ 25; Resp. to Def. ¶ 75.  While remotely logged onto the computer, Lan downloaded onto a USB thumb drive documents that were saved on the computer and external hard drives.  Resp. to Pl. ¶ 25; Resp. to Def. ¶ 81.  Lan also took a screenshot of at least one browser window that had been left open on the computer (a subfolder of Iacovacci's Yahoo! email account inbox).  Resp. to Def. ¶ 81.  Lan did not delete any information from the computer, but he did install FileZilla, an application used to transfer files.  Resp. to Def. ¶¶ 86, 91.  Lan's late night remote access was done without Iacovacci's knowledge.  Resp. to Pl. ¶ 25.

After leaving Brevet, Iacovacci launched Enascor, a hedge fund that competes against Brevet.  In a related federal action pending before this Court, Brevet has sued Enascor and Iacovacci, alleging that Iacovacci misappropriated proprietary communications and documents from Brevet for his use at Enascor.  *See Brevet Holdings, LLC v. Enascor, LLC*, No. 1:21-CV-01540 (MKV) (S.D.N.Y).

## II.   Procedural Posture

Iacovacci filed this action in September 2018, alleging that Lan's remote access of the computer (Count One), the attached external hard drives (Count Two), and the Yahoo! email account (Count Three) violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) ("CFAA").  Iacovacci also alleges that Lan's access of the Yahoo! email account violated the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a) ("FWA") (Count Four), and the Stored Communications Act, 18 U.S.C. § 2701 ("SCA") (Count Five).  In addition, he asserts New York common law claims for conversion (Count Six) and trespass to chattels (Count Seven).  *See* Complaint [ECF No. 11].  Defendants moved to dismiss, arguing that this action was duplicative of the State Action.  *See* Motion to Dismiss [ECF No. 34].  That motion was denied by Judge Keenan.  *See* Opinion & Order [ECF No. 49].

3

Defendants then answered the Complaint, asserting twelve counterclaims against Iacovacci: breach of contract on behalf of BCM (First Counterclaim); breach of the covenant not to compete on behalf of BCM (Second Counterclaim); breach of the covenant of confidentiality on behalf of BCM (Third Counterclaim); breach of fiduciary duty on behalf of BCM, Monticciolo, and Callahan (Fourth Counterclaim); breach of the duty of loyalty on behalf of BCM, Monticciolo, and Callahan (Fifth Counterclaim); unfair competition on behalf of BCM (Sixth Counterclaim); tortious interference with business relations on behalf of BCM (Seventh Counterclaim); tortious interference with prospective business relations on behalf of BCM (Eighth Counterclaim); misappropriation of trade secrets on behalf of BCM (Ninth Counterclaim); violation of the CFAA on behalf of BCM, Monticciolo, and Callahan (Tenth Counterclaim); violation of the SCA on behalf of all named Brevet entities, Monticciolo, and Callahan (Eleventh Counterclaim); and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), on behalf of all named Brevet entities (Twelfth Counterclaim).  Amended Answer ¶¶ 58–165 [ECF No. 79] ("AA").[2] Defendants also asserted defenses, including an affirmative defense that "[t]he allegations contained in [the] Complaint [arose] out of Brevet's regulatory compliance obligation to monitor certain communication and correspondence."  AA Twenty-Third Affirmative Defense.  Iacovacci moved to dismiss Defendants' counterclaims, again arguing that these claims were duplicative of the State Action.  *See* Motion to Dismiss [ECF No. 115].  Judge Pauley subsequently denied that motion to dismiss.  *See* Opinion & Order [ECF No 131].

The parties' competing motions for summary judgment are now pending before the Court. Defendants moved for summary judgment seeking dismissal of all of Iacovacci's claims.  *See*

---

[2] Defendants later voluntarily dismissed Counterclaims One (breach of contract), Ten (violation of the CFAA), and Eleven (violation of the SCA).  *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss 4 n.1 [ECF No. 119]; Joint Response 7 [ECF No. 251].

Motion for Summary Judgment [ECF No. 284]; Memorandum of Law in Support [ECF No. 285] ("Def. Mem."). Iacovacci filed a response brief. *See* Memorandum of Law in Opposition [ECF No. 324] ("Pl. Opp."). Defendants replied. *See* Reply Memorandum of Law in Support [ECF No. 331] ("Def. Reply").

Iacovacci moves for partial summary judgment, seeking dismissal of the breach of covenant claims, the breach of duty claims with respect to Defendants Monticciolo and Callahan, the unfair competition and trade secrets claims, and the tortious interference claims. *See* Motion for Summary Judgment [ECF Nos. 293, 294]; Memorandum of Law in Support [ECF No. 294-1] ("Pl. Mem."). Defendants filed a response brief. *See* Memorandum of Law in Opposition [ECF No. 316] ("Def. Opp."). Iacovacci replied. *See* Reply Memorandum of Law in Support [ECF No. 332] ("Pl. Reply").

In support of these motions, both parties filed a statement of undisputed facts pursuant to Local Rule 56.1 and dozens of exhibits. The parties also filed motions *in limine* to exclude expert testimony. *See* Motions *In Limine* [ECF Nos. 281, 295, 296, 301].[3]

## **LEGAL STANDARDS**

To prevail on a motion for summary judgment, the movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The Court's role at this stage is "not to resolve disputed issues of fact but to assess whether there are

---

[3] The parties are commended for their thorough and exhaustive briefing. The Court concluded that any arguments or authority not explicitly referenced in this Opinion were unnecessary to the resolution of the pending motions.

any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may satisfy this burden "by submitting evidence that negates an essential element of the non-moving party's claim" or "by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of [its] claim."  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).  If the moving party satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  But "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

## DISCUSSION

### I.    Defendants' Motion for Summary Judgment

#### A.    *Computer Fraud and Abuse Act (Counts One, Two, and Three)*

Defendants seek summary judgment on Iacovacci's CFAA claims, contending that, as a matter of law, Iacovacci cannot prevail on Counts One, Two, or Three.  To sustain a civil CFAA claim, Iacovacci must establish that Defendants (1) obtained information through intentional unauthorized access to a computer and (2) caused damage or loss as a result.  18 U.S.C. § 1030(a)(2)(C), (a)(5)(C).  Any civil CFAA action involving "damage or loss" must satisfy a $5,000 threshold.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 439 (2d Cir. 2004).  "Damage"

is defined as "any impairment to the integrity or availability of data, a program, a system, or information," 18 U.S.C. § 1030(e)(8), and "loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data . . . to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service," *id.* § 1030(e)(11).

Iacovacci purports to establish over $5,000 in damages through an invoice dated April 17, 2017 for "Digital Forensics Services" by Yalkin Demirkaya.  *See* Exhibit 143 [ECF No. 314-5] ("Demirkaya Invoice"); Resp. to Def. ¶ 95.  Defendants contend that the Demirkaya Invoice should not be considered because Iacovacci failed to produce it during discovery.  The Court agrees.

In September 2019, Defendants asked Iacovacci to provide:

- "[A] detailed computation and quantification of each category and type of damages sought in connection with each Count asserted in the Complaint, including but not limited to compensatory, statutory, and punitive damages,"

- "All [d]ocuments concerning the quantification or computation of Plaintiff's alleged damages," and

- "Documents sufficient to show the time expended and costs incurred by or on behalf of Plaintiff to retain forensic computer experts to investigate Defendants' alleged unauthorized access to the Computer and/or the External Drives and to assess any damage allegedly caused by such unauthorized access."

Exhibit A at Interrog. 5, RFP 4, 36 [ECF No. 286-1] ("Ex. A").  In response, Iacovacci objected on various grounds, including privilege, and stated:

> [W]hile Plaintiff is unable to provide a precise computation of damages . . . [his] anticipated damages, which [were] still accruing, may include . . . compensatory damages in excess of $35,000 for the cost of retaining forensic computer experts to investigate Defendants' unauthorized intrusions and assess the damage caused thereby.

Exhibit B at Interrog. 5 Answer [ECF No. 286-2] ("Ex. B").  Iacovacci promised to "supplement [his] response as additional information [became] available through fact and expert discovery."

Ex. B at Interrog. 5 Answer; *see also* Exhibit C at Responses 4, 36 [ECF No. 286-3] ("Ex. C").  At his deposition, Iacovacci testified that he did not personally pay or hire a forensic expert, but otherwise asserted privilege when asked about these damages.  *See* Exhibit 1 185:21–191:15 [ECF No. 279-1].

Fact discovery closed in October 2021.  *See* Post-Conference Scheduling Order [ECF No. 233].  Iacovacci did not produce the Demirkaya Invoice in his Rule 26(a) initial disclosures, in response to Defendants' timely discovery requests, or otherwise.  *See* Def. Mem. 8–9.  Instead, Iacovacci waited until *after* Defendants had submitted their Rule 56.1 Statement in connection with the pending summary judgment motions to produce—for the first time ever—the Demirkaya Invoice.  *See* Exhibit D [ECF No. 286-4].  Iacovacci does not contest these facts or even attempt to explain his several year delay.  *See* Pl. Opp. 7–9.

A district court has "wide discretion in imposing sanctions," *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991), for "untimely, incomplete, or misleading responses during discovery," *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015) (citation omitted).  In considering whether a discovery sanction is appropriate, the Court must consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the [excluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance."  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (cleaned up) (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).  These considerations each favor the exclusion of Iacovacci's late-produced evidence.

Iacovacci has provided no justification for his failure to produce the Demirkaya Invoice during discovery.  Iacovacci does not contend that the invoice—which *pre-dates* the filing of the

Complaint in this federal action—was not in his possession during discovery.  By its very terms, Rule 26(a) requires litigants to provide in their initial disclosures "a computation of each category of damages . . . [and] the documents or other evidentiary material . . . on which each computation is based."  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).  If this directive was not clear enough, early in the discovery process, Defendants requested *all* documents concerning the quantification of Plaintiff's alleged damages *and* documents showing the costs incurred in retaining any forensic computer experts.  Ex. A.  The Demirkaya Invoice was plainly responsive to Defendants' requests, and yet Iacovacci neglected to produce it during the several year period of discovery.  *See Design Strategy*, 469 F.3d at 295 (Rule 26(a) violation "was especially troubling because . . . [the] Defendants specifically *requested* a calculation of damages." (emphasis in original)).  Even after receiving these production requests, Iacovacci did not inform Defendants about the invoice or abide by his promise to "supplement [his] response[s]."  Ex. B; Ex. C.

The invoice is clearly important to Iacovacci's case.  Apart from his own testimony and self-serving assertions, it is his only evidence of damages for purposes of the $5,000 threshold. However, the centrality of proving damages in the CFAA context is *exactly why* Defendants requested these documents.  "As a result, although the Court recognizes that the excluded evidence is plainly important, it would be awarding gamesmanship and a failure to follow the rules if the Court allowed the evidence into the record."  *Mantel v. Microsoft Corp.*, No. 16-CV-5277 (AJN), 2018 WL 1602863, at *4 (S.D.N.Y. Mar. 29, 2018).

Defendants would be prejudiced if the evidence was considered at this late stage of litigation.  Because the invoice was not produced during discovery, Defendants were deprived "of the opportunity to discover, take depositions, and respond."  *Mail America Commc'ns, Inc. v. World Healing Ctr. Church, Inc.*, No. 18 CIV. 8481 (AKH), 2021 WL 1298925, at *3 (S.D.N.Y.

Apr. 7, 2021); *see also Mantel*, 2018 WL 1602863, at *4 ("It would . . . be highly prejudicial to Defendants to allow the Plaintiff to supplement the record with dispositive evidence after the motions for summary judgment have been fully briefed.").   Indeed, Iacovacci's eleventh hour production of the invoice is "precisely the kind of 'sandbagging' that Rule 37 seeks to prevent." *Mail America*, 2021 WL 1298925, at *3.

Finally, a continuance would not remediate any prejudice to Defendants, as "the bell cannot be unrung with regard to the time and money devoted by the parties to summary judgment based on the evidentiary record as developed." *Mantel* 2018 WL 1602863, at *4.  The parties have been litigating the same underlying circumstances in three cases filed in two different courts for nearly five years.  Reopening discovery in this case—which has already been closed for nearly a year and a half—would only increase costs and further delay resolution of this several-year-old case.

Iacovacci does not dispute any of this.  Instead, he weakly suggests that the invoice should not be excluded because Demirkaya was "expressly identified" as a "person with knowledge of Iacovacci's damages" and "Defendants elected not to take his deposition."  Pl. Opp. 8 (emphasis omitted).  But that fact is beside the point.[4]  Defendants' decision not to depose Demirkaya was understandable in light of how Iacovacci described his role, and in any event, does not excuse Iacovacci's failure to produce a requested and clearly responsive document bearing on a critical element of a *prima facie* case under the CFAA.  Moreover, Defendants may well have pursued a different litigation strategy (such as deposing Demirkaya) if Iacovacci had been forthcoming and provided the invoice.

For these reasons, in evaluating Defendants' summary judgment motion, the Court

---

[4] Defendants explain that they did not seek to depose Demirkaya because Iacovacci characterized him as a consulting expert witness who, Defendants contend, is generally not subject to deposition.  Def. Mem. 9; Def. Reply 3–4; *see* Fed. R. Civ. P. 26(b)(4)(D).

disregards the Demirkaya Invoice.  *See, e.g.*, *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 572–73 (S.D.N.Y. 2020) (disregarding invoices produced for the first time at summary judgment phase); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 269 n.4 (S.D.N.Y. 2014), *aff'd*, 882 F.3d 394 (2d Cir. 2018) (declining to consider a document produced "for the first time in response to [a] motion for summary judgment"); *Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co.*, 726 F. Supp. 2d 339, 348–49 (S.D.N.Y. 2010) (refusing to consider documents on summary judgment motion that were not produced during discovery). With the invoice excluded, Iacovacci offers no other evidence from which the Court can infer that he suffered $5,000 in damages.  Accordingly, the three CFAA claims must fail as a matter of law, and Defendants are entitled to summary judgment.

   B.   <u>*Federal Wiretap Act (Count Four)*</u>

   Defendants also seek summary judgment on the FWA claim, which asserts that Lan intercepted Iacovacci's personal Yahoo! email address.

   The FWA imposes liability on any person who "intentionally intercepts [or] endeavors to intercept . . . any wire, oral, or electronic communication."  18 U.S.C. § 2511(1)(a).  The statute defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  "Courts in this circuit, and elsewhere, have construed the term 'intercept' narrowly to require that the interception of an electronic communication be *contemporaneous* with the transmission of that communication."  *Tantaros v. Fox News Network, LLC*, No. 17 CIV. 2958 (GBD), 2018 WL 2731268, at *7 (S.D.N.Y. May 18, 2018) (emphasis added); *see also Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 446 (S.D.N.Y. 2019).

   The contemporaneity rule is based on the statutory distinction between an "electronic

communication" and "electronic storage."  An "electronic communication" is defined in the FWA as "any *transfer* of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system."  18 U.S.C. § 2510(12) (emphasis added).  "Electronic storage," in contrast, is defined by the FWA as "any temporary, intermediate *storage of a wire or electronic communication* incidental to the electronic transmission thereof" and "any *storage* of such communication by an electronic communication service."  *Id.* § 2510(17) (emphasis added).

The Second Circuit has not yet addressed this issue.  However, "[e]very circuit court to have considered the matter has held that an 'intercept' under the Act must occur contemporaneously with transmission."  *Luis v. Zang*, 833 F.3d 619, 627 (6th Cir. 2016) (citation and brackets omitted); *see also Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113–14 (3d Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1048–49 (11th Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461 (5th Cir. 1994).  These courts have concluded that because the term "intercept" applies only to electronic *communications*, *see* 18 U.S.C. § 2510(4) (defining "intercept" to mean "the aural or other acquisition of the contents of any . . . *electronic* . . . *communication*" (emphasis added)), and not to electronic *storage*, a communication may only be intercepted when it is "in flight," meaning "before the communication comes to rest."  *Luis*, 833 F.3d at 628 (quoting *Steve Jackson*, 36 F.3d at 461–62).  Once the communication comes to rest, "the communication ceases to be a communication at all," and instead "becomes part of 'electronic storage.'"  *Id.* at 627–28.  The Court adopts the reasoning of these courts and concludes that "[i]nterception must . . . occur contemporaneously with the transmission of the communication."  *Id.* at 627.

Iacovacci does not dispute, or even mention, the contemporaneity rule in his opposition

brief.  Instead, Iacovacci simply asserts that Defendants "intercepted or endeavored to intercept [his] personal email."  Pl. Opp. 20.  But the Complaint does not allege and there is no evidence to suggest that Lan intercepted Iacovacci's emails "*contemporaneously* with [their] transmission." *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 446 (emphasis added).  Iacovacci points to a screenshot that Lan took of Iacovacci's "live Yahoo! mailbox."  Pl. Opp. 20 (emphasis omitted). However, the most recent email shown in the screenshot is dated October 5—nearly *two weeks before* Lan accessed the computer.  Exhibit 182 [ECF No. 287-66] ("Yahoo! Screenshot").  That October 5 email (along with all of the earlier emails depicted in the screenshot) had "come[] to rest" long before Lan's access on October 18.  *Luis*, 833 F.3d at 628.  Iacovacci also argues that the evidence is "consistent with Lan using the [Chrome] browser to interact with the Yahoo! Account."  Resp. to Def. ¶ 89; *see* Exhibit 171 ¶ 89 [ECF No. 314-19].  Even if true, that fact is not material to, nor indicative of, whether any email communications were intercepted by Lan *contemporaneously*.  Iacovacci has therefore failed to "come forward with specific evidence demonstrating the existence of a genuine dispute of *material* fact."  *Brown*, 654 F.3d at 358 (emphasis added).

Iacovacci's cited authority does not suggest otherwise.  In *TLS Management v. Rodriguez-Toledo*, 260 F. Supp. 3d 154 (D.P.R. 2016), a district court in Puerto Rico permitted a FWA claim to proceed beyond a motion to dismiss where the plaintiffs alleged that electronic communications were seized "contemporaneously with their transmission."  *Id.* at 164 (emphasis omitted).  The district court in *Arrington v. Colortyme, Incorporated*, 972 F. Supp. 2d 733 (W.D. Pa. 2013), similarly denied a motion to dismiss a FWA claim based on the plaintiff's "well-pleaded factual allegations."  *Id.* at 746–47.  And no party in *Telerate Systems, Incorporated v. Caro*, 689 F. Supp. 221 (S.D.N.Y. 1988), contested that communications were intercepted.  *Id.* at 230–31.  Here, the

parties have already proceeded beyond the motion to dismiss stage and interception is not conceded.  The authority Iacovacci cites is not persuasive or even helpful.  Summary judgment on the FWA claim is granted.

     C.     *Stored Communications Act (Count Five)*

Defendants move for summary judgment on the SCA claim, which again relates only to Lan's access of the Yahoo! email account.  The SCA creates a private right of action against anyone who "intentionally accesses without authorization" or "intentionally exceeds an authorization to access" a "facility through which an electronic communication service is provided" and "thereby obtains . . . a wire or electronic communication while it is in electronic storage."  18 U.S.C. § 2701(a).

Defendants argue that this claim should fail because Iacovacci cannot "identify a single Yahoo! email that Brevet obtained."  Def. Mem. 23.  That assertion is undermined by the evidence, which shows that Lan viewed the Yahoo! email account and even took a screenshot of a folder within Iacovacci's inbox.  *See* Yahoo! Screenshot.  Defendants assert, without authority, that no emails were "obtained" because the screenshot simply shows "a photograph of an email folder, not of any email."  Def. Reply 9.  However, contents of some email communications, such as the subject lines and sender information, are visible even from the screenshot.  This is sufficient to create a genuine dispute of material fact regarding whether Lan "obtained" any email communications.

Defendants next argue that the SCA claim should be dismissed because Lan's access was authorized.  *See* Def. Mem. 23.  First, pointing to the Handbook, Defendants argue that the computer belonged to the company,[5] and that Brevet reserved the "right to review, read, access, or

---

[5] The parties dispute whether the computer belonged to the company or whether it was given to Iacovacci as a benefit of his employment.  *Compare* Def. Mem. 12–13, *with* Pl. Opp. 14–15.  It is unnecessary to reach this issue

otherwise monitor all electronic documents . . . and messages" on the computer, including those that did "not directly relate to Brevet's business."  Handbook 39.  But Iacovacci argues that these provisions do not apply post-termination.  *See* Pl. Opp. 14 & n.6.  Indeed, in support of their assertion that Brevet was entitled to access the information on the computer, Defendants provide citations only to *other* provisions of the Handbook.  *See* Def. Mem. 14–15 (citing Handbook 28 (obligation to maintain confidentiality applies "at any time," including "following the end of" employment)).  The Court cannot conclude, as a matter of law, that Defendants' right of access extended beyond Iacovacci's termination.[6]

Defendants also contend that Lan's access was authorized by Brevet's regulatory obligations to maintain books and records.  Def. Mem. 17–19.  However, Defendants provide no authority indicating that their regulatory obligations justify otherwise unlawful acts.  Further, evidence in the record suggests that Lan's access may not have been motivated by compliance purposes.  *See, e.g.*, Resp. to Pl. ¶¶ 34–36, 39–41, 43 (compliance personnel not involved in the decision to access the computer).

There are genuine disputes of material fact regarding whether Defendants "obtained" any of Iacovacci's emails and whether any such access was authorized.  Defendants' motion for summary judgment is denied and the SCA claim may proceed to trial.

D.     *State Law Claims (Counts Six and Seven)*

Defendants also move for summary judgment on Iacovacci's state law claims for conversion (Count Six) and trespass to chattels (Count Seven).

---

because even if the computer *did* belong to the company, there is still a dispute of fact regarding whether the Handbook policies applied to the computer *after* Iacovacci was terminated.

[6] Iacovacci also argues that he did not agree to be bound by the Handbook or its provisions.  *See* Pl. Opp. 13–14.  This argument is rejected in Section II.A below.

1.    <u>Conversion</u>

In New York, conversion "is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (citation omitted).   Conversion requires "the *complete* exclusion of the rightful possessor." *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983) (emphasis added), *rev'd on other grounds*, 471 U.S. 539 (1985).   Electronic records may be subject to a conversion claim. *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292–93, 864 N.E.2d 1272, 1278, 832 N.Y.S.2d 873, 879 (N.Y. 2007).

Even assuming the computer was owned by Iacovacci, Defendants are nonetheless entitled to summary judgment on this claim.   Iacovacci does not—and cannot—contend that Defendants deleted material from the computer or hard drives.   Resp. to Def. ¶ 86.   Instead, Iacovacci argues that his property was converted because "Defendants took control of [the] computer and . . . hard drives to the complete exclusion of Iacovacci."   Pl. Opp. 23.   But that claim is belied by the record. Lan testified that if both he and Iacovacci were logged into the computer simultaneously, neither of them "would have been able to accomplish much."   Exhibit 3 204:25 [ECF No. 279-3].   Contrary to Iacovacci's assertions, Lan did *not* testify that both he and Iacovacci could not "have been on the computer at the same time."   Pl. Opp. 24.   Iacovacci was therefore not "complete[ly] exclu[ded]" from possession. *Harper*, 723 F.2d at 201.

Iacovacci next contends that Lan's remote copying of the documents gives rise to a conversion claim "because the copying diminished the documents' value."   Pl. Opp. 24. Specifically, Iacovacci argues that the copying of some attorney-client privileged materials prejudiced him.   Pl. Opp. 24.   The Court is unpersuaded.   Mere copying—without more—is insufficient to state a conversion claim. *See Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F.

Supp. 3d 408, 415 (S.D.N.Y. 2018).   Further, "no decisional authorities support [Iacovacci's] theory that privileged attorney-client information may be the subject of an action for conversion in New York." *Madden v. Creative Servs., Inc.*, 872 F. Supp. 1205, 1210 (W.D.N.Y. 1993), *aff'd*, 51 F.3d 11 (2d Cir. 1995).   Even if the purportedly privileged information *was* subject to a conversion action, Iacovacci provides no reason to depart from "the traditional rule [with regard to a conversion claim] requiring the exercise of unauthorized dominion and control to the *complete exclusion* of the rightful possessor." *Reis, Inc. v. Spring11 LLC*, No. 15 CIV. 2836 (PGG), 2016 WL 5390896, at *10 (S.D.N.Y. Sept. 26, 2016) (emphasis added) (quotation marks and citation omitted).   Because there is no evidence of complete exclusion, this claim must fail.[7]

The district court opinion in *Clark Street Wine and Spirits v. Emporos Systems Corporation*, 754 F. Supp. 2d 474 (E.D.N.Y. 2010), does not undermine this conclusion.   There, the defendants "converted [the plaintiffs'] customers' credit card information . . . [which] result[ed] in fines imposed by credit card companies and loss of business." *Id.* at 482.   Accordingly, the court concluded that the value of the customer information was "seriously diluted." *Id.* at 484.   Here, there is no evidence that the value of any documents was diminished economically (or otherwise). Accordingly, Defendants' motion for summary judgment on the conversion claim is granted.

### 2.   Trespass to Chattels

Under New York law, a trespass to chattels "occurs when a party intentionally damages or interferes with the use of property belonging to another." *Register.com*, 356 F.3d at 437 (citation omitted).   Interference may be accomplished by "'dispossessing another of the chattel' or 'using or intermeddling with a chattel in the possession of another.'" *Id.* (quoting Restatement (Second)

---

[7] To the extent Iacovacci argues that Defendants' counsel improperly retained the privileged documents, a conversion action is not the proper way to raise, let alone resolve, that charge. *See* Pl. Opp. 24.   As Iacovacci notes, the state court has already ordered a civil contempt hearing to address this allegation. *See* Exhibit 180 at 23–25 [ECF No. 287-64].

of Torts § 217).  Where a plaintiff alleges interference by unauthorized use or intermeddling, there must be "a showing of actual damages."  *Id.*

Iacovacci makes no such showing here.  Lan installed FileZilla, an application used to transfer files, onto the computer.  Resp. to Def. ¶ 91.  But Iacovacci proffers no evidence that FileZilla "adversely affect[ed] the computer" in any way.  Pl. Opp. 25.  Because trespass to chattels "does not encompass an electronic communication that neither damages the recipient computer system nor impairs its functioning," *Mount v. PulsePoint, Inc.*, No. 13 CIV. 6592 (NRB), 2016 WL 5080131, at *9 (S.D.N.Y. Aug. 17, 2016) (cleaned up), *aff'd*, 684 F. App'x 32 (2d Cir. 2017), Defendants are entitled to summary judgment on this claim.

## II.    Plaintiff's Partial Motion for Summary Judgment

### A.    <u>Breach of Covenant (Second and Third Counterclaims)</u>

Iacovacci moves for summary judgment on BCM's breach of covenant claims, which allege that Iacovacci breached the non-compete (Second Counterclaim) and confidentiality (Third Counterclaim) provisions of the Handbook.  AA ¶¶ 66–80.  Iacovacci argues that the Handbook is not an enforceable contract and, even if it were, he did not agree to be bound by it.

The Handbook states that it "is not an employment agreement or guarantee of employment."  Handbook 49.  Seizing on that language, Iacovacci relies on the decision of the New York Court of Appeals in *Lobosco v. New York Telephone Company/NYNEX*, 96 N.Y.2d 312, 751 N.E.2d 462, 727 N.Y.S.2d 383 (N.Y. 2001), for the proposition that the Handbook cannot constitute a binding agreement because the "disclaimer prevents the creation of a contract."  *Id.* at 317, 465, 386; *see* Pl. Mem. 6.  But the holding of *Lobosco* was not so broad.  There, a terminated employee argued that he was fired in violation of his employee manual, which provided for "protection against any form of reprisal" for whistleblowing.  *Id.* at 314–15, 463–64, 384–85.  The

page in the manual directly facing the whistleblower provision clearly stated, however, that "[t]his code of conduct is not a contract of employment and does not create any contractual rights of any kind." *Id.* at 315, 464, 385. Accordingly, the Court of Appeals rejected the plaintiff's contract claim, holding that the disclaimer "prevent[ed] the creation of a contract and negate[d] any protection from termination [the] plaintiff may have inferred from the manual's no-reprisal provision." *Id.* at 317, 465, 386.

While *Lobosco* cautions courts against "lightly" converting "[r]outinely issued employee manuals, handbooks[,] and policy statements . . . into binding employment agreements," *id.* at 317, 465, 386, the Court is unpersuaded by Iacovacci's suggestion that employee manuals can *never* constitute enforceable contracts. Indeed, since *Lobosco*, the First Department has found that a contractual provision stating "that the policies and benefits contained therein were not intended to be contractual," was "plainly *not* intended to render the handbook wholly nugatory." *Kaplan v. Cap. Co. of America LLC*, 298 A.D.2d 110, 111, 747 N.Y.S.2d 504, 505 (1st Dep't 2002) (emphasis added). *See also Miloscia v. B.R. Guest Holdings, LLC*, 94 A.D.3d 563, 564, 942 N.Y.S.2d 484, 486 (1st Dep't 2012) (explaining that while "an employee may not maintain an action for breach of contract based upon provisions . . . in an employee manual where that manual also expressly provides that the employment remains at-will" under *Lobosco*, there were still issues of fact pertaining to the "plaintiff's contract claim . . . for benefits, including health insurance"). The Court therefore declines to hold that, as a matter of law, the Handbook is unenforceable.

Nor is the Court persuaded by Iacovacci's contention that there is "*no* evidence that [he] agreed to be legally bound by the Handbook." Pl. Mem. 7 (emphasis added). Contrary to that brazen assertion, the Handbook includes the following language: "BY ACKNOWLEDGING THIS HANDBOOK, THE EMPLOYEE AGREES AND UNDERSTANDS THAT IF THEY VIOLATE

THESE POLICIES, THEY WILL BE SUBJECT TO DISCIPLINE . . .  AND SHALL BE RESPONSIBLE FOR ALL DAMAGES SUSTAINED BY BREVET AS A RESULT OF SUCH VIOLATION."  Handbook 3.  Iacovacci *concedes* that he "acknowledged . . . receipt of" the Handbook.  Resp. to Def. ¶ 113; Exhibit 144 37 [ECF No. 287-28].  Accordingly, the Court finds there is at least a question of fact regarding whether Iacovacci agreed to be legally bound by the Handbook.  The Court declines to grant summary judgment on the covenant claims.

B.     *Breach of Duty (Fourth and Fifth Counterclaims)*

BCM, Monticciolo, and Callahan assert counterclaims for breach of fiduciary duty (Fourth Counterclaim) and breach of the duty of loyalty (Fifth Counterclaim).  AA ¶¶ 81–97.  They contend that Iacovacci owed "the Company and *each other Member* the highest fiduciary loyalty and duty" under the Brevet LLC Agreements, Exhibit 93 § 7.5 ("Ex. 93") [ECF No. 278-83]; Exhibit 94 § 7.5 ("Ex. 94") [ECF No. 278-84] (emphasis added), and that Iacovacci breached those duties by "usurping the corporate opportunities of Brevet," "directly competing with Brevet," "using the resources of Brevet . . . to facilitate this improper competition," "improperly accessing, using, and removing [Brevet's] . . . trade secret information," and "soliciting customers" of Brevet, among other things.  AA ¶¶ 84, 92.  Iacovacci seeks summary judgment on these counterclaims as to Monticciolo and Callahan, but *not* as to BCM, arguing that they are "improper derivative claims that belong to the company."  Pl. Mem. 7.

In briefing the issue, the parties assume, without explanation, that Delaware law governs these counterclaims, "and such implied consent is sufficient to establish choice of law."  *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (cleaned up).[8]  *See* Pl. Mem. 7–9, Def.

---

[8] Although Defendants contend that the substance of their claims lies under *both* New York and Delaware law, Defendant's brief provides citations only to Delaware case law.  *See* Def. Opp. 6–8.  Moreover, the LLC Agreements state that they shall be construed and enforced in accordance with Delaware law.  *See* Ex. 93 § 9.6; Ex. 94 § 9.6.

Opp. 6–8, Pl. Reply 2.  Accordingly, this Court will apply Delaware law to analyze whether these are *derivative* claims that belong to BCM or whether they may be asserted *directly* by Monticciolo and Callahan as individuals.[9]

Delaware courts distinguish between direct and derivative actions using the test outlined in *Tooley v. Donaldson, Lufkin & Jenrette, Incorporated*, 845 A.2d 1031 (Del. 2004).[10]  Under the *Tooley* test, courts must solely consider: "(1) who suffered the alleged harm (the [LLC] or the suing [member], individually); and (2) who would receive the benefit of any recovery or other remedy (the [LLC] or the [member], individually)?"  *Id.* at 1033; *see also Clifford Paper, Inc. v. WPP Invs., LLC*, No. CV 2020-0448-JRS, 2021 WL 2211694, at *6 (Del. Ch. June 1, 2021) (applying *Tooley* to an LLC); *Schiff v. ZM Equity Partners, LLC*, No. 19CV4735, 2020 WL 5077712, at *10 (S.D.N.Y. Aug. 27, 2020) (same).  To prevail under *Tooley*, Monticciolo and Callahan's "claimed direct injury must be *independent* of any alleged injury to" Brevet.  *Tooley*, 845 A.2d at 1039.

Monticciolo and Callahan's purported harms are predicated on conduct directed at Brevet. They allege that Iacovacci "usurp[ed] the corporate opportunities of *Brevet*," "directly compet[ed] with *Brevet*," "us[ed] the resources of *Brevet*," "improperly [used] . . . [*Brevet's*] trade secret[s]," and "solicit[ed] customers" of *Brevet*.  AA ¶¶ 84, 92.  This is (purported) harm *to Brevet*—not to Monticciolo and Callahan.  Indeed, Defendants assert that Monticciolo and Callahan "have been harmed personally *by the harm to Brevet*."  Resp. to Pl. ¶ 72 (emphasis added).  This is insufficient under the first prong of *Tooley*.  *See Backus v. U3 Advisors, Inc.*, No. 1:16-CV-8990-GHW, 2017 WL 3600430, at *16 (S.D.N.Y. Aug. 18, 2017) (concluding claim was derivative where "the

---

[9] The parties do not suggest that Delaware law applies to any other claims or counterclaims at issue.

[10] Even assuming New York law *did* apply to the breach of duty counterclaims, New York courts have explicitly adopted the *Tooley* test.  *See, e.g.*, *Yudell v. Gilbert*, 99 A.D.3d 108, 110, 949 N.Y.S.2d 380, 381 (1st Dep't 2012).

complaint allege[d] injury to [p]laintiff only in terms of the alleged harm to [the company]").

Defendants do not persuade otherwise. First, they assert that Iacovacci "directly owed Callahan and Monticciolo fiduciary duties." Def. Opp. 7 (emphasis omitted). Even assuming that statement is accurate, it is irrelevant because Monticciolo and Callahan have "not explained how [*they*] would be harmed directly by these alleged breaches of fiduciary duties *independent from the harm to the Company*." *Dietrichson v. Knott*, No. CV 11965-VCMR, 2017 WL 1400552, at *4 (Del. Ch. Apr. 19, 2017) (emphasis added). *See also Schiff*, 2020 WL 5077712, at *10 ("Although Schiff is . . . a party to the LLC Agreement, that status does not 'enable him to litigate directly every claim arising from the LLC Agreement.'" (quoting *El Paso Pipeline GP Co., LLC v. Brinckerhoff*, 152 A.3d 1248, 1259 (Del. 2016))).

Defendants next contend that Monticciolo and Callahan "suffered personal injury . . . by being named as individual defendants in this action and [the] state court action." Def. Opp. 7; *see also* Resp. to Pl. ¶ 72. Unsurprisingly, Defendants offer no legal authority to support this questionable claimed injury.[11] Even if they had, the purported harm is entirely unrelated to Iacovacci's alleged breach of duty—that is to say, Callahan and Monticciolo were not sued *because* Iacovacci breached his duties to them.

Finally, Defendants urge this Court to utilize a pre-*Tooley* Delaware trial court decision, *Anglo American Securities Fund, L.P. v. S.R. Global International Fund, L.P.*, 829 A.2d 143 (Del. Ch. 2003), to sustain their claims. In *Anglo American*, the Delaware Court of Chancery found claims asserted by a limited partner were direct, rather than derivative, because "the [Partnership] Agreement" at issue diverged "so radically from the traditional corporate model" that "imposition of derivative requirements would impede efficient and final resolution of the claims and would

---

[11] To the extent that Defendants contend that Iacovacci's complaints were frivolous, that assertion is more appropriately dealt with on a Rule 11 motion.

simply make no sense." *Id.* at 152, 153 (emphasis added) (cleaned up).  Defendants do not even attempt to suggest the same is true here.  The Court is therefore unpersuaded that Monticciolo or Callahan have satisfied the first prong of *Tooley*.

The Defendants also fail to satisfy the second *Tooley* prong.  Defendants seek damages "including but not limited to compensation that was paid to [Iacovacci] *by Brevet*."  AA ¶ 95.  Any recovery for this harm "would flow first to [Brevet] and only derivatively to its members." *Clifford*, 2021 WL 2211694, at *11.  "This is the very definition of a derivative claim under *Tooley*." *Id.*

The breach of fiduciary duty and breach of the duty of loyalty claims may not be asserted directly by Monticciolo and Callahan.  Iacovacci is entitled to summary judgment on the breach of fiduciary duty claims (the Fourth and Fifth Counterclaims) as asserted by Defendants Monticciolo and Callahan.

C.     <u>*Unfair Competition and Trade Secrets (Sixth, Ninth, and Twelfth Counterclaims)*</u>

BCM asserts common law counterclaims for unfair competition (Sixth Counterclaim), AA ¶¶ 98–107, and misappropriation of trade secrets (Ninth Counterclaim), AA ¶¶ 121–33.  In addition, all named Brevet Defendants assert a counterclaim for violation of the federal Defend Trade Secrets Act (Twelfth Counterclaim).  AA ¶¶ 153–65.  Iacovacci moves for summary judgment.

1.     <u>Unfair Competition</u>

Iacovacci argues that the unfair competition claim should be dismissed as duplicative of the trade secret misappropriation claims.  Pl. Mem. 9.  In response, Defendants argue that the unfair competition claim "subsumes and incorporates" *not just* the facts underlying the trade secrets claims, but "all facts supporting" *all* of their other causes of action.  Def. Opp. 9–10; AA ¶ 99.

This argument proves too much.  Defendants may not simply repackage an amalgamation of their other claims to state an unfair competition claim.  *See also Data Device Corp. v. W.G. Holt, Inc.*, No. 19-CV-4105(JS)(ARL), 2020 WL 7024312, at *6 (E.D.N.Y. Nov. 30, 2020) (dismissing unfair competition claim as duplicative of other claim).  Iacovacci is entitled to summary judgment dismissing the unfair competition claim.

2.     Misappropriation of Trade Secrets

Defendants also assert separate counterclaims for misappropriation of trade secrets under the DTSA and under New York state law.  Because "the requirements for showing a misappropriation of a trade secret under the DTSA are similar to those for misappropriation under New York law, . . . district courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *ExpertConnect, LLC v. Fowler*, No. 18 CIV. 4828 (LGS), 2019 WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019).

Under the DTSA, trade secrets include:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, . . . [so long as] (A) the owner . . . has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  Also relevant here, New York courts consider the following factors in determining whether information qualifies as a trade secret:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

24

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (citation omitted).   "These factors are guideposts, not elements."   *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015).

The evidence demonstrates that there are material issues of fact such that the claims are sufficient to survive summary judgment.   As a threshold matter, Brevet clearly defined its purported trade secrets.   At his deposition, Monticciolo identified forty-one categories of what he contends are Brevet trade secrets.   Resp. to Pl. ¶ 90.   These categories include investor lists, presentation materials, valuation methodologies, and underwriting documentation.   Exhibit 7 422:4–423:24 [ECF No. 308-13].

Iacovacci asserts that these claimed trade secrets must fail for "lack of specificity."   Pl. Mem. 10–12.   In support of that assertion, Iacovacci urges this Court to consider *Big Vision Private Limited v. E.I. DuPont De Nemours & Company*, 1 F. Supp. 3d 224 (S.D.N.Y. 2014).   *See* Pl. Mem. 10, 11.   But *Big Vision* does not help Iacovacci's case.   There, the Court awarded summary judgment because the plaintiff had "made virtually no effort to identify its alleged trade secret with particularity."   1 F. Supp. 3d at 259.   Defendants have not only specified their trade secrets with particularity, but with *granularity*.   Although the Court appreciates that "not every asset of value constitutes a trade secret," *PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105 (KBF), 2016 WL 7116132, at *11 (S.D.N.Y. Dec. 5, 2016), construing the facts in the light most favorable to Brevet (the non-movant), Defendants have alleged categories of trade secrets with sufficient particularity.

Defendants also introduced evidence indicating that Brevet keeps this information secret. For instance, Callahan affirmed that Brevet "expended considerable resources, both financial and in personnel time, developing [this] non-public information," that "[a]ccess to th[e] information is restricted," and that most such documents are marked "Proprietary and Confidential."   Exhibit 127

¶¶ 6, 8 [ECF No. 287-13] ("Ex. 127"). Callahan also explained that Brevet maintains "written policies and protocols and in some cases, . . . explicit contracts ensuring that confidentiality is respected." Exhibit 146 ¶ 6 [ECF No. 314-7] ("Ex. 146"). In that vein, all Brevet employees have signed the Handbook, which includes a provision stating that an employee may "not, at any time . . . for any reason whatsoever, directly or indirectly disclose or furnish [to] any firm, corporation or person . . . any Proprietary Information or Trade Secrets of [Brevet]." Ex. 127 ¶ 9; Handbook 28. The record also contains evidence reflecting that when Brevet documents are sent externally, they are sent only to select investors and borrowers, and only after confidentiality or non-disclosure agreements are executed. Ex. 146 ¶ 8.

Pointing to the purported expert testimony of Neil Librock, Iacovacci asserts that the claimed trade secrets consist of general industry knowledge that is not actually secret. *See* Pl. Mem. 15. Defendants filed a motion *in limine* seeking to exclude Librock's testimony on *Daubert* grounds. *See* Motion *in Limine* [ECF No. 281]. Resolving the motion is not necessary at this stage, however, because even if the Court *were* to consider Librock's testimony, there would still be a dispute of material fact. Namely, the evidence indicates that Brevet has expended significant resources to protect its purported trade secrets and has taken care to limit their access to the outside world. Because the DTSA broadly protects "*all* forms and types of financial, business, [or] economic" information, so long as the owner "has taken reasonable measures to keep such information secret," and "the information derives independent economic value . . . from not being generally known," 18 U.S.C. § 1839(3) (emphasis added), the Court finds a genuine dispute of material fact regarding whether the information may constitute protectable trade secrets.

Iacovacci's legal authority on the secrecy issue is also distinguishable. For instance, in *Big Vision*, the parties *agreed* "that all . . . elements of Big Vision's claimed trade secret were publicly

26

known." 1 F. Supp. 3d at 270. There is, quite evidently, no such agreement here. In *PaySys International, Incorporated v. Atos Se*, the claimed trade secret consisted of "a million lines of code written thirty years ago and licensed to people all over the world." 2016 WL 7116132, at *11. Although Iacovacci asserts that some of Brevet's secrets have been shared, Brevet has introduced evidence indicating that disclosures are only made after third parties execute confidentiality or other non-disclosure agreements. This issue is obviously hotly disputed, with or without the benefit of Mr. Librock's testimony. Lastly, while the purported trade secrets in *LinkCo, Incorporated v. Fujitsu Limited* "may [have been] nothing more than an amalgamation of business concepts, strategies, and ideas," that decision is not helpful to the analysis here since it involved a motion for judgment as a matter of law *after* the plaintiff had presented its evidence at trial. 230 F. Supp. 2d 492, 493, 500 (S.D.N.Y. 2002).

Finally, there is evidence that Iacovacci misappropriated Defendants' trade secrets. On October 10, 2016, Iacovacci forwarded an email from his Brevet email address to his personal email address containing a list of over 27,000 "investor contacts." Resp. to Pl. ¶ 93; Exhibit 57 [ECF No. 279-48]. In addition, Defendants provide an extensive list summarizing dozens of emails that Iacovacci forwarded from his Brevet email account to his personal email address. Resp. to Pl. ¶¶ 94, 95; Exhibit 147 at Interrog. 6 Response [ECF No. 287-31] ("Ex. 147"). The forwarded emails appear to include non-disclosure agreements, presentations, management reports, and sourcing checklists. Resp. to Pl. ¶¶ 94, 95; Ex. 147 at Interrog. 6 Response.

Iacovacci does not dispute these facts. Instead, he argues that there is no evidence indicating he used any of this information. Pl. Mem. 16. Defendants concede that they are not aware of any other entity using some of Brevet's purported trade secrets, such as its loan documents. Resp. to Pl. ¶ 123. However, a side-by-side comparisons of Brevet documents with

certain Enascor documents indicates striking similarities.[12]  *See* Resp. to Pl. ¶ 108; Exhibit 152

[ECF No. 314-11]; Exhibit 157 [ECF No. 314-13].  Defendants argue that these similarities are

not coincidences—but rather indicate that Iacovacci has plagiarized Brevet's materials.  Drawing

all reasonable inferences in favor of Defendants, the Court concludes that a reasonable juror may

conclude that Iacovacci misused Defendants' purported trade secrets.  *See Celotex*, 477 U.S. at

323.  Summary judgment with respect to the state and federal trademark claims is denied.

      D.    <u>*Tortious Interference (Seventh and Eighth Counterclaims)*</u>

Iacovacci also moves for summary judgment on BCM's counterclaims for tortious

interference with business relations (Seventh Counterclaim) and tortious interference with

prospective business relations (Eighth Counterclaim).  AA ¶¶ 108–20.

As an initial matter, "tortious interference with business relations and tortious interference

with prospective economic advantage are not distinct causes of action."[13]  *Valley Lane Indus. Co.*

*v. Victoria's Secret Direct Brand Mgmt., LLC*, 455 F. App'x 102, 105 (2d Cir. 2012) (citing *Catskill*

*Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  Although Defendants

now contend that, "[d]espite the nomenclature," their "7th counterclaim is better viewed under the

lens of tortious interference with contract," Def. Opp. 16, "[i]t is well settled that a party may not

amend its pleadings in its briefing papers" on a motion for summary judgment.  *Enzo Biochem,*

*Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) (citing *Avillan v. Donahoe*, 483

---

[12] Iacovacci contends in his Reply Brief that Defendants may not point to these documents because they are "the subject of a separate action."  Pl. Reply 5.  Although these documents are at issue in the related federal action pending before this Court, Iacovacci provides no authority indicating they may not also be considered here.  Moreover, summary judgment may only be awarded where the record is "fully developed."  *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991).  To the extent Iacovacci urges the Court to award summary judgment on a less-than-fully developed record, that is an alternate reason to deny summary judgment.

[13] These causes of action are also synonymous with tortious interference with prospective business relations. *See, e.g.*, *Godinger Silver Art Ltd. v. Hirschkorn*, 433 F. Supp. 3d 417, 426 (E.D.N.Y. 2019) (applying the same elements to a claim titled "tortious interference with prospective business relations").

F. App'x 637, 639 (2d Cir. 2012)).  Because Defendants may not plead two identical causes of action, nor amend their causes of action in summary judgment briefing, summary judgment is awarded to Iacovacci on the seventh counterclaim.

The eighth counterclaim, however, may proceed beyond summary judgment.  To assert a tortious interference with prospective business relations claim, Defendants must show "(1) [they] had business relations with a third party; (2) [Plaintiff] interfered with those business relations; (3) [Plaintiff] acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) [Plaintiff's] acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citing *Catskill*, 547 F.3d at 132).

Iacovacci argues that this claim should fail as a matter of law because Defendants have not shown that Iacovacci acted with wrongful means. Pl. Mem. 17–18.  As a general rule, the wrongful means element is established where "the defendant's conduct . . . amount[s] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103, 785 N.Y.S.2d 359, 362 (N.Y. 2004).  Where the "alleged interference occur[s] by means of [a] separate tort[]," including "trade secret misappropriation," the wrongful means element is established. *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, No. 10 CIV. 4062 JSR, 2011 WL 1899730, at *10 n.9 (S.D.N.Y. May 13, 2011).  The Court has already concluded that Defendants' trade secret misappropriation claims may proceed to trial. *See* Section II.C.2.  Accordingly, there is at least a material question of fact regarding whether Defendants have satisfied the "wrongful means" element.

Iacovacci also contends that there is "no admissible evidence [showing] that Iacovacci's conduct prevented Brevet from entering any transactions it would have otherwise entered." Pl. Reply 6.  That is inaccurate.  Brevet identified six transactions with third parties that it contends

Iacovacci diverted away from Brevet.  Resp. to Pl. ¶ 75.  Mei-Li da Silva Vint, designated as one of Brevet's Rule 30(b)(6) corporate representatives, testified about these transactions at her deposition, and her belief that, but for Iacovacci's actions, these transactions would have executed. Resp. to Pl. ¶ 76; Exhibit 6 35:15–19 [ECF No. 308-11] ("Vint Depo.").  Although Iacovacci characterizes this testimony as "speculative," Resp. to Pl. ¶ 76, and "sketchy," Pl. Reply 6, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (cleaned up).  Genuine questions of material fact exist regarding the tortious interference claim.  The eighth counterclaim may proceed to trial.

       E.     *Damages*

Iacovacci next argues that Defendants' remaining breach of covenant, tortious interference, and trade secrets claims should fail because "the record is devoid of evidence that Brevet has suffered any damage."  Pl. Mem. 19 (emphasis omitted).[14]  The Court does not agree.

With respect to the breach of covenant claims, even assuming there was no evidence of damages, "nominal damages are always available in a breach of contract action even if a party cannot prove general or consequential damages."  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020); *cf. Fox v. Bd. of Trustees of State Univ. of New York*, 42 F.3d 135, 141 (2d Cir. 1994) (nominal damages not available where complaint sought only declaratory and injunctive relief on First Amendment grounds).  The covenant claims may

---

[14] Iacovacci "does not seek summary judgment on liability [on the breach of duty claims] as to BCM."  Pl. Mem. 9 n.1.  However, Iacovacci also states in a footnote that BCM "cannot obtain damages on the [breach of duty] claims."  Pl. Mem. 9 n.1.  Apart from this footnote, Iacovacci's briefing does not clearly address why Defendants' claimed damages for the breach of duty claims are insufficient.  *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them.").  Moreover, "[d]amages . . . are not an element of a claim for fiduciary breach under Delaware law."  *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, No. CV 2018-0059-JRS, 2021 WL 3184591, at *18 (Del. Ch. July 28, 2021).

therefore proceed to trial.

There also is sufficient evidence in the record for the trade secrets claims to proceed to trial. Callahan affirmed that Brevet has "expended considerable resources, both financial and in personnel time, developing" its trade secrets. Ex. 127 ¶ 6. Investment losses are recoverable in trade secrets cases under New York law. *See, e.g.*, *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 454, 105 N.E.3d 301, 311, 80 N.Y.S.3d 162, 173 (N.Y. 2018). Moreover, Defendants request injunctive relief on the trade secrets claim, seeking to enjoin Iacovacci from using Brevet's trade secrets and proprietary information. *See* AA Prayer for Relief.

Finally, the record evinces a material question of fact regarding Defendants' claimed damages for the tortious interference claim. Vint and Monticciolo described several transactions Brevet believes it lost due to Iacovacci's alleged interference. *See* Resp. to Pl. ¶ 70. Vint estimated that lost profits for at least one of those transactions could have ranged from 25 million dollars to hundreds of millions of dollars. *See* Vint Depo. 30:11–16. These numbers may be imprecise, but Defendants have provided more than "*no* information about the size of the purported potential investments." Pl. Reply 8 (emphasis in original). The tortious interference claim also seeks punitive damages, *see* AA Prayer for Relief, which is classically "a question for the jury." *Northrop v. Hoffman of Simsbury, Inc.*, 12 F. App'x 44, 50 (2d Cir. 2001). For these reasons, material questions of fact remain regarding Defendants' alleged damages on the covenant, trade secrets, and tortious interference claims.

F.    *Twenty-Third Affirmative Defense*

Finally, Iacovacci moves to strike Defendants' twenty-third affirmative defense. The twenty-third affirmative defense states that "[t]he allegations contained in [the] Complaint arise out of Brevet's regulatory compliance obligation to monitor certain communications and

correspondence." AA 15.  Iacovacci contends that there is no "statutory or other authority for the proposition that Brevet's regulatory compliance obligations are an affirmative defense to Iacovacci's claims." Pl. Mem. 23.

An affirmative defense is an "assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all allegations in the complaint are true." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (quoting Black's Law Dictionary (7th ed. 1999)). Rule 8 provides a non-exhaustive list of affirmative defenses. *See* Fed. R. Civ. P. 8(c). "Where a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (cleaned up). Defendants provide no authority, nor has the Court found any, indicating that purported compliance efforts "will defeat" Iacovacci's remaining SCA claim. *Saks*, 316 F.3d at 350; *see Flores*, 885 F.3d at 122 ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."). Accordingly, the twenty-third affirmative defense is stricken.

## III.     Motions to Exclude Expert Testimony

In addition to summary judgment briefing, both parties filed motions *in limine* seeking to exclude expert testimony proffered by the opposing side. *See* Motions *In Limine* [ECF Nos. 281, 295, 296, 301]. Consideration of the expert reports was unnecessary for resolution of the summary judgment motions. The motions *in limine* are therefore denied without prejudice to renewal 60 days before trial.

## IV.     Motions to Seal

The summary judgment briefing was accompanied by five letter motions to seal. [*See* ECF

Nos. 304, 305, 310, 320, 336.]  The Court provisionally granted those sealing requests, pending resolution of the parties' motions for summary judgment.  *See* Order [ECF No. 341].

The sealing requests are overly broad.  The parties are directed to file letters with narrowed sealing requests and accompanying legal authority on or before April 28, 2023.

## <u>CONCLUSION</u>

For the above reasons, Defendant's motion for summary judgment is GRANTED with respect to the Computer Fraud and Abuse Act claims, GRANTED with respect to the Federal Wiretap Act claim, DENIED with respect to the Stored Communication Act claim, and GRANTED with respect to the state law claims.  Accordingly, Counts One, Two, Three, Four, Six, and Seven of the Complaint are dismissed.

Plaintiff's motion for partial summary judgment is DENIED with respect to the breach of covenant claims, GRANTED with respect to the breach of duty claims asserted by Defendants Monticciolo and Callahan, GRANTED with respect to the unfair competition claim, DENIED with respect to the trade secrets claims, GRANTED with respect to the tortious interference with business relations claim, DENIED with respect to the tortious interference with prospective business relations claim, and GRANTED with respect to the twenty-third affirmative defense. Accordingly, the Sixth and Seventh Counterclaims are dismissed, the Fourth and Fifth Counterclaims are dismissed as asserted by Defendants Monticciolo and Callahan, and the Twenty-Third Affirmative Defense is stricken.

The parties' motions *in limine* to exclude expert testimony are DENIED without prejudice to renewal 60 days before trial.  The parties are directed to appear for a pre-trial conference on June 6, 2023 at 11:30 AM.

The Clerk of Court is respectfully requested to terminate docket entries 281, 284, 293, 294,

295, 296, and 301.

**SO ORDERED.**

**Date:** **March 24, 2023**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**